CARLOS HOLGUÍN (Cal. Bar No. 90754)
Center for Human Rights and Constitutional Law
256 South Occidental Blvd.
Los Angeles, CA 90057
Telephone: (213) 388-8693, ext. 309
Facsimile: (213) 386-9484
email: crholguin@centerforhumanrights.org

*Listing continued on next page*
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCAS R., by his next friend MADELYN R.; DANIELA MARISOL T., by her next friend KATHERINE L.; MIGUEL ANGEL S., by his next friend GERARDO S.; GABRIELA N., by her next friend ISAAC N.; JAIME D., by his next friend REYNA D.; SAN FERNANDO VALLEY REFUGEE CHILDREN CENTER, INC.; UNACCOMPANIED CENTRAL AMERICAN REFUGEE EMPOWERMENT, <br><br> Plaintiffs, <br><br> v. <br><br> ALEX AZAR, Secretary of U.S. Department of Health and Human Services; E. SCOTT LLOYD, Director, Office of Refugee Resettlement of the U.S. Department of Health & Human Services, <br><br> Defendants. | Case No.  2:18-CV-05741 <br><br> **COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND NOMINAL DAMAGES** <br><br> **(CLASS ACTION)** |

1   *Counsel for Plaintiffs, continued*

2   HOLLY S. COOPER (Cal. Bar No. 197626)
    Co-Director, Immigration Law Clinic
3   CARTER C. WHITE (Cal. Bar No. 164149)
    Director, Civil Rights Clinic
4   University of California Davis School of Law
    One Shields Ave. TB 30
5   Davis, CA 95616
    Telephone: (530) 754-4833
6   Email: hscooper@ucdavis.edu
            ccwhite@ucdavis.edu
7

8   LEECIA WELCH (Cal. Bar No. 208741)
    NEHA DESAI (Cal. RLSA Bar No. 803161)
9   POONAM JUNEJA (Cal. Bar No. 300848)
    National Center for Youth Law
10  405 14th Street, 15th Floor
    Oakland, CA 94612
11  Telephone: (510) 835-8098
    Email: lwelch@youthlaw.org
12          ndesai@youthlaw.org
            pjuneja@youthlaw.org
13

14  CRYSTAL ADAMS (Cal. Bar No. 308638)
    National Center for Youth Law
15  1313 L St. NW, Suite 130
    Washington, DC 20005
16  Telephone: (202) 868-4785
    Email: cadams@youthlaw.org
17

18  SUMMER WYNN (Cal. Bar No. 240005)
    MARY KATHRYN KELLEY (Cal. Bar No. 170259)
19  JON F. CIESLAK (Cal. Bar No. 268951)
    Cooley LLP
20  4401 Eastgate Mall
    San Diego, CA 92121-1909
21  Telephone: (858) 550-6000
    Email: swynn@cooley.com
22          mkkelley@cooley.com
            jcieslak@cooley.com
23

24

25

26

27

28

Complaint

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

# I.

## INTRODUCTION

1.     This is an action for injunctive relief, declaratory relief, and nominal damages, challenging certain unlawful policies and practices of Defendant Office of Refugee Resettlement ("ORR"), a subordinate entity within the U.S. Department of Health and Human Services ("HHS"). These policies and practices are causing grave harm to children detained for alleged civil violations of the Immigration and Nationality Act, 8 U.S.C. §§ 1101, *et seq*. ("INA"). Pursuant to § 462 of the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, codified at 6 U.S.C. § 279 ("HSA"), and § 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. 110-457, 122 Stat. 5044, codified at 8 U.S.C. § 1232 ("TVPRA"), ORR is responsible for the placement, care, custody and release of "unaccompanied alien children."

2.     The named Plaintiffs are immigrant and asylum-seeking children detained for alleged civil violations of the INA and are members of the class protected under the settlement in *Flores, v. Sessions*, No. 85-cv-4544-DMG (AGRx) (C.D. Cal.) ("*Flores* Settlement"). Plaintiffs file this complaint as an adjunct and supplement to their motion to enforce their rights under the *Flores* Settlement. That motion is pending before this Court and calendared for hearing on July 27, 2018. (*See Flores v. Sessions*, No. 85-cv-4544, ECF Nos. 409, 440.)

3.     The *Flores* Settlement and TVPRA § 235 oblige ORR to —

(a)     minimize the detention of immigrant children by releasing them to their parents or other qualified custodians so long as their continued detention is not required due to dangerousness or unusual flight risk;

(b)     place detained immigrant children in the least restrictive setting that is in the best interest of individual children—generally a facility having a state license to care for dependent, as opposed to delinquent, juveniles—for however long as they remain in federal custody;

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

(c)   ensure that detained immigrant children are held only in facilities that are safe, sanitary and consistent with concern for the particular vulnerability of minors; and

(d)   ensure to the greatest extent practicable that children who are or have been in ORR custody, except those from contiguous countries, have counsel to represent them in legal matters and protect them from mistreatment, exploitation, and trafficking.

4.    ORR violates the foregoing requirements, as well as the Due Process Clause of the Fifth Amendment of the U.S. Constitution and the Freedom of Association Clause of the First Amendment to the U.S. Constitution, by pursuing the following policies and practices:

(a)   ORR confines children in staff-secure facilities, residential treatment centers ("RTCs"), and secure facilities peremptorily, often on bare allegations they are dangerous or pose a flight risk, without affording them a meaningful or timely opportunity to be heard regarding the reasons for such placement;

(b)   ORR prolongs children's detention on the ground that their parents or other available custodians are or may be unfit, while affording neither detained juveniles nor their proposed custodians a meaningful or timely opportunity to be heard regarding a proposed custodian's fitness;

(c)   ORR places children in residential treatment facilities and detention facilities in which it knows they will be administered powerful psychotropic medications for weeks, months, or years, without procedural safeguards, including seeking their parents' consent—even those who are present in the United States and readily available to grant or withhold consent to ORR's medicating their children—or other lawful authorization; and

(d)   ORR blocks lawyers from representing detained children with respect to

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

1             placement, non-consensual administration of psychotropic medications,

2             or release to available custodians notwithstanding that Congress has

3             allocated funds specifically to provide such lawyers to represent children

4             who are or have been in ORR custody in "legal matters," including issues

5             related to release and least-restrictive placement.

6       5.     By this action, Plaintiffs seek equitable relief on behalf of themselves and

7 those similarly situated requiring Defendants to conform their polices, practices, and

8 procedures to the *Flores* Settlement, § 235 of the TVPRA, the Due Process Clause of

9 the Fifth Amendment to the U.S. Constitution, and the Freedom of Association Clause

10 of the First Amendment to the U.S. Constitution. Plaintiffs also seek nominal damages

11 against individual Defendant E. Scott Lloyd in his personal capacity pursuant to *Bivens*

12 *v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

13                                       II.

14                    JURISDICTION AND VENUE

15       6.     This Court has jurisdiction over this action pursuant to Paragraph 37 of

16 the *Flores* Settlement (providing for "the enforcement, in this District Court, of the

17 provisions of this Agreement except for claims brought under Paragraph 24"); 28

18 U.S.C. § 1331 (federal question jurisdiction); and 28 U.S.C. § 2241 (habeas corpus

19 jurisdiction).

20       7.     Plaintiffs' action for declaratory relief is brought pursuant to 28 U.S.C.

21 §§ 2201 and 2202, and 5 U.S.C. § 703.

22       8.     Venue is properly in this court pursuant to Paragraph 37 of the *Flores*

23 Settlement and 28 U.S.C. § 1391(b) and (e)(1), because this action challenges class-

24 wide violations of the *Flores* Settlement, and because acts complained of herein

25 occurred in this district, Defendants have offices in this district, and no real property

26 is involved in this action.

27       9.     Plaintiffs have private rights of action against Defendants pursuant to

28 Paragraph 37 of the *Flores* Settlement, the Administrative Procedure Act, and 5 U.S.C.

Complaint                          3.

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

§§ 701 *et seq.*

## III.

## PARTIES

10.     Plaintiff Lucas R.[1] is a native and citizen of Guatemala whom ORR is currently detaining at the Shiloh Residential Treatment Center ("Shiloh RTC") in Texas. He was born in 2005 and is twelve years old. Lucas is, and at all relevant times was, an unaccompanied alien child within the meaning of 6 U.S.C. § 279(g)(2) and a member of the plaintiff class the *Flores* Settlement protects. Pursuant to Federal Rule of Civil Procedure 17(c)(2), Lucas appears through his Next Friend and sister, Madelyn R., a resident of Los Angeles, California. ORR has refused to release Lucas to his Next Friend and sister on the ground that Madelyn's home may be unfit.

11.     Plaintiff Daniela Marisol T. is a native and citizen of Honduras in ORR custody in a residential group home in Kentwood, Michigan. Daniela Marisol was born in 2001 and is sixteen years old. Daniela Marisol is, and at all relevant times was, an unaccompanied alien child within the meaning of 6 U.S.C. § 279(g)(2) and a member of the plaintiff class the *Flores* Settlement protects. Pursuant to Federal Rule of Civil Procedure 17(c)(2), Daniela Marisol appears through her Next Friend and sister, Katherine L., a resident of St. Paul, Minnesota. ORR has refused to release Daniela Marisol to her Next Friend and sister on the ground that Katherine is or may be unfit.

12.     Plaintiff Gabriela N. is a native and citizen of El Salvador whom ORR is presently detaining in St. Michael's Home for Children in Houston, Texas. She was born in 2000 and is seventeen years old. Gabriela is, and at all relevant times was, an unaccompanied alien child within the meaning of 6 U.S.C. § 279(g)(2) and a member of the plaintiff class the *Flores* Settlement protects. Pursuant to Federal Rule of Civil Procedure 17(c)(2), Gabriela appears through her Next Friend and grandfather, Isaac

---

[1] Plaintiffs concurrently seek permission to use pseudonyms for the named Plaintiffs and their Next Friends.

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

N., a resident of Oakland, California. ORR has refused to release Gabriela to her Next Friend and grandfather on the ground that Isaac is or may be unfit.

13.     Plaintiff Miguel Angel S. is a native and citizen of Mexico whom ORR is presently detaining at Yolo County Juvenile Detention Center ("Yolo"), a secure facility in Woodland, California. He was born in 2001 and is seventeen years old. Miguel Angel is, and at all relevant times was, an unaccompanied alien child within the meaning of 6 U.S.C. § 279(g)(2) and a member of the plaintiff class the *Flores* Settlement protects. Pursuant to Federal Rule of Civil Procedure 17(c)(2), Miguel Angel appears through his Next Friend and father, Gerardo S., a resident of San Jose, California. ORR has refused to release Miguel Angel to his Next Friend and father on the ground that Gerardo is or may be unfit.

14.     Plaintiff Jaime D. is a native and citizen of Honduras and presently being held in ORR custody in Dobbs Ferry, New York. He was born in 2004 and is thirteen years old. Jaime is, and at all relevant times was, an unaccompanied alien child within the meaning of 6 U.S.C. § 279(g)(2) and a member of the plaintiff class the *Flores* Settlement protects. Pursuant to Federal Rule of Civil Procedure 17(c)(2), Jaime appears through his Next Friend, Reyna D., a resident of Riverdale, Maryland. Reyna is Jaime's aunt. Reyna has sought to be Jaime's custodian and to have Jaime released from ORR custody into her care.

15.     Plaintiff San Fernando Valley Refugee Children Center, Inc. ("Children Center") is a non-profit organization incorporated in the State of California, with its principal place of business in North Hills, California. The Children Center is a project of the North Hills United Methodist Church's Hispanic Mission. The Children Center's mission is to provide comprehensive social services, including mental health care, shelter, transitional living assistance and legal aid, to children, youth, and families who have come in search of refuge from persecution and endemic violence in the Northern Triangle of Central America (El Salvador, Honduras, and Guatemala). The children and youth the Children Center serves are the functional equivalents of its

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

members. The rights of children and youth the Children Center seeks to protect in this action are germane to its mission and purpose. ORR's policies and practices, as alleged herein, make it substantially more difficult for the Children Center to carry out its mission. For example, many of the children and youth whom the Children Center serves have suffered multiple psychological and physical traumas, first in their countries of origin, next during their journeys through Mexico, and then again, upon being arrested and detained for immigration violations. The more time already-traumatized children and youth remain detained, separated from their parents and families, the more their mental and physical health deteriorates. The trauma that immigration detention causes children and youth is greater still when ORR places them in restrictive settings such as juvenile halls and RTCs, or medicates them involuntarily or without their parents' consent or other lawful authority. The additional trauma such detention inflicts requires the Children Center to devote commensurately greater resources, particularly mental health resources, to assist such children and youth to recover.

16.     The Children Center is one of a small number of non-profit organizations that serve refugee children and youth. The Children Center's resources are limited and do not allow it to help all who are in need. The Children Center's ability to raise funds depends in part on the raw number of children and youth it helps. As a practical matter, resources the Children Center's devotes to serving one child or youth are unavailable to others. Defendants' challenged policies and practices divert the Children Center's limited resources to address the injuries those policies and practices cause, thereby reducing the number of other needy children and youth the Children Center is able to assist, and, *a fortiori*, its ability to raise funds. The Children Center therefore has a direct institutional interest in: (a) minimizing the time refugee children and youth are detained; (b) ensuring that such children and youth are housed in minimally restrictive settings for however long they must remain in immigration-related detention; (c) minimizing the injury children and youth suffer as a result of taking psychotropic

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

drugs; and (d) ensuring that refugee children and youth have counsel to assist them in all legal matters relating to their immigration status, including custody, placement, and the administration of psychotropic drugs without parental consent. The direct participation in this litigation of the children and youth whom the Children Center serves is not necessary because Plaintiffs seek only prospective equitable relief and nominal damages.

17.     Plaintiff Unaccompanied Central American Refugee Empowerment ("UCARE") is an unincorporated consortium of non-profit agencies, most of which are incorporated in the State of California, with its principal place of business in Los Angeles, California. UCARE's mission is to advocate for and provide legal and social services to immigrant and refugee minors, many of whom are or have been in ORR or Immigration and Customs Enforcement custody. In appropriate cases, UCARE arranges free representation and assistance to youth with immigration problems before the U.S. Citizenship and Immigration Services, the Executive Office of Immigration Review, and the Board of Immigration Appeals. Defendants' unlawful policies, and practices, as alleged herein, make such assistance and representation substantially more difficult and render UCARE's work less effective. ORR's compliance with the *Flores* Settlement and § 235 of the TVPRA is germane to UCARE's purpose. The individual participation of aggrieved youth the UCARE serves is not necessary because UCARE seeks only prospective or injunctive relief and nominal damages for its client members. UCARE has an actual stake in this litigation because the funding of UCARE's member organizations is largely determined by the number of youth they serve. Defendants' challenged policies and practices deny or delay children's release, and thus delay or deny Plaintiff UCARE's member organizations the opportunity to serve them.

18.     Defendant Alex Azar is the Secretary of HHS and oversees ORR. Pursuant to 6 U.S.C. § 279, HHS is responsible for the proper care and placement of unaccompanied alien children who are in federal custody by reason of their

immigration status. HHS and ORR discharge these duties by, *inter alia*, entering into contracts with public and private entities to house, care for, and provide legal assistance to unaccompanied alien children arrested and detained pursuant to the INA. Defendant Azar is sued in his official capacity only.

19.    Defendant E. Scott Lloyd is the Director of ORR. ORR is responsible for the care and custody of unaccompanied alien children in federal custody on account of their immigration status. Defendant Lloyd is sued in his individual capacity for nominal damages pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), and in all other respects in his official capacity only.

20.    Defendants, and each of them, have historically professed to act in the capacity of *parens patriae* to detained children. Defendants, and each of them, thereby assume a legal obligation to act in such children's best interests. Defendants breach this duty in pursuing the policies and practices challenged in this Complaint.

IV.

NAMED PLAINTIFFS' EXPERIENCES IN ORR CUSTODY

A.    Lucas R.

21.    On or about February 12, 2018, ORR assumed custody of Plaintiff Lucas R. after he arrived at the U.S.-Mexico border. ORR placed him at the Hacienda del Sol facility in Youngtown, Arizona. Within approximately ten days, Madelyn R., Lucas' adult sister and Next Friend, requested Lucas' custody and delivered to ORR a family reunification packet with the required documentation. Many years ago, Lucas and Madelyn's father abandoned them; their mother died when Lucas was approximately two years old. Thereafter, Madelyn and an aunt raised Lucas in his parents' stead. Madelyn and Lucas have a very close relationship. Over the next six weeks or so, ORR assured Madelyn that everything was in order and that it would soon release Lucas to her custody; it did not.

22.    According to Madelyn, in Guatemala, Lucas was a thriving, happy child who liked to joke, play, and talk with people. When he arrived at Hacienda del Sol,

8.

facility staff noted that Lucas appeared cooperative, calm, and alert, and showed "no behavioral concerns."

23.    As his confinement wore on, however, Lucas became depressed, fearing that ORR would never release him to his family. Without obtaining Madelyn's informed consent, the informed consent of any other adult family member, or judicial authorization, ORR administered Lucas psychotropic drugs, ostensibly to control "moderate" depression.  Upon information and belief, ORR did not involve a neutral decision maker in the initial determination of whether to prescribe psychotropic medications to Lucas or in ongoing reviews of those medications.

24.    The medications caused Lucas stomach pain, and he refused to continue taking them. On or about May 21, 2018, ORR transferred Lucas to Shiloh RTC in Manvel, Texas, without affording him notice, an opportunity to be heard, or a right to appeal. ORR led Madelyn to believe Shiloh RTC was simply another shelter to which it was sending Lucas because Hacienda del Sol lacked space. ORR did not inform Madelyn that Shiloh RTC is a psychiatric institution, that it had administered Lucas psychotropic drugs at the Hacienda del Sol facility, that he was being transferred to Shiloh RTC for mental health reasons, or that Lucas would be required to take more psychotropic drugs at Shiloh RTC.

25.    Approximately six weeks after Madelyn had requested Lucas' custody, ORR sent an investigator to Madelyn's home in Los Angeles, California. Living with Madelyn then and now are her infant daughter, adult brother, and an unrelated female roommate and her child. At the time the investigator arrived, Madelyn's roommate's brother was visiting.

26.    The investigator indicated to Madelyn that her home was suitable, but that all adults who reside with her would have to appear for fingerprinting, including her roommate's brother. Madelyn advised the investigator that her roommate's brother did not live in the home, but the investigator insisted that the visitor appear for fingerprinting regardless. All the adult residents of Madelyn's home appeared for

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

fingerprinting, but her roommate's brother did not. Approximately one month later, ORR orally advised Madelyn that it would not release Lucas to her because her roommate's brother had failed to appear for fingerprinting. ORR represented to Madelyn that its decision was final, and afforded neither Madelyn nor Lucas any hearing, right to administrative appeal, or other means to change its decision. ORR failed to provide Madelyn with a written decision or written explanation for denying her custody of Lucas.  Due to ORR's actions and inactions, Lucas' release has been unnecessarily delayed, and Lucas has not been placed in the least restrictive setting.

27.   Twelve-year-old Lucas remains detained at Shiloh RTC where he has been administered Zoloft. Zoloft's side-effects include rigidity in the muscles, high fever, sweating, confusion, agitation, hallucinations, overactive reflexes, tremors, nausea, vomiting, diarrhea, loss of appetite, fainting, and seizures.

28.   Shiloh personnel have now diagnosed Lucas with "major depressive disorder." Among Lucas' "major stressors," Shiloh personnel identify his "[b]eing kept from family and in ORR custody." Shiloh staff have nonetheless told Lucas that ORR will not release him until Shiloh medical personnel declare him psychologically sound.

29.   ORR has provided Lucas no legal counsel to represent him with respect to release, the administration of psychotropic medications, or placement at Shiloh.

B.   Daniela Marisol T.

30.   On or about August 3, 2017, Plaintiff Daniela Marisol T., a partially deaf sixteen-year-old girl, arrived at the U.S.-Mexico border with her older sister, Katherine L., and her nephew.  Daniela Marisol, Katherine, and her younger nephew fled from their home country in fear for their lives. At the border, Daniela Marisol was forcibly separated from her sister and nephew and placed in the custody of ORR at the International Education Service Norma Linda Shelter in Los Fresnos, Texas. Daniela Marisol and Katherine are very close, and Daniela Marisol views Katherine as a second mother. Daniela Marisol was so emotionally traumatized by the separation that

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

she was later admitted to a psychiatric hospital to cope with the trauma. The screening physician also recommended treatment for Daniela Marisol's hearing disability once she was released to her sister—a release that, eleven months later, has yet to come to fruition.

31.    Katherine and her son, detained separately from Daniela Marisol, were released from immigration custody after they proved to an Asylum Officer that they have a credible fear of persecution should they be returned to Honduras. Upon release, Katherine applied to become Daniela Marisol's custodian and have ORR release Daniela Marisol to her custody. However, ORR has placed arbitrary, expensive, and excessive conditions on Daniela Marisol's release, which Katherine has not been able to meet.

32.    According to Katherine, when Daniela Marisol lived in Honduras with her family, she did not seem to have mental health issues. However, Daniela Marisol's psychological state rapidly deteriorated after her family separation. It was further exacerbated when caseworkers told Daniela Marisol that she was not going to be released to her sister. Daniela Marisol lost hope that she would ever be released to her family. Depressed and suicidal, she was admitted to a psychiatric hospital where she suffered a psychotic breakdown.

33.    While Daniela Marisol was detained at the Norma Linda shelter, a doctor recognized that she was deaf in one ear. ORR declined to treat her deafness and instead noted that she should consult a specialist regarding her deafness "once [she was] reunified with family." Months later, when she was at a new facility, it was recommended she receive hearing aids, but to date, Daniela Marisol has not received them.

34.    After her breakdown, on or about September 8, 2017, ORR transferred Daniela Marisol to Shiloh RTC in Manvel, Texas, without affording her notice, an opportunity to be heard or a right to appeal. At Shiloh, Daniela Marisol's hearing disability went untreated.

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

35.     Without obtaining the informed consent of Daniela Marisol's mother, Katherine, other family members, or court authorization, ORR administered numerous psychotropic medications to Daniela Marisol, including atypical antipsychotics and antidepressants, starting when she was in the Norma Linda shelter, and continuing while she was at Shiloh RTC and the David and Margaret shelter in La Verne, California, and through her present placement, Bethany Christian Services in Michigan. In the approximately ten months that she has been in ORR custody, Daniela Marisol has been given multiple psychotropic medications, including Prozac, Abilify, Clonidine, Risperdal, Seroquel, and Zyprexa. While in ORR custody, Daniela Marisol has been the subject of numerous, changing diagnoses, including "Bipolar disorder, MRE, Mixed, with psychosis, GAD, PTSD;" "major depressive disorder, recurrent episode, severe with mood-congruent psychotic features;" and "bipolar II disorder, generalized anxiety disorder, PTSD." Upon information and belief, ORR did not involve a neutral decision maker in the initial determination of whether to prescribe psychotropic medications to Daniela Marisol or in ongoing reviews of those medications.

36.     As recognized by the U.S. Food and Drug Administration ("FDA"), antidepressants such as those prescribed to Daniela Marisol "increase[] the risk compared to placebo of suicidal thinking and behavior (suicidality) in children, adolescents, and young adults in short term studies of major depressive disorder (MDD) and other psychiatric disorders." ORR has frequently given Daniela Marisol an atypical antipsychotic and an antidepressant in combination. Research demonstrates that the number and severity of side effects, such as thoughts of suicide and intentional self-harm, increases as the number of concurrent medications increases. Daniela Marisol has become suicidal while being made to take such antidepressants and drug combinations.

37.     Daniela Marisol believes that she has to take the medicine because facility staff have told her that she must in order to be released from government custody.

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

38.     Katherine desperately wants to provide her younger sister a loving and safe home, and she has done everything in her power to have Daniela Marisol released to her care. However, ORR has told Katherine that, in order for Daniela Marisol to be released to her care, Katherine must move to a new house, have a separate private bedroom for Daniela Marisol, and prove that she can pay over $500 per month for Daniela Marisol's medical care. Katherine has been unable to meet ORR's arduous and arbitrary demands. ORR never provided Katherine with a written decision or written explanation for denying her custody of Daniela Marisol.  It represented to her that the requirements that it set and its decision were final, and it never afforded Katherine or Daniela Marisol any hearing, right to administrative appeal, or other means to change its decision.  Due to ORR's actions and inactions, Daniela Marisol's release has been unnecessarily delayed, and she has not been placed in the least restrictive setting.

39.     Daniela Marisol remains in government custody, away from her sister and other family.  ORR has given her no legal counsel to represent her with respect to release, administration of psychotropic medications, or her placement.

C.   <u>Miguel Angel S.</u>

40.     On or about May 16, 2017, ORR assumed custody of Plaintiff Miguel Angel after he arrived at the U.S.-Mexico border.  ORR placed him at the Southwest Key shelter in southern California.  The staff initially told Miguel Angel that he would be released to Gerardo S., his father and next friend, within three months.

41.     As Miguel's time in detention wore on, he felt anxious at the shelter and often feared he would never be released.  On July 17, 2017, ORR transferred Miguel Angel to Shiloh RTC in Texas, without affording him notice, an opportunity to be heard or a right to appeal.   At Shiloh, Miguel Angel was administered several psychotropic medications, including Remeron, Trazadone, Seroquel, and Lexapro. Side effects of these medications include stomach pain, dizziness, nausea, drowsiness, unusual weight gain, blurred vision, and insomnia.

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

42.    Miguel Angel objected to taking the medications because they made him feel itchy, dizzy, aggressive, nauseous, and caused him to gain an unusual amount of weight in a short period of time. Shiloh staff insisted that he take the medication. Upon information and belief, the staff at Shiloh administered these medications to Miguel Angel without obtaining Gerardo's informed consent or judicial authorization.

43.    Upon information and belief, ORR did not involve a neutral decision maker in the initial determination of whether to prescribe psychotropic medications to Miguel Angel or in ongoing review of those medications.

44.    While Miguel Angel was detained at Shiloh, several staff members physically assaulted him multiple times. During one incident, a staff member placed Miguel Angel in a headlock, painfully ripping Miguel Angel's earring out of his earlobe. A physician's assistant watched this, but did nothing to stop the attack. Miguel Angel reported the incident immediately to the facility doctor, but the doctor laughed and did nothing. Another time, two Shiloh staff members picked Miguel Angel up by his arms and pushed him up against a wall. One of the staff members pressed his forearm across Miguel Angel's throat, making it hard for him to breathe. Upon information and belief, when Miguel Angel reported the incidents to staff, no disciplinary action was taken.

45.    In March 2018, shortly after these assaults took place, ORR transferred Miguel Angel to Yolo Juvenile Detention Center, affording him neither notice nor opportunity to be heard. Upon information and belief, Miguel Angel was transferred to Yolo in retaliation for reporting the assaults.

46.    At Yolo, facility staff attacked Miguel Angel with pepper spray, and he fears they will do it again. On one occasion, after Miguel Angel had been pepper sprayed by staff in his eyes and ears, he had to use water from the toilet in his cell to wash out his eyes because staff cut off water to his sink. The pepper spray made his eyes feel like they were on fire, and he lost hearing in one ear for several days. Miguel Angel spends most of his time at Yolo locked in a small cell and is only allowed out

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

for short periods, which makes him feel trapped and tortured.

47.    Miguel Angel's father, Gerardo, applied to be Miguel Angel's sponsor around October 2017. Miguel Angel and Gerardo have a very close relationship, and Miguel Angel wants to live with him. Gerardo lives in an apartment with his brother, and in October 2017 both Gerardo and his brother submitted all required documents to ORR, including birth certificates and fingerprints. ORR also requested that Gerardo's neighbor, who lives across the hallway, submit the same information. The neighbor submitted this information in October 2017.

48.    In December 2017, a home investigator visited Gerardo's apartment to perform a home study. The home study went well, and the investigator assured Gerardo that Miguel Angel would probably be released in the first few weeks of January. Gerardo heard nothing from ORR or Miguel Angel's case workers throughout January or February 2018.

49.    In March 2018, Gerardo was told that the Shiloh doctors would not approve Miguel Angel for release and that he would remain in ORR custody until they do. In early May 2018, Miguel Angel's case worker at Yolo told Gerardo that he needed to provide proof of school enrollment and the name of a psychiatric clinic in order for Miguel Angel to be released. Gerardo has tried his best to comply with these requirements, but the local school requires Miguel Angel to be physically present in order to be enrolled, and Gerardo has been unable to find a psychiatric clinic that will give Miguel Angel an appointment. In late May 2018, Miguel Angel's case worker told Gerardo that his fingerprints had expired, and that Gerardo, his brother, and his neighbor would need to submit their fingerprints again.

50.    ORR has refused to release Miguel Angel to Gerardo's custody for eight months. ORR has not provided Miguel Angel or Gerardo with written notification of its refusal to release Miguel Angel or the basis for the refusal, or an opportunity to review the underlying evidence or appeal ORR's refusal to release Miguel Angel to his father. Due to ORR's actions and inactions, Miguel Angel's release has been

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

1   unnecessarily delayed and he has not been placed in the least restrictive setting.

2   D.   Gabriela N.

3        51.   On or about January 8, 2017, ORR assumed custody of Plaintiff Gabriela

4   N., shortly after she had turned herself in at the U.S.-Mexico border. As a young girl

5   living in El Salvador, Gabriela experienced extreme violence and did not feel safe at

6   home. ORR placed her at the Southwest Key Casita del Valle facility ("Casita del

7   Valle shelter") in Clint, Texas. In the fall of 2017, Isaac N., Gabriela's grandfather and

8   Next Friend, requested Gabriela's custody and submitted an application to serve as her

9   custodian. Gabriela's mother appeared before a U.S. Consular official in El Salvador

10  to execute a formal designation pursuant to Paragraph 14D of the *Flores* settlement

11  directing ORR to release Gabriela to her grandfather.

12       52.   Gabriela's biological father is deceased, and her stepfather physically

13  abused her mother and disabled sister who suffers from paralysis from the abuse and

14  can no longer to speak. Thus, Gabriela fled to the U.S. seeking safety, with the hope

15  of living with her grandfather. Gabriela and her grandfather, Isaac, have a close

16  relationship, and she wants to live with him. Over the next eight months or so, Isaac

17  continued to submit documents that ORR requested and completed a home study in

18  anticipation that ORR would release Gabriela to his custody; it did not.

19       53.   According to Isaac, in El Salvador, Gabriela had no mental health

20  concerns, and she took no medications for mental illness. When she arrived at Casita

21  del Valle shelter, facility staff noted that Gabriela appeared emotionally stable,

22  receptive, and resilient.

23       54.   As her confinement wore on, however, Gabriela became depressed and

24  anxious, fearing that ORR would never release her to her family. Without obtaining

25  Isaac's informed consent, the informed consent of any other adult family member, or

26  judicial authorization, ORR repeatedly administered Gabriela psychotropic

27  medications, ostensibly to control post-traumatic stress disorder, anxiety, major

28  depressive disorder, and attention-deficit hyperactivity disorder ("ADHD").

55.     While at Casita del Valle shelter, Gabriela was administered Prozac, a psychotropic medication.

56.     On or about September 7, 2017, ORR transferred Gabriela to Shiloh RTC, without affording notice, an opportunity to be heard or a right to appeal. At Shiloh, ORR administered Gabriela more psychotropic medications, including Gabapentin, Prozac, and Bupropion, all of which include side effects of increased risk of suicidal ideation and behavior.  Bupropion is not FDA-approved to treat depression or ADHD in adolescents. Upon information and belief, ORR did not involve a neutral decision maker in the initial determination of whether to prescribe psychotropic medications to Gabriela or in ongoing review of those medications.

57.     Gabriela does not believe the medications help her, and she does not want to take them. However, Gabriela believes that she must take the medications in order to be released from detention. Shiloh staff told Gabriela that ORR would not release her until Shiloh medical personnel declare her psychologically sound.

58.     In February 2018, ORR sent an investigator to Isaac's home in Oakland, California, where he lived, and continues to live, alone. Isaac moved to a new apartment and purchased a new bed for Gabriela in preparation for her release.

59.     The investigator indicated to Isaac that his home was suitable, but questioned Isaac's ability to support Gabriela's education and care for her financially. Isaac assured the investigator that he would do everything required to provide for Gabriela. Later, Gabriela's social worker at Shiloh told Isaac that ORR was no longer considering him as a custodian for his granddaughter and was going to transfer Gabriela elsewhere. ORR afforded neither Isaac nor Gabriela any hearing, right to administrative appeal, or other means to change its decision. ORR failed to provide Isaac with a written decision or written explanation for denying him custody of Gabriela. Due to ORR's actions and inactions, Gabriela's release has been unnecessarily delayed and Gabriela has not been placed in the least restrictive setting.

60.     Seventeen-year-old Gabriela remains detained at St. Michael's Home for

17.

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

Children, where she has been administered Prozac.

61.     After being detained for over one and a half years, Gabriela is miserable and desperately wants to live with her grandfather. Her grandfather is ready and eager to care for her. Shiloh staff have nonetheless told Gabriela that ORR will not release her to her grandfather. ORR has provided Gabriela no legal counsel to represent her with respect to release, the administration of psychotropic medications, or her placement at Shiloh.

E.     <u>Jaime D.</u>

62.     On or about April 8, 2018, ORR assumed custody of Plaintiff Jaime D. after he arrived at the U.S.-Mexico border with his 6-year-old sister and 10-year-old aunt. ORR placed Jaime and his younger sister and aunt at the Cayuga Centers shelter in Bronx, New York. On or about April 10, 2018, Reyna D., Jaime's aunt and Next Friend, requested Jaime's custody and submitted a family reunification packet to ORR. Reyna is Jaime's only family in the United States. Jaime desperately wants to be released to Reyna's care.  Jaime's mother died when he was seven years old and, upon information and belief, his father died before he was born. Reyna discussed ORR's requirements for becoming Jaime's custodian in detail with Jaime's case manager at Cayuga Centers and immediately began gathering the required documents to send to ORR.

63.     When Jaime was first sent to Cayuga Centers, the staff made him feel very nervous. Jaime was terrified that he would be forced to return to his home country, where his life had been threatened. He made up a story about his life in his home country, because he thought that this would make the shelter staff leave him alone. He later recanted this story multiple times. Despite the shelter recommending that Jaime be placed in a staff-secure facility, thirteen-year-old Jaime was transferred to a secure facility.

64.     On or about April 18, 2018, ORR transferred Jaime to Yolo County Juvenile Detention Center in Woodland, California. ORR transferred Jaime to Yolo

Complaint                                    18.

without affording him notice, an opportunity to be heard or a right to appeal. He was awakened at 4:00 in the morning and restrained with heavy shackles throughout the cross-country flight from New York to California. Jaime was not allowed to say goodbye to his younger sister or aunt.  He was extremely worried they would think he had abandoned them.

65.    Yolo staff first contacted Reyna regarding her application for Jaime's custody about a week after Jaime arrived at Yolo. Approximately two weeks later, Jaime's case manager noted that Reyna had "provided all that [had] been asked of her," including a complete family reunification packet and fingerprints. In late May 2018, Reyna completed a home study and interview with a home investigator. ORR found Reyna a suitable custodian for Jaime's younger sister and aunt. ORR released the two girls to Reyna's care on or about June 8, 2018.

66.    While detained at Yolo, Jaime was very scared for his safety and suffered from anxiety. Reyna was extremely concerned for his well-being as well, as Jaime sounded increasingly sad and scared during their phone calls. Throughout his time at Yolo, Jaime suffered physical abuse at the hands of older youth in the facility. Jaime alerted facility staff of the abuse, but staff ignored his concerns and said they did not believe him.

67.    Two weeks after he was transferred to Yolo, Jaime's case manager noted that the Yolo staff were "all in agreement that [Jaime] isn't appropriately placed in a secure setting." Jaime was told by his case worker that he was too young to be at Yolo and would hopefully be transferred soon. However, Jaime remained at Yolo for another three weeks. On or about May 24, 2018, ORR transferred Jaime to Children's Village staff secure facility in Dobbs Ferry, New York.

68.    Thirteen-year-old Jaime remains detained at Children's Village, where he is increasingly anxious and worried that he will never be released to his aunt's care. As of the filing of this Complaint, Reyna has not heard from Jaime's case worker at Children's Village for over a month. Reyna has not been given any information about

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

why Jaime has not yet been released to her care. ORR has not provided Jaime or Reyna with written notification of its refusal to release Jaime or the basis for the refusal, or an opportunity to review the underlying evidence or appeal ORR's refusal to release Jaime to his aunt. Due to ORR's actions and inactions, Jaime's release has been unnecessarily delayed and Jaime has not been placed in the least restrictive setting.

69.    ORR has provided Jaime no legal counsel to represent him with respect to release or his placement at Children's Village.

V.

CLASS ACTION ALLEGATIONS

70.    The named Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) on behalf of themselves and the following similarly situated proposed class members:

All children in ORR custody pursuant to 6 U.S.C. § 279 and/or 8 U.S.C. § 1232 —

(a)    whom ORR refuses to release to parents or other available custodians within thirty days of the proposed custodian's submitting a complete family reunification packet on the ground that the proposed custodian is or may be unfit;

(b)    who have been, are or will be placed in a secure facility, medium-secure facility, or RTC, or continued in any such facility for more than thirty days, without being afforded notice and an opportunity to be heard before a neutral and detached decisionmaker regarding the grounds for such placement; or

(c)    who have been or will be administered psychotropic medication without procedural safeguards, including obtaining informed consent or court authorization prior to medicating a child, involving a neutral decisionmaker in the initial determination of whether to prescribe psychotropics to a child in ORR custody, and involving a neutral

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

1    decision-maker to conduct periodic reviews of those medications as
2    treatment continues; or

3    (d)    who are natives of non-contiguous countries and to whom ORR blocks
4            legal assistance in legal matters or proceedings involving their custody,
5            placement, release, and/or non-consensual consumption of psychotropic
6            drugs.

7        71.    The exact size of the proposed class is unknown, but likely includes
8    hundreds of children. The size of the class is so numerous that joinder of all members
9    is impracticable.

10       72.    The claims of Plaintiffs and those of the proposed class members raise
11   common questions of law and fact concerning whether Defendants' policies and
12   practices relating to the release, placement, treatment, and legal representation of
13   detained immigrant children are consistent with the *Flores* Settlement, § 235 of the
14   TVPRA, the Fifth Amendment to the United States Constitution, and the First
15   Amendment of the Constitution. These questions are common to the named Plaintiffs
16   and the members of the proposed class because Defendants have acted and will
17   continue to act on grounds generally applicable to the named Plaintiffs and the
18   proposed class members. Plaintiffs' claims are typical of the class's claims.

19       73.    The prosecution of separate actions by individual members of the
20   proposed class would create a risk of inconsistent or varying adjudications establishing
21   incompatible standards of conduct for Defendants. Proposed class members are
22   predominantly indigent, non-English-speaking children who are being denied basic
23   fairness in ORR's prolonging their detention in lieu of releasing them to parents or
24   other proposed custodians, "stepped up" to RTC, secure or staff-secure placement
25   without notice or opportunity to be heard, and administered psychotropic medications
26   without a parent's informed consent. The proposed class members are under ORR's
27   exclusive physical control and often understand little, if anything, about their rights
28   under the *Flores* Settlement, the TVPRA, or the Constitution. ORR actively obstructs

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

lawyers from representing members of the proposed class in legal proceedings relating to custody, placement, or release. Unless this matter proceeds as a class action, the majority of class members have little chance of securing judicial review of the policies and practices challenged herein.

74.     Defendants, their agents, employees, and predecessors and successors in office have acted or refused to act, and will continue to act or refuse to act, on grounds generally applicable to the class, thereby making injunctive relief and corresponding declaratory relief appropriate with respect to the class as a whole. Plaintiffs will vigorously represent the interests of unnamed class members. All members of the proposed class will benefit by this action. The interests of the named Plaintiffs and those of the proposed class members are identical.

75.     Plaintiffs are represented by experienced and reputable lawyers associated with non-profit public interest law firms and an international law firm serving *pro bono publico*. Plaintiffs' counsel includes attorneys with years of experience litigating complex suits and class actions on behalf of children and foreign nationals, including counsel for the plaintiff class in *Flores v. Sessions*.

VI.

ORR POLICY & PRACTICE VIOLATES DUE PROCESS

A.     <u>Defendants have violated Plaintiffs' due process and family association rights, the TVPRA, and the *Flores* Settlement in determining custodians' fitness.</u>

76.     When children are held in government custody apart from their primary caregivers for long periods, they suffer profound and long-lasting injury. The American Academy of Pediatrics has explained that "highly stressful experiences, like family separation, can cause irreparable harm, disrupting a child's brain architecture and affecting his or her short- and long-term health. This type of prolonged exposure to serious stress—known as toxic stress—can carry lifelong consequences for children." Toxic stress is associated with increased rates of mental health issues, risky health behaviors, and physical illness such as diabetes, cancer, posttraumatic stress

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

disorder ("PTSD"), and heart disease. Studies of immigrant children detained in the United States have discovered high rates of PTSD, anxiety, depression, and suicidal ideation. A primary factor in recovering from such trauma is reunification with a parent or other trusted adult. Without the presence of trusted caregivers, children are often unable to cope with the psychological trauma and stress associated with detention.

77.     Paragraph 14 of the *Flores* Settlement requires ORR to release children from immigration-related custody "without unnecessary delay" so long as their continued detention is not required to secure availability for removal or to protect safety. Paragraph 18 of the Settlement requires ORR to make "prompt and continuous efforts" toward family reunifications and to release children to suitable custodians without unnecessary delay.

78.     Similarly, § 235(c)(2)(A) of the TVPRA, codified at 8 U.S.C. 1232(c)(2)(A), requires ORR to "promptly" place detained children "in the least restrictive setting that is in the best interest of the child," generally, with "a suitable family member . . . ." TVPRA § 235(c)(3)(A) provides, "[A]n unaccompanied alien child may not be placed with a person or entity unless the Secretary of Health and Human Services makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being."

79.     Paragraph 24A of the *Flores* Settlement guarantees detained children the right to a hearing during which an immigration judge reviews whether they may be continued in custody because they are dangerous or unusually likely to abscond. However, neither the *Flores* Settlement nor the TVPRA prescribe what process is due where ORR unreasonably prolongs a juvenile's detention or refuses to release him or her because ORR questions whether an available parent or other potential custodian is capable of providing for the child's physical and mental well-being.

80.     Plaintiffs have substantial liberty interests in being free from government custody, in preserving their family unity and the ability for their family to care for

Complaint                                       23.

them, and in family association. Defendants may not abridge these liberty interests without appropriate procedures to protect against erroneous deprivation.

81.     Plaintiffs have a fundamental right to the supervision, companionship, and care of their parents. Absent a showing of parental unfitness, the government may not keep children from their parents or refuse to release children into the custody of their parents.

82.     As a matter of both policy and practice, ORR does not make prompt and continuous efforts toward family reunification and the release of children in its custody. Instead, it delays or refuses to make determinations about whether proposed custodians are or may be unfit.

83.     As a matter of both policy and practice, ORR affords Plaintiffs and their proposed class members little or no procedural protection against prolonged detention on the ground that their parents or other proposed custodians are or may be unfit. ORR's nominal procedures for vetting detained children's parents or other proposed custodians do not appear in the Code of Federal Regulations, nor even in a semi-permanent practice manual. Rather, they appear on ORR's web page, www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2 (last visited June 29, 2018), and are subject to change without prior notice or opportunity for comment. Under its nominal procedures —

(a)     ORR does not decide within any time certain whether a detained minor's parent or other proposed custodian is suitable;

(b)     ORR does not provide a detained minor, or his or her parent or other proposed custodian, an opportunity to inspect or rebut evidence derogatory of the proposed custodian's fitness;

(c)     ORR does not afford a detained minor or his or her proposed custodian a hearing before a neutral and detached decisionmaker either before or after ORR declares a potential custodian unfit;

(d)     Once ORR decides a proposed custodian is unsuitable, it need not inform

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

1    a detained minor or the proposed custodian of its decision for up to 30

2    days;

3    (e)    ORR allows detained minors no appeal or other administrative recourse

4    from its finding a proposed custodian unsuitable, though such a decision

5    nearly always prolongs the minor's detention;

6    (f)    Except for parents and legal guardians, ORR allows rejected custodians

7    no appeal from a decision declaring them unfit, which nearly always

8    prolongs an affected minor's detention;

9    (g)    As for parents and legal guardians, ORR's policy requires them to submit

10    a written request to HHS's Assistant Secretary for Children and Families

11    to be heard regarding ORR's declaring them unfit, but a hearing need not

12    be convened within any time certain.

13    84.    Whether a parent or other custodian is qualified to care for a child is a

14 matter generally committed to state and local governments. Plaintiffs are informed and

15 believe that in all fifty states and their subdivisions, children may not be detained for

16 want of a qualified custodian without affording them and/or their parents or other

17 potential custodians a prompt hearing before a judge or other neutral and detached

18 decisionmaker, during which allegations of unfitness are tested via trial-like

19 procedures and any ensuing finding of unsuitability must be based on competent

20 evidence.

21    85.    In contrast, in refusing to release Plaintiffs and those similarly situated to

22 parents and other available custodians on grounds of fitness, ORR provides neither

23 Plaintiffs nor those similarly situated —

24    (a)    an evidentiary hearing;

25    (b)    the right to review or rebut adverse witnesses and evidence;

26    (c)    appointed counsel, guardians *ad litem*, or interpreters;

27    (d)    a finding of suitability or lack thereof by a neutral and detached decision-

28    maker under defined and consistent legal standards;

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

(e)     the right to a prompt determination of a proposed custodian's fitness; or

(f)     the right to appeal administratively adverse decisions.

86.     In practice, ORR often refuses to decide whether a detained child's proposed custodian is fit, thereby needlessly prolonging detention and family separation.

87.     On information and belief, Plaintiffs allege that, to date, HHS's Assistant Secretary for Children and Families has never convened an actual hearing before a neutral arbiter to review a decision by ORR declaring a detained child's proposed custodian unsuitable.

88.     ORR's procedures for determining whether parents and other proposed custodians are suitable creates an unreasonable risk that Plaintiffs and those similarly situated will be erroneously —

(a)     subjected to prolonged detention;

(b)     placed in overly restrictive settings that are not in their best interests;

(c)     administered psychotropic medications; and

(d)     separated from parents and family.

89.     As a direct and proximate result of ORR's torpid, opaque, and perfunctory procedures for declaring detained children's parents and other proposed custodians unsuitable, Plaintiffs and those similarly situated have been and will be erroneously—

(a)     subjected to prolonged detention;

(b)     placed in overly restrictive settings that are not in their best interests;

(c)     administered psychotropic medications; and

(d)     separated from parents and family.

90.     The government's refusing to release children to their parents' custody, or to the custody of adult siblings and other family members, deprives plaintiffs of their fundamental rights without any reasonable justification or legitimate purpose, violates the substantive and procedural components of the Due Process Clause, and

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

violates the freedom of association clause of the First Amendment.  In prolonging the separation of children from their proposed custodians, Defendants also compromise the short and long-term health of Plaintiffs and those similarly situated.

B.  <u>Defendants have violated Plaintiffs' due process rights, the TVPRA, and the *Flores* Settlement by placing them in unlicensed placements.</u>

91.  Definition 6 and paragraph 19 of the *Flores* Settlement require ORR to place a detained child in a non-secure facility holding a state license to care for dependent children except in circumstances enumerated in Settlement paragraph 21: *i.e.,* the child has committed a violent crime or non-petty delinquent act, has threatened violence during federal custody, is an unusual escape-risk, or is so disruptive that secure confinement is necessary to ensure the welfare of the minor or others.

92.  Section 235(c)(2)(A) of the TVPRA similarly requires ORR to place detained children promptly "in the least restrictive setting that is in the best interest of the child . . ." and bars its placing a child "in a secure facility absent a determination that the child poses a danger to self or others or has been charged with having committed a criminal offense."

93.  TVPRA § 235(c)(2)(A) provides, "The placement of a child in a secure facility shall be reviewed, at a minimum, on a monthly basis, in accordance with procedures prescribed by the Secretary, to determine if such placement remains warranted." The TVPRA is otherwise silent with respect to what process is due when ORR places or continues a child in an RTC, medium-secure or secure facility.

94.  Federal law and policy recognize that both children and communities are better off when children are not needlessly incarcerated. A vast body of research has established that detaining children interferes with healthy development, exposes youth to abuse, undermines educational attainment, makes children with mental health needs worse off, and puts children at greater risk of self-harm. Juvenile detention facilities often respond to threats of self-harm in ways that further endanger youth, such as by placing them in isolation. Schooling children receive during detention is often

27.

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

substandard, which places them at serious disadvantage when they enter school after having been detained for substantial periods. Research has demonstrated that incarceration also exacerbates pre-existing trauma.

95.     The vast majority of children who end up in secure custody through ORR have never been charged, let alone convicted, of crimes in the U.S. or in their home country. Often, ORR places the most vulnerable children—those with the greatest mental health needs—in staff-secure, secure or RTC facilities. Prolonging the detention of children with mental health needs in such facilities is profoundly injurious. ORR's detaining children in such facilities exacerbates mental health issues to the point that ORR eventually consigns children to mental hospitals.

96.     The Fifth Amendment's Due Process Clause protects children's freedom from unnecessary physical restraint, including placement in RTCs, medium-secure or secure facilities. ORR's placing children in such facilities is constrained by due process, which requires adequate procedural protections to ensure that ORR's asserted justification for such placement outweighs children's constitutionally protected interest in avoiding excessive physical restraint. Due process requires that ORR give Plaintiffs and their proposed class members meaningful notice and an opportunity to be heard before it places them in RTCs, medium-secure or secure facilities and an ongoing review with commensurate protections every thirty days.

97.     As a matter of policy and practice, Defendant ORR affords detained children wholly inadequate procedural protection against erroneous placement in RTCs, secure or medium-secure facilities. ORR's procedures for initially placing a child in an RTC, secure or medium-secure facility and for periodically reviewing the need for such placements appear nowhere in the Code of Federal Regulations. Rather, they appear on ORR's web page and are subject to change without prior notice or opportunity for public comment.

98.     In practice, ORR's placing children in RTCs, secure or medium-secure facilities results from an opaque and peremptory process in which youth are summarily

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

"stepped up" to such facilities without any meaningful opportunity to be heard, either before or after being stepped up, regarding the reasons for placing them in such facilities. In placing children in RTCs, secure and medium-secure facilities, ORR provides neither Plaintiffs nor those similarly situated —

(a)  an evidentiary hearing;

(b)  notice of the placement decision or individualized reasoning therefor;

(c)  an opportunity to present evidence and witnesses;

(d)  the right to a neutral adjudicator;

(e)  an opportunity to review or rebut adverse witnesses and evidence;

(f)  the right to counsel, guardians *ad litem*, or interpreters;

(g)  a finding of dangerousness or other adequate cause for such placement under coherent and consistent legal standards;

(h)  the right to appeal administratively from adverse decisions; or

(i)  a monthly review of whether their placement in RTCs, medium-secure, or secure facilities remains warranted.

99.  Pursuant to paragraph 24A of the *Flores* Settlement and orders issued by the District Court for the Central District of California, immigration judges may review ORR's decisions to continue detaining children in federal custody on grounds they are dangerous or unusual flight-risks. ORR regularly places children in RTCs, secure and medium-secure facilities on the ground that they are dangerous or unusual flight-risks, contrary to immigration judges' determinations that they are neither.

100.  Plaintiffs are informed and believe that in all fifty states and their subdivisions, it is unlawful to place children in RTCs, secure or medium-secure facilities without affording them a prompt and meaningful opportunity to be heard before a neutral and detached decisionmaker regarding the grounds for such placement.

101.  The lack of procedural protection against erroneous ORR decisions to place children in RTCs, secure and medium-secure facilities creates an unreasonable

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

risk that youth will be placed in overly restrictive settings against their best interests, subjected to needless restrictions on their personal liberty, and unjustly suffer the trauma and stigma of imprisonment. As a direct and proximate result of ORR's peremptorily consigning children to RTCs, secure and medium-secure facilities, Plaintiffs and their proposed class members have been and are being erroneously: (a) placed in restrictive settings against their best interests; (b) subjected to excessive restrictions on their personal liberty; and (c) subjected to the trauma and stigma of imprisonment.

102.   Placement in RTCs, secure and medium-secure facilities further injures Plaintiffs and those similarly situated because ORR, as a matter of policy and practice, delays release to parents and other reputable custodians of youth whom it has ever confined in such facilities, even when such placement is based on incomplete, inaccurate, or erroneous evidence, and even if ORR subsequently transfers a child to a non-secure dependent care facility.

103.   As a matter of policy and practice, ORR refuses to release children whom it has ever placed in a secure or medium-secure facility until and unless its director or his designee approves release. In practice, this policy prolongs non-dangerous children's detention for weeks or months notwithstanding that parents or other reputable custodians are available to care for them.

104.   As a matter of policy and practice, ORR refuses to release children whom it has placed in RTCs until and unless RTC medical personnel declare the child mentally fit. ORR affords children no hearing or other meaningful procedural recourse when RTC medical personnel refuse to declare them mentally fit. As a direct and proximate result of said policy and practice, children placed in RTCs suffer the functional equivalent of indefinite civil commitment without due process of law.

105.   On information and belief, Plaintiffs further allege that ORR regularly insists that the parents and other potential custodians possess novel and superfluous qualifications to receive custody of children whom ORR has ever placed in an RTC,

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

secure or medium-secure facility. Such qualifications include being cancer-free, having income sufficient to supply released children with psychotropic drugs, repetitive fingerprinting, and supplying fingerprints of third parties who do not reside in the proposed custodian's home. As a direct and proximate result of said policy and practice, children placed in RTCs, secure and medium-secure facilities have been and are being erroneously: (a) placed in restrictive settings against their best interests; and (b) subjected to excessive restrictions on their personal liberty.

C.   Defendants have subjected Plaintiffs to the administration of psychotropic drugs without having procedural safeguards in place, including obtaining informed consent.

106.   Paragraph 7 of the *Flores* Settlement provides in pertinent part: "The INS shall assess minors to determine if they have special needs …." A child may have special needs "due to drug or alcohol abuse, serious emotional disturbance, mental illness or retardation, or a physical condition or chronic illness that requires special services or treatment." Paragraph 12 of the *Flores* Settlement provides in pertinent part: "Following arrest, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors." The *Flores* Settlement further provides that facilities in which ORR places children with mental health needs must "meet those standards . . . set forth in Exhibit 1." Settlement ¶¶ 6, 8. Exhibit 1 requires that licensed programs "comply with all applicable state child welfare laws and regulations . . . and shall provide or arrange for the following services for each minor in its care: . . . appropriate mental health interventions when necessary."

107.   Section 235(c)(2) of the TVPRA requires ORR to provide children in its custody with safe and secure placements.  Placements that involve the unnecessary or coerced administration of psychotropic medications are neither "safe" nor "secure."

108.   The *Flores* Settlement incorporates by reference relevant law of the state in which children are placed and thereby requires ORR to comply with applicable child

Center for Human Rights & Costitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

welfare laws and regulations when administering psychotropic medications to Plaintiffs and those similarly situated. Plaintiffs are informed and believe, and on such basis allege, that the laws of all states in which ORR places Plaintiffs and those similarly situated require ORR to obtain informed parental consent or its lawful equivalent when administering psychotropic medications to minors.

109.   For example, Texas Administrative Code sections 748.2001(b), 748.2253, 748.2255 require informed consent be provided prior to administering psychotropic drugs to children in state custody.  Texas Family Code section 266.004(a) provides that before children in the care of the Texas Department of Family and Protective Services may receive medical care, someone authorized by a court must provide consent.

110.   Similarly, California Welfare and Institutions Code sections 369.5(a)(1) and 739.5(a)(1) provide that only a juvenile court may lawfully authorize the administration of psychotropic medication to children who are in state custody, unless the juvenile court specifically authorizes a parent to do so after making specific findings regarding the parent's fitness and capacity to do so.

111.   Plaintiffs and their proposed class members have a substantial liberty interest protected by the Due Process Clause of the Fifth Amendment in being free from the unauthorized and unnecessary administration of psychotropic medications. Plaintiffs are entitled to constitutionally sufficient procedures to protect against erroneous deprivation of this interest.

112.   Psychotropic medications are powerful drugs that act on the central nervous system and affect cognition, emotions, and behavior. Such drugs should only be administered in combination with other mental health supports to treat specifically diagnosed psychiatric illnesses and mental health disorders. Few psychotropic medications have been approved by the FDA as safe and effective to treat children, and careful oversight and monitoring is accordingly required when children are given such drugs. Such medications should not be used as chemical straitjackets to control

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

1   behavior.

2   113.   Serious, long-lasting adverse effects are common for individuals given

3   psychotropic medications. The full risks of giving such drugs to children are not well

4   understood, although psychotropics are known to cause serious and sometimes

5   irreversible side effects in adults, including psychosis, seizures, movement disorders,

6   suicidal ideation, aggression, extreme weight gain, and organ damage. Increasing the

7   number of psychotropic drugs children take concurrently increases the likelihood of

8   adverse reactions and long-term side effects. Close and continuing scrutiny of children

9   given such medications is therefore critical.

10   114.   As a matter of policy and practice, ORR authorizes and condones the

11   administration of psychotropic drugs to children entirely without procedural

12   safeguards, including informed parental consent. Rather, ORR authorizes detention

13   facility staff to "consent" to the involuntary, long-term administration of psychotropic

14   drugs to juveniles in their parents' stead, even when such parents are readily available

15   to ORR and/or the detention facility to give or withhold such consent.

16   115.   As a matter of policy and practice, ORR also fails to provide any

17   substantial procedural safeguards against unnecessary or unauthorized administration

18   of psychotropic drugs to children in its custody. At a minimum, such safeguards must

19   include a neutral decisionmaker's approval of the initial decision to administer

20   psychotropics to a child, as well as periodic reviews to ensure that youth are not

21   administered psychotropic medications unnecessarily, for too long, at harmful dosages

22   or in harmful combinations.

23   116.   On information and belief, Plaintiffs allege that ORR failed to have any

24   of these procedural safeguards in place prior to administering psychotropic

25   medications to the named Plaintiffs. In addition, the psychiatrist who currently

26   prescribes psychotropic medications to children at ORR's Shiloh RTC, Dr. Javier

27   Ruíz-Nazario, is not certified by the Texas Medical Board to treat children and

28   adolescents. Dr. Ruíz-Nazario has also received payments from drug companies that

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

1   manufacture psychotropic drugs given to children at Shiloh RTC.

2   D.      Defendants have obstructed Plaintiffs' access to counsel.

3         117.   Paragraph 24A of the *Flores* Settlement requires ORR to give detained
4   children a hearing before an immigration judge to review whether they are dangerous
5   or likely to abscond. Settlement paragraph 24D provides that Defendants must
6   "promptly provide each minor not released with . . . the list of free legal services
7   providers compiled pursuant to INS regulation . . . ." Exhibit 1, paragraph 14 of the
8   *Flores* Settlement requires licensed facilities in which Defendants detain minors to
9   provide "information regarding the availability of free legal assistance, the right to be
10  represented by counsel at no expense to the government . . . ." Exhibit 6 of the *Flores*
11  Settlement advises detained minors, "If you believe that you have not been properly
12  placed or that you have been treated improperly, you may ask a federal judge to review
13  your case. You may call a lawyer to help you do this. If you cannot afford a lawyer,
14  you may call one from the list of free legal services given to you with this form."

15        118.   Section 235(c)(5) of the TVPRA directs Defendant HHS Secretary to
16  "ensure, to the greatest extent practicable and consistent with section 292 of the
17  Immigration and Nationality Act (8 U.S.C. § 1362), that all unaccompanied alien
18  children who are or have been in the custody of the Secretary or the Secretary of
19  Homeland Security, and who are not [from contiguous countries], have counsel to
20  represent them in legal proceedings or matters and protect them from
21  mistreatment . . . ." Section 279(b)(A) of the HSA makes ORR responsible for
22  "developing a plan to be submitted to Congress on how to ensure that qualified and
23  independent legal counsel is timely appointed to represent the interests of each such
24  [unaccompanied alien] child . . . ." Immigration regulations, including 8 C.F.R.
25  §§ 287.3(c), 1003.62, 1240.10(a)(2) and 1292.1 *et seq*., generally guarantee Plaintiffs
26  and their proposed class members the right to be represented by retained and *pro bono*
27  counsel in proceedings before U.S. Citizenship and Immigration Services and the
28  Executive Office for Immigration Review.

Complaint                                    34.

119.   In furtherance of TVPRA § 235(c)(5), Defendant HHS contracts with the Vera Institute of Justice ("VIJ"), a non-profit organization, to coordinate the delivery of free legal services to unaccompanied children from non-contiguous countries who are or have been in ORR custody. VIJ in turn subcontracts with non-profit legal aid providers to counsel and represent such children in applying for affirmative immigration benefits, such as asylum or Special Immigrant Juvenile Status, and in asserting other defenses against removal.

120.   In many regions of the country, VIJ-funded legal services providers are the only legal counsel available to juveniles in ORR custody. Plaintiffs and the members of the proposed class are almost uniformly indigent, speak little or no English, and have little or no ability to represent themselves in hearings pursuant to paragraph 24A of the *Flores* Settlement or in any other legal proceedings involving ORR's custody, release, placement or medication decisions.

121.   On information and belief, ORR has no eligibility standards for providing VIJ-funded legal services to detained children. Rather, ORR exercises opaque and arbitrary discretion to prescribe those legal matters or proceedings in which VIJ-funded legal providers may represent detained children and those in which they may not.

122.   As a matter of policy and practice, ORR routinely bars VIJ-funded legal services providers from representing unaccompanied children from non-contiguous countries in legal proceedings involving ORR's custody, release, placement, and medication decisions, even when such legal services providers have the time and desire to undertake such representation.

123.   Legal proceedings involving ORR's custody, release, placement, and medication decisions, including hearings pursuant to paragraph 24A of the *Flores* Settlement, are "legal proceedings or matters" within the meaning of TVPRA § 235(c)(5).

124.   By blocking VIJ-funded legal services providers from representing

Complaint                                35.

children in legal proceedings involving ORR's custody, release, placement and medication decisions, ORR forces Plaintiffs and those similarly situated to fend for themselves in a complex and foreign adversarial legal system with little hope of prevailing. Without meaningful access to counsel, Plaintiffs and those similarly situated are denied a fair chance of succeeding in legal challenges to ORR's custody, release, placement and medication decisions and, *a fortiori*, suffer prolonged detention and the harms extended confinement and family separation inflicts. ORR deprives youth of liberty for years, which is comparable to imprisonment for a felony conviction.

125.   In blocking Plaintiffs and those similarly situated from receiving assistance in legal matters and proceedings involving ORR's custody, placement, medication, and release decisions, ORR acts arbitrarily, capriciously, abusively of discretion, and contrary to children's best interests, and obstructs lawyers from discharging their duty of zealous representation.

126.   As a direct and proximate result of ORR's blocking VIJ-funded legal services providers from representing Plaintiffs and those similarly situated children in legal proceedings involving ORR's custody, release, placement, or medication decisions, including hearings pursuant to paragraph 24A of the *Flores* Settlement, Plaintiffs and those similarly situated are being: (a) improperly administered psychotropic drugs; (b) erroneously denied placement in the least restrictive setting that is in their best interest; and (c) erroneously denied release to available custodians without unnecessary delay.

## VII.

## IRREPARABLE INJURY

127.   Plaintiffs have suffered and will continue to suffer irreparable harm because of Defendants' policies and practices as challenged herein. ORR has deprived and will continue to deprive Plaintiffs and those similarly situated of their rights under the First and Fifth Amendments, the TVPRA, and the *Flores* Settlement. ORR

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

confines children to jail-like settings without affording them a meaningful or timely opportunity to be heard regarding the reasons for such placement; prolongs children's detention on the ground that their parents or other available custodians are or may be unfit, while affording neither detained children nor their proposed custodians a meaningful or timely opportunity to be heard regarding a proposed custodian's fitness; places children in facilities in which it knows they will be administered powerful psychotropic medications without procedural safeguards; and blocks lawyers from representing detained children with respect to placement, administration of psychotropic medications, or release to available custodians. In doing so, Defendants have profoundly undermined the health and well-being of Plaintiffs and those similarly situated along multiple domains, as described above.

VIII.

FIRST CLAIM FOR RELIEF

[DENIAL OF DUE PROCESS: DETERMINING CUSTODIANS' FITNESS]

128.   Plaintiffs hereby incorporate by reference Paragraphs 1-127 of this Complaint as though fully set forth here.

129.   As a matter of policy and practice Defendants unreasonably and unnecessarily delay or refuse to release children to parents, close family members, and other available custodians on the ostensible grounds that such custodians are or may be unfit, and they do so without affording detained minors or their proposed custodians a timely, prompt, or meaningful opportunity to be heard regarding such custodians' fitness. Defendants' policies and practices violate the fundamental rights of Plaintiffs and those similarly situated and demonstrate a deliberate indifference to risk of harm to children.

130.   Such policy and practice individually and collectively violate paragraphs 14 and 18 of the *Flores* Settlement, TVPRA § 235(c)(2)(A), the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*., the procedural and substantive components of the Due Process Clause of the Fifth Amendment of the United States Constitution, and

1  the Freedom of Association Clause of the First Amendment of the United States
2  Constitution.

3                                     IX.

4                        SECOND CLAIM FOR RELIEF

5            [DENIAL OF DUE PROCESS: RESTRICTIVE PLACEMENT]

6        131.   Plaintiffs hereby incorporate by reference Paragraphs 1-127 of this
7  Complaint as though fully set forth here.

8        132.   As a matter of policy and practice, Defendants place Plaintiffs and those
9  similarly situated in RTCs, secure facilities, and medium-secure facilities without
10 affording them a meaningful opportunity to be heard either prior or subsequent to such
11 placement.

12       133.   Such policy and practice individually and collectively violate Definition
13 6 and paragraph 19 of the *Flores* Settlement, TVPRA § 235(c)(2)(A), the
14 Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*., and the Due Process Clause of
15 the Fifth Amendment to the United States Constitution.

16                                    X.

17                        THIRD CLAIM FOR RELIEF

18         [UNLAWFUL ADMINISTRATION OF PSYCHOTROPIC DRUGS]

19       134.   Plaintiffs hereby incorporate by reference Paragraphs 1-127 of this
20 Complaint as though fully set forth here.

21       135.   As a matter of policy and practice, Defendants administer children
22 psychotropic drugs without procedural safeguards, including: obtaining informed
23 consent or the lawful equivalent; involving a neutral decision maker in the initial
24 determination of whether to prescribe psychotropic medications to children in ORR
25 custody; and conducting a periodic review of such treatment decisions to ensure that
26 youth are not administered psychotropic medications unnecessarily or at harmful
27 dosage levels or in harmful combinations.

28       136.   Such policy and practice individually and collectively violate paragraphs

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

6, 8, 12, and 19 and Exhibit 1 of the *Flores* Settlement, the TVPRA, the Administrative Procedure Act, 5 U.S.C. §§ 501 *et seq.*, and the Due Process Clause of the Fifth Amendment to the United States Constitution.

XI.

FOURTH CLAIM FOR RELIEF

[BLOCKING LEGAL ASSISTANCE IN MATTERS RELATING TO CUSTODY, MEDICATION AND RELEASE]

137.   Plaintiffs hereby incorporate by reference Paragraphs 1-127 of this Complaint as though fully set forth here.

138.   As a matter of policy and practice, ORR blocks VIJ-funded lawyers from representing Plaintiffs and those similarly situated in legal matters and proceedings involving ORR's decisions regarding custody, release, medication, and placement.

139.   Such policy and practice individually and collectively violate paragraphs 24A and 24D, Exhibit 1 paragraph 14, and Exhibit 6 of the *Flores* Settlement, TVPRA § 235(c)(5), HSA § 279(b)(A), 8 C.F.R. §§ 287.3(c), 1003.62, 1240.10(a)(2) and 1292.1 *et seq.*, the Administrative Procedure Act, 5 U.S.C. §§ 501 *et seq.*, and the Due Process Clause of the Fifth Amendment to the United States Constitution.

XII.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court —

1.     assume jurisdiction of this cause;

2.     certify this case as a class action on behalf of the class proposed herein;

3.     enter declaratory judgment that Defendants' policies and practices as challenged herein are unlawful;

4.     issue temporary and permanent injunctions enjoining Defendants from —

(a)    denying Plaintiffs or their proposed class members due process in evaluating the fitness of parents and other available custodians;

(b)    denying Plaintiffs or their class members due process in placing them in

Complaint                                          39.

1    RTCs, medium-secure or secure facilities;

2    (c)    administering psychotropic drugs to Plaintiffs or their class members in

3    non-exigent circumstances without parental consent or the lawful

4    equivalent thereof;

5    (d)    blocking Plaintiffs or their class members from receiving legal assistance

6    pursuant to 8 U.S.C. § 1232(c)(5) in hearings in legal proceedings or

7    matters involving ORR's decisions regarding custody, placement, or

8    release;

9    5.    award the named Plaintiffs and their class members nominal damages

10   pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403

11   U.S. 388 (1971);

12   6.    award Plaintiffs costs and attorney's fees pursuant to the Equal Access to

13   Justice Act, 28 U.S.C. § 2412; and

14   7.    issue such further relief as the Court deems just and proper.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint                                    40.

Dated:  June 29, 2018

Respectfully submitted,

CARLOS HOLGUÍN
Center for Human Rights &
Constitutional Law

HOLLY COOPER
CARTER WHITE
University of California Davis School of
Law

LEECIA WELCH
NEHA DESAI
POONAM JUNEJA
CRYSTAL ADAMS
National Center for Youth Law

SUMMER WYNN
MARY KATHRYN KELLEY
JON CIESLAK
Cooley LLP

 */s/ Carlos R. Holguín*
Carlos R. Holguín

*/s/ Holly Cooper*
Holly Cooper

*/s/ Leecia Welch*
Leecia Welch

*/s/ Summer Wynn*
Summer Wynn

*Attorneys for Plaintiffs*