# Exhibit 3

Exhibit 3
Page 54

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JENNY LISETTE FLORES; *et al.*,
           Plaintiffs,

           v.

LORETTA E. LYNCH, Attorney
General of the United States; *et al.*,

           Defendants.

Case No. CV 85-4544

District Judge Dolly M. Gee

**REVISED DECLARATION OF JALLYN N. SUALOG, DEPUTY
DIRECTOR FOR CHILDREN'S PROGRAMS
OFFICE OF REFUGEE RESETTLEMENT,
ADMINISTRATION FOR CHILDREN AND FAMILIES,
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES**

I, Jallyn N. Sualog, for my declaration pursuant to 28 U.S.C. § 1746, hereby state and

depose as follows:

    1.    I am the Deputy Director and the Director of Children's Services for the

Office of Refugee Resettlement ("ORR"), a component of the Administration for Children

and Families within the United States Department of Health and Human Services

("HHS"). I am re-submitting this declaration in opposition to Plaintiffs' Motion to

Enforce Settlement in order to clarify and correct my prior declaration of May 25, 2018.

The following statements are based on my personal knowledge, information acquired by

1

**Exhibit 3
Page 55**

me in the course of performing my official duties, information contained in the records of HHS, and information supplied to me by current HHS employees.  I am located in Washington, D.C.

2.      I have held the position of Deputy Director – first in an acting capacity – since March of 2018.  I have been the Director of Children's Services since September of 2013.  I have worked at ORR since February of 2007.  I have a Masters of Arts in Clinical Psychology.  Prior to working at ORR, I worked as a mental health professional and I managed the child welfare and social services programs for Hawaii's largest non-profit organization.

3.      As the Deputy Director of ORR, I have responsibility for oversight of the Unaccompanied Alien Children (UAC) program, including operations, planning and logistics, medical service and monitoring.  As the Director for the Division of Unaccompanied Children Operations (DUCO) my responsibilities include direct oversight of all operational components of the UAC program such as intakes, program management, field operations, contracts, and grant awards.  Also, as the DUCO director, I supervise the work of the data and system development team.

**PLACEMENT OF UAC IN ORR CUSTODY, LICENSED PROGRAMS & TRANSFERS ("STEP UPS" AND "STEP DOWNS")**

4.      When an agency such as the Department of Homeland Security (DHS) transfers a UAC to ORR's care and custody, in accordance with the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), 8 U.S.C. § 1232(c)(3), ORR follows child welfare best practices to place the child in the "least

2

**Exhibit 3
Page 56**

1   restrictive setting that is in the best interest of the child," taking into account factors such

2   as the child's age and gender, as well as considerations of danger to self or others. 8

3   U.S.C. § 1232(c)(2)(A); ORR Guide to Children Entering the United States

4   Unaccompanied (ORR Guide), at Section 1.1 (Summary of Policies for Placement and

5   Transfer of Unaccompanied Alien Children in ORR Care Provider Facilities) (available at

6   https://www.acf.hhs.gov/orr/ resource/children-entering-the-united-states-unaccompanied,

7

8   last visited May 25, 2018).  ORR provides grants to numerous types of care providers,

9   including foster care providers and shelter-care group home type shelters in order to meet

10  the individual needs of UAC in ORR care and custody.  *See* ORR Guide, at Section 1.2

11

12  (ORR Standards for Placement and Transfer Decisions).  Notably, ORR facilities are <u>all</u>

13  licensed by the state in which they are located to care for minors, in their specific care

14

15  setting.

16

17      5.      The majority of care providers operate one of three types of facilities:

18  shelter-type facilities, staff secure facilities, or secure facilities. ORR Guide § 1.1.  Shelter

19  care is the most common type of placement for UAC in ORR custody, and is a residential

20  care facility in which all programs are administered on-site in the least restrictive setting.

21

22  *See* ORR Guide: Guide to terms.  Staff secure facilities maintain stricter security measures

23  than shelter care, such as a higher staff to UAC ratio for supervision and a secure

24  perimeter with a "no climb" fence.  *Id.*  These facilities have a more shelter, home-like

25

26  setting than secure detention, and do not have locked pods or cell units.  *Id.*  Secure

27

28

3

**Exhibit 3**
**Page 57**

facilities are the most restrictive level of care.  They are physically secure structures with staff able to control violent behavior and are licensed juvenile detention centers.  *Id.*

6.     It is my understanding that, in most states where ORR places UAC, such as Texas, Washington, Florida, New York, and Arizona, staff secure and non-secure shelters have the very same state license.  An exception, however, is the State of California which has different licenses for these two kinds of facilities.

7.     Under specified circumstances, ORR also places UAC with a high level of needs, such as significant mental health problems and/or violent histories, in Residential Treatment Centers (RTCs).  The ORR Guide defines a Residential Treatment Center (RTC) as a "sub-acute, time limited, interdisciplinary, psycho-educational, and therapeutic 24-hour-a-day structured program with community linkages, provided through non-coercive, coordinated, individualized care, specialized services and interventions. Residential treatment centers provide highly customized care and services to individuals following either a community based placement or more intensive intervention, with the aim of moving individuals toward a stable, less intensive level of care or independence. ORR uses a RTC at the recommendation of a psychiatrist or psychologist for an unaccompanied alien child who poses a danger to self or others and does not require inpatient hospitalization." ORR Guide, Guide to Terms.

8.     ORR policy provides that care providers may request that a UAC who has a psychiatric or psychological issue that cannot be addressed in an outpatient setting be transferred to an RTC.  ORR Guide § 1.4.6 (Residential Treatment Center Placements).

4

**Exhibit 3
Page 58**

ORR will consider transferring the UAC to an RTC if "a licensed psychologist or psychiatrist has indicated the following:

- The unaccompanied alien child has not shown reasonable progress in the alleviation of his/her mental health symptoms after a significant period of time in outpatient treatment. (Note: the amount of time within which progress should be demonstrated varies by mental health diagnosis).

- The child's behavior is a result of his/her underlying mental health symptoms and/or diagnosis and cannot be managed in an outpatient setting.

- The unaccompanied alien child requires therapeutic-based intensive supervision as a result of mental health symptoms and/or diagnosis that prevent him or her from independent participation in the daily schedule of activities.

- The child presents a continued and real risk of harm to self, others, or the community, despite the implementation of short-term clinical interventions (such as, medications, a brief psychiatric hospitalization, intensive counseling, behavioral management techniques, 24 hour supervision, supportive services or therapeutic services)."

*Id.* Therefore, ORR's policy is that it will only refer a UAC to an RTC with a written recommendation from a psychologist or psychiatrist that such a placement is clinically necessary.

9.     Restrictions at RTCs are in accordance with state law, and are necessary to ensure the protections of the special needs minors placed into those facilities.

10.     The following tables show, first, the breakdown of total admissions of UAC into shelter, staff secure, secure, and RTC programs in Fiscal Year 2017 ("admissions" counts all admissions, so it would reflect a re-counting of UAC whom ORR transferred to different placements); and, second, four snapshots indicating total UAC in ORR custody, broken down by placement level, on four specific dates.

Exhibit 3
Page 59

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

6

Exhibit 3
Page 60

| FY17 Total Admissions | | |
|---|---|---|
| Program Type | # of UAC | % of Total Admissions |
| Shelter | 45,594 | 90% |
| Secure | 197 | .38% |
| Staff Secure | 612 | 1.2% |
| RTC | 74 | .14% |
| Total Admissions* | 50,834 | 100% |

*This is the total of UAC in ORR care on the given date, all program types are not represented in the table

| Census Snapshot in time | | | | | |
|---|---|---|---|---|---|
| FY17 | Shelter | Secure | Staff Secure | RTC | Total in Care* |
| 11-Nov-16 | 6,964 | 51 | 131 | 32 | 10,765 |
| | 64.7% | 0.5% | 1.2% | .3% | 100.0% |
| 14-Feb-17 | 5,219 | 51 | 112 | 38 | 7,059 |
| | 73.9% | 0.7% | 1.6% | .54% | 100.0% |
| 12-May-17 | 1,779 | 35 | 109 | 40 | 2,407 |
| | 73.9% | 1.5% | 4.5% | 1.7% | 100.0% |
| 11-Aug-17 | 2,776 | 52 | 117 | 25 | 3,667 |
| | 75.7% | 1.4% | 3.2% | .68% | 100.0% |

*This is the total of UAC in ORR care on the given date, all program types are not represented in the table

11.     The reasons provided in ORR's Notice of Placement in a Restrictive Setting (Notice), which is provided to UAC who are placed in secure, staff-secure, or Residential Treatment Centers (RTCs), provide notice of the reasons for housing the minors in such facilities and enable judicial review in a Federal court of such decisions by ORR.  For a UAC placed in a secure provider facility, the Notice indicates that the UAC poses a danger to self or others or has been charged with having committed a criminal offense. For a UAC placed in a staff secure facility, the Notice indicates that the UAC requires close supervision but does not require placement in a secure care provider facility.  For a

7

**Exhibit 3
Page 61**

UAC placed in an RTC, the Notice indicates that, according to the clinical assessment of a licensed psychologist or psychiatrist, the UAC has a psychiatric or psychological issue that cannot be addressed in an outpatient setting.  The Notice also clearly informs UAC that ORR reviews restrictive placements at least every 30 days to assess whether such a placement is still necessary; and, if after 30 days, UAC are still in a restrictive setting they may request reconsideration of a secure or RTC placement designation.  *See also* ORR Guide § 1.4.7.  Finally, the Notice informs UAC that they may seek judicial review of ORR's placement decision in a Federal district court.

12.    In making decisions to "step up" or "step down" a UAC to a more or less restrictive placement, ORR must take into account the well-being of the other minors who would also be in care with the UAC.  When placing a UAC with known gang affiliation, for instance, ORR must consider the trauma other children who are not gang members have experienced and whether they may be intimidated by the placement of a UAC who is a gang member in the facility with them.  Such a placement would undoubtedly change the dynamics of the living environment for all the UAC in the facility where children live and eat their meals in close quarters together, and attend the same school.

8

**Exhibit 3
Page 62**

**APPROPRIATE MENTAL HEALTH INTERVENTIONS FOR UAC & PRESCRIPTION OF PSYCHOTROPIC MEDICATIONS**

13.    Consistent with Exhibit 1 of the Settlement Agreement in *Flores v. Reno*, Case CV-85-4544-RJK(px) (C.D. Cal.) (*Flores* Agreement or Agreement), ORR care providers must comply with various applicable state child welfare laws and regulations as is required by the pertinent state licensing authorities, including those that concern the administration of psychotropic medications to children.  Various state licensing authorities monitor ORR facilities located in the particular state where they are located. An example is Shiloh RTC, which is a residential treatment center in Manvel, Texas that cares for children, including UAC in ORR's custody, with a very high level of mental health needs and/or violent histories who require specialized treatment and services.  The State of Texas is responsible for monitoring  Shiloh RTC for compliance with its state child welfare laws, including those pertaining to the prescription of psychotropic medications to children placed in that facility, through regular announced and unannounced visits each year.

14.    Shiloh RTC's operations are governed by the Texas Department of Family and Protective Services (TDFPS) Licensing Division's Minimum Standards for General Residential Operations, which include policy, procedures, and practices concerning the use of psychotropic medication.  *See generally* TDFPS' Minimum Standards for General Residential Operations, available at

https://www.dfps.state.tx.ug/Child_Care/documents/Standards_and_Regulations/748_GRO.pdf (last visited May 25, 2018), at page 161 (use of psychotropic medications).  These

9

**Exhibit 3
Page 63**

standards specifically require that Texas state licensed residential facilities comply with state regulations concerning the use of psychotropic medication by children which are now found at Texas Administrative Code Chapter 748, Title 26, Health and Human Services, Part 1, Health and Human Services Commission, Subchapter L (Medication), Division 7, Use of Psychotropic Medication.

15.     Shiloh RTC's Texas state license mandates that it follow applicable Texas state law concerning informed consent pertaining to the prescription of psychotropic medications to children in state residential treatment facilities. *See* 26 Tex. Admin. Code § 748.2253 (use of psychotropic medication). It is my understanding that, if a UAC has a viable sponsor, it is Shiloh's policy to  inform the sponsor about any changes in medications prescribed for the child, including starting a new medication or increasing the dose of a current medication. Shiloh's policy is to explain the following: benefits; risks; side effects; medical consequences of refusing the medication or recommendation for the medication; and contact information for the prescribing physician.  However, Texas law permits psychiatrists to prescribe psychotropic medications to UAC at Shiloh on an emergency basis without such consent or court authorization when their extreme psychiatric symptoms render them a danger to themselves or others. *See* Tex. Fam. Code § 266.009.

16.     Shiloh RTC must follow any recommendations for corrective action from Texas' licensure process concerning the care of UAC and other children who reside and receive treatment services there.  However, ORR does not enforce Texas state licensing

10

**Exhibit 3
Page 64**

requirements and relies on the state to enforce its requirements.   To my knowledge, Texas state licensing officials have not reported any concerns during licensing inspections regarding Shiloh's compliance with state guidelines concerning the administration of psychotropic medications to UAC in ORR's custody.  Likewise, to my understanding, the State of Texas has expressed no concern during such monitoring visits with the consent procedures applied by Shiloh to UAC, nor has it provided any opinion or other basis on which it could be concluded that these procedures violate Texas state law.

17.    It is my understanding that, in addition to monthly reviews of all their medication orders, on at least a quarterly basis, it is the policy of Shiloh that psychiatrists[1] who contract with the facility to provide psychiatric care for UAC and other children review current prescriptions of psychotropic medications using the best practice guidelines set forth in Texas' Psychotropic Medication Utilization Parameters for Children and Youth in Foster Care (5th Version) (March 2016), available at https://www.dfps.state.tx.us/Child_Protection/Medical_Services/documents/reports/2016-03_Psychotropic_Medication_Utilization_Parameters_for_Foster_Children.pdf. Consistent with these guidelines, psychiatrists treating UAC at Shiloh strive to use no more than four psychotropic medications concurrently, attempt a mono-therapy regimen for identified target symptoms before prescribing a multiple-therapy regimen, and avoid

---

[1] It has come to my attention since submitting my May 25th declaration that Dr. Ruiz who prescribed a number of medications for UAC at Shiloh RTC is no longer board certified as a <u>child and adolescent</u> psychiatrist; however, he is board certified in psychiatry.

11

Exhibit 3
Page 65

high-dose pharmacotherapy.  It is Shiloh's policy to document any deviation from these standards.  Peer reviews may also be conducted to review a multiple-therapy regimen.

18.     ORR also conducts routine Federal monitoring visits and medical reviews, and regularly participates in various treatment meetings concerning UAC placed at Shiloh RTC.   However, as noted, ORR does not enforce Texas state licensing requirements and relies on the state to enforce its requirements.

**RELEASE TO SPONSORS, AND SEPARATE DANGEROUSNESS AND SUITABILITY DETERMINATIONS**

19.     ORR policy requires the timely release of UAC to qualified parents, guardians, relatives, or other adults, referred to collectively as "sponsors."  ORR Guide § 2.1 (Summary of Safe and Timely Release Process).  Consistent with the TVPRA's mandate, *see* 8 U.S.C. § 1232(c)(3)(A), ORR evaluates the ability of any potential sponsor, including the child's parent, to provide for the child's physical and mental well-being, in order to protect him or her from "smugglers, traffickers, or others who might seek to victimize or otherwise engage the child in criminal, harmful or exploitative activity."  ORR Guide § Section 2.1.  According to ORR policy:  "The process for the safe and timely release of an unaccompanied alien child from ORR custody involves many steps, including:  the identification of sponsors; the submission by a sponsor of the application for release and supporting documentation; the evaluation of the suitability of the sponsor, including verification of the sponsor's identity and relationship to the child, background checks, and in some cases home studies; and planning for post-release."  *Id.* While ORR's preference is to release a child to an appropriate sponsor who is verified to

12

**Exhibit 3
Page 66**

be the child's parent (*see* ORR Guide § 2.2.1), each of these steps apply to *all* sponsors prior to release, including parents.

20.     It is important for ORR to fully assess a sponsor (even a parent[2]) before making any release determination.  This is particularly appropriate because ORR lacks the authority to reassume care if the sponsor abuses or neglects a child after a UAC has been released from ORR custody; in that respect, ORR is very different from domestic child welfare organizations, which typically retain such authority post-placement.

21.     ORR does not consider dangerousness of a minor as a part of this suitability analysis of a potential sponsor.  Rather, after the Ninth Circuit decision in *Flores v. Sessions*, 862 F.3d 863 (9th Cir. 2017), the dangerousness determination is a separate inquiry that must be made before the minor can be released from ORR custody.  Since that time, all UAC in ORR custody may receive a *Flores* bond hearing before an immigration judge to determine whether ORR may keep them in custody on the basis of dangerousness.  *See* ORR Guide § 2.9.

22.     ORR has also implemented a separate review procedure by which the release determination for any UAC who has been previously housed in staff-secure or secure ORR facilities is reviewed by the Director of ORR for a final determination regarding dangerousness prior to release. However, there is no ORR Director review of releases if an

---

[2] As noted in the ORR Guide, ORR gives preference to a parent or legal guardian when determining release plans, but there are instances when ORR would not release an unaccompanied alien child to a parent or legal guardian, such as where there has been a court ordered termination of parental rights over the child, or where there is substantial evidence that the child would be at risk of harm if released to the parent or legal guardian. *See* ORR Guide § 2.2.1.

**Exhibit 3
Page 67**

Immigration Judge in a *Flores* Custody Redetermination hearing determines a UAC is not a danger to the community, and ORR does not appeal the decision. The ORR Director previously did review such cases, but would not deny release based on dangerousness where an immigration judge had found that the UAC was not dangerous.  This policy was recently changed to clarify that no review by the ORR Director would be conducted in such circumstances.

**POLICY CHANGES FOR RELEASE DECISIONS 2015-2017**

23.    Some of ORR's biggest recent policy changes were changes to the UAC release policy that occurred in 2015 and 2016.  In 2015, a federal indictment was brought against labor traffickers, to whom ORR had released 8 UAC.  The traffickers had been identified by both the parents and UAC in affidavits as family friends, and had been able to get through ORR's sponsor evaluation process without incident.  The traffickers, however, were not friends of these parents, and instead, forced the UAC to live in substandard conditions and work 12 hours a day, 6-7 days a week, on an egg farm.  This indictment led to extensive press coverage and prompted an investigation by the Senate Permanent Subcommittee on Investigations Committee on Homeland Security and Governmental Affairs into ORR's process of screening potential UAC sponsors and other measures to protect UAC from trafficking.  The then-Acting Assistant Secretary for the Administration for Children and Families testified in front of the committee on July 7, 2015.  The results of the investigation were released in January 2016; the Senate Subcommittee found that there were systemic deficiencies in ORR's UAC placement

14

**Exhibit 3**
**Page 68**

process and that ORR needed to improve oversight and regularize its procedures regarding release of UAC.  In response to findings from the Senate Committee, ORR made changes to its release procedures.  ORR made these changes without impact analyses or other data –based evaluations regarding these changes to ORR policy.

24.    In response to an investigation from the Senate Subcommittee, in July 2015, ORR expanded the children who received post-release services to all children being released to a non-relative sponsor.  We have since expanded post-release services so that in addition to providing such services for all children who received a home study, they are also performed for all children, 12  years and younger, released to a non-relative sponsor, as well as if the care provider determines that the child and sponsor would benefit from ongoing assistance from a community-based provider.  In March 2016, ORR required that UAC who fall into the mandatory categories in the TVPRA and other cases where a home study is conducted, must have a post-release services provider in place, prior to discharge. For non-TVPRA cases, post-release services may begin after release.  This referral can sometimes lengthen the time some UAC spend in care because ORR is unable to release a TVPRA or a home study case without post-release services in place.  This is the case where there are waitlists for both home studies and post-release services.

25.    In March 2016, ORR also amended its policy regarding the use of home studies, in order to prevent placing children with dangerous sponsors.  Home studies investigate a potential UAC sponsor's ability to ensure a child's safety and well-being. Instituted about halfway through fiscal year 2016, the change emphasized the need for

15

**Exhibit 3
Page 69**

discretionary home studies, whereby a Case Manager and Case Coordinator may recommend a home study may be conducted, even if not required by the TVPRA. *See* ORR Guide § 2.4.2. Following this change, the number of home studies increased numerically and/or proportionally to the total number of UAC.[3] In FY2015, ORR conducted 1,895 home studies and had 33,726 UAC referred to it (5.6%); in FY2016, ORR conducted 3,540 home studies and had 59,170 referrals (5.98%); and in FY2017, ORR conducted 3,173 home studies and had 40,810 referrals (7.77%). *See* ORR: Facts and Data, available at https://www.acf.hhs.gov/orr/about/ucs/facts-and-data (last visited May 25, 2018). When these changes to home studies were first made, there was a backlog for home studies, which increased the length of care. The backlog has since been resolved, but a home study that is referred and accepted immediately can take 30 days to complete. Further, the additional home studies necessarily required additional post-release services, because any UAC who receives a home study must also receive post-release services.

26.     In April 2016, ORR clarified the criteria for sponsor background checks. *See* ORR Guide § 2.5.1. In January 2016, ORR required all individuals undergoing a public records check to also undergo a sex offender registry check for all adult household members living with sponsors. In March 2015, ORR added a requirement for category 3 sponsors to undergo Child Abuse and Neglect checks. The time it took to schedule

---

[3] In certain instances, a UAC may require multiple home studies. For example, where an initial home study identifies problems, the proposed sponsor may attempt to remedy the issues or another sponsor may be identified, and a subsequent home study would then be ordered.

Exhibit 3
Page 70

1  fingerprints, get the results, as well as getting child abuse and neglect information from

2  the states, lengthened the amount of time UAC spent in care.

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

17

**Exhibit 3
Page 71**

**DATA ON LENGTH OF CARE AND DISCHARGE**

27.     In my role as Director of DUCO, I supervise the data analysis team.  The data analysis team uses information inserted into the ORR database called the UCPortal and provides reports on such information as length of care, types of discharges, etc. The information in this section was provided to me by my data team.

28.     My data team was asked to compile data on UAC currently and previously in ORR care.  ORR has a database (contained in the UCPortal).  This database is the only database that ORR has and is where Headquarters (HQ) staff (to include intakes, Federal Field Specialists (FFS), Contractor Field Staff (CFS), UC Medical team), U.S. Customs and Border Protection (CBP), Home Study (HS)/Post-Release Services (PRS) providers and ORR Grantee staff enter UAC data, such as the date the UAC enters care, their placements, if they have an identified sponsor, their data of discharge and reason for discharge.  The UC Portal is used in the regular course by ORR staff in performing their duties.  The data team has full access to the data that is entered into the database and can use it to compile information.

29.     The data team was asked to compile certain data regarding the length of care for UAC.  The length of care for a UAC measure the entire period of time a child spends in ORR care.  The length of care calculation follows the child who enters ORR in a given year, even if the child exits care in the next fiscal year.  Thus, if a child entered ORR care on September 15, 2016, and exited ORR care on October 15, 2016 (the next fiscal year)[4],

_____

[4] ORR's fiscal year runs from October 1 to September 30.

18

**Exhibit 3
Page 72**

the average length of care for that child is counted for the month and fiscal year the child was discharged in; in this case October of FY2016.  Length of care can also be calculated for UAC that have not been released from ORR care.  In that case a distinct point in time is used to calculate the length of care, for example a specific date or as of the date the data is compiled.

30.     My data team determined the average length of care for all UAC discharged from ORR care in FY2015, FY2016, FY2017, and the first seven months of FY2018, for all discharge types and from all shelter types, *i.e.* shelter, transitional foster care, secure care etc.  The average length of care for FY2015 was 37 days.  The average length of care for FY2016 was 40 days.[5]  The average length of care for FY2017 was 51 days.  The average length of care for the first 7 months of FY2018 is 57 days.

31.     These average length of care numbers differ from the average length of stay numbers on ORR's website.  *See* Office of Refugee Resettlement Facts and Data General Statistics, available at https://www.acf.hhs.gov/orr/about/ucs/facts-and-data (last visited May 25, 2018).  As the website indicates, the average length of stay refers to the amount of time a child spends in a shelter care facility or in transitional foster care.  *See id.* Further, it only applies to the final placement of UAC before discharge.  Thus, although uncommon, if a child is transferred between shelters, the length of stay will only show the time spent in the final shelter before discharge.  The length of care, in contrast, refers to

---

[5] In his June 22, 2017 congressional testimony, Scott Lloyd stated that the length of care for FY2016 was 45 days.  The date for this figure was in error.  It should have been the length of care for FY2017 until that point.

19

Exhibit 3
Page 73

the entire period a child spends in ORR care, including time spent in transitional foster care, shelter care, staff secure care, or secure facilities, as well as long-term foster care. UAC placed in long-term foster care tend to cause average length of care numbers to increase disproportionately because they often do not have a viable sponsor in the United States and are placed in foster care for typically long periods of time without the option of release.

32.     Between FY2016 and FY2018, there have also been changes in the makeup of categories of sponsors identified by ORR.  ORR divides sponsors into 4 categories, with different background check requirements for each category.  Category 1 is a parent or legal guardian.  Category 2 is an immediate relative, such as a brother, sister, aunt, uncle, grandparent or first cousin.  Category 3 is a distant or unverified relative or unrelated adult.  Category 4 is for UAC who have no sponsor. *See generally* ORR Guide § 2.

33.     Between FY2016 and FY2018, ORR has seen a decrease in the percentage of sponsors who are category 1, parents or legal guardians, and a steady increase in the number of category 2 and category 3 sponsors.

34.     In FY2016, ORR released a total of 55,524 UAC from care.  It released 95% of them, or 52,547 UAC, to individual sponsors.[6]  Of those, 55% of the sponsors were category 1, 36% percent of the sponsors were category 2, and 9% of the sponsors were in category 3.

---

[6] ORR released 95% of UAC who entered custody in FY2016, but as explained above, some of them may have been released in subsequent years.

20

**Exhibit 3
Page 74**

35.     In FY2017, ORR released a total of 45,493 UAC from care.  It released 93% of them, 42,497 UAC, to individual sponsors.  Of those, 49% of the sponsors were in category 1, 41% were in category 2, and 10% were in category 3.

36.     From October through April of FY2018, ORR has released a total of 21,906 UAC from its care.  As of April 30, 2018, ORR has released 90% of them, 19,675 UAC, to individual sponsors.  Of those, 42% of sponsors were in category 1, 47% were in category 2, and 11% were in category 3.

37.     Between FY2016 and FY2018, there were variations in the length of care for those UAC reunified with an individual (released to sponsor) depending on the category of sponsor.

38.     In FY2016, the average length of care for a UAC released to a category 1 sponsor was 27 days; for a category 2 sponsor, it was 42 days; and for a category 3 sponsor, it was 75 days.

39.     In FY2017, the average length of care for a UAC released to a category 1, sponsor was 33 days; for a category 2 sponsor, it was 52 days; and for a category 3 sponsor, it was 84 days.

40.     In FY2018, the average length of care for UAC released to a category 1 sponsor was 36 days; for a category 2 sponsor, it was 55 days; and for a category 3 sponsor, it was 82 days.

41.     My data team was also asked to determine the length of care of all UAC who were or had ever been in secure or staff secure facilities on three dates in FY2016,

21

**Exhibit 3**
**Page 75**

1   FY2017, and FY2018.  The dates chosen were February 1, 2016, February 1, 2017, and

2   February 1, 2018, for these UAC.

3
4       42.    On February 1, 2016, out of the 5,082 UAC in ORR care on that date, there

5   were 196 UAC who on that date were in secure or staff secure facilities or who had ever

6   been in secure or staff secure facilities.  The average length of care for those UAC was

7
8   254 days as of February 1, 2016.

9       43.    Of those 196 UAC, fifty-one (51), or 26%, had been in care for 90 days or

10  fewer.  Fifty-two (52), or 27%, had been in care between 91 and 180 days.  Twenty-three

11
12  (23), or 12%, had been in care between 181 and 270 days.  Nineteen (19), or 10%, had

13  been in care between 271 days and a year.  Fifty-one (51), or 26%, had been in care for

14  over a year.[7]  The UAC who had been in care the longest as of February 1, 2017, had been

15
16  in care for 949 days.

17      44.    On February 1, 2017, of the 8,372 UAC in ORR care that day, there were 232

18  UAC who on that date were in secure or staff secure facilities or who had ever been in

19
20  secure or staff secure care.  The average length of care for those UAC was 238 days as of

21  February 1, 2017.

22      45.    Of those 232 UAC, seventy (70), or 30%, had been in care 90 days or fewer.

23
24  Fifty-six (56), or 24%, had been in care between 91 days and 180 days.  Forty (40), or

25  17%, had been in care between 181 days and 270 days.  Twenty-one (21), or 9%, had been

26  in care between 271 days and a year.  Forty-five (45), or 19%, had been in care a year or

27

28  _____

[7] Because of rounding of the percentages, they do not add up to 100%.

22

**Exhibit 3**
**Page 76**

longer.[8]  The UAC who had been in care the longest as of February 1, 2017, had been in care for 1,174 days.

46.     On February 1, 2018, of the total of 7,796 UAC in ORR care that day, there were 251 UAC who on that date were in secure or staff secure care or had previously been in secure or staff secure care.  The average length of care was 213 days as of February 1, 2018.

47.     Of those 251 UAC, seventy-eight (78), or 31%, had been in care 90 days or fewer.  Twenty-three (71), or 28%, had been in care between 91 days and 180 days.  Forty-two (42), or 17%, had been in care between 181 days and 270 days.  Fourteen (14), or 6%, had been in care between 271 days and a year.  Forty-six (46), or 18%, had been in care for over a year.  The UAC who had been in care the longest as of February 1, 2018, had been in care for 1,373 days.

---

[8] Because of the rounding of the percentages, they do not add up to 100%.

23

Exhibit 3
Page 77

48.     The data contained in paragraphs 42 through 47 are depicted in the following bar chart:



Length of care of UAC who are/were in
Secure/Staff-Secure Care in % terms
(as of Feb. 1 of a specified year)

I, Jallyn N. Sualog, declare under penalty of perjury that the foregoing is true and correct.  Executed on July 26, 2018.

Jallyn Sualog

24

Exhibit 3
Page 78