# Exhibit 22

**REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL**

Exhibit 22
Page 244

DECLARACIÓN DE ▮▮▮▮

Yo, ▮▮▮▮, declaro y digo lo siguiente:

1. Hago la presente de conocimiento personal. Si me llaman de testigo en el litigio actual, declararía competentemente a lo siguiente.

2. Tengo 28 años de edad. Soy la hermana de ▮▮▮▮, que actualmente se encuentra detenido por razones migratorias en Shiloh, en el estado de Texas. Nunca me han arrestado ni he tenido problemas con la policía jamás, ni en Guatemala ni en los EE.UU.

3. Desde 2017, estoy viviendo yo con mi hermano ▮▮▮▮ y mi niña de un año y seis meses, ▮▮▮▮, en Los Ángeles, California. Rento una recamera a ▮▮▮▮, una mujer adulta, y a su hijo de siete años, ▮▮▮▮. Actualmente, nosotros somos los cinco que vivimos en la casa, nadie más.

4. En Guatemala vivíamos juntos yo y mi hermano ▮▮▮▮, desde cuando nació él, hasta que 2006, cuando me casé. Luego vivimos apartes por los siguientes seis años. Me separaré de mi marido, y volví a vivir con ▮▮▮▮. Vivimos juntos hasta 2017, cuando vine a los Estados Unidos.

5. Nuestra mamá murió cuando ▮▮▮▮ tenía unos dos años. Su papá lo abandonó a ▮▮▮▮ hace muchos años. No tengo idea dónde ande ni como comunicarme con él, ni siquiera si está vivo. Cuando falleció nuestra mamá, mi tía ▮▮▮▮ y yo cuidábamos a ▮▮▮▮.

6. El 10 de febrero de 2018, me enteré que la inmigración había arrestado a ▮▮▮▮ en Arizona. El día siguiente me llamó Jazmin para dicerme que ella iba a ser la trabajadora del caso de ▮▮▮▮. Le pedí que me dieran custodio de ▮▮▮▮. Ella me pidió varios papeles: actas de nacimiento, acta de defunción de mi mamá, y exámenes de escuela de ▮▮▮▮. En seguida, pedí a mi hermano en Guatemala que me los mandara todos. Me llegaron los documentos, y luego luego se los envié a Jazmin por correo electrónico.

Exhibit 22
Page 245

7. Pasó como un mes y medio. Nadie me pidieron nada más. Al contrario, me aseguraron que todo estaba en orden, y que seguramente iban a entregarme a ▮; lo mismo le decían a ▮. Sin embargo, no lo liberaron.

8. Que yo sepa, al principio ▮ estuvo más o menos bien en la detención. Sin embargo, en una semana la trabajadora me llamó para decirme que habían trasladado a ▮ a un hospital porque, según ella, ▮ quería lastimarse. Tengo entendido que ▮ le contó a la trabajadora social que quería suicidarse en Guatemala, y que quería lastimarse en la detención. Concedo que no vivímos juntos nosotors por unos seis años, pero que yo sepa ▮ nunca tuvo problemas psicológicas tan graves in Guatemala. Creo yo que la detención y separación de su familia contribuyó a cualquiera crisis en que ▮ entró de detenido.

9. Durante la semana en el hospital, no pude comuncarme con ▮, porque no le daban el teléfono. Al fin recibí una llamada del hospital, y me la pasaron a ▮. Me contó él que ya no quería estar detenido. Lo regresaron al albergue en Arizona.

10. A fines de marzo llegó una trabajadora social para realizar un estudio de mi casa. La trabajadora, Brenda, se quedó unas tres horas. Cuando llegó Brenda, un hermano de ▮, ▮, estaba de visita. Me preguntó Brenda si ▮ viví en la casa, y le avisé que no, que ▮ estaba de visita. Al terminar la visita, no me informó Brenda de ningún problema con mi casa. Solo me dijo que todos en la casa tendríamos que presentarnos para dar huellas digitales, incluso a ▮. Le repité que ▮ no más estaba de visita, pero Brenda dijo que él también tendría que dar huellas. A fin de cuentas, todos los adultos de mi casa nos presentamos para huellas, incluso ▮, pero como no vive en mi casa y no tiene porque hacerlo, ▮, se rehusó presentarse.

11. Como en una semana, Brenda volvió a la casa otra vez. Según, ella ▮ tiene muchos problemas psicológicos. Le contesté que puede ser, pero de

todos modos que la detención y la separación de su familia no le ayudan, que no más le están causando aún más ansiedad y desesperación. Le aseguré que buscaría ayuda para ▮ si me lo entregara y me da cuenta que anda en crisis.

12. En otra semana, me avisó mi hermano ▮ que Brenda había llegado a la casa otra vez. Yo no estaba, así que, no tengo conocimiento personal de lo que sucedió en ese entonces. El 7 de julio del año actual, la Sra. Saco me informó que según mi expediente ▮ estaba cuando llegó Brenda, y que él intentó esconderse. Fue la primera vez que me enteré de esa historia.

13. Como a un mes, me avisó la trabajadora social que me habían negado el custodio de ▮ porque ▮ no se había presentado para huellas. Me dijo que ya no se puede hacer nada, que la negación fue decisión final. No me concedieron ninguna oportunidad de apelar la negación, o pedir que se la cambiara. Nunca me dieron nada por escrito explicándome la razón por haberme negado el custodio de mi hermanito.

14. Al regresar del hospital, ▮ se quedó en el albergue como un mes y medio más, hasta que me dijeron que no había espacio para ▮ en el albergue, y que lo iban a cambiar para otro. En mayo lo mandaron a Shiloh. No me dijo nadie que Shiloh es centro psiquiátrico, y hasta la fecha nadie del gobierno me lo ha dicho. Nadie de Shiloh ni del gobierno me informó que le están dando drogas psicotrópicas a ▮, mucho menos me pidieron permiso para darselos. ▮ ya tiene casi dos meses en Shiloh, y no tenemos idea de cuando lo vayan a liberar.

15. Repito que ▮ no vive en mi casa. Que sepa yo, no haya llegado a mi casa desde abril del año presente. He hecho todo lo posible para obtener pruebas de que no vive con nostoros, pero ▮ no quiere problemas.

16. La Sra. Saco me ha explicado que uno no tiene que estar loco para beneficiarse de atención de salud mental. Su explicación fue muy diferente de lo que me dijo Brenda. Ahora entiendo que ▮ ha sufrido traumas en Guatemala, y que la detención migratoria ha lastimado a ▮ aún más. Estoy de acuerdo en

obtener ayuda profesional para ▬ en cuanto su ansiedad, desesperación, depresión o cualquier otro problema psicológico que tenga él. La Dra. Amy Cohen me dice que ella cuenta con recursos de salud mental en la comunidad, y ella me dirigirá a ellos.

Declaro bajo protesta de decir la verdad y pena de perjurio que toda la información que aquí he proporcionado es correcta y completa, consciente de las consecuencias legales de declarar con falsedad ante la autoridad.

Hecho el día 19 de julio 2018, en Los Ángeles, California.



///

I, Carlos Holguín, declare and say as follows:

1. I speak English and Spanish fluently.

2. The following is a true and correct translation of the annexed Declaration of ▮.

\* \* \* \* \* \*

DECLARATION OF ▮

I, ▮, declare and say as follows:

1. I execute the present [declaration] from personal knowledge. If I am called as a witness in the present case, I would testify competently to the following.

2. I am 28 years old. I am the sister of ▮, who is presently detained because of immigration reasons at Shiloh, in the state of Texas. I have never been arrested nor have I ever had problems with the police, either in Guatemala or in the United States.

3. Since 2017, I have lived with my brother ▮ and my daughter, ▮, one year and six months old, in Los Angeles, California. I rent a bedroom to ▮, an adult woman, and her seven-year-old son, ▮. Presently, only he file of us live in the house, no one else.

4. In Guatemala , my brother ▮ and I lived together from the time ▮ was born until 2006, when I married. We lived apart for the next six years. I separated from my husband, and I went back to living with ▮. We lived together until 2017, when I came to the United States.

5. Our mother died when ▮ was about two years old. His father abandoned ▮ many years ago. I have no idea where he is or how to communicate with him, nor even if he is still alive. When our mother passed away, my aunt ▮ and I took care of ▮.

6. On February 10, 2018, I learned that the immigration had arrested ▮ in Arizona. The next day Jazmin called to tell me that she was going to be

case worker. I asked her to give me ▮ custody. She asked me for various papers: birth certificates, my mother's death certificate and ▮ school records. I promptly asked my brother in Guatemala to send me everything. The documents arrived, and I promptly sent them to Jazmin by email.

7. About a month and a half went by. Nobody asked me for anything more. To the contrary, they assured me that everything was in order, and that they were surely going to give me ▮; they told ▮ the same thing. Nonetheless, they did not release him.

8. As far as I know, at the beginning ▮ was more or less alright being detained. Nonetheless, in about a week the worker called to tell me they had sent ▮ to the hospital because, according to her, ▮ wanted to hurt himself. My understanding is that ▮ told the social worker that he had wanted to commit suicide in Guatemala, and that he wanted to hurt himself in detention. I concede that we did not live together for some six years, but as far as I know ▮ never had serious psychological problems in Guatemala. I believe that detention and separation from his family have contributed to whatever crisis ▮ suffered while detained.

9. During the week he was in the hospital, I had no communication with ▮, because they wouldn't let him use the telephone. At last I received a call from the hospital, and they passed the phone to ▮. He told me he didn't want to be detained. They sent him back to the shelter in Arizona.

10. At the end of March a social worker came to perform a home study. The worker, Brenda, stayed for about three hours. When Brenda arrived, ▮ brother, ▮, was visiting. Brenda asked me if ▮ lived in the house, and I advised her that he did not. When she finished the visit, Brenda didn't tell me about any problem with my home. She only told me that everyone in the house would have to appear for fingerprinting, including ▮. I repeated that ▮ was only visiting, but Brenda said he, too, would have to give fingerprints. In the

Exhibit 22
Page 250

end, all the adults in my home appeared for fingerprinting, including ▇, but inasmuch as he doesn't live in my house and doesn't have any reason to do so, ▇ refused to appear [for fingerprinting].

11. In about a week, Brenda returned to the house. According to her, ▇ has many psychological problems. I told her that could be, but that in any event detention and separation from his family was causing him even more anxiety and desperation. I assured her that I if they gave me ▇ I would look for help for him should appear to be experiencing a crisis.

12. About a week later, my brother ▇ told me that Brenda had come to the house once again. I was not a home, and I therefore have no personal knowledge of what happened at that time. On July 7 of this year, Ms. Saco told me that according to my file ▇ was there when Brenda arrived, and that he tried to hide. This was the first time I had heard this story.

13. About a month later, the social worker told me that they had denied me ▇ custody because ▇ hadn't appeared for fingerprinting. She told me nothing could be done, that the denial was a final decision. They didn't give me any opportunity to appeal the denial, or to ask that the decision be changed. She never gave me anything in writing explaining the reason for having denied me ▇ custody.

14. After arriving from the hospital, ▇ remained in the shelter about another month and a half, until they told me there was no room for ▇ at the shelter, and that they were going to send him to another shelter. In May they sent him to Shiloh. No one told me that Shiloh is a psychiatric facility, and to this day no one from the government has so advised me. Nobody from Shiloh or the government advised me that they are giving ▇ psychotropic drugs. ▇ has now been detained almost two months at Shiloh, and we have no idea when they will release him.

15. I repeat that ▮ does not live in my home. As far as I know, he has not come to my house since April of this year. I have done everything possible to obtain proof that he does not live with us, but ▮ doesn't want problems.

16. Ms. Saco explained to me that someone does not have to be crazy to benefit from mental health care. Her explanation was very different from what Brenda told me. Now I understand that ▮ suffered traumas in Guatemala, and that immigration detention has hurt him even more. I am in agreement with obtaining professional help for ▮ regarding his anxiety, desperation, depression, or whatever other psychological problems he may have. Dr. Amy Cohen tells me that she has at her disposal mental health services in our community, and she will direct me to those.

I declare under obligation to tell the truth and penalty of perjury that all the information I have provided here is correct and complete, being aware of the legal consequences of declaring falsely before authority.

Done this 19th day of July, 2018, at Los Angeles, California.

/s/ _____

▮

\* \* \* \* \* \* \* \*

I declare under penalty of perjury that the foregoing is true and correct. Executed this 30th day of July, 2018, at Santa Clarita, California.



Carlos Holguin

- 8 -

Exhibit 22
Page 252