CARLOS R. HOLGUÍN (Cal. Bar No. 90754)
Center for Human Rights & Constitutional Law
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.org

*Listing continues on next page*

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| LUCAS R., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ALEX AZAR, Secretary of U.S. Department of Health and Human Services; *et al.*,<br><br>Defendants. | No. CV 2:18-CV-05741-DMG-PLA<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION<br><br>Hearing:  August 31, 2018<br>Time:      9:30 a.m.<br>Room:     1st St. Courthouse<br>             Courtroom 8C |

/ / /

*Counsel for Plaintiffs, continued*

HOLLY S. COOPER (Cal. Bar No. 197626)
Co-Director, Immigration Law Clinic
CARTER C. WHITE (Cal. Bar No. 164149)
Director, Civil Rights Clinic
University of California Davis School of Law
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu
          ccwhite@ucdavis.edu

LEECIA WELCH (Cal. Bar No. 208741)
NEHA DESAI (Cal. RLSA Bar No. 803161)
POONAM JUNEJA (Cal. Bar No. 300848)
National Center for Youth Law
405 14th Street, 15th Floor
Oakland, CA 94612
Telephone: (510) 835-8098
Email: lwelch@youthlaw.org
          ndesai@youthlaw.org
          pjuneja@youthlaw.org

CRYSTAL ADAMS (Cal. Bar No. 308638)
National Center for Youth Law
1313 L St. NW, Suite 130
Washington, DC 20005
Telephone: (202) 868-4785
Email: cadams@youthlaw.org

TABLE OF CONTENTS

I. Introduction ................................................................................1

II. Statement of Facts.........................................................................3

III. Legal Standard for issuance of temporary injunction ....................5

IV. ORR's detaining Lucas indefinitely is inflicting irreparable injury on a vulnerable child. ...........................................................................5

    A. Madelyn is a fit custodian for Lucas. ........................................ 5

    B. Lucas is suffering irreparably in ORR detention. .................... 11

V. Lucas is more than likely to succeed on the merits of his claim that ORR's continuing to detain him is unlawful. .............................16

    A. ORR's detaining Lucas breaches the *Flores* Settlement. ......... 17

    B. ORR's refusing to release Lucas violates the TVPRA....................... 17

    C. Lucas's indefinite detention without due process violates the First and Fifth Amendments. ......................................................... 18

VI. The equities tip sharply in Lucas's favor....................................22

VII. Reuniting Lucas with his family is in the public interest. ............23

VIII. Conclusion................................................................................23

TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) ........................................... 9

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ......................... 5

*Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531 (1987) ......................................21

*Arc of Cal. v. Douglas*, 757 F.3d 975 (9th Cir. 2014)...........................................5, 21

*Arizona Dream Act Coalition v. Brewer*, 757 F.3d1053 (9th Cir. 2014)...................16

*Beltran v. Cardall*, 222 F. Supp. 3d 476 (E.D. Va. 2016)........................................22

*Flores v. Johnson*, 212 F. Supp. 3d 864 (C.D. Cal. 2015) .......................................17

*Flores v. Lynch,* 828 F.3d 898 (9th Cir. 2016) ...................................................... 2

*Flores v. Sessions*, 862 F.3d 863 (9th Cir. 2017)...................................................18

*Flores v. Sessions*, No. CV 85-4544 DMG (C.D. Cal.) ............................................ 1

*In re Gault*, 387 U.S. 1, 34, 87 S. Ct. 1428; 18 L. Ed. 2d 527 (1967) .......................21

*Int'l Refugee Assistance Project v. Trump*, _ F.3d _, 2018 WL 894413 (4th Cir. Feb. 15, 2018)..........................................................................................18

*M.D. v. Abbott*, 152 F. Supp. 3d 684 (S.D. Tex. 2015)...........................................10

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ...............................................................19

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012)..........................................16, 23

*Mission Power Eng'g Co. v. Continental Cas. Co.*, 883 F. Supp. 488, 492 (C.D. Cal. 1995)............................................................................................ 5

*Reno v. Flores*, 507 U.S. 292 (1993) .........................................................................19

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) .............................................23

*Sammartano v. First Judicial District Court*, 303 F.3d 959 (9th Cir. 2002) .............23

*Schad v. Arizona*, 501 U.S. 624 (1991) ....................................................21

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415 (9th Cir. 1984) .......... 5

*United States v. Bogle*, 855 F.2d 707 (11th Cir. 1988) ..............................................18

*V.W. by & through Williams v. Conway*, 236 F. Supp. 3d 554 (N.D.N.Y. 2017).......15

*Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir. 2005) ...........................................16

*Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) ................................................ 5

*Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................ 5

**Statutes and Regulations**

8 U.S.C. § § 1232(c)(2)(A) ........................................................................10

8 U.S.C. § 1232 .......................................................................................... 2

8 U.S.C. § 1232(c)(2)(A) ...........................................................................18

William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008,
   Pub. L. 110-457, 122 Stat. 5044 ........................................................... 2

**Other Authorities**

Barry Holman & Jason Ziedenberg, *The Dangers of Detention: The Impact of
   Incarcerating Youth in Detention and Other Secure Facilities* (Justice Policy
   Institute, ed.) ........................................................................................11

Institute of Judicial Administration & American Bar Association, *Juvenile Justice
   Standards Annotated: A Balanced Approach* (1996) ..............................20

National Council of Juvenile and Family Court Judges, *Resource Guidelines:
   Improving Court Practice in Child Abuse & Neglect Cases* 30 (1995)..................20

## I.   INTRODUCTION

Plaintiff Lucas R. is a child from Guatemala whom Defendant Office of Refugee Resettlement ("ORR") has detained and separated from his family since February 2018— over 170 days now. Plaintiffs seek a preliminary injunction requiring his immediate release. As will be seen, there is no substantial doubt that ORR's continuing detention of Lucas will cause him irreparable injury, nor is there any substantial question that Lucas will likely prevail on his claim that such detention is unlawful.

Shortly after Lucas surrendered to immigration authorities, they transferred him to ORR's custody. His sister and Next Friend herein, Madelyn R., promptly asked ORR to release Lucas to her.

ORR declared Madelyn unfit to receive custody of her brother for two reasons: First, because an adult male who ORR alleged was living in Madelyn's home failed to appear for fingerprinting; second, because it suspected Lucas would need mental health care following release, which Madelyn might be reluctant to provide.

On July 7, MSW Cecilia Saco, a social worker with over three decades' experience vetting custodians for dependent children for the Los Angeles County Department of Children and Family Service ("DCFS"), evaluated Madelyn R. and her household. Ms. Saco found no reason to think that Madelyn would harm or neglect Lucas were he released to her custody and that ORR's contrary view was unsound from a child welfare perspective in multiple respects.

On July 12, 2018, Dr. Amy Cohen, a respected child psychiatrist, evaluated Lucas at ORR's Shiloh psychiatric facility. Dr. Cohen found that Lucas's continuing detention at Shiloh and prolonged separation from his family are profoundly and irreparably injuring him. Dr. Cohen concludes that Lucas would be far better off in Madelyn's care, and that indeed, continuing to detain Lucas at the Shiloh RTC threatens to cause him catastrophic injury.

Moreover, Lucas will succeed on the merits of his claims for relief. First, Lucas is a member of the class protected by the settlement in *Flores v. Sessions*, No. CV 85-4544 DMG (C.D. Cal.), Plaintiffs' Exhibits in Support of Class Certification, August 2, 2018 ("CCX"), Exhibit 1, Dkt. No. 25-3  ("*Flores* Settlement"). The *Flores* Settlement requires ORR to pursue a "general policy favoring release" to reputable adult family members. The *Flores* Settlement accordingly provides: "Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay, . . . [to] an adult relative (brother, sister, aunt, uncle, or grandparent). . ." *Id*. ¶ 14.

Second, in 2008 Congress "partially codified" the *Flores* Settlement. *Flores v. Lynch,* 828 F.3d 898, 904 (9th Cir. 2016). Like the *Flores* Settlement, § 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. 110-457, 122 Stat. 5044, *codified at* 8 U.S.C. § 1232 ("TVPRA"), requires ORR to "promptly" place detained a minor "in the least restrictive setting that is in the best interest of the child," generally, with "a suitable family member . . . ." Only if  "a 'suitable family member' or other guardian is not available to take custody of a minor," may ORR continue to detain him or her "in a specialized juvenile program or facility." *Flores v. Sessions*, 862 F.3d 863, 871 (9th Cir. 2017).

Finally, ORR's refusing to release Lucas impairs his fundamental constitutional rights to personal liberty and family integrity without the slightest procedural fairness or transparency.

ORR has now detained Lucas for nearly half a year on vague unsubstantiated allegations regarding Madelyn's fitness. That is more than long enough. Should ORR doubt Madelyn's ability to care for Lucas, it is free to refer its concerns to local child protection officials. Continuing to visit irreparable injury on him is simply not an acceptable alternative.

## II.   STATEMENT OF FACTS

In February 2018, ORR took Lucas R. into its custody and placed him at the Hacienda del Sol facility ("HdS") in Youngtown, Arizona. HdS Admission Record, May 20, 2018, Exhibit 33, Plaintiffs' Exhibits in Support of Motion for Preliminary Injunction, filed herewith ("PX"), at 3. When Madelyn learned of Lucas's arrest, she promptly asked ORR to release Lucas to her. Decl. of Madelyn R., July 20, 2018, CCX  22 ¶ 6, Dkt. No. 25-25 ("Madelyn R.").

Madelyn promptly gave ORR all the documents it requested. *Id*. Over the next month or so, ORR led Madelyn and Lucas to believe it would soon release the boy to Madelyn's care, but it did not. *Id*. ¶ 7.

Shortly after Lucas arrived at HdS, medical staff evaluated him and failed to identify any mental health issues. HdS Response Report, Feb. 15, 2018, PX at 88.

On February 20, 2018, however, ORR hospitalized Lucas, purportedly due to suicidal ideation. Banner Health ER Report, Feb. 20, 2018, PX 35 at 6 ("ER Report"). According to the emergency room report, Lucas had "[suicidal ideation] x8 days since being moved to southwest key . . . 'and being removed from family.'" *Id*. It further states that Lucas "denie[d] [suicidal ideation] at this time [and] just states he is sad and depressed being away from his family in Guatemala." *Id*.[1]

Upon being returned to HdS, a nurse practitioner promptly placed Lucas on sertraline (brand name: Zoloft), a psychotropic drug. Decl. of Lucas R., June 8, 2018, CCX 21 ¶ 4, Dkt. No. 25-24 ("Lucas R."); Psychiatric Report (excerpt), March 6, 2018, PX at 4. Among sertraline's known side-effects: suicidal ideation, agitation, hallucinations, fever, sweating, confusion, severe muscle stiffness or twitching, loss of coordination, nausea, vomiting, and diarrhea. *See Sertraline*, U.S. NATIONAL

---

[1] Lucas has consistently told ORR that he wishes to join his family "as soon as possible." *E.g.*, Madelyn ¶ 9; Decl. of Luca's Brother, July 19, 2018. PX at 14-17, ¶ 7 ("Lucas's Brother"). His pleas have fallen on deaf ears.

1  LIBRARY OF MEDICINE, MEDICINE PLUS,

2  https://medlineplus.gov/druginfo/meds/a697048.html (last visited July 19, 2018).

3      The medication caused Lucas stomach pain, and he periodically resisted taking

4  it. Lucas ¶ 4. No one from the shelter or ORR asked Madelyn for her consent to

5  administer Lucas psychotropic drugs. Madelyn ¶ 14.

6      On or about March 15, 2018, ORR arranged a home study to assess Madelyn's

7  suitability as a custodian for Lucas. HdS Response Report, March 15, 2018, PX at 19.

8  On April 12, 2018, ORR's home investigator recommended against releasing Lucas

9  to Madelyn. ORR-DUCS Home Study Report, Apr. 12, 2018, PX at 21-64 ("Home

10  Study").

11      According to the home study report, Madelyn was unfit for two reasons: First,

12  the investigator suspected an adult male, one Evelio—the brother of Madelyn's

13  renter—might be living in Madelyn's home, and he had not appeared for

14  fingerprinting, *id*. at 42; second, the investigator thought Madelyn might fail to

15  provide Lucas mental health care following release. *Id*. at 62.

16      Madelyn describes how she learned that ORR had declared her unfit to care for

17  her brother:

18      [T]he social worker told me that they had denied me [Lucas's] custody because

19      Evelio hadn't appeared for fingerprinting. She told me nothing could be done,

20      that the denial was a final decision. They didn't give me any opportunity to

21      appeal the denial, or to ask that the decision be changed. She never gave me

22      anything in writing explaining the reason for having denied me [Lucas's]

23      custody.

24  Madelyn R. ¶ 13.

25      On May 21, 2018, ORR transferred Lucas to the Shiloh RTC, Transfer Request

26  & Tracking Form, May 21, 2018, PX at 90, where it continues to confine him to this

27  day.

28

4

### III.   LEGAL STANDARD FOR ISSUANCE OF TEMPORARY INJUNCTION

Fed. R. Civ. Proc. 65(a) & (b) authorize courts to issue temporary restraining orders and preliminary injunctions. The standards for issuing a temporary restraining order and a preliminary injunction are "substantially identical." *See, e.g., Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017). Both remedies are granted to preserve the status quo and prevent irreparable injury before judgment. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1423 (9th Cir. 1984).

To obtain preliminary relief, Lucas must establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Courts evaluate these factors on a "sliding scale." *Arc of Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014) (internal quotations and citation omitted). A "stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). But where, as here, the likelihood of grave irreparable injury is palpable and the balance of equities tips sharply in Plaintiff's favor, "the moving party [need only] demonstrate a fair chance of success on the merits or questions serious enough to require litigation." *Arc of Cal.*, 757 F.3d at 993-94 (internal quotations and citation omitted). Lucas easily satisfies this test here.

### IV.   ORR'S DETAINING LUCAS INDEFINITELY IS INFLICTING IRREPARABLE INJURY ON A VULNERABLE CHILD.

#### A.   Madelyn is a fit custodian for Lucas.

On the whole, ORR's home study is remarkably positive regarding Madelyn's fitness to care for Lucas. The report credits Madelyn for "understanding that minors must attend school," and for "her desire to motivate [Lucas] to learn English and continue his academic studies." Home Study at 39.

ORR's investigator reports that Madelyn "was proactive in attempting to create a safe environment for [Lucas]," *id*. at 53, and had submitted to fingerprinting and provided all requested documents "in a timely manner." *Id*.

The investigator notes that Madelyn "has previous parenting experience," *id*. at 54, and would "provide [Lucas] with full supervision. . . ." *Id*. at 56. Moreover, the investigator found that Madelyn "appeared to have insight of how trauma . . . can affect a child" and "appeared receptive and understanding of [Lucas's] mental health needs . . . ." *Id*. at 40.

The investigator concludes, "At this time, it appears *[Madelyn] is able to provide an appropriate home environment for [Lucas]*. [Madelyn's] home is appropriately furnished and holds all necessary items to provide [Lucas] with an environment to meet his basic needs." *Id*. at 54 (emphasis added).

In the end, however, ORR deemed Madelyn unfit because it suspected (1) that her roommate's brother might be living in Madelyn's home, and he had not appeared for fingerprinting; and (2) that Madelyn was insufficiently committed to providing Lucas mental health care immediately upon his being released. Neither ground warrants protracting Lucas's detention any further.

To begin, ORR's home study is hardly a model of consistency with regard to whether her roommate's brother does or does not actually live in Madelyn's home. On March 30, 2018, for example, the report states, "SW conducted a second home visit to verify household member Evelio is no longer residing in the home. Per the SW's observations, it appeared household member Evelio no longer resides in the home." *Id*. at 48.

For some reason, ORR's investigator returned to the home on April 5, 2018, again to verify Evelio's not residing there. Her entry for that date indicates that Madelyn was not present and that Lucas's brother delayed "approximately 5-10 minutes" before allowing her entry, during which she observed "frantic movements"

MEMORANDUM IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:18-CV-05741-DMG-PLA

in the residence from the sidewalk. *Id*.[2] According to the report, "[I]t appears household member Evelio is residing in the home," *id*., and because "Evelio has not submitted fingerprints . . . it is *uncertain* if there *may* be a concern to [Lucas's] welfare and safety." *Id*. at 62 (emphasis added).

As against these speculations, both Madelyn and her brother declare categorically and under penalty of perjury that Evelio does *not* live in their home. Madelyn R. ¶ 3 ("Since 2017, I have lived with my brother [] and my daughter, [], one year and six months old, in Los Angeles, California. I rent a bedroom to . . . an adult woman, and her seven-year-old son, Justin. Presently, only the five of us live in the house, no one else.); *id*. ¶ 15 ("I repeat that Evelio dos not live in my home. . . ."); Lucas's Brother ¶ 6 ("In truth neither Evelio nor any other adult lives in our house besides my sister [Madelyn], [our roommate], and myself."); *see also* Decl. of Cecilia Saco, July 14, 2018, PX at 137-42, ¶ 8 ("Saco") (child protection expert who visited Madelyn's home observed nothing "to indicate that [Evelio] in fact lives there.").

As for Madelyn's purported reluctance to providing Lucas mental health care, the facts are even less supportive of detaining him even longer.

According to ORR's investigator, Madelyn believed that Lucas would not want to harm himself once "reunified" with her, because "he will no longer feel the

---

[2] In his sworn declaration, Lucas's brother, offers a commonsensical explanation for the investigator's observations:

> Somewhat less than a month later, Brenda returned to the house for a surprise visit. When she arrived, I was sleeping, and I therefore delayed a little in opening the door. When I opened the door, I saw Brenda and her student already leaving. I called to her to come back, and they came in. Evelio had come to see his nephew and his sister. The three of them were in [our roommate's] bedroom. Brenda did not ask me if Evelio was visiting or if he lived in the house. Brenda and the student stayed for about half an hour and then left.

Lucas's Brother ¶ 5.

1   desperation to be released from shelter." Home Study, *supra*, PX at 38. Madelyn

2   assured the investigator she would "observe [Lucas] and gauge how [he] is adjusting"

3   to living with her. *Id*. She promised that if Lucas "begins displaying old behavior or

4   there is a crisis, she will ensure [sic] to obtain mental health services" for him. *Id*.

5       Madelyn's position was hardly unreasonable. As detailed below, Dr. Amy

6   Cohen's independent psychiatric assessment of Lucas accords with Madelyn's

7   intuition. Dr. Cohen confirms that ORR's detaining Lucas has itself profoundly

8   exacerbated his psychological distress, and it would indeed be reasonable to expect

9   vast improvement in Lucas's mental health were he released from ORR confinement

10  and reunited with his family.

11      ORR's investigator nonetheless demanded that Madelyn agree to "follow

12  through with mental health services," including immediately "discuss[ing] the

13  prescribed medication with a psychiatrist." *Id*. Doubting Madelyn's keenness for

14  doing so, ORR declared her unfit and thereby consigned Lucas to indefinite detention

15  at Shiloh. This was hardly an example of sound child welfare practice.

16      Cecilia Saco is a retired Supervising Social Worker with the Los Angeles

17  County Department of Children and Family Services ("DCFS"). For over three

18  decades, Ms. Saco dedicated her professional life to protecting abused and neglected

19  children. In the course of her career she evaluated placements for dependent children

20  "hundreds" of times. Saco ¶ 2.

21      On July 7, 2018, Ms. Saco visited Madelyn's home to assess her suitability as

22  Lucas's caregiver. Regarding ORR's doubts about Madelyn's willingness to get

23  mental health care for Lucas, Ms. Saco declares as follows:

24      . . . ORR should have explained to the family that not all persons with mental

25      health needs are psychotic, and that there is no shame in getting help for mental

26      health problems. As noted, I often had to explain this to our Spanish-speaking

27      families; . . . In my experience the majority of families do understand when

28      give a chance, and they thereafter follow through with seeing to it that a child

MEMORANDUM IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:18-CV-05741-DMG-PLA

receives needed mental health treatment. In the case of [Madelyn], if [Lucas] was to be released to her, she assured me her willingness to look for mental health resources in her community, educate herself about the possible issues concerning her brother [Lucas], and to get the appropriate services for him, before a crisis may arise. In my opinion, if given the opportunity, [Madelyn] and [his brother] would not neglect [Lucas's] mental health needs.

*Id*. ¶ 14.

Madelyn agrees:

Ms. Saco explained to me that someone does not have to be crazy to benefit from mental health care. Her explanation was very different from what [ORR's investigator] told me. Now I understand that [Lucas] suffered traumas in Guatemala, and that immigration detention has hurt him even more. I am in agreement with obtaining professional help for [Lucas] regarding his anxiety, desperation, depression, or whatever other psychological problems he may have. Dr. Amy Cohen tells me that she has at her disposal mental health services in our community, and she will direct me to those.

Madelyn ¶ 16; *see also* Psychiatric Assessment, July 22, 2018, PX at 83 ("Cohen") (Madelyn "welcome to consult [child psychiatrist] for mental health resources close to their home.").

Unsworn equivocations in ORR's home study report do not trump sworn, unequivocal declarations to the contrary. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n.17 (1970) (unsworn statements insufficient to create genuine issue of material fact). Here, all competent evidence—including the declarations of two highly qualified child welfare experts—establishes that Madelyn is more than fit to care for Lucas. *See* Cohen, PX at 80 ("I believe [Madelyn] would be an excellent sponsor for [Lucas]. . . . [H]er concern and empathy for his suffering were profound and I have no doubt that she would seek any mental health treatment necessary . . . She clearly

loves her brother and appears to be an excellent and responsible mother to her infant."); Saco ¶ 15 ("If I was still working for DCFS, as long as I was presented with proof that the roommate's brother lives in a different residence, and I had the commitment of [Madelyn] . . . to seek mental health services for [Lucas], I would release [him] to his siblings."). It is often remarked that the only perfect human being is the Savior. By any other measure, Madelyn is wholly qualified to care for her brother.

And although ORR would prefer to ignore it, there is another side to the "fitness" equation: If ORR wishes to deny Madelyn Lucas's custody, it must place him somewhere better than his sister's home. *See* 8 U.S.C. § § 1232(c)(2)(A) (requiring ORR to place children in "least restrictive" setting consistent with their best interests).

In Lucas's case, sadly, ORR's preferred placement is the notorious Shiloh psychiatric facility.[3] Lucas is clearly far *worse* off at Shiloh than he would be with Madelyn.

---

[3] According to news reports, Clay Dean Hill, who owns the Shiloh RTC, previously owned the Daystar residential treatment facility, also in Manvel, Texas. *Federal Agency's Shelter Oversight Raises Questions*, HOUSTON CHRONICLE, Dec. 19, 2014, *available at* www.houstonchronicle.com/news/article/Federal-agency-s-shelter-oversight-raises-5969617.php (last visited June 11, 2018).

In *M.D. v. Abbott*, 152 F. Supp. 3d 684, 802 (S.D. Tex. 2015), the court had this to say about Daystar:

> The Daystar facility in Manvel, Texas had a capacity of 141 children. Between 1993 and 2002, three teenagers died at Daystar from asphyxiation due to physical restraints. In most cases, the children were hog-tied. Beyond these deaths, there were reports of sexual abuse and staff making developmentally disabled girls fight for snacks. . . . In November 2010, a fourth child died in what was ruled a homicide by asphyxiation due to physical restraints.

*Id*. at 803.

**B.      Lucas is suffering irreparably in ORR detention.**

It has long been recognized that even short periods of detention are inimical to the well-being of children and youth. *See generally* B. Holman & J. Ziedenberg, *The Dangers of Detention: The Impact of Incarcerating Youth in Detention and Other Secure Facilities* (Justice Policy Institute, ed.) *available at* www.justicepolicy.org/images/upload/06-11_rep_dangersofdetention_jj.pdf.

Dr. Luis Zayas, a leading child psychologist and Dean of the School of Social Work at the University of Texas at Austin, emphasizes the unanimity of this view among child welfare experts: "The medical and psychiatric literature has shown that incarceration of children, even in such circumstances as living with their mothers in detention, has long-lasting psychological, developmental, and physical effects." Decl. of Luis Zayas, Dec. 10, 2014, PX at 93-135, ¶¶ 1-6.

Lucas is particularly vulnerable, and prolonged detention far more than just generally injurious: it is inflicting devastating trauma on a child who has already endured far more than anyone should.

---

Reacting to reports of abuses at Shiloh itself, Congresswoman Sheila Jackson Lee, a senior member of the House Homeland Security and Judiciary Committees and Founder and Co-Chair of the Congressional Children's Caucus, said this:

> I am appalled by record of abuse and mistreatment of children at the Shiloh Treatment Center in Manvel documented by the Houston Chronicle in an expose published December 19, 2014. The abuses documented in that report – ranging from physical violence, unreasonable and excessive use of physical restraints, administering emergency medications without notice to governmental authorities, and several deaths of minor children while in custody – is not reflective of the quality of care and support that should be provided to the at-risk children, including the dozens of unaccompanied immigrant children, committed to its care.

jacksonlee.house.gov/media-center/press-releases/shiloh-treatment-center-in-manvel-should-be-closed-by-hhs-for (last visited December 28, 2017).

MEMORANDUM IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:18-CV-05741-DMG-PLA

On July 12, 2018, Dr. Amy Cohen, an eminent child psychiatrist evaluated Lucas at Shiloh.[4] She found the mental health "care" ORR provided Lucas at the Hacienda del Sol shelter woefully lacking on multiple counts:

- ORR's "psychological and social evaluations at [Hacienda del Sol] failed to include critical information about [Lucas], including his history of severe abuse, his ongoing grief for his mother, *the degree to which reuniting with family was central to his mental health issues*. Had they compiled a more accurate picture of [Lucas] it would have come as no surprise when *he was devastated by the news—received in what appears to have been a rather perfunctory manner—that it would likely be months before the process would be completed and he would be reunited with his siblings*." PX at 73 (emphasis added).

- After ORR hospitalized him, Lucas "appears to have received a wholly inadequate evaluation with an unsubstantiated diagnosis ('Major Depressive Disorder, Single Episode'), no extended evaluation, no psychotherapeutic treatment and no discharge summary which might have helped to enlighten the staff at [Hacienda del Sol]." *Id*. at 74.

- Shelter staff "fail[ed] to understand the underlying issues behind [Lucas's] distress, appear to have been consistently over-reactive to it, and thought, somehow, that medication was the answer." *Id*.

---

[4] On July 23, 2018, counsel forwarded Dr. Cohen's report and Ms. Saco's declaration, discussed *infra*, to Defendants. As far as counsel can tell, doing so made absolutely no difference.

- A "*nurse practitioner* . . . prescribed [Lucas] Sertraline for 'depression and anxiety' . . ., [but Lucas's] mental status had already improved before the medication was started, and it is *questionably appropriate* for a non-medical therapy staff member to have made any recommendations at all." *Id*. (emphasis supplied).

- "No attempt appears to have been made by the prescribing practitioner to discuss or obtain consent for [Lucas's] medication from [Madelyn], who was at that time referred to in the SWK notes as [Lucas's] 'sponsor.'" *Id*.

- "A request for transfer to [Shiloh RTC] was submitted on April 19th, again with *no note of behavior or verbalization on [Lucas's] part which would warrant such a transfer*." *Id*. (emphasis supplied).

Dr. Cohen concludes that ORR treatment of Lucas at Hacienda del Sol was egregiously substandard:

> All of these reactions to [Lucas's] episodic and entirely understandable distress over the ongoing delay in his reunification were experienced by [Lucas] as punishments and as reasons to hide sad feelings from staff as nothing good arose from his openness. Rather than the empathy and support that he needed, combined with communication with ORR that *[Lucas] was deteriorating due to delays in reunification, [HdS] pushed medication on him, threatened him when he failed to take it, restricted his activities and ultimately sent him to Shiloh.*

*Id*. (emphasis added); *see also*, Lucas R. ¶ 5 ("I was unhappy at the shelter. . . I didn't want to be detained. I told a staff member that I was thinking of hurting myself, . . . They sent me to a hospital."); Madelyn R. ¶ 11 ( "detention and separation from his family" causing Lucas "even more anxiety and desperation");

Lucas's Brother ¶ 7 (Lucas "very tired of being detained," "misses his family," and "is now depressed.").

Nor did ORR's dispatching Lucas to Shiloh make things any better. If anything, Lucas's plight grew only worse. Again, Dr. Cohen confirms numerous shortcomings in Lucas's "care":

- "The Shiloh intake . . . fails to mention [Lucas's] escalating anxiety and distress over his protracted confinement and separation from his family: *the principal triggers for his decline*." Cohen, PX at 75 (emphasis added).

- Shiloh misdiagnosed Lucas as suffering from "'Major Depressive Disorder, Recurrent, Severe' despite a history inconsistent with this. Other diagnoses - including 'Adjustment Disorder with Mixed Anxiety and Depressed mood' and 'PTSD' - far more accurately fit [Lucas's] historic pattern of mood and behavior." *Id.*

- ORR increased Lucas's psychotropic dosage without "waiting to see if more time would resolve [his] symptoms – as is often the case with [anti-depressants]." "There is no note of any attempt to contact [Lucas's] family about this new medication, . . ." Lucas is "being compliant with the medication because he fears the repercussions of failing to do so." *Id.*

- Lucas's "assigned therapist at Shiloh . . . is not a medical practitioner . . . ." Lucas reports that the therapist "has no interest in truly getting to know and understand him and that . . . his sessions with her were 'useless'. He also indicated that he no longer trusted shelter staff with his feelings and worried that opening up would just result in more time being 'locked up'." *Id.*

- Lucas reports that "no one - including his therapist – ever talked to him about his mother, that no one seemed to wish to help with getting him to his family . . ."; that "medication appears to be the only thing to which everyone has turned . . ." and that "close supervision and restricted activities" at HdS made "him feel claustrophobic, and more depressed." *Id*. at 77.

- Lucas] "states that he does 'nothing at Shiloh. He reports that there is no real teaching going on at school, that they are simply given books to copy." *Id*. at 75.[5]

Dr. Cohen concludes that ORR's confining Lucas and protracting his separation from his family are placing him at risk of serious injury:

> Currently, [Lucas] is doing the best he can to hold on to hope in the midst of increasing despair. He is still able to engage with others who he trusts and to show a brightened affect when discussing his future and his hopes. However, *his mood darkens considerably when discussing his time in ORR confinement* and the fear he feels as the days go by without either of his siblings receiving approval as sponsors. Given his history of maternal loss at a vulnerable age followed by severe and protracted abuse, his history of suicidal ideation triggered by separation from loved ones and impulses to self-harm triggered by feelings of powerlessness in the face of aggression, *[Lucas] is a serious risk of further deterioration into a more dangerous state should his confinement and separation from his siblings continue.*

*Id*. at 79 (emphasis added).

---

[5] ORR's depriving Lucas of adequate education alone constitutes irreparable injury. *See V.W. by & through Williams v. Conway*, 236 F. Supp. 3d 554, 588-89 (N.D.N.Y. 2017) (finding irreparable harm because "deprivation of education services . . . hinders important aspects of their adolescent development").

MEMORANDUM IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:18-CV-05741-DMG-PLA

Taking into account what Lucas is going through in ORR custody, Dr. Cohen's recommendation is unequivocal: Lucas's "ongoing separation from his family in the United States has *seriously* jeopardized his mental health and safety. . . . *[He] should be discharged as soon as possible from Shiloh and reunited with his siblings.*" *Id.* (emphasis added).

In sum, the harm ORR is causing Lucas is clear and present; the harm it thinks he may experience in Madelyn's care is speculative and remote. Yet nowhere in its home study or elsewhere does it appear that ORR ever stopped to think that its alternative to releasing Lucas—indefinite detention at Shiloh—might be far worse for him.

As will be seen, ORR's confining Lucas indefinitely also impairs multiple constitutional rights. Even apart from all he is suffering at Shiloh, these constitutional violations establish as a matter of law that (1) Lucas's ongoing injuries are irreparable; (2) that the balance of equities tips in his favor; and (3) that enjoining his further confinement is in the public interest. *Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005) ( "colorable claim" of constitutional violation establishes irreparable injury sufficient to enjoin preliminarily) (internal quotations and citation omitted)); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury'") (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)); *Arizona Dream Act Coalition v. Brewer*, 757 F.3d1053, 1069 (9th Cir. 2014) (when party establishes a "likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction.").

## V.   LUCAS IS MORE THAN LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIM THAT ORR'S CONTINUING TO DETAIN HIM IS UNLAWFUL.

The *Flores* Settlement, the TVPRA and the First and Fifth Amendments to the Constitution all prohibit ORR's unnecessarily prolonging the detention of children

and separating them from family. Lucas has more than a reasonable chance of succeeding on the merits of his legal challenges to indefinite ORR detention and family separation.

### A.     ORR's detaining Lucas breaches the *Flores* Settlement.

Paragraph 14 of the *Flores* Settlement provides: "Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, [ORR] *shall release a minor from its custody without unnecessary delay* . . . [to] an adult relative (brother, sister, aunt, uncle, or grandparent). . ." (Emphasis added.) Further grounding ORR's obligation to minimize children's detention, ¶ 18 of the *Flores* Settlement provides, "Upon taking a minor into custody, the INS . . . shall make and record the prompt and continuous efforts on its part toward . . . the release of the minor . . ."

This Court has repeatedly affirmed its jurisdiction to enforce the *Flores* Settlement and set out the principles guiding enforcement. *See, e.g.*, *Flores v. Johnson*, 212 F. Supp. 3d 864 (C.D. Cal. 2015).

The cardinal principle is straightforward: "'Where the contract is clear, the plain language of the contract governs.'" *Id*. at 870.

Here, the only reason ORR continues to detain Lucas is because it purports to doubt Madelyn's fitness. Although nothing in the *Flores* Settlement requires ORR to release Lucas to someone it reasonably believes may harm or neglect him, the evidence establishes that Madelyn would do neither. He is likely to succeed on the merits of his claim that ORR's refusing to release him violates the plain text of the *Flores* Settlement.

### B.     ORR's refusing to release Lucas violates the TVPRA.

Next, Lucas is very likely to prevail on his claim that ORR's continuing to detain him at Shiloh violates the TVPRA's command that it place him the least restrictive setting consonant with his best interests.

Section 235(c)(2)(A) of the TVPRA, *codified at* 8 U.S.C. § 1232(c)(2)(A), requires ORR to "promptly" place detained children "in the least restrictive setting that is in the best interest of the child," generally, with "a suitable family member . . . ." Only if "a 'suitable family member' or other guardian is not available to take custody of a minor," may ORR continue to detain him or her "in a specialized juvenile program or facility." *Flores v. Sessions*, 862 F.3d 863, 871 (9th Cir. 2017).

Again, Lucas's legal claim is straightforward: As between ORR custody and his family, the competent evidence leaves no doubt that the least restrictive setting in Lucas's best interests is with Madelyn. Lucas is likely to succeed on this claim as well.[6]

**C.     Lucas's indefinite detention without due process violates the First and Fifth Amendments.**

Finally, ORR's detaining Lucas plainly implicates his constitutional rights to physical liberty, family unity, and family association.

First, Lucas has a fundamental right to freedom from detention. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("Freedom from imprisonment – from government custody, detention, or other forms of physical restraint – lies at the heart of the liberty [the Fifth Amendment's Due Process] Clause protects."); *United States v. Bogle*, 855 F.2d 707, 710-11 (11th Cir. 1988) (the "unnecessary deprivation of liberty clearly constitutes irreparable harm") (citation omitted); *Reno v. Flores*, 507 U.S. 292, 316 (1993) ("a child's constitutional freedom from bodily restraint is no narrower than an adult's").

Second, Lucas has a substantial liberty interest in family unity and family association. *See, e.g.*, *Int'l Refugee Assistance Project v. Trump*, _ F.3d _, 2018 WL

---

[6] As discussed *post*, construing the TVPRA as granting ORR unbridled power to detain Lucas indefinitely by administrative fiat would raise profound constitutional questions contrary to the rule of "constitutional avoidance." *Diouf v. Napolitano*, 634 F.3d 1081, 1086 (9th Cir. 2011).

894413, at *18 (4th Cir. Feb. 15, 2018), *vacated by* _ S.Ct. _, 2018 WL 1256938 ("Prolonged and indefinite separation of parents, children, siblings and partners create not only temporary feelings of anxiety but also lasting strains on the most basic human relationships cultivated through shared time and experience."); *Aristotle P. v. Johnson*, 721 F. Supp. 1002, 1005 (N.D. Ill. 1989) (recognizing children's "constitutionally protected right to associate with their siblings" and that their "relationships with their siblings are the sort of 'intimate human relationships' that are afforded 'a substantial measure of sanctuary from unjustified interference by the State'"); *see also Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984) (the freedom of intimate association stems from the necessity of protecting individuals' ability "to enter into and maintain certain intimate human relationships [that] must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme").[7]

The uncontroverted evidence shows that ORR has provided neither Lucas nor Madelyn any meaningful process by which they may contest ORR's having declared Madelyn an unfit custodian.[8] Madelyn ¶ 13 (Madelyn told "nothing could be done" about denial of Lucas's custody; "the denial was a final decision"; given nothing "in writing explaining the reason for having denied me [Lucas's] custody."). Such autocratic decision-making is simply unacceptable when children's freedom and family unity are at stake:

---

[7] By refusing to release Lucas to his sister's custody, regardless of the procedures given, ORR has violated Lucas's rights to substantive due process and family association. *See Aristotle P.*, 721 F. Supp. at 1005-10.

[8] To determine the protections due process requires, courts apply the test prescribed in *Mathews v. Eldridge*, 424 U.S. 319 (1976), which requires consideration of (1) the private interest at stake, (2) the comparative risk of an erroneous deprivation of liberty with and without additional safeguards, and (3) any countervailing interests. *Id.* at 334-35.

First, standard child welfare practice requires that families receive a detailed, written explanation of why they are being denied custody of a dependent minor. This gives the family guidance about how to cure any problems the child welfare investigator uncovers during a home evaluation. Unless a family member has committed major crimes . . . standard child welfare practice is to encourage families to make any needed changes to reduce or eliminate concerns. This reflects the consensus among child welfare professionals that it is better to place children with their families whenever it is safe to do so. Second, in county child welfare systems, social workers assess the caregivers' home, the caregivers' ability to care and provide for the child, and the caregiver's background check; finally they make recommendations. Our reports are reviewed by State legal counsel after which families are entitled to contest and rebut social workers' findings and recommendations. According to [Madelyn], however, ORR gave her no opportunity to appeal or otherwise contest ORR's decision to deny her [Lucas's] custody. *I know of no child protection agency that is similarly empowered to issue final, unreviewable decisions regarding the suitability of family members to care for dependent children*.

Saco ¶¶ 12, 13 (emphasis added).

As Ms. Saco observes, juvenile justice and child welfare standards uniformly require prompt notice and opportunity to be heard when a child is detained. The guidelines of the National Council of Juvenile and Family Court Judges, which are widely followed in all states, require that a "preliminary protective hearing" "must take place promptly"—in most states, within one to three days of removal. National Council of Juvenile and Family Court Judges, *Resource Guidelines: Improving Court Practice in Child Abuse & Neglect Cases* 30 (1995), *available at* www.ncjfcj.org/sites/default/files/ resguide_0.pdf ("NCJFCJ Guidelines").

MEMORANDUM IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:18-CV-05741-DMG-PLA

In the juvenile justice context, the American Bar Association's Juvenile Justice Standards similarly require that upon a child's being detained, juvenile authorities must request a hearing before a judge or referee no later than 24 hours following the juvenile's arrival at a detention facility, and further, that the juvenile court should hear such a petition no more than 24 hours after that. Institute of Judicial Administration & American Bar Association, *Juvenile Justice Standards Annotated: A Balanced Approach* (1996), at 131, 134, *available at* www.ncjrs.gov/pdffiles1/ojjdp/166773.pdf ("ABA Standards").

Competent child welfare and juvenile justice standards further prescribe the basic procedural protections of a fair and effective detention hearing. Obviously, a child must be given notice of the hearing and of the reasons the state has taken him or her into custody. NCJFCJ Guidelines at 36; ABA Standards at 134; *In re Gault*, 387 U.S. 1, 34 (1967). Next, a judge or other neutral decision maker must preside over the hearing. NCJFCJ Guidelines at 33; ABA Standards at 131. When a court determines that a child should remain in detention, it must provide her or him with a written explanation of its reasons. NCJFC Guidelines at 40-41; ABA Standards at 135-36.

The Supreme Court has held that "widely shared practice" serves to inform whether a particular practice so drastically departs from accepted norms as to be presumptively violative of due process. *Schad v. Arizona*, 501 U.S. 624, 640 (1991) (plurality opinion) ("widely shared practice" a "concrete indicator[] of what fundamental fairness and rationality require").

Here, ORR disregarded each and every one of the foregoing child welfare standards: it not only failed to give Madelyn and Lucas notice and hearing within any time certain, it gave them no notice or hearing at all. ORR's process, or rather the utter lack thereof, is presumptively unconstitutional. Lucas has a fair chance of prevailing on his constitutional claim as well.

## VI.   THE EQUITIES TIP SHARPLY IN LUCAS'S FAVOR.

When ruling on a preliminary injunction, "a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Arc of Cal.*, *supra*, 757 F.3d at 991 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)).

Here, ORR's sole *legitimate* interest in refusing to release Lucas is to protect him from harm or neglect.[9] Yet the facts show that ORR's confining Lucas

---

[9] Unfortunately, Defendants' public statements suggest that ORR's detaining children at times aims more to deter unauthorized immigration than to protect children.

Steven Wagner, acting assistant secretary at HHS's Administration for Children and Families, recently characterized the *Flores* Settlement and the TVPRA as creating an "immigration loophole [in which] HHS is forced to release minors from Central America into the United States . . ." Illegal Immigrant Program Creating Proxy Foster Care System, Says Official, THE EPOCH TIMES, June 23, 2018, *available at* www.theepochtimes.com/illegal-immigrant-program-creating-proxy-foster-care-system-says-official_2544724.html (last visited June 4, 2018).

He continued to argue that ORR's releasing children "'is an example of open borders,'" "makes the immediate crisis worse and creates an economic incentive for further violation of federal immigration law." *Id*.

ORR's apparent zeal to detain children in order to deter others from entering unlawfully betrays a hollowness in its professed concern for Lucas's welfare. Sadly, it is of a piece with other "deterrents" Defendants have recently embraced. *See, e.g., How the Trump Administration Got Comfortable Separating Immigrant Kids from Their Parents*, THE NEW YORKER, May 20, 2018, *available at* www.newyorker.com/news/news-desk/how-the-trump-administration-got-comfortable-separating-immigrant-kids-from-their-parents (last visited June 4, 2018) ("On April 6th, Jeff Sessions and Kirstjen Nielsen, the head of Homeland Security, announced a zero-tolerance policy for immigrants at the border. Anyone who didn't cross the U.S. border at an official port of entry would be criminally prosecuted . . . and those travelling with their children would be separated from them. The policy was now official, and the Administration acknowledged its rationale: it was separating families to discourage others from travelling to the United States illegally.").

indefinitely is doing the precise opposite: i.e., causing him far greater injury than any his family might inflict.

Even were ORR's concerns about Madelyn's fitness more substantial, nothing stops it from referring those concerns to competent state or local child protective services. *See, e.g.*, *Beltran v. Cardall*, 222 F. Supp. 3d 476, 489 (E.D. Va. 2016) (ordered ORR to release minor immediately and refer any concerns it may have for the youth's well-being to state juvenile authorities).

## VII.   REUNITING LUCAS WITH HIS FAMILY IS IN THE PUBLIC INTEREST.

The Ninth Circuit has repeatedly held that "'it is always in the public interest to prevent the violation of a party's constitutional rights.'" *Melendres*, *supra,* 695 F.3d at 1002 (quoting *Sammartano v. First Judicial District Court*, 303 F.3d 959 (9th Cir. 2002)). There is also a weighty public interest in "ensur[ing] that federal statutes are construed and implemented in a manner that avoids serious constitutional questions." *Rodriguez v. Robbins*, 715 F.3d 1127, 1146 (9th Cir. 2013).

## VIII.   CONCLUSION

For the foregoing reasons, the Court should grant this motion and issue an order preliminarily enjoining ORR from continuing to detain Plaintiff Lucas and requiring that he be reunited with Madelyn forthwith.

Dated: August 3, 2018.

CARLOS HOLGUÍN
Center for Human Rights &
Constitutional Law

HOLLY COOPER
CARTER WHITE
University of California Davis School of Law

LEECIA WELCH
NEHA DESAI
POONAM JUNEJA
CRYSTAL ADAMS
National Center for Youth Law

1
2
3                                                      /s/ *Carlos Holguín*
4                                                      Carlos Holguín
5                                                      *One of the Attorneys for Plaintiffs*
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MEMORANDUM IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:18-CV-05741-DMG-PLA