# Exhibit 44

<u>**DECLARATION OF CECILIA SACO IN SUPPORT OF** ▮ **DENIAL TO SPONSOR** ▮ **BY ORR**</u>

I, Cecilia Saco, declare as follows:

1. I write this declaration in support of ▮ regarding her denial by ORR to sponsor her brother ▮. I make all of the statements herein of my personal knowledge, except as to those matters based on information and belief, which I believe to be true. I believe the statements herein to be true and if called to testify as a witness thereto, could do so competently under oath.

2. I am a retired Supervising Social Worker with Los Angeles County Department of Children and Family Services' (DCFS) Special Immigrant Status (SIS) Unit. I was a Los Angeles County employee for 32 years and 5 months. I was a Supervising Children's Social Worker for the past 28 years and have extensive experience working with abused and neglected children. I have a Master degree in Social Work and I have received training on Intervention in Child Maltreatment & Domestic Violence from UCLA's School of Public Policy & Social Research, Department of Social Welfare. Also, I have extensive child welfare and immigration experience working with undocumented immigrant children and families. I have managed a specialized unit within DCFS responsible for the filing of over 3000 Special Immigrant Juvenile Status (SIJS) applications with USCIS on behalf of DCFS undocumented immigrant dependent children. I was also the designated U Visa Certifier for DCFS for the period of 2008-2018.

3. During my tenure with DCFS, I investigated hundreds of reports of child abuse and neglect. Such investigations typically included evaluating children's relatives and their homes in an effort to determine whether a child could be safely placed with family, rather than in taxpayer-funded foster or group homes.

4. I am a native Spanish-speaker; I am bicultural as well, and I was accordingly tasked with investigating many monolingual Spanish-speaking families. As part of my duties with DCFS, I also had occasion to discuss child protection practices with colleagues from other states and counties; I believe DCFS's policies and practices with respect to evaluating the suitability of family members to care for children to be fairly typical of child welfare practices nationwide.

5. I have been asked to give an opinion regarding the suitability of ▮ and ▮ to care for their brother, ▮, whom I understand has currently been detained by the Office of Refugee Resettlement ("ORR") at the Shiloh Residential Treatment Center in Texas. I have reviewed ORR's files for ▮ and its

Page 1 of 4

Page 91

home study of ▮. These were provided by Carlos Holguín, one of the lawyers for the plaintiffs in *Flores v. Sessions*. On July 9, 2018, I visited the home of ▮ and ▮ ▮, in Los Angeles, California. I spoke with ▮ and ▮ at length, and following standard DCFS practices and standards, evaluated their suitability to serve as custodians for ▮.

6. ORR's file indicates that it denied ▮ custody of her brother because of two concerns: First, that her roommate's brother, who was present at the time ORR's investigator visited the home, failed to appear for fingerprinting; and second, that ▮ was unlikely to address ▮ mental health needs following release.

7. With respect to the first of ORR's concerns, when any adult applies with DCFS to become a resource family, he/she and all adult members of the household complete the same paperwork to live scan (fingerprint). Applicants don't have to have documented immigration status, but they do need appropriate ID to live scan (*matricula consular* or passport in the case of undocumented people). DCFS sends the live scan paperwork to three data bases: California Department of Justice ("DOJ"), FBI and California CACI (Child Abuse Central Index). When the applicant reports he/she has lived out of state, DCFS also checks the appropriate out-of-state CACI. To the best of my knowledge, DCFS does not share live scan information with ICE except pursuant to court order. It is my understanding that California DOJ sometimes shares information with ICE on a case-by-case basis, but that ICE needs a court order to access California DOJ records.

8. ▮ assured me that her roommate's brother does not live in the home. She stated that she told ORR's investigator, Brenda, the same. During my visit, the roommate's brother was not present, nor did I observe anything in the home to indicate that he in fact lives there. I explained to ▮ that if I had a reason to suspect that an adult male was residing in the home and would not appear for fingerprinting, I would need a letter from his actual landlord verifying that he was living elsewhere. ▮ readily agreed to get such a letter, or similar proof.

9. I then asked ▮ if ORR's investigator had been similarly open to the family's clearing up questions about her roommate's brother's residence. ▮ reported that ORR had given her no chance to change its belief that her roommate's brother lived in ▮ home.

10. I next discussed with ▮ and ▮ whether they were open to seeking mental health services for ▮. ▮ initially assured me that ▮ is not "crazy" and does not need mental health care. In my experience, ▮ equating mental health concerns with psychosis is fairly typical in Latin America, where cultural attitudes and limited education engender a reluctance to seek help for common mental health conditions

Page 2 of 4

such as anxiety and depression. I explained that many people who are not "crazy" nonetheless have mental health problems that should be treated, and that they should be open to the possibility that ▇ too, may such have such mental health needs. ▇ and ▇ indicated they understood and agreed to have ▇ treated for any mental health issues he may have following release. I also asked ▇ if anyone from ORR had discussed ▇ mental health with her. She said no one had.

11. ▇ also related that ORR had given her nothing in writing explaining its reasons for refusing to release ▇ to her, and that as far as she knew, she had no right to a hearing, administrative appeal, or other procedure by which the family might seek to change ORR's decision. In my opinion, ORR's denying ▇ ▇ custody failed to meet accepted child welfare standards in several particulars.

12. First, standard child welfare practice requires that families receive a detailed, written explanation of why they are being denied custody of a dependent minor. This gives the family guidance about how to cure any problems the child welfare investigator uncovers during a home evaluation. Unless a family member has committed major crimes such as murder, rape or sex-related offenses, child endangerment, willful cruelty, or similarly irremediable safety-risk, standard child welfare practice is to encourage families to make any needed changes to reduce or eliminate concerns. This reflects the consensus among child welfare professionals that it is better to place children with their families whenever it is safe to do so.

13. Second, in county child welfare systems, social workers assess the caregivers' home, the caregivers' ability to care and provide for the child, and the caregiver's background check; finally they make recommendations. Our reports are reviewed by State legal counsel after which families are entitled to contest and rebut social workers' findings and recommendations. According to ▇, however, ORR gave her no opportunity to appeal or otherwise contest ORR's decision to deny her ▇ custody. I know of no child protection agency that is similarly empowered to issue final, unreviewable decisions regarding the suitability of family members to care for dependent children.

14. Third, ORR should have explained to the family that not all persons with mental health needs are psychotic, and that there is no shame in getting help for mental health problems. As noted, I often had to explain this to our Spanish-speaking families; I did not always succeed in convincing them, but in my experience the majority of families do understand this explanation when given a chance, and they thereafter follow through with seeing to it that a child receives needed mental health treatment. In the case of ▇, if ▇ was to be released to her, she assured me her willingness to look for mental health resources in her community, educate herself about the possible issues concerning her brother ▇, and to get the appropriate services for him, before a crisis may arise. In my opinion, if given the opportunity, ▇ and ▇ would not

neglect ▇ mental health needs.

15. If I was still working for DCFS, as long as I was presented with proof that the roommate's brother lives in a different residence, and I had the commitment of ▇ and ▇ to seek mental health services for ▇, I would release ▇ to his siblings. I would also continue to support the family after the release with the appropriate community resources to secure a permanent home for ▇.

I declare under penalty of perjury and the laws of the United States that the foregoing is true and correct.

Executed at Los Angeles, California on:

04/14/18
Date

*[signature]*
Cecilia Saco