1  CARLOS R. HOLGUÍN (Cal. Bar No. 90754)
2  Center for Human Rights & Constitutional Law
   256 South Occidental Boulevard
3  Los Angeles, CA 90057
4  Telephone: (213) 388-8693
   Email: crholguin@centerforhumanrights.org
5
6  *Listing continues on next page*
7   *Attorneys for Plaintiffs*
8
9                 UNITED STATES DISTRICT COURT
10        CENTRAL DISTRICT OF DISTRICT OF CALIFORNIA
11                      WESTERN DIVISION
12
13  LUCAS R., *et al.*,              No. CV 2:18-CV-05741-DMG-PLA

14              Plaintiff,           MEMORANDUM OF POINTS AND
                                     AUTHORITIES IN SUPPORT OF MOTION
15       v.                          FOR PRELIMINARY INJUNCTION RE:
                                     PLAINTIFF GABRIELA N.
16  ALEX AZAR, Secretary of U.S.
17  Department of Health and Human   Hearing: September 14, 2018
    Services; *et al.*,              Time:      9:30 a.m.
18                                   Room:    1st St. Courthouse
                Defendant.                    Courtroom 8C
19
20  / / /
21
22
23
24
25
26
27
28

*Counsel for Plaintiffs, continued*

HOLLY S. COOPER (Cal. Bar No. 197626)
Co-Director, Immigration Law Clinic
CARTER C. WHITE (Cal. Bar No. 164149)
Director, Civil Rights Clinic
University of California Davis School of Law
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu
          ccwhite@ucdavis.edu

LEECIA WELCH (Cal. Bar No. 208741)
NEHA DESAI (Cal. RLSA Bar No. 803161)
POONAM JUNEJA (Cal. Bar No. 300848)
National Center for Youth Law
405 14th Street, 15th Floor
Oakland, CA 94612
Telephone: (510) 835-8098
Email: lwelch@youthlaw.org
          ndesai@youthlaw.org
          pjuneja@youthlaw.org

CRYSTAL ADAMS (Cal. Bar No. 308638)
National Center for Youth Law
1313 L St. NW, Suite 130
Washington, DC 20005
Telephone: (202) 868-4785
Email: cadams@youthlaw.org

SUMMER WYNN (Cal. Bar No. 240005)
MARY KATHRYN KELLEY (Cal. Bar No. 170259)
JON F. CIESLAK (Cal. Bar No. 268951)
MEGAN L. DONOHUE (Cal. Bar No. 266147)
Cooley LLP
4401 Eastgate Mall
San Diego, CA 92121-1909
Telephone: (858) 550-6000
Email: swynn@cooley.com
          mkkelley@cooley.com
          jcieslak@cooley.com
          mdonohue@cooley.com

# TABLE OF CONTENTS

**Page**

I.     Introduction .................................................................................................. 1

II.    Statement Of Facts ....................................................................................... 2

      A.     Gabriela is Being Harmed by her Prolonged Detention and Separation from her Grandfather ................................................. 2

      B.     Isaac Has Established that He Would Be a Safe and Suitable Sponsor ........................................................................................ 5

III.   Legal Standard for Issuance of Temporary Injunction ................................ 8

IV.    ORR'S Indefinite Detention of Gabriela is Inflicting Irreparable Injury ........... 8

      A.     Gabriela's Time in ORR Custody has Resulted in On-going Harm ......... 8

      B.     Isaac is a Fit Custodian for Gabriela ...................................... 10

V.     Gabriela Is Likely to Succeed on the Merits of her Claim that ORR's Continuing to Detain her is Unlawful ........................................................ 14

      A.     ORR's Detention of Gabriela Breaches the Flores Settlement ........... 15

      B.     ORR's Refusal to Place Gabriela with Isaac Violates the TVPRA ........ 15

      C.     Gabriela's Indefinite Detention Without Due Process Violates the First and Fifth Amendments ................................................. 16

VI.    The Equities Weigh Heavily in Gabriela's Favor ....................................... 19

VII.   Reuniting Gabriela with her Family Is in the Public Interest ...................... 19

VIII.  Conclusion ................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adickes v. S.H. Kress & Co.*,
   398 U.S. 144 (1970)....................................................................13

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) .....................................................8

*Amoco Prod. Co. v. Vill. of Gambell*,
   480 U.S. 531 (1987)....................................................................19

*Arc of Cal. v. Douglas*,
   757 F.3d 975 (9th Cir. 2014) ..................................................8, 19

*Diouf v. Napolitano*,
   634 F.3d 1081 (9th Cir. 2011) ....................................................16

*Flores v. Johnson*,
   212 F. Supp. 3d 864 (C.D. Cal. 2015) ........................................15

*Flores v. Sessions*,
   862 F.3d 863 (9th Cir. 2017) ..................................................2, 16

*Flores v. Sessions*,
   No. CV 85-4544 DMG (C.D. Cal.) .......................................*passim*

*In re Gault*,
   387 U.S. 1 (1967)........................................................................18

*Int'l Refugee Assistance Project v. Trump*,
   _ F.3d _, 2018 WL 894413 (4th Cir. Feb. 15, 2018), *vacated by* _
   S.Ct. _, 2018 WL 1256938 ..........................................................16

*Johnson v. City of Cincinnati*,
   310 F.3d 484 (6th Cir. 2002) ......................................................17

*Mathews v. Eldridge*,
   424 U.S. 319 (1976)....................................................................17

*Moore v. City of East Cleveland*,
   431 U.S. 494 (1977) (plurality opinion)......................................16

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Reno v. Flores*,
   507 U.S. 292 (1993) ........................................................................................ 16

*Roberts v. United States Jaycees*,
   468 U.S. 609 (1984) ........................................................................................ 17

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013) ...................................................................... 20

*Sammartano v. First Judicial District Court*,
   303 F.3d 959 (9th Cir. 2002) ........................................................................ 20

*Schad v. Arizona*,
   501 U.S. 624 (1991) (plurality opinion) .................................................... 18

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
   739 F.2d 1415 (9th Cir. 1984) ........................................................................ 8

*United States v. Bogle*,
   855 F.2d 707 (11th Cir. 1988) ...................................................................... 16

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) ........................................................................ 8

*Winter v. Nat'l Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................................ 8

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) ........................................................................................ 16

**Statutes**

8 U.S.C. § 1232 .................................................................................................... 2

8 U.S.C. §§ 1232(c)(2)(A) ........................................................................... 14, 15

William Wilberforce Trafficking Victims Protection Reauthorization Act
   of 2008, Pub. L. 110-457, 122 § 235 Stat. 5044 ............................................ 2

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

**Other Authorities**

B. Holman & J. Ziedenberg, *The Dangers of Detention: The Impact of Incarcerating Youth in Detention and Other Secure Facilities* (Justice Policy Institute, ed.) ................................................................... 8

Fed. R. Civ. Proc. 65(a) & (b) ........................................................ 8

Juvenile and Family Court Judges, *Resource Guidelines: Improving Court Practice in Child Abuse & Neglect Cases* 30 (1995) .................................. 18

*Juvenile Justice Standards Annotated: A Balanced Approach* (1996) ........................ 18

## I. INTRODUCTION

Plaintiff Gabriela N. is a seventeen-year-old girl from El Salvador who has been detained by Defendant Office of Refugee Resettlement ("ORR") and separated from her family since January 2017–over nineteen months now. Plaintiffs seek a preliminary injunction requiring her immediate placement with her grandfather and Next Friend, Isaac N. Isaac has worked diligently to navigate ORR's sponsorship process and address ORR's ever-changing concerns and demands so that he could be reunited with his granddaughter. All the while, ORR's treatment of Gabriela has exacerbated her trauma history and caused a steady deterioration of her mental state, which worsens each day she remains in ORR custody. Plaintiffs can easily show that ORR's continuing detention of Gabriela will cause her irreparable injury and that Gabriela will likely prevail on her claim that such detention is unlawful.

Plaintiffs' experts demonstrate that Isaac could provide Gabriela with safe and stable care that far surpasses the treatment she has received from ORR institutions. Candida Rugama, a social worker with a Master's Degree in Social Work and over two decades' experience vetting custodians for dependent children, recently evaluated Isaac and his household. Ms. Rugama found Isaac to be a fit custodian and strongly recommended that Gabriela be immediately placed in his custody. Dr. Amy Cohen, a respected child psychiatrist, evaluated Gabriela at ORR's St. Michael's Home for Children shelter facility ("St. Michael's") on July 11, 2018. Dr. Cohen was highly critical of ORR's treatment of Gabriela and found that her continued detention at St. Michael's and prolonged separation from her family are profoundly and irreparably injuring her.

Plaintiffs can also establish that Gabriela will succeed on the merits of her claims for relief. **First**, Defendants have violated the *Flores* Settlement's "general policy favoring release" and requirement that: "Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS shall

release a minor from its custody without unnecessary delay, . . . [to] an adult relative (brother, sister, aunt, uncle, or grandparent). . ." *Flores v. Sessions*, No. CV 85-4544 DMG (C.D. Cal.), Plaintiffs' Exhibits in Support of Class Certification, August 2, 2018 ("CCX"), Exhibit 1, at 9 ¶ 14 ("*Flores* Settlement"). **Second**, Defendants have violated § 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. 110-457, 122 Stat. 5044, *codified at* 8 U.S.C. § 1232 ("TVPRA"), requiring ORR to "promptly" place a detained minor "in the least restrictive setting that is in the best interest of the child," generally, with "a suitable family member . . . ." Only if "a 'suitable family member' or other guardian is not available to take custody of a minor," may ORR continue to detain him or her "in a specialized juvenile program or facility." *Flores v. Sessions*, 862 F.3d 863, 871 (9th Cir. 2017). **Finally**, ORR's ongoing detention of Gabriela has impaired her fundamental constitutional rights to personal liberty, family integrity, and family association without the slightest procedural fairness or transparency.  Decl. of Isaac N., March 15, 2018, Exhibit 7 at 3 ¶ 12; Decl. of Gabriela N., Dec. 1, 2017, Exhibit 2 at 1 ¶ 6.

ORR has now detained Gabriela for over a year and a half on vague, unsubstantiated allegations regarding Isaac's fitness. Enough is enough. Gabriela is far worse off in ORR's custody than with a loving relative who can provide her the support and care she desperately needs. Gabriela will suffer irreparable injury if she is not immediately placed with her grandfather. Because her continued detention is unlawful, the Court should grant this motion for a preliminary injunction.

## II.   STATEMENT OF FACTS

### A.   Gabriela is Being Harmed by her Prolonged Detention and Separation from her Grandfather

Gabriela is an extraordinary seventeen-year-old who wants nothing more than to be reunited with her grandfather and to attend school in California.  Ex. 34 at 303-04. She hopes to become an attorney someday. *Id.* at 303. ORR detained her in January 2017 and placed her at the Southwest Key Casita del Valle shelter ("Casita del Valle")

in Clint, Texas. Ex. 8 at 116. Gabriela came to the United States from El Salvador to escape extreme violence and an abusive stepfather.  Ex. 34 at 288.

Despite the trauma she has experienced, Gabriela has demonstrated resiliency. Shortly after Gabriela arrived at Casita del Valle, medical staff evaluated her and did not identify medical issues. Ex. 8 at 116-17. Shelter facility staff noted that Gabriela appeared emotionally stable, receptive, and resilient; they did not identify any mental health concerns. Ex. 9 at 120.

As months passed without being reunited with her family, however, Gabriela began to deteriorate. Ex. 34 at 290. After an incident in April 2017 resulting from an ongoing conflict with a staff member, Gabriela "smash[ed] a mirror and us[ed] a broken shard to 'poke' herself." *Id.*; *see also* Ex. 20 at 150. The effects of her detention worsened still. On August 2, 2017, Gabriela reported suicidal ideation "related to increased frustration over her case . . . and extended stay in the program." Ex. 20 at 150.[1] She was hospitalized on August 3, 2017. *Id.* When a doctor at the hospital conducted a psychological evaluation, the doctor incorrectly recommended ORR transfer Gabriela to a Residential Treatment Center. *Id.* ("[Gabriela] will benefit form (sic) a residential treatment center to target her therapeutic needs at this time."). The doctor also prescribed Prozac, which Gabriela was administered without first obtaining informed consent from her family. Ex. 18 at 139, 141-42.[2]

On September 7, 2017, a few weeks after Gabriela's discharge from the hospital, ORR transferred Gabriela to Shiloh Residential Treatment Center ("Shiloh RTC") per the doctor's unfounded recommendation. Ex. 22 at 166. Prior to this transfer, ORR failed to provide Gabriela and Isaac with notice, an opportunity to be heard, or a right to appeal. Ex. 2 at 49 ¶ 6 ("I don't remember ever being told or reading that I could

---

[1] Prior to this report of suicidal ideation, Gabriela was forced to wait several weeks for a psychiatric evaluation due to a perpetual lack of available providers; her social worker requested the evaluation in June and was told the first available appointment was not until September. Ex. 13 at 129; Ex. 14 at 131; Ex. 15 at 133; Ex. 16 at 135.

[2] Among Prozac's known side-effects are increased risk of suicidal ideation and behavior, and weight gain in excess of ten pounds. ECF 1 at 17, ¶ 56; Ex. 34 at 310.

1  appeal or challenge the government's decision to put me into this treatment facility, or

2  that I could go to court about it.").

3      Upon Gabriela's arrival at Shiloh, the staff noted that "separation from family"

4  and "frustration with lengthy reunification process" were major stressors for her. Ex. 22

5  at 172. Yet, throughout her time at Shiloh, Gabriela and Isaac continued to struggle with

6  ORR's endless, byzantine process.

7      While at Shiloh, Gabriela was required to take both Prozac and Adderall. Ex. 25

8  at 189. Gabriela did not want to take the medications. Ex. 3 at 53 ¶ 6. They made her

9  feel very sleepy, and she did not find them helpful, but she feared her ability to leave

10  detention would be jeopardized if she did not take the medications. *Id.*; Ex. 19 at 146.

11  Gabriela gained twenty-five pounds during her first three months at Shiloh, which may

12  also have been an adverse effect of Prozac.  Ex. 34 at 310.[3]  No one from the shelter or

13  ORR asked Isaac or Gabriela's mother for their consent to administer Gabriela these

14  psychotropic drugs. Ex. 5 at 63 ¶ 9.

15      On April 26, 2018, after eight months of detention at Shiloh, Gabriela was

16  stepped down–i.e., transferred to a less secure facility–to St. Michael's because she

17  "ha[d] not reported self-injurious behavior, or . . . any suicidal ideations," nor was she

18  a flight risk. Ex. 31 at 261. Gabriela's psychiatrist recommended the step down on

19  March 6, 2018, yet it took nearly two months to facilitate the transfer. *Id.*[4]

20      Now at her third ORR detention placement, Gabriela feels "miserable" and is "so

---

[3] Dr. Cohen's report notes that although "this increase in weight was duly noted, there is no evidence that the cause of this weight gain was explored.  [Gabriela's] abnormal lipid profile discovered her first month at Shiloh – suggesting a risk factor for developing cardiovascular problems – was never rechecked despite her subsequent weight gain." Ex. 34 at 295. Dr. Cohen further notes that Prozac "is reported to cause an increase in weight in excess of 10 lbs in 25% of those who take it."  *Id.* at 310. Gabriela was told she was subsequently placed on Adderall to address this weight gain. *Id.* at 311.

[4] Less than one month after her transfer to Shiloh, it appears that Gabriela's psychiatrist was prepared to recommend Gabriela be stepped down to a shelter because Gabriela was "doing well, compliant with treatment, no incidents." Ex. 23 at 175; Ex. 34 at 295. However, for unknown reasons, Gabriela was not transferred to a less secure facility for another five months. Ex. 31 at 261-62.

4

1    tired of being detained." Ex. 3 at 53 ¶ 2; Ex. 34 at 302 ("Of her three settings, [Gabriela]

2    reported that she finds St. Michael's to be the most intolerable."). She says: "I can't cry

3    because the staff ask me why I'm crying. . . . The staff yell at us all the time. . . . We

4    just stay here locked up. We don't have any privacy." Ex. 3 at 55 ¶ 9.

5            After over one and a half years in ORR custody, Gabriela feels devastated by

6    ORR's repeated rejections of her grandfather's sponsorship applications, as well as the

7    lack of procedural safeguards at her disposal to contest ORR's autocratic decision-

8    making. She feels powerless and miserable due to ORR's continued unnecessary

9    administration of psychotropic medications without her or her family's consent, and the

10   unending daily harassment and abuse she faces from St. Michael's staff. Every day she

11   is in detention, she feels more and more desperate: "I have to get out of this place. The

12   staff are so mean; they tease me and try to embarrass me. . . . I know I will be so happy

13   when I am finally free." Ex. 4 at 58-59 ¶¶ 7-8.

14   ## B.    Isaac Has Established that He Would Be a Safe and Suitable Sponsor

15           Isaac has been working diligently to become Gabriela's sponsor so that she can

16   be released from the detention that is causing her harm. Ex. 5 at 62-63 ¶¶ 3, 12; Ex. 34

17   at 290, 296. As the months passed by, he has become increasingly worried about

18   Gabriela's well-being, dealt with the stress and anxiety of ORR's ever-changing

19   demands, and worked hard to navigate ORR's roadblocks. Ex. 7 at 112 ¶15; Ex. 5 at 62

20   ¶ 6. He has addressed each and every concern raised by ORR–and there is not a single

21   issue remaining to justify his continued separation from his granddaughter.

22           Isaac submitted his family reunification packet on April 12, 2017. Ex. 11 at 124.

23   ORR initially rejected Isaac's application because his roommates refused to be

24   fingerprinted. Ex. 10 at 122.

25           In May 2017, Isaac's fingerprints results suggested he had a criminal history in

26   El Salvador fifteen years ago. Ex. 21 at 155. Although Isaac explained that the

27   government had cleared him of those charges, Gabriela's case manager required him to

28   obtain a letter of exoneration from the government of El Salvador. Ex. 7 at 111 ¶ 8; Ex.

5

12 at 127. Isaac requested the letter from El Salvador, and it arrived a little over one month later. Ex. 7 at 111 ¶ 8. Although Gabriela's case manager and ORR received the letter of exoneration they requested, ORR nonetheless rejected Isaac as a potential sponsor. Ex. 17 at 137; Ex. 21 at 155. ORR also concluded that Isaac's work schedule was too demanding and would prohibit him from adequately caring for seventeen-year-old Gabriela. Ex. 17 at 137; Ex. 21 at 155.

While Isaac remained committed to doing everything he could to reunify with Gabriela, the reunification process stalled for several months. After Gabriela arrived at Shiloh RTC in September 2017, ORR intentionally halted Isaac's application process altogether. Ex. 23 at 182. The ORR Federal Field Specialist (FFS) at Shiloh refused to provide guidance to Gabriela's case manager regarding how to proceed with Isaac's application. *Id.* Instead, the FFS instructed the case manager to wait to consider Isaac's application until a different FFS began working at Shiloh. *Id.*

At the end of November, over two months after Gabriela's arrival at Shiloh, ORR finally gave her case manager permission to reconsider Isaac for sponsorship. *Id.* Isaac submitted a new family reunification packet on December 12, 2018. Ex. 26 at 206. Unfortunately, while Isaac was responsive to all of the case manager's requests, Isaac's roommate refused to submit his fingerprints. *Id.* Within less than a month after his roommate refused to be fingerprinted, Isaac moved into a new apartment and submitted necessary documentation to Gabriela's case manager to ensure the reunification process could proceed as quickly as possible. *Id.*; Ex. 27 at 215.

In early January, Gabriela's case manager submitted a home study request to ORR. *Id.* However, the delays in the process continued: ORR did not arrange a home study to assess Isaac's suitability as a custodian for Gabriela for another month. Ex. 28 at 218 ("Home Study").

On or about February 1, 2018, ORR arranged a home study. *Id.* On February 15, 2018, ORR's home investigator recommended against placing Gabriela with Isaac, Home Study, at 241-42, and as a result Gabriela's case manager and ORR rejected

Isaac's application. Ex. 29 at 259; Ex. 31 at 261.[5]

From the time Isaac first applied for reunification in April 2017 to March 2018, no one ever even informed him that his application had been rejected. Instead, Isaac only learned that he had been declared unfit to care for his granddaughter after he inquired about the status of his application:

> When I reached out to [Gabriela's] social worker at Shiloh, she told me that ORR threw out my application . . . ORR has never officially told me that they are looking for other sponsors or that my application has been rejected.

Ex. 7 at 112 ¶ 12.

In May 2018, shortly after Gabriela arrived at St. Michael's, Gabriela's new caseworker explained to Isaac that his sponsorship application had three errors: (1) his roommate refused to sign ORR's paperwork; (2) he had not provided a letter of exoneration; and (3) ORR was concerned about whether he would support Gabriela's education. Ex. 5 at 62-63 ¶ 7. However, if this caseworker's explanation was actually the basis for ORR's denial, none of these grounds have any basis in reality: (1) Isaac no longer lives with a roommate; (2) he has submitted the exoneration letter to ORR; and (3) he wholeheartedly supports Gabriela's education.[6] *Id.*; Ex. 7 at 110 ¶ 3. Given that ORR's sponsorship process fails to provide notice to family members of the reason for their denial as sponsors, to this day Isaac has no way to know the actual basis for the

---

[5] Notably, Gabriela's therapist, Ms. Avila, described Isaac as "attentive, caring, [demonstrating] appropriate concern for [Gabriela's] well-being." Ex. 34 at 296. The case worker also observed Isaac's support of "healthy and positive choices" for Gabriela. *Id.* In his conversations with the case manager, Isaac communicated a strong desire to understand Gabriela's psychiatric diagnoses and medications, and he committed to maintaining communication with Gabriela's case manager. Ex. 7 at 111-12 ¶¶ 11-12.

[6] Regarding Gabriela's education, it should be noted that the Oakland Unified School District (OUSD) 2018-19 school year has already begun. Each day Gabriela remains detained in ORR custody, she misses out on the opportunity to attend one of OUSD's specialized newcomer high school programs and falls further behind academically. *See* Ex. 34 at 314-17.

1    denial and certainly has not had an opportunity to dispute the decision other than

2    through filing this lawsuit.

3    **III.    LEGAL STANDARD FOR ISSUANCE OF TEMPORARY INJUNCTION**

4         Federal Rule of Civil Procedure 65(a) and (b) authorize courts to issue temporary

5    restraining orders and preliminary injunctions. The standards for issuing a temporary

6    restraining order and a preliminary injunction are "substantially identical." *See, e.g.*,

7    *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017). Both remedies are

8    granted to preserve the status quo and prevent irreparable injury before judgment. *Sierra*

9    *On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1423 (9th Cir. 1984).

10        To obtain preliminary relief, Gabriela must establish: (1) "that [she] is likely to

11   succeed on the merits"; (2) "that [she] is likely to suffer irreparable harm in the absence

12   of preliminary relief"; (3) "that the balance of equities tips in [her] favor"; and (4) "that

13   an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S.

14   7, 20 (2008).

15        Courts evaluate these factors on a "sliding scale." *Arc of Cal. v. Douglas*, 757

16   F.3d 975, 983 (9th Cir. 2014) (internal quotations and citation omitted). A "stronger

17   showing of irreparable harm to a plaintiff might offset a lesser showing of likelihood of

18   success on the merits." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th

19   Cir. 2011). But where, as here, the likelihood of grave irreparable injury is palpable and

20   the balance of equities tips sharply in Gabriela's favor, "the moving party [need only]

21   demonstrate a fair chance of success on the merits or questions serious enough to require

22   litigation." *Arc of Cal.*, 757 F.3d at 993-94 (internal quotations and citation omitted).

23   Gabriela easily satisfies this test.

24   **IV.    ORR'S INDEFINITE DETENTION OF GABRIELA IS INFLICTING IRREPARABLE**
     **INJURY.**
25

26       **A.    Gabriela's Time in ORR Custody has Resulted in On-going Harm.**

27        It has long been recognized that even short periods of detention are inimical to

28   the well-being of children and youth. *See generally* B. Holman & J. Ziedenberg, *The*

*Dangers of Detention: The Impact of Incarcerating Youth in Detention and Other Secure Facilities* (Justice Policy Institute, ed.) available at www.justicepolicy.org/images/upload/06-11_rep_dangersofdetention_jj.pdf.  Dr. Luis Zayas, a leading child psychologist and Dean of the School of Social Work at the University of Texas at Austin, emphasizes the unanimity among child welfare experts of the serious harm resulting from detention of children.  The medical and psychiatric literature has shown that incarceration of children, even in such circumstances as living with their mothers in detention, has long-lasting psychological, developmental, and physical effects. Ex. 6 at 70, 77-80 ¶¶ 10-11, 30-33, 35-36.

Gabriela is particularly vulnerable to the harms of prolonged detention due to her trauma history, which has been exacerbated by ORR's poor treatment and improper care. Ex. 34 at 305. Dr. Amy Cohen has concluded that ORR's poor care, including multiple misdiagnoses, unnecessary hospitalization, and harmful responses to Gabriela's trauma have had, and continue to have, grave implications for Gabriela's mental health. *See Id.* at 309. Moreover, Gabriela has suffered immeasurably while in ORR custody as a result of:

- ORR's repeated refusal to reunite her with her grandfather;
- Gabriela's feelings of powerlessness due to her inability to challenge ORR's inept decision-making relating to her placement and reunification;
- ORR's insistence that she take psychotropic medications that she does not feel she has needed for more than a year; and
- On-going verbal abuse and harassment from staff at all three ORR placements.

*Id.* at 305; Ex. 7 at 112 ¶ 15; Ex. 5 at 62 ¶ 6; Ex. 3 at 55 ¶¶ 9, 10.

Dr. Cohen's report notes that Gabriela's level of distress has increased since her arrival at St. Michael's four months ago. This is likely due to a combination of the psychological effects of her protracted detention, plus her experience at the facility which she has referred to as the "most intolerable" of her three placements. Ex. 34 at

**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION CASE NO. 2:18-CV-05741-DMG-PLA**

302. Gabriela reports being picked on and made fun of for being Central American. *Id.* She states that the "staff are so mean; they tease me and try to embarrass me." Ex. 4 at 58 ¶ 7. Gabriela recounted an episode to Dr. Cohen in which staff told Gabriela and her peers: "You're nobodies . . . You don't have any rights . . . You were detained by the government. . . . Who do you think you are?" Ex. 34 at 302. Gabriela recently shared that, "if I laugh loud, they tell me to shut up. The staff yell at us all the time. The staff don't really care about us." Ex. 3 at 55 ¶ 9.

Dr. Cohen has concluded: "There is no doubt that 18 months of incarceration have taken a toll on her and that she is likely less accessible and trusting and certainly more cynical about the intentions of those who are currently caring for her . . . I believe that ongoing institutionalization is having and will continue to have a seriously deleterious effect on her well-being." Ex. 34 at 313-14. When looking globally at the over a year and a half of confinement, Dr. Cohen opines that:

> "Beyond the marathon failure of appreciation of [Gabriela's] PTSD and its devastating and global impact, there was also a parallel failure of empathy for and understanding of the enormity of the proximal stressor which was worsening daily: [Gabriela's] ongoing incarceration, her uncertainty about a sponsor . . . the rollercoaster of her grandfather's attempts to become her sponsor . . . The fact that this took a tremendous toll on her which showed in her mood, her physiologic state, her capacity to focus is not in the least surprising. But, again, was somehow lost on those whose job was to care for her."

*Id.* at 305.

## B.   Isaac is a Fit Custodian for Gabriela

In stark contrast to the harmful conditions in which ORR is detaining Gabriela, her grandfather Isaac is ready and willing to provide a stable and loving home.  Indeed, ORR's own home study of Isaac highlights many positive elements regarding Isaac's fitness to care for Gabriela. The examiner underscores the close relationship between Isaac and Gabriela, and credits Isaac for having "adequate housing," "access to transportation," and "maintain[ing] stable employment." ORR Home Study, Ex. 28 at 228, 240. The ORR home study also notes that Isaac is committed to "oversee

10

[Gabriela's] arrival to school each day and . . . provide afterschool supervision," is aware of a local "hospital where he could take [Gabriela] for any medical needs," and had "identified a local mental health provider . . . where he intends to connect [Gabriela]." *Id.* at 227, 232. The ORR investigator further found that Isaac "understand[s] [his] sponsorship responsibilities" and "agree[s] to comply with conditions of release, including educational, legal, medical, mental health, and safety components, in addition to participation in post release services." *Id.* at 241.

Despite Isaac's many positive attributes, however, ORR has refused to place Gabriela in his care. The record presents a confusing and sometimes conflicting array of reasons why ORR has rejected Isaac as Gabriela's sponsor.[7] What is clear is that none of the many grounds ORR raised to deny Isaac's reunification application warrant protracting Gabriela's detention any further or preventing her from living with her grandfather.

On July 17, 2018, Candida Rugama visited Isaac's home to assess his suitability as Gabriela's caregiver. Ms. Rugama is a retired social worker with the San Mateo County Department of Children and Family Services ("DCFS"). In the course of her career with DCFS she has evaluated placements for foster children "hundreds" of times. Ex. 33 at 276 ¶ 4. Ms. Rugama "strongly disagree[d] with the conclusions in ORR's home study" raising concern about Isaac's suitability, found that Isaac has the capacity and willingness to serve as a safe and responsible custodian for Gabriela, and recommended that Gabriela be placed with Isaac immediately. *Id.* at 281 ¶ 18.

Ms. Rugama's home study refutes each and every concern raised by ORR. Among her conclusions, Ms. Rugama found that:

- Isaac is "highly motivated to care for [Gabriela] and seek the services that he needs to support her overall well-being." *Id.* at 277 ¶ 8. He "understands that

---

[7] For example, ORR's concern that Isaac's former roommate refused to sign paperwork or submit fingerprints is not relevant today. Isaac lives alone in his own apartment.

MEMORANDUM IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:18-CV-05741-DMG-PLA

[Gabriela] has had a history of abuse and trauma and knows that she needs specialized services and supports," and he "has sought out services in his community and believes that the support of doctors and therapists will be very important in helping [Gabriela] to transition." *Id.* at 279 ¶12.

- Isaac maintains strong relationships with each of his three children (including Gabriela's mother) and is "willing to attend parenting classes and any other related classes in order to learn how to best support [Gabriela]." *Id.* at 277 ¶ 8.

- Isaac has community supports in place and is willing to seek out further community supports for Gabriela's benefit. *Id.* at 278 ¶ 10. Isaac's close friend has stated that she is willing to be a source of support for Gabriela, and has even submitted her fingerprints to ORR "as a gesture of her commitment to both [Gabriela] and [Isaac]." *Id.*

- Isaac "is committed to supporting [Gabriela] financially and has the means to do so." *Id.* at 279 ¶ 13. Ms. Rugama determined that the ORR examiner's concerns over Isaac's financial ability to support Gabriela were misplaced. Isaac "has provided [Gabriela] with financial support while she has been detained, and has also routinely sent money back home to family in El Salvador." *Id.*

- Isaac has a stable and structured home environment. *Id.* at 280 ¶ 16. His work schedule is "stable and predictable." *Id.* at 279 ¶ 14. Isaac has also bought [Gabriela] a new twin bed, bedding, and dresser for her living space. *Id.* Ms. Rugama further noted that Isaac "would be happy to buy dishes and have more food available at home for [Gabriela] if she were to come and live with him." *Id.* at 280 ¶ 16.

- Isaac's health is stable. He has been consistently obtaining medical treatment for his health condition. *Id.* 279-80 ¶ 15. Diagnosed with Chronic Lymphocytic Leukemia, Isaac has been entirely compliant with his chemotherapy treatment and reports that he is "recovering well." *Id.*

1        Furthermore, Isaac has "proactively identified a person to take care of

2        [Gabriela] should his health deteriorate." *Id.*

3        Ms. Rugama also concluded that ORR's alleged concerns regarding Isaac's

4 criminal history are unfounded and irrelevant. Even the ORR Home Study confirms that

5 Isaac "has provided documentation to support his clearance of any criminal charges."

6 ORR Home Study, Ex. 28 at 242; Ex. 24 at 126. Moreover, he left El Salvador years

7 ago and "does not have any associations with individuals involved in criminal activity."

8 Ex. 33 at 281 ¶ 17.

9        Isaac and Gabriela have a strong relationship, and Isaac desperately wishes to

10 care for his granddaughter. Ex. 5 at 63 ¶ 12. When Isaac and Gabriela lived in El

11 Salvador they spent a "significant amount" of time together. Ex. 33 at 280 ¶ 16. When

12 Isaac moved to the United States, he and Gabriela "kept in regular communication with

13 weekly telephone calls and [Isaac] provided [Gabriela] and her family with financial

14 support." *Id.* Gabriela has continued to keep in regular contact with Isaac since she has

15 been detained by ORR, calling him weekly. *Id.*; ORR Home Study, Ex. 28 at 228.

16 Gabriela "reports (and her therapist affirms) that her grandfather encourages good

17 decision making and helps her when she struggles to get through difficult times." Ex.

18 34 at 314. Gabriela loves her grandfather very much and knows that he would take good

19 care of her. Ex. 3 at 54 ¶ 7. Moreover, Gabriela's mother has provided written and verbal

20 approval of Isaac, stating that she wants him to care for Gabriela as her sponsor. Ex. 30

21 at 253; Ex. 7 at 110 ¶ 5. Indeed, "[Isaac] offers [Gabriela] *something that no one else*

22 *can*: a constant, steady and loving presence who will be there for her no matter what.

23 More than anything else, this is the medication that [Gabriela] most needs." Ex. 34 at

24 314 (emphasis added).

25        Unsworn equivocations in ORR's home study report do not trump sworn,

26 unequivocal declarations to the contrary. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144,

27 158 n.17 (1970) (unsworn statements insufficient to create genuine issue of material

28 fact). Here, all competent evidence—including the declarations of two highly qualified

child welfare experts—establishes that Isaac is more than fit to care for Gabriela. *See* Ex. 34 at 313 ("the options for [Gabriela] if released to her grandfather in a community such as Oakland are filled with possibility for growth and healing while the ongoing incarceration and institutional life are stifling and unhealthy."); Ex. 33 at 278 ¶ 9 ("[Isaac] is fully aware that parenting [Gabriela] may come with challenges, but it is clear that he has the capacity and support that he needs to effectively support Gabriela.").

* * *

In sum, the harm ORR is causing Gabriela is clear and present; the harm it thinks she may experience in Isaac's care is, at best, speculative and remote. If ORR wishes to deny Isaac Gabriela's custody, it must place her somewhere better than her grandfather's home. *See* 8 U.S.C. §§ 1232(c)(2)(A) (requiring ORR to place children in "least restrictive" setting consistent with their best interests). Yet nowhere in its home study or elsewhere does it appear that ORR ever stopped to think that its alternative to reunifying Gabriela—indefinite detention—might be far worse for her than placement with her grandfather. As Dr. Cohen aptly observed, "there is something very troubling about a system in which children are kept institutionalized and loving family members denied sponsorship based on criteria which—were they applied to households throughout America—would find the vast majority of normal, healthy parents unacceptable." Ex. 34 at 313.

## V.   GABRIELA IS LIKELY TO SUCCEED ON THE MERITS OF HER CLAIM THAT ORR'S CONTINUING TO DETAIN HER IS UNLAWFUL

The *Flores* Settlement, the TVPRA and the First and Fifth Amendments to the Constitution all prohibit ORR from unnecessarily prolonging the detention of children and separating them from family. Gabriela has more than a reasonable chance of succeeding on the merits of her legal challenges to indefinite ORR detention and family separation.

14

### A.      ORR's Detention of Gabriela Breaches the Flores Settlement

Paragraph 14 of the *Flores* Settlement provides: "Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, [ORR] *shall release a minor from its custody without unnecessary delay* . . . [to] an adult relative (brother, sister, aunt, uncle, or grandparent). . ." Ex. 1 at 10-11 (emphasis added). Further grounding ORR's obligation to minimize children's detention, Paragraph 18 of the *Flores* Settlement provides, "Upon taking a minor into custody, the INS . . . shall make and record the prompt and continuous efforts on its part toward . . . the release of the minor . . ." *Id.* at 13.

This Court has repeatedly affirmed its jurisdiction to enforce the *Flores* Settlement and set out the principles guiding enforcement. *See, e.g.*, *Flores v. Johnson*, 212 F. Supp. 3d 864 (C.D. Cal. 2015). The cardinal principle is straightforward: "'Where the contract is clear, the plain language of the contract governs.'" *Id.* at 870.

Here, the only reason ORR continues to detain Gabriela is because it purports to doubt Isaac's fitness. Although nothing in the *Flores* Settlement requires ORR to place Gabriela with someone it reasonably believes may harm or neglect her, the evidence establishes that Isaac would do neither. Indeed, Ms. Rugama's home study demonstrates that Isaac would provide a safe, caring, and supportive home for Gabriela. Accordingly, she is likely to succeed on the merits of her claim that ORR's refusal to reunify her violates the plain text of the Flores Settlement.

### B.      ORR's Refusal to Place Gabriela with Isaac Violates the TVPRA

Gabriela is also likely to prevail on her claim that her continued detention at St. Michael's violates the TVPRA's requirement that ORR place her in the least restrictive setting consonant with her best interests. Section 235(c)(2)(A) of the TVPRA, *codified at* 8 U.S.C. § 1232(c)(2)(A), requires ORR to "promptly" place detained children "in the least restrictive setting that is in the best interest of the child," generally, with "a suitable family member . . . ." Only if "a 'suitable family member' or other guardian is

not available to take custody of a minor," may ORR continue to detain him or her "in a specialized juvenile program or facility." *Flores v. Sessions*, 862 F.3d at 871.

Again, Gabriela's legal claim is straightforward: As between ORR custody and her family, the competent evidence leaves no doubt that the least restrictive setting in Gabriela's best interests is with Isaac. Gabriela is likely to succeed on this claim as well.[8]

## C. Gabriela's Indefinite Detention Without Due Process Violates the First and Fifth Amendments

Finally, ORR's prolonged detention of Gabriela plainly implicates her constitutional rights to physical liberty, family unity, and family association.

First, Gabriela has a fundamental right to freedom from detention. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty [the Fifth Amendment's Due Process] Clause protects."); *United States v. Bogle*, 855 F.2d 707, 710-11 (11th Cir. 1988) (the "unnecessary deprivation of liberty clearly constitutes irreparable harm") (citation omitted); *Reno v. Flores*, 507 U.S. 292, 316 (1993) ("a child's constitutional freedom from bodily restraint is no narrower than an adult's").

Second, Gabriela has a substantial liberty interest in family unity and family association. *See, e.g.*, *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 270 (4th Cir. 2018), *vacated by* _ S.Ct. _, 2018 WL 1256938 ("Prolonged and indefinite separation of parents, children, siblings and partners create not only temporary feelings of anxiety but also lasting strains on the most basic human relationships cultivated through shared time and experience."); *Moore v. City of East Cleveland*, 431 U.S. 494, 503-04 (1977) (plurality opinion) (stating that "the Constitution protects the sanctity of

---

[8] As discussed *post*, construing the TVPRA as granting ORR unbridled power to detain Gabriela indefinitely by administrative fiat would raise profound constitutional questions contrary to the rule of "constitutional avoidance." *Diouf v. Napolitano*, 634 F.3d 1081, 1086 (9th Cir. 2011).

the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition" and noting that "[o]urs is by no means a tradition limited to respect for the bonds uniting the members of the nuclear family. The tradition of uncles, aunts, cousins, and *especially grandparents* sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition." (emphasis added); *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984) (the freedom of intimate association stems from the necessity of protecting individuals' ability "to enter into and maintain certain intimate human relationships [that] must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme"); *Johnson v. City of Cincinnati,* 310 F.3d 484, 501 (6th Cir. 2002) (finding that "nothing in our tradition or precedent can credibly be read to suggest that the right to participate in child rearing does not extend to grandparents.").[9]

Third, the uncontroverted evidence shows that ORR has provided neither Gabriela nor Isaac any meaningful process by which they can contest ORR's having declared Isaac an unfit custodian.[10] Ex. 7 at 112 ¶ 12 ("When I reached out to [Gabriela's] social worker at Shiloh, she told me that ORR threw out my application . . . ORR has never officially told me that they are looking at other sponsors or that my application has been rejected."); Ex. 2 at 49 ¶ 6 ("I don't remember ever being told or reading that I could appeal or challenge the government's decision to put me into this treatment facility, or that I could go to court about it."). ORR's failure to afford Gabriela and Isaac with even the most minimal procedural protections violates Gabriela's

---

[9] By refusing to placement Gabriela in her grandfather's custody, regardless of the procedures given, ORR has violated Gabriela's rights to substantive due process and family association. *See Aristotle P. v. Johnson*, 721 F. Supp. 1002, 1005-10 (N.D. Ill. 1989); *see also Johnson v. City of Cincinnati*, 310 F.3d at 501.

[10] To determine the protections due process requires, courts apply the test prescribed in *Mathews v. Eldridge*, 424 U.S. 319 (1976), which requires consideration of (1) the private interest at stake, (2) the comparative risk of an erroneous deprivation of liberty with and without additional safeguards, and (3) any countervailing interests. *Id.* at 334-35.

MEMORANDUM IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:18-CV-05741-DMG-PLA

procedural due process rights and has resulted in subjecting her to prolonged detention, placement in overly restrictive settings, and prolonged separation from her family. ORR's autocratic decision-making is simply unacceptable when children's freedom and family unity are at stake.

The Supreme Court has held that "widely shared practice" serves to inform whether a particular practice so drastically departs from accepted norms as to be presumptively violative of due process. *Schad v. Arizona*, 501 U.S. 624, 640 (1991) (plurality opinion) ("widely shared practice" a "concrete indicator[] of what fundamental fairness and rationality require"). Concerning the detention of minors, juvenile justice and child welfare standards uniformly require prompt notice and opportunity to be heard when a child is detained. The guidelines of the National Council of Juvenile and Family Court Judges, which are followed in all states, require that a "preliminary protective hearing" "must take place promptly"—in most states, within one to three days of removal. National Council of Juvenile and Family Court Judges, *Resource Guidelines: Improving Court Practice in Child Abuse & Neglect Cases* 30 (1995), available at www.ncjfcj.org/sites/default/files/ resguide_0.pdf ("NCJFCJ Guidelines"). The American Bar Association's Juvenile Justice Standards similarly require that juvenile authorities must request a hearing before a judge or referee no later than 24 hours following the juvenile's arrival at a detention facility, and further, that the juvenile court should hear such a petition no more than 24 hours after that the request for hearing. Institute of Judicial Administration & American Bar Association, *Juvenile Justice Standards Annotated: A Balanced Approach* (1996), at 131, 134, *available at* www.ncjrs.gov/pdffiles1/ojjdp/166773.pdf ("ABA Standards").

Competent child welfare and juvenile justice standards further prescribe the basic procedural protections of a fair and effective detention hearing. Obviously, a child must be given notice of the hearing and the reasons the state has taken him or her into custody. NCJFCJ Guidelines at 36; ABA Standards at 134; *In re Gault*, 387 U.S. 1, 34 (1967). Next, a judge or other neutral decision maker must preside over the hearing. NCJFCJ

Guidelines at 33; ABA Standards at 131. When a court determines that a child should remain in detention, it must provide her or him with a written explanation of its reasons. NCJFC Guidelines at 40-41; ABA Standards at 135-36.

Here, ORR disregarded each and every one of the foregoing child welfare standards: it not only failed to give Isaac and Gabriela notice and hearing within any time certain, it gave them no notice or hearing at all. ORR's process, or rather the utter lack thereof, is presumptively unconstitutional. Gabriela is likely to prevail on her constitutional claim as well.

## VI.   THE EQUITIES WEIGH HEAVILY IN GABRIELA'S FAVOR

When ruling on a preliminary injunction, "a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Arc of Cal., supra,* 757 F.3d at 991 (*quoting Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)).

Here, ORR's sole *legitimate* interest in refusing to reunify Gabriela with her grandfather is to protect her from harm or neglect.[11] Yet the facts show that ORR's indefinite detention of Gabriela is doing the precise opposite: causing her great harm that she would not suffer with her family.

## VII.   REUNITING GABRIELA WITH HER FAMILY IS IN THE PUBLIC INTEREST

The Ninth Circuit has repeatedly held that "'it is always in the public interest to

---

[11] Unfortunately, Defendants' public statements suggest that ORR's detaining children at times aims more to deter unauthorized immigration than to protect children. Steven Wagner, acting assistant secretary at HHS's Administration for Children and Families, recently characterized the *Flores* Settlement and the TVPRA as creating an "immigration loophole [in which] HHS is forced to release minors from Central America into the United States . . ." Illegal Immigrant Program Creating Proxy Foster Care System, Says Official, THE EPOCH TIMES, June 23, 2018, *available at* www.theepochtimes.com/illegal-immigrant-program-creating-proxy-foster-care-system-says-official_2544724.html (last visited June 4, 2018). He continued to argue that ORR's releasing children "'is an example of open borders,'" "makes the immediate crisis worse and creates an economic incentive for further violation of federal immigration law." *Id.*

ORR's apparent zeal to detain children in order to deter others from entering unlawfully betrays a hollowness in its professed concern for Gabriela's welfare, especially considering that she will turn eighteen in four months.

prevent the violation of a party's constitutional rights.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (*quoting Sammartano v. First Judicial District Court*, 303 F.3d 959, 974 (9th Cir. 2002)). There is also a weighty public interest in "ensur[ing] that federal statutes are construed and implemented in a manner that avoids serious constitutional questions." *Rodriguez v. Robbins*, 715 F.3d 1127, 1146 (9th Cir. 2013).

## VIII. CONCLUSION

For the foregoing reasons, the Court should grant this motion and issue an order preliminarily enjoining ORR from continuing to detain Plaintiff Gabriela and requiring that she be reunited with her grandfather Isaac immediately.

Dated:        August 17, 2018

CARLOS HOLGUÍN
Center for Human Rights &
Constitutional Law

HOLLY COOPER
CARTER WHITE
University of California Davis School of Law

LEECIA WELCH
NEHA DESAI
POONAM JUNEJA
CRYSTAL ADAMS
National Center for Youth Law

SUMMER WYNN
MARY KATHRYN KELLEY
JON F. CIESLAK
MEGAN DONOHUE
Cooley LLP


/s/ *Leecia Welch*
Leecia Welch

*One of the Attorneys for Plaintiffs*