CARLOS R. HOLGUÍN (Cal. Bar No. 90754)
Center for Human Rights & Constitutional Law
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.org

*Listing continues on next page*

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| LUCAS R., *et al.*,<br><br>            Plaintiffs,<br><br>    v.<br><br>ALEX AZAR, Secretary of U.S. Department of Health and Human Services; *et al.*,<br><br>            Defendants. | Case No. CV 2:18-CV-05741<br><br>DECLARATION OF DR. AMY COHEN, M.D., IN SUPPORT OF EX PARTE APPLICATION TO RECONSIDER CONTINUANCE OF LUCAS R. MOTION FOR PRELIMINARY INJUNCTION.<br><br>Hearing:   None |

*Counsel for Plaintiffs, continued*

HOLLY S. COOPER (Cal. Bar No. 197626)
Co-Director, Immigration Law Clinic
CARTER C. WHITE (Cal. Bar No. 164149)
Director, Civil Rights Clinic
University of California Davis School of Law
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu
　　　　ccwhite@ucdavis.edu

LEECIA WELCH (Cal. Bar No. 208741)
NEHA DESAI (Cal. RLSA Bar No. 803161)
POONAM JUNEJA (Cal. Bar No. 300848)
National Center for Youth Law
405 14th Street, 15th Floor
Oakland, CA 94612
Telephone: (510) 835-8098
Email: lwelch@youthlaw.org
　　　　ndesai@youthlaw.org
　　　　pjuneja@youthlaw.org

CRYSTAL ADAMS (Cal. Bar No. 308638)
National Center for Youth Law
1313 L St. NW, Suite 130
Washington, DC 20005
Telephone: (202) 868-4785
Email: cadams@youthlaw.org

I, Dr. Amy Cohen, M.D., declare and say as follows:

1. I have previously submitted a declaration attesting to my qualifications and experience. *See* ECF 39-7. I have also submitted a supplemental declaration in which I updated my assessment of the mental health of Plaintiff Lucas R. following a telephone interview with him on August 16, 2018. *See* ECF 55-1.

2. On August 23 and 24, 2018 I visited Shiloh Treatment Center ("Shiloh RTC") in Manvel, Texas, at the request of counsel for the plaintiff children in *Flores v. Sessions*. The purposes of the visit were two: (i) to assess whether *Flores* class members housed at Shiloh RTC following the Court's order of July 30, 2018, pose a risk of harm to themselves or others; and (ii) to evaluate the mental health of Lucas R. Over the course of two days I assessed ten of the twenty-five children in residence there, including Lucas R., whom I assessed during the morning of August 23, 2018.

3. In the late afternoon of August 23, 2018, I was advised that the Court had postponed hearing on Lucas's motion for an order requiring his immediate placement with his sister, Madelyn R., from August 31, 2018, to September 21, 2018. I execute this declaration in support of Lucas's request that the Court reconsider postponing the hearing on his motion such that his request for reunification with his sister may be heard on the originally scheduled date of August 31, 2018. As explained below, it is my professional opinion that unless the Court acts promptly to remove Lucas from Shiloh and reunite him with his family, the ongoing decline detention is causing in his psychological well-being may very well prove catastrophic.

4. As described in my original evaluation (ECF 39-7), Lucas has suffered from post-traumatic stress disorder owing to physical abuse he suffered at the hand of his aunt, uncle, cousins and brother in Guatemala. ORR detention has significantly worsened his PTSD symptoms and caused him to develop Adjustment Disorder with Anxiety and Depressed Mood. As a consequence, his feelings of anger, mistrust, isolation, and despondency associated with both diagnoses have intensified. In short,

Lucas's deterioration was—and is—entirely iatrogenic: that is, a consequence of prolonged detention, family separation, and improper mental health "treatment" ORR has given him, all of which are making Lucas sicker.

5. In my professional opinion, Lucas does not and will not pose a danger to others. In arriving at this opinion I utilized the Columbia-Suicide Severity Rating Scale ("C-SSRI"). [As Lucas had never been deemed a risk to others, it was unnecessary to engage him in a more formal screening process for this]. The C-SSRI is the single most widely accepted, well-researched tool for assessing actual "danger to self" in both children and adults. While many patients experience suicidal thoughts, the C-SSRI enables the clinician to determine when those thoughts rise to "intent": a level of actual dangerousness requiring referral for a higher level of care or supervision. Children and adults with histories of severe trauma often experience repeated and transient "suicidal ideation" which does not rise to that level of intent..

6. This evaluation also engendered my professional opinion that at the present time Lucas does not pose a danger to himself, but that failing to end his confinement and separation from his family may soon cause him to pose a risk of harm to himself, the very condition that ostensibly justifies Lucas's confinement at Shiloh RTC. Lucas's suicidal thoughts have been vague and have not been accompanied by the "intent" or "plan" which would raise them to a level of dangerousness. These thoughts are nearly always precipitated by identifiable events or circumstances: the frequency of his ideation has increased during his time in custody and he is able to identify that feelings that he will never get out of Shiloh and rejoin his family will often lead to a vague wish to die. He is also able to state that each disappointing event - the rejection of his sister as sponsor, the cessation of his phone calls with her - has intensified his experience of isolation and hopelessness and that this, in turn, has increased the frequency of his suicidal ideation. By my evaluation, Lucas does not represent a risk to himself at this time. However, as his protracted separation from

4

his family and his consequent hopelessness continues, he is at increasing danger of crossing that line from thought to intent.

7. Nor, in my opinion, has ORR has evaluated Lucas—or any of the other twenty-four children at Shiloh—carefully enough to conclude that any of them pose a risk of harm to themselves or others. My extensive review of the records of Lucas and another child have suggested that no standardized metric whatsoever is used to evaluate actual risk to self. Rather, the mere admission of suicidal thoughts have been sufficient to precipitate significantly elevated supervision and transfer to a higher level of care, often - as in Lucas's case - to the detriment of these children. For some, this has meant that they learn to keep such thoughts to themselves, increasing their isolation and preventing them from receiving the appropriate treatment for such a symptom.

8. Upon being admitted to the Shiloh RTC on August 23, 2018, *Flores* counsel and I met with Douglas Plaeger, who identified himself as Shiloh's Program Director. Mr. Plaeger stated that someone from the Public Health Service had spent two days during the week of August 13, 2018, reviewing case files for Shiloh's current detainees, but had only spoken to about three children. Mr. Plaeger further stated that ORR has not informed Shiloh of the results of this file review, and Shiloh had accordingly transferred no child to another facility based on ORR's having determined that they do not pose a risk of harm to themselves or others.

9. Mr. Plaeger further stated that Shiloh continues to deem ORR the custodian or guardian of children detained at Shiloh and that ORR continues to have full authority to authorize Shiloh to administer children psychotropic medications on a non-emergent basis without parental consent or court authorization.

10. Lucas confirmed that since July 30, 2018, no one has interviewed him to assess whether he poses a danger to himself or others. He further confirmed that he continues to take Lexapro and that as far as he knows, no one from Shiloh or ORR

5

has asked Madelyn or any other adult family member for permission to continue giving him psychotropic medication.

11. All of the other children I assessed at Shiloh reported much the same: (i) no one has spoken with them to assess whether they pose a risk of harm to themsevles or others; and (ii) Shiloh continues to administer psychotropic medications without parental consent or court order.

12. In an effort to form an opinion on whether the medications Shiloh continues to administer children are safe and effective, I requested Mr. Plaeger provide me with a medication list for each child whom I interviewed and who provided formal consent that I receive this information. Initially, Mr. Plaeger indicated he had no objection to doing so, but later refused to share medication lists, purportedly pursuant to instructions from ORR.

13. From his attorneys and myself, Lucas has been aware that the hearing to address his status has been scheduled for August 31st. This beacon has gotten him through weeks of misery. Just as his trust in his attorneys and myself has represented a counterweight to the alienation and isolation that Lucas feels toward the staff at Shiloh, so too his court date has served as the singular hope in what has felt like an increasingly hopeless existence.

14. On Friday, August 24, 2018, attorney Carlos Holguín and I met with Lucas to tell him about the Court's having postponed the hearing on his request to be reunited with his family. Children suffering from PTSD often struggle to internalize psychological distress as a means to keep from losing control of overwhelming emotions. I carefully observed Lucas's reaction to the news that he may have to spend an additional four weeks in confinement away from his family. He became notably withdrawn and quiet, turning inward, shutting down, putting his earbuds back in his ears.  Unlike in our other interviews he was unable to speak directly of the feelings generated by this news, suggesting that these feelings were too overwhelming to

address directly. His body language - a shrug and pulling back from the table - suggested that this news had left him feeling more hopeless, less trustful in the system which might allow him relief - perhaps even in those of us he's counted on to help him - more isolated. These are all factors which increase his risk of deterioration into a dangerous state.

15. In my opinion, ORR's treatment of Lucas and other children at Shiloh RTC continues to fall far short of both accepted mental health care standards and the "risk of harm" and informed consent standards set out in the Court's order of July 30. These failures create an unreasonable risk that Lucas will suffer serious harm should he remain in ORR detention for an additional four weeks. No child—especially one suffering from PTSD—is impervious to the destructive effects of institutionalization and separation from family. I believe that ongoing residence at Shiloh and separation from the family could well push Lucas, like any such youth, to an experience of isolation and hopelessness wholly inimical to his long-term well-being.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed this 26 day of August, 2018, at Los Angeles, California.

Dr. Amy Cohen, M.D.