CARLOS HOLGUÍN (Cal. Bar No. 90754)
Center for Human Rights and Constitutional Law
256 South Occidental Blvd.
Los Angeles, CA 90057
Telephone: (213) 388-8693, ext. 309
Facsimile: (213) 386-9484
email: crholguin@centerforhumanrights.org

*Listing continued on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCAS R., by his next friend MADELYN R.; DANIELA MARISOL T., by her next friend KATHERINE L.; MIGUEL ANGEL S., by his next friend GERARDO S.; GABRIELA N., by her next friend ISAAC N.; JAIME D., by his next friend REYNA D.; SIRENA P., by her next friend EDUARDO P.; BENJAMIN F., by his next friend ISABELLA F.; SAN FERNANDO VALLEY REFUGEE CHILDREN CENTER, INC.; UNACCOMPANIED CENTRAL AMERICAN REFUGEE EMPOWERMENT, <br><br> Plaintiffs, <br><br> v. <br><br> ALEX AZAR, Secretary of U.S. Department of Health and Human Services; E. SCOTT LLOYD, Director, Office of Refugee Resettlement of the U.S. Department of Health & Human Services, <br><br> Defendants. | Case No.  2:18-CV-05741 <br><br> **FIRST AMENDED[1] COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND NOMINAL DAMAGES** <br><br> **(CLASS ACTION)** |

*Counsel for Plaintiffs, continued*

---

[1] Because the amendments made herein do not affect the arguments raised in Defendants' pending Motion to Dismiss, the Court should construe Defendants' Motion as one to dismiss this First Amended Complaint in order to avoid needlessly delaying this action. *See Martin v. Weed, Inc.*, No. 18-cv-00027-TUC-RM, 2018 WL 2431837, at *1 n.1 (D. Ariz. May 30, 2018).

First Amended Complaint

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

HOLLY S. COOPER (Cal. Bar No. 197626)
Co-Director, Immigration Law Clinic
CARTER C. WHITE (Cal. Bar No. 164149)
Director, Civil Rights Clinic
University of California Davis School of Law
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu
        ccwhite@ucdavis.edu

LEECIA WELCH (Cal. Bar No. 208741)
NEHA DESAI (Cal. RLSA Bar No. 803161)
POONAM JUNEJA (Cal. Bar No. 300848)
National Center for Youth Law
405 14th Street, 15th Floor
Oakland, CA 94612
Telephone: (510) 835-8098
Email: lwelch@youthlaw.org
        ndesai@youthlaw.org
        pjuneja@youthlaw.org

CRYSTAL ADAMS (Cal. Bar No. 308638)
National Center for Youth Law
1313 L St. NW, Suite 130
Washington, DC 20005
Telephone: (202) 868-4785
Email: cadams@youthlaw.org

SUMMER WYNN (Cal. Bar No. 240005)
MARY KATHRYN KELLEY (Cal. Bar No. 170259)
JON F. CIESLAK (Cal. Bar No. 268951)
MEGAN L. DONOHUE (Cal. Bar No. 266147)
Cooley LLP
4401 Eastgate Mall
San Diego, CA 92121-1909
Telephone: (858) 550-6000
Email: swynn@cooley.com
        mkkelley@cooley.com
        jcieslak@cooley.com
        mdonohue@cooley.com

First Amended Complaint

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

# I.

# INTRODUCTION

1.    This is an action for injunctive relief, declaratory relief, and nominal damages, challenging certain unlawful policies and practices of Defendant Office of Refugee Resettlement ("ORR"), a subordinate entity within the U.S. Department of Health and Human Services ("HHS"). These policies and practices are causing grave harm to children detained for alleged civil violations of the Immigration and Nationality Act, 8 U.S.C. §§ 1101, *et seq.* ("INA"). Pursuant to § 462 of the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, codified at 6 U.S.C. § 279 ("HSA"), and § 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. 110-457, 122 Stat. 5044, codified at 8 U.S.C. § 1232 ("TVPRA"), ORR is responsible for the placement, care, custody and release of "unaccompanied alien children."

2.    The named Plaintiffs are immigrant and asylum-seeking children detained for alleged civil violations of the INA and are members of the class protected under the settlement in *Flores v. Sessions*, No. 85-cv-4544-DMG (AGRx) (C.D. Cal.) ("*Flores* Settlement").

3.    The *Flores* Settlement and TVPRA § 235 oblige ORR to —

(a)    minimize the detention of immigrant children by releasing them to their parents or other qualified custodians so long as their continued detention is not required due to dangerousness or unusual flight risk;

(b)    place detained immigrant children in the least restrictive setting that is in the best interest of individual children—generally a facility having a state license to care for dependent, as opposed to delinquent, juveniles— for however long they remain in federal custody;

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

1    (c)    ensure that detained immigrant children are held only in facilities that
2           are safe, sanitary and consistent with concern for the particular
3           vulnerability of minors; and

4    (d)    ensure to the greatest extent practicable that children who are or have
5           been in ORR custody, except those from contiguous countries, have
6           counsel to represent them in legal matters and protect them from
7           mistreatment, exploitation, and trafficking.

8    4.    ORR violates the foregoing requirements, as well as the Due Process
9    Clause of the Fifth Amendment of the U.S. Constitution, the Freedom of Association
10   Clause of the First Amendment to the U.S. Constitution, and Section 504 of the
11   Rehabilitation Act of 1973 by pursuing the following policies and practices:

12   (a)    ORR confines children in medium secure facilities, residential treatment
13          centers ("RTCs"), and secure facilities peremptorily, often on bare
14          allegations they are dangerous or pose a flight risk, without affording
15          them a meaningful or timely opportunity to be heard regarding the
16          reasons for such placement;

17   (b)    ORR prolongs children's detention on the ground that their parents or
18          other available custodians are or may be unfit, while affording neither
19          detained juveniles nor their proposed custodians a meaningful or timely
20          opportunity to be heard regarding a proposed custodian's fitness;

21   (c)    ORR places children in residential treatment facilities and detention
22          facilities in which it knows they will be administered powerful
23          psychotropic medications for weeks, months, or years, without
24          procedural safeguards, including seeking informed parental consent or
25          other lawful authorization, even from parents present in the United
26          States.

27

28

First Amended Complaint

2

(d)    ORR blocks lawyers from representing detained children with respect to placement, non-consensual administration of psychotropic medications, or release to available custodians notwithstanding that Congress has allocated funds specifically to provide such lawyers to represent children who are or have been in ORR custody in "legal matters," including issues related to release and least-restrictive placement;

(e)    ORR segregates children who have or are perceived to have a behavioral, mental health, intellectual, and/or developmental disability in secure facilities, medium secure facilities, and RTCs, instead of the most integrated setting appropriate to their needs; and

(f)    ORR's actions prolong the detention of children who have or are perceived to have a behavioral, mental health, intellectual, and/or developmental disability by placing them in restrictive settings associated with heightened administrative barriers to release.

5.    By this action, Plaintiffs seek equitable relief on behalf of themselves and those similarly situated requiring Defendants to conform their polices, practices, and procedures to the *Flores* Settlement, § 235 of the TVPRA, the Due Process Clause of the Fifth Amendment to the U.S. Constitution, the Freedom of Association Clause of the First Amendment to the U.S. Constitution, and Section 504 of the Rehabilitation Act. Plaintiffs also seek nominal damages against individual Defendant E. Scott Lloyd in his personal capacity pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

II.

JURISDICTION AND VENUE

6.    This Court has jurisdiction over this action pursuant to Paragraph 37 of the *Flores* Settlement (providing for "the enforcement, in this District Court, of the provisions of this Agreement except for claims brought under Paragraph 24"); 28

First Amended Complaint

3

1    U.S.C. § 1331 (federal question jurisdiction); and 28 U.S.C. § 2241 (habeas corpus

2    jurisdiction).

3         7.     Plaintiffs' action for declaratory relief is brought pursuant to 28 U.S.C.

4    §§ 2201 and 2202, and 5 U.S.C. § 703.

5         8.     Venue is properly in this court pursuant to Paragraph 37 of the *Flores*

6    Settlement and 28 U.S.C. § 1391(b) and (e)(1), because this action challenges class-

7    wide violations of the *Flores* Settlement, and because acts complained of herein

8    occurred in this district, Defendants have offices in this district, and no real property

9    is involved in this action.

10        9.     Plaintiffs have private rights of action against Defendants pursuant to

11    Paragraph 37 of the *Flores* Settlement and the Administrative Procedure Act, 5 U.S.C.

12    §§ 701 *et seq.*

13                             III.

14                      PARTIES

15        10.    Plaintiff Lucas R.[2] is a native and citizen of Guatemala whom ORR is

16    currently detaining at the Shiloh Residential Treatment Center ("Shiloh RTC") in

17    Texas. He was born in 2005 and is thirteen years old. Lucas is, and at all relevant

18    times was, an unaccompanied alien child within the meaning of 6 U.S.C. § 279(g)(2)

19    and a member of the plaintiff class the *Flores* Settlement protects. Pursuant to Federal

20    Rule of Civil Procedure 17(c)(2), Lucas appears through his Next Friend and sister,

21    Madelyn R., a resident of Los Angeles, California. Before Tuesday, September 4,

22    2018, ORR refused to release Lucas to his Next Friend and sister on the ground that

23    Madelyn's home may be unfit. ORR indicated on September 4, 2018 that it would

24

25

26    ───────────────────

27    [2] The Court has previously granted permission to use pseudonyms for the named
Plaintiffs and their Next Friends. Plaintiffs will promptly seek permission to use

28    pseudonyms for the two new named Plaintiffs and their Next Friends.

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

1   release Lucas on September 6, 2018. Upon information and belief, as of the timing of

2   this filing, Lucas is scheduled to be released on September 8, 2018.

3        11.   Plaintiff Daniela Marisol T. is a native and citizen of Honduras in ORR

4   custody in a residential group home in Kentwood, Michigan. Daniela Marisol was

5   born in 2001 and is seventeen years old. Daniela Marisol is, and at all relevant times

6   was, an unaccompanied alien child within the meaning of 6 U.S.C. § 279(g)(2) and a

7   member of the plaintiff class the *Flores* Settlement protects. Pursuant to Federal Rule

8   of Civil Procedure 17(c)(2), Daniela Marisol appears through her Next Friend and

9   sister, Katherine L., a resident of St. Paul, Minnesota. ORR previously refused to

10  release Daniela Marisol to her Next Friend and sister on the ground that Katherine is

11  or may be unfit due to not having a separate bedroom for Daniela Marisol and not

12  having adequate income to support Daniela Marisol's medical expenses. Katharine

13  has now met ORR's requirements for reunification having rented a larger apartment

14  and having enough disposable income to pay Daniela Marisol's medical expenses and

15  is currently awaiting ORR's decision to release Daniela Marisol into her care.

16       12.   Plaintiff Gabriela N. is a native and citizen of El Salvador whom ORR is

17  presently detaining in St. Michael's Home for Children in Houston, Texas. She was

18  born in 2000 and is seventeen years old. Gabriela is, and at all relevant times was, an

19  unaccompanied alien child within the meaning of 6 U.S.C. § 279(g)(2) and a member

20  of the plaintiff class the *Flores* Settlement protects. Pursuant to Federal Rule of Civil

21  Procedure 17(c)(2), Gabriela appears through her Next Friend and grandfather, Isaac

22  N., a resident of Oakland, California. ORR has refused to release Gabriela to her Next

23  Friend and grandfather on the ground that Isaac is or may be unfit.

24       13.   Plaintiff Miguel Angel S. is a native and citizen of Mexico whom ORR

25  is presently detaining at Yolo County Juvenile Detention Center ("Yolo"), a secure

26  facility in Woodland, California. He was born in 2001 and is seventeen years old.

27  Miguel Angel is, and at all relevant times was, an unaccompanied alien child within

28

5

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

the meaning of 6 U.S.C. § 279(g)(2) and a member of the plaintiff class the *Flores* Settlement protects. Pursuant to Federal Rule of Civil Procedure 17(c)(2), Miguel Angel appears through his Next Friend and father, Gerardo S., a resident of San Jose, California. Gerardo has sought to be Miguel Angel's custodian and to have Miguel Angel released from ORR custody into his care.

14.     Plaintiff Jaime D. is a native and citizen of Honduras and presently being held in ORR custody in Dobbs Ferry, New York. He was born in 2004 and is thirteen years old. Jaime is, and at all relevant times was, an unaccompanied alien child within the meaning of 6 U.S.C. § 279(g)(2) and a member of the plaintiff class the *Flores* Settlement protects. Pursuant to Federal Rule of Civil Procedure 17(c)(2), Jaime appears through his Next Friend, Reyna D., a resident of Riverdale, Maryland. Reyna is Jaime's aunt. Reyna has sought to be Jaime's custodian and to have Jaime released from ORR custody into her care.

15.     Plaintiff Sirena P. is a native and citizen of Mexico and is presently being held in ORR custody at Shiloh RTC in Manvel, Texas. She was born in 2003 and is fourteen years old. Sirena is, and at all relevant times was, an unaccompanied alien child within the meaning of 6 U.S.C. § 279(g)(2) and a member of the plaintiff class the *Flores* Settlement protects. Pursuant to Federal Rule of Civil Procedure 17(c)(2), Sirena appears through her Next Friend, Eduardo P., a resident of Ontario, California. Eduardo is Sirena's parent. Eduardo has sought to be Sirena's custodian and to have Sirena released from ORR custody into his care.

16.     Plaintiff Benjamin F. is a native and citizen of El Salvador whom ORR is currently detaining at Shiloh RTC in Manvel, Texas. He was born in 2008 and is an autistic, developmentally delayed nine-year-old boy with limited verbal abilities. Benjamin is, and at all relevant times was, an unaccompanied alien child within the meaning of 6 U.S.C. § 279(g)(2) and a member of the plaintiff class the *Flores* Settlement protects. Benjamin F. appears through his Next Friend and grandmother,

6

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

Isabella F., a resident of Los Angeles, California. Isabella has sought to be Benjamin's sponsor and to have Benjamin released from ORR custody into her care.

17.    Plaintiff San Fernando Valley Refugee Children Center, Inc. ("Children Center") is a non-profit organization incorporated in the State of California, with its principal place of business in North Hills, California. The Children Center is a project of the North Hills United Methodist Church's Hispanic Mission. The Children Center's mission is to provide comprehensive social services, including mental health care, shelter, transitional living assistance and legal aid, to children, youth, and families who have come in search of refuge from persecution and endemic violence in the Northern Triangle of Central America (El Salvador, Honduras, and Guatemala). The children and youth the Children Center serves are the functional equivalents of its members. The rights of children and youth the Children Center seeks to protect in this action are germane to its mission and purpose. ORR's policies and practices, as alleged herein, make it substantially more difficult for the Children Center to carry out its mission. For example, many of the children and youth whom the Children Center serves have suffered multiple psychological and physical traumas, first in their countries of origin, next during their journeys through Mexico, and then again, upon being arrested and detained for immigration violations. The more time already-traumatized children and youth remain detained, separated from their parents and families, the more their mental and physical health deteriorates. The trauma that immigration detention causes children and youth is greater still when ORR places them in restrictive settings such as juvenile halls and RTCs, or medicates them involuntarily or without their parents' consent or other lawful authority. The additional trauma such detention inflicts requires the Children Center to devote commensurately greater resources, particularly mental health resources, to assist such children and youth to recover.

First Amended Complaint

7

18.     The Children Center is one of a small number of non-profit organizations that serve refugee children and youth. The Children Center's resources are limited and do not allow it to help all who are in need. The Children Center's ability to raise funds depends in part on the raw number of children and youth it helps. As a practical matter, resources the Children Center's devotes to serving one child or youth are unavailable to others. Defendants' challenged policies and practices divert the Children Center's limited resources to address the injuries those policies and practices cause, thereby reducing the number of other needy children and youth the Children Center is able to assist, and, *a fortiori*, its ability to raise funds. The Children Center therefore has a direct institutional interest in: (a) minimizing the time refugee children and youth, including youth with disabilities, are detained; (b) ensuring that such children and youth are housed in minimally restrictive settings for however long they must remain in immigration-related detention; (c) minimizing the injury children and youth suffer as a result of taking psychotropic drugs; and (d) ensuring that refugee children and youth have counsel to assist them in all legal matters relating to their immigration status, including custody, placement, and the administration of psychotropic drugs without parental consent. The direct participation in this litigation of the children and youth whom the Children Center serves is not necessary because Plaintiffs seek only prospective equitable relief and nominal damages.

19.     Plaintiff Unaccompanied Central American Refugee Empowerment ("UCARE") is an unincorporated consortium of non-profit agencies, most of which are incorporated in the State of California, with its principal place of business in Los Angeles, California. UCARE's mission is to advocate for and provide legal and social services to immigrant and refugee minors, many of whom are or have been in ORR or Immigration and Customs Enforcement custody. In appropriate cases, UCARE arranges free representation and assistance to youth with immigration problems before the U.S. Citizenship and Immigration Services, the Executive Office of

8

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

Immigration Review, and the Board of Immigration Appeals. Defendants' unlawful policies and practices, as alleged herein, make such assistance and representation substantially more difficult and render UCARE's work less effective. ORR's compliance with the *Flores* Settlement and § 235 of the TVPRA is germane to UCARE's purpose. The individual participation of aggrieved youth the UCARE serves is not necessary because UCARE seeks only prospective or injunctive relief and nominal damages for its client members. UCARE has an actual stake in this litigation because the funding of UCARE's member organizations is largely determined by the number of youth they serve. Defendants' challenged policies and practices deny or delay children's release, and thus delay or deny Plaintiff UCARE's member organizations the opportunity to serve them.

20.  ORR has placed many unaccompanied children in the communities that the Children Center and UCARE serve. In federal fiscal year 2018, ORR placed more than 1,100 unaccompanied children in Los Angeles alone.

21.  Defendant Alex Azar is the Secretary of HHS and oversees ORR. Pursuant to 6 U.S.C. § 279, HHS is responsible for the proper care and placement of unaccompanied alien children who are in federal custody by reason of their immigration status. HHS and ORR discharge these duties by, *inter alia*, entering into contracts with public and private entities to house, care for, and provide legal assistance to unaccompanied alien children arrested and detained pursuant to the INA. Defendant Azar is sued in his official capacity only.

22.  Defendant E. Scott Lloyd is the Director of ORR. ORR is responsible for the care, custody, and release of unaccompanied alien children in federal custody on account of their immigration status. Defendant Lloyd is sued in his individual capacity for nominal damages pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), and in all other respects in his official capacity only.

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

23.     Defendants, and each of them, have historically professed to act in the capacity of *parens patriae* to detained children. Defendants, and each of them, thereby assume a legal obligation to act in such children's best interests. Defendants breach this duty in pursuing the policies and practices challenged in this Complaint.

IV.

NAMED PLAINTIFFS' EXPERIENCES IN ORR CUSTODY

A.     Lucas R.

24.     On or about February 12, 2018, ORR assumed custody of Plaintiff Lucas R. after he arrived at the U.S.-Mexico border. ORR placed him at the Hacienda del Sol facility in Youngtown, Arizona. Within approximately ten days, Madelyn R., Lucas' adult sister and Next Friend, requested Lucas' custody and delivered to ORR a family reunification packet with the required documentation. Many years ago, Lucas and Madelyn's father abandoned them; their mother died when Lucas was approximately two years old. Thereafter, Madelyn and an aunt raised Lucas in his parents' stead. Madelyn and Lucas have a very close relationship. Over the next six weeks or so, ORR gave Lucas and Madelyn the impression that everything was in order and that it would soon release Lucas to Madelyn's custody; it did not.

25.     According to Madelyn, in Guatemala, Lucas was a thriving, happy child who liked to joke, play, and talk with people. When he arrived at Hacienda del Sol, facility staff noted that Lucas appeared cooperative, calm, and alert, and showed "no behavioral concerns."

26.     As his confinement wore on, however, Lucas became depressed, fearing that ORR would never release him to his family. Without obtaining Madelyn's informed consent, the informed consent of any other adult family member, or judicial authorization, ORR administered Lucas psychotropic drugs, ostensibly to control "moderate" depression. Upon information and belief, ORR did not involve a neutral

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

decision maker in the initial determination of whether to prescribe psychotropic medications to Lucas or in ongoing reviews of those medications.

27.    The medications caused Lucas stomach pain, and he refused to continue taking them. Lucas thinks that his refusal to take the medications harmed his ability to reunify with his sister.

28.    Approximately six weeks after Madelyn had requested Lucas' custody, ORR sent an investigator to Madelyn's home in Los Angeles, California. Living with Madelyn then and now are her infant daughter, adult brother, and an unrelated female roommate and her child. At the time the investigator arrived, Madelyn's roommate's brother was visiting.

29.    The investigator indicated to Madelyn that her home was suitable, but that all adults who reside with her would have to appear for fingerprinting, including her roommate's brother. Madelyn advised the investigator that her roommate's brother did not live in the home, but the investigator insisted that the visitor appear for fingerprinting regardless. All the adult residents of Madelyn's home appeared for fingerprinting, but her roommate's brother did not. Approximately one month later, ORR orally advised Madelyn that it would not release Lucas to her because her roommate's brother had failed to appear for fingerprinting. ORR represented to Madelyn that its decision was final, and afforded neither Madelyn nor Lucas any hearing, right to administrative appeal, or other means to change its decision. ORR failed to provide Madelyn with a written decision or written explanation for denying her custody of Lucas.

30.    When Lucas learned that the ORR home examiner recommended against releasing him to Madelyn, he was devastated. Lucas began feeling desperate and helpless over his prolonged detention and shared those feelings with staff members. Rather than attempting to help Lucas manage his feelings, Hacienda del Sol personnel

11

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

1   responded to his pleas for support by hospitalizing Lucas and requesting that ORR

2   transfer him to a more secure facility.

3       31.    On or about May 21, 2018, ORR transferred Lucas to Shiloh RTC in

4   Manvel, Texas due to his mental health needs. ORR did not afford Lucas notice of

5   this transfer, an opportunity to be heard, or a right to appeal. ORR led Madelyn to

6   believe Shiloh RTC was simply another shelter to which it was sending Lucas because

7   Hacienda del Sol lacked space. Due to ORR's actions and inactions, Lucas' release

8   has been unnecessarily delayed, and Lucas has not been placed in the least restrictive

9   setting.

10       32.    Upon information and belief, while detained at Shiloh RTC, Lucas has

11   been administered Zoloft. Zoloft's side-effects include rigidity in the muscles, high

12   fever, sweating, confusion, agitation, hallucinations, overactive reflexes, tremors,

13   nausea, vomiting, diarrhea, loss of appetite, fainting, and seizures.

14       33.    Shiloh personnel have now diagnosed Lucas with "major depressive

15   disorder." Among Lucas' "major stressors," Shiloh personnel identify his "[b]eing

16   kept from family and in ORR custody." Shiloh staff nonetheless told Lucas that ORR

17   would not release him until Shiloh medical personnel declared him psychologically

18   sound. Lucas' experiences in ORR custody, including prolonged separation from his

19   family and administration of psychotropic medications over his objection and without

20   informed consent, exacerbated his mental health symptoms and made this approval

21   less likely, thereby delaying his release.

22       34.    Shiloh personnel have regularly prevented Lucas from communicating

23   with Madelyn over the telephone. Shiloh denied Lucas his right to speak with

24   Madelyn on a weekly basis without providing him or his sister any explanation for

25   the denial. This prohibition has made Lucas deeply despondent and has increased his

26   feelings of isolation.

27

28

First Amended Complaint

12

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

35.     ORR has provided Lucas no legal counsel to represent him with respect to release, the administration of psychotropic medications, or placement at Shiloh.

36.     Prior to Tuesday, September 4, 2018, ORR refused to release Lucas to his Next Friend and sister on the ground that Madelyn's home may be unfit. ORR indicated on September 4, 2018, that it would release Lucas on September 6, 2018; however as of the time of this filing, upon information and belief, Lucas remains detained.

B.     Daniela Marisol T.

37.     On or about August 3, 2017, Plaintiff Daniela Marisol T., a partially deaf seventeen-year-old girl, arrived at the U.S.-Mexico border with her older sister, Katherine L., and her nephew. Daniela Marisol, Katherine, and her younger nephew fled from their home country in fear for their lives. At the border, Daniela Marisol was forcibly separated from her sister and nephew and placed in the custody of ORR at the International Education Service Norma Linda Shelter in Los Fresnos, Texas. Daniela Marisol and Katherine are very close, and Daniela Marisol views Katherine as a second mother. Daniela Marisol was so emotionally traumatized by the separation that she was later admitted to a psychiatric hospital to cope with the trauma. The screening physician also recommended treatment for Daniela Marisol's hearing disability once she was released to her sister—a release that, eleven months later, has yet to come to fruition. Daniela Marisol finally received a hearing aid ten months after the screening physician's original recommendation, and thus spent nearly a year with limited ability to hear.

38.     Katherine and her son, detained separately from Daniela Marisol, were released from immigration custody after they proved to an Asylum Officer that they have a credible fear of persecution should they be returned to Honduras. Upon release, Katherine applied to become Daniela Marisol's custodian and have ORR release Daniela Marisol to her custody. However, ORR has placed arbitrary, expensive, and

13

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

excessive conditions on Daniela Marisol's release, which preemptively dissuaded Katherine from applying to be her sponsor, and included conditions purportedly related to Daniela Marisol's mental health needs. Only recently, following overwhelming community support, has Katherine finally been able to meet these excessive conditions and apply to be Daniela Marisol's sponsor.

39.    According to Katherine, when Daniela Marisol lived in Honduras with her family, she did not seem to have mental health issues. However, Daniela Marisol's psychological state rapidly deteriorated after her family separation. It was further exacerbated when caseworkers told Daniela Marisol that she was not going to be released to her sister. Daniela Marisol lost hope that she would ever be released to her family. Depressed and suicidal, she was admitted to a psychiatric hospital where she suffered a psychotic breakdown.

40.    While Daniela Marisol was detained at the Norma Linda shelter, a doctor reiterated the screening physician's recommendation, while also discovering that she was largely deaf in one ear. ORR declined to treat her deafness and instead noted that she should consult a specialist regarding her deafness "once [she was] reunified with family." Likewise, at Shiloh RTC, Daniela Marisol's hearing disability went untreated. Months later, when she was stepped-down to a shelter care facility in Los Angeles County called David and Margaret, it was again recommended she receive hearing aids. Again, she never received the hearing aids while in Los Angeles County. Finally, only after she was transferred to Michigan and in the custody of Bethany Christian Services—almost ten months after her hearing disability diagnosis and only at the repeated request of counsel—did she receive her hearing aids.

41.    After her breakdown, on or about September 8, 2017, ORR transferred Daniela Marisol to Shiloh RTC in Manvel, Texas due to her mental health needs. ORR did not afford her notice of her transfer, an opportunity to be heard or a right to appeal. Moreover, Daniela Marisol's sister, Katherine, was required to show a $500

First Amended Complaint

14

per month disposable income in order to support Daniela Marisol's psychological and medical needs. Because her sister did not have sufficient economic resources ORR told her she could not qualify to sponsor Daniela Marisol.

42.     Without obtaining the informed consent of Daniela Marisol's mother, Katherine, other family members, or court authorization, ORR administered numerous psychotropic medications to Daniela Marisol, including atypical antipsychotics and antidepressants, starting when she was in the Norma Linda shelter, and continuing while she was at Shiloh RTC and the David and Margaret shelter in Los Angeles County, and through her present placement, Bethany Christian Services in Michigan. In the approximately thirteen months that she has been in ORR custody, Daniela Marisol has been given multiple psychotropic medications, including Prozac, Abilify, Clonidine, Risperdal, Seroquel, and Zyprexa. While in ORR custody, Daniela Marisol has been the subject of numerous, changing diagnoses, including "Bipolar disorder, MRE, Mixed, with psychosis, GAD, PTSD;" "major depressive disorder, recurrent episode, severe with mood-congruent psychotic features;" and "bipolar II disorder, generalized anxiety disorder, PTSD." Upon information and belief, ORR did not involve a neutral decision maker in the initial determination of whether to prescribe psychotropic medications to Daniela Marisol or in ongoing reviews of those medications.

43.     As recognized by the U.S. Food and Drug Administration ("FDA"), antidepressants such as those prescribed to Daniela Marisol "increase[] the risk compared to placebo of suicidal thinking and behavior (suicidality) in children, adolescents, and young adults in short term studies of major depressive disorder (MDD) and other psychiatric disorders." ORR has frequently given Daniela Marisol an atypical antipsychotic and an antidepressant in combination. Research demonstrates that the number and severity of side effects, such as thoughts of suicide and intentional self-harm, increases as the number of concurrent medications

First Amended Complaint

15

increases. Daniela Marisol has become suicidal while being forced to take such antidepressants and drug combinations.

44.    Daniela Marisol believes that she has to take the medication because facility staff have told her that she must in order to be released from government custody.

45.    Katherine desperately wants to provide her younger sister a loving and safe home, and she has done everything in her power to have Daniela Marisol released to her care. However, ORR told Katherine that, in order for Daniela Marisol to be released to her care, Katherine must move to a new house, have a separate private bedroom for Daniela Marisol, and prove that she can pay over $500 per month for Daniela Marisol's medical care. In response to these demands, Katherine engaged with a local, supportive Jewish Synagogue that has raised money for a new apartment with a separate bedroom for Daniela Marisol, donated new furnishings for Daniela Marisol's bedroom, and fundraised over $5,000 in cash from its congregation to support Daniela Marisol's medical needs. Katherine currently lives in a new apartment which she rented specifically to meet ORR's demand that Daniela Marisol have a separate bedroom, and has enough money saved to meet all of Daniela Marisol's medical needs. She has received a positive home study evaluation and an expert psychologist found it was in Daniela Marisol's best interest to be reunited with her sister. Katherine has attempted to meet ORR's arduous demands, but has yet to be provided with any written decision as to whether she will be reunified with Daniela Marisol. ORR's requirements that Katherine must have a two-bedroom apartment and be able to demonstrate she has the ability to pay $500 per month in medical expenses were represented to Katherine as fixed prerequisites to sponsoring Daniela Marisol. ORR never afforded Katherine or Daniela Marisol any hearing, right to administrative appeal, or other means to change its decision. Due to ORR's actions and inactions,

First Amended Complaint

16

Daniela Marisol's release has been unnecessarily delayed, and she has not been placed in the least restrictive setting.

46.     Daniela Marisol remains in government custody, away from her sister and other family. ORR has given her no legal counsel to represent her with respect to release, administration of psychotropic medications, or her placement.

C.     Miguel Angel S.

47.     On or about May 16, 2017, ORR assumed custody of Plaintiff Miguel Angel after he arrived at the U.S.-Mexico border. ORR placed him at the Southwest Key shelter in southern California. The staff initially told Miguel Angel that he would be released to Gerardo S., his father and next friend, within three months.

48.     As Miguel Angel's time in detention wore on, he felt anxious at the shelter and often feared he would never be released. On July 17, 2017, ORR transferred Miguel Angel to Shiloh RTC in Texas due to his mental health needs. ORR did not afford him notice of his transfer, an opportunity to be heard or a right to appeal. At Shiloh, Miguel Angel was administered several psychotropic medications, including Remeron, Trazadone, Seroquel, and Lexapro. Side effects of these medications include stomach pain, dizziness, nausea, drowsiness, unusual weight gain, blurred vision, and insomnia.

49.     Miguel Angel objected to taking the medications because they made him feel itchy, dizzy, aggressive, nauseous, and caused him to gain an unusual amount of weight in a short period of time. Shiloh staff insisted that he take the medication. Upon information and belief, the staff at Shiloh administered these medications to Miguel Angel without obtaining Gerardo's informed consent or judicial authorization.

50.     Upon information and belief, ORR did not involve a neutral decision maker in the initial determination of whether to prescribe psychotropic medications to Miguel Angel or in ongoing review of those medications.

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

51.     While Miguel Angel was detained at Shiloh, several staff members physically assaulted him multiple times. During one incident, a staff member placed Miguel Angel in a headlock, painfully ripping Miguel Angel's earring out of his earlobe. A physician assistant watched this, but did nothing to stop the attack. Miguel Angel reported the incident immediately to the facility doctor, but the doctor laughed and did nothing. Another time, two Shiloh staff members picked Miguel Angel up by his arms and pushed him up against a wall. One of the staff members pressed his forearm across Miguel Angel's throat, making it hard for him to breathe.  Upon information and belief, when Miguel Angel reported the incidents to staff, no disciplinary action was taken.

52.     In March 2018, shortly after these assaults took place, ORR transferred Miguel Angel to Yolo Juvenile Detention Center, affording him neither notice nor opportunity to be heard. Upon information and belief, Miguel Angel was transferred to Yolo in retaliation for reporting the assaults.

53.     At Yolo, facility staff has attacked Miguel Angel with pepper spray, and he fears they will do it again. On one occasion, after Miguel Angel had been pepper sprayed by staff in his eyes and ears, he had to use water from the toilet in his cell to wash out his eyes because staff cut off water to his sink. The pepper spray made his eyes feel like they were on fire, and he lost hearing in one ear for several days. Miguel Angel spends most of his time at Yolo locked in a small cell and is only allowed out for short periods, which makes him feel trapped and tortured.

54.     Miguel Angel's father, Gerardo, applied to be Miguel Angel's sponsor around October 2017. Miguel Angel and Gerardo have a very close relationship, and Miguel Angel wants to live with him. Gerardo lives in an apartment with his brother, and in October 2017 both Gerardo and his brother submitted all required documents to ORR, including birth certificates and fingerprints. ORR also requested that

First Amended Complaint

18

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

Gerardo's neighbor, who lives across the hallway, submit the same information. The neighbor submitted this information in October 2017.

55.     In December 2017, a home investigator visited Gerardo's apartment to perform a home study. The home study went well, and the home investigator recommended that Miguel Angel be released to Gerardo's custody. The home investigator assured Gerardo that Miguel Angel would probably be released in the first few weeks of January. Gerardo heard nothing from ORR or Miguel Angel's case workers throughout January or February 2018.

56.     At both facilities, Miguel Angel experienced barriers to release to his father. In March 2018, Gerardo was told that the Shiloh doctors would not approve Miguel Angel for release and that he would remain in ORR custody until they do. Miguel Angel's experiences in ORR custody, including prolonged separation from his family, administration of psychotropic medications over his objection and without informed consent, and assaults by staff at Shiloh, exacerbated his mental health symptoms and made this approval less likely, thereby delaying his release.

57.     In early May 2018, Miguel Angel's case worker at Yolo told Gerardo that he needed to provide proof of school enrollment and the name of a psychiatric clinic in order for Miguel Angel to be released. Gerardo has tried his best to comply with these requirements, but the local school requires Miguel Angel to be physically present in order to be enrolled, and Gerardo has been unable to find a psychiatric clinic that will give Miguel Angel an appointment. In late May 2018, Miguel Angel's case worker told Gerardo that his fingerprints had expired, and that Gerardo, his brother, and his neighbor would need to submit their fingerprints again.

58.     ORR has refused to release Miguel Angel to Gerardo's custody for over a year. ORR has not provided Miguel Angel or Gerardo with written notification of its refusal to release Miguel Angel or the basis for the refusal, or an opportunity to review the underlying evidence or appeal ORR's refusal to release Miguel Angel to

19

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

his father. Due to ORR's actions and inactions, Miguel Angel's release has been unnecessarily delayed and he has not been placed in the least restrictive setting.

D.     Gabriela N.

59.     On or about January 8, 2017, ORR assumed custody of Plaintiff Gabriela N., shortly after she had turned herself in at the U.S.-Mexico border. As a young girl living in El Salvador, Gabriela experienced extreme violence and did not feel safe at home. ORR placed her at the Southwest Key Casita del Valle facility ("Casita del Valle shelter") in Clint, Texas. In April 2017, Isaac N., Gabriela's grandfather and Next Friend, requested Gabriela's custody and submitted an application to serve as her custodian. Gabriela's mother appeared before a U.S. Consular official in El Salvador to execute a formal designation pursuant to Paragraph 14D of the *Flores* settlement directing ORR to release Gabriela to her grandfather.

60.     Gabriela's biological father is deceased, and her stepfather physically abused her mother and disabled sister who suffers from paralysis from the abuse and can no longer speak. Thus, Gabriela fled to the U.S. seeking safety, with the hope of living with her grandfather. Gabriela and her grandfather, Isaac, have a close relationship, and she wants to live with him. Over the next approximately fourteen months, Isaac continued to submit documents that ORR requested and completed a home study in anticipation that ORR would release Gabriela to his custody; it did not.

61.     In El Salvador, Gabriela took no medications for mental illness. When she arrived at Casita del Valle shelter, facility staff noted that Gabriela appeared emotionally stable, receptive, and resilient.

62.     As her confinement wore on, however, Gabriela became depressed and anxious, fearing that ORR would never release her to her family. Without obtaining Isaac's informed consent, the informed consent of any other adult family member, or judicial authorization, ORR repeatedly administered Gabriela psychotropic

First Amended Complaint

20

medications, ostensibly to control post-traumatic stress disorder, anxiety, major depressive disorder, and attention-deficit hyperactivity disorder ("ADHD").

63.     While at Casita del Valle shelter, Gabriela was administered Prozac, a psychotropic medication.

64.     On or about September 7, 2017, ORR transferred Gabriela to Shiloh RTC due to her mental health needs. ORR did not afford her notice of the transfer, an opportunity to be heard or a right to appeal. At Shiloh, ORR administered Gabriela another psychotropic medication, Adderall, which includes side effects of irritability and difficulty with sleep initiation. Adderall is also known to cause or worsen depression in a significant proportion of those who take it. Over the course of Gabriela's detention in Shiloh, the psychiatrist at Shiloh increased the dosage of Adderall administered to Gabriela several times. Upon information and belief, ORR did not involve a neutral decision maker in the initial determination of whether to prescribe psychotropic medications to Gabriela or in ongoing review of those medications.

65.     Gabriela does not believe the medications help her, and she does not want to take them. However, Gabriela believes that she must take the medications in order to be released from detention. Shiloh staff told Gabriela that ORR would not release her until Shiloh medical personnel declare her psychologically sound. Gabriela's experiences in ORR custody, including prolonged separation from her family and taking medications she does not want to take, exacerbated her mental health symptoms and made this approval less likely, thereby delaying her release.

66.     In February 2018, ORR sent an investigator to Isaac's home in Oakland, California, where he lived, and continues to live, alone. Isaac moved to a new apartment and purchased a new bed for Gabriela in preparation for her release.

67.     The investigator's report acknowledges the close relationship between Isaac and Gabriela, credits Isaac for having "adequate housing," "access to

First Amended Complaint

21

transportation," and "maintain[ing] stable employment," and notes that Isaac is committed to "oversee[ing] [Gabriela's] arrival to school each day and . . . provid[ing] afterschool supervision," is aware of a local "hospital where he could take [Gabriela] for any medical needs," and has "identified a local mental health provider . . . where he intends to connect [Gabriela]." However, the investigator questioned Isaac's ability to support Gabriela's education and care for her financially. Isaac assured the investigator that he would do everything required to provide for Gabriela. Later, Gabriela's social worker at Shiloh told Isaac that ORR was no longer considering him as a custodian for his granddaughter. ORR afforded neither Isaac nor Gabriela any hearing, right to administrative appeal, or other means to change its decision. ORR failed to provide Isaac with a written decision or written explanation for denying him custody of Gabriela. Due to ORR's actions and inactions, Gabriela's release has been unnecessarily delayed and Gabriela has not been placed in the least restrictive setting.

68.     Seventeen-year-old Gabriela remains detained in ORR custody at St. Michael's Home for Children, where she has been administered Prozac and Adderall. For four months, St. Michael's personnel continued to administer Adderall to Gabriela without obtaining new prescriptions from a psychiatrist. After Gabriela finally met with a psychiatrist four months into her detention at St. Michael's, the psychiatrist increased the dosage of Adderall yet again.

69.     After being detained for over one and a half years, Gabriela is miserable and desperately wants to live with her grandfather. Her grandfather is ready and eager to care for her. Shiloh staff have nonetheless told Gabriela that ORR will not release her to her grandfather. ORR has provided Gabriela no legal counsel to represent her with respect to release, the administration of psychotropic medications, or her placement at Shiloh.

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

E.      Jaime D.

70.      On or about April 8, 2018, ORR assumed custody of thirteen-year-old Plaintiff Jaime D. after he arrived at the U.S.-Mexico border with his six-year-old sister and ten-year-old aunt. ORR placed Jaime and his younger sister and aunt at the Cayuga Centers shelter in Bronx, New York. On or about April 10, 2018, Reyna D., Jaime's aunt and Next Friend, requested Jaime's custody and submitted a family reunification packet to ORR. Reyna is Jaime's only family in the United States. Jaime desperately wants to be released to Reyna's care. Jaime's mother died when he was seven years old and, upon information and belief, his father died before he was born. Reyna discussed ORR's requirements for becoming Jaime's custodian in detail with Jaime's case manager at Cayuga Centers and immediately began gathering the required documents to send to ORR.

71.      When Jaime was first sent to Cayuga Centers, the staff made him feel very nervous. Jaime was terrified that he would be forced to return to his home country, where his life had been threatened. He made up a story about his life in his home country, because he thought that this would make the shelter staff leave him alone. He later recanted this story multiple times.

72.      On or about April 18, 2018, ORR transferred Jaime to Yolo County Juvenile Detention Center in Woodland, California. ORR transferred Jaime to Yolo without affording him notice, an opportunity to be heard or a right to appeal. He was awakened at 4:00 in the morning and restrained with heavy shackles throughout the cross-country flight from New York to California. Jaime was not allowed to say goodbye to his younger sister or aunt. He was extremely worried they would think he had abandoned them.

73.      Yolo staff first contacted Reyna regarding her application for Jaime's custody about a week after Jaime arrived at Yolo. Approximately two weeks later, Jaime's case manager noted that Reyna had "provided all that [had] been asked of

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

her," including a complete family reunification packet and fingerprints. In late May 2018, Reyna completed a home study and interview with a home investigator. ORR found Reyna a suitable custodian for Jaime's younger sister and aunt. ORR released the two girls to Reyna's care on or about June 8, 2018.

74.     While detained at Yolo, Jaime felt unsafe and suffered from anxiety. Reyna was extremely concerned for his well-being as well, as Jaime sounded increasingly sad and scared during their phone calls. Throughout his time at Yolo, Jaime suffered physical abuse at the hands of older youth in the facility. Jaime alerted facility staff of the abuse, but staff ignored his concerns and said they did not believe him.

75.     Two weeks after he was transferred to Yolo, Jaime's case manager noted that the Yolo staff were "all in agreement that [Jaime] isn't appropriately placed in a secure setting." Jaime was told by his case worker that he was too young to be at Yolo and would hopefully be transferred soon. However, Jaime remained at Yolo for another three weeks. On or about May 24, 2018, ORR transferred Jaime to Children's Village medium secure facility in Dobbs Ferry, New York.

76.     Thirteen-year-old Jaime remains detained at Children's Village, where he is increasingly anxious and worried that he will never be released to his aunt's care. As of the filing of this Amended Complaint, Reyna has not heard from Jaime's case worker at Children's Village for almost a month. ORR has not provided Jaime or Reyna with written notification of its refusal to release Jaime or the basis for the refusal, or an opportunity to review the underlying evidence or appeal ORR's refusal to release Jaime to his aunt. Due to ORR's actions and inactions, Jaime's release has been unnecessarily delayed and Jaime has not been placed in the least restrictive setting.

77.     ORR has provided Jaime no legal counsel to represent him with respect to release or his placement at Children's Village.

24

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

F.      Sirena P.

78.      On or about April 14, 2018, ORR assumed custody of Plaintiff Sirena P. after she arrived at the U.S.-Mexico border with her two siblings. ORR placed Sirena and her siblings at the Southwest Key Campbell shelter ("Campbell") in Phoenix, Arizona. Shortly after, Eduardo P., Sirena's father and Next Friend, requested Sirena's custody and submitted a family reunification packet to ORR. Sirena's father has completed two home studies and received positive recommendations for both. After the first home study was completed, Campbell released Sirena's siblings to her parents' custody. ORR prohibited Sirena from joining her siblings and parents, citing Sirena's mental health needs.

79.      Sirena's separation from her parents upset her so severely that she was hospitalized twice in May 2018. Sirena has explained that her mental health needs are fueled solely by the agony she feels as a result of her ongoing separation from her parents.

80.      Without obtaining Eduardo's informed consent, the informed consent of any other adult family member, or judicial authorization, while detained at Campbell and during her hospitalization, shelter and hospital personnel administered multiple psychotropic medications to Sirena, including Hydroxyzine, Prozac, Abilify, and Zoloft.

81.      On or about June 4, 2018, ORR transferred Sirena to Shiloh RTC in Manvel, Texas due to her mental health needs. ORR transferred Sirena to Shiloh without affording her notice, an opportunity to be heard or a right to appeal. She was awakened around 3:00 in the morning and transported to Shiloh against her wishes.

82.      At Shiloh, Sirena struggles with anxiety, depression, and hopelessness. Sirena's Admission Assessment indicated that Sirena's major stressors include "[s]eparation from family" and "[f]rustration with lengthy reunification process." Without obtaining Eduardo's informed consent, the informed consent of any other

First Amended Complaint

25

adult family member, or judicial authorization, Shiloh personnel have administered Buproprion, a psychotropic medication, to Sirena.

83.     Sirena remains detained at Shiloh, where she is increasingly anxious and worried that she will never be released to her parents' care. As of August 24, 2018, Sirena's release was still pending her doctor's approval. Sirena's experiences in ORR custody, including prolonged separation from her family and administration of psychotropic medications without informed consent, have exacerbated her mental health symptoms, thereby making this approval less likely and delaying her release.

84.     Due to ORR's actions and inactions, Sirena's release has been unnecessarily delayed and Sirena has not been placed in the least restrictive setting. While Sirena's two nondisabled siblings have been released to their parents, Sirena has been placed at Shiloh and her release has been delayed on the basis of her mental health needs.

85.     Upon information and belief, ORR has provided Sirena no legal counsel to represent her with respect to release or her placement at Shiloh.

G.     Benjamin F.

86.     On or about July 2, 2018, ORR assumed custody of Benjamin F. after he and his brother were inexplicably separated from their mother in the South Texas Family Residential Center, known as Dilley.

87.     Nine-year-old Benjamin, who is autistic and developmentally delayed, struggles to function and speak when he is not in the presence of his mother. His traumatic separation from his mother and placement in ORR custody has led to a cascading effect of multiple physical and emotional challenges for him, none of which are being addressed by ORR.

88.     Benjamin was initially placed at St. PJ's Children's Home with his brother. Mateo P. Isabella, Benjamin's grandmother and Next Friend, immediately began the process of filling out the Family Reunification Packet so that both of her

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

grandsons could be released to her in Los Angeles, California. Isabella received confusing and conflicting information about additional information she needed to provide to ORR, but she kept responding to every request that she received and she successfully submitted a completed packet to ORR. ORR conducted a home study of Isabella and gave her a positive recommendation.

89.     Without obtaining Isabella's informed consent, the informed consent of any other adult family member, or judicial authorization, Benjamin was placed on multiple psychotropic medications, including Guanfacine and Risperidone, while he was at St. PJ's Children's Home. The Guanfacine made Benjamin severely drowsy. Upon information and belief, ORR did not involve a neutral decision maker in the initial determination of whether to prescribe psychotropic medications to Benjamin or in ongoing review of those medications.

90.     On or about July 23, 2018, ORR transferred Benjamin to Shiloh RTC in Manvel, Texas due to his mental health and behavioral health needs. ORR transferred Benjamin to Shiloh without affording him notice, an opportunity to be heard or a right to appeal. This transfer resulted in yet another devastating separation: between Benjamin and his older brother Mateo.

91.     Benjamin's isolation and trauma have worsened at Shiloh. Shortly after Benjamin was transferred to Shiloh, in August 2018, St. PJ's released Mateo to his grandmother's care. While Mateo now lives in the comfort of Isabella's home hundreds of miles away in Los Angeles, Benjamin continues to languish in detention without the benefits of the daily protection and care of his older brother.

92.     At Shiloh, personnel continued to administer Guanfacine and Risperidone to Benjamin. Within three weeks of his arrival, Shiloh administered a new psychotropic medication, Lexapro, and increased the dosages of both Guanfacine and Lexapro administered to Benjamin. Upon information and belief, as was the case at St. PJ's, ORR did not involve a neutral decision maker in the initial determination

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

1  of whether to prescribe psychotropic medications to Benjamin or in ongoing review

2  of those medications.

3       93.    Upon information and belief, Benjamin will not be released from Shiloh

4  until medical personnel declare him psychologically sound and approve his release.

5  Benjamin's experiences in ORR custody, including prolonged separation from his

6  family—in particular his mother, the only person with whom he communicates

7  effectively verbally—and administration of psychotropic medications without

8  informed consent, have exacerbated his mental health symptoms and made this

9  approval less likely, thereby delaying his release.

10       94.    While Benjamin's nondisabled brother has been released to his

11  grandmother, Benjamin has been placed at Shiloh and his release has been delayed on

12  the basis of his mental health needs, which are in no way being met in his current

13  placement.

14       95.    Nine-year-old Benjamin remains detained at Shiloh, where he is

15  increasingly anxious and desperate to reunite with his brother and grandmother. Due

16  to ORR's actions and inactions, Benjamin's release has been unnecessarily delayed

17  and Benjamin has not been placed in the least restrictive setting.

18  V.

19  CLASS ACTION ALLEGATIONS

20       96.    The named Plaintiffs bring this action pursuant to Federal Rule of Civil

21  Procedure 23(a) and (b)(2) on behalf of themselves and the following similarly

22  situated proposed class members:

23  All children in ORR custody pursuant to 6 U.S.C. § 279 and/or 8 U.S.C.

24  § 1232 —

25      (a)    whom ORR refuses to release to parents or other available custodians

26           within thirty days of the proposed custodian's submitting a complete

27

28

First Amended Complaint

28

family reunification packet on the ground that the proposed custodian is or may be unfit;

(b) who have been, are or will be placed in a secure facility, medium-secure facility, or RTC, or continued in any such facility for more than thirty days, without being afforded notice and an opportunity to be heard before a neutral and detached decisionmaker regarding the grounds for such placement;

(c) who have been or will be administered psychotropic medication without procedural safeguards, including obtaining informed consent or court authorization prior to medicating a child, involving a neutral decisionmaker in the initial determination of whether to prescribe psychotropics to a child in ORR custody, and involving a neutral decision-maker to conduct periodic reviews of those medications as treatment continues;

(d) who are natives of non-contiguous countries and to whom ORR blocks legal assistance in legal matters or proceedings involving their custody, placement, release, and/or non-consensual consumption of psychotropic drugs;

(e) who have, will have, or are perceived to have a behavioral, mental health, intellectual and/or developmental disability, and who have been, are, or will be placed in a secure facility, medium-secure facility, or RTC because of such disability or perceived disability; or

(f) who have, will have, or are perceived to have a behavioral, mental health, intellectual and/or developmental disability, and whose release has been, is, or will be delayed or obstructed because of such disability or perceived disability.

First Amended Complaint

29

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

97.    The exact size of the proposed class is unknown, but likely includes hundreds of children. The size of the class is so numerous that joinder of all members is impracticable.

98.    The claims of Plaintiffs and those of the proposed class members raise common questions of law and fact concerning whether Defendants' policies and practices relating to the release, placement, treatment, and legal representation of detained immigrant children are consistent with the *Flores* Settlement, § 235 of the TVPRA, the Fifth Amendment to the United States Constitution, the First Amendment of the Constitution, and Section 504 of the Rehabilitation Act. These questions are common to the named Plaintiffs and the members of the proposed class because Defendants have acted and will continue to act on grounds generally applicable to the named Plaintiffs and the proposed class members. Plaintiffs' claims are typical of the class's claims.

99.    The prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants. Proposed class members are predominantly indigent, non-English-speaking children who are being denied basic fairness and/or being discriminated against on the basis of disability in ORR's prolonging their detention in lieu of releasing them to parents or other proposed custodians, "stepped up" to RTC, secure or medium-secure placement without notice or opportunity to be heard and/or on the basis of disability, and administered psychotropic medications without a parent's informed consent. The proposed class members are under ORR's exclusive physical control and often understand little, if anything, about their rights under the *Flores* Settlement, the TVPRA, the Constitution, or Section 504 of the Rehabilitation Act. ORR actively obstructs lawyers from representing members of the proposed class in legal proceedings relating to custody, placement, or release. Unless this matter proceeds as

First Amended Complaint

30

1  a class action, the majority of class members have little chance of securing judicial

2  review of the policies and practices challenged herein.

3        100.   Defendants, their agents, employees, and predecessors and successors in

4  office have acted or refused to act, and will continue to act or refuse to act, on grounds

5  generally applicable to the class, thereby making injunctive relief and corresponding

6  declaratory relief appropriate with respect to the class as a whole. Plaintiffs will

7  vigorously represent the interests of unnamed class members. All members of the

8  proposed class will benefit by this action. The interests of the named Plaintiffs and

9  those of the proposed class members are identical.

10       101.   Plaintiffs are represented by experienced and reputable lawyers

11  associated with non-profit public interest law firms and an international law firm

12  serving *pro bono publico*. Plaintiffs' counsel includes attorneys with years of

13  experience litigating complex suits and class actions on behalf of children and foreign

14  nationals, including counsel for the plaintiff class in *Flores v. Sessions*.

15                                    VI.

16            ORR POLICY & PRACTICE VIOLATES DUE PROCESS

17  A.   Defendants have violated Plaintiffs' due process and family association rights,

18        the TVPRA, and the *Flores* Settlement in determining custodians' fitness.

19       102.   When children are held in government custody apart from their primary

20  caregivers for long periods, they suffer profound and long-lasting injury. The

21  American Academy of Pediatrics has explained that "highly stressful experiences,

22  like family separation, can cause irreparable harm, disrupting a child's brain

23  architecture and affecting his or her short- and long-term health. This type of

24  prolonged exposure to serious stress—known as toxic stress—can carry lifelong

25  consequences for children." Toxic stress is associated with increased rates of mental

26  health issues, risky health behaviors, and physical illness such as diabetes, cancer,

27  posttraumatic stress disorder ("PTSD"), and heart disease. Studies of immigrant

28

First Amended Complaint

31

children detained in the United States have discovered high rates of PTSD, anxiety, depression, and suicidal ideation. A primary factor in recovering from such trauma is reunification with a parent or other trusted adult. Without the presence of trusted caregivers, children are often unable to cope with the psychological trauma and stress associated with detention.

103.   Paragraph 14 of the *Flores* Settlement requires ORR to release children from immigration-related custody "without unnecessary delay" so long as their continued detention is not required to secure availability for removal or to protect safety. Paragraph 18 of the Settlement requires ORR to make "prompt and continuous efforts" toward family reunifications and to release children to suitable custodians without unnecessary delay.

104.   Similarly, § 235(c)(2)(A) of the TVPRA, codified at 8 U.S.C. 1232(c)(2)(A), requires ORR to "promptly" place detained children "in the least restrictive setting that is in the best interest of the child," generally, with "a suitable family member . . . ." TVPRA § 235(c)(3)(A) provides, "[A]n unaccompanied alien child may not be placed with a person or entity unless the Secretary of Health and Human Services makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being."

105.   Paragraph 24A of the *Flores* Settlement guarantees detained children the right to a hearing during which an immigration judge reviews whether they may be continued in custody because they are dangerous or unusually likely to abscond. However, neither the *Flores* Settlement nor the TVPRA prescribe what process is due where ORR unreasonably prolongs a juvenile's detention or refuses to release him or her because ORR questions whether an available parent or other potential custodian is capable of providing for the child's physical and mental well-being.

106.   Plaintiffs have substantial liberty interests in being free from government custody, in preserving their family unity and the ability for their family to care for

32

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

them, and in family association. Defendants may not abridge these liberty interests without appropriate procedures to protect against erroneous deprivation.

107.   Plaintiffs have a fundamental right to the supervision, companionship, and care of their parents. Absent a showing of parental unfitness, the government may not keep children from their parents or refuse to release children into the custody of their parents.

108.   As a matter of both policy and practice, ORR does not make prompt and continuous efforts toward family reunification and the release of children in its custody. Instead, it delays or refuses to make determinations about whether proposed custodians are or may be unfit.

109.   As a matter of both policy and practice, ORR affords Plaintiffs and their proposed class members little or no procedural protection against prolonged detention on the ground that their parents or other proposed custodians are or may be unfit. ORR's nominal procedures for vetting detained children's parents or other proposed custodians do not appear in the Code of Federal Regulations, nor even in a semi-permanent practice manual. Rather, they appear on ORR's web page, www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2 (last visited September 7, 2018), and are subject to change without prior notice or opportunity for comment. Under its nominal procedures —

(a)   ORR does not decide within any time certain whether a detained minor's parent or other proposed custodian is suitable;

(b)   ORR does not provide a detained minor, or his or her parent or other proposed custodian, an opportunity to inspect or rebut evidence derogatory of the proposed custodian's fitness;

(c)   ORR does not afford a detained minor or his or her proposed custodian a hearing before a neutral and detached decisionmaker either before or after ORR declares a potential custodian unfit;

First Amended Complaint

33

(d)     Once ORR decides a proposed custodian is unsuitable, it need not inform a detained minor or the proposed custodian of its decision for up to 30 days;

(e)     ORR allows detained minors no appeal or other administrative recourse from its finding a proposed custodian unsuitable, though such a decision nearly always prolongs the minor's detention;

(f)     Except for parents and legal guardians, ORR allows rejected custodians no appeal from a decision declaring them unfit, which nearly always prolongs an affected minor's detention;

(g)     As for parents and legal guardians, ORR's policy requires them to submit a written request to HHS's Assistant Secretary for Children and Families to be heard regarding ORR's declaring them unfit, but a hearing need not be convened within any time certain.

110.    Whether a parent or other custodian is qualified to care for a child is a matter generally committed to state and local governments. Plaintiffs are informed and believe that in all fifty states and their subdivisions, children may not be detained for want of a qualified custodian without affording them and/or their parents or other potential custodians a prompt hearing before a judge or other neutral and detached decisionmaker, during which allegations of unfitness are tested via trial-like procedures and any ensuing finding of unsuitability must be based on competent evidence.

111.    In contrast, in refusing to release Plaintiffs and those similarly situated to parents and other available custodians on grounds of fitness, ORR provides neither Plaintiffs nor those similarly situated —

(a)     an evidentiary hearing;

(b)     the right to review or rebut adverse witnesses and evidence;

(c)     appointed counsel, guardians *ad litem*, or interpreters;

First Amended Complaint

34

(d)    a finding of suitability or lack thereof by a neutral and detached decision-maker under defined and consistent legal standards;

(e)    the right to a prompt determination of a proposed custodian's fitness; or

(f)    the right to appeal administratively adverse decisions.

112.   In practice, ORR often refuses to decide whether a detained child's proposed custodian is fit, thereby needlessly prolonging detention and family separation.

113.   On information and belief, Plaintiffs allege that, to date, HHS's Assistant Secretary for Children and Families has never convened an actual hearing before a neutral arbiter to review a decision by ORR declaring a detained child's proposed custodian unsuitable.

114.   ORR's procedures for determining whether parents and other proposed custodians are suitable creates an unreasonable risk that Plaintiffs and those similarly situated will be erroneously —

(a)    subjected to prolonged detention;

(b)    placed in overly restrictive settings that are not in their best interests;

(c)    administered psychotropic medications; and

(d)    separated from parents and family.

115.   As a direct and proximate result of ORR's torpid, opaque, and perfunctory procedures for declaring detained children's parents and other proposed custodians unsuitable, Plaintiffs and those similarly situated have been and will be erroneously—

(a)    subjected to prolonged detention;

(b)    placed in overly restrictive settings that are not in their best interests;

(c)    administered psychotropic medications; and

(d)    separated from parents and family.

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

116.   The government's refusing to release children to their parents' custody, or to the custody of adult siblings and other family members, deprives plaintiffs of their fundamental rights without any reasonable justification or legitimate purpose, violates the substantive and procedural components of the Due Process Clause, and violates the freedom of association clause of the First Amendment. In prolonging the separation of children from their proposed custodians, Defendants also compromise the short and long-term health of Plaintiffs and those similarly situated.

B.   Defendants have violated Plaintiffs' due process rights, the TVPRA, and the *Flores* Settlement by placing them in unlicensed placements.

117.   Definition 6 and paragraph 19 of the *Flores* Settlement require ORR to place a detained child in a non-secure facility holding a state license to care for dependent children except in circumstances enumerated in Settlement paragraph 21: *i.e.,* the child has committed a violent crime or non-petty delinquent act, has threatened violence during federal custody, is an unusual escape-risk, or is so disruptive that secure confinement is necessary to ensure the welfare of the minor or others.

118.   Section 235(c)(2)(A) of the TVPRA similarly requires ORR to place detained children promptly "in the least restrictive setting that is in the best interest of the child . . ." and bars its placing a child "in a secure facility absent a determination that the child poses a danger to self or others or has been charged with having committed a criminal offense."

119.   TVPRA § 235(c)(2)(A) provides, "The placement of a child in a secure facility shall be reviewed, at a minimum, on a monthly basis, in accordance with procedures prescribed by the Secretary, to determine if such placement remains warranted." The TVPRA is otherwise silent with respect to what process is due when ORR places or continues a child in an RTC, medium-secure or secure facility.

First Amended Complaint

36

120.    Federal law and policy recognize that both children and communities are better off when children are not needlessly incarcerated. A vast body of research has established that detaining children interferes with healthy development, exposes youth to abuse, undermines educational attainment, makes children with mental health needs worse off, and puts children at greater risk of self-harm. Juvenile detention facilities often respond to threats of self-harm in ways that further endanger youth, such as by placing them in isolation. Schooling children receive during detention is often substandard, which places them at serious disadvantage when they enter school after having been detained for substantial periods. Research has demonstrated that incarceration also exacerbates pre-existing trauma.

121.    The vast majority of children who end up in secure custody through ORR have never been charged, let alone convicted, of crimes in the U.S. or in their home country. Often, ORR places the most vulnerable children—those with the greatest mental health needs—in medium secure, secure or RTC facilities. Prolonging the detention of children with mental health needs in such facilities is profoundly injurious. ORR's detaining children in such facilities exacerbates mental health issues to the point that ORR eventually consigns children to mental hospitals.

122.    The Fifth Amendment's Due Process Clause protects children's freedom from unnecessary physical restraint, including placement in RTCs, medium-secure or secure facilities. ORR's placing children in such facilities is constrained by due process, which requires adequate procedural protections to ensure that ORR's asserted justification for such placement outweighs children's constitutionally protected interest in avoiding excessive physical restraint. Due process requires that ORR give Plaintiffs and their proposed class members meaningful notice and an opportunity to be heard before it places them in RTCs, medium-secure or secure facilities and an ongoing review with commensurate protections every thirty days.

First Amended Complaint

37

123.   As a matter of policy and practice, Defendant ORR affords detained children wholly inadequate procedural protection against erroneous placement in RTCs, secure or medium-secure facilities. ORR's procedures for initially placing a child in an RTC, secure or medium-secure facility and for periodically reviewing the need for such placements appear nowhere in the Code of Federal Regulations. Rather, they appear on ORR's web page and are subject to change without prior notice or opportunity for public comment.

124.   In practice, ORR's placing children in RTCs, secure or medium-secure facilities results from an opaque and peremptory process in which youth are summarily "stepped up" to such facilities without any meaningful opportunity to be heard, either before or after being stepped up, regarding the reasons for placing them in such facilities. In placing children in RTCs, secure and medium-secure facilities, ORR provides neither Plaintiffs nor those similarly situated —

(a)     an evidentiary hearing;

(b)     notice of the placement decision or individualized reasoning therefor;

(c)     an opportunity to present evidence and witnesses;

(d)     the right to a neutral adjudicator;

(e)     an opportunity to review or rebut adverse witnesses and evidence;

(f)     the right to counsel, guardians *ad litem*, or interpreters;

(g)     a finding of dangerousness or other adequate cause for such placement under coherent and consistent legal standards;

(h)     the right to appeal administratively from adverse decisions; or

(i)     a monthly review of whether their placement in RTCs, medium-secure, or secure facilities remains warranted.

125.   Pursuant to paragraph 24A of the *Flores* Settlement and orders issued by the District Court for the Central District of California, immigration judges may review ORR's decisions to continue detaining children in federal custody on grounds

First Amended Complaint

38

they are dangerous or unusual flight-risks. ORR regularly places children in RTCs, secure and medium-secure facilities on the ground that they are dangerous or unusual flight-risks, contrary to immigration judges' determinations that they are neither.

126.  Plaintiffs are informed and believe that in all fifty states and their subdivisions, it is unlawful to place children in RTCs, secure or medium-secure facilities without affording them a prompt and meaningful opportunity to be heard before a neutral and detached decisionmaker regarding the grounds for such placement.

127.  The lack of procedural protection against erroneous ORR decisions to place children in RTCs, secure and medium-secure facilities creates an unreasonable risk that youth will be placed in overly restrictive settings against their best interests, subjected to needless restrictions on their personal liberty, and unjustly suffer the trauma and stigma of imprisonment. As a direct and proximate result of ORR's peremptorily consigning children to RTCs, secure and medium-secure facilities, Plaintiffs and their proposed class members have been and are being erroneously: (a) placed in restrictive settings against their best interests; (b) subjected to excessive restrictions on their personal liberty; and (c) subjected to the trauma and stigma of imprisonment.

128.  Placement in RTCs, secure and medium-secure facilities further injures Plaintiffs and those similarly situated because ORR, as a matter of policy and practice, delays release to parents and other reputable custodians of youth whom it has ever confined in such facilities, even when such placement is based on incomplete, inaccurate, or erroneous evidence, and even if ORR subsequently transfers a child to a non-secure dependent care facility.

129.  As a matter of policy and practice, ORR has refused to release children whom it has ever placed in a secure or medium-secure facility until and unless its director or his designee approves release. In practice, this policy prolongs non-

First Amended Complaint

39

dangerous children's detention for weeks or months notwithstanding that parents or other reputable custodians are available to care for them.

130.   As a matter of policy and practice, ORR refuses to release children whom it has placed in RTCs until and unless RTC medical personnel declare the child mentally fit. ORR affords children no hearing or other meaningful procedural recourse when RTC medical personnel refuse to declare them mentally fit. As a direct and proximate result of said policy and practice, children placed in RTCs suffer the functional equivalent of indefinite civil commitment without due process of law.

131.   On information and belief, Plaintiffs further allege that ORR regularly insists that the parents and other potential custodians possess novel and superfluous qualifications to receive custody of children whom ORR has ever placed in an RTC, secure or medium-secure facility. Such qualifications include being cancer-free, having income sufficient to supply released children with psychotropic drugs, repetitive fingerprinting, and supplying fingerprints of third parties who do not reside in the proposed custodian's home. As a direct and proximate result of said policy and practice, children placed in RTCs, secure and medium-secure facilities have been and are being erroneously: (a) placed in restrictive settings against their best interests; and (b) subjected to excessive restrictions on their personal liberty.

C.   Defendants have subjected Plaintiffs to the administration of psychotropic drugs without having procedural safeguards in place, including obtaining informed consent.

132.   Paragraph 7 of the *Flores* Settlement provides in pertinent part: "The INS shall assess minors to determine if they have special needs …." A child may have special needs "due to drug or alcohol abuse, serious emotional disturbance, mental illness or retardation, or a physical condition or chronic illness that requires special services or treatment." Paragraph 12 of the *Flores* Settlement provides in pertinent part: "Following arrest, the INS shall hold minors in facilities that are safe and sanitary

First Amended Complaint

40

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

and that are consistent with the INS's concern for the particular vulnerability of minors." The *Flores* Settlement further provides that facilities in which ORR places children with mental health needs must "meet those standards . . . set forth in Exhibit 1." *Flores* Settlement ¶¶ 6, 8. Exhibit 1 requires that licensed programs "comply with all applicable state child welfare laws and regulations . . . and shall provide or arrange for the following services for each minor in its care: . . . appropriate mental health interventions when necessary."

133.   Section 235(c)(2) of the TVPRA requires ORR to provide children in its custody with safe and secure placements. Placements that involve the unnecessary or coerced administration of psychotropic medications are neither "safe" nor "secure."

134.   The *Flores* Settlement incorporates by reference relevant law of the state in which children are placed and thereby requires ORR to comply with applicable child welfare laws and regulations when administering psychotropic medications to Plaintiffs and those similarly situated. Plaintiffs are informed and believe, and on such basis allege, that the laws of all states in which ORR places Plaintiffs and those similarly situated require ORR to obtain informed parental consent or its lawful equivalent when administering psychotropic medications to minors.

135.   For example, Texas Administrative Code sections 748.2001(b), 748.2253, 748.2255 require informed consent be provided prior to administering psychotropic drugs to children in state custody. Texas Family Code section 266.004(a) provides that before children in the care of the Texas Department of Family and Protective Services may receive medical care, someone authorized by a court must provide consent.

136.   Similarly, California Welfare and Institutions Code sections 369.5(a)(1) and 739.5(a)(1) provide that only a juvenile court may lawfully authorize the administration of psychotropic medication to children who are in state custody, unless

First Amended Complaint

41

the juvenile court specifically authorizes a parent to do so after making specific findings regarding the parent's fitness and capacity to do so.

137.   Plaintiffs and their proposed class members have a substantial liberty interest protected by the Due Process Clause of the Fifth Amendment in being free from the unauthorized and unnecessary administration of psychotropic medications. Plaintiffs are entitled to constitutionally sufficient procedures to protect against erroneous deprivation of this interest.

138.   Psychotropic medications are powerful drugs that act on the central nervous system and affect cognition, emotions, and behavior. Such drugs should only be administered in combination with other mental health supports to treat specifically diagnosed psychiatric illnesses and mental health disorders. Few psychotropic medications have been approved by the FDA as safe and effective to treat children, and careful oversight and monitoring is accordingly required when children are given such drugs. Such medications should not be used as chemical straitjackets to control behavior.

139.   Serious, long-lasting adverse effects are common for individuals given psychotropic medications. The full risks of giving such drugs to children are not well understood, although psychotropics are known to cause serious and sometimes irreversible side effects in adults, including psychosis, seizures, movement disorders, suicidal ideation, aggression, extreme weight gain, and organ damage. Increasing the number of psychotropic drugs children take concurrently increases the likelihood of adverse reactions and long-term side effects. Close and continuing scrutiny of children given such medications is therefore critical.

140.   As a matter of policy and practice, ORR authorizes and condones the administration of psychotropic drugs to children entirely without procedural safeguards, including informed parental consent. Rather, ORR authorizes detention facility staff to "consent" to the involuntary, long-term administration of psychotropic

First Amended Complaint

42

1  drugs to juveniles in their parents' stead, even when such parents are readily available

2  to ORR and/or the detention facility to give or withhold such consent.

3      141.  As a matter of policy and practice, ORR also fails to provide any

4  substantial procedural safeguards against unnecessary or unauthorized administration

5  of psychotropic drugs to children in its custody. At a minimum, such safeguards must

6  include a neutral decisionmaker's approval of the initial decision to administer

7  psychotropics to a child, as well as periodic reviews to ensure that youth are not

8  administered psychotropic medications unnecessarily, for too long, at harmful

9  dosages or in harmful combinations.

10     142.  On information and belief, Plaintiffs allege that ORR failed to have any

11  of these procedural safeguards in place prior to administering psychotropic

12  medications to the named Plaintiffs. In addition, the psychiatrist who currently

13  prescribes psychotropic medications to children at ORR's Shiloh RTC, Dr. Javier

14  Ruíz-Nazario, has received payments from drug companies that manufacture

15  psychotropic drugs given to children at Shiloh RTC.

16  D.    Defendants have obstructed Plaintiffs' access to counsel.

17     143.  Paragraph 24A of the *Flores* Settlement requires ORR to give detained

18  children a hearing before an immigration judge to review whether they are dangerous

19  or likely to abscond. Settlement paragraph 24D provides that Defendants must

20  "promptly provide each minor not released with . . . the list of free legal services

21  providers compiled pursuant to INS regulation . . . ." Exhibit 1, paragraph 14 of the

22  *Flores* Settlement requires licensed facilities in which Defendants detain minors to

23  provide "information regarding the availability of free legal assistance, the right to be

24  represented by counsel at no expense to the government . . . ." Exhibit 6 of the *Flores*

25  Settlement advises detained minors, "If you believe that you have not been properly

26  placed or that you have been treated improperly, you may ask a federal judge to review

27

28

43

your case. You may call a lawyer to help you do this. If you cannot afford a lawyer, you may call one from the list of free legal services given to you with this form."

144.   Section 235(c)(5) of the TVPRA directs Defendant HHS Secretary to "ensure, to the greatest extent practicable and consistent with section 292 of the Immigration and Nationality Act (8 U.S.C. § 1362), that all unaccompanied alien children who are or have been in the custody of the Secretary or the Secretary of Homeland Security, and who are not [from contiguous countries], have counsel to represent them in legal proceedings or matters and protect them from mistreatment . . . ." Section 279(b)(A) of the HSA makes ORR responsible for "developing a plan to be submitted to Congress on how to ensure that qualified and independent legal counsel is timely appointed to represent the interests of each such [unaccompanied alien] child . . . ." Immigration regulations, including 8 C.F.R. §§ 287.3(c), 1003.62, 1240.10(a)(2) and 1292.1 *et seq.*, generally guarantee Plaintiffs and their proposed class members the right to be represented by retained and *pro bono* counsel in proceedings before U.S. Citizenship and Immigration Services and the Executive Office for Immigration Review.

145.   In furtherance of TVPRA § 235(c)(5), Defendant HHS contracts with the Vera Institute of Justice ("VIJ"), a non-profit organization, to coordinate the delivery of free legal services to unaccompanied children from non-contiguous countries who are or have been in ORR custody. VIJ in turn subcontracts with non-profit legal aid providers to counsel and represent such children in applying for affirmative immigration benefits, such as asylum or Special Immigrant Juvenile Status, and in asserting other defenses against removal.

146.   In many regions of the country, VIJ-funded legal services providers are the only legal counsel available to juveniles in ORR custody. Plaintiffs and the members of the proposed class are almost uniformly indigent, speak little or no English, and have little or no ability to represent themselves in hearings pursuant to

First Amended Complaint

44

paragraph 24A of the *Flores* Settlement or in any other legal proceedings involving ORR's custody, release, placement or medication decisions.

147.   On information and belief, ORR has no eligibility standards for providing VIJ-funded legal services to detained children. Rather, ORR exercises opaque and arbitrary discretion to prescribe those legal matters or proceedings in which VIJ-funded legal providers may represent detained children and those in which they may not.

148.   As a matter of policy and practice, ORR routinely bars VIJ-funded legal services providers from representing unaccompanied children from non-contiguous countries in legal proceedings involving ORR's custody, release, placement, and medication decisions, even when such legal services providers have the time and desire to undertake such representation.

149.   Legal proceedings involving ORR's custody, release, placement, and medication decisions, including hearings pursuant to paragraph 24A of the *Flores* Settlement, are "legal proceedings or matters" within the meaning of TVPRA § 235(c)(5).

150.   By blocking VIJ-funded legal services providers from representing children in legal proceedings involving ORR's custody, release, placement and medication decisions, ORR forces Plaintiffs and those similarly situated to fend for themselves in a complex and foreign adversarial legal system with little hope of prevailing. Without meaningful access to counsel, Plaintiffs and those similarly situated are denied a fair chance of succeeding in legal challenges to ORR's custody, release, placement and medication decisions and, *a fortiori*, suffer prolonged detention and the harms extended confinement and family separation inflicts. ORR deprives youth of liberty for years, which is comparable to imprisonment for a felony conviction.

45

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

151.   In blocking Plaintiffs and those similarly situated from receiving assistance in legal matters and proceedings involving ORR's custody, placement, medication, and release decisions, ORR acts arbitrarily, capriciously, abusively of discretion, and contrary to children's best interests, and obstructs lawyers from discharging their duty of zealous representation.

152.   As a direct and proximate result of ORR's blocking VIJ-funded legal services providers from representing Plaintiffs and those similarly situated children in legal proceedings involving ORR's custody, release, placement, or medication decisions, including hearings pursuant to paragraph 24A of the *Flores* Settlement, Plaintiffs and those similarly situated are being: (a) improperly administered psychotropic drugs; (b) erroneously denied placement in the least restrictive setting that is in their best interest and appropriate to their needs; and (c) erroneously denied release to available custodians without unnecessary delay.

VII.

A.   Defendants have violated Plaintiffs' rights under Section 504 by unnecessarily placing them in restrictive settings on the basis of disability.

153.   Under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency . . . ."

154.   Members of the Plaintiff class are qualified individuals with disabilities because they have, have a record of having, and/or are regarded as having a physical or mental impairment which substantially limits one or more major life activities, such as caring for one's self, learning, and working, and because they are unaccompanied alien children whose placement, care, custody, and release is the responsibility of ORR. 45 C.F.R. § 84.3(j), (l).

First Amended Complaint

46

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

155.   ORR's placement, care, custody, and release of immigrant children is a program or activity conducted by an Executive agency and which receives Federal financial assistance.

156.   HHS regulations implementing Section 504 prohibit any entity receiving federal financial assistance from "[a]fford[ing] a qualified handicapped person an opportunity to participate in or benefit from [an] aid, benefit, or service that is not equal to that afforded others;" "[p]rovid[ing] a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others;" "[p]rovid[ing] different or separate aid, benefits, or services to handicapped persons or to any class of handicapped persons unless such action is necessary to provide qualified handicapped persons with aid, benefits, or services that are as effective as those provided to others;" and "[o]therwise limit[ing] a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service." 45 C.F.R. § 84.4(b)(1)(ii), (iii), (iv), (vii).

157.   The aids, benefits, and services ORR provides to immigrant children need not "produce the identical result . . . for handicapped and nonhandicapped persons, but [they] must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs." 45 C.F.R. § 84.4(b)(2).

158.   Upon information and belief, as a matter of both policy and practice, ORR is not equipped to provide even minimal mental health services or supports to children it places in most shelters.

159.   As a matter of both policy and practice, ORR therefore steps up children who need such services and supports, or whom shelter staff believe need such services and supports, to more restrictive placements, including secure facilities, medium secure facilities, or RTCs. ORR licenses only two RTCs in the entire country, so such

First Amended Complaint

47

1  a placement often results in ORR abruptly separating young people with mental health

2  needs or perceived needs from their peers and transporting them across the country.

3      160. ORR steps up some children with minimal mental health needs,

4  including children who require counseling or medication management that could be

5  effectively provided in a shelter setting.

6      161. Members of the Plaintiff class who have or are perceived to have a

7  behavioral, mental health, intellectual, and/or developmental disability and whose

8  needs therefore exceed or are perceived to exceed the resources of ORR shelters are

9  consequently segregated from their non-disabled peers on the basis of their disabilities

10  and are unnecessarily placed in restrictive settings, instead of the most integrated

11  setting appropriate to their needs.

12      162. In warehousing youth with disabilities in secure facilities, medium

13  secure facilities, and RTCs, instead of providing them appropriate mental health

14  services in the most integrated setting appropriate to their needs, Defendants

15  unlawfully discriminate against youth on the basis of disability in violation of Section

16  504 of the Rehabilitation Act.

17  **B.**    **Defendants have violated Plaintiffs' rights under Section 504 by delaying**

18      **and/or obstructing their release because of disability.**

19      163. Under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, "[n]o

20  otherwise qualified individual with a disability . . . shall, solely by reason of her or

21  his disability, be excluded from the participation in, be denied the benefits of, or be

22  subjected to discrimination under any program or activity receiving Federal financial

23  assistance or under any program or activity conducted by any Executive agency. . . ."

24      164. Members of the Plaintiff class are qualified individuals with disabilities

25  because they have, have a record of having, and/or are regarded as having a physical

26  or mental impairment which substantially limits one or more major life activities, such

27  as caring for one's self, learning, and working, and because they are unaccompanied

28

First Amended Complaint                       48

alien children whose placement, care, custody, and release is the responsibility of ORR. 45 C.F.R. § 84.3(j), (l).

165. ORR's placement, care, custody, and release of immigrant children is a program or activity conducted by an Executive agency and which receives Federal financial assistance.

166. HHS regulations implementing Section 504 prohibit any entity receiving federal financial assistance from "[a]fford[ing] a qualified handicapped person an opportunity to participate in or benefit from [an] aid, benefit, or service that is not equal to that afforded others;" "[p]rovid[ing] a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others;" "[p]rovid[ing] different or separate aid, benefits, or services to handicapped persons or to any class of handicapped persons unless such action is necessary to provide qualified handicapped persons with aid, benefits, or services that are as effective as those provided to others;" and "[o]therwise limit[ing] a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service." 45 C.F.R. § 84.4(b)(1)(ii), (iii), (iv), (vii).

167. "A recipient may not, directly or through contractual or other arrangements, utilize criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons." 45 C.F.R. § 84.4(b)(4).

168. The methods of administration utilized by Defendants in providing for the placement, care, custody, and release of immigrant children discriminate on the basis of disability. They further have the effect of substantially impairing accomplishment of the objective of release to an appropriate sponsor with respect to children with disabilities.

First Amended Complaint

49

169.   Upon information and belief, as a matter of policy and practice, ORR is not equipped to provide even minimal mental health services or supports to children it places in most shelters.

170.   As a matter of policy and practice, ORR steps up children who need mental health services and supports, or whom shelter staff believe need such services and supports, to more restrictive placements, including secure facilities, medium secure facilities, or RTCs. Members of the Plaintiff class who have or are perceived to have a behavioral, mental health, intellectual, and/or developmental disability are therefore placed in such restrictive placements on the basis of disability.

171.   Placement in secure facilities, medium-secure facilities, or RTCs delays release to parents and other custodians of youth.

172.   As a matter of policy and practice, ORR has refused to release children whom it has ever placed in a secure or medium secure facility until and unless its director or his designee approves release. In practice, this policy prolongs children's detention for weeks or months even when parents or other reputable custodians are available to care for them. When children are placed in secure or medium secure facilities because of disability, this policy and practice results in the prolonged detention and separation of children from their families on the basis of disability.

173.   As a matter of policy and practice, ORR refuses to release children whom it has placed in RTCs until and unless RTC medical personnel declare the child mentally fit. When children are placed in RTCs because of disability, this policy and practice results in the prolonged separation of children from their families on the basis of disability.

174.   On information and belief, Plaintiffs further allege that ORR regularly insists that the parents and other potential custodians possess novel and superfluous qualifications to receive custody of children whom ORR has ever placed in an RTC, secure, or medium secure facility. When children are placed in restrictive settings

50

because of disability, such practices result in the prolonged separation of children from their families on the basis of disability.

175. Prolonged detention of children with behavioral, mental health, intellectual, and/or developmental disabilities can exacerbate their disabilities and result in deterioration of their mental health. By placing children with disabilities in restrictive settings and prolonging their detention and separation from their families, Defendants exacerbate their symptoms, making it less likely that they will be approved for release, and thereby further prolonging their detention.

176. Defendants' methods of administration therefore have the effect of discriminating against children with disabilities and substantially impairing accomplishment of the objectives of ORR's programs and activities with respect to such children in violation of Section 504. Defendants are subjecting children to prolonged detention and separation from their families based on their disabilities.

177. Defendants fail to make reasonable accommodations in policies, practices, and procedures that are necessary to avoid discrimination on the basis of disability. Specifically, *inter alia*, Defendants fail to provide adequate and appropriate mental health services in an integrated setting; fail to implement trauma-sensitive policies and procedures for children with disabilities in ORR custody; and fail to afford children with disabilities access to counsel to challenge restrictive placements that prolong their detention.

## VIII.

## IRREPARABLE INJURY

178. Plaintiffs have suffered and will continue to suffer irreparable harm because of Defendants' policies and practices as challenged herein. ORR has deprived and will continue to deprive Plaintiffs and those similarly situated of their rights under the First and Fifth Amendments, the TVPRA, the *Flores* Settlement, and Section 504 of the Rehabilitation Act. ORR confines children to jail-like settings without affording

First Amended Complaint

51

them a meaningful or timely opportunity to be heard regarding the reasons for such placement; prolongs children's detention on the ground that their parents or other available custodians are or may be unfit, while affording neither detained children nor their proposed custodians a meaningful or timely opportunity to be heard regarding a proposed custodian's fitness; places children in facilities in which it knows they will be administered powerful psychotropic medications without procedural safeguards; blocks lawyers from representing detained children with respect to placement, administration of psychotropic medications, or release to available custodians; unnecessarily places youth in restrictive settings on the basis of disability; and delays and/or obstructs their release on the basis of disability. In doing so, Defendants have profoundly undermined the health and well-being of Plaintiffs and those similarly situated along multiple domains, as described above.

IX.

FIRST CLAIM FOR RELIEF

[DENIAL OF DUE PROCESS: DETERMINING CUSTODIANS' FITNESS]

179. Plaintiffs hereby incorporate by reference Paragraphs 1-178 of this Complaint as though fully set forth here.

180. As a matter of policy and practice Defendants unreasonably and unnecessarily delay or refuse to release children to parents, close family members, and other available custodians on the ostensible grounds that such custodians are or may be unfit, and they do so without affording detained minors or their proposed custodians a timely, prompt, or meaningful opportunity to be heard regarding such custodians' fitness. Defendants' policies and practices violate the fundamental rights of Plaintiffs and those similarly situated and demonstrate a deliberate indifference to risk of harm to children.

181. Such policy and practice individually and collectively violate paragraphs 14 and 18 of the *Flores* Settlement, TVPRA § 235(c)(2)(A), the Administrative

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

Procedure Act, 5 U.S.C. §§ 701 *et seq*., the procedural and substantive components of the Due Process Clause of the Fifth Amendment of the United States Constitution, and the Freedom of Association Clause of the First Amendment of the United States Constitution.

X.

SECOND CLAIM FOR RELIEF

[DENIAL OF DUE PROCESS: RESTRICTIVE PLACEMENT]

182.   Plaintiffs hereby incorporate by reference Paragraphs 1-178 of this Complaint as though fully set forth here.

183.   As a matter of policy and practice, Defendants place Plaintiffs and those similarly situated in RTCs, secure facilities, and medium-secure facilities without affording them a meaningful opportunity to be heard either prior or subsequent to such placement.

184.   Such policy and practice individually and collectively violate Definition 6 and paragraph 19 of the *Flores* Settlement, TVPRA § 235(c)(2)(A), the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*., and the Due Process Clause of the Fifth Amendment to the United States Constitution.

XI.

THIRD CLAIM FOR RELIEF

[UNLAWFUL ADMINISTRATION OF PSYCHOTROPIC DRUGS]

185.   Plaintiffs hereby incorporate by reference Paragraphs 1-178 of this Complaint as though fully set forth here.

186.   As a matter of policy and practice, Defendants administer children psychotropic drugs without procedural safeguards, including: obtaining informed consent or the lawful equivalent; involving a neutral decision maker in the initial determination of whether to prescribe psychotropic medications to children in ORR custody; and conducting a periodic review of such treatment decisions to ensure that

First Amended Complaint

53

1   youth are not administered psychotropic medications unnecessarily or at harmful

2   dosage levels or in harmful combinations.

3       187.   Such policy and practice individually and collectively violate paragraphs

4   6, 8, 12, and 19 and Exhibit 1 of the *Flores* Settlement, the TVPRA, the

5   Administrative Procedure Act, 5 U.S.C. §§ 501 *et seq*., and the Due Process Clause

6   of the Fifth Amendment to the United States Constitution.

7                                     XII.

8                        FOURTH CLAIM FOR RELIEF

9   [BLOCKING LEGAL ASSISTANCE IN MATTERS RELATING TO CUSTODY,

10                      MEDICATION AND RELEASE]

11      188.   Plaintiffs hereby incorporate by reference Paragraphs 1-178 of this

12  Complaint as though fully set forth here.

13      189.   As a matter of policy and practice, ORR blocks VIJ-funded lawyers from

14  representing Plaintiffs and those similarly situated in legal matters and proceedings

15  involving ORR's decisions regarding custody, release, medication, and placement.

16      190.   Such policy and practice individually and collectively violate paragraphs

17  24A and 24D, Exhibit 1 paragraph 14, and Exhibit 6 of the *Flores* Settlement, TVPRA

18  § 235(c)(5), HSA § 279(b)(A), 8 C.F.R. §§ 287.3(c), 1003.62, 1240.10(a)(2) and

19  1292.1 *et seq*., the Administrative Procedure Act, 5 U.S.C. §§ 501 *et seq*., and the Due

20  Process Clause of the Fifth Amendment to the United States Constitution.

21                                    XIII.

22                        FIFTH CLAIM FOR RELIEF

23           [DISCRIMINATION ON THE BASIS OF DISABILITY]

24      191.   Plaintiffs hereby incorporate by reference Paragraphs 1-178 of this

25  Complaint as though fully set forth here.

26      192.   As a matter of policy and practice, ORR places Plaintiffs who have or

27  are perceived to have behavioral, mental health, intellectual and/or developmental

28

First Amended Complaint                54                Center for Human Rights & Constitutional Law
                                                         256 S. Occidental Blvd.
                                                         Los Angeles, CA 90057
                                                         213/388-8693

1   disabilities in restrictive settings, such as secure facilities, medium secure facilities,
2   or RTCs, because of their disabilities.

3   193.   As a matter of policy and practice, ORR delays or obstructs the release
4   of Plaintiffs who have or are perceived to have behavioral, mental health, intellectual
5   and/or developmental disabilities to parents, close family members, and other
6   available custodians because of their disabilities.

7   194.   Such policy and practice individually and collectively violate Section
8   504 of the Rehabilitation Act.

9                                               XIV.

10                             PRAYER FOR RELIEF

11   WHEREFORE, Plaintiffs pray that this Court —

12   1.   assume jurisdiction of this cause;

13   2.   certify this case as a class action on behalf of the class proposed herein;

14   3.   enter declaratory judgment that Defendants' policies and practices as
15   challenged herein are unlawful;

16   4.   issue temporary and permanent injunctions enjoining Defendants
17   from—

18   (a)   denying Plaintiffs or their proposed class members due process in
19         evaluating the fitness of parents and other available custodians;

20   (b)   denying Plaintiffs or their class members due process in placing them in
21         RTCs, medium-secure or secure facilities;

22   (c)   administering psychotropic drugs to Plaintiffs or their class members in
23         non-exigent circumstances without parental consent or the lawful
24         equivalent thereof;

25   (d)   blocking Plaintiffs or their class members from receiving legal assistance
26         pursuant to 8 U.S.C. § 1232(c)(5) in hearings in legal proceedings or

27
28

First Amended Complaint                        55

matters involving ORR's decisions regarding custody, placement, or release;

(e)    unnecessarily placing Plaintiffs in restrictive settings on the basis of disability;

(f)    delaying and/or obstructing Plaintiffs' release on the basis of disability;

5.    award the named Plaintiffs and their class members nominal damages pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971);

6.    award Plaintiffs costs and attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

7.    issue such further relief as the Court deems just and proper.

First Amended Complaint

56

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

Dated: September 7, 2018

Respectfully submitted,

CARLOS HOLGUÍN
Center for Human Rights &
Constitutional Law

HOLLY COOPER
CARTER WHITE
University of California Davis School of
Law

LEECIA WELCH
NEHA DESAI
POONAM JUNEJA
CRYSTAL ADAMS
National Center for Youth Law

SUMMER WYNN
MARY KATHRYN KELLEY
JON CIESLAK
MEGAN DONAHUE
Cooley LLP

*/s/ Carlos R. Holguín*
Carlos R. Holguín

*/s/ Holly Cooper*
Holly Cooper

*/s/ Leecia Welch*
Leecia Welch

*/s/ Summer Wynn*
Summer Wynn

*Attorneys for Plaintiffs*

First Amended Complaint

57