# Exhibit 7

Exhibit 7
Page 152

DECLARATION OF LORILEI ALICIA WILLIAMS

I, Lorilei Alicia Williams, declare and say as follows:

1. I am an attorney licensed to practice in the states of Texas and New York. I joined Staten Island Legal Services, part of Legal Services NYC, in January 2016 as the Immigration Unit Director.

2. From September 2012 until April 2014, I worked as a staff attorney in the unaccompanied minors program of the St. Frances Cabrini Center for Immigration Legal Assistance at Catholic Charities of the Archdiocese of Houston-Galveston. In the course of my practice I regularly represented unaccompanied juveniles detained pursuant to the Immigration and Nationality Act (INA) and housed by the Office of Refugee Resettlement of the Department of Health and Human Services (ORR) at the following detention facilities: Southwest Key Conroe, Shiloh, Southwest Key Casa Houston, Southwest Key Mesa, Baptist Children and Family Services Baytown, Catholic Charities St. Michael's, and the Children's Center in Galveston.

3. From May 2014 until January 2016, I worked as a staff attorney in the unaccompanied minors program of Catholic Charities Community Services of the Archdiocese of New York. During this period I regularly represented unaccompanied juveniles detained ORR detained at the following facilities: MercyFirst, the Children's Village, Cayuga Centers, Abbott House, Leake and

Exhibit 7
Page 153

Watts, New York Foundling, the Children's Home of Poughkeepsie, the Children's Home of Kingston, Lincoln Hall, and Cardinal McClosky, among others.

4. My representation included assisting detained juveniles contest removal, seek affirmative immigration benefits such as asylum and special immigrant juvenile status, as well as seeking their release to parents or other custodians and advocating for their placement in the least restrictive setting. I have accordingly had regular occasion to observe, and am intimately familiar with, ORR's policies and practices, as well as those of United States Immigration and Customs Enforcement (ICE), toward the detention, release, and treatment of juveniles. I am also familiar with how those policies and practices have changed over time.

5. In the Houston area, Southwest Key Mesa was primarily a shelter-level facility, although it did have staff-secure beds. Shiloh was primarily a residential treatment center, although for some time it also had staff-secure beds. In New York, the Children's Village was primarily a shelter-level facility with two cottages dedicated to staff-secure beds. MercyFirst has both shelter-level beds and residential treatment center beds.

6. Children are placed in staff-secure beds if ORR determines that they require a higher level of supervision than the general population of detained immigrant and refugee youth. Staff-secure placement is more restrictive than shelter placement or placement in transitional foster care. In all aforementioned

facilities, I observed that children placed in staff-secure beds oftentimes remained at staff-secure level for several months. In a few cases, ORR released such children to sponsors or transferred them directly to a less secure long-term placement (such as ORR-funded long-term foster care or the Unaccompanied Refugee Minors (URM) program). In most cases, however, ORR required that the child earn the right to be "stepped-down" from staff-secure level to shelter level before it would release the child or transfer him or her to a long-term placement. It was common to see children detained for six months or longer in staff-secure placements.

7. ORR places children at residential treatment centers (RTCs) when it believes they need psychological or medical intervention. Most children I worked with at RTCs suffered from post-traumatic stress disorder. Many had thoughts of self-harm or suicide, or had experienced psychotic episodes. (A few had no extraordinary psychological needs, but had heightened medical conditions such as deafness, muteness, autism, or epilepsy.) Many children suffering from PTSD or other psychological trauma also had alleged criminal history closely associated with such trauma. Similar to staff-secure children, ORR would sometimes release RTC children directly from RTC, but most often would refuse to release them until they had first stepped down to a less secure placement. In both staff-secure and RTC placements, children suffered greater restrictions on their liberties, such as

being denied permission to leave the facility to attend school or recreational activities. In my experience, children in staff-secure or RTC placements also reported shelter abuses more frequently, such as excessive use of force when restraining a child, threatening children with removal, and general hostility towards the children.

8. I am informed and believe that the *Flores* settlement and § 235(c)((2) of the 2008 Trafficking Victims Protection Act (TVPRA) require ORR to place detained juveniles in the least restrictive setting that is in the best interests of the child. I am further informed and believe that the *Flores* settlement and the TVPRA require ORR to minimize the detention of juveniles by releasing them to their parents and other reputable custodians except where a particular minor is an extraordinary flight-risk or to ensure his or her safety or the safety of others. I am further informed and believe that the *Flores* settlement guarantees juveniles whom ORR refuses to release notice and a meaningful opportunity to be heard regarding the grounds for continuing to detain them. In my opinion, ORR is clearly in breach of these requirements: ORR is needlessly extending the juveniles' time in detention, placement in staff-secure beds and RTCs, and it affords detained youth little or no opportunity to examine or contest the grounds for continuing to detain them or house them in restrictive settings. The following examples illustrate ORR's policies and practices.

9. Alan Yair Cruz Mar, a 16-year-old born in Mexico, A 205 907 243, was detained by Customs and Border Protection (CBP) on August 24, 2015. Alan's father is a U.S. citizen who recognized his paternity over Alan and agreed to provide him with financial support until he turns 18, thereby making Alan a derivative U.S. citizen effective the date of his birth. A derivative citizen does not need to apply for citizenship: he or she is a citizen at birth. Alan did not know that he had this claim to citizenship until I met with him and also spoke with his father.

10. On November 6, 2015, I informed ORR and ICE that Alan was a U.S. citizen and therefore not subject to detention under the INA. ICE's Enforcement and Removal Operations (ERO) unit terminated removal proceedings against Alan during the fourth week of November because of his probative claim to U.S. citizenship and, advised ORR regarding his U.S. citizenship claim. ORR nevertheless continued to detain him for months without affording him any meaningful opportunity contest such detention and despite my best efforts to have him released to his father.

11. In an effort to have Alan released to his father, I reached out multiple times via telephone and email to David Fink, ORR's Federal Field Specialist (FFS) supervisor, and James "Jim" de la Cruz, also an FFS supervisor, both out of Washington, D.C. On multiple occasions, they simply refused to respond to inquiries regarding why Alan was being detained in lieu of release to his father. A

- 5 -

Exhibit 7
Page 157

local FFS, Karla Mansilla, instructed me to bring up the question with ORR's legal counsel, but when I asked for their counsel's contact information, she refused to give it to me. (I considered filing a petition for habeas corpus contesting Alan's continued detention, but as explained below, I was then funded by the Vera Institute pursuant to a contract with ORR; both ORR and Vera Institute informally discourage Vera-funded lawyers from taking any legal action against ORR lest they cut off funds entirely for assisting unaccompanied minors.)

12. I successfully had Alan's removal proceedings terminated in immigration court in mid-January 2016, but it took more than a week for ORR to release Alan to his grandmother. At no time did ORR provide Alan, his father, his grandmother, or me any written explanation of its reasons for continuing to detain him. At no time did ORR present Alan for a bond redetermination hearing. At no time did ORR disclose to Alan, his father, his grandmother, or to me the evidence supporting its decision to continue Alan in detention. At no time did ORR grant Alan, his father, or his grandmother a hearing regarding the grounds for continuing to detain Alan. The most ORR could muster was to advise me informally that they did not want release Alan because they were concerned about his father's criminal history.

13. Another of my clients who suffered needless detention was William Alberto Alvarez Argaeta, A 205 298 892, from El Salvador. (William recently

Exhibit 7
Page 158

passed away at the age of 14 in a fishing accident.) CBP apprehended William on December 26, 2011, when he was nine years old. ORR first detained William at the IES Harlingen Foster Program, and then at the Children's Center in Galveston, Texas. On January 4, 2012, ORR transferred him to Shiloh RTC. William was diagnosed with Attention-Deficit/Hyperactivity Disorder, Combined Type; Posttraumatic Stress Disorder; and, Bipolar I Disorder, with episodes that have been mixed, severe with psychotic features.

14. William's psychological difficulties stemmed from a long and tragic history of sexual abuse in El Salvador. He had been abandoned by extended family with whom his parents had left him, and for at least a year he lived alone, homeless, and defenseless on the streets of El Salvador; he was eight years old and easy prey for sexual predators. William's parents eventually managed to find him and arranged to have him brought to Dallas, Texas, where they lived.

15. I began representing William in October 2012. On numerous occasions he was uncooperative and exhibited clear indicia of mental illness. During this initial period of detention, William had no next-friend or child advocate, so I undertook to advocate for release to his parents. Being reunified with his parents was William's only clear wish, and I believed his parents would speak for him during removal proceedings. ORR refused to release William. As was the case with Alan, the agency refused to provide any written explanation of why a child of

such tender age and suffering from such trauma needed to be detained for more than a year when his parents were ready, willing and able to care from him and lived only a few hours away. Again, at no time did ORR present William for a bond redetermination hearing. At no time did ORR disclose to William's parents or to me the evidence supporting its decision to continue William in detention. At no time did ORR grant William or his parents any hearing regarding its reasons for continuing to detain their nine year old child.

16. ORR also appears to have done its best to insulate its decisions to continue children in detention from judicial review. When I discussed William's plight with my supervisors at Catholic Charities Houston, I was told explicitly that we could not take legal action against ORR because our Vera Institute funding to help detained children would be at risk. I determined, then, that my only recourse was to attempt to terminate William's removal proceedings on the basis of his incompetency. In January 2013, I submitted a motion to the immigration court. I also reached out to ORR and asked them if William's psychiatrist and clinician would be able to testify in court as to William's competency. I believe an individual hearing date was either for April or June 2013, but I do not recall the exact date. Some time prior to the competency hearing, ORR suddenly and without explanation released William to his parents; he had by that time spent almost a year and a half needlessly detained.

17. As the foregoing cases illustrate, in practice I have never known ORR to provide any written explanation for its decisions against releasing juveniles from staff-secure or RTC detention. In my experience, ORR affords neither detained juveniles nor their parents or other proposed custodians any transparent, meaningful opportunity to be heard on the matter of children's release, no opportunity to see, explain or rebut whatever evidence ORR believes justifies a child's continued secure confinement, or any effective way to appeal ORR's custody decisions administratively. Although ORR publishes on its website that parents may send a letter to the ACF Assistant Secretary appealing the denial, this is not communicated clearly to the parents or children. In sum, in denying juveniles' release to their parents or other caregivers, ORR provides—

- no notice of the reasons for housing them in a staff-secure or RTC facility;

- no bond redetermination or other hearing on the reasons for continuing to detain them;

- no written information regarding when or if it will reach a decision on whether to detain or release a child;

- no written information regarding when or if it will "step down" a child from a staff-secure or RTC placement to a non-secure licensed placement;

- no explanation of the right of judicial review; and

18. Although I am not a mental health professional, I have noted the deleterious effects ORR's opaque and oft-delayed release and step-down decisions have on detained youth. In both Alan's and William's cases, facility staff repeatedly encouraged my clients, their parents, and myself to believe that ORR would release my clients promptly, whereas in truth and fact the agency delayed its decisions for weeks or months, leaving children, their parents, and their lawyer twisting in the wind, awaiting a decision from on high that might or might not be favorable and that would never be explained other than in the barest of conclusory terms. In the face of such extended and faceless uncertainty, detained children— already traumatized by horrific experiences in their countries of origin—have expressed to me feeling profound helplessness and despair, to the point where they are prepared to take extreme measures, including opting for voluntary return to countries in which they know their lives and freedom will be in jeopardy, rather than continue to live day after day in ORR's detention facilities never knowing if or when they will be reunited with their families.

19. Additionally, although ORR boasts of providing free legal services to detained minors, it hobbles free legal service providers who undertake to represent detained children. While working for both Catholic Charities in Houston and in New York, I was funded by ORR to represent detained unaccompanied minors.

ORR provides such funds pursuant to the TVPRA to the VERA Institute of Justice, which then sub-contracts with nonprofit legal service organizations to provide direct legal services to ORR detainees, among others.

20. In cases where ORR insisted upon detaining children for unusually long periods of time, pursuing relief in federal court was not an option, so my only recourse was to maintain open communication with shelter staff and ORR personnel in the hopes that a positive long-term stakeholder relationship would work to detained children's benefit. On more than one occasion, shelter staff and I strategized together on how to persuade ORR to release a child, but these measures were no substitute for a fair and transparent procedure by which detained children and their parents could understand and test the government's case for refusing release.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5 day of August, 2016, at Staten Island, NY.

Rachel W W Granfield
Notary Public, State of New York
No. 02GR6333769
Qualified in Richmond County
My Commission Expires 11-22-19

Lorilei Alicia Williams

/// Rachel WW Granfield

- 11 -

Exhibit 7
Page 163