CARLOS HOLGUÍN (Cal. Bar No. 90754)
Center for Human Rights and Constitutional Law
256 South Occidental Blvd.
Los Angeles, CA 90057
Telephone: (213) 388-8693, ext. 309
Facsimile: (213) 386-9484
Email: crholguin@centerforhumanrights.org

*Attorneys for Plaintiffs*

*Listing of counsel for Plaintiffs and Defendants continued on next page.*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCAS R. *et al*, | Case No. 2-18-CV-05741 DMG (PLA) |
| Plaintiffs, | REPORT OF PARTIES' PLANNING |
| v. | MEETING UNDER FED. R. CIV. P. |
| | 16 and 26(f) and L.R. 26-1 |
| ALEX AZAR, Secretary of U.S. Dep't of Health and Human Services, *et al.*, | |
| Defendants. | SCHEDULING CONFERENCE set for February 22, 2019, 9:30 a.m. |

REPORT OF PARTIES' PLANNING MEETING UNDER FED. R. CIV. P. 16 AND 26(f)

*Additional counsel for Plaintiffs:*

HOLLY S. COOPER (Cal. Bar No. 197626)
Co-Director, Immigration Law Clinic
CARTER C. WHITE (Cal. Bar No. 164149)
Director, Civil Rights Clinic
University of California Davis School of Law
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email:    hscooper@ucdavis.edu
          ccwhite@ucdavis.edu

LEECIA WELCH (Cal. Bar No. 208741)
NEHA DESAI (Cal. RLSA Bar No. 803161)
POONAM JUNEJA (Cal. Bar No. 300848)
National Center for Youth Law
405 14th Street, 15th Floor
Oakland, CA 94612
Telephone: (510) 835-8098
Email:    lwelch@youthlaw.org
          ndesai@youthlaw.org
          pjuneja@youthlaw.org

CRYSTAL ADAMS (Cal. Bar No. 308638)
National Center for Youth Law
1313 L St. NW, Suite 130
Washington, DC 20005
Telephone: (202) 868-4785
Email:    cadams@youthlaw.org

REPORT OF PARTIES' PLANNING MEETING UNDER FED. R. CIV. P. 16 AND 26(f)

SUMMER WYNN (Cal. Bar No. 240005)
MARY KATHRYN KELLEY (Cal. Bar No. 170259)
JON F. CIESLAK (Cal. Bar No. 268951)
MEGAN L. DONOHUE (Cal. Bar No. 266147)
Cooley LLP
4401 Eastgate Mall
San Diego, CA 92121-1909
Telephone: (858) 550-6000
Email:    swynn@cooley.com
          mkkelley@cooley.com
          jcieslak@cooley.com
          mdonohue@cooley.com

*Attorneys for Defendants in official capacity only:*

JOSEPH H. HUNT
Assistant Attorney General
United States Department of Justice
Civil Division
ERNESTO H. MOLINA, JR.
Deputy Director
Office of Imm. Litigation
W. DANIEL SHIEH
BENJAMIN MARK MOSS
Senior Litigation Counsel
ANDREW B. INSENGA
Trial Attorney
SHERRY D. SOANES
Trial Attorney
MARINA C. STEVENSON
Trial Attorney
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 532-4108
Facsimile: (202) 616-4950
Email:    sherry.soanes@usdoj.gov

REPORT OF PARTIES' PLANNING MEETING UNDER FED. R. CIV. P. 16 AND 26(f)

*Attorneys for Defendant E. Scott Lloyd:*

NICOLA T. HANNA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, General Civil Section
DAVID PINCHAS
Assistant United States Attorney

*/ / /*

REPORT OF PARTIES' PLANNING MEETING UNDER FED. R. CIV. P. 16 AND 26(f)

Under Fed. R. Civ. P. 16 and 26(f), L.R. 26-1 and this Court's January 10, 2019 Scheduling Order, a meeting by telephone was held on January 23, 2019, and was attended by Leecia Welch, Jon Cieslak, Holly Cooper, Crystal Adams, counsel for Plaintiffs, and Benjamin Mark Moss, Marina C. Stevenson, Andrew B. Insenga, Ernesto H. Molina, Jr., and W. Daniel Shieh, counsel for Defendants in their official capacity, and David Pinchas, counsel for Mr. Lloyd in his individual capacity.

Pursuant to Rule 26(f)(2) and L.R. 26-1, the Parties jointly report as follows.

Index

I.    Rule 26(f) matters. ........................................................................7

      A.    Changes in timing, form, or requirement for initial disclosures under Rule 26(a). ..............................................................7

      B.    Subjects on which discovery may be needed; discovery schedule; discovery phasing, limitations, focus.........................7

            1.    Plaintiffs' position .....................................................7

                  a.    Subjects ..........................................................7

                  b.    Schedule .........................................................7

                  c.    Phasing and limitations .................................8

            2.    Defendants' position ...............................................14

      C.    Disclosure, discovery, or preservation of electronically stored information. ...............................................................20

      D.    Claims of privilege or of protection as trial-preparation materials. ..................................................................20

      E.    Changes in limitations on discovery..................................21

      F.    Other proposed orders under Rule 26(c) or under Rule 16(b) and (c)........................................................................21

II.   Matters listed in Scheduling Order..........................................22

A.    Other discovery matters. ..........................................................22

    1.    Electronic materials. ...................................................22

    2.     Discovery cut-off. ....................................................22

    3.    Class counsel access to class members..................................22

B.    Law and motion. ..........................................................23

C.    Settlement. ..............................................................23

D.    Trial estimate; proposed pretrial and trial dates.............................24

E.    Addition of parties. ......................................................24

F.    Trial to jury or court......................................................24

G.    Other issues. ............................................................25

H.    Proposals re: severance bifurcation or other ordering proof. .............25

I.    Synopsis of principal issues. ..............................................25

    1.    Plaintiffs' statement. ..................................................25

    2.    Defendants' statement. ................................................26

J.    Likelihood of amendment to pleadings. ...................................27

K.    Issues that may be determined by motion....................................27

III.    Additional matters listed in Rule 16(b)(3) or L.R. 26-1.............................27

A.    Complexity. ............................................................27

B.    Motion schedule.........................................................27

C.    ADR. ..................................................................28

D.    Trial estimate. ..........................................................28

E.    Additional parties........................................................28

F.    Expert witnesses. ........................................................28

REPORT OF PARTIES' PLANNING MEETING UNDER FED. R. CIV. P. 16 AND 26(f)

I.       RULE 26(f) MATTERS.

      **A.      Changes in timing, form, or requirement for initial disclosures under Rule 26(a).**

Given the complex issues, multiple parties and large public organization in this case, the Parties agreed to adjust the time required for initial disclosures.  The parties will exchange initial disclosures under Fed. R. Civ. P. 26(a)(1) on or before February 22, 2019. The Parties do not anticipate any changes to the form or requirements for the initial disclosures.

Plaintiffs represent that they have made efforts to preserve discoverable information.

Defendants represent that they have made efforts to preserve discoverable information.

      **B.      Subjects on which discovery may be needed; discovery schedule; discovery phasing, limitations, focus.**

The Parties' respective positions are presented below.  The parties agree, however, that before noticing depositions, the parties will confer in a good faith effort to select mutually agreeable times and locations.

      1.       <u>Plaintiffs' position</u>

         *a.      Subjects*

Plaintiffs anticipate that discovery will be needed on all five claims the Court has certified for class treatment.

         *b.      Schedule*

Plaintiffs intend to pursue the following discovery schedule:

Plaintiffs will shortly serve a first set of written discovery to Defendant Alex Azar, Secretary of U.S. Department of Health and Human Services.

Plaintiffs propose to conduct depositions upon oral examination of non-expert witnesses during April, May, and June, 2019.

Plaintiffs anticipate serving a second set of written discovery in July 2019.

Plaintiffs anticipate conducting a limited number of additional depositions upon oral examination of non-expert witnesses in August and September, 2019.

Plaintiffs propose completing depositions upon oral examination of expert witnesses by March 2, 2020.

In the event Defendants request additional time to respond to written discovery, accommodate the schedules of deponents, or object to discovery Plaintiffs believe essential, the foregoing dates will need adjustment.

### c.    Phasing and limitations

Plaintiffs oppose Defendants' proposal for phased discovery and law and motion practice, in which all discovery and briefing relating to Plaintiffs' certified class claims would be stayed, in favor of limited fact discovery and briefing narrowly relating to a so-called "facial" challenge to Defendants' "policies."

First, Plaintiffs' first, second and third claims for relief allege that ORR violates due process in denying class members licensed placement, refusing to release them on the ground their parents or other proposed custodians are or may be unfit, and administering psychotropic medications. First Amended Complaint (Doc. # 81) ¶¶ 180, 183-84, and 186-87.

The test for what process is due is well-settled. *See Mathews v. Eldridge*, 424 U.S. 319 (1976). Under *Mathews*, courts determine what process is due by weighing (1) "the private interest that will be affected by the official action"; (2) "the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

*Mathews* posits a fundamentally *factual* test for determining what process is due. *See, e.g., Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 331

8

1   (1985) (court reviews district court's holding in light of record evidence relating to

2   *Mathews* factors); *see also id*. at 357 (Brennan, J., dissenting) (majority "excoriates

3   the appellees and the District Court repeatedly for failing to muster sufficient

4   evidence to support the 'holding'" of denial of due process under *Mathews*).   And

5   Defendants are likely to appeal any judgment the Court might issue that finds the

6   *Mathews'* test is met here. Defendants have appealed from every substantive order

7   of this Court in *Flores v. Whittaker*, No. CV 85-4544, a case that involves the

8   rights of detained immigrant and asylum-seeking youth, and there is no reason to

9   think they would be any less inclined to do so in this action. By agreeing to limit

10   discovery, Plaintiffs may then find themselves unfairly "excoriated for failing to

11   muster sufficient evidence,"  *see Walters*, 473 U.S. at 357, to support their due

12   process claims, an unacceptable  an inefficient bargain.

13         Second, Plaintiffs' class-wide claims for relief are not "facial."[1] In their First

14   Claim for Relief, for example, Plaintiffs allege —

15

16   ───────────────

16   [1] A "facial" challenge would be Plaintiffs' sole avenue of relief had ORR never

17   implemented the various policies and practices here at issue. *See generally, <u>Reno v.</u>*

18   *<u>Flores</u>*, 507 U.S. 292, 300-01 (1993) (challenge to INS policy could only be facial

18   because it "had been in effect only a week when the District Court issued the

19   judgment invalidating it. We have before us no findings of fact, indeed no record,

20   concerning the INS's interpretation of the regulation or the history of its

21   enforcement.").

22   The showing required to prevail on a facial challenge—"'that no set of

23   circumstances exists under which the [challenged practices] would be valid,'" *id*.,

24   *quoting United States v. Salerno*, 481 U.S. 739, 745 (1987), is superfluously

24   exacting here because ORR *has* applied all of the challenged policies and practices

25   for months or even years. They accordingly have a long history of enforcement and

26   interpretation that should be discovered and presented for the Court's

26   consideration.

27

28   Defendants would, of course, enjoy great advantage on appeal were the Court to

28   declare ORR's challenged policies and practices facially invalid, but that is no

9

1
2
3
4
5
6
7
8
9

> As a matter of policy and practice Defendants *unreasonably and unnecessarily* delay or refuse to release children to parents, close family members, and other available custodians on the *ostensible* grounds that such custodians are or may be unfit, and they do so without affording detained minors or their proposed custodians a *timely, prompt, or meaningful* opportunity to be heard regarding such custodians' fitness. Defendants' policies and practices violate the fundamental rights of Plaintiffs and those similarly situated and demonstrate a *deliberate indifference to risk of harm* to children.

10  First Amended Complaint (Doc. # 81) ¶ 180 (emphasis added).

11         The text emphasized above makes clear that ORR's detaining class members
12  without a hearing because available custodians are or may be unfit is a mixed
13  question of fact and law. Plaintiffs allege (i) that ORR unreasonably or
14  unnecessarily delays or refuses to release class members; (ii) that it does so on
15  pretext; (iii) that ORR's existing procedures for evaluating proposed custodians are
16  neither reasonably prompt nor meaningful; and (iv) that ORR is indifferent to the
17  harm detention itself causes class members in declaring a proposed custodian unfit.
18  Defendants deny these factual allegations. *See* Answer (Doc. # 93) ¶ 180
19  (characterizing allegations of Complaint ¶ 180 as "legal arguments and
20  conclusions," but denying them "to the extent a response is required. . ."), and
21  Plaintiffs are accordingly entitled to discovery on this claim.

22         Third, Defendants' proposed phasing would force Plaintiffs to litigate this
23  matter piecemeal. Among other things, Plaintiffs would almost certainly be
24  required to file twice—and the Court to decide—dispositive motions on each of
25  their claims for relief: first, challenging ORR's "policies" as facially invalid; and
26  then again, as those "policies" are applied.

27
28  reason to preempt Plaintiffs' right to litigate their instant claims as they deem best
to secure a resolution that will survive appeal.

10

This Court's and the Ninth Circuit's managing of similar claims in *Flores* is instructive. Both courts decided the plaintiffs' various claims that ORR and DHS were violating the *Flores* settlement in unified proceedings during which both facts and law were considered. *See, e.g., Flores v. Johnson*, 212 F. Supp. 3d 864, 877 (C.D. Cal. 2015) (considering evidence on whether, *inter alia,* the "release of accompanied children and their parents gives families a strong incentive to undertake the dangerous journey to this country"); *Flores v. Sessions,* 862 F.3d 863, 872 (9th Cir. 2017) ("Plaintiffs submit evidence showing that, in practice, ORR currently detains unaccompanied minors for months, and even years, without providing them with any opportunity to be heard before a neutral person with authority to review the basis for the detention."); *Flores v. Sessions*, No. CV 85-4544 DMG (AGRx), Order, July 30, 2018 (Doc. # 470) at 21 (C.D. Cal.) ("*Flores* July 30 Order") (discussing evidence that, *inter alia*, "on numerous occasions, ORR staff at Shiloh RTC signed forms purportedly authorizing the administration of psychotropic medication to Class Members"). There is no reason the Court should proceed piecemeal here.

Fourth, class members are suffering irreparable injury that will only be exacerbated the longer Defendants are permitted to delay resolution of Plaintiffs' instant claims. To take one example, the population of children ORR is now confining at its unlicensed "tent city" at Homestead, Florida, will reportedly soon exceed 2,300. *See* NEW YORK TIMES, *Trump Administration to Nearly Double Size of Detention Center for Migrant Teenagers*, Jan. 15, 2019, *available at* www.nytimes.com/2019/01/15/us/migrant-children-shelter-tent-city-tornillo-homestead.html (last visited Jan. 30, 2019). According to Sen. Jeff Merkely (D. Oregon), who led a congressional delegation to ORR's tent city in Tornillo, Texas, the expansion of Homestead shows that "the Trump administration has not changed its fundamental strategy of deliberately hurting kids as part of its ongoing strategy of deterrence." *Id*.

11

ORR is increasingly detaining children—many of whom could and should be released to waiting parents and other custodians or "stepped down" to a licensed facility—even as reports of malfeasance and physical and sexual abuse of children housed at Homestead mount. *See, e.g.*, SOUTH FLORIDA SUN-SENTINEL, *Ex-employee at Homestead immigration center under scrutiny admitted to sex abuse*, June 20, 2018, *available at* www.sun-sentinel.com/local/miami-dade/fl-reg-homestead-abuse-case-20180620-story.html (last visited Jan. 30, 2019); ASSOCIATED PRESS, *Caregivers for 3600 migrant teens lack complete abuse checks*, Dec. 7, 2018, *available at* www.apnews.com/ee3fd8496204496fb72ee7924dceb12d (last visited Jan. 30, 2019).

A child's private interest in release and step down only increases in proportion to the likelihood that he or she will be abused or mistreated during ORR custody. Plaintiffs should not be forced to delay discovery bearing on the abuse and mistreatment of class members on a hope and wish the Court might declare ORR's challenged "policies" facially invalid.

Fifth, Defendants' preference for piecemeal litigation is predicated largely on an assumption that there is a reasonable probability the Parties will settle Plaintiffs' instant claims. Plaintiffs wish they could share Defendants' professed optimism.

As the Court is aware, in *Flores* these same defendants have now had years to come to the negotiating table on claims that their treatment of detained children falls below lawful standards. They have assiduously declined to do so, and have instead appealed from each and every order this Court has issued in children's favor. Out of court, Defendants have repeatedly denounced the *Flores* settlement and the TVPRA as leading impediments to border control. *See, e.g.*, Letter from Donald J. Trump to Congress, Jan. 4, 2019, Attachment B (identifying "[t]erminat[ion] of the Flores Settlement Agreement" and "[a]mend[ing] the

REPORT OF PARTIES' PLANNING MEETING UNDER FED. R. CIV. P. 16 AND 26(f)

Trafficking Victims Protection Reauthorization Act" as "[t]he most pressing legal changes . . ." the Administration wishes Congress would make).[2]

Tellingly, Defendants have not presented Plaintiffs with any offer of settlement in this action, nor have they identified which of Plaintiffs' claims they think amenable to settlement, nor have they outlined terms upon which they are prepared to settle.[3] Should Defendants proffer a reasonable offer of settlement,

_____

[2] Defendants have embraced the President's call for ever-harsher treatment of asylum-seeking children and their family members—including separating families and detaining accompanied children indefinitely—as a deterrent to future unauthorized immigration.

Steven Wagner, acting assistant secretary at HHS's Administration for Children and Families, impugned the *Flores* settlement and the TVPRA as creating an "immigration loophole [in which] HHS is forced to release minors from Central America into the United States," and releasing children as "an example of open borders" that "creates an economic incentive for further violation of federal immigration law." *Illegal Immigrant Program Creating Proxy Foster Care System, Says Official*, The Epoch Times (June 23, 2018); *see also, e.g.*, U.S. Dep't of Homeland Security, *Unaccompanied Alien Children and Family Units Are Flooding the Border Because of Catch and Release Loopholes* (Press Release, Feb. 15, 2018), *available at* www.dhs.gov/news/2018/02/15/unaccompanied-alien-children-and-family-units-are-flooding-border-because-catch-and (last visited October 17, 2018) ("The *Flores* settlement agreement . . . handicap[s] the government's ability to detain and promptly remove UACs. . . . These legal loopholes lead to 'catch and release' policies that act as a 'pull factor' for increased future illegal immigration."); *How the Trump Administration Got Comfortable Separating Immigrant Kids from Their Parents*, The New Yorker, (May 20, 2018) (reporting DHS's family separation policy intended "to discourage others from traveling to the United States illegally").

[3] Defendants' argument that settlement of Plaintiffs' instant claim regarding the administration of psychotropic medication without lawful consent is currently under negotiation in *Flores v. Whitaker*, No. 85-4544 (C.D. Cal.) is misleading.

Rather, the parties in *Flores* are discussing resolution of a dispute over whether ORR is violating provisions of the *Flores* July 30 Order that apply to a single ORR

13

1   Plaintiffs would willingly pause discovery for however long settlement talks
2   appear promising. But Plaintiffs' right to advocate vigorously on behalf of certified
3   classes should not be hobbled by mandatory phasing predicated on little more than
4   a hope and a wish the Parties might settle.

5                  2.    Defendants' position

6          As discussed below, Defendants propose bifurcation of discovery.  The
7   outlined plan is entirely consistent with Plaintiffs' representations during class
8   certification.  Throughout the course of this litigation to date, Plaintiffs have
9   asserted that "[r]esolving Plaintiffs' claims involves *nearly pure questions of law*,"
10  ECF No. 97-1 at 3 (emphasis added).  Now, however, they re-characterize their
11  claims as "not primarily facial," in an effort to pursue overly broad discovery that
12  they have not shown is proportional to the needs of the case under Rule 26(b).
13  Based upon Plaintiffs' representations and allegations, Defendants crafted a phased
14  discovery plan, below, to minimize the impact of this duplicative class action on
15  the Court, and to facilitate the orderly and efficient adjudication of Plaintiffs'
16  claims.  Defendants' proposed plan enables Plaintiffs to pursue and the Court to
17  efficiently adjudicate those "pure questions of law," ECF No. 97-1 at 13, with the
18  additional benefit of:  (1) the Answer; (2) Rule 30(b)(6) depositions; (3) disclosure
19  of relevant, nonprivileged policy documents; and (4) the case files of the named
20  class members, *see* ECF No. 114 at 18 ("That ORR might argue about whether a
21  particular child needs psychotropic medications, secure confinement, or a better
22

23  _____
24  facility: the Shiloh Residential Treatment Center in Manvel, Texas. *See* Letter to
    Special Master, *et al.*, December 14, 2018, Attachment A.

25
26  The claim certified for national class treatment in this case extends to children
    medicated in countless other ORR facilities and is not confined to violations of
27  idiosyncratic state law regulating the medication only of children whom ORR
    detains in Texas. Plaintiffs instant claim is obviously much broader than any
28  settlement the parties might reach in *Flores*.

                                                                                    14

custodian, does not negate commonality.  Such disputes are immaterial to whether more and better procedures are required to determine fairly and transparently whether ORR's position is justified."); *id.* at 19 ("As discussed [in the Motion for Class Certification], the named Plaintiffs have suffered injuries from Defendants' policies and practices *that are typical of class members*.").  Based on Plaintiffs' original representations, phased discovery is wholly appropriate and warranted.

Moreover, Plaintiffs seek to minimize the possibility that settlement is entirely possible in this case.  In fact, settlement with respect to the "medicated class" is currently being pursued within the related *Flores* litigation.  Plaintiffs also do not explain why discovery is yet warranted on claims that are presently being negotiated, such as the medication class.

To the extent the Court is not amenable to Defendants' proposed phased discovery plan appearing below, Defendants request an affirmative discovery plan that substantially follows Plaintiffs' schedule, including the ability to conduct non-expert and expert depositions and to propound two sets of written discovery requests.  Defendants propose that counsel work together in a good faith effort to schedule depositions at mutually agreed upon times and locations, taking into consideration witnesses' availability and schedules.  *See* Fed. R. Civ. P. 30(b).

Further, Defendants do not necessarily agree with Plaintiffs' characterizations and assertions in Plaintiffs' discussion of phasing and limitations, and Defendants reserve the right to respond to them in the future if warranted.  For instance, Plaintiffs misapprehend what *Mathews*, 424 U.S. at 319, requires in this case.  While the *Mathews* Court recognized that the concept of due process is "flexible" and requires an examination of the particular situation at issue, when it comes to assessing Plaintiffs' "nearly pure questions of law" sounding in due process, *Matthews* does not demand the individualized, factual inquiry that Plaintiffs' argue is needed here.  *Id.* at 334.

15

Rather, in holding that the administrative procedures in the particular context of appeals of disability benefit denials satisfied constitutional due process, the *Matthews* Court made clear that individual, factual circumstances surrounding the denial of benefits to certain individuals need not be examined—only the various administrative procedures that were in place. *Id.* 343. The question was whether an evidentiary hearing was necessary for persons seeking disability benefits and denied them, and the Court held that such a hearing was not constitutionally required. *Id.* Similarly, in this case, for instance, whether ORR's policies regarding the "stepping up" of unaccompanied children to more restrictive settings such as for safety reasons, or the release of children to appropriately vetted sponsors who are capable of providing for their physical and mental well-being are sufficient as a constitutional matter, does not depend on how those policies were implemented in practice in the individual cases of certain children. *See Walters*, 473 U.S. at 321 ("In applying [the *Mathews*] test we must keep in mind ... the fact that the very nature of the due process inquiry indicates that the fundamental fairness of a particular procedure does not turn on the result of any individual case; rather, procedural due process rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions.") (internal quotation marks and citation omitted).   Plaintiffs' facial challenges can and should be tested through phased discovery and adjudication, especially given that, if Plaintiffs prevail in their facial challenges concerning Defendants' policies, it is far from clear that discovery into Defendants' *practices* would be relevant or proportional to the needs of the case under Rule 26(b).

On November 2, 2018, and modified on December 27, 2018, the Court certified five subclasses. Accordingly, the scope of discovery in this action is limited to the claims or defenses regarding those minors in ORR's legal custody under 6 U.S.C. § 279 and/or 8 U.S.C. § 1232 who fall within the step-up class, the suitability of the sponsor  class, the psychotropic medication class, the legal

REPORT OF PARTIES' PLANNING MEETING UNDER FED. R. CIV. P. 16 AND 26(f)

representation class, and the disability class.  Discovery must be proportional to the needs of the case, cannot be unduly burdensome such that its burden or expense outweighs its likely benefit, and should be important to resolving the issues.  *See* Fed. R. Civ. P. 26(b).  Defendants' proposed phased discovery plan accords with the intent and language of Rule 26 to ensure that discovery occur only where necessary and not unduly burdensome, and is spelled out below:

### (a) Proposed Schedule of written discovery, depositions.

Under Rule 26(d) of the Federal Rules of Civil Procedure, all methods of discovery may be used in any sequence, and discovery by one party does not require any other party to delay its discovery.  Defendants wish to alter the limits and frequency of discovery under Rule 26(b)(2).   Accordingly, Defendants propose bifurcation of discovery in the following phases:

### Phase 1: Facial challenge to ORR's policies

Plaintiffs challenge, in part, the legal sufficiency of ORR's alleged policies with respect to the certified classes. (*See, e.g.*, First Amended Complaint, ECF 81, pp. 52-55.)  To narrow the scope of issues for this Court to adjudicate, and to limit discovery to matters relevant and proportional to the needs of the case, Defendants propose as the first phase of discovery, that the parties engage in discovery on the existence and nature of any such policies, followed by briefing and a ruling from this Court on the facial legality (including constitutionality) of these policies.  As Phase 1 addresses Plaintiffs' facial challenge, discovery in this phase would include ORR's policies and memoranda of general applicability governing care for UACs that fall within the five certified classes.[4]  Likewise, discovery during Phase

---

[4] Some ORR guidance documents may use descriptors such as "policies," "procedures," "practices," and the like; whatever descriptors these guidance documents may use, the point is that Phase 1 discovery is limited to ORR guidance of general applicability; phase 1 does not include how ORR guidance was implemented in any particular situation (see phase 2).

17

1 would not include inquiry into the extent to which ORR complies with its policies.

If Plaintiffs prevail on their facial challenge to ORR's policies, such a ruling could potentially resolve the case as to one or more of these issues. Consequently, there is good cause to bifurcate discovery on this issue, as a ruling favorable to Plaintiffs on their facial challenge could render further discovery (on the as-applied claims, discussed below) not relevant, and thus, not proportional to the needs of the case under Rule 26(b).

Defendants propose the following timeline and parameters for Phase 1, beginning [at the conclusion of the 60-day settlement negotiations or] the date the Court issues a scheduling order adopting a discovery plan:

- Within 30 days of the order's issuance [or conclusion of settlement negotiations]: The parties propound written discovery requests limited to ORR's policies pertaining to the certified classes.
  - The parties are limited to five Rule 30(b)(6) depositions.
  - The parties are limited to forty interrogatories (eight for each class) in Phase 1.
  - Electronically stored data ("ESI") is excluded from Phase 1.[5]
- Within 90 days of receipt of propounded discovery: The parties exchange responses and objections, and produce documents in response to document production requests.
- Within 150 days of receipt of propounded discovery: Completion of Phase 1 occurs; all Phase 1 document and deposition discovery must be completed.
- Within 60 days of completion of Phase 1 discovery: Cross-motions for summary judgment from both parties on legality and constitutionality of ORR's policies are due with Court.
- Within 21 days of cross-motions for summary judgment filed with the Court: Responses from both parties due with Court.

**Phase 2: As-applied challenge to ORR's practices**

---

[5] ESI includes the production of email discovery. ESI does not include the production of case files for the specifically named class representatives.

18

Separate from their facial challenge to ORR policies, Plaintiffs also challenge ORR's implementation of these policies, i.e., ORR's practices.  If Plaintiffs do not prevail on their facial challenge, Defendants propose that, as a second phase of discovery, the parties engage in discovery on the existence and nature of ORR's practices with respect to the classes.  Thus, Phase 2 begins, if needed, on the date that the Court issues a ruling on the merits of the issues briefed in Phase 1.

To facilitate the efficient exchange of information, Defendants propose that this discovery proceed within Phase 2 in two sub-phases as follows:

**Phase 2A:  Case file discovery as to ORR's practices**

All written discovery (including document production requests, admissions requests, and interrogatories, but excluding ESI) relating to ORR's practices. Defendants propose this timeline, beginning from the date that discovery Phase 2A begins:

- Within 30 days of the Court's ruling on the parties' cross-motions for summary judgment:  Parties propound written discovery requests.
- Within 90 days of receipt of propounded discovery:  The parties exchange responses and objections, and produce non-objected documents in response to document production requests.

**Phase 2B:  ESI discovery as to ORR's practices**

Defendants propose rolling production of ESI following a conference with Plaintiffs on setting a Joint Electronic Discovery Plan, with ESI production set to begin 120 days after the commencement of Phase 2A.

**Phase 3:  Expert discovery**

Defendants propose the timeline for expert discovery as outlined later in this report.

**Fact depositions during Phase 2**

Defendants respectfully request permission from this Court to take up to 30 fact depositions.  Defendants reserve the right to depose, among other potential witnesses, the named Plaintiffs, their sponsors, and any declarants who class counsel has offered in support of Plaintiffs' positions on class or merits issues. This is proportional to the needs of the case because the depositions will bear on the individual merits of each named plaintiffs' claims.  This limit includes all depositions under Rule 30, Rule 31 and Rule 45.  Expert depositions are excluded from this limit.  At this time, Defendants are not in a position to stipulate the number of fact witnesses Plaintiffs should be permitted to depose, as Defendants do not yet know who Plaintiffs seek to depose or for what reasons.  Defendants propose that fact depositions begin no earlier than the commencement of Phase 2A.

**C.    Disclosure, discovery, or preservation of electronically stored information.**

Under Rule 34, the Parties' disclosure and production obligations will be limited to data reasonably available as they are kept in the ordinary course of business. The Parties will produce discovery on electronic media (*e.g.*, CD, DVD, USB drive, etc.), and they will produce electronically stored information in digital format.  As discussed, Defendants propose discussing production format, schedule, and other ESI-related issues at a conference with Plaintiffs on setting a Joint Electronic Discovery Plan.

**D.    Claims of privilege or of protection as trial-preparation materials.**

The Parties will rely on all available privileges. Trial materials will be protected against disclosure pursuant to Fed. R. Civ. P. 26(b)(3)-(5). Inadvertent disclosure of privileged information shall be governed by Fed. R. Civ. P. 26(b)(5)(B) and Fed. R. Evid. 502. The production of privileged or protected documents (including electronic documents) without the intent of waiving that privilege or protection does not constitute a waiver, so long as the disclosing party identifies the inadvertently disclosed documents within a reasonable time.  If such

REPORT OF PARTIES' PLANNING MEETING UNDER FED. R. CIV. P. 16 AND 26(f)

documents are identified, they will be returned promptly to the disclosing party.
The Parties anticipate the need for a claw-back order.

### E.   Changes in limitations on discovery.

The Parties propose that each side be entitled to take 30 fact depositions,
which includes all depositions under Rule 30, 31 and 45.  Expert depositions are
excluded from this limit.

Plaintiffs propose that the limitation on the number of interrogatories set out
in Rule 33, Fed. R. Civ. Proc., should apply separately to each of the five claims
for relief certified for class treatment, not all five classes collectively, and reserve
the right to seek an enlargement of those limits for each class claim upon a
showing of good cause.

Defendants propose that the limitation on the number of interrogatories be in
accordance with the proposed phased plan, *i.e.* forty interrogatories, including all
discrete subparts—eight for each sub-class—in phase 1, and forty interrogatories,
including, including all discrete subparts—eight for each sub-class—in phase 2.  If
the Court rules against Defendants' proposed phased plan, Defendants similarly
request, consistent with Rule 33, the right to propound up to 25 interrogatories on
*each* named plaintiff—both individual and institutional.  *Compare* Fed. R. Civ. P.
33(a) ("Unless otherwise stipulated or ordered by the [C]ourt, a party may serve on
any other party no more than 25 written interrogatories, including all discrete
subparts.").

### F.   Other proposed orders under Rule 26(c) or under Rule 16(b) and (c).

Because this case involves Health Information, information about minors, as
well as other personally identifiable information that may be subject to the
provisions of the Privacy Act, 5 U.S.C. § 552a, the parties anticipate the need for a
protective order. The Parties agree that to facilitate the efficient exchange of
discovery, they will propose the entry of a protective order consistent with the

21

Privacy Act of 1974, 5 U.S.C. § 552a to be tendered to the Court as a separate filing. To the extent information is protected health information subject to the provisions of 45 C.F.R. §§ 164.102 – 164.534 (regulations promulgated pursuant to the Health Insurance Portability and Accountability Act (HIPAA)), the parties will ensure the protective order protects such information as well.

II.   MATTERS LISTED IN SCHEDULING ORDER

    A.    **Other discovery matters.**

        1.    Electronic materials.

Under Rule 5(b)(2)(E) of the Federal Rules of Civil Procedure, counsel for the parties agree to service of discovery and responses to discovery by electronic means.  Counsel also agree that if responses to discovery are too large to send electronically that they will immediately communicate this fact to each other and arrange for alternative methods of delivery.

        2.    Discovery cut-off.

The Parties propose that fact discovery (written discovery, depositions and service of subpoenas) be completed by January 31, 2020, and that expert discovery (including depositions of experts) be completed by March 2, 2020.

Defendants propose that this schedule may need to be adjusted to the extent that the Court permits phased discovery, as proposed by Defendants above. Defendants further propose that, consistent with applicable rules, all discovery disputes be adjudicated by the magistrate judge assigned to this case.

        3.    Class counsel access to class members.

Plaintiffs' propose that class counsel shall have access to class members by making a written request to Defendants with two business days' notice.

Defendants propose that class counsel shall have access to class members by making a written request to Defendants' counsel, with five business days' notice, and that class counsel comply with any applicable grantee care provider / ORR

policies related to visiting children in ORR's legal custody that the parties will discuss at a later date.

**B.     Law and motion.**

The Parties propose the deadline for filing discovery motions be set for March 2, 2020 (30 days after January 31, 2020).

Defendants propose that discovery motions and applications for discovery protective orders be scheduled and adjudicated before the magistrate judge assigned to the case.  Any motion challenging the adequacy of discovery responses must be calendared sufficiently in advance of the cut-off date to permit any compelled response to be obtained before the end of discovery.

The Parties propose that the deadline for filing other motions, including for summary judgment, partial summary adjudication, or to decertify the class be set for May 1, 2020 (60 days after the close of fact/expert discovery), and that motions *in limine* be due seven days before trial.

**C.     Settlement.**

Plaintiffs are amenable to discussing settlement for however long reaching settlement seems reasonably likely, but object to staying discovery or such other pre-trial procedures, including those to preserve class members against irreparable injury. Plaintiffs believe that any settlement would have to come in the form of a consent decree securing the rights of the class members.

Defendants propose a 60-day time period to engage in settlement discussions in order to narrow the scope of issues for this Court to adjudicate, and to limit discovery to matters relevant and proportional to the needs of the case; discovery should be tolled until settlement discussions conclude, no later than the 60-day period.  At this time, and without limiting future possibilities, Defendants are willing to negotiate in settlement discussions regarding the step-up class, the suitable sponsor class, and the medication class.  Indeed, settlement is already being pursued to resolve the medicated class within the *Flores* litigation.  Indeed,

23

Plaintiffs offer no basis for conducting discovery on issues that are already in settlement negotiations which could potentially resolve them entirely. *See* Fed. R. Civ. P. 26(b) (discovery must be "relevant" and "proportional to the needs of the case"). Importantly, however, Defendants are firmly opposed to any settlement that is in the form of a consent decree without a definitive end-date. A consent decree is not needed when an Independent Monitor with broad authority has already been appointed by this Court. Furthermore, the Administration of Children and Families (ACF) within HHS has hired an internal monitor to engage with ORR on compliance issues, and to work cooperatively with the Independent Monitor.

### D.   Trial estimate; proposed pretrial and trial dates.

The Parties estimate that trial will take six weeks.

The Parties propose that this matter be scheduled for a pre-trial conference on June 9, 2020, with trial commencing on July 28, 2020.

The proposed trial date is somewhat later than the time frame provided in the Court's scheduling worksheet due to the substantial volume of materials which will likely be submitted in support of dispositive motions and the time the Court will likely require to adjudicate such motions.

### E.   Addition of parties.

The Parties do not anticipate adding parties.

Plaintiffs do not intend to add any additional plaintiffs. The court has ruled that the named plaintiffs are adequate representatives of the five classes, but Plaintiffs reserve all rights to add additional named plaintiffs. If Defendants named in their official capacities cease to hold office, their successors will automatically be substituted in under Rule 25(d) of the Federal Rules of Civil Procedure.

### F.   Trial to jury or court.

Plaintiffs believe this entire action should be tried to the Court.

24

Defendants believe trial should be by the Court.  As discussed elsewhere, Defendants anticipate filing motions for summary judgment (or partial summary judgment), and Defendants anticipate moving to decertify some of the sub-classes within the deadline discussed.

Defendant Scott Lloyd has requested a jury trial of Plaintiffs' claims against him in his individual capacity.

**G.    Other issues.**

None.

**H.    Proposals re: severance bifurcation or other ordering proof.**

As discussed above, Plaintiffs' oppose Defendants' request for phased discovery and law and motion practice for Plaintiffs' claims.

**I.    Synopsis of principal issues.**

1.    <u>Plaintiffs' statement.</u>

May Defendants delay or decline to release children to their parents or other available custodians because they suspect such custodians or may be unfit without affording a timely and fair opportunity to be heard on the proposed custodian's fitness?

May Defendants deny children placement in a facility licensed to care for dependent children without affording a timely and fair opportunity to be heard on the reasons for unlicensed placement?

May Defendants administer children psychotropic medications without their parents' consent or its lawful equivalent?

May Defendants deny detained children legal assistance Congress funds in furtherance of children's right to counsel under 8 U.S.C. § 1232(c)(5) in legal matters or proceedings involving such children's placement, release, and consumption of psychotropic medications?

May Defendants obstruct children's release or place them in restrictive settings on account of real or perceived behavioral, mental health, intellectual or developmental disability?

2. <u>Defendants' statement.</u>

The principal issues in this case are identified by the Court in the definitions of the five classes of plaintiffs certified by the Court on November 2, 2018, and modified on December 27, 2018. The Court defined those classes as alleged minors in Office of Refugee Resettlement ("ORR")'s legal custody pursuant to 6 U.S.C. § 279 and/or 8 U.S.C. § 1232:

a. who are or will be placed in a secure facility, staff-secure facility, or residential treatment centers ("RTC"), or whom ORR has continued to detain in any such facility for more than 30 days, without being afforded notice and an opportunity to be heard before a neutral and detached decisionmaker regarding the grounds for such placement (the "step-up class");

b. whom ORR is refusing or will refuse to release to parents or other available custodians within 30 days of the proposed custodian's submission of a complete family reunification packet on the ground that the proposed custodian is or may be unfit (the "suitability of the sponsor class");

c. who are or will be prescribed or administered one or more psychotropic medications without procedural safeguards;

d. who are natives of non-contiguous countries and to whom ORR is impeding or will impede legal assistance in legal matters or proceedings involving their custody, placement, release, and/or administration of psychotropic drugs (the "legal representation class"); and

e. who have or will have a behavioral, mental health, intellectual, and/or developmental disability as defined in 29 U.S.C. § 705, and who are or will be placed in a secure facility, medium-secure facility, or RTC solely by reason of such disabilities (the "disability class").

26

### 3. Defendant Scott Lloyd's Statement

The principal issues are whether Defendant Lloyd personally participated in any alleged constitutional violation and whether he is entitled to qualified immunity from this suit.  In addition, Defendant Lloyd contends that venue for the claims against him does not lie in this District because he lacks the minimum contacts to be sued in California.

### J. Likelihood of amendment to pleadings.

The Parties do not anticipate amending the pleadings, but Plaintiffs reserve all rights to do so.

Defendants oppose future amendments to the pleadings, and insist that the deadline for amending the pleading and adding parties has elapsed; any future requests to amend pleadings or add parties must comply with applicable rules.

### K. Issues that may be determined by motion

The Parties believe that all issues and class claims will likely be determined by motion for partial summary adjudication or summary judgment following completion of discovery.

Defendant Lloyd in his individual capacity believes that the claims against him will be dismissed on either a motion to dismiss or a motion for summary judgment.

### III. ADDITIONAL MATTERS LISTED IN RULE 16(b)(3) or L.R. 26-1.

### A. Complexity.

The Parties believe the Federal Rules of Civil Procedure and local rules are sufficient to govern this action and that use of the Manual For Complex Litigation is therefore unnecessary.

### B. Motion schedule.

Plaintiffs anticipate moving for summary judgment or partial summary judgment on all issues and class claims in April 2020. Plaintiffs will bring additional preliminary injunction and discovery motions as needed.

Defendants anticipate moving to decertify the class within the law and motion deadline indicated above.  Defendants propose a motion schedule consistent with Defendants' proposed discovery plan.

Defendant Lloyd in his individual capacity anticipates filing a motion to dismiss under Fed.R.Civ.P. 12(b)(3) and 12(b)(6) in February 2019 and if such motion is denied, he will file a motion for summary judgment as soon as practicable thereafter.

**C.      ADR.**

Plaintiffs select the ADR Procedure No. 2.

Defendants request ADR Procedure No. 1 or 3 (adjudication by a judicial officer).

**D.      Trial estimate.**

Discussed above.

**E.      Additional parties.**

Discussed above.

**F.      Expert witnesses.**

The Parties agree to identify their expert witnesses, designate all trial experts, and provide opposing counsel with reports from retained experts pursuant to Rule 26(a)(2) by August 30, 2019.

The Parties shall counter-designate in response to the other party's expert witness disclosure and designate all trial experts and provide opposing counsel with reports from retained experts pursuant to Rule 26(a)(2) by November 1, 2019.

The Parties agree that depositions of all such experts be completed by the close of expert discovery, March 2, 2020.

As officers of the Court, undersigned counsel agree to cooperate with each other and the Court to secure the just, speedy, and inexpensive determination of this actions.

Dated: February 8, 2019.

/s/ *Carlos Holguín*                                            /s/ Benjamin Mark Moss
CARLOS HOLGUÍN (Cal. Bar No. 90754)              JOSEPH H. HUNT
Center for Human Rights and Constitutional Law     Assistant Attorney General
256 South Occidental Blvd.                                    United States Department of
Los Angeles, CA 90057                                        Justice
Telephone: (213) 388-8693, ext. 309                      Civil Division
Facsimile: (213) 386-9484                                     ERNESTO H. MOLINA, JR.
email: crholguin@centerforhumanrights.org          Deputy Director
                                                                       Office of Imm. Litigation
HOLLY S. COOPER (Cal. Bar No. 197626)          W. DANIEL SHIEH
Co-Director, Immigration Law Clinic                     BENJAMIN MARK MOSS
CARTER C. WHITE (Cal. Bar No. 164149)          Senior Litigation Counsel
Director, Civil Rights Clinic                                  ANDREW B. INSENGA
University of California Davis School of Law           Trial Attorney
One Shields Ave. TB 30                                         SHERRY D. SOANES
Davis, CA 95616                                                  Trial Attorney
Telephone: (530) 754-4833                                   MARINA C. STEVENSON
Email: hscooper@ucdavis.edu                              Trial Attorney
ccwhite@ucdavis.edu                                          P.O. Box 878
                                                                       Ben Franklin Station
LEECIA WELCH (Cal. Bar No. 208741)             Washington, D.C. 20044
NEHA DESAI (Cal. RLSA Bar No. 803161)         Telephone: (202) 532-4108
POONAM JUNEJA (Cal. Bar No. 300848)          Facsimile: (202) 616-4950
National Center for Youth Law                             Electronic mail:
405 14th Street, 15th Floor                                  sherry.soanes@usdoj.gov
Oakland, CA 94612                                             Attorneys for Defendants
Telephone: (510) 835-8098                                  (official capacity only)
Email: lwelch@youthlaw.org
ndesai@youthlaw.org
pjuneja@youthlaw.org

REPORT OF PARTIES' PLANNING MEETING UNDER FED. R. CIV. P. 16 AND 26(f)

CRYSTAL ADAMS (Cal. Bar No. 308638)
National Center for Youth Law
1313 L St. NW, Suite 130
Washington, DC 20005
Telephone: (202) 868-4785
Email: cadams@youthlaw.org

SUMMER WYNN (Cal. Bar No. 240005)
MARY KATHRYN KELLEY (Cal. Bar No. 170259)
JON F. CIESLAK (Cal. Bar No. 268951)
MEGAN L. DONOHUE (Cal. Bar No. 266147)
Cooley LLP
4401 Eastgate Mall
San Diego, CA 92121-1909
Telephone: (858) 550-6000
Email: swynn@cooley.com
mkkelley@cooley.com
jcieslak@cooley.com
mdonohue@cooley.com

*Attorneys for Plaintiffs*


NICOLA T. HANNA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, General Civil Section

   */s/ David Pinchas*
_____
 DAVID PINCHAS
Assistant United States Attorney

*Attorneys for Defendant E. Scott Lloyd*

30

REPORT OF PARTIES' PLANNING MEETING UNDER FED. R. CIV. P. 16 AND 26(f)

Judge Dolly M. Gee

**SCHEDULE OF PRETRIAL & TRIAL DATES WORKSHEET**

Case No.    2:18-cv-05741            Case Name:    Lucas R., et al. v. Azar, et al.

| MATTER | JOINT REQUESTED DATE or PLNTF/DEFT REQUESTED DATE | TIME |
|---|---|---|
| **TRIAL**    [ x ] Court   [   ] Jury    *Defendant Lloyd requests a jury trial.<br>Duration Estimate:  Six weeks | July 28, 2020<br><br>(Tuesday) | 8:30 a.m. |
| **FINAL PRETRIAL CONFERENCE ("FPTC")**<br>4 wks before trial | June 9, 2020<br><br>(Tuesday) | 2:00 p.m. |

| MATTER | TIME COMPUTATION | JOINT REQUESTED DATE or PLNTF/DEFT REQUESTED DATE |
|---|---|---|
| Amended Pleadings and Addition of Parties Cut-Off (includes hearing of motions to amend) | 90 days after scheduling conf | Plntfs requested date: May 23, 2019 |
| Non-Expert Discovery Cut-Off (includes hearing of discovery motions) | at least 14 wks before FPTC | Discovery: Jan. 31, 2020 Motions: March 2, 2020 |
| Motion Cut-Off   (filing deadline) | at least 13 wks before FPTC | May 1, 2020 |
| Initial Expert Disclosure & Report Deadline | at least 9 wks before FPTC | August 30, 2019 |
| Rebuttal Expert Disclosure & Report Deadline | at least 5 wks before FPTC | Nov. 1, 2019 |
| Expert Discovery Cut-Off (includes hearing of discovery motions) | at least 3 wks before FPTC | March 2, 2020 |
| Settlement Conference Completion Date | at least 4 wks before FPTC | May 12, 2020 |
| Motions in Limine Filing Deadline | at least 3 wks before FPTC | May 19, 2020 |
| Opposition to Motion in Limine Filing Deadline | at least 2 wks before FPTC | June 23, 2020 |
| Other Dates: (e.g., class cert motion cut-off, early mediation, etc.) | at least 90 days after complaint served (unless longer time justified) | |

**EXHIBIT A**

6

Attachment A

# CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW

256 S. OCCIDENTAL BOULEVARD
LOS ANGELES, CA 90057
Telephone: (213) 388-8693 Facsimile: (213) 386-9484
www.centerforhumanrights.org

December 14, 2018

Special Master Andrea Sheridan Ordin
Strumwasser & Woocher
10940 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024

William Silvis
Sarah B. Fabian
Office of Immigration Litigation – District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044

*Via email.*

      Re: *Flores*, et al., *v. Whittaker,* et al.*,* No. CV 85-4544 DMG (C.D. Cal.).

Dear Ms. Ordin, Mr. Silvis, and Ms. Fabian:

Pursuant to Paragraph D.3. of the Court's Order Appointing Special Master/Independent Monitor of October 5, 2018 [Doc. #494] ("Reference Order"), Plaintiffs hereby give notice that Defendants are not in compliance with the Court's Order Re: Plaintiff's Motion to Enforce Settlement, July 30, 2018 [Doc. #470] ("July 30 Order") in the following particulars:

**1. Shiloh continues to administer psychotropic medications without informed parental consent or court order.**

Paragraph 5 of the July 30 Order provides:

In accordance with Paragraphs 6 and 9 and Exhibit 1 of the Agreement, the Court ORDERS Defendants to comply with all Texas child welfare laws and regulations governing the administration of psychotropic medications to Class Members at Shiloh RTC. Most importantly, Defendants shall do the following before administering any psychotropic medication to Class Members at Shiloh RTC: (1) provide the disclosure required by 26 Texas Administrative Code section 748.2253 to a "person legally authorized to give medical consent" as that term is defined under 26 Texas Administrative Code section 748.43(47), and (2) obtain the informed written consent of that person in accordance with 26 Texas Administrative Code sections 748.2001 and 748.2253. If Defendants are not able to obtain such informed written consent, then they may not administer the psychotropic medication to the Class Member unless they obtain a court order authorizing them to do so under Texas law or there is an "emergency" as that term is defined in Texas Family Code section 266.009 and 26 Texas Administrative

Code section 748.2257. If Defendants administer psychotropic medication on an emergency basis, then they shall adhere to all of the notification and documentation requirements imposed by Texas Family Code section 266.009 and 26 Texas Administrative Code section 748.2257.

As explained in their letter to the Special Master dated November 29, 2018, Plaintiffs' counsel interviewed numerous class members detained at Shiloh as of August 23 and 24, 2018, and October 17 and 18, 2018. Based on these interviews and the statements of Shiloh's director, it was evident that ORR had yet to come into compliance with the Court's order requiring Shiloh to comply with Texas law before administering psychotropic medications to class members. Rather, children uniformly reported that Shiloh was continuing to administer them psychotropic drugs without informed parental consent.

ORR subsequently produced "consent" forms that it suggested evince informed parental consent to Shiloh's medicating children. *See* Attachment 6 to Letter to Special Master, November 29, 2018. They did not:

- None of the forms bore the signature of anyone purporting to be a detained child's parent or legal guardian.
- None of the forms indicated that a mental health professional authorized to prescribe psychotropic medications had provided children's parents an explanation of the side effects of the medication, the risks and benefits of the alternative treatments or procedures, or that parent may withdraw consent and request the medication be discontinued at any time. Instead, they were signed by individuals purporting to be children's "case managers."
- All of the forms had been "signed" by case managers days or weeks after Shiloh had begun administering psychotropic medications to detained children.

During the Special Master's visit to Shiloh December 3, 2018, ORR representatives and/or Shiloh staff admitted they had yet to seek or obtain a single court order authorizing Shiloh to medicate any child detained at Shiloh. They further stated that 90 percent of the children then being detained were being administered psychotropic medications regardless.

Shiloh's lead spokesperson, Dr. Luis Valdez, claimed that Shiloh had obtained "consent" to administer psychotropics to all but one of these children, yet he admitted that Shiloh's current practice is to have its case workers telephone parents and solicit their oral consent to Shiloh's medicating their children and does not require parents to sign medication consent forms.

With respect to the child for whom Shiloh admitted having no consent, Dr. Valdez stated that staff had been attempting to obtain consent, but had been unable to do so. Shiloh's lead psychiatrist, Dr. Javier Ruiz, reported that Shiloh was medicating this child regardless.

The foregoing uncontroverted facts show ORR in *prima facie* violation of the following Texas statutes and regulations, and, *a fortiori*, the *Flores* Settlement and Paragraph 5 of the July 30 Order:

2

a)    26 Tex. Admin. Code § 748.2001, which provides: "You must obtain a written, signed,
and dated consent, specific to the psychotropic medication to be administered, from the
person legally authorized to give medical consent *before* administering a new
psychotropic medication to a child, . . ." (Emphasis added.)

b)    40 Tex. Admin. Code § 748.2253(a), which requires that prior to obtaining written
consent, "*the prescribing health care professional"* must provide a person legally
authorized to give medical consent with a detailed disclosure regarding the administration
of psychotropic drugs. (Emphasis added.)

c)    40 Tex. Admin. Code § 748.2253(b), which requires that a "health-care professional,"
and not a case worker, "answer any questions the person legally authorized to give
consent has about the medication."

d)    40 Tex. Admin. Code § 748.2253(c), which requires that an authorizing parent "sign a
consent form that acknowledges that you have provided all of the information set forth in
subsection (a) of this section."

The foregoing violations are not in material dispute. Examination of the class members' files and
interviews of class members and their parents and other proposed custodians would likely reveal
further violations. Plaintiffs accordingly renew their request that the Special Master conduct the
fact-finding requested in their letter of November 29, 2018, and advise the Court and Plaintiffs of
her findings.

### 2.    ORR continues to detain class members at Shiloh without competently determining that they pose a risk of harm to themselves or others.

The July 30 Order also requires ORR to remove all class members from Shiloh except those
whom a licensed psychologist or psychiatrist determines pose a risk of harm to self or others:

[T]he Court ORDERS Defendants to transfer all Class Members out of Shiloh RTC
unless a licensed psychologist or psychiatrist has determined or determines that a
particular Class Member poses a risk of harm to self or others. Class Members who do
not fall within that exception shall be placed "in the least restrictive setting appropriate to
[each Class Member's] age and special needs, provided that such setting is consistent
with [Defendant's] interests to ensure the [Class Member's] timely appearance before
[Defendants] and the immigration courts and to protect the [Class Member's] well-being
and that of others.

July 30 Order at 30 ¶ 1.

After refusing Plaintiffs' requests for specific information regarding ORR's compliance with the
foregoing, ORR submitted the Declaration of Marivic Fields in support of its motion to exempt
ORR from independent monitoring. Fields declared that he had "made individualized
recommendations to ORR leadership for each of the 27 UAC who were placed at Shiloh as of
July 20, 2018." *Id.* at ¶ 6.

3

On December 3, however, ORR's representatives denied that Mr. Fields—or anyone else not
employed by Shiloh itself—had any part in determining whether children placed there pose a risk
of harm. Rather, Defendants stated that Dr. Ruiz makes that determination, which he proceeded
to conflate with both dangerousness and suicidality. Both Dr. Ruiz and Dr. Valdez also admitted
that Shiloh uses no accepted metric in determining whether a child poses a risk of harm, is
dangerous, or is suicidal.

Plaintiffs explained in their letter of November 3, 2018, that Shiloh's failure use a valid metric to
determine whether children pose a risk of harm reduces Paragraph 1 to a mere formality;
Defendants confirmed this to be the case. According to Dr. Valdez, the *only* difference Paragraph
1 has made at Shiloh is that ORR now sometimes allows its staff to speak with detained
children's parents somewhat earlier than was the case prior to July 30. Dr. Ruiz admitted that
even one "stabilized" child was then being detained at Shiloh, ostensibly because ORR was
finding it difficult to locate a less restrictive placement for him.

The foregoing uncontroverted facts place ORR in clear violation of Paragraph 1 of the July 30
Order. Interviewing class members and their proposed custodians, and reviewing their ORR files
would likely reveal further violations of Paragraph 1. Plaintiffs accordingly renew their request
that the Special Master conduct fact-finding as set out in their letter of November 29, 2018.

### 3. Additional violations.

Paragraph A.2. of the Reference Order provides: "During the course of her monitoring duties, if
the Monitor discovers potential breaches of the *Flores* Agreement that are beyond the scope of
the June 27, 2017, July 27, 2018, or July 30, 2018 Orders, she shall bring them to the Court's and
the Parties' attention."

Plaintiffs request that the Special Master bring the following additional violations of the *Flores*
Settlement to the attention of the Court:

### a. Admission to Shiloh in violation of state law.

Exhibit 1 of the *Flores* Settlement requires ORR to comply with all Texas child welfare laws and
regulations and all Texas health and safety codes.

Texas law regulating involuntary commitment to mental health facilities is set out in Tex. H
Health & Safety Code Chapter 574. Insofar as Plaintiffs are aware, ORR has never invoked
Chapter 574 before or after consigning children to the Shiloh psychiatric facility. Placements at
Shiloh must therefore accord with Texas law governing voluntary admission to mental health
inpatient facilities, which is codified at Tex. H Health & Safety Code §§ 572.001-572.0051.

Tex. Health & Safety Code § 572.001(a) provides:

> A person 16 years of age or older may request admission to an inpatient mental health
> facility or for outpatient mental health services by filing a request with the administrator

4

of the facility where admission or outpatient treatment is requested. The parent, managing conservator, or guardian of a person younger than 18 years of age may request the admission of the person to an inpatient mental health facility or for outpatient mental health services by filing a request with the administrator of the facility where admission or outpatient treatment is requested.

Tex. Health & Safety Code § 572.001(d) provides: "The administrator of an inpatient or outpatient mental health facility may admit a minor who is 16 years of age or older to an inpatient or outpatient mental health facility as a voluntary patient without the consent of the parent, managing conservator, or guardian."

Tex. Health & Safety Code § 572.001(b) provides: "An admission request must be in writing and signed by the person requesting the admission."

Annexed to Plaintiffs' letter of November 29 as Attachment 6 are two forms entitled "Acuerdo de Ubicación" which purport to memorialize parents' consent to ORR's placing two children at Shiloh. It is clear these forms fall short of the requirements of Texas law for voluntary admission to Shiloh. Both are partially filled out and are signed by Shiloh case managers, not class members' parents managing conservators, or guardians.

Plaintiffs request the Special Master bring this violation to the attention of the Court.

### b.  Shiloh's "stabilization" requirement prolongs class members' detention unnecessarily in violation of the *Flores* Settlement and state law.

Paragraphs 6 and 7 or the July 30 Order enjoin ORR against requiring (i) that its Director or designee approve the release of certain class members; and (ii) that post-release services be in place before releasing a class member, unless it makes an individualized determination that a parent or other sponsor would be unsuitable without such services being in place. The Court held these policies violative of the *Flores* Settlement's provision barring ORR from needlessly protracting children's detention.

On December 3, however, both Dr. Ruiz and Dr. Valdez stated that class members are ineligible for release to parents or other custodians until and unless Dr. Ruiz determines they have been "stabilized," apparently on the assumption that children with mental health needs can obtain adequate mental health care nowhere else except Shiloh.

Although this policy may not squarely contravene the July 30 Order, unless Defendants can show that adequate mental health services are unavailable to class members following release from Shiloh—something ORR apparently makes no effort to ascertain—detaining class members until Dr. Ruiz deems them "stabilized" needlessly prolongs children's detention no less than did the two practices the July 30 Order specifically enjoins.[1]

---

[1] ORR's confining youth until it thinks them stable raises constitutional concerns. The practice is tantamount to indefinite civil commitment, which entails a "massive curtailment of liberty," lawful only with due process and

In addition, it is all but certain that ORR has never invoked Texas's procedures for involuntary commitment, and any placement at Shiloh must accordingly accord with Tex. Health & Safety Code § 572.004(a), which provides:

> A voluntary patient is entitled to leave an inpatient mental health facility in accordance with this section after a written request for discharge is filed with the facility administrator or the administrator's designee. The request must be signed, timed, and dated by the patient or a person legally responsible for the patient and must be made a part of the patient's clinical record. If a patient informs an employee of or person associated with the facility of the patient's desire to leave the facility, the employee or person shall, as soon as possible, assist the patient in creating the written request and present it to the patient for the patient's signature.

ORR's admitted policy and practice to confine children at Shiloh until Dr. Ruiz declares them "stabilized" and regardless of their or their parents' wishes squarely violate § 572.004(a) and, *a fortiori*, the *Flores* Settlement.

Plaintiffs request the Special Master bring these violation to the attention of the Court as well.

* * * * *

Pursuant to Paragraph D.3.a. of the Reference Order, Plaintiffs request Defendants provide a written statement responding to the above-alleged violations with 14 calendar days and, within 21 days, meet with Plaintiffs in a good faith effort to resolve this dispute informally.

Thank you,

Carlos Holguín
One of the Attorneys for Plaintiffs

/ / /

---

proof of dangerousness to others. *O'Connor v. Donaldson,* 422 U.S. 563, 575 (1975) (government may not "confine the mentally ill merely to ensure them a living standard superior to that they enjoy in the private community").

Attachment B



**THE WHITE HOUSE**

WASHINGTON

January 4, 2019

Dear Members of Congress:

Congratulations to Speaker Nancy Pelosi, and her entire team, on her election to be Speaker of the House.  I look forward to working together on our shared priorities for the American People, including rebuilding our infrastructure, reforming unfair trade deals, and reducing the price of prescription drugs.  Our recent bipartisan success on numerous legislative accomplishments such as Criminal Justice Reform, opioid legislation, and the Farm Bill, underscores the extraordinary achievements that are possible when we rise above party politics to advance the good of the Nation as a whole.

As we begin this new Congress, our first task should be to reopen the Government and to deliver on our highest duty as elected officials: the security of the Nation and its borders.

It is the sovereign right of every nation to establish an immigration program in its national interest—lawfully admitting those who have followed the rules, while denying entry to those who break the rules or fail to meet the requirements established in law.

A nation that fails to control its borders cannot fulfill its most basic obligations to its citizens—physical safety, economic security, essential public services, and the uniform protection of our laws.

I was grateful for the opportunity to meet with Congressional leadership at the White House this Wednesday to discuss the border security crisis, and the need for a government funding bill that secures the border and keeps Americans safe.

During the meeting, there was debate over the nature and extent of this crisis and its impact on Americans.  It had been my hope that Homeland Security Secretary Kirstjen Nielsen would have the opportunity to deliver a presentation discussing the facts about the depth and severity of the humanitarian crisis and the security crisis that is now unfolding at the Southern Border.

However, some of those present did not want to hear the presentation at the time, and so I have instead decided to make the presentation available to all Members of Congress.  I encourage you to review it carefully, to share it with your staff, and to discuss it with other lawmakers.  In crafting a Homeland Security bill, it is essential that we make decisions based upon the facts on the ground—not ideology and rhetoric—and that we listen to the law enforcement personnel on the front lines. The Southern Border is a very dangerous place—in fact, Border Patrol agents routinely encounter some of the most dangerous criminals, cartels, and traffickers anywhere in the world.

Effective border security must dramatically reduce the entry of illegal immigrants, criminals, and drugs; it must keep out terrorists, public safety threats, and those otherwise inadmissible under U.S. law; and it must ensure that those who do enter without legal permission can be promptly and safely returned home.

2

As the enclosed presentation makes clear, current funding levels, resources, and authorities are woefully inadequate to meet the scope of the problem.  We are no longer in a status quo situation at the Southern Border but in a crisis situation.  Status quo funding is not enough.

- In fiscal year (FY) 2018, 17,000 adults at the border with existing criminal records were arrested by Customs and Border Protection (CBP) and border agents.
- In FY2017 and FY2018, ICE officers arrested approximately 235,000 aliens on various criminal charges or convictions within the interior of the United States—including roughly 100,000 for assault, 30,000 for sex crimes, and 4,000 for homicides.
- We are now averaging 60,000 illegal and inadmissible aliens a month on our Southern Border.
- Last month alone, more than 20,000 minors were smuggled into the United States.
- The immigration court backlog is nearly 800,000 cases.
- There has been a 2,000 percent increase in asylum claims over the last five years, with the largest growth coming from Central America—while around 9 in 10 claims from Central American migrants are ultimately rejected by the immigration courts, the applicant has long since been released into the interior of the United States.
- In FY2017, roughly 135,000 illegal and inadmissible family units arrived from Central America. Of those, less than 2 percent have been successfully removed from the country due to a shortage of resources and glaring loopholes in our federal laws.
- So far in FY2019, we have seen a 280 percent increase in family units from FY2018.
- 300 Americans are killed every week from heroin—90 percent of which floods across our Southern Border.
- Illegal immigration is a humanitarian crisis: 1 in 3 migrant women is sexually assaulted on the journey northward to the U.S. border; 50 illegal migrants a day are referred for emergency medical care; and CBP rescues 4,300 people a year who are in danger and distress.

Illegal immigration is NOT progressive—by every measure, it is unfair, unjust, uncompassionate, and cruel.  Many people are killed. It hurts both those who make the journey and so many communities bearing the cost in lives, safety, and dollars.

Senator Chuck Schumer once said: "Illegal immigration is wrong, plain and simple. Until the American people are convinced that we will stop future flows of illegal immigration, we will make no progress on dealing with the millions of illegal immigrants who are here now, and on rationalizing our system of legal immigration. That's plain and simple and unavoidable."

Absolutely critical to border security and national security is a wall or a physical barrier that prevents entry in the first place.  Members of both parties—including then Senators Obama and Clinton, current Senator Schumer, and many other members of the House and Senate—all voted for a hard, physical barrier.  Walls work.  That's why rich, powerful, and successful people build them around their homes.  All Americans deserve the same protection.  In Israel, it is 99 percent effective.

3

We must also close the legal gaps in America's defenses.  Loopholes in federal law that prevent removals provide a magnet for illegal entry, and a lucrative business model for vicious coyotes, while overwhelming the U.S. immigration system.  The worst loopholes incentivize the smuggling of minors.  Under these legal loopholes, if an illegal minor, or those traveling with a minor, merely set foot on United States soil, they cannot be successfully returned home.  This explains the profound increases in the arrival of minors travelling both alone and with adults on the dangerous journey to our border.

To protect these children from abuse, and stop this illegal flow, we must close these loopholes. This is an urgent humanitarian necessity.  Children are terribly used by criminals and coyotes to gain access to our country—they are the biggest victims of all.

The most pressing legal changes are as follows:

- Terminate the Flores Settlement Agreement—which is preventing families from being held together through removal; and

- Amend the Trafficking Victims Protection Reauthorization Act (TVPRA), to allow for the safe and humane return of illegally-smuggled minors back to their families in their home countries.

Americans have endured decades of broken promises on illegal immigration.  Now, is the time for both parties to rise above the partisan discord, to set aside political convenience, and to put the national interest first.  Now is the time—this is the moment—to finally secure the border and create the lawful and safe immigration system Americans, and those wanting to become Americans, deserve.

Sincerely,