1 | CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
2 | CARLOS R. HOLGUÍN (90754)
256 South Occidental Boulevard
3 | Los Angeles, CA 90057
Telephone: (213) 388-8693
4 | Email: crholguin@centerforhumanrights.org

5 | *Attorneys for Plaintiffs*

6 | *Additional counsel listed on following page and signature blocks*

7 |

8 | UNITED STATES DISTRICT COURT

9 | CENTRAL DISTRICT OF CALIFORNIA

10 | WESTERN DIVISION

11 |

12 | LUCAS R., et al.,

13 |          Plaintiffs,

14 |     v.

15 | ALEX AZAR, et al.,

16 |          Defendants.

Case No.  2:18-CV-05741 DMG PLA

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**

Hearing: None Set
Judge: Hon. Dolly M. Gee

17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

UNIVERSITY OF CALIFORNIA DAVIS SCHOOL OF LAW
HOLLY S. COOPER (197626)
Co-Director, Immigration Law Clinic
CARTER C. WHITE (164149)
Director, Civil Rights Clinic
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu
        ccwhite@ucdavis.edu

NATIONAL CENTER FOR YOUTH LAW
LEECIA WELCH (208741)
NEHA DESAI (CAL. RLSA NO. 803161)
POONAM JUNEJA (300848)
FREYA PITTS (295878)
1212 Broadway, Suite 600
Oakland, CA 94612
Telephone: (510) 835-8098
Email:  lwelch@youthlaw.org
        ndesai@youthlaw.org
        pjuneja@youthlaw.org
        fpitts@youthlaw.org

NATIONAL CENTER FOR YOUTH LAW
BRENDA SHUM (OR. BAR NO. 961146), *admitted pro hac vice*
CRYSTAL ADAMS (308638)
1313 L St. NW, Suite 130
Washington, DC 20005
Telephone: (202) 868-4785
 Email:  bshum@youthlaw.org
        cadams@youthlaw.org

COOLEY LLP
SUMMER J. WYNN (240005)
MARY KATHRYN KELLEY (170259)
4401 Eastgate Mall
San Diego, CA  92121
Telephone: (858) 550-6000
Facsimile:  (858) 550-6420
Email:  swynn@cooley.com
        mkkelley@cooley.com
        mdonohue@cooley.com

COOLEY LLP
REBECCA L. TARNEJA (293461)
ALEXANDRA R. MAYHUGH (300446)
1333 2nd Street, Suite 400
Santa Monica, CA  90401
Telephone: (310) 883-6400
Facsimile:  (310) 883-6500
Email:  rtarneja@cooley.com
        amayhugh@cooley.com

*Attorneys for Plaintiffs*

Memo. of Ps & As iso Ex Parte Application
for TRO and OSC re: Preliminary injunction
Case No. 2:18-cv-05741 DMG PLA

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................. 1

II.  STATEMENT OF FACTS ................................................................... 2

    A.  The COVID-19 Global Pandemic Demands Extraordinary Measures Be Taken to Protect Class Members ............................ 2

    B.  Class Members Residing in Congregate Settings Are at Grave Risk of Contracting COVID-19. ...................................................... 3

        1.  Pandemic risks in congregate settings are dire. ................... 3

        2.  The conditions at ORR facilities increase the pandemic risks. ................................................................................. 4

        3.  The pandemic risks to detained children are particularly grave. ................................................................................ 6

    C.  ORR's Recently Adopted Safety Measures for Congregate Care Facilities Fail to Protect Class Members from COVID-19. ............ 7

        1.  ORR's COVID-19 Guidelines Do Not Comply with CDC and Epidemiological Mandates Regarding Vital Safety Measures. .......................................................................... 7

        2.  ORR's COVID-19 Guidelines Fall Far Below Federal, State, and Local Mandates to Reduce the Spread of COVID-19. ......... 10

III.  STANDARDS FOR ISSUANCE OF TEMPORARY RESTRAINING ORDER .............................................................................................. 12

IV.  CLASS MEMBERS WILL SUCCEED ON THE MERITS ................. 12

    A.  ORR Violates The TVPRA By Continuing To Detain Children With Viable Sponsors In Congregate Settings ......................... 13

    B.  ORR Violates The Flores Settlement By Refusing To Release Children To Available Custodians, And Instead Forcing Them To Remain In Unsafe Or Unsanitary Conditions. .......................... 17

    C.  ORR Violates the Due Process Clause Of The Fifth Amendment By Exposing Vulnerable Children To Clearly Dangerous Conditions. ....................................................................... 18

        1.  ORR has an affirmative duty to guarantee Class Members' reasonable health and safety. ............................................. 18

        2.  ORR's failure to release Class Members expeditiously and ensure adequate safety measures in the midst of a pandemic violates their substantive due process rights. .......................... 19

        3.  ORR's failure to release Class Members expeditiously in the midst of a life-threatening pandemic clearly violates their procedural due process rights. .......................................... 20

1

# TABLE OF CONTENTS

2
(continued)

3
**Page**

4
V.   ABSENT A TEMPORARY RESTRAINING ORDER, CLASS
MEMBERS IN CONGREGATE FACILITIES WILL SUFFER
5
IRREPARABLE INJURY. ................................................................ 22

6
VI.  THE BALANCE OF EQUITIES FAVORS INJUNCTIVE RELIEF ............. 23

VII. CONCLUSION ................................................................................. 25

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMO. OF Ps & As iso Ex Parte Application
for TRO and OSC re: Preliminary Injunction
Case No. 2:18-CV-05741 DMG PLA

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*All. for the Wild Rockies v. Cottrell,*
 632 F.3d 1127 (9th Cir. 2011) ................................................10, 12, 13

*Amoco Prod. Co. v. Vill. of Gambell,*
 480 U.S. 531 (1987)..........................................................................24

*Arc of Cal. v. Douglas,*
 757 F.3d 975 (9th Cir. 2014) ..............................................12, 13, 24

*Cal. v. Azar,*
 911 F.3d 558 (9th Cir. 2018) ..........................................................24

*Caribbean Marine Servs. Co. v. Baldrige,*
 844 F.2d 668 (9th Cir. 1988) ..........................................................22

*City of Sacramento v. Lewis,*
 523 U.S. 833 (1998)..........................................................................18

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,*
 489 U.S. 189 (1989)..........................................................................18

*Edmo v. Corizon, Inc.,*
 935 F.3d 757 (9th Cir. 2019) ..........................................................23

*Flores v. Barr,*
 No. 2:85-cv-04544-DMG-AGR, ECF No. 470 (July 30, 2018) .......15

*Flores v. Sessions,*
 862 F.3d at 871 ........................................................................*passim*

*Harris v. Bd. of Supervisors, Los Angeles Cty.,*
 366 F.3d 754 (9th Cir. 2004) ....................................................22, 23

*Helling v. McKinney,*
 509 U.S. 25 (1993)............................................................................19

Memo. of Ps & As iso Ex Parte Application
for TRO and OSC re: Preliminary Injunction
Case No. 2:18-cv-05741 DMG PLA

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Henry A. v. Willden*,
678 F.3d 991 (9th Cir. 2012) ............................................................. 18

*Jones v. Blanas*,
393 F.3d 918 (9th Cir. 2004) ............................................................. 19

*Jones v. Tex. Dep't. of Crim. Justice*,
880 F.3d 756 (5th Cir. 2018) ............................................................. 23

*Lopez v. Heckler*,
713 F.2d 1432 (9th Cir. 1983) ........................................................... 24

*Mathews v. Eldridge*,
424 U.S. 319 (1976) .......................................................................... 13

*McNearney v. Wash. Dep't of Corr.*,
No. 11-cv-5930 RBL/KLS, 2012 WL 3545267 (W.D. Wash. June 15, 2012) ................................................................................................ 24

*Morrissey v. Brewer*,
408 U.S. 471 (1972) .......................................................................... 21

*Ms. L. v. ICE*,
310 F. Supp. 3d 1133 (S.D. Cal. 2018) .............................................. 24

*N.D. ex rel. parents acting as guardians ad litem v. Haw. Dep't of Educ.*,
600 F.3d 1104 (9th Cir. 2010) ........................................................... 24

*Nken v. Holder*,
556 U.S. 418 (2009) .......................................................................... 23

*Norsworthy v. Beard*,
87 F. Supp. 3d 1164 (N.D. Cal. 2015) ............................................... 24

*Portman v. Cnty. of Santa Clara*,
995 F.2d 898 (9th Cir. 1993) ............................................................. 20

*Reno v. Flores*,
507 U.S. 292 (1993) ..................................................................... 20, 21

MEMO. OF Ps & As iso Ex Parte Application
FOR TRO AND OSC RE: PRELIMINARY INJUNCTION
CASE NO. 2:18-CV-05741 DMG PLA

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Request to Commute or Suspend Cnty. Jail Sentences*,
  N.J. ECF No. 084230 (Mar. 22, 2020) ............................................................. 12

*Rodriguez v. Robbins*,
  715 F.3d 1127 (9th Cir. 2013) ...................................................................... 24

*Rosenbaum v. Washoe Cty.*,
  663 F.3d 1071 (9th Cir. 2011) ...................................................................... 21

*Small v. Avanti Health Sys., LLC*,
  661 F.3d 1180 (9th Cir. 2011) ...................................................................... 24

*Spark Indus., LLC v. Kretek Int'l, Inc.*,
  No. CV 14-5726-GW(ASX), 2014 WL 12600262 (C.D. Cal. July 29,
  2014) ................................................................................................................... 22

*Stanley v. Ill.*,
  405 U.S. 645 (1972) ........................................................................................ 21

*Stanley v. Univ. of S. Cal.*,
  13 F.3d 1313 (9th Cir. 1994) ........................................................................ 23

*Unknown Parties v. Johnson*,
  No. CV-15-00250-TUC-DCB, 2016 WL 8188563 (D. Ariz. Nov. 18,
  2016), *aff'd sub nom. Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017)............... 19, 22

*Wang v. Reno*,
  81 F.3d 808 (9th Cir. 1996) .......................................................................... 18

*Washington v. Trump*,
  847 F.3d 1151 (9th Cir. 2017) ...................................................................... 12

*Winter v. Nat'l Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ....................................................................................... 12, 13

*Xochihua-Jaimes v. Barr*,
  18-cv-71460, ECF No. 53 (Mar. 23, 2020) ................................................. 19

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Zadvydas v. Davis*,
  533 U.S. 678 (2001) ........................................................................... 19, 20

**Statutes**

8 U.S.C.
  § 1232(c)(2)(A) ....................................................................................... 13
  § 1232(c)(3)(A) ....................................................................................... 14
  § 1232(c)(3)(B) ....................................................................................... 15

**Other Authorities**

Federal Rule of Civil Procedure 65 .......................................................... 12

U.S. Constitution
  First Amendment .................................................................................... 13
  Fifth Amendment ............................................................................. *passim*
  Eighth Amendment ................................................................................. 19

1

## I. INTRODUCTION

2      Plaintiffs request a temporary order protecting children whom the Office of

3  Refugee Resettlement ("ORR") has placed in congregate detention from the clear and

4  present danger the COVID-19 pandemic poses to their health and well-being. While

5  medical experts unanimously demand that we all practice physical distancing, avoid

6  groups of ten or more, and self-isolate, such precautions are all but impossible for

7  children in congregate settings, who are therefore at unacceptable risk.

8      Last Sunday, CNN reported that a 12-year-old child with no preexisting health

9  conditions and no known contact with an infected person was diagnosed with

10 pneumonia, tested positive for coronavirus, and was on a ventilator fighting for her life.[1]

11 As her cousin observed, "Everyone keeps saying 'it doesn't impact younger people.'

12 But here's a 12-year-old fighting for her life. People need to practice social distancing.

13 *People need to take care of their children*."[2]

14     The spread of COVID-19 into ORR facilities is not hypothetical: It has infiltrated

15 ORR's MercyFirst and Abbott House congregate facilities in New York,[3] and an ICE

16 immigration detainee has tested positive for COVID-19.[4] Children in ORR's custody

17 will be placed in life-threatening danger when – not if – the contagion spreads through

18 ORR's congregate facilities.

19     ORR has immediate legal duties under the TVPRA, *Flores* Settlement, and Fifth

20 Amendment to the Constitution to avoid detaining children in congregate settings as

21 much as possible. The obvious ways of doing so are (1) expediting children's release to

22 waiting family whenever it is safe to do so, and (2) transferring as many children as

23

24 [1] *See* Amara Walker, et al., *12-year-old girl with coronavirus is on a ventilator and fighting for her life*, CNN (Mar. 22, 2020, 11:35 AM), https://cnn.it/39mU77W.

25 [2] *Id*. (emphasis added).

26 [3] *See* H. Aleaziz, *A Staff Member at a Facility Housing Unaccompanied Immigrant Children Has Tested Positive for the Coronavirus*, BUZZFEED NEWS (Mar. 19, 2020),

27 https://bit.ly/39fRPYa.

28 [4] Priscilla Alvarez & Catherine E. Shoichet, *First ICE detainee tests positive for coronavirus*, CNN, https://cnn.it/39aEyju (last updated Mar. 24, 2020).

MEMO. OF PS & AS ISO EX PARTE APPLICATION
FOR TRO AND OSC RE: PRELIMINARY INJUNCTION
CASE NO. 2:18-CV-05741 DMG PLA

possible who must remain in ORR custody to non-congregate settings. A growing number of jails and prisons are taking analogous steps to reduce their populations; ORR has no excuse for failing to follow suit.

Presently before the Court, *inter alia*, are the rights of all children in ORR custody whom the agency "is refusing or will refuse to release to parents or other available custodians within 30 days of the proposed custodian's submission of a complete family reunification packet on the ground that the proposed custodian is or may be unfit (i.e., the 'unfit custodian class')." (Amended Order re Defendants' Motion to Dismiss and Plaintiffs' Motion for Class Certification, Dec. 27, 2018 (ECF No. 141) at 27.)

Under the current circumstances, an order requiring ORR to release children it has already detained for 30 days to ready custodians, transfer them to non-congregate settings, or else justify why it has done neither, is both reasonable and necessary to protect the rights of the nearly 1,200 children who are members of this certified class. As a collateral benefit, should ORR place a significant number of currently detained children with their families, those remaining in detention will have both more ability to practice social distancing and more medical resources available to them if they fall ill, increasing their chance of protecting themselves against the current pandemic.

## II.   STATEMENT OF FACTS

### A.   The COVID-19 Global Pandemic Demands Extraordinary Measures Be Taken to Protect Class Members.

COVID-19 is a deadly and highly infectious disease that has evolved into a global pandemic and spread to all 50 states in the U.S. (Ex. B (Declaration of Dr. Julie DeAun Graves ¶ 6 ("Graves Decl.")); Ex. C (Declaration of Dr. Jaimie Meyer ¶ 20 ("Meyer Decl.")))[5] The disease spreads through respiratory droplets and can be transmitted through person-to-person contact – including contact with asymptomatic individuals – and through contact with inanimate surfaces. (Meyer Decl. ¶ 20.; Graves Decl. ¶ 11.)

---

[5] Declarations are submitted as exhibits to the concurrently filed Declaration of Carlos Holguín ("Holguín Decl.").

As of March 24, 2020, the U.S. Centers for Disease Control and Prevention ("CDC") reported 46,481 cases in the U.S. and 593 deaths. (Graves Decl. ¶ 6.)[6] Given the severe shortage of COVID-19 tests, these numbers underestimate the true spread of the disease. (*Id.* ¶ 7.) Unfortunately, this pandemic has already reached the ORR system, with several staff members at ORR facilities testing positive for COVID-19.[7]

### B.   Class Members Residing in Congregate Settings Are at Grave Risk of Contracting COVID-19.

The vast majority of children in ORR custody live in congregate settings, where they spend all of their time in close proximity to other children and staff members.[8] The CDC has warned that detained individuals who "live, work, eat, study, and recreate within congregate environments" are at heightened risk of contracting COVID-19.[9]

### 1.   Pandemic risks in congregate settings are dire.

There is no cure or vaccine for this highly contagious virus. (Graves Decl. ¶ 8.) The only way to avoid transmission of COVID-19 is for individuals to practice "social distancing" (maintaining a distance of at least six feet from the nearest person) and frequent hand washing. (*Id.*; Ex. E (Declaration of Dr. Nancy Y. Wang ¶ 12 ("Wang Decl."))). For this reason, the CDC deems social distancing a "cornerstone of reducing transmission of respiratory diseases such as COVID-19."[10]

---

[6] For updated statistics, see *Coronavirus COVID-19 Global Cases*, Ctr. Systems Science & Engineering, Johns Hopkins Univ., (JHU), http://www.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6.

[7] Camilo Montoya-Galvez, *3 workers at facilities housing migrant kids in U.S. custody test positive for coronavirus*, CBS News (Mar. 23, 2020), https://cbsn.ws/39hlkbY.

[8] *See* ORR, *Children Entering the United States Unaccompanied: Guide to Terms*, HHS (Mar. 21, 2016), https://bit.ly/3aIIaR2; *see also Amra Uzicanin & Joanna Gaines, Field Epidemiology Manual: Community Congregate Settings*, CDC, https://bit.ly/3drRgO9 (last reviewed Dec. 13, 2018) ("congregate settings" includes "detention facilities").

[9] *Interim Guidance on Mgmt of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, CDC, https://bit.ly/3aiq8za (last updated Mar. 23, 2020) (Ex. L.)

[10] *Id.*

The rapid transmission of COVID-19 in congregate settings is clearly evidenced by the tragic spread of the virus within cruise ships, nursing homes, and prisons worldwide. Over 800 people tested positive for COVID-19 on cruise ships in Japan and off the coast of California.[11] At a nursing home facility in Washington, two-thirds of the residents and 47 staff tested positive for COVID-19, with 35 people ultimately dying from the virus.[12] On March 21, 2020, Mayor de Blasio announced that at least 21 inmates and 17 employees at the Rikers Island Correctional Center tested positive for COVID-19, a drastic increase from the first case identified just three days earlier.[13] For this reason, correctional public health experts recommend the release of those most vulnerable to COVID-19. (Ex. D (Letter to Congress at 6) ("Finally, regarding the need to implement immediate social distancing to reduce the likelihood of exposure to detainees, facility personnel, and the general public, it is essential to consider releasing all detainees who do not pose an immediate risk to public safety.").)

Reducing the number of individuals in congregate care protects the safety of those individuals as well as the communities around them. An outbreak of COVID-19 in a congregate environment could quickly overwhelm local health care services and cause individuals to be transported to more distant hospitals and clinics, utilizing more resources and potentially exposing health care workers in communities where the disease is not yet prevalent. (Graves Decl. ¶ 31; Ex. D (Letter to Congress at 4).)

### 2. The conditions at ORR facilities increase the pandemic risks.

The communal living that defines congregate care renders it nearly impossible for detained individuals, including children in ORR facilities, to engage in practices –

---

[11] Victoria Forster, *What Have Scientists Learned About COVID-19 and Coronavirus By Using Cruise Ship Data?*, FORBES, (Mar. 22, 2020) https://bit.ly/2UeSgNS.

[12] Jack Healy & Serge F. Kovaleski, *The Coronavirus's Rampage Through a Suburban Nursing Home*, N.Y. TIMES (Mar. 21, 2020), https://nyti.ms/2QIcVaS; *see also* John Balance, et al., *Louisiana identifies new cluster of coronavirus cases in Donaldsonville retirement home*, THE ADVOCATE, (Mar. 23, 2020), https://bit.ly/39hxQZ9.

[13] *21 Inmates, 17 Employees Test Positive for COVID-19 on Rikers Island*, NBC NEW YORK, https://bit.ly/2y1J6eZ (last updated Mar. 22, 2020).

MEMO. OF PS & AS ISO EX PARTE APPLICATION
FOR TRO AND OSC RE: PRELIMINARY INJUNCTION
CASE NO. 2:18-CV-05741 DMG PLA

such as social distancing and increased hygiene – necessary to mitigate the risk of COVID-19 transmission. (Wang Decl. ¶ 16, Graves Decl. ¶¶ 10-11; Ex. D (Letter to Congress at 4).) The majority of children in ORR shelters, group homes, residential treatment centers, staff-secure facilities, and secure facilities live in close quarters, share multiple communal spaces, and cannot consistently maintain the minimum six foot distance from others. (Graves Decl. ¶¶ 10-11; Wang Decl. ¶ 16; Ex. F (Declaration of Anthony Enriquez ¶¶ 11, 21, 29 ("Enriquez Decl.")); Ex. G (Declaration of Hannah P. Flamm ¶ 12 ("Flamm Decl."))).

ORR facilities often house multiple children in single rooms, with some sleeping in bunk beds placed close together. (Enriquez Decl. ¶¶ 12, 22, 30; Flamm Decl. ¶¶ 13, 25.) Children are required to participate in group activities and classes where they share space with others in a confined area. (Enriquez Decl. ¶¶ 7, 18; Flamm Decl. ¶¶ 8-9, 22-23; Ex. H (Declaration of Rachel Rutter ¶¶ 5-6, 26 ("Rutter Decl."))). Children share school materials, telephones, televisions, dining tables, and other equipment with other children. (Enriquez Decl. ¶¶ 7, 18, 26; Flamm Decl. ¶¶ 6, 20; Rutter Decl. ¶¶ 4-6, 11.) Children also eat their meals in communal areas, in close proximity to other children and staff, which creates a dangerous situation for the spread of COVID-19. (Enriquez Decl. ¶¶ 13, 23, 31; Flamm Decl. ¶¶ 15, 27; Rutter Decl. ¶¶ 14-15; Graves Decl. ¶ 10.)

In addition, toilets, sinks, and showers are shared and regularly used by large numbers of children. (Flamm Decl. ¶ 14; Rutter Decl. ¶¶ 12-13, 16.) Some facilities require children to ask permission to use the bathroom and require staff to accompany children to the bathroom. (Flamm Decl. ¶¶ 14, 26.)

Like other detention centers, ORR facilities are accessible to staff and other outside visitors who may transmit the virus. (Meyer Decl. ¶ 8; Graves Decl. ¶¶ 10, 23; Wang Decl. ¶ 17.) The CDC has warned that "[t]here are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family,

legal representatives, and other community members."[14] Program staff – including case managers, teachers, youth care workers, medical providers, and clinicians – enter and leave these facilities in shifts and interact closely with the children. (Enriquez Decl. ¶¶ 8-10, 19-20, 27-28, 33; Flamm Decl. ¶¶ 7, 11, 21; Rutter Decl. ¶ 25.) To date, staff at two ORR facilities have tested positive for COVID-19 – Abbott House in Irvington, New York, and Mercy First in Syosset, New York.[15] It has also recently been reported that an ICE detainee tested positive for COVID-19.[16]

### 3. The pandemic risks to detained children are particularly grave.

Children in ORR custody are at risk of serious illness if they contract COVID-19, and often face particular vulnerabilities to the virus. Severe illness and death from COVID-19 have been reported in people of all ages, including children. (Graves Decl. ¶ 7; Wang Decl. ¶ 9.) Even children without identifiable risk factors can become seriously ill from COVID-19.[17] The largest study of pediatric COVID-19 patients to date shows that approximately 6% of infected children and 11% of infected infants had severe or critical cases. These cases included children and infants who suffered from respiratory failure, shock, encephalopathy, heart failure, coagulation dysfunction, acute kidney injury, and life-threatening organ dysfunction.[18] Tragically, California reported its first death of a minor linked to COVID-19 on March 24, 2020.[19]

[14] *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Ex. L.)
[15] Mazin Sidahmed, *Another Worker in a New York Shelter for Migrant Children has Tested Positive for COVID-19*, DOCUMENTED (Mar. 20, 2020), https://bit.ly/33Hs8yx; *Brooklyn Count Soars, as Coronavirus Cases in N.Y.C. Near 4,000*, N.Y. TIMES, https://nyti.ms/2J9GxtR (last updated Mar. 20, 2020).
[16] Priscilla Alvarez and Catherine E. Shoichet, *supra* note 4.
[17] *See* Amara Walker, et al., *supra* note 1; *Panama: 13-year-old girl with coronavirus dies, officials say*, AL JAZEERA (Mar. 23, 2020), https://bit.ly/2wzvvvb.
[18] *See* Yuanyuan Dong, et al., *Epidemiological characteristics of 2143 pediatric patients with 2019 coronavirus disease in China*, PEDIATRICS, https://bit.ly/39hz1Yz (lasted visited Mar. 24, 2020).
[19] *See* Jenny Gross and Tim Arrango, *Teenager's death in California is linked to Coronavirus*, N.Y. TIMES (Mar. 24, 2020),

Moreover, many children in ORR custody have experienced intense trauma in their home countries and on their journey to the United States that may be exacerbated by the stress and uncertainty of detention.[20] Post-traumatic stress disorder and related conditions are associated with weakened immune systems and a heightened susceptibility to infection. (Graves Decl. ¶ 12; *see generally* Ex. I (Declaration of Dr. Mira Zein ("Zein Decl."))). Certain children are at even higher risk of serious illness if they contract COVID-19, including those with pre-existing health conditions or compromised immune systems,[21] or who are pregnant or parenting. (Flamm Decl. ¶ 31; Wang Decl. ¶ 19.)

And yet many ORR facilities have limited capacity to provide appropriate medical care or mental health services. (Graves Decl. ¶ 31; Enriquez Decl. ¶ 33; Flamm Decl. ¶ 17-18; Rutter Decl. ¶¶ 18-23, 27.)

The uncertainty and anxiety created by this pandemic creates particular risks for children. (Ex. J (Declaration of Dr. Craig Haney ¶¶ 12-16 ("Haney Decl."))). Now more than ever, children need the support of caring family or caregivers. (*Id.*) To the extent that ORR programs respond to this public health risk by further isolating children and limiting opportunities for recreation or visits, this may further traumatize vulnerable children. (Haney Decl. ¶ 12; Meyer Decl. ¶¶ 30, 34; Wang Decl. ¶ 23.)

### C. ORR's Recently Adopted Safety Measures for Congregate Care Facilities Fail to Protect Class Members from COVID-19.

#### 1. ORR's COVID-19 Guidelines Do Not Comply with CDC and Epidemiological Mandates Regarding Vital Safety Measures.

On March 19, 2020, ORR distributed the "COVID-19 Interim Guidance for ORR Programs" ("ORR Guidance") to its contracted facilities. (Ex. K) The policies included in the ORR Guidance are inadequate to protect children in ORR custody from the

---

https://www.nytimes.com/2020/03/24/us/california-coronavirus-death-child.html.
[20] OIG, *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody*, HHS (Sept. 3, 2019), https://bit.ly/2QKIHEe.
[21] *See Are you at risk for serious illness?*, CDC, https://bit.ly/39ciF37 (last reviewed Mar. 20, 2020).

transmission of COVID-19 and contrary to current CDC guidelines as well as widespread public health practice. (*See* Graves Decl. ¶¶ 13-20; Wang Decl. ¶¶ 20-26.)

The CDC has stated in no uncertain terms that "[t]he best way to prevent illness is to avoid being exposed to this virus." [22] In order to minimize exposure, current CDC guidance stresses the importance of practicing "social distancing" and frequently washing hands.[23] The CDC defines social distancing as "remaining out of congregate settings, avoiding mass gatherings, and maintaining distance (approximately 6 feet or 2 meters) from others when possible."[24] On March 16, 2020, the White House introduced "The President's Coronavirus Guidelines for America," which asked everyone in the nation to "avoid social gatherings in groups of more than 10 people," avoid visiting "long-term care facilities unless to provide critical assistance," "[d]isinfect frequently used items and surfaces as much as possible," and "close schools in affected and surrounding areas" as well as indoor and outdoor venues where groups of people generally congregate, such as restaurants, food courts, and gyms.[25]

The ORR Guidance makes no mention of requiring or encouraging social or physical distancing between children or staff, nor of limiting the gathering of groups of children or staff within facilities. (*See* Graves Decl. ¶14, Wang Decl. ¶ 21; Ex. K (ORR Interim Guidance).) This is not surprising, as it is nearly impossible for children detained in ORR facilities to engage in appropriate social distancing to prevent the transmission of COVID-19. (Enriquez Decl. ¶¶ 11, 21, 29; Flamm Decl. ¶ 12.) Unless the number of children at these facilities is drastically reduced, the majority of these facilities have insufficient space to allow children to maintain the required six-foot

---

[22] *How to Protect Yourself*, CDC, https://bit.ly/33Pkr9p (last reviewed Mar. 18, 2020).
[23] *Id*.
[24] *Interim US Guidance for Risk Assessment and Public Health Management of Persons with Potential Coronavirus Disease 2019 (COVID-19) Exposures: Geographic Risk and Contacts of Laboratory-confirmed Cases*, CDC, https://bit.ly/2QKU4w1 (last updated Mar. 22, 2020).
[25] *The President's Coronavirus Guidelines for America: 15 Days to Slow the Spread*, THE WHITE HOUSE & CDC (Mar. 16, 2020), https://bit.ly/2Jfkx7r7.

MEMO. OF PS & AS ISO EX PARTE APPLICATION
FOR TRO AND OSC RE: PRELIMINARY INJUNCTION
CASE NO. 2:18-CV-05741 DMG PLA

distance between themselves and the nearest child or staff member. (Graves Decl. ¶¶ 28-32; Wang Decl. ¶ 28.)

The ORR Guidance also neglects to:

- Provide information on managing the spread of disease among particularly vulnerable children, such as those with compromised immune systems, heart disease, diabetes, asthma or other chronic respiratory disease, and infants. (*See* Graves Decl. ¶ 18; Wang Decl. ¶ 22.)

- Anticipate a situation in which more children need to be quarantined than facilities' isolation rooms can handle. (Graves Decl. ¶ 17; Wang Decl. ¶ 24.)

- Ensure that children have independent access to hand washing and sanitizing supplies. (*See* Graves Decl. ¶ 20.)

- Provide a screening or testing protocol for children not deemed to be "at risk" but still exhibiting COVID-19 symptoms, who could spread the disease. (*See* Graves Decl. ¶ 19; Wang Decl. ¶ 25.)

On March 23, 2020, the CDC released "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities" ("CDC Detention Facility Guidance"). (Ex. L.) The CDC Detention Facility Guidance acknowledges that "(i)ncarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced," and instructs facilities to "implement social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms)," but acknowledges that "not all strategies will be feasible in all facilities." (*Id*.) Partial implementation of social distancing will not adequately protect individuals from the spread of disease. (*See* Graves Decl. ¶ 28.)

ORR may issue updated guidance in the coming days or weeks that adheres more closely to the new CDC Detention Facility Guidance. However, unless the updated guidance also provides for the expedited release of children such that strict adherence

to social distancing within ORR facilities is possible, it will not adequately protect against the transmission of COVID-19 and the risk of serious illness and death for detained children. (*See* Graves Decl. ¶¶ 28-32; Wang Decl. ¶ 20.)

### 2. ORR's COVID-19 Guidelines Fall Far Below Federal, State, and Local Mandates to Reduce the Spread of COVID-19.

In accordance with the CDC and federal guidelines discussed above, numerous federal, state, and local agencies have imposed swift mandates to reduce the spread of COVID-19 in public and congregate settings such as nursing homes, homeless shelters, schools, jails, and prisons. These mandates consistently prioritize social distancing, increased sanitation, education, reduced visitation, and release. In many instances, the actions taken are even more protective than those recommended by the CDC.

Indeed, numerous states have issued extraordinary and unprecedented measures to ensure "social distancing" and to date over 160 million Americans have been ordered to "shelter in place."[26] For example, on March 19, 2020, Governor Gavin Newsom ordered 40 million Californians to stay in their homes, with limited exceptions, and maintain a minimum distance of 6 feet from others.[27] The following day, New York issued similar orders, requiring a distance of "at least six feet" between people in public, cancelling all "non-essential gatherings of individuals of *any* size for *any* reasons," closing *all* non-essential business, and requiring those essential business that remain open to "implement rules that help facilitate social distancing of at least six feet."[28] Within the past two weeks, Washington D.C. and forty-six states have mandated statewide school closures,[29] with only four states left to follow.[30]

---

[26] Sarah Mervosh and Denise Lu, *See Which States and Cities Have Told Residents to Stay Home*, THE NEW YORK TIMES, Mar. 24, 2020.

[27] *Coronavirus (COVID-19) in California*, CALIFORNIA STATE GOVERNMENT, https://covid19.ca.gov/ (last Mar. 24, 2020).

[28] Gov. Andrew M. Cuomo's Press Office, *Governor Cuomo Signs the 'New York State on PAUSE' Executive Order*, https://on.ny.gov/2UtTYtO (last visited Mar. 24, 2020).

[29] David Nagel, *Updated List of Statewide School Closures with Closure Dates*, THE JOURNAL, https://bit.ly/2UjPKWV (last updated Mar. 24, 2020).

[30] Dante Chinni, *School closures skyrocket, nearly 54 million students sent home*, NBC

States have also adopted measures to limit exposure in congregate settings like homeless shelters. On February 24, 2020, New York issued guidance for homeless shelters, which recommends a minimum distance of three to six feet between beds and head-to-toe or toe-to-toe sleeping arrangements; barriers between beds (such as curtains); separating symptomatic residents in private rooms with separate bathrooms where available; and staggered mealtimes and use of common areas.[31] Staff are advised to clean their hands in accordance with CDC guidelines, and hand sanitizer is to be made available to residents along with tissues, soap and paper towels for hand washing, and face masks.[32] Even so, individuals in New York homeless shelters have still tested positive for COVID-19.[33] Recognizing that large shelters are particularly susceptible to the spread of COVID-19, California is setting up shelters in trailers, hotels and motels to facilitate social distancing.[34]

In the prison and jail context, similar concerns have been raised. Although the U.S. Bureau of Prisons has implemented some precautions, they have proven inadequate[35] and raise valid concerns from experts in detention health, infectious disease, and public health, as well as U.S. Senators, who urged the release of "those who do not pose an immediate danger to public safety."[36] The U.S. government is now

---

NEWS (Mar. 22, 2020, 9:00 AM), https://nbcnews.to/2Ue3m5P.

[31] *Interim COVID-19 Guidance for Homeless Shelters*, NYC DEPT. OF HEALTH, https://on.nyc.gov/39g0slr (last visited Mar. 24, 2020).

[32] *Id.*

[33] *Coronavirus 'Attack Rate' in N.Y. Concerns White House*, N.Y. TIMES (Mar. 24, 2020), https://www.nytimes.com/2020/03/23/nyregion/coronavirus-new-york-update.html.

[34] *Governor Newsom Takes Emergency Actions & Authorizes $150 Million in Funding to Protect Homeless Californians from COVID-19*, OFFICE OF GOV. GAVIN NEWSOM (Mar. 18, 2020), https://bit.ly/3bpbG8B.

[35] Craig McCarthy, *NYC jails see outbreak of coronavirus cases with exponential increase expected*, N.Y. POST (Mar. 22, 2020), https://bit.ly/2xmGHVA.

[36] Josiah Rich, et al., *We must release prisoners to lessen the spread of the coronavirus*, WASH. POST (Mar. 17, 2020), https://wapo.st/33IpbO5; Zack Budryk, *Harris pushes for release of low-risk federal prisoners amid coronavirus outbreak*, THE HILL (Mar. 19, 2020), https://bit.ly/2Uh2JZi. Relatedly, the American Bar Association policy favors

entertaining the possibility of releasing some inmates to reduce the risk of a larger outbreak.[37] State and local jurisdictions, also concerned with their inability to protect inmates, staff, and the community are making concerted efforts to release detainees as expeditiously as possible.[38]

## III.   STANDARDS FOR ISSUANCE OF TEMPORARY RESTRAINING ORDER

A plaintiff seeking preliminary relief under Federal Rule of Civil Procedure 65 must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (noting standards for issuing temporary restraining orders and preliminary injunctions are "substantially identical"). In balancing these elements, "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Thus, when the likelihood of grave irreparable injury is palpable and the balance of equities tips sharply in a plaintiffs' favor, the plaintiffs need only "demonstrate a fair chance of success on the merits or questions serious enough to require litigation." *Arc of Cal. v. Douglas*, 757 F.3d 975, 993-94 (9th Cir. 2014) (internal quotations and citation omitted).

## IV.   CLASS MEMBERS WILL SUCCEED ON THE MERITS

The foregoing demonstrates beyond any shadow of a doubt that Class Members

___

release of prisoners in exceptional circumstances, including serious illness concerns. *Criminal Justice Standards: Standards on Treatment of Prisoners*, ABA, Standard 23-8.9(g), https://bit.ly/39nj4QF (last visited Mar. 24, 2020).

[37] Johnson, *Trump weighs release of some federal prisoners after inmate tests positive for coronavirus*, USA TODAY, https://bit.ly/3bsYpMp (last updated Mar. 22, 2020).

[38] New Jersey's Supreme Court issued a Consent Order that is expected to result in the release of at least 1,000 inmates. Consent Order, *In re: Request to Commute or Suspend Cnty. Jail Sentences*, N.J. ECF No. 084230 (Mar. 22, 2020). Iowa reported the expedited release of 700 incarcerated people, Los Angeles County has already released over 600 inmates, and other jurisdictions are promptly following suit, including in Ohio and Texas. Prison Policy Initiative, *Responses to the Covid-19 Pandemic* (Mar. 23, 2020).

1   in ORR congregate detention are vulnerable to contract COVID-19. The threat of

2   irreparable injury to their health and safety is palpable, and for those detained at least

3   30 days while ORR evaluates their potential custodians, the balance of the equities

4   clearly tips sharply in their favor.

5         Class Members therefore need only demonstrate "a fair chance of success on the

6   merits or questions serious enough to require litigation" to secure preliminary relief.

7   *Arc of Cal*., 757 F.3d at 993-94 (internal quotations and citation omitted); *All. for the*

8   *Wild Rockies*, 632 F.3d at 1132 ("'[S]erious questions going to the merits' and a

9   hardship balance that tips sharply toward the plaintiff can support issuance of an

10   injunction, assuming the other two elements of the *Winter* test are also met."). Class

11   Members' prospects here far exceed a "fair chance" of succeeding on the merits.

12         The *Flores* Settlement, the TVPRA, and the First and Fifth Amendments to the

13   U.S. Constitution each vest children who have custodians available to receive them with

14   substantive rights against ORR's keeping them in congregate care, especially during a

15   global pandemic. Given a health crisis that will only worsen in the coming days and

16   weeks, Class Members' requested due process relief easily satisfies the *Mathews v.*

17   *Eldridge*, 424 U.S. 319 (1976), balancing test. *See infra* Sec. IV.C.3.

18   **A.    ORR Violates The TVPRA By Continuing To Detain Children With**
19   **Viable Sponsors In Congregate Settings.**

20         The TVPRA requires ORR to "promptly" place detained children "in the least

21   restrictive setting that is in the best interest of the child," generally with "a suitable

22   family member . . ." or other available guardian. 8 U.S.C. § 1232(c)(2)(A). Only if a

23   suitable family member or other guardian is not available to take custody of a minor

24   may ORR continue to detain him or her "in a specialized juvenile program or

25   facility." *Flores v. Sessions*, 862 F.3d at 871.

26         By definition, all members of the "unfit custodian" class – and, *a fortiori*, those

27   whom the requested relief would protect – have family or other custodians available to

28

13

receive them. Their ongoing detention in congregate care in the face of a rapidly spreading public health crisis is a *prima facie* violation of the TVPRA.

According to the most recent ORR data at Plaintiffs' disposal, as of March 13, 2020, ORR had 3,622 children in custody, 1,193 – nearly a third – of whom have been placed in congregate settings for 30 days or more. (Holguín Decl., ¶ 3.) ORR's data do not indicate why the agency has yet to release these children, nor how many of them have available custodians, yet the vast majority likely do.[39]

Unless they meet the specific criteria, the TVPRA requires ORR to release children to any available custodian who "is capable of providing for the child's physical and mental well-being." 8 U.S.C. § 1232(c)(3)(A). In determining whether a proposed custodian meets this standard, the TVPRA requires ORR (1) to verify "the custodian's identity," and (2) "relationship to the child, if any," and (3) "make an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." *Id*.

The first two determinations are fairly straightforward, and may be verified following the submission of a completed "family reunification application" ("FRA"). (*See* Ex. N (ORR Policy Guide § 2.2.4 (when submitting an FRA, "potential sponsors must provide documentation of identity, address, and relationship to the child").) As for the third determination – whether the proposed sponsor has "engaged in any activity

---

[39] ORR categorizes detained children pursuant to their relationship with potential custodians. (Ex. N (ORR Policy Guide § 2.2.1).) The approximate percentage of children in ORR custody in each category are as follows:

- 42% in "Category 1" – i.e., they have parents or guardians in the U.S.;
- 47% in "Category 2" – i.e., they have an "immediate" relative – brother, sister, grandparent, aunt, uncle, or first cousin –to whom they could be released;
- 11% in "Category 3" – i.e., children with "other sponsors," such as "more distant relatives and unrelated adult individuals";
- The remainder are "Category 4" – i.e., children for whom ORR has identified no potential custodian.

(Holguín Decl. ¶ 4; Ex. O (Shiloh PowerPoint Presentation)).

that would indicate a potential risk to the child" – ORR requires potential custodians to "immediately" advise whether the proposed custodian has "a record of a criminal charge or child abuse" and submit "detailed documentation of the charges, dispositions, police reports, and evidence of rehabilitation." (Ex. N (ORR Policy Guide § 2.5.3).) ORR also completes background checks of all sponsors and adult household members through a public records criminal history check and a sex offender registry check. (Ex. N (ORR Policy Guide § 2.5).) These are simple internet searches that can be completed expeditiously by a case manager. (Ex. M. (ORR Manual of Procedures at § 2.5).) Although ORR chooses to require certain sponsors, household members, and adult caregivers to further undergo an FBI National Criminal History Check, Child Abuse and Neglect (CA/N) Check, and State Criminal History Repository Check and/or Local Police Check, these are not mandated by the TVPRA.

In the vast majority of cases,[40] any additional delay is often attributable either to (1) discretionary investigatory measures, or (2) administrative inefficiency or indifference. In establishing the requirements to vet proposed custodians, ORR has a track record of arbitrariness and vacillation. (*E.g.*, *After policy reversal, hundreds of detained children could be released*, PBS, Dec. 19, 2018, https://www.pbs.org/newshour/show/after-policy-reversal-hundreds-of-detained-migrant-children-could-be-released (according to HHS Assistant Secretary Lynn Johnson, ORR's expanded fingerprinting policy was "not adding anything to the protection or the safety for these children"); *Flores v. Barr*, No. 2:85-cv-04544-DMG-AGR, Order re Pls.' Mot. to Enforce Class Action Settlement, July 30, 2018 (ECF No.

[40] The TVPRA requires ORR to conduct home studies before releasing trafficking and abuse victims and children with special needs, 8 U.S.C. § 1232(c)(3)(B); but relatively few class members – and certainly not a third – fall within these special categories. Nor is there any apparent reason ORR could not generally complete a home study within 30 days. (*See* Ex. M (ORR Manual of Procedures at § 2.4.2) (directing that cases be referred for home studies within three business days and completed within ten business days of acceptance of the referral).)

470) at 27-29 (disapproving ORR requirement that its director approve release of any child placed in a restrictive setting); *id*. at 29-30 (disapproving ORR requirement that myriad post-release services be in place before a child is released to a sponsor subjected to a home study).

The harm that detention inflicts upon children is well established S*ee, e.g.*, Julie M. Linton et al., *Detention of Immigrant Children*, PEDIATRICS, Apr. 2017, at 6 ("[E]xpert consensus has concluded that even brief detention can cause psychological trauma and induce long-term mental health risks for children."). Plaintiffs reject the presumption that ORR's obligation to vet proposed custodians necessarily offsets that harm. These delays must now be evaluated in light of the extraordinary circumstances presented by this pandemic. The science is clear: if ORR fails to end congregate detention, or at least reduce it dramatically, it is only a matter of time before COVID-19 illness rages among children forced into close proximity with one another.

Thirty days should be more than enough for ORR to assess post-release risk. (*E.g.*, Ex. P (Declaration of James M. Owens ¶ 6 ("Owens Decl.") (state dependency courts determine whether there is cause to detain children within three days)); Ex. M (ORR Manual of Procedures, at § 2.2.2 (care providers generally expected to complete custodian evaluations within 10-21 days), § 2.7.2 (case coordinators expected to make recommendation within 1 business day), and § 2.7.3 (Federal Field Specialists expected to make release decisions within 1-2 business days of receiving case coordinator recommendations)). Any marginal gains to child safety from ORR's distending investigations for more than 30 days cannot outweigh the harm congregate detention will inevitably cause. Leaving children on the tracks with the COVID-19 train fast approaching while ORR takes even more time is unconscionable.

There is accordingly no serious question that ORR detaining over one thousand children in congregate settings for more than 30 days during a raging pandemic, even though they have custodians available to care for them, is a *prima facie* violation of the

TVPRA's requirement that it promptly place children in the least restrictive setting that is in their best interest.

**B.    ORR Violates The *Flores* Settlement By Refusing To Release Children To Available Custodians, And Instead Forcing Them To Remain In Unsafe Or Unsanitary Conditions.**

The injunctive relief Plaintiffs seek is also a necessary step to protect against the erroneous deprivation of children's substantive rights under the *Flores* Settlement[41] to (1) prompt release and (2) safe and sanitary conditions, rights that have become vastly more important to children in congregate detention during a pandemic. In particular, the *Flores* Settlement requires:

- "Where [ORR] determines that the detention of the minor is not required either to secure his or her timely appearance before [DHS] or the immigration court, or to ensure the minor's safety or that of others, [ORR] *shall release a minor from its custody without unnecessary delay . . .* [to] an adult relative . . ." (*Flores* Settlement ¶ 14 (emphasis added));

- "[ORR] . . . shall make and record the prompt and continuous efforts on its part toward . . . the release of the minor . . ." (*id.* ¶ 18);

- ORR must house children "in facilities that are safe and sanitary and that are consistent with [its] concern for the particular vulnerability of minors" (*Id.* ¶ 12);

- ORR must place detained children in state-licensed facilities that comply with both state health and safety standards and the minimum standards listed in Exhibit 1 to the Settlement, which include "[p]roper physical care and maintenance, including suitable living accommodations." (*id.* ¶¶ 6, 19 Ex. 1, ¶ A.1).

During a public health crisis, ORR holding class members in congregate detention even after it has already had 30 days to evaluate available custodians is in

---

[41] This Court has clarified that, although Plaintiffs may not seek to enforce the *Flores* Settlement in this action, "Plaintiffs may pursue due process claims predicated on Defendants' failure to provide sufficient procedural safeguards for alien minors to exercise their Flores rights" (ECF No. 141 at 10-11).

prima facie violation of each of these provisions, yet class members have been deprived of adequate process to protect these rights. This Court should require ORR to articulate good cause for exposing children to the clear dangers of congregate detention in lieu of release to their families or transfer to non-congregate settings.

### C.   ORR Violates the Due Process Clause Of The Fifth Amendment By Exposing Vulnerable Children To Clearly Dangerous Conditions.

The Due Process Clause of the Fifth Amendment protects individuals against (i) "arbitrary action of government" – a denial of procedural due process – or (ii) "the exercise of power without any reasonable justification in the service of a legitimate government objective" – a denial of substantive due process. *City of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998) (citations and internal quotations omitted). Detaining Class Members in congregate facilities that are inherently unsafe in the midst of the COVID-19 pandemic rather than releasing them to available custodians violates both substantive and procedural due process.

### 1.   ORR has an affirmative duty to guarantee Class Members' reasonable health and safety.

ORR has an affirmative duty to place Class Members in facilities capable of ensuring their reasonable health and safety. "When the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989); *see also Henry A. v. Willden*, 678 F.3d 991, 998 (9th Cir. 2012). The Ninth Circuit has found that a special relationship "applies to children in foster care," *Henry A.*, 678 F.3d at 1000, as well as others in government custody. *See Wang v. Reno*, 81 F.3d 808, 818 (9th Cir. 1996). As a result, ORR's obligation to provide children in its custody with, *inter alia*, "medical care, and reasonable safety," *DeShaney* at 200, includes reasonable protections from the risks presented by the COVID-19 pandemic. The constitutional guarantee of "reasonable safety" protects against the risk of

future harm even in the less protective Eighth Amendment context.[42] Yet here, Class Members are civil immigration detainees with rights derived from the Fifth Amendment. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). In *Helling v. McKinney*, the Supreme Court specifically recognized that the *risk* of contracting a communicable disease may constitute an "unsafe, life-threatening condition" that threatens "reasonable safety." 509 U.S. 25, 33 (1993). The Fifth Amendment thus protects Class Members in the government's custody from the risk of contracting COVID-19, exacerbated by unsafe conditions inherent to congregate settings.

### 2. ORR's failure to release Class Members expeditiously and ensure adequate safety measures in the midst of a pandemic violates their substantive due process rights.

The Ninth Circuit has recognized that individuals who have been *civilly* committed or detained "cannot be subjected to conditions that 'amount to punishment.'" *Jones v. Blanas*, 393 F.3d 918, 931, 934 (9th Cir. 2004).

Courts in this Circuit have recognized that immigration detention may amount to punishment and violate due process "if it imposes some harm to the detainee that significantly exceeds or is independent of the inherent discomforts of confinement and is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective." *Unknown Parties*, 2016 WL 8188563, at *5. Here, as the Ninth Circuit recognized, the continued detention of Class Members in congregate care settings both (i) imposes harm that significantly exceeds the inherent discomforts of their confinement and (ii) is excessive in relation to legitimate governmental objectives. *See Xochihua-Jaimes v. Barr*, 18-cv-71460, ECF No. 53 (Mar. 23, 2020) ("In light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers,

---

[42] *See Unknown Parties v. Johnson*, No. CV-15-00250-TUC-DCB, 2016 WL 8188563, at *5 (D. Ariz. Nov. 18, 2016), *aff'd sub nom. Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017) (immigration detainees "are most decidedly entitled to 'more considerate treatment' than those who are criminally detained"; "decisions defining the constitutional rights of prisoners establish a floor for the constitutional rights of [civil immigration detainees]").

the court *sua sponte* orders that Petitioner be immediately released from detention ….").

*First*, it is indisputable that the grave risk to all Class Members of potential exposure to COVID-19 is both significantly greater than and unrelated to the "inherent discomforts" generally associated with detention in ORR's custody.

*Second*, although Defendants maintain that ORR's detention of Class Members beyond 30 days is required by law to prevent the release of children to custodians who may abuse and neglect them, the continued detention of Class Members in life-threatening congregate care settings is grossly excessive in view of the substantial and immediate threat posed by the COVID-19 pandemic. Accelerating release of children to available sponsors would dramatically reduce the harm to all Class Members by both vastly reducing their own risk of exposure to COVID-19 and allowing children without sponsors to be placed in less crowded settings. Defendants' failure to expedite release to protect the health and safety of all class members is thus excessive and unjustifiable.

### 3.   ORR's failure to release Class Members expeditiously in the midst of a life-threatening pandemic clearly violates their procedural due process rights.

In addition, ORR's failure to expedite release of Class Members given the imminent threat to their health and safety posed by COVID-19 violates procedural due process as guaranteed by the Fifth Amendment. As this Court has recognized, "[Procedural] due process . . . has three elements: (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; (3) lack of process." (ECF No. 141 at 13 (quoting *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993)).) The Class Members easily satisfy these factors.

*First*, as this Court has recognized, Class Members have substantive interests implicated by their detention in ORR custody that give rise to due process protection, all of which are heightened by the unprecedented threat posed by COVID-19:

- A fundamental right to freedom from detention, *e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *Reno v. Flores*, 507 U.S. 292, 316 (1993);

- a substantial liberty interest in family unity and family association, *e.g.*,

1   *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011); and

2   • rights to prompt release under the TVPRA and the *Flores* Agreement (*see* ECF

3   No. 141 at 14-15).

4   *Second*, ORR's actions deprive Class Members of these constitutionally

5   protected interests. Indeed, ORR's delay in releasing children in its custody is deeply

6   harmful to children even under ordinary circumstances, and is especially dangerous in

7   light of the current pandemic. *See Stanley v. Ill.*, 405 U.S. 645, 647 (1972) (even a

8   temporary deprivation of the right to family integrity is constitutionally significant).

9   *Third*, ORR's procedures governing release of Class Members fall short of those

10   required under the Due Process Clause. Due process is "flexible and calls for such

11   procedural protections as the particular situation demands." *See Morrissey v. Brewer*,

12   408 U.S. 471, 481, (1972). Normally, "[t]he consequences of an erroneous commitment

13   decision are more tragic where children are involved" because "childhood is a

14   particularly vulnerable time of life and children erroneously institutionalized during

15   their formative years may bear the scars for the rest of their lives." *Reno v. Flores*, 507

16   U.S. at 318 (O'Connor, J. and Souter, J., concurring) (internal citations omitted). Now,

17   in light of the COVID-19 pandemic, the consequences of an erroneous commitment

18   decision for these children could be deadly.[43] *See supra* Sec. II.

19   Given the extraordinary circumstances presented by this pandemic, due process

20   requires at a minimum that ORR (1) release all Unfit Custodian Class Members to

21   available sponsors absent credible evidence that such sponsors would harm or neglect

22   them, (2) place such Class Members in non-congregate care that satisfies Centers for

23   Disease Control and Prevention guidelines, or (3) provide all such Class Members with

24   evidence supporting ORR's decision not to release them and an opportunity to be heard

25   regarding the grounds for continued congregate detention as set forth in Plaintiffs'

26   requested Temporary Restraining Order. ORR currently affords Class Members none

27

28   [43] *See supra* footnote 17.

of these minimal procedural protections under any circumstances.[44] *See* Office of Refugee Resettlement, *Children Entering the United States Unaccompanied: Section 2*, HHS (Jan. 30, 2015), https://bit.ly/2UwJM3G.[45]

Without such protections, there is a high likelihood that Class Members have been and will continue to be subjected to the risk of death or serious illness, and the traumatic effects of heightened isolation (Graves Decl. ¶ 13; Zein Decl.; Haney Decl. ¶ 12), and will further be deprived of essential support from family members or other caring adults at this time of extreme stress and anxiety. (Haney Decl. ¶¶ 12-16.)

## V.   ABSENT A TEMPORARY RESTRAINING ORDER, CLASS MEMBERS IN CONGREGATE FACILITIES WILL SUFFER IRREPARABLE INJURY.

A plaintiff must also demonstrate "immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). "Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Spark Indus., LLC v. Kretek Int'l, Inc*., No. CV 14-5726-GW(ASX), 2014 WL 12600262, at *3 (C.D. Cal. July 29, 2014) (citations omitted). Increased risk of exposure to a deadly virus by virtue of placement in congregate care represents a paradigmatic example of imminent irreparable harm.

An imminent threat to health and safety constitutes irreparable harm. For example, in *Unknown Parties*, the district court – as later affirmed by the Ninth Circuit – issued an injunction to curb physiological, health and/ or medical risks to civil immigration detainees, including "*being exposed to communicable diseases*." 2016 WL 8188563, at *15 (emphasis added). Likewise, in *Harris v. Bd. of Supervisors, Los*

---

[44] Plaintiffs assert that due process requires greater protections than currently sought in this Temporary Restraining Order. *See* First Amended Complaint ¶ 111. Plaintiffs reserve their right to seek such protections through a preliminary injunction.

[45] In the child welfare systems of all fifty states, children may not be detained for want of a qualified custodian without affording them and/or their parents or other potential custodians a prompt hearing before a judge or other neutral and detached decisionmaker, during which allegations of unfitness are tested via trial-like procedures and any ensuing finding of unsuitability must be based on competent evidence.

*Angeles Cty.*, the Ninth Circuit affirmed a preliminary injunction where the closure of a hospital and bed reductions would irreparably injure chronically ill indigent patients by inflicting "pain, infection, amputation, medical complications, and death due to delayed treatment." 366 F.3d 754, 756 (9th Cir. 2004); *see also Jones v. Tex. Dep't. of Crim. Justice*, 880 F.3d 756, 760 (5th Cir. 2018) (denial of adequate medical care for prisoner's diabetes constituted irreparable harm).

In light of the rapid spread of COVID-19 across the country and the impossibility of maintaining proper social distancing in ORR congregate care facilities, Class Members face an unacceptable risk of contracting COVID-19 in ORR custody. This danger will only grow the longer Class Members remain detained in unsafe facilities. Class Members who contract COVID-19 are at risk of death or serious illness, including the potential for permanent impairment. (Graves Decl. ¶ 7.) Even Class Members who display less severe symptoms will face the discomfort of being ill and, if they are quarantined, the traumatic psychological effects of isolation far from caring family members or other caregivers. (Wang Decl. ¶ 23.)

All Class Members, even those who do not become ill, are vulnerable to irreparable psychological harm from the anxiety and likely heightened isolation of being detained in the midst of a pandemic. (Haney Decl. ¶¶ 12-17.) *See Edmo v. Corizon, Inc.*, 935 F.3d 757, 797-98 (9th Cir. 2019) (noting that "severe, ongoing psychological distress" can constitute irreparable harm); *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1324 n.5 (9th Cir. 1994) (finding legal support for conclusion that "serious emotional distress" cannot be remedied through money damages).

Conditions in ORR facilities are incompatible with preserving Class Members' health and mental wellbeing. These  unsafe conditions, along with the lack of available medical care pose an extremely high likelihood of irreparable harm to Plaintiffs.

## VI.   THE BALANCE OF EQUITIES FAVORS INJUNCTIVE RELIEF

In this case, the equities and public interest merge into a single balancing test because Defendants are government officials. *See Nken v. Holder*, 556 U.S. 418, 435

(2009); *see also Cal. v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018). "A court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Arc of Cal.*, 757 F.3d at 991 (*quoting Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)). Importantly, "the Ninth Circuit expects lower courts to protect physical harm to an individual over monetary costs to government entities." *McNearney v. Wash. Dep't of Corr.*, No. 11-cv-5930 RBL/KLS, 2012 WL 3545267, at *15 (W.D. Wash. June 15, 2012).

The balance here tips decidedly in favor of Plaintiffs' interest in health and safety, which Defendants are placing at unnecessary risk. Unless this Court intervenes, Plaintiffs are likely to suffer serious and severe irreparable harm, including likely exposure to COVID-19. No purported government interest justifies subjecting children to this life-threatening virus. *See Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1193 (N.D. Cal. 2015) (holding equities sharply favored detainee who "established that she is suffering and is likely to continue to suffer unnecessary pain"); *see also Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983) ("Faced with . . . a conflict between financial concerns and preventable human suffering, [the court has] little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor.").

Granting Plaintiffs' motion would not subject Defendants to any identifiable hardship outweighing the irreparable harm to Plaintiffs' health and safety. Indeed, Defendants cannot point to *any* harm because they "'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *Ms. L. v. ICE*, 310 F. Supp. 3d 1133, 1147 (S.D. Cal. 2018) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). Moreover, "it is obvious that compliance with the law is in the public interest." *N.D. ex rel. parents acting as guardians ad litem v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1113 (9th Cir. 2010); *see also Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1197 (9th Cir. 2011) (The "public interest favors applying federal law correctly."). Because the requested relief would simply mandate compliance with Constitution, TVPRA, and the *Flores* Settlement, the Government could suffer no harm as a result.

24

1    Granting Plaintiffs' request for preliminary relief also serves the public interest

2  because allowing COVID-19 to spread in ORR congregate care facilities endangers the

3  general public. As public health experts have explained, reducing the number of

4  individuals in congregate care settings protects both those individuals and the

5  communities around them. An outbreak of COVID-19 in a congregate facility, such as

6  an ORR shelter, could quickly overtake the capacity of local health care resources, and

7  would likely require transport of infected individuals, potentially to areas where

8  COVID-19 has not yet spread. (Graves Decl. ¶ 36; Ex. D (Letter to Congress at 4.))

9  **VII.   CONCLUSION**

10    For the foregoing reasons, the Court should grant this application for a temporary

11  restraining order and order Defendants to show cause why a preliminary injunction

12  should not issue in the form lodged herewith.

13

14  Dated:  March 25, 2019                    CARLOS R. HOLGUIN
                                              Center for Human Rights &
15                                            Constitutional Law

16                                            HOLLY S. COOPER
                                              CARTER C. WHITE
17                                            University of California Davis School of Law

18                                            LEECIA WELCH
                                              BRENDA SHUM
19                                            NEHA DESAI
                                              POONAM JUNEJA
20                                            FREYA PITTS
                                              CRYSTAL ADAMS
21                                            National Center for Youth Law

22                                            SUMMER J. WYNN
                                              MARY KATHRYN KELLEY
23                                            REBECCA L. TARNEJA
                                              ALEXANDRA R. MAYHUGH
24                                            Cooley LLP

25                                            By: *s/ Carlos R. Holguin*
                                                  Carlos R. Holguin (90754)

26                                                *s/ Leecia Welch*
                                                  Leecia Welch (208741)

27

28

MEMO. OF PS & AS ISO EX PARTE APPLICATION
FOR TRO AND OSC RE: PRELIMINARY INJUNCTION
CASE NO. 2:18-CV-05741 DMG PLA