# EXHIBIT F

# DECLARATION OF ANTHONY ENRIQUEZ, ESQ.

I, Anthony Enriquez, declare as follows:

1. This declaration is based on my personal knowledge. If called to testify in this case, I would testify competently about the following facts.

2. My name is Anthony Enriquez, Esq. and I am an attorney licensed to practice in the State of New York. This declaration describes my experiences and observations working with unaccompanied migrant youth detained in congregate care facilities in New York State. These facilities include MercyFirst, Rising Ground, and Catholic Guardian Services, in addition to others.

Experience Serving Youth in ORR Custody

3. Since January of 2018, I have been the Director of the Unaccompanied Minors Program Catholic Charities Community Services of the Archdiocese of New York, (CCCS-NY), a legal service provider that serves youth at MercyFirst, Rising Ground, and Catholic Guardian Services, in addition to a number of other facilities in New York. I supervise a team of nearly 40 attorneys, paralegals, case managers, and operational staff who together work to represent detained unaccompanied migrant youth seeking relief before immigration courts and agencies. Over the last 10 years, Catholic Charities has represented hundreds of youth in the legal custody of the Office of Refugee Resettlement (ORR) custody. Although the majority of these youth come from Honduras, Guatemala and El Salvador, youth placed at this facility may come from all over the world.

4. As the legal service provider for MercyFirst, Rising Ground, and Catholic Guardian Services, our legal staff maintain regular contact with the youth at each of these facilities. We provide ongoing consultations and presentations concerning the legal rights of detained minors. We are also providing direct legal representation to youth currently detained at these facilities.

**MercyFirst**

*Background*

5. Since 2014, MercyFirst has been a facility subcontracted by ORR to house unaccompanied children. It is located in Syosset, New York.

6. MercyFirst has two different settings. One of them is a Residential Treatment Center (RTC) for youth between the ages of 13 and 17. The other houses youth between the ages of 6 and 17 in congregate or shelter care. It is my understanding that MercyFirst is licensed to provide shelter care for up to 60 youth. The current population of the RTC setting is approximately seven youths. The current population of the shelter setting is approximately 34 youth.

7. MercyFirst consists of a campus that includes approximately 5 buildings or "units" as well as another location with a "unit" where youth are housed in buildings that accommodate up to 12 youth. In addition to interaction with other residents, youth in each unit have regular contact with the various staff that provide daily supervision. Children and youth are regularly transported to other buildings on the campus for educational programming as well as other services. Residents are expected to share common equipment such as telephones, televisions, tables, recreational games and other living accommodations.

*Youth Interactions with Staff*

8. MercyFirst has a 6:1 ratio of supervision for children in shelter. Many youth in the RTC setting are required to receive one-on-one supervision from staff, in addition to the general daily supervision provided. Staff work different shifts and youth are exposed to different staff throughout the day.

9. Youth also meet individually with case managers and mental health clinicians on a weekly basis.

---

Declaration of Anthony Enriquez

2

10. Often, staff interact with youth in the RTC in a physical manner, including using physical restraints. When these incidents occur, minors are at times taken to the hospital for further evaluation, medication, or hospitalization.

11. Due to space constraints and group programmatic needs, it would be very difficult or almost impossible for children to maintain six feet of social distancing between themselves and everyone else in the facility.

*Sleeping Arrangements*

12. Youth at MercyFirst are held in a communal setting in close quarters with other children. Based on observation of and conversations with clients, youth sleep in individual rooms with one bed or two beds with approximately two or three feet between the beds.

*Dining Facilities*

13. Youth at MercyFirst typically eat meals in a communal setting. Meals are served three times a day in a single location which serves all the kids in a unit at the same time. Various staff are also present during meals.

*Access to Medical Care*

14. There is a nurse and a psychiatrist on campus and children have access to medical care. For more specialized medical care, children must be transported outside of MercyFirst. If access to local hospitals is limited due to the coronavirus, minors at MercyFirst may be at serious risk of being denied access to essential medical care.

**Rising Ground**

*Background*

15. Rising Ground (RG) detains unaccompanied migrant youth between the ages of 13 and 17. It is my understanding that this facility is licensed to provide shelter care for up

to 65 youth in the regular shelter setting. The current population of this facility is approximately 22 young people.

16. Rising Ground currently houses unaccompanied children in four different cottages located on the same campus. Each unit currently holds up to 8 young people who are regularly transported to other locations within the same campus for educational programming as well as other services. Residents are expected to share common equipment such as telephones, televisions, tables, recreational games and other living accommodations.

*Youth Interactions with Staff*

17. There are staff and personnel who provide 24-hour care and supervision with a 6:1 ratio of supervision. Staff work different shifts and youth are exposed to different staff throughout the day.

18. Youth also meet individually with case managers and mental health clinicians on a weekly basis.

19. Due to space constraints and group programmatic needs, it would be very difficult or almost impossible for children to maintain six feet of social distancing between themselves and everyone else in the facility.

*Sleeping Arrangements*

20. Youth at RG are held in a communal setting in close quarters with other children. Based on my observation, youth sleep in rooms with two beds with approximately two or three feet between the beds.

*Dining Facilities*

21. Youth at RG also eat meals in a communal setting. Meals are served three times a day in a single location which serves meals to all the residents in the cottage at the same time. Various staff are also present during meals.

*Access to Medical Care*

22. To my knowledge, there is a nurse practitioner on campus. Youths at RG have access to regular medical care. For more specialized medical care, children must be transported outside of RG's campus. If access to local hospitals in the surrounding area is limited due to the pandemic, minors in shelter at RG may be at serious risk of being denied access to essential medical care.

**Catholic Guardian Services**

*Background*

23. Catholic Guardian Services (CGS) detains unaccompanied migrant youth between the ages of 13 and 17. It is my understanding that this facility is licensed to provide shelter care for up to 56 youth in the regular shelter setting. The current population of this facility is approximately 23 young people.

24. CGS houses unaccompanied children in three different buildings. The largest of these can accommodate up to 24 young people. Residents are expected to share common equipment such as telephones, televisions, tables, recreational games and other living accommodations.

*Youth Interactions with Staff*

25. There are staff and personnel who provide 24-hour care and supervision with a 6:1 ratio of supervision. Staff work different shifts and youth are exposed to different staff throughout the day.

26. Youth also meet individually with case managers and mental health clinicians on a weekly basis.

27. Due to space constraints and group programmatic needs, it may be very difficult or almost impossible for children to maintain six feet of social distancing between themselves and everyone else in the facility.

*Sleeping Arrangements*

28. Youth at CGS are held in a communal setting in close quarters with other children. Youth sleep in rooms with two or three beds with approximately two or three feet between the beds.

*Dining Facilities*

29. Youth at CGS also eat meals in a communal setting. Meals are served three times a day in a single location. All the residents in the cottage eat at the same time. Various staff members are also present during meals.

*Access to Medical Care*

30. To my knowledge young people at CGS have access to regular medical care. For more specialized medical care, children must be transported outside of CGS's campus. If access to local hospitals in the surrounding area is limited due to the pandemic, minors in shelter at CGS may be at serious risk of being denied access to essential medical care.

*General Risks of Congregate Care*

31. It is my understanding that some facilities are making specific efforts to implement practices designed to mitigate the public health risks associated with COVID-19.

32. Even so, I remain concerned that children in congregate care are at heightened risk of being infected by or exposing others to the novel coronavirus. This includes exposure introduced by shelter staff who must remain in close contact with detained youth and who themselves are exposed to the virus in daily travels to and from the shelters throughout the New York City area. Such exposure places children, staff, and the general public at risk of contracting the virus.

33. I am also concerned that due to the current overwhelming strain on New York hospitals and medical facilities there may be no way to ensure that children in ORR facilities receive timely or adequate medical care, both on and off site. Consequently,

youth in ORR custody may be acutely compromised with respect to exposure to the dangerous virus and its potentially deadly effects.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 24 day of March, 2020, at New York, New York.

                                                  ANTHONY ENRIQUEZ

Declaration of Anthony Enriquez

7