JOSEPH H. HUNT
Assistant Attorney General
United States Department of Justice
Civil Division
SCOTT G. STEWART
Deputy Assistant Attorney General
AUGUST E. FLENTJE
Special Counsel
ERNESTO H. MOLINA, JR.
JEFFREY S. ROBINS
Deputy Directors
Office of Immigration Litigation
BENJAMIN MARK MOSS
W. DANIEL SHIEH
Senior Litigation Counsel
MARINA C. STEVENSON
ANTHONY J. MESSURI
JONATHAN K. ROSS
Trial Attorneys
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-9344
Facsimile: (202) 305-1890
Email: Ernesto.H.Molina@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

LUCAS R. *et al.*,

Plaintiffs,

v.

ALEX AZAR, Secretary of U.S. Dep't of Health and Human Services, *et al.*,

Defendants.

Case No.: 2-18-CV-05741 DMG (PLA)

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER [DKT. NO. 227]**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................. iii

I.   INTRODUCTION AND SUMMARY ........................................................ 1

II.  BACKGROUND ......................................................................................... 6

    A. ORR's Robust Actions.......................................................................... 6

    B. Plaintiffs' TRO Motion.........................................................................10

III. ARGUMENT.............................................................................................11

    A. Plaintiffs Fail to Show a Likelihood of Success on the Merits ...............12

        1.  Plaintiffs' TVPRA Claim Fails Because ORR is Fulfilling its
            Obligations Under the TVPRA by Implementing Careful Protocols in
            Response to COVID-19 and Plaintiffs' Proposed Relief Would Force
            ORR to Violate those Obligations ................................................12

        2.  The Relief Plaintiffs Seek is Barred by the *Flores*
            Agreement ......................................................................................15

        3.  Plaintiffs Cannot Succeed on the Merits Because the TRO that they
            Seek is Beyond the Scope of the Complaint's Allegations and is
            Improper for Class-Wide Relief ....................................................17

        4.  Plaintiffs Fail to Show a Due-Process Violation ..............................19

        5.  Plaintiffs Fail to Show That Their Requested Relief Will Mitigate
            Risk of Harm from COVID-19 .......................................................21

    B. Considerations of Harm and the Equities Cut Against a TRO ................23

IV.  CONCLUSION .........................................................................................24

# TABLE OF AUTHORITIES

## CASES:

*Clark v. Bank of Am. N.A.*,
   No. 14-14-232, 2015 WL 1433834 (D. Idaho Mar. 27, 2015).....................17, 18

*Committee of Cent. Am. Refugee v. INS*,
   795 F.2d 1434 (9th Cir. 1986) ...............................................................24

*Estelle v. Gamble*,
   429 U.S. 971 (1976) ...............................................................................19

*Flores v. Sessions*,
   No. 85-4544, 2018 WL 10162328 (C.D. Cal. July 30, 2018) ......................16, 17

*Garcia v. Google, Inc.*,
   786 F.3d 740 (9th Cir. 2015) ..............................................................11, 17, 24

*Gonzales v. Gorsuch*,
   688 F.2d 1263 (9th Cir. 1982) ...............................................................21

*Los Angeles v. Lyons*,
   41 U.S. 95 (1983) ...................................................................................21

*L.W. v. Grubbs*,
   92 F.3d 894 (9th Cir. 1996) ...................................................................19

*Martin v. Int'l Olympic Comm.*,
   740 F.2d 670 (9th Cir. 1984) .................................................................24

*Northern Arapaho Tribe v. LaCounte*,
   Nos. 60-11 & 16-60, 2017 WL 908547 (D. Mont. March 17, 2017) .................17

*Orr v. Bank of America, NT & SA*,
   285 F.3d 764 (9th Cir. 2002) .................................................................10

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
   810 F.2d 636 (9th Cir. 2015) .................................................................17

Defendants' Opposition to TRO

*Patel v. Kent Sch. Dist.,*
    648 F.3d 965 (9th Cir. 2011) ............................................................................19

*Reno v. Flores*,
    507 U.S. 292 (1993) ..............................................................5, 14, 19, 21

*SEC v. Randolph*,
    736 F.2d 525 (9th Cir. 1984) ............................................................................15

*Sekerke v. Leo*,
    No.: 3:19-cv-0034-GPC-RBB, 2020 WL 619581 (S.D. Cal. Feb. 10, 2020) .....17

*Vermont Agency of Nat'l Res. v. United States ex rel. Stevens*,
    529 U.S. 765 (2000) .........................................................................22

## STATUTES:

8 U.S.C. § 1232 ............................................................................ 1

8 U.S.C. § 1232(c)(2)(A) ............................................................................ 1

8 U.S.C. § 1232(c)(3)(A) ............................................ 1, 2, 12, 14, 16

## FEDERAL RULES OF CIVIL PROCEDURE:

Fed. R. Civ. P. §  56(c)(4) ............................................................................10

## OTHER MATERIALS:

*Flores* Settlement Agreement..................................................................2, *passim*

## I.  INTRODUCTION AND SUMMARY

This Court should deny Plaintiffs' extraordinary request for class-wide injunctive relief.  Plaintiffs' claims lack merit, their motion rests on a mistaken view of the facts, and Plaintiffs fail to account for the many equitable and harm-related considerations that weigh strongly against the relief that Plaintiffs seek.

The COVID-19 pandemic has presented tremendous challenges for our Nation.  But the Executive Branch is responding to those challenges for everyone in the country and for everyone who is entitled to its protection—including for the children at issue in this case.  The U.S. Department of Health and Human Service (HHS) Office of Refugee Resettlement (ORR) is carefully, thoroughly, and expeditiously safeguarding the health and interests of the unaccompanied alien children (UACs) entrusted to its care under federal law.  *See* 8 U.S.C. § 1232.  Plaintiffs' claims in their TRO motion are not well taken and do not warrant a disruption of ORR's careful efforts to fulfill its statutory mandate.  And their request for TRO relief is fundamentally improper:  The purpose of a TRO is to maintain the status quo, yet the broad and hasty relief that Plaintiffs seek would be highly disruptive and would violate the TVPRA.  Indeed, the rushed and sweeping relief that Plaintiffs seek threatens to increase the risk of harm to UACs in ORR custody.  The Court should deny this motion for the multiple reasons.

Plaintiffs' arguments fail on the merits.  To start, far from showing that ORR is violating the Trafficking Victims Protection Act of 2008 (TVPRA), the government is complying with the TVPRA, and the relief requested by Plaintiffs would violate that statute.  The TVPRA imposes robust and thorough procedures that ORR must use, all to the end of safeguarding the welfare of children in its care, which includes both its obligation to safely and expeditiously release children to approved sponsors under 8 U.S.C. § 1232(c)(3)(A) and to maintain safe custody of those children under 8 U.S.C. § 1232(c)(2)(A).  ORR's procedures are suited to safeguard these interests during the COVID-19 pandemic.  In fulfilling its TVPRA obligations for safe custody, ORR maintains rigorous protocols for handling infectious diseases for children in care,

including mandatory staff training requirements, isolation capabilities across ORR's network of care providers that are suitable for housing children, hygiene education, and medical screenings. *See* ORR Guide § 3.4.6. ORR also issued extensive field guidance on the COVID-19 pandemic to its care provider network on March 2, March 13, March 19, March 20, and March 23, which implements important safety measures such as mandatory temperature checks for children and visitors; placement and travel restrictions to and from at-risk facilities; and heightened medical care. *See* Ex. R-W.

Against the backdrop of ORR's intensified efforts to protect the health and well-being of UACs in its care and custody during the COVID-19 pandemic, Plaintiffs' miscalculated assertions of injury have led them to ask that this Court impose a truncated and unlawful standard for release of those children (to un-vetted sponsors) and require administrative hearings for all denied sponsors where ORR would need to affirmatively prove that a sponsor would harm or neglect a child to avoid release. Br. 21; Pls. Proposed Order 41. That relief would upend the TVPRA's requirement of safe reunification, which requires that the sponsor be "capable of providing for the child's physical and mental well-being." 8 U.S.C. § 1232(c)(3)(A). The unsubstantiated claims of harm that Plaintiffs allege do not justify the far-sweeping relief they seek. Plaintiffs disregard that the COVID-19 response requires flexibility as the situation develops and given the varying circumstances in different parts of the country. Plaintiffs filed an emergency TRO motion without any real effort to understand the significant actions being taken by ORR in response to this fast-developing challenge. And Plaintiffs indiscriminately lump all congregate-care facilities together, irrespective of size, location, and set-up. These differing circumstances show that class-wide resolution would override the discretion ORR and care facilities need to manage this developing and changing crisis across the country to protect children and would disregard ORR's statutory obligations of safe and expeditious relief.

Plaintiffs' TRO request also conflicts with the *Flores* Settlement Agreement. *Flores* resolved due-process claims concerning the medical care of minors in custody

Defendants' Opposition to TRO

as well as release standards and procedures.  Plaintiffs cannot bring claims here alleging that these policies and procedures violate the Due Process Clause; these claims are barred by res judicata.  If there are concerns that *Flores* is now being violated, those claims must proceed in a *Flores* enforcement action.  Plaintiffs cannot avoid that limitation by asserting that their claims have been brought exclusively under the TVPRA or that the TVPRA (or *Flores*) creates rights that they can enforce under the Due Process Clause.  As this Court has held, the TVPRA is coextensive with *Flores* when it comes to release provisions.  And the Agreement's care provisions are far more detailed than the TVPRA and ORR, under this Court's ruling, provides medical care that seeks compliance with applicable state laws.  Plaintiffs should be precluded from arguing here that the medical care standards they negotiated for, and agreed to, in *Flores* are insufficient.  If Plaintiffs are no longer satisfied with their negotiated and agreed-to rights under *Flores*, then they should seek to amend that agreement.  Having not done so, their claims should fail because Plaintiffs cannot here claim that the medical care being provided does not comply with the *Flores* Settlement Agreement.

All of Plaintiffs' TRO merits arguments also fail because none of the facts relevant to their TRO request are pleaded in their operative (first amended) complaint ("complaint" or "Compl.," ECF No. 80), and thus none of the certified classes are appropriate to address their new allegations of injury.  The complaint makes no allegations about any of the protocols that ORR has implemented to protect those in its care and custody from COVID-19, or the general conditions, cleanliness, or medical treatment inside any of ORR's grantee care facilities where UACs reside while awaiting unification with a safe sponsor.  And notably, the operative complaint does not seek to address "extraordinary circumstances" like COVID-19—rather, it seeks an administrative appeal for minors denied unification to otherwise qualified sponsors under the TVPRA.  Compl. ¶¶ 179-90.  Plaintiffs are thus attempting to bring, by TRO motion, new claims based on new facts to seek new relief.  Plaintiffs must file a new complaint and withstand the rigorous class-certification procedures before being

granted this relief.  Given the widely varying circumstances presented by COVID-19, and the quickly changing crisis, class resolution very likely would not be appropriate if it were sought.  But in any event, certification of a class for their original claims does not provide roving authority to obtain class-wide oversight on any issue of concern.

Even if *Flores* were disregarded and Plaintiffs could obtain TRO relief in this case on a due-process theory, Plaintiffs fail to show a due-process violation arising from either a lack of adequate medical care or unsafe conditions.  The extensive measures that ORR has taken in coordination with the CDC and other components of HHS confirms the contrary.  ORR has gone to extraordinary lengths to care for children in a profoundly challenging situation, while also fulfilling its statutory mandate under the TVPRA for expeditious release of children to custodians who will care for them, implementing measures both to prevent the spread of COVID-19 and provide appropriate medical care in the case of infection.  ORR: (1) has stopped placements in New York, California, and Washington; (2) has limited air travel to local placements; (3) requires all care providers to conduct temperature checks for every UAC in care twice each day; (4) elevates all medical cases with flu-like symptoms; (5) maintains medically appropriate isolate capabilities at all of its shelters; and (6) restricts access to all visitors who display either an elevated temperature or flu-like symptoms.  *See* Ex. Q-W.  For medical care, ORR provides all UACs with testing at the recommendation of medical personnel, has full-time medical staff on-site, and isolates anyone who either tests positive or is suspected of exposure to the COVID-19 virus.  *Id.*  ORR is continuing to monitor the fast-developing situation, and will make further changes to policies as warranted.  *See e.g.,* Ex. R at 1.  These measures show neither a violation of the Due Process Clause's requirement for adequate medical care, nor deliberate indifference to protecting the safety and well-being of minors in its custody.

Plaintiffs also fail to show how their alleged injury would be redressed by the relief they seek.  They provide no explanation of how the relevant actors could safely undertake Plaintiffs' proposed mass transit, within days, of hundreds of children across

Defendants' Opposition to TRO

the country at a time when public transportation is halted or severely restricted given the risks it poses to travelers and others.  Nor have they shown why release to un-vetted sponsors who may have differing home situations would be safer than remaining in a facility with a medical staff on call 24 hours a day in conjunction with the normal TVPRA vetting process that Congress required.  And Plaintiffs have not shown that their demand for administrative hearings during a time of strained resources for ORR would redress the harm that they allege.  Plaintiffs' requested additional procedures are not required under the Due Process Clause, as explained in *Reno v. Flores*, 507 U.S. 292, 303 (1993), and would take crucial agency employees away from the vital task of releasing children to vetted sponsors and keeping them safe and healthy in the meantime.

The remaining injunctive factors weigh against the extraordinary remedy that Plaintiffs seek.  As explained, Plaintiffs have not shown on a class-wide basis that every child in ORR care faces the same or a substantially similar risk of injury, given the significant differences in size, location, and capacity across ORR's network of care providers.  Indeed, most of ORR's facilities are operating far below capacity, facilitating practices recommended by the CDC such as social distancing.  Plaintiffs' claims of harm rely on guidance issued to prisons and jails, not congregate-care facilities housing children that often have to take account of many other factors such as whether the children, who are always in some form of custody, have a safe home in which to be placed.  Even then, ORR's efforts to mitigate the risks of COVID-19 meet or exceed those that the CDC recommends for other types of congregate-care facilities.  Ex. AA ¶ 20.  Nor have Plaintiffs shown that the public interest weighs in their favor given the operational reality of what they seek would entail.  Plaintiffs' dangerous proposal potentially involves transporting hundreds or thousands of children across the country, contrary to the CDC's shelter-in-place guidance, to un-vetted potential applicants, some of whom are strangers to the child, along with requiring ORR to implement potentially hundreds of administrative hearings for the remaining children during a pandemic.

Defendants' Opposition to TRO

## II.     BACKGROUND

### A. ORR's Robust Actions

Defendants' official response to COVID-19 dates at least to January 31, 2020, when the Secretary of Health and Human Services declared COVID-19 a public health emergency.  *See* Ex. AA ¶ 13.  From the first appearance of COVID-19 in the United States, ORR has monitored the developing public health situation, including both federal and state mandates applicable to the jurisdictions in which ORR grantee care provider facilities—the locations where UAC in ORR custody and care reside—operate. *Id.* ¶ 17-18.  ORR has provided the facilities with regular updates on infection prevention and control protocols, and has issued guidance on the screening and management of potential COVID-19 exposure among UACs, facility personnel, and visitors, consistent with official guidance from the Center for Disease Control (CDC), an agency of the Department of Health and Human Services.  *Id.*

ORR is equipped to deal with viral and bacterial outbreaks. It has years of experience in identifying, containing, and treating contagious diseases, including seasonal influenza (flu), measles (rubella), mumps (parotitis), chicken pox (varicella), and tuberculosis.  *See* Ex. Q ¶ 15.  Even before the spread of COVID-19, ORR was ahead of the curve in developing protocols, policies, and experience relating to infectious disease containment.  *See id.*

ORR's policies relating to managing communicable diseases are extensive, including policies requiring routine assessment of travel history when a child arrives at a care provider program, as well as medical screenings and vaccinations within 48 hours; ability to isolate or quarantine individuals for infectious disease control; hand hygiene and respiratory etiquette educational efforts; and established communicable disease reporting to the local health authority. Ex. Q ¶ 16 (citing ORR Policy Guide § 3.4.6 (Management of Communicable Diseases); § 3.4.7 (Maintaining Health Care Records and Confidentiality)).

Defendants' Opposition to TRO

Even accounting for its significant experience successfully managing communicable diseases, ORR's response to COVID-19 remains highly responsive and adaptable to the particular challenges of COVID-19. *See* Ex. Q ¶ 14, 17. To enhance its efforts to prevent the risk of exposure to COVID-19, ORR has mandated that all visitors and staff seeking to enter any grantee care provider facility must answer COVID-19 screening questions and submit to a mandatory temperature check. *Id.* ¶ 18. Except for UACs being processed for admission to the particular facility, grantee care-provider facilities are required to deny access to anyone who has a fever of 100°F or above; who exhibits symptoms of an acute respiratory infection; who has had contact with someone with a confirmed COVID-19 diagnosis in the previous 14 days; who has been tested for COVID-19 and is awaiting test results; or in the previous 14 days, has traveled to an area identified by the CDC as having widespread, sustained community transmission of COVID-19. *Id.* All UACs entering ORR care are screened for COVID-19 exposure or symptoms consistent with CDC COVID-19 guidelines. *Id.* ¶ 19. UACs at risk of COVID-19 exposure based on reported travel history, but without symptoms, are quarantined and monitored for 14 days. *Id.* ¶ 20. UACs who exhibit COVID-19 symptoms will be isolated and tested in consultation with the local health authority. *Id.*

Alongside measures to prevent exposure to COVID-19, ORR has instituted a rigorous monitoring regime to assure that any UAC who exhibits symptoms of COVID-19 is identified and appropriately isolated in consultation with the local health authority. Ex. Q ¶ 20-21. During this time in isolation, a child receives the same services as non-isolated peers in the same facility, which includes recreation and counseling, with adjustments—particularly to education services—to accommodate proper infection-control procedures. *Id.* ¶ 28. ORR has also required that each grantee care-provider facility monitor the temperature of every UAC in care. *Id.* ¶ 22. Children's temperatures are recorded twice daily. *Id.* If any UAC has a temperature above 100°F, the grantee care provider must immediately alert ORR, and must do so each day any child has a temperature over 100°F. *Id.* Further, any UAC who exhibit symptoms consistent with

Defendants' Opposition to TRO

COVID-19 will be immediately isolated and referred for evaluation by a licensed medical provider, in consultation with local health authorities, and tested for COVID-19, if that is the health provider's guidance. *Id.* ¶ 23.

The isolation procedures are the same for any UAC determined to be at risk for COVID-19 exposure or infection. Ex. Q ¶ 24. More specifically, the affected UAC will be provided a private room, with a closed door and bathroom access, preferably a private bathroom that is not used by others. *Id.* State and local health officials, along with ORR's health division, are notified and consulted for additional guidance on risk assessment, symptom monitoring, and isolation/quarantine. *Id.* Any facility personnel who enter an occupied isolation room are required to wear personal protective equipment, including an N95 respiratory mask and goggles or a face shield, per CDC guidelines. *Id.* ¶ 25. If a UAC in isolation needs to leave the isolation room for any reason (*e.g.*, to use the bathroom, to attend a medical appointment, etc.), the UAC must wear a surgical mask. *Id.* ¶ 26. If a UAC needs to be transported to a health clinic or other off-site location, the facility must notify the local health department for guidance on proper precautions during transport. *Id.* ¶ 27. The facility is also required to alert the intended destination in advance so proper infection control measures may be undertaken. *Id.* UACs are required to remain in isolation until cleared by appropriate health officials. *Id.* ¶ 28.

Besides extensive procedures to limit exposure to individual facilities and address and treat any affected UAC who may have COVID-19, ORR has also implemented further protocols to limit the overall risk of spreading COVID-19. ORR has stopped the placement of UAC at grantee care facilities in California, New York, and Washington due to COVID-19 outbreaks among the general public in those states. Ex. Q ¶ 32. ORR continues to monitor applicable state guidance to determine whether conditions warrant the suspension of placements in any particular locale, and will make changes as circumstances require. *Id.* Further, ORR prioritizes local facility placements for UACs in order to limit the need for travel on commercial airliners, but may use

Defendants' Opposition to TRO

commercial airliners to reunify a UAC with a sponsor, if it is safe to do so.  *Id.* ¶ 33. Care providers must assess the safety of the UAC's ultimate destination, to anticipate logistical issues associated with COVID-19 disruptions.  *Id.*  Care providers also must consult with a Federal Field Specialist (who is an ORR employee) if a UAC will be traveling to a jurisdiction with widespread COVID-19 community transmission and resulting shelter-in-place order.  *Id.*  In such cases, release should be postponed until it is safe for the UAC to travel.  *Id.*

Before the outbreak, ORR had been working on a telehealth initiative to increase UAC access to healthcare resources. Ex. Q ¶ 34.  In light of orders restricting movement in New York and California, ORR rolled out its telehealth program in those locations ahead of schedule in order to ensure care provider facilities are able to provide UACs with access to medical care without leaving facilities.  *Id.*

As of March 26, 2020, there were four confirmed cases among UACs in ORR care provider facilities.  Ex. Q ¶ 35.  All four cases were in a single facility in New York State, and the affected UACs are currently in isolation, per ORR and CDC guidelines, and are receiving appropriate monitoring and medical care.  *Id.*  Eighteen UACs in the care provider network had been tested, with at least eleven returning negative results. Ex. Q ¶ 36.  While the tests were pending, pursuant to CDC Guidance, any UAC who had undergone COVID-19 testing was considered presumptively positive until results are available (usually, within three or four days after testing).  Ex. Q ¶ 37.  Eight program staff/contractors or foster parents at five care-provider programs located in New York, Washington, and Texas have self-reported testing positive for COVID-19. ORR's medical team and the affected programs have worked in close coordination with the local public-health departments on appropriate public-health measures, which typically involve self-quarantine at home, and the tracking and monitoring of the affected staff members' contacts within the care-provider facility, per CDC guidance. Ex. Q ¶ 38.  The protocols discussed above are in place to prevent the further spread of

Defendants' Opposition to TRO

COVID-19, and ORR is providing medical care to those affected children.  *See* Ex. Q ¶ 39.

CDC has issued guidance on COVID-19 containment in various congregate settings, including colleges, nursing homes, prisons, and homeless shelters. Ex. Q ¶ 36. ORR considered the CDC guidance when developing its own COVID-19 procedures, vetted its COVID-19 procedures with CDC, and understands that public health experts at CDC agree that the ORR procedures are consistent with CDC guidance. *Id.*  Indeed, CDC has advised that "ORR's current COVID-19 procedures are consistent with CDC guidances for congregate settings; they direct grantee care-provider facilities to implement both containment and mitigation measures. In some respects, ORR's current COVID-19 procedures actually exceed those set forth in the CDC guidances to congregate care facilities." Ex. AA ¶ 20.

## B. Plaintiffs' TRO Motion

Plaintiffs filed their TRO papers on March 25.  Plaintiffs acknowledge that in light of the COVID-19 pandemic, ORR recently adopted safety measures for its congregate-care facilities and the unaccompanied minors in ORR care. Pl. Br. 7-8.  They claim, however, that ORR guidelines fail to comply with safety measures from CDC and the medical community.  Br. 8.  Plaintiffs suggest that "ORR Guidance makes no mention of requiring or encouraging social or physical distancing between children or staff, nor of limiting the gathering of groups of children or staff within facilities."  Br. 8-9 (citing Graves Decl.; Wang Decl.; Ex. K).[1]  And they suggest that

---

[1] The materials submitted with Plaintiffs' TRO request should be given minimal weight. *See Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773-74 (9th Cir. 2002); L.R. 7-6, 7-7 (mandating that the declarations "shall contain only factual, evidentiary matter and shall conform as far as possible to the requirements of Fed. R. Civ. P. 56(c)(4).").  Plaintiffs' declarations are replete with hearsay and speculation, improperly attempt to lay the foundation necessary for expert opinion, and are of tenuous relevance to litigation involving UACs in shelters. *E.g.*, Meyers Decl. (prisons and jails); Graves Decl. (populations other than ORR children).  These and other exhibits present no factual evidence or expert opinion upon which the Court

Defendants' Opposition to TRO

ORR's COVID-19 guidelines "fall far below federal, state, and local mandates to reduce the spread of COVID-19," highlighting states' general "shelter in place" orders, as well as protocols for homeless shelters and prisons. Br. 10-12 (citations omitted). Plaintiffs do not cite any state guidance requiring congregate care facilities to release all children in care, nor could they. *See* Ex. X-Y (NY and CA guidance for children to remain in congregate care).

Plaintiffs allege that Defendants are in violation of the TVPRA by continuing to hold unaccompanied minors in shelters, specifically in instances where they have viable sponsors. Br. 13-16. They also claim that ORR is violating the terms of the *Flores* Settlement Agreement by not releasing UACs to remain in its care, alleging that said facilities are both unsafe and unsanitary. Br. 17. And they claim ORR violated UACs' procedural and substantive due-process rights by exposing them to dangerous conditions. Br. 18-22.

Finally, Plaintiffs claim that because of "the rapid spread of COVID-19 across the country and the impossibility of maintaining proper social distancing in ORR congregate care facilities, Class Members face an unacceptable risk of contracting COVID-19 in ORR custody." Br. 23. They ask the Court to enter a TRO ordering the immediate release of hundreds of UACs from congregate care.

## III.   ARGUMENT

The Court should deny Plaintiffs' TRO motion. "When 'a plaintiff has failed to show the likelihood of success on the merits, [the Court] need not consider the remaining three [elements]" for TRO relief. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (internal quotations and formatting omitted). Plaintiffs

---

should rely in finding facts. Finally, all of Plaintiffs' exhibits that focus on the nature and infectiousness of COVID-19 (*see, e.g.*, Ex. B; Ex. C; Ex. E) should be afforded minimal weight compared with evidence from HHS, which houses true authorities: the Centers for Disease Control and the Assistant Secretary for Preparedness and Response.

Defendants' Opposition to TRO

cannot make this showing.  And considerations of harms and the equities strongly cut against a TRO, particularly where the sweeping and rushed relief that Plaintiffs seek threatens to increase harm to the UACs in ORR's care.  Finally, Plaintiffs' request for relief is fundamentally improper.  The purpose a TRO or preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  Yet the relief that Plaintiffs seek would not maintain the status quo:  it would disrupt the status quo and violate federal law.

### A. Plaintiffs Fail to Show a Likelihood of Success on the Merits

   1.  **Plaintiffs' TVPRA Claim Fails Because ORR is Fulfilling its Obligations Under the TVPRA by Implementing Careful Protocols in Response to COVID-19 and Plaintiffs' Proposed Relief Would Force ORR to Violate those Obligations**

ORR is addressing the challenges presented by COVID-19 consistently with the TVPRA's requirements.  The TVPRA imposes robust and thorough procedures on ORR, all to the end of safeguarding the welfare of children in its care, which includes both its obligation to safely and expeditiously release children to approved sponsors under 8 U.S.C. § 1232(c)(3)(A), *and* to maintain safe custody of those children under Section (c)(2)(A). ORR's procedures are particularly suited to safeguard these interests during the COVID-19 pandemic.  In fulfilling its TVPRA obligations, ORR maintains rigorous protocols for handling infectious diseases for children in care, including mandatory staff training requirements, quarantine capabilities across ORR's network of care providers that are suitable for housing children, hygiene education, and medical screenings.  *See* ORR Guide § 3.4.6.  These procedures were formalized in 2015, but have been in place even longer.  To further ensure the safety of children in care, ORR also issued extensive field guidance on the COVID-19 pandemic to its care provider network on March 2, March 13, March 19, March 20, and March 23, which implements important safety measures such as mandatory temperature checks for children and visitors; placement and travel restrictions to and from at-risk facilities; and heightened

Defendants' Opposition to TRO

medical care.  *See* Ex. R-W.  These guidelines are consistent with the approaches of state child welfare agencies who have children in congregate care, including New York and California, two epicenters of the COVID-19 pandemic.  *See* Ex. X-Y.

Plaintiffs therefore misfire in contending that COVID-19 precautions are "all but impossible" for children in ORR congregate care.  Nor have they explained why management of ORR grantee facilities should work differently from the many other types of congregate care facilities like nursing homes and long-term care facilities in the United States.  They cite CDC Guidance used for jails and prisons, but the CDC has recognized that appropriate COVID-19 measures can be implemented at certain congregate care settings, including nursing homes and long-term care facilities. https://www.cdc.gov/coronavirus/2019-ncov/healthcare-facilities/prevent-spread-in-long-term-care-facilities.html; *see also* Ex. AA ¶ 17-18, 20 (CDC declaration).

In contending that ORR is violating the TRO (Br. 13-17), Plaintiffs fail to account for these significant measures that ORR has taken.  And the arguments they do make lack merit.  Plaintiffs principally contend that continuing to keeping the UACs at issue in custody for more than 30 days violates the TVPRA's prompt-placement mandate because those children "have family or other custodians available to receive them" and "[t]hirty days should be more than enough for ORR to assess post-release risk" to them. Br. 13-14, 16-17; *see also* Br. 13-17. The TVPRA erects no 30-day requirement, and Plaintiffs have provided no factual basis for grafting one into the statute when Congress has not spoken. Rather, Plaintiffs' claims are based on mere speculation and hypothesis, citing no evidence that a significant number of periods longer than 30 days are due to improper reasons.

Plaintiffs also suggest that ORR takes longer than 30 days to release the children at issue because of "discretionary investigatory measures" or "administrative inefficiency or indifference" and that such grounds are inadequate in the circumstances here. *See* Br. 15-16.  But Plaintiffs cite no evidence to show that those reasons apply to the UACs here—let alone uniformly or on a class-wide basis.  And the evidence shows

- 13 -

otherwise, as Plaintiffs are aware given their regular *Flores* updates on ORR's population in care.

Indeed, far from showing that ORR is violating the TVPRA, the relief that Plaintiffs request itself squarely conflicts with the TVPRA. Plaintiffs ask that the Court order ORR to release a child "[a]bsent good cause based on articulable facts that available custodian(s) would harm or neglect a class member, or that an individual class member presents an articulable danger to the public." Pls. Proposed Order 1. But this standard conflicts with the TVPRA. The standard states that ORR "may not" place a minor with a proposed custodian "unless" ORR determines that the "proposed custodian is *capable* of *providing for* the child's physical and mental well-being," which "at a minimum" "shall include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." 8 U.S.C. § 1232(c)(3)(A) (emphasis supplied). Plaintiffs ask ORR to release "*[a]bsent* good cause based on articulable facts that available custodian(s) *would harm or neglect* a class member, or that an individual class member presents an articulable danger to the public." Pls. Proposed Order at 1 (emphasis supplied). That is, instead of demonstrating the ability to *provide for* the child, Plaintiffs request there simply be no articulable evidence the applicant sponsor would *harm* the child.

Plaintiffs also ask the Court to direct ORR to provide an administrative hearing to all applicants for whom a determination has not yet been made. Pls. Proposed Order 1. Such a hearing would consist of the right to examine evidence, an opportunity to submit evidence, and a hearing. *Id.* at 1-2. But Congress did not provide these rights in the TVPRA. (And the Supreme Court has already said these are not required by the Due Process Clause, *see Reno v. Flores*, 507 U.S. 292, 303 (1993) (rejecting an asserted "right to an individual hearing on whether private placement would be in the child's 'best interests'" when "institutional custody (despite the availability of responsible

- 14 -

Defendants' Opposition to TRO

private custodians) is not unconstitutional in itself.").)  There is no basis for engrafting such requirements onto the procedures here.

It is true that as of March 26, 2020, there have been four confirmed COVID-19 cases among UACs in one ORR care provider facility in New York. Ex. Q ¶ 35.  But ORR has been addressing those cases with care and expedition, including providing immediate testing of every individual suspected of exposure, quarantine, and following CDC guidance.  And importantly to the current motion seeking class-wide relief, there are no cases elsewhere in the network, and Plaintiffs have not shown that all UACs in ORR custody are at similar risk of injury.  Indeed, children in ORR care are not located in just one uniform facility, and children are not all released to comparable homes.

### 2.     The Relief Plaintiffs Seek is Barred by the *Flores* Agreement

Plaintiffs contend that ORR has violated the *Flores* Settlement Agreement (Br. 17-18), but the request for a TRO conflicts with the Agreement.  As this Court knows, that Agreement remains in force and resolved due-process claims relating to the medical care of minors while in custody as well as standards and procedures for their release. *See Flores* Settlement Agreement ¶¶ 14, 15A, 17; *Flores v. Sessions*, 2018 WL 10162328 (C.D. Cal. July 30, 2018) (rejecting effort to impose additional release procedures under *Flores* Agreement or TVPRA).  Plaintiffs are "members of the class protected under the settlement in *Flores*."  Compl. ¶ 2; Order (Nov. 2, 2018). Accordingly, Plaintiffs cannot bring claims here alleging that the policies for providing medical care and policies and procedures for release of minors violate the Due Process Clause.  *See SEC v. Randolph*, 736 F.2d 525, 528 (9th Cir. 1984) (consent decrees have the force of *res judicata*).  Instead, if there are concerns that the *Flores* Agreement is now being violated, those claims must proceed in an enforcement action in the *Flores* litigation.  *See* Order (Nov. 2, 2018) ("the interests of judicial economy counsel against permitting them to enforce the *Flores* Agreement in this action"); *id*. (citing cases laying out the "prohibition on duplicative actions").

- 15 -

Defendants' Opposition to TRO

Plaintiffs cannot avoid that limitation by asserting that their claims have been brought exclusively under the TVPRA or that the TVPRA (or *Flores* Agreement) creates rights that they can now enforce under the Due Process Clause.  As this Court has held, the TVPRA is coextensive with the *Flores* Agreement when it comes to release provisions, as "[b]oth the TVPRA and the *Flores* Agreement allow ORR to determine a proposed sponsor's suitability" and in this respect "the Ninth Circuit noted that the TVPRA's suitability requirements mirror their counterparts in the Agreement." *Flores*, 2018 WL 10162328, at *2 (citing *Flores*, 862 F.3d at 878).  The *Flores* Agreement resolved claims relating to the procedures for release, and Plaintiffs should not be re-litigating those procedures here.  *See id.*  And under the TVPRA, ORR "may not" release unless it determines that the potential custodian is capable of caring for the minor's physical and mental well-being.  The evaluation "shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child."  8 U.S.C. § 1232(c)(3)(A).  The statute thus both mandates an affirmative determination and vests the responsibility in ORR.  Plaintiffs have no basis for departing from that.

And the care provisions of the *Flores* Settlement Agreement—in Exhibit 1 to that Agreement—are far more detailed than the TVPRA.  *See* 2014 WL 7152078 (describing the medical care that must be provided to UAC).  In its July 30, 2018 order, however, the *Flores* Court ruled that this Exhibit requires medical care that complies with applicable state laws.  *See* Order 3 n.5.  Plaintiffs should be precluded from arguing here that the standards of medical care they negotiated for, and agreed to, in *Flores* are insufficient.  If Plaintiffs are no longer happy with their negotiated and agreed-to rights under *Flores*, then they should seek amendment of that agreement either through negotiations with the government or from the Court.  *See Flores v. Sessions*, No. 85-4544, ECF No. 455, at 7 (C.D. Cal. July 9, 2018) (denying the government's motion to amend the agreement, but noting that "the parties are always free to meet and confer

Defendants' Opposition to TRO

regarding any contractual amendments on which they can mutually agree"). Further, as we explain, their claims that ORR has violated paragraph 9 of the *Flores* Agreement by failing to provide "suitable living accommodations" fails on the merits (Br. 17-18), as ORR's COVID-19 protocol and procedures fully comply with existing CDC and state and local guidance, *see supra* 12-13, *infra* 18-20 (¶ 12 does not apply, because it pertains to conditions following apprehension and not for ORR licensed facilities).

### 3. Plaintiffs Cannot Succeed on the Merits Because the TRO that they Seek is Beyond the Scope of the Complaint's Allegations and is Improper for Class-Wide Relief.

Plaintiffs TRO fails for a further independent reason. To qualify for injunctive relief, Plaintiffs must also show a sufficient nexus between the injury claimed in the motion and the conduct alleged in the underlying complaint. *See Pac. Radiation Oncology, LLC. v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015); *see also Garcia v. Google, inc.*, 786 F.3d 733, 744 (9th Cir. 2015) (because of a "mismatch" between the plaintiff's substantive copyright claim and the dangers she hoped to remedy through an injunction, the district court did not abuse its discretion in denying Garcia's request for a preliminary injunction). To that end, courts have denied motions for injunctive relief that are based on allegations and claims for relief that are beyond the scope of the complaint. In *Sekerke v. Leo*, No.: 3:19-cv-0034-GPC-RBB, 2020 WL 619581, at *9 (S.D. Cal. Feb. 10, 2020), for example, the court denied plaintiff's TRO request because it was premised on events that occurred after and outside of the events that gave rise to the complaint. The court ruled that if it were to grant plaintiffs' TRO request, it "would be required to engage in a factual analysis distinct from the analysis required by the claims," which would be improper. *Id.* (citations omitted); *see also, e.g., Northern Arapaho Tribe v. LaCounte*, Nos. 60-11 & 16-60, 2017 WL 908547, at *3 (D. Mont. Mar. 7, 2017) (where TRO motion and complaint "present[ed] distinct facts and address distinct governing statutes and regulations," TRO motion fell "beyond the scope of either Complaint in this consolidated action."); *Clark v. Bank of Am. N.A.*,

Defendants' Opposition to TRO

No. 14-14-232, 2015 WL 1433834, at *8 (D. Idaho Mar. 27, 2015) (declining to consider TRO or preliminary injunction request raising "new arguments" that related broadly to the mortgage-centered conduct at the heart of complaint, but raised new, specific allegations).

The Court should reject the TRO request for the same reasons. Plaintiffs' TRO motion rests on events that occurred after and outside of events giving rise to the complaint. The complaint in this case has nothing to do with ORR's response to infectious disease or COVID-19. It does not assert that ORR's response to this crisis is inappropriate or inadequate under the TVPRA or the Constitution. And it does not lay out facts to establish that the response is improper or inadequate. And because of that, there was never any assessment of whether this Court could properly define or certify a class to address such concerns through class remedies. The complaint makes only general claims about the treatment and care of children, which cannot properly give rise to either a certification order or class-wide injunctive relief addressing COVID-19. *See* Compl. ¶ 189-90 ("As a matter of policy and practice, Defendants unreasonably and unnecessarily delay or refuse to release children to [proposed custodians]"). Similarly, the class was certified to address timing-based concerns about release; it was not certified to address requirements imposed by the TVPRA or the Due Process Clause on release relating to COVID-19 or concerns related to the spread of infectious diseases. *See* ECF No. 126 at 16-17 (certifying class where "ORR is refusing or will refuse to release to parents or other available custodians within thirty days of the proposed custodian's submitting a complete family reunification packet on the ground that the proposed custodian is or may be unfit").

Plaintiffs' TRO request bears no relationship to the ground for relief in the complaint or the basis for this Court's class-certification order. The complaint and the certified class challenge purported refusals to release minors to otherwise suitable sponsors within thirty days of receipt of a completed Family Reunification Packet, and the prayer for relief makes no mention of dramatically altering the standard governing

Defendants' Opposition to TRO

release under the TVPRA for sponsors due to a global pandemic.  And there is no nexus to the purported lack of process in sponsor denial adjudication alleged in the complaint and the TRO's request for a mass release of hundreds of children to individuals who have not been properly vetted and have not shown they will be safe sponsors under the standards of the TVPRA.  The newly alleged relief sought here must be sought, if at all, in a new complaint, not shoehorned into the existing one by requesting administrative hearings that are entirely inappropriate in a time of strained agency resources devoted to combatting the pandemic.  And any class-wide relief would need to be sought based on such a complaint and only after Plaintiffs establish that they satisfy the rigorous requirements imposed by Rule 23.

For scope reasons alone, Plaintiffs lack a likelihood of success on the merits.

### 4.    Plaintiffs Fail to Show a Due-Process Violation

As explained above, due-process claims relating to conditions and release for minors in ORR care were resolved in *Flores*, and any claim regarding enforcement of that Agreement would need to be raised in that matter under the terms set forth in the *Flores* Agreement. In any event, ORR's extensive and comprehensive response to COVID-19 satisfies the Due Process Clause.  Plaintiffs' arguments to the contrary, Br. 18-22, lack merit.

Due process requires ORR to provide Plaintiffs with adequate medical care and safe conditions.  *See Reno v. Flores*, 507 U.S. 292 (1993).  And due process bars the government from acting with deliberate indifference to a known or obvious danger. *Patel v. Kent Sch. Dist.*, 648 F.3d at 971-72 (quoting *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)).  Deliberate indifference is a high bar and recognizes the discretion of caregivers to make appropriate treatment decisions—prior cases have explained that it could be met when a caregiver denies access to medical care, interferes with treatment, or fails to respond to a child's medical needs. *Estelle v. Gamble*, 429 U.S. 971, 104-05 (1976).

Defendants' Opposition to TRO

ORR has taken extensive measures to address the risks that COVID-19 could present to the UACs in its case.  ORR has implemented a number of heightened safety precautions to ensure minors in its custody are not exposed to COVID-19 and that should those precautions not succeed, minors would receive the proper medical care. To prevent infection, ORR guidance to its network of care providers requires any UAC exhibiting symptoms consistent with COVID-19, such as coughing, fever, or difficulty breathing, at any point during their time in ORR care, to be immediately isolated and referred for evaluation by a licensed medical provider, in consultation with the local health authority.  Ex. Q ¶ 22.  Temperature checks are taken twice a day for UACs in care, with temperatures over 100 degrees requiring elevation to ORR, and visitors may not enter shelters who exhibit any of the above symptoms.  Ex T.  Further, if a UAC is recommended for testing by the health care provider or public health department, the UAC will receive testing.  Ex. Q ¶ 23.  ORR has also initiated telehealth capabilities in California and New York to ensure care provider facilities are able to provide UAC with access to medical care without having to leave their facilities. *Id.* ¶ 34.  And for the rare cases where a UAC becomes infected with COVID-19, like the four children at the one NY shelter above, full medical quarantine is available for the other children in care, and the child is guaranteed to receive appropriate medical treatment. *Id.* ¶ 35; ORR Guide § 3.4.6.

Plaintiffs cite no evidence that ORR has acted with deliberate indifference to the impact of the COVID-19 pandemic on UACs in care.  And the response shows that ORR has been extremely active and diligent.  ORR provided initial COVID-19 guidance to the entire UAC care-provider network on March 2, 2020.  Ex. R.  It provided additional guidance on COVID-19 to the entire UAC care-provider network on March 19, 21, and 23. Ex. R-W.  The mere fact that minors remain in congregate care while ORR attempts to safely and expeditiously reunify them with a qualified sponsor does not show that ORR has either failed to provide appropriate medical care required under the Due Process Clause, or that ORR is deliberately indifferent.  Plaintiffs therefore

Defendants' Opposition to TRO

cannot prevail in the due process claims either as alleged in the complaint or as reiterated in the TRO and as applied to medical care and treatment.

Given these points, there is no basis to Plaintiffs' argument that ORR has failed to provide reasonable protections from the risks presented by the COVID-19 pandemic. Br. 18-19.  Nor is there any merit to Plaintiffs' claim that ORR is subjecting the UACs at issue to "conditions that amount to punishment" or that are "excessive."  Br. 19; *see also* Br. 19-20.  As shown by the steady stream of guidance issued by ORR to address COVID-19 for its population in care, Ex. R-W, ORR's protocol for combatting the pandemic is calculated and calibrated to address the risk here—it is not excessive or unjustifiable as Plaintiffs claim.

Finally, Plaintiffs contend that ORR's failure to release the UACs at issue more rapidly violates procedural-due-process requirements for all UACs with an identified sponsor, even if the sponsor is distantly or unrelated to the child.  *See* Br. 20-22. But Congress did not provide these rights under the TVPRA, and the Supreme Court has already held that such a hearing is not required by the Due Process Clause, when "institutional custody (despite the availability of responsible private custodians) is not unconstitutional in itself."  *See Reno*, 507 U.S. at 303.  For the reasons explained above, *supra* 18-19, ORR's medical care for its UAC population during this time of pandemic fully comports with the Due Process clause, and thus, Plaintiffs' procedural Due Process claims similarly fail.

### 5. Plaintiffs Fail to Show That Their Requested Relief Will Mitigate Risk of Harm from COVID-19

Plaintiffs' request for relief is barred for another independent reason:  Plaintiffs' alleged injury—that they are subject to being exposed to COVID-19 due to their placement in congregate care—will not be redressed by ordering their release on an expedited basis to potential sponsors who have not yet been vetted. "Redressability requires an analysis of whether the court has the power to right or to prevent the claimed injury."  *Gonzales v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir. 1982) (Kennedy, J.). For

standing purposes, a plaintiff's injury is redressable where there is "a 'substantial likelihood' that the requested relief will remedy the alleged injury." *Vermont Agency of Nat'l Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (citation omitted). Plaintiffs have not carried their burden of showing that their desired relief—expedited release from ORR custody based on improperly overriding the TVPRA standard—will likely diminish their risk of exposure to COVID-19.

Notably, Plaintiffs do not articulate how release into communities or to sponsors who may already be exposed to COVID-19 will reduce the likelihood that the released minors will be exposed to or contract COVID-19.  And in contrast to ORR's careful procedures for protecting against COVID-19 transmission, Plaintiffs do not explain how a massive number of expedited releases will safely occur.  They offer no discussion of how to safely transport children from a facility that does not yet have a *single* case of COVID-19 into homes and communities that cannot make the same representation to justify class-wide relief.  They have not addressed the reality that the situation is vastly different in different parts of the country, and to the contrary, ORR is taking that into account in managing its many grantees and placements with grantees.  Ex. Q ¶ 32. Indeed, granting Plaintiffs' proposed TRO could even *increase* children's risk of exposure to COVID-19.  ORR should be permitted to fulfill its statutory mandate of assessing whether releasing a child would be safe under all the circumstances, and a blanket order requiring releases on a set timeframe would be the opposite of helping to mitigate risks posed by the COVID-19 pandemic.

Moreover, ORR provides medical care at no cost of children in its custody, including Plaintiffs.  Ex. Q ¶ 45.  By reason of their placement in ORR facilities, Plaintiffs have greater access to robust medical care than does the general public. *See id.*; ORR Guide § 3.4.6.  Aside from the increased risk of placing vulnerable children with un-vetted sponsors, ordering their release from ORR grantee care providers would leave these children without their present access to health care and could put Plaintiffs at greater risk should they contract COVID-19; at a minimum, ORR must be permitted

Defendants' Opposition to TRO

to assess whether proposed sponsors are able to provide adequate medical care. Additionally, transporting unexposed children via airlines to affect unification would *increase* their risk of exposure—the very harm Plaintiffs fear.

**B. Considerations of Harm and the Equities Cut Against a TRO**

Plaintiffs' TRO request fails on the remaining injunctive factors as well.

Plaintiffs fail to establish irreparable injury.  An injunction is "unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged []—a 'likelihood of substantial and immediate irreparable injury." *Los Angeles v. Lyons*, 41 U.S. 95, 111 (1983).   Plaintiffs contend that detaining the children at issue "in congregate facilities that are inherently unsafe in the midst of the COVID-19 pandemic rather than releasing them to available custodians violates both substantive and procedural due process."  Br. 18.  But Plaintiffs' view fails to account for the measures that ORR has put into place (and will continue to put into place) to protect the children committed to its care.  As discussed above, ORR has deployed extensive resources and efforts to address the harms that Plaintiffs claim.  Given these measures in particular, Plaintiffs have not established that residing at an ORR grantee care provider facility increases risk to UACs of exposure to COVID-19 or presents a sufficient likelihood of irreparable harm.  Moreover, many ORR grantee care provider facilities are currently far below capacity, which better enables social distancing. Ex. Q, ¶ 13-14.  Notably, States continue to consider congregate care facilities essential.[2]  Plaintiffs have not shown that Defendants are unprepared to respond to COVID-19 infections in specific grantee care facilities, let alone that they are unprepared to do so on a nationwide basis. Indeed, as shown above, ORR has robust procedures in place to protect children from the disease and provide any needed medical treatment.  Further, the CDC indicates that "children do not appear to be at higher risk for COVID-19 than adults; . . . adults make

---

[2]  *See, e.g.,* https://www.gnyha.org/news/executive-order-identifies-essential-health-care-operations/

Defendants' Opposition to TRO

up most of the known cases to date."[3]  Plaintiffs are not entitled to immediate release to un-vetted applicant sponsors or to a transfer in facilities based on a conjectural injury that defies the known facts.  As to the equities, the public interest favors not disturbing ORR's careful and adaptable response to this situation, especially where release threatens the public interest and increases health risks to the very children who Plaintiffs purport to help.

Finally, Plaintiffs have not satisfied the standard for a mandatory injunction. "Where a party seeks mandatory preliminary relief that goes well beyond maintaining the status quo pendent lite, courts should be extremely cautious about issuing a preliminary injunction."  *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 675 (9th Cir. 1984); *see also Committee of Cent. Am. Refugee v. INS*, 795 F.2d 1434, 1442 (9th Cir. 1986).  For mandatory preliminary relief to be granted, the plaintiff "must establish that the law and facts *clearly favor* [the plaintiff's] position."  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (emphasis in original).  That is, the showing necessary to obtain an injunction that alters the status quo is higher than the showing necessary to merely preserve the status quo.  *See*, *e.g.*, *id.*  Plaintiffs fall far short of making the necessary showing—their TRO motion is beyond the scope of the facts alleged in the complaint, it is unripe, it is not based on a class certified for the claims that Plaintiffs now make, it fails to show a likelihood of success on the merits, it fails to show irreparable injury, and it fails to show that the balance of the public interest factors favors them.  Plaintiffs have failed to show that the facts and law "clearly favor" their position, so as to justify a mandatory injunction.

## IV.   CONCLUSION

In consultation with a host of federal, state, and local public health authorities, ORR is working day and night to reduce the risk to UACs posed by COVID-19, while complying with ORR's statutory mandate to release these children to safe sponsors as

---

[3] https://www.cdc.gov/coronavirus/2019-ncov/faq.html

Defendants' Opposition to TRO

soon as it is safe to do so.  Plaintiffs' requested TRO would cause the agency to violate the TVPRA, undercut the agency's prodigious efforts, and *increase* the risk of harm to these children.  The Court should deny the TRO motion.

Defendants' Opposition to TRO

DATED: March 27, 2020                           Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

SCOTT G. STEWART
Deputy Assistant Attorney General
AUGUST E. FLENTJE
Special Counsel

BY:  */s/ Ernesto H. Molina, Jr.*
ERNESTO H. MOLINA
JEFFREY S. ROBINS
Deputy Directors,
Office of Immigration Litigation

BENJAMIN MARK MOSS
W. DANIEL SHIEH
Senior Litigation Counsel

MARINA C. STEVENSON
ANTHONY J. MESSURI
JONATHAN K. ROSS
Trial Attorneys
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-9344
Facsimile: (202) 305-1890
Email: Ernesto.H.Molina@usdoj.gov

*Attorneys for Defendants*

- 26 -
Defendants' Opposition to TRO