1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3      HONORABLE DOLLY M. GEE, JUDGE PRESIDING

4  LUCAS R., ET AL.,                    )
                                        )
5                                       )
                                        )
6                      Plaintiffs,      )
                                        )
7                                       )
                                        )
8          Vs.                          )  No. CV18-05741-DMG
                                        )      CV85-05741-DMG
9                                       )
                                        )
10  ALEX AZAR, ET AL.,                  )
                                        )
11                                      )
                                        )
12                     Defendants.      )
                                        )
13  _____    )

14

15

16      REPORTER'S TRANSCRIPT OF VIDEO PROCEEDINGS

17      FOR CASE 85-4544 AND RELATED CASE 18-05741

18              *VIDEO TELECONFERENCE*

19            FRIDAY, MARCH 27, 2020

20

21

22          MIRIAM V. BAIRD, CSR 11893, CCRA
          OFFICIAL U.S. DISTRICT COURT REPORTER
23          411 WEST FOURTH STREET, SUITE 1-053
              SANTA ANA, CALIFORNIA 92701
24              MVB11893@aol.com

25

```
1                    A P P E A R A N C E S

2

3    IN BEHALF OF THE PLAINTIFFS,    PETER A. SCHEY
     JENNY L. FLORES, ET AL.         CENTER FOR HUMAN RIGHTS AND
4    AND LUCAS R, ET AL.:            CONSTITUTIONAL LAW
                                     256 SOUTH OCCIDENTAL
5                                    BOULEVARD
                                     LOS ANGELES, CA 90057
6
                                     LEECIA WELCH
7                                    NATIONAL CENTER FOR YOUTH
                                     LAW
8                                    1212 BROADWAY, SUITE 600
                                     OAKLAND, CA 94612
9

10

11

12   IN BEHALF OF THE DEFENDANT,     SARAH B. FABIAN
     ALEX AZAR, ET AL.,:             US DEPARTMENT OF JUSTICE
13                                   OFFICE OF IMMIGRATION
                                     LITIGATION
14                                   PO BOX 868 BEN FRANKLIN
                                     STATION
15                                   WASHINGTON, DC 20044

16                                   SCOTT G. STEWART
                                     US DEPARTMENT OF JUSTICE
17                                   950 PENNSYLVANIA AVENUE NW
                                     WASHINGTON, DC 20530
18

19
     ALSO PRESENT:SPECIAL MASTER ANDREA ORDIN
20   REBECCA TARNEJA
     CARLOS HOLGUIN
21   KATHERINE MANNING
     HOLLY HOOPER
22   NEHA DESA
     DAISY FELT
23   SUMMER WYNN
     BRENDA SHUM
24   AUGUST FLENTJE
     CARTER WHITE
25
```

UNITED STATES DISTRICT COURT

```
1        LOS ANGELES, CALIFORNIA; FRIDAY, MARCH 27, 2020; 2:00 P.M.

2                              ---

3

4        THE CLERK:  Calling CV85-4544, Jenny L. Flores

5   versus William Barr, et al., and Lucas R., et al., vs. Alex

6   Azar, et al.

7        Your Honor, we're ready for you.

8        THE COURT:  All right.  Thank you.  Hello everyone.

9   This is my first video conference hearing.  So I want to just

10  set some ground rules to make sure that we can hear everybody

11  and so that the court reporter can take down who is speaking

12  at any given time.  Please remember that when you speak, to

13  state your name before you speak.

14       I received a lot of filings in the very recent few

15  hours and I've read them.  Obviously, I've read the Lucas R

16  papers with greater attention since the Flores opposition was

17  just filed fairly short time ago.  But I wanted to ask if the

18  parties would stipulate that the Court can use the

19  declarations filed in Lucas R for the Flores case and vice

20  versa?  Subject to any evidentiary objections, of course.

21       MR. SCHEY:  This is Peter Schey for the plaintiffs

22  in Flores.  That's fine for plaintiffs in Flores.

23       MR. STEWART:  Scott Stewart for the government,

24  Your Honor.  With the caveat Your Honor noted subject to

25  objections, that's fine with the government.
```

1          THE COURT:  All right.  Thank you.  So I'm mindful

2    of the fact that some of you are calling on East Coast time.

3    It's 5:00 o'clock there.  I want to cut to the chase.  There

4    is no need for a long discussion about the COVID-19.  I'm

5    well aware of it.  Obviously, it's in both sides' papers.

6    We're all living through it.  The reason why we're having

7    this video conference is because of the serious public health

8    emergency.  In fact, the courthouse is closed to the public.

9    So I'm well aware of the emergent nature of the situation.

10   So we don't need to waste time on that.

11          In fact, two weeks ago -- almost two weeks ago, I

12   asked my special monitor to contact you folks to make sure

13   you were geared up for addressing this emergency.  I didn't

14   really mean gear up for litigation.  I meant gearing up for

15   the addressing of the problem, but here we are.  We have two

16   TROs.  So let me tell you what my thinking is on it to begin

17   with.  With all due respect to the plaintiffs in Lucas R, you

18   did a monumental job of putting together a lot of information

19   for the Court in a short time, but I'm going to focus this

20   hearing primarily on the Flores TRO application, because to a

21   certain extent, I think that the issues raised in the context

22   of Lucas R are kind of like trying to fit a square peg into a

23   round hole.

24          So I'm going to try to address the -- but both

25   sides -- both cases are concerned about through the Flores

1    TRO application.  As I said, I have read through the papers,

2    and, as you know, I'm obviously familiar with all of the

3    various orders I've issued in the past, which cover many of

4    these subjects already.  So my initial thinking is that I am

5    going to deny the TRO with respect to the request for an

6    order that the ORR release minor class members, because I

7    don't think that plaintiffs have shown that the ORR is not in

8    substantial compliance with the safe and sanitary

9    requirements of the Flores agreement.  By releasing, I mean

10   en masse, releasing them right away.  I don't think that's

11   responsible given the current environment.  I think there

12   needs to be an orderly process.

13          So that gets me to that aspect of the TRO that I'm

14   granting, which is that plaintiffs have shown that both ICE

15   and ORR appear to have failed to comply with the Flores

16   agreement and for that matter, my prior orders' requirements

17   to make and record continuous efforts to release class

18   members and place them in suitable homes, whether it be with

19   guardians that are listed in order of preference under the

20   Flores agreement or in non-secure licensed facilities.

21          I also am going to grant the plaintiffs' TRO

22   request to the extent that they have shown that ICE may not

23   have been in substantial compliance with CDC guidelines, such

24   that ICE facilities may not be safe and sanitary for the

25   purposes of the current crisis.

1          So with that, I will open up any comments that

2     counsel for Flores would like to make.  Then I'll hear from

3     the defendants.

4          Mr. Schey.

5          MR. SCHEY:  Yes, this is Mr. Schey.  Thank you very

6     much, Your Honor.  Thank you for reading the materials on

7     such short order.  I guess, a couple of things.  One thing we

8     would like the Court to consider, and I'm not sure based on

9     what the Court has said up to now, it just wasn't clear if

10    the Court would consider it or not consider it, but in

11    paragraph five of the proposed temporary restraining order,

12    we make reference to certain data that I think the Court

13    contemplated the defendants would be collecting, because in

14    its order appointing the special master at Section V1, the

15    Court had said if the special master requests the following

16    kind of data, you shall give it to her.

17         That data I identify it in paragraph five, although

18    I incorrectly identified a paragraph lower case Roman Numeral

19    2, 1 through 6, which actually applies to CBP, so I would

20    actually drop that from the request.  The balance of that

21    material that the Court obviously contemplated the government

22    would be collecting, and it seems to me if the -- if the

23    defendants were actually complying with the Court's previous

24    orders, they would be collecting this kind of data and -- and

25    it -- it included, for example, in their V1C, and then three,

1    it includes things like the dates on which the option for

2    these was explained to defendants.  The dates on which the

3    class member -- if a parent opted out her class member child,

4    the date that that happened.  The dates on which efforts were

5    made and recorded by defendants to release, et cetera.  So

6    it's about five or six things.

7              We just think it would be enormously helpful if in

8    a temporary restraining order the Court could indicate that

9    that that kind of data should be shared with both the special

10   master without her requesting it in this emergency situation,

11   and it should also be shared with class counsel.  I think

12   that would go a long way towards encouraging compliance with

13   the terms of the settlement paragraph 14, paragraph 18,

14   paragraph 19, but particularly paragraph 14 -- it would go

15   toward a long way of encouraging government to actually

16   comply if they have to share data showing that they are

17   complying with plaintiffs' class counsel.

18             The Court has previously enhanced the reporting

19   requirements.  I unfortunately don't recall when the Court

20   did it, but previously, the government was required to give

21   us certain data every six months, and the Court then required

22   that they do it every month.  They have been doing that.

23   There have been -- there are some ongoing disputes about it,

24   but it does not include any of this kind of information that

25   they -- the data that we get on a monthly basis.  It's

```
 1   confidential.  We don't disclose it to anybody.  We just use
 2   it for monitoring purposes.  The data we do already get is
 3   name, place of birth, date of birth, date of apprehension,
 4   and date of placement.  Every time that kid is moved from one
 5   facility to another, we do get that data.  What we don't get
 6   is any data that efforts could be made to comply with
 7   paragraph 14.  So that is something that -- that we would
 8   like the -- the Court to consider.
 9         The other two parts we had in there, paragraph 6
10   and 7, paragraph six, really just involves -- again, the
11   language for this is in the settlement, but the declarations
12   that we have filed, particularly the three declarations
13   really the most knowledgeable people about the ICE facilities
14   because they run programs at that facility -- at those
15   facilities that provide legal services for the families
16   there, including the children.  They have indicated in their
17   declarations that when people get transferred or moved, they
18   often do not get advance notice of that, which paragraph 27
19   says they should.  In these times where kids may be moved
20   from one facility to another possibly because of the current
21   crisis situation, just keeping their lawyers informed of
22   where these kids are moved to, would, I think, be important.
23         Finally, we would just encourage the paragraph H,
24   which really is fairly soft to the extent it says to the
25   extent that just maximum extent possible that to the extent
```

```
 1   that children are not released, that the defendants and maybe
 2   it would just be ICE, maybe ICE and ORR, but the defendants
 3   comply with those A through whatever it -- A through H with
 4   those provisions.  Again, we -- it was relatively soft
 5   declaration in the sense that we didn't say you have to
 6   comply in a hundred percent of the cases.  We just said to
 7   the maximum extent that it is possible, you do those things
 8   outlined in A through H.
 9            So those are the only comments that I would make,
10   Your Honor.
11            THE COURT:  Before we move on to comments from the
12   defense.  I'm going to ask my court clerk whether we can stop
13   any people from coming onto the conference late because it
14   keeps causing the audio for the person speaking to go out,
15   and I'm sure the court reporter is having a hard time hearing
16   when that happens.
17            THE CLERK:  Your Honor, I don't think we can stop
18   calls from coming in.  What we could do is once the Court is
19   speaking, if they do hear that, beep repeat that sentence
20   again.  Remind everyone that just joined in, if you're not
21   speaking, please mute your phones.  That keeps the feedback
22   down.  Thank you.
23            THE COURT:  All right.  Who from the defense would
24   like to speak at this time?
25            MS. FABIAN:  Your Honor, this is Sarah Fabian for
```

1    the defendants.  Would it be possible for me to ask a

2    clarifying question to focus the comments that I think might

3    be the most helpful here?

4              THE COURT:  Sure.

5              MS. FABIAN:  Specifically, it would be -- I -- I

6    want to understand -- I understand that the Court is granting

7    the TRO in part.  Is the -- is that grant tied to specific

8    injunctive relief that you intend to require the government

9    to follow, because understanding what the Court expects of

10   the government in response to that grant would be very

11   helpful for me to focus the information that I think might be

12   helpful to respond.

13             THE COURT:  All right.  Well, this is tentative.  I

14   haven't obviously put all of this in writing yet, but these

15   are my current thoughts:  That would be to require the

16   defendants to make a record of continuous efforts to release

17   class members or place them in suitable -- with suitable

18   custodians or with -- in the list of preferences that is

19   identified in paragraph 12 of the Flores agreement.

20   Enjoining defendants from keeping minors in congregate

21   custody either by ORR not promptly releasing minors to fit

22   custodians or ICE continuing to detain minors without

23   justification for more than 20 days, which this Court has

24   already previously ordered in prior orders.  For minors who

25   remain detained in congregate settings that ICE implement to

1    the maximum extent possible the CDC interim guidance on

2    management of COVID-19 in detention facilities.

3              MS. FABIAN:  Thank you, Your Honor.

4              THE COURT:  There are some other thoughts that I

5    have with regard to the monitoring, which I will share with

6    you in a moment, but that's kind of the gist or the most

7    substantive part of what I'm trying to tell you is going to

8    be in the order.

9              MS. FABIAN:  Thank you, Your Honor.  That's very

10   helpful.  With regard to the make and record, I think the

11   government would dispute Your Honor's finding, but I do think

12   that is something that has been for ICE, at least, the

13   subject of -- already the subject of some monitoring by

14   Ms. Ordin.  It is something that we have been reporting to

15   her.  I know that the focus of the monitoring has gone to

16   other issues more recently, but that is information that we

17   have shared with her and continue to share with her.  I think

18   that, you know, we would -- we would -- of course, this TRO

19   process has been a very quick turnaround for the government.

20   We would -- we would welcome the opportunity to present more

21   evidence on that topic, but I think that being the subject of

22   ongoing monitoring already, the best forum to address that

23   might be through continuing to work with Ms. Ordin on that

24   particular issue.

25              As far as --

1          THE COURT:  Let me just interrupt you for a moment

2     so that I can be more clear.  I am particularly concerned

3     about the statistics showing that there are large numbers of

4     minors who remain in custody, hundreds of them, in fact, for

5     four months or five months or more.  So the objective of this

6     order is for the government to show cause why those minors

7     have not been placed.

8          MS. FABIAN:  Thank you, Your Honor.  I share your

9     concern with those numbers, but my primary concern is that

10    they are -- the little I know of them right now, they are

11    just incorrect.  I -- as you note on page 23 of our brief,

12    we -- we tried to look at the numbers very quickly to see if

13    we could provide Your Honor with -- with corrections.  We did

14    not have the time to pull updated or corrected information,

15    but what we do know is that the baseline number of numbers in

16    custody is incorrectly determined, and we can only presume

17    then that the rest of the calculations may likely rely on

18    other -- you know, misunderstandings of the data.  I -- I --

19    so I understand Your Honor's concern with those numbers.  I

20    can't give you other numbers now, but what I can say is that

21    with more time, I think ICE would like the opportunity to be

22    able to -- to look and see and to provide their own numbers

23    there to see if we can't reconcile those numbers.

24          THE COURT:  What about ORR?

25          MS. FABIAN:  For ORR, I think it's a different

```
 1    issue.  As far as make and record, that is -- that is
 2    something that occurs on a -- well, let me ask this -- I
 3    guess, Your Honor, if -- if I understand then Your Honor to
 4    be saying the same concern is the length of time in custody
 5    in ORR, I'm not sure that plaintiffs have really presented
 6    any evidence on that topic.  Their evidence on that topic is
 7    somewhat speculative as far as the reasons for longer care.
 8    I think what they state as far as the reasons for longer care
 9    is not consistent with our understanding of children in care,
10    but, you know, what I would say on that is -- I think when
11    Your Honor references the 20 days, that 20-day ruling was
12    with regard to unlicensed facilities.  ORR facilities are
13    licensed.  So they're not -- the 20-day limitation was based
14    on the expeditiously as possible portion of the order
15    relating to unlicensed facilities.
16             So the --
17             THE COURT:  I understand that.  I think the -- I
18    think the standard is prompt.
19             MS. FABIAN:  It is prompt.  In Your Honor's
20    July 30th order, the decision was that it had to do with
21    whether the minors were released without unnecessary delay as
22    required by paragraph 14.  In that order, the parties were
23    talking about specific requirements that ORR had placed
24    related to determining suitability of the minors under
25    paragraph 17, and it -- in that -- in looking at those
```

1    provisions, the Court found that -- that ORR had not been

2    engaging in unnecessary delay.  I think what -- what I don't

3    see in plaintiffs' motion is any evidence that due to

4    COVID-19 or due to any emergent issues now, there are new or

5    different concerns about the time and the processes that ORR

6    is using to release.

7            I think -- if there are --

8            THE COURT:  Let me ask you this, Ms. Fabian:  Since

9    the plaintiffs don't necessarily have access to the

10   statistics, which, I guess, is the point of Mr. Schey's

11   request that you provide that type of information.  What we

12   do know at least as of February of 2020 is that there were

13   over 3,000 people in ORR custody.

14           Now, if you're saying that those 3,000 people have

15   been there for only less than 30 days, then that would be one

16   thing.  If they've been there for more than 30 days or any

17   subpart of that number, then that is of concern as well.

18           MS. FABIAN:  Your Honor, I -- I guess I would say

19   there's been nothing in this case that has imposed any sort

20   of inherent 30-day limitation on ORR custody.  I understand

21   the concerns with --

22           THE COURT:  I'm not suggesting that there is

23   anything that specifically says 30 days.  I'm just -- I'm

24   using that as kind of a broad marker for what may or may not

25   be prompt.

1           MS. FABIAN:  Your Honor, I -- I understand that.  I

2     don't think that we've ever litigated or briefed the issue of

3     what would be part of the -- a prompt requirement.  I

4     think 3,000 children in custody is -- is a very low number

5     for ORR number, in fact, right now.  ORR's -- has a very low

6     percentage of its overall beds.  You know, intakes are

7     reduced now as part of the response to the pandemic.

8           So I couldn't say -- I wasn't able to gather

9     information in this short time sort of what the range of

10    reasons are for any children who are remaining in care.

11    However, what I would say is that there -- the evidence that

12    plaintiffs are relying on is entirely speculative.  It is

13    sort of a supposition that there are available sponsors for

14    these children.  I think that where there are available

15    sponsors, ORR is taking steps to expeditiously release.  ORR

16    has no equities in keeping the children in custody.

17          I think on a case-by-case basis, when issues are

18    brought with delays in release to our attention, that we have

19    dealt with them in various circumstances.  I think -- the

20    only recent order from this Court was, in fact, that the

21    suitability analysis that ORR was conducting were consistent

22    with the agreement.  So I -- I -- I don't believe that

23    plaintiffs' motion brings up any new reason to find that

24    there are delays or unnecessary delays or, you know, that --

25    that ORR's releases and process for release is anything but

```
1    prompt.

2            THE COURT:  All right.  Well, Ms. Fabian, I cannot

3    tell the plaintiffs to come up with data that they don't have

4    because you won't give it to them.  The issue here, separate

5    and apart from the TRO, is that there is a concern in this

6    current climate with COVID-19 that congregate facilities may

7    be causing problems for maintaining safe and sanitary

8    conditions.  So that is at least a serious question.  If

9    there are over 3,000 in ORR custody.

10           Now, I understand that that we're not talking about

11   one facility.  We're talking about many facilities throughout

12   the country.  So plaintiffs have not done a particularly good

13   job of separating out what facility might be overcrowded or

14   may have more people than can apply the CDC guidelines.  I

15   understand that.  But they also don't have the information.

16   I can't sit here and say, let's just ignore it because we

17   don't know what the numbers are.

18           I have the obligation to oversee the implementation

19   of this agreement.  So if they have raised a serious

20   question, then you should probably give us some information

21   about what the snapshot looks like.  I'm not necessarily

22   going to say you have to do that on a daily basis, but at

23   least let us know in this current crisis what it looks like

24   on the ground.

25           MS. FABIAN:  Your Honor, I -- I understand the
```

1    Court's concern.  I -- I -- I would say, you know, first and

2    foremost, we are talking about the agreement.  The agreement

3    is the plaintiffs would be given certain information.  So to

4    the extent the plaintiffs don't have information they didn't

5    bargain to receive, that is not a violation of the agreement.

6    It is simply the consequences of the bargain that they

7    struck.

8              As far as providing information about -- I mean,

9    congregate care is not in and of itself a violation of the

10   agreement either.  I understand the concerns.  I think that,

11   you know, to the extent the Court intends to order monitoring

12   of that and require the provision of the information

13   consistent with the order that the Court has previously

14   issued that monitoring by Ms. Ordin would be consistent with

15   this Court's prior orders.  That providing that information

16   to Ms. Ordin, you know, subject to that type of order would

17   be consistent with the Court's prior orders.  There is --

18   providing additional information adding provisions to the

19   agreement that require the provision of additional

20   information to plaintiffs is an entirely separate thing and

21   would expand the agreement and would seem inconsistent with

22   this Court's prior statements that plaintiffs are entitled to

23   only the bargains that they struck in --

24             THE COURT:  Have you been providing that

25   information to Ms. Ordin?

1      MS. FABIAN:  Well, MS. Ordin is not currently

2      set -- I mean, the monitoring order, as far as ORR, is

3      limited to the Court's July 30th order.  So that, you know,

4      to the extent we're talking about new claims of violation and

5      new issues as far as congregate care, if the Court believes

6      that there are monitoring issues related to Flores and the

7      method of providing congregate care, you know, I think --

8      it's not our position at this time that that -- that is the

9      subject of Ms. Ordin's monitoring scope, but --

10      THE COURT:  Well, obviously, I'm not going to say

11      that every detention facility has to close down because it's

12      congregate care.  My concern here is that there is

13      noncompliance with -- potentially noncompliance with prompt

14      release of minors pursuant to the agreement.  So the only way

15      that I can determine whether or not that is true -- maybe

16      it's not true.  I don't know.  The only way that I can

17      determine if that is true is for you to provide information,

18      whether that's to Ms. Ordin alone or to Ms. Ordin and the

19      plaintiffs, I'll have to think about that.  The issue is that

20      you have the data and nobody else does.

21      MS. FABIAN:  I do believe -- I certainly defer to

22      Ms. Ordin.  I do believe that she has received information

23      regarding times in custody in ORR over the period of

24      monitoring, and that we have had discussions about that.  I

25      do believe that Ms. Ordin recently spoke with the juvenile

```
1    coordinator for ORR or at least -- perhaps, they were not

2    able to connect, but I know that.  So -- so I do -- I do

3    believe that that is information that to some extent has been

4    provided to Ms. Ordin and that could be provided going

5    forward particularly with regard to, you know -- I -- again,

6    I defer to Ms. Ordin, but I believe that our juvenile

7    coordinator has been very forthcoming with that sort of data

8    upon request.

9          So I -- I think if there is a way forward,

10   certainly with Ms. Ordin, that we can provide more

11   information that would help look into that issue.  I think

12   that is something that would be consistent and -- and easily

13   done relative to the way that things have been proceeding.  I

14   think our -- our objection as far as the TRO is whether there

15   is anything in the TRO that establishes that the time of

16   custody has -- has changed or that there is any inherent

17   violation, because the same procedures are being followed,

18   but now they're being followed during the current crisis.  I

19   think that -- that that alone does not provide a basis to

20   find that existing procedures that were otherwise consistent

21   with the agreement are now in violation.

22          THE COURT:  Could you please state for the record

23   the name of the juvenile coordinator for ORR.

24          MS. FABIAN:  Her first name is Aurora.  I cannot

25   off the top of my head remember her last name.  Ms. Ordin is
```

smiling.  She may remember.

THE COURT:  Except we can't hear Ms. Ordin.  I will get Ms. Ordin's response later.

Now we can hear Ms. Ordin.

MS. ORDIN:  It's Aurora Maese, M-a-e-s-e.  I can add also that we had a two-day meeting scheduled for March 16th and March 17th in which I was asking specifically, and they were going to give me very specific hour-long meetings based upon length of stay, placement, and various other positions in particular the medical side.  Because of the crisis, that trip was canceled.  The -- my own theory of working with Aurora Maese is that I would be setting up hourly telephonic conferences to try to obtain that material.

On a regular basis, the only material I get is the material the plaintiffs get, the monthly reports about length of stay.  So anyways, I think the process interfered with being able to get just exactly the information the plaintiffs have been wanting.

THE COURT:  All right.  Is there anything else you would like to address, Ms. Fabian?

MS. FABIAN:  Your Honor, I do want to reiterate my concern with the potential of ordering release within -- particular -- within 20 days, particularly with regard to ORR.  I think the 20-day time limit was ordered with regard to the expeditiously as possible provision related to

```
 1    unlicensed facilities.  So I want to highlight that there is
 2    no applicability of that 20-day timeframe to the licensed
 3    facilities managed by ORR.
 4          I -- I want to note -- and it may -- it --
 5    depending on the Court's intention here, I have
 6    information -- I want to stress that the government's
 7    response to these issues is -- is sort of rapidly evolving.
 8    So, you know, with a very short turnaround time, I think we
 9    submitted information that was prepared for some other cases
10    to give Your Honor the best that we could do as far as giving
11    information about the conditions.  I understand Your Honor is
12    not finding that ORR is in violation as far as conditions.
13          I want to highlight the applicable CDC order here
14    is the CDC order relating to detention facilities and
15    congregate care facilities and not the CDC order that is
16    federally applicable that was focused upon by plaintiffs.  So
17    to the extent the Court intends to order ICE to comply with
18    the CDC, I would request or would urge that the Court order
19    that compliance to be with the CDC order that we submitted.
20    I believe it's Exhibit L to our opposition filing.
21          I also want to note that just 48 minutes before
22    this hearing I got an e-mail with, you know, five bullet
23    points of additional measures that ICE is undertaking with
24    regard to implementing various measures providing for more
25    space.  You know, I'm happy to read them here for the Court
```

```
 1    or to submit supplemental filings on those measures.  I think
 2    the rapidly evolving nature of these steps that ICE is taking
 3    and the steps that the -- is being highlighted by the fact
 4    that, you know, even between our filing and this hearing,
 5    there were additional improvements to the steps that ICE is
 6    taking in its facilities.
 7            THE COURT:  Yes, I understand that, Ms. Fabian.  I
 8    appreciate that it is a fluid situation.  I know that things
 9    change probably on a daily basis.  I would have preferred
10    that the parties had continued to work with the special
11    monitor to try to work through these issues, rather than deal
12    with litigation in the midst of all of this, but that is what
13    I've been presented.  So there's nothing to prevent the
14    parties, however, after this hearing, to continue their
15    efforts to try to resolve these issues in as expeditiously
16    way as possible.  I think that issuing orders is a blunt
17    instrument.  It is not tailored to some of nuances that exist
18    in this current environment.  So it's not my favorite
19    approach, but it is a crisis.  So I think we need to attend
20    to some of these issues that have been raised.
21            With regard to what you consider to be prompt,
22    Ms. Fabian, do you have some thought as to what "prompt"
23    means?
24            MS. FABIAN:  Your Honor, with regard to -- if
25    we're -- if you're asking with regard to ORR, I think the
```

1    important consideration -- and I know this is an -- is an

2    answer for -- a very lawyerly answer, it will certainly

3    depend on the circumstances of the child's case.  I think as

4    a general matter, there are steps that both Flores and TVPRA

5    require and other cases that they permit.  Those are designed

6    to ensure the safety of the release.

7         I think Mr. Schey referenced in his filing a case

8    where recently we were able to work together and have a child

9    released to his father in only a few days.  That was a case

10   where the child had been with his father previously and came

11   into ORR custody through -- through a series of events, but

12   it was -- it was a positive outcome.  In that case, ORR was

13   able to release the child back to his father quickly.  I

14   think that was a -- a -- an example of where the parties

15   worked together on these issues.  It -- it does work well.

16   Ms. Ordin was involved in that as well.

17        I think as a general matter, prompt is as quickly

18   as ORR can do so while ensuring to take the steps necessary

19   to ensure the safety of the child.  That is the steps

20   required by the TVPRA to ensure that there is a suitable

21   custodian for release.  I think that some of the issues

22   raised by plaintiffs in their briefing involving danger and

23   flight risk, to the extent -- I think many of those may have

24   been intended to refer to ICE custody rather than ORR

25   custody, and not resolved in many ways by this Court's order

```
1    and the Ninth Circuit's order regarding bond hearing.  I

2    don't believe that sort of the danger aspect is an issue for

3    releases from ORR at this time.  I think that it really is

4    how quickly can ORR conduct the safety and suitability

5    analysis that ensures that the child is going to a suitable

6    custodian.

7             I -- I would acknowledge in this time, there may be

8    other issues that are going into those analyses.  I'm not

9    aware of it.  You know, if there are specific cases of that,

10   I certainly welcome anyone to bring those to my attention.  I

11   will work with ORR on them.

12            THE COURT:  Mr. Schey, that actually raises a

13   question that I had.  That is, if you're aware that there are

14   minors who have suitable custodians and yet have not been

15   placed by them, why is it not feasible for them to simply

16   utilize the procedure that is provided in the Flores

17   agreement to seek a --

18            MR. SCHEY:  Yeah.  That's a good question.  Can you

19   hear me okay, Your Honor?

20            THE COURT:  I can hear you.

21            MR. SCHEY:  Okay.  Perfect.  Yeah.  I'd like to

22   answer that question.  Also just add a couple of other

23   details, if I may.  One is that to the best -- the data that

24   we do get and we do have ongoing disputes with them about the

25   scope of this data, but that's for another day.  But the data
```

1    that we do have, the most recent data that we have been able

2    to analyze with regards to ORR, which was data at the end of

3    January.  So we were able to analyze it in February.  We have

4    no real reason to believe that this would be any different in

5    March or December of 2019.

6         What that data indicates is that in ORR custody,

7    about 15 percent, that is 1, 5.  15 percent of the detained

8    minors were therefore 61 to 90 days.  About 31.9 percent.

9    This is data analyzed for us by folks at Stanford University.

10   It seemed pretty competent.

11        THE COURT:  Is this in the record?

12        MR. SCHEY:  You know, I'm happy to submit this.

13   It's not in the record.  So just for information for the

14   Court.  But I am happy to submit this report that I have, a

15   written report from Stanford that has analyzed the January

16   data.  What it indicates is 31 percent were there for 31 to

17   60 days.  15 percent were there for 61 to 90 days.  Seven

18   percent were there from 91 to 100 days.  Approximately,

19   3.9 percent were there for 121 to 150 days.  Then the

20   percentage gets smaller.

21        But just to give a sense that -- by the way, the

22   data that I put into my declaration, that comes from the data

23   that they gave us for February.  So that -- the Stanford

24   folks had not had time to analyze that for us yet.  I

25   analyzed that pretty carefully.  And so the data that I gave

1   to the Court about the length of detention of those children,

2   that came directly from the data that shared with us in -- in

3   February.  So I -- I think it's pretty accurate.

4           THE COURT:  Mr. Schey, I think the question is

5   about ORR data.  The data that you supplied for ICE is broken

6   down by time period.  So that is much more --

7           MR. SCHEY:  Exactly.

8           THE COURT:  The ORR data is not as explicit.

9           MR. SCHEY:  Yeah.  I'm happy.  I mean, I could file

10  this as soon as we get off the call.  It's a -- it's about a

11  five-page report.  And it -- it looks at from ten different

12  ways.  So it is interesting.  I would be happy to -- like I

13  said, I could just this report with the -- it's managed by a

14  Dr. Nancy Wang, who is one of the experts.  One of our expert

15  declarations, although her declaration doesn't go to this

16  data management stuff.  I'm happy to submit it to the -- to

17  the Court.

18          Now, you know, with regards to this business about

19  the data, I would just circle back to this:  That getting the

20  data from the government about which we get every month about

21  sort of length of stay, how long was a kid in defendant's

22  custody and were they moved?  You know, when did they go from

23  border patrol to ICE or to ORR.  If they were in ICE, when

24  were they moved from one facility to another facility, and

25  same with ORR.  If they were in ORR custody, when were they

1    moved from one facility to another facility?  We get this for

2    every single kid in custody.  So it's quite granular.  I

3    mean, you know, it would be thousands -- it's a spreadsheet

4    with thousands of rows on the spreadsheet.

5             The underlying problem, at least from the

6    standpoint of our -- the way that we look at this as

7    plaintiffs' counsel, the underlying problem is that data

8    tells us nothing about why a child was not released.  It

9    tells us nothing about the efforts that were being made.  The

10   settlement specifically says at paragraph 14 and 18,

11   specifically says that the government is supposed to make and

12   record continuous efforts really from the time of

13   apprehension, let's leave border patrol out of this for a

14   second.  It says from the time of apprehension, it is

15   supposed to make and record continuous efforts aimed at the

16   release of children without unnecessary delay is the

17   language.

18             But -- and so if they're making an -- so the

19   settlement requires that they not only make these efforts, it

20   specifically says make and record.  So if they're recording

21   that information about the steps that they're taking, they're

22   obviously going to record well, who took the steps.  I mean,

23   you would think so.  You would think they would record the

24   time, the date that they took those steps.  You would think

25   that they would record the results that, you know, we called

 1    the sponsor.  The sponsor didn't pick up.  We told the

 2    sponsor we need X.  We need an affidavit.  They haven't

 3    gotten it to us.  You would think that logically that to

 4    implement the steps that the settlement calls for, which is

 5    efforts aimed at the release, and that you've got to record

 6    those efforts, then it shouldn't be the end of the world for

 7    the government to share that information with us.  It's all

 8    confidential.  Just like the data they already give us is

 9    confidential, which includes name, it includes date of birth,

10    place of birth.  That's all confidential.  We don't -- we

11    never made that public.

12         You would think that it would be not that difficult

13    for them to give us that information, which would then really

14    put us -- for really the first time, it would put us in a

15    position to be able to have an intelligent discussion with

16    the government to say, look, in these 20 cases or whatever it

17    is, 50 cases, a hundred cases, we totally agree with you.  We

18    can see why it took even 60 days, 70 days, 80 days to release

19    a kid.  We can see that you're making reasonable steps to

20    release this kid.  It's not your ineptitude or your lethargy

21    or your ignoring the settlement.

22         On the other hand, with these 30 or 40 cases, we

23    think there's a big problem.  We could then at least have an

24    intelligent meet-and-confer with the government about those

25    cases.  And to be honest, you know, more importantly, as

```
 1    happened in this case that I mentioned in just one sentence
 2    in my affidavit -- my declaration, and that Sarah mentioned
 3    to you a few minutes ago, I mean, in that one case, I was
 4    able to get that kind of information.  I was able to get the
 5    name of the sponsor.  With that information, I was able to
 6    help secure the release of that kid within five days.  Had I
 7    not had that information, it would have taken a month or two
 8    months or three months to get that kid released.  It was a
 9    four-year-old boy who was separated from his father.  It was
10    only my access to that information that gave me the ability
11    to work with a father and to work with -- Sarah got involved.
12    People at ORR got involved.  Sure enough, five days later
13    this kid was released to his father.
14            So if we have that kind of information, it's not
15    only that it would allow us to intelligently assess the
16    extent to which they are complying, whether it's ICE or ORR,
17    it would not only allow us to intelligently assess whether
18    they're in compliance or not, whether they're making
19    reasonable efforts -- we're not looking for a hundred percent
20    perfection.  We're looking for 80 percent or substantial
21    compliance.
22            THE COURT:  How do you respond to Ms. Fabian's
23    point that it's not required under the agreement?
24            MR. SCHEY:  That's a good point.  Just let me add
25    one other quick point then I will respond to that.  The other
```

1    quick point is we have over a thousand volunteer lawyers

2    willing to help with Flores issues and compliance, volunteer

3    lawyers.  If we -- if we had that information, we -- we

4    could -- we could have a large number of pro bono lawyers

5    helping the sponsors to get their kids out.  It would

6    probably reduce by, lord knows what, maybe 50, 75 percent.

7    It would reduce the amount of time that kids are in custody,

8    because there are lawyers more than willing -- we have a

9    website called reunify.org, www.reunify.org where lawyers can

10   sign up to help with Flores monitoring.  We have over a

11   thousand lawyers who have signed up who want to help pro

12   bono.

13          So to respond to your question, the Court, as I

14   mentioned previously, the Court on several occasions has --

15   has provided relief that was not specifically set forth in

16   the settlement.  That, for example, with regards to the

17   provision of data to us, the settlement said they should

18   provide this data every six months.  And then in -- I forget

19   if it was the 16 or 17 order that the Court issued, the Court

20   said well, you know, to really be ensure increased compliance

21   and to facilitate the monitoring, I'm going to increase that

22   to once a month.  Nobody -- to the best of my recollection,

23   nobody appealed that.  Nobody had a big problem with that.

24   Government has been providing us with that data once a month.

25          It seems to me that in these extraordinary times

```
1    and emergent times where a misstep could result in a lot of

2    class members suffering severe health consequences, possibly

3    life endangering consequences, it seems to me that since the

4    agreement already says that it's supposed to be recording

5    this data, it seems to me that as part of its remedial

6    powers, it seems to me that the Court would have the power to

7    say that the -- that that -- that if you're not going to

8    release a kid within X amount of time, I suggested seven

9    days.  It could be one day.  It could be ten days.  In some

10   reasonable period of time, if you're not going to release a

11   child, then share with the class counsel the data that you're

12   supposed to record anyway under paragraph 14, share that data

13   with the class counsel under the existing confidentiality

14   agreements.  You know, it wouldn't be any different than a

15   Court having said in its order appointing the special

16   master -- and there, the Court seemed to believe, and we, of

17   course, believed that the Court had the power to do this.

18   And the Court said in that order well, if the special master

19   requests the dates on which you made these efforts, who made

20   the efforts, what was the result of the efforts, and the

21   Court ordered the government to provide that data to Andrea

22   Ordin, you know, if she requested it.  Well, the government

23   appealed that order, but then dismissed its appeal.

24             So that -- if the Court had the authority to put it

25   in that order to say well, give this to Ms. Ordin if she
```

```
 1    requests it, then it seems to me, it would also have the

 2    authority to say, give this same information -- give it to

 3    class counsel.  It's going to be equally confidential, and I

 4    would think the authority would be the same in both

 5    situations.

 6         So that's how I would respond to that question,

 7    Your Honor.

 8         MS. WELCH:  Your Honor, this is Leecia Welch.  I

 9    think there's a great deal of overlap right now in the

10    discussions on Flores and Lucas R with regards to these

11    issues.  I'm wondering if there's going to be an opportunity

12    for us to respond as well?

13         THE COURT:  Why don't you take that opportunity

14    right now.

15         MS. WELCH:  Well, I guess to start off, I mean, I

16    think it probably goes without saying that plaintiffs share

17    the Courts concerns that children are languishing in ORR

18    custody for greater than 30 days.  That is -- you know,

19    that's the reason why we filed our due process claim in Lucas

20    R, and, you know, we obviously now have the unfit custodian

21    class that is exactly that group of children with the caveat

22    that our class has a family reunification packet that has

23    been submitted to ORR, and 30 days have passed without ORR

24    acting on that packet.

25         So I think we are of the position that the issues
```

 1    that we're raising in the TRO are very much consistent with

 2    what we raised in our first amended complaint.  So we don't

 3    think that what we're doing here is, you know, putting a

 4    round peg in a square hole at all.  We think what we're doing

 5    is responding to a crisis situation that makes the -- the due

 6    process protections that this class is entitled to all the

 7    more important and all the more urgent.

 8              THE COURT:  Ms. Welch, the problem I have with the

 9    remedy that you seek in Lucas R is that it appears to me to

10    be a mandatory injunction.  It would in effect impose

11    procedures that you have requested as the relief in your

12    lawsuit.  It would be a victory in your lawsuit.

13              MS. WELCH:  So I -- I would say this:  I mean,

14    we -- we feel that those procedures are absolutely justified

15    under the circumstances that we find ourselves, but what we

16    think is most important is that there be an individualized

17    kind of analysis of why children who have been languishing

18    for more than 30 days and are now facing a deadly virus are

19    not being released from ORR custody.

20              So I think there is a lot of overlap between what

21    Mr. Schey was talking about in terms of the need for ORR to

22    provide individualized information on why children are not

23    being released.

24              THE COURT:  Which is why I'm dealing with this

25    issue in the Flores case and not in the Lucas R case.  The

```
1   Lucas R case is a class action that deals with certain
2   overarching issues relating to procedural due process among
3   other things.  So an individualized analysis about whether
4   one child or another was kept longer than another child is
5   not, I think, an appropriate exercise in the Lucas R case.
6           MS. WELCH:  We think that the plaintiff should have
7   an opportunity to contest their ongoing detention in the face
8   of a virus that is deadly.
9           THE COURT:  Which is what the Flores plaintiffs are
10  doing.
11          MS. WELCH:  I understand that.  So I think what
12  we're saying here is that we think that -- that Lucas R
13  provides an alternate path for a remedy.  We think that it
14  should be more individualized than simply providing the data
15  that Mr. Schey has been discussing.  We think that due
16  process requires more.
17          THE COURT:  All right.
18          MR. SCHEY:  This is Mr. Schey.  Yeah.  This is
19  Peter.  If I could add one or two more things.  I am not
20  requesting a -- just numbers.  I already get numbers.  What
21  I'm requesting is that if they don't release a kid within a
22  certain amount of time, whether they are in ORR or ICE
23  custody, they explain us -- just like now, they give us the
24  names of thousands and thousands of kid, every single kid,
25  including the kids they release like my kid, who was released
```

1    in four or five days.  His name also appears.

2            What I am saying is if they don't release a kid

3    within a certain amount of time, they should just tell us

4    why.  It might be very simple.  It could be two words, three

5    words.  Mother waived the kid's right to release.  Okay.

6    Fine.  It could be whatever.  It could be there is no

7    sponsor.  It could be a sponsor hasn't responded.  Hasn't

8    given us what we need.  That way we would have some -- an

9    understanding as to why they're not releasing the kids.  That

10   way we can engage in discussions with Sarah.  We can engage

11   in discussions with the special master, and if need be, we

12   would definitely, if need be, we could then come to the Court

13   if we felt that was necessary.

14           Really more importantly, we could help get these

15   kids out, which would be helpful to everybody.  To the

16   defendants and to the children who are being detained and to

17   their parents and their grandmothers and the sisters and the

18   mothers who are ready, willing, and able to receive them.  So

19   I just wanted to make that point.  I'm not looking for more

20   numbers.  I am looking for why didn't you release this kid.

21   Again, it doesn't have to be a long book or several pages.

22   It could literally be one sentence about what -- you know,

23   why didn't you release the kid and what were the efforts that

24   you made.  Supposedly, they're recording that.  If they

25   recording that, then it shouldn't be that hard for the

1    government to share that with us.

2           The one other point I wanted to make briefly was

3    what Ms. Fabian was saying well, about ICE and maybe they're

4    doing it or whatever.  They're not doing it.  They're not

5    making any -- you know, when the Court allowed us to take

6    depositions, whatever it was a couple years ago, then they

7    said, oh, yeah, when I deposed the ICE people, oh, yeah,

8    we're making these efforts.  That was a couple years ago.

9           Now -- I put this in my affidavit.  When we had the

10   meet-and-confer, they conceded they're making zero efforts.

11   They told us that during the meet-and-confer.  The three

12   declarations that I submitted from the three people who are

13   the most knowledgeable people on the face of the earth other

14   than the people working for ICE, because they represent

15   hundreds upon hundreds of these families in those three ICE

16   family detention centers.  They said in their declarations

17   and in the motion -- in the application, I cite to the

18   particular paragraphs where they say that, zero -- zero

19   efforts aimed at release.  Mothers are not told about it.

20   Zero efforts are being made aimed at the prompt release of

21   those children.

22          You know, we all know when we first argued the

23   first motion that we brought, and Carlos Holguin argued the

24   motion and Leon -- I forget his last name -- argued for the

25   government.  We first appeared in front of you.  I think it

 1   was late 2015.  You -- it was the Court that raised the

 2   question and said about the family detention, well, what if a

 3   mother doesn't want the kid released?  You, the plaintiff,

 4   you don't expect them to just be torn away from the mother,

 5   do you?  We said, no, of course, not.  President Trump

 6   accuses us of that.  Of course, not.  We made clear that a

 7   mother -- in fact, if you look at the -- your order of

 8   reference for the special master, you put in there as one of

 9   the things that they should record is did the mother opt the

10   kid out of the class, or the father opt the kid out of the

11   class.

12           So we're not saying that every single kid has to be

13   released, because you may have a situation where -- you could

14   have multiple different situations where there's a very

15   legitimate reason why the kid is not being released.  All

16   we're saying is in order for us to effectively monitor this

17   situation, in order for us to help kids get out of detention,

18   in order to encourage the government to actually comply with

19   paragraph 14, if they have to share information with us about

20   why they're not releasing a kid within some period of time --

21   whatever that may be that the Court decides -- that is going

22   to more than anything else that we can think of right now,

23   that is going to encourage compliance, because they'll no

24   longer be a secret that ORR and ICE know about.  Nobody else

25   knows about.  That would more than anything else that we can

```
 1    think about encourage the prompt release of these children.

 2            That's not to detract from the Lucas R claims,

 3    which at some point will be litigated that -- or a kid is not

 4    going to be released within an X amount of time, whatever it

 5    is 30 days, they should have a due process hearing.  That's a

 6    separate question.  What I'm trying to get to is how do we

 7    enforce and ensure to the maximum extent reasonably possible

 8    how do we enforce compliance with paragraph 14.  Providing --

 9    providing us with that data.  That's all of I have to say,

10    Your Honor.

11            MS. WELCH:  Your Honor, this Leecia Welch.  I would

12    agree with Mr. Schey wholeheartedly and just basically focus

13    on the fact that Lucas R provides an alternative basis for

14    getting this very vital information at this crucial time.

15            MS. FABIAN:  Your Honor, if I may respond just in a

16    very --

17            THE COURT:  For the record, this is Sarah Fabian.

18            MS. FABIAN:  Yes.  This is Sarah Fabian for the

19    defendants.

20            The data that Mr. Schey is talking about -- we've

21    had these discussions extensively with Mr. Schey, with

22    Ms. Ordin.  ORR keeps information about children as general

23    matter on a very individualized basis.  Mr. Schey knows and

24    many of the counsel here would know that, you know, when

25    they've requested case files with regard to individual
```

1    children, they've received those case files.  It's a

2    burdensome some process of pulling the case file, providing

3    the information requested.  It's not something that ORR could

4    quickly and easily do to provide -- you know, even if

5    Mr. Schey says one line here, I mean, with only 3,000

6    children in custody, that is 3,000 lines that sort of have to

7    be pulled from the file and pulled together and provided in a

8    way that could be turned over to plaintiffs.

9            Where that requirement is not in the agreement and

10   not really -- there's no -- no basis to find that this --

11   this information that needs to be provided in the agreement.

12           THE COURT:  Ms. Fabian, I have ordered the

13   compliance with that provision at least twice now in prior

14   orders.  The first time was five years ago.  How much longer

15   do I have to wait and continue to keep arguing about this

16   compliance?  Does it have to come through contempt?  Is it

17   better that you try to work something out that allows some

18   glimmer of information as to how you're complying.  It's not

19   sufficient for me to have ordered this -- not once, not

20   twice, but maybe three times now that you comply with that

21   provision, and then you say, but we can't give you any

22   statistics as to whether we're complying or not.

23           MS. FABIAN:  Your Honor has never ordered ORR to

24   comply with that provision.  That -- the orders that

25   Your Honor is referring to both relate to findings related to

```
 1   DHS.  Those findings are now the subject of the monitoring

 2   order and the monitor's ongoing --

 3              THE COURT:  I understand that.  That is a very

 4   lawyerly response.  The problem here is that we now have a

 5   TRO that does raise ORR, and it applies the same principle.

 6   So why should the result be different?

 7              MS. FABIAN:  Well, Your Honor, it is then the first

 8   time that this principle is being raised and addressed for

 9   ORR.  It's saying that, you know, in an emergency basis

10   because of the current crisis, the Court should address

11   this -- this issue that is being raised for the first time,

12   and it is saying that -- that procedures and processes and --

13   and, you know, that -- that the 30-day limit should all be

14   imposed here on this expedited basis without --

15              THE COURT:  I'm not.  Let me make it clear.  I'm

16   not imposing a 30-day limit.  I'm looking for a snapshot.

17   I'm trying to set some parameters to get that snapshot.

18   That's not a rule going forward.  It's for me to have some

19   evidentiary basis to understand that you are or are not in

20   compliance.

21              MS. FABIAN:  Your Honor, I think to the extent that

22   the question is the current times in custody for ORR, I would

23   ask Mr. Schey is talking about a report that was compiled

24   based on data from -- where we are all aware that there was

25   significant crisis of different kind at the border, and that
```

1    certainly impacted the times in custody.  We had a lot of

2    discussions on those numbers and on those -- so the -- the

3    report that Mr. Schey is referring to is a report that covers

4    the time frame of last summer.  Those numbers are very

5    different from when ORR had -- had -- three to four times as

6    many children in custody as it does now.

7            So if the question is -- if the Court is asking for

8    the opportunity to sort of look at the situation now, the

9    numbers now -- if what the Court is looking to do is to

10   analyze the situation now, the times in custody now and to

11   provide whether the Court wants to look at it in the first

12   instance or to ask the monitor to take a look at that, I

13   think it's something that can be done.  None of that data is

14   currently before the Court.

15           Nothing in the TRO establishes that this important

16   question and the issue of times in custody and ORR's

17   processes that -- that they need to or should be dealt with

18   in the context of a TRO where the need for a TRO related to

19   the current crisis is not tied to the issue of whether there

20   are currently violations of ORR's release processes.

21           There's just no showing in the motion that it --

22   that if ORR has challenges or impediments to its -- in its

23   release processes that need to be addressed, nothing ties

24   those to the current crisis.  So whether that is an issue

25   that needs to be looked at by the Court and/or by the monitor

```
 1    is certainly an open question.  It's not a question that the

 2    record establishes needs to be dealt with on an expedited

 3    basis through a TRO where the Court has said that the problem

 4    is that there is a lack of evidence here.

 5               THE COURT:  Well, apparently Mr. Schey is going to

 6    file something tomorrow or tonight that will provide some

 7    evidentiary support for the problem of prolonged detention.

 8               So I think --

 9               MR. SCHEY:  Your Honor, just to be -- this is

10    Peter Schey.

11               Just to be clear, the data that I'm referring to

12    has nothing to do with the summer or the crisis that we had

13    at the border in April and May that resulted in us filing the

14    motion in June about border patrol conditions, and that's the

15    subject of the settlement that almost -- I hope is very close

16    to completion.  The data I'm referring to is January of 2020.

17               So hopefully there's no more kids still in custody

18    from that April of 2019 situation.  This is current data.

19    This is the most current data that we have.  I'm happy to

20    file the whole -- the whole spreadsheet that they gave us.  I

21    can file that under seal later today, and I'm happy to also

22    file the report that we got from the Stanford University

23    folks, which I don't have to file under seal because it

24    doesn't have the names.  I'm happy to file that.  It's very

25    clear.  It is about three pages' long.  It just provides the
```

```
1    data that I had just told you about.  Because they give us --
2    it's just the raw data.  It's in a spreadsheet.  If you
3    then -- it takes a little bit of manipulation to look at --
4    you can even do it with the data that they gave us.  I mean,
5    the Stanford folks make nice charts.  They make it easy to
6    understand.
7            With the ICE data that I put in my declaration, I
8    did those calculations myself.  They may not be a hundred
9    percent correct.  I think they're close.  I think they're
10   99 percent correct.  It was just a process I had to go
11   through looking at the ICE data to figure out -- and the ICE
12   data I was looking was actually from February.
13           THE COURT:  All right.
14           MR. SCHEY:  The most recent.
15           THE COURT:  Mr. Schey, we've been going for almost
16   an hour and a half now.  The court reporter needs a break.
17   Unless there is anything else that anybody needs to raise
18   very quickly, I'm going to adjourn.
19           MR. SCHEY:  Nothing else.
20           MS. WELCH:  Your Honor, this is Leecia Welch for
21   the Lucas R plaintiffs.  I guess, the last thing I would like
22   to say is that, you know, as we look all across the country,
23   we have huge numbers of inmates from correctional facilities,
24   including hundreds of inmates in New Jersey and New York
25   being released in light of the spread of COVID-19.  We have
```

1    ICE detainees being released in the past few days on the same

2    sort of procedural due process arguments that the Lucas R

3    plaintiffs are presenting to this Court.

4         So we do feel like they're highly relevant, and

5    they provide all the more protection for our clients during

6    this time.  Certainly, more at a greater magnitude than when

7    we filed our first amended complaint.  So if you have any

8    other specific concerns about the scope of the remedy or what

9    we're seeking, we would love to be able to address them.

10        THE COURT:  All right.  Well, I understand that

11   there are adults who are being released who are non-violent

12   offenders in order to reduce overcrowding in prisons.  I have

13   serious concerns about en masse ordering the government to

14   release thousands of minors without knowing where they're

15   going, to whom they're going, and whether they will be

16   exposed to even worse conditions where they're going.

17        So I don't think that's the responsible way to deal

18   with this.  I am interested in getting people out who have

19   been held longer than they should be and that would have

20   available suitable custodians.  I need to know that is done

21   in an orderly fashion and in a way that is not a danger to

22   the minors.  I don't think an individualized inquiry of that

23   sort is appropriate in the Lucas R case.

24        MS. WELCH:  We understand that the inquiry needs to

25   be individualized.  We think that is what due process

1    requires.  We're not seeking a wholesale release of thousands

2    of children.  We're seeking release of children that are

3    limited to the unfit custodian class who have been in custody

4    for longer than 30 days with a family reunification packet on

5    file and who have not been released.

6            So ORR has had well over 30 days to consider the

7    appropriateness of the custodian, and if they have found that

8    custodian to be inappropriate, then they can provide that

9    information, as we've requested.  But we agree with you that

10   the release needs to be orderly.  We feel like we've

11   presented a remedy that could accomplish that.

12           THE COURT:  Thank you.

13           Anything further?

14           MR. SCHEY:  This is Mr. Schey.  I'm so sorry to

15   have one final comment, but I cannot resist.  One thing that

16   I want to make absolutely clear that we, in the Flores case,

17   are not seeking the en masse, you know, put them out on the

18   street release of children within seven days or 10 days or

19   20 days.  What we are saying is that the settlement itself

20   calls for without unnecessary delay, and another place it

21   uses the word expeditiously that -- that defendants do their

22   job and that defendants assess an appropriate placement for

23   that kid, and that in -- and we think that can be done -- I

24   did it three weeks ago.

25           THE COURT:  I understand, Mr. Schey.  I heard you

 1   tell me already.

 2          MR. SCHEY:  Okay.

 3          THE COURT:  Okay.

 4          MR. SCHEY:  So we're not looking for mass release.

 5          THE COURT:  I understand that.  I've looked at --

 6          MR. SCHEY:  Okay.

 7          THE COURT:  -- the proposed orders on both cases.

 8   I understand what you're looking for.  I am very familiar

 9   with this case.

10          MR. SCHEY:  Okay.  Thank you.

11          THE COURT:  I've lived with it now for five years.

12   So don't assume that I don't know what you're talking about.

13   My issue --

14          MR. SCHEY:  Okay.  Thank you.

15          THE COURT:  My final parting comment to all of you

16   is that I have issued orders up the wazoo during these past

17   five years.  I would like to have compliance with those

18   orders.  The best way to get compliance with those orders is

19   to finalize some of the negotiations you've been engaged in

20   with the assistance of the special monitor and our medical

21   consultants so that you have specific standards to apply in

22   certain contexts.  I don't see why some of those standards

23   once you agree to them couldn't also be adopted in some

24   fashion in the ORR, if necessary.

25          MR. SCHEY:  Right.

1          THE COURT:  Those are things that are best suited

2     for your negotiations with the assistance of the special

3     master.  When you asked me for an order whether it's through

4     a TRO or a preliminary injunction or any other format, it is

5     a blunt instrument.  I cannot deal with some of the nuances

6     that you're dealing with within the contours of the Flores

7     settlement agreement alone.  Some of the issues you're

8     talking about need to be thrashed out.  Maybe you need to

9     have a supplemental agreement on certain things.  Some things

10    I cannot order because they are not provided for in the

11    agreement.

12          So I would urge both sides again to redouble their

13    efforts to try to get some sort of resolution about protocols

14    and procedures that can be applied as soon as possible to

15    these facilities.  We have an emergency on our hands.  We

16    have to stop dithering about how to do this.  We know what

17    the agreement provides.  You know what I've said in multiple

18    prior orders in the past.  You don't need me to keep

19    repeating myself.

20          So I urge you for the sake of these minors and

21    given the crisis that has befallen us, you need to act with

22    due diligence.  I can issue as many orders as you want me to

23    issue, but until and unless you folks agree to implement it

24    on the ground, it's going to be meaningless.

25          Do I make myself clear?

1           MR. SCHEY:  Yes, Your Honor, very clear.

2           MS. FABIAN:  Yes, Your Honor.

3           THE COURT:  All right.  We are adjourned.

4           MR. SCHEY:  Thank you.

5           MS. FABIAN:  Thank you, Your Honor.

6           MS. WELCH:  Thank you.

7           (Proceedings concluded at 2:30 p.m).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                      CERTIFICATE

1    I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

2    TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN

3    THE ABOVE MATTER.

4    FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

5    REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

6    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

7

8    /s/ Miriam V. Baird              04/01/2020

9    MIRIAM V. BAIRD                        DATE
     OFFICIAL REPORTER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25