CENTER FOR HUMAN RIGHTS
& CONSTITUTIONAL LAW
CARLOS R. HOLGUÍN (90754)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.email

*Attorneys for Plaintiffs*

*Additional counsel listed on following pages and signature block*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LUCAS R., et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>ALEX AZAR, et al.,<br><br>    Defendants. | Case No.  2:18-CV-05741 DMG PLA<br><br>**JOINT STIPULATION REGARDING MOTION AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:  Dec. 11, 2020<br>Time:  3:00 p.m.<br>Place:  Courtroom 8C, 8th Floor<br><br>Complaint Filed: June 29, 2018<br>Pretrial Conference Date: March 2, 2021<br>Trial Date:  March 30, 2021<br>Judge: Hon. Dolly M. Gee |

HOLLY S. COOPER (197626)
Co-Director, Immigration Law Clinic
CARTER C. WHITE (164149)
Director, Civil Rights Clinic
DAISY O. FELT (307958)
JONATHAN P. MULLIGAN (CAL RLSA NO. 803383)
MONICA J. JULIAN (265075)
University of California Davis School of Law
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu
        ccwhite@ucdavis.edu
        dofelt@ucdavis.edu
        jmulligan@ucdavis.edu
        mjulian@ucdavis.edu

NATIONAL CENTER FOR YOUTH LAW
LEECIA WELCH (208741)
NEHA DESAI (CAL. RLSA NO. 803161)
POONAM JUNEJA (300848)
FREYA PITTS (295878)
MISHAN WROE (299296)
MELISSA ADAMSON (319201)
1212 Broadway, Suite 600
Oakland, CA 94612
Telephone: (510) 835-8098
Email:  lwelch@youthlaw.org
        ndesai@youthlaw.org
        pjuneja@youthlaw.org
        fpitts@youthlaw.org
        mwroe@youthlaw.org
        madamson@youthlaw.org

NATIONAL CENTER FOR YOUTH LAW
BRENDA SHUM (ADMITTED PRO HAC VICE)
CRYSTAL ADAMS (308638)
1313 L St. NW, Suite 130
Washington, DC 20005
Telephone: (202) 868-4785
Email:  bshum@youthlaw.org
        cadams@youthlaw.org

COOLEY LLP
SUMMER J. WYNN (240005)
MICHAEL J. MCMAHON (*ADMITTED PRO HAC VICE*)
REBECCA L. TARNEJA (293461)
ALEXANDRA R. MAYHUGH (300446)
JAYME B. STATEN (317034)
1333 2nd Street, Suite 400
Santa Monica, CA  90401
Telephone: (310) 883-6400
Facsimile:  (310) 883-6500
Email:  swynn@cooley.com
          mmcmahon@cooley.com
          rtarneja@cooley.com
          amayhugh@cooley.com
          jstaten@cooley.com

*Attorneys for Plaintiffs*

The Parties, by and through their undersigned counsel, for the limited purposes of Plaintiffs' motion and Defendants' cross-motion for partial summary judgment of Plaintiffs' First, Second, and Fourth Claims for Relief, hereby stipulate as follows:

The parties agree that all documents exchanged in discovery of the above-entitled matter are authentic pursuant to Rule 901 of the Federal Rules of Evidence.

The parties agree that the following facts are undisputed:

1.      ORR policies are contained in ORR's Policy Guide available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied. Only policies relevant to the claims at issue in the Parties' respective motions for partial summary judgment are discussed in this Joint Stipulation of Facts.

2.      ORR procedures are contained in ORR's Manual of Procedures ("MAP"), a copy of which has been produced in this litigation at GOV-00016596-00016671 (Section 1), GOV-00207375-00207517 (updated Section 2), and GOV-00016812-00016998 (Sections 3-6). Only procedures relevant to the claims at issue in the parties' respective motions for partial summary judgment are discussed in this Joint Stipulation of Facts.

3.      According to ORR's Policy Guide, ORR groups potential sponsors into the following categories:

- **Category 1**, a parent or legal guardian (including qualifying step-parents that have legal or joint custody of the child or teen);
- **Category 2A**, an immediate relative—a brother, sister, grandparent, or other close relative (aunt, uncle, first cousin) who previously served as the child's primary caregiver (including biological relatives, relatives through legal marriage, and half-siblings);
- **Category 2B**, an immediate relative—aunt, uncle, or first cousin who was not previously the child's primary caregiver (including biological relatives and relatives through legal marriage);
- **Category 3**, other sponsors such as distant relatives and unrelated adult

individuals; and

- **Category 4**, no sponsor identified.

Policy Guide § 2.2.1.

4.      ORR's Policy Guide defines "care provider" as "any ORR funded program that is licensed, certified or accredited by an appropriate State agency to provide residential care for children, including shelter, group, foster care, staff-secure, secure, therapeutic or residential treatment care for children." Policy Guide, Guide to Terms.

5.      ORR's Policy Guide provides that "ORR and its care providers work to ensure that children are released timely and safely from ORR custody to parents, other family members, or other adults (often referred to as 'sponsors'). . . ." The Policy Guide also provides: "Safe and timely release (also known as 'family reunification') must promote public safety and ensure that sponsors are able to provide for the physical and mental well-being of children." Policy Guide, Intro. & § 2.1.

6.      Federal Field Specialists ("FFS") "are ORR's field staff located regionally throughout the country and are assigned to a group of [ORR] care providers within a particular geographic region." Policy Guide § 2.3.1.

7.      ORR's Policy Guide provides that "[ORR/FFS] have the authority to approve all unaccompanied alien children transfer and release decisions; oversee care providers to ensure all services are properly provided and implemented; and serve as a local liaison to community stakeholders, including other Federal agencies, local legal service providers, communities, Child Advocates, etc. ORR/FFS also provide guidance, direction, and technical assistance to care providers. ORR/FFS also make final decisions as to whether home studies are conducted and/or post-release services are provided. ORR/FFS coordinate all aspects of a child's case with care provider staff, Case Coordinators, stakeholders, and other Federal agencies." Policy Guide § 2.3.1 (footnote omitted).

8.      ORR's Policy Guide provides that "Case Managers perform a variety of duties, including coordinating the completion of assessments of unaccompanied alien

children, completing individual service plans, assessing potential sponsors, making transfer and release recommendations, and coordinating the release of a child or youth from ORR care and custody." Policy Guide § 2.3.2. The Policy Guide also provides: "The Case Manager's role is also to ensure that information is gathered or shared with the appropriate staff and stakeholders during the sponsor assessment process." *Id.*

9.     ORR's Policy Guide provides that "Case Coordinators are non-governmental contractor field staff assigned to one or more care providers primarily to review unaccompanied alien children cases and provide transfer and release recommendations to ORR staff." Policy Guide § 2.3.3.

10.     ORR's Policy Guide provides: "The Case Coordinator is responsible for integrating all areas of assessment from the Case Manager, Child Advocates, where applicable, and other stakeholders into a release plan that provides for the unaccompanied alien child's physical and mental well-being." Policy Guide § 2.3.3.

11.     FFS make the final decision as to whether a discretionary home study of a child's proposed custodian will be required.

12.     An FFS can authorize an extension of the time it takes to complete a home study beyond the ten business days required by ORR.

13.     ORR's MAP provides that Case Managers may recommend a discretionary home study of a proposed custodian prior to release. As part of that recommendation, the MAP provides that Case Managers summarize the following for discretionary home studies: "What additional information will a discretionary home study be able to provide, other than what has already been gathered via the sponsor assessment process, to mitigate concerns and create a safer release scenario for the [child]." MAP § 2.4.2. The MAP further provides: "In order to recommend a discretionary homes [sic] study, the case manager and case coordinator must have a reasonable expectation that results of the home study process (i.e., home visit, face-to-face interviews with the potential sponsor and household members) will provide additional information, other than what has already been gathered via the sponsor assessment process, which will mitigate

concerns. Care providers should only request home studies for potentially viable sponsors. Concerns related to moving violations and DUI/DWIs (unless there are multiple charges in a relatively short period) unconnected to a well-founded child welfare concern are not to be used as the underlying basis for a discretionary home study. The home study must focus on potential sponsor's ability to appropriately care for the [child] and the sponsor's ability to ensure the safety and well-being of the [child]. The case coordinator elevates the recommendation to perform a discretionary home study to the FFS after justification for the home study recommendation has been documented in the Release Request as 'Conduct Home Study—Discretionary.'" *Id.*

14.    ORR's MAP provides that "[i]f the FFS or case coordinator requests additional information [after the case manager and/or case coordinator recommend a discretionary home study], the case manager and/or case coordinator must respond within 1 business day. If needed, the FFS may staff the case with the FFS supervisor. The FFS sends their determination [regarding the discretionary home study] in writing within 1 business day to the case coordinator and case manager." MAP § 2.4.2.

15.    ORR's Policy Guide provides that "[c]are providers must conduct a Safety and Well Being Follow Up Call with an unaccompanied alien child and his or her sponsor 30 days after the release date. The purpose of the follow up call is to determine whether the child is still residing with the sponsor, is enrolled in or attending school, is aware of upcoming court dates, and is safe. . . . If the care provider believes that the child is unsafe, the care provider must comply with mandatory reporting laws, State licensing requirements, and Federal laws and regulations for reporting to local child protective agencies and/or law enforcement." Policy Guide § 2.8.4.

16.    Following reports to state or local child protection agencies that children released from ORR custody have been abused or neglected, state or local protection agencies can take steps to try to protect those children from abuse or neglect following release from ORR custody.

17.    ORR's written policies do not require providing children with a written

denial of a proposed custodian's release request, unless the sole reason for the denial is a concern that the unaccompanied alien child is a danger to himself/herself or the community.

18.     ORR's written policies do not require that proposed custodians other than a parent or legal guardian be provided written notice that their release request has been denied.

19.     ORR's MAP provides that the "ORR Director must review any release decision denying sponsorship to a Category 1 sponsor." MAP § 2.7.

20.     ORR's Policy Guide provides that "[i]f the ORR Director denies the reunification application of an unaccompanied alien child's parent or legal guardian, the ORR Director notifies the parent/legal guardian by sending a denial letter to the parent/legal guardian within 30 business days of receiving all the required information and documentation in a specific case." The Policy Guide further provides: "The denial letter includes: [a] An explanation of the reason(s) for the denial; [b] Instructions on how to obtain the child's case file; [c] The supporting materials and information that formed the basis for ORR's decision; and [d] An explanation of the process for requesting an appeal of the denial. The explanation also informs the prospective sponsor that he or she may submit additional information to support an appeal request." Policy Guide § 2.7.7.

21.     ORR's Policy Guide provides that if ORR denies a request to release a child to a parent or legal guardian, the "parent/legal guardian may seek an appeal of the ORR Director's denial decision by submitting a written request to the Assistant Secretary for Children and Families within 30 business days of receipt of the final decision from the ORR Director." The Policy Guide further provides: "The request may seek an appeal without a hearing or may seek a hearing." Policy Guide § 2.7.8.

22.     ORR's Policy Guide provides that if the parent or legal guardian requesting an appeal of the ORR Director's denial decision "seeks a hearing, the Assistant Secretary will schedule a teleconference or video conference, per the requester's

preference, at which time the requestor (or the requestor's representative) may explain the reasons why he or she believes the denial was erroneous. The Assistant Secretary will consider the testimony and evidence presented at the hearing, in addition to the original denial letter and information referenced therein, to make a determination." Policy Guide § 2.7.8.

23.    ORR's Policy Guide provides that, for parents and legal guardians, "[a]ppeals are recorded, and the requester may request a copy of the recording." Policy Guide § 2.7.8.

24.    ORR's Policy Guide provides that if a parent or legal guardian requesting an appeal of the ORR Director's denial decision also seeks a hearing, the "Assistant Secretary will notify the requester of the decision in writing within 30 business days following the hearing." Policy Guide § 2.7.8.

25.    ORR's Policy Guide provides that if a parent or legal guardian requesting an appeal of the ORR Director's denial decision "seeks an appeal without a hearing," the "Assistant Secretary will notify the requester of a decision within 30 business days of receiving the request.  If more information is needed to make a decision, or for good cause, the Assistant Secretary may stay the request until he or she has the information needed." Policy Guide § 2.7.8.

26.    ORR's Policy Guide provides that if a parent or legal guardian requests an appeal of the ORR Director's denial decision, "[a]ny evidence submitted to the Assistant Secretary by ORR is shared with the requester in compliance with privacy protections." Policy Guide § 2.7.8.

27.    ORR's Policy Guide provides that if a parent or legal guardian requests an appeal of the ORR Director's denial decision, the "Assistant Secretary conducts a de novo review and may affirm or overturn the ORR Director's decision, or send the case back to ORR for further action." Policy Guide § 2.7.8.

28.    ORR's Policy Guide provides that "[t]he Assistant Secretary's decision to affirm or overrule the ORR Director's decision to deny release to a parent/legal guardian

1    is the final administrative decision of the agency on the application that had been under

2    consideration." Policy Guide § 2.7.8.

3        29.    ORR's Policy Guide provides that "[i]f the sole reason for denial of release

4    is concern that the unaccompanied alien child is a danger to himself/herself or the

5    community, the unaccompanied alien child may seek an appeal of the denial [to the

6    Assistant Secretary], provided the parent/legal guardian is not seeking an appeal.  If the

7    child expresses a desire to seek an appeal, ORR appoints a child advocate to assist the

8    unaccompanied alien child in seeking the appeal." Policy Guide § 2.7.8.

9        30.    ORR's Policy Guide provides that notwithstanding the Assistant

10   Secretary's decision affirming the ORR Director's decision to deny release to a parent

11   or legal guardian, "if there is new information or a change in circumstances regarding

12   the reunification application of a parent/legal guardian, or regarding the unaccompanied

13   alien child's circumstances, a new reunification application may be submitted that

14   highlights the change(s) and explains why such changes should alter the initial decision.

15   Similarly, if ORR discovers new information or becomes aware of a change in the

16   circumstances of the parent/legal guardian and/or the unaccompanied alien child, ORR

17   may assess the case anew." Policy Guide § 2.7.8.

18       31.    ORR's Policy Guide provides that "[a]fter obtaining physical custody of

19   an unaccompanied alien child" and "[t]o identify any of the child's immediate needs or

20   issues, a trained staff member with the care provider must use the *Initial Intakes

21   Assessment* to interview the child within 24 hours of the child's admission to the facility.

22   The *Initial Intakes Assessment* guides the interviewer through a series of questions to

23   obtain information about family members, any immediate medical or mental health

24   concerns, current medications, and any concerns about personal safety that the child

25   may have at that time." Policy Guide § 3.2.1.

26       32.    ORR's Policy Guide provides that "[c]are providers must screen all

27   unaccompanied alien children to identify potential victims of a severe form of

28   trafficking." Policy Guide § 3.3.3.

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

7

33.     ORR's Policy Guide provides that the "Case Manager provides weekly status updates (monthly for children in [Long Term Foster Care]) to the [child] on the child's case and provision of services, preferably in person." Policy Guide § 2.3.2.

34.     ORR's Policy Guide provides that "ORR begins the process of finding family members and others who may be qualified to care for an unaccompanied alien child as soon as the child enters ORR's care." Policy Guide § 2.2.

35.     ORR's Policy Guide provides that "[f]inding a sponsor for the child is an ongoing process that continues during the unaccompanied alien child's stay in ORR care and custody in the event that the primary potential sponsor or primary release plan is not approved." Policy Guide § 2.2.1.

36.     ORR's Policy Guide provides: "Q: What happens if a new sponsor is identified during the sponsor assessment process? A: If there are multiple potential sponsors, the ORR-funded care provider will exhaust all efforts to facilitate a release to a parent or legal guardian while also contacting and evaluating other potential sponsors concurrently." Policy Guide § 2.4.3.

37.     ORR's Policy Guide provides that "[a]ll potential sponsors must complete an application in order for a child to be released to them from ORR custody (the 'Family Reunification Application')." Policy Guide § 2.2.3.

38.     ORR's Policy Guide provides that "[w]ithin 24 hours of identification of a potential sponsor for a child or youth, the care provider or the ORR National Call Center sends the sponsor a package with the application and related documents (called the Family Reunification Packet or FRP)." Policy Guide § 2.2.3.

39.     ORR's Policy Guide provides that the "care provider also informs potential sponsors that they may submit additional information to support the application and reminds potential sponsors of the deadlines for completing the forms." Policy Guide § 2.2.3.

40.     ORR's Policy Guide provides that "ORR's sponsor assessment and release decision process requires coordination among care provider staff, nongovernmental

third-party reviewers (Case Coordinators), ORR staff, other Federal agencies, stakeholders, and Child Advocates, where applicable." Policy Guide § 2.3.

41.    ORR's Policy Guide provides: "The Case Manager provides weekly status updates to the unaccompanied alien child's Case Coordinator and ORR/FFS on the progress in achieving safe and timely release with family members as well as potential challenges that may delay a release." Policy Guide § 2.3.2.

42.    ORR's Policy Guide provides that "Case Managers communicate with potential sponsors, gather necessary information and documentation, talk to any relevant stakeholders, and assess sponsors to formulate a recommendation to the Case Coordinator." Policy Guide § 2.3.

43.    ORR's Policy Guide provides that "Case Coordinators concurrently review all assessment information on an unaccompanied alien child and sponsor to also make a recommendation." Policy Guide § 2.3.

44.    ORR's Policy Guide provides that "the ORR/FFS makes a final  release decision." Policy Guide § 2.3.

45.    ORR's Policy Guide provides that "ORR conducts monitoring visits at least monthly to ensure that care providers meet minimum standards for the care and timely release of unaccompanied alien children." Policy Guide § 5.5.

46.    ORR's Policy Guide provides that "[w]hen making a placement determination or recommendation, ORR and care providers consider the following factors as they pertain to the child or youth:

- Trafficking or other safety concerns
- Any special needs or issues requiring specialized services (for example, a child with language needs, mental health or medical concerns, or a youth who is pregnant or parenting)
- Possibility of heightened vulnerability to sexual abuse due to prior sexual victimization
- Prior sexual abusiveness

- Identification as lesbian, gay, bisexual, transgender, questioning or intersex, or gender non-conforming appearance or manner
- Location of potential sponsor and family sponsorship options
- Siblings in ORR custody
- Immigration issues (for example, legal representation needs, immigration proceedings)
- Behavior
- Criminal or juvenile background
- Danger to self
- Danger to the community
- Escape risk
- Age
- Gender
- Length of stay in ORR custody
- Location where the child was apprehended."

Policy Guide § 1.2.1.

47.   A "step-up" is a transfer to a more restrictive level of care.

48.   A "step-down" is a transfer to a less restrictive level of care.

49.   ORR's Policy Guide provides that "step-downs may occur when ORR, in its discretion, determines the [child] no longer poses a danger to himself or others, or no longer presents an escape risk (for staff secure step downs only). . . . In making a step-down decision, ORR considers criteria identified in making a secure placement and takes into consideration any mitigating factors based on an assessment of the [child]'s current functioning and behavior, previous conduct, self-disclosures, and criminal/delinquent history. The care provider documents the underlying assessment used to make this determination in the [child]'s case file." Policy Guide § 1.4.2.

50.   Secure juvenile detention facilities are the most restrictive facilities to which ORR steps up class members.

51.     Formerly, ORR maintained three in-network secure juvenile detention centers: Yolo County Juvenile Center ("Yolo") in Woodland, California, Shenandoah Valley Juvenile Center ("SVJC") in Staunton, Virginia, and Northern Virginia Juvenile Detention Center ("NOVA") in Alexandra, Virginia. ORR's grant with Yolo ended in January 2020.  ORR's grant with NOVA ended in September 2017. Currently, the only secure juvenile detention center in which ORR places class members is SVJC.

52.     ORR currently maintains two in-network Residential Treatment Centers ("RTC"): MercyFirst in Syosset, New York, and Shiloh in Manvel, Texas.

53.     Staff-secure facilities are more restrictive than shelters.

54.     ORR's Policy Guide provides that a child "may only be placed into an RTC if the youth is determined to be a danger to self or others by a licensed psychologist or psychiatrist. . . . In addition, ORR will consider a transfer to an RTC only if a licensed psychologist or psychiatrist has determined the following: [1] The unaccompanied alien child has not shown reasonable progress in the alleviation of his/her mental health symptoms after a significant period of time in outpatient treatment. (Note: the amount of time within which progress should be demonstrated varies by mental health diagnosis). [2] The child's behavior is a result of his/her underlying mental health symptoms and/or diagnosis and cannot be managed in an outpatient setting. [3] The unaccompanied alien child requires therapeutic-based intensive supervision as a result of mental health symptoms and/or diagnosis that prevent him or her from independent participation in the daily schedule of activities. [4] The child presents a continued and real risk of harm to self, others, or the community, despite the implementation of short-term clinical interventions (such as, medications, a brief psychiatric hospitalization, intensive counseling, behavioral management techniques, 24 hour supervision, supportive services or therapeutic services)." Policy Guide § 1.4.6.

55.     ORR's Policy Guide provides that "[a] [child] may only remain in a RTC placement if a licensed psychiatrist or psychologist has determined that they are a danger to themselves or others." Policy Guide § 1.4.2.

56.     Foster care programs, where children reside with a foster family, are one of the least restrictive settings in which ORR places class members.

57.     ORR's Policy Guide provide that secure facilities "have a secure perimeter, major restraining construction inside the facility, and procedures typically associated with correctional facilities." Policy Guide § 1.2.4.

58.     ORR considers a secure facility to be a juvenile detention center or a highly structured therapeutic facility.

59.     ORR's Policy Guide provides in part that "[s]ecure facilities are for youth who require the strictest level of supervision." Policy Guide § 1.2.4.

60.     ORR's Policy Guide provides that "ORR only places an unaccompanied alien child in a secure facility if the child: 1. poses a danger to self or others; or 2. has been charged with or convicted of a criminal offense, or is chargeable with such an offense." Policy Guide § 1.2.4.

61.     Yolo and SVJC secure are locked facilities with 24-hour surveillance and monitoring.

62.     ORR's MAP provides that when a step-down to a less restrictive placement is appropriate, "[i]f a step-down . . . is not completed within 7 days due to problems finding a suitable care provider to transfer the [child] to, the case manager explains what efforts have been undertaken to transfer the [child] in writing." MAP § 1.4.2.

63.     A child may be more likely to be accepted by a local Unaccompanied Refugee Minors ("URM") program after the child has been stepped down to a less restrictive placement.

64.     The average length of care of unaccompanied children who were in secure, staff-secure, or RTC care is longer than the average length of care of unaccompanied children who were never stepped up.

65.     ORR's Policy Guide provides that "[c]are providers also take into consideration information from the referring Federal entity, child assessment tools, interviews, location of the child's sponsor or family in the U.S., records from local,

State, and Federal agencies, and information from stakeholders, including the child's legal service provider, attorney of record or Child Advocate, as applicable, when making transfer recommendations." Policy Guide § 1.4.

66.    ORR's written policy does not mandate that Case Coordinators interview children before they make a recommendation on step-up or step-down.

67.    FFS are ORR staff members.

68.    ORR's written policy does not require FFS to interview children before making a final step-up and step-down decision.

69.    An FFS did not interview class representatives Lucas R., Gabriela N. Daniela Marisol, Sirena P., or Benjamin F. before stepping them up to Shiloh RTC. Notes in their case files show they met with their Case Managers to discuss their case.

70.    An FFS did not interview class representative Jaime D. before stepping him up to Yolo secure.  Jaime D. met with his Case Manager to discuss his case.

71.    ORR's written policy does not require FFS to communicate with a child's potential custodian before making a step-up or step-down decision.

72.    ORR's MAP Section 3.2.1 provides: "Within 24 hours of admission, the designated care provider staff . . . [d]etermines if it is safe to allow the [child] to contact family members or other relatives, following ORR policy and procedures and the care provider's internal safety procedure. Provides [child] an opportunity with assistance, as necessary, to contact family members, or other relatives, or the [child]'s consulate."

73.    ORR does not require that a child be provided prior notice that he or she may be stepped up or the reasons for step-up.

74.    Class representatives Lucas R. Gabriela N., Daniela Marisol, Sirena P., Jaime D., and Benjamin F. were stepped up without being provided written notice of the basis for restrictive placement prior to step-up.

75.    Class representatives Lucas R., Gabriela N., Daniela Marisol, Sirena P, Jaime D., and Benjamin F.'s potential sponsors were not provided written notice of the basis for restrictive placement prior to the child being stepped-up.

76.     The Notice of Placement ("NOP") states that: "ORR will review your placement at a minimum, every 30 days to determine whether your placement in a restrictive level of care is still necessary. If you remain in a secure facility or RTC after 30 days, you may request that the ORR Director reconsider your placement. For more information on the process, please ask your case manager. If you believe you have not been properly placed or that you have been treated improperly, you may also ask a Federal District court to review your case. You may call a lawyer to assist you."

77.     ORR's written policy does not require that a child's NOP be provided to the child's parents or other potential sponsors.

78.     ORR's MAP provides: "All information used in assessing a 30-day Case Review decision is considered evidence. This information must be shared with the [child]'s attorney of record, LSP or Child Advocate, on demand and does not require a prior *Authorization for Release of Records* only proof of representation." MAP § 1.4.2.

79.     Class representatives Lucas R. Gabriela N., Daniela Marisol, Sirena P., and Benjamin F. were stepped up to an RTC, and Jaime D. was stepped up to secure juvenile detention without being provided an evidentiary hearing to challenge the step-up decision.

80.     Class representatives Lucas R. Gabriela N., Daniela Marisol, Sirena P., and Benjamin F. were stepped up to an RTC, and Jaime D. was stepped up to secure juvenile detention without being provided an opportunity to inspect or rebut adverse evidence in an evidentiary hearing regarding step-up or placement in a restrictive setting.

81.     ORR does not provide children the opportunity to cross-examine witnesses in an evidentiary hearing regarding step-up or placement in a restrictive setting.

82.     Class representatives Lucas R. Gabriela N., Daniela Marisol, Sirena P., and Benjamin F. were stepped up to an RTC, and Jaime D. was stepped up to secure juvenile detention without being provided an opportunity to cross-examine witnesses in an evidentiary hearing regarding step-up or placement in a restrictive setting.

83.     ORR's Policy Guide provides that "children have the opportunity to seek

a bond hearing with an immigration judge. In a bond hearing, an immigration judge decides whether the child poses a danger to the community. . . . An immigration judge's decision that the unaccompanied alien child is not a danger to the community supersedes an ORR determination on that question, unless the immigration judge's decision is overturned by the Board of Immigration Appeals (BIA). However, even if an immigration judge decides the child is eligible for bond (meaning the child does not pose a danger to the community and need not remain in an ORR facility for that reason), in all cases release from ORR custody cannot occur until ORR has identified, evaluated and approved an appropriate sponsor . . . . An immigration judge does not rule on any of the following: [1] release to a sponsor; [2] the unaccompanied alien child's placement or conditions of placement while in ORR custody; or [3] releasing the child on his or her own recognizance." Policy Guide § 2.9.

84.     ORR's Policy Guide requires that stepped up children receive a placement review at least once every 30 days they spend in a restrictive placement. Policy Guide § 1.4.2

85.     ORR's MAP Section 1.4.2, titled "30 Day Restrictive Placement Case Review," states: "If the FFS decision is to continue the [child]'s placement the information justifying the [child]'s placement in a restrictive setting is summarized by the case manager and provided in a new *Notice of Placement in a Restrictive Setting*, with a date stamp within the 'summary of placement decision or case review' section of the form. Fig. 1.12 is the snapshot of the Summary of Placement Decision or Case Review Section of the Notice of Placement in a Restrictive Setting." ORR's Policy Guide also provides that "[t]he care provider staff documents the basis for continued placement in a secure staff secure, or RTC facility in the [child]'s case file and provides the information to the youth's attorney of record, legal service provider, or Child Advocate, on demand." Policy Guide § 1.4.2.

86.     ORR's Policy Guide provides that the "FFS consults with Supervisory ORR staff for [children] who have resided in a secure or RTC care facility for over 90

days," and the "FFS consults with Supervisory ORR staff regarding the placement every 30 days thereafter until the [child] is stepped down or discharged." Policy Guide § 1.4.2.

87.   Class representatives Lucas R. Gabriela N., Daniela Marisol, Sirena P., Jaime D., and Benjamin F. participated in case management meetings with their Case Managers, but they were not a part of the case staffing meetings that occurred between Case Managers, Clinicians, Case Coordinators, and FFS to discuss their cases.

88.   Class representatives Lucas R., Gabriela N., Daniela Marisol, Sirena P., Jaime D., and Benjamin F. did not request ORR Director review of ORR's decision to place them in a restrictive placement.

89.   Class representatives Lucas R., Gabriela N., Daniela Marisol, Sirena P., Jaime D., and Benjamin F. were not provided an opportunity to cross-examine witnesses in an evidentiary hearing regarding eligibility for step-down.

90.   ORR's placement of children in RTCs is more financially expensive than placing them in shelters.

91.   ORR steps up relatively few children.

92.   Case Managers are not federal employees, but are employed by "care providers," *i.e.*, private facilities with which ORR enters into cooperative agreements to place and care for children in ORR legal custody.

93.   Since the Unaccompanied Alien Child ("UAC") program began, starting with the Immigration and Nationalization Service, the program has used cooperative agreements with state-licensed shelters, RTCs, and juvenile detention centers.

94.   Once a Case Manager recommends for or against releasing a child, a recommendation is made to a Case Coordinator— a "non-governmental contractor field staff assigned to . . . review unaccompanied alien children cases and provide transfer and release recommendations to ORR staff."

95.   FFS exercise final "authority to approve all unaccompanied alien children transfer and release decisions" except denials of release to a parent or legal guardian, which must be elevated to the ORR Director.

96.     Clinicians are "[r]esponsible for interviewing a potential sponsor, completing the Sponsor Assessment, and collecting other information to evaluate the sponsor."

97.     ORR has a legal services contract with the Vera Institute of Justice that funds limited scope direct representation for UAC in immigration-related matters.

98.     Vera is a contractor whose scope of work is to implement regional programs providing limited scope legal services to UAC.

99.     ORR views its Congressional appropriation for legal services funding as funding immigration-related legal services. ORR does not view the appropriation as funding other attorney work, such as work to represent children with respect to (i) release, (ii) step-up or step-down, and/or (iii) the administration of psychotropic medications.

100.    CAIR (in Virginia and Maryland) and LSC (in Northern California) have appeared as counsel of record in federal court cases.  CAIR represented a UAC in an administrative appeal before the Assistant Secretary.

101.    ORR appointed a Juvenile Coordinator with respect to the July 30, 2018 Order in *Flores v. Barr*, No. 85-4544-DMG (C.D. Cal.).

102.    On July 1, 2020, the ORR Juvenile Coordinator submitted an annual report to the court in *Flores v. Barr*, No. 85-4544-DMG (C.D. Cal.).

103.    The ORR Juvenile Coordinator's July 1, 2020 Annual Report "documents ORR services, processes, and policies throughout various departments" and "summarizes the Juvenile Coordinator's site visits to the various shelters from June 1, 2019 through May 31, 2020."

Dated:  October 2, 2020

CENTER FOR HUMAN RIGHTS
& CONSTITUTIONAL LAW

By: */s/ Summer J. Wynn*
    Summer J. Wynn (240005)
    Attorneys for Plaintiffs
    Email:  swynn@cooley.com

JEFFREY B. CLARK
Acting Assistant Attorney General

ERNESTO H. MOLINA
Deputy Director

*/s/ W. Daniel Shieh*
BENJAMIN M. MOSS
W. DANIEL SHIEH
Senior Litigation Counsel

NANCY K. CANTER
JONATHAN K. ROSS
ANTHONY J. MESSURI
Trial Attorneys
Office of Immigration Litigation
United States Department of Justice
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-9802
Email: Daniel.Shieh@usdoj.gov

*Counsel for Defendants*

## CERTIFICATION

Pursuant to Local Rule 5-4.3.4(a)(2)(i), I certify that all of the above signatories concur in this filing's content and have authorized the filing.

Dated:  October 2, 2020

CENTER FOR HUMAN RIGHTS
& CONSTITUTIONAL LAW

By: */s/ Summer J. Wynn*
    Summer J. Wynn (240005)
    Attorneys for Plaintiffs
    Email:  swynn@cooley.com

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

18

STIPULATED FACTS
CASE NO. 2:18-CV-05741 DMG PLA