JEFFREY B. CLARK
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
ERNESTO H. MOLINA, JR.
Deputy Director
CHRISTOPHER A. BATES
Senior Counsel to the Assistant Attorney General
BENJAMIN M. MOSS
W. DANIEL SHIEH
Senior Litigation Counsel
NANCY K. CANTER
ANTHONY J. MESSURI
JONATHAN K. ROSS
Trial Attorneys
Office of Immigration Litigation
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-9802
Daniel.Shieh@usdoj.gov

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Lucas R., *et. al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> Alex M. Azar, <br> Secretary of U.S. Dep't of Health and Human Services, *et al*. <br><br> *Defendants*. | Case No.: 18-cv-05741-DMG-PLA <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES AND EXHIBITS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO F.R.C.P. 56.** <br><br> Hearing Date: December 11, 2020 <br> Time: 3:00 p.m. PT <br> 350 West 1st Street <br> Los Angeles, CA 90012 <br><br> Honorable Dolly M. Gee <br> United States District Judge |

# **TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................1

II.    RELEVANT BACKGROUND ........................................................6

III.   ISSUES PRESENTED ..................................................................12

    1.  Whether the Court should grant summary judgment for Defendants on Plaintiffs' step-up claim (the second claim for relief, Compl. ¶¶ 183-84), because the claim is barred by res judicata and because there is no genuine dispute of material fact that ORR's policies and procedures on placement of UACs in restrictive settings comport with due process, the TVPRA, and the APA ............................................................12

    2.  Whether the Court should grant summary judgment for Defendants on Plaintiffs' unfit-custodian claim (the first claim for relief, Compl. ¶¶-180-81), because the claim is barred by res judicata and because there is no genuine dispute of material fact that ORR's policies and procedures for release decisions comport with due process, the TVPRA, the APA, and the First Amendment's Freedom of Association Clause...................12

    3.  Whether the Court should grant summary judgment for Defendants on Plaintiffs' legal-representation claim (the fourth claim for relief, Compl. ¶¶ 189-90), because the claim is barred by res judicata and because there is no genuine dispute of material fact that ORR's policies and procedures regarding legal representation of UACs comport with due process, the TVPRA, the HSA, federal immigration regulations, and the APA. ........12

IV.   LEGAL STANDARD FOR SUMMARY JUDGMENT .............................13

V.    ARGUMENT...................................................................................14

    A. Defendants Are Entitled to Judgment as a Matter of Law on the Step-Up Class's Claim. ..............................................................14

       1)  Plaintifs' claim for the step-up class is barred by *res judicata.* .........14

       2) ORR's policies and procedures for the step-up class satisfy due process as a matter of law. .................................................................18

i

a.  Private interests..................................................................19

b.  Risk of erroneous deprivation ................................25

c.  The government's interest ................................31

d.  Balance of *Mathews* factors ................................32

3) ORR's policies and procedures for the step-up class comport with the TVPRA and the APA ................................33

B. Defendants Are Entitled to Judgment as a Matter of Law on the Unfit-Custodian Class's Claim..................................34

1) The unfit-custodian claim is barred by *res judicata.* ..........34

2) ORR's policies and procedures for the unfit-custodian class satisfy due process as a matter of law. ................................38

a.  Private interests..................................................................38

b.  Risk of erroneous deprivation ................................43

c.  The government's interest ................................48

d.  Balance of *Mathews* factors ................................49

3) ORR's policies and procedures for the unfit-custodian class comport with the TVPRA, the APA, and the First Amendment ........49

C. Defendants Are Entitled to Judgment as a Matter of Law on the Legal-Representation Class's Claim. ................................51

1) The legal-representation class's claim is barred by *res judicata.* .......51

2) ORR's policies and procedures for the legal-representation class satisfy due process as a matter of law. ................................53

3) ORR's policies and procedures for the legal-representation class comport with the TVPRA, the HSA, Title 8, and the APA ...............57

VI.   CONCLUSION................................................................60

ii

## **TABLE OF AUTHORITIES**

## **CASES**

*Al Otro Lado, Inc. v. McAleenan*,
  423 F.Supp.3d 848 (S.D. Cal. 2019) ........................................... 31, 47

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ..................................................................... 13, 14

*Beyene v. Coleman Sec. Servs., Inc.*,
  854 F.2d 1179 (9th Cir. 1988) ....................................................... 13-14

*Boy Scouts of America v. Dale*,
  530 U.S. 640 (2000) .............................................................................50

*Carver v. Lehman*,
  558 F.3d 869 (9th Cir. 2009) ..................................................... 20, 53

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .............................................................................13

*Connecticut Bd. of Pardons v. Dumschat*,
  452 U.S. 458 (1981) .............................................................................20

*Cortez–Flores v. INS*,
  500 F.2d 178 (5th Cir. 1974) ..............................................................43

*Costantini v. Trans World Airlines*,
  681 F.2d 1199 (9th Cir. 1982) ............................................................35

*D.B. v. Cardall*,
  826 F.3d 721 (4th Cir. 2016) ..............................................................42

*Dawson v. Delaware*,
  503 U.S. 159 (1992) .............................................................................50

*Demore v. Kim*,
  538 U.S. 510 (2003) .............................................................................40

*Devereaux v. Abbey*,
    263 F.3d 1070 (9th Cir. 2001) ...............................................................13

*DHS v. Thuraissigiam*,
    140 S. Ct. 1959 (2020) .........................................................................40

*Fiallo v. Bell*,
    430 U.S. 787 (1977) .............................................................................21

*Flores v. Lynch*,
    828 F.3d 898 (9th Cir. 2016) ......................................................... 6, 15

*Flores v. Barr*,
    No. 2:85-cv-04544 (July 30, 2018). .............................................. 20, 52

*Flores v. Sessions*,
    862 F.3d 863 (9th Cir. 2017) ...................................................... 9-10, 26

*Flores–Quezada v. Gonzales*,
    134 F. App'x 202 (9th Cir. 2005) ........................................................43

*Gallanosa v. United States*,
    785 F.2d 116 (4th Cir. 1986) ..............................................................42

*Gault, In re*,
    387 U.S. 1 (1967) ......................................................................... 22, 23

*Harris v. Cty. of Orange*,
    682 F.3d 1126 (9th Cir. 2012) .................................................. 15, 35, 51

*Hayward v. Marshall*,
    603 F.3d 546 (9th Cir. 2010) .............................................. 20, 21, 39, 40

*Ho by Ho v. San Francisco Unified School Dist.*,
    965 F. Supp. 1316 (N.D. Cal 1997) .....................................................15

*Howard v. City of Coos Bay*,
    871 F.3d 1032 (9th Cir. 2017) ...................................... 16, 35, 47, 52

*IDK, Inc. v. Clark Cty.*,
  836 F.2d 1185 (9th Cir. 1988) ...............................................................50

*J.E.F.M. v. Lynch*,
  837 F.3d 1026 (9th Cir. 2016) ..............................................................53

*J.F.G., Reyna as next friend of v. Hott*,
  921 F.3d 204 (4th Cir. 2019) ................................................................42

*Kentucky Dep't of Corrections v. Thompson*,
  490 U.S. 454 (1989) ..................................................... 19, 21, 39-40

*King Cty. v. Rasmussen*,
  299 F.3d 1077 (9th Cir. 2002) ..............................................................13

*King v. Atiyeh*,
  814 F.2d 565 (9th Cir. 1987) ........................................................ 30, 47

*Mathews v. Diaz*,
  426 U.S. 67 (1976) ..................................................................................22

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ...................................................................... passim

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ................................................................................14

*McSherry v. City of Long Beach*,
  584 F.3d 1129 (9th Cir. 2009) ...................................................... 13, 56

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) ................................................................................15

*Newton v. INS*,
  736 F.2d 336 (6th Cir. 1984) ................................................................43

*Olim v. Wakinekona*,
  461 U.S. 238 (1983) ................................................................................20

v

*Parham v. J.R.*,
   442 U.S. 584 (1979) ................................................................. 23, 27

*Parra v. Perryman*,
   172 F.3d 954 (7th Cir. 1999) ....................................................22

*Payne-Barahona v. Gonzales*,
   474 F.3d 1 (1st Cir. 2007) ........................................................43

*Perez-Funez v. Dist. Dir., INS*,
   619 F. Supp. 656 (C.D. Cal. 1985)...........................................53

*Reno v. Flores*,
   507 U.S. 292 (1993) ......................................................... passim

*Robles v. INS*,
   485 F.2d 100 (10th Cir. 1973)..................................................43

*Rufo v. Inmates of Suffolk Cnty. Jail*,
   502 U.S. 367 (1992) .................................................................15

*Santos v. Smith*,
   260 F. Supp. 3d 598 (W.D. Va. 2017)......................................40

*Schall v. Martin*,
   467 U.S. 253 (1984) .................................................................21

*Smith v. Sumner*,
   994 F.2d 1401 (9th Cir. 1993) ..................................... 20, 21, 54

*Taylor v. Sturgell*,
   553 U.S. 880 (2008) .................................................................15

*Troxel v. Granville*,
   530 U.S. 57 (2000) ...................................................................42

*United States v. Asarco Inc.*,
   430 F.3d 972 (9th Cir. 2005) ....................................................20

vi

*United States v. Johnson*,
    28 F.3d 151 (D.C. Cir. 1994)..............................................................................23

*United States v. Salerno*,
    481 U.S. 739 (1987) ...........................................................................................24

*Western Radio Servs. Co., Inc. v. Glickman*,
    123 F.3d 1189 (9th Cir. 1997) .................................................................... 37, 53

## **STATUTES**

6 U.S.C. § 279 .................................................................................... passim

8 U.S.C. § 1229c .........................................................................................22

8 U.S.C. §1232 ................................................................................... passim

8 U.S.C. § 1252 ...........................................................................................6

8 U.S.C. § 1362 .................................................................................. 53, 58

8 U.S.C. § 1522 .........................................................................................39

31 U.S.C. § 6305 ..........................................................................................9

## **REGULATIONS**

8 C.F.R. § 240.25 ................................................................................ 10, 22

8 C.F.R. § 287.3 ................................................................................... 58, 60

8 C.F.R. § 1003.62 ............................................................................... 57-58

8 C.F.R. § 1240.10 ............................................................................... 57-58

8 C.F.R. § 1292.1 ................................................................................. 57-58

## **RULES**

Fed. R. Civ. P. 56 .................................................................................. 1, 13

## I.    INTRODUCTION

Plaintiffs seek judicially-created policies and procedures regarding the care of unaccompanied alien children (UACs) in Office of Refugee Resettlement (ORR) custody under a procedural-due-process theory that exceed both what they previously negotiated in a nationwide settlement agreement and what Congress has mandated by statute. These additional procedures would alter the policies and procedures that ORR follows in making three vital decisions to safeguard the welfare of UACs entrusted to its legal custody: (1) where UACs are housed; (2) when and how they are released; and (3) the services they receive while in federal custody. Two of the plaintiff classes in this case—the step-up class and the unfit-custodian class—challenge the policies and procedures ORR follows in making those decisions.  A third plaintiff class—the legal representation class—seeks additional services not provided by Congress to contest those decisions.  Each class's claims fail as a matter of law.  To start, their challenges were conclusively resolved in *Flores v. Barr*, No. 85-cv-04544, where this Court approved a settlement agreement (the *Flores* Settlement or Settlement) that "set[ ] out nationwide policy for the detention, release, and treatment of minors in the custody of the INS" (¶ 9) for "[a]ll minors who are detained in the legal custody of the INS" (¶ 10).  Even if these claims were not barred by *res judicata*, ORR's procedures satisfy due process as a matter of law and withstand all of Plaintiffs' other challenges.  This Court should therefore grant summary judgment for Defendants under Fed. R. Civ. P. 56 on those three classes' claims.

***First***, the Court should grant summary judgment for Defendants on the step-up class's claim that ORR does not provide adequate notice and an opportunity to be heard for UACs who are placed in a secure, staff-secure, or residential-treatment-center facility within 30 days of a step-up to those facilities.  The step-up claim is barred by *res judicata*.  The *Flores* Settlement conclusively resolved the question of what procedures due process requires be provided to UACs who wish to challenge

ORR placement decisions. Under the Settlement, a minor may seek "a bond redetermination hearing before an immigration judge" (¶ 24A) to determine dangerousness or whether they are a flight risk, and "[a]ny minor who disagrees with the INS's determination to place that minor in a particular type of facility . . . may seek judicial review in any United States District Court with jurisdiction and venue over the matter to challenge that placement determination" (¶24B). The step-up class's claim involves substantially the same evidence, alleges infringement of the same rights, and arises out of the same transactional nucleus of facts as the *Flores* Settlement. Under settled principles of *res judicata*, the Settlement precludes the step-up class from raising a *new* procedural due process claim to seek *new* procedures not required under the Settlement for this class, and imposing such procedures would deprive Defendants of the benefits that they negotiated under the Settlement.

Even if *res judicata* did not bar the step-up class's claim, the Court should still grant summary judgment to Defendants because ORR's policies and procedures for that class satisfy due process as a matter of law under *Mathews v. Eldridge*, 424 U.S. 319 (1976). Children, unlike adults, are always in some form of custody, and so their liberty interest is limited. UACs in particular are children who lack an available care provider, and Congress has expressly granted custody of UACs to ORR. ORR, in turn, has developed and follows extensive procedures when placing a UAC in a more restrictive setting. Those procedures include multiple levels of review and opportunities to be heard, and balance important interests such as placing a child in the least restrictive setting appropriate for the child's needs while also providing for the safety and welfare of other children in ORR care. Additional procedures allowing further challenges to routine child-welfare decision-making in an adversarial proceeding would not meaningfully reduce the (already low) risk of erroneous deprivation of the class members' diminished liberty interest.

Accordingly, under *Mathews*, Defendants are entitled to judgment as a matter of law on the step-up class's due-process claim.

Defendants are also entitled to judgment as a matter of law on the step-up class's claim that ORR's policies and procedures on custody decisions violate the Trafficking Victims Protection Reauthorization Act (TVPRA) and the Administrative Procedure Act (APA). Plaintiffs identify no provision under either statute that mandates the procedures they seek, and their claim under both statutes is simply their procedural-due-process claim recast as a statutory violation. So their claims under the TVPRA and the APA fail as a matter of law.

***Second***, the Court should grant summary judgment for Defendants on the unfit-custodian class's claim that ORR does not provide a timely and meaningful opportunity to be heard when ORR delays or denies release to potential sponsors. Plaintiffs' unfit-custodian claim is barred by *res judicata* because the *Flores* Settlement conclusively resolved what procedures due process requires for release decisions. The Settlement requires ORR to avoid "unnecessary delay" in releasing minors from its custody (¶ 14), sets forth criteria for ORR to consider in making a suitability determination for potential sponsors (¶ 17), requires ORR to "make" and "record" release efforts (¶ 18), and sets forth a procedure for a UAC's attorney to contact a "juvenile coordinator" to "investigate" any case where "Plaintiffs' counsel have reasonable cause to believe a minor . . . should have been released" (¶ 28B). The unfit-custodian class's claim involves substantially the same evidence, alleges infringement of the same rights, and arises out of the same transactional nucleus of facts as *Flores*, which set forth "nationwide policy for the detention, release, and treatment of minors in the custody of the INS" (¶ 9). *Res judicata* thus precludes a new due-process claim like this one that seeks additional procedures for minors in immigration custody on claims that could have been raised in *Flores*.

Even if *res judicata* did not bar the unfit-custodian class's claim, the Court should still grant summary judgment for Defendants because ORR's policies and

procedures regarding release satisfy due process as a matter of law.  As with the step-up class, the unfit-custodian class's liberty interest is limited given class members' status as children and as UACs apprehended at the border without legal immigration status.  And ORR has developed and follows extensive procedures involving multiple levels of review in determining whether to release a UAC to a potential sponsor.  These processes safeguard the welfare of children in ORR's care while affording both children and potential sponsors ample opportunities to present information supporting release.  These processes, which appropriately balance the competing interests involved in release decisions in a safe and timely manner, satisfy due process as a matter of law.

Defendants are further entitled to judgment as a matter of law on the unfit-custodian class's claim that ORR's policies and procedures for release decisions violate the TVPRA, the APA, and the First Amendment.  Plaintiffs identify no provision under either the TVPRA or the APA that mandates the procedures they seek, and their claims under both statutes are simply their procedural-due-process claims recast as statutory violations.  Similarly, Plaintiffs' claim under the First Amendment fails as a matter of law because it is simply their flawed due-process claim recast under the First Amendment's Freedom of Association Clause, which does not help them in this context.

***Finally***, the Court should grant summary judgment for Defendants on the legal-representation class's claim that ORR "blocks" lawyers from representing class members in matters involving ORR's custody, release, medication, and placement decisions.  The legal-representation class's claim that due process requires ORR to facilitate access to counsel to contest routine ORR decisionmaking is barred by *res judicata*.  The *Flores* Settlement conclusively resolved this issue: for legal representation, the Settlement expressly provides that UACs must receive information regarding the "right to be represented by counsel at no expense to the government," but articulates no other requirements for facilitation beyond providing

"[l]egal services information regarding the availability of free legal assistance" (Ex. 1, ¶ 14). Like the claims of the step-up and unfit-custodian classes, the legal-representation class's claim involves substantially the same evidence, alleges infringement of the same rights, and arises out of the same transactional nucleus of facts as *Flores*. *Res judicata* therefore precludes Plaintiffs' due process claim seeking additional legal-representation entitlements for class members beyond those provided in the *Flores* Settlement.

Summary judgment for Defendants is also warranted on the legal-representation class's claim, even if *res judicata* did not apply, because ORR's policies and procedures regarding legal representation of UACs satisfy due process. There is no protected liberty interest in Plaintiffs' claimed right to access representation by ORR-funded legal service providers to challenge ORR's step-up, release, and medication decisions. Challenges to routine child-welfare decisionmaking have never been interpreted to mean "legal proceedings or matters" under § 235(c)(5) of the TVPRA, and there is no evidence that ORR blocks legal service providers from using non-ORR funds to independently represent UACs. And even if there were some minimal interest, any risk of erroneous deprivation is low given ORR's extensive policies and procedures to ensure that UACs can obtain information about the ability "to be represented by counsel at no expense to the government" (Ex. 1, ¶ 14).

Defendants are also entitled to judgment as a matter of law on the legal-representation class's claim that ORR's policies and procedures for legal representation of UACs contravene the TVPRA, the Homeland Security Act (HSA), federal immigration regulations, and the APA. None of these statute and regulations mandate the right to access government-funded counsel to represent UACs in matters unrelated to immigration proceedings, government-funded or not, nor do the uncontroverted facts show that ORR blocks attorneys of record from representing their clients. Thus, Plaintiffs' legal-representation claims fail as a matter of law.

For all these reasons, Defendants are entitled to judgment as a matter of law on the step-up, unfit-custodian, and legal-representation classes' claims.

## II.   RELEVANT BACKGROUND

***The* Flores *Litigation and Its Resolution of Issues for UACs.*** *Flores v. Barr*, No. 85-cv-04544 (C.D. Cal.), was filed in 1985.  The *Flores* plaintiffs brought suit on behalf of a class of certain alien minors detained by the INS because "a parent or legal guardian [had] fail[ed] to personally appear to take custody of them." *Reno v. Flores*, 507 U.S. 292, 296 (1993).  In 1986, the district court certified two classes:

> (1) All persons under the age of eighteen (18) years who have been, are, or will be arrested and detained pursuant to 8 U.S.C. § 1252 by [INS] within the INS' Western Region and who have been, are, or will be denied release from INS custody because a parent or legal guardian fails to personally appear to take custody of them; and (2) All persons under the age of eighteen (18) who have been, are, or will be arrested and detained pursuant to 8 U.S.C. § 1252 by [INS] within the INS' Western Region and who have been, are, or will be subjected to any of the following conditions: a. inadequate opportunities for exercise or recreation; b. inadequate educational instruction; c. inadequate reading materials; d. inadequate opportunities for visitation with counsel, family, and friends; e. regular contact as a result of confinement with adult detainees unrelated to such minors either by blood, marriage, or otherwise; f. strip or body cavity search after meeting with counsel or at any other time or occasion absent demonstrable adequate cause.

*Flores v. Lynch*, 828 F.3d 898, 902 (9th Cir. 2016).  In May 1988, the INS published rules governing the detention and release of juveniles, 53 Fed. Reg. 17449, which the Supreme Court upheld.  *Flores*, 507 U.S. at 315.  The Supreme Court held that the new rules were a "reasonable response to the difficult problems presented when the [INS] arrests unaccompanied alien juveniles" and "accord[ed] with both the Constitution and the relevant statute." *Id.* at 315.

Memorandum in Support of Motion for Summary Judgment

In 1997, the *Flores* district court approved a settlement agreement between the federal government and a class of "[a]ll minors who are detained in the legal custody of the INS" (¶ 10).  The Settlement "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS" (¶ 9) and provides detailed procedures and standards for the release and placement of UACs in federal custody (Ex. 1).  The Settlement states that "upon execution of this Agreement in their representative capacities, the principals, agents, and successors of such principals and agents shall be fully and unequivocally bound hereunder to the full extent authorized by law" (¶ 41).

On placement of UACs in federal custody, the Settlement provides that "[a] minor may be held in or transferred to a suitable State or county juvenile detention facility" whenever the relevant agency official "determines that the minor" has met certain criteria, including being chargeable with a crime, making credible threats of violence, engaging in unacceptably disruptive behavior, or being an escape risk (¶ 21).  The Settlement additionally allows challenges to certain agency custodial decisions: it specifies procedures for a bond hearing before an immigration judge (¶ 24A), allows for judicial review in a court with jurisdiction and venue to challenge placement in a particular type of facility, such as a secure facility (¶ 24B), and articulates an "abuse of discretion" standard of review for such placements (¶ 24C).  It also delegates review and approvals of placements in secure facilities to agency personnel and does not require further process within the agency (¶ 23).

On release, the Settlement provides that release shall be considered only where the agency "determines that detention . . . is not required . . . to secure . . . appearance before the . . . immigration court, or to ensure the minor's safety or that of others."  In such a case, the agency "shall release a minor from its custody without unnecessary delay" to an approved custodian (¶ 14), and the agency "shall make and record the prompt and continuous efforts on its part toward . . . release" (¶ 18).  The

7

Memorandum in Support of Motion for Summary Judgment

Settlement also provides the agency with broad authority to conduct suitability determinations of potential custodians, which "may" include a number of "components," before releasing a class member (¶ 17).  The Settlement specifies that if "Plaintiffs' counsel have reasonable cause to believe that a minor in INS legal custody should have been released pursuant to Paragraph 14, Plaintiffs' counsel may contact the Juvenile Coordinator to request that the Coordinator investigate the case and inform Plaintiffs' counsel of the reasons why the minor has not been released" (¶ 28B).

Finally, the Settlement provides that UACs are to be provided with a list of free legal services that may be available to them, and that UACs in licensed programs should be informed of their "right to be represented by counsel at no expense to the government" (¶ 24D; Ex. 1, ¶ 14).  The Settlement provides no right to counsel, government-funded or not.

***Legislative Developments to Address UACs.***  In 2002, Congress enacted the HSA, Pub. L. No. 107-296, 116 Stat. 2135 (codified in relevant part at 6 U.S.C. § 279).  The HSA abolished the INS, established the Department of Homeland Security (DHS), and transferred several functions with respect to the care of UACs from the INS to ORR, an office within the Department of Health and Human Services (HHS).  6 U.S.C. §§ 279(a), (b)(1)(A), (g)(2).  Under the HSA, ORR is responsible for the care and placement of UACs who enter the United States illegally and who are "in Federal custody by reason of their immigration status."  *Id.* § 279(b)(1)(A).  The HSA charges ORR with "coordinating and implementing the care and placement of unaccompanied alien children," "ensuring that the best interests of the child are considered in decisions and actions relating to the care and custody of an unaccompanied alien child," and identifying "a sufficient number of qualified individuals, entities, and facilities to house" such children. *Id.* § 279(b)(1). The HSA provides that ORR "shall not release" unaccompanied minor children "upon their own recognizance."  6 U.S.C. § 279(b)(2)(B).  The HSA includes a

8

Memorandum in Support of Motion for Summary Judgment

savings clause that preserves "administrative actions" to which INS was a party, *id.* § 552(a)(1) (incorporated by reference in 6 U.S.C. § 279(f)(2)), which has been read to include the *Flores* Settlement.

In 2008, the TVPRA was enacted, Pub. L. No. 110-457, 122 Stat. 5044 (principally codified in relevant part at 8 U.S.C. § 1232), "to enhance the efforts of the United States to prevent trafficking in persons," to reflect Congress's goal of ensuring that UACs "are safely repatriated to their country of nationality or of last habitual residence," and to avoid incentives that would lead to alien smuggling and dangerous travel for minor children. 8 U.S.C. § 1232(a). The TVPRA defines a UAC as a person under age 18 who lacks lawful immigration status in the United States and for whom (a) no parent or legal guardian is in the United States, or (b) no parent or legal guardian is available to provide care and physical custody. 8 U.S.C. § 1232(g); *see also* 6 U.S.C. § 279(g)(2). Under the TVPRA, UACs from countries not contiguous to the United States and certain UACs from contiguous countries are placed into HHS custody. *See* 8 U.S.C. §§ 1232(a)(3)-(4), (a)(5)(D), (d)(8). The TVPRA further directs HHS to place UACs "in the least restrictive setting that is in the best interest of the child," 8 U.S.C. § 1232(c)(2)(A), while the UAC is in HHS ORR custody—that is, until the UAC is released to a suitable sponsor, obtains lawful status, or leaves the country, *see* 6 U.S.C. § 279(g); 8 U.S.C §§ 1232(b)(1), (g). In placing children in the least restrictive setting that is in the child's best interests, HHS is to "consider danger to self, danger to the community, and risk of flight." 8 U.S.C. § 1232(c)(2)(A). Organizations that provide shelter and services to UACs do so with substantial ORR involvement pursuant to a cooperative agreement with ORR, *see* 31 U.S.C. § 6305, and must comply with ORR's policies and procedures. Defendants' Statement of Uncontroverted Facts (U.F.) ¶¶ 8-9; Joint Stipulation Regarding Motion and Cross-Motion for Summary Judgment (J.S.) ¶ 93.

The ORR Guide specifies several mechanisms for obtaining a UAC's release. *See generally* ORR Guide § 2; *Flores v. Sessions*, 862 F.3d 863, 871, n.8 (9th Cir.

2017).  "Parents, relatives, or close family friends may apply to have the child released to their care."  ORR Guide § 2.2.  In the rare situation where release is denied to a parent or legal guardian, special procedures apply, a formal decision letter is sent, and the parent or legal guardian may appeal and request a hearing before the Assistant Secretary for Children and Families.  ORR Guide § 2.7.8.  The Ninth Circuit has additionally interpreted the *Flores* Settlement to provide UACs in ORR custody the right to challenge in an immigration-court bond hearing continued custody that is based solely upon the danger the UAC would present upon release. *Flores*, 862 F.3d at 881.[1]  A UAC can decide to leave ORR's custody at any time by seeking voluntary departure to his or her country of origin, at no cost to the UAC. *See* 8 U.S.C. § 1232(a)(5)(D)(ii); 8 C.F.R. § 240.25.

***This Case.***  On June 29, 2018, seven individual plaintiffs and two institutional plaintiffs filed this lawsuit challenging ORR's policies and practices regarding UACs in its custody.  In their operative, amended complaint, Plaintiffs brought five claims.  Amended Complaint, ECF. No. 81 (Compl.).  First, Plaintiffs claim that— in violation of the *Flores* Settlement, the TVPRA, the APA, the Due Process Clause, and the First Amendment's Freedom of Association Clause—"[a]s a matter of policy and practice Defendants unreasonably and unnecessarily delay or refuse to release children to parents, close family members, and other available custodians on the ostensible grounds that such custodians are or may be unfit, and they do so without affording detained minors or their proposed custodians a timely, prompt, or meaningful opportunity to be heard regarding such custodians' fitness."  Compl. ¶¶ 180-81.  Second, Plaintiffs claim that—in violation of the *Flores* Settlement, the TVPRA, the APA, and the Due Process Clause—"[a]s a matter of policy and practice, Defendants place Plaintiffs and those similarly situated in [residential

---

[1] The United States respectfully disagrees with the Ninth Circuit's interpretation of the *Flores* Settlement.  A favorable finding at a *Flores* bond hearing does not automatically entitle a UAC to release, as ORR must still determine the suitability of the sponsor to be a custodian.  *Flores*, 862 F.3d at 878.

treatment centers], secure facilities, and medium-secure facilities without affording them a meaningful opportunity to be heard either prior or subsequent to such placement." *Id.* ¶¶ 183-84.  Third, Plaintiffs claim that—in violation of the *Flores* Settlement, the TVPRA, the APA, and the Due Process Clause—"[a]s a matter of policy and practice, Defendants administer children psychotropic drugs without procedural safeguards, including: obtaining informed consent or the lawful equivalent; involving a neutral decision maker in the initial determination of whether to prescribe psychotropic medications to children in ORR custody; and conducting a periodic review of such treatment decisions to ensure that youth are not administered psychotropic medications unnecessarily or at harmful dosage levels or in harmful combinations."  *Id.* ¶¶ 186-87.  Fourth, Plaintiffs claim that—in violation of the *Flores* Settlement, the TVPRA, the HSA, the APA, and the Due Process Clause—"[a]s a matter of policy and practice, ORR blocks [Vera Institute of Justice (VIJ)]-funded lawyers from representing Plaintiffs and those similarly situated in legal matters and proceedings involving ORR's decisions regarding custody, release, medication, and placement." *Id.* ¶¶ 189-90.  Fifth, Plaintiffs claim that—in violation of the Rehabilitation Act—(1) "[a]s a matter of policy and practice, ORR places Plaintiffs who have or are perceived to have behavioral, mental health, intellectual and/or developmental disabilities in restrictive settings, such as secure facilities, medium secure facilities, or [residential treatment centers], because of their disabilities"; and (2) "[a]s a matter of policy and practice, ORR delays or obstructs the release of Plaintiffs who have or are perceived to have behavioral, mental health, intellectual and/or developmental disabilities to parents, close family members, and other available custodians because of their disabilities."  *Id.* ¶¶ 192-94.

In September 2018, Defendants moved to dismiss Plaintiffs' complaint in its entirety and Plaintiffs moved for class certification.  ECF No. 97, 101.  The Court granted Defendants' motion to dismiss "only insofar as it seeks the dismissal without prejudice of Plaintiffs' claims to enforce the *Flores* Agreement, but not insofar as it

requests the dismissal of Plaintiffs' claims that ORR failed to provide sufficient procedural safeguards for alien minors to exercise their *Flores* rights."  Amended Order, ECF No. 126 at 27 (Order).  The Court also certified five classes: (1) a step-up class, based on Plaintiffs' second claim—that UACs are denied due process when they are placed in secure, staff-secure, and residential-treatment-center facilities; (2) an unfit-custodian class, based on Plaintiffs' first claim for relief—that UACs are denied due process when they are denied release to potential sponsors; (3) a drug-administration class, based on Plaintiffs' third claim—that UACs are administered psychotropic drugs without appropriate safeguards; (4) a legal-representation class, based on Plaintiffs' fourth claim—that ORR blocks legal assistance to UACs in matters relating to their custody, medication, and release; and (5) a disability class, based on Plaintiffs' fifth claim—that ORR discriminates against UACs on the basis of disability in placement and release decisions. *Id.* at 27-28.

## III.   ISSUES PRESENTED

1. Whether the Court should grant summary judgment for Defendants on Plaintiffs' step-up claim (the second claim for relief, Compl. ¶¶ 183-84), because the claim is barred by *res judicata* and because there is no genuine dispute of material fact that ORR's policies and procedures on placement of UACs in restrictive settings comport with due process, the TVPRA, and the APA.

2. Whether the Court should grant summary judgment for Defendants on Plaintiffs' unfit-custodian claim (the first claim for relief, Compl. ¶¶ 180-81), because the claim is barred by *res judicata* and because there is no genuine dispute of material fact that ORR's policies and procedures for release decisions comport with due process, the TVPRA, the APA, and the First Amendment's Freedom of Association Clause.

3. Whether the Court should grant summary judgment for Defendants on Plaintiffs' legal-representation claim (the fourth claim for relief, Compl.

¶¶ 189-90), because the claim is barred by *res judicata* and because there is no genuine dispute of material fact that ORR's policies and procedures regarding legal representation of UACs comport with due process, the TVPRA, the HSA, federal immigration regulations, and the APA.

## IV.   LEGAL STANDARD FOR SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party has the initial burden of demonstrating the absence of any genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).  A fact is material if it may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Once the moving party carries its initial burden," the non-moving party must provide evidence that "set[s] forth specific facts showing that there is a genuine issue for trial." *Devereaux*, 263 F.3d. at 1076 (quoting Fed. R. Civ. P. 56(e)).

At summary judgment, the Court should draw evidentiary inferences in the light most favorable to the non-moving party. *King Cty. v. Rasmussen*, 299 F.3d 1077, 1083 (9th Cir. 2002).  But the moving party need not disprove matters on which the opponent has the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

To create a genuine issue of material fact, a party must rely on facts, not unsupported statements. *McSherry v. City of Long Beach*, 584 F.3d 1129, 1138 (9th Cir. 2009).  "[O]nly admissible evidence may be considered by the trial court in ruling on a motion for summary judgment." *Beyene v. Coleman Sec. Servs., Inc.*,

854 F.2d 1179, 1181 (9th Cir. 1988).  To defeat a motion for summary judgment, the non-moving party must present "evidence on which the [factfinder] could reasonably find for the" non-moving party.  *Liberty Lobby*, 477 U.S. at 252.  Thus, where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial and summary judgment is appropriate.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## V.   ARGUMENT

As a matter of law, Plaintiffs cannot prevail on their claims for the step-up, unfit-custodian, and legal-representation classes.  The Court therefore should grant summary judgment for Defendants on the first, second, and fourth claims in the operative complaint.

## A.   Defendants Are Entitled to Judgment as a Matter of Law on the Step-Up Class's Claim.

The Court should grant summary judgment for Defendants on Plaintiffs' claim that ORR's step-up procedures are unlawful because ORR allegedly does not provide adequate notice and an opportunity to be heard for UACs placed in secure, staff-secure, and residential-treatment-center facilities within 30 days. Compl. ¶¶ 122, 182-84.  Plaintiffs' step-up claim is barred by *res judicata*.  And ORR's policies and procedures for stepping up UACs to more restrictive settings satisfy due process and other legal requirements as a matter of law.

### 1)  Plaintiffs' claim for the step-up class is barred by *res judicata*.

Plaintiffs' step-up challenge—including the purported statutory aspects of their claim that simply replicate their due-process challenge—is barred by *res judicata*.  Their claim that due process requires additional procedures to challenge placement decisions was conclusively resolved in *Flores*.  "Under the doctrine of claim preclusion [*res judicata*], a final judgment forecloses 'successive litigation of

the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.'"   *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)).   "Claim preclusion requires three things: (1) identity of claims; (2) a final judgment on the merits; and (3) the same parties, or privity between the parties."   *Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012).

The last two requirements are straightforwardly satisfied here.   On the second requirement, the Ninth Circuit has treated the *Flores* Settlement as a consent decree, and it is therefore a final judgment on the merits.   *See Flores v. Lynch*, 828 F.3d 898, 905 (9th Cir. 2016) (stating "[t]he Settlement is a consent decree"); *see also Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992) (a consent decree is "an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees").   The *Flores* Settlement additionally states that it "constitutes a full and complete resolution of the issues raised in th[e] action."   *Flores* Settlement, pp. 3-4.

On the third requirement, the members of the step-up class are *Flores* class members, so they are in privity with the *Flores* class.   *See Ho by Ho v. San Francisco Unified School Dist.*, 965 F. Supp. 1316, 1321 (N.D. Cal 1997) (in a class action, the judgment "binds all class members on every matter which was or could have been offered to sustain or defeat the claims sued upon").   Paragraph 10 of the *Flores* Settlement defines the *Flores* class as "[a]ll minors who are detained in the legal custody of" ORR (previously the INS).[2]   The *Lucas R.* step-up class comprises "all

---

[2] As explained, the HSA transferred responsibilities for the care of UACs from the INS to ORR, *see* 6 U.S.C. §§ 279(a), (b)(1)(A), (g)(2), and the HSA's savings clause preserves administrative actions to which INS was a party, *see id.* § 552(a)(1) (incorporated by reference into 6 U.S.C. § 279(f)(2)).   This includes agreements to which INS was a party, such as the *Flores* Settlement, as set forth in paragraph 41 of the Settlement.   *See id.* § 552(a)(2).

minors in ORR custody . . . who are or will be placed in a secure facility, medium-secure facility, or [residential treatment center], or whom ORR has continued to detain in any such facility for more than 30 days, without being afforded notice and an opportunity to be heard before a neutral and detached decisionmaker regarding the grounds for such placement." Order at 27. All step-up class members are in ORR custody. The step-class is therefore a subset of the *Flores* class, and there is privity between the parties in the two suits.

On the first requirement for *res judicata*, there is an identity of claims between the step-up class's claim and the claims resolved in the *Flores* Settlement. In assessing whether there is an identity of claims between suits, the Court considers: (a) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (b) whether substantially the same evidence is presented in the two actions; (c) whether the two suits involve infringement of the same right; and (d) whether the two suits arise out of the same transactional nucleus of facts. *Howard v. City of Coos Bay*, 871 F.3d 1032, 1039 (9th Cir. 2017). "These criteria are not applied mechanistically," and "[t]he fourth criterion is the most important." *Id.* (internal quotation marks omitted).

All four factors establish an identity of claims between *Flores* and the step-up class. First, rights established under the *Flores* Settlement would be impaired by the step-up class's claim. The *Flores* Settlement authorizes the government, in resolution of Plaintiffs' due process claim, to place a minor in a restrictive facility "whenever" ORR determines the minor has met the criteria articulated in the Settlement (¶ 21), subject to two provisions: (1) that "[a]ll determinations to place a minor in a secure facility will be reviewed and approved by the regional juvenile coordinator" (¶ 23) and (2) that placement determinations may potentially be challenged through bond hearings (¶ 24A). ORR's placement authority, and the limitations on that authority, are thus part of the *Flores* Settlement. Upsetting that

authority—as Plaintiffs here seek to do—would impair rights established under *Flores*. *See* Compl. ¶ 126.

Second, the two actions involve substantially the same evidence. Both *Flores* and the step-up class's claim involve the procedures due process requires ORR to provide minors for challenging the government's decision to place a minor in a more restrictive facility. This is articulated in paragraph 69 of the original *Flores* complaint, which challenges the government's procedures for placing detained minors in restrictive settings, and in the preamble of the Settlement, which states that "Plaintiffs have filed this action against Defendants, challenging, *inter alia*, the *constitutionality* of Defendants' policies, practices and regulations regarding the detention and release of unaccompanied minors." Settlement at 3 (emphasis added). The parties also agreed in the Settlement that, in making placement decisions, the government will consider whether the minor poses a danger to self or others, including whether the minor "has been charged with, is chargeable, or has been convicted of a crime" or "is chargeable with a delinquent act" (¶ 21). This is the same standard articulated in the ORR Guide § 1.2.4, which also considers whether the minor "poses a danger to self or others." Thus, the question of what evidence the government should consider and what procedures it should follow in making placement decisions, as well as what processes it must provide to minors seeking to challenge such a decision, is the same in both cases.

Third, *Flores* and the step-up class's claim involve alleged infringement of the same right—the minor's asserted due-process right to contest the agency's placement decision. The *Flores* parties agreed that minors were entitled to a bond hearing, and further agreed that minors could challenge individual placement decisions in a court with jurisdiction and venue to hear their claims (¶ 24), which the parties agreed satisfied due process in order to resolve the suit, which was also brought on due-process grounds. Further, in holding that the immigration bond hearings under ¶ 24A were not terminated by the TVPRA, the Ninth Circuit reasoned

that these hearings were necessary because they "provide an opportunity to contest the basis of such confinement" and "ensure[ ] that [UACs] are not held in secure detention without cause," and that these hearings "provide[ ] meaningful protections" against arbitrary decisionmaking. *Flores*, 862 F.3d at 868.

Finally, the two actions arise out of the same transactional nucleus of facts. Both *Flores* and the step-up class ask the Court to address the procedures that due process requires when a minor wants to challenge his or her placement in a restrictive setting while in federal custody. The *Flores* Settlement sets forth processes for such placement decisions and for review of those decisions (¶¶ 21-24). In both *Flores* and this case, the factual scenario before the Court—the placement of a minor in a restrictive setting and the processes for review of such a placement—is the same. Accordingly, there is identity of claims between *Flores* and the step-up class.

All the requirements for claim preclusion are satisfied for the step-up class's claim. Thus, *res judicata* applies and bars the step-up class from seeking additional procedures beyond those already provided in the *Flores* Settlement without the Court first terminating the *Flores* Settlement.[3] Order 9-11.

### 2) ORR's policies and procedures for the step-up class satisfy due process as a matter of law.

Defendants are also entitled to judgment as a matter of law on the step-up class's due-process claim because ORR's policies and procedures for placement of minors in a restrictive setting satisfy due process as a matter of law. The Court weighs three factors in assessing whether the procedures the government provides comport with due process: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute

---

[3] If Plaintiffs are actually asserting that ORR is violating the *Flores* Settlement, *e.g.*, Compl. ¶ 126 ("ORR regularly places children in RTCs, secure and medium-secure facilities . . . contrary to immigration judges' determinations"), they must bring those claims in an enforcement action in *Flores* itself.

procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. The government's strong interests in protecting children in its care and the thorough procedures ORR follows in making placement decisions demonstrate that ORR's step-up procedures satisfy due process as a matter of law.

### a. Private interests

To start, the private interests that Plaintiffs allege have limited force as applied to ORR step-up decisions. Plaintiffs contend that minors in ORR care have two protected liberty interests that are relevant to the step-up claim: (1) a statutory interest under the TVPRA and a related contractual interest under the *Flores* Settlement to be placed in the "least restrictive setting"; and (2) a due-process interest in being free from "unnecessary physical restraints, including placement in RTCs, medium-secure or secure facilities." Comp. ¶¶ 117-19, 122. Both interests have limited weight as applied to Plaintiffs' step-up claim and, as explained below, are decisively outweighed by the other *Mathews* factors.

First, Plaintiffs have at most a limited interest under the TVPRA in placement "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A). A statute creates a protected liberty interest only when it: (1) establishes "'substantive predicates' to govern official decision-making," and (2) uses "'explicitly mandatory language,' *i.e.*, specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 462-63 (1989) (internal citations omitted). Even if the TVPRA establishes "substantive predicates"—*i.e.*, that a UAC "shall be promptly placed in the least restrictive setting that is in the best interest of the child," subject to considerations of "danger to self, danger to the community, and risk of flight"—it contains no "explicitly mandatory language" that provides that, when "substantive predicates are

present, a particular outcome must follow." 8 U.S.C. § 1232(c)(2)(A). The TVPRA's use of the word "shall" does not mandate a particular outcome. *See Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 466 (1981). The "'expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause' of the Fourteenth Amendment." *Carver v. Lehman*, 558 F.3d 869, 875 (9th Cir. 2009) (quoting *Olim v. Wakinekona*, 461 U.S. 238, 250-51 n. 12 (1983)). Here, the TVPRA uses broad language that directs the Secretary to consider "danger" to self or others in making placement decisions and delegates to the Secretary equally broad authority to "prescribe" the "procedures" used to review secure placements and determine if the "placement remains warranted." 8 U.S.C. § 1232(c)(2)(A). The statute does not mandate a particular outcome or require ORR to adopt a particular set of procedures. *See Hayward v. Marshall*, 603 F.3d 546, 560 (9th Cir. 2010) (holding that because parole is a discretionary, predictive decision, it does not create a protected liberty interest) (en banc). Thus, the TVPRA does not create a protected liberty interest in placement in a non-restrictive setting.

Plaintiffs' claimed liberty interest under the *Flores* Settlement similarly fails. Even if a consent decree could confer a protected liberty interest in limited instances, it does not do so here. To begin, although the Ninth Circuit has suggested that *Thompson*'s two-part test for ascertaining protected liberty interests can, under some circumstances, be applied to consent decrees, *see Smith v. Sumner*, 994 F.2d 1401, 1405-06 (9th Cir. 1993), the Ninth Circuit has never held that a consent decree can expand on itself, creating protected liberty interests that mandate *additional* procedures the parties never negotiated or agreed upon. To hold otherwise would be to contravene the rule that a "consent decree, like a contract, must be discerned within its four corners." *United States v. Asarco Inc.*, 430 F.3d 972, 980 (9th Cir. 2005). It would also conflict with this Court's ruling in *Flores* that procedural remedies (like the ones sought here) are not available to Plaintiffs for violations of the Settlement. *See Flores v. Barr*, Case No. 2:85-cv-04544, ECF No. 470 at 2-3

(July 30, 2018).  Further, *Smith* was a case about jury instructions, not nationwide injunctive relief, and the court in that case ruled that the consent decree at issue did *not* create the claimed liberty interest.  *Smith*, 994 F.2d at 1407 (holding "the right to retain counsel conferred by the consent decree is not itself a protected liberty interest.").

And in any event, the *Flores* Settlement does not create a protected liberty interest under *Thompson*'s two-part test because as with the TVPRA, it does not contain "explicitly mandatory language" that when "substantive predicates are present, a particular outcome must follow." *Thompson*, 490 U.S. at 463.  Paragraph 19 of the Settlement provides that UACs "shall be placed temporarily in a licensed program until such time as release can be effected in accordance with Paragraph 14" except in circumstances articulated under Paragraph 21.  Paragraph 21 in turn delegates broad authority to the government to place a UAC in a secure facility, including when the minor "has committed, or has made credible threats to commit, a violent or malicious act" or "has engaged, while in a licensed program, in conduct that has proven to be unacceptably disruptive of the normal functioning of the licensed program" (¶¶ 24B, 24C), and again does not mandate a particular outcome or set of procedures.  *See Hayward*, 603 F.3d at 560.  Thus, like the TVPRA, the *Flores* Settlement also does not create a protected liberty interest in placement in a non-restrictive setting.

Second, Plaintiffs' asserted due-process interest in freedom from "unnecessary physical restraint" has limited force as applied to ORR step-up decisions.  The Supreme Court has recognized that children, "unlike adults, are always in some form of custody." *Reno v. Flores*, 507 U.S. at 302; *Schall v. Martin*, 467 U.S. 253, 265 (1984).  Thus, every child's interest in freedom from custody is constrained, whether that child is in ORR custody by statutory mandate or in the custody of a private guardian.

Further, even if UACs in ORR care have a *general* liberty interest in freedom from "unnecessary physical restraint," this liberty interest is different from (and weaker than) the liberty interests of minors in other juvenile detention contexts. *See Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Mathews v. Diaz*, 426 U.S. 67, 79-80) (1976) ("[I]n the exercise of its broad power over immigration and naturalization, 'Congress regularly makes rules that would be unacceptable if applied to citizens.'"). In other juvenile detention contexts, the minor is coercively confined with no ability to secure his or her release. *See, e.g.*, *In re Gault*, 387 U.S. 1 (1967). The minor thus has no control over the length (or terms) of his or her detention, and additional, procedural safeguards are warranted to ensure that the greater loss of liberty comports with due process. Minors in the ORR context, by contrast, lack the same liberty deprivation, because a UAC can obtain release from custody by applying for and obtaining lawful immigration status, voluntarily departing the United States, or obtaining ORR approval for a sponsor to take custody of the UAC—none of these options are available in the juvenile detention context. 8 U.S.C. §§ 1229c, 1232(a)(5)(D); 8 C.F.R. § 240.25; *cf. Parra v. Perryman*, 172 F.3d 954, 958 (7th Cir. 1999) ("An alien in Parra's position can withdraw his defense of the removal proceeding and return home to his native land, thus ending his detention immediately. He has the keys in his pocket."). A UAC remains in ORR custody only until the UAC (or a person acting on the UAC's behalf) accomplishes one of the above actions. And until the UAC does so, ORR is charged by Congress with overseeing the UAC's care and custody, which includes placing the minor in a setting that ensures the minor is not a danger to themselves or others. 8 U.S.C. § 1232(c)(2)(A).

Minors in ORR care who are stepped-up to more restrictive settings are also *already* subject to a form of governmental custody prior to step-up. This differs from minors in the domestic juvenile-justice context. Unless the minor is already in a state child welfare system, prior to placement in an institutional setting, such

Memorandum in Support of Motion for Summary Judgment

minors are not in *any* sort of institutional care, as was the case in *Gault*, 387 U.S. at 4-5, where the minor resided with his parents.  Thus, the comparative loss of liberty for minors in ORR care who are stepped up to more restrictive settings is generally less than for domestic minors entering the juvenile-justice system from living with their parents or legal guardians.  *Cf. United States v. Johnson*, 28 F.3d 151, 155 (D.C. Cir. 1994) (noting that under D.C. law, "judges may impose a wide range of dispositions on juveniles who are adjudged delinquent.  The nature of confinement may vary considerably.  Juveniles may be placed in foster care, or in group homes, or in residential treatment centers, or in secure prison-like facilities.").

Plaintiffs' asserted interest in freedom from "unnecessary physical restraint" is also weaker for members of the step-up class who are in ORR state-licensed residential treatment centers as compared to domestic juveniles who are involuntarily committed to mental hospitals.  Unlike the mental-hospital context described in *Parham v. J.R.*, 442 U.S. 584 (1979), the two residential treatment centers in the ORR network are based on a group home model where residents sleep without locked doors and there is a higher staff-to-minor ratio than in shelters.  U.F. ¶ 48.[4]  An ORR residential treatment center also differs significantly from the involuntary psychiatric hospitalization described in *Parham* because it is more home-like and less institutionalized than a hospital, while providing comprehensive inpatient care.  *See* U.F. ¶¶ 44-45.  In addition, unlike involuntary commitment at a psychiatric hospital, care at an ORR residential treatment center has community connections that provide holistic support to treat UACs with significant emotional, intellectual, or developmental needs.  U.F. ¶ 44. And residential treatment centers,

---

[4] *Parham*, like *Gault*, was decided long before the *Flores* Settlement was entered into in 1997.  Plaintiffs' counsel in *Flores* did not negotiate for the procedures recognized in *Parham* or *Gault*, and Congress did not mandate those procedures for UACs in ORR care in the TVPRA or the HSA.  Both features weigh against the conclusion that, 23 years later, due process now mandates those procedures.

1   with greater staff training and ratios, are better equipped to care for youth with more

2   serious psychiatric problems when compared with shelters.  U.F. ¶ 76.

3        Plaintiffs' asserted interest in freedom from "unnecessary physical restraint"

4   is even weaker for members of the step-up class who are in staff-secure facilities.

5   Notably, no class representative was stepped up to a staff-secure facility.  Further,

6   staff-secure facilities do not impose physical restraints, with the main difference

7   from a shelter being that the staff-to-child ratio is higher in staff-secure facilities.

8   U.F. ¶¶ 37-39.   Compared to shelters, staff-secure facilities merely provide a

9   heightened level of staff supervision, increased communication, and services to

10  control problem behavior and prevent escape.  U.F. ¶ 38.  Staff-secure facilities are

11  not equipped internally with multiple locked pods or cell units, and, in almost all

12  states, staff-secure providers maintain an identical type of license as a non-secure

13  care provider, and for such purposes are not viewed as different from a non-secure

14  care provider.  U.F. ¶¶ 39-40.  Notably, Congress did not require any additional

15  procedures under the TVPRA for staff-secure placements, mandating only that ORR

16  undertake monthly review of the "placement of a child in a secure facility." 8 U.S.C.

17  § 1232(c)(2)(A).  Accordingly, given the limited force of Plaintiffs' asserted liberty

18  interests as applied to the step-up claim, the first element of the *Mathews* test, the

19  private interests at stake, weighs against finding that ORR's step-up procedures

20  violate procedural due process.

21       To the extent that Plaintiffs assert a substantive-due-process right to "freedom

22  from unnecessary physical restraint" (Compl. ¶ 122), that claim also fails as a matter

23  of law.  A substantive-due-process right is one "so rooted in the traditions and

24  conscience of our people as to be ranked as fundamental."  *United States v. Salerno*,

25  481 U.S. 739, 751 (1987) (internal quotations omitted).   If Plaintiffs assert a

26  substantive-due-process right here, the Fifth Amendment "forbids the government

27  to infringe [upon that right] *at all*, no matter what process is provided, unless the

28  infringement is narrowly tailored to serve a compelling state interest."  *Reno v.*

*Flores*, 507 U.S. at 302 (emphasis in original).  Among other things, such a claim would be inconsistent with Plaintiffs' requested relief in their complaint, which only seeks additional procedures: "Due process requires that ORR give Plaintiffs and their proposed class members meaningful notice and an opportunity to be heard before it places them in RTCs, medium-secure or secure facilities and an ongoing review with commensurate protections every thirty days."  Compl. ¶ 122.  Even assuming Plaintiffs assert a substantive-due-process right for the step-up class, such a claim cannot be squared with the Supreme Court's holding in *Reno v. Flores*. There, the Court ruled that the plaintiffs' asserted substantive-due-process right to "freedom from physical restraint" failed because "where the government does not intend to punish the child, and where the conditions of governmental custody are decent and humane, such custody surely does not violate the Constitution." 507 U.S. at 303.   As explained, when ORR places a child in a secure, staff-secure, or residential-treatment-center facility, it does so to protect the welfare of the child (and other children in ORR care) and to prevent flight risk, not to punish the child.  *See* U.F. ¶¶ 36, 52; 8 U.S.C. § 1232(c)(2)(A).  Nor do any of these facilities involve inhumane conditions as described in *Reno v. Flores*.  *See* U.F. ¶¶ 8, 10-11.  Thus, any substantive-due-process claim for the step-up class fails as a matter of law.  *See also Reno v. Flores*, 507 U.S. at 305 ("If we harbored any doubt as to the constitutionality of institutional custody over unaccompanied juveniles, they would surely be eliminated as to those juveniles . . . who are aliens.").

### b.  Risk of erroneous deprivation

The second *Mathews* factor, "the risk of an erroneous deprivation of [a protected] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," strongly weighs in Defendants' favor.  424 U.S. at 335.  ORR provides thorough, effective procedures that balance numerous important child-welfare considerations while also providing UACs with

notice and a meaningful opportunity to be heard regarding their placement within 30 days.

First, ORR provides notice to minors who are stepped-up.  ORR policy and practice requires that every minor placed in a staff-secure, secure, or a residential-treatment-center facility receive a Notice of Placement within 48 hours of placement, which is provided to counsel on demand.  U.F. ¶¶ 54-55; J.S. ¶ 76.  This Notice explains why the minor has been placed in a more restrictive setting, the minor's ability to seek review in court, and the minor's ability to seek review before the ORR Director.  U.F. ¶¶ 54, 56, 64; J.S. ¶ 76.  The Notice is provided in English and Spanish, and is translated and explained for children who do not speak either language.  U.F. ¶¶ 54, 57.

Second, ORR provides UACs who are stepped up with multiple opportunities to be heard before a neutral and detached decisionmaker.  A UAC may seek a *Flores* bond hearing before an immigration judge at any time.  U.F. ¶ 65; J.S. ¶ 83. Although the immigration judge's decision in bond hearings does not bind ORR, ORR considers the decision in setting the level of placement.  U.F. ¶ 66.  "The [bond] hearing is a forum in which a child has the right to be represented by counsel, and to have the merits of his or her detention assessed by an independent immigration judge."  *Flores*, 862 F.3d at 867.  Paragraph 24B of the *Flores* Settlement also provides UACs the ability to seek judicial review of placement decisions, which are reviewed for abuse of discretion (¶ 24C).  U.F. ¶ 63.  *Flores* bond hearings and judicial proceedings are both hearings before a neutral decisionmaker, and both can take place within 30 days of placement at the UAC's request.

ORR also provides UACs placed in a secure or residential-treatment-center facility with an internal administrative appeal process 30 days after placement, through which the UAC can either request a hearing or submit a written statement. *See* U.F. ¶¶ 67, 70-71.  The appeal panel comprises three experienced ORR staff members with extensive child-welfare and mental-health backgrounds, and ORR

provides the minor and the minor's attorney of record with any evidence supporting the minor's continued placement before the hearing.  U.F. ¶¶ 68-69.  UACs without an attorney are appointed a child advocate or can ask the juvenile coordinator—a contractor appointed to monitor compliance with the terms of the *Flores* Settlement—to assist them, and the panel issues a written decision at the conclusion of the hearing.  U.F. ¶¶ 72-74.

ORR has additional procedures that it follows before transferring a minor to a residential treatment center.  Because Congress has assigned ORR the role of the child's custodian, ORR may, as a general matter, consent to the child's placement in a residential treatment center.  *Cf. Parham*, 442 U.S. at 619 ("the state agency having custody and control of the child *in loco parentis* has a duty to consider the best interests of the child with respect to a decision on commitment to a mental hospital," and thus "the State may constitutionally allow that custodial agency to speak for the child, subject, of course, to the restrictions governing natural parents").  Further, before placing a child in residential treatment, ORR also requires a licensed psychologist or psychiatrist to determine that the decision is medically indicated, and a UAC may remain in residential treatment only if the licensed psychologist or psychiatrist determines the child remains a danger to self or others.  *See* U.F. ¶¶ 46-47; J.S. ¶¶ 54-55.  Notably, for each class representative placed in a residential treatment center, a licensed psychologist or psychiatrist determined that such a placement was necessary because the child had serious mental health needs that made them a danger to themselves or others.  *See* U.F. ¶¶ 109 (Lucas R.), 125 (Daniela Marisol T.), 140 (Gabriela N.), 143-44 (Sirena P.), 145-46 (Benjamin F.).  This satisfies due process.  *Cf. Parham*, 442 U.S. at 606-07 ("some kind of inquiry should be made by a 'neutral factfinder' to determine whether statutory requirements for admission are satisfied," and "a staff physician will suffice, so long as he or she is free to evaluate independently the child's mental and emotional condition and need for treatment").

Third, step-up decisions are subject to extensive internal review procedures, both before and after step-up, involving multiple decisionmakers to ensure that placements reflect sound clinical judgment. U.F. ¶¶ 24, 79.  Any request that a case manager makes to transfer a minor to a more restrictive setting must be reviewed by a case coordinator and approved by the federal field specialist.[5]  U.F. ¶¶ 13-16, 49-51; J.S. ¶¶ 7-10.  In deciding whether to approve a step-up request, the federal field specialist may consult with numerous individuals, including a supervisor, a federal field specialist supervisor for special populations, and the senior federal field specialist supervisor, as well as the ORR Division of Policies and Procedures.  U.F. ¶ 53.  Further, ORR Guide § 1.4.2 requires step-up determinations to be reviewed by the case manager, case coordinator, and federal field specialist at least every 30 days to determine whether the child should remain in his or her current placement, and § 1.4.7 allows a UAC to seek reconsideration of placement at a secure or residential-treatment-center facility from the ORR Director (the only review expressly required under the TVPRA § 235(c)(2)(A)).  U.F. ¶¶ 60, 64.  Before their 30-day review, case managers meet with the UAC to discuss their behavior and needs, inform them of their upcoming review, and inform them of the bases for determining whether their continued placement remains warranted.  U.F. ¶ 61.  If a decision is made to continue the UAC's current placement, the case manager, case coordinator, and federal field specialist must document the reasons why in a new Notice of Placement.  U.F. ¶ 62.  At least every 30 days, ORR also separately reviews each Notice of Placement through an internal monitoring panel for compliance with

---

[5] Case managers are grantee facility employees who are approved by ORR, and are required to take 40-hours of annual training on all aspects of the UAC program.  U.F. ¶¶ 14-15; J.S. ¶ 8.  Case coordinators are third-party contractors who are assigned to one or more ORR care provider facilities to review children's cases and provide independent recommendations to ORR staff on transfer and release.  U.F. ¶¶ 16, 29; J.S. ¶¶ 9-10.  Federal field specialists are located throughout the country and assigned to a group of ORR grantee care providers within a particular geographic region.  J.S. ¶ 6.

Memorandum in Support of Motion for Summary Judgment

ORR policies and procedures, including whether the Notice was completed within the required timeframe, whether the Notice was reviewed with the minor in the minor's preferred language, and whether the placement decision continues to meet ORR criteria. U.F. ¶¶ 58-59. And if a UAC has resided in a secure or residential-treatment-center facility for more than 90 days, ORR requires the federal field specialist to consult with supervisory ORR staff about the reasons for the continued placement. J.S. ¶ 86.

Given ORR's extensive procedures for determining whether a child in ORR care should be stepped up to a more restrictive setting, and the multiple levels of review that ORR provides UACs to challenge placement decisions, "the risk of an erroneous deprivation of such interest through the procedures used" is low. *Mathews*, 424 U.S. at 334. There is no genuine dispute of material fact that the probability of step-up to a more restrictive facility for any individual UAC is exceedingly low, particularly when compared to children in domestic child-welfare systems. *See* U.F. ¶¶ 98-103; J.S. ¶ 91. In fiscal year 2020 (through June 2020), only 56 out of 14,421 placements were to secure settings (0.39%). U.F. ¶¶ 98, 101. Even when UACs in residential treatment centers are included, the percentage of UACs in ORR care who have been stepped up is 0.55%: through June 2020 (80 out of 14,421 placements). U.F. ¶¶ 98, 100-01. And even when UACs in staff-secure facilities are included, the percentage of UACs who have been stepped up is only 1.6%: through June 2020 (236 out of 14,421 placements). U.F. ¶¶ 98, 99-101. This is compared to a step-up rate of approximately 14 percent for children in the domestic child-welfare context. U.F. ¶ 103; Dr. Ryan Expert Report ¶ 35 ("one would likely conclude, as I do, that stepping UAC up to more secure settings is not overused"). Thus, the risk of erroneous deprivation based on ORR step-up decisions is very low.

Further, of the small fraction of children in ORR care who are stepped up, the overwhelming majority are stepped up only after more than two months in shelter

care (86%), indicating that shelter staff and ORR work to accommodate the needs of children before placing them in a more restrictive facility. *See* U.F. ¶ 104. Of the named Plaintiffs, only one, Jaime D., was stepped up to a secure facility, and that happened only after he told shelter staff that he was a gang member and had murdered 4 people in his home country on their behalf—a placement decision with which both the third-party case coordinator and the federal field specialist concurred. *See* U.F. ¶¶ 114-17. Importantly, Jaime D. was stepped back down within about 30 days after he recanted those statements, showing that ORR's robust review process was both responsive and efficient. *See* U.F. ¶¶ 119-22. And as noted above, of the named Plaintiffs who were stepped up to a residential treatment center, all were stepped up only at the authorization of a qualified medical professional, and only after a recommendation was made by the third-party case coordinator and shelter staff, and approved by ORR. *See* U.F. ¶¶ 109, 125, 130-32, 140, 143-46. These undisputed facts further confirm that the risk of erroneous deprivation under ORR's current procedures is low. *See* U.F. ¶ 79.

The "probable value, if any, of additional or substitute procedural safeguards," *Mathews*, 424 U.S. at 335, is also low, particularly given that ORR already provides UACs what Plaintiffs claim that due process requires: notice and an opportunity to be heard within 30 days of step-up. *See* Compl. ¶ 122 ("Due process requires that ORR give Plaintiffs and their proposed class members meaningful notice and an opportunity to be heard before it places them in RTCs, medium-secure or secure facilities and an ongoing review with commensurate protections every thirty days."). Although Plaintiffs identify a number of procedures that ORR allegedly does not provide, including "an opportunity to present evidence and witnesses" and "the right to counsel" (Compl. ¶ 124), they do not contend that due process *requires* these other procedures, or that they are asking the Court to order those specific procedures. *See King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987) ("All causes of action alleged in an original complaint which are not alleged in an amended complaint are waived.").

Thus, any claim for procedures beyond notice and an opportunity to be heard within 30 days of step-up are not properly before the Court.

Indeed, the Court's certified class definition makes no mention of these other procedures, as it comprises only "minors in ORR custody pursuant to 6 U.S.C. section 279 and/or 8 U.S.C. section 1232 who are or will be placed in a secure facility, medium-secure facility, or RTC, or whom ORR has continued to detain in any such facility for more than 30 days, without being afforded notice and an opportunity to be heard before a neutral and detached decisionmaker regarding the grounds for such placement . . . ." Order at 27. And as explained, ORR satisfies the relief set forth in the class definition, providing minors numerous opportunities to be heard before a neutral and detached decisionmaker within 30 days of step-up. Any additional procedures Plaintiffs might seek are outside the class definition and beyond the scope of this case. *See Al Otro Lado, Inc. v. McAleenan*, 423 F.Supp.3d 848, 878 (S.D. Cal. 2019) (holding that "the scope of the injunctive relief is limited by the class definition"). In any event, the probable value of such additional procedures is very low. The second *Mathews* factor strongly favors Defendants.

### c. The government's interest

The final *Mathews* factor, the government's interest, also strongly favors Defendants and, when balanced against the other factors, confirms that Defendants are entitled to judgment as a matter of law. ORR, acting *in loco parentis*, has an interest in each UAC's welfare as the child's custodian and in the safety and well-being of other children in its care. Congress prescribed by statute ORR's interest regarding *all* children in its care when it directed ORR to consider children's safety when making placement decisions: "In making such placements, the Secretary may consider danger to self, danger to the community, and risk of flight." 8 U.S.C. § 1232(c)(2)(A). To promote the safety of all children in its care, ORR must be able to place children in appropriate settings, promptly and without undue delay, to avoid

serious harm to the child and others in ORR's care. U.F. ¶¶ 41-43, 75-78. As explained, ORR's robust procedures already minimize the risk of erroneous deprivation; any additional procedures would delay ORR's ability to provide needed care and services. And "[n]ormally when children are stepped up, particularly to a secure juvenile detention, but also to staff-secure, there is already considerable evidence that their behaviors are problematic, and time is of the essence. Any delay in moving them . . . would put the children themselves at risk, other minors, and staff." Antkowiak Declaration ¶ 33; U.F. ¶¶ 77-78; s*ee also* Dr. Lubit Expert Report, ¶ 3(b) ("When UACs pose a threat to the health and safety of themselves or others, and the UACs cannot be maintained safely in a less restrictive setting, the UACs should go to a higher level of care. Delaying step-ups to RTCs in these situations is contrary to acceptable practice because serious avoidable harm could occur during the period of delay."). Further, the financial burden on ORR in providing the additional procedures that Plaintiffs seek would be substantial. In contrast with DHS, which has approximately 1,100 attorneys and 350 support personnel funded by congressional appropriations to represent DHS in administrative proceedings, ORR has traditionally funded only two dedicated attorneys, so any appreciable increase in administrative hearings would massively burden the agency. U.F. ¶ 80. Accordingly, the third *Mathews* strongly favors Defendants as well.

### d.  Balance of *Mathews* factors

In sum, the balance of *Mathews* factors conclusively favors Defendants. First, the step-up class's asserted liberty interests have limited force: (1) the TVPRA and *Flores* Settlement do not create a protected liberty interest because they do not mandate any particular outcome or procedures for placing UACs in restrictive settings; and (2) Plaintiffs' interest in being free from unnecessary physical restraints is weaker in the ORR setting than in other juvenile-detention or involuntary commitment settings because UACs in ORR custody have multiple paths to obtain release from a restrictive placement. Second, the risk of erroneous deprivation under

ORR's procedures is low, as is the probable value of mandating additional procedures. UACs in ORR care have multiple avenues to challenge placement decisions, and ORR *already* provides step-up class members with notice and an opportunity to be heard within 30 days. UACs receive notice of the reasons for their placement within 48 hours, and UACs can challenge their placements at a bond hearing or in federal court. U.F. ¶¶ 54, 63, 65; J.S. ¶¶ 76, 83. UACs placed in secure and residential-treatment-center facilities also can seek an administrative hearing within 30 days before a three-member panel, and separately seek direct review by the ORR Director. U.F. ¶¶ 64, 67. Such placements are also reviewed at least every 30 days by the federal field specialist, case coordinator, and case manager, and are separately reviewed by an ORR monitoring group within the same timeframe. U.F. ¶¶ 58, 60. Third, ORR's interest in being able to make prompt placement decisions without unnecessary delay is substantial and outweighs the probable value of imposing additional procedures that will delay needed care and treatment and consume government resources without significantly reducing the likelihood of an erroneous deprivation. ORR's procedures for stepping up children in its care to more restrictive settings thus fully comport with due process, and Defendants are entitled to judgment as a matter of law on Plaintiffs' step-up claim.

### 3) ORR's policies and procedures for the step-up class comport with the TVPRA and the APA.

ORR's policies and procedures for the step-up class also satisfy the TVPRA and APA as a matter of law. First, ORR's step-up policies and procedures comport with the TVPRA. Plaintiffs' claim that ORR's "policy and practice individually and collectively violate" TVPRA § 235(c)(2)(A) is just their procedural-due-process claim recast as a purported statutory violation. Compl. ¶ 184. Plaintiffs acknowledge that the TVPRA does not articulate a right to additional procedures to contest placement, but only mandates a review of secure placements every 30 days—which Defendants already provide. *See* Compl. ¶ 119. Rather, what Plaintiffs claim

is that the TVPRA creates a liberty interest in being placed in the "least restrictive setting," and that procedural due process therefore requires the imposition of the additional procedural remedies they might seek.  *See* Compl. ¶ 118.  But as explained above, ORR's thorough procedures satisfy due process, balancing important child-welfare considerations with safety, while also providing UACs with notice and a meaningful opportunity to be heard within 30 days.  Second, ORR's policies and procedures for the step-up class also comport with the APA.  Compl. ¶ 184. Plaintiffs make no independent claim under the APA beyond their procedural-due-process claim, which fails for the reasons described above, and the relief they seek under the APA is the same as the relief they seek on their due-process claim—notice and an opportunity to be heard.  Further, like the TVPRA, the APA does not separately impose additional procedural requirements on ORR placement decisions. Thus, Plaintiffs' step-up claims under the TVPRA and APA fail as a matter of law.

**B.     Defendants Are Entitled to Judgment as a Matter of Law on the Unfit-Custodian Class's Claim.**

The Court should grant summary judgment on the unfit-custodian class's claim that ORR's procedures for making release decisions are unlawful because ORR does not provide a timely, meaningful opportunity to be heard when ORR delays or denies release to potential sponsors.  Compl. ¶¶ 179-81.  Plaintiffs' unfit-custodian claim is barred by *res judicata*.  And ORR's policies and procedures for this class satisfy due process and other legal requirements as a matter of law.

**1)  The unfit-custodian claim is barred by *res judicata*.**

The Court should grant summary judgment for Defendants on the unfit-custodian claim because the claim——including the purported statutory aspects of their claim that simply replicate their due-process challenge—is barred by *res judicata*.  Their claim that due process requires the imposition of additional procedures to challenge release decisions was conclusively resolved in *Flores*.

Memorandum in Support of Motion for Summary Judgment

As noted above, claim preclusion requires: (1) identity of claims; (2) a final judgment on the merits; and (3) privity between the parties. *Harris*, 682 F.3d at 1132. The second and third requirements are clearly satisfied here. The *Flores* Settlement is a final judgment. *See supra* Part A. And there is privity between the parties: the unfit-custodian class comprises all UACs in ORR custody "whom ORR is refusing or will refuse to release to parents or other available custodians within 30 days of the proposed custodian's submission of a complete family reunification packet on the ground that the proposed custodian is or may be unfit." Order at 27. The unfit-custodian class is therefore a subset of the *Flores* class—"'[a]ll minors who are detained in the legal custody of the INS'" (¶ 10).

There is also identity of claims. All four factors for assessing identity of claims favor that conclusion. *See Howard*, 871 F.3d at 1039. First, rights established under the *Flores* Settlement would be destroyed or impaired by the unfit-custodian claim. The *Flores* Settlement, in resolution of Plaintiffs' due process claim, sets forth procedures governing release for all UACs in ORR care. These procedures include that ORR must avoid "unnecessary delay" (¶ 14) and must "record" its release efforts (¶ 18). Neither paragraph contains any requirement that ORR provide a hearing for class members who remain in custody more than thirty days. Mandating different or additional procedures for the unfit-custodian class beyond those provided in the *Flores* Settlement would therefore impair or destroy rights established under the Settlement. *See Costantini v. Trans World Airlines*, 681 F.2d 1199, 1201 (9th Cir. 1982) ("[T]he doctrine of res judicata (or claim preclusion) 'bar(s) all grounds for recovery which could have been asserted, whether they were or not, in a prior suit between the same parties . . . on the same cause of action.'") (internal citations omitted).

Second, the two actions involve substantially the same evidence. Again, this is articulated in the Settlement: "Plaintiffs have filed this action against Defendants, challenging, *inter alia*, the *constitutionality* of Defendants' policies, practices and

regulations regarding the . . . *release* of unaccompanied minors."  Settlement at 3
(emphasis added).  To assess whether to release a minor to a potential sponsor, ORR
conducts a suitability analysis, which may include consideration of various factors
outlined in ¶ 17 of the Settlement, such as the living conditions and the standard of
care the UAC would receive with the proposed sponsor.  The additional hearings
that Plaintiffs now request here would involve reconsidering substantially the same
evidence that would apply in an enforcement action under the *Flores* Settlement.

Third, the two suits involve infringement of the same right—an asserted due-
process right to contest ORR's decisions regarding release.  Significantly, the *Flores*
Settlement did not include an internal administrative appeal process; rather, the
parties in *Flores* agreed that ORR must avoid "unnecessary delay" and must
"record" its release efforts (¶¶ 14, 18), which the parties agreed satisfied the
requirements of due process to resolve the suit, which was brought on due-process
grounds.  The Settlement also sets forth a procedure for the UAC's attorney to
contact a "juvenile coordinator" to "investigate" any case where "Plaintiffs' counsel
have reasonable cause to believe a minor . . . should have been released" (¶ 28B).
Plaintiffs now seek different procedures under the same procedural-due-process
theory to protect their asserted right to challenge ORR's release decisions.  *See*
Compl. ¶ 110 (noting that "in all fifty states and their subdivisions . . . allegations of
unfitness" are "tested via trial-like procedures and any ensuing finding of
unsuitability . . . be based on competent evidence").  But the alleged right is the same
in both actions.

Finally, the two actions arise out of the same transactional nucleus of facts.
Both *Flores* and the unfit-custodian class's claim ask the Court to address what
procedures due process requires for decisions regarding whether to release a UAC
from government custody and reunify the UAC with a potential sponsor.  As
explained, the *Flores* Settlement sets forth specific criteria for sponsor assessments
(¶ 17) and specific requirements the government must follow in making

Memorandum in Support of Motion for Summary Judgment

reunification decisions (¶ 18).  The Settlement also expressly states that it "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS" in order to resolve the due-process claims raised in the original *Flores* complaint regarding release (¶ 9).  Thus, both *Flores* and this case arise out of the same transactional nucleus of facts, and Plaintiffs' claim that due process requires additional procedures for the unfit-custodian class is barred by *res judicata.*

Plaintiffs contend that the *Flores* Settlement does not expressly address what procedures apply when ORR declines to release a UAC because of questions regarding a potential sponsor's suitability.  *See* Compl. ¶ 105 ("[N]either the *Flores* Settlement nor the TVPRA prescribe what process is due where ORR unreasonably prolongs a juvenile's detention or refuses to release him or her because ORR questions whether an available parent or other potential custodian is capable of providing for the child's physical and mental well-being.").  But that does not change the *res judicata* analysis.  As explained, ¶¶ 14, 17, and 18 of the *Flores* Settlement set forth the procedures that apply to release decisions, and ¶ 28B sets forth a procedure for the child's attorney to seek further review of a release decision.  The *Flores* Plaintiffs could have negotiated a process for challenging such decisions as they did for step-up decisions (¶¶ 21-24), and did not do so.  Indeed, Plaintiffs had unsuccessfully sought these same procedures in *Reno v. Flores*, 507 U.S. at 308-09 prior to entering the Settlement.  Thus, to the extent that Plaintiffs allege that the procedures they agreed to in the *Flores* Settlement are insufficient to satisfy due process, such an allegation is barred because *res judicata* "bars litigation in a subsequent action of any claims that were raised *or could have been raised* in the prior action."  *Western Radio Servs. Co., Inc. v. Glickman*, 123 F.3d 1189, 1192 (9th Cir. 1997) (emphasis added).  Plaintiffs' apparent dissatisfaction with the bargain they struck in *Flores* does not allow them to bring the same claims in subsequent litigation to seek a different result.

Memorandum in Support of Motion for Summary Judgment

### 2) ORR's policies and procedures for the unfit-custodian class satisfy due process as a matter of law.

The Court should also grant summary judgment for Defendants on the unfit-custodian class's due-process claim because ORR's policies and procedures for release decisions satisfy due process as a matter of law. The governing factors—the private interests at stake, the risk of erroneous deprivation, and the government's interest, *Mathews*, 424 U.S. at 335—establish that ORR's policies and procedures for the unfit-custodian class satisfy the requirements of procedural due process.

### a. Private interests

Plaintiffs allege that children in ORR care have three protected liberty interests that are affected by ORR's release decisions: (1) a statutory interest under the TVPRA and related contractual interest under the *Flores* Settlement to be placed in the least restrictive setting; (2) an interest in being free from government custody; and (3) an interest in family unity or family association. Compl. ¶¶ 103-07. These interests have limited weight as applied to ORR release decisions and are decisively outweighed by the other *Mathews* factors.

To start, Plaintiffs claim a liberty interest in release because the TVPRA provides that UACs must be placed "in the least restrictive setting that is in the best interest of the child," 8 U.S.C. § 1232(c)(2)(A). *See* Compl. ¶ 104 (alleging that the TVPRA "requires ORR to 'promptly' place detained children 'in the least restrictive setting that is in the best interest of the child,' generally, with 'a suitable family member"). But that provision of the TVPRA concerns the level of *restrictiveness* of the facility in which a minor is placed, and not when they are released. Immediately after the language quoted by Plaintiffs, the statute reads: "*In making such placements*, the Secretary may consider danger to self, danger to the community, and risk of flight." 8 U.S.C. § 1232(c)(2)(A) (emphasis added). Although the provision later refers to the availability of a "suitable family member," it does so in the context of *placement* decisions—not release—for a particular subcategory of UACs (child

trafficking victims), and even then does not require placement with family members. *See id.* ("Placement of child trafficking victims may include placement in an Unaccompanied Refugee Minor program, pursuant to section 412(d) of the Immigration and Nationality Act (8 U.S.C. § 1522(d)), if a suitable family member is not available to provide care."). Thus, the TVPRA does not impose an affirmative obligation on ORR to expeditiously release UACs to potential sponsors, nor does it create procedural rights for UACs to contest the denial of release.

Indeed, the TVPRA provision applicable to release decisions provides broad discretion to the Secretary. It provides that "an unaccompanied alien child *may not be placed with a person or entity* unless the Secretary of Health and Human Services makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being." 8 U.S.C. § 1232(c)(3)(A) (emphasis added). And the TVPRA sets only a minimum standard for release: "Such determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." *Id.* The TVPRA thus contains no "explicitly mandatory language" imposing a maximum timeframe for when release decisions must be made, nor does it provide "specific directives to the decisionmaker" that if release does not occur within a set timeframe, "a particular outcome must follow." *Thompson*, 490 U.S. at 462-63. Rather, the TVPRA entrusts release determinations to ORR's discretion and expertise to ensure the safety and well-being of UACs in ORR custody and care. *See Hayward*, 603 F.3d at 560 (holding that because parole is a discretionary, predictive decision, it does not create a protected liberty interest). Thus, Plaintiffs' claimed liberty interest in release under the TVPRA fails.

Plaintiffs' asserted liberty interest under the *Flores* Settlement in release also fails. As explained, *supra* Part A, Plaintiffs may not seek injunctive relief to rewrite a settlement they negotiated to include additional procedures they never bargained

for.  And even if they could, there is no additional liberty interest created by the *Flores* Settlement.  As with the TVPRA, the *Flores* Settlement contains no "explicitly mandatory language" regarding release decisions that provides that when "substantive predicates are present, a particular outcome must follow."  *Thompson*, 490 at 463.  Paragraph 14 provides that "the INS shall release a minor from its custody without unnecessary delay," but the phrase "without unnecessary delay" is broad and permissive, does not mandate a particular set of procedures, and is cabined by Paragraph 17, which gives the agency wide discretion to conduct a "positive suitability assessment" prior to release.  *Hayward*, 603 F.3d at 560.  Thus, the *Flores* Settlement also does not create a protected liberty interest in release.

Second, Plaintiffs' asserted liberty interest in being free from government custody is also, at most, limited.  To start, the Court in *Reno v. Flores* has already held that there is no substantive-due-process right for children to be in a "non-custodial" setting, and that any procedural-due-process argument for a hearing is merely "the substantive due process argument recast in procedural terms."  507 U.S. at 302-03, 306; *see also Santos v. Smith*, 260 F. Supp. 3d 598, 611-12 (W.D. Va. 2017) (framing the constitutional issue not as a right of the minor to live outside a state-licensed facility, but rather, as a "familial right to be raised and nurtured by . . . parents").  Further, Plaintiffs' claimed liberty interest in freedom from government custody is limited by their lack of lawful immigration status and apprehension at the border between ports of entry.  *See Demore v. Kim*, 538 U.S. 510, 521-22 (2003); U.F. ¶ 4.  As the Supreme Court has emphasized, "the Constitution gives the political department of the government plenary authority to decide which aliens to admit, and a concomitant of that power is the power to set the procedures to be followed in determining whether an alien should be admitted."  *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) (internal quotations and citations omitted).  Here, Congress created a detailed scheme for the UAC program, and determined not to create an

administrative appeal process for ORR decisions regarding the suitability of applicant sponsors.  Such an appeal process is precisely what Plaintiffs now seek.

Finally, Plaintiffs' asserted liberty interest in family unity has limited weight as applied to the unfit-custodian class.  The relationships between the named Plaintiffs and their proposed sponsors vary substantially.  Only one named Plaintiff, Sirena P., had a proposed sponsor who is a parent, and she is not a class representative for the unfit-custodian class.  Order at 28.  Neither of the class representatives for the unfit-custodian class, Lucas R. and Gabriela N., had a parent as a proposed sponsor.  U.F. ¶¶ 106, 111, 134, 139.  And to the extent that Plaintiffs assert a liberty interest in family unity with "other available custodians" who are not close relatives, a parent, or a legal guardian (Order at 27), their asserted interest fails as a matter of law.  In *Reno v. Flores*, the Supreme Court explained that "[w]here a juvenile has no available parent, close relative, or legal guardian, where the government does not intend to punish the child, and where the conditions of governmental custody are decent and humane, such custody surely does not violate the Constitution."  507 U.S. at 303.  This is because retaining custody to preserve and promote the child's welfare is "rationally connected" to a legitimate government interest.  *Id.*  Thus, to the extent that Plaintiffs claim a protected liberty interest in family unity (or reunification) with distant relatives or unrelated adult individuals, *Reno v. Flores* forecloses that claim.  And given the substantially varied relationships between the named Plaintiffs and their proposed sponsors, Plaintiffs' assertion that they have a general liberty interest "in preserving their family unity and the ability for their family to care for them, and in family association" has limited weight.  Compl. ¶¶ 106-07.

To the extent that Plaintiffs assert a substantive-due-process right to family unity, that claim also fails as a matter of law.  As a preliminary matter, the unfit-custodian class includes members who have no available parent, close relative, or legal guardian.  *See* Order at 27 (class includes UACs "whom ORR is refusing or

will refuse to release to parents or other available custodians"). UACs in ORR custody are also held in humane conditions at state licensed grantee facilities (U.F. ¶¶ 8, 10-11). Thus, finding a substantive-due-process right to family unity for the entire certified class would contravene the Supreme Court's holding in *Reno v. Flores.* 507 U.S. at 303 ("We are unaware, however, that any court—aside from the courts below—has ever held that a child has a constitutional right not to be placed in a decent and humane custodial institution if there is available a responsible person unwilling to become the child's legal guardian but willing to undertake temporary legal custody.").

Further, although "the interest of parents in the care, custody, and control of their children" has been recognized as a "fundamental liberty interest[ ]," *Troxel v. Granville*, 530 U.S. 57, 65 (2000), that right is qualified, and in most cases, "the constitutionality of state actions that interfere with family integrity depends on the adequacy of the procedures available to contest them." *D.B. v. Cardall*, 826 F.3d 721, 741 (4th Cir. 2016). And in the context of immigration proceedings, the Fourth Circuit recently held that there is no "substantive due process right to family unity in the context of immigration detention pending removal." *Reyna as next friend of J.F.G. v. Hott*, 921 F.3d 204, 210 (4th Cir. 2019). Thus, to the extent that Plaintiffs assert that ORR's policies and practices regarding release violate a substantive-due-process right to family unity, that claim fails. Compl. ¶ 181; *see, e.g.*, *Payne-Barahona v. Gonzales*, 474 F.3d 1, 3 (1st Cir. 2007) ("[D]eportations of parents are routine and do not of themselves dictate family separation. If there were such a right, it is difficult to see why children would not also have a constitutional right to object to a parent being sent to prison or, during periods when the draft laws are in effect, to the conscription of a parent for prolonged and dangerous military service"); *Gallanosa v. United States*, 785 F.2d 116, 120 (4th Cir. 1986) ("The courts of appeals that have addressed this issue have uniformly held that deportation of the alien parents does not violate any constitutional rights of the citizen children.");

*Cortez–Flores v. INS*, 500 F.2d 178, 180 (5th Cir. 1974) ("[D]eportation of a parent does not deprive the child of any constitutional rights."); *Newton v. INS*, 736 F.2d 336, 342 (6th Cir. 1984) (stating that courts of appeals have "uniformly" held that the deportation of parents does not deprive their children of constitutional rights); *Flores–Quezada v. Gonzales*, 134 F. App'x 202, 203 (9th Cir. 2005) (unpublished) (holding that deportation does not result in deprivation of due process where a child would be denied the Arizona constitutional right to education); *Robles v. INS*, 485 F.2d 100, 102 (10th Cir. 1973) (rejecting the argument that it is unconstitutional to break up a family and deprive children of "their constitutional right to a continuation of the family unit").

### b. Risk of erroneous deprivation

The second *Mathews* factor— "[t]he risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," 424 U.S. at 335—likewise favors the government. ORR provides robust processes that safeguard the welfare of children in its care while also affording children and potential sponsors continuous opportunities to provide information in favor of release and sponsorship.

First, ORR's release process is a collaborative endeavor that acts as a significant safeguard against erroneous and arbitrary decisionmaking.  U.F. ¶¶ 24, 79.   The federal field specialist, case manager, and case coordinator (a nongovernmental third-party reviewer) all work together in making release decisions and meet weekly to discuss the status of each child's case.  U.F. ¶¶ 24-25, 27, 29; J.S. ¶¶ 94-95.  The case coordinator provides an independent evaluation of whether a child should be released to a potential sponsor, and case managers and federal field specialists can elevate the concerns of sponsors up the chain, ultimately to the Deputy Director of the Division of Policy and Procedure.  U.F. ¶¶ 25, 29; J.S. ¶¶ 7-10.  ORR has also implemented numerous child-welfare policies to promote timely release, including immediately searching for a potential sponsor upon the child's

arrival, and performing concurrent sponsor vetting when there is more than one potential sponsor.  U.F. ¶¶ 20-23. Lastly, ORR supervisors regularly monitor the work of federal field specialists and coordinate with staff on any matters related to release that require additional supervision or oversight.  U.F. ¶ 26.  As one child welfare expert testified, "But you're presuming that ORR doesn't have checks and balances.  What I see here is a great deal of concern about doing home studies, about contacting sponsors, about vetting sponsor, about having reviews of who the sponsor is. . . .  I think that those are - - that's a very appropriate process in order to ensure that release of the child to a situation where you can be at least assured that you made every effort possible to ensure that that child will be safe once [they are] out of your care."  Dr. Earner Dep. 146:23-147:14; U.F. ¶ 24.

Second, ORR provides multiple opportunities for potential sponsors to be heard.  Case managers are required to communicate regularly with potential sponsors and other relevant individuals in formulating release recommendations.  U.F. ¶ 28. Potential sponsors and children are able to present their side of the story and to share any information they believe would place their case for sponsorship in the best possible light with the case manager, the home study provider (when applicable), and ORR.  U.F. ¶¶ 17-18, 28, 30, 33.  ORR requires case managers to engage the potential sponsor throughout the process, explain the process to them, and invite the potential sponsor to participate, freely ask questions, and submit any additional information for consideration—including information that could mitigate any potential concerns.  U.F. ¶¶ 22, 28, 30, 33.

Third, ORR provides a process for appealing denial decisions: "The parent/legal guardian may seek an appeal of the ORR Director's denial decision by submitting a written request to the Assistant Secretary for Children and Families within 30 business days of receipt of the final decision from the ORR Director."  J.S. ¶¶ 21-29.  The parent or legal guardian may request either a written appeal or a hearing, and "[a]ny evidence submitted to the Assistant Secretary by ORR is shared

with the requester in compliance with privacy protections." J.S. ¶¶ 21, 26.  UACs can also seek judicial review of their continued custody in federal court.  U.F. ¶ 63.

Given ORR's extensive, collaborative process for assessing potential sponsors and the multiple opportunities for review of denial decisions, "the risk of an erroneous deprivation" under ORR's current procedures is very low.  *See* U.F. ¶ 124. Further, there is no genuine dispute of material fact that, excluding data from April and May 2020 distorted by the COVID-19 pandemic, length of stay for UACs in ORR care has been consistently brief.  U.F. ¶ 95.  From June 2019 through March 2020, the average length of stay was less than two months (48.4 days).  U.F. ¶ 96. Even including the outlier months of April and May 2020, the average length of stay was only 54 days.  U.F. ¶ 97.  In cases where children are in ORR case for longer lengths of time, both a review conducted by expert witnesses of case files the parties negotiated in discovery, and consistent testimony from ORR headquarter staff, case managers, and federal field specialists, show that release delays are generally not attributable to tardiness on the part of ORR, but rather a UAC's lack of a sponsor or unresponsiveness from potential sponsors.  U.F. ¶ 34.  For comparison, in the foster-care context, in states where a guardian who is related to a foster child needs to be licensed to accept the child, it can take up to 6 months to place a child with the relative.  *See, e.g.*, http://icpcstatepages.org/california/licensingcertificationapproval (in California, foster parents who are relatives of the child must be licensed, and the process can take 3-6 months).  Indeed, as a further safeguard, ORR-contracted facilities have no financial incentive to keep children in care longer than appropriate because they are paid on a funded capacity basis regardless of how many or long minors remain in care.  U.F. ¶ 7.

The experiences of the only two named Plaintiffs who are class representatives for the unfit-custodian class, Gabriela N. and Lucas R., *see* Order 28, confirm that delays in release are not normally attributable to arbitrary or dilatory decision-making on ORR's part.  Neither representative's potential sponsor is a

parent or legal guardian.  U.F. ¶¶ 106, 111, 134, 139.  Gabriela N.'s potential sponsor, her grandfather, had never been her primary caregiver, had not seen her in 14 years, had a serious medical condition, did not timely provide exonerating evidence of a kidnapping charge from his home country, and received a negative recommendation from a TVPRA-mandated home study.  U.F. ¶¶ 134-38.  Lucas R.'s potential sponsor, his sister, had left their home country only a year before he did, had another non-relative adult living in her home who would not come in for fingerprinting (contrary to ORR policy), and similarly received a negative recommendation from a TVPRA-mandated home study.  U.F. ¶¶ 19, 106-08.  These undisputed facts confirm that Plaintiffs do not face a "risk of an erroneous deprivation" under ORR's current procedures.

The value of additional procedures is also low.  As one child-welfare expert writes, "[I]f only one clinical staff member were responsible for making the release or placement decision, or if individual children's cases were not reviewed on a regular basis, I would favor additional safeguards to ensure that placements and transfers reflected sound clinical practice.  Yet, as discussed above, each child's case is jointly reviewed on a regular basis by a team of program staff and supervisors in consultation with ORR federal representatives."  Dr. Ryan Expert Report ¶ 46; U.F. ¶ 79.  Thus, "it is unclear what problem would be solved by injecting additional requirements of consulting with a child's legal representative at any instance that a potential step-up or step-down, or release was under consideration."  *Id.*; *see also* Expert Report of Dr. Earner, ¶ 30, p. 9 ("The proposal for a quasi-judicial 'fair' hearing would do nothing to further the safety of the UAC.  Hearings are court-like processes that create an adversarial environment and only prolong the length of time that UAC spend in care.").

Indeed, it is unclear from Plaintiffs' complaint what alternative procedures they even seek.  Plaintiffs claim that they "are informed and believe that in all fifty states and their subdivisions, children may not be detained for want of a qualified

custodian without affording them and/or their parents or other potential custodians

a prompt hearing before a judge or other neutral and detached decisionmaker, during

which allegations of unfitness are tested via trial-like procedures and any ensuing

finding of unsuitability must be based on competent evidence." Compl. ¶ 110.[6] But

they do not clarify whether they are seeking "trial-like procedures" for UACs in

ORR custody, what that means, or whether they are claiming that due process entitles

them to such "trial-like procedures." Plaintiffs also claim that ORR fails to "afford[ ]

detained minors or their proposed custodians a timely, prompt, or meaningful

opportunity to be heard regarding such custodians' fitness." *Id.* ¶ 180. But they do

not identify any specific procedures they are denied other than "a meaningful

opportunity to be heard," which, as explained, ORR already provides. Accordingly,

to the extent that Plaintiffs assert that *additional* procedures are required beyond a

meaningful opportunity to be heard, any such claim is waived. *King*, 814 F.2d at

567 ("All causes of action alleged in an original complaint which are not alleged in

an amended complaint are waived.").

Further, as with the step-up class, the scope of relief for the unfit-custodian

class is "limited by the class definition." *Al Otro Lado*, 423 F.Supp.3d at 878. Based

on Plaintiffs' complaint, the Court certified a class of "all minors in ORR custody

pursuant to 6 U.S.C. section 279 and/or 8 U.S.C. section 1232 whom ORR is

refusing or will refuse to release to parents or other available custodians within 30

days of the proposed custodian's submission of a complete family reunification

packet on the ground that the proposed custodian is or may be unfit." Order at 27-

28. So any additional procedures Plaintiffs may seek that go beyond a "meaningful

---

[6] Further, unlike domestic foster care, ORR does not remove children from their current custodians; rather, ORR places them with such custodians in the first instance after the child arrives unaccompanied. U.F. ¶¶ 4-5. Thus, ORR makes an affirmative determination the custodian is able to provide for the child's physical and mental well-being, and not a finding that the custodian is unfit and the child should be removed. U.F. ¶ 2; J.S. ¶ 5.

opportunity to be heard" after 30 days are outside the class definition and thus beyond the scope of available relief.

### c. The government's interest

The final *Mathews* factor, the government's interest, also heavily favors the government.  ORR has its own statutorily prescribed interest in child welfare, and acts *in loco parentis* to protect UACs' interests in safety and permanency.  Congress codified ORR's interest at 8 U.S.C. § 1232(c)(3)(A), mandating that "an unaccompanied alien child may not be placed with a person or entity unless the Secretary of Health and Human Services makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being."  Congress further directed that "[s]uch determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." *Id.*  Congress did not impose any similar mandate that ORR speedily release children in its care, although ORR seeks to timely release UACs.  U.F. ¶ 1.  Further, the potential risks to children from release to a sponsor who has not been adequately evaluated are significant.  Indeed, the TVPRA was enacted in response to child-trafficking concerns.  U.F. ¶¶ 4-7.  The government's interest in safe release is also heightened by the fact that, unlike domestic child welfare agencies, ORR does not maintain custody of the child after release.  U.F. ¶ 12.  And again, the financial burden on ORR in staffing more hearings would be substantial.  U.F. ¶¶ 35, 80.  ORR thus has a strong interest both in avoiding the burden and delay of unnecessary additional procedures, and in efficiently directing its resources to ensure the safe and prompt release of children in its care to suitable sponsors.  *See* U.F. ¶¶ 2-6; Expert Report of Dr. Earner ¶ 31 ("Screening potential sponsors of UACs is a serious child safety issue. Safety cannot be sacrificed for speed of release of a UAC."); *id.* ¶ 32 ("For UACs who may have

no viable sponsor, or a sponsor claiming a distant or vague relationship, the question then becomes one of whether the UAC is being trafficked for some other purpose.").

### d. Balance of *Mathews* factors

The balance of *Mathews* factors weighs conclusively in the government's favor. First, the unfit-custodian class's asserted liberty interests are limited. The TVPRA and *Flores* Settlement do not create a liberty interest in release. Plaintiffs' asserted interest in family unity is already limited in the immigration custody context, and such an interest carries even less weight here given the widely varying relationships between the Plaintiffs and their potential sponsors. Second, the risk of erroneous deprivation under ORR's current procedures is low, as is the probable value of more procedures. UACs and potential sponsors already have multiple opportunities to present their case for release, and ORR's release procedures involve multiple levels of review and oversight. U.F. ¶¶ 24-32. Case managers and federal field specialists can elevate the concerns of sponsors, and supervisors regularly monitor the cases of the federal field specialists under them. U.F. ¶¶ 24-25. Plaintiffs do not explain how additional procedures would increase the accuracy of ORR's sponsor suitability assessments. Finally, ORR's statutorily-mandated interest in safely placing children with approved sponsors is substantial. *See* U.F. ¶¶ 3-6. The balance of these factors conclusively establishes that ORR's existing procedures satisfy due process as a matter of law. The Court should therefore grant summary judgment for Defendants on the unfit-custodian class's due-process claim.

### 3) ORR's policies and procedures for the unfit-custodian class comport with the TVPRA, the APA, and the First Amendment.

ORR's policies and procedures for the unfit-custodian class also satisfy the TVPRA, the APA, and the First Amendment as a matter of law.

First, ORR's policies and procedures for release comport with the TVPRA. Plaintiffs' claim that ORR's "policy and practice individually and collectively violate . . . TVPRA § 235(c)(2)(A)" (Compl. ¶ 181) is again simply their flawed

procedural-due-process claim recast as an alleged statutory violation.  The TVPRA does not specify any procedures for challenging ORR's release decisions, which Plaintiffs acknowledge.  *Id.* ¶ 105; 8 U.S.C. § 1232(c).  And, as explained, to the extent that Plaintiffs raise a procedural-due-process claim based upon a claimed liberty interest in the TVPRA, the TVPRA gives rise to no such interest.  But even if the TVPRA did, ORR's robust procedures satisfies procedural due process, balancing the need to safeguard the welfare of children in its care while affording both children and potential sponsors continuous opportunities to provide information in favor of sponsorship, thereby minimizing the risk of erroneous deprivation.  Thus, ORR's release policies and procedures satisfy the TVPRA as a matter of law.

Second, ORR's policies and procedures for the unfit-custodian class also comport with the APA.  Compl. ¶ 181.  Plaintiffs similarly make no independent claim under the APA beyond their procedural-due-process claim, which fails for the reasons described above, and the relief they request under the APA is the same as the relief they request on their due-process claim—an opportunity to contest the denial of release to any potential sponsor.  Further, like the TVPRA, the APA does not separately impose additional procedural requirements on ORR release decisions.  The unfit-custodian class's APA claim fails as a matter of law.

Third, to the extent that the unfit-custodian class asserts a claim under the Freedom of Association Clause of the First Amendment, that claim fails.  *See* Compl. ¶ 106.  The First Amendment protects a person's right to associate with others so as to protect the person's right to engage in group activities like speech, that are *themselves* protected under the First Amendment.  *Dawson v. Delaware*, 503 U.S. 159, 163 (1992); *see also IDK, Inc. v. Clark Cty.*, 836 F.2d 1185, 1193 (9th Cir. 1988).  The First Amendment right of association also protects the right to band together to pursue a common goal.  *See Boy Scouts of America v. Dale*, 530 U.S. 640, 647-48 (2000).  Nothing in the complaint alleges that class members have been prevented by ORR from associating with others to exercise other First Amendment

rights.  Plaintiffs also have not alleged that they are part of any group that has been prevented by ORR from pursuing a common goal.  Rather, their First Amendment claim is simply their substantive-due-process claim to family unity recast under the First Amendment.  *See* Compl. ¶ 116 ("The government's refusing to release children to their parents' custody, or to the custody of adult siblings and other family members . . . violates the freedom of association clause of the First Amendment."). That claim fails for the reasons described above.

Thus, Plaintiffs' unfit-custodian claims under the TVPRA, the APA, and the First Amendment fail as a matter of law.

## C.   Defendants Are Entitled to Judgment as a Matter of Law on the Legal-Representation Class's Claim.

Finally, the Court should grant summary judgment for Defendants on Plaintiffs' claim that ORR unlawfully prevents access to lawyers from representing class members in proceedings involving ORR decisions on custody, placement, release, and medication.  Compl. ¶¶ 188-90.  The legal-representation class's claim is barred by *res judicata*.  And Defendants' procedures on legal representation of UACs satisfy due process and other legal requirements as a matter of law.

### 1)  The legal-representation class's claim is barred by *res judicata*.

The legal-representation class's claim—including the purported statutory aspects of their claim that simply replicate their due-process challenge—is barred by *res judicata.  Flores* conclusively resolved their claim that due process requires the imposition of additional procedures for legal representation.  As explained, claim preclusion requires: (1) identity of claims; (2) a final judgment on the merits; and (3) privity between the parties.  *Harris*, 682 F.3d at 1132.  The *Flores* Settlement is a final judgment.  *See supra* Part A.  And there is privity between the parties.  The legal-representation class comprises minors "to whom ORR is impeding or will impede legal assistance in legal matters or proceedings involving their custody, placement, release, and/or administration of psychotropic drugs."  Order at 28.  This

51

Memorandum in Support of Motion for Summary Judgment

class is a subset of the *Flores* class, which comprises "[a]ll minors who are detained in the legal custody of the INS" (¶ 10).

There is also identity of claims.  All four factors of the *Howard* test support that conclusion.  First, Plaintiffs' claimed right to access counsel—in particular, the right to access representation by ORR-funded legal service providers to challenge ORR decisions on placement, release, and medication (Compl. ¶ 148)—would impair rights and obligations established under the *Flores* Settlement.  The *Flores* Settlement expressly provides, consistent with due process, that UACs must be provided with information regarding their "right to be represented by counsel *at no expense to the government*" (Ex. 1, ¶ 14) (emphasis added).  The Settlement also states that ORR is to provide UACs a "list of free legal services available in the district pursuant to INS regulations (unless previously given to the minor)" (¶ 24D).[7] The second and third factors—whether the two actions involve substantially the same evidence and infringement of the same right—also favor finding an identity of claims.  Both *Flores* and this case involve the same claimed right to access counsel and the same evidence regarding whether the government must facilitate such access for UACs wishing to challenge their "detention, release, and treatment." *Compare* Settlement ¶ 9 ("This Agreement sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS . . .") *with* Compl. ¶ 189 (seeking legal access "involving ORR's decisions regarding custody, release, medication, and placement").  Finally, the fourth factor—whether the two actions arise out of the same transactional nucleus of facts—also favors finding identity of claims.  Both cases involve the services ORR must provide UACs on legal representation while in government care and custody.  Plaintiffs could have negotiated a right to access counsel for purposes of challenging ORR decisions

---

[7] When class counsel tried to assert a right to government-funded counsel in *Flores*, the Court deemed that claimed right to be "extracontractual"—*i.e.*, not protected under the *Flores* Settlement. *See Flores v. Sessions,* No. 85-cv-4544, ECF No. 470 at 5-6 (July 30, 2018).

regarding "detention, release, and treatment" as part of the *Flores* Settlement, but did not do so.  Thus, Plaintiffs' legal-representation claim is barred by *res judicata*.  *See Western Radio*, 123 F.3d at 1192 (*res judicata* "bars litigation in a subsequent action of any claims that were raised *or* could have been raised in the prior action") (emphasis added).  To the extent that Plaintiffs claim that the procedures they negotiated in *Flores* are not being followed, they should seek relief under *Flores*.

### 2) ORR's policies and procedures for the legal-representation class satisfy due process as a matter of law.

The Court should also grant summary judgment for Defendants because ORR's policies and procedures regarding legal representation for UACs satisfy due process as a matter of law.

On the first *Mathews* factor, Plaintiffs lack a constitutionally protected interest in attorneys (government-funded or not) to formally appear to contest routine ORR decision-making regarding placement, release, and medication (Compl. ¶ 148).  *Cf. J.E.F.M. v. Lynch*, 837 F.3d 1026, 1038 (9th Cir. 2016) (rejecting minors' claim "to government-provided counsel as a matter of constitutional and statutory right"); *Perez-Funez v. Dist. Dir., INS*, 619 F. Supp. 656, 665 (C.D. Cal. 1985) (the court is "by no means ruling that unaccompanied minors have a right to appointed counsel. The case law clearly forecloses such a finding."). Further, neither the HSA nor the TVPRA contain "mandatory language" that would create a liberty interest. *Carver*, 558 F.3d at 874-75.  The TVPRA directs ORR to "ensure, to the greatest extent practicable and consistent with section 292 of the Immigration and Nationality Act (8 U.S.C. § 1362), that all unaccompanied alien children who are or have been in the custody of [HHS] . . . have counsel to represent them in legal proceedings or matters and protect them from mistreatment."  8 U.S.C. § 1232(c)(5).  The statute pertains to pro bono legal services: "To the greatest extent practicable, the Secretary of Health and Human Services shall make every effort to utilize the services of pro bono counsel who agree to provide representation to such children without charge."

*Id.*  The language "to the greatest extent practicable" and that ORR make "every effort to utilize . . . pro bono counsel" does not mandate that any "particular outcome must follow," nor does it create a protected liberty interest in a right to access representation to challenge ORR decisions.  Similarly, the HSA's directive to HHS to "develop[ ] a plan to be submitted to Congress on how to ensure that qualified and independent legal counsel is timely appointed to represent the interest of each [UAC]," 6 U.S.C. § 279(b)(1)(A), does not mandate a "particular outcome" and thus does not create a constitutionally protected liberty interest.  Finally, the *Flores* Settlement does not create a protected liberty interest in access to counsel to challenge routine ORR decisions.  The Ninth Circuit has held that the "right to retain counsel conferred by [a] consent decree is not itself a protected liberty interest." *Smith*, 994 F.2d at 1407.  So Plaintiffs' legal-representation claim fails at the outset.

On the second *Mathews* factor, the risk of erroneous deprivation is low in children not being informed of available pro bono legal immigration services.  Upon entering ORR custody, the facility must give the UAC a *Legal Resource Guide*—which includes a form for requesting a *Flores* bond hearing—and read the contents of the form to the child in a language the child understands.  U.F. ¶ 81.  The *Legal Resource Guide* contains a state-by-state listing of attorneys and legal service providers.  *Id.*  UACs in ORR custody also receive a free legal consultation with licensed attorneys through an ORR-funded legal-service contract.  *Id.*; J.S. ¶¶ 97-98.  Upon a UAC's admission to ORR care, legal service providers are required to provide a know-your-rights presentation and individualized legal screening to the UAC for possible immigration relief.  U.F. ¶ 81.  Though ORR's legal-service contract funds only certain types of assistance related to immigration proceedings, legal service providers may assist UACs with other matters using non-ORR funds.  U.F. ¶¶ 88-91, 93-94; J.S. ¶ 99.  UACs in ORR custody can also access legal services through other funding or through pro bono counsel, and ORR does not discourage attorneys from representing UACs in ORR custody, does not refuse to work with

54

Memorandum in Support of Motion for Summary Judgment

such attorneys, and does not reduce funding for attorneys with ORR legal services contracts who also provide other assistance to UACs. U.F. ¶¶ 81, 90, 93-94. ORR's policies and procedures also require that attorneys representing UACs have unlimited telephone access to their clients, and ORR instructs care providers to provide regular updates to counsel and to provide meeting places between UACs and their attorneys. U.F. ¶¶ 86-87. ORR also encourages all potential sponsors to attend a legal orientation provided by the care-provider facilities to further inform them of possible free legal immigration services for the child. U.F. ¶¶ 82-84. The risk of erroneous deprivation under these procedures is low, particularly given the absence of any constitutionally protected liberty interest related to ORR-funded legal representation, and Plaintiffs cannot show that additional procedures would meaningfully reduce any risk of error.

Plaintiffs also cannot point to any evidence that ORR "blocks" access to counsel. None of the four class representatives—Lucas R., Jaime D., Daniela Marisol T., and Gabriela N.—has offered any evidence supporting their legal-representation claim. All four class representatives were provided screenings for legal relief, legal rights presentations, and a list of pro bono legal service providers while in ORR custody, and met with attorneys of record or a child advocate. U.F. ¶¶ 105, 110, 113, 118, 124, 126-28, 133, 141. During discovery, each of these Plaintiffs was asked to "[i]dentify and describe the factual circumstance of each instance since January 2017 in which you claim Defendants blocked Vera Institute lawyers from representing you regarding custody, medication, placement, or release from ORR custody." U.F. ¶¶ 112, 123, 129, 142. Each Plaintiff simply replied, "Plaintiff answers that he [or she] was not privy, and accordingly can neither identify nor describe, the factual circumstances in which Defendants blocked Vera Institute lawyers from representing [them] regarding custody, medication, placement, or release from ORR custody. Plaintiff further answers that to the best of his [or her] knowledge and recollection no lawyer ever represented him [or her] with respect to

custody, medication, placement, or release at any time while he was in ORR custody." *Id.* Such bare assertions without any supporting evidence do not create a genuine issue of material fact. *McSherry*, 584 F.3d at 1138 (to demonstrate a genuine issue of material fact, a party must rely on facts, not unsupported assertions).

Other discovery likewise has not uncovered any factual support for Plaintiffs' allegations on the legal-representation class. The deposition testimony of the attorneys who submitted declarations on behalf of Plaintiffs in support of the legal-representation class shows that the class's claims rest almost entirely on hearsay and speculation. Lorilei Williams, a former ORR legal service provider contracted through the Vera Institute of Justice, admitted that to her knowledge, Vera had never denied funding to a legal-service provider on the basis that the provider, or one of its attorneys, brought an action against ORR. Williams Dep. 96:20-97:2; U.F. ¶ 94. Megan Stuart, another attorney with a Vera-funded legal-service provider, testified: "Q. Did anyone at Vera tell you that you could not advocate for a child? A. No. I never—I was—I had no occasion to interact with Vera." Stuart Dep. 75:10-13; U.F. ¶ 90. And Justin Mixon, the third attorney with a Vera-funded legal-service provider, testified: "Q. You state that Vera at the behest of the ORR [sic] blocks the majority of the qualified and available representatives from children affirmed by ORR's custody and placement decisions? A. Yeah. I'm not in the room when ORR negotiates the contract with Vera." Mixon Dep. 154:2-8; U.F. ¶ 90.

The final *Mathews* factor, the government's interest, also decisively favors the government. The TVPRA does not require ORR to provide UACs a right to access representation from ORR-funded legal service providers to challenge routine decisionmaking, and ORR designates legal-representation resources for other UAC services. *See* U.F. ¶ 92. Mandating access to ORR-funded legal representation to challenge ORR placement, release, and medication decisions would thus divert valuable program resources currently used to connect children with legal service

providers for other purposes (such as seeking immigration relief) and used to fund other essential activities, such as care and placement of children. *Id.*

Thus, the balance of *Mathews* factors conclusively favors Defendants. Plaintiffs do not have a constitutionally protected interest in government-funded legal counsel to challenge ORR decisions on placement, release, and medication. There is no evidence that Plaintiffs face a risk of erroneous deprivation under existing procedures for connecting UACs with counsel, or that mandating more procedures would meaningfully reduce any minimal risk that does exist. And the government's interest in soundly allocating its resources to meet other program needs is substantial. The legal-representation class's due-process claim thus fails as a matter of law, and the Court should grant summary judgment for Defendants on the claim.

### 3) ORR's policies and procedures for the legal-representation class comport with the TVPRA, the HSA, Title 8, and the APA.

ORR's policies and procedures for the legal-representation class satisfy the requirements of the TVPRA, the HSA, Title 8, and the APA as a matter of law. Plaintiffs allege that these statutes and associated regulations "generally guarantee Plaintiffs and their proposed class members the right to be represented by retained and *pro bono* counsel in proceedings before U.S. Citizenship and Immigration Services and the Executive Office for Immigration Review." Compl. ¶ 144. Plaintiffs further allege that "[l]egal proceedings involving ORR's custody, release, placement, and medication decisions, including hearings pursuant to paragraph 24A of the *Flores* Settlement, are 'legal proceedings or matters' within the meaning of the TVPRA § 235(c)(5)." *Id.* ¶ 149. These arguments lack merit: such a right is not articulated in any of the statutes or regulations that Plaintiffs cite. The Court should therefore reject the claim that ORR's policies and procedures "violate . . . the TVPRA § 235(c)(5), HSA § 279(b)(A) [sic], 8 C.F.R. §§ 287.3(c), 1003.62, 1240.10(a)(2) and 1292.1 *et seq.* [collectively, the federal immigration regulations

under Title 8]," and the APA, as applied to the legal-representation class.  Compl. ¶ 190.

First, Plaintiffs' claim under the TVPRA fails, as the TVPRA nowhere specifies a right to access government-funded counsel to challenge routine ORR decision-making.  The TVPRA instructs ORR to "ensure, to the greatest extent practicable and consistent with section 292 of the Immigration and Nationality Act (8 U.S.C. § 1362), that all unaccompanied alien children who are or have been in the custody of [HHS] . . . have counsel to represent them in legal proceedings or matters and protect them from mistreatment."  8 U.S.C. § 1232(c)(5).  Section 292 of the INA in turn provides that "[i]n any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (*at no expense to the Government*) by such counsel, authorized to practice in such proceedings, as he shall choose."  8 U.S.C. § 1362 (emphasis added). These provisions do not create a general right to access government-funded counsel to challenge routine ORR decisions, such as step-up, release, and medication. Rather, these provisions impose an obligation on ORR to connect UACs with pro bono counsel in their immigration proceedings.  And as explained, ORR's policies and procedures on legal representation satisfy this obligation, as ORR works to ensure "to the greatest extent practicable" that UACs are able to access such representation.  U.F. ¶ 81.  Thus, Plaintiffs' claim that ORR's policies and practices on legal representation violate the TVPRA fails as a matter of law.

To the extent that Plaintiffs claim that challenges to routine ORR decision-making on release, step-up, and the administration of psychotropic medication are "legal proceedings" covered under subsection (c)(5) of the TVPRA, such a claim conflicts with a plain reading of the statute, its legislative history, and congressional appropriations.  To start, the TVPRA plainly states that it must be applied "consistent with" section 292 of the INA (8 U.S.C. § 1362), and that provision addresses access

58
Memorandum in Support of Motion for Summary Judgment

to counsel in "removal proceedings."   Further, such a reading contravenes the TVPRA's legislative history.   One of the main sponsors of the TVPRA, Senator Diane Feinstein, introduced the finalized bill as follows: "This trafficking bill includes a provision I authored over 8 years ago—the Unaccompanied Alien Minor Act . . . .   The bill also provides for pro bono legal representation for unaccompanied alien children in their immigration matters . . . ."   154 Cong. Rec. S10, 886-87 (daily ed. Dec. 10, 2008).   Finally, congressional appropriations show that Congress intended to fund only access to immigration services.   For the current fiscal year 2020, Congress set aside not less than $160 million for three areas: legal services, child advocates, and post-release services.   *See* Further Consolidated Appropriations Act, 2020, Pub. L. 116-94, Division A, Title II, 133 Stat. 2570.   Statements of the House Appropriations Committee Chairwoman, Chairwoman DeLauro, further show that this funding is designated for assisting children in obtaining representation in immigration proceedings: "[L]egal counsel for unaccompanied children increases the efficiency and effectiveness of immigration proceedings and significantly reduces the failure-to-appear rate of children who are released from HHS custody." H.R. Rep. 116-62, 144-45, 116th Congress, 1st Sess. (May 15, 2019).

Read in context, the TVPRA addresses legal representation in immigration removal proceedings, not the day-to-day decisions that Plaintiffs characterize as "legal proceedings."   And ORR has never considered challenges to step-up, release, and medical care to be legal matters or proceedings under the TVPRA.   J.S. ¶ 99. On Plaintiffs' view, any day-to-day custodial decision could become a "legal proceeding," including educational services, recreational activities, and routine medical care.   Plaintiffs provide no basis for this sweeping view of the statute, which was intended to "provide[ ] for pro bono legal representation for unaccompanied alien children in their immigration matters."   154 Cong. Rec. S10, 886-87.

Second, Plaintiffs' claim under the HSA fails.   Like the TVPRA, the HSA does not create a right to access government-funded counsel to challenge ORR

decisions on step-up, release, and medication.  Section 279(b)(1)(A) of the HSA directs ORR to "develop[ ] a plan to be submitted to Congress on how to ensure that qualified and independent legal counsel is timely appointed to represent the interests of each such [unaccompanied alien] child," but does not require ORR to provide access to government-funded legal representation in these matters.

Third, Plaintiffs' claim fails under federal immigration regulations, including 8 C.F.R. §§ 287.3(c), 1003.62, 1240.10(a)(2), and 1292.1 *et seq*.  Those regulations generally provide arriving aliens with the opportunity to retain their own counsel in proceedings before U.S. Citizenship and Immigration Services and the Executive Office for Immigration Review, but make no mention of legal representation in ORR custody to contest other decisions unrelated to immigration relief, nor do they require access to government-funded counsel.

Finally, ORR's policies and procedures for the legal-representation class comport with the APA.  Plaintiffs make no independent claim under the APA beyond their procedural-due-process claim, which fails for the reasons described, and the relief they seek under the APA is the same relief they seek on their due-process claim—access to government-funded legal counsel to challenge ORR decisions on step-up, release, and medication.  In addition, like the TVPRA, HSA, and federal immigration regulation provisions discussed above, the APA does not separately impose a right to access government-funded counsel.

The legal-representation class's claims under all these statutes fail as a matter of law.

## VI.   Conclusion

The Court should grant summary judgment for Defendants on the step-up, unfit-custodian, and legal-representation class's claims.

1    Dated: October 2, 2020                    Respectfully submitted,

2

3                                              JEFFREY B. CLARK
                                               Acting Assistant Attorney General
4
                                               SCOTT G. STEWART
5                                              Deputy Assistant Attorney General

6                                              ERNESTO H. MOLINA
                                               Deputy Director
7
                                               CHRISTOPHER A. BATES
8                                              Senior Counsel to the
                                               Assistant Attorney General
9

10                                             */s/ W. Daniel Shieh*
                                               W. DANIEL SHIEH
11                                             BENJAMIN M. MOSS
                                               Senior Litigation Counsel
12
                                               NANCY K. CANTER
13                                             JONATHAN K. ROSS
                                               ANTHONY J. MESSURI
14                                             Trial Attorneys
                                               Office of Immigration Litigation
15                                             United States Department of Justice
16                                             P.O. Box 878
                                               Ben Franklin Station
17                                             Washington, D.C. 20044
                                               Telephone: (202) 305-9802
18         *Counsel for Defendants*            Email: Daniel.Shieh@usdoj.gov
19

20

21

22

23

24

25

26

27

28

                                        61
                Memorandum in Support of Motion for Summary Judgment