# DX-02

Rule 30(b)(6) Deposition of Toby Biswas, February 18-19, 2020

```
 1              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
 2                    Western Division

 3   - - - - - - - - - - - - - -+
                                 |
 4   LUCAS, R., et al.,          |
                                 |
 5          Plaintiffs,          |    Case Number:
                                 |
 6     vs.                       |    2:18-cv-05741
                                 |
 7   ALEX AZAR, Secretary of     |
     U.S. Department of Health   |
 8   and Human Services, et al., |
                                 |
 9          Defendants.          |
                                 |
10   - - - - - - - - - - - - - -+

11

12                 ***CONFIDENTIAL***

13          Rule 30(b)(6) Deposition of the

14          Office of Refugee Resettlement,

15    by and through its designated representative,

16              TOBY R.M. BISWAS, ESQ.

17              Washington, D.C.

18          Tuesday, February 18, 2020

19                  9:00 a.m.

20                 (VOLUME 1)

21

22

23   Job No. 177358

24   Reported by:  Laurie Donovan, RPR, CRR, CLR

25
```

Confidential

Page 12

1    heightened level of placement.

2         Q    What are the options for an initial

3    placement that ORR has when receiving a child

4    referred from the Border Patrol?

5         A    Can you clarify?

6         Q    What types of placements in terms of

7    level of security?

8         A    Well, we have our most basic level of

9    care, which are our shelters, our group homes,

10   make up the vast majority of our bed capacity.

11             We also have transitional foster care

12   homes, which are typically reserved for special

13   populations, younger tender age children or

14   children with other special needs, parenting or

15   pregnant teenagers.

16             We have what are known as staff secure

17   facilities, which are essentially just licensed

18   shelters.  However, the ratio of staff is higher

19   to maintain security and prevent escape; and then

20   we have secure facilities which are for children

21   that are determined to be a danger to self/others

22   or have been charged with a criminal offense.

23        Q    Does ORR also have facilities known as

24   "RTCs" or residential treatment centers?

25        A    We do.

Confidential

```
 1          Q     And does it also occasionally place
 2    children in what are called out-of-network
 3    facilities?
 4          A     Yes.
 5          Q     All right.  Please describe what an RTC
 6    is.
 7          A     Residential treatment centers are
 8    facilities for children with pretty severe, acute
 9    mental health, psychiatric problems, who are
10    determined to be a danger to self or others by a
11    licensed psychiatrist or psychologist.
12          Q     And out-of-network facilities?
13          A     It can be a range of types of
14    facilities; sometimes just regular hospitals for
15    children who require, you know, very specific
16    medical needs, have, you know, a heart problem or
17    a kidney problem that can't be -- their needs
18    can't be met in one of our shelters, as well as
19    other types of residential treatment centers that
20    can accept placements for children that our
21    in-network RTCs cannot.
22          Q     Okay.
23                Now, in terms of level of security, is
24    it fair to say that the shelters and long-term
25    foster care are the least secure of ORR's
```

Confidential

1    placement options?

2         A    Yes.

3         Q    And that is followed by staff secure?

4         A    Yes.

5         Q    And then that would be followed -- which

6    is more secure; the secure placements or RTC

7    placements?

8         A    We generally think of them as the same

9    level of restriction.

10        Q    And out-of-network placements, where do

11   they fall in the hierarchy of security?

12        A    It depends.  So for those facilities

13   that are really hospitals, as secure as any

14   hospital would be; and then for the RTC type

15   facilities, as secure as an RTC would be.

16        Q    Okay, and are children whom ORR receives

17   directly from Border Patrol placed in -- does ORR

18   on occasion place children in all the different

19   types of facilities we've been discussing, or is

20   there some -- are there some facilities where ORR

21   will not place a child initially after receiving

22   him or her from the Border Patrol?

23        A    By practice, it would be very unlikely

24   that we would directly place a child into an RTC

25   facility unless that child had previously been in

Confidential

1    our care in an RTC and is exhibiting symptoms that

2    would require an RTC placement, and a licensed

3    psychiatrist or psychologist has made that

4    determination while the child is in Border

5    Patrol's custody or other DHS component.

6         Q    What about direct placement into

7    out-of-network facilities; would that be --

8         A    If you're talking about out-of-network

9    facilities like a hospital, it's possible.  We

10   sometimes receive referrals of children with some

11   very severe medical conditions, so they're already

12   in a hospital even while they're technically in

13   Border Patrol's custody, and so they would be

14   transferred to ORR's custody and put in a

15   placement kind of on paper, but the child would

16   remain in a hospital, because without those

17   medical services, they would be determined to be

18   at risk.

19        Q    How about placement directly from Border

20   Patrol in an out-of-network RTC; is that ever

21   done?

22        A    No.

23        Q    So then the range of initial placements

24   would be shelter, staff secure, secure, unless you

25   have some prior thing, which we would then --

Confidential

1    the acronym for federal field specialist?  That's

2    what we're talking about when we say "FFS,"

3    federal field specialist?

4         A    Yes.

5         Q    All right.  Does the federal field

6    specialist, in reviewing the checklist or the

7    information that is being submitted, provided

8    surrounding an initial placement, does the federal

9    field specialist speak personally with the child?

10        A    No.

11        Q    All right.  So then is the process any

12   different with respect to consultation with a

13   federal field specialist when the initial

14   placement is going to be in a secure facility?

15        A    No.  It would undergo the same type of

16   review.

17        Q    Okay.  All right.  So speaking about the

18   different levels of security, I believe you

19   testified that a staff secure facility is akin to

20   a licensed facility but has a higher staffing

21   ratio; is that correct?

22        A    Yes.

23        Q    Do ORR's staff secure facilities, are

24   they licensed to care for dependent children by

25   the states in which they are located?

Confidential

1    A    I guess what do you mean by "dependent

2    children"?

3    Q    Nondelinquent children.

4    A    Yes.

5    Q    So is there any difference in the

6    license that a staff secure facility would have

7    from what a shelter facility has?

8    A    No.

9    Q    What about going to the secure

10   facilities; do they have the same sort of license

11   that a shelter has?

12   A    No.

13   Q    What sort of license, if any, do they

14   have?

15   A    The one secure facility we currently

16   operate is licensed by a juvenile justice agency.

17   Q    Okay, and is that the Shenandoah Valley

18   Juvenile Center?

19   A    Shenandoah Valley, yes.

20   Q    And the Shenandoah Valley facility is a

21   juvenile hall; is that correct?

22   A    I don't know how it's specifically

23   licensed, but it appears and looks like a juvenile

24   justice facility.

25   Q    How does -- how, if any -- how, if at

Confidential

Page 30

1   all, does the Shenandoah Valley Juvenile Center

2   differ from a jail?

3      A    Well, its population are just juveniles

4   and not adults.

5      Q    Any other difference you can think of?

6      A    I think the folks that work there are

7   trained in juvenile justice and not in adult

8   detention.

9      Q    Okay, but the, but the security, the

10  level of security in terms of fencing and guards

11  and so forth is equivalent to a jail at Shenandoah

12  Valley; is that correct?

13     A    Yes.

14     Q    All right.  Is there any limit on the

15  amount of time that a child may be placed by ORR

16  at Shenandoah Valley?

17     A    They are required to have a review every

18  30, at least every 30 days of their placement in

19  any restrictive setting.

20     Q    But is there a requirement that at the

21  conclusion of that review, that the child be

22  transferred out of the facility?

23     A    If they're determined to no longer meet

24  the requirements that constitute a placement in

25  that facility, then they would be transferred, and

Confidential

1    if they don't meet those standards, then they

2    would be transferred.  If they still do, then they

3    would continue to be placed there.

4         Q    And as long as a child continues to meet

5    the criteria, is there any limit on the amount of

6    time that he or she may be detained at Shenandoah

7    Valley?

8         A    No.  So if they're still determined to

9    be a danger to others, then they would continue to

10   be placed at Shenandoah Valley.

11        Q    All right, and what about a staff secure

12   facility; is there any hard limit on the amount of

13   time a child may be placed in staff secure,

14   assuming that they continue to meet the

15   requirements for such placement?

16        A    Again, their placement is reviewed every

17   30 days.

18        Q    But if they continue to meet the

19   criteria for staff secure placement, is there any

20   limit on the amount of time they could be placed

21   in a staff secure facility?

22        A    No.

23        Q    Now, I believe you testified earlier

24   that there is -- on occasion, children will be

25   placed directly from the border into RTCs or an

Confidential

1    RTC, but in the case where ORR has no prior

2    history or knowledge about the child's mental

3    health status, what are the criteria for -- well,

4    strike that.

5              With respect to children who are placed

6    in RTCs, is there any hard time limit as to how

7    long they can be kept there, assuming they

8    continue to meet the requirements for RTC

9    placement?

10       A    So their placement is reviewed every 30

11   days, and so there's not a strict time limit, but

12   there's a review every, at least every 30 days to

13   the appropriateness of the placement.

14       Q    What is the longest time that a child

15   has been placed by ORR in a secure facility?

16       A    I know that we've had children placed in

17   secure facilities for over nine months.

18       Q    What is the longest time that a child

19   has been placed in a staff secure facility?

20       A    An individual child?  I don't know that

21   I'm reasonably certain.

22       Q    Would it -- do you have any estimate?

23       A    I mean I --

24            MR. SHIEH:  We would object.  You

25       know, data points like this were not

Confidential

1          reasonably noticed.  I mean this is not a

2          memory -- he's not going to remember.

3                    MR. HOLGUIN:  All right, fair

4          enough, if he can't remember.

5    BY MR. HOLGUIN:

6          Q    Do you have, do you have a basis to, to

7    testify as to how long a child has been placed --

8    the maximum amount a child has been placed in an

9    RTC?

10         A    I mean it could --

11                   MR. SHIEH:  Same objection.

12                   THE WITNESS:  Yeah.

13   BY MR. HOLGUIN:

14         Q    How does ORR track the amount of time

15   that children have been placed in secure

16   facilities?

17         A    So through our UAC portal system, for

18   all children that are in care, we can see how long

19   they have been placed in a particular facility,

20   and then again, that, you know, at least every 30

21   days there's a 30-day review of the case, there

22   are weekly reviews by the child's case manager and

23   FFS and case coordinator, and then there's a

24   compliance review that's done on a monthly basis

25   as well, to determine whether the 30-day reviews

Confidential

1    are happening and happening as scheduled.

2         Q    Does ORR have any system to flag cases

3    in which children have been detained for long

4    periods in secure facilities?

5         A    So like I said, those systems we have

6    with the weekly reviews, the 30-day reviews, and

7    the compliance reviews would all be systems we

8    have in place to determine how long children have

9    been in a secure placement.

10        Q    So who conducts the weekly reviews?

11        A    So that's a team of the child's assigned

12   case manager who works for the care provider, and

13   then the child's case coordinator, which is an

14   independent third-party social worker, and then

15   the child is assigned an FFS.

16        Q    And the case coordinator, is he or she

17   an employee of ORR?

18        A    No.

19        Q    Who employs the case coordinator?

20        A    General Dynamics Information Technology.

21        Q    And are you -- what, what requirements

22   does ORR have for minimum qualifications to serve

23   as a case coordinator?

24             MR. SHIEH:  Same objection as

25        before on qualifications.  Outside the scope

1    at a staff secure, is there a 30-day review that

2    happens then?

3         A    Yes.

4         Q    What's the purpose of that review?

5         A    To determine whether the placement is

6    still appropriate.

7         Q    In a staff secure facility?

8         A    Yes.

9         Q    Is that -- is it -- the term used when,

10   when a child is transferred from a staff secure to

11   a shelter, is that called a "step down"?

12        A    Yes.

13        Q    And when a child is transferred from a

14   staff secure to a secure facility, is that called

15   a "step up"?

16        A    It would be in that context, but "step

17   up" is the term we use anytime a child is put into

18   a more restrictive setting.

19        Q    And then is it fair to say that a "step

20   down" is the term you use when a child is

21   transferred to a less restrictive setting?

22        A    Correct.

23        Q    Now, the 30-day review when a child has

24   been placed in a restrictive setting, what takes

25   place during that?

1      A      So there's a meeting between the child's

2    case manager, case coordinator, and FFS, and they

3    go through the child's case and look or the

4    child's behavior as well as any information they

5    have gathered during that period to determine

6    whether placement at that facility is still

7    warranted.

8      Q      So the case coordinator and the case

9    manager and the FFS, are they physically in the

10    same place talking about a particular case?

11      A      They can be, but more often they're

12    either on the phone or they're reviewing things on

13    paper or some combination.

14      Q      Do they review the information in the

15    case portal during those 30-day reviews?

16      A      Yes.

17      Q      For shorthand, can we call them "step

18    down reviews," or how would you refer to them?

19      A      So in our policy guide at Section 1.4.2,

20    they're called "30-day Restrictive Placement Case

21    Reviews."

22      Q      That's kind of a mouthful.  Can we just

23    call them 30-day placement reviews for shorthand?

24      A      For purposes of this, yes.

25      Q      Okay.  All right.  So typically what

Page 53

1    would happen then in a review pursuant to 1.4.2 of

2    the -- how do we refer to this?  I'm referring to

3    Plaintiff's Exhibit 178.  Is this -- can we call

4    this the online guide?

5         A     I just call it the policy guide.

6         Q     The policy guide.  All right.  We'll

7    refer to Exhibit 178 as the policy guide.

8               So when there is a 30-day restrictive

9    placement case review pursuant to 1.4.2 of the

10   policy guide, who initiates that review?

11        A     The case manager.

12        Q     And so then is it fair to say that the

13   case manager contacts the FFS and the case

14   coordinator to set up one of these reviews?

15        A     Yes.

16        Q     Okay, and how does ORR ensure that the,

17   the 30-day restrictive placement case review is

18   calendared?

19        A     I mean, one, the FFS for that particular

20   facility is, you know, responsible also for

21   ensuring that these reviews are happening, and

22   then we have a compliance review team that also

23   ensures that these, these meetings are taking

24   place.

25        Q     And how does the compliance review team

Confidential

1    ensure that the meetings are taking place?

2        A    So they're meeting at least monthly to

3    go over all the placements and restrictive

4    settings.

5        Q    And who's -- what do you call the unit

6    that conducts these compliance reviews?

7        A    So it's a working group.  It's made up

8    of the supervisory FFS for special populations,

9    members of ORR's division of policy and

10   procedures, ORR's juvenile coordinator, as well as

11   other support staff.

12       Q    Okay.  So these individuals look at

13   every restrictive placement every 30 days?

14       A    Yes.

15       Q    Okay.

16            Now, during the 30-day review, what role

17   does the, the child him or herself play?

18       A    So they're told at the end of the

19   process what their, what the decision has been

20   made regarding their placement, and they're

21   provided a notice of the reasons for either step

22   down or their continued placement.

23       Q    And is that the extent of their

24   involvement?

25       A    I mean they are on a -- leading up to

Confidential

Page 55

1   that time, they are meeting with their case

2   manager who goes over their case with the child

3   and talks to them about, you know, their behavior

4   and that sort of thing.

5        Q    Now, the information that is considered

6   during the 30-day restrictive placement case

7   reviews, what is the source of that information?

8        A    It varies.  It could be court records.

9   It could be information based on significant

10  incidents that happened while the child is in

11  care.  It can be conversations with the child's

12  clinician, other assessments that are done by

13  other medical professionals.

14       Q    Now, when you mentioned clinicians, who

15  is it that hires clinicians?

16       A    The ORR care provider.

17       Q    And what are the minimum qualifications

18  for clinicians, if you know?

19       A    So they have to have a master's in

20  behavioral science, typically social work.

21       Q    Now, are clinicians involved in

22  providing children in ORR care therapy?

23       A    They provide counseling sessions for the

24  child.

25       Q    And are those counseling sessions

1  dangerousness as a basis for refusing to release a

2  child, is that dangerousness to self or just

3  dangerousness to others?

4       A    It's danger to self/others or a risk to

5  the community.

6       Q    All right.  So going back to the, to the

7  30-day restrictive placement reviews, is the child

8  given notice that the review is going to take

9  place?

10      A    Yes.  The child is told that there's a

11  review of their case every 30 days.

12      Q    When are they told that?

13      A    At the time of their admission into the

14  restrictive setting.

15      Q    Are they told that at any other later

16  point in their custody?

17      A    Based on my experience, yes, the case

18  manager informs them that they have 30-day reviews

19  coming up.  Children are usually quite aware of

20  it.

21      Q    Is there any policy that ORR has here

22  that would require the case manager to advise a

23  child that a 30-day review is coming up?

24      A    It's provided in their Notice of

25  Placement that the child's going to have a 30-day

Confidential

Page 65

```
 1   review.

 2        Q     When is the child provided a Notice of

 3   Placement?

 4        A     They're provided it at the time of their

 5   admission and then subsequently after a 30-day

 6   review has been completed.

 7        Q     So in other words, they are told that

 8   there will be another 30-day review at the time

 9   they receive the results of their first 30-day

10   review?

11        A     Yes, and case managers are required to

12   give updates about the child's case to the child

13   throughout their stay in ORR custody.

14        Q     Does ORR specifically require the case

15   manager to advise a child that a 30-day placement

16   review, restrictive placement review is coming up?

17        A     So that would be part of the general

18   guidance that's given to case managers, that

19   they're supposed to provide case updates to the

20   child on a regular basis.

21        Q     So they're told that they are supposed

22   to provide regular updates to the child, but

23   there's -- are they specifically told that they

24   are to advise the child that a 30-day review is

25   coming up?
```

Confidential

1    Q    What other services.

2    A    They do legal screenings of individual

3  children to determine their eligibility for

4  potential legal relief.  They provide

5  friend-of-the-court services where allowed by

6  local rules at immigration court, and provide

7  limited direct representation for immigration

8  proceedings in certain instances.

9    Q    Okay.  With respect to direct

10 representation, does ORR track what percentage of

11 its population, the population of detained

12 children receive direct representation?

13   A    No.

14   Q    Does it track how many children receive

15 friend-of-the-court services?

16   A    No.  These would be requirements of the

17 contractor, not of ORR.

18   Q    Does ORR award the contract?

19   A    Yes.

20   Q    And so children also have the right to

21 hire their own lawyers, correct?

22   A    Yes.

23   Q    And does ORR have any tracking of the

24 number of children who are represented by private

25 counsel?

Confidential

1       A    No.

2       Q    What role, if any, does a child's lawyer

3  have in the 30-day restrictive placement review

4  process?

5       A    They're informed of the results of the

6  30-day review.

7       Q    What about in advance of the 30-day

8  review; is there any notice given to the child's

9  lawyer that a 30-day review is coming up?

10      A    We require case managers to provide

11  general case updates to attorneys of record, so

12  that would be one of the issues that would be

13  discussed during one of those case updates.

14      Q    And where in the, in the policy guide or

15  the MAP does it instruct case managers to keep

16  lawyers up to date with respect to the progress of

17  their clients' cases?

18      A    It's a general requirement in the

19  description of what a case manager's role is.

20  It's Section 2.3 -- yeah, 2.3.2.

21      Q    So the section you're referring to is

22  the last paragraph of Section 2.3.2 where it says

23  that "stakeholders may include local legal service

24  providers and attorneys of record and other local

25  service providers"; is that correct?

1      A    Yes.

2      Q    Now, when you say "may," when the policy

3   says "may," doesn't that indicate that the case

4   manager -- well, I suppose it speaks for itself.

5           Is there anything else, sitting here

6   today, that you can think of that instructs case

7   managers to advise attorneys of record or legal

8   services providers of an upcoming 30-day

9   restrictive placement review?

10     A    At Section 1.4.2, we talk about what the

11  basis is for stepping up or stepping down a child

12  and share that information with the child's

13  attorney of record or legal service provider on

14  demand.

15     Q    And you're referring to Section 1.4.2 --

16     A    Yes.

17     Q    -- in that response?  All right, but is

18  it fair to say that this information is provided

19  to the youth's attorney of record following the

20  30-day restrictive placement case review?

21     A    Yes.

22     Q    Is the child -- is there any section in

23  this manual or other written ORR policies that

24  requires ORR or any of its contractors to instruct

25  or to advise a child's lawyer that a 30-day review

1    is going to be conducted?

2         A    So like I said, the case managers are

3    supposed to keep case updates, provide case

4    updates to relevant stakeholders, which would

5    include the attorney of record or legal service

6    provider.

7         Q    If a child's lawyer were to request to

8    be present during the 30-day review, what is ORR's

9    policy with respect to granting or denying that

10   request?

11        A    They're not party to the 30-day

12   placement review process.

13        Q    So they would not be permitted to

14   participate, correct?

15        A    We would be open to receiving

16   information from them, but there's no requirement

17   that they be present during the review process.

18        Q    Now, I believe you mentioned that there

19   were -- the information that's considered during

20   the 30-day restrictive placement review includes

21   information from serious incident reports; is that

22   correct?

23        A    Yes.

24        Q    Now, a serious incident report, how is

25   that generated?

Confidential

1    placement review, is the child permitted to

2    examine the evidence that is going to be

3    considered in the 30-day review?

4          A     There's no prohibition, but typically

5    they're provided the evidence after the review

6    decision has been made.

7          Q     In determining whether a child should be

8    stepped down, does ORR prescribe any particular

9    standard or burden of proof?

10         A     We don't have a specific burden of

11   proof, but what information is reviewed is

12   discussed in our manual of procedures in Section

13   1.4.2 of that document.

14         Q     Do you have a page number there?

15         A     Sure, so page 34.

16         Q     34.

17         A     So included in this are interviews with

18   the child and the child's family, as well as other

19   criminal history or other more documentary

20   evidence.

21         Q     Okay.  So you're referring to the top of

22   page 35, or is it the bottom of page 35 that

23   you're referring to?

24         A     I guess the top of page 35.

25         Q     Okay.  So when we have in this section,

Confidential

Page 75

```
 1    there's a list, correct?  "Attestations from law

 2    enforcement, criminal history," et cetera, and

 3    these are the things, correct, that are considered

 4    during the 30-day restrictive placement review; is

 5    that right?

 6         A    Yes.

 7         Q    Okay.  So my question is -- in paragraph

 8    1, which appears in about the middle of page 34 --

 9    you see here where it's paragraph 1, and it talks

10    about clinicians having counseling sessions,

11    generating psychological reports and documents and

12    so forth, and then -- so that's what the

13    clinicians are supposed to gather, correct?

14         A    Yes.

15         Q    For the 30-day restrictive placement

16    review, correct?

17         A    Correct.

18         Q    And then it says "case managers," and

19    then it has a number of items that they are

20    supposed to gather, and then, and then between the

21    clinicians and the case managers, they provide

22    what is, what is listed in paragraph 1 to the case

23    manager, the case coordinator, and the FFS, who

24    are running the 30-day restrictive placement

25    review; is that right?
```

Confidential

1   proof that's required to continue a child in a

2   restrictive placement?

3       A    So an FFS makes the decision ultimately

4   to determine whether the information received and

5   the recommendations made by the case coordinator

6   and case manager and other staff at the facility

7   warrant continued placement based on our policies.

8       Q    But is there, is there a particular

9   standard of proof that ORR requires, showing that

10  the criteria for restrictive placement continue to

11  be met?

12      A    I mean what do you mean by specific

13  standard?

14      Q    Well, say there is some evidence of

15  continued need for restrictive placement versus a

16  preponderance of the evidence, versus clear and

17  convincing evidence.

18      A    I mean FFSs don't use those types of

19  legal standards.  They make determinations based

20  on the child's previous history and current

21  functioning, whether they currently warrant

22  continued placement in such a facility.

23      Q    But what, if anything, in ORR's policies

24  restricts an FFS from making a decision that is

25  contrary to the weight of the evidence?

Confidential

1      A      If that were the case, the child is able

2   to appeal that decision for reconsideration by the

3   ORR director in certain instances.

4      Q      And what instances are those?

5      A      In situations where the child's placed

6   in a secure or RTC facility, they can ask for

7   reconsideration of placement.

8      Q      And how does a child go about doing

9   that?

10      A      They notify their case manager, and then

11   the case manager contacts ORR.

12      Q      And where is this process set out in

13   the --

14      A      It's described in Section 1.4.7 of the

15   ORR policy guide, but we don't have specific

16   procedures.

17      Q      Is there a form that a child can fill

18   out to request reconsideration of a secure RTC

19   placement?

20      A      We don't have a form at this time.

21      Q      Is there any requirement that a child be

22   informed that they may request reconsideration of

23   a secure RTC placement?

24      A      Yeah, so it's in the Notice of Placement

25   itself.

Confidential

Page 79

1          Q     And the Notice of Placement is given to

2     the child how?  When?

3          A     So it's given to the child within 48

4     hours of placement in a restrictive setting as

5     well as after the 30-day review.

6          Q     How quickly after the 30-day review are

7     they given it?

8          A     I need to look it up, but -- I mean at

9     least within seven days.  I don't know that we

10    have a specific time limit, but within a

11    reasonable time and at least within seven days.

12         Q     You mean at the longest, within seven

13    days?

14         A     Yeah, at the longest.

15         Q     But you don't recall where in the guide

16    or the MAP that seven-day limit would be

17    specified?

18         A     Well, it would be specified in --

19    Section 1.4.2, again, talks about the time it

20    would take if a child is to be stepped down.  We

21    do occasionally have difficulty transferring

22    children to less restrictive settings, finding

23    available placements, and so there's an outward

24    requirement that at least every seven days, the

25    child be notified of the reasons for the actions

Confidential

1   taken to step them down.

2       Q    In reviewing Section 1.4.2, I see

3   nowhere in here that a child should be given a

4   notice of the outcome of a 30-day restrictive

5   placement case review within seven days.

6       A    So on page 37, sort of middle of the

7   page, it says "Note:  If a step down to a less

8   restrictive environment is not completed within

9   seven days due to problems finding a suitable care

10  provide to transfer the UAC to, the case manager

11  explains what efforts have been undertaken to

12  transfer the UAC in writing in updates to the UAC

13  Case Review notes."

14      Q    But this, this is where the 30-day case

15  review is determined that a child should be

16  stepped down, correct?

17      A    Correct.

18      Q    But my question concerns when a child

19  has been -- after the 30-day review, the decision

20  is to retain the child in a restrictive setting.

21  When does the, when does the child receive notice

22  of that decision and the grounds for it?

23      A    I believe the guidance we've provided to

24  care providers is that they be provided it within

25  30 days of the last review.  So the 30-day

Confidential

Page 81

1    restrictive placement review needs to technically

2    happen within enough time such that the child's

3    provided a new Notice of Placement within 30 days

4    of the last one.

5              So time can be sort of a sliding scale,

6    but it has to be within 30 days of the last time

7    they received a Notice of Placement.

8         Q    Okay.  So a child's at Shenandoah, and

9    there's an initial restrictive placement, and so

10   under ORR policy, it may be 30 days before the

11   child receives notice of the restrictive placement

12   review, correct?

13        A    I don't think I understand the question.

14        Q    Okay.  So these 30-day reviews happen,

15   well, every 30 days, correct?

16        A    At least every 30 days.

17        Q    So let's assume then that there is a

18   30-day restrictive placement review that takes

19   place on January 2, and so if I understand you

20   correctly, the child may -- what ORR requires is

21   that the child receive a notice advising him or

22   her of the outcome of that January 2 restrictive

23   placement review at least one day before the

24   following, before the next 30-day placement

25   review?

Confidential

1        A    No.  So if a child was placed in a

2   restrictive setting on January 2, that was their

3   initial placement, there's 48 hours for them to

4   receive a notice.  Then there needs to be a 30-day

5   review before the January 2nd deadline, so we'll

6   just say it's February 2nd.  The child needs to

7   receive the notice by February 2 of the reasons

8   for their placement, their continued placement.

9        Q    Okay, and, and that was -- and those

10  reasons were determined during the January 2nd

11  30-day placement review?

12       A    No.  It would be within the 30 days

13  prior to February 2nd.

14       Q    Okay.  When a child is transferred from

15  a shelter to a staff secure, an RTC or a secure

16  facility, when do they, when do they first receive

17  a review of the reasons for restrictive placement?

18       A    Generally speaking, within 30 days of

19  their initial placement into one of those

20  facilities, but it can be sooner.

21       Q    Okay.  So a child is stepped up to one

22  of these more secure placements, receives a

23  restrictive placement review, and there's a

24  determination made to retain the child in the

25  restrictive setting, so do I understand you

Confidential

Page 83

1    correctly that the child would be given the notice

2    of the outcome of that restrictive placement

3    review at some point prior to the next placement

4    review?

5         A    Yes.

6         Q    But there is no, there is no requirement

7    that the child receive the Notice of Reasons for

8    Restrictive Placement any sooner than before the

9    subsequent or next placement review?

10        A    I still don't think I'm tracking your

11   question.

12        Q    In other words, when a child is given

13   notice of, the Notice of Restrictive Placement, is

14   that pegged to when they've had a 30-day review,

15   or is that pegged to the next 30-day review

16   they're going to have?

17        A    It's pegged to the 30-day review, so

18   this Notice of Placement needs to be reissued to

19   the child within 30 days of the initial placement

20   and then every 30 days subsequent to that.  That's

21   when this is due to the child.  So that 30-day

22   review has to happen before the 30th day of this

23   notice being provided to the child.

24        Q    So now you're, you're holding in your

25   hand a document that -- could you tell us what

Confidential

1    instructs -- first of all, who fills out these

2    Notices of Placement in Restrictive Setting?

3        A    The case manager.

4        Q    And is there anywhere else in the guide

5    or MAP that you know of that instructs them as to

6    what should be placed in the summary of placement

7    decision or case review section?

8        A    Yeah, so this would also be contained in

9    Section 1.4.2 of the policy guide itself.

10       Q    Okay, and what paragraph of that section

11   instructs case managers on what to place in the

12   summary?

13       A    So there's sort of general information

14   about the reasons for placement, and then the

15   procedures themselves and the MAP discuss, you

16   know, where in the -- that that information then

17   is placed into the summary of placement decision

18   or case review.

19       Q    Any other instructions or memoranda that

20   instruct on how this form is to be completed?

21       A    I mean we've provided trainings on this

22   as well.

23       Q    And who is responsible for ensuring that

24   these forms are properly -- are completed in

25   accordance with ORR policy?

Confidential

1      A     So, you know, at first strike, the FFS

2   is responsible for that, but our monitoring teams

3   also look for these, and then our compliance

4   review team, that working group, is also looking

5   for these documents as well.

6      Q     Has ORR ever thought it necessary to

7   issue corrective instructions for having failed to

8   fill out these forms properly?

9      A     Do you mean corrective actions?  Is

10   that -- I'm not totally sure what you mean by --

11      Q     Well, has ORR ever determined that the

12   forms are not properly filled out and instructed

13   staff, case managers or others, to improve their

14   performance in the future?

15      A     Yes.

16      Q     And who, who did that?

17      A     I mean different staff have done that

18   over time.

19      Q     All right.

20            Now, what burden would it impose on ORR

21   were children to be told the reasons for their --

22   what burden would there be on ORR for it to allow

23   children to participate in the 30-day restrictive

24   placement reviews, to be personally present?

25                    MR. SHIEH:  Objection to the extent

Confidential

1        it calls for privileged information on the

2        deliberative process, if there has been an

3        accounting of such, but you can answer to the

4        extent you know that doesn't call for

5        privileged information.

6                THE WITNESS:  I think it would

7        depend, because there are a lot of different

8        scenarios in which a child could potentially

9        participate, so it would vary depending on

10       forum and time and a number of different

11       factors.  It could vary significantly.

12  BY MR. HOLGUIN:

13       Q    So what sort of burden would, would you

14  believe that -- does ORR believe allowing a child

15  to be personally present during a 30-day review

16  would create?

17       A    It depends.  So some of the information

18  that is talked about during the 30-day review may

19  include information that we receive from other

20  children at the facility that could potentially

21  put that other child in danger.  So that would be

22  something that we would consider, and then, you

23  know, the child's interviewed by the case manager

24  as well, ahead of time of the case review, as

25  discussed in the procedures already.

1   placement.

2        Q     Is the child offered an opportunity to

3   submit evidence in rebuttal to what is going to be

4   considered in the 30-day restrictive placement

5   case review prior to the case review itself?

6        A     Generally, no, but they are able to talk

7   to their case manager.

8        Q     And is there anything in the manuals

9   here or the guide that requires case managers to

10  report that evidence in the 30-day placement

11  review?

12       A     Well, they're required to talk about

13  interviews they have had with the child, so if

14  that information is pertinent to the decision,

15  then it should be included in the discussion.

16       Q     But is there anywhere in these, in these

17  materials of ORR policy that says to a case

18  manager you must report evidence that the child

19  submits or offers in his or her favor for

20  consideration during the 30-day restrictive

21  placement review?

22       A     That would be information that goes to

23  the totality of the decision, so it would be

24  required that the case manager speak to it.

25  That's one of the things about -- talking about

Confidential

1    where we reference interviews with the child and

2    the child's family.

3         Q    In a hypothetical situation, what if the

4    child were to, has, has a -- what is it?  I'm

5    trying to remember.  A substantial incident

6    report, correct?

7         A    Significant.

8         Q    Significant incident report.  Sorry.

9              So the child has a significant incident

10   report in which it's alleged that he or she got

11   into a fight and was the aggressor, okay, and

12   that's, and that's going to be considered in a

13   30-day restrictive placement review.  The child

14   claims self-defense, and so how does, how does

15   that claim -- how does the evidence of that

16   child's claim of self-defense reach the parties

17   who are participating in the 30-day restrictive

18   placement review?

19        A    So the SIRs themselves come up with a

20   summary of what transpired, and in almost all

21   instances I can think of, there's information from

22   the UAC on the reasons for the incident and their

23   perspective on it, and so that would be one way;

24   and then, again, during conversations with the

25   case manager, which would be reported during

Confidential

1        A     Yes.

2        Q     And what is the training -- what is the

3   source of that training?  What materials are you

4   referring to?

5        A     Discussions we've had, during trainings,

6   of prolonged periods of congregate care and the

7   effects it has on children.

8        Q     And what was the substance of that, of

9   that training?

10       A     I mean it wasn't a specific training on

11  just that issue, but that children who are in

12  congregate care in the domestic system tend to

13  have more behavioral problems the longer they are

14  in congregate care.

15       Q     And was the point of that training to,

16  to make clear that children may be misbehaving

17  during ORR care as a result of their having stayed

18  for prolonged periods in custody?

19       A     No.  I think it was just merely the fact

20  to point out that long-term congregate care

21  studies in domestic settings have shown that

22  children may have -- are likely to exhibit more

23  behavioral problems.

24       Q     All right.  So at what point is a child

25  who comes into ORR care first permitted access to

Confidential

1    counsel?

2         A     We don't have a restriction on a child's

3    ability to access counsel.

4         Q     Is there anything in the guide or the

5    MAP that instructs facility staff to provide

6    children access to counsel within any time

7    certain?

8         A     No.   The understanding is that they have

9    access to counsel.

10        Q     Where is that understanding set out?

11        A     Just a general expectation that we have,

12   that children have access to counsel.

13        Q     And who is responsible for ensuring that

14   that general expectation is heeded?

15        A     The care provider.

16        Q     Well, does ORR have anybody who's

17   monitoring the care providers to ensure that they

18   are providing children access to counsel?

19        A     I mean we have a monitoring team, but in

20   our experience, if counsel have trouble accessing

21   children, they make it pretty well known.   They're

22   fairly sophisticated parties.   It hasn't been an

23   issue, as far as I know.

24        Q     Well, but that's for children who

25   already have counsel.   How about children who are

Confidential

1    looking for counsel?  What does ORR do to ensure

2    that children who wish to have legal

3    representation can seek it?

4         A    They have access to the legal service

5    provider that's funded through the Vera contract.

6    The local legal service contract providers are

7    free to meet with those children.  We provide the

8    children with a legal resource guide that gives

9    them, you know, names and phone numbers of local

10   attorneys who are willing to work pro bono as

11   well.

12        Q    Is there a Vera-subcontracted legal

13   services provider for every one of ORR's

14   facilities?

15        A    Yes.

16        Q    Did ORR have a facility in Clint or I

17   mean in -- an influx facility in Texas?  I'm

18   trying to remember the name.  What was the most

19   recent influx facility that ORR had in Texas?

20   Carrizo Springs?

21        A    Carrizo Springs, yes.

22        Q    You remember that, correct?

23        A    That facility, yes.

24        Q    And so were children allowed -- was

25   there a Vera Institute subcontractor that assisted

Confidential

1    those children immediately upon opening of that

2    facility?

3         A    There may not have been funding

4    immediately available, but there was no

5    restriction on a legal service provider having

6    access to the children.

7         Q    Okay, but since then, you know of no

8    other ORR facility that has no funded legal

9    services provider?

10        A    Correct.

11        Q    And in terms of the percentages or the

12   numbers of children, I believe you said you didn't

13   know how many are represented by Vera Institute-

14   funded, subcontracted legal services providers; is

15   that right?

16        A    Correct.

17        Q    Does ORR do any studies as to how

18   quickly children are able to secure legal

19   representation?

20        A    No.

21        Q    Does ORR keep any statistics on the

22   number of children who have counsel to help them

23   challenge placement decisions?

24        A    No, but not many children try to

25   challenge placement decisions.

Confidential

1    others, warranting continued placement in a secure

2    facility, they would be released to a sponsor.

3         Q    Now, children currently have the ability

4    to go to an immigration judge for review of

5    whether they are too dangerous to be released,

6    correct?

7         A    Yes.

8         Q    If an immigration judge determines that

9    a child is not too dangerous to be released, how

10   does that affect placement in a secure facility,

11   if at all?

12        A    It's considered as evidence that the

13   child is not a danger to self or others.

14        Q    Where in the guide or the MAP is that

15   stated, if at all?

16        A    Let me check.  Flores bond hearings is

17   what I believe you're referring to, and that's in

18   2.9 of the policy guide.

19             Yeah, so just prior to the subtitle

20   "Requesting a Bond Hearing," two sentences up,

21   "ORR also takes into consideration the immigration

22   judge's decision in the bond hearing about the

23   youth's level of danger when assessing the youth's

24   placement and conditions of placement."

25        Q    All right.  So it takes into

Confidential

1    consideration, but is there anywhere that the, the

2    MAP or the guide or anything else that ORR has

3    instructs -- oh, first of all, this would be the

4    same, the same individuals, correct, who are

5    conducting the 30-day restrictive placement

6    reviews?  This is instructions to them to take

7    into consideration?

8        A    Yes.

9        Q    The IJ's decision?

10       A    Well, ORR, but yes.  So the individual

11   who -- the ORR representative who's conducted the

12   bond hearing on behalf of ORR would contact the

13   program to discuss with them the basis of the

14   judge's decision.

15       Q    Okay.  So when it says "ORR," the people

16   at ORR would be the case manager, the case

17   coordinator, and the FFS who would be considering

18   the immigration judge's decision?

19       A    Well, it's really the FFS and the ORR

20   representative.  The case manager and the case

21   coordinator make recommendations, but they're not

22   the deciders.  The FFS and the ORR representative

23   would discuss with the other two parties for their

24   recommendations.

25       Q    Okay.  So I'm just trying to get a

Confidential

1    picture of how this would in the real world work.

2             An IJ decides that the youth is not too

3    dangerous to release, and as I understand you, the

4    ORR representative who was at the bond hearing

5    would then advise the FFS of the immigration

6    judge's decision?

7        A    Yes.

8        Q    Is there anywhere a requirement here

9    that the actual decision of the immigration judge

10   be provided to the FFS?

11       A    I need to check the procedures, but as a

12   matter of course, that's what we've done in the

13   past.

14       Q    Okay, and in some of these cases, do the

15   immigration judge's decision discuss the

16   various -- the evidence in support of, the

17   evidence relevant to whether the youth is too

18   dangerous to release?

19       A    Yes.

20       Q    Okay.  So then the immigration judge's

21   decision, even though it's not specified in these

22   materials, you say in a general matter, the

23   immigration judge's decision does reach the FFS?

24       A    Yes.

25       Q    Does the case manager, the case

Confidential

1     A     They certainly made their views known.

2     Q     How, how did they do that?

3     A     They notified the case manager and the

4  FFS and I think me as well.

5     Q     Okay.  Do you recall how long the child

6  had been at Shenandoah before being sent to an

7  RTC?

8     A     I don't.

9              MR. SHIEH:  Is now a good time for

10       a lunch break?

11             MR. HOLGUIN:  Yeah, we can stop

12       now.

13             (Whereupon, the lunch recess was

14             taken.)

15  BY MR. HOLGUIN:

16     Q     In determining whether a child should be

17  stepped up to a more restrictive placement, does

18  ORR use any tools or instruments, assessment tools

19  or assessment instruments as a matter of policy?

20     A     Yes.

21     Q     And what tools or assessment instruments

22  does ORR use now?

23     A     So as described in the procedures, the

24  accompanying procedures in the MAP in Section

25  1.4.2, one of the tools is the Ohio Youth

Confidential

1   Assessment tool, as well as our typical

2   assessments that we use, so our UAC assessment,

3   our UAC case review, assessment for risk, and then

4   any other psychological tools used by specialists.

5        Q    All right.  So is it the case that ORR

6   is -- has it come to ORR's attention that children

7   have been needlessly placed in restrictive

8   placements?

9        A    I don't know -- I guess I need more

10  clarification what you mean by that.

11       Q    That ORR has determined that children

12  have been placed in restrictive settings

13  needlessly.

14       A    I think we've come to the conclusion in

15  some cases that, you know, after some children

16  have been placed in a restrictive setting, that

17  upon further assessment, that their placement is

18  not warranted in that setting.  I don't know if I

19  would use the term "needless," because based on

20  initial evidence, it appeared that it was

21  necessary.

22       Q    Is ORR currently undergoing an

23  evaluation of -- or training of its staff with

24  respect to the use of the Ohio assessment tool?

25       A    Not at this time, but they have

Confidential

1   BCFS program has a model that does it like that,

2   and our Homestead facility, when it was

3   operational, also had some similar process.

4       Q    So do case coordinators have a role with

5   respect to family reunification as well as

6   placement?

7       A    Yes.

8       Q    And is it a similar situation or

9   arrangement with them; in other words, that a

10  child might have one case coordinator involved in

11  placement and another case coordinator working on

12  family reunification?

13      A    No.

14      Q    Okay.  So where are case coordinators

15  physically located?

16      A    They're distributed around the country.

17  Some may work out of a care provider, work out of

18  a particular care provider like a couple of days a

19  week and then out of another on different days.

20  Some work out of their homes when they're not

21  traveling to various facilities.

22      Q    So a case coordinator who is working at

23  home, how would he or she communicate with a

24  child, assuming that's what he or she wanted to

25  do?

Confidential

1          A     Via phone or when they go to do a

2     facility visit.

3          Q     Okay, and what contact do children's

4     lawyers have with case coordinators, if any?

5          A     They don't typically have direct access

6     to case coordinators, but case coordinators are

7     responsible for maintaining stakeholder relations,

8     so they would, you know, be able to reach out to

9     attorneys that way.

10         Q     At their discretion?

11         A     Yeah.

12         Q     Okay.  Is there anywhere in the written

13    materials, ORR's written policy statements, guide

14    or MAP, that instructs or encourages case

15    coordinators to speak with children?

16         A     I need to look.

17               So a description of their duties are in

18    Section 2.3.3, I think, yeah.  Yes, in the

19    description of the case coordinator's

20    responsibilities in the ORR policy guide at

21    Section 2.3.3, the third bullet describing their

22    duties is "meeting with individual unaccompanied

23    alien children and care provider staff at

24    designated ORR-funded care provider sites."

25         Q     2.3.3, you said?

Confidential

1    Q    Okay, and how does the information about

2   potential sponsors come to the attention of a case

3   manager?

4    A    Typically through the child themselves

5   or through interviews with the child's family.

6    Q    All right, and when does the case

7   manager begin collecting information around the

8   child's family members or potential custodians?

9    A    As soon as the child is admitted into

10  ORR custody.

11   Q    What is ORR's policy with respect to

12  advising children's lawyers of the identity of

13  potential sponsors?

14   A    Case managers are required to provide

15  updates to stakeholders of the child's case and in

16  that role would disclose information related to

17  potential sponsors or sponsors of children.

18   Q    And are case managers instructed to

19  provide children's lawyers with name and contact

20  information for proposed sponsors?

21   A    There's nothing specifically prohibiting

22  them from providing names of sponsors, but

23  generally we don't provide other contact

24  information without a sponsor permission.

25   Q    When a child receives a Notice of

Confidential

1    maintained in the UAC's case file and provided to

2    the UAC to keep with their personal belongings."

3         Q    And that's on page --

4         A    Page 38 of the MAP.

5         Q    Okay.

6         A    And then, and then on page 9, this would

7    be placement in a restrictive setting, not the

8    30-day review, the second bullet down says

9    something very similar.

10        Second sentence, "The care provider

11   scans and uploads the Notice of Placement in a

12   Restrictive Setting into the UAC Portal.  A copy

13   of the Notice of Placement in a Restrictive

14   Setting is maintained in the UAC's case file, and

15   another copy is provided to the UAC to keep with

16   their personal belongings."

17        Q    All right.  Now, is the, is the Notice

18   of Restrictive Placement provided in, in the

19   language that the minor understands?

20        A    Yes.  So we have a Spanish version of

21   the form that we've had officially translated.  It

22   looks exactly the same.  It's just in Spanish.  If

23   the child speaks a language other than English or

24   Spanish, we provide the English version and a

25   testament that it's been translated into a

Confidential

1    language the child understands.

2         Q    So do we have -- do you have a -- is

3    that the Spanish version of the form?

4         A    This is the English version of the form.

5         Q    Okay.  Well, we don't have a Spanish

6    version of the form here.

7         A    It's in the addendum to the MAP, but I

8    don't think we have addendum documents here.

9         Q    Okay.  All right.  So then for children

10   who don't speak English or Spanish, it would be

11   translated to them once, and who would do that

12   translation?

13        A    It would depend.  We do have case

14   managers who do speak languages other than Spanish

15   or English who may speak a language that the child

16   speaks.  Like Hindi comes to mind, for instance.

17   Otherwise, we would use an official translation

18   service.

19        Q    So an official translation service would

20   involve what?  Calling someone on a phone, and

21   they would -- someone would read the form to them,

22   and then they would translate it into the child's

23   language, and the child would be listening?

24        A    Yes.

25        Q    So with respect to the, to the

Confidential

1    investigation of, of children's proposed sponsors,

2    what is the process that a -- well, first of all,

3    is the case manager the one primarily responsible

4    for carrying out the evaluation of proposed

5    sponsors?

6         A    I guess it means what -- not really.

7    They're the ones who have the main -- they're sort

8    of the main point of contact for the proposed

9    sponsor, but I wouldn't characterize them as the

10   primary evaluator of a sponsor.

11        Q    Are they the ones that are primarily

12   involved in gathering information about the

13   sponsor?

14        A    As far as sort of routine documents

15   connected to the sponsor and supporting

16   documentation, yes.

17        Q    Okay.  Do they also interview sponsors?

18        A    Yes.

19        Q    Do they interview them in person or on

20   the phone or both?

21        A    Typically on the phone.

22        Q    Okay, and what are the -- is there an

23   interview guide that ORR has with respect to how

24   they're supposed to interview sponsors?

25        A    Yes.

Confidential

1        Q     What's that called?

2        A     The sponsor assessment.

3        Q     And is that in the materials we have

4   here, or is that something that exists on the

5   portal?

6        A     So it's an addendum form, and it has a

7   list of questions on it.  It's referenced, I

8   believe, in Section 2 -- it's referred to in both

9   the policy guide and the MAP in Section 2.  I can

10  take a second to look.

11       Q     2.2.2, perhaps?

12       A     So 2.4 describes it, and then it's an

13  appendix document, "Sponsor Assessment

14  Interviewing Guidance" in Appendix 2.5 of the MAP,

15  which is under 2.4.1, "Assessment Criteria," in

16  the MAP.

17       Q     If I could ask you to tell us what page

18  in the MAP, that would help.

19       A     Sure.  The specific reference is on page

20  31 on Section 2 of the MAP.  The procedures

21  themselves begin on page 30.

22       Q     Okay.  So the, the case manager is

23  instructed to make a recommendation regarding

24  release to a proposed sponsor, correct?

25       A     Yes.

Confidential

Page 130

1     Q     That's the goal of this interviewing

2   process?

3     A     Yes.

4     Q     Okay.

5           Now, what is the overall standard that a

6   case manager is supposed to find or require before

7   recommending in favor of release?

8     A     So that's making a determination that

9   the proposed sponsor will provide for the child's

10  physical and mental well-being and not, you know,

11  endanger the child.

12    Q     In terms of providing for physical

13  well-being, what role does poverty have, if any,

14  in the assessment process?

15    A     There's no specific reference to poverty

16  in any of our assessment criteria.

17    Q     Then when you refer to "physical

18  well-being," are you referring to the ability to

19  provide food, shelter and clothing?

20    A     Yes.

21    Q     All of which costs money, correct?

22    A     Mm-hmm.

23    Q     So how much money or how much food,

24  clothing and shelter must a proposed sponsor be in

25  a position to provide in order to -- in order for

Confidential

1    ORR to release a child to that individual?

2         A    It's kind of a very basic standard, but

3    an evaluation would be done on a case-by-case

4    basis.

5         Q    Does ORR have any written materials or

6    instructions on the ultimate standard that the

7    case-by-case determination is supposed to look

8    for?

9              Let me rephrase that.

10             Does ORR, in its policy, distinguish

11   between a custodian's fitness and a child's best

12   interest?

13        A    The sponsor needs to be able to provide

14   for a child's physical and mental well-being.

15   That's a statutory requirement.

16        Q    Okay.  So would it be fair to say that a

17   sponsor's ability to provide for the physical and

18   mental well-being of a child is more important

19   than what would be in the child's best interests?

20        A    I don't know that we could distinguish

21   that.  Those would both be taken into

22   consideration in any release.

23        Q    Does ORR distinguish at all between a

24   child's best interests and the fitness of a

25   custodian or the ability of a custodian to care

Confidential

```
 1          specifics about such a case or that, you
 2          know, some -- a household member would then
 3          argue that they weren't guilty of chronic
 4          abuse and neglect.  I just --
 5   BY MR. HOLGUIN:
 6      Q    Well --
 7      A    We're not in the -- look, we're not in
 8   the business of releasing children to dangerous
 9   houses.  That's sort of the basis, underlying
10   basis of this policy.  We are generally trying to
11   release children as quickly and as safely as
12   possible, and, you know, we're latching onto this
13   one like little sort of random part of a denial
14   piece in our policy guide.
15          You know, if there's a dispute, there's
16   an opportunity for the individual to talk to the
17   case manager about it, and if they're ultimately
18   not happy with that, they could pursue other
19   avenues, but, you know, it's not, it's just not in
20   sort of our common practice to go around denying
21   releases.  I'm just --
22      Q    Well, it may not be common, but it does
23   happen, correct, because if people are following
24   the policy guide, they would deny release if a
25   member of the sponsor's household --
```

Confidential

1    households.  Does ORR know how long it is before

2    the child or his or her parents get a hearing?

3         A    I assume it would vary by jurisdiction,

4    but I'm trying to determine the relevance.

5         Q    Well, a child in ORR care sometimes has

6    parents in the United States, correct?

7         A    Sometimes, yes.

8         Q    Would it be fair to say in approximately

9    40 percent of the cases, a child has a parent in

10   the United States?

11        A    That sounds accurate.

12        Q    And so in those cases when ORR is

13   evaluating the parent, the child remains in an ORR

14   facility, correct?

15        A    Correct.

16        Q    And how long does a child typically

17   remain in an ORR facility while ORR goes about

18   evaluating a parent's fitness?

19        A    This fiscal year we're running an

20   average of about 51 days in our custody.

21        Q    Okay, and how does that 51 days compare

22   to state child welfare practices and averages for

23   keeping children apart from their parents, if ORR

24   studies that?

25        A    Even if we knew, had a specific number,

Confidential

1    BY MR. HOLGUIN:

2         Q    Okay, but in determining whether to

3    release, doesn't ORR evaluate specific instances

4    of abuse or neglect?

5         A    It is something that is considered, yes.

6         Q    But it's not the only thing that's

7    considered?

8         A    No.

9         Q    And your understanding is in the child

10   welfare system, it's only the incidents of abuse

11   and neglect that are considered?

12        A    Where we overlap with them, that seems

13   to be one of the overlaps.

14        Q    Okay.  So is it fair to say then that in

15   addition to excluding the negatives, the potential

16   for abuse and neglect, ORR must also verify a

17   positive, which is that the individual sponsor is

18   able to care for the physical and mental

19   well-being of the child?

20        A    Yes.  Congress requires that.

21        Q    Okay.

22             So then does ORR know of any analogs in

23   the state child welfare system, analogs to this

24   standard of care for the physical and mental

25   well-being of the child?  Does any state have that

Confidential

1    should be one month or one week, so the child

2    would have to go back to the FFS and persuade the

3    FFS that the original requirement was excessive;

4    is that right?

5         A    Again, it's going to vary case by case.

6    I'm having a lot of difficulty following this

7    hypothetical, because it just organically would

8    never happen, but, in theory, I don't know how it

9    would go.  It would really determine on the

10   individual factors of the case.

11        Q    Okay, but I guess my question is really

12   with respect to the process and who would decide.

13        A    I mean ultimately ORR is required to

14   make release decisions on behalf of children, so

15   it would be up to the FFS.

16        Q    All right, and the FFS is also the one

17   that is authorized to require a certain period of

18   regular ongoing contact for a Category 3 sponsor?

19        A    In consultation with care provider

20   staff, yes, based on large part, you know, what

21   the clinician thinks would be very informative.

22        Q    Mm-hmm.  What, what does it mean to have

23   "regular contact"?  How, how frequently must

24   contact occur for it to be considered "regular"?

25        A    Whatever is reasonable under the

Confidential

1    check tell you who's in the home?

2        A    A completed background check would tell

3    you whether that person has been convicted of

4    certain crimes, and we're sending social workers

5    out by themselves, and so they want to know ahead

6    of time who they're going to be meeting with and

7    what their potential criminal history is.

8        Q    So, but this, this is with respect to

9    the sponsor, correct?

10       A    Yes.  They also should have information

11   on who else is in the sponsor's home as well,

12   other adult household members.

13       Q    And are background checks done on other

14   household members?

15       A    In some scenarios, yes.

16       Q    So the individuals who are performing

17   the home studies want to know the sponsor's

18   criminal background before they initiate or start

19   a home study?  Is that -- that's essentially what

20   you're saying?

21       A    Yes.

22       Q    And does that conform to child welfare

23   practice in general, to your knowledge?

24       A    Yes.  I mean typically a background

25   check would have been conducted prior to a home

Confidential

1    when they think it's relevant to include

2    interviewing the child or not.

3         Q    Okay.

4              Now, who decides whether to refer a case

5    for a discretionary home study?

6         A    That would be the case manager and case

7    coordinator.

8         Q    So the FFS doesn't have any role in

9    determining whether a home study should be

10   required?

11        A    They would be ultimately making a

12   decision on whether to approve a home study, but

13   the recommendations for one would come from the

14   case manager and/or a case coordinator.

15        Q    Okay, but the recommendations would go

16   to the federal field specialist for a final

17   decision?

18        A    Yes.

19        Q    All right, and what role, if any, does a

20   child have in the FFS's deciding whether to

21   approve the case for a home study or not?

22        A    They don't have a role.  Most of these

23   are based -- the major basis for home studies are

24   really based on statute, which are more factual

25   considerations, or the type of placement itself.

1    collected this information?

2        A    I mean she reviews the reports and

3    determines what services are being provided and

4    what needs there are, but what we're really trying

5    to do -- I guess it goes back to the whole theory

6    of what post-release services are, right, which is

7    they're really -- these aren't, these aren't

8    designed to be child welfare checks for children.

9            They're services to try to connect

10   families with community services, and to the

11   extent -- that's really largely what these reports

12   are sort of following up on.  They're not really

13   focused on child welfare issues.  To the extent

14   that there are child welfare concerns connected to

15   the release, those would be reported to state

16   authorities as appropriate.

17       Q    Okay.  All right.  I see that.

18            All right.  So there is a -- let's take

19   the case in which there is not going to be a home

20   study.  How quickly following the submission of a

21   complete family reunification packet must a

22   release decision be made, if there is any such

23   requirement?

24       A    I think those are sort of laid out in

25   the MAP.  It would be in the Release Approval

Confidential

1    Process, which is in 2.7, so -- okay.

2              So here on page 62 of Section 2 of the

3    UAC MAP, "Within one calendar day of completion of

4    the FRP documentation, the case manager uses the

5    Release Review Completion Guidance to complete the

6    requester Information, sponsor information, and

7    case manager recommendation of the Release

8    Request," at which point, after this is completed,

9    the case manager notifies -- would update the

10   release request in the portal and email the case

11   coordinator to notify them that it is -- you know,

12   the case has been submitted to them for their

13   release recommendation.

14        Q    And so the family reunification packet

15   is submitted, and within one calendar day, the

16   case manager is expected to recommend for or

17   against release?

18        A    Yes.

19        Q    And the background check is completed

20   before the family reunification packet is

21   provided, or after?

22        A    So it could be going on simultaneously.

23        Q    Okay, and how does ORR ensure that a

24   case manager is recommending for or against

25   release within one day of submission of the family

Confidential

1      A     That's the completion of the family

2   reunification packet, but the assessment would

3   have already occurred.

4      Q     So sponsors are assessed before the

5   sponsor submits the complete family reunification

6   packet?

7      A     Yes.

8      Q     Well, as a -- say, for example, a

9   proposed sponsor is particularly diligent and

10   provides the family reunification packet complete

11   within 24 hours.  Would the case manager still be

12   expected to make a release recommendation within

13   one calendar day?

14      A     Provided they have all the supporting

15   information they need, yes.

16      Q     Well, you know, again, I stipulated that

17   the sponsor had submitted a complete family

18   reunification application or packet, and so --

19      A     It's very, you know, unlikely that that

20   scenario would actually occur, so I don't -- I

21   mean I guess -- well, you know, some of our

22   releases are able to be done rather quickly.  Like

23   I said, we've done releases in a week.

24      Q     Yeah, but when I look at this list, you

25   know, the list of acceptable documents, I mean I

Confidential

1        Q      When, when notifying a parent, this

2   30-day period, this is when ORR has received all

3   the required information and documentation in a

4   specific case, correct?

5        A      Correct.

6        Q      Does that include the assessment?

7        A      Yes, the sponsor assessment.  Assuming

8   that's what you're referring to, then yes.

9        Q      Yes, sponsor assessment.

10              All right.  So in terms of completing

11   the sponsor assessment, the time limits are set

12   out at page 13 of MAP, Section 2, correct?

13        A      Yes.  These are the expectations.

14        Q      The expectations, all right, but how

15   does ORR monitor whether these expectations are

16   being fulfilled?

17        A      I mean the FFS is meeting -- you got to

18   remember that there's weekly meetings between the

19   case manager, the case coordinator, and the FFS

20   regarding all cases at a particular facility, and

21   so the FFS is working to determine where cases are

22   and ensuring that they're moving, so that these

23   sort of time frames are the expectation that it

24   would be for each of these types of cases.

25        Q      "Creating the sponsor record."  I'm

Confidential

1    CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

2              I, Laurie Donovan, Registered

3         Professional Reporter, Certified Realtime

4         Reporter, and notary public for the District

5         of Columbia, the officer before whom the

6         foregoing deposition was taken, do hereby

7         certify that the foregoing transcript is a

8         true and correct record of the testimony

9         given; that said testimony was taken by me

10        stenographically and thereafter reduced to

11        typewriting under my supervision; and that I

12        am neither counsel for, related to, nor

13        employed by any of the parties to this case

14        and have no interest, financial or otherwise,

15        in its outcome.

16              IN WITNESS WHEREOF, I have hereunto

17        set my hand and affixed my notarial seal this

18        29th day of February 2020.

19

20        My commission expires:  March 14, 2022

21

22        _Laurie Donovan_

23   LAURIE DONOVAN

24   NOTARY PUBLIC IN AND FOR

25   THE DISTRICT OF COLUMBIA

1              UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF CALIFORNIA
2                  Western Division

3    - - - - - - - - - - - - - -+
                                 |
4    LUCAS, R., et al.,          |
                                 |
5              Plaintiffs,       |     Case Number:
                                 |
6       vs.                      |     2:18-cv-05741 DMG PLA
                                 |
7    ALEX AZAR, Secretary of     |
     U.S. Department of Health   |
8    and Human Services, et al., |
                                 |
9              Defendants.       |
                                 |
10   - - - - - - - - - - - - - -+

11

12                 ***CONFIDENTIAL***

13            Rule 30(b)(6) Deposition of the

14            Office of Refugee Resettlement,

15      by and through its designated representative,

16               TOBY R.M. BISWAS, ESQ.

17               Washington, D.C.

18          Wednesday, February 19, 2020

19                    9:30 a.m.

20                  (VOLUME 2)

21

22

23   Job No. 177359

24   Reported by:  Laurie Donovan, RPR, CRR, CLR

25

Confidential

1                    P R O C E E D I N G S

2                    TOBY R.M. BISWAS, ESQ.,

3          having been previously sworn, testified

4          further upon his oath as follows:

5          EXAMINATION BY COUNSEL FOR PLAINTIFFS

6  BY MR. HOLGUIN:

7     Q    All right.  Back on the record,

8  continuing from yesterday.

9          Mr. Biswas, you understand that you're

10  still under the oath that was administered to you

11  yesterday, correct?

12    A    Yes.

13    Q    Now, just to begin defining some terms,

14  is it correct to say that step up refers to a

15  youth transfer to a more restrictive placement?

16    A    Yes.

17    Q    Has ORR analyzed the reasons for which

18  youth are most often stepped up to more -- well,

19  stepped up?

20    A    So we review all -- anytime a child

21  steps up, we look at the reasons why there's a

22  request, why there's a transfer request, and then

23  those reasons would be also evaluated during

24  weekly reviews of the child's case with the case

25  manager, as well as various compliance reviews

Confidential

1    that we do on a monthly basis.

2        Q    Okay, but in terms of statistical

3    compilation, macro reasons, what are the main

4    reasons why youth are stepped up, is there any

5    analysis done of step up and your reasons for them

6    and their frequency?

7        A    During the compliance review that's been

8    conducted, that's one of the, one of the factors

9    that the team, that that working group looks at.

10   The purpose of their analysis isn't specific for

11   just evaluating, for statistical purposes, the

12   reason why children are typically stepped up or

13   remain in a particular placement, but that's a

14   point that is, that is pooled when they're

15   evaluating each case.

16       Q    So you're not able to tell us today what

17   the primary reason is for a step up, the most

18   common reason?

19       A    As far as what's written in the Notice

20   of Placement?  I guess I'm trying to --

21       Q    Well, what, what are the reasons for,

22   for step up?

23       A    So the factors for stepping up a child

24   are contained in ORR's policies at Section 1.2.4.

25   Broadly speaking, for purposes of transferring a

Confidential

1  the, doesn't the ORR Policy Guide allow that child

2  to be placed in a secure facility?

3       A    It's a factor that's considered in

4  making a dangerousness determination.

5       Q    All right.  Let's say that there are no

6  other factors that are listed here, "being charged

7  with a crime, making credible threats," et cetera,

8  et cetera, none of those, none of those exist, and

9  the child does, in ORR's judgment, pose a danger

10  to self.

11           Is that adequate, standing on its own,

12  to step up a child to a secure facility?

13       A    I'm not aware of any case where that has

14  by itself been considered so serious that it's

15  been more -- that it's been used to justify a

16  danger to self or others such that we would place

17  a child in a secure facility.

18       Q    But my question goes to ORR's policy,

19  not whether you're aware of cases where this has

20  been done, but in accordance with ORR policy,

21  could a child be placed in a secure facility

22  for -- solely because he or she poses a danger to

23  self?

24       A    It's a factor that would be considered.

25  We look at several factors in making a

Page 266

1  determination of dangerousness.  That's one of the

2  factors.

3       Q    Correct, and once again, my hypothetical

4  excludes all other factors, so my question is:

5  Does ORR policy allow the placement of a child in

6  a secure facility solely on account of danger to

7  self?

8       A    Again, it is one of the factors that

9  would be considered in totality with these other

10  factors to make a determination whether the minor

11  is dangerous.  It's impossible for me to make a

12  call on what would happen in a hypothetical case

13  without knowing other facts with that case.

14       Q    No, I'm talking about ORR policy, ORR

15  policy.  So would placing a child in a secure

16  facility solely on account of danger to self

17  comply or comport with ORR policy?  It's really a

18  yes-or-no question.

19       A    Well, I'm not able to give a yes-or-no

20  answer, because it is merely a factor that would

21  be considered in a possible danger.

22       Q    All right.  Now, according to ORR

23  policy, it is -- is it permissible to step up a

24  child from a licensed dependent care facility to a

25  secure facility?

1        A        If you're referring to a licensed

2   dependent care facility referring to a shelter

3   placement --

4        Q        Yes.

5        A        -- to a -- directly to a secure?

6        Q        Yes.

7        A        Yes, it is permissible.

8        Q        Okay.  Does ORR maintain statistics on

9   how frequently that occurs?

10       A        Like I referenced in my previous answer,

11  during our compliance reviews, we -- the working

12  group does look at the reasons, the factors used

13  to make a placement determination or justify

14  continued placement in a restrictive setting, and

15  so that information is, you know, considered then.

16       Q        All right.  Now, according to the Policy

17  Guide, a licensed psychiatrist or psychologist

18  must approve step up to a residential treatment

19  center, correct?

20       A        Correct.

21       Q        Must a licensed psychologist or

22  psychiatrist also approve a step up to a secure

23  facility?

24       A        While it's not required, psychologists

25  and psychiatrists are routinely used when

Confidential

1    evaluating placements in a secure facility or to

2    make a placement in a secure facility, but at

3    times when we come across information that the

4    child is dangerous, requires an immediate

5    transfer, or we come into information on the

6    child's criminal history that warrants an

7    immediate transfer, we would effectuate the

8    transfer as quickly as possible to protect other

9    children and staff at the shelter.

10        Q    When there is an evaluation by a

11   psychiatrist or psychologist in conjunction with a

12   decision to step up a child, is the child provided

13   a copy of the psychiatrist's or psychologist's

14   report?

15        A    Generally speaking, no.

16        Q    Is the child's parent, if available,

17   provided a copy of the psychologist's or

18   psychiatrist's report?

19        A    The parent is perfectly welcome to make

20   a case file request for that information.  It's

21   also unusual that you would provide a psychologist

22   or psychiatrist report directly to a child client

23   in any context.

24        Q    All right.  Is the child's lawyer,

25   assuming he or she has one, provided a copy of the

Confidential

1    counter-indicative of a step up?  In other words,

2    it's exculpating evidence, so it's not being used

3    to justify the step up, but it counter-indicates

4    the need for a step up.

5              Is that evidence provided to the child's

6    lawyer?

7         A    As part of a case file request, it would

8    be.  What we're talking about specifically with

9    the 30-day case review and for the Notice of

10   Placement is the justification for placement in

11   secure or other restrictive setting.  It wouldn't

12   contain necessarily exculpatory information.  That

13   would be made with the case file request.

14        Q    All right.  So when is this information

15   provided to the child's lawyer?

16        A    When the child's attorney asks for it.

17        Q    Is that -- will it be provided before

18   the step up is actually effected?

19        A    So it says "on demand," so it will be

20   provided on demand.  If the -- in most instances

21   step ups have to occur fairly quickly because

22   there's an exigent circumstance requiring the

23   placement quickly.

24        Q    All right.  So when there's a step up

25   being contemplated, are you aware of any case in

Confidential

1    transfer request.

2         Q    All right.  Transfer request.  It's

3    shorthand.  The transfer request materials, we can

4    say that.

5         A    Okay.

6         Q    All right.  So you've already testified

7    that the case coordinators and the case managers

8    and the FFS all receive the complete transfer

9    request materials.  What, what happens if one of

10   the three or more than one of the three think

11   additional information is required?

12        A    Then one would make such a request.

13        Q    In your experience, how often do case

14   coordinators request additional information in

15   reviewing the transfer request file?

16        A    Not often.

17        Q    Okay.  Are there cases where clinical

18   staff disagree with a recommendation to step up a

19   child?

20        A    Yes, I believe so.

21        Q    Does ORR track how frequently this

22   occurs?

23        A    No.

24        Q    When that happens, how is the

25   conflicting opinion -- how are the conflicting

Confidential

1    opinions resolved either in favor of or against

2    step up, and who resolves them?

3         A    Ultimately, the FFS.

4         Q    What criteria does the FFS use in

5    determining which of the recommendations to heed?

6         A    They look at the case in total and make

7    a decision, including recommendations.  Not one

8    request is weighed more than another or

9    recommendation is weighed more than another.  They

10   look at all the information contained in a case.

11        Q    So, therefore, if a, if a clinical

12   staff -- well, have there been circumstances where

13   the program that the youth is being referred to,

14   such as Shenandoah Juvenile Hall, does not believe

15   that a child belongs there?

16        A    Sorry.  Can you repeat the question?

17        Q    Yes.  Have there been occasions where

18   Shenandoah Valley Juvenile Center has indicated to

19   ORR that it does not believe that a child that it

20   has placed there belongs at Shenandoah Valley

21   Juvenile Center?

22        A    Yes.

23        Q    How often does that happen?

24        A    I don't know with what frequency that

25   happens.

Confidential

1      Q     Okay.  What, if anything, has ORR done

2   when Shenandoah Valley Juvenile Center staff

3   indicates that a child it wishes to place there,

4   ORR wishes to place there should not be at that

5   facility?

6      A     As with any case, that would be staffed

7   with the FFS and case coordinator.

8      Q     And so the FFS would decide whether to

9   continue the child's placement at Shenandoah

10  Valley Juvenile Center over the Juvenile Center

11  staff's objections?

12     A     Yes.  Ultimately, ORR's FFS is

13  responsible for making placement decisions.

14     Q     Are youth with mental health needs more

15  likely to be stepped up to an RTC than other

16  youth?

17              MR. SHIEH:  Objection to form.

18              THE WITNESS:  I don't know that I

19        could answer that with any particular

20        clarity.  "Mental health" is sort of a very

21        vague term.  It refers to a broad range of

22        conditions.

23  BY MR. HOLGUIN:

24     Q     Okay, but children, children with mental

25  health needs are stepped up to residential

Confidential

1          MR. SHIEH:  Good time for a break?

2          MR. HOLGUIN:  Yeah, I was just

3     going to say.

4               (Whereupon, a short recess was

5               taken.)

6  BY MR. HOLGUIN:

7     Q    All right.  I believe you called it the

8  "compliance team," but is it "compliance unit"?

9  How would you -- the entity within ORR that

10 monitors facilities and their compliance with ORR

11 policies; what's that called?

12    A    So I think you're conflicting.  So

13 there's the compliance work group that reviews the

14 restrictive placements, and then there's the

15 monitoring team which I also referred to, which

16 undertakes extensive monitoring efforts of ORR's

17 care providers.

18    Q    So the compliance work group?

19    A    Yes.

20    Q    And they're focused on restrictive

21 placements?

22    A    Yes.

23    Q    And then there's the monitoring --

24    A    There's a monitoring team.

25    Q    Team, okay, and they are concerned with

Confidential

1    that the members of the monitoring team speak

2    Spanish?

3         A    No, but many do.

4         Q    Are you aware of a monitoring visit to a

5    facility by a single individual who does not speak

6    Spanish?

7         A    Yes.

8         Q    How often does that happen?

9         A    I can't say.  I mean for those

10   monitoring team members who don't speak Spanish,

11   it would be fairly common.

12        Q    Okay.  Now, going to the, the compliance

13   work group, what's its function?

14        A    Its function is to review compliance of

15   restrictive placement facilities, ensure that

16   children placed in restrictive settings are

17   receiving Notice of Placements within the

18   scheduled time frames required by our policies,

19   and that the reasons for their placements continue

20   to be warranted.

21        Q    Okay.  I apologize for this.  I was just

22   trying to figure out from, you know, thinking

23   about yesterday and the, and the Notice of

24   Placement, I'd just like to clarify that, because

25   I don't think it was -- certainly not clear in my

Confidential

1              When a child is going to be stepped up,

2    being considered for step up on account of mental

3    or behavioral issues, what is ORR's policy with

4    respect to offering that child additional mental

5    or behavioral health services in the current

6    placement?

7              MR. SHIEH:  Objection to form.

8              THE WITNESS:  So we provide

9         services tailored to the individual needs of

10        all children in our custody, so to the extent

11        the child has additional mental health needs,

12        the facility where they're currently placed

13        would either try to arrange those in-house at

14        the facility or could use community-based

15        medical professionals, using the treatment

16        authorization reimbursement, the TAR system I

17        spoke about earlier.

18   BY MR. HOLGUIN:

19        Q    Okay, and so who evaluates whether the

20   current program is able to provide adequate mental

21   or behavioral health services such that the child

22   need not be stepped up?

23        A    So like sort of all services done at our

24   facilities is a consultative process between the

25   child's clinician, the case manager, the FFS; you

Confidential

1    that the child is placed in.

2                    MR. SHIEH:  Well, I'll just object.

3         This is really getting into topic 6 on

4         children with disabilities.

5                    MR. HOLGUIN:  Okay.

6    BY MR. HOLGUIN:

7         Q    Does ORR believe that a child placed in

8    a secure or staff secure facility is safer than a

9    shelter when they may be a danger to themselves?

10        A    I don't understand the question.  We

11   have -- can you repeat the question?

12        Q    Yes.  Does ORR believe that placing a

13   child in a secure or staff secure facility

14   contributes to the safety of a child whom it

15   considers to be a danger to themselves?

16        A    To some extent, yes.  The staffing

17   ratios at those staff secure facilities and secure

18   facilities are I guess lower, so we have more

19   staff to observe children, and thereby prevent

20   self-harming or dangerous behavior.

21        Q    When a child has been stepped up to a

22   secure facility or an RTC, what efforts does ORR

23   make to determine whether the child's mental

24   health or behavior is improving or deteriorating?

25        A    So all children are required to meet

Confidential

1  instructed to query the children as to their

2  understanding of what appears on the Notice of

3  Placement in a Restrictive Setting?

4       A    I don't understand the question.

5       Q    Well, when someone is trying to figure

6  out whether a child understands something, they

7  might ask them questions, to repeat in their own

8  terms, for example, what their understanding of

9  the Notice of Placement says, something of that

10 nature.

11      A    That would seem to be just common sense

12 child welfare practice.  Our policies don't

13 necessarily go into that level of specificity, but

14 the case managers, you know, as discussed in our

15 Policy Guide and our procedures guide, do discuss

16 this document with the child.

17      Q    Okay.  When a child is stepped up and

18 receives the first Notice of Placement in a

19 Restrictive Setting, how soon after the step up

20 occurs does ORR require the notice to be provided

21 to the child?

22      A    Within 48 hours of placement.

23      Q    And what are the consequences if a care

24 provider fails to provide the Notice of Placement

25 in a Restrictive Setting within 48 hours of the

Confidential

1    child's arrival?

2         A    ORR would issue a corrective action or

3    notify the program to become in compliance with

4    the requirement.

5         Q    Okay, and how soon would that Notice of

6    Corrective Action issue?

7         A    When we realize that the notice hasn't

8    been provided within the 48-hour time frame.

9         Q    So how would, how would ORR become aware

10   that the Notice of Placement was not provided

11   within 48 hours?

12        A    If the program hasn't uploaded the

13   Notice of Placement into the UAC portal as

14   required by our procedures.

15        Q    And is there some sort of a computer

16   program that flags the, that the Notice of

17   Placement has not been uploaded within 48 hours of

18   a child's arrival?

19        A    No.  An individual would look up to see

20   when the Notice of Placement was uploaded into the

21   portal.

22        Q    So are individuals assigned to, to look

23   at every record in the portal for a child who's

24   been stepped up?

25        A    Yes.  That's what the compliance work

Confidential

1        A    Yes.

2        Q    All right.  Apart from uploading the

3   form, any programs out of compliance with policy

4   on providing Notice of Placement in a Restrictive

5   Setting?

6        A    Yes.  Some have been late.  The

7   requirement is 48 hours.  Some, especially

8   children who are transferred on say a Friday, you

9   know, may not get a signature until Monday or

10  Tuesday of the following week.

11       Q    Any other violations of ORR policy that

12  you can think of?

13       A    I take it those are at least the most

14  common.

15       Q    And so what action was taken, if any, in

16  light of those problems?

17       A    We notified the programs that they

18  needed to follow ORR's policies and procedures.

19       Q    Okay.  When receiving -- if a program

20  receives a Notice of Corrective Action -- is that

21  what it's called?

22       A    Yes.

23       Q    And they fail to take corrective action,

24  what is ORR's policy with respect to following up

25  to ensure compliance?

1   done within a seven-day period of entering the

2   facility.

3            We also allow case reviews to be

4   conducted more quickly as well, should the case

5   manager at the facility and the clinician at the

6   facility determine that it be warranted that such

7   case review be done, but prior to the 30-day mark.

8            So what this provision is saying is that

9   there's no -- that while a case review can be done

10  more quickly, just because a child is about to age

11  out does not, does not require the, the 30-day

12  review or the case review to be done prior to that

13  30-day period.

14           So if the child had just had a case

15  review but is within two weeks of being -- of

16  aging out, there doesn't need to be another case

17  review within that 30-day period.

18      Q    Okay.  So why would, why would a youth

19  request a restrictive placement case review

20  proximate to age-out?

21      A    It could be for a variety of reasons.  I

22  think some would see a benefit in not being placed

23  in a secure facility just prior to age-out, in

24  anticipation that ICE would put a detainer on the

25  child and transfer them to adult detention,

Confidential

1    individual who would take custody of the UAC

2    should the UAC's proposed sponsor become

3    unavailable.

4        Q    Is it ORR's policy to decline to release

5    a youth to a proposed sponsor unless they identify

6    an alternate caregiver?

7        A    It would depend on the circumstances,

8    but generally we have -- I am not aware of us

9    having problems working with sponsors to identify

10   an alternate caregiver.

11       Q    Does ORR also evaluate or screen the

12   alternate caregiver?

13       A    We conduct a public records check on

14   that individual.  The vast majority of the time,

15   it's someone who is already living in the

16   sponsor's household, and so they were already

17   being provided public records checks anyway.

18       Q    So according to ORR policy, if a sponsor

19   is unable or unwilling to identify an alternate

20   caregiver, may a youth, may a child be released to

21   him or her?

22       A    It would go into sort of the totality of

23   the, looking at the case as a whole, but there's

24   no blanket prohibition on not identifying an

25   alternate caregiver.  It may -- it would also sort

Confidential

1    then they would work with a legal service provider

2    to determine legal relief eligibility, and also

3    work with the legal service provider to find

4    either another local legal service provider where

5    the child's being proposed to be transferred to to

6    take on the child's case.

7         Q    But who decides whether the child gets

8    into a long-term foster care placement?

9         A    Ultimately, if there's a placement

10   available, it would be the FFS.

11        Q    Okay, and so what role, if any, does the

12   child play in advocating for placement in

13   long-term foster care before the FFS?

14        A    In conversations with the child's case

15   manager and as well through their attorney.

16        Q    The child's attorney, are they allowed

17   to advocate for long-term foster care placement

18   with the FFS?

19        A    Yes, and they do.

20        Q    Okay, and so the child's attorney has

21   to -- what role does the child's attorney play in

22   determining whether the child is eligible,

23   potentially eligible for immigration relief?

24        A    So the attorneys -- our local legal

25   service providers screen children for eligibility

Confidential

1    for legal relief within the first seven to ten

2    days of their entrance into the program, as well

3    as, if ORR gains information that we think would

4    be pertinent to a legal case, we would notify the

5    legal service provider as well.

6         Q    When Section 1.2.6 of the Policy Guide

7    references a "legal service provider," does that

8    mean any legal services provider or does that mean

9    the Vera Institute subcontractors?

10        A    In that instance it refers to any legal,

11   local legal service provider, but in effect it's

12   really just the Vera legal service providers that

13   do so.

14        Q    Okay, and why is it that somebody

15   identifying a child as potentially eligible for

16   immigration relief is an eligibility requirement

17   for placement in long-term foster care?

18        A    Because we anticipate them, if they are

19   also without a sponsor, to be in our custody for a

20   protracted amount of time.  These legal cases can

21   take a very long time to go through the courts.

22        Q    Okay, but is it only youth who are

23   potentially eligible for immigration relief and

24   don't have sponsors that spend prolonged periods

25   in ORR custody?

Confidential

Page 399

1    correct?

2         A    Yes.  It's generally understood that the

3    services provided under that contract are for

4    those types of proceedings.

5         Q    Okay.

6              So you mentioned representation in

7    removal proceedings, but doesn't it also include

8    Know Your Rights presentations?

9         A    That is one of the services that we

10   provide.

11        Q    Okay.  Does one of the legal service

12   categories include legal representation with

13   respect to placement?

14        A    I don't understand.

15        Q    Well, we have legal representation in an

16   immigration proceeding, correct, a removal

17   proceeding?

18        A    Yes.

19        Q    That's one of the things that ORR funds?

20        A    Yes.

21        Q    And it also funds lawyers to prosecute

22   applications for things like special immigrant

23   juvenile status and asylum?

24        A    That would be related to their

25   immigration proceedings.

Confidential

Page 400

```
 1        Q     Okay.  Does it also fund lawyers to
 2   represent children to advocate on behalf of being
 3   placed in a less restrictive environment?
 4        A     No.
 5        Q     Does it fund lawyers to represent
 6   children with respect to release to available
 7   sponsors?
 8        A     No.
 9        Q     Does it fund legal services providers to
10   represent children with respect to the
11   administration of psychotropic medications?
12        A     No.
13        Q     What is ORR's policy -- I believe we
14   looked at this, actually, that there's a -- I
15   believe you testified that ORR provides children
16   with a copy of the free legal services list.
17        A     Yes, as part of the Legal Resource
18   Guide.
19        Q     Okay, and is there any, anything written
20   in the Guide or the MAP or anywhere else that
21   would require facilities to allow access to
22   non-Vera-funded legal services providers, access
23   to children?
24        A     So we have no prohibition, and some of
25   the providers on the legal -- on a list that's
```

1  there's any provision in the Cooperative Agreement

2  or any of the manuals that says that they must

3  allow access to children by non-Vera-funded legal

4  services.

5      A    It doesn't go into that level of

6  specification in the Cooperative Agreement.

7      Q    What in the Cooperative Agreement, the

8  Policy Guide or the MAP addresses the issue of

9  lawyers communicating directly with case

10  coordinators?

11      A    We don't address that specifically in

12  the Cooperative Agreement, because cooperative

13  agreements are between the care provider and ORR.

14  The case coordinators are a contractor.

15      Q    Okay.  Is there anything in the contract

16  with GDIT that requires case coordinators speak

17  with children's lawyers?

18      A    We have policy that we discussed

19  yesterday that the case coordinators participate

20  in collaborative meetings with local stakeholders,

21  which would include attorneys of record and legal

22  service providers.

23      Q    So if a lawyer for a child wants to talk

24  with a case coordinator, does ORR's policy require

25  the case coordinator to speak with them?

Confidential

1      A      We don't prohibit it.

2      Q      Okay, but you don't require it either?

3      A      We don't prohibit it.

4      Q      But do you require it?

5      A      We don't prohibit it.

6      Q      All right, and what about children's

7   lawyers having communication with federal field

8   specialists; is there anything that requires

9   federal field specialists to speak with children's

10  lawyers?

11     A      Yes.  They serve as the local liaison to

12  community stakeholders, including local legal

13  service providers and attorneys of record.

14     Q      Do the federal field specialists have

15  discretion to not speak with children's lawyers?

16     A      It would depend on the particular

17  circumstances, but yes.  If they're being harassed

18  by an attorney or threatened, I don't see why they

19  would be prohibited from not speaking to the

20  attorney.

21     Q      Who determines whether they have been

22  harassed or --

23     A      I think it's pretty common sense.

24     Q      So the FFS him or herself would decide,

25  oh, this lawyer is harassing --

Confidential

1    additional questions and answers on this topic.

2              There's a question, sort of like a

3    question/answer, that says, "What happens if a new

4    sponsor is identified during the sponsor

5    assessment process?  Answer:  If there are

6    multiple potential sponsors, the ORR-funded care

7    provider will exhaust all efforts to facilitate a

8    release to a parent or legal guardian while also

9    contacting and evaluating other potential sponsors

10   concurrently.  ORR has a release order preference

11   and will evaluate sponsors concurrently in

12   accordance with the preference orders to determine

13   the best placement for the child."

14        Q    Okay.  So then it's ORR's policy to

15   essentially pursue different sponsors

16   simultaneously, correct?

17        A    Correct.

18        Q    And how does, how does ORR ensure

19   that -- is this, is that the job of case managers,

20   by the way?

21        A    Yes.

22        Q    So how does ORR ensure that case

23   managers are pursuing multiple sponsors

24   simultaneously?

25        A    Well, there needs to be an assumption

Confidential

1    that there are multiple sponsors.

2         Q    Yeah, when there are multiple sponsors.

3         A    I mean these efforts are recorded in

4    case management notes as well as the various

5    assessment documents, so like the UAC Assessment

6    and the UAC Case Review.

7         Q    All right.  So does this requirement for

8    concurrent evaluation apply to, for example, a

9    child who has both a Category 1 and a Category 2

10   sponsor?

11        A    Yes.

12        Q    What about a child who has a Category 2A

13   and a 2B sponsor?

14        A    Yes, any combination of types of sponsor

15   categories.

16        Q    So that would apply then as well to

17   someone who -- a child who has got a Category 2

18   sponsor and a Category 3 sponsor?

19        A    Correct.

20        Q    Okay.  What is ORR's policy with respect

21   to care providers furnishing children's lawyers

22   with the name and contact information of the

23   sponsors it's evaluating?

24        A    So we provide case updates.  Case

25   managers would provide attorneys of record case

Confidential

1       Q     So how does ORR decide what does and

2   does not make it into the Guide or the MAP?

3       A     So both the MAP and the Policy Guide are

4   sort of the "Bible," right?  The big overarching

5   major policies are, you know -- and the MAP sort

6   of echos the Policy Guide, so we can't really

7   cover every type of scenario that comes up.  You

8   know, the Policy Guide itself is already fairly

9   lengthy.

10          We hear complaints about that all the

11  time, but, you know, if we were to address every

12  potential scenario, this thing could be ten times

13  as long, and it's just -- an evolving program like

14  we're in, it would just be extremely complicated

15  and cumbersome on our grantees and our staff to be

16  able to even use the document if it were to be so

17  big.  So we do a lot of guidance and -- you know,

18  to, to have some program flexibility.

19      Q     Can we take a look at the Guide?  I

20  think we had talked a little bit about different

21  sections of the Guide.  Earlier on, you testified

22  to it.

23          Can we look at ORR Guide Section 1.2.4?

24  We spent some time talking about secure and staff

25  secure placements.

Confidential

1        A     Yes.

2        Q     There was some question on how the

3    factors, for example, for a secure care facility

4    are applied.  That would be on the page over in

5    the document -- is everyone looking at the same

6    thing?

7              So you notice that some of these factors

8    are worded "in the alternative," and you had

9    testified that the factors are taken in totality.

10             Can you explain how that works?

11       A     Well, specifically for secure

12   facilities, the language "poses a danger to self

13   or others" comes directly from the TVPRA.  I

14   believe a citation that it comes from is

15   8 U.S. Code 1232(c)(2)(a), and it uses exactly

16   that language.  So in order to reflect Congress'

17   wishes, that's why we entered this language, and

18   these factors sort of go in to support that, but

19   we read them in totality when we are applying them

20   to a particular UAC's case for placement.

21       Q     You're saying as a matter of practice,

22   ORR interprets factors such as this one that are

23   worded "in the alternative" in the totality?

24       A     Yes.

25       Q     You also testified earlier that

Confidential

1    establishing a sponsor's identity can be difficult

2    in the reunification process.

3              Do you recall that testimony?

4    A    Yes.

5    Q    And can you explain why it's difficult

6    sometimes for ORR to establish that a person

7    claiming to be a parent or an aunt or a

8    grandparent is, in fact, who they say they are?

9    A    Yes.  I mean we're talking about

10   families that are spread across continents, across

11   countries.  Our providers aren't always, you know,

12   directly interacting with this person face to

13   face.  The child may not have seen or interacted

14   with the family member ever or sometimes for many,

15   many years.

16             So this kind of -- this really does

17   present challenges to identifying individuals.

18   We're also dealing with foreign documentation,

19   documents that might be old or damaged, so it

20   takes, it takes some time and some work to

21   establish that a relationship exists and that

22   people are who they say they are.

23   Q    In ORR's experience, what would cause

24   someone to claim to be someone they're not in

25   order to sponsor a child, what would be one of the

Confidential

1    reasons?

2        A    Trafficking.  We've had traffickers who

3    have posed as family members in order to secure

4    custody of a child.

5        Q    And can you remind us again of the name

6    of the statute Congress entrusted ORR with

7    administering?

8        A    Yes.  It's the Trafficking Victims

9    Protection Reauthorization Act of 2008.

10       Q    So would it be fair to say Congress

11   thought that trafficking was a unique concern for

12   ORR population?

13       A    Yes, and some of the statutory language

14   is specific to that as well.

15       Q    You testified earlier about the process

16   by which ORR assesses possible release to a

17   sponsor, and I think you used a phrase "case by

18   case" in the evaluation process.

19           Do you recall that testimony?

20       A    Yes.

21       Q    So let me just understand.  Does that

22   mean ORR is free to disregard its written

23   sponsorship criteria?

24       A    No.  I mean these are, you know,

25   standard high-level policies that we use to

Confidential

1    Q    So how does ORR determine which

2   processes and services to provide, the balancing

3   involved?

4    A    Right.  So we really consider what's

5   best for -- what, what can we get the most bang

6   for our bulk?  You know, what, what things would

7   benefit the most amount of children, and so that's

8   sort of where our focus is, how can we release the

9   most amount of children to sponsors possible.

10   That's sort of our focus.

11    Q    And you testified earlier about a UAC's

12   access to counsel.

13        Do you recall that testimony?

14    A    Yes.

15    Q    Does ORR block attorneys from

16   representing children in its care?

17    A    No.

18    Q    Does ORR ever discourage attorneys from

19   representing children in its care?

20    A    No.

21    Q    Does ORR refuse to work with attorneys

22   who challenge ORR decisions?

23    A    No.

24    Q    Does or has ORR ever cut funding for its

25   contracted legal services providers if attorneys

1   use non-ORR funding to challenge ORR decisions?

2        A    Never, nor have we ever threatened to.

3        Q    Does ORR permit attorneys using non-ORR

4   funding to challenge ORR decisions?

5        A    Sorry.  Can you repeat the question?

6        Q    Does ORR permit attorneys using non-ORR

7   funding to challenge ORR decisions?

8        A    Yes, we do.

9        Q    One last question.  This is kind of

10  high-level.

11            Does ORR view access to counsel as an

12  "unmitigated good," meaning, all things being

13  equal, is it always better to provide children

14  with more legal representation, or are there other

15  costs and considerations ORR weighs?

16       A    So one of the costs we consider is a lot

17  of the attorneys -- our process is really designed

18  to be collaborative in nature.  The work that

19  we've done is not, is not intended to be

20  adversarial, and some of the process that we hear

21  from legal service providers advocating for really

22  would make our process much more adversarial,

23  which we think is really to the detriment of

24  children.

25            This is a collaborative process.  We're

Confidential

Page 466

1

2

3

4

5    CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

6              I, Laurie Donovan, Registered
         Professional Reporter, Certified Realtime
7        Reporter, and notary public for the District
         of Columbia, the officer before whom the
8        foregoing deposition was taken, do hereby
         certify that the foregoing transcript is a
9        true and correct record of the testimony
         given; that said testimony was taken by me
10       stenographically and thereafter reduced to
         typewriting under my supervision; and that I
11       am neither counsel for, related to, nor
         employed by any of the parties to this case
12       and have no interest, financial or otherwise,
         in its outcome.

13

14             IN WITNESS WHEREOF, I have hereunto
         set my hand and affixed my notarial seal this
         2nd day of March 2020.

15

16       My commission expires:  March 14, 2022

17

18       _Laurie Donovan_

19

20       LAURIE DONOVAN
         NOTARY PUBLIC IN AND FOR
21       THE DISTRICT OF COLUMBIA

22

23

24

25