# DX-04

Deposition of Jallyn Sualog, August 21, 2019

Confidential

Page 1

1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4              Case No.  No. 2:18-CV-05741-DMG-PLA

5

6      _____

7      LUCAS R., et al.,                    )

8               Plaintiffs,                 )

9          v.                               )

10     ALEX AZAR, Secretary of U.S.         )

11     Department of Health and             )

12     Human Services, et al.,              )

13               Defendants.                )

14     _____     )

15                       CONFIDENTIAL

16              DEPOSITION OF JALLYN SUALOG

17                    Washington, D.C.

18                    August 21, 2019

19

20

21

22

23

24     Reported by: BARBARA DE VICO

25     Job No. 166053

Confidential

Page 45

1          A.      I do not.

2          Q.      Do you know anyone at Lutheran

3    Immigration Refugee Services who has authority over

4    the fingerprinting process?

5          A.      I do not.

6          Q.      Same question with respect to any

7    other fingerprint contractor that you can think of

8    right now.

9          A.      I do not, I do not know anyone

10   specific to those types of services.

11         Q.      Okay.  Now, in terms of step-ups,

12   what are the names of the positions of people who

13   are involved in deciding whether a child should be

14   stepped up to a higher level security?

15         A.      Case managers, clinicians, case

16   coordinators, federal field specialists.

17         Q.      Now, when a child is stepped up, do

18   all of those personnel, all of those positions have

19   to concur in the step-up process decision?

20         A.      I don't know what the exact

21   procedures are for that.

22         Q.      You're familiar with the term

23   "step-down" as well, correct?

24         A.      Yes.

25         Q.      And  what does that refer to?

Confidential

Page 51

1    in general of discharges from facilities specific.

2           Q.      Okay.  Does ORR require that a child

3    released -- that a child be stabilized before being

4    released from a residential treatment center?

5           A.      ORR's requirement is that the

6    treatment team that's around that child's care at

7    any given facility agrees that the child can be

8    stepped down from such a facility.  I don't believe

9    that ORR has anything specific that says, that

10   defines, defines stability.

11          Q.      May a child be stepped down from a

12   residential treatment center without the

13   concurrence of the medical staff at the facility?

14          A.      I do not know.

15          Q.      Who would know that, if anyone?

16          A.      Case managers would know.  At the

17   facility case managers would definitely know.  The

18   FFS may know.

19          Q.      Okay.  So there are case managers --

20   how many RTCs does ORR operate or place children

21   at?

22          A.      Within our network?

23          Q.      Yes.

24          A.      We have two.

25          Q.      Would one of them be the Shilow

Page 52

1    residential treatment near Manvel, Texas?

2            A.    Yes.

3            Q.    Is one of them at Mercy First in

4    Syosset, New York?

5            A.    Yes.

6            Q.    Are case managers at both of those

7    RTCs?

8            A.    Yes.

9            Q.    And those case managers within,

10   would be in a position to decide whether a child

11   should be stepped down or not based upon the

12   reports of their stability, mental stability?

13                    MR. SHIEH:   Object to the form.

14           A.    Case managers do not decide.  Case

15   managers as part of the facility can recommend.

16           Q.    Okay.  And the recommendation for a

17   step-down from an RTC, does that go first to a case

18   coordinator?

19           A.    The routing of any change in

20   placement such as a transfer is routed to a case

21   coordinator.

22           Q.    And then from the case coordinator,

23   it would be routed to the federal field specialist?

24           A.    Yes.

25           Q.    And the federal field specialist

Confidential

Page 53

1    would have the final word on whether to approve the

2    step-down from a residential treatment center,

3    correct?

4            A.    Yes.

5            Q.    Are you aware of any training that

6    ORR has given to federal field specialists on when

7    children should be removed from residential

8    treatment centers?

9            A.    I'm not aware of what training the

10   federal field specialists are provided.

11           Q.    Are you aware of the qualifications

12   that a federal field specialist must have in terms

13   of education to be hired into that position?

14           A.    I don't recall what it is.

15           Q.    Did you ever work as a federal field

16   specialist yourself?

17           A.    No.

18           Q.    And the same question with respect

19   to experience.  Are you aware of what experience

20   someone must have to be hired into the federal

21   field specialist position?

22           A.    I don't know specifically.  I know

23   that federal field specialists are federal

24   employees and based on their GS level meet the

25   minimum requirement.  But specific to FFSs, I do

Confidential

Page 76

1    before being placed at Shenandoah?

2           A.     I do not know.

3           Q.     Are you aware that, of children

4    placed at Yolo County juvenile hall, juvenile

5    detention center, who have been diagnosed with

6    mental illness?

7           A.     I am aware that there are children

8    in Yolo County that have mental health diagnosis.

9           Q.     Now, what action does ORR take, if

10   any, when a child at either -- well, when a child

11   at Yolo is diagnosed with mental illness?

12                 MR. SHIEH:  Objection to form.

13          A.     When a child is diagnosed with a

14   mental illness, whether in a secure facility or any

15   other facility that ORR has, ORR will look at the

16   recommendation of the professional who had

17   diagnosed that in terms of what is the appropriate

18   placement for that child.

19          Q.     Okay.  So there is no policy to

20   remove children with diagnosed mental illness from

21   secure facilities; is that correct?

22                 MR. SHIEH:  Objection.

23            Mischaracterizes prior testimony.

24          A.     I'm not aware of any such policy.

25          Q.     Okay.  Turning to the matter of

Page 80

1    expeditiously evaluate proposed sponsors?

2              MR. SHIEH:  Objection to form.

3         A.    Yes.

4         Q.    How long does ORR believe it

5    consistent with child welfare to retain a child in

6    congregate care?

7              MR. SHIEH:  Objection to form.

8         A.    There is no system similar to ORR in

9    the domestic child care setting that's, you know,

10   that has real a hundred percent parity with ORR so

11   ORR -- ORR's general guiding principle is that a

12   child should not be in ORR custody longer than they

13   have to.  So there is emphasis on safe and timely

14   discharge.

15        Q.    Well, in your understanding of child

16   welfare standards, how long should -- what is the

17   ideal or what is the recommended the amount of time

18   that a child should spend in congregate care?

19              MR. SHIEH:  Objection to the form.

20        A.    I'm not aware of any child welfare

21   limit on congregate care in the domestic setting.

22        Q.    I'd like to direct your attention to

23   Exhibit 1.  If you could tell me if you recognize

24   that document.

25        A.    Yes.

Confidential

Page 105

1          MR. SHEIH:   Objection to form.

2     A.     I don't know who determines that.

3     Q.     Okay.  Would it be fair to say that

4  the grant agreement contains general requirements

5  for facilities, whereas the other items that you

6  mentioned are specific to a particular facility

7  itself?

8     A.     The cooperative agreement is based

9  on -- is based on, even though it's a template,

10  it's the same, it's an agreement directly signed by

11  the grantee and ORR.  So it's specific to the

12  grantee.  Policies and procedures, that's in

13  general across -- those are all ORR's requirements

14  for the provision of care to unaccompanied alien

15  children.  And the funding opportunity announcement

16  is the document by which applicants respond to in

17  terms of getting an award to be able to provide

18  care.

19     Q.     So in terms of the number of, the

20  frequency with which case managers are required to

21  update detained children as to the status of their

22  reunification process, what does ORR require in

23  that regard?

24     A.     ORR requires a weekly update to

25  children, minimum weekly updates.

Confidential

Page 106

1     Q.     And how does ORR ensure that that

2  happens?

3     A.     That is a -- that is something that

4  is in our policies and procedures.  It is something

5  that is specifically, during monitoring visits, it

6  is something that is specifically looked at as a

7  Flores minimum standard.

8     Q.     What if a child wishes to report

9  that he or she has not been updated on the status

10  of family reunification?  What ability does a child

11  have to report that?

12     A.     Children can file that as a

13  grievance.  Grievances submitted by children are

14  sent immediately to ORR.  They can make that known

15  to ORR staff if they are interviewed when staff are

16  on site.  They can make -- they can elevate that to

17  if they have attorneys.  Primarily those things are

18  elevated as a grievance, and then ORR will

19  specifically look and maybe do a monitoring

20  specifically for that one complaint.

21     Q.     How does a child make a complaint?

22     A.     Make a complaint?

23     Q.     Yes.

24     A.     It depends on what type of

25  complaint.

Confidential

Page 110

1        A.      I guess I need a little bit clarity

2    on what you're asking.  So there are clear

3    standards.  There is a clear requirement, what is

4    required in a typical reunification packet.

5        Q.      What's the ultimate question that

6    ORR is trying to answer, what's the ultimate

7    determination it's trying to make when it's

8    evaluating a proposed sponsor?

9        A.      At the base level it's whether or

10   not the sponsor can provide for the safety and well

11   being of that child.

12       Q.      Okay.  And I believe your testimony

13   is that there are certain factors that if present

14   will disqualify somebody from meeting that

15   standard, correct?

16       A.      Yes, there are some requirements.

17   It's outlined what is, what those bars are.

18       Q.      Okay.  Let's assume that none of

19   those bars applies for the moment.

20       A.      Uh-huh.

21       Q.      And the ultimate standard is to show

22   that the proposed sponsor is able to care for the

23   health and safety of the minor.

24       A.      Okay.

25       Q.      What level of proof -- first of all,

Confidential

Page 116

1    contract is in terms of what services they are to

2    provide on a contract.

3            Q.      Okay.   Start with that.

4            A.      There are three main components of

5    that contract.   The first is to provide -- well,

6    actually four components.   The first is to provide

7    Know Your Rights presentation to every child in ORR

8    custody.

9            The second is to provide legal screening to

10   every child in ORR custody.

11           The third is to provide pro bono, develop

12   pro bono coverage, and the fourth is to do a direct

13   representation.

14           Q.      Okay.   With respect to direct

15   representation, what sorts of cases or matters did

16   the contract require Vera Institute to supply legal

17   services?

18           A.      There is not a list of matters that

19   Vera is to cover.   There is only, there are just --

20   there is language in which they would provide

21   representation.   One is for children in ORR custody

22   that was, had a -- that had a court proceeding

23   scheduled when they're in our custody.   The second

24   is that they could accept cases of children that

25   are released into the vicinity of the ORR facility

Confidential

Page 118

1          A.      Can you restate that.

2          Q.      Have you ever heard somebody, you or

3    anyone else at ORR ever told Vera in so many words

4    that where a child is placed and whether a child is

5    to be released is really up to ORR and is not,

6    should not be a concern of the Vera-contracted

7    lawyers?

8               MR. SHIEH:    Objection.   Compound.

9          A.      I have never given that instruction

10   to Vera and I'm not aware of anyone else.

11         Q.      In terms of ORR's oversight and

12   control of the delivery of services, how does ORR

13   monitor what the Vera Institute-funded lawyers are

14   doing?

15         A.      ORR has the facilities to record the

16   date in which legal screening and legal screening

17   and ORR's presentations are provided by a legal

18   service provider.   That is -- that's one.   If

19   there's an attorney of record for a specific child,

20   whether it's Vera or not, that's recorded by

21   facilities as well.   Otherwise, Vera as a

22   deliverable in their contract provides data or a

23   report on a monthly basis.   We do not have any more

24   insight into what services they provide other than

25   that.

Confidential

Page 121

1    free legal services list?

2         A.    Yes.

3         Q.    And who compiles that?

4         A.    I do not know who compiles that

5    list.

6         Q.    Do you know whether it's national or

7    regional?

8         A.    I believe that it's quite a long

9    list that covers a national, spans nationally.

10        Q.    What is ORR's policy with respect to

11   providing detained children with that free legal

12   services list?

13        A.    I know it is ORR policy that every

14   child is provided that list.

15        Q.    When?

16        A.    I believe they are provided that

17   list at orientation or intake.

18        Q.    Does ORR policy require that the

19   children be permitted to retain that list amongst

20   their personal effects immediately available to

21   them in custody?

22        A.    To my knowledge, it is provided to

23   the child, and the child keeps it with them in

24   their belongings.

25        Q.    And those are belongings that they

Confidential

Page 126

1          So I don't know if what you have in there

2     is a point of contact for the legal service

3     provider or the attorney that has filed a G-28.  I

4     do not know.

5          Q.     I'd like to hand you Witness

6     Exhibit 14.  And if you could find in there where

7     this field that you're talking about where legal

8     representation would be indicated.

9          A.     This is the sponsor assessment.

10         Q.     It's nowhere in there?

11         A.     This is, you know, I don't think it

12    would be in this at all.

13         Q.     Thank you.  In terms of privacy

14    between attorneys and clients, child clients in ORR

15    custody, what are ORR's policies and practices?

16         A.     Just that the child, the child and

17    attorney are afforded the space to be able to

18    conduct private conversations.

19         Q.     And facilities are required to

20    provide space?

21         A.     Yes.

22         Q.     And in what document is that

23    requirement set out?

24         A.     I do not know.

25         Q.     Have you ever seen that requirement

Confidential

Page 127

1   set out in writing?

2          A.      No.  But I have been, I have seen

3   the private spaces that are provided for attorneys

4   to meet with the clients in the facilities that I

5   have visited.

6          Q.      Do you know how much private space

7   ORR requires facilities to provide?

8          A.      I believe it depends on the size of

9   the facility and the number of children housed

10  there.

11         Q.      So what is the requirement for

12  attorney-client space per 100 children?

13         A.      There is no such specific

14  requirement.  So the attorney coming into the

15  facility are found, have the right to meet with

16  their client in private.  Usually there's some

17  coordination between attorneys and the facilities

18  to ensure that the facilities are aware that an

19  attorney is coming in and that space can be found.

20  If there is not space because another attorney is

21  coming, then there is coordination to ensure

22  privacy.

23         Q.      Now, in terms of privacy, does ORR

24  policy recognize an attorney-client visit as

25  private even though facility staff are observing it

Confidential

Page 134

1        Q.      Do you have any knowledge as to how

2   long it takes ORR to produce a file following

3   submission of a properly executed request?

4        A.      I do not.

5        Q.      What is ORR's policy with respect to

6   providing children's lawyers with information about

7   potential sponsors?

8        A.      I do not know what ORR's policies

9   are regarding that.

10        Q.      What are ORR's policies regarding

11   children's lawyers having access to facility

12   clinicians?

13                MR. SHEIH:   Objection to form.

14        A.      I'm not aware of any policies

15   regarding that.

16        Q.      Based on your experience with ORR,

17   what impact do you think it would have on ORR if it

18   were to require facilities to allow children's

19   lawyers regular access to case managers?

20                MR SHEIH:   Objection.   Calls for

21             speculation.

22        A.      My understanding is there's regular

23   contact between the children's attorneys and case

24   managers.   They are each other's primary point of

25   contact.

Confidential

Page 138

1   if the FFSs were required to speak to attorneys

2   prior to every decision for discharge, that could

3   potentially delay the discharge.

4          Q.     Okay.   What about if they were

5   required to speak with attorneys prior to every

6   denial of discharge?   How would that adversely

7   affect the agency, if at all, that you can think of

8   sitting here today?

9          A.     I don't know enough about how many

10  denials of discharges realistically that the field

11  does to be able to I think accurately answer that.

12         Q.     But you can't think of any adverse

13  impact sitting here today?

14                MR SHEIH:   Objection.

15         Mischaracterizes testimony.

16         A.     I don't know enough about the

17  process to tell you that there's any adverse

18  impact.

19         Q.     What is ORR's policy with respect to

20  allowing children to telephone their attorneys?

21         A.     Children can telephone their

22  attorneys whenever they want.

23         Q.     Is that in the MAP, is it in the

24  cooperative agreement?   Where have you seen that

25  policy?

Confidential

Page 139

1          A.      I believe it's in the MAP.

2          Q.      Okay.  And so your understanding is

3     that children are permitted to call their attorneys

4     any time of the day whenever they want?

5          A.      Yes.

6          Q.      Okay.  And what would be the

7     consequence if a facility were to disallow a child

8     an opportunity to call his or her lawyer?

9          A.      It would be a noncompliance with ORR

10    requirements.  I would suppose that ORR would hear

11    from attorneys that they are not, their clients

12    were not allowed to contact them at will.

13         Q.      Okay.  Have you ever, do you recall

14    ever seeing a notice of noncompliance when a

15    facility has barred a child from calling his or her

16    lawyer?

17         A.      I don't recall any, seeing anything

18    regarding that specifically.

19         Q.      Okay.  Do you believe that there

20    would be, that -- does ORR have any policy with

21    respect to allowing children's lawyers expedited

22    access to a copy of the ORR file?

23              MR SHEIH:  Objection.  Calls for

24         speculation.

25         A.      A couple things.  I don't know, I

Confidential

1          A.      The FFS and other ORR staff, the

2     contractor field staff, interacts with, on a

3     regular basis, with case coordinators in general to

4     see how the flow is at the facility.  They can also

5     look at the database, and it has on a status page

6     that looks at all essential, the unification

7     milestones to see what the progress of that is and

8     then follow up with case managers.

9          Q.      And is there -- does ORR generate

10    regular aging reports or reports that would

11    indicate that so many children have remained in

12    custody for particular lengths of time, something

13    of that nature?

14         A.      Regular reports?

15         Q.      Yes.

16         A.      I believe the field gets specific

17    reports about the kids that are in their facilities

18    that have been in care over X amount of days.  And

19    they use it as a follow-up or as a tool to follow

20    up with the programs.

21         Q.      Okay.  And who gets these reports?

22         A.      I believe the FFS supervisors get

23    them, and they disseminate them to the FFS staff.

24         Q.      How many FFS supervisors are there?

25         A.      There are nine supervisory FFSs.

Confidential

1  correct?

2       A.    Not unless they saw other factors or

3  features of it that they wanted to elevate up.

4       Q.    But it would still be the FFS making

5  that decision?

6       A.    Yes.

7       Q.    Okay.  So is it the case ORR must

8  always balance an expeditious release against

9  ensuring that the program protects the UACs in its

10  care from traffickers and other persons seeking to

11  victimize or otherwise engage such children,

12  criminal, harmful or exploitative activity?

13            MR. SHEIH:  Objection to form.

14       Compound.

15       A.    ORR has to balance safety and

16  timeliness in its work with unaccompanied children.

17       Q.    Okay.  But is ORR's responsibilities

18  specifically to protect UACs from traffickers or

19  other persons seeking to victimize or otherwise

20  engage such children in the criminal, harmful or

21  exploitative activity?

22            MR. SHEIH:  Objection to form.

23       Compound.

24       A.    It is certainly one of the things

25  that we are protecting children from, trafficking.

Confidential

Page 163

1    give to that factor?

2              MR. SHEIH:   Objection to form.

3         A.    I think -- I think -- ultimately the

4    FFS makes a decision based on the information that

5    is presented in that case.   The case manager at the

6    very basic level, the facility which includes the

7    clinician and the case manager would make a

8    determination from their standpoint that this child

9    is appropriate to be released to a particular

10   sponsor.

11             The case coordinator in turn based on the

12   information they get from the facility through the

13   weekly staffings and the professional judgment

14   would say I concur or say no, this child is

15   actively suicidal, I don't recommend that they be

16   discharged, that would go to FFS.   The FFS would

17   make a decision based on all that information

18   available.

19        Q.    Well, is there a difference between

20   being actively suicidal and suicidal ideation?

21        A.    I think there is a range.

22        Q.    So one might engage in suicidal

23   ideation without being actively suicidal; is that

24   correct?

25        A.    There is a range.   I'm not -- I'm

Confidential

Page 184

1    same process, the same group of people who decide

2    whether a sponsor is too ill to be able to care for

3    a child properly?

4            A.     Yes.

5            Q.       And what if the mother believes that

6    she does have the physical ability to care for the

7    child and disagrees with what the various actors

8    we've been discussing decides, what recourse does

9    she have to show that she does have the physical

10   ability to care for the child?

11                   MR SHEIH:   Objection.   Asked and

12             answered.

13           A.       If a mother is denied sponsorship of

14   their child, they have the right to appeal that

15   decision.  That decision to deny a parent

16   sponsorship of their child is elevated and

17   ultimately approved by the ORR director.  And it's

18   very specific, the appeal rights of a parent is

19   very specific, and they can make that appeal and

20   ask for a hearing of that decision.

21           Q.     How many such appeals has ORR

22   received in the last year?

23           A.     From a parent that's been denied, I

24   don't recall any in the last year.

25           Q.     Do you recall any in the year before

Confidential

1    that?

2              A.      It's a very rare occurrence.

3              Q.      Okay.  So what would be ORR's

4    response if the parent who disagrees with its

5    determination and believes that she is able to care

6    for her child were to submit independent medical

7    evidence of her physical abilities to care for the

8    child?

9                       MR. SHEIH:  Objection to form.

10             A.      What would ORR do?

11             Q.      Yes.

12             A.      If a parent submits additional

13   information on their ability to care for the child?

14             Q.      Physical ability, yes.

15             A.      Then ORR would accept that

16   documentation as part of the, their body of

17   evidence that's collected on the suitability of

18   that sponsor.

19             Q.      Okay.  So what policy, written

20   policy would so provide?

21             A.      I mean, it is part of the assessment

22   and the form collected by the facility in making a,

23   making a suitability assessment of the sponsor.

24   There's nothing, there's not a -- there's nothing

25   that says -- you're asking for whether or not ORR

Confidential

Page 186

1    has a policy that's in the negative, so there's not

2    a policy that says ORR will not accept additional

3    information from a sponsor regarding their

4    suitability.  The process is to collect information

5    that the sponsor is suitable.

6         Q.    But my question is really both sides

7    of the coin.  Is there a policy that directs ORR to

8    accept independent evidence from those sponsors?

9              MR. SHEIH:  Objection to form.

10        Q.    It's a positive.  Is there a

11   positive policy on that?

12        A.    There is no specific policy that

13   says ORR will accept just like there is no specific

14   policy that ORR will not accept any such evidence

15   provided by a sponsor.

16        Q.    Okay.  Now, when ORR has received a

17   medical report that indicates that a potential

18   sponsor may not be able, physically able to provide

19   for a child's physically and mental well being,

20   what is ORR's policy with respect to advising the

21   potential sponsor of that report?

22        A.    Could you be more clear and specific

23   on what type of report that ORR would get

24   independent regarding the sponsor?

25        Q.    No.  ORR has gathered evidence

Confidential

Page 198

1    time, that the sponsor is not a viable sponsor for

2    that child.

3              Q.      What child welfare standards did ORR

4    cut in prescribing that policy, if any?

5              A.      In child welfare, there is no child

6    welfare standard saying it's okay to release a

7    child from child welfare into the home of a

8    stranger.

9              Q.      Is it not the case that child

10   protection agencies all over the country routinely

11   place children with foster families and parents

12   with whom the child has no prior existing

13   relationship?

14             A.      But the relationship exists between

15   the state who vets, who vets that foster parent.

16   That child is still under the custody of the state

17   in the home of that foster parent.

18             Q.      But that doesn't -- how does that

19   mitigate the risk of harm that this stranger might

20   pose for a child?

21             A.      The stranger is a de facto employee

22   of the state and provides residential care for

23   children in the state's custody.  That is vastly

24   different from a sponsor to get a child released

25   into -- for ORR to make a determination that is a

Confidential

Page 199

1   suitable sponsor in that case.   It is an

2   apples-to-orange comparison of a state foster home

3   versus a sponsor.

4          Q.      So then it's ORR's belief that

5   caregivers who are in the employ of the state do

6   not or are less likely to abuse or neglect

7   children?

8                  MR SHEIH:   Objection.

9              Mischaracterizes testimony.

10         A.      That is not what I'm saying.

11         Q.      Well, they're employees of the

12  state, foster families; correct?   That's what you

13  said.

14         A.      Yes.   So if I am the state and you

15  are a foster home and I put a child in your home,

16  that child is under my custody.   And if there is

17  any allegation that you have perhaps have had of

18  abuse of that child, I can immediately come in and

19  I can take that child from you.

20         Q.      And so child protective services

21  when they get a report of abuse or neglect say by a

22  parent who is not an employee of the state, they

23  are not permitted to go in and remove the child

24  from the home?

25         A.      They can.   It's within their

Confidential

Page  223

1          Q.      Okay.  Does ORR record the number of

2     those calls that it receives during the year?

3          A.      No.

4          Q.      Now, earlier you referred to

5     differences between what ORR does and what a

6     traditional child protective services does.  Could

7     you elaborate on what those different, the primary

8     differences are?

9          A.      The primary difference is once ORR

10    releases a child to the custody of a sponsor, ORR

11    does not have the ability to take that child back

12    unless that child somehow is referred to ORR by a

13    federal entity.

14          So ORR has mainly one opportunity to get

15    the -- to ensure that a child is safe once they

16    leave our care.  Unlike the state, who retains, if

17    the child is placed in foster care with a foster

18    parent, the child remains under the purview of the

19    state.

20          If a child is endangered in that setting,

21    the state can immediately remove that child and put

22    them in another setting.  In turn, if the state

23    determines that a child who is at risk for abuse

24    and removed temporarily from their parents' care,

25    after investigation if they deem that that, that

Confidential

Page 232

1                         C E R T I F I C A T E

2

3      LUCAS right.              )

4           v.                   )

5      ALEX AZAR, et al.,        )

6

7

8           I, BARBARA DeVICO, a Notary Public within and

9      for the District of Columbia , do hereby certify:

10          That JALLYN SUALOG, the witness whose

11     deposition is hereinbefore set forth, was duly

12     sworn by me and that such deposition is a true

13     record of the testimony by such witness.

14          I further certify that I am not related to

15     any of the parties to this action by blood or

16     marriage; and that I am in no way interested in

17     the outcome of this matter.

18          IN WITNESS WHEREOF, I have hereunto set my

19     hand this 3rd of September, 2019.

20

21

22     _____

23              BARBARA DeVICO

24

25