# DX-05

Deposition of Micaela Vergara, June 9, 2020

Confidential

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3            WESTERN DIVISION

4   -----------------------------

5   LUCAS R., et al.,
                    Plaintiffs,
6
    vs.                          Case No.
7                        2:18-cv-05741 DMG PLA

8   ALEX AZAR, Secretary of U.S.
    Department of Health and
9   Human services, et al.,

10                  Defendants.
    -----------------------------
11

12

13

14

15  TELECONFERENCE DEPOSITION OF MICAELA VERGARA

16          June 9, 2020

17

18         ***CONFIDENTIAL***

19

20

21

22

23

24  Reported by:  Susan S. Klinger, RMR-CRR, CSR

25  Job No. 180316

Confidential

1      Q.      Okay.

2      A.      -- to give you an accurate answer.

3      Q.      And you left -- you transitioned out

4   of your role as FFS for Shiloh in October of

5   2018; correct?

6      A.      Yes.

7      Q.      What does your supervision of the

8   FFS involve?

9      A.      I meet with them regularly for

10  supervision to talk about complicated cases,

11  any cases that need to be elevated to

12  headquarters, you know, we talk about issues

13  and trends in the region.

14     Q.      What are some examples of cases that

15  need to be elevated to headquarters?

16     A.      Some examples, a parent denial has

17  to be elevated to headquarters, a supervisor or

18  an FFS can't make that decision, only the ORR

19  director.

20     Q.      Does anything else come to mind?

21     A.      That is all I can think of right now

22  as an example.

23     Q.      And what are some of the complicated

24  cases that you talk about with the FFS?

25     A.      They would be non-routine cases.

1    the prescribing practices for psychotropic

2    medication at the facility?

3         A.    I don't know.

4         Q.    I would like to talk a bit about the

5    step-up process.  What is the step-up process?

6         A.    From what I understand, the step-up

7    process would be that the program notifies a

8    child their concern about a placement that the

9    child is exhibiting, the types of behavior and

10   that there is a concern regarding that child's

11   ability to remain in that level of care.

12              So they would give that

13   recommendation -- the program would make the

14   assessment, but also they would talk with their

15   case coordinator.  The case coordinator and

16   they would discuss the need for a step-up.

17        Q.    And what does the step-up -- sorry,

18   let me say that again.  What does the step-down

19   process refer to?

20        A.    I'm sorry, say that again.

21        Q.    What does the step-down process

22   refer to?

23        A.    Step down is every 30 days, the

24   child -- and even before then, the child

25   placement is reviewed to see if they're

Confidential

1   appropriate for that level of care.  And so

2   within that 30-day period if it is identified

3   or even beforehand if it is identified that

4   they are appropriate for a less restrictive

5   environment, then they begin the transfer

6   process.  The program notifies the case

7   coordinator and then the FFS and then they

8   begin the step-down process.

9       Q.   Have you visited any ORR facilities

10  other than Shiloh?

11      A.   You mean RTCs or just programs?  I

12  cover several programs, so I'm not

13  understanding your question.

14      Q.   I'm wondering whether you have

15  visited any of the programs that you are

16  responsible for besides Shiloh?

17      A.   I've visited all of them.

18      Q.   How would you describe the

19  differences between an RTC facility and a staff

20  secure placement?

21      A.   An RTC facility is focused on

22  treatment on mental health, treatment for --

23  well, treatment for both educational, mental

24  health, autism spectrum.  And so the RTC has

25  treatment -- they're based on treatment.

Confidential

1      So you're going to have a doctor, a

2   psychiatrist, because oftentimes certain --

3   with mental health they also have medical

4   needs, so you're going to have a medical

5   doctor.  There is going to be more services

6   group therapy, more individual therapy, and a

7   staff secure.

8          The different -- the different piece

9   of that is that it is a different population,

10  where you're addressing behavioral, really

11  focusing on behavioral issues, staff secure.

12  They -- the population is also different in

13  that, you know, they have different needs as

14  far as some of them have a criminal background.

15  So they require, you know, that is one of the

16  access, more training so different types of

17  processes regarding that.

18          So the focus is more on the behavior

19  in staff secure, while in RTC you're looking at

20  behavior plus the mental health, educational

21  component, counseling and the complexities of

22  all of that and you are getting treatment

23  there.

24      Q.    Are the differences between RTC and

25  staff secure placements reflected in ORR

Confidential

1    responsible once that child is in their

2    program.

3        Q.    Have you ever stepped a child down

4    from Shiloh because they were placed at Shiloh

5    for inappropriate reasons?

6        A.    I don't remember.

7        Q.    Do you know whether Nikki has ever

8    decided to step a child down from Shiloh

9    because they were placed at Shiloh for

10   inappropriate reasons?

11       A.    I don't know.

12       Q.    Are children ever placed at Shiloh

13   because they are a danger to themselves?

14       A.    Yes, the children are placed in

15   Shiloh because they are either a danger to

16   themselves or others.

17       Q.    Do you know how that dangerousness

18   assessment is made?

19       A.    It is made by typically a physician,

20   a psychiatrist or another mental health

21   practitioner that -- that would make that

22   determination, that is licensed to make that

23   determination.

24       Q.    Does ORR require the recommending

25   mental health professional to explicitly state

Confidential

1    that a child is a danger to themselves or

2    others in their RTC recommendations?

3             MR. MOSS:   Objection, foundation.

4         Q.    You may respond.

5         A.    What I do know is that a

6    psychiatrist or a psychologist they make that

7    recommendation for residential treatment

8    centers.  What they include in that -- in that

9    recommendation, you know, that is up to the

10   physician because they're licensed and they

11   have to meet their licensing criteria when they

12   make recommendations.

13        Q.    Does ORR require Shiloh staff to

14   determine whether a child is a danger to

15   themselves at regular intervals once the child

16   has been admitted to Shiloh?

17        A.    The psychiatrist is the one that

18   makes that recommendation that is of their

19   work.  That is what falls under their services

20   is to make that determination.

21        Q.    And do you know how frequently the

22   psychiatrist at Shiloh is assessing whether a

23   child is a danger to themselves?

24        A.    I think all the time.

25        Q.    Do you know whether ORR policy

1      A.     I just mentioned that it is really

2    hard, that we see that all the time.  We look

3    at any alternatives to step-up.  It is very

4    hard, once again, to step-up a kid, it is very

5    laborious to do that.

6      Q.     Thank you.  Does ORR policy require

7    facilities to consider whether a child could

8    remain in their current placement with

9    additional services and support before they

10   recommend a step-up to an RTC?

11     A.     I don't have the policy in front of

12   me, so I can't respond to that.

13     Q.     How does ORR monitor whether

14   facilities are considering whether a child

15   could remain in their current placement with

16   additional services and support before the

17   facility recommends a step-up to an RTC?

18            MR. MOSS:  Objection, foundation.

19     A.     There is various ways.  You know the

20   program, the case coordinator also is involved

21   and will make recommendations on different

22   types of -- will make recommendations for the

23   child on meeting the needs.  The FFS also will

24   try to work with the program, the project

25   officers will try to work with the program, the

Confidential

1    medical team tries to work with the program,

2    who else.  You know, Point Comfort

3    Underwriters, there is many layers of trying to

4    make the placement work for the child.

5         Q.    Does ORR require the recommending

6    psychiatrist or other mental health

7    professionals to consider whether a child could

8    remain in their current placement with

9    additional services and support before the

10   recommending psychiatrist or mental health

11   professional recommends a step-up to an RTC?

12        A.    Like I mentioned before, is that the

13   program will take a child to receive services,

14   and they work with the doctor to discuss the

15   child's needs.  And so again, they're not

16   going -- the question about needing to go to

17   another facility will not come up until after

18   they have already done work on trying to

19   maintain that placement.

20        Q.    Thank you.  Does ORR require that

21   process that you just described to happen?

22        A.    I don't have the policy in front of

23   me.

24        Q.    Does ORR require that recommending

25   psychiatrists and psychologists be informed of

Confidential

1    made a determination that they are safe, that

2    they are no longer a danger to self or others.

3         Q.    Do you recall any child that was

4    stepped down from Shiloh because they were no

5    longer a danger to self or others and even

6    though they had not met their treatment goals?

7         A.    I don't recall any specific cases.

8         Q.    Does the child participate in the

9    30-day review process?

10        A.    I know that they have individualized

11   service plans that they are part of.  As far as

12   the review process, I'm not 100 percent sure.

13        Q.    Do you know whether the child is

14   allowed to provide information to the Shiloh

15   team as to why the child should be stepped

16   down?

17        A.    I know that the child has the

18   opportunity to discuss placement with their

19   team whenever they want to, so I do know that

20   they are able to talk about improvements that

21   they have made.  I don't know that it is, you

22   know, a formal meeting or if, you know, if the

23   child does have the option to talk to the team

24   about his needs.

25        Q.    Does ORR monitor whether a child has

Confidential

1    been given the opportunity to discuss whether

2    the child should be stepped down with Shiloh

3    staff?

4         MR. ROSS:  Objection.

5         A.    I know that they do -- I know that

6    they do meet with the children to review

7    placements so they do have -- I think it is a

8    requirement of the MLP that they do have to

9    talk about placement of the child.  The child

10   has to sign that document, they have to sign a

11   notice of placement, and so they have to sign a

12   document regarding their placement.

13        Q.    Does ORR monitor whether a child was

14   given the opportunity to discuss why they

15   should be able to be stepped down with Shiloh

16   staff before the child is given the notice of

17   placement form?

18        MR. MOSS:  Objection, foundation.

19        A.    I know that they have opportunities

20   to meet with the team regarding placement, so I

21   know that they do meet with their treatment

22   team regarding placement.

23        Q.    Thank you.  To clarify, I'm

24   wondering whether you know whether ORR in

25   particular monitors whether that process takes

1        A.     From day 1, as soon as they know

2    there is a need.

3        Q.     Does ORR monitor this process in

4    which care providers assist sponsors in setting

5    up mental health services?

6        A.     I don't know.

7        Q.     If a home study evaluator provides a

8    negative recommendation, is the sponsor

9    notified of the recommendation before ORR

10   denies the sponsor?

11       A.     Can you repeat that?

12       Q.     If a home study evaluator provides a

13   negative recommendation, is the sponsor

14   notified of that negative recommendation before

15   ORR denies the sponsor?

16       A.     Basically the policy, I believe,

17   states that the sponsor is made aware once the

18   final decision can be made.  The program can

19   talk to them about things that need to be

20   worked on, so they could say, you know, you

21   need to fix that door or put the guns in a --

22   in a safe, you know that type of thing.  They

23   give that guidance to the family that was in

24   the recommendations from the home study work

25   there.

Confidential

1        Q.    I just want to make sure that I

2   understand what you mean by final decision.

3   When you say final decision, are you talking

4   about a home study evaluator's final

5   recommendation or the final decision that an

6   FFS makes regarding whether to release a child

7   or not?

8        A.    The final decision that the FFS

9   makes.  The program, the case coordinator and

10  the home study provider only provide

11  recommendations.  The FFS makes the final

12  decision unless it is a parent denial case.

13       Q.    And when you talk about the sponsor

14  having an opportunity to learn about certain

15  things that need to be changed like fixing a

16  door, for example, when is the sponsor informed

17  about those changes that could be made?

18       A.    As soon as possible.

19       Q.    Is the sponsor informed about those

20  potential changes before the FFS makes a final

21  decision?

22       A.    Yes.

23       Q.    Does ORR require the sponsors are

24  informed of those possible changes before the

25  FFS makes a final decision?

Confidential

1     A.     I would have to look at the policies

2   and procedures to confirm that.

3     Q.     Who informs the sponsor of any

4   requirements that they change certain things

5   about their homes?

6     A.     Sometimes the home study workers

7   provide feedback to the family and right there

8   when they are in the home.  Other times it is

9   -- well, that may be the first time a family

10   hears about something and then the case manager

11   would communicate with the family as well or

12   clinician, perhaps the clinical specialist is

13   going to help them, what they -- 10 minutes

14   before they got the report or whatever.  And

15   they would, you know, they do it in a family

16   session perhaps to make sure that the family is

17   aware as soon as possible.

18     Q.     How much time is the sponsor

19   provided to address any issues that were raised

20   in a home study evaluator's report?

21     A.     They're given as much time as

22   possible.

23     Q.     Are FFSs permitted to deny a sponsor

24   if a sponsor has not been able to address

25   certain issues that were raised in a home study

Confidential

1      Q.     Who is involved to determine whether

2   a sponsor has sufficiently addressed any issues

3   raised in home study reports?

4      A.     So the case manager, the case

5   coordinator, the FFS.  They would communicate

6   that information.  You know, everyone has an

7   option to change recommendations as well so the

8   case manager -- there could be a claim in

9   recommendations so that would need to be

10  discussed and it is a process.  The final

11  decision is made by the FFS.

12     Q.     What is some examples of issues that

13  a sponsor has not sufficiently addressed?

14     A.     I remember a specific case with

15  firearms and the home sponsor didn't want to

16  lock up his firearms.  And so they -- that was

17  an issue.

18     Q.     If a sponsor is not fully aware of a

19  child's mental health needs, can that be a

20  basis for denial?

21     A.     I would have to look at the denial

22  criteria, because there is denial criteria that

23  we must follow in order to meet that.

24     Q.     If a sponsor disagrees that a child

25  needs to continue taking psychotropic

Confidential

1      A.     Yes.

2             MR. MOSS:   Foundation, pardon me,

3      just want to make an objection to your

4      response.   Objection, foundation,

5      mischaracterizes prior testimony.

6      A.     So I can respond.   Like, the goal

7      for every FFS and for everyone involved is safe

8      and timely reunification and appropriate

9      caregiver, that is the goal.

10     Q.     Does the FFS ever consider that the

11     child's mental health or behavior might improve

12     significantly once the child has been reunified

13     with the sponsor?

14     A.     You know, I think that everyone

15     hopes for that, everyone hopes that the child

16     or mental health needs will dissipate or

17     somehow go away when the kid is reunified.

18     Unfortunately with children that have DSM

19     diagnoses, it is a long-term -- mental health

20     is -- mental health is usually a lifelong

21     diagnoses.   They are able to manage it better,

22     but they will have that kind of complex need

23     for the rest of their lives.

24     Q.     Are FFSs required to consider the

25     potential -- I see that you have disappeared

Confidential

1    from the screen again, sorry.  Great.

2                    Just to follow up on that last

3    question, just to clarify are FFSs required as

4    they make decisions regarding the reunification

5    to consider whether the child's mental health

6    or behavior might improve significantly once

7    they reunify with the sponsors?

8         A.    Generally speaking, you know, all of

9    the FFSs are concerned, you know, with making

10   sure that the kids are released to their

11   families as soon and as safely -- as soon as

12   they can and safely as possible.  That is

13   always our concern.  You know, the children

14   should be with their families.  And so if it is

15   a safe environment, they should be with their

16   families, so that is always the concern for an

17   FFS.

18        Q.    Are you aware of any times in which

19   a Shiloh staff member has made an error within

20   the reunification process?

21        A.    Generally speaking there is a lot of

22   case managers and there are human errors, so

23   there are policies.  You know, if it is a new

24   case manager they may not have a process that

25   they are aware of and so case managers are

Confidential

1        Q.    What do you mean when you say that

2    it is common for children at a treatment center

3    to be on medication because it is the nature of

4    the facility?

5        A.    For a residential treatment center

6    it is not an acute care facility, but it is not

7    an acute care hospital.  So like when you are

8    thinking about a psychiatric hospital, or a

9    child being placed in a psychiatric hospital,

10   that is for emergencies only, so they may be

11   there for a couple of weeks.

12            But when you are talking about a

13   residential treatment center, a treatment

14   center is a mental health facility that has --

15   that really is for longer term not for acute

16   mental health placing, but longer term

17   treatment of a mental health diagnosis.  So

18   common in those treatment centers are

19   medication management along with behavioral

20   intervention and clinical intervention.

21       Q.    You were asked earlier about

22   procedures for obtaining consent for

23   psychotropic medication.  Do you recall that

24   testimony?

25       A.    Yes.

Confidential

1          Q.      Ms. Vergara, look at that Section

2     2.1 and let me know when you are there, please.

3          A.      You are talking about page 1, 2.1?

4          Q.      That's correct.

5          A.      Okay, yes, I'm there.

6          Q.      Do you see where it says state and

7     timely release also known as family

8     reunification?

9          A.      Yes, I see that.

10         Q.      It continues, must promote public

11    safety and ensure that sponsors are able to

12    provide for the physical and mental well-being

13    of children.  Did I get that right?

14         A.      Yes, correct.

15         Q.      In your experience, do care

16    providers act diligently to move the

17    unification process forward?

18         A.      Yes.  It has always been the mission

19    has been safe and timely release.  So the

20    sponsor, the case manager reports very quickly

21    on reunification as fast as they possibly can

22    to reunify children.

23         Q.      In your experience, do ORR employees

24    also work diligently to move the reunification

25    process forward?

Confidential

1           If sponsorship is denied, is that
2      the end of the road or are there opportunities
3      for the potential sponsors to continue to
4      pursue sponsorship, for instance, by addressing
5      any safety concerns that the FFS may have?
6           A.    It isn't the end of the line, you
7      know.  We do have sponsors that are revisited.
8      The circumstances have changed so many times,
9      you know, because they're always assessing
10     appropriate sponsorship.  And at points there
11     will be -- they will go back to that sponsor.
12     Their situation sometimes has changed, you
13     know.
14           And an example is a domestic
15     violence case.  There is violence in the home
16     and then we have a sponsor who they have left
17     that partner and it is now a safe environment
18     for the child to go into.  So things change,
19     you know, people, situations change and so it
20     is not the end of the line.
21           Q.    Shifting gears, you testified
22     earlier about trauma informed training.  Did I
23     understand you to say that you had received
24     some trauma informed from ORR?  Did I correctly
25     understand you to say that?

Confidential

1          A.    Yes.

2          Q.    Now, in your experience, does ORR

3    review placement at least every 30 days?

4          A.    Yes, if not sooner.

5          Q.    For instance, what are some reasons

6    an ORR might review placement, in fact, more

7    frequently than the policies may require?

8          A.    For example, if you know, if the

9    child has been determined to be safe, no longer

10   a danger to self or others.  If that happens on

11   day 32, then they may do another evaluation of

12   -- they might review the placement before then

13   so maybe two days later to go ahead and step

14   that child down.

15         Q.    Now, how about documentation, is it

16   your experience that care providers staff

17   routinely document the basis for a child to

18   continue placement in a case file?

19         A.    Yes.

20         Q.    Is it your understanding that care

21   providers staff provide information regarding a

22   child's placement to the child's attorney,

23   legal service provider or child's advocate, if

24   requested?

25         A.    Yes.

1    medication?

2         A.    Yes, I have reviewed them in the

3    past, but I don't recall the details because I

4    don't have it in front of me.  A lot of the

5    licensing regulations are very detailed.  And

6    without it in front of me, I can't provide -- I

7    won't be able to provide that information.

8         Q.    As you are sitting here today, do

9    you know whether any state licensing

10   requirements require that families be informed

11   that they may refuse to consent to the

12   prescription or administration of psychotropic

13   medication?

14        A.    If I recall correctly, there are

15   details for families around informing families

16   regarding medication.

17        Q.    But you don't know for sure?

18        A.    No, because I don't have the

19   policies in front of me.

20        Q.    You testified that it is your

21   experience that the FFSs under your supervision

22   ensure that children are placed in the

23   appropriate placement pursuant to ORR policies

24   and procedures.  How do you ensure that the

25   FFSs under your supervision ensure that

Confidential

1    children are placed in the appropriate

2    placement?

3         A.    Well, I meet with them regularly to

4    discuss cases.  And they bring up cases where

5    there is concerns regarding the child's

6    behavior or a need has been identified because

7    that communication occurs on a weekly basis

8    between the program and the FFS or the FFS is

9    notified of cases that or issues that come up

10   with any children that are non-routine.  And so

11   the FFSs would be made aware of those things

12   and then would elevate them to me.

13        Q.    Do you review every case that your

14   FFS is staffing to ensure that children are

15   placed in the appropriate placement pursuant to

16   ORR policies and procedures?

17        A.    I provide guidance to the FFS for

18   them to review the cases to ensure whether or

19   not the child meets the criteria.

20        Q.    But you yourself do not review each

21   case that an FFS has to ensure that the child

22   is placed in the appropriate placement pursuant

23   to ORR policies?

24        A.    I don't check every single case, no.

25        Q.    My other question is you testified

Confidential

```
 1              C E R T I F I C A T E

 2

 3         I, SUSAN S. KLINGER, a certified shorthand

 4    reporter within and for the State of Texas, do

 5    hereby certify:

 6         That MICAELA VERGARA, the witness whose

 7    deposition is hereinbefore set forth, was duly

 8    sworn by me and that such deposition is a true

 9    record of the testimony given by such witness.

10         I further certify that I am not related to

11    any of the parties to this action by blood or

12    marriage; and that I am in no way interested in

13    the outcome of this matter.

14         IN WITNESS WHEREOF, I have hereunto set my

15    hand this 19th of June, 2020.

16

17              _____

18              Susan S. Klinger,

19              RMR-CRR, CSR

20              Texas CSR# 6531

21

22

23

24

25
```