# DX-06

Deposition of Dr. Ilze Earner, August 10, 2020

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              WESTERN DIVISION

4        Case No. 2:18-cv-05741 DMG PLA

5    --------------------------------------x

6    LUCAS R., et al.,

7                      Plaintiffs,

8        v.

9    ALEX AZAR, Secretary of U.S. Department

10   of Health and Human services, et al.,

11                     Defendants.

12   --------------------------------------x

13

14       TELEPHONIC DEPOSITION OF ILZE EARNER

15          Monday, August 10, 2020

16

17

18

19

20

21   Reported by:

22   Amy A. Rivera, CSR, RPR, CLR

23   JOB NO. 182276

24

25

1        Q.      You describe in paragraph 20 that the

2   shelters in the staff-secured facilities were

3   "well-appointed with individual and/or shared

4   dormitory-style bedrooms, cafeteria, recreation

5   areas, and maybe one had an outdoor pool and

6   educational classroom facilities."

7              When you say, "well-appointed," what

8   standards are you applying there?

9        A.      Because in my work in child welfare

10  I've been to many domestic child welfare

11  congregate care facilities, and I have to tell

12  you, these were -- these were pretty nice.

13       Q.      You're basing that upon your -- your

14  experience?

15       A.      Yes, I am.

16       Q.      And in paragraph 20, you also say that

17  the facilities were fully staffed despite none

18  being at capacity.

19              What did you do to confirm staffing

20  levels?

21       A.      We spoke with the program director.

22       Q.      What did you --

23       A.      And also, quite frankly, you could

24  observe that there were many, many staff there.

25       Q.      Did you check staffing records?

1    difference?

2              Yes, it does.

3        Q.    How so?

4        A.    Well, in my understanding of how the

5    murals were created, the kids themselves created

6    the murals.  So it's representative of an

7    expression of their feelings, their emotions,

8    their aspirations.

9        Q.    So is it sufficient that -- to paint

10   the mural -- strike that.

11             Are you suggesting artwork is a best

12   practice -- a necessary best practice within

13   facilities?

14       A.    I think the literature speaks to --

15             MR. SHIEH:  Object to form.

16       A.    -- it as being a good practice in

17   institutional settings.

18       Q.    Did you note any concerns about the

19   way that Shenandoah was operated?

20       A.    Did I have any concerns about

21   Shenandoah?

22             Well, I -- again, I think that some

23   facilities are -- they are more jail like, and

24   it's -- yeah.

25             I don't think that it's an ideal

1   situation for kids to be in juvenile detention,

2   but there are instances when children are a danger

3   to themselves and others that you do have to have

4   secure facilities for them.

5        Q.   I guess, and just to be clear, my

6   question was:  Did you have any concerns about --

7   did you observe any concerns while you were

8   touring the Shenandoah facility?

9        A.   I did not observe anything that

10  concerned me.

11       Q.   What about any of the other

12  facilities, did you have any concerns while

13  touring the other facilities?

14       A.   My only concern about some of the

15  facilities was the size of them.

16       Q.   Can you describe that?

17            What was your concern?

18       A.   Well, I think at a couple of the

19  shelters that we visited, the -- they had 400, 600

20  bed capacity, which that concerned me.  It's not

21  an accepted standard of care in congregate care.

22       Q.   Any other concerns?

23       A.   No.

24       Q.   Is there any information that you

25  learned during your site visits that has informed

1    standards of care going down, you know, in terms

2    of placing children in out-of-home care in the

3    least restrictive environment, ensuring that their

4    psychosocial needs are met, you know, and that the

5    children are maintained safely and that there is

6    timely reunification with family.

7         Q.    And would those standards of care

8    include the delivery of things like wraparound

9    services?

10        A.    In the domestic child welfare system,

11   that generally is the case, yes.

12        Q.    Now, are you drawing the distinction

13   between the domestic child welfare system and the

14   ORR system?

15        A.    The populations are different.

16        Q.    So is it your opinion that the

17   standard of care in the ORR system did not include

18   wraparound services?

19        A.    I'm not going to say that, because

20   what we were made aware of is that there is --

21   there is community engagements with many of the

22   UAC, but in terms of being able to engage

23   institutions which -- with these -- with which

24   these children have been involved in, that's

25   really not possible because they're -- they are

1                    "It is my opinion that ORR has

2    improved focus on the safety of UACs by

3    implementing increased standards of assessment and

4    evaluation of potential sponsors to ensure that

5    UACs are not at risk of abuse, neglect, or

6    exploitation once they are released from care."

7                    First of all, what is your basis for

8    this opinion?

9         A.    Because of what I saw when I went to

10   the UAC programs in 2000 -- what was it -- '7,

11   2008.

12                   It was pretty hair raising.

13        Q.    So that actually -- you anticipated my

14   question then.

15                   So when you say "improved focus," your

16   comparison there is your experience in 2007-2008

17   versus today.  Is that fair?

18        A.    Yes.

19        Q.    And how has ORR improved focus on

20   safety in the intervening 13 years?

21        A.    By a factor of a thousand.

22                   In the early days of this program,

23   there was virtually no staff training.  I don't

24   even know who got hired.  Some people just seemed,

25   you know, left McDonald's this week, they're

1    they're very traumatized.

2              So when you're releasing them, even if

3    it is a parent, that parent may not necessarily be

4    able to take care of them appropriately, and

5    what's going to happen then?

6         Q.    And what does the ORR do in that

7    situation?

8         A.    Well, I think that they very

9    appropriately screen potential sponsors.  I think

10   that they take greater care in assuring that when

11   a UAC is released, they're released to a situation

12   keeping in mind safety and well-being.

13             I did not see that standard

14   previously.

15             MR. McMAHON:  Alison, if you could

16        turn to page 7, paragraph 25, I'd appreciate

17        it.

18        Q.    Dr. Earner, towards the end of

19   paragraph 25, you say:

20             "One significant change identified in

21   the UAC population since 2010 is that -- however,

22   is that children are presenting with more complex

23   needs and higher instances of trauma, mental

24   health, and substance abuse histories, 85 percent

25   of children who are in custody have some kind of

1    trauma history."

2           What are you comparing to here?

3    You're referencing higher instances.  What are you

4    comparing to, pre- and post-2010, some other time

5    period?  What is the comparison?

6        A.    Again, I'm comparing that to the

7    earlier time frame when I was working directly

8    with making recommendations to ORR about UACs.

9           There seems to be very, very little

10   recognition that -- how really traumatized these

11   kids might have been previous to crossing the

12   border, and that has long-term effects on their

13   mental health and well-being while in the shelter

14   system and post release.

15          And I see, again, in terms of what I

16   looked at in terms of the -- the treatment

17   services, the release protocols, there's certainly

18   greater attention to the mental health needs of

19   these kids, recognition of trauma, recognition of

20   the histories of trauma and that there is

21   appropriate focus on that in terms of what happens

22   to them in the long term.

23       Q.    And in footnote 3 here, you reference

24   reunification, and you say that a more inclusive

25   term is "unification," that some UAC have never

1    experienced may impact their behavior within the

2    facility?

3         A.     Oh, yeah.

4         Q.     And is it your understanding or your

5    testimony that ORR needs to be sympathetic for

6    those needs and traumas?

7         A.     Yes, they do.

8              MR. SHIEH:   Objection to form.

9         Q.     And is it that best practice in child

10   welfare to be sympathetic to those needs and

11   traumas?

12             MR. SHIEH:   Object to form.

13        A.     I would believe so.

14        Q.     Now, in paragraph 27, you say that

15   UACs differ from the population of domestic

16   children in the care of state child welfare

17   agencies in a number of unique ways, and you seem

18   to be drawing a distinction that, you know,

19   they're placed in congregate care shortly after

20   our detention versus other, I guess, domestic

21   children that are known to the system.

22             What is your basis for that

23   comparison?

24             I guess what's the relevance of that

25   comparison to your opinion?

1        A.    Well, I think that aspect is extremely

2   important because, first of all -- you know, when

3   a kid comes into care in the domestic child

4   welfare system, they come with a record.  They've

5   been to school.  There are school records.  There

6   are health records.  There -- they may have had

7   mental health services.  So you would have all of

8   these records available to you.  People know them

9   in the community.

10            A UAC shows up, who are they?  You

11   have nothing.  How do you know where to begin with

12   this kid?  How do you know what their story is?

13   How do you know what their previous life

14   experience are?  Have they ever been diagnosed

15   with any intellectual disability or cognitive

16   disability?

17            You have no way of knowing any of

18   that.

19        Q.    So would it be appropriate to suggest

20   that these kids that aren't known to the system

21   may need increased protection?

22            MR. SHIEH:  Objection to form.

23        A.    I'm saying that these kids come into

24   care, they're a blank slate, and you have no idea

25   what their story is, what their history is, what

1    needs they have -- what -- what affects them or

2    how they've been affected, and so you're starting

3    from ground zero.

4              That requires a higher level of

5    service, knowledge, a higher level of intensity in

6    terms of assessment.  And, yes, I do believe that

7    they need to be protected, because the other

8    aspect is, you know, how did they get here?

9         Q.    That was going to be my next question.

10             You know, when you say, how did they

11   get here, you're referring to, you know, maybe

12   were they trafficked?

13        A.    I have to say that, you know, this

14   notion that somehow, you know, these kids walked

15   out the front door and walked halfway across the

16   continent and showed up on the border all by

17   themselves I think is fantasy.

18             Somebody brought them.  Somebody

19   guided them.  Somebody perhaps trafficked them.

20   Somebody is going to have to be paid.  Somebody --

21   somebody has some sort of control.  And I think

22   that has to be taken into extreme consideration.

23             Who are you going to release this kid

24   to, and what are going to be the consequences of

25   that release for the kid?

1    paragraph 30 that the proposal for a quality

2    judicial fair hearing would do nothing to further

3    the safety of the UAC.

4              Is that your opinion?

5         A.   Yes.

6         Q.   Is your opinion exclusively related to

7    furthering the safety of the UAC?

8         A.   I think once you get into having,

9    again, these quasi-judicial fair hearings where

10   attorneys are appointed, the minute you get

11   lawyers involved, everything takes so much longer.

12        Q.   Well, you say -- and -- I guess

13   explain that for me.  Why is that?

14        A.   You can look at that in child welfare.

15   In child welfare, every child is appointed an

16   attorney, and the average length of stay in child

17   welfare, in congregate care, out-of-home care is

18   quite extensive.

19             And because there are always hearings,

20   and hearings are -- not everybody shows up to

21   court.  The court calendars are very full.  It

22   just creates further and further delay.  I don't

23   think it accomplishes anything.

24        Q.   So why -- I guess what are you citing,

25   I guess?  Do you have any authority or is it just

1    your experience when you say that getting

2    attorneys involved increases length of stay?

3         A.    I'm citing my experience.  I'm citing

4    the fact that child welfare -- and I'm talking

5    about domestic child welfare -- has tried to move

6    away from putting cases into court just simply

7    because it ridiculously prolonged the process, and

8    there's absolutely no benefit to the child.

9         Q.    Okay.  So two points there.

10             So how does getting lawyers involved

11   ridiculously prolong the proceeding?

12        A.    Okay.  I don't want to be glib about

13   this, but I think lawyers like to argue and they

14   like to be adversarial, and when you're talking

15   about kids and families, that's not the place

16   where you need necessarily adversarial,

17   contentious arguments.

18             What you need is to get consensus

19   about what is best for the child, and I think

20   keeping lawyers out of that process works a lot

21   better.

22        Q.    Other than lawyers, is there somebody

23   else that could advocate for the needs of a UAC,

24   in your opinion?

25        A.    Well, there could be a child advocate.

1    potential sponsor is.

2         Q.    And is it your testimony that they

3    have a say if ORR makes the decision to deny that

4    sponsor?

5         A.    Well, why is the sponsor denied?

6              They're usually denied because they

7    are either inappropriate or there are some

8    concerns about the ability of the sponsor to meet

9    the needs of the child.

10             I think those are fair concerns.

11   Those are appropriate concerns.

12             Again, you're talking about minors and

13   you're talking about individuals who may be under

14   pressure to say, yes, I want to go with so and so.

15   So and so is a great person.  And so and so may

16   not be such a great person for this kid.

17        Q.    Is ORR infallible?

18        A.    Are any of them?

19             MR. SHIEH:   Argumentative.

20        Q.    Fair question.

21        A.    I don't think anyone is infallible.

22             Are mistakes made?  Of course they're

23   made.  But, again, you have to look at how many

24   mistakes are made and is this an organization that

25   rife with mistakes, indiscriminate, arbitrary,

1    capricious, I don't see that.

2              I see that people do have concerns.

3    They have legitimate concerns for kids, and it's a

4    population that's at very high risk, and I don't

5    think, you know, appropriate concerns for their

6    safety is such a far-fetched concern to -- to

7    undertake with a degree of -- of being impartial,

8    of being thorough, of being sure that when you

9    release this kid, this kid isn't going to wind up

10   as some domestic slave somewhere.

11        Q.    How does having a fair hearing

12   undermine the safety of a child?

13        A.    I think a fair hearing is a -- people

14   hear a fair hearing and they think it's fair and

15   they think they're going to get their way, and

16   what winds up happening?  There is more delay,

17   more arguing, more adversarial, contentious

18   relationships, and you know what?  In the end, I

19   don't think you really benefit from this.  I mean,

20   I just don't see the purpose of it.

21        Q.    I'm sorry, Dr. Earner, but you didn't

22   answer my question.

23              How does a fair hearing undermine the

24   safety of the child?

25        A.    I think it undermines --

1  or not they would guarantee the safety of a

2  child -- a UAC child, I can only base that in my

3  experience from the domestic child welfare system

4  where I have seen fair hearings in front of a

5  judge in court about the release of a child to a

6  parent, and that parent had a good lawyer and the

7  lawyer made a great argument.  The kid was

8  released, and subsequently, got hurt by that

9  parent.

10        Q.    Are you saying that the kid is better

11  offer in ORR custody?

12        A.    I think that a child, unless you're

13  sure that you're releasing that child to an

14  appropriate, safe situation, is better off in ORR

15  custody than being released to a potentially

16  negative or dangerous situation.

17        Q.    So on the topic of being sure about

18  the release, why is it less safe for ORR to have

19  the final say with no checks and balances as to

20  whether or not that child should be released?

21        A.    I --

22              MR. SHIEH:  Objection, form.

23        A.    But you're presuming that ORR doesn't

24  have checks and balances.

25              What I see here is a great deal of

1    concern about doing the home studies, about

2    contacting sponsors, about vetting sponsors, about

3    having reviews of who the sponsor is.  All of that

4    process that's in place -- and by the way, that

5    doesn't necessarily mean that even that sponsor

6    is -- or a bad placement doesn't occur.  It may.

7              But I see that there's a number of

8    crazy protocols in place, but I don't think that

9    that isn't a check and balance.  I think that

10   those are -- that's a very appropriate process in

11   order to ensure that release of the child to a

12   situation where you can be at least assured that

13   you made every effort possible to ensure that that

14   child will be safe once it's out of your care.

15        Q.   And you state in paragraph 53 of your

16   report that it's possible that mental health

17   deteriorates the longer the child is kept in ORR

18   custody.

19              If a hearing were to result in an

20   earlier release of that child, would that not

21   ultimately be more safe and beneficial for the

22   child?

23        A.   Which -- where -- what are you

24   referring to, 53?

25        Q.   You state in paragraph 53:

1    decisions where these decisions are made based on

2    less information, like you're suggesting here?

3              MR. SHIEH:  Objection to form.

4         A.    If you -- if you look at the way --

5    and, again, in terms of -- there's no one person

6    making decisions.  There is a team.  There are

7    multiple people involved in case reviews.  I find

8    it highly unlikely that, you know, everybody just

9    goes along with what one person says.

10             I mean, none of this takes place based

11   on the decision of one person.  There -- there is

12   a clinical team that reaches a decision here.

13        Q.    Let's talk about that for a second.

14             So in paragraph 46, you -- you say

15   that the -- that the procedures that ORR has

16   implemented at shelters is impressive.

17             So first off, you're referring to in

18   shelters here.

19             Is your opinion in paragraph 46

20   limited to shelters?

21        A.    Again, I use shelters in a broad

22   sense.  I was talking about the shelters that we

23   visited, which included a therapeutic shelter and

24   a secure facility.

25        Q.    And you've mentioned a number of times

1   environment?

2        A.    I saw that -- and it was described to

3   us that they did extensive training, again, on

4   trauma-informed classes, that they also talked

5   about CPT site intervention, that they used a

6   number of modalities that would -- therapeutic

7   modalities that are accepted in -- in terms of

8   trying to keep somebody stabilized and safe.

9        Q.    Back to paragraph 47, how was it

10  evident that UACs were active participants in the

11  intervention process and encouraged to discuss

12  their concerns, frustrations, and anxieties?

13       A.    Because they meet with their case

14  manager weekly.  They're asked about -- well, more

15  than weekly.  They regularly engaged with the case

16  managers.  They're in counseling sessions, group

17  sessions, but they are active participants.

18  They're not -- they're not passive in this

19  process.

20       Q.    Are they informed prior to a step up?

21       A.    They're supposed to be.

22       Q.    What's your basis for that?

23       A.    According to the ORR policy and

24  protocol.

25       Q.    And the protocol is they get some sort

1   report.  Again, we talked about this briefly

2   before.

3            Again, where do you gain your

4   understanding of the legal services that are

5   available to UACs?

6        A.    This is based on what we were told,

7   and again, I hope I didn't misunderstand this, but

8   we were told that they had access to attorneys --

9   pro bono attorneys through a bureau of providers.

10           As I recall now, the name was the

11  Young Center, who would -- who advised them of

12  their rights and -- and immigration proceedings,

13  and all of these, as I state there, these notices

14  were available to the UAC in the common areas.

15       Q.    Moving on to paragraph 56, you talk

16  about how children in domestic child welfare are

17  automatically assigned an attorney, which you

18  called their guardian ad litem.

19           Are UACs entitled to a guardian ad

20  litem?

21       A.    No, they are not.

22       Q.    Are they entitled to any equivalent of

23  a guardian ad litem?

24       A.    Not that I'm aware of.

25       Q.    And you say that there was evidence

1  that they were informed of their rights -- that

2  UACs are informed of their rights.  This is

3  towards the end of paragraph 56.

4           What rights are you talking about?

5       A.    Informed of their rights to report

6  abuse, neglect, abuse, sexual abuse, grievance

7  procedures.  There were -- yeah, how to make a

8  report if they felt they were violated, and access

9  to an attorney for immigration proceedings.

10      Q.    Okay.  And at paragraph 57, you

11  reference materials being posted on how to report

12  sexual abuse and for filing grievances, and you

13  highlight a few grievances here.

14           Is it your understanding that -- that

15  UACs only had complaints about food, movies, and

16  being denied points for good behavior?

17      A.    That's what the staff told us.

18      Q.    So you thought that these were great

19  places to stay and that the UACs didn't have any

20  other complaints, other than food, movies, and

21  good behavior points?

22           MR. SHIEH:  Objection to form.

23      A.    If you've ever worked in institutional

24  care, that's the majority of the complaints you

25  get.

1          A.    I think, based on what we saw and what

2    was described to us and on the policies and

3    procedures, that the ORR has vastly improved its

4    vetting process of potential sponsors and who they

5    are releasing children to.

6               And I think that they clearly reflect

7    acknowledgement that once children are released,

8    they don't really have any control over what

9    happens to them and that it's best to err to the

10   side of caution in terms of ensuring safety and

11   well-being of that child.

12         Q.    In your review, did you note any

13   procedures that are in place at ORR for ensuring

14   that they don't appropriately screen out an

15   otherwise eligible partner?

16         A.    I think that their vetting process is

17   fairly extensive and, again, because it is

18   reviewed not just by one person but -- but others.

19              You know, not to say that mistakes

20   will never happen, of course, they will.  But

21   overall, I think -- I think it reflects a best

22   practice.

23         Q.    Just a couple more paragraphs and then

24   maybe we can take a break.

25              In paragraph 70, you say:

1    the ORR system?

2                  MR. SHIEH:  Objection to form.

3           A.     I am making analogies to the child

4    welfare system.

5                  I misunderstand you -- unless I

6    misunderstand your question, I'm talking about --

7    I'm rebutting the assertions made by Drs. Matlow

8    and Wang and their citation of literature that is

9    coming from the child welfare system, but again,

10   comparing UACs to children in the child welfare

11   system, that's apples and oranges.  You can't

12   compare the two.

13          Q.     Not at all.

14          A.     Yeah, okay.  I -- "not at all" is

15   global.  Some characteristics they may share but

16   not all of them, and the life experiences were

17   different.  The demographic is different.

18                 So to compare this as if they were an

19   interchangeable group, I don't think that that

20   works.  It does not.  And, you know, if you want

21   to pick out certain parts of that, well, then cite

22   that specifically.

23                 But they haven't done that.  They made

24   this global assertion, the child welfare

25   population, which is not the UAC population.

Page 286

1                         CERTIFICATE

2              I, AMY A. RIVERA, a Certified Shorthand

3    Reporter, Registered Professional Reporter,

4    Certified LiveNote Reporter, and Notary Public of

5    the State of New York, do hereby certify that prior

6    to the commencement of the examination ILZE EARNER,

7    was duly sworn by me to testify the truth, the whole

8    truth and nothing but the truth.

9              I DO FURTHER CERTIFY that the foregoing is

10   a true and accurate transcript of the testimony as

11   taken stenographically by and before me at the time,

12   place and on the date hereinbefore set forth.

13             I DO FURTHER CERTIFY that I am neither a

14   relative nor employee nor attorney nor counsel of

15   any of the parties to this action, and that I am

16   neither a relative nor employee of such attorney or

17   counsel, and that I am not financially interested in

18   the action.

19   _____

20                  Amy Rivera

21             Notary Public of the State of New York

22             My commission expires December 6, 2021

23             License No. XI00939

24   Dated:  August 20, 2020

25