# DX-07

Deposition of Dr. Sid Mohn, August 5, 2020

Confidential

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                   WESTERN DIVISION

 4

 5

 6     LUCAS R., et al.,                )

 7              Plaintiffs,              )  Case No.

 8              vs.                      )  2:18-CV-05741

 9     ALEX AZAR, et al.,                )  DMG PLA

10              Defendants.              )

11

12                    CONFIDENTIAL

13             TELECONFERENCE DEPOSITION OF

14                REVEREND DR. SID MOHN

15              Wednesday, August 5, 2020

16

17

18

19

20

21

22   Reported by:

23   JENNIFER L. BERNIER, Il. CSR, RPR, CRR

24   Job No. 182275

25
```

```
 1        explain.
 2        A.    I don't wish --
 3              MR. ROSS:  I disagree with that.
 4        The witness was communicating the answer.
 5        I disagree with that, with that
 6        classification.  The witness was
 7        communicating an answer, and I ask that he
 8        please be allowed to finish the question
 9        before you pose your next question.
10        Q.    Go ahead, Dr. Mohn.
11        A.    There is an assessment of harm that
12   needs to be conducted on a comprehensive basis.
13   There are multiple sources of harm for trauma.
14   An inappropriate release or a premature release
15   can be even more harmful or traumatic than a
16   shelter stay.
17              My experience, in conversations with
18   shelter staff, is they were constantly engaged
19   in determinations around timely and safe
20   release and balancing those two factors to make
21   the best and most timely and most safe and most
22   advantageous release decisions.
23        Q.    Is it possible that a delayed
24   release could be harmful to children?
25        A.    It is if it is an intentional
```

```
 1   welfare perspectives, professionals would have
 2   occasional differing opinions.  That's why I
 3   really lauded this multipart decision-making
 4   system that is now in place, an improvement
 5   over the past practice.
 6        Q.    And when you talk about the
 7   multipart decision-making system, are you
 8   referring to the involvement of the case
 9   manager or case coordinator and FFS?
10        A.    Yes.  And, at times, central office
11   and, at times, a child advocate.
12        Q.    And the central office, I know you
13   said it a couple of times.  Are you referring
14   to a central office within ORR or somewhere
15   else?
16        A.    Within ORR.  I think the language in
17   the guide is the director's office or his or
18   her designee.
19        Q.    And you mentioned that this is an
20   improvement over past practice.  What was the
21   past practice?
22        A.    Moving back to the earlier stages of
23   the program when release decisions were often
24   made unilaterally in the director's office.
25        Q.    Would you agree that, based on your
```

1   perspective.

2       Q.    So is this one way in which

3   Heartland exceeds ORR's requirements?

4       A.    Using LBGTQ youth, ORR requires that

5   training and inclusion and integrative services

6   for LBGTQ youth or children are provided.  In

7   this case, Heartland has a subcontract

8   agreement, I believe, with Howard Brown Health

9   Center, which is the City of Chicago's LBGTQ

10  primary care center.  So this would be an

11  example where there my lexicon is robust

12  compliance with ORR -- with the ORR guide.

13      Q.    Do you believe that access to these

14  types of community supports could reduce the

15  need to transfer children to a more restrictive

16  setting?

17          MR. ROSS:  Objection, calls for

18      speculation.

19      A.    My interviews with shelter staff and

20  case reviews suggested that shelter staff

21  endeavored to meet specialty behavioral or

22  medical needs internally as much as possible in

23  order to maintain a least restrictive setting

24  commitment, and only when that could not be

25  done as a result of primarily safety concerns

1   were step-up programs explored.
2           Now, your question leads to what I
3   heard from shelter staff is that domestic child
4   welfare services are woefully inadequate in
5   terms of providing step-up programs or even
6   residential treatment programs for domestic
7   youth.
8       Q.   And when you say domestic child
9   welfare services, are you referencing the types
10  of community services that you list in
11  paragraph 34, or something else?
12      A.   No.  I'm referencing as if you were
13  a U.S. citizen youth who were homeless and
14  needed more intensive behavioral or
15  psychological services or residential treatment
16  services.  There is a woeful paucity of such
17  services available in the domestic child
18  welfare system.
19      Q.   Dr. Mohn, I would like to go to the
20  handwritten notes.
21           MS. MAYHUGH:  So, Julie, if you
22       could pick up or put up Tab 4, Exhibit 298.
23       And, Dr. Mohn -- you know, Julie, if you
24       wouldn't mind scrolling, perhaps, through
25       the document.  I'll represent it is a

Page 160

```
 1   evidence that shelter staff make dogged efforts
 2   to contact potential sponsors and to assist
 3   potential sponsors in gathering all
 4   documentation required within the FRP.
 5        Q.    And by FRP, you mean family
 6   reunification packet?
 7        A.    I do.
 8        Q.    So you said your opinion is based on
 9   the standards of safe and timely and best
10   interest as applied to the placement decision.
11   Is it your opinion that those standards do not
12   require the ultimate decision-maker to meet
13   with the child?
14        A.    My understanding is, the ultimate
15   decision-maker is a team process with checks
16   and balances and multiple perspectives included
17   in that team process.
18        Q.    Are you aware that the FFS can deny
19   relief where it has been recommended by both
20   the case manager and the case coordinator?
21              MR. ROSS:  Objection, argumentative.
22        A.    I'm aware, from reading the guide,
23   that that is a possibility.  I did not see
24   evidence of the use of that unilateral
25   authority.
```

Page 180

```
 1      A.     I did.
 2      Q.     What are the opinions and
 3   conclusions that you formed?
 4      A.     That there were no financial
 5   benefits to an ORR shelter provider relative to
 6   shortening or lengthening stay; number two,
 7   that shelters model a safe and humane
 8   environment; number three, that I saw evidence
 9   of assessment of children's needs and
10   addressing of those needs through both group
11   and individualized services; that I saw
12   dedicated involvement in the sponsor setting;
13   and that staff were doggedly committed to
14   timely and safe placement.
15      Q.     Dr. Mohn, did you form any other --
16   any other opinions or conclusions in this
17   matter?
18      A.     Those were my primary conclusions.
19   Of course, one could look at subsets of those
20   conclusions.
21      Q.     Now, if it would assist you in
22   having the report in front of you, I think it's
23   sufficient to warrant any objections from
24   counsel.  I think it's sufficient to have your
25   own report in front of you, specifically
```

```
 1                MR. ROSS:  Thank you, Julie.  You
 2      can pull that down.
 3      Q.    Dr. Mohn, in reviewing the case
 4   file -- the case files, themselves, and not the
 5   case file summaries, did you formulate an
 6   opinion regarding the quality of the FFS
 7   interaction and coordination with shelter staff
 8   making recommendations?
 9                MS. MAYHUGH:  Objection, beyond the
10      scope.
11      A.    I was able to assess quality more in
12   the interactions between the FFS and shelter
13   staff during my site interviews.  FFS
14   comments/concerns were clearly noted in case
15   files.  It's difficult to opine the qualitative
16   nature.
17                There was evidence of that
18   communication and joint decision process.  In
19   the site visit, I was struck by the
20   collaborative understanding of the
21   check-and-balance role of the FFS.
22      Q.    What do you mean by that?
23      A.    Frankly, I went into the interviews
24   expecting more of an antagonistic relationship.
25   And what I discovered was the affirmation and
```

1   recognition of the FFS roles as another set of
2   eyes who was somewhat removed from the
3   day-to-day interchanges with the child; and
4   whereas those day-to-day interchanges may have
5   brought more in-depth insight, they could also
6   be colored by emotions.  And so the FFS helped
7   move the discussions solidly around safe and
8   timely.
9       Q.   In your preparation of your expert
10  report, did you see evidence that shelter staff
11  were working closely with children in the
12  release process?
13      A.   Yes, I did.  I observed good
14  communication with children as to potential
15  sponsors and communication around if potential
16  sponsors discontinued their interest in being a
17  sponsor.  And staff endeavored to communicate
18  that children in a way that diminished a sense
19  of rejection or hopelessness that no one wants
20  me.
21      Q.   Within the scope of your expertise,
22  do you have any doubt that the best interest of
23  the child were considered in the recommendation
24  and decision-making processes related to
25  release?

```
 1                  C E R T I F I C A T E

 2            I, Jennifer L. Bernier, Illinois

 3   Certified Shorthand Reporter, do hereby

 4   certify:

 5            That REVEREND DR. SID MOHN, the

 6   witness whose remote deposition is hereinbefore

 7   set forth, was duly sworn by me and that such

 8   remote deposition is a true record of the

 9   testimony given by such witness.

10            I further certify that I am not

11   related to any of the parties to this action by

12   blood or marriage; and that I am in no way

13   interested in the outcome of this matter.

14            IN WITNESS WHEREOF, I have hereunto

15   set my hand this 17th day of August, 2020.

16

17   _____

18         JENNIFER L. BERNIER, CSR, RPR, CRR

19   CSR No.  084-004190
20
21
22
23
24
25
```