# DX-08

Deposition of Dr. Joseph Ryan, July 31, 2020

Confidential

1              IN THE UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
2                   WESTERN DIVISION

3
       LUCAS R., et al.,            )
4                                   )
                  Plaintiffs,       )
5                                   )
            vs.                     )    Case No.
6                                   )    2:18-cv-05741-DMG-PLA
       ALEX AZAR, Secretary of      )
7      U.S. Department of           )
       Health and Human             )
8      Services, et al.,            )
                                    )
9                 Defendants.       )

10

11              * C O N F I D E N T I A L *

12

13   VIDEOCONFERENCE DEPOSITION OF JOSEPH RYAN, PH.D.

14                   Ann Arbor, Michigan

15                 Friday, July 31, 2020

16

17

18

19

20

21

22

23   Reported by:

24   RACHEL F. GARD, CSR, RPR, CLR, CRR

25   JOB NO. 182306

1    children with sponsors.  They have staff

2    dedicated specifically in charge of helping

3    children connect with potential sponsors.  And

4    children leave the shelters, you know, not all

5    children, but the majority of children leave

6    and go to a sponsor.  And the idea, the word

7    permanency, the idea is that it's not a setting

8    that will dissolve in a week but there's been

9    some thought to the quality of the environment,

10   the potential stability of the placement

11   itself.  That there's some sense that this will

12   be a permanent placement.  This is not a

13   temporary transfer.

14        Q.    When does a temporary transfer

15   become permanent?  Where's the dividing line?

16        A.    In the case of permanency, I'm

17   specifically referring to the movement of

18   children outside the ORR network and that that

19   is -- that's the goal, that's the ideal for the

20   staff who are working there that, you know, if

21   they could wave a magic wand, every child that

22   came into their facility would have a caring,

23   responsible adult that would take them in and

24   provide them care, supervision, and shelter.  I

25   mean, so I'm talking permanency.  I'm talking

Confidential

```
 1   foster home.

 2        Q.    Right.  But I'm wondering what -- my

 3   question is:  What is your understanding of the

 4   importance that ORR places on permanency in

 5   determining whether to release a child from its

 6   custody?

 7        A.    It seemed like that is a major focus

 8   of the staff and the culture in the facilities.

 9        Q.    Is there a difference in your

10   experience between safety and permanency?

11        A.    Yes.

12        Q.    What's the difference?

13        A.    So safety, you could be in a

14   permanent -- you could achieve permanency.

15   Let's say you leave the foster care system, you

16   leave the shelter care environment, and you go

17   live with a parent, a relative, a brother, an

18   aunt, an uncle, and you stay there.  From the

19   perspective of the, you know, responsible

20   agency, let's say it's ORR, let's say it's

21   Michigan's child welfare system, if that child

22   doesn't come back, they would view that as

23   achieving permanency.

24             Now, that child might not be safe

25   there.  That parent might be doing something to
```

Confidential

1    talk with individual staff.

2              And then, you know, some of it also

3    involves looking at the date to see whether or

4    not, let's say, the risk of being stepped up to

5    a secure facility seems high, right.  And I

6    don't think by anyone's estimation they would

7    say that the risk of being stepped up to a

8    secure placement is high, certainly not in my

9    estimation, you know.  Ideally would the

10   number, would everyone like the number to be

11   zero?  I think so.

12       Q.    What percentage of children in the

13   Michigan child welfare system or foster care

14   system are stepped up to secure facilities?

15       A.    So I think there's about 13,000

16   children in care today, and it's probably 8- or

17   900 are in a residential setting.

18       Q.    Well, but I'm talking about stepping

19   them up to a secure facility.  What percentage

20   of children in residential or foster care in

21   Michigan are stepped up to secure facilities?

22       A.    Well, that is a secure facility.

23   Residential is, by and large, a secure facility

24   here.  These are children who, you know,

25   probably start in a foster care setting or go

Confidential

1    directly there from juvenile court.  There's

2    about 8- or 900 today in a variety of either

3    staff secure -- I don't know the number that

4    are in juvenile detention facilities, but

5    that's about 8- or 900 that the state

6    supervises in a variety of residential

7    settings, some being highly secure and some

8    being staff secure.

9         Q.    Are any of the highly secure

10   facilities you're talking about equivalent to

11   Shenandoah Valley Juvenile Center?

12        A.    Yes.

13        Q.    So they're basically juvenile halls,

14   correct?

15        A.    Yes.

16        Q.    And your testimony is that -- please

17   remind me -- how many children does Michigan

18   send from group homes, residential facilities,

19   and so forth to juvenile halls per year?

20        A.    I don't know the exact number.  More

21   than ORR.

22        Q.    Are you familiar with a case known

23   as Dwayne B. versus Snyder?

24        A.    Yes.

25        Q.    And that was -- is it correct to say

Confidential

1  back to your question about infallibility of

2  clinicians making decisions with the evidence

3  that they have in front of them.

4      Q.    But sitting here today, you can't

5  quantify the risk that when a child is going to

6  be -- is stepped up, that it has been done so

7  unnecessarily?

8      A.    I could quantify the risk of being

9  stepped up in general is very little,

10  unnecessarily or otherwise.

11      Q.    But can you quantify the risk of

12  being stepped up unnecessarily?

13          MR. MOSS:   Objection.   Asked and

14      answered.

15      A.    It has to be less than the

16  .3 percent, unless you believe all of those

17  decisions were made unnecessarily.

18      Q.    But that would -- wouldn't you agree

19  that it's unreasonable to assume that all have

20  been made unnecessarily, just as it's

21  unreasonable to assume that they all had been

22  necessarily stepped up?

23      A.    I would say given the procedures --

24  sorry.   I didn't give you enough time.

25          I would say given the procedures in

1   place, the odds are that the vast majority of

2   cases, there's justification for their step-up

3   rather than the unnecessarily -- unnecessarily

4   stepped-up cases that you are proposing.

5        Q.    In the state child welfare system,

6   when children are removed from their parents,

7   are the vast -- what percentage of those

8   decisions are correct?

9              MR. MOSS:  Objection.

10       Q.    Sorry?  Could you repeat your

11   answer, please?

12       A.    The exact percentage is unknown.

13       Q.    Do you have any estimate?

14             MR. MOSS:  Objection.  Scope.

15       A.    I think I would probably have the

16   same position that I have for this, given the

17   procedures in place.  So if you think about it

18   from the domestic foster care side, about

19   4 percent of investigations result in a foster

20   care placement.  So the risk of entering the

21   foster care system is quite low, given the

22   safeguards, procedures, teamwork that goes into

23   these decisions, no different than the decision

24   to step up or step down a child.

25             So given those safeguards and

Confidential

1    procedures, I would think most of them are

2    correct and that some children enter the foster

3    care system that didn't really need to be

4    there, and there's probably a group of children

5    that were left at home that should have come

6    in.

7              But, again, these are human

8    decisions.  These are not -- you know, it's not

9    an engineering project where you're making

10   widgets.  There is some estimating going on

11   here of where a child is better off.

12        Q.    Would you agree that the accuracy

13   and reliability of these human decisions, the

14   step-up children, to place them into foster

15   care is improved by the decision-makers having

16   access to all of the evidence?

17        A.    In general, I believe all the

18   evidence to be considered.

19        Q.    Now, when a child is going to be

20   stepped up in the ORR system, what is your

21   understanding of the process by which he or she

22   can present evidence to the decision-maker?

23        A.    Well -- first, it's not a singular

24   event.  I think only on very rare occasions did

25   I read about a singular event that resulted in

1    a step-up.  So, in general, the process to step

2    up is quite extensive, and it starts even

3    before a conversation about being stepped up.

4              It starts with these incident

5    reports.  It starts with an attempt to manage

6    behavior in the shelter environment.  So all of

7    these things I think factor into the decision

8    to step up or step down a child.  It's not --

9    it's not -- you know, it's different, let's

10   say, than we were talking earlier about a

11   delinquency proceeding where a discussion is

12   about a singular event and a specific judicial

13   outcome.

14             The process from reading the files,

15   from talking with the staff, it sounds like

16   it's quite extensive and it's not made lightly.

17   I think that's reflected in the data in terms

18   of the number of children that experience

19   step-up, so it's not -- it's different than a

20   child did X.  Let's have a judicial hearing.

21   These, you know, discussions and evidence, it

22   seems, are ongoing.  They're about the child's

23   daily experiences in a facility, whether their

24   behaviors -- whether the environment is a good

25   fit for their needs, and so that's how I see

Confidential

1    the step-up process.  That's how it's sort of

2    described, and I think this sort of data

3    indicate that.  Kids don't come -- children

4    don't come into the shelter and, oh, you have a

5    mental health problem, you're automatically out

6    of here.  It doesn't seem to work that way.

7         Q.    Okay.  But my question is when a

8    child has been stepped up to Shenandoah Valley,

9    for example, what opportunity, to your

10   understanding, has that child had to defend

11   against that step-up, to present evidence

12   counter-indicating step-up?

13        A.    To my understanding, there's no

14   formal hearing.  So to present evidence makes

15   it sound like it's before -- you know, to

16   myself, it makes it sound like it's before a

17   judge.  The presenting evidence has occurred

18   prior to that decision in consultation in the

19   individual clinical sessions in the observed

20   behavior of the child or adolescent in the

21   shelter environment.  That's the presentation

22   of evidence.

23        Q.    In the state child welfare system --

24   sorry.

25             MR. MOSS:  Sorry.  I just was noting

Confidential

1    someone needs to do a home study and you have

2    to make a really high-stakes decision about

3    finding a safe and stable and hopefully

4    somewhat permanent home, a relationship to

5    release that child to, 60 days to me sounds

6    kind of quick.  No one -- you know, not many

7    children leave foster care in 60 days.

8         Q.    If you were designing a child

9    welfare system in which the average length of

10   detention was approximately 30 days, do you

11   think it would be a good idea to have some sort

12   of a system whereby children who remain longer

13   than 30 days are flagged for extra scrutiny?

14   In other words, investigate why they have

15   remained there for longer than the mean?

16              MR. MOSS:  Objection.  Calls for

17         speculation.

18         A.    I think I would design a system

19   where workers are carrying a manageable

20   caseload and working towards securing

21   sponsorship, which I think is what's happening

22   in the ORR system of care.  I don't think staff

23   are unnecessarily sitting on kids and delaying

24   their reunification.  I don't think they're

25   creating obstacles.  It doesn't seem to be some

Page 196

1    big financial incentive to be holding on to

2    children or some anger towards the child that's

3    there.  Not that I witnessed.

4             They seemed to be similar to social

5    workers on the domestic side who are trying to

6    do some pretty complicated work with a

7    complicated population.  And, you know, so I

8    would design a system, if it were up to me

9    that -- where you have people dedicated towards

10   working towards identifying sponsors, getting

11   children to sponsors, and making sure that they

12   are safe there.

13        Q.    But no system is perfect, correct?

14        A.    No system is perfect.

15        Q.    So when a system fails, how do you

16   know that it's failing?

17             MR. MOSS:  Objection.  Vague.

18        A.    Well, it depends where it's failing,

19   right.  So if all children came into the

20   shelter care system starting today and all of a

21   sudden the length of stay is 6 months instead

22   of 36 days, you'd have to look at what changed.

23   Or if no children were leaving or if CPS was

24   investigating reports of abuse and neglect and

25   staff were routinely being fired or children

Confidential

1      A.     Can I answer that?

2      Q.     Yeah, you can answer.  You can look

3  at the report, other parts of the file,

4  whatever you'd like.

5      A.     I don't -- I don't know -- I don't

6  have any reason to believe that an attorney

7  calling the parent and saying, hey, get the

8  materials in would have any additional impact

9  on the timeliness of completing.  I don't think

10  there's anything magical the attorneys do or

11  have a special skill set that program staff

12  don't have.

13           I would think the clinical

14  caseworker would, in fact, be a better person

15  to encourage that family to complete the

16  materials.  There's nothing -- there's nothing

17  about having the J.D. that I think would speed

18  this process up.

19      Q.     Well, it's not having a J.D.  It's

20  having an attorney-client relationship with the

21  minor of the family.  And you don't think that

22  would add any incentive for the proposed

23  sponsor to cooperate and complete the

24  reunification application?

25           MR. MOSS:  Objection.

```
 1                    So, you know, I have no idea how it

 2    would -- there's no perceived benefit that I

 3    could see of anything magical happening to

 4    speed up the process by having an attorney that

 5    the family doesn't know call them up and

 6    saying, hey, could you get the paperwork in?

 7         Q.    What about offering them assistance

 8    in completing the paperwork, gathering the

 9    necessary documents?

10                    MR. MOSS:  Objection.  Speculation.

11         Scope.

12         A.    It's my understanding that program

13    staff do that now, that they reach out to

14    families.  They don't just send them the packet

15    and wait for it to be returned, that the family

16    reunification materials, I think it's discussed

17    in the policies and procedures manual that

18    certainly what staff said there, that they work

19    and they encourage and maybe it even says,

20    yeah, so shows the case manager trying

21    repeatedly to speed up the reunification

22    process.  So, I mean, I think they do work to

23    do that, and I think that's in part helped by

24    having a lower caseload.  If they had 60 cases,

25    they wouldn't be able to do that.  So that
```

1    produced.

2        Q.    Even accounting for the potential

3    discrepancy in the number of admissions and

4    discharges, can you still draw conclusions

5    about the relative frequency of step-ups of

6    children in ORR care to secured settings

7    compared with the domestic setting?

8        A.    Yes.

9        Q.    What conclusion do you draw?

10       A.    Children in ORR are far less likely

11   than children in domestic settings to

12   experience a step-up to a more secure setting.

13       Q.    You testified earlier about whether

14   you interviewed children in ORR care, and you

15   said you had not done so.  What information did

16   you consider in forming your opinions in this

17   case?

18       A.    I considered the data files that

19   were provided.  I considered the case files

20   that were provided.  I considered the case file

21   tables that were provided.  I considered the

22   interviews and observations at the various

23   facilities.

24       Q.    Does not having interviewed children

25   in ORR care undermine your confidence in the

Page 246

1    were consistent with domestic child welfare

2    systems for achieving permanency for children?

3        A.    Yes, they would talk with sponsors.

4    They would prioritize biological family

5    members, which is something the domestic child

6    welfare system does.  At times they would do

7    home studies and background checks.  So all of

8    these things are similar to what good

9    caseworkers would do in a domestic child

10   welfare setting.

11       Q.    You were also asked about ORR's

12   policies about safety when it comes to

13   releasing children.  Did you form an opinion on

14   whether ORR's policies concerning safety are

15   consistent with child welfare principles?

16       A.    Yes.  It seemed from both the

17   materials provided and talking with staff that

18   safety is a big concern for program staff in

19   terms of releasing children, you know, fears

20   and concerns about human trafficking, fears and

21   concerns about releasing a 12- or 13-year-old

22   new mother to a 30-year-old boyfriend.  So

23   these things seem to be front and center in the

24   workers' minds that they weren't releasing

25   children without considerable thought and

Confidential

1    without considerable plans to help ensure that

2    the placements were safe.

3         Q.    In your opinion, were ORR's policies

4    and practices concerning safety that you've

5    just been describing consistent with child

6    welfare practices?

7         A.    Yes.

8         Q.    You were also asked about the

9    opportunity of a potential sponsor to present

10   information to ORR.  Is it your understanding

11   that the case manager keeps in touch with the

12   potential sponsor?

13        A.    Yes.

14        Q.    And I believe you may have also

15   testified, is it your understanding whether the

16   case manager shared information about the

17   status of the family reunification application

18   with the potential sponsor?

19        A.    The status meaning like, hey, the

20   forms are not done or the packet is not done,

21   we need it, we need it completed?

22        Q.    Sure, that sort of thing.  Do you

23   know if that happens?

24        A.    Yes.  Yes, there's some back and

25   forth.  The case managers help the family with

Confidential

1    these materials.  They're working to secure a

2    sponsor for particular children.

3        Q.    Is it your understanding that the

4    case manager is open to receiving information

5    from the potential sponsor?

6        A.    I think there's a line of

7    communication that is open.  So if potential

8    sponsors have concerns or inability to complete

9    things, that's -- you know, it's a two-way

10   street.  There is a communication between the

11   program staff and potential sponsors.

12       Q.    If ORR denies release to a sponsor,

13   do you know whether ORR works with the

14   potential sponsor to try to overcome whatever

15   concerns led to the denial?

16       A.    I don't know about in a general

17   sense, but it sounded like that there are times

18   when sponsors are, for whatever, seem to be not

19   viable that a child could eventually go to that

20   sponsor.  So clearly they must continue to work

21   with them at some level, at least the ones that

22   they think could potentially get there.

23            You know, let's say, for example,

24   there's no -- you know, a sponsorship is denied

25   because there's room available.  You've got a

Confidential

1    13-year old girl and a 35-year old who, you

2    know, has a tenuous relationship with a

3    particular child and that they would share a

4    room, that would seem problematic.  One staff

5    had talked about this.  And, you know, once

6    room or available space is secured, then, you

7    know, maybe that sponsorship would become

8    viable.

9         Q.    You were asked whether a hearing is

10   offered when a child in ORR care is stepped up

11   to a more secure setting such as Shenandoah.

12   Do you recall that?

13        A.    I do.

14        Q.    Can you please describe what you

15   learned about what steps ORR takes before a

16   child in ORR care is stepped up to a secure

17   setting?

18        A.    It's clear from the case files and

19   the case file tables that step-up is quite a

20   process, and it's a deliberate process.  It's

21   not made without thought.  It's not made sort

22   of spontaneously.  It's not made without care

23   or consideration for the child's needs.  It

24   seemed that the children that were stepped

25   up -- and, again, I don't have the universe of

Confidential

1   children who were stepped up to read their case

2   file, but it seems in the incidents, that many

3   incident reports were filled out prior to a

4   decision to step up, indicating that shelter

5   staff work with children quite extensively to

6   maintain their placement in the least secure

7   environment possible.  And that was also

8   supported by the administrative data, that very

9   few children were moved up.

10          Q.    Do you recall learning whether there

11  are weekly staff meetings or meetings with

12  federal field specialists, case coordinators,

13  and case managers to talk about each child's

14  case?

15          A.    Yes.

16          Q.    And what did you learn about that?

17          A.    I believe there are weekly -- the

18  staff talked about weekly team meetings to talk

19  about individual cases, where the children were

20  in terms of the connection with a sponsor.  If

21  they were experiencing problems, put some plan

22  in place to help resolve those problems.  If

23  there were decisions to try to step them down,

24  there was discussions about the progress

25  children were making towards that step-down.

Confidential

1    But yes, they had weekly team meetings on

2    individual cases.

3         Q.    For children who were stepped up, do

4    you recall learning whether there's something

5    called a notice of placement?

6         A.    I do recall the term "notice of

7    placement," but I can't recall off the top of

8    my head what it is.

9         Q.    In terms of decisions for step-up,

10   in your experience, is clinical judgment

11   relevant to whether a child should be placed in

12   a more restrictive setting?

13        A.    Yes.

14        Q.    Why does clinical judgment matter

15   for whether a child should be stepped up?

16        A.    Because the decision to step up

17   should be based on what the child needs and

18   what's available in the particular placement

19   location, whether the current environment is

20   meeting those needs or not, and what other

21   options are available.

22        Q.    Did you learn whether ORR care

23   providers do anything to try to avoid a step-up

24   for a child and try to maintain care in a less

25   restrictive setting?

1      A.     Would having a sponsor impact the

2   timing of release?

3      Q.     Sorry.  I think maybe the sound is

4   cutting out a little.

5             What I'm trying to get at is, would

6   a requirement that there be a hearing before a

7   judge concerning whether the child should be

8   released to a sponsor, would that impact the

9   timing of the release?

10     A.     Yes.

11     Q.     And how would having an additional

12  requirement of a hearing about release impact

13  the timing of release?

14     A.     It would seem that any new procedure

15  that's put in place would likely cause delays.

16     Q.     For children in ORR care, do you

17  have an opinion about whether categorically

18  mandating additional legal hearings for release

19  or for step-up would improve child welfare

20  outcomes?

21     A.     I don't think there's any evidence

22  to indicate that.

23     Q.     And just so I'm clear, is it your

24  testimony that you do not think there is any

25  evidence to indicate that categorically

Confidential

Page 256

1    mandating additional hearings for release or

2    step-up would improve child welfare outcomes?

3         A.    That's correct.

4         Q.    Turning to staff qualifications,

5    which is another topic you were asked about,

6    did you form opinions about whether staff at

7    ORR grantee care facilities are sufficiently

8    qualified?

9         A.    I did.

10        Q.    What did you base those opinions on?

11        A.    I base them on my discussions with

12   staff about the type of people they hire,

13   trainings they offer, and a review of the

14   materials and minimum qualifications for

15   working in the ORR facilities.

16        Q.    And what is your opinion concerning

17   whether staff at ORR grantee care facilities

18   are sufficiently qualified?

19        A.    The staff at the ORR facilities seem

20   to have sufficient professional training,

21   meaning academic, educational credentials,

22   training and support to do the jobs that

23   they've been assigned.

24        Q.    You were asked about background

25   checks and preventing the hiring of a person

Confidential

1      Q.    When you visited ORR care provider

2   facilities, were you tasked with monitoring

3   adherence to state licensing requirements?

4      A.    No.

5      Q.    Do you recall testimony about the

6   concept of a closest neighbor?

7      A.    Yes.  I think it was nearest

8   neighbor.

9      Q.    Nearest neighbor, thank you.  Did

10  you visit an ORR facility that ORR considers to

11  be a staff secure facility?

12     A.    Yes.

13     Q.    Do you recall which facility that

14  was?

15     A.    I believe it was the facility in San

16  Antonio.

17     Q.    Do you mean BCFS?

18     A.    I believe so.

19     Q.    How would you compare shelters that

20  you visited with BCFS staff secure?

21     A.    Indistinguishable.

22     Q.    Can you describe what you mean by

23  that?

24     A.    They were near identical.  They were

25  on the same plot of land, and I think they were

Confidential

1    separated by a gate.  The staff secure has

2    either more staff or fewer youth.  The ratios

3    are a little bit different.  But the

4    environment where the children live, there were

5    soccer fields where the children play.  The

6    food that's made available, they were all the

7    same.  You wouldn't know you were in a

8    different facility.

9         Q.    And were the levels of, let's say,

10   physical restriction the same as far as you

11   could tell?

12        A.    I think we asked them about bedtime

13   and their movement around, and they were --

14   they were the same.  You know, no different

15   fencing around the facility.  Just the ratios

16   were different.

17        Q.    Returning to the concept of a

18   nearest neighbor, what, if anything, is the

19   nearest neighbor in the domestic setting to an

20   ORR staff secure facility?

21        A.    Probably a small residential

22   provider, you know, where children do

23   everything on a particular campus.  They can't

24   come and go from a setting.  They don't go to

25   public schools.  They don't go to work.

1          Q.     So in these differential responses,

2    are children separated from their families

3    against -- over the objections of them and

4    their families?

5          A.     I would think sometimes that still

6    happens.  The goal of these is to work

7    primarily with low-risk ones that are very

8    unlikely to enter the system to begin with.  I

9    would think in some states eventually children

10   have been moved into foster care placements.

11         Q.     Without the involvement of a judge?

12         A.     That would involve the involvement

13   of a judge.

14         Q.     Okay.  Now, you testified that you

15   believe that requiring any new procedure in --

16   when ORR is going to deny release would result

17   in delay.  Is that a fair characterization of

18   your testimony, or did I misstate it?

19         A.     I said I think introducing new

20   procedures could likely cause a delay.  I

21   didn't say categorically.  I said it seems like

22   any new requirement, new procedural

23   requirement, in addition to things that are

24   going on, I don't see how that would

25   universally or on average speed things up.

Confidential

```
 1               C E R T I F I C A T E

 2   STATE OF ILLINOIS   )
                         ) ss.:
 3   COUNTY OF COOK      )

 4        I, RACHEL F. GARD, CSR, RPR, CLR, CRR,

 5   within and for the State of Illinois do hereby

 6   certify:

 7        That JOSEPH RYAN, PH.D., the witness whose

 8   deposition is hereinbefore set forth, was

 9   duly sworn by me and that such deposition

10   is a true record of the testimony given by

11   such witness.

12        I further certify that I am not

13   related to any of the parties to this

14   action by blood or marriage; and that I am

15   in no way interested in the outcome of this

16   matter.

17        IN WITNESS WHEREOF, I have hereunto

18   set my hand this 13th day of August, 2020.

19   Rachel F Gard

20   ----------------------------------

21   RACHEL F. GARD, CSR, RPR, CLR, CRR

22

23

24

25
```