# DX-09

Declaration of Stephen Antkowiak, September 17, 2020

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCAS R. *et al.*,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>ALEX AZAR, Secretary of U.S. Dep't of Health and Human Services, *et al.*,<br><br>　　　　Defendants. | Case No.: 2-18-CV-05741 DMG (PLA)<br><br>DECLARATION OF<br>STEPHEN M. ANTKOWIAK |

## I.　　INTRODUCTION

1. I, Stephen Antkowiak, under 28 U.S.C. § 1746, declare, under penalty of perjury, as follows. If asked to testify, I would testify under oath as follows.

2. I am the Director of the Division of Unaccompanied Children Operations ("DUCO") within the Office of Refugee Resettlement ("ORR"), Administration for Children and Families ("ACF"), U.S. Department of Health and Human Services ("HHS").

3. As DUCO Director, I have responsibility for overseeing the operational aspects of intake and placement decisions for all unaccompanied alien children, sponsor reunifications, background checks, home studies, and post-release services. I became DUCO Director in March, 2019. Prior to joining HHS, I was employed with U.S. Immigration and Customs Enforcement for ten years where I served as Chief of both the Office of Detention Oversight under the Office of Professional Responsibility and the Juvenile and Family Residential Management Unit under Enforcement and Removal Operations. In these roles, I provided policy guidance and trained agency staff in cases involving the processing and care of unaccompanied alien children, developed and oversaw the implementation of national standards of care for families housed in ICE residential programs; and oversaw staff who conducted compliance inspections of ICE detention facilities to assess conditions of confinement and adherence to ICE standards.

4. Prior to joining ICE, I spent nearly ten years at the U.S. Department of Justice, Office of Justice Programs and in the private sector supporting a variety of programs targeting at-risk populations. This included court-based diversion programs for adults, juveniles, and family dependency court participants designed to curb substance abuse and crime and improve offender reentry into the community. I received a B.A. from the University of Maryland in Criminology/Criminal Justice, where I also completed Master's level coursework.

5. I am submitting this declaration to explain the processes ORR has in place for both step-up (to secure juvenile detention, staff-secure care providers, and finally, residential treatment centers ("RTCs")) and for reviewing applicant sponsors.

6. The statements in this declaration are based on my personal knowledge, information acquired by me in the course of performing my official duties (such as my knowledge of ORR policies and procedures, including the ORR Policy Guide[1] as well as the ORR Manual of Procedures ("MAP")) and my review of HHS records and information contained therein. I am testifying to the best of my knowledge at the time of submitting this declaration.

## II.     LEAST RESTRICTIVE SETTING

7. ORR maintains a detailed process that guides care providers, the independent third party case coordinator, and Federal Field Specialists in ensuring that children are maintained in the least restrictive setting. "Care providers must make every effort to place and keep children and youth in a least restrictive setting. For children who are initially placed in a least restrictive setting, care providers must provide support services and effective interventions, when appropriate, to help keep a child in the setting." ORR Policy Guide § 1.4.1.

8. ORR ensures that children are placed in the least restrictive setting. Both the Policy Guide and the MAP include a detailed process to guide care providers, the independent third party case coordinator, and Federal Field Specialists ("FFS") in ensuring that children are maintained in the least restrictive setting. "Care providers must make every effort to place and keep children and youth in a least restrictive setting. For children who are initially placed in a least restrictive setting, care providers must provide support services and effective interventions, when appropriate, to help keep a child in the setting. If a child or youth is placed in a restrictive setting, care providers provide services to facilitate the unaccompanied alien child's successful transfer to a less restrictive setting to allow the child to move when he or she is ready." ORR Policy Guide § 1.4.1.

9. In addition, the Policy Guide provides at section 1.4.7: "After 30 days of placement in a secure or RTC facility, UAC may request the ORR Director, or the Director's designee, to reconsider their placement. The ORR Director, or designee, may deny the request, remand the request to the ORR/FFS for further consideration, or approve the request and order the youth transferred to a staff secure or other care provider facility."

10. The three types of "restrictive" placements of which Plaintiffs complain – secure juvenile detention (referred to as "secure"); staff-secure; and RTC placements – are distinct from one another and vary considerably in terms of level of restriction, services offered, and children placed in the setting.

11. The most restrictive of the three is the secure placement. Secure juvenile detention centers are for those children in ORR care and custody who require a restricted environment for their own and the community's safety. Such centers must maintain state or county licensing to operate a secure juvenile detention facility. According to ORR's funding opportunity announcement for secure

---

[1] https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied

placement,[2] secure care providers must have access to specialized services for UAC with substance abuse problems, anger management issues, mental health issues, and/or other special behavior needs in addition to all the services required of all care providers. They must have in-house bilingual mental health/clinician services, including psychiatric evaluations; medication assessment and management; and bilingual ORR case management services. Children moved to juvenile detention centers are those with significant criminal history or juvenile delinquency (some have pending charges) who have generally been violent in care or have such significant history that a transfer is necessary. The population is similar to the juvenile justice population.  For such minors , it is determined that they require a secure setting, as they could victimize other children in care, and they need the security of the most restrictive setting. For example, in other care providers, while children remain under staff supervision, doors generally will not lock (particularly bedroom doors) and children are free to move about interior spaces within the rules of the care provider. Should a minor who belongs in a secure setting be placed in one of these environments they may have more access to victimize others at the care provider. In congregate setting, to ensure safety of children in ORR care, and of program staff, children must be placed in an environment most suitable for their individual needs and one tailored to their particular needs and history of behaviors.

12. In contrast to a secure setting, a staff-secure setting is not viewed as significantly more restrictive than a non-secure setting. These care providers are almost identical to non-secure settings. They are often on the same campus and indistinguishable from the non-secure placement. In almost all states, a staff-secure care provider's license is identical to that of a non-secure placement (for example, they will be licensed as group homes, general residential operations, or institutions). The only difference between a staff-secure and non-secure shelter is generally behavioral plans and that staff-secure care providers are required to maintain a higher ratio of staff to minors, as the children placed there require a greater level of supervision given past attempts to run away or past disruptive behavior. Staff-secure care providers do not require lock-down procedures typically associated with juvenile detention facilities. The care provider, for example, cannot conduct strip searches, utilize mechanical restraints, utilize cell-like sleeping rooms, or employ other security devices more typically found in secure settings. There must, however, be effective monitoring so that entry to and egress from the building is controlled.

13. An RTC is different from both staff-secure and secure placements. The two RTCs in ORR's network are based on a group home model. For example, at Shiloh RTC, the children live in cottages with an attached kitchen, generally have a roommate, and sleep in a bedroom without locked doors. The RTC offers a higher staff-minor ratio than does a non-secure shelter. In addition, the RTC makes available intensive therapy and on-site psychiatric care, and is accredited by a nationally recognized accrediting organization such as the Joint Commission on the Accreditation of Hospital Organizations ("JCAHO").

14. An RTC also differs significantly from involuntary, acute inpatient psychiatric hospitalization. An RTC is sub-acute, is more home-like, and less institutional than a hospital. Its treatment is interdisciplinary, psycho-educational, and therapeutic, and it is designed to have a 24-

---

[2] https://ami.grantsolutions.gov/files/HHS-2021-ACF-ORR-ZU-1784_0.htm#I.%20Program%20Description

hour-a-day structured program with community linkages to provide the support necessary for those with significant emotional needs or intellectual and developmental needs. ORR only uses an RTC at the referral of a psychiatrist or psychologist. A child who required inpatient hospitalization would have to have shown some stability of symptoms to be placed at an RTC; otherwise, an RTC would not necessarily be able to meet the needs of an actively suicidal or homicidal minor. For example, the ORR Guide to Terms (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Residential%20Treatment%20Center) makes clear that an RTC is not an appropriate placement for a child who requires "inpatient hospitalization."

15. The process for stepping up a child is multi-disciplinary and iterative, based on the observations and input of numerous professionals – most of whom are independent of the care providers making the requests to transfer the child – and where attorneys can weigh in, informally, if they wish.

16. Care providers conduct "ongoing assessments" of a minor's needs "throughout the child or youth's stay in ORR custody," ORR Policy Guide § 1.4. Care providers also take into consideration the information from a long list of individuals, including: "the child's sponsor or family in the U.S., records from local, State, and Federal agencies, and information from stakeholders, including the child's legal service provider, attorney of record or Child Advocate, as applicable." ORR Guide § 1.4. Any request that a care provider makes to transfer a minor to a more restrictive setting must be reviewed by a case coordinator, who is a third-party independent reviewer under contract. The case coordinator includes trained, independent professionals, who make a third-party recommendation regarding the recommended step-up. Finally, before any step-up may occur, an FFS (who is independent from the grantee care provider, and representative of Federal government review) must approve the step-up as well. In approving any step-up request, the FFS can consult with a host of individuals, including their own Supervisor, a special FFS Supervisor for special populations, David Fink, the Senior Advisor for Child Well-Being, Marivic Fields, the senior FFS Supervisor, Jim De La Cruz, the Division of Health of Unaccompanied Children ("DHUC") team, and the Division of Policies and Procedures (which maintains a special "UC Policy" inbox for any FFS questions on policy or procedure).

17. In addition to the long list of individuals who must be involved in any step-up decision, a minor cannot be stepped up if the receiving facility does not accept the minor. Typically, a receiving facility may not accept the step-up of a minor if (a) the placement would violate the facility's licensing; or (b) the facility believes the step-up does not comply with ORR criteria.

18. Stepping up a child to a more restrictive level of care is not an easy process for case managers or FFSs. In my experience, case coordinators and FFSs do not allow for the step-up if needs can be met at a lower level of care.

19. Care providers are also required to document the basis for stepping up or stepping down a UAC into or from a secure, RTC, or staff secure care provider. The information is documented in the UAC's case file and the care provider is directed to give the information to the youth's attorney of record, legal service provider, or Child Advocate, on demand.

20. ORR reviews all step-up placements at least every 30 days.

21. Under section 1.4.2 of the ORR Policy Guide, at least every 30 days, the care provider staff, in collaboration with the Case Coordinator and the ORR/FFS, review the placement of a UAC into a secure, staff secure, or RTC facility to determine whether a new level of care is more appropriate. The ORR/FFS may allow the review to take place earlier than 30 days, particularly if new information indicates an alternative placement is more appropriate. *Note:* ORR performs the 30-day review of staff-secure placements, even though such reviews are not required under the TVPRA.

22. The care provider staff document the basis for continued placement in a secure, staff-secure, or RTC facility in the UAC's case file and provides the information to the youth's attorney of record, legal service provider, or Child Advocate, on demand. The FFS consults with Supervisory ORR staff for UAC who have resided in a secure juvenile detention or RTC care facility for over 90 days. The FFS consults with Supervisory ORR staff regarding the placement every 30 days thereafter until the UAC is stepped down or discharged.

23. The Manual of Procedures at section 1.4.2 provides greater detail and is specific that the review process begins earlier than the 30-day mark, so as to allow for the gathering of material, and a formal review at the 30-day limit. Specifically, it requires that a "30 day Case Review is conducted for UAC in Secure, Staff Secure and RTCs." It states that "over the 30 day period following placement or during the 30 day period following the previous 30 Day Restrictive Placement Case Review, ORR grantees, contractors and ORR staff perform the following:

• Clinicians continue weekly or biweekly counseling sessions that focus, in part, on the UAC's dangerousness, threats to self, others or the community and risk of escape. The information collected or reported by the clinician, includes: o Clinical and psychological reports and documents, including those by medical and/or mental health providers. The Ohio Youth Assessment System is included, as applicable . . . . o Clinical notes maintained by the clinician, documented in accordance with ORR policy and procedure.

• Case managers working in coordination with the FFS, obtain the following information, as applicable: o Attestations from law enforcement. o Criminal history, including but not limited to police records, arrest records, court records (including *Saravia* and *Flores* hearings), probation records, etc. This may include documents retrieved from foreign governments. o Records pertaining to a UAC's dangerousness obtained from non-law enforcement entities, including schools, child welfare agencies or other government institutions. o Interviews with the UAC's family or other caregivers. o Track behavioral SIRs indicative of dangerousness or flight risk, this includes destruction of property and SA SIRs in which the UAC is a perpetrator. o Information that indicates a UAC may not be a danger, including reports from schools, counselors (including from the UAC's current placement)."

24. Section 1.4.2 of the MAP also provides that "Prior to a UAC's 30th day of placement in a secure, staff secure, or RTC facility or prior to their 30th day Case Review, the clinician, case manager, FFS and case coordinator staff the UAC's 30 day Case Review using the information provided at the UAC's referral/transfer request and the information gathered by the case

manager/FFS as described in the proceeding step, and determine whether the UAC requires continued placement in a restrictive setting. • The case manager, clinician and case coordinator make recommendations regarding the UAC's placement to the FFS during the 30 day Case Review staffing. • After considering recommendations from the UAC's clinician, case manager and case coordinator, the FFS makes a final restrictive placement case review decision regarding the UAC's placement. • If the UAC has resided in a secure or RTC facility for over 90 straight calendar days the FFS consults with Supervisory ORR staff on the case regarding the reasons for the UAC's continued placement, and thereafter after every 30 day restrictive placement case review (unless the UAC is stepped down or discharged). • If a restrictive placement case review is not completed prior to the 30 day mark, the case manager records the reasons for the delay in summary notes regarding the placement. • The summary notes maintained by the case manager include the following information: o UAC's basic biographical information. o Background information on the case. o Summary of case review discussion. o Summary of evidence. o The care provider's recommendation, including names and titles of those making recommendations, and basis for it. o The case coordinator's name, recommendation and basis for it. o The FFS's name, decision and basis for it. o Signature of Note Taker (typically the case manager)."

25. Finally, if the FFS decides that a UAC should continue in a more restrictive placement, then section 1.4.2 of the MAP requires that the "the information justifying the UAC's placement in a restrictive setting is summarized by the case manager and provided in a new *Notice of Placement in a Restrictive Setting*, with a date stamp within the 'summary of placement decision or case review' section of the form. . . . The case manager marks the appropriate box noting the reason for the placement. If the case manager is unclear what the rationale for the FFS decision is, the case manager contacts the FFS for clarification and assistance in drafting language into the summary portion of the form."

26. ORR maintains detailed standards regarding how UACs are notified of why they are placed in or remain in a staff-secure, secure, or RTC placement. *See* Sample Notice of Placement in a Restrictive Setting at Appendix 1.3 of the MAP. *See also* Appendix 1.5 and 1.6 of the MAP for the transfer request form and 30-day case review summary. The Notice of Placement explains not only why a minor has been stepped up or remains in the setting, but also that the minor may seek review in a Federal District Court, and may call an attorney if they have questions.

27. There are detailed standards for what to include in the Notice of Placement. The MAP § 1.4.2 explains that: the "case manager" must "upload[] all information used in assessing the restrictive placement case review (including the signed Summary Notes) in the UAC Portal. All information used in assessing a 30-day Case Review decision is considered evidence. This information must be shared with the UAC's attorney of record, LSP [legal service provider] or Child Advocate, on demand and [such sharing] does not require a prior *Authorization for Release of Records* only proof of representation." In other words, if the attorney of record asks for the information, then the procedure provides that it will be shared.

28. Per the MAP, § 1.4.2. Minors also sign and date the *Notice of Placement in a Restrictive Setting* form if placement continues in the current restrictive placement. (If the UAC refuses to sign the form the care provider notes "UAC refused to sign" on the signature page of the

6

document. The care provider scans and uploads the *Notice of Placement in a Restrictive Setting* into the UAC Portal.) After the UAC signs the form, a copy is uploaded into the UAC Portal, and copies are maintained in the UAC's case file and provided to the UAC to keep with their personal belongings. NOPs are written in English and Spanish, and will be read to a child in a language he or she understands. Care providers use a language line or some other translation to ensure that the child understands the NOP.

29. For RTC placement as well, the MAP is clear that the "RTC reviews the UAC placement **every 30 days, at a minimum**. The case manager and the clinician provide the clinical updates and placement recommendations to the case coordinator and FFS to evaluate the need for continued stay or transfer." MAP § 1.4.6. In addition, clinical staff explain to the UAC why they are stepped up to an RTC or remain there.

30. In preparing this declaration I asked the data team to produce data on the number of RTC, staff-secure, and secure placements as a proportion of all UAC placements in ORR legal custody for both fiscal year ("FY") 2019 and 2020. I also asked the data team to take a number of snapshots of RTC, staff-secure and secure placements on particular dates in FYs 2019 and 2020. I work directly with the data team in the course of performing my official duties overseeing the operational aspects of intake and placement decisions for all unaccompanied alien children, and would testify under oath to the veracity of the information below.

31. The below table shows the numbers and percentages for total placements of UAC in fiscal year 2019 (October 1, 2018 through September 30, 2019), and again for fiscal year 2020 year to date (October 1, 2019 through June 30, 2020).

| FY | Total UAC Placements | Secure Placements | RTC Placements | Staff-Secure Placements |
|---|---|---|---|---|
| 2019 | 77,488 | Number: 113<br><br>% of All Placements:.15% | Number: 33<br><br>% of All Placements: .04% | Number: 340<br><br>% of All Placements: .44% |
| 2020 through June 2020[3] | 14,421 | Number: 56<br><br>% of All Placements: .39% | Number: 24<br><br>% of All Placements: .17% | Number: 156<br><br>% of All Placements: 1.08% |

32. Because the above table represents placements for the year, the below table presents various recent snapshots of numbers and percentages of minors in custody in each setting: secure

---

[3] Data is unreconciled

juvenile detention, RTC and staff-secure. It shows that any given time, the maximum percentage of children in any one of the restrictive placements is, at most, approximately 1 percent, and this is at a time of low census. The more common figures are from .5 to 1% for staff-secure; .2 to .5% for RTC, and .1 to .4% for secure.

| Date | | Total UAC | Secure | RTC | Staff Secure |
|---|---|---|---|---|---|
| **12/31/2018** | # | 12,852 | 27 | 34 | 94 |
| | % | | 0.21% | 0.26% | 0.73% |
| **3/30/2019** | # | 12,275 | 12 | 36 | 66 |
| | % | | 0.10% | 0.29% | 0.54% |
| **6/30/2019** | # | 13,027 | 17 | 27 | 67 |
| | % | | 0.13% | 0.21% | 0.51% |
| **9/30/2019** | # | 5,078 | 19 | 21 | 50 |
| | % | | 0.37% | 0.41% | 0.98% |
| **12/31/2019** | # | 4,038 | 16 | 21 | 35 |
| | % | | 0.40% | 0.52% | 0.87% |
| **3/30/2020** | # | 3,126 | 12 | 15 | 28 |
| | % | | 0.38% | 0.48% | 0.90% |
| **6/30/2020** | # | 889 | 8 | 9 | 10 |
| | % | | 0.90% | 1.01% | 1.12% |

33.     I understand that Plaintiffs have advocated for some sort of hearing, perhaps a trial-like hearing prior to placement in RTCs, staff-secure or secure. In my judgment and experience, overlaying a court-like process on these decisions would, on balance, be more detrimental than helpful. Normally when children are being stepped up, particularly to a secure juvenile detention, but also to staff-secure, there is already considerable evidence that their behaviors are problematic, and time is of the essence. Any delay in moving them, such as to await a hearing, would put the children themselves at risk, other minors, and staff. If the current shelter has a lower staff-child ratio, then the staff at the current shelter may not have the staffing to oversee the behaviors, without detracting from the ability to care for other minors. In addition, children who know they are leaving the current care provider may escalate behaviors – either because they know they will no longer be subject to the behavior plans of the current shelter, or because they disagree with the transfer. If the minor hurts other children or staff through such behavior, this creates additional risk for the program, as well as potential liability for grantee care providers, potentially affecting their willingness to participate as licensed care providers in the program. This year, ORR has experienced several incidents of minors in staff-secure and secure settings who have assaulted staff and engaged in extensive property damage.  In two instances, ORR had to issue temporary stop placements at these locations until repairs could be made.

34.     The same concerns would exist for a transfer to an RTC. In that case, it has already

been determined by a licensed mental health professional that the minor's needs cannot be met at the shelter level through outpatient services. So, if the current placement does not have the ability to meet the needs of the child, it is important to place the child in a location where their needs can be met without undue delay. A hearing would prolong placement at a site that cannot meet the individual's needs. In certain cases, advance notice could trigger a reaction in an already vulnerable child with self-harming behavior. This could affect the minor's behavior toward him or herself, toward other children, and finally toward staff.

35. ORR already has a layered process for step-up (for RTC, an independent psychiatrist or psychologist must make the recommendation and referral), and multiple levels of review and analysis, including by an independent third party case coordinator, and then by an FFS (who is not located at the care provider site). Adding automatic hearings to this process (when ORR cannot predict census) would increase workload: FFSs, case managers, clinicians and others at the grantee care provider would need to stop working on their current assignments to prepare for and appear at any hearing, necessarily detracting from the time that would otherwise be spent caring for the minor and working toward unification and release.

36. For RTCs, it can be difficult for some care providers to locate culturally competent, bilingually staffed licensed mental health care providers who can offer the full range of services to unaccompanied children. Any additional demands on case managers or others at such settings could reduce the availability of such settings, and/or the willingness of independent licensed care providers to work with the ORR federal program.

37. Finally, ORR does not have an attorney corps, and Congress has not funded attorneys to represent ORR in administrative hearings. A useful comparison might be the DHS program, where attorneys represent the agency before immigration judges. In that program, Congress apparently funds approximately 1,100 attorneys and 350 personnel to support such attorneys in representing the Department before immigration judges. https://www.ice.gov/opla. In contrast, ORR has traditionally funded two attorneys within the Department of Health & Human Services Office of the General Counsel out of its appropriations.

### III.  SAFE AND TIMELY RELEASE

38. ORR's mission is the safe & timely release of a child to a safe adult sponsor. ORR has policies and procedures in place to ensure unaccompanied alien children in ORR care are released in a safe, efficient, and timely manner. Safe and timely release (also known as "family reunification" or "family unification") must promote public safety and ensure that sponsors are able to provide for the physical and mental well-being of children. ORR Policy Guide § 2.1.

39. In addition, to ensure that potential sponsors are able to provide for the child's physical and mental well-being, ORR also seeks to ensure that in releasing children, they are protected from smugglers, traffickers, or others who might seek to victimize or otherwise engage the child in criminal, harmful or exploitative activity. The process for the safe and timely release of an unaccompanied alien child from ORR custody involves several steps, including: the identification of sponsors; sponsor application; interviews; the assessment (evaluation) of sponsor suitability,

including verification of the sponsor's identity and relationship to the child (if any), background checks, in some cases home studies; and post-release planning. ORR Policy Guide § 2.1.

40. Neither ORR, nor the grantee care providers, have a financial incentive to keep children in care longer than is appropriate. Care providers are paid on a funded capacity basis whether they have minors in custody, or not.

41. In addition, ORR consistently applies pressure on care providers to ensure children are released safely and timely. Care providers and children in care are actively monitored, and ORR often will pull numbers on specific care providers to determine location, average length of care, and how a particular care provider compares to other care providers.

42. I receive a report on Category 1 children (children with parents or legal guardians who have or are expected to apply as potential sponsors) every two weeks to see if there any children with long lengths of care.

43. If there were a pattern of a care provider having inexplicably high lengths of care that would certainly be something ORR would review, and it could result in the non-renewal or even termination of a grant if it became clear the care provider was not following ORR policies and procedures for safe and timely release.

44. The philosophy I have seen across the agency, as well as within care provider facilities, is that children belong with their families and that the program would like to see children unified if at all possible. Although in many instances there are genuine safety impediments, or other obstacles to release, in my experience through visits to care providers and other communications, care providers will become frustrated if a minor cannot be released. Staff will ask me for assistance in ensuring release – they may ask for a waiver of a certain requirement or other assistance. There is a genuine desire to see the unification with family. Any allegation that care providers delay release for financial gain simply does not align with my experiences in the program.

45. ORR has experienced a great deal of variability in the number of children referred to its care and custody on an annual basis. Because ORR must accept referrals of unaccompanied children from other agencies, particularly the Department of Homeland Security, it has little ability to control or anticipate the numbers that will be referred for placement and eventual unification with sponsors.

46. The below table, posted on the HHS website[4], reflects the number of referrals ORR received from the Department of Homeland Security each fiscal year.

---

[4] https://www.acf.hhs.gov/orr/about/ucs/facts-and-data

| YEAR | REFERRALS |
|---|---|
| **FY2019** | 69,488 |
| **FY2018** | 49,100 |
| **FY2017** | 40,810 |
| **FY2016** | 59,170 |
| **FY2015** | 33,726 |
| **FY2014** | 57,496 |
| **FY2013** | 24,668 |
| **FY2012** | 13,625 |

47.     I also asked the data staff to break down the average length of care for children released to category 1, 2, and 3 sponsors, in fiscal year 2019, as represented below. Although the below Table identifies sponsors by "category," this does not necessarily mean this was the first identified sponsor, or that the sponsor was identified immediately after the minor entered ORR legal custody. Each case is different. In some cases, a minor and his or her family are not able to identify any potential sponsor, and it is only after many months of searching that the case manager finally identifies a potential sponsor. In other cases, a minor (or his or her family) may first identify a "Category 2" sponsor, but that sponsor then withdraws from the process for various reasons. Thus, just because the Table below identifies a minor as released to a "Category 2 sponsor" after an average length of care of 59 days, this does not necessarily mean that all minors had Category 2 sponsors identified from the moment they entered ORR care and custody and it took 59 days to effectuate a release.

| **FY 2019: Length of care data broken down by Categories 1, 2, and 3** | | | | |
|---|---|---|---|---|
| Average of LOC (Days) | Sponsor Category 1 | Sponsor Category 2 | Sponsor Category 3 | Overall Average |
| | 43 | 59 | 107 | 56 |

| **FY 2020 YTD: Length of care data broken down by Categories 1, 2, and 3** | | | | |
|---|---|---|---|---|
| Average of LOC (Days) | Sponsor Category 1 | Sponsor Category 2 | Sponsor Category 3 | Overall Average* |
| | 34 | 45 | 93 | 48 |

*Please note that this data is unreconciled

48.     As noted in describing the Tables above, there is a great deal of variability in the relationship between UACs in ORR legal custody and each potential sponsor. Even for parents, every case is different. In some cases, the applicant sponsor is a biological parent who has not seen their

11

child for a decade or more, and may have started a new family in the United States. In such cases, the minor child may be hesitant about joining a new family, with potentially new step-siblings and/or step-parent, and care provider grantees will work to set up family sessions to ensure familiarity for the minor and sponsor. In other cases, one or both parents have traveled to the United States, and always intended to reunify with a child or children, when the children could travel alone as a UAC. In cases of Category 2 or Category 3 sponsors, the relationship will vary widely. Some category 2 sponsors will have little to no prior relationship with the child (but may have a relationship with the family or parents). In other cases, applicants may claim to be close relatives, but lack documents (including birth certificates) to prove it.

49. In addition to variability in the nature of the minor-sponsor relationship, there is also variability in how responsive potential sponsors (and their household members) are in completing the steps of the family reunification application. This includes how quickly they provide all necessary documentation; how quickly they attend a fingerprinting appointment (where applicable); how willing they are to participate in family sessions (where recommended); how responsive they are to a home study (where applicable); and how responsive they are to ensuring they have a safety plan to care for the minor. In some cases, a relative contacted by the care provider may agree to apply as a potential sponsor, but then find that his or her housemate(s) decline to identify themselves or be fingerprinted (where applicable).

50. ORR is unique among agencies with care and custody of unaccompanied children, for a number of reasons. First, children would not be referred to ORR care and custody but for their lack of immigration status (most are detained by the Department of Homeland Security after crossing the border between ports of entry). Second, children arrive in ORR custody already unaccompanied – unlike a state child welfare agency, ORR does not terminate parental rights in any respect. (Although UAC may have parents in the United States, my understanding is that Congress has always understood and accepted that children may be considered UAC at the point of apprehension if they cross the border unaccompanied. A large proportion of children referred to ORR have always been released to parental sponsors, without Congress ever amending legislation or issuing findings that such children should not be considered "unaccompanied" while in ORR care and custody. Third, unlike a state child welfare agency, once ORR releases a minor to a sponsor, it does not continue to maintain custody. Unlike a state child welfare agency, ORR cannot terminate the fostering relationship of the sponsor, resume custody of the UAC, or move that UAC to another sponsor. For example, although ORR offers post-release services in certain circumstances, a sponsor must consent before services may be provided and may withdraw his or her consent at any time after services have begun, since post-release services are a voluntary service. ORR Policy Guide § 2.7.2.

51. Because ORR cannot resume custody, it must be especially careful in ensuring that it does not release children to sponsors who might seek to harm or exploit the children. I understand that Plaintiffs advocate for some sort of trial-like administrative hearing if an applicant sponsor has submitted what they refer to as a complete family reunification application and a certain amount of time has passed. In my view, there would be several public harms or costs associated with such a process.

52. There could be a risk of applicant sponsors bringing appeals when their interests are

not aligned with the child. During my career, I have experienced situations where individuals prey on children. I have also been aware of situations where individuals presented themselves as family members when they turned out not to be. The children in ORR custody are especially vulnerable once they are released. They already arrive in the country in a disenfranchised state, unaccompanied by parents or a legal guardian. In my view, all of the minors in custody are at risk upon release, and if they have to remain in custody a bit longer to ensure the release is safe, it is more than reasonable to weigh the minor's safety as paramount, and to be concerned about an uninvolved hearing officer somehow ordering a precipitous and unsafe release.[5]

53.     Another harm associated with a trial-like process would be the cost to the Government and the public. Preparing for and appearing at an administrative hearing would take FFSs and grantee care provider staff away from their day-to-day responsibilities, thus shortchanging their ability to pursue releases. In addition, because ORR must accept all referrals of unaccompanied children, its census is inherently unpredictable, and fluctuates by the tens of thousands. As noted above, Congress has never appropriated funds for ORR to hire hundreds or thousands of attorneys to represent the agency in administrative hearings.

54.     ORR's process for release to an applicant sponsor involves a number of different independent players, in order to evaluate potential sponsors' ability to provide for the child's physical and mental well-being, as required by law. The process for the safe and timely release of an unaccompanied alien child from ORR custody involves several steps, including: the identification of sponsors; sponsor application; interviews; the assessment (evaluation) of sponsor suitability, including verification of the sponsor's identity and relationship to the child (if any), background checks, and in some cases home studies; and post-release planning. ORR Policy Guide § 2.1.

55.     The Manual of Procedures contains detailed procedures and deadlines for the unification process. For example, section 2.2. of the MAP contains deadlines and procedures governing how case managers identify and work with applicant sponsors to complete the application, including assisting applicant sponsors unable to read or write in English or Spanish, continually following up, scheduling fingerprints (where applicable), working with the applicant if they have missing documentation, and more. Readers should review the MAP and ORR Guide for more information.

56.     Section 2.4 of the MAP contains detailed guidelines regarding how applicant sponsors are assessed and each person's responsibility in the process. Case managers (who are grantee – not government – employees) provide their independent judgment in accordance with ORR policy, through grant agreements. Case coordinators provide an independent third party recommendation.

---

[5] In cases where states require licensing prior to placement, such licensing can take months, including for relatives wishing to act as a foster parents. Such states require both fingerprinting, child abuse and neglect checks and home studies, and will include the applicant foster parent and any household members in the background check. For example, California's process appears to take at least 3-6 months for a relative to be licensed to act as a foster parent. This process may take longer based on delays resulting from criminal background checks, exceptions and waivers, and need for corrections to foster family homes. http://icpcstatepages.org/california/licensingcertificationapproval/

FFSs – who are not involved in the day-to-day care of the UAC – act as Government representatives, and issue final approval of release, home studies, post-release services, and other aspects of the release process. As with the application process, the MAP contains deadlines for assessing potential sponsors and acting on recommendations. There are also deadlines for home studies, including deadlines for the report.

57. Section 2.5 of the MAP contains guidelines spelling out how ORR conducts background checks, which include everything from public record checks, sex offender registry checks, FBI national criminal history fingerprint-based checks, child abuse and neglect checks, and state criminal history repository and/or local police checks. Again, there are deadlines for scheduling digital fingerprint appointments.

58. Section 2.7 of the MAP contains deadlines for when release recommendations must be made (case manager makes recommendation within 1 calendar day of completion of all family reunification packet documentation and all other required information; independent, third-party case coordinator reviews recommendation within 1 business day and updates with his or her recommendation; FFS reviews and makes final release decision within 1 business day (2 business days for home study cases).

59. Special procedures, including administrative appeal, attach when a parent or legal guardian is being denied. (MAP §§ 2.7; 2.8).

60. Because non-parents do not maintain the same family unity rights as parents, denial of a Category 2 or 3 sponsor requires notification of all affected parties, including the legal service provider or attorney of record, and if applicable, the child advocate and home study provider, but not the same level of process as is required for parents or legal guardians. MAP § 2.7.4. Non-parent/legal guardians are notified verbally that they have been denied sponsorship. MAP § 2.7.7. HHS does not maintain an Assistant Secretary hearing process for non-parents/legal guardians, but as with all administrative decisions, affected parties may seek judicial review of an adjudicative decision under the Administrative Procedure Act.

61. In addition to the procedural protections ORR provides for release, as noted above, every care provider generates reports to me regarding their length of care for each minor and category of parent, and this is something leadership and FFS scrutinize to ensure releases are occurring efficiently but safely. ORR also engages an independent, third-party case coordinator to ensure there is an independent voice in determining whether a minor should be released. The policies for what is required for release are specified in the ORR Policy Guide, section 2. Attorneys of record are always permitted to be in contact with care provider case managers to determine the status of release. Case managers meet with children at least once per week to explain the status of their release and answer any questions. Case managers or clinicians often hold family sessions as well where potential sponsors and the UAC discuss the case.

I declare under penalty of perjury that the foregoing is true and correct.

**DATE**

**CITY**

Stephen M. Antkowiak -S
Digitally signed by Stephen M. Antkowiak -S
Date: 2020.09.17 00:14:52 -04'00'

**STEPHEN M. ANTKOWIAK**