# DX-10

Declaration of Toby Biswas, September 15, 2020

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCAS R. *et al.*, | ) Case No.: 2-18-CV-05741 DMG (PLA) |
| Plaintiffs, | ) |
| v. | ) DECLARATION OF |
| | ) TOBY BISWAS |
| ALEX AZAR, Secretary of U.S. Dep't of | ) |
| Health and Human Services, *et al.*, | ) |
| Defendants. | ) |

## I.      Introduction

1.      Toby Biswas, under 28 U.S.C. § 1746, declares, under penalty of perjury, as follows.  If asked to testify, I would testify under oath as follows.

2.      I am employed in the position of Senior Supervisory Policy Counsel within the Office of Refugee Resettlement (ORR), a component of the Administration for Children and Families (ACF) within the U.S. Department of Health and Human Services (HHS).

3.      I have held the position of Senior Supervisory Policy Counsel, formerly called the Senior Supervisory Policy Analyst, since 2015.  In this capacity my job duties include supervising several teams of Policy or Procedures Analysts who are responsible for drafting and revising agency policies, procedures, and guidance; providing litigation support; representing the government in *Flores* bond hearings; ensuring ORR's compliance with legal settlements; drafting and revising regulations; and providing official responses on behalf of ORR to other Executive branch agencies, Congress, and other oversight bodies such as the Government Accountability Office and HHS/Office of the Inspector General.

4.      Prior to assuming my current position, I held the position of Policy Analyst, and in that capacity I was primarily responsible for the duties described above in the preceding paragraph in a non-supervisory role. In addition to those responsibilities, I served as the Contract Officer Representative for ORR's Legal Service contract with the Vera Institute of Justice and ORR's Case Coordination contract with General Dynamics Information Technology. I held this position from 2012 to 2014.

5.      Prior to my position as a Policy Analyst, I served as an ORR Project Officer Monitor, and in that capacity I was primarily responsible for ensuring ORR's care provider facilities compliance with their Cooperative Agreements, and ORR's policies and procedures, and *Flores* minimum standards. I held this as a General Dynamics Information Technology contractor to ORR from late 2009 to 2012.

6.      I earned a Bachelor's Degree in History from the University of Maryland - College Park where I graduated in 2004. I also earned a Bachelor's Degree in Government and Politics from the University of Maryland - College Park where I graduated in 2004. I earned a Juris Doctor from the University of Maryland School of Law in Baltimore, Maryland, (now called the University of Maryland Francis King Carey School of Law) in 2009.

7.      I have been licensed to practice law in the state of Maryland since January 2010.

8.      I previously served as an Intakes Specialist making initial placement decisions and assisting with the development of an electronic database as a contractor to ORR from 2005 to 2006. During the summer of 2007 (after completing my first year of law school) I worked with ORR's UAC program case management team, as a contractor. In that

Declaration of TOBY BISWAS

capacity, I reviewed home studies and post release service reports. At that time, I also assisted the Division Director for Unaccompanied Children's Services pilot a legal service contract for UAC. Prior to re-joining ORR in 2009, I served as a legal intern for the U.S. House of Representatives Committee on Homeland Security during my second and third years of law school in 2008 and 2009, and as a legal intern to HHS/OGC during the summer of 2008.

9.     I am submitting this declaration to explain ORR policies and procedures on step-up, release, and legal services, as well as to provide additional clarification regarding issues raised by Plaintiffs in the *Lucas R* case.

10.     The statements in this declaration are based on my personal knowledge, information acquired by me in the course of performing my official duties (such as my knowledge of ORR policies and procedures, including the ORR Policy Guide[1] as well as the ORR Manual of Procedures (MAP)) and my review of HHS records and information contained therein. I am testifying to the best of my knowledge at the time of submitting this declaration.

**POLICY, PROCEDURE, AND ORGANIZATION**

11.     I am familiar with ORR Policy and Procedure as the Senior Supervisory Policy Counsel in the Division of Policy and Procedures. I wrote, reviewed, or revised most of the policies and procedures. I am also familiar with compliance with the *Flores* settlement agreement, including *Flores* bond hearings, and compliance training and reviews. The Division of Policy and Procedures is lead for such compliance.

---

[1] https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied

Declaration of TOBY BISWAS

12.     I know that ORR requires care providers to adhere to ORR Policy and Procedures under the cooperative agreement, and monitors care providers to ensure that they do so. If ORR finds that care providers fail to adhere to such policy and procedures, it typically issues a corrective action plan, but may terminate the cooperative agreement or not renew if there is substantial non-compliance. I am familiar with ORR monitoring, because the monitoring team consults with the Division of Policies and Procedures with questions of policy. My team meets with the monitoring team on a periodic basis as well. I was also a monitor, myself, for approximately two years.

13.     ORR Policies are available on the internet. ORR also maintains a Manual of Procedures (MAP), which serves as an explanation to care provider facilities and FFS, as well as other ORR staff, as to how those policies are operationalized. The MAP is available to FFS, ORR staff, care provider staff, and care coordinators.

14.     The Policy team also sends out emails to the care provider network ("Policy Monday" emails) providing additional assistance on Policy or Procedure, and maintains an inbox for answering questions from FFS or care provider staff. The Policy team develops training on matters of policy as well. For step-up in particular, the Policy team ensures that personnel that are involved in step-up, including ORR care provider case managers and clinicians, case coordinators, and ORR federal staff (specifically FFS and FFS Supervisors), are adequately trained by having a training coordinator who conducts trainings. Facility staff are required to take 40 hours of trainings annually, as well as pre-employment training. My team has undertaken training initiatives on aspects of family reunification (such as sponsorship assessment and background checks), restrictive placement and transfers, processing of significant incident reports, and age determinations.

Declaration of TOBY BISWAS

15.      I am also familiar with ORR's organizational structure, having worked at ORR since 2012, and before that as a contractor, and having drafted and reviewed statements of organization and delegations of authority.

16.      FFS are federal employees located throughout the country and assigned to a group of ORR grantee care providers, generally within a particular geographic region. FFS make final decisions on release, step-up, and step-down, but generally also consult with supervisors and other central office staff on complex cases, and can have their decisions reconsidered if there is a Director review of a step-up. Each FFS supervisor supervises between 3-8 FFS. One FFS supervisor, currently David Fink, has a unique role in that he only evaluates special populations, such as those in secure shelters. FFS supervisors are typically consulted on complex cases or cases where a child may be being transferred or recommended for transfer to a more restrictive environment, as well as long-term foster care placement.

17.      Case managers and case coordinators are not federal employees. Case managers are governed by the cooperative agreement, are approved by ORR, and are considered grantee employees. Case managers are required to provide updates on a child's release case once per week to the FFS. Case managers can make recommendations on release or step-up, but do not make final decisions.

18.      Case managers are required to regularly inform other stakeholders of the progress of a child's case, including notification that a UAC may not have a potential sponsor, and any final release decisions. Stakeholders may include local legal service providers and attorneys of record, other local service providers, Child Advocates, post-release and home study providers, and other Federal agencies.

5

Declaration of TOBY BISWAS

19.     Case coordinators are third-party contractors who are assigned to one or more ORR care providers to review children's cases and provide independent recommendations to ORR staff. Case coordinators cannot issue a final decision.

20.     **INTAKE TO ORR CARE AND CUSTODY**

21.     Unaccompanied alien children (UACs) arrive in ORR Care and Custody in a variety of ways. When Border Patrol apprehends a child and is processing them, and determines that the child is unaccompanied, they fill out biographic and apprehension information in their database, and their database then can push that same information into ORR's UAC portal.

22.     ORR cannot interview the UAC prior to the initial placement; a member of the ORR intakes team makes the initial placement decision based upon the information shared by the referring agency.

23.     Once an initial placement decision is determined, ORR custody does not begin until the child enters the assigned care provider. The Department of Homeland Security generally transports the child to the assigned care provider.

24.     There are also special considerations, for example, for children under 13 years of age, for sibling groups (and keeping siblings together), for teens who are pregnant or parenting, for special language needs, for mental health or medical concerns (where noted by the referring agency), for possibility of heightened vulnerability to sexual abuse due to prior sexual victimization, and for identification as lesbian, gay, bisexual, transgender, questioning or intersex, or gender non-conforming appearance or manner.

25.     Currently, due to the COVID-19 situation, ORR is prioritizing placement to care providers close to place of apprehension, to ensure travel time is as short as possible.

Declaration of TOBY BISWAS

26.     Placement may be dependent on the licensing requirements of a facility. For example, some facilities can only take males, or some facilities can only take children between the ages of 6 and 17.

27.     **LEVEL OF PLACEMENT**

28.     ORR maintains different levels of care provider. Currently all care providers have cooperative agreements with ORR. Since Immigration and Naturalization Service (INS) had responsibility for the UAC program, the grantee care providers have operated pursuant to cooperative agreements. Cooperative agreements are governed under grant regulations. They are considered grants, as the principal purpose of the relationship is to accomplish a public purpose of support or stimulation; rather than purchasing services for the direct benefit or use of the Federal Government.

29.     The least restrictive, most basic level of care provider is the shelter (or group home) level of care. These group homes are all state licensed and make up the vast majority of ORR bed capacity. Transitional foster care homes are also considered the least restrictive level of care and are reserved for special populations, younger tender age children or children with other special needs, and parenting or pregnant teenagers.

30.     Staff-secure facilities are licensed shelters with the same kind of state license as any shelter, and merely provide a heightened level of staff supervision, increased communication, and services to control problem behavior and prevent escape.

31.     Secure juvenile detention facilities are for children determined to be a danger to self/others or have been charged with a criminal offense. The criteria for placement in secure can be found at 1.2.4 of the ORR Guide and MAP. ORR currently has one juvenile detention facility in network, the Shenandoah Valley Juvenile Center.

Declaration of TOBY BISWAS

32.     Residential treatment centers are facilities for children with significant emotional, intellectual, developmental, mental health, or psychiatric needs, who are determined to be a danger to self or others by a licensed psychiatrist or psychologist. An ORR residential treatment center differs from inpatient psychiatric hospitalization – it is subacute, not acute, and is more of a residential setting, with children living in cottages or double rooms, and with attached kitchens or cafeterias for eating.

**STEP-UP**

33.     ORR Policy and Procedures contain detailed requirements for step-up to staff-secure, RTC, or secure juvenile detention.

34.     To be stepped up to an RTC, a minor must be determined to be a danger to self or others by a licensed psychologist or psychiatrist, and meet the requirements of ORR Guide 1.4.6 (including ensuring their needs could not be met in a lower level of care, could not be managed in an outpatient setting, and could not be addressed through short-term clinical interventions, such as medication, brief psychiatric hospitalization, intensive counseling, behavioral management techniques, 24 hour supervision, supportive services or therapeutic services). Readers should review section 1.4.6 of the ORR Guide and MAP for more information.

35.     The MAP states that if an FFS has any concerns about a step-up to RTC, he/she elevates it to the FFS supervisor who may consult with the Division of Health Unaccompanied Children ("DHUC") to arrange a second opinion, if necessary.

36.     The ORR Guide also contains standards for step up to secure juvenile detention and staff-secure. See Generally Part 1 of the ORR Guide and MAP, particularly 1.2.4, 1.2.5, and 1.4.2.

Declaration of TOBY BISWAS

37.     ORR places a small percentage of children in ORR care in secure juvenile detention or RTC. For example even at very high census in approximately September 2019, ORR had only six children in Shenandoah Valley Juvenile Center ("SVJC"), when thousands of minors were in custody.

38.     When making a recommendation as to whether step-up should be approved or not, the case coordinator looks at the child's entire case file and reviews the documentation listed in ORR's MAP, including for example, case notes, criminal information in the case file, behavioral reports, and other information. The case coordinator is privy to the child's entire case file, and participates in weekly staffings where a child's case is discussed.

39.     If the case coordinator differs from the case manager as to whether a minor should be stepped up, then the case coordinator must staff the case with the supervisory case coordinator, who makes a recommendation to the FFS. The case coordinator also staffs the case with the supervisory case coordinator if the UAC has special needs or concerns. Ultimately, the FFS resolves any disagreement in recommendations between the sending case manager and the sending case coordinator, and decides on placements for UAC with special needs or concerns.

**NOTICE AND REVIEW OF STEP UP**

40.     The policy for providing notice and review stems from the *Flores* settlement. There are numerous procedural protections for ensuring notice and review of step-up, including the Notice of Placement (NOP); ORR's collaborative 30-day review process from Policy and Procedures; special procedures after 90 days of placement; the ORR compliance review team; *Flores* bond hearings; Director review (currently before a Placement Review

Panel); and finally, judicial review.

41.     Under ORR Policy and Procedures, children must receive an NOP (written in English or Spanish) within 48 hours of placement, and translated into a language the child understands if he or she does not read or speak English or Spanish. The NOP explains why the minor was stepped up. The NOP (a template of which is included in the MAP) has boxes to check (such as "charged with a crime" or "chargeable with a crime" for placement in secure juvenile detention), which should be marked by the case manager. There is also a text box for the case manager to fill out, to provide greater detail as to why the child is stepped up or remains in staff-secure, secure, or RTC.

42.     Children might not receive an advance notice of transfer, as this could endanger other children or create a "run risk."   A large number of step-ups are due to a specific incident that occurred in the facility, and it generally requires an expeditious transfer.

43.     ORR has found through monitoring review that in practice, secure placements such as Shenandoah Valley Juvenile Center include in the NOP the full summary of information presented by the case manager to the FFS used to make the decision. Thus, the NOP in these cases contains all the information that the case manager and case coordinator reviewed in recommending whether a child should be stepped up or remain in a more restrictive placement.

44.     In addition, when there is a step-up or continued placement in a staff-secure, secure or RTC placement, the case manager is required to share all of the information used in assessing the restrictive placement with the UAC's attorney of record, Legal Service Provider or Child Advocate, on demand. This does not require a request for the full case

file, only proof of representation. Such information will include the recommendations of the case manager and case coordinator as well.

45.    After step-up, the ORR FFS and a team (including the child's clinician, case manager, and case coordinator) meet weekly to discuss the minor's case. Before a 30-day period has ended, the team meets to review whether the minor should be stepped down. ORR relies on the case coordinators to provide an independent review from a social worker who provides another perspective.

46.    If new information makes clear an alternate placement is more appropriate, the review must occur before the end of the 30-day period so that the UAC may be transferred to a more appropriate care setting without delay.

47.    Clinicians and FFS consider the factors in section 1.4.2 of the ORR Guide and MAP to determine whether the child's placement is still warranted, including for an RTC. For an RTC, this would revolve around whether a licensed psychologist or psychiatrist still thinks the child's placement is necessary.

48.    Leading up to the time of the 30-day review, ORR requires that the case manager meet with the UAC on a weekly basis to go over the UAC's case with him or her, and discuss their behavior and improvements. A UAC is told that there is a review of their case every 30 days. The case manager is required to inform the UAC that they have a 30-day review coming up. A child is interviewed by the case manager in preparation for the 30-day review. Although the child does not participate in the 30-day review, they are provided with the outcome and the evidence that is relied on in determining that continued placement is warranted.

49.    One common misconception about step-ups (as well as release) is that

"SIRs" or "significant incident reports" will be determinative of a step-up. SIRs are merely a tool for care providers to report a number of different kinds of incidents to ORR in an efficient manner, including incidents entirely unrelated to a child's behavior such as experiencing a fall or accident. They do not necessarily have any impact on step-up or release.

50.     In addition, if a UAC has resided in a secure juvenile detention or RTC facility for over 90 straight calendar days, ORR policy requires the FFS to consult with the Supervisory ORR staff on the case regarding the reasons for the UAC's continued placement, and thereafter after every 30 day restrictive placement case review (unless the UAC is stepped down or discharged).

51.     ORR has a central office compliance review team that reviews placements in and step-ups to secure, staff-secure, and RTC facilities. The team is comprised of the supervisory FFS for special populations, the FFS supervisor for Shiloh RTC, members of ORR's division of policy and procedures, ORR's Juvenile Coordinator, as well as other support staff. The team determines whether a notice of placement has been timely provided to the child for secure, staff-secure, and RTC. For secure juvenile detention and RTC, the team also determines whether the basis provided for step-up meets the criteria. The team reviews the evidence used to support a finding that a child should be placed or remain in a secure or RTC care provider.

52.     When ORR first started doing the compliance reviews, it did return noncompliant cases, but since then, the reviews have resulted in almost 100 percent compliance. The reviews have now been occurring for almost two years – since November 2018.

Declaration of TOBY BISWAS

53.     Children also have the opportunity to request " *Flores* bond hearings" before immigration judges to determine if they are not being released solely due to the danger they present to themselves or others. In most cases, ORR agrees that a minor's danger is not what is precluding release (in other words, the lack of a suitable sponsor – not danger - is the reason a minor remains in custody). However, in cases where danger is the sole basis for continued custody, and an immigration judge rules to the contrary, ORR policy is to take into consideration the immigration judge's decision in determining the level of placement. *See* ORR Policy Guide, 2.9. Bond Hearings for Unaccompanied Alien Children. ORR Policy Guide § 1.4.2.

54.     Children learn about the *Flores* bond hearing shortly upon entering a shelter. The hearing form is in English and Spanish and is part of the legal resource guide. If the children cannot read English or Spanish, the explanation of the bond hearing will be provided in the child's preferred language. UACs placed in staff-secure, secure, and RTC are reminded of their option to request a *Flores* bond hearing and provided an opportunity to do so during their review of the Notice of Placement. The explanation and opportunity is provided to UACs in more restrictive placement every 30 days and at the time their Notice of Placement is reviewed. In addition, UACs are able to request such a bond hearing at any time while in ORR custody.

55.     For UACs without an attorney of record, ORR facilitates their bond hearing request by filing it on their behalf with the Immigration Court in the area where they are placed. ORR also files responsive documents, which either contest the UAC's position or indicates that ORR does not consider the UAC a danger to themselves or the community.

56.     A recent Juvenile Coordinator Report provided details on the five bond

Declaration of TOBY BISWAS

hearing requests filed by UAC from June 1, 2019 to May 31, 2020.

| Date | Shelter Type | ORR Response | Disposition |
|---|---|---|---|
| June 2019 | Transitional Foster Care | N/A | UAC discharged before hearing |
| July 2019 | Staff Secure | No Contest Letter supported by Behavioral Management Plan w/UAC | UAC discharged before hearing |
| September 2019 | Shelter | No Concern Letter | Bond Granted |
| March 2020 | RTC | NA | UAC discharged before hearing |
| April 2020 | Shelter | NA | UAC discharged before hearing |

57. Since June 2017, ORR has, at section 1.4.7 of the Policy Guide, offered Director review through the Director or the Director's designee after 30 days of placement in a secure or RTC facility. The UAC may request the ORR Director, or the Director's designee, to reconsider their placement. The ORR Director, or designee, may deny the request, remand the request to the ORR/FFS for further consideration, or approve the request and order the youth transferred to a staff secure or other care provider facility.

58. Children are reminded of their opportunity to request Director Review in the Notice of Placement. Specifically, the NOP states: "If you remain in a secure facility or RTC after 30 days, you may request that the ORR Director reconsider your placement. For more information on this process, please ask your case manager."

59. Starting in March 2020, ORR has a pilot project for the Director Review to occur through the Placement Review Panel (PRP). The Panel consists of three ORR staff – personnel with several years of experience as professionals in the fields of child welfare, mental health and related policy. They are also veteran Department of Health and Human Services staff, with experience in ORR's unaccompanied children's program. The PRP

ensures that the unaccompanied alien child (or their attorney of record) reviews any evidence supporting their continued placement at the secure or RTC placement prior to holding the panel. In addition, the minor (or their attorney) can opt to provide the PRP a written statement and/or request a hearing. It is the unaccompanied alien child's decision whether to have both a written statement and a hearing or elect to engage in only one of the options. In cases where the unaccompanied child does not have an attorney of record, ORR encourages the program to seek assistance from a contracted legal service provider or a Child Advocate. ORR also arranges for the Juvenile Coordinator to act as an advocate for the minor if needed. After reviewing the evidence, statements, and holding the hearing (if elected), the PRP provides the unaccompanied alien child a written decision regarding their placement.

60.     There have been six PRP requests filed by UACs (all of whom were in secure juvenile detention) through September 11, 2020. In two of the cases, the minor was stepped down prior to a panel review. In two cases, the minors did not continue to pursue review. In two cases the minor had a PRP hearing – and in both such cases, the minor was stepped down after panel review.

61.     Finally, in keeping with the standards of the *Flores* Settlement Agreement, all children in care are informed in writing of their ability to seek judicial review of their placement in a language they understand, which the *Flores* Agreement specifies should be reviewed for abuse of discretion. This is template language for the NOP, which is reviewed with the UAC every 30 days. Specifically, the NOP says: "If you believe you have not been properly placed or that you have been treated improperly you may also ask a Federal District Court to review your case. You may call a lawyer to assist you."

**RELEASE**

62.     ORR has a multi-step process, involving a number of different independent players, to evaluate potential sponsors' ability to provide for the child's physical and mental well-being, as required by law. The Policy and Procedure are in section 2 of the ORR Guide and MAP.

63.     ORR has as its goal the safe and timely release of UAC to suitable sponsors. Children are not required to "earn" the right to release.

64.     Under the TVPRA, ORR is prohibited from releasing a child to a proposed sponsor, unless it makes an affirmative determination that the proposed sponsor will provide for the child's physical and mental well-being and not endanger the child.

65.     ORR Guide § 2.4.1 sets forth the assessment criteria for sponsors. These factors: include the sponsor's motivations for wanting to sponsor the child; the sponsor's plan to provide adequate care, supervision, access to community resources, and housing; the sponsor's strengths, resources, mitigating factors in relation to any risks or special concerns of the child or sponsor related to the release; and the child's current functioning and strengths in relation to any risk factors or special concerns.

66.     Case managers begin working on release from the time children enter custody.

67.     As the process unfolds, case managers collect primary source documents from potential sponsors like birth certificates, proof of address, immigration status information, and the information from the family reunification packet.

68.     One of the primary sources for delay in release is a sponsor who either cannot or does not provide documentation, or, household members who do not wish to provide

Declaration of TOBY BISWAS

identification documents, such as their IDs, as part of the application.

69.     As with step-up, case managers make initial release recommendations, and case coordinators provide input on the decision.

70.     An FFS makes final release decisions for UAC. They meet weekly/bi-weekly with case managers and case coordinators to go over cases in order to assess where individual UAC cases are in the release process. FFS monitor cases to ensure that the case is meeting the milestones for reunification, and the case is moving forward. The FFS will review information on the UAC Portal, look at the census lists provided by the care provider, and continually ask case managers questions regarding how to move forward on reunification for each individual child.

71.     In making recommendations, case managers/coordinators consider the materials from the family reunification application, the supporting documents, the results of background checks, the results of interviews with the family, the child and the sponsor, and the results of any home studies.

72.     Home studies can be mandated by the TVPRA, such as when a UAC is disabled; be required under ORR policy; or may be requested by a case manager and recommended by a case coordinator on a case-by-case basis. If the case manager and case coordinator disagree, the case will be elevated to the FFS, to determine if a home study should be ordered in discretionary cases. The Policy Guide and MAP at section 2.4.2 discuss home studies. There are special rules for when a case manager should ask for a discretionary home study and the request must be justified as explained in the MAP. See MAP at § 2.4.2.

73.     In some cases, it does not become apparent until later that a minor requires a mandatory TVPRA home study. For example, a minor might disclose abuse after growing

more comfortable with his or her clinical team, thus triggering a mandatory home study under the statute. In other cases, because ORR has limited information when children are initially referred, mental health or other disabilities may not be apparent until later in the case. The TVPRA requires a home study for "a special needs child with a disability (as defined in section 12102 of title 42)."

74.     Home studies provide insight into what the home environment looks like, whether there are unaccounted for adult individuals living in the home that were not reported in the application, and a chance for a caseworker to interview all of those individuals in the household.

75.     UACs are told why a home study is being done – typically during their weekly meeting with the case manager. Similarly, during weekly case manager meetings, UACs have the opportunity to express their views about a potentially negative release decision (before the decision is actually finalized). Under the cooperative agreement, ORR requires case managers to provide the UAC with ongoing information as to what the status of his or her release is, including any explanation for delays and case status.

76.     A negative home study also does not necessarily mean that a potential sponsor will never be approved. A material change in circumstances will be considered, and case managers may continue to work with applicant sponsors, even after a negative home study is received.

77.     Category 1 children (children whose sponsors are parents or legal guardians) have on average a lower length of care.

78.     Category 2A sponsors are grandparents, adult siblings or other close relatives (that is aunts, uncles, and first cousins) who were also a primary caregiver to the child

Declaration of TOBY BISWAS

previously. Category 2B sponsors are these close relatives (aunts/uncles/first cousins) who were not primary caregivers to the child.

79.     Category 3 sponsors are unrelated sponsors or are distant relatives.

80.     The UAC is interviewed as part of the sponsorship process, and asked whether he or she wants to be released to the applicant sponsor. The case manager's meetings with the UAC provides an opportunity for sharing this information.

81.     When a parent is going to be recommended for denial, there are special procedures, including review by the ORR Director, a written denial, and then a full administrative appeal before the Assistant Secretary. See generally §§ 2.7.7 and 2.7.8 of the ORR Guide and MAP (the sections of the Guide and the MAP correspond with each other).

82.     ORR procedure requires case managers to be in regular and frequent contact with potential sponsors, and potential sponsors can work with the case manager to explain any delays in their case, or to work through the questions the case manager might have. A previously denied sponsor will be reconsidered if there is a material change in circumstances.

83.     In addition, the case manager must record weekly case notes that explain the status of the release case. There are weekly reviews of the status of release by the case manager, clinician, case coordinator, and FFS.

84.     ORR has no requirement that a child must be stepped down prior to release. Children may be, and are, released directly out of secure juvenile detention, RTC, and staff-secure care, including class representatives in this case.

85.     Transferring to another facility alone should not materially disrupt the sponsorship process. Care providers are required to share all prior information with the new

Declaration of TOBY BISWAS

care provider, and case managers can access all information from the UAC Portal.

86.     There is no requirement that a UAC must have his or her own bedroom upon release, but again, this will depend on the unique facts of each case. For example, in one case I recall, a 15-year-old girl was being released to a household of all adult men. The potential sponsor was proposing to have her share a bedroom with two other adult males. In this case, it seemed inappropriate not to require an individual bedroom for the fifteen-year-old girl.

87.     While there are many child welfare systems, the ORR program provides care to an exclusively immigrant population, and the children are in custody solely by reason of their lack of lawful immigration status. In addition, children can depart care through voluntary departure, and, the majority of children, historically, will not qualify for asylum once all immigration proceedings are completed.

**LEGAL SERVICES**

88.     In addition to the "Know Your Rights" presentations and legal screenings by legal service providers, ORR provides funds to the Vera Institute of Justice for limited scope legal representation where attorneys become the minor's attorney of record. Generally, legal service provider attorneys do not provide direct representation of children, but help the children to understand their rights, and provide screenings to determine if the minor might be eligible for immigration relief.

89.     The Vera funding is generally for immigration-related legal representation, such as assisting a minor in applying for asylum; or in limited cases, dependency hearings that would assist in qualifying for special immigrant juvenile status.

90.     ORR does not consider decisions on release, step-up, and psychotropic

20
Declaration of TOBY BISWAS

medicine prescription to be legal matters or proceedings under the TVPRA because they are not before an administrative or federal judge. Nor do ORR attorneys appear when these decisions are being made, as would occur in a typical "legal" matter or proceeding, such as a hearing before an immigration judge. ORR has never considered these decisions to be legal matters or proceedings under the legal services language of the TVPRA. In other cases where Congress used the word "proceedings," ORR has interpreted this to mean immigration proceedings. For example, in the Homeland Security Act, Congress requires the ORR Director to ensure, in making decisions on release, that children are "likely to appear for all hearings or proceedings in which they are involved." ORR has always interpreted such language to refer to the immigration hearings and proceedings.

91.     Children have the right to hire their own lawyers, and ORR provides each child with a pro bono list of lawyers as part of the initial orientation at each care provider. When the UAC has his or her own attorney of record, there should be open lines of communication with the case manager to keep the attorney up-to-date on the minor's case, and to provide the attorney on demand of any 30-day review of a more restrictive placement.

92.     Children have unlimited telephone time with their attorneys of record.

93.     I am not aware of any case in which ORR blocked attorneys from providing services to UACs, cut funding for legal service providers who represent UACs in actions against ORR, or otherwise refuse to work with such attorneys after such representation. ORR may not fund the activities, but it does not block them. Legal service providers who are funded through ORR may use non-ORR funds for such representation. As one example, Capital Area Immigrant Rights (CAIR) is a subcontractor to Vera in both Maryland and Virginia. CAIR represented a UAC in his appeal to the Assistant Secretary of ACF

challenging his lack of release. LSC in San Francisco, California; the legal services provider

in Oregon; and Cabrini in Houston, Texas, have all represented children bringing

administrative or Federal court challenges against ORR. To my knowledge, neither Vera

nor ORR blocked such representation.


I declare under penalty of perjury that the foregoing is true and correct.

    Dated:   DATE  9/15/2020

             CITY  Rockville, MD

             Toby Biswas

Declaration of TOBY BISWAS