# DX-12

Deposition of Karen Husted, April 25, 2019

```
                                                              Page 1

 1            UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
 2                  WESTERN DIVISION
 3
              CASE NO. 2:18-CV-05741-DMG-PLA
 4
 5   LUCAS R., et al.,
 6             Plaintiffs,
 7   vs.
 8   ALEX AZAR, Secretary of U.S.
     Department of Health and Human
 9   Services; et al.,
10             Defendants.
     _____
11
12
                       DEPOSITION OF
13
                       KAREN HUSTED
14
15
16        DATE TAKEN:   Thursday, April 25, 2019
          TIME:         9:34 a.m. - 3:25 p.m.
17        PLACE:        2 South Biscayne Boulevard
                        Suite 3100
18                      Miami, Florida  33131
19
20
21      Taken on behalf of the Plaintiffs before
22   Fanny R. Kerbel, Shorthand Reporter and Notary Public in
23   and for the State of Florida at Large, pursuant to
24   Notice of Taking Deposition in the above cause.
25
```

1      Q.   So when you were doing home visits, you would
2   actually go to the home.  What was your process when you
3   would arrive at a potential home?
4      A.   The goal was to try to reunify the child with
5   the parents.
6      Q.   And the goal that you are pursuing now in
7   evaluating these releases, making these release
8   decisions, is that goal the same or is it any different?
9      A.   No.  The goal is to safely -- I am going to
10  use that term over and over again because that is what
11  we try to do.  Safely reunify the child with family in
12  the United States.
13     Q.   But in terms of what you used to do when you
14  were conducting home visits and what you do now, what is
15  the major difference?
16     A.   I am not visiting the home.
17     Q.   So you make the decision based upon paper, the
18  data that is transmitted to you through the portal,
19  correct?
20     A.   Largely, yes.
21     Q.   What other sources of information do you use,
22  apart from what is recorded in the portal, to make a
23  decision whether to release or not?
24     A.   Again, I staff the cases when I feel that I
25  need to, so I would get some feedback from either the

Page 71

1    A.   I don't know the answer to that.  The case
2  managers meet with the child weekly and they review the
3  progression of the case.  To some extent, I am sure it
4  is, but I am not there.  I don't know.  I can't really
5  answer with certainty.
6    Q.   Are the case managers privy to the
7  information, all the information that the case
8  coordinators have?
9    A.   Are you speaking of their internal notes on
10  their system?
11    Q.   Yes.
12    A.   No, they are not privy to those.
13    Q.   As a matter of course, then, there is
14  information that only the case coordinators have; is
15  that correct?
16    A.   The information that they have in their
17  staffing notes comes from the case managers.  So I am
18  not quite sure that I would characterize it as they
19  don't have access to it.  Because it is solely based on
20  the staffing of the case with the case manager.  I am
21  not sure if it's any information that the case managers
22  wouldn't already have.
23    Q.   So then everything that the case
24  coordinators have -- all the information the case
25  coordinators have comes from the case managers; is that

Page 79

1  the home study worker determined that the person ran a
2  restaurant and had other people in her home with beds
3  all over the floor, no food in the house.
4      Q.   That was an individual investigation, correct?
5           MS. DAVILA:  Objection.  Counsel has
6       interrupted the witness.
7           Did you finish your answer?
8           THE WITNESS:  No.
9           MS. DAVILA:  Please allow the witness to
10      finish her answer.
11 BY MR. HOLGUIN:
12      Q.   Please finish.
13      A.   What I am telling you is that unlike some of
14 the other populations that I have worked with, we have
15 children that could possibly be trafficked.  So when you
16 are looking at preestablished relationships, you are
17 really concerned with possible trafficking, which brings
18 a different level to safety.
19           The concern is there for that purpose.  We are
20 talking about safety.  And have I seen that?  Yes, I
21 have.  I have in the case I just described, and I am
22 sure I could find others to discuss with you.  After the
23 fact, I don't have any knowledge.
24      Q.   Is it your understanding that U.S. citizen
25 children are not trafficked?

Page 100

1  conduct home studies before there is a recommendation
2  regarding release?
3       A.   Yes.
4       Q.   Under what circumstances does that happen?
5       A.   It is always before there is a recommendation
6  of release.  They are recommending a home study.
7       Q.   So the case managers will recommend a home
8  study without recommending release?
9       A.   It is two different things that you are
10 talking about.
11      Q.   So sometimes you get cases that come to you
12 just for the decision about home study, correct?
13      A.   Yes.
14      Q.   Now I understand.  When a home study comes
15 back negative, is that information shared with the
16 proposed custodian?
17      A.   If it's a denial, it is shared.  If there are
18 issues that the proposed sponsor can mitigate that the
19 home study -- the reason for the denial, then yes, the
20 case manager will speak to them about what we can
21 mitigate from that.  So a negative home study would not
22 necessarily mean a denial.
23      Q.   I am referring to the home study that comes
24 back negative, whether or not it results in an actual or
25 final denial.  Just a home study that comes back with a

Page 102

1 recommends it back to the FFS.
2 Q. In circumstances where the case manager
3 determines that the concerns have not been mitigated,
4 what opportunity, if any, does the proposed sponsor have
5 to contest that determination?
6 A. They are able to contest any -- if it results
7 in a denial of the case, they could request a denial. I
8 mean, they could request an appeal to the denial.
9 Q. To whom do they appeal?
10 A. They appeal to ORR headquarters.
11 Q. Is it your understanding that any custodian or
12 proposed custodian who has been denied custody of a
13 child has that right to appeal?
14 A. I believe I am speaking -- I know that the
15 parents have the right to appeal. A parental denial is
16 very different from a denial of any other category of
17 sponsor.
18  I know that in the case of a Cat 3 sponsor
19 that was denied, they appealed it to my supervisor, not
20 headquarters. So anybody other than the parents, they
21 can request that somebody else look at the case.
22 Q. They can request that someone else within ORR
23 look at the case?
24 A. Exactly.
25 Q. Now, you were talking about state and local

1  unrelated sponsors.
2      Q.   In Category 3?
3      A.   In Category 3.
4      Q.   And then in Category 4?
5      A.   That means no sponsor.
6      Q.   I see.  So when I ask about hierarchy,
7  assuming all other things are equal, you would release
8  to Category 1, someone in Category 1, before you would
9  release to someone in Category 2; is that correct?
10          MS. DAVILA:  Objection.  Misstates prior
11      testimony.
12          THE WITNESS:  Yes.  You said if everything is
13      okay.  Yes.
14  BY MR. HOLGUIN:
15      Q.   Yes.  Now, when a child reports that he or she
16  has more than one potential sponsor, what is the policy
17  of ORR in terms of simultaneous evaluation or serial
18  evaluation?  In other words, will ORR evaluate both
19  potential custodians at the same time or do you want to
20  wait for one to be rejected before going to the next?
21      A.   No.  We stress that they should do concurrent
22  sponsorship when it is not, like, a parent.  Because you
23  never know what is going to happen or if somebody is
24  going to drop out.  So yes, we are all for concurrent
25  sponsors.

```
                                                       Page 148
 1        Q.   Concurrently evaluating sponsors?
 2        A.   Yes.
 3        Q.   Returning a little bit to the topic of
 4   children's behavior at Homestead, have reports come to
 5   your attention that children are being told that by
 6   behaving badly at Homestead their detention will be
 7   extended?
 8             MS. DAVILA:  Objection.  Vague.  Objection.
 9        Argumentative.  Objection.  Compound.  Objection.
10        Mischaracterizes prior testimony.  Objection.
11        Speculative.
12             THE WITNESS:  I am not quite sure.  Are you
13        talking about a youth care worker saying this or a
14        case manager or anyone at Homestead?
15   BY MR. HOLGUIN:
16        Q.   Anyone in authority at Homestead.
17             MS. DAVILA:  Same objections.
18             THE WITNESS:  To my knowledge, I have not
19        heard that.  It could happen.  I have not heard
20        that.
21   BY MR. HOLGUIN:
22        Q.   If it is told to them, it would be inaccurate;
23   is that correct?
24             MS. DAVILA:  Same objection as before.
25             THE WITNESS:  Yes.
```

Page 190

1 CERTIFICATE OF REPORTER

2

3 STATE OF FLORIDA )
COUNTY OF MIAMI-DADE )

4

5     I, FANNY R. KERBEL, Court Reporter, do hereby
6 certify that I was authorized to and did
7 stenographically report the deposition of Karen Husted;
8 that a review of the transcript was not waived; and that
9 the foregoing transcript, pages 1 through 186, is a true
10 and complete record of my stenographic notes.
11     I FURTHER CERTIFY that I am not a relative,
12 employee, attorney or counsel of any of the parties, nor
13 am I a relative or employee of any of the parties'
14 attorney or counsel connected with the action, nor am I
15 financially interested in the action.
16     Dated this 1st day of May, 2019.

17

18

19

20

_____
21     FANNY R. KERBEL, Court Reporter

22

23

24

25