# DX-13

Expert Report of Dr. Ilze Earner, June 19, 2020

JEFFREY B. CLARK
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
ERNESTO H. MOLINA, JR.
Deputy Director
CHRISTOPHER A. BATES
Senior Counsel to the Assistant Attorney General
BENJAMIN MARK MOSS
W. DANIEL SHIEH
Senior Litigation Counsel
NANCY K. CANTER
ANTHONY J. MESSURI
JONATHAN K. ROSS
Trial Attorneys
Office of Immigration Litigation
U.S. Department of Justice
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-9802
Daniel.Shieh@usdoj.gov
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Lucas R., *et. al.*,<br><br>                     *Plaintiffs*,<br><br>        v.<br><br>Alex M. Azar,<br>Secretary of U.S. Dep't of Health and<br>Human Services, *et al*.<br><br>                     *Defendants*. | Case No.: 18-cv-05741-DMG-PLA<br><br>**DECLARATION OF DR. ILZE EARNER IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

**DECLARATION OF DR. ILZE EARNER**

I, Ilze Earner, declare and state as follows:

1.     I have expertise in child welfare, specifically with immigrant populations. I have a Ph.D. from Columbia University and a M.S.W. from California State University – Fresno. I am an Associate Professor of Social Work at the Hunter College Silberman School of Social Work in New York City, where I have taught social work graduate and undergraduate students since 2001. I make this Declaration in support of Defendants' Motion for Summary Judgment.

2.     Counsel for Defendants contacted me to provide expert opinion and testimony on the policies and procedures of United States Department of Health and Human Services, Office of Refugee Resettlement ("ORR") with respect to the care and supervision of unaccompanied alien children. Counsel asked me to review certain materials and thereafter render my opinions, which I did in a June 19, 2020 Expert Report. On August 10, 2020, I appeared for a deposition and testified regarding the contents of my June 19, 2020 Expert Report.

3.     If called as a witness to this action, I could and would testify competently to the facts and opinions set forth herein, including my June 19, 2020 Expert Report and my August 10, 2020 deposition.

I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct.

Executed this September 18, 2020 at Martindale, New York.

Ilze Earner, Ph.D., LCSW
Declarant

1
Declaration of Dr. Ilze Earner in Support of Defendants' Motion for Summary Judgment

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

LUCAS R. *et al.*,

           Plaintiffs,

     v.

ALEX AZAR, Secretary of U.S. Dep't of Health and Human Services, *et al.*,

           Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 2-18-CV-05741  DMG (PLA)

**EXPERT REPORT OF DR. ILZE EARNER, PH.D., LCSW**

**I.    Scope of the report**

1.    I was asked to produce an expert witness report on the care and treatment of unaccompanied alien children (UACs) in federal custody at the Office of Refugee Resettlement (ORR) funded grantee care facilities.  Specifically, in this report, I address the policies, procedures and standards of: A) release of UACs from care and B) placement of UACs in different levels of care (i.e., restrictiveness).

2.    I also opine on whether the policies, procedures, practices and standards of care of UACs in ORR-funded grantee care facilities adhere to the principles of best practices in child welfare to ensure the prompt release of children from ORR's care and custody, and ensure safety and well-being of the children.

**II.    Findings**

3.    It is my opinion that ORR policies, procedures and practices concerning UACs either meet or exceed the standards of care for domestic children in

out of home care in the United States with regard to placement in the least restrictive environment, and timely and safe unification with family, relative or other viable sponsors;

4.  It is my opinion that ORR policies, procedures, and practices ensure that UACs are maintained safely in the least restrictive environment, and that ORR staff engage in case management practices that are appropriate to ensure continuity of placement and safety of UACs;

5.  It is my opinion that, based on my observations, ORR care provider direct service staff are appropriately trained, have the necessary skills and are appropriately supervised to address the emotional, behavioral needs of UACs while they are in care; and

6.  It is my opinion that ORR has improved focus on the safety of UACs by implementing increased standards of assessment and evaluation of potential sponsors to ensure that UACs are not at risk of abuse, neglect or exploitation once they are released from care.

**III.   Expert Qualifications**

7.  I am an Associate Professor of Social Work at the Hunter College Silberman School of Social Work in New York City where I have taught social work graduate and undergraduate students since 2001.  My field of specialization is in child welfare, specifically with immigrant populations.

8.  I founded the Immigrants and Child Welfare Project at Hunter College in 1999 to train social work graduate students in the field to work with immigrant children and families.  I am a faculty associate with the National Center for Child Welfare Excellence at the Silberman School of Social Work.  Previously I was a faculty consultant with the National Resource Center for Permanency Planning and Family Connections from 2001 to 2010, a national resource center funded by The Children's Bureau through the

Confidential - Under Protective Order

United States Department of Health and Human Services, Administration for Children and Families.

9.  I was a consultant with the Adolescent Services Resource Network of the New York State Office of Children and Family Services from 2008-2015.   I developed, wrote and implemented training curricula for social workers, case workers and child protective workers for the New York City Administration for Children's Services on practice with immigrant children, families and youth from 1999 to 2004.  From 2002 to 2010, I was a consultant with Bridging Refugee Youth and Children's Services (BRYCS), a resource and referral service of the United States Conference of Catholic Bishops (USCCB).

10.  Outside of the university I have held professional positions as the Director of Family Services with the East Harlem Council for Community Improvement in New York, interim-Executive Director with Cabrini Residential Treatment Center in West Park, New York, and currently I serve as a pro-bono social work consultant with MASA Afterschool Program in the Bronx and as the Chair of the Board of Directors for Cabrini Immigrant Services in New York.

11.  For additional information please see my CV – Appendix 1.

12.  Specific to the scope of this report, from 2004 until 2006, I was a panel member of the National Child Welfare Advisory Board (List of Panel Members – Appendix 2) organized by Lutheran Immigration and Refugee Services (LIRS) and USCCB  to develop best practices guidelines for ORR-funded shelters for UACs.

13.  From 2008-2009, I was sub-contracted as a consultant by DHHS-Administration Children and Families (ACF) through the Children's Bureau and BRYCS/LIRS to provide onsite staff training on The Prevention of

3

Confidential - Under Protective Order

Maltreatment in ORR-Funded Care Programs.  During that time period, I
visited and trained staff at 9 ORR care provider facilities in Texas, Florida,
New Jersey and New York.   These experiences with ORR-funded facilities
for UACs have given me both a historical and program developmental
perspective.

14. I obtained my graduate degree in social work at the State University of
California in Fresno and my Ph.D. at Columbia University in New York.  I
am a Licensed Clinical Social Worker in New York State.

15. I have not previously served as an expert witness, to include providing expert
testimony at either trial or deposition, in any criminal or civil litigation.

16. I am being compensated for my work in this case at my standard rate of $120
per hour. My compensation is not affected by the outcome of this matter.

**IV. Description of documents reviewed and ORR shelters visited**

17. I have considered and reviewed the following documents: the U.S. Office of
Refugee Resettlement Unaccompanied Alien Children's Manual of
Procedures; the U.S. Office of Refugee Resettlement Unaccompanied Alien
Children's Policy Guide; the case files of the six named Lucas R. plaintiffs;
and seventy-five ORR UAC case files; the Plaintiffs' First Amended
Complaint; the Defendants' Answer; the Defendants' Response to Plaintiffs'
Request for Admissions; copies of the Jallyn Sualog and Faith Ray
Depositions taken in this case; and several documents for family unification
process, including the cover letter, legal orientation program, sponsor care
agreement, family reunification application, authorization for release of
information, fraud warning, privacy notice for parents, privacy notice for
sponsors, sponsor handbook, documents on the fingerprinting process, UAC
sexual abuse hotline flyer, and the letter of designation of care for a minor.

Confidential - Under Protective Order

18. <u>ORR-funded Facilities Visited</u>: I visited a total of seven (7) ORR-funded facilities between January 10 and February 10, 2020 to provide a diverse cross-section of ORR care providers, based upon size, location, program-methodology, and security-level.

    A. Southwest Keys El Presidente, Brownsville, Texas (shelter, least restrictive).  Funded capacity: 413. Census: 39 (January 14, 2020).

    B. Casa Norma Linda, Los Fresnos, Texas (shelter, least restrictive, gated, security guard). Funded capacity: 646 (adding 154 beds). Census: 52 (January 14, 2020).

    C. Upbring Grace House, McAllen, Texas (shelter, least restrictive, also therapeutic shelter). Funded capacity: 60. Census: 30 (January 15, 2020).

    D. BCFS San Antonio, San Antonio, Texas (shelter and staff secure). Funded capacity: 36. Census: 14 (January 16, 2020).

    E. Seton Home, San Antonio, Texas (shelter, least restrictive, parent/pregnant shelter). Funded capacity: 51. Census: 19 (January 16, 2020).

    F. St. Peter-St. Joseph Children's Home shelter, San Antonio, Texas (shelter, least restrictive). Funded capacity: 82. Census:  13 (January 17, 2020).

    G. Shenandoah Valley Juvenile Center, Verona, Virginia (secure facility). Funded capacity: 34. Census: 16 (February 10, 2020).

19. ORR-funded facilities for UACs offer a number of models for congregate care including shelters, therapeutic shelters, staff-secure facilities, residential treatment centers, and a secure facility.[1] 3 of the 7 facilities I visited were

---

[1] David Fink, FFS Supervisor, Office of Refugee Resettlement, Presentation, January 6, 2020 Washington, DC.

Confidential - Under Protective Order

defined as shelters; 1 was a shelter facility that had a special therapeutic shelter program onsite, 1 facility had shelter and staff secure programs, 1 was a shelter specifically for mothers with minor children between the ages of 0-4 or who were pregnant; and 1 was a secure facility inside a juvenile justice center. The difference between shelter and staff-secure is distinguished by staff ratios: 1:8 for basic shelters, 1:4 for staff-secure.

20.     All of the facilities I visited are licensed by the applicable state child welfare authorities and are required to adhere to state licensing regulations for congregate care of minors.  All the shelters and staff secure facilities were well-appointed with individual and/or shared dormitory-style bedrooms, cafeterias, recreation areas, gymnasiums (one had an outdoor pool) and educational classroom facilities.  The secure facility operated on the model of a juvenile detention center – doors are locked and remotely controlled, security cameras are placed throughout the facility, and children eat meals in their "pods".  Individual UAC rooms which are grouped in pods at this facility are sparsely furnished with an observation window on the door.  The pods are monitored at all times by a guard.  All facilities were fully staffed despite none being at capacity and, in fact, most were operating significantly below capacity.

21.     The facilities I visited were clean and were designed to appear cheerful and colorful for the children.  The secure facility at Shenandoah, in particular, incorporated indigenous art and symbols.   According to the staff a local artist volunteered once a year to work with the UACs at the facility to design and draw a mural reflecting their hopes, dreams and aspirations – these murals were awesome.  They reflect best practices in juvenile care facilities.[2]

---

[2] Cash, L. (2018). The Arts Within Juvenile Justice Facilities.  Drexel University Press.

Confidential - Under Protective Order

According to shelter directors, each shelter met the annual state-mandated licensing requirements for congregate care.

22.   At each site I visited, I toured the facility including common areas, grounds, offices and UAC rooms; met with administrators, program directors, clinicians, caseworkers; and met with ORR Federal Field Specialists (FFS) and FFS Supervisors assigned to oversee the facilities.

23.   The key personnel answered questions about the program, UAC population served; described mental health services, assessment and diagnosis of UACs for appropriate placement setting and the process of unification of UACs with family, relatives or other appropriate sponsors.

## V.   Context

24.   <u>Population Background</u>: UACs are minor children without lawful immigration status in the United States, are not yet 18 years of age and have no parent or legal guardian in the United States or no parent or legal guardian available to provide immediate care and physical custody. The majority of UACs are apprehended attempting to cross the Mexico-United States border although some are apprehended when they are already in the United States.

25.   The basic demographic profile of UACs has changed only slightly since the inception of the ORR-funded shelter program in 2002: the majority are male, most are from Central America, and many are trying to escape abusive situations or violence in their home country. Their expressed reasons for coming to the United States are to reunify[3] with family, or to seek employment or education.[4]  One significant change identified in the UAC

---

[3] Often referred to as "reunification," a more inclusive term is "unification," as some UAC have never met or lived with the family members or others who seek to sponsor them or with whom the UAC seek to live.

[4] Congressional Research Service (October 9, 2019), #R43599,

Confidential - Under Protective Order

population since 2010, however, is that children are presenting with more complex needs and higher incidences of trauma, mental health and substance abuse histories; 85% of children in ORR custody have some kind of trauma history.[5]

26. Whether UACs are, in fact, more traumatized or have higher rates of mental health and substance abuse issues is not clear as this data may also attest to the higher level of awareness, training and assessment skills on the part of ORR-funded facility staff.  Regardless, the history of trauma and other special needs that UACs present with has implications for children's behavior, affect and cognitive functioning as well caretakers' responses and interventions to ensure children's safety and well-being while in care and in their future placement with family or other sponsors.

27. UACs differ from the population of domestic children in the care of state child welfare agencies in a number of unique ways.  Despite the anecdotal evidence of abuse, neglect or trauma in the past of some children in ORR's care, UACs are not placed into congregate care due to allegations or findings of abuse and neglect by their parents or legal guardians.  Rather, they are placed in congregate care shortly after apprehension by a federal agency (frequently the U.S. Department of Homeland Security) and remain in federal custody under the care of the Office of Refugee Resettlement (ORR) while their immigration case proceeds until they can be safely released.

---

https://crsreports.congress.gov.
[5] USCCB (December 2012). The Changing Face of the Unaccompanied Alien Child:  A Portrait of Foreign-born Children in Federal Foster Care and How Best to Meet Their Needs. http://www.usccb.org/about/children-and-migration/unaccompanied-refugee-minor-program/upload/A-Portrait-of-Foreign-Born-Children-in-Federal-Foster-Care-and-How-to-Best-Meet-Their-Needs_USCCB-December-2012.pdf.

8

28.    When domestic children enter care, the agency is tasked with developing a permanency plan. As soon as a UAC is placed with ORR, staff are tasked with screening parents, legal guardians or other potential sponsors for release from congregate care regardless of their immigration claim or potential relief. The current ORR guidelines categorize sponsors by relationship to the UAC. *See* ORR Guide § 2.2.1.

29.    While many UACs have identified a parent, legal guardian, relative or other potential sponsor already in the United States when they come into care, a number of UACs have no known relatives or other potential sponsors in the United States. To ensure safety and well-being of the UAC, ORR staff screen parents, family members or other potential sponsors for potential trafficking as required by the Trafficking Victims Protection Reauthorization Act (TVPRA), 8 U.S.C. § 1232(c)(3).  This is a higher standard of vetting than that which would occur within a domestic child welfare situation, as to my knowledge, no state routinely screens families, kin or other potential legal guardians for trafficking prior to release of a domestic child from congregate care. However, it should be noted that foster parents, legal guardians and others in kinship arrangements would require assessments and home studies, and that would include fingerprinting and background checks.

30.    Releasing UACs to sponsors prior to a completed home study and other background checks is not advisable; unfortunately because of the lack of prior information about UACs and their family the process can take longer than 30 days; such a delay, where needed, is appropriate.  The proposal for a quasi-judicial "fair" hearing would do nothing to further the safety of the UAC.  Hearings are court-like processes that create an adversarial environment and only prolong the length of time that UAC spend in care. Time and energy would be better spent working with a social worker to seek

Confidential - Under Protective Order

and screen a viable sponsor for the UAC and/or encouraging family members
to come forward and complete the process.

31.   Screening potential sponsors of UACs is a serious child safety issue.  Safety
cannot be sacrificed for speed of release of a UAC. There are a number of
reasons for this. We have little to no understanding of the mechanics of how
minor children migrate – although through studies that have been done and
anecdotal evidence we know that many migrants engage with criminal gangs
and outfits to facilitate crossing the border.  What this means for children's
safety cannot be underestimated as there is evidence that children are often
required to participate in repayment of smuggling fees.[6]

32.   For UACs who may have no viable sponsor, or a sponsor claiming a distant
or vague relationship, the question then becomes one of whether the UAC is
being trafficked for some other purpose.  The discussion of adequately
assessing family, relatives or other proposed sponsors prior to release of
UACs was contentious within the National Advisory Council – many, myself
included with backgrounds in child welfare, felt that there was inadequate
concern for UAC safety and sponsors were not adequately screened or
assessed; the priority was a rush to unify a UAC with any sponsor that
stepped forward.  As a consequence, there was anecdotal evidence that UACs
were being trafficked – as 'restiviks' or other form of exploited domestic
labor.

33.   Lastly, even when a UAC presents with the name of a parent or close
relative, it is important to recognize that they may not have seen each other

---

[6] Uehling, G. L. (2008). The international smuggling of children: Coyotes,
snakeheads, and the politics of compassion. *Anthropological Quarterly, 81*(4),
833-871.
doi:http://dx.doi.org.proxy.wexler.hunter.cuny.edu/10.1353/anq.0.0031.

over an extended period of time; new families have formed and the UAC may be an unwelcome reminder of a previous relationship.[7] There can be significant risk of abuse or neglect of the UAC under those circumstances. It is an unnecessary risk to release any UAC without an appropriate assessment of the potential sponsor, and appropriate assessments simply take time.

34. The importance of a home study cannot be underestimated, even when UAC are to be released to the care of immediate family members. Home studies should not be construed as punitive or invasive exercises, rather they serve as a very useful tool of assessment – primarily to ensure the safety of a minor but, also to identify potential barriers or issues to placement permanence that may guide recommendations for follow-up services in the community. Home study assessments should be performed for all potential sponsors of UACs including immediate family members.

35. Trauma and UAC: Many years ago, in the early years of ORR-funded grantee care facility programs for UACs, many facilities were either converted congregate care facilities for domestic child welfare populations or had a small adjunct program dedicated to UACs; at that time few staff were trained or knowledgeable about trauma associated with migration or had familiarity with the conditions in the home countries of UACs. I am aware of this because throughout the years 2008-2009 I facilitated onsite training of ORR staff in 9 ORR funded facilities.

36. This has clearly changed. In each of the facilities I visited in 2020, staff were knowledgeable about the effect of trauma upon children and spoke clearly of

---

[7] Rodriguez, F. A., & Dawkins, M. (2017). Undocumented Latino youth: Migration experiences and the challenges of integrating into American society. *Journal of International Migration and Integration, 18*(2), 419-438. doi:http://dx.doi.org.proxy.wexler.hunter.cuny.edu/10.1007/s12134-016-0484-y.

11

Confidential - Under Protective Order

utilizing a 'trauma-informed' lens with which to assess behavior, affect and cognitive functioning of UACs.  This indicates a significant improvement in staff training, skills and practice approaches consistent with standards of excellence in child welfare.  Standards of excellence in child welfare refers to the standards that the Child Welfare League of America (CWLA) has published over 70 years that aid and assist states, localities and agencies in developing programs to ensure safety, permanency and well-being; help facilitate training curriculum development; and otherwise assist the child-serving community in finding and implementing best and promising practices in child welfare services.[8]

37.   Trauma-informed practice knowledge affects how staff understand not only the personal histories of UACs, but also affects their assessment of parents, legal guardians, and other proposed sponsors for unification purposes. Research suggests that one of the most mentioned forms of trauma for UACs is "abandonment by parents or primary caretakers"; 42% of Honduran children reported parental abandonment.[9]

38.   The second most common form of trauma is from gang-related violence.[10]  In many instances, the perpetrators of violence against children were the smugglers, who are also gang members, paid by parents or relatives to bring their children to the United States.  Children often become victims of human trafficking when families are unable to pay for their transit.[11]

---

[8] https://www.cwla.org/our-work/cwla-standards-of-excellence/.

[9] W. Savenjie and C. van der Borgh, "Gang Violence in Central America: Comparing Anti-Gang Approaches and Policies, The Broker (April 2, 2009).

[10] *Id.*

[11] Congressional Research Service Report for Congress, "Gangs in Central America" (August 2, 2007).

Confidential - Under Protective Order

39.  <u>ORR Facilities Visited & Congregate Care in Domestic Child Welfare</u>:  The facilities I visited which were selected by ORR ranged in capacity from 34 to 646 beds. The size of some of the largest facilities is not reflective of best practices in residential care.  State child welfare agencies have worked to both reduce the size of congregate care facilities and length of stay for children in these facilities over the last two decades.[12]

40.  Current trends also indicate a significant decrease in the number of domestic children placed in congregate care.  Congregate care placement for the domestic child welfare populations is usually for children who have been identified as needing more supervision and structure than a less restrictive environment can provide.[13] Children with dual diagnoses, for example combinations of severe mental health disorders, substance abuse, developmental disorders and/or physical disabilities are more likely to be placed in a congregate care setting as a first placement option, with transfer to a group home or family reunification as a future outcome.

41.   About half of domestic children in out of home care, are placed in congregate care at some point in their time in care as a result of enhanced assessment, diagnosis, or escalating behavioral problems.[14]  A transfer from congregate care to foster homes or group homes is usually based on individual prognosis for the safety and well-being of the child. [15]

---

[12] CWLA (2004). Standards of Excellence for Residential Services, https://www.cwla.org/our-work/cwla-standards-of-excellence/standards-of-excellence-for-child-welfare-services.

[13] National Conference of State Legislatures, Congregate Care, Residential Treatment and Group Home State Legislative Enactments, https://www.ncsl.org/research/human-services/congregate-care-and-group-home-state-legislative-enactments.aspx.

[14] Casey Family Programs, Research Brief, (March, 2016) https://www.casey.org/media/Group-Care-complete.pdf.

[15] *Id.*

13

42. <u>ORR-funded facilities follow child welfare practices in assessment, placement and unification of UAC: Assessment and Placement in Appropriate Level of Care</u>. Best practices in child welfare are based on decades of evidence-based research on domestic child welfare populations and the agencies that serve them.  Domestic children who are placed into state child welfare congregate care facilities are usually known to agencies, institutions, case workers and other interdisciplinary care providers for months if not years prior to their placement.

43. A domestic child, even one placed into foster care through emergency removal from an abusive or neglectful home, would most likely have a school file, and mental health and health records.  If the family had received any kind of preventive services prior to the child's placement in care, a case file with multiple assessments would also be available.  The child's family and his local community would be known to providers, and vital records would be more readily accessible. Such documentation facilitates the diagnosis and assessment of the child, the appropriate placement of that child in the least restrictive setting in his best interests, and the determination of appropriate services for the child and his family.

44. A UAC, by comparison, is most likely unknown to any U.S. agency or institution until apprehension and referral to ORR's grantee care provider network.   There are generally no assessments, diagnoses, or records of services that accompany that child to placement in an ORR-funded facility; such assessments are undertaken after the child arrives in the United States.

45. Service providers in ORR-funded facilities face a distinct challenge in being able to make an assessment of an appropriate placement setting for UACs because they lack any previous records of mental, physical or developmental disabilities.  Likewise, because so many UACs have experienced severe

14

trauma, the UACs themselves may "shut down" or be unable to give caseworkers useful information about their history.  This is a factor that distinguishes the circumstances of the UAC placement framework from the domestic child welfare framework; the UAC framework is unique in this regard.

46.   To address this initial lack of concrete information about the history and mental or physical health status of UACs the procedures ORR has implemented at the shelters is impressive.  At every shelter there was a detailed description of how a UAC is assessed by the team of services providers; how information is shared on a regular basis through a form of 'grand rounds' case review process each week; and log books are kept noting behavior and clinical sessions that are conducted on a weekly basis.

47.   This type of case management that is present at the ORR facilities is in keeping with the standards of excellence in domestic child welfare.[16] According to the case supervisors and clinical social work staff I spoke with, all UACs are assessed and evaluated weekly for emotional and behavioral changes.  Intervention is conducted with the intent to maintain UACs in the least restrictive setting through enhanced clinical services or behavior modification, as is needed; it was also evident that UACs are active participants in this process and are encouraged to discuss their concerns, frustrations and anxieties.  The purpose is to maintain continuity of placement and placement stability.

48.   The only instance in which I was made aware of an immediate restrictive placement setting based on available records was the apprehension of UACs with criminal records or records of previous deportation, or UACs that are

---

[16]https://www.cwla.org/our-work/cwla-standards-of-excellence/standards-of-excellence-for-child-welfare-services/.

Confidential - Under Protective Order

apprehended inside the United States and engaged in illicit activities (personal communication, February 10, 2020, Shenandoah).  These UACs would most likely be placed in a secure facility pending further assessment (personal communication, February 10, 2020, Shenandoah).

49.  Best practices in recent years have focused on a number of models proven to be more effective with behavioral and conduct disorders such as Multi-Systemic Therapy, Wraparound Services and Therapeutic Foster Care.[17] Clinical services and therapeutic interventions for children in congregate care settings vary greatly across states and even within different agencies.  In recent years, in recognition of the prevalence of trauma in the child welfare population, 'trauma-informed' perspectives have been increasingly prescribed in child welfare settings.[18]

50.  Clinical services are offered to the UACs at all of the ORR-funded facilities I am aware of, including those I visited.  The range and type of clinical services described to me are in keeping with what a domestic child in care might experience, including individual and group counseling every week.  In the therapeutic shelter facility I visited in McAllen, Texas, in which the staff to child ratio was 1:4, the staff told me that UACs attended group therapy once a week and individual counseling twice a week. Some facilities include art therapy or recreational therapy along with psycho-social therapy.

51.  Behavioral management models used at the facilities I visited are based on accepted therapeutic, cognitive and positive behavioral reinforcement models

---

[17] James, S. (2017).  Implementing Evidence-Based Practice in Residential Settings:  How Far Have We Come. https://dx.doi.org/10.1080%2F0886571X.2017.1332330

[18] CW360, Winter 2013, Trauma-Informed Child Welfare Practice, http://www.traumacenter.org/products/pdf_files/Complex%20Trauma%20in%20Child%20Welfare.pdf.

Confidential - Under Protective Order

commonly found in domestic congregate care settings.  Most typically the
facilities had a 'point' system where UACs would earn daily points for such
things as attending classes, keeping their room clean, participating in
activities.  Depending on the points earned the UACs were able to "buy"
treats in the "community store" – typically candy, toys, snacks, and in one
shelter special sneakers or T-shirts.  Direct services staff have either
professional degrees (most often Licensed Professional Counselor) or had
previous work experience in child welfare settings.   Staff ratios to capacity
population are appropriate to child welfare standards of excellence.[19]

52.  Case reviews, as described by the staff I spoke with, take place weekly, and
include behavioral reports from staff, incident reports, and updates on
(re)unification planning; case reviews utilize a multi-disciplinary team
approach. The staff I spoke with in each of the facilities I visited expressed
sensitivity and awareness to the trauma-informed perspective and how
previous experiences with trauma in UACs may manifest through behavior,
affect, and cognitive functioning.  Clinicians informed me of some of the
stories that the UACs have shared with them about the extreme violence and
trauma that they have experienced in the migration process or in their country
of origin.  This includes kidnapping by gangs, rape, torture, witnessing the
murder of family members, neighbors or travelling companions.  Especially
poignant were the stories of UACs who did not have family or relatives and
for whom no potential sponsor has been found – these children often saw
others leaving the facility and again experienced abandonment (personal
communication, January 17, 2020, San Antonio).

---

[19] CWLA; https://www.cwla.org/our-work/cwla-standards-of-
excellence/standards-of-excellence-for-child-welfare-services/.

Confidential - Under Protective Order

53. Staff reported that children who remained in placement longer because family, relatives or appropriate sponsors could not be located or had especially complicated histories such that it took longer to ensure the safety of the potential sponsor, did show signs of deteriorating mental health (personal communication, January 17, 2020 San Antonio). It was evident from discussion with shelter staff that every effort is made to locate a viable sponsor for a UAC as detailed in the ORR Policy Guide, § 2.2.1 for identification of qualified sponsors.

54. Wraparound services, according to staff, for UACs while in congregate care include off-site medical, psychological and psychiatric evaluation by community-based providers, as is needed. In domestic child welfare services, wraparound services would include families, relatives or other individuals or agencies with whom a child has a significant relationship. UACs can call their parents or family members through phone lines that provide privacy.

55. Legal services for immigration proceedings are available to UACs through a network of pro bono and Vera-funded providers. UACs are advised of their ability to access legal services as soon as they arrive. Notice of access to legal services for immigration are posted prominently in common areas.

56. Children in domestic child welfare are automatically assigned an attorney by the state, known as a guardian ad litem, to represent their interests in any family or juvenile court proceeding. In 15 states and Puerto Rico, state legislatures have enacted a Foster Children Bill of Rights designed to inform foster children of their rights within the child welfare system. Many children's bills of rights provide that they must be posted in a place where children will see them and include provisions requiring foster children to be informed about why they are in foster care and how the process will proceed.

Confidential - Under Protective Order

In addition, participation in extracurricular or community activities, efforts to maintain educational stability, access to guardians ad litem, access to mental, behavioral and physical health care, access to or communication with siblings and family members are major features of the foster children's bill of rights.[20] At each shelter I visited there was evidence that UACs were informed of their rights and how to make reports if they felt violated; how to access an attorney and information about immigration proceedings.

57.   At each of the UAC facilities that I visited there were materials posted on how to report sexual abuse, a child abuse hotline and information and forms for filing grievances.  When asked what the nature of the grievances the children filed, staff reported that "they complained about the food," "they didn't like the movie selections," or "they felt that they were unfairly denied points for good behavior."

58.   Unification Services: Permanency planning is a goal-oriented activity in child welfare to maintain children in their families of origin or place them with other responsible, long-term caregivers.[21]  Concurrent planning is the accepted standard of best practices in child welfare services.[22]  Concurrent planning, required in the domestic setting by the Adoption and Safe Families Act of 1997, is an approach that seeks to eliminate delays in attaining permanent families for children and youth in foster care. Effective implementation requires comprehensive and early assessment. It involves identifying and working toward a child's primary permanency goal (such as

---

[20] National Conference of State Legislatures, https://www.ncsl.org/research/human-services/foster-care-bill-of-rights.aspx#Children.

[21] Child Welfare Information Gateway, https://www.childwelfare.gov/topics/permanency/overview/.

[22] https://www.childwelfare.gov/topics/permanency/planning/concurrent/

Confidential - Under Protective Order

reunification with the birth family) while simultaneously identifying and working on a secondary goal (such as guardianship with a relative). This practice can shorten the time to achieve permanency if efforts toward the primary goal prove unsuccessful because progress has already been made toward the secondary goal.[23]

59.   ORR staff indicated that ORR-funded shelter facilities utilize a concurrent planning model for UAC unification, with preferences given to parents or legal guardians, and close relatives with a significant relationship with the UAC, as is consistent with the Flores settlement agreement.

60.   According to the directors, managers, supervisors and caseworkers I spoke with at the ORR-funded facilities I visited, the process of assessment of a UAC for unification begins when the UAC arrives.  The immediate goal for UACs placed in congregate care is family unification, "the majority of time the kids show up with the name of a sponsor" (personal communication, January 14, 2020, Southwest Keys, Brownsville, TX).

61.   ORR has implemented a system of categorizing sponsors in order of preference for UACs in its family unification process. *See* ORR Policy Guide § 2.2.1.  Initial assessment is focused on gathering information about family, relatives or potential sponsors.  Category 1 are parents or legal guardians, Category 2A are immediate relatives (brothers, sisters, grandparents, or other close relatives (aunt, uncle, first cousin) who previously served as the UAC's primary caregiver; Category 2B are immediate relatives (aunts, uncles, first cousins) who were not previously the UAC's primary caregiver; Category 4 have no sponsors identified.

---

[23] Child Welfare Information Gateway, https://www.childwelfare.gov/topics/permanency/planning/concurrent/

Confidential - Under Protective Order

62. Finding a sponsor for a UAC is an ongoing process that continues during the UAC's stay in ORR care and custody if the primary potential sponsor or primary release plan is not approved.  ORR Guide, § 2.2.1.

63. <u>Length of Time in ORR-funded Facilities</u>: The average length of stay for UACs in ORR funded facilities varies based on a number of factors.  The 'average' stay was 66 days in 2019.[24]  This is significantly shorter than the average length of stay of domestic children in foster care (2 years) or in congregate care (8 months).  According to the key personnel in the shelters I visited, the factors that explain differences in length of stay include:

- Children waiting for parents, relatives or sponsors to complete home studies and all required paperwork;

- Children with severe mental, health or physical disabilities who may need to stabilize before they can be safely placed with a parent, relative or sponsor; or

- Children who do not have any parent, relative or sponsor available to care for them.

64. These are factors that are beyond the control of ORR or facility staff.  It is important to note that for many UACs, the parent or relative that may be in the United States may also be a parent or family member that they have been separated from for a number of years.  Some parents of UACs may have re-married or had additional children with another partner.  These factors may contribute to reluctance on the part of parents and relatives to unify with UACs.

65. There is abundant need for caution in ensuring that appropriate home studies (both those mandated by law and on a discretionary basis) and background

---

[24] ORR, https://www.acf.hhs.gov/orr/about/ucs/facts-and-data.

Confidential - Under Protective Order

checks, including in some cases fingerprinting, are conducted prior to a
UAC's release to a parent, relative or potential sponsor.  Unlike domestic
children in out of home care, the families, relatives and potential sponsors of
the UAC are unknown to any agency or institution in any meaningful way.
Many parents and relatives, because of their own immigration status, do
everything possible to live and work 'below the radar' of agencies,
institutions or authorities.

66.   In contrast to ORR procedures where fingerprinting is not standard, most
states require fingerprinting of all household members prior to licensing a
home for foster care placements.  These standards are recommended as best
practices by the National Association of Regulatory Administration.[25]

67.   UACs and their families are extremely vulnerable to predation by smugglers,
gang members or others who may be engaged in human trafficking.  Lack of
appropriate home studies, inconsistent background checks and other failures
to ensure the safety and well-being of UACs resulted in past cases where
UACs were later discovered in oppressive and forced labor conditions
working on dairy farms, in landscaping, child-care and house-keeping; some
were victims of sexual exploitation and others were forced into narcotic
sales.[26]

68.   One case that was described to me during my site visit to Casa Norma Linda
in Los Fresnos, Texas was that of a 9 year old girl who had been in ORR

---

[25] NARA (2018). Model Family Foster Home Licensing Standards.
https://www.grandfamilies.org/Portals/0/Model%20Licensing%20Standards%202018%20update.pdf.
[26] USCCB, December 2012, The Changing Face of the Unaccompanied Alien
Child.  See http://www.usccb.org/about/children-and-migration/unaccompanied-refugee-minor-program/upload/A-Portrait-of-Foreign-Born-Children-in-Federal-Foster-Care-and-How-to-Best-Meet-Their-Needs_USCCB-December-2012.pdf.

Confidential - Under Protective Order

shelter care for a year.  She was diagnosed with developmental delays as well as anxiety and adjustment disorders. Her only known contact was a person in Puerto Rico that she did not know; her parents in Guatemala were uncooperative with unification efforts. The caseworker indicated that the shelter was pursuing long-term foster care options for this girl as it appeared she was a victim of human trafficking.

69.   ORR has greatly improved its process for screening potential sponsors to whom UACs are released and what conditions they will be living in after leaving the shelters.  This vetting of sponsors is particularly important because once UACs are released to them, ORR cannot resume custody. ORR's current unification practices reflect the best interests of the child in ensuring safety and well-being.

70.   There is no financial incentive for ORR-funded facilities to keep children in care longer than necessary as there is in domestic child welfare where agencies are reimbursed only as long as the child is in care.  ORR-funded shelters are reimbursed for the beds that they have available for UACs, not whether those beds are occupied.

71.   Post-Release Services to UAC: Unlike children in domestic child welfare services, UACs, their parents, relatives or other sponsors do not receive services directly from ORR once the UACs leave shelter care.  However, per the ORR Guide, Section 6, for UACs for whom a mandatory or discretionary home study is completed, or UACs who could benefit from mental health or

Confidential - Under Protective Order

1
2
3
4

other services following release, ORR contracts with various post-release social service provider organizations that provide case management services to UACs following release in order to link them to community services.

5   72.
6
7
8
9
10
11
12
13
14
15

To be consistent with best practices in child welfare, all UACs, their families, and sponsors should receive post-release services. Both UACs and their families or sponsors represent a vulnerable and at-risk population with multiple challenges for safety, stability and well-being of children. In domestic child welfare cases, unification is closely followed with referral to wraparound services in the community to ensure placement stability. As noted, however, one key difference for UACs is that ORR's custody ends at the time of release, and ORR cannot resume custody. While beyond the scope of this litigation, it is my recommendation that Congress provide additional funding for post-release services to enable more UACs and their families to be linked to community resources.[27]

16
17

Dated:  June 19, 2020

18
19
20
21
22



Ilze Earner, Ph.D., L.C.S.W.

23
24
25
26
27
28

---

[27] Supporting Successful Reunifications (October 2017) https://www.childwelfare.gov/pubPDFs/supporting_reunification.pdf.

24

Confidential - Under Protective Order

# APPENDIX 1

Confidential - Under Protective Order

# ILZE A. EARNER

## EDUCATION

| | |
|---|---|
| 5/04 | Ph.D., Columbia University |
| 5/93 | M.S.W., California State University - Fresno |
| 5/82 | B.A., City University of New York - Hunter College |

## ACADEMIC APPOINTMENTS

9/10 – present *Associate Professor*, Hunter College School of Social Work
9/13 – 2018 *Department Chair,* Human Behavior in the Social Environment
6/04 – 6/10 *Assistant Professor,* Hunter College School of Social Work
9/01 – 5/08 *Field Instructor,* Hunter College School of Social Work
1/97 – 5/08 *Field Instructor*, Columbia University, School of Social Work
1/97 - 5/04 *Field Instructor*, New York University, School of Social Work
1/96 - 5/04 *Adjunct Lecturer*, New York University, School of Social Work
1/97 - 5/99 *Adjunct Lecturer*, Columbia University, School of Social Work
9/96 - 5/97 *Field Advisor*, Columbia University, School of Social Work
9/95 - 1/96 *Guest Lecturer*, University of Latvia, Department of Sociology
9/95 - 5/96 *Adjunct Lecturer*, Pace University, Department of Sociology

## AGENCY POSITIONS

| | |
|---|---|
| 7/10-1/11 | *Acting Executive Director*; St. Cabrini Home for Children West Park, NY |
| 1/01 - 5/04 | *Project Director and Senior Policy Analyst;* Immigrants and Child Welfare Project, National Resource Center for Foster Care and Permanency Planning, Hunter College School of Social Work, New York |
| 7/97 - 2/01 | *Director of Family Services*; East Harlem Council for Community Improvement, New York, NY |
| 9/93 - 8/94 | *Social Worker*, First Step Outreach, Fresno, CA |
| 8/91-8/93 | *Case Manager*, Y.W.C.A., Fresno, CA |
| 1/86 -7/91 | *Counselor*, Berkeley Place, Inc., Berkeley, CA |

## CONSULTING ACTIVITIES

| | |
|---|---|
| 1/20-present at- | Safe Haven at Whispering Meadows – animal assisted intervention with risk children in Columbia County, NY |
| 9/14- present | M.A.S.A., Mex-EdNYC |
| 9/14-present | National Center for Excellence in Child Welfare Silberman School of Social Work at Hunter College |
| 9/04-7/14 | National Resource Center for Family Connections and Permanency; Hunter College School of Social Work |

| | |
|---|---|
| 2011-2012 | Cabrini West Park, Residential School for Emotionally and Behaviorally Disturbed Girls |
| 2006-2013 | U.S. Conference of Catholic Bishops; Bridging Refugee Youth and Childrens' Services Program |
| 2009-2010 | Adolescent Services Resource Network |
| 2008-2009 | Catholic Charities, Archdiocse of New York |
| 2007-2009 | U.S. Conference of Catholic Bishops; Department on Unaccompanied Childrens Services Program. |
| 9/02-present | Cabrini Immigrant Services |
| 9/02-6/08 | Administration for Children's Services, New York, NY |
| 12/01 | F.R.I.E.N.D.S., Mott Haven, Bronx, NY; |
| 6/00 | Department of Field Work Education, Columbia University |
| 1/97 - 6/97 | Arete Corporation, New York, NY |
| 5/96 - 12/96 | John Linder & Associates, New York, NY |
| 9/95 - 5/96 | European Union/P.H.A.R.E., Riga, Latvia |

**PROFESSIONAL AFFILIATIONS**

National Association of Social Workers (1991 - present)
Council on Social Work Education (2007- present)
PATH, International (2012-present)
ISPCAN (2012-present)
CWLA 2018-present

**PUBLIC SERVICE**

Chair of the Board, Cabrini Immigrant Services (2018-present)
Consultant, MASA – NYC; Parent-Child Home Program and Afterschool Services
    (2014-present)
Consultant, Cabrini Immigrant Services (2000-present)
Member, New York City Medical Reserve Corps; Response to Crisis Team (2002-present)

Confidential - Under Protective Order

## GRANTS/FUNDING

| | |
|---|---|
| 2018-2019 | Fellowship<br>Hunter College Silberman School of Social Work |

2015-2016     Eurasia Foundation, University Partnership Programs
              Child Protection, $35,000.

2013-2014     Eurasia Foundation.  Fellowship, Social Expertise Exchange Program – Child
Protection; $2100.00

2013-2015PSC-CUNY.  Mexican-American Youth Who Drop Out of High School in New York
City:  What Could Have Helped Them Stay in School?
              $5,000.

2009-2014     Center for the Integration and Advancement of New Americans
              Queens, NY; Administration for Children's Services, General
              Preventive Services; 5 year renewable contract
              $638,000

              Center for the Integration and Advancement of New Americans; Queens,
              NY; Department of Youth and Community Development, Services to
              Immigrant Families; 5 year renewable contract
              $620,000

2009-2012     United States Conference of Catholic Bishops; technical assistance
              $6,000

2009-2011     National Resource Center for Permanency and Family Connections;
              technical assistance;
              $18,000

2008-2009     American Humane Association; co-PI with
              Alan Detlaff, University of Illinois in Chicago
              $35,000

2008-2009     United States Conference of Catholic Bishops; technical assistance
              $6,000

2007-2010     Department of Youth and Community Development, Immigrant Families
              Initiative; NICE-CIANA
              $140,000

2007-2008     National Resource Center for Family Centered Practice and Permanency
              Planning; technical assistance
              $18,000

Confidential - Under Protective Order

| | |
|---|---|
| 2007-2008 | United States Conference of Catholic Bishops; technical assistance $3,000 |
| 2007-2008 | PSC-CUNY.  Undocumented Minors in New York State; $5,000 |
| 2006-2007 | National Resource Center for Family Centered Practice and Permanency Planning; technical assistance $18,000 |
| 2004-2006 | Department of Youth and Community Development; Immigrant Women's Outreach Program; Cabrini Immigrant Services $12,400. |
| 2002-2006 | Administration for Children's Services; Immigrants and Child Welfare Project; Training Curriculum;  $79,500. |
| 2005 | Hunter College, Auxilliary Enterprise Board Conference on Human Trafficking:  So Great a Violence $2,000. |
| 2004-2005 | Department of Health and Human Services - Office of Refugee Resettlement and Lutheran Immigration Services; National Resource Center for Family-Centered Practice and Permanency Planning $14,900; |
| | Lutheran Immigration Services, Immigrants and Child Welfare Project $5,900; |
| | Diversity Grant, City University of New York $4,000 |
| 2001-2004 | Child Welfare Fund; Immigrants and Child Welfare Project, NRCFCPP, $75,000 |
| 2000- 2003 | Administration for Children's Services; General Preventive Program, EHCCI; $431,000/three year renewable |
| 2000-2002 | Administration for Children's Services/Department of Youth & Community Development; EHCCI Beacon Preventive Services $360,000/two year renewable |
| 1999-2001 | United Way; Hunger Prevention and Nutrition Assistance, EHCCI; $3,000/renewable each year |

Confidential - Under Protective Order

2000-2001      Youth Development Initiative/Family Development Committee; Fund for the City of New York; EHCCI
$5,000

2000-2005      New York State Office of Family and Children's Services; Project Family Advantage; EHCCI
$135,000/five year renewable

## PRESENTATIONS

Earner, I.

*The Development of Child Protection Across the Former Soviet Union – A Twenty-Five Year Perspective Roundtable with representatives from 15 former Soviet republics*
The XV International Scientific and Practical Conference "Psychology of Education and Best Practices of Working with Childhood
Moscow, Russian Federation
November 20-22, 2019

Earner, I.

*De-Institutionalization in the Russian Federation and Services to At-risk Youth:  A Long Way Home*
Strengthening Families:  Moving to a Global Perspective
CWLA
Washington, D.C.
Saturday, April 13, 2019

Earner, I., Telitsyna, A.

*The Anti-Café:  Anti-dote to Social Isolation for Vulnerable and At-risk Youth*
International Society for the Prevention of Child Abuse and Neglect
16th European Regional Conference
Prague, Czech Republic
August 31 – September 5, 2018

Earner, I., Morse, J., Telitsyna, A., Semya, G., Shulga, T. and Lvoff, O.

*The Use of Digital Story-telling and Other Media in Training And Skill-Building of Child Welfare Workers, Social Work Students, Mentors and Foster Parents:  The Child's Voice Revisited*
International Society for the Prevention of Child Abuse and Neglect
15th European Regional Conference
The Hague, Netherlands
October 1 – 4, 2017

Confidential - Under Protective Order

Earner, I.

*A Modern Constructed Family:  U.S.-born Children of
Unauthorized Immigrants*
Ministry of Education and Science, Russian Federation
Russian Academy of Education, Herzen University
St. Petersburg, Russian Federation
April 13-15, 2017

Earner, I.

*Developing Competencies for Child Welfare Workers:  A
United States Perspective*
Udmurt State Pedagogical Institute
Udmurt University
Izshevsk, Russian Federation
April 19, 2016

Earner, I., Lalayants, M., Baranova, Z. and Baranov, A.

*Towards Competency-Based Workforce Development:
Collaboration Between United States and Russian Federation
Child Welfare Faculty*
International Society for the Prevention of Child Abuse and Neglect
21st International Congress
Calgary, Canada
August 28-31, 2016

Bausman, M. and Earner, I.

*A Good Place to Start:  Building Information Literacy into Social Work
Education Across Fields of Practice*
New York State Social Work Education Association
48th Annual Conference
Saratoga Springs, NY
November 18-20, 2015

Earner, I., Sahonchik, K., Semya, G. and Shulga, T.

*U.S. and Russian Collaboration to Improve Safety and Well-Being for Children
and Older Youth*
International Society for the Prevention of Child Abuse and Neglect
14th European Regional Conference
Bucharest, Romania
September 27-30, 2015

Earner, I. and Sahonchik, K.

*The Road Home:  Russian Child Welfare Services and Permanency Planning*
American Professional Society on the Abuse of Children
22nd Colloquium
Boston, MA
July 22-15, 2015

Confidential - Under Protective Order

Sahonchik, K. and Earner, I.

*Improving Outcomes for Older Youth in Russia*
Children's Mental Health Research and Policy
Conference
Tampa, FL
March 23-25, 2015


Earner, I.

*The Road Home:  Permanency for Older Adolescents in
the United States*
International Conference for the De-Institutionalization
Of Orphans:  International and Moscow Practices
Moscow City Government and Social Project Development
Center
Moscow, Russia
March 17, 2014


Earner, I. and Kriz, K.

*Immigrant Families and Child Welfare in the United States.*
International Society for the Prevention of Child Abuse and Neglect(ISPCAN)
13th European Regional Conference
Dublin, Ireland
September 17, 2013


Earner, I. and Maiter, S.

*Considering Knowledge Requirements for Services to Immigrants and Culturally
and Ethnically Diverse Families in the Child Protection System.*
American Professional Society on the Abuse of Children (APSAC)
Las Vegas, NV
June 27, 2013


Earner, I.

*Social Entrepreneurship and Field Education in Social Work:  Make the Road
By Walking*
New York State Social Work Education Association (NYSSWEA)
Saratoga Springs, NY
October 14, 2012


Earner, I.

*Immigrants and the Child Welfare System in the United States*
Norwegian Research Council
University of Bergen School of Social Welfare
Bergen, Norway
September 18, 2012

Confidential - Under Protective Order

Earner, I.

> *Engaging Immigrant Parents in Accessing Community Services*
> Cornell Cooperative Extension
> Haverstraw, NY
> September 7, 2012

Earner, I.  and Baal, C.

> *Engaging Immigrant Families, Children and Youth*
> Dominican College
> Orange, NY
> June 1, 2012

Earner, I.

> *Welcoming Immigrant Families.*
> Rockland 21 C
> West Nyack, NY
> February 9, 2012

Earner, I.

> *Integrating Immigrant Students into School Settings*
> Washington and Warren County School Consortium
> Glens Falls, NY
> January 27, 2012

Morland, L., Earner, I. and Taylor, P.

> *Strengthening Refugee Families:  Accessing Mainstream Prevention and*
> *Support Services*
> Office of Refugee Resettlement Annual Conference
> Washington, D.C.
> August 2, 2011

Earner, I.

> *The Experience of Refugee Students, and Ways to Support*
> *Their Families*
> Rockland 21st Century Collaborative for Children and Youth
> Stony Point Center, NY
> April 1, 2011

Earner, I.

> *Immigrant Issues and Child Welfare*
> Department of Health and Human Services
> The Children's Bureau
> Washington, D.C.
> October 6, 2010

Confidential - Under Protective Order

Earner, I.

    *Immigrants and Refugees:  U.S. Child Welfare Response to Special Needs*
    University of Bergen; Norwegian Research Council
    Bergen, Norway
    August 16 – 18, 2010

Earner, I.

    *Immigrant Children and Families:  Bridging Social Work Knowledge and Social
    Work Practice*
    Emmanuel College
    Boston, MA
    March, 19, 2010

Detlaff, A., Earner I.,  Fong, R. and Lincroft, Y.

    *Translating Knowledge to Practice Effectiveness*
    Council on Social Work Eduation; 55th APM
    San Antonio, TX
    November 6-9, 2009

Earner, I., Detlaff, A. and Fong, R.

    *Preparing Social Workers for Culturally Competent Practice with Immigrants
    and Refugees*
    Council on Social Work Eduation; 55th APM
    San Antonio, TX
    November 6-9, 2009

Detlaff, A., Earner I., Vericker, T. and Cabrera, J.

    *Immigrants and Child Welfare:  Turning Research Into Practice*
    17th National Conference on Child Abuse and Neglect
    Department of Health and Human Services – the Children's Bureau
    Atlanta, GA
    March 30-April 4, 2009

Earner, I.

    *The Intersection of Child Welfare and Immigration:  Unaccompanied Alien
    Children*
    Children's Rights Institute
    Rutgers University School of Law
    Camden, NJ
    March 23, 2009

Davidson, H. and Earner, I.

    *Legal Issues with Immigrant Children and the Child Welfare System.*
    Children's Law Institute
    Albuquerque, NM
    January 7-9, 2009

Confidential - Under Protective Order

Fong, R. and Earner, I.
>*Culturally Competent Practice with Mixed Status Families and Human Trafficking Victims*, Faculty Development Institute, Council on Social Work Education, San Francisco, CA
>October 27, 2007

Earner, I.
>*Culture and Trauma*
>Culturally Competent Mental Health New Jersey
>Secaucus, NJ
>September 28, 2007

Earner, I. and Schmidt, S.
>*Responding to Immigrant Families and Children*
>Center for Advanced Studies in Child Welfare
>University of Minnesota
>Kandiyohi County Health and Human Services
>Willmar, MN
>June 28, 2007

Earner, I.
>*Immigrant Issues in an Aging Population*.
>JASA, New York.
>June 22, 2007

Earner, I and Smolenski, C.
>*Human Trafficking is a Child Welfare Issue.*  National Conference on Child Abuse and Neglect, Department of Health and Human Services.  Portland, OR.
>April 16-19, 2007

Earner, I.
>*Mexican Immigrant Mothers, Domestic Violence and Child Welfare in New York City*.
>International Conference on Violence Against Women: Diversifying Social Responses.  CRI-VIFF, University of Laval and University of Montreal, Canada
>October 22-24, 2006.

Earner, I.
>*Dual Track Citizenship:  Mixed Status Families and Social Welfare Policy Affecting Access to Benefits*.
>A Convergence of Realities:  A Conference on the Intersection of International and National Humanitarian Action.  Columbia University School of International and Public Affairs.  September 28, 2006.

Earner, I.

*Human Trafficking: A Child Welfare Issue.*
Queensboro Council for Social Welfare, Flushing Hospital, June 7, 2006.

Earner, I.

*Engaging Immigrant-Serving Neighborhood-based Agencies in Training Social Work Students: Implications for Teaching Multicultural Practice.*
The 2006 power of Social Work Conference: Professional Revitalization in a Climate of Change
Albany, NY.
March 24, 2006.

Earner, I.

*Immigrants, Refugees and the U.S. Child Welfare System: A Collaborative Model Between NGOs and Schools of Social Work to Address Special Needs.*
Oxford Education Roundtable on Diversity,
Pembroke College, Oxford, United Kingdom. March 13-16, 2006.

Earner, I.

*Immigrants and Refugees and Public Child Welfare in Texas.*
Texas Consortium of Refugee Services Providers; San Antonio, TX, September 11-13, 2005.

Earner, I.

*Immigrants and Child Welfare; Issues and Community Responses;*
Annie E. Casey Foundation
Orange County, CA
July 28-29, 2005

Earner, I.,

*Global Context for Child Welfare*
New York University; Kimmel Center
New York, NY
June 1, 2005

Morland, L., Kreihbel, S. and Earner, I.,
*Roundtable on Immigrants and Child Welfare*
Office of Child Abuse and Neglect Conference
Boston, MA
April 20, 2005.

Earner, I.,

*Human Trafficking*
USCCB-LIRS Conference
Portland, Oregon,
April 14-14, 2005

Earner, I.,

>  *Creating a Culturally Competent Approach to Services*
>  DHHS - Office of Minority Health Conference
>  Washington, D.C.
>  October 27-29, 2004

Earner, I.,

>  *Immigrants and the Child Welfare System*
>  Creating a Latino Agenda in Child Welfare
>  Committee on Hispanic Children and Families; United Way
>  New York
>  June 3, 2004

Earner, I. and Gundanna, A.,

>  *Immigrant Communities and Child Welfare Training Collaboration Project*
>  NGO Committee on the Family
>  United Nations
>  New York
>  October 23, 2003

Earner, I. and McCarthy, K.

>  *Bridging the Gap:  Immigrant Communities and Child Welfare Training*
>  National Refugee Program Consultation
>  Office of Refugee Resettlement
>  Washington, D.C.
>  October 2-3, 2003

Earner, I. and Gundanna, A.

>  *Developing an Immigrant Agenda in Child Welfare Services*
>  LIRS and USCCB Roundtable
>  Washington, D.C.
>  July 20-22, 2003

Earner, I.

>  *Immigrant Issues in Child Welfare.*
>  New York State Office of Children and Family Services
>  Training symposium
>  New York
>  June 20, 2002

Earner, I.,

>  *Policy Roundtable on Immigrant Women in New York State*
>  Women in Government and Civil Society, S.U.N.Y.
>  at Albany, New York.  December 5, 2001

Confidential - Under Protective Order

Earner, I.,
>> *Immigrant Parents and Child Welfare:  Special Needs*
>> Achieving Justice:  Parents and the Child Welfare System
>> Fordham University
>> April 27 and 28, 2001.

Earner, I., Brown, H.B., Montalvo, E. and Chahine, Z.,
>> *Invisible Walls:  Immigrants in NYC's Child Welfare System*
>> The Center for NYC Affairs
>> Robert J. Milano Graduate School of Management and Urban Policy
>> New School University
>> New York
>> March 28, 2001

Earner, I., Moran, M.,
>> *Immigration and Children in Foster Care*
>> Regional Conference on Children, Youth & Families
>> Department of Health and Human Services and Children's Bureau and
>> Administration for Children and Families
>> New York
>> July 27, 2000

## PUBLICATIONS

Earner, I. and Telitsyna, A. (in press).  The Development of Child Protection Systems in the Post Soviet States:  A Twenty Five Year Perspective.  The Hague, Netherlands:  Springer International

Earner, I. and Morland, L. (November 6, 2018). No, Its Not an Infestation.  It's a Refugee Crisis.  Times Union, Albany, NY. Page A6.

Earner, I. (2017) Immigrant and Refugee Children and Families: Culturally Responsive Practice by Alan J. Dettlaff and Rowena Fong, Journal of Teaching in Social Work, 37:1, 101-103, DOI: 10.1080/08841233.2017.1254487

Fong, R. and Earner, I. (2016) Multiple traumas of undocumented immigrants:  Crisis  re-enactment play therapy:  The case of Julia.  In Nancy Boyd Webb (Ed), Play therapy with children in crisis, fourth edition.  New York:  The Guilford Press.

Earner, I. and Detlaff, A. (2015). Social work with Latinos.   In R. Fong (Ed), Social Worker's Desk Reference, third edition. New York:  Oxford University Press.

Earner, I. and Kriz, K. (2015) Child welfare and immigrant families in the United States.  In M. Skivenes, R. Barns, T. Poso and K. Kriz (Editors), Child Welfare and Immigrant Families in Ten Countries.   London:  Oxford University Press.

Earner, I., Fong, R. and Smolenski, C. (2014).  Migrating children and child welfare services in
the U.S.  In G.Mallon and P. Hess (Editors),  Handbook of Child Welfare, second edition. New
York:  Columbia University Press.

Detlaff, A. and Earner, I. (2012). Children of immigrants in the child
welfare system:  Characteristics, risk and maltreatment.  *Families in Society* 93(4), 295-303.

Detlaff, A., Earner, I., Phillips, S.D. and Choi, E. H. (2009).  Latino immigrant children in child
welfare. *Children and Youth Services Review*.

Earner, I. (2009).  Double risk:  Immigrant Mexican mothers, spouse abuse
and child welfare services in New York City.  *Journal of Evaluation and Program Planning*.

Earner, I. and Garcia, G. (2008).  Social work practice with Mexican immigrant families.  In A.
R. Roberts (Ed),  Social Workers' Desk Reference, second
edition.  New York:  Oxford University Press.

Earner, I. (Spring, 2008).  Children with immigrant parents in deportation
proceedings.  CW360.  Minneapolis, MN:  University of Minnesota Center for Advanced Studies
in Child Welfare.

Detlaff, A. and Earner, I. (2007).  (Eds.)  Special Issue:  The Intersection of Migration and Child
Welfare:  Emerging Issues and Implications. *Protecting Children:  A Professional Publication of
the American Humane Association* 22(2).  Englewood, CO:  American Humane.

Borelli, K., Earner, I. and Lincroft, Y. (2007).  Administrators in public child
welfare:  Responding to immigrant families in crisis.  *Protecting Children:  A
Professional Publication of the American Humane
Association* 22(2).  Englewood, CO:  American Humane.

Earner, I. (2007). Immigrant families and public child welfare services:  Barriers to
 services and approaches to change.  *The Journal of Child Welfare* 86(4).

Velazquez, S., Earner, I, and Lincroft, Y. (2007 January/February).  National attention to
immigration by child welfare organizations.  *Child Welfare League of America Children's
Voices,* 16(2).

Fong, R. and Earner, I. (2007).  Multiple traumas of undocumented immigrants:  Crisis
re-enactment play therapy:  Case of Ximena, age 12.  In Nancy Boyd Webb (Ed), Play therapy
with children in crisis, third edition.  New York:  The Guilford Press.

Rivera, H. and Earner, I. (2006).  A model of collaboration between schools of social work and
immigrant-serving community-based organizations to ensure child well-being.  *Protecting
Children*, *A Professional Publication of the American Humane Association* 21(2), 36-52.

Morland, L., Lummert, N. and Earner, I. (February, 2006).  Brighter Futures
for  Migrating Children:  An Overview of Current Trends and Promising Practices in Child
Welfare.  Washington, D.C.:  Lutheran Immigration and Refugee Services and United
States Conference of Catholic Bishops.  [Available on-
line:  http:www.brycs.org/documents/BRYCSReport.pdf]

Earner, I. (2006, April).  Lessons learned:  Best practices with immigrant and refugee families,
children and youth.  Washington, D.C.:  Lutheran Immigration and
Refugee Services and United States Conference of Catholic Bishops.  [Available
on-line: http://www.brycs.org/documents/cwla22706_earner_pdf]

Earner, I. (2005). Immigrant youth in the child welfare system.  In G. Mallon, P.
Hess (Eds).  Handbook of child welfare.  New York:  Columbia University Press.

Earner, I., Rivera, H. (Eds). (2005) Special Issue:  Immigrants and Refugees and Public Child
Welfare Services; *The Journal of Child Welfare* 84(5).
Washington, D.C.:  CWLA

Earner, I. (2005, March).  Case study of child welfare interventions with refugee
families in Texas.  Washington, D.C.:  Lutheran Immigration and Refugee Services and United
States Conference of Catholic Bishops. [Available on-
line: http://www.brycs.org/documents/TexasCaseStudyMarch2005.pdf]

Earner, I. and Riedel, M. (2004, May).  Enhancing field internships and building capacity in
immigrant community services.  Poster presented at Fourth International Conference on Social
Work in Health and Mental Health, Quebec City, Canada.


**CERTIFICATIONS/LICENSING**

Licensed Clinical Social Worker #5538564  New York State License #072429-1
Child Abuse:  Identification and Reporting / New York State 12-7-98

Confidential - Under Protective Order

# APPENDIX 2

Confidential - Under Protective Order

**National Child Welfare Advisory Board**

# In Search of Safe Haven:
# Reaching for Excellence in Providing
# Care for Migrating Children

September 13-15

WASHINGTON, DC

Organized by:





Confidential - Under Protective Order

## National Child Welfare Advisory Board Participant Spreadsheet

| Name Address Phone/Email | Current Job Title Agency | Areas of Expertise |
|---|---|---|
| Dona Abbot 901 Eastern NE Grand Rapids, MI 49503 Phone: 616-224-7530 DAbbott@bethany.org | URM/Foster Care Agency    Director, Bethany Christian Services | URM Foster Care |
| Wafa Abdin St. Francis Cabeva Center Catholic Charities CATHOLIC CHARITIES of the Diocese of Galveston-Houston 2900 Louisiana Street Houston, Texas 7700 713-874-6570 wabdin@catholiccharities.org | Supervising Attorney Cabrini Center for Immigrant Legal Assistance | Immigration law |
| Myrna Adkins Spring Institute 1610 Emerson Street Denver, Colorado 80218 maadkins@springinstitute.org | President/CEO Spring Institute for Intercultural Learning | Educational systems |
| Jacqueline Bhabha Harvard University-Eliot 218 79 JFK St. Cambridge, MA 02138 Phone: 617-384-7743 Fax: 617-495-4297 jacqueline_bhabha@harvard.edu http://www.humanrights.harvard.edu | Researcher Executive Director University Committee on Human Rights Studies, Harvard University | Unaccompanied minors (international); Immigration and human rights law; Research |
| Allison Boak P.O. Box 25792 Brooklyn, NY 11202 Phone: 718-222-5802 aboak@iofa.org | Executive Director, International Organization for Adolescents (IOFA | Child trafficking (domestic and international); Positive youth development; Research |
| Larry Burgess E-557 DFPS 701 W. 51ST. St. P.O. Box 149030 Austin, Texas 78714-9030 Phone: 512-438-5320 burgesl@dfps.state.tx.us | CPS Program Specialist, Texas Department of Family and Protective Services | Child Protective Services, Refugee Resettlement |
| Janet Cahill, Ph. D. 452 East Third St. Moorestown, NJ 08057 Phone: 856-866-9396 or 856-256-4500 ext. 3520 Cahillj@rowan.edu | Professor Dept. of Psych., Rowan University | Developed a model approach to assessing kinship families |

- 1 -

Confidential - Under Protective Order

## National Child Welfare Advisory Board Participant Spreadsheet

| Name<br>Address<br>Phone/Email | Current Job Title<br>Agency | Areas of Expertise |
|---|---|---|
| Elena Cohen<br>5730 Utah Avenue, NW,<br>Suite 1100<br>Washington, DC 20036<br>Phone: 202-742-5340<br>elenac@lsg-dc.com | Director,<br>National Child Welfare Resource<br>Center for Family-Centered Practice | Domestic and international:<br>CPS, Family Pres<br>Refugee Resettlement<br>Congregate Care |
| Elizabeth Dallam<br>1775 K Street NW<br>Suite 300<br>Washington, DC 20003<br>Phone: 202-296-5191<br>Dallam@unhcr.ch | Protection Officer, UNHCR | UAC |
| Rebecca Davis, PhD<br>583 Sayre Drive<br>Princeton, New Jersey 08540<br>Phone: 609-919-9172<br>BeckyTD@aol.com | Clinical Social Worker and<br>Consultant,<br>Independent Consultant and<br>Practitioner in Child Welfare Reform | Child Welfare Systems |
| Pamela Day<br>50 F St. NW 6th floor<br>Washington, DC 20001<br>Phone: 202-638-2952<br>pday@cwla.org | Director of<br>Family Center Practice,<br>CWLA | Child Welfare |
| Peter Dudding<br>209- 75 Albert Street<br>Ontario, Canada K1S 2L3<br>Phone: 613-235-4412<br>Fax: 613-235-7616<br>E-mail: peter@cwlc.ca | Executive Director,<br>Child Welfare League of Canada | Child Welfare |
| Dr. Ilze Earner<br>701 Greenwood Avenue<br>Brooklyn, NY 11218<br>Phone: 212-452-7435<br>Phone: 718- 871-5875<br>iearner@hunter.cuny.edu | Project Director,<br>Immigrants and Child Welfare Project,<br>National Resource Center for Foster<br>Care and Permanency Planning; Hunter<br>School of Social Work | Immigration<br>Child Welfare<br>UAC |
| Aline Francois, MSW<br>8320 N.E. 2nd Avenue<br>Suite 212<br>Miami, FL 33138<br>Fax: 305-756-8150<br>Aline_msw@yahoo.com | Clinical Social Worker Supervisor,<br>Haitian Women of Miami | Immigration<br>Resettlement |
| Louise Gagne'<br>1185 rue Saint-Mathieu Street<br>Montreal, Quebec H3H 2P7 Canada<br>l.gagne@ibcr.org | Community Coordinator<br>International Bureau for Children's<br>Rights | UAC-asylum in Europe and<br>Canada/international systems of<br>care for UACS |

- 2 -

Confidential - Under Protective Order

## National Child Welfare Advisory Board Participant Spreadsheet

| Name Address Phone/Email | Current Job Title Agency | Areas of Expertise |
|---|---|---|
| Maggie Gayton<br>Facility Administrator<br>Southwest Initiatives Group/Texas Shelter<br>406 S. Parker St.<br>Nixon, TX 78140<br>830-582-3300<br>mmgayton@hotmail.com | | Child Protective Services<br>Foster Care<br>Independent Living<br>Refugee Resettlement |
| Patti Grogan<br>Refugee Services<br>Dept. of Children and Families<br>1317 Winewood Blvd.<br>Bldg. 1 Room 302<br>Tallahassee, FL 32399-0700<br>Phone: 850-414-0066<br>patti_grogan@dcf.state.fl.us | Policy and Planning Manager,<br>Florida Department of Child and<br>Family Services | Domestic Foster Care<br>Refugee Resettlement<br>Child Welfare and Immigration Law<br>Trafficking |
| Anita Gundanna<br>50 Broad Street<br>Room 1701<br>New York, NY 10004<br>Phone: 212-809-4675 x103<br>agundanna@cacf.org | Child Welfare Policy and Program Coordinator,<br>Coalition for Asian American Children and Families | Policy<br>Child Welfare<br>Independent Living<br>Asian immigrant families<br>UAC<br>Domestic Violence and Gang Activity in Asian Communities |
| Bruce Harris<br>SJO 1039 P.O. Box 025216<br>Miami, FL 33102-5216<br>Phone: 011-506-253-5439<br>bruce@casa-alianza.org | Director,<br>Casa Alianza | Street Youth (domestic and/or international); Independent Living<br>Child Migration<br>CPS<br>International child welfare law |
| Judge Patrick Hillary<br>17th Circuit Court<br>180 Ottawa Avenue, N.W.<br>Suite 9200B<br>Grand Rapids, MI 49503-2751<br>Phone: 616-632-5206<br>patrick.hillary@kentcounty.org | Family Court Judge,<br>Kent County Family Court | Child Welfare Law<br>Family Preservation<br>CPS<br>Foster Care<br>Independent Living |
| Sam Joseph<br>2959 Martin Luther King Blvd.<br>Detroit, MI 48208<br>Phone: 313-463-2010<br>sjoseph@covenanthouse.org | Executive Director,<br>Covenant House-Michigan | Shelter care |

- 3 -

Confidential - Under Protective Order

## *National Child Welfare Advisory Board Participant Spreadsheet*

| Name<br>Address<br>Phone/Email | Current Job Title<br>Agency | Areas of Expertise |
|---|---|---|
| Richard Klarberg<br>120 Wall Street<br>11th Floor  Suite 10005<br>New York, NY  10005<br>Phone: 212-430-9260<br>Phone: 1-866-262-8088<br>rklarberg@coanet.org | President and CEO,<br>Council on Accreditation | Diverse population issues |
| Irena Lieberman<br>American Bar Association<br>740 15th Street, N.W.<br>Washington, DC  20005-1019<br>liebermi@staff.abanet.org | Director, Coordinating Committee on<br>Immigration Law<br>American Bar Association | Immigration Law |
| Samantha Morse<br>100 Boylston Street<br>Suite 702<br>Boston, MA  02140<br>Phone: 617-695-0041 ext. 216<br>smorse@phrusa.org | Asylum Network Coordinator,<br>Physicians for Human Rights | Forensic Exams<br>Legislative Advocacy<br>Research: Detention Effects,<br>Bone-Age Testing |
| L. Diane Mull<br>1016 South Wayne Street<br>Suite 702<br>Arlington, VA 22204<br>Phone: 703-920-0435<br>mull@endchildlabor.org | President/CEO,<br>International Initiative to End Child<br>Labor | Child Labor |
| Catherine Nolan<br>Bureau of Children Services Rm 2419<br>330 C Street SW<br>Washington, DC  20447<br>Phone: 202-260-5140<br>cnolan@acf.hhs.gov | Director,<br>Office of CAN-ACF<br>Office of Child Abuse and    Neglect | Child Welfare |
| Chris Nugent<br>2099 Pennsylvania Avenue N.W.<br>Suite 100<br>Washington, DC  20006-6801<br>202-419-2428<br>Christopher.nugent@hklaw.com | Holland & Knight LLP<br>Senior Counsel/Community Services<br>Team | Legal Treatment of Alien<br>Children |
| Lieutenant Commander Elizabeth<br>Osborne<br>1220 L Street NW<br>Suite 500<br>Washington, DC  20005<br>202-305-7173<br>Elizabeth.Osborne@dhs.gov | Public Health Services | Health Services available to<br>Undocumented Minors |

- 4 -

Confidential - Under Protective Order

| *National Child Welfare Advisory Board Participant Spreadsheet* | | |
|---|---|---|
| Name<br>Address<br>Phone/Email | Current Job Title<br>Agency | Areas of Expertise |
| Carol Peck<br>Catholic Charities USA<br>1731 King Street<br>Alexandria, VA  22314<br>703-549-1390 ext. 129<br>cpeck@catholiccharitiesusa.org | Director Family Services | Child Welfare<br>Family Preservation |
| Robin Pike<br>P.O.Box 9722 STN Prov. Govt.<br>Victoria B.C., Canada  V8W 9S2<br>Phone: 250-387-7061<br>Fax: 250-356-6534<br>Robin.pike@gems4.gov.bc.ca | Manager,<br>Divisional Operations and Support &<br>Director, Migrant Services, Provincial<br>Services Division, Ministry of Children<br>and Family Development | Trafficking<br>Refugee Resettlement<br>Accreditation/best practice |
| Lin Piwowarczyk<br>Boston Medical Center<br>Dowling 7<br>One Boston Medical Center Place<br>Boston, MA  02118<br>Phone: 617-414-5082<br>piwo@bu.edu | Boston University Medical Center | Torture survivors –mental health |
| Cecilia Saco<br>5835 S. Eastern Avenue<br>Los Angeles, CA  90040<br>Phone:323-725-4409 or 323-725-4667<br>sacoce@dcfs.co.la.ca.us | Special Immigrant Status Unit, County<br>of Los Angeles/Department of Children<br>and Family Services | Child Welfare/UACs/CPS/SIJS |
| Mattie Satterfield,<br>436 Sixth Ave, N<br>8th floor<br>Nashville, TN 37243-1290<br>work # 615-532-5626<br>mattie.satterfield@state.tn.us | Tennessee Department of Children's<br>Services, Office of Child Permanency | Kinship Care<br>Foster Care<br>Family Pres<br>Independent Living<br>CW Law |
| Susan Schmidt<br>1055 Van Slyke Avenue<br>St. Paul, MN  55103<br>651-488-2637<br>susanschmidt2@aol.com | Research Coordinator, U.S. Report<br>Seeking Asylum Alone Project | Foster Care<br>Independent Living<br>Refugee Resettlement<br>Child Migration<br>Research |
| Joanne Selinske<br>207 E. Redwood Street, 3rd Floor<br>Baltimore, MD  21202<br>Phone: 443-451-1212<br>jselinske@iss-usa.org | Director,<br>International Social Service | International and Domestic<br>Foster Care; CPS; Family<br>Preservation<br>Child Migration |

- 5 -

Confidential - Under Protective Order

| National Child Welfare Advisory Board Participant Spreadsheet | | |
|---|---|---|
| Name<br>Address<br>Phone/Email | Current Job Title<br>Agency | Areas of Expertise |
| Carol Smolenski<br>157 Montague St.<br>Brooklyn, NY 11201<br>Phone: 718-935-9192<br>csmolenski@ecpatusa.org<br>ecpatusa@hotmail.com | Director,<br>ECPAT-USA | Child trafficking and sexual exploitation, domestically and internationally; Research |
| Phyllis Stockton<br>Nationalities Service Center<br>1300 Spruce Street<br>Philadelphia, PA 19107<br>Phone: 215-893-8400<br>phyllisstockton@yahoo.com | Attorney,<br>Immigrant Children Detention and Advocacy Project<br>Nationalities Service Center | Immigration Law |
| Carola Suarez-Orozco<br>Ross Institute<br>18 Goodfriend Dr.<br>East Hampton, NY 11937<br>Phone: 617-233-6666<br>Fax: 617-496-2802<br>email: suarezca@gse.harvard.edu<br>cso2@nyu.edu | Executive Director,<br>David Rockefeller Center for Latin America,<br>Ass. Professor, Depart. of Applied Psychology NYU | Research |
| James Toner<br>1041 N. Virginia Street<br>3rd Floor<br>Reno, NV 89557<br>Phone: 775-784-1960<br>jtoner@ncjfcj.org | Dean,<br>National Council of Juvenile & Family Court Judges, University of Nevada | Juvenile Justice |
| Megan Van Fossan<br>P.O. Box 112<br>Berryville, VA 22611<br>Phone: 540- 955-2400<br>mvanfossan@grafton.org | Director,<br>Grafton Treatment Services | Adolescent Residential Treatment |
| Chia Vang<br>160 E. Kellogg Blvd.<br>St. Paul, MN 55101<br>Phone: 651-266-4249<br>Chia.Vang@co.ramsey.mn.us | Social Worker,<br>Ramsey County Com. Human Svcs | Recruiting diverse populations |
| Millicent Williams<br>50 F Street N.W.<br>6th Floor<br>Washington, DC 20001<br>Phone:202-638-2952<br>mwillia@cwla.org | Director of Foster Care Services,<br>CWLA | Child Welfare |

Confidential - Under Protective Order

## *National Child Welfare Advisory Board Participant Spreadsheet*

| Name<br>Address<br>Phone/Email | Current Job Title<br>Agency | Areas of Expertise |
|---|---|---|
| Maria Woltjen<br>Project Coordinator<br>Unaccompanied Children's Advocate Project<br>130 E. Randolph St.<br>Chicago, IL 60601<br>312-861-2936<br>[cell: 773-447-4680]<br>mariawoltjen@sbcglobal.net | Project Coordinator<br>Heartland Alliance | Child Welfare<br>Refugee Resettlement |
| Marleen Wong<br>333 Office of Child Abuse and Neglect<br>So. Beaudry<br>20th floor<br>Los Angeles, CA  90017<br>213-241-2174<br>marleen.wong@lausd.net<br>mwonglausd@aol.com | Crisis Counseling and Intervention Services<br>Los Angeles Unified School District | Child Welfare<br>Mental Health |
| Wendy Young<br>3405 Arnold Lane<br>Falls Church, VA  22042<br>Phone: 703-560-2621<br>wyoung7@cox.net | Director of Gov. Relations,<br>Women's Commission for Refugee Women and Children | Immigration law and children/human rights for children/history of care of UACs in U.S. |
| Jessica Yutacom<br>2401 E St Nw<br>Suite L505, SA1<br>Washington, DC 20522<br>202-663-1052<br>yutacomjw@state.gov | Program Officer,<br>Department of State,<br>Bureau for Refugees and Migration | Resettlement of Refugee Youth |

- 7 -

Confidential - Under Protective Order

**Office of Refugee Resettlement Staff:**

- Dr. Nguyen Van Hanh, 202-401-9246
- Jim de la Cruz, 202-401-4724
- Maureen Dunn, 202-401-5523, mdunn@acf.hhs.gov
- Ricardo Jonas, 202-401-5733, rjonas@acf.hhs.gov
- Shereen Faraj, 202-401-4631, sfaraj@acf.hhs.gov
- Juanita Matthews 202-401-4873
- Susana Ortiz-Ang, 202-401-5329 sortiz-ang@acf.hhs.gov
- Marta Pernas, 202- 401-4832, mpernas@acf.hhs.gov
- Tsegaye Wolde, 202-401-5144, twolde@acf.hhs.gov

**United States Conference of Catholic Bishops Staff:**

- Julianne Duncan, jduncan@usccb.org , 202/541-5412
- Mimi Kleiner, mkleiner@usccb.org, 202/541-3219
- Nathalie Lummert, nlummert@usccb.org, 202/541-3114
- Margaret MacDonnell, mmacdonnell@usccb.org, 202/541-3462
- Lyn Morland, lmorland@usccb.org, 202/541-3354
- Marie Mercoux, mmercoux@usccb.org

**Lutheran Immigration and Refugee Services Staff:**

- Susan Krehbiel, skrehbiel@lirs.org, 410-230-2700
- Marla Schmidt, mschmidt@lirs.org, 410-230-2700
- Tenneh Johnson, tjohnson@lirs.org, 410-230-2700
- Amy Anderson, aanderson@lirs.org, 410-230-2700
- Charu Newhouse al-Sahli, cal-sahli@lirs.org, 410-230-2700
- Kerry McCarthy, kmccarthy@lirs.org, 410-230-2700

**Institute for the Study of International Migration Staff:**

- Dr. Susan Martin, martinsf@georgetown.edu, 202-687-4712
- Dr. Elzbieta Gozdziak, emg27@georgetown.edu, 202-687-2193
- Micah Bump, bumpm@georgetown.edu, 202-687-2401
- Evelina Gueorguieva, etg8@georgetown.edu, 202-320-9526

Confidential - Under Protective Order