# DX-14

Expert Report of Dr.  Sid Mohn, June 17, 2020

JEFFREY B. CLARK
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
ERNESTO H. MOLINA, JR.
Deputy Director
CHRISTOPHER A. BATES
Senior Counsel to the Assistant Attorney General
BENJAMIN MARK MOSS
W. DANIEL SHIEH
Senior Litigation Counsel
NANCY K. CANTER
ANTHONY J. MESSURI
JONATHAN K. ROSS
Trial Attorneys
Office of Immigration Litigation
U.S. Department of Justice
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-9802
Daniel.Shieh@usdoj.gov
*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Lucas R., *et. al.*, | Case No.: 18-cv-05741-DMG-PLA |
| *Plaintiffs*, | **DECLARATION OF REV. DR. SID L. MOHN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Alex M. Azar, Secretary of U.S. Dep't of Health and Human Services, *et al*. | |
| *Defendants*. | |

## DECLARATION OF REV. DR. SID L. MOHN

I, Sid L. Mohn, declare and state as follows:

1.     I have expertise in administering child welfare services and legal programs to migrant children. I received my B.A. in sociology and anthropology at Messiah College and Temple University, my M.Div. from Claremont School of Theology, and my Doctorate in Ministry from McCormick Theological Seminary. I served as President and CEO of Heartland Alliance for Human Needs and Human Rights for thirty-five years. I make this Declaration in support of Defendants' Motion for Summary Judgment.

2.     Counsel for Defendants contacted me to provide expert opinion and testimony on the policies and procedures of United States Department of Health and Human Services, Office of Refugee Resettlement ("ORR") with respect to the care and supervision of unaccompanied alien children. Counsel asked me to review certain materials and thereafter render my opinions, which I did in a June 19, 2020 Expert Report. On August 5, 2020, I appeared for a deposition and testified regarding the contents of my June 19, 2020 Expert Report.

3.     If called as a witness to this action, I could and would testify competently to the facts and opinions set forth herein, including my June 19, 2020 Expert Report and my August 5, 2020 deposition.


I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct.

Executed this September 16, 2020 at Buchanan, Michigan.

Rev. Dr. Sid L. Mohn, D.Min.
Declarant

1

Declaration of Rev. Dr. Sid Mohn in Support of Defendants' Motion for Summary Judgment

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

LUCAS R. *et al.*,                    ) Case No.: 2-18-CV-05741 DMG (PLA)
                                      )
            Plaintiffs,               )
                                      )
      v.                              )
                                      )
ALEX AZAR, Secretary of U.S. Dep't    )
of Health and Human Services, *et al.*, )
                                      )
            Defendants.               )
                                      )
_____ )

# EXPERT REPORT OF SID MOHN

1. My name is Sid Mohn.  I currently serve as Director of Interfaith Action of SW Michigan, a peace and justice collaborative of more than thirty faith based communities.  A key focus of our work is migration.  Consistent throughout my professional career has been a commitment to human rights advocacy, specifically migrant rights for immigrants, refugees, asylum seekers and displaced populations, and child rights including advocacy around the International Convention on the Rights of the Child.

2. I was asked to prepare this synopsis of my anticipated testimony in support of Defendants, the United States Department of Health and Human Services, and the Office of Refugee Resettlement (ORR).

3. I have been asked to provide my expert opinions (at deposition and potentially trial) concerning: (1) the financial relationship between ORR and its grantee care providers; (2) whether conditions for unaccompanied alien children (UAC) in shelter care in ORR custody are safe and humane; (3) the roles of shelters in assessing and addressing the unique needs of UACs while in ORR care ; (4) the roles of shelters in vetting potential sponsors for UACs; (5) the considerations and timelines for the safe release of UACs to vetted sponsors or alternate permanency plans.

4. For the reasons set forth in this report, it is my opinion that ORR has appropriate policies and procedures in place to ensure the safe and timely release of UACs to suitable sponsors or to other permanency options. Flexible timeframes, as provided for and monitored by ORR and implemented by grantee care providers, are essential to an individualized service plan that ensures the short and long-term safety and well-being of children, both while in care in the least restrictive environment in their best interests, and upon release.

# I.  BACKGROUND AND RELEVANT EXPERIENCE

5.  I received my bachelor of arts in sociology and anthropology at Messiah College and Temple University, Philadelphia, PA in 1970 and my Masters of Divinity from Claremont School of Theology, Claremont, CA in 1973.  I also received my Doctorate in Ministry at McCormick Theological Seminary, Chicago, IL, with a focus on management of not-for-profit organizations in 1983.

6.  **Career Experiences:**  My entire career has been in the not-for-profit human services sector.  Given my twenty-five years of experience administering UAC shelter programs and my thirty-five years of experience administering child welfare, immigrant service and legal programs, my expertise is well-grounded in an understanding of immigrant population needs and in effective program administration.  My broad and deep human-service-based expertise was manifest both in Heartland Alliance's own strategic planning and policy advocacy, and also in my role as convener of U.S. and Global Working Groups on UACs.

- I was the President and CEO of Heartland Alliance for Human Needs and Human Rights for thirty-five years (1980–2015).  In that role, I launched the following initiatives relevant to this testimony:
    - Neon Street Center for Homeless Youth;
    - Saura Center for Detained Youth;
    - International Children's Centers for Unaccompanied Minors;
    - Kovler Center for the Treatment of Survivors of Torture;
    - National Immigrant Justice Center;
    - Mexico-US Advocates Network;
    - Illinois Coalition on Refugee and Immigrant Rights; and

3

  o National Association of Latin American & Caribbean
   Communities.

- My tenure at Heartland Alliance commenced in 1980 in tandem with the U.S. Congress's passage of the Refugee Act of 1980.  Consequently, I had frequent contact with the then newly-instituted U.S. Office of Refugee Resettlement (ORR).  My advisory contacts with ORR were both informal and formal, and at times took the form of advocacy. These advocacy efforts related to the following:  (1) incorporation of Mutual Assistance Associations in program funding; (2)  development of trauma and torture treatment programs; (3) inclusion and specialized resources for LGBT refugees; (4) expedited processing of refugees at extreme risk; (5) legal counsel for UACs; (6) specialized service resources for UACs; (7) the development of best interest standards for UACs; (8) and multilateral prevention and care strategies for UACs and their communities.

- Additionally, for twenty-five years, (1990–2015) I oversaw Heartland Alliance's UAC programs, which were initially launched under the auspices of the U.S. Department of Justice (DOJ), Division of International Affairs. Subsequently the program was administered through DOJ's Community Relations Program, and then transferred to the auspices of the U.S. Department of Health and Human Services (HHS), Administration of Children and Families (ACF).  UAC programs in my purview included both shelter programs and staff-secure programs.

- My experiences with ORR spanned several different political administrations. I was able to speak regularly and candidly with the Director or Associate Director of ORR (irrespective of the administration), and I was able to present and advance arguments for positive change in the care and custody of UACs.

Confidential - Under Protective Order

Given the longevity of Heartland Alliance's experience with UACs, I was consulted for my expertise both formally and informally by ORR. During my final ten years at Heartland Alliance, I typically met with the ORR Director at least annually and commonly every six months, and had phone calls more frequently. During the "surges" of arriving UACs, I often had daily conversations with the ORR Director. These communications focused on challenges Heartland Alliance was experiencing with the UAC Program, recommendations for policy or program changes by ORR or collaborative problem solving. I always felt that my concerns were heard and that efforts were made to resolve those concerns.

- From 2000 to 2014, I also invested extensively in efforts to develop regional solutions to the growing phenomenon of UACs. These efforts were undertaken to advance multi-lateral prevention strategies in order to eliminate the need for migration *or* to provide multi-lateral agreements on the protections and rights of UACs during their transit, reception, and processing. Through my tenure at Heartland Alliance, I launched the Regional Network of Civil Society Organizations on Migration, which met as an NGO parallel group to the Vice-Ministerial meetings of governments in North and Central America, known as the Regional Conference on Migration. Through the Regional Network (comprised primarily of migrant rights and legal rights groups) we endeavored to develop legal guidelines and regional protections for UACs throughout the entirety of their migration journey.

- During the period 2011–2014, I served as Convener of the Mexico-US Working Group on Unaccompanied Child Migrants which subsequently evolved to become the North and Central American Working Group on Unaccompanied Child Migrants. Meetings of the Working Group were held in Chicago, IL, Washington, DC, and Mexico City, Mexico. Participants

5

included: representatives of governments; members of Congress; international organizations; legal rights organizations; academic institutions; child rights organizations; migrant organizations; and migrant rights organizations.

- From 2012–2014, I convened a working group of legal service organizations assisting UACs, including Kids in Need of Defense, CLINIC, National Immigrant Justice Center and others. I undertook this effort to provide a common voice for UAC legal service providers in defining areas of unmet need as well as policy recommendations.

- From 2009–2014, I developed working relationships with lead international organizations concerned with UACs, including the United Nations High Commissioner for Refugees (UNHCR) (New York, Washington DC, and Mexico City offices), the United Nations Children's Fund (UNICEF), and the Women's Commission on Refugee Women and Children/International Rescue Committee.

- In addition to national and regional work on key policy issues concerning UACs, beginning in 2000, I began focusing on broader migration issues given Heartland Alliance's work with migrants, immigrants, refugees, and asylum seekers. I led the efforts of the Mexico-US Advocates Network as a cross-border network of migrant rights advocates who worked to develop a binational advocacy and rights agenda.

- In my role as a clergy person, I coordinated the second sanctuary church in the U.S. (Wellington Ave United Church of Christ, Chicago) providing safe haven to refugees from El Salvador. I also served as a volunteer with the World Council of Churches providing accompaniment to Salvadoran refugees displaced along the border in Honduras and threatened by military incursions.

- Finally, in 1990, I founded Centro Romero in Chicago, an organization which is led by and serves migrants from the Northern Triangle of Central America.

Confidential - Under Protective Order

7.   **Key Professional Accomplishments:**

- Led the growth of Heartland Alliance from a $2 million operating budget to a $110 million operating budget with a staff of 1,200 and operations in 18 countries—distinguished as the largest human rights not-for-profit organization in the U.S.;

- Founded the National Immigrant Justice Center, now the U.S.'s largest not-for-profit legal service organization for immigrants;

- Founded the following:  the Social Impact Research Center; Chicago Coalition for the Homeless; the Kovler Center for the Treatment of Survivors of Torture; the Century Place Housing Development Corporation; the Heartland International Health Center (with a focus on multi-cultural health care delivery to immigrant and refugee communities); the International Children's Center; the National Alliance of Latino and Caribbean Communities; and the Global Initiative for Human Rights;

- Established Heartland Health Outreach as a center for integrated and multi-disciplinary health and wellness services (medical, mental health and addiction services, social services, and oral health);

- Launched Health Care Interpreting Services to ensure language access to the health care system;

- Facilitated national refugee service models in the areas of employment, mental health care, medical services,  HIV care, and specialized resettlement for persons with trauma, physical disabilities, or HIV;

- Developed supportive housing for women and children experiencing trauma, HIV infected individuals, former public housing families, youth and young adults;

- Staffed the following international boards of directors:   Heartland International–UK, Heartland International–Lebanon, Heartland Alliance–Nigeria, and Alianza Heartland–Mexico;

7

- Created the U.S. Mexico Advocates Network, and the North and Central American Partnership on Unaccompanied Minors;
- Served as Expansion Lead for developing initiatives in the following: Nigeria; Kenya; Ethiopia; Sri Lanka; Afghanistan; Iraq; Lebanon; Guatemala; El Salvador; Mexico; Haiti; Dominican Republic; Ghana; Nigeria; Iraq; and Jordan.   Led pilot teams to:   Egypt; Tunisia; Libya; Rwanda; Burundi, Uganda; and the Democratic Republic of Congo. I have also been a strategic consultant to operations in Côte d'Ivoire, Rwanda, and Burundi.

8. **Board and Community Experiences:**

- Chair, City of Chicago Advisory Council on Refugee and Immigrant Affairs (1995–2013)
- Executive Committee, International Social Services (Geneva, Switzerland) (1995–2005)
- Board Chair, National Immigration Forum (2000–2002)
- Board Director, US Committee for Immigrants & Refugees (1986–1995)

9. **Awards and Recognitions:**

- United Way of Metropolitan Chicago Executive Director of the Year (1988)
- Founder's Award, Illinois Coalition on Immigrant & Refugee Rights (2015)

10. My complete academic background, training, and professional experience are further detailed and set forth in my Curriculum Vitae, a copy of which is attached hereto as Exhibit "A."

11. I have not previously served as an expert witness, to include providing expert testimony at either trial or deposition, in any criminal or civil litigation.

12. I am being compensated for my work in this case at my standard rate of $300 per hour. My compensation is not affected by the outcome of this matter.

8

Confidential - Under Protective Order

## II.   **MATERIALS CONSIDERED**

13.   In providing my opinions herein, I have considered and reviewed a number of documents: (1) the most current iteration of the U.S. Office of Refugee Resettlement Unaccompanied Alien Children's Manual of Procedures (MAP); (2) the U.S. Office of Refugee Resettlement Unaccompanied Alien Children's Policy Guide; (3) annual statistical summary of the U.S. Office of Refugee Resettlement Children's program; (4) the case files of the six named *Lucas R.* plaintiffs; (5) seventy-five ORR UAC case files with an emphasis on restrictive settings to include secure, staff-secure, and residential treatment center (RTC) placements; and (6) ORR Contracts.   A complete list of documents is included in Attachment A. I have also conducted site visits at two of the shelter programs operated by Heartland Human Care Services in Chicago, IL in December 2019, and conducted an additional site visit at a shelter operated by Bethany Christian Services in Grand Rapids, MI in January 2020.   Throughout this report, I cite portions of these and other documents or reference these site visits. These citations are intended only as examples, however, and I reserve the right to rely on all portions of these documents in addition to those cited in this report. Additionally, I may use the cited materials to assist me in preparing demonstratives such as graphics and animations for my testimony.

14.   This report is based on information known to me as of the date I signed this report, and I reserve the right to amend or supplement this report in view of any additional discovery, reports and testimony that I receive after issuance of this report.

Confidential - Under Protective Order

### III.   OPINIONS

### A. ORR's Contracting Relationship with Grantees.

15.   It is my opinion that there are no financial incentives for ORR grantee care providers to prolong the length of time UACs spend in these facilities.

16.   ORR grantee care providers typically enter into a three-year cooperative agreement with ORR. C.A. §§ I, VII, XI. However, budgets are reviewed and renegotiated on an annual basis. C.A. § 1; § IV(F)(5), (F)(8)(c); § V. Negotiated budgets are line item expense budgets that permit grantees flexibility with ORR funds to increase services as needed to provide needed services to the UACs in each specific facility's care. C.A. § IV(F)(2); § IX.

17.   My experience is that ORR annual budget negotiations are detailed and require precise documentation of line item expenses.  Contrary to some other government contracted programs —those based on a cost per unit of service or a per capita reimbursement basis— annual budgets for ORR grantee care providers are detailed and document operational costs to provide the availability of a precise number of beds on an annual basis.  The amount awarded to grantees each year by ORR is a fixed amount, whether the maximum number of beds are filled or not.

18.   Because budgets negotiated between ORR and grantee care providers pursuant to ORR cooperative agreements are not based on a per capita or per filled bed basis, there is no financial incentive for grantee care providers to either release UAC too quickly without adequate vetting of sponsors so as to increase head counts, or, on the other hand, to prolong the stay of UACs in care in order to secure a filled bed reimbursement arrangement.  This is true over time; due to past surges where ORR did not have excess shelter capacity

10

and had to push providers to set up new facilities, ORR has shown a strong preference for excess capacity rather than rush to find new placements.

19. ORR grantee care providers are funded on a fixed operational cost basis, irrespective of the number of children in care (albeit with no ability to exceed maximum capacity which would violate applicable state child welfare regulations).  *See* ORR Guide § 3.3 & 5.5.1; C.A. §§ II(1), § IV(1).

## B. ORR's Philosophy of Care for UACs

20. It is my opinion that ORR's philosophy of care for children is the gold standard based on my experience in the field in child welfare policies and programs, and ORR's philosophy of care is captured in the ORR Guide and MAP.  Shelter staff in the sites I visited were fully conversant with the necessary steps needed to ensure the "safe and timely" release of UACs to suitable, vetted sponsors, given my experience with an array of child welfare programs, simultaneously providing care to UACs that is not only safe and humane, but enriching and nurturing consistent with their best interests.

21. The ORR Guide articulates three key policy components for UACs: safety, least restrictive setting, and best interests of the child.  The three bedrock standards that are articulated in the Guide were also repeatedly expressed in the case notes found in the case files I reviewed.  These standards were also prevalent themes articulated in interviews with shelter staff during the three recent site visits I conducted in Illinois and Michigan.  Consequently, I'm able to conclude that the ORR standards are best practice—and also that the standards are also followed in practice.  It was apparent to me that the ORR system is grounded in these standards and in practice:

Confidential - Under Protective Order

- Safety (ORR Guide, §§ 1.1 (Summary of Policies for Placement and Transfer), 1.2 (ORR Standards for Placement and Transfer Decisions), and 2.1 (Summary of the Safe and Timely Release Process). The commitment to safety is evident during the time period when UACs are in ORR care and is the primary goal in the unification of a child with a suitable sponsor.

- Least Restrictive Environment (ORR Guide, §§ 1.1 (Summary of Policies for Placement and Transfer), 1.2 (ORR Standards for Placement and Transfer Decisions), and 1.4.1 (Least Restrictive Setting). ORR's Policy Guide repeatedly emphasizes that grantee care providers must provide supportive services and effective interventions, as appropriate, to keep a child in the least restrictive setting while in ORR care.

- Best Interest of the Child (ORR Guide, § 1.1, Summary of Policies for Placement and Transfer). During my long tenure in the child welfare field, I, along with many other legal and child rights advocates, have advocated for ORR's inclusion of a best interests standard as a key philosophy of care standard within the UAC program. The best interest standard is also one that is advanced on a global scale by UNHCR and by UNICEF, as well as numerous child welfare professionals and legal advocates internationally. It is encouraging to see that this important standard is explicitly incorporated in the ORR Policy Guide and ORR's decisions regarding placements and transfers of UACs in care.

22.   During discussions with grantee shelter staff at the three shelter sites that I recently visited, staff tended to shorthand these bedrock commitments as "safe and timely"—referring to obligations to keep the child safe and provide needed, individualized services in the least restrictive setting while in ORR

Confidential - Under Protective Order

1    care, with an aim towards timely release to a suitable sponsor in a safe
2    environment.

23.    While there are timelines regarding release discussed in Section Two of the
       MAP, these are not rigid deadlines, but rather guidelines which enable a
       critical determination that a potential sponsor is capable of providing for a
       child's physical and mental well-being, as is required by law. To implement
       strict length of stay timelines would violate ORR's commitments to child
       safety and well-being—both in the short term and long term.  Shelter staff
       unequivocally opposed rigid length of stay requirements as being in the
       disinterest of the child.  They reiterated that they are guided by "safe and
       timely" standards and that their goal is to release the child as soon as possible
       to a safe and humane environment.  It should be noted that national ORR staff
       and the ORR Federal Field Specialists (FFS) provide ongoing oversight as to
       length of stay so an institutional check and balance is in place (a continuous
       monitoring mechanism so to speak). *See* ORR Guide, § 5.5, ORR Monitoring
       and Compliance.

24.    For these reasons, it is my opinion that, while providing care in the least
       restrictive setting that meets children's unique needs consistent with their best
       interests, ORR's UAC program adheres to the principles of "safe and timely"
       release, and has appropriate safeguards in place to balance any tensions
       between the two.

**C. Shelter Services**

25.    It is my opinion that shelters operate best when they are given operational
       flexibility to provide services that meet or exceed ORR's policy requirements.
       It is also my opinion that while awaiting release to a safe home with a suitable
       sponsor or an alternate permanency plan, ORR shelter care provider facilities

13

Confidential - Under Protective Order

provide excellent care and services to often-traumatized UACs which is consistent with their individualized needs and best interests, and as is assessed on an ongoing basis from the time that UACs enter care.

26.  Based on my experience, in overseeing shelter programs in Illinois and in visiting the 3 sites detailed previously in this report, it is my view that shelters implement ORR's policies and procedures beginning with their initial interaction with UACs.  ORR's mandated intake and assessment protocol is very precise and is critical to the care, safety, and best interest of the child. This Initial Intakes Assessment must be completed within twenty-four hours of the UAC's admission to the facility and a complete medical screening must occur within forty-eight-hours.  *See* ORR Guide, §§ 3.2.1, Admissions for UAC; 3.4.2, Initial Medical Exam.  The ORR Guide provides a detailed checklist of tasks for the shelter provider to accomplish to ensure the physical and mental well-being of children.  *See* ORR Guide, § 3.2.1, Admissions for UAC.

27.  Based on my experience operating the Kovler Center for the Treatment of Survivors of Torture and Trauma at Heartland Alliance, issues of safety and basic needs must be addressed. Consequently, the first order of business is for the child to be fed, to sleep a full night in safety and warmth, to know that they are in a safe place where they are not in danger, to know that their health concerns will be addressed, and to know that someone is helping them connect to family. From my direct experience with shelter programs in Chicago, it is customary for UACs to have significant and positive weight gains during their first month in shelter care (children often arrive malnourished and dehydrated); and shelter staff report that children quickly outgrow clothes and must be repeatedly refitted with new clothes.

14

28.   In addition to the initial intakes assessment, ORR also requires a comprehensive assessment of UACs on an ongoing basis. *See* ORR Guide, § 3.2.1, UAC Assessment and Case Review).   A thorough and multifaceted assessment is critical for the provision of appropriate shelter services in the short-term, the referral to essential health and mental health care services, healing from the journey to the United States, and assessing options for long-term permanency with a suitable sponsor or alternative plans.

29.   Critical to a thorough assessment of a UAC's needs is the establishment of trust between the child, the facility in general, and the primary staff team (comprised of the clinician, case manager, and youth care workers) who interact with the child.  In my experience, UACs often have had few trusting relationships during their migration and have appropriately learned to be untrusting of authorities or unknown individuals.   Consequently, trust building is key as a threshold to UACs' short and long term well-being.

30.   As is consistent with my review of the *Lucas R.* case files, children often experienced trauma in their home country in the form of physical and sexual abuse, violence and/or family disintegration in the country of origin.  Given this reality and without the establishment of a trusting triad between the child, the facility, and the primary staff person, a full assessment and the revelation of past traumas will not occur.  Revelation of these traumas, particularly if the perpetrator is a proposed sponsor, is crucial to ensuring a safe release to a sponsor.   While the Initial Intake Assessment, which as noted must be completed within twenty-four-hours of the UAC's admission to a shelter facility, includes screening for abuse or trafficking, ongoing assessments of risk are done while the child is in ORR care.  *See* ORR Guide, § 4.8.1, Assessment of Risk.

Confidential - Under Protective Order

31.  During my 35 year tenure at Heartland Alliance, I have had the opportunity to visit multiple shelter sites in Illinois and in Texas in my professional capacity as Heartland Alliance's CEO, and, most recently have visited shelter sites in Illinois and Michigan. I found that these shelters are clean and well-maintained, are licensed by their state child welfare departments in accordance with very strict standards, are child and youth friendly, and are decorated with festive art to include children's own contributions of posters and art pieces.

32.  The Heartland shelters in Illinois also include posters on the Universal Declaration of Human Rights and other human rights themed posters. Reprints of children's rights and responsibilities, written in several different languages, are posted in facilities' common areas and—in the case of Heartland facilities—are also posted in each child's room.  These postings are indicative that the shelter program affirms children's human rights and seeks to convey this commitment to the children.  Staff explained that site standards of conduct and obligations are challenging to absorb in an initial orientation and are therefore posted as a permanent referral resource for the children.

33.  Multi-lingual and multi-cultural signage, food, and events are tailored in accordance with the ethnic and nationality diversity of children in residence.

34.  Shelter sites that I visited exceeded ORR requirements, which, based on my child welfare experience, I consider to be the gold standard in child welfare as articulated in the ORR Guide (see ORR Guide, § 3.3, Summary of Services), and had multiple ORR approved agreements with external health and mental health providers.  These third party providers also help acclimate children to the "real world" of receiving medical and mental health care in community settings.  For example, Heartland has an agreement with Rush

Confidential - Under Protective Order

Presbyterian Hospital to provide UACs with a full array of mental health, psychological, and psychiatric services that could not be provided in-house. Heartland also has agreements with Howard Brown Health Center for LGBTQI youth, with Lurie's Children's Center for medical care, with the Erickson Institute for developmental and psychological care, and with Kovler Center for Survivors for torture treatment.

35.   While external resource agreements, where available, are key to the package of services, shelter staff stressed that referral to professional psychiatric or psychological care is not the first step that is pursued.  Each shelter has their own clinical team and these teams work closely with the child on psychological education and self-care.  Additionally these teams, along with placement staff, work with sponsors relative to the mental health needs of children and provide psychosocial education to the sponsors in preparation for integration of the children into their homes and the arrangement for post release community based services, as is needed.

36.   ORR also requires that ORR-funded grantee care providers be trained in child friendly and trauma-informed interviewing, assessment, observation, and other techniques.  *See* ORR Guide §§ 3.2 & 4.3.6; C.A. § IV(C).

37.   Each child in shelter care must also have an Individual Service Plan in addition to the provision of standard services.  *See* ORR Guide, § 3.3, Care Provider Required Services.  A review of case files indicated that these were in place.

38.   During my prior experiences with ORR, I often advocated for services sensitive to the needs of LGBTQI youth.  I was impressed that the ORR Guide now includes an extensive section on LGBTQI youth and requires shelter sites

Confidential - Under Protective Order

to have LGBTQI inclusive policies, programs, and services. *See* ORR Guide, § 3.5, Guiding Principles for the Care of UACs who are LGBTQI).

39.   In summary, the comprehensive bundle of services (required and monitored by ORR) for UACs in ORR care is an essential contribution to the child's transition to life in the United States upon release to a suitable sponsor. In addition to the baseline of well-being services, of particular value are the following services:   pre-vocational, English language instruction, basic educational skill development, independent living skills development, and orientation programs directed to life in the United States.

40.   For these reasons, it is my opinion that the period of time UACs spend in the ORR shelter care system, while the safe and timely release process proceeds, provides for a wide array of short and long-term benefits. These benefits include:   health assessments and treatment plans; educational skill development; vocational skill development; behavioral management; building of interpersonal skills and trusting relationships; cultural orientation; and preparation for community integration.   Thus, the period of shelter stay is critical preparation for a UAC's safe and successful release, and unification with a vetted, suitable sponsor, or an alternative permanency plan.

**D.  Sponsor Unification**

41.   It is my opinion that shelters provide a safe and nurturing environment for UACs while simultaneously taking essential steps to vet potential sponsors so that UACs may be unified with them in a safe and timely manner.

42.   According to the ORR Guide § 2.1, the guiding standards in the release process are:   safe and timely release, promotion of public safety, and assurance that sponsors are able to provide for the physical and mental well-

18

being of children. As previously discussed, shelter placement staff in the shelters that I recently visited in Illinois and Michigan consistently expressed the guidelines of "safe and timely" release as a summation of the conditions of release.  Underscoring the critical nature of these standards of release, it should be noted that release to a sponsor is not a magical fix in and of itself. Rather, release must take into account child safety and well-being, as well as public safety.

43.    Domestic child welfare systems typically assess placement decisions for children removed from the home due to abuse or neglect through face-to-face encounters with potential caregivers.  Within the ORR UAC program, to limit the duration of the UAC's custody, the vetting of sponsors is done primarily (and necessarily) through a paper process (except in those mandated situations in which a home study is required by law, or in discretionary situations where a home study is appropriately requested for important safety reasons).  *See* ORR Guide § 2.4, Sponsor Assessment Criteria and Home Studies.

44.    Ensuring safety is of critical importance in the release process, and a too-hasty release to an un-vetted sponsor poses unwarranted potential danger to a UAC. As stated in the ORR Guide, the goal is to release children "in a safe, efficient and timely manner . . . and to ensure that sponsors are able to provide for the physical and mental well-being of children."  ORR Guide, § 2.1.  ORR's policies and practices, as enumerated throughout the ORR Guide, Section 2, describe accountabilities to achieve these twin goals of a safe and timely release, and family reunification.

45.    Within 24 hours, the shelter placement specialist is required to send the potential sponsor a family reunification packet. ORR Guide § 2.2.3.  Through

Confidential - Under Protective Order

my review of case files and my discussions with shelter staff, this 24 hour requirement is being met. My review of case files indicated that some sponsors return completed packets and all supporting documentation in a relative short period of time.  In those instances, the reunification process was of short duration.   In contrast, other case files indicate prolonged delays (months and months) in receiving completed and documented packets from potential sponsors.  Reasons for delays included the following:   a non-responsive sponsor who loses interest in sponsorship; non-responsive parents in the home country who failed to submit a Letter of Designation of Care of a Minor; communication issues with parents in their home country such as remote locations or lack of phone or computer resources; difficulty in securing important documentation (e.g., identification or proof of relationship documents);   fingerprinting   or   background   check   difficulties;   and/or submission of incomplete or fraudulent packets.

46.   During my recent shelter site interviews in Illinois and Michigan, shelter staff explained that family reunification, or sponsorship is not a one-point-in-time event.  Rather, it is a highly individualized process entailing the child, the potential sponsor or sponsors (concurrent planning may be done), and other household members as warranted—and consequently a legitimate, safety-based process that cannot be strictly time-limited in all cases.

47.   Case files I reviewed documented the individualized nature of this process of release to a sponsor. At times, a potential sponsor may have initially indicated a willingness to serve as a sponsor and welcome a child into his or her home, only to later withdraw that interest or ability. In the obverse, there were documented cases in which the UAC initially welcomed placement with a potential sponsor only to later express fears of being placed with the potential sponsor.   It should be noted that oftentimes UACs have never met the

potential sponsor or have not seen the potential sponsor in years so this requires careful communication, exploration and evaluation between the potential sponsor and the child.  In such cases, the release process should not be short-circuited simply to expedite the release of a UAC to a sponsor without taking important steps to assure safety. Notably, shelter staff often expend considerable time in facilitating communication between the UAC and the potential sponsor, assisting them in developing a trusting and caring relationship, where little or no history of relationship had existed previously.

48.   Fears on the part of undocumented sponsors can also sometimes prolong release decisions.  Many times ORR grantee care provider case managers or other shelter staff must invest time in building trusting relationships with potential sponsors, assuring them as best as possible that their futures will not be jeopardized by coming forward.  As with the building of a trusting relationship with a child to ensure a comprehensive assessment and appropriate individualized services, so too is trust building with a potential sponsor critical to ensure the UAC's safe release and long term permanency.

49.   In my review of case files, I noted that Family Reunification Packets can go back and forth many times given the absence of essential information, the lack of important and necessary documentation, the addition or subtraction of information that may impact safety issues (e.g., a change in address, withdrawal of support from a household member serving as a back-up caregiver), the changed perspectives of children or the potential sponsor, or the discovery or disclosure of complicating concerns that may militate against a safe release.  Again, the flexibility of release time lines is essential to ensure a thoroughly vetted process—the well-being and safety of a child is at stake.

21

Confidential - Under Protective Order

50.   In contrast, in  my review of case files, I noted several cases in which a child was unified with a Category 1 sponsor (parent or legal guardian) within seven to eight days based on immediate identification of the sponsor, the lack of complicating concerns, and the absence of delays in receiving or evaluating the sponsor's application packet.   This timeframe was also confirmed by interviews with shelter staff during my recent site visits in Illinois and Michigan.

51.   Were ORR to implement a policy requiring an arbitrarily selected timeframe upon which release was mandatory (that is, a UAC must have been released within sixty days), the complete vetting of a sponsor needed for a safe release could not always occur.

52.   The decision to release a child to a sponsor, or another placement, requires the involvement of the case manager, the case coordinator (a non-governmental contracted field staff person), ORR's Federal Field Specialist (FFS), and when applicable, the child advocate. This multi-party decision making is critical to ensure that considerations of the child's safety, and short and long term well-being are sufficiently evaluated.  Each role brings a unique prospective and fresh eyes to each reunification effort.  This team can approve release, approve the release with mandated post release services, require a home study, deny release, or remand the case for further information. *See* ORR Guide § 2.7, Recommendations and Decisions on Release.

53.   Home studies are required, according to ORR policy and federal law (ORR Guide §§ 2.4 and 2.4.2) for survivors of human trafficking, children with special needs, or with a disability as defined by the Americans with Disabilities Act, children who are victims of physical or sexual abuse with indications that the child's health or welfare has been harmed or threatened,

Confidential - Under Protective Order

or situations in which a child's sponsor presents a risk of abuse, maltreatment, exploitation or trafficking.  Children who are under the age of twelve and are being released to a non-relative, or a non-relative who has or is seeking to sponsor multiple UACs must also have a home study.  Additionally, ORR can request a home study as necessary on a discretionary basis to ensure the welfare of the child.  *See* ORR Guide, § 2.4.   In these mandated or discretionary home study requests, release decisions are not made until the home study has been completed and results submitted to ORR.  Results from such home studies are necessary in order to ensure the UAC's safety, protection, and well-being.

54.   Of the six *Lucas R.* named Plaintiff case files I reviewed, there were serious complications warranting any delays in release.  Each child had complex health, mental health, or behavioral issues which needed to be addressed during the release process. Additionally, there were a variety of sponsor identification, documentation, and evaluation delays that *further* lengthened, albeit appropriately, the release decision.  In my opinion, shelter staff and ORR did not appear to delay release decisions on an arbitrary basis. Rather, the case files illustrated the multiple challenges in identifying and approving appropriate sponsors who could assure the children's safety, and physical and mental well-being.

55.   Of the seventy-five case files I reviewed, I found multiple examples involving trauma in the country of origin, multiple Significant Incident Reports (SIRs) both from the UAC's background experience and in the ORR setting, and/or diagnosed mental illnesses (typically with sponsor or parental approval for treatment) which warranted longer stays in care. To the contrary, cases with no Significant Incident Reports, and an easily identified and vetted sponsor tended to be released within four to six weeks.

Confidential - Under Protective Order

56. For these reasons, it is my opinion that ORR's unification decisions are made in accordance with appropriate "safe, efficient, and timely" criteria in order to ensure that sponsors are able to care for the child's physical and mental well-being.  It is also my opinion that when sponsors are quickly identified and there are no complexities around sponsor assessments that children are released in a short period of time; and, when there are complexities, application delays, or substantive assessment concerns that flexible timelines around release are important to ensure that the child is placed in a safe home setting with access to post-release services as may be needed.

57. I reserve the right to amend or supplement this Report based on further preparation or discovery in this action, including my review and any further expert statements or reports submitted on behalf of Plaintiffs. I reserve the right to supplement or amend my opinions in response to opinions expressed by Plaintiffs' experts, or in light of any additional evidence, testimony, or other information that may be provided to me after the date of this Report, including at trial. In addition, I expect that I may be asked to testify in rebuttal to issues that may be raised in the reports of Plaintiffs' experts, or to issues that may be raised by fact witnesses and technical experts at trial.


Dated: June 17, 2020

_____

Sid Mohn

Confidential - Under Protective Order

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

1

2

3    LUCAS R. *et al.*,                                ) Case No.: 2-18-CV-05741 DMG (PLA)
                                                       )
4                  Plaintiffs,                         )
                                                       )
5            v.                                        )
                                                       )
6    ALEX AZAR, Secretary of U.S. Dep't                )
                                                       )
7    of Health and Human Services, *et al*.,           )
                                                       )
8                  Defendants.                         )
                                                       )
9    _____               )

10

11                          **ATTACHMENT A TO**

12                **EXPERT REPORT OF SID MOHN**

13                       **(Curriculum Vitae)**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Confidential - Under Protective Order

## Biographical Summary

Rev. Dr. Sid L. Mohn, OEF
104 Mount Tabor Road
Buchanan, Michigan 49107
Sid.impacto@gmail.com
312-209-1301

**Educational Background:**

B.A. - Sociology/Anthropology – Temple University, Philadelphia, PA
M.Div. - Claremont School of Theology, Claremont, CA
D.Min. -  McCormick Theological Seminary, Chicago, IL (Doctoral Focus – Management and Leadership of Not for Profit Organizations)

**Key Competencies:**

.Leadership and management of large multi-service organizations
.Development of competency-based professional educational programs and team building
.Program Development and Impact Evaluation
.Integration and coordination of multi-disciplinary services and systems
.Strategy and organizational transformation
.ROI analysis

**Career Experiences:**

.Office Director, American Osteopathic Association, Office of Hospital Affairs
.Community Organizer, La Casa Community Center (So. California) and Bedford Stuyvesant Youth Center
.US Coordinator,  International Documentation Center
.Deputy Director, Kane & DeKalb Counties (IL) Employment Consortium
.Strategic Planner, Chicago Urban League
.Chief Executive Officer, Heartland Alliance for Human Needs & Human Rights
.Founder and Chief Executive Officer, IMPACTO Consulting
.Convener, Interfaith Action of Southwest Michigan

**Key Professional Accomplishments:**

.Led the growth of Heartland Alliance from a $2 million operating budget to a $110 million operating budget with a staff of 1,200 and operations in 18 countries – distinguished as the largest human rights not for profit organization in the US;
.Established a Washington DC Office and facilitated regional expansion from Illinois to Michigan, Indiana, and Wisconsin, along with sub-granting throughout the US;
.Developed Heartland University with a two track system: one for professional skill development and one for management and leadership;
.Founded the Chicago Health Care for the Homeless initiative as a metropolitan-wide program, one of 15 RWJ Foundation pilot initiatives in designated metropolitan areas;

.Founded the National Immigrant Justice Center, now the US's largest not for profit legal service organization for immigrants;

.Founded the following: the Social Impact Research Center, Chicago Coalition for the Homeless, the Kovler Center for the Treatment of Survivors of Torture, the Century Place Housing Development Corporation, the Heartland International Health Center (with a focus on multi-cultural health care delivery to immigrant and refugee communities, the International Children's Center, the National Alliance of Latino and Caribbean Communities, and the Global Initiative for Human Rights;

.Established Heartland Health Outreach as a center for integrated and multi-disciplinary health and wellness services (medical, mental health and addiction services, social services, and oral health);

.Developed Chicago's first homeless elderly dental program and first dental program for HIV infected individuals;

.Developed elderly homeless research and pilot program initiatives and the nation's second LGBT elderly affordable housing project;

.Launched national homeless youth pilot inclusive of street outreach, drop in center services, and transitional housing;

.Launched a national model of HIV care including medical care, addictions treatment, recovery housing, emergency shelter, transitional housing and permanent housing;

.Piloted one of Illinois' first harm reduction program for injectable drug users and a continuum of care services for person with severe mental illness and addictions;

.Launched Health Care Interpreting Services to ensure language access to the health care system;

.Facilitated national refugee service models in the areas of employment, mental health care, medical services, HIV care, and specialized resettlement for persons with trauma, physical disabilities, or HIV;

.Developed supportive housing for women and children experiencing trauma, HIV infected individuals, former public housing families, youth and young adults;

.Operated one of the US's most comprehensive homeless services programs including health care, employment, addictions treatment, transitional and permanent housing;

.Staffed the US Boards of Directors of Heartland Alliance and its 3 subsidiary entities;

.Staffed the following international boards of directors: Heartland International – UK, Heartland International Lebanon, Heartland Alliance Nigeria, Alianza Heartland Mexico;

.Created the US Mexico Advocates Network and the North and Central American Partnership on Unaccompanied Minors;

.Served as Expansion Lead for developing initiatives in Nigeria, Kenya, Ethiopia, Sri Lanka, Afghanistan, Iraq, Lebanon, Guatemala, El Salvador, Mexico, Haiti, Dominican Republic, Ghana, Nigeria, Iraq, Jordan. Led pilot teams to Egypt, Tunisia, Libya, Rwanda, Burundi, Uganda, Democratic Republic of Congo. Strategic consultant to operations in Côte d'Ivoire, Rwanda, Burundi.

**Consultancy Projects:**

.Social Determinants of Health Consultant – Trinity-Health's National Innovation Program on Medicaid/Medicare Eligible Individuals and Trinity-Health's Philosophy of Care Development for national health care for the homeless initiatives

.Alliance of Chicago Community Health Centers – Development of health care research capacity and Clinical Integrated Network Design

.Leadership Mentor – Kinexus Employment and Economic Development; Implemented Senior Leadership and Middle Manager Professional Development programs and Strategy and Impact Evaluation Consultant

.Strategy Consultant and CEO Mentor – South Bend Heritage Foundation

.Strategy Consultant – United Way of Southwest Michigan

Confidential - Under Protective Order

.Strategy Consultant – Notre Dame University's Center for Social Concerns
.CEO Mentor – Fernwood Botanical Garden

**Professional Certifications:**

Ordained Clergy, United Church of Christ
Professed, Order of Ecumenical Franciscans

**Board and Community Experiences:**

.Advisory Council, Ethiopian Community Association
.Commissioner, City of Chicago Commission on Human Relations
.Chair, City of Chicago Advisory Council on Refugee and Immigrant Affairs
.Co-Chair, Illinois Governor's Commission on the Elimination of Poverty
.Executive Committee, International Social Services (Geneva, Switzerland)
.Board Chair, National Immigration Forum
.Board Director, US Committee for Immigrants & Refugees
.Board Director, Adler University
.Board Director, Diaconia Connections
.Board Chair, Synergia – Global Initiatives for Human Rights
.Ecumenical Franciscan Associate, St. Peter's United Church of Christ
.Founding Board, One Buchanan
.Contributor, National Journal of Nonprofit Learning and Education
.Interfaith Consultant, United Religious Communities and Community of the Holy Cross
.Diversity and Inclusion Consultant, Andrews University

**Awards and Recognitions:**

.United Way of Metropolitan Chicago Executive Director of the Year
.State of Illinois' Governor's Award for Not for Profit Leadership
.City of Chicago Commission on Human Relations Wright Award for Human Rights Leadership
.LaSalle Bank Community Leaders Award
.City of Chicago LGBT Hall of Fame
.Founder's Award, Illinois Coalition on Immigrant & Refugee Rights
.Founder's Award, Centro Romero
.Human Rights Leader's Award, Centro Romero
.Goldman Religious Leadership Award
.DePaul University Rerum Novarum Award

**All Publications Authored in the Previous 10 Years:**

.None. Earlier publications are as follows:

*Central American Refugees:  The Search for Appropriate Responses*. World Refugee Survey 1983
*Nurturing the Vision of Plurality.* Illinois TESOL. Volume 15. November 1987
*From Charity to Entrepreneur.* Institute of Cultural Affairs. Volume 16. Summer 2000

Confidential - Under Protective Order

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

LUCAS R. *et al.*,

        Plaintiffs,

    v.

ALEX AZAR, Secretary of U.S. Dep't of Health and Human Services, *et al.*,

        Defendants.

Case No.: 2-18-CV-05741 DMG (PLA)

# ATTACHMENT B TO
# EXPERT REPORT OF SID MOHN
## (Reviewed Documents)

# REVIEWED DOCUMENTS

- ORR Guide (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied)
- ORR Forms (https://www.acf.hhs.gov/orr/resource/unaccompanied-childrens-services)
- ORR Statistics (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied)
- Case files belonging to 75 randomly selected UACs
- Case files belonging to the named Plaintiffs in this case
- Prior ORR Policy Guides (2017, 2018, and 2019)
- Emails and other files from Defendants' Document Production 4, 6, 8
- Plaintiffs' Responses to Defendants' Revised First Set of Interrogatories
- UAC Procedures Ops Manual v1 (2012-2014)
- UAC Procedures Ops Manual v2 (2013-2015)
- UAC Procedures Ops Guide (2015-present)
- UAC MAP (2017-present)
- First Amended Complaint
- Answer to First Amended Complaint
- Defendants' Responses to Plaintiffs' Request for Admission
- Defendants' Second Set of Responses to Plaintiffs' Request for Admission
- Cooperative Agreement – Residential Services (February 2017)
- Cooperative Agreement – Secure Addendum and Staff Secure Addendum
- ORR "Children Entering the United States Unaccompanied"
- Attached ORR Contracts

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

LUCAS R. *et al.*,                                )   Case No.: 2-18-CV-05741 DMG (PLA)
                                                  )
              Plaintiffs,                         )
                                                  )
       v.                                         )
                                                  )
ALEX AZAR, Secretary of U.S. Dep't               )
of Health and Human Services, *et al*.,          )
                                                  )
              Defendants.                         )
                                                  )
_____          )

**ATTACHMENT C TO**

**EXPERT REPORT OF SID MOHN**

**(ORR Shelter Flow Chart)**



Confidential - Under Protective Order

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

LUCAS R. *et al.*,                        )        Case No.: 2-18-CV-05741 DMG (PLA)
                                          )
            Plaintiffs,                   )
                                          )
      v.                                  )
                                          )
ALEX AZAR, Secretary of U.S. Dep't        )
of Health and Human Services, *et al*.,   )
                                          )
            Defendants.                   )
                                          )
_____  )

## ATTACHMENT C TO

## EXPERT REPORT OF SID MOHN

## (ORR Contracts and Budgetary Factors)

Confidential - Under Protective Order

# ORR BUDGETARY FACTORS

**Personnel Expenses**

Salaries

Benefits


**Direct Expenses**

Rent

Utilities

Maintenance

Repairs

Insurance

Telephone

Computer

Furnishings

Clothing

Toiletries

Food

Food preparation

Recreational costs

Vehicles

Transportation expenses

Instructional materials

Medical supplies

Subcontractors


**Other Indirect Expenses**

Confidential - Under Protective Order

# COOPERATIVE AGREEMENT

## BETWEEN

## U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,

## ADMINISTRATION FOR CHILDREN AND FAMILIES (ACF),

## OFFICE OF REFUGEE RESETTLEMENT (ORR)

## DIVISION OF UNACCOMPANIED CHILDREN'S OPERATIONS (DUCO)

## AND

## Heartland Human Care Services, Inc. (90ZU0233)

**SECTION I**: <u>Summary</u>

The Director of the Office of Refugee Resettlement (ORR) of the Department of Health and Human Services (HHS) has responsibility for the care and placement of unaccompanied children (UC) in accordance with Section 462 of the Homeland Security Act of 2002 (HSA of 2002), 6 U.S.C. § 279. An unaccompanied child is defined under 6 U.S.C. § 279(g)(2) as a child who is: under 18 years old, who has no lawful immigration status in the United States, and no parent or legal guardian in the United States or no parent or legal guardian in the United States available to provide care and physical custody.

Within ORR, the Division of Unaccompanied Children's Operations (DUCO) has delegated authority for the care and placement of UC.

1

Confidential - Subject to Protective Order

GOV-00126439

The DUCO's primary objectives are to provide a safe, appropriate, and placement in the least restrictive environment for UC, taking into consideration the risk of harm to the UC or others, the community and the risk of flight, while in ORR custody until they are released to a sponsor, obtain immigration legal relief, age out, or are discharged to the Department of Homeland Security (DHS).

ORR provides residential care and services through contracts or through the competitive or non-competive grant process to organizations incorporated under State law which have demonstrated child welfare, social service, or related experience and are appropriately licensed to provide care and related services to dependent children. Recipients of ORR funding, that provide residential services for UC, must comply with State residential care licensing requirements; the Flores Settlement Agreement, Case No. CV85-4544-RJK (C.D. Cal. 1996) (Flores settlement agreement); pertinent federal laws and regulations, and all ORR policies and procedures.

Pursuant to 6 U.S.C. §279 the Director of the ORR, hereinafter called the Director, approves awards for residential services to UC. In accordance with this award and pursuant to the aforementioned laws, **Heartland Human Care Services, Inc.** has funding approved to provide residential services for UC, which meets the requirements in the previous paragraph.

Pursuant to the aforementioned laws, Heartland Human Care Services, Inc., hereinafter called Heartland Human Care Services, Inc has submitted an application and has been approved for funding to provide residential services for UC.

By signing this Cooperative Agreement, the Director agrees to make a grant award in accordance with approved annual continuation applications and quarterly reviews of program performance and financial reports for the project period of the grant. Under the terms of this agreement, Heartland Human Care Services, Inc. will provide residential services for UC.

This Cooperative Agreement and the Terms and Conditions, listed in Heartland Human Care Services, Inc. Notice of Award (NoA), establish the requirements and responsibilities for implementing Heartland Human Care Services, Inc. residential services for UC. Continued

2

Confidential - Under Protective Order

Confidential - Subject to Protective Order                                          GOV-00126440

funding is contingent upon satisfactory performance, availability of funds, and determination that
continuation is in the best interests of the Federal Government.


**SECTION II**: Purpose and Objective

The purpose of this agreement is to support the provision of residential services for UC
according to the objectives and activities outlined in the application and consistent with State
residential care licensing requirements.

In making decisions on placement and residential services provided to UC, the Director is
governed by §462 of the HSA of 2002, 6 U.S.C. §279; § 235 of the William Wilberforce
Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA of 2008), 8 U.S.C.  §1232,
as amended[1]; relevant portions of the Prison Rape Elimination Act of 2003 (PREA of 2003), 42
U.S.C. §15607, as amended[2]; and when it is not inconsistent with subsequent law, the Flores
settlement agreement and the Perez-Olano Settlement Agreement, Case No. CV85-4544RJK (C.
D. Cal. 1996) (Perez-Olano settlement agreement).

In December 2014, HHS released an Interim Final Rule (IFR) on standards to prevent, detect,
and respond to sexual abuse and sexual harassment involving UC.  The IFR sets forth standards
to prevent, detect, and respond to sexual abuse and sexual harassment in ORR care provider
facilities that house unaccompanied children (UCs) in accordance with section 1101(c) of the
Violence Against Women Reauthorization Act of 2013, Pub. L. 113-4 (VAWA 2013).  VAWA
2013 directed the Secretary of the Department of Health and Human Services (HHS) to adopt
national standards for the detection, prevention, reduction, and punishment of rape and sexual
assault in facilities that maintain custody of UCs.  The standards apply to all ORR care provider
facilities housing UCs except secure care provider facilities and individual foster care
homes.  The standards build upon and enhance existing State and local laws, regulations, and
licensing standards.

---

[1]  Section 235 of the TVPRA of 2008 was amended in part by section 1262 of the Violence Against Women
Reauthorization Act of 2013.
[2]  Section 8 of PREA of 2003, was amended in part by section 1101(c) of the Violence Against Women
Reauthorization Act of 2013.

3

Confidential - Under Protective Order

Confidential - Subject to Protective Order                                                                      GOV-00126441

**SECTION III**: <u>Authority</u>

As provided by the terms of the Federal Grant and Cooperative Agreement Act of 1977 (FGCAA), 31 U.S.C. §6301, as amended, the  grant awarded establishes a Cooperative Agreement between the Office of Refugee Resettlement (ORR) and Heartland Human Care Services, Inc.  Pursuant to the FGCAA, this cooperative agreement (hereinafter "agreement") provides for substantial involvement and collaboration of ORR in activities related to cooperative agreements for residential services.

Furthermore, ORR is authorized to enter into this  agreement under 6 U.S.C. §279 and 8 U.S.C. §1232(i) of the TVPRA of 2008.

**SECTION IV**: <u>Description of Activities</u>

A. **<u>Residential and Other Services</u>**

1. **Heartland Human Care Services, Inc.** must provide residential shelter and services for UC in compliance with respective State residential care licensing requirements, the <u>Flores</u> settlement agreement, pertinent federal laws and regulations, and the ORR policies and procedures, unless otherwise expressly waived (in writing) by authorized ORR staff.

2. Under the terms of the <u>Flores</u> settlement agreement, care providers must provide the following  services for each UC in their care:

   - Proper physical care and maintenance, including suitable living accommodations, food, appropriate clothing and personal grooming items.

   - Appropriate routine medical and dental care, family planning services, and emergency health care services, including a complete medical examination (including screenings for infectious disease) within 48 hours of admission, excluding weekends and holidays, unless the UC was recently examined at another ORR care provider facility; appropriate immunizations in accordance with recommendations of the U.S. Department of Health and Human Services / U.S. Public Health Service (PHS), Centers for Disease Control and Prevention (CDC) Advisory Committee on

4

Confidential - Subject to Protective Order

GOV-00126442

Immunization Practices; administration of prescribed medication and special diets;
appropriate mental health interventions when necessary.

- An individualized needs assessment, which includes the various initial intake forms,
  collection of essential data relating to the identification and history of the child and
  his or her family, identification of the UC's special needs including any specific
  problems which appear to require immediate intervention, an educational assessment
  and plan, an assessment of family relationships and interaction with adults, peers and
  authority figures; a statement of religious preference and practice; an assessment of
  the unaccompanied child's personal goals, strengths and weaknesses; identifying
  information regarding immediate family members, other relatives, godparents or
  friends who may be residing in the United States and may be able to assist in
  connecting the child with family members.

- Educational services appropriate to the unaccompanied child's level of development
  and communication skills in a structured classroom setting Monday through Friday,
  which concentrates primarily on the development of basic academic competencies
  and secondarily on English Language Training. The educational program must
  include instruction and educational and other reading materials in such languages as
  needed. Basic academic areas should include Science, Social Studies, Math, Reading,
  Writing and Physical Education. The program must provide unaccompanied children
  with appropriate reading materials in languages other than English and spoken by the
  UC in care for use during leisure time.

- Activities according to a recreation and leisure time plan that include daily outdoor
  activity, weather permitting, with at least one hour per day of large muscle activity
  and one hour per day of structured leisure time activities (that should not include time
  spent watching television). Activities should be increased to a total of three hours on
  days when school is not in session.

- At least one individual counseling session per week conducted by trained social work
  staff with the specific objective of reviewing the child's progress, establishing new
  short term objectives, and addressing both the developmental and crisis-related needs
  of each child.

5

Confidential - Under Protective Order

                                                              GOV-00126443

- Group counseling sessions at least twice a week.

- Acculturation and adaptation services which include information regarding the development of social and inter-personal skills which contribute to those abilities necessary to live independently and responsibly.

- A comprehensive orientation regarding program intent, services, rules (written and verbal), expectations and the availability of legal assistance.

- Whenever possible, access to religious services of the child's choice, and in an environment that ensures children feel free to ask for such access.

- Visitation and contact with family members (regardless of their immigration status), which is structured to encourage such visitation.

- A reasonable right to privacy, which includes (1) the right to wear his or her own clothes when available, (2) retain a private space in the residential facility, group or foster home for the storage of personal belongings, (3) talk privately on the phone and visit privately with guests, as permitted by ORR policy and applicable regulations, (4) receive and send uncensored mail unless there is a reasonable belief that the mail contains contraband.

- Services designed to identify relatives in the United States as well as in foreign countries and assistance in obtaining legal guardianship when necessary for the release of the unaccompanied child.

- Legal services information, including the availability of free legal assistance, the right to be represented by counsel at no expense to the government, the right to a removal hearing before an immigration judge, the right to apply for asylum or to request voluntary departure in lieu of deportation.

## B. **Organizational Capacity and Structure**

1. **Heartland Human Care Services, Inc.** must have the infrastructure and organizational capacity (governance structure, procedures, standards, and accountability controls) to

6

Confidential - Under Protective Order

                                              GOV-00126444

meet all ORR program requirements and to properly manage all program resources
(finances, personnel, physical plant structures, technology) and other provisions within
the scope of this agreement.

2. Unless waived by ORR, **Heartland Human Care Services, Inc.** should be accredited  by
   a nationally recognized accreditation organization, at ORR's discretion.[3]

3. **Heartland Human Care Services, Inc.** must have an effective program management
   structure that designates clear lines of authority and responsibility and promotes the
   effective use of organizational resources and positive outcomes, including the safe and
   timely release of unaccompanied children.

4. **Heartland Human Care Services, Inc.** must have internal policies and procedures in
   place for monitoring and evaluating their program and conducting ongoing quality
   assurance activities to identify areas in need of improvement and/or modification.

5. **Heartland Human Care Services, Inc.** must provide services in a culturally sensitive
   and knowledgeable manner. The majority of staff responsible for direct service delivery
   must be bilingual in English and Spanish. Staff who routinely work with unaccompanied
   children who speak other languages must be proficient in that language. Care providers
   must have access to interpreters for other languages that unaccompanied children in their
   care may speak.

6. **Heartland Human Care Services, Inc.** must maintain internal policies and procedures
   in electronic and hard copy form and readily accessible for all care provider and ORR
   staff. Internal policies and procedures are subject to ORR approval and must comply with
   all applicable federal law, regulations, and ORR's policies and procedures. The care
   provider's internal policies and procedures must address the following:

---

[3] As applicable: The Council on Accreditation (COA), the Joint Commission (TJC), the
Commission on Accreditation of Rehabilitation Facilities (CARF) or the American Correctional
Association (ACA).

7

Confidential - Under Protective Order

 GOV-00126445

- Provision of services that is specific to the type/level of care;

- State mandated placement criteria, including licensing-related restrictions;

- Population of children and youth served and facility capacity;

- Personnel policies and procedures[4], including training requirements;

- Emergency and evacuation policies and procedures;

- Physical plant requirements and maintenance policies and procedures (inspections for safety and maintenance, review of heating and cooling systems, plumbing, etc.);

- Health policies and procedures for unaccompanied children;

- Procedures for meeting mandated reporting requirements (reporting suspected neglect, maltreatment and/or abuse and sexual abuse and/or sexual harassment);

- Zero tolerance policy for sexual abuse and harassment;

- Grievance policies and procedures for both unaccompanied children and staff;

- Financial management policies and procedures (including internal controls for errors, mismanagement or fraud and provisions for regular audits performed by an outside, independent auditor)[5];

- Internal monitoring, evaluation, and continued quality assurance policies and procedures;

- Relationships with key external stakeholders; and,

---

[4] Including equal employment policies, prohibitions against nepotism and favoritism, policies on benefits, insurance protections, promotions and professional development, reporting requirements, sanctions and discipline of staff, working conditions, wage, time-off and lay off policies, activities and behaviors that require immediate suspension and possible termination.

[5] All modifications to award budgets require prior approval from both the Administration for Children and Families Office of Grants Management (ACF/OGM) and an ORR PO.

8

Confidential - Under Protective Order

- "Drug Free Workplace" policies.

7. **Heartland Human Care Services, Inc.** must maintain or attempt to enter into memoranda of understanding (MOUs) or other agreements with local child advocacy centers, rape crisis centers, immigrant victim service providers, and/or other community service providers to provide services to victims of sexual abuse and sexual harassment that occurred at the care provider facility. If local service providers are not available, **Heartland Human Care Services, Inc.** must maintain or attempt to enter into MOUs or other agreements with national service provider organizations. All agreements must have provisions that require the community or immigrant service provider to report any allegations of mistreatment or abuse to ORR. Care provider facilities must maintain copies of its agreements or documentation showing attempts to enter into such agreements and provide copies to ORR upon request.

## C. **Management of Personnel and Volunteers**

1. **Heartland Human Care Services, Inc.** must develop, implement, and document a staffing plan based on the populations served, the scope and type of provided services, anticipated requirements, current and projected staff vacancies, and project budgets. The staffing plan must:

   a. Include staffing ratios in accordance with State licensing requirements, and as required by ORR's policies and guidelines;

   b. Include a UC to Case Manager ratio of 8:1, unless waived by ORR; and,

   c. Include a UC to Clinician ratio of 12:1, unless waived by ORR.

2. **Heartland Human Care Services, Inc.** must complete background investigations on all staff, contractors, and volunteers prior to hire to ensure the candidate is suitable for employment to work with minors in a residential setting. Background checks must be completed in accordance with ORR's minimum standards and State licensing requirements. The results must be included in the employee's personnel file. If State

9

Confidential - Subject to Protective Order

licensing requirements do not require a national criminal history fingerprint check, **Heartland Human Care Services, Inc.** must complete the check using a public or private vendor. If there is an additional cost associated with this fingerprint check, the cost may be included in **Heartland Human Care Services, Inc.'s** budget plan.

3. Requirements for all hired staff. All staff must:

   - Be at least 21 years of age;

   - Exhibit integrity and good moral character to provide appropriate care to UC;

   - Possess the relevant experience and/or qualifications to work with UC and UC with special needs; and,

   - Be properly trained and licensed, as necessary.

4. **Heartland Human Care Services, Inc.** may not hire, continue employment, or enlist the services of any contractor or volunteer who:

   - Has engaged in any form of child abuse or neglect, including domestic violence;

   - Has been convicted of engaging or attempting to engage in sexual abuse facilitated by force, overt or implied threats of force, coercion or if the victim did not consent, or was unable to consent or refused; and/or,

   - Is undergoing civil or administrative adjudication or has been civilly or administratively adjudicated for engaging in an activity listed above.

5. **Heartland Human Care Services, Inc.** must consider incidents of sexual harassment in determining whether to hire anyone or to enlist the services of any contractor or volunteer. **Heartland Human Care Services, Inc.** must ask all applicants about previous misconduct in written applications or interviews for hiring. Applicants or employees must disclose any misconduct, whether the conduct occurs on or off duty. **Heartland Human Care Services, Inc. personnel policies and procedures must provide that** material omissions regarding such misconduct or providing materially false information will be grounds for termination.

10

Confidential - Under Protective Order

Confidential - Subject to Protective Order

6. **Heartland Human Care Services, Inc.** must have job descriptions and selection criteria for all staff positions that state the qualifications, performance standards, and responsibilities for each position. (Each job description must include a section on Essential Functions as mandated by the Americans with Disabilities Act).

7. **Heartland Human Care Services, Inc.** must obtain prior approval for the positions noted in the table below. The table also includes job descriptions and minimum qualifications for positions that require ORR approval as well as those that do not. Exceptions to the minimum qualifications require ORR's explicit written approval prior to hire and ORR may require supervision plans and additional training.

| Positions Requiring ORR Prior Approval | | |
|---|---|---|
| **Position** | **Job Description** | **Minimum Qualifications** |
| Program Director | Overall management of the programmatic, administrative, financial, and operational systems related to the provision of care and services; provision of regular and timely reports to ORR regarding operations, services, and finances; establishing a respective and supportive workplace environment; elevating any issues or concerns to ORR. | Master's degree in social work or an equivalent degree in education, psychology, sociology, or other relevant behavioral science degree or bachelor's degree plus 5 years' experience in child welfare administration, child protective services; and, 2 years of experience in program management or as director of a licensed child care program. Possess the administrator's license for the care provider's facility. |

11

Confidential - Under Protective Order

GOV-00126449

| Assistant Program Director | Serves as secondary liaison with ORR. The need for an Assistant Program Director will vary depending on the number of unaccompanied children served at a care provider facility. | Bachelor's degree in education, psychology, sociology or other relevant behavioral science plus 5 years of progressive employment experience with a social services or childcare agency or organization. |
|---|---|---|
| Clinician | Conducts mental health assessments; provides ongoing individual and group counseling services, screens for human trafficking concerns, and provides crisis intervention services. | Master's degree in social work with clinical experience in the program, or Master's degree in psychology, sociology, or other relevant behavioral science in which direct clinical experience is a program requirement, or a bachelor's degree plus 5 years clinical employment experience. Must be licensed or eligible for licensure. |
| Lead Clinician | Coordinating clinical services, training new clinicians, and supervising the clinical staff. | Master's degree in social work, 2 years of postgraduate direct service delivery experience or a Master's degree or Ph.D. in psychology, sociology, or other relevant behavioral science in which clinical experience is a program requirement, plus 2 years of postgraduate direct service delivery experience/or bachelor's degree plus 5 years clinical employment experience in the behavioral sciences. Must have supervisory experience and be licensed to provide clinical services in the State where the care provider is located. |
| Lead Case Manager | Responsible for coordinating case management and safe and timely release services, training new case managers, and supervising the work of other case manager. | Master's degree in the behavioral sciences, human services or social services fields or bachelor's degree and at least 3 years progressive employment experience that demonstrates supervisory and case management experience. |

12

Confidential - Under Protective Order

Confidential - Subject to Protective Order

GOV-00126450

| Prevention of Sexual Abuse (PSA) Compliance Manager | Oversees implementation and ongoing compliance with the Interim Final Rule on UC Sexual Abuse and Sexual Harassment standards at care provider facilities. | Bachelor's degree in behavioral sciences, human services, or social service fields and at least 1 year experience working with child welfare standards, best practices, and compliance issues. |

| Positions  NOT Requiring ORR Prior Approval | | |
| --- | --- | --- |
| **Position** | **Job Description** | **Minimum Qualifications** |
| Case Manager[6] | Assesses the needs of unaccompanied children in care, develops Individual Service Plans, screens for human trafficking concerns, facilitates the safe and timely release or discharge of children and youth, documents the provision of services in case files. | Bachelor's degree in the behavioral sciences, human services or social services fields. Child welfare and/or case management experience is strongly encouraged. |
| Medical Coordinator | Arrange or partners with other health professionals regarding health and safety standards for out-of-home child care, child care licensing requirements, disease reporting requirements for care providers, immunizations for children, injury prevention for children, medication management and knowledge of community health and mental health resources for children. If the size of the program does not justify hiring a full time Medical Coordinator, the responsibilities may be combined with another position. | High school diploma or equivalent degree and a minimum of 1 year employment experience in the child welfare field working with children and/or adolescents in a social service setting. |

---

[6] This position may require ORR approval if the Case Manager is conducting clinical assessments.

Confidential - Under Protective Order

Confidential - Subject to Protective Order

GOV-00126451

| | | |
|---|---|---|
| Teacher | Provides educational services and assessments, including curriculum building meeting <u>Flores</u> standards for education requirements. | Bachelor's degree; certification by the relevant governing authority, Teaching English as a Second Language/Teaching English to Speakers of Other Languages certification or other appropriate accrediting body and additional training to meet the special needs of unaccompanied children. |
| Trainer | Conduct trainings, select or develop training materials; maintain records on training program attendance, trainings offered, and evaluation measures. This position does not have to be full time and the responsibilities may be combined with another position. | Bachelor's degree. |
| Youth Care Worker | Provide direct supervision of children in care, and maintain line-of-sight at all times | High school diploma or equivalent degree and a minimum of 1 year employment experience in the child welfare field working with children and/or adolescents in a social service setting. |

8. **Heartland Human Care Services, Inc.** must maintain a personnel file for each employee, whether part-time or full-time, that documents the employee's credentials, competencies, and performance, and provide access to ORR upon request. The employee personnel file must be up-to-date and must include the criteria for the employee's selection, hiring, suspension, or termination.

   a. Personnel files must include at the minimum:

      o   Resume;

      o   Job Description

      o   Employment application;

      o   Professional references;

14

Confidential - Under Protective Order

Confidential - Subject to Protective Order

GOV-00126452

- o  Educational records/diploma;

- o  Professional licensure (if applicable);

- o  Form I-9, Employment Eligibility Verification, and appropriate identification documentation;

- o  Results of medical examination (as required by State licensing, including results of TB tests and immunization records);

- o  Child Abuse Mandated Reporter agreement (signed);

- o  Confidentiality policy acknowledgement;

- o  Most recent performance review (signed);

- o  Child abuse and neglect record check results (for all jurisdictions lived in for the past 5 years);

- o  National FBI criminal background check and State repository check results (for all jurisdictions lived in for the past 5 years);

- o  Driver's Record and Clearance (if transporting children and youth); and,

- o  Record of completion of mandated trainings and required acknowledgements.


b.  **Heartland Human Care Services, Inc.** must have policies and procedures for using and managing volunteers and interns (this includes those working in foster care).[7] This includes:

- o  Establishing requirements for their selection;

- o  Ensuring that each volunteer and intern complete pre-service and annual  training, if applicable;

---

[7] Family and friends of the foster family may interact with unaccompanied children as they would in a normal community setting without having to complete the volunteer requirements listed above.

15

Confidential - Under Protective Order

Confidential - Subject to Protective Order

GOV-00126453

o   Using paid staff to supervise all volunteers and interns;

o   Requiring authorization for any volunteers or interns to accompany
    unaccompanied children and care provider staff outside the facility for trips,
    medical appointments, or other visits;

o   Requiring all volunteers and interns to complete a volunteer application, provide
    disclosures, and references; and,

o   Conducting background checks on all volunteers and interns.

## D. Code of Conduct and Conflict of Interest Requirements

1. **Code of Conduct**

   a. **Heartland Human Care Services, Inc.** must create and implement a Code of
      Conduct that reflects the ethical standards of a reputable professional organization,
      such as the National Association of Social Workers, Child Welfare League of
      America, or the American Public Health Human Services Association. The Code of
      Conduct must specifically address the employee's obligations with respect to
      interactions and interventions with unaccompanied children, staff, and external
      stakeholders.

   b. **Heartland Human Care Services, Inc.** must train all employees on the Code of
      Conduct and have a "whistleblower policy" that provides staff an opportunity to
      report suspicious unethical, inappropriate or illegal activities without negative
      consequence. **Heartland Human Care Services, Inc.** must include proof in the
      employee's file that the employee has received training in the Code of Conduct.
      **Heartland Human Care Services, Inc.** must have policies and procedures for the
      discipline or termination of personnel who violate the Code of Conduct.

   c. The Code of Conduct is required to indicate that staff must:

16

Confidential - Under Protective Order

Confidential - Subject to Protective Order

GOV-00126454

- o   Respect the boundaries inherent in the relationship between unaccompanied
      children and care provider staff both while in ORR care and after release (for
      example staff should not take an unaccompanied child to his or her home (with
      the exception of community-based foster care parents) or the home of the
      employee's personal acquaintances);

- o   Enforce zero tolerance and other policies to prevent, detect and respond to sexual
      abuse and harassment by not engaging in any kind of sexual activity or personal
      relationship with unaccompanied children, or former unaccompanied children; or
      parents, guardians, or sponsors of unaccompanied children;

- o   Not provide legal advice to UC;

- o   Only provide therapeutic counseling if properly licensed and authorized;

- o   Maintain professional standards and manner when dealing with children and
      youth, visitors or fellow employees by dressing appropriately and refraining from
      giving money or gifts, using inappropriate language, proselytizing religion or
      making unauthorized disclosures of confidential information, or campaigning on
      behalf of a political party, politician or interest group;

- o   Not discriminate against any person on the basis of race, color, religion, national
      origin, or sex; lesbian, gay, bisexual, transgender, questioning or intersex status;
      veteran status, age, or disability;

- o   Employ strength-based behavior management approaches and never hit, harass,
      humiliate or degrade an unaccompanied child or other staff member;

- o   Cooperate with official investigations (Child Protective Services, State licensing,
      etc.) as well as other legally sanctioned investigations, such as those conducted by
      law enforcement;

- o   Report any criminal or inappropriate conduct of other staff and never participate
      in the activities of a criminal gang; and,

17

Confidential - Under Protective Order

Confidential - Subject to Protective Order                                              GOV-00126455

       o   Protect fellow care provider staff and unaccompanied children from retaliation if they disclose or threaten to disclose the existence of an illegal or unsafe practice.

2. **Heartland Human Care Services, Inc.** staff are required to timely report to care provider management any misconduct (on or off duty). Failure to report misconduct or reporting false information will be grounds for termination.

   a.  Misconduct may include but is not limited to:

      o   Any criminal arrests and/or convictions;

      o   Any child abuse and/or neglect allegations, adjudications, or convictions (whether criminal, civil or administrative); and,

      o   Any engagement or attempt to engage in sexual activities facilitated by force, overt or implied threats of force or coercion; or if the victim did not consent or was unable to consent or refuse.

   b.  Timely reporting is defined as no later than 24 hours from when a subject has knowledge of an arrest, conviction, or allegation, or earlier if the subject has unsupervised access to unaccompanied children. Other unethical conduct may also be the basis for disciplinary action and/or termination. Program Directors or other care provider management officials must report any disciplinary action and/or termination of any employee to ORR.

3. **Conflict of Interest**

   a.  **Heartland Human Care Services, Inc.** staff are prohibited from taking unfair advantage of any professional or personal relationship or from exploiting their position to further their personal, religious, political, financial, or business interests.

   b.  **Heartland Human Care Services, Inc.** must establish and maintain a written Conflict of Interest policy applicable to all staff, board members, contractors, sub-

Confidential - Under Protective Order

Confidential - Subject to Protective Order

GOV-00126456

contractors, sub-grantees, volunteers, and other internal stakeholders. The policy
must:

- o Identify and define conduct that creates a conflict of interest or a potential conflict
  of interest;

- o Prohibit employees from having any direct or indirect financial interests in the
  transactions of services of the program;

- o Require staff to recuse themselves from the decision-making process if there is a
  conflict of interest or a potential conflict of interest;

- o Require staff to disclose any conflicts of interest prior to their involvement in a
  decision related to or affected by the conflict; and,

- o State that failure to disclose conflicts of interest or potential conflicts of interest
  may result in discipline or termination of employment.

## E. **Training**

1. **Heartland Human Care Services, Inc.** must ensure all prospective employees meet all
   required educational and professional experience qualification and demonstate that ability
   to provide culturally competent services and all employees, contractors, and volunteers
   complete pre-service training prior to having direct contact with UC and complete the
   required annual training.

2. Newly hired employees must complete pre-service training prior to having direct contact
   with unaccompanied children. **Heartland Human Care Services, Inc.** must provide pre-
   training on the following:

- • ORR's Standards to Prevent, Detect, and Respond to Sexual Abuse and Sexual
  Harassment involving Unaccompanied Children;

- • All State and local licensing requirements; and,

19

Confidential - Under Protective Order

Confidential - Subject to Protective Order

- State license required trainings (for example, CPR, first aid, mandatory reporting).

3. Staff who are required to have professional certifications must abide by continuing education requirements necessary to maintain licensure. In addition, all care provider staff must complete 40 hours of training annually of which 2 hours must involve training on the Flores settlement agreement, the HSA of 2002, the TVPRA of 2008, the Perez-Olano settlement agreement, and 10 hours on ORR policies and procedures.  Foster care providers and foster families are subject to all ORR training and documentation requirements.  In addition, the foster care providers must ensure that foster parents meet the competencies required at the time of licensing and focus the foster parent pre-service and ongoing training on developing these competencies.

4. **Heartland Human Care Services, Inc.** must develop annual staff trainings based on the following areas[8]:

- State licensing requirements, laws, regulations, and policies relevant to the ORR UC Program;

- ORR operational policies and relevant guidance[9];

- The Safe and Timely Release process;

- Cultural competency, including awareness of and sensitivity to different cultural backgrounds;

- Prohibition against providing legal advice or counsel;

- Strength-based behavior management approaches, such as using conflict resolution, problem solving skills, using rewards and consequences and de-escalation techniques and helping children and youth learn accountability and self-control;

- Prohibition against conflicts of interest;

---

[8]  Care providers have two years to complete. They are not required to cover all topic areas within the same year.
[9]  Care providers must have policies and procedures for the prompt dissemination, training, and implementation of new or updated ORR policies and procedures.

20

Confidential - Under Protective Order

Confidential - Subject to Protective Order

GOV-00126458

- Crisis/intervention procedures and techniques;

- Immigration and child welfare systems (local, national, international);

- Child development theory;

- Issues related to loss and family separation;

- Common health and mental health issues;

- First aid and cardiopulmonary resuscitation (CPR);

- Medication management;

- Infection control procedures and Occupational Safety and Health Administration
  (OSHA) or equivalent course that covers blood borne pathogens, airborne pathogens,
  and employee safety;

- Working with victims of human trafficking and other crimes;

- Mandatory child abuse and neglect reporting requirements: prevention, signs, and
  reporting;

- Professional boundaries;

- Emergency and disaster preparedness;

- Code of Conduct and Conflicts of Interest;

- Grievance policies and procedures; and,

- Incident reporting.

5. **Heartland Human Care Services, Inc.** must provide training to all new contractors and
volunteers, where the level and type of training provided is based on the services they
provide and the level of contact they have with unaccompanied children. Contractors
hired for a term that is expected to last one year or more must undergo the standard 40
hours of training required for all care provider employees. All contractors and volunteers

21

Confidential - Under Protective Order

                                                      GOV-00126459

must undergo pre-service training prior to having direct contact with UC.

6. **Heartland Human Care Services, Inc.** must document all trainings completed by staff and place a copy in the staff's personnel file, including:

   - The date, number of hours, and subject-matter of the employee's orientation training;

   - The date and number of hours of in-service training completed by the employee in each topic area listed above;

   - A confirmation that the employee understood each training that he/she completed; and,

   - The name of the individual and/or entity providing the training.

F. **Grant Administration**

1. **Heartland Human Care Services, Inc.** must submit a detailed project plan of the approach, activities, staffing, and timelines which is approved by ORR and is in compliance with respective State residential care licensing requirements, the <u>Flores</u> settlement agreement, applicable federal laws and regulations, and the ORR policies and procedures. Any modifications must be discussed with the ORR Project Officer prior to implementation.

2. **Heartland Human Care Services, Inc.** must submit a program budget for ORR and ACF's Office of Grants Management (OGM) approval that accurately reflects proposed activities as described in the project plan.

3. **Heartland Human Care Services, Inc.** must notify the ORR Project Officer of any significant delays or issues regarding implementation of grant activities.

4. **Heartland Human Care Services, Inc.** must regularly consult with the ORR Project Officer and other ORR staff while implementing grant activities during each phase of the

22

Confidential - Under Protective Order

Confidential - Subject to Protective Order

GOV-00126460

project. Consultation shall include, but is not limited to, participation in status meetings
by telephone to review project implementation or as required by ORR.

5. **Heartland Human Care Services, Inc.** must provide ORR with unrestricted access to
clear, timely, and accurate information about all aspects of the program. This access
includes, but is not limited to: activities, policies, and financial information;
documentation on individual UC and provided services; and unrestricted physical access
to **Heartland Human Care Services, Inc.'s** premises, buildings, staff and UC in the
programs physical custody; and any physical property on the premises, such as video
monitoring equipment and footage.

6. **Heartland Human Care Services, Inc.**  must ensure that all Sub-Recipients comply
with respective state residential care licensing requirements, the Flores settlement
agreement, pertinent federal laws and regulations, and the ORR policies and procedures,
unless otherwise expressly waived (in writing) by authorized ORR staff.

7. **Heartland Human Care Services, Inc.** must submit the following documents to the
ORR Project Officer:

   a. All applicable State and local licensures, incorporations, and/or authorizations for
   **Heartland Human Care Services, Inc.** and any Sub-Recipient at the beginning of
   each Federal fiscal year.

   b. A description of responsibilities and activities of all organizations, individuals, or
   Sub- Recipients providing services to UC within 30 days of ORR's award date.  All
   Sub- Recipients are subject to approval by the ORR Project Officer and must include
   the following considerations:

      o Memoranda of Understanding (MOU) or similar instrument, with organizations or
      individuals selected for receipt of sub-awarded funds;

23

Confidential - Under Protective Order

Confidential - Subject to Protective Order                                                    GOV-00126461

- o  A detailed description of the Sub-Recipients' activities, if not adequately described in the MOUs (or similar instrument) or project plan (may include a monitoring tool jointly developed by Project Officer and Grantee);

- o  Complete budget for each Sub-Recipient;

- o  Schedule for monitoring Sub-Awardees with respect to location, dates, and agenda will be reported in **Heartland Human Care Services, Inc.** quarterly reports to ORR;

- o  Reports following monitoring visits of sub-awardees and immediately notifies the ORR Project Officer of any serious concerns and will submit the final report within 30 days following the monitoring visit; and,

- o  Prompt notification to ORR Project Officer of any changes regarding Sub-Recipient.

c.  Report of all State defined residential care placement restrictions to be submitted within 7 days of date of ORR award.

d.  Notify the ORR Project Officer immediately but no later than 24 hours after the care provider, service provider/contractor or Sub- Recipient receives a revocation or suspension of a license, incorporation or authorization to provide services.

e.  Notify the ORR Project Officer immediately  but no later than 24 hours after the care provider, service provider/contractor or Sub-Recipient receives any citiation from a State or local licensing agency or other accrediting agency and any citation for health, safety or enviornemental code violations violaitons.

f.  List of all State mandated staff trainings, including required timeline for completion dates within 30 days of date of ORR award.

g.  All materials (e.g., forms and other tools) used or created for residential services for UC.  Materials are subject to approval by ORR Project Officer and must be submitted to the Project Officer 30 days prior to being implemented.

24

Confidential - Under Protective Order

 GOV-00126462

h.  Quarterly performance and financial reports are to be uploaded into GrantSolutions
unless otherwise directed by OGM or ORR..

8.  **Heartland Human Care Services, Inc.**  also agrees:

a.  To comply with HHS policy and regulations, unless otherwise expressly waived in
the approved application and all other applicable Federal statutes and regulations in
effect during the time that it is receiving grant funding.

b.  To amend the approved project plan as needed to comply with standards, goals, and
priorities established by the Director;

c.  To submit quarterly performance and financial reports in a timely fashion based on
the schedule that is described in Section VIII of this agreement.

d.  To abide by provisions of the Service Contract Act, Code of Federal Regulations
(CFR) Title 29 and abide by applicable State wage determination guidelines in its
program.

G.  **Adherence to ACF Policy on Grants to Faith-Based Organizations**

Consistent with the ACF Policy on Grants to Faith-Based, ACF is mindful that potential
grantees may have religious objections to providing certain kinds of services.  ACF is
committed to providing the full range of legally permissible services to people who need
them, and to do so in a timely fashion and in a manner that respects the diverse religious
and cultural backgrounds of those we serve. At the same time, ACF is also committed to
exploring ways for organizations to partner with ACF and other grantees even if they
object to providing specific services on religious grounds.

The following are ways in which organizations with such objections may be able to
participate in human services programs:

25

Confidential - Under Protective Order

 GOV-00126463

- <u>Serve as subgrantees:</u> In many cases, subgrantees do not need to provide every service for which the grantee is responsible, so long as all clients served have access to all services required under the grant in a timely and respectful manner. Grantees must ensure that their overall program provides all of the required services, but grantees can use subgrantees to provide some services. Under this arrangement, as long as other subgrantees are readily available to provide clients with the objected-to services, a subgrantee may participate in the grant program while declining to provide services to which they have religious objection.

- <u>Apply in a consortium:</u> A second possibility is for faith-based organizations to apply in a consortium with one or more partners. The consortium would allow for a division of responsibility consistent with each organization's principles. Again, as long as clients have timely access to all required services, different organizations could divide up the services provided.

- <u>Notify grantor:</u> A third possibility in some circumstances would be for the grantee to notify the federal program office responsible for the grant if a client's needs or circumstances may require services, including referrals, to which the organization has a religious objection. It would then be the federal agency's responsibility to follow through with the needed services, or, if appropriate, transfer the case to another provider.

ACF will consider any combination of these approaches and is open to considering other approaches that would accomplish the goal of ensuring that people have access to a full range of services while enabling qualified faith-based organizations to participate in the delivery of those services in a manner consistent with their principles.

## H. **Responsibilities of ORR**

ORR hereby agrees to the following:

1. To confirm project plan (which includes approach, activities, timelines, and results expected) and budget, and discuss minor modifications;

2. To submit and/or review FFR SF-425 to be sure it accurately reflects proposed activities;

26

Confidential - Under Protective Order

Confidential - Subject to Protective Order

GOV-00126464

3.  To participate in status meetings by telephone to review project implementation (monthly, or as required by the ORR Project Officer or other ORR staff);

4.  To keep Heartland Human Care Services, Inc. informed of policy, regulatory and legal developments as they affect the implementation of the project;

5.  To review and approve Heartland Human Care Services, Inc. Sub-awards of organizations providing residential services;

6.  To review and approve additions or hiring of key personnel, including those of Sub-Awardee of organizations providing residential services, in a timely manner;

7.  To review all internal policies, procedures, and protocols used or created for the residential services for DUCO in a timely fashion;

8.  To provide training and technical assistance, as needed, regarding project implementation, and residential service delivery; and,

9.  To promptly review written requests for prior approval of deviations from the project plan or approved budget. Any changes that affect the terms and conditions of the grant award or revisions/amendments to the Cooperative Agreement or to the approved scope of activities will require prior approval by the ORR Project Officer and the Grants Management Specialist in the Office of Grants Management (OGM).

**SECTION V:** <u>Budget and Financial Arrangement</u>

The approved budget is reflected in the Notice of Award (NoA). The award will be based on the ORR and the OGM approved negotiated budget and project plan.

The Government shall not be obligated to reimburse the recipient for costs incurred in excess of the total amount allotted to this project, and the recipient shall not be obligated to continue performance under the Agreement (including actions under the termination clause) or otherwise to incur costs in excess of the amount allotted to this Agreement unless and until ORR and the OGM have notified the recipient in writing that additional funds have been awarded. No notice, communication, or representation from any person other than the Grants Management Specialist

Confidential - Under Protective Order

Confidential - Subject to Protective Order                                                           GOV-00126465

shall authorize the expenditure of additional funds. The United States Government will not be obligated for any excess costs in the absence of a written notice of authorization from the Grants Management Officer. Changes issued pursuant to this Agreement shall not be considered an authorization to the recipient to exceed the allotted amount of this Agreement unless specifically stated by the Grants Management Officer.

**SECTION VI:** Monitoring

ORR will conduct announced and unannounced monitoring activities throughout the project period. The purpose of ORR monitoring is to ensure compliance with the Flores settlement agreement, pertinent federal laws and regulations, and ORR policies and procedures. Performance and compliance measures are reflected in:

- The grant application, as funded;

- Program requirements contained in the authorizing statutes;

- Program regulations and guidelines incorporated in the grant award;

- Program grant and administrative requirements contained in regulations and policy;

- Relevant public policy requirements (assurances, certifications);

- This agreememt;

- The ORR Policy Guide and relevant procedures; and,

- Special programmatic terms and conditions, if any.

ORR monitoring activities will include desk and on-site (announced and unannounced) monitoring and site visits. ORR will monitor or conduct site visits on programs based on some of the following factors:

- Costs and Total Support – high cost projects

- Complexity – projects with multiple service components;

28

Confidential - Under Protective Order

- Age and Experience of Program – newly established program, one receiving Federal
  funds for the first time, one with inexperienced key personnel, or one whose legislation
  has recently undergone substantial change, may require closer scrutiny than a long
  established program;

- Prior Indication of Compliance issues – available audit or evaluation findings, recipient
  requests for assistance, or data on financial stability of an organization;

- Length of Grant – multi-year award, particularly one up for continuation awards that have
  never been visited may take precedent over new ones;

- Time Since Last Visit – if program has not been recently or previously visited;

- Geographic Location – proximity to other recipients, accessibility to program office;

- Agency Priority – high priority / visibility projects within the agency, high interest to
  Congress, the executive branch, or the public; and,

- Potential for Dissemination – programs / projects that show potential for developing
  exemplary practices suitable for dissemination.


ORR will provide Heartland Human Care Services, Inc. with a monitoring report following
formal monitoring visits or if required site visits, that will include citations for noncompliance,
recommendations, a corrective action plan if needed, timelines for reporting, and consequences
for not responding.

The monitoring report is not exhaustive of all that is reviewed during the monitoring visit.
Rather, the report highlights the key issues in need of attention, as determined by the monitor and
based on the review of all ORR policies and procedures.  After review of the monitoring report, a
formal corrective action plan should be submitted to the designated Project Officer within 30
business days.  The corrective action plan will identify objectives, specific actions, persons
responsible and date of completion for each monitoring citation.

**SECTION VII:** Continuation Applications

Confidential - Under Protective Order

Confidential - Subject to Protective Order

GOV-00126467

Heartland Human Care Services, Inc. must submit an ORR provided continuation application by June 1, or a later date determined by ORR.   For continuation applications, Heartland Human Care Services, Inc. will provide the following information:

1. Standard Forms: SF 424 Application for Federal Assistance, SF 424A Budget Information for Non-Construction Programs, and SF 424B Assurances for Non-Construction Programs;
2. Certification Regarding Lobbying
3. Budget worksheets and narrative;
4. Program Description and Work plan;
5. Current State Residential Care License;
6. Proof of Insurance;
7. Facility lease or bank mortgage note on property (as applicable);
8. Indirect Cost Rate approval, if any;
9. Current Program Organizational Chart;
10. Staffing and Volunteer Roster;
11. Copy of all Child Protective Services reports, allegations and CPS investigations;
12. Property/Inventory List;
13. Project/Performance Site Location(s) form

Heartland Human Care Services, Inc. must use the current version of all standard applications and reporting forms.

Current versions of the forms are available at: https://www.grants.gov

**SECTION VIII:** Applicable Regulations

Heartland Human Care Services, Inc. must provide all residential services for UC in compliance with respective state residential care licensing, the Flores settlement agreement, pertinent federal laws and regulations, including Standards to Prevent, Detect, and Respond to Sexual Abuse and Sexual Harassment involving Unaccompanied Children, 45 C.F.R. 411, and ORR policies and procedures.  Other applicable federal regulations are discussed in the attached Standard Terms and Conditions.

30

Confidential - Under Protective Order

 GOV-00126468

**SECTION IX**: Records and Reports

For quarterly performance reports, Heartland Human Care Services, Inc. will use the ACF
Performance Progress Report ACF-OGM SF-PPR form. Performance Reports are due quarterly
based on the project period start date.

For financial status reports, Heartland Human Care Services, Inc. will use the SF-425 form,
which will include report of expenditures and unliquidated obligations.  Quarterly financial
reports are due every 90 days based on the project period start date.. The Annual Financial
Status and Performance report is due 90 days after the end of the budget period. The Final
Financial Status and Performance report is due90 days after the end of the project period.

Funds awarded under this Cooperative Agreement shall be accounted for and reported upon
separately from all other grant activities.

Heartland Human Care Services, Inc. must use the current version of all reporting forms.
Current versions of the forms are available at:https://www.grants.gov

All correspondence and reports related to this agreement must include the Grant Number and
should be uploaded to GrantSolutions at https://home.grantsolutions.gov/home/. Notification of
submission should be sent via email to the ORR Project Officer.

**SECTION X**: Project Contacts

Heartland Human Care Services, Inc. designates the following person as project contact for this
cooperative agreement:

| | |
|---|---|
| **Name:** | **Susan Trudeau** |
| **Title:** | **Senior Director of SAFEty Initiatives** |
| **Address:** | **Heartland Human Care Services, Inc.** |
| | **4822 N. Broadway, 2nd Floor** |
| **Telephone:** | **773.830.5403** |

31

Confidential - Under Protective Order

                                     GOV-00126469

| | |
|---|---|
| Fax: | 773.271.8810 |
| Email: | strudeau@heartlandalliance.org |

ORR designates the following person as ORR Project Officer for this cooperative agreement:

| | |
|---|---|
| Name: | **Jacqueline De Puy** |
| Address: | **330 C Street, SW, Washington, DC 20201** |
| Telephone: | **(202) 754-2087** |
| Fax: | **(202) 401-1022** |
| Email: | **Jacqueline.DePuy@acf.hhs.gov** |

**SECTION XI**: Duration of Agreement

This agreement will be effective February 1, 2017- January 31, 2020. Annual continuations will be entertained on a non-competitive basis, subject to availability of funds, satisfactory performance of the project, capacity needs and a determination that continued funding is in the best interest of the Federal Government.

_____    _____
**E. Scott Lloyd**                                      **Date**
**Director**
**Office of Refugee Resettlement**

_____    4 – 11 – 17
**David Sinski**                                      **Date**
**Executive Director**
**Heartland Human Care Services, Inc.**

32

Confidential - Under Protective Order

Confidential - Subject to Protective Order

GOV-00126470