# DX-15

Deposition of Toby Biswas, November 13, 2019

Page 1

1          Confidential

2      FOR THE UNITED STATES DISTRICT COURT

3   CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

4        Case No.  2:18-CV-05741-MG-PLA

5

6   _____

7   LUCAS R., et al.,                    )

8          Plaintiffs,                   )

9        v.                              )

10  ALEX AZAR, Secretary of U.S.         )

11  Department of Health and             )

12  Human Services, et al.,              )

13          Defendants.                  )

14  _____

15              CONFIDENTIAL

16       DEPOSITION OF TOBY BISWAS

17           Washington, D.C.

18          November 13, 2019

19

20

21

22

23

24  REPORTED BY:  Barbara DeVico, CRR, RMR

25  JOB NO. 170311

1                      Confidential

2          A.      Correct.  It's a contractor.

3          Q.      And so I understand that they do an

4    independent review and actually approval of home

5    studies, correct?

6          A.      No.

7          Q.      So then what do they do with home

8    studies?

9          A.      So there's a case coordination

10   contract that GDIT holds as well as like a separate

11   sort of staffing contract that they have with ORR.

12   As far as the home studies go, their case

13   coordinators can make a recommendation that a case

14   receive a home study.

15         Q.      Okay.  And then once they make that

16   recommendation, is there follow-up about after the

17   home study is performed?

18         A.      Yes, and they would review the

19   results of the home study.

20         Q.      And then do they make a

21   recommendation based on that review as to whether

22   the kid gets released to that home?

23         A.      Yes.

24         Q.      So that's what I meant by approval.

25         A.      Okay.

Page 29

1                    Confidential

2    questions on interpreting policy.

3            And then members on my team meet with them

4    on some periodic basis for suggestions on policy

5    improvements, procedures improvements, that sort of

6    thing.

7            Q.    So you don't know who the people are

8    that Ms. -- is it Blakeny?

9            A.    I think Blakeny.

10           Q.    Okay.  Who the people are that she

11   supervises.

12           A.    Not that well, no.

13           Q.    Can you tell me any of their names?

14           A.    No.

15           Q.    Okay.  So we talked to Ms. Ray, and

16   she is one of your people that you supervise;

17   correct?

18           A.    Yes.

19           Q.    For a time she was, I believe I'm

20   correct in saying that she fulfilled a monitoring

21   function for a period of time?

22           A.    Call it compliance, but yes.

23           Q.    What is the difference between

24   compliance and monitoring?

25           A.    For that project we were looking at

                         Confidential

1

2    ORR's compliance with the July 30 motion to enforce

3    the Flores settlement.  And so a couple others sort

4    of focused on reviewing our compliance with that

5    order.

6            Q.    So I'm still trying to get a handle

7    on the difference to you in the terms "compliance"

8    and "monitoring."  Does compliance have to do with

9    compliance with court orders?

10           A.    For this function -- for that

11   function, yes.

12           Q.    So why did you assign Ms. Ray and

13   the other folks to that project?

14           A.    I wanted to ensure that children who

15   were being placed in restrictive settings were

16   there for reasons outlined in our policy guide.

17   And that procedurally they were receiving -- their

18   cases were being reviewed as required.

19           Q.    And so at some point you chose to

20   reassign her or she discontinued the compliance

21   work; is that right?

22           A.    Yes.

23           Q.    And the other folks did as well?

24           A.    Yes.

25           Q.    So why did that happen?

1                     Confidential

2          A.     So we had different priorities at

3    that time.  And so we were just kind of traded off

4    the compliance review with a different team.

5          Q.     So is the team that you traded off

6    with still doing it?

7          A.     Yes.

8          Q.     And who is that?

9          A.     That's the field team.

10         Q.     Okay.  Who is on the field team?

11         A.     So it's the federal field

12   specialists.  That particular unit is led by David

13   Fink.  He's the federal field specialist supervisor

14   for special populations, which includes children in

15   restrictive settings.

16         Q.     So the FFS specialists -- I guess

17   that's redundant -- FFS stands for federal field

18   specialists, correct?

19         A.     Yes.

20         Q.     So the FFS that are under Mr. Fink's

21   supervision are now doing the compliance work in

22   connection with the July 30 order?

23         A.     Yes.

24         Q.     Do you know who those people are?

25         A.     Patricia Rivera is one.  Monica, I

1                         Confidential

2     publications.  This compliance review was focused

3     fairly closely on making sure that the July 30

4     order was being followed specific to the

5     restrictive setting policies and procedures that

6     ORR had laid out and had revised in accordance with

7     that court order.  So it was very narrowly focused.

8          Q.      Okay.  So is the monitoring team

9     involved in the issuance of corrective action as

10    well?

11         A.      Yes.

12         Q.      And can that be for violations of

13    the policies and procedures?

14         A.      Yes.

15         Q.      And can it also be for violation

16    or -- what I'm thinking of is like breach of

17    contract for these like, what did you call the --

18    cooperative agreements.  Is that something that

19    would be -- if the monitoring team, someone on the

20    monitoring team felt that the contracting

21    organization wasn't complying with that contract,

22    would they issue a corrective action or do

23    something else?

24         A.      So just to be clear, we have grants

25    on contracts.  So under the terms of the

1                    Confidential

2          A.      Yes.

3          Q.      So what's done before they're

4    placed?

5          A.      So before they're placed, like

6    during a referral?

7          Q.      Yes.  I guess I'm from the way you

8    have used term "assessment" up until this point in

9    this discussion, I didn't understand there to be an

10   assessment done before a child is placed.  So I'm

11   trying to understand what -- in just the common use

12   of the term "assessment" there's some sort of

13   evaluation or decision-making that comes into, if a

14   kid is referred to ORR as involved in ORR's

15   determination as to what they're going to do with

16   them initially.  That's what I'm trying to

17   understand what's your nomenclature for that and

18   what's actually done.

19         A.      I think you're talking about our

20   placement criteria.

21         Q.      There you go.

22         A.      So at the time of a referral, at the

23   time another federal agency makes a referral to

24   ORR, they provide very basic information on the

25   child.  And using our placement criteria policies,

1                     Confidential

2    our intakes team then makes a determination of

3    where that child ought to be placed and what type

4    of facility.  Or if they should be placed in a

5    foster home that, sort of thing.

6            Q.     Okay.  So in terms of the initial

7    assessment that you described that is after that

8    placement, you said one of the things would be an

9    assessment of mental health.  Is that correct?

10           A.     Yes.

11           Q.     So is there any mental health

12   information that's part of the referral process?

13           A.     If there is any, it should be sent

14   to our intakes team, but often the vast majority of

15   our children are being referred from the border,

16   and there's been no evaluation by border patrol

17   over, of a child's mental health.

18           Q.     And so any evaluation that ORR would

19   be responsible for would be after the initial

20   placement?

21           A.     For children who are initially

22   placed in ORR custody, yes.

23           Q.     What other situation would we be

24   talking about?

25           A.     A transfer between an ORR care

Page 53

1                        Confidential

2    are described in this 2.3.3, do they work for GDIT?

3              A.      Yes.

4              Q.      And the policy guide states they are

5    nongovernmental contractor field staff.  Is that

6    accurate?

7              A.      Yes.

8              Q.      So is there anyone else in ORR that

9    performs that function?

10             A.      No.

11             Q.      So this says that the case

12   coordinator is responsible for integrating all

13   areas of assessment from the case manager, child

14   advocates where applicable and other stakeholders

15   into a release plan that will provide for the

16   unaccompanied alien child's physical and mental

17   well being.

18             So this is just -- that sentence is

19   specific to when a child is going to be released?

20             A.      Correct.

21             Q.      And is that the only role that the

22   coordinator plays?

23             A.      They provide recommendations on

24   transfers as well as, I'd say transfers generally,

25   and then -- yeah, on transfers.

1                         Confidential

2    conducts the home study, do they make a

3    recommendation as to whether the person in the home

4    be approved as sponsor?

5            A.      They would make recommendation, yes.

6            Q.      Okay.  And so who then takes that

7    recommendation and acts upon it?

8            A.      The federal field specialist.

9            Q.      Okay.  So what's -- and is it the

10   FFS, are they the ones that decide whether the -- I

11   mean, FFS is deciding on release or not; right?

12           A.      Correct.

13           Q.      And the home study is one factor

14   that they consider?

15           A.      Correct.

16           Q.      Okay.  So I'm trying to understand

17   the case coordinator's role in that process.  They

18   can request the home study, correct?

19           A.      Yes.

20           Q.      Okay.  And there are certain

21   situations where that's mandated, right?

22           A.      The home study.

23           Q.      Yes.

24           A.      Yes, by law.

25           Q.      Okay.  And so the ones that the GDIT

Page 57

Confidential

1

2      case coordinators are recommending, those are

3      presumably the discretionary home studies; right?

4              A.      Correct.

5              Q.      Okay.  So once the home study is

6      sort of returned or completed by the nonprofit,

7      what role does the case coordinator have in either

8      like accepting or rejecting the recommendation of

9      the person that did the home study?

10             A.      They read through the recommendation

11     and then make their own independent recommendation,

12     utilizing what was in the home study as well as

13     other information in the case.

14             Q.      So they're making a recommendation?

15             A.      Yes.

16             Q.      And what other information besides

17     the home study would they typically look at?

18             A.      Assessments of the child.

19     Assessments of the sponsor.  Documents used to

20     support the application for release.

21             Q.      And is their role in that process

22     set out somewhere in this policy guide?

23             A.      The case coordinator's.

24             Q.      Correct.

25             A.      The process that's followed is set

Page 58

1                              Confidential

2       out in our Manual of Procedures, like a

3       corresponding document to this.  And that sets out

4       case coordinator timelines and what she should be

5       reviewing and that sort of thing.  Sort of

6       generalized information on what they're reviewing

7       with the policy guide.

8               Q.      Okay.  So in your experience have

9       the case coordinators always been involved with

10      this process?

11              A.      Yes, since we contracted with them.

12              Q.      Okay.  But that -- when did that

13      happen?

14              A.      I think it was 2012.

15              Q.      Why do we need this separate

16      independent evaluation or recommendation from an

17      outside contractor?

18              A.      We look at them as a third-party

19      reviewer that aren't necessarily tied to the care

20      provider or to ORR.  They are able to make an

21      independent recommendation.

22              Q.      Why isn't the FFS independent?

23              A.      They're a federal employee.

24              Q.      Okay.  So I mean, in answering my

25      question as to why it's like -- you explained that

1                    Confidential

2          A.     Sort of traditional sort of

3    PowerPoint presentations, role playing, that type

4    of function.

5          Q.     And the new case managers, what are

6    they being trained on or to do?

7          A.     On sort of general ORR, the general

8    ORR program, Flores settlements, placement

9    services, release process.

10         Q.     And the stuff in the online?

11         A.     Yes.

12         Q.     Policy guide and the map?

13         A.     Yes.

14         Q.     But you don't have any role in that

15   training?

16         A.     No.

17         Q.     Never have?

18         A.     No.

19         Q.     So you indicated that GDIT case

20   coordinators provide recommendations on individual

21   cases, correct?

22         A.     Yes.

23         Q.     So if a case coordinator and a case

24   manager had a disagreement about whether a youth

25   was to be placed in secure placement, how would

Page 66

1                    Confidential

2    that disagreement be resolved?

3         A.    Explain their rationale for their

4    position, and ultimately the FFS would make a

5    decision.

6         Q.    So the FFS would consider the

7    information from the two sources and make a final

8    determination?  Is that a yes?

9         A.    Yes.

10         Q.    Does one recommendation, would the

11    FFS give one side more priority or preference in

12    that scenario?

13         A.    I'm not in FFS, so I'm not sure.

14         Q.    Okay.  But you've observed this

15    process from the inside for many years, right?

16         A.    Yes.

17         Q.    So in your understanding or

18    experience, have FFS typically given more weight to

19    the recommendation of a GDIT case coordinator or

20    that of a case manager?

21         A.    I don't know that I can make a

22    general, generalization.

23         Q.    Okay.  I'm just asking if you know

24    or not.  So is that an I don't know?

25         A.    It's an I don't know.

Page 68

1                     Confidential

2    guide.

3                     MR. WHITE:  I think that is good

4            time for our first break.  We can take

5            about --

6                     MR. MOLINA:  Are we finished with

7            the answer to the question?

8                     MR. WHITE:  Well, I was going to

9            give him time to look it up.  So we can

10           do that or we can do what -- I mean, yes,

11           this is an exception to my request that

12           we answer the question.  It seemed like

13           it was going to take a little bit of

14           time.

15                    THE WITNESS:  It's referred to in

16           Section 1.4.2.

17   BY MR. WHITE:

18           Q.    1.4.2?

19           A.    Yes, 1.4.2, the 30-day restrictive

20   placement review.

21           Q.    Okay.  Tell me, can you point to me

22   on this page 7 of 11?

23           A.    Yeah.  In the section sort of in the

24   middle of the page step-ups and step-downs, go over

25   the criteria and the factors that's used to make

Page 69

1                          Confidential

2    the basis of a decision and then the last paragraph

3    from the page, the care provider documents the

4    basis for stepping up or stepping down a UAC into

5    or from a secure or staff secure care provider in

6    the UAC's case file and provides the information to

7    the youth's attorney of record, legal service

8    provider or child advocate on demand.

9           Q.      That doesn't say the child, does it?

10          A.      "When a UAC is stepped up to a more

11   restrictive setting, secure, staff secure or RTC

12   facility, he or she is provided with a notice of

13   placement and restrictive setting in language he or

14   she understands within a reasonable time either

15   before or after ORR's placement decision."

16          Q.      Okay.  So the first sentence that

17   you read refers to the documentation that the care

18   provider has collected, I guess, or that's the

19   basis for the step-up or step-down?  And that

20   that's provided to, on demand to the attorney,

21   legal services provider or child advocate; correct?

22          A.      Correct.

23          Q.      Okay.  And what the child is

24   provided in the second sentence is the notice,

25   right?

1                          Confidential

2   basis for ORR's decision, that's supposed to be

3   included in the denial letter under this?

4          A.     Yes.

5          Q.       In your experience, is that actually

6   taking place?

7          A.       In my experience it's rare that we

8   deny a child for sponsorship based on reasons that

9   they're a danger to self or others.

10         Q.       And my question is in your

11  experience are the supporting materials and

12  information that form the basis for ORR's decision

13  actually being included in denial letters where a

14  denial is based on that sponsorship?

15         A.     I don't write the actual letters,

16  but given that it's our policy, I assume that our

17  staff are following the terms of our policy.

18         Q.       Okay.  And is the basis of that

19  answer your assumption that staff follows policy?

20         A.     Yes.

21         Q.       Okay.  Anything else that it's based

22  on, any actual experience?

23         A.       Yeah.  We had a case where -- so

24  children who are denied for that basis may have an

25  opportunity for appeal to the assistant secretary

Confidential

2  over children and families.  And we had a case last

3  year that happened.

4          Q.      Where there was an appeal?

5          A.      Yes.

6          Q.      And you examined the letter and the

7  supporting materials were included?

8          A.      I just made sure one of my staffers

9  ensured that that had indeed taken place.

10         Q.      And it had?

11         A.      Yes, to the best of my knowledge.

12         Q.      Okay.  And had it happened before

13  your staffer got involved, or was it after your

14  staffer got involved that that was?

15         A.      I don't recall.

16         Q.      Okay.  You don't recall the nature

17  of the case?

18         A.      No.

19         Q.      Who was the staffer?

20         A.      Shannon Herboldsheimer.

21         Q.      Where was the kid?

22         A.      I think he was, his base facility

23  was the Shenandoah facility, which is one of our

24  secure programs.  But the minor was I think at the

25  time placed in an out-of-network RTC provider in

1                    Confidential

2    Arkansas, I believe.

3          Q.     And that was the situation where the

4    child's release was denied and the appeal was

5    filed?

6          A.     Yes.

7          Q.     Was the appeal filed by an attorney?

8          A.     Yes.

9          Q.     What was the result of the appeal

10   decision?

11         A.     I know ultimately the minor was

12   released.  I don't know whether it was based upon

13   the assistant secretary's decision or whether she

14   asked that the FFS consider some additional

15   information that had come between the time of the

16   appeal and the actual hearing.  I don't really

17   recall that.  But I believe it was ultimately

18   released.

19         Q.     So under this appeal there's a

20   hearing?

21         A.     There can be, yes.

22         Q.     Where is that provided in the

23   regulations in the policy guide?

24         A.     In 2.7.8, the next section.

25         Q.     Okay.  And so this reads like the

Page 76

1                         Confidential

2    determination as to whether a hearing will take

3    place or not is at the request of the requester,

4    who is the person appealing?

5         A.     Yes.

6         Q.     So in the explanation of the process

7    for requesting an appeal that's described in 2.7.7,

8    does that include the information about the

9    requester's ability to request a hearing?

10        A.     Yes.

11        Q.     In the case that you were talking

12   about where the child was in the out-of-network

13   placement in Arkansas, was there a federal habeas

14   or federal litigation filed also?

15        A.     I believe so.  I think the child's

16   attorney asked to stay -- I can't remember if they

17   filed a habeas or threatened a habeas, but they

18   wanted to complete this process first.

19        Q.     This process being the appeal

20   through --

21        A.     Yes.

22        Q.     Okay.  This is a good example of I

23   pause when I speak and you're going to know what my

24   question is, but just for the sake of the court

25   reporter, if you can let me finish and I'll try to

Page 87

Confidential

1

2    with the sponsor.

3          Q.      So when the sentence says "ORR may

4    in its discretion require this of potential

5    sponsors," does that exclude GDIT from making the

6    direct request, meaning they don't have that

7    discretion, or is it that they would just make the

8    request indirectly because these other, case

9    manager and FFS have the direct contact with the

10   sponsors?

11         A.      Yes.  So we would read that as

12   meaning that it needs to come through either the

13   care provider or case manager or the FFS.

14         Q.      But if the case coordinator wants

15   additional information, they can get it by making

16   the request indirectly through one of these other

17   two people; right?

18         A.      Yes.

19         Q.      So who -- is there any supervision

20   at ORR of this discretionary process?

21         A.      I guess I don't -- what do you mean?

22         Q.      The decision about release to a

23   custodian, I believe you testified earlier, is

24   ultimately that of the FFS; correct?

25         A.      Correct.

Page 98

Confidential

1    that the child had a history of being abused?

3        A.    Speaking specifically in that

4    instance to the sponsor being an abuser.

5        Q.    So if a determination is made that

6    the sponsor's relationship is not sufficient, is

7    the child given any opportunity to answer or rebut

8    that decision?

9        A.    The child is interviewed as part of

10   the sponsorship process.  So their views of the

11   relationship that they have with the sponsors would

12   be taken into account of the youth's assessment.

13       Q.    So that's a different question than

14   what I'm asking.  What I'm asking is if the FFS

15   here is making its decision or for that matter if

16   the case manager's recommendation is that the

17   relationship with the potential sponsor is not

18   sufficient, is the child then informed of that and

19   given the opportunity to provide further

20   explanation or rebut the decision?

21       A.    The child is provided sort of

22   ongoing information as to what the status of the

23   release is.  So that would be a conversation that

24   the case manager would have with the child

25   regarding what hiccups there are with the case and

1                        Confidential

2      what the case status is.

3            Q.      So is that notice to the kid, is

4      that provided for anywhere in the policy guide?

5            A.      So it's part of just the family

6      reunification services that ORR provides, that they

7      are provided updates as to the status of the case.

8            Q.      So there's no specific requirement

9      in here that when a potential Category 3 sponsor is

10     recommended for denial or denied that the child be

11     informed of that and given the opportunity to rebut

12     that information as the basis of that decision?

13           A.      It would be -- so there's not --

14     Category 3 sponsors aren't denied just because they

15     have no bona fide relationship with the child.

16     It's a consideration.  It's not a sole reason.

17           Q.      Okay.

18           A.      The policy was changed in -- yeah,

19     this past July.

20           Q.      And what -- when you're -- what are

21     you looking at when you say that?

22           A.      There's a revision date at the

23     bottom of the policy at each section.

24           Q.      Right.  And which section are you

25     referring to?

1                          Confidential

2          A.      If we have information that they

3    have a final order of removal, it's a strong

4    likelihood that there could be disruption in the

5    sponsorship and already with a fairly tenuous

6    relationship to the child.

7          Q.      So I want to understand the sources

8    of information and if they're different, this

9    actually kind of goes back to when we were talking

10   about step-ups.  So let's start there.

11         When the GDIT case coordinator is making

12   their independent determination about whether a

13   step-up is advised or not, do you understand the

14   circumstance I'm describing?

15         A.      Yes.

16         Q.      I want to understand the sort of

17   world or what all is the information that that

18   person is privy to or given to make that

19   determination.

20         So it's my understanding that that would be

21   whatever the case manager has been given in terms

22   of -- well, just the case manager's recommendation

23   and -- well, what else would they -- what is the

24   GDIT case coordinator looking at, what information

25   when they're making a recommendation as to whether

1                       Confidential

2    a step-up should be approved or not?

3              A.      So they would be looking at the

4    child's entire case file, our manual procedures

5    list out, you know, specific things that should be

6    reviewed, certain types of serious reports,

7    criminal information that may be contained in the

8    child's case file, but they are privy to the entire

9    child's case file.

10             Q.      To your knowledge, is that entire

11   child's case file in the UAC portal?

12             A.      No.   That has like the most

13   important information, but there could be hard file

14   notes that a case manager has that are not in the

15   portal, but the important information, the

16   assessments, the evidence used to make

17   determinations underlying the bases of any decision

18   would be maintained in the portal.

19             Q.      Okay.   So the case manager's

20   recommendation would be based on the information

21   that's in the portal and the case manager's notes

22   that you're talking about, the hard file; right?

23             A.      Correct.

24             Q.      And then anything else that the case

25   manager would be basing that on?

1                          Confidential

2              A.      They can request the child's file.

3              Q.      Okay.  But then they only consider

4    it if they request it, right?

5              A.      Yes.

6              Q.      It's not provided in these policies

7    or in the MAP that the case manager is required to

8    provide all their hard copy notes?

9              A.      No.

10             Q.      Okay.  So other than the notes if

11   they're requested and the information that's in the

12   portal, does the GDIT case coordinator, case

13   coordinator, have access to any other information

14   in making their recommendation about a step-up

15   decision?

16             A.      Not that I can think of.

17             Q.      Okay.  So their independent review

18   is of essentially the same information that the ORR

19   case manager has, right?

20             A.      Uh-huh, yes.

21             Q.      Okay.  And that is also the same

22   information that the FFS is reviewing in making

23   that same determination, correct?

24             A.      Yes.

25             Q.      And is that similar for these

1                         Confidential

2    determinations that case coordinators are making

3    about the release process?

4           A.     Yes.

5           Q.     The information, I think you

6    described earlier, a GDIT case coordinator would

7    have the information they would consider in release

8    would be the home study and the information

9    provided by the case manager; right?

10          A.     Yeah.  And information provided by

11   the sponsor.  If they're looking at the application

12   packet, all the supporting documents, all the

13   results of all the assessments, any mental health

14   reports, any medical reports.

15          Q.     All that goes to the case manager,

16   though, initially; right?

17          A.     Yes.

18          Q.     Is that provided to the case

19   coordinator by the case manager?

20          A.     It's on the portal, so the case

21   coordinator doesn't need to wait for the case

22   manager to do anything.

23          Q.     Is the home study on the portal?

24          A.     It's uploaded on to the portal.

25          Q.     And is that typically where the case

1                          Confidential

2       in your procedures how much of the communication

3       the case manager is required to document.

4              A.      So they would be documenting sort of

5       major steps in the release process.

6              Q.      And where does it tell them to do

7       that in here?

8              A.      I believe it's in the MAP, in the

9       Manual of Procedures.  But again, I need to look

10      this up.  I don't remember off the top of my head.

11             Q.      So perhaps we'll get to that later.

12             If a case manager was discouraging a

13      potential sponsor from applying, would that be

14      documented?

15             A.      So I'm trying to understand the

16      scenario.

17             Q.      The scenario is a potential

18      sponsor -- typically how does the case manager

19      initially come into contact with a potential

20      sponsor?

21             A.      It's usually one or a combination of

22      ways.  Often children come with like a name and a

23      number of potential sponsors or somebody they know

24      in the United States.  Or when the case manager

25      establishes contact with the child's family in

1                         Confidential

2    their home country, the child's family has an

3    individual who they know or who they intended the

4    child to live with.

5            Q.     So under either of those two

6    scenarios, the kid gives the number to the case

7    manager or the family in the home country gives the

8    number.  The case manager is going to initiate

9    contact with that potential sponsor?

10           A.     Yes.

11           Q.     Unless the sponsor has already

12   figured out who to call and has initiated the

13   contact on their own, right?

14           A.     That happens occasionally.

15           Q.     Okay.  So in this scenario that I'm

16   describing, if the case manager is discouraging to

17   that potential sponsor saying you shouldn't apply,

18   is the case manager supposed to document that

19   communication in their file?

20           A.     They're supposed to be documenting

21   sort of generally communications they have with

22   sponsors.  The scenario seems somewhat like going

23   against the interest of the case manager, so I'm

24   having trouble thinking why that would happen.

25           Q.     So the, if -- if a potential sponsor

1                      Confidential

2          The FFS is the ultimate decision-maker in

3   the step-up decision; correct?

4          A.     Yes.

5          Q.     Are they also the ultimate

6   decision-maker in the release process?

7          A.     Yes.

8          Q.     So this states that the case is

9   elevated to the FFS when there's this disagreement;

10  right?

11         A.     I should make one clarification,

12  that in the case where a parent is going to be

13  recommended for a denial, that that actually needs

14  to be elevated to the ORR director, the release

15  decision.  But in all other cases typically it's

16  the ORR and FFS.

17         Q.     Okay.  So is that every time what

18  you just described, or is it only when the kid

19  appeals or the lawyer appeals?

20         A.     No, it's only for cases where the

21  parent is being denied it would go to the ORR

22  director.

23         Q.     And it automatically goes to the ORR

24  director whether or not there's an appeal of that

25  denial?

Page 127

                    Confidential

1

2    slow to try to get together the packet.

3          So there are questions as to the motives of

4    the sponsor and the situation that the family, that

5    the home is -- home environment, that sort of

6    thing.

7          Q.    Okay.  And this sentence refers us

8    to footnote 5 that says ORR or FFS supervisors have

9    the final authority for approving discretionary

10   home studies.  So does that always happen?

11         A.    I usually think it falls to the FFS.

12   The idea is that it's commitment of federal funds

13   to do that.  And so much we determine that in

14   order, ORR determined that in order to do so based

15   on appropriations laws we needed to have a federal

16   employee make that call.

17         Q.    Okay.  But this footnote says the

18   supervisor is the ultimate final authority for

19   approval, but you're telling me that FFS approved

20   these as well?

21         A.    As a matter of course, I'm aware

22   that FFS had been the authority on it, even though

23   the policy specifies that supervisors do it.

24         Q.    So if -- if a case coordinator

25   recommends the home study, it still has to be

1                        Confidential

2    approved by the FFS or the FFS supervisor?

3            A.      Correct.

4            Q.      And what if they disagree with the

5    recommendation?

6            A.      Then they move forward with the

7    release decision without a home study.  And this,

8    you know, the basis of this was by request of a

9    recommendation of Congress that we have the

10   discretionary home studies kind of in this manner.

11           Q.      Well, when you say it was a

12   recommendation, was that in the statute?

13           A.      No.  It was the result of an

14   investigation done by a Congressional, a Senate

15   Congressional committee.

16           Q.      It was the, where some kids had been

17   released to traffickers?

18           A.      Yes.

19           Q.      Okay.  So this provision says that

20   what the case manager or case coordinator is

21   recommending, if the home study is likely to

22   provide additional information required to

23   determine that the sponsor is able to care for the

24   health, safety and well being of the child.  Do you

25   agree that that's what that says, right?

1          Confidential

2          A.      Yes.

3          Q.      So what additional information are

4   we talking about?  What is -- what is a home study

5   likely to produce that will help determine the

6   sponsor's ability to care for the child?

7          A.      Well, it gives some insight into

8   what the home environment looks like.  Whether

9   there are unaccounted for adult individuals living

10  in the home that weren't reported in the

11  application and a chance for a caseworker to

12  interview all of those individuals.

13         Q.      So the supervision over -- is there

14  supervision over whether these discretionary home

15  studies are being requested in accordance with ORR

16  policies and procedures?

17         A.      So there's a project officer who

18  oversees the home study and post-release service

19  grants.

20         Q.      And who is that?

21         A.      That's Gail.  I mentioned her

22  earlier.

23         Q.      And when you mentioned her earlier,

24  did you not remember her last name?

25         A.      Correct.  Yeah.  It starts with an

Page 140

1                       Confidential

2          break now.

3                        (Recess)

4                   AFTERNOON SESSION

5   BY MR. WHITE:

6               MR. WHITE:  We're back on the

7          record.

8          Q.    Mr. Biswas, if I could direct your

9   attention to Section 2.7 of the policy guide, I

10  want to ask some questions about this.

11         You're familiar with this provision, are

12  you not?

13         A.    Yes.

14         Q.    So in this care provider

15  recommendation process, does the child have any

16  role in that prior to the recommendation, or what

17  is the child's role?

18         A.     In the recommendation and decision

19  process?

20         Q.    Yes.

21         A.    The case manager takes the child's

22  views of the sponsor and the potential release into

23  consideration in making a release decision or

24  release recommendation.

25         Q.    Any recommendation in the policy to

1                        Confidential

2    do that?

3            A.      Yes.

4            Q.      Where?

5            A.      The assessment area of 2.4.1, I

6    think the fourth criterion, "ORR considers the

7    following factors when evaluating family members or

8    potential sponsors," and then the fourth bullet

9    down is "The child's views on the release and

10   whether he or she wants to be released to the

11   individual."

12           Q.      Okay.  In the situation where the

13   care provider is viewing -- is contemplating making

14   a negative recommendation for release, is there a

15   formal requirement that the child be notified of

16   that?

17           A.      Yes.  I mean, there's a notification

18   to the child that the decision has been made to

19   deny release.

20           Q.      That the decision has been made?

21           A.      Yes.

22           Q.      Okay.  So is there any requirement

23   that the child be notified prior to the decision?

24           A.      Prior to the decision to deny?

25           Q.      Yes.

1                              Confidential

2              A.      I guess I don't understand the

3      context.  The decision has been made to deny --

4              Q.      No.  Before that when the care

5      provider is considering all the information and

6      they're looking towards a potential denial, is

7      there any involvement of the child other than

8      what's stated here on this bulletpoint that you

9      cited under 2.4.1?

10             A.      Any other involvement of the child.

11     I guess I'm not -- I'm still not understanding.

12             Q.      That's a yes-or-no question.  Is

13     there any opportunity for the child's views to be

14     taken into account about a potential negative

15     release determination before it's actually

16     finalized?

17             A.      Yes.  I mean, the case manager is

18     meeting with the child on a regular basis.  So this

19     is an ongoing process.

20             Q.      But only as stated in this

21     bulletpoint that the views on the release and

22     whether they want to be released to the individual,

23     correct?

24             A.      Yes.  But those views could change

25     over time.  So it's a continuous process.

1                    Confidential

2      your instruction to not release the child's

3      involvement in receiving and distributing child

4      pornography.

5              A.      Yes.

6              Q.      Was that a criminal conviction, or

7      what was the nature of that information?

8              A.      It was a juvenile adjudication.

9              Q.      In the United States?

10             A.      Yes, in Montgomery County.

11             Q.      Do you know if the circuit court had

12     that information in front of them when it made its

13     placement decision?

14             A.      Yes.

15             Q.      It did?

16             A.      Yes.

17             Q.      And it ordered the kid released to

18     this state facility?

19             A.      To my knowledge, yes.

20             Q.      Okay.  So if you can look with me at

21     2.7.4, 14/22 of Section 2 in the policy guide.

22             A.      Sorry which section?

23             Q.      2.7.4.

24             A.      Yes.

25             Q.      So the first bullet point there, it

1                    Confidential

2    says, "ORR will deny release to potential sponsor

3    if any one of the following conditions exist," and

4    the first one is the potential sponsor is not

5    willing or able to provide for the child's physical

6    or mental well being.

7            Do you follow me there?

8            A.     Yes.

9            Q.     Are you aware of any denials on this

10   basis?

11           A.     Generally, yes.  Specific cases, no.

12           Q.     So what's your general recollection

13   about those cases?  When does that happen?

14           A.     When a sponsor has had a history of

15   not providing for a child or, either the child

16   they're attempting to sponsor or potentially

17   another child that may have been in their home.

18   You know, adequate supervision or they were

19   abusive, that sort of thing.

20           Q.     Okay.  If the sponsor, potential

21   sponsor indicates that they don't intend, do not

22   intend to continue a child's psychotropic

23   medications, is that an indicia that the potential

24   sponsor is not willing or able to provide for the

25   child's physical or mental well being?

1                          Confidential

2          Q.      You've had them ask.  Have they been

3   approved?

4          A.      I recall some being approved.

5          Q.      Do you recall any that resulted in a

6   child's release?

7          A.      I don't recall the results one way

8   or the other.

9          Q.      Can a child who is not represented

10  by an attorney make such a request for an

11  independent psychiatric evaluation?

12         A.      We have no policies against it.

13         Q.      Are children informed of their

14  ability to request an independent psychiatric

15  evaluation, to challenge denial of release?

16         A.      No.

17         Q.      You said you had no policy against

18  it, but there's no policy to inform the minor child

19  of that right; correct?

20         A.      Correct.  They have a right to a

21  Flores bond hearing and make a determination

22  whether they're dangerous or not.  Those kind of

23  issues could be brought up in that setting.

24         Q.      So of the Flores bond hearings that

25  you're familiar with, have some of them involved

Page 184

1                         Confidential

2      where the immigration judge is considering

3      psychiatric evaluation?

4           A.     The cases I've handled, it has been

5      presented as evidence, yes.

6           Q.     That was the psych eval done by the

7      care provider?

8           A.     In some instances, yes.  In others,

9      I think we've had independent evaluations that were

10     done.

11          Q.     Where an attorney got an independent

12     evaluation done?

13          A.     Yeah.  I believe so.  I think I

14     recall a few cases like that.

15          Q.     Attorney for the child?

16          A.     Yes.

17          Q.     So are the -- did the Vera attorneys

18     ever handle the bond hearing?

19          A.     They typically are the ones that

20     handle the bond hearing.  And to clarify, they are

21     subcontractors.

22          Q.     Okay.  So in your attempt to

23     clarify, I'm confused.  What does that mean?

24          A.     Vera doesn't actually provide

25     representation.  They subcontract with

Confidential

1

2    that, I believe that it was from that order that we

3    were required to strike it and only limit it to

4    licensed psychologist or psychiatrist.

5              Q.      So to the best of your recollection,

6    the reason that policy was amended in October of

7    2018 was in response to the Court's July 30 order

8    on the motion to enforce?

9              A.      Yes.

10             Q.      And your recollection of what the

11   previous policy was is the nurse practitioner could

12   make the certification, or what was it?

13             A.      Yes.

14             Q.      Did the previous policy also include

15   these other people?

16             A.      Yes.

17             Q.      So how has the process changed, the

18   decision to transfer a youth to an RTC?  How has

19   that decision process changed?

20             A.      Only that the, you know, transfer

21   needs to be recommended by a licensed psychologist

22   or psychiatrist.

23             Q.      So what criteria is used to

24   determine that a child's mental health symptoms

25   cannot be managed in an outpatient setting?

Confidential

A.      That would be something that would
be under the evaluation of the licensed
psychologist or psychiatrist to determine.

Q.      So you don't know what criteria are
used?

A.      Well, we would -- the four criteria
that are listed in this policy are the reasons why
a transfer would happen.  I think the individual
factors in an individual case would be something
that would be made by the professional judgment of
a licensed psychologist or psychiatrist.

Q.      So given that the children are in
ORR custody, I'm trying to understand the
difference between outpatient and inpatient in this
context.

A.      So if the services couldn't be -- if
the child had a mental health need that we couldn't
just address by having the child go to a
psychologist in the community a couple of times a
week for therapy sessions or have that therapist
come to the shelter, for instance, that their needs
couldn't be handled in that manner, that they
needed a full residential treatment center, the
resources that those types of programs have, then

1                     Confidential

2    the child would be transferred.

3            Q.     And are the case managers involved

4    in that determination at all, or is it exclusively

5    that of a psychologist or psychiatrist?

6            A.     The case managers are kind of

7    running down the paperwork.  But the psychologists

8    and psychiatrists are the ones that make the

9    decision.

10           Q.     So the decision whether outpatient

11   or inpatient is appropriate, the case manager has

12   no role in that decision other than running down

13   the paperwork?

14           A.     More or less, yes.

15           Q.     Well, when you say it that way, I

16   need to understand what the "less" is.  What would

17   be the case manager's role?

18           A.     I mean, they would be -- they're

19   managing the child's general case outside their

20   sort of, the mental health piece of it.  So they

21   would be trying to connect the parties that need to

22   talk in these scenarios.

23           Q.     Okay.  But are they making

24   recommendations, inpatient versus outpatient?

25           A.     No.

                                Confidential

1
2       the shelter setting that they received in the RTC?

3              A.      Typically our shelters are not

4       designed to care for acute mental health needs of

5       children with this type of, these types of needs.

6              Q.      Your shelters are full of kids with

7       PTSD, aren't they?

8              A.      I'm not a psychiatrist or

9       psychologist, so I'm not sure what their diagnoses

10      are.

11             Q.      Does a child need to complete a

12      30-day initial placement review in an RTC before

13      they're recommended for a step-down or release?

14             A.      No.

15             Q.      Are family reunification efforts

16      ever delayed while a child completes their initial

17      assessment period in an RTC?

18             A.      They are two different processes.

19             Q.      Explain.  I don't understand.

20             A.      They are not connected.  Just

21      because a child is going through a release process

22      with a sponsor, it's not connected with the review

23      of their case for step-down.

24             Q.      So the completion of a child's

25      initial assessment period in an RTC can never

Page 199

1                          Confidential

2     affect the or delay the child's release to a

3     potential sponsor?

4           A.     I need to look at like specific

5     cases.  It's hard to come up with a generalization.

6           Q.     You just said the two things aren't

7     connected?

8           A.     I said there are two different

9     processes, that's right.

10          Q.     So I need to understand how they're

11    different.

12          A.     One is about releasing a child to

13    sponsor, and one has to do with identifying the

14    child's needs while they are in a congregate care

15    setting.

16          Q.     How might that initial assessment

17    period in an RTC delay release of a child to a

18    potential sponsor?

19          A.     I don't know.  It would need -- I

20    would need to look at the individual facts of the

21    case.

22          Q.     So what factors do clinicians and

23    FFSs consider before recommending a child placed in

24    an RTC for step-down or for release?

25          A.     So they would look at factors in

Confidential

1.4.2 to determine whether the child's placement is
still warranted, specifically for an RTC.  This
would revolve around whether a licensed
psychologist or psychiatrist still thinks the
child's placement is necessary.

          For purposes of release, it's the same
criteria that we would use for any release.  Is
there a sponsor available under the criteria we
discussed at 2.7.  Or is the child a danger to self
or others.

          Q.    So is an RTC considered a
restrictive setting?

          A.    Yes.

          Q.    Do you know if a child who is placed
in an RTC has to fulfill their treatment objectives
or make substantial progress toward these
objectives before they are recommended for
step-down or release?

          A.    I'm unfamiliar with those terms.

          Q.    You're unfamiliar with the term
"treatment objectives"?

          A.    Yes.

          Q.    So if I use the term "treatment
objectives" in a question, you're not going to

Confidential

1    trying to understand what the fix would be in the

2    policy to consider that, that the behavioral issues

3    are the result of an underlying disability or that

4    they're more just adolescent nuisance behavior.

5                    MR. WHITE:  Are you instructing

6            him not to answer?

7                    MR. MOLINA:  Is there a question?

8                    MR. WHITE:  Yes, I'm trying to

9            understand what the policy fix would look

10           like to address that concern.

11                   MR. MOLINA:  In that case we're

12           going to object.  That's getting to

13           deliberative process.  I'm directing the

14           witness not to answer.

15   BY MR. WHITE:

16           Q.    Okay.  So who makes the

17   determination as to whether a child is a dangerous

18   to their civil or others?

19           A.    Ultimately it's a decision that's

20   made by the ORR/FFS.

21           Q.    With input from?

22           A.    The case manager, clinician,

23   possibly case coordinator.  Immigration judge in

24   some cases.  Child advocate.

Confidential

1

2          Q.      So does this mean that children with

3   mental health needs are evaluated in the same

4   manner as those with criminal charges or who are

5   chargeable with certain offenses?

6          A.      So for those children that are

7   placed in a residential treatment center, they

8   cannot be handled in an outpatient setting.  We

9   would evaluate them in congruence with some of the

10  criteria that may also be used for placement in a

11  secure facility for finding of dangerousness.

12         Q.      Okay.  I don't see anything limiting

13  that sentence in 1.4.6.  So which criteria from

14  1.2.4 come into play and which don't, if you're

15  telling me only a few of them do.

16         A.      Well, I'm saying the ones that are

17  focused on danger to self or others.  I mean, you

18  can have a child who has both criminal, problems

19  with criminal offenses and criminal history but

20  also has acute mental health needs.  I'm saying it

21  can be both.

22         Q.      But according to this policy in

23  assessing dangerousness, you use the criteria

24  1.2.4; correct?

25         A.      Yes.

Confidential

3/11, the third full paragraph, "If a child has a
severe mental health issue in addition to serious
behavioral concerns or criminal/delinquent history
warranting placement into a restrictive level of
care, ORR may place the youth in a residential
treatment center, RTC or other therapeutic
setting."

      So who decides if the RTC is a better
placement for a youth than a secure facility?

      A.    So that would be the licensed
psychologist or psychiatrist.

      Q.    In connection with FFS or it's only
the --

      A.    Well, they need to make a
recommendation, and then the FFS would then be
authorized to facilitate the transfer.

      Q.    Well, I'm just trying to parse this
too carefully, but it says "The child has severe
mental health issues in addition to serious
behavioral concerns or criminal delinquent history.
ORR may place in RTC or other therapeutic
settings."

      So is it just that first clause, the mental
health issue that you're getting input from the

1                    Confidential

2    psychologist or psychiatrist?

3         A.    No.  I mean, the psychologist or

4    psychiatrist is making that determination based on

5    the following criteria, 1.4.6.

6         Q.    So that does not include their

7    criminal background then, right?

8         A.    It might insofar as psychiatrist or

9    psychologist determines that the criminal conduct

10   was the result of a, you know, some type of mental

11   health crisis.

12        Q.    Okay.  So that's in the province of

13   the healthcare provider as to how they make that

14   determination; is that right?

15        A.    Yes.

16        Q.    I mean, they're determining one or

17   more of these criteria, but how they go about it --

18   the four bulletpoints in 1.4.6; correct?

19        A.    Correct.

20        Q.    But what they consider is sort of

21   their province, right?

22        A.    Yes.

23        Q.    So are licensed psychologists or

24   psychiatrists always involved in the step-ups to

25   secure facilities?

1                    Confidential

2          A.     No.

3          Q.     How does ORR ensure that kids are

4    not inappropriately stepped up to secure?

5          A.     So in addition to the FFS and the

6    case manager and the clinician, there's the case

7    coordinator who is making an independent evaluation

8    of the placement as well.  And then there's a

9    30-day review process to determine whether the

10   placement is still warranted.

11         Q.     Once it's already been done?

12         A.     Yes.

13         Q.     So have all the kids that have been

14   stepped up to secure been evaluated by a licensed

15   psychologist or psychiatrist?

16         A.     I don't know.  It's not a

17   requirement that they all get a secure -- that the

18   child placed in secure have their case be reviewed

19   by a psychologist or psychiatrist.

20         Q.     Are there children with mental

21   health diagnoses in secure facilities?

22         A.     I assume that there would be based

23   on my experience, but I'm not aware of individual

24   cases at the moment.

25         Q.     Have you been inside these

1                     Confidential

2          A.     So that was in the fall of 2009

3     through 2010, 2011.

4                          (Discussion held off the

5                          record.)

6          Q.     So if a child is placed in a secure

7     facility but disagrees with that placement, is

8     there any mechanism that they can challenge the

9     placement?

10         A.     Yes.

11         Q.     What is that?

12         A.     They can request reconsideration of

13    their placement under Section 1.4.7, policy guide.

14         Q.     So that's only after they've been

15    there for 30 days?

16         A.     Correct.

17         Q.     Are they given a notice of this

18    ability to request reconsideration?

19         A.     Yes.

20         Q.     Where does it say that?

21         A.      I think it's in the procedures.

22    It's also on the -- it should be on the form itself

23    that notifies them of their placement in a secure

24    facility.  I don't know if you have Section 1 of

25    the MAP.

Page 225

1                     Confidential

2              MR. MOLINA:  It wasn't in here.

3         A.      So anyways, one of the appendix

4    forms, the notice of placement in a restrictive

5    setting informs the child that they have a right to

6    reconsideration of their placement in a secure or

7    RTC placement after 30 days.

8         Q.      Is that one of those -- go ahead.

9         A.      Also the child could ask for a

10   Flores bond hearing for determination of

11   dangerousness.  And while the decision on

12   dangerousness is not holding to whether we would

13   continue placing the child in a secure facility or

14   not, we would take it under consideration.

15        Q.      But that's only one of four or it's

16   a subpart of the fourth criteria for RTC placement,

17   right?

18        A.      Pardon?

19        Q.      Harm to -- well to the community.

20   Does the Flores bond hearing, does the judge

21   consider danger to self or just harm to the

22   community?

23        A.      To my knowledge, it's just danger to

24   the community.

25        Q.      Okay.  So that's a small part of the

Confidential

1

2          A.      The clinical staff at the program

3    often working with a licensed psychologist or

4    psychiatrist.

5          Q.      So in a situation where a child has

6    requested reconsideration of RTC placement, what

7    are they allowed to do in that request?  Are they

8    allowed to rebut the documentation?

9          A.      So they would be given an

10   opportunity to either write or through a

11   representative explain their disagreement with the

12   placement and the reasons why they think it's

13   improper.

14         Q.      Has ORR ever changed the placement

15   decision as a result of a reconsideration request?

16         A.      Not to my knowledge.

17         Q.      How many kids have sought

18   reconsideration of placement determinations?

19         A.      I can only think of one or two

20   cases.

21         Q.      Do you know of any children who

22   disagreed with their placement determinations but

23   have not sought reconsideration?

24         A.      Not aware.

25         Q.      Does ORR do anything to ascertain

Page 230

1                          Confidential

2      whether the kids actually understand their right to

3      seek reconsideration?

4              A.     Yes.  It's explained during the

5      notice of placement in restrictive setting when the

6      form is provided to the child.  And then again at

7      their 30-day follow-up review.

8              Q.     And what documentation exists of

9      that explanation or process?

10             A.     So the form itself is marked and

11     there's a summary of the reasons why the child is

12     placed in a restrictive setting.  And then the

13     child signs the form to acknowledge receipt.

14             Q.     Is that requirement spelled out in

15     the MAP?

16             A.     Yes.

17             Q.     So is there any method or mechanism

18     for a child to challenge a potential step-up prior

19     to the actual occurrence of the step-up?

20             A.     Yes, they can make a habeas.

21             Q.     Is that the only method?

22             A.     To my knowledge.

23             Q.     Do you know if any children have

24     refused to sign the notice of placement?

25             A.     I'm not aware.

Page 231

1                    Confidential

2          Q.      Not aware of that happening at all?

3          A.      Yeah, I'm not aware of that

4    happening.

5          Q.      Do you know what would happen if

6    they did?

7          A.      There's a procedure noted in the MAP

8    that care provider would just note, put a note that

9    they explained to the child that the child refused

10   to sign.

11         Q.      Okay.  So I believe you've testified

12   that the ultimate decision-maker in determining

13   whether the step-up is appropriate is the FFS;

14   correct?

15         A.      Correct.

16         Q.      And is there any like potential like

17   override or veto power of that in ORR?

18         A.      I mean, their supervisor may find

19   that such a placement is inappropriate.

20         Q.      How would that happen?

21         A.      I think I've mentioned a lot of

22   these complex cases FFS just naturally talked to

23   their supervisors about these cases.

24         Additionally, the policy requires at 1.4.2

25   that children who are in custody in a secure

Page 233

1                           Confidential

2           A.      Correct.

3           Q.      So is there any requirement for the

4    supervisor to track these 90-day placements?  Is

5    there any guidance for what their supervision looks

6    like here?

7           A.      I mean, it would be sort of the

8    normal function of their job to ensure the children

9    are properly placed.

10          Q.      Okay.  So that's a no.  There's not

11   any other guidance in the policy?

12          A.      No.

13          Q.      Do attorneys for the children have

14   any role in the step-up process?

15          A.      They request the reasons for the

16   placement that are provided them.  They are

17   provided notices that the children are being

18   transferred.

19          Q.      After the transfers happened?

20          A.      Yes.

21          Q.      Is it the same notice that you give

22   the children, notice of placement?

23          A.      No, the case manager would email or

24   call them to let them know that the child is being

25   transferred.

1                      Confidential

2          Q.      And is that spelled out in the

3    policies or procedures anywhere?

4          A.      Yes.  I mean, it just says, that

5    would be part of the normal transfer procedure, one

6    point -- I have to look it up.

7          Q.      Transfers within the ORR care

8    provider network?

9          A.      I believe so.  Yeah, 1.4 -- yeah.

10         Q.      Okay.  Notifies all designated

11   stakeholders, for example, the child's attorney.

12   Is that what you're talking about?

13         A.      Yes.

14         Q.      And so that specifically is after

15   the FFS has approved the transfer?

16         A.      Yes.

17         Q.      And so the request for

18   reconsideration is just for secure or RTC

19   placement?

20         A.      Yes.

21         Q.      So if a kid is stepped up to staff

22   secure, they don't have the right to request

23   reconsideration?

24         A.      Yeah.  I mean, staff secures are

25   licensed as shelters.

1          Confidential

2          Q.     Okay.  So is providing notice of the

3     reasons for secure placement a sufficient process

4     for the youth that are placed in secure setting?

5                    MR. MOLINA:  Objection.  Calls for

6          a legal conclusion.

7          Q.     You can answer to the extent

8     understand the question.

9          A.     Yes.  We're required to provide

10    notice to children by the terms of the settlement

11    and we're providing that notice.

12         Q.     Okay.  In your experience, have

13    youth ever been placed in staff secure/secure for

14    reasons that were later discovered to be erroneous?

15         A.     Yes.

16         Q.     How often?

17         A.     When we first undertook a secure

18    compliance review, I think we found a number of

19    cases where we felt that children were either

20    inappropriately transferred or -- while at the time

21    of their transfer it was proper to place them in

22    secure, their continued placement was unwarranted.

23    And so we made arrangements to have those children

24    transferred.

25         Q.     Okay.  So was anything else done to

1                        Confidential

2    turnover occurs someone could go back and refer to

3    see if somebody is like a repeat performer or

4    something, right?

5           A.     Yes.

6                  MR. WHITE:  I'll pass the witness.

7    EXAMINATION BY

8    MR. MOLINA:

9                  MR. MOLINA:  I don't have too many

10          questions for you.  There are a few

11          things I'd like to focus on here.

12          Q.     When you -- for the appraisal

13   process, you supplied some testimony as to a lot of

14   process that goes on when there's an application

15   made and there's the reunification packets put

16   together.  Is that an adversarial process?

17          A.     No.

18          Q.     So it's not a burden of proving

19   something?  What goes on when a -- when that

20   package is looked at, is the adjudicator free to

21   examine it and work with the party to get all the

22   answers that are necessary?

23          A.     Yes.  It's case managers and

24   sponsors and a lot of communication, all that sort

25   of thing.

1                        Confidential

2         Q.      So there's frequent communication

3   with sponsors throughout the process?

4         A.      Yes.

5         Q.      All right.  Now, when a decision is

6   made -- when a case manager makes a recommendation,

7   is the sponsor notified?

8         A.      Yeah.  I think the sponsor, I can't

9   remember specifically on what timelines they are,

10  but they would be told I made a recommendation and

11  the case is now proceeding to its next steps.

12        Q.      When the FFS makes the decision,

13  they get, the sponsor gets notice of it again?

14        A.      Correct, yes.

15        Q.      Now, is that decision final?  I

16  mean, what I mean by that is is an FFS able to

17  reconsider the decision?

18        A.      Yeah.  We've said in the past that

19  there's a material change in circumstance that sort

20  of the underlying basis for why there was a

21  decision to deny is cured, that we would reconsider

22  the sponsorship.

23        Q.      So it's not, a decision by FFS is

24  not the end of the line?

25        A.      Correct, yes.  That would be, the

1                        Confidential

2    issue had to do with housing and if the sponsor

3    knew, that sort of thing.

4         Q.    Are you aware of anything like that

5    ever happening where a request to reconsider or

6    reevaluate in light of curative action where that

7    has succeeded?

8         A.    Yes.

9         Q.    If I could also delve into the

10   process a little bit more and talk about the GDIT,

11   independent reviewers.  And you mentioned they're

12   involved in the release process.

13        A.    Right.

14        Q.    And they come in after the case

15   manager has made a recommendation?

16        A.    So they're involved in sort of the

17   general case staffing of the case, but then yes,

18   during the recommendation release process, their

19   recommendation comes after the case manager's.

20        Q.    So they have the opportunity to look

21   at essentially the same record the case managers

22   have?

23        A.    Yes.

24        Q.    And that recommendation -- and you

25   were saying that ORR values the GDIT reviewers.

1                    Confidential

2    Why?

3          A.    They provide an independent review

4    from a social worker who provided another

5    perspective.

6          Q.    Okay.  So it's another person

7    trained to care about the welfare of kid, helping

8    to provide input into the care of a child?

9          A.    Yes.

10               MR. WHITE:  Objection, leading.

11         Q.    So now, in assessing that, do you

12   consider FFSs in any way to be biased on the

13   results in a particular case?

14         A.    I think that they want to see what's

15   done in the child's best interest.  That's their

16   perspective.

17         Q.    So their criteria is the child's

18   best interest?

19         A.    Yes.

20         Q.    And they're making all the

21   determinations according to that?

22         A.    Correct.

23         Q.    Do they care whether that

24   necessarily involves release or non-release?

25         A.    I think they, you know, the general

1                    Confidential

2          follow-up.

3   EXAMINATION BY

4   MR. WHITE

5          Q.    So I understood you to say that the

6   case manager notifies the potential sponsor of

7   their recommendation on release.

8          A.    Yes.  They're supposed to provide

9   case updates to the sponsor in regular intervals.

10         Q.    And where is that in the policy?

11         A.    I think it's in the MAP somewhere.

12         Q.    And it's your recollection that

13   that's a requirement that they do that?

14         A.    To the best of my recollection it's

15   a requirement.

16         Q.    Does that include Category 2A

17   sponsors or just Category 1?

18         A.    The sponsor updates are for any

19   sponsor so that they know the progress of the

20   child's case.

21         Q.    So it's your testimony that a case

22   manager recommendation either in favor of or

23   against release of the child would be the type of

24   sponsor update that would be required by the MAP to

25   be given by a case manager to a potential sponsor?

1                        Confidential

2    talking about?

3            A.      The last four or five years.

4            Q.      So you told Mr. Molina that you

5    remember specific, a specific request to reconsider

6    in light of a corrective action or a curative

7    action in one case?

8            A.      Yes.

9            Q.      What case was that?

10           A.      I don't remember the specific case,

11   but I remember the question coming, can we

12   reconsider the sponsor and we said yes, we can.

13           Q.      Sir, I'm pretty sure you testified

14   you remembered that.  But you're telling me you

15   don't remember any of the details now that I'm

16   asking you, right?

17           A.      Excuse me?

18           Q.      When he asked you about this, I got

19   the impression that you had a very clear memory,

20   and maybe I misunderstood.  But I need to know

21   everything you recall about the specific case in

22   which a request to reconsider in light of a

23   curative action was granted.

24           A.      I remember being asked whether we

25   can reconsider a sponsor who had been previously

Confidential

1  denied.  And me saying yes, that's possible that

2  there's been a material change in circumstance that

3  warrants the case being reconsidered.

4

5       I can't remember the exact terminology, but

6  I do remember that.  I don't remember the

7  individual circumstances or the name of the

8  sponsor, the name of the child.

9       Q.     And you don't remember what the

10 curative action was that the person took?

11      A.     I believe it had something to do

12 with the sponsor moving.

13      Q.     And even though you don't remember

14 any of the details sitting here today, you believe

15 that the sponsor was then approved after this

16 curative action?

17      A.     Yes.

18      Q.     And the kid was released?

19      A.     Yes.

20      Q.     So I understood your testimony when

21 Mr. Molina was asking you questions that the FFS is

22 not biased towards a result, is that accurate?

23      A.     Yes.

24      Q.     But that the FFS is acing in the

25 child's best interest.  Is that accurate?

1                          Confidential

2                     C E R T I F I C A T E

3

4    LUCAS R., et al.,                    )

5         v.                              )

6    ALEX AZAR, et al.,                   )

7

8

9         I, BARBARA DeVICO, a Notary Public within and

10   for the District of Columbia , do hereby certify:

11        That TOBY BISWAS, the witness whose

12   deposition is hereinbefore set forth, was duly

13   sworn by me and that such deposition is a true

14   record of the testimony by such witness.

15        I further certify that I am not related to

16   any of the parties to this action by blood or

17   marriage; and that I am in no way interested in the

18   outcome of this matter.

19        IN WITNESS WHEREOF, I have hereunto set my

20   hand this 27th of November, 2019.

21

22

23   _____

24          BARBARA DeVICO

25