# DX-16

Deposition of James De La Cruz, March 10, 2020

Page 1

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                   WESTERN DIVISION

4    - - - - - - - - - - - - - - - x

5    LUCAS R., et al.,              :

6              Plaintiffs,          :

7    vs.                            : Case No.

8    ALEX AZAR, Secretary of U.S.   : 2:18-cv-05741 DMG PLA

     Department of Health and Human

9    Services, et al.,              :

10             Defendants.          :

11   - - - - - - - - - - - - - - - x

12

13

14        DEPOSITION OF JAMES DE LA CRUZ

15             Washington, D.C.

16             March 10, 2020

17

18

19

20

21

22   Reported by:

     Misty Klapper, RMR, CRR

23   Job No.: 176920

24

25

1      on policies and procedures and review cases,

2      children's cases.

3            Q.    Are care provider facilities owned by

4      ORR?

5            A.    No, ma'am.

6            Q.    Who owns care provider facilities?

7            A.    Care providers are independently

8      licensed facilities.  I should say entities.

9            Q.    Entities.  And ORR contracts with

10     these independently licensed entities?

11           A.    Clarification?

12           Q.    Of course.

13           A.    The majority of our programs are

14     funded through cooperative agreements, which are

15     similar to grants and different from contracts.

16     And we do have some programs who in the past

17     have -- and there currently may be one or two

18     programs that have a contract.

19           Q.    Do you know the names of those

20     programs off the top of your head?

21           A.    That would have a contract?

22           Q.    Yes.

23           A.    I have to think through to see,

24     because I'm trying -- there's a couple that did

25     have a contract, but I'm trying to remember --

Page 26

1      A.      Yes, ma'am.

2      Q.      Is that the same with the 41 FFS?

3      A.      Yes, ma'am.

4      Q.      So you've served in your role as

5 senior FFS supervisor for eight years?

6      A.      Going on seven.

7      Q.      Going on seven.  My math may be

8 wrong.

9              What are your responsibilities as a

10 senior FFS supervisor?

11      A.      My responsibilities are to carry out

12 our mission, which is to ensure that children

13 have a safe place while in ORR custody until

14 they can be safely released to a safe and

15 appropriate adult without unnecessary delay.

16      Q.      And what does that look like on a

17 day-to-day level?

18      A.      Every day is different.  We do -- it

19 can mean meeting with agencies from care

20 providers to discuss, you know, how children's

21 safety is -- is being carried out and also, you

22 know, those meetings would occur with the FFS

23 supervisor, FFS.  It could be -- a lot of times

24 it's meeting with maybe somebody from court.

25              There is a good amount of time spent

1   ensuring that we have operations that ensure

2   that children are being released and discharged

3   in an appropriate amount of time.  And sometimes

4   there's issues with specific cases that are

5   different.

6           And so I might spend time working on

7   those cases to give depositions.  There's a

8   number.  There's many, many activities.

9       Q.    So I want to try to go one by one

10  through those buckets of activities that you

11  just listed.

12      A.    Sure.

13      Q.    The first one was meetings, I think.

14  So it sounds like you meet with agencies, care

15  providers and the court you said?

16      A.    The court representatives, yes,

17  ma'am.

18      Q.    What is a court representative?

19      A.    Someone who works for EOIR, the

20  Executive Office of Immigration Review.

21      Q.    Okay.  And what is that office's

22  role?

23      A.    To ensure that children's immigration

24  cases are processed.

25      Q.    So in addition to ensuring that the

1    cater to a population of kids who need mental

2    health services or counseling sessions,

3    medication?

4         A.    Generally those would be programs

5    where children might have some kind of an

6    emotional concern and not necessarily diagnosis,

7    but they could be diagnosed.  And it could be

8    mental health as well, but not as -- it's not

9    acute or it's not necessarily something that's a

10   severe chronic mental health issue.  If it was

11   chronic, it would probably be more appropriately

12   placed in a residential treatment center.

13        Q.    And why is that?

14        A.    Because in a residential treatment

15   center, those -- those facilities are -- are --

16   are licensed.  And also, they generally provide

17   a lot more intensive therapeutic care,

18   therapeutic being defined as more mental health

19   therapy, group services, and they would always

20   have some kind of alignment with psychiatric and

21   psychological services as well.

22        Q.    Are therapeutic staff secure

23   facilities not licensed?

24        A.    They are licensed.

25        Q.    They're just licensed differently

1      A.    So the times that I can recall it's

2 because an FFS and an FFS supervisor might have

3 said hey, we're finding it difficult to place

4 this child, can you help us think of any other

5 options that are available for this particular

6 child.

7           And so that's normally how those go.

8      Q.    What is your role, if any, with

9 respect to releasing children from ORR custody?

10     A.     It's generally broad.  It's making

11 sure that we have a system that works, where

12 shelters are able to follow ORR's guidance and

13 their procedures in regards to family

14 reunification or sponsor release and that --

15 that there's a safe decision -- that the system

16 that we use or the process that we use helps us

17 to ensure that there's -- their safety is

18 preserved in those release decisions and that --

19 and that the sponsor -- and that we can vet the

20 sponsor to ensure that they're safe and

21 appropriate and that there's not any type of

22 issues, aside from concerns of safety or

23 appropriateness, that are holding those cases

24 up.

25     Q.     I think you used the phrase system

Page 62

1    that works.

2         A.    Right.

3         Q.    You want to make sure there's a

4    system that works.

5         A.    Right.

6         Q.    What are some hallmarks of a system

7    that works?

8         A.    Hallmarks of a system that works are

9    that everyone that's involved in a case

10   understands what the process is, meaning that we

11   have different milestones that -- that occur in

12   a child's case.

13              For instance, a child comes into ORR

14   care, there's an initial intake assessment.

15   There's a trafficking assessment.  And then

16   there's location of sponsors.  And then there's,

17   if needed, a background check that we -- you

18   know, process that we would have to adhere to.

19              And then once a child's -- well, and

20   then also that children are receiving know your

21   rights and that they're also receiving a legal

22   screening, that that's being adhered to.

23              Making sure that, you know, folks

24   understood the requirements for home studies,

25   post-release services, ensuring that if there

1    was medical concerns that folks at the very --

2    at the level that's actually working with that

3    child's case know what to do and that once, you

4    know, all of the requirements for reunification

5    or release or whatever is going on in a

6    particular child's case is -- is complete, that

7    it's ready for a decision to -- for a release or

8    for a denial.

9               And that would be processed through

10   the system of -- being routed from the shelter

11   case manager to the case coordinator to the FFS.

12   And also that if there's a child advocate

13   involved, that we would be making sure the child

14   advocate is informed of where that case stands.

15   So we make sure that we include that in -- in

16   our decision-making process.

17              And generally, pretty much that's --

18   that's it.

19        Q.    So based on that description, would

20   you say that ORR's current system works?

21        A.    Yes, ma'am.

22        Q.    And it sounds like a big part of that

23   is that folks on the ground understand the

24   process and the requirements.

25        A.    Yes, ma'am.

Page 121

1          Q.      Do you know what the ratio of staff

2     to children in secure facilities are?

3          A.      I believe it's one to four.   My

4     belief.

5          Q.      Do children have access to programs

6     in the community when housed in secure

7     facilities?

8          A.      My understanding is yes, they do.

9          Q.      And how do you know that?

10          A.      Because children are required to have

11    available access to off-campus activities and

12    they also have religious services.

13          Q.      And when you say required, is that

14    required by ORR policy?

15          A.      Yes, ma'am.

16          Q.      So children housed in a secure

17    facility are required to have access to

18    community services?

19          A.      Yes.

20          Q.      What makes a staff secure facility

21    different from a secure facility?

22          A.      It would be -- they would have more

23    structure and the staff should be receiving

24    training that's focused on -- on behavior

25    management techniques for kids who are more

1  aggressive or have more externalized behaviors.

2      Q.    Do you mean that secure has more

3  structure and training and behavior management

4  tools or staff secure has more?

5      A.    They should have -- they should

6  both -- they should have both have -- they

7  should have both of those two things.  But

8  secure is going to have a license that allows

9  them to have a structured -- you know, a

10  detention facility.

11      Q.    Understood.  What makes a staff

12  secure facility different from a shelter?

13      A.    Primarily the staff.  The staff and

14  the training.

15          MR. MOSS:  I think somebody may be

16      on the phone who may be talking and may

17      not have the mute on.  Just so we can all

18      hear each other during the deposition, I

19      would just ask anybody on the phone to

20      please mute.

21          MS. MAYHUGH:  And I think if it's

22      all right with you, we should take a break

23      for lunch.

24          THE WITNESS:  I think so.

25          MR. MOSS:  No objection.

1          You know, discretion is also limited.

2    And the reason why I'm saying that is because,

3    you know, Flores stipulates that all of our kids

4    go into licensed facilities.  And so every

5    facility has to follow whatever licensing

6    requirements there are in that state.  And, you

7    know, some states have multiple licensing

8    entities.  Some have singular.

9          Texas, for example, all residential

10   programs, except for children who have -- who

11   are considered autistic, all -- except for kids

12   who go into autistic placements, for example,

13   everyone else goes into a program that's

14   licensed by the Texas Department of -- I want to

15   say human services, because it changed.  And so

16   those licenses fall under their umbrella.

17          And then in Florida you might have

18   two licensed entities where shelters, foster

19   homes fall under the license of -- I think it's

20   Florida DCA or something like that.  But then

21   you also have mental health facilities that are

22   licensed separately from another entity that's a

23   part of the state's health.

24          So each one of those have

25   requirements.  And within those requirements

1      Q.     What is in a notice of placement?

2      A.     Okay.  So I do want to say this, is

3   that I've seen that and that's something that I

4   regularly -- usually when somebody asks me that

5   question, I'll access it and I'll look at it to

6   make sure that I reference it properly.

7           But offhand what I will say is that

8   it's going to -- it's going to identify why that

9   child is being stepped up to a secure, staff

10  secure or -- or an RTC.  It's going to give them

11  their notification that they have a right to

12  appeal the decision to place them in -- keep

13  them in that -- that type of placement.  And

14  then there's also notification that there's an

15  expectation that it's -- that it's going to be

16  reviewed periodically.

17          So I can speak to that part, but --

18     Q.     I appreciate that.  You're not on the

19  ground dealing with them every day.

20     A.     Right.

21     Q.     In your experience, if you know, how

22  often do children challenge restrictive

23  placement by seeking ORR director review?

24     A.     To my knowledge, there's only been

25  one occasion.

Page 158

1    look at that again.

2         Q.    Are care provider and ORR staff

3    required to find the least restrictive placement

4    for a child?

5         A.    All children should be placed in the

6    least restrictive environment, I guess, period.

7    So --

8         Q.    So yes?

9         A.    Yes.

10        Q.    Would this ever result in a child

11   being stepped down from a secure facility to a

12   shelter?

13        A.    It could.

14        Q.    Is that something that's considered

15   during the step-down decision-making process?

16        A.    I believe so.

17             MS. MAYHUGH:   I am going to ask the

18        court reporter to mark this as Exhibit

19        Number 222.

20                  (Exhibit 222 was marked for

21             identification.)

22        Q.    This is a two-page E-mail chain --

23   I'll let you take a look at it -- with Bates

24   numbers GOV-000-29021.

25        A.    Okay.

1    the page number?

2         Q.    Unfortunately, I don't think there

3    are page numbers.

4         A.    So I'm seeing RTC and shelter care.

5    Okay.  So I see those two.

6         Q.    Right.  And my question to you:

7               Is RTC a higher security facility

8    than a shelter care facility?

9         A.    It is.

10        Q.    It is.

11              If a clinician -- scratch that.

12              In order to be stepped up from a

13   shelter to an RTC, does a -- what's required?

14        A.    A recommendation from a psychiatrist

15   or a psychologist.

16        Q.    And does ORR have any policies or

17   practices that would require the psychiatrist or

18   psychologist before making that recommendation

19   to weigh the harm that a child may experience by

20   going to a higher security facility?

21        A.    A psychiatrist or psychologist is

22   going to look at what's in the best interest of

23   that child.

24        Q.    Does ORR provide the psychiatrist or

25   psychologist any guidelines for making that

1    behavior would be taken into consideration.

2        Q.    Is a staff secure or secure facility

3    a safer place than a shelter for a child that

4    may be a danger to themselves?

5        A.    It certainly could.

6        Q.    In what ways?

7        A.    That there's more staff supervision.

8        Q.    Would the solution -- would a

9    different solution to that be adding additional

10   staff to a shelter facility?

11       A.    It could.  It could, so long as the

12   staff is properly trained.

13       Q.    Does a child's placement in the

14   various types of facilities affect their

15   reunification process?  And by that I mean does

16   a proposed sponsor of a child in staff secure

17   required to meet additional requirements than a

18   proposed sponsor for a child in a shelter care

19   setting?

20       A.    A child would be in a staff secure or

21   secure or any -- you know, somewhere more

22   restrictive, based on their behavior and on

23   their needs.  It's those needs that need to be

24   attended to that could extend some placement.

25   It's not their geographical or physical

1  location.

2      Q.    And it would extend placement because

3  it would take a longer time to evaluate whether

4  a proposed sponsor would provide a suitable

5  environment for the child?

6      A.    So we call -- I mentioned there was a

7  case for a girl who we knew was going to die.

8  We weren't able to release her to her mom, who

9  wanted her.  And it wasn't because she was in a

10 hospice location.  It was because her mother was

11 not able to provide for the type of care that

12 she needed while she was alive.

13     Q.    Okay.  Are you aware of what access,

14 if any, children have to legal service providers

15 in ORR custody?

16     A.    Can you explain that again, ma'am?

17     Q.    Are you aware of what access, if any,

18 children in ORR custody have to legal service

19 providers?

20     A.    Yes, I'm aware of it.

21     Q.    And what kind of access do they have?

22     A.    They should have private access for

23 face-to-face meetings.  Well, all children

24 should receive know your rights.  They should

25 receive legal screenings.  When they do meet and

Page 219

1   have legal screenings, it should be in a private

2   place.  The other thing is that they should be

3   provided with phone calls.  And then the other

4   thing is that they're provided with a list of

5   legal service providers by DHS when they come

6   into our care and the care providers do the same

7   thing.

8          Q.    Do care providers communicate

9   directly with legal service providers?

10         A.    Yes.

11         Q.    Do FFS communicate with legal service

12  providers?

13         A.    They do.

14         Q.    Do you ever communicate with legal

15  service providers?

16         A.    I do.

17         MS. MAYHUGH:  Let's go off the

18         record.  I just want to take a minute and

19         then we'll be back, unless you guys need a

20         longer break.

21         MR. MOSS:  Take whatever time you

22         need.

23         (Thereupon, a brief recess was

24         taken.)

25

1      A.      Yes, sir.

2      Q.      You were asked earlier about

3  training.

4              Do you recall that testimony?

5      A.      Yes, sir.

6      Q.      And you were asked earlier about

7  training provided by the ORR policy division as

8  well.

9              Do you recall that?

10     A.      Yes.

11     Q.      Does the ORR policy division send out

12  E-mails periodically providing guidance and

13  training concerning ORR policies?

14     A.      Yes, sir.

15     Q.      And if an FFS has questions about

16  policy, can the FFS consult with a supervisor?

17     A.      Yes.

18     Q.      If an FFS has questions about policy,

19  can the FFS consult with the policy division?

20     A.      Yes.

21     Q.      If a program has questions about ORR

22  policy, can the program consult the FFS?

23     A.      Yes.

24     Q.      And can the program consult the ORR

25  policy division?

1          A.     Yes.

2          Q.     As the senior FFS supervisor, do you

3   ensure that FFS receive the guidance they need

4   to do their jobs?

5          A.     Yes, sir.

6          Q.     Do you expect that FFS will ensure

7   that grantee care provider programs know and

8   follow ORR policy?

9          A.     Yes, sir.

10         Q.     And in your experience, do FFS ensure

11  that grantee care provider programs know and

12  follow ORR policy?

13         A.     Yes.

14         Q.     Now, you were asked earlier about

15  different types of placements.

16                Do you recall that testimony?

17         A.     Yes, sir.

18         Q.     And I believe you testified that

19  there are different kinds of placements at

20  varying levels of security; is that right?

21         A.     Yes, sir.

22         Q.     Is there a guiding principle that ORR

23  must follow when placing a child in a given

24  facility?

25         A.     That they should be placed in the

Page 234

1    least restrictive environment.

2         Q.    What sorts of factors does ORR

3    consider in deciding what is the least

4    restrictive environment?

5         A.    The child's present and any

6    historical background and information.

7         Q.    And are there other factors that are

8    listed in the policy guide?

9         A.    I would have to look at that.

10             There are.

11        Q.    So I think I got your answer yes, but

12   you'd have to look to see what they are?

13        A.    Right.  There is -- more specific,

14   yes.

15        Q.    Sir, you were asked earlier about the

16   placement of children with disabilities.

17             Do you recall that?

18        A.    Yes, sir.

19        Q.    What does ORR consider in placing

20   children who may have disabilities?

21        A.    What their needs are.

22        Q.    And does the least restrictive

23   setting analysis also apply when deciding

24   whether to place children with disabilities?

25        A.    Yes, sir.

1    which is entitled Residential Treatment Center

2    Placements, says, Care providers request a

3    transfer to an RTC for an unaccompanied alien

4    child who has a psychiatric or psychological

5    issue that cannot be addressed in an outpatient

6    setting.

7            Is that correct?

8        A.   Yes, sir.

9        Q.   Now, I think it also says in the

10   second paragraph, first line, that A UAC may

11   only be placed into an RTC if the youth is

12   determined to be a danger to self or others by a

13   licensed psychologist or psychiatrist.

14           Is that correct?

15       A.   Yes, sir.

16       Q.   And then does that section of the

17   guide, 1.4.6, go on to provide various placement

18   criteria for whether a child should be placed at

19   an RTC?

20       A.   Yes, sir.

21       Q.   So just so I'm clear, before an FFS

22   will approve a transfer of a child to an RTC, is

23   it correct that a psychiatrist or psychologist

24   first must recommend that step?

25       A.   Yes, sir.

1    counseling?  What will the shelter do in that

2    scenario?

3         A.    They should find it.

4         Q.    You were asked earlier about who gets

5    consulted in a step-up decision.

6               Do you recall that?

7         A.    Yes, sir.

8         Q.    Can you turn to 1.4 that's within

9    Exhibit 225?  And that's entitled Transfers

10   Within the ORR Care Provider Network.

11        A.    Okay.

12        Q.    So I'd like you to look at the second

13   sentence there.  It starts with Care providers

14   also take into consideration.

15              Do you see that?

16        A.    Yes, sir.

17        Q.    And that sentence includes a few

18   things, and then it continues at the end of the

19   second to last line of that paragraph.

20              Do you see where it says and

21   information from stakeholders?

22        A.    Yes.

23        Q.    And it goes on to say, including the

24   child's legal services provider, attorney of

25   record or child advocate, as applicable, when

Page 248

1    making transfer recommendations.

2            Did I get that right?

3       A.   Yes, sir.

4

5            EVENING SESSION     (5:00 p.m.)

6       Q.   So does this mean that ORR will

7    consult with those stakeholders in assessing a

8    possible step-up?

9       A.   Yes, sir.

10      Q.   Now, in terms of stepping up a child,

11   what is the scenario when a child with mental

12   health issues might need to be stepped up to a

13   more restrictive setting?

14      A.   So what are some --

15      Q.   Scenario.  What's an example?

16      A.   When a child needs to go to a secure

17   facility?

18      Q.   Whether it be secure or any more

19   restrictive setting than a shelter.

20      A.   One is the program should look --

21   should -- should be able to ascertain why, or is

22   there -- is there a service that they could find

23   to provide for the child before they step the

24   child up because the need should be the reason

25   why they go to secure or, you know, another

1   placement and there's alternatives to find a

2   service that might help settle the child down or

3   be able to -- to better -- you know, not

4   externalize certain types of behavior.  So

5   that's one.

6           The other that they should do is look

7   at their own facility and decide can they

8   take -- can they properly provide for the child,

9   but if they provide -- by -- and avoid

10  transferring by providing a certain service for

11  a particular need.

12          And then the other thing is if they

13  were going to have to transfer that child, they

14  should look at the policy to see what the

15  requirements are for secure, staff secure and

16  residential treatment.

17      Q.    So on that last point, if a child is

18  potentially going to get stepped up, does that

19  happen only in accordance with policy?

20      A.    To the best of my knowledge, yes,

21  sir.

22      Q.    Now, what about if children become

23  dangerous to themselves or others?  What would

24  ORR do in that situation?

25      A.    Seek immediately -- immediate

1    intervention.

2         Q.    What kind of intervention?

3         A.    It could be medical or it could be

4    mental health.

5         Q.    You were asked earlier about

6    notifying a child about a step-up decision.

7              Do you recall that testimony?

8         A.    Yes, sir.

9         Q.    And I believe you testified that

10   sometimes clinicians might tell children before

11   they're being stepped up.

12             Did I get that right?

13        A.    Yes, sir.

14        Q.    Now, in the converse, is it true that

15   there are other times when a child may not be

16   notified before being stepped up?

17        A.    Yes, sir.

18        Q.    In your experience, might notifying a

19   child about a step-up ahead of time increase the

20   possibility of a flight risk?

21        A.    Yes.

22        Q.    Is that a reason why the child might

23   not be notified before the step-up?

24        A.    Could you restate your question?

25        Q.    Sure.  You said earlier just now that

1    telling a child about a step-up ahead of time

2    could increase flight risk.  At least that's

3    what I understood you to say.

4         A.    Right.

5         Q.    I'm wondering if that's a reason why

6    children might not get notified ahead of time if

7    they're about to get stepped up.

8         A.    Not by itself.

9         Q.    What else would be a factor in that

10   decision?

11        A.    If that child ran away and became a

12   danger to self or others.

13        Q.    You were asked earlier about

14   step-downs.

15             Do you recall that testimony?

16        A.    Yes, sir.

17        Q.    Can you please turn to -- in

18   Exhibit 225 Section 1.3.3 of the guide?

19        A.    1.3. --

20        Q.    3.

21        A.    Okay.

22        Q.    And that's entitled Care Provider

23   Placement Acceptance.

24             Do you see that?

25        A.    Yes, sir.

1              CERTIFICATE OF NOTARY

2         I, MISTY KLAPPER, the officer before

3    whom the foregoing deposition was taken,

4    do hereby certify that the witness whose

5    testimony appears in the foregoing

6    deposition was duly sworn by me; that the

7    testimony of said witness was taken by me

8    in shorthand and thereafter reduced to

9    typewriting by me; that said deposition is

10   a true record of the testimony given by

11   said witness; that I am neither counsel

12   for, related to, nor employed by any of

13   the parties to the action in which this

14   deposition was taken; and, further, that I

15   am not a relative or employee of any

16   attorney or counsel employed by the

17   parties hereto, nor financially or

18   otherwise interested in the outcome of

19   this action.

20   Dated: 3-17-2020

21              *Misty Klapper*
                _____

22              Misty Klapper
                Notary Public in and for

23              the District of Columbia

24

25