# DX-17

Deposition of Shaanan Meyerstein, February 11, 2020

```
                                                              Page 1
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3                   WESTERN DIVISION

 4

 5   _____
                                    )
 6   LUCAS R., et al.,              )
                                    )
 7           Plaintiffs,            )
                                    )  Case No.
 8   vs.                            )
                                    )  2:18-cv-05741
 9   ALEX AZAR, Secretary of U.S.   )  DMG-PLA
     Department of Health and       )
10   Human Services, et al.,        )
                                    )
11           Defendants.            )
     _____)
12

13

14                     CONFIDENTIAL

15

16      DEPOSITION OF SHAANAN MEYERSTEIN, M.D.

17                  Washington, D.C.

18                  February 11, 2020

19

20

21

22

23

24   Reported by:  John L. Harmonson, RPR

25   Job No. 176784
```

TSG Reporting - Worldwide (877) 702-9580

1   don't like siloed conversations.  I like

2   multidisciplinary conversations.  Because if you

3   don't have multidisciplinary conversations, one

4   person doesn't know what the right hand is doing

5   and the person on the right doesn't know what the

6   left hand is doing.

7          So it's the FFS who really ultimately

8   makes the determination on the case, on release

9   decisions, on whatever, not me.  I can just

10  provide my best medical recommendations.  The FFS

11  doesn't necessarily like to challenge a medical

12  specialist's recommendations if they're not

13  trained in that way.  So I want them to be

14  involved from the beginning.

15         And they might also say this is not an

16  appropriate question for the medical team, you

17  know the answer to this.  And they'll have

18  visibility on where we are in the process.  I

19  just think it's really important.  I shouldn't be

20  the one -- they just need to be involved from the

21  beginning.

22      Q.   Where we are in the process of

23  placement or reunification?

24      A.   Well, the kid is already placed.  It's

25  presumably -- you know, when a kid comes into our

Page 107

1  care, the reunification process begins on day
2  one.  Where are we in identifying the sponsor?
3  Where is the sponsor?  What's pending with
4  reunification?  What are the pending documents?
5  The case management teams a lot of times can
6  answer that, but they're not going to have
7  visibility on the medical side.  The FFS is the
8  one who, in my opinion -- it's maybe like an
9  immature comparison, but I view the FFS as the
10 parent, in a way.
11             I don't want to use that as a loaded
12 term as it might impact other legal definitions
13 or decisions, but I use that in the way that it
14 is the FFS that is entrusted with the child's
15 best interests.  Obviously the program is
16 responsible for the direct care, but the FFS is
17 the one making those decisions.  It's not me.
18             Did that clarify?
19      Q.    Yeah.
20      A.    Okay.
21      Q.    As part of your job, do you work -- do
22 you work with Marivic Fields?
23      A.    Yes.
24      Q.    And when would you work with Marivic
25 Fields?

 1    traumatic.
 2              In fact, many of the RTCs on that list
 3    are programs that already have ORR contracts to
 4    provide regular shelter care.  So I think as it
 5    relates to placement in RTCs that have been
 6    something I did, like, two years ago -- I haven't
 7    really followed up since and I don't dictate
 8    funding announcements for new programs.
 9              Now the main thing I would do, as I
10    alluded to earlier, in terms of approval of
11    services, if a child is at an RTC, I'm saying
12    yes, we should pay them for the last 30 days.
13    But I'm not calling into question or judging or
14    interpreting the qualitative care that's there.
15    I don't have that training.
16         Q.   So only evaluating whether they should
17    be paid for services that have already been
18    provided?
19         A.   (Nodding head.)
20         Q.   Can we get a verbal answer, please?
21         A.   Oh, I'm sorry.  Yes.
22         Q.   Thank you very much.
23              Is it correct that there is still only
24    two RTCs in ORR's network?
25         A.   That is my understanding.

1    Q.    And you were talking about your effort

2  or your hope that that number could be expanded

3  beyond two.  Do you know whether anything

4  happened or why that didn't happen?

5    A.    I really don't.  Other than to say

6  that funding announcements happen, like, every

7  couple of years, and I don't really have any

8  input on it.

9    Q.    In your experience, are there

10 situations where it's difficult to find a child a

11 placement at an RTC?

12   A.    Because I don't make those placement

13 decisions, I can't really speak to that.  I've

14 had cases originally, like two years ago, where

15 the RTCs would be hesitant to take a child that

16 had significant medical needs.  And as a result

17 of kind of working with them -- a good example is

18 Shiloh.  They were hesitant to take kids with

19 significant medical needs, and I've been able to

20 make great introductions to specialists at Texas

21 Children's, and now they're taking everything, to

22 the best of my knowledge.  So...

23         Same thing at MercyFirst, by the way.

24 I've introduced them to large healthcare systems,

25 and kids with medical issues who are at RTCs are

1  getting their issues addressed.

2     Q.   And we were talking before about RTCs'

3  reluctance to care for children you were calling

4  dual diagnosis youth, so kids with both mental

5  health and behavioral health needs.  Do you know

6  whether that's still true, whether they still

7  don't want to house dual diagnoses?

8     A.   I can't speak to it.  I haven't been

9  involved in that kind of analyzing process.

10    Q.   In your opinion, if you have an

11 opinion, is an RTC the correct placement for a

12 dual diagnosis youth?

13    A.   To be honest, I don't think I have an

14 opinion because I don't have enough training or

15 experience in behavioral and mental health issues

16 to know what is and what is not expected of a

17 residential treatment center.  So I would rather

18 defer my opinion.

19    Q.   Do you know or do you remember from

20 some of those cases that came across your desk

21 before if an RTC won't house a dual diagnosis

22 youth, what type of placement those children go

23 to?

24    A.   So if an RTC won't place a child with

25 mental and behavioral health problems, where do

```
 1   with PCU because they actually are getting the
 2   claims that are actually being rendered.  I can't
 3   speak to it.
 4        Q.   Do you know who decides whether a
 5   child is going to be placed in an RTC?
 6        A.   Well, the child's not going to
 7   magically end up in an RTC unless a child
 8   psychiatrist or psychologist, whoever is deemed
 9   the mental health professional makes a
10   determination that that's required.  Because I
11   think like it would work in the regular
12   healthcare system, you need a referral.  You need
13   some kind of a referral to warrant stepping up.
14   That's my working understanding.  So it starts
15   with the medical professional making the
16   recommendation.
17        Q.   Are there any other requirements that
18   you're aware of for placement in an RTC other
19   than a psychiatrist's or psychologist's
20   recommendation?
21        A.   Not that I'm aware of.
22        Q.   To your knowledge, is this process the
23   same as would apply to a non-detained child who
24   is living in the community?
25        A.   I think so.  But I'm not a
```

1   psychiatrist, so I can't speak 100 percent to
2   that.
3       Q.   Do you know whether it's always been a
4   requirement that there is a recommendation from a
5   psychologist or a psychiatrist?
6       A.   I can't speak to before me.
7       Q.   But while you've been at ORR, as far
8   as you're aware has it always been you need a
9   recommendation from a psychiatrist or a
10  psychologist?
11      A.   I think so.
12      Q.   Are you aware of any exceptions to
13  that requirement that there be a recommendation
14  from a psychiatrist or a psychologist?
15      A.   Specific cases, no.
16      Q.   As far as you're aware, can ORR
17  override that requirement?
18      A.   To place or not to place?
19      Q.   Can ORR override the requirement for
20  there to be a recommendation from a licensed
21  psychiatrist or psychologist in order to place a
22  kid in an RTC?
23      A.   From which angle?
24      Q.   So if ORR is going to place a child in
25  an RTC, can ORR decide to do that and waive the

Page 235

1    A.   I'm not aware of a form.  The intake

2  of a hospital.  I mean, every hospital, whether

3  it's a medical facility or an inpatient, there

4  has to be a consent form.  But I'm not aware of a

5  transfer form.

6    Q.   Would there be an intake form for an

7  RTC?

8    A.   I'm not aware of one.

9    Q.   Do you know whether before a child is

10  sent to an RTC, ORR considers whether additional

11  services could be provided to meet the child's

12  needs in a shelter setting?

13    A.   I would assume that's the working

14  assumption since we're obligated by law to

15  provide care in the least restrictive setting,

16  and that elevation to a residential treatment

17  center would be the last option if necessary.  So

18  yes.

19    Q.   So you assume that's true but you

20  don't have knowledge of that being a policy or

21  practice?

22    A.   Again, if a child is referred to a

23  child psychiatrist in the community, we're going

24  to find a child psychiatrist for that patient to

25  have their behavioral health needs addressed.  If

1  the child is at a clinical level where their
2  needs are not going to just be met by an
3  outpatient psychiatrist, that was showing
4  homicidal, suicidal ideations, I would assume
5  that the medical professional would make a
6  recommendation that they need a more intensive
7  treatment course.
8           You had asked me a question maybe half
9  an hour ago about am I aware of out-of-network
10 stuff.  I know that I've seen recommendations for
11 partial hospitalization, like day programs where
12 a child would sleep at the ORR shelter but
13 they're getting more intensive mental health
14 services at a day program.
15          So I'm very aware of, like, eating
16 disorders.  My wife does eating disorders.  So
17 there are a lot of day programs where the child
18 would go for a partial hospitalization but then
19 they would sleep in the shelter.  So they are
20 going to get more intensive services than they do
21 kind of...
22      Q.   Can you think of other examples where
23 you've seen that happen other than eating
24 disorders?
25      A.   Well, the eating disorder example was

 1   like a personal example of what types of

 2   conditions could result in partial

 3   hospitalizations.

 4        Q.    Understood.

 5        A.    I know that I've approved, I can't

 6   recall what the cases were, kids going to partial

 7   hospitalization.

 8        Q.    Do you know how many times you've seen

 9   that?

10        A.    It's not a lot.

11        Q.    As you're thinking about those

12   examples as best you can recall, do those come

13   from one area of the country or are they all over

14   the place?  Are they just as likely to come from

15   one place as the other?

16        A.    I would say it's random.

17        Q.    Do you know whether before a child is

18   sent to an RTC, ORR considers whether the child

19   is currently receiving any benefits from a

20   shelter environment?

21        A.    Can you clarify what you mean by

22   benefits?

23        Q.    So, for example, social benefits,

24   educational benefits, maybe they're with a

25   sibling and they have a sibling relationship in

1  question just as a point of clarification.  That

2  doesn't mean they're not being released.  It

3  means that there may be a vetting process that I

4  have no visibility on.  But to the best of my

5  knowledge, no one from the medical team is

6  involved in that release decision-making process.

7       Q.    Got it.  Thank you.

8             If there is a child with a special

9  healthcare need, does the medical team or do you

10 need to sign off on release?

11      A.    I don't think it's written in any

12 policy or procedure that Dr. Meyerstein has to

13 write an e-mail saying the child is medically

14 stable to reunify.  I'm very careful that the FFS

15 is the one to make the ultimate release decision.

16            I try to defer to the medical

17 specialist who has been managing the child's

18 healthcare needs to that point to make the

19 determination as to whether or not a child is

20 stable for reunification.

21            So I think programs have gotten in the

22 habit of elevating cases to me for my review and

23 just to kind of highlight gaps that I may

24 identify that we need to think about to ensure

25 comprehensive release.

Page 308

C E R T I F I C A T E

DISTRICT OF COLUMBIA

   I, JOHN L. HARMONSON, a Notary Public within and for the District of Columbia, do hereby certify:

   That SHAANAN MEYERSTEIN, M.D., the witness whose deposition is hereinbefore set forth, was duly sworn or affirmed by me and that such deposition is a true record of the testimony given by such witness.

   That if the foregoing pertains to a federal case, before completion of the proceedings, review and signature of the transcript [X] was [ ] was not requested.

   I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

   IN WITNESS WHEREOF, I have hereunto set my hand this 24th day of February, 2020.

*John L. Harmonson*
_____
JOHN L. HARMONSON, RPR
My commission expires: 11/14/20