# DX-19

Deposition of David Fink, February 12, 2020

Confidential

```
 1            UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
 2               WESTERN DIVISION

 3

 4   LUCAS R., et al.,           )
                                 )
 5           Plaintiffs,         )        CASE NO.
                                 )
 6       vs.                     ) 2:18-CV-05741 DMG PLA
                                 )
 7   ALEX AZAR, Secretary of     )
     U.S. Department of Health   )
 8   and Human Services, et al., )
                                 )
 9           Defendants.         )
     _____)
10

11

12        *** C O N F I D E N T I A L ***

13

14        DEPOSITION OF DAVID R. FINK

15             Atlanta, Georgia

16        Wednesday, February 12, 2020

17

18

19

20   Reported by:

21   Judith Leitz Moran

22   CCR, RPR, RSA

23   JOB NO.: 175989

24

25
```

Confidential

1     Q    How does ORR define special populations

2  or the youth that are actually within your

3  jurisdiction or your responsibility?

4     A    Minors that are in special population are

5  in placements like residential treatment centers,

6  staff securers and securers.

7     Q    And was this a new position when you

8  joined -- when you were -- sorry, when you returned

9  to ORR in November of 2018 or was it a position

10  that had already been created prior to your return?

11     A    It was a new position.

12     Q    Okay.  And how would you describe your

13  responsibilities in your current position?

14     A    To look at the existing programs and see

15  how we can improve the quality of services in the

16  special populations group and to -- yeah.

17     Q    And what is your understanding of the

18  reason why the position was actually created in

19  2018?

20     A    I don't know.

21     Q    When you were describing your role and

22  responsibilities as FFS over special populations,

23  you described the types of placements that these

24  young people are in.

25         So would you describe -- would you say

Confidential

1    that as the FFS supervisor for special populations

2    you're not responsible for specific youth with

3    specific diagnoses but you oversee certain types of

4    placements?

5         A    Yes, but with a caveat.

6         Q    Uh-huh.

7         A    So right now I am acting as supervisor

8    for Natasha David who covers Shenandoah until that

9    FFS supervisor vacancy is filled.

10        Q    So there's currently a vacancy for the

11   FFS responsible for Shenandoah Valley?

12        A    Yes, FFS supervisor.

13        Q    Okay.  FFS supervisor.

14             So in what ways, then, are your roles and

15   responsibilities as FFS supervisor for the special

16   populations identical or different to you than the

17   role of other FFS supervisors?

18        A    So my role is to work with them on

19   complex cases, cases that might need a specialized

20   placement.  They might consult with me.  I'm

21   involved less in releases.  It's very -- on a

22   limited basis.  And I work with them to identify

23   out-of-network placements if that's needed.

24        Q    So who is your current supervisor?

25        A    Jim De La Cruz.

Confidential

1    assigned to a specific region?

2          A     Youth?

3          Q     Yeah.

4          A     So basically the kids are referred by DHS

5    to intakes.  And then intakes will usually place

6    kids closest to the point of referral and then they

7    will fan out.  So it's basically based on capacity

8    is where they're placed.  And need.

9          Q     So would you agree that each regional FFS

10   serves as the final approval authority for all

11   placement, transfer and release decisions for the

12   youth that are within their region -- their region

13   or their jurisdiction?

14         A     Yes.

15         Q     When, if ever, is an FFS required to

16   discuss a case with an FFS supervisor prior to

17   making a decision regarding the placement, transfer

18   or release of a youth?

19         A     I'm not sure of any requirements.  I know

20   that if it's a complicated case they will reach out

21   to their supervisor to staff it.

22         Q     As the FFS supervisor for special

23   populations, do you serve as the final approval

24   authority responsible for the placement, transfer

25   and release of children placed in restrictive

1    settings?

2          A     No.

3          Q     Who would that person be?

4          A     The FFS supervisor that covers that area

5    of responsibility.

6          Q     So then what is your relationship between

7    the FFS supervisor who is supervising a particular

8    facility and your role as an FFS supervisor for

9    special populations?

10         A     To help them identify special placements

11   that they're struggling -- you know, they might be

12   struggling to locate a placement that's suitable

13   for the minor, so I would help with that.

14               And then help with them with any kind of

15   ongoing issues with the ORR grantee.

16         Q     So you, yourself, are not the point of

17   authority for making placement or transfer

18   decisions for youth?

19         A     Correct.  I only consult.  It's

20   ultimately left with the supervisor that's

21   responsible for the case.

22         Q     So you -- once a youth is transferred to

23   a less restrictive facility, your role and

24   responsibility with respect to a specific young

25   person ends at that point?

Confidential

1       A    Correct.

2       Q    Okay.  So it would also be helpful if you

3  could establish who you're interacting with as you

4  fulfill your responsibilities as an FFS supervisor

5  for the special populations -- for special

6  populations at ORR.

7            Other than your direct supervisor,

8  Mr. De La Cruz, and the other federal field

9  specialists, who else do you communicate with or

10 work with as a regular part of your job?

11      A    The project -- I'm sorry, the policy

12 team, I do a lot of work with the policy team.

13      Q    And do you recall who specifically on the

14 policy team you tend to have frequent communication

15 with?

16      A    Faith Ray.

17      Q    And what is Ms. Ray's role and

18 responsibilities at ORR?

19      A    She's a policy analyst.

20      Q    And what does a policy analyst do?

21      A    Develops -- develops current and existing

22 policies and procedures for ORR.

23      Q    And why do you need to work with Ms. Ray

24 as the FFS supervisor for special populations?

25      A    We --

Confidential

1      Q     Sure.

2            So what is the nature of your

3  interactions with Ms. Fields?

4      A     Special populations and looking at ways

5  to improve care standards for special populations.

6      Q     And do you communicate with

7  Dr. Meyerstein?

8      A     Once in a while.  Not much.

9      Q     And what is his role at ORR?

10     A     Part of the medical team.  He's a

11 pediatrician.

12     Q     Do you have the need to communicate with

13 Ms. Micaela Vergara?

14     A     Yes.

15     Q     Do you know what her role is?

16     A     She's an FFS supervisor for the Houston

17 and El Paso region.

18     Q     Does that include the Shiloh facility?

19     A     Yes.

20     Q     And what types of communications are

21 required between you and Ms. Vergara?

22     A     It's a similar capacity to the other

23 supervisors.  It's case consultations.  And then

24 she's also part of the notice of placement, the

25 work group that we meet to talk about notice of

Confidential

1    placement compliance.

2        Q    So tell me a little bit about the work

3    group on notice of placement compliance.  How long

4    has that work group existed?

5        A    When I came back a year ago, it was

6    already in existence, so I'm not sure how long

7    prior to that.

8        Q    And what is the purpose of that work

9    group?

10       A    It's to ensure that the programs are in

11   compliance with the notice of placements that they

12   are required to provide to the children when they

13   enter that level of care.

14       Q    And who participates in the notice of

15   placement work group?

16       A    That would be Faith, Faith Ray, Aurora

17   Miranda-Maese, Micaela Vergara, myself, and then

18   two contracted field specialists.  I'm trying to

19   remember -- Patricia Rodriguez and Monica Brown.

20       Q    And what is the difference between a

21   contract field specialist and the other field

22   specialists?

23       A    They're not federal employees.  They

24   don't make release decisions or transfer decisions.

25       Q    And then what is their role then in terms

1    a transfer?

2         A    It's documented in the case review.

3         Q    And to what extent does ORR evaluate

4    whether a provider has offered a youth or a child

5    more intensive interventions and supportive

6    services prior to a decision to request a transfer

7    or terminating a child from their program?

8         A    So it's done through the case review

9    documentation, significant incident reports, and

10   ongoing staffings with the case coordinator and the

11   federal field specialist.  So they are always

12   looped in to talk about those cases.

13        Q    Are there ever times when a provider is

14   determined to have failed to offer services or

15   interventions prior to a request that a child be

16   terminated from the program?

17        A    Yes.

18        Q    And what is ORR's response if that

19   occurs?

20        A    If we feel that that child can be

21   maintained in that facility, we ask them to provide

22   us a plan to -- with the goal of maintaining that

23   child in care.

24        Q    And if the program refuses to maintain

25   the child in -- in their program, does ORR offer

1    the child a placement at a similar level of care?

2        A    We would work with the clinician in the

3    program to determine what levels of assessments we

4    would need to determine if that child needs to

5    maintain that level of care or if they need to go

6    to a higher level of care.

7        Q    Are there programs that terminate

8    children more frequently than others?

9        A    Yes.

10       Q    And how would ORR determine this?

11       A    Determine how -- like the programs that

12   are terminated -- like difficult to place children

13   or...

14       Q    Yeah, how do you track that?

15       A    I work with the case coordination team to

16   track reasons for denial.  So I've been tracking

17   that for less than a year.

18       Q    And what programs could you identify that

19   may terminate children more frequently than others?

20       A    I would say generally staff secures is

21   the level that would terminate mostly.

22       Q    And you said that you've been tracking

23   this information for approximately a year, less

24   than a year?

25       A    Less than a year, yeah.

1    engaged on.

2            What types of guidance or expectations

3    are there on -- so let me take a step back.  Who

4    reaches out to you about an individual child?

5        A    It would be the FFS supervisor or the

6    FFS.

7        Q    Okay.  And so your first interaction with

8    a case would be a referral from the FFS or the FFS

9    supervisor?

10       A    Correct.

11       Q    Okay.  So what kinds of expectations are

12   there on an FFS in terms of when your assistance

13   might be useful in terms of placement?

14       A    Usually if it's a place -- if they're

15   looking at transferring that minor to a higher

16   level of care or an out-of-network placement.

17       Q    And an FFS has an ability to reach out to

18   you and ask for your assistance, it does not have

19   to be approved by the FFS supervisor?

20       A    Correct.

21       Q    Okay.  You had stated a little bit

22   earlier that the URM program is for sort of a

23   specific group of youth who -- or kids who have --

24   who have status.  What does that mean?

25       A    So their immigration status has been

1    disruptive behavior?

2         A    Again, it goes back to the reports that

3    we might get from the facilities.  If there's

4    fighting, there's property damage, things of that

5    nature, would constitute staff secure placement.

6         Q    You mentioned that's sort of -- the

7    determination begins at the program or provider

8    level.  Do programs vary in terms of how they might

9    define an unacceptably disruptive behavior?

10        A    They vary in terms of how long they will

11   try to manage the behavior as opposed to -- the

12   criteria will be the same, but it will be dependent

13   on the level of tolerance that program might have

14   for their behavior.

15        Q    What, if anything, does ORR do to try to

16   ensure that the criteria or sort of the standards

17   are being applied at the program level in a

18   consistent way?

19        A    Programs -- when a child enters one of

20   those levels of care that requires a notice of

21   placement, they're required to inform that minor

22   within 48 hours of placement of why they're placed

23   in that particular level of care, be it a staff

24   secure or a TC or secure.

25             And then they are to evaluate that

Confidential

1  placement 30 days or less with the child as well.

2      Q    You mentioned that you were part of the

3  notice of placement work group that meets weekly,

4  and that part of the role of that work group is to

5  review compliance with the notice of placement; is

6  that correct?

7      A    That's correct.

8      Q    Okay.  So what have been examples of

9  inappropriate placements that you've discussed or

10  addressed within the context of the working group?

11      A    So when we look at compliance, we're

12  looking at a couple of things.  So it might not be

13  inappropriate placement, it might be that they

14  didn't provide the NOP in a timely manner.

15      Q    Uh-huh.

16      A    It might have not been in the minor's

17  language of their understanding, so we got to

18  address that as well.

19      Q    Uh-huh.

20      A    As far as noncompliance, one of the

21  things we look at, too, is if a child is ready for

22  transfer or they've been approved for step-down to

23  a least restrictive setting, they're required to

24  start working on that.

25          And if they aren't transferred because

 1   the 30 days or less they're required to provide the

 2   NOP with the minor in their language of their

 3   understanding and review it and then upload it,

 4   they did not do that in a timely manner.

 5        Q    And what is the nature of the Carson

 6   noncompliance?

 7        A    Same.

 8        Q    And is it the same for Shiloh?

 9        A    Yes.  It was one case they didn't -- they

10   didn't upload a notice of placement.

11        Q    And what is the timeline within which a

12   program is expected to bring itself into

13   compliance?

14        A    Immediately.  So they have the next

15   cycle, the next month.  If they have kids that have

16   been there for 30 days, the next -- we would go and

17   review those -- all those programs, NOPs, every

18   month, and so they have to be in compliance within

19   that time.

20        Q    And what is the consequence if a program

21   -- on the program side if the program fails to

22   bring itself into immediate compliance with the

23   corrective action plan?

24        A    So we have provided refreshers,

25   refreshing trainings and discussed the issues with

1    started to talk about this a little before.

2          A     Yes.

3          Q     Okay.  And based on your experience, how

4    frequently does that happen?

5          A     So those -- when those transfers occur,

6    I'm not a part of those discussions.  I only get

7    really involved when there's a potential

8    out-of-network.  So I wouldn't be able to give you

9    that number.

10         Q     So can you remind me who is involved --

11   who recommends whether a child should be

12   transferred to a secure facility?

13         A     So the recommendation would come from the

14   program and the case coordinator, and then the

15   decision to do that would be with the FFS.

16         Q     And so kind of focusing a little more

17   specifically on the secure facility right now, what

18   factors do those individuals consider when they are

19   making recommendations that a youth needs to be

20   transferred to a secure facility?

21         A     Danger to the community and committing

22   chargeable crimes.

23         Q     And is it necessary for -- oh, wait.  I'm

24   sorry.  Danger to the community and then what?

25         A     Chargeable crimes.

Confidential

Page 118

```
 1      A    Correct.

 2      Q    Do you know as of when?

 3      A    I don't know.

 4      Q    Has Shenandoah Valley also been the

 5 subject of any kind of intensive compliance review?

 6      A    No.

 7      Q    Okay.

 8      A    Not that I recall.

 9      Q    Okay.  So you can actually be placed in

10 those secure settings if they've committed or

11 threatened to commit or engaged in serious

12 self-harming behavior to -- that poses a risk to

13 themselves.

14           From what you understand, are those

15 behaviors -- is it possible for those behaviors to

16 be caused by an underlying mental health condition

17 or behavioral disorder?

18      A    It could.

19      Q    Uh-huh.

20      A    But I would like to ask -- also add that

21 if a child -- if a kid is self-harming, we would

22 not put that kid in secure if he was self-harming.

23           He would really have to be a danger to

24 the community or have committed a serious

25 chargeable crime.
```

Confidential

1    an underlying intellectual or cognitive disability?

2         A    I don't.

3         Q    Are secure facilities appropriate

4    placements for kids who might have an underlying

5    intellectual or cognitive disability?

6              MS. STEVENSON:  Objection, calls for an

7    expert opinion and personal knowledge.

8              Go ahead.

9         A    So if that is identified in those

10   facilities, we will work to move those kids out of

11   secures.  A lot of times what happens when we get a

12   kid like that in from a facility, they might not

13   have the bandwidth or the capacity to evaluate, so

14   they might get misdiagnosed when they come in.  And

15   then we find out in that level of care that they

16   might have those delays, and then we would refer

17   that minor to an evaluation to determine what is

18   the appropriate level of care.

19   BY MS. STEVENSON:

20        Q    So what are ORR's policies and practices

21   to guard against inappropriate placement of youth

22   with a cognitive or intellectual disability at a

23   secure level of placement?

24        A    I don't know of any.

25        Q    Are you aware of ORR policies and

Confidential

1    the exact range but up to 17.  Shiloh is both

2    female and males.  And I'm not sure what the exact

3    age range.

4        Q    Are you aware of any decisions that have

5    been made on the part of ORR to increase the number

6    of in-network residential treatment programs within

7    the -- available to ORR youth?

8        A    No.

9        Q    Okay.  You referred to a psychologist or

10   a psychiatrist participating in the recommendation

11   for a youth to be placed at -- in a residential

12   treatment program.

13            I'm trying to understand, does ORR

14   require that a recommendation for an RTC be made or

15   confirmed by a licensed psychologist or a

16   psychiatrist?

17       A    Yes.

18       Q    And does a psychologist or a physician

19   need to make their recommendation based on an

20   in-person evaluation of the child or does ORR

21   accept a paper review of a child's file for the

22   treatment recommendations?

23       A    In person.

24       Q    Is ORR able to excuse compliance with the

25   policy that a psychiatrist or a physician make a

Confidential

1    within ORR's different division, meaning you could

2    -- I guess what I'm asking is, if there's a request

3    for a second opinion, that second opinion is done

4    by the medical team at ORR; is that correct?

5         A    Correct.  Correct.

6         Q    Okay.  And the psychiatrist that you

7    referred to, was that a psychiatrist that was

8    affiliated with a specific program and provider?

9         A    No, he was employed with us.

10        Q    Oh, I see.  The in-house psychiatrist?

11        A    Yes.

12        Q    Your in-house ORR psychiatrist?

13        A    In-house, yes.

14        Q    Who is currently on leave?

15        A    Correct.

16        Q    Okay.  So given your role as the FFS

17   supervisor for special populations, do you have any

18   role in the decision whether to transfer youth to a

19   foster care or transitional foster care?

20        A    No, unless it's specialized, unless it's

21   out of network.  So if we have a child who has

22   therapeutic needs and they want to do an

23   out-of-network foster care placement through an

24   agency, they would -- they might reach out to me

25   and consult.

1    Q    Okay.  Does ORR analyze the reasons and

2  the frequency for which youth are stepped up to

3  more restrictive programs?

4    A    Yes, in the NOP process.  And then we --

5  and FFS is weekly staffings as well.

6    Q    From a trend line perspective, does ORR

7  analyze the reasons and the frequency for which

8  youth are stepped up to restrictive programs for

9  specific reasons?

10    A    So that -- all of that is kind of -- I've

11  been working on that.  But like as far as our --

12  like if we have -- as far as like national --

13  like --

14    Q    Yeah.

15    A    -- our team in headquarters, no.

16    Q    Okay.  So, again, can you just sort of

17  clarify the extent to which you are looking at

18  that?

19    A    Making sure that the right kids are

20  getting referred to secure, staff secure.

21    Q    Uh-huh.

22    A    Making sure that they are placed there

23  for the right reasons.  And that if they're not

24  being transferred, why.

25    Q    Uh-huh.

Confidential

1    A    And then making sure that if they are

2   eligible for transfer, that they are working on

3   that placement and recording why they haven't been

4   stepped down.

5    Q    So can you describe what your work

6   involves specific to that last point, sort of if

7   they are appropriate for step-down?  And how do you

8   -- what do you do in terms of looking at whether

9   that's happening in a timely fashion and why it

10   might not be?

11    A    So part of that is calls, our weekly call

12   that we have for compliance.  Another piece of that

13   is looking at the monthly compliance review and

14   going through and seeing if these kids are

15   appropriate for their current placement.

16    Q    And upon what type of information do you

17   rely on in order to determine whether kids are

18   appropriate for their current level of placement?

19    A    So I look at their documentation, of

20   course, their case reviews, their SIRs, and the

21   behaviors that precipitated that placement, that

22   led to that placement.

23    Q    And what do you do with that information?

24    A    So we make sure -- if I have that

25   information, making sure that programs are getting

Confidential

1       A    No.

2       Q    Based on your experience kind of working

3   with special populations, would -- are youth with

4   mental health needs more likely to be stepped up to

5   a restrictive setting?

6       A    I wouldn't know.  It depends.  I wouldn't

7   know how to answer that question.  Some kids with

8   mental health issues can be maintained in a

9   shelter, some cannot.

10      Q    When a child who has an identified

11  behavioral or mental health or intellectual

12  disability is recommended for a step-up, is the

13  procedure for stepping up that youth, is it

14  different than a recommendation for children

15  without disabilities?

16      A    I don't think so.  No, I don't know.  The

17  only thing I can tell you is the psychological

18  evaluation if you're talking about identified

19  mental health issues?

20      Q    Yes.

21      A    And there is a clinician who says this

22  kid has a mental health issue, you know, we need to

23  look to a higher level of care.  We might ask,

24  okay, you know, we need an evaluation to determine

25  the placement for that child.

Confidential

1          Q     And in your role and capacity as acting

2     supervisor for Ms. David, Natasha David, what has

3     been your role in offering final approval in the

4     release or reunification of a child?

5          A     She would staff any cases that would seem

6     to be complex that she would need an additional

7     review from me.

8          Q     And are there times when you have

9     disagreed with Ms. David or -- let me put it -- let

10    me back up.

11              Are there times when you have disagreed

12    with the recommendation that Ms. David and the

13    program staff are making with respect to release,

14    transfer or -- release, transfer, reunification of

15    the youth?

16         A     No, we have not had that.

17         Q     You mentioned before -- so you have

18    actually served at ORR in a number of different

19    capacities, correct?

20         A     Yes.

21         Q     You've been an FFS for the northeast

22    region, correct?

23         A     Yes.

24         Q     And an FFS supervisor for that same

25    region?

Confidential

```
 1        A     Where I disagreed with an FFS?

 2        Q     Yes.

 3        A     Or --

 4        Q     No, sorry, where there was disagreement

 5   between the FFS and the program staff.

 6        A     The program staff?

 7        Q     Yeah.

 8        A     About a release, right, or --

 9        Q     Yeah.

10        A     Release or transfer.

11              I know there are.  I can't think of

12   anything off the top of my head.  It's been a

13   minute.

14        Q     Can you describe the process by which you

15   as a supervisor would resolve conflicting

16   recommendations by your FFS and program staff or

17   line staff?

18        A     Uh-huh.

19              So we would get the release

20   recommendation along with the supporting documents

21   and the placement's recommendation and the case

22   coordinator's recommendation, review all of those

23   documents.

24              I might have a call also with the case

25   coordinator and the placement to understand what
```

Confidential

1  was the -- what led to them drawing the conclusion

2  that they could release or deny this placement.

3          And then I would staff it -- I would have

4  a staffing with my supervisor and maybe bring in

5  another FFS supervisor to get a final concurrence

6  to determine how to move forward.

7      Q    And in that circumstance where there

8  might have been disagreement by the team in terms

9  of a release recommendation, would you, as the FFS

10  supervisor, hold final approval authority with

11  respect to a release or reunification

12  determination?

13      A    For what level of care?

14      Q    For any level of care.

15      A    Okay.  And what time frame are we talking

16  about?  Are we talking -- because the policies have

17  changed since 2017 when I left so they're not the

18  same anymore.

19      Q    What was the policy prior -- which policy

20  -- you're talking about the release policy has

21  changed since you served in that role?

22      A    Yes.  For different levels of care, yes.

23      Q    Let's just talk about what was in your

24  experience when you were actually in that role.

25      A    Okay.

 1    of compliance?

 2         A    So noncompliance to -- noncompliance is

 3    one of those things where they -- what we're

 4    finding -- what we're finding is that they are out

 5    of compliance with the 30-day, not necessarily with

 6    inappropriately placing kids out-of-network.

 7              So when we get a kid that's out of --

 8    like if we have a notice of placement that's out of

 9    compliance, we might issue a -- we'll issue a

10    corrective action plan.

11              So that's what we've been seeing is not

12    uploading in 30 days, missing signatures, not in

13    the language of understanding.  But we -- in our

14    review we have not seen kids that were

15    inappropriately placed in those levels of care.

16         Q    Uh-huh.

17         A    Yeah.

18         Q    Okay.  So based on your recollection,

19    none of the programs currently out of compliance

20    are out of compliance for reasons of inappropriate

21    placement?

22         A    Correct.

23         Q    Okay.  And when ORR is reviewing

24    appropriateness of placement, are they relying

25    exclusively on whether the NOP is correctly filled

1    out, uploaded, and has the right signatures?

2         A    No.  We're looking at their information

3    in the system, too.  It contains all of their --

4    the case reviews and assessments and that kind of

5    thing, SIRs.

6         Q    SIRs.

7         A    Uh-huh.

8         Q    So have there been times when the

9    compliance review has looked at the evidentiary

10   basis for appropriateness of placement, the reason

11   for placement, and determined that even though the

12   form was correctly filled out and signed and

13   presented to the youth in a timely way that the

14   basis for placement was inappropriate?

15        A    Other than the emails that you showed me,

16   I haven't -- I don't have any recollection of --

17   other than what you've provided me in the emails.

18        Q    And so would you say primarily that the

19   information that's used to review or evaluate

20   appropriateness of placement is the portal in the

21   child's ORR file?

22        A    Yeah.  So the child's file is uploaded

23   into the portal so we have access to both.

24        Q    Kind of the same?

25        A    Yes, yes.

Confidential

Page 248

1    she's doing with respect to her regular caseload?

2         A    Correct.

3         Q    Of those 14 cases, how many has she

4    identified as complex enough to engage your

5    assistance on?

6         A    I mean, I think I did one a couple of

7    weeks ago.

8         Q    Okay.

9         A    And -- yeah.

10        Q    And with specific to the residential

11   treatment programs, you had mentioned that an FSS

12   is required to have a psychiatric recommendation

13   supporting residential placement prior to being

14   able to approve the placement of a youth at an RTC;

15   is that correct?

16        A    Yes.

17        Q    Okay.  Is a psychiatric approval also

18   required in order to authorize release or a

19   step-down from a residential treatment program?

20        A    No, I'm not aware of that being anywhere

21   in the policy or anything.

22        Q    Do the out-of-network residential

23   treatment programs require any kind of psychiatric

24   approval of discharge before they're able to step

25   down or transfer a youth from an out-of-network

Confidential

1      A      Yes.

2      Q      Do you remember a line of questioning as

3   to whether a child is entitled to a lawyer to

4   challenge being stepped up?

5      A      Yes.

6      Q      If a child wants access to a lawyer, does

7   ORR or the federal field specialist block them

8   access to that lawyer?

9      A      No.

10      Q      If a lawyer wanted to work with a child,

11   does ORR block their access to the child?

12      A      No.

13      Q      If a child wanted a lawyer's assistance

14   to challenge being stepped up, would ORR block that

15   lawyer's access to the child?

16      A      No.

17      Q      And if the lawyer wanted to access a

18   child to assist them in challenging a step-up,

19   would ORR block that access?

20      A      No.

21      Q      What about if a child wanted a lawyer's

22   assistance to be released, would ORR block access

23   of that lawyer to the child?

24      A      No.

25      Q      Would ORR block the child's access to the

Confidential

1    lawyer?

2         A    No.

3         Q    So when you say "entitled," you just

4    mean -- what do you -- what does "entitled" mean to

5    you?

6         A    They have legal access.  They have access

7    to attorneys.  That's what I meant.

8         Q    Okay.  So they do have access?

9         A    Yes, they do.

10             MS. STEVENSON:  Can we go off the record

11    for one minute?

12             (Recess taken 4:23 - 4:27 p.m.)

13             MS. STEVENSON:  I just want to ask a few

14    final questions.

15    BY MS. STEVENSON:

16         Q    Do you remember being asked what has been

17    the most challenging part of your job thus far?

18         A    Yes.

19         Q    And do you remember testifying as well

20    about difficulty stepping down minors because

21    facilities wouldn't accept them?

22         A    Yes.

23         Q    And have you -- do you remember

24    testifying as to any difficulty with placing --

25    finding out-of-networks to accept some of the

Confidential

1  youth from accessing legal counsel in -- or

2  representation on a number of type of matters?

3      A    So we have a contract with the Vera

4  network or a grant.  I'm not sure which it falls

5  under.

6              THE COURT REPORTER:  I'm sorry, what

7  network?

8              THE WITNESS:  Vera.  It's another

9  acronym, but I don't know what it stands for.

10     A    So Vera, and they subcontract out to

11 different immigration nonprofits like Catholic

12 Charities and ICE.

13             And those immigration attorneys have

14 access and come into our programs regularly to give

15 "Know your rights" presentations and screen kids

16 for possible legal services.  And can refer

17 children to, you know, pro bono attorneys.

18             And can also -- those kids can, you know,

19 talk -- call attorneys and access attorneys by

20 phone if they want to talk to them.

21     Q    And are you personally aware of any

22 restrictions on the type of legal matters or

23 representation that the Vera-funded attorneys are

24 able to provide you in ORR custody?

25     A    No.

1              CERTIFICATE OF COURT REPORTER

2

3     STATE OF GEORGIA       )

4     COUNTY OF DEKALB       )

5

6          I hereby certify that the foregoing deposition
      was reported as stated in the caption, and the
7     questions and answers thereto were reduced to
      writing by me; that the total transcript pages 1
8     through 281 represent a true, correct, and complete
      transcript of the evidence given on February 12,
9     2020, by the witness, DAVID R. FINK, who was first
      duly sworn by me.

10

11         I further certify that I am not related to any
      of the parties to this action by blood or marriage;
12    and that I am in no way interested in the outcome
      of this matter.

13

14         I certify that I am not disqualified for a
      relationship of interest under O.C.G.A. Section
15    9-11-28(c); I am a Georgia Certified Court Reporter
      here as a representative of TSG Reporting; I was
16    contacted by TSG Reporting to provide court
      reporting services for this deposition; I will not
17    be taking this deposition under any contract that
      is prohibited by O.C.G.A. Sections 15-14-37(a) and
18    (b) or Article 7.C. of the Rules and Regulations of
      the Board of Court Reporting.

19

20         This 25th day of February 2020.

21

22    _____
      Judith L. Leitz Moran, B-2312
23    Georgia Certified Court Reporter

24

25