# DX-20

Deposition of Natasha David, October 24, 2019

CONFIDENTIAL

Page 1

1     UNITED STATES DISTRICT COURT
2     CENTRAL DISTRICT OF CALIFORNIA
3     WESTERN DIVISION
4
5     _____
                                    )
6     LUCAS R., et al.,             )
                                    )
7         Plaintiffs,               )
                                    ) Case No.
8     vs.                           )
                                    ) 2:18-cv-05741
9     ALEX AZAR, Secretary of U.S.  ) DMG-PLA
      Department of Health and      )
10    Human Services, et al.,       )
                                    )
11        Defendants.               )
      _____)
12
13
14              CONFIDENTIAL
15
16         DEPOSITION OF NATASHA DAVID
17              Reston, Virginia
18              October 24, 2019
19
20
21
22
23
24    Reported by:  John L. Harmonson, RPR
25    Job No. 170111

TSG Reporting - Worldwide - 877-702-9580

1   Children Program.
2       Q.   And what is your job title?
3       A.   I'm a federal field specialist.
4       Q.   And what does a federal field
5   specialist do?
6       A.   A federal field specialist provides
7   oversight to care provider programs that relate
8   to the care and custody of unaccompanied alien
9   minors in the custody of ORR.
10      Q.   What types of oversight do you
11  provide?
12      A.   I monitor the progress of cases.  I
13  provide guidance to the programs.  And I make
14  decisions on the safe and timely release process.
15      Q.   You make decisions on what?
16      A.   The safe and timely release process.
17      Q.   Do you have much direct contact with
18  the children?
19      A.   Yes.
20      Q.   Can you explain just the circumstance
21  where that would occur?
22      A.   There are times where I would meet
23  with children or they request to meet with me.
24      Q.   What would be the type of thing that a
25  child would ask to meet with you about?

1     A.    To discuss their case.
2     Q.    And would that include your decision
3     on their safe and timely release?
4     A.    It allows them to provide me
5     information or talk to me about their case.  That
6     supports decisions that I make.
7     Q.    Okay.  So other than the decision on
8     release, what other types of decisions that you
9     make would a child have occasion to talk to you
10    about?
11    A.    I've spoken to children in regards to
12    their placement.
13    Q.    Okay.  Anything else?
14    A.    And how long their case is taking.
15    Q.    And by how long it's taking, is part
16    of that a reference to how long it's taking for
17    the release process to take place?
18    A.    Yes.
19    Q.    Encompassed or as part of deciding on
20    safe and timely release, does your
21    decision-making include approval or disapproval
22    of sponsors?
23    A.    Yes.
24    Q.    So what role do you play in sponsor
25    approval?

1   action in those ten months?
2        A.    I have not.
3        Q.    Have you given anyone there any
4   warnings that if they don't correct something
5   that they might get one in the future?
6        A.    I don't recall issuing any warnings of
7   corrective action.
8             MR. WHITE:  All right.  I would like
9        to take a five-minute break now.  Off the
10       record.
11            (Recess taken.)
12  BY MR. WHITE:
13       Q.    So what is custodial vetting?  Is that
14  a term that you would use?
15       A.    No.
16       Q.    So what I want to understand -- I want
17  to ask you some questions about how -- For a
18  youth to be discharged, generally are they
19  discharged to a sponsor?
20       A.    Yes.
21       Q.    And is that sponsor also sometimes
22  referred to as a custodian?
23       A.    We refer to them as sponsors.
24       Q.    Okay.  So I want to understand the
25  process for how one would become a proposed

Page 52

1  sponsor and how they would be approved or not
2  approved.  So can you tell me generally how that
3  process is initiated?
4       A.   The care providers become aware of
5  sponsors through the children, through their
6  families.  They provide them with all the
7  information in regards to sponsoring and
8  reunification.
9       Q.   And by "they provide them," the care
10 providers provide that information to the
11 proposed sponsors?
12      A.   Correct.
13      Q.   And then what happens?
14      A.   Through that, they initiate the
15 reunification process.
16      Q.   So I need to understand what that
17 reunification process actually operates or looks
18 like.
19      A.   It starts by the sponsors completing
20 the family reunification application.
21      Q.   Okay.
22      A.   Understanding the criteria for
23 sponsorship.
24      Q.   And so is it accurate to say that the
25 process can't really initiate until the

1    application is submitted?

2        A.    No.  There is preliminary initiation
3    just by virtue of contacting the sponsor.

4        Q.    So what else would happen pending the
5    submission of that application?

6        A.    There is assessments that's completed,
7    background checks, obtaining information on the
8    sponsor.

9        Q.    Okay. Is the information that's --
10   Whenever I've had a background check done on me,
11   like if I'm going to visit a client in a jail or
12   something, I have to give a driver's license
13   number or something.  Does the proposed sponsor
14   have to give information that will allow the
15   background check to be completed?

16       A.    Yes.

17       Q.    And is that information contained in
18   the application, or can that be provided some
19   other way?

20       A.    The sponsors are able to provide that
21   information through e-mail, mail.

22       Q.    So who are they providing it to?

23       A.    They're providing it to the case
24   managers and aftercare provider.

25       Q.    So the case manager is the point of

1    contact for the proposed sponsors to give
2    information?
3        A.    Yes.
4        Q.    Anyone else?
5        A.    They have contact with the clinicians.
6        Q.    And the "they" in that sentence is the
7    sponsors -- the proposed sponsors have contact
8    with the clinicians?
9        A.    Yes.
10       Q.    And who are the clinicians?  What do
11   they do?
12       A.    They're clinical professionals that
13   provide mental health services to the children.
14       Q.    So what would be the nature of the
15   contact that a proposed sponsor would have with a
16   clinician?
17       A.    It would relate to mental health,
18   abuse, corroboration of information on those
19   areas.
20       Q.    Just so I understand that answer,
21   would this be a clinician trying to get
22   corroboration from a proposed sponsor about some
23   possible mental health issue or abuse that the
24   child had?
25       A.    Yes, that's correct.

1  Q.  As I understand your response to my
2  question about whether the family sessions were
3  required, I thought you said something like
4  assessments have to occur.  Is that accurate?
5  A.  As a part of the reunification
6  process.
7  Q.  Who makes those assessments?
8  A.  Through ORR's procedure, there's
9  assessments that must be completed as a part of
10 reunification.
11 Q.  By whom?
12 A.  Assessments are completed by the case
13 manager and the clinician.
14 Q.  And what is the FFS's role in those
15 assessments, if any?
16 A.  I review the assessments.  If there is
17 a concern that is identified in completing the
18 assessments that concern can be elevated to the
19 FFS for further guidance.
20 Q.  Does it ever occur in this process
21 that you communicate with proposed sponsors?
22 A.  No.
23 Q.  So is there any reason that a child --
24 In a situation where the proposed sponsor and the
25 child have not met before, is there any reason

1  just based on that that the sponsor cannot
2  receive custody of the child?
3      A.   No.
4      Q.   In that or any other situation where
5  the sponsor is not approved, does the sponsor
6  have an ability to challenge or appeal that
7  denial?
8      A.   Category 1 sponsors can appeal the
9  final determination if denied.  I have -- I am
10 aware of other categories requesting
11 reconsideration for sponsorship as well.
12     Q.   We'll get to that.
13          What's a category 1 sponsor?
14     A.   It's a parent or legal guardian.
15     Q.   And that's it?
16     A.   Yes.
17     Q.   If there is a category 1, I assume
18 there is a category 2.
19     A.   Yes.
20     Q.   What's that?
21     A.   The category 2 are -- there's 2(a)
22 which is biological or half sibling.
23     Q.   Before you answer any more, where is
24 this spelled out in the -- or is it spelled out
25 in either the UAC MAP or the online regulations?

1      A.     It's in the online policy.

2      Q.     Okay.  So when you mentioned that

3  you're aware of other categories of sponsors

4  requesting reconsideration, were those requests

5  honored or acted upon?

6      A.     Yes.

7      Q.     And what do you remember about any of

8  those situations?

9      A.     I've had a few cases where it's a

10 category other than category 1 where they

11 requested to be reconsidered based on a changed

12 circumstance.

13     Q.     Is that request to you or to the

14 director or to someone else?

15     A.     The request starts -- it's elevated to

16 the FFS, from my experience only.

17     Q.     So if initially a proposed sponsor is

18 denied, who makes that denial?

19     A.     Depending on the category, it would be

20 the FFS or the ORR directer if it's category 1.

21     Q.     So I guess when you say that a

22 reconsideration would be elevated to an FFS, I'm

23 not understanding that.  Because wouldn't it

24 already be at that level?

25     A.     Yes.  So if, like, a category 2 was

1      Q.    So are the sponsors allowed to view
2   the home study reports?
3      A.    Yes.
4      Q.    Who informs the sponsors of their
5   ability to view the home study reports?
6      A.    In our guidance it states that if it's
7   denied, then the sponsor can view it.  And the
8   home study procedure, I'm not clear on that.
9      Q.    So you don't know who informs the
10  sponsor of their right to look at the report?
11     A.    I don't recall what it says in terms
12  of how that happens.
13     Q.    But as far as you know, it is not the
14  FFS that does that?
15     A.    No.
16     Q.    So if I understand your answer, is the
17  sponsor allowed to view the home study report
18  before or after the FFS makes the determination?
19     A.    I don't know.
20     Q.    Well, earlier you testified, as I
21  understood it, that the sponsor is only allowed
22  to view the report if there is a denial.  Was
23  that accurate?
24     A.    Incorrect in that it's not the denial
25  but a negative recommendation.  So denial of the

1   home study, not the denial of the case.
2        Q.   By the FFS?
3        A.   No, the denial by the home study
4   provider.
5        Q.   That's what kicks in the sponsor's
6   right to see a copy of the report?
7        A.   Yes.
8        Q.   So if the home study recommendation is
9   negative, do they get to provide any kind of
10  additional evidence about their response to the
11  home study before the FFS makes the final
12  decision?
13       A.   Yes.
14       Q.   And have you had situations where this
15  has taken place?
16       A.   Yes.  It's through the mitigation
17  process that I described earlier.
18       Q.   Okay.  So the mitigation process can
19  happen or does happen before the FFS makes the
20  final decision whether to release a child or not?
21       A.   Yes.
22       Q.   And you've had situations where the
23  initial provider, home study provider's
24  recommendation was negative and through
25  mitigation you've been able to resolve it in such

1  a way that the child can be released?
2       A.   Yes.
3       Q.   How long does a mitigation process
4  take?
5       A.   It depends on the circumstances, how
6  proactive the sponsor is. It depends on, you
7  know, the -- I mean, yeah, it just depends on the
8  circumstances.
9       Q.   Can the mitigation process delay the
10 release of the child?
11      A.   I think it adds to the process.
12      Q.   So is that a yes?
13      A.   So from my experience, it becomes a
14 part of that process. I don't agree that it
15 delays the process because it's concerns that are
16 present in order to make a determination.
17      Q.   And the question is not does it
18 always, but can it delay the release of the
19 child?
20      A.   Well, I mean, it depends. My answer
21 is not yes, it delays it. It just adds to the
22 circumstances of assessment.
23      Q.   And I'm not asking you does it always
24 delay it or does it delay it, which is what
25 you're answering. I'm asking can it delay it?

1    the middle of the night?
2        A.    I've seen transports happen at all
3    hours of the day and night.
4        Q.    They could leave at 3:00 or 4:00 a.m.?
5        A.    Yes, based on the travel arrangements
6    and availability.
7            MR. WHITE:  I would like to take a
8        five-minute break.
9            (Recess taken.)
10   BY MR. WHITE:
11       Q.    Is there a periodic review of the
12   level of placement for children in the ORR
13   system?
14       A.    Yes.
15       Q.    And what is that?
16       A.    It's the notice of placement review.
17   Notice of restrictive placement for secure, staff
18   secure, and RTC.
19       Q.    And how often does that take place?
20       A.    30 days.
21       Q.    Every 30 days?
22       A.    Yes.
23       Q.    Who does the review?
24       A.    It starts with the care provider.
25       Q.    And is that the case manager or is

Page 149

1  that others?
2      A.    Case manager and clinician,
3  supervisors, and it's elevated to the case
4  coordinator for review and then elevated to the
5  FFS.
6      Q.    For final sign-off?
7      A.    Final sign-off.  Depending on the
8  length of stay, it would also be staffed with the
9  FFS supervisor.
10     Q.    And what length of stay would kick in
11 that last thing?
12     A.    After 90 days.
13     Q.    So any placement that's been longer
14 than 90 days in duration is going to include that
15 final FFS supervisor level review?
16     A.    Yes, at least staffed.
17     Q.    Or they're staffed in on it?
18     A.    Yes.
19     Q.    Okay.  So what influence do case
20 managers have in the ultimate decision to step
21 someone down or to not step someone down?
22     A.    Case managers work directly one-on-one
23 with the children.  They complete assessments on
24 the children.  So when it comes time for
25 decisions or recommendations or elevation of

1    review.

2        Q.    And who does that?

3        A.    The care provider.

4        Q.    And is it the case manager?

5        A.    I believe it's the case manager.

6        Q.    Do the sponsors similarly get informed
7    of the opportunity to challenge placement?

8        A.    If a category 1 is denied, they're
9    advised of their rights.

10       Q.    That's referring to release, to the
11   category 1, correct?

12       A.    Yes.

13       Q.    I'm talking about a prospective family
14   member who -- a prospective sponsor family member
15   on the outside who wants to help a child
16   challenge their continued restrictive placement.
17   Are they allowed to do that?

18       A.    I would have to consult the policy to
19   be sure.

20       Q.    Are attorneys informed of the right of
21   a child to challenge their placement if a child
22   has an attorney?

23       A.    If there is an attorney of record,
24   they are advised.

25       Q.    Every 30 days?

Page 159

1    A.    I'm not sure. I would have to consult
2  the regs. Attorney of records can request the
3  notice of placement on demand.
4    Q.    To whom would that attorney of record
5  make that request? The care provider?
6    A.    Yes.
7    Q.    And that has to be honored per policy?
8    A.    Per policy, yes.
9    Q.    When the children are informed of
10  their right to challenge placement, are they
11  informed of both their right to review by the
12  director and their right to go to federal court?
13    A.    Yes, they're advised of the
14  administrative and judicial review. Since
15  working with Shenandoah, it's documented on the
16  notice of placement.
17    Q.    I know that the notice of placement is
18  required to be given to a child within 48 hours
19  of a new placement. Right?
20    A.    Correct.
21    Q.    Is the notice that's received and
22  provided to the child after that 30-day review,
23  is that the same document or is it a separate
24  notice of continued placement?
25    A.    It's the same document.

CONFIDENTIAL

Page 217

1         C E R T I F I C A T E

2

3   COMMONWEALTH OF VIRGINIA

4         I, JOHN L. HARMONSON, a Notary Public

5   within and for the Commonwealth of Virginia, do

6   hereby certify:

7         That NATASHA DAVID, the witness whose

8   deposition is hereinbefore set forth, was duly

9   sworn by me and that such deposition is a true

10  record of the testimony given by such witness.

11        That if the foregoing pertains to a

12  federal case, before completion of the

13  proceedings, review and signature of the

14  transcript [x] was [ ] was not requested.

15        I further certify that I am not related

16  to any of the parties to this action by blood or

17  marriage; and that I am in no way interested in

18  the outcome of this matter.

19        IN WITNESS WHEREOF, I have hereunto set

20  my hand this 6th day of November, 2019.

21        *John L. Harmonson* (signature)

22  _____

23          JOHN L. HARMONSON, RPR
            Virginia CCR #0613313
24          Notary Public for the
            Commonwealth of Virginia #7349255
25          My commission expires: 01/31/22