# DX-22

Deposition of Carina Contreras, January 23, 2020

Page 1

1

2                    IN THE UNITED STATES DISTRICT COURT

3                      CENTRAL DISTRICT OF CALIFORNIA

4                             WESTERN DIVISION

5      -----------------------------------

6      LUCAS R., et al.,

7                         Plaintiffs,

8        -vs-                 Case No.:  2:18-CV-05741 DMG PLA

9      ALEX AZAR, Secretary of U.S.

10     Department of Health and Human

11     Services, et al.,

12                      Defendants.

13     -----------------------------------

14

15

16

17

18               Deposition of CARINA CONTRERAS

19                   Harrisonburg, Virginia

20                 Thursday, January 23, 2020

21                        8:58 a.m.

22

23

24     Reported by:  Valarie L. S. May

25     Job No: 175374

1    responsibilities that they have and the job

2    responsibilities that you had when you served as a

3    case manager?

4         A     Not that I can recall right now.

5         Q     Okay.  And can you tell me a bit more

6    about what your -- what your supervision of them

7    involves?

8         A     We have internal procedural checklists for

9    all of the case plans, and I often update those.  And

10   they know to follow those guidance forms.

11            I supervise their documentation on a

12   weekly basis, and we have at least, if not more,

13   monthly meetings to talk about the cases in the last

14   month.

15            And then I would say often it's on a daily

16   basis that we're staffing how to move cases.  So they

17   come to me for additional guidance.

18        Q     Are case managers required to speak with

19   you before making certain recommendations or kind of

20   moving to the next step with a specific case?

21        A     It's not required, but it happens often.

22   And they are pretty independent in their work once

23   they've been fully trained.

24        Q     And can you just clarify again how you

25   ensure they are fulfilling their job responsibilities?

1    document in the case's case manager notes when I staff

2    something with her.

3         Q     Okay.  And when you communicate with the

4    FFS supervisor, are those communications documented

5    anywhere?

6         A     We have email correspondence.

7         Q     Okay.  Do you communicate with children's

8    family members or sponsors?

9         A     Yes.

10        Q     And what do you communicate with them

11   about?

12        A     Their reason for placement in secure;

13   reunification procedures, if they live in the US;

14   notification of just general updates or how they're

15   doing, for family members in home country.  Yeah,

16   legal updates or anything related, really, to the

17   minors.

18        Q     And how often would you say that you

19   communicate with family or sponsors?

20        A     Multiple times a week.

21        Q     And do you document your communication

22   with family members and sponsors?

23        A     Yes.

24        Q     Where do you keep that documentation?

25        A     In case manager notes.  Case reviews.

1       Q       Are all of your communications with family

2   and sponsors documented?

3       A       Yes.

4       Q       And when you communicate with family

5   members and sponsors, is that usually over the phone?

6       A       Yes.

7       Q       Do you sometimes send text messages?

8       A       Yes, I do.

9       Q       Okay.  When you are just having a phone

10  call with family members and sponsors, do you have a

11  transcript of that conversation?

12      A       The case manager notes contains a summary

13  of the conversation.

14      Q       Okay.  But it's not word for word

15  everything that was said?

16      A       No.

17      Q       Okay.  If a family member or sponsor calls

18  or texts or emails you, how much time passes before

19  you end up responding to that communication?

20      A       I would say I respond as soon as I'm

21  available.

22      Q       Okay.  What's the longest amount of time

23  that it's taken to respond?

24      A       Twenty-four hours.

25      Q       Okay.  Are you aware of any ORR policies

1    or procedures related to your ability or the amount of

2    time it should take you to communicate with family or

3    sponsors?

4         A     In the reunification policy, there's

5    guidelines on how -- when the sponsor should be

6    identified and when they should be provided with the

7    family reunification packet.

8         Q     Do you ever communicate with attorneys for

9    children?

10        A     I communicate with the legal service

11   provider and any private attorney or counsel.

12        Q     Okay.  And how often do you communicate

13   with them?

14        A     As needed.

15        Q     Do they usually contact you, or do you

16   ever reach out and affirmatively contact them?

17        A     Both.

18        Q     Okay.  Are you aware of any ORR policies

19   or procedures related to your ability to communicate

20   with attorneys?

21        A     Can you explain "ability"?

22        Q     Sure.  So are there any policies or

23   procedures that say that you are allowed to speak with

24   attorneys about certain topics? not allowed to talk

25   about other topics?

Page 61

1          A      Not that I can think of specifically.

2     Generally just discuss legal cases.

3          Q      Okay.  And have you ever been told that

4     you're not allowed to share certain information with

5     attorneys?

6          A      Yes.

7          Q      Is there specific information that you've

8     been told you're not allowed to share?

9          A      Documentation that contains sensitive

10    information or personal identifying information, case

11    documentation that needs to be requested through the

12    ORR file request inbox.

13         Q      And who has told you that you're not

14    allowed to share that information?

15         A      My FFS.  There's some guidelines in the

16    policy.

17         Q      And just to clarify, when you say "the

18    policy," are you referring to ORR-specific policy?

19         A      Yes.

20         Q      Okay.  So we've covered quite a bit of

21    people that you've communicated with.  Are there any

22    people that I have not mentioned that you communicate

23    with as part of your job?

24         A      The child advocates from the Young Center.

25         Q      Right.  And what, in particular, do you

Page 62

1    talk to them about?

2         A     If they are assigned or approved for an

3    advocate and -- the minors, if they're approved, we

4    discuss their case and provide case files.

5         Q     What role, if any, do the child advocates

6    have in the reunification process?

7         A     They provide best-interest

8    recommendations.

9         Q     What are those?

10        A     Recommendations on release or step down.

11        Q     And how do you use best-interest

12   recommendations?

13        A     It's a part of our recommendations.

14        Q     Okay.  So if a child has a best-interest

15   recommendation, you review it as a part of making a

16   decision about your own recommendation?

17        A     Yes, I review the best-interest

18   recommendation.  It may not necessarily be aligned

19   with our specific recommendations, but it is a part of

20   the case.

21        Q     Okay.  So sometimes you disagree with the

22   best-interest recommendations from the Young Center?

23        A     I can recall one where I have, but we

24   might differ on specific recommendations.

25        Q     Okay.  Does the FFS review best-interest

Page 63

1      recommendations?

2              A      It's my understanding that they do.

3              Q      Do clinicians review them as well?

4              A      It's my understanding that they do.

5              Q      Are you currently a member of any

6      committees or working groups related to your work at

7      Shenandoah?

8              A      Can you explain what those are?

9              Q      Yeah.  I'm just trying to understand

10     whether you meet with a group of people regularly to

11     discuss certain issues at Shenandoah, apart from

12     everything we've talked about -- if there's a regular

13     task force or group of people that meet together to

14     troubleshoot certain problems or focus on a specific

15     topic.

16             A      I'm not sure what, like, topics you mean

17     or -- like, the minor's needs or just general case?

18             Q      Either, yeah.  But if nothing comes to

19     mind, that's okay.  I'm just curious.

20             A      I mean, we are in constant communication

21     with the supervisors about their daily interactions

22     and needs on the units, and the floor staff, the

23     school.

24             Q      Okay.  Okay.  Great.

25                    MS. ADAMS:  I think it's time to take a

Page 80

1    requirements.

2         Q     Okay.  Are there children who have been

3    admitted to Shenandoah who had criminal charges

4    dropped prior to their admission to Shenandoah?

5         A     Yes.

6         Q     Are those children still eligible or

7    qualified to be at Shenandoah?

8         A     According to the notice of placement, the

9    first criteria says "have been a subject of

10   delinquency proceedings."

11        Q     Do you feel like, in your own independent

12   view, that those kids should be at Shenandoah or a

13   lesser-restrictive placement?

14        A     If the only reason said to place them in

15   secure is the charge that was dropped, no.

16        Q     No, you think they should --

17        A     Not be placed in secure.

18        Q     Okay.  When do you first meet a child who

19   is added to your caseload?

20        A     Within 24 hours of their arrival.

21        Q     And is that 24-hour timeline required by

22   ORR?

23        A     Yes.

24        Q     And what happens at that first meeting

25   with the child?

Page 81

1          A      We provide orientation, review case plans,

2     talk about their rights and legal service providers

3     that are available, sign documentation for placement.

4          Q      Okay.  Do you identify potential sponsors

5     in that first meeting?

6          A      It is our goal to do that.

7          Q      And how often are you able to identify

8     sponsors in that first meeting?

9          A      I would say most cases arrive with a

10    sponsor identified.  If one is not identified, then it

11    might take longer than that to identify.

12         Q      Percentagewise, would you say 60 percent

13    of the kids that you meet initially have sponsors

14    identified?  Or a higher percentage?  Lower

15    percentage?

16         A      I'll stay in the middle:  50/50.

17         Q      Okay.  And if a child does not have a

18    sponsor identified during that first meeting, what's

19    kind of the longest that it's taken to identify a

20    sponsor sometimes?

21         A      I don't recall exactly, but it can take

22    weeks or months.

23         Q      Does ORR have any specific requirements

24    about what occurs during that initial meeting with the

25    child?

Page 82

1        A      Can you explain further?

2        Q      Sure.  Are you required to get a specific

3    form signed or review certain information during that

4    first meeting?

5        A      Yes, just basic orientation and

6    information about ORR and who we are.

7        Q      Okay.

8        A      Their rights.

9        Q      Are you required to review the notice of

10   placement during that first meeting?

11       A      Yes.

12       Q      Do you use any specific assessments or

13   tools when interacting with the child?

14       A      Like what?

15       Q      So I'm just wondering if there's a certain

16   form or certain metrics that you have to kind of check

17   off, checklist, when you meet the child for the first

18   time.

19       A      ORR requires an individual in-care safety

20   plan to be created within 24 hours of their arrival

21   that identifies certain risk factors or

22   vulnerabilities.

23       Q      Okay.  Were you trained on how to complete

24   that form?

25       A      Yes.

Page 98

1   have been coming from changed since you first started

2   working at Shenandoah?

3              Has it always been common for kids to come

4   from staff secure placements, or has that varied over

5   time?

6        A    I mean; I think it varies always.  I can't

7   identify any specific trend.

8        Q    Okay.  What is your understanding of how

9   the step up process works?

10       A    It's my understanding the facilities, in

11  their assessment of the minors, merited placement in a

12  staff secure if they're displaying behaviors that

13  might merit secure.  They staff the case with both

14  their case coordinator and their FFS to determine

15  whether secure is an appropriate placement, and then

16  after FFS approval, they will refer the case to their

17  case coordinator who then refers the case to us for

18  review.

19       Q    Okay.  We've talked about how you are

20  involved in the review process when Shenandoah

21  receives a referral.  What factors do you consider

22  when you make a recommendation about a child being

23  accepted to Shenandoah?

24       A    In the case manager role, my goal is to

25  review their case plan, the status of their case plan,

Page 99

1    their legal case, identified legal eligibilities,

2    behavior, history or trends, and reviewing that

3    base -- or comparing that to, like, the NOP secure

4    criteria.

5              Other things I would review are medical

6    needs, apart from any mental health or psychotropic,

7    which would be the lead clinician role, but any

8    specific medical or dental needs that need to be

9    addressed.

10        Q    If a lead clinician has a different

11   recommendation than you, do you ever communicate with

12   the lead clinician to try to reconcile your

13   differences?

14        A    Yes.

15        Q    And what does that conversation usually

16   look like?

17        A    Well, it depends on the case, of course,

18   but we discuss just how to make sure -- how we can

19   keep the minor safe, if the clinician doesn't agree,

20   and how the behaviors can be managed in the secure

21   setting rather than where they're at currently.

22             Yeah, it's just a case-by-case basis, but

23   we discuss whether we can find common ground.  And, if

24   not, then, ultimately, it's ORR's decision to place in

25   secure.

1        Q     Okay.  Would a parent, family member, or

2   potential sponsor have any role in deciding whether a

3   child is stepped up?

4        A     Not that I'm aware of.

5        Q     Would a child's attorney be involved in

6   that decision?

7        A     In the past, I've seen where attorneys --

8   their recommendation regarding whether it would affect

9   their legal case is considered.

10       Q     Okay.  And how is -- who considers the

11  input from the attorney?

12       A     Well, as it relates to step downs, for

13  example, from our facility, our FFS has, at times,

14  indicated:  Have you followed up with the legal

15  service provider to find out whether this would affect

16  the legal case?

17       Q     Okay.  And if a child is being referred to

18  be stepped up to Shenandoah, is there ever a time when

19  you, the lead clinician, or Kelsey interact with the

20  child's attorney?

21       A     Not prior to their arrival.

22       Q     Okay.  So we've talked a bit about the

23  various reasons why a child could be stepped up to

24  Shenandoah, and you've mentioned that you look at the

25  criteria listed in the notice of placement; correct?

1          A       During our intake meeting where we provide

2     them the notice of placement and reason for placement

3     in secure, the minors are not only explained but

4     they're also offered -- they're told their right to an

5     administrative or a judicial review if they would like

6     to appeal the reason for placement in secure.  And

7     they don't have to sign.  They have the right not to

8     sign it, and we've had minors who have done that.

9          Q       Okay.  Have kids ever asked to leave

10     Shenandoah and go to a different facility?

11         A       Yes.

12         Q       And who do kids communicate this request

13     to?

14         A       Their case managers.

15         Q       You mentioned that during the intake

16     process kids are told about a right to administrative

17     review and judicial review.  Do you know whether

18     children understand those rights?

19         A       We explain that an administrative review

20     is through ORR and a judicial review is through their

21     legal service provider and through a court.  So I

22     would say that most minors understand that.

23         Q       Okay.  And when you use the term "we," who

24     are you referring to?

25         A       Case managers.

1    phrase that's used to describe what the judicial

2    review process is called or what the process looks

3    like once they're in court?

4          A    No.

5          Q    Okay.  Do you understand whether that's

6    separate from a Flores bond hearing?

7          A    Yes.

8          Q    Okay.  Have kids ever been -- have you

9    ever observed that kids have been confused about their

10   right to an administrative review or a judicial review

11   process?

12         A    Yes.

13         Q    And whenever a child has said that they

14   disagree with their placement or want to leave

15   Shenandoah, do you remind them of their ability to

16   request administrative review and judicial review

17   process?

18         A    Yes.

19         Q    Do you remind them of those rights every

20   single time a child expresses disagreement with their

21   placement?

22         A    I can't speak for the other case managers,

23   but I would say that it's a conversation that is had

24   with the kids.

25         Q    Okay.  So I'd like to talk a little bit

Page 136

1          A       Not that I can recall.

2          Q       Okay.  Can a youth be reunified or stepped

3     down directly from an out-of-network placement?

4          A       It's my understanding that it would be

5     possible.  That would be -- that would be passed on to

6     the other facilities to continue.

7          Q       Okay.  What is your understanding of how

8     the step down process works?

9          A       At Shenandoah, the step down process

10    begins with the notice of placement, the request for

11    the review of the case on or before 30 days and,

12    thereafter, every 30 days, and if ORR identifies that

13    they -- or decides that they are eligible to step

14    down, we notify their legal service provider and get

15    any feedback about that.  And then we make a transfer

16    request to -- for step down to staff secures or RTC or

17    whatever is approved by ORR.  The transfer request

18    file is provided to the case coordinator, and the case

19    coordinator refers to the other case coordinators who

20    then pass that on to staff secure facilities.

21         Q        If you or the clinician do not believe

22    that step down should occur, will the FFS consider

23    whether a step down should occur?

24         A       That would be up to the FFS, but all the

25    recommendations are considered by ORR.

1          Q      Has there been a situation where the

2     clinician and the case manager have recommended to

3     continue at Shenandoah but the FFS has decided to step

4     down?

5          A      Not that I can recall right now.

6          Q      Okay.  Are you familiar with a requirement

7     that a child must have 30 days of good behavior before

8     being eligible to be stepped down?

9          A      It's my understanding that notice of

10    placement reviews can occur before 30 days.

11         Q      And, in your experience, have notice of

12    placement reviews -- sorry.

13                Is it your understanding that 30-day

14    reviews or notice of placement reviews have occurred

15    before the 30-day term?

16         A      Yes.

17         Q      Okay.  Does that happen often?

18         A      At Shenandoah, the case managers and

19    clinicians request the NOP review within a week before

20    they reach 30 days, with our recommendations, and we

21    sign whatever ORR's decision is on or before the 30th

22    day.

23         Q      Okay.  Have you ever seen a situation

24    where a recommendation regarding step down has

25    occurred before that week period that you just

1          A      No.

2          Q      Would their evaluations ever be considered

3    in deciding whether to step down a child?

4          A      Yes.  They're a part of the

5    recommendation, but they're not directly involved.

6          Q      Okay.  Would a child be involved in the

7    decision to step down the child?

8          A      I can imagine if they ask for, like, an

9    administrative review, then they would be involved in

10   asking for that.

11         Q      But before a step down decision is made,

12   is the child consulted or involved in any way?

13         A      No, not that I can recall.

14         Q      Is a child's attorney involved in the step

15   down decision process?

16         A      We ask them for their input or

17   recommendation in regards to how a step down may

18   affect their legal case.

19         Q      Okay.  And by "we," are you referring to

20   case managers?

21         A      Yes.

22         Q      Okay.  Who notifies a child if they are

23   not approved for step down?

24         A      The case managers.

25         Q      Who notifies a child's attorney if a child

Page 169

1    cases, yes.

2         Q      Were there any penalties or consequences

3    for home study evaluators when they took a long time

4    to accept referrals?

5         A      I'm not sure what ORR did for that.

6         Q      If a home study evaluator provides a

7    negative recommendation, is the sponsor notified of

8    the recommendation before ORR denies the sponsor?

9         A      The sponsor is notified of the negative

10   home study when the report is received.

11        Q      Okay.  And is the sponsor given an

12   opportunity to address any issues identified in that

13   report?

14        A      Yes.

15        Q      And how is the sponsor informed of this

16   opportunity?

17        A      The case manager discusses concerning

18   factors or risk factors in the home study and works

19   with the sponsor to mitigate those concerns.

20        Q      Okay.  And who is involved in determining

21   whether the sponsor has sufficiently mitigated the

22   concerns?

23        A      The ultimate decision is ORR.  Case

24   managers make a recommendation based on what is

25   present.

1          Q     And can a child be released to a sponsor

2     if a case manager does not first make that

3     recommendation for release?

4          A     Not that I'm aware of, no.

5          Q     Okay.  Can a child be released to a

6     sponsor if a psychiatrist or psychologist does not

7     recommend the child to be released?

8          A     Yes.

9          Q     Okay.  Are psychiatrists or psychologists

10    usually involved in recommending whether a child

11    should be released or not?

12         A     Not that I'm aware of.

13         Q     Okay.  Do psychiatric evaluations or

14    psychological evaluations have to be completed before

15    a child can be released to a sponsor?

16         A     No, that would be ORR to determine whether

17    that's necessary.

18         Q     Can a child be released to a sponsor if a

19    clinician does not first recommend the child be

20    released?

21         A     Can you say that again?

22         Q     Can a child be released to a sponsor if a

23    clinician has not provided a recommendation that the

24    child be released to the sponsor?

25         A     The case manager and clinician work

1    together to make a recommendation.  So I would say no.

2         Q     Okay.  Can a child be released to a

3    sponsor if a home study evaluator has recommended

4    against release?

5         A     Can you say that again?

6         Q     Can a child be released to a sponsor if a

7    home study recommender -- sorry.  Let me say it one

8    more time.

9               Can a child be released to a sponsor if a

10   home study evaluator recommends against release?

11        A     Yes.

12        Q     Can a child be released to a sponsor if a

13   case coordinator recommends against release?

14        A     Yes.

15        Q     Would you say that it's rare for a child

16   to be released if a case coordinator recommends

17   against release?

18        A     Can you say that again?

19        Q     Would you say that it's rare for a child

20   to be released to a sponsor even though a case

21   coordinator has recommended against release?

22        A     If it's rare?

23        Q     Sorry.  So let me try to phrase it a

24   different way.

25               So if a case coordinator does not

Page 242

1    COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2              I, Valarie Lee Schmit May,

3    Notary Public for the Commonwealth of Virginia at

4    Large, whose commission expires June 30, 2020, do

5    certify that the aforementioned appeared before me,

6    was sworn by me, and was thereupon examined by

7    counsel; and that the foregoing is a true, correct,

8    and full transcript of the testimony adduced.

9              I further certify that I am neither related

10   to nor otherwise associated with any counsel or

11   party to this proceeding, nor otherwise interested in

12   the event thereof.

13             IN WITNESS WHEREOF, I have hereunto set my

14   hand and affixed my notarial seal this 5th day of

15   February 2020.

16

17

18

19   *Valarie May*
     _____

20     Valarie Lee Schmit May, Notary Public, #242129

21            Commonwealth of Virginia at Large

22

23

24

25