# DX-23

Deposition of Whitney Eich, February 27, 2020

Page 1

```
 1              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
 2                    WESTERN DIVISION

 3
     LUCAS R., et al.,           )
 4                               )
                                 )
 5        Plaintiffs,            )
                                 )    CASE NO.
 6   VS.                         )    2:18-cv-05741 DMG PLA
                                 )
 7   ALEX AZAR, Secretary        )
     of U.S. Department of       )
 8   Health and Human            )
     Services, et al.,           )
 9                               )
          Defendants.            )
10

11

12

13                      DEPOSITION

14                         OF

15                    WHITNEY EICH

16      1700 7th Avenue, Seattle, Washington

17                 FEBRUARY 27, 2020

18

19

20                    CONFIDENTIAL

21

22

23

24  Reported by:
    Monna J. Nickeson, CRR, CLR, RPR, CRR
25  Job No. 177834
```

Page 41

1  visits?

2     A.   So once a week, YouthCare has case
3  staffing where we review 100 percent of the
4  cases in care.  Case staffing is weekly with
5  the GDIT case coordinator.  And so attending
6  the case staffing meeting is myself in the role
7  of assistant director, the case management team
8  at YouthCare, which is two case managers and a
9  case aide, and two -- our two mental health
10 therapists, and so we are providing updates to
11 the case coordinator on the reunification
12 status of each case, any pending documents or
13 challenges that may be happening in the case,
14 and then mental health therapists also provides
15 an update on the child's mental health for that
16 week.

17          While we're in those meetings with
18 the case coordinator, the interactions are
19 generally between myself, my team and the case
20 coordinator and the CFS is there, really, to
21 take notes, and ensure that the program is
22 following policy and report any concerns to
23 ORR.

24    Q.   So the CFS is a part of the case
25 staffing meetings?

1   client's beginning and ending educational

2   evaluation, like, any educational progress

3   notes that they may have, their attendance

4   sheets.  The kids have to do like a daily

5   report, which is just like writing a few

6   sentences like what they did each day, so

7   that's all in there.  The teacher also provides

8   a letter that is discharged with the client for

9   their sponsor and for the school district they

10  are eventually going to go to, explaining what

11  subjects they studied when they were in our

12  care.

13              Another section is the kids' legal

14  section.  So in the kids' legal section, we

15  have their notice to appear.  The kids also

16  have to sign an acknowledgement that they were

17  provided with legal resources within 24 hours

18  of admission.  And so when their initial case

19  management intake is completed within 24 hours,

20  case managers are also providing all of the

21  legal resources -- legal resource guide to

22  minors and they are initialing and

23  acknowledging that, and so that's kept there.

24              Also at discharge, clients are also

25  required to receive the same information, as

1    for an SIR, then whatever is applicable for the
2    SIR would also be included in the SIR.
3         Q.    Can you walk me through a little bit
4    of what happens after that initial meeting, if
5    there's been a case plan developed or things
6    like that?
7         A.    Uh-huh.  So in the initial meeting,
8    like I said, we're trying to contact family in
9    home country and we're trying to contact the
10   potential sponsor in the U.S.
11              It depends on which family member is
12   where, like, if the client's parents are both
13   in the U.S. or one parent is in the U.S. and
14   the parent is deceased, we may call directly
15   first the parent who is in the U.S.
16              But if the parent is in home
17   country, we will definitely try to contact the
18   parent first, let them know that their child is
19   here, you know, they made it to the U.S., they
20   are safe, they are in this shelter.  Tell them
21   a little bit about where their child is so they
22   can have peace of mind.
23              That's after we do like our
24   confirmation identity questions to make sure
25   that we're talking to the right person.  Then

Page 147

1  we ask -- prior to calling the parent, we ask
2  the client who their intended sponsor is, and
3  then we confirm that information with what the
4  parent says or a primary caregiver, if the
5  parents were not part of the child's life.
6           After that, then we call the
7  proposed sponsor and then confirm their
8  identity and explain to them very briefly what
9  the sponsorship process is and ask if they want
10 to be considered, at least initially, you know,
11 as a sponsor.  Generally, that answer is yes.
12          And so then we ask -- we inform them
13 that we have to send them some information.  We
14 ask them what is the best way to send that
15 information?  We can send it via email, if they
16 have an email address.  We can fax it or we can
17 send it just in the normal post, right.
18          So whatever is most convenient for
19 the sponsor, that's what we do.  Do you want me
20 the continue?
21      Q.    I think that's good for now.  We'll
22 come back to --
23      A.    To the whole process, yeah.  Okay.
24 But that's initially the steps that we take.
25      Q.    Are there any kids that you refer

1    I think they are able to have more success in
2    that small home-like environment.
3         Q.   Do you know -- in these cases
4    between four and five cases of a step-up, do
5    you know if the child at YouthCare received
6    notification prior to the step-up occurring
7    that they were going to be stepped up?
8         A.   Some -- well, what do you mean by
9    prior notification?  How much prior
10   notification do you mean?
11        Q.   Before they were transferred to the
12   facility.
13        A.   All the youth were notified prior to
14   their transfer.
15        Q.   And how long before the transfer?
16        A.   For kids who were transferred to
17   Friends of Youth, a few days, if not longer,
18   because typically Friends of Youth will have a
19   preplacement call with those youth because they
20   want to make sure that those youth understand
21   the program and are going to be
22   participating -- willing participants in that
23   program.
24              For Selma Carson Home, typically
25   notice is provided on the same day of the

 1    transfer.
 2         Q.    Do you know if any of the youth that
 3    were stepped up disagreed with the decision to
 4    be stepped up, or did they tell you that they
 5    disagreed with the decision to step them up?
 6         A.    I was not in the conversation where
 7    the news was shared with the minor that they
 8    were being stepped up, so I don't know what
 9    their response to that was.
10         Q.    Do you know if -- who provides legal
11    services to the youth?
12         A.    Kids in need for defense or KIND.
13         Q.    Do you know if they are informed of
14    the child's step-up?
15         A.    Yes, they are.
16         Q.    And do you know if there is any
17    right that a child has to challenge the
18    step-up?
19         A.    I don't know.
20         Q.    Or instead of challenging, do you
21    know of a right to request reconsideration for
22    their placement, perhaps?
23         A.    I don't know.
24         Q.    So we talked, you had four to five
25    kids that have been stepped up from YouthCare.

```
 1   a home study.  And so if a home study is
 2   required, the case manager will explain that to
 3   the sponsor, that a case manager or a social
 4   worker will be coming to their home to conduct
 5   the home study, and make sure that they are in
 6   agreement with that process.
 7              And so once -- potentially, if
 8   there's a home study, once the report is
 9   received, if there is no more concerns or if
10   all concerns have been mitigated and all
11   document is received, at that point we can
12   submit the case.
13        Q.    And by "submit the case," you mean
14   to bring all the documentation together and
15   send it to GDIT and the FFS?
16        A.    Yes.
17        Q.    You said case managers from
18   YouthCare stay in close contact with parents.
19   How often are -- not with parents -- sorry --
20   with sponsors.
21        A.    Uh-huh.
22        Q.    How often are they speaking with the
23   sponsors?
24        A.    Multiple times a week.
25        Q.    And at present, what is the caseload
```

1   recommendation to have PRS --
2       A.   Right.
3       Q.   -- is there a difference -- and
4   maybe I could use the term discretionary.
5       A.   Uh-huh.
6       Q.   Do case managers ever recommend
7   discretionary things for a sponsor to do before
8   a youth can be released to them?
9       A.   I'm not thinking of any examples
10  that would fall into that.  All of our cases
11  have the same release requirements based on the
12  category type.  If concerns arise during that
13  process, case managers will work to mitigate
14  those concerns with the sponsor prior to
15  release, or if there's a home study, and let's
16  say the home study, it can be positive, but
17  with recommendations, the home study -- or not
18  the home study -- the case manager will work
19  with the sponsor to fulfill those
20  recommendations which we believe are
21  appropriate, and then we will submit the case.
22           The home study can also be negative,
23  and we have been able to submit the case with a
24  negative home study as long as us and
25  ultimately the FFS believe that the concerns

1  have been mitigated.
2      Q.   Do you know if the requirements for
3  releasing a child to a sponsor are any
4  different, in your experience, if the child has
5  mental health needs?
6      A.   Depending on the type of mental
7  health needs that the minor has, a
8  discretionary home study may be recommended.
9      Q.   And that's because of the
10 minor's ---
11     A.   Mental health.
12     Q.   -- and not because of anything the
13 sponsor did, correct?
14     A.   Discretionary home studies can also
15 be recommended for things that sponsor did,
16 like I gave the example of their criminal
17 history.
18     Q.   But a discretionary home study, in
19 your example, can also be recommended when a
20 youth has mental health concerns?
21     A.   Yes.
22     Q.   Can you give an example of when that
23 might be?
24     A.   Yes.  So over this past year, we had
25 a case of a 13-year-old boy who I believe had

1      Q.    Sure.

2      A.    I don't know the specific number.

3      Q.    And we talked earlier that Kids in

4  Need of Defense, or KIND, is the legal service

5  provider for YouthCare; is that correct?

6      A.    That's correct.

7      Q.    To your knowledge, have the KIND

8  attorneys ever -- well, we talked about we had

9  four to five kids stepped up from YouthCare in

10 your time at YouthCare, correct?

11     A.    Yes.

12     Q.    To your knowledge, has a KIND

13 attorney ever advocated for a child with

14 respect to the step-up?

15     A.    Yes.

16     Q.    And what was the situation

17 surrounding that?

18     A.    In one of the clientS who we were

19 going to place in Friends of Youth Therapeutic

20 Staff Secure, an attorney expressed her

21 disagreement and anger with that decision to

22 us.

23     Q.    And --

24     A.    And reported or advocated that the

25 client should be placed in long-term foster

```
 1   care.
 2       Q.    And what was the result of that?
 3       A.    The client was transferred to
 4   Friends of Youth Therapeutic Staff Secure.
 5       Q.    Has it been your experience that
 6   KIND attorneys advocate for children with
 7   respect to their release to sponsors?
 8       A.    No.
 9       Q.    Are you aware of any instances in
10   which a KIND attorney or others was prevented
11   or impeded from advocating for a child in any
12   way?
13       A.    No.
14       Q.    Are you familiar with the "Remain in
15   Mexico" policy?
16       A.    Yes.
17       Q.    What do you know about it?
18       A.    That instead of being allowed to
19   enter into the U.S., many migrant families are
20   being returned to Mexico to await for their
21   asylum proceeding.
22       Q.    Has that affected the YouthCare
23   population?
24       A.    It has.
25       Q.    In what way?
```

1    Q.   And are you at all aware about a new
2  ORR directive in which the youth can no longer
3  be transferred to their attorney offices?
4    A.   No, I've never heard of that.
5    Q.   Do you know what corrective action
6  means?
7    A.   Yes.
8    Q.   What does it mean?
9    A.   In the context of this conversation,
10 it would be when the program has broken policy
11 and ORR can issue a corrective action.
12   Q.   And has that ever happened with
13 YouthCare?
14   A.   Yes.
15   Q.   How many times?
16   A.   Two to three times.
17   Q.   And do you remember what the
18 recommendations were following the corrective
19 actions?
20   A.   They were all related to runaways.
21 So that youth had run away from the program
22 when staff did not have direct line of sight of
23 them.
24   Q.   Were any of them related to the UAC
25 portal?

Confidential

Page 230

```
 1                    C E R T I F I C A T E

 2             STATE OF WASHINGTON  )
                                    )  ss.
 3             COUNTY OF BENTON     )

 4             This is to certify that I, Monna J.

 5   Nickeson, Certified Court Reporter in and for

 6   the State of Washington, residing at Richland,

 7   reported the within and foregoing deposition;

 8   said deposition being taken before me on the

 9   date herein set forth; that pursuant to RCW

10   5.28.010 the witness was first by me duly

11   sworn; that said examination was taken by me in

12   shorthand and thereafter under my supervision

13   transcribed, and that same is a full, true and

14   correct record of the testimony of said

15   witness, including all questions, answers and

16   objections, if any, of counsel, consisting of

17   231 pages.

18             I further certify that I am not a

19   relative or employee or attorney or counsel of

20   any of the parties, nor am I financially

21   interested in the outcome of the cause.

22             IN WITNESS WHEREOF I have set my

23   hand on March 10, 2020.
                              _Monna Nickeson_
24
             MONNA J. NICKESON, CLR, RPR, CRR
25           CCR NO. 3322
```