# DX-25

Deposition of Nidia Murray, December 17, 2019

Page 1

1              UNITED STATES DISTRICT COURT
2           IN THE CENTRAL DISTRICT OF CALIFORNIA
3
4    -------------------------------x
5    LUCAS R., et al
6                Plaintiffs,         CASE NO:
7           v.                       2:18-CV-05741-
8    ALEX AZAR, SECRETARY OF U.S.    DMGPLA
9    DEPARTMENT OF HEALTH AND HUMAN
10   SERVICES, INC.
11               Defendants.
12   -------------------------------x
13
14                   CONFIDENTIAL
15       TELEPHONIC DEPOSITION OF NIDIA MURRAY
16                  Houston, Texas
17                    9:14 a.m.
18
19
20
21
22
23   Reported by:
24   Paula J. Eliopoulos
25   JOB NO. 170999

1  Operations Coordinator, one of two in the Houston
2  area.
3     Q.    You're the director of what?
4     A.    Direct Operations Coordinator.
5     Q.    Before getting into that, have you
6  ever worked for the government?
7     A.    No.
8     Q.    You said you took a new position in
9  April of 2018, of this year?
10    A.    Of 2019.
11    Q.    2019. Sorry.
12    A.    Yes.
13    Q.    Before taking that new position, did
14 you hold the same position at GDIT up until that
15 point?
16    A.    Yes.
17    Q.    And what was that?
18    A.    Case coordinator.
19    Q.    And what were your job
20 responsibilities as a case coordinator?
21    A.    The main responsibility is to provide
22 an independent recommendation to ORR on the
23 reunification of minors or transfer of minors.
24    Q.    Let me back up really quick.
25    A.    Yes.

Page 63

1  that their case coordinators are knowledgable of
2  the policy?
3      A.    During the calls we're often reminded
4  to make sure that we are reading policy, that
5  we're following up with any changes or that we
6  refer to policy when there are any questions.
7      Q.    Do you know if ORR expects case
8  coordinators to be knowledgable and to comply with
9  ORR policies?
10     A.    That is the expectation.  I do not
11 know if it's written anywhere, but yes.
12     Q.    Do you know if and how ORR tracks
13 compliance with that expectation?
14     A.    I don't know.
15         MS. CHAPUIS:  I don't want to
16     interrupt your flow, but whenever you get to
17     the end of a topic, we've been going for an
18     hour and half.
19         MR. SCAIFE:  Sure.  We can take a
20     break shortly.  Just a little bit longer.
21     Q.    When the initial training on ORR
22 policies, is there -- is the attendee or the
23 trainee required to do anything other than show up
24 and listen?
25     A.    We just show up and listen.

1 that's determining whether that minor is a danger
2 to self or others.
3     Q. And why does that happen? Why is that
4 important in the analysis?
5     A. Because a child that is still
6 considered to be a danger to self or others should
7 not be placed in a -- let's say a shelter or even
8 in a shelter environment where he could, where he
9 or she could hurt himself or others.
10     As far as the step up, the
11 psychiatrist recommendation is needed. Because a
12 child who is not a danger to self or others,
13 according to policy, should not be placed in RTC.
14     Q. Where should a child that is a danger
15 to self or others be placed, in your opinion?
16     A. In my opinion? It's a very broad
17 question. I think it really would depend.
18     With the -- I think it would -- I
19 think it would depend. Yeah. I don't know that
20 I -- that's a very broad question. Can you
21 rephrase it?
22     Q. When you say you think it would
23 depend -- depend on what?
24     A. Mental health. Behavior. There are
25 sexual predators. There are just different

Page 124

1  Q. Do you know why none of those three
2  parties could submit evidence to the case
3  coordinator?
4  A. The -- let's start with the child.
5  Q. Sure.
6  A. The child actually -- if the child
7  ever wants to speak to the case coordinator, they
8  can certainly do that. The case coordinator does
9  speak to the child. So I would correct that; that
10 the child is able to speak to the case
11 coordinator. And so information can be shared
12 verbally.
13          No documents that I've ever seen.
14 Q. Okay.
15 A. As far as the sponsor, the sponsor's
16 main contact is the case manager at the facility.
17 And so we only get information from the case
18 manager regarding the sponsor.
19          And as far as attorneys, we just don't
20 have contact with the attorneys. I know that even
21 case managers at times were just trying to get
22 information. Like, what else needs to be happen?
23 Is there legal relief? What is going on? And the
24 attorneys are usually -- of course, there's, you
25 know, confidential information.

Page 135

1   media searches for anything like that that
2   might -- but that's -- I've seen the program do
3   that before, when they're trying to gather
4   additional information or they're having trouble
5   locating someone.
6        Q.    What's the relevance of the social --
7   the social media and the case coordinator's
8   recommendation whether to transfer a child?
9        A.    Oh.  To transfer a child?  It wouldn't
10  really mean anything.
11       Q.    What about to release a child to his
12  sponsor?
13       A.    A social media search my be helpful
14  for the program so that they can find a sponsor.
15  Or if they've had difficulty finding someone.
16  But -- that, with ORR approval, will be used.  But
17  that's about -- yeah.  That's really -- the case
18  coordinator really won't take that into
19  consideration for relief.
20       Q.    Okay.  And I believe you said a couple
21  minutes ago that the case coordinator can meet
22  with the child.  Is that correct?
23       A.    Yes.
24       Q.    If the case coordinator was to meet
25  with the child, when would that happen?

1    A.    At any point during their stay in ORR.
2  I mean, it could be from the very beginning, which
3  we try to avoid that.  Any time.  From the
4  beginning to even a couple of days before release,
5  once we're providing a final recommendation.
6    Q.    Okay.  And so the meeting with the
7  child would likely occur before the case
8  coordinator gave the recommendation?
9    A.    Yes.
10    Q.    Okay.  Who initiates the meeting
11  between the child and the case coordinator?
12    A.    Typically it's the case coordinator
13  that initiates that.
14    Q.    And what's the purpose of the meeting?
15    A.    At one point we were just interviewing
16  all the kids.  That has changed a little bit, and
17  we are now really focusing on interviewing kids
18  where there may be additional questions or any
19  concerns, red flags.  And so those minors who go
20  in an interview, we have a better sense of what's
21  going on.
22    Q.    Have you ever interviewed a child when
23  you were a case coordinator?
24    A.    Yes.
25    Q.    When you were a case coordinator, did

Page 212

1   A.   I don't think so.
2   Q.   Pardon?
3   A.   I don't recall any that have been
4   released without a home study.
5   Q.   Is a home study required for children
6   placed at Shiloh?
7   A.   Yes.  Since those minors have been
8   diagnosed with mental health illness.
9   Q.   So every child placed at Shiloh has a
10  TVPRA-mandated home study?
11  A.   If they get assigned a sponsor, yes.
12  Q.   Okay.
13  A.   Unless -- unless the sponsor is denied
14  for whatever reason before a home study is
15  completed.
16  Q.   And in that situation there just
17  wouldn't be a home study?
18  A.   Right.  It would just be a denial.
19  Q.   Do you interview the child -- or do
20  case coordinators interview the child as part of
21  the reunification process?
22  A.   At times.  Not every child, but yes.
23  Q.   What would be the reason for the
24  interview?
25  A.   Typically if there are concerns with

Page 213

1  the child or red flags or the case coordinator
2  wants more information.  If there's a history of
3  anything.  They may go ahead and interview the
4  child.
5       Q.     Have you ever requested additional --
6  or as the case coordinator have you ever requested
7  additional information in order to assess whether
8  a proposed sponsor is appropriate?
9       A.     Yes.
10      Q.     What information?
11      A.     Court documents.  Criminal charges.
12 CAN checks.  Yeah.  Anything that might help just
13 make a better decision.
14             Sometimes you can further question the
15 sponsor regarding their relationship with the
16 minor or how they know them, especially on those
17 cases where the sponsor is unrelated and there
18 were maybe trafficking concerns.
19      Q.     When you were a case coordinator, did
20 you ever recommend a child not be released?
21      A.     Yes.  I'm sure.
22      Q.     How often?  I mean, do you remember
23 how often or what percentage?
24      A.     Not very often.  It was not very often
25 at all.  But I know that it happened.

1    A.    Perhaps issues with substance abuse,
2    where they're conducting a home visit -- it's
3    happened -- and evidence of drug paraphernalia.
4    That may be a little more difficult to resolve.
5    Q.    Who makes the decision whether the
6    sponsor is given the opportunity to fix the issues
7    that the home study raises?
8    A.    Those cases are typically staffed with
9    a case coordinator and the case management team.
10   It's ultimately the FFS to determine whether --
11   whether the issues that were found can be
12   resolved.  Criminal charges and convictions and
13   things like that.  And there's just no -- no way
14   around it.  Then that -- it could be that
15   that's -- the determination is made to go ahead
16   and provide a recommendation.  A lot of time FFS
17   will say go ahead and provide your recommendation.
18   Q.    Recommendation whether to release or
19   not?
20   A.    Right.
21   Q.    Does the case coordinator have any
22   input in whether a sponsor is given an opportunity
23   to remedy issues?
24   A.    Yeah.
25   Q.    What kind of input does the case

1  coordinator have?
2     A.    There have been situations in which
3  the case coordinator has gone back and said "We do
4  not believe that they should be denied at this
5  time. We feel that the sponsor should be given an
6  opportunity to remedy these conditions or resolve
7  these issues."
8     Q.    In your experience, has the case
9  coordinator ever recommended that a sponsor be
10 allowed to fix various issues but the sponsor was
11 not given that opportunity by the FFS?
12    A.    I can't recall. Because it seems like
13 even lately the ones we've had like that, the FFS
14 has said yes, absolutely; the sponsor needs to go
15 ahead and be given the opportunity to resolve the
16 issue.
17    Q.    How long does a sponsor have to remedy
18 issues raised by the home study?
19    A.    They should be given adequate time.
20    Q.    Who makes that decision how much time
21 should be given?
22    A.    Again, it's -- nobody really makes
23 that decision. The sponsor is given the
24 opportunity. And they're either going to do it or
25 not. If it's taking a long time or the sponsor is

Page 242

1  not compliant, in this case it would be re-staffed
2  to determine if we should continue or not.
3       Q.    How does FFS or the case manager
4  determine that the issues raised by the home study
5  were remedied by the sponsor?
6       A.    Many times there's a home study
7  addendum and a home study worker goes back out to
8  them.
9       Q.    And what does the addendum, the home
10 study addendum cover?
11      A.    Typically it's just the issues that
12 were listed by that home study worker.  So that
13 home study will have perhaps a list of things that
14 they thought wrong or they feel are concerns.  And
15 so the home study worker will address those
16 concerns in that home study addendum.
17      Q.    Are you aware of any situation where
18 the home study addendum, they did the addendum and
19 that raised new issues that were not raised in the
20 first home study?
21      A.    I don't know.  But I know that there
22 have been situations where the same issues come up
23 again.  That's just the way it is.
24      Q.    If a sponsor is not approved, do you
25 know if the child has an opportunity to challenge

Page 286

CERTIFICATE

STATE OF MARYLAND )

COUNTY OF BALTIMORE)

        I, PAULA J. ELIOPOULOS, a Notary Public within and for the State of Maryland, do hereby certify that NIDIA MURRAY, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

        I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

        In witness whereof, I have hereunto set my hand this 2nd day of January, 2020.

*Paula J. Eliopoulos Weigand*

_____

PAULA J. ELIOPOULOS

CONFIDENTIAL

Page 287

1              CERTIFICATE

2  STATE OF NEW JERSEY    )

3  COUNTY OF MORRIS       )

4           I, JANET HAMILTON, a Registered

5  Professional Reporter and New Jersey Notary

6  Public, do hereby certify that:

7           I joined this deposition telephonically

8  after the lunch recess, at 12:41 p.m. CST, and

9  ended my reporting at 5:45 p.m. CST, at which time

10 the deposition was concluded.

11          I further certify that I am not related

12 to any of the parties to this action by blood or

13 marriage and that I am in no way interested in the

14 outcome of this matter.

15          In witness whereof, I have hereunto set

16 my hand this 2nd day of January, 2020.

17

18

19          _____

             JANET HALL, RPR, CRC, FPR, NJCCR
20           NJCCR License 30X100240200
             Expires 6/30/2020

21

22

23

24

25