# DX-26

Deposition of Yesenia Heath, February 26, 2020

1          UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF CALIFORNIA
2                WESTERN DIVISION
3

   LUCAS R., et al.,          )
4                             )
                              )
5       Plaintiffs,           )
                              )    CASE NO.
6       vs.                   )    2:18-cv-05741 DMG PLA
                              )
7   ALEX AZAR, Secretary      )    CONFIDENTIAL
    of U.S. Department of     )
8   Health and Human          )
    Services, et al.,         )
9                             )
        Defendants.           )
10
11
12
13
14                  DEPOSITION
15                     OF
16               YESENIA HEATH
17    1700 7th Avenue, Seattle, Washington
18             FEBRUARY 26, 2020
19
20
21               CONFIDENTIAL
22
23
24  Reported by:
    Monna J. Nickeson, CRR, CLR, RPR, CRR
25  Job No. 176785

Confidential

Page 20

1     A.     Yes.

2     Q.     Who supervises you?

3     A.     Deborah Thomas.

4     Q.     And what is her title?

5     A.     Federal field specialist supervisor,

6  FFSS.

7     Q.     And sometimes also referred to as

8  supervisory FFS --

9     A.     Yes.

10     Q.     -- or is that different?

11     A.     I think it's the same.

12     Q.     How often do you communicate with

13  your supervisor?

14     A.     At least once a week.  Minimum once

15  a week.

16     Q.     And how does your supervisor ensure

17  you're fulfilling your job responsibilities?

18     A.     We have weekly staffings with the

19  region, and we also have individual staffings.

20  We also talk about what are the trends in the

21  regions, and we discussed what our -- what, you

22  know, what should be done.  So I get a lot of

23  guidance from her.

24     Q.     And guidance, meaning if you have a

25  question --

Confidential

Page 49

1      A.    No.   There is a clinician at each

2  facility whose role has to be a master's in

3  clinical work and see the kids once a week, and

4  they provide an assessment that let us know

5  about the welfare.

6           So I see the assessments, but I

7  don't meet with the clinicians.  And when the

8  child is deemed that he needs more than just

9  ongoing counseling, they make their

10 recommendations to send the kid to a

11 psychologist or a psychiatrist, and then we get

12 the assessment.

13          I never speak with the psychiatrist

14 or the psychologist directly.

15     Q.    Do you ever speak to prospective

16 sponsors?

17     A.    No.

18     Q.    You've never spoken to a potential

19 sponsor?

20     A.    No.

21     Q.    Have you ever spoken to a child's

22 attorney?

23     A.    Yes.

24     Q.    About how many times do you recall

25 in the last ten years?

Confidential

Page 50

1          A.     I don't know.  They come to my

2     stakeholder's meetings.  So a few times.  I

3     mean, it's not like, you know.

4          Q.     What are the stakeholder's meetings?

5          A.     The stakeholder meeting is where we

6     get all the stakeholders together that are

7     vested in working with the children and care at

8     ORR.  So the program directors, the consulates,

9     the children attorneys, the immigration

10    officers, representatives, we all come

11    together, court administrator for immigration,

12    we all come together every three or four months

13    to talk about how to best serve our children

14    and get them moving through the process, what

15    are the hiccups that we're seeing, what are the

16    trends; and to communicate to each other in a

17    manner that's very friendly as to how to be

18    able to kind of work together and help make

19    each others' jobs easier.

20         Q.     Have you ever spoken to an attorney

21    about a specific child?

22         A.     No.  I don't -- I can't call and

23    say, you know, "Oh, tell you" -- that's -- no.

24         Q.     Have they ever reached out to you

25    regarding a child's case?

Confidential

Page 73

1    those recommendations on whether the child is

2    appropriate for Secure placement?

3         A.    I have to staff it with my

4    supervisor and then make a decision.

5         Q.    And the same for placing a child in

6    Therapeutic Staff Secure?

7         A.    Yes.

8         Q.    And Residential Treatment Center?

9         A.    Yes.

10        Q.    You've mentioned that there are

11   multiple people involved in a step-up decision,

12   starting with the case manager.

13             What is the case manager's goal?

14        A.    The case manager will identify they

15   are in a case staffing to the case coordinator

16   that a minor -- that a minor has not been

17   following program rules, that there's been some

18   consistency with issues that have come up.  She

19   will discuss the clinician's input in terms of

20   what that child's behavior has been, what

21   different attempts of behavior modification

22   plans they had tried to put into place in order

23   to help the child remain in care, and how long

24   they have been attempting it.

25             If that hasn't worked, then they

Page 74

1    say, "We feel that this program can no longer

2    meet the needs of the child.  We need to step

3    him up to a different placement."

4           Then the case coordinator will come

5    and staff that with me, and I'll say, "Okay.

6    Let me see what the -- the transfer request,

7    let's put a transfer request together."

8           And then I will discuss it with my

9    supervisor.  And then my supervisor and I will

10   come to an agreement as to whether that child

11   should be stepped up or not.

12        Q.    How long does that process or

13   decision-making take?

14        A.    It's not overnight.  It can take

15   between two to -- two weeks to four weeks.

16   Sometimes even longer.

17        Q.    So let's break it down a little bit.

18   A case manager and the clinician prepare a

19   request for step-up or a recommendation?

20        A.    Uh-huh.

21        Q.    And they send it to the case

22   coordinator?

23        A.    Uh-huh.

24        Q.    And how much time does the case

25   coordinator have to make a decision before she

Confidential

Page 75

1    sends it to you?

2         A.    I believe she has up to three days.

3    But she staffs it with me.

4         Q.    And then once you get the

5    recommendations from the care provider and the

6    case coordinators, how much time do you have to

7    make a decision?

8         A.    It depends on the case.

9         Q.    What's the shortest amount of time

10   that it has taken you to make a step-up

11   decision?

12        A.    Two days.

13        Q.    And what's the longest?

14        A.    About four to six weeks.  And that's

15   why I said it depends on the case.

16        Q.    And during this time frame, for

17   example, four to six weeks, are the children

18   informed that they are being considered for

19   step-up?

20        A.    Yes.

21        Q.    Is that an ORR policy requirement

22   that they be informed?

23        A.    Yes.

24        Q.    Do you know how much time they

25   have -- how much time before step-up occurs

Confidential

Page 76

1    that a child has to be informed?

2         A.    I think it's 24 hours.  I would have

3    to look it up in the policy, but I believe it's

4    24 hours.

5         Q.    But your understanding is that

6    somewhere in the policy it indicates that the

7    child be informed prior to step-up?

8         A.    Yes.

9         Q.    Aside from your understanding that

10   the child is notified, is the child involved in

11   the staffing of a step-up decision?

12        A.    Yes.

13        Q.    Is that always the case?

14        A.    When it's feasible, yes.

15        Q.    And what does that look like?

16        A.    Do you want me to give you an

17   example?

18        Q.    That would be awesome.

19        A.    If a child begins to not follow the

20   rules, be very disturbing, not getting up, not

21   being consistent, they will meet with the case

22   manager and clinician and they will talk about,

23   "We need you to focus, we need this goal this

24   week."  So they have a target plan and a

25   behavior modification plan.  And then they will

Confidential

Page 77

1    adapt to that, and they'll send it to me and

2    say, "This is what we are working on this week.

3    We attempted A, B and C."

4            After continually working with that,

5    he knows that the reason why we're working on

6    that is because they are potentially going to

7    be transferred to a different setting.  At

8    times kids will be, like, "Send me now.  I

9    don't want to be here."  And at times they'll

10   be, like, "Oh, okay, no, I want to do it."

11           But my goal is to attempt several

12   behavior modification plans with the kids

13   before they actually get stepped up to a

14   different level.  So that's why I say it

15   depends.  Most of the time the kids are aware

16   that it's going to happen.

17       Q.    How do you know that the kids are

18   aware?  Are you seeking --

19           (Parties speaking simultaneously.)

20       A.    The case manager and the clinician

21   are telling --

22           (The reporter requested

23       clarification.)

24       A.    That they are going to be moved.

25   The case manager and the clinician are

Confidential

Page 126

1    receives the Notice of Placement every 30 days.

2              Does the Notice of Placement change

3    every 30 days?

4        A.   Yes.

5        Q.   There's new information --

6        A.   Yes.

7        Q.   -- included?

8        A.   Yes.

9        Q.   Is there a 90-day review of

10   placement?

11       A.   It's every 30 days.

12       Q.   Are you aware if there's a different

13   review that happens after a child has been

14   there for 90 days?

15       A.   No, I'm not aware.

16       Q.   What happens if the child doesn't

17   receive a Notice of Placement?

18       A.   We get tracked.

19       Q.   By who?

20       A.   There's an email that comes from

21   somebody at headquarters who reviews the Staff

22   Secure placements and says, "Hey, it's been

23   over 30 days, and this hasn't been uploaded.

24   Where is it?  Please review with your staff."

25       Q.   And those -- they are emails that

Confidential

Page 169

1   study, you know, like wonderful sponsor, has

2   everything in place, it can be, like, they can

3   get that this morning, and I can get in the

4   evening, you know, because it goes bam, bam,

5   bam.  But if it's not like that and takes more

6   time, it can be up to a week.

7        Q.    A week is the longest you have seen

8   between a case manager receiving the report and

9   providing the recommendation --

10        A.    Longer, depending on how quickly the

11   sponsor meets the stipulations on the home

12   study for them to receive the kid.

13        Q.    So you don't hear about the case

14   manager's recommendation until some form of

15   mitigation has occurred?

16        A.    I hear right away because I staff

17   cases with my case coordinator on a weekly

18   basis.  My case manager will say, "Hey,

19   Yesenia, remember the home study it said that

20   the sponsor had to get parenting class?"

21   "Uh-huh."  "Well, the sponsor's saying that

22   they can't because it doesn't go with their

23   schedule," la, la, la, right?  And I go, "Can

24   we try and taper -- what can we put into

25   place?"

Confidential

1          So I'm aware of it as we're trying

2     to mitigate until we're able to release the

3     kid.  So it's a three-prong, ongoing process.

4     That's the best way I can describe it.

5          Q.    Good description.

6                Does the case coordinator have to

7     wait until the case manager makes his or her

8     recommendation?

9          A.    Yes.

10         Q.    So the case manager's the only one

11    really working with the potential sponsor on

12    any mitigation --

13         A.    Yes.

14         Q.    -- per the home study report?

15         A.    Yes.

16         Q.    The case coordinator isn't working

17    with the sponsor?

18         A.    No.

19         Q.    What is the longest amount of time

20    you have seen it take from a home study report

21    to a final recommendation from a case manager?

22         A.    I don't remember, but there's been

23    cases that have taken a while.

24         Q.    A while:  A couple weeks, a month,

25    several months, a year?

Confidential

Page 213

my ten years, it was very often because we

didn't have that many Staff Secure programs

back then.

Recently, the capacity for Staff

Secures went up, so that has not been an issue

in the last two to three years.

Q.    Are children's mental health needs

considered in a step-down process?

A.    Yes.

Q.    How?

A.    If we have a minor in a Therapeutic

Staff Secure facility like Friends of Youth,

and we know that he would benefit from a

therapeutic foster home, that would be the

recommendation.  So we always are looking at a

placement that's going to meet the kids's

mental health, as well as the rest of his

needs.

Q.    Have you experienced difficulties

stepping children down from Therapeutic Staff

Secure?

A.    Yes.

Q.    Can you explain those difficulties?

A.    It is challenging to find

therapeutic homes willing to take kids who have

Confidential

1      Q.     Who notifies the child's family if

2    they were not approved for step-down?

3      A.     The case manager.

4      Q.     When is the family notified?

5      A.     I think as soon as it happens.

6      Q.     So we talked about ways that a child

7    can challenge their current placement.

8              Can a child present any additional

9    information to you that you can take into

10   consideration for step-down?

11     A.     Always.

12     Q.     Has that ever happened?

13     A.     No.

14     Q.     Do the children know they can do

15   this?

16     A.     I believe so.

17     Q.     Why do you believe that?

18     A.     Because the case manager is supposed

19   to tell them that they are allowed to do that.

20     Q.     Is that a requirement that ORR has

21   for the case managers?

22     A.     Yes.

23            MS. STEVENSON:  Jonathan Wall

24        dropped off.

25     Q.     You said that when a child is

Confidential

1    informed that a step-down is not approved, the

2    case manager notifies the child?

3         A.    Yes.

4         Q.    And you said signs a form?

5         A.    The NOP form.

6         Q.    The NOP form?

7         A.    Yes.

8         Q.    And so the Notice of Placement is

9    reviewed with the child when they are denied

10   step-down?

11        A.    Yes.

12        Q.    And that form is uploaded to the UAC

13   portal?

14        A.    Yes.

15        Q.    Or is supposed to be?

16        A.    Yes.

17             MS. FELT:  Let's take a break.

18             (A recess was taken.)

19   BY MS. FELT:

20        Q.    Back on the record.

21        A.    Yes.

22        Q.    What is the step-by-step process for

23   children to be released to a sponsor?

24        A.    Okay.  I can tell you what my step

25   is.  I don't know the other steps that the case

Confidential

Page 238

1    factors.  That's why it can't be just one

2    thing.  It's going to be a holistic approach to

3    the best outcome for the child.

4         Q.    Do you make decisions regarding Post

5    Release Services?

6         A.    It's part of the policy, so it's --

7    I'm not making the decisions.  Sometimes it's

8    pretty clear-cut.  The care manager and

9    clinician and the case coordinator will say,

10   "Hey, Yesenia, this is a Post Release case."

11   The only time I'm involved in the decision is

12   when they are not in agreement.

13        Q.    So the case manager and the

14   clinicians decide whether or not Post Release

15   Services are necessary?

16        A.    Yes.

17        Q.    And they don't need your approval?

18        A.    Well, they tell the case coordinator

19   and the case coordinator tells me, and then I

20   review it and approve it.  So, yes, I'm always

21   approving the decisions at the end.

22              But they make the decisions

23   originally because they are the ones that have

24   the one-on-one contact with the kids.

25        Q.    Does a child need to be eligible to

1  be stepped down in order to be released to a

2  sponsor?

3       A.    No.

4       Q.    Is the child more likely to be

5  reunified with the sponsor if they are eligible

6  to be stepped down?

7       A.    No.  There's two independent

8  processes.

9       Q.    So it's not more difficult to

10  release a child from a Staff Secure?

11      A.    No.  I've had kids be released from

12  my Staff Secure program in as little as two

13  weeks.  So it really is dependent on how

14  quickly the sponsor gives me the paperwork back

15  so they can give me the recommendation.

16      Q.    Are there requirements for releasing

17  a child to a sponsor any different if a child

18  has a disability?

19      A.    Yes.

20      Q.    How so?

21      A.    Under the TVPRA, it states if a

22  child has a disability that impacts his daily

23  living skills, there must be a home study.

24      Q.    Any other requirements of sponsors

25  receiving a child with a disability?

Confidential

Page 241

1     Q.     Has that always been the policy?

2     A.     No.

3     Q.     When did it change?

4     A.     A couple years ago.

5     Q.     Who else is involved in deciding

6  whether to release a child to a sponsor, other

7  than the case manager, clinician, case

8  coordinator and yourself?

9     A.     Only when we have a minor that we

10  are not in agreement on the release decision,

11  we elevate the decision to the supervisor, who

12  then, in turn, can elevate it to her supervisor

13  at headquarters to make that decision.  It can

14  go all the way to the director.

15     Q.     Would a child's attorney be involved

16  in the decision for release?

17     A.     No.

18     Q.     Would a child be involved in the

19  decision?

20     A.     Every step of the process.

21     Q.     In what way?

22     A.     Because he's the one providing the

23  information on the sponsor, so he's the one

24  saying, "Yes, I know my uncle.  He used to do

25  this, and I want to live with my uncle," or, "I

Confidential

Page 242

1    don't live with my uncle because my uncle used

2    to be --" you know, like, yeah, so the child is

3    aware of -- and the case manager lets the child

4    know every step of the process until he gets

5    released.

6        Q.    The child doesn't communicate that

7    direct -- all that information directly to you?

8        A.    No.

9        Q.    The child communicates that to the

10   case manager?

11       A.    And the clinician.

12       Q.    And your basis of this understanding

13   is from what the case manager and the

14   clinicians have told you the child has

15   indicated --

16       A.    Yes.

17       Q.    -- or stated?

18             I think you indicated earlier that

19   there were instances where clinicians and case

20   managers might disagree with the case

21   coordinator?

22       A.    Yes.

23       Q.    Have you ever seen instances where

24   the clinician and the case managers disagree?

25       A.    Yes.  Well, clinician with the case

Confidential

Page 298

1                   C E R T I F I C A T E

2    STATE OF WASHINGTON          )

                                  )

3    COUNTY OF BENTON             )

4              I, Monna J. Nickeson, a Certified

5    Court Reporter within and for the State of

6    Washington, do hereby certify:

7              YESENIA HEATH, the witness whose

8    deposition is hereinbefore set forth, was duly

9    sworn by me and that such deposition is a true

10   record of the testimony given by such witness.

11             I further certify that I am not

12   related to any of the parties to this action by

13   blood or marriage; and that I am in no way

14   interested in the outcome of this matter.

15             IN WITNESS WHEREOF, I have hereunto

16   set my hand this day, March 11th, 2020.

17

18

19                    *Monna Nickeson*

20   _____

     MONNA J. NICKESON, CRR, CLR, RPR, CCR 3322

21

22

23

24

25