# DX-28

Deposition of Elicia Smith, November 22, 2019

Page 1

1  UNITED STATES DISTRICT COURT
2  CENTRAL DISTRICT OF CALIFORNIA
3  WESTERN DIVISION
4  _____
5  LUCAS R., et al.,                )
                                     )
6          Plaintiffs,               )
                                     )
7     v.                             )  Case No.
                                     )  2:18-CV-05741-DMG-PLA
8  ALEX AZAR, Secretary of U.S.      )
   Department of Health and Human    )
9  Services, et al.,                 )
                                     )
10                                   )
                                     )
11         Defendants.                )
                                     )
12 _____)
13
14
15     Confidential Pursuant to the Protective Order
16   Deposition of U.S. Department of Health and Human
17  Services, By and through its Designated Representative,
18          DEPOSITION OF ELICIA F. SMITH
19             San Francisco, California
20             Friday, November 22, 2019
21
22
23 Reported Stenographically by:
   MARY J. GOFF
24 CSR No. 13427
   Job No. 170746
25 PAGES 1-225

1    Q    When you say "expectation of the care
2    providers to be reviewing," can you help me out on
3    understanding what that means?
4    A    The case managers need to facilitate the
5    conversation on or before the 30 -- within that 30-day
6    timeline, they need to have a staffing conversation to
7    have clear documentation in place why the child is being
8    maintained in either a staff secure or a secure
9    facility.
10   Q    And that's within -- did I understand that
11   to -- your testimony to be the first 30 days that the
12   child is in that facility?
13   A    No, that's not my testimony.
14   Q    Okay.
15   A    It's when the child arrives, they need to be
16   provided notification of where they are and why and then
17   every 30 days thereafter.
18   Q    Right.  They get a new notification of
19   placement?
20   A    Yes.
21   Q    And is that referred to with the acronym NOP?
22   A    Yes.
23   Q    Okay.  And so when we talked about case
24   managers needing to facilitate the conversation, I
25   understood your answer to be a staffing conversation; is

Page 45

1  in the portal or how else would you obtain it or you
2  just don't need it?
3      A    The care provider is going to be the one in
4  direct communication with the medical care provider.  So
5  if there was a situation that they needed my assistance
6  in getting something from a doctor, I would call, but...
7      Q    Okay.  And do you ever have communication
8  directly with family members or potential sponsors?
9      A    No.
10     Q    And is that typically the case manager's role
11 as well?
12     A    Yes.
13     Q    Does anyone other than the case manager
14 typically routinely communicate with potential sponsors?
15     A    It's mainly the case manager.  Sometimes
16 possibly the clinician, if they're participating in
17 family sessions.
18     Q    What about the GDIT case coordinator?  Would
19 they have routine communication with the family members?
20     A    They do not contact the family members.
21     Q    Okay.  Do you communicate with attorneys for
22 the children or the sponsors?
23     A    I communicate with the Vera grantee attorneys
24 here.
25     Q    And what do you communicate with them about?

CONFIDENTIAL

Page 46

1  A    They reach out to me generally with any
2  concerns or issues that they have about specific cases.
3  They also keep me updated on immigration court and
4  general regional issues here in San Francisco that may
5  affect the legal proceedings for the kids.
6  Q    When you communicate with the Vera grantee
7  attorneys about specific children's cases, do you enter
8  that information into the UAC portal?
9  A    No.
10 Q    Why not?
11 A    I have never been asked to do so.
12 Q    Okay.  Are there other reasons that you
13 communicate with the Vera grantee attorneys, other than
14 the ones you have told me about?
15 A    I don't think so.
16 Q    I'm going to -- when a minor is going to be
17 transferred or stepped up to a restrictive setting, who
18 all do you communicate with from ORR about that?
19 A    As the federal field specialist, who do I
20 communicate with?
21 Q    Yep.
22 A    If I am in agreement with a step-up decision,
23 I will approve it in the portal once the child is
24 accepted at the facility that we have referred them to.
25 That's the only notification that I...

1  attorney contesting a transfer.
2      Q   Okay.  I mean, the only way they would be able
3  to contest it is if they knew about it beforehand,
4  correct?
5      A   Yes.
6      Q   And you don't recall it ever being a request
7  to transfer a youth locally so that the attorney can
8  continue their legal representation of the youth?
9      A   The care providers and the attorneys are in
10 regular communication.  And the attorneys are made aware
11 when a child is -- when the care provider is in the
12 process of making a recommendation for transfer, so
13 that's not going to be a surprise.
14         But the notification that a child physically
15 has been transferred, I think there's -- I don't know
16 exactly how it's laid out in policy, but I think they
17 have to be notified within 24 hours.
18     Q   So then to the extent that the attorney is
19 involved in the transfer decision at all, it would be
20 through a communication with the case manager?
21     A   Yeah, if they have -- as you had suggested, if
22 they wanted to, you know, request or consider keeping
23 the child in Northern California to continue to be able
24 to work with them, then that would be included in the
25 transfer recommendation for the attorneys.

1  Q    Okay.  And so the attorney would typically
2  have that communication with the case manager, not with
3  the FFS?
4  A    Correct --
5  Q    Okay.
6  A    -- yeah.  It would be included as part of
7  their legal update in the transfer recommendation.
8  Q    Got it.  Can a kid be stepped down directly
9  from secure, staff secure to long-term foster care?
10 A    I don't think so.
11 Q    And why is that?
12 A    Long-term foster care in the least restrictive
13 setting, so I believe the foster care providers would
14 want the child to be coming from a shelter, the lower
15 level of care.
16 Q    So the reason that that can't happen is
17 because the long-term foster care providers won't accept
18 a child from other than a shelter, in your
19 understanding?
20 A    I don't know if that's the only reason, but I
21 don't believe we would be successful in placing a child
22 in long-term foster care from staff secure.
23 Q    Okay.  Is it -- is there something in the
24 policy that prohibits that?
25 A    I'm not sure.

1    A    Not in the final decision to step up or down.
2    Q    What would the child's involvement be in the
3    step-up determination?
4    A    The case manager and the clinician would be in
5    regular communication with the -- with the child and
6    sponsor, if there is one, about the behaviors.
7         The step-up wouldn't just happen out of
8    nowhere. There would be behaviors and rationale for
9    meeting a step-up criteria, so the child would have been
10   probably on a behavioral plan or working with their case
11   manager to try to mitigate the need to be stepped up.
12   Q    So that plan might look like: Behave a
13   certain way or you're going to be stepped up?
14   A    Just being able to identify the triggers that
15   are making you aggressive or -- it would be different
16   for individual...
17   Q    Okay. If everyone involved in the step-up
18   determination doesn't agree, who makes the final
19   decision about a step-up?
20   A    The FFS.
21   Q    Okay. How do the people involved in making
22   step-up determinations, you know, arrive at the
23   determination of whether the restrictive placement is
24   necessary?
25   A    I'm not sure how the individual case managers

Page 109

1  A   Yes.
2  Q   Okay.  The -- so say it's been two years or
3  however long it's been.  Every step-up to staff secure
4  and secure that you have been involved in, since that
5  time you have seen an OYAS assessment on the kid before
6  that step-up was completed?
7  A   I'm not sure if it was included in every one,
8  but it's definitely a regular part of their assessment
9  tool kit since it was brought into --
10 Q   Is it --
11 A   -- the policy.
12 Q   -- required by the policy?
13 A   I believe that it is, yes.
14 Q   Are children's mental health needs considered
15 in the step-up process?
16 A   The kid's mental health needs are considered
17 for all of the placement recommendations.
18 Q   In what way?
19 A   The clinician provides updates to their mental
20 health -- or to their assessments.  And any
21 psychological or psychiatric appointments or assessments
22 or reports are all included in concluding a placement
23 recommendation for a kid.
24 Q   So that's input that the clinician gets from
25 their own involvement with the kid or from the

1  coordinator sends the transfer request to the lower
2  level of care facility.
3          She sends it to our colleagues who cover her
4  case coordinator -- case coordinator colleagues who
5  cover the lower level of care.
6      Q   Okay.  And what's your involvement, if any, in
7  the step-down process for kids at Yolo?
8      A   I approve the -- that the transfer requests go
9  out.
10     Q   Do the case coordinators play an important
11 role in this process?
12     A   Yes.
13     Q   It's not duplicative of what's already being
14 done by the case managers or by you?
15     A   I don't -- I don't think so.
16     Q   You -- you don't think the process would work
17 just as well if GDIT wasn't involved in this at all?
18     A   I suppose it's possible.
19     Q   Okay.  Are you involved in any step-down
20 process for children at BCFS Fairfield?
21     A   Yes.
22     Q   And is it the same involvement that you would
23 have for kids at Yolo who are stepping down?
24     A   Yes.
25     Q   Okay.  So I think I have got a clear handle on

Page 147

1    the case manager, case coordinator, and clinician's
2    role.
3             Does the project officer have any role in
4    step-down?
5         A   No.
6         Q   What about the FFS supervisor, do they have
7    any involvement?
8         A   Not generally, no.
9         Q   And when might they be involved in an FFS --
10   in a -- the supervisor be involved in a step-down case?
11        A   I would reach out to my supervisor if I had a
12   step-down transfer request that was not successful
13   across the network and ask for her support to identify
14   an appropriate placement.
15        Q   Is that typically the only reason you would
16   get the supervisor involved?
17        A   It's probably the most common.
18        Q   Okay.  Is it the case that the FFS supervisor
19   is only going to be involved in this if the FFS chooses
20   to involve them?
21        A   No.
22        Q   Would a child's attorney be involved in a
23   step-down decision?
24        A   Not in making the decision.
25        Q   Would they be involved at all in the process?

1    A    The case manager would notify the attorney
2  that the minor had been -- that they were eligible for
3  step-down.
4    Q    And is that in policy?
5    A    I'm not sure.
6    Q    But in your experience, do the case managers
7  typically have regular communication with the children's
8  attorneys?
9    A    Yes.
10   Q    Okay. Would a child's potential sponsor be
11 involved in a step-down determination?
12   A    Not in the decision.
13   Q    Would the child?
14   A    No.
15   Q    So if there's disagreement in these various
16 people that are involved, who makes the final decision
17 about a step-down?
18   A    The federal field specialist.
19   Q    Okay. What is actually being reviewed by the
20 decision-makers in a step-down determination? What
21 documentation?
22   A    The transfer request in the UAC portal.
23   Q    Okay. Is the -- so the transfer request is
24 prepared by the case manager?
25   A    Yes.

1   that the child is in ORR care?
2       A   Yes.
3       Q   Okay. You said that -- you testified earlier
4   that ORR makes both release recommendation -- or release
5   decisions and placement decisions.
6           And could you restate what is the goal with
7   respect to placement decisions and release decisions of
8   ORR, the overarching goal?
9       A   Once we have -- I mean, the kids come into
10  care, and we're going to immediately try to identify
11  sponsors and work towards a safe release as quickly as
12  possible.
13          And if there isn't a sponsor or the sponsor
14  assessment taking time, we want to make sure the child
15  is maintained in the least restrictive setting that
16  meets their needs.
17      Q   Okay. In this process of determining, let's
18  say, release, you already said there -- there's several
19  play that play a role in it, correct?
20      A   Making the recommendations?
21      Q   Yeah, building the recommendation.
22      A   Yeah.
23      Q   So that would be -- the clinical staff is
24  involved in that?
25      A   Yes.

1   Q   And the -- the case manager, obviously?
2   A   Yes.
3   Q   Case coordinator?
4   A   Yes.
5   Q   And you take part in the process through
6   staffing activities?
7   A   The team -- the case coordinator with the case
8   manager and the clinicians, they're meeting weekly.
9       I participate as often as possible.  But I'm
10  receiving a report on the weekly staffings from the case
11  coordinator, and I meet with her directly weekly, if I
12  have not been in attendance at the staffing.
13  Q   And so you will answer policy questions and
14  things like that from them?
15  A   I definitely will do that.  Those don't tend
16  to come up as much at a staffing conversation.
17      But if there is something related to policy,
18  yeah, we can address it --
19  Q   So --
20  A   -- with staffing.
21  Q   -- you consider this a collaborative process,
22  to get the recommendation to together, and then it comes
23  to your desk?
24  A   Yeah.  By the time a release recommendation is
25  submitted to me, I have participated in a few

Page 208

1   conversations about the case, so I -- yeah.
2       Q    Now, what happens if you're dealing with a
3   sponsor and you determine that the sponsor is not an
4   appropriate sponsor to release a child to?  What do you
5   do next?
6       A    Well, I don't generally make that decision on
7   my own.
8       Q    Well, what does the team do next?
9       A    If the individual sponsor has concluded the
10  sponsor assessment process and there's a denial
11  decision, then we move through that process and the
12  sponsor is denied in the portal.
13           And if we're in con -- if the sponsor is not
14  an immediate family or even if they are, we work with
15  the family to identify another potential sponsor.
16      Q    So you keep looking for another sponsor until
17  you find someone that -- that can fit the needs of this
18  child?
19      A    Yes.
20      Q    And even if -- and if you find a sponsor, have
21  you ever felt pressure to, nevertheless, deny a
22  recommendation for a release?
23           ATTORNEY WHITE:  Objection, form.
24      A    Pressure from?
25      Q    (BY ATTORNEY VERBY) From anything, from

CONFIDENTIAL

1  I, MARY J. GOFF, CSR No. 13427, Certified Shorthand
2  Reporter of the State of California, certify;
3  That the foregoing proceedings were taken before me
4  at the time and place herein set forth, at which time
5  the witness declared under penalty of perjury; that the
6  testimony of the witness and all objections made at the
7  time of the examination were recorded stenographically
8  by me and were thereafter transcribed under my direction
9  and supervision; that the foregoing is a full, true, and
10 correct transcript of my shorthand notes so taken and of
11 the testimony so given;
12 That before completion of the deposition, review of
13 the transcript (  ) was (  ) was not requested:   (XX)
14 that the witness has failed or refused to approve the
15 transcript.
16 I further certify that I am not financially
17 interested in the action, and I am not a relative or
18 employee of any attorney of the parties, nor of any of
19 the parties.
20 I declare under penalty of perjury under the laws
21 of California that the foregoing is true and correct,
22 dated this 6th day of December, 2019.   *Mary J. Goff*
23                  _____
                    MARY J. GOFF
24
25