# DX-29

Deposition of Nithya Nathan-Pineau, August 20, 2019

Page 1

1  UNITED STATES DISTRICT COURT

2  CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4  Case No.  No. 2:18-CV-05741-DMG-PLA

5

6  _____

7  LUCAS R., et al.,                    )

8        Plaintiffs,              )

9    v.                                 )

10 ALEX AZAR, Secretary of U.S.         )

11 Department of Health and             )

12 Human Services, et al.,              )

13       Defendants.              )

14 _____

15

16          ***CONFIDENTIAL***

17    DEPOSITION OF NITHYA NATHAN-PINEAU, ESQ.

18           Washington, D.C.

19           August 20, 2019

20

21

22

23

24 Reported by: BARBARA DE VICO

25 Job No.166052

Page 36

1            So if we've already started representation,
2   for example, on an asylum claim, then we can
3   provide representation on one of these bond
4   proceedings, but we would not be able to initiate
5   representation solely for the purpose of pursuing a
6   bond or custody review.
7            Q.   Okay.  Now, in terms of what's
8   called reunification or we can also refer to it as
9   release of a child to a sponsor, are you familiar
10  with categories 1, 2A and 2B, 3 and 4?
11           A.   Yes, I'm familiar with them.
12           Q.   Just generally what do those
13  categories refer to?
14           A.   My understanding is that Category
15  1 sponsors biological parents.  That Category
16  2 sponsors are other close family members where the
17  relationship can be confirmed by birth certificates
18  or other legal documentation.  And that Category
19  3 might be another family member, community member
20  that's more distant where the relationship maybe
21  can't be confirmed.  And Category 4 is a child who
22  does not have an adult sponsor.
23           Q.   Now, referring to Category 3, are
24  you familiar with a, what might be called a
25  preexisting relationship rule, meaning that in

1   they had bad behavior, and we've also been told
2   even when we send a list in advance of children
3   we'd like to meet with that a child is not
4   available to meet with us because of a behavioral
5   infraction and they're in isolation.
6           Q.    Who's told you that, Shenandoah
7   Valley staff?
8           A.    Case managers have told us that,
9   yes.
10          Q.    Did Shenandoah previously -- I think
11  you said this, but did Shenandoah previously
12  conduct staffing meetings?
13          A.    They did.  That was a regular
14  practice for a long period of time, and it was
15  about, my best guess maybe seven months ago that
16  that stopped.
17          Q.    What would happen in a staffing
18  meeting?
19          A.    We would conduct those meetings both
20  by phone and in person.  We alternated, and we
21  would go through the list of children there.  And
22  we would provide updates on our end from things
23  like maybe a child had an appointment to have their
24  biometrics taken or maybe they had an upcoming
25  immigration court hearing, so we would provide

1  logistical information around that.
2          And then the case manager could provide
3  reunification updates or, you know, if a child
4  asked to speak with us, they would inform us during
5  that time as well.
6          Q.   Were you given any explanation as to
7  why those meetings were discontinued?
8          A.   Nothing specific, no.  Just that the
9  case managers preferred communication by email.
10         Q.   Do these staffing meeting continue
11 with respect to children or with respect to the
12 other facilities that CAIR serves?
13         A.   We do in-person staffing meetings at
14 Youth for Tomorrow once a month.  And at Board of
15 Child Care and Bethany we have a weekly call.  And
16 at Richmond Commonwealth Catholic Charities there
17 is a monthly call.
18         Q.   And those calls are, or meetings are
19 similar to what used to happen at Shenandoah in
20 terms of their content?
21         A.   Exactly.  Similar in purpose and
22 substance.  We discuss -- we provide updates about
23 the child's legal case, if there are any, and we
24 provide updates about reunification if there are
25 any, and we make referrals of children who have

1  asked to speak with us.
2      Q.   Okay.  In considering reunification,
3  do the case managers at Shenandoah pursue
4  concurrent evaluation of potential sponsors, or do
5  they just look at one and then another?
6      A.   It's my understanding that they do
7  pursue multiple sponsors concurrently that are
8  available.
9      Q.   When you -- when CAIR lawyers
10 interview children, is it your practice to ask them
11 about potential sponsors to receive in the United
12 States?
13     A.   We do ask children about the
14 location of their family members and location of
15 anyone who might be a sponsor for them for the
16 United States.
17     Q.   Will case managers at Shenandoah
18 receive information from CAIR lawyers advising them
19 of the availability of particular family members in
20 the United States?
21     A.   I'm not sure I understand that
22 question.
23     Q.   Well, if a child discloses to you I
24 have a brother or I have a sister, here is their
25 location, whatever --

Page 75

1  have another adult who could be responsible for the
2  child.
3       Q.    What's your understanding as to when
4  is that required?
5       A.    My understanding is that is required
6  if the sponsor does not have immigration status or
7  if they have perhaps a currently pending
8  application with immigration court for some kind of
9  immigration status.
10      Q.    Are you familiar with anyone who's
11 referred to as an intake program specialist?
12      A.    It's my understanding that those are
13 people who interview the children when they arrive
14 in ORR custody, but I'm not sure if that's
15 accurate.
16      Q.    Have you ever met an intake program
17 specialist?
18      A.    I have not.
19      Q.    Has CAIR had occasion to go to
20 federal court on behalf of any of its clients who
21 are in ORR custody?
22      A.    We have.
23      Q.    Can you describe the circumstances
24 when you've done that?
25      A.    We have filed writs of habeas corpus

1  for clients who have been unsuccessful in their
2  reunification cases.  We have also -- that's, yeah,
3  that's the circumstance in which we've gone to
4  federal court on behalf of our child clients, yes.
5       Q.    How many times?
6       A.    We've placed some with external
7  pro bono counsel, but in terms of internal ones
8  that were filed by CAIR Coalition, I believe we
9  filed three.  Might be two.
10      Q.    Two or three?
11      A.    Two or three.
12      Q.    What's your understanding as to the
13 degree of discretion that facility operators have
14 to regulate CAIR's access to detained children?
15      A.    In my experience they have a lot of
16 discretion in terms of the amount of time we're
17 allowed to be in the facility, the types of spaces
18 we're able to use, what we're able to bring in.  We
19 used to bring small stress balls and little toys
20 for children to use, and we were asked to
21 discontinue that practice.
22            So there's a lot of discretion in a wide
23 variety of areas that the facility has in terms of
24 our access and what we can do.
25      Q.    So in terms of the amount of time

Page 79

1  with respect to every child at all of these
2  facilities?
3      A.    We do.  For every child who is not
4  already represented, we offer The Know Your Rights
5  presentation and intake, legal intake.  It's
6  completely voluntary, so some children decline.
7  But the vast majority of children participate.
8      Q.    Now, is it your understanding that
9  another person who participates in the
10 decision-making process around reunification is the
11 clinician?
12     A.    Yes, that's my understanding.
13     Q.    At Shenandoah, do you know the name
14 of any of the clinicians who work there?
15     A.    I believe the clinicians that work
16 there are Melissa Cook and Evenor Aleman.
17     Q.    Are you permitted to speak with
18 them?
19     A.    We don't have any regular meetings
20 with them.  We do email with them sometimes, but we
21 don't have any other way to communicate with them.
22     Q.    So telephone calls aren't permitted?
23     A.    We don't have regular staffing calls
24 and we don't have regular meetings with them, but
25 we could call them.

1  Q. Are there also clinicians at Youth
2  for Tomorrow?
3  A. Yes, there are.
4  Q. So do your staff lawyers have the
5  ability to communicate with them?
6  A. They do, yes.
7  Q. With respect to the medications, do
8  you have any understanding as to what the
9  consequence of a child's refusing to take
10 medications would be?
11 A. I heard children report that if they
12 refuse a medication, it can result in a significant
13 incident report being written essentially as a
14 failing to obey orders, failing to obey rules,
15 failing to comply, and that could have a negative
16 impact such as that a significant incident report
17 has.
18 Q. Have you had any circumstance where
19 a clinic client was only to be released upon
20 condition that his or her sponsor continue to
21 provide psychotropic medications?
22 A. I've seen that on ICE forms as a
23 condition of release. I haven't seen it in ORR
24 paperwork as a condition of release.
25 Q. Okay. Are you familiar with

1  called the Immigration Impact Lab, which is focused
2  on federal litigation.
3      Q.   That last one, that doesn't involve
4  children?
5      A.   They do take some cases of children,
6  but that's not the principal focus of that program
7  there.
8      Q.   You mentioned there was a breakdown
9  with your contract with Vera, that broke down into
10 three parts?
11     A.   That's correct.
12     Q.   You said 50 to 55 percent of that
13 contract goes to direct representation of the
14 children?
15     A.   That's correct.
16     Q.   And you had mentioned that bond
17 hearings are excluded from that contract unless
18 you're already representing them in immigration
19 proceedings?
20     A.   That's correct.
21     Q.   Anything else excluded?
22     A.   Nothing that I'm aware of expressly
23 that we received guidance on.
24     Q.   And you said you got an email about
25 that?

1   A.   Yes, we did.

2   Q.   And when did you receive that email?

3   A.   I don't remember the exact date, but it was after the decision that essentially created the bond review process for children, which at this point I believe was in the summer of 2017.

7   Q.   Do you remember the month?

8   A.   It was either June or July. I don't remember specifically. A lot of things have happened in the last year.

11   Q.   Was that an email that just went to CAIR or to all Vera-funded legal services providers?

14   A.   It went to all Vera-funded legal service providers. There was several follow-up calls to discuss that email.

17   Q.   So what would you understand that prohibition to mean? What exactly can't you do?

19   A.   We can't initiate representation with a child solely for the purpose of representing them in a bond or custody review. We wouldn't be able to use Vera funding for that. So if we were to initiate representation solely for that purpose, we would need to use an outside source of funding.

25   Q.   And where do those bond hearings

1   take place?

2       A.    Where?

3       Q.    What context?

4       A.    We represent children in both the
5   Arlington and Baltimore immigration courts, so they
6   take place in those two immigration courts.

7       Q.    Have there been any other
8   restrictions placed on CAIR's ability to represent
9   clients?

10      A.    None that have been communicated to
11  me.

12      Q.    Do you know for fiscal year 2019 to
13  date the number of minors in ORR custody that CAIR
14  has directly represented?

15      A.    I don't have that number, the exact
16  number for this fiscal year.  I do know at the
17  six-month mark we were on track to represent over
18  11,000 children in the fiscal year.

19      Q.    Vera receives its funding from ORR,
20  is that correct?

21      A.    That's my understanding.

22      Q.    So let's go through those two things
23  together.  Has Vera forbidden any other
24  representation of minors in ORR custody beyond the
25  bond hearings?

Page 129

1  bond hearing context?
2           MS. DeWITT:  Object to the form.
3       A.   Yeah.  I mean, we have not used Vera
4  funds for purposes that we're not able to use them
5  for.
6       Q.   Same line of questioning with regard
7  to ORR.  Has ORR prohibited representation of
8  children beyond the bond hearing context?
9       A.   I haven't received a communication
10 like that from ORR.
11      Q.   Has ORR in any way blocked direct
12 representation of children by CAIR?
13           MS. DeWITT:  Object to the form.
14      A.   Yeah.  I'm not sure I understand
15 what you mean by "blocked."
16      Q.   Has ORR made on it more difficult to
17 represent children in -- let me rephrase.
18      Has ORR taken any action to make it more
19 difficult to carry out responsibilities of direct
20 representation of children in ORR care?
21           MS. DeWITT:  Object to the form.
22      A.   Are you asking if there are new
23 policies or -- I'm not sure exactly what
24 specifically you're asking about.
25      Q.   I'm asking about their current

1   directives.  Is there anything in place, that ORR
2   has in place, that would make it difficult, that
3   would make it harder for you to represent children?
4                   MS. DeWITT:  Object to the form.
5         A.    There are a number of practices that
6   make it difficult to represent children in terms of
7   multiple transfers, prolonged detention, lack of
8   appropriate therapeutic treatment.  So those all
9   impact our ability to represent children.
10        Q.    And you had mentioned that CAIR has
11  represented UAC's in habeas proceedings?
12        A.    Yes.
13        Q.    And those challenge, those have been
14  challenges to the release process?
15        A.    Yes.
16        Q.    Have there been habeas proceedings
17  challenging anything else?
18        A.    Those are both the in-house habeas
19  and the ones we referred have both been focused of
20  release and issues with the reunification process.
21        Q.    Do you know the number of UACs on
22  average that are in Shenandoah care at any given
23  time?
24        A.    They have a bed capacity of 34, and
25  in my time serving the facility we've seen

Page 144

CERTIFICATE

LUCAS right.       )
      v.          )
ALEX AZAR, et al. )

   I, BARBARA DeVICO, a Notary Public within and for the District of Columbia, do hereby certify:

   That NITHYA NATHAN-PINEAU, ESQ., the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony by such witness.

   I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

   IN WITNESS WHEREOF, I have hereunto set my hand this 30th of August, 2019.

_____
BARBARA DeVICO