# DX-30

Expert Report of Dr. Joseph P. Ryan, June 19, 2020

JEFFREY B. CLARK
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
ERNESTO H. MOLINA, JR.
Deputy Director
CHRISTOPHER A. BATES
Senior Counsel to the Assistant Attorney General
BENJAMIN MARK MOSS
W. DANIEL SHIEH
Senior Litigation Counsel
NANCY K. CANTER
ANTHONY J. MESSURI
JONATHAN K. ROSS
Trial Attorneys
Office of Immigration Litigation
U.S. Department of Justice
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-9802
Daniel.Shieh@usdoj.gov
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Lucas R., *et. al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>Alex M. Azar,<br>Secretary of U.S. Dep't of Health and Human Services, *et al*.<br><br>*Defendants*. | Case No.: 18-cv-05741-DMG-PLA<br><br>**DECLARATION OF DR. JOSEPH P. RYAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

# DECLARATION OF DR. JOSEPH P. RYAN

I, Joseph P. Ryan, declare and state as follows:

1.     I have expertise in the care and supervision of children in substitute care settings (e.g., foster care, congregate care) in the United States.  I have an M.S.W. from the University of Michigan and a Ph.D. from the University of Chicago.  I am a tenured professor at the University of Michigan School of Social Work, and the founder and director of the Child and Adolescent Data Lab.  I make this Declaration in support of Defendants' Motion for Summary Judgment.

2.     Counsel for Defendants contacted me to provide expert opinion and testimony on the policies and procedures of United States Department of Health and Human Services, Office of Refugee Resettlement ("ORR") with respect to the care and supervision of unaccompanied alien children.  Counsel asked me to review certain materials and thereafter render my opinions, which I did in a June 19, 2020 Expert Report.  On July 31, 2020, I appeared for a deposition and testified regarding the contents of my June 19, 2020 Expert Report.

3.     If called as a witness to this action, I could and would testify competently to the facts and opinions set forth herein, including my June 19, 2020 Expert Report and my July 31, 2020 deposition.

I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct.

Executed this September ___, 2020 at Ann Arbor, Michigan.

Joseph Ryan
Digitally signed by Joseph Ryan
Date: 2020.09.18 15:39:45 -04'00'

_____
Joseph P. Ryan, M.S.W., Ph.D.
Declarant

Expert Witness Report
Joseph P. Ryan, Ph.D.
June 19, 2020

## I.   Overview

### Scope of assignment

1.  The purpose of this document is to summarize my findings as they relate to the care and supervision of unaccompanied alien children ("UAC").  I pay particular attention to the policies and procedures designed to move children from U.S. Department of Health and Human Services, Office of Refugee Resettlement ("ORR") grantee care facilities to the sponsors.  Such policies and procedures include staff ratios (which gets to the issue of manageable workload) and staff qualifications.  I also focus on the quality of care and supervision provided by ORR facilities – with a particular eye on the safety of the environment, and the policies and procedures in place for children to seek additional professional assistance beyond the confines of each facility.

2.  The scope of the assignment – and thus the structure of this report - reflects the primary arguments raised by the plaintiffs.  The primary areas of plaintiffs' allegations are as follows:
    - ORR confines children in medium (or "staff secure") facilities, residential treatment centers ("RTCs"), and secure facilities peremptorily, often on bare allegations that they are dangerous or pose a flight risk, without affording them a meaningful or timely opportunity to be heard regarding the reasons for such placement.
    - ORR prolongs children's detention on the ground that their parents or other available custodians are or may be unfit, while affording neither detained juveniles nor their proposed custodians a meaningful or timely opportunity to be heard regarding a proposed custodian's fitness.
    - ORR places children in residential treatment facilities and detention facilities in which it knows they will be administered powerful psychotropic medications for weeks, months, or years, without procedural safeguards, including seeking informed parental consent or other lawful authorization, even from parents present in the United States.
    - ORR blocks lawyers from representing detained children with respect to placement, non-consensual administration of psychotropic medications, or release to available custodians notwithstanding that Congress has allocated funds specifically to provide such lawyers to represent children who are or have been in ORR custody in "legal matters," including issues related to release and least-restrictive placement;
    - ORR segregates children who have or are perceived to have a behavioral, mental health, intellectual, and/or developmental disability in secure facilities, staff secure facilities, and RTCs, instead of the most integrated setting appropriate to their needs; and
    - ORR's actions prolong the detention of children who have or are perceived to have a behavioral, mental health, intellectual, and/or developmental disability by placing them in restrictive settings associated with heightened administrative barriers to release.

1

Confidential - Under Protective Order

3. It is important to note that many of plaintiffs' arguments contain multiple assertions.  Within individual arguments, the plaintiffs often identify a specific complaint and offer a proposed remedy.  For example, plaintiffs argue that children are confined in secure facilities peremptorily, often on bare allegations.  The plaintiffs then go on to propose that a remedy (specifically a hearing) would resolve the overuse of secure placements.  As part of my report, when possible, I will address both plaintiffs' initial argument/complaint and share my opinion on the child-welfare implications of plaintiffs' proposed remedy.

II.    Qualifications

4. I am an expert on the care and supervision of children in substitute care settings (e.g. foster care, congregate care) in the United States.  I have an MSW from the University of Michigan and a Ph.D. from the University of Chicago.  I have more than 25 years of professional experience with child-care institutions and the State agencies responsible for these institutions.  I started my professional career as a direct care worker in various residential and community-based group homes.  These programs served children removed from their biological parents due to substantiated cases of maltreatment/abandonment or removed from their communities by the juvenile court because of an adjudicated petition of delinquency.  Throughout graduate studies at the University of Michigan, I continued to work in child-care agencies serving children in residential and non-residential settings.  These programs varied in terms of security ranging from in-home community-based to staff-secured and locked-secured.  Post MSW, I worked for one of the largest residential providers in the State of Michigan.  I worked in the program evaluation office and further developed skills in performance metrics, measurement, longitudinal analysis, and the assessment of quality of care.  I remained at this office engaged in program evaluation activities for the two years leading up to my doctoral studies at the University of Chicago.

5. As a doctoral student at the University of Chicago, I worked with leading experts in the areas of child welfare and foster care.  I was a research assistant at the Chapin Hall Center for Children on the National Evaluation of Family Preservation Programs.  At Chicago, I enrolled in advanced research and evaluation courses at the School of Social Service Administration, the Harris School of Public Policy and the Booth School of Business.  Following the completion of doctoral studies, I was an Assistant and then Associate Professor (with tenure) at the University of Illinois.  I taught and conducted research in the areas of child maltreatment, foster care, substance abuse, juvenile delinquency, and program evaluation.  I served as chair of the child welfare curriculum committee, helped direct a research center focused on child welfare policy/practice and was the principle investigator on a Title IV-E waiver demonstration focused on substance abuse and foster care placements.

6. After ten years at the University of Illinois (2001 to 2011), I accepted a faculty position (with tenure) at the University of Michigan.  I currently teach in the areas of child welfare and juvenile justice.  I was promoted to Full Professor in 2018, I co-direct the child welfare specialization and I founded and direct the Child and Adolescent Data Lab.  The Data Lab is a partnership between the University, county courts, and State agencies responsible for the

2

care and supervision of vulnerable children and families.  Within the Data Lab, I manage a wide range of projects focused on system performance and quality of care metrics.  I work closely with agency leadership on ways to use data and information to improve services and outcomes for children.

7.  I have secured more than 30 research grants and published more than 50 peer reviewed journal articles and book chapters.  All of my publications are in the area of children and family services.  I serve on the editorial boards of *Child Maltreatment, Child Welfare, Social Work Research*, and *Residential Treatment for Children and Youth*.  I am an invited member of the Society for Social Work and Research Fellowship Program and I received the 2019 University of Michigan Presidential Award for Public Impact.  The Presidential Award honors individuals who have offered their academic research and expertise in tangible service of a major public-sector challenge.  Because of my expertise, I am often invited to serve on statewide committees, advisory panels, research networks and county boards of governance.  For example, I was invited and appointed by both a Republican and Democratic Governor to serve on the Michigan Committee for Juvenile Justice.

8.  My compensation is a standard hourly rate of $295/hour in this case.  My compensation is not affected by the outcome of this matter.  My curriculum vitae includes a summary of my professional qualifications (see Appendix A).  I have not testified as an expert in the past 4 years.

## III.    Facts and Data Considered

9.  In addition to my professional training, periodic review of scholarly literature and experiences in direct services with children in child welfare, my expert opinions are based on the review of ORR documents, the analysis of ORR administrative data, and in-person visits to ORR headquarters and a range of ORR grantee care facilities.

10. ORR Documents: I received copies of documents related to the Lucas R. First Amended Complaint.  Defendants made available 75 UAC case file tables corresponding to 75 individual UAC case files.  In addition, I received the UAC case files for each of the Named Plaintiffs in this case.  I also receive the Plaintiffs' First Amended Complaint, the Defendants Answer, the Defendants' Response to the Plaintiffs' Requests for Admission, ORR's Policy Guide, ORR statistical summaries, Sections 1 to 3 of the ORR Manual of Procedures (MAP), and copies of the Sualog and Ray depositions taken in this case.

11. In addition to the case files and procedural documents, Defendants provided copies of several documents that are central to the family unification process.  Such documents include the cover letter, legal orientation program, sponsor care agreement, family reunification application, authorization for release of information, fraud warning, privacy notice for parents, privacy notice for sponsors, sponsor handbook, documents on the fingerprinting process, UAC sexual abuse hotline flyer, and the letter of designation of care for a minor.

3

12. <u>Administrative Data</u>: Although I received access to the statistical summaries produced by ORR, I requested and received the raw administrative data files that captured the movement of children through the ORR system of care.  Defendants provided access to more than 30 Excel spreadsheets (data files titled *DOJ OIL Flores data*) that captured the intakes, transfers, discharges and daily census for all children under ORR supervision between January 2017 and November 2019.  Because of formatting variations associated with the 2017 spreadsheets (e.g., inconsistencies across variable names, column widths), I focused my analyses on the last two calendar years of entries (approximately 97,000 children).  These two years of data provide more than enough observations to understand the movement of children through the ORR system.  Defendants also provided approximately 140 additional Excel spreadsheets that captured the weekly reports of home studies (data files titled *weekly HS and active PRS case report*).

<u>Facility Visits</u>:  I visited six ORR grantee child-care facilities between January and February 2020.  The purpose of these visits was to learn about the daily operations of each facility.  I primarily focused on learning about the care and supervision of children, the policies and procedures in place to connect children with sponsors, the policies and procedures in place to handle special needs or special circumstances, and to compare this information to the written materials published by ORR and assertions made by the plaintiffs.  Each visit opened with a 60 to 90 minute conversation about the facility and its approach to creating a safe and nurturing environment.  I would then take a detailed and guided tour of the facility, talking with program staff along the way.  Each tour included a visit to bedrooms, general living areas, kitchen/dining, medical services, clinical services, recreational spaces and administrative offices.  I followed each tour with a subsequent detailed discussion about issues that emerged on the tour.  The individual facilities were selected by ORR so that I had the opportunity to tour and interview key staff in shelters, a staff secured facility and a secure facility.

## IV.    Opinions

13. In order to assess any child welfare system, it is important to interview with a wide range of program staff, tour the facilities and thoroughly read the agency materials (here, for example, the ORR policy guide and MAP, and case files).  This approach to performance measurement permits one to identify and document inconsistencies between what agency materials state that staff ought to be doing with children (as documented in program manuals) and what staff report they are doing on a daily basis with children.  In addition to careful document reviews and staff interviews, I also approach the issues of facility/agency performance by analyzing the administrative data (e.g. entries, transfers, discharges) associated with the UAC in federal custody.  Overall, my approach to evaluating the quality of care in ORR facilities is similar to the approach of licensing bodies and a best practices approach to understanding performance of domestic child welfare systems.

14. It is important to note that there are differences between domestic child welfare systems and the ORR system of care for UAC in federal custody.  Most obvious, children in domestic

4

foster care systems are separated from their parents for reasons of substantiated abuse/neglect. Although we lack systematic data on why children cross the U.S. border, and although UACs have experienced familial violence, it is reasonable to assume that fleeing parental abuse/neglect is not their singular or primary motive. In a recent study published by the Center for Latin American and Latino Studies at American University[1], the authors conclude that community violence in the home country of origin, severe economic deprivation and limited opportunities for the development of human capital contribute to the decision to migrate. In this way, the UAC population is distinct from the domestic foster care population.

15. Nonetheless, there are many similarities between the domestic child welfare systems and the ORR system. At their core, both systems seek to help children achieve permanency. On the domestic side, caseworkers seek to reunify children with their biological parents or secure permanency via adoption or guardianship. Within the ORR system, case managers (along with their supervisors, other stakeholders, and those who provide oversight from ORR) seek to achieve permanency for children via placement with a suitable sponsor, if available, or other viable alternative options (e.g., long-term foster care).

16. Regardless of the child's citizenship, safety and stability are paramount in the permanency process. The decision to relocate a child from an ORR grantee care facility to a sponsor must be based on the belief that the relocated child will be safe – and that belief must be supported by evidence. It is critical to acknowledge that the permanency process takes time and social workers and other clinical care professionals correctly err, if at all, on the side of child safety and well-being.

17. To understand how children move through the ORR system and to understand the time required for connecting children with sponsors (and alternative discharge options), I analyzed administrative data. The following are some of the questions that guided these analyses. This list is not exhaustive.
   • What are the monthly admission and discharge rates over time?
   • What demographic characteristics (age, sex, home country) are associated with children in ORR's custody and care?
   • How many children transfer between facilities?
   • What percent of children are stepped up to more secure settings?
   • How long do children spend in care?
   • Does time in care vary by the security level?
   • Do child demographics help explain time in care?
   • What percent of children's proposed sponsors receive home studies?
   • Does the home study process increase the time in care for children?
   • Where do children go upon release?

I display the data tables and figures in Appendix B.

---

[1] https://www.american.edu/centers/latin-american-latino-studies/unaccompanied-minors.cfm.

5

Overview of Performance Assessment

18. The ORR system is unique in that it is the only system of care in the United States that works with the UAC population on issues of permanency and safety.  In order to properly assess the program, special attention must be given to ORR policies and procedures, visits and interviews with ORR's network of care providers, and analysis of existing data.

19. Domestic child welfare systems are required to report on specific performance metrics.  As part of the 1994 amendments to the Social Security Act, the U.S. Department of Health and Human Services, Administration for Children & Families, Children's Bureau engages in a systematic review referred to as the Child and Family Services Review ("CFSR").[2]  Safety and permanency are core components of the CFSR.  Safety refers to the protection of children from abuse/neglect and permanency refers to the long-term stability of placements (either with or without family).  As part of the CFSR, individual states are measured against national benchmarks.  For example, for children entering foster care, the federal government indicates that 40.5% of children should exit care within 12 months.[3]  Once in care, federal benchmarks on placement stability indicate that States should experience no more than an average of 4.12 placement changes per 1,000 days of care.[4]  Regarding safety, no more than 9.2% of children should experience two substantiated reports of abuse/neglect within 365 days.[5]  The CSFR with respect to a given state's child welfare system is made easier by having 49 other reference points – that is – other state child welfare systems for comparison.  The ORR system of care is unique in that it does not have the benefit of 49 other directly analogous reference points.

20. Although both state and ORR systems of care are designed to serve highly traumatized and victimized populations, the ORR system is the only system of care in the United States that works solely with the UAC population.  Thus there are no established benchmarks associated with other UAC systems that one can reference to understand their performance.  In order to understand an important question of performance such as "are children spending too long in care," one needs to study the published ORR Policy Guide and corresponding sections of the Manual of Procedures, talk with individual staff across multiple facilities, and analyze the administrative data.

---

[2]https://www.acf.hhs.gov/sites/default/files/cb/cfsr_3_statewide_data_indicators_data_dictionary.pdf.
[3]https://secureapp.dhs.state.ia.us/PublicROMReports/report_help/default.htm#!Documents/federalpermanencyin12months.htm.
[4]https://secureapp.dhs.state.ia.us/PublicROMReports/report_help/default.htm#!Documents/federalplacementstability.htm.
[5]https://secureapp.dhs.state.ia.us/PublicROMReports/report_help/default.htm#!Documents/federalrecurrenceofmaltreatment.htm.

Confidential - Under Protective Order

21. Reviewing the ORR published material is important because it lays the foundation for a standardized approach across facilities.  Interviewing program staff is critical because it allows one the opportunity to learn whether their description of daily activities reflects the policies established by ORR.  This is an identical process to how states license and subsequently monitor child-care facilities.[6]  Finally, data analysis is important as it permits an objective assessment of program performance and a window into the variation that exists with the system.  For example, similar to domestic child welfare, some children move quickly through the ORR system (e.g., child A.M.G.M.)[7] and connect with a sponsor while other children require more time.[8]  Understanding this variation is important to any performance evaluation.

## Qualification of Staff, Training and Staff to Child Ratios

22. It is my opinion that ORR grantee care facilities seek to, and do, hire staff with appropriate credentials and adequate experience; properly staff each facility with appropriate worker to child ratios; and provide the proper training suited to care for their unique population.  I arrived at this opinion, as explained below, based on my education and experience in this area, based on my knowledge of the training and experience required at facilities similar to ORR and from a careful review of the minimal professional qualifications and trainings associated with employment in ORR grantee care provider facilities.

23. Qualifications: On my site visits, I primarily interacted with youth specialists, youth care workers, case managers, federal field specialists and their supervisors, clinical staff, medical staff, and program managers.  Overall, I was impressed with the program staff in each of the facilities.  At the core and regardless of their professional role, the staff seemed to (1) genuinely care about the children/adolescents under their supervision, (2) have the qualifications and training required to work with children/adolescents, (3) understand the long and dangerous journey for many of these children/adolescents, (4) understand the implications of the historical traumas for many of these children/adolescents, and (5) empathize with the challenges that many of these children/adolescents face as they attempt to connect with a sponsor or secure permanency via alternative methods/routes.

24. The foundation for quality staff begins with the minimal qualifications associated with each position.  It is clear that ORR grantee care providers seek to hire staff with appropriate credentials and adequate experience.  I find many similarities between the qualifications required to work with UAC and the qualifications required to work with domestic foster care populations.  In Illinois, for instance, a State with one of the largest child welfare populations and a State committed to high quality innovative programming for children, foster care workers are required (at a minimum) to have a bachelor's degree and two years of direct

---

[6] See https://www.michigan.gov/mdhhs/0,5885,7-339-71551_27716_76094---,00.html.

[7] References to children in this report are among the 75 select case files which I reviewed.

[8] For instance, if a safe sponsor is unavailable or delays completing steps toward reunification.

Confidential - Under Protective Order

care experience.[9]  The minimum requirements for critical staff in the ORR grantee care provider facilities are aligned well with the domestic standards.  The following published standards[10] apply to ORR facility staff:

- Program Directors are required to have at least a Master's degree in social work (MSW) or an equivalent degree in education, psychology, sociology, or other relevant behavioral science.  Alternatively, a Program Director may also qualify with a bachelor's degree in one of the aforementioned behavioral sciences plus five years of experience in child welfare administration, child protective services, program management, or in a director position of a licensed childcare program.
- Lead Clinicians are required to have a MSW and two years of postgraduate direct service delivery experience or a Master's degree or Ph.D. in psychology, sociology, or other relevant behavioral science in which clinical experience is a program requirement plus two years of postgraduate direct service delivery experience. Alternatively, a Lead Clinician may also qualify with a bachelor's degree in one of the aforementioned behavioral sciences plus five years of clinical employment experience in the behavioral sciences. Lead Clinicians are also required to have supervisory experience and current licensure.
- Clinicians are required to have a MSW and have clinical experience as a part of the master's program requirements. Alternatively, a Clinician may have a Master's degree in psychology, sociology, or other relevant behavioral science in which clinical experience is a program requirement or a bachelor's degree in one of the aforementioned sciences plus five years of clinical employment experience in this area. Clinicians are required to be licensed or license-eligible.  License-eligible Clinicians are required to be actively pursuing licensure, and shall obtain licensure as soon as possible.
- Lead Case Workers (primarily responsible for the unification and sponsorship activities) are required to have a Master's degree in the behavioral sciences, human services, or social services fields or, alternatively, a minimum of a bachelor's degree and three years of progressive employment experience in the aforementioned fields that demonstrates supervisory and case management experience.  This position is perhaps most similar to a domestic foster care worker and the ORR qualifications require additional years of combined education and professional experience.

25. <u>Ratios</u>: All facilities I visited were well below the established guidelines for maximum child to worker ratios.  That is, there were far more staff than required by policy.  For example, at Seton Home, a program serving pregnant and newly parenting teens, the census was 19 teens and the staff included seven case managers, one lead case manager, one lead clinician, three clinicians, one medical manager, one case coordinator, two staff supervisors, three teachers, and 26 youth care workers.  The daycare and daycare staff were licensed by the State of Texas.  Similar ratios were seen across all facilities.  Every facility I visited had more

---

[9] https://www2.illinois.gov/dcfs/aboutus/Documents/bw_are_you_interested.pdf.

[10] Cooperative Agreement for Residential Services between HHS/ACF/ORR/DUCO and Grantees (2017).

8

Confidential - Under Protective Order

than enough qualified staff to serve the population of children.  In fact, most of the facilities seemed prepared – or were in the process of getting prepared – to respond to another influx of UAC.

26. Overall, compared with the domestic child welfare system, the maximum caseloads in ORR facilities are significantly less than the ratio for foster care workers associated with non-UAC facilities.  Depending on whether a domestic worker is associated with a child protection services (CPS) investigation or a foster care case, the domestic caseload is expected to be no more than 15 children per worker.  In contrast, case managers in the ORR facilities (the position most similar to a domestic foster care worker) are capped at a ratio of eight children per worker in shelters and four children per worker in staff secure settings.  *See* ORR Policy Guide § 4.4.1.[11]  This was noted in the policy manuals and confirmed by staff during the interviews.

27. Training: All of the staff talked about the training that is available subsequent to employment.  The training programs varied by the staff position but at a minimum all staff were required to review the policy guidelines established by ORR, participate in trainings related to child trauma and complete the Normalcy training protocol (in Texas).  The Normalcy protocol (https://www.dfps.state.tx.us/Training/Normalcy/index.html) is required for all foster care providers in the State of Texas.  The basic concept of the course is that despite children living in a congregate care environment, we want children to live and experience life as "normal" as possible.  Some of the training modules focus on safety and policy knowledge (sex trafficking information for workers, minimal standards for child caring institutions in Texas) and the remaining modules are more child oriented (child development and developmentally appropriate activities for children, social media and children, normal activities and their importance to children).

28. With regard to training and staff competency, ORR facilities comply with best practices in domestic child welfare systems.  I arrive at this opinion after talking with and interviewing clinical staff in each of the ORR facilities.  As one example, I was impressed with the lead Masters level clinician (Melissa Cook) at the Shenandoah secure facility in Virginia.  Ms. Cook went into a lengthy discussion of trauma informed work and Shenandoah's overall approach to stabilizing behavioral issues.  Oftentimes in the domestic setting, clinical staff are inclined to have children discuss (in detail) their trauma histories.  The problem with this approach in the ORR setting is that there is not enough time in short term care placements to do anything with this information (from a therapeutic perspective).  Ms. Cook articulated the delicate balance of complex needs in short term care.

29. For these reasons (qualifications, workload ratios and training), I am confident that the professional staff in the ORR facilities are capable of handling the challenges presented by the UAC population in a timely and caring manner.  This is true even in times of influx.  Figure

---

[11] See https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-4#4.4.1.

9

Confidential - Under Protective Order

1a displays the unique admissions and discharges by month.  It is clear that the discharges mirror (with a short lag) the admissions.  If facility staff were struggling to do their work – either because they were unqualified or overwhelmed – one would not see discharges keeping pace with admissions.  Similarly, if facility staff were struggling to do their work and as a consequence were taking unnecessary shortcuts (e.g. not vetting sponsors) one would observe a dramatic and sharp increase in discharges (relative to intakes).  In short, there is no evidence that the ORR workforce is either unprepared or unsupported in the mission to meet the needs of the children.  Moreover, given the safeguards in place for vetting sponsors, there is no evidence that the ORR workforce is simply releasing children to unsafe environments.

## Placements and Transfers

30. It is my opinion that when ORR places children in settings more restrictive than the shelter level, the ORR program does so appropriately.  I reach this conclusion based on my analysis of the frequency rate at which this happens (see Appendix B), the processes ORR uses to ensure the placements are proper as an initial matter and on an ongoing basis, and the narrative experiences of these decisions as noted in the case files.

31. The program staff described the initial intake and subsequent placement decisions consistent with published ORR guidelines.  Of primary concern to the staff was the match between the child's needs and the program's ability to meet those needs.  Throughout my visits, staff routinely mentioned getting to know the child's history, identifying any special needs, connecting children with appropriate services, and identifying any challenges that may arise throughout placement.  Staff seemed to pay particular attention to the child's educational needs, mental health concerns, physical/medical needs including disabilities, family relationships (e.g., siblings) and connection with potential sponsors.

32. At times, children move between ORR grantee care provider facilities.  For instance, when children move from a shelter program to either a staff-secure, an RTC, or a secure facility, that is commonly referred to as a "step-up."  Conversely, for instance, when children move from either a staff-secure, an RTC, or secure setting to a shelter facility, such a move is referred to as a "step down."  "Lateral moves" occur when children change facilities but do not change restrictiveness levels.

33. One of the plaintiffs' central complaints was that ORR unnecessarily transferred children to secure settings.  A secondary yet related complaint was that these children were not afforded the opportunity to be "heard" regarding the transfer.

34. There are three domains of evidence I use to judge the merits of these arguments from an empirical and child welfare perspective.  First, the frequency (or risk) of transfer to a staff-secure, RTC, or secure facility.  See Appendix B. Second, the process for step-ups as noted in procedures (see ORR MAP §1.4) and reported by staff.  This domain gets at the rationale for transferring children to more secure settings.  Third, the narrative experiences of step-ups as noted in the case files.

10

Confidential - Under Protective Order

35. First, with regard to frequency, approximately 3% of children experience a transfer between two ORR facilities of key program types[12] as gleaned from the data I analyzed in Appendix B. When transfers do occur, 86% of transfers are lateral moves between shelters, 10% are step-ups and 4% are step-downs (see Appendix B, Figure 11).  One of the questions raised by plaintiffs focused on the frequency of stepping children up to staff-secure and secure facilities.  From these data, the risk of a child experiencing a step up is very low (.3%).  The difficulty with this particular performance metric is that there are no other systems of care to use for comparison.  Yet if one compares the risk of congregate care placement with children in the domestic child welfare system – which is closer to 14%[13] - one would likely conclude, as I do, that stepping UAC up to more secure settings is not overused.

36. Unfortunately, some children entering the United States with a long history of trauma, violence and poverty will require a setting that offers additional structure, supervision, and clinical attention.   Secure settings are not ideal treatment environments but they are an absolute necessity.  This is true for all child caring systems (domestic or otherwise).  For example, some children assigned to ORR shelters have self-documented histories of crime, violence, murder, torture and even dismemberment (e.g., child A.E.S.C.).  Although these children most often start and remain in shelter care, behavioral disruptions and physical altercations may understandably result in a clinical decision to relocate a child to a more secure and supportive setting, for the safety of the child and others.

37. It is important to note that the case file materials I was provided complicate and in fact significantly obscure an assessment of the step-up process (see Appendix B).  When you look at the total UAC population, less than 1% experience a step-up.  A different finding emerges from the case files I was given – where closer to 50% of the cases experienced a step-up.  I understand that the sampling of case files resulted from negotiations between government and plaintiffs' counsel, with the parties agreeing upon 75 case files with the following breakdown: 15 secure, 15 RTC, 15 staff-secure, and 30 shelters.  While the files selected from this breakdown were random, the allocation is clearly not representative of the UAC population in ORR care.

38. This is highly problematic from a scientific and empirical perspective.  If one is interested in learning about trends or patterns (e.g., risk of secure placement) or the process (e.g., decision making) of step-up, it is imperative that the sample reflects the general UAC population.  I understand the sample was not selected to be representative, and was

---

[12] These facilities include the following:
- Low security:  Shelter and therapeutic group home;
- Medium security:  Staff secure and therapeutic staff secure; and
- High security:  Secure and residential treatment center.

[13] https://www.acf.hhs.gov/sites/default/files/cb/cbcongregatecare_brief.pdf.

11

intended to provide the plaintiffs with a cross-section of files that were tailored to the certified classes.  However, the fact remains that the sample of case files I was provided greatly over-represents the risk of step-up.  Thus, although I highlight incidents noted within the case files for illustrative purposes, I will not use the case files to draw any conclusions about the overall risk of step-up or trends in clinical decision-making.  Rather, the data tables and figures provided in Appendix B represent a more accurate estimate of step-up.

39. <u>Second</u>, regarding ORR's processes for stepping children up to more secure settings, interviews with program staff were consistent with ORR policy.  All staff reported that the children were knowledgeable about the possibility of a transfer to a more secure setting. This is true within the ORR system and within the domestic system.  Further, staff reported a detailed process for stepping children up.  Some of the circumstances that drove decision-making in this area included behavioral problems (e.g., consistent destruction of property), serious criminal history background, danger to self or others, serious escape risk and age of the child (step-ups are limited to children 12 years of age or older).  There is evidence of this decision-making process from my review of the case files I was provided.

40. To begin with, children are not stepped-up simply because they have a history of criminal behavior or because of simple non-compliance in the shelters.  For instance, child E.N.C.G. had more than 10 incidents related to potentially concerning behavior in his home county (e.g., weapons-related offense, drug use) and potentially concerning behaviors within the shelters (e.g., verbal threats, physical altercations, bullying other youth).  The staff did not automatically step this child up to a more secure setting after the first incident.  Rather, the staff provided E.N.C.G. opportunities to discuss these events and thus arrived at a clinical decision representing the least restrictive setting that was in the best interest of the child.

41. Similarly, for children who were stepped up, the case files indicate that decisions were made with careful deliberation rather than being reactionary, in retaliation, or impulsive.  This is evident from the staff interviews, and case files that reflect that staff try to accommodate children in less restrictive settings prior to requesting a step-up.  For example, child P.D.O.P. displayed a range of serious behavioral and emotional problems.  Rather than immediately transfer this child to a more secure setting, staff attempted to stabilize his behavior in the shelter with short-term strategies such as short-term psychiatric hospitalizations.  The multi-disciplinary team meetings and 30 day reviews are an essential component of this decision making process – both in terms of step-ups and step-downs.

42. It is also important to note that a decision to step a child up is not made in isolation or made by a single individual.  Clinical staff conduct weekly multi-disciplinary reviews on each child in a placement.  From my interviews with clinical staff, it was clear that it was not uncommon for ORR staff to have engaged in lengthy conversations about stepping a child up to a secure setting, but in the end, with input from youth care specialists and case managers, children remain in their current placement.  From these interviews and from the policy protocols in place, I conclude that step-up decisions are only made after a comprehensive review of the case and with connection back to established procedural guidelines.

Confidential - Under Protective Order

43. As I did not review the entire universe of step-up decisions, I of course cannot conclude whether all step-ups are made in complete compliance with policy or whether a different clinical staff would have arrived at the same decision in a given case.  Yet from a careful review of the policy and procedures, interviews with staff, and from a review of the sampled case files the parties negotiated based on a randomly selected number of files from restrictive placements and which comprises a sizable portion of step up decisions made in the past year, clinical staff appear to make decisions that place children (and try to maintain children) in the least restrictive setting.  This is in line with the best interest of the child.[14]  I did not find evidence (as contended by the plaintiff's attorneys) that children are segregated simply for behavioral and developmental disabilities.

44. With regard to the argument that placing children in ORR custody in settings more restrictive than the shelter level prolongs their length of stay, any correlation between such placement and length of stay does not support a finding that such placements *cause* prolonged stays.  It is a fact that children who are stepped-up to more secure settings spend more time under ORR custody/supervision as compared to children that remain only in shelters (see Figure 6).  However, these children have additional needs and demonstrate behaviors that (1) increase their likelihood of placement in settings more secure than the shelter level and (2) decrease the likelihood of a safe potential sponsor coming forward or being identified, being vetted, and being approved as quickly.

45. One cannot simply compare the length of stay in shelters with the length of stay in more secure settings and conclude that it was the placement decision that increased the overall length of stay.  There is a serious problem of selection bias that undoubtedly leads to erroneous conclusions about causation when the most that might be shown is correlation.  The same issues are observed in domestic child welfare settings when children are moved into group homes, residential facilities, and other secure settings.  Moreover, one should not compare the outcomes of youth assigned to a residential facility with the outcomes of youth assigned to a foster care home.  There exist important qualitative differences between the populations that make categorical comparisons illogical.

## Procedural Protections and Legal Representation

46. The plaintiffs raise the issue of the involvement of a child's legal representative in ORR's transfer, release, and other decisions.  From the standpoint of whether it is likely to improve child welfare outcomes, I do not view legal representation as a categorically productive activity in these social welfare decision-making processes.  True, if only one clinical staff member were responsible for making the release or placement decision, or if individual children's cases were not reviewed on a regular basis, I would favor additional safeguards to ensure that placements and transfers reflected sound clinical practice.  Yet, as discussed above, each child's case is jointly reviewed on a regular basis by a team of

---

[14] Placements, transfers, and, for that matter, releases, are only made with the review and approval of ORR staff.

13

program staff and supervisors in consultation with ORR federal representatives. Consequently, it is unclear what problem would be solved by injecting additional requirements of consulting with a child's legal representative at any instance that a potential step-up or step-down, or release was under consideration.  In general, I am against inserting additional adults into the lives of children without a specific and evidence based rationale, which is lacking here.  Stability with relationships are important and disrupting those relationships is problematic[15].

47. Relatedly, to my knowledge, plaintiffs have not offered any evidence that categorical, mandatory consultation with a child's legal representative before decisions are made would improve child welfare outcomes in the areas of placement, release, and other ORR decisions.  In any event, while it is my understanding that program staff are generally open to receiving and considering information provided by a child's legal representative, I am aware of no evidence-based reason that, from a child welfare perspective, would support making such a consultation mandatory. In addition, adding a mandatory process of consultation with a child's legal representative in connection with making placement, transfer, release, and other decisions would likely cause delays to the placement, transfer, and release process.

48. One of the other complaints put forth by the plaintiffs is that "ORR prolongs children's detention on the ground that their parents or other available custodians are or may be unfit, while affording neither detained juveniles nor their proposed custodians a meaningful or timely opportunity to be heard regarding a proposed custodian's fitness."  The plaintiffs' complaint reflects an unproven premise, similar to another unproven premise and logical fallacy noted above. Specifically, any correlation between the process of identifying and vetting a potential sponsor and length of stay does not support a finding that ORR *causes* prolonged stays.  Rather, if potential sponsors are difficult to identify, reluctant to participate in the sponsorship application process, or if there are difficulties establishing that releasing the child to the proposed sponsor would be safe, the cause of the child's increased length of stay is not ORR.  Moreover, mandating plaintiffs' proposed additional procedural safeguards across the board would not improve child welfare outcomes.  Correlation is not causation.

49. Moreover, the plaintiffs' complaint is in conflict with what I learned from program staff and from what is specified in the ORR policy manual.  Category 1 sponsors can challenge a denial through an administrative appeal with the Assistant Secretary for ACF, who is the recipient and arbiter of the denial appeals.  This process may or may not involve a hearing/meeting.  In addition, I understand that potential sponsors can also avail themselves of the federal courts. It is my opinion therefore, that unlike the contents of the plaintiffs' complaint, potential sponsors are afforded a timely opportunity to appeal an adverse reunification decision. Further, to my knowledge, plaintiffs have not offered persuasive evidence that categorically mandating the additional procedures plaintiffs propose would improve child welfare outcomes.  In addition, adding a mandatory process of consultation with a child's legal

---

[15] https://www.ncsl.org/Portals/1/Documents/cyf/Social_Emotional_WellBeing_Newsletter.pdf.

14

representative in connection with sponsorship assessment decisions would likely cause delays to the sponsorship assessment process.

50. In addition to challenging the step-up decision making process and alleging that secure placements add to the UAC's overall length of stay, the plaintiffs also argued that ORR administers "powerful psychotropic medications for weeks, months, or years, without procedural safeguards, including seeking informed parental consent or other lawful authorization." I found no evidence for this complaint. Every facility I visited had medical professionals on site or in close physical proximity. Decisions concerning medications were made by licensed health care providers, not individual program staff. Children were provided regular medical exams, both for their physical and mental health.

51. In terms of consent for psychotropic medications, all staff noted their desire to secure parental consent for prescription medications. However, at times, and for a variety of reasons (e.g., unable to connect with parents in country of origin), some parental consents are not secured. In these instances, according to program staff, information about the medication and the medical rationale is mailed to parents. This process mirrors passive consent in domestic research/programming. As I understand it, this process also mirrors domestic child welfare law/policy in Texas. Specifically, if parents are not available, other individuals may be designated as the "medical consenter." In domestic foster care, this is most often the care provider or the caseworker.[16] Children 16 or 17 years of age can also provide their own individual consent. In summary, I found no evidence that children are prescribed unnecessary medications or prescribed medications without proper medical supervision.

### The Path to Sponsorship

52. It is my opinion that ORR's policies and procedures are specifically designed to increase the probability of long-term and stable reunifications, and therefore are consistent with best practices in domestic child welfare systems for achieving permanency for children.

53. A sponsor is someone or some entity that assumes the care, custody and supervision of a UAC. Sponsors are mostly parents or biological relatives. One theme that emerged across all my site visits is that some sponsor categories require less time in care than others. UACs are associated with four sponsor categories. Taken from the ORR Sponsor Handbook, the categories are as follows:

- **Category 1:** Parent or legal guardian (This includes qualifying step-parents that have legal or joint custody of the child or teen)

- **Category 2A:** An immediate relative—a brother; sister; grandparent <u>or</u> other close relatives (aunt, uncle, first cousin) who previously served as the UAC's primary caregiver. (This includes biological relatives, relatives through legal marriage, and half-siblings).

---

[16] https://www.dfps.state.tx.us/Child_Protection/Medical_Services/Medical_Consent.asp.

15

Confidential - Under Protective Order

- **Category 2B:** An immediate relative—including aunt, uncle, or first cousin who was not previously the UAC's primary caregiver. (This includes biological relatives, relatives through legal marriage.)

- **Category 3:** Other sponsor, such as distant relatives and unrelated adult individuals

- **Category 4:** No sponsors identified

54. As noted in the handbook and as confirmed by staff, parents and legal guardians are preferred as sponsors.  Yet the evidence suggests that the perceived safety of the child is the foundation for a timely exit from care, regardless of the receiving individual/entity.  Staff talked extensively about a process that tries to ensure safety upon release, UACs have adequate supervision, a means to satisfy basic needs of food and shelter, access to post discharge legal services, and the support necessary to help ensure physical, emotional, and mental well-being.  It is important to note that the child's preferences are taken into consideration.

55. Similar to the reunification and adoption process in the domestic child welfare system, there are no guarantees that sponsorships will be successful.  Yet, in evaluating child welfare system safeguards and system performance, I look for procedures that are known in the field and in my experience to increase the probability of long-term and stable reunifications (i.e., sponsorships).  The work of the case managers and the home study process are evidence that ORR seriously considers potential sponsors and the best interests of the child prior to discharge, and my conversations with staff and review of case files further support this conclusion.

56. All potential sponsors must complete the family reunification application.  Case managers and staff noted that the reunification application is comprehensive and captures information about the following:  household members; relationships; contact information; financial status; health information; and an open-ended response about how sponsors will meet the individual needs of children.  Case managers noted that potential sponsors may have difficulty completing the application – and thus require assistance from program staff.  Case managers and other ORR and program staff also noted that the potential sponsor's failure to timely complete the family reunification applications significantly slows down and may stall out the sponsorship process.  After interviewing the ORR and program staff and reviewing the family reunification requirements (including the reunification application), I see no evidence that this application process unnecessarily prevents UAC from leaving care in a timely manner.  In contrast, if potential sponsors do not complete the applications after many reminders and with the opportunity for individual assistance, a strong argument could be made that the person either is not interested in being a sponsor or is perhaps incapable of consistently meeting the basic needs of the UAC.

57. In addition to the family reunification packet (required for all proposed sponsors), the home study process is another mechanism by which ORR staff seek to ensure sponsorships are safe, supportive and stable.  Not all potential sponsors require a home study.  In contrast

16

with the domestic child welfare system, in which all families experience a home evaluation/study, only a small percentage (7%) of UAC cases actually receive a home study. Home studies are required for some children (under the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA")), but can also be triggered at the discretion of the case managers for safety reasons (see ORR Policy Guide § 2.4.2). The TVPRA requirement is triggered for victims of human trafficking, children with disabilities, victims of child maltreatment or if the sponsor is at risk of trafficking humans. Younger children attempting unification with non-relatives and unrelated sponsors who wish to take custody of multiple children must also complete a home study. Case managers can trigger a discretionary home study if there are unanswered questions about the ability of sponsors to meet the needs of the individual child.

58. Home studies increase a child's length of stay in the system (see Figure 12). To the extent home studies are mandated by law, this increase in length of stay is inevitable. To the extent the child's needs or the potential sponsor's circumstances indicate that a discretionary home study is needed, this increase is also inevitable as it is necessary to ensure the safety of the child. The median time in care among youth without a home study is approximately 36 days. Among youth with a home study, the median time in care is 93 days. Independent third party providers complete home studies. Although I did not analyze data related to the timeliness of home studies once a need for a home study is identified, case managers and supervisors noted that home study providers contact potential sponsors within 48 hours post referral. Here, as in other settings, correlation is not causation, and it would be a mistake to conclude, without sufficient research, that getting a home study causes a longer stay when it is also possible that factors leading to the need for a home study may also make it more difficult to locate a potential sponsor and ensure that this person is capable of safely providing for the child's needs, including any special needs.

59. Subsequent to the completion of the home study and recommendation of the provider, federal field specialists, in consultation with the case managers and independent case coordinators, make a final decision about the viability of the sponsor. Sponsorship can be denied for a variety of reasons. From the site interviews, staff talked about denying sponsorship because of maltreatment in the home, criminal activity in the home or unsafe living environments. If sponsorship is denied for a Category 1 sponsor (parents/legal guardians), ORR staff must detail the reasons for denial within 30 days (see ORR Policy Guide § 2.7.7). This statement of denial must detail the rationale for denial and include instructions on how sponsors can file an appeal.

60. It is critical to note that along with keeping children safe while in ORR's custody and care, the pathway to sponsorship and the home study process are perhaps the most important activities of the ORR grantee care provider system. It is by necessity both time-consuming and comprehensive. Although the program staff (on the site visits) noted that the home study and release process could take as little as three weeks, the reality is that this process is more typically far more labor intensive – as it should be given the wide geographic distribution of potential sponsors (see Figure 9). In domestic child welfare practice, the

17

states generally retain legal guardianship over reunification cases for several months post-release (i.e., trial home visits).  In contrast, the federal government maintains no legal supervision over UAC post reunification.  Consequently, in the child's long-term best interest, case managers, field staff and program staff must do everything they can to increase the likelihood that UAC will be safe and supported post discharge.

V.      Conclusion

The evidence reviewed supports the following opinions:

61. ORR facilities hire, train and support professional staff to provide a high level of care and supervision for the UAC.
62. The child to staff ratios reflect best practices in the field and allow ORR facility staff to accomplish their professional objectives and obligations.
63. The relative risk for children experiencing a step-up in placement is very low.
64. Transfer decisions are made in the best interest of the child.
65. Transfer decisions are made after a careful and thorough review of the individual child's case.
66. Decisions to transfer children are made by a team of clinical staff and supervisors.
67. The time required to connect children with sponsors varies – but this variation is not a result of misguided policies, a lack of effort on the side of ORR facility staff or a desire to keep UAC separated from family.
68. There was nothing in the policy manuals and nothing observed in my meetings with individual staff that leads me to believe that ORR is not focused on securing timely sponsors for all UAC.
69. I found no evidence that would support a legal hearing for all children at the time of transfer or release.  In fact, the qualified and trained ORR facility staff are the most appropriate individuals to be making such important decisions.

Joseph P. Ryan, MSW, PhD
Professor, School of Social Work
Director, Child and Adolescent Data Lab
University of Michigan

18

Confidential - Under Protective Order

Appendix A

Joseph P. Ryan, MSW, Ph.D.

*1080 South University Ave ♦ Ann Arbor, MI 48109 ♦ (734) 763-6580 ♦ joryan@umich.edu*

---

Educational Background

| | | | |
|---|---|---|---|
| University of Massachusetts, Amherst | BA | Psychology | 1992 |
| University of Michigan, Ann Arbor | MSW | Research/Evaluation | 1996 |
| University of Chicago, SSA | Ph.D. | Social Work | 2002 |

Academic Positions

| | | |
|---|---|---|
| 2002 - 2009 | Assistant Professor | University of Illinois School of Social Work |
| 2009 - 2011 | Associate Professor | University of Illinois School of Social Work |
| 2011 - 2018 | Associate Professor | University of Michigan School of Social Work |
| 2012 - present | Faculty Associate | Center for Population Studies, ISR |
| 2015 - present | Co-Director | Child and Adolescent Data Lab (ssw-datalab.org) |
| 2018 – present | Professor | University of Michigan School of Social Work |

Other Professional Employment

| | | |
|---|---|---|
| 1991 - 1993 | Youth Counselor | Eagle Hill School, Hardwick, Massachusetts |
| 1993 - 1994 | Group Home Specialist | Huron Services for Youth, Ann Arbor, Michigan |
| 1994 - 1996 | MSW Research Fellow | Boysville/Michigan School of Social Work |
| 1995 - 1996 | Research Assistant | Institute for Social Research, Michigan |
| 1996 - 1998 | Clinician/Applied Evaluator | Starr Commonwealth, Albion, Michigan |
| 1998 - 2002 | Research Analyst | Chapin Hall, University of Chicago |

Research Grants

| | | | |
|---|---|---|---|
| 2000 - 2001 | PI | Department of Health and Human Services (dissertation) | $30,000 |
| 2005 | PI | Campus Research Board, University of Illinois | $16,961 |
| 2005 | co PI | Los Angeles Country Department of Mental Health | $10,000 |
| 2005 - 2006 | PI | Silberman Faculty Grant Program, NY Community Trust | $28,936 |
| 2005 - 2007 | PI | Department of Children and Family Services/CFRC | $500,448 |
| 2007 - 2008 | PI | Casey Family Programs | $50,000 |
| 2008 - 2010 | PI | John D. and Catherine T. MacArthur Foundation | $119,000 |
| 2009 | PI | Department of Children and Family Services/CFRC | $169,009 |
| 2010 - 2012 | co PI | John D. and Catherine T. MacArthur Foundation | $30,000 |
| 2010 - 2012 | co PI | John D. and Catherine T. MacArthur Foundation | $250,000 |
| 2011- 2012 | PI | State of Illinois, Alcohol and Other Drug Abuse | $115,562 |
| 2011- 2012 | co PI | Michigan Child Welfare Learning Community | $15,000 |
| 2011- 2013 | co PI | Michigan, Vice Chancellor for Research | $20,000 |
| 2011- 2012 | PI | DuPage County (IL) Evaluation of Juvenile Probation | $30,000 |

Confidential - Under Protective Order

Research Grants (continued)

| | | | |
|---|---|---|---|
| 2013-2014 | PI | State of Illinois, Alcohol and Other Drug Abuse Waiver | $115,000 |
| 2013-2014 | PI | State of Michigan, Mental Health and Juvenile Justice | $284,160 |
| 2015-2016 | PI | State of Illinois, Alcohol and Other Drug Abuse (AODA) | $98,455 |
| 2015 - 2016 | PI | Redlich Horwitz Foundation, Child/Adolescent Data Lab | $50,000 |
| 2015-2016 | PI | State of Michigan, Protect MiFamily | $54,231 |
| 2015-2016 | PI | State of Illinois, Pay for Success | $68,234 |
| 2016-2017 | PI | State of Michigan, Protect MiFamily | $54,231 |
| 2015-2017 | co PI | W.K. Kellogg Foundation | $219,619 |
| 2015-2017 | co PI | State of Michigan, Child Analytics | $189,350 |
| 2016-2018 | PI | Redlich Horwitz Foundation, Child/Adolescent Data Lab | $100,000 |
| 2017-2018 | PI | Michigan Committee on Juvenile Justice | $100,000 |
| 2018 | co PI | Casey Family  Programs | $50,000 |
| 2018 | co PI | Midland County Juvenile Court | $5,000 |
| 2018 | PI | Criminal Justice Policy Commission | $5,000 |
| 2015-2021 | PI | State of Michigan, Performance Based Foster Care | $425,674 |

Publications

Ryan, J. P., Davis, R., and Yang, H. (2001) Reintegration Services and the Likelihood   of Adult Imprisonment: A Longitudinal Study of Adjudicated Delinquents. *Research on Social Work Practice,* 11, 321-337

Ryan, J. P., and Schuerman, J. R. (2004) Matching Family Problems with Specific Family Preservation Services: A study of Service Effectiveness.  *Children and Youth Services Review,* 26, 347 – 372.

Ryan, J. P., & Testa, M. F. (2005) Child Maltreatment and Juvenile Delinquency: Investigating the Role of Placement and Placement Instability. *Children and Youth Services Review,* 27, 227 – 249.

Ryan, J. P., & Yang, H. (2005). Family Contact and Recidivism: A Longitudinal Study of Adjudicated Delinquents in Residential Care. *Social Work Research,* 29, 31-39.

Ryan, J. P., Marsh, J., Testa, M.F., & Louderman, R. (2006) Integrating Substance Abuse Treatment and Child Welfare Services: Findings from the Illinois AODA Waiver Demonstration. *Social Work Research, 30,* 95-107.

Marsh, J., Ryan, J. P., Choi, S. & Testa, M. (2006) Integrated Services for Families with Multiple Problems: Obstacles to Family Reunification. *Children and Youth Services Review, 28,* 1074-1087

Ryan, J. P., Garnier, P., Zyphur, M. & Zhai, F. (2006) Testing the Effects of Caseworker Characteristics in Child Welfare.  *Children and Youth Services Review, 28,* 993-1006.

Confidential - Under Protective Order

Ryan, J. P. (2006) Dependent Youth in Juvenile Justice: Do Positive Peer Culture Programs Work for Victims of Child Maltreatment? *Research on Social Work Practice, 16,* 511-519.

Choi, S. & Ryan, J. P. (2006) Completing Substance Abuse Treatment in Child Welfare: The Role of Co-Occurring Problems and Primary Drug of Choice. *Child Maltreatment, 11,* 313-325.

Ryan, J. P., Hernandez, P. M., & Herz, D. (2007) Developmental Trajectories of Offending for Adolescents Aging out of Foster Care. *Social Work Research, 31,* 83-93.

Choi, S. & Ryan, J. P. (2007). Co-occurring Problems for Substance Abusing Mothers in Child Welfare: Matching Services to Improve Family Reunification. *Children and Youth Services Review, 29, 1395-1410*.

Ryan, J. P., Herz, D., Hernandez, P. & Marshall, J. (2007). Maltreatment and Delinquency: Investigating Child Welfare Bias in Juvenile Justice Processing.  *Children and Youth Services Review, 29, 1035-1050*.

Ryan, J. P., Testa, M. F., & Zhai, F. (2008) African American Youth in Foster Care and the Risk of Delinquency: The Value of Social Bonds and Permanence. *Child Welfare, 87,* 115-140.

Ryan, J. P., Marshall, J. M., Herz, D., & Hernandez, P. (2008) Juvenile Delinquency in Child Welfare: Investigating Group Home Effects. *Children and Youth Services Review, 30,* 1088-1099.

Herz, D. & Ryan, J. (2008). Building multisystem approaches in child welfare and juvenile justice. Washington, D.C. Center for Juvenile Justice Reform.

Park, M. & Ryan, J. P. (2009) Placement and Permanency Outcomes for Children in Out-of-Home Care by Prior Inpatient Mental Health Treatment. *Research on Social Work Practice*, *1*, 42-51.

Ryan, J. P., Choi, S., Hong, J., Hernandez, P. & Larrison, C. (2009). Recovery Coaches and Substance Exposure at Birth. *Child Abuse and Neglect*, *32,* 1072-1079

Herz, D., Harada, S, Lecklitner, G., Rauso, M. & Ryan, J. P. (2009) Identifying and Responding to Criminogenic Risk and Mental Health Treatment Needs of Crossover Youth. In Andrade, J (Ed) *Violence Risk Assessment and Treatment for Forensic Practitioners*. New York: Springer Publishing.

Herz, D., Ryan, J., & Bilchik, S. (2010) Challenges Facing Crossover Youth: An Examination of Juvenile-Justice: Decision-Making and Recidivism. *Family Court Review*, *48*, 305-321

Ryan, J., Hong, J., Herz, D., & Hernandez, P. (2010) Kinship Foster Care and the Risk of Juvenile Delinquency. *Children and Youth Services Review, 32,* 1823-1830.

Confidential - Under Protective Order

Huang, H. & Ryan, J.P. (2011).  Trying to Come Home: Substance Abused Infants in Child Welfare: *Children and Youth Services Review*, 33, 322-329.

Chiu, Y., Ryan, J.P. & Herz, D. (2011) Allegations of Maltreatment and Delinquency: Does the Risk of Juvenile Arrest Vary by Substantiation Status.  *Children and Youth Services Review, 33*, 855-860.

Marshall, J., Huang, H., & Ryan, J. P. (2011) Intergenerational families in child welfare: Assessing needs and estimating permanency.  *Children and Youth Services Review, 33*, 1024-1030.

Huang, H., Ryan, J.P., & Herz, D. (2012). The journey of dually-involved youth: The description and prediction of re-reporting and recidivism. *Children and Youth Services Review, 34*, 254-260.

Choi, S., Huang, H., & Ryan, J. (2012) Substance Abuse Treatment Completion in Child Welfare: Does Substance Abuse Treatment Completion Matter in the Decision of Family Reunification? *Children and Youth Services Review, 34,* 1639-1645.

Ryan, J. P. (2012) Substitute Care in Child Welfare and the Risk of Arrest: Does the Type of Placement Matter?  *Child Maltreatment, 17,* 167-171.

Ryan, J.P., Williams, A., & Courtney, M. E. (2013) Adolescent Neglect, Juvenile Delinquency and the Risk of Recidivism.  *Journal of Youth and Adolescence, 42,* 454-465.

Douglas-Siegel, J., & Ryan, J.P.  (2013) The Effect of Recovery Coaches for Substance-Involved Mothers in Child Welfare: Impact on Juvenile Delinquency. *Journal of Substance Abuse Treatment*, 45, 381-387.

Hong, JS, Ryan, JP, Chiu, YL, & Sabri, B (2013). Re-arrest among juvenile justice-involved youth: An examination of the static and dynamic risk factors.  *Residential Treatment for Children and Youth 2,* 131-148.

Perron, B.E., Vaughn, M.G., Ryan, J., Salas-Wright, C, Ruffolo, M., & Guerrero, E.  (2014). *Predictive validity of self-reported head injuries among delinquent youth.*  In M. DeLisis & M.G. Vaugh (Eds.), International Handbook of Biosocial Criminology.  New York: Routledge.

Huang, H., & Ryan, J. P. (2014) The location of placement and juvenile delinquency: Do neighborhoods matter in child welfare?  *Children and Youth Services Review, 44, 33-45.*

Hong, J.S. & Ryan, J.P. (2014) *Juvenile Delinquents.*  In L. Cousins & G. Golson (Eds). Encyclopedia on Human Services and Diversity.

Ryan, J. P., Abrams, L., & Huang, H. (2014) First Time Violent Juvenile Offenders: Probation, Placement and Recidivism.  *Social Work Research, 38,* 7-18.

Confidential - Under Protective Order

Hong, J.S., Ryan, J.P., Hernandez, P.M., & Brown, S. (2014). Termination of parental rights for parents with substance use disorder: For whom and then what? *Social Work in Public Health, 29*, 503-517

Ryan, J., Huang, H. (2014) Substance Abuse and Child Welfare. In Mallon and Hess (Eds) *Child Welfare for the 21st Century, a Handbook of Policies, Practices and Programs*, 2nd Edition.  New York: Columbia University Press.

Huang, H., Ryan, J. P., Sappleton, A., & Chiu, Y. (2015). Crossover youth post arrest: Placement status and recidivism. *Children and Youth Services Review*, 57, 193-200.

Williams, A., Ryan, J., Davis-Keen, P., & McLoyd, V. (2015) The Discontinuity of Offending among African American Youth in the Juvenile Justice System. *Youth and Society*.

Huang, H., Ryan, J. P., & Rhoden, M. (2015). Foster Care, Geographic Neighborhood Change and Delinquency. *Children and Youth Services Review, 65,* 32-41.

Tam, C., Abrams, L., Freisthler, B., & Ryan, J.P. (2016) Juvenile Justice Sentencing: Do Gender and Child Welfare Involvement Matter?  *Children and Youth Services Review, 64,* 60-65.

Sarri, R., Stoffregen, E., & Ryan. J.P. (2016) Running Away from Child Welfare Placements: Justice System Entry Risk. *Children and Youth Services Review, 67,* 191-197.

Ryan, J., Perron, B., and Huang, H. (2016). Child Welfare and the Transition to Adulthood: Investigating Placement Status and Subsequent Arrests.  *Journal of Youth and Adolescence, 45,* 172-182.

Victor, B.G., Ryan, J.P., Moore, A., Mowbray, O., Evangelist, M. & Perron, B.E. (2016).  Foster care licensing and the risk of reentry to out of home care following family reunification. *Children and Youth Services Review, 70*, 112-119.

Ryan, J. P., Victor, B.G., Moore, A., Mowbray, O. & Perron. B. E. (2016) Recovery coaches and the stability of reunification for substance abusing families in child welfare. *Children and Youth Services Review 70*, 357-363

Evangelist, M., Ryan, J.P., Victor, B.G., Moore, A., & Perron B.E. (in press). Disparities at Adjudication in the Juvenile Justice System: An Examination of Race, Gender, and Age. *Social Work Research*.

Mowbray, O., Victor, B., Ryan, J.P., Moore, A., & Perron, B.E. (in press).  Parental Substance Use and Foster Care Re-entry.  *Journal of Social Work Practice and the Addictions*.

Ryan, J.P., Perron, B.E., Moore, A., Victor, B.G. & Evangelist, M. (2016).  Foster home placements and the probability of family reunification: Does licensing matter?  *Child Abuse & Neglect,* 59, 88-99.

Mowbray, O., Ryan, J. P., Victor, B.G., Bushman, G., Yochum, C. & Perron, B.E. (2017) Longitudinal trends in substance use and mental health service needs in child welfare. *Children and Youth Services Review 73*, 1-8

Ryan, J. P., Perron, B. E., Moore, A., Victor, B. G., & Park, K. (2017). Timing matters: A randomized control trial of recovery coaches in foster care. *Journal of Substance Abuse Treatment.* doi: 10.1016/j.jsat.2017.02.006

Victor, B., Grogan-Kaylor, A., Ryan, J.P., Perron, B.E. & Gilbert, T. (2018).  Domestic violence, parental substance misuse and the decision to substantiate child maltreatment.  *Child abuse & neglect 79,* 31-41

Bushman, G., Victor., B., Ryan, J.P. & Perron, B. (2018) In Utero Exposure to Opioids: An Observational Study of Mothers Involved in the Child Welfare System.  *Substance Use & Misuse* 53 (5), 844-851

Victor. B., Resko, S., Ryan, J.P. & Perron, B. (2018) Identification of Domestic Violence Service Needs Among Child Welfare–Involved Parents with Substance Use Disorders: A Gender-Stratified Analysis.  *Journal of Interpersonal Violence,* 0886260518768569.

Jonson-Reid, M., Dunnigan, A., & Ryan, J.P. (2018) Foster Care and Juvenile Justice Systems. Handbook of Foster Youth.

Victor, B., Grogan-Kaylor, A, Ryan, J., Perron, B. & Gilbert, T. (2018) Domestic Violence, parental substance misuse and the decision to substantiate child maltreatment.  *Child Abuse and Neglect,* 79, 31-41.

Ryan, J.P., Jacob, B., Gross. M., Perron, B.,& Moore, A. (2018) Early Exposure to Child Maltreatment and Academic Outcomes.  *Child Maltreatment*, doi.org/10.1177/1077559518786815

Perron, B, Victor, B., Bushman, G., Moore, A., Ryan, JP., Lu, A., & Piellusch, E. (2019) Detecting substance-related problems in narrative investigation summaries of child abuse and neglect using text mining and machine learning.  *Child abuse & neglect*

Victor, B., Henry, C., Gilbert, T., Ryan, JP., Perron, B. (2019) Child protective service referrals involving exposure to domestic violence: prevalence, associated maltreatment types, and likelihood of formal case openings.  *Child maltreatment* 24, 299-309

Lin, Y.,  Hedeker, D., Ryan, J., Marsh, J (2020) Longitudinal Analysis of Need-Service Matching for Substance-Involved Parents in the Child Welfare System. *Children and Youth Services Review*

Sokol, R., Li, J., Victor, B., Miller, A., Ryan, J., Perron, B. (2020) Changes in Child and Adolescent Needs and Strengths (CANS) scores over time: A systematic review. *Children and Youth Services Review*

Invited Lectures

2004    1st National Conference on Substance Abuse, Child Welfare and the Dependency Courts, Baltimore, MD.

2004    Child Maltreatment and Juvenile Delinquency.  Invited plenary presented at the Child Welfare League of America National Juvenile Justice Symposium, Indianapolis, IN.

2005    African American Youth in Foster Care and Delinquency. University of Michigan School of Social Work, Association of Black Social Work Students.

2006    Co-occurring Problems and the Likelihood of Reunification. University of Chicago.

2006    Dependent and Delinquent: Initial Risks and Pathways through Child Welfare and Juvenile Justice.  Woodrow Wilson International Center for Scholars: Washington, DC.

2006    Substance Abuse in Child Welfare: Understanding the Problem and Testing Innovative Strategies.  Harvard University Law School

2006    Child Maltreatment and Juvenile Delinquency. Beyond the Bench Conference, Judicial Council of California: Monterey, CA.

2007    Child Welfare's and the Overrepresentation of African American Youth in Juvenile Justice: MacArthur Foundation Models for Change Initiative. New York, NY.

2007    Group Placements and Delinquency in Child Welfare: MacArthur Foundation Models for Change Initiative. Santa Monica, CA.

2007    Parental Substance Abuse: Reform Initiatives including CAPTA - Inspired Early Intervention Programs and Family Drug Courts. American Bar Association 12th National Conference on Children and the Law: Harvard University Law School

2008    Child Maltreatment and Delinquency: Child Development/Counseling Psychology, University of Illinois at Urbana Champaign.

2008    Building Multisystem Approaches in Child Welfare and Juvenile Justice, Wingspread Policy Retreat sponsored by Casey Family Programs, American Public Human Services Association, and Georgetown University's Center for Juvenile Justice Reform

2008    Child Welfare's Contribution to Overrepresentation in Juvenile Justice, Developmental Psychology, University of Illinois at Urbana - Champaign

2008    The Intersection of Child Welfare and Juvenile Justice. Woodrow Wilson School, Princeton University

2009   Juvenile Delinquency in Child Welfare Systems. MacArthur Foundation's Models for Change National Meeting, Washington DC.

2010   Neglected and Delinquent: Investigating Risk Profiles and the Likelihood of Recidivism. George Warren Brown School of Social Work, Washington University.

2010   University of Chicago, Doctoral Theory and Teaching Seminar

2011   Harvard University Law School, Substance Abuse and Child Welfare: Implications for the Overrepresentation of African American Families

2011   Harvard University Law School, Testing Innovative Approaches for Substance Abusing Families in Child Welfare.  Child Advocacy Law Program.

2011   MacArthur Foundation Models for Change National Conference.  Disproportionate Minority Contact in Juvenile Justice: The Role of Child Welfare.  Washington DC

2012   Harvard University Law School, Family Treatment Drug Courts and the Prevention of Repeat Child Maltreatment.  Child Advocacy Law Program.

2012   Child Welfare Statewide Data Summit, sponsored by Casey Family Programs, Chicago Illinois.  Substance Abuse and Child Maltreatment, children zero to five.

2013   Child Welfare and Juvenile Delinquency; evidence to date and critical issues looking forward.  University of Michigan Law School.

2013   Loyola Law School, using data for inform child welfare and juvenile justice policy. Conference sponsored by the John D. and Catherine T. MacArthur Foundation.

2014   Substance Abuse and Child Maltreatment. MI Assoc. of Family Court Judges

2015   Adolescent Development in the Context of Child Welfare and Juvenile Justice.  Youth in Transition Funders Group (YTF).  New York, NY.

2016   Empirical Basis for the School to Prison Pipeline.  University of Michigan Law School

2017   Early child maltreatment and academic outcomes.  State of Michigan, School Justice Partnership.  Traverse City, MI.

2018   Child Maltreatment and Juvenile Crime. Keynote Address, Oklahoma Statewide Conference on Family Court Improvement

2018   Integrating Administrative Data to Improve Child and Family Outcomes.  College of Health and Human Development, Penn State University

2018   Challenges in Foster Care and Child Welfare: Indiana State Legislators

Confidential - Under Protective Order

Editorial Board Memberships

Research on Social Work Practice (2006 – 2008)
Social Work Research (2007 – present)
Residential Treatment for Children and Youth (2007 – present)
Child Maltreatment (2008 – present)
Child Welfare (2008 – present)

University, County and State Service

Governor Appointed Statewide Committee on Juvenile Justice (2014 – present)
Criminal Justice Policy Commission
PBS SoCal, Fostering Change Advisory Board (2017 – present)
Executive Committee, University of Michigan School of Social Work (2012 – 2016)
Search Committee, University of Michigan School of Social Work (2016 – 2017)
Child Welfare Learning Community, University of Michigan School of Social Work (2012 – 2017)
Washtenaw County Human Services Advisory Board (2014 – 2016)
Executive Committee, University of Illinois Social Work (2008 – 2011)
Chair, Child Welfare Curriculum Specialization, University of Illinois Social Work (2006 – 2011)

Confidential - Under Protective Order

Appendix B

Figure 1a. Summary of admissions (census files) and discharges (discharge files) by month

Figure 1b. Summary of admissions and discharges based only on discharge files

Figure 2.  Age distribution of youth at discharge

Figure 3:  Gender distribution of youth

Figure 4.  Number of youth by country of birth

Figure 5. Time in care by type of discharge

Figure 6.  Time in care by security type

Figure 7. Time in care by country of birth (COB)

Figure 8. Time in care by age

Figure 9.  Location of sponsors for reunified youth (individual sponsors)

Figure 10.  Number of transfers among all youth with at least one transfer

Figure 11.  Types of transfers among youth with at least one transfer among key program types

Figure 12.  Difference in time in care among home study and non-home study youth

Figure 13.  Time in care for youth with a step-up in security

Total number of unique youth admitted between 1-1-2018 and 12-31-2019
- Estimates based on census file:  96,371
- Estimates based on discharge file:  108,512

Confidential - Under Protective Order

Figure 1 summarizes the unique admissions and discharges by month from November 2017 through December 2019.  The number of admissions is based on the census files, whereas the number of discharges is based on the discharge files.  Please note that these estimates do not reflect unique youth but unique episodes.  An episode is defined by an admission and discharge.  Some youth can have multiple episodes -- that is, discharged from one shelter and readmitted to another.

We also note some discrepancies in the data with the number of discharges outpacing admissions.  This is likely explained by a couple of factors.  First, we don't know the number of youth admitted prior to November 2017.  That is, the number of admissions could have outpaced the number of discharges prior to this period.  Second, we are working with different data extracts that do not have alignment.  For example, we have 19,063 unique ID's in the discharge files that are not observed in the census files.  Third, there may be some delays in the updates to the data files.  However, despite the discrepancies, this figure is likely an accurate representation of the overall system trends, revealing a significant increase in admissions/discharges from October 2018 through June 2019.  After June 2019, we observe a significant decrease in admissions/discharges.

Confidential - Under Protective Order

**Figure 1a. Summary of admissions (census files) and discharges (discharge files) by month**



Confidential - Under Protective Order

**Figure 1b. Summary of admissions and discharges based only on discharge files**

This figure summarizes the unique youth admitted and discharged using a fixed admission window (January 1, 2018 through December 31, 2019).  This is based on all youth in the discharge data.



Figure 2 shows the age distribution of youth at the time of discharge among all youth admitted anytime during 2018 through 2019.  This figure is based on the discharge data and truncates (rounds downward) all age values.  For example, a youth who has a calculated age (at discharge) of 17.9 years is in the 17 years of age category.  Thus, all youth in the 18+ category has officially reached or exceeded their 18th birthday based on the data provided.  We also note that this figure includes all discharge types.

**Figure 2.  Age distribution of youth at discharge**



**Figure 3:  Gender distribution of youth**



Confidential - Under Protective Order

Figure 4 provides a summary of the number of youth by country of birth based on the discharge data (reflecting admissions from 2018 through 2019).

## Figure 4.  Number of youth by country of birth

| Country | N | | Country | N | | Country | N |
|---|---|---|---|---|---|---|---|
| Guatemala | 51584 | | Angola | 9 | | Argentina | 1 |
| Honduras | 32003 | | Uzbekistan | 9 | | Benin | 1 |
| El Salvador | 17150 | | Dem Rep Of The Congo | 8 | | Gambia | 1 |
| Mexico | 2646 | | Ghana | 7 | | Germany | 1 |
| Ecuador | 1285 | | Azerbaijan | 6 | | Hungary | 1 |
| India | 1072 | | Somalia | 6 | | Ivory Coast | 1 |
| Nicaragua | 1071 | | Sri Lanka | 6 | | Jordan | 1 |
| Bangladesh | 413 | | Bahamas | 5 | | Kosovo | 1 |
| United States of America | 286 | | Eritrea | 5 | | Lebanon | 1 |
| Brazil | 187 | | Russia | 5 | | Mali | 1 |
| China | 132 | | Albania | 4 | | Mongolia | 1 |
| Cuba | 87 | | France | 4 | | Myanmar | 1 |
| Venezuela | 83 | | Italy | 3 | | New Zealand | 1 |
| Romania | 65 | | Jamaica | 3 | | Poland | 1 |
| Peru | 54 | | Pakistan | 3 | | Serbia | 1 |
| Vietnam | 51 | | Uganda | 3 | | Slovakia | 1 |
| Nepal | 42 | | Ukraine | 3 | | Spain | 1 |
| Belize | 40 | | Bolivia | 2 | | Sudan | 1 |
| Haiti | 31 | | Canada | 2 | | Thailand | 1 |
| Guinea | 27 | | Chile | 2 | | | |
| Colombia | 20 | | Ethiopia | 2 | | | |
| Congo | 20 | | Saudi Arabia | 2 | | | |
| Armenia | 19 | | Sierra Leone | 2 | | | |
| Dominican Republic | 16 | | South Sudan | 2 | | | |
| Cameroon | 11 | | Syria | 2 | | | |
| Costa Rica | 10 | | Turkey | 2 | | | |
| Ireland | 10 | | United Kingdom | 2 | | | |
| Nigeria | 10 | | Algeria | 1 | | | |

Confidential - Under Protective Order

Figure 5 summarizes time in care by discharge type for new admissions from 2018 through
2019. This figure excludes certain lateral discharges (e.g., discharge to another shelter).  The
overall mean time in care is 55 days (standard deviation = 57 days, median = 38 days).

## Figure 5. Time in care by type of discharge

| DISCHARGE_TYPE | N | Mean | Median | SD | Min | Max |
|---|---|---|---|---|---|---|
| Reunified (Individual Sponsor) | 96629 | 49 days | 36 days | 42 | 0 days | 579 days |
| Age Out | 3015 | 66 days | 38 days | 79 | 0 days | 527 days |
| Age Redetermination | 1517 | 38 days | 23 days | 44 | 0 days | 467 days |
| Voluntary Departure | 1414 | 132 days | 126 days | 72 | 1 days | 485 days |
| Transitional Foster Care | 435 | 63 days | 60 days | 29 | 3 days | 171 days |
| Ranaway from Facility | 221 | 71 days | 45 days | 79 | 1 days | 437 days |
| Ordered Removed | 60 | 67 days | 51 days | 54 | 1 days | 243 days |
| Ranaway on Field Trip | 52 | 69 days | 58 days | 64 | 3 days | 283 days |
| Immigration Relief Granted | 38 | 296 days | 302 days | 149 | 33 days | 567 days |
| DHS Family Shelter | 10 | 85 days | 92 days | 61 | 6 days | 167 days |
| Residential Treatment Center | 5 | 120 days | 144 days | 55 | 22 days | 152 days |

Confidential - Under Protective Order

Figure 6 summarizes time in care by security type at discharge.  This figure is based on the entirety of the discharge data and includes all security types.  The definitions of security are based on Program Types as listed in the discharge file.  This figure is based on all admissions ranging from 2018 through 2019.  Unlike Figure 5, this figure does not exclude lateral discharges (e.g., discharge to another shelter).

- Low security:  Shelter and therapeutic group home
- Medium security:  Staff secure and therapeutic staff secure
- High security:  Secure and residential treatment center
- Unclassified:  All remaining types of programs

**Figure 6.  Time in care by security type**

| security_level | N | Percent | Mean | Median | SD | Min | Max |
|---|---|---|---|---|---|---|---|
| Low security | 103980 | 85.4 | 51 days | 36 days | 47 | 0 days | 659 days |
| Unclassified | 4286 | 3.5 | 58 days | 52 days | 31 | 1 days | 209 days |
| Medium security | 377 | 0.3 | 64 days | 52 days | 54 | 1 days | 365 days |
| High security | 161 | 0.1 | 94 days | 74 days | 77 | 3 days | 483 days |

Confidential - Under Protective Order

Figure 7 summarizes the time in care by the country of birth limited to the top-10 countries by unique youth counts (among youth admitted anytime between 2018 through 2019).

## Figure 7. Time in care by country of birth (COB)

| COB | N | Percent | Mean | Median | SD | Min | Max |
|---|---|---|---|---|---|---|---|
| Guatemala | 59755 | 49.1 | 58 days | 41 days | 60 | 0 days | 1190 days |
| Honduras | 34493 | 28.3 | 52 days | 37 days | 53 | 0 days | 1602 days |
| El Salvador | 18590 | 15.3 | 43 days | 31 days | 44 | 0 days | 1100 days |
| Mexico | 3085 | 2.5 | 65 days | 46 days | 70 | 1 days | 952 days |
| India | 1406 | 1.2 | 80 days | 64 days | 64 | 1 days | 622 days |
| Ecuador | 1299 | 1.1 | 27 days | 20 days | 22 | 2 days | 301 days |
| Nicaragua | 1113 | 0.9 | 48 days | 36 days | 41 | 1 days | 406 days |
| Bangladesh | 485 | 0.4 | 91 days | 81 days | 56 | 3 days | 427 days |
| United States of America | 311 | 0.3 | 64 days | 45 days | 69 | 1 days | 547 days |
| Brazil | 216 | 0.2 | 61 days | 44 days | 71 | 4 days | 535 days |

Confidential - Under Protective Order

Figure 8 summarizes time in care by age.  This figure is based on the discharge data extract and truncates (rounds downward) all age values.  For example, a youth who has a calculated age (at discharge) of 17.9 years is in the 17 years of age category.  Thus, all youth in the 18+ category has officially reached or exceeded their 18th birthday based on the data provided.  We also note that this figure includes all discharge types.

**Figure 8. Time in care by age**



Figure 9 summarizes the state of the "sponsor" for youth who are discharged with a program type of "Reunified (Individual Sponsor)".  These data are derived from the discharge file extract and include all available admissions (7-15-2015 through 11-23-2019) and discharges (8-5-2015 through 11-30-2019).

**Figure 9.  Location of sponsors for reunified youth (individual sponsors)**

| region | N | Percent | region | N | Percent |
|---|---|---|---|---|---|
| texas | 14173 | 13.2 | mississippi | 771 | 0.7 |
| california | 13088 | 12.1 | arizona | 760 | 0.7 |
| florida | 11410 | 10.6 | kansas | 735 | 0.7 |
| new york | 9303 | 8.6 | iowa | 714 | 0.7 |
| maryland | 6446 | 6.0 | rhode island | 687 | 0.6 |
| new jersey | 6150 | 5.7 | missouri | 632 | 0.6 |
| virginia | 5877 | 5.5 | delaware | 616 | 0.6 |
| georgia | 3822 | 3.5 | arkansas | 549 | 0.5 |
| north carolina | 3642 | 3.4 | oregon | 503 | 0.5 |
| tennessee | 3329 | 3.1 | nevada | 452 | 0.4 |
| louisiana | 2864 | 2.7 | district of columbia | 430 | 0.4 |
| massachusetts | 2566 | 2.4 | michigan | 384 | 0.4 |
| alabama | 1820 | 1.7 | wisconsin | 343 | 0.3 |
| pennsylvania | 1804 | 1.7 | utah | 286 | 0.3 |
| ohio | 1616 | 1.5 | south dakota | 241 | 0.2 |
| south carolina | 1506 | 1.4 | new mexico | 127 | 0.1 |
| illinois | 1321 | 1.2 | idaho | 91 | 0.1 |
| connecticut | 1318 | 1.2 | west virginia | 58 | 0.1 |
| washington | 1194 | 1.1 | maine | 46 | 0.0 |
| indiana | 1192 | 1.1 | new hampshire | 42 | 0.0 |
| kentucky | 1036 | 1.0 | wyoming | 33 | 0.0 |
| colorado | 1026 | 1.0 | (Missing) | 26 | 0.0 |
| nebraska | 919 | 0.9 | hawaii | 19 | 0.0 |
| minnesota | 905 | 0.8 | north dakota | 15 | 0.0 |

Confidential - Under Protective Order

Between January 1, 2017 and December 31, 2019, we observed a total of 121,356 unique youth admitted to the system (based on discharge data).  Among these youth, 9,062 (7%) had at least one transfer.  Figure 10 summarizes the number of transfers among these youth.  Note that the transfer definition refers to any type of discharge followed by readmission.

**Figure 10.  Number of transfers among all youth with at least one transfer**



Given the diversity of possible types of transfers, we further limit the analyses to key types of programs, categorized by their security type:

- Low security:  Shelter and therapeutic group home
- Medium security:  Staff secure and therapeutic staff secure
- High security:  Secure and residential treatment center

Using the same timeframe as Figure 10 (January 1, 2017 through December 31, 2019), we observe a total of 3,042 transfers among the types of programs above, which is approximately 3% of the total youth.  We have three different types of transfers:  lateral, step-up, and step-down.  A lateral transfer refers to staying at the same level of security when being transferred.  A change from a lower level to a higher level (e.g., low to medium, medium to high, and low to high) is a step-up.  A change from a higher level of security to a lower level of security (e.g., high to medium, medium to low, high to low) is a step-down.  Figure 11 summarizes the different types of transfers among youth with at least one transfer among key program types.

**Figure 11.  Types of transfers among youth with at least one transfer among key program types**



About 7% of youth receive a home study. The mean number of days between ORR administrative approval and the execution of the home study is roughly 70 days (sd = 86, Median = 51).  The following life history chart shows the amount of time in care among youth with and without a home study.  The median time in care among youth without a home study is about 36 days.  Among youth with a home study, the median time in care is 93 days.  Note that this figure is based only on youth with an observed discharge.

**Figure 12.  Difference in time in care among home study and non-home study youth**



Figure 13 shows the time in care for youth with a step-up in their security level, compared to the overall population.

**Figure 13.  Time in care for youth with a step-up in security**

| Group | Mean time in care | Median time in care |
|---|---|---|
| Overall population (N = 108,512) | 55 days (sd = 57) | 38 days |
| Youth with a step-up (N = 345) | 80 days (sd = 65) | 60 days |

Confidential - Under Protective Order