# DX-31

Expert Rebuttal Report of Dr. Joseph P. Ryan, June 19, 2020

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCAS R. *et al.*, <br><br>     Plaintiffs, <br><br>     v. <br><br> ALEX AZAR, Secretary of U.S. Dep't of Health and Human Services, *et al*., <br><br>     Defendants. | Case No.: 2-18-CV-05741 DMG (PLA) |

**REBUTTAL REPORT OF DR. JOSEPH R. RYAN**

Rebuttal of Drs. Ryan Matlow and Nancy Ewen Wang

1. Just for context, let me note that no one believes child development is enhanced in long-term detention facilities. Children are better off in loving families and families are better off in supportive and healthy communities. The question all child welfare systems face is what to do when family placements are not available? How do we keep children in the least restrictive environments? How are children supported in more-restrictive environments? Are there consequences associated with the most restrictive environments? Drs. Matlow and Wang opine on trauma, detention and restrictive settings (which they refer to as institutions, congregate care facilities and detention).

2. I have no objections to the authors' review of the trauma literature as it relates to brain development and attachment in the general population. I also have no contradictory opinions as it relates to the authors discussion of brain development and the lack of impulse control associated with adolescence. There is plenty of science to support their statements. However, I have serious concerns about the authors' opinions as it relates to their definition (adopted from the Dozier et al. (2012) of "institutions" and the generalizability of findings to the UAC population. Drs. Matlow and Wang make the argument that "although there has not been a peer reviewed study conducted on the impacts of detention in ORR custody, it is our opinion that the findings on institutional care would apply" (page 15). I strongly believe and will demonstrate that "institutions" as defined by Dozier et al. (2012) and adopted by Drs. Matlow and Wang in no way resemble the ORR shelter care network. Consequently, the authors' argument that the findings apply to ORR custody is without merit. Moreover, the majority of literature cited by Drs. Marlow and Wang focused on populations that are significantly different (in terms of both individual demographics and life circumstances) from the UAC population.

3. Underlying these concerns is a more general critique of the attributions made to the ORR shelter care system. It is not clear whether the authors' interpretation of trauma and toxic stress would apply to any substitute care setting for UACs. Children in domestic foster homes experience a limited sense of personal agency, a lack of knowledge about what will happen to them (contingent on how biological parents respond), and feelings of fear and helplessness that is not caused by the setting but rather the children's circumstances. Do the authors argue that the stress is a function of the setting itself or the circumstances that bring children into ORR's care and custody? If children were placed in foster homes along the southern border, would the limited sense of personal agency, lack of knowledge about the future, and feelings of fear and helplessness no longer be an issue?

4. The authors note that a number of adverse childhood experiences (ACEs) are "indistinguishable from those associated with ORR custody." The authors specifically note parental separation, physical and emotional neglect and physical abuse. The parental separation experience is legitimate but should not be applied to the shelter care experience. That particular ACE happened prior to arrival in the United States and would apply to any setting in which the child awaits sponsorship. Regarding experiences of abuse and neglect, for clarity, the actual items on the ACE instrument follow:

000002

- Did a parent in the household **often or very often** swear at you, insult you, put you down, or humiliate you in a way that makes you afraid that you might be physically hurt?
- Did a parent **often or very often** push, grab, slap or throw something at you or ever hit you so hard that you had marks and were injured?
- Did you **often or very often feel** that you did not have enough to eat, had to wear dirty clothes and had no one to protect you (from harm)? Or your parents were too drunk or too high to take care of you?

5. The authors note it is clear that these events happen "either before or during their time in ORR custody." (page 11). This statement – as it relates to the experiences **in** ORR custody requires evidence. I have seen no evidence to support a finding that UAC are deprived of food and clothing, are cared for by staff that are drunk/high, are humiliated and shamed to the point of fearing for their safety or are physically beaten by those responsible for their care and supervision.[1]

6. The authors note (page 12) the serious issues UACs bring to the shelters. They note histories of trauma, Post Traumatic Stress Disorder (PTSD), anxiety, depression, family violence and altered developmental functioning to name a few. These historical traumas and prior life experiences can cascade and create long-term emotional and behavior issues. In one of the articles cited by the authors, Sege and colleagues (2017) note that these experiences can lead to a child's inability to regulate emotional states and can result in challenging behaviors when interacting with others (presumably staff and peers). Sege and colleagues go on to note that in addition to counseling, some of these children may require additional services to address more persistent and severe behavioral problems. Recognizing the amount of trauma UACs experience prior to ORR contact and given the authors' negative assessment of the step-up process (e.g. sudden and unexpected placement transfers, often in the middle of the night (page 23), step-ups without consideration for the child's trauma history (page 5)), one might assume that a majority of UACs experience a transfer to a more secure setting. Yet, this is not the case. Despite the long and tragic histories of trauma experienced by UACs, and despite the serious emotional and behavioral issues often displayed by UACs (because of such trauma), very few UACs escalate to a secure facility (less than 1%). Moreover, approximately 96% of the UACs move to live with an identified sponsor in an average of 36 days. These statistics do not reflect a system that is over-utilizing secure placements within the

---

[1] The Declarations that the authors cite do not provide such evidence. *See*, *e.g.*, J.D.PP.'s Decl., ¶ 18 (cited in Matlow & Wang, page 13). JDPP made 2 CPS allegations while at Shenandoah Valley Juvenile Center (SVJC), a secure facility. The first, on March 8, 2018, alleged sexual harassment by staff, but "was deemed unfounded after the investigation conducted by Shenandoah Valley Department of Social Services." The second occurred on April 1, 2018, and alleged physical abuse by staff, but "did not meet the definition of child abuse/neglect according to Virginia State policy." (GOV-00239760, GOV-00239765).

continuum of care. In contrast, these statistics reflect a system that is working quite effectively to manage a highly traumatized population in the least restrictive setting.[2]

7. Throughout the report, the authors note that children "demonstrated" anxiety symptoms because of the uncertainty of their own personal well-being and that of a loved one. The children also reported being overwhelmed by their circumstances. This sounds reasonable and in fact a perfectly normal response. How could one not be anxious and overwhelmed after traveling to a new country without adult family members and often without a clear path to sponsorship? The question is – is this anxiety related to the placement itself? It seems the same feelings (symptoms) would emerge in any setting.

8. Throughout the report, the authors claim that psychological functioning deteriorates over time and mental health problems are exacerbated. "We frequently observed that increased length of time in ORR custody was associated with increased severity of depressive symptoms marked by desperation, hopelessness and helplessness" (page 14). This conclusion would require interviewing children repeatedly and contemporaneously, and measuring changes in symptoms over time, or reviewing a representative sample of case files with an eye on temporal sequence. I was not in possession of the authors' methods or interview protocols, but I am guessing neither are true. The authors attempt to provide some evidence for this statement (footnote 10, page 17), but this vague anecdote is not convincing and does not meet the threshold to be considered evidence.

9. A fundamental weakness of Drs. Matlow and Wang's report is the reliance (overreliance is more accurate) on the Dozier et al. (2012) article. The authors lean heavily on the findings noted in this article, the literature associated with this article and the core definition of institutional care. Drs. Matlow and Wang characterize institutions (citing Dozier and colleagues) as having high child to caregiver ratios, rotating caregivers who lack formal education and training, low wages, regimented and non-individualized care

---

[2] Not only is step-up rare, but evidence exists that ORR care providers often make considerable efforts to identify community resources to prevent the step up of a UAC to more restrictive settings such as a secure facility if it is safe to do so. For instance, in discussing the need to step up B.D.H.G. (a UAC who submitted a Declaration cited by authors, see page 13) to a more restrictive setting, the authors cite the declaration for their assertion that "[t]he experiences and presentations of children in ORR custody appear consistent with the expected effects and manifestations of traumatic stress." However, a behavior summary at BCFS Fairfield stated: "There have been family sessions with his uncle and grandmother via video as an intervention to see if it would help minor with his current behaviors. In addition, the program has had various meetings with this minor to identify any unmet needs and another way of intervening. We continue being creative in identifying interventions that will help [BDHG] in having control of his behavior in an effort to be placed in a shelter level of care as this has been his goal since day of arrival. Unfortunately, [BDHG's] behaviors have been worsening and have put himself and others at eminent risk. It is important to know that we have identified community resources for this minor, however, we have seen no improvement and at this point we can no longer house him at BCFS Fairfield for no longer meeting our licensing and ORR criteria at a staff secure." (GOV-00240681). B.D.H.G. was also provided and signed a Notice of Placement form (in Spanish and English) which explained why he was placed at SVJC, a secure facility. (GOV-00240796-799).

and a lack of psychological investment. I am convinced the authors did not read the original source materials that Dozier and colleagues relied on for this definition. Drs. Matlow and Wang cited and adopted these characteristics of institutional care as if they originated with Dozier (2012). They did not. Dozier used the following three documents to create this definition: (1) a paper published in 1915 on the care and supervision of acutely sick infants and abandoned babies (Chapin, 1915), (2) a study of orphanages for abandoned infants and toddlers in Bucharest, Romania (Zeanah, et al, 2003), and (3) a study of orphanages for infants in St. Petersburg, Russian Federation (St. Petersburgh – USA Orphanage Research Team, 2008). No one could successfully argue that the placement settings (i.e. orphanages) or the populations of interest (i.e. infants and toddlers) in these source papers even remotely resembles either the ORR shelter care network or the UACs. Thus, it is impossible to generalize the findings of these studies to the UAC shelter care experience. Moreover, the characteristics (high child to caregiver ratios and staff that lack training) are not applicable to any of the ORR facilities I visited or the policy (hiring) documentation I reviewed for this case. I do not know about the characteristic of "low wage."

10. A secondary setting referenced throughout the report is detention facilities for adjudicated or pre- adjudicated delinquency offenders. This point of comparison seems only relevant to Shenandoah (which serves domestic juvenile offenders on one side and the highest risk/need UAC on the other side).

11. The authors have an issue with the lack of psychotherapy and other trauma informed treatments for youth in secure settings. The authors note an interview with one of the clinical directors in the most secure setting who confirms that they are in fact not a treatment facility (citation 55, page 30). I am in full agreement with the position that detention facilities are not treatment facilities. To be fair, there is debate in the broader juvenile justice field about the role of treatment – and the ethics of treatment – for children in short term detention settings. In an article titled "Ethical Treatment of Youthful Offenders: Issues for Psychologists," Hoffman (2017), specifically notes the potential conflict between psychologically-based goals and correctional objectives. Hoffman (2017) also notes the complicated nature of engaging in meaningful clinical work in detention and correctional settings often defined by power, control, and compliance. Moreover, engaging in intensive psychotherapy or certain evidence-based trauma therapies, (such as trauma-focused Cognitive Behavioral Therapy or TF-CBT) requires stable placements and adequate time. For example, trauma-focused CBT could take up to twenty sessions for children in placement.[3] And in fact, some trauma-based treatment approaches are designed to stabilize placements and may actually increase the likelihood that a child remains in care longer (perhaps as they make progress on psychological goals).

12. The authors repeatedly note that staff-secure placements are more restrictive, thus giving the impression that staff-secure facilities are more institutional, more correctional and by extension, more trauma inducing. This claim is without evidence. The staff-secure

---

[3] https://tfcbt.org/wp-content/uploads/2018/05/FosterCareManual-FINAL.pdf.

setting is no more restrictive as compared with shelters. Staff-secured facilities simply have more staff (better child to staff ratios). I am not sure if either Dr. Matlow or Dr. Wang had the opportunity to visit a shelter and staff secure facility, but from my visits, and even with an eye focused on uncovering differences, the living space, the classrooms, and the outdoor facilities were identical.

13. The authors note of "long lasting harm" from institutional placement. The authors cite von Werthern, 2018). Once again, I do not believe the authors read the underlying material cited by von Werthen. If they had – they would find that the three studies were of older asylum seekers that spent a significantly longer time in "detention" as compared with the average UAC. In the three underlying studies, the asylum seekers spend on average 7 months, 6 months and 3 years in care. Within this same section of the Matlow and Wang report (page 19), the authors cite Linton (2017) and Wood (2018). These studies focused on young children separated from their parents as part of the zero tolerance policy, which is no longer in effect. Neither piece is empirical – meaning no new data or evidence were presented to support Drs. Matlow and Wang's claim.

14. Pages 19 through 26 discuss ways in which ORR custody makes it more likely that UACs will experience trauma. Many if not all of these conditions would be present in a foster home (domestic) situation. So again, is it the settings or the circumstances associated with UACs that are responsible for trauma symptoms?

15. As a general comment, Drs. Matlow and Wang rely on interview questions (inserted as footnotes in the document) that are leading and designed to elicit a negative response. Drs. Matlow and Wang exacerbate this problem by then expanding, interpreting, and even editing the answers to these interview questions to support a particular position. This is highly problematic. For example, in the section titled *Perceived lack of predictability and consistency in the environment* (page 23), Drs. Matlow and Wang state the "facilities' behavioral reinforcement systems are not understood by clients, effectively rendering the clients helpless, incapable, and unmotivated to meet behavioral goals and expectations, as well as rendering the reinforcement system ineffective." The following interviewer question and response is the source evidence for this statement. "Question: what types of challenges do those types of behavioral management programs present for the population of kids that ORR serves?

16. Answer: So they are authoritarian. And most of these kids come from where they are taking care of themselves and are highly independent and have been through a lot. And so going from that environment into a facility where they're being told and directed to do something is not – is not effective."

17. Not only is the question leading and negative (as opposed to open and neutral) but nowhere in the response did I see anything about the system not being understood, or anything about clients feeling helpless, incapable or unmotivated.

**Rebuttal of Dr. Emily Ryo's Expert Report**

18. Overall, the analyses in Dr. Ryo's report look very similar (in terms of trends and directions) to the results presented in my report. In particular, the low risk of experiencing a step-up highlighted in my report is similarly reflected in Dr. Ryo's report.

19. Dr. Ryo's report also notes that step-ups do not happen quickly. Eighty-six percent of all step-ups occur more than 2 months post admit. If children were automatically bounced up to more secure settings, or if staff did not try to accommodate the needs of children, or if staff did not try to maintain youth in shelter (least restrictive) settings, we would observe step-ups that occur more closely to the date of admission.

20. The one area that I would disagree with Dr. Ryo is the repeated indication that placement types are "associated" with the length of time in care. One may read Dr. Ryo's report and walk away with the idea that certain ORR placement types directly increase a child's length of stay in care. To be fair, Dr. Ryo never states that the type of placement *causes* children to remain longer in ORR custody, but the repeated use of the term "associated" may unintentionally encourage one to think about a cause and effect relationship. A more accurate statement would be: while placement types may be correlated with length of time in care, there is insufficient evidence of a causative effect.

21. The fundamental challenge with trying to understand the role of placement restrictiveness and length of stay with non-experimental methods (i.e. no random assignment) is that the populations served in shelters and more secure settings are qualitatively different, and therefore limit the ability to identify a causative link between the two. Children and adolescents step up to more secure settings because they have behavioral and mental health needs that cannot be addressed in shelters. This finding is well documented in the literature and even summarized in the Cruise and Rasmussen expert report, which I discuss in greater detail, below. Specifically, Drs. Cruise and Rasmussen note that "UACs suffer from a number of specific mental health problems including anxiety, depression, post-traumatic stress disorder, psychosomatic complaints, suicide ideation and aggression" (page 5); it is therefore unsurprising, as I note in my report, that at least some of these children will need more restrictive levels of care.

22. In the service research and program evaluation literature, the sorting of individuals by treatment modalities (in this case restrictiveness levels) is a problem of selection bias (also referred to as selection effects). Rather than placement restrictiveness causing increases in length of care, it is the characteristics of the individual child (e.g. serious mental health diagnosis) that are causally related to the treatment decision to change settings (i.e., step-up) – and perhaps most critical to the question here is that these same characteristics are also responsible for treatment outcomes (e.g., length of stay as one example). The empirical literature supports this argument. In fact, Drs. Cruise and Rasmussen's report note these relationships in their literature review: "UACs mental health problems present treatment challenges and contribute to longer lengths of stay in ORR detention" (page 6). Drs. Cruise and Rasmussen go on to note that this finding is not limited to ORR populations. Within domestic human service and juvenile correctional facility settings, "having a mental health disorder significantly contributed to longer lengths of stay" (page 6).

23. In my opinion, the evidence confirms that length of stay is largely determined by the characteristics of the individual children.  Similar, if not identical to children in domestic foster care settings, serious mental and behavioral health challenges explain the overall time in care.

**Rebuttal of Drs. Keith Cruise and Andrew Rasmussen's Expert Report**

25. The authors were asked to elaborate on how mental health problems contributed to UAC's length of stay. They reviewed 20 years of published literature and a random sample of 30 out of the 75 negotiated UAC case files. The authors begin by stating UACs "suffer" from a wide range of mental health problems and these problems create serious challenges for treatment providers (for both domestic and ORR populations) (page 5), and that a child's mental health problems increase time in care. The authors also investigated if time in care further exacerbated a child's mental health problems – and perhaps creating this unfortunately reinforcing cycle where children were not improving (from a mental health perspective) and thus required more time in care. The authors acknowledge that they found "no literature specific to time in facility and impact on mental health during or post release" (page 7).

26. The authors note that domestically, child welfare, juvenile justice and mental health systems of care "have shifted away from extended placements in residential care" (page 7) and moved to more family based (i.e. lower restrictiveness level) types of settings. This trend is widely recognized as a best practice in the field of children and family services. The same is true for the ORR system of care. As I state in my report, and as Dr. Ryo found as well, all evidence to date supports the conclusion that UACs are very unlikely to experience a step-up to a more restrictive setting.

27. There are serious methodological problems with the Cruise and Rasmussen report. If you were to ask these authors to design their own rigorous investigation utilizing case files to understand placement decisions, I am 100% confident that these 75 case files would not have been selected. The authors note that these 75 cases are "not representative of all children in ORR custody but rather is intended to reflect the experiences of children who were stepped up to more restrictive setting" (page 10). The authors sampled on their dependent measure. Perhaps more accurately, someone else sampled (the original 75 cases) on the dependent measure, and the authors (five doctoral students for 27 out of the 30 case files, page 9) then resampled on that sample. Regardless, this is highly problematic and undoubtedly led to biased conclusions. To adequately understand the step-up process and to understand if UAC "received appropriate mental health services" (a stated goal on pages 10 – 11), one would have to sample on a set of UAC case files that represented similar youth (e.g. youth presenting mental and behavioral health challenges). This would require a random sampling from the entire UAC population rather than sampling primarily children who have been stepped up, and then investigate the subsequent decision-making process. This would show, among other things, steps ORR takes in providing mental health services to children before step-up and the ability of shelters to meet those needs on site. Drs. Cruise and Rasmussen did not follow this approach. What is especially concerning is that the authors specifically note the serious problems of "cherry picking" (page 10) case files to justify their sub-sampling of 30 cases, without acknowledging the cherry-picked nature of the larger 75 sample. Therefore, although their 30 case sample is a random draw from the larger set of 75, their sample is compromised and biased in directions that are both known and unknown.

28. It is not clear what the authors mean when they report that only three of the 30 children received a "validated psychological screening." It is unclear whether they mean that no screenings or assessments were completed for the other 27 children, or that ORR did not use an instrument that they deem "validated." And if they mean the latter, the authors have not identified what must be included on this list of approved and validated assessments. Children in the domestic foster care system do not receive psychological screenings when removed from the biological family home. If only three children received, valid screenings (reported in "(a)" on page 11), the authors do not explain how the case files show that it was concluded 19 children reported a history of prior trauma exposure and that 21 of the 30 received a mental health diagnosis. It is critical to note that children are not simply placed in shelters without a review of their individual strengths and needs. In fact, clinical staff complete a comprehensive and standardized assessment of child needs at intake and times of transfer. This assessment covers a wide range of issues including *physical health* (e.g. difficulty breathing, confusion, allergies, headaches, injuries, medications, dietary restrictions), *mental health* (e.g. self-harm, suicidal attempts, exposure to violence, hallucinations, anger issues), *prior trauma* (e.g. harmed by prior caregivers), and *child safety*. It is also important to note that clinical staff complete and record a few observational items (e.g. was child distracted, alert, uncooperative, etc.)

29. The authors also do not explain why intake is the best time to conduct a "validated psychological screening." There are valid child welfare reasons to wait at least a few days for children to trust the clinical staff and in some cases to be more honest with the screener. When Cruise and Rasmussen talk about assessments at "intake," it is also unclear whether they are viewing intake as a singular event (the day the child arrives) or they are thinking about intake as a process that might require time and the development of a trusting relationship. The authors note that "[v]alidated screening tools are critical to identifying UACs exhibiting emotional and behavioral difficulties, and are a best practice," but they offer no support for this claim. As noted above, if clinicians were unable to identify trauma without a "validated psychological screening," it is unclear how most of the children reported trauma and received a mental health diagnosis.

30. On page 12 of their report, Drs. Cruise and Rasmussen use the term "typical," but that term should not be used to indicate a particular case file represents anything more than a singular point of data. The authors use this term repeatedly as a strategy to convince the reader that these experiences are common and shared by all or many youth in ORR care, but that is not the case given the serious issues with sampling.

31. The authors note, "Although it is unclear the extent to which this UAC's trauma history affected his behavior, it seems likely that trauma was a predisposing factor, and that combined with lengthy detention resulted in the deterioration of his behavior" (page 12). This is speculation. Drs. Cruise and Rasmussen acknowledge that they did not know the impact of the child's trauma history, but proceed to posit an explanation for the child's behavior anyway that they deem "likely." Nor do the authors put forward any other alternative explanations, or reasons why those alternative explanations are unlikely.

32. On page 12, the authors note that the level of clinical care is appropriate for patients experiencing normative stress in their lives, but it is not the type of psychotherapy that addresses trauma-related mental health diagnoses.  But there is evidence to suggest that beginning psychotherapy for children in short-term placements (even domestically, such as juvenile detention facilities) goes against this notion of best practices.  Drs. Cruise and Rasmussen's argument for psychotherapy is indefensible, particularly in light of their other stated goal of quick release from ORR care.

33. Similar to the use of the term "typical," the authors should not (and could not defend) the use of the term "usual treatment" page 13.  The authors present the case of a 15-year-old Latino on bottom of page 13 as "an example of the usual treatment for UACs with mental health disabilities, and how even compliant UACs were stepped up for mental health related concerns that could be treated at lower levels of restriction."  In my opinion, the child was matched with the appropriate level of care, and this level of care perhaps resulted in reduced problematic behaviors and eventual step down.  As the authors acknowledge, the minor "reported a history of gang affiliation and involvement in a murder in his country of origin in an assessment," which resulted in his being stepped up to a secure facility, and later to an RTC based on his PTSD diagnosis and need for additional medical care.  The authors simply cite without support that the fact the child's files showed he was "compliant" means the restrictive placements were somehow inappropriate, or that his time in care was unnecessary extended.  Are the authors suggesting a home study was not justified?  Yes, completing a home study delays the reunification process.  But for this particular child, a home study was required by law because the "UC has been identified as a victim of a severe form of trafficking" (page 3 of the home study report).  In this particular instance, the purpose of the home study was to determine if the sponsor was "able to provide and maintain a safe, stable and appropriate home environment due to the minor's previous criminal and substance abuse history.  Able to meet the minor's social, emotional, educational, physical and medical needs. Explore the Sponsor's capacity to identify community services and awareness of services in the area, such as counseling, mentoring programs, etc. Assess the Sponsor's parenting skills (i.e. discipline techniques).  Explore the Sponsor's resources, strengths and support system. Explore what boundaries/expectations the Sponsor has of the minor once the reunification transpires. Explore the household composition and the sleeping arrangements for minor. Explore whether Sponsor's ability to care for and supervise minor. Assess the Sponsor's ability to enroll minor in an educative setting that will be appropriate for him. Assess the Sponsor's financial ability to provide for minor. Assess the Sponsor's home environment, describe if there are any safety concerns/threats. Assess the Sponsor and minor's commitment to participate in additional services offered through Post Release Services."  The case coordinator also asked that the home study worker verify sponsor's awareness of the minor's gang involvement and criminal behavior with them as well as minor's incarceration in home country" (pages 3 -4 of the home study report).  These are all highly relevant and ethical activities that must be completed prior to the placement of a traumatized and formerly trafficked child.

34. On pages 14-15, the authors document children stepped-up for reasons of serious mental health issues, including harm to self and others. An important note is the time between the first SIR (specific to danger to self and others) and the decision to step up. The median number of days was 16 between first placement (perhaps this is intake) and first SIR. Yet the median time to step up was 58 days, indicating that children are not immediately moved at the first indication of a mental health problem. This significant lag – between entry and first transfer - reflects what the staff reported during my site visits to several ORR shelters that they try to work to accommodate children – or meet the treatment needs of children – before moving them to a more secure setting.

35. On page 15, the authors note that "there are UACs that are being stepped up for mental health disabilities who do not have any different patterns of behavior from those not stepped up." The authors do not have the data or evidence to make this statement. As I note above, in order to conduct a rigorous investigation utilizing case files, the authors would need to randomly sample from the entire UAC population and compare how children move through the system. The authors are significantly limited in their ability to make statements about "patterns of behaviors" for children who are stepped-up or not stepped-up.

36. In the first paragraph on page 16, the authors indicate that recommendations are not being followed – and when they are followed – worse outcomes are observed. The authors note that following "the recommendations in these files did not prevent staff from placing UACs in more restrictive settings." This is a common finding in all services research. Patients – in this case children – with the most serious treatment needs are the mostly likely to receive services and also the most likely to experience negative outcomes (e.g. step-up). The authors suggest that there is no discernable pattern of recommendations followed. The case files cannot be used to support this argument. What are staff required to document in the case files when children do not receive services? Are staff expected to document when decisions are made about services that might not be necessary? Treatment staff document – and perhaps are required to document – why something happens, not why something does not happen. The authors are making judgements (or conclusions) about why some things did not happen. That is beyond the scope of the case files.

37. The authors indicate that "most UACs in the sample seemed to warrant more intensive, trauma informed psychotherapy." This finding is in stark contrast with the goals and objectives of short-term shelter care. Trauma informed treatments require time (duration) and stability (consistency). It would be unethical and detrimental to the child to initiate trauma informed psychotherapy knowing full well that the child is likely to leave ORR custody. In fact, not only are the children likely to leave, but staff are actively working to secure their leave, a goal the authors themselves seek to accomplish.

38. Based on my review of Drs. Cruise and Rasmussen's methodology and analyses in their report, I will now respond to each of their expert opinions (noted on pages 19 through 22).

39. **Page 19: "Do children in ORR custody have behavioral, mental health, intellectual, and/or developmental disabilities or are regarded by ORR as having such**

000012

**disabilities?"** The authors write: "Based on review of intake and other assessment materials, it is also clear that ORR intake assessments are inadequate to identify the majority of UACs with disabilities. Most screening tools appeared to be ad hoc lists of symptoms or simple check boxes, of which the reliability and validity were unknown—and thus their use was inappropriate for providing the type of clinical decision-making needed to detect and address mental health disabilities. The lack of validated screening and assessment tools across most files raises concerns about appropriate detection of the frequency and severity of mental health symptoms, which leads to concerns about the accuracy of diagnoses offered in the case files." The evidence clearly indicates that some UACs have significant behavioral, mental health and intellectual issues. This is understandable given the life histories associated with UACs and the often times difficulty journey children make enroute to the United States. It is my opinion that the assessments of child needs is adequate given the primary goal of the shelter care network. Specifically, the goal of moving children as quickly and as safely as possible to a caring and responsible sponsor who is able to ensure their physical and emotional well-being.

40. **Page 20: "Do children in ORR custody receive appropriate mental health services and reasonable accommodations for their disabilities to enable them to remain in less restrictive placements?"** The authors write: "Most UACs in the sample seemed to warrant more intensive, trauma-informed psychotherapy." It is my opinion that UACs receive regular clinical services from qualified professionals. Moreover, the vast majority (more than 99%) of children remain in the least restrictive setting. Consequently, it seems the clinical services were both appropriate and effective.

41. **Page 20: "Are children in ORR custody stepped-up to residential treatment centers, staff-secure facilities, or secure facilities because of their disabilities and are these step-ups necessary and clinically appropriate to meet the child's needs or protect the safety of others?"** The authors write: "Step-ups justified by mental health diagnoses do not seem to be necessary to meet the UACs' needs or protect the safety of others. First, prior to step up, there is uneven implementation of recommended accommodations (aside from pharmacology). If ORR staff more consistently addressed recommended accommodations, step ups may have been prevented. Second, there is no evidence that accessing community mental health treatment services was considered during the accommodations process. Failure to consider community-based treatment options, particularly at lower levels of restrictive placement (e.g., shelters) indicates these ORR facilities failed to explore treatment options that could have prevented further mental health decline and avoid step up to more restrictive levels of care. Third, before step up, and after step up, there is no discernible match between services, accommodations in response to continued SIRs for harm to self or others, or documented mental health needs. Across the files we reviewed, step ups did not increase the likelihood that UACs were provided with more specialized mental health treatments that better matched their documented mental health diagnoses." It is my opinion that children were not unnecessarily or spontaneously stepped-up without first trying to accommodate the child's needs in the least restrictive setting. I arrive at this opinion based on a review of the ORR policy/practice manuals, interviewing treatment staff and the finding that (1)

000013

very few children are stepped-up, (2) children are not stepped-up without written justification and significant consultation with a clinical team and (3) children are not stepped-up following a single incident.

42. **Page 22: "Do children in ORR custody experience delays in release and what are the reasons for such delays?"** The authors write: "The length of this processes [sic] is problematic as the literature suggests that longer time in detention provides more opportunity for increasing mental health and behavioral problems. That mental health and behavioral problems are not adequately assessed at intake or addressed during detention likely adds to the distress associated with lengthy detention. In this manner the lengthy vetting process appears to contribute to (1) UACs' increasing mental health distress and (2) some sponsors' willingness to follow through with the vetting process, leading several sponsors to change their minds about sponsorship because of changes in behavior." It is my opinion that some children do experience delays in release from the ORR network. The causes for delay are multifaceted but first and foremost, ORR staff are responsible for identifying and ensuring that children are (re)unified with safe, caring and responsible adults. This process takes time. Fortunately, most children move through the ORR network quite quickly. Others, those without viable sponsors, are less fortunate.

Materials Considered In Preparing This Rebuttal Report

The materials I considered in forming my opinions as referenced in my June 19, 2020 report in this matter.

44. Dr. Emily Ryo's expert report in this matter.
45. Drs. Cruise & Rasmussen's expert report in this matter.
46. Drs. Matlow & Wang's expert report in this matter.
47. Case file summaries referred to in Drs. Cruise & Rasmussen's expert report in this matter and shared by Plaintiffs' counsel to Defendants' counsel.
48. Chapin, H. D. (1915). Are institutions for infants really necessary? *Journal of the American Medical Association, LXIV,* 1–3.
49. Dozier, M., Zeanah, C. H., Wallin, A. R., & Shauffer, C. (2012). Institutional care for young children: Review of literature and policy implications. Social Issues and Policy Review, 6(1), 1–25. https://doi.org/10.1111/j.1751-2409.2011.01033.x
50. Hoffmann, S. (2017) "Ethical Treatment of Youthful Offenders: Issues for Psychologists," https://www.researchgate.net/publication/314250191_Ethical_Treatment_of_Youthful_Offenders_Issues_for_Psychologists
51. Linton, J. M., Griffin, M., Shapiro, A. J., & Council on Community Pediatrics. (2017). Detention of immigrant children. Pediatrics, 139(5). https://doi.org/10.1542/peds.2017-0483
52. Sege, R. D., Amaya-Jackson, L., AAP Committee on Child Abuse and Neglect, Council on Foster Care, Adoption, and Kinship Care, AACAP Committee on Child Maltreatment and Violence, & National Center for Child Traumatic Stress. (2017). Clinical considerations related to the behavioral manifestations of child maltreatment. Pediatrics, 139(4). https://doi.org/10.1542/peds.2017-0100
53. The St. Petersburg –USA Orphanage Research Team (2008). The effects of early social emotional and relationship experience on the development of young orphanage children. *Monographs of the Society for Research in Child Development, 73*, 1–262.
54. von Werthern, M., Robjant, K., Chui, Z., Schon, R., Ottisova, L., Mason, C., & Katona, C. (2018). The impact of immigration detention on mental health: A systematic review. BMC Psychiatry, 18(32). https://doi.org/10.1186/s12888-018-1945-y
55. Wood, L. C. N. (2018). Impact of punitive immigration policies, parent-child separation and child detention on the mental health and development of children. BMJ Paediatrics Open, 2:e000338. https://doi.org/10.1136/bmjpo-2018-000338
56. https://tfcbt.org/wp-content/uploads/2018/05/FosterCareManual-FINAL.pdf.
57. Zeanah, C. H., Nelson, C. A., Fox, N. A., Smyke, A. T., Marshall, P., Parker, S. W., & Koga, S. (2003). Designing research to study the effects of institutionalization on brain and behavioral development: The Bucharest Early Intervention Project. *Development and Psychopathology, 15*, 885–907. doi: 10.1017/S0954579403000452.
58. Certain declarations cited by Drs. Matlow & Wang in their expert report in this matter.

Case file excerpts:

59. AJVM, GOV-00239487 to GOV-00239674
60. BDAC, GOV-00239346 to GOV-00239486
61. BDHG, GOV-00240639 to GOV-00240844
62. JDPP, GOV-00239675 to GOV-00239925
63. MJRM, GOV-00239988 to GOV-00240209
64. OAAT, GOV-00239926 to GOV-00239987
65. DALI, GOV-00240276 to GOV-00240384
66. HARM, GOV-00240533 to GOV-00240638
67. Deposition of David Fink, February 12, 2020

Other materials as may be referenced elsewhere in this rebuttal report.

Sincerely,

*[signature: Joseph P Ryan]*

Joseph P. Ryan, MSW, PhD
Professor
School of Social Work
Director
Child and Adolescent Data Lab
Faculty Associate
Center for Population Studies, ISR
University of Michigan