# DX-33

Deposition of Faith Ray, October 23, 2019

CONFIDENTIAL

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              WESTERN DIVISION

4

5    _____
                                    )
6    LUCAS R., et al.,              )
                                    )
7         Plaintiffs,               )
                                    )  Case No.
8    vs.                            )
                                    )  2:18-cv-05741
9    ALEX AZAR, Secretary of U.S. ) DMG-PLA
     Department of Health and       )
10   Human Services, et al.,        )
                                    )
11        Defendants.               )
     _____)

12

13

14              CONFIDENTIAL

15

16         DEPOSITION OF FAITH RAY

17            Washington, DC

18          October 23, 2019

19

20

21

22

23

24   Reported by:  John L. Harmonson, RPR

25   Job No. 170109

CONFIDENTIAL

Page 70

1    other levels of facilities, right?

2         A.    Not to my knowledge.

3         Q.    Okay.  So is it fair to say that of

4    the people that you listed who were doing work on

5    compliance with the July 30th order today, you

6    don't know what their respective roles are with

7    respect to these different subparts?

8         A.    I know that the current compliance

9    working group is reviewing the basis for

10   placement and the notice of placement receipt for

11   the restrictive settings.

12        Q.    Okay.  So for basis of placement, does

13   that include initial and step-ups?

14        A.    Yes, it does include initial

15   placements at a restrictive setting or kids who

16   have been stepped up from, for example, a shelter

17   to a staff secure.

18        Q.    So they're still trying to figure out

19   if the facilities are in compliance with the

20   whole order, as far as you know, right?

21        A.    They're still checking for those two

22   areas, the working group, to see if a minor has

23   been appropriately or inappropriately stepped up

24   to a restrictive setting and provided a written

25   notice of placement in a language that he or she

CONFIDENTIAL

Page 71

1    prefers.

2         Q.    Are they no longer monitoring

3    compliance with the other aspect of Judge Gee's

4    July 30th order?

5         A.    I do not have visibility on that.

6         Q.    What does "I do not have visibility"

7    mean?

8         A.    I don't know.

9         Q.    So what was your understanding -- You

10   started as a policy analyst in September of 2018

11   and two months later you were given the

12   compliance assignment, correct?

13        A.    That's correct.

14        Q.    What was your understanding of why you

15   as a policy person were being given this

16   compliance job?

17        A.    I was not given a reason.  I was just

18   assigned.

19        Q.    And so you and Aaron were both policy

20   people, right?

21        A.    We're both policy analysts, correct.

22        Q.    And he was given a similar task at the

23   same time, right?

24        A.    Around the same time.

25        Q.    Were other policy people sort of

CONFIDENTIAL

Page 73

1       Q.    Okay.  So in your compliance work, in

2   addition to the work that you've already

3   explained, the one site visit and the review of

4   information on the portal, did you communicate

5   with any of the facility employees?

6       A.    Yes, I did.

7       Q.    And did you do that by e-mail or by

8   phone or both?

9       A.    Both.

10      Q.    And what was the nature of that

11  communication?

12      A.    If I had a question about a particular

13  case, if I couldn't find information I needed for

14  my weekly review, for example, I would reach out

15  to the FFS, the federal field specialist, as well

16  as the program director at the facility.

17      Q.    All right.

18      A.    I would also communicate my weekly

19  findings eventually with the programs to let them

20  know how many cases, if any, were out of

21  compliance for that week.

22      Q.    So when is a notice of placement

23  supposed to be provided to a child?

24      A.    Within 48 hours of placement in that

25  facility.  And then again at least every 30 days

CONFIDENTIAL

Page 74

1    thereafter.

2         Q.    All right.  And during the time you

3    were responsible for compliance, did that always

4    happen?

5         A.    We found noncompliance with that.

6         Q.    Can you quantify that at all for me?

7         A.    Yes, I can.  At the initial start of

8    my compliance review work there were 34 kids in

9    the two secure facilities and 18 cases were

10   noncompliant.

11        Q.    And by the end of the five months, do

12   you have a --

13        A.    They were 100 percent compliant by

14   then.

15        Q.    With regard to notice of placement?

16        A.    With regard for a basis of placement

17   and notice of placement, both secure facilities

18   were 100 percent compliant.

19        Q.    And was the 34 kids that you quoted

20   me, was that at the start in November?

21        A.    Yes, that was at the start in

22   November.

23        Q.    And what was the number after the five

24   months, at the end?

25        A.    The number of children in secure?

CONFIDENTIAL

Page 76

1    prepare that request.

2         Q.    Okay.

3         A.    Or that recommendation.

4         Q.    And a facility, some human in that

5    facility is doing this, right?

6         A.    That's correct.

7         Q.    Who?

8         A.    There is a group of people involved in

9    decisions related to step-ups.  So the case

10   manager, the clinician.  I'm talking about ORR

11   grantees.  The case manager, the clinician, a

12   case coordinator, the federal field specialist,

13   and perhaps a federal field specialist supervisor

14   would come together in what's called when they

15   staff a case.  So if there is a recommendation

16   for a step-up, it should be based on the group's

17   recommendation and the FFS's decision.

18        Q.    So you said -- I'm talking about the

19   ORR grantees.

20        A.    Uh-huh.

21        Q.    Yes?

22        A.    I'm sorry, what's your question?

23        Q.    Well, I was asking if "uh-huh" meant

24   yes.  You said "uh-huh."

25        A.    Let's go back.  What's your question?

CONFIDENTIAL

Page 82

1    recommendation for the step-up?

2         Q.    Correct.

3         A.    It would be either the case manager or

4    the clinician to make the recommendation.

5         Q.    Okay.  And do you know why?

6         A.    It depended on the case.

7         Q.    Well, wouldn't it be fair to say that

8    of those people, the case manager and the

9    clinician are the two of that five that have

10   direct contact with the kid, right?

11        A.    They do have direct contact with the

12   children.

13        Q.    So it's reasonable to assume that they

14   would have more firsthand knowledge about a lot

15   of the factors that are reasons to step up a kid,

16   correct?

17        A.    That's correct.

18        Q.    Okay.  So when you were doing this

19   compliance, the group -- I understood your

20   characterization of the way this process worked

21   was that this group reviewed it but the FFS made

22   the final decision.  Is that correct?

23        A.    That's correct.

24        Q.    And then did the FFS supervisor have

25   input or have to approve the approval?  Or what

CONFIDENTIAL

Page 83

1   was their role?

2        A.    My understanding is that the FFS

3   supervisor does not need to approve the FFS's

4   approval.  The FFS has that authority to -- the

5   FFS alone has the authority to make placement

6   decisions for children.

7             But my understanding is that if it's a

8   particularly complex case, then the FFS

9   supervisor is there for guidance and

10  consultation, an extra layer of review if needed.

11  That's my understanding.

12       Q.    So is it accurate to say that one of

13  the things you were involved in doing compliance

14  review on was whether the minor was informed of

15  the decision to step them up?

16       A.    No.

17       Q.    You didn't have any involvement in

18  that?

19       A.    No.

20       Q.    Okay.  Was that something that you

21  were made aware of in your review of the step-up

22  documentation when you reviewed the UAC portal?

23       A.    What are you asking specifically?

24       Q.    What was your understanding at the

25  time you did this work of whether the minor child

CONFIDENTIAL

Page 84

1    was supposed to be notified of a decision to step

2    them up?

3         A.    My understanding at the time was that

4    a minor may or may not be notified that they were

5    being stepped up to a restrictive setting.

6         Q.    And there was no requirement to do

7    that?

8         A.    So I'm just speaking to secure

9    facilities because that's what my involvement was

10   in.  But there is no requirement to notify a

11   minor before they're getting stepped up to

12   secure.  No, there's not.

13        Q.    That's your understanding of current

14   policy as well?

15        A.    Yes.

16        Q.    Okay.  So it may or may not have been

17   done at the time?

18        A.    It may or may not have been done.  My

19   understanding is that there are complex factors

20   at play including child welfare decisions.  But

21   again, my understanding is that a kid may or may

22   not have been informed that they were getting

23   stepped up to secure.

24        Q.    Okay.  So to your understanding, did

25   the kid have any right to challenge that

CONFIDENTIAL

Page 85

1    decision?

2         A.    They do, yes.

3         Q.    So how would they know to challenge it

4    if they weren't informed?

5         A.    So that's what the notice of

6    placement -- part of the purpose of the notice of

7    placement form is for.  The intention is to tell

8    the minor the reasons why they were placed in a

9    secure facility and to also tell them how to

10   essentially challenge their placement or request

11   reconsideration of their placement.

12        Q.    So just educate me here.  I'm having

13   trouble understanding the difference between the

14   notice of a step-up and notice of placement.  I'm

15   not understanding why that wouldn't be the same

16   thing.

17        A.    I'm not aware that there is notice of

18   a step-up.

19        Q.    Okay.  But if a kid is being stepped

20   up to a different placement, they'll get a notice

21   of placement, right?

22        A.    After they're --

23        Q.    After it's a done deal?

24        A.    After they have already been

25   transferred to the setting.

CONFIDENTIAL

Page 86

1      Q.      Got it.

2      A.      The other setting.

3      Q.      Okay.  And so any appeal or challenge

4  to that would be after the fact?

5      A.      Right.  They can request

6  reconsideration of their placement or challenge

7  their placement after they have already been

8  stepped up.

9      Q.      So the notice of placement, did you

10  say that's within 48 hours?

11     A.      Yes, within 48 hours.

12     Q.      And that's of an initial placement or

13  a step-up or --

14     A.      That's correct.  Regardless of whether

15  it's initial or a step-up, they must receive

16  their notice of placement within 48 hours.

17     Q.      Of arrival at the place, the new

18  facility?

19     A.      That's correct, of arrival.

20     Q.      And what was your understanding of the

21  requirement that the notice of placement be in

22  the native language?

23     A.      My understanding was that the July

24  Flores order required that the notice of

25  placement be in a language that the minor

CONFIDENTIAL

1   understands, whereas ORR policies and procedures

2   requires a higher standard that the notice of

3   placement be in the minor's preferred language.

4       Q.    So you're saying that the higher

5   standard that you're describing was already in

6   place when Judge Gee entered this order on

7   July 30, 2018?

8       A.    I don't know.  I was not part of the

9   program at that time.

10      Q.    So you don't know if it was the

11  practice of ORR to provide foreign language

12  notice of placements prior to your work in this

13  area.  Is that right?

14      A.    That's correct.  I can't speak to that

15  before I joined the policy division.

16      Q.    The current language is still

17  preferred language, right?

18      A.    That's correct.

19      Q.    And you don't know when that policy

20  went into effect?

21      A.    I don't know.  But there is a date on

22  the policy guide, the online policy guide.

23      Q.    Do you know the number?

24      A.    The number of?

25      Q.    That policy.

CONFIDENTIAL

Page 98

1          Q.    So if the form was only available

2     in -- I mean, this sounds to me like the form was

3     only available in English.  Is that accurate?

4          A.    That's correct.

5          Q.    So they were out of compliance with

6     that because they weren't given forms that met

7     the requirement, right?

8          A.    I'm sorry.  The requirement is that

9     the notice of placement be given in a language

10    that the minor prefers.  And if the minor speaks

11    a language other than English or Spanish, then

12    the staff will use an interpreter in the language

13    that the minor prefers.

14               But I'm sorry, I misstated.  I believe

15    there was a -- there is a Spanish notice of

16    placement form.  So there is a Spanish one and an

17    English one.

18          Q.    There is now?

19          A.    No.  There was a Spanish one and an

20    English one at the time.  The issue was that

21    they're the same form but they're two different

22    forms; one is in Spanish and one is in English.

23    And if a minor spoke only Spanish, for example,

24    then the minor would be given the Spanish form,

25    the notice of placement, as well as the English

CONFIDENTIAL

Page 99

1    notice of placement.

2        Q.    Why was the staff requesting that the

3    ORR update the form to make it Spanish-English

4    bilingual if the form was available in Spanish?

5        A.    Because the children did not like the

6    fact that they had to sign two forms, and they

7    questioned whether the form that they were

8    signing in English, for example, if they didn't

9    speak English, actually said what the Spanish

10   version said.  So the staff recommended --

11       Q.    So they weren't allowing them to sign

12   the Spanish form?

13       A.    The staff recommended that they create

14   a new form where it has Spanish and English on

15   the same page.  But the children were given the

16   Spanish form if they spoke Spanish.

17       Q.    But they were asked to sign the form

18   in English, an English form?

19       A.    In addition to the Spanish one, yes.

20       Q.    So in the first bullet point you

21   indicate that "The two youth that you say we

22   interviewed" -- Is that you and Aaron?

23       A.    That's me and Aaron Marcus.

24       Q.    With the Spanish interpreter?

25       A.    That's correct.

CONFIDENTIAL

Page 109

```
 1   --------------------------------------------------
 2                   AFTERNOON SESSION
 3                       1:37 p.m.
 4   --------------------------------------------------
 5   BY MR. WHITE:
 6       Q.    So we're back on the record.  I want
 7   to make sure that I understand one thing that I
 8   believe you discussed this morning, which is --
 9   and just correct me if this understanding is
10   incorrect.  The secure placements that you were
11   responsible for doing the compliance review at
12   the start of the time that you did it, there were
13   34 children in placement and there was
14   noncompliance issues with regard to about 18 of
15   the 34.  Is that accurate?
16       A.    That's correct.
17       Q.    And by the time your five-month tenure
18   doing compliance review ended, there were about
19   ten kids in secure placement and you had zero
20   issues of noncompliance?
21       A.    That's correct.
22       Q.    So do you know anything about the
23   current levels of compliance?
24       A.    I don't know what last week's
25   compliance review was, for example, but I believe
```

CONFIDENTIAL

Page 110

1   that the secure facilities are still in full

2   compliance.

3           Q.    On what do you base that belief?

4           A.    I am still copied on those e-mails

5   that get sent for the weekly compliance, and I

6   think I recall -- Let me rephrase that.  I don't

7   recall seeing an issue where they were not

8   compliant.

9           Q.    So is it your testimony that since

10  March of this year until now, you're getting

11  weekly e-mails about the compliance review in the

12  secure facilities?

13          A.    I can't recall if every week I receive

14  the e-mails or not.  But I am still getting

15  copied on some of them.

16          Q.    And is it your testimony that of the

17  ones that you recall sitting here today, these

18  e-mails regarding compliance in the secure

19  facilities between March and October of 2019, you

20  believe that every single one of them has been

21  100 percent compliant?

22          A.    No, I'm not sure about that.

23          Q.    So it's possible there have been some

24  noncompliance issues?

25          A.    I mean, it's possible.

CONFIDENTIAL

Page 111

1    Q.    Sitting here today, do you recall any?

2    A.    No, not off the top of my head I

3  don't.

4    Q.    And are these e-mails that you're

5  receiving reporting compliance only at the secure

6  facilities or in the other ones?

7    A.    In the other ones as well, for the

8  RTCs and the staff secure and the therapeutic

9  staff secure.

10    Q.    And do you know what the compliance

11  level was in the RTCs and staff secures at the

12  time you left the compliance review position in

13  March of 2019?

14    A.    I recall it being mixed where some of

15  the facilities still had compliance issues, and

16  then a couple were fully compliant.

17    Q.    And what were the compliance issues

18  that you recall that were in existence in March

19  of 2019?

20    A.    With the nonsecure facilities?

21    Q.    Correct.

22    A.    Nonsecure facilities, they would have

23  been around the notice of placement and if the

24  minor received the notice of placement form in

25  the time frame that was required or in the

Page 112

1    language that they preferred.

2        Q.    Okay.  And was there compliance review

3    for the nonsecure restricted facilities with

4    regard to the reason for placement?

5        A.    No.

6        Q.    I'm trying to understand what exactly

7    it was that was 100 percent compliant with regard

8    to these ten youth in the secure facilities in

9    March of 2019.  Was it just the receipt of notice

10   of placement form in the child's preferred

11   language, or was there more to it than that?

12       A.    So if a secure facility was

13   100 percent compliant, that meant that every

14   child in their caseload had received the notice

15   of placement within the time frame that is

16   required, that the notice of placement was given

17   in a language that they preferred or translated

18   into their preferred language, and that their

19   basis for placement was appropriate.

20       Q.    Okay.  And the basis for placement and

21   reason for placement would be synonymous?

22       A.    Yes.

23       Q.    So the factors that were supposed to

24   be in place for a kid to be in secure, they were

25   100 percent compliant with that?

CONFIDENTIAL

Page 113

1          A.     That's correct.  If they were

2    compliant, then, yes.

3          Q.     In March of 2019.

4                 And have you seen any reports of

5    noncompliance with regard to basis for placement

6    since March of 2019 to the present?

7          A.     I don't recall seeing that.

8          Q.     And what, if anything, do you recall

9    seeing about noncompliance issues since March of

10   2019 in the nonsecure placements?

11         A.     Those reviews happen monthly, and I

12   believe each month there has been noncompliance

13   issues for the nonsecure restrictive settings.

14         Q.     And what issues of noncompliance do

15   you remember?

16         A.     They would all have been around the

17   notice of placement form.  So again, either the

18   child didn't receive the notice of placement in

19   the time frame that they should have, or the

20   notice of placement didn't have -- it wasn't

21   clear on the notice of placement why the child

22   was in that restrictive setting or the minor

23   didn't receive it in the language that they

24   preferred.

25         Q.     So I'm trying to understand how it is

CONFIDENTIAL

Page 115

1    not inappropriately keeping kids in secure if a

2    kid should have been stepped down.  And they were

3    notifying the children of their right to

4    reconsideration of placement or their right to

5    challenge placement through court.

6        Q.    My question is were practices changed

7    when it was learned or identified that the secure

8    facilities were in noncompliance with the

9    requirement that the notice of placement form be

10   given to the kids that led to compliance?

11       A.    Yes.

12       Q.    What was that?

13       A.    So what I mentioned just previously,

14   and also we requested that the FFS, the federal

15   field specialist, in conjunction with the team

16   that decides on the placement of the minor be a

17   lot more specific for the reasons that the child

18   was stepped up to secure.  So on the notice of

19   placement form we asked that they provide all the

20   details as to why that child was recommended for

21   step-up and why they were indeed stepped up.

22       Q.    And so was the form changed in any

23   way?

24       A.    The form itself was not changed, but

25   there is a space on the form for the federal

CONFIDENTIAL

Page 116

1   field specialist to type in information.  And so

2   a lot more detail was provided.

3        Q.    Because you asked them to?

4        A.    Yes.

5        Q.    All right.  So is that the same form

6   that they use for the nonsecure restrictive?

7        A.    It's the same form.

8        Q.    So I'm trying to figure out why their

9   compliance has been mixed and the secure is

10  100 percent compliant.  So what else do they need

11  to do, or what have they not done?

12       A.    I think more training is probably

13  needed for the care provider staff.  More ongoing

14  training, I should say.

15       Q.    So that would be something that ORR

16  would accomplish?  I mean, when you did the

17  training, it was ORR providing training to these

18  contract grantees, right?

19       A.    Yes.  And we also provided training to

20  ORR staff as well.  So we did three levels of

21  training for my secure process.  I trained ORR

22  colleagues, the grantees, the secure grantees

23  themselves, and then the whole UAC network.

24       Q.    Okay.  And is it fair to say that was

25  not done as extensively for the nonsecure

CONFIDENTIAL

Page 150

1    Q.    Well, you just used the term "ongoing

2  technical assistance."  What's your understanding

3  of what that means?  I just don't understand.

4    A.    So what I mean by that would be that

5  if a care provider has a question about criteria

6  for stepping up, then they reach out to the

7  federal field specialist.  And if the federal

8  field specialist has questions, then that person

9  can reach out to the policy division or the FFS

10  special populations supervisor for technical

11  assistance on placement decisions.

12    Q.    That assumes that the person at the

13  front line has a question about it, right?

14    A.    Yes.

15    Q.    So the next slide is criteria 2.  So

16  when you list the examples of what is not a

17  violent act, shoving another person while

18  standing in line or screaming at a person on the

19  soccer field, did either or both of those come

20  from your own experience?

21    A.    I want to clarify.  The examples that

22  we provided on this slide for what is a violent

23  act and what is not a violent act are all case

24  examples of children in care.

25    Q.    Meaning they came from real life?

CONFIDENTIAL

Page 164

1      Q.     And some of those 18 have included
2  kids that were placed because of suspected gang
3  activity?
4      A.     Right.  I answered that before, and
5  yes, there were a couple of them, a few of them.
6      Q.     And some were placed based on -- well,
7  at least one based on an arrest and then
8  subsequent dismissal of charges?
9      A.     That's correct.
10     Q.     And another was -- or at least one or
11 more were based on a risk of escape?
12     A.     That's correct.
13     Q.     About how many of those were there?
14     A.     Maybe less than three.
15     Q.     So how were these compliance issues
16 resolved?
17     A.     If the kid was inappropriately placed?
18     Q.     Yes.
19     A.     Then they had to be stepped down
20 immediately.  So the care provider had to find
21 other placement for the child.
22     Q.     Okay.  So did you look at how long
23 these kids had been in secure placement?
24     A.     Yes.
25     Q.     So do you have any kind of

CONFIDENTIAL

Page 196

1      A.    No, I don't think I have anything more

2  to add.

3           MR. WHITE:  I need to take another

4      break.  I'll try to make it quick, but I

5      need to consult with these folks.

6           MR. SHIEH:  Sure.

7           MR. WHITE:  Then we'll hopefully get

8      you out of here in time to get your kid.

9           (Recess taken.)

10  BY MR. WHITE:

11     Q.    Who is responsible for giving a notice

12  of placement to the child within the 48 hours

13  after their placement?

14     A.    The case manager.

15     Q.    And who is responsible for advising

16  the child of their right to challenge that

17  placement?

18     A.    The case manager.

19     Q.    And is it required that the case

20  manager advise the kid of both their right to

21  appeal to the director or file a federal lawsuit

22  about that?

23     A.    Yes.

24     Q.    How is that carried out at the Yolo

25  facility to make sure that that happens, if you

CONFIDENTIAL

Page 197

1   know?

2          A.    I don't know how the case managers do

3   that at the facility.  They're supposed to do

4   that as they go over the notice of placement form

5   with the child.

6          Q.    So you don't know what the procedures

7   are with regard to how that's done at either Yolo

8   or Shenandoah?

9          A.    I don't know how it's done.  The

10  notice to request reconsideration of placement or

11  to challenge placement is actually on the notice

12  of placement form.  So the case manager is

13  supposed to go over that information when they

14  give the form to the minor.

15         Q.    Is there anything on the form that

16  would require the case manager to either, like,

17  check or initial that the advice was given?

18         A.    Not on the current form.

19         Q.    Was it ever on the form?

20         A.    Well, the child and the case manager

21  need to sign the notice of placement form, and so

22  those rights are on the form itself.  But there

23  is no initial -- there is no place for initials

24  or signature beside that particular area of the

25  notice of placement form.

CONFIDENTIAL

Page 222

1                C E R T I F I C A T E

2

3    DISTRICT OF COLUMBIA

4           I, JOHN L. HARMONSON, a Notary Public

5    within and for the District of Columbia, do

6    hereby certify:

7           That FAITH RAY, the witness

8    whose deposition is hereinbefore set forth, was

9    duly sworn or affirmed by me and that such

10   deposition is a true record of the testimony

11   given by such witness.

12          That if the foregoing pertains to a

13   federal case, before completion of the

14   proceedings, review and signature of the

15   transcript [x] was [ ] was not requested.

16          I further certify that I am not related

17   to any of the parties to this action by blood or

18   marriage; and that I am in no way interested in

19   the outcome of this matter.

20          IN WITNESS WHEREOF, I have hereunto set

21   my hand this 4th day of November, 2019.

22                    *John L. Harmonson*

23                    _____

24                    JOHN L. HARMONSON, RPR

                      My commission expires: 11/14/20

25