# DX-34

Deposition of Jose Castaneda, November 21, 2019

Page 1

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                      WESTERN DIVISION

 4

 5    LUCAS R. , et al.,

 6
                       Plaintiffs,
 7
      vs.                                NO. 2:18-CV-05741 DMG PLA
 8
      ALEX AZAR, Secretary of U.S.
 9    Department of Health and Human
      Services, et al.,
10
                       Defendants.
11    _____/

12

13

14

15

16           DEPOSITION OF JOSE CASTANEDA

17         Thursday, November 21, 2019, 9:37 a.m.

18                   Woodland, California

19

20

21

22    Reported By:

23    PEGGY A. PORTER, RDR, CRR, CSR No. 6086

24    Job No. 172051

25    PAGES 1 - 196
```

```
 1    A       Usually I'll interact with them if I'm carrying
 2    a certain caseload, I do interact with them.  It just
 3    depends on their specific case.  It could be once a
 4    week, multiple times a week.  It just depends on the
 5    actual case.
 6    Q       And why would you interact with the family of
 7    the ORR youth?
 8    A       So if I'm carrying a caseload, I would be -- if
 9    they are going through the reunification process, I
10    would be interacting with them to try to ensure that
11    they have received information I send them such as like
12    the reunification packet or any upcoming appointments,
13    like fingerprint appointments, whatever may be needed
14    through the requirements set forth by ORR for
15    sponsorship.  Updates to the cases.
16    Q       Can the case managers at Yolo request a home
17    study?
18    A       Can we request a home study?  We do -- we'll
19    send a request out to ORR and they approve or deny
20    whether one is needed or not.
21    Q       Do you ever communicate with attorneys for the
22    children in the ORR population?
23    A       Yes.
24    Q       For what purpose are you communicating with the
25    attorney?
```

Page 48

1  A      Well, the legal service provider that's assigned
2  to Yolo County for the ORR population is Legal Services
3  for Children.  They are on site once, maybe twice a
4  week.
5          So we do meet weekly to discuss certain cases.
6  They may just ask for an update or provide us with
7  updates on certain cases.
8          I also have communication with the attorneys at
9  the UC Davis law clinic when they're here on site.
10 Q      Thank you.
11         I think I want to move on a little bit to talking
12 about the intake and placement of the ORR population at
13 Yolo.
14         MS. STEVENSON:  Can we take a quick break?
15         MR. MAY:  I was going to say is this a good
16 time?
17         MS. TARNEJA:  Yes.
18         (Recess taken.)
19         MR. MAY:  So we just wanted to clarify three
20 areas of the prior testimony to make sure that they're
21 complete for everyone.
22         The first area, we talked about trends of the
23 ORR population.  And Jose wanted to talk a little bit
24 about why the trend recently of going down to five, how
25 that is a trend that has a reason for it.

Page 81

1    A      I don't know why.

2           Kind of going back to the parents.  If they're

3    provided with the notice of placement -- so I can give

4    you an example.  The youth are provided with a notice of

5    placement.  The family or the parents are not.  But in

6    the instance that it's a case that was just referred to

7    us from intakes that has no other previous placements in

8    ORR, when we make contact with the family, the reasons

9    for the placement in ORR or at a secure level is

10   reviewed with them.  They are made aware of why he was

11   referred to us.

12   Q      And does the child have an opportunity to

13   challenge the placement?

14   A      They have the option to do it.

15   Q      How can they challenge that?

16   A      They can request -- I know ORR has a policy that

17   they can request at the 30-day mark to request a hearing

18   with the ORR to see if they want -- to contest their

19   placement in secure.

20          They also have an option to -- for a Flores Bond

21   hearing.  That's something that is reviewed with them at

22   the time of intake within 24 hours of their arrival

23   here.

24          But those usually, they don't sign them.  They

25   don't want to sign them.  The legal service provider,

Page 82

1  Legal Services for Children, they have asked for us not
2  to submit them until they're able to discuss this with
3  the youth.
4          So what we do, we review it with them.  It's
5  both in English and Spanish, depending on what their
6  language is.  But they are reminded of that, that the
7  legal service provider has requested that they speak to
8  them prior to them signing anything.
9  Q      And both of those hearing opportunities are
10 after they've been transferred to Yolo; is that correct?
11 A      That's what we review with them when they arrive
12 here.
13 Q      The 30-day hearing is 30 days after they arrive?
14 A      They can request it 30 days after.  What happens
15 prior to that, I mean, that's -- I don't know how other
16 programs function.
17 Q      Have you ever had a child request a hearing
18 after 30 days?
19 A      From my knowledge there's only been one.  In my
20 time that I've been with the office, only one.
21 Q      Do you remember when that was?
22 A      I don't remember the exact date.
23 Q      Do you remember what happened?
24 A      No.  I don't remember everything that happened
25 on that.  It's been a couple of years.

Page 85

```
 1    placements.
 2    Q      Does the FFS review every 30-day --
 3    A      Yes.
 4    Q      -- notice of placement?
 5           And GDIT does as well?
 6    A      They're part of the call, yes.
 7    Q      So could you just describe kind of the process,
 8    once Yolo has decided to accept a youth, what happens
 9    next?  What's the process for accepting the youth into
10    Yolo custody and care?
11    A      Are you speaking of a step-up or an intake,
12    initial intake?
13    Q      I guess let's start with step-up.
14    A      So step-up, once we do accept a youth, an email
15    is sent out to the case coordinator that sent the
16    referral to us.  They do make notification to ORR.  The
17    FFS assigned to wherever that program, the referring
18    program is, they'll approve for the transfer.  And then
19    the program will reach out to us and we will coordinate
20    arrangements to have a youth transferred to us.
21           When the youth arrives to us here, within 24
22    hours the case manager is meeting with the youth to
23    conduct an initial intake with them, also making contact
24    with the family making them aware of what to expect
25    during their time here, the program.
```

Page 86

1  They're made aware of the legal service
2  provider's number being on their phone account as soon
3  as they arrive here.  Their option or right to reach out
4  to them, call them.
5  We kind of review the intake process with them
6  like what to expect from us, what we're going to be
7  doing.  We do offer them the Flores Bond hearing.  We
8  review that with them as well.
9  We do review the notice of placement with them,
10  why they were referred to us.  They review it.  If they
11  have any questions, we'll discuss it at that time.  They
12  sign it.
13  They are provided with the legal resource guide
14  that provides the legal service providers throughout the
15  U.S.
16  We do conduct a -- well, the intake people, our
17  line staff do conduct a preassessment with them and, if
18  needed, one of us will conduct it with them.
19  What else?  We do contact the family, the
20  sponsor and make them aware of where they're at, the
21  reason for the placement here.  We confirm who their --
22  you know, identity is.  They provide us identifying
23  information on them.  We do add them to our phone
24  accounts so they have access to the youth.
25  We also do provide -- make them aware, both the

Page 87

1  youth and the family aware that they have the option to
2  have video calls with them through different
3  applications on the phones.  Give them our direct
4  number.  So if they have any questions, they can reach
5  out to us.
6          Let them know what we're going to be doing for
7  them during the time that they are here.  And kind of
8  integrate them into the program.
9          So just kind of reviewing what to expect with
10 the program.  So like school program, the point system
11 that we have in place here, the daily schedule, what
12 services are offered to them.
13  Q     And how does that process differ when it's not a
14 step-up?
15  A     When it's intakes, it's being referred from the
16 intakes department, we usually get a call or an email
17 from the agency that's going to be transferring them to
18 us.  They coordinate a date and time that will work for
19 us to accept them.  Then they provide us with the
20 information as far as an arrival time and the person to
21 contact with that agency who's bringing them here.  And
22 then the intake process is pretty much the same.  Well,
23 it is the same.
24  Q     Okay.
25  A     And one more thing adding to the intake process.

Page 88

1  I failed to mention it.  They are offered an opportunity
2  to contact their attorney if they have an attorney prior
3  to arriving here.
4       They also are allowed time to shower.  Provided
5  with clothing, linen at the time they walk in.
6  Q    Thank you.
7       I want to go back a little bit to talking about
8  the dangerousness assessment and when Yolo's determining
9  whether to accept a youth.
10      When you're deciding whether a child is dangerous
11 to themselves or others, is mental health taken into
12 account in that determination?
13 A    Yes.
14 Q    How so?
15 A    Well, if it's a danger to self or others, we do
16 take into consideration all of that.  So if there is any
17 records or documents of some sort of mental health
18 history or if these issues are something that we see or
19 something underlying that hasn't been identified, we do
20 request additional information.
21 Q    And is it correct that in 2017 Yolo disagreed
22 with ORR's placement of seven minors based on a supposed
23 gang affiliation?  If you recall.
24 A    Can you say that again?
25 Q    In 2017 did Yolo disagree with ORR's placement

Page 195

```
 1                    REPORTER'S CERTIFICATE

 2          I, PEGGY A. PORTER, do hereby certify:

 3     That the witness named in the foregoing deposition,

 4                       JOSE CASTANEDA

 5   was present at the time and place therein specified;

 6           That the said proceeding was taken before me at

 7   the said time and place, and was taken down in shorthand

 8   writing by me;

 9           That I am a Certified Shorthand Reporter of the

10   State of California;

11           That the said proceeding was thereafter, under

12   my direction, transcribed into computer-assisted

13   transcription; and that the foregoing transcript

14   constitutes a full, true, and correct report of the

15   proceedings which then and there took place; that I am a

16   disinterested person to the said action.

17           IN WITNESS WHEREOF, I have hereunto subscribed

18   my hand this 5th day of December 2019.

19
                     _____
20
                     PEGGY A. PORTER, CSR 6086
21

22

23

24

25
```