# REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCAS R. *et al.*, | ) Case No.: 2-18-CV-05741 DMG (PLA) |
| Plaintiffs, | ) |
| v. | ) |
| ALEX AZAR, Secretary of U.S. Dep't of | ) |
| Health and Human Services, *et al.*, | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**EXPERT REBUTTAL REPORT OF DR. ROY LUBIT**

I.    ~~Rebuttal of Dr. Anthony Joseph Urquiza Expert Report~~

A. Executive Summary

1. ████████████████████████████████
████████████████████ █████████████
████████████████████████████████
██████████████████ █ ████████████
████████████████████████████████
████████████

■ ████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
██ ███ ████ ████ █ ████ ██ ██ ███ ████ ██ ██
████████████████████████████████
██████████

■ ████████████████████████████████
████████████ █ ███████████████████
████████████████████████████████



[REDACTED]

1 Global Assessment of Functioning has been a widely used way of providing a general impression of an individual's functioning.

**61-70** Some mild symptoms *or* some difficulty in social, occupational, or school functioning, but generally functioning pretty well.

**51-60** Moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic.
attacks) *or* moderate difficulty in social, or school functioning (e.g., few friends, conflicts with peers).

**41 – 50** Serious symptoms (e.g., suicidal ideation, frequent shoplifting) *or* any serious impairment in social, or school functioning (e.g., no friends, cannot work).

**31 – 40** Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) *or* major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (child frequently beats up younger children, is defiant at home, and is failing at school).

15. ████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████ █████
████████████████████ █ █████████████
██████████████

████████████ █ █████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
███████ █████ ███ ██ ███ █████ ███ ████
████████████████████████████████
████████████████████████████████
████████████████████ █

████████████████████████████████
████████████████████████████████
████████████████████████ █ █████████

2 http://psychology.iresearchnet.com/counseling-psychology/counseling-therapy/integrative-eclectic-therapy/)

3 Cook, S. C., Schwartz, A. C., & Kaslow, N. J. (2017). Evidence-Based Psychotherapy: Advantages and Challenges. *Neurotherapeutics : the journal of the American Society for Experimental NeuroTherapeutics*, *14*(3), 537–545. Also Greenhalgh T, Howick J, Maskrey N. Evidence based medicine: a movement in crisis? *BMJ*. 2014;348:g3725; Kazdin AE. Evidence-based treatment and practice: new opportunities to bridge clinical research and practice, enhance the knowledge base, and improve patient care. *Am Psychol*. 2008;63:146–159.

4 Cook, S. C., Schwartz, A. C., & Kaslow, N. J. (2017). Evidence-Based Psychotherapy: Advantages and Challenges. *Neurotherapeutics : the journal of the American Society for Experimental NeuroTherapeutics*, *14*(3), 537–545. https://doi.org/10.1007/s13311-017-0549-4

5 Watts BV, Shiner B, Zubkoff L, Carpenter-Song E, Ronconi JM, Coldwell CM. (2014) Implementation of evidence-based psychotherapies for posttraumatic stress disorder in VA specialty clinics. *Psychiatr Serv*. 65(5):648–653.



[6]Sackett et al (1996) Evidence based medicine: what it is and what it isn't. *BMJ* ;312:71. https://www.bmj.com/content/312/7023/71.

[7] Gersons, B. P., & Schnyder, U. (2013). Learning from traumatic experiences with brief eclectic psychotherapy for PTSD. *European journal of psychotraumatology*, *4*, 10.3402/ejpt.v4i0.21369. https://doi.org/10.3402/ejpt.v4i0.21369.

[8] Cohen, Mannarino and Deblinger (2017) Trauma-Focused Cognitive-Behavioral Therapy for Traumatized Children, in John R. Weisz and Alan E. Kazdin (eds). *Evidence-Based Psychotherapies for Children and Adolescents Third Edition,* discussing their evidence-based protocol for treating traumatized children.



9 Ibid.





37. 

12 Clifford G, Dalgleish T, Hitchcock C. Prevalence of auditory pseudohallucinations in adult survivors of physical and sexual trauma with chronic post-traumatic stress disorder (PTSD). *Behav Res Ther*. 2018;111:113-118.

13 OConghaile A, DeLisi LE. Distinguishing schizophrenia from posttraumatic stress disorder with psychosis. *Curr Opin Psychiatry*. 2015;28(3):249-255.



43.

[14]https://www.aacap.org/aacap/families_and_youth/Resources/Psychiatric_Medication/The_Treatment_for_Adolescents_with_Depression_Study_TADS.aspx



48. 



59.





















99. 



105.

















140. 



17 Martindale, D.A. (2005). Confirmatory Bias and Confirmatory Distortion. *Journal of Child Custody:
   Research,Issues, and Practices*, 2(1-2), 31-48; Lubit, submitted for consideration to a journal.

18 Martindale, D.A. (2001). Cross-examining mental health experts in child custody litigation. *The Journal of
   Psychiatry and Law*, 29, 483-511. (2001: 503). "[T]he defining attributes of an expert opinion relate not to the
   credentials held by the individual whose fingers type the words or from whose mouth the words flow; rather, the
   requisite characteristics relate to the procedures that were employed in formulating the opinion and the body of
   knowledge that forms the foundation upon which those procedures were developed".











19 People use a variety of terms when discussing evidence based psychotherapy (EBP). EBP is a subset of Evidence Based Treatment (EBT) which can refer to medical treatment as well as psychotherapy.  The term Evidence Based Medicine (EBM) is also used.  The term Evidence Based Therapy (also EBT) is sometimes used.  For the purpose of this report there is no difference between EBP and EBT.



173.



## II.  Rebuttal of Drs. Ryan Matlow and Nancy Ewen Wang

Executive Summary

Drs. Matlow and Wang claim that secure settings such as Residential Treatment Centers (RTCs) cause psychological harm and so children in the custody of the Office of Refugee Resettlement (ORR) should be kept in shelters rather than being stepped up to RTCs, and should be sent more rapidly to potential sponsors.  Their paper is not a scientific or clinical assessment of the situation.  The literature they cite to support their argument is based on populations and experiences that are drastically different than what UACs experience in the RTCs to which unaccompanied alien children (UACs) in ORR custody are sometimes placed.  Specifically, they

cite research on infants in institutions, and children and adults in detention centers where they had little to do and were exposed to high levels of violence.  UACs are stepped up from shelters to RTCs when they pose significant danger to themselves.  Youths are less likely to engage in self harm in an RTC than in a shelter because of the high staff to youth ratio.  Decreasing the incidence of self-harm not only spares the youth self-inflicted trauma, it also spares other minors in the facility exposure to violence.  As noted by the literature cited by Drs. Matlow and Wang, witnessing violence is a key cause of harm to those in detention centers.  The second key mechanism of harm in detention centers noted by the authors of the cited articles is extreme boredom. In RTCs youths have high far more education and recreation than occurs in detention centers.

Drs. Matlow and Wang claim children in ORR care deteriorate psychologically.  However, detailed review of cases shows that they are doing much better at the end of their stays in RTCs than before they went to the RTCs.

Drs. Matlow and Wang fail to engage in clinical assessment.  They fail to discuss the risks and benefits of the alternative options.  They fail to note that the children need high levels of psychological care, which they get in the RTCs, and would almost certainly not receive in the community once they go to live with a sponsor.  They have 3 hours of individual and group therapy, very frequent monitoring of medication if they are on medication and milieu therapy.  In the community it is unlikely that youths would have more than an hour every one to two weeks.  Drs. Matlow and Wang do not note or discuss the risk that potential sponsors might not provide adequate supervision and support.  They do not note or discuss the harm to the UAC in question, and other children in ORR care, of being in a lower level of care in which there would be a greater likelihood of self-harm or assault on others.  Their opinions lack what is required for an opinion to be an actual expert opinion, i.e., accurate presentation of the data, hypothesis testing, and appropriate use of the results of empirical research.  Decisions on placement are almost always made by psychiatrists and require complex analysis of risks and benefits.  Psychiatrists receive extensive training during their years in medicine learning clinical thinking skills, assessing the risks and benefits of the possible courses of action, and have extensive experience and supervision concerning the issue of committing and releasing people who present a danger to themselves and others.  Drs. Matlow and Wang's paper suggests that they do not have expertise concerning this issue.

1.  The majority of Drs. Matlow and Wang's report discusses the research on the impact of trauma on children, pointing out that it is very serious.  I do not disagree that emotional trauma adversely affects children in multiple ways.  Their long exegesis on this topic gives the report the patina of being scientific.  While the exegesis is scientific, their analysis of the impact of placement in congregate care facilities and their opinion that such placement is traumatic is not scientific.  The literature they cite (research about detention centers) is not relevant and they fail to cite the relevant literature on RTCs, which has found that RTCs are often helpful.  The issue for the psychiatric and psychological experts in this case is what placement is most appropriate for the children in ORR custody, not whether trauma is harmful.

The research on the impact of trauma on the brain focuses on trauma that fulfills Diagnostic and Statistical Manual of Mental Disorder, Fifth Edition (DSM V) criteria for Post Traumatic Stress Disorder (PTSD). The criteria begin with the causal criteria: exposure to actual or threatened death, serious injury or sexual violence. There are then four types of

symptoms.  One must have at least one from the first two categories and two from the last two categories.  The four categories are: (B) intrusive distressing recollections of the event, (C) avoidance of traumatic reminders, (D) negative alterations in mood or cognition, and (E) trauma related changes in arousal and reactivity.[20]

2. Being in ORR care is markedly different from, and does not come close to, the type of trauma referred to in most of the studies that Drs. Matlow and Wang cite.  Being seriously assaulted, suffering sexual violence, witnessing someone engage in serious self-harm or seriously harming someone else, being kidnapped, or losing a parent to violence, are all very different than being in ORR care.  It is not scientific to suggest that research studies on the impact of sexual violence, and accidents that risk or cause serious injury or death, apply to being in ORR care in a shelter or RTC which does not meet DSM V criteria for PTSD.  Assuming that being in an RTC causes harm similar to that of PTSD (which requires exposure to actual or threatened death, serious injury or sexual violation, and developing sufficient symptoms that fulfill the symptom requirements for PTSD) is not scientific and misleads the reader about key scientific knowledge.

3. Plaintiff's experts also fail to tell the reader that of those who suffer events sufficient to cause PTSD, only 15% develop PTSD, and that of those who do develop PTSD, those who do not suffer sexual assault or permanent physical trauma, the majority recover in a matter of months.[21]

4. There is a bigger error in Drs. Matlow and Wang's report.  The issue is not simply whether ORR care causes enduring significant harm to children, the issue is weighing the risks and benefits of care options for the children in ORR care.  Medical decision making entails complex assessments of the likelihood and severity of benefits and risks from the various possible courses of action.  Analogies may be helpful.  When someone has appendicitis,

---

[20] The "B" criteria, intrusive, distressing recollections (nightmares, intrusive thoughts about the event, dissociative reactions, and marked emotional distress or physiologic reaction when exposed to traumatic reminders) are the hallmark of PTSD. They result from a variety of processes, including unusual memory handling and storage caused by the intense emotions connected with the memory. Stimuli and thoughts associated with the traumatic event serve as traumatic triggers, bringing it into the forefront of the victim's mind, and leading the individual to experience intense emotional distress. When reminded of the event, the individual may feel as if he or she is reliving it rather than simply thinking about it.

The "C" criteria is avoidance of thoughts, feelings, or conversations associated with the event, and/or avoidance of people, places or activities that remind the person of the event.  This symptom is an attempt to avoid the pain that arises when memories of the event are triggered by associations.

The "D" criterion is 2 or more negative alterations in cognitions and mood associated with the traumatic event(s). Inability to remember an important aspect of the event is the result of dissociation blocking out parts of the memory. Negative beliefs about oneself or the world are the result of having an extremely negative experience that challenges more positive preexisting beliefs about oneself and the world. Victims sometimes experience inappropriate self-blame. Persistent negative emotions, inability to experience  positive emotions, loss of interest in significant activities and detachment from others can also occur.  She cannot remember parts of the appointment in which she was abused, indicating dissociation.

The "E" criteria (trauma related changes in arousal and reactivity): consists of irritable behavior and angry outbursts, hyper-vigilance, sleep disturbance, increased startle reaction, and concentration problems, arise from a victim's fight flight mechanism being turned up to very high levels and staying at high levels. Reckless and self-destructive behavior can also occur.

[21] Galatzer-Levy IR, Ankri Y, Freedman S, Israeli-Shalev Y, Roitman P, et al. (2013) Early PTSD Symptom Trajectories: Persistence, Recovery, and Response to Treatment: Results from the Jerusalem Trauma Outreach and Prevention Study (J-TOPS). PLOS ONE 8(8):

the historic course of action is an appendectomy.  The harm caused if the surgery goes well and the risk of something going seriously wrong, is small compared to the risk of an appendix bursting and causing peritonitis.  Similarly, blood pressure medicines have side effects, but the likely benefit (decreased risk of premature death) is clearly worth the risk of the side effects of the medication.  Moreover, committing a person to a psychiatric hospital against his or her will clearly has adverse impacts.  However, for people who are at high risk of suicide or homicide, the risk benefit ratio is clearly on the side of commitment.

5. When discussing the appropriateness of various care options for UACs, Drs. Matlow and Wang ignore the reasons why children are placed in more restrictive congregate care facilities, including RTCs.  Their report does not address the benefits of residential care and they do not discuss the risk of serious harm if children are not placed in a facility that can provide the level of care they need.  The calculus they use, focusing solely on the possible negative impacts of congregate care, ignoring where the children would be and what might happen if they are not in an appropriate placement, is equivalent to a forensic expert writing a report accusing all surgeons and internists of malpractice for performing surgery (since cutting people clearly causes some harm) and prescribing medication (since essentially all medications can have negative side effects) regardless of the reasons for the surgery or prescription of medication.

6. Without adequate evaluation of potential sponsors, some children might be sent to homes in which they will be abused, neglected, or even trafficked.  Without a sponsor who has sufficient knowledge, energy, and time to adequately supervise and support the minor, some will cut, and some will attempt suicide.  Without a sponsor who can afford the costs of therapy and medication, and who understands the importance and is committed to getting the child to therapy, the children with serious mental health issues will often suffer relapse or deterioration.  Sponsors who are not able to handle a child with serious mental health issues and respond with anger to a child's behavior would be very harmful.  Being abused and engaging in self-harm are traumatic to children.

7. Not placing a child in an RTC when he or she needs a higher level of care to treat serious mental health symptoms and avoid harm to self or others is contrary to good medical judgment.  Keeping a child who is at high risk for self-harm or harm to others in a shelter, rather than an RTC, increases the risk of self-harm and harm to others by assault. Moreover, other children in the shelter have a right to be kept safe from assault and from witnessing violence by an out of control child.  Keeping the other children safe from traumatic experiences is also important.

8. While being in a secure setting, such as an RTC, may be more difficult in some ways for a minor than being in a shelter, it is often necessary for the safety of the minor and safety of others.  Drs. Matlow and Wang systematically ignore the dangers of failing to have children in an adequately secure setting and of release to less secure settings.

9. Drs. Matlow and Wang also make serious errors of scientific analysis.  They conflate causation and correlation.  They assert that children who spent more time at RTCs had greater problems.  It would be surprising if this was not a general finding, since those with greater problems are going to need a greater period of stabilizing and intensive treatment.  Moreover, children who do not have a sponsor who is able to ensure their emotional and

physical well-being will tend to both spend more time in congregate care and to have greater anxiety about where they will eventually be staying.

10. To do a reliable forensic evaluation of whether youths should be placed in RTCs, and whether they should be released to lower levels of care or families sooner, one needs to assess the costs, risks and benefits of the alternative options.  In addition, one needs to look to see if in general, and specifically what types of children, improve or deteriorate in RTCs and in other levels of congregate care.

11. Drs. Matlow and Wang have presented a hypothesis: Children would be better off if they spent less time in RTCs and other types of congregate care.  There are alternative hypotheses that are also viable: If children spent less time in RTCs and other congregate care and were sent to live with sponsors without the current level of due diligence, (1) a number would likely wind up suffering from being placed with sponsors who cannot provide the care they need or might harm them, (2) some would likely not progress as fast in therapy in the community as they do in RTCs and other congregate care settings since they would have much less therapy, and (3) some would likely harm themselves and others at higher rates since they would have less adult supervision.

12. As discussed, children in ORR care receive significant therapy services which are superior for children who self-harm or are aggressive to the services of shelters or the community.

13. Research has shown that children in RTCs generally benefit from the experience.[22]

14. I reviewed 23 ORR cases for children who were placed in RTCs at some point while they were in ORR care.  In every instance when a potential sponsor was not accepted, it was the proper decision to not accept the potential sponsor.  I have considerable experience doing custody evaluations and have on numerous occasions been declared an expert for the purpose of advising a court on the benefits and risks of the parents' households, and whether a parent was fit to take care of a child.  I have also been an expert on cases in which protective services removed children from a parent's care and there were questions about whether the children should be returned to the home.

15. I have expertise and considerable experience with the issue of when it is appropriate to commit someone to the hospital and when people were safe being in the community.  As a psychiatrist, I have evaluated over a thousand individuals for admission or commitment to a psychiatric hospital.  I have also been asked by courts to be a neutral evaluator of whether someone could leave the hospital when the doctors wanted them to stay and testified in over a hundred cases about whether someone needed to be retained in the hospital or could be released.   Decisions on commitment and retention are almost always made by psychiatrists, not by psychologists.  Drs. Matlow and Wang's report shows a lack of crucial clinical analysis of the issue.

16. Drs. Matlow and Wang begin by saying that "some ORR placement settings do not provide a trauma-sensitive environment that is appropriate for children with trauma histories and disabilities stemming from prolonged exposure to toxic stress (as defined below). As a result, placement in ORR custody, in many cases, exacerbates psychological stress resulting in further decline that is likely to continue beyond a child's stay in ORR custody." This is a vague statement for which they do not provide a reasonable basis. They have not

---

[22] https://www.ojjdp.gov/mpg/litreviews/Residential_Treatment_Centers.pdf.

provided data or explanations of their opinion that provide reasonable support for a conclusion that ORR placements do not provide trauma-sensitive environments. Review of records shows that ORR staff gathers data about traumatic experiences and therapists teach coping skills the children need to tolerate the psychological distress they feel, and also help youths process their traumatic experiences. Drs. Matlow and Wang did not demonstrate that placement in ORR custody exacerbates the stress of UACs (compared to other options) or that it leads to psychological decline, or that the decline is likely to continue beyond the children's time in ORR custody. The articles they cite both fail to support and even contradict their assertions.

17. Drs. Matlow and Wang further claim, "Detention in and of itself constitutes a traumatic stress and toxic stress exposure and therefore puts children at increased risk of suffering various health and psychological harms. These harms only increase when detention is prolonged or occurs in a restrictive environment." Detention centers are very different than RTCs. Being placed in a shelter or RTC with education, medical and psychological care, and relative safety from abuse, after years of physical and sexual abuse, neglect, lack of education, constant fear of assault, would not be expected to cause toxic stress, much less traumatic stress. Detailed review of 23 cases of children who spent time in an ORR RTC showed that, in general, their psychological condition greatly improved.

18. Drs. Matlow and Wang claim, "Without appropriate accommodations, such as realistic behavioral goals and treatment goals that account for a child's trauma history, and consideration of their trauma history, children are likely to be stepped-up to more restrictive facilities because of behavioral difficulties that are symptoms of their psychological distress and pre-existing disability (e.g., depression, anxiety, PTSD). Placement in restrictive residential or rehabilitative settings while in ORR custody is contraindicated for addressing children's disabilities related to trauma exposure, traumatic distress, and corresponding functional impairments. Moreover, secure facilities and other restrictive care settings are associated with deterioration in psychological functioning over time therefore children in ORR custody who are placed in these restrictive care settings often experience worsening psychological symptoms." Drs. Matlow and Wang are wrong for multiple reasons.

19. The authors' opinion is contrary to medical practice and contrary to the articles they present to support their argument. A child at home or in a classroom should be given extra tolerance for problematic behavior arising from trauma, and not be punished for things one might punish other children. However, going to a higher level of care is not punishment. It is for security and intensified treatment. If a child is cutting or at risk of suicide or assault, the child needs to be protected from himself or herself. Moreover, other children need protection from exposure to violence. All children who are acting out, whether because of having experienced trauma, or because of predominantly biologically-based psychiatric issues such as bipolar disorder, should be in facilities that are sufficiently secure to protect them and those around them. In my decades of practice in psychiatry, I have not heard a colleague say that someone who presented a substantial risk of harm to themselves or others should not be placed in a secure facility because their problems arise from trauma, as opposed to some other reason.

20. In addition, the articles that Drs. Matlow and Wang present to support their work do not support their argument. The articles they cite assert that infants in institutional settings and

children in detention centers or prisons who have little to do leading to great boredom and who witness high levels of violence, suffer decline.  Research on infants in orphanages doing poorly as a result of inadequate attention is not relevant to teenagers in RTCs who get more attention than they would in shelters.  RTCs are drastically different than the detention centers discussed in the articles that Drs. Matlow and Wang cite. RTCs are for treatment.  They are not prisons filled with violence and nothing to do leading to extreme boredom.  The children in RTCs have a great deal of education and other activities.

21. In addition, all children in ORR custody are safer under a policy in which children who are at significant risk of harm to themselves and others are placed in a facility with a level of security where the risk of harm is adequately controlled.

22. Drs. Matlow and Wang's assertion that "children in ORR custody who are placed in these restrictive care settings often experience worsening psychological symptoms" and "ORR's release requirements that depend upon demonstration of emotional, psychological, or behavior stability are contradictory because the facility setting itself is often the source of the child's distress."  Drs. Matlow and Wang's statements are contrary to the available data.  My detailed review of these 22 cases of children placed in RTCs demonstrated that the children who were sent to RTCs considerably improved during their time in the RTCs.  Plaintiffs repeatedly claimed children were stressed by the placement or being kept from relatives when the statements in their charts often noted other causes for their distress such as missing people in their country of origin (COO) and fear for the safety of their family in their COO, or upset over being confronted about rule breaking, or memories of traumatic events in their COO.

23. Statements by the children that their stress is from being in the placement require analysis, rather than being unequivocally accepted.  I frequently need to assess the meaning of statements made to others, and to myself, when doing abuse allegations and custody evaluations.  Leading and suggestive questions by detectives, parents and others can lead children to say all sorts of things and provide all sorts of quotes that do not actually reflect what they actually think and feel.  In abuse cases, leading and suggestive questions not only invalidate the child's statements, but can so corrupt the child's thinking that statements in future interviews, done correctly, need to be questioned.  The minors' alleged statements in this case are particularly suspect, because they contain wording and words that are far more sophisticated than are likely to come from teenagers who have limited English ability, and often have very similar wording.  If I had seen the statements from a parent and child in a case I would state there was a high likelihood they had coordinated answers.  One needs to know how questions were asked and what was spontaneously said.

24. ███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████

25. One has to be careful of the tendency of people having emotional distress to seek "geographic cures." People often believe that their current situation is the cause of all of their distress and that going elsewhere will somehow lead them to do much better. If the reason for distress is not where they are, and they attempt to fix things by going elsewhere, they are likely to suffer significantly greater symptoms when they go to a new environment and find that it does not solve their problems.

26. Medical and psychiatric treatment often causes some distress, whether it is doing painful exercises necessary after surgery, or talking about painful events, or looking at self-destructive behavior and personality traits, or needing to go to meetings to talk about issues rather than being outdoors playing. Even if the facility causes some of the distress, sending a child out to a facility or potential sponsor who cannot adequately ensure the minor's safety is medically inappropriate, since the risk of harm is greater than the benefit.[23]

27. A prominent complaint in the UACs' alleged statements reported by their lawyers is that their therapist at shelters were more helpful than the therapist at Shiloh. This does not mean that children should, in general, be kept at the shelter. It means that the children were not comfortable with the therapist at Shiloh. It is possible that these UACs happened to have an unusually great therapist at their shelters. This is not a reason to, in general, keep children in shelters. It is possible the therapist at the RTC is poor. The solution is to change that particular therapist. It is possible that the RTC therapist confronted the UAC about self-destructive behavior or other issues that were difficult to speak about, while the shelter therapist ignored these issues, and supported the UAC blaming others for all problems. The real issue is not which therapist the youth was more comfortable with or found more pleasant to speak with. The real issue is who was, in fact, more helpful. To assess this one needs to look at the level of improvement in the shelter and in the RTC.

28. Drs. Matlow and Wang claim, "Children in ORR custody have frequently already had traumatic and toxic stress exposure and in our opinion, they are likely to experience additional traumatic and toxic stress while detained." I disagree. The detention center literature they repeatedly cite states that extreme boredom, exposure to violence, and fear of being sent back to their home countries are the key stresses. These stresses are not descriptive of RTCs. Children are less likely to suffer these issues in an RTC than in a shelter or sponsor's home. They are more likely to suffer traumatic events and high levels of stress if in a placement that cannot adequately meet their needs for support and structure, either lower levels of care or release to potential sponsors who may harm them, may not be able to protect them from self-harm, or cannot ensure that their mental health needs are met in the community.

29. Drs. Matlow and Wang assert, "As explained in detail below, our personal interviews as well as the sworn declarations provided by children in ORR custody reveal that many of these children experience factors associated with an increased likelihood of trauma while in ORR custody. Specifically, many of the children expressed their limited sense of control or personal agency, lack of knowledge as to what would happen to them, a lack of

---

[23] One could also not connect with one's particular therapist. This does not mean that the therapist is poor. And, even if the therapist is poor, it does not mean that the entire program should be closed.

predictability regarding their day and treatment, and feelings of fear and helplessness. These perceptions of fear, lack of agency, and lack of information influence the biological stress response, related psychological reactions, and subsequent psychiatric symptomatology (Ford et al., 2015; SAMHSA, 2014)."

30. Throughout their paper, Drs. Matlow and Wang's assertions demonstrate a failure to engage in clinical assessment.[24] They fail to discuss the risks and benefits of the alternative options, and whether the specific mechanisms of harm that they worry about are more or less likely in alternative placements. The lack of predictability of their day and treatment would, in all likelihood, be worse outside of an RTC or other structured congregate care settings. Concerning lack of control of their situation, children do not make choices for themselves as to where they will be. Whether living with parents or other caretakers, or in a shelter, children are told where they can and cannot go, and with whom they can and cannot associate. Children who are under poor control will wind up being punished in school and by parents. The fear of punishment and the reality of punishment does far more damage to one's sense of control than being in a highly structured environment. Staff are likely to be more patient than sponsors who may not expect or understand the children's mental health issues and who do not have the backup that staff in an RTC or other congregate care settings have. Concerning lack of knowledge as to what will happen, this will be no greater in an RTC than in a shelter, and depends upon the family being able to find appropriate sponsors.[25]

---

[24] The training of psychiatrists and psychologists is rather different. Central to medical training is to consider the risks and benefits of any intervention. Every time we give a medication, decide to hospitalize, and decide to release from the hospital, we are obligated to give serious consideration of the risks and benefits of each reasonable possibility. I had extensive experience under supervision when I was a resident in psychiatry at Yale. I have had over a thousand occasions when I have had to opine on whether someone should or should not be committed and/or released from commitment. I have been an expert in cases in which people were not committed and went home and killed themselves or others, and also repeatedly opined that contrary to the views of the doctors on the psychiatric ward, a patient should not be forced to remain in the hospital. I have been appointed by courts to be the neutral expert in retention cases and repeatedly been awarded expert status to opine on these issues. I have supervised residents concerning these issues and supervised fully trained psychiatrists concerning these issues when I was acting medical director of a state hospital. I am not aware of psychologists regularly needing to make the final decision on where a patient should be, knowing that there would be risk of harm no matter what the choice.

[25] See, e.g., C.J.A.L. Decl. at ¶ 7 (Drs. Matlow & Wang, page 13) ("After spending roughly six months in Casa Franklin, I started becoming very depressed and frustrated with how long I had already been in ORR custody. When I was at Casa Franklin, my dad had informed me that he was no longer going to be my sponsor, and once I heard that, I became incredibly upset…As a result, I was admitted to a psychiatric hospital. My case manager and counselor at Casa Franklin and the doctor at the hospital all explained that I needed to go to an RTC…I did not want to go to the RTC, but I had no chance to appeal or disagree with the decision.") A clinical note from C.J.A.L's therapist at Casa Franklin stated that he "continues to struggle with his emotional well-being from the lack of support from his family [including recent rejection by mother and father], which UC believes is the cause of his continuous instability and defiant behavior, as per PEAK Behavioral Health hospital. Ultimately, UC's regular severe crises in the program is a reflection of his unstable mental well-being and is evidence that this program is not equipped to provide him with the level of mental health services that he needs at this time." (GOV-00241049). The transfer recommendation states that CJAL "has been diagnosed with Major Depressive Disorder and requires ongoing and intense therapy that can no longer be provided in an outpatient setting. As per PEAK's psychiatrist . . . and their clinical team, [CJAL] has been determined to be a danger to himself. [CJAL] has not demonstrated progress in current acute setting, requires therapeutic-based intensive supervision as he has had several suicide ideations and history of suicide attempts that intervene with his daily functioning and participation in daily activities, has been provided with various short-term clinical interventions such as three hospitalizations to mental health hospitals, mental health medication regimen, intensive counseling and therapeutic services, and constant

31. Drs. Matlow and Wang claim, "It is clear from our 2018 and 2019 interviews of children in ORR custody, the sworn declarations of children in ORR custody and our review of ORR case files, that children in ORR custody similarly suffer from parental separation, physical and emotional neglect, and experiences of physical and sexual abuse either before or during their time in ORR custody."  Drs. Matlow and Wang produced no credible evidence of abuse or neglect of children in ORR custody.  The very rare allegations they presented were not credible.  Physical, emotional and sexual abuse occurred before the children came to the US.  ORR made appropriate protective decisions to not send children to potential sponsors who posed a risk of emotional or physical abuse or neglect.  Placing children in more secure settings decreases the risk of self-harm and suicide, and thereby reduces the risk of further trauma.  Moreover, stepping-up children who are dangerous to themselves and others, decreases the risk of other children being exposed to violence and spares them further trauma.  Concerning parental separation, few of the children in the 23 cases I reviewed were kept from parents.  When they were, the parents were markedly inappropriate caretakers and the children generally did not want to be with them.  If they were suffering from parental separation or separation from their primary caretakers, one can wonder why Plaintiffs' lawyers are not working to send them back to their home countries.  Lawyers fighting to keep them in the US was repeatedly the cause of separation from historic caretakers, not ORR actions.  If Drs. Matlow and Wang are not aware of the information I present in this paragraph then they do not understand the situation about which they are opining.  If they are aware of this information and, nevertheless, use it to support their argument, they are not engaging in scientific analysis.

32. Drs. Matlow and Wang assert, "Over the course of these visits we interviewed approximately 30 children and we frequently observed the signs and symptoms of anxiety, depression, and PTSD that are consistent with prior research on mental health outcomes of immigration detention. In many cases, these symptoms were directly related to children's experiences in detention.  In our interviews, children demonstrated anxiety symptoms (including worry, agitation, difficulty relaxing, nervousness) related to concerns and uncertainty about their own personal well-being, or that of a loved one. They reported feeling overwhelmed by their circumstances (which included limited access to support resources) that results in emotion dysregulation corresponding with behavioral impulsivity and, in some cases, self-harming behaviors."

33. There are serious problems with the foundation of their opinion.  First, correlation does not prove causation.  The UACs who went to RTCs generally suffered very high levels of trauma before they came to the US.  The children generally had high levels of anxiety, depression and PTSD before the came into ORR care.  The authors do not mention this.  They then write that the symptoms were directly related to their experiences in detention.  This assertion does not meet the requirements for an opinion to be an expert opinion.  Not all opinions by experts are expert opinions.  Opinions are expert opinions when an expert uses scientific methods to analyze data.  This includes appropriate use of empirical research, avoidance of logical fallacies (such as the fallacy that correlation indicates

modification to his level of supervision. Current placement is no longer capable to provide the appropriate services to meet UC's current mental health needs as all efforts have been unsuccessful as UC continues demonstrating high-risk concerning behavior." (GOV-00241053).  CJAL signed acknowledgement (in Spanish and English) of Notice of Placement at Mercy First RTC (GOV-00234061-64).

causation), fair presentation of the data, hypothesis generation, often search for additional data, and hypothesis testing.  Moreover, experts are generally required to explain the scientific thinking that was the basis for their opinion.  They do not provide an adequate scientific basis for the statement "these symptoms were directly related to children's experiences in detention."  The statement "children demonstrated anxiety symptoms (including worry, agitation, difficulty relaxing, nervousness) related to concerns and uncertainty about their own personal well-being, or that of a loved one" does not prove that detention was the cause of their symptoms.  Concerns about the welfare of a loved one was not the result of the UAC being in detention.  Moreover, "concerns and uncertainty about their own personal well-being" is also not necessarily the result of being in an RTC.  In fact, it is likely that other issues are predominant.  For example, children who suffered the level of trauma these children did are likely to be concerned about their personal well-being wherever they go.  Second, some were concerned about the possibility of deportation.  Third, it seems likely that there would be concerns about what life would be like outside of the RTC living with relatives they often did not know very well, sometimes having people they did not know in the house, not knowing the children in the school they would go to, having limited English and knowing that would cause problems, integrating into a new culture and society, etc.

34. An analogy may help.  A child who had been bullied the prior year at camp who is going off to camp, or changing schools is likely to be concerned about their personal well-being in the new school or camp.  Drs. Wang and Matlow's methods of analysis would blame their home for their anxiety and would lead to a recommendation that they be taken from their home as soon as possible.

35. It is not adequate in a forensic report to simply claim that they believe symptoms were related to certain experiences, when there are other possibilities.  They need to explain the analysis that leads them to assert that it was being in congregate care, rather than the trauma they sustained in their home countries, and not knowing if a suitable sponsor would be found, that is causing their symptoms.  My analysis of the data, provided in Addendum 4 and 5 of my expert report, comes to the opposite conclusion.  Moreover, as noted, immigrant detention experiences are drastically different than being in an RTC.  The children's concerns about family in their home country will not disappear if they are in lower levels of care.  Concerns about their own well-being may well be greater in lower levels of care. Their risk of harm would be greater in lower levels of care.  Moreover, the children came to RTCs because they already had serious emotional and behavioral issues, generally for years.  That the issues did not disappear when they entered the RTC or shelter does not mean the RTC or shelter caused it.  Drs. Matlow and Wang write that one of the problems was limited access to support resources.  As I say above, the level of support services in an RTC is much greater than the patient will have in the community.  Drs. Matlow and Wang's arguments support RTC treatment.

36. Drs. Matlow and Wang assert, "We frequently observed that increased length of time in ORR custody was associated with increased severity of depressive symptoms marked by desperation, hopelessness, and helplessness. As children experience prolonged delays in release (and, in many cases, family reunification)."  Correlation does not prove causation.  Frequently, correlation only means that two things have the same cause.  Children with more severe mental health issues would be expected to stay in care longer.  The level of

emotional difficulties leads both to longer stays and to higher levels of problems being observed. The issues are correlated. Moreover, delay in finding an appropriate sponsor, or lack of an appropriate sponsor, is likely to lead to greater stress, but it is not the fault of ORR. Finally, my review of 23 cases showed that children in ORR care with serious mental health needs improved over time. Drs. Matlow and Wang's claim that time in congregate care led to deterioration is contrary to the data. Drs. Matlow and Wang go on, apparently giving examples found in the children's Declarations, to state that anxiety symptoms related to concerns and uncertainty about their own personal well-being, or that of a loved one. The children's fears about loved ones, clearly a serious issue, was for relatives in their home country subject to gangs, abuse, and food shortages. Their fears about loved ones is not the result of being in an RTC and would not be reduced by them leaving the RTC or other congregate care. Uncertainty about their own personal well-being, is likely to be about what life will be like outside of ORR care as well as when they will leave. Some children were worried about immigration issues. And, once in the community, this fear is likely to continue as they try to acclimate to a less structured and less supportive environment.

37. Drs. Matlow and Wang claim, "Immigration detention has been associated with elevated rates and severity of anxiety, depression, and PTSD in adults, adolescents, and children (for review of research, see MacLean et al., 2019; Keller et al., 2003; von Werthern et al., 2018[26]; Robjant, Hassan, & Katona, 2009[27]).…. Children in immigration detention are also at risk of exposure to additional trauma including abuse and threat from facility staff, physical and sexual violence from other detainees, social isolation, and family separation and loss (von Werthern et al., 2018; Linton et al., 2017). It is our professional opinion that these experiences of trauma while detained, coupled with prior experiences of pre- and peri-migration traumas, combine to have a cumulative and lasting impact on psychological functioning."

38. Drs. Matlow and Wang's applying empirical research from prison like detention centers to intensive psychiatric treatment centers is not scientific. Prison like detention centers and RTCs are markedly different. The articles they cite say more than that people deteriorate in detention centers. Robjant and von Werthern assert that extreme boredom and witnessing violence are the key mechanisms of harm. RTCs provide high levels of education and therapy as well as recreational opportunities. If children at risk for self-harm and violence to others are in kept in shelters, rather than transferred to more secure settings, they and all children in shelters would be at increased risk for witnessing or otherwise experiencing violence. The children would also be at increased risk for experiencing a traumatic event in the community either because of their own actions or someone victimizing them in a setting with far less adult supervision than exists in an RTC.

39. The actual mechanisms of harm that cause problems for those in detention centers are less of a problem in RTCs than in other options. It is surprising that Drs. Matlow and Wang

---

[26] von Werthern, M., Robjant, K., Chui, Z. *et al.* The impact of immigration detention on mental health: a systematic review. *BMC Psychiatry* **18,** 382 (2018).

[27] Katy Robjant, Rita Hassan and Cornelius Katona (2009) Mental health implications of detaining asylum seekers: systematic review. *The British Journal of Psychiatry* 194, 306–312.

fail to note this, and simply try to generalize from detention centers to RTCs which are markedly different.

40. In addition, there is literature about RTCs and statements by professional organizations which is relevant.  Drs. Matlow and Wang do not mention this literature.  The literature asserts that RTCs are generally helpful, not harmful.[28]  Bettmann and Jasperson (2009)[29] conducted a review of the outcome literature on adolescent residential treatment programs, including RTCs. Examining 13 studies they found to fit their review criteria, they concluded that "the outcome literature of adolescent residential and inpatient treatment indicates that these therapeutic settings are successful interventions for many clients" (2009, 174). Moreover, the American Academy of Child and Adolescent Psychiatry (AACAP)'s position is that AACAP states, "Residential treatment can help children and adolescents whose health is at risk while living in their community. For example, the programs are helpful for those who have not responded to outpatient treatments, who have education needs that cannot be met in less restrictive settings at their local schools, or who are in need of further intensive treatment following inpatient psychiatric care."

41. Applying empirical research from one setting to a second setting that does not apply, failing to mention that the mechanism of harm the research found in the first setting does not exist in the second setting, and failing to present empirical research about the specific type of setting you are opining on that shows the opposite of what you are saying destroys the scientific foundation of the opinion.

42. Drs. Matlow and Wang state, "Detaining children in restrictive environments is exceedingly harmful to their physical and mental health (Sege et al., 2017; Barnert, 2016). A well-established body of research has demonstrated that detaining children in restrictive environments interferes with healthy development, exacerbates pre-existing trauma, puts children at greater risk of self-harm, and exposes children to abuse (Holman & Ziedenberg, 2006). In a 2013 report, the National Academy of Sciences presented the myriad ways in which incarceration disrupts healthy development for adolescents (National Research Council) . . . . Furthermore, many restrictive care settings operate as juvenile detention facilities that are not designed for rehabilitation and treatment; therefore, there is a lack of services and treatments to adequately address children's psychological distress and trauma. Thus, psychological symptoms continue untreated and, in many cases, worsen."  Once again, generalizing across very different populations and very different types of detention is not scientific.

43. Other articles they cite are not relevant to their argument.  Sege is about children up to age 6.  Holman and Zeidenberg (2006) is about detention.  The article states "Detention: A form of locked custody of youth pre-trial who are arrested— juvenile detention centers are the juvenile justice system's version of 'jail.'" This is not relevant to RTCs.  Barnert is about incarceration not about treatment centers. Moreover, Barnert notes that there may be correlation but no causal connection between being in a detention center and having psychiatric issues since those with mental problems are more likely to be incarcerated. They say it is "plausible" incarceration contributes to health problems.  Among the causal

mechanisms for detention centers causing harm, they note sexual and physical trauma. As noted, sexual and physical trauma are less likely to occur if children under poor control are in higher levels of care. They add that it is likely that confinement adversely affects health. It is important to remember that incarceration of a minor takes the child from his family, school, and causes embarrassment. UACs are not taken from their family, school and friends, they choose to come to the US, and their family and friends are generally not here. Children in RTCs are not kept in cells. They live in rooms with ongoing access to peers, TV, recreation, support and therapy.

44. Drs. Matlow and Wang state, "While this research has not been specifically conducted in ORR facilities, the broad consensus around the harms of detaining immigrant children against their will in locked and restricted facilities justifies extrapolation of findings to the ORR context." Their deduction is not scientific. While there may be a broad consensus that placing children in prison like detention centers with adults is harmful, there is no broad consensus that RTCs are harmful. Drs. Wang and Matlow are making an error of logic. Specifically, if placement A is markedly different than placement B, it does not matter whether the consensus about placement A is broad or narrow. One cannot say that research about A tells us anything about B. One cannot generalize across markedly different situations.

45. They go on to write that "[t]he data indicates that things do not 'get better with time' for children in immigration detention; rather than experiencing positive or healthy adjustment to detention, children's adaptations are associated with psychological deterioration and increased symptom severity (Mares, 2016; von Werthern et al., 2018; Robjant et al., 2009)." In our observations and interviews in ORR facilities (Southwest Key Casa Padre (Brownsville, Texas), BCFS Tornillo Influx Facility (El Paso, Texas), and Homestead Influx Facility (Homestead, Florida), children with longer lengths of stay had the most concerning psychological presentations."

46. There are serious problems with this opinion. First, Drs. Matlow and Wang do not present even illustrative data. Second, they say that their observations and interviews support their opinions, but they do not say how many times they saw each child, over what length of time they observed and interviewed each child, and how much time they spent with each child each time. Without this information it is not possible for the reader to know if they have a valid basis for rendering opinions. Third, they do not mention reviewing the UACs' charts or how long was the expanse of time. This is crucial information for the reader. Third, they do not discuss what the charts show. Ignoring crucially important data is not scientific. Fourth, the charts show that the children generally had substantial improvement. Most of the 23 files I reviewed provided GAF scores (Global Assessment of Functioning) scores for the children. The scores always improved over time. This is important data. Drs. Matlow and Wang may disagree with these scores. It is appropriate for experts to note the scores and then explain why they disagree with them. Experts are not supposed to simply ignore significant material that disagrees with their statements. Ignoring significant material is cherry picking. In addition, my review of charts shows that children, in fact, were doing much better.

47. Drs. Matlow and Wang note, "Testimony and reporting from HHS's OIG Report (2019) and the ORR Northern California Federal Field Specialist, as well as the ORR files for individual children, confirm that placement and detention in secure facilities is associated

with deterioration in psychological functioning over time."  They further note, "Our findings are corroborated by the report from the U.S. Office of Inspector General (2019), which states that 'some children [in ORR custody] who did not initially exhibit mental health or behavioral issues began reacting negatively as their stays grew longer . .  longer stays resulted in higher levels of defiance, hopelessness, and frustration among children, along with more instances of self-harm and suicidal ideation' (p. 12). Mental health clinicians 'described that a child's mental health often deteriorates as the length of their stay in ORR custody increases' (Office of Inspector General [OIG], 2019, p. 20)."

48. These statements do not support plaintiffs' arguments or the report of Drs. Matlow and Wang.  As noted, one cannot generalize from prison like settings to RTCs or from highly secure settings to facilities that are designed for treatment.  Research on RTCs indicates they are helpful and the position of the American Academy of Child and Adolescent Psychiatry is that they can be helpful.  An additional problem with Drs. Matlow and Wang using this to support their argument is that the questions asked and the answers given are not the basis for an expert opinion.  Experts need to use good data.  The speculation of one or more staff members is not the basis for an expert opinion.  The speculation of a staff member cannot scientifically be turned into an expert opinion by having an expert repeat it.  Moreover, without interviewing the staff members one cannot know what the staff member actually thinks.  Perhaps the staff member(s) simply means that some youths went downhill in custody.  Perhaps the staff member assumed the child went downhill because he or she was in custody.  One needs an expert to take a close look at the situation to assess what is happening.   The observation was that some children became frustrated and began acting out.  This is not an uncommon experience in children's lives.  It does not support the conclusion by Drs. Matlow and Wang that the children suffer enduring psychological damage.  An additional problem is that over time, in any setting, one expects some youths to be doing better and some worse, as a result of random changes in functioning.  It is not scientific to say there were some who did worse and so it is harmful.  One also needs to look at how many did worse and how many did better.  An additional issue is that even if, on the whole, detention had an adverse impact, it does not mean that one should cease using the placements.  One needs to engage in clinical analysis and consider the relative risks, costs and benefits of keeping a child in the placement longer versus sending the child to potential sponsors without adequate vetting, which would likely lead to some being neglected, mistreated and possibly abused.  Moreover, stepping-down runs a risk of the youth engaging in self-harm and suffering greater damage, and harming other youths.

49. The data from OIG is not a scientific analysis.  It points to the need for a scientific analysis.  There is a basis for a scientific analysis.  My review of 22 cases of children in RTCs, and in particular the named cases, shows that in RTCs children improved greatly.  Moreover, studies of RTCs, noted above, have generally shown they are beneficial.

50. Drs. Matlow and Wang state, "While release from detention has been shown to correspond with some relative alleviation in psychological distress, the psychological consequences of detention are clearly demonstrated to endure post-release, and may result in long-term impact (von Werthern et al., 2018). Multiple research studies have shown that symptoms of depression, anxiety, and PTSD endure for years beyond release from detention, with many enduring symptoms being directly related to the detention experience (e.g., avoidance of detention reminders, nightmares and flashbacks from detention) (von

Werthern et al., 2018)." Von Werthern and Robjant note that there were serious traumatic experiences in detention centers such as seeing people self-harm, being assaulted and riots. There was also extreme boredom. The experiences which von Werthern and Robjant assert are traumatic are far less likely to occur in RTCs and shelters if children who are under poor control are sent to RTCs than if they are kept in shelters or prematurely sent to sponsors.

51. Throughout their report, Drs. Matlow and Wang fail to discuss the benefits and risks of different alternative placements for children with certain types of needs. Instead they simply point out what they think is negative about congregate care. I agree that placing children in congregate care could be harmful. Taking children from a stable, supportive home, and placing them in a restrictive setting, will cause significant stress and adversely affect a child. However, if a child comes from an abusive and chaotic environment and for the first time in his or her life has a stable environment with appropriate and caring adults, lots of therapy, individual instruction in school, and a safe environment for interacting with peers, as well as milieu therapy to help the child to learn appropriate behavior, it would not be traumatizing. Releasing a child who is acting hurting herself or suicidal or assaultive to an environment without adequate support and structure will lead to deterioration. Releasing a child to sponsors who have not been properly vetted, and without the intensive therapy available in an RTC, will lead to deterioration. Giving anti-depressants to people who do not need them will often lead to side effects and no benefit. But, giving anti-depressants to people who are depressed will generally be more beneficial than harmful.

52. Drs. Matlow and Wang write, "In order to appropriately respond to children with trauma histories and trauma related disabilities, ORR must have trauma informed systems that adequately address children's disabilities related to trauma exposure. This includes, but is not limited to, providing a safe, consistent, and predictable environment for children. Children in ORR custody must be provided appropriate accommodations and support (e.g. appropriate behavioral goals and evidence-based therapeutic treatment) to meet realistic goals in the least restrictive settings. Finally, ORR must consider a child's trauma history and potential for ongoing trauma when evaluating placement and release options." I am in agreement. My review of 23 cases showed that this occurs.

53. Drs. Matlow and Wang assert that "institutionalized child-rearing has been shown to have long-term negative effects on children's development and functioning in multiple domains" (Dozier et al., 2012)[30] and that "[r]esearch on the impact of child-care and child-rearing in institutionalized settings and congregate care settings demonstrates profound short- and long-term harm." "Although there has not been a peer-reviewed study conducted on the impacts of detention in ORR custody, it is our expert opinion that the findings on institutional care would apply."

54. There are serious problems with these statements and the supporting literature they use. Dozier's article states, *"Millions of infants and toddlers are in institutional care around the world, care that is poorly suited to meet young children's developmental needs."* Research on infants and toddlers, comparing them to normal homes, is not relevant. Moreover, infants need great amounts of attention and do not receive such attention in

[30] Dozier, M., Zeanah, C. H., Wallin, A. R., & Shauffer, C. (2012). Institutional care for young children: Review of literature and policy implications. Social Issues and Policy Review, 6(1), 1–25.

institutional care.  Teenagers in RTCs receive more attention than they would in other settings.

55. They go on to write, "Placement in congregate care settings (i.e., residential care facilities with more than 12 children) within the U.S. child welfare system is associated with a three-fold increase in prevalence of psychiatric diagnosis (Children's Bureau, 2015). While the nature of causality in this association is unconfirmed, there is general consensus among child mental health and child welfare experts that institutionalized care and congregate care is inappropriate for children with psychiatric disabilities, and there has been a reduction in the rates of placement in congregate care in the U.S. since 2004 (Children's Bureau, 2015; Dozier et al., 2012)."

56. There are two serious problems with this statement.  Drs. Matlow and Wang do not provide a basis for saying there is a general consensus that institutional care is not appropriate for children with disabilities.  It is precisely children with psychiatric issues who are sent to RTCs.  Moreover, one must consider the options that are possible and not simply say this particular option has problems and so send the child to anything but this option.

57. Their report contains vague comments that the most secure facilities are not designed for the children's needs. They write, "Some of the behavioral reinforcement systems that are utilized in ORR 'step up' facilities have been deemed ineffective for the population served."  The footnote reports Mr. Fink was referring to a token economy.  For this complaint to support their overall position, they would need to show that other settings do a significantly better job in this area and that the issue has a greater impact on the children's welfare than the issues of safety and availability of intensive treatment.

58. ███████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████  ██████████████
████████████████  █████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████  ███████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████

59. 

60.

61. The core of plaintiffs' argument is that RTCs are harmful and youths would be better off remaining in shelters, being transferred to potential sponsors more quickly than they currently are, and being more readily stepped back down to shelters. To support this position, they argue that greater restriction is inherently bad and that RTCs are more restrictive than shelters or living in the community with a sponsor. In addition, they assert that the children in RTCs deteriorate psychologically, and do better when not in an RTC. Plaintiffs also argue that all therapy available in RTCs can be provided outside of the RTC.

62. Reasonable people can disagree about the proper interpretation of data, and about the significance of empirical findings to a specific situation. People can also, however, be deeply affected by confirmation bias and motivated bias, and interpret, vet, and value information in ways that support their existing beliefs or what they wish to be true. At times, forensic evaluators engage in confirmation distortion and deliberately spin and cherry pick information so that it supports what they wish to believe.[31] There are also

---

31 Martindale, D.A. (2005). Confirmatory Bias and Confirmatory Distortion. *Journal of Child Custody: Research,Issues, and Practices*, 2(1-2), 31-48; Lubit, submitted for consideration to a journal.

professionals who do not appreciate that expert opinions and speculations are not the same thing, and that experts should only present opinions that result from scientific analysis.[32]

63. A central part of an argument stating that RTCs harm children, and that shelters and living with a sponsor are better for children, involves knowing what each of the placements and therapy opportunities is like.  In addition, if saying that research shows detention is bad for youths (and so RTCs are bad for youths), one needs to see if the type of detention centers studied are actually similar to RTCs, and if the elements of detention centers found to be destructive to youths are also present in RTCs.  In addition, one should also pay attention to the children's specific needs and backgrounds.  For example, taking a child from competent parents, friends who are good for his growth and development that he is connected to, and from a good therapist he is connected to, to place the child in a psychiatric treatment facility for a period, with the intention of returning him to his prior life, has great costs.  It may be necessary or more helpful than harmful.  Regardless, it has costs.  Taking a child from such a situation is markedly different than taking a UAC from a shelter the child has been in for a few weeks, and which the child will leave in the near future.  To do a scientific or appropriate clinical analysis of the situations and what is in the child's best interests, one needs to consider these factors.

64. To forge and present true expert opinions, forensic evaluators need to fairly present the relevant available data (both when it supports and when it contradicts the ultimate conclusion), use empirical literature that actually applies to the situation being addressed, generate competing hypotheses, assess which hypothesis is best supported by the data (and is least at odds with the available data), and when possible look for additional data that could affect the opinion.  In particular, one should search for data that could disprove the preferred hypothesis.  Cherry picking and spinning information to create convergent data is generally relatively easy.  As a result, convergent data is not dispositive.  Therefore, rather than looking for data to support their preferred hypothesis, experts should look for information to support each hypothesis, and even more important, search for information to disconfirm each hypothesis.  Disconfirming data are particularly powerful in hypothesis testing (Koriat, Lichtenstein, & Fischhoff 1980; Popper 1959).

65. Drs. Matlow and Wang fail to present and analyze data in the ways necessary to come up with scientifically based, expert opinions.  They make statements without presenting even illustrative data, fail to present available data that contradicts their speculation, and fail to explain the scientific analysis that led to their opinions.  There is also no indication that they considered alternative hypotheses or tests them.  Therefore, their statements are generally speculations, rather than expert opinions.  Moreover, the speculations are frequently at odds with the available data.  The data in the UACs' RTC files shows that they made considerable progress while in the RTCs.  In particular, their GAF scores showed marked improvement.  Forensic evaluators are cherry picking data if they ignore such powerful facts.  If a forensic evaluator has an opinion that is contrary to key facts, the

---

[32] Martindale, D.A. (2001). Cross-examining mental health experts in child custody litigation. *The Journal of Psychiatry and Law*, 29, 483-511. (2001: 503). "[T]he defining attributes of an expert opinion relate not to the credentials held by the individual whose fingers type the words or from whose mouth the words flow; rather, the requisite characteristics relate to the procedures that were employed in formulating the opinion and the body of knowledge that forms the foundation upon which those procedures were developed".

evaluator needs to note the discrepant facts and explain why, despite these facts, (s)he holds the opinion (s)he does.

66. The literature cited by Plaintiffs' experts, and literature cited by the articles they cite, does not support a conclusion that being in an RTC is harmful. RTCs are very different than detention centers. RTCs are treatment centers. Domestic children are sent to RTCs to obtain psychiatric help when their problems cannot be handled on an outpatient basis, but they do not require hospital level care. RTCs are not simply holding areas.

67. Steele et al (2004) researched what about detention centers caused harm. The factors that they found were particularly harmful are not descriptive of RTCs. In fact, what they found supports having the more troubled children in RTCs, rather than in shelters. In brief, they noted that both adults and children were harmed by seeing serious violence against detainees and seeing detainees self-harm. Moving children who are at increased risk of violence to themselves or others to more secure facilities with higher staff-child ratios, decreases the risk of violence, by these individuals and greatly decreases the risk that the other children in the facility will be exposed to the violence. Plaintiffs' desire to keep children who are at risk for violence in shelters which are less able to contain violence will lead to avoidable, substantial psychological harm occurring.

68. In addition, other key issues that Steel et al highlight as being problematic about detention centers are not true of RTCs. The children in RTCs have many activities and school. They have good access to medical treatment and counseling.

69. Steel et al 2004 write that "[a]ll families described traumatic experiences in detention, such as witnessing riots in which guards in riot uniform hit detainees with batons; detainees fighting each other; fire breakouts; detainees publicly committing acts of self-harm; and witnessing suicide attempts…..Children commonly reported distress associated with witnessing acts of self-harm and suicide by other detainees. All of the children witnessed the same act of self-harm by an adult detainee who repeatedly mutilated himself with a razor- blade in the main compound of the detention centre. Children also described having witnessed detainees who had slashed their wrists, jumped from buildings and attempting to strangle or hang themselves with electric cords. At times, children witnessed suicide attempts by their parents, or their parents being struck by batons. A number also witnessed their friends and family members harming themselves (eight children). All children reported boredom, isolation and poor-quality food in detention. They also identified poor access to medical and dental services and counselling." [33]  The mechanisms of harm of the detention centers von Werthern, Robjant and others studied do not exist in RTCs.

70. There are other serious problems with the Plaintiffs' experts' use of the von Werthern article to support their case. Von Werthern specifically notes there is a dearth of quantitative data on unaccompanied minors. Von Werthern found that only one of four studies found that mental health issues increased with time spent in detention. Robjant (2009) wrote that a prominent fear of those in detention centers was being sent home. In other words, immigration status uncertainty was a major stress. Robjant also writes that detainees are preoccupied with time and have extreme boredom. They cannot use normal coping skills. 90% of children reported threatening or humiliating events in detention

[33] Zachary Steel, Shakeh Momartin, Catherine Bateman, Atena Hafshejani, Derrick M. Silove (2004). Psychiatric status of asylum seeker families held for a protracted period in a remote detention centre in Australia. *Australian And New Zealand Journal Of Public Health* v 28(6), 527-536.

centers.  Once again, these stresses are no more likely to occur in RTCs than shelters and being with a sponsor, and are actually less likely to occur in RTCs. Concerning humiliating events, I have not seen evidence that children are more likely to be humiliated in the RTCs than in any other environment.  In all likelihood, humiliation would be more likely for a child who was release to a potential sponsor to go to a local school prior to the child having sufficient therapy to be in good self-control, and who also have communication difficulties. RTCs are more controlled environments than public schools.  Bullying is a very serious problem in public schools.  New students who have limited English speaking skills and do not know the culture are likely targets for bullies.  They are less likely to experience humiliation in an RTC than in a public school.

71. Ian Lambie & Isabel Randell (2013) discuss the harm of incarceration.  The aspects that they note are harmful are very different from what exist in RTCs and so one cannot scientifically claim that the harm of incarceration applies to youths in RTCs.  They write that "[d]uring incarceration, isolation, boredom, bullying, and victimization are pervasive stressors (Greve, 2001) and, given the permeable and transitory nature of adolescent identity and self-esteem, incarceration can have a negative long-term effect on a young person's sense of self and self-worth (Lane et al., 2002). In addition to existing difficulties and stressors associated with an incarceration environment, these youth also lose their lives outside of the facility, which adds to their distress and deteriorating mental health (Ng et al., 2011). Mental health problems are often not identified or addressed during periods of incarceration (Altschuler & Brash, 2004; Soler, 2002), and mental health services and juvenile justice systems are often not well integrated (Rapp-Paglicci, 2007). This suggests that in many cases services are not equipped to cope with preexisting mental health problems, nor those that may worsen or develop during incarceration…. There is evidence that juveniles who are confined in an adult prison environment may have particular difficulty in adjusting and that they may require specially targeted care (Kuanliang et al., 2008). Staff within the adult justice system lack knowledge and training in child and adolescent development and, therefore, are ill equipped to understand the needs of the youth (Soler, 2002)."[34]

72. Directly contradicting the argument of Drs. Matlow and Wang that people become worse in congregate care, Lambie and Randell (2013) note that research has shown that when youths are in facilities exclusively for youthful offenders and are not with adults, they do not deteriorate.  "There is some research to suggest that mental problems experienced by incarcerated youth may not be long-lasting and decrease over time. Brown and Ireland (2006), in a study of male adolescent prisoners in the United Kingdom, found significant decreases in both anxiety and depression during the six weeks following incarceration. The authors explain that this could be a result of acculturation, as incarcerated youth develop more adaptive strategies to incarceration over time (2006). Similar findings were reported by Shulman and Cauffman (2011), who found that symptoms of psychopathology declined over the first month of incarceration among male juvenile offenders held in the California Department of Juvenile Justice correctional reception facility. However, both samples of youth offenders involved in the research of Brown and Ireland (2006), and Shulman and Cauffman (2011) were confined to Juvenile Justice Facilities in England and the United

---

[34] Ian Lambie & Isabel Randell (2013) The impact of incarceration on juvenile offenders. *Clinical Psychology Review* v 33(3), 448-459.

States, which house juvenile offenders alone. In contrast, the sample of youth offenders involved in the study conducted by Ng et al. (2011) were confined in adult prisons. It may be likely that for youth offenders confined in adult prisons, particularly if juvenile inmates are integrated with the prison population, there is a heightened degree of stress and potential threat in comparison to offenders imprisoned in juvenile justice settings. Juvenile offenders may find it more difficult to adapt to life inside an adult prison, which may explain the negative effects of incarceration on juvenile mental health found by Ng et al. (2011)."[35]

73. Highlighting the value of the increased security and safety of secure settings, the authors note that research has found that although rates of suicidal ideation are higher in incarcerated youths, successful attempts are lower.  The authors write that "Victimization has also been identified as a key driver, with those who experienced being bullied in custody being over nine times more likely to attempt suicide than those who were not (Kiriakidis, 2008)."  Victimization is less likely to occur in an RTC than in a shelter or outside of congregate care.

74. Psychiatrists and psychologists have a responsibility to society as well as the individuals that they treat.  If an individual in psychiatric care presents a danger to others and the therapist fails to take reasonable action to protect society, the therapist is liable. The responsibility is particularly high if the possible victims are also in the care of the psychiatrist, as is the case in congregate care.

75. While it is true that both therapy occurs at both RTCs and shelters, RTCs are better prepared to deal with youths who have more serious psychiatric problems.  The training requirements for staff are greater at RTCs.  Of particular importance, the staffing levels at RTCs are twice that at shelters.  As a result, children can get more attention and there is greater safety.  It is less likely that a child can harm himself or harm others either by mistreating another child or by self injury, leading the other child to witness the child hurting himself.  The articles by Robjant, Von Werthern and Steel, noted above, all note that witnessing someone self harm is one of the psychologically destructive events that caused harm in the detention centers they studied.

.

_____
Roy Lubit, M.D., Ph.D.
Dated: July 17, 2020

---

[35] Ian Lambie & Isabel Randell (2013) The impact of incarceration on juvenile offenders. *Clinical Psychology Review* v 33(3), 448-459.

<u>Materials Considered In Preparing This Rebuttal Report</u>

1. The materials I considered in forming my opinions as referenced in my June 19, 2020 report in this matter.
2. Drs. Matlow & Wang's expert report in this matter.
3. Certain declarations cited by Drs. Matlow & Wang in their expert report in this matter.
4. Key articles cited by Drs. Matlow & Wang in their expert noted below.
5. Dr. Urquiza's expert report in this matter.
6. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 5th ed. (2013) ("DSM "V).
7. Barnert, E. S., Dudovitz, R., Nelson, B. B., Coker, T. R., Biely, C., Li, N., & Chung, P.J. (2017). How does incarcerating young people affect their adult health outcomes? Pediatrics, 139(2). https://doi.org/10.1542/peds.2016-2624
8. Bettmann, J. E., & Jasperson, R. A. (2009). Adolescents in residential and inpatient treatment: A review of the outcome literature. Child & Youth Care Forum, 38(4), 161–183.
9. Clifford G, Dalgleish T, Hitchcock C. Prevalence of auditory pseudohallucinations in adult survivors of physical and sexual trauma with chronic post-traumatic stress disorder (PTSD). Behav Res Ther. 2018;111:113-118.
10. Cohen, Mannarino and Deblinger (2017) Trauma-Focused Cognitive-Behavioral Therapy for Traumatized Children, in John R. Weisz and Alan E. Kazdin (eds). Evidence-Based Psychotherapies for Children and Adolescents Third Edition, discussing their evidence-based protocol for treating traumatized children.
11. Cook, S. C., Schwartz, A. C., & Kaslow, N. J. (2017). Evidence-Based Psychotherapy: Advantages and Challenges. Neurotherapeutics : the journal of the American Society for Experimental NeuroTherapeutics, 14(3), 537–545. https://doi.org/10.1007/s13311-017-0549-4
12. Dozier, M., Zeanah, C. H., Wallin, A. R., & Shauffer, C. (2012). Institutional care for young children: Review of literature and policy implications. Social Issues and Policy Review, 6(1), 1–25. https://doi.org/10.1111/j.1751-2409.2011.01033.x
13. Gersons, B. P., & Schnyder, U. (2013). Learning from traumatic experiences with brief eclectic psychotherapy for PTSD. European journal of psychotraumatology, 4, 10.3402/ejpt.v4i0.21369. https://doi.org/10.3402/ejpt.v4i0.21369.
14. Galatzer-Levy IR, Ankri Y, Freedman S, Israeli-Shalev Y, Roitman P, et al. (2013) Early PTSD Symptom Trajectories: Persistence, Recovery, and Response to Treatment: Results from the Jerusalem Trauma Outreach and Prevention Study (J-TOPS). PLOS ONE 8(8):
15. Greenhalgh T, Howick J, Maskrey N. Evidence based medicine: a movement in crisis? BMJ. 2014;348:g3725;
16. Alison Hendricks, Judith A. Cohen, Anthony P. Mannarino, and Esther Deblinger, Trauma-Focused Cognitive Behavioral Therapy (TF-CBT) workbook, https://tfcbt.org/wp-content/uploads/2014/07/Your-Very-Own-TF-CBT-Workbook-Final.pdf

17. Holman, B., & Ziedenberg, J. (2006). The dangers of detention: The impact of incarcerating youth in detention and other secure facilities. Justice Policy Institute. http://www.justicepolicy.org/uploads/justicepolicy/documents/dangers of detention.pdf

18. https://www.ojjdp.gov/mpg/litreviews/Residential_Treatment_Centers.pdf.

19. Katy Robjant, Rita Hassan and Cornelius Katona (2009) Mental health implications of detaining asylum seekers: systematic review. The British Journal of Psychiatry 194, 306–312.

20. Kazdin AE. Evidence-based treatment and practice: new opportunities to bridge clinical research and practice, enhance the knowledge base, and improve patient care. Am Psychol. 2008;63:146–159.

21. Koriat, A., Lichtenstein, S., & Fischhoff, B. (1980). Reasons for confidence. *Journal of Experimental Psychology: Human Learning and Memory*, 6(2), 107-118.

22. Lambie, I. & Randell, I. (2013) The impact of incarceration on juvenile offenders. *Clinical Psychology Review* v 33(3), 448-459.

23. Martindale, D.A. (2005). Confirmatory Bias and Confirmatory Distortion. Journal of Child Custody: Research, Issues, and Practices, 2(1-2), 31-48;

24. https://www.aacap.org/aacap/families_and_youth/Resources/Psychiatric_Medication/The_Treatment_for_Adolescents_with_Depression_Study_TADS.aspx

25. Martindale, D.A. (2001). Cross-examining mental health experts in child custody litigation. The Journal of Psychiatry and Law, 29, 483-511. (2001: 503).

26. OConghaile A, DeLisi LE. Distinguishing schizophrenia from posttraumatic stress disorder with psychosis. Curr Opin Psychiatry. 2015;28(3):249-255.

27. Popper, K.R. (1959). *The Logic of the Scientific Discovery*. London: Hutchinson.

28. Rosenberg, W., & Donald, A. (1995). Evidence based medicine: an approach to clinical problem-solving. *BMJ (Clinical research ed.)*, *310*(6987), 1122–1126. https://doi.org/10.1136/bmj.310.6987.1122

29. Steel, Z., Momartin, S., Bateman, C., Hafshejani, A., Silove, D. (2004). Psychiatric status of asylum seeker families held for a protracted period in a remote detention centre in Australia. Australian And New Zealand Journal Of Public Health v 28(6), 527-536.

30. Sackett et al (1996) Evidence based medicine: what it is and what it isn't. BMJ ;312:71. https://www.bmj.com/content/312/7023/71.

31. Sternberg, R. J. (2006). Evidence-Based Practice: Gold Standard, Gold Plated, Or Fool's Gold? In C. D. Goodheart, A. E. Kazdin, & R. J. Sternberg (Eds.), Evidence-based psychotherapy: Where practice and research meet (p. 261–271). American Psychological Association. https://doi.org/10.1037/11423-011

32. http://psychology.iresearchnet.com/counseling-psychology/counseling-therapy/integrative-eclectic-therapy/

33. Sege, R. D., Amaya-Jackson, L., AAP Committee on Child Abuse and Neglect, Council on Foster Care, Adoption, and Kinship Care, AACAP Committee on Child Maltreatment and Violence, & National Center for Child Traumatic Stress. (2017). Clinical considerations related to the behavioral manifestations of child maltreatment. Pediatrics, 139(4). https://doi.org/10.1542/peds.2017-0100

34. Watts BV, Shiner B, Zubkoff L, Carpenter-Song E, Ronconi JM, Coldwell CM. (2014) Implementation of evidence-based psychotherapies for posttraumatic stress disorder in VA specialty clinics. Psychiatr Serv. 65(5):648-653.
35. von Werthern, M., Robjant, K., Chui, Z. et al. The impact of immigration detention on mental health: a systematic review. BMC Psychiatry 18, 382 (2018).
36. Texas Minimum Standards for General Residential Operations, https://hhs.texas.gov/sites/default/files/documents/doing-business-with-hhs/provider-portal/protective-services/ccl/min-standards/chapter-748-gro.pdf.
37. ORR Funding Opportunity Announcement (FOA) for RTCs: https://protect2.fireeye.com/url?k=f17b29b5-ad2f009e-f17b188a-0cc47a6d17cc-2b1068199be42001&u=https://ami.grantsolutions.gov/files/HHS-2017-ACF-ORR-ZU-1154_1.pdf.
38.  FOA for general shelter: https://protect2.fireeye.com/url?k=09a620a9-55f20982-09a61196-0cc47a6d17cc-d9567bb73991329f&u=https://ami.grantsolutions.gov/files/HHS-2017-ACF-ORR-ZU-1132_3.pdf.
39. Personal communication with Brooke Gonzales, LMSW, Vice President of Immigration Services, MercyFirst.
40. Deposition of David Fink, February 12, 2020
41. NY licensing rules, GOV-00242713 to GOV-00242762
42. MercyFirst documents received by Plaintiffs' counsel and shared with Defendants' counsel, GOV-00242657 to GOV-00242712
43. Excerpts from UAC case files:
    a.   C.J.A.L., GOV-00241049, GOV-00241053, GOV-00234061-64.
44. Other materials as may be referenced elsewhere in this rebuttal report.