# REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

LUCAS R. *et al.*,

    Plaintiffs,

v.

ALEX AZAR, Secretary of U.S. Dep't of Health and Human Services, *et al.*,

    Defendants.

Case No.: 2-18-CV-05741 DMG (PLA)

DECLARATION OF
JAMES S. DE LA CRUZ
REGARDING CLASS REPRESENTATIVE
LUCAS R.

## I. Introduction

1. James S. De La Cruz, under 28 U.S.C. § 1746, declare, under penalty of perjury, as follows. If asked to testify, I would testify under oath as follows:

2. I am employed in the position of Senior Federal Field Specialist (FFS) Supervisor within the Office of Refugee Resettlement (ORR), a component of the Administration for Children and Families (ACF) within the U.S. Department of Health and Human Services (HHS).

3. The statements in this declaration are based on my personal knowledge, information acquired by me in the course of performing my official duties (such as my knowledge of ORR policies and procedures, including the ORR Guide[1]), my review of HHS records and information contained therein (including Lucas R's case file).

4. I have held the position of Senior Federal Field Specialist Supervisor since 2013. In this capacity, my job duties include supervision of the FFS Team. The FFS staff I supervise routinely make release and transfer decisions. Staff have a wide array of professional backgrounds, including Master Level Social Workers, previous Child Care Administrators, and some have licenses in their field to include Licensed Clinical Social Workers and PhD level psychologists. From 2013 to 2018, I also oversaw the ORR Intakes Team.

5. Prior to assuming my current position, I held the position of FFS. In that capacity, I worked with care providers to ensure appropriate and safe care for children, I responded to requests to assist care providers, I provided training and technical assistance to colleagues and care providers, and I liaised with community stakeholders. I also routinely made release and transfer decisions.

---

[1] https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied

6. From approximately 1984 to 2004 I worked with a private, non-profit agency that worked with "at risk youth." Children I worked with were referred by the Texas Department of Protective Services, various juvenile probation departments, runaway and drop-in children, parolees from the Texas Youth Commission, and Immigration and Naturalization Services. By 2004, I served as agency administrator, overseeing several programs for children aged 5 to 17 years. I also developed and opened a Transitional Living Program that provided transitional services to children turning 18 and services for young adults up to 21 years of age.

7. I have a Bachelor's Degree in Public Justice, which is a multidisciplinary degree that includes education in social work, psychology and the United States justice system. I also have a Master's Degree in Public Administration, focusing on public institutions and systems. I have a Masters in Social Work as well. Both my career and formal education focus on systems and institutions that provide for care and services for children and families.

8. Until 2013, I was licensed as a Texas Licensed Residential Child Care Administrator. I continue to remain affiliated with the Texas Network of Youth Services and the National Association of Counsel for Children.

9. Recent and relevant trainings include: Ohio Youth Assessment 2018; Flores Compliance February 2019; Trauma-Informed Care for Unaccompanied Children May and June 2019; Training #1: Basic Psychopathology September 2019; Unaccompanied Children and Trauma Informed Care December 2019; Prevention of Sexual Abuse March 2020; A Child Trauma Perspective on Positively Coping with Stress Related to COVID-19 May 2020; Supporting the Mental Health of Children who are Socially Isolated or Quarantined May 2020; Introduction to Psychotropic Medications in the Care of Unaccompanied Minors July 2020.

**Placement in SW Key Sol**

10. Plaintiff Lucas R. entered ORR care and custody February 11, 2018. He was placed in Southwest Key Sol. GOV-000009218.

11. He received an orientation on his day of arrival and then an intakes assessment the day after. GOV-00010020-000010023.

12. The Complaint alleges lack of legal services (First Amended Complaint ("FAC") at ¶ 35). However, three days after arrival, the case file shows that on February 14, 2018, Lucas R. received a Know Your Rights Presentation from a Ms. Ana Marla Miranda from a non-profit, independent group, the Florence Immigrant and Refugee Rights Project. He also received a list of pro bono legal service providers, and other orientation materials (such as rights to be safe in ORR custody from sexual abuse and harassment and how to report any such abuse or harassment). GOV-00010486; 00010498; 00009343. Florence Immigrant Rights conducted a legal screening of Lucas R. and found he likely was not eligible for immigration legal relief, such as asylum. GOV-00009501.

13. SW Key Sol began working with Lucas R.'s half-sister, Madelyn to apply as a sponsor

2

and by March 1, 2018, she had submitted a partially complete application. GOV-00010520. Her household member, at that time, had not submitted his forms to investigate his background (until at least 4/19/2018), and Lucas R.'s brother also did not submit such a form until 4/19/2018. GOV-00010527; GOV-00010529. A commercial background check on the roommate could not be ordered until 4/22/2018. GOV-00010559.

14. At the same time that SW Key Sol was pursuing reunification with Lucas R.'s half-sister, Lucas R began exhibiting mental health concerns. Within a week of arriving on 2/11/2018 (on 2/20/18) he expressed an idea t[REDACTED] GOV-00010586. He was transported to [REDACTED] where a therapist recommended hospitalization of 6 to 7 days to complete full evaluation. He was hospitalized at [REDACTED] for a period of eight days from February 20, 2018 to February 28, 2018. GOV-00010039 to -00010063, -00010166 to -00010173. During his period at [REDACTED] medical records show [REDACTED] GOV-00010107. This is contrary to claims in the Complaint that Lucas R. only began exhibiting mental health concerns after his sister was denied as a sponsor. FAC at ¶ 30.

15. On February 27, 2018, a doctor evaluated Lucas R. and deemed his discharge from the hospital to be appropriate. He was released back to SW Key Sol with a [REDACTED] diagnosis and no medication. He was placed on 1:1 supervision. GOV-00010586; GOV-00010027

16. On March 6, 2018 Lucas R. received a psychiatric evaluation from [REDACTED] in Mesa, Arizona. The Evaluation noted that Lucas R. reported [REDACTED]. Lucas R.'s risk factors included [REDACTED] He stated that his mother had died in childbirth and he wished to reunite with siblings in California, and that his recent crossing was the second time he had tried to come to the United States. He stated that [REDACTED] GOV-00010027. Lucas R. did not have just "moderate depression," FAC at ¶ 26; he was diagnosed with [REDACTED] GOV-00010031. By the time he had moved to Shiloh, his active diagnosis was [REDACTED] GOV-009374. In prescribing the medicines the nurse practitioner explained the target symptoms of the medication in person, the rationale for the medication choices, the possible risks, benefits, effectiveness and alternative treatments. The prescriber analyzed possible allergic reactions, reviewed whether there were possible; side effects to the medicine (yes), and determined whether both Lucas R and the shelter staff accompanying him understood the information and agreed to take or give the medicine. Because Lucas R. was in the custody of the care provider (and in addition had no available

3

parent), the informed consent request was provided to his caregivers. GOV-00010030-00010032; GOV-00010103-00010104. This is contrary to implications in the Complaint that medications are prescribed without any explanations, a neutral decision maker, consent, or oversight. FAC at ¶ 26. I understand that Plaintiffs advocate for judicial consent for psychotropic medications in certain cases – however, in states like Texas, judges are elected officials. Even Family Court judges are not medically licensed practitioners. Judges on a family court or children's court might have training in medication issues, but they would still rely on information from the prescribing medical practitioner and the care provider's clinical staff. It is not clear why such judges would be in a better position to consent to psychotropic medications than those working at a grantee care provider and who know and understand the minor. In any case, Texas state courts have denied jurisdiction in UAC cases seeking judicial consent for psychotropic medication.

17. Although Lucas R. was diagnosed ███████████████, when he reported stomach pain from the medication, he was switched. On 3/27/2018, he was switched from a pill to a liquid form, to alleviate stomach-related illness. In addition, on March 20, 2018, the program documented that he was refusing to take medicines and understood the risks. The program did not require him to take medicines, and no program is permitted to require a minor to take medicine, nor do they so require unless the result of not taking a medication would place the child in imminent danger. GOV-00010578 *Compare* to FAC at ¶ 27.

18. In conversations with the Home Study worker, Lucas R.'s clinician also reported that he ███████████████████████████████████████████████████. For example, on March 23, 2018, he said something like "██████████████████" and "████████████████████". The clinician reported the sponsor had been informed of Lucas R.'s history ███████████████████████ and that Madelyn was aware of his prescribed medicines. Although the complaint has noted that Lucas R. often appeared calm and alert (FAC at ¶ 25), the clinician noted that Madelyn was in agreement with the mental health services provided to Lucas R., and Madelyn was supportive – not dismissive – of the information. GOV-00010587

19. As noted below, by mid-March, SW Key Sol had referred Lucas R. for a home study. In discussing Lucas R.'s case with the Home Study Social Worker, Lucas R.'s clinician also disclosed that during his hospitalization at ██████████ his room was searched. Staff found ██████████████████████████████████████████. The clinician also reported that Lucas R. had disclosed ██████████████████████████. He disclosed that on one occasion █████████████████████ but denied a ████████████████████. GOV-00010586.

20. On March 29, 2018, Lucas R. disclosed to the Home Study Social Worker ██████████████████████████. GOV-00010586. In contrast to the factual allegations of the Complaint, which alleged that Lucas R. was a happy thriving child in Guatemala (FAC at ¶ 25), Madelyn also stated that ████████████████████████████████████ GOV-00010593. His caregiver in home country ████████████████ GOV-00010596.

4

21.     In addition, by mid-March due to his ▮▮▮▮▮ at SW Key Sol, it became clear that a TVPRA-required home study would be required. The Case Manager for Lucas R. made the recommendation on March 15, 2018, GOV-00010564, and by March 16, 2018, the third party case reviewer, who serves an independent check on recommendations, concurred that the case mandated a home study, GOV-00010563. On Saturday March 17, 2018, the Federal Field Specialist had approved the home study, and stated it would be referred for a home study provider to conduct the review. GOV-00010563

22.     A home visit was then conducted by the independent, non-profit home study agency, Crittenton Services for Children and Families, Family Reunification Program, with the initial visit March 22, 2018, a follow-up visit March 30, 2018, and a third home visit April 5, 2018. An approximately 30-page report issued April 12, 2018. GOV-00010581-10583.

23.     The home study report made a negative recommendation. Contrary to implications from the Complaint (FAC ¶¶ 28-29), the home study noted several concerns about Madelyn. Certainly, the case file does not support Lucas R.'s allegation (FAC ¶ 29) that the home study worker "indicated to Madelyn that her home was suitable . . . ." Although the home study report described Madelyn as engaging and cooperative, during the home visit, Madelyn also minimized Lucas R.'s statements about ▮▮▮▮▮. Madelyn stated that once he was reunified he would no longer have such thoughts. When the home study social worker stressed the importance of lining up mental health services when Lucas R. reunified, Madelyn again repeated that he would not have ideas about ▮▮▮▮▮ when he was released. Madelyn stated that once released, Lucas R. would no longer feel the desperation to be released from the shelter, and that Madelyn would not pursue mental health services for Lucas R. upon his release. Madelyn said she would first observe Lucas R. and gauge how he is adjusting to placement, but would obtain mental health services if there was a crisis or he began displaying his old behavior. The Social Worker then explained, again, that Lucas R. was currently ▮▮▮▮▮ and that it was possible he would be released with only 30 days of medicine. The Social Worker discussed the importance of following through with mental health services to discuss the prescribed medicines ▮▮▮▮▮ The Social Worker again sought clarification if Madelyn would obtain mental health services immediately or only when needed (i.e., during a crisis). Madelyn responded that she would first observe and see how Lucas R was adjusting. If there was a crisis, or it appeared Lucas R. needed services, then she would obtain them. The Social Worker asked what Madelyn would do if Lucas R. made a statement about ▮▮▮▮▮ She said she would explore with him why he is making those statements. The Social Worker asked what she would do if Lucas R. made statements ▮▮▮▮▮ and then Madelyn ▮▮▮▮▮ Madelyn said she would discipline Lucas R. and obtain mental health services help. The Social Worker explored the benefits of mental health services as a preventive factor and encouraged seeking help from a local hospital if an event were to occur. The Home Study Social Worker concluded that a decision not to arrange for mental health services upon release could pose a risk to Lucas R.'s safety and overall well-being, due to his history ▮▮▮▮▮ The Report notes that Lucas R. had ▮▮▮▮▮ at SW Key Sol. The home study worker reported that Lucas R. continuously ▮▮▮▮▮ while in SW Key Sol. In addition, the home study worker noted that a plan to wait to arrange for mental health services could affect the psychiatric

5

medicine intake, and therefore, overall mental well-being.

24. In addition, the Home Study Worker was concerned that Madelyn appeared to have a habit or desire to omit information. For example, during the first home visit, Madelyn reported three additional household members but requested that the home study worker not report them in the home study report to prevent complications with reunification. During the first home study visit, Madelyn reported that the three household members were only temporary, but then during the second visit, she admitted they were permanent, and had rented the second bedroom. Madelyn said she did not admit the roommates were permanent in the first visit, because she was told by a family friend that ORR would not release Lucas R. if there were additional household members. The Home Study Social Worker concluded that this might indicate that Madelyn had omitted other information that could negatively affect reunification. Madelyn also was unable to provide the last name of her three household members or where the seven-year old son attended school. During the first home visit, the Social Worker inquired further about Lucas R.'s date of birth (since Lucas had reported two different dates). Madelyn appeared reluctant to provide further information, but upon further prompting reported that Lucas R.'s mother had obtained the birth certificate a few years after his birth. Therefore his certificates provide a birth year of 2005 (rather than 2003). Madelyn asked that the Social Worker omit this information from the home study report to prevent complications with reunification. The Social Worker thus was unsure whether Madelyn had omitted other information that might complicate reunification.

25. Due to Madelyn's prior habit of omitting information, on April 5, 2018, the Social Worker conducted an unannounced home visit with a Social Worker Practicum Student to verify that a household member, "E," (who refused to provide fingerprints) had moved out of the home. During the visit, there was evidence to suggest that E had not moved out and was still residing in the home. He was in the home when the Social Worker conducted the unannounced home visit. Lucas R.'s brother, ▮▮▮▮▮ said he had just arrived and was only visiting, but there was evidence E had spent the night. His vehicle was blocked in by Lucas R. brother's (▮▮▮▮▮ vehicle even though ▮▮▮▮▮ had not left the home all day. There were adult male clothing in the laundry hamper in the room where E, his sister and her son resided. E and his sister did not open the bedroom door until approximately 10 minutes after they were asked to do so. In addition, E's sister said she was a stay-at-home mother and would not earn income to pay rent. At that time, He had not submitted fingerprints. Thus, both the case file documents and the home study social worker's visits appear to directly contradict Lucas R's allegation (FAC ¶ 29) that the roommate's brother (that is, E) was not living with Madelyn R., but rather only visiting.

26. Even though the reported Home Study report was negative, the report did make recommendations for Madelyn to address the negative recommendation with the hope of receiving a positive recommendation in the future, such as establishing contact with a mental health clinic and inquiring about psychiatric services for Lucas R., further home visits to ensure E was not living in the home (or evidence of E's new residence) or E providing fingerprints given that he appeared to reside in the home. The Home Study worker also stated that if granted release, the case manager should follow up on fingerprints, background checks, sex offender registry checks for the other household member (E's sister), and assess that those results were not a threat to Lucas R.'s safety; for the FFS to assess fingerprint results for Lucas R.'s brother, given that he disclosed criminal history and was

Lucas R.'s back-up caregiver; to conduct family sessions with Madelyn and Lucas R to address household rules and discipline methods (given that Lucas R. had stated he was unaware of these rules); to provide additional psychoeducation about the potential benefits of mental health services and taking prescribed medicine; to assist Madelyn in setting up ▮▮▮▮ for Lucas R. upon his release from ORR; and to create a safety plan to ensure Lucas R.'s safety (▮▮▮▮). GOV-00010620-00010626.

27. Contrary to Lucas R.'s claims that ORR refused to release Lucas R. to his sister on the grounds that Madelyn's home may be "unfit" (FAC at ¶ 36), ORR does not use the term "unfit." Unlike children in foster care, children referred to ORR generally arrive unaccompanied, on their own, and unaccompanied by a parent or legal guardian. They are not being removed from a household or legal guardian or someone they are already living with, and parental rights are not being terminated. ORR Policy uses the language of the TVPRA. Specifically, ORR speaks of "Safe and timely release (also known as 'family reunification')," that "must promote public safety and ensure that sponsors are able to provide for the physical and mental well-being of children." ORR Policy Guide § 2.1.

28. The factual record also shows that the home study worker was concerned about more than Madelyn's home. As noted above, there were several issues with Madelyn herself, such as lack of candor, potentially hiding a household member that did not wish to be fingerprinted or otherwise identified, and not demonstrating that she would provide for Lucas R.'s significant ▮▮▮▮ needs. As discussed below, a later home study of Lucas R.'s brother, ▮▮▮▮ then revealed that Madelyn had abused Lucas R. in home country. GOV-00009645. In addition, the Complaint notes that Lucas R. "thinks that his refusal to take the medications harmed his ability to reunify with his sister" (FAC at ¶ 27, see also id. ¶ 33). As noted above, an independent social worker employed by a non-profit home study provider recommended against reunification due to Madelyn's own statements, evasiveness, and behaviors. The case file does not support the allegation that a refusal to take medications had an impact on the determination of whether Lucas R's half-sister would be a safe sponsor.

29. The case file also shows that ORR evaluated each applicant (and household member) on their own merits, and based on case-by-case analysis. For example, in reviewing Lucas R.'s brother as a household member (when Madelyn was the primary applicant sponsor), he reported ▮▮▮▮ serve as disqualification factors. Instead, the FFS advised that the case manager could proceed with family reunification efforts. GOV-00010573-75.

30. Although the Complaint alleges that "Madelyn and an aunt raised Lucas in his parents' stead," and that "Madelyn and Lucas have a very close relationship," (FAC at ¶ 24), Madelyn did not know much about Lucas R.'s journey to leave Guatemala and come to the United States. The home study report notes she was unsure about when Lucas R left his home country, how long his trip took, who paid for his trip, and how he got to the United States. GOV-00010596-7. A later home study (conducted when ▮▮▮▮ not Madelyn, was the potential sponsor and had moved to a new residence), notes as well that Lucas R. had an "okay" relationship with Madelyn, and that he knew her "when he was young," but he "hasn't seen her for a while." He also stated that Madelyn "▮▮▮▮ ▮▮▮▮" GOV-00009646.

7

31. The case file also lacks support for Lucas R.'s allegation (FAC ¶ 24) that either ORR or SW Key Sol gave Lucas R. and Madelyn R. the impression that everything was in order and that it would soon release Lucas R. to Madelyn R.'s custody. In my experience, the staff participating in the release recommendation and approval process are doing so as advocates for the child. Staffs' intentions are to ensure that children's needs are thoroughly identified so that should the sponsor be identified as "safe and qualified" final placement with the sponsor will likely remain uninterrupted. Information learned from a home study is used to identify areas where additional support, resources, or information are needed to ensure a successful sponsorship through ORR's system of Post Release Services, and provide corresponding psycho-educational assistance to the child and sponsor. (2.4.2 Home Study Requirement). This piece of the home study process is critical because each sponsor is unique and requires different levels education to care for a child with mental health needs.

32. By April 30, 2018, the FFS had indicated that she was denying Madelyn's application to act as the sponsor. She noted that the denial could be revisited once Lucas R. was stabilized and the concerns noted in the home study had been addressed. The home study is valid for one year, so an addendum could be offered if Madelyn still seemed like a viable option once Lucas R. was stable. GOV-00010501. The FFS only made her denial decision after involving an independent third-party reviewer (a Master's of Science in Family Therapy) and the lead case manager both recommended against release. GOV 00010502. In addition, through the home study interviews, it became clear that while Madelyn had maintained contact with Lucas R., she did not raise him, in contrast to allegations in the Complaint (FAC at ¶ 24). The Home Study report showed that he was raised by his maternal aunt and uncle and lived with a biological brother and sister. GOV-00010585. While Madelyn reported that she had a good relationship with Lucas R., and had known him since he was born, she only lived with him (and their maternal aunt and uncle) for four years. Their last contact had been in January 2017 when they were both traveling from Guatemala to the United States. Once she was in the United States and he in Guatemala, she stated she contacted him in home country every 15 days. GOV-00010594-00010595. Lucas R. also confirmed that he and Madelyn had an "okay" relationship. He said he knew her since he was young, but hadn't seen her in a while. He reported the last contact was a year ago, and that he would speak with her once per week over the phone. GOV-00010588.

33. Due to his ▓▓▓ needs, his ▓▓▓ he discovery of potential ▓▓▓ and his long-standing history of ▓▓▓ ORR determined that Lucas R could not be treated through outpatient services in a shelter-setting and needed a residential setting more appropriately tailored to meeting his needs. I have reviewed Lucas R.'s UAC case file to assess whether there is evidence supporting Lucas R.'s allegation (FAC ¶ 30) that "[r]rather than attempting to help Lucas manage his feelings, Hacienda del Sol personnel responded to his pleas for support by hospitalizing Lucas and requesting that ORR transfer him to a more secure facility." This allegation is not supported by the record. Rather, as discussed, above, staff at the shelter, along with ORR, met Lucas R's needs by obtaining medical treatment for his already ▓▓▓ first at a hospital, then through a psychiatric evaluation at ▓▓▓ and then finally, by transferring Lucas R to a residential treatment center designed to assist children with emotion disorders, when Lucas R displayed ▓▓▓ ▓▓▓ and that could not be served in a shelter setting. GOV-00009223.

34. On May 21, 2018, Lucas R. was transferred from SW Key Sol to Shiloh Residential

8

Treatment Center, a treatment center that treats children with emotional, developmental and intellectual disorders and that is accredited by the Joint Commission on the Accreditation of Hospital Organizations ("JCAHO").

35. *Note:* I have also reviewed Lucas R.'s UAC case file to assess whether there is evidence supporting Lucas R.'s allegation (FAC ¶ 31) that "ORR led [Lucas R.'s half-sister and proposed sponsor] Madelyn to believe Shiloh RTC was simply another shelter to which it was sending Lucas because Hacienda del Sol lacked space." The case file lacks documentation that would support this claim. It does contain information that staff at SW Key Sol keep Madelyn apprised of Lucas R's mental health needs, and assisted in locating mental health resources in the community should Lucas R be released to her. *See e.g.,* GOV-00010599; GOV-00010617; GOV-00010622. Such actions are consistent with my experience. After a sponsor is identified, my experience is that the sponsor can, at any point, ask the case manager or clinician or child advocate (where applicable) about the child's case (including reunification status). The child also can ask about their case. My experience is that ORR attempts to operate in the most transparent way possible. Since my employment in 2004, I have been personally involved in children's cases when a concern about a case was elevated by a parent, a care provider staff, an attorney, medical providers, consular staff, or the child him or herself. This concern and attention to transparency continue today; and all FFS are attentive to stakeholder concerns. In fact, on almost any day, I am working with an FFS to resolve a case brought to their attention by an attorney, sponsor, child advocate, or other interested party. Issues elevated to ORR have always been openly resolved with the appropriate parties.

### Shiloh Residential Treatment Center ("RTC")

36. On the day after he arrived at Shiloh RTC, Lucas R was assessed by the on-staff psychiatrist at Shiloh RTC, Dr. Javier Ruiz. The Complaint presents Lucas R. as a "thriving, happy child who liked to joke, play, and talk with people," in Guatemala (FAC at ¶ 25). The case file assessment notes that Lucas R. was not thriving in Guatemala. His mother died when he was an infant and he never knew his biological father. He was raised by an aunt who allegedly ███████ ████████████████ Lucas R. reported that he came to the United States to be reunited with his siblings in California, as his brother wanted him to move away from his current caregiver, his aunt. While Lucas R. initially denied the ████████████████████ in Guatemala, he later acknowledged it. He also reported ████████████████████████████████████████████████████████████████ He also reported that at times, he would ████████████████████████████████████████ He reported needing medical attention after his ████████████████████████████████████████████ GOV-00009222. He also reported that he was ██████████████████████████ resulting ████████ He reported that his aunt also ████████████ him, and at times ████████████████████ ████████████████████ GOV-00009223. Although the assessment notes that while Lucas R. appeared cooperative and calm, by February 20, 2018, during his placement at SW Key Sol, he had ████████ and comments ████████████████████ He was taken to ████████████████████████ Emergency Room where he was assessed to meet the criteria for hospitalization. While in the hospital he spoke about ████████████████ in home country with ████ ████████████████████████████████████████████████████████████████ On March 6, 2018 he was diagnosed with ████████████████ He was prescribed ████

9

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ GOV-00009223.

37. The assessment also included goals and objectives for Lucas R., including long-term treatment, expectations, family involvement, sponsor information and discharge plans. GOV-00009228.

38. An initial individual service plan by a professional counselor (masters in psychology) from May 21, 2018 noted that Lucas R. had risk indicators of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ The counselor noted that Lucas R. was ▓▓▓▓▓▓ and had had ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ He denied self-injurious behavior, but said he ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ He reported ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ He reported that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Contrary to the Complaint about prescribing Sertraline (i.e., Zoloft) at Shiloh (FAC at ¶ 32), the case file specifically notes that Sertraline was discontinued from the day he entered Shiloh. GOV-00009360. There is no evidence in the case file to support Lucas R's allegation that he was administered Zoloft at Shiloh (FAC ¶ 32); the case file would contain evidence of such prescription. *See* ORR Guide § 3.4.4 (requiring grantee care providers to record all prescribed medications in the child's file.).

39. The counseling goals from the individual service plan include ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ GOV-00009361-00009362. *See also* GOV-00009363-00009366.

40. On the day of his arrival at Shiloh as well, Shiloh RTC received a consent for medical care from Lucas R.'s case manager. GOV-00009241, as well as a detailed orientation package, provided in Spanish, that described Lucas R's right to be free from sexual abuse; instructions regarding Safe Crisis Management, list of legal services providers, and information regarding requesting a bond hearing if he felt he was being kept in custody solely due to being dangerous. GOV-00009254; 00009265; 00009296. Contrary to allegations of Lucas R. that there were no reviews of medication, (FAC at ¶ 26), records also show that Shiloh plans included medication monitoring to determine progress and effectiveness of medications, blood level monitoring of medication, and educating Lucas R. about his medications, the reasons each was prescribed, and the side effects for each medication – to be monitored by a Registered Nurse. GOV-00009376. The case file shows that such monitoring occurred. Records from 5/29/2018 and 6/5/2018 show Shiloh was measuring hemoglobin/hemocrit and whether triglycerides increased, along with medical consultation for each factor. GOV-00009412. The case file further shows that Shiloh specifically maintained goals and objectives for medication administration. These included "At each medication administration period, ask [Lucas R.] to come to the medication area to take scheduled medications, and monitor medication to ensure medication is administered as prescribed." GOV-00009377. Shiloh specifically planned that Lucas R. should be able to "identify each medication that has been prescribed according to . . . age-appropriate or functioning level," and that he should be able to relate why he "takes each medication that has been prescribed . . . according to . . . age-appropriate or functioning level." The plan was to ask Lucas R. at least once per day to name each medicine and identify what the medicine was for. GOV-00009378. The case file also includes detailed prescription medical reports noting whether

10

Lucas R. took his medicine, and these forms were signed by Lucas R. *See e.g.,* GOV-00009907-GOV-00009908.

41. In addition, since Lucas R.'s stay at Shiloh RTC, Shiloh, starting in about November 2018, now receives written, informed consent from relatives (preferably parents) prior to being transferred to Shiloh and for all psychotropic medications. The informed consent is maintained in the case file and monitored by a central office team at ORR. Aside from the issue of formal consent, prior to November 2018, my understanding and experience is that Shiloh, in its regular practice engaged family and or sponsors in family counseling sessions. Mental health and care were commonly discussed, especially in light of the fact that the sponsor and child would need to learn to be comfortable with discussing this issue once the child was released to the sponsor's care. This practice continues. Family members are also informed of their right to refuse placement and that refusing placement will not be the reason family reunification is delayed or denied. Shiloh also sends a weekly roster to the FFS Supervisor listing each child in care and whether he or she remains a danger to self or others.

42. There also is not evidence in the case file to support Lucas R.'s allegation (FAC ¶ 27) that Lucas R. categorically refused to take all medications that his doctors prescribed for him. If such categorical refusal occurred, it would have been evident in the case file (through psychiatric notes and other medical records) and it is not evident in the file.

43. Under ORR practice, a UAC is allowed to refuse medication. I understand both Shiloh and Mercy First maintain policies to this effect, and in my experience this is the protocol across all ORR-funded care providers. Lucas R's case file reflects instances where Lucas R. declined to take the medications that doctors prescribed for him. GOV-00010578. Lucas R.'s allegation that he was prescribed medication "over his objection" (FAC ¶ 33) is not supported by ORR policy, practice, or the case file.

44. While at Shiloh, Lucas R. also received notice of why he was placed at Shiloh RTC. GOV-00009306. The Notice shows it continued to be reviewed at least every 30 days (and sometimes weekly) to determine if he continued to require the same restrictive level of care, in accordance with the TVPRA. GOV-00009306. The records show that he signed his notice explaining why he was placed at Shiloh RTC August 7, 2018. GOV-00009307. He signed another Notice August 1, 2018. GOV-00009311. His Notice (and corresponding placement at an RTC) similarly were reviewed July 5, 2018. GOV-00009313.

45. Contrary to allegations by Lucas R. (FAC ¶ 35) that he was provided no access to counsel, Lucas R. also received a Know Your Rights presentation and legal screening for possible legal relief from the Cabrini center 10 days after arrival on May 31, 2018, GOV-00009428, and acknowledged as much by signing the form. GOV-00009314. He had his own representative, as well, who entered in an appearance for him as of August 9, 2018. GOV-00009338. All children in ORR custody are provided a list of free legal services upon orientation. The case file further shows a two-hour meeting between Lucas R. and both a Flores-affiliated attorney, Crystal Adams, and a doctor, Doctor Amy Cohen, on July 12, 2018, as well as a meeting with the Cabrini Center on July 18, 2018 (lasting 30 minutes). GOV-00009760. On May 31, he received a visit from Legal aid (friend of the

court). GOV-00009762.

46. Contrary to claims (FAC at ¶ 31) that he was given no opportunity to contest placement, on 5/21/2018 Lucas R. rejected requesting a Flores bond hearing, GOV 00009334, under which he would have been permitted to challenge whether he was being held solely due to danger. ORR Policy Guide at § 2.9. ORR policy also contains procedures for an unaccompanied child to seek review by the Director (or her designee) of a placement in a secure or RTC facility. ORR Guide at § 1.4.7. The case file contains case reviews at least every 30 days to evaluate the 30-day restrictive placement. The case reviews also show that Lucas R. saw a psychiatrist once per week and was seen by a clinician twice per week. GOV-00009351. Finally, the case file does not contain evidence supporting Lucas R.'s allegation (FAC ¶ 33) that "Shiloh staff . . . told Lucas that ORR would not release him until Shiloh medical personnel declared him psychologically sound." Instead, the policy and practice are that children cannot be released or stepped down from RTCs when they continue to be a danger to self or others. ORR Guide at § 1.4.2. Shiloh continuously worked to reunify Lucas R. with a sponsor. When he first arrived at Shiloh, Shiloh discussed reunification with Madelyn. The Assessment of Lucas R. notes that Madelyn was told that if she was interested in sponsorship she would have to go through an "appeals process to continue the case." It does not appear that Madelyn ever enquired further regarding an appeals process or continuing with her application. GOV-00009500. Moreover, on July 17, 2018, Lucas R. disclosed that Madelyn had physically abused him when they lived together in home country. GOV-00009645.

47. Case management staff then began the reunification process with Lucas R.'s half-brother beginning mid-June. Unfortunately, however, Lucas R's brother was moving to a new apartment. Thus, concurrent planning began with a maternal cousin, who also was sent a family reunification package June 19, 2018. GOV-00009506. Although Shiloh reached out to Lucas R.'s brother in mid-June, ▇ could not provide information because he was moving. In addition, the case manager at Shiloh repeatedly followed up with Lucas R.'s brother to ensure that the program could gather information about unrelated household member(s) with whom Lucas R. also would be living upon release. While ▇ responded, it was not immediate. For example, on June 23, the case manager explained that she would need information about household members, along with an authorization signed by the room/housemate to be fingerprinted. ▇ said to email him the forms, and the case manager did so. By June 27, ▇ had not sent the forms back. He claimed he could not open the attachment, but that the case manager should go ahead and schedule a fingerprint appointment for his household member, preferably for after 4 p.m. The case manager called the fingerprint location, and then called ▇ to let him know that there was an appointment available for the next day, June 28 at 3:30 p.m. Although ▇ said he would contact the household member to see if she could make the appointment, it does not appear that such contact ever occurred. This is evident from case review notes showing that the case manager called the household member herself on June 28. The case manager asked if the household member knew she had a fingerprint appointment for that day. The household member was not aware. The case manager explained the situation, about ▇ moving in – which the household member confirmed as true – and then explained the fingerprint process. The household member expressed some doubt about getting fingerprinted and whether it would affect her immigration case, said she would contact her lawyer, and then let the program know. The household member failed to attend the June 28 appointment, and on June 29, 2018 did not answer the phone. The case manager made another appointment for the household member. By July 13, ▇ reported

12

that the household member had been fingerprinted. GOV-00009515.

48.     Shiloh also arranged regular family sessions between Lucas R. and his brother. GOV-00009436, 00009448. Due to Lucas R.'s disability, the case was referred for a mandatory TVPRA home study on July 23, 2018, and accepted by BCFS on July 24. GOV-00009525. A home study occurred August 4, with a positive result, but with a number of conditions prior to release. First, because Lucas R. and ▮▮▮▮ did not have prior relationship, GOV-00009586; GOV-00009642  the home study social worker recommended, clinical family sessions (minimum of 5) to include video calls between the sponsor and minor prior to release. GOV-00009670. The home study report also recommended: disclosure of all household members; clinical sessions to discuss importance of medication management and side effects of discontinuing psychotropic medications without medical consent, as well as reunification expectations, household rules, and discipline plans, providing a list of mental health referrals, crisis hotlines and emergency resources, and making an appointment with a mental health provider prior to the release to ensure continued psychiatric care. The home study also recommended that post-release services be initiated prior to the minor's arrival in the home. GOV-00009439; GOV-00009670. Shiloh complied with the home study recommendations, and family sessions with Lucas R's brother occurred on 7/25, 8/2, 8/23, 8/30, 8/31, and 9/4/2018. GOV-00009449. In some cases, when the clinician attempted to set up family sessions, ▮▮▮▮ did not answer. GOV-00009586. The case file shows Shiloh staff frankly discussing Lucas R's medical condition, as well as the psychotropic medications he was taking during such sessions. GOV-000009449.

49.     The case file also shows that as of August 31, 2018 (that is after the five family sessions recommended by the home study social worker), the case manager formally recommended approving release with post-release services, as required under the TVPRA. The Case Coordinator (and independent, third-party reviewer) concurred in the recommendation on the same day with some recommendations. The FFS at the time concurred and officially approved release on the same day -- August 31, 2018. GOV-00009587. *See also* GOV-00009678-00009681.

50.     Although Lucas R. claims that his stay at Shiloh exacerbated his mental health disability (FAC at ¶ 33) and even made his release less likely, as noted above, a home study had already recommended family sessions prior to release, which took some time to conclude. In addition, the case file, on balance, indicates that Shiloh assisted Lucas R. in addressing his main diagnosis of depression, although his behaviors varied during his stay. As of 5-22-2018, his psychiatric treatment plan notes a GAF [Global Assessment of Functioning] of 40 (GOV-00009374), with an active diagnosis of ▮▮▮▮ GOV-009374. By June 5, 2018, the recorded GAF is 50 (GOV-00009412), with ▮▮▮▮ GOV-00009414. There were also 0 therapeutic holds and 0 incidents of emergency medication. GOV-00009415. By July 3, 2018, his GAF was 60, and he was reported to be responding well to the psychotropic medications. ▮▮▮▮ He met 3 of 5 objectives for target behavior. GOV-00009423. By August 7, 2018, psychiatric notes report a GAF of 70, GOV-00009433, with ▮▮▮▮

GOV-00009434. ▓▓▓ GOV-00009435. Altogether, on August 7, 2018, Lucas R. met five objectives for his target psychiatric behavior. A sixth added objective, however, regarding "non-compliance" increased from 40 to 134, and that objective was not met. *Id.*

51. On the other hand, counseling notes show Lucas R. increasing, ▓▓▓ (6/26/2018) and ▓▓▓ (6/28/2018), ▓▓▓ GOV-00009425. On July 5, 2018, he flat out ▓▓▓ GOV-00009426. July counseling notes continued a pattern ▓▓▓ with Lucas R. ▓▓▓ (he was assured this was his choice), and ▓▓▓ However, by early August, ▓▓▓ GOV-00009436. Throughout August, Lucas R.'s ▓▓▓ August 23, 2018 notes record him presenting with a "much better attitude from previous sessions." GOV-00009447. However, on August 30, 2018, ▓▓▓ GOV-00009448, 00009457. *See also* GOV-00009694-00009711 for Individual Counseling Notes.

52. In addition, as noted above, the record shows that Lucas R. arrived in ORR custody with a significant ▓▓▓ While it might be understandable that Lucas R., Madelyn, and ▓▓▓ would wish to place all responsibility for any deteriorating mental condition on ORR and/or Shiloh, Lucas R. arrived at ORR ▓▓▓ In addition ▓▓▓



GOV-00009641-00009643.

53. Lucas R. claims that Shiloh personnel "regularly prevented Lucas from communicating with Madelyn over the telephone," and denied him the right to speak to her. FAC at ¶ 34. There is no indication as to such a prohibition in the case file. The case file shows he had two telephone calls per week, and often chose to speak with his relatives in home country. GOV-00009475. Shiloh maintained detailed telephone logs showing he chose to speak to different relatives over the phone, including a brother in home country, an aunt, and his brother-sponsor. GOV-00009764. On July 11, 2018, Lucas R. spoke with Madelyn. GOV-00009478; GOV-00009764 (6-minute call with Madelyn). A call to a sister/prospective sponsor is also noted for May 23, 2018, as well as another call to a "sister" on May 30, 2018. GOV-00009768. There is nothing in the case file showing that Lucas R. asked to speak to his sister and was blocked from doing so.

54.     Some other aspects to Lucas R.'s case file are as follows: He asked his case manager if giving wrong birthdates would prolong his case. The Case Manager informed him that any false information can affect a case. He then stated that he was not 14, but actually 16, and had previously been giving false information. (This was after he had already stated that his birth certificate showed him to be age 12, but that his deceased mother registered him two years late, and he was actually 14). GOV-00009515. On June 20, 2018, as well, Lucas R.'s brother called him, and proceeded to tell him "not to disclose further information," and that if he continued to give information his case would "be affected." *Id.* As with all case files for ORR care and custody, the case file includes detailed logs of field trips, calendared activities (such as basketball, soccer, arts and crafts, volleyball, puzzles), recreational participation, and daily progress notes, GOV-00009878-GOV9905.

55.     Lucas R. was discharged from Shiloh when he "was no longer a danger to himself or others and no longer presented with the symptoms he was admitted for." GOV-00009564. He was provided with medications prescribed by his physician (including psychotropic medications) upon his discharge. GOV-00009567. After release, ORR policy at section 2.8.4 of the Policy Guide requires conducting a safety and well-being follow-up call. The case file shows that a follow up call occurred October 9, 2018. In response to the question: "Is the child demonstrating any behavioral issues?" Lucas R.'s brother reported that "minor has a strong personality and can be difficult to manage. However, sponsor reported they are managing." In an additional comment, the case file notes that "Sponsor stated that the minor has not seen a psychiatrist and is no longer taking his medication. Case manager reminded the sponsor on the importance of psychiatric care. Sponsor stated that the minor is attending school and they help him there. Case manager reiterated the importance of psychiatric care. Sponsor stated they understood." GOV-00009568. Shiloh had provided ▮ with a detailed supervision and security plan. The Plan was written in Spanish and included all of Lucas R's medications, a list of community-based mental health services, the likely cost of Lucas R's prescriptions, and numerous other pieces of information, such as pro bono legal service providers in the area. GOV-00009569-00009584. Previously, the record shows that ▮ had replied he was "aware that the minor will benefit from counseling to address any ▮ experience in home country and current mental health diagnosis. The sponsor is aware that the minor will need psychiatric follow-up upon release. . . . The sponsor reported that he would ensure the minor continues his medicinal regimen unless otherwise directed by a medical or mental health provider. The sponsor agreed to initiate counseling after the minor's arrival in the home." GOV-00009586; GOV-00009669. In family sessions, ▮ had been informed that Lucas R had already stated he was likely to discontinue medicine after release and was asked what his plan was to address this. He stated he would speak to Lucas R. and explain the reason for the medication and the importance of taking it. GOV-00009586. Given ▮ previous representations that he would ensure Lucas R continued his medication, it is notable that the follow-up call found ▮ did not ensure such continued medication.

### Lucas R's Case File

56.     In my work as a Federal Field Specialist and then Supervisor, I have become familiar with how ORR and its grantee care providers create and maintain case files of unaccompanied alien children (UAC case files). In connection with my employment responsibilities, I have viewed many UAC case files and UAC case file documents.

15

57. In accordance with ORR policies, ORR and its grantee care providers maintain comprehensive, accurate, and up-to-date case files as well as electronic records on unaccompanied alien children. *E.g.*, ORR Guide § 5.6.2. These UAC case files include a wide variety of information concerning an individual UAC, including: "the child's name, alien number, date of services, and Federal fiscal year. The file documents all services provided, information about the child or youth's progress, barrier's to the child's progress, and the outcome of the case." ORR Guide § 5.6.2. As further detailed in the ORR Guide, UAC case files also include UAC information, admission documents, legal information, assessments (including medical records containing statements made for and reasonably pertinent to medical diagnosis or treatment, and describing medical history, past or present symptoms or sensations, the symptoms' inception, or their general cause), educational services, case management records, clinical services, incident reports, and discharge/exit information. *See id.*

58. Also in accordance with ORR policies, ORR and its grantee care providers have procedures to maintain, protect, and review UAC case files for completeness and accuracy. *See* ORR Guide § 5.6.3.

59. UAC case files are made at or near the time by—or from information transmitted by—someone with knowledge; they are also kept in the course of a regularly conducted activity. Making UAC case files is a regular practice of the operations of ORR and its grantee care providers.

60. The UAC case file (or excerpts thereof) Bates stamped GOV-00009220 through GOV-00010017 and GOV-00010018 through GOV-00010636 is a true and correct copy of (or excerpts from) the UAC case file of Lucas R., which was created and maintained in accordance with the procedures described above.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: **DATE** September 18, 2020
       **CITY** Washington D.C.

_____
JAMES S. DE LA CRUZ