**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCAS R. *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ALEX AZAR, Secretary of U.S. Dep't of Health and Human Services, *et al.*, <br><br> Defendants. | Case No.: 2-18-CV-05741 DMG (PLA) <br><br> DECLARATION OF DAVID FINK REGARDING CLASS MEMBER MIGUEL ANGEL S. |

### I. Introduction

1. David Fink, under 28 U.S.C. § 1746, declares, under penalty of perjury, as follows. If asked to testify, I would testify under oath as follows.

2. The statements in this declaration are based on my personal knowledge, information acquired by me in the course of performing my official duties (such as my knowledge of ORR policies and procedures, including the ORR Guide[1]), my review of HHS records and information contained therein (including Miguel Angel's case file).

3. I am employed in the position of Federal Field Specialist (FFS) Supervisor for Special Populations within the Office of Refugee Resettlement (ORR), a component of the Administration for Children and Families (ACF) within the U.S. Department of Health and Human Services (HHS).

4. I have held the position of Federal Field Specialist Supervisor since November 2018. In this capacity, my job duties are to ensure ORR's specialized placements such as Secure, Staff Secure and Residential Treatment Centers remain compliant with ORR's Notice of Placement policy and procedures. In addition, I work with ORR management to enhance best practices and services for children placed in higher levels of care. My role includes working with ORR headquarters to identify additional placements that meet the needs of ORR's specialized population and provide technical assistance to FFS and FFS Supervisor's on a case by case basis.

5. Prior to assuming my current position, I worked at Accenture from October 2017 to November 2018 as a consultant working with the Georgia Department of Family and Children Services to enhance their existing State Automated Child Welfare and Information System. From 2013 to 2017, I held the position of FFS Supervisor for the Northeast region. In that capacity, I supervised

---

[1] https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied

1

FFS staff that routinely make release and transfer decisions. From 2010 to 2013, I was the FFS for the Mid-Atlantic and Northeast region routinely making release and transfer decisions. I also responded to requests and assisted ORR care providers. My role as FFS required me to provide training and technical assistance to ORR care providers and colleagues, and I liaised with community stakeholders.

6. I received a B.S. from Piedmont College in Sociology and completed my Master's in Social Work from Arizona State University.

## II. Miguel Angel S Placement and Reunification

7. Miguel Angel S. entered ORR legal custody on or about May 17, 2017. FAC ¶ 47, GOV-00010657.

8. Contrary to the FAC ¶ 47, there is nothing in the case file indicating that his initial shelter placement, SW Key San Diego, informed Gerardo that Miguel Angel S. would be released within three months. Indeed, I would be surprised if a shelter made such a promise due to the fact that Miguel disclosed information to the Care Provider at the time of admission about abuse in the country of origin which fit the criteria for home study – although a shelter might indicate that if everything goes according to plan, minors typically are released prior to a 90-day period.

9. In addition, although the Complaint claims that Miguel Angel S. and Gerardo had a "very close relationship," (FAC at ¶ 54) from the beginning, the case file shows that case workers understood that Gerardo never served as Miguel Angel S.'s primary caretaker in Mexico. Gerardo moved to the United States when Miguel Angel S. was very young – approximately one year old. Miguel Angel S.'s mother also abandoned Miguel Angel S. when he was a young toddler. Miguel Angel S.'s grandmother raised him until she passed away. Miguel Angel S. then lived with an aunt and cousins, but ███████████████████████████████████████ He moved (ran away with his brother) to live with an uncle or cousin, and then – ███████████████ - lived in a shelter in ███████ until crossing the border into the United States and being referred to ORR legal custody. GOV-00010660. Miguel Angel S. and Gerardo did not meet each other in person until 2018. GOV-00011587. *See also* GOV-00010849 ("Minor's parents have been absent for most of his life and minor was primarily raised by grandmother.") GOV-00011308 ("His mother left the children with their paternal grandmother when Miguel Angel S. was approximately one year old, and [Gerardo] left around the same time and moved to California."). Finally, although Gerardo stated he was Miguel Angel S.'s ████████████████████████████████████████████████████████ ███████████ GOV-00011416.

10. The case file also shows that Gerardo did not promptly follow up on all family reunification application requirements. For example, Southwest Key San Diego sent Gerardo a family reunification package ("FRP") immediately after Miguel Angel S.'s arrival and followed up to ensure he received it and would complete the requirements. GOV-00010701; GOV-000748. Because of Miguel Angel S.'s prior trauma, the program understood immediately that all household members would require fingerprinting and that the case would require a home study. However, Gerardo reported that not all household members were willing to provide identification documents and would not want

2

to get fingerprinted. GOV-00010749. By the time Miguel Angel S. was in ORR care for 15 days, Gerardo had not submitted all supporting documents for the family reunification application, and the program expressed concern about lack of interest from the sponsor. GOV-00010752. The program reported calling Gerardo almost every day, but the sponsor not cooperating and not wanting to provide the identification documents of household members. GOV-00010755. After trying to call Gerardo repeatedly, the program finally got through in early July. GOV-00010779. The program had weekly staffings to discuss Miguel's case. The staffings included the Federal Field Specialist, the Case Coordinator, the Program Director, the "MC" [Medical Coordinator], the Lead Case Manager, the Lead Clinician, the Clinician, and the Case Manager. Gerardo had no set schedule for work and no driver's license, as he had been unable to pass the test, though he admitted he sometimes drove out of necessity. GOV-00010780. Gerardo did not return the family reunification packet with all signatures until July 3, 2017. GOV-00010701. Further, although Gerardo claimed to be Miguel Angel S.'s biological father, the Mexican consulate was unable to verify Gerardo's birth certificate, and so the shelter could not be sure Gerardo truly was Miguel's father. As a result, SW Key San Diego began to ▮▮▮▮ GOV-00010673. *See also* GOV-00010788 (Miguel Angel S. told that Gerardo was not being responsive to the family reunification application process).

11. The case file also shows that shortly after entering SW Key San Diego shelter, Miguel Angel S. both reported and exhibited symptoms that led to the consideration of a special needs shelter that could better meet his needs, such as an RTC. His initial case review notes ▮▮▮ stating that he has had a ▮▮▮," as well as problems complying with the rules and procedures of the program due to his own past experiences and the "▮▮▮ He describes himself as a "▮▮▮ Dealing with "▮▮▮" "▮▮▮ o ▮▮▮" "Enjoys coloring and writing songs." Performs better on "1:1 supervision." ▮▮▮ GOV-00010660. ▮▮▮ GOV-00010661. ▮▮▮ GOV-00010663. ▮▮▮ GOV-00010664. ▮▮▮ GOV-00010664. ▮▮▮ GOV-00010664-5.

12. Within a month at SW Key San Diego, Miguel Angel S. failed to follow rules and did not respect directions. He did not engage in school or program activities, and SW Key began looking into transfer to an RTC. GOV-00010675. SW Key reported that his speech and thought process ▮ ▮▮▮ GOV-00010679, and that he had an SGAF of 45. GOV-00010682.

13. Miguel Angel S. also had significant incident reports ("SIRs") while at SW Key San Diego for both ▮▮▮ (i.e, punching a wall). GOV-00010726. He reported he ▮▮▮ He refused to go for a second set of immunizations because he did not want to be bothered by anyone. GOV-00010726. He appeared to

3

prefer 1:1 supervision, and being alone with staff with time for himself, rather than doing things he does not enjoy like running or playing with other peers. He had problems with peers, and wanted to keep to himself. He was not adjusting while at the shelter, although it was determined that he was not at risk for suicidal or homicidal ideation. GOV-00010728. At SW Key he sought out and received counseling several times per week, and noted mood changes, with a hard time relating to peers. He liked staff attention, and constantly asked to talk to the clinician (which was granted), appeared angry and upset, though again there was no suicidal or homicidal ideation or run risk during the last weeks of June 2017. GOV-00010729. *See also* GOV-00010730, GOV-00010731. When speaking with the psychologist, he noted that ██████████████████████████████████████████████ ██████████████████████████████████████████████████████████ GOV-00010732.

14. By the end of June, Miguel Angel S. exhibited aggressive behavior. On or about June 28, 2017, he wanted to take a shower, and was told he should wait until dinner. When he finished dinner and again asked for shower, he was told to wait until after vocational, and that it was not time for shower, which he knew. He hit the dinner table hard with his palm. After vocational, he then took a shower, and then went into bedroom. He hit the bed about 10 times as hard as he could and then turned around and laughed and said, "That's how I get out my frustration." When asked why he felt that way, he did not answer. Later he hit the wall hard. When asked not to do that, he laughed and said it would not fall. GOV-00010772. His punching of the frame of the bed, in fact, was so hard that he put a hole in the board underneath. In counseling, he stated ██████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ GOV-00010736.

15. By early July, Miguel Angel S.'s behaviors were escalating, according to the case file. A youth care worker reported that by that point, Miguel had been on 1:1 for 3 weeks and behaviors became more aggressive. He did not take direction from staff, and tried to intimidate them so he could do what he wanted. ████████████████████████████████████████████████████. He got up without permission, did not get involved in school activities, purposely kicked a ball toward peers and staff, and repeatedly punched and kicked a sandbag on the basketball court though asked not to do so. GOV-00010777. On July 7, 2017, as well, it was reported that his lawyer had written that he could not represent Miguel Angel S. anymore due to behavioral problems at program. His behavior was reported to be tearful, angry, agitated, erratic, irrational thoughts, disorganized and volatile, with a sense of reality not present. He had trouble calming himself and focusing on the present and had negative and impulsive thoughts. GOV-00010738.

16. Miguel Angel S. was transferred to Shiloh RTC only after a psychological evaluation by a psychologist with a Doctorate in Psychology. GOV-00010856 GOV-00010848-00010856. The psychologist noted that Miguel Angel S. █████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ " Although Miguel Angel S. showed ████████████████████████ ██████████ psychologist determined that Miguel Angel S. needed a higher level of care that can meet the minor's mental health needs. GOV-00011854. The case file also shows that Gerardo

4

was aware of Miguel Angel S.'s level of suffering, especially from ▬▬▬▬▬▬▬▬▬▬▬▬▬▬. He understood that Miguel Angel S. had ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ that he might need additional counseling or therapeutic services as a result of his experiences. GOV-00010780. Contrary to implications that Miguel Angel S. did not want to be transferred (*see e.g.,* FAC ¶ 48), the case file also shows that Miguel Angel S. asked shelter staff to transfer him to a place where he could ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬." GOV-0001171.

17.   Miguel Angel S. transferred to Shiloh RTC on July 17, 2017.

18.   Plaintiffs claim that Miguel Angel S. objected to medications at Shiloh RTC because they made him feel "itchy, dizzy, aggressive, nauseous, and caused him to gain an unusual amount of weight in a short period of time," but "Shiloh staff insisted that he take the medication." FAC at ¶ 49. Plaintiffs also discuss obtaining informed consent from Gerardo or obtaining judicial authorization to administer medication. *Id.*

19.   Based on review of the Shiloh RTC case file, however, there is not an indication of Miguel Angel S. complaining of medications making him itchy, dizzy, aggressive and nauseous, although later in his stay at Shiloh, Miguel Angel S. did express concern about weight gain. GOV-00011474. The home study report stated that "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ GOV-00011716. Miguel Angel S. had approximately weekly reviews of medication with the psychiatrist at Shiloh. When he objected to weight gain from Remeron in February 2018, the notes indicate to "discontinue Remeron." GOV-00011474. Shiloh also had family sessions with Gerardo almost every week, where they reviewed medications with Gerardo. GOV-00011588. I have found no evidence in the case file that Shiloh insisted that Miguel Angel S take medications. In my experience, children at ORR grantee care providers, who do not wish to take medication are free to refuse to do so.

20.   In addition, although Plaintiffs complain that ORR did not involve a neutral decision maker in the initial determination of whether to prescribe psychotropic medications to Miguel Angel S., or in ongoing review of the medications (FAC at ¶50), in fact, the psychiatrist prescribing medications was not an ORR employee, but instead, an independent psychiatrist answerable to his own licensing and medical boards (in addition, Shiloh RTC – as a licensed residential operation is subject to oversight by Texas state licensing and by its accreditation board).  The records show that the physician reviewed medications with Miguel Angel S. and never forced him to take medications, and carefully monitored Miguel's medication regimen, decreasing or increasing dosages based on what Miguel and or staff reported. When Remeron was decreased in September 2017, Miguel suffered ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ it was reported that there was a clear difference when he was not taking Remeron. As a result, the psychiatrist increased Remeron, and ordered monitoring mood swings. GOV-00011407. The records show careful monitoring of side effects from the medication, and evaluations of how Miguel adjusted to medication. GOV-00011422. As noted above, Shiloh staff reviewed medications with Gerardo in family sessions, and adjusted medications when Miguel Angel S. objected to side effects. GOV-00011588; GOV-00011474.

21.   Shiloh RTC also now requires written consent from parents or other close relatives both for RTC and to prescribe psychotropic medications. I understand that the requirement for written

5

consent can sometimes be difficult for parents or other relatives to comply with and has been viewed by staff at the RTC, as well as ORR professionals, as sometimes creating additional record-keeping and process-oriented steps that have not truly enhanced child welfare. In addition, Texas state courts have already denied state jurisdiction to opine on children in Federal legal custody. It also does not seem appropriate for non-parental applicant sponsors to consent for a child. While ORR may be evaluating a relative as a potential sponsor for a child, that relative may not have been involved in the minor's life previously, and may even turn out to be not a suitable sponsor, by the time ORR completes the sponsor evaluation process. In my experience, States view ORR as the temporary custodian for children in its care and custody, and that the states do not have jurisdiction.

22. Miguel Angel S. also claims he was physically assaulted at Shiloh and that he was transferred to Yolo in retaliation for reporting attacks. (FAC at ¶51-52). However, the case file does not support such claims, other than a discussion about staff "horse playing" with him and causing him to hurt his ear. GOV-00012167. Indeed, claims in the Complaint (FAC at ¶ 51) about a headlock, ripping out an earring, a physician assistant failing to stop the incident, a doctor laughing at Miguel Angel S's reports, Shiloh staff pushing Miguel Angel S. against a wall, staff pressing a forearm against his throat making it hard for him to breath, and Miguel reporting these incidents to staff are not supported by the case file, and if they had occurred would likely be documented in a significant incident report or otherwise.

23. The case file shows that during the month of October, Miguel Angel S. began decompensating, and then exhibiting disruptive, aggressive behaviors warranting an increase in the level of care. During a clinical session, he expressed ▮▮▮▮▮▮▮▮▮▮. Toward the end of October, he received detrimental news ▮▮▮▮▮▮▮▮▮▮. This may have caused dysphoria. By the end of November, he began making progress in session again, and remained stable until the middle of January. At that point, he reported ▮▮▮▮▮▮, ▮▮▮▮▮▮ During the month of January, his mood "escalated to verbal aggression, physical aggression, property destruction, and self-injury causing fractures to his fingers when he punched a wall. He engaged in physical aggression toward peers, which included punching a peer several times in the ribs and stomach area, and against staff, which included kicking and biting. He ultimately had to be restrained to avoid further injury to staff, peers, and himself. Due to the seriousness and escalation of his physical aggression, verbal aggression, property destruction, and self-injurious behavior, Shiloh recommended he be transferred to a higher level of care. GOV-00011589. *See also* GOV-00011505 (report of Miguel Angel S. punching a wall, causing fracture to his hand). GOV-00011476 (2/6/2018 – classroom therapeutic hold – reports of screaming, cursing, and biting staff and resisting therapeutic hold. Required administration of PRN oral medication with consent). GOV-00011588 (reporting ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ GOV-00012195 (1/19/18 - threatening with fist clenched to beat peer. Turned to staff and yelled "and you too, I'll get you too bunch of fools." Asked for medication to calm him down); GOV-00012183

(2/1/18 threw a chair, and said his medication might be causing mood swings – records show psychiatrists would evaluate pharmaceutical regimen for any needed change); GOV-00012166 (Returned from seeing the doctor and became aggressive, hitting the walls, throwing trash and making threats. Staff asked him to calm down, but he became aggressive, pushing the supervisor three times. When staff asked how they could help and backed away to give space, he escalated, by hitting and threatening, requiring a two-man bicep assist therapeutic hold for two minutes. When released, became verbally aggressive and threatened staff. Staff backed away but stayed in proximity, and Miguel began trying to take his cast – from the fracture – off. Staff tried to stop him, and he began hitting, kicking and biting staff. Another therapeutic hold was used for two minutes); GOV-00012170 (2/6/2018 emergency medication for agitation, aggression and homicidal threat). GOV-00012164 (2/11/18 - Told other peers that he is "boss and they need to do as he says." "If you don't do as I say I'm gonna show you who I am." Yelled at intervening staff: "You too asshole, I'll beat your ass too you or anybody here tells me what I can't do." Asked to calm down, walked out of room and said: "Don't talk to me. I'm in charge. Nobody tells me what to do."); GOV-00012162-3 (Other verbal aggressions 2/12/18 and 2/11/18); GOV-00012157-8 (pacing, cursing peers and provoking, saying " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ - ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and "es el tipo de persona que soy, no me importo para mierda y que no me digan mierda nadie" - that's what kind of person I am, I don't care about shit, don't nobody tell me shit." "All these assholes need to know who is in charge and need to do as he says."); GOV-00012152-4 (2/19/18 – reports of several minor incidents, but due to volume being reported); GOV-00012147-8 (3/5/18 – physical aggression toward peer over a pen – screamed at other boy, "let's fight." When second boy walked away, Miguel said: "You are a dick and you didn't defend me. Better not get another IR [incident report] or else." Stood in staff's face with fist balled up as if he was going to punch him, but did not); GOV-00012144 (refused to leave classroom and threw schoolwork on floor).

24. Later, when asked about his behaviors, Miguel Angel S. admitted his aggression. For example, when interviewed about therapeutic holds and asked "what did staff do before the TH [therapeutic hold] or EPR [emergency medication]," he answered: "Telling me to calm down, asking what they can do." When asked "How did you respond?" he said "with hits." GOV-00012173. At Yolo, as well, Miguel Angel S. admitted he "hit a staff member at a previous placement" GOV-00012735.

25. From the case file, Texas state licensing investigated Miguel Angel S.'s claims of assault, and found no evidence to support such an allegation. GOV-00011904. State licensing investigated the claim that staff had threatened him with physical harm as punishment, that staff attempted to bribe him to not tell anyone by offering to purchase him new tennis shoes and that a nurse was witness to one or more of these allegations. Texas licensing interviewed several individuals at Shiloh, as well as other minors in care; it reviewed records and reports by minors. The investigation did not corroborate Miguel Angel S.'s statements. The investigators concluded that they "could not find any evidence of [Miguel Angel S.'s] statement after trying to piece together records." Texas licensing closed the investigation and found no deficiencies. GOV-00013641.

26. Miguel Angel S. also complains of the lack of process involved in step-up to Yolo. (FAC at ¶52). However, the case file shows ORR staff and grantee engaging in an iterative process to ensure a justifiable step-up to Yolo. Shiloh staff, the FFS, and the case coordinator had several staffings to

discuss Shiloh's recommendation for step-up. The case coordinator requested information on what interventions had already occurred, and needing to understand whether a behavioral contract had already been tried. It is clear the case coordinator reviewed the case file, because it was noted that the minor had had a "good therapy session" on February 14, and the case coordinator wanted to know what had happened since then to justify step-up. GOV-00011527. In March, Shenandoah declined to take Miguel Angel S. into secure, noting that the placement would not be a proper fit for him. The Federal Field Specialist for Shiloh recommended a "debrief" to understand the case more fully, and on March 23, 2018, the FFS approved transfer. GOV-00011528. Miguel Angel S. transferred to Yolo Juvenile Detention March 27, 2018. GOV-00011306. In my experience, Yolo looked very carefully and each referral, and quite often would reject minors if the facility determined the child did not meet the ORR criteria for secure placement or the placement would otherwise violate their state licensing. In addition, Yolo itself was subject to rigorous state auditing and oversight and would be subject to citation if it housed children inappropriate for secure placement.

27. At Yolo, as well, the case file shows that Miguel Angel S. received and signed his notices of placement ("NOPs") in Spanish at least every 30 days. GOV-00012698. The NOPs explained why he was at Yolo (i.e., credible threats of violent and malicious harm, disruptive conduct), and explained that ORR would review his placement every 30 days at a minimum. It explained that if Miguel Angel S. remained in a secure facility or RTC after 30 days, he could request that the ORR Director reconsider his placement, and to talk to his case manager if he wanted more information on this process. It also explained that if "you believe you have not been properly placed or that you have been treated improperly you may also ask a Federal District Court to review your case. You may call a lawyer to assist you." The case file includes NOPs from 4/26, 5/26, 6/25, 7/25, 8/24, and 9/26, 2018. GOV-00012698; GOV-00013507; GOV-00013512; GOV-00013516; GOV-00013520.

28. Miguel Angel S. also was offered a Flores bond hearing, and notified Yolo that he would be requesting one. Yolo notified the legal service provider of the request, and Legal Services for Children wrote back: "Thank you for letting us know . . . I would appreciate it if you did not submit the request until I have had a chance to discuss this . . . At that time, as his attorney, I will make the request for him, if appropriate." GOV-00012851.

29. The case file also shows that contrary to allegations in the Complaint (FAC ¶¶ 54-56), ORR and its grantee care providers continuously sought reunification with Miguel Angel S.'s sponsor, but could not release when Gerardo or his housemates or alternate caregiver failed to follow up with information, Miguel could not be released due to dangerousness, and, had been charged with assaulting staff and was awaiting a court hearing. The case file repeatedly shows Miguel Angel S. having to put pressure on Gerardo to complete family reunification application steps. GOV-00010757 (6-6-17 – Miguel Angel S. asks case manager to please put pressure on Gerardo to provide the documents as soon as possible); GOV-00010758 (6-7-2017 – case coordinator, program director, lead case manager, lead clinician, clinician, and case manager staff case and note that only two parts of application had yet been received and household member identification and proof of address still missing); GOV-00010760 (6-6-2017 – case file notes that Gerardo is evasive – he claims not to remember talking to the case manager when he talked to her one day earlier. Household members are refusing to be fingerprinted, but sponsor won't get a new apartment); GOV-00010761 (6-14-17 Gerardo claims he did not receive all of the documents, when previously he said he had received all

8

pages- failed to submit pictures of the house, specifically the door that connects to the main house to determine whether housemates still need to submit fingerprints and identification. Once it seemed that Gerardo could move forward with reunification, ORR grantee care providers sent him fingerprint cards - on August 1, 2017 – but by August 28, 2017, Gerardo had still not sent fingerprints. By late September, however, fingerprints were received and FBI results came in a day or two later. By October 11, 2017, child protective service results had come in. Still, Shiloh needed documents on proof of relationship between Gerardo and Miguel Angel S., ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. GOV-00011416. On October 16, 2017, Gerardo provided documents showing he had sent money to Mexico, but the lead case manager noted that such money transfers had occurred over the past few years only, and Gerardo had not provided documentation of a relationship from the time Miguel Angel S. was young. The lead case manager asked for further proof of a familial relationship between Gerardo and Miguel, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. On October 25, 2017, Gerardo sent pictures of the minor from when he was very young. GOV-00011430. By November of 2017, Gerardo still had not completed providing all documents and Shiloh gave him a deadline. GOV-00011443. In December 2017, Gerardo's housemate disclosed a drunk driving charge from 2004 and noted he would need documentation to show resolution of the charge. By December 2017, Gerardo was ready to undergo a home study – and within a week of a home study being requested (on December 14, 2017) it was accepted by Baptist Children and Family Services. GOV-00011457. A positive home study recommendation issued January 3, 2018 – however, the case required a withholding of approval because of the unexplained charges regarding the household member. GOV-00011469.

30. At Yolo, staff continued efforts to release Miguel – despite his dangerous and disruptive behaviors. Case review notes from April 5, 12, 19, 20 and 27 show that Yolo initially had trouble getting in contact with the sponsor - noting that the case manager has "yet to hear back from sponsor," since Miguel Angel S. transferred, although by April 20, they were in touch and trying to arrange a physical visit, but certainly weekly video calls. GOV-00012964-65. In May, Yolo had provided Gerardo with information for a digital fingerprint site, and left messages as to what dates would work. Miguel also said he would remind Gerardo of the appointment when they spoke. GOV-00012961. Throughout May, the case file shows attempts to make contact with the sponsor, but being unsuccessful. Miguel, also, reported that he had not been in contact over the past week. Later, it became apparent that Gerardo had been hospitalized, but the reasons were not apparent. GOV-00012962. In June, case notes show that Yolo had to send new family reunification packet forms to Gerardo, and he was still completing his forms. Miguel Angel S. also had pending charges against him at that point. Gerardo also got the date wrong for his fingerprint appointment, but the site said they had a cancellation and could fit him in. GOV 00012958-61. By July, fingerprints from Gerardo had been received, but the alternate care provider and household member had not yet had their fingerprint appointments. GOV-00012956-8. In August and September 2018, it became clear there were issues with the household member fingerprints, as well as Miguel Angel S. being required to appear in Yolo superior court for charges stemming from a violent assaultive incident at Yolo against staff. GOV-00012954-6.

31. Miguel Angel S. also alleges that Gerardo heard nothing from ORR or Miguel Angel S.'s case workers through January or February 2018. (FAC ¶55). The case file, however, shows family sessions with Gerardo, and the staff working closely with him. GOV-00011494. Family sessions

9

between Miguel Angel S. and Gerardo occurred January 4, 11, February 7, 2018. GOV-00011463-464. The case manager also met twice per week with Miguel Angel S. to explain his reunification case. GOV-00011469

      32.     Although Miguel Angel S. claims that his stay in ORR care and custody exacerbated his mental health symptoms and delayed his release, and that prescriptions of psychotropic medications were over his objection (FAC ¶ 56) – the case file, instead, shows that Miguel Angel S. both needed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that his own behaviors were disruptive. He agreed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." GOV-00010850. The case file shows him ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. GOV-00012145. The Yolo case file contains a signed consent form for psychotropic medication – signed by both Miguel's conservator (the Program Director) and the physician. GOV-00012776-7. The case file shows Yolo – like Shiloh – meeting regularly with Miguel Angel S. to consider and evaluate medications. They discussed new medications to help reduce and manage temper tantrums. GOV-00012805. On May 31, 2018, Miguel Angel S. reports "no chief complaint" for his medication and added that the current medications are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" and Miguel is "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ GOV-00012804. On May 29, the case file notes that current medications ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The case file appears to show Miguel Angel S. meeting every other day to discuss mental health, GOV-00012805-6, and stating that he ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ GOV-00012809. He noted that he felt medications were addressing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ GOV-00012816-17. In my experience no care provider will ever require a minor to take medicines, if they refuse to do so.

      33.     Contrary to the claims of paragraph 56 in the first amended complaint, Miguel Angel S. arrived in ORR care with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. He had been ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮lly ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, GOV-00010828, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ GOV-00010830. He had ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, GOV-00010831. For about three years, Miguel Angel S. and his brother ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ He and his brother ran away and went to live with an uncle who reported ▮▮▮▮▮▮ to Gerardo who had been in the U.S. for "16 years." Miguel Angel S. reported he was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ GOV-00010849. See also GOV-00011628. He discussed ▮▮▮ GOV-00011627; 631. He was described as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ GOV-00011714. He also disclosed that he had previously been ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ GOV-00012740. He reported ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. GOV-00012733. To be sure, the case file notes that being kept from his family was a weakness for Miguel, but he also ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ GOV-

10

00011359.

34. Miguel Angel S.'s time at Shiloh, in particular, shows improvement. For example, he had a GAF of 45 upon arriving. GOV-00011313. It had increased to 70 as of October 4, 2017 and October 24, 2017, GOV-00011421, and to 75 by January 2018. GOV-00011461. It was 70 at time of discharge. GOV-00011649. Shiloh also re-connected Miguel Angel S. with his mother, as well as a younger brother in Mexico. GOV-0001140; GOV-00011424. He stated that his relationship with his mother had improved and reported getting along well with staff. GOV-00011425. The case file also shows Shiloh maintaining detailed progress notes monitoring everything from behavior to interventions, with reports every 30 minutes on a daily basis. GOV-0012208-00012462. A typical day might be: wake up, medicine, hygiene, breakfast, transport to school, basketball, English, math, lunch, science, history, reading, card game, snack, shower, dinner, group therapy, watching movie, snack, medicine, watching movie, sleep. GOV-00012215.

35. At Yolo, the case files show a robust quality of care that accounts for child welfare considerations. Miguel Angel S. received an assessment of risk, GOV-00012731, almost immediately after arrival, as well as an initial intakes assessment, with an orientation that included an explanation of legal services, visits, telephone rules, program rules, behavior, school, programs available, releases, step downs, roommates, grievances, communication with the consulate, etc). He declined to contact the consulate. GOV-00012965. In his initial intakes assessment, when asked "Do you feel safe?," he answered, "Yes." When asked: "Do you fear someone will harm you?" he said "Yes," but explained he feared another youth would attempt to hurt him. Not a specific youth, just a youth he did not know. GOV-00012742. He had at least weekly sessions with the case manager and video calls with his sponsor. When he wanted to submit a grievance, his case manager helped him to do so. His case manager met regularly with him. *See e.g.,* GOV-00012951-3. The Yolo program materials discuss the education program, including: life skills, consumer skills, fine arts, English language, history, a resource specialist program to work with classroom teachers to meet educational needs of special needs students, a bilingual para-educator to work with unaccompanied children whose English language skills were limited, tools such as Rosetta Stone, Imagine Learning, Burlington English to aid educational development and promote integration into regular school programs, a volunteer program offering tutors for youth, G.E.D. testing and certificates for youth obtaining the high school degree, and finally a reward of $100 and a celebration for anyone earning a G.E.D. Yolo also offered Alcoholics Anonymous, Narcotics Anonymous, and literacy programs for those who wish to have further support with volunteers from the community who were current and retired teachers, paraeducators, and university students. It offered the "Beat Within," a safe space for literacy, self-expression and critical thinking. It offered "Storm for Success," which provided opportunities to discuss common topics from minors' lives. The program was hosted by UC Davis students, who themselves had been through the topics discussed and made positive choices. Yolo offered spiritual services facilitated by volunteers, along with several different church organizations facilitating faith-based services occurring Thursday evenings and Sunday afternoons, with translators provided for those who need it. Yolo maintained a collaborative partnership with community-based treatment and service providers, as well as an interfaith immigration network for the children in care. Members of churches would come once per week to interact with youth, play games and share traditions and socialization from all cultures. Instructors might facilitate guitar lessons to interested youth. Volunteers led a "Youth Empowerment Program." Led by volunteers from surrounding churches and

11

UC Davis students, the groups met twice per month to mentor youth, provide curriculum based games and life skill activities. The program offered behavioral health, substance abuse treatment, health and education support, emotion regulation through Dialectical Behavior Therapy (DBT) groups, assertive communication and socialization skills groups through the California Forensic Medical Group, cognitive behavioral therapies, thought stopping techniques, and techniques for challenging distorted thinking. The program offered "Empower Yolo," a support and advocacy program for those who are victims of sexual abuse. For recreation, the program offered arts and crafts, contests, tournaments, guest speakers, board games, computer games, Kinect, Xbox, ping pong, basketball, soccer, obstacle courses, relay races, and movie nights. GOV-00013005. The case file shows Miguel Angel S. having calls almost every day. GOV-00013007.

36. Unfortunately, at both Shiloh and Yolo, Miguel Angel S. began to exhibit aggressive behavior that made him a danger to others. At Yolo, reports show that he: pushed at, struck, kicked at and swung a closed fist at staff when they tried to intervene in an incident with a peer on April 21, requiring deployment of "pepper spray," after several warnings. This was not an attack as alleged in the Complaint (FAC ¶ 53). The Significant Incident Report ("SIR") describes how all other youth took cover, and Miguel and one other youth were the only ones to disregard directions. He not only attempted to strike others with a closed fist, but was instructed several times to get down in cover position or staff would deploy the oleoresin capsicum ("OC") spray. He disregarded these directives and took an aggressive stance with fists closed. He was instructed again to cover or be sprayed. He failed to do so and finally was sprayed in the facial area. He was placed in mechanical hand restraints, and escorted to his room, where restraints were removed and staff secured him in his room. GOV-00013139-41. Other allegations of the Complaint, such as spending most of his time confined in his cell, only being permitted to leave for short periods, using water from a toilet to wash pepper spray from his eyes (FAC ¶¶ 52-53) do not appear supported in the case file – and likely would be reflected there due to licensing requirements of the program. A report does show that he had a decontamination shower at the 14:54 hour. GOV-00013140.

37. Miguel Angel S. acknowledged ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, and wanted to get help to get out as quickly as possible (4-24-2018. GOV-00012793-4). He had to have water turned off in his room, because he flooded his room, cursed at staff, threatened to urinate and defecate in his room, and spit on staff (GOV-00012810, GOV-00013144-5, GOV-000147-8). He not only threatened staff (GOV-00013148); but placed batting from his mattress over the window in his door to block it (GOV-00012812). He punched staff in abdomen as they tried to intervene in aggression between peers and get Miguel Angel S. to take a time out (5-23-2018 –GOV-00013165). He was found snorting a white substance (5-24-2018. GOV-00012790); and with a blanket tied twice around his neck. He yelled he was being treat unfairly by staff (5-28-2018. GOV-00012789; GOV-00012807); and bit himself out of anger (5-30-2018. GOV-00012788). An incident from late May led to staff reporting criminal charges against him. In this incident, he kicked staff as they tried to secure his legs. As they carried him to his room, he spit in the face of one of the staff. When placed in his bed, he again attempted to kick and spit and cough in staff's face. He forced spit and mucus out, yelled at and threatened female staff. The incident lasted more than an hour, and Miguel Angel S. was eventually placed in a "safety smock," and pushed against his wrist restraints causing damage to his wrists. GOV-00013160-GOV-00013162. With the public defender assigned to represent him against these criminal charges, staff were urgently called to the meeting room, where they found him standing and cursing at

the translator, stating: "You shut the fuck up, you don't even know what we are talking about," and walked toward staff with clenched fists and holding a pencil like a knife, stating: "Just watch son of a bitch, don't think this ends here, wait til I see you in the pod," "I don't give a fuck if you guys add charges to me, just wait to see what is going to happen to you." When the lawyer wanted to continue meeting with Miguel Angel S., staff kept a visual line of sight on the three of them, to ensure the lawyer and translator were okay. GOV-00013178. In July, there are reports of being disrespectful to staff, calling staff a "stupid hag," and "stupid bitch," walking toward female staff with fists clenched, and saying "Stupid hag, I told you to get me napkins or else," GOV-00013185. In August, he made threatening comments toward another minor in care, saying "we are going to get him." GOV-00013193, and calling staff a "fuckin faggot!" GOV-00013196. He also pulled apart the metal pieces of a water valve in the recreation yard. GOV-00013208, and ripped up a weighted blanket (used to help with anxiety) and turned it into a weapon by storing the weighting beads inside a sock, GOV-00013211. In September, he (unprovoked – when asked how he was for the day) threw an unfinished carton of milk at staff, causing milk to splatter on staff's face, arm, and leg, GOV-00013225. During a collection of signatures, he grabbed the paper, ripped it and damaged the pen, and then threw a milk carton against a wall. GOV-00013241. He called staff "maricas," a derogatory term toward the homosexual community, and motioned to kick his legs backwards to strike staff when being walked to his room. GOV-00013244.

38. Based on review of the case file, it is not clear whether Gerardo was told that he needed to provide proof of school enrollment and the name of a psychiatric clinic in order for Miguel Angel S. to be released (FAC at ¶ 57), although such requirements would not be improper to ensure that the sponsor is capable of caring for the minor's physical and mental wellbeing upon release. If it is true that rules prohibited enrolling in school pre-release, the case manager would have accounted for that reality. Miguel Angel S. was released to Gerardo on October 11, 2018. GOV-00011306. In a follow-up call post-release with Gerardo, on November 15, 2018 (a full month post-release), Gerardo said they were "working on enrollment in a trade school." When Gerardo was reminded that he is responsible for enrolling Miguel Angel S. in school, he stated he "would be doing so, in the meantime, while he is accepted by a trade school." GOV 00012950. It is not clear from the case file whether Gerardo ever enrolled Miguel Angel S. in school.

39. As for fingerprints "expiring" (FAC ¶ 57), fingerprints do not themselves expire, but results become outdated with time, and for privacy reasons the agency collecting fingerprints for background checks does not retain them for longer than a specified period of time. To ensure his record remained acceptable, ORR required new results – that showed he had not engaged in criminal activity while his application remained pending. Under ORR policy, fingerprint results remain valid for 270 days from the day results are received. Once 270 days have passed, a new fingerprint is required to ensure against any crimes committed in the interim. ORR Guide § 2.5.3.

40. Finally, Miguel Angel S. received a number of legal services. At Southwest Key he received a legal screening and a know your rights presentation on May 19, 2017, only two days after arriving. He was not identified as having any pending legal relief from the independent, non-profit legal service provider, CCLC. GOV-00010659. He also had a visit with the Mexican consulate on May 24, 2017. GOV00010742-3. At Shiloh he was again screened for potential legal relief (by the Cabrini Center), but no such relief was identified. GOV-00011414; GOV-00011482. At Yolo, again,

13

he was screened by Legal Services for Children, but no relief identified. GOV-00012708-9. He received Know Your Rights presentations and legal resource guides at all three shelters. *See e.g.,* GOV-00012877. He received a "Notice of Rights," stating that if had questions, he could speak to an "attorney or legal service provider listed in this packet." GOV-00012880. The Guide indicated: "If you believe you have been denied your rights you can file a complaint. Contact the LSP or legal service provider list. GOV-00012883. The case file also contains a number of representation forms showing representation by counsel. GOV-00012849; GOV-00012852 (visit from Flores counsel – Holly Cooper - with G-28 saying appearance is limited to representation regarding class member rights pursuant to *Flores v. Sessions*); GOV-00012862 (same – Neha Desai); GOV-00012867 (G-28 form Shiloh); GOV-00013614 (G-28 from Yolo); GOV-00013261 (second visit with two attorneys visiting as part of Flores counsel). The FFSs I supervise are open to communicating with UAC counsel and will consider their input in making step-up and release decisions.

### III. Miguel Angel S. Case File

41. In my work with ORR, I have become familiar with how ORR and its grantee care providers create and maintain case files of unaccompanied alien children (UAC case files). In connection with my employment responsibilities, I have viewed many UAC case files and UAC case file documents.

42. In accordance with ORR policies, ORR and its grantee care providers maintain comprehensive, accurate, and up-to-date case files as well as electronic records on unaccompanied alien children. *E.g.*, ORR Guide § 5.6.2. These UAC case files include a wide variety of information concerning an individual UAC, including: "the child's name, alien number, date of services, and Federal fiscal year. The file documents all services provided, information about the child or youth's progress, barrier's to the child's progress, and the outcome of the case." ORR Guide § 5.6.2. As further detailed in the ORR Guide, UAC case files also include UAC information, admission documents, legal information, assessments (including medical records containing statements made for and reasonably pertinent to medical diagnosis or treatment, and describing medical history, past or present symptoms or sensations, the symptoms' inception, or their general cause), educational services, case management records, clinical services, incident reports, and discharge/exit information. *See id.*

43. Also in accordance with ORR policies, ORR and its grantee care providers have procedures to maintain, protect, and review UAC case files for completeness and accuracy. *See* ORR Guide § 5.6.3.

44. UAC case files are made at or near the time by—or from information transmitted by—someone with knowledge; they are also kept in the course of a regularly conducted activity. Making UAC case files is a regular practice of the operations of ORR and its grantee care providers.

45. The UAC case file (or excerpts thereof) Bates stamped GOV-00010640 to -00011306, GOV-00011308 to -00012696, and GOV-00012697 to -00013692 is a true and correct copy of (or excerpts from) the UAC case file of Miguel Angel S., which was created and maintained in accordance

with the procedures described above.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:   DATE 9.16.2020

   CITY Atlanta

_____
_____

David Fink