# REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| LUCAS R. *et al.*, | ) Case No.: 2-18-CV-05741 DMG (PLA) |
| Plaintiffs, | ) |
| v. | ) DECLARATION OF |
| ALEX AZAR, Secretary of U.S. Dep't of | ) MICAELA VERGARA |
| Health and Human Services, *et al.*, | ) |
| Defendants. | ) |

## I.   Introduction

1.  Micaela Vergara, under 28 U.S.C. § 1746, declares, under penalty of perjury, as follows.  If asked to testify, I would testify under oath as follows.

2.  I am employed in the position of Federal Field Specialist (FFS) Supervisor within the Office of Refugee Resettlement (ORR), a component of the Administration for Children and Families (ACF) within the U.S. Department of Health and Human Services (HHS).

3.  The statements in this declaration are based on my personal knowledge, information acquired by me in the course of performing my official duties (such as my knowledge of ORR policies and procedures, including the ORR Guide[1]), my review of HHS records and information contained therein (including Gabriela N.'s case file).

4.  I have held the position of Federal Field Specialist Supervisor since October 2018. In this capacity, my job duties include: supervising assigned FFS to ensure they monitor and report on quality of care and best practices in provision of program services to unaccompanied alien children (UAC); providing daily supervisory oversight for Field Staff; ensuring adherence to ORR's policies and procedures; and providing assistance to FFS staff in drafting individual learning action plans and developing skills. I also collaborate with the ORR Intakes Team and FFS teams in assigned and other regions to improve the intake process, and communicate regularly with government agencies and other local stakeholders regarding the referral process to ORR and other issues.

5.  Prior to assuming my current position, I held the position of Federal Field

---

[1] https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied

Specialist (FFS), and in that capacity I was primarily responsible for: decision-making regarding unification of UACs in ORR care and custody with their families; provision of Federal oversight of local Houston-based programs that care for children in ORR custody; tracking and monitoring trends affecting specialized populations of UACs in ORR care; and assisting in the monitoring of programs to ensure that they meet both state licensing requirements and federal performance standards.  I also provided technical assistance on policy and procedure standards; consulted regularly with program clinicians and administrators providing care to children with complex medical and mental health needs; and debriefed with staff directly involved with these cases.

6.      I have prior clinical experience working in various social service agencies and medical facilities.  I worked as a clinician for a domestic foster care agency, provided medical social work services in a community medical provider office, and also was a contract employee for a private practice providing therapy to children and families.

7.      I have a Bachelors of Arts from Saint Mary's College of Notre Dame, and a Master of Social Work degree from the University of Houston.

8.      I have been a Licensed Clinical Social Worker (LCSW) in the State of Texas since 2005.  I have full clinical licensure and am also certified to provide clinical supervision to social workers with a basic Master in Social Work (MSW) working towards obtaining a Clinical Social Work license in Texas.  I have worked as a Masters-level Social Worker since 2002.

9.      I have professional experience in medical, domestic foster care, and in private practice settings.  I also have training in play therapy, Parent Child Interactive Therapy (PCIT), and trauma-focused therapies.

10.     As a Licensed Clinical Social Worker (LCSW) in Texas, I must receive 30 continuing education units (CEUs) every two years in order to maintain my clinical licensure.  Therefore, every year I attend various social work trainings on topics that include: immigrant issues; mental health; trauma-focused interventions; and various other social work-related topics.  Most recently, in May and June 2020, I attended 6 virtual trainings which were offered to ORR staff and grantees by expert mental health professionals in the Substance Abuse and Mental Health Services Administration's (SAMHSA) National Child Traumatic Stress Network in collaboration with ORR, as well as HHS experts; topics included:   trauma-informed care during the COVID-19 crisis, understanding the impact of COVID-19 on children with preexisting mental health needs and strategies for helping them cope, psychotropic medications for UAC, tools for promoting wellness and relieving stress, and coping with secondary traumatic stress in working with UAC.  Additionally, in June 2019, I also traveled to Central America for a social work course on topics such as: migration; mental health; health care; domestic violence; and issues pertaining to women and children in that geographic region.

11.     Under ORR policy, when making step-up and release decisions, information provided from a child's stakeholders, including the child's attorney, are taken into

consideration.  *See* ORR Guide § 1.4, 2.3, 2.3.1, 2.7.  I follow these policies in
making such decisions.  In addition, I am open to communicating with UAC
counsel, and will consider any input they offer.

12.     ORR "has policies and procedures in place to ensure unaccompanied alien
children in ORR care are released in a safe, efficient, and timely manner."  See
ORR Guide § 2.1.  "Safe and timely release (also known as 'family reunification')
must promote public safety and ensure that sponsors are able to provide for the
physical and mental well-being of children."  *Id.*

13.     ORR's "policies for placing children and youth in its custody into care provider
facilities are based on legal requirements as well as child welfare best practices in
order to provide a safe environment and place the child in the least restrictive
setting appropriate for the child's needs."  *See* ORR Guide § 1.1.  ORR's "[c]are
providers must make every effort to place and keep children and youth in a least
restrictive setting."  *See* ORR Guide § 1.4.1.

## II.     Placement and Unification Efforts for Gabriela N.

14.     Plaintiff Gabriela N. was born in El Salvador in the year 2000 and was an
unaccompanied alien child who was transferred to ORR's legal custody on or
around January 8, 2017. FAC ¶ 59.

15.     Gabriela N. stated that ███████████████████████████████
████████████████████. GOV-00007328.  She also reported
that ██████████████████████, GOV-00007362, and that ████████████
████████████████████, GOV-00007253.  *See also* GOV-
00004796.  Gabriela's ████████████████████████████████████
██████████ FAC ¶ 60. Gabriela N's father is deceased.  *Id.*

16.     Gabriela reported ██████████████████████████████████████
████████ GOV-00004800. The ████████████████████████████████
██████████████████████. GOV-00004810.

17.     The FAC ¶ 61 states that, "In El Salvador Gabriela N. took no medications for
mental illness."  However, the complaint does not acknowledge that medications
or additional psychological or psychiatric therapy may have assisted Gabriela with
the trauma she suffered in home country, as well as suicidal ideation. Gabriela's
mother reported that in her home country ████████████████████████
████████████ OV-00007257.  Her mother also said
that between December 2015 and January 2016, ████████████████████
██████████████████████████ *Id.* Gabriela ████
████████████████████████████████████████████. *Id.*



Gabriela reported that ███████████████████████████████████ GOV-00007222.  She said that ████████████ *Id.* Gabriela N stated that ██████ ████████████. GOV-00007222-23; *see also* GOV-00006371 ████████████████████ Gabriela also reported that ████████████ ███████████. GOV-00006113.

### Southwest Keys Casita del Valle shelter placement

18. On January 8, 2017, ORR placed Gabriela N. at Southwest Key Casita del Valle (SWK), a shelter facility in Clint, Texas.  FAC ¶ 59.

19. The complaint notes that when she "arrived at Casita del Valle shelter, facility staff noted that Gabriela appeared emotionally stable, receptive, and resilient." FAC ¶ 61; *see also* GOV-00007256.  However, this was at initial intake. Gabriela's initial mental health intake stated that she "appears stable, and denies a history of suicidal ideation or self harm." GOV-00007223. She disclosed that ████ ██████████████████████████████████. However, at that time, although she was asked assessment questions, she denied having ever been a victim of any sexual or physical abuse, or any mental illness or trauma.  GOV-00007242, GOV-00007245. Gabriela also did not ████████████████████ ██████████ GOV-00007242, GOV-00007245, GOV-00007248. Gabriela was thus not initially identified as having an ADA disability. GOV-00007650, GOV-00007248. Major stressors were listed as including:  "relocation, concern about legal status, and separation from family of origin and acculturation difficulties."  GOV-00007253.

20. On January 19, 2017, Gabriela was provided a Know Your Rights (KYR) presentation by a legal service provider, Diocesan Migrant & Refugee Services, Inc. (DMRS). GOV-00006152.

21. Although Gabriela alleges in the complaint that "she fled to the U.S. seeking safety, hoping to live with her grandfather [Isaac N.]" with whom she said she had a "close relationship", *see* FAC ¶ 60, in a UAC Assessment dated January 23, 2017, Gabriela stated that she planned to live with an aunt and did not mention her grandfather; Gabriela also sought to live with a cousin in New York.  GOV-00007251, GOV-00007644, GOV-00007649.

22. On February 20, 2017, during an individual therapy session, Gabriela started to open up to her clinician at the SWK shelter and █████████████████████████ ████████████████████████████████ GOV-00007499, GOV-00007683-85 (SIR).  Gabriela █████████████████████████

Declaration of Micaela Vergara



GOV-00007499. Gabriela stated that

*Id.* Her clinician

*Id.*

23. Also on February 20, 2017, Gabriela's clinician and her Case Manager spoke by phone with her mother in their home country. Gabriela's mother stated

GOV-00007257. Gabriela's mother also said that

*Id.*

24. On February 28, 2017, during a clinical session, Gabriela made an additional disclosure of , and a Significant Incident Report (SIR) was made. GOV-00007664. As a result, a TVPRA home study of her potential sponsor was mandatory. *Id.* Gabriela also disclosed that . *Id.* A clinical note dated March 8, 2017 states that

. GOV-00007257.

25. In an individual therapy session on March 13, 2017, Gabriela GOV-00007506. She had been informed that her aunt would no long be sponsoring her. Gabriela stated that

GOV-00007506; *see also* GOV-00007511. Gabriela also reported . GOV-00007506.

26. On April 29, 2017, Gabriela N. GOV-00007285, GOV-00007674-76. The next day, on April 30, Gabriela was taken to the El Paso Psychiatric Center (EPPC) for an assessment. GOV-00007656, GOV-00007674-76 (SIR), GOV-00007753-7755 (Psychiatric Evaluation). The day before,

GOV-00007665. "[Gabriela] stated that



████████████████████████████████████████ *Id.* After further evaluation, Dr. A █████ from EPPC did not recommend inpatient services for Gabriela ████████████████████████████████████████. GOV-00007656.

27. Gabriela's clinician spoke with her mother on May 2, 2017 and informed her about ████████████████████████████ and her mental health assessment. GOV-00007526. Gabriela had also already informed her mother about ███████. *Id.* The clinician explained that Gabriela ████████████ ████████████ Gabriela's mother "expressed her appreciation for [the] services and support given to her daughter." *Id.*

28. On May 4, 2017, Gabriela met with the treatment team and her clinician recommended that she remain on 1:1 supervision because of the ████████████ ████████████████████████████████. Gabriela "expressed her appreciation for support given to her while at the program". GOV-00007294.

29. On May 8, 2017, in a therapy session, Gabriela ████████████████████ ████████████████████████████████████████████ GOV-00007529; see also GOV-00007537. Although Gabriela alleges in the complaint that, *see* FAC ¶ 62, "[a]s her confinement wore on . . . [she] became depressed and anxious, fearing that ORR would never release her to her family," there were in fact other issues exacerbating her anxiety at the time. On May 21, 2017, for instance, she also shared with her clinician that ███████████████████ ████████████████████████████████████████████ GOV-00007535. Staff at SWK shelter encouraged Gabriela to ████████████████████████ *Id.*

30. Another treatment team meeting was held on May 11, 2017 and Gabriela's supervision level was changed to close observation with clinical and medical approvals, and concurrence of the case manager given her improved behavior. GOV-00007294, GOV-00008316. It was also noted that Gabriela had been recently informed that her grandfather would no longer sponsor her. GOV-00007309. She appeared to understand the recommendation, and said that she would pursue a long-term foster care (LTFC) placement. GOV-00007309. As of May 25, 2017, Gabriela was removed from elevated supervision (close observation) and ████████████████████████████████████████ ████████ on April 29. GOV-00007294.

31. In a therapy session on June 1, 2017, Gabriela and her clinician ███████████ ████████████████████████ GOV-00007523. ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████ *Id.* Gabriela also ██████████

████████████████████████████████████████████
██████████████ *Id.* Gabriela told her clinician that ████
█████████████████████████████████████ *Id.* A
clinical note dated June 6, 2017 also indicated that ████████████
███████████████ GOV-00007314.

32. In another therapy session a week later on June 13, 2017, Gabriela expressed that ████████████████████████████████████████████
█████████████████████ GOV-00007545, GOV-
00007686-88 (SIR). Gabriela disclosed that ███████████████████
████████████████████████ GOV-00007328.
███████████████. *Id.* Gabriela's clinician ████
███████████████████████████████ *Id.*

33. A psychologist, Dr. ███ P███, met with Gabriela via an e-psychiatry service on July 5, 2017 and provided a diagnosis of █████████████████
██████████████████████, and recommended that Gabriela receive a psychiatric evaluation for treatment with medication to alleviate symptoms of depression and anxiety.  GOV-00007656, GOV-00007677-79, GOV-00007730-32. Dr. P███ noted that Gabriela had depressive symptoms ████████████
██████████████████████ Dr. P███ did not believe that an RTC was needed at the time, but stated that Gabriela ███████████████████
█████████████████ *Id.* Dr. P███ also recommended that Gabriela receive cognitive-behavioral therapy to address depression, anxiety, and ████
████████████████████. GOV-00007731. Case records show that contrary to implications in the complaint that ORR care and custody caused Gabriela's mental health to deteriorate, *see* FAC ¶ 62, ORR implemented additional counseling services to help alleviate her distressing symptoms and to try to avoid the need for an RTC placement.  A clinical note dated July 6, 2017, for instance, indicated that Gabriela would begin receiving additional therapy services twice weekly per the recommendation of Dr. P███.  GOV-00007554.

34. As of July 5, 2017, Gabriela did not have a viable sponsor, was referred to the legal service provider DMRS to explore possible legal relief, and a request for a LTFC placement was made.  GOV-00007322.

35. As indicated in a July 6, 2017 clinical note, after her ████████████████
████████████████████████████████████████
███████████ GOV-00007328-29; *see also* GOV-00007334 (stating that Gabriela "has ███████████████████████████████
████████████ ; *but cf.* GOV-00007561 (7/1/17 clinical note, ████████████); GOV-00007570 (7/31/17 clinical note, ███████████

7



█████████████████████████████████████ ).

36.    In a therapy session on July 18, 2017, Gabriela spoke about ███████ ██████████████████████████████████████ . GOV-00007561.

37.    On August 2, 2017, in a therapy session with her clinician, Gabriela disclosed ████████████████████████████████████████ she was placed back on 1:1 supervision for her safety.  GOV-00007636, GOV-00007377, GOV-00007656, GOV-00007680-82 (SIR), GOV-00008319-20. She was psychiatrically hospitalized once again at El Paso Behavioral Health System (EPBH) on August 3, 2017 and remained in the hospital until she was discharged on August 14, 2017. *See* GOV-00007689-705 (EPBH Clinical Assessment); GOV-00007725-29 (Discharge Summary). An August 4, 2017 clinical note stated that an ITCT Assessment-Treatment Flowchart: Adolescent/Young Adult version (ATF-A) was completed for Gabriela which indicated that ████████████████████████████████████████ . GOV-00007665. While hospitalized, Gabriela was diagnosed with ████████████████████████████ . GOV-00007656.  Upon discharge, her diagnosis was ████████████████████████████████ . *Id.* Gabriela's clinician and her Case Manager visited her while she was hospitalized. GOV-00007637. Gabriela was prescribed 20 mg of Prozac at the hospital and post-discharge.  *Id.*; *see also* GOV-00007722.

38.    On August 21, 2017, Gabriela received a psychiatric evaluation by Dr. ████ A██████ from Texas Tech University Psychiatry, who diagnosed her with ██████████████████████████████████████████████████ and recommended that she be placed in an RTC to target her therapeutic needs.  GOV-00007656, GOV-00007724. According to Dr. A███████, ████████████████████████████████████████████████████████ GOV-00007656. She also stated that "[Gabriela] will benefit [from] a residential treatment center to target her therapeutic needs at this time.  A residential treatment center serves as a live-in health care facility that will provide treatments including intensive individual and group therapy and psychopharmacology to address [Gabriela's] mental health."  GOV-00007372-73. Gabriela's Prozac (Fluoxetine) prescription was continued.  *Id. See also* GOV-00007724.  Per Dr. A██████'s recommendation, Gabriela continued on elevated (1:1) supervision at the shelter.  GOV-00007724.

39.    It was also Dr. A██████'s recommendation that "clinical sessions focus on relaxation skills, coping skills, and impulse control", and she stated that ████████████████████████████████████████████ GOV-00007373. Instead, Dr. A██████ "recommended the use of sensory activities such as arts, crafts, and coloring." Id. Dr. A██████ stated that Gabriela ██████████ █████████████████████████████████████████████████████████

Declaration of Micaela Vergara



. *Id.*

40. During an individual therapy session on August 21, 2017, Gabriela and her clinician spoke about her psychiatric evaluation and the recommendation that she transfer to an RTC.  GOV-00007583. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *Id.*  As recommended by Dr. A████, Gabriela's clinician provided her psycho-education about her diagnosis in order to help her "understand how her past experiences have affected her."  *Id.*  In a letter dated August 23, 2017, Dr. A████ stated that Gabriela may take her Fluoxetine medication (20 mg) at bedtime rather than the morning to avoid sedation during the daytime.  GOV-00007758.

41. Gabriela met with Dr. A████ again on August 28, 2017 who worked to adapt her medication regimen to better meet her needs.  GOV-00007373, GOV-00007723. Gabriela's Fluoxetine medication was changed to a nighttime administration to counter daytime sedation, and Melatonin was added to aid sleep. GOV-00007373. Gabriela was accepted for placement at Shiloh RTC on August 29, 2017. *Id.* Dr. A████ encouraged Gabriela to journal ███████████ *Id.*

42. In a therapy session on August 28, 2017, Gabriela ████████████████████ GOV-00007586. That same day, Gabriela met with her Case Manager who discussed the pending approval of an RTC placement in Houston (Shiloh). The CM notes state:  "Minor appeared calm and with a good attitude, just stating she is nervous about change in environment but understands she needs additional help."  GOV-00007640.  Approval from Shiloh was received on August 29 and the Case Manager and clinician agreed to notify Gabriela during the treatment team meeting on August 31 to provide her proper support.  *Id.*

43. On August 31, 2017, Gabriela ████████████████████████████████████████████. GOV-00007368, GOV-00007588.  Gabriela told her clinician ███████████████████████████████████████ GOV-00007588. Again, Gabriela ████████████ GOV-0007588.  She also reported ████████████████

44. On September 4, 2017, Shiloh Residential Treatment Center (RTC) accepted Gabriela for transfer to her new placement following a delay due to Hurricane Harvey. GOV-00007360  On September 5, 2017, Gabriela's clinician contacted her mother to update her on Gabriela's "psychiatric treatment, and upcoming

Declaration of Micaela Vergara



transfer to an RTC, which clinician explained.  Minor's mother expressed her ██████████████████████████████████████ GOV-00007590. On September 6, 2017, ████████████████████████████. GOV-00007592.  Contrary to Gabriela's allegations that she was not provided notice of her transfer to Shiloh, FAC ¶ 64, in fact between August 28 and September 5, 2017, Gabriela met with shelter staff and said that she understood the reason for the transfer to an RTC; her mother likewise thanked the program for the support and the transfer.  *See* GOV-00007640-42; GOV-00007655-66 (Case Review upon Discharge).  Gabriela was ████████████████████████████████████████████████████████████████ GOV-00007641.

45. While placed at the SWK shelter, Gabriela was provided information about her legal rights and screened for eligibility for legal relief.  Specifically, Gabriela was provided a Know Your Rights (KYR) presentation and legal screening by a legal service provider (DMRS) on January 19, 2017; at that time, possible legal relief was not identified.  GOV-00007241, GOV-00008353. Later, she was referred to DMRS for possible legal relief as Gabriela considered her possible eligibility for long-term foster care.  GOV-00007263, GOV-00007291, GOV-0007305, GOV-00007619; *see also* GOV-00007664-65 (Case Review Upon Discharge). DMRS concluded that Gabriela qualified for LTFC. GOV-00007305, GOV-00008362. However, a clinical note dated August 3, 2017 indicated that the Case Coordinator had decided not to pursue LTFC at that time due to Gabriela's concerning behavior, as LTFC would not be able to address her complex mental health needs. GOV-00007341.

**Shiloh RTC placement**

46. Gabriela N. was admitted to Shiloh Residential Treatment Center on September 7, 2017.  GOV-00006113.  She was referred to Shiloh RTC following ██████████ ██████████████████████████████████ *Id.*  She was admitted to Shiloh on an emergency basis "due to displaying behaviors that are an immediate danger to herself and cannot be served at the current shelter level."  *Id.*

47. An Admission Assessment was done of Gabriela N. at Shiloh on September 8, 2017 which included background information about her history leading up to her placement at the RTC which Gabriela had revealed over time to her clinician during her shelter stay.  GOV-00006113-6120.

48. Gabriela N. lived in San Salvador, El Salvador with her mother, stepfather, older sister, and two younger brothers.  Her father passed away when Gabriela N. was five years old, and ██████████████████████████████████████████████ ██████.█████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████



GOV-0006113. Gabriela                          GOV-00006113.
Gabriela N

*Id.*

*Id.*  Gabriela N

*Id.*

49.   The Admission Assessment noted that Gabriela N. "appears to be suffering from depressed mood and anxiety with post traumatic symptoms.  She reports that she has suffered from increased anger and anxiety in recent months since she has been incarcerated by ORR and unable to reunify with her family."  GOV-00006117. Gabriela N. received the following diagnoses:

Based on her diagnoses, Gabriela was found to have an ADA disability.  GOV-00006374.

50.   The Admission Assessment concluded the following about Gabriela N.:  "Due to her current mental and emotional functioning, the least restrictive environment necessary to care for her needs is in a highly structured residential subacute treatment setting.  She should initially have trained staff to provide one-on-one supervision to monitor her as her mood stabilizes.  She should receive counseling to address the                                                                                                   She should receive psychiatric services to monitor her symptoms and manage medication."  GOV-00006119-6120.  Treatment services initially to be provided Gabriela N. were the following:  weekly medication monitoring, or as needed, with Dr. Javier Ruiz; 2 hours of individual therapy weekly; and 1 hour of group therapy weekly. GOV-00006120; *see also* GOV-00006177-6179 (Initial Staff Briefing and Preliminary Service Plan, dated September 7, 2017).

51.   A comprehensive Individual Service Plan (ISP) was developed for Gabriela N. at Shiloh which included individualized goals and objectives in areas such as: health care, psychiatric treatment; medication administration; behavior; group counseling; academics; social skills development; recreation and leisure; community recreation and leisure; life skills training; sexual health education; religious services; family communication; case coordination; and discharge planning. GOV-00006180-6221 (Individual Service Plan (ISP), dated September 28, 2017).  The Initial Service Planning meeting was held with treatment team

members on October 5, 2017.  GOV-0006221. Gabriela signed her approval of the ISP on October 11, 2017.  *Id.* Gabriela's ISP was reviewed with her every 30 days by a multi-disciplinary team of clinical, administrative and other staff, and an independent case coordinator.  *See* Service Plan Reviews at: GOV-00006222-6231 (October 5, 2017); GOV-00006232-6242 (November 2, 2017); GOV-00006243-6254 (November 30, 2017); GOV-00006255-6265 (December 28, 2017); GOV-00006266-6276 (January 25, 2018); GOV-00006277-6286 (February 21, 2018); GOV-00006287-6296 (March 22, 2018); GOV-00006297-6307 (April 19, 2018). Initially, while Gabriela was in the subacute level of care at Shiloh and on 1:1 supervision, her case was reviewed weekly.  *See* Subacute Case Reviews at: GOV-00006352-6355 (September 14, 2017); GOV-00006356-6359 (September 21, 2017); GOV-00006360-6363 (September 28, 2017); GOV-00006364-6367 (October 10, 2017).

52.   While placed at Shiloh, Gabriela met with her Case Manager on a weekly basis to discuss the status of her case, including her progress towards her treatment goals and objectives.  *See* UAC Weekly Case Reviews, GOV-00006308-6351.

53.   Gabriela received individual counseling (once/twice weekly), family counseling (monthly), and group counseling (weekly) while placed at Shiloh. *See* GOV-00006662-00006708 (individual), GOV-00006709-6713 (family), and GOV-00006714-6760 (group), respectively. Gabriela received medical services (GOV-00007063-7136), and dental services (GOV-00007207-7211).  She also received individualized educational services.  *See* educational records, GOV-00006446-6468.  She was administered educational testing in Spanish, *see* GOV-00006464-6468. While placed at Shiloh, Gabriela was able to participate in recreation and other activities.  GOV-00006848-6897.

54.   A Placement Authorization, and an Authorization for Medical, Dental, and Mental Health Care were signed on September 7, 2017 by the ORR Director and an authorized representative of the care provider (Shiloh), Gabriela N.'s Case Manager.  GOV-00006127-6128, GOV-00006133-6134.  The Case Manager also signed a Consent to Medical Care, and a Consent to Administer Prescription and Non-prescription (OTC) Medications.  GOV-00006132.  At the time, the medical authorization of the ORR Director, as well as the clinical judgment of treating clinicians, was considered sufficient documentation and protocol for prescribing medications to Gabriela N.  Also, contrary to allegations in the FAC ¶ 64 that a "neutral decision maker" was not involved in ongoing review of Gabriela's medications, while Gabriela's grandfather Isaac was being considered as a sponsor for her, he was provided with information in writing and over the phone about her mental health status, diagnosis, medication, and counseling. GOV-00006678; GOV00006710-6711; *see, e.g.*, GOV-00006711 ("Clinician reviewed treatment services being provided in placement such as psychiatric, medication, and counseling.  Clinician provided an update on [Gabriela's] therapy outcome to sponsor. Clinician also provided with [Gabriela's] diagnosis and medications she is currently taking.  The clinician also informed sponsor of outpatient services that

would be recommended once client is reunified."). Moreover, Shiloh clinicians are not ORR employees and have independence from the government; they must be compliant with state licensing requirements. Shiloh also maintains the standards necessary for accreditation by the Joint Commission on Accreditation of Healthcare Organizations (JCAHO).

55.   During orientation at Shiloh, Gabriela N. acknowledged in writing that she received training regarding prevention of sexual abuse and sexual harassment. *See* GOV-00006137-6140 (Spanish).

56.   Gabriela N.'s Psychiatric Treatment Plan dated September 8, 2017, which set forth her individual goals and objectives for her treatment at Shiloh, indicated that her General Assessment of Functioning (GAF) score at the time of admission was 40. GOV-00006191-6195.  In the FAC ¶ 65, Gabriela states that "ORR would not release her until Shiloh medical personnel declare her psychologically sound." Her psychiatric treatment plan mentioned no such goal.  To the contrary, it listed the following as goals, among others: "Behavior no longer dangerous to self or others"; "Reduction of symptoms allows [Gabriela] to function in less restrictive environment"; "Behavior no longer requires an intensively structured environment"; and "Psychiatric and/or medical problem requires treatment which can be monitored in a less restrictive setting." GOV-00006194. On September 7, 2017, Gabriela also signed a Safety Contract, which is an agreement between her counselor, the service director, and the staff at Shiloh to help keep her and others safe.  GOV-00006198.

57.   At intake, as of September 7, 2017, Gabriela's already existing medications, Fluoxetine (Prozac) 20 mg for depression and Melatonin 3 mg for sleep, which had been prescribed previously by Dr. A███████ while she was placed at SW Keys, were continued.  GOV-00006188, GOV-00006487.

58.   During orientation at Shiloh RTC, Gabriela N received notice of why she was placed there ███████████. GOV-00006126 (Spanish). Gabriela's placement continued to be reviewed at least every 30 days (and sometimes weekly) to determine if she continued to require the same restrictive level of care, in accordance with the TVPRA. Records show that Gabriela was informed about and participated in this meetings, as evidenced by her signature on the service plan and subacute case review forms.  GOV-00006221 (Individual Service Plan (ISP), 9/28/17); Subacute Case Reviews: GOV-00006354-6355 (9/14/17), GOV-00006358-6359 (9/21/17),  GOV-00006362-6363 (9/28/17); GOV-00006366-6367 (10/12/17); Service Plan Reviews:  GOV-00006229, GOV-00006231 (10/5/17); GOV-00006239, GOV-00006242 (11/2/17); GOV-00006250, GO-00006254 (11/30/17); GOV-00006262, GOV-00006265 (12/28/17); GOV-00006273, GOV-00006276 (1/25/18); GOV-00006283, GOV-00006286 (2/21/18); GOV-00006293, GOV-00006296 (3/22/18); GOV-00006304, GOV-00006307 (4/19/18). *See also* GOV-00006177-79 (Initial Staff Briefing and Preliminary Service Plan, 9/7/17); 30-Day Case Reviews:  GOV-00006377-6383 (10/10/17); GOV-00006385-6392 (11/6/17); GOV-00006394-6401 (12/8/17); GOV-00006403-6411

(1/5/18); GOV-00006413-6421 (2/5/18); GOV-00006423-6432 (3/6/18); GOV-00006434-6443 (3/27/18). The records show that Gabriela signed notices explaining why she was placed at Shiloh RTC on February 22, 2018 and March 22, 2018.  GOV-00006147-6150.

59.     While placed at Shiloh, Gabriela was informed of her legal rights, and received legal screenings and legal services.  On September 8, 2017, she was provided a listing of Texas legal service providers in Spanish.  GOV-00006153-6159. On September 14, 2017, Gabriela N. signed her acknowledgement that she was provided with a Know Your Rights (KYR) presentation by the Cabrini Center in which her legal rights were explained, and a legal screening. GOV-00006151, GOV-00006527. Gabriela received legal screenings with legal service providers on multiple occasions.  GOV-00006168-6169.  Based on these screenings it appeared that Gabriela may be eligible asylum and/or Special Immigrant Juvenile Status (SIJS).  On September 21, 2017, Gabriela N. met with a Cabrini Center attorney for an hour.  GOV00006820.  Gabriela N. initialed a form (in English and Spanish) entitled Client Authorization for Long-Term Foster Care Placement and indicated her wish to apply for long-term foster care placement, which had been explained to her by a Catholic Charities attorney in the Archdiocese of Galveston-Houston.  GOV-00006171.  On or about September 26 or October 2, 2017, Gabriela received a Good Faith Letter from Cabrini Center.  GOV-00006229, GOV-00006527.  On December 14, 2017, an attorney (Paola Midence) signed a Department of Homeland Security (DHS) Notice of Entry of Appearance as Attorney or Accredited Representative (G-28) Form on behalf of Gabriela. GOV-00006172-6175. On March 8, 2018, Gabriela met with a Cabrini Center attorney for an hour. GOV-00006814. On March 21, 2018, Gabriela's case manager signed a Client Service Request Form which indicated that she emailed a referral to an attorney for her.  GOV-00006661. On March 23, 2018, a G-28 was received from the attorney for Cabrini Center. GOV-00006529. On April 5, 2018, Gabriela met with an immigration attorney for an hour.  GOV-00006813; *see also* GOV-00005249-5252 (G-28, immigrant legal assistance). Gabriela was also provided information in Spanish about legal service providers upon her discharge on April 26, 2018.  GOV-00006500-6508.

60.     While placed at Shiloh, in addition to continuing her prescriptions of Prozac and Melatonin, Gabriela N. was prescribed Adderall by her treating psychiatrist to assist with hyperactivity and decrease her inattention.  Her dosage of Adderall was titrated upwards twice as she adjusted to the medication, from a low of 10 mg to a dosage of 25 mg.  GOV-00007144 (25 mg), GOV-00007153 (20 mg), GOV-00007161 (20 mg), GOV-00007168 (10 mg), GOV-00007154-7168, , GOV-00007171-7176.  Although the complaint noted possible side effects of irritability and difficulty with sleep initiation, *see* FAC ¶ 64, case records do not confirm that Gabriela N. experienced these as side effects of taking Adderall. GOV-00006255; GOV-00006266; GOV-00006277-6278; GOV-00006287; GOV-00006297. The FAC ¶ 64 also alleged that "Gabriela does not believe the medications help her, and she does not want to take them.  However, Gabriela believes that she must

take the medications in order to be released from detention." *Id.* The case records do not reflect that Gabriela voiced such a concern about medication to her treating psychiatrist, her clinician, or other staff at Shiloh, although, as noted above, her treatment was discussed with her and the treatment team regularly, and she continued to take her medication.   GOV-00006223; GOV-00006232-6233; GOV-00006255; GOV-00006266; GOV-00006277-6278; GOV-00006287; GOV-00006297; *see also* GOV-00007137-7206 (psychiatric records).  Individual goals and objections for medication administration and education were included in the Gabriela's Individualized Service Plan, which she signed and acknowledged. GOV-00006196-6197, GOV-00006221. Further, children in ORR care are always permitted to refuse their medication if they choose to do so.

61. While placed at Shiloh, Gabriela's psychiatric progress was monitored regularly by Dr. Javier Ruiz and her psychotropic medication regimen was reviewed.  *See* GOV-00007137-7206 (Psychiatric Services).  Abnormal Involuntary Movement Scale (AIMS) testing was done.  GOV-00007145.

62. During her placement at Shiloh, Gabriela's GAF scores increased steadily from 40 at intake to 70 at discharge.  GOV-00006192 (9/8/17: GAF 40); GOV-00006222 (9/26/17: GAF 47); GOV-00006232 (10/10/17: GAF 50); GOV-00006243 (11/07/17: GAF 50); GOV-00006255 (12/18/17: GAF 60); GOV-00006277 (1/23/18: GAF 63); GOV-00006287 (2/2018: GAF 65); GOV-00006297 (3/27/18: GAF 70).

63. While placed at Shiloh, Gabriela reportedly missed her family but also developed positive relationships with peers, and clinical and other staff at the RTC. During an individual therapy session on March 21 2018, Gabriela reported ███████████████████████████████████████████████████████████████████████████████████████████████████ GOV-00006669.  Later, on April 25, 2018, Gabriela N. and her clinician, J████ A████, M.A., LPA,  discussed her feelings about being stepped down to a shelter. According to the clinician's progress notes, ████████████████████████████████████████████████████████████████████████████ GOV-00006663.

64. Gabriela N. was discharged from Shiloh on April 26, 2018 and stepped down to a less restrictive Catholic Charities-Houston shelter (St. Michael's Home) with a plan to ensure her supervision and safety.  *See* Discharge Summary, GOV-00006490-6495; Supervision and Safety Plan, GOV-00006496-6499.  The discharge summary noted that Gabriela "did not receive any SIRS due to any type of negative behaviors such as physical or verbal aggression, or for self-injurious behaviors."  GOV-00006490. As noted, by the time of her discharge, Gabriela's GAF score had increased significantly from 40 to 70.  GOV-

00006494.  Her diagnosis at discharge was: ████████████████████████████
████████████████████████████████████████████████████████████

Gabriela's medications at the time of discharge were Adderall XR
(Dextroamphetamine/Amphetamine) 25 mg, Prozac (Fluoxetine) 20 mg, and Melatonin 3
mg. GOV-00005399.

### St. Michael's Home shelter placement

65.   On April 26, 2018, Gabriela was stepped down and placed at St. Michael's Home
      for Children, an ORR shelter operated by Catholic Charities of the Archdiocese of
      Galveston-Houston.  GOV-00003999.  Per her Safety and Support Plan, *see* GOV-
      00004862-4869, Gabriela had █████████████████████████████
      ██████████ since being placed at Shiloh in September 2017.  GOV-00004862.  At
      the time of intake at the shelter, ██████████████████
      ██████ she presented as "stable and self-regulating adequately." *Id.*  An
      individualized service plan was developed for her within 72 hours of her arrival at
      St. Michael's home, GOV-00004015-4017, and was updated regularly, GOV-
      00004876-4884, GOV-00004886-4890, GOV-00004940-4944, GOV-00004995-
      4996.  While placed there, Gabriela received individual therapy and group therapy
      services weekly, as well as educational and recreational services.  *Id.*

66.   Gabriela's medications upon intake at St. Michael's remained the following: Adderall
      XR (Dextroamphetamine/Amphetamine) 25 mg, Prozac (Fluoxetine) 20 mg, and
      Melatonin 3 mg (same as Shiloh RTC). GOV-00004001, GOV-00005391-5393. Her
      Melatonin dosage was increased by a board-certified family physician to 10 mg because
      of Gabriela's ongoing reported problems with sleep.  GOV-00005392, GOV-00005453.
      During an evaluation on August 7, 2018 with psychiatrist Dr. ██████ B██ of the
      Alliance Wellness Center in Houston, Texas, it was recommended that her Fluoxetine
      dosage be increased to 30 mg; her Adderall dosage was kept the same. GOV-00004895-
      4896, GOV-00005389, GOV-00005445.   Dr. B███ diagnosed her with ██████████
      █████████████████████████ GOV-00005449. Gabriela was ██████████
      █████████████████████ GOV-00004896.

67.   In a note dated May 9, 2018, Gabriela's case manager indicated that she may have
      a legal case for trafficking status – which is not legal immigration status, but
      allows an individual to receive federal public benefits despite a lack of lawful
      immigration status -- and that a clinician would work with her to see if she
      qualifies for Office of Trafficking in Persons (OTIP) benefits.  GOV-00004686.
      Gabriela received an interim eligibility letter from the Office on Trafficking of
      Persons stating that she could start applying for OTIP benefits on June 28, 2018.
      GOV-00005265.

68.    Gabriela met with a psychiatrist on August 7, 2018 and reportedly was anticipating being sent to the Unaccompanied Refugee Minor (URM) program. GOV-00004662.  During the appointment, Gabriela was ███████████ ███████████████████████████████ GOV-00004716.  Gabriela was ██ ███████████████████████████████████████████████ *Id.*

69.    In a subsequent therapy session with her clinician on August 17, 2018, Gabriela stated that ██████████████████████████████████████████ GOV-00004722. Gabriela also expressed ███████████████████ ████████ GOV-00004722.  Also, a clinician's note from August 28, 2018 following Gabriela's appointment with a psychiatrist states that Gabriela ██ ██████████████████████████████████████████████ GOV-00004736.

70.    Upon admission to St. Michael's Home, on April 26, 2018, Gabriela was provided a list of pro bono legal service providers.  GOV-00005113-57.  On June 6, 2018, a Flores attorney (Crystal Adams) submitted G-28 for Gabriela for representation as to class rights.  GOV-00005253-5259. According to her Case Manager's note dated August 8, 2018, Gabriela had been meeting with her two attorneys regarding her immigration case and preparing for a court hearing on August 21. GOV-00004662.  She also met with her "Flores lawyer" weekly every Wednesday. GOV-00004652.  In a letter dated July 23, 2018, attorney Paola Perez stated that she represents Gabriela on asylum and Special Immigrant Juvenile Status (SIJS) matters and that she would take steps to transfer her case to the closest jurisdiction to where she would be placed in the URM program. GOV-00005261.

71.    While the FAC ¶ 69 states that "Gabriela is miserable and desperately wants to live with her grandfather, a progress note from the shelter indicates that although Gabriela said that she was ready to leave to be with her family, she said that she was "happy".  *See*, *e.g.*, GOV-00004235 (note dated 9/4/18).  *See also* clinician's notes: GOV-00004720 ██████████████████████████████████ ███████████████████████████ ); GOV-00004738 ███████████ ; GOV-00004740 █████████████████████████████████████████████████ As detailed below, *infra* ¶¶ 87-89, however, at the time, ORR had already determined that Gabriela's grandfather would not be a suitable sponsor for her and he was not able to provide for her physical and emotional well-being as is required by the TVPRA.  GOV-00006548-49.  And, while she may have desired to be placed with family, Gabriela did not have any other family members who were willing and able to sponsor her.  GOV-

00004668.

### A.  ORR Placed Gabriela N. In The Least Restrictive Setting Appropriate For Her Needs

72.  Each of the facilities where Gabriela was placed while in ORR care represented, at the time of placement, the least restrictive setting appropriate for her needs.  As Gabriela's needs evolved, different levels of placement became appropriate, and Gabriela was moved to a different setting to accommodate her current needs.

73.  While Gabriela initially presented as "emotionally stable, receptive, and resilient", *see* FAC ¶ 61, when she first came into care in January 2017 and thus a placement in the SWK shelter was appropriate, her serious mental health needs including ████████████████████████████ necessitated a step-up to Shiloh Residential Treatment Center in September 2017.  *See*, *supra*, ¶ 50.

74.  It was necessary for Gabriela to remain in a highly structured RTC until such time as she was no longer a danger to herself.  *See*, *supra*, ¶ 56.

75.  Under ORR policy and in practice, UACs are given legal screenings and access to free legal services.  *See* https://www.acf.hhs.gov/orr/about/ucs/services-provided; *see also* ORR's Legal Services Guide, available at https://www.acf.hhs.gov/sites/default/files/orr/english_legal_service_providers_guide_with_form_508.pdf (English and Spanish).  While Gabriela was in ORR's care and custody, as noted above, she received legal screenings and access to free legal services as described in ORR's policies.  *See*, *supra*, ¶¶ 20, 59, 70.  In addition, Gabriela had legal representation while at Shiloh RTC and St. Michael's home.  *See*, *supra*, ¶¶ 59, 70.

### B.  ORR Worked Diligently To Release Gabriela N. To A Safe Alternative Placement, The Unaccompanied Alien Refugee Program, Without Undue Delay

76.  The family unification process begins the day a child enters ORR's legal custody and care.  *See* ORR Guide § 2.2.  Although the complaint alleges Gabriela came to the U.S. with the hope of living with her grandfather, Isaac N., *see* FAC ¶ 60, she initially sought to be released to her aunt in New York, instead. GOV-00007483.

77.  Shortly after being placed at Southwest Keys Casita del Valle shelter on January 8, 2017, the unification process began with Gabriela N.'s aunt 9 days later on January 17. GOV-00007483. The Case Manager (CM) contacted the sponsor and she expressed some reservations about sponsorship but was open to family sessions; the CM offered post-release services to assist with sponsorship.  GOV-00007599. Gabriela expressed to her clinician ████████████████████. GOV-00007496. On February 14, Gabriela's clinician did facilitate a call between Gabriela and her aunt in order to encourage their relationship.  GOV-00007497. A TVPRA home

study was required because of Gabriela's disclosure of abuse in her home country. GOV-00007603. Although the Case Manager had offered assistance with the reunification process, *see e.g.*, GOV-00007601, by March 8, 2017 the Family Reunification Packet (FRP) had not been submitted.  GOV-00007250, GOV-00007263; *see also* GOV-00008438-40 (Family Reunification Checklist for sponsor).   The next week, on March 16, 2017, the aunt declined to complete the unification process, citing as reasons a medical condition, feelings of stress about the unification process, and her undocumented status.  GOV-00007606, GOV-00007669.

78.   Other possible sponsorship options for Gabriela also turned out to not be viable. Another uncle was suggested as a possible sponsor but he declined.  GOV-00007600. Gabriela N.'s first cousin also was noted as a potential sponsor.  GOV-00007649, GOV-00004680.  Sponsorship was discontinued, however, as the cousin was only 19 years old at the time.  GOV-00007670.

79.   On March 27, 2017, after sponsorship with her aunt fell through, ORR helped identify Gabriela's grandfather, Isaac N., as a potential sponsor for her. GOV-00007637; GOV-00008375-76 (Family Reunification Checklist for sponsor). While the complaint stated that Gabriela and her grandfather Isaac "have a close relationship," *see* FAC ¶ 60, Gabriela's grandfather reported that he last saw her and her family about 14 years ago when he immigrated to the U.S.  GOV-00006628.  Later, Gabriela ████████████████████████████████████████████████ clinician on April 19, 2017, and stated that █████████████ GOV-00007520.  Gabriela's mother provided ORR a notarized letter allegedly signed in El Salvador in April 2017 that purported to give custodial rights over Gabriela N. to her grandfather. GOV-00006562-63 (Spanish).

80.   On April 4, 2017, the CM noted that the grandfather would not be a good candidate for sponsorship because household members with whom he lived would not agree to provide their IDs or fingerprints.  GOV-00007610. The grandfather sought to move to a new apartment as a result. GOV-00007611, GOV-00007613. As of April 17, 2017, the grandfather provided proof of a new address and the sponsorship process began. GOV-00007614.

81.   As of May 7, 2017, a home study of the grandfather was pending.  GOV-00007276. The grandfather disclosed prior kidnapping charges against him in his home country of El Salvador and said that he had spent two years in jail.  *Id.* The grandfather claimed that he was not actually involved.  After the grandfather delayed in providing requested documentation, *see* GOV-00007618, Gabriela's Case Manager met with her to discuss her case and informed her that his sponsorship was going to be discontinued.  The grandfather finally submitted a letter which he says exonerated him of the kidnapping charge.  GOV-00007341. However, by June 7, 2017, the grandfather's sponsorship application had been discontinued due to these serious criminal charges and the time he spent in jail per the recommendations of the CM and CC.  GOV-00007305. Gabriela and her grandfather and mother were informed about the anticipated discontinuation and

agreed that she would seek LTFC.

82.  On August 14, 2017, the Case Manager and clinician at the shelter likewise agreed that the grandfather's sponsorship application should be denied because he worked too much and would not be available to help Gabriela and to ensure that her significant mental health needs were met.  GOV-00007637-38. The grandfather's sponsorship application was discontinued on August 17, 2017.  GOV-00007638.

83.  Although SW Keys discontinued sponsorship with Gabriela's grandfather, the case notes indicate that Shiloh remained open-minded about possibly working with him as a potential sponsor, once Gabriela transferred to Shiloh. A Shiloh case review note dated October 10, 2017 indicated that a case manager from a previous facility (SWK shelter) discontinued the sponsorship process for Gabriela's grandfather due to "past criminal history, not providing documentation in a timely manner, and not being able to properly care for minor."  GOV-00006383. A case review note from November 6, 2017 states that "there is no written denial of the previous sponsor and guidance is currently pending from FFS if grandfather could potentially be a sponsor."  GOV-00006391. On November 21, 2017, the FFS informed the case manager to proceed with processing the grandfather for potential reunification.  GOV-00006401. The next day, on November 22, 2017, the FFS at Shiloh reached out to the grandfather and again explained the sponsorship process.  GOV-00006410.

84.  The case notes show that Gabriela did maintain a positive relationship when speaking with her grandfather in family therapy sessions arranged by Shiloh. *See e.g.,* GOV-00006685 
); GOV-00006713 (November 30, 2017 family therapy session grandfather

);
GOV-00006269 (

); GOV-00006678 (January 25, 2018, individual therapy session

); GOV-00006710 (family therapy progress note

); GOV-00006711

); GOV-00006675 (February 8, 2018 individual therapy session

.

85.  However, Gabriela's grandfather continued to have issues with family reunification, such as a roommate not wishing to provide information, GOV-00006323, and taking more than a month to submit the family reunification application. ((Family Reunification Packet received December 28, 2017 when

Declaration of Micaela Vergara

process started in late November).  *Id.*; *see also* GOV-00006531-32 (Family
Reunification Checklist).

86.    On January 10, 2018, a mandatory TVPRA Home Study was requested of
       Gabriela's maternal grandfather who resides in Oakland CA.  GOV-00006543-
       6544. Unfortunately, the results of the home study, completed February 15, 2018,
       were negative.  *See* GOV-00006618-00006642 (Home Study Report).  Although
       Gabriela's grandfather voiced a "genuine desire to sponsor" her, the home study
       worker had several serious concerns about his capacity to meet her high level of
       needs, and to provide the stable and structured home environment she requires.
       GOV-00006641-6642. While the complaint (FAC ¶ 67) mentions that
       "investigator questioned Isaac's ability to support Gabriela's education and care
       for her financially", it is silent on these more serious concerns raised by the home
       study. For instance, the grandfather was "not aware of [Gabriela's] abuse history
       and although informed about [her] mental  health needs, he was unable to
       articulate details of her diagnosis or potential issues and voiced unrealistic
       expectations." GOV-00006641. Also of concern was the grandfather's lack of
       parenting experience which was a result of his extensive history with alcohol
       abuse and his absence from his own children's upbringing.  GOV-0006639.
       According to the home study worker, "Upon discussion with sponsor regarding
       parenting skills and how he intends to address UC's needs, including potential
       issues that may arise, the sponsor was unable to articulate any plans of how he
       would respond.  His response was limited to connecting UC to mental health
       provider and reaching out to the assigned PRS worker so that the worker could
       address behavioral issues with the UC."  GOV-00006639. The grandfather also
       lacked a familial or other support system and had inadequate financial resources to
       assume additional expenses related to Gabriela's care.  GOV-00006642.
       Additionally, "during the home study process, questions were raised regarding
       accuracy of the sponsor's work schedule and unclear information regarding his
       health history as related to his disclosure of recent Cancer diagnosis."  GOV-
       00006642. According to the home study worker, "[t]he lack of information
       regarding sponsor's recent Cancer diagnosis raises concern regarding sponsor's
       long-term health and potential impact to his caregiver abilities."  GOV-00006626.
       Further, despite the documentation he presented to support his clearance of any
       criminal charges in his country of origin, the home study worker continued to have
       concerns about the grandfather's history including an "extensive period of alcohol
       abuse and association with individuals involved in criminal activity."  GOV-
       00006642.  The home study report concluded, "Overall, it is evident that [the
       grandfather] does not present with the capacity to meet [Gabriela's] high level of
       needs, and it appears that he cannot ensure the structured and stable home
       environment she requires, thus a negative recommendation is warranted."  *Id.*

87.    On March 7, 2018, the grandfather was submitted for denial, the independent
       GDIT Case Coordinator (CC) concurred, and the FFS denied his sponsorship of
       Gabriela. GOV-00006331, GOV-00006533-6540,.  In denying release to the
       grandfather, the Case Manager stated, "Overall the sponsor's lack of

comprehension and skills paired with the minor's high and specific needs made it clear that he is not an appropriate sponsor for this particular UC. Based on the home study report it does not appear as though the sponsor is adequately prepared to care for a minor with high level of needs." The CC concurred, and the FFS denied release of Gabriela to her grandfather. GOV-00006548-49.

88.  Gabriela claimed (FAC ¶ 12) that ORR refused to release her to her grandfather on the ground that he "is or may be unfit". To the contrary, ORR did not make a determination as to the grandfather's "fitness". Rather, on March 20, 2018, in my role as the ORR/FFS for Shiloh, I agreed with the program and GDIT CC recommendation to deny release to Gabriela's maternal grandfather per ORR Guide § 2.7.4 (Deny Release Request) stating: "The potential sponsor is not willing or able to provide for the child's physical or mental well-being." GOV-00006533-6535. According to the Home Study Social Worker ▮▮▮▮▮▮▮▮, "The HS report did not include any recommendations that could potentially change the negative recommendation to positive, as the potential for change to occur within an immediate timeframe was not present. Overall, the sponsor's lack of comprehension and skills, paired with the minor's high and specific needs, made it clear that he is not an appropriate sponsor for this particular UC." GOV-00006539-6540.

89.  After Gabriela was stepped down to St. Michael's Home (a shelter), her grandfather once again attempted to sponsor her. GOV-00004692. At that time, Gabriela's Case Manager stated she would staff Gabriela's case to see if sponsorship was possible with the grandfather, or if an alternate post 18 plan was needed. GOV-0004690, GOV-00004688. However, by May 9, 2018, the independent GDIT Case Coordinator recommended that the shelter not work with the grandfather any more as a potential sponsor as he had been denied by two previous facilities. GOV-00004686-4692.

90.  In the First Amended Complaint, Gabriela states that "ORR afforded neither Isaac nor Gabriela any hearing, right to administrative appeal, or other means to change its decision. ORR failed to provide Isaac with a written decision or written explanation for denying him custody of Gabriela. Due to ORR's actions and inactions, Gabriela's release has been unnecessarily delayed and Gabriela has not been placed in the least restrictive setting." FAC ¶ 67. However, the Complaint fails to explain why a geographically estranged grandfather with no prior caregiving relationship would have any custodial right to appeal and demand custody of a minor when the government entity with custody (in this case ORR) has decided he could not provide the necessary care for her physical and mental well-being as required under the TVPRA. The complaint also fails to acknowledge the regular meetings Gabriela, herself, had with her Case Manager to discuss the progress of her reunification case and the concerns regarding her grandfather's potential sponsorship of her. *See, e.g.*, GOV-00004684, GOV-00004686. All three of the ORR-funded programs where Gabriela received services made efforts towards achieving successful unification of Gabriela with

her grandfather. *See*, *supra*, ¶¶ 79-89. However, the various care providers, independent case coordinators, and ORR staff all identified concerns with the grandfather's ability to care for Gabriela. *Id.* The complaint does not acknowledge key risk factors, nor the important child welfare issues that were identified. On May 24, 2018, the Case Manager was working with another potential sponsor, Gabriela's "apparent" cousin. GOV-00004912. The Family Reunification application was completed on June 27, 2018. GOV-00005485-93. On July 9, 2018, the Case Coordinator and FFS stated that "it was best to deny sponsor based on no valid relationship (birth certificates did not provide relationship) and the sponsors' age." GOV-00004670. The Case Manager submitted the denial for the cousin's sponsorship on July 20, 2018 and the Case Coordinator concurred. GOV-00004666.

91.  On July 3, 2018, Gabriela's Case Manager met with her to discuss the status of her case. The CM worked on initiating OTIP benefits as she had received an interim letter. At that time, the CM also explained the benefits of going for a placement in the URM placement, and stated that Gabriela "was receptive to the idea." GOV-00004672. Later in July 2018, Gabriela's CM began working on the URM application as Gabriela had no viable sponsor; GDIT/FFS started on the URM process as Gabriela did receive OTIP benefits. GOV-00004912, GOV-00004668, GOV-00004670. The CM submitted Gabriela's case for URM on July 25, and a clinical summary was sent to URM on August 28, 2018. GOV-00004654. A potential URM placement was identified for Gabriela through Catholic Charities of Santa Clara County in San Jose, California. *Id.* The CM noted that Gabriela had a good conversation with the potential family. *Id.*

92.  As they traveled to a psychiatric appointment on August 28, 2018, Gabriela told her clinician said that ███████████████████████████ ███████████████████████████████████████████ GOV-00004736.

93.  Gabriela received her URM acceptance letter on September 14, 2018. GOV-00004652. The case manager prepared discharge paperwork and made arrangements to send by certified mail Gabriela's benefits check and her belongings by UPS to her social worker. GOV-00004650. She had a pre-placement call on September 20, 2018. GOV-00004652. Gabriela was released to the URM program in San Jose, California, close to where her grandfather lives on or around October 2, 2018. GOV-000005627-29 (Release Request).

94.  As shown above, ORR and its grantee care providers worked diligently to release Gabriela N. to the URM program without undue delay.

Declaration of Micaela Vergara

**Gabriela N. Case File**

95.  In my work with ORR, I have become familiar with how ORR and its grantee care
     providers create and maintain case files of unaccompanied alien children (UAC case
     files). In connection with my employment responsibilities, I have viewed many UAC case
     files and UAC case file documents.

96.  In accordance with ORR policies, ORR and its grantee care providers maintain
     comprehensive, accurate, and up-to-date case files as well as electronic records on
     unaccompanied alien children. *E.g.*, ORR Guide § 5.6.2. These UAC case files include a
     wide variety of information concerning an individual UAC, including: "the child's name,
     alien number, date of services, and Federal fiscal year. The file documents all services
     provided, information about the child or youth's progress, barriers to the child's progress,
     and the outcome of the case." ORR Guide § 5.6.2. As further detailed in the ORR Guide,
     UAC case files also include UAC information, admission documents, legal information,
     assessments (including medical records containing statements made for and reasonably
     pertinent to medical diagnosis or treatment, and describing medical history, past or
     present symptoms or sensations, the symptoms' inception, or their general cause),
     educational services, case management records, clinical services, incident reports, and
     discharge/exit information. *See id.*

97.  Also in accordance with ORR policies, ORR and its grantee care providers have
     procedures to maintain, protect, and review UAC case files for completeness and
     accuracy. *See* ORR Guide § 5.6.3.

98.  UAC case files are made at or near the time by—or from information transmitted by—
     someone with knowledge; they are also kept in the course of a regularly conducted
     activity. Making UAC case files is a regular practice of the operations of ORR and its
     grantee care providers.

99.  The UAC case file (or excerpts thereof) Bates stamped GOV-00003991 to -00006110,
     GOV-00006111 to -00007211, and GOV-00007212 to -0008517 is a true and correct copy
     of (or excerpts from) the UAC case file of Gabriela N., which was created and maintained
     in accordance with the procedures described above.

   I declare under penalty of perjury that the foregoing is true and correct.

   Dated:  September 23, 2020

       HOUSTON, TEXAS

Declaration of Micaela Vergara