**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

LUCAS R. *et al.*,

    Plaintiffs,

v.

ALEX AZAR, Secretary of U.S. Dep't of Health and Human Services, *et al.*,

    Defendants.

Case No.: 2-18-CV-05741 DMG (PLA)

DECLARATION OF JAMES S. DE LA CRUZ REGARDING CLASS REPRESENTATIVE BENJAMIN F.

### Introduction

1. James S. De La Cruz, under 28 U.S.C. § 1746, declares, under penalty of perjury, as follows. If asked to testify, I would testify under oath as follows.

2. The statements in this declaration are based on my personal knowledge, information acquired by me in the course of performing my official duties (such as my knowledge of ORR policies and procedures, including the ORR Guide[1]), my review of HHS records and information contained therein (including Benjamin F's case file).

3. My current position and experience are described in the Declaration I have submitted regarding Plaintiff, Lucas R.

### Placement and Unification Efforts for Benjamin F.

4. Plaintiff Benjamin F. was born in El Salvador in 2008. He entered the United States along with his mother and brother in June or July of 2018. His intake form indicates that the Department of Homeland Security separated him from his mother, due to his mother being a ▓▓▓ ▓▓▓ and referred him and his brother to ORR. His mother was placed in ICE detention by the Department of Homeland Security. GOV-00000008, GOV-00000681, GOV-00000700. Although ORR has no authority or jurisdiction regarding DHS's separation of parent and child, it is important to note that the evidence in the file regarding ▓▓▓ does not support allegations of the First Amended Complaint, that the Benjamin F and his brother were "inexplicably separated" from their mother, after having first been placed together in a family residential center, known as Dilly. (First Amended Complaint ("FAC") ¶ 86).

---

[1] https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied

1

5. As unaccompanied alien children, Benjamin F and his brother were referred to ORR's legal custody on or around July 2, 2018 and placed at St. PJ's Children's Home. ORR then transferred Benjamin F. to Shiloh Residential Treatment Center on or about July 23, 2018. ORR released Benjamin F. from custody on or around September 15, 2018. GOV-00000008.

6. Following his entry into ORR's legal custody and care, ORR and its grantee care providers made prompt and continuous efforts to unify Benjamin F. with a safe adult sponsor as further elaborated below.

Additionally, as elaborated below, during Benjamin F.'s time in ORR's legal custody and care, ORR and its grantee care providers ensured that the child was placed in the least restrictive setting that was in the best interest of the child.

### St. PJ's Children's Home

7. On the day he arrived at the St. PJ's Children's Home, Benjamin F. underwent an Initial Intakes Assessment. The intake form notes that Benjamin F. was non-verbal and could not answer many of the questions. GOV-00000681. The intake noted that Benjamin F suffered from outbursts, would require special education, was unable to read or write, that he had immediate need of therapy, and that he had an urgent need for mental health attention. The intake evaluated a safety plan to keep Benjamin F. safe, with increased need for support, supervision, and that he should be kept near his brother. GOV-00000681-686

8. The records show that while at St. P.J.'s, Benjamin F. received weekly case management services. The first case management note, dated July 5, 2018, notes that St. P.J.'s ensured contact with Benjamin F.'s mother, who at the time was detained at South Texas Detention Facility in Pearsall, Texas. At that time, the mother had stated that she wanted her son to reunify with her. While Benjamin F.'s grandmother resides in the United States, contrary to allegations in the Complaint (¶ 88 FAC), the grandmother stated that it was best for the minor to be with his mother. The case manager then made contact with the mother's attorney, Ms. Jessica Delgado, to explain the family reunification process, birth certificates, identification documents, and other requirements. The attorney stated she would try to assist in the process. The case manager also reached out to the facility where the mother was detained, to see if the case manager could complete a sponsor assessment on July 6, 2018. The case manager also received a G-28 for the minor's attorney, and the minor's attorney came to visit to check on him. GOV-00000710-711

9. As noted below, case management notes also record that beginning very soon after arrival, Benjamin F. began exhibiting ██████████████████████████████████ behavior.

10. A case management note from July 13, 2018 similarly reflects expectations that Benjamin F.'s mother would act as his sponsor, and his grandmother would not. The case manager, however, spoke to the grandmother to explain that the program could not be sure what would happen, and the grandmother should refrain from telling Benjamin F. he would be reunited with his mother, because if that did not happen he would feel bad. The grandmother agreed not to do so again. The grandmother also stated that the attorney told her (the grandmother) not to sponsor the boys at this time, because the plan is reunify the boys with the mom. The grandmother therefore stated she would

not act as sponsor and would not sponsor unless told by her daughter's attorney if that is what she should do. GOV-00000709.

11. A case management note from July 20, 2018 notes that the "Case is pending status on mom's immigration case and grandmother's reluctance to sponsor minor is holding up the case. Grandmother says that the attorney told her to hold off in sponsoring minor and his brother. Grandmother continues to have communication with minor and sibling." GOV-00000708.

12. The grandmother's affirmative statements that she would not act as Benjamin F (and his brother's) sponsor contradicts allegations of the First Amended Complaint that while Benjamin F resided at St. P.J.'s, Isabella (Benjamin F's grandmother and Next Friend) "immediately began the process of filling out the Family Reunification Packet so that both of her grandsons could be released to her in Los Angeles, California," but that "Isabella received confusing and conflicting information about additional information she needed to provide to ORR, but she kept responding to every request that she received and she successfully submitted a completed packet to ORR." (FAC ¶ 88).

13. Case review notes similarly show the case manager spoke with Benjamin F.'s mother on both July 2 and July 5, 2018, and also worked with his mother to gather her documents in the event she were released from ICE adult detention and could sponsor Benjamin F. For example, the program received the mother's birth certificate, as well as Benjamin F.'s birth certificate and passport on July 16 and July 12, 2018 respectively. The program began background checks for his mother on July 17, 2018. Furthermore, the case review notes identify that Benjamin F. was referred for a child advocate on July 18, 2018. Benjamin F also received a Know Your Rights presentation on July 3, 2018 and a legal screening to determine if he was eligible for immigration legal relief. The independent, non-profit legal service provider determined he was not eligible for immigration legal relief during that screening. GOV-00000726

14. During his time at St. P.J.'s Children's Home, the case file shows that Benjamin F. had legal representation from Ms. Jessica Delgado, with the Dilley Pro Bono Project, as well as from another attorney, Ms. Sarah Burrow, with the Cara Pro Bono Project. GOV-00000750; 00000752.

15. The case file shows that Benjamin F. arrived at St. P.J.'s Children's Home having already been prescribed Guanfacine 1 mg, from when he resided in a family residential center. GOV-00000739. Note, this is contrary to allegations in the First Amended Complaint (FAC ¶ 89) that ORR failed to obtain informed consent; Benjamin F resided with his mother at the time Guanfacine was prescribed -- at Dilley.

16. In addition, the First Amended Complaint appears to blame ORR for the Guanfacine making "Benjamin F severely drowsy" (FAC ¶ 89). But, the case file shows that St. P.J.'s staff arranged for Benjamin F. to be evaluated by a medical office July 3, 2018, one day after arrival, and staff first stopped, but then reduced Benjamin's Guanfacine dosage, due to its drowsiness effects. The medical record notes ███████████████████████████████████████

pping

3

GOV-00000833.

17.     The medical professional diagnosed Benjamin F. with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ He had a GAF of 35.[2] The professional reduced the Guanfacine dose to .5 mg 2 times per day, and ordered monitoring mood and activity level. Further, contrary to the allegations of the First Amended Complaint that there was no neutral decision maker or consent for Benjamin F's medications (FAC ¶ 90), the case file shows the medical professionals explaining target symptoms with the St. P.J.'s staff, as well as side effects. The medical notes recommend: "Continue the rest of the current treatment plan & therapies. Monitor mood and behavior at home, school and other settings and report major problems. Monitor for response to the changes made and for adverse medication events and contact the office with any concerns." GOV-00000834.

18.     On July 9, 2018, St. P.J.'s staff sent an email to the medical office noting Benjamin F.'s numerous behavioral incidents, including ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The program requested moving Benjamin F. to a more appropriate residential or therapeutic placement that could meet his needs. GOV-00000834.

19.     On July 13, 2018, the program again reached out to the medical office to note Benjamin F.'s worsening condition. The program noted that while they were currently seeking a transfer of Benjamin F. to a more appropriate placement, in the meantime his behaviors had continued to deteriorate (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The program noted that while he was not causing significant harm to others, he would ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The message again noted that Benjamin F. had arrived at St. P.J.'s from the family residential center already prescribed Guanfacine 1 mg twice daily. The program noted him to be drowsy and lethargic, and after a medical visit, the medication was reduced. The program reached out to psychiatric hospitals, but were told they could not assess him for acute treatment. GOV-00000836.

20.     The medical record shows careful monitoring of Benjamin F.'s medication through medication logs, with discrepancies from the regimen noted specifically in any case. GOV-00000841;

---

[2] The Global Assessment of Functioning (GAF) score is used to rate how serious a mental illness may be. It measures how much a person's symptoms affect his or her daily life on a scale of 1 to 100. Higher scores indicate higher functioning. *See* Expert Report of Roy Lubit, M.D. Addendum 4, p. 6. A GAF score in the 40s indicates serious symptoms and a GAF score in the 60s represents mild symptoms. *Id.* at p. 13.

855.

21. Finally, the case file documents a high number of behavioral incidents (approximately 45 in a short time period with several per day). The reports generally report ███████████████████████████████████████

██ The first report came shortly after Benjamin F's entry to St. P.J.'s home on July 4, 2018, indicating ████████████████████████████████████ GOV-00000925. It notes that Benjamin F. ████████████████████████████████████████

23. The next day, July 5, 2018, Benjamin F. had three reports of ████████████████████████████████████████████████████████████████████████████████████

GOV-00000928-32.

24. On July 6, 2018, Benjamin F. had four reports, including ████████████████████████████████████████████████████████████████████████████████████████████████████ GOV-00000934-940

25. Benjamin F. was placed on one-on-one supervision. On July 7, 2018, he then ████████████████████████████████████████████████████████████████████████████████████████████████████████████████

GOV-00000943-46

26. On July 8, 2018, after breakfast, Benjamin F. ████████████████████████████████████████████████████████████████████████████████████████████████ Also on July 8, 2018, he

Case 2:18-cv-05741-DMG-PLA Document 264-11 Filed 10/02/20 Page 6 of 13 Page ID #:7186

███████ GOV-00000949-55.

27. On July 9, Benjamin F. ███████████████████████████████████████████████████████████████ ning, GOV-00000958-970.

28. On July 10, Benjamin F. ███████████████████████████████████████████ GOV-00000973-975.

29. For the remainder of Benjamin F.'s time at St. P.J.'s Children's Home there are typically several reports of disruptive behavior per day, involving ███████████████████████████████████, GOV-00000978 et seq. At one point he stated, ██████████████ GOV-00001012.

30. Case management notes show that on July 23, 2018, the case manager had a phone call with Benjamin F.'s grandmother about why Benjamin F. was being transferred and separated from his sibling. The notes show that the case manager "explained that minor has lots of issues that need to be managed by a qualified group of people." The case manager explained "at times ██████████ ██████████████████████████████" According to the notes, Benjamin F.'s grandmother stated she understood. The case manager also let the grandmother know that she would have told Benjamin F.'s mother, but had not had contact with her. The case manager explained that when Benjamin F. arrived at the new facility they would contact Benjamin F's mother regarding paper work. The grandmother stated she understood, according to notes. GOV-00000707. Thus, although Benjamin F, through his Next Friend, alleges there was no "notice" regarding transfer (FAC ¶ 90), in fact, Isabella received notice and explanation of the transfer, and St. P.J.'s tried but could not reach Benjamin F's mother in ICE adult detention.

6

## Shiloh Residential Treatment Center

31. Benjamin F. transferred to Shiloh, a Residential Treatment Center that treats children with emotional disorders, as well as children with intellectual and developmental disabilities, on July 23, 2018, where he resided until September 15, 2018, at which time ORR released him to his grandmother-sponsor.

32. The case file shows that Benjamin F.'s mother reported that he had been taking medication in home country – risperidone, and that he might have been modeling behaviors from when cared for by father and family ███████████████████████. The intake forms show that Benjamin F. was assessed by Shiloh staff one day after arriving and that they spoke with his mother to obtain a case history. GOV-00000012, 16. *Contra* FAC ¶¶ 89, 91 (implying that Benjamin F was prescribed psychotropic medications for the first time when he entered ORR custody).

33. Within a day of arriving at Shiloh, Benjamin F. received an assessment from the psychiatrist on staff. The assessment notes that "███████████████████████████████████████████████████████████████████████████████████████████████████████████" GOV-00000018. The individual assessment also notes a GAF score of 45. GOV-00000017.

34. The treatment goals for Benjamin F. were listed as ███████████████████████████████████████████████████████████ The long-term goals were identifying a viable sponsor, ███████ and stabilizing mood, consistent positive participation while in placement. GOV-00000017.

35. Upon arriving at Shiloh, Benjamin F. received an orientation, as well as a discussion of medications. GOV-00000025–34. He received a "Know Your Rights" presentation from RAICES. GOV-00000042.

36. Benjamin F. received an individual service plan to be reviewed regularly, that discussed allergies, supervision, child care services, educational services, daily social skills training, daily recreation and leisure, medication administration, medication education, community recreation and leisure, daily life skills training, vocational education on all weekdays, acculturation services on weekdays, preparation for independent living on weekdays, religious services, family and communication. GOV-00000059-60. The individual service plan also includes treatment, including psychotropic medication monitoring, behavioral programming, individual, family and group counseling, case coordination on a daily basis, and ongoing discharge planning. The services included general dental care, child advocate assigned to Benjamin F., legal representation, and locating a viable sponsor, working concurrently with Benjamin F's mother and grandmother.

37. Records show that during his time at Shiloh, medical professionals and staff worked to

7

determine and treat Benjamin F. with an appropriate dosage of medication for his behaviors. Doctors started him at 1 mg of Guanfacine twice per day, and moved him to 3 mg once per day on August 8, 2018, and then to 4 mg once per day on August 22, 2018. The doctor also prescribed Lexapro 5 mg once per day at night starting on July 31, 2018 and then increased the dose of 10 mg once per night starting August 9, 2018. Finally, the doctor concluded that it was appropriate for Benjamin F. to continue taking Risperdal .5 mg (1/2 tablet by mouth twice daily) and that dosage did not change for the period at Shiloh. GOV-00000067.

38. Benjamin F. received medication planning with a goal of Benjamin F. having a basic understanding of the need for medicine, and why he takes medicine. The plans called for asking Benjamin F. at least once per day to name his medicine, and ask him what it is for. GOV-00000074.

39. Interventions planned included behavior interventions, de-escalation techniques, talking about difficulties, emotional support, individual counseling, and psychotropic medications. GOV-00000076.

40. Shiloh records show detailed recording of symptoms and monitoring of behavior. Reporting included reporting incidents of mood instability for each reporting period, with objectives of increasing mood stability. GOV-00000078.

41. Daily progress notes record Benjamin F.'s behavior on half-hour increments, demonstrating the close supervision and care a residential treatment center can provide. GOV-00000555-608

42. Records show staff working through the goals and objectives of individual counseling, family therapy goals and objectives, group counseling goals and objectives, academic goals and objectives, social skills development, recreation and leisure, community recreation and leisure, life skills sexual health, religious services, family communication, case coordination, and discharge planning (including assisting the sponsor with the transition of caring for Benjamin F., assisting ORR with the transition, assisting the treatment team in determining whether he met program goals and should transition to a less restrictive environment.) GOV-00000080-95

43. The case file includes service plan reviews with eight pages of detailed review of Benjamin F.'s case, and staff sensitivity to Benjamin F.'s condition. In one example, the service review notes that Benjamin F " ███████████████████████ " ███████████████████████████████ Service review notes also show continual review of medication, noting "reviewing whether to continue meds." GOV-00000098.

44. Records also show that Benjamin F. benefited from care at Shiloh with a GAF increasing to 55 as of August 21, 2018, and to 60 as of September 14, 2018. GOV-00000110; 00000098; GOV-00000070; GOV-00000209. Files show that by September 11, 2018, his impulse control was "much improved," and both school productivity had improved, he appeared "much happier," and staff reported his issues with boundaries had improved. GOV-00000643-4.

45. During his time at Shiloh, Benjamin F. continued to receive reports of ███████ ███████ but the number of reports diminished as compared to St. P.J.'s. There are reports for ███

8

on August 1, 2018. GOV-00000100; GOV-00000541-554.

46. Shiloh also arranged for Benjamin F. to speak with his mom, his grandmother, and his brother at St. P.J.'s through both video and telephone calls. GOV-000000120. When Benjamin F. was set to be released, Shiloh worked to set up an in-person visit between his mother and Benjamin F. GOV-00000124.

47. The case file also shows that Benjamin F.'s mother did not remain consistent about whether he should reunify with his grandmother or his mother. In one conversation with the case manager from July 31, 2018, Benjamin F.'s mother reported not feeling the need to continue the reunification process with her mother (minor's grandmother) because she was under the impression she will be released from ICE detention after her court date today and it is her understanding that her children will be reunified with her. Shiloh, however, did not stop reunification efforts with the grandmother. GOV-00000436.

48. By mid-August, Shiloh was working to ensure the legally mandated home study of Benjamin F's grandmother occurred prior to release, as a home study was required by statute under the TVPRA (due to Benjamin F.'s disability and the fact that he had been a victim of abuse). On or about August 23, 2018, a positive home study was received, recommending that psychiatrist and therapist appointments be made for Benjamin F. pre-release, and that he be discharged with a supply of medication. GOV-00000124, 127-28. The Home Study also recommended that Shiloh "secure an evaluation and medication management for the child," once he is released, and that the "sponsor continue to communicate with the child to the best of her ability in order to build their relationship." GOV-00000331.

49. ORR released Benjamin F. to his grandmother, Isabella, on September 15, 2018, after the grandmother was able to comply with the requirements of the home study and once it was determined Benjamin F would not be a danger to self or others upon release.

50. Case notes also show that Benjamin F. was screened for possible immigration relief, but found by independent, non-profit legal service providers not to qualify. GOV-00000704.

51. Plaintiffs allege that Benjamin F's placement in "ORR custody . . . led to a cascading effect of multiple physical and emotional challenges for him, none of which are being addressed by ORR." FAC ¶ 86. The case file shows that Shiloh RTC provided consistent, daily care addressed to Benjamin F's needs, that it consistently worked to adjust medications to address Benjamin F's underlying medical condition, that it connected Benjamin F with his mother and grandmother, that it provided access to health care at Texas Children's Hospital, that it provided child-centered care addressing Benjamin F's intellectual, developmental and emotional disorders, and that Benjamin F increased verbalization while in custody. GOV-00000631.

### ORR Placed Benjamin F. in the Least Restrictive Setting Appropriate For His Needs

52. As shown above, each of the facilities where ORR placed Benjamin F. represented, at the time of placement, the least restrictive setting appropriate for his needs.

53. St. P.J.'s attempted to resolve Benjamin F.'s needs through outpatient and supportive services. Benjamin F. transferred to Shiloh RTC, which according to Texas Health and Human Services is licensed as a Residential Treatment Center and approved to provide services to children with Emotional Disorders, Mental Retardation, and Pervasive Developmental Disorders. While at St. P.J.'s Benjamin F received a psychological evaluation (on July 18, 2018) recommending residential treatment. GOV-00000013.

54. Once he arrived at Shiloh RTC, ORR and care provider staff reviewed his placement at least every 30 days.

55. The documents summarized show a reduction in ▮▮▮▮▮▮▮▮ reports, reports on improved mood, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and higher GAF scores while at Shiloh RTC. Nevertheless, the First Amended Complaint states that "Benjamin's isolation and trauma have worsened at Shiloh," that Benjamin F "languish[ed] in detention," and that custody "exacerbated his mental health symptoms and made . . . approval [of release] less likely, thereby delaying his release." FAC ¶¶ 91, 93.

56. Plaintiffs also claim that Benjamin's time at Shiloh delayed his release, and that his needs "are in no way being met in his current placement." FAC ¶ 94. The Shiloh case file shows improvement in Benjamin F's functioning and his behaviors.

57. While Benjamin F. was in ORR's legal care and custody, he received legal screenings and access to free legal services as described in ORR's policies. In addition, Benjamin F. had legal representation while placed at St. P.J.'s Children's Home and Shiloh RTC.

### ORR Worked to Release Benjamin F to a Safe Adult Sponsor

58. The family unification process begins the day a child enters ORR's legal custody and care. *See* ORR Guide § 2.2.

59. Benjamin F. had initially been living with his mother in a family detention center. Once DHS transferred him to ORR, the program worked concurrently with his mother and grandmother to complete family reunification applications. His mother initially requested that the program not consider her mother (Benjamin F.'s grandmother) as a sponsor, because her attorney had told her it would be better to reunify as mother and son. Once Benjamin F. arrived at Shiloh, Shiloh case managers also worked, and did not stop vetting the grandmother, even when the mother predicted she would be released from adult detention soon and could reunify. Shiloh also arranged a visit for Benjamin F. and his mother at the shelter, arranged for family therapy sessions between Benjamin F. and his grandmother, and worked to develop the relationship between grandmother and grandson.

60. Throughout his time at both St. P.J.'s Children's Home and Shiloh, the case file shows

Benjamin F. was represented by an attorney, who also represented Benjamin F's mother.

61. Benjamin F alleges that medical personnel had to declare him "psychologically sound," to be released. FAC ¶ 93. The case file does not support such a conclusion. The case file supports the finding that once ORR determined that Benjamin F's grandmother was capable of caring for Benjamin F's physical and well-being, and that Benjamin F would not present a danger to himself or others, ORR released to Isabella F, Benjamin F's grandmother.

62. Benjamin F further alleges that he became increasingly anxious and desperate to reunite with his brother and grandmother, and that ORR unnecessarily delayed Benjamin F's release and did not place him the least restrictive setting FAC ¶ 95. The case file does not support such a finding. The case file shows that Benjamin F improved while at Shiloh RTC, that Shiloh RTC, which treats both children with emotional disorders and those with intellectual and developmental disabilities, was an appropriate placement for him. The case file shows Shiloh worked with both Benjamin F's grandmother and mother to ensure he could be released, and that ORR released after a statutorily-required home study, the sponsor meeting the additional recommendations of the home study, and determining Benjamin F would not be a danger to self upon release.

### Shiloh Monitored and Adjusted Benjamin F's Psychotropic Medication Regimen. Shiloh Requires Informed Consent for Both Placement and Psychotropic Medication Prescriptions as of 2018.

63. Plaintiffs allege in the First Amended Complaint that there was no neutral decision maker in the "ongoing review of . . . medications" (FAC ¶ 91). Shiloh carefully monitored Benjamin F.'s psychotropic medicines and mental health status, keeping logs of how often he was taking medications, behaviors and mood. Shiloh's psychiatric staff maintained detailed psychiatric progress notes approximately every two-three weeks that tracked everything from blood pressure, temperature and pulse, to weight, BMI, response to medication, whether he was alert and oriented to person and place, affect, mood, appearance, whether he suffered any hallucinations or delusions, impulse control (much improved by 9/11/2018), level of functioning in school (notably increased in terms of productivity), number of incidents of throwing objects, being physically aggressive, destroying property, being verbally aggressive, irritability, anxiety, impulsivity, aggressiveness, distractibility, problems with primary support group, problems related to social environment, educational problems, problems related to/interaction with the legal system, other psychosocial/environmental problems, whether there was a change in diagnosis, change in target symptoms (showing improvement as of 9/11/2018), need for laboratory tests. GOV-00000643-646. *See also* GOV-00000649-652 (psychiatric progress note from 8/21/2018); 8/7/2018 GOV-00000655-658; 7/31/2018 GOV-00000661-665;

64. Shiloh also used an "abnormal involuntary movement scale" ("AIMS") to monitor Benjamin F's condition and ensure the shelter was meeting his needs appropriately. GOV-00000648

65. Shiloh's psychiatrist referred Benjamin F. for evaluation from a speech therapist, in order to determine whether such therapy could assist him in addressing his disability. GOV-00000641. The record shows that a speech pathologist with Texas Children's Hospital evaluated Benjamin F. September 5, 2018 GOV-00000628 and that by September 11, 2018, Shiloh had recorded an improved

verbalization. GOV-00000631.

66. Benjamin F. was already taking medicines when he arrived at St. P.J.'s apparently having been prescribed Guanfacine in a family residential center while in the care of his mother. Benjamin F.'s mother reported that he had been prescribed medication in the past as well, including Risperidone, for what she recognized might be a branch of autism, evident developmental delays, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (which she stated began prior to his being in ORR custody or approximately 7 months prior). *See e.g.*, GOV-00000629; GOV-00000668.

67. Benjamin F's case file shows that the case manager signed a consent form regarding Benjamin F's prescriptions. Since approximately November of 2018, Shiloh requires parents or other consenters to consent to placement at Shiloh, as well as in all prescriptions of psychotropic medications.

### Benjamin F.'s UAC Case File

68. In my work as a Senior Federal Field Specialist Supervisor, I have become familiar with how ORR and its grantee care providers create and maintain case files of unaccompanied alien children (UAC case files). In connection with my employment responsibilities, I have viewed many UAC case files and UAC case file documents.

69. In accordance with ORR policies, ORR and its grantee care providers maintain comprehensive, accurate, and up-to-date case files on unaccompanied alien children. *E.g.*, ORR Guide § 5.6.2. These UAC case files include a wide variety of information concerning an individual UAC, including: "the child's name, alien number, date of services, and Federal fiscal year. The file documents all services provided, information about the child or youth's progress, barrier's to the child's progress, and the outcome of the case." ORR Guide § 5.6.2. As further detailed in the ORR Guide, UAC case files also include UAC information, admission documents, legal information, assessments (including medical records containing statements made for and reasonably pertinent to medical diagnosis or treatment, and describing medical history, past or present symptoms or sensations, the symptoms' inception, or their general cause), educational services, case management records, clinical services, incident reports, and discharge/exit information. *See id.*

70. Also in accordance with ORR policies, ORR and its grantee care providers have procedures to maintain, protect, and review UAC case files for completeness and accuracy. *See* ORR Guide § 5.6.3.

71. UAC case files are made at or near the time by—or from information transmitted by— someone with knowledge; they are also kept in the course of a regularly conducted activity. Making UAC case files is a regular practice of the operations of ORR and its grantee care providers.

72. The UAC case file (or excerpts thereof) Bates stamped GOV-00000008 through GOV-00000678 and GOV-00000679 through GOV-00001217 is a true and correct copy of (or excerpts from) the UAC case file of Benjamin F., which was created and maintained in accordance with the procedures described above.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: DATE: September 21, 2020

CITY: Washington D.C.

_____
NAME OF WITNESS