# Exhibit 23

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 23**

**Page 845**

1             UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF CALIFORNIA
2                 WESTERN DIVISION

3

4   LUCAS R., et al.,              )
                                   )
5           Plaintiffs,            )        CASE NO.
                                   )
6       vs.                        )  2:18-CV-05741 DMG PLA
                                   )
7   ALEX AZAR, Secretary of        )
    U.S. Department of Health      )
8   and Human Services, et al.,    )
                                   )
9           Defendants.            )
    _____)

10

11

12         *** C O N F I D E N T I A L ***

13

14         DEPOSITION OF DAVID R. FINK

15              Atlanta, Georgia

16       Wednesday, February 12, 2020

17

18

19

20   Reported by:

21   Judith Leitz Moran

22   CCR, RPR, RSA

23   JOB NO.: 175989

24

25

**Exhibit 23**

**Page 846**

TSG Reporting - Worldwide (877) 702-9580

Confidential

Page 23

1   assigned to a specific region?

2        A     Youth?

3        Q     Yeah.

4        A     So basically the kids are referred by DHS

5   to intakes.  And then intakes will usually place

6   kids closest to the point of referral and then they

7   will fan out.  So it's basically based on capacity

8   is where they're placed.  And need.

9        Q     So would you agree that each regional FFS

10  serves as the final approval authority for all

11  placement, transfer and release decisions for the

12  youth that are within their region -- their region

13  or their jurisdiction?

14       A     Yes.

15       Q     When, if ever, is an FFS required to

16  discuss a case with an FFS supervisor prior to

17  making a decision regarding the placement, transfer

18  or release of a youth?

19       A     I'm not sure of any requirements.  I know

20  that if it's a complicated case they will reach out

21  to their supervisor to staff it.

22       Q     As the FFS supervisor for special

23  populations, do you serve as the final approval

24  authority responsible for the placement, transfer

25  and release of children placed in restrictive

Confidential

Page 37

```
 1        Q     And does ORR place children in
 2   therapeutic staff secure programs as well?
 3        A     Yes, that's part of the staff secure,
 4   yes.
 5        Q     Does ORR utilize influx facilities for
 6   the care and custody of youth within its custody?
 7        A     Within its custody?
 8        Q     Yeah.
 9        A     Yes.
10        Q     Does ORR place children in therapeutic
11   group homes?
12        A     Yes.  There's one -- I believe there's
13   one in New York.
14        Q     Does ORR place children with the
15   Unaccompanied Refugee Child Program for longer term
16   foster care programs?
17        A     So that would be when they achieve
18   status, and so they would be actually discharged
19   from DUCO custody and then they would go into the
20   URM program.
21        Q     I see.
22              And so of the types of ORR placements
23   that you've described, can you place those on a
24   continuum from least restrictive to more
25   restrictive?
```

Confidential

1    A    Yes.  So shelter and transitional foster

2  care are least restrictive settings.  Then staff

3  secure.  And RTC and secure.

4    Q    And where would you place therapeutic

5  staff secure in that continuum?  Are you

6  classifying it as a staff secure?

7    A    Yes, it's listed -- it's classified as a

8  staff secure.

9    Q    And where would therapeutic group homes

10  fall within that continuum?

11    A    Usually kids that are from shelter, right

12  above a shelter placement.

13    Q    And you also mentioned out-of-network

14  placements.

15    A    Uh-huh.

16    Q    Are out-of-network placements limited to

17  residential treatment centers or residential

18  treatment programs?

19    A    Yes.

20    Q    I'll have a few questions about that in a

21  moment.

22        But before we get there, would you agree

23  that children in ORR custody are required to be

24  placed in the least restrictive environment

25  appropriate for that child's needs?

Confidential

Page 40

1   a transfer?

2        A    It's documented in the case review.

3        Q    And to what extent does ORR evaluate

4   whether a provider has offered a youth or a child

5   more intensive interventions and supportive

6   services prior to a decision to request a transfer

7   or terminating a child from their program?

8        A    So it's done through the case review

9   documentation, significant incident reports, and

10  ongoing staffings with the case coordinator and the

11  federal field specialist.  So they are always

12  looped in to talk about those cases.

13       Q    Are there ever times when a provider is

14  determined to have failed to offer services or

15  interventions prior to a request that a child be

16  terminated from the program?

17       A    Yes.

18       Q    And what is ORR's response if that

19  occurs?

20       A    If we feel that that child can be

21  maintained in that facility, we ask them to provide

22  us a plan to -- with the goal of maintaining that

23  child in care.

24       Q    And if the program refuses to maintain

25  the child in -- in their program, does ORR offer

Exhibit 23
Page 850

1   not quite as acute as a child in RTC, but they

2   still need more mental health interventions than a

3   regular staff secure or shelter could provide.

4        Q    So how would you describe the

5   distinctions then between a therapeutic staff

6   secure shelter and a staff secure program?

7        A    So the therapeutic staff secure uses DBT,

8   dialectical behavioral therapy, as their system to

9   work with the kids teaching them.  It's a

10  therapeutic intervention that's used and taught to

11  the children to work on mindfulness and kind of

12  self-control and those kind of things.

13            And it's more groups than what's

14  prescribed.  So we prescribe like two groups.  They

15  do groups every day and it's all therapeutic.

16       Q    So you talked a little bit about this,

17  but then how would you describe the distinctions

18  between a therapeutic staff secure shelter and an

19  RTC?

20       A    A shelter might be something where the

21  child might have some mental health issues, but

22  they're not particularly in crisis.  They're not

23  very acute.

24       Q    You described a little bit of the

25  distinction between sort of the treatment modality

**Exhibit 23**
**Page 851**

Confidential

1   at a staff -- at a therapeutic staff secure and a

2   staff secure shelter program -- staff secure

3   program.

4       A    Uh-huh.

5       Q    In terms of the restrictiveness of the

6   programs, how would you describe the similarities

7   or the differences in terms of the restrictiveness

8   of those two placements?

9       A    So it depends on the staff secure and the

10  locale.  So Friends of Youth, which is the

11  therapeutic staff secure you're talking about, is

12  an open campus and so it's not locked.

13          Whereas, BCFS San Antonio might have a

14  fence -- has a fence around it.

15          And then Children's Village, staff

16  secure, is also an open campus and its our standard

17  staff secure.  So it varies.

18      Q    So how would you describe an open campus?

19      A    It doesn't have a fence around it.

20      Q    Okay.  So that's helpful.  But in terms

21  of the buildings, the residences, the buildings

22  where children are receiving services, they're

23  going to school, are those locked buildings at both

24  an open campus and a fenced campus?

25      A    Yes, they have a delay lock on them, yes.

Confidential

Page 55

1    Q    Okay.  Do you believe that the FFSs have

2  been trained on and understand the differences

3  between a therapeutic staff secure, a staff secure

4  and a residential treatment program?

5    A    Some have, yes.

6    Q    And to what extent are the placement

7  criteria for placement at a therapeutic staff

8  secure different than the placement criteria for a

9  staff secure shelter?

10    A    So a therapeutic staff secure isn't going

11  to take a child that is aggressive or disruptive,

12  they're going to take children with mental health

13  diagnoses that are amenable to treatment.

14        And staff secure are required to take

15  kids with disruptive and aggressive behavior.

16    Q    And are those criteria reflected in the

17  ORR policy guide or the MAP?

18    A    I don't -- I don't know it off the top of

19  my head.  I couldn't tell you.

20    Q    How many therapeutic staff secure

21  shelters are actually available within the ORR

22  network?

23    A    One.

24    Q    And what is that?

25    A    Friends of Youth.

**Exhibit 23**
**Page 853**

Confidential

1        A    I would say it's right above -- it's for

2    kids that are shelter kids that have mental health

3    issues but really are not in crisis and kind of

4    lower level issues that can't be maybe managed in a

5    shelter but need a little bit more therapeutic

6    intervention.

7        Q    So in terms of restrictiveness you would

8    put therapeutic above a shelter but below a staff

9    secure, a therapeutic staff secure?

10       A    Yes, correct.

11       Q    Okay.  And functionally, how is a

12   therapeutic group home different than a group home?

13       A    So in the domestic system, because we

14   only have the one group home, in the domestic

15   system there's various levels of group homes.

16            And some of our programs are actually

17   licensed as group homes, but you can be licensed to

18   be a group home, like a regular group home that

19   takes standard kids, or a therapeutic group home

20   would probably be the difference.

21       Q    I see.

22            And do you believe that the FFS -- so

23   where is -- what is and where is the therapeutic

24   group home?

25       A    It's in Children's Village in Dobbs

Confidential

Page 61

1       Q    Okay.

2       A    Yeah.

3       Q    So I apologize, I'm just trying to

4    recall.  So I know you have one therapeutic group

5    home that you have access to.

6            In terms of the therapeutic staff secure,

7    can you remind me what therapeutic staff secure

8    programs are within the ORR network?

9       A    Friends of Youth.

10      Q    Okay.  You mentioned out-of-network

11   facilities.  And I think you also testified before

12   that currently the out-of-network facilities that

13   ORR would utilize would all be at the RTC level of

14   placement; is that correct?

15      A    Yes.

16      Q    Okay.  Who within ORR has the ability to

17   authorize placement or transfer or release of a

18   youth from an out-of-network program?

19      A    So a couple of things with that.  So

20   transfers to an out-of-network, that would have to

21   be staffed by -- with the federal field specialist

22   and their supervisor.

23           So they would have to -- the FFS would

24   have to let the supervisor know they've exhausted

25   all internal placement options that were

**Exhibit 23**

**Page 855**

Confidential

Page 62

```
 1   recommended for that youth before going

 2   out-of-network.

 3        Q     Uh-huh.

 4        A     And then once they agree, they would let

 5   me know, and then they would refer to

 6   out-of-network.

 7        Q     Okay.  And just to clarify for the

 8   record, what is an out-of-network facility?

 9        A     It's a facility that doesn't have a grant

10   with ORR.

11        Q     And why does ORR place youth at

12   out-of-network facilities?

13        A     Because we have children that have

14   recommended RTC placements and our existing RTC

15   placements will not accept those children.

16        Q     Can you describe the criteria that ORR

17   uses to identify sort of a special needs case and

18   how those needs are documented?

19        A     It's usually those -- those

20   recommendations are made by a psychologist and a

21   psychiatrist, and they are specifically

22   recommending that level of care for that child.

23        Q     Can you describe the criteria that is

24   used to be able to identify when a youth might need

25   more specialized services?
```

**Exhibit 23**

**Page 856**

Confidential

1   variation in terms of the types of behaviors or

2   incidents that are reflected or documented in a

3   significant incident report?

4        A    They -- they're very broad.

5        Q    In terms of -- is there variation by

6   program in terms of how programs interpret what

7   might constitute a need to document behavior in a

8   significant incident report?

9        A    Yes.

10       Q    And from ORR's perspective, is there any

11  kind of guidance or training provided in terms of

12  what types of behavior should be captured by the

13  significant incident reports?

14       A    So when we rolled out the policy, we did

15  this training, but the other piece of this that

16  makes this a little tricky is that their licensing

17  will also call for different standards of

18  reporting, too.  And so what may not be significant

19  to us might be significant to the state and vice

20  versa.

21       Q    Okay.  So there could be differences

22  between ORR reporting requirements and state

23  licensing reporting requirements?

24       A    And it may require them -- they're going

25  to report to both regardless.

**Exhibit 23**

TSG Reporting - Worldwide (877) 702-9580          **Page 857**

Confidential

1    disruptive behavior?

2        A    Again, it goes back to the reports that

3    we might get from the facilities.  If there's

4    fighting, there's property damage, things of that

5    nature, would constitute staff secure placement.

6        Q    You mentioned that's sort of -- the

7    determination begins at the program or provider

8    level.  Do programs vary in terms of how they might

9    define an unacceptably disruptive behavior?

10       A    They vary in terms of how long they will

11   try to manage the behavior as opposed to -- the

12   criteria will be the same, but it will be dependent

13   on the level of tolerance that program might have

14   for their behavior.

15       Q    What, if anything, does ORR do to try to

16   ensure that the criteria or sort of the standards

17   are being applied at the program level in a

18   consistent way?

19       A    Programs -- when a child enters one of

20   those levels of care that requires a notice of

21   placement, they're required to inform that minor

22   within 48 hours of placement of why they're placed

23   in that particular level of care, be it a staff

24   secure or a TC or secure.

25            And then they are to evaluate that

**Exhibit 23**
**Page 858**

1   started to talk about this a little before.

2       A    Yes.

3       Q    Okay.  And based on your experience, how

4   frequently does that happen?

5       A    So those -- when those transfers occur,

6   I'm not a part of those discussions.  I only get

7   really involved when there's a potential

8   out-of-network.  So I wouldn't be able to give you

9   that number.

10      Q    So can you remind me who is involved --

11  who recommends whether a child should be

12  transferred to a secure facility?

13      A    So the recommendation would come from the

14  program and the case coordinator, and then the

15  decision to do that would be with the FFS.

16      Q    And so kind of focusing a little more

17  specifically on the secure facility right now, what

18  factors do those individuals consider when they are

19  making recommendations that a youth needs to be

20  transferred to a secure facility?

21      A    Danger to the community and committing

22  chargeable crimes.

23      Q    And is it necessary for -- oh, wait.  I'm

24  sorry.  Danger to the community and then what?

25      A    Chargeable crimes.

Exhibit 23
Page 859

Confidential

1    residential treatment programs that you're

2    currently placing at, how many youth do you

3    currently have in out-of-network RTCs?

4        A    I don't know the exact number.  Probably

5    under 10.

6        Q    And I apologize.  I think you said that.

7    And at which programs?

8        A    Again, don't know exactly.  I know

9    there's some at Devereux, and then San Jose

10   Behavioral Health.  And the rest of them I don't

11   remember off the top of my head.

12       Q    Okay.  So you mentioned the notice of

13   placement and the information that's contained in

14   that.  What is the purpose of the notice of

15   placement?

16       A    It's to ensure the programs are in

17   compliance with placement and that they're

18   informing the right -- the child's -- the reasons

19   why that child is in placement to that child.

20       Q    To what extent is a notice of placement

21   also intended to offer a youth protection when

22   they're being stepped up to a more restrictive

23   setting?

24       A    It offers them the right to go through an

25   appeal process to contest their placement.

Exhibit 23
Page 860
TSG Reporting - Worldwide (877) 702-9580

Confidential

1    the notice of placement for staff secure is

2    identical to notice of placement for therapeutic

3    staff secure?

4          A    Correct.

5          Q    The therapeutic group home does not

6    require -- does the therapeutic group home require

7    a notice of placement?

8          A    No.

9          Q    Okay.  Is the notice of placement

10   provided to a youth -- let me just take a step

11   back.

12              MS. SHUM:  Okay.  I'm going to just take

13   a look at another document.

14              (Deposition Exhibit 175 marked.)

15   BY MS. SHUM:

16         Q    All right, Mr. Fink, I'm going to ask

17   that you to take a look at what's been marked as

18   Exhibit 175.

19         A    (Witness reviews document.)

20         Q    Okay.  So this appears to be an email

21   from Mr. ████    to Mr. Biswas dated January 9th,

22   2019.  It has the Subject line January NOP

23   Compliance Review: Staff Secure and RTC Facilities;

24   is that right?

25         A    Yes.

Confidential

1        Q     How frequently are these types of reports

2   prepared?

3        A     Monthly.

4        Q     Okay.  And this report indicates that 93

5   out of 128 cases of youth at both staff secure or

6   RTCs were noncompliant with the NOP, correct?

7        A     Correct.

8        Q     So from ORR's perspective, over 70

9   percent of kids in restrictive settings in January

10  of 2019 had not -- were placed there out of

11  compliance with ORR's own policies and a standing

12  court order specific to NOPs; is that correct?

13       A     Correct.

14       Q     Okay.  What was the outcome of this

15  particular month's compliance review?

16       A     I don't -- I don't remember.  This is

17  when they were running -- I wasn't -- I was

18  starting to get involved, ramped up into this

19  process.

20       Q     I see.

21       A     So I don't really remember.

22       Q     And you said these reports are generated

23  monthly?

24       A     Yes.

25       Q     And so the most recent compliance report

Confidential

1    they are in common with the court order.

2         Q    You mentioned before that in terms of a

3    notice of placement it informs a youth of their

4    right to challenge a decision to step them up to a

5    more restrictive setting.

6              What is your understanding of what that

7    involves?

8         A    The minor's right to challenge?

9         Q    Yes.

10        A    It's very limited.  I haven't seen a

11   child challenge a placement yet.  So I've yet to

12   see that process.

13        Q    Does a youth have the right to an

14   attorney in order to challenge that decision to

15   step them up to a more restrictive setting?

16        A    To step them up to a more restrictive

17   setting, no.

18        Q    We've talked a lot about step-up, a

19   little bit about step-down.  But just for the

20   record, can you please define what a step-down

21   would involve?

22        A    A transfer to a least restrictive

23   placement.

24        Q    So given sort of your pretty specific

25   role as FFS for special populations, what is your

1      A     Yes.

2      Q     And now you have a specific role of FFS

3   for special populations, correct?

4      A     Yes.

5      Q     What expectations or policies does ORR

6   have in terms of what types of decisions an FFS

7   needs to seek approval from their FFS supervisor in

8   order to move forward?

9      A     It's on a case-by-case basis.

10      Q     Okay.  So is an FFS independently

11   authorized to serve as the final decision maker on

12   decisions related to -- final authorizer on

13   recommendations related to release and transfer and

14   step-up and step-down of youth?

15      A     Yes.

16      Q     Okay.

17      A     Except when it comes to out-of-network

18   placements.

19      Q     Okay.

20      A     Yeah, that is the caveat.

21      Q     Okay.

22      A     And then the RTC placements have to

23   become from a -- that has to be recommended by a

24   doctor before they do that.  They can't put a kid

25   into an RTC without that recommendation.

Exhibit 23
Page 864

TSG Reporting - Worldwide (877) 702-9580

Confidential

1    Q    Okay.  Are there other types of decisions

2  that an FFS is required to staff and get approved

3  by an FFS supervisor before they're able to

4  implement that decision?

5        A    A release decision?

6        Q    Other decisions.

7        A    Like transfers or --

8        Q    Yeah.

9        A    No.

10        Q    Okay.

11        A    They can make those independently.

12        Q    So those decisions are within the

13  independent discretion of the individual FFS,

14  correct?

15        A    To my knowledge, yes.

16        Q    With the caveat limitations that you

17  already put on the record?

18        A    Yes.

19        Q    Okay.  You mentioned that there was --

20  and you described the circumstances around a youth

21  who had a viable sponsor and who had been referred

22  to you for an out-of-network placement where you

23  declined to facilitate an out-of-network placement;

24  is that correct?

25        A    The minor from the shelter that you're

Confidential

1    to make release determinations without kicking that

2    up to the regional supervisor?

3         A    I would have to review the policy again.

4         Q    Uh-huh.

5         A    So I'm not clear.  So it could be where

6    they have to kick it up to me.

7         Q    Uh-huh.

8         A    But again, I'd have to revisit the

9    policy.  I don't have it on me.

10        Q    Okay.  But when you talk about there

11   being less -- your understanding of current policy.

12   When you're describing less need to engage a

13   supervisory FFS, what kinds of decisions remain in

14   the final purview of an FFS?

15        A    Release decisions are in their purview,

16   transfers are in their purview.

17        Q    Release and transfers.

18        A    Uh-huh.

19        Q    From your understanding of current policy

20   release and transfers remain within the authority

21   of FFS?

22        A    Yes.

23        Q    Okay.  What is your understanding of --

24   let me ask a question before I move on.

25             Going back again for a moment to when you

**Exhibit 23**
**Page 866**

Confidential

Page 248

1    she's doing with respect to her regular caseload?

2         A    Correct.

3         Q    Of those 14 cases, how many has she

4    identified as complex enough to engage your

5    assistance on?

6         A    I mean, I think I did one a couple of

7    weeks ago.

8         Q    Okay.

9         A    And -- yeah.

10         Q    And with specific to the residential

11   treatment programs, you had mentioned that an FSS

12   is required to have a psychiatric recommendation

13   supporting residential placement prior to being

14   able to approve the placement of a youth at an RTC;

15   is that correct?

16         A    Yes.

17         Q    Okay.  Is a psychiatric approval also

18   required in order to authorize release or a

19   step-down from a residential treatment program?

20         A    No, I'm not aware of that being anywhere

21   in the policy or anything.

22         Q    Do the out-of-network residential

23   treatment programs require any kind of psychiatric

24   approval of discharge before they're able to step

25   down or transfer a youth from an out-of-network

**Exhibit 23**

**Page 867**

Confidential

```
 1                    J U R A T

 2

 3   I,              , do hereby certify under

 4   penalty of perjury that I have read the foregoing

 5   transcript of my deposition taken on              ;

 6   that I have made such corrections as appear noted

 7   herein in ink, initialed by me; that my testimony as

 8   contained herein, as corrected, is true and correct.

 9

10   DATED this _____ day of _____, 2020,

11   at _____,         .

12

13

14

15

16

17   _____

18           David R. Fink

19

20

21

22

23

24

25
```

Confidential

1                    DISCLOSURE OF NO CONTRACT

2

3         I, Judith L. Leitz Moran, do hereby disclose
    pursuant to Article 10.B. of the Rules and
4   Regulations of the Board of Court Reporting of the
    Judicial Council of Georgia that TSG Reporting was
5   contacted by the party taking the deposition to
    provide court reporting services for this
6   deposition and there is no contract that is
    prohibited by O.C.G.A. Sections 15-14-37(a) and (b)
7   or Article 7.C. of the Rules and Regulations of the
    Board of Court Reporting for the taking of this
8   deposition.

9         There is no contract to provide reporting
    services between TSG Reporting or any person with
10  whom TSG Reporting has a principal and agency
    relationship nor any attorney at law in this
11  action, party to this action, party having a
    financial interest in this action, or agent for an
12  attorney at law in this action, party to this
    action, or party having a financial interest in
13  this action.  Any and all financial arrangements
    beyond our usual and customary rates have been
14  disclosed and offered to all parties.

15

16        This 25th day of February 2020.

17

18

    _____
19  Judith L. Leitz Moran, B-2312
    Georgia Certified Court Reporter
20

21

22

23

24

25

**Exhibit 23**
**Page 869**

Confidential

1                    CERTIFICATE OF COURT REPORTER

2

3      STATE OF GEORGIA      )

4      COUNTY OF DEKALB      )

5

6           I hereby certify that the foregoing deposition
       was reported as stated in the caption, and the
7      questions and answers thereto were reduced to
       writing by me; that the total transcript pages 1
8      through 281 represent a true, correct, and complete
       transcript of the evidence given on February 12,
9      2020, by the witness, DAVID R. FINK, who was first
       duly sworn by me.

10

11          I further certify that I am not related to any
       of the parties to this action by blood or marriage;
12     and that I am in no way interested in the outcome
       of this matter.

13

14          I certify that I am not disqualified for a
       relationship of interest under O.C.G.A. Section
15     9-11-28(c); I am a Georgia Certified Court Reporter
       here as a representative of TSG Reporting; I was
16     contacted by TSG Reporting to provide court
       reporting services for this deposition; I will not
17     be taking this deposition under any contract that
       is prohibited by O.C.G.A. Sections 15-14-37(a) and
18     (b) or Article 7.C. of the Rules and Regulations of
       the Board of Court Reporting.

19

20          This 25th day of February 2020.

21

22     _____
       Judith L. Leitz Moran, B-2312
23     Georgia Certified Court Reporter

24

25

**Exhibit 23**
**Page 870**