# Exhibit 28

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 28**
**Page 958**

CONFIDENTIAL

Page 1

1              UNITED STATES DISTRICT COURT

2          IN THE CENTRAL DISTRICT OF CALIFORNIA

3

4      -------------------------------x

5      LUCAS R., et al

6                  Plaintiffs,        CASE NO:

7              v.                     2:18-CV-05741-

8      ALEX AZAR, SECRETARY OF U.S.    DMGPLA

9      DEPARTMENT OF HEALTH AND HUMAN

10     SERVICES, INC.

11                 Defendants.

12     -------------------------------x

13

14                 CONFIDENTIAL

15       TELEPHONIC DEPOSITION OF NIDIA MURRAY

16                 Houston, Texas

17                  9:14 a.m.

18

19

20

21

22

23     Reported by:

24     Paula J. Eliopoulos

25     JOB NO. 170999

CONFIDENTIAL

Page 46

1   perhaps something should happen.

2       Q.     Do you ever recommend what conclusion

3   or what recommendation the case coordinator should

4   come to?

5       A.     No.

6       Q.     Do you ever actually review the

7   information and the documents that the case

8   coordinator is reviewing in coming to their

9   recommendation?

10      A.     Yes.

11      Q.     What documents are those?

12      A.     First from the child, the UAC portal

13  is where we would find many of our documents.

14  That could be all of the documents in the UAC

15  portal, case reviews, significant incident reports

16  and maybe even home studies.  But it really does

17  differ from child to child.

18      Q.     Are there any documents outside of

19  what's in the ORR portal that you review or that

20  your case coordinators review?

21      A.     There were times when case managers

22  don't load everything into the portal that they

23  should be so there may be -- maybe a safety plan

24  that's attached to an e-mail, you know, where they

25  let us know this case is ready for review in the

Exhibit 28
Page 960

CONFIDENTIAL

Page 47

1    UAC portal.  He's the safety plan.

2              So that may be an example of a time

3    where we're reviewing something outside.

4        Q.     Does GDIT have their own portal or

5    document, I guess, server that they store their

6    own information and documents on related to

7    unaccompanied children?

8        A.     Not documents, no.

9              The only -- that I'm aware of, the

10   only database is Share Point and it's really just

11   to keep track, maybe add an administrative note,

12   but to keep track of when the cases are assigned

13   and when recommendations are provided.

14             I know that data is provided to ORR

15   from that, numbers.

16       Q.     Are there any details about the

17   specific children themselves in Share Point?

18       A.     That really is up to the case

19   coordinator if they add an administrative note or

20   maybe somebody goes on an interview.  That's about

21   it.

22       Q.     So there could be some information?

23       A.     There may be.

24       Q.     You mentioned that you assign specific

25   cases to your different case coordinators?

**Exhibit 28**
**Page 961**

CONFIDENTIAL

Page 59

1  coordinators, what training do they receive as the

2  initial training regarding ORR policy?

3      A.    We may go over some of the main

4  points, but what I encourage is read it.  It's

5  extremely important to actually review and read

6  and study it.

7            And so I realize that policy changes

8  quite often but initially the guidance given is to

9  go ahead and take specific sections of that policy

10  and read them very carefully.

11      Q.    Is it required that they read it, the

12  policy guide?

13      A.    I don't know that it's -- I don't know

14  that there's a written requirement anywhere but I

15  know that as a DOC, yes, I ask them to read it and

16  review it.

17      Q.    Do you followup with them to ask if

18  they do read it?

19      A.    Yes.

20      Q.    Do you know if other DOC supervisors

21  verify that the people they supervise read the

22  policies?

23      A.    I don't know that.

24      Q.    When is the last time that you read

25  the ORR policies?

**Exhibit 28**
**Page 962**

CONFIDENTIAL

Page 67

1   case came in after 5:00 and it was noted

2   incorrectly in Share Point so they may have fixed

3   something or edited dates and said oh, this was --

4   the e-mail shows that it was after 5:00 central

5   time so it should have had a different received

6   date.  Administrative things.

7        Q.    Is it anything besides administrative

8   or logistical details that could be included in

9   Share Point?

10       A.    There may be interviews that happened

11  with children.  If a case coordinator interviewed

12  a child they may add notes in there, other

13  entries.

14       Q.    Are those notes in the ORR portal as

15  well?

16       A.    No.  They're in Share Point.

17       Q.    Okay.  So what would those notes --

18  what are some examples of what notes regarding

19  interviews look like or detail?

20       A.    They are different from case

21  coordinator to case coordinator but it may just be

22  as simple as, you know, interviewed such and such

23  minor on this date.  No concerns were noted.  And

24  that's it.

25              Or it could have more details, the

CONFIDENTIAL

Page 68

1   minor said X,Y,Z in the actual note somebody put

2   in.

3        Q.    So it could cover things that the

4   minor said?

5        A.    Yes, to the case coordinator.

6        Q.    Could it cover the case coordinator's

7   impressions of the child?

8        A.    Yes.

9        Q.    Could it cover whether the case

10  coordinator thought the child may have a

11  disability?

12       A.    The case coordinator does not

13  determine if the child has a disability.

14       Q.    Right.  But could the case coordinator

15  make a note whether they think there was a

16  disability?

17       A.    They may make a note that the child

18  needs to be either seen by a doctor or gather more

19  information to determine whether the child has a

20  disability.

21       Q.    Does it make note that the child

22  appears like they have full mental capacity or

23  not -- did not have any disabilities?

24       A.    Again it's from case coordinator to

25  case coordinator.  I suppose someone could write

**Exhibit 28**
**Page 964**

CONFIDENTIAL

Page 69

1    something like that down.

2                But most of the interviews are to

3    determine whether the minor wants to go to the

4    sponsor.  If the minor makes -- has any concerns

5    with the sponsor or what their life was like in

6    their home country, we actually have an interview

7    template that we use just as a starting point, but

8    it's not something that we have to use.

9                If there is a concern with a

10   disability, I suppose someone could write it in

11   there, but it's again --

12        Q.    Could the notes cover the case

13   coordinator's thoughts on the potential sponsor?

14        A.    If the case coordinator chose to put

15   it in there, perhaps.

16                But, again, it's sort of a blank space

17   and a case coordinator will choose what they put

18   in there.

19        Q.    Have you ever seen the administrative

20   notes that case coordinators have put in Share

21   Point?

22        A.    Yes.

23        Q.    And anything else besides what you

24   said, have you seen any specific examples related

25   to disabilities or sponsors?

Exhibit 28
Page 965

CONFIDENTIAL

Page 70

1          MS. CHAPUIS:  Objection to form.

2     A.     Have I seen anything in our Share

3     Point note?

4     Q.     Yes.

5     A.     On disabilities?

6          Yes.  If a case coordinator has

7     received information from a doctor that the minor

8     meets criteria or has a disability then they may

9     add the information stating that maybe the case

10    meets the DPI criteria due to that disability.

11    Q.     And we'll talk a little bit more about

12    that in a little bit.

13    A.     Okay.

14    Q.     You mentioned that there's a kind of

15    standard template that can be used for the, I

16    guess the case coordinator's initial assessment?

17    A.     No.

18    Q.     Well, you just mentioned an initial

19    template.  Can you describe what that was?

20    A.     Yes.  For interviews with minors.  If

21    a case coordinator is going to interview a minor

22    then they may be able to use that template.

23         So I know for any employee I provided

24    that template just as an idea or the suggestion on

25    questions that may be asked.

Page 103

1      Q.      Would the -- what you refer to as the
2  administrative notes, would those be sent to ORR?
3      A.      No.
4      Q.      Does anyone out of GDIT have access to
5  the administrative notes?
6      A.      Not that I know of.  No.
7      Q.      Are you aware of any time that the
8  administrative notes were sent to someone else
9  outside of GDIT?
10     A.      No.  No.  Not that I know of.
11     Q.      Okay.  I want to transition now to
12 talk about the case coordinators.  Specifically,
13 any kind of -- where they fit into the picture.
14             Can you just go over again what the
15 case coordinator's role is in regards to an
16 unaccompanied child's case?
17     A.      The role or the responsibility, the
18 main responsibility is to provide a recommendation
19 on reunification to ORR.  It would be to provide a
20 recommendation of reunification or transfer to
21 ORR.  So they are third-party reviewers.
22             The -- the facility, the case
23 management of the facility provides a
24 recommendation on whether a minor should reunify
25 with their sponsor or not or step up to a

CONFIDENTIAL

Page 104

1   different level of care, step down to a different

2   level of care.

3              The case coordinator is the third

4   party that either concurs or does not concur with

5   that recommendation, and provides that to ORR.

6   ORR makes the final decision.

7        Q.    What would you or how would you

8   describe the case coordinator's objective?

9        A.    It's simply -- the goal is to simply

10  provide a recommendation to ORR.

11       Q.    Okay.

12       A.    And to ensure that the reunification

13  is safe.

14       Q.    You mentioned that case coordinators

15  are independent or third-party, I guess,

16  reviewers.  What makes them independent?

17       A.    They do not work for the facility that

18  houses the immigrant children.  And although we do

19  have a contract with ORR, we are not required to

20  concur with ORR's final decision.  So it could be

21  that our decision is different -- I mean our

22  recommendation is different from their decision.

23             So we are looking at the case facts

24  and not having that close contact with the child

25  or the sponsor.

**Exhibit 28**
**Page 968**

CONFIDENTIAL

Page 117

```
1        A.    Yes.

2        Q.    Okay.  What does the case coordinator

3   make recommendations on?  I believe we touched on

4   this already.

5        A.    Yes.

6        Q.    But I --

7        A.    Yes.  Of course.

8              Reunification and transfers.  Step up,

9   step down.  As well as any other recommendations

10  on maybe safety planning or resources in the

11  community or anything like that.

12       Q.    Okay.  And let's talk about Shiloh

13  specifically, just to kind of focus our

14  discussion.

15       A.    Okay.

16       Q.    What information or evidence does the

17  case coordinator review in deciding whether to

18  recommend whether a child should be transferred to

19  or from Shiloh?

20       A.    Anything that's in the UAC portal.

21  Various incident reports.  Case reviews.  Clinical

22  notes.  Specifically, the recommendation from the

23  psychiatrist.

24       Q.    Why specifically that recommendation?

25       A.    Because the psychiatrist is the one
```

**Exhibit 28**
**Page 969**

CONFIDENTIAL

Page 119

1    factors.

2        Q.      Are you able or is the case

3    coordinator able to request more information if

4    they -- if he or she wants to?

5        A.      Yes.  Absolutely.

6        Q.      What kind of information might a case

7    coordinator request that they would not receive in

8    the ordinary process?

9        A.      For a step up?  Step down?  Or

10   reunification?

11       Q.      Let's start with a step up.

12       A.      Okay.  Specifically?  I mean -- okay.

13              There's a very specific listing in our

14   policy of requirements of documents that need to

15   be included when a step up or step down or

16   transfer or reunification is going to occur.  All

17   of those things need to be included.  And so if

18   one of those items is missing or if the case

19   coordinator needs additional information, then,

20   yes, they would request any of that.  And that's

21   just a very specific list in policy.  So if any of

22   that information is needed, is missing, if there

23   are any incident reports or anything like that,

24   that can be requested.

25       Q.      Where is that list that you just

**Exhibit 28**
**Page 970**

CONFIDENTIAL

Page 123

1   psychiatrist indicating the minor was no longer a

2   danger to self or others.  The minor was, let's

3   say, stepped up to RTC because they were a danger

4   to self or others.  That would be something to

5   check for; to make sure that the child was going

6   to be safe.

7        Q.     When you were a case coordinator, did

8   you ever request additional information that was

9   in addition to the checklist items?

10       A.     I know I always requested to see the

11  psychiatric notes.

12       Q.     Anything else besides that?

13       A.     I can't think of anything.

14       Q.     Can the child submit, directly submit

15  information or evidence directly to the case

16  coordinator?

17       A.     No.

18       Q.     Can the child's attorney do that?

19       A.     No.  We had enough of a hard time

20  getting information from them as it was.

21       Q.     Can the child's family or potential

22  sponsor directly submit evidence or information to

23  the case coordinator?

24       A.     They submit -- no, not to the case

25  coordinator.

**Exhibit 28**
**Page 971**

CONFIDENTIAL

Page 124

1    Q.    Do you know why none of those three

2  parties could submit evidence to the case

3  coordinator?

4    A.    The -- let's start with the child.

5    Q.    Sure.

6    A.    The child actually -- if the child

7  ever wants to speak to the case coordinator, they

8  can certainly do that.  The case coordinator does

9  speak to the child.  So I would correct that; that

10  the child is able to speak to the case

11  coordinator.  And so information can be shared

12  verbally.

13         No documents that I've ever seen.

14    Q.    Okay.

15    A.    As far as the sponsor, the sponsor's

16  main contact is the case manager at the facility.

17  And so we only get information from the case

18  manager regarding the sponsor.

19         And as far as attorneys, we just don't

20  have contact with the attorneys.  I know that even

21  case managers at times were just trying to get

22  information.  Like, what else needs to be happen?

23  Is there legal relief?  What is going on?  And the

24  attorneys are usually -- of course, there's, you

25  know, confidential information.

**Exhibit 28**
**Page 972**

CONFIDENTIAL

Page 125

1        Q.     Sure.

2        A.     So...

3        Q.     So is that official policy?  Is it

4    official GDIT policy or official ORR policy that

5    the sponsor cannot directly submit information to

6    the case coordinator?

7        A.     It's not because they cannot.  They

8    don't even -- we don't even communicate.  It's not

9    policy.  It's not written anywhere.  It's just

10   that the main point of contact is the case

11   manager.

12            There's a lot of -- there's a lot of

13   care that goes into protecting the sponsors.

14   Especially from fraud.  And so they are very clear

15   on who their case manager is, so that they can be

16   kept safe.

17       Q.     Do you know what the admission

18   assessment form is?

19       A.     Yes.

20       Q.     For example --

21       A.     Yes.  From Shiloh?

22       Q.     Sure.  At Shiloh.

23       A.     Okay.  Yes.

24       Q.     Does this --

25       A.     I'm going to correct that.

CONFIDENTIAL

Page 128

1      Q.      What do you mean by "stabilize" a

2  child?

3      A.      My understanding of that, from what

4  I've heard during staffings, is that the minor is

5  no longer a danger to self or others.

6      Q.      Do you know if a child can be

7  transferred or can be -- let me start over.

8              Can a child be transferred from Shiloh

9  before that 30-day psychiatric evaluation is

10 completed?

11     A.      Can you repeat the question?

12     Q.      Sure.

13             Can a child be transferred from Shiloh

14 before the 30-day psychiatric evaluation is

15 completed?

16     A.      I suppose that if the doctor

17 determined that the child was not a danger to self

18 or others and is stable, then perhaps.  But I

19 don't -- I don't recall any situation like that.

20     Q.      So, to your knowledge, no child has

21 been placed at Shiloh for less than 30 days.  Is

22 that correct?

23             MS. CHAPUIS:  Objection.  Misstates

24     the testimony.

25     A.      I do not know of every single child at

**Exhibit 28**
**Page 974**

CONFIDENTIAL

Page 131

1    evidence or information beyond that which is

2    submitted by the ORR?

3         A.    So -- reviewers.  The evidence or the

4    information is really mostly submitted by -- by

5    the facilities which are contracted.  But it's

6    only the facilities that provide information on

7    the minors.

8              Once in a while the ORR will provide

9    information on the minor.  But it's typically

10   the -- I just wanted to get that flow in the right

11   order.

12        Q.    Okay.

13        A.    But your question was?

14        Q.    Does the case coordinator ever review

15   evidence or information beyond that which is

16   submitted by ORR or the facilities?

17        A.    No.  There's only -- there's only

18   that.  They're the ones that receive the

19   information.  It's in the UAC portal or even

20   sometimes provided by email.  But that's about

21   all.

22        Q.    Does the case coordinator ever review

23   their own -- oh.  Go ahead.

24        A.    I'm sorry.  I just thought of

25   something.

**Exhibit 28**
**Page 975**

CONFIDENTIAL

Page 136

1    A.     At any point during their stay in ORR.

2  I mean, it could be from the very beginning, which

3  we try to avoid that.  Any time.  From the

4  beginning to even a couple of days before release,

5  once we're providing a final recommendation.

6    Q.     Okay.  And so the meeting with the

7  child would likely occur before the case

8  coordinator gave the recommendation?

9    A.     Yes.

10    Q.     Okay.  Who initiates the meeting

11  between the child and the case coordinator?

12    A.     Typically it's the case coordinator

13  that initiates that.

14    Q.     And what's the purpose of the meeting?

15    A.     At one point we were just interviewing

16  all the kids.  That has changed a little bit, and

17  we are now really focusing on interviewing kids

18  where there may be additional questions or any

19  concerns, red flags.  And so those minors who go

20  in an interview, we have a better sense of what's

21  going on.

22    Q.     Have you ever interviewed a child when

23  you were a case coordinator?

24    A.     Yes.

25    Q.     When you were a case coordinator, did

**Exhibit 28**
**Page 976**

CONFIDENTIAL

Page 137

1    the child interview ever change what you thought

2    would be your recommendation prior to the

3    interview?

4         A.    I don't -- I don't know.  And I've

5    provided recommendations for probably hundreds of

6    children.  So it's difficult to think of a time.

7         Q.    Sure.  Can the child initiate an

8    interview with the case coordinator?

9         A.    They could.  If their case manager

10   made them very aware of the entire process, they

11   could.  But it's very, very rare.

12        Q.    Are you aware of any child initiating

13   that interview with the case coordinator?

14        A.    I can't think of one.

15        Q.    Okay.  Are there facilities that are

16   specific to therapeutic care?

17        A.    Yes.

18        Q.    All right.  Which facilities -- or

19   kind of what's the label of those facilities?

20        A.    We have a therapeutic staff secure, a

21   therapeutic group home, and a therapeutic shelter.

22        Q.    And how do those differ from one

23   another?

24        A.    The therapeutic -- the therapeutic

25   staff secure, even though it has the name "staff

CONFIDENTIAL

Page 140

1  facility -- I'm trying to figure out where the

2  child would be coming from here.

3      Q.    Okay.  Well --

4      A.    So let's say that the child was in a

5  shelter and we were looking for a therapeutic

6  placement because the minor did not meet criteria

7  to go and be placed in a residential treatment

8  center.  They did not have a recommendation from a

9  psychiatrist.  That psychiatrist or psychologist

10 may have recommended therapeutic placement.  And

11 so that's when a therapeutic placement would be

12 sought.  So it would be that therapeutic group

13 home.

14          So therapeutic staff secure, again,

15 just -- because of the minors that they're able to

16 accept, it just -- the staff secure part almost

17 doesn't even meet the criteria for staff secure.

18     Q.    Do therapeutic staff secure facilities

19 and therapeutic group homes have the same

20 staff-to-child ratio generally?

21     A.    I don't know what the ratios are.

22 Sorry.

23     Q.    Which would you say is more

24 restrictive?

25     A.    Out of therapeutic --

**Exhibit 28**
**Page 978**

CONFIDENTIAL

Page 141

1      Q.      Out of the two.  Out of therapeutic

2   staff secure and therapeutic group home.

3      A.      I don't know.  I would classify those

4   probably about the same.

5      Q.      Okay.  Do you know why they're

6   classified differently or have different names?

7      A.      I'm not sure.  I'm not sure.  It's a

8   question that I've actually wondered about and

9   asked why that particular facility that I'm

10  thinking about, therapeutic staff secure, has the

11  staff secure piece in it and they don't accept the

12  children that typically would need to go to staff

13  secure.

14     Q.      What was -- oh.  Go ahead.

15             I was going to say:  What was the

16  response you received to that question?

17     A.      I didn't.

18     Q.      Who did you ask?

19     A.      I don't know.  It was just in general.

20     Q.      Okay.

21     A.      I mean, we were discussing placements.

22  I don't even remember when.  But the question has

23  come up why that facility has that name if it

24  really will not accept the children that typically

25  need to be stepped up to staff secure.

CONFIDENTIAL

Page 156

1  facility that would approve the transfer of that

2  minor.

3       Q.     Right.  And then --

4       A.     So the receiving FFS, the receiving

5  facility, would really just -- typically is just

6  observing what's going on.

7       Q.     But the FFS at the receiving

8  facility -- or, excuse me -- the FFS at the

9  transferring facility and making the decision, are

10 they reviewing the information that the case

11 coordinators receive that the transferring

12 facility sent them?

13            MS. CHAPIUS:  Objection to form.

14      A.     I -- I'm not sure if they're reviewing

15 the information.  It is my understanding that they

16 would.  But I don't know what, whether they're

17 actually doing that or not.

18      Q.     (By Mr. Scaife) Okay.  In your

19 experience, has Shiloh refused to receive a child

20 from a secure facility?

21      A.     Yes.  They have denied -- Shiloh has

22 denied placement at Shiloh of kids that are coming

23 from secure facilities in the past.

24      Q.     How many times would you say Shiloh

25 has denied a step-down request?

**Exhibit 28**
**Page 980**

CONFIDENTIAL

Page 158

1        A.      A run risk or a minor who would be a

2    risk of running away.

3        Q.      Are there any other reasons you can

4    think of?

5        A.      Not that I can think of.

6        Q.      If Shiloh denies placement at Shiloh,

7    what does the secure facility that's seeking to

8    transfer or step down the child, what do they do

9    next?

10       A.      What would the sending --

11       Q.      What would the sending facility do

12   next after Shiloh denies the placement?

13       A.      So that would be up to them.  They can

14   always seek placement at a different RTC, if it's

15   a male child.

16               They can keep the child.

17               There is also an option for the child

18   to be transferred to placement outside of the ORR

19   network.  We don't really have much to do with

20   that.

21               But those are just some options.

22       Q.      How many RTCs are you aware of besides

23   Shiloh?

24       A.      In the ORR network?

25       Q.      In the ORR.

**Exhibit 28**
**Page 981**

CONFIDENTIAL

Page 164

1    Q.    Could physical disruptions -- could

2    the child -- let me rephrase.

3          Could it be a sign of a mental health

4    need if a child makes repetitive -- like physical

5    disruptions in interacting with others?

6    A.    I -- that's kind of broad.  I suppose

7    that it could be.  And it's really something that

8    should be asked of maybe a clinician or a

9    psychiatrist or a psychologist, to see if those

10   symptoms would be related to certain diagnoses.

11   Q.    Could threats of suicide be a sign of

12   mental health needs?

13   A.    Again, it could be.  It could be.

14   Suicidal ideations or -- suicidal ideations or

15   self-harm in some of the children that are

16   exhibiting -- that have mental health needs.

17   Q.    In your opinion, are secure facilities

18   or RTCs better equipped to handle mental health

19   needs?

20   A.    Your question is which one is better

21   equipped?

22   Q.    Which one is better equipped?

23   A.    I would believe that an RTC is better

24   equipped to handle mental health needs.

25              (Exhibit 162 marked for

**Exhibit 28**
**Page 982**

Page 165

1       identification.)

2       Q.     (By Mr. Scaife) All right.  I'm going
3  to hand you what we marked as Exhibit Number 162.

4       A.     Okay.

5       Q.     And specifically I want to ask
6  you about -- we'll start with Pages 4 and 5 of
7  that document.

8       A.     I'm sorry.  What page?

9       Q.     4 and 5.

10      A.     It starts with --

11      Q.     Sure.  Yeah.  We'll start with
12  Page 00033323.

13             When you've have a chance to review
14  that, Ms. Murray, just describe what the document
15  is.

16      A.     Can you give me a minute?  I'm going
17  to start from the beginning.

18      Q.     Sure.

19      A.     (Reviews document.)

20      Q.     Did you have a chance to review it?

21      A.     Yes.  I did have -- give me just a
22  second.  I'm sorry.

23             I have not read all of it.  But...

24      Q.     All right.  Ready?

25      A.     Almost.

CONFIDENTIAL

Page 166

1    Q.    Okay.  Sorry.

2          Let's first look at the document

3    ending in Bates Number 323.  The number in the

4    lower right.

5    A.    Okay.

6    Q.    Okay.  And on the bottom half of that

7    page, do you see the email from Mr. Douglas

8    Plaeger --

9    A.    Yes.

10   Q.    -- to you?

11   A.    Yes.

12   Q.    Who is Mr. Douglas Plaeger?

13   A.    He is the program director for Shiloh

14   Treatment Center.

15   Q.    And in this email -- what is this

16   email about?

17   A.    He is denying placement of

18   ██████████████████████ from Yolo to Shiloh.  And he

19   provides his reasons.

20   Q.    And Yolo is -- is Yolo a secure

21   facility?

22   A.    Yes.

23   Q.    And so I believe you said earlier that

24   to be placed at an RTC like Shiloh there has to be

25   a psychologist or psychiatrist recommendation.  Is

CONFIDENTIAL

Page 167

1   that correct?

2        A.      (No audible response.)

3        Q.      Okay.  So does this mean that a

4   psychologist or a psychiatrist recommended that

5   ███████  be transferred to an RTC?

6        A.      I do not know.  I'd have to look to

7   see if they actually had that.

8        Q.      Well, if ORR policy was followed,

9   would a psychologist or psychiatrist have

10  recommended placement at an RTC?

11       A.      If ORR policy was followed, then yes.

12  They would have to have included that.

13       Q.      What are the reasons that Mr. Plaeger

14  denied placement at Shiloh in this email?

15       A.      Here it says that Shiloh responded to

16  Yolo's initial transfer request on 3/20/17 with

17  concerns regarding ███████ flight risk and

18  aggressive behaviors.  They indicate that, since

19  that time and with the recent transfer request,

20  ███████ continues to engage in physically

21  aggressive, disruptive, and noncompliant

22  behaviors, with the latest incident on 7/8/17,

23  where he manipulated staff by saying he was going

24  to kill himself and then later smeared blood on

25  the door window, disrupting the program, and

CONFIDENTIAL

Page 168

1   showing he can do what he wants.  Shiloh also has

2   concerns of ██████ not being receptive to

3   therapeutic treatment, as evidenced by the

4   estimated six incidents of medication

5   noncompliance.

6        Q.    So if ORR policy was followed,

7   psychologists or psychiatrists recommended that

8   ██████ be transferred to an RTC.  Right?

9        A.    If --

10       Q.    If ORR policy was followed?

11       A.    Right.

12       Q.    And the reason Shiloh denied placement

13   of ██████ at Shiloh was because of his flight

14   risk and aggressive behaviors.  Is that right?

15       A.    According to the email --

16       Q.    According to --

17       A.    -- it states that.  Yes.

18       Q.    As well as physically aggressive,

19   disruptive, and noncompliant behaviors.  Correct?

20       A.    Yes.  And then it goes on to list an

21   incident.

22       Q.    Where he said he was going to kill

23   himself.  Correct?

24       A.    Actually, it says where he manipulated

25   staff by saying he was going to kill himself.

**Exhibit 28**
**Page 986**

CONFIDENTIAL

Page 169

1      Q.     Yes.  Can these factors -- the flight

2   risk, the aggressive behaviors, the physically

3   aggressive, disruptive, and noncompliant behaviors

4   and statements he's going to kill himself be

5   indicative of mental health needs?

6      A.     That's really for his psychiatrist to

7   determine.  I'm not sure of this minor's history

8   or anything at all.  So I don't know if this is

9   behavioral, mental health related.  It really is

10  up to the psychiatrist.

11     Q.     And if this ORR -- and if ORR policy

12  was followed, a psychiatrist would recommend that

13  he be placed at an RTC.  Correct?

14     A.     I would think that, if policy was

15  followed, then there should be a recommendation.

16  Somewhere in the packet there should have been.

17     Q.     Okay.  If we look at the document --

18  it's one page over, ending in 322.

19     A.     Okay.

20     A.     At the very top, do you see the email

21  on July 12, 2017, from Ivonne Velazquez?

22     A.     Yes.

23     Q.     Who is Ivonne Velazquez?

24     A.     It does not say.  On here her

25  signature is not included.  But she -- yeah.  So I

**Exhibit 28**
**Page 987**

CONFIDENTIAL

Page 170

1    can't say for sure.

2         Q.     Okay.  Do you see Ivonne's statement

3    in the email saying "I have several cases at Yolo

4    that are in need of RTC, but our RTC keep

5    rejecting them.  At this point we are looking for

6    out-of-network placement"?

7         A.     Yes.

8         Q.     In your experience as a case

9    coordinator, was there instances where you viewed

10   RTCs, including Shiloh, as consistently rejecting

11   step-down placements or step-down transfers from a

12   secure facility?

13              MS. CHAPIUS:  Objection to form.

14        A.     I don't know.  You're asking whether

15   Shiloh consistently denies placement of kids from

16   secure --

17        Q.     (By Mr. Scaife) From secure

18   facilities.

19        A.     I would not say they consistently deny

20   placement from secure -- or minors from secure

21   placement.

22        Q.     How often would you say?

23        A.     You'd have to go look back and look at

24   numbers.  But I know that they do accept placement

25   from secure facilities.

CONFIDENTIAL

Page 175

1   where the shelter sometimes requested a step up to

2   staff secure.  And I would not agree, because I

3   did not feel that minor met the criteria.  And

4   they didn't transfer.  That was the decision; not

5   to transfer the minor.

6       Q.    When you did not concur with the

7   transfer request, would you say the transfer

8   request still went through?  Or did not go

9   through?  Or complied with your recommendation as

10  case coordinator or --

11      A.    Sometimes I -- sometimes it would

12  still go through.  It -- really, it was ORR who

13  made the final decision.  So it just depends on

14  what ORR chooses in the end.

15      Q.    When you were a case coordinator would

16  you feel that your recommendation carried weight

17  when it did not concur with the case manager's

18  recommendation?

19      A.    Sometimes it did.  Sometimes it

20  didn't.

21      Q.    Okay.  Sometimes it -- can you just

22  explain how it did sometimes and how it did not?

23      A.    So there were times where I would --

24  going back to -- it might have been me reviewing

25  all the documents that were provided and

**Exhibit 28**
**Page 989**

CONFIDENTIAL

1   determining this minor -- you know.  I've reviewed

2   policy.  This minor does not qualify for step

3   up -- regardless of what the program is saying,

4   does not qualify for step up to staff secure.  I

5   would staff that with the FFS.  Provide my

6   recommendation.  Say I understand they're

7   submitting it.  I am just letting you know I don't

8   agree.  I'm going to document that.

9            And a lot of times the FFS would say

10  "I see your point.  I see it does not meet

11  criteria.  Thank you for the information," and

12  would actually make the final decision not to

13  transfer the child.

14           Other times the child might have been

15  transferred anyway.

16       Q.    Did you ever feel when you were a case

17  coordinator and did not concur with the transfer

18  request that your recommendation was ignored?

19       A.    I don't think it was ignored.  But

20  there were -- there were times when the placement

21  wasn't what I wanted it to be.  But if the FFS

22  wanted to make that decision, then they are able

23  to do that.

24       Q.    Did you ever feel that the case

25  manager's recommendation was given more weight

**Exhibit 28**
**Page 990**

CONFIDENTIAL

Page 177

1   than your recommendation regarding transfer?

2       A.      No.  I think it's pretty equal.

3       Q.      Since you took your new role in I

4   guess April or maybe November of this year, the

5   case coordinators you supervise, have they ever

6   disagreed with the case manager's recommendation

7   regarding transfer?

8       A.      Yes.

9       Q.      How many times?

10      A.      Recommendation for transfer or

11  reunification?  Many.  Like, I can't count them.

12  I don't know how many.  But yes.

13      Q.      Are you saying since April 2019?

14      A.      Yes.  Since April.

15      Q.      Would you say it's more than 100

16  times?

17      A.      No.  Probably less than that.

18  Maybe -- maybe -- maybe around the 50 mark.  And

19  I'm just really guessing here.

20      Q.      And of those around 50 times, about

21  how many times did the -- did the case manager's

22  recommendation be carried out rather than the case

23  coordinator's recommendation?

24      A.      Very few.  Very few.  I think that --

25  very few.  I think I see it more where the FFS

CONFIDENTIAL

Page 184

1    recommendation by the case manager?

2         A.    It varies from program to program.

3         Q.    Okay.  What would you say is the ideal

4    goal?

5         A.    Ideally, and according to policy, the

6    packet should be submitted to a program.  And

7    within one business day that program should

8    provide a decision.

9         Q.    The receiving program?

10        A.    The receiving program.  Sorry.

11        Q.    Okay.

12        A.    Should provide a decision and say

13   whether they accept that minor or not.  And that

14   minor should be transferred within a certain -- I

15   don't know that time frame, but should be

16   transferred as soon as possible.

17        Q.    All right.  I'm going to hand you

18   another exhibit.

19        A.    Yes.

20        Q.    This is Deposition Exhibit 163.

21              (Exhibit 163 marked for

22        identification.)

23        Q.    (By Mr. Scaife) Are you ready?

24        A.    Yes.

25        Q.    Let's start on the page that ends in

**Exhibit 28**
**Page 992**

CONFIDENTIAL

Page 185

1    770.   The second-to-last page.

2         A.     All right.

3         Q.     All right.  You see towards the top of

4    the page is an email from Brenda Banda to you?

5         A.     Uh-hum.  Yes.

6         Q.     And what is -- what is Brenda telling

7    you?

8         A.     Brenda is submitting a transfer

9    request for lower level of care.  A shelter

10   placement for ████████████████████████.

11        Q.     So Brenda -- or Shiloh -- or Brenda is

12   the case manager at Shiloh at this time.  Right?

13        A.     Yes.  That is correct.

14        Q.     Okay.  So Shiloh is submitting a

15   step-down request?

16        A.     Yes.

17        Q.     And you see on that same page, the

18   last paragraph before "Mental Health"?  It says:

19   "████   has made significant progress and has been

20   given the recommendation to step down to a lower

21   level of care by her treating psychiatrist."

22        A.     Yes.

23        Q.     Do you see that?

24        A.     Yes.

25        Q.     And what is the date of that email?

**Exhibit 28**
**Page 993**

CONFIDENTIAL

Page 186

1        A.      That is January 12.

2        Q.      And then on the next page ending in

3    769, do you see an email from you?

4        A.      Yes.

5        Q.      To Bernal Cruz and to other people?

6        A.      Yes.

7        Q.      And do you see where you say in that

8    email -- or end of that first paragraph:  "Please

9    submit this case to the following shelters"?

10       A.      Yes.

11       Q.      And you list six shelters?

12       A.      Yes.

13       Q.      And what is the date of that email?

14       A.      January 22.

15       Q.      Which is ten days after the initial

16   transfer request.  Right?

17       A.      Yes.

18       Q.      Do you know why it took ten days to

19   send this email out?

20       A.      I would have to go back to check.  But

21   I would think that there might have been some

22   documents missing or the packet was not complete

23   or something like that.

24       Q.      What was the purpose of this email

25   being sent out to all these people?

**Exhibit 28**
**Page 994**

CONFIDENTIAL

Page 187

1      A.     Okay.  So the purpose of this email

2  was to get the packet out to those shelters.  The

3  sending case coordinator to the receiving case

4  coordinator.  And so these people, the group of

5  people in the two lines -- Bernal Cruz,

6  Jennifer Quimi -- are the case coordinators for

7  the shelters that are listed below.  Morrison,

8  Abbott, Crittenton, David and Margaret, Heartland,

9  and Casa Franklin.

10      Q.     Okay.  All right.  Now let's turn

11  together page ending in 768.  The page before

12  that?

13      A.     Uh-hum.

14      Q.     Do you see the email from Jenna

15  Lovejoy to you?

16      A.     Yes.

17      Q.     And do you see in that second

18  sentence?  It says:  "David & Margaret will accept

19  this minor, pending the availability of a female

20  bed"?

21      A.     Right.

22      Q.     And what is the date of that email?

23      A.     February 7.

24      Q.     And the email above that one, which is

25  the next email in the thread.

**Exhibit 28**
**Page 995**

CONFIDENTIAL

Page 188

1       A.      Uh-hum.

2       Q.      Brenda to -- or from you, I'm sorry,

3   to Brenda.

4               Do you see that one?

5       A.      Yes.

6       Q.      And it says, second sentence:  "I will

7   send out the official transfer email once the bed

8   is open"?

9       A.      Yes.

10      Q.      And then on the very first page,

11  ending in 766, what is that?  Or do you see the

12  email from Micaela to a group of people -- or to

13  you and Brenda?

14      A.      Micaela?  Yes.

15      Q.      And what does that email say?

16      A.      The transfer request has been approved

17  in the UAC portal.

18      Q.      Okay.  What is the date of that email?

19      A.      February 13.

20      Q.      Okay.  And that is over a month after

21  the initial transfer request by Shiloh.  Right?

22      A.      Yes.

23      Q.      And that date is also a month after

24  the psychiatrist recommended that placement at

25  Shiloh was no longer justified.  Right?

CONFIDENTIAL

Page 189

1       A.      Correct.  Yes.

2       Q.      Would you say this was timely, this

3    email?

4       A.      No.

5       Q.      Is this timeline -- or how often do

6    you see a timeline like this when it comes to

7    step-down transfers?

8       A.      Often.

9       Q.      Often?  And why is that?

10       A.      I -- when you asked me the first

11    question, how long should it take?  I said

12    ideally.

13       Q.      Right.

14       A.      There's great difficulty in placing or

15    getting acceptance of a minor that is being

16    stepped down from Shiloh at shelters.  Even though

17    there's a recommendation for a lower level of care

18    or is indicating that the minor is no longer a

19    danger to self or others, there's still denial

20    after denial from some of these programs.

21            What you don't see here -- and you

22    might have an idea -- are all the denials we know

23    that came through for this child.  And so it

24    likely took this long to get acceptance from a

25    program.  And then -- I see the date.  2018.  I

CONFIDENTIAL

Page 190

1    believe that was a pretty busy time also.  And

2    then for an actual bed to become available.  But

3    that wasn't too long, if you give it five days or

4    something like that.

5              But programs provide reasons for not

6    accepting the minors into their shelters.  And

7    many of them -- well, you can go through those.

8    But they list things like they're not able to meet

9    the minor's needs, et cetera.

10         Q.    And what do they mean, they can't meet

11   the minor's needs?

12         A.    It's a question you have to ask them.

13   Because, according to Shiloh, the minor simply

14   would need therapeutic -- or clinical therapy and

15   a psychiatric visit once a month.

16         Q.    Is it your opinion that the step-down

17   process takes too long?

18         A.    Yes.

19         Q.    How would you -- or let me rephrase.

20              Are there steps that can be taken to

21   speed up the process?

22         A.    Yes.

23         Q.    And what kind of steps would those be?

24         A.    Proper training to the program.

25   Gathering the information and providing the proper

**Exhibit 28**
**Page 998**

CONFIDENTIAL

Page 191

1  information to their case coordinator.  Case

2  coordinators identifying placements that will be

3  able to meet the needs.  And then programs giving

4  these kids a chance.

5      Q.    Has this concern with the timelessness

6  of step down, the step-down process been raised to

7  ORR?

8      A.    Yes.

9      Q.    By who?

10      A.    I have.  I've let the FFS -- for

11  example, Micaela was the FFS at the time.

12  Nickie Heimel.  Let them know constantly of the

13  difficulties in stepping down minors from Shiloh

14  into shelter placements.  As well as I've provided

15  that in my -- there is a weekly report that a case

16  coordinator provides to the FFS.  When I was case

17  coordinator I would provide that in my weekly

18  report.

19      Q.    And what did -- what was the response

20  that you received when you raised this concern?

21      A.    There's really no response other than,

22  you know, let's keep trying.  Let's look for other

23  programs.

24            This shows a list of six -- no.  Six

25  placements that I referred this particular minor

**Exhibit 28**
**Page 999**

CONFIDENTIAL

Page 192

1    to.  And at the end there, in March and April, I

2    was referring kids to 20, 25 programs, just to try

3    to get placement.

4         Q.    Were any steps taken to try to lower

5    the time frame after you raised these concerns?

6         A.    Not that I know of.

7         Q.    Were there any policy changes that

8    you're aware of that attempted to expedite this

9    process?

10        A.    Not that I know of.  No.

11        Q.    All right.  And so when a child, like

12    ███████  in this situation -- or let me rephrase.

13             While this transfer process is being

14   carried out, the child who is seeking to be

15   transferred, they remain at the current facility

16   that they're placed at.  Is that correct?

17        A.    Yes.

18        Q.    Okay.  So here, ███████ remained at

19   Shiloh during this time.  Right?

20        A.    Yes.

21        Q.    And so do you agree that ██████ was

22   placed in inappropriate placement for over a month

23   while this process carried out?

24        A.    Yes.  The psychiatrist had provided a

25   recommendation to step down.

**Exhibit 28**
**Page 1000**

CONFIDENTIAL

Page 193

1      Q.     And do you agree that that means that
2  there would be a more restrictive placement than
3  necessary?

4      A.     Yes.

5      Q.     In that same document, the page ending
6  in 768, it says:  "David & Margaret will accept
7  this minor, pending the availability of a female
8  bed"?

9      A.     Yes.

10     Q.     How often is a minor unable to be
11 stepped down due to the unavailability of space at
12 other facilities?

13     A.     I actually do see that quite often,
14 especially with minors that are in shelter and
15 need to be stepped down or need to be placed in a
16 long-term foster care.  It's a response we get
17 quite often for those.

18            As it comes to -- from RTC right now?
19 That's not going to be a very typical response.
20 Because ORR, the number of children in ORR custody
21 at this time is very, very low.  And so that is
22 not going to be something that is going to be an
23 issue right now.  But during times of influx or
24 when the programs are at max capacity, then yes,
25 that might be more of an issue.

**Exhibit 28**
**Page 1001**

CONFIDENTIAL

Page 196

1      Q.     And just generally speaking, how much

2    of a delay does the unavailability of space cause

3    in the step-down process?

4      A.     It can be a big delay.

5      Q.     What's the longest that you've seen?

6      A.     Due to space?

7      Q.     Yes.

8      A.     I don't know.  Due to space, I don't

9    know.  That would be probably a long-term foster

10   care situation.  And it would be months where a

11   minor will be in shelter placement because there

12   is no long-term foster care placement or bed.

13     Q.     Would you say more than four months?

14     A.     I've seen more than four months.

15   Yeah.

16     Q.     More than six months?

17     A.     I'm not sure.  Again, due to space.

18     Q.     Are there other reasons that would --

19   all right.  Why do you want to clarify due to

20   space?

21     A.     Because you brought that up.  I just

22   want to make sure we're clear.

23           MR. SCAIFE:  All right.  Are you still

24       okay?

25           THE WITNESS:  I'm fine.

CONFIDENTIAL

Page 197

1          MR. SCAIFE:  Okay.

2      Q.     (By Mr. Scaife) I want to switch gears

3  a little bit and talk about the reunification

4  process.

5          What is the -- pardon.  Let me back

6  up.

7          Does the child have to spend a certain

8  amount of time at Shiloh before they can be

9  released to a sponsor?

10     A.     No.  The only -- no.  The only

11 requirement at that point would be to make sure

12 that they are safe and that the reunification

13 process has been completed or the requirements

14 have been met.

15     Q.     Can a child be released during that

16 30-day psychiatric evaluation that is referenced

17 in the admission assessment forms?

18     A.     I suppose, if the psychiatrist felt

19 the minor was stable.

20     Q.     Has that ever happened, in your

21 experience?

22     A.     Not to -- not to my knowledge.

23     Q.     When a child is stepped up -- or let

24 me back up.

25          When the reunification process begins

CONFIDENTIAL

Page 198

1    at a facility and then that minor is stepped up,

2    what happens to the reunification process?

3         A.    It continues.

4         Q.    Is there any delay from the step up?

5         A.    There may be a delay.  Not

6    because anything stops.  But because -- for

7    example, if a minor now requires a home study,

8    that may make it a little more lengthy.  Because a

9    home study will take ten days to complete.

10        Q.    Does anything have to be redone in the

11   process after a step up?

12        A.    The only thing that I can think of

13   that might need to be redone or really would be

14   more of an addendum, would be maybe an addendum to

15   a home study.  Where -- perhaps the home study was

16   completed when the minor was in a shelter.  And

17   then the minor was stepped up to a staff secure.

18   And an addendum would be completed, just to make

19   sure that the sponsor is really aware of what's

20   going on.  And maybe another visit to the home or

21   something like that.

22        Q.    How much of a delay does this addendum

23   cause to the reunification process?

24        A.    It doesn't necessarily have to be a

25   long time.  The addendum can -- it's not always

**Exhibit 28**
**Page 1004**

Page 211

1   since it does not meet one of the other criteria.

2             My question with those is always what

3   answers do you want that cannot be answered by

4   phone?  Why do we have to send someone out to a

5   home?

6        Q.    How often -- in your experience, how

7   often does a discretionary home study occur?

8        A.    They're not rare, but they're not --

9   it's not something that happens all the time.

10       Q.    You mentioned the possibility of a lot

11  of people living in the home or a lack of

12  fingerprints could be a reason for a discretionary

13  home study.  What are some other reasons?

14       A.    Maybe the minor having some special

15  needs.  Trying to find out if the sponsor is able

16  to meet those needs.  Or maybe the minor not

17  qualifying or having a disability or being a

18  victim.  But just -- maybe a child who self-harms

19  all the time and we need to know if the sponsor is

20  able to meet their needs.  That's --

21       Q.    Are you -- go ahead.

22       A.    -- an example.

23       Q.    Are you aware of any children who have

24  been placed at Shiloh who did not have a home

25  study completed?

CONFIDENTIAL

Page 212

1      A.      I don't think so.

2      Q.      Pardon?

3      A.      I don't recall any that have been

4  released without a home study.

5      Q.      Is a home study required for children

6  placed at Shiloh?

7      A.      Yes.  Since those minors have been

8  diagnosed with mental health illness.

9      Q.      So every child placed at Shiloh has a

10 TVPRA-mandated home study?

11     A.      If they get assigned a sponsor, yes.

12     Q.      Okay.

13     A.      Unless -- unless the sponsor is denied

14 for whatever reason before a home study is

15 completed.

16     Q.      And in that situation there just

17 wouldn't be a home study?

18     A.      Right.  It would just be a denial.

19     Q.      Do you interview the child -- or do

20 case coordinators interview the child as part of

21 the reunification process?

22     A.      At times.  Not every child, but yes.

23     Q.      What would be the reason for the

24 interview?

25     A.      Typically if there are concerns with

**Exhibit 28**
**Page 1006**

CONFIDENTIAL

Page 232

1      A.      Perhaps ongoing therapy or continued

2  medication monitoring.  Some examples I've seen in

3  notes.

4      Q.      Would a treating psychiatrist or

5  psychologist have any input on post-release

6  services?

7      A.      Again, I think it would be more of

8  just whether they need to see a psychiatrist or --

9  outside of placement or therapy.  Just to give

10  some examples.

11      Q.      When a case coordinator is deciding

12  whether to recommend release to a sponsor, is the

13  case coordinator required to consider the harm to

14  a child's mental health by remaining in ORR

15  custody?

16      A.      No.  We are not required to look at or

17  consider that.  We consider the safety of the

18  minor.  Will the minor be safe in the sponsor's

19  home and will his needs be met?  Mostly because we

20  consider the minor to be safe in ORR's care.

21      Q.      Do you -- in your experience, is the

22  child always safe in ORR's care?

23      A.      I'm sorry.

24      Q.      In your experience, is the child

25  always safe in ORR's care?

**Exhibit 28**
**Page 1007**

CONFIDENTIAL

Page 286

1                    CERTIFICATE

2    STATE OF MARYLAND )

3    COUNTY OF BALTIMORE)

4              I, PAULA J. ELIOPOULOS, a Notary

5    Public within and for the State of Maryland, do

6    hereby certify that NIDIA MURRAY, the witness

7    whose deposition is hereinbefore set forth, was

8    duly sworn by me and that such deposition is a

9    true record of the testimony given by such

10   witness.

11             I further certify that I am not

12   related to any of the parties to this action by

13   blood or marriage and that I am in no way

14   interested in the outcome of this matter.

15             In witness whereof, I have hereunto

16   set my hand this 2nd day of January, 2020.

17                    _Paula J. Eliopoulos Weyand_

18             _____

19                    PAULA J. ELIOPOULOS

20

21

22

23

24

25

Exhibit 28
Page 1008

CONFIDENTIAL

Page 287

1                        CERTIFICATE

2    STATE OF NEW JERSEY    )

3    COUNTY OF MORRIS        )

4            I, JANET HAMILTON, a Registered

5    Professional Reporter and New Jersey Notary

6    Public, do hereby certify that:

7            I joined this deposition telephonically

8    after the lunch recess, at 12:41 p.m. CST, and

9    ended my reporting at 5:45 p.m. CST, at which time

10   the deposition was concluded.

11           I further certify that I am not related

12   to any of the parties to this action by blood or

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15           In witness whereof, I have hereunto set

16   my hand this 2nd day of January, 2020.

17

18

19   _____

     JANET HALL, RPR, CRC, FPR, NJCCR

20   NJCCR License 30X100240200

     Expires 6/30/2020

21

22

23

24

25