# Exhibit 33

## <u>REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL</u>

**Exhibit 33**
**Page 1078**

CONFIDENTIAL

Page 1

1                   UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                        WESTERN DIVISION

4

5        _____
                                        )
6        LUCAS R., et al.,              )
                                        )
7              Plaintiffs,              )
                                        )   Case No.
8        vs.                            )
                                        )   2:18-cv-05741
9        ALEX AZAR, Secretary of U.S. ) DMG-PLA
         Department of Health and       )
10       Human Services, et al.,        )
                                        )
11             Defendants.              )
         _____)

12

13

14                       CONFIDENTIAL

15

16                 DEPOSITION OF FAITH RAY

17                      Washington, DC

18                    October 23, 2019

19

20

21

22

23

24       Reported by:  John L. Harmonson, RPR

25       Job No. 170109

CONFIDENTIAL

Page 76

1    prepare that request.

2         Q.    Okay.

3         A.    Or that recommendation.

4         Q.    And a facility, some human in that

5    facility is doing this, right?

6         A.    That's correct.

7         Q.    Who?

8         A.    There is a group of people involved in

9    decisions related to step-ups.  So the case

10   manager, the clinician.  I'm talking about ORR

11   grantees.  The case manager, the clinician, a

12   case coordinator, the federal field specialist,

13   and perhaps a federal field specialist supervisor

14   would come together in what's called when they

15   staff a case.  So if there is a recommendation

16   for a step-up, it should be based on the group's

17   recommendation and the FFS's decision.

18        Q.    So you said -- I'm talking about the

19   ORR grantees.

20        A.    Uh-huh.

21        Q.    Yes?

22        A.    I'm sorry, what's your question?

23        Q.    Well, I was asking if "uh-huh" meant

24   yes.  You said "uh-huh."

25        A.    Let's go back.  What's your question?

Exhibit 33
Page 1080

CONFIDENTIAL

Page 82

1   recommendation for the step-up?

2        Q.    Correct.

3        A.    It would be either the case manager or

4   the clinician to make the recommendation.

5        Q.    Okay.  And do you know why?

6        A.    It depended on the case.

7        Q.    Well, wouldn't it be fair to say that

8   of those people, the case manager and the

9   clinician are the two of that five that have

10  direct contact with the kid, right?

11       A.    They do have direct contact with the

12  children.

13       Q.    So it's reasonable to assume that they

14  would have more firsthand knowledge about a lot

15  of the factors that are reasons to step up a kid,

16  correct?

17       A.    That's correct.

18       Q.    Okay.  So when you were doing this

19  compliance, the group -- I understood your

20  characterization of the way this process worked

21  was that this group reviewed it but the FFS made

22  the final decision.  Is that correct?

23       A.    That's correct.

24       Q.    And then did the FFS supervisor have

25  input or have to approve the approval?  Or what

Page 83

1    was their role?

2         A.    My understanding is that the FFS

3    supervisor does not need to approve the FFS's

4    approval.  The FFS has that authority to -- the

5    FFS alone has the authority to make placement

6    decisions for children.

7              But my understanding is that if it's a

8    particularly complex case, then the FFS

9    supervisor is there for guidance and

10   consultation, an extra layer of review if needed.

11   That's my understanding.

12        Q.    So is it accurate to say that one of

13   the things you were involved in doing compliance

14   review on was whether the minor was informed of

15   the decision to step them up?

16        A.    No.

17        Q.    You didn't have any involvement in

18   that?

19        A.    No.

20        Q.    Okay.  Was that something that you

21   were made aware of in your review of the step-up

22   documentation when you reviewed the UAC portal?

23        A.    What are you asking specifically?

24        Q.    What was your understanding at the

25   time you did this work of whether the minor child

CONFIDENTIAL

Page 84

1    was supposed to be notified of a decision to step

2    them up?

3        A.    My understanding at the time was that

4    a minor may or may not be notified that they were

5    being stepped up to a restrictive setting.

6        Q.    And there was no requirement to do

7    that?

8        A.    So I'm just speaking to secure

9    facilities because that's what my involvement was

10   in.  But there is no requirement to notify a

11   minor before they're getting stepped up to

12   secure.  No, there's not.

13       Q.    That's your understanding of current

14   policy as well?

15       A.    Yes.

16       Q.    Okay.  So it may or may not have been

17   done at the time?

18       A.    It may or may not have been done.  My

19   understanding is that there are complex factors

20   at play including child welfare decisions.  But

21   again, my understanding is that a kid may or may

22   not have been informed that they were getting

23   stepped up to secure.

24       Q.    Okay.  So to your understanding, did

25   the kid have any right to challenge that

CONFIDENTIAL

Page 85

1    decision?

2         A.    They do, yes.

3         Q.    So how would they know to challenge it

4    if they weren't informed?

5         A.    So that's what the notice of

6    placement -- part of the purpose of the notice of

7    placement form is for.  The intention is to tell

8    the minor the reasons why they were placed in a

9    secure facility and to also tell them how to

10   essentially challenge their placement or request

11   reconsideration of their placement.

12        Q.    So just educate me here.  I'm having

13   trouble understanding the difference between the

14   notice of a step-up and notice of placement.  I'm

15   not understanding why that wouldn't be the same

16   thing.

17        A.    I'm not aware that there is notice of

18   a step-up.

19        Q.    Okay.  But if a kid is being stepped

20   up to a different placement, they'll get a notice

21   of placement, right?

22        A.    After they're --

23        Q.    After it's a done deal?

24        A.    After they have already been

25   transferred to the setting.

**Exhibit 33**
**Page 1084**

CONFIDENTIAL

Page 86

1    Q.    Got it.

2    A.    The other setting.

3    Q.    Okay.  And so any appeal or challenge

4  to that would be after the fact?

5    A.    Right.  They can request

6  reconsideration of their placement or challenge

7  their placement after they have already been

8  stepped up.

9    Q.    So the notice of placement, did you

10  say that's within 48 hours?

11    A.    Yes, within 48 hours.

12    Q.    And that's of an initial placement or

13  a step-up or --

14    A.    That's correct.  Regardless of whether

15  it's initial or a step-up, they must receive

16  their notice of placement within 48 hours.

17    Q.    Of arrival at the place, the new

18  facility?

19    A.    That's correct, of arrival.

20    Q.    And what was your understanding of the

21  requirement that the notice of placement be in

22  the native language?

23    A.    My understanding was that the July

24  Flores order required that the notice of

25  placement be in a language that the minor

**Exhibit 33**
**Page 1085**

CONFIDENTIAL

Page 87

1  understands, whereas ORR policies and procedures

2  requires a higher standard that the notice of

3  placement be in the minor's preferred language.

4      Q.   So you're saying that the higher

5  standard that you're describing was already in

6  place when Judge Gee entered this order on

7  July 30, 2018?

8      A.   I don't know.  I was not part of the

9  program at that time.

10     Q.   So you don't know if it was the

11 practice of ORR to provide foreign language

12 notice of placements prior to your work in this

13 area.  Is that right?

14     A.   That's correct.  I can't speak to that

15 before I joined the policy division.

16     Q.   The current language is still

17 preferred language, right?

18     A.   That's correct.

19     Q.   And you don't know when that policy

20 went into effect?

21     A.   I don't know.  But there is a date on

22 the policy guide, the online policy guide.

23     Q.   Do you know the number?

24     A.   The number of?

25     Q.   That policy.

**Exhibit 33**
**Page 1086**

CONFIDENTIAL

Page 88

1        A.      Off the top of my head, no.

2        Q.      Let me do that at lunch.

3        A.      It should be in Section 1.

4        Q.      So if a minor challenges their

5   placement, who reviews the challenge?

6        A.      So if a minor for the secure

7   facilities requests reconsideration, then the ORR

8   director or his or her designee reviews that

9   request.

10       Q.      And do you know who the designee has

11  been when you were working in this?

12       A.      My understanding is that the ORR

13  director would review those cases.

14       Q.      So other than the request for

15  reconsideration, what other way or ways would a

16  minor challenge the placement?

17       A.      So for secure, they can file suit in

18  court.

19       Q.      Did you come across that when you were

20  doing compliance review?

21       A.      Did I come across what?

22       Q.      Kids that had filed something in court

23  to challenge their placement.

24       A.      I don't recall that.

25       Q.      Would that have been information that

CONFIDENTIAL

Page 89

1  would have been input into the UAC portal?

2       A.    I believe so.

3       Q.    And sitting here today, you don't

4  recall having come across that in your review?

5       A.    No, I don't recall.  No.

6       Q.    Did that discussion of that type of a

7  lawsuit come up in the weekly meetings that you

8  had?

9       A.    We discussed the rights of the minors

10  to challenge their placement, yes.

11      Q.    And that was included in some of the

12  training that you and Mr. ███████ did?

13      A.    Yes, that is correct.

14      Q.    Any other context in which that would

15  have been discussed by you and the people in the

16  working group weekly meetings, the federal habeas

17  or lawsuit challenges to placement?

18      A.    We discussed it in the context of the

19  minor's due process rights for their placement in

20  secure facilities.  And we also discussed ways --

21  we discussed whether or not we thought that the

22  minors understood what their rights were.

23      Q.    Okay.  Did you think the minors

24  understood what their rights were?

25      A.    So I can't speak, obviously, for all

**Exhibit 33**
**Page 1088**

CONFIDENTIAL

Page 90

1    of the minors in secure facilities.  I did speak

2    to two of them.  I interviewed two of them when I

3    visited, and no, they did not understand their

4    rights.

5         Q.    Did you speak -- When you did these

6    interviews, did you speak to these two minors in

7    their native language?

8         A.    I did not.  I spoke in English, and

9    there was a Spanish interpreter.

10        Q.    For both of them?

11        A.    Yes, that's correct.

12             MR. WHITE:  Off the record.

13             (Off the record.)

14             MR. WHITE:  Could you mark that next.

15             (Exhibit 113 marked for identification

16        and attached hereto.)

17             MR. SHIEH:  Can we go off the record

18        real quick?

19             MR. WHITE:  Yeah, that's fine.

20             (Off the record.)

21   BY MR. WHITE:

22        Q.    Ms. Ray, what number is that exhibit?

23        A.    Exhibit 113.

24        Q.    So have you had a chance to review

25   Exhibit 113?

**Exhibit 33**
**Page 1089**

CONFIDENTIAL

Page 92

1    Q.    And was she the FFS supervisor for

2    Ms. ████████    and Shenandoah?

3    A.    I believe so.

4    Q.    So on the topic that we were

5    discussing before the break -- So just read the

6    sentence, the first two sentences after the

7    second bullet point that starts "No staff were."

8    A.    So I'm reading:  "No staff were aware

9    of a minor's right to challenge secure placement

10   either through a review by the ORR director or by

11   bringing suit in a federal court.  No one has

12   been communicating this right to minors at

13   Shenandoah."

14   Q.    And that statement was accurate when

15   you made it?

16   A.    That was my understanding, yes, when I

17   wrote that.

18   Q.    So how many staff did you communicate

19   with to reach this understanding?

20   A.    I can't remember.

21   Q.    Was it more than three?

22   A.    Yes.

23   Q.    Was it more than eight?

24   A.    It was maybe around eight staff or

25   less, or fewer.

**Exhibit 33**
**Page 1090**

CONFIDENTIAL

Page 93

1      Q.    But of those more than three, less

2   than eight staff, none of them had an awareness

3   of the kid's right to challenge this?

4      A.    That was my understanding at the time,

5   yes.

6      Q.    Has that understanding changed at all?

7      A.    Yes, it has.

8      Q.    So what's your understanding now?

9      A.    My understanding is that all staff in

10  both secure facilities understand what a minor's

11  rights are.

12     Q.    So that's a different question.  Has

13  anything changed about the information that you

14  had that at the time, January 11th of 2019, no

15  staff at Shenandoah were aware of this?

16         MR. SHIEH:  Objection to form.

17  BY MR. WHITE:

18     Q.    Do you understand the question?

19     A.    No, I don't.

20     Q.    So we're talking about two different

21  time frames.

22     A.    Uh-huh.

23     Q.    Is that a yes?

24     A.    Yes.

25     Q.    You have to answer out loud.

**Exhibit 33**
**Page 1091**

CONFIDENTIAL

Page 94

1       A.      Yes.

2       Q.      So the time frames are January 11,

3    2019 --

4       A.      Correct.

5       Q.      -- and October 23, 2019.

6       A.      Okay.

7       Q.      I'm not asking about what people know

8    now at Shenandoah.  I'm asking about what they

9    knew on January 11th.  And you wrote in an e-mail

10   at the time that nobody knew about a minor's

11   right to challenge secure placement.

12      A.      That's correct.

13      Q.      And that statement as of

14   January 11th is still correct, is it not?

15      A.      On January 11th when I wrote this,

16   that was correct.

17      Q.      Right.  You haven't found out

18   subsequently that this was wrong and that three

19   other people actually knew about this on January

20   11th of 2019?

21      A.      Oh, I understand your question.  No, I

22   haven't.

23      Q.      Okay.  So it's still accurate as

24   written, that at the time nobody on the staff at

25   Shenandoah that you spoke with were aware of

**Exhibit 33**
**Page 1092**

CONFIDENTIAL

Page 95

1   these rights?

2        A.    Correct, that I spoke with.  The staff

3   were not aware of those rights.

4        Q.    And about how many staff were there at

5   the time you did the site visit?

6        A.    Again, there were around eight.  There

7   were a handful of staff.

8        Q.    Did you speak to all of them?

9        A.    I did not speak to all of them, no.

10       Q.    Who did you not speak to?

11       A.    I don't know who I did not speak to.

12       Q.    I mean, you don't know the job of any

13  of the people that you didn't -- Did you try to

14  interview as many people as you could when you

15  were there?

16       A.    No.  That was not the purpose of the

17  site visit.

18       Q.    What were the positions of the staff

19  that you did speak to?

20       A.    Clinicians and case managers.

21       Q.    And those are the people that would

22  have been in a position -- that are now in a

23  position and they would have been at the time in

24  a position to advise a minor of their rights to

25  challenge this, right?

CONFIDENTIAL

Page 96

1      A.    That's correct.

2      Q.    So is it fair to say that nobody who

3  needed to know knew at the time that a minor had

4  a right to challenge secure placement at

5  Shenandoah?

6      A.    Of the people that I spoke with, they

7  said they did not know.

8      Q.    So this says that you confirmed this

9  "in the interviews that Aaron and I did with the

10  two youth."

11          So did you and Aaron participate in

12  the interviews together?

13      A.    We did.

14      Q.    And did Aaron interview other youth?

15      A.    No.

16      Q.    Did Aaron do other site visits?

17      A.    Aaron visited Yolo.

18      Q.    And did the other policy person do

19  site visits?

20      A.    What other policy person?

21      Q.    The one with the last name no one can

22  pronounce.

23      A.    ████████████████████?

24      Q.    ██████████, yes.

25      A.    She did do a site visit.  I cannot

**Exhibit 33**
**Page 1094**

Page 127

1   release services, correct?

2       A.    Yes.

3       Q.    And you don't know when that happened?

4       A.    I don't.

5       Q.    So what is your understanding of the

6   part of that requirement that post release

7   services be required on a particularized needs

8   basis?

9       A.    So if a child is particularly

10  vulnerable or if there is a child welfare

11  concern, then they would do an individualized

12  assessment.  And if the FFS in his or her

13  professional judgment thinks that post release

14  services do need to be in place before the child

15  is released, then they can make that

16  determination but it has to be for a particular

17  child welfare concern.

18      Q.    And who imposes the PRS requirement?

19      A.    What do you mean, imposes the PRS

20  requirement?

21      Q.    When we talked about step-ups, you

22  described what I would refer to as a committee,

23  and you had, like, five different members of that

24  that were involved in the recommendation but the

25  FFS had the ultimate approval.  Correct?

CONFIDENTIAL

Page 128

1      A.    Yes, FFS has the legal authority.

2      Q.    Okay.  So post release service has to

3  do with when a kid is released from what we

4  call -- I don't know.  What do you call it?  I

5  call it custody or detention.  What do you call

6  it?

7      A.    We call it care and custody.

8      Q.    So when a kid is released, someone is

9  deciding whether there be a post release services

10  requirement as a condition of release, correct?

11      A.    So again, a child is not -- is not

12  denied or delayed release if post release

13  services aren't in place unless there's that

14  caveat that's mentioned in the court order.  ORR

15  is legally mandated to provide post release

16  services for TVPRA cases, but children and their

17  sponsors are not mandated to participate in those

18  support services in the post release services.

19          MR. WHITE:  Could you read my last

20      question?

21          (The record was read back by the

22      reporter as follows:

23          "Question:  So when a kid is released,

24      someone is deciding whether there be a post

25      release services requirement as a condition

Exhibit 33
Page 1096

CONFIDENTIAL

Page 148

1    Q.    That's a different question.  My

2  question is -- it's similar, but did you identify

3  these particular types of compliance problems

4  with secure placement in your review?

5    A.    Yes.  We found the secure facilities

6  or ORR to be noncompliant with criterion 1, for

7  example.

8    Q.    Okay.  And about how many were you

9  personally made aware of during your five months?

10    A.    How many of what, exactly?

11    Q.    Of a kid who was -- Let me ask a

12  different question.

13        Yeah, give me an example of a

14  compliance issue that you would have identified

15  under criterion 1.

16    A.    Well, we found a case of a kid who was

17  charged with a crime; I can't remember the exact

18  crime.  But the charges were later dropped, and

19  that was the basis for the child's placement in

20  secure.  And this happened, obviously, outside of

21  ORR custody.  So that case was found to be

22  noncompliant.

23    Q.    And so is it fair to say that the

24  examples that you used in this PowerPoint came

25  from your experience and that of your colleagues?

**Exhibit 33**
**Page 1097**

Page 152

1   the two that are there that were not malicious

2   acts, did either of those come from a real

3   example of a kid who was placed in secure for

4   either slapping someone or bumping someone hard?

5        A.    No, neither of them did.  But again,

6   we had questions from care providers on whether a

7   similar scenario, if a care provider encountered

8   a situation like this, if that met the criteria

9   for stepping up to secure.  So we wanted to be

10  very clear that these examples did not rise to

11  the level of a secure placement.

12       Q.    We're going to move on to another

13  exhibit.

14            (Exhibit 117 marked for identification

15       and attached hereto.)

16            THE WITNESS:  Okay, I'm ready.

17  BY MR. WHITE:

18       Q.    Do you remember this incident?

19       A.    Yes, I do remember it.  I don't

20  remember all the details, but I do remember.

21       Q.    Do you remember what was -- Was the

22  kid stepped down?

23       A.    I don't remember.

24       Q.    And this is an e-mail exchange between

25  you and Elicia Smith, who was the FFS at the time

Page 153

1    over the Yolo facility, correct?

2         A.    Yes, that's correct.

3         Q.    Regarding a youth that was detained in

4    Yolo, correct?

5         A.    That's correct.

6         Q.    So it appears that he had been at Yolo

7    for 22 days, from January 24th of 2019, to

8    February 15th of 2019, based on the information

9    that's in the long paragraph in Elicia's e-mail

10   to you that starts "Per intake referral."  Right?

11        A.    Right.

12        Q.    So when you got that e-mail, even

13   though a lot of it is redacted, literally the

14   bottom line in that e-mail was:  "Is there

15   another reason why he should be in secure that

16   you are aware of?"  Correct?

17        A.    Correct.

18        Q.    So is it accurate to state that the

19   reasons that she states in that long paragraph

20   were not adequate or appropriate for placement in

21   secure?

22        A.    Correct.

23        Q.    And you have no recollection as to any

24   follow-up that Elicia did with you?

25        A.    On this case, I don't remember.

CONFIDENTIAL

Page 157

1              (Exhibit 118 marked for identification

2       and attached hereto.)

3    BY MR. WHITE:

4       Q.    Do you remember this child?

5       A.    I don't remember the child.  I

6    remember the e-mail.

7       Q.    Can you tell me what Exhibit 118 is?

8       A.    So it's an e-mail from me to Elicia

9    Smith who was the FFS for Yolo at the time.

10      Q.    And what was your purpose in sending

11   this?

12      A.    I was doing the weekly compliance

13   review for Yolo, and I could not find enough

14   documentation in the portal to understand why he

15   was placed there.  I couldn't tell if he met the

16   criteria for placement in secure.  I reviewed

17   some of the significant incident reports, and

18   from what I recall, they also did not speak to

19   dangerousness.

20      Q.    The subject of the e-mail is "Secure

21   Case Inquiry 2."

22      A.    Yes.

23      Q.    Do you know what the secure case

24   inquiry 1 was?

25      A.    No, I don't.

**Exhibit 33**
**Page 1100**

CONFIDENTIAL

Page 158

1      Q.     Do you think it would have been
2   something similar to this?
3      A.     It would have been -- it most likely
4   would have been just another child's case that I
5   had questions about.
6      Q.     Okay.
7      A.     That I probably sent on the same date.
8      Q.     To Elicia?
9      A.     Uh-huh.
10     Q.     Is that a yes?
11     A.     Yes, that's a yes.
12     Q.     From the material that you reviewed
13  before you sent Ms. Smith this message, you
14  concluded that, from what you could tell, the kid
15  was more of an annoyance than an actual danger
16  when they got stepped up to Yolo?
17     A.     Yes.
18     Q.     Did you learn anything subsequent to
19  this that shed more light on whether the kid was
20  more of an annoyance than an actual danger?
21     A.     I don't.  I don't remember this
22  particular case, what the follow-up to it was.
23     Q.     Do you think Elicia might have written
24  you back about this?
25     A.     Yes, I do.

CONFIDENTIAL

Page 162

1    working group.

2        Q.    Got it.

3              So which was the most common

4    noncompliance issue?

5        A.    I'm trying to remember.  So from what

6    I recall, it kind of changed throughout the five

7    months.  In the beginning I saw noncompliance

8    issues with kids just being inappropriately

9    stepped up to secure where they didn't meet the

10   criteria.  Then towards the end of the five

11   months it was more -- more of not enough

12   information, that the step-up might have been

13   allowed under our policy but that there just

14   wasn't enough documentation for me to cross-check

15   that that was an appropriate step-up.

16       Q.    So just so I understand, for that

17   latter situation, once you got into it and probed

18   for the reasons, you felt satisfied that they

19   were there, they just hadn't been noted properly

20   in the portal or on the NOP?

21       A.    So towards the end of the five months

22   I did find a couple of things:  That the care

23   providers might not have uploaded the

24   documentation but had the documentation in a hard

25   copy, or that they just needed more guidance on

**Exhibit 33**
**Page 1102**

CONFIDENTIAL

Page 163

1   how to describe the reasons for the step-up, not

2   necessarily that the kids were being

3   inappropriately stepped up.

4           So it shifted throughout that time

5   period.

6       Q.    So what I'm understanding from that

7   answer is that towards the end it wasn't that the

8   kid was inappropriately placed or stepped up in

9   secure.  It's that there was a lack of

10  documentation and that upon further probing you

11  identified the proper documentation.

12      A.    Right, that was the majority of the

13  cases at the end.  That's correct.

14      Q.    So particularly focusing on the

15  problems that you identified initially where -- I

16  mean, can we agree that that was a significant

17  number of kids who were inappropriately housed in

18  secure at the time?

19      A.    Yes, it was the majority of kids that

20  were inappropriately sheltered.

21      Q.    The majority of the 34 kids in secure

22  placement in around November of 2018 when you

23  first started compliance review were

24  inappropriately placed in secure?

25      A.    Right.  It was 18 out of 34.

CONFIDENTIAL

Page 164

1    Q.    And some of those 18 have included

2  kids that were placed because of suspected gang

3  activity?

4    A.    Right.  I answered that before, and

5  yes, there were a couple of them, a few of them.

6    Q.    And some were placed based on -- well,

7  at least one based on an arrest and then

8  subsequent dismissal of charges?

9    A.    That's correct.

10    Q.    And another was -- or at least one or

11  more were based on a risk of escape?

12    A.    That's correct.

13    Q.    About how many of those were there?

14    A.    Maybe less than three.

15    Q.    So how were these compliance issues

16  resolved?

17    A.    If the kid was inappropriately placed?

18    Q.    Yes.

19    A.    Then they had to be stepped down

20  immediately.  So the care provider had to find

21  other placement for the child.

22    Q.    Okay.  So did you look at how long

23  these kids had been in secure placement?

24    A.    Yes.

25    Q.    So do you have any kind of

**Exhibit 33**
**Page 1104**

Page 166

1    immediately.

2              Does that make sense?

3         Q.    I understand your answer.

4              Let's take the kid that was there for

5    two years.  When you're going through the web

6    portal, you're looking at every 30-day review, or

7    just the most recent one?

8         A.    The most recent.

9         Q.    You don't go back?

10        A.    I guess it would depend on if there is

11   not enough information.  But I would look to see

12   if they're currently compliant.

13        Q.    Okay.  And so you wouldn't have --

14   your testimony is you wouldn't have any reason to

15   go back and see how long the person had been

16   there inappropriately?

17        A.    No, that's not what I said.

18        Q.    So would you do that?

19        A.    So for example, with the kid that had

20   been there for almost two years, I recall that

21   there wasn't updated information on him.  So yes,

22   I would look back through his case file.

23        Q.    So how long was he there

24   inappropriately?  How long?

25        A.    At the time of the review, I believe

**Exhibit 33**
**Page 1105**

CONFIDENTIAL

Page 167

1    that he was in secure -- So it's a little

2    complicated.  When I first reviewed his case, it

3    had been a couple of months that there wasn't

4    updated information on him.

5         Q.   Okay.  If there is not updated

6    information --

7         A.   So at least a couple of months.

8         Q.   Okay.  I mean, how often did you go

9    back and look at more than just one 30-day

10   review?

11        A.   It depended on the case.  I don't

12   recall exactly, but it would depend on the case.

13        Q.   Approximate for me over the five

14   months how often you -- I think you tried to give

15   me a guesstimate or an estimate of the total

16   number of children whose UAC portal information

17   you reviewed during your five months, did you

18   not?

19        A.   No, I didn't give an estimate.

20        Q.   Do you think you could tell me?  Was

21   it 200?

22        A.   No.

23        Q.   Less?

24        A.   Yes.

25        Q.   Okay.  So would it be more than 50?

**Exhibit 33**
**Page 1106**

Page 170

1    to look at the cases in front of me to be able to

2    give you an accurate response.

3         Q.   So in that situation you described,

4    the change during the 30 days might have resulted

5    in a continued circumstance where secure

6    placement was valid and it might have also

7    changed in a way that secure placement was no

8    longer appropriate.  Is that right?

9         A.   Just so I'm clear, so you're asking if

10   during that 30-day period the child's

11   circumstances could have changed where they no

12   longer belong in -- they don't meet the criteria?

13   Yes, that's correct.

14             Or something happened where they --

15        Q.   Beat somebody up.  Stabbed a guard.

16   Whatever, right?  That could keep them there?

17        A.   Yes, that's correct.  So both of those

18   scenarios happened.

19        Q.   And it happened more than once where

20   it changed in a way that secure placement was no

21   longer appropriate but where the kid stayed in

22   secure placement, correct?

23        A.   Correct.

24        Q.   About how many times?

25        A.   I don't remember how many times.

**Exhibit 33**
**Page 1107**

Page 196

1    A.    No, I don't think I have anything more

2    to add.

3         MR. WHITE:  I need to take another

4    break.  I'll try to make it quick, but I

5    need to consult with these folks.

6         MR. SHIEH:  Sure.

7         MR. WHITE:  Then we'll hopefully get

8    you out of here in time to get your kid.

9         (Recess taken.)

10   BY MR. WHITE:

11   Q.    Who is responsible for giving a notice

12   of placement to the child within the 48 hours

13   after their placement?

14   A.    The case manager.

15   Q.    And who is responsible for advising

16   the child of their right to challenge that

17   placement?

18   A.    The case manager.

19   Q.    And is it required that the case

20   manager advise the kid of both their right to

21   appeal to the director or file a federal lawsuit

22   about that?

23   A.    Yes.

24   Q.    How is that carried out at the Yolo

25   facility to make sure that that happens, if you

CONFIDENTIAL

Page 202

1    reviewing information on these kids in the UAC

2    web portal, did you ever find any information

3    that was submitted by an attorney?

4         A.    I am trying to recall.  I don't recall

5    seeing information from an attorney in the

6    portal.

7         Q.    Do you know if attorneys are allowed

8    to review the web portal?

9         A.    I don't believe that they are.

10        Q.    Do you know if the children are

11   allowed to review the information on them in the

12   web portal?

13        A.    No, they are not.

14        Q.    And on what do you base that

15   testimony?

16        A.    I have never heard of a child being

17   allowed access to the UAC portal.

18        Q.    But sitting here today, you don't know

19   if it's prohibited or not?

20        A.    I know that it would not be allowed.

21   I don't believe that there is specific policy on

22   a child trying to access the portal.

23        Q.    So let's go back and talk a little bit

24   more about corrective action.  It was my

25   understanding from your testimony that at least

**Exhibit 33**
**Page 1109**

CONFIDENTIAL

Page 212

1      Q.    Do you recall anything else that you

2  learned in that five to ten minutes other than

3  what was documented in that e-mail about what

4  they had not been advised of?

5      A.    We asked them how they were being

6  treated at the Shenandoah facility, and they both

7  said that they were being treated well.

8      Q.    But they both indicated problems at

9  other facilities?

10      A.    That's correct.

11          We asked them do they know why they

12  were placed there in the first place.

13      Q.    And they didn't?

14      A.    Neither seemed to really understand

15  why they were there.

16      Q.    Do you think a kid can be provided

17  with a notice of placement and still not

18  understand the reasons for their placement?

19      A.    Yes.

20      Q.    Do you think that a kid may receive a

21  notice of placement and still not understand that

22  they have the right to challenge that placement?

23      A.    Yes.

24      Q.    And does that include that they might

25  not be aware of the right to appeal that

CONFIDENTIAL

Page 213

1    decision?

2         A.    Yes.

3         Q.    And they might not understand the

4    right to file a federal lawsuit?

5         A.    Yes.

6         Q.    And why is that?

7         A.    I think those are very difficult

8    concepts for children to understand.

9         Q.    Is that the only reason?

10        A.    In my professional judgment.  Again,

11   these are very vulnerable children, especially

12   when information is being translated.  There

13   could be interpretation issues.  But I think

14   bottom line, these are very difficult concepts

15   for children to understand.

16        Q.    And just so I understand, your

17   professional judgment is based on two interviews,

18   right?

19        A.    My --

20        Q.    What else do you base your

21   professional judgment on, this opinion?

22        A.    My opinion is based on the notice of

23   placement itself and the language in the notice

24   of placement.

25        Q.    Have you been a witness to the reading

CONFIDENTIAL

Page 216

1   violation is something that they're likely not to

2   find that difficult?

3       A.    Are you asking if an older teen would

4   understand if they've been convicted of a crime?

5       Q.    Or not, yes.

6       A.    I would think so, yes.

7       Q.    So I'm trying to understand, what are

8   the difficult concepts that you describe in the

9   notice of placement.

10      A.    I don't know if you have the notice of

11  placement form with you, but it has the criteria

12  listed.  But it also has the criteria for the

13  staff secure and the RTC settings and they're

14  different.  So it's a lot of information on the

15  form to begin with.  And the language, it's not

16  child-friendly language.  It's legalese, so to

17  speak.  And the kids are usually -- the cases

18  I've seen that have been referred to step up to

19  secure, it's more than just one criterion.  So to

20  really understand what the two criteria are, for

21  example, the two reasons that they've been

22  stepped up, I think that that can be difficult

23  for children to understand, especially if they

24  are dealing with trauma and they're in this

25  restrictive secure setting.

Exhibit 33
Page 1112

CONFIDENTIAL

Page 218

1    then there should be an explanation of what that

2    means by the FFS.

3           Q.    But that's a verbal explanation that's

4    off the form?  Or is that explanation also

5    written there?

6           A.    It should be written on the form.

7           Q.    So would that be a difficult concept

8    for most kids in secure placement to understand?

9           A.    I mean, I'm not sure I understand

10   where this is going because these are

11   hypotheticals.

12          Q.    Well, I mean, I'm just really

13   seriously trying to understand your basis for

14   testifying that these are difficult concepts.

15   And if you can elaborate on that, please do so.

16   If you think you've already told me all the

17   reasons for that opinion, we can move on.

18          A.    I think that the -- I think there are

19   areas for improvement on the form itself and the

20   way the notice of placement is communicated to

21   the child.  Those are topics that we've discussed

22   in the working group.  But I don't know that I

23   have more to add than that.

24          Q.    So would that include areas for

25   improvement to the form itself or just in the

CONFIDENTIAL

Page 221

1                    ACKNOWLEDGMENT OF DEPONENT

2

3         I, FAITH RAY, have read or have had the

4    foregoing testimony read to me and hereby certify

5    that it is a true and correct transcription of my

6    testimony with the exception of any attached

7    corrections or changes.

8

9

10   _____

11   FAITH RAY

12   [ ] No corrections

13   [ ] Correction sheet(s) enclosed

14

15        SUBSCRIBED AND SWORN TO BEFORE ME, the

16   undersigned authority, by the witness, FAITH RAY,

17   on this the _____ day of _____,

18   _____.

19

20

21

22

23

24

25

**Exhibit 33**
**Page 1114**

CONFIDENTIAL

Page 222

1                    C E R T I F I C A T E

2

3    DISTRICT OF COLUMBIA

4              I, JOHN L. HARMONSON, a Notary Public

5    within and for the District of Columbia, do

6    hereby certify:

7              That FAITH RAY, the witness

8    whose deposition is hereinbefore set forth, was

9    duly sworn or affirmed by me and that such

10   deposition is a true record of the testimony

11   given by such witness.

12             That if the foregoing pertains to a

13   federal case, before completion of the

14   proceedings, review and signature of the

15   transcript [x] was [ ] was not requested.

16             I further certify that I am not related

17   to any of the parties to this action by blood or

18   marriage; and that I am in no way interested in

19   the outcome of this matter.

20             IN WITNESS WHEREOF, I have hereunto set

21   my hand this 4th day of November, 2019.

22                    _John L. Harmonson_

23                    _____

24                    JOHN L. HARMONSON, RPR

                      My commission expires: 11/14/20

25

**Exhibit 33**
**Page 1115**