1   CENTER FOR HUMAN RIGHTS &
    CONSTITUTIONAL LAW
2   CARLOS R. HOLGUÍN (90754)
    256 South Occidental Boulevard
3   Los Angeles, CA 90057
    Telephone: (213) 388-8693
4   Email: crholguin@centerforhumanrights.email

5   *Attorneys for Plaintiffs*

6   *Additional counsel listed on following pages*

7

8                  UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10                        WESTERN DIVISION

11

12   LUCAS R., et al.,                 Case No.  2:18-CV-05741 DMG PLA

13            Plaintiffs,              **MEMORANDUM OF POINTS AND
                                       AUTHORITIES IN SUPPORT OF
14       v.                            PLAINTIFFS' MOTION FOR PARTIAL
                                       SUMMARY JUDGMENT**
15   ALEX AZAR, et al.,
                                       Date:     Dec. 11, 2020
16            Defendants.              Time:     3:00 p.m.
                                       Place:    Courtroom 8C, 8th Floor
17

18                                     Complaint Filed: June 29, 2018
19                                     Pretrial Conference Date: March 2, 2021
                                       Trial Date:  March 30, 2021
20                                     Judge: Hon. Dolly M. Gee

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

HOLLY S. COOPER (197626)
Co-Director, Immigration Law Clinic
CARTER C. WHITE (164149)
Director, Civil Rights Clinic
DAISY O. FELT (307958)
JONATHAN P. MULLIGAN (CAL RLSA NO. 803383)
MONICA J. JULIAN (265075)
University of California Davis School of Law
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu
        ccwhite@ucdavis.edu
        dofelt@ucdavis.edu
        jmulligan@ucdavis.edu
        mjulian@ucdavis.edu

NATIONAL CENTER FOR YOUTH LAW
LEECIA WELCH (208741)
NEHA DESAI (CAL. RLSA NO. 803161)
POONAM JUNEJA (300848)
FREYA PITTS (295878)
MISHAN WROE (299296)
MELISSA ADAMSON (319201)
1212 Broadway, Suite 600
Oakland, CA 94612
Telephone: (510) 835-8098
Email:  lwelch@youthlaw.org
        ndesai@youthlaw.org
        pjuneja@youthlaw.org
        fpitts@youthlaw.org
        mwroe@youthlaw.org
        madamson@youthlaw.org

NATIONAL CENTER FOR YOUTH LAW
BRENDA SHUM *(ADMITTED PRO HAC VICE)*
CRYSTAL ADAMS (308638)
1313 L St. NW, Suite 130
Washington, DC 20005
Telephone: (202) 868-4785
Email:  bshum@youthlaw.org
        cadams@youthlaw.org

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

COOLEY LLP
SUMMER J. WYNN (240005)
MICHAEL J. MCMAHON (*ADMITTED PRO HAC VICE*)
REBECCA L. TARNEJA (293461)
ALEXANDRA R. MAYHUGH (300446)
JAYME B. STATEN (317034)
1333 2nd Street, Suite 400
Santa Monica, CA  90401
Telephone: (310) 883-6400
Facsimile:  (310) 883-6500
Email:  swynn@cooley.com
          mmcmahon@cooley.com
          rtarneja@cooley.com
          amayhugh@cooley.com
          jstaten@cooley.com

*Attorneys for Plaintiffs*

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................1

II.   PROCEDURAL AND FACTUAL BACKGROUND ........................................3

      A.    Procedural Background..................................................3

      B.    Determining Custodians' Fitness (First Claim for Relief) ...................4

            1.    ORR's policies regarding custodial vetting. ................................5

            2.    ORR's policies regarding custodial vetting lack basic
                  procedural protections................................................7

      C.    Restrictive Placement (Second Claim for Relief) ...........................8

            1.    ORR's policies regarding restrictive placement. .......................13

            2.    ORR's policies regarding restrictive placement lack basic
                  procedural protections................................................14

      D.    Obstructing Legal Assistance in Matters Relating to Release,
            Placement, and Medication (Fourth Claim for Relief)........................15

      E.    Plaintiffs Suffered Real and Substantial Harm as a Result of
            Defendants' Policies ...................................................17

III.  LEGAL STANDARD........................................................19

IV.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON
      THEIR FIRST AND SECOND CLAIMS FOR RELIEF ................................19

      A.    Plaintiffs Have Protected Liberty Interests Vested by the
            Constitution, the TVPRA, and the FSA....................................20

      B.    ORR's Policies Lack Even Minimal Due Process .........................24

      C.    ORR's Policies Fail to Provide a Hearing as Required Under the
            APA..................................................................26

      D.    *Mathews v. Eldridge* Also Entitles Plaintiffs to Procedural
            Safeguards. ...........................................................27

            1.    ORR's custodial vetting policies and procedures are
                  constitutionally inadequate under *Mathews*......................28

                  a.    Plaintiffs' interests are substantial...........................28

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

i

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

# TABLE OF CONTENTS
### (continued)

Page

b. Plaintiffs have been prejudiced by ORR's erroneous deprivations of liberty in its release decisions and the value of additional safeguards is undisputable. ....................................................29

   (i) ORR's failure to provide adequate notice and an opportunity to be heard harms Plaintiffs' interests. ...................................29

   (ii) ORR's failure to apply clear standards for determining custodial fitness harms Plaintiffs' interests. ......................................31

   (iii) ORR's failure to provide for prompt release harms Plaintiffs' interests. ................33

   (iv) ORR's failure to provide counsel to challenge release denials harms Plaintiffs' interests. ......................................34

   (v) ORR's failure to provide interpreters harms Plaintiffs' interests. ...........................34

   (vi) ORR's failure to afford due process runs contrary to prevailing state and federal child welfare practices. ...............................35

c. Plaintiffs' liberty interests far outweigh the government's interest. ...............................................37

2. ORR's restrictive placement policies and procedures are constitutionally inadequate. .........................................37

a. Plaintiffs' interests are substantial. ..........................37

b. Plaintiffs have been prejudiced by ORR's erroneous deprivations of liberty in its step-up and step-down decisions and the value of additional safeguards is undisputable. ....................38

   (i) ORR's failure to provide Class Members adequate notice and an opportunity to be heard harms Plaintiffs' interests. ..................40

   (ii) ORR's failure to articulate clear standards to initially place, step-up, or step-down children harms Plaintiffs' interests. ...................................................44

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

ii

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

# TABLE OF CONTENTS
### (continued)

Page

(iii)   ORR's failure to provide counsel  to challenge restrictive placements harms Plaintiffs' interests. .......................................46

(iv)   ORR's failure to provide automatic hearings before a neutral factfinder harms Plaintiffs' interests.............................46

(v)   ORR's failure to provide interpreters harms Plaintiffs' interests.............................47

(vi)   ORR's failure to provide periodic hearings on placement decisions harms Plaintiffs' interests. .......................................48

(vii)   ORR's failure to afford adequate due process protections runs contrary to prevailing state and child welfare practices.........................................................49

c.   Plaintiffs' liberty interests far outweigh the government's interest...............................................51

V.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR FOURTH CLAIM FOR RELIEF .......................................51

   A.   The TVPRA Grants Plaintiffs a Comprehensive Right to Counsel........52

   B.   Plaintiffs Are Entitled to Counsel as a Matter of Due Process...............53

   C.   ORR Violates Plaintiffs' Right to Counsel by Denying Effective Assistance of Counsel ....................................................................54

   D.   ORR Unlawfully Bars Legal Service Providers from Using Federal Funding to Represent Children with Respect To Release, Placement, and Administration of Psychotropic Medication .................56

VI.   PLAINTIFFS ARE ALSO ENTITLED TO SUMMARY JUDGMENT ON THEIR FIRST, SECOND, AND FOURTH CLAIMS FOR RELIEF UNDER THE APA .....................................................................56

VII.   PLAINTIFFS ARE ENTITLED TO A PERMANENT INJUNCTION...........58

VIII.   CONCLUSION .......................................................59

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aageson Grain & Cattle v. U.S. Dep't of Agric.,*
   500 F.3d 1038 (9th Cir. 2007)...................................................................27

*Addington v. Texas,*
   441 U.S. 418 (1979).....................................................................21, 45

*Amoco Production Co. v. Gambell,*
   480 U.S. 531 (1987).............................................................................58

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986).............................................................................19

*Aristotle P. v. Johnson,*
   721 F. Supp. 1002 (N.D. Ill. 1989)................................................22

*ASSE Int'l, Inc. v. Kerry,*
   803 F.3d 1059 (9th Cir. 2015)..........................................26, 57

*Atterbury v. U.S. Marshals Serv.,*
   941 F.3d 56 (2d Cir. 2019)..................................................................57

*Augustin v. Sava,*
   735 F.2d 32 (2d Cir. 1984)..................................................................35

*Beltran v. Cardall,*
   222 F. Supp. 3d 476 (E.D. Va. 2016) .........................................*passim*

*Bismullah v. Gates,*
   514 F. 3d 1291 (D.D.C. 2008)............................................................40

*Boumediene v. Bush,*
   553 U.S. 723 (2008)......................................................................24, 40

*Bowman Transp. v. Arkansas Best Freight Sys.,*
   419 U.S. 281 (1974)............................................................................25

*Carver v. Lehman,*
   558 F.3d 869 (9th Cir. 2009)........................................................20, 23

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

iv

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..................................................................................19

*Ching v. Mayorkas*,
   725 F.3d 1149 (9th Cir. 2013)...................................................................22

*D.B. v. Cardall*,
   826 F.3d 721 (4th Cir. 2016)........................................................22, 30, 34

*Diouf v. Napolitano*,
   634 F.3d 1081 (9th Cir. 2011)...................................................................48

*Doe v. Gallinot*,
   657 F.2d 1017 (9th Cir. 1981)............................................................25, 47

*E.J. v. Templeton*,
   No. 3:16-cv-01975, 2017 WL 2080182 (M.D. Tenn. May 15, 2017) ...................40

*Flores v. Barr*,
   No. 2:85-cv-04544-DMG-AGR (C.D. Cal. Apr. 10, 2020) .....................................2

*Flores v. Barr*,
   No. CV 85-4544-DMG, 2020 WL 2758798 (C.D. Cal. Apr. 10, 2020) ................33

*Flores v. Sessions*,
   862 F.3d 863 (9th Cir. 2017)....................................................................53

*Flores v. Sessions*,
   No. 2:85-cv-4544-DMG (C.D. Cal. July 30, 2018) ..................................24, 33, 53

*Flores-Chavez v. Aschcroft*,
   362 F.3d 1150 (9th Cir. 2004).................................................................37

*Foucha v. Louisiana*,
   504 U.S. 71 (1992)........................................................................21, 28, 38

*In re Gault*,
   387 U.S. 1 (1967).........................................................................41, 42, 44

CooleyLLP
Attorneys At Law
Los Angeles

v

Mem. ISO Mot.
For Partial Summary Judgment
Case No. 2:18-CV-05741 DMG PLA

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Goldberg v. Kelly,*
    397 U.S. 254 (1970).................................................................25, 52, 54

*Greene v. McElroy,*
    360 U.S. 474 (1959).................................................................26

*Gutknecht v. United States,*
    396 U.S. 295 (1970).................................................................46

*Hamdi v. Rumsfeld,*
    542 U.S. 507 (2004).................................................................25

*Hernandez v. Sessions,*
    872 F.3d 976 (9th Cir. 2017).......................................................21

*Hicks v. Comm'r of Soc. Sec.,*
    909 F.3d 786 (6th Cir. 2018).......................................................25, 26

*Hubbart v. Knapp,*
    379 F.3d 773 (9th Cir. 2004).......................................................45

*INS v. St. Cyr,*
    533 U.S. 289 (2001).................................................................54

*J.D.B. v. North Carolina,*
    564 U.S. 261 (2011).................................................................54

*J.E.C.M. v. Lloyd,*
    352 F. Supp. 3d 559 (E.D. Va. 2018)...........................................22, 37

*Jie Lin v. Ashcroft,*
    377 F.3d 1014 (9th Cir. 2004)......................................................54

*Johns v. Cty. of San Diego,*
    114 F.3d 874 (9th Cir. 1997).......................................................54

*Kansas v. Hendricks,*
    521 U.S. 346 (1997).................................................................25

Cooley LLP
Attorneys At Law
Los Angeles

vi

Mem. ISO Mot.
For Partial Summary Judgment
Case No. 2:18-CV-05741 DMG PLA

## TABLE OF AUTHORITIES
(continued)

**Page**

*Kelly v. R.R. Ret. Bd.*,
  625 F.2d 486 (3d Cir. 1980).................................................................56

*L.V.M. v. Lloyd*,
  318 F. Supp. 3d 601 (S.D.N.Y. 2018) ...........................................32, 45

*Lassiter v. Dep't of Soc. Servs. of Durham Cnty.*,
  452 U.S. 18 (1981)...............................................................................37

*Logan v. Zimmerman Brush Co.*,
  455 U.S. 422 (1982).......................................................................26, 30

*Marathon Oil Co. v. EPA*,
  564 F.2d 1253 (9th Cir. 1977)..............................................................26

*Martinez-de Bojorquez v. Ashcroft*,
  365 F.3d 800 (9th Cir. 2004)................................................................42

*Mathews v. Eldridge*,
  424 U.S. 319 (1976)......................................................................*passim*

*McQuillion v. Duncan*,
  306 F.3d 895 (9th Cir. 2002)................................................................20

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012)................................................................59

*Moore v. City of East Cleveland*,
  431 U.S. 494 (1977).............................................................................22

*Morrisey v. Brewer*
  408 U.S. 471 (1972).............................................................................46

*Mosley v. St. Louis Southwestern Railway*,
  634 F.2d 942 (5th Cir. 1981)................................................................56

*Nat'l Ass'n of Optometrists & Opticians v. Harris*,
  682 F.3d 1144 (9th Cir. 2012)..............................................................19

CooleyLLP
Attorneys At Law
Los Angeles

vii

Mem. ISO Mot.
For Partial Summary Judgment
Case No. 2:18-cv-05741 DMG PLA

# TABLE OF AUTHORITIES
(continued)

**Page**

*Padilla v. Immigration & Customs Enf't*,
  953 F.3d 1134 (9th Cir. 2020)..................................................................51, 59

*Parham v. J.R.*,
  442 U.S. 584 (1979)....................................................................21, 48, 49

*Powell v. Alabama*,
  287 U.S. 45 (1932)....................................................................35, 52

*Quilloin v. Walcott*,
  434 U.S. 246 (1978)....................................................................53

*Ramirez v. U.S. Immigr. & Customs Enf't*,
  --- F. Supp. 3d ----, 2020 WL 3604041 (D.D.C. July 2, 2020)..................49, 58, 59

*Reno v. Flores*,
  507 U.S. 292 (1993)....................................................................29

*Rivera v. Cty. Of Los Angeles*,
  2011 WL 2650006 (C.D. Cal. July 5, 2011)....................................................37

*Rivera v. Granucci*,
  1993 WL 76202 (D. Conn. Mar. 12, 1993) ....................................................35

*In re Robin M.*,
  21 Cal. 3d 337 (1978) ....................................................................34

*Rosenbaum v. Washoe Cty.*,
  663 F.3d 1071 (9th Cir. 2011)....................................................................22

*San Luis & Delta-Mendota Water Auth. v. Locke*,
  776 F.3d 971 (9th Cir. 2014)....................................................................57

*Santos v. Smith*,
  260 F. Supp. 3d 598  (W.D. Va. 2017)....................................................30, 31, 33

*Santosky v. Kramer*,
  455 U.S. 745 (1982)....................................................................22, 33, 37

Cooley LLP
Attorneys At Law
Los Angeles

Mem. ISO Mot.
For Partial Summary Judgment
Case No. 2:18-CV-05741 DMG PLA

# TABLE OF AUTHORITIES
(continued)

**Page**

*Saravia v. Sessions,*
  905 F.3d 1137 (9th Cir. 2018)........................................................................*passim*

*Schad v. Arizona,*
  501 U.S. 624 (1991)......................................................................................36, 50

*Schall v. Martin,*
  467 U.S. 253 (1984)...........................................................................28, 30, 38, 44

*Singh v. Holder,*
  638 F.3d 1196 (9th Cir. 2011)........................................................................*passim*

*Smith v. Sumner,*
  994 F.2d 1401 (9th Cir. 1993)........................................................................20, 24

*Stanley v. Ill.,*
  405 U.S. 645 (1972)................................................................................................34

*Staub v. City of Baxley,*
  355 U.S. 313 (1958)................................................................................................32

*Superintendent, Mass. Corr. Inst., Walpole v. Hill,*
  472 U.S. 445 (1985)................................................................................................47

*Tawadrus v. Ashcroft,*
  364 F.3d 1099 (9th Cir. 2004)..............................................................................54

*Todaro v. Ward,*
  565 F.2d 48 (2d Cir.1977)......................................................................................35

*United States v. Raya-Vaca,*
  771 F. 3d. 1195 (9th Cir. 2014), *abrogated on other grounds by Dep't
  of Homeland Sec. v. Thuraissigiam,* 140 S. Ct. 1959 (2020) ................................42

*United States v. Salerno,*
  481 U.S. 739 (1987)................................................................................................25

*United States v. Si,*
  333 F.3d 1041 (9th Cir. 2003)..............................................................................35

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

ix

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

## TABLE OF AUTHORITIES
(continued)

Page

*Vitek v. Jones,*
445 U.S. 480 (1980).................................................................*passim*

*Walters v. Reno,*
145 F.3d 1032 (9th Cir. 1998).........................................42, 47

*Weinberger v. Romero-Barcelo,*
456 U.S. 305 (1982)...............................................................58

*In re Winship,*
397 U.S. 358 (1970)...............................................................45

*Wong Yang Sung v. McGrath,*
339 U.S. 33 (1950), *superseded in part by statute on other grounds*
*Ardestani v. I.N.S.*, 502 U.S. 129 (1991) ............................27

*Zadvydas v. Davis,*
533 U.S. 678 (2001).................................................20, 21, 46

*Zerezghi v. U.S. Citizenship and Immigr. Serv.,*
955 F.3d 802 (9th Cir. 2020)...............................................26

*Zinermon v. Burch,*
494 U.S. 113 (1990).........................................................30, 42, 43

**Statutes**

5 U.S.C.
§ 554................................................................................26, 27
§ 555(b).............................................................................52
§ 556...................................................................................27
§ 557...................................................................................27
§ 702 *et seq.*......................................................................57
§ 706(1).........................................................................49, 58
§ 706(2)...............................................................................57

6 U.S.C. § 279 ..............................................................3, 8

CooleY LLP
Attorneys At Law
Los Angeles

x

Mem. ISO Mot.
For Partial Summary Judgment
Case No. 2:18-cv-05741 DMG PLA

# TABLE OF AUTHORITIES
(continued)

**Page**

8 U.S.C.
  § 1232 ........................................................................................... 3, 8
  § 1232(b)(5) ........................................................................................ 1
  § 1232(c)(2) .................................................... 2, 8, 22, 49, 58
  § 1232(c)(5) .............................................................. 53, 56, 58
  § 1362 ............................................................................................... 56

28 U.S.C. § 1827(d) ........................................................................ 35

Further Consolidated Appropriations Act, 2020, 116 Pub. L. No. 94, Title
  II, 133 Stat. 2534 (2019) ........................................................... 57

Homeland Security Act of 2002, § 462(b) Pub. L. No. 107-296, 116 Stat.
  2135 (2002) .................................................................................. 56

William Wilberforce Trafficking Victims Protection Reauthorization Act
  of 2008 ........................................................................................... 1

**Other Authorities**

Black's Law Dictionary 442 (11th ed. 2019) ............................ 53

Fed. R. Civ. P. 56(a) .................................................................... 19

CooleyLLP
Attorneys At Law
Los Angeles

xi

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE No. 2:18-CV-05741 DMG PLA

## I.   INTRODUCTION

Plaintiffs challenge the policies and practices of the Office of Refugee Resettlement ("ORR") that prolong immigrant children's detention under harsh conditions, creating a continuum of trauma that vulnerable children—many of whom arrive in the United States after having suffered horrific trauma in their countries of origin—are ill-equipped to endure. Plaintiffs immigrated to the United States often fleeing violence, physical and sexual assault, and extreme poverty only to be detained by ORR for months, and sometimes years, while denied reunification with their parents, siblings, and other family members.

ORR prolongs children's detention in ORR custody on the ground that their parents or other available custodians are or may be unfit, but affords neither detained children nor their proposed custodians any meaningful or timely opportunity to be heard regarding a proposed custodian's fitness. Moreover, ORR "steps up" children from shelters to staff-secure, secure, and restrictive psychiatric facilities without even the most rudimentary procedural protections. Youth housed in shelters report being awakened in the small hours of the morning and soon thereafter finding themselves confined in juvenile detention centers or psychiatric facilities, where they suffer irreparable harm inherent to confinement. ORR also undermines lawyers' ability to represent detained children with respect to placement, administration of psychotropic medications, or release to available custodians, notwithstanding that Congress specifically directed ORR to "ensure, to the greatest extent practicable" that children who are or have been in its custody have legal representation in "legal proceedings or matters." William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, 8 U.S.C. § 1232(b)(5) ("TVPRA").

To protect children like Gabriela N., who was held in ORR custody for 633 days while ORR refused to release her to her grandfather, and Lucas R., who was refused release to his sister and brother for over 200 days, from severe and unnecessary harm upon arrival in the United States, Congress incorporated into federal law two bedrock

Cooley LLP
Attorneys At Law
Los Angeles

1

Mem. ISO Mot.
For Partial Summary Judgment
Case No. 2:18-CV-05741 DMG PLA

principles from the settlement in *Flores v. Barr*, No. 2:85-cv-04544-DMG (C.D. Cal.) ("FSA"): (1) ORR must release children to parents or other qualified custodians without unnecessary delay; and (2) ORR must place children in the "least restrictive" setting for however long it detains them. *See* 8 U.S.C. § 1232(c)(2)(a). The FSA and TVPRA—along with the Constitution—provide substantive rights to Class Members entitled to procedural protection. (*See* ECF No. 141 at 11-15.)

However, neither the TVPRA nor the FSA prescribes *procedures* pursuant to which Defendants must transparently and rationally determine: (1) whether children's parents or other available custodians are fit; or (2) whether a child may be consigned to a restrictive placement. This procedural vacuum has necessitated numerous motions to enforce the FSA, and prompted this Court to convene multiple conferences, and order ORR "for the umpteenth time . . . to abide by the FSA." *Flores v. Barr*, No. 2:85-cv-04544-DMG-AGR, ECF No. 768 at 3 (C.D. Cal. Apr. 10, 2020). Absent meaningful process to determine whether ORR is unnecessarily detaining children or placing them in restrictive facilities, Plaintiffs must continue to resort to judicial enforcement of the substantive provisions of the TVPRA and FSA.

ORR's unnecessary delay and refusal to release children to qualified custodians inflicts grievous injury. And as days of detention stretch into weeks and months, frustration and trauma often culminate in behaviors indicative of their deteriorating emotional state. When this happens, instead of considering the mental and other health needs of the child, ORR "step-ups" children to even more restrictive settings, often exacerbating the child's needs. Once stepped up, Defendants' own data shows that children spend weeks or months *longer* in detention than those who are not stepped up.

ORR justifies this vicious cycle as a byproduct of its duty to protect children from abuse or neglect. However, the uncontroverted evidence shows that, *inter alia*:

- ORR prescribes no limit on how long it may take to decide whether a proposed custodian is fit;

- ORR grants its staff and contractors broad discretion to invent requirements and

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

2

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

evaluate a custodian's fitness before they are deemed fit;

- ORR fails to consider the trauma that detention itself causes in weighing whether continued detention is in the child's best interest;

- When detained children engage in undesirable behaviors, ORR transfers them to restrictive placement, most often waking them in the early hours of the morning and transporting them to an unknown and unfamiliar destination;

- Even when ORR conducts TVPRA-required "30-day reviews" of restrictive placement, it denies children, their custodians, and their lawyers any meaningful role in deciding whether to "step-down" a child back to a non-secure placement; and

- ORR exercises unilateral discretion in children's release and placement; it does not provide notice or an opportunity to be heard by children, their custodians, or their counsel in making these significant decisions.

No other child welfare agency in the country enjoys unilateral discretion to detain children, keep them separated from their families, consign them to psychiatric wards and juvenile lockups for however long it wants, or medicate them without parental consent. If children's substantive rights under the TVPRA, FSA, and Constitution are to mean anything at all, more process than none is due. Accordingly, Plaintiffs request that the Court enter judgment for Plaintiffs on their First (Custodians' fitness), Second (Restrictive Placement), and Fourth (Obstructing Legal Assistance) Claims for Relief.

## II.   PROCEDURAL AND FACTUAL BACKGROUND

### A.   Procedural Background

On June 29, 2018, Plaintiffs filed a complaint for injunctive relief, declaratory relief, and nominal damages, challenging certain unlawful policies and practices of ORR, an agency within the U.S. Department of Health and Human Services ("HHS") that has responsibility for the placement, care, custody and release of "unaccompanied alien children." 6 U.S.C. § 279; 8 U.S.C. § 1232; ECF No. 1. On September 7, 2018, Plaintiffs filed the First Amended Complaint ("FAC"). (ECF No. 81.) On December 27, 2018, the Court issued an amended order granting in part and denying in part

CooLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

3

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

Defendants' motion to dismiss and certifying five classes of minors in ORR custody. (ECF No. 141.) As relevant here, the Court certified the following classes:

- Minors in ORR custody "who are or will be placed in a secure facility, medium-secure facility, or RTC, or whom ORR has continued to detain in any such facility for more than 30 days, without being afforded notice and an opportunity to be heard before a neutral and detached decisionmaker regarding the grounds for such placement (*i.e.*, the 'step-up class')";

- Minors in ORR custody "whom ORR is refusing or will refuse to release to parents or other available custodians within 30 days of the proposed custodian's submission of a complete family reunification packet on the ground that the proposed custodian is or may be unfit (*i.e.*, the 'unfit custodian class')"; and

- Minors in ORR custody "who are natives of non-contiguous countries and to whom ORR is impeding or will impede legal assistance in legal matters or proceedings involving their custody, placement, release, and/or administration of psychotropic drugs (*i.e.*, the 'legal representation class')."

(*Id.* at 27–28.)[1]

The Court also made several findings relevant to the instant motion. ***First***, the Court allowed Plaintiffs to proceed with "due process claims predicated on Defendants' failure to provide sufficient procedural safeguards for alien minors to exercise their *Flores* rights because Plaintiffs cannot bring those claims in the *Flores* Action." (*Id.* at 10–11.) ***Second***, the Court concluded that ORR's policies and practices "constitute final agency actions such that Plaintiffs may raise their TVPRA claims under the APA." (*Id.* at 11–12.) ***Third***, the Court found that Plaintiffs "identified . . . substantive rights underlying their procedural due process claims" arising under the Constitution, the TVPRA, and the FSA. (*Id.* at 13–15.) ***Fourth***, the Court rejected Defendants' argument that children in ORR custody, as undocumented minors, are not entitled to any procedural protections beyond those explicitly provided by Congress. (*Id.* at 13, 15.)

### B.    Determining Custodians' Fitness (First Claim for Relief)

Many of the named Plaintiffs and Class Members have endured unnecessary and prolonged detainments in ORR custody, separated from their families, often leading to

---

[1] The Court certified two additional classes of minors related to Plaintiffs' Third and Fifth Claims for Relief, which are not at issue in this motion. (ECF No. 141 at 27–28.)

CooLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

4

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

the children's placements in more restrictive detention centers. Gabriela N. was in ORR congregate care for 633 days;[2] Lucas R. was in ORR custody for 208 days; and one Class Member remained in ORR custody for at least 1,570 days—or more than four years. (Statement of Uncontroverted Facts and Conclusions of Law in Support of Plaintiffs' Motion for Partial Summary Judgment ("SUF") ¶¶ 26–27.) As of March 13, 2020, there were approximately 1,193 children in ORR custody who had been detained by ORR for more than 30 days. (SUF ¶ 23.)

It is indisputable that detention and family separation are detrimental to the well-being of children, as demonstrated by the psychological harm suffered by Plaintiffs. (*See, e.g.*, SUF ¶ 17 (Lucas R. had trouble sleeping and psychological issues until reunified with his brother); SUF ¶ 18 (Sirena P.'s separation from her family was noted as a trigger to her mental health symptoms); SUF ¶ 19 (Benjamin F.'s separation from his mother and placement in ORR's legal custody led to physical and emotional challenges).[3] Notwithstanding this demonstrated harm, ORR's policies fail to provide adequate procedural protections to guard against unnecessary and prolonged detention.

### 1.    ORR's policies regarding custodial vetting.

ORR's command is clear: make "prompt and continuous efforts" toward family reunification and release children "without unnecessary delay." (SUF ¶ 29.) ORR releases children to potential custodians or "sponsors," which include parents or legal guardians (Category 1 sponsors), immediate relatives (Category 2A/B sponsors), or more distant relatives and individuals (Category 3 sponsors). (SUF ¶ 30.) Cases with no identified sponsors are referred to as Category 4. (SUF ¶ 31.)[4]

---

[2] Plaintiff Gabriela N. has reached the age of majority since this action was filed and now maintains this action on her own behalf, rather than through her next friend, Isaac N., who passed away in July 2020.

[3] Indeed, detention is correlated with both short-term and long-term adverse effects on children's physical and mental health and well-being. (SUF ¶¶ 1–4.)

[4] Some children designated as Category 4 may have had identified sponsors that were

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

5

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

ORR employees make final release decisions with minimal if any oversight, much less the kind of judicial oversight applied in the analogous child welfare context. (SUF ¶¶ 32–35, 37–38, 57.) Case Managers are not federal employees but are employed by "care providers," *i.e.*, private facilities with which ORR enters into cooperative agreements to place and care for children in ORR custody. (SUF ¶ 274.) Case Managers are responsible for assessing potential sponsors and making transfer and release recommendations. (SUF ¶ 33.) Case Coordinators are non-governmental contractor field staff assigned to one or more care providers primarily to review children's cases and provide transfer and release recommendations to ORR staff. (SUF ¶ 34.) Federal Field Specialists ("FFS") are ORR field staff located regionally throughout the country with final decision-making authority to, *inter alia*, release a child to a proposed sponsor. (SUF ¶¶ 35, 37.) Although Case Managers are the first of three actors involved in release decisions, they also have unilateral authority to declare a potential sponsor "non-viable," which ends the vetting process for that sponsor. (SUF ¶ 38.)

ORR's written policies offer a broad list of assessment criteria that Case Managers, Case Coordinators, and FFS ("case staff") ***may*** use to evaluate the fitness of potential sponsors. (SUF ¶ 59.) For example, the only requirements for ordering a discretionary home study are that the sponsor be potentially viable and case staff "have a reasonable expectation that results of the home study process . . . will provide additional information, other than what has already been gathered via the sponsor assessment process, which will mitigate concerns." (SUF ¶ 45.) Prior to release, ORR may also conduct additional assessments of minors in custody, such as psychological evaluations. (SUF ¶ 52.) Yet ORR provides no written standards for when it may require a psychological evaluation as a prerequisite to release. (SUF ¶ 53.)

ORR fails to provide written notice of decisions denying release in all but the most limited circumstances. Only when ORR deems a Category 1 sponsor unfit, will it

---

denied or deemed non-viable by ORR. (SUF ¶ 69.)

CooleY LLP
ATTORNEYS AT LAW
Los Angeles

6

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

send the sponsor a denial letter. (SUF ¶ 72.) No other category of sponsor is entitled to written notification of the denial and reasons for that denial. (*Id.*) And only if the sole reason for denial is a concern that the child may be a danger to themself or the community, does ORR send the child a denial letter. (SUF ¶ 70.) No other child is entitled to written notification of the denial and reasons for that denial. (SUF ¶ 71.) Opportunities to challenge decisions denying release are similarly limited.  Only parents and legal guardians have a right to appeal; no other proposed sponsors have any opportunity to challenge a release denial. (SUF ¶ 79.) Children are only entitled to appeal an adverse decision if the sole reason for the denial is a concern that the child is a danger to themselves or the community. (SUF ¶¶ 77–78.) None of these criteria was true for Lucas R., which meant that neither he nor his sister, Madelyn R., were ever told why Madelyn's sponsorship application was denied, which resulted in Lucas R. being detained in ORR custody awaiting reunification for 208 days. (SUF ¶¶ 26, 86–87.)

### 2. ORR's policies regarding custodial vetting lack basic procedural protections.

ORR's policies confer enormous discretion on case staff to determine whether a child can be released from federal custody without any of the basic procedural protections afforded in analogous child welfare systems. These policies frequently change and none of the limited guidance provided to case staff concerning custodial vetting is published in the Federal Register or Notice of Proposed Rulemaking or otherwise made available for public comment. (SUF ¶ 63.) Moreover, the policies on their face fail to provide even the most basic procedural protections to children and their sponsors. For example, the policies:

- Fail to provide guidance on how to weigh information once collected or require application of any particular standard—much less an evidentiary standard—when making release decisions (SUF ¶¶ 59, 61–62);

- Fail to provide a hearing before a neutral factfinder to challenge a decision denying release to a proposed custodian (SUF ¶ 74, 76);

- Fail to afford children the opportunity to review evidence relied upon in

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

7

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

denying a sponsor or otherwise provide a meaningful opportunity to challenge denial decisions (SUF ¶ 73);

- Fail to provide children with written notification of a proposed sponsor's denial in all but the most limited circumstances (SUF ¶ 70–71);

- Fail to afford children the right to appeal adverse decisions in all but the most limited circumstances (SUF ¶ 77–78);

- Fail to require any timeline for providing adverse decisions to proposed custodians other than parents or legal guardians (SUF ¶ 96);

- Fail to provide proposed custodians an opportunity to meaningfully inspect or rebut evidence relied upon to declare them unfit (SUF ¶ 75);

- Fail to ensure children their constitutional and statutory rights to counsel; and

- Fail to provide proposed custodians other than parents or legal guardians an opportunity to challenge adverse decisions through appeal or otherwise (SUF ¶¶ 79–80).

## C.   Restrictive Placement (Second Claim for Relief)

ORR is responsible for the placement, care, custody, and release of "unaccompanied alien children." 6 U.S.C. § 279; 8 U.S.C. § 1232. A child in ORR's custody "shall be promptly placed in the least restrictive setting that is in the best interest of the child" and "shall not be placed in a secure facility absent a determination that the child poses a danger to self or others or has been charged with having committed a criminal offense." 8 U.S.C. § 1232(c)(2)(A).

Despite this Congressional command, ORR detains children in restrictive facilities without affording them fundamental rights to hearings or any meaningful procedural protections. Children may be placed in restrictive settings as: (1) an initial placement upon transfer to ORR custody; or (2) when they are moved or "stepped up" from a lower level of care to a more restrictive placement. (SUF ¶¶ 102–03, 105.)[5] ORR has a network of available placements, which include shelters, short-term or transitional foster care, long-term foster care, group homes, therapeutic group homes, staff-secure,

---

[5] Children can also be moved from a more restrictive to a less restrictive level of care. This is referred to as a "step-down." (SUF ¶ 106.)

CooLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

8

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

therapeutic staff-secure, secure, and residential treatment centers ("RTCs"). (SUF ¶¶ 101, 107–08.) ORR also detains children in a number of out-of-network ("OON") facilities, some of which are RTCs. (SUF ¶ 108.)[6]

ORR regularly "steps up" Class Members. (SUF ¶ 104.) As of March 13, 2020, 14 of the total 3,621 children in ORR in-network care were detained in a secure facility; 17 were detained in a RTC; 30 were detained in a staff-secure facility; 6 were detained in a therapeutic staff-secure facility; and 13 were detained in therapeutic group homes. (SUF ¶ 223.) As of that same date, 11 children were detained in out-of-network RTCs. (SUF ¶ 224.) The longer ORR detains a child, the more likely they will be stepped up to a restrictive placement. (SUF ¶ 115.)

Secure juvenile detention facilities, which ORR concedes "have a secure perimeter, major constraining construction inside the facility, and procedures typically associated with correctional facilities," are the most restrictive facilities in ORR's network. (SUF ¶¶ 129, 117.)[7] Secure facilities—which have been compared to "prisons" and "jails" by ORR's own staff (SUF ¶ 128)—are "locked facilities with 24-hour surveillance and monitoring." (SUF ¶ 131.) Children are detained alone in small cells with concrete beds layered with only a thin mattress and no pillow. (Ex. 82 [Y.A.M.S. Decl.] ¶¶ 29–30.)[8] Children report being allowed out of their cells for only short periods of time and that the lights remain on through the night. (Ex. 137 [F.R.A.] Decl. ¶ 10 ("[At Yolo] they never turn out the lights. The lights stay on all night so you have to cover your head to try to sleep.").)

---

[6] ORR's Manual of Procedures ("MAP") refers to OON RTC placements as Treatment Authorization Request ("TAR") RTC placements. (SUF ¶ 110.)

[7] Previously, ORR maintained three secure facilities: Yolo County Juvenile Center ("Yolo"), Shenandoah Valley Juvenile Center ("SVJC"), and Northern Virginia Juvenile Detention Center ("NOVA"). (SUF ¶ 119.) Presently, ORR only maintains one secure facility: SVJC. (*Id.*)

[8] All exhibits cited are attached to the Declaration of Alexandra R. Mayhugh in Support of Plaintiffs' Motion for Partial Summary Judgment filed concurrently herewith.

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

9

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

Guards forcibly restrain and pepper spray children (SUF ¶ 130), which is traumatizing for those being restrained or pepper sprayed as well as the children witnessing the incident. (Ex. 137 [F.R.A. Decl.] ¶¶ 7–8 (child recounting staff throwing him on the ground and handcuffing him and witnessing another child being restrained so forcefully that his arm broke).) Children who have endured confinement in ORR's juvenile detention centers describe being "treated like criminals" and made to "feel like an animal." (Ex. 82 [Y.A.M.S. Decl.] ¶¶ 27, 29–30 ("It has been 11 months of misery [at Yolo]"—"a juvenile jail where we are kept in cells, forced to wear uniforms and treated like criminals. The detention center makes me feel like an animal.").)

RTCs are highly restrictive psychiatric facilities, which are similarly restrictive as secure facilities. (SUF ¶¶ 118, 127.)[9] In addition to physical liberty restrictions (SUF ¶ 132), RTCs require children to undergo treatment prescribed by the respective facility (SUF ¶¶ 133, 134). As part of that treatment, children report being medicated against their will, including being forcibly injected with psychotropic medication. (SUF ¶¶ 133, 134; Ex. 82 [Y.A.M.S. Decl.] ¶¶ 13–20 (recounting that staff would force the child's mouth open if they tried to refuse to take the medication; "I felt like I had no one to help me and no option but to take the daily medication."); Ex. 69 [K.N.A.T. Decl.] ¶ 11 ("The staff hold down and inject youth that aren't able to calm down."); Ex. 62 [D.S.J.L. Decl.] ¶ 11 ("Two staff grabbed me, and the doctor gave me an injection despite my objection and left me there on the bed.").)

OON facilities are often RTCs that are similarly restrictive as in-network RTCs. (SUF ¶ 121.) Staff-secure, therapeutic staff-secure, and therapeutic group homes are less restrictive than RTCs and secure jails, but more restrictive than shelters. (SUF ¶¶ 122–23, 125; *id.* ¶ 135 (children in therapeutic staff-secure facilities may be required to undergo sex offender treatment); *id.* ¶ 124 (staff-secure facilities can be gated,

---

[9] ORR currently maintains two in-network RTCs: MercyFirst Residential Treatment Center ("MercyFirst") in Syosset, New York, and Shiloh Treatment Center ("Shiloh") in Manvel, Texas. (SUF ¶ 120.)

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

10

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

1  enclosed, fenced facilities).) Foster care programs are the least restrictive settings in

2  which ORR places Class Members. (SUF ¶ 126.) ORR may consider each of these

3  placements when determining the "least restrictive" environment for a child.

4      It is unsurprising that the cumulative impact of confinement in ORR's restrictive

5  facilities are deleterious for a child's psychological and emotional functioning. (SUF

6  ¶ 1, 3-4, 136.) Yet children who then manifest behavioral symptoms of mental

7  decompensation are at risk of being detained even longer in a restrictive setting, or

8  generally in ORR custody unless they show good behavior (SUF ¶¶ 68, 152), something

9  that experts say may not be achievable. (*See* Ex. 56 [Matlow & Wang Expert Rep.] at

10  1387 ("Due to the impact of traumatic stress on cognitive, emotional, and behavioral

11  regulation skills . . . expectations for perfect behavior (i.e. no impulsive behavior, no

12  defiant behavior, no rule breaking, etc.) over extended periods of time are

13  unrealistic.").) This cruel cycle of indefinite detention exacerbates behaviors used to

14  justify further detention. (*Id.* at 1389 ("Release or step-down requirements that depend

15  upon demonstration of emotional, psychological, or behavioral stability are

16  contradictory in that the facility setting itself is often the source of the child's distress

17  and dysregulation.").)

18      Further problematic is that ORR evaluates this "good behavior" based on, among

19  other things, the number of Special Incident Reports ("SIRs") a child has received (SUF

20  ¶ 153), yet the behaviors that trigger a SIR vary from program to program (SUF ¶ 154).

21  Step-up can also further delay a child's release to a sponsor because ORR generally

22  requires home studies of proposed custodians of the children it steps up to secure

23  facilities or RTCs. (SUF ¶¶ 44, 156.)

24      Children stepped up to secure, staff-secure, and RTCs, as well as OON,

25  therapeutic staff-secure, and therapeutic group homes, are detained on average longer

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

11

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

than children who are not stepped up. (SUF ¶¶ 140, 141.) For example, Plaintiffs' expert Dr. Emily Ryo, a Professor of Law and Sociology at the University of Southern California, reviewed ORR data from November 2017 to March 13, 2020 and found that more restrictive placement correlated with longer average lengths of stay:

| Placement type | Average (days) |
| --- | --- |
| Only shelter placements, no step-ups | 52.9 |
| Stint at a staff secure facility | 176.5 |
| Stint at a therapeutic group home, no step-ups | 184.6 |
| Stint at a secure facility | 185.9 |
| Stint at a residential treatment center | 236.3 |
| Stint at a therapeutic staff secure facility | 246.3 |
| Stint at an out-of-network facility | 327.2 |

(Ex. 57 [Ryo Expert Rep.] at 1403; SUF ¶ 142.) At least one class-member was held in restrictive placements for more than four years. (SUF ¶ 143.)

Children who spend time in secure, staff-secure, therapeutic staff-secure, RTC, OONs, and therapeutic group homes are also less likely to be reunified with a proposed custodian (SUF ¶¶ 144–45), and more likely to voluntarily depart the United States than those who are not stepped up (SUF ¶¶ 146–47). Further, children who are stepped up are generally ineligible for step-down to long-term foster care programs (SUF ¶ 139), and children who are stepped up and have no potential sponsor or their sponsor(s) were denied—*i.e.*, Category 4 cases—are unlikely to be released to Unaccompanied Refugee Minor ("URM") programs (SUF ¶¶ 148–49).[10]

---

[10] "The URM program is the ORR-funded foster care services program . . . that establishes legal responsibility, under State law, to ensure that unaccompanied minor refugees and other eligible children . . . receive the full range of assistance, care, and services that are available to all foster children in the State." (Ex. 1 [ORR Policy Guide], Guide to Terms at 21.)

CooleyLLP
Attorneys At Law
Los Angeles

12

Mem. ISO Mot.
For Partial Summary Judgment
Case No. 2:18-CV-05741 DMG PLA

### 1. ORR's policies regarding restrictive placement.

ORR's written policies and procedures govern ORR's placement and transfer decisions. (SUF ¶ 157.) ORR's policies provide no definition or placement criteria for therapeutic staff-secure facilities, therapeutic group homes, and out-of-network facilities, despite mandate to consider least restrictive placements. (SUF ¶¶ 109, 111–14.)

ORR case staff participate in step-up and step-down determinations. (SUF ¶¶ 34, 161, 167.) Case Managers compile the information ORR relies upon to decide whether children will be stepped up or stepped down and recommend whether step-up or step-down is appropriate. (SUF ¶ 161–62.) Case Coordinators offer a third-party review of the Case Manager's recommendations regarding step-ups and step-downs (SUF ¶ 34), but unlike Case Managers they are not required to speak with children before making their recommendation (SUF ¶ 164). In practice, Case Coordinators rely exclusively on written documentation (SUF ¶ 163), and rarely speak with children before making step-up and step-down recommendations. (SUF ¶ 165.) FFS, who are ORR staff (SUF ¶ 166), provide final authorization for step-up and step-down decisions and can depart from a Case Manager's and/or Case Coordinator's recommendation without further review by any other ORR official. (SUF ¶ 167.) Like Case Coordinators, FFS rely exclusively on written documentation (SUF ¶ 168), which is not always accurate (SUF ¶ 169), and are not required to interview children or communicate with a child's potential custodian before making such decisions. (SUF ¶ 170.)

If ORR determines that a child warrants a more restrictive level of placement, ORR procedures only require that children be given a notice of placement form ("NOP") within 48 hours *after* step-up. (SUF ¶ 183.) The NOP is supposed to inform the child of the reason for placement in a restrictive setting and their right to challenge the placement. (SUF ¶ 186.) However, *prior* notice of step-up or placement in a restrictive setting is not required. (SUF ¶¶ 179, 181.) Additionally, children placed in OON facilities are not required to receive the NOP within the same time frame (SUF

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

13

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

¶ 184), and children placed in therapeutic group homes are not entitled to receive *any* NOP under ORR policy or procedures. (SUF ¶ 185.)

These draconian policies and lack of notice have a devastating effect on already traumatized children, sowing confusion, fear and anxiety. (Ex. 58 [A.D.A Decl.] ¶ 4 ("One morning at 4:00am, officials came and took me from the shelter and transferred me . . . No one told me where I was going or why."); Ex. 4 [M.A.P.S. Decl.] ¶ 4 ("One night, the staff told me to get in the car because we were going to look at the stars outside. It was really late at night, and I was tired and fell asleep. When I woke up, I was furious because I realized that they had lied to me. They had taken me to Shiloh and left all my personal belongings behind at the shelter. No one had told me that I would be transferring to a new facility. I had no prior notice of the transfer and neither did my family.").)

ORR also limits appeal rights regarding placement to an administrative request for reconsideration to the ORR Director or federal district court review, neither of which is automatic. (SUF ¶ 187.) The request for reconsideration does not include a hearing with the right to present evidence or confront adverse evidence. (SUF ¶ 204.) And children are only entitled to seek reconsideration by the ORR Director *after 30 days in a secure facility or RTC*. (SUF ¶ 201.) Children placed in staff-secure or therapeutic staff-secure facilities, or therapeutic group homes are not afforded an administrative appeal under ORR policy. (SUF ¶ 202.)

Although a child who ORR steps up may request a *Flores* bond hearing before an immigration judge, the outcome of the bond hearing has no determinative outcome on the child's level of placement in ORR custody. (SUF ¶ 205.) Moreover, the bond process puts the onus to initiate and the burden of proof on the child (SUF ¶ 276), in contravention of basic procedural due process standards.

### 2. ORR's policies regarding restrictive placement lack basic procedural protections.

ORR's policies confer unlimited discretion on staff and FFS. None of the limited

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

14

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

guidance provided to case staff concerning step-up, step-down or placement is published in the Federal Register or Notice of Proposed Rulemaking or otherwise made available for public comment. (SUF ¶ 158.) And the policies as written fail to provide even the most basic procedural protections to children. For example, the policies:

- Fail to provide guidance on how to weigh placement considerations or the application of any particular standard—much less an evidentiary standard—to placement decisions (SUF ¶ 177–78);

- Fail to provide a child any prior written notice that a child may be stepped up or the reasons for step-up (SUF ¶ 179);

- Fail to provide children with adequate notice of placement, or in some instances—such as therapeutic group homes—to provide any notice of placement whatsoever (SUF ¶¶ 184–85, 192);

- Fail to provide a child's parent or other potential custodian a notice of placement prior or subsequent to restrictive placement (SUF ¶¶ 181, 191);

- Fail to provide children a meaningful opportunity to inspect and rebut adverse evidence relied upon to step them up or decline to step them down (SUF ¶¶ 197, 215);

- Fail to provide children an opportunity to present evidence or cross-examine witnesses in a hearing regarding step-up, step-down or placement in a restrictive setting (SUF ¶¶ 196, 199, 204, 216);

- Fail to provide a hearing before a neutral factfinder to challenge an anticipated or completed step-up or anticipated denial of step-down (SUF ¶¶ 166–67, 187, 193, 204); and

- Fail to provide children an opportunity to challenge adverse decisions regarding placement through appeal or otherwise in all but the most limited circumstances (SUF ¶¶ 201–02).

### D. Obstructing Legal Assistance in Matters Relating to Release, Placement, and Medication (Fourth Claim for Relief)

Plaintiff Class Members are children who are typically indigent, speak little or no English, and have little or no knowledge of the United States' legal system. (SUF ¶ 226.) Their right to legal representation while in ORR custody is statutorily guaranteed and critical to the protection of their rights.

ORR is required to ensure "to the greatest extent possible" that children from noncontiguous countries have counsel to represent them "in legal proceedings or matters and protect them from mistreatment." (SUF ¶ 227.) ORR and care provider

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

15

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

1   facilities are required to provide children with information about the availability of free

2   legal assistance and their right to be represented by counsel. (SUF ¶ 228.)

3          HHS contracts with the Vera Institute of Justice ("VIJ"), a non-profit

4   organization, to coordinate the delivery of free legal services to children who are or

5   have been in ORR custody. (SUF ¶ 229.) VIJ in turn subcontracts with non-profit legal

6   aid providers to counsel and represent children in immigration proceedings. (SUF

7   ¶ 231.) The vast majority of Class Members are represented, if at all, by legal service

8   providers under subcontract with VIJ. (SUF ¶ 233.)

9          The undisputed facts demonstrate that ORR's policies and procedures frequently

10  compromise lawyers' ability to represent detained children with respect to release,

11  placement, and medication decisions.

12         *First*, Case Managers are not required to communicate with children's lawyers

13  about release and placement decisions. Although ORR policy nominally declares that

14  "Case Manager[s] inform[] other stakeholders of the progress" toward release, it

15  nowhere *requires* case managers to inform children's lawyers of anything, but instead

16  provides that such "other stakeholders" "*may* include local legal service providers and

17  attorneys of record." (SUF ¶ 236 (emphasis added).) ORR's lack of policy grants broad

18  discretion to Case Managers to communicate—or not—with children's counsel. (SUF

19  ¶¶ 236–37, 241–42.) Thus, lawyers' access to Case Managers varies by facility. (SUF

20  ¶ 240.) Indeed, some facilities even refuse to tell lawyers who their client's Case

21  Manager is. (SUF ¶ 237.) Likewise, Case Coordinators and FFS are not required to

22  communicate with children's legal counsel. (SUF ¶ 238–39.) And, in practice, they

23  rarely do. (SUF ¶ 239.)[11]

24         *Second*, in the limited instances when children's counsel are made aware of

25  release and placement decisions, ORR denies them timely access to evidence and

---

[11] Nor do children's legal representatives have access to personnel tasked with
completing home studies for proposed sponsors, even though such home studies may
be determinative in deciding whether ORR releases a child. (SUF ¶ 261.)

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

16

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

information it relies upon in making those decisions. Case Managers do not regularly provide legal representatives with evidence relied upon in recommending for or against release. (SUF ¶ 241.) They inconsistently allow children's lawyers to submit affirmative evidence in support of a client's release. (SUF ¶ 242.) They do not provide legal representatives with copies of their ultimate recommendation for or against release. (SUF ¶ 243.) Likewise, Case Coordinators and FFS are not obligated to provide children's lawyers the opportunity to submit affirmative evidence or even provide a copy of the ultimate recommendation and decision. (SUF ¶¶ 244–45.) The same goes for restrictive placement. Legal representatives must formally request a copy of the child's file in order to access evidence ORR believes justifies restrictive placement. (SUF ¶¶ 246–47.) There are no time limits on how long ORR may take before it releases a child's file pursuant to a request from their lawyer; in practice, counsel may wait weeks or months before receiving the file. (SUF ¶¶ 248–49.)[12]

**Third**, ORR obstructs children's counsel from advocating for them with respect to step-up or step-down decisions. (SUF ¶ 251–54.) ORR does not require that a child's lawyer be informed when a child is being stepped-up to a restrictive placement until after the transfer occurs. (SUF ¶ 255.) Nor does ORR disclose any psychological reports relied upon to transfer a child to a secure and/or psychiatric facility. (SUF ¶ 254.)

**Fourth**, ORR's written policies do not require that a child's legal representative be informed if their client is being administered psychotropic medication. (SUF ¶ 259.)

### E.   Plaintiffs Suffered Real and Substantial Harm as a Result of Defendants' Policies

In February 2018, ORR took Plaintiff Lucas R. into its custody and placed him at the Hacienda del Sol facility ("HdS") in Youngtown, Arizona. (SUF ¶ 10.) When Lucas R.'s sister, Madelyn, learned of his arrest, she quickly asked ORR to release

---

[12] And when it does at least produce a child's file, ORR redacts the names and contact information of third parties, including names of potential custodians and witnesses to events allegedly justifying restrictive placement. (SUF ¶ 250.)

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

17

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

Lucas R. to her. (SUF ¶ 49.) Madelyn promptly gave ORR all the documents it requested and applied to be his sponsor. (SUF ¶ 49.)

On February 20, 2018, ORR hospitalized Lucas R., purportedly due to suicidal ideation. (SUF ¶ 11.) According to the emergency room report, Lucas R. had "[suicidal ideation] x8 days since being moved to southwest key . . . 'and being removed from family.'" (SUF ¶ 11.) The report further states that Lucas R. "denie[d] [suicidal ideation] at this time [and] just states he is sad and depressed being away from his family in Guatemala." (SUF ¶ 12.) Nonetheless, upon being returned to HdS, a nurse practitioner promptly placed Lucas R. on sertraline (brand name Zoloft), a psychotropic drug with severe potential side effects. (SUF ¶ 13.) The medication caused Lucas R. stomach pain, and he periodically resisted taking it. (SUF ¶ 13.) No one from the shelter or ORR asked Madelyn for her consent to administer Lucas R. psychotropic drugs. (SUF ¶ 14.)

On or about March 15, 2018, ORR arranged a home study to assess Madelyn's suitability as a custodian for Lucas R. (SUF ¶ 50.) On April 12, 2018, ORR's home investigator recommended against releasing Lucas R. to Madelyn. (SUF ¶ 51.) Madelyn describes how she learned that ORR had declared her unfit to care for her brother:

> She told me nothing could be done, that the denial was a final decision. They didn't give me any opportunity to appeal the denial, or to ask that the decision be changed. She never gave me anything in writing explaining the reason for having denied me [Lucas R.'s] custody.

(ECF No. 37-13 [Madelyn R. Decl.] ¶ 13.)

Shortly thereafter, ORR transferred Lucas R. to Shiloh RTC. (SUF ¶ 15.) There, ORR continued to confine and medicate him without his or his family's consent until he was finally released to his brother on September 4, 2018. (SUF ¶ 16.)

Numerous named Plaintiffs and Class Members recount similarly precipitous and perfunctory decision-making that extended detention for months without their having the least ability to correct faulty assumptions, rebut derogatory evidence, or fill in the evidentiary record. (See, e.g., Ex. 138 [J.F.A. Decl.] ¶ 9 (Gabriela N.'s grandfather, after

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

18

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

she was detained six months at Shiloh RTC: "I got the impression that the home investigator didn't think I made enough money to be able to support [my granddaughter] and myself."); ECF No. 37-14, ¶ 8 (youth detained for fifteen months: "My case worker told me that the only reason that I haven't been released to my aunt [is] because I don't have an official birth certificate[.] My mother died before she could register me for [one].").)

If the statements of these children were not enough, Plaintiffs' experts similarly agree that prolonged detention, such as that described above, is positively associated with increased incidences of "step-up," thus producing a vicious cycle. (*See* SUF ¶ 115.)

## III.   LEGAL STANDARD

A party may move for partial summary judgment. Fed. R. Civ. P. 56(a). The standard for partial summary judgment is the same as summary judgment generally, such that summary judgment on a claim is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012). A dispute is genuine "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## IV.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR FIRST AND SECOND CLAIMS FOR RELIEF

The undisputed facts show that ORR's custodial vetting and step-up policies and practices fail to provide procedural due process when denying a child release to a parent or other proposed custodian and when detaining children in restrictive facilities.

The Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections."

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

19

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

*McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002) (internal quotation marks omitted). A constitutionally protected liberty or property interest can arise from the Constitution, statute, or contract, including a consent decree. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (Constitution); *Carver v. Lehman*, 558 F.3d 869, 874–75 (9th Cir. 2009) (statute); *Smith v. Sumner*, 994 F.2d 1401, 1406 (9th Cir. 1993) (consent decree); *see* ECF No. 141 [Class Cert. Order] at 13-15.

Plaintiffs have clear liberty interests to be free from detention, to familial association, and to be placed in the least restrictive setting—interests guaranteed by the Constitution, the TVPRA, and the FSA. (*See infra* Section IV.A.) Moreover, the undisputed record demonstrates that ORR's policies violate even the most basic tenets of due process by failing to provide Plaintiffs with notice and a hearing. (*See infra* Section IV.B.) Because Plaintiffs are constitutionally entitled to a hearing, binding Supreme Court precedent mandates that ORR provide such hearing in accordance with the procedures set forth in the APA. (*See infra* Section IV.C.) Finally, the high risk of erroneous deprivation, probable value of additional safeguards, and relatively low burden associated with additional procedural requirements, *see Mathews v. Eldridge*, 424 U.S. 319 (1976), further weigh in favor of granting summary judgment and the remedies articulated in the concurrently filed Proposed Order. (*See infra* Section IV.D.)

### A.   Plaintiffs Have Protected Liberty Interests Vested by the Constitution, the TVPRA, and the FSA

The substantive rights underlying Plaintiffs' procedural due process claims are rooted in the Constitution, the TVPRA, and the FSA—all of which guarantee rights to be free from detention and to familial association. (*See* ECF No. 141 [Class Cert. Order] at 13-15.)

**Constitution**. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Fifth Amendment's Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690 (recognizing Fifth Amendment liberty interest for immigrant detainees in civil custody);

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

20

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

*see also Hernandez v. Sessions*, 872 F.3d 976, 981 (9th Cir. 2017) ("[T]he government's discretion to incarcerate non-citizens is always constrained by the requirements of due process."); *id.* at 990 ("In the context of immigration detention, it is well-settled that 'due process requires adequate procedural protections to ensure that the government's asserted justification for physical confinement outweighs the individual's constitutionally protected interest in avoiding physical restraint.'") (quoting *Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011)).

Further, children placed in secure psychiatric facilities, including but not limited to RTCs, are often subjected to highly restrictive conditions amounting to civil commitment. And "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Foucha v. Louisiana*, 504 U.S. 71, 75-80 (1992) (recognizing Fifth Amendment liberty interest for civilly committed detainees) (quoting *Addington v. Texas*, 441 U.S. 418, 425 (1979)); *Parham v. J.R.*, 442 U.S. 584, 600 (1979) (there is a "substantial liberty interest in not being confined unnecessarily for medical treatment"). The uncontroverted record also shows that children stepped up to secure psychiatric facilities may be required to undergo mandatory behavior modification (SUF ¶ 135 (children forced to undergo sex-offender treatment); SUF ¶ 134 (children forcibly injected with psychotropic medication)), which itself requires due process protections under the Constitution. *See Vitek v. Jones*, 445 U.S. 480, 494 (1980) ("[T]he stigmatizing consequences of a transfer to a mental hospital for involuntary psychiatric treatment, coupled with the subjection of the prisoner to mandatory behavior modification as a treatment for mental illness, constitutes the kind of deprivations of liberty that requires procedural protections.").

"The substantive due process right to family integrity or to familial association is [also] well established." *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011); *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (holding that parents and children have a well-elaborated constitutional right to live together without government interference); *Ching v. Mayorkas*, 725 F.3d 1149, 1157 (9th Cir. 2013) ("The right to

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

21

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

live with and not be separated from one's immediate family is 'a right that ranks high among the interests of the individual' and that cannot be taken away without procedural due process."); *D.B. v. Cardall*, 826 F.3d 721, 740 (4th Cir. 2016) (children "enjoy a familial right to be raised and nurtured by their parents") (internal quotation marks omitted); *Beltran v. Cardall*, 222 F. Supp. 3d 476, 482 (E.D. Va. 2016) ("It is beyond dispute that [a mother's] right to the care and custody of her son – and [a son's] reciprocal right to his mother's care . . . is deserving of the greatest solicitude.") (internal quotation marks and citation omitted).

Numerous courts have also held that a child's right to familial association is not limited to parents. *See Moore v. City of East Cleveland*, 431 U.S. 494, 504 (1977) ("The tradition of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition."); *J.E.C.M. v. Lloyd*, 352 F. Supp. 3d 559, 585 (E.D. Va. 2018) (rejecting argument that child's interest in family unity is unique to parents, and finding "siblings, aunts or uncles, grandparents, or first cousins" are family "captured in ORR's second-level category of would-be sponsors" and also "constitutionally significant"); *Aristotle P. v. Johnson*, 721 F. Supp. 1002, 1006 (N.D. Ill. 1989) (children have "constitutionally protected right to associate with their siblings").

**TVPRA**. The TVPRA creates a protected liberty interest to be "promptly" placed "in the least restrictive setting that is in the best interest of the child," generally with "a suitable family member" or other available guardian or entity. 8 U.S.C. § 1232(c)(2)(A) ("[A]n unaccompanied alien child . . . ***shall*** be promptly placed in the least restrictive setting that is in the best interest of the child.") (emphasis added). The TVPRA also prescribes ORR's duty to place children in non-secure facilities: "A child ***shall not*** be placed in a secure facility absent a determination that the child poses a danger to self or others or has been charged with having committed a criminal offense." *Id*. (emphasis added); *see Carver*, 558 F.3d at 872–73 (statute creates constitutionally protected interest if it contains "explicitly mandatory language"); ECF No. 141 at 13-14.

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

22

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

**FSA**. The FSA creates protected liberty interests in the right to expeditious release from detention and the right to family reunification. (*See* ECF No. 141 at 14-15 (finding FSA protections "are secured by a consent decree and constitute civil rights because they are akin to . . . constitutional and statutory rights").) Paragraph 14, for example, mandates that, where detention is not necessary to secure a minor's timely appearance or ensure safety of the minor or others, "***[ORR] shall release a minor from its custody without unnecessary delay***, in the following order of preference, to: A. a parent; B. a legal guardian; C. an adult relative (brother, sister, aunt, uncle, or grandparent) . . . E. a licensed program willing to accept legal custody; F. an adult individual or entity seeking custody . . . ." (Ex. 8 [FSA] ¶ 14 (emphasis added).) Similarly, Paragraph 18 provides that "[ORR] . . . ***shall make and record the prompt and continuous efforts*** on its part toward family reunification and the release of the minor pursuant to Paragraph 14 above." (*Id*. ¶ 18 (emphasis added).)

Notably, the rights created by the FSA are not tethered to the degree of relation to the prospective sponsor. Put differently, the FSA grants all Class Members the right to prompt release from detention; it does not give Class Members a lesser right to prompt release depending on the degree of kinship with or availability of sponsors.

The FSA also creates a constitutionally protected liberty interest in non-secure, licensed facilities: "Except as provided in Paragraphs 12 or 21, such minor ***shall*** be placed temporarily in a licensed program until such time as release can be effected . . . or until the minor's immigration proceedings are concluded, whichever occurs earlier." (Ex. 8 [FSA] ¶ 19 (emphasis added).) Further, "[a] licensed program . . . ***shall*** be non-secure as required under state law" and "licensed by an appropriate State agency to provide  . . . care services for dependent children." (*Id*. ¶ 6 (emphasis added).) This Court has already determined that RTCs and juvenile detention centers are ***not*** "licensed programs" within the meaning of the FSA. *See Flores v. Sessions*, No. 2:85-cv-4544-DMG (AGRx), ECF No. 470 at 11-14 (C.D. Cal. July 30, 2018). The FSA enumerates limited circumstances under which ORR may place children in unlicensed facilities—

Cooley LLP
Attorneys At Law
Los Angeles

23

Mem. ISO Mot.
For Partial Summary Judgment
Case No. 2:18-CV-05741 DMG PLA

*e.g.*, when a child has committed a violent crime, is an unusual escape risk, or is so disruptive that secure confinement is necessary to ensure the welfare of the minor or others—but even then, requires that no "less restrictive alternatives [be] available." (Ex. 8 [FSA] ¶¶ 21, 23.)

These provisions of the FSA create constitutionally protected liberty interests for the custodial vetting and step-up Class Members. *See Sumner*, 994 F.2d at 1406.

### B. ORR's Policies Lack Even Minimal Due Process

ORR's policies and procedures for release and step-up or step-down of minors are constitutionally inadequate because ORR deprives children of liberty without any hearing or meaningful legal process.

> The observations of the judicious Blackstone . . . are well worthy of recital: "To bereave a man of life . . . or by violence to confiscate his estate, without accusation or trial, would be so gross and notorious an act of despotism as must at once convey the alarm of tyranny throughout the whole nation; but confinement of the person, by secretly hurrying him to jail, where his sufferings are unknown or forgotten, is a less public, a less striking, and therefore a more dangerous engine of arbitrary government."

C. Rossiter ed., p. 512 (1961) (quoting 1 Blackstone *136). Yet, here, the most vulnerable children—unaccompanied immigrant children—are denied release to family and other willing sponsors and locked in jails and psychiatric centers without anything remotely close to a hearing.[13]

---

[13] The law grants even *less* vulnerable groups *more* protections than detained unaccompanied immigrant children. *See e.g. Boumediene v. Bush,* 553 U.S. 723, 783-84 (2008) (requiring sufficient process for suspected terrorists held at Guantanamo, including the rights to assistance of counsel, notice of allegations, presentation of evidence and cross-examination of witnesses against them where a court "must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power to detain"); *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (plurality) (finding that enemy combatant has right to "notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker."); *United States v. Salerno*, 481 U.S. 739, 751-52 (1987) (upholding Bail Reform Act as providing sufficient process, where pretrial detainees

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

24

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

Courts have long applied the *Mathews v. Eldridge* balancing test to "assess whether the government has provided 'the core due process protection of a meaningful hearing.'" *Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 797 (6th Cir. 2018). But where, as here, the government's decision depends on factual findings and plaintiffs are ***denied the opportunity to be heard at all***, the court need not weigh the interests at stake under the *Mathews* balancing test. *See id.* at 797 (concluding that procedures "violate long-standing principles of procedural due process that predate the *Mathews* test").

At a minimum, due process requires notice and "a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker." *Hamdi*, 542 U.S. at 533; *Doe v. Gallinot*, 657 F.2d 1017, 1024 (9th Cir. 1981); *see also Bowman Transp. v. Arkansas Best Freight Sys.*, 419 U.S. 281, 288 n. 4 (1974) ("[T]he Due Process Clause forbids an agency to use evidence in a way that forecloses an opportunity to offer a contrary presentation."); *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) ("In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses.").

One such "immutable" principal of due process is that "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Beltran*, 222 F. Supp. 3d at 485 (quoting *Greene v. McElroy*, 360 U.S. 474, 496 (1959)) (finding that "notice" provided to proposed custodian was made "in exceedingly general terms" and that such an "opaque procedure deprived Petitioner of any opportunity to contest ORR's findings, and thus any meaningful opportunity to alter its conclusions"); *Saravia v.*

---

were provided counsel, right to present evidence, cross-examine witnesses and testify in front of a neutral judicial officer at detention hearing); *Kansas v. Hendricks*, 521 U.S. 346, 353 (1997) (upholding sexually violent predator statute where procedural safeguards of counsel, the right to present and rebut evidence and witnesses, and the burden of proof is on the government).

CooLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

25

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

*Sessions*, 905 F.3d 1137, 1144 (9th Cir. 2018) ("Due process always requires, at minimum, notice and an opportunity to respond."); *see also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982).

ORR's refusal to permit children and their custodians the opportunity to inspect and rebut evidence material to ORR's decision-making before a neutral factfinder offends the most "basic tenet[s]" of due process. *See Hicks*, 909 F.3d at 797 (collecting cases); *see also Zerezghi v. U.S. Citizenship and Immigr. Serv.*, 955 F.3d 802, 810–12 (9th Cir. 2020) (government violated due process where it failed to provide the evidence it relied upon in making its decision thereby denying plaintiffs the opportunity to rebut the evidence); *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1075 (9th Cir. 2015) (same). This denial of even minimally required procedural protections is itself a violation of due process and grounds for granting summary judgment in Plaintiffs' favor on their First and Second Claims for Relief.

### C.    ORR's Policies Fail to Provide a Hearing as Required Under the APA

The Administrative Procedure Act ("APA") regulates federal administrative proceedings in "every case of adjudication required by statute to be determined on the record after [the] opportunity for an agency hearing." 5 U.S.C. § 554(a).[14] The Supreme Court has determined that the APA applies with equal, if not more, force when a hearing is required by the Constitution. *See Wong Yang Sung v. McGrath,* 339 U.S. 33, 50 (1950), *superseded in part by statute on other grounds Ardestani v. I.N.S.*, 502 U.S. 129 (1991). In *Wong Yang Sung*, the Supreme Court held that the APA's "limitation to hearings 'required by statute'" "exempts from that section's application only those

---

[14] There can be no dispute that ORR's decisions regarding the fitness of prospective custodians and restrictive placement are adjudicatory. As the Ninth Circuit has held, adjudicatory decisions are those that "determine the specific rights of particular individuals." *See Marathon Oil Co. v. EPA,* 564 F.2d 1253, 1261 (9th Cir. 1977). Relevant here, ORR is adjudicating matters directly related to children's rights to (i) physical liberty, (ii) family integrity, (iii) least restrictive placement consistent with their best interests, and (iv) release without unnecessary delay to qualified custodians.

hearings which administrative agencies may hold by regulation, rule, custom, or special dispensation; *not those held by compulsion*." *Id.* (emphasis added). In other words, they "exempt hearings of less than statutory authority, *not those of more than statutory authority*." *Id.*; *see also Aageson Grain & Cattle v. U.S. Dep't of Agric.*, 500 F.3d 1038, 1043-44 (9th Cir. 2007) ("[T]he APA generally applies where an administrative hearing is required by statute *or the Constitution*.") (emphasis added).

As established in Section IV.A, *supra*, the Government's decisions denying release of Plaintiffs to proposed custodians and to initially place or step-up or step-down minors directly implicates Plaintiffs' liberty interests in freedom from detention and rights to familial association. And because these decisions depend on factual findings, due process requires at a minimum notice and a hearing. (*See supra* Section IV.B.)

Where the Constitution requires a hearing, as it does here, the APA prescribes the procedures that must be provided. *See Wong Yang Sung*, 339 U.S. at 51, 53; 5 U.S.C. §§ 554, 556, 557. Thus, ORR must provide children in its custody: (1) "notice" of the hearing; (2) the opportunity to present his or her "case or defense by oral or documentary evidence"; (3) "to submit rebuttal evidence"; and (4) "to conduct such cross-examination as may be required for a full and true disclosure of the facts." 5 U.S.C §§ 554(b)-(d), 556(d). And if any agency decision "rests on official notice of a material fact not appearing in the evidence in the record," the party is "entitled to an opportunity to show the contrary." 5 U.S.C § 556(e). ORR's policies with respect to determining custodians' fitness and restrictive placement fail to afford these basic protections. Accordingly, the Court should order ORR to afford detained children prompt in-person hearings consistent with the procedures mandated by the APA.

### D.   *Mathews v. Eldridge* Also Entitles Plaintiffs to Procedural Safeguards.

Courts use the three-factor test articulated in *Mathews v. Eldridge* to determine which procedural protections are warranted:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

27

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335. Plaintiffs' interests in freedom from detention and familial association and their right to placement in the least restrictive setting are substantial and far outweigh Defendants' interests in denying basic procedural protections.

### 1.   ORR's custodial vetting policies and procedures are constitutionally inadequate under *Mathews*.

#### a.   Plaintiffs' interests are substantial.

It is well-established that a minor's interests in freedom from detention and familial association are substantial. *See, e.g.*, *Schall v. Martin*, 467 U.S. 253, 265 (1984) ("The juvenile's countervailing interest in freedom from institutional restraints, even for the brief time involved here, is undoubtedly substantial as well."); *Singh*, 638 F.3d at 1208 ("The private interest here—freedom from prolonged detention—is unquestionably substantial"); *Foucha*, 504 U.S. at 80 ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."); *Beltran*, 222 F. Supp. 3d at 482 ("In light of the right at issue [family integrity] and the magnitude of the government's intrusion upon it, Respondents must counterbalance the first *Mathews* factor with a strong showing under the second and third factors").

The profound harm that detention causes for children is uniformly recognized by scholars and researchers worldwide. (SUF ¶ 1.) And here, the undisputed facts demonstrate that children are at risk of harm in ORR custody.  Children have been physically abused and sexually abused in ORR custody. (SUF ¶¶ 6–7.) Gabriela N. experienced verbal abuse and harassment and suicidal ideation in ORR custody, which resulted in hospitalization. (SUF ¶ 5.) And it is beyond dispute that children in ORR custody experience separation from their parents, siblings, grandparents, and other

CooLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

28

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

1  family members. (SUF ¶ 8.)

2          **b.**    **Plaintiffs have been prejudiced by ORR's erroneous**
3                **deprivations of liberty in its release decisions and the**
              **value of additional safeguards is undisputable.**

4        The prejudice and risk of an erroneous deprivation of a child's liberty without

5  adequate procedural safeguards is high. Given the substantial interests at play, and the

6  inherent harms of detention, children are entitled to robust procedural protections.

7  Moreover, "[t]he consequences of an erroneous commitment decision are more tragic

8  where children are involved" because "childhood is a particularly vulnerable time of

9  life and children erroneously institutionalized during their formative years may bear the

10  scars for the rest of their lives." *Reno v. Flores*, 507 U.S. 292, 318 (1993) (O'Connor,

11  J. and Souter, J., concurring) (internal citations omitted).

12        Accordingly, at least the following procedural protections are necessary to guard

13  against the risk of erroneous deprivation of Plaintiffs' substantial interests in freedom

14  from detention and familial association: (i) adequate notice and an opportunity to be

15  heard; (ii) clear standards for determining custodial fitness; (iii) timelines to ensure

16  prompt release; (iv) right to counsel; and (v) interpreters. Because these safeguards

17  would reduce the risk of erroneous, prolonged, and harmful detention, this factor weighs

18  heavily in favor of granting relief.

19           **(i)**    **ORR's failure to provide adequate notice and an**
20                 **opportunity to be heard harms Plaintiffs' interests.**

21        Generally, the Constitution requires some kind of a hearing before a deprivation

22  of property or liberty. *Zinermon v. Burch*, 494 U.S. 113, 127-28 (1990) (collecting

23  cases). Due process requires "an opportunity to be heard in person and to present

24  documentary evidence," as well as "[a]n opportunity at the hearing to present testimony

25  of witnesses . . . and to confront and cross-examine witnesses called by the state, except

26  upon a finding, not arbitrarily made, of good cause for not permitting such presentation,

27  confrontation, or cross-examination." *Vitek*, 445 U.S. at 494; *Schall*, 467 U.S. at 277

28  (due process satisfied where accused juvenile was provided a hearing to call witnesses

CooleyLLP
Attorneys At Law
Los Angeles

29

Mem. ISO Mot.
For Partial Summary Judgment
Case No. 2:18-CV-05741 DMG PLA

and offer evidence on his own and where government was allowed to call witnesses under oath and witnesses were subject to cross examination); *Beltran*, 222 F. Supp. 3d at 486 (holding that once ORR decided to withhold minor from the care of his mother, "ORR owed [the mother] some form of adversarial process, and could not simply require [the mother] to change the agency's mind"); *see also Logan*, 455 U.S. at 433; *D.B. v. Cardall*, 826 F.3d at 743.

At least two courts have already found ORR's reunification policies violate due process. In *Beltran v. Cardall*, the court held that ORR's failure to provide adequate notice and adversarial hearing procedures failed to make sponsors "aware of any of the evidence or factual findings upon which ORR relied" and improperly placed the burden on the sponsor to "change the agency's mind," or, if unable to do so, "initiate court proceedings." 222 F. Supp. 3d at 485. The court also found:

> Virtually all of [ORR's] procedures . . . consisted of internal evaluation and unilateral investigation. In effect, Respondents contend that due process was satisfied here because ORR made a significant effort to reach the correct decision. But ***due process does not concern itself only with the degree to which one can trust the government to reach the right result on its own initiative; rather, due process is measured by the affected individual's opportunity to protect his or her own interests.***

*Id*. at 486-87 (emphasis added). Likewise, in *Santos v. Smith*, the court found all of the same due process deficiencies to exist and noted that they contributed to an increased risk of erroneous deprivation, finding that "had better or more process been given especially as to the delay and the burden being on Ms. Santos to initiate and justify reunification, rather than the default rule being otherwise, the outcome could have been different." 260 F. Supp. 3d 598, 614 (W.D. Va. 2017).

Here, it is undisputed that "children are not provided a written denial of a proposed custodian's release request, unless the sole reason for the denial is a concern that the unaccompanied alien child is a danger to himself/herself or the community." (SUF ¶ 70; *see* SUF ¶ 86 (Lucas R. did not know reasons sister was rejected, and neither

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

30

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

he nor his sister were provided written explanation for rejection); SUF ¶ 85 (Gabriela N.'s proposed custodian was her grandfather, yet he was not provided written notice of the reasons for rejection); Ex. 138 [J.F.A. Decl.] ¶ 12 (ORR never officially told Gabriela N.'s grandfather that his sponsorship application had been denied or that they were looking for other sponsors).) It is also undisputed that ORR does not have a policy requiring it to provide an opportunity to inspect or rebut evidence that ORR considers in determining whether a child should be released to a proposed custodian. (SUF ¶ 75.)

It is further undisputed that ORR does not, in policy or practice, provide children or sponsors a hearing to challenge an anticipated denial of a proposed custodian's release request, much less any opportunity to offer input designed to rebut ORR's decision. (SUF ¶ 74–77.) Accordingly, the Court should find ORR's policies and procedures deficient, and order Defendants to provide Class Members with notice and a hearing.[15]

> **(ii)   ORR's failure to apply clear standards for determining custodial fitness harms Plaintiffs' interests.**

Clear standards for determining custodial fitness would protect Plaintiffs against ORR's unchecked discretion. In *L.V.M. v. Lloyd*, for example, children detained by ORR challenged a new policy requiring director-level approval to release children who were currently or previously detained in staff-secure or secure facilities.  318 F. Supp. 3d 601, 608-09 (S.D.N.Y. 2018). The court found that "[u]nder a policy of his own making, [the director] has unfettered discretion to approve, deny, or request additional information, unguided by any rule or fixed set of criteria, giving him unrestricted power

---

[15] It is similarly undisputed that, with very limited exception, ORR fails to allow Class Members, or their sponsors, any opportunity to appeal its finding that a proposed custodian is unfit, much less within any certain timeframe. (SUF ¶¶ 77–80.) At most, only parents and legal guardians, and no other class of proposed sponsors—regardless of familial relation or other connection—are allowed an appeal; even then, ORR's policies do not require that ORR provide a hearing on an appeal within any time certain. (SUF ¶ 80.)

CooLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

31

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

1   to rule over the fate of vulnerable children." *Id.* at 611. The court ordered ORR to vacate
2   the policy, calling it "the zenith of impermissible agency actions." *Id.* at 609; *see also*
3   *Staub v. City of Baxley*, 355 U.S. 313, 322 (1958) (finding unconstitutional official's
4   "uncontrolled discretion" based on decision criteria "without semblance of definitive
5   standards or other controlling guidelines").

6        The same arguments apply to ORR's current approach to determining custodial
7   fitness. *First*, ORR admits that, in making release decisions, "ORR does not use an
8   'evidentiary' standard such as is more appropriately applied in formal court
9   proceedings." (SUF ¶¶ 61–62, 93.) *Second*, ORR's written policies offer only limited
10   instructions to case staff in making reunification decisions, none of which is published
11   in the Federal Register or a Notice of Proposed Rulemaking and is therefore shielded
12   from public scrutiny. (SUF ¶ 63.) Further, the limited guidance only instructs staff what
13   general categories of information to collect and consider, but not how to weigh
14   information once collected. (*E.g.*, SUF ¶ 59.) *Third*, the undisputed evidence confirms
15   that the vast discretion afforded to case staff has resulted in arbitrary, inconsistent, and
16   shifting reasons for denial. (*See* SUF ¶ 38 (sponsor deemed non-viable by case staff at
17   one facility and then approved two weeks later after child was transferred to different
18   facility); SUF ¶ 82 (child's sister denied as sponsor because child and sister did not have
19   same last name).)[16]

20        Where, as here, "the individual interests at stake . . . are both particularly
21   important and more substantial than mere loss of money," fundamental fairness requires
22   ORR to apply clear standards under a heightened standard of proof. *Santosky*, 455 U.S.
23   at 756 ("clear and convincing evidence" standard appropriate where government-
24   initiated proceedings . . . threaten the individual involved with a significant deprivation
25   of liberty or stigma") (internal quotation marks and citations omitted).

26

---

27   [16] ORR similarly uses vague criteria to assess a sponsor's ability to care for a child's
28   mental health needs prior to authorizing release. (*See* SUF ¶ 58.)

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

32

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

### (iii)   ORR's failure to provide for prompt release harms Plaintiffs' interests.

Courts have already found that ORR's "significant" and "unexplained delay[s] in responding to [a proposed sponsor's] unification request" violate due process irrespective of other procedural defects. *Santos*, 260 F. Supp. 3d at 614. Indeed, timely process is required to ensure that ORR is not allowing Class Members to languish in custody indefinitely. (*See* SUF ¶ 29; *see also Flores v. Sessions*, No. 2:85-cv-4544-DMG (AGRx), 2018 WL 10162328, at *21 (C.D. Cal. July 30, 2018) (finding ORR's policies caused unnecessary delay, at least in part, because (1) they were not required by the TVPRA or FSA, and (2) were not deemed necessary in analogous state child welfare contexts); *Flores v. Barr*, No. CV 85-4544-DMG (AGRx), 2020 WL 2758798, at *3 (C.D. Cal. Apr. 10, 2020) ("Any unnecessary delay in releasing a minor is, under normal circumstances, a violation of the FSA . . . .").

Even so, it is undisputed that "ORR does not have a policy requiring it to make a final suitability determination regarding a proposed sponsor within any specific timeline." (SUF ¶ 96.) In fact, Defendants admit that "it may take several months before ORR reaches a conclusion concerning whether a proposed sponsor is capable of providing for a child's physical and mental well-being and is otherwise suitable." (SUF ¶ 66; *see also* SUF ¶ 48 (ORR's choice to require all household members to submit fingerprints can cause "significant[] delay[].");  SUF ¶¶ 44–45 (home studies prolong detention). Even after ORR makes its final determination, ORR policy does not require that proposed custodians other than parents or legal guardians be notified of the determination within any set time period. (SUF ¶ 72.)

The undisputed evidence also confirms that children are often in ORR custody for significant periods of time even when they have available sponsors. Gabriela N., for example, was in ORR custody for 633 days—nearly two years—despite her grandfather being ready and willing to sponsor her release. (SUF ¶ 25.) ORR rejected Gabriela N.'s grandfather's sponsorship application and failed to provide written notice of its

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

33

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

rejection—or the reasons for that rejection—to Gabriela N. or her grandfather. (SUF ¶ 85.) Lucas R. was in ORR custody for 208 days, despite two different siblings applying to sponsor him. (SUF ¶ 26, 49.) These experiences are representative of other Class Members who have been detained for extended periods of time in ORR custody, at least one of whom was in ORR custody for more than four years. (SUF ¶ 27; *see also Stanley v. Ill.*, 405 U.S. 645, 647 (1972) (even a temporary deprivation of the right to family integrity is constitutionally significant); *D.B. v. Cardall*, 826 F.3d at 741 (ORR's continued and prolonged detention of children "implicates protected liberty interests"); *cf. In re Robin M*., 21 Cal. 3d 337, 342-43 (1978) (expressing disapproval over "the practice of detaining a child one to six months prior to [a] juvenile court hearing" as inconsistent "with the protective philosophy of the juvenile court").)

Each of the foregoing failures, and the risk of erroneous deprivation, is further compounded by substantial, undisputed evidence of the inherent harm in detention. (SUF ¶¶ 1–4, 6–7.) Accordingly, the Court should order ORR to comply with the timelines set forth in the concurrently filed Proposed Order.

### (iv) ORR's failure to provide counsel to challenge release denials harms Plaintiffs' interests.

Plaintiffs' right to counsel is both constitutionally and statutorily guaranteed, *see infra* Section V, and the importance of counsel in legal proceedings where life or liberty is at stake is beyond cavil. The right to be heard is of "little avail if it d[oes] not comprehend the right to be heard by counsel. *Powell v. Alabama,* 287 U.S. 45, 68-69 (1932).

### (v) ORR's failure to provide interpreters harms Plaintiffs' interests.

Appellate and district courts have routinely held that due process requires the assistance of an interpreter, including in the immigration context. *See Augustin v. Sava*, 735 F.2d 32, 36–37 (2d Cir. 1984); *Rivera v. Granucci*, 1993 WL 76202, at *6 (D. Conn. Mar. 12, 1993).

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

34

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

In a judicial proceeding where a defendant lacks the ability to speak or understand English, an interpreter can be essential for ensuring a fair trial. . . . Under the Court Interpreters Act, a trial judge must use an interpreter in the courtroom if that judge determines that a party "speaks only or primarily a language other than the English language . . . so as to inhibit such party's comprehension of the proceedings or communication with counsel or the presiding judicial officer."

*United States v. Si*, 333 F.3d 1041, 1042 (9th Cir. 2003) (quoting 28 U.S.C. § 1827(d)(1)).

It is undisputed that ORR's written policies do not guarantee the right to an interpreter. (SUF ¶ 264.) Class Members nonetheless have the right to notice and an opportunity to be heard and should be entitled to an interpreter as part of that process.

### (vi)   ORR's failure to afford due process runs contrary to prevailing state and federal child welfare practices.

"Appellate tribunals have accorded district courts broad discretion to frame equitable remedies so long as the relief granted is commensurate with the scope of the constitutional infraction." *Todaro v. Ward*, 565 F.2d 48, 54 n. 7 (2d Cir.1977) (citations omitted). Due process likewise "is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334–35.

State and other federal systems provide useful analogs for the types of protections and safeguards necessary here. *See Schad v. Arizona*, 501 U.S. 624, 640 (1991) (In certain cases, a "widely shared practice" can help inform whether a particular practice so drastically departs from accepted norms as to be presumptively violative of due process). For example, in California, child welfare agencies must promptly involve the juvenile court whenever the agency removes a child from their home. (Ex. 53 [Edwards Expert Rep.] at 1334.) The juvenile court in turn provides a number of procedural protections to children separated from their families, including the right to notice and an opportunity to be heard, the right to a trained, neutral factfinder who applies consistent evidentiary standards, and the right to appeal. (*Id*. at 1335.)

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

35

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

Indeed, dependency hearings are "evidentiary hearings, where children have the right to review and rebut adverse evidence, including rebutting the evidence of adverse witnesses." (*Id*. at 1336.) And the system relies upon "[c]lear statutory timelines" for hearings and dispositions, which "move children's cases forward toward timely permanency." (*Id*. at 1337.) As explained by Plaintiffs' expert, Judge Leonard Edwards, "the procedural protections afforded to children and youth in the U.S. child welfare system improve the quality of the decisions made in dependency proceedings and minimize the risk of erroneous deprivation of the rights of children in the child welfare system." (*Id*. at 1326, 1338; *see also* Ex. 54 [Heldman Expert Rep.] at 1350 (finding that "ORR's policies and procedures for transferring and keeping children in restrictive settings are far more informal and prone to error when compared to the procedures provided in state and federal juvenile justice and child welfare statutes.").) According to Judge Edwards: "In most of the thousands of cases I heard, what happened at the court hearing . . . modified in some way the recommendation of the social worker." (Ex. 53 [Edwards Expert Rep.] at 1339.) By contrast, the undisputed facts show that FFS—and therefore ORR—have virtually unfettered discretion to deny Plaintiffs' liberty interests and, further, that Plaintiffs have no ability to challenge those decisions. (SUF ¶¶ 37, 46, 57–59, 77–80; *see also* Ex. 53 [Edwards Expert Rep.] at 1339 (concluding that ORR's procedures "fall far short of the procedures provided in the U.S. child welfare system"); Ex. 54 [Heldman Expert Rep.] at 1354 (pointing out that "in the child welfare system, procedural protections center on the rights of parents and children to maintain the parent-child relationship").)

More process will improve government decision-making and reduce the risk of erroneous deprivation of the substantial liberty interests at stake. Accordingly, this Court should compel ORR to: (i) provide adequate notice and an opportunity to be heard with respect to release decisions; (ii) articulate and adhere to clear standards in its decision-making; (iii) adhere to timelines to ensure prompt release; (iv) provide the right to counsel in release proceedings; and (v) guarantee interpreters.

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

36

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

1
2

> c.     **Plaintiffs' liberty interests far outweigh the government's interest.**

3
4
5
6
7
8
9

The government's interest is "to place a child in a home suited to the child's welfare and needs," and "that goal [i]s best served by 'procedures that promote an accurate determination of whether [custodians] can and will provide a normal home.'" *J.E.C.M.*, 352 F. Supp. 3d at 586 (quoting *Santosky*, 455 U.S. 745); *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty.*, 452 U.S. 18, 27 (1981) ("Since the State has an urgent interest in the welfare of the child, it shares the parent's interest in an accurate and just decision.").

10
11
12
13
14
15
16
17
18

Here, Plaintiffs' interests in being free from detention and to familial association far outweigh the government's interests, fiscal, administrative or otherwise. *See Beltran*, 222 F. Supp. 3d at 482 (Defendants must make "strong showing under the second and third [*Mathews*] factors" in light of substantiality of Plaintiffs' interests); *see also Flores-Chavez v. Aschcroft*, 362 F.3d 1150, 1161 (9th Cir. 2004); *Rivera v. Cty. Of Los Angeles*, 2011 WL 2650006, at *13 (C.D. Cal. July 5, 2011). To be sure, ORR denies that the principal reason it does not afford Class Members greater procedural protections is because it would entail greater expense and administrative inconvenience. (SUF ¶ 81.)

19
20
21

Accordingly, the Court should find that Defendants have failed to afford Plaintiffs with basic due process protections and enter the relief requested in Plaintiffs' Proposed Order filed concurrently herewith.

22
23

> 2.     **ORR's restrictive placement policies and procedures are constitutionally inadequate.**

24

> a.     **Plaintiffs' interests are substantial.**

25
26
27
28

Plaintiffs' interests in freedom from detention and familial association are substantial. *See, e.g.*, *Schall*, 467 U.S. at 265 (freedom from institutional restraints); *Singh*, 638 F.3d at 1208; *Foucha*, 504 U.S. at 80; *Beltran*, 222 F. Supp. 3d at 482; *see supra* Section IV.A. Even more so when placed in ORR's secure detention facilities

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

37

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

which are akin to jails and prisons. (SUF ¶ 128; *supra* Section II.C.) Children are confined to locked facilities, subject to 24-hour surveillance, and treated like criminals. (SUF ¶ 131.) They sleep in cells on concrete beds and are subject to being pepper sprayed by guards. (SUF ¶ 130.) In RTC facilities, children face the added indignity of being forced to take psychotropic medications. (SUF ¶¶ 133–34.)

Moreover, once stepped up: (i) children spend significantly longer detained and separated from family—on average 131.2 days longer than children not stepped up (SUF ¶ 141); (ii) children remain in restrictive placements despite ORR's having found them suitable for step-down (SUF ¶ 137); (iii) children detained in secure, staff-secure, therapeutic staff-secure, RTCs, OON facilities, or therapeutic group homes are less likely to be reunified with a proposed custodian (SUF ¶¶ 144–45), and more likely to voluntarily depart the United States than children who are only ever placed in shelter care (SUF ¶¶ 146–47); and (iv) children who are stepped up are unlikely to be released to URM programs (SUF ¶¶ 148–49), and are ineligible for step-down to long-term foster care programs (SUF ¶ 139). Even more concerning, restrictive placements can lead to deterioration of children's mental health (SUF ¶ 136), and ORR admits that failing to step-down children who are ready for step-down can be detrimental to their long-term psychological well-being and contrary to their best interests. (SUF ¶ 138.)

Accordingly, it is uncontroverted that the step-up Class Members' interest is significant and substantial. Thus, the first *Mathews* factor weighs strongly in favor of due process protections.

### b. Plaintiffs have been prejudiced by ORR's erroneous deprivations of liberty in its step-up and step-down decisions and the value of additional safeguards is undisputable.

The prejudice and risk of erroneous deprivation of placing children in restrictive facilities without commensurate procedural safeguards is high, particularly when it results in children spending much longer time in ORR custody away from family. (*See supra* Section II.C.) ORR's opaque process also has resulted in numerous erroneous

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

38

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

decisions—either sending children to unnecessarily restrictive detention centers where children suffer long lasting harms or keeping children in restrictive placements even after a step-down decision is made. (SUF ¶¶ 137, 218–19.) Indeed, even once ORR finds a child suitable for step-down, the step-down process can take several weeks and sometimes even several months. (SUF ¶ 155.)

For example, Defendants admit that Class Representative Jaime D. was detained in a secure detention center and kept there three weeks *after* it was determined that he had been erroneously placed there in the first place. (SUF ¶¶ 218–19; ECF No. 144 [Azar Answer] ¶ 75 (Defendants admitting that two weeks after transfer to Yolo, "staff were all in agreement that [Jaime] isn't appropriately placed in a secure setting" and that nonetheless Jaime stayed at Yolo for three more weeks).) Additionally, ORR's own compliance review of secure facilities revealed that "the majority of the kids [ ] were inappropriately sheltered." (Ex. 19 [Ray Dep. Tr.] at 163:19–25;[17] *see also* SUF ¶ 218.) Likewise, the review showed that placement of over 70% of kids in staff-secure and RTCs was non-compliant with ORR's own policies and this Court's orders. (Ex. 23 [Fink Dep. Tr.] 153:8–13; SUF ¶ 218.)[18]

Defendants also admit that needlessly placing children in restrictive facilities or failing to step them down from restrictive facilities is contrary to their best interests. (SUF ¶¶ 116, 138.) Yet ORR's current process allows for little to no oversight of decisions related to restrictive placement. Accordingly, the Court should order ORR to provide: (i) adequate notice and an opportunity to be heard; (ii) clear standards to initially place, step-up, or step-down children; (iii) counsel to challenge restrictive

---

[17] All citations to deposition transcripts refer to original pagination.

[18] The compliance review revealed even more failures in ORR's step-up and step-down processes, including instances where children remained in secure and RTC placements even after such placement was no longer appropriate. (SUF ¶ 219; Ex. 19 [Ray Dep. Tr.] at 170:19–23; SUF ¶¶ 218–19; Ex. 22 [Fields Dep. Tr.] at 148:8–23 (admitting there were "quite a few children" for whom the psychiatrist had recommended step down or reunification, but who were still at Shiloh RTC).)

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

39

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

placements; (iv) automatic hearings before a neutral factfinder; (v) interpreters; and (vi) periodic hearings on placement decisions.

> **(i)** **ORR's failure to provide Class Members adequate notice and an opportunity to be heard harms Plaintiffs' interests.**

Due process requires notice and an opportunity to be heard, particularly where, as here, "subjective judgments are . . . susceptible to error." *Beltran*, 222 F. Supp. 3d at 486. Indeed, "even when all parties involved in this process act with diligence and good faith, there is considerable risk of error in the tribunal's findings of fact. There is a risk inherent in any process that . . . is closed and accusatorial." *Boumediene*, 553 U.S. at 785 (quoting *Bismullah v. Gates*, 514 F. 3d 1291, 1296 (D.D.C. 2008) (Ginsburg, C.J., concurring)). Confining children in secure juvenile detention, where they "can't freely walk out the door" or are "locked in a cell" entails important liberty interests because such detention departs from ordinary standards. *See E.J. v. Templeton*, No. 3:16-cv-01975, 2017 WL 2080182, *7 (M.D. Tenn. May 15, 2017) (finding Fourteenth Amendment protects juveniles from denial of liberty interest in avoiding incarceration in secure detention facility because such confinement *drastically departs* from the "ordinary standards" of juvenile detention). Accordingly, a "factfinding process" is required to protect children from erroneous detention in restrictive placements, including psychiatric facilities and juvenile detention centers. *See Saravia,* 280 F. Supp. 3d at 1199.

For over 50 years, the Supreme Court has recognized that detained children must be provided notice "sufficiently in advance of scheduled [hearings] so that reasonable opportunity to prepare will be afforded, and it must 'set forth the alleged misconduct with particularity.'" *In re Gault*, 387 U.S. 1, 33 (1967). Similarly, in the civil commitment context, notice is "essential to afford the [individual] an opportunity to challenge the contemplated action and to understand the nature of what is happening to him." *Vitek*, 445 U.S. at 496.

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

40

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

Here, there is no dispute that ORR does not require that a child and/or his or her parent or other potential custodian be provided any prior notice that he or she may be stepped up or the reasons for step-up (SUF ¶¶ 179, 181), and that Class Representatives were stepped up without written notice to them or their potential sponsors of the basis for restrictive placement prior to step-up. (SUF ¶¶ 180, 182; *see also* Ex. 70 [K.S.G.P. Decl.] ¶ 2 (minor was not informed of the reason for transfer prior to or subsequent to her second placement at Shiloh RTC); Ex. 82 [Y.A.M.S. Decl.] ¶¶ 27, 42 ("I arrived at the Yolo . . . in December 2016 and have been detained here ever since. . . . I have never been told why I am here, had a chance to present any evidence on why I should not be here, or been given any notice of any classification review.").)

Although ORR requires that a child receive a NOP within 48 hours following step up, i.e. *after* the decision has been made, such notice is inadequate where it is undisputed that:

(1) ORR procedures do not require that the notice be provided within the same time frame to children placed in out-of-network facilities, or to children placed in therapeutic group homes at all (SUF ¶¶ 184–85);

(2) Children do not always receive a NOP within 48 hours after arrival at a restrictive placement (SUF ¶ 188);

(3) Children do not consistently know or understand the reasons for restrictive placement and are not consistently informed and sometimes do not understand the contents of the notice (SUF ¶¶ 189–90);

(4) The NOP does not include documents or other evidence supporting the step-up decision (SUF ¶ 192); and

(5) Children are not given adequate opportunity to respond to the NOP (SUF ¶¶ 201–02, 204).

Providing notice after step-up has occurred without the documents or evidence used to make the decision, fails to afford the child enough time to confront the evidence to understand what is happening and an opportunity to challenge the contemplated deprivation. *See In re Gault*, 387 U.S. at 33; *Vitek*, 445 U.S. at 495–96. Further, notice without an opportunity to respond is worthless. *Saravia*, 905 F.3d at 1144 ("Due process always requires, at minimum, notice *and an opportunity to respond*.") (quoting *United*

CooleyLLP
Attorneys At Law
Los Angeles
41
Mem. ISO Mot.
For Partial Summary Judgment
Case No. 2:18-cv-05741 DMG PLA

*States v. Raya-Vaca*, 771 F. 3d. 1195, 1204 (9th Cir. 2014), *abrogated on other grounds by Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959 (2020)).

Finally, the Government faces minimal burdens in providing adequate notices. *See Martinez-de Bojorquez v. Ashcroft*, 365 F.3d 800, 805 (9th Cir. 2004) (cost of adding written notice is "minimal"); *Walters v. Reno*, 145 F.3d 1032, 1044 (9th Cir. 1998) ("Providing constitutionally adequate notice requires only minor changes in the content of [INS] forms themselves and equally slight adaptations in the INS's method of presenting the forms."). Especially here, where it is undisputed that the evidence is compiled and reviewed by Case Managers, reviewed by Case Coordinators before making a recommendation, and then sent to FFS for final decision-making. (SUF ¶ 162–63, 167–68.) The same evidence could easily be shared with the child and his or her legal representative contemporaneously with the evidence being shared with the Case Coordinator and FFS.

Defendants also admit that no hearing is afforded to children prior to or after step-up (SUF ¶¶ 193–99, 204), and there is no constitutionally adequate opportunity to be heard. Given the deprivation of liberty, the substantial private interest at stake, and the risk involved, due process requires that such hearing occur pre-deprivation—prior to initial placement or step-up to a restrictive setting. *See Zinermon*, 494 U.S. at 127–28 (due process generally requires ***"some kind of a hearing"*** before a deprivation of protected liberty interests) (emphasis added). While the Supreme Court has made exceptions for situations "where a predeprivation hearing is unduly burdensome in proportion to the liberty interest at stake . . . or where the State is truly unable to anticipate and prevent a random deprivation of liberty interest," *id*. at 132 (internal citations omitted), such exceptions are inapplicable here.

Indeed, it is highly predictable that a child could be erroneously deprived of his or her interest where the child, parent, sponsor and/or the child's attorney or representative is not notified or made part of the decision-making process (SUF ¶¶ 164–65, 170–73, 179, 234–39, 244), no hearing or opportunity to respond is afforded (SUF

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

42

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

¶¶ 193–95), and decision-makers are given no evidentiary standard to apply and little to no guidance on how to weigh factors or assess criteria, like danger to self or others (SUF ¶¶ 176–78). It is also feasible to provide pre-deprivation hearings and notice where ORR steps up relatively few children (SUF ¶ 222), making the administrative burden minimal at most. Despite the predictability and feasibility of providing a pre-deprivation opportunity to be heard, ORR policy and practice does not afford children an opportunity to challenge a decision to place them in a restrictive setting before such placement occurs. (SUF ¶¶ 193–95.)

Even *after* placement in a restrictive setting, children are not provided an opportunity to challenge their placement in an evidentiary hearing. (SUF ¶ 204.)[19] Although some children are afforded an opportunity to request reconsideration of placement, this request for reconsideration is inadequate because:

(1)   Only children placed in RTCs and secure facilities are afforded this opportunity, but not children placed in staff-secure, therapeutic staff-secure, or therapeutic group homes (SUF ¶¶ 201–02);

(2)   Children are not heard by a neutral factfinder (SUF ¶ 187; *see infra* Section IV.D.2.b.ii);

(3)   Children have no ability to inspect or rebut information relied upon in making a placement decision (SUF ¶ 215);

(4)   Children have no opportunity to present witnesses or evidence on their own behalf (SUF ¶ 204); and

(5)   Children have no chance to cross-examine adverse witnesses (SUF ¶ 199).[20]

*See Vitek*, 445 U.S. at 494–95 (Due process requires "an opportunity to be heard in

---

[19] Class representatives Lucas R. Gabriela N., Daniela Marisol, Sirena P., and Benjamin F. were stepped up to an RTC, and Jaime D. was stepped up to secure juvenile detention without being provided an evidentiary hearing to challenge the step-up decision. (SUF ¶ 195.)

[20] Class representatives Lucas R. Gabriela N., Daniela Marisol, Sirena P., and Benjamin F. were stepped up to an RTC, and Jaime D. was stepped up to secure juvenile detention without being provided an opportunity to cross-examine witnesses in an evidentiary hearing regarding step-up or placement in a restrictive setting. (SUF ¶ 200.)

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

43

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

person and to present documentary evidence," as well as "[a]n opportunity at the hearing to present testimony of witnesses by the defense and to confront and cross-examine witnesses called by the state, except upon a finding, not arbitrarily made, of good cause for not permitting such presentation, confrontation, or cross-examination.); *Schall*, 467 U.S. at 277 (due process satisfied where accused juvenile was provided a hearing to call witnesses and offer evidence on his own and where government was allowed to call witnesses under oath and witnesses were subject to cross examination); *In re Gault,* 387 U.S. at 57 ("absent a valid confession, a determination of delinquency and an order of commitment to a state institution cannot be sustained in the absence of sworn testimony subjected to the opportunity for cross-examination in accordance with our law and constitutional requirements").

Moreover, in *Saravia v. Sessions,* the Ninth Circuit upheld a preliminary injunction that provided detention hearings for children who were rearrested by ICE and placed in ORR custody. 905 F.3d at 1141, 1144–45 (finding no abuse of discretion where district court required prompt hearing before a neutral decisionmaker at which the minors could contest gang allegations and government would need to justify detention based on allegations). There is no reason the same process should not be afforded to all children ORR steps up to restrictive detention centers based on similarly one-sided allegations, where the provision of such hearings would be a minimal burden to the government. *Id.* at 1143 ("district court was well within its discretion to conclude that the cost of transporting minors to the hearing location was not likely to outweigh the benefits provided by its order, given that witnesses and evidence concerning the gang allegations that led to the minor's current predicament are most likely to be found where they lived").

         **(ii)**    **ORR's failure to articulate clear standards to initially place, step-up, or step-down children harms Plaintiffs' interests.**

As discussed *supra*, courts have disapproved of ORR policies that result in "unfettered discretion . . . to rule over the fate of vulnerable children." *L.V.M.*, 318 F.

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

44

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

Supp. 3d at 609, 611. Yet ORR enjoys virtually unfettered discretion in deciding whether to initially place or step-up or step-down children to more or less restrictive detention centers. **First**, ORR admits that it does not use any type of evidentiary standard in making detention placement decisions. (SUF ¶ 177.)[21] **Second**, ORR's written policies offer only limited guidance to case staff for initially placing, stepping up or stepping down children, and no guidance whatsoever on how to weigh information relevant to placement decisions. (SUF ¶ 178.) Further, not all FFS receive formal training on the differences between all of the different restrictive detention centers. (SUF ¶ 175.) And ORR policy provides no standardized metric to assess whether a child is a danger to self or others for step-up to a more restrictive setting—including the most restrictive, jail-like facilities—or "stable enough" for step-down. (SUF ¶¶ 150–51, 176.) **Third**, ORR's written policies and procedures on initial placements, step-up, and step-down change frequently (SUF ¶ 160), are not always consistent (SUF ¶ 159), and are not published in the Federal Register or a Notice of Proposed Rulemaking and are therefore shielded from public scrutiny (SUF ¶ 158). **Fourth**, FFS make final placement decisions based on information and evidence provided by case staff, which is not always accurate (SUF ¶ 169), and do not independently interview the children and/or their potential sponsors to aid in their decision-making (SUF ¶ 170–73).[22] **Fifth**, in most cases, FFS placement decisions are not subject to review (SUF ¶ 174), and FFS may disregard recommendations of case staff when making such decisions (SUF ¶ 167).

---

[21] In contrast, courts uniformly require a showing of "clear and convincing evidence" for involuntary civil commitment, *Addington*, 441 U.S. at 432–33; *Hubbart v. Knapp*, 379 F.3d 773 (9th Cir. 2004) (same), and "proof beyond a reasonable doubt" if a juvenile is to be confined in juvenile detention. *In re Winship*, 397 U.S. 358, 368 (1970). The Ninth Circuit has also required the "clear and convincing evidence" standard of proof for prolonged immigration detention. *Singh*, 638 F.3d at 1203–05.

[22] An FFS did not interview class representatives Lucas R., Gabriela N., Daniela Marisol, Sirena P., Benjamin F., or Jaime D. before stepping them up to restrictive settings. (SUF ¶¶ 171–72.)

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

45

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

Additionally, an FFS holds all the power to decide whether a placement review can occur earlier than 30 days. (SUF ¶ 211). Power, like that given to an FFS, "exercised entirely at the[ir] discretion . . . is a broad, roving authority, a type of administrative absolutism not congenial to our law-making traditions." *Gutknecht v. United States*, 396 U.S. 295, 306 (1970).

        **(iii)**    **ORR's failure to provide counsel  to challenge restrictive placements harms Plaintiffs' interests.**

As discussed, a right to be heard is concomitant with the right to counsel. (*See supra* Section IV.D.1.b.iv.) Because these children have a fundamental liberty interest at stake, there is no doubt that the right to counsel is constitutionally mandated—especially where the detainee is a vulnerable unaccompanied child. (*See infra* Section V.)

        **(iv)**    **ORR's failure to provide automatic hearings before a neutral factfinder harms Plaintiffs' interests.**

Procedural due process also requires an automatic hearing by a neutral factfinder. (*See supra* Section IV.B.; *Morrisey v. Brewer* 408 U.S. 471, 485 (1972); *see also Zadvydas*, 533 U.S. at 692 (recognizing this Court has suggested that "the Constitution may well preclude granting 'an administrative body the unreviewable authority to make determinations implicating fundamental rights'") (quoting *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 450 (1985)).) The undisputed facts show that ORR's written policies do not guarantee Class Members the right to a hearing before a neutral factfinder in connection with decisions to detain a child in a restrictive placement, despite the fact that all 50 states and the District of Columbia require a hearing before a neutral factfinder before a child can be detained in a secure facility, and a majority of the states provide the same for children placed in staff-secure facilities. (SUF ¶¶ 74, 207.)

Further, due process tilts overwhelmingly in favor of automatic hearings to ensure Class Members' ongoing prolonged confinement in restrictive detention centers

remains justified. **First**, "[t]he private interest here—freedom from prolonged detention—is unquestionably substantial." *Singh*, 638 F.3d at 1208. Prolonged confinement imposes not only lengthy physical restraint, but also loss of familial association. **Second**, the record evidence establishes that erroneous deprivations of liberty occur without automatic hearings and adequate notice. Many Class Members lack English proficiency or literacy in any language meaning that due process can only be achieved if a child's hearings are automatic. *See Walters*, 145 F.3d at 1043 (striking down INS procedures in part because "the alien never learns how to take advantage of the procedures because the combined effect of all the [immigration] forms together is confusion") (emphasis in original); *see also Gallinot*, 657 F.2d at 1023 (lack of automatic hearings rendered process "illusory" because detainees "cannot realistically be expected to set the proceedings into motion in the first place").

In similar juvenile proceedings, children's deprivation hearings occur as of right and the onus is never placed on a child to prove that they should not be deprived of liberty. (Ex. 144 [Quinn Expert Rep.] at 2050.) According to Professor Mae Quinn, who has nearly thirty years of experience in juvenile and criminal court systems throughout the United States, it is self-evident that, before a youth is "exposed to a secure detention setting for a prolonged period, there needs to be a hearing provided in an automatic way, that is the youth shouldn't have the [burden of requesting it]." (Ex. 32 [Quinn Dep. Tr.] at 91:1–3.) Finally, the Government faces minimal burdens in scheduling automatic hearings and has denied cost is a principal factor. (SUF ¶ 225.) Thus, requiring ORR to institute procedural safeguards before detaining children in restrictive placements will lessen any burden by avoiding costly and unnecessarily prolonged detentions.

### (v)   ORR's failure to provide interpreters harms Plaintiffs' interests.

As discussed, courts routinely hold that due process requires the assistance of an interpreter. (*See supra* Section IV.D.1.) This right is particularly important where, as

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

47

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

1  here, the vast majority of children neither speak nor understand English. (SUF ¶ 226.)

2  Accordingly, children in ORR custody are entitled to a qualified interpreter when

3  challenging ORR's decisions with respect to restrictive placement.

### (vi) ORR's failure to provide periodic hearings on placement decisions harms Plaintiffs' interests.

6  The Ninth Circuit has specifically held that immigrants at risk of prolonged

7  detention are entitled to individualized periodic review at which *they must be released*

8  unless the government establishes—through a formal hearing adjudicated by an

9  immigration judge—that they are a flight risk or danger to the community. *Diouf v.*

10  *Napolitano,* 634 F.3d 1081, 1091–92 (9th Cir. 2011). Children at risk of indefinite

11  detention in ORR custody are therefore entitled to individualized periodic reviews of

12  their placement in restrictive facilities and such reviews must include the full panoply

13  of procedural rights.

14  Likewise, "it is necessary that the child's continuing need for commitment be

15  reviewed periodically by a similarly independent procedure" as provided upon

16  confinement. *Parham*, 442 U.S. at 607. In *Parham*, periodic reviews were conducted

17  by "at least one independent, medical review group" and were "as frequent as weekly,

18  but none are less often than once every two months." *Id*. at 615. The court did not rule

19  on whether this review was sufficient but rather held that the periodic review provided

20  reduced the risk of error and therefore was necessary. *Id*. at 617. Similarly, recognizing

21  the risk of error and risk of prolonged or indefinite detention in the juvenile justice

22  context, a majority of states, statutes and court rules explicitly ensure that detention of

23  a juvenile in a secure detention facility does not continue indefinitely without court

24  review. (Ex. 54 [Heldman Expert Rep.] at 1353 & App'x B (citing to 30 state statutes

25  or court rules).)

26  Although ORR policy provides for placement reviews at least every 30 days a

27  child spends in a restrictive placement (SUF ¶ 209), the evidence shows that ORR has

28

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

48

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

failed to provide the reviews under the mandated timeframe. (SUF ¶ 212.)[23] And even when it does provide a 30-day review, the review is meaningless where children are not permitted to and do not participate or submit evidence (SUF ¶ 213),[24] and are not allowed an opportunity to cross-examine witnesses (SUF ¶ 216).[25]

### (vii) ORR's failure to afford adequate due process protections runs contrary to prevailing state and child welfare practices.

The safeguards Plaintiffs are seeking have long since been standard protocol both at the state and federal level. *See Schad*, 501 U.S. at 640. Plaintiffs' expert, Professor Jessica Heldman, conducted a review of the laws and policies in all 50 states, as well as federal law and policy, relating to detention and placement of children and youth in secure and staff secure settings within juvenile justice systems. (Ex. 54 [Heldman Expert Rep.] at 1349.) Professor Heldman concluded that "the procedural protections afforded children in the juvenile justice and child welfare systems minimize the risk of erroneous and unnecessarily lengthy placements in secure and staff secure settings which can be harmful and traumatic." (*Id.* at 1350.)

More specifically, Professor Heldman found that in all 50 states plus the District of Columbia, children are "entitled to a hearing when they are placed in a secure

---

[23] Failure to provide children placed in secure facilities a placement review "at minimum, on a monthly basis" is also a violation of the TVPRA. *See* 8 U.S.C. § 1232(c)(2). Agency action "not in accordance with the law," like the TVPRA, not only violates the APA under 5 U.S.C. § 706(2)(A), but also constitutes "agency action unlawfully withheld" under § 706(1). *Ramirez v. U.S. Immigr. & Customs Enf't*, --- F. Supp. 3d ----, 2020 WL 3604041, *83 (D.D.C. July 2, 2020); *see also infra* Section VI.

[24] Class representatives Lucas R. Gabriela N., Daniela Marisol, Sirena P., Jaime D., and Benjamin F. participated in case management meetings with their Case Managers, but they were not a part of the case staffing meetings that occurred between Case Managers, Clinicians, Case Coordinators, and the FFS to discuss their cases. (SUF ¶ 214.)

[25] Class representatives Lucas R. Gabriela N., Daniela Marisol, Sirena P., Jaime D., and Benjamin F. were not provided an opportunity to cross-examine witnesses in an evidentiary hearing regarding eligibility for step-down. (SUF ¶ 217.)

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

49

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

detention facility." (*Id.* at 1351.) Broken down by time frame, 19 states require a detention hearing within 24 hours of a youth entering a secure facility; 16 states within 48 hours; and 12 states within 72 hours. In comparison, ORR provides no time frame nor an automatic right to a detention hearing at all. Instead, children are expected to pursue federal court review or ORR Director review on their own. This is unrealistic when ORR does not provide counsel to children in restrictive placements to challenge their placement. In 41 states plus the District of Columbia, there is an explicit right to an attorney in a detention hearing; in the 9 other states, counsel is provided "either 'at all proceedings' or 'at all stages of proceedings' under the juvenile delinquency code." (*Id.* at 1352.) Additionally, the "majority of states have written policies—through statute, court rules, or both—indicating that all juveniles have a right to notice prior to their detention hearing." (*Id.*)

Professor Heldman concluded that "the most basic state law protections providing the right to a hearing, representation by an attorney, and an opportunity to be heard with testimony, witnesses and presentment of evidence in determinations regarding placement in a staff secure or secure facility exceed the procedural protections within ORR's written policies and procedures regarding the placement of children in restrictive settings." (*Id.* at 1350; SUF ¶ 220.)

Meaningful process will improve ORR's decision-making with respect to restrictive placement and it will bring ORR's restrictive placement process in-line with the vast majority of states' juvenile justice protections, as well as in-line with the process due under the Fifth Amendment given the substantial interests at stake and significant risk of erroneous deprivation. Accordingly, this Court should compel ORR to: (i) provide Class Members adequate notice and an opportunity to be heard, with the opportunity to inspect, confront, present and rebut evidence through testimony, if necessary; (ii) articulate clear standards to initially place or step-up or step-down children; (iii) provide Class Members with the right to counsel to challenge their restrictive placement; (iv) provide Class Members the right to automatic hearings before

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

50

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

1   a neutral factfinder regarding their placement; (v) provide interpreters; and (vi) provide

2   periodic hearings on placement decisions.

3          **c.    Plaintiffs' liberty interests far outweigh the government's
               interest.**

4

5          The government denies that its decision to provide children with no notice or

6   opportunity to be heard is rooted in economic burdens or administrative inconvenience.

7   (SUF ¶ 225.) Nor could the government assert economic or administrative burden as

8   the excuse to unilaterally deprive children of liberty without due process because the

9   burden would be insignificant. *See Beltran*, 222 F. Supp. 3d at 482; *see also Padilla v.*

10  *Immigration & Customs Enf't*, 953 F.3d 1134, 1142 (9th Cir. 2020) ("In the context of

11  immigration detention, it is well-settled that due process requires adequate procedural

12  protections to ensure that the government's asserted justification for physical

13  confinement outweighs the individual's constitutionally protected interest in avoiding

14  physical restraint.") (internal quotation marks omitted). Moreover, given that it is more

15  expensive to detain children in RTC placements than in shelters (SUF ¶ 221), procedural

16  safeguards that minimize the rate of erroneous placements in RTCs will reduce rather

17  than increase costs to Defendants.

18         The number of youth detained in ORR restrictive placements as of March 2020

19  was a small percentage of the total detained population in ORR custody. (*See supra*

20  Section II.B.) Of the 3,632 total children in ORR care (in- and out-of-network), 91 were

21  detained in restrictive placements, or less than 2.5% of the total ORR population. (*See*

22  SUF ¶¶ 222–23). Thus, a minimal financial and administrative burden would be placed

23  on the government to provide these additional protections to less than 2.5% of the total

24  detained population before placing a youth in a restrictive placement.

25  **V.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR
           FOURTH CLAIM FOR RELIEF**

26

27         "'The right to be heard would be, in many cases, of little avail if it did not

28  comprehend the right to be heard by counsel.'. . . Counsel can help delineate the issues,

present the factual contentions in an orderly manner, conduct cross-examination, and generally safeguard the interests of the recipient." *Goldberg*, 397 U.S. at 270–71 (quoting *Powell*, 287 U.S. at 68–69). Since the Supreme Court's decision in *Goldberg*, the right of anyone who appears before a federal administrative agency to be represented by counsel has been a hallmark of administrative law: "A person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative. A party is entitled to appear in person or by or with counsel or other duly qualified representative in an agency proceeding." 5 U.S.C. § 555(b).

Giving children in ORR custody—the vast majority of whom speak no English and have no ability to advocate for themselves within the U.S. legal system—a right to be heard will be of little practical benefit if they are denied effective assistance of counsel. Indeed, Plaintiffs' right to legal assistance is codified in the TVPRA, *see infra* Section V.A, and required as a matter of due process, *see infra* Section V.B. Nonetheless, the undisputed facts confirm that Defendants consistently and effectively deny children legal representation with respect to their release, placement, and medication decisions, *see infra* Section V.C, and even forbid legal services providers from using federal funds to represent children in those decisions, *see infra* Section V.D.

### A.   The TVPRA Grants Plaintiffs a Comprehensive Right to Counsel

The TVPRA obliges ORR to "ensure, to the greatest extent practicable . . . that all unaccompanied alien children who are or have been in [its] custody . . . have counsel to represent them in ***legal proceedings or matters*** and ***protect them from mistreatment*** . . . ." 8 U.S.C. § 1232(c)(5) (emphases added). But ORR has never issued regulations or other written guidance on the definition of "legal proceedings or matters" or what amounts to protection "from mistreatment." (SUF ¶ 270.)

Here, there can be little question that ORR detaining children, placing them in high-security facilities like psychiatric facilities and juvenile detention centers, and administering psychotropic medication without parental consent are all "legal

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

52

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

proceedings or matters" within the meaning of the TVPRA. Black's Law Dictionary defines "matter" as a "subject under consideration, esp. involving a dispute or litigation." Black's Law Dictionary 442 (11th ed. 2019). And decisions concerning the fitness of custodians, placing children in psychiatric facilities or juvenile detention centers, and medicating children without parental consent are all matters routinely disputed and litigated. *See, e.g.*, *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("We have little doubt that the Due Process Clause would be offended if a State were to force the breakup of a natural family . . . without some showing of unfitness") (internal quotation marks omitted); *Flores v. Sessions*, 862 F.3d 863 (9th Cir. 2017) (considering ORR's process for denying children's release); *Flores v. Sessions*, No. 2:85-cv-4544-DMG (AGRx), ECF No. 470, at 20–24 (C.D. Cal. July 30, 2018) (considering whether ORR medicating children without informed parental consent violates consent decree); *id.* at 15–20 (considering whether ORR's transferring children to restrictive placement violates consent decree).[26]

Accordingly, ORR has a clear statutory obligation to ensure, to the greatest extent practicable, that Plaintiffs have counsel to represent them with respect to release, placement, and medication.[27]

## B.    Plaintiffs Are Entitled to Counsel as a Matter of Due Process

Courts have found that individuals have a due process right to legal counsel in a host of scenarios, including the termination of welfare benefits. *Goldberg*, 397 U.S. at 270–71 (welfare recipient "must be allowed to retain an attorney"). If adult welfare recipients must be allowed to retain an attorney before benefits may be terminated, it

---

[26] Nor can there be any credible argument that making such decisions without adequate cause or procedural protections amounts to "mistreatment." 8 U.S.C. § 1232(c)(5).

[27] That denying Plaintiffs access to counsel violates the due process clause (*see infra* Section V.B.) likewise counsels in favor of interpreting the TVPRA to provide a comprehensive right to counsel. *See INS v. St. Cyr*, 533 U.S. 289, 300 (2001) (if "fairly possible" to interpret a statute to avoid raising serious constitutional problems, courts must do so).

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

53

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

must be true that vulnerable, detained, non-English-speaking children facing prolonged detention, step-up, or forced medication are also entitled to counsel. *See generally J.D.B. v. North Carolina*, 564 U.S. 261, 272 (2011) (children "as a class" "lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them"); *see also Tawadrus v. Ashcroft*, 364 F.3d 1099, 1103 (9th Cir. 2004) (immigrant in removal proceedings entitled to counsel). As for children, the Ninth Circuit also has held that minors in removal proceedings "are entitled to trained legal assistance so their rights may be fully protected . . . ." *Jie Lin v. Ashcroft*, 377 F.3d 1014, 1033 (9th Cir. 2004). In *Jie Lin v. Ashcroft*, for example, the Ninth Circuit held that when a child appears in removal proceedings with "obviously unprepared" counsel, an immigration judge must "suspend the hearing and give [the child] a new opportunity to retain competent counsel or *sua sponte* take steps to procure competent counsel to represent [the child]." 377 F.3d at 1033 (quoting *Johns v. Cty. of San Diego*, 114 F.3d 874, 877 (9th Cir. 1997)).

As discussed *supra*, ORR's decisions with respect to release and placement implicate significant liberty interests, including the right to be free from detention, the right to familial association, and the right for children in ORR custody to be placed in the least restrictive setting that is in the best interest of the child. (*See supra* Sections II, IV.) Just as the Supreme Court and the Ninth Circuit have already found in the context of welfare benefits and immigration proceedings, children detained by ORR have a right to counsel to protect the liberty interests implicated by decisions concerning release, placement, and medication.

### C.   ORR Violates Plaintiffs' Right to Counsel by Denying Effective Assistance of Counsel

ORR obstructs Plaintiffs from receiving effective legal representation in myriad ways, thereby implicating their rights relating to release, placement, and medication decisions. **First**, as further explained *infra* in Section V.D, rather than ensuring access to counsel on all the matters contemplated by the TVPRA, ORR limits its funding to

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

54

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

immigration matters only. (SUF ¶¶ 271–72.)

*Second*, ORR grants a host of actors and decision-makers—including FFS, Case Coordinators, Case Managers, and Clinicians—broad discretion to communicate (or not) with children's legal representatives, which makes it difficult, if not impossible, for such representatives to effectively advocate for their clients. (SUF ¶¶ 234–39; *see also supra* Sections IV.D.) And in some cases, children's lawyers are excluded entirely from the decision-making process. (*E.g.*, SUF ¶ 251 (children's lawyers excluded from 30-day reviews of placement in high security facilities); SUF ¶ 255 (ORR policy provides for no prior notice of step-up decisions).)

*Third*, even when a child's attorney is able to speak with someone in ORR's decision-making tree, she often does so without the benefit of having been given all the evidence and information that ORR relied upon for its decision—decisions that significantly affect children's liberty interests. (SUF ¶¶ 241, 243–44, 246, 254, 259); *see also supra* Section IV.D.)

*Fourth*, ORR's policies and practices deny attorneys any meaningful opportunity to present affirmative evidence to rebut ORR's adverse decisions. (SUF ¶ 252; *see also supra* Sections IV.D.) In other words, ORR's policies provide legal counsel no role whatsoever in decisions impacting their clients' lives.

Subjecting children to decisions relating to release, placement and medication without affording meaningful access to legal counsel is incompatible with Plaintiffs' rights to counsel, grounded in both the TVPRA and the Constitution.[28]

---

[28] ORR's attempt to exclude attorneys from the process altogether is significantly more egregious than other cases finding violations of the right to counsel. *See, e.g.*, *Mosley v. St. Louis Southwestern Railway*, 634 F.2d 942, 945–56 (5th Cir. 1981) (finding violation of right to counsel where EEOC investigator denied plaintiff opportunity to discuss proposed settlement with lawyer); *Kelly v. R.R. Ret. Bd.*, 625 F.2d 486, 492 (3d Cir. 1980) (finding violation of right to counsel where appeals referee questioned disability applicant outside presence of attorney, concluding that such "ex parte questioning is inconsistent with the right to be represented by counsel").

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

55

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

**D.  ORR Unlawfully Bars Legal Service Providers from Using Federal Funding to Represent Children with Respect To Release, Placement, and Administration of Psychotropic Medication**

Defendants *admit* that they forbid legal services providers from using federal funds to represent children in opposition to ORR's wishes. (SUF ¶¶ 271–72.) But Congress specifically gave children whom ORR takes into its custody the right to legal representation in legal matters and to protect them from mistreatment in the TVPRA:

> The Secretary of Health and Human Services *shall ensure, to the greatest extent practicable* and consistent with section 292 of the Immigration and Nationality Act (8 U.S.C. 1362), that all unaccompanied alien children who are or have been in the custody of the Secretary or the Secretary of Homeland Security . . . have counsel to represent them in *legal proceedings or matters* and *protect them from mistreatment*, exploitation, and trafficking.

8 U.S.C. § 1232(c)(5) (emphasis added); *see also* Homeland Security Act of 2002, § 462(b) Pub. L. No. 107-296, 116 Stat. 2135 (2002) ("HSA") ("[T]he Director of the Office of Refugee Resettlement shall be responsible for . . . developing a plan to be submitted to Congress on how to ensure that qualified and independent legal counsel is timely appointed to *represent the interests* of each such child . . . .") (emphasis added).[29]

Accordingly, the Court should order ORR to allow legal services providers to use federal funds to represent children in release, placement, and medication decisions.

**VI.  PLAINTIFFS ARE ALSO ENTITLED TO SUMMARY JUDGMENT ON THEIR FIRST, SECOND, AND FOURTH CLAIMS FOR RELIEF UNDER THE APA**

Federal courts have jurisdiction to review final agency decisions and compel a

---

[29] The TVPRA and HSA directed Defendants to recruit counsel to represent detained children *pro bono publico*, *and* for years Congress also has consistently appropriated funds to ensure that Plaintiff Class Members receive legal representation. *See, e.g.,* Further Consolidated Appropriations Act, 2020, 116 Pub. L. No. 94, Title II, 133 Stat. 2534 (2019) (appropriating $160 million to "be used for legal services, child advocates, and post-release services").

CooleyLLP
Attorneys At Law
Los Angeles

56

Mem. ISO Mot.
For Partial Summary Judgment
Case No. 2:18-CV-05741 DMG PLA

federal officer to perform a duty owed to a plaintiff. 5 U.S.C. §§ 702 *et seq*.[30] A Court "shall . . . hold unlawful and set aside agency action" where the action is: (i) contrary to a constitutional right; or (ii) "otherwise not in accordance with law." 5 U.S.C §§ 706 (2)(A), (2)(B).[31]

*First*, as discussed *supra*, ORR's custodial vetting and restrictive placement policies and procedures deny children basic due process rights. As such, ORR's denials of Class Members' sponsor applications and step-up decisions violate the Constitution and should be set aside. *See* 5 U.S.C § 706(2)(B); *Asse Intern., Inc.*, 803 F.3d at 1073 n.12 (setting aside agency action as contrary to constitutional right); *see also Atterbury v. U.S. Marshals Serv.*, 941 F.3d 56, 64 (2d Cir. 2019) (summary judgment on employee termination reversed and remanded to agency to conduct further proceedings that comport with due process).

*Second*, ORR's release and step-up decisions are "otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A) because they result in unnecessary delay of children's release, denied family reunification, and improper placement in high security settings, all of which violate the express provisions of the TVPRA. *See* 8 U.S.C. § 1232(c)(2)(A); *supra* Section IV.D. ORR's obstruction of children's legal counsel's involvement in decisions relating to release, placement, and administration of psychotropic medication likewise violate the express provisions of the TVPRA. 8 U.S.C. § 1232(c)(5); *supra* Section V.

---

[30] ORR decisions with respect to release and placement are "final agency decisions." (*See* SUF ¶¶ 57, 167; Ex. 1 [ORR Policy Guide] §2.7 ("Only ORR (or ACF) has the authority to make the final decision on a release."); *id*. § 1.3.2 ("The ORR/FFS supervisor makes a final placement decision on the level of care."); ECF No. 141 at 11–13 (concluding "that the policies and/or practices identified in the FAC constitute final agency actions").)

[31] Under 5 U.S.C § 706(2)(A), the Court's review is limited to the administrative record with limited exceptions. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014).

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

57

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

1   By denying sponsors and placing children in restrictive settings without affording

2   any opportunity to be heard or to be represented by legal counsel, ORR's policies violate

3   the Constitution, the TVPRA, and, in turn, the APA. Accordingly, this Court should

4   compel ORR to afford basic due process protections to Plaintiffs, as requested herein

5   and in the concurrently filed Proposed Order. *See* 5 U.S.C § 706(1); *Garcia-Ramirez v.*

6   *ICE*, 2020 WL 3604041, at *83 (holding that APA claims under 5 U.S.C. § 706(1) and

7   § 706(2) can work together such that if you can show an agency acted not in accordance

8   with the law, you have shown that agency action has been "unlawfully withheld or

9   unreasonably delayed").

10  **VII.  PLAINTIFFS ARE ENTITLED TO A PERMANENT INJUNCTION**

11  To obtain a permanent injunction, a plaintiff must show: (1) that it has suffered

12  an irreparable injury; (2) that remedies available at law, such as monetary damages, are

13  inadequate to compensate for the injury; (3) that the remedy in equity is warranted upon

14  consideration of the balance of hardships between the plaintiff and defendant; and

15  (4) that the permanent injunction being sought would not hurt public interest. *See, e.g.*,

16  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–313 (1982); *Amoco Production Co.*

17  *v. Gambell*, 480 U.S. 531, 542 (1987).

18  Plaintiffs' deprivation of liberty clearly constitutes irreparable harm. The harm

19  caused by unlawful detention without adequate process is particularly severe given that

20  Class Members are unaccompanied minor children detained for prolonged periods of

21  time, some in jail-like conditions separated from their families. *See Garcia Ramirez v.*

22  *ICE,* 2020 WL 3604041, at *148 (holding that "deprivations of physical liberty are the

23  sort of actual and imminent injuries that constitute irreparable harm"); *see also Saravia*,

24  905 F.3d at 1143; *Padilla*, 953 F.3d at 1147-48. Nor are money damages an option in

25  this case. Finally, given the substantiality of the interests involved (*see supra* Sections

26  IV.A and IV.D), and the minimal burden that would be imposed on the government to

27  revise its policies and procedures (*see supra* Section IV.D), a permanent injunction

28  would not hurt the public interest, but instead promote it; the balance therefore tips

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

58

MEM. ISO MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:18-CV-05741 DMG PLA

significantly in Plaintiffs' favor. *Padilla*, 953 F.3d at 1147 ("'it is always in the public interest to prevent the violation of a party's constitutional rights'") (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).[32]

## VIII.   CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Partial Summary Judgment of their First, Second, and Fourth Claims for Relief.


Dated:  October 2, 2020                              COOLEY LLP


                                                     /s/ *Summer J. Wynn*
                                                     Summer J. Wynn (240005)
                                                     Attorneys for Plaintiffs
                                                     Email: swynn@cooley.com

---

[32] Plaintiffs respectfully refer the Court to the Proposed Order filed concurrently herewith. Plaintiffs further respectfully request that the Court order additional briefing on remedy should it so require.

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES
                                        59                      MEM. ISO MOT.
                                                        FOR PARTIAL SUMMARY JUDGMENT
                                                        CASE NO. 2:18-CV-05741 DMG PLA