# Exhibit 4

Exhibit 4
Page 278



ADMINISTRATION FOR

# CHILDREN & FAMILIES

Office of Refugee Resettlement | 330 C Street, S.W , Washington, DC 20201
www.acf.hhs.gov/programs/orr

# The UAC Manual of Procedures

# (UAC MAP)

## *For ORR Staff, Contractors, and Grantees*

# Section 3: Services

**Office of Refugee Resettlement**
**Office of the Director**
**The Division of Policy and Procedures**
**January 2019 — Version 1.0**

Exhibit 4
Page 279

Not Confidential

GOV-00016812

# Section 3: Services

# Table of Contents

Section 3: Services ............................................................................................................ 2

3.1 Summary of Services ................................................................................................. 5

3.2 Care Provider Admissions and Orientation for UAC ................................................ 6

   3.2.1 Admissions for UAC ............................................................................................ 6

   3.2.2 Orientation ....................................................................................................... 12

3.3 Care Provider Required Services ............................................................................. 16

   3.3.1 UAC Assessment and Case Review ................................................................... 17

   3.3.2 Long Term and Concurrent Planning ............................................................... 27

   3.3.3 Screening for Child Trafficking and Services for Victims ................................. 27

   3.3.4 Safety Planning ................................................................................................ 30

   3.3.5 Academic Educational Services ........................................................................ 32

   3.3.6 Vocational Educational Services ....................................................................... 33

   3.3.7 Services Related to Culture, Language, and Religious Observation .................. 34

   3.3.8 Recreation and Leisure Time Services .............................................................. 35

   3.3.9 Nutritional Services .......................................................................................... 35

   3.3.10 Telephone Calls, Visitation, and Mail ............................................................ 36

   3.3.11 Clothing and Personal Grooming ................................................................... 37

   3.3.12 Assignment of Chores .................................................................................... 38

   3.3.13 Behavior Management .................................................................................... 38

   3.3.14 Transportation Services .................................................................................. 40

   3.3.15 Use of Restraints or Seclusion in Emergency Safety Situations in RTCs ......... 41

   3.3.16 Notification and Reporting of the Death of a UAC .......................................... 42

   3.3.17 Use of Restraints During Transport and in Immigration Court ....................... 42

   3.3.18 Restraints in Immigration Court and Asylum Interviews ............................... 42

**Exhibit 4**
**Page 280**

GOV-00016813

3.4 Health Services .................................................................................................. 42

    3.4.1 Health Care Eligibility and General Standards ............................................. 44

    3.4.2 Initial Medical and Dental Examinations ...................................................... 44

    3.4.3 Requests for Health Care Services ................................................................ 48

    3.4.4 Medication Administration and Management ............................................... 48

    3.4.5 Responding to Medical Emergencies ........................................................... 48

    3.4.6 Management of Communicable Diseases ..................................................... 48

    3.4.7 Maintaining Health Care Records and Confidentiality ................................. 49

    3.4.8 Medical Clearance Prior to Release or Transfer ........................................... 49

    3.4.9 Provider Reimbursement .............................................................................. 49

3.5 Guiding Principles for the Care of UAC Who are LGBTQI ......................................... 50

    3.5.1 Zero Tolerance for Discrimination and Harassment .................................... 50

    3.5.2 Prohibition on Segregation and Isolation ..................................................... 50

    3.5.3 Confidentiality with Regards to Sexual Orientation and Gender Identity ................... 50

    3.5.4 Housing ......................................................................................................... 50

    3.5.5 Restroom and Dressing Area Accommodations ........................................... 50

3.6 Long-Term Foster Care ........................................................................................ 50

    3.6.1 ORR Long-Term Foster Care Service Provision ............................................. 51

    3.6.2 Change in Placements While in ORR Long-Term Foster Care ....................... 54

    3.6.3 Additional Questions and Answers About This Topic .................................... 54

Appendix 3.1 Checklist for Child Friendly Environment ............................................... 56

Appendix 3.2 Initial Intakes Assessment .................................................................... 59

Appendix 3.3 *Garza v. Azar* Notice (English and Spanish) ........................................... 63

Appendix 3.4 Notice for Shelters (English and Spanish) ............................................... 65

Appendix 3.5 Assessment for Risk ............................................................................. 67

Appendix 3.6 Interviewing Guidance for Clinicians and Caseworkers ........................... 70

Appendix 3.7 UAC Assessment .................................................................................. 74

Appendix 3.8 Individual Service Plan ......................................................................... 80

Appendix 3.9 UAC Case Review ................................................................................. 81

Not Confidential

GOV-00016814

Appendix 3.10 OYAS-RET Interviewing Guidance, OYAS-RET Score Sheet, and the OYAS
Reentry Self-Report Questionnaire ........................................................................................... 85

Look for these **icons** for quick cues on what is required for a specific procedure or a reference
to a particular policy in the UAC Policy Guide.

📖 **UAC Policy Guide (ORR Guide to Children Entering the United Stated Unaccompanied)**

✉ Email

📬 Mail

🕑 Tasks associated with a deadline

📑 Form or other template

🖱 UAC Portal

☎ Phone call

Not Confidential

GOV-00016815

# 3.1 Summary of Services

📖 See Section 3.1 of <u>UAC Policy Guide (ORR Guide to Children Entering the United Stated Unaccompanied) (UAC Policy Guide)</u>.

## OVERVIEW

This section includes procedures for care providers who are administering required services for UAC in ORR care, including admissions and orientation; UAC screenings, assessments and required notices; education; nutritional services; services related to culture, language, and religious observation; recreation and leisure time; telephone calls and visitation rights; and other mandated services.

Care providers are required to provide services in a child-friendly, structured, safe, and productive environment that meets respective state guidelines, relevant federal law and settlement agreements, their Cooperative Agreements, the ORR Policy Guide and the UAC Manual of Operations (UAC MAP) and local building, fire, and health and safety codes. (For general guidance see **Appendix 3.1 Checklist for Child Friendly Environment.**)

These services must be sensitive to the age, culture, religion, dietary needs, native language, sexual orientation, gender identity, and other important individual needs of each UAC. All UAC in ORR care are entitled to human rights protections and freedom from discrimination and abuse.

Care providers must administer all services and assessments for all UAC even if a UAC is in ORR custody for a short time.  Care providers are required to have the capacity to provide services in the language spoken by the majority of UAC in their facility and/or provide translation services.

ORR expects care providers to tailor the dissemination of information, such as the orientation regarding sexual abuse and sexual harassment, in a manner that is appropriate for tender aged UAC and other younger UAC in their care. ORR also expects clinicians and other qualified staff to find effective ways to tailor delivery of services, such as substituting standard group counseling sessions for direct observation and therapeutic play and games in an informal setting, to address post trauma needs of younger UAC.

Care providers must provide UAC who are placed into staff secure, secure, and RTC with notice of the reasons for the placement or continued placement. Care providers must regularly review a restrictive placement for a possible "step downs" to a less restrictive environment.

UAC MAP Section 3: Services (Version 1.0)

Not Confidential

# 3.2 Care Provider Admissions and Orientation for UAC

📖 See Section 3.2 of the UAC Policy Guide.

## OVERVIEW

Care provider services begin when the care provider takes physical custody of the UAC. At that point, the care provider admits the UAC into the care provider program via the UAC Portal, provides food and beverages and other services, and notifies and informs UAC of his or her rights and responsibilities. The care provider gives the UAC an orientation within **48 hours of admission**.

| Key Players | Responsibilities |
|---|---|
| Designated care provider staff | Admits UAC into program, provides placement authorization form and required notifications to UAC, conducts an initial medical exam, and provides a standard orientation to all UAC. |

| Related Forms/Instruments | Used By |
|---|---|
| *Placement Authorization Form* | Designated care provider staff |
| *Authorization for Medical, Dental, and Mental Health Care* | Designated care provider staff |
| *Initial Intakes Assessment* and *Interviewing Guidance for Clinicians and Caseworkers* | Designated care provider staff |
| *Notice of Placement in a Restrictive Setting* | Designated care provider staff |
| *Notice to Juvenile Aliens in Federal Facilities Funded by DHS or HHS by Reason of Their Immigration Status* | Designated care provider staff |
| *Legal Resource Guide for UAC* | Designated care provider staff |
| *Initial Medical Exam* | Designated care provider staff |

# 3.2.1 Admissions for UAC

📖 See Section 3.2.1 of the UAC Policy Guide.

6
Exhibit 4
Page 284

GOV-00016817

## PROCEDURES

1. **Upon arrival at the care provider facility**, the designated staff admits the UAC to the care provider program in the UAC Portal by completing the following steps:
   - Go to the Admission tab of their specific program. **NOTE:** ORR care providers with more than one facility must designate the correct program from the list. (See **Fig. 3.1 UAC Portal Admission Navigation Tab**).

### Fig. 3.1 UAC Portal Admission Navigation Tab



- Enter the UAC case file by clicking on the Alien number on the left-hand side which brings the user to the Admission screen (See **Fig. 3.2 Admission Screen.**)
- Select "admit" under status.
- If the UAC did not arrive at the program, contact ORR Intakes to confirm the status of the UAC and ask ORR Intakes if "cancel" should be selected for the status of the UAC (do not select the status "pending").
- Answer "yes" to the question "By selecting "Yes" in this field......" and fill in the date and time, and click "save."
- Upload all DHS documents and forms given to the facility at placement. ✐⁀🖑 📄

**NOTE:** UAC MAP Section 1: Placement in ORR Care Provider Facilities **Section 1.3.4 UAC Transferred to ORR Custody** includes a "Quick Glance: How to Admit UAC to Program" as well as additional guidance on reviewing and uploading DHS records in the UAC Portal.

## Fig. 3.2 Admission Screen



**NOTE:** Foster parents are not responsible for admitting UAC.

2. **Within 2 hours of admission and within 4 hours of admission into an HPC or Influx Care Facility**, the designated staff:
   - Provides food and beverage to the UAC (asking about any food allergies and/or dietary restrictions);
   - Allows the UAC to shower or bathe, with assistance if required due to disability or young age;
   - Provides the UAC with clean clothing, clean bedding, and personal hygiene items and documents this in the UAC case file;
   - Ensures, to the extent practical under the circumstances, that the UAC does not come into contact with other UAC currently placed at the program until he or she has showered/bathed and eaten;
   - Creates an inventory list for all cash and other property obtained at admission. The UAC must sign the inventory sheet and the care provider must provide the UAC with a copy of the inventory, retaining the original document in the UAC case file. See the **Quick Glance: UAC Personal Property.**

## Quick Glance: UAC Personal Property

Care providers must conduct an inventory of all UAC cash and property upon admission into the care provider's care. UAC belongings that are stored must be kept in a secure location to be returned to the UAC at release or transfer. Care providers must prevent mishandling, loss, or theft of the UAC's personal cash and property. UAC

Not Confidential

GOV-00016819

UAC's personal property should be thoroughly cleaned and sanitized before storage or use by the UAC. UAC should have access to their personal property upon request, if safety allows, during normal business hours or other reasonable time during the weekends or holidays.

Care providers must develop a waiver for UAC who wish to keep certain pre-approved items, such as religious bracelets or prayer books or materials, in their possession while in care. The inventory must be updated to include any additional property the UAC received during the UAC's stay with the care provider.

In the event that a UAC runs away, the care provider must keep any property the UAC leaves behind for 90 days. If the UAC does not contact the care provider to claim their property within 90 days, gently used clothing or other similar items may be donated to a local charity or shelter. If the UAC leaves items of value ($25 or more in cash, jewelry), the care provider must try to contact the parent or family either in home country or in the United States for their preference (mail the property or donate).  If the care provider is unable to reach the parent or family, items of value may be donated to a local charity or shelter. The care provide may recycle or dispose of any items that are unable to be donated

-----

3. **Within 24 hours of admission**, the designated care provider staff:
   - Verifies that all DHS documents that accompanied the UAC are complete and accurate. If the UAC's reported name or date of birth is incorrect, the designated staff attempts to verify the information on the UAC birth certificate through school records and/or the UAC's parents, if possible (see also step 4 below).
   - Takes the UAC's photograph and uploads it to the UAC portal. (**Note**: Care providers may take photographs and record videotapes of UAC in care for purposes of identification or for the child's personal use. ORR prohibits release of any photographs or videotapes of any UAC for public use, including for training purposes or for promotional materials without written authorization from ORR.)
   - Determines if it is safe to allow the UAC to contact family members or other relatives, following ORR policy and procedures and the care provider's internal safety procedures. Provides UAC an opportunity with assistance, as necessary, to contact family members, or other relatives, or the UAC's consulate.
   - Uploads the following into the UAC Portal and saves a copy in the UAC case file case file with appropriate signatures:
     - *Placement Authorization* form
     - *Authorization far Medical Dental and Mental Health Care* form
     - *Page 2 of Legal Resource Guide – Legal Service Provider List for UAC*

UAC MAP Section 3: Services (Version 1.0)

Not Confidential                                                                  GOV-00016820

o Supporting documents from referring federal agency (e.g. DHS) 🖉✓🗎 🗐

**NOTE**: If there are concerns that the UAC may be 18 years of age or older, the designated staff follows the procedures outlined in Section 1: Placement in ORR Care Provider Facilities **Section 1.6.2.**

4. **Within 24 hours of obtaining the UAC birth certificate** and the name and age of the UAC doesn't match the DHS records, the designated care provider staff notifies the local DHS FOJC about the discrepancy in information and includes information about how the discrepancy was identified and the attempts made to verify the information, such as verification from Consulate. The notification includes a request to DHS FOJC for an updated Notice to Appear (NTA) to reflect the correct name and A number. If the UAC has an attorney, cc the attorney in the correspondence. (See also **UAC MAP Section 1.3.4.**) The designated staff makes changes to the name and/or DOB in the UAC Portal. 🖉✓🗎 🗐

5. **Within 24 hours of admission**, care provider staff trained in the use of the *Initial Intakes Assessment* form
   - Interviews the UAC in a private setting using all questions in the assessment to identify any immediate needs and/or issues.
   - Completes all sections of the *Initial Intakes Assessment* in the UAC Portal.
   - Saves a copy in the UAC case file.
   - If the UAC responses raise suspicions that the UAC's health or life is at imminent risk or his/her condition places the safety of others at imminent risk, calls 9-1-1 for crisis response and transportation to the nearest emergency room; follows significant incident reporting procedures (See **Section 5.7.3 Significant Incidents**).
   - Determines if the UAC's responses indicate that he/she falls under any of the criteria for trafficking under TVPRA. 🖉🗐

See **Quick Glance: Tips for Completing the Initial Intakes Assessment.**

**Appendix 3.2 is the Initial Intakes Assessment.**

**NOTE:** Care providers must complete a new *Initial Intakes Assessment* after each transfer within the ORR network.

**Quick Glance: Tips for Completing the Initial Intakes Assessment**

The Initial Intakes Assessment allows the care provider to identity any immediate needs or issues, identity the severity of any medical or mental health needs and ensure that the needs are met; facilitate gathering of basic identifying information, and inform the UAC's initial housing/bed assignment.

Phrase questions in a child-friendly and culturally appropriate manner to engage the UAC. Inform the UAC that self-disclosures of previously unreported criminal history or violent behavior to any other children, care provider staff, ORR, or others may result in the child's transfer to another care provider facility and may affect their release.

**UAC Basic Information**—Auto-populates in the UAC Portal
**Family Information**—Document any relative or non-relative contracts in the United States as well as the name and contact information of anyone that the UAC wishes to inform of their placement.
**Medical**—Document any observable or reported medical needs and immediately report them to the clinician, lead case manager, program director, or other supervisor designated for follow-up care, and/or any on-call medical staff member for further guidance on the need to seek immediate medical care.
**Mental Health**--Document any observable or reported mental health questions in this section and/or if any concerning behaviors or emotions were observed or reported and immediately report them to the clinician, lead case manager, program director, or other supervisor designated for follow-up care for further guidance on the need to seek mental health care.
**Safety Assessment**--Document any observations and/or concerns that the UAC has regarding his/her safety. If the UAC answers "yes" to any of the safety assessment concerns, immediately report them to the clinician, lead case manager, program director, or other supervisor designated for follow-up care for further guidance.
**Interviewer Summary of Critical Issues that Need Immediate Attention** and **Action Taken**—Summarize critical issues and note the steps taken to address identified critical issues as well as any actions for the immediate future.
**Certification**—Enter name, title, and date and time the assessment was completed. If a translator was used, enter the translator's, name, language translated, and the date and time.

**See also ORR Policy Guide Section 5.8 Significant Incident Reports and Notification Requirements for information gathered at intakes that may require an SIR.**

6. **Within 48 hours of admission**, for secure, staff-secure or non-TAR (Treatment Authorization Request) residential treatment center programs **only**, the care provider staff:

   - Provides the UAC with the *Notice of Placement in a Restrictive Setting* and ensures that the UAC signs or marks the notice. The original signed form is

placed in the **UAC** case file and a copy uploaded to the UAC Portal. (If the UAC refuses or declines to sign the form, the staff member should note that on the form and complete the staff section).

- Notifies the UAC of the opportunity to request a *Flores* bond hearing. (See **UAC MAP Section 2: Subsection 2.9**.) ⏱📋🖐

7. **Within 2 business days**, the designed staff ensures that UAC receives an initial medical exam and uploads the *Initial Medical Exam* form and any prior medical evaluations (for UAC transfers) into the UAC Portal and saves a copy into the Health tab. (See below **Subsection 3.4.2**) the UAC case file. ⏱📋🖐

# 3.2.2 Orientation

## PROCEDURES

### Quick Glance: Orientation Accessibility

The care provider must present the orientation in a way that is appropriate for the age, culture, and language of the child or youth. The orientation must be provided in formats that are accessible to UAC with limited English proficiency, visual or audio impairments, or other type of disability, as well as those with limited literacy skills.
--If the UAC is not literate, the care provider must verbally explain all the documents in the UAC's native or preferred language.

--If forms are not translated into a language that the UAC can read, the care provider staff must verbally translate the document for the child or youth and document in the UAC's case file that the form was verbally translated.

--Care providers lacking staff who speak a UAC's native or preferred language must make every attempt to utilize a professional translation service for the UAC's orientation.
In cases where no such service exists or is unavailable, care providers must consult with the FFS, PO and other relevant stakeholders to create and implement a strategy for communicating with the UAC as effectively as possible. One possible strategy may be to create a written translation of the orientation information and documents.

1. **Within 48 hours of admission**, the care provider provides a standardized orientation for all UAC that, at a minimum(See **Quick Glance: Orientation Accessibility** above), includes the following topics:

Not Confidential

GOV-00016823

- Explanation of the nature of the UAC's custody in ORR including the fact that they will either be released to a qualified sponsor in the United States; or they will attend a court hearing to request to go home to their family; or will request to work with an attorney to file for legal relief to stay in the United States.
- Emphasis that the UAC must attend an immigration court hearing whichever occurs first either:
  - After the UAC is released to a sponsor at a court located nearest the sponsor; or
  - After the UAC has been in ORR custody for 60 days at a court located near the care provider, or
  - While in ORR custody, the UAC may request at any time to go to immigration court earlier and not wait the full 60 days.
- Care provider rules, responsibilities, and procedures;
- Care provider behavior management policies;
- Care provider grievance policies and procedures (See the **Quick Glance to Grievance Policies and Procedures**);
- Care provider daily schedule;
- The UAC's rights and responsibilities;
- The fact that they will get a legal rights presentation by a legal rights attorney ("The Know Your Rights" presentation) and will receive a pamphlet about the immigration process;
- Emergency and evacuation procedures;
- Explanation regarding the possibility of transfer to another care provider facility or an influx care facility.

## Quick Glance: Care Provider Grievance Policies and Procedures

Care providers must have written internal grievance policies and procedures that meet the following standards.

If needed or requested by the UAC, a staff member, another youth, a family member, UAC's legal representative or a legal service provider may help a UAC write up the grievance. All staff must be trained on the grievance policy and procedures. Extra copies of the UAC grievance forms need to be readily available to UAC.

Examples of grievance may include, but are not limited to:
--Complaints of services denied/not being provided to the UAC
--Forceful religious observation
--Unresolved complaints regarding shelter environment/living conditions
--Sexual abuse, sexual harassment, or inappropriate sexual behavior
--Breach of confidentiality by staff

UAC MAP Section 3: Services (Version 1.0)

13

**Exhibit 4**
**Page 291**

--Staff putting UAC at risk of harm
--Unnecessary monitoring of mail/phone calls

Written grievance policies and procedures must be easily understood by children and provided in the languages of the majority of UAC in care. The grievance procedure must clearly explain the following: the process for initiating a grievance, how and by whom the grievance will be addressed and the procedure to follow if the grievance is not addressed in a satisfactory manner.

The care provider must take into consideration the age and maturity of the child when processing any grievance. Copies of written grievances and their final resolutions must be maintained in the UAC's case file.

The care provider must implement policies and procedures to identity and handle time-sensitive incidents reported through a grievance that involve an immediate threat to the health, safety, or welfare or a child or youth. In the case of medical emergencies, staff must ensure the minor receives proper medical attention.

The care provider must address the grievance policy and procedures during program orientation and post grievance procedures in a common area. Each UAC in attendance must receive a copy.

Care providers must report all UAC grievances according to ORR reporting policies and procedures. (For example, if the grievance is about a fight between UAC, they report via a regular SIR. If the grievance is about sexual harassment, they report it as a SA/SIR) The program must provide a written decision or response to the grievance within 5 days of receipt. Care providers must immediately respond to allegations of sexual abuse or sexual harassment reported via a grievance. If the grievance involves an immediate threat to the health, safety, or welfare of a UAC, the care provider must immediately respond as needed.

2. **Within 48 hours of admission,** the care provider must provide all UAC with a separate orientation from any immigration-related topics, on sexual abuse and sexual harassment policies and procedures, including but not limited to:
   - Zero tolerance policy for all forms of sexual abuse, sexual harassment, and inappropriate sexual behavior;
   - The right of UAC to be free from sexual abuse and sexual harassment as well as the UAC's right to be free from retaliation for reporting such incidents;
   - Definitions and examples of UAC-on-UAC sexual abuse, staff-on-UAC sexual abuse, coercive sexual activity, appropriate and inappropriate relationships, and sexual harassment;
   - How to report sexual abuse and sexual harassment, including:

UAC MAP Section 3: Services (Version 1.0)

Not Confidential

GOV-00016825

> o Reporting to any care provider staff member, volunteer or contractor either verbally, in writing, or via a grievance;
> o Reporting to ORR by telling an FFS or calling the ORR Hotline;
> o Informing an outside community service provider via telephone or in writing;
> o Reporting to consular officials via telephone or in writing.

- An explanation of a UAC's right to receive treatment and counseling if the UAC is abused.
- Boundaries and respecting one another.

As part of the orientation, the care provider must

- Provide every UAC with the <u>ORR Pamphlet (What You Need to Know About Sexual Abuse and Harassment)</u>;
- Provide every UAC with a care provider pamphlet that contains, at a minimum, the following:
  - o The care provider's policies and procedures related to sexual abuse and sexual harassment;
  - o The child or youth's rights and responsibilities related to sexual abuse and sexual harassment;
  - o How to contact diplomatic or consular personnel.
- Provide every UAC information regarding the local and/or national service providers and organizations (local child advocacy centers, rape crisis centers, immigrant victim service providers, and or other community service provider to provide services to victims of sexual abuse and sexual harassment that occurred at the care provider facility) available to assist UAC.

Care providers must document in case files that every UAC received the orientation and the ORR and care provider pamphlets as well as the list of local and/or national service organizations available to assist UAC, as noted in the **Quick Glance** below. ⏱📖

3. As part of the orientation described in step 2 above, the care provider provides verbal and written notice to ALL UAC regardless of gender the notice in English and Spanish related to the *Garza v. Arza* court ruling as well as the <u>ORR Pamphlet (What You Need to Know About Sexual Abuse and Harassment)</u> ⏱📖

**Appendix 3.3 is the *Garza v. Arza* notice in English and Spanish.**

**NOTE:** The *Garza v. Azar* ruling includes a requirement to post the English and Spanish versions of the notice on housing bulletin boards adjacent to the notice required by ORR's Interim Final

**Exhibit 4
Page 293**

GOV-00016826

Rule. Care providers must display ORR Posters and notices in prominent locations throughout the facility, including on housing bulletin boards, next to telephones, and throughout the care provider facility. See **UAC Policy Guide 4.7.2 Bulletin Board Postings.**

4. ORR also requires care providers to post an additional notice, "The Notice for Shelters" adjacent to the *Garza v. Azar* notice.  In addition, providers must make available the "A Woman's Right to Know" booklet in places where reading materials, pamphlets, and other information are made available to UAC, in color where possible. The booklet is available at https://dshs.texas.gov/wrtk/

    Care providers must also provide all UAC with a written copy in Spanish and English of "The Notice for Shelters" as well as verbally explaining the content in the notice at time of orientation. 📖

**Appendix 3.4 is The Notice for Shelters.**

5. The care provider's designated staff provides the UAC a tour of the care provider's facility and shows what various areas are used for, noting emergency evacuation routes and exits. If safety does not allow for a tour, the facility layout and emergency routes and exits must be verbally explained to the UAC.

6. The care provider documents that the UAC receives all orientation information in the UAC case file. 📖

## 3.3 Care Provider Required Services

📖 See Section 3.3 of the UAC Policy Guide.

### OVERVIEW

This section includes procedures for all *Flores* mandated services for care providers in all settings, including standard shelter, restrictive settings, and long term foster care.

| Key Players | Responsibilities |
|---|---|
| Case manager or clinician | Conducts *Assessment for Risk* and *UAC Assessment*; develops *Individual Service Plan* and *UAC Case Review* (case manager). |
| Other care provider staff | Provide services, including education, transportation, activities related to *Flores* mandated services. |

Not Confidential

| Foster care parent(s) | Provides services in a community setting |
|---|---|

| Related Forms/Instruments | Used By |
|---|---|
| *Assessment for Risk* | Qualified case manager or clinician (**UAC Policy Guide 4.8.1** notes who may conduct the assessment.) |
| *UAC Assessment* | Qualified case manager or clinician |
| *Individual Service Plan* | Qualified case manager or clinician |
| *UAC Case Review* | Qualified case manager or clinician |
| *Ohio Youth Assessment System (OYAS) Reentry (RET) Tool*<br>• *OYAS-RET Interview Guide*<br>• *OYAS-RET Score Sheet*<br>• *OYAS-RET Self Report Questionnaire* | Qualified case manager or clinician in secure and staff secure facilities |

## 3.3.1 UAC Assessment and Case Review

📖 See Section 3.3.1 of the UAC Policy Guide.

### PROCEDURES

### Assessment for Risk

1. **Within 72 hours of admission**, a qualified case manager or clinician conducts an *Assessment for Risk* to assess the UAC for risk of being a victim or a perpetrator of sexual abuse while in ORR care. The case manager or clinician:

    - Interviews the UAC in a private setting in a child-friendly and culturally appropriate manner using all questions in the instrument (see ORR Policy Guide Section 4.8.1 Assessment for Risk).
    - Uses the specific questions in the assessment, but also draws upon their professional training and experience to obtain additional information to complete a thorough assessment.
    - Completes all sections of the *Assessment for Risk* in the UAC Portal using information gathered from a variety of sources, including, but not limited

to, the *Assessment for Risk* interview, any other conversations with the UAC, court records, case files, behavioral records, and other relevant documentation.
- Saves a copy of the *Assessment for Risk* in the UAC case file. 🖉

2. The clinician reviews the results:
- Makes an individualized determination to ensure the safety and health of the child, using the Assessment for Risk, along with any other completed assessments to inform the child's assignment for housing, education, recreation, and other services.
- Considers the youth's gender self-identification and the health and safety of UAC when making a housing assignment for a transgender or intersex UAC (See **Policy Guide Section 4.8.2**).
- Does not use the result of the Assessment for Risk to place a child on one-on-one supervision unless there are exigent circumstances. (See **Policy Guide Section 4.8.2**)
- Reports any UAC disclosures made during the assessment in accordance with ORR policies and Procedures.
- If the assessment indicates that the child experienced prior sexual victimization or perpetrated sexual abuse, ensures follow-up, as appropriate, with any necessary medical or mental health services.
- If medical or mental health referral is necessary, the UAC must receive a medical and/or mental health evaluation **no later than 72 hours after the referral**.
- If the UAC's responses indicate that they fall under any of the criteria for a mandatory or discretionary home study and/or post release services, immediately refers the case following the referral process (see **UAC MAP Section 2.4.2 Home Study Requirement**). 🖉

3. The case manager or clinician:
- Continuously updates the *Assessment for Risk* when the case manager or clinician learns any new information that would change the housing, education, recreation, and other service assignments of the UAC.
- Updates the *Assessment for Risk* **every 30 calendar days** while the UAC is in care (**every 90 days for UAC in long term foster care**).
- Completes a new Assessment for Risk after each transfer within the ORR network of care. This includes transfers to an Influx Care Facility.

UAC MAP Section 3: Services (Version 1.0)

18
**Exhibit 4**
**Page 296**

GOV-00016829

- Immediately reports any significant changes in behaviors indicative of emotional stress, significant shifts in behavior and/or symptoms requiring intervention of a mental health professional to the Shift Supervisor and Lead Clinician. 🕐🗐

**NOTE**: Do not delete previously entered information when updating the *Assessment for Risk*.

See **Quick Glance: Guide to the Assessment for Risk**.

**Appendix 3.5 is the Assessment for Risk.**

---

### Quick Glance: Guide to the Assessment for Risk

**UAC Basic Information**—Auto-populates in the UAC Portal.
**Information Clinicians or Qualified Case Managers Obtain from Child or Youth**—Document the UAC's responses.
**Questions for Clinicians or Qualified Case Managers to Answer**—Document your professional assessment of the individual case based on observations and information reported by the UAC during the interview and review of case files and other records.
**Housing, Other Service Assignments, and Follow-Up**—Document any housing or other service assignments needed to ensure the safety and well-being of the UAC. Indicate specific actions and follow-up. If housing and other service assignments changed at any time, including after the initial placement, describe the change, the reason for the change, and date in this section.
**Certification**—Enter the signature of the official completing the assessment including name, title, and the date and time the assessment was completed. If using a translator, have the translator enter his/her signature, name, the language translated, and the date and time the assessment was completed.

---

### UAC Assessment

1. **Within 5 calendar days of admission,** a qualified case manager or clinician conducts a UAC Assessment by
   - Interviewing the UAC in a private setting using the *Interviewing Guidance for Clinicians and Case Workers* to evaluate the UAC for services and as a basis for the UAC's release plan.
   - Completing all sections of the *UAC Assessment* in the UAC Portal (See Quick Glance: Guide to Completing the UAC Assessment). 🕐🗐

**Appendix 3.6 is the *Interviewing Guidance for Clinicians and Case Workers.***

Not Confidential

2. If the qualified case manager or clinician needs to update the *UAC Assessment* **past the five calendar day time frame**, he or she enters the additional required or relevant information into the *UAC Case Review.* 📖🖼

3. If the UAC's responses indicate that he/she falls under any of the criteria for a mandatory or discretionary home study and/or post release services, immediately refers the case following the referral process (see **UAC MAP Section 2.4.2 Home Study Requirement**).

4. The UAC Assessment must be fully completed before:
   - Submitting a home study referral
   - Submitting a release recommendation
   - Submitting a transfer request except in the case of an emergency transfer
   - The case coordinator issues a third-party recommendation. 📖🖼

**NOTE**: Complete a new UAC Assessment after each transfer within the ORR network of care.

---

### Quick Glance: Guide to the UAC Assessment

The UAC Assessment interview must be in a private setting. The interviewer must phrase questions in a child-friendly and culturally appropriate manner to engage the UAC. The interviewer must ask follow-up questions based on the UAC responses to obtain as much detail needed to inform the following: individual service plan, safety plan, and the UAC's release plan, regardless if the questions are explicitly stated in the *UAC Assessment* instrument and the *Interviewing Guidance for Clinicians and Case Workers*.

**Inform the UAC that self-disclosures of previously unreported criminal history or violent behavior to any other children, care provider staff, ORR, or others may result in the child's transfer to another care provider facility and may affect their release.**

The questions may be asked out of order so that the interview may flow naturally.

Assessment of the UAC does not end with the interview. The interviewer must continue to build a rapport with the UAC and continuously assess him/her while the UAC remains in ORR care.

**UAC Basic Information—**Auto-populates in the UAC Portal.
**Additional Basic UAC Information—**Document the city and neighborhood of origin, previous placement, religious affiliation, case manager's name, and clinician's name.
**Journey and Apprehension—**Document the circumstances leading up to and including the UAC's journey to the United States and his/her apprehension.
**Family and Significant Relationships—**Document familial and other significant relationships in the UAC's country of origin and in the United States.

---

UAC MAP Section 3: Services (Version 1.0)

20

**Exhibit 4**
**Page 298**

Not Confidential

GOV-00016831

**Medical—**Document any health concerns raised by the UAC, the UAC's medical and medication history, and any reported allergies. Review the UAC Portal Health Tab to ensure that the initial medical exam was completed and fully documented. If a medical exam is not completed, notify medical staff immediately. If the information required is in the UAC Portal Health Tab, write "see Health Tab" in lieu of entering the information.

**Education—**Document the UAC's academic history in order to determine the appropriate educational services for the UAC.

**Legal—**Document the provision of legal services while in ORR custody and whether the legal service provider identified possible legal relief.

**Criminal History—**Document any criminal history disclosed by the UAC to help determine if the UAC is in the appropriate level of care or if the UAC needs further assessment.

**Mental Health and Behavior—**Document the UAC's mental status during the interview to evaluate the UAC's level of post-traumatic stress, depression, and exposure to violence and the UAC's substance use history.

**Trafficking—**Document any trafficking concerns in the UAC's country of origin, during the UAC's journey, and in the United States. This includes concerns related to coercion, debt bondage/labor trafficking, and commercial sex trafficking.

**Mandatory TVPRA 2008—**Document whether the case requires a TVPRA-mandated home study based on information gathered in the assessment and from any other relevant sources.

**Additional information—**Report any additional information that may be pertinent to the UAC's identified needs that has not been covered in the sections above or that requires further elaboration. Identity assessment areas that require immediate follow-up or intervention. Note any significant issues that are not urgent but may require additional assessment, observation, or services.

**Certification—**Enter the signature of the official completing the assessment including name, title, and the date and time the assessment was completed. If a translator was used, have the translator enter his/her signature, name, the language translated, and the date and time the assessment was completed.

---

Appendix 3.7 is the UAC Assessment

## Individual Service Plan

1. **Within 5 calendar days of admission and concurrent with completion of the UAC Assessment,** the case manager uses information gathered from preceding interviews and assessments (i.e., *Initial Intakes Assessment, UAC Assessment, Assessment for Risk*) to complete in the UAC Portal an *Individual Service Plan (ISP)* for the UAC (see **Quick Glance: Guide to the ISP**). 🖥️📋🖱️

2. Creates a new *ISP* **every 30 calendar days after admission— (90 calendar days for LTFC)** and any time there is a substantive changes in the UAC's case information. **NOTE:** the

**Exhibit 4**
**Page 299**

GOV-00016832

30 days is always after admission, even though another *ISP* might have occurred in the interim. ⌖▤↻

**NOTE**: Complete a new *ISP* after each transfer within the ORR network of care.

---

**Quick Glance: Guide to the ISP**

Case managers complete the following sections of the *ISP* in the UAC Portal:
**UAC Basic Information**—Auto-populates in the UAC Portal.
**Mandatory Services**—Document the start and end date and the person responsible for mandatory services. If the service only occurs once and does not span over multiple days, the start and end dates will be the same. If the service is ongoing, an end date does not need to be entered until the UAC is released from care.
**Other Services (optional)**—Document any additional services; enter the type of service, task, frequency, start and end date, and person responsible.
**Certificate**—Enter the signature, name, title, and date and time the *ISP* was completed. Include a copy of the certified ISP in the UAC case file.

---

**Appendix 3.8 is the Individual Service Plan.**

### UAC Case Review

1. **After 30 calendar days in care or when substantive changes or receipt of additional information after the UAC Assessment *is* complete,** the case manager completes all sections of the UAC Case Review in the UAC Portal. See **Quick Glance: UAC Case Review**. ⌖▤↻

---

**Quick Glance: UAC Case Review**

Case managers complete the following sections of the *UAC Case Review* in the UAC Portal:
**UAC Basic Information**—Auto-populates in the UAC Portal.
**Medical**—Document any observable or reported medical needs. If any observed or reported medical concerns are checked in this section, they must be immediately reported to the clinician, lead case manager, program director, shift supervisor, and/or any on-call medical staff member for further guidance on the need to seek immediate medical care.
**NOTE:** If the information required in this section is in the UAC Portal Health Tab, the case manager may write "see Health Tab" in lieu of entering the information.
**Legal**—Document provision of legal services while in ORR care and whether the legal service provider identified possible legal relief.
**Trafficking**—Document any trafficking concerns in the UAC's country of origin, during the UAC's journey, and in the United States. This includes concerns related to coercion, debt

---

UAC MAP Section 3: Services (Version 1.0)

22

**Exhibit 4**
**Page 300**

Not Confidential

GOV-00016833

bondage/labor trafficking, and commercial sex trafficking. **NOTE:** Click "yes" to the question that the child is a victim of a severe form of trafficking in persons if ORR has issued a trafficking eligibility letter for the UAC even if the case is still waiting for the final Trafficking Eligibility Letter from OTIP.

**Mandatory TVPRA 2008**—Document whether the case requires a TVPRA-mandated home study based on information gathered in the assessment and from any other relevant sources.
**Recommendations**—Document the current release recommendation for the UAC.
**Care Plan**—Document actions taken and outline care plans that have or will be implemented to address reunification, legal, and mental health needs, and/or issues.
**Certificate**—Enter the signature, name, title, and date and time the assessment was completed.

2. If the UAC's responses indicate that he/she falls under any of the criteria for a mandatory or discretionary home study and/or post-release services, the case manager immediately refers the case following the referral process in **UAC MAP Section 2.4.2.**

3. The case manager maintains direct contact with each UAC in care and **meets at least once a week** with each UAC to discuss reunification options. The case manager documents the weekly meetings with the UAC and communication with potential sponsors in the UAC case file. 📖🕐

4. The case manager continuously updates the *UAC Case Review* **within 30 calendar days after admission (90 days for LTFC)** or in the following circumstances:
    - The care provider receives required or relevant information that was unknown during the time of the assessment
    - The care provider receives additional information from the UAC or other sources.

    **NOTE:** Do not delete previously entered information when updating the *UAC Case Review.* 📖🕐

5. The case manager creates a new UAC Case Review:
    - **Every 30 calendar days after admission** into a shelter, staff secure, secure, transitional foster care or residential treatment center care provider facility
    - **Every 90 calendar days after admission** into an ORR long term foster care program
    - Any time there is a substantial change in the UAC's case information (e.g., upon reunification, age out, or voluntary departure) 📖🕐

**Appendix 3.9 is the UAC Case Review.**

Not Confidential

GOV-00016834

## UAC with Known, Disclosed, or Alleged Violent Criminal History

1. In addition to *the Initial Intake Assessment, UAC Assessment, ISP*, and *UAC Case Review*, the case manager gathers criminal history information as described in the **Quick Glance: Guide to UAC with Known, Disclosed, or Alleged Violent Criminal History**.

   The case manager **immediately** elevates the criminal history information to the clinician, case coordinator and the assigned FFS to review placement based on the alleged crime and completes an *SIR* and notifies the UAC's parents/legal guardian, potential sponsor, attorney of record or the local legal service provider, and child advocate, if applicable. The FFS reviews the case, placement, and sponsorship and notifies DHS ICE to request that they verify the criminal activity, which may include an Interpol check or record request from the UAC's Consulate.

   For UAC with known, disclosed, or alleged violent criminal history, clinicians must request a psychologist perform a psychological risk assessment as described below. Where appropriate, collect criminal history information and the completed psychological assessment. The psychological assessment must be completed **within 7 business days of the child's admission (or when care provider is made aware of the criminal history.** The psychological evaluation focuses on:
   - Current level of functioning
   - Treatment recommendations
   - Placement recommendations
   - Risk assessment
   - Psychosexual (if applicable) 🕮

2. The clinician reviews the psychological assessment in collaboration with the case manager to determine if the UAC is in the appropriate placement level of care and if the UAC needs any additional services.

3. The case manager notifies the assigned FFS and case coordinator of any case updates and follows ORR home study policy and procedures for cases that meet the TVPRA or other home study criteria. 🕮

**Quick Glance: Guide to UAC with Known, Disclosed, or Alleged Violent Criminal History**

If a UAC has a known, disclosed, or alleged violent criminal history that includes violence toward others (e.g., murder, attempted murder, rape, sexual assault, assault with a deadly weapon, arson, an act that resulted in the serious injury or death of another), the case manager and FFS work together to gather information about the activity.

Not Confidential

GOV-00016835

**UAC Adjudicated in the United States**
The case manager:
-- Obtains UAC criminal records, court records, court disposition, correctional detention records, child welfare records, mental health records, dental records, medical records, police reports, proof of rehabilitation, and letters of explanation of the incident(s).
--Identifies and contacts the parole or probation officer and/or child welfare worker assigned to the UAC, if any.

If the case manager is unable to successfully obtain criminal records or contact the courts or law enforcement entities, he/she documents attempts to obtain additional information and elevates the issue to the FFS for assistance.

If criminal records are no longer available because they have been expunged, the case manager verifies as much information as possible with the relevant court or law enforcement entity; documents efforts to obtain information in the UAC Case Review, and proceeds with making a recommendation regarding the suitability of the potential sponsor and current ORR placement level.

**UAC Reportedly Involved in Criminal Activity in His/Her Country of Origin**
The case manager
--Reaches out to the Country of Origin Consulate for assistance in corroborating any allegations.
**NOTE:** Do not reach out to the Consulate if the UAC has filed a credible fear claim.
The FFS
--Asks DHS and/or other law enforcement entities for assistance in verifying criminal activity in country of origin.

---

*All UAC in Secure and Staff Secure*

1. All UACs placed in secure and staff secure must undergo a risk assessment **within 30 days of referral to the program** by a clinician trained in the use of the *Ohio Department of Youth Services (OYAS) Reentry Tool*, which is comprised of the *OYAS-RET Interview Guide, OYAS-RET Score Sheet,* and *OYAS-RET Self Report Questionnaire.*   Clinicians use *OYAS Reentry Tool* in conjunction with other appropriate clinical assessment tools and their professional judgement to establish a comprehensive assessment of risk level. The clinician uploads completed *OYAS-RET Interview Guide, OYAS-RET Score Sheet,* and *OYAS-RET Self Report Questionnaire* into the UAC Portal and saves copies in the UAC Portal and in the UAC case file.
   **NOTE: Prior to the interview, the clinician must inform the UAC that self-disclosures of previously unreported criminal history or violent behavior to any other children, care**

UAC MAP Section 3: Services (Version 1.0)

Not Confidential

GOV-00016836

provider staff, ORR, or others may result in the child's transfer to another care provider facility and may affect their release. 🕐📑👆

2. UAC in staff secure and secure undergo a re-assessment **every 30 days following the initial *OYAS* assessment** and the file updated in the UAC Portal and case file. 🕐📑

   **See also UAC MAP Section 1.4.2 30 Day Restrictive Placement Case Review.**

**Appendix 3.10 Includes screen shots of the OYAS RET Interviewing Guidance, OYAS RET Score Sheet and the OYAT Reentry Self-Report Questionnaire.**

## CASE MANAGEMENT

1. Case managers are responsible for gathering and maintaining the UAC case records. This includes keeping the UAC Portal up-to-date as well as the hard copy file. See **Quick Glance: Summary of UAC Case Records**. Case managers manage the case file by:
   - Timely entry and organization of documents, records, and any other information in the UAC case file.
   - Including records generated and gathered for the UAC and his/her sponsor.
   - Storing hard copy UAC case files in a secure location accessible only to case managers, clinicians and other designated staff and archiving records in a secure location.

---

### Quick Glance: Summary of UAC Case Records

The master case file is the complete UAC file. For service delivery, programs typically maintain documents separately while the child is in care (i.e. the phone logs might be housed in areas where UAC make the actual calls, medical usually keeps their documents separate while the child is in care, some required document are on the UAC Portal etc.)

When a child is discharged, programs must consolidate all the separate files into a master case file, so that all the information is in one place. Depending on the facility, the master case file is either electronic or hard copy or a combination of both.

The UAC Case File includes (and may include other relevant information) (See also **Section 5.6.2**):
--Criminal or delinquency records, including but not limited to, police reports, arrest records, court information, and probation records
--Psychological, psychiatric, and/or psychosocial records
--Individual Service Planning

**Exhibit 4**
**Page 304**

Not Confidential                                                                                    GOV-00016837

--Educational assessments and records, including individualized education plans, report cards, and other education status updates

--Clinical screening tools

--Medical records, including but not limited to, immunization records, TB tests, physicals, prescription information, specialist visits, ER visits, drug and alcohol treatment, Treatment Authorization Requests, other medical treatment and follow-up

--Dental records, including but not limited to, documenting the UAC's scheduled dentist visit, reporting on the dental visit, any dental exams and any dental work

--Significant Incident Reports and internal incident reports

--Official ORR forms (such as Placement Authorization, Notice of Placement in a Restrictive Setting

--Any documentation required under State licensing

2. Case managers must meet with each UAC at a minimum of once a week to assess and discuss case outcome goals and services. UAC placed temporarily in hospitals and mental health facilities should continue to receive visits from case managers at a minimum of once a week to assess and communicate the needs and progress of UAC to the care provider staff and the FFS. Case managers must document these meetings with the UAC in the case manager notes section of the UAC case file. 🗐

3. Case manager must participate in weekly staffing meeting with care provider staff and the Case Coordinator to provide recommendations for best course of action on behalf of UAC. (See additional case management consultations for UAC in restrictive environments).

## 3.3.2 Long Term and Concurrent Planning

📖 See Section 3.3.2 of the UAC Policy Guide.

## 3.3.3 Screening for Child Trafficking and Services for Victims

📖 See Section 3.3.3 of the UAC Policy Guide.

## PROCEDURES

**Exhibit 4**
**Page 305**

Not Confidential                                                                        GOV-00016838

**UAC Assessment tool**

📖 See Section 3.1.1 of the UAC Policy Guide.

**Referrals**

1. If the care provider suspects the child may be a victim of trafficking, refer the case to the Office on Trafficking in Persons (OTIP) **within 24 hours.** ⏱

2. Care provider make referrals by emailing the child's *Significant Incident Report (SIR)* with trafficking concerns and the child's *UAC Assessment* to Childtrafficking@acf.hhs.gov. ✉

3. In cases where the care provider is uncertain whether a child may be a victim of trafficking, or if the care provider is uncertain whether to make a referral, the care provider can email OTIP at Childtrafficking@acf.hhs.gov or call OTIP at 202-205-4582 to schedule a case staffing. ✉☎

**Eligibility and Interim Assistance Letters**

📖 See Sections 3.3.3 and 5.6.2 of the UAC Policy Guide

1. OTIP issues and mails the Eligibility and Interim Assistance Letters to the care provider facility in which the child is currently housed.  The care provider must retain the letter until the child leaves the care provider's custody.  The original letter must go with the child upon release or transfer per 5ection 5.6.2 of the UAC Policy Guide. 🗐

2. If the care provider submitted a referral to OTIP and the child leaves the care provider's custody before the Eligibility or Interim Assistance Letter arrives, the care provider must immediately notify OTIP and provide an updated address and point of contact for the child by emailing Childtrafficking@acf.hhs.gov. The timely notification of a change of address is imperative to ensure that the child can access time-limited benefits and services. ✉

When a care provider receives Eligibility and Interim Assistance Letters while the child is in their care:

1. The care provider must explain next steps and help the child and child's sponsor to understand the benefits and the services available to the child, including comprehensive case management services through the Trafficking Victim Assistance Program (TVAP).

   - Information about services is available here: https://www.acf.hhs.gov/sites/default/files/otip/traffickingservices.pdf

   - Information about TVAP case management services is available here: https://www.acf.hhs.gov/otip/trafficking-victim-assistance-program-grantees

Not Confidential                                                        GOV-00016839

2. When OTIP issues an Interim Assistance Letter, OTIP will include a TVAP provider on the email to help facilitate the process of connecting the child to TVAP case management services. After receipt of this email, the care provider must give the TVAP provider the child's most recent contact information to ensure the child receive services. ✉

3. The care provide must explain to the child and child's sponsor the importance of keeping the original copy of the Interim Assistance and/or Eligibility Letter in order to access benefits and services.

4. If there are any questions regarding victim assistance, benefits, or local service referrals, the care provider, child, or child's sponsor can call the National Human Trafficking Hotline (NHTH) at 888-373-7888, which is available 24 hours a day, 7 days a week. ☎

5. If there are any questions about state-specific protocols for benefits and services, the state refugee coordinators can provide further guidance.

6. Document the details of these discussions and explanations in the UAC case file. 🗐

When a child has a case that is being reviewed by OTIP and is discharged from the care of a care provider *prior* to receiving the Eligibility or Interim Assistance Letter determination, the care provider must:

1. Explain the Child Eligibility process to the child and child's sponsor to help them to understand that the child's case is still under review by OTIP and to expect an upcoming decision on their case from the care provider, post-release services worker, or the identified point of contact.

2. Explain to the child and child's sponsor what to do should the child receive an Interim Assistance and/or Eligibility Letter, as well as the benefits and the services that are available to the child should the child be issued a letter.

3. Explain to the child and child's sponsor the importance of keeping the original copy of the Interim Assistance and/or Eligibility Letter in order to access benefits and services.

4. When OTIP issues an Interim Assistance Letter, OTIP will include a TVAP provider on the email to help facilitate the process of connecting the child to TVAP case management services. While the child may be in the care of their sponsor, after receipt of this email, the care provider must give the TVAP provider the child's most recent contact information so that the child receives services. ✉

5. If there are any questions regarding victim assistance, benefits, or local service referrals, the care provider, child, or child's sponsor can call the National Human Trafficking Hotline (NHTH) at 888-373-7888, which is available 24 hours a day, 7 days a week. ☎

Not Confidential

6. If there are any questions about state-specific protocols for benefits and services, the state refugee coordinators can provide further guidance.

7. Document the details of these discussions and explanations in the UAC case file. 📑

# 3.3.4 Safety Planning

📖 See Section 3.3.4 of the UAC Policy Guide.

Care providers must develop a written safety and security plan contained in the care provider's policies and procedures to maintain safety. The safety plan must address the following emergencies: runaways, evacuations, medical and mental health emergencies, and disease outbreaks.

Care providers and foster care programs and homes must meet the safety requirements maintained by their local/state licensing entity, fire code regulations, and local zoning and building code regulations.

Care providers must submit all state and local licensing reports including citations, monitoring assessments and corrective actions, to the ORR PO **within three business days of receipt** of such reports, citations, or assessments. 

*Safety Planning for Field Trips or Other Off-Site Outings*

The program must consider staffing ratios for field trips and outings for the safety of UAC as well as the type of outing.  The ratio should be higher than expected under normal conditions.

UAC not eligible for field trips or outings include:

- Those currently on 1:1 supervision
- Those determined to be a run risk
- UAC who have not completed all initial assessments
- UAC whose identity is in question
- UAC with behavior in last 48 hours that if done in public would draw unnecessary attention to all UAC at the outing or be deemed unsafe or aggressive.

*Procedures for UAC Who Run Away*

In cases involving an unauthorized absence by a UAC (runaway), care providers should NOT discharge the UAC for **24-48 hours** (depending on the circumstances). They should follow

Not Confidential

GOV-00016841

emergency SIR reporting and notifications procedures that are outlined in the ORR Ops Guide Section 5.7.2. Emergency Incidents. ⚙

*Evacuations*

Care providers must establish written evacuation plans for implementation in the event of earthquakes, fires, hurricanes, tornadoes, other natural disasters or other potentially dangerous situations that threaten the safety of the program or the UAC's placement.

Foster care provider agencies shall have an evacuation plan for all foster homes. Emergency or respite care homes may be designated for this purpose. Foster care programs that provide other ORR residential care may use the shelter care facility, where appropriate.

Procedures shall also include a list of agencies and individuals to notify in the event of an evacuation. The list must include all relevant ORR contacts, the DHS, and local law enforcement. The emergency contact list shall be posted in the care provider's office area in a visible location.

Care providers shall identify information of importance to transport during the evacuation, including information on each UAC (identifying any health information, including allergies and prescription medications), a photo of each UAC, information on each UAC's potential sponsor, and important telephone numbers.

Additionally, care providers shall identify items of importance to transport during the evacuation, including medications taken by any UAC, and any other items that are essential to the well-being of any individual or group of UAC. In the event of an emergency, care provider staff will not be expected to physically remove case files. However, care providers shall have in place procedures to protect service and organizational records, whether in electronic or paper form, from destruction by fire, water, loss, other damage and from unauthorized access. Care providers are expected to comply with their state licensing requirements regarding the protection of records.

Care providers must conduct evacuation drills **every 60 days** to ensure maximum preparedness in the event of a disaster or potentially dangerous situation. Additional evacuation drills may occur depending on state licensing requirements. Each drill must use alarms and the complete and orderly evacuation of the building. Care providers must follow state licensing requirements pertaining to the specific content of the drill. Foster care programs must follow state licensing requirements for evacuation drills with all foster homes providing care to the ORR. ⚙

**Exhibit 4**
**Page 309**

Not Confidential

GOV-00016842

# 3.3.5 Academic Educational Services

📖 See Section 3.3.5 of the UAC Policy Guide.

1. **Within 72 hours of admission**, a teacher or trained staff must assess a UAC to determine an individual educational competency level and document the assessment in the UAC case file and in the Education Tab under Assessments in the UAC Portal. (See **Fig. 3.3**) 👆

## Fig. 3.3 Education Assessment Tab



2. Care providers must design a minimum of six hours of educational coursework to meet the unique competency levels of the UAC in care (as well as the *Flores* requirements), including linguistically appropriate educational materials and English language training, Monday through Friday, throughout the year. The care provider must submit the curriculum to the PO for approval. (See below for exceptions for LTFC and Parenting UAC. Breaks for federal holidays do not need ORR approval.) Educational field trips may count toward the six hours of coursework if approved by the PO.

Daily class attendance must be documented in the UAC's case file. Care providers must provide academic reporting and progress notes on the UAC including transcripts, grades, or other assessments. These documents  must be updated in the case file and in the UAC Portal.

**Exhibit 4**
**Page 310**

Not Confidential

GOV-00016843

3. **Upon release to a sponsor,** the care provider must include educational assessments and records. (See **UAC MAP Section 2.8 Release from ORR Custody**.) ⏱ ˍ

*Parenting UAC*

Parenting UACs who recently had a baby should follow the doctor's orders regarding when they may return to a full school day. The care provider should email the PO and FFS when a UAC will be out of school for an extended period of time and when the UAC returns to the classroom setting. For UAC who have toddlers, the care provider must care for the toddler so that the UAC may attend school.

*Long Term Foster Care*

UAC who are in LTFC receive academic instructions in a community setting. Because most school districts do not offer year round academic instruction, LTFC providers must work with their POs to develop a summer learning schedule for UAC in care.

# 3.3.6 Vocational Educational Services

📖 See Section 3.3.6 of the UAC Policy Guide.

1. Vocational programs may not replace academic education or substitute for basic subject areas, nor the required six hours of academic instruction.

2. The care provider must obtain prior authorization from their assigned PO before implementing a vocational program. The following information must be submitted in the authorization request:
   - Name of vocation or trade
   - Rationale
   - Staff qualifications
   - Location of vocational training
   - Safety precautions (staff)
   - Safety education (students)
   - Student capacity
   - Frequency and duration of course
   - Community partnerships
   - Course curriculum
   - Policy and procedures for standardizing the process of selling UAC created items and dispensing funds to the UAC from a sale of any item made by a UAC.

**Exhibit 4**
**Page 311**

Not Confidential

GOV-00016844

# 3.3.7 Services Related to Culture, Language, and Religious Observation

📖 See Section 3.3.7 of the UAC Policy Guide.

1. The care provider must support the cultural identity of UAC through various programs and services, which may include:
   - Contact with family or other support system through telephone calls, letters, or visits
   - Addressing the UAC by his or her given names
   - Inclusion of cultural awareness in daily activities, such as menus, clothing, and hygiene routines
   - Celebration of culture-specific events and holidays
   - Academic education covering various cultures within a classroom setting

2. Care providers must ensure that UAC obtain skills necessary for acculturation in the United States. In addition to English language classes, services may include:
   - Access to community services
   - Academic learning, including geography
   - Celebration of U.S. holidays
   - Discussion of U.S. laws
   - Food and entertainment (e.g., music, books, magazines, and dancing)
   - Field trips to local historical, scientific, or cultural points of interest

3. Care providers must make every effort to provide on-site staff or interpreters who speak the native language of each UAC. If staff or on-site interpreters are unavailable in the geographic region of the care providers, they may utilize a paid translation services, such as a telephone-accessible language line.

4. Care providers must make every reasonable effort to provide services in the UAC's preferred language. The UAC may choose to communicate in his or her preferred or native language (safety of UAC and staff permitting).

5. Care providers must grant UAC every opportunity to observe and practice their spiritual or religious beliefs. Care providers must provide the following:
   - Assurances that religious and spiritual beliefs, including food preparation and dietary restrictions are permitted and accommodated;
   - Internal procedures reflective of ORR religious services policy

Not Confidential

GOV-00016845

- Religious items, books, or clothing at the UAC's request, provided that these requests are reasonable.

## 3.3.8 Recreation and Leisure Time Services

📖 See Section 3.3.8 of the UAC Policy Guide.

1. Care providers must have a recreation and leisure plan that includes daily outdoor activity, weather permitting. The plan:
    - Must include at least one hour per day of large muscle activity and one hour per day of structured leisure time activity that does not include time spent watching television.
    - Be increased to three hours on days when school is not in session.
    - Not be included in the 6 hours per day of required educational services.
    - Account for insufficient onsite recreation areas by taking UAC to off-site parks, community recreation centers or other locations (off-site recreation involves a higher staff-to-child ratio—see staff ratios for field trips and outings).

    **NOTE:** Care provider may not restrict outdoor recreational time because a UAC has previously run away or is a flight risk. Care providers are required to mitigate any flight risk concerns and allow UAC access to outdoor activities.

2. Care provider must provide, at a minimum, one monthly opportunity for escorted visits to the surrounding community for all UAC.

3. Foster parents must provide opportunities for recreation as part of the regular activities of the family. UAC in individual foster homes must participate in normal family and community activities with consideration to the demands of school, homework, and extra-curricular activities.

4. Care providers must document UAC's participation in physical activity, leisure time and off site visits in the UAC case file. 📑

## 3.3.9 Nutritional Services

📖 See Section 3.3.9 of the UAC Policy Guide.

Not Confidential

GOV-00016846

# 3.3.10 Telephone Calls, Visitation, and Mail

📖 See Section 3.3.10 of the UAC Policy Guide.

1. Care providers must develop internal procedures to accommodate potential visitors and include safety and privacy measures to ensure that the UAC and facility are safe and that the UAC may communicate with the visitor in private. The care provider should ensure the UAC's case file includes the approved list of visitors and a log documenting any visits.

2. Care providers must provide UAC the opportunity to make a minimum of two telephone calls per week (minimum 10 minutes each) to family members and/or sponsors in a private setting—this includes those living in the United States and abroad. UAC telephone calls must be private. A clinician or case manager or other professional staff may only listen in on a UAC conversation with the approval of the FFS, based on safety concerns. Care providers must document the weekly phone calls in the UAC case files as well as a list of approved contacts.

3. Care providers may use social media under supervision of the case manager to find and contact family members or potential sponsors for a particular UAC. A case manager or other staff must supervisor the use of social media for these purposes. While in care, UAC may not post to a social media site. Pictures or any identifying information of UAC in care (present or in the past) should not be posted to the care provider's Facebook or in any other care provider social media content.

4. UAC in LTFC may have access to cell phones and social media. The LTFC provider must ensure that every foster parent has ground rules in place on the safe use of social media and electronic devices, including cell phones and computers.  Ground rules should reflect the following best practices:
   - No UAC under the age of 13 may join Facebook or other social media sites.
   - Privacy settings for the Internet and Facebook must be set to the strictest levels.
   - Keeping the computer in a central location and high traffic zone for all users.
   - A requirement that all UAC understand the ground rules for social media and cell phone use in the household.
   - Telling UAC to avoid responding to questionnaires, free giveaways and contests (these links make children susceptible to identity theft).
   - Foster parent monitoring of pictures posted by UAC online and vetting of friends to make sure he/she is not a target. (A UAC's online friends should match his/her friends. Foster parents must have access to UAC Facebook page at any time.)

Not Confidential

GOV-00016847

- Limiting use of computer, cell phone, and TV or gaming systems (i.e., only allowing cell phone usage at certain hours in the evening or after homework is completed).
- Educating UAC on importance of protecting their online reputation and being aware of online dangers.
- Foster parents must demonstrate and insist on proper technology etiquette, such as no bullying or teasing. Adults in the household must also teach youth to avoid disclosures and sharing of personal information, such as where they will be at a certain time or other information that may put them or others at risk of harm.

## 3.3.11 Clothing and Personal Grooming

📖 See Section 3.3.11 of the UAC Policy Guide.

1. Care providers must confiscate or cover any gang-related UAC tattoos, accessory or other item by:
   - Covering gang symbol tattoos at all times
   - Replacing or repairing immediately defaced care provider property, including schools books and notebooks with gang-related symbols
   - Confiscating clothing with any religious symbol that may denote gang affiliation
   - Confiscating clothing worn by UAC in a certain manner that denotes gang affiliation
   - Room checks to ensure that UAC are not defacing property with gang symbols.

   Further procedures may be developed by the care provider as deemed necessary and safe for containing gang-related symbols, tattoos, and accessories. 📖

2. Upon UAC arrival, the care provider must wash and store the UAC clothing and must supply the UAC with clothing for court dates, classrooms, outdoor recreation, and sleeping, as well as undergarments and footwear and personal grooming items.

3. At a minimum of once a week, staff will collect soiled clothes to wash and return to the UAC in a timely manner.

37

**Exhibit 4**
**Page 315**

GOV-00016848

4. Care providers may require UAC to wear school uniforms during school hours and
   school-related outings as long as UAC are allowed to wear their personal clothing at all
   other times.

## 3.3.12 Assignment of Chores

📖 See Section 3.3.12 of the UAC Policy Guide.

1. Care providers must have written policies and procedures for chores that reflect the
   following:

   - UAC may not be assigned chores that generate income for care providers
     or replace duties of paid staff
   - UAC must be medically screened before being assigned chores
   - Assignments must be developmentally and age appropriate
   - Chores must not interfere with participation in educational services,
     leisure or recreation, or meal times, as well as time set aside for showers
     or other personal hygiene activities
   - UAC has the right to request an accommodation to a chore type or
     schedule based on religious or cultural beliefs
   - Chores may include the maintenance of a child's sleeping area and
     personal space as well as help cleaning classrooms
   - Staff and not UAC should apply any cleaning agents
   - UAC should not be responsible for cleaning bathrooms in common areas
   - UAC must have equal cleaning responsibilities
   - Chores/cleaning may not be used as a means of punishment
   - Cleaning supplies must be maintained in a locked area
   - UAC may not be forced to maintain uncomfortable positions while
     cleaning and must wear appropriate clothing and footwear

## 3.3.13 Behavior Management

📖 See Section 3.3.13 of the UAC Policy Guide.

All care providers (including LTFC) must have a behavioral management plan that meet child
welfare best practice standards. All interventions must be positive and strength-based. Care
providers may never subject UAC to corporal punishment, humiliation, mental abuse, or

38
**Exhibit 4**
**Page 316**

Not Confidential

GOV-00016849

punitive interference with the daily functions of living, such as eating or sleeping. Behavior management plans must not affect the requirements of the Flores Settlement Agreement, including daily outdoor activity or leisure time.

The strength-based behavioral management policy must include the following:

- Credentials of the personnel involved in developing, approving, implementing, monitoring, and overseeing the implementation of the behavior management policy and procedures.
- System for training and assuring the competency (both written and practical) of individuals involved in all facets of behavior management.
- Procedures on how to handle, report, and follow-up behavioral incidents and emergencies.
- Documentation that all staff who come into contact with children subscribe to a Code of Ethics.
- Policy of providers that indicate that they must comply with discipline and restraint requirement as stated within the state licensure requirements.
- Crisis prevention/intervention procedures (i.e., approved de-escalation techniques, system for elevating instances of behavior that are dangerous to self or others to trained staff for review)
- Clearly articulated rules for the facility/home, list of minor and major behavioral infractions, earned privileges, and system for discipline that allow UAC to develop self-control, positive coping skills and the ability to assume responsibility for his or her actions.
- Any time of solitary time as a result of behavior must meet state licensing standards.

## PROCEDURES

1. Care providers must submit their behavior management plan to their PO for approval. ☒

2. Care providers and foster/group homes must post the program rules and grievance procedures in English and language of majority of UAC in care.

3. Care providers may conduct drug testing of UAC in accordance with state licensing requirements. Care providers must have reason for testing the minor and document the information in the minor's medical records in the UAC Portal and in the UAC case file.

Not Confidential

Behavior management plans must not include drug testing as a consequence or as a form of intervention.

# 3.3.14 Transportation Services

📖 See Section 3.3.14 of the UAC Policy Guide.

1. Care providers must comply with all local licensing requirements and state and federal regulations, including but not limited to the following:
    - Train all staff responsible for transporting UAC.
    - Transport UAC in a safe and humane manner and under the supervision of trained and experienced personnel.
    - Transport UAC in a manner that is appropriate to the UAC's age and physical and mental needs, including proper use of car seats for young children.
    - Transport UAC with special needs in vehicles that can best accommodate their needs.
    - The number of staff escorts must meet (or exceed) the minimum staff/child ratio required by the transporting care provider's licensing agency.
    - To the greatest extent possible under the circumstances when transporting UAC, assign transport staff of the same gender as the child or youth.
    - Maintain constant "line of sight and sound" supervision of each UAC during transport.
    - All occupants must wear a seat belt when the vehicle is moving.
    - The driver must have a valid state driver's license and have a cleared driving record.
    - The driver must drive defensively and take care to protect the occupants and vehicle, obey traffic laws, and report damage or accidents immediately to the care provider.
    - Complete a vehicle inspection report, including an odometer reading, following each trip.
    - Create and maintain a manifest of UAC transported and account for each UAC at exit or entrance of the vehicle.
    - Regularly maintain and inspect all vehicles used for transportation.
    - Take immediate action for any defect that could render the vehicle unsafe and/or inoperable.

2. For any secure transportation:

Not Confidential

- It must involve a trained care provider staff or an agency experienced in secure transportation. Training must include the following: conflict resolution without the use of physical or mechanical restraints, the safe and effective use of approved soft restraints, and the emergency use of safe and approved physical restraints during an emergency response.
- Trained shelter or foster care staff may transport UAC in their care to a staff-secure or secure placement as long as the staff's or UAC's safety is not compromised.
- Make all transportation decisions on a case-by-case basis in consultation with the FFS.
- For UAC in ORR funded staff secure facilities, shelter facilities, group homes, and foster care homes, ORR prohibits the use of mechanical restraints at any time.
- For transport of UAC's in ORR-funded secure detention facilities, ORR authorizes (but does not require) the use of soft restraints. If the transport can be safe and secure without mechanical restraints, then do not use restraints. ORR does not authorize hard restraints except in an emergency response during a secure transport.

Care providers must submit to their PO operational details concerning secure transportation services, use of mechanical restraints during secure transport and use of mechanical restraints in response to an emergency.

3. UAC with serious physical or mental health issues or exposed to a communicable disease should not be moved until medically cleared by a health care professional or ORR is consulted.
    - The health care professional must email the medical clearance to the care provider and the FFS.
    - If a care provider must move a UAC with a communicable respiratory disease (e.g., infectious TB), the UAC must wear a mask at all times and the care provider must implement Universal Precautions. If exposure is undetermined, the care provider should employ an emergency vehicle and consult with the Division of Health for Unaccompanied Children (DHUC).

# 3.3.15 Use of Restraints or Seclusion in Emergency Safety Situations in RTCs

📖 See Section 3.3.15 of the UAC Policy Guide.

## 3.3.16 Notification and Reporting of the Death of a UAC

📖 See Section 3.3.16 of the UAC Policy Guide.

Care providers must follow *SIR* reporting and notification procedures (see ORR Ops Guide
Section 5.8.1 Emergency Incidents).

## 3.3.17 Use of Restraints During Transport and in Immigration Court

📖 See Section 3.3.17 of the UAC Policy Guide.

## 3.3.18 Restraints in Immigration Court and Asylum Interviews

📖 See Section 3.3.18 of the UAC Policy Guide.

## 3.4 Health Services

📖 See Section 3.4 of the UAC Policy Guide.

ORR's Division of Health for Unaccompanied Children (DHUC) oversees public health screening
and the provision of health services to UAC in ORR care.  DHUC monitors for serious medical
conditions and infectious diseases of public health importance through an automated
notification system. DHUC responds to care provider programs 24 hours a day, 7 days a week
and provides management guidance on infectious diseases, serious mental health conditions,
and complex medical cases.  DHUC also ensures reporting of public health information to the
appropriate public health authorities.

Each care provider program that accepts placement of children in ORR custody must have an
established network of healthcare providers, including specialists, emergency care services,

Not Confidential

GOV-00016853

mental health practitioners, and dental providers that will accept ORR's fee-for-service billing system.

ORR has developed its health care policies with the goals of ensuring the children's physical and mental well-being and the safety of care providers, medical personnel and communities. Through its care providers and other health care professionals and based on the requirements of the Flores Settlement Agreement, ORR provides the following services:

- Routine medical and dental care
- Family planning services, including pregnancy tests and comprehensive information about and access to medical reproductive health services and emergency contraception
- Emergency health services
- A complete medical examination (including screening for infectious diseases) **within two business days**
- Immunizations in accordance with recommendations of the Centers for Disease Control and Prevention (CDC)
- Administration of prescribed medications and special diets
- Appropriate mental health interventions

Under the terms of the Flores Settlement Agreement, ORR care providers must also provide:

- At least one individual counseling session per week conducted by a trained social work staff with the specific objective of reviewing the child's progress, establishing new short term objectives, and addressing both the developmental and crisis related needs of each child and
- Group counseling sessions at least once a week that may be adjusted according to the needs of the population.

Care providers must deliver services in a standardized manner that is sensitive to the age, culture, native language, and needs of each unaccompanied alien child. Care providers also must meet state and local licensing and public health requirements.

Care providers must have policies and procedures based on state or local laws and regulations to ensure the safe, discreet, and confidential provision of prescription and nonprescription medications to unaccompanied alien children, secure storage of medications, and controlled administration and disposal of all drugs.

From intake to release, care providers must observe all children for signs or symptoms of communicable diseases and act accordingly to protect others against possible infection.

Care providers must have an identified space within the shelter facility that may be used for quarantine or isolation in the event that an unaccompanied alien child must be separated from

Not Confidential

the general population for a medical reason. The space must be suitable to house a child for days or weeks.

The care provider must have written policies, procedures, and practices that protect the confidentiality of medical information.

# 3.4.1 Health Care Eligibility and General Standards

📖 See Section 3.4.1 of the UAC Policy Guide.

# 3.4.2 Initial Medical and Dental Examinations

📖 See Section 3.4.2 of the UAC Policy Guide.

Each child must receive an initial medical examination (IME) within **2 business days** of admission to ORR. The purposes of the IME are to assess general health, administer vaccinations in keeping with U.S. standards, find out about health conditions that require further attention, and detect contagious diseases, such as influenza or tuberculosis. The IME is based on a well-child examination, adapted for the UAC population with consideration of screening recommendations from the American Academy of Pediatrics, the Centers for Disease Control and Prevention (CDC), and the U.S. Preventive Services Task Force (USPSTF).

Components of the IME are outlined in the *Initial Medical Exam Form*, the **Supplemental TB Screening Form***, and *Program Guidance – Revised Initial Medical Exam Requirements*. The IME covers the following elements:

- History and physical: Vital signs, documentation of allergies, vision screen (>5 years), a medical history, a review of systems (signs and symptoms), and a physical exam.
- Review of psychosocial risk: Mental health screening, physical abuse history, sexual activity/abuse history, and substance use history.
- Risk- and age-based laboratory testing: Influenza (if symptomatic with fever and cough or sore throat); pregnancy (girls >10 years and girls <10 years who have reached menarche or reported sexual activity); lead level (6 months up to 6 years); HIV (adolescents >13 years and children <13 years who have reported sexual activity); hepatitis C (history of IV drug use); hepatitis B (history of IV drug use or sexual activity); and chlamydia, gonorrhea, and syphilis (history of sexual activity).

Not Confidential

- TB screening: All children (except for babies of UAC who are born in the United States) are screened with a tuberculin skin test (TST) or blood test (interferon-gamma release assay [IGRA]); IGRA is the preferred test for children $\geq$2 years.  All adolescents $\geq$15 years also receive a chest x-ray (posterior-anterior [PA] view). Children <15 years only receive a chest x-ray if their TST or IGRA result is positive. Radiologists are to review and issue a report of their findings on all imaging studies including, chest x-rays.
- Assessment and plan: Clinical findings noted and diagnoses made, medications prescribed, vaccinations given (in accordance with the Advisory Committee on Immunization Practices [ACIP] catch-up schedule: https://www.cdc.gov/vaccines/schedules/hcp/child-adolescent.html), labs ordered/refused, and referrals or follow-up recommended.

All elements of the IME should be started within **2 business days of the child's admission** to the care provider program. The IME is performed or supervised by licensed physicians (MD/DO) or non-physician practitioners (NP or PA). The ***Initial Medical Exam Form*** should be completed by the healthcare provider during the IME. The ***Supplemental TB Screening Form*** should be filled out by the healthcare provider performing the IME or by the health department if the provider does not perform these services. Data from these forms must be entered into the IME form in the UAC Portal; all health documents (screening forms, lab results, chest x-ray reports, vaccination records) must also be uploaded to the UAC Portal.

For babies born in the United States to girls in ORR care, a Medicaid application should be prepared and submitted. The initial check-up should be documented in the UAC Portal and the office notes uploaded.

**Vaccinations**

UAC are eligible for the Vaccine for Children (VFC) Program and should be vaccinated by a VFC provider. Simultaneous administration of all indicated vaccines per the ACIP catch up schedule should be given during the IME. Minor illnesses (diarrhea, urinary tract infection, mild upper respiratory infection, and other low-grade febrile illness) are not contraindications to vaccination; in general, antibiotic treatment is not a contraindication to vaccination. Live virus vaccines (MMR and varicella), human papillomavirus (HPV), and polio (IPV) vaccines should be deferred for pregnant girls, but pregnant girls should receive all other indicated vaccinations: https://www.cdc.gov/vaccines/pregnancy/hcp/guidelines.html.

TB testing (TST or IGRA) can be done before or on the same day that live virus vaccines are administered; live vaccines may interfere with the response to TB testing and cause false negative results if TB testing is done 1 day to 4 weeks after administration of live vaccines.

If a child will need hepatitis B testing (hepatitis B surface antigen), it is preferable to draw blood samples before administering vaccines since hepatitis B vaccine given before blood samples are collected can cause false positive hepatitis B results. If it is not logistically feasible to collect

UAC MAP Section 3: Services (Version 1.0)

Exhibit 4
Page 323

Not Confidential

GOV-00016856

blood before vaccines are administered, other hepatitis B tests (hepatitis B core antibody and hepatitis B surface antibody) will need to be ordered to confirm active infection if the hepatitis B surface antigen result is positive. ⑦

**Repeat Examinations**

Children who are transferred to another care provider program do not need to undergo another IME, unless specifically required by state law. If a new IME is required by state law, the care provider program should inform the FFS as well as the Division of Health for Unaccompanied Children (DHUC), and cite the relevant law for ORR review. If a new IME is performed, the new healthcare provider should be given a copy of the previous IME, including all lab and chest x-ray reports and vaccination records. Depending on the timing and previous diagnoses, not all components of the IME should be repeated; the care provider should consult with DHUC on these cases. For example, if the child was previously diagnosed with latent tuberculosis infection (LTBI), a repeat TB test (e.g., TST/IGRA, CXR) should not be performed. The vaccination record should be reviewed and the next round of vaccines given at the appropriate interval.

Children who are released from ORR custody, but are referred back into care will need another IME; however, they may not need all the components, depending on the results of their previous IME, length of time they were out of ORR custody, and exposure risk. In general, TB screening should be repeated if **more than 6 months have elapsed since the last screening** or if a new exposure to active TB is reported since the last screening and the child was not previously diagnosed with LTBI; if previously performed, HIV testing should be repeated if new exposure risk since last IME is revealed (IV drug use, sexual activity since last IME) and the child was not previously diagnosed with HIV infection; if previously performed, sexually transmitted disease testing should be repeated if new sexual activity since last IME is disclosed. The care provider should consult with DHUC on these cases. ⑦

**Follow-up Care**

Children should receive follow-up care for conditions identified during health exams, as directed by the healthcare provider. Examples:

- Children who fail a vision test (20/40 or worse in either or both eyes) during the IME should be referred to an optometrist.
- Pregnant girls should be referred for prenatal care.
- Children with a positive HIV test should be referred to an infectious disease specialist.

Children who remain in care for longer than 30 days should receive their next set of vaccinations per the <u>ACIP catch up schedule</u>. Children who remain in ORR care long-term should

Not Confidential

have routine well-child examinations scheduled at recommended intervals; in children over the age of 3 years, annual health exams are advised.

All follow-up care evaluations should be documented in the UAC Portal and documentation uploaded. 🕐✓🖑

## Initial Dental Exam and Follow-Up Care

Care providers must provide appropriate dental care to UAC by providing initial dental evaluations, urgent dental care services, and follow-up dental services, as necessary. Prior ORR authorization is required for all dental services.

### Initial Dental Evaluation and Six (6)-Month Dental Evaluation

Care providers must provide UAC an initial dental evaluation **within 90 days but not before 60 days after the UAC's date of admission into ORR care**. If state guidelines require an initial dental evaluation with a dentist before the UAC's 60th day in care, the care provider must email evidence of the relevant state guidelines to the Division of Health for Unaccompanied Children (DHUC) for prior authorization in advance of any dental provider visit occurring before the UAC's 60th day in ORR care. 🕐✉

The initial dental examination must be completed in a single visit to a dental provider. UAC may only receive one initial dental examination while in ORR care. If a UAC is in ORR care for six (6) months or longer, the care provider may schedule another dental evaluation. Dental evaluations may occur every six (6) months to ensure UAC dental health. ORR may, in its discretion, approve preventive dental services only for children in ORR care for six (6) months or longer. 🕐

If a UAC is transferred to another ORR care provider, the referring care provider must include all dental documentation with the UAC's transfer documentation, including initial dental examination information, if one was provided. 🗐

### Urgent Dental Care

ORR will authorize urgent dental care, only if the UAC:

- Is experiencing acute tooth pain;
- Needs one or more procedures to maintain basic function; OR
- Has a severe and/or acute infection or a severe and/or acute infection is imminent (e.g. an abscess in a tooth or gums).

UAC MAP Section 3: Services (Version 1.0)

Not Confidential

**Follow-Up Dental Services**

If a UAC received an initial dental evaluation and was given a treatment plan, care providers may request follow-up dental services via a TAR for UAC:

- Who have been in ORR care for longer than 90 days; OR
- Who are in long-term foster care.

If the UAC's treatment plan requires several procedures, care providers must ensure that the dental provider's treatment plan prioritizes procedures and treatments based on urgency and severity. DHUC will only approve up to four (4) procedures at one time but has discretion to approve more than four (4) procedures in one TAR in exceptional cases.

For each UAC requiring follow-up dental services, care providers may only submit up to four (4) procedures in one TAR and submit one TAR at a time. To request additional follow-up procedures, care providers must wait two weeks after the UAC's initial follow-up dental visit in order to submit another TAR to request up to four (4) more procedures. Care providers may repeat this two-week process until all follow-up dental procedures are complete. 🕮

# 3.4.3 Requests for Health Care Services

📖 See Section 3.4.3 of the UAC Policy Guide.

# 3.4.4 Medication Administration and Management

📖 See Section 3.4.4 of the UAC Policy Guide.

# 3.4.5 Responding to Medical Emergencies

📖 See Section 3.4.5 of the UAC Policy Guide.

# 3.4.6 Management of Communicable Diseases

📖 See Section 3.4.6 of the UAC Policy Guide.

Not Confidential

GOV-00016859

## 3.4.7 Maintaining Health Care Records and Confidentiality

📖 See Section 3.4.7 of the UAC Policy Guide.

## 3.4.8 Medical Clearance Prior to Release or Transfer

📖 See Section 3.4.8 of the UAC Policy Guide.

## 3.4.9 Provider Reimbursement

📖 See Section 3.4.9 of the UAC Policy Guide.

Payment for health services while in ORR care is managed by a third party entity, Point Comfort Underwriters (PCU). Healthcare providers are encouraged to enter into an agreement with PCU *before* providing care for UACs. Contracting with PCU in advance will facilitate the appointment scheduling and billing process.  Programs should submit the names of selected healthcare providers directly to PCU who will then contact the healthcare providers and work out an agreement. Facilities providing emergency or urgent services do not need to have an agreement with PCU prior to administering care.

Care provider programs must obtain approval from PCU by submitting a Treatment Authorization Request (TAR) before a mental, dental, and medical service occurs, unless it is an emergency or urgent. Guidance on submitting TARs can be found on the PCU Portal, https://maps.pointcomfort.com/login .

Payment for the IME is pre-approved with the Initial Examination Authorization number, which is automatically generated on each child's ID document in the PCU Portal. All labs and chest x-rays that are part of the IME are included under the Initial Examination Authorization number, and do not require separate TARs as long as tests are performed within 72 hours of the IME date.

ORR will not approve or reimburse retroactive TARs submitted for dental procedures but may, in its discretion, allow exceptions for dental emergencies that occur over a weekend or federal holiday.

Exhibit 4
Page 327

Not Confidential

GOV-00016860

# 3.5 Guiding Principles for the Care of UAC Who are LGBTQI

📖 See Section 3.5 of the UAC Policy Guide.

## 3.5.1 Zero Tolerance for Discrimination and Harassment

📖 See Section 3.5 of the UAC Policy Guide.

## 3.5.2 Prohibition on Segregation and Isolation

📖 See Section 3.S.2 of the UAC Policy Guide.

# 3.5.3 Confidentiality with Regards to Sexual Orientation and Gender Identity

📖 See Section 3.5.3 of the UAC Policy Guide.

## 3.5.4 Housing

📖 See Section 3.5.4 of the UAC Policy Guide.

## 3.5.5 Restroom and Dressing Area Accommodations

📖 See Section 3.5.5 of the UAC Policy Guide.

# 3.6 Long-Term Foster Care

📖 See Section 3.6 of the UAC Policy Guide.

## OVERVIEW

Foster care is the least restrictive placement option in the ORR continuum of care. As a community-based form of care, not all services will be provided within the residential structure of the foster/group home. UAC will typically access different elements of their care in several locations, including but not limited to, public school, foster care agency offices, foster homes, and counseling centers. ORR generally uses foster care, therefore, for more long-term placement and care of children, and implementation of procedures for their care may differ from shelter care settings.

Each foster family home must be licensed in accordance with state licensing regulations. However, ORR does not permit more than six children to a two-parent foster home, even if state licensing requirements allow for higher ratios. The number of children includes both foster and biological children. State-licensed group homes may have higher ratios, which are permissible by ORR. Placements must be based in individual needs and characteristics of each child and the overall makeup of the identified foster home.

Categories of long-term foster care providers include:

- Basic foster care: UAC resides with an unrelated licensed foster parent(s) and requires only the minimal services required in a licensed foster care setting.
- Therapeutic foster care: UAC resides with an unrelated licensed foster parent(s) but receives additional treatment services and/or supervision specific to the identified treatment needs. UAC with significant emotional, behavioral, medical, and/or developmental needs receive structured treatment within a therapeutic foster care setting.
- Basic group home: UAC resides in a living arrangement with a designated house parent(s) and/or staff. This setting is for those UAC who do not wish to be in a family setting.
- Therapeutic group home: UAC resides in a living arrangement with a designated house parent(s) and/or staff. The setting is for those UAC that have difficulties within a family setting and require therapeutic services/interventions due to significant emotional, behavioral, medical, and/or development needs.

## 3.6.1 ORR Long-Term Foster Care Service Provision

📖 See Section 3.6.1 of the UAC Policy Guide.

UAC MAP Section 3: Services (Version 1.0)

51

Exhibit 4
Page 329

Not Confidential

## PROCEDURES

In long-term foster care, an ORR care provider places the UAC with a state-certified caregiver, referred to as a "foster parent" or "house parent." The care provider is responsible for recruiting, assessing, selecting, credentialing, training, monitoring, and retaining foster/house parents and foster care sites.

The long-term foster care provider must establish community contacts for children, especially with regards to educational, health, spiritual, extra-curricular and recreational resources.

*Educational Services in a Community Based School*

UAC in a foster home attend state-regulated public school or other state-licensed educational programs in the local school district of the foster and/or group home during the academic year.

The foster care provider and foster parent take part in the selection of and arrangements for educational programs appropriate to UAC's age and abilities. Foster care providers and foster parents collaborate with school personnel and advocate as needed when there are any problems with UAC in the school setting.

In conjunction with the foster parents, the care provider's case manager takes an active role in attending school conferences, individual education plan (IEP) meetings, and similar activities, whenever possible.

For public school breaks longer than two weeks, care providers are required to develop a plan of study for UAC who are placed in foster care and submit it to their PO for approval.

**NOTE:** ORR is reviewing the year-round academic requirements for LTFC in light of the difficulty of individual foster homes to provide 6 hours of structured educational activities in the summer months.

*Telephone Calls, Visitation, and Mail*

(See also **Section 3.3.10** above)

UAC placed in LTFC can have access to a personal cell phone, computers, and other communication methods that help prepare them for making a successful transition to independent living. However, the care provider must develop and disseminate ground rules for foster homes to enforce with all UAC in care. Care providers or foster parents must communicate these ground rules verbally and in writing to the UAC.

Family visitation follows state licensing regulations. ORR does not permit family visits to take place in foster homes or group homes, but they may occur at the administrative offices of the foster care provider.

Not Confidential

GOV-00016863

Long-term foster care providers are not required to maintain telephone logs, except in cases with identified safety concern. In such cases, providers must maintain telephone logs as indicated in the child's safety plan.

*Travel and Overnight Trips*

Requests for travel and overnight trips must follow state licensing regulations.

Any travel or overnight trip request requiring custodian consent by state regulations and any travel request involving a child with flight risk or safety concerns requires prior approval by ORR. The care provider submits a request to the FFS **10 days prior to the trip departure date** and keeps a copy in the UAC's file. ⏀✉📄

Travel requests include information regarding travel destination, dates, mode and purpose, contact information and relationship of individual accompanying the UAC and exploration of any safety or security concerns.

*Counseling Services*

In accordance with the *Flores* Settlement Agreement, UAC in LTFC receive weekly individual counseling.

LTFC providers are encouraged to adapt group-counseling activities suitable to a community-based setting, such as youth advisory boards and foster youth support groups.

**NOTE:** At the request of a UAC, care providers are not required to complete the weekly individual counseling session or the group counseling session requirement of two group sessions per week. (See the addendum to the Cooperative Agreement.) Care providers must document this change in the UAC case file. ✉📄

*Case Management Services*

1. LTFC care providers must implement and administer a case management system that tracks and monitors a UAC's progress on a regular basis to ensure that each UAC receives the full range of program services.

2. Care providers' case managers meet with UAC, at a minimum, once a month, either in person (preferred) or by telephone. The foster care provider uses an interdisciplinary team approach that includes active participation by the child (as appropriate) and a complementary partnership between the case manager and foster parents, and other agency staff members and stakeholders as needed.

4. Case managers maintain the Individual Service Plan and **update every 90 days**. Planning for independent living should be included as part of the ISP for UAC in LTFC (meal planning, cooking, nutritional requirements, medical checkups, available health care, and financial literacy). ⏀📄

UAC MAP Section 3: Services (Version 1.0)

Not Confidential

GOV-00016864

5.   The case manager maintains the UAC's records in the UAC Portal. 🖰

# 3.6.2 Change in Placements While in ORR Long-Term Foster Care

## PROCEDURES

Foster care providers (LTFC and TFC) must notify the FFS, CFS and the CC **24 hours prior to a placement change** and follow state licensing requirements. The foster care provider must document the change of placement in the UAC's case file. ⊙✉ .

# 3.6.3 Additional Questions and Answers About This Topic

📖 See Section 3.6.3 of the UAC Policy Guide.

Q: Can a minor in LTFC work during the summer?

A: Yes, barring any concerns by the PO, if he/she has the proper credentials, including any necessary permits required under state law and is still in the UAC program.

If h/she is transferred to URM, then the decision would be made by the legal guardian, or whoever has legal authority for him (which may be the alien himself if he's above the age of majority) following state law where the minor resides.

Q: One of our foster parents has offered paying for driving lessons for one of our UAC in care. If this permitted?

A: Yes, if state licensing approves.

Q: What employment forms does a foster parent need to provide to the LTFC or TFC provider?

A: All foster parents must provide an I-9 form to ensure that he/she may work in the United States.

Q: May foster families have pets in the home?

A: As long as state licensing requirements are met (including proper pet vaccines and licensing), the PO has the discretion to approve. Foster families must be vigilant for signs of allergies in the UAC.

55

**Exhibit 4**
**Page 333**

Not Confidential

GOV-00016866

# Appendix 3.1 Checklist for Child Friendly Environment

The ORR policy is to ensure that, while adhering to state licensing requirements, UAC receive care a within a child-friendly residential environment that does not pose a safety risk to the child, staff, or neighborhood or a risk to the child of sexual abuse, sexual harassment, and inappropriate sexual behavior. The residential structure should emphasize a non-institutional, home-like atmosphere of care in the least restrictive environment.

| General Residential Structure | Yes/No |
|---|---|
| Controlled entry and exit from premises | |
| Clean | |
| Child-friendly (e.g. no fire, safety, or trip hazards; murals, colorful wall paint, pictures/posters on wall, etc.; youth permitted to personalize assigned room area with pictures, personal art work, etc.) | |
| Furniture and building are properly maintained | |
| Well-ventilated | |
| Adequately heated/cooled | |
| Cleaning chemicals inaccessible to youth | |
| Medical supplies/prescriptions inaccessible to youth | |
| Alarm systems in designated areas of the residential structure | |
| Video monitoring in common and living areas | |
| "Mirrored Windows"/windows in offices where staff and visitors meet with youth 1:1 | |
| Evacuation procedures posted prominently on each floor and at eye level for children and youth | |
| Fire extinguishers and smoke detectors in good working order and inspected as required | |
| Unsafe areas and equipment inaccessible to youth | |
| Infants/Toddlers – age appropriate furniture (e.g. cribs/bedding, high chairs, toys, outlet covers) | |
| Preprogrammed phones that provide some level of privacy and are accessible to youth | |
| Documents that should be posted/accessible to youth (In English and Spanish/language most commonly spoken by youth) | Yes/No |
| Grievance policies and procedures  (grievance forms readily available to youth) | |
| ORR posters with phone numbers for UC to report sexual abuse/harassment | |
| ORR *and* care provider pamphlets on sexual abuse/harassment (additional copies readily available) | |
| *Garza* and other ORR Required Notices and Booklets | |
| Bedrooms | Yes/No |

Not Confidential

GOV-00016867

| Adequately accommodate all youth (e.g. individual bed with mattress for each youth) | |
| Natural Light/Dark at night | |
| Private place for youth to store personal belongings | |
| Provision of appropriate bed linens | |
| Desk and chair in room | |
| **Bathrooms** | **Yes/No** |
| Soap | |
| Toilet paper | |
| Towels | |
| Hygiene items | |
| Bathroom in good working order (e.g. toilets, sinks, drains, etc.) | |
| Hot/cold water available in sink and shower/bath tub | |
| Appropriate privacy | |
| **Kitchen** | **Yes/No** |
| UAC dietary restrictions posted/accessible to staff | |
| Food stored in a sanitary manner | |
| Knives/sharp objects inaccessible to youth | |
| **Outdoor Areas** | **Yes/No** |
| Video monitoring for exterior of building and surrounding premises | |
| Play equipment safe and in good repair | |
| **Vehicles** | **Yes/No** |
| Vehicle in good repair including, car seats and seatbelts, fire extinguisher; first aid kit. | |
| Insurance/Inspection current | |
| **Other** | **Yes/No** |
| Secure locations to store UAC personal property/valuables | |

# Guidance Checklist for Child-Friendly Environment –
# Individual Foster Home Checklist

The ORR policy is to ensure that, while adhering to state licensing requirements, UAC are provided care and placement within a child-friendly residential environment that does not pose a safety risk to the child, staff, or neighborhood. The residential structure should emphasize a non-institutional, home-like atmosphere of care in the least restrictive environment.

| **General Residential Structure** | **Yes/No** |
| Clean | |
| Child-friendly (e.g. no fire, safety, or trip hazards) | |
| Furniture and foster home are properly maintained | |
| Well-ventilated | |
| Adequately heated/cooled | |

UAC MAP Section 3: Services (Version 1.0)

Not Confidential

GOV-00016868

| | |
|---|---|
| Cleaning chemicals inaccessible to youth | |
| Medical supplies/prescriptions inaccessible to youth | |
| Evacuation procedures posted prominently on each floor | |
| Fire extinguishers and smoke detectors in good working order | |
| Unsafe areas inaccessible to youth | |
| Infants/Toddlers – age appropriate furniture (e.g. cribs/bedding, high chairs, toys, outlet covers) | |
| **Documents that should be posted/accessible to youth** | **Yes/No** |
| Foster home rules | |
| **Bedrooms** | **Yes/No** |
| Adequately accommodate all youth (e.g. individual bed with mattress for each youth) | |
| Natural Light/Dark at night | |
| Private place for youth to store personal belongings | |
| Provision of appropriate bed linens | |
| **Bathrooms** | **Yes/No** |
| Soap | |
| Toilet paper | |
| Towels | |
| Hygiene items | |
| Toilets in good repair | |
| Hot/cold water available in sink and shower/bath tub | |
| Appropriate privacy | |
| **Kitchen** | **Yes/No** |
| UAC dietary restrictions posted/accessible | |
| Food stored in a sanitary manner | |
| Knives/sharp objects inaccessible to youth | |
| **Outdoor Areas** | **Yes/No** |
| Play equipment safe and in good repair | |
| **Vehicles** | **Yes/No** |
| Vehicle in good repair including, car seats and seatbelts | |
| Insurance/Inspection current | |

Not Confidential

GOV-00016869

# Appendix 3.2 Initial Intakes Assessment

**UC Identification**

First Name:

Last Name:

AKA:

Status:

Date of Birth:                                      Gender:

A No.:                                              LOS:

Age:                                               Current Program:

Child's Country of Birth:                          Admitted Date:

**Initial Intake Assessment**

A staff member trained in use of this form completes it within 24 hours of the child's admission at the care provider facility. The staff member completing this form must be trained to ask and gather sensitive information in a child-friendly and culturally appropriate manner. The purpose of this intake is to learn about the child and determine any discomfort that may affect the child's safety and wellbeing at the care provider's facilities goals. In particular, these questions should help identify the severity of any medical or mental health needs the child has, ensure that the meals are approached ways, facilitate gathering of basic identifying information, and inform the child's initial housing/bed assignment.

Child's Arrival Date/Time:                         Intake Interview Date/Time:

Child's Primary Language:

Intake conducted in what
language:

Date of departure from home
country:                                           Date of Arrival in the US (approx.):

**Family Information:**

Do you know anybody in the U.S.? Include relative and non-relative contacts in this section.

| Name | Relationship | Address | | Phone |
|------|--------------|---------|--|-------|
| Is there someone we can contact to let them know you are here? | | | | |

**Medical**

| | | |
|--|--|--|
| Have you experienced any physical/medical problems today or in the last 30 days? | Yes No | |
| If yes, please explain: | | |
| Have you experienced any physical/medical problems? | Yes No | |
| If yes, please explain: | | |
| Do you have any allergies? | Yes No | |
| If yes, please explain: | | |
| Do you have any special dietary needs? | Yes No | |
| If yes, please explain: | | |

Are you currently taking any prescribed or other medication? If yes, list below. Other medication may include herbal remedies, over-the-counter remedies etc.
Yes No

**Medication**

| Medication | Dose | Reason |
|------------|------|--------|

Observable or reported medical concerns (Check all that apply).

| Concern | Yes/No |
|---------|--------|
| Coughing | Yes No |
| Difficulty Breathing | Yes No |
| Dehydration | Yes No |
| Dizziness | Yes No |
| Confusion | Yes No |
| Fever | Yes No |
| Pregnant | Yes No |
| Exhaustion | Yes No |
| Lice | Yes No |
| Injuries | Yes No |
| Bruises | Yes No |
| Burns | Yes No |
| Scabies | Yes No |
| Vomiting | Yes No |
| Abdominal Pain | Yes No |
| Coughing Blood | Yes No |
| Nausea | Yes No |

Not Confidential                                   GOV-00016870

| | |
|---|---|
| Skin lesions/rash | Yes No |
| Sever/persistent headache | Yes No |
| Jaundice (Yellowing of the skin/whites of eyes) | Yes No |
| Neurological symptoms (Spasms, tics, uncontrollable movements, paralysis or numbness of any part of the body) | Yes No |
| Others/dott | Yes No |

**If injuries, wounds, bruises present, describe them and how they occurred:**

List of other medical concerns:

**Have you ever been to a doctor or stayed in a hospital?**   Yes No

If yes, please list any visit or stay for any reason. Also include visits to other healers or alternative treatment providers:

**Do you have a history of tuberculosis?**   Yes No

If yes explain:

**Do you have a history of seizures of convulsions?**   Yes No

If yes explain:

**Do you have any scars, birthmarks, or tattoos?**   Yes No

If yes explain:

If any observed or reported medical concerns are checked in the sections above, please report these to Program Director, shift supervisor, and/ or any on call medical staff immediately for further guidance on the need to seek immediate medical care.

**Mental Health (Check all that apply)**

| | |
|---|---|
| Tried to hurt yourself? | Yes No |
| Felt urges to hurt, injure or harm someone? | Yes No |
| Harmed anyone? | Yes No |
| Thought of attempting suicide or hurting yourself? | Yes No |
| Attempted suicide? | Yes No |
| Heard voices that others do not? | Yes No |
| Seen things or people that others do not see? | Yes No |
| Had trouble controlling anger or violent behavior? | Yes No |
| Are you having thoughts of harming yourself or someone else? | Yes No |

**Please explain any checked answers above:**

**Observable emotional concerns (Check all that apply)**

| | |
|---|---|
| Cooperative | Yes No |
| Uncooperative | Yes No |
| Alert | Yes No |
| Distracted | Yes No |
| Calm | Yes No |
| Excited | Yes No |
| Nervous | Yes No |
| Agitated | Yes No |
| Confused | Yes No |
| Sad | Yes No |
| Angry | Yes No |
| Other | Yes No |

If any the UC answered "yes" to any of the mental health questions and/or if any concerning behaviors and emotions were observed or reported, report to Program Director, shift supervisor, and/or any on call clinical staff immediately for further guidance on the need to seek mental health care.

**Are you having thoughts of harming yourself or someone else?**

**Safety Assessment**

**Do you feel safe now?**   Yes No

Explain if No:

**Do you fear that someone will harm you?**   Yes No

Explain if yes:

If the child answered "yes" to any of the safety health questions, report to Program Director or shift supervisor immediately for further guidance on how to ensure the child's safety.

Explain to the child where the child's room will be located in this facility, the number of potential roommates, the age and sex of the

roommates, and the bathroom and shower area associated with the potential room assignment. After having explained this, does he or   Yes No

she identify any specific fears about this potential housing assignment?

**Do you need anything right now?**

Interviewer summary of critical issues that need immediate attention:

Action taken (each action should correspond to the concern described above):

**Assessment For Risk**

The Assessment for Risk must be completed by a Clinician or qualified Case Manager within 72 hours of a child or youth's admission to the care provider facility.

**Do you feel safe in your current room assignment or the assignment that will be given to you?**   Yes No

Explain:

**Has anyone made any inappropriate comments to you about your body, clothes, or appearance that made you uncomfortable so far at this facility?**   Yes No

Explain:

Do you identify as:

If the child or youth identified as transgendered or intersex, then ask whether the child or youth would rather have a female or male staff member conduct a pat down search if one was necessary?

Do you feel safe telling people about your sexual preference during your time in ORR care?

Explain

Is there something that you think we can do to help you feel safe and comfortable while you are here?

Explain

Do you find that people make a lot of sexual comments to you or about you?

Explain

Have you ever been sexually active?

Have you ever felt like you needed to perform sexual favors or allow someone to touch your body in a sexual way in order to avoid additional harm, to obtain things you needed or wanted, or to be accepted by a person or group of people?

Explain

Have you ever been in trouble for having sex with another person?

Explain

Have you ever had to talk to a counselor, social worker, psychologist, teacher, or any other adult because of a sexual experience you had?

Explain:

QUESTIONS FOR CLINICIAN TO ANSWER: [Every Question Must Be Answered]

Does the child or youth exhibit any gender nonconforming appearance or manner?

Explain:

Does the child or youth have any current or criminal charges?

Explain:

Explain:

Does the child or youth have any mental, physical, or developmental disability or illness or suspected of having any of the above?

What is the child's physical size and stature?

Other specific information that may indicate heightened needs and/or additional safety precautions:

Explain:

HOUSING, OTHER SERVICE ASSIGNMENTS, AND FOLLOW-UP

Housing and Other Service Plan

Clinician shared appropriate information with relevant care provider facility team

Explain:

Child or youth provided with psycho education on identified issue

Explain

Child or youth provided with information on how to report threats, intimidation, or harassment by other children, youth, or facility staff

Explain:

Child or youth moved to a private room

Explain

Child or youth moved to a room/dormitory area that matches the child or youth's gender identity (if different from sex)

Not Confidential

GOV-00016872

Child or youth provided with alternative bathroom facilities or schedule

Explain:

Child or youth placed in educational or activities group(s) to reflect child or youth's gender identity (if different from sex)

Explain:

Developed and implemented a safety plan between child or youth, clinician, and care provider staff to address a specific issue

Explain:

Implemented increased clinical sessions

Explain:

Child or youth referred for professional mental health services

Explain:

Child or youth placed on closer staff supervision

Explain:

Staffed with FFS and CC for possible transfer

Explain:

Other:

Explain:

Staff Signature:                                                      Date:

Staff Name:                                                          Staff Title:

Translator's Signature:                                             Date:

Translator's Name:                                                  Language:

62

**Exhibit 4**

**Page 340**

Not Confidential

GOV-00016873

# Appendix 3.3 *Garza v. Azar* Notice (English and Spanish)

---

Please read this notice.

If you are pregnant, you have the right to decide whether to have the baby or to have an abortion.

No one who works for the government or the shelter can force your decision either way.

No one who works for the government or the shelter can tell anyone about your pregnancy or decision to have an abortion if you don't want them to do so.

---

A United States court has approved a legal case on behalf of all pregnant women in this shelter. The legal case was filed to prevent the government or the shelter from interfering with your ability to get information about abortion, and to get an abortion if you want one. If you are pregnant, you are protected by the lawsuit.

If you are pregnant and are having problems getting information about abortion, or getting an abortion, or if feel that you are being pressured not to get an abortion, please contact attorney Lindsey Kaley by telephone at 212-549-2633 or email at lkaley@aclu.org.  She speaks English and Spanish. Please tell her:

- Your name

- Your A-number

- Your location (shelter name, city, state)

> Por favor lea este aviso
>
> Si está embarazada, tiene el derecho a decidir si desea tener un bebe o un aborto.
>
> Ningún agente del gobierno ni personal del albergue puede forzar su decisión de una manera u otra.
>
> Ningún agente del gobierno ni personal del albergue puede decirle a nadie sobre su embarazo o la decisión de hacerse un aborto si no quiere que lo haga.

Un tribunal de los Estados Unidos ha aprobado un caso legal en nombre de todas las mujeres embarazadas en este albergue. El caso legal fue presentado para impedir que el gobierno o el albergue interfieran con su capacidad de obtener información sobre el aborto y hacerse un aborto si lo desea.

Si está embarazada, está protegida por la demanda judicial.

Si está embarazada y tiene problemas para obtener información sobre el aborto o para hacerse un aborto, o si siente que la están presionando para que no consiga un aborto, por favor contacte la abogada Lindsey Kaley por teléfono al 212-549-2633 o por correo electrónico a lkaley@aclu.org. Ella habla inglés y español. Por favor dile:

- Su nombre

- Su número A

- Su ubicación (nombre del albergue, cuidad, estado)

Not Confidential

# Appendix 3.4 Notice for Shelters (English and Spanish)

**If you are pregnant and want information about support for your pregnancy, you may speak to your clinician. As an alternative, you may call any of the following organizations, which are experienced in counseling women who have an unexpected pregnancy:**

**Option Line: 1-800-712-HELP**

**Pregnancy Decision Line: 1-877-791-5475**

**Sisters of Life: 1-877-777-1277**

**If you are pregnant, the Office of Refugee Resettlement will provide prenatal and medical care for you. If you give birth while in ORR custody, ORR will care for both you and your child.**

**ORR also offers assistance to help you care for your child, or – if you wish—to plan for an adoption.**

Not Confidential

GOV-00016876

**Regardless of any decisions you make or have made regarding your pregnancy, you can count on ORR to provide you with the same high standard of care.**

**If you have any questions about this information, please ask your clinician or case manager.**

# Appendix 3.5 Assessment for Risk

## Assessment for Risk

First Name:
[redacted]

Last Name:
[redacted]

AKA:

| | | | |
|---|---|---|---|
| Status: | [redacted] | | |
| Date of Birth: | [redacted] | Gender: | [redacted] |
| A No.: | [redacted] | LOS: | [redacted] |
| Age: | [redacted] | Current Program: | [redacted] |
| Child's Country of Birth: | [redacted] | Admitted Date: | [redacted] |

INSTRUCTIONS: A care provider facility Clinician or Qualified Case Manager must complete the Assessment for Risk in the ORR database within 72 hours of a child or youth's admission. It must be updated every 30 days. The purpose of the assessment is to identify risk factors for potential sexual victimization or sexual abuse tendencies so early intervention can take place to mitigate any potential risks or safety concerns. Although the assessment presents a specific list of questions, the Clinician or Qualified Case Manager is expected to draw upon his/her professional training to obtain any additional information that may contribute to a thorough assessment. The assessment includes questions that the Clinician or Qualified Case Manager obtains from the child or youth as well as questions that the Clinician or Qualified Case Manager must answer based on his/her professional assessment of the individual case.

Child's Primary Language: [redacted]

Intake conducted in what language [redacted]

INFORMATION CLINICIANS OR QUALIFIED CASE MANAGERS OBTAIN FROM CHILD OR YOUTH

1. Do you feel safe in your current room assignment or the assignment that will be given to you? (•) Yes ( ) No

   If No, explain:

   N/A

2. Has anyone made any inappropriate comments to you about your body, clothes, or appearance that made you uncomfortable at the facility? ( ) Yes (•) No

   If Yes, explain:

3. Do you identify as:
   - ☐ Decline to Answer
   - ☑ Straight
   - ☐ Lesbian
   - ☐ Gay
   - ☐ Bisexual
   - ☐ Questioning
   - ☐ Intersex-Identify as Male
   - ☐ Intersex-Identify as Female
   - ☐ Transgender (Select an option below): ( ) Male to Female ( ) Female to Male ( ) Other, Specify
   - ☐ Other, Specify:

4. If the child or youth identified as Transgender or Intersex, Click Here: ☐

   If you clicked the box, then answer the following:

   (a) Ask whether the child or youth would rather be housed with boys or girls?

   ( ) Housed with Boys ( ) Housed with Girls (•) No Preference

   (b) Ask whether the child or youth would rather have a female or male staff member conduct a pat down search if one is necessary:

   ( ) Male Staff ( ) Female Staff (•) No Preference

5. Do you feel safe talking to people about your sexual preference or gender identity since you have been here? (•) Yes ( ) No

   If No, explain:

   N/A

6. Is there something that you think we can do to help you feel safe and comfortable while you are here? ( ) Yes (•) Not at this time

   If Yes, explain:

   N/A

7. Do you find that people make a lot of sexual comments to you or about you? ( ) Yes (•) No

   If Yes, explain:

8. Have you ever been sexually active?

   ( ) Decline to Answer, Explain: N/A

   (•) Yes, if yes, ask whom: (•) With Males Only ( ) With Females Only ( ) With both Males and Females

   ( ) No

   ( ) Other Specify [redacted]

   If you click Yes above, please ask the following: Have you ever had a sexual experience that was not consensual? ( ) Yes (•) No

   Explain:

   N/A

Exhibit 4
Page 345

9. Have you ever felt like you needed to perform sexual favors or allow someone to touch your body in a sexual way in order to avoid additional harm, to obtain something you wanted, or to be accepted by a person or group of people?  ⬤ Yes ⬤ No

If Yes, explain:

N/A

10. Have you ever spoken to a counselor, social worker, psychologist, teacher, or any other adult because of a sexual experience you had?  ⬤ Yes ⬤ No

If Yes, explain:

N/A

INSTRUCTIONS: After interviewing the child or youth and reviewing relevant case files and other records, Clinicians and Qualified Case Managers must use their professional opinion to answer the following questions.

QUESTIONS FOR CLINICIANS OR QUALIFIED CASE MANAGERS TO ANSWER

1. Does the child or youth exhibit any gender nonconforming appearance or manner?  ⬤ Yes ⬤ No

If Yes, explain:

N/A

2. Does the child or youth have any current or past criminal charges?  ⬤ Yes ⬤ No

If Yes, List the Charges and Explain:

N/A

3. Does the child or youth have any mental, physical, or developmental disability or illness or suspected or known physical abuse?

⬤ No

⬤ Yes    ☐ Mental ☐ Physical ☐ Developmental

Explain: N/A

⬤ Suspected    ☐ Mental ☐ Physical ☐ Developmental

Explain: N/A

4. What is the child's physical size and stature?    ⬤ Average  ⬤ Smaller than Average  ⬤ Larger than Average

5. Other specific information that may indicate heightened needs and/or additional safety precautions:  ⬤ Yes ⬤ No

If Yes, explain:

N/A

INSTRUCTIONS: After completing the above assessment, determine if any housing and other service assignments are needed to ensure the safety and wellbeing of the child or youth. Describe housing and other service assignments here. Indicate specific actions and follow-up. If housing and other service assignments are changed at any time, including after the initial placement, describe the change and the reason for the change here.

HOUSING, OTHER SERVICE ASSIGNMENTS, AND FOLLOW-UP

1. Housing and Other Service Plan

N/A

2. Is the child or youth considered transgender or intersex, Click Here: ☐

If yes indicate the way, answer the following:

(a) The child or youth was placed in a room/dormitory that reflects the minor's preference    ⬤ Yes ⬤ No

Explain:                                                        N/A

(b) The child or youth was placed in educational or activities group(s) to reflect the minor's preferences    ⬤ Yes ⬤ No

Explain:                                                        N/A

3. Actions Taken (Mark all that apply)

☐ Clinician or Qualified Case Manager shared appropriate information with relevant care provider facility teams

Explain:

N/A

☐ Child or youth provided with psycho-education or identified issue

Explain:

☐ Child or youth provided with information on how to report threats, intimidation, or harassment by other children, youth, or facility staff

Explain:

████████████████████████████████████████████████

☐ Developed and implemented a site safety plan between child or youth, clinician, and care provider staff to address a specific issue

Explain:

☐ Child or youth provided with additional or alternate restroom accommodations

Explain

N/A

☐ Implemented increased clinical sessions

Explain:

N/A

☐ Child or youth referred for professional external mental health services

Date of Referral:

Explain:

Not Confidential

GOV-00016879



☐ Child or youth referred for medical services
Date of Referral
Explain:
N/A
☐ Child or youth placed on closer staff supervision
Explain:
N/A
☐ Staffed with PFS and CO for possible transfer
Explain:
N/A
☐ Other
Explain:
N/A
☐ Other Attachments

Staff Signature:
Staff Name:
Staff Title:    Counselor

Date/Time:

Translator's Signature:
Translator's Name:
Language:

Date/Time:

# Appendix 3.6 Interviewing Guidance for Clinicians and Caseworkers

## INTERVIEWING GUIDANCE FOR CLINICIANS AND CASEWORKERS

Case Workers and Clinicians must use the suggested questions below when initially interviewing UAC for the Case Summary and ISP.  During interviews with UAC, Clinicians and Case Workers must follow-up on UAC's comments and responses appropriately.   They must avoid reading the following questions verbatim and instead use them as a guide to engaging UAC and to track if all areas have been assessed.  Both professionals must also continue to build rapport with the UAC and continuously assess the UAC during his/her placement.

### ——— SUGGESTED INTERVIEW QUESTIONS ———

#### BACKGROUND HISTORY

- Where did you reside prior to arriving here at this program?
- How long did you live there?
- With whom did you live?
- What was your experience like there?
- What did a typical day look like for you?
- Have you lived anywhere else?  With whom?  When and for how long?
- What brought you to the United States?
- When did you leave home country?
- With whom did you travel to the U.S.?

- What happened along the journey here?
- How and where were you apprehended?
- What was your plan for when you arrived in the U.S.?  With whom did you plan to live, if anyone?
- Where were you planning on living and what were you planning on doing in the U.S.?
- Had you been to the U.S. before this journey?  *If yes*- When did you come to the U.S.?  For how long were you in the U.S.?  What brought you here then?

#### FAMILY/SIGNIFICANT RELATIONSHIPS
*If the Case Worker has already gathered contact information regarding the UAC's family, it may not necessary for you to gather this information.*

- Where are your mother and father?
- Do you have siblings?
- Do you have family in the U.S.?  Do you know anyone else in the U.S.?
- *If yes to any of the above, for each person:* What is his/her name and age?  Where does he/she live?  What has your relationship been like with him/her?  When is the last time you contact with him/her, and what kind of contact did you have (e-mail, phone, mail)?  How often have you been in contact with his/her and for how long?  What kind of contact have you had in the past with him/her?  Do you have his/her current contact information?

- Are you a parent to a child?  *If yes*- Where is the child?  Who is the mother/father?  How would you like to be involved as a parent to your child?
- Are you married or single?  *If the UAC is married*- Who is your spouse?  Where is your spouse?  How long have you been married?  What is your relationship like with your spouse?

#### CULTURAL BACKGROUND

- What languages and dialects do you speak?
- Are you spiritual or religious?  *If yes*- What are your beliefs?
- What faith do you practice, if any?  How do you practice your faith?
- Are there traditions you have practiced, through your family or in your home country, which are important to you?  *If yes*- What are they?

- While in DCS care, what religious practices or traditions do you want to continue?
- Is there anything else you would like to share about your culture or background?

#### MEDICAL

- Do you have any medical conditions that you know of?  *If yes*- Please explain.
- Do you feel any pain/discomfort?  *If yes*- Please explain.
- Have you ever been hospitalized?  *If yes*- When?  What happened?  How long were you hospitalized for and where?  What was the outcome of the hospitalization?

- Have you ever taken medication?  *If yes*- What was the medication(s)?  When is the last time you took this medication?  Do you know the dosage?  *If yes*- what is the dosage and times taken per day?  To your knowledge, should you still be on any medication?
- Do you have any allergies?  *If yes*- What are you allergic to?
- Have you been sexually active?  *If yes*- when is the last sexual encounter you had and with whom?  Did you practice safe sex?

UAC MAP Section 3: Services (Version 1.0)

Not Confidential

GOV-00016881

- Have you ever received medical treatment? *If yes-* What for and when? What happened? What was the outcome of this treatment? Where was the treatment provided?

- Have you ever caught an illness from sexual contact? *If yes-* What illness, from whom and when?
- Is it possible that you are pregnant? What was the date of your last menstrual cycle?

## CRIMINAL HISTORY

- Have you ever been arrested or charged with a crime? *If yes, for each charge ask*: What happened? When did this happen? Where did this happen? What was the outcome in court?
- Are you on probation? *If yes-* When did probation start? How long will it last and in what state? What are the conditions of your probation? Do you know the name and number of your probation officer?
- Are you on parole? *If yes-* When did parole start? How long will it last and in what state? What are the conditions of your parole? Do you know the name and number of your parole officer?

- Have you ever been held in juvenile detention or adult jail? *If yes-* How many times? *For each time-* Where were you held? How long were you incarcerated? What were the dates of incarceration, as you can best remember?
- Have you experienced any violence or threats while in government custody (local, state and DCS custody)? *If yes-* What happened? Where did this happen? When did this happen?
- Have you ever been involved in a gang? *If yes-* What gang(s) and for how long? How did you become involved? When did you become involved? What was your involvement in the gang? Did you have specific roles or responsibilities? *If yes-* What were these roles and responsibilities?

## EDUCATION

- What other schools have you attended? When did you attend these schools?
- How many years of schooling have you had?
- Where did you last attend school? What level/grade was this?

- What classes/subjects do you feel strongest in?
- What classes/subjects would you like to work on or improve?
- What are your educational goals (e.g.: high school diploma, GED)?

## LEGAL

- Do you have and have you ever had an attorney? *If yes and if applicable-* What is the attorney's name and contact information? On what matter/case did this attorney represent you and in what court? When (what dates) did the attorney represent you? Who provided or arranged for your attorney?

## UAC's PRIMARY AND CONCURRENT CASE OUTCOME GOALS

- What is your first choice for where and with whom you want to live after being in DCS care?
- What makes this your first choice?
- Right now, what is your second choice for where you want to live/be after being in DCS care?

*If there is a potential sponsor(s), for each potential sponsor:*
- Have you lived with this person before? *If yes-*
  - When did you live with this person?
  - Where did you live with this person?
  - For how long did you live with this person?
  - What was it like living with this person before?
  - What did your day look like?
  - Did you attend school?
  - Did you work? *If yes-* What kind of work were you doing?
  - Where did you sleep?
  - How did this person discipline you?
  - Who else lived in the home?
  - When is the last time you had contact with this person?
  - What kind (phone/e-mail etc) of contact have you had?
  - How frequent was your contact?

## SHORT-TERM GOALS

- What goals would you like to accomplish while in DCS care? These goals can be anything from educational, vocational, athletic, artistic, and/or related to how you want to feel or behave.

## OTHER SIGNIFICANT ISSUES

- Is there anything else you think we should know?

Not Confidential

GOV-00016882

## STRENGTHS/RESILIENCY/COPING SKILLS

- What do you think are your biggest strengths?
- What do you think are your best skills?

- What kinds of activities do you enjoy doing?
- What/who has helped you get through difficulties?

## BEHAVIORAL ISSUES

- What was your behavior like in the past, before coming to DCS?

- Was your behavior any different before you were in DCS care? *If yes-* How was your behavior different? What do you think makes your behavior different here?

## MENTAL HEALTH

*Assess UAC's orientation to person, time and place:*

- What's your name?
- Do you know today's date? What is today's date?
- Do you know where you are? Where?

In the past 60 days, have you had any of the following happen? (*If UAC answers yes to any of the following, ask follow-up questions for more details*).

- Sleeping too little or too much
- Had nightmares
- Had difficulty paying attention
- Felt hopeless about the future
- Felt very sad
- Experienced serious anxiety
- Had trouble controlling anger or violent behavior

Have you ever had any of the following happen: (*If UAC answers yes to any of the following, ask follow-up questions for more details*).

- Ever tried to hurt yourself
- Had urges to beat, injure or harm someone
- Ever thought about attempting suicide
- Ever attempted suicide
- Heard voices that others do not hear

*Use your clinical skills to conduct additional clinical assessment of the UAC as appropriate to evaluate the UAC's level of post-traumatic stress, depression and exposure to violence. Below are some example questions. Conduct additional assessment and ask different questions when needed and appropriate:*

- Do you have any mental health conditions that you know of? *If yes-* What conditions?
- Have you ever been psychiatrically hospitalized? *If yes-* When? What happened? How long were you hospitalized for and where? What was the outcome of the hospitalization?
- Have you ever received mental health treatment? *If yes-* What for and when? What happened? What was the outcome of this treatment? Where was the treatment provided?
- Have you ever taken psychotropic medication? *If yes-* Which medications have you taken? When is the last time you took this medication? What is the dosage and times taken per day, if you recall? To your knowledge, should you still be on any medication? *If yes-* What medication?
- Have you ever used drugs or alcohol? What are the names of substances? *For each substance:* What was your age when you first used? How often did you use and how much? What was the last date you used?
- Did anyone in your family use drugs or consume alcohol? *If yes-* Who? What substances did he/she use? How much and how often?

## TRAUMA AND CHILD PROTECTION

- Have you ever lived on the street? *If yes-* Can you describe how this happened? Where and for how long did you live on the street?
- Have you witnessed acts of violence? *If yes-* What happened?
- Have you lost any friends or family to violence? *If yes-* What happened?
- Have you ever been hit or hurt in any way that left bruises or other marks on or caused pain? *If yes-* What happened? When did this happen? How many times did this happen? Who hurt you? Where is this person/people now?

- Has anyone ever touched you or did something in a way that made you feel uncomfortable or confused? *If yes-* What happened? When did this happen? How many times did this happen? Who did this? Where is this person now?
- Has anyone ever forced you to touch someone or to do anything uncomfortable? *If yes-* What happened? When did this happen? How many times did this happen? Who did this? Where is this person now?

## TRAFFICKING AND EXPLOITATION

Not Confidential

GOV-00016883

_Recruitment /Transportation:_

- Who planned/organized your journey?
- What were you told about the arrangements before the journey?
- Did the arrangements change during the journey? _If yes-_ How did they change?
- Does your family owe money to anyone for the journey?
- How much money was charged or promised?
- Who is expecting to be paid?
- Are you expected to pay for the journey? _If yes-_ How?
- What do you expect will happen if the person owed is not paid?

_Coercion/Control Indicators:_

- Did anyone threaten you or your family? _If yes-_ Who and what happened?
- Were you ever physically harmed?
- Was anyone around you ever physically harmed? _If yes-_ Who was harmed and what happened?
- Were you ever held against your will? _If yes-_ Who held you and what happened?
- Did anything bad happen to anyone else in this situation or anyone else who tried to leave? _If yes-_ What happened exactly?
- How many other people were in this situation?
- Did anyone ever keep/destroy your documents? _If yes-_ Who did this and what documents?
- Did anyone ever threaten to report you to the police/immigration? _If yes-_ Who did this and what did they say exactly?
- Are you worried anyone might be trying to find you?

_Debt Bondage/Labor Trafficking Indicators:_

- Were you involved in any labor or services?
- Did you perform any work or provide any services?
- Who arranged the work?
- What type of work did you perform?
- What was the work schedule? (Hours per day, days per week, what times of day/night?)
- Did you have to work for anyone in a home?
- What were you told when he/she began working?
- Did work conditions change over time?
- Is there a debt? _If yes-_ Has any debt amount increased? By how much? When did it increase? Why did it increase?
- Have you or your family ever been threatened over payment or work for the journey? _If yes-_ Who threatened you and how exactly?
- What did you expect would happen if you left the job or stopped working?
- Were you ever made to work or do anything you did not want to do?
- Were you paid to work?
- Did you receive pay or did someone else keep the pay?
- Were you paid what was promised when you started working?
- Were expenses taken out of the pay? What did the pay go towards?
- How did you get to the work site?
- Where did you live while working?

_Commercial Sex Indicators_

- Did anyone ever ask you to see you naked or in your underwear in exchange for money/anything of value?
- Did anyone ever pay/accept money/anything of value from other people in order to see you naked or in your underwear?
- Did anyone ever ask to take pictures or recording of you naked or engaged in sex acts?  If so, did they offer you money/anything of value to do this or did they accept money/anything of value from others in order to see these pictures or recordings?
- Did anyone ever ask or expect you to perform sexual acts in exchange for money/anything of value? _If yes-_ Who asked you and what happened?
- Did anyone ever promise or give money/anything of value to you in exchange for sexual acts? _If yes-_ Who asked you?  What did he/she promise?

UAC MAP Section 3: Services (Version 1.0)

**Exhibit 4**
**Page 351**

Not Confidential

GOV-00016884

# Appendix 3.7 UAC Assessment

The HHS/ORR/DUCS/ Interview of UAC/DUCS .... is used to conduct a relevant Unaccompanied Alien Child (UAC) assessment, which takes place during the initial intake of the UAC. The assessment is completed by the case manager, which are obtained from the UAC, case file, and other available sources.

First Name:

Last Name:

AKA:
Status:
Date of Birth:                                      Gender:
A No.:                                               LOS:
Age:                                                 Current Program:
Country of Birth                                     Admitted Date:
City of Origin                                       Neighborhood of Origin

Previous Placement:
Religious Affiliation:
Case Manager:
Clinician:

Describe day to day life in home country'
Why did you decide to travel to the U.S. at this time?

   Did the child mention any U.S. immigration policy or practice as a factor in his/her decision to travel to the U.S.?
   ☐ Yes ☐ No
   For UC aged 14-17 ONLY: Did the child mention economic, job, or educational opportunities as a factor in his/her decision to travel to the U.S.?
   ☐ Yes ☐ No
When did you leave your home country (month, day, year)?

   How long did the trip take?

How did you get to the U.S.?

Who did you travel with?

Who were you living with when you decided to leave your home country?

Where were you planning on living in the U.S. and with whom?

Where were you apprehended?

   At which U.S. Border Patrol sector did the child cross into the U.S.?
   ☐ age of the Ave ones, TX
Have you ever been to the U.S. before? ☐ Yes ☐ No
If yes, when?

The child's experience and additional information regarding journey and apprehension:

Has Family in Country of Origin? (If yes, list below)          ☐ Yes ☐ No
Family in Country of Origin

|  |  |  |
|---|---|---|
|  |  | -- Select Relationship -- |
|  |  | -- Select Relationship -- |

Has Family in the U.S.? (If yes, list below)                   ☐ Yes ☐ No
Family and Family Friends in the U.S.

|  |  |  |
|---|---|---|
|  |  | -- Select Relationship -- |

Parent's whereabouts?

Are you married?                                ☐ Yes ☐ No
Spouse Name, Age, and Location:

UAC MAP Section 3: Services (Version 1.0)

74
**Exhibit 4**
**Page 352**

| Has Children? (If yes, list below) | | | | ☐ Yes ☐ No |
| --- | --- | --- | --- | --- |
| Children | | | | |
| Name of child | Age | DOB | Current Location | Name of Mother/Father |

Have you ever been hurt, physically, mentally or emotionally by someone taking care of you?   ☐ Yes ☐ No

If yes, who and when?

Have you ever been taken to the hospital/emergency room because you were hurt?   ☐ Yes ☐ No

If yes, explain:

What does the word "discipline" mean to you?

| | | Medical | |
| --- | --- | --- | --- |

List any allergies:

Do you feel unwell?   ☐ Yes ☐ No

If yes, what are your symptoms?

Additional medical information:

Medical History

| | Yes/No | If yes, list medications/current status | |
| --- | --- | --- | --- |
| Pregnant | ☐ Yes ☐ No | | |
| Tuberculosis | ☐ Yes ☐ No | | |
| Varicella | ☐ Yes ☐ No | | |
| Measles | ☐ Yes ☐ No | | |
| Mumps | ☐ Yes ☐ No | | |
| Rubella | ☐ Yes ☐ No | | |
| Asthma | ☐ Yes ☐ No | | |
| Diabetes | ☐ Yes ☐ No | | |
| Cancer | ☐ Yes ☐ No | | |
| Cardiac Issues | ☐ Yes ☐ No | | |
| Sexually Transmitted Disease | ☐ Yes ☐ No | | |
| Respiratory/Lung Disorder | ☐ Yes ☐ No | | |
| Physical Disability | ☐ Yes ☐ No | | |

Medication History:

**Education**

What is the highest level of education you have completed?

When was the last time you were in school? What age?

| | | Legal | |
| --- | --- | --- | --- |
| Know Your Rights Presentation provided? | ☐ Yes ☐ No | | |
| When?: | | | |
| Legal screening completed? | ☐ Yes ☐ No | | |
| When?: | | | |
| Any possible legal relief identified? | ☐ Yes ☐ No | | |
| Specify: | | | |

| | | | Criminal History | | |
| --- | --- | --- | --- | --- | --- |
| Any Criminal history? (If yes, list below) | ☐ Yes ☐ No | | | | |
| List any felony convictions: | | | | | |

List any Misdemeanor convictions:

List any Probation/Parole:

List and describe any disclosed criminal activity:

Additional information:

History of incarceration

| Felony | Date | Length of time in Custody | |
| --- | --- | --- | --- |

UAC MAP Section 3: Services (Version 1.0)

Not Confidential

GOV-00016886

**Mental Status Evaluation**

| | |
|---|---|
| Attitude | ☐ Calm and Cooperative ☐ Other |
| | If other, describe: |
| Behavior | ☐ No Unusual Movements or Psychomotor Changes ☐ Other |
| | If other, describe: |
| Speech | ☐ Normal Rate/Tone/Volume ☐ Other |
| | If other, describe: |
| Affect | --- Please Select --- |
| | If other, describe: |
| Mood | --- Please Select --- |
| | If other, describe: |
| Thought Process | ☐ Goal-oriented and Logical ☐ Disorganized ☐ Other |
| | If other, describe: |

Thought Content:

Suicidal Ideation
☐ None ☐ Passive ☐ Active
If active:
Plan: ☐ Yes ☐ No
Intent: ☐ Yes ☐ No
Means: ☐ Yes ☐ No
--- Please Select ---
If other, describe:

Homicidal Ideation
☐ None ☐ Passive ☐ Active
If active:
Plan: ☐ Yes ☐ No
Intent: ☐ Yes ☐ No
Means: ☐ Yes ☐ No

| | |
|---|---|
| Perception | ☐ No Hallucinations or Delusions During Interview ☐ Other |
| Orientation | ☐ Time ☐ Place ☐ Person ☐ Self |
| | If other, describe: |
| Memory/Concentration | ☐ Short term intact ☐ Long term intact ☐ distractible/inattentive |
| | If other, describe: |
| Insight/Judgment | ☐ Good ☐ Fair ☐ Poor |

**Mental Health**

Have you ever talked to a psychiatrist, psychologist, therapist, social worker or counselor about an emotional problem?   ☐ Yes ☐ No
When:

Have you ever felt you needed help with your emotional problems, or have you had people tell you that you should get help for your emotional problems?   ☐ Yes ☐ No
When:

Have you ever been advised to take medication for anxiety, depression, hearing voices or for any other emotional problems?   ☐ Yes ☐ No
When:

Have you ever been seen in a psychiatric emergency room or been hospitalized for psychiatric reasons?   ☐ Yes ☐ No
When:

Have you ever heard voices no one else could hear or seen objects or things that others could not see?   ☐ Yes ☐ No
When:

Have you ever been depressed for weeks at a time, lost interest or pleasure in most activities, had trouble concentrating and making decisions or thought about killing yourself?   ☐ Yes ☐ No
When:

Did you ever attempt to kill yourself?   ☐ Yes ☐ No
When:

Have you ever had nightmares or flashbacks as a result of being involved in some traumatic/terrible event? For example, warfare, gang fights, fire, domestic violence, rape, murder, accident, being killed.   ☐ Yes ☐ No
When:

Have you ever given in to an aggressive urge or impulse on more than one occasion that resulted in serious harm to others or led to the destruction of property?   ☐ Yes ☐ No
When:

**Substance Use History**

| Substance | Have you ever tried? | No. years of Use | Date of Last Use |
|---|---|---|---|
| Alcohol | ☐ Yes ☐ No | | |
| Marijuana | ☐ Yes ☐ No | | |
| Cocaine | ☐ Yes ☐ No | | |
| Other Stimulants (Meth, Ritalin, etc) | ☐ Yes ☐ No | | |
| Heroin | ☐ Yes ☐ No | | |
| Other Opiates (Oxycodone, Morphine, etc) | ☐ Yes ☐ No | | |
| Nicotine | ☐ Yes ☐ No | | |

Not Confidential

GOV-00016887

Who planned/organized your journey?

Did a family member or family friend pay for your travel to the U.S.?  ☐ Yes ☐ No

What were you told about the arrangements before the journey?

Did the arrangements change during the journey?  ☐ Yes ☐ No

If yes, how?

Does your family or family friend owe money to anyone for the journey?  ☐ Yes ☐ No

If yes, how much?

Whom is the money owed?

Who is expected to pay?

What do you expect to happen if payment is not made?

**Coercion Indicators**

Did anyone threaten your or your family?  ☐ Yes ☐ No

If yes, who made the threats?

Were you ever physically harmed?  ☐ Yes ☐ No

If yes, how?

Was anyone around you ever physically harmed?  ☐ Yes ☐ No

If yes, how?

Were you ever held against your will?  ☐ Yes ☐ No

If yes, where?

Did anything bad happen to anyone else in this situation or anyone else who  ☐ Yes ☐ No
tried to leave?

What happened and to whom?

Did anyone ever keep/destroy your documents?  ☐ Yes ☐ No

If yes, who and what?

Did anyone ever threaten to report you to the police/immigration?  ☐ Yes ☐ No

If yes, who?

Are you worried anyone might be trying to find you?  ☐ Yes ☐ No

If yes, who?

**Debt Bondage/ Labor Trafficking**

Did you perform any work or provide any services?  ☐ Yes ☐ No

If yes, what and where?

Who arranged the work?

What type of work did you perform?

What was the work schedule?

Did work conditions change over time?

Is there a debt?  ☐ Yes ☐ No

If yes, has any debt amount increased?  ☐ Yes ☐ No

By how much?

When did it increase?

Why did it increase?

UAC MAP Section 3: Services (Version 1.0)

77

Exhibit 4
Page 355

Not Confidential

GOV-00016888

Have you or your family ever been threatened over payment or work for the journey?  ☐ Yes ☐ No

If yes, who threatened you and how?

What did you expect would happen if you left the job or stopped working?

Were you ever made to work or do anything you did not want to do?  ☐ Yes ☐ No

Did you receive pay or did someone else keep the pay?

Were you paid what was promised when you started working?

Were expenses taken out of the pay?  ☐ Yes ☐ No

If yes what?

How did you get to the work site?

Where did you live while working?

**Commercial Sex Indicators**

Did anyone ever ask to see you naked or in your underwear in exchange for money/anything of value?  ☐ Yes ☐ No

Did anyone ever pay/accept money/anything of value from other people in order to see you naked or in your underwear?  ☐ Yes ☐ No

Did anyone ever ask to take pictures or recording of you naked or engaged in sex acts?  ☐ Yes ☐ No

If so, did they offer you money/anything of value to do this or did they accept money/anything of value from others in order to see these pictures or recordings?  ☐ Yes ☐ No

Did anyone ever ask or expect you to perform sexual acts in exchange for money/anything of value?  ☐ Yes ☐ No

Did anyone ever promise or give money or anything of value to you in exchange for sexual acts?  ☐ Yes ☐ No

Based on the information provided above in the "Trafficking" section, is there a trafficking concern?  ☐ Yes ☐ No

If yes, describe trafficking concern.

| Current Sponsor | Cat (1,2,3) | Sponsor Name | DOB | Address | Phone | Legal Status | Relationship |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |

**Sponsor Risk Assessment**

Substance abuse concerns?  ☐ Yes ☐ No

If yes, explain

Domestic violence concerns?  ☐ Yes ☐ No

If yes, explain

Child abuse or neglect concerns?  ☐ Yes ☐ No

If yes, explain

Mental health issues?  ☐ Yes ☐ No

If yes, explain:

Does the sponsor have any family support?  ☐ Yes ☐ No

Specify:

Does the sponsor have any identified special needs?  ☐ Yes ☐ No

If yes, explain

Does the sponsor have financial needs?  ☐ Yes ☐ No

If yes, explain.

Does the sponsor have adequate housing?  ☐ Yes ☐ No

If yes, explain

Are there any concerns with the disciplinary practices/philosophy of sponsor?

Does the sponsor have any criminal history?  ☐ Yes ☐ No

List any Felony convictions.

List any Misdemeanor convictions.

List any Probation/Parole.

List and describe any disclosed criminal activity

UAC MAP Section 3: Services (Version 1.0)

78

**Exhibit 4**
**Page 356**

Not Confidential

GOV-00016889

List and describe any disclosed criminal activity:

History of Incarceration:              Crime          Date        Length of Sentence        Location

Are there any parent/child relational issues?                    ☐ Yes ☐ No

If yes, explain:

Does the sponsor have an Order of Removal?                    ☐ Yes ☐ No

If yes, date issued:

Has the sponsor sponsored any other UC in DCS care?           ☐ Yes ☐ No

Additional sponsor information:

Sponsor Sponsored UCs:         Name of UC         A Number         Relationship:         Facility sponsored from:

Based on the most recent trafficking screening, is the child a victim of a severe form of trafficking in persons? (Indicate 'yes' only if ORR has issued a           ☐ Yes ☐ No
trafficking eligibility letter for UC.)

Date eligibility letter issued:

Based on the most recent screening for disabilities, does the child have a disability as defined in section 3 of the Americans with Disabilities Act of 1990,           ☐ Yes ☐ No
42 U.S.C. § 12102(1)?

If yes, specify disability:

Based on the most recent screening, has the child been a victim of physical or sexual abuse under circumstances that indicate that the child's health or           ☐ Yes ☐ No
welfare has been significantly harmed or threatened?

If yes, provide a short summary.

Based on the sponsor risk assessment, does the sponsor clearly present a risk of abuse, maltreatment, exploitation, or trafficking to the UC?           ☐ Yes ☐ No

If yes, provide a short summary.

Please input any additional information if needed:

Please input any additional information if needed:

Signature:                                        Date:

                                                  Print Name:

                                                  Title:

UAC MAP Section 3: Services (Version 1.0)

Exhibit 4
Page 357

Not Confidential

GOV-00016890

# Appendix 3.8 Individual Service Plan



Not Confidential

GOV-00016891

# Appendix 3.9 UAC Case Review

First Name:

Last Name:

AKA:
Status:
Date of Birth:                                          Gender:
A No.:                                                  LOS:
Age:                                                    Current Program:
Country of Birth:                                       Admitted Date:

◯ 30-day Case Review? ◯ Discharge? ◯ Transfer          Are there any changes?        ◯ Yes ◯ No

Previous Placement:

test

Religious Affiliation:

test

Case Manager:

test

Clinician:

test

Document any new information regarding the UC not indicated in the UC Assessment and/or the previous case summary below:

**Medical**

List any allergies:
Do you feel unwell?
◯ Yes ◯ No
If yes, what are your symptoms?
Additional medical information:
Medical History

| Condition | Yes/NO | Date of Diagnosis/Clarification |
|---|---|---|
| Pregnant | ◯ Yes ◯ No | |
| Tuberculosis | ◯ Yes ◯ No | |
| Varicella | ◯ Yes ◯ No | |
| Measles | ◯ Yes ◯ No | |
| Mumps | ◯ Yes ◯ No | |
| Rubella | ◯ Yes ◯ No | |
| Asthma | ◯ Yes ◯ No | |
| Diabetes | ◯ Yes ◯ No | |
| Cancer | ◯ Yes ◯ No | |
| Cardiac Issues | ◯ Yes ◯ No | |
| Sexually Transmitted Disease | ◯ Yes ◯ No | |
| Respiratory/Lung Disorder | ◯ Yes ◯ No | |
| Physical Disability | ◯ Yes ◯ No | |

Medication History

| Medication | Dosage | Timeframe | Medical Condition |
|---|---|---|---|

**Legal**

Know Your Rights Presentation provided?          ◯ Yes ◯ No

Date:

Legal screening completed?          ◯ Yes ◯ No

Date:

Any possible legal relief identified?          ◯ Yes ◯ No

Specify:

Exhibit 4
Page 359

Not Confidential                                                                          GOV-00016892

Provide a short summary of the child's current presentation

Psychological Evaluation

Date of Evaluation:

Evaluator:

Axis I:

Axis II:

Axis III:

Axis IV:

Axis V:

Summary of Recommendations:

Who planned/organized your journey?

What were you told about the arrangements before the journey?

Did the arrangements change during the journey?                                                Yes  No

If yes, how?

Does your family owe money to anyone for the journey?                                          Yes  No

If yes, how much?

Whom is the money owed?

Who is expected to pay?

What do you expect to happen if payment is not made?

*Overview indicators:

Did anyone threaten you or your family?                                                         Yes  No

If yes, who made the threats?

Were you ever physically harmed?                                                                Yes  No

If yes, how?

Was anyone around you ever physically harmed?                                                   Yes  No

If yes, who?

Were you ever held against your will?                                                           Yes  No

If yes, where?

Did anything bad happen to anyone else in this situation or anyone else who tried to leave?     Yes  No

What happened and to whom?

Did anyone ever keep/destroy your documents?                                                    Yes  No

If yes, who and what?

Did anyone ever threaten to report you to the police/immigration?                               Yes  No

If yes, who?

Are you worried anyone might be trying to find you?                                             Yes  No

If yes, who?

*Labor Exploitation/Labor Trafficking

Did you perform any work or provide any services?                                               Yes  No

If yes, what and where?

Who arranged the work?

What type of work did you perform?

What was the work schedule?

Did work conditions change over time?

Is there a debt?                                                                                Yes  No

Not Confidential

GOV-00016893

If yes, has any debt amount increased?

By how much?

When did it increase?

Why did it increase?

Have you or your family ever been threatened over payment or work for the journey?

If yes, who threatened you and how?

What did you expect would happen if you left the job or stopped working?

Were you ever made to work or do anything you did not want to do?

Did you receive pay or did someone else keep the pay?

Were you paid what was promised when you started working?

Were expenses taken out of the pay?

If yes what?

How did you get to the work site?

Where did you live while working?

Commercial Sex Trafficking

Did anyone ever ask you to see you naked or in your underwear in exchange for money/anything of value?

Did anyone ever pay/accept money/anything of value from other people in order to see you naked or in your underwear?

Did anyone ever ask to take pictures or recording of you naked or engaged in sex acts?

If so, did they offer you money/anything of value to do this or did they accept money/anything of value from others in order to see these pictures or recordings?

Did anyone ever ask or expect you to perform sexual acts in exchange for money/anything of value?

Did anyone ever promise or give money or anything of value to you in exchange for sexual acts?

Based on the information provided above in the "Trafficking" section, is there a trafficking concern?

If yes, date of trafficking referral:

| Current Sponsor | Cat (1,2,3) | Sponsor Name | DOB | Address | Phone | Legal Status | Relationship |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

Sponsor Risk Assessment/Sponsor Risk Association

Substance abuse concerns?
If yes, explain

Domestic violence concerns?
If yes, explain

Child abuse or neglect concerns?
If yes, explain

Mental health issues?
If yes, explain

Does the sponsor have any family support?
Specify:

Does the sponsor have any identified special needs?
If yes, explain

Does the sponsor have financial needs?
If yes, explain

Does the sponsor have adequate housing?
If yes, explain

Are there any concerns with the disciplinary practices/philosophy of sponsor?

Does the sponsor have any criminal history?
List any Felony convictions

List any Misdemeanor convictions:

List any Probation/Parole.

List and describe any disclosed criminal activity:

History of Incarceration                    Crime          Date          Length of Sentence          Location

Are there any parent/child relational issues?
If yes, explain
Does the sponsor have an Order of Removal?
If yes, date raised:
Has the sponsor sponsored any other UC in DCS care?
Additional sponsor information

| Sponsor Sponsored UCs: | Name of UC | A-Number | Relationship | Facility sponsored from |
|---|---|---|---|---|

Not Confidential

GOV-00016895

# Appendix 3.10 OYAS-RET Interviewing Guidance, OYAS-RET Score Sheet, and the OYAS Reentry Self-Report Questionnaire

**Prior to using these tools: Inform the UAC that self-disclosures of previously unreported criminal history or violent behavior to any other children, care provider staff, ORR, or others may result in the child's transfer to another care provider facility and may affect their release.**

## OHIO YOUTH ASSESSMENT SYSTEM REENTRY TOOL (OYAS-RET) INTERVIEW GUIDE



The interview guide is designed to assist the assessor in gathering the information necessary to accurately assess the youth on the OYAS-RET. It is important to establish rapport with the youth, and while it is recommended that the interview guide be closely followed, the wording of the questions may vary. Here are some tips for conducting the interview:

- Conduct the interview in a relaxed and private environment.

- Explain the purpose of the interview and stress the need for honesty and complete answers to questions.

- Do not hesitate to use follow-up questions and probe. Examples of follow-up questions:
    - Tell me more; I want to be certain that I understand you.
    - What happened next?
    - Could you explain that further?
    - What do you mean?
    - Can you describe some examples?
    - How did that make you feel?

- Remember what information you are trying to obtain. Develop clear examples and remember there are sometimes differences in perception.

- Remember that the interviewer sets the tone. Be patient, and try not to correct or teach.

Not Confidential

GOV-00016896

- Whenever possible, use open-ended questions where the respondent provides his or her opinion and is able to elaborate. For example, "Tell me more about your relationship with..."

- Avoid double-barreled questions where the respondent is asked a combination of questions:
    - "How is your relationship with your mother and father?"

- Avoid biased questions where the respondent is led in a certain direction.
    - "Your relationship with your mother isn't bad, is it?"

Also, remember that the interview is only one source of information. Official records and collateral sources, such as family members or other professionals, should also be consulted. It is important to corroborate the youth's responses whenever possible.

Note: Throughout the interview guide there will be questions marked with an *. These questions are available on the self-report questionnaire also. If the interviewer is using the self-report questionnaire with the youth, they do not necessarily have to ask these questions.

## The following domains are scored:

1. Juvenile Justice History
2. Family and Living Arrangements
3. Peers and Social Support Network
4. Education and Employment
5. Pro-Social Skills
6. Substance Abuse, Mental Health, and Personality
7. Values, Beliefs, and Attitudes

| Name: | |
|---|---|
| Gender: | ☐ Male     ☐ Female |
| Race: | ☐ Caucasian     ☐ Black/Africa-American     ☐ Native American <br> ☐ Asian     ☐ Pacific Islander |
| Ethnicity: | ☐ Hispanic/Latino     ☐ Non-Hispanic |
| Date of Birth: | |
| County: | |
| Education (highest completed): | ☐ 8th or less     ☐ 9th     ☐ 10th     ☐ 11th     ☐ HS Diploma/GED |

Not Confidential

GOV-00016897

# 1.0 Juvenile Justice History

Items:

1.1) Documented Contact with Juvenile Justice System
  0 = 14 or older
  1 = 13 or younger

1.2) Attempted and/or Escaped from Residential Facility
  0 = No history of attempt/escape
  1 = History of attempt/escape

1.3) History of Selling Drugs
  0 = Has never sold drugs
  1 = Has sold drugs

1.4) Physical Altercation with an Authority Figure
  0 = No history of physical altercation with authority figure
  1 = Has a history of physical altercation with authority figure

1.5) Weapon Used During a Crime
  0 = Never used a weapon during a crime
  1 = Has used a weapon during a crime

1.6) Victim Physically Harmed During Offense
  0 = Has never physically harmed a person during a crime
  1 = Has physically harmed a person during a crime

1.7) Received a Major Sanction while in Residential Care
  0 = Has never received a major sanction while in residential care
  1 = Has received at least 1 major sanction while in residential care

*I am going to ask you a few questions about your past.*

1. *How old were you the first time you got in trouble?

   a. What did you do?

   b. What happened?

2. How about the most recent offense, tell me about it.

3. How many times altogether have you gotten in trouble with the law?

   a. Of those, how many resulted in adjudication?

UAC MAP Section 3: Services (Version 1.0)

Not Confidential

b. What offenses were you adjudicated on?

4. Have you ever sold drugs?

a. *If so, how often?

    ○ Never    ○ Once in a While    ○ Sometimes    ○ Often

5. Did you ever use a weapon during any of the offenses you got into trouble for? Is so, tell me about that.

6. Has anyone gotten hurt during an offense that you have committed?

7. Tell me about any physical fights you have been in with staff.

    a. What about any other authority figures (e.g., police, teachers/school personnel, detention workers, bosses, etc.)?

UAC MAP Section 3: Services (Version 1.0)

Exhibit 4
Page 367

Not Confidential

GOV-00016900

8. Have you ever been held in detention?

9. How about another residential facility besides this one?

    a. If so, have you ever gotten into trouble for trying to leave a residential facility without permission?

    b. Were you charged with AWOL?

10. Since being in the facility, have you received any consequences?

    a. If yes, for what?

UAC MAP Section 3: Services (Version 1.0)

90

Exhibit 4
Page 368

Not Confidential

GOV-00016901

b. What happened to you as the result of the the consequence?

## 2.0 Family and Living Arrangement

Items:

2.1) Family is Important
0 = Family is very important to the youth
1 = Family is not very important to the youth

2.2) Family Member(s) Arrested
0 = No
1 = Yes

2.3) Parents/Caregivers Use Appropriate Consequences
0 = Parents/caregivers use appropriate consequences most of the time
1 = Parents/caregivers use inappropriate consequences

2.4) Positive Relationship with Person at Planned Residence
0 = Positive/supportive relationship with adult at planned residence
1 = Does not have a positive relationship with adult at planned residence

*I am going to ask you a few questions about your family.*

1. Tell me about your biological parents and/or adoptive parents.

a. How often do you have contact with them?

b. If the youth was raised by non-biological parents, ask them about their relationship with these parents also.

UAC MAP Section 3: Services (Version 1.0)

2. Who were you living with the last time you were in the community?

a. How well did you get along with the people you were living with?

3. *How would you rate the following statement: "My family is important to me?"

○ Strongly Agree      ○ Agree      ○ Disagree      ○ Strongly Disagree

a. How often do you talk to them?

b. Over the phone? Visitation?

3. *How many close family members (e.g., parents, siblings) have been arrested before?
○ 0      ○ 1      ○ 2      ○ 3+

a. Have any of them ever been in jail/prison?

5. Tell me about the consequences your parents/caregivers gave you when you got in trouble.

UAC MAP Section 3: Services (Version 1.0)

Exhibit 4
Page 370

Not Confidential

GOV-00016903

a. Have you ever gotten grounded? If so, how long?

b. Have you ever been hit as a punishment?

6. Tell me about where you are going to live when you leave here.

a. How well do you get along with them?

b. Do you think the people you are going to live with are supportive?

## 3.0 Peers and Social Support Network

Items:

3.1) Acquaintances Use Drugs
    0 = 5 or fewer acquaintances use drugs
    1 = 6 or more acquaintances use drugs

3.2) Friends Fight
    0 = Friends do not get in fights often
    1 = Friends fight a lot

3.3) Friends Use Drugs
    0 = Less than 50% of friends use drugs
    1 = 50% or more of friends use drugs

UAC MAP Section 3: Services (Version 1.0)

Not Confidential

GOV-00016904

3.4) Friends Arrested
  0 = Less than 50% of friends have been arrested
  1 = 50% or more of friends have been arrested

3.5) Relationship with Youth on Unit
  0 = Gets along with youth on the unit
  1 = Does not get along with youth on the unit

3.6) Relationship with Staff
  0 = Gets along with staff at the facility
  1 = Does not get along with staff at the facility

3.7) Friends/Family Associated with Gang Activity

  0 = Friends are not part of a gang
  1 = Friends are part of a gang

3.8) Arrested with Friends
  0 = Not arrested with friends
  1 = Arrested with friends

3.9) Adults in the Community are Supportive
  0 = Adults in the community are supportive
  1 = Adults in the community are not supportive

*I am going to ask you a set of questions about the people that you know. Some of the questions will be about acquaintances and some will be about your close friends.*

1. Talking about your acquaintances (people who you know but are not your close friends), how many have been in trouble with the law?

    a. For what?

2. *How about the number of acquaintances that use drugs? Do you know about how many (outside the facility) use substances?
   ⟨⟩ 0 to 5      ⟨⟩ 6 to 10      ⟨⟩ 11 to 15      ⟨⟩ 16 to 20      ⟨⟩ 21+

UAC MAP Section 3: Services (Version 1.0)

Not Confidential

GOV-00016905

*Now focusing on your friends:*

3. Tell me about your close friends (consider those in the community as well as in the facility).

How many friends would you say you have? ☐

    a. Of those friends, how many use alcohol? ☐

    b. Of those friends, how many use drugs? ☐

    a. Of those friends, how many have been suspended/expelled from school? ☐

    a. Of those friends, how many have been in detention? ☐

    a. Of those friends, how many have been arrested? ☐

4. *How would you rate the following statement: "My friends get into physical fights?"

    ○ Never    ○ Sometimes    ○ Often

5. *How many times have you been arrested/committed a crime while you have been with your friends?

6. *How many of your friends are involved in a gang? ☐

7. *As for the youth on your unit, how well do you get along with them?

    ○ Not at All    ○ Ok    ○ Somewhat    ○ Good    ○ Very Good

    a. Do you consider any of them to be your friends?

UAC MAP Section 3: Services (Version 1.0)

95

Exhibit 4
Page 373

Not Confidential

GOV-00016906

8. *How about staff? How well do you get along with them at the facility?

  ○ Not at All     ○ Ok     ○ Somewhat     ○ Good     ○ Very Good

9. As for the community you will be living in, tell me about any non-family members that you feel are supportive.

    a. Have you talked to any of them since you have been here?

## 4.0 Education and Employment

Items:

4.1) Truant from School
    0 = Never been charged with truancy
    1 = Charged with truancy

4.2) Expelled - Ever
    0 = Never been expelled from school
    1 = Expelled from school

4.3) Effort in School
    0 = Effort in school
    1 = Little effort in school

4.4) Relationship with Current School Personnel/Employer
    0 = Positive relationship with school personnel/employer
    1 = No positive relationship with school personnel/employer

*This section focuses on education and employment. If the youth is employed full-time or her/his primary focus is employment item 4.3 should be scored based on employment.*

1. Tell me about school before you came to the facility.

    a. When was the first time you skipped class?

Exhibit 4
Page 374

Not Confidential         GOV-00016907

b. How often did you skip class?

c. *How many times were you charged with truancy in the last two years?

2. Were you ever expelled from school?

3. *How did you get along with teachers?

a. Did you consider any of them positive influences?

b. If yes, how many?

c. Were they available to help you outside the classroom?

d. How about school since you have been here?

UAC MAP Section 3: Services (Version 1.0)

Exhibit 4
Page 375

Not Confidential

GOV-00016908

4. Have you been in trouble at school since you have been here?

*Now I am going to ask you questions about any jobs you have had.*

5. Describe any jobs you have ever had.

   a. Did you get along with your co-workers?

   b. How about your boss?

   c. Did you ever have a problem with staff or co-workers?

6. Describe any problems that you had.

7. How did it end up?

8. What is the longest you worked at a job?

UAC MAP Section 3: Services (Version 1.0)

98

**Exhibit 4**
**Page 376**

Not Confidential

GOV-00016909

9. How about the shortest time?

## 5.0 Pro-Social Skills

Items:

5.1) Can Identify Triggers/High Risk Situations
   0 = Identifies high risk situations

   1 = Does not identify high risk situations

5.2) Weighs Pros/Cons of a Situation
   0 = Weighs the pros and cons of a situation
   1 = Does not weigh the pros and cons of a situation

5.3) Pro-Social decision Making
   0 = Demonstrates pro-social decision making
   1 = Does not demonstrate pro-social decision making

5.4) Frustration Tolerance
   0 = Adequate skills to manage frustration
   1 = Some/minimal skills to manage frustration

1. What kinds of things lead you to get into trouble?

2. Tell me about a time where you did not realize you were headed for trouble, but looking back on it, you should have seen trouble coming your way.

*I am going to ask you a set of scenarios. I want you to think of the answer that best fits with what you would normally do. [NOTE TO INTERVIEWER: probe to determine whether the youth can identify high-risk situations and then whether they are able to weigh pros/cons of that situation before they engage in any behavior for each scenario.]*

3. Scenario #1:  If one of our friends asked you to go to a party, would you go?

a. Why or why not?

b. What if you knew there would be alcohol and drugs there?

4. Scenario #2:  If you found a wallet with $100 in it, what would you do?

5. Scenario #3:  If you knew your friend was driving a car that was not his/hers, would you get in the car?

a. Why or why not?

6. Switching gears for a second. Tell me about stuff that makes you frustrated.

Exhibit 4
Page 378

Not Confidential

GOV-00016911

a. When was the last time you felt frustrated?

b. How hard is it to deal with things when you are frustrated?

c. You ever just give up?

**Staff Rating: Can the youth identify triggers/high risk situations effectively?**

○ No          ○ Somewhat          ○ Yes

**Staff Rating: Does the youth weigh pros/cons?**

○ No          ○ Somewhat          ○ Yes

**Interviewer's Impressions:**

**Can the youth tie behavior to the consequence?**

**Rate the youth on his/her ability to understand the consequences of his/her actions.**

○ None          ○ Very Little          ○ Some          ○ Good

**Staff Rating: Does the youth make pro-social decisions given these scenarios?**

○ No          ○ Somewhat          ○ Yes

**Staff Rating: Does the youth have adequate skills to handle frustration?**

○ No          ○ Somewhat          ○ Yes

UAC MAP Section 3: Services (Version 1.0)

Exhibit 4
Page 379

# 6.0 Substance Abuse, Mental Health, and Personality

Items:

6.1) Age of Drug Onset
   0 = 13 or older
   1 = 12 or younger

6.2) Others Complained about Drug/Alcohol Use
   0 = No one has complained about substance use
   1 = Others have complained about substance use

6.3) Failed Drug Test within Past 6 Month
   0 = Has not failed drug test within past 6 months
   1 = Has failed drug test within past 6 months

6.4) Alcohol/Drugs have Caused a Problem in Major Life Area
   0 = Alcohol/Drugs have not caused a problem
   1 = Alcohol/Drugs have caused a problem

6.5) Used Substances While in Residential Facility
   0 = Has not used alcohol or drugs while in the facility
   1 = Has used alcohol and/or drugs while in the facility

6.6) Inflated Self-Esteem
   0 = Appropriate level of self-esteem
   1 = Inflated self-esteem

6.7) Risk Taking Behavior
   0 = Does not generally take risks
   1 = Takes risks

*Now we are going to talk about any alcohol or drugs you have used.*

1. Tell me about any drugs that you have used.

| | Type of Drug | How often were you using at time of arrest (e.g., daily, weekly, etc.)? | How much? | Most ever? | Last use (date or about how long ago)? |
|---|---|---|---|---|---|
| - + | | | | | |
| - + | | | | | |
| - + | | | | | |
| - + | | | | | |

UAC MAP Section 3: Services (Version 1.0)

Not Confidential

GOV-00016913

2. How old were you the first time you used marijuana?

　　a. How about any other drugs?

3. Tell me about what your [insert appropriate adult: parent, counselor, uncle/aunt] thinks about your [drug/alcohol] use.

　　a. *Has anyone complained [showed concern] about your alcohol/drug use?

4. When is the last time you took a drug test?

　　a. What were the results?

5. Have you ever tested positive for drugs?

　　a. If so, how long ago?

UAC MAP Section 3: Services (Version 1.0)

103

Exhibit 4
Page 381

GOV-00016914

6. Given what you have told me so far, do you think that drugs and/or alcohol have caused you any problems?

a. How has your use affected school?

b. How about with your family?

c. Legal problems?

d. Friends?

7. What kind of drugs have you seen while in the facility?

a. What about while you were still living in the facility but out on pass?

b. Have you ever seen anyone use drugs while in the facility? What about alcohol?

UAC MAP Section 3: Services (Version 1.0)

104

Exhibit 4
Page 382

GOV-00016915

c.  Have you ever had an opportunity to use drugs while in the facility? What about alcohol?

d.  Have you used drugs while in the facility? What about alcohol?

e.  How about on a community pass?

*I am going to ask you some questions about yourself.*

8.  *On a scale of 1 to 10 how cool do you consider yourself?

9.  *If your friends had to rate you, how cool would they rate you on a scale of 1 to 10?

10.  Tell me about any situations that you have participated in that you would consider risky (dangerous).

a.  Would you consider yourself a risk taker?

b.  Have you ever driven a car without a driver's license?

UAC MAP Section 3: Services (Version 1.0)

105

Exhibit 4
Page 383

c. What is the fastest you have driven a car (or been in a car)?

d. Have you ever stolen something when you had enough money to pay for it?

e. Ever carry a loaded gun? How about into a place where you weren't supposed to have it (e.g., school)?

f. Have you ever taken any drugs that you did not know what they were?

## 7.0 Values, Beliefs, and Attitudes

Items:

7.1) Pro-Criminal Statements
   0 = No/Few pro-criminal beliefs
   1 = Some/A lot of pro-criminal beliefs

7.2) Negative Attitudes Towards Supervision
   0 = Will complete supervision without problems
   1 = Will have a difficult time with supervision

7.3) Attitude Supports Substance Use
   0 = Not supportive of substance use
   1 = Supportive of substance use

7.4) Demonstrates Remorse for Offense
   0 = Full remorse
   1 = Some remorse
   2 = No remorse

Exhibit 4
Page 384

Not Confidential

GOV-00016917

7.5) Demonstrates Empathy Towards Others
    0 = Demonstrates empathy towards others
    1 = Does not show empathy towards others

7.6) Attitude Towards Gangs
    0 = negative attitude towards gangs
    1 = Supportive of gangs

*I am now going to ask you some questions about your beliefs and values. (NOTE TO INTERVIEWER: This section should be rated based on the entire interview. There are some questions that are provided as suggestions if you do not feel that you have captured the necessary information to score these items.)*

1. Based on what you have told me, what do you think about being on parole?

    a. Tell me about your plan to make it on parole.

2. What do you see as your parole (probation) officer's job?

3. *How would you rate the following statement: "I will get off supervision without any problems."

    ◌ Strongly Agree      ◌ Agree      ◌ Disagree      ◌ Strongly Disagree

4. What do you think about marijuana? Should it be legal?

    a. How about other drugs?

UAC MAP Section 3: Services (Version 1.0)

Exhibit 4
Page 385

Not Confidential

GOV-00016918

4. What do you think about marijuana? Should it be legal?

    a. How about other drugs?

    b. What are the chances that you use drugs in the next couple of years?

5. You talked about your offense earlier. Tell me how it affected the people involved.

    a. How was your family affected?

    b. If you could change anything about your offense what would it be?

6. Ever think about how people's behavior affects others?

7. What about how your behavior affects others?

Not Confidential

8. Would you say that you generally care about others?

9. What do you think about gangs?

10. Do you think that gangs are helpful?

11. Should youth be allowed to join a gang?

**Staff Rating: Does the youth use pro-criminal statements?**

  ○ None    ○ Few    ○ Some    ○ A Lot

* If the youth is rated some/a lot this item should be scored a 1.

**Staff Rating: Youth has negative attitude towards supervision.**

  ○ Strongly Agree    ○ Agree    ○ Disagree    ○ Strongly Disagree

**Staff Rating: Youth's attitude towards substance use.**

  ○ Supportive of Drug/Alcohol Use    ○ Somewhat Supportive    ○ Not Supportive

**Staff Rating: Does the youth demonstrate remorse for offense?**

  ○ Full Remorse    ○ Some Remorse    ○ No Remorse

**Staff Rating: Youth's level of empathy towards others.**

  ○ None    ○ Very Little    ○ Some    ○ Good

  * If the youth is rated as none or very little this item should be scored a 1.

UAC MAP Section 3: Services (Version 1.0)

**Exhibit 4**
**Page 387**

Not Confidential

GOV-00016920

**Staff Rating:  Supportive of Gangs**

    ◌ **Highly Supportive**     ◌ **Supportive**     ◌ **Somewhat Supportive**     ◌ **Not Supportive**

\* If the youth is rated highly supportive, supportive, or somewhat supportive this item should be scored a 1.

# OHIO YOUTH ASSESSMENT SYSTEM
# REENTRY TOOL (OYAS-RET)
# SCORE SHEET



**Name** [_____]  **Date** [_____]

## 1.0 Juvenile Justice History

1.1) Documented contact with juvenile justice system
     0 = 14 or older
     1 = 13 or younger      [____]

1.2) Attempted and/or escaped from residential facility
     0 = No history of attempt/escape
     1 = History of attempt/escape      [____]

1.3) History of selling drugs
     0 = Has never sold drugs
     1 = Has sold drugs      [____]

1.4) Physical Altercation with an authority figure
     0 = No history of physical altercation with authority figure
     1 = Has a history of physical altercation with authority figure      [____]

1.5) Weapon used during a crime
     0 = Never used a weapon during a crime
     1 = Has used a weapon during a crime      [____]

1.6) Victim physically harmed during offense
     0 = Has never physically harmed a person during a crime
     1 = Has  physically harmed a person during a crime      [____]

1.7) Received a major sanction while in residential care
     0 = Has never received a major sanction while in residential care
     1 = Has received at least 1 major sanction while in residential care      [____]

     **TOTAL** [____]

## 2.0 Family and Living Arrangements

2.1) Family is important
     0 = Family is very important to the youth
     1 = Family is not very important to the youth      [____]

UAC MAP Section 3: Services (Version 1.0)

110
**Exhibit 4**
**Page 388**

GOV-00016921

2.2) Family member(s) arrested

    0 = No

    1 = Yes

2.3) Parents use appropriate consequences

    0 = Parents use appropriate consequences most of the time

    1 = Parents use inappropriate consequences

2.4) Positive relationship with person at planned residence

    0 = Positive/supportive relationship with adult at planned residence

    1 = Does not have a positive relationship with adult at planned residence

**TOTAL**

| | Strength | Barrier |
|---|---|---|
| Family supportive of change | | |
| Family is engaged | | |
| Family willing to participate in treatment | | |
| Family is stable | | |
| History of abuse/neglect | | |
| TOTAL: | 0 | 0 |

## 3.0 Peers and Social Support Network

3.1) Acquaintances Use Drugs

    0 = 5 or fewer acquaintances use drugs

    1 = 6 or more acquaintances use drugs

3.2) Friends Fight

    0 = Friends do not get in fights often

    1 = Friends fight a lot

3.3) Friends Use Drugs

    0 = Less than 50% of friends use drugs

    1 = 50% or more of friends use drugs

3.4) Friends Arrested

    0 = Less than 50% of friends have been arrested

    1 = 50% or more of friends have been arrested

3.5) Relationship with Youth on Unit

    0 = Gets along with youth on the unit

    1 = Does not get along with youth on the unit

3.6) Relationship with Staff

    0 = Gets along with staff at the facility

    1 = Does not get along with staff at the facility

3.7) Friends/Family Associated with Gang Activity

    0 = No friends/family in a gang

    1 = Friends/family in a gang

Not Confidential

GOV-00016922

3.8) Arrested/Charged with Friends

    0 = Not arrested/charged with friends

    1 = Arrested/charged with friends

3.9) Adults in the community are supportive

    0 = Adults in the community are supportive

    1 = Adults in the community are not supportive

| | Strength | Barrier | TOTAL |
|---|---|---|---|
| Pro-social peers | | | |
| Manage antisocial peers effectively | | | |
| Pro-social leisure activities | | | |
| Motivation to make new friends | | | |
| TOTAL: | 0 | 0 | |

## 4.0 Education and Employment

4.1) Truant from school

    0 = Never been charged with truancy

    1 = Charged with truancy

4.2) Expelled ever

    0 = Never been expelled from school

    1 = Expelled from School

4.3) Effort in School

    0 = Effort in school

    1 = Little effort in school

4.4) Relationship with Current School Personnel/Employer

    0 = Positive relationship with school personnel/employer

    1 = No positive relationship with school personnel/employer

| | Strength | Barrier | TOTAL |
|---|---|---|---|
| Motivation for education | | | |
| Motivation for employment | | | |
| Has HS Diploma/GED | | | |
| Previous employment experience | | | |
| Individualized education plan | | | |
| Parents supportive of education | | | |
| Parents supportive of employment | | | |
| TOTAL: | 0 | 0 | |

## 5.0 Pro-Social Skills

5.1) Can identify triggers/high risk situations

    0 = Identifies high risk situations

    1 = Does not identify high risk situations

5.2) Weighs pro/cons of a situation

    0 = Weighs the pros and cons of a situation

    1 = Does not weigh the pros and cons of a situation

Not Confidential

GOV-00016923

5.3) Pro-social decision making

    0 = Demonstrates pro-social decision making
    1 = Does not demonstrate pro-social decision making

5.4) Frustration Tolerance

    0 = Adequate skills to manage frustration
    1 = Some/minimal skills to manage frustration

**TOTAL**

| | Strength | Barrier |
|---|---|---|
| Ability to manage own behavior | | |
| Motivated to learn new skills | | |
| Age appropriate social skills | | |
| Availability of pro-social models | | |
| TOTAL: | 0 | 0 |

## 6.0 Substance Abuse, Mental Health, and Personality

6.1) Age of Drug Onset

    0 = 13 or older
    1 = 12 or younger

6.2) Others Complained about Youth's Drug/Alcohol Use

    0 = No one has complained about substance use
    1 = Others have complained about substance use

6.3) Positive Drug Test within Past 6 Months

    0 = Has not failed drug test within past 6 months
    1 = Has failed drug test within past 6 months

6.4) Alcohol/Drugs have Caused Problem in Major Life Area

    0 = Alcohol/Drugs have not caused a problem
    1 = Alcohol/Drugs have caused a problem

6.5) Used Substances While in Residential Facility

    0 = Has not used alcohol or drugs while in the facility
    1 = Has used alcohol or drugs while in the facility

6.6) Inflated Self-Esteem

    0 = Appropriate level of self-esteem
    1 = Inflated self-esteem

6.7) Risk Taking Behavior

    0 = Does not generally take risks
    1 = Takes risks

Not Confidential

GOV-00016924

|  | Strength | Barrier | TOTAL |
|---|---|---|---|
| Motivation to stop using |  |  |  |
| History of substance abuse |  |  |  |
| Sober support network |  |  |  |
| Motivated for treatment |  |  |  |
| Attitude towards psychotropic med |  |  |  |
| Stable mental health issues |  |  |  |
| Anger Management |  |  |  |
| TOTAL: | 0 | 0 |  |

## 7.0 Values, Beliefs, and Attitudes

7.1) Pro-Criminal Sentiments

    0 = No/few pro-criminal sentiments
    1 = Some/a lot of pro-criminal sentiments

7.2) Negative Attitudes Towards Supervision

    0 = Will complete supervision without problems
    1 = Will have a difficult time with supervision

7.3) Attitude Supports Substance Use

    0 = Not supportive of substance use
    1 = Supportive of substance use

7.4) Demonstrates Remorse for Offense

    0 = Full remorse
    1 = Some remorse
    2 = No remorse

7.5) Demonstrates Empathy Towards Others

    0 = Demonstrates empathy towards others
    1 = Does not show empathy towards others

7.6) Attitude Towards Gangs

    0 = Negative attitude towards gangs
    1 = Supportive of gangs

|  | Strength | Barrier | TOTAL |
|---|---|---|---|
| Motivation to change |  |  |  |
| Take responsibility for offense |  |  |  |
| Supportive of pro-social lifestyle |  |  |  |
| TOTAL: | 0 | 0 |  |

UAC MAP Section 3: Services (Version 1.0)

114

**Exhibit 4**
**Page 392**

Not Confidential

GOV-00016925

Overall Impressions

Total Risk Score

Total Number of Strengths | 0

Total Number of Barriers | 0

## SCORING

|  | Cutoffs | Recidivism Rates | Youth Score |
|---|---|---|---|
| LOW | 0 - 15 | 15% | |
| MODERATE | 16 - 24 | 35% | |
| HIGH | 25 - 42 | 67% | |

Instrument Risk Level       LOW        MODERATE        HIGH

Override

Final Risk Level       ☐ LOW       ☐ MODERATE       ☐ HIGH

Not Confidential

GOV-00016926

 

# OHIO YOUTH ASSESSMENT SYSTEM
## REENTRY SELF-REPORT
### QUESTIONNAIRE

*Please fill this out to the best of your ability. Your responses will be used to help make the best decisions regarding your situation.*

1. How old were you when you first got in trouble with the law?

   a. What did you do to get in trouble? ................................................................
   ................................................................................................................

2. How often have you sold drugs?

   Never              Once in a while         Sometimes            Often

3. My family is important to me.

   Strongly agree       Agree              Disagree          Strongly Disagree

4. How many close family members (parents, siblings) have been arrested before?

   0               1                    2                3+

5. Who are you planning on living with when you get released? ................................

   a. Of those you are going to live with, who do you get along with the best? ..................

   b. Rate your relationship with this person.

   Very Good         Good            OK         Poor        Very poor

6.  My friends fight.

    All of the time        Often            Sometimes           Rarely            Never

7.  When you are out of the facility how many people would you say you "hang out" with but do not
    consider your close friends?  _____

8.  Of those that you hang out with outside the facility, but are not close friends, how many of them use
    drugs?

    0 to 5             6 to 10           11 to 15             16 to 20          21+

9.  How well do you get along with youth at the unit?

    Not at all        Somewhat          OK                  Good              Very good

10. How well do you get along with the staff at the program facility?

    Not at all        Somewhat          OK                  Good              Very good

11. How many of your friends or family are involved in a gang?  _____

12. Have you ever been arrested with any of your friends?              ☐ No          ☐ Yes

13. How many times have you been charged with crimes in the past 3 years?

    0                 1                 2                  3+

14. How many times have you been expelled from school?

    0                 1                 2                  3+

15. How many school staff do you have a positive relationship with currently?

   0         1         2         3         4 +

16. Have you ever been employed?      ☐ No    ☐ Yes

  17. How did you get along with your boss?

    Never employed   Not at all   Somewhat   OK   Good   Very good

  18. Has anyone complained about your use of drugs?    ☐ No    ☐ Yes

  19. Has anyone complained about your use of alcohol?    ☐ No    ☐ Yes

  20. On a scale of 1 to 10 rate yourself on how cool you are.   _____

                    (10 is the most cool)

  21. On a scale of 1 to 10 how cool would your friends rate you?  _____

                    (10 is the most cool)

  22. I will make it off supervision without getting in to trouble.

    Strongly agree     Agree     Disagree     Strongly disagree

23. I believe that marijuana should be legalized.

    Strongly agree     Agree     Disagree     Strongly disagree

**Exhibit 4**
**Page 396**

Not Confidential           GOV-00016929

24. People should be allowed to use drugs without any legal consequences.

    Strongly agree        Agree        Disagree        Strongly disagree

25. There are some good things about gangs

    Strongly agree        Agree        Disagree        Strongly disagree

26. I am friends with people in a gang          ☐ No     ☐ Yes

27. Have you ever experienced any of the following?

| | | |
|---|---|---|
| Neglect | ☐ No | ☐ Yes |
| Sexual abuse | ☐ No | ☐ Yes |
| Physical abuse | ☐ No | ☐ Yes |

UAC MAP Section 3: Services (Version 1.0)

**Exhibit 4**
**Page 397**

Not Confidential

GOV-00016930



## 4.403 ASSESSMENT: Recommendations and Decision-Making
**Effective Date: Rev. 11/25/2013 (Original 04/30/2012, Rev. 12/21/2012)**

## POLICY

Upon completion of the family reunification assessment process, Case Managers shall make a timely recommendation to the Case Coordinator for release.  Release recommendation options include:

- Approve release
- Approve release with post-release services
- Conduct a home study before a release decision can be made
- Deny release

Case Coordinators shall conduct a third-party review of the proposed release, and submit one of the following release recommendations (either in the form of a *Third Party Recommendation* or case concurrence) to the ORR/FFS in a timely manner:

- Approve  release
  - For Category 1 cases, where the sponsor does not present a safety risk, the UAC is not especially vulnerable, and there is no TVPRA of 2008 concern requiring a mandatory home study- A case concurrence[1], after a Case Coordination interview, on the Case Manager's recommendation will suffice for the Case Manager to send the case forward for a release decision by the ORR/FFS.
  - For all other cases, a *Third Party Recommendation* (TPR) will need to be completed prior to the release recommendation being forward to the ORR/FFS.

- Approve release with post-release services
  - For cases where the Case Coordinator agrees with the Case Manager that post-release only services should be approved, the case may be referred by the Case Manager to a post-release service provider after the TPR is completed by the Case Coordinator.
  - For cases where the Case Coordinator and Case Manager disagree on the recommendation for post-release only services, the case will be elevated to the ORR/FFS for a decision on whether post-release only services will be approved.

- Conduct a home study before a release decision can be made –
  - For cases where the Case Coordinator agrees with the Case Manager that a home study should be completed prior to a TPR being completed, a concurrence on the home study recommendation (noted in the TPR form) will be necessary for the case to be referred to a Home Study provider.

---

[1] The concurrence on the straight release can occur either as an email by the Case Coordinator to the Case Manager. However, Case Coordinators and Case Managers should have reached a decision on the straight release decision for cases meeting this exemption from fingerprint background checks and from a TPR requirement, prior to Case Manager's formal recommendation

Not Confidential

GOV-00016931



  o For cases where the Case Coordinator and Case Manager disagree on the recommendation for a home study, the case will be elevated to the ORR/FFS for a decision on whether a home study will be required prior to release.

- Recommendation pending – additional information needed
- Deny release

DHS shall be provided with 24 hours to comment on the proposed release from the time the Case Manager sends the notice, by email, of the pending release request.

Only the ORR/FFS has the authority to make a release decision. The ORR/FFS considers the Case Manager's and Case Coordinator's recommendations or concurrences, and those of other stakeholders, as applicable, and makes the final release decision ORR release determinations include:

- Approve release
- Approve release with post-release services
- Conduct a home study before a final release decision can be made
- Remand release request-decision pending
- Deny release[2]

## Waiver of Release Requirements

If comprehensive child welfare assessment of both safety AND mitigating factors shows that the sponsor can provide for the child's physical and mental well-being, and fulfilling a particular requirement would cause a delay in timely family reunification, the care provider should request a waiver from non-statutory requirements from ORR. Any waivers must be approved by an ORR Supervisor (Field or Headquarters). The following requirements can NOT be waived under any circumstances:

- Verification of the sponsor's ID
- Verification of the sponsor's relationship with the UAC
- An independent finding in the form of a background check and Case Coordinator third party recommendation or concurrence that the sponsor has not engaged in any activity that would pose a risk to the UAC
- Child assessments including screenings for mandatory home study eligibility

## Safety Planning

In consultation with the Case Coordinator, the Case Managers shall prepare safety plans as needed. Safety plans should be prepared to address any outstanding needs that the UAC will have following release, and to enhance the UAC's opportunity for safe and successful integration into the sponsor family unit and community.

---

[2] The approval of the ORR Director or designee is required for the denial of release to a parent or legal guardian.

Exhibit 4
Page 399

28

Not Confidential

ORR UAC PROGRAM OPERATIONS MANUAL (Care Provider Version) 

### Incomplete Sponsorship Applications

Case Managers shall document efforts and outcomes for any potential sponsor to whom a FRP was sent, even if the potential sponsor does not complete the reunification process or withdraws sponsorship. Case Managers shall document information on unsafe potential sponsors in the ORR database[3] in order to prevent the sponsor from sponsoring other UACs.

### Home Studies

Please refer to ORR Operations Guide, Section 2.2.6 Mandatory Home Studies

---

[3] Document in the notes section of the sponsor entity.

**Exhibit 4**
**Page 400**

29

Not Confidential

GOV-00016933

**ORR UAC PROGRAM OPERATIONS MANUAL (Care Provider Version)** 

### Remand

ORR may remand a release request if additional information is needed or additional actions need to be taken before a release decision can be made. The release decision is held pending when ORR enters a remand in the ORR database. The Case Coordinator or ORR/FFS documents the date of the remand, an explanation of why the case is remanded, and which party is responsible for addressing the outstanding issues in the *Release Request*. When the additional information is received or the actions are completed, the ORR/FFS documents the date and provides an explanation in the *Release Request* as to why the remand was lifted and what the ORR decision on the release request is.

### Release Options

#### Release

A recommendation for a release without a home study or post-release services shall be made after a thorough assessment of the sponsor, the sponsor's family unit, and the needs of the UAC demonstrates that the sponsor can provide for the UAC's physical and mental well-being without additional assessment or services. Release is recommended after it is determined that the release will not endanger the UAC or others in the household or community, and that the UAC is likely to appear before the U.S. Department of Homeland Security (DHS) and/or the U.S. immigration court.

#### Release with Post-Release Services[1]

A recommendation for a release with post-release services shall be made when the release is determined safe and appropriate as outlined above, but the UAC and sponsor need additional assistance to connect them to appropriate resources in the community. These services can only be provided with the consent of the sponsor. The Case Manager shall document the sponsor's consent during the sponsor assessment process.

Post-release services shall be provided for six months after the UAC is released to the sponsor, unless determined to be necessary for a shorter or longer period of time by the post-release services provider, and

---

[1] This term is used synonymously with follow-up services as described in TVPRA of 2008, §235(c)(3)(B).

Not Confidential

GOV-00016934



approved by ORR. If the service needs identified in the referral are fully met prior to completion of the six month period, the post-release services provider shall make a request to ORR to conclude the services. If the UAC has significant outstanding service needs that could impact the safety of the UAC or others at the completion of the six month period, the post-release services provider may request prior approval from ORR to extend the services. Post-release services do not continue under any circumstance beyond a UAC's 18th birthday.

**Deny Release**

Only ORR has the authority to deny release of a UAC to a potential sponsor. Even if the Case Manager or Case Coordinator does not find a potential sponsor to be suitable, he or she must submit a recommendation indicating such to ORR for ORR's review and final decision.

Release to a potential sponsor may be denied if any one of the following conditions exists:

- The potential sponsor is not willing or able to provide for the UAC's physical or mental well-being.

- The potential sponsor would present a moderate to high level of risk to the UAC because the potential sponsor:

  o Has been convicted of (including a plea of no contest) a felony involving child abuse or neglect; spousal abuse; a crime against a child or children (including child pornography); or a crime involving violence, including rape, sexual assault, or homicide

  o Has been convicted within the last five years of a felony involving physical assault, battery, or drug related offenses

  o Has been convicted of a misdemeanor for a sex crime, an offense involving a child victim, or a drug offense that compromises the sponsor's ability to ensure the safety and well-being of the UAC

  o Has other criminal history or pending criminal charges that compromises the sponsor's ability to ensure the safety and well-being of the UAC

- Placement in the potential sponsor's household would present a moderate to high level of risk to the UAC because:

  o A household member has been convicted of a crime that compromises the suitability of the home environment for the UAC

  o A household member presents child welfare concerns

  o The physical environment of the home presents risks to the UAC's safety and well being

- Release of the UAC would present a moderate to high risk to him or herself, the sponsor, family unit, or the community.

Not Confidential

GOV-00016935



# PROCEDURES

## Incomplete Family Reunification Process

1) If any potential sponsor initiates, but does not complete the family reunification and release process, the Case Manager documents in the ORR database that the reunification process is cancelled and enters the corresponding justification in the *Release Request* in the ORR database.

## Release Recommendations

**Case Manager:** Within **2 business days** of the completion of the family reunification assessment, the Case Manager submits a release recommendation. The Case Manager:

1) In collaboration with the Clinician, updates or creates the *UAC Assessment, UAC Case Review* (as applicable), *Sponsor Addendum* (as applicable), and *Individual Service Plan (ISP)* with a release recommendation. Will document in the *UAC Assessment* or *UAC Case* Review, as applicable, a summary of the assessment of the potential sponsor's ability to provide for the UAC's physical and mental well-being and the Case Manager's recommendations.

2) Completes the *Release Request*, and notes whether the case is a Category 1 exempt case in the comments with the date the Case Coordinator concurred.

3) Completes the *Discharge Notification* with the sponsor and UAC demographic information; the actual discharge date is left blank at this point.

4) Updates the *Care Provider Family Reunification Checklist* indicating the date each item was completed and the specific document(s) used as supporting documentation for each category of documentation on the checklist.

5) Emails notification of the pending release decision to the DHS/JC to provide DHS 24 hours to comment on the release, with copy to the Case Coordinator, legal service provider or attorney of record, and Child Advocate, if applicable. Specifies in the subject line "Pending Release Decision," the UAC's full name and alien number (e.g., Pending Release Decision: Garcia Santos, Jose, 098-765-432).

6) Emails notification of the release request to the Case Coordinator. For Category 1 cases meeting the exemption requirement, the Case Manager will skip the email notification to the Case Coordinator and send the case (following the procedure below) straight to the ORR/FFS and CC the Case Coordinator.

**Case Coordinator: Within a maximum of 3 business days (excluding weekends and holidays)** of receipt of the Case Manager's recommendation, the Case Coordinator submits a release recommendation. The Case Coordinator:

1) Reviews the *Release Request*, the *UAC Assessment, UAC Case Review* (as applicable), *Sponsor Addendum* (as applicable) and *ISP* in the ORR database.

2) If additional information is needed to make a recommendation[5], the Case Coordinator requests the information from the Case Manager. The Case Manager responds to requests for additional information within 1 business day.

---

[5] Additional information shall only be requested if needed to assess the sponsor's overall ability to provide for the UAC's physical and mental well-being.

Not Confidential

GOV-00016936



3) Completes a TPR under one of the following scenarios:

   a. **Home Studies:** Makes a home study concurrence to send the case to home study. In this case the notice will be sent back to the Case Manager who will begin the home study referral process.

   b. **Post-Release only Services:** Makes a post-release only services concurrence to recommend post-release only services, the concurrence will ALSO require a completed *Third-Party Recommendation*.

   c. **All other releases (excluding exempt Category 1 cases), and cases with completed home studies:** Completes the *Third-Party Recommendation*, if applicable addressing the following:

      i) Narrative of release recommendation and justification for the recommendation

      ii) Summary of Case Coordinator interviews with UAC

      iii) Summary of interviews or information gathered from sponsor or other stakeholders, as applicable

      iv) Any additional recommendations to promote the UAC's physical and mental well-being and the safety of the release

      v) Explanation of any identified discrepancies in information

4) Completes the Case Coordinator's release recommendation in the *Release Request* and documents whether a TPR or concurrence has been made.

5) Sends the *Third-Party Reunification*, if necessary, with a formal notice of the recommendation to the Case Manager.

**Case Manager:** Within **1 business days** of receipt of the Case Coordinator's *Third-Party Recommendation* and/or case concurrence, the Case Manager:

1) Sends the *Care Provider Family Reunification Checklist*, and either the *Third-Party Recommendation* and/or a notice in the email of the Case Coordinator's case concurrence, and release recommendation to the ORR/FFS, with a copy to the Field Support Specialist and the Case Coordinator, requesting a final release decision.

2) If the ORR/FFS requests additional information, the Case Manager or Case Coordinator responds within 1 business day.

**ORR/FFS**: Within **2 business days** of receipt of the Case Coordinator's and/or Case Manager's completed recommendations the ORR/FFS makes the release decision. The ORR/FFS:

1) Reviews the release request, including the: *Release Request* (in the ORR database), *UAC Assessment*, *UAC Case Review* (as applicable), *Sponsor Addendum* (as applicable) and *ISP* (in the ORR database), *Care Provider Family Reunification Checklist*, and if applicable the *Third-Party Recommendation*.

2) Updates the ORR release decision in the *Release Request* and the *Discharge Notification*.

3) Emails notification of the ORR release decision (e.g., release, release with post-release services, etc.) to the Field Support Specialist, Case Manager, Case Coordinator, legal service provider or attorney of record, and Child Advocate, if applicable. The subject line of the email shall specify "ORR Release Decision" and shall contain the UAC's full name and alien number.

Not Confidential

GOV-00016937



## Conduct Home Study

Please refer to ORR Operations Guide, Section 2.2.6 Mandatory Home Studies

Exhibit 4
Page 405

Not Confidential

Not Confidential

GOV-00016939

ORR UAC PROGRAM OPERATIONS MANUAL (Care Provider Version)

4.403

Not Confidential

GOV-00016940

ORR UAC PROGRAM OPERATIONS MANUAL (Care Provider Version) 

## Release with Post-Release Only Services

**Case Manager:** Within **1 business day** of the ORR/FFS approval to release with post-release only services, the Case Manager:

1) Selects a post-release services provider based on provider capacity and the geographic location of the sponsor, utilizing the *Post-release Referral Contacts*. The Case Manager only refers the case to one post-release services provider at a time, unless otherwise directed by ORR for exceptional circumstances (e.g., capacity issues).). In the event that the case is referred to more than one post-release services provider at a time, the Case Manager must clearly advise each post-release services provider of this in the referral email.

2) Sends the post-release services provider the referral for post-release services, and all attachments as ordered below:

   a) *Release Request* (reflecting Case Manager's and Case Coordinator's recommendations and ORR's decision for release following completion of home study).

   b) *Care Provider Family Reunification Checklist*

   c) *UAC Assessment, UAC Case Review* (as applicable), *Sponsor Addendum* (as applicable)

   d) Updated *Individual Service Plan.*

   e) Results of background checks (including fingerprint results and CA/N results if applicable).

Not Confidential

GOV-00016941

**ORR UAC PROGRAM OPERATIONS MANUAL (Care Provider Version)** 

f) Family reunification packet, supporting documentation and background check results (including on household members), and any additional information, as applicable, obtained by the home study provider, Case Manager or Case Coordinator during the home study process (one PDF file).

g) Child assessments including any additional documentation, as applicable, obtained by the home study provider, care provider or Case Coordinator on the UAC during the home study process that relates to release assessment (one PDF file).

h) *Third-Party Recommendation.*

i) Safety plan, as applicable.

**Post-Release Provider:** Confirms services are in place within **2 business days** of ORR/FFS release approval. The post-release services provider.

1) Reviews the UAC's assessments and family reunification information.

2) Confirms services are in place within 2 business days, and emails notification to the Case Manager, copying the Case Coordinator, ORR/FFS, and Field Support Specialist.

3) In the event that the post-release services provider is unable to secure services, the post-release services provider immediately informs the Case Manager, copying the Case Coordinator, and the Case Manager refers the case to another post-release services provider.

**Care Provider:**

1) The UAC is not released until after the post-release services provider confirms that a post-release services provider is available to begin services immediately upon the UAC's release. However, the UAC's release should not be delayed if a post-release service provider is not available to immediately begin services. The Case Manager informs the post-release services provider of the planned date of discharge prior to release.

## Denial of Release:  Parent/legal guardian

**ORR/FFS:**

1) Consults with the ORR/FFS Supervisor on any denial of release to a parent/ legal guardian to ensure that all alternatives to a denial were explored and that even with additional services the UAC could not be safely reunified with the parent or legal guardian.

2) Emails recommendation of denial of release and clearly outlines justification for denial to  the ORR/FFS Supervisor with the following attachments:

a) All supporting documentation related to the reason(s) for denial.

b) *Release Request.*

c) *UAC Assessment, UAC Case Review* (as applicable), *Sponsor Addendum* (as applicable)

d) *Individual Service Plan.*

e) Sponsor's background check.

f) *Third-party Recommendation.*

Not Confidential

GOV-00016942

**ORR UAC PROGRAM OPERATIONS MANUAL (Care Provider Version)** 

g) *Home Study*, if applicable.

3) In consultation with the ORR/FFS Supervisor, prepares a denial notification letter addressing the basis for denial and information on the process for requesting a reconsideration of the decision, and submits to the ORR/HQ Supervisor.

### ORR/HQ:

1) The ORR/HQ Supervisor, in consultation with the ORR/DCS Division Director, submits to the ORR/Director or his/her designee for final denial determination.

2) The signed denial notification letter is mailed to the parent/legal guardian by ORR.

### ORR/FFS:

1) Notes the ORR/Director's denial of release to a parent/legal guardian in the *Release Request* in the ORR database and documents the justification for the denial.

2) Emails notice of the denial to the Case Manager with a copy of the signed denial letter attached.

3) Emails notification of the denial to the following stakeholders. The subject line of the email shall contain the UAC's full name and alien number and specify "ORR Release Decision: Denial."

   a) Case Coordinator

   b) Legal service provider or attorney of record

   c) Child Advocate, if applicable

   d) Home study provider, if applicable

### Care Provider:

1) Within **1 business day** of receipt of the signed denial letter, the Case Manager, in collaboration with the Clinician, as needed, explains to the sponsor in a language the sponsor understands the reason for the denial and the process to submit a request for reconsideration of ORR's decision as outlined in the letter.

2) The Case Manager, in collaboration with the Clinician, notifies the UAC of the denial.

### Denial of Release:  Non-parent/non-legal guardian

### ORR/FFS:

1) Consults with the ORR/FFS Supervisor on any denial of release to a non-parent/non-legal guardian.

2) Notes the denial decision in the *Release Request* and documents the justification for the denial.

   a) Emails notification of the denial to the stakeholders indicated below. The subject line of the email shall contain the UAC's full name and alien number and specify "ORR Release Decision: Denial."

   b) Case Manager.

   c) Case Coordinator.

   d) Legal service provider or attorney of record.

Not Confidential

GOV-00016943



e) Child Advocate.

f) Home study provider, if applicable.

**Care Provider:**

1) Within 1 business day of receipt of the ORR/FFS's denial decision notice, the Case Manager, in collaboration with the Clinician, notifies the UAC and proposed sponsor of the denial, in a language they understand. The Case Manager informs the proposed sponsor and UAC that a reconsideration of ORR's decision may be requested by writing to:

    ACF Assistant Secretary

Not Confidential

GOV-00016944



# SUBSECTION 4.500
# RELEASE FROM ORR

Exhibit 4
Page 412

Not Confidential



## 4.501 RELEASE FROM ORR: After Care Planning
**Effective Date: Rev. 11/25/2013 (Original 04/30/2012, Rev. 12/21/2012)**

## POLICY

Care providers shall conduct planning for the UAC's needs following release. Throughout the family reunification process, care providers shall work with sponsors and UACs to prepare them for reunification, to assess the sponsor's ability to access community resources, and to provide guidance regarding safety planning and accessing services for the UAC following release. For all UAC, Case Managers shall provide sponsors and UAC with information on basic safety and resources.

Once a UAC is approved for release, the care provider shall collaborate with the sponsor to ensure the UAC is released as quickly as possible. The care provider shall coordinate the physical discharge of the UAC to occur within three (3) calendar days after ORR approves the release. In order to provide DHS sufficient time to comment on the release request, the care provider shall not release the UAC until 24 hours have elapsed from the time the care provider emails notification of the pending release decision to the DHS/JC.

The Case Manager shall ensure that all of the UAC's belongings (money, clothes, etc.) are given to the UAC and sponsor at time of release, including belongings the UAC had at the time they entered ORR custody, and any belongings they acquired during their stay. The care provider shall ensure that the UAC is dressed appropriately for their destination. The Case Manager shall ensure that the UAC and sponsor receive copies of case file documentation needed for the UAC to obtain medical, educational, legal or other services following release.

The Case Manager shall ensure that all stakeholders are informed of the UAC's discharge date and change of address and venue, as applicable.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## PROCEDURES

### Care Planning

1) The Case Manager explains to the UAC and sponsor the following:

    a) U.S. child abuse and neglect standards and child protective services[1]

    b) Human trafficking indicators and resources

    c) Basic safety and 911

### Stakeholder Notification

1) The Case Manager completes the following:

    a) *Verification of Release* (completed on date of release)

---

[1] http://www.childwelfare.gov/pubs/can_info_packet.pdf

Not Confidential                                                                                          GOV-00016946



b) *ORR Notification to ICE Chief Counsel Release of Unaccompanied Alien Child to Sponsor and Request to Change Address. Completes and sends to the:*

   i) ICE Office of Chief Counsel (OCC)

   ii) EOIR Immigration Court Administrator

2) The Case Manager coordinates with the legal service provider or attorney of record to ensure completion of the EOIR Change of Venue Motion and EOIR Alien's Change of Address Form/Immigration Court EOIR - 33/IC, and to provide the sponsor and UAC with instructions for filing Change of Venue Motions and Change of Address forms if the sponsor subsequently moves.

3) Within 24 hours of the UAC's physical release from the care provider, the care provider updates the *Discharge Notification* in the ORR database with the UAC's discharge date.

4) The Case Manager emails the completed *Discharge Notification* to the ORR/FFS, Case Coordinator, DHS/JC, UAC's attorney of record or legal service provider, Child Advocate, post-release services provider, and probation officer, as applicable. The subject line of the email must specify "Discharge Notification" and contain the UAC's full name and alien number.


**UAC's Belongings and Records**

1) At the time of discharge, the care provider gives the sponsor and UAC all of the UAC's belongings, and copies of the following documentation and UAC case records below. The care provider retains a copy in the UAC's case file of any documents provided to the sponsor and UAC:

   a) Personal belongings brought with UAC at time of admission or acquired during stay with ORR

   b) Money from the UAC's daily allowance, if applicable

   c) *Verification of Release* - The original is given to the UAC and sponsor

   d) *Sponsor Care Agreement*

   e) UAC's documents, including but not limited to:

      i) Immigration case related documents

         1. U.S. Department of Homeland Security, Form I-862, Notice to Appear

         2. U.S. Customs and Border Protection, I-94 (if applicable)

         3. Immigration court orders

         4. DHS notifications and determinations

      ii) Original, notarized *Letter of Designation for Care of a Minor*, if applicable

      iii) Immunization record and initial medical screening

      iv) Initial dental exam and any significant dental records

      v) List of all medications the UAC is taking, including reason and dosage, and original of all prescriptions

      vi) Name and contact information of medical, mental health, and dental care providers so sponsor and UAC may request additional records if needed

      vii) Educational assessments and records

Not Confidential

GOV-00016947



viii)  Original or certified official documents in the UAC's case file (e.g., birth, marriage, or death, certificates, etc.)

ix)  Any change of venue and change of address documents (in collaboration with legal service provider or attorney of record), if applicable

x)  Blank copies of Alien's Change of Address Form/Immigration Court EOIR - 33/IC (in collaboration with legal service provider or attorney of record). Each immigration court's Change of Address Form may be accessed here: http://www.justice.gov/eoir/eoirforms/eoir33/ICadr33.htm

xi)  Post-release safety plan, as needed for cases with potential safety risks to UAC or community.

Not Confidential

GOV-00016948

**ORR UAC PROGRAM OPERATIONS MANUAL (Care Provider Version)** 

## 4.502 RELEASE FROM ORR: Transfer of Physical Custody of UAC
**Effective Date: Rev. Rev. 11/25/2013 (Original 04/30/2012, Rev. 12/21/2012)**

## POLICY

The care provider shall notify the Field Support Specialist of the date the UAC will be picked up by the sponsor, or travel to the sponsor, upon confirmation of the date.

Whenever possible, sponsors shall obtain physical custody of the UAC by picking him or her up at the care provider's site or at an off-site location designated by the care provider. Off-site locations (e.g., the care provider's administrative offices) may be designated for care provider sites that maintain a confidential address for the building in which UAC are housed.

The ORR/FFS may approve a UAC to be escorted to the sponsor in extenuating circumstances (e.g., sponsor cannot travel due to medical condition), or if sponsor pick-up of the UAC would cause delay in timely release of the UAC. UAC ages 14 and over may be escorted by an airline escort to a location where a sponsor is waiting. For airline escorts, the care provider must verify the airline's requirements for airline escorts, and ensure in advance that the sponsor can comply with all of the requirements (e.g., ID requirements), that the UAC's needs do not require escort by the sponsor or the care provider, and that there are no safety concerns. UAC under the age of 14 may only be escorted by care provider staff.

The sponsor is responsible for the cost of the UAC's transportation and if an escort is used, for the escort's transportation/airfare. However, in exigent circumstances where a sponsor is unable to afford the cost of airfare for the escort, and the sponsor needs assistance with the costs for the escort's airfare to ensure timely release, ORR may reimburse the care provider for these costs. In no circumstances will ORR pay for the sponsor's airfare. The care provider shall follow ORR instructions and procedures on transportation of UAC.

The care provider escort staff shall verify the identity of the sponsor prior to the sponsor taking physical custody of the UAC. The care provider shall not release the UAC to any individual other than the sponsor approved by ORR.

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

## PROCEDURES

### Sponsor Pick-Up

1) The Case Manager collaborates with the sponsor in selecting a date and time for the sponsor to pick-up the UAC, and advises the sponsor to bring valid government issued photo identification (from a U.S. or foreign government).

2) The care provider notifies the Case Coordinator and Field Support Specialist of the date the UAC will be picked up by the sponsor, upon confirmation of the date.

3) Upon arrival of the sponsor, the care provider checks the sponsor's valid government issued identification.

4) The care provider gives the sponsor the UAC's release documents and personal possessions as outlined in the sub-section on follow-up care planning.

**Exhibit 4**
**Page 416**

45

 GOV-00016949



5) The care provider advises the sponsor, if traveling by airplane, to check in the UAC at the ticket counter with a copy of the UAC's U.S. Department of Homeland Security, Form I-862, Notice to Appear.

6) If the sponsor does not arrive or does not produce valid identification, the care provider contacts his/her supervisor and the ORR/FFS to discuss alternate release plans.

## Care Provider Escort

1) The Case Manager collaborates with the sponsor in selecting flights for the UAC and escort.

2) The care provider notifies the Case Coordinator of the date the UAC will travel, upon confirmation of the date.

3) The Case Manager arranges for the sponsor to pay for the airline tickets for the UAC and escort.

4) The sponsor[1] purchases the airfare and sends the itinerary to the care provider, along with a copy of valid government issued photo identification. The Case Manager ensures the identification document will be acceptable, and instructs the sponsor to meet the UAC and escort at the airport with valid government issued identification.

5) At the airport, the care provider escort checks in the UAC at the ticket counter with a copy of the UAC's U.S. Department of Homeland Security, Form I-862, Notice to Appear.

6) At the final destination, the care provider escort releases the UAC to the sponsor after the sponsor has presented to the escort valid government issued identification.   The care provider escort provides the sponsor with the UAC's release documents and personal possessions.

7) If the sponsor does not arrive at the airport or does not produce valid identification, the care provider escort shall contact his/her supervisor and the ORR/FFS to work out the safe return of the UAC to the care provider program.

8) If the care provider escort has concerns regarding the identity of the sponsor or the safety of the reunification upon meeting the sponsor, the care provider escort shall contact his/her supervisor and the ORR/FFS prior to releasing the UAC.

## Airline Escort

1) The Case Manager contacts the airline to obtain information on airline escort requirements.

2) The Case Manager collaborates with the sponsor to confirm that the sponsor can comply with airline escort requirements.

3) The Case Manager staffs the case with the Case Coordinator to determine if the UAC is an appropriate candidate for an airline escort.

4) The Case Manager collaborates with the sponsor in selecting flights for the UAC.

5) The Case Manager arranges for the sponsor to pay for the airline tickets for the UAC and escort.

6) The sponsor[2] purchases the airfare and sends the itinerary to the care provider, along with a copy of valid government issued photo identification. The Case Manager ensures the identification document

---

[1] The Case Manager should assist the sponsor with making travel reservations if the sponsor requests such assistance.
[2] The Case Manager should assist the sponsor with making travel reservations if the sponsor requests such assistance.

Not Confidential

GOV-00016950

**ORR UAC PROGRAM OPERATIONS MANUAL (Care Provider Version)**



will be acceptable, and instructs the sponsor to meet the UAC and escort at the airport with valid government issued identification.

7) At the airport, the care provider escort checks in the UAC at the ticket counter with a copy of the UAC's U.S. Department of Homeland Security, Form I-862, Notice to Appear.

8) The care provider gives the UAC their personal possessions and documents and mails an additional copy of the release documents to the sponsor.

Not Confidential

GOV-00016951



## 4.503 RELEASE FROM ORR: Closing the UAC's Case File
**Effective Date: Rev. Rev. 11/25/2013 (Original 04/30/2012, Rev. 12/21/2012)**

## PROCEDURES

After completing the *Discharge Notification*, and within 24 hours of the discharge of the UAC, the care provider:

1) Closes the UAC's case file record in the ORR database by dismissing the UAC from the program, and entering the end date as the date that the UAC was physically discharged.

2) Completes the remaining portions of the *Care Provider Family Reunification Checklist* and submits to the ORR/FFS and Field Support Specialist.

Not Confidential

GOV-00016952

# ORR OPERATIONS GUIDE:
## CHILDREN ENTERING THE UNITED STATES UNACCOMPANIED

## Section 5:  Program Management

**Click HERE to link to Section 5 of the ORR Policy Guide.**

### Section 5 Table of Contents

**5.1 REQUESTS TO VISIT ORR CARE PROVIDER FACILITIES** ........................................................................ 2

5.1.1 Related Forms, Checklists, and Other Tools ............................................................................. 2

5.1.2 Requests for Care Provider Facility Tours ............................................................................. 2

5.1.3 Government Accountability Office Visits ................................................................................. 8

**5.7 SIGNIFICANT INCIDENT REPORTING** ............................................................................................. 10

5.7.1 Related Forms, Checklists, and Other Tools ........................................................................... 10

5.7.2 Emergency Incidents ............................................................................................................. 10

5.7.3 Significant Incidents ............................................................................................................. 16

5.7.4 Sexual Abuse Significant Incidents in ORR Care ...................................................................... 21

**5.8 REPORTING TO FEDERAL AGENCIES** ............................................................................................. 27

5.8.1 Related Forms, Checklists, and Other Tools ........................................................................... 27

5.8.2 Reporting to HHS OIG ............................................................................................................. 27

5.8.3 Reporting to USICE HSI ........................................................................................................... 30

5.8.4 Reporting Allegations that Occurred in DHS Custody ............................................................... 33

Exhibit 4

Page 420

Not Confidential

GOV-00016953

## 5.1 REQUESTS TO VISIT ORR CARE PROVIDER FACILITIES

⇨ ORR Policy Guide, Section 5.2 ORR Policies on Requests to Visit ORR Care Provider Facilities

## 5.1.1 Related Forms, Checklists, and Other Tools

| FORM | USED BY |
|---|---|
| *Care Provider Facility Tour Request* | Requesting Party, FFS, Project Officer, DCS Headquarters |
| *Care Provider Facility Tour Addendum* | FFS, Project Officer, DCS Headquarters |

| TOOL | USED BY |
|---|---|
| *Best Practices for Care Providers in Preparing for Facility Tours* | DCS Headquarters, Care Providers |
| *What to Expect — Care Provider Facility Shelter Tours* | DCS Headquarters, Requesting Party |
| *Care Provider Facility Tour Requests Email Templates* | DCS Headquarters |
| *Care Provider Facility Tour Request Tracker* | DCS Headquarters |

## 5.1.2 Requests for Care Provider Facility Tours

Interested parties, including advocacy groups, faith-based organizations, researchers, government officials, international delegations and other relevant stakeholders who wish to tour a care provider facility must request a visit through ORR. ORR considers various factors when responding to these requests with the best interests of the children of paramount importance.

A standard shelter tour consists of guided tour of the care provider facility and does not include standard consular visits. See ⇨ ORR Policy Guide, Section 5.4 ORR Policies on Communication and Interaction with Consulates for policy on standard consular visits.

**Requesting a Standard Shelter Tour**

⇨ ORR Policy Guide, Section 5.2.2 Special Arrangements

**CARE PROVIDER**

1) Refers any requests to tour their facility to the assigned FFS and Project Officer.

**FFS or PROJECT OFFICER**

2) Provides the *Care Provider Facility Tour Request* to the requesting party and instructs them to complete Section 1 of the form and return it to the FFS or Project Officer no later than two weeks before the requested visit date.

Not Confidential

GOV-00016954

3) Upon receipt of the *Care Provider Facility Tour Request* from the requesting party, ensures that:

   a) Section 1 has been fully completed;

   b) Any special arrangements, such as additional security and accessibility issues, are indicated in Section 1C. Such arrangements must be included in the *Care Provider Facility Tour Request* and will be coordinated prior to the approved visit; and

   c) Any specific individuals to whom the requesting party wishes to speak (i.e., care provider staff, children) are indicated in Section 1C. Requests which include access to specific individuals during the visit will be coordinated with the FFS. ORR will only approve such requests if it is consistent with the best interest of the child.

4) Completes Section 2A of the *Care Provider Facility Tour Request*.

5) If the request only requires **FFS Supervisor or Project Officer Supervisor approval** (See *Table 5.1.2-A* below), uses the following criteria to evaluate the tour request:

   ⫸ ORR Policy Guide, Section 5.2.1 Evaluation Criteria

   a) Requestor has a legitimate mission or business purpose for participating touring the shelter (e.g. State/local government matter, child welfare advocacy, legal issue, etc.).

   b) The privacy and well-being of children at the care provider facility will not be adversely affected by the visit.

   c) There are sufficient staffing and ground resources to conduct the visit and protect the privacy and well-being of children. ORR will also consider the number of visitors requested.

   d) There is sufficient notice. Requests should be submitted two weeks prior to the requested tour date. Requests not received within this time frame may be considered if there are exigent circumstances.

6) Emails the *Care Provider Facility Tour Request* to the **FFS SUPERVISOR** or **PROJECT OFFICER SUPERVISOR** for final approval.

7) After supervisor approval is received, completes the remainder of Section 2 and emails the *Care Provider Facility Tour Request* back to the requester to confirm approval or denial of the request, copying the assigned FFS or Project Officer, the FFS Supervisor or Project Officer Supervisor and **UCTourRequests@acf.hhs.gov** for tracking purposes.

| REQUESTS REQUIRING FFS SUPERVISOR OR PROJECT OFFICER SUPERVISOR APPROVAL ONLY |
| --- |
| • Outside Group Events *(religious services, holiday parties, etc. held by outside groups)*<br>• Students |

*Table 5.1.2-A*

**Section 5: Program Management**
**Version 2 (Effective 09/12/16)**

3

**Exhibit 4**
**Page 422**

Not Confidential

GOV-00016955

 **REQUESTS FROM ATTORNEYS**

Shelter tours are generally not allowed for attorneys. If the attorney is interested in providing legal services for UC, contact information should be requested from the attorney and provided to the ORR Division of Policy via **UCPolicy@acf.hhs.gov**. A Division of Policy team member will contact the attorney with further information.

8) If the request requires **ACF or ORR DCS Headquarters approval** (See *Table 5.1.2-B* below), forwards the *Care Provider Facility Tour Request* to **UCTourRequests@acf.hhs.gov**, copying the assigned FFS or Project Officer and the FFS Supervisor and Project Officer Supervisor.

| REQUESTS REQUIRING ACF OR ORR DCS HEADQUARTERS APPROVAL |
| --- |
| • Advocates *(includes religious groups)* <br> • Congressional <br> • Consular Visits *(non-standard)* <br> • Federal Agencies <br> • International *(non-consular)* <br> • State/Local Officials <br> • Media |

*Table 5.1.2-B*

See ⇢ **ORR Policy Guide, Section 5.4 ORR Policies on Communication and Interaction with Consulates** for policy on standard consular visits.

## DCS HEADQUARTERS

9) Reviews requests requiring ACF or ORR DCS Headquarters approval for completeness and accuracy.

10) Uses following criteria to evaluate the tour request:

⇢ **ORR Policy Guide, Section 5.2.1 Evaluation Criteria**

a) Requestor has a legitimate mission or business purpose for participating touring the shelter (e.g. State/local government matter, child welfare advocacy, legal issue, etc.).

b) The privacy and well-being of children at the care provider facility will not be adversely affected by the visit.

c) There are sufficient staffing and ground resources to conduct the visit and protect the privacy and well-being of children. ORR will also consider the number of visitors requested.

d) There is sufficient notice. Requests should be submitted two weeks prior to the requested tour date. Requests not received within this time frame may be considered if there are exigent circumstances.

11) If the criteria above is not met:

a) Confirms decision to deny request with DCS Director and/or Senior FFS Supervisor.

b) Completes Section 2B and emails denial of the request as follows:

**Section 5: Program Management**
**Version 2 (Effective 09/12/16)**

4

**Exhibit 4**
**Page 423**

Not Confidential

GOV-00016956



| | |
|---|---|
| **To:** | FFS or Project Officer (whoever submitted the request) |
| **Cc:** | FFS, Project Officer, FFS Supervisor, Project Officer Supervisor, Senior FFS Supervisor, ORR DCS Director, ORR Chief of Staff, ORR Associate Deputy Director, UCTourRequests@acf.hhs.gov |
| **Body:** | Use language from the *Care Provider Facility Tour Request Email Templates*. |
| **Attachments:** | *Care Provider Facility Tour Request* |

12) If the criteria above is met:

   a) Coordinates with the FFS assigned to the care provider location requested to verify the availability of care provider staff on the date and time requested and the availability of an FFS or FFS Supervisor to staff the tour.

   b) Concurrently forwards the request to the approving official(s) per the table below, copying the DCS Director, Senior FFS Supervisor, Project Officer Supervisor, ORR Chief of Staff, and ORR Associate Deputy Director.



| TYPE OF VISITOR | APPROVING OFFICIAL |
|---|---|
| Advocates (*includes religious groups*) | HHS Office of Intergovernmental and External Affairs |
| Congressional | HHS Assistant Secretary for Legislation |
| Consular Visits | HHS Office of Global Affairs – International Advisory Group |
| International | HHS Office of Global Affairs – International Advisory Group |
| Federal Agencies | Senior FFS Supervisor and/or DCS Director |
| State/Local Officials | HHS Office of Intergovernmental and External Affairs |
| Media | ACF Office of Public Affairs |

*Table 5.1.2-C*

 **REQUESTS FROM THE MEDIA**

For any requests from the media or that involve a media component, the ORR Public Affairs Specialist and ORR Communications Specialist must be copied on the request for approval.

The press may want to visit a facility but not speak with the children. To maintain the privacy, security and well-being of the children, ORR generally does not approve media tours of facilities. However, in certain circumstances, ORR will consider a request and evaluate the request using the following factors in consultation with ACF Office of Public Affairs prior to making a decision about allowing the press to visit a particular facility.

- To what extent will the visit be disruptive to the facility or children in the facility?
- Will special arrangements be needed? (e.g., security)
- How will the visit be conducted? (e.g., interviews with facility staff, number of reporters) How long will the visit be?

**Exhibit 4**
**Page 424**

Not Confidential

GOV-00016957

> - Are there preferable alternatives?
>
> ⇝ **ORR Policy Guide, Section 5.1.4 Requests to Visit a Facility**

13) If the request is denied, completes Section 2B and emails denial of the request as follows:



| | |
|---|---|
| **To:** | FFS or Project Officer (whoever submitted the request) |
| **Cc:** | FFS, Project Officer, FFS Supervisor, Project Officer Supervisor, Senior FFS Supervisor, ORR DCS Director, ORR Chief of Staff, ORR Associate Deputy Director, UCTourRequests@acf.hhs.gov |
| **Body:** | Use language from the *Care Provider Facility Tour Request Email Templates.* |
| **Attachments:** | *Care Provider Facility Tour Request* |

14) If the request is approved, completes the remainder of Section 2 and emails approval of the request as follows:



| | |
|---|---|
| **To:** | FFS or Project Officer (whoever submitted the request) |
| **Cc:** | FFS, Project Officer, FFS Supervisor, Project Officer Supervisor, Senior FFS Supervisor, ORR DCS Director, ORR Chief of Staff, ORR Associate Deputy Director, UCTourRequests@acf.hhs.gov |
| **Body:** | Use language from the *Care Provider Facility Tour Request Email Templates.* |
| **Attachments:** | • *Care Provider Facility Tour Request*<br>• *Best Practices for Care Providers in Preparing for Facility Tours*<br>• *What to Expect – Care Provider Facility Tours* |

15) Updates the *Care Provider Facility Tour Request Tracker* and UC Tour Requests Outlook calendar.



**TOUR REQUEST TRACKING**

The following information must be tracked via spreadsheet for each tour request, at a minimum:

- Date Received
- Type of Visitor (e.g., international, congressional, etc.)
- Number of Visitors
- Care Provider Location
- Tour Date
- Approval Status (i.e., approved or denied)

Each approved tour must be saved in the UC Tour Requests Outlook calendar. Be sure to account for differences in time zones when saving the appointment.

Not Confidential

**FFS or PROJECT OFFICER**

16) If the tour was denied, informs the requesting party that their request cannot be accommodated and includes a copy of the *Care Provider Facility Tour Request* in the email.

17) If the tour was approved:

    a) Emails the approved *Care Provider Facility Tour Request* and *What to Expect – Care Provider Facility Tours* to the requesting party.

    b) Emails the approved *Care Provider Facility Tour Request* and *Best Practices for Care Providers in Preparing for Facility Tours* to the care provider hosting the tour.

    c) Responds to any follow-up questions from the requesting party or care provider, elevating any questions they cannot answer to **UCTourRequests@acf.hhs.gov**.

    d) Emails any changes to the approved tour request (i.e., additional visitors, change in date, time, or location) to **UCTourRequests@acf.hhs.gov**.

**Conducting a Standard Shelter Tour**

⇨ ORR Policy Guide, Section 5.2.3 Visitation Protocol

**FFS or FFS SUPERVISOR**

18) Staffs the tour, answering any ORR-related questions posed by the visitors or referring the questions to ORR HQ and ensuring that the visitors follow ORR visitation protocol as outlined in *What to Expect – Care Provider Facility Tours*.

19) Ensures that the care provider follows ORR policy and procedures as outlined in *Best Practices for Care Providers in Preparing for Facility Tours*.

20) Ensures that the tour does not exceed three (3) hours.

**Post-Tour Responsibilities**

**FFS or FFS SUPERVISOR**

21) **NO LATER THAN TWO (2) BUSINESS DAYS** after the tour date, completes the *Care Provider Facility Tour Addendum* and emails it to **UCTourRequests@acf.hhs.gov**, flagging any major issues or concerns that arose during the tour in the body of the email.

Not Confidential

GOV-00016959

**DCS HEADQUARTERS**

22) Emails the final *Care Provider Facility Tour Request* and *Care Provider Facility Tour Addendum* to the ORR Chief of Staff as follows:



| | |
|---|---|
| **To:** | ORR Chief of Staff |
| **Cc:** | FFS, Project Officer, FFS Supervisor, Project Officer Supervisor, Senior FFS Supervisor, ORR DCS Director, ORR Chief of Staff, ORR Associate Deputy Director, ORR Deputy Director for Children's Programs, UCTourRequests@acf.hhs.gov |
| **Body:** | Use language from the *Care Provider Facility Tour Request Email Templates.* |
| **Attachments:** | • *Care Provider Facility Tour Request*<br>• *Care Provider Facility Tour Addendum* |

23) Updates the *Care Provider Facility Tour Request Tracker* and saves the final *Care Provider Facility Tour Request* and *Care Provider Facility Tour Addendum* on the ORR shared drive.

## 5.1.3 Government Accountability Office Visits

The U.S. Government Accountability Office (GAO), an independent, nonpartisan agency that works for Congress, may request to visit a care provider facility in order to:

- Audit agency operations to determine whether federal funds are being spent efficiently and effectively;
- Investigate allegations of illegal and improper activities;
- Report on how well government programs and policies are meeting their objectives;
- Perform policy analyses and outlining options for congressional consideration; and/or
- Issue legal decisions and opinions, such as bid protest rulings and reports on agency rules.

**FFS, PROJECT OFFICER, or ORR OFFICIAL**

1) Received request from GAO to visit a care provider facility. If the request is received by the care provider, they must email the request to their assigned FFS and Project Officer.

2) Completes Section 1 of the *Care Provider Facility Tour Request* and emails the form to **UCTourRequests@acf.hhs.gov,** copying the assigned FFS, Project Officer, FFS Supervisor, and Project Officer Supervisor.

- GAO is categorized as a Federal agency, which requires ACF or ORR DCS Headquarters approval, and is required to formally request a visit that is then elevated to ORR Headquarters for situational awareness.
- If GAO requests to interview care provider staff or UC, this should be indicated ahead of time on the *Care Provider Facility Tour Request.*
- If GAO requests to review UC case files or other documentation, this should be indicated ahead of time on the *Care Provider Facility Tour Request* so that the care provider may have these items ready and available on the day of the visit.

Not Confidential                                                                                                    GOV-00016960

**DCS HEADQUARTERS**

3) Follows the procedures outlined above in ⇛ **Section 5.1.2 Requests for Care Provider Facility Tours**, beginning with Step 9.

**FFS**

4) Follows the procedures outlined above in ⇛ **Section 5.1.2 Requests for Care Provider Facility Tours**, beginning with Step 18 under Conducting a Standard Shelter Tour.

5) The FFS staffing the tour should make themselves available to answer ORR-related questions. At times, GAO may ask the FFS to leave the room so that they may speak with UC or staff privately. The FFS must comply with this request.

Not Confidential

GOV-00016961

## 5.7 SIGNIFICANT INCIDENT REPORTING

➾ ORR Policy Guide, Section 5.8 Significant Incident Reports and Notification Requirements

## 5.7.1 Related Forms, Checklists, and Other Tools

| FORM | USED BY |
|------|---------|
| Significant Incident Report (SIR) | Care Provider |
| Sexual Abuse Significant Incident Report (SA/SIR) | Care Provider |
| Significant Incident Report (SIR) Addendum | Care Provider |
| Sexual Abuse Significant Incident Report (SA/SIR) Addendum | Care Provider |

| TOOL | USED BY |
|------|---------|
| CHART 1: Definition of Sexual Abuse and Sexual Harassment | Care Provider |
| CHART 2: Reporting and Notification Requirements for Significant Incidents | Care Provider |
| FLOWCHART: How to Report Sexual-Related Incidents | Care Provider |
| UC Portal SIR User Guide | Care Provider |

## 5.7.2 Emergency Incidents

➾ ORR Policy Guide, Section 5.8.1 Emergency Incidents
➾ ORR Policy Guide, Section 5.8.8 Elevation of Emergencies and Serious Incidents
➾ ORR Policy Guide, Section 3.3.16 Notification and Reporting of the Death of an Unaccompanied Child
➾ ORR Policy Guide, Section 3.4.5 Responding to Medical Emergencies

**Emergency incidents include:**

- Death of a child, staff, or other person in a care provider facility
- Situations in which the lives of children or staff are in immediate danger (e.g., active shooter, earthquake or other natural disaster, medical emergency that is life threatening in nature requiring immediate hospitalization) **NOTE:** A medical emergency is an acute injury, illness, or toxic exposure that necessitates a 911 call or urgent medical attention that, if not received, may result in death or damage to vital bodily functions.
- Unauthorized absence from a care provider (i.e., a runaway)

Emergency Incidents and allegations may be reported to care providers multiple ways (e.g., ORR staff; stakeholders such as legal service providers, DHS, or the sponsor; the UC; self-observation). No matter

Not Confidential                                                                    GOV-00016962

the method by which the care provider became aware of the incident or allegation, the care provider must follow all reporting, notification, and follow-up requirements in this subsection.

**Reporting**

**CARE PROVIDER**

1) **IMMEDIATELY**:

   a) Calls **911**, if appropriate (For unauthorized absences always call 911).

   b) For unauthorized absences:

      - Calls the National Center for Missing and Exploited Children Hotline at **1-800-THE-LOST** (1-800-843-5678).

      - Calls the DHS FOJC.

   c) Reports the emergency incident to CPS and/or State licensing according to State licensing requirements and reporting procedures.

   d) Reports emergency incident to the ORR Intakes Hotline at **(202) 401-5709**.

**INTAKES**

2) **IMMEDIATELY**, notifies the FFS Supervisor (or on-call FFS Supervisor) of the emergency incident **via phone.**

3) If unable to reach the FFS Supervisor (or on-call FFS Supervisor) **within 15 minutes**, calls the Senior FFS Supervisor.

**FFS SUPERVISOR**

4) **WITHIN 30 MINUTES**, elevates the emergency incident to Senior FFS Supervisor, DCS Director, ORR Deputy Director for Children's Services, and ORR Director.

**CARE PROVIDER**

5) **WITHIN 4 HOURS OF THE EMERGENCY INCIDENT (or within 4 hours of the care provider becoming aware of the incident):**

   a) Completes an *SIR* in the UC Portal (see *UC Portal SIR User Guide* located on the UC Portal homepage)



> **ENTERING SIR DATES IN THE UC PORTAL**
>
> **Event Section**
> - **Date of Event** – Date the actual incident occurred (or estimate if occurred prior to ORR care)
>
> **SIR Incident Information Section**
> - **Date Reported to Care Provider** – Date the incident was reported to the Care Provider
> - **Date Reported to ORR** – Date the Care Provider reported the incident to ORR

Not Confidential                                                                                                                                    GOV-00016963

b)  Notifies ORR as show below, and saves a copy of the *SIR* in the UC's case file.



| | |
|---|---|
| **To:** | Required for All Emergency Incidents<br>SIRHotline@acf.hhs.gov<br>Project Officer<br>FFS Supervisor<br>FFS<br>CFS<br>Case Coordinator<br><br>Required for Certain Types of Emergency Incidents<br>ORR Medical Coordinator (medical incidents)<br>ICE FOJC (unauthorized absences) |
| **Subject Line:** | Must read "Report of Emergency Incident" and include the event number (e.g., "Event 12345") |
| **Body:** | Use *Synopsis of the Event* from UC Portal and do not include UC's full name or alien number |
| **Attachments:** | *SIR* |

## Notifications

### CARE PROVIDER

**WITHIN 48 HOURS OF THE EMERGENCY INCIDENT (or within 48 hours of the care provider becoming aware of the incident):**

1) Notifies the UC's attorney of record and/or legal service provider of any <u>unauthorized absences</u> following the table below **(except when otherwise required by state licensing)** and documents the UC's decision in the *UC Case Review*.

   **Note: DO NOT send a copy of the *SIR* to the attorney of record of legal service provider.**

   **NOTIFICATION TO ATTORNEYS AND LEGAL SERVICE PROVIDERS**

| UC'S AGE | DOES UC HAVE AN ATTORNEY OF RECORD? | CARE PROVIDER REQUIREMENTS |
|---|---|---|
| 14 Years or Older | Yes | Follow minor's decision |
| 14 Years or Older | No | 1. Inform minor that the allegation may affect the his/her eligibility for immigration relief<br>2. Ask whether the minor would like to speak with an attorney<br>3. Follow minor's decision |

**Exhibit 4**
**Page 431**

Not Confidential

GOV-00016964

| 14 Years or Older with a Diagnosed Developmental Disability | Yes or No | Notify the FFS prior to speaking with the minor |
| Under 14 Years Old | Yes or No | Notify the minor's attorney of record or the local legal service provider |

Table S.7.4-A ⇨ ORR Policy Guide, Figure 4.10.1

2) Notifies the UC's parent or legal guardian and the UC's sponsor or the receiving entity that will be caring for the UC (when the UC is released from ORR custody) of any <u>unauthorized absences, hospitalizations, or serious medical services</u> following the table below **(except when otherwise required by state licensing)** and documents the UC's decision in the *UC Case Review*.

**Note: DO NOT send a copy of the *SIR* to the UC's parent, legal guardian, sponsor, or entity caring for the UC.**

### NOTIFICATION TO PARENTS/LEGAL GUARDIANS AND SPONSORS

| UC'S AGE | CARE PROVIDER REQUIREMENTS |
|---|---|
| 14 Years or Older | 1. Follow minor's decision whether to notify the parent or legal guardian unless there is evidence showing they should not be notified<br>2. Follow the minor's decision whether to notify the sponsor or receiving facility, if different from the parent or legal guardian |
| 14 Years or Older with a Diagnosed Developmental Disability | Notify the FFS prior to speaking with the minor |
| Under 14 Years Old | 1) Notify the minor's parent or legal guardian unless there is evidence showing they should not be notified<br>2) Notify the minor's sponsor or receiving facility, if different from the parent or legal guardian |

Table S.7.4-B ⇨ ORR Policy Guide, Figure 4.10.2

3) If applicable, notifies the UC's child advocate of any <u>unauthorized absences, hospitalizations, or serious medical services</u> following the table below **(except when otherwise required by state licensing)** and documents the UC's decision in the *UC Case Review*.

**Note: Include a copy of the *SIR*.**

Not Confidential

GOV-00016965

**NOTIFICATION TO CHILD ADVOCATES**

| UC'S AGE | CARE PROVIDER REQUIREMENTS |
|---|---|
| 14 Years or Older | Follow minor's decision |
| 14 Years or Older with a Diagnosed Developmental Disability | Notify the FFS prior to speaking with the minor |
| Under 14 Years Old | Notify the minor's child advocate |

Table 5.7.4–C ⇨ ORR Policy Guide, Figure 4.10.3

## DCS HEADQUARTERS

In the event of the death of a UC:

1) **IMMEDIATELY (within 24 hours of DCS HQ becoming aware of the incident)** notifies:
   - UC's parent, legal guardian, or next-of-kin
   - UC's consulate
   - UC's attorney of record and/or legal service provider, if applicable
   - Child advocate, if applicable
   - ICE FOJC
   - DHS ERO Juvenile and Family Residential Management Unit (JFRMU) at **JFRMU@ice.dhs.gov.**

### Follow-Up and Additional Reporting

⇨ ORR Policy Guide, Section 5.8.7 SIR Addendums

## CARE PROVIDER

1) Uploads any documents received related to investigations and law enforcement involvement (e.g., CPS, State licensing) to the UC Portal upon receipt, if applicable.

2) Updates the UC on the results of the law enforcement investigation, if applicable. (Note: If the victim is no longer in ORR custody, the care provider must attempt to notify the victim of the results of the investigation at his or her last known address.)

3) Creates an *SIR Addendum* (see *UC Portal SIR User Guide* located on the UC Portal homepage) to an existing *SIR* when:

   1) Information in the original *SIR* was incorrect or incomplete

   2) New or more detailed information has become available since the original *SIR* was submitted. Examples of new information include, but are not limited to:

      o Discussion with the sponsor about the incident

      o Media inquiries about the incident

      o Receipt of official reports from State or local government agency

**Section 5: Program Management**
**Version 2 (Effective 09/12/16)**

14

**Exhibit 4**
**Page 433**

   o   Updates on investigations and law enforcement involvement

4) **WITHIN 24 HOURS of determining the need to create an *SIR Addendum*,** notifies ORR as shown below, and saves a copy of the *SIR Addendum* in the UC's case file.

| | | |
|---|---|---|
| **To:** | _Required for All Emergency Incident SIR Addendums_<br>SIRHotline@acf.hhs.gov<br>Project Officer<br>FFS Supervisor<br>FFS<br>CFS<br>Case Coordinator<br><br>_Required for Certain Types of Emergency Incident SIR Addendums_<br>ORR Medical Coordinator (medical incidents) | |
| **Subject Line:** | Must read "Report of Emergency Incident Addendum" and include the event number (e.g., "Event 12345") | |
| **Body:** | Use _Synopsis of the Event_ from UC Portal and do not include UC's full name or alien number | |
| **Attachments:** | _SIR Addendum_ | |

**FFS AND PO**

1) FFS and PO during their monthly meeting review the emergency SIRs to ensure that the SIR is clearly written with all required information. Also, ensures that the emergency SIR was reported appropriately.
2) If the emergency *SIR* was not reported to the appropriate agency or with the appropriate information:
   a) Coordinate providing the care provider technical assistance.
   b) If the issue persists, then coordinates issuing a corrective action and requires the care provider to take appropriate action. ⇛ **ORR Policy Guide, Section 5.5.2 Follow Up and Corrective Actions**

**FFS**

For unauthorized absences, hospitalizations, and serious medical services only:

1) If any investigative entity (e.g., CPS, law enforcement, State licensing, USICE HSI, HHS OIG, DHS OIG, CRCL, CBP) that received a report has not verified if they will conduct an investigation within the entity's standard response time, then **WITHIN 1 BUSINESS DAY**, follows up with that investigative entity to determine if the incident will be investigated.
2) If an investigative entity opens an investigation for the reported *SIR* then the care provider, FFS Supervisor, and FFS cooperate fully during the investigative process.

**Section 5: Program Management**                     15<br>**Version 2 (Effective 09/12/16)**

**Exhibit 4**<br>**Page 434**

Not Confidential                               GOV-00016967

**FFS or FFS SUPERVISOR**

In the event of the death of a UC:

- Obtains police reports and uploads them into the UC Portal.

- Works with the Medical Examiner or other appropriate office to obtain a death certificate and upload to the UC Portal.

- Works with DCS Headquarters, Project Officer, and other appropriate stakeholders to arrange for transportation of the UC's remains to country of origin and/or a funeral.

- Follows up with State licensing to determine if the care provider is required to perform any additional actions.

## 5.7.3 Significant Incidents

➠ **ORR Policy Guide, Section 5.8.2 Significant Incidents**
➠ **ORR Policy Guide, Section 5.8.5 Allegations of Past Abuse that Occurred Outside the United States**
➠ **ORR Policy Guide, Section 5.8.6 Allegations of Past Abuse that Occurred Inside the United States**
➠ **ORR Policy Guide, Section 5.8.8 Elevation of Emergencies and Serious Incidents**

**Significant incidents include, but are not limited to:**

- Abuse or neglect in ORR care (not including sexual abuse)
- Past abuse and neglect in the U.S. – not in ORR care (includes sexual abuse)
- Past abuse and neglect outside the U.S. (includes sexual abuse)
- Abuse or neglect in DHS custody (includes sexual abuse)
- Behavioral incidents that threaten safety, such as physical aggression, assaults, or suicide attempts
- Escape risk or escape attempt
- Incidents involving law enforcement
- Pregnancy and pregnancy-related issues
- Safety measures, such as the use of restraints
- Criminal history (all types of criminal history)
- Contact or threats to a UC while in ORR care from smuggling syndicates, organized crime or other criminal actors
- Potential fraud schemes
- Any type of non-emergency incident that endangers the safety and well-being of the minor

For incidents of sexual abuse that occurred while the UC was in ORR care, refer to ➠ **ORR Ops Guide, Section 5.7.4 Sexual Abuse Significant Incidents in ORR Care.**

Incidents and allegations may be reported to care providers multiple ways (e.g., ORR staff; stakeholders such as legal service providers, DHS, or the sponsor; the UC; self-observation). No matter the method by which the care provider became aware of the incident or allegation, the care provider must follow all reporting, notification, and follow-up requirements in this subsection.

Not Confidential                                                                          GOV-00016968

**Reporting**

**CARE PROVIDER**

**WITHIN 4 HOURS OF THE SIGNIFICANT INCIDENT (or within 4 hours of the care provider becoming aware of the incident):**

1) Reports the incident to CPS, local law enforcement, and/or State licensing according to State licensing requirements and reporting procedures.

   NOTE: Incidents must be reported to CPS in both the state of the reporting care provider and the state in which the incident took place according to state licensing requirements.

2) Reports incidents to other federal agencies. Refer to:

   ⇒ *ORR Ops Guide, Section 2.2.5 Protecting Sponsors from Fraud*
   ⇒ *ORR Ops Guide, Section 5.8 Reporting to Federal Agencies*

3) Completes an *SIR* in the UC Portal (see *UC Portal SIR User Guide* located on the UC Portal homepage).



> **ENTERING SIR DATES IN THE UC PORTAL**
>
> **Event Section**
> - **Date of Event** – Date the actual incident occurred (or estimate if occurred prior to ORR care)
>
> **SIR Incident Information Section**
> - **Date Reported to Care Provider** – Date the incident was reported to the Care Provider
> - **Date Reported to ORR** – Date the Care Provider reported the incident to ORR

4) Notifies ORR as shown below, and saves a copy of the *SIR* in the UC's case file.



| | |
|---|---|
| **To:** | Required for All *SIRs*<br>SIRHotline@acf.hhs.gov<br>Project Officer<br>FFS<br>CFS<br>Case Coordinator<br><br>Required for Certain Types of *SIRs*<br>ORR Medical Coordinator (medical incidents) |
| **Subject Line:** | Must read "Report of Significant Incident" and include the event number (e.g., "Event 12345") |
| **Body:** | Use *Synopsis of the Event* from UC Portal and do not include UC's full name or alien number |
| **Attachments:** | *SIR* |

*Section 5: Program Management*
*Version 2 (Effective 09/12/16)*

17

**Exhibit 4**
**Page 436**

Not Confidential

GOV-00016969

## Notifications Required for Abuse/Neglect or Human Trafficking SIRs

### CARE PROVIDER

1) **WITHIN 48 HOURS OF THE SIGNIFICANT INCIDENT (or within 48 hours of the care provider becoming aware of the incident),** makes additional notifications following the tables below, except when otherwise required by state licensing.

2) Documents any decisions the UC makes regarding notifications in the *UC Case Review*.

   **Note: DO NOT send a copy of the *SIR* to these individuals/entities unless otherwise specified.**

### NOTIFICATION REQUIREMENTS

| TYPE OF INCIDENT | NOTIFICATION REQUIREMENT |
|---|---|
| Any Allegation of Abuse or Neglect, Regardless of Where It Occurred | • Parent or Legal Guardian (see table 5.7.3-C below)<br>• Attorney of Record and/or Legal Service Provider (see table 5.7.3-B below)<br>• Sponsor or Receiving Facility (see table 5.7.3-C below)<br>• Child Advocate, if applicable (include copy of *SIR*, see table 5.7.3-D below) |
| Human Trafficking Prior to ORR Care | • OTIP at **ChildTrafficking@acf.hhs.gov** (include a copy of relevant *SIRs*, the most recent *UC Assessment*, and note if reported to investigative entities)<br>• Attorney of Record and/or Legal Service Provider (see table 5.7.3-B below)<br>• Child Advocate, if applicable (include copy of *SIR*, see table 5.7.3-D below) |
| Human Trafficking Post-Release | • OTIP at **ChildTrafficking@acf.hhs.gov** (include a copy of the *SIR*, the most recent *UC Assessment*, and note if reported to investigative entities)<br>• Attorney of Record and/or Legal Service Provider (see table 5.7.3-B below)<br>• Child Advocate, if applicable (include copy of *SIR*, see table 5.7.3-D below) |

Table 5.7.3-A

Not Confidential

GOV-00016970

**All required notification must be made in accordance with the tables below, except when otherwise required by state licensing:**

### NOTIFICATION TO ATTORNEYS AND LEGAL SERVICE PROVIDERS

| UC'S AGE | DOES UC HAVE AN ATTORNEY OF RECORD? | CARE PROVIDER REQUIREMENTS |
|---|---|---|
| 14 Years or Older | Yes | Follow minor's decision |
| 14 Years or Older | No | 1. Inform minor that the allegation may affect the his/her eligibility for immigration relief<br>2. Ask whether the minor would like to speak with an attorney<br>3. Follow minor's decision |
| 14 Years or Older with a Diagnosed Developmental Disability | Yes or No | Notify the FFS prior to speaking with the minor |
| Under 14 Years Old | Yes or No | Notify the minor's attorney of record or the local legal service provider |

Table 5.7.3-B ⇝ ORR Policy Guide, Figure 4.10.1

### NOTIFICATION TO PARENTS/LEGAL GUARDIANS AND SPONSORS

| UC'S AGE | CARE PROVIDER REQUIREMENTS |
|---|---|
| 14 Years or Older | 1. Follow UC's decision whether to notify the parent or legal guardian unless there is evidence showing they should not be notified.<br>2. Follow the UC's decision whether to notify the sponsor or receiving facility, if different from the parent or legal guardian. |
| 14 Years or Older with a Diagnosed Developmental Disability | Notify the FFS prior to speaking with the minor. |
| Under 14 Years Old | 1. Notify the minor's parent or legal guardian unless there is evidence showing they should not be notified.<br>2. Notify the minor's sponsor or receiving facility, if different from the parent or legal guardian. |

Table 5.7.3-C ⇝ ORR Policy Guide, Figure 4.10.2

Not Confidential

GOV-00016971

**NOTIFICATION TO CHILD ADVOCATES**

| UC'S AGE | CARE PROVIDER REQUIREMENTS |
|---|---|
| 14 Years or Older | Follow minor's decision |
| 14 Years or Older with a Diagnosed Developmental Disability | Notify the FFS prior to speaking with the minor |
| Under 14 Years Old | Notify the minor's child advocate |

Table 5.7.3-D ⁂ ORR Policy Guide, Figure 4.10.3

## Follow-Up and Additional Reporting

⁂ ORR Policy Guide, Section 5.8.7 SIR Addendums

**CARE PROVIDER**

1) Uploads any documents received related to investigations (e.g., CPS, State licensing, HHS OIG, DHS OIG, USICE HSI, CRCL, CBP) to the UC Portal upon receipt, if applicable.

2) Creates an *SIR Addendum* (see *UC Portal SIR User Guide* located on the UC Portal homepage) to an existing *SIR* when:

- Information in the original *SIR* was incorrect or incomplete

- New or more detailed information has become available since the original *SIR* was submitted. Examples of new information include, but are not limited to:
  - o Discussion with the sponsor about the incident
  - o Media inquiries about the incident
  - o Receipt of official reports from State or local governments
  - o Updates on investigations

2) **WITHIN 24 HOURS of determining the need to create an *SIR Addendum*,** notifies ORR as shown below, and saves a copy of the *SIR Addendum* in the UC's case file.

| | |
|---|---|
| **To:** | Required for All *SIR Addendums* SIRHotline@acf.hhs.gov Project Officer FFS CFS Case Coordinator |
| | Required for Certain Types of *SIR Addendums* ORR Medical Coordinator (medical incidents) ChildTrafficking@acf.hhs.gov (human trafficking in ORR care and human trafficking post release) |
| **Subject Line:** | Must read "Report of Significant Incident Addendum" and include the event number (e.g., |

Section 5: Program Management
Version 2 (Effective 09/12/16)
20
**Exhibit 4**
**Page 439**
Not Confidential
GOV-00016972

|  | "Event 12345") |
| --- | --- |
| **Body:** | Use *Synopsis of the Event* from UC Portal and do not include UC's full name or alien number |
| **Attachments:** | *SIR Addendum* |

**FFS**

1) Reviews the UC's allegation in the *SIR* and ensures that the *SIR* is clearly written with all required information. Also, ensures that the SIR was reported to the appropriate investigative agency.

2) If the allegation was not reported to the appropriate agency or with the appropriate information:

- Provide the care provider technical assistance.

- If the issue persists, then issues corrective action findings and requires the care provider to take appropriate action. ⇨ **ORR Policy Guide, Section 5.5.2 Follow Up and Corrective Actions**

3) If any CPS, local law enforcement, or State Licensing investigative entity that received a report has not verified if they will conduct an investigation within the entity's operational response time, then **WITHIN 1 BUSINESS DAYS**, follows up with that investigative entity to determine if the incident will be investigated.

⇨ **ORR Ops Guide, Section 2.2.5 Protecting Sponsors from Fraud**
⇨ **ORR Ops Guide, Section 5.8 Reporting to Federal Agencies**

4) If an investigative entity opens an investigation for the reported *SIR* then the care provider, FFS Supervisor, FFS and CFS cooperate fully during the investigative process.

## 5.7.4 Sexual Abuse Significant Incidents in ORR Care

⇨ **ORR Policy Guide, Section 4.10 Reporting and Follow-up**
⇨ **ORR Policy Guide, Section 4.10.1 Methods for Children and Youth to Report**
⇨ **ORR Policy Guide, Section 4.10.5 Confidentiality**
⇨ **ORR Policy Guide, Section 4.10.6 UC Sexual Abuse Hotline**
⇨ **ORR Policy Guide, Section 5.8.3 Allegations of Sexual Abuse and Harassment in ORR Care**

**Care providers must use the Sexual Abuse Significant Incident Form to report the following:**

- Sexual abuse in ORR care
- Sexual harassment in ORR care
- Inappropriate sexual behavior in ORR care

Incidents and allegations may be reported to care providers multiple ways (e.g., ORR staff; outside stakeholders such as legal service providers, DHS, or the sponsor; the UC; self-observation). No matter the method by which the care provider became aware of the incident or allegation, the care provider must follow all reporting, notification, and follow-up requirements according to Section 4.10 of the ORR Policy Guide and as described in this subsection.

**Exhibit 4**
**Page 440**

Not Confidential

GOV-00016973

Care providers may use CHART 1: *Definition of Sexual Abuse and Sexual Harassment* as a reference guide in determining whether an incident is considered sexual abuse or sexual harassment.

Care providers may refer to FLOWCHART: *How to Report Sexual-Related Incidents* for a quick reference guide on reporting and notification requirements for sexual abuse significant incidents.

## Reporting

➣ ORR Policy Guide, Section 4.10.2 Care Provider Reporting Requirements

**CARE PROVIDER**

**WITHIN 4 HOURS OF THE SEXUAL-RELATED SIGNIFICANT INCIDENT (or within 4 hours of the care provider becoming aware of the incident):**

1) Reports the incident to CPS, local law enforcement, and/or State licensing according to State licensing requirements, and ORR reporting policies.

   NOTE: Incidents of sexual abuse or harassment that occurred at another care provider must be reported to CPS in both the state of the reporting care provider and the state in which the incident took place.  Incidents of sexual abuse involving an adult must be reported to local law enforcement.

2) Completes a *Sexual Abuse SIR* (*SA*/SIR) in the UC Portal (see *UC Portal SIR User Guide* located on the UC Portal homepage) and saves a copy of the *SA/SIR* in the UC's case file.

3) Reports incidents that fall under the definition of **sexual abuse** to the FBI as follows:



| | | |
|---|---|---|
| **To:** | VCACU_ORR_Reporting@ic.fbi.gov | |
| **Cc:** | FFS | |
| | CFS | |
| | Project Officer | |
| | UAC@oig.hhs.gov | |
| | psac@acf.hhs.gov | |
| **Subject Line:** | Must only include the event number (e.g., "Event 12345") | |
| **Attachments:** | *SA/SIR* | |
| | ○ Do not send all *SA/SIRs* for each UC involved in the incident; only send one *SA/SIR* per event. | |
| | ○ Attachment must be labeled with event number | |
| | ○ Attachment must be password protected | |
| | ○ Password must be sent in a separate email that references the event number | |

**Exhibit 4**
**Page 441**

Not Confidential

GOV-00016974

4) Reports all allegations of **sexual abuse, sexual harassment, and inappropriate sexual behavior** to ORR as follows:



| To: | Required for All SA/SIRs |
| --- | --- |
| | SIRHotline@acf.hhs.gov |
| | Project Officer |
| | FFS |
| | FFS Supervisor |
| | Case Coordinator |
| | CFS |
| | ORR Medical Coordinator |
| | |
| | Required for Sexual Abuse SA/SIRs Only (DO NOT send sexual harassment or inappropriate sexual behavior SA/SIRs) |
| | UAC@oig.hhs.gov |
| | psac@acf.hhs.gov |
| Attachments: | SA/SIR |

**Notifications**

↠ ORR Policy Guide, Section 4.10.4 Notification and Access to Attorneys/Legal Representatives, Families, Child Advocates, and Sponsors

**CARE PROVIDER**

**WITHIN 48 HOURS OF A SEXUAL ABUSE OR SEXUAL HARASSMENT INCIDENT (or within 48 hours of the care provider becoming aware of the incident):**

1) Notifies the UC's attorney of record and/or legal service provider of the incident following *Table 5.7.4-A* below and documents how the notification was made in the Notifications section of the *SA/SIR* or *SA/SIR Addendum*.

   **Note: DO NOT send a copy of the *SA/SIR* to the attorney of record or legal service provider.**

**NOTIFICATION TO ATTORNEYS AND LEGAL SERVICE PROVIDERS**

| UC'S AGE | DOES UC HAVE AN ATTORNEY OF RECORD? | CARE PROVIDER REQUIREMENTS |
| --- | --- | --- |
| 14 Years or Older | Yes | Follow minor's decision |
| 14 Years or Older | No | 1. Inform minor that the allegation may affect the his/her eligibility for immigration relief<br>2. Ask whether the minor would like to speak with an attorney<br>3. Follow minor's decision |

Not Confidential

| 14 Years or Older with a Diagnosed Developmental Disability | Yes or No | Notify the FFS prior to speaking with the minor |
| Under 14 Years Old | Yes or No | Notify the minor's attorney of record or the local legal service provider |

Table S.7.4-A  ⟶ ORR Policy Guide, Figure 4.10.1

2) Notifies the UC's parent or legal guardian and the UC's sponsor or the receiving entity that will be caring for the UC (when the UC is released from ORR custody) of the incident following *Table 5.7.4-B* below and documents how the notification was made in the Notifications section of the *SA/SIR* or *SA/SIR Addendum*.

**Note: DO NOT send a copy of the *SA/SIR* to the UC's parent, legal guardian, sponsor, or entity caring for the UC.**

### NOTIFICATION TO PARENTS/LEGAL GUARDIANS AND SPONSORS

| UC'S AGE | CARE PROVIDER REQUIREMENTS |
|---|---|
| 14 Years or Older | 1. Follow minor's decision whether to notify the parent or legal guardian unless there is evidence showing they should not be notified<br>2. Follow the minor's decision whether to notify the sponsor or receiving facility, if different from the parent or legal guardian |
| 14 Years or Older with a Diagnosed Developmental Disability | Notify the FFS prior to speaking with the minor |
| Under 14 Years Old | 1. Notify the minor's parent or legal guardian unless there is evidence showing they should not be notified<br>2. Notify the minor's sponsor or receiving facility, if different from the parent or legal guardian |

Table 5.7.4-B  ⟶ ORR Policy Guide, Figure 4.10.2

3) If applicable, notifies the UC's child advocate of the incident following *Table 5.7.4-C* below and documents how the notification was made in the Notifications section of the *SA/SIR or SA/SIR Addendum*.

**Note: If notifying the child advocate, include a copy of the *SA/SIR*.**

### NOTIFICATION TO CHILD ADVOCATES

| UC'S AGE | CARE PROVIDER REQUIREMENTS |
|---|---|
| 14 Years or Older | Follow minor's decision |

Not Confidential

GOV-00016976

| 14 Years or Older with a Diagnosed Developmental Disability | Notify the FFS prior to speaking with the minor |
|---|---|
| Under 14 Years Old | Notify the minor's child advocate |

Table 5.7.4–C ⇒ ORR Policy Guide, Figure 4.10.3

## Follow-Up and Additional Reporting

⇒ ORR Policy Guide, Section 4.10.3 Sexual Abuse and Harassment Follow-up
⇒ ORR Policy Guide, Section 5.8.7 SIR Addendums

## CARE PROVIDER

1) Uploads any documents received related to investigations (e.g., CPS, State licensing) to the UC Portal upon receipt, if applicable.

2) Creates an *SA/SIR Addendum* (see *UC Portal SIR User Guide* located on the UC Portal homepage) to an existing *SA/SIR* when:

   - Information in the original *SA/SIR* was incorrect or incomplete

   - New or more detailed information has become available since the original *SA/SIR* was submitted. Examples of new information include, but are not limited to:

     o Discussion with the sponsor about the incident

     o Media inquiries about the incident

     o Receipt of official reports from State or local governments

     o Updates on investigations

3) **WITHIN 24 HOURS of determining the need to create an *SA/SIR Addendum*,** notifies ORR as shown below, and saves a copy of the *SA/SIR Addendum* in the UC's case file.



| **To:** | Required for All *SA/SIR Addendums* |
|---|---|
| | SIRHotline@acf.hhs.gov |
| | Project Officer |
| | FFS |
| | FFS Supervisor |
| | Case Coordinator |
| | CFS |
| | ORR Medical Coordinator |
| | |
| | Required for Sexual Abuse *SA/SIR Addendums* Only (DO NOT send sexual harassment or inappropriate sexual behavior *SA/SIRs*, DO NOT send *SA/SIR Addendums* to the FBI) |
| | UAC@oig.hhs.gov |
| | psac@acf.hhs.gov |
| **Attachments:** | *SA/SIR Addendum* |

**Section 5: Program Management**
**Version 2 (Effective 09/12/16)**

25

**Exhibit 4**
**Page 444**

Not Confidential

GOV-00016977

**FFS**

**For Local Investigative Entities Only**

1) If any investigative entity (e.g., CPS, law enforcement, State licensing) that received a report has not verified if they will conduct an investigation within the entity's mandated response time, then **WITHIN 1 BUSINESS DAY**, follows up with that investigative entity to determine if the incident will be investigated.

2) Regularly follows up with any investigative entity that opened an investigation to determine that status of the investigation.

3) Ensures that all notifications and follow-up actions required by ⇨ ORR Policy Guide, Section 4 Preventing, Detecting, and Responding to Sexual Abuse and Harassment and the Interim Final Rule (located on the UC Portal) are completed.

**For All Investigative Entities**

4) **WITHIN 48 BUSINESS HOURS of receiving notification that an investigation is complete,** notifies the victim involved in the incident of the result of the investigation.

- If the victim involved in the incident is no longer in ORR care, attempts to notify the UC at his/her last known address.

Notifies the investigating agency of any individuals involved in the incident, such as other complainants or other additional parties, and encourages the investigating agency to notify the other individuals involved

*Section 5: Program Management*
*Version 2 (Effective 09/12/16)*

26

**Exhibit 4**
**Page 445**

Not Confidential

GOV-00016978

## 5.8 REPORTING TO FEDERAL AGENCIES

⇘ ORR Policy Guide, Section 5.8 Significant Incident Reports and Notification Requirements

### 5.8.1 Related Forms, Checklists, and Other Tools

| FORM | USED BY |
|---|---|
| Significant Incident Report (SIR) | Care Provider |
| Sexual Abuse Significant Incident Report (SA/SIR) | Care Provider |
| Significant Incident Report (SIR) Addendum | Care Provider |
| Sexual Abuse Significant Incident Report (SA/SIR) Addendum | Care Provider |

| TOOL | USED BY |
|---|---|
| CHART 1: Definition of Sexual Abuse and Sexual Harassment | Care Provider |
| CHART 2: Reporting and Notification Requirements for Significant Incidents | Care Provider |
| FLOWCHART: How to Report Sexual-Related Incidents | Care Provider |
| UC Portal SIR User Guide | Care Provider |

### 5.8.2 Reporting to HHS OIG

⇘ ORR Policy Guide, Section 5.7 ORR Policies to Protect Sponsors from Fraud

**Types of Incidents to Report to HHS OIG**

**Reportable incidents to HHS OIG include, but are not limited to:**

- Potential fraud schemes involving one or more individuals claiming to represent a charitable/nonprofit organization that will assist in processing and reuniting unaccompanied children with their families ⇘ **ORR Ops Guide, Section 2.2.5 Protecting Sponsors from Fraud**

- Potential fraud schemes involving providing false documentation and/or information to deceive ORR for the purpose of obtaining the release of a child from ORR custody (Including but not limited to address fraud, identity fraud, identity theft, and manufacturing or altering identity documents)

**Note:** These schemes can be perpetuated by a sponsor, ORR Care Provider, ORR federal or contracted staff, or an outside individual or organization.

Not Confidential

GOV-00016979

**Reporting To HHS OIG**

⇝ ORR Policy Guide, Section 5.7.2 Responding to Fraud Attempts
⇝ ORR Ops Guide, Section 5.7.3 Significant Incidents

**WITHIN four (4) HOURS OF THE SIGNIFICANT INCIDENT (or within four (4) hours of the care provider becoming aware of the incident):**

**CARE PROVIDER**

1) Gathers the following information:

- UC full name, alien number, and date of birth

- Time and date of the report

- Name of the ORR care provider facility and care provider address (include city/state)

- Name, telephone number and location of the sponsor;

- Name, phone number, and other contact information given by the person/program who filed the report;

- Description of the event
    - o Date and time of alleged incident
    - o If money was asked for from the sponsor
    - o Whether money was actually paid by the sponsor
    - o Amount and method of any payment made (e.g., wire transfer, money order)
    - o If sponsor retained receipt/proof of payment application such as PayPal, Apple Pay, Google Wallet, etc., a copy should be provided.
    - o Identifying information for receiving account of any payment made to include account name, account number, routing number, or other account identifiers.
    - o Name and description of any individuals or organizations involved in the incident
        - ▪ If the sponsor was contacted by someone, name, phone number, and other contact information of the person/program who contacted the sponsor
        - ▪ Location where the alleged incident occurred (include location name, address, city, state)
        - ▪ Provide any additional identifying details such as places of birth, countries of citizenship, and social security/alien numbers
        - ▪ Detail how the individual or organization is involved in the incident
    - o Name and alien number/social security number (if applicable) of any potential witnesses

- Any other details for which the UC or caller has information

- Actions taken (including reports made to other individuals or entities and any associated case numbers)

2) Completes a *Significant Incident Report (SIR)* in the UC Portal with all of the information gathered.

3) Reviews the *SIR* and ensures that the *SIR* is clearly written with all required information.

4) Notifies ORR as shown below and includes a copy of the *SIR* and notification email in the UC's case file.

| To: | Required for All *SIRs* |
| --- | --- |
| | SIRHotline@acf.hhs.gov |
| | Project Officer |
| | FFS |
| | CFS |
| | Case Coordinator |
| Subject Line: | Must read "Report of Fraud" and include the event number (e.g., "Event 12345") |
| Body: | Use *Synopsis of the Event* from UC Portal and do not include UC's full name or alien number |
| Attachments: | • *SIR* |
| | • Relevant Supporting Documents |

5) Reports the fraud allegation to local law enforcement. Obtains and saves an incident report number or copy of the incident report from local law enforcement.

6) Reports to State licensing, if Care Provider staff are involved. Obtains and saves an incident report number or copy of the incident report.

**FFS**

7) Reviews the allegation in the *SIR* and ensures that the *SIR* is clearly written with all required information. If *SIR* is missing information, the missing information must be submitted in an *SIR Addendum.*

8) **WITHIN 1 BUSINESS DAY OF RECEIVING THE *SIR*, for document and information fraud allegations only** – Reports to USICE HSI (Follow → ORR Ops Guide, Section 5.8.3 Reporting to USICE HSI) and instructs the Case Manager to save the reporting email in the UC's case file.

**Note:** **DO NOT** send the same information more than once to HSI Tip Line and **DO NOT** file a duplicate report by calling the HSI Tip Line. If unsure about if USICE HSI is already aware of an allegation, then work with the local USICE HSI agent to determine if they are aware of the allegation.

| To: | HSI Tip Line (HSITipLine.Collaboration@ice.dhs.gov) |
| --- | --- |
| Subject Line: | Must read "Report Fraud" and include the event number (e.g., "Event 12345") |
| Body: | Use *Synopsis of the Event* from UC Portal and do not include UC's full name or alien number |
| Attachments: | • *SIR* |
| | • Relevant Supporting Documents |

Not Confidential

GOV-00016981

9) **WITHIN 1 BUSINESS DAY OF RECEIVING THE SIGNIFICANT INCIDENT REPORT,** reports all types of fraud schemes, whether attempted or successfully perpetrated, to HHS Office of the Inspector General (OIG) at **UAC@oig.hhs.gov**. Instructs the Case Manager to save the reporting email in the UC's case file.

| | |
|---|---|
| **To:** | HHS OIG |
| **Subject Line:** | Must read "Report of Fraud" and include the event number (e.g., "Event 12345") |
| **Body:** | Use *Synopsis of the Event* from UC Portal and do not include UC's full name or alien number |
| **Attachments:** | • *SIR*<br>• Relevant Supporting Documents |

10) If an investigation is opened for the reported allegation, FFS will notify the FFS Supervisor, Project Officer, and CFS.

11) If an investigation is opened for the reported allegation, then the FFS Supervisor, FFS and CFS cooperate fully during the investigative process (e.g., providing any information or documentation requested by investigative agency).

12) If the fraud scheme involves ORR care provider staff:

- Follows up with HHS OIG within ten (10) business days to determine if the reported fraud allegation will be investigated further.

- Instructs the care provider to follow their local licensing guidelines regarding reports of inappropriate employee behavior and to inform their local licensing agency that the case was referred to other investigative agencies.

- Provide the care provider with technical assistance.

- If applicable, issues corrective action findings and requires the care provider to take appropriate action. ⇒ **ORR Policy Guide, Section 5.5.2 Follow Up and Corrective Actions**

- Program should submit/have internal disciplinary protocols to address Fraud Scheme involving care provider staff.

## 5.8.3 Reporting to USICE HSI

**Types of Incidents to Report to USICE HSI**

**Reportable incidents to USICE HSI include, but are not limited to:**

- Human Trafficking that occurred in the United States
- Human Trafficking that occurred outside of the United States
- Drug and Weapon trafficking
- Gang or Cartel-Related Crimes/Activity

**Section 5: Program Management**
**Version 2 (Effective 09/12/16)**

30

**Exhibit 4**
**Page 449**

Not Confidential

GOV-00016982

- Contact or threats to a UC while in ORR care from smuggling syndicates, organized crime or other criminal actors
- Potential document/information fraud schemes (Includes, identity fraud, immigration benefit fraud, identity theft, and manufacturing or altering identity documents) that could be perpetrated by any individual or entity (e.g., sponsor, household members, UC, care provider)

Incidents and allegations may be reported to care providers multiple ways (e.g., ORR staff; stakeholders such as legal service providers, the sponsor; the UC; self-observation). No matter the method by which the care provider became aware of the incident or allegation, the care provider must follow all reporting, notification, and follow-up requirements in this subsection.

**Reporting to USICE HSI**

⇨ ORR Ops Guide, Section 5.7.3 Significant Incidents

**CARE PROVIDER**

**WITHIN 4 HOURS OF THE SIGNIFICANT INCIDENT (or within 4 hours of the care provider becoming aware of the incident):**

1) If informed of an allegation that USICE HSI has authority to investigate (use list above to guide that determination), gathers that following information:

    - UC Full Name, Alien Number, and Date of Birth
    - Time and date of the UC disclosure
    - Name of the ORR facility, as well as city/state;
    - Description of the situation
        - Date and time of alleged incident
        - Location where the alleged incident occurred (include, Location Name, Address, City, State)
        - Name and description of any individuals or organizations involved in the incident
            - Provide any additional identifying details such as places of birth, countries of citizenship, and social security/alien numbers
            - Detail how the individual or organization is involved in the incident
        - Name and Alien number (if applicable) of any potential witnesses
        - The name and phone number given by the person on the phone who filed the report (if applicable).
    - Any other details for which the UC has information related to the incident
    - Actions taken (including information on who else the incident was reported to and any associated case numbers)

2) Completes a *Significant Incident Report (SIR)* in the UC Portal with all of the information gathered.

**Section 5: Program Management**
**Version 2 (Effective 09/12/16)**

31

**Exhibit 4**
**Page 450**

Not Confidential

GOV-00016983

3) Reviews the *SIR* and ensures that the *SIR* is clearly written with all required information.

4) Notifies ORR as shown below, and saves a copy of the *SIR* in the UC's case file.

| | |
|---|---|
| **To:** | Required for All *SIRs*<br>SIRHotline@acf.hhs.gov<br>Project Officer<br>FFS<br>CFS<br>Case Coordinator |
| **Subject Line:** | Must read "Report of Significant Incident/USICE HSI" and include the event number (e.g., "Event 12345") |
| **Body:** | Use *Synopsis of the Event* from UC Portal and do not include UC's full name or alien number |
| **Attachments:** | • *SIR*<br>• Relevant Supporting Documents |

5) Reports to State licensing, if Care Provider staff are involved. Obtains and saves an incident report number or copy of the incident report.

**FFS**

6) Reviews the *SIR* and ensures that the *SIR* is clearly written with all required information. Also, ensures that the allegation is a type of allegation that USICE HSI has authority to investigate (use list above to guide that determination). If SIR is missing information, the missing information must be submitted in an SIR Addendum.

7) Prior to reporting the allegation to the USICE HSI Tip Line, ensures that the allegation has not already been reported to USICE HSI Tip Line by phone, email or online.

8) **WITHIN 1 BUSINESS DAY OF RECEIVING THE SIGNIFICANT INCIDENT REPORT,** reports allegations to USICE HSI, as follows. Instructs the Case Manager to save the reporting email in the UC's case file.

**Note:** **DO NOT** send the same information more than once, and **DO NOT** file a duplicate report by calling the USICE HSI Tip Line. If unsure about if USICE HSI is already aware of an allegation, then work with the local USICE HSI agent to determine if they are aware of the allegation.



| | |
|---|---|
| **To:** | USICE HSI Tip Line (HSITipLine.Collaboration@ice.dhs.gov)<br><br>Required for Certain Types of USICE *SIRs*<br>ICEHumantrafficking.helpdesk@ice.dhs.gov (All Human Trafficking allegations) |
| **Subject Line:** | Must read "Report of UC Allegation" and include the event number (e.g., "Event 12345") |
| **Attachments:** | • *SIR*<br>• Relevant Supporting Documents |

Not Confidential

GOV-00016984

9)  If an investigation is opened for the reported allegation, FFS will notify the FFS Supervisor, Project Officer and CFS.

10) If an investigation is opened for the reported allegation, then the FFS Supervisor, FFS and CFS cooperate fully during the investigative process (e.g., providing any information or documentation requested by investigative agency).

11) For Human Trafficking Allegations—follows up with **ICEHumantrafficking.helpdesk@ice.dhs.gov** within ten (10) business days to determine if the reported allegation will be investigated further.

12) If the allegation involves care provider staff:

- Follows up with local USICE HSI agent within ten (10) business days to determine if the reported allegation will be investigated further.

- Instructs the care provider to follow their local licensing guidelines regarding reports of inappropriate employee behavior and to inform their local licensing agency that the case was referred to USICE HSI.

- Provide the care provider technical assistance.

- If applicable, issues corrective action findings and requires the care provider to take appropriate action.   ⇝ **ORR Policy Guide, Section 5.5.2 Follow Up and Corrective Actions**

- Program should submit/have internal disciplinary protocols to address Fraud Scheme involving care provider staff.

## 5.8.4 Reporting Allegations that Occurred in DHS Custody

⇝ **ORR Policy Guide, Section 5.8.4 Allegations of Abuse that Occurred in DHS Custody**

**Checking for Potential Allegations of Abuse that Occurred in the Department of Homeland Security (DHS) Custody**

The Department of Homeland Security **Office of Inspector General (DHS OIG) Hotline** is a resource for Federal employees and the public to report allegations of employee corruption, civil rights and civil liberties abuses, program fraud and financial crimes, and miscellaneous criminal and non-criminal activity associated with waste, abuse or fraud affecting the programs and operations of DHS.

The DHS **Office for Civil Rights and Civil Liberties (CRCL)**'s Compliance Branch investigates and resolves civil right and civil liberties complaints regarding DHS policies and activities. CRCL works in coordination with the entirety of DHS to address civil rights and civil liberties concerns, including the DHS OIG.

Types of allegations that should be reported to DHS OIG for investigation:

- **Conditions of Detention**: Includes, but not limited to, not receiving food, drink, access to sanitary items (e.g. diapers, feminine hygiene products) or access to bathroom or medication; discarding personal items (e.g. birth certificate, money, medication); overcrowded hold room cells; or unsanitary hold room cell.

Not Confidential

- **Disability Accommodation (Section 504 of the Rehabilitation Act)**: Includes, but not limited to, not providing appropriate assistance for a UC with a hearing impairment or not providing assistance for a UC with a mobility impairment during transportation.

- **Excessive Force or Inappropriate Use of Force**: Includes, but not limited to, inappropriate use of taser or baton; use of weapon; inappropriate shackling/handcuffs; inappropriate physical abuse. Particularly after the subject has been apprehended or subdued or when medical attention was needed after the use of force incident.

- **Fourth Amendment** (Search and Seizure): Includes, but not limited to, confiscation of identity documents and property that is then not returned.

- **Intimidation/Threat/Improper Coercion:** Includes, but not limited to, threatening to deport the UC, if he/she does not admit to being an adult.

- **Legal Access/Due Process:** Includes, but not limited to, when the UC states that while in DHS custody they claimed credible fear of returning to home country, or that they are a human trafficking victim, but the information was not documented or communicated in the initial placement request. Also, includes denial of phone call, the UC was in DHS custody over 72 hours, or improper age determination.

- **Separation from a sibling or parent/legal guardian**, but the information was not documented or communicated in the initial placement request.

- **Medical/Mental Health care:** Includes, but not limited to, incidents of not receiving medical attention for an injury or upon request.

- **Violation of Privacy:** Includes, but not limited to, UC's medical privacy was violated or the UC was strip searched by or in front of an officer of the opposite gender.

- **Religious Accommodation**: Includes, but not limited to, not providing reasonable accommodation for religious dietary restrictions.

- **Retaliation:** Includes, but not limited to, punishment by being forced to clean toilets or retaliation as a results of reporting an allegation against a DHS employee.

- **Reporting Sexual Assault/Abuse allegations that occurred in DHS custody**

  **NOTE: Allegations of sexual abuse/assault that occurred in DHS custody must be reported to DHS OIG, DHS CRCL, CBP and ICE ERO.**

Not Confidential

GOV-00016986

**Reporting Potential Allegations that Occurred in DHS Custody**

❖ ORR Ops Guide, Section 5.7.3 Significant Incidents

**WITHIN 4 HOURS OF THE SIGNIFICANT INCIDENT (or within 4 hours of the care provider becoming aware of the incident):**

**CARE PROVIDER**

1) If the UC alleges that he/she was or witnessed the abuse of another UC while in DHS Custody or that his/her civil rights or civil liberties may have been violated by a DHS employee, gathers the following information:

   - UC Full Name (including aliases), Alien Number, and Date of Birth (ensure that the name is spelled correctly and that the Alien Number and date of birth are correct);

   - Time and date UC reported allegation;

   - Name, city, and state of the ORR care provider;

   - Description of the situation;

     o Date and time of alleged incident
       *If the specific time is unknown, then provide a description of the sky or environment that may indicate time of day*

     o Location where the alleged incident occurred (include, city, state, and Border Patrol Station/Port of Entry/Checkpoint, if applicable)
       *If the specific location is unknown, then provide a description of landmarks or the nearest Border Patrol Station where the child was temporarily placed prior to ORR custody*

     o Descriptions of any injuries incurred as a result of the incident and any medical care provided

     o Indication if the UC felt that the incident or action was intentional or an accident

     o Name and description of any DHS employees involved in the incident
       *If the DHS employees name is unknown, then provide a detailed description of the employee, including, but not limited to, gender, approximate height, hair style, hair color, body type, color of uniform, and distinctive traits or characteristics of the DHS employee*

     o Name and Alien number (if applicable) of any potential witnesses

     o The name and phone number given by the person on the phone who filed the report

   - Any other details for which the UC has information related to the incident; and

   - Actions taken (including information on who else the incident was reported to and any associated case numbers).

2) Completes a *Significant Incident Report (SIR)* in the UC Portal with all of the information gathered.

**Exhibit 4**
**Page 454**

Not Confidential                                                                    GOV-00016987

3) Reviews the *SIR* and ensures that the *SIR* is clearly written with all required information.

4) Notifies ORR as shown below, and saves a copy of the *SIR* in the UC's case file.

| | |
|---|---|
| **To:** | SIRHotline@acf.hhs.gov |
| | Project Officer |
| | FFS |
| | CFS |
| | Case Coordinator |
| **Subject Line:** | Must read "Report of Incident in DHS Custody" and include the event number (e.g., "Event 12345") |
| **Body:** | Use *Synopsis of the Event* from UC Portal and do not include UC's full name or alien number |
| **Attachments:** | • *SIR* |
| | • Relevant Supporting Documents |

5) Reports the allegation to CPS in the State of the reporting Care Provider as well as the State where the incident occurred, according to State mandatory reporting laws. Obtains and saves an incident report number or copy of the incident report from local law enforcement.

**FFS**

6) Reviews the allegation in the *SIR* and ensures that the *SIR* is clearly written with all required information. Also, ensures that the allegation is a type of allegation that DHS has authority to investigate (use list above to guide that determination).

7) If SIR is missing information, the missing information will be submitted in an *SIR Addendum*.

8) **WITHIN 1 BUSINESS DAY OF RECEIVING THE SIGNIFICANT INCIDENT REPORT,** reports potential allegations of abuse that occurred in DHS custody as follows and instructs the Case Manager to save the reporting email in the UC's case file.

| | |
|---|---|
| **To:** | DHS OIG (Hotline@oig.dhs.gov) |
| **CC:** | DHS CRCL (CRCLCompliance@hq.dhs.gov) |
| | Required for Certain Types of DHS *SIRs* |
| | ORR Medical Coordinator (medical incidents) |
| | ERO.SexualAssault@ice.dhs.gov (sexual abuse in DHS custody) |
| | PREA.CBP@cbp.dhs.gov (sexual abuse in DHS custody) |
| **Subject Line:** | Must read "Report of UC Allegation" and include the event number (e.g., "Event 12345") |
| **Attachments:** | • *SIR* |
| | • *Initial Intakes Assessment* |
| | • Intakes Form (The case manager will need to select the "Go to Intakes" option in the case record in the portal, and print that page to PDF.) |
| | • Release Contact Information (if UC is no longer in ORR custody) |
| | • Any other supporting documentation (if allegation relates to physical abuse, injury or medical issue include initial medical exam records and photo of injury) |

Not Confidential

GOV-00016988

9) If an investigation is opened for the reported allegation, then the FFS Supervisor, FFS and CFS cooperate fully during the investigative process (e.g., providing any information or documentation requested by investigative agency).

10) If the allegation was not reported with the appropriate information:

- Provide the care provider technical assistance.

- If the issue persists, then issues corrective action findings and requires the care provider to take appropriate action.  ⋙ **ORR Policy Guide, Section 5.5.2 Follow Up and Corrective Actions**

**Exhibit 4**
**Page 456**

Not Confidential                                                                                                            GOV-00016989

Not Confidential

# FLOWCHART: How to Report Sexual-Related Incidents



Exhibit 4
Page 457

GOV-00016990

FLOWCHART: How to Report Sexual-Related Incidents, 03/21/2016
ORR UC/A-9

# CHART 1: Definition of Sexual Abuse and Sexual Harassment

Not Confidential

## SEXUAL ABUSE

Sexual abuse includes the acts described in the chart below:

| Sexual Abuse of a Minor by Another MINOR | Sexual Abuse of a Minor by an ADULT |
|---|---|
| (1) The employment, use, persuasion, inducement, enticement, or coercion of a child to engage in, or assist another person to engage in, (2) or (3) below or the rape, molestation, prostitution, or other form of sexual exploitation of children, or incest with children | (1) The employment, use, persuasion, inducement, enticement, or coercion of a child to engage in, or assist another person to engage in, (2) or (3) below or the rape, molestation, prostitution, or other form of sexual exploitation of children, or incest with children |
| (2) Actual or simulated sexual intercourse, including **sexual contact in the manner of genital-genital, oral-genital, anal-genital, or oral-anal contact**, whether between persons of the same or opposite sex | (2) Actual or simulated sexual intercourse, including **sexual contact in the manner of genital-genital, oral-genital, anal-genital, or oral-anal contact**, whether between persons of the same or opposite sex |
| (3) **Intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or the buttocks** of another person, excluding contact incidental to a physical altercation | (3) **Intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or the buttocks**, that is unrelated to official duties or where the staff member, grantee, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire |
| (4) **Penetration of the anal or genital opening of another person, however slight, by a hand, finger, object, or other instrument** | (4) **Contact between the mouth and any body part** where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire |
| (5) Bestiality | (5) **Penetration of the anal or genital opening, however slight, by a hand, finger, object, or other instrument** that is unrelated to official duties or where the staff member, grantee, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire |
| (6) Masturbation | |
| (7) Lascivious exhibition of the genitals or pubic area of a person or animal | (6) **Any attempt, threat, or request** by a staff member, grantee, contractor, or volunteer to engage in activities (1) through (5) above |
| (8) Sadistic or masochistic abuse | (7) **Any display** by a staff member, grantee, contractor, or volunteer **of his or her uncovered buttocks or breast in the presence of a child** |
| (9) Child pornography or child prostitution | (8) Bestiality |
| | (9) Masturbation |
| | (10) Lascivious exhibition of the genitals or pubic area of a person or animal |
| | (11) Sadistic or masochistic abuse |
| | (12) Child pornography or child prostitution |
| | (13) Voyeurism by a staff member, grantee, contractor, or volunteer (See definition below) |

Exhibit 4
Page 458

GOV-00016991

Not Confidential

**Voyeurism**

Voyeurism is an invasion of privacy of a child by a staff member, grantee, contractor, or volunteer for reasons unrelated to official duties. Examples include inappropriately viewing a child perform bodily functions or bathing; or requiring a child to expose his or her buttocks, genitals, or breasts; or recording images of all or part of a child's naked body or part of a child performing bodily functions.

## SEXUAL HARASSMENT

Sexual harassment includes the acts described in the chart below:

| Sexual Harassment of a Minor by Another MINOR | Sexual Harassment of a Minor by an ADULT |
|---|---|
| Repeated and unwelcome sexual advances, requests for sexual favors, or verbal comments, gestures, phone calls, emails, texts, social media messages, pictures sent or shown, other electronic communication, or actions of a derogatory or offensive sexual nature | Repeated verbal comments, gestures, phone calls, emails, texts social media messages, pictures sent or shown, or other electronic communication of a sexual nature to a child by a staff member, grantee, contractor, or volunteer, including demeaning references to gender, sexually suggestive or derogatory comments about body or clothing, or obscene language or gestures |

Exhibit 4
Page 459

GOV-00016992

# ORR OPERATIONS GUIDE:

## CHILDREN ENTERING THE UNITED STATES UNACCOMPANIED

### Section 6: Resources and Services Available After Release from ORR Care

**Click HERE to link to Section 6 of the ORR Policy Guide.**

## Section 6 Table of Contents

6.2 SAFETY AND WELL-BEING FOLLOW-UP CALL ............................................................................. 2

**Exhibit 4**
**Page 460**

Not Confidential

## 6.2 SAFETY AND WELL-BEING FOLLOW-UP CALL

⇒ ORR Policy Guide, Section 2.8.4 Safety and Well Being Follow Up Call

**CARE PROVIDER**

1) Thirty days after release of the UC, Care Provider staff calls the sponsor and UC to conduct a safety and well-being follow-up call.

   - All call attempts must be made within seven (7) days after the 30-day mark of the UC's release.
   - A minimum of three (3) attempts must be made, unless the phone is disconnected.

2) Confirms that the sponsor still resides at the address on the *Verification of Release Form*.

   - Documents if an updated address is provided in the UC case file
   - Reminds the sponsor to file a change of address with DHS and EOIR if they moved or have recently moved

3) Makes every effort to speak to the sponsor and UC separately, on the following topics:

   - Sponsor Topics
     - o Is the child still residing with the sponsor?
     - o Is the child demonstrating any behavioral issues?
     - o Is the child enrolled in and/or attending school?
     - o Is the sponsor aware of upcoming court dates?
     - o Did the sponsor attend an LOPC presentation?
     - o Has the sponsor been contacted and asked to pay fees or wire money related to the release of the child?
     - o (If the case was release with PRS) Did PRS provider contact the sponsor?

   - UC Topics
     - o Is the child still residing with the sponsor?
     - o Does the child feel safe?
     - o Is the child enrolled in and/or attending school?
     - o Is the child aware of upcoming court dates?
     - o Has the child been contacted and asked to pay fees or wire money related to their release?
     - o (If the case was release with PRS) Did PRS provider contact the child?
     - o Is the child being forced to work without pay or being forced to work to pay his/her share for rent and utilities or repay a debt?

4) If the follow-up call indicates that the child may be in immediate danger, completes all the following actions:

   - Calls **911** immediately.
   - Stays on the phone with the child until authorities arrive.
   - Reports any emergency for which 911 is contacted to the ORR Intakes Hotline at **202-401-5709**.

Not Confidential

GOV-00016994

- Complies with mandatory reporting laws, State licensing requirements, and Federal laws and regulations for reporting to local child protective agencies and/or law enforcement.

- If the sponsor is the perpetrator of the allegation, then flag the sponsor and provide explanation as to why the sponsor is being flagged in the UC Portal.

- Emails notification to the FFS, including:
    - o UC name and alien number
    - o UC date of release
    - o Sponsor/child contact phone number
    - o Sponsor address
    - o Previous ORR p.acement
    - o Summary of call
    - o Actions taken (including information on who else the incident was reported to and any associated case numbers)

5) If the follow-up call indicates that the child may be unsafe, completes all the following actions:

- Complies with mandatory reporting laws, State licensing requirements, and Federal laws and regulations for reporting to local child protective agencies and/or law enforcement.

- If the sponsor is the perpetrator of the allegation, then flag the sponsor and provide explanation as to why the sponsor is being flagged in the UC Portal.

- Emails notification to the FFS, including:
    - o UC name and alien number
    - o UC date of release
    - o Sponsor/child contact phone number
    - o Sponsor address
    - o Previous ORR placement
    - o Summary of call
    - o Actions taken (including information on who else the incident was reported to and any associated case numbers)

6) If the follow-up call indicates fraud or extortion of money/fees attempts against the sponsor and/or child related to the release of the child, follows the following policy and procedures regarding what information to gather and how to report the incident to the FFS:

> ORR Ops Guide, Section 5.8.1 Reporting to HHS OIG
> ORR Ops Guide, Section 2.2.5 Protecting Sponsors from Fraud
> ORR Policy Guide, Section 5.7 ORR Policies to Protect Sponsors from Fraud

7) If the follow-up call indicates that the child may have been sexually abused or harassed while in ORR care, completes all the following actions:

- Complies with mandatory reporting laws, State licensing requirements, and Federal laws and regulations for reporting to local child protective agencies and/or law enforcement.

- Gather details about the allegation.

- If the sponsor is the perpetrator of the allegation, then flag the sponsor and provide explanation as to why the sponsor is being flagged in the UC Portal.

- Refers the child or sponsor to the ORR UC Sexual Abuse Hotline (**855-232-5393**).

**Section 6: Resources and Services Available After Release from ORR Care**
**Version 1.0 (Effective 09/12/2016)**

3

**Exhibit 4**
**Page 462**

Not Confidential

GOV-00016995

- Emails notification to the FFS, including:
  - o UC name and alien number
  - o UC date of release
  - o Sponsor/child contact phone number
  - o Sponsor Address
  - o Previous ORR placement
  - o Summary of call
  - o Actions taken (including information on who else the incident was reported to and any associated case numbers)

8) If the follow-up call indicates that the sponsor and/or child would benefit from additional support or services or the sponsor has not attended an LOPC presentation, completes all the following actions:

- Refers the sponsor or child to the ORR National Call Center (**800-203-7001**)

- Emails the ORR National Call Center (**information@orrncc.com**) the following information for each referral:
  - o UC name and alien number
  - o Sponsor's name
  - o Sponsor/child contact phone number
  - o Sponsor address
  - o Date of referral
  - o Reason for referral

9) Documents results of the call in the case management notes of the UC's case file and in the *Follow-Up Call Tracking Report*.



**FOLLOW-UP CALL TRACKING REPORT**

1) The **CARE PROVIDER** completes the *Follow-Up Call Tracking Report* no later than the 8th of every month for UC release two months earlier. If the 8th falls on a weekend or holiday, the report will be due the next business day. This report is emailed to the **FFS** and **CFS**.

2) The **FFS** elevates any concerns raised by the *Follow-Up Call Tracking Report* to the **FFS SUPERVISOR**.

3) The **CFS** compiles individual *Follow-Up Call Tracking Report* into a *Master Follow-Up Call Tracking Report* and submits to the **SPECIAL ASSISTANT** and **SENIOR FFS SUPERVISOR**.

**FFS**

10) If the care provider notifies the FFS that the follow-up call indicates that the child may be in immediate danger:

a) Immediately elevates the incident to the **FFS SUPERVISOR**.

b) Elevates any identified safety trends or issues to the **FFS SUPERVISOR**.

c) Reviews the allegation and ensures that the incident was reported to the appropriate authority to investigate.

Not Confidential

- If the allegation was not reported to the appropriate agency or with the appropriate information:

  o Provide the care provider technical assistance.

  o If the issue persists, then issues corrective action findings and requires the care provider to take appropriate action. ⇨ **ORR Policy Guide, Section 5.5.2 Follow Up and Corrective Actions**

11) If the care provider notifies the FFS that the follow-up call indicates that the child may be unsafe:

  b) Reviews the allegation and ensures that the incident was reported to the appropriate authority to investigate.

  - If the allegation was not reported to the appropriate agency or with the appropriate information:

    o Provide the care provider technical assistance.

    o If the issue persists, then issues corrective action findings and requires the care provider to take appropriate action. ⇨ **ORR Policy Guide, Section 5.5.2 Follow Up and Corrective Actions**

  c) Elevates any identified safety trends or issues to the **FFS SUPERVISOR**.

12) If the care provider notifies the FFS that the follow-up call indicates fraud or extortion of money/fees attempts against the sponsor and/or child related to the release of the child:

  ⇨ **ORR Ops Guide, Section 5.8.1 Reporting to HHS OIG**
  ⇨ **ORR Ops Guide, Section 2.2.5 Protecting Sponsors from Fraud**
  ⇨ **ORR Policy Guide, Section 5.7 ORR Policies to Protect Sponsors from Fraud**

  a) Reviews the fraud allegation and ensures that the incident report is clearly written with all required information. Notifies the Project Officer, CFS and FFS Supervisor of the fraud allegation.

  b) **WITHIN 1 BUSINESS DAY OF RECEIVING THE INCIDENT REPORT,** reports all fraud schemes, whether attempted or successfully perpetrated, to HHS Office of the Inspector General (OIG) at **UAC@oig.hhs.gov**.

| | |
|---|---|
| **To:** | HHS OIG |
| **Subject Line:** | Must read "Report of Fraud" and include the UC's last name |
| **Body:** | Use a Synopsis of the Incident and do not include UC's full name or alien number |
| **Attachments:** | • Incident Report Email<br>• Any other supporting documentation |

  c) If the fraud scheme involves care provider staff:

  - Follow up with HHS OIG within **10** business days to determine if the reported fraud allegation will be investigated further.

  - Instructs the care provider to follow their local licensing guidelines regarding reports of inappropriate employee behavior and to inform their local licensing agency that the case was referred to HHS OIG.

Not Confidential

GOV-00016997

- Along with the care provider, FFS Supervisor, and Project Officer, cooperates fully with HHS OIG during the investigative process.

- Issues corrective action findings and requires the care provider to take appropriate action. ☞ **ORR Policy Guide, Section 5.5.2 Follow Up and Corrective Actions**

13) If the care provider notifies the FFS that the follow-up call indicates that the child may have been sexually abused or harassed while in ORR care:

   a) Reviews the allegation and ensures that the incident was reported to the appropriate authority to investigate.

   - Follows up with the care provider where the alleged incident occurred to determine if the incident was previously reported and/or investigated while the UC was in ORR care.

   - If the allegation was not reported to the appropriate agency or with the appropriate information:

      o Provide the care provider technical assistance.

      o If the issue persists, then issues corrective action findings and requires the care provider to take appropriate action. ☞ **ORR Policy Guide, Section 5.5.2 Follow Up and Corrective Actions**

   d) Forwards the email notification to the **ORR SA/SIR MAILBOX (psac@acf.hhs.gov)**.

   e) Ensures that the allegation is appropriately investigated and addressed.


**INTAKES HOTLINE**

14) If the care provider notifies the Intakes hotline that the follow-up call indicates that the child may be in immediate danger and was reported to 911:

   - **Intakes** immediately notifies the **FFS Supervisor** (or **On-call FFS Supervisor** if after hours).

   - The **FFS SUPERVISOR** immediately informs the **SENIOR FFS SUPERVISOR**, the **DCS DIRECTOR**, and the **DEPUTY DIRECTOR FOR CHILDREN'S SERVICES** of the incident.

**Section 6: Resources and Services Available After Release from ORR Care**
**Version 1.0 (Effective 09/12/2016)**                                          **6**

                                                                    **Exhibit 4**
                                                                    **Page 465**

Not Confidential                                                      GOV-00016998

# Exhibit 5

Exhibit 5
Page 466

1  JOSEPH H. HUNT
   Assistant Attorney General
2  United States Department of Justice
   Civil Division
3  ERNESTO H. MOLINA, JR.
   Deputy Director
4  JEFFREY S. ROBINS
   Deputy Director
5  Office of Immigration Litigation
   BENJAMIN MARK MOSS
6  W. DANIEL SHIEH
   Senior Litigation Counsel
7  SHERRY D. SOANES
   MARINA C. STEVENSON
8  Trial Attorneys
   P.O. Box 878
9  Ben Franklin Station
   Washington, D.C. 20044
10 Telephone: (202) 307-8675
   Facsimile: (202) 616-4950
11 benjamin.m.moss2@usdoj.gov

12 Attorneys for Defendants

13              UNITED STATES DISTRICT COURT
           FOR THE CENTRAL DISTRICT OF CALIFORNIA

14

15 LUCAS R. *et al.*,                    ) Case No.: 2-18-CV-05741 DMG (PLA)
                                         )
16          Plaintiffs,                  ) DEFENDANTS' FIRST SET OF
                                         ) RESPONSES TO PLAINTIFFS'
17     v.                                ) REQUESTS FOR ADMISSION TO
                                         ) DEFENDANT ALEX AZAR,
18 ALEX AZAR, Secretary of U.S. Dep't of ) SECRETARY OF U.S. DEPARTMENT
                                         ) OF HEALTH AND HUMAN SERVICES,
19 Health and Human Services, *et al.*,  ) SET ONE
                                         )
20          Defendants.                  )
                                         )
21 _____ )

22

23              **PROTECTIVE ORDER ADVISALS**

24   THIS DOCUMENT IS SUBJECT TO A COURT ORDER IN *LUCAS R. V. AZAR*, CASE NO.

25 18-CV-05741 (C.D. CAL). THIS DOCUMENT AND ITS CONTENTS SHALL NOT BE USED,

26 SHOWN OR DISTRIBUTED EXCEPT AS PROVIDED IN THE PROTECTIVE ORDER.

27

28

**REQUEST FOR ADMISSION NO. 2**

**REQUEST:**  Admit that the UAC PROGRAM MANUAL is subject to change without prior notice to the public or opportunity for the public to comment on change.

**OBJECTIONS:**  Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the term UAC PROGRAM MANUAL.

**RESPONSE:** Subject to and without waiving these objections, Defendants state as follows.  Defendants admit that changes to the ORR Guide are not formally published in the Federal Register in a Notice of Proposed Rulemaking (NPRM).  However, any changes to the ORR Guide are posted online and available to the public. Additionally, ORR regularly holds stakeholder meetings where interested parties have the opportunity to comment upon ORR's policies.

**REQUEST FOR ADMISSION NO. 3**

**REQUEST:** Admit that the UAC PROGRAM MANUAL does not set out every ORR POLICY AND PRACTICE RELATING TO the treatment and conditions CLASS MEMBERS experience during ORR custody, but that additional such POLICY AND PRACTICES are set out in internal DOCUMENTS such as policy manuals, memoranda, and contracts.

**OBJECTIONS:**  Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms POLICY AND PRACTICE, RELATING TO, POLICY AND PRACTICE, YOUR, and DOCUMENTS.

**RESPONSE:** Subject to and without waiving these objections, Defendants state as follows. Defendants admit that, in addition to the online ORR Guide, there are other documents (some of which are considered guidance documents) that relate to treatment and conditions of UAC (including class members) in ORR legal custody, including but not limited to: ORR's MAP (procedures), cooperative agreements with grantee care providers, funding opportunity announcements, the ORR operational directive on the policy for fingerprinting, and certain guidance provided by ORR to care providers (e.g., "Policy Mondays" and "FAQ Fridays"). In addition, in December 2014, ORR issued the Interim Final Rule on Standards to Prevent, Detect, and Respond to Sexual Abuse and Sexual Harassment Involving Unaccompanied Alien Children, 79 Fed. Reg. 77768 (Dec. 24, 2014), codified at 45 C.F.R. Part 411.

**REQUEST FOR ADMISSION NO. 4**

**REQUEST:** Admit that the UAC PROGRAM MANUAL does not require ORR to decide whether a PROPOSED CUSTODIAN is FIT within any time certain.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms UAC PROGRAM MANUAL, PROPOSED CUSTODIAN, and FIT.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants state as follows. Defendants admit that ORR describes its

policies for the safe and timely release of unaccompanied alien children from ORR care in Section 2 of the ORR Guide including sponsor assessment criteria and includes certain timelines for assessing potential sponsors in Section 2 of the ORR MAP.  Defendants also admit that ORR does not have a policy requiring it to make a final suitability determination regarding a proposed sponsor within any specific timeline.

**REQUEST FOR ADMISSION NO. 5**

**REQUEST:**  Admit that the UAC PROGRAM MANUAL does not require ORR to provide a CLASS MEMBER, or his or her PROPOSED CUSTODIAN, an opportunity to inspect or rebut evidence YOU consider in determining whether a PROPOSED CUSTODIAN is FIT.

**OBJECTIONS:**  Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms UAC PROGRAM MANUAL, PROPOSED CUSTODIAN, and FIT.

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Throughout the release  evaluation process, ORR Federal Field Specialists (FFS) and their supervisors, ORR grantee case managers, and case coordinators routinely offer proposed custodians an informal opportunity to comment upon or explain information gathered, for instance, during background checks such as  documentation  evidencing  a  criminal  history,  or  prior  abuse  and  neglect

Defendants' First Set of RFA Responses          - 19 -     **Exhibit 5**

allegations.  Defendants admit that ORR does not have a policy requiring it to provide an opportunity to inspect or rebut evidence that ORR considers in determining whether an unaccompanied alien child should be released to a proposed custodian.

**REQUEST FOR ADMISSION NO. 6**

**REQUEST:** Admit that the UAC PROGRAM MANUAL does not require ORR to afford a CLASS MEMBER, or his or her PROPOSED CUSTODIAN, a hearing before a neutral and detached decisionmaker either before or after ORR finds a PROPOSED CUSTODIAN UNFIT.

**OBJECTIONS:**  Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBER, UAC PROGRAM MANUAL, PROPOSED CUSTODIAN, and UNFIT.  Defendants also object to the suggestion that ORR decisionmakers are not "neutral and detached."

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  An administrative appeals process does exist for parents or legal guardians whose sponsorship applications are denied, in order to challenge that decision in an appeal to the Assistant Secretary for Children and Families (ACF), with or without a hearing.  This process is described in Section 2.7.8 of the ORR Guide.

There is not presently an administrative appeals process for people who are not parents or legal guardians of UACs whose sponsorship applications are denied.

**REQUEST FOR ADMISSION NO. 7**

**REQUEST:** Admit that the UAC PROGRAM MANUAL does not require ORR to inform a CLASS MEMBER, or his or her PROPOSED CUSTODIAN, that ORR has determined the PROPOSED CUSTODIAN is UNFIT for up to 30 days.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBER, UAC PROGRAM MANUAL, PROPOSED CUSTODIAN, and UNFIT.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants state as follows. A parent or guardian who requests an appeal pursuant to the process referenced in the Response to Request for Admission No. 6 may do so within 30 days of receiving the denial of release notification.

ORR's policies do not presently require that proposed sponsors be notified within 30 days of ORR's determination that they have not been selected as sponsors.

**REQUEST FOR ADMISSION NO. 8**

**REQUEST:** Admit that the UAC PROGRAM MANUAL does not require ORR to provide a CLASS MEMBER an appeal or other administrative recourse from a finding by ORR that a PROPOSED CUSTODIAN is UNFIT.

Defendants' First Set of RFA Responses     - 21 -     **Exhibit 5**
**Page 472**

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBER, UAC PROGRAM MANUAL, PROPOSED CUSTODIAN, and UNFIT.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.   Alternatively, subject to and without waiving these objections, Defendants state that ORR's policies do not presently require that ORR provide a class member an appeal or other administrative recourse from a finding by ORR that a proposed custodian is unfit.

**REQUEST FOR ADMISSION NO. 9**

**REQUEST:** Admit that the UAC PROGRAM MANUAL does not require ORR to allow PROPOSED CUSTODIANS it finds UNFIT, other than parents and legal guardians, to appeal from a finding by ORR that the PROPOSED CUSTODIAN is UNFIT.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms UAC PROGRAM MANUAL, PROPOSED CUSTODIAN, and UNFIT.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state that ORR's policies do not presently require that ORR provide proposed sponsors other than parents and guardians an appeal or other

administrative recourse from a finding by ORR that a proposed custodian is unfit.

**REQUEST FOR ADMISSION NO. 10**

**REQUEST:**  Admit that the UAC PROGRAM MANUAL does not require ORR or HHS to convene a hearing on an appeal or other challenge to a decision by ORR finding a PROPOSED CUSTODIAN who is a parent or legal guardian UNFIT within any time certain.

**OBJECTIONS:**  Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms UAC PROGRAM MANUAL and PROPOSED CUSTODIANS.

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state that ORR's policies do not presently require that ORR provide a hearing on an appeal or other challenge to a decision by ORR finding a proposed custodian who is a parent or legal guardian unfit within any time certain.

**REQUEST FOR ADMISSION NO. 11**

**REQUEST:**  Admit that protecting CHILDREN from abuse and neglect is generally a function of state and local government agencies.

**OBJECTIONS:**  Defendants object to this request as vague and ambiguous.  It is not clear whether Plaintiffs intend the phrase "a function of state and local government agencies" to include or exclude state and local courts, for instance, or whether Plaintiffs

Additionally, Defendants object to the use of the word "detention" to refer to ORR's care and custody of children pursuant to the TVPRA, 8 U.S.C. § 1232, and the Homeland Security Act, 6 U.S.C. § 279. As mandated by law, ORR places unaccompanied alien children in the least restrictive setting that is in their best interests subject to considerations of danger to self, danger to others, or risk of flight.  *See* ORR Guide, Section 1 (Placement in ORR Care Provider Facilities).

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants deny the characterization that ORR unnecessarily prolongs federal legal custody, and admit that generally, children remain in ORR's legal custody pending an evaluation of whether a proposed sponsor is capable of providing for a child's physical and mental well-being and is otherwise suitable.

**REQUEST FOR ADMISSION NO. 15**

**REQUEST:** Admit that a decision by ORR finding a PROPOSED CUSTODIAN UNFIT often results in prolonging a CLASS MEMBER's separation from his or her parents.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms PROPOSED CUSTODIAN, UNFIT, and CLASS MEMBERS.

Defendants further object to this request as vague and ambiguous: the terms "often" and "prolonging" are not quantified.

Defendants further object to the implication, if any is intended, that ORR "separates" children from their parents – ORR does not do so, as children are unaccompanied when they are referred to the care and legal custody of ORR. Rather, by law, ORR must care for unaccompanied alien children who are referred to the program by the Department of Homeland Security (DHS) or another federal agency. *Se*e 8 U.S.C. § 1232(b). As stated in Defendants' Response to Request for Admission No. 4, in order to release a child, ORR must undertake a safety and suitability assessment for any proposed custodian, including a parent. ORR is statutorily prohibited from releasing a child to a parent or other proposed custodian who ORR determines is not capable of providing for the child's physical and/or mental well-being. 8 U.S.C. § 1232(c).

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.   Alternatively, subject to and without waiving these objections, Defendants deny the characterization that ORR unnecessarily prolongs federal legal custody, and admit that (1) generally, children remain in ORR's legal custody pending an evaluation of whether a proposed sponsor is capable of providing for a child's physical and mental well-being and is otherwise suitable; and (2) while in ORR's legal custody, children sometimes but not universally experience separation from their parents.

**REQUEST FOR ADMISSION NO. 16**

**REQUEST:** Admit that a decision by ORR finding a PROPOSED CUSTODIAN UNFIT often results in prolonging a CLASS MEMBER's separation from his or her siblings.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms PROPOSED CUSTODIAN, UNFIT, and CLASS MEMBERS.

Defendants further object to this request as vague and ambiguous: the terms "often" and "prolonging" are not quantified.

Defendants further object to the implication, if any is intended, that ORR "separates" children from their parents.  Rather, by law, ORR must care for unaccompanied alien children who are referred to the program by the Department of Homeland Security (DHS) or another federal agency.   *See* 8 U.S.C. § 1232(b).  As stated in Defendants' Response to Request for Admission No. 4, in order to release a child, ORR must undertake a safety and suitability assessment for any proposed custodian, including a parent. ORR is statutorily prohibited from releasing a child to a parent or other proposed custodian who ORR determines is not capable of providing for the child's physical and/or mental well-being.  8 U.S.C. § 1232(b).

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.   Alternatively, subject to and without waiving these objections, Defendants deny the characterization that ORR unnecessarily prolongs federal legal custody, and admit that: (1) generally, children remain in ORR's legal custody pending an evaluation of whether a proposed sponsor is capable of providing for a child's physical and mental well-being and is otherwise suitable; and (2) while in ORR's legal

custody, children sometimes but not universally experience separation from their siblings.

**REQUEST FOR ADMISSION NO. 17**

**REQUEST:** Admit that a decision by ORR finding a PROPOSED CUSTODIAN UNFIT often results in prolonging a CLASS MEMBER's separation from family members other than his or her parents or siblings.

**OBJECTIONS:**   Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms PROPOSED CUSTODIAN, UNFIT, and CLASS MEMBERS.

Defendants further object to this request as vague and ambiguous: the terms "often" and "prolonging" are not quantified.

Defendants further object to the implication, if any is intended, that ORR "separates" children from their parents.  Rather, by law, ORR must care for unaccompanied alien children who are referred to the program by the Department of Homeland Security (DHS) or another federal agency.   *See* 8 U.S.C. § 1232(b).  As stated in Defendants' Response to Request for Admission No. 4, in order to release a child, ORR must undertake a safety and suitability assessment for any proposed custodian, including a parent. ORR is statutorily prohibited from releasing a child to a parent or other proposed custodian who ORR determines is not capable of providing for the child's physical and/or mental well-being.  8 U.S.C. § 1232(b).

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.   Alternatively, subject to and without waiving these objections, Defendants deny the characterization that ORR unnecessarily prolongs federal legal custody, and admit that: (1) generally, children remain in ORR's legal custody pending an evaluation of whether a proposed sponsor is capable of providing for a child's physical and mental well-being and is otherwise suitable; and (2) while in ORR's legal custody, children sometimes but not universally experience separation from relatives.

**REQUEST FOR ADMISSION NO. 18**

**REQUEST:**  Admit that ORR's POLICIES AND PRACTICES do not require it to decide a FAMILY REUNIFICATION APPLICATION within any time certain.

**OBJECTIONS:**   Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the term POLICIES AND PRACTICES. Defendants further object that this request is vague and ambiguous as the term "decide" is unclear in its meaning and misleading as used herein.  ORR does not "decide" a Family Reunification Application (FRA), as is described in Sections 2.2.3 and 2.2.4 of the ORR Guide, but rather works with non-Federal case managers to assess the submission of documents required by the application for release, wherein the application is only one part of the more comprehensive process for assessing a potential sponsor of a child as is required by law. A more fulsome explanation of the complete sponsor assessment process appears in Section 2 of the ORR Guide, including the discussion of ORR's sponsor

assessment criteria and home studies in Section 2.4, required background checks for sponsors and household members in Section 2.5, and fingerprinting in Section 2.6.2.  As described in ORR Guide, Section 2.7, ORR's decision whether to release a child to a potential sponsor is based on an evaluation of all the available information.

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants respond that, as Defendants stated in their Response to Request for Admission No. 4, ORR includes certain timelines for assessing potential sponsors in Section 2 of the ORR MAP.

**REQUEST FOR ADMISSION NO. 19**

**REQUEST:**  Admit that in practice ORR may take up to several months to decide a FAMILY REUNIFICATION APPLICATION.

**OBJECTIONS:**  Defendants object that this request is vague and ambiguous, as the term "decide" in this context is unclear in its meaning and does not accurately describe the process involved. ORR does not "decide" a Family Reunification Application (FRA), as is described in Sections 2.2.3 and 2.2.4 of the ORR Guide, but rather works with non-Federal case managers to assess the submission of documents required by the application for release, wherein the application is only one part of the more comprehensive process for assessing a potential sponsor of a child as is required by law.

A more fulsome explanation of the complete sponsor assessment process appears in Section 2 of the ORR Guide, including the discussion of ORR's sponsor assessment criteria

Exhibit 5
Page  479_001

and home studies in Section 2.4, required background checks for sponsors and household members in Section 2.5, and fingerprinting in Section 2.6.2. As described in ORR Guide, Section 2.7, ORR's decision whether to release a child to a potential sponsor is based on an evaluation of all the available information.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants respond that in practice it may take several months before ORR reaches a conclusion concerning whether a proposed sponsor is capable of providing for a child's physical and mental well-being and is otherwise suitable.

**REQUEST FOR ADMISSION NO. 20**

**REQUEST:** Admit that, as a matter of POLICY AND PRACTICE, ORR does not allow CLASS MEMBERS to inspect adverse evidence before it denies a FAMILY REUNIFICATION APPLICATION seeking their release.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBERS and POLICY AND PRACTICE.

Defendants state, however, that children, potential custodians, and attorneys are able to speak with case managers and clinicians at care providers where the unaccompanied alien children are placed about the status of a sponsorship application of a proposed custodian (including any adverse evidence that arose during a background check or through

**REQUEST FOR ADMISSION NO. 22**

      **REQUEST:** Admit that, as a matter of POLICY AND PRACTICE, ORR employs no articulated evidentiary standard, such as a preponderance of the evidence, in deciding FAMILY REUNIFICATION APPLICATIONS seeking CLASS MEMBERS' release.

      **OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBERS and POLICY AND PRACTICE.

      Defendants also object that this request is vague and ambiguous, as the term "deciding" in this context is unclear in its meaning and does not accurately describe the process involved. ORR does not "decide" a Family Reunification Application (FRA), as is described in Sections 2.2.3 and 2.2.4 of the ORR Guide, but rather works with non-Federal case managers to assess the submission of documents required by the application for release, wherein the application is only one part of the more comprehensive process for assessing a potential sponsor of a child as is required by law. A more fulsome explanation of the complete sponsor assessment process appears in Section 2 of the ORR Guide, including the discussion of ORR's sponsor assessment criteria and home studies in Section 2.4, required background checks for sponsors and household members in Section 2.5, and fingerprinting in Section 2.6.2. As described in ORR Guide, Section 2.7, ORR's decision whether to release a child to a potential sponsor is based on an evaluation of all the available information.

Defendants also object to the premise of this request, to the extent it presumes, incorrectly, that ORR should be treated as if ORR were a judicial body, rather than an agency statutorily mandated, in pertinent part, to provide care for unaccompanied alien children.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants state that in exercising its statutory duty under the Homeland Security Act and the TVPRA to determine whether a proposed custodian is capable of caring for the physical and mental well-being of a child, ORR does not use an "evidentiary" standard such as is more appropriately applied in formal court proceedings.

**REQUEST FOR ADMISSION NO. 23**

**REQUEST:** Admit that, as a matter of POLICY AND PRACTICE, ORR does not allow PROPOSED CUSTODIANS to inspect adverse evidence before it denies a FAMILY REUNIFICATION APPLICATION seeking CLASS MEMBERS' release.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBERS, PROPOSED CUSTODIANS, and POLICY AND PRACTICE.

Defendants also object that this request is vague and ambiguous, as in this context the term "denies" is unclear in its meaning and does not accurately describe the process involved. ORR does not "grant" or "deny" a Family Reunification Application

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state that when ORR is inclined to determine, based on the information known to ORR, that a proposed sponsor is not capable of providing for a child's physical and mental well-being or otherwise is not suitable, ORR does generally give the proposed sponsor the opportunity to submit evidence designed to rebut this conclusion.

**REQUEST FOR ADMISSION NO. 25**

**REQUEST:**  Admit that, as a matter of POLICY AND PRACTICE, ORR does not provide CLASS MEMBERS a written decision explaining its reasons for denying a FAMILY REUNIFICATION APPLICATION seeking their release.

**OBJECTIONS:**  Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBERS and POLICY AND PRACTICE.

Defendants also object that this request is vague and ambiguous, as the term "denying" in this context is unclear in its meaning and does not accurately describe the process involved.  ORR does not "grant" or "deny" a Family Reunification Application (FRA), as is described in Sections 2.2.3 and 2.2.4 of the ORR Guide but rather works with non-Federal case managers to assess the submission of documents required by the application for release, wherein the application is only one part of the more comprehensive

Defendants' First Set of RFA Responses        - 41 -      **Exhibit 5**

process for assessing a potential sponsor of a child as is required by law.  A more fulsome explanation of the complete sponsor assessment process appears in Section 2 of the ORR Guide, including the discussion of ORR's sponsor assessment criteria and home studies in Section 2.4, required background checks for sponsors and household members in Section 2.5, and fingerprinting in Section 2.6.2.  As described in ORR Guide, Section 2.7, ORR's decision whether to release a child to a potential sponsor is based on an evaluation of all the available information.

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants admit that children are not provided a written denial of a proposed custodian's release request, unless the sole reason for the denial is a concern that the unaccompanied alien child is a danger to himself/herself or the community (see 2.7.7 and 2.7.8 of the ORR Guide).  Defendants also refer Plaintiffs to their Response to Request for Admission No. 20.  Defendants further refer Plaintiffs to sections 2.7.7 and 2.7.8 of the ORR Guide, which include standards and timelines when the proposed custodian is a parent or legal guardian (including the requirement for a denial letter explaining the reasons for the denial; instructions on how to obtain the child's case file; the supporting materials and information that formed the basis for ORR's decision; and an explanation of the process for requesting an appeal of the denial (see Section 2.7.8)) as well as a discussion of the Policy for Appeal of a Release Denial.  Plaintiffs should refer to the full ORR Guide for its full content. Children are not, however, provided a written denial of a proposed custodian's release request, unless the sole reason for the denial is a concern that the unaccompanied

alien child is a danger to himself/herself or the community (see 2.7.7 and 2.7.8 of the ORR Guide).

**REQUEST FOR ADMISSION NO. 26**

    **REQUEST:** Admit that, as a matter of POLICY AND PRACTICE, ORR does not provide a PROPOSED CUSTODIAN who is not a CLASS MEMBER's parent or legal guardian a written decision explaining its basis for denying a FAMILY REUNIFICATION APPLICATION seeking CLASS MEMBERS' release.

    **OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBERS, PROPOSED CUSTODIAN, and POLICY AND PRACTICE.

    Defendants also object that this request is vague and ambiguous, as the term "denying" in this context is unclear in its meaning and does not accurately describe the process involved. ORR does not "grant" or "deny" a Family Reunification Application (FRA), as is described in Sections 2.2.3 and 2.2.4 of the ORR Guide, but rather works with non-Federal case managers to assess the submission of documents required by the application for release, wherein the application is only one part of the more comprehensive process for assessing a potential sponsor of a child as is required by law. A more fulsome explanation of the complete sponsor assessment process appears in Section 2 of the ORR Guide, including the discussion of ORR's sponsor assessment criteria and home studies in Section 2.4, required background checks for sponsors and household members in Section

process for assessing a potential sponsor of a child as is required by law.  A more fulsome explanation of the complete sponsor assessment process appears in Section 2 of the ORR Guide, including the discussion of ORR's sponsor assessment criteria and home studies in Section 2.4, required background checks for sponsors and household members in Section 2.5, and fingerprinting in Section 2.6.2.  As described in ORR Guide, Section 2.7, ORR's decision whether to release a child to a potential sponsor is based on an evaluation of all the available information.

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants: (1) admit that proposed custodians other than a parent or legal guardian are not generally provided a written denial of their release request; and (2) further object that searching through all records relating to every child for whom ORR did not find a proposed sponsor to be suitable—to ascertain whether there was ever an instance where ORR provided a written explanation—would be unduly burdensome and not proportionate to the needs of the case, especially in light of point (1).

**REQUEST FOR ADMISSION NO. 28**

**REQUEST:**  Admit that to date HHS has convened fewer than four hearings on administrative appeal by Proposed Custodians from a denial of a Family Reunification Application.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically,

Defendants object to Plaintiffs' definitions of the terms CLASS MEMBERS, PROPOSED CUSTODIAN.

Defendants also object that this request is vague and ambiguous, as the term "denying" in this context is unclear in its meaning and does not accurately describe the process involved. ORR does not "grant" or "deny" a Family Reunification Application (FRA), as is described in Sections 2.2.3 and 2.2.4 of the ORR Guide, but rather works with non-Federal case managers to assess the submission of documents required by the application for release, wherein the application is only one part of the more comprehensive process for assessing a potential sponsor of a child as is required by law. A more fulsome explanation of the complete sponsor assessment process appears in Section 2 of the ORR Guide, including the discussion of ORR's sponsor assessment criteria and home studies in Section 2.4, required background checks for sponsors and household members in Section 2.5, and fingerprinting in Section 2.6.2. As described in ORR Guide, Section 2.7, ORR's decision whether to release a child to a potential sponsor is based on an evaluation of all the available information.

Defendants further object to the undefined, overly broad time period to which this request applies. Searching through all records relating to every child for whom ORR did not find a proposed sponsor to be suitable—to ascertain whether there were fewer than four hearings on administrative appeal relating to the suitability of a proposed custodian—would be unduly burdensome and not proportionate to the needs of the case.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants state that: (1) to the best of undersigned counsel's knowledge as of the date of these responses, a proposed custodian has not requested an administrative appeal of the denial of a release request since the filing of the instant lawsuit; and (2) a relatively low proportion of proposed sponsors elect to pursue an administrative appeal process.

**REQUEST FOR ADMISSION NO. 29**

**REQUEST:** Admit that HHS has not, as of the PRESENT, reversed a denial of a FAMILY REUNIFICATION APPLICATION on administrative appeal pursuant to § 2.7.8 of the UAC PROGRAM MANUAL.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the term UAC PROGRAM MANUAL.

Defendants also object that this request is vague and ambiguous, as the term "denial" in this context is unclear in its meaning and does not accurately describe the process involved. ORR does not "grant" or "deny" a Family Reunification Application (FRA), as is described in Sections 2.2.3 and 2.2.4 of the ORR Guide, but rather works with non-Federal case managers to assess the submission of documents required by the application for release, wherein the application is only one part of the more comprehensive process for assessing a potential sponsor of a child as is required by law. A more fulsome

explanation of the complete sponsor assessment process appears in Section 2 of the ORR Guide, including the discussion of ORR's sponsor assessment criteria and home studies in Section 2.4, required background checks for sponsors and household members in Section 2.5, and fingerprinting in Section 2.6.2.  As described in ORR Guide, Section 2.7, ORR's decision whether to release a child to a potential sponsor is based on an evaluation of all the available information.

Defendants further object to the undefined, overly broad time period to which this request applies.   Searching through all records relating to every child for whom ORR did not find a proposed sponsor to be suitable—to ascertain the number of times that HHS reversed ORR's position relating to the suitability of a proposed custodian following an administrative appeal—would be unduly burdensome and not proportionate to the needs of the case.

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants admit that a relatively low proportion of proposed sponsors elect to pursue an administrative appeal process, so any reversals of ORR's suitability determination as a result of any such administrative appeals would likewise be relatively infrequent.

**REQUEST FOR ADMISSION NO. 30**

**REQUEST:**  Admit that, as a matter of POLICY AND PRACTICE, ORR does not afford CLASS MEMBERS a hearing before denying a FAMILY REUNIFICATION

APPLICATION.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms POLICY AND PRACTICE and CLASS MEMBERS.

Defendants also object that this request is vague and ambiguous, as the term "denying" in this context is unclear in its meaning and does not accurately describe the process involved.  ORR does not "grant" or "deny" a Family Reunification Application (FRA), as is described in Sections 2.2.3 and 2.2.4 of the ORR Guide, but rather works with non-Federal case managers to assess the submission of documents required by the application for release, wherein the application is only one part of the more comprehensive process for assessing a potential sponsor of a child as is required by law.  A more fulsome explanation of the complete sponsor assessment process appears in Section 2 of the ORR Guide, including the discussion of ORR's sponsor assessment criteria and home studies in Section 2.4, required background checks for sponsors and household members in Section 2.5, and fingerprinting in Section 2.6.2.  As described in ORR Guide, Section 2.7, ORR's decision whether to release a child to a potential sponsor is based on an evaluation of all the available information.

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants acknowledge that ORR does not provide children a hearing

to challenge an anticipated denial of a proposed custodian's release request.

**REQUEST FOR ADMISSION NO. 31**

**REQUEST:**  Admit that, as a matter of POLICY AND PRACTICE, ORR does not afford CLASS MEMBERS' PROPOSED CUSTODIANS a hearing before denying a FAMILY REUNIFICATION APPLICATION.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms POLICY AND PRACTICE and CLASS MEMBERS.

Defendants also object that this request is vague and ambiguous, as the term "denying" in this context is unclear in its meaning and does not accurately describe the process involved. ORR does not "grant" or "deny" a Family Reunification Application (FRA), as is described in Sections 2.2.3 and 2.2.4 of the ORR Guide, but rather works with non-Federal case managers to assess the submission of documents required by the application for release, wherein the application is only one part of the more comprehensive process for assessing a potential sponsor of a child as is required by law.  A more fulsome explanation of the complete sponsor assessment process appears in Section 2 of the ORR Guide, including the discussion of ORR's sponsor assessment criteria and home studies in Section 2.4, required background checks for sponsors and household members in Section 2.5, and fingerprinting in Section 2.6.2.  As described in ORR Guide, Section 2.7, ORR's decision whether to release a child to a potential sponsor is based on an evaluation of all

neglected them, and other close relatives are unable or unwilling to care for them as kinship caregivers.  Further, Defendants object that surveying a multitude of ORR employees to ascertain whether any of them may be aware of a state or local child protection agency that refuses to place dependent children with unrelated adults or relatives more distant than a brother, sister, aunt, uncle, grandparent, or first cousin, on the ground a bona fide social relationship with the child and/or the child's family did not exist before dependency proceedings commenced would be unduly burdensome and not proportionate to the needs of this case.

**RESPONSE:**  In light these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state that after making a reasonable but not exhaustive inquiry, Defendants are not aware of a state or local child protection agency that refuses to place dependent children with unrelated adults or relatives more distant than a brother, sister, aunt, uncle, grandparent, or first cousin, on the ground a bona fide social relationship with the child and/or the child's family did not exist before dependency proceedings commenced.

**REQUEST FOR ADMISSION NO. 36**

**REQUEST:** Admit that ORR regularly places CLASS MEMBERS in long-term care with foster parents with whom neither the CLASS MEMBER nor his or her family had a bona fide social relationship before the CLASS MEMBER migrated to the United States.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definition of the terms CLASS MEMBER(S). Defendants further object to this request as overbroad, vague, and ambiguous. It is unclear what the term "regularly" means in this request as it is unquantified. Defendants also object to the term "long term" as unquantified; Defendants' response to this request will assume that term refers to a length of four (4) months or more. *See* ORR Guide, Section 1.4.3

**RESPONSE:** Subject to and without waiving these objections, Defendants state as follows. Unaccompanied alien children may under certain circumstances remain in ORR's legal custody for a period of four (4) months or more. Children in long term care by definition do *not* have a viable sponsor *and* one of the two following situations has occurred: (1) a legal service provider or attorney has screened the child or youth as eligible for immigration relief; *or* (2) another reason prevents return of the child to his/her home country, such as that the child's country of origin is in a state of emergency and safe repatriation is delayed as a result. *See* ORR Guide, Section 1.4.3. When unaccompanied alien children are in long term care, ORR care providers continue to make their best efforts to identify more permanent arrangements in order to release such children from ORR's legal custody. *See id.* Defendants further admit that, when appropriate, ORR places unaccompanied alien children in long term foster care in licensed foster homes and considers their cultural and linguistic needs when making such placements. *See id.* at Section 1.4.4.

Defendants further object to this request on relevance grounds to the extent that Plaintiffs request information covering a period before the date that any of the named Plaintiffs first entered ORR's legal custody.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants state that for all unaccompanied alien children in ORR's legal custody during fiscal year 2018, the average length of care was 60 days, as reported on ORR's website at: https://www.acf.hhs.gov/orr/about/ucs/facts-and-data.

**REQUEST FOR ADMISSION NO. 40**

**REQUEST:** Admit that ORR took custody of more CLASS MEMBERS in fiscal years 2014 and 2016 than it did in fiscal year 2018.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definition of the term CLASS MEMBERS. On relevance grounds, Defendants also object to the relevance of Plaintiffs' request concerning whether "more" CLASS MEMBERS were in ORR custody in fiscal years 2014 and 2016, which are outside the timeframe when any named Plaintiff was in ORR custody, than in fiscal year 2018. Defendants also object to this request as vague, in that it is not clear which of the following meanings Plaintiffs intend: (1) whether ORR took custody of more class members in 2014 than it did in fiscal year 2018, and took custody of more class members in 2016 than it did in fiscal year 2018; or (2) whether the combined total number of class

members that ORR took custody of in 2014 and 2016 exceeds the number from 2018.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.   Alternatively, subject to and without waiving these objections, Defendants state as follows.  Data concerning the total number of referrals of unaccompanied alien children to ORR in fiscal years 2012 through 2018 is publicly available on ORR's website at https://www.acf.hhs.gov/orr/about/ucs/facts-and-data.  The number of referrals for fiscal years 2014, 2016, and 2018, are 57,496, 59,170, and 49,100, respectively.

**REQUEST FOR ADMISSION NO. 41**

**REQUEST:** Admit that ORR does not generally place CLASS MEMBERS whom it deems dangerous to themselves or others in LICENSED PLACEMENTS.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms CLASS and LICENSED PLACEMENTS.

**RESPONSE:**   In light these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state that:

- as described in the ORR Guide, Section 1.2.4, ORR places an unaccompanied alien child in a secure facility if the child:  "(1) poses a danger to self or others; or (2) has been charged with or convicted of a criminal offense, or is chargeable with such an offense."

- secure care providers, which are licensed by the state in which they are located, are for "youth who require the strictest level of supervision" and "have a secure perimeter, major restraining construction inside the facility, and procedures typically associated with correctional facilities." *Id.*

- ORR does not generally place unaccompanied alien children whom it deems dangerous to themselves or others in grantee care providers other than secure care facilities and residential treatment centers, both of which are licensed by the states in which they are located.

**REQUEST FOR ADMISSION NO. 42**

**REQUEST:** Admit that the most frequent reason ORR does not release CLASS MEMBERS from LICENSED PLACEMENTS is because it has yet to determine that a POTENTIAL CUSTODIAN is FIT.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBERS, LICENSED PLACEMENTS, POTENTIAL CUSTODIAN, and FIT.

**RESPONSE:** In light these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants admit that unaccompanied alien children in ORR's legal custody generally remain there until ORR identifies a sponsor who is capable of providing for the child's physical and mental well-being and until logistical arrangements to transfer

non-Federal case managers to assess the submission of documents required by the application for release, wherein the application is only one part of the more comprehensive process for assessing a potential sponsor of a child as is required by law. A more fulsome explanation of the complete sponsor assessment process appears in Section 2 of the ORR Guide, including the discussion of ORR's sponsor assessment criteria and home studies in Section 2.4, required background checks for sponsors and household members in Section 2.5, and fingerprinting in Section 2.6.2.  As described in ORR Guide, Section 2.7, ORR's decision whether to release a child to a potential sponsor is based on an evaluation of all the available information.

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants deny this request.  Defendants aver that ORR policy provides a way to appeal a release denial decision by the ORR Director to the Assistant Secretary for Children and Families, within the Health and Human Services Department. *See* ORR Guide § 2.7.8.

**REQUEST FOR ADMISSION NO. 73**

**REQUEST**: Admit that the principal reason YOU do not afford CLASS MEMBERS greater procedural protections against improper denial of FAMILY REUNIFICATION APPLICATIONS is because doing so would entail greater expense and administrative inconvenience.

1  **OBJECTIONS:**  Defendants object to this request to the extent it uses

2  Plaintiffs' definitions to which Defendants object, as discussed above; specifically,

3  Defendants object to Plaintiffs' definitions of the terms YOU, CLASS MEMBERS, and

4  FAMILY REUNIFICATION APPLICATIONS.

5

6  Defendants also object that this request is vague and ambiguous, as in this

7  context the term "denial" is unclear in its meaning and does not accurately describe the

8  process involved.  ORR does not "grant" or "deny" a Family Reunification Application

9  (FRA), as is described in Sections 2.2.3 and 2.2.4 of the ORR Guide, but rather works with

10 non-Federal case managers to assess the submission of documents required by the

11 application for release, wherein the application is only one part of the more comprehensive

12 process for assessing a potential sponsor of a child as is required by law.  A more fulsome

13 explanation of the complete sponsor assessment process appears in Section 2 of the ORR

14 Guide, including the discussion of ORR's sponsor assessment criteria and home studies in

15 Section 2.4, required background checks for sponsors and household members in Section

16 2.5, and fingerprinting in Section 2.6.2.  As described in ORR Guide, Section 2.7, ORR's

17 decision whether to release a child to a potential sponsor is based on an evaluation of all

18 the available information.

19 **RESPONSE:**  In light of these objections, Defendants are unable to admit this

20 request as worded, and therefore deny it.  Alternatively, subject to and without waiving

21 these objections, Defendants deny this request.

**REQUEST FOR ADMISSION NO. 74**

        **REQUEST**: Admit that, as a matter of POLICY AND PRACTICE, ORR regularly STEPS UP CLASS MEMBERS.

       **OBJECTIONS:**   Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms POLICY AND PRACTICE, STEPS UP, and CLASS MEMBERS.

        **RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  To the extent that transfers to more secure facilities occur in the course of providing care and custody to thousands of unaccompanied alien children, Defendants admit this request.

**REQUEST FOR ADMISSION NO. 75**

        **REQUEST**:  Admit that, as a matter of POLICY AND PRACTICE, ORR STEPS UP CLASS MEMBERS because they may be chargeable with a criminal offense, notwithstanding that ORR has no probable cause to believe the CLASS MEMBER has committed any actual criminal offense.

        **OBJECTIONS:**   Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms POLICY AND PRACTICE, STEPS UP, and CLASS MEMBERS.  Defendants further object that the Request's use of the phrase

follows: "A staff secure care provider is a facility that maintains stricter security measures, such as higher staff to unaccompanied alien children ratio for supervision, than a shelter in order to control disruptive behavior and to prevent escape.  A staff secure facility is for unaccompanied alien children who may require close supervision but do not need placement in a secure facility.  Service provision is tailored to address an unaccompanied alien child's individual needs and to manage the behaviors that necessitated the child's placement into this more restrictive setting.  The staff secure atmosphere reflects a more shelter, home-like setting rather than secure detention. Unlike many secure care providers, a staff secure care provider is not equipped internally with multiple locked pods or cell units."

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Staff-secure facilities have a higher ratio of staff per child but do not necessarily place greater restrictions on the children's freedom of movement.  *See* ORR Guide, § 1.2.4.

**REQUEST FOR ADMISSION NO. 79**

**REQUEST**: Admit that CLASS MEMBERS STEPPED UP to RTCs are subjected to restrictions on liberty and freedom of movement substantially equivalent to those experienced by JUVENILES who have been involuntarily committed.

**OBJECTIONS:**  Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically,

Defendants' First Set of RFA Responses     - 87 -   **Exhibit 5**
                                                    **Page 499**

Defendants object to Plaintiffs' definitions of the terms, CLASS MEMBERS and STEPPED UP.   It is also unclear what restrictions experienced by juveniles who have been involuntarily committed are referenced in this request; relatedly, it would be unduly burdensome and disproportionate to the needs of the case to require Defendants to conduct a nationwide survey of juveniles who have been involuntarily committed to a state, federal, or local facility and to then assess the degree to which the juveniles possess freedom of movement and then conduct Plaintiffs' requested comparison.

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  RTCs are more restrictive settings than shelters. ORR only places children in RTCs if a psychiatrist or psychologist determines that a child is a danger to self or others, and specifically recommends RTC placement because the child needs intensive mental health services unavailable in an outpatient setting, and thus the RTC is the least restrictive setting in the best interest of that particular child.  *See* ORR Guide § 1.4.6 (RTC Placements).  HHS has two RTCs in network, Mercy First in Syosset, NY and Shiloh, in Manvel, TX, and occasionally enters into single case agreements to place children in other RTCs as needed.  However, at this time, despite reasonable inquiry, the information Defendants know or can readily obtain is insufficient to enable Defendants to further admit or deny this request.  For instance, Defendants lack specific knowledge as to whether the treatment and restrictions on liberty would be substantially equivalent to that experienced by the domestic population in such facilities, given that the facilities are required to comply with policies specific to ORR.  Moreover,

Defendants' First Set of RFA Responses          - 88 -      **Exhibit 5**
**Page 500**

Defendants lack specific knowledge as to whether the Shiloh RTC and Mercy First are similar to other facilities across the United States where children might be involuntarily committed.

**REQUEST FOR ADMISSION NO. 80**

      **REQUEST**: Admit that CLASS MEMBERS STEPPED UP to a secure facility are subjected to restrictions on liberty and freedom of movement substantially equivalent to those experienced by adjudicated JUVENILE delinquents.

      **OBJECTIONS:**  Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the term CLASS MEMBERS, and STEPPED UP. Defendants further object to this request as the term, "secure facility," is not defined. Defendants use the definition of secure facility used in the ORR Guide, Guide to Terms, in which secure care is either an RTC or licensed juvenile detention facility.  Defendants further object that the phrase, "are subjected to restrictions on liberty and freedom of movement  substantially  equivalent  to  those  experienced  by adjudicated JUVENILE delinquents," because the phrase "substantially equivalent" is not qualified. Moreover, Plaintiffs do not explain how liberty and freedom of movement would be restricted for "juvenile delinquents," and on this basis Defendants raise a vagueness objection. Defendants also object to this request as overbroad and unduly burdensome, to the extent it asks Defendants to survey a wide range of state, local, and federal facilities across the country to ascertain what restrictions on liberty and freedom of movement may exist,

and then to conduct Plaintiffs' requested comparison.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows. ORR has cooperative agreements with two licensed juvenile detention centers, one in Yolo County, California; and one in Staunton, Virginia – the Shenandoah Valley Juvenile Center ("SVJC").  These facilities currently hold less than 1 percent of unaccompanied alien children in the care of the Department.  Both such facilities also house a domestic population.  However, at this time, despite reasonable inquiry, the information Defendants know or can readily obtain is insufficient to enable Defendants to further admit or deny this request.  For instance, Defendants lack specific knowledge as to whether the treatment and restrictions on liberty would be substantially equivalent to that experienced by the domestic population in such facilities, given that the facilities are required to comply with policies specific to ORR.  Moreover, Defendants lack specific knowledge as to whether the Yolo and SVJC facilities are similar to other juvenile justice facilities across the United States.

**REQUEST FOR ADMISSION NO. 81**

**REQUEST**: Admit that CLASS MEMBERS whom ORR STEPS UP often spend more time in ORR custody than those not STEPPED UP.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the term CLASS MEMBERS, and STEPS UP or

Defendants' First Set of RFA Responses          - 90 -     **Exhibit 5**

STEPPED UP.

**RESPONSE:**  Subject to and without waiving these objections, Defendants admit that the average length of care of unaccompanied alien children who were in secure or staff secure care is longer than the average length of care of unaccompanied alien children who were never in secure or staff secure care. Unaccompanied alien children do not, however, always stay longer when in secure or staff secure care.

**REQUEST FOR ADMISSION NO. 82**

**REQUEST**: Admit that CLASS MEMBERS whom ORR STEPS UP to RTCs are ineligible for release to PROPOSED CUSTODIANS until an RTC HEALTH CARE PROVIDER determines they are stable.

**OBJECTIONS:**  Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the term CLASS MEMBERS, STEPS UP, RESIDENTIAL TREATMENT CENTER, PROPOSED CUSTODIAN, and HEALTH CARE PROVIDER. Defendants also object to the absolute nature of the request, wherein the request includes assumptions that there are absolute bars making a minor "ineligible" for release; in contrast, Defendants aver that the release process is a multi-factor determination that depends both on the nature of the UACs in question (and whether conditions will allow them to be properly cared for upon release) in conjunction with the abilities of the potential sponsor, and whether they have the supports necessary to offer care that may be needed. Defendants further object to the term, "stable," as it is undefined and vague and ambiguous,

1    due to its lack of relation to any particular clinical condition.

2         **RESPONSE:** In light of these objections, Defendants are unable to admit this

3

4    request as worded, and therefore deny it.  Alternatively, subject to and without waiving

5    these objections, Defendants state as follows.  Defendants admit that many UACs in RTCs

6    have significant mental health needs and that one factor that frequently weighs strongly in

7

8    the release determination is: "the . . . child's current functioning and strengths in relation

9    to any risk factors or special concerns, such as children or youth who . . . have special

10   needs, disabilities or medical or mental health issues." *See* § 2.4.1 of the ORR Guide.

11   **REQUEST FOR ADMISSION NO. 83**

12

13        **REQUEST**: Admit that CLASS MEMBERS whom ORR STEPS UP to RTCs

14   are ineligible for STEP DOWN until an RTC HEALTH CARE PROVIDER determines they

15

16   are stable.

17        **OBJECTIONS:**   Defendants object to this request to the extent it uses

18

19   Plaintiffs' definitions to which Defendants object, as discussed above; specifically,

20   Defendants object to Plaintiffs' definitions of the term CLASS MEMBERS, STEPS UP,

21   RESIDENTIAL TREATMENT CENTER, STEP DOWN, and HEALTH CARE PROVIDER.

22   Defendants also object to the absolute nature of the request, wherein the request includes

23

24   assumptions that there are absolute bars making a minor "ineligible" for step-down.

25   Defendants further object to the term, "stable," as it is undefined and vague and ambiguous,

26   due to its lack of relation to any particular clinical condition.

27

28

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants refer Plaintiffs to § 1.4.2 of the ORR Guide, which states, in pertinent part: "Step-downs may occur when ORR, in its discretion, determines the UAC no longer poses a danger to himself . . . . In making a step-down decision, ORR considers criteria identified in making a secure placement and takes into consideration any mitigating factors based on an assessment of the UAC's current functioning and behavior . . . . The care provider documents the underlying assessment used to make this determination in the UAC's case file."  Defendants admit that in many cases if a minor is in an RTC, and the treating psychologist or psychiatrist has determined that the minor remains a danger to him- or herself, then the minor will need to remain within the RTC in order to receive treatment and will not be stepped down until the medical provider determines that doing so would be consistent with the minor's healthcare needs.

**REQUEST FOR ADMISSION NO. 84**

**REQUEST**: Admit that ORR often requires that PROPOSED CUSTODIANS for CLASS MEMBERS whom it has STEPPED UP to secure facilities be more skilled or qualified to care for CHILDREN than PROPOSED CUSTODIANS for CLASS MEMBERS whom it has not STEPPED UP to secure facilities.

**OBJECTIONS:**  Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms PROPOSED CUSTODIANS, CLASS

Defendants' First Set of RFA Responses     - 93 -     **Exhibit 5**

**REQUEST FOR ADMISSION NO. 92**

**REQUEST**: Admit that, as a matter of POLICY AND PRACTICE, ORR FACILITIES awaken CLASS MEMBERS during scheduled sleep hours to effectuate STEP UP in order to deter CLASS MEMBERS from objecting to STEP UP.

**OBJECTIONS:**   Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms, POLICY AND PRACTICE, ORR FACILITIES, CLASS MEMBERS, and STEP UP.

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  For safety reasons, there are situations in which ORR care providers finds it prudent to wake up an unaccompanied alien child during scheduled sleep hours to effectuate a step up.   ORR care providers do not, however, wake up a child in order to deter objections to step up.

**REQUEST FOR ADMISSION NO. 93**

**REQUEST**: Admit that, as a matter of POLICY AND PRACTICE, ORR does not afford CLASS MEMBERS a hearing on whether they should be STEPPED UP either before or after STEP UP.

**OBJECTIONS:**   Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms, POLICY AND PRACTICE, CLASS

MEMBERS, and STEP(PED) UP.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants state as follows. After an unaccompanied alien child is transferred to a more restrictive placement, ORR Policy requires a review of the transfer decision within 30 days, and possibly sooner if there is "new information" available. *See* ORR Guide § 1.4.2. Such new information may potentially come from any source, including the child. The policy does not require that a hearing take place before the transfer occurs.

**REQUEST FOR ADMISSION NO. 94**

**REQUEST**: Admit that YOUR affording CLASS MEMBERS a hearing before a neutral and detached decisionmaker on whether they should be STEPPED UP would improve the reliability of YOUR STEP UP decisions.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms YOUR, CLASS MEMBERS ,and STEP UP. Defendants further object to this request, as the request contains unproven assumptions about reliability and calls for speculation. Moreover, Defendants object to the term "improve" as vague and ambiguous. Defendants object to the suggestion that ORR decisionmakers are not "neutral and detached."

1   the reliability of YOUR STEP UP decisions.

2       **OBJECTIONS:**   Defendants object to this request to the extent it uses
3
4   Plaintiffs' definitions to which Defendants object, as discussed above; specifically,

5   Defendants object to Plaintiffs' definitions of the terms, CLASS MEMBERS and STEP UP.

6   Defendants further object to this request, as the request contains unproven assumptions

7   about reliability and calls for speculation.  Defendants also object to the term "improve" as
8
9   vague and ambiguous.

10      **RESPONSE:**  In light of these objections, Defendants are unable to admit this
11
12  request as worded, and therefore deny it.  Alternatively, subject to and without waiving

13  these objections, Defendants deny this request.

14  **REQUEST FOR ADMISSION NO. 97**
15
16      **REQUEST**: Admit that, as a matter of POLICY AND PRACTICE, ORR uses no

17  articulable evidentiary standard, such as the preponderance of the evidence, in determining
18
19  whether to STEP UP CLASS MEMBERS.

20      **OBJECTIONS:**   Defendants object to this request to the extent it uses

21  Plaintiffs' definitions to which Defendants object, as discussed above; specifically,
22
23  Defendants object to Plaintiffs' definitions of the terms POLICY AND PRACTICE, STEP UP,

24  and CLASS MEMBERS.  Defendants also object to the premise of this request, to the extent

25  it presumes, incorrectly, that ORR should be treated as if ORR were a judicial body, rather
26
27  than an agency statutorily mandated to provide care for unaccompanied alien children

28  under the Homeland Security Act, 6 U.S.C. § 679, and the TVPRA, 8 U.S.C. § 1232.

Defendants' First Set of RFA Responses       - 104 -   **Exhibit 5**

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants state as follows. Defendants admit that ORR does not use a specific evidentiary standard in assessing whether, for the child's own protection and/or the protection of others, the child should be transferred to a more restrictive setting. The decision to transfer an unaccompanied alien child to a more restrictive placement is based on consideration of multiple factors as articulated in the ORR Guide at § 1.2.4, which are documented in the case file and provided upon demand to the child's counsel of record, legal services organization, or Child Advocate. *See* ORR Guide, § 1.4.2 (30 Day Placement Restrictive Case Review).

**REQUEST FOR ADMISSION NO. 98**

**REQUEST**: Admit that YOUR using an articulable evidentiary standard, such as the preponderance of the evidence, in determining whether to STEP UP CLASS MEMBERS would improve the reliability of YOUR STEP UP decisions.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms YOUR, STEP UP, and CLASS MEMBERS. Defendants further object to this request, as it contains unproven assumptions about reliability and calls for speculation. Moreover, Defendants object to the term "improve" as vague and ambiguous. Defendants also object to the premise of this request, to the extent it presumes, incorrectly, that ORR should be treated as if ORR were a judicial

body, rather than an agency statutorily mandated to provide care for unaccompanied alien children under the Homeland Security Act, 6 U.S.C. § 679, and the TVPRA, 8 U.S.C. § 1232.

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants deny this request.  Decisions to transfer minors to more restrictive placements are highly individualized.  ORR's policies in the ORR Guide, §§ 1.2.4 and 1.4.2 (30 Day Restrictive Placement Review) allow it to make decisions tailored to promote individual minors' best interests while also providing for outside review by a Care Coordinator of its decision-making.

**REQUEST FOR ADMISSION NO. 99**

**REQUEST**: Admit that, as a matter of POLICY AND PRACTICE, ORR allows CLASS MEMBERS no opportunity to present witnesses or evidence before it STEPS UP the CLASS MEMBERS.

**OBJECTIONS:**  Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms POLICY AND PRACTICE, STEP UP, and CLASS MEMBER(S).

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows. Defendants admit that unaccompanied alien

children do not have the opportunity to present witnesses or evidence before they are stepped up to a more restrictive setting. However, Defendants aver that "[w]hen a UAC is stepped up to a more restrictive setting (secure, staff-secure or RTC facility), he/she is provided with a *Notice of Placement in Restrictive Setting* in a language that he/she understands within a reasonable time either before or after ORR's placement decision." ORR Guide § 1.4.2.  Moreover, "[a]fter 30 days of placement in a secure or RTC facility, UAC may request the ORR Director, or the Director's designee, to reconsider their placement. The ORR Director, or designee, may deny the request, remand the request to the ORR/FFS for further consideration, or approve the request and order the youth transferred to a staff secure or other care provider facility."  ORR Guide, § 1.4.7.  As explained in ORR Guide, § 2.9, unaccompanied alien children also have the opportunity to seek a bond hearing with an immigration judge who decides whether the child poses a danger to the community."

Additionally, ORR continually assesses minors in its care and documents significant updates in its records, including updates based on ORR receiving and assessing new information about a child's case.  Children, and their legal counsel and Child Advocates have the opportunity to share new information with ORR care provider staff, which is considered along with any other information that is known in determining whether a new level of care is warranted.  As provided in ORR Guide § 1.4.2, "At least every 30 days, the care provider staff, in collaboration with the Case Coordinator and the ORR/FFS, reviews the placement of a UAC into a secure, staff secure, or RTC facility to determine whether a new level of care is more appropriate.  The ORR/FFS may allow the review to

take place earlier than 30 days, particularly if *new information* indicates an alternative placement is more appropriate" (emphasis added). New information may come many sources, including from children themselves, as they develop relationships with their case managers and clinicians. Defendants aver that such statements, along with any other new information, influence ORR's ongoing placement decisions.

**REQUEST FOR ADMISSION NO. 100**

**REQUEST**: Admit that YOUR providing CLASS MEMBERS an opportunity to present witnesses or evidence before it STEPS UP the CLASS MEMBERS would improve the reliability of YOUR STEP UP decisions.

**OBJECTIONS:**   Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms YOUR, CLASS MEMBER(S), and STEP UP.  Defendants further object to this request, as it contains unproven assumptions about reliability and calls for speculation.  Defendants object to the term "improve" as vague and ambiguous.

**RESPONSE:**   In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants deny this request.  As explained in the response to Request 99, ORR does allow and assess "new information," including that offered by minors, their attorneys of record, legal service providers, or Child Advocates, in its continual assessment of minors' placements.

**REQUEST FOR ADMISSION NOs. 101-199**

Under the parties' agreement, Defendants' objections, if any, and responses to these requests will follow in a future production.

DATED:  March 14, 2019       Respectfully submitted,

                    JOSEPH H. HUNT
                    Assistant Attorney General
                    Civil Division

                    ERNESTO H. MOLINA
                    Deputy Director, Office of Immigration Litigation

                    JEFFREY S. ROBINS
                    Deputy Director, Office of Immigration Litigation

                    BY: */s/ Benjamin Mark Moss*
                    BENJAMIN MARK MOSS
                    Senior Litigation Counsel
                    W. DANIEL SHIEH
                    Senior Litigation Counsel
                    SHERRY D. SOANES
                    MARINA C. STEVENSON
                    Trial Attorneys
                    Office of Immigration Litigation
                    Civil Division, U.S. Department of Justice
                    P.O. Box 868, Ben Franklin Station
                    Washington, DC 20044
                    Telephone: (202) 307-8675
                    Facsimile: (202) 307-8781

Attorneys for Defendants     benjamin.m.moss2@usdoj.gov
  (official capacity only)

# Exhibit 6

Exhibit 6
Page 514

1    JOSEPH H. HUNT
2    Assistant Attorney General
     United States Department of Justice
3    Civil Division
4    ERNESTO H. MOLINA, JR.
     JEFFREY S. ROBINS
5    Deputy Director
     Office of Immigration Litigation
6    BENJAMIN MARK MOSS
7    W. DANIEL SHIEH
     Senior Litigation Counsel
8    SHERRY D. SOANES
9    MARINA C. STEVENSON
     JONATHAN K. ROSS
10   Trial Attorneys
11   P.O. Box 878
     Ben Franklin Station
12   Washington, D.C. 20044
13   Telephone: (202) 307-8675
     Facsimile: (202) 307-8781
14   benjamin.m.moss2@usdoj.gov
15   Attorneys for Defendants

16              UNITED STATES DISTRICT COURT
17          FOR THE CENTRAL DISTRICT OF CALIFORNIA

18   LUCAS R. *et al.*,                )   Case No.: 2-18-CV-05741 DMG (PLA)
                   Plaintiffs,          )
19                                      )
            v.                          )   DEFENDANTS' SECOND SET OF
20   ALEX AZAR, Secretary of U.S. Dep't of)  RESPONSES TO PLAINTIFFS'
21   Health and Human Services, *et al*.,   )  REQUESTS FOR ADMISSION TO
                   Defendants.          )   DEFENDANT ALEX AZAR,
22                                      )   SECRETARY OF U.S. DEPARTMENT
                                        )   OF HEALTH AND HUMAN SERVICES,
23                                      )   SET ONE
                                        )
24                                      )
                                        )
25                                      )
26                                      )
27   _____)
28

**Exhibit 6**
**Page 515**

**<u>Defendants' Further Responses to Specific Requests for Admissions</u>**

**REQUEST FOR ADMISSION NO. 43**

**REQUEST:** Admit that CLASS MEMBERS have been physically abused during ORR custody.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definition of the term CLASS MEMBERS. Defendants also object to the phrase "physically abused," as it is undefined, and therefore lacking in specificity and particularity. Defendants further object to this request based on relevancy. Allegations of physical abuse of unaccompanied children while placed at ORR care providers do not relate specifically to the claims of the five subclasses certified in this case – the step up, unfit custodian (release), medication, disability, and legal representation classes. Defendants also object to this request as lacking in relevancy because it does not identify a particular time frame, and allegations of abuse from any given point in time are not relevant to the five certified subclasses or the injunctive relief Plaintiffs presently seek, and constitutes an improper use of a request for admission to obtain discoverable information. *See Gibson Brands Inc. v. John Hornby Skewes & Co.*, 2015 WL 12681376, at \*6 (C.D. Cal. 2015) (holding that "[u]nlike interrogatories, document requests, and depositions, requests for admission 'are not a discovery device at all, since [they] presuppose[] that the party proceeding under [Rule 36] knows the facts or has the document and merely wishes its opponent to concede their genuineness.'") (quoting *Pasternak v. Dow Kim*, 2011 WL 4552389, at \*5 (S.D.N.Y. 2011) (quoting 8B Wright, Miller, & Marcus, Federal Practice and Procedure § 2253 at 324)). Defendants will respond to this request for the time period beginning in 2017.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants state as follows. Defendants admit that allegations of physical abuse of unaccompanied alien children in ORR custody (by other minors or adult staff

members) have at times been reported, and that sometimes these allegations are substantiated.  However, ORR policies are set up to address such allegations quickly and fully.  As is described in Section 5.5.4 of the ORR Guide, in addition to the routine monitoring process, ORR has an Abuse Review Team (ART) to review allegations of abuse (physical, sexual, and negligent treatment) that are particularly serious or egregious in nature.  The team is composed of ORR staff with the appropriate expertise to assess and identify remedial measures to address these allegations, including members of ORR's Monitoring Team, the Division of Health for Unaccompanied Children and ORR's Prevention of Sexual Abuse Coordinator.

**REQUEST FOR ADMISSION NO. 44**

       **REQUEST:** Admit that CLASS MEMBERS have been sexually abused during ORR custody.

       **OBJECTIONS:**  Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definition of the term CLASS MEMBER.  Defendants also object that Plaintiffs do not define the term "sexually abused"; for purposes of this request, Defendants will use the definitions of "sexual abuse," "sexual harassment," and "inappropriate sexual behavior" found in Sections 4.1.1, 4.1.3, and 4.1.4, respectively, of the ORR Guide; and ORR's regulations at 45 C.F.R. § 411.6 (defining sexual abuse, sexual harassment, and inappropriate sexual behavior).  Defendants further object to this request based on relevancy.  Allegations of sexual abuse of unaccompanied children while placed at ORR care providers do not relate to the claims of the five subclasses certified in this case – the step up, unfit custodian (release), medication, disability, and legal representation classes.  Defendants also object to this request as lacking in relevancy because it does not identify a particular time frame, and allegations of abuse from any given point in time are not relevant to the five certified subclasses or the injunctive relief Plaintiffs presently seek. *See Gibson Brands Inc.*, 2015 WL 12681376, at *6 (holding that a request for admission is not a discovery device).  Defendants will respond to this request for the time period

beginning in 2017.

RESPONSE:  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants admit this request.  Defendants aver, however, that ORR has a zero-tolerance policy for all forms of sexual abuse, sexual harassment, and inappropriate sexual behavior at all care provider facilities, including secure care provider facilities and long term foster care providers, and will make every effort to prevent, detect, and respond to such conduct.  In addition to the ART described in Response to Request for Admission No. 43 above, Section 4 of the ORR Guide provides an outline for and guidance on ORR's comprehensive approach to preventing, detecting, and responding to such conduct.  Defendants admit that, notwithstanding the existence of these policies, there are a limited number of allegations of sexual abuse, sexual harassment, or other sexually inappropriate conduct that involved unaccompanied alien children while they were placed with ORR care providers, some of which were substantiated.  More serious allegations rising to the level of "sexual abuse" are rare and are reported to ORR, the Department of Justice (DOJ), and HHS' Office of Inspector General (OIG).  Of these, the vast majority involve "UAC-on-UAC" allegations, and the distinct minority involve adults.  In FY 2018 (through July), for example, ORR and DOJ received 412 allegations of sexual abuse, and 11.9% involved facility-staff-on-minor allegations, the vast majority of which were not substantiated.  Notably, none of the allegations involved ORR federal staff.  These allegations were all fully investigated and remedial action was taken where appropriate.

**REQUEST FOR ADMISSION NO. 45**

REQUEST:  Admit that CLASS MEMBERS have been physically or  sexually abused at the Hacienda del Sol facility in or near Youngtown, Arizona.

OBJECTIONS:  Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definition of the term CLASS MEMBERS.   Defendants also

**REQUEST FOR ADMISSION NO. 46**

  **REQUEST:** Admit that ORR placed CLASS MEMBERS at the Hacienda del Sol facility even after becoming aware that CLASS MEMBERS had been physically or sexually abused there.

  **OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definition of the term CLASS MEMBERS. Defendants also object to the phrase "physically abused," as it is undefined, and therefore lacking in specificity and particularity. Defendants also object that Plaintiffs do not define the term "sexually abused"; for purposes of this request, Defendants will use the definitions of "sexual abuse," "sexual harassment," and "inappropriate sexual behavior" found in Sections 4.1.1, 4.1.3, and 4.1.4, respectively, of the ORR Guide; and ORR's regulations at 45 C.F.R. § 411.6 (defining sexual abuse, sexual harassment, and inappropriate sexual behavior). Defendants further object to this request based on relevancy. Allegations of physical or sexual abuse of unaccompanied children while placed at ORR care providers do not relate specifically to the claims of the five subclasses certified in this case – the step up, unfit custodian (release), medication, disability, and legal representation classes. Defendants also object to this request as lacking in relevancy because it does not identify a particular time frame, and allegations of abuse from any given point in time at the Hacienda del Sol facility are not relevant to the five certified subclasses or the injunctive relief Plaintiffs presently seek. *See Gibson Brands Inc.*, 2015 WL 12681376, at *6 (holding that a request for admission is not a discovery device). Defendants will respond to this request for the time period beginning in 2017.

  **RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants state as follows. Defendants admit that ORR has continued to place unaccompanied alien children at the Hacienda de Sol facility since the January 2017 allegation of sexual abuse of a minor by a staff member was made, investigated, and

1   found to be unsubstantiated.

2   **REQUEST FOR ADMISSION NO. 47**

3   **REQUEST:** Admit that CLASS MEMBERS have been physically or sexually
4   abused at the Shiloh RTC in or near Manvel, Texas.

5   **OBJECTIONS:** Defendants object to this request to the extent it uses
6   Plaintiffs' definitions to which Defendants object, as discussed above; specifically,
7   Defendants object to Plaintiffs' definition of the term CLASS MEMBERS. Defendants also
8   object to the phrase "physically abused," as it is undefined, and therefore lacking in
9   specificity and particularity. Defendants also object that Plaintiffs do not define the term
10  "sexually abused"; for purposes of this request, Defendants will use the definitions of
11  "sexual abuse," "sexual harassment," and "inappropriate sexual behavior" found in
12  Sections 4.1.1, 4.1.3, and 4.1.4, respectively, of the ORR Guide; and ORR's regulations at
13  45 C.F.R. § 411.6 (defining sexual abuse, sexual harassment, and inappropriate sexual
14  behavior). Defendants further object to this request based on relevancy. Allegations of
15  physical or sexual abuse of unaccompanied children while placed at ORR care providers
16  do not relate specifically to the claims of the five subclasses certified in this case – the step
17  up, unfit custodian (release), medication, disability, and legal representation classes.
18  Defendants also object to this request as lacking in relevancy because it does not identify
19  a particular time frame, and allegations of abuse from any given point in time at the Shiloh
20  RTC are not relevant to the five certified subclasses or the injunctive relief Plaintiffs
21  presently seek. *See Gibson Brands Inc.*, 2015 WL 12681376, at *6 (holding that a request
22  for admission is not a discovery device). Defendants will respond to this request for the
23  time period beginning in 2017.

24  **RESPONSE:** In light of these objections, Defendants are unable to admit this
25  request as worded, and therefore deny it. Alternatively, subject to and without waiving
26  these objections, Defendants state as follows. Defendants admit that in April 2017, an
27  unaccompanied alien child alleged that a Shiloh RTC staff member inappropriately touched
28  her. This allegation was reported to CPS and licensing authorities, as well as HHS OIG,

(release), medication, disability, and legal representation classes.  Defendants also object because ORR does not place children in a care provider facility referred to as Mesa Southwest Key Facility in or near Phoenix, Arizona; Defendants believe that Plaintiffs are actually referring in this request to the Southwest Key Las Palmas facility in Mesa, Arizona and will respond accordingly.  Defendants also object to this request as lacking in relevancy because it does not identify a particular time frame, and allegations of abuse from any given point in time at the Southwest Key Las Palmas facility are not relevant to the five certified subclasses or the injunctive relief Plaintiffs presently seek.  *See Gibson Brands Inc.*, 2015 WL 12681376, at *6 (holding that a request for admission is not a discovery device). Defendants will respond to this request for the time period beginning in 2017.

> **RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants admit that ORR has continued to place unaccompanied alien children at Southwest Key Las Palmas facility in Mesa, Arizona since 2017.

**REQUEST FOR ADMISSION NO. 51**

> **REQUEST:** Admit that Levian Pacheco, while HIV-positive and employed at an ORR FACILITY in or near Phoenix, Arizona, sexually abused CLASS MEMBERS there.

> **OBJECTIONS:**   Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms ORR FACILITY and CLASS MEMBERS. Defendants also object that Plaintiffs do not define the term "sexually abused"; for purposes of this request, Defendants will use the definitions of "sexual abuse," "sexual harassment," and "inappropriate sexual behavior" found in Sections 4.1.1, 4.1.3, and 4.1.4, respectively, of the ORR Guide; and ORR's regulations at 45 C.F.R. § 411.6 (defining sexual abuse, sexual harassment, and inappropriate sexual behavior).  Defendants further object to this request based on relevancy.  Allegations of sexual abuse of unaccompanied children while placed at ORR care providers do not relate specifically to the claims of the

five subclasses certified in this case – the step up, unfit custodian (release), medication, disability, and legal representation classes.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants admit this request.

**REQUEST FOR ADMISSION NO. 52**

**REQUEST:** Admit that Levian Pacheco had not completed a required fingerprint check prior to beginning employment at an ORR FACILITY in or near Phoenix, Arizona.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definition of the term ORR FACILITY.  Defendants further object to this request based on relevancy.  Allegations of irregularities in employee background checks performed at ORR care providers do not relate specifically to the claims of the five subclasses certified in this case – the step up, unfit custodian (release), medication, disability, and legal representation classes.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants admit this request.  Pacheco's hire date was May 23, 2016 and Arizona issued a fingerprint card on September 27, 2016.

**REQUEST FOR ADMISSION NO. 53**

**REQUEST:** Admit that CLASS MEMBERS have been physically or  sexually abused at the Southwest Key Facility in or near Glendale, Arizona.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definition of the term CLASS MEMBERS.  Defendants also object to the phrase "physically abused," as it is undefined, and therefore lacking in

specificity and particularity.  Defendants also object that Plaintiffs do not define the term "sexually abused"; for purposes of this request, Defendants will use the definitions of "sexual abuse," "sexual harassment," and "inappropriate sexual behavior" found in Sections 4.1.1, 4.1.3, and 4.1.4, respectively, of the ORR Guide; and ORR's regulations at 45 C.F.R. § 411.6 (defining sexual abuse, sexual harassment, and inappropriate sexual behavior).  Defendants' further object to this request based on relevancy.  Allegations of physical or sexual abuse of unaccompanied children while placed at ORR care providers do not relate specifically to the claims of the five subclasses certified in this case – the step up, unfit custodian (release), medication, disability, and legal representation classes. Defendants also object to this request as lacking in relevancy because it does not identify a particular time frame, and allegations of abuse from any given point in time at the Southwest Key Facility in or near Glendale, Arizona are not relevant to the five certified subclasses or the injunctive relief Plaintiffs presently seek.  *See Gibson Brands Inc.*, 2015 WL 12681376, at *6 (holding that a request for admission is not a discovery device). Defendants will respond to this request for the time period beginning in 2017.

      **RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants admit that in July 2018, an unaccompanied alien child alleged inappropriate sexual contact (kissing, fondling) by a youth care worker previously employed by the Southwest Key Campbell facility in Glendale, Arizona.   The facility reported the allegations to ORR, CPS, local law enforcement, HHS/OIG, and the FBI, and they were substantiated.  The youth care worker was no longer employed at Campbell when the abuse was disclosed.  Additionally, from September 18, 2017 to January 31, 2019, there were no SIRs concerning alleged physical abuse of UAC by staff.

**REQUEST FOR ADMISSION NO. 54**

      **REQUEST:** Admit that an employee of the Southwest Key Facility in or near Glendale, Arizona was criminally charged with molesting a CLASS MEMBER.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definition of the term CLASS MEMBERS. Defendants also object that Plaintiffs do not define the term "molesting." Defendants further object to this request based on relevancy. Allegations of sexual abuse of unaccompanied children while placed at ORR care providers do not relate specifically to the claims of the five subclasses certified in this case – the step up, unfit custodian (release), medication, disability, and legal representation classes.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants state as follows. Defendants admit that in July 2018, an unaccompanied alien child alleged inappropriate sexual contact (kissing, fondling) by a youth care worker previously employed by the Southwest Key Campbell facility in Glendale, Arizona. The facility reported the allegations to ORR, CPS, local law enforcement, HHS/OIG, and the FBI, and the youth care worker was criminally charged. The youth care worker was no longer employed at Campbell when the abuse was disclosed.

**REQUEST FOR ADMISSION NO. 55**

**REQUEST:** Admit that CLASS MEMBERS have been physically or sexually abused at the Casa Kokopelli facility in or near Mesa, Arizona.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definition of the term CLASS MEMBERS. Defendants also object to the phrase "physically abused," as it is undefined, and therefore lacking in specificity and particularity. Defendants also object that Plaintiffs do not define the term "sexually abused"; for purposes of this request, Defendants will use the definitions of "sexual abuse," "sexual harassment," and "inappropriate sexual behavior" found in Sections 4.1.1, 4.1.3, and 4.1.4, respectively, of the ORR Guide; and ORR's regulations at 45 C.F.R. § 411.6 (defining sexual abuse, sexual harassment, and inappropriate sexual

behavior).  Defendants further object to this request based on relevancy.  Allegations of physical or sexual abuse of unaccompanied children while placed at ORR care providers do not relate specifically to the claims of the five subclasses certified in this case – the step up, unfit custodian (release), medication, disability, and legal representation classes. Defendants also object to this request as lacking in relevancy because it does not identify a particular time frame, and allegations of abuse from any given point in time at the Casa Kokopelli facility are not relevant to the five certified subclasses or the injunctive relief Plaintiffs presently seek.  *See Gibson Brands Inc.*, 2015 WL 12681376, at \*6 (holding that a request for admission is not a discovery device).  Defendants will respond to this request for the time period beginning in 2017.

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants admit that a staff member at Southwest Keys Kokopelli in Mesa, Arizona sexually abused unaccompanied alien children who had been placed there.  The Southwest Keys Kokopelli facility completed a Sexual Abuse Significant Incident Report (SA/SIR) on July 24, 2107 about the sexual abuse by the staff member, and more UACs were identified as victims.  The incidents were reported to the FBI, HHS/OIG, CPS, and law enforcement.  In response, the perpetrator was terminated and he was criminally prosecuted.  *See* https://www.justice.gov/usao-az/pr/youth-care-worker-sentenced-19-years-prison-sexually-abusing-unaccompanied-minors (press release of indictment).   ORR also transferred all UACs at Kokopelli to other facilities; the transfers were approved on August 4, 2017.  ORR conducted monitoring at Kokopelli from August 14-16, 2017 and issued three corrective actions, including directives to retrain staff on reporting and notification requirements.  Once Southwest Keys Kokopelli implemented these corrective actions, it was again allowed to accept UACs beginning on October 23, 2017. Additionally, from September 18, 2017 to January 31, 2019, there were no SIRs concerning alleged physical abuse of UAC by staff.

specific ORR care providers.  Defendants further object to this request based on relevancy.  Allegations concerning citations of ORR care providers by Texas state licensing officials for health and safety violations do not relate specifically to the claims of the five subclasses certified in this case – the step up, unfit custodian (release), medication, disability, and legal representation classes.

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants deny this request due to lack of knowledge by ORR regarding the number of citations Texas care providers may have received from Texas state licensing inspectors.  Plaintiffs should seek this information from licensing officials in the state of Texas directly.

**REQUEST FOR ADMISSION NO. 58**

**REQUEST:** Admit that Merice Perez Colon sexually exploited CLASS MEMBERS while employed at the Homestead ORR FACILITY in Florida.

**OBJECTIONS:**  Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBERS and ORR FACILITY.  Defendants also object to the phrase "sexually exploited," as it is undefined, and therefore lacking in specificity and particularity.  Defendants further object to this request based on relevancy.  Allegations of sexual exploitation of unaccompanied children while placed at an ORR care provider do not relate specifically to the claims of the five subclasses certified in this case – the step up, unfit custodian (release), medication, disability, and legal representation classes.

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants admit that Merice Perez Colon was convicted in November 2017 of engaging in inappropriate relationships with minors she met at the Homestead influx shelter by sending and receiving explicit videos and

images.   *See*  https://www.justice.gov/usao-sdfl/pr/former-shelter-worker-sentenced-10-years-imprisonment-attempting-coerce-and-entice (press release of indictment).

**REQUEST FOR ADMISSION NO. 101**

**REQUEST:** Admit that, as a matter of POLICY AND PRACTICE, ORR does not provide CLASS MEMBERS an opportunity to cross-examine witnesses before the CLASS MEMBER is STEPPED UP.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above: specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBERS, STEPPED UP, and POLICY AND PRACTICE.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants admit that unaccompanied alien children do not have the opportunity to cross-examine witnesses before they are stepped up to a more restrictive setting.  However, as explained in the response to Request 99, ORR does allow and assess "new information," including that offered by minors, their attorneys of record, legal services providers, or Child Advocates, in its continual assessment of minors' placements.  Additionally, "[a]fter 30 days of placement in a secure or RTC facility, UAC may request the ORR Director, or the Director's designee, to reconsider their placement."  ORR Guide, Section 1.4.7.

**REQUEST FOR ADMISSION NO. 102**

**REQUEST:** Admit that YOUR providing CLASS MEMBERS an opportunity to cross-examine witnesses before ORR STEPS UP the CLASS MEMBER would improve the reliability of YOUR STEP UP decisions.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above: specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBER(S), STEPS UP, and

reliability of YOUR STEP UP decisions.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above: specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBER(S), STEPPING UP/STEPS UP, and POLICY AND PRACTICE.  Defendants further object to this request as the term "improve" is vague and ambiguous.  Defendants further object to this request as it contains unproven assumptions about reliability and calls for speculation.  Defendants also object to this request to the extent its premise—that ORR does not provide an explanation of the reasons for step-up—is mistaken.  Defendants object to this request because "[t]he use of RFAs as discovery devices to obtain new information, particularly when that information may require complex judgments and nuanced appraisals, is generally improper."  *See Gibson Brands Inc.*, 2015 WL 12681376, at *6.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants deny this request.

**REQUEST FOR ADMISSION NO. 105**

**REQUEST:** Admit that, as a matter of POLICY AND PRACTICE, ORR does not provide CLASS MEMBERS the right to appeal administratively from a decision that the CLASS MEMBER should be STEPPED UP.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above: specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBER(S), STEPPED UP, and POLICY AND PRACTICE.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants deny this request for admission.  As explained in the response to Request 99, after 30 days in a secure or RTC facility, a UAC may request that the ORR Director, or Director's designee, reconsider the placement.

Additionally, while a UAC is placed in a restrictive placement, the level of care is reviewed at least every 30 days to determine whether a new level of care is more appropriate. *See* ORR Guide, Sections 1.4.2 and 1.4.7.  In addition, a UAC may request a *Flores* bond hearing before an immigration judge to contest ORR's determination that he or she presents a danger to the community.  While the immigration judge does not determine the UAC's placement, "ORR . . . takes into consideration the immigration judge's decision in the bond hearing about the youth's level of danger when assessing the youth's placement and conditions of placement."  ORR Guide, Section 2.9.

**REQUEST FOR ADMISSION NO. 106**

**REQUEST:** Admit that YOUR providing CLASS MEMBERS the right to  appeal administratively from a decision that the CLASS MEMBER should be STEPPED UP would improve the reliability of YOUR STEP UP decisions.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above: specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBER(S), STEPPED UP/STEP UP, and YOUR. Defendants further object to this request as the term "improve" is vague and ambiguous.  Defendants further object to this request as it contains unproven assumptions about reliability and calls for speculation. Defendants object to this request because "[t]he use of RFAs as discovery devices to obtain new information, particularly when that information may require complex judgments and nuanced appraisals, is generally improper."  *See Gibson Brands Inc.*, 2015 WL 12681376, at *6.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants deny this request.

**REQUEST FOR ADMISSION NO. 107**

**REQUEST:** Admit that the principal reason YOU do not afford CLASS MEMBERS greater procedural protections against unnecessary STEP UP is because doing so would entail greater expense and administrative inconvenience.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above: specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBERS, STEP UP, and YOU.  Defendants object to this request because "[t]he use of RFAs as discovery devices to obtain new information, particularly when that information may require complex judgments and nuanced appraisals, is generally improper."  *See Gibson Brands Inc.*, 2015 WL 12681376, at *6.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants deny this request.

**REQUEST FOR ADMISSION NO. 108**

**REQUEST:** Admit that, as a matter of POLICY AND PRACTICE, ORR does not afford CLASS MEMBERS a hearing on whether they should be STEPPED DOWN.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above: specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBERS, STEPPED DOWN, and POLICY AND PRACTICE. Defendants further object to this request as the term "hearing" is vague and ambiguous, and Plaintiffs do not define it.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants deny this request for admission; there is an opportunity to be heard.  As described in Section 1.2.4 of the ORR Guide, "[a]t least every 30 days, the care provider staff, in collaboration with the Case Coordinator and the ORR/FFS, reviews the placement of a UAC into a secure, staff secure, or RTC facility to determine whether a new level of care is more appropriate.  The ORR/FFS may allow the review to take place earlier than 30 days, particularly if new information indicates an alternative placement is more appropriate."  These reviews may address whether it is appropriate for a UAC to be stepped down to a less restrictive setting, and the UAC, as

Defendants object to Plaintiffs' definitions of the terms YOUR, CLASS MEMBERS, STEP DOWN, and POLICY AND PRACTICE.  Defendants further object to this request as the term "improve" is vague and ambiguous. Defendants further object to this request as it contains unproven assumptions about reliability and calls for speculation.  Defendants object to this request because "[t]he use of RFAs as discovery devices to obtain new information, particularly when that information may require complex judgments and nuanced appraisals, is generally improper."  *See Gibson Brands Inc.*, 2015 WL 12681376, at *6. Defendants also object to this request to the extent its premise—that ORR does not provide an opportunity to understand the basis for declining to step down or an opportunity to respond—is mistaken.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants deny this request.

**REQUEST FOR ADMISSION NO. 112**

**REQUEST:** Admit that, as a matter of POLICY AND PRACTICE, ORR uses no articulable evidentiary standard, such as the preponderance of the evidence standard, in determining whether to STEP DOWN CLASS MEMBERS.

**OBJECTIONS:**  Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms POLICY AND PRACTICE, STEP DOWN, and CLASS MEMBERS.

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants admit that ORR does not use a specific evidentiary standard in assessing whether a child may be transferred to a less restrictive setting, and no longer needs to be in a more restrictive setting for the child's own protection and/or the protection of others.

**REQUEST FOR ADMISSION NO. 113**

**REQUEST:** Admit that YOUR using an articulable evidentiary standard, such as the preponderance of the evidence standard, in determining whether to STEP DOWN CLASS MEMBERS would improve the reliability of YOUR STEP DOWN decisions.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms YOUR, STEP DOWN, and CLASS MEMBERS. Defendants further object to this request, as it contains unproven assumptions about reliability and calls for speculation. Defendants object to this request because "[t]he use of RFAs as discovery devices to obtain new information, particularly when that information may require complex judgments and nuanced appraisals, is generally improper." *See Gibson Brands Inc.*, 2015 WL 12681376, at *6. Moreover, Defendants object to the term "improve" as vague and ambiguous.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants state as follows. Defendants deny this request for admission. Decisions to transfer minors to less restrictive placements are highly individualized. ORR's policies in the ORR Guide, §§ 1.2.4 and 1.4.2 (30 Day Restrictive Placement Review) allow it to make decisions tailored to promote individual minors' best interests while also providing for outside review by a Care Coordinator of its decision-making.

**REQUEST FOR ADMISSION NO. 114**

**REQUEST:** Admit that, as a matter of POLICY AND PRACTICE, ORR allows CLASS MEMBERS no opportunity to present witnesses or evidence in determining whether to STEP DOWN the CLASS MEMBER.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms POLICY AND PRACTICE, STEP DOWN, and CLASS MEMBER(S).

**RESPONSE:** In light of these objections, Defendants are unable to admit this

request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants admit that unaccompanied alien children do not have the opportunity to present witnesses or evidence before they are stepped down to a less restrictive setting.  However, Defendants aver that "[a]fter 30 days of placement in a secure or RTC facility, UAC may request the ORR Director, or the Director's designee, to reconsider their placement.   The ORR Director, or designee, may deny the request, remand the request to the ORR/FFS for further consideration, or approve the request and order the youth transferred to a staff secure or other care provider facility." ORR Guide, § 1.4.7.  As explained in ORR Guide, § 2.9, "unaccompanied alien children also have the opportunity to seek a bond hearing with an immigration judge" who "decides whether the child poses a danger to the community."

Additionally, ORR continually assesses minors in its care and documents significant updates in its records, including updates based on ORR receiving and assessing new information about a child's case.   Children, and their legal counsel and Child Advocates have the opportunity to share new information with ORR care provider staff which is considered along with any other information that is known in determining whether a new level of care is warranted.  As provided in ORR Guide § 1.4.2, "At least every 30 days, the care provider staff, in collaboration with the Case Coordinator and the ORR/FFS, reviews the placement of a UAC into a secure, staff secure, or RTC facility to determine whether a new level of care is more appropriate.  The ORR/FFS may allow the review to take place earlier than 30 days, particularly if *new information* indicates an alternative placement is more appropriate" (emphasis added).  New information may come from many sources, including from children themselves as they develop relationships with their case managers and clinicians.  Such statements, along with any other new information, influence ORR's ongoing placement decisions.

**REQUEST FOR ADMISSION NO. 115**

**REQUEST:** Admit that YOUR providing CLASS MEMBERS an opportunity to present witnesses or evidence in deciding whether to STEP DOWN the CLASS MEMBER

would improve the reliability of YOUR STEP DOWN decisions.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms YOUR, CLASS MEMBER(S) and STEP DOWN    Defendants further object to this request, as it contains unproven assumptions about reliability and calls for speculation.  Defendants object to this request because "[t]he use of RFAs as discovery devices to obtain new information, particularly when that information may require complex judgments and nuanced appraisals, is generally improper."  *See Gibson Brands Inc.*, 2015 WL 12681376, at *6.  Defendants object to the term "improve" as vague and ambiguous.

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants deny this request.  As explained in the response to Request 114, ORR does allow and assess "new information," including that offered by minors, their attorneys of record, legal service providers, or Child Advocates, in its continual assessment of minors' placements.

**REQUEST FOR ADMISSION NO. 116**

**REQUEST:** Admit that, as a matter of POLICY AND PRACTICE, ORR does not provide CLASS MEMBERS an opportunity to cross-examine witnesses in determining whether to STEP DOWN the CLASS MEMBER.

**OBJECTIONS:**  Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms POLICY AND PRACTICE, STEP DOWN, and CLASS MEMBER.

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants admit that unaccompanied alien children do not have the opportunity to cross-examine witnesses in determining whether to

step them down to a less restrictive setting.  However, as explained in the response to Request 114, ORR does allow and assess "new information," including that offered by minors, their attorneys of record, legal service providers, or Child Advocates, in its continual assessment of minors' placements.

**REQUEST FOR ADMISSION NO. 117**

**REQUEST:** Admit that YOUR providing CLASS MEMBERS an opportunity to cross-examine witnesses in deciding whether to STEP DOWN the CLASS MEMBER would improve the reliability of YOUR STEP DOWN decisions.

**OBJECTIONS**: Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms, YOUR, CLASS MEMBER(S), and STEP DOWN.  Defendants further object to this request, as it contains unproven assumptions about reliability and calls for speculation.  Defendants object to this request because "[t]he use of RFAs as discovery devices to obtain new information, particularly when that information may require complex judgments and nuanced appraisals, is generally improper."  *See Gibson Brands Inc.*, 2015 WL 12681376, at *6.

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving any of the above objections, Defendants state as follows.  Defendants deny this request.

**REQUEST FOR ADMISSION NO. 118**

**REQUEST:**  Admit that, as a matter of POLICY AND PRACTICE, ORR does not provide CLASS MEMBERS with a written explanation of the reasons for STEPPING DOWN the CLASS MEMBER.

**OBJECTIONS**:  Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms, POLICY AND PRACTICE, CLASS MEMBER(S), and STEPPING DOWN.  Defendants further object to this request, as it fails to

RTC facility), he/she is provided with a *Notice of Placement in Restrictive Setting* in a language that he/she understands within a reasonable time either before or after ORR's placement decision." Defendants refer Plaintiffs to the full ORR Guide for its contents.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.   Alternatively, subject to and without waiving any of the above objections, Defendants deny this request.

**REQUEST FOR ADMISSION NO. 120**

**REQUEST:** Admit that, as a matter of POLICY AND PRACTICE, ORR does not provide CLASS MEMBERS the right to appeal administratively from a decision refusing to STEP DOWN the CLASS MEMBER.

**OBJECTIONS**: Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms, POLICY AND PRACTICE, CLASS MEMBERS, and STEP DOWN.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.   Alternatively, subject to and without waiving any of the above objections, Defendants deny this request.   Defendants further aver that per § 1.4.7 of the ORR Guide, "After 30 days of placement in a secure or RTC facility, UAC may request the ORR Director, or the Director's designee, to reconsider their placement. The ORR Director, or designee, may deny the request, remand the request to the ORR/FFS for further consideration, or approve the request and order the youth transferred to a staff secure or other care provider facility."

**REQUEST FOR ADMISSION NO. 121**

**REQUEST:** Admit that YOUR providing CLASS MEMBERS the right to  appeal administratively from a decision refusing to STEP DOWN the CLASS MEMBER would improve the reliability of YOUR STEP DOWN decisions.

**OBJECTIONS**: Defendants object to this request to the extent it uses

legal services." *Id.*

**REQUEST FOR ADMISSION NO. 138**

**REQUEST:** Admit that ORR funds the Vera Institute of Justice to provide legal assistance to CLASS MEMBERS in furtherance of 8 U.S.C. § 1232(c)(5), and that the Vera Institute of Justice in turn funds legal services providers to provide such assistance.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the term CLASS MEMBERS.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants state as follows. Defendants admit this request. As explained in response to Request for Admission No. 137, Defendants aver that ORR funds legal services for children in its care.

**REQUEST FOR ADMISSION NO. 139**

**REQUEST:** Admit that the majority of CLASS MEMBERS who are represented by counsel are represented by legal services providers funded by Congress to assist CLASS MEMBERS in furtherance of 8 U.S.C. § 1232(c)(5).

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the term CLASS MEMBERS. Defendants further object to this request because it is vague and ambiguous. It is not clear what Plaintiffs mean by the term "represented by legal service providers," as that concept could be read to include representation to pursue only one or, alternatively, a variety of matters. Defendants understand the concept of legal representation funded by Congress under 8 U.S.C. § 1232(c)(5) to extend to those matters defined by ORR's contract. *See* https://www.acf.hhs.gov/orr/about/ucs/services-provided.

English ability varies widely.

**REQUEST FOR ADMISSION NO. 141**

**REQUEST:** Admit that the majority of CLASS MEMBERS have little or  no knowledge of the United States legal system.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the term CLASS MEMBERS. Defendants further object to this request because it is vague and ambiguous.  It is unclear what constitutes "little" knowledge; it is also unclear what aspect of the United States legal system Plaintiffs mean.  Defendants further object to this request because it calls for speculation about what Plaintiffs know or do not know; Plaintiffs, and not Defendants, are in the best position to know the extent of Plaintiffs' knowledge.  Defendants object to this request because "[t]he use of RFAs as discovery devices to obtain new information, particularly when that information may require complex judgments and nuanced appraisals, is generally improper."  *See Gibson Brands Inc.*, 2015 WL 12681376, at *6.

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows. Defendants admit this request.  Defendants aver that ORR provides all unaccompanied alien children with "[l]egal services information, including the availability of free legal assistance, the right to be represented by counsel at no expense to the government, the right to a removal hearing before an immigration judge, the right to apply for asylum or to request voluntary departure in lieu of deportation." ORR Guide, Section 3.3.  In addition, ORR-funded legal service providers may conduct one-on-one interviews with children in ORR custody, advise them, and answer any questions they have about their immigration cases. *See* Legal Resource Guide for        Unaccompanied        Alien        Children,        available        at https://www.acf.hhs.gov/orr/resource/unaccompanied-childrens-services#legal.

legal services providers and are given a list of such providers. *See* https://www.acf.hhs.gov/sites/default/files/orr/lrg_5_legal_service_provider_list_for_uac_in_orr_care_e02_09_15.pdf.

**REQUEST FOR ADMISSION NO. 146**

**REQUEST:** Admit that YOU have told the Vera Institute of Justice that legal services providers it funds to assist CLASS MEMBERS in furtherance of 8 U.S.C. § 1232(c)(5) are not to assist CLASS MEMBERS with respect to STEP UP or STEP DOWN.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms YOU, CLASS MEMBERS, STEP UP, and STEP DOWN.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants state as follows. Defendants deny that ORR told the Vera Institute of Justice that legal services providers it funds under 8 U.S.C. § 1232(c)(5) may not assist unaccompanied alien children with respect to STEP UP or STEP DOWN. The decision to place UACs in specific types of ORR placements are based on child welfare factors, and ORR's placement decisions are not judicial proceedings. *See* ORR Guide, § 1.2. Attorneys for UACs are informed of transfers, but are not involved in decision-making process other than as contemplated by ORR policies. ORR has not specifically instructed legal service providers not to participate in these determinations. While contracts for ORR-funded legal services do not include legal representation of unaccompanied alien children with regard to release to potential sponsors, minors are able to contact pro bono legal services providers and are given a list of such providers. *See* https://www.acf.hhs.gov/sites/default/files/orr/lrg_5_legal_service_provider_list_for_uac_in_orr_care_e02_09_15.pdf.

**REQUEST FOR ADMISSION NO. 147**

**REQUEST:** Admit that YOU have told legal services providers funded  to

request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants deny that ORR care and custody is inherently harmful to unaccompanied alien children.

**REQUEST FOR ADMISSION NO. 154**

 **REQUEST:** Admit that the longer a CHILD is detained, the greater the risk of harm to the detained CHILD.

 **OBJECTIONS:** Defendants object to this request based on relevance, as it does not relate to the situation of ORR care and custody of unaccompanied alien children, who arrive into ORR care and custody precisely because they are unaccompanied and until they may be released to a suitable sponsor.

 Defendants further object to this request based on relevance because ORR does not "detain" children; rather, under the TVPRA, 8 U.S.C. § 1232 and the Homeland Security Act, 6 U.S.C. § 279, ORR is charged with the care and custody of unaccompanied alien children. The vast majority of grantee care providers are group shelters that are more akin to group homes or other foster settings that provide a supportive environment for children and not jail-like settings. When Congress, in the Homeland Security Act of 2002, transferred responsibility for the care of unaccompanied alien children to ORR (from the prior Immigration and Naturalization Service) it urged ORR to use a "foster care system" for housing unaccompanied children, as ORR employs with respect to minors admitted as refugees, but who are unaccompanied, under the Refugee Act of 1980. 6 U.S.C. § 279(b)(3). The ORR Guide further explains that "policies for placing children and youth in its custody into care provider facilities are based on child welfare best practices in order to provide a safe environment and place the child in the least restrictive setting appropriate for the child's needs. ORR may place a child in a shelter facility, foster care or group home (may be therapeutic), staff secure or secure care facility, residential treatment center, or other special needs care facility." ORR Guide, Section 1.2. ORR has explained that grantee care providers are distinct from "confinement" facilities such as prisons or jails, stating that its "facilities . . . differ greatly from typical confinement facilities and prisons.

Most ORR care provider facilities are shelters, group homes, and residential therapeutic centers." 79 Fed. Reg. 77768 (Dec. 24, 2014).  ORR further explained that unaccompanied alien children:

> move around freely in a supervised environment, and most care provider facilities do not maintain secure perimeters. Many care provider facilities are run by nonprofit grantees and located in residential neighborhoods. U[A]Cs must be provided with a level of privacy like having personal clothes, personal effects, and privacy when changing, using the restroom, and showering. U[A]Cs receive daily educational services, weekly group and individual counseling, an individualized service plan, and many other services that follow accepted child welfare principles. HHS, with its expertise with child welfare issues and U[A]C populations, has policies and procedures in place to protect the safety and security of U[A]Cs in accordance with State and local licensing standards.

*Id.* at 77770.

Defendants further object to this request as calling for speculation.  Defendants object to this request because "[t]he use of RFAs as discovery devices to obtain new information, particularly when that information may require complex judgments and nuanced appraisals, is generally improper." *See Gibson Brands Inc.*, 2015 WL 12681376, at *6.  Defendants further object to the request as vague and ambiguous as it fails to distinguish between different ages, prior diagnoses, or other characteristics of children, and appears to include as an unsubstantiated underlying assumption that all children will have the same reaction to care and custody.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants deny that, with respect to ORR care and custody, there is a greater risk of harm to children who reside for longer period of times in the legal custody of ORR (and the physical custody of a grantee care provider), as compared to release to any and all potential sponsors.

**REQUEST FOR ADMISSION NO. 155**

**REQUEST:** Admit that separating CHILDREN from FIT parents is inherently

additionally, if the minor would be a "risk of flight."  8 U.S.C. § 1232(c)(2) and Flores Settlement Agreement at ¶ 14.  Defendants further object to this request as an improper challenge to requirements mandated by statute under the TVPRA, which prohibits HHS from releasing a minor to a putative sponsor, without a determination of suitability pursuant to 8 U.S.C. § 1232(c)(3), including in some cases, home studies. Defendants further object to this request to the extent it seeks to challenge applicable law in 8 U.S.C. § 1232(b)(1) through (3), wherein unaccompanied alien children who cross the border or are otherwise encountered accompanied by an adult sibling who is not a legal guardian are considered unaccompanied alien children and must generally be referred to HHS for care and custody. *See* 6 U.S.C. § 279(g)(2) (defining "unaccompanied alien child").

Defendants further object to this request as vague and ambiguous, as Plaintiffs do not define "mistreatment," and do not indicate whether they intend that concept to refer to any legal standard under applicable law.

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants deny that ORR's compliance with the TVPRA, including with respect to adult siblings, constitutes mistreatment.

**REQUEST FOR ADMISSION NO. 169**

**REQUEST:** Admit that unnecessarily STEPPING UP CLASS MEMBERS is contrary to their best interests.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBERS and STEPPING UP. Defendants object to this request because "[t]he use of RFAs as discovery devices to obtain new information, particularly when that information may require complex judgments and nuanced appraisals, is generally improper." *See Gibson Brands Inc.*, 2015 WL 12681376, at *6.

**RESPONSE:** In light of these objections, Defendants are unable to admit this

request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants admit that unnecessarily STEPPING UP CLASS MEMBERS may be contrary to their best interests, which is why ORR policy only allows STEP UP when a more restrictive level of care is necessary for the safety of the UAC or others.  It is Defendants' policy to place UACs "in the least restrictive setting that is in the best interest of the child."  ORR Guide, Section 1.2.1.  To assess whether it is necessary to place a UAC in a more restrictive level of care, the case manager, case coordinator, and ORR/FFS work closely together to determine whether the UAC's behavior, criminal history, or self-disclosures require placement in a more restrictive environment.  In making that assessment, they consider specific factors identified in Section 1.2.4 of the ORR Guide that indicate when a UAC may require placement in a staff-secure or secure facility.  *See* ORR Guide, Section 1.4.2.

**REQUEST FOR ADMISSION NO. 170**

 **REQUEST:** Admit that unnecessarily STEPPING UP CLASS MEMBERS is detrimental to their long-term psychological well-being.

 **OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBERS and STEPPING UP.  Defendants further object to this request as vague and ambiguous in that it does not quantify or otherwise define "long-term."  Defendants also object to this request as speculative regarding the future psychological well-being of all CLASS MEMBERS. Defendants object to this request because "[t]he use of RFAs as discovery devices to obtain new information, particularly when that information may require complex judgments and nuanced appraisals, is generally improper."  *See Gibson Brands Inc.*, 2015 WL 12681376, at *6.

 **RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants deny that STEPPING UP CLASS

MEMBERS unnecessarily is categorically detrimental to their long-term psychological well-being.  While it may be true in some cases, Defendants lack the information necessary to assess the long-term psychological well-being of all or even most UACs after they leave ORR custody.  Defendants, as a matter of both policy and practice, make every effort to avoid placing UACs in a more restrictive environment than necessary.

**REQUEST FOR ADMISSION NO. 171**

**REQUEST:** Admit that unnecessarily STEPPING UP CLASS MEMBERS constitutes mistreatment.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBERS and STEPPING UP.  Defendants object to this request because "[t]he use of RFAs as discovery devices to obtain new information, particularly when that information may require complex judgments and nuanced appraisals, is generally improper."  *See Gibson Brands Inc.*, 2015 WL 12681376, at *6.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants deny that unnecessarily STEPPING UP CLASS MEMBERS categorically constitutes mistreatment.  As explained in response to Request for Admission 169, Defendants, as both a matter of policy and practice, make every effort to avoid placing UACs in a more restrictive environment than necessary, and ORR takes affirmative measures to ensure that UACs in ORR custody are not mistreated, whatever their placement setting.  ORR strives to provide all UACs in its care with appropriate medical, educational, and other supports.

**REQUEST FOR ADMISSION NO. 172**

**REQUEST:** Admit that unnecessarily failing to STEP DOWN CLASS MEMBERS is contrary to their best interests.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBERS and STEP DOWN. Defendants object to this request because "[t]he use of RFAs as discovery devices to obtain new information, particularly when that information may require complex judgments and nuanced appraisals, is generally improper." *See Gibson Brands Inc.*, 2015 WL 12681376, at *6.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants state as follows. Defendants admit that failing to STEP DOWN CLASS MEMBERS who are ready for step down may be contrary to their best interests, which is why ORR, as a matter of both policy and practice, makes every effort to adjust a UAC's placement as necessary and appropriate based on the UAC's changing needs and circumstances. ORR's policy requires the placement of UACs "in the least restrictive setting that is in the best interest of the child." ORR Guide, Section 1.2.1. ORR staff – specifically the care provider staff, case coordinator, and ORR/FFS – review the case of every minor placed in a restrictive setting at least every 30 days to determine whether a new level of care is more appropriate. Once a UAC has resided in a secure or RTC facility for more than 90 days, supervisory ORR staff also participate in all of the 30-day reviews. If the team determines that the UAC is not ready for step down, the care provider staff document the basis for continued restrictive placement in the UAC's case file and provide that information to the UAC's attorney of record, legal services provider, or child advocate on demand. *See* ORR Guide, Section 1.4.2.

**REQUEST FOR ADMISSION NO. 173**

**REQUEST:** Admit that unnecessarily failing to STEP DOWN CLASS MEMBERS is detrimental to their long-term psychological well-being.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically,

Defendants' Second Set of RFA Responses    - 93 - **Exhibit 6**
Page 545

Defendants object to Plaintiffs' definition of the term CLASS MEMBERS and STEP DOWN. Defendants further object to this request as vague and ambiguous in that it does not quantify or otherwise define "long-term." Defendants also object to this request as speculative regarding the future psychological well-being of all CLASS MEMBERS. Defendants object to this request because "[t]he use of RFAs as discovery devices to obtain new information, particularly when that information may require complex judgments and nuanced appraisals, is generally improper." *See Gibson Brands Inc.*, 2015 WL 12681376, at *6.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants state as follows. Defendants deny that unnecessarily failing to step down CLASS MEMBERS is categorically detrimental to their long-term psychological well-being. While it may be true in some cases, Defendants lack the information necessary to assess the long-term psychological well-being of all of even most UACs after they leave ORR custody. Defendants, as a matter of both policy and practice, make every effort to adjust a UAC's placement as necessary based on the UAC's changing needs and circumstances.

**REQUEST FOR ADMISSION NO. 174**

**REQUEST:** Admit that unnecessarily failing to STEP DOWN CLASS MEMBERS constitutes mistreatment.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definition of the term CLASS MEMBERS and STEP DOWN. Defendants object to this request because "[t]he use of RFAs as discovery devices to obtain new information, particularly when that information may require complex judgments and nuanced appraisals, is generally improper." *See Gibson Brands Inc.*, 2015 WL 12681376, at *6.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving

Defendants object to this request because "[t]he use of RFAs as discovery devices to obtain new information, particularly when that information may require complex judgments and nuanced appraisals, is generally improper." *See Gibson Brands Inc.*, 2015 WL 12681376, at *6.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants state as follows. Defendants deny that unnecessary prescriptions of psychotropic medication to UACs categorically constitutes mistreatment in each and every instance. ORR expects that UACs in federal custody are only prescribed psychotropic medications by a licensed clinician when medically necessary and not as a chemical restraint. Under the terms of the *Flores* settlement agreement, care providers must provide UACs with appropriate mental health interventions when necessary. *See* ORR Guide, Section 3.3. Within 24 hours of a UAC's admission, each UAC must receive a complete initial medical exam. *See* ORR Guide, Section 3.2.1. Within five days of a UAC's admission, each UAC must an assessment by a trained staff member that includes a mental health history. *See* ORR Guide, Section 3.3.1. UACs receive follow-up psychiatric assessments and care as necessary based on their particular needs while in placement. ORR expects each care provider to carefully monitor each UAC's well-being to identify if they may have unmet mental health needs. ORR also expects each care provider to carefully monitor each UAC who is taking psychotropic medication to identify if they may be experiencing any problematic side effects.

**REQUEST FOR ADMISSION NO. 178**

**REQUEST:** Admit that YOU know of no state or local jurisdiction that denies CHILDREN appointed counsel in proceedings to determine whether they may be detained.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the term YOU. Defendants further object to

this request because it is vague, overly broad and unduly burdensome, as it is unclear whether Plaintiffs are seeking an admission that: (1) all "past and PRESENT officers, employees, representatives, and agents of HHS and/or ORR" lack knowledge regarding whether any "state or local jurisdiction [] denies CHILDREN appointed counsel in proceedings to determine whether they may be detained"; and/or (2) whether HHS and ORR institutionally lack this knowledge.  It is unduly burdensome to survey every past and PRESENT employee on what they may or may not know, and the agency does not take an official position on its knowledge, or lack thereof, regarding the laws governing every state and local jurisdiction.  Further, Defendants object to this request because it is vague and ambiguous, as it does not specify any state or local jurisdictions to which it is referring, and surveying every state and local jurisdictions to assess whether CHILDREN are "appointed counsel in proceedings to determine whether they may be detained" is unduly burdensome and exceeds the scope of the case.  Defendants further object to this request as lacking in relevancy because ORR does not "detain" children; rather under the TVPRA, 8 U.S.C. § 1232(c)(2)(A) and the Homeland Security Act, 6 U.S.C. § 279(b)(2), ORR is charged with the care and custody of unaccompanied alien children.

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.

**REQUEST FOR ADMISSION NO. 179**

**REQUEST:** Admit that YOU know of no state or local jurisdiction that denies CHILDREN appointed counsel in proceedings to determine whether their parents are FIT.

**OBJECTIONS:**  Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms YOU and FIT. Defendants further object to this request because it is vague, overly broad and unduly burdensome, as it is unclear whether Plaintiffs are seeking an admission that: (1) all "past and PRESENT officers, employees, representatives, and agents of HHS and/or ORR" lack knowledge regarding whether any "state or local jurisdiction [] denies CHILDREN appointed counsel in

proceedings to determine whether their parents are FIT"; and/or (2) whether HHS and ORR institutionally lacks this knowledge.  It is unduly burdensome to survey every past and PRESENT employee on what they may or may not know, and the agency does not take an official position on its knowledge, or lack thereof, regarding the laws governing every state and local jurisdiction.  Further, Defendants object because this request is vague and ambiguous, as it does not specify any state or local jurisdictions to which it is referring, and surveying every state and local jurisdictions to assess whether CHILDREN are "appointed counsel in proceedings to determine whether their parents are FIT" is unduly burdensome and exceeds the scope of the case.

.          **RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.

**REQUEST FOR ADMISSION NO. 180**

**REQUEST:** Admit that YOU know of no state or local jurisdiction that denies CHILDREN appointed counsel in proceedings to determine whether they may be confined in secure JUVENILE detention facilities.

**OBJECTIONS:**  Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the term YOU. Defendants further object to this request because it is vague, overly broad and unduly burdensome, as it is unclear whether Plaintiffs are seeking an admission that: (1) all "past and PRESENT officers, employees, representatives, and agents of HHS and/or ORR" lack knowledge regarding whether any "state or local jurisdiction [] denies CHILDREN appointed counsel in proceedings to determine whether they may be confined in secure JUVENILE detention facilities"; and/or (2) whether HHS and ORR institutionally lack this knowledge.  It is unduly burdensome to survey every past and PRESENT employee on what they may or may not know, and the agency does not take an official position on its knowledge, or lack thereof, regarding the laws governing every state and local jurisdiction.  Further, Defendants object because this request is vague and ambiguous, as it does not specify any

state or local jurisdictions to which it is referring, and surveying every state and local jurisdictions to assess whether CHILDREN are "appointed counsel in proceedings to determine whether they may be confined in secure JUVENILE detention facilities" is unduly burdensome and exceeds the scope of the case.  Defendants further object to this request as lacking in relevancy because ORR does not "confine" children; rather under the TVPRA, 8 U.S.C. § 1232(c)(2)(A) and the Homeland Security Act, 6 U.S.C. § 279(b)(2), ORR is charged with the care and custody of unaccompanied alien children.

**RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.

**REQUEST FOR ADMISSION NO. 181**

**REQUEST:** Admit that YOU know of no state or local jurisdiction that denies CHILDREN appointed counsel in proceedings to determine whether they may be confined in psychiatric treatment centers.

**OBJECTIONS:**  Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the term YOU. Defendants further object to this request because it is vague, overly broad and unduly burdensome, as it is unclear whether Plaintiffs are seeking an admission that: (1) all "past and PRESENT officers, employees, representatives, and agents of HHS and/or ORR" lack knowledge regarding whether any "state or local jurisdiction [] denies CHILDREN appointed counsel in proceedings to determine whether they may be confined in psychiatric treatment centers"; and/or (2) whether HHS and ORR institutionally lack this knowledge.  It is unduly burdensome to survey every past and PRESENT employee on what they may or may not know, and the agency does not take an official position on its knowledge, or lack thereof, regarding the laws governing every state and local jurisdiction.  Further, Defendants object because this request is vague and ambiguous, as it does not specify any state or local jurisdictions to which it is referring, and surveying every state and local jurisdictions to assess whether CHILDREN are "appointed counsel in proceedings to determine whether

they may be confined in psychiatric treatment centers" is unduly burdensome and exceeds the scope of the case. Defendants further object to this request as lacking in relevancy because ORR does not "confine" children; rather under the TVPRA, 8 U.S.C. § 1232(c)(2)(A) and the Homeland Security Act, 6 U.S.C. § 279(b)(2), ORR is charged with the care and custody of unaccompanied alien children.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.

**REQUEST FOR ADMISSION NO. 182**

**REQUEST:** Admit that YOU know of no state or local jurisdiction that denies CHILDREN appointed counsel in proceedings to determine whether they may be administered PSYCHOTROPIC MEDICATIONS over a parent's, guardian's, or other CONSENTING PARTY's objection.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms YOU and PSYCHOTROPIC MEDICATIONS. Defendants also object because the request uses an undefined term, CONSENTING PARTY. Defendants further object to this request because it is vague, overly broad and unduly burdensome, as it is unclear whether Plaintiffs are seeking an admission that: (1) all "past and PRESENT officers, employees, representatives, and agents of HHS and/or ORR" lack knowledge regarding whether any "state or local jurisdiction [] denies CHILDREN appointed counsel in proceedings to determine whether they may be administered PSYCHOTROPIC MEDICATIONS over a parent's, guardian's, or other CONSENTING PARTY's objection"; and/or (2) whether HHS and ORR institutionally lack this knowledge. It is unduly burdensome to survey every past and PRESENT employee on what they may or may not know, and the agency does not take an official position on its knowledge, or lack thereof, regarding the laws governing every state and local jurisdiction. Further, Defendants object because this request is vague and ambiguous, as it does not specify any state or local jurisdictions to which it is referring, and surveying every state

and local jurisdictions to assess whether CHILDREN are "appointed counsel in proceedings to determine whether they may be confined in psychiatric treatment centers" is unduly burdensome and exceeds the scope of the case.

     **RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.

**REQUEST FOR ADMISSION NO. 183**

     **REQUEST:**  Admit that lawyers YOU fund in furtherance of 8 U.S.C. § 1232(c)(5) have an ethical responsibility to advocate zealously on behalf of CLASS MEMBERS who are their clients.

     **OBJECTIONS:**  Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBERS and YOU.

     **RESPONSE:**  In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it.  Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants admit that lawyers generally have an ethical responsibility to zealously advocate for their clients within the scope of their representation.  Thus, individual lawyers representing CLASS MEMBERS would be subject to the same rules of professional conduct of the state(s) in which they are licensed and/or in which they practice.  Defendants have not reviewed those various state rules of professional conduct to determine their precise requirements, as conducting a survey of all 50 or more jurisdictions would be unduly burdensome and disproportionate to the needs of the case.  However, Section 1.2 of the American Bar Association (ABA) Model Rules of Professional Conduct, which many states model their own rules after, recognizes that lawyers may reasonably limit the scope of the representation where the client gives informed consent.  *See* https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/model_rules_of_professional_conduct_table_of_contents/. Model Rule 1.3 also describes a duty to "act with reasonable diligence and promptness in

representing a client," but this duty is limited to the scope of the representation.

In addition, "ORR provides 'Know Your Rights' presentations and legal screenings of unaccompanied alien children to determine potential eligibility for immigration relief.  Information about legal services are also maintained and provided upon release.  In addition, ORR supports pro bono representation and provides ORR-funded legal representation for children in its long-term foster care program, children released locally to their care provider facility, those seeking voluntary departure, and those imminently facing an order of removal or otherwise without reunification options."  *See* https://www.acf.hhs.gov/orr/about/ucs/services-provided.   Also, ORR "funds direct representation or court appearance support for unaccompanied children."  *Id.*   The permissible scope of legal services funded by ORR in furtherance of 8 U.S.C. § 1232(5) and available to minors in ORR legal custody is governed by contract.  "The contracts focus on providing post-release direct representation in the nine priority cities, children who are released from a shelter locally, and other children according to the solicitation and ORR requirements."  *See*  https://www.acf.hhs.gov/orr/about/ucs/services-provided.  *Id.* Finally, so that they may exercise their rights, "children in ORR custody have access to phones to contact family and legal services." *Id.*

**REQUEST FOR ADMISSION NO. 184**

**REQUEST:** Admit that lawyers YOU fund in furtherance of 8 U.S.C. § 1232(c)(5) would, from time to time, undertake to represent CLASS MEMBERS with respect to release to PROPOSED CUSTODIANS were YOU to advise them that doing so is consistent with their federal funding.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBERS, PROPOSED CUSTODIANS, and YOU.  Defendants also object to this request as calling for speculation. Defendants object to this request because "[t]he use of RFAs as discovery devices to obtain new information, particularly when that information may require complex judgments and

Staff-secure facilities are considered outpatient settings and thus by definition are not equipped to serve minors who have significant mental health needs that cannot be addressed in an outpatient setting.  However, minors placed in staff-secure facilities, at a minimum are provided the weekly individual counseling services, and twice weekly group counseling services which are described in Section 3.3 of the ORR Guide as is consistent with Exhibit 1 of the Flores Settlement Agreement.

**REQUEST FOR ADMISSION NO. 197**

**REQUEST:** Admit that ORR FACILITIES that operate secure facilities are not equipped to provide mental health services to CLASS MEMBERS whom ORR determines have significant health needs or psychiatric or psychological issues that cannot be addressed in an outpatient setting.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBERS and ORR FACILITIES.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants admit this request.  A secure care provider is "a facility with a physically secure structure and staff able to control violent behavior. ORR uses a secure facility as the most restrictive placement option for an unaccompanied alien child who poses a danger to self or others or has been charged with having committed a criminal offense. A secure facility may be a licensed juvenile detention center or a highly structured therapeutic facility." *See*

https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms.  While placement into a secure care provider is based in part on the UAC's behavioral challenges, secure facilities are considered outpatient settings and are generally not equipped to serve minors who have significant mental health needs that cannot be addressed in an outpatient setting.  However, minors placed in secure facilities (Yolo and

Shenandoah) are provided regular individual and group counseling for UACs in accordance with ORR's policy.  The cooperative agreements with ORR for the secure facilities set a minimum ratio of one clinician per 12 UAC at each shelter, and in practice, the ratio is often much lower.  Each secure facility has a psychiatrist who manages the UACs medication and evaluates the minors, as well a psychologist who conducts evaluations. Additional onsite mental health services or referrals to an RTC can be arranged as needed.

**REQUEST FOR ADMISSION NO. 198**

**REQUEST:** Admit that, as a matter of POLICY AND PRACTICE, RTC medical PERSONNEL at Shiloh RTC do not use a standardized metric to determine whether a particular CLASS MEMBER is "stabilized."

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBERS, PERSONNEL and RTCs. Defendants further object to the term, "stabilized," as it is undefined and vague and ambiguous.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants state as follows.  Defendants admit this request.

**REQUEST FOR ADMISSION NO. 199**

**REQUEST:** Admit that ORR has failed to release or transfer CLASS MEMBERS from Shiloh RTC even after Shiloh RTC medical PERSONNEL declared such CLASS MEMBERS "stabilized" due to an alleged difficulty in finding less restrictive placements for the CLASS MEMBERS.

**OBJECTIONS:** Defendants object to this request to the extent it uses Plaintiffs' definitions to which Defendants object, as discussed above; specifically, Defendants object to Plaintiffs' definitions of the terms CLASS MEMBERS, PERSONNEL and RTCs. Defendants further object to the term, "stabilized," as it is undefined and vague and

ambiguous.

**RESPONSE:** In light of these objections, Defendants are unable to admit this request as worded, and therefore deny it. Alternatively, subject to and without waiving these objections, Defendants admit this request.  In four cases where children are currently placed at Shiloh RTC, ORR has not been able to timely step down a minor from Shiloh because ORR has not been able to find a less restrictive appropriate placement.  In each of these cases, for reasons beyond ORR's control, ORR made intensive efforts to timely transfer the UAC to a less restrictive placement but could not find such an appropriate placement willing to accept the UAC, even outside of ORR's network of care providers. The reasons for this were varied, but included lack of available beds, the form of legal relief available to the UAC, and the limited availability of necessary mental health supports required by the child.

| | |
|---|---|
| 1 | DATED:  April 4, 2019 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

DATED:  April 4, 2019

Respectfully submitted,
JOSEPH H. HUNT
Assistant Attorney General
Civil Division

ERNESTO H. MOLINA
Deputy Director, Office of Immigration Litigation

JEFFREY S. ROBINS
Deputy Director, Office of Immigration Litigation

BY: */s/ Benjamin Mark Moss*
BENJAMIN MARK MOSS
W. DANIEL SHIEH
Senior Litigation Counsel
SHERRY D. SOANES
MARINA C. STEVENSON
Trial Attorneys
Office of Immigration Litigation
Civil Division, U.S. Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 307-8675
Facsimile: (202) 307-8781
benjamin.m.moss2@usdoj.gov

Attorneys for Defendants
(official capacity only)

# Exhibit 7

Exhibit 7
Page 558

JOSEPH H. HUNT
Assistant Attorney General
United States Department of Justice
Civil Division
ERNESTO H. MOLINA, JR.
JEFFREY S. ROBINS
Deputy Directors
BENJAMIN MARK MOSS
W. DANIEL SHIEH
Senior Litigation Counsel
SHERRY D. SOANES
MARINA C. STEVENSON
JONATHAN K. ROSS
Trial Attorneys
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-9802
Facsimile: (202) 305-1890
daniel.shieh@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCAS R. *et al*, | Case No.: 2-18-CV-05741 DMG (PLA) |
| Plaintiffs, | |
| v. | **DEFENDANTS' SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFFS' REQUESTS FOR ADMISSIONS** |
| ALEX AZAR, Secretary of U.S. Dep't of | |
| Health and Human Services, *et al*., | |
| Defendants, | |

Defendant Alex Azar, Secretary of the United States Department of Health and Human Services and Jonathan Hayes, Director of the Office of Refugee Resettlement of the United States Department of Health and Human Services in their official capacity, by counsel provide the following supplemental responses to Plaintiffs' requests for admissions. Defendants incorporate their objections to the definitions, instructions, and individual requests for admissions from their original responses.

**REQUEST FOR ADMISSION NO. 28:** Admit that to date HHS has convened fewer than four hearings on administrative appeal by PROPOSED CUSTODIANS from a denial of a FAMILY REUNIFICATION APPLICATION.

**RESPONSE:** To the best of undersigned's knowledge, since January 1, 2017, no proposed custodians have requested administrative appeals of the denial of a request for release, and consequently, that is the number of such administrative appeals that have been convened within that timeframe.  There has been one administrative appeal filed since January 1, 2017, and it was filed by the UAC through his attorney.

**REQUEST FOR ADMISSION NO. 29**: Admit that HHS has not, as of the PRESENT, reversed a denial of a FAMILY REUNIFICATION APPLICATION on administrative appeal pursuant to § 2.7.8 of the UAC PROGRAM MANUAL.

**RESPONSE:** To the best of undersigned's knowledge, since January 1, 2017, there have been no reversals on administrative appeal of adverse suitability determinations.

**REQUEST FOR ADMISSION NO. 56:** Admit that the Arizona Department of Health Services threatened to revoke the licenses of Southwest Key's Arizona ORR FACILITIES because they failed to provide proof that their employees had undergone required background checks.

**RESPONSE:** Defendants maintain their objection that they have insufficient knowledge to admit or deny Plaintiffs' requests as worded, and therefore deny them.  Where Defendants are not a party to licensing agreements or citations issued by state licensing inspectors they would have to rely on representations by third parties and would not have personal knowledge sufficient to provide an admission or denial.  Defendants maintain their position that Plaintiffs should seek this information from licensing officials in the state of Arizona directly.

In the spirit of mutual cooperation, however, Defendants admit that they had been made aware that Arizona Department of Health Services had threatened to revoke the licenses

2

of Southwest Key's Arizona ORR facilities.  Defendants, to the extent that they had been
made aware of this situation, deny that Arizona Department of Health Services made
these threats because Southwest Key failed to provide proof that their employees had
undergone required background checks.

**REQUEST FOR ADMISSION NO. 57:** Admit that Texas state inspectors have cited
ORR FACILITIES over 400 times for violations of state law and regulations addressing the
health and safety of detained CHILDREN.

**RESPONSE:** Defendants maintain their objection that they have insufficient knowledge
to admit or deny Plaintiffs' requests as worded, and therefore deny them.  Where
Defendants are not a party to licensing agreements or citations issued by state licensing
inspectors they would have to rely on representations by third parties and would not have
personal knowledge sufficient to provide an admission or denial.  Defendants maintain
their position that Plaintiffs should seek this information from licensing officials in the
state of Texas directly.

In the spirit of mutual cooperation, however, Defendants admit that they had been made
aware that the Texas Department of Family and Protective Services have cited ORR
FACILITIES for violations of state law and regulations addressing the health and safety of
detained CHILDREN.  However, Defendants continue to deny this request due to lack of
knowledge by ORR regarding the exact number of citations Texas care providers may
have received from Texas state licensing inspectors.

3

DATED:  July 10, 2019

Respectfully submitted,
JOSEPH H. HUNT
Assistant Attorney General
Civil Division

ERNESTO H. MOLINA
JEFFREY S. ROBINS
Deputy Director, Office of Immigration Litigation

BY: */s/ W. Daniel Shieh*
BENJAMIN MARK MOSS
W. DANIEL SHIEH
Senior Litigation Counsel
SHERRY D. SOANES
MARINA C. STEVENSON
JONATHAN K. ROSS
Trial Attorneys
Office of Immigration Litigation
Civil Division, U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 305-9802
Facsimile: (202) 305-1890
daniel.shieh@usdoj.gov

Attorneys for Defendants
  (official capacity only)

4

1

## **CERTIFICATE OF SERVICE**

2        I certify that on July 10, 2019, I caused the foregoing to be served on

3  representatives of all parties' counsel by email.

4

5                     */s/ W. Daniel Shieh*

6                     W. DANIEL SHIEH
                       Senior Litigation Counsel

7                     U.S. Department of Justice

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

# Exhibit 8

Exhibit 8
Page 564

8/12/96

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
256 South Occidental Boulevard
Los Angeles, CA  90057
(213) 388-8693

NATIONAL CENTER FOR YOUTH LAW
Alice Bussiere
James Morales
114 Sansome Street, Suite 905
San Francisco, CA  94104
(415) 453-3307

Attorneys for Plaintiffs

Michael Johnson
Assistant United States Attorney
300 N. Los Angeles St., Rm. 7516
Los Angeles, CA  90012

Allen Hausman
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC  20044

Attorneys for Defendants

Additional counsel listed next page



FILED
CLERK, U.S. DISTRICT COURT

JAN 1 7 1997

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JENNY LISETTE FLORES, et al., | ) | Case No. CV 85-4544-RJK(Px) |
| | ) | |
| Plaintiffs, | ) | Stipulated Settlement |
| | ) | Agreement |
| -vs- | ) | |
| | ) | |
| JANET RENO, Attorney General | ) | |
| of the United States, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**Exhibit 8**
**Page 565**

Plaintiffs' Additional Counsel

ACLU FOUNDATION OF SOUTHERN CALIFORNIA
Mark Rosenbaum
Sylvia Argueta
1616 Beverly Boulevard
Los Angeles, CA  90026
Telephone: (213) 977-9500

STREICH LANG
Susan G. Boswell
Jeffrey Willis
1500 Bank of America Plaza
33 North Stone Avenue
Tucson, AZ  85701
Telephone: (602) 770-8700

Defendants' Additional Counsel:

Arthur Strathern
Mary Jane Candaux
Office of the General Counsel
U.S. Immigration & Naturalization Service
425 I St. N.W.
Washington, DC  20536
/ / /

2

**Exhibit 8**
**Page 566**

## STIPULATED SETTLEMENT AGREEMENT

WHEREAS, Plaintiffs have filed this action against Defendants, challenging, *inter alia*, the
constitutionality of Defendants' policies, practices and regulations regarding the detention and release of
unaccompanied minors taken into the custody of the Immigration and Naturalization Service (INS) in
the Western Region; and

WHEREAS, the district court has certified this case as a class action on behalf of all minors
apprehended by the INS in the Western Region of the United States; and

WHEREAS, this litigation has been pending for nine (9) years, all parties have conducted
extensive discovery, and the United States Supreme Court has upheld the constitutionality of the
challenged INS regulations on their face and has remanded for further proceedings consistent with its
opinion; and

WHEREAS, on November 30, 1987, the parties reached a settlement agreement requiring that
minors in INS custody in the Western Region be housed in facilities meeting certain standards,
including state standards for the housing and care of dependent children, and Plaintiffs' motion to
enforce compliance with that settlement is currently pending before the court; and

WHEREAS, a trial in this case would be complex, lengthy and costly to all parties concerned,
and the decision of the district court would be subject to appeal by the losing parties with the final
outcome uncertain; and

WHEREAS, the parties believe that settlement of this action is in their best interests and best
serves the interests of justice by avoiding a complex, lengthy and costly trial, and subsequent appeals
which could last several more years;

NOW, THEREFORE, Plaintiffs and Defendants enter into this Stipulated Settlement Agreement

3

**Exhibit 8**
**Page 567**

(the Agreement), stipulate that it constitutes a full and complete resolution of the issues raised in this action, and agree to the following:

I      DEFINITIONS

As used throughout this Agreement the following definitions shall apply:

1. The term "party" or "parties" shall apply to Defendants and Plaintiffs.  As the term applies to Defendants, it shall include their agents, employees, contractors and/or successors in office.  As the term applies to Plaintiffs, it shall include all class members.

2. The term "Plaintiff" or "Plaintiffs" shall apply to the named plaintiffs and all class members.

3. The term "class member" or "class members" shall apply to the persons defined in Paragraph 10 below.

4. The term "minor" shall apply to any person under the age of eighteen (18) years who is detained in the legal custody of the INS.  This Agreement shall cease to apply to any person who has reached the age of eighteen years.  The term "minor" shall not include an emancipated minor or an individual who has been incarcerated due to a conviction for a criminal offense as an adult.  The INS shall treat all persons who are under the age of eighteen but not included within the definition of "minor" as adults for all purposes, including release on bond or recognizance.

5. The term "emancipated minor" shall refer to any minor who has been determined to be emancipated in an appropriate state judicial proceeding.

6. The term "licensed program" shall refer to any program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors.  A licensed program must also meet those standards for licensed programs set forth in

4

**Exhibit 8**
**Page 568**

Exhibit 1 attached hereto.  All homes and facilities operated by licensed programs, including facilities for special needs minors, shall be non-secure as required under state law; provided, however, that a facility for special needs minors may maintain that level of security permitted under state law which is necessary for the protection of a minor or others in appropriate circumstances, *e.g.*, cases in which a minor has drug or alcohol problems or is mentally ill.  The INS shall make reasonable efforts to provide licensed placements in those geographical areas where the majority of minors are apprehended, such as southern California, southeast Texas, southern Florida and the northeast corridor.

7.  The term "special needs minor" shall refer to a minor whose mental and/or physical condition requires special services and treatment by staff.  A minor may have special needs due to drug or alcohol abuse, serious emotional disturbance, mental illness or retardation, or a physical condition or chronic illness that requires special services or treatment.  A minor who has suffered serious neglect or abuse may be considered a minor with special needs if the minor requires special services or treatment as a result of the neglect or abuse. The INS shall assess minors to determine if they have special needs and, if so, shall place such minors, whenever possible, in licensed programs in which the INS places children without special needs, but which provide services and treatment for such special needs.

8.  The term "medium security facility" shall refer to a facility that is operated by a program, agency or organization licensed by an appropriate State agency and that meets those standards set forth in Exhibit 1 attached hereto. A medium security facility is designed for minors who require close supervision but do not need placement in juvenile correctional facilities.  It provides 24-hour awake supervision, custody, care, and treatment.  It maintains stricter security measures, such as intensive staff supervision, than a facility operated by a licensed program in order to control problem behavior and to prevent escape.  Such a facility may have a secure perimeter but shall not be equipped internally with

5

**Exhibit 8**
**Page 569**

major restraining construction or procedures typically associated with correctional facilities.

II       SCOPE OF SETTLEMENT, EFFECTIVE DATE, AND PUBLICATION

9.  This Agreement sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS and shall supersede all previous INS policies that are inconsistent with the terms of this Agreement.  This Agreement shall become effective upon final court approval, except that those terms of this Agreement regarding placement pursuant to Paragraph 19 shall not become effective until all contracts under the Program Announcement referenced in Paragraph 20 below are negotiated and implemented.  The INS shall make its best efforts to execute these contracts within 120 days after the court's final approval of this Agreement.  However, the INS will make reasonable efforts to comply with Paragraph 19 prior to full implementation of all such contracts.  Once all contracts under the Program Announcement referenced in Paragraph 20 have been implemented, this Agreement shall supersede the agreement entitled Memorandum of Understanding Re Compromise of Class Action: Conditions of Detention (hereinafter "MOU"), entered into by and between the Plaintiffs and Defendants and filed with the United States District Court for the Central District of California on November 30, 1987, and the MOU shall thereafter be null and void.  However, Plaintiffs shall not institute any legal action for enforcement of the MOU for a six (6) month period commencing with the final district court approval of this Agreement, except that Plaintiffs may institute enforcement proceedings if the Defendants have engaged in serious violations of the MOU that have caused irreparable harm to a class member for which injunctive relief would be appropriate.  Within 120 days of the final district court approval of this Agreement, the INS shall initiate action to publish the relevant and substantive terms of this Agreement as a Service regulation.  The final regulations shall not be inconsistent with the terms of this Agreement.  Within 30 days of final court approval of this

6

**Exhibit 8**
**Page 570**

Agreement, the INS shall distribute to all INS field offices and sub-offices instructions regarding the processing, treatment, and placement of juveniles. Those instructions shall include, but may not be limited to, the provisions summarizing the terms of this Agreement, attached hereto as Exhibit 2.

III   CLASS DEFINITION

10. The certified class in this action shall be defined as follows: "All minors who are detained in the legal custody of the INS."

IV   STATEMENTS OF GENERAL APPLICABILITY

11. The INS treats, and shall continue to treat, all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors. The INS shall place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before the INS and the immigration courts and to protect the minor's well-being and that of others. Nothing herein shall require the INS to release a minor to any person or agency whom the INS has reason to believe may harm or neglect the minor or fail to present him or her before the INS or the immigration courts when requested to do so.

V   PROCEDURES AND TEMPORARY PLACEMENT FOLLOWING ARREST

12.A. Whenever the INS takes a minor into custody, it shall expeditiously process the minor and shall provide the minor with a notice of rights, including the right to a bond redetermination hearing if applicable. Following arrest, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors. Facilities will provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to

**Exhibit 8**
**Page 571**

protect minors from others, and contact with family members who were arrested with the minor.  The

INS will segregate unaccompanied minors from unrelated adults.  Where such segregation is not

immediately possible, an unaccompanied minor will not be detained with an unrelated adult for more

than 24 hours.  If there is no one to whom the INS may release the minor pursuant to Paragraph 14, and

no appropriate licensed program is immediately available for placement pursuant to Paragraph 19, the

minor may be placed in an INS detention facility, or other INS-contracted facility, having separate

accommodations for minors, or a State or county juvenile detention facility.  However, minors shall be

separated from delinquent offenders.  Every effort must be taken to ensure that the safety and

well-being of the minors detained in these facilities are satisfactorily provided for by the staff.  The INS

will transfer a minor from a placement under this paragraph to a placement under Paragraph 19, (i)

within three (3) days, if the minor was apprehended in an INS district in which a licensed program is

located and has space available; or (ii) within five (5) days in all other cases; except:

1.    as otherwise provided under Paragraph 13 or Paragraph 21;

2.    as otherwise required by any court decree or court-approved settlement;

3.    in the event of an emergency or influx of minors into the United States, in which case

the INS shall place all minors pursuant to Paragraph 19 as expeditiously as possible; or

4.    where individuals must be transported from remote areas for processing or speak

unusual languages such that the INS must locate interpreters in order to complete

processing, in which case the INS shall place all such minors pursuant to Paragraph 19

within five (5) business days.

B.  For purposes of this paragraph, the term "emergency" shall be defined as any act or event

that prevents the placement of minors pursuant to Paragraph 19 within the time frame provided.  Such

8

**Exhibit 8**
**Page 572**

emergencies include natural disasters (e.g., earthquakes, hurricanes, etc.), facility fires, civil

disturbances, and medical emergencies (e.g., a chicken pox epidemic among a group of minors). The

term "influx of minors into the United States" shall be defined as those circumstances where the INS

has, at any given time, more than 130 minors eligible for placement in a licensed program under

Paragraph 19, including those who have been so placed or are awaiting such placement.

    C.  In preparation for an "emergency" or "influx," as described in Subparagraph B, the INS shall

have a written plan that describes the reasonable efforts that it will take to place all minors as

expeditiously as possible.  This plan shall include the identification of 80 beds that are potentially

available for INS placements and that are licensed by an appropriate State agency to provide residential,

group, or foster care services for dependent children.  The plan, without identification of the additional

beds available, is attached as Exhibit 3.  The INS shall not be obligated to fund these additional beds on

an ongoing basis.  The INS shall update this listing of additional beds on a quarterly basis and provide

Plaintiffs' counsel with a copy of this listing.

    13.  If a reasonable person would conclude that an alien detained by the INS is an adult despite

his claims to be a minor, the INS shall treat the person as an adult for all purposes, including

confinement and release on bond or recognizance.  The INS may require the alien to submit to a

medical or dental examination conducted by a medical professional or to submit to other appropriate

procedures to verify his or her age.  If the INS subsequently determines that such an individual is a

minor, he or she will be treated as a minor in accordance with this Agreement for all purposes.

VI     GENERAL POLICY FAVORING RELEASE

    14.  Where the INS determines that the detention of the minor is not required either to secure his

or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that

**Exhibit 8**
**Page 573**

of others, the INS shall release a minor from its custody without unnecessary delay, in the following

order of preference, to:

A.      a parent;

B.      a legal guardian;

C.      an adult relative (brother, sister, aunt, uncle, or grandparent);

D.      an adult individual or entity designated by the parent or legal guardian as capable and

willing to care for the minor's well-being in (i) a declaration signed under penalty of

perjury before an immigration or consular officer or (ii) such other document(s) that

establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or

guardianship;

E.      a licensed program willing to accept legal custody; or

F.      an adult individual or entity seeking custody, in the discretion of the INS, when it

appears that there is no other likely alternative to long term detention and family

reunification does not appear to be a reasonable possibility.

15.   Before a minor is released from INS custody pursuant to Paragraph 14 above, the custodian

must execute an Affidavit of Support (Form I-134) and an agreement to:

A.      provide for the minor's physical, mental, and financial well-being;

B.      ensure the minor's presence at all future proceedings before the INS and the immigration

court;

C.      notify the INS of any change of address within five (5) days following a move;

D.      in the case of custodians other than parents or legal guardians, not transfer custody of the

minor to another party without the prior written permission of the District Director;

10

Exhibit 8
Page 574

E.      notify the INS at least five days prior to the custodian's departing the United States of such departure, whether the departure is voluntary or pursuant to a grant of voluntary departure or order of deportation; and

F.      if dependency proceedings involving the minor are initiated, notify the INS of the initiation of such proceedings and the dependency court of any immigration proceedings pending against the minor.

In the event of an emergency, a custodian may transfer temporary physical custody of a minor prior to securing permission from the INS but shall notify the INS of the transfer as soon as is practicable thereafter, but in all cases within 72 hours.  For purposes of this paragraph, examples of an "emergency" shall include the serious illness of the custodian, destruction of the home, etc.  In all cases where the custodian, in writing, seeks written permission for a transfer, the District Director shall promptly respond to the request.

16.  The INS may terminate the custody arrangements and assume legal custody of any minor whose custodian fails to comply with the agreement required under Paragraph 15.  The INS, however, shall not terminate the custody arrangements for minor violations of that part of the custodial agreement outlined at Subparagraph 15.C above.

17.  A positive suitability assessment may be required prior to release to any individual or program pursuant to Paragraph 14.  A suitability assessment may include such components as an investigation of the living conditions in which the minor would be placed and the standard of care he would receive, verification of identity and employment of the individuals offering support, interviews of members of the household, and a home visit.  Any such assessment should also take into consideration the wishes and concerns of the minor.

11

**Exhibit 8**
**Page 575**

18.   Upon taking a minor into custody, the INS, or the licensed program in which the minor is

placed, shall make and record the prompt and continuous efforts on its part toward family reunification

and the release of the minor pursuant to Paragraph 14 above.  Such efforts at family reunification shall

continue so long as the minor is in INS custody.

VII     INS CUSTODY

19.   In any case in which the INS does not release a minor pursuant to Paragraph 14, the minor

shall remain in INS legal custody.  Except as provided in Paragraphs 12 or 21, such minor shall be

placed temporarily in a licensed program until such time as release can be effected in accordance with

Paragraph 14 above or until the minor's immigration proceedings are concluded, whichever occurs

earlier.  All minors placed in such a licensed program remain in the legal custody of the INS and may

only be transferred or released under the authority of the INS; provided, however, that in the event of an

emergency a licensed program may transfer temporary physical custody of a minor prior to securing

permission from the INS but shall notify the INS of the transfer as soon as is practicable thereafter, but

in all cases within 8 hours.

20.   Within 60 days of final court approval of this Agreement, the INS shall authorize the

United States Department of Justice Community Relations Service to publish in the <u>Commerce

Business Daily</u> and/or the <u>Federal Register</u> a Program Announcement to solicit proposals for the care of

100 minors in licensed programs.

21.   A minor may be held in or transferred to a suitable State or county juvenile detention

facility or a secure INS detention facility, or INS-contracted facility, having separate accommodations

for minors whenever the District Director or Chief Patrol Agent determines that the minor:

A.      has been charged with, is chargeable, or has been convicted of a crime, or is the subject

12

**Exhibit 8**
**Page 576**

of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act; provided, however, that this provision shall not apply to any minor whose offense(s) fall(s) within either of the following categories:

i.    Isolated offenses that (1) were not within a pattern or practice of criminal activity and (2) did not involve violence against a person or the use or carrying of a weapon (Examples: breaking and entering, vandalism, DUI, etc.  This list is not exhaustive.);

ii.   Petty offenses, which are not considered grounds for stricter means of detention in any case (Examples: shoplifting, joy riding, disturbing the peace, etc.  This list is not exhaustive.);

As used in this paragraph, "chargeable" means that the INS has probable cause to believe that the individual has committed a specified offense;

B.    has committed, or has made credible threats to commit, a violent or malicious act (whether directed at himself or others) while in INS legal custody or while in the presence of an INS officer;

C.    has engaged, while in a licensed program, in conduct that has proven to be unacceptably disruptive of the normal functioning of the licensed program in which he or she has been placed and removal is necessary to ensure the welfare of the minor or others, as determined by the staff of the licensed program (Examples: drug or alcohol abuse, stealing, fighting, intimidation of others, etc.  This list is not exhaustive.);

D.    is an escape-risk; or

E.    must be held in a secure facility for his or her own safety, such as when the INS has

13

**Exhibit 8**
**Page 577**

reason to believe that a smuggler would abduct or coerce a particular minor to secure

payment of smuggling fees.

22.   The term "escape-risk" means that there is a serious risk that the minor will attempt to

escape from custody.  Factors to consider when determining whether a minor is an escape-risk or not

include, but are not limited to, whether:

A.   the minor is currently under a final order of deportation or exclusion;

B.   the minor's immigration history includes: a prior breach of a bond; a failure to appear

before the INS or the immigration court; evidence that the minor is indebted to

organized smugglers for his transport; or a voluntary departure or a previous removal

from the United States pursuant to a final order of deportation or exclusion;

C.   the minor has previously absconded or attempted to abscond from INS custody.

23.   The INS will not place a minor in a secure facility pursuant to Paragraph 21 if there are less

restrictive alternatives that are available and appropriate in the circumstances, such as transfer to (a) a

medium security facility which would provide intensive staff supervision and counseling services or (b)

another licensed program.  All determinations to place a minor in a secure facility will be reviewed and

approved by the regional juvenile coordinator.

24.A.   A minor in deportation proceedings shall be afforded a bond redetermination hearing

before an immigration judge in every case, unless the minor indicates on the Notice of Custody

Determination form that he or she refuses such a hearing.

B.   Any minor who disagrees with the INS's determination to place that minor in a particular

type of facility, or who asserts that the licensed program in which he or she has been placed does not

comply with the standards set forth in Exhibit 1 attached hereto, may  seek judicial review in any

14

**Exhibit 8**
**Page 578**

United States District Court with jurisdiction and venue over the matter to challenge that placement

determination or to allege noncompliance with the standards set forth in Exhibit 1.  In such an action,

the United States District Court shall be limited to entering an order solely affecting the individual

claims of the minor bringing the action.

C.  In order to permit judicial review of Defendants' placement decisions as provided in this

Agreement, Defendants shall provide minors not placed in licensed programs with a notice of the

reasons for  housing the minor in a detention or medium security  facility.   With respect to placement

decisions reviewed under this paragraph, the standard of review for the INS's exercise of its discretion

shall be the abuse of discretion standard of review.  With respect to all other matters for which this

paragraph provides judicial review, the standard of review shall be *de novo* review.

D.  The INS shall promptly provide each minor not released with (a) INS Form I-770, (b) an

explanation of the right of judicial review as set out in Exhibit 6, and (c) the list of free legal services

available in the district pursuant to INS regulations (unless previously given to the minor).

E.  Exhausting the procedures established in Paragraph 37 of this Agreement shall not be a

precondition to the bringing of an action under this paragraph in any United District Court.  Prior to

initiating any such action, however, the minor and/or the minors' attorney shall confer telephonically or

in person with the United States Attorney's office in the judicial district where the action is to be filed,

in an effort to informally resolve the minor's complaints without the need of federal court intervention.

VIII    TRANSPORTATION OF MINORS

25.  Unaccompanied minors arrested or taken into custody by the INS should not be transported

by the INS in vehicles with detained adults except:

A.  when being transported from the place of arrest or apprehension to an INS office, or

15

**Exhibit 8**
**Page 579**

B.  where separate transportation would be otherwise impractical.

When transported together pursuant to Clause B, minors shall be separated from adults.  The INS shall

take necessary precautions for the protection of the well-being of such minors when transported with

adults.

26.  The INS shall assist without undue delay in making transportation arrangements to the INS

office nearest the location of the person or facility to whom a minor is to be released pursuant to

Paragraph 14.  The INS may, in its discretion, provide transportation to minors.

IX     TRANSFER OF MINORS

27.  Whenever a minor is transferred from one placement to another, the minor shall be

transferred with all of his or her possessions and legal papers; provided, however, that if the minor's

possessions exceed the amount permitted normally by the carrier in use, the possessions will be shipped

to the minor in a timely manner.  No minor who is represented by counsel shall be transferred without

advance notice to such counsel, except in unusual and compelling circumstances such as where the

safety of the minor or others is threatened or the minor has been determined to be an escape-risk, or

where counsel has waived such notice, in which cases notice shall be provided to counsel within 24

hours following transfer.

X MONITORING AND REPORTS

28A.  An INS Juvenile Coordinator in the Office of the Assistant Commissioner for Detention

and Deportation shall monitor compliance with the terms of this Agreement and shall maintain an

up-to-date record of all minors who are placed in proceedings and remain in INS custody for longer

than 72 hours.  Statistical information on such minors shall be collected weekly from all INS district

offices and Border Patrol stations.  Statistical information will include at least the following: (1)

16

**Exhibit 8**
**Page 580**

biographical information such as each minor's name, date of birth, and country of birth, (2) date placed

in INS custody, (3) each date placed, removed or released, (4) to whom and where placed, transferred,

removed or released, (5) immigration status, and (6) hearing dates. The INS, through the Juvenile

Coordinator, shall also collect information regarding the reasons for every placement of a minor in a

detention facility or medium security facility.

B. Should Plaintiffs' counsel have reasonable cause to believe that a minor in INS legal custody

should have been released pursuant to Paragraph 14, Plaintiffs' counsel may contact the Juvenile

Coordinator to request that the Coordinator investigate the case and inform Plaintiffs' counsel of the

reasons why the minor has not been released.

29. On a semi-annual basis, until two years after the court determines, pursuant to Paragraph

31, that the INS has achieved substantial compliance with the terms of this Agreement, the INS shall

provide to Plaintiffs' counsel the information collected pursuant to Paragraph 28, as permitted by law,

and each INS policy or instruction issued to INS employees regarding the implementation of this

Agreement. In addition, Plaintiffs' counsel shall have the opportunity to submit questions, on a

semi-annual basis, to the Juvenile Coordinator in the Office of the Assistant Commissioner for

Detention and Deportation with regard to the implementation of this Agreement and the information

provided to Plaintiffs' counsel during the preceding six-month period pursuant to Paragraph 28.

Plaintiffs' counsel shall present such questions either orally or in writing, at the option of the Juvenile

Coordinator. The Juvenile Coordinator shall furnish responses, either orally or in writing at the option

of Plaintiffs' counsel, within 30 days of receipt.

30. On an annual basis, commencing one year after final court approval of this Agreement, the

INS Juvenile Coordinator shall review, assess, and report to the court regarding compliance with the

17

**Exhibit 8**
**Page 581**

terms of this Agreement. The Coordinator shall file these reports with the court and provide copies to the parties, including the final report referenced in Paragraph 35, so that they can submit comments on the report to the court. In each report, the Coordinator shall state to the court whether or not the INS is in substantial compliance with the terms of this Agreement, and, if the INS is not in substantial compliance, explain the reasons for the lack of compliance. The Coordinator shall continue to report on an annual basis until three years after the court determines that the INS has achieved substantial compliance with the terms of this Agreement.

31. One year after the court's approval of this Agreement, the Defendants may ask the court to determine whether the INS has achieved substantial compliance with the terms of this Agreement.

XI   ATTORNEY-CLIENT VISITS

32.A.  Plaintiffs' counsel are entitled to attorney-client visits with class members even though they may not have the names of class members who are housed at a particular location. All visits shall occur in accordance with generally applicable policies and procedures relating to attorney-client visits at the facility in question. Upon Plaintiffs' counsel's arrival at a facility for attorney-client visits, the facility staff shall provide Plaintiffs' counsel with a list of names and alien registration numbers for the minors housed at that facility. In all instances, in order to memorialize any visit to a minor by Plaintiffs' counsel, Plaintiffs' counsel must file a notice of appearance with the INS prior to any attorney-client meeting. Plaintiffs' counsel may limit any such notice of appearance to representation of the minor in connection with this Agreement. Plaintiffs' counsel must submit a copy of the notice of appearance by hand or by mail to the local INS juvenile coordinator and a copy by hand to the staff of the facility.

B.  Every six months, Plaintiffs' counsel shall provide the INS with a list of those attorneys who

18

**Exhibit 8**
**Page 582**

may make such attorney-client visits, as Plaintiffs' counsel, to minors during the following six month period.  Attorney-client visits may also be conducted by any staff attorney employed by the Center for Human Rights & Constitutional Law in Los Angeles, California or the National Center for Youth Law in San Francisco, California, provided that such attorney presents credentials establishing his or her employment prior to any visit.

C.  Agreements for the placement of minors in non-INS facilities shall permit attorney-client visits, including by class counsel in this case.

D.  Nothing in Paragraph 32 shall affect a minor's right to refuse to meet with Plaintiffs' counsel.  Further, the minor's parent or legal guardian may deny Plaintiffs' counsel permission to meet with the minor.

XII   FACILITY VISITS

33.  In addition to the attorney-client visits permitted pursuant to Paragraph 32,  Plaintiffs' counsel may request access to any licensed program's facility in which a minor has been placed pursuant to Paragraph 19 or to any medium security facility or detention facility in which a minor has been placed pursuant to Paragraphs 21 or 23.  Plaintiffs' counsel shall submit a request to visit a facility under this paragraph to the INS district juvenile coordinator who will provide reasonable assistance to Plaintiffs' counsel by conveying the request to the facility's staff and coordinating the visit.   The rules and procedures to be followed in connection with any visit approved by a facility under this paragraph are set forth in Exhibit 4 attached, except as may be otherwise agreed by Plaintiffs' counsel and the facility's staff.  In all visits to any facility pursuant to this Agreement, Plaintiffs' counsel and their associated experts shall treat minors and staff with courtesy and dignity and shall not disrupt the normal functioning of the facility.

Exhibit 8
Page 583

## XIII  TRAINING

34.  Within 120 days of final court approval of this Agreement, the INS shall provide appropriate guidance and training for designated INS employees regarding the terms of this Agreement. The INS shall develop written and/or audio or video materials for such training.  Copies of such written and/or audio or video training materials shall be made available to Plaintiffs' counsel when such training materials are sent to the field, or to the extent practicable, prior to that time.

## XIV   DISMISSAL

35.  After the court has determined that the INS is in substantial compliance with this Agreement and the Coordinator has filed a final report, the court, without further notice, shall dismiss this action.  Until such dismissal, the court shall retain jurisdiction over this action.

## XV   RESERVATION OF RIGHTS

36.  Nothing in this Agreement shall limit the rights, if any, of individual class members to preserve issues for judicial review in the appeal of an individual case or for class members to exercise any independent rights they may otherwise have.

## XVI   NOTICE AND DISPUTE RESOLUTION

37.  This paragraph provides for the enforcement, in this District Court, of the provisions of this Agreement except for claims brought under Paragraph 24.  The parties shall meet telephonically or in person to discuss a complete or partial repudiation of this Agreement or any alleged non-compliance with the terms of the Agreement, prior to bringing any individual or class action to enforce this Agreement.  Notice of a claim that a party has violated the terms of this Agreement shall be served on plaintiffs addressed to:

/ / /

20

**Exhibit 8**
**Page 584**

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
256 South Occidental Boulevard
Los Angeles, CA  90057

NATIONAL CENTER FOR YOUTH LAW
Alice Bussiere
James Morales
114 Sansome Street, Suite 905
San Francisco, CA  94104

and on Defendants addressed to:

Michael Johnson
Assistant United States Attorney
300 N. Los Angeles St., Rm. 7516
Los Angeles, CA  90012

Allen Hausman
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC  20044

XVII   PUBLICITY

38.  Plaintiffs and Defendants shall hold a joint press conference to announce this Agreement. The INS shall send copies of this Agreement to social service and voluntary agencies agreed upon by the parties, as set forth in Exhibit 5 attached.  The parties shall pursue such other public dissemination of information regarding this Agreement as the parties shall agree.

XVIII ATTORNEYS' FEES AND COSTS

39.  Within 60 days of final court approval of this Agreement, Defendants shall pay to Plaintiffs the total sum of $374,110.09, in full settlement of all attorneys' fees and costs in this case.

/ / /

21

**Exhibit 8**
**Page 585**

XIX   TERMINATION

40.  All terms of this Agreement shall terminate the earlier of  five years after the date of final court approval of this Agreement or three years after the court determines that the INS is in substantial compliance with this Agreement, except that the INS shall continue to house the general population of minors in INS custody in facilities that are licensed for the care of dependent minors.

XX      REPRESENTATIONS AND WARRANTY

41.  Counsel for the respective parties, on behalf of themselves and their clients, represent that they know of nothing in this Agreement that exceeds the legal authority of the parties or is in violation of any law.  Defendants' counsel represent and warrant that they are fully authorized and empowered to enter into this Agreement on behalf of the Attorney General, the United States Department of Justice, and the Immigration and Naturalization Service, and acknowledge that Plaintiffs enter into this Agreement in reliance on such representation.  Plaintiffs' counsel represent and warrant that they are fully authorized and empowered to enter into this Agreement on behalf of the Plaintiffs, and acknowledge that Defendants enter into this Agreement in reliance on such representation.  The undersigned, by their signatures on behalf of the Plaintiffs and Defendants, warrant that upon execution of this Agreement in their representative capacities, their principals, agents, and successors of such principals and agents shall be fully and unequivocally bound hereunder to the full extent authorized by law.

For Defendants:  Signed: _Doris Meissner_   Title: _Commissioner, INS_

Dated: _9 / 16 / 96_

For Plaintiffs:  Signed: _per next page_   Title: _____

Dated: _____

22

**Exhibit 8**
**Page 586**

The foregoing stipulated settlement is approved as to form and content:

CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
Carlos Holguin
Peter Schey

NATIONAL CENTER FOR YOUTH LAW
Alice Bussiere
James Morales

ACLU FOUNDATION OF SOUTHERN CALIFORNIA
Mark Rosenbaum
Sylvia Argueta

STEICH LANG
Susan G. Boswell
Jeffery Willis

Date: 1/13/97          By _____

Date: 11/13/96         By _____

23

Exhibit 8
Page 587

Exhibit 1

Exhibit 8
Page 588

EXHIBIT 1

MINIMUM STANDARDS FOR LICENSED PROGRAMS

A.  Licensed programs shall comply with all applicable state child welfare laws and regulations and all state and local building, fire, health and safety codes and shall provide or arrange for the following services for each minor in its care:

1.   Proper physical care and maintenance, including suitable living accommodations, food, appropriate clothing, and personal grooming items.

2.   Appropriate routine medical and dental care, family planning services, and emergency health care services, including a complete medical examination (including screening for infectious disease) within 48 hours of admission, excluding weekends and holidays, unless the minor was recently examined at another facility; appropriate immunizations in accordance with the U.S. Public Health Service (PHS), Center for Disease Control; administration of prescribed medication and special diets; appropriate mental health interventions when necessary.

3.   An individualized needs assessment which shall include: (a) various initial intake forms; (b) essential data relating to the identification and history of the minor and family; (c) identification of the minors' special needs including any specific problem(s) which appear to require immediate intervention; (d) an educational assessment and plan; (e) an assessment of family relationships and interaction with adults, peers and authority figures; (f) a statement of religious preference and practice; (g) an assessment of the minor's personal goals, strengths and weaknesses; and (h) identifying information regarding immediate family members, other relatives, godparents or friends who may be

1

**Exhibit 8**
**Page 589**

residing in the United States and may be able to assist in family reunification.

4.  Educational services appropriate to the minor's level of development, and communication skills in a structured classroom setting, Monday through Friday, which concentrates primarily on the development of basic academic competencies and secondarily on English Language Training (ELT).  The educational program shall include instruction and educational and other reading materials in such languages as needed.  Basic academic areas should include Science, Social Studies, Math, Reading, Writing and Physical Education.  The program shall provide minors with appropriate reading materials in languages other than English for use during the minor's leisure time.

5.  Activities according to a recreation and leisure time plan which shall include daily outdoor activity, weather permitting, at least one hour per day of large muscle activity and one hour per day of structured leisure time activities (this should not include time spent watching television).  Activities should be increased to a total of three hours on days when school is not in session.

6.  At least one (1) individual counseling session per week conducted by trained social work staff with the specific objectives of reviewing the minor's progress, establishing new short term objectives, and addressing both the developmental and crisis-related needs of each minor.

7.  Group counseling sessions at least twice a week.  This is usually an informal process and takes place with all the minors present.  It is a time when new minors are given the opportunity to get acquainted with the staff, other children, and the rules of the program. It is an open forum where everyone gets a chance to speak.  Daily program management

2

**Exhibit 8**
**Page 590**

is discussed and decisions are made about recreational activities, etc.  It is a time for staff and minors to discuss whatever is on their minds and to resolve problems.

8.   Acculturation and adaptation services which include information regarding the development of social and inter-personal skills which contribute to those abilities necessary to live independently and responsibly.

9.   Upon admission, a comprehensive orientation regarding program intent, services, rules (written and verbal), expectations and the availability of legal assistance.

10.   Whenever possible, access to religious services of the minor's choice.

11.   Visitation and contact with family members (regardless of their immigration status) which is structured to encourage such visitation.  The staff shall respect the minor's privacy while reasonably preventing the unauthorized release of the minor.

12.   A reasonable right to privacy, which shall include the right to: (a) wear his or her own clothes, when available; (b) retain a private space in the residential facility, group or foster home for the storage of personal belongings; (c) talk privately on the phone, as permitted by the house rules and regulations; (d) visit privately with guests, as permitted by the house rules and regulations; and (e) receive and send uncensored mail unless there is a reasonable belief that the mail contains contraband.

13.   Family reunification services designed to identify relatives in the United States as well as in foreign countries and assistance in obtaining legal guardianship when necessary for the release of the minor.

14.   Legal services information regarding the availability of free legal assistance, the right to be represented by counsel at no expense to the government, the right to a deportation or

**Exhibit 8**
**Page 591**

exclusion hearing before an immigration judge, the right to apply for political asylum or

to request voluntary departure in lieu of deportation.

B.  Service delivery is to be accomplished in a manner which is sensitive to the age, culture,

native language and the complex needs of each minor.

C.  Program rules and discipline standards shall be formulated with consideration for the range

of ages and maturity in the program and shall be culturally sensitive to the needs of alien minors.

Minors shall not be subjected to corporal punishment, humiliation, mental abuse, or punitive

interference with the daily functions of living, such as eating or sleeping.  Any sanctions employed shall

not: (1) adversely affect either a minor's health, or physical or psychological well-being; or (2) deny

minors regular meals, sufficient sleep, exercise, medical care, correspondence privileges, or legal

assistance.

D.  A comprehensive and realistic individual plan for the care of each minor must be developed

in accordance with the minor's needs as determined by the individualized need assessment.  Individual

plans shall be implemented and closely coordinated through an operative case management system.

E.  Programs shall develop, maintain and safeguard individual client case records.  Agencies and

organizations are required to develop a system of accountability which preserves the confidentiality of

client information and protects the records from unauthorized use or disclosure.

F.  Programs shall maintain adequate records and make regular reports as required by the INS

that permit the INS to monitor and enforce this order and other requirements and standards as the INS

may determine are in the best interests of the minors.

4

**Exhibit 8**
**Page 592**

Exhibit 2

Exhibit 8
Page 593

EXHIBIT 2

INSTRUCTIONS TO SERVICE OFFICERS RE:
PROCESSING, TREATMENT, AND PLACEMENT OF MINORS

These instructions are to advise Service officers of INS policy regarding the way in which minors in
INS custody are processed, housed and released.  These instructions are applicable nationwide and
supersede all prior inconsistent instructions regarding minors.

**(a)  Minors.**  A minor is a person under the age of eighteen years.  However, individuals who have
been "emancipated" by a state court or convicted and incarcerated for a criminal offense as an adult are
not considered minors.  Such individuals must be treated as adults for all purposes, including
confinement and release on bond.

Similarly, if a reasonable person would conclude that an individual is an adult despite his claims to be a
minor, the INS  shall treat such person as an adult for all purposes, including confinement and release
on bond or recognizance.  The INS may require such an individual to submit to a medical or dental
examination conducted by a medical professional or to submit to other appropriate procedures to verify
his or her age.  If the INS subsequently determines that such an individual is a minor, he or she will be
treated as a minor for all purposes.

**(b)  General policy.**  The INS treats, and will continue to treat minors with dignity, respect and special
concern for their particular vulnerability.  INS policy is to place each detained minor in the least
restrictive setting appropriate to the minor's age and special needs, provided that such setting is
consistent with the need to ensure the minor's timely appearance and to protect the minor's well-being
and that of others.  INS officers are not required to release a minor to any person or agency whom they
have reason to believe may harm or neglect the minor or fail to present him or her before the INS or the
immigration courts when requested to do so.

**(c)  Processing.**  The INS will expeditiously process minors and will provide a Form I-770 notice of
rights, including the right to a bond redetermination hearing, if applicable.

Following arrest, the INS will hold minors in a facility that is safe and sanitary and that is consistent
with the INS's concern for the particular vulnerability of minors.  Such facilities will have access to
toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of
emergency services, adequate temperature control and ventilation, adequate supervision to protect
minors from others, and contact with family members who were arrested with the minor.  The INS will
separate unaccompanied minors from unrelated adults whenever possible.  Where such segregation is
not immediately possible, an unaccompanied minor will not be detained with an unrelated adult for
more than 24 hours.

If the juvenile cannot be immediately released, and no licensed program (described below) is available
to care for him, he should be placed in an INS or INS-contract facility that has separate
accommodations for minors, or in a State or county juvenile detention facility that separates minors in

1

**Exhibit 8**
**Page 594**

INS custody from delinquent offenders.  The INS will make every effort to ensure the safety and well-being of juveniles placed in these facilities.

**(d)  Release.**  The INS will release minors from its custody without unnecessary delay, unless detention of a juvenile is required to secure her timely appearance or to ensure the minor's safety or that of others. Minors shall be released, in the following order of preference, to:

> (i)  a parent;

> (ii) a legal guardian;

> (iii) an adult relative (brother, sister, aunt, uncle, or grandparent);

> (iv) an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer, or (ii) such other documentation that establishes to the satisfaction of the INS, in its discretion, that the individual designating the individual or entity as the minor's custodian is in fact the minor's parent or guardian;

> (v) a state-licensed juvenile shelter, group home, or foster home willing to accept legal custody; or

> (vi) an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.

**(e)  Certification of custodian.**  Before a minor is released, the custodian must execute an Affidavit of Support (Form I-134) and an agreement to:

> (i) provide for the minor's physical, mental, and financial well-being;

> (ii) ensure the minor's presence at all future proceedings before the INS and the immigration court;

> (iii) notify the INS of any change of address within five (5) days following a move;

> (iv) if the custodian is not a parent or legal guardian, not transfer custody of the minor to another party without the prior written permission of the District Director, except in the event of an emergency;

> (v) notify the INS at least five days prior to the custodian's departing the United States of such departure, whether the departure is voluntary or pursuant to a grant of voluntary departure or order of deportation; and

2

**Exhibit 8**
**Page 595**

(vi) if dependency proceedings involving the minor are initiated, notify the INS of the initiation of a such proceedings and the dependency court of any deportation proceedings pending against the minor.

In an emergency, a custodian may transfer temporary physical custody of a minor prior to securing permission from the INS, but must notify the INS of the transfer as soon as is practicable, and in all cases within 72 hours. Examples of an "emergency" include the serious illness of the custodian, destruction of the home, etc. In all cases where the custodian seeks written permission for a transfer, the District Director shall promptly respond to the request.

The INS may terminate the custody arrangements and assume legal custody of any minor whose custodian fails to comply with the agreement. However, custody arrangements will not be terminated for minor violations of the custodian's obligation to notify the INS of any change of address within five days following a move.

**(f) Suitability assessment.** An INS officer may require a positive suitability assessment prior to releasing a minor to any individual or program. A suitability assessment may include an investigation of the living conditions in which the minor is to be placed and the standard of care he would receive, verification of identity and employment of the individuals offering support, interviews of members of the household, and a home visit. The assessment will also take into consideration the wishes and concerns of the minor.

**(g) Family reunification.** Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, will promptly attempt to reunite the minor with his or her family to permit the release of the minor under Paragraph (d) above. Such efforts at family reunification will continue as long as the minor is in INS or licensed program custody and will be recorded by the INS or the licensed program in which the minor is placed.

**(h) Placement in licensed programs.** A "licensed program" is any program, agency or organization licensed by an appropriate state agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors. Exhibit 1 of the *Flores v. Reno* Settlement Agreement describes the standards required of licensed programs. Juveniles who remain in INS custody must be placed in a licensed program within three days if the minor was apprehended in an INS district in which a licensed program is located and has space available, or within five days in all other cases, except when:

(i) the minor is an escape risk or delinquent, as defined in Paragraph (i) below;

(ii) a court decree or court-approved settlement requires otherwise;

(iii) an emergency or influx of minors into the United States prevents compliance, in which case all minors should be placed in licensed programs as expeditiously as possible; or

(iv) the minor must be transported from remote areas for processing or speaks an unusual

3

**Exhibit 8**
**Page 596**

language such that a special interpreter is required to process the minor, in which case the minor must be placed in a licensed program within five business days.

**(i) Secure and supervised detention.** A minor may be held in or transferred to a State or county juvenile detention facility or in a secure INS facility or INS-contracted facility having separate accommodations for minors, whenever the District Director or Chief Patrol Agent determines that the minor —

> (i) has been charged with, is chargeable, or has been convicted of a crime, or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act, unless the minor's offense is

>> (a) an isolated offense not within a pattern of criminal activity which did not involve violence against a person or the use or carrying of a weapon (Examples: breaking and entering, vandalism, DUI, etc.); or

>> (b) a petty offense, which is not considered grounds for stricter means of detention in any case (Examples: shoplifting, joy riding, disturbing the peace, etc.);

> (ii) has committed, or has made credible threats to commit, a violent or malicious act (whether directed at himself or others) while in INS legal custody or while in the presence of an INS officer;

> (iii) has engaged, while in a licensed program, in conduct that has proven to be unacceptably disruptive of the normal functioning of the licensed program in which he or she has been placed and removal is necessary to ensure the welfare of the minor or others, as determined by the staff of the licensed program (Examples: drug or alcohol abuse, stealing, fighting, intimidation of others, etc.);

> (iv) is an escape-risk; or

> (v) must be held in a secure facility for his or her own safety, such as when the INS has reason to believe that a smuggler would abduct or coerce a particular minor to secure payment of smuggling fees.

"Chargeable" means that the INS has probable cause to believe that the individual has committed a specified offense.

The term "escape-risk" means that there is a serious risk that the minor will attempt to escape from custody. Factors to consider when determining whether a minor is an escape-risk or not include, but are not limited to, whether:

> (a) the minor is currently under a final order of deportation or exclusion;

4

**Exhibit 8**
**Page 597**

(b) the minor's immigration history includes: a prior breach of a bond; a failure to appear before
the INS or the immigration court; evidence that the minor is indebted to organized smugglers
for his transport; or a voluntary departure or a previous removal from the United States pursuant
to a final order of deportation or exclusion;

(c) the minor has previously absconded or attempted to abscond from INS custody.

The INS will not place a minor in a State or county juvenile detention facility, secure INS detention
facility, or secure INS-contracted facility if less restrictive alternatives are available and appropriate in
the circumstances, such as transfer to a medium security facility that provides intensive staff
supervision and counseling services or transfer to another licensed program. All determinations to
place a minor in a secure facility will be reviewed and approved by the regional Juvenile Coordinator.

**(j) Notice of right to bond redetermination and judicial review of placement.** A minor in
deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge
in every case, unless the minor indicates on the Notice of Custody Determination form that he or she
refuses such a hearing. A juvenile who is not released or placed in a licensed placement shall be
provided (1) a written explanation of the right of judicial review as set out in Exhibit 6 of the *Flores v.
Reno* Settlement Agreement, and (2) the list of free legal services providers compiled pursuant to INS
regulations (unless previously given to the minor.

**(k) Transportation and transfer.** Unaccompanied minors should not be transported in vehicles with
detained adults except when being transported from the place of arrest or apprehension to an INS office
or where separate transportation would be otherwise impractical, in which case minors shall be
separated from adults. INS officers shall take all necessary precautions for the protection of minors
during transportation with adults.

When a minor is to be released, the INS will assist him or her in making transportation arrangements to
the INS office nearest the location of the person or facility to whom a minor is to be released. The INS
may, in its discretion, provide transportation to such minors.

Whenever a minor is transferred from one placement to another, she shall be transferred with all of her
possessions and legal papers; provided, however, that if the minor's possessions exceed the amount
permitted normally by the carrier in use, the possessions must be shipped to the minor in a timely
manner. No minor who is represented by counsel should be transferred without advance notice to
counsel, except in unusual and compelling circumstances such as where the safety of the minor or
others is threatened or the minor has been determined to be an escape-risk, or where counsel has waived
notice, in which cases notice must be provided to counsel within 24 hours following transfer.

**(l) Periodic reporting.** Statistical information on minors placed in proceedings who remain in INS
custody for longer than 72 hours must be reported to the Juvenile Coordinator by all INS district offices
and Border Patrol stations. Information will include: (a) biographical information, including the
minor's name, date of birth, and country of birth, (b) date placed in INS custody, (c) each date placed,
removed or released, (d) to whom and where placed, transferred, removed or released, (e) immigration

**Exhibit 8**
**Page 598**

status, and (f) hearing dates.  INS officers should also inform the Juvenile Coordinator of the reasons for placing a minor in a medium-security facility or detention facility as described in paragraph (i).

**(m) Attorney-client visits by Plaintiffs' counsel.**  The INS will permit the lawyers for the *Flores v. Reno* plaintiff class to visit minors, even though they may not have the names of minors who are housed at a particular location.  A list of Plaintiffs' counsel entitled to make attorney-client visits with minors is available from the district Juvenile Coordinator.  Attorney-client visits may also be conducted by any staff attorney employed by the Center for Human Rights & Constitutional Law of Los Angeles, California, or the National Center for Youth Law of San Francisco, California, provided that such attorney presents credentials establishing his or her employment prior to any visit.

Visits must occur in accordance with generally applicable policies and procedures relating to attorney-client visits at the facility in question.  Upon Plaintiffs' counsel's arrival at a facility for attorney-client visits, the facility staff must provide Plaintiffs' counsel with a list of names and alien registration numbers for the minors housed at that facility.  In all instances, in order to memorialize any visit to a minor by Plaintiffs' counsel, Plaintiffs' counsel must file a notice of appearance with the INS prior to any attorney-client meeting.  Plaintiffs' counsel may limit the notice of appearance to representation of the minor in connection with his placement or treatment during INS custody. Plaintiffs' counsel must submit a copy of the notice of appearance by hand or by mail to the local INS juvenile coordinator and a copy by hand to the staff of the facility.

A minor may refuse to meet with Plaintiffs' counsel.  Further, the minor's parent or legal guardian may deny Plaintiffs' counsel permission to meet with the minor.

**(n) Visits to licensed facilities.**  In addition to the attorney-client visits, Plaintiffs' counsel may request access to a licensed program's facility (described in paragraph (h)) or to a medium-security facility or detention facility (described in paragraph (i)) in which a minor has been placed.  The district juvenile coordinator will convey the request to the facility's staff and coordinate the visit.  The rules and procedures to be followed in connection with such visits are set out in Exhibit 4 of the *Flores v. Reno* Settlement Agreement, unless Plaintiffs' counsel and the facility's staff agree otherwise.  In all visits to any facility, Plaintiffs' counsel and their associated experts must treat minors and staff with courtesy and dignity and must not disrupt the normal functioning of the facility.

**Exhibit 8**
**Page 599**

Exhibit 3

Exhibit 8
Page 600

EXHIBIT 3

CONTINGENCY PLAN

In the event of an emergency or influx that prevents the prompt placement of minors in licensed programs with which the Community Relations Service has contracted, INS policy is to make all reasonable efforts to place minors in programs licensed by an appropriate state agency as expeditiously as possible.  An "emergency" is an act or event, such as a natural disaster (e.g. earthquake, fire, hurricane), facility fire, civil disturbance, or medical emergency (e.g. a chicken pox epidemic among a group of minors) that prevents the prompt placement of minors in licensed facilities.  An "influx" is defined as any situation in which there are more than 130 minors in the custody of the INS who are eligible for placement in licensed programs.

1.  The Juvenile Coordinator will establish and maintain an Emergency Placement List of at least 80 beds at programs licensed by an appropriate state agency that are potentially available to accept emergency placements.  These 80 placements would supplement the 130 placements that the INS normally has available, and whenever possible, would meet all standards applicable to juvenile placements the INS normally uses.  The Juvenile Coordinator may consult with child welfare specialists, group home operators, and others in developing the List.  The Emergency Placement List will include the facility name; the number of beds potentially available at the facility; the name and telephone number of contact persons; the name and telephone number of contact persons for nights, holidays, and weekends if different; any restrictions on minors accepted (e.g. age);  and any special services that are available.

2.  The Juvenile Coordinator will maintain a list of minors affected by the emergency or influx, including (1) the minor's name, (2) date and country of birth, (3) date placed in INS custody, and (4)

1

**Exhibit 8**
**Page 601**

place and date of current placement.

3.  Within one business day of the emergency or influx the Juvenile Coordinator or his or her designee will contact the programs on the Emergency Placement List to determine available placements.  As soon as available placements are identified, the Juvenile Coordinator will advise appropriate INS staff of their availability.  To the extent practicable, the INS will attempt to locate emergency placements in geographic areas where culturally and linguistically appropriate community services are available.

4.  In the event that the number of minors needing emergency placement exceeds the available appropriate placements on the Emergency Placement List, the Juvenile Coordinator will work with the Community Relations Service to locate additional placements through licensed programs, county social services departments, and foster family agencies.

5.  Each year the INS will reevaluate the number of regular placements needed for detained minors to determine whether the number of regular placements should be adjusted to accommodate an increased or decreased number of minors eligible for placement in licensed programs.  However, any decision to increase the number of placements available shall be subject to the availability of INS resources.  The Juvenile Coordinator shall promptly provide Plaintiffs' counsel with any reevaluation made by INS pursuant to this paragraph.

6.  The Juvenile Coordinator shall provide to Plaintiffs' counsel copies of the Emergency Placement List within six months after the court's final approval of the Settlement Agreement.

**Exhibit 8**
**Page 602**

Exhibit 4

Exhibit 8
Page 603

EXHIBIT 4

AGREEMENT CONCERNING FACILITY VISITS UNDER PARAGRAPH 33

The purpose of facility visits under paragraph 33 is to interview class members and staff and to observe conditions at the facility. Visits under paragraph 33 shall be conducted in accordance with the generally applicable policies and procedures of the facility to the extent that those policies and procedures are consistent with this Exhibit.

Visits authorized under paragraph 33 shall be scheduled no less than seven (7) business days in advance. The names, positions, credentials, and professional association (e.g., Center for Human Rights and Constitutional Law) of the visitors will be provided at that time.

All visits with class members shall take place during normal business hours.

No video recording equipment or cameras of any type shall be permitted. Audio recording equipment shall be limited to hand-held tape recorders.

The number of visitors will not exceed six (6) or, in the case of a family foster home, four (4), including interpreters, in any instance. Up to two (2) of the visitors may be non-attorney experts in juvenile justice and/or child welfare.

No visit will extend beyond three (3) hours per day in length. Visits shall minimize disruption to the routine that minors and staff follow.

1

**Exhibit 8**
**Page 604**

Exhibit 5

Exhibit 8
Page 605

EXHIBIT 5

LIST OF ORGANIZATIONS TO RECEIVE INFORMATION RE: SETTLEMENT AGREEMENT

Eric Cohen, Immig. Legal Resource Center, 1663 Mission St. Suite 602, San Francisco, CA 94103

Cecilia Munoz, Nat'l Council Of La Raza, 810 1st St. NE  Suite 300, Washington, D.C. 20002

Susan Alva, Immig. & Citiz. Proj Director, Coalition For Humane Immig Rights of LA, 1521 Wilshire Blvd., Los Angeles, CA 90017

Angela Cornell, Albuquerque Border Cities Proj., Box 35895, Albuquerque, NM 87176-5895

Beth Persky, Executive Director, Centro De Asuntos Migratorios, 1446 Front Street, Suite 305, San Diego, CA 92101

Dan, Kesselbrenner, , National Lawyers Guild, National Immigration Project, 14 Beacon St.,#503, Boston, MA 02108

Lynn Marcus , SWRRP, 64 E. Broadway, Tucson, AZ 85701-1720

Maria Jimenez, , American Friends Service Cmte., ILEMP, 3522 Polk Street, Houston, TX 77003-4844

Wendy Young, , U.S. Cath. Conf., 3211 4th St. NE, , Washington, DC, 20017-1194

Miriam Hayward , International Institute Of The East Bay, 297 Lee Street , Oakland, CA 94610

Emily Goldfarb, , Coalition For Immigrant & Refugee Rights, 995 Market Street, Suite 1108 , San Francisco, CA 94103

Jose De La Paz, Director, California Immigrant Workers Association, 515 S. Shatto Place , Los Angeles, CA, 90020

Annie Wilson, LIRS, 390 Park Avenue South, First Asylum Concerns, New York, NY 10016

Stewart Kwoh, Asian Pacific American Legal Center, 1010 S. Flower St., Suite 302, Los Angeles, CA 90015

Warren Leiden, Executive Director, AILA, 1400 Eye St., N.W., Ste. 1200, Washington, DC, 20005

Frank Sharry, Nat'l Immig Ref & Citiz Forum, 220 I Street N.E., Ste. 220, Washington, D.C. 20002

Reynaldo Guerrero, Executive Director, Center For Immigrant's Rights, 48 St. Marks Place , New York, NY 10003

1

**Exhibit 8**
**Page 606**

Charles Wheeler , National Immigration Law Center, 1102 S. Crenshaw Blvd., Suite 101  , Los Angeles, CA 90019

Deborah A. Sanders, Asylum & Ref. Rts Law Project, Washington Lawyers Comm., 1300 19th Street, N.W., Suite 500 , Washington, D.C. 20036

Stanley Mark, Asian American Legal Def.& Ed.Fund, 99 Hudson St, 12th Floor, New York, NY 10013

Sid Mohn, Executive Director, Travelers & Immigrants Aid, 327 S. LaSalle Street, Suite 1500, Chicago, IL, 60604

Bruce Goldstein, Attornet At Law, Farmworker Justice Fund, Inc., 2001 S Street, N.W., Suite 210, Washington, DC 20009

Ninfa Krueger, Director, BARCA, 1701 N. 8th Street, Suite B-28, McAllen, TX 78501

John Goldstein, , Proyecto San Pablo, PO Box 4596,, Yuma, AZ 85364

Valerie Hink, Attorney At Law, Tucson Ecumenical Legal Assistance, P.O. Box 3007 , Tucson, AZ 85702

Pamela Mohr, Executive Director, Alliance For Children's Rights, 3708 Wilshire Blvd. Suite 720, Los Angeles, CA 90010

Pamela Day, Child Welfare League Of America, 440 1st St. N.W., , Washington, DC 20001

Susan Lydon, Esq., Immigrant Legal Resource Center, 1663 Mission St. Ste 602, San Francisco, CA 94103

Patrick Maher, Juvenile Project, Centro De Asuntos Migratorios, 1446 Front Street, # 305, San Diego, CA 92101

Lorena Munoz, Staff Attorney, Legal Aid Foundation of LA-IRO, 1102 Crenshaw Blvd., Los Angeles, CA 90019

Christina Zawisza, Staff Attorney, Legal Services of Greater Miami, 225 N.E. 34th Street, Suite 300, Miami, FL 33137

Miriam Wright Edelman, Executive Director, Children's Defense Fund, 122 C Street N.W.  4th Floor, Washington, DC 20001

Rogelio Nunez, Executive Director, Proyecto Libertad, 113 N. First St., Harlingen, TX  78550

**Exhibit 8**
**Page 607**

Exhibit 6

Exhibit 8
Page 608

EXHIBIT 6
NOTICE OF RIGHT TO JUDICIAL REVIEW

"The INS usually houses persons under the age of 18 in an open setting, such as a foster or group home, and not in detention facilities.  If you believe that you have not been properly placed or that you have been treated improperly, you may ask a federal judge to review your case.  You may call a lawyer to help you do this.  If you cannot afford a lawyer, you may call one from the list of free legal services given to you with this form."

**Exhibit 8**
**Page 609**

PROOF OF SERVICE BY MAIL

I, Sonia Fuentes, declare and say as follows:

1. I am over the age of eighteen years and am not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 South Occidental Boulevard, Los Angeles, California 90057, in said county and state.

2. On January ___, 1997, I served the attached STIPULATED SETTLEMENT AGREEMENT on defendants in this proceeding by placing a true copy thereof in a sealed envelope addressed to their attorneys of record as follows:

> Mr. Michael Johnson
> Assistant U.S. Attorney
> 300 N. Los Angeles St. #7516
> Los Angeles, CA 90012

and by then sealing said envelope and depositing the same, with postage thereon fully prepaid, in the mail at Los Angeles, California; that there is regular delivery of mail between the place of mailing and the place so addressed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___th day of January, 1997, at Los Angeles, California.

/ / /

- 3 -

Exhibit 8
Page 610

LODGED

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguin
Peter A. Schey
Charles Song
256 South Occidental Boulevard
Los Angeles, CA  90057
Telephone: (213) 388-8693; Fax: (213) 386-9484

LATHAM & WATKINS
Steven Schulman
555 Eleventh St., NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2184

*Of counsel:*

YOUTH LAW CENTER
Alice Bussiere
417 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 543-3379 x 3903

*Attorneys for plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JENNY LISETTE FLORES, et al., | ) | Case No. CV 85-4544-RJK(Px) |
| | ) | |
| Plaintiffs, | ) | STIPULATION EXTENDING |
| | ) | SETTLEMENT AGREEMENT AND FOR |
| -vs- | ) | OTHER PURPOSES; AND ORDER |
| | ) | THEREON |
| JANET RENO, Attorney General | ) | |
| of the United States, et al. | ) | |
| | ) | |
| Defendants. | ) | |

/ / /

Exhibit 8
Page 611

1

2      IT IS HEREBY STIPULATED by and between the parties as follows:

3      1. Paragraph 40 of the Stipulation filed herein on January 17, 1997, is modified to read

4      as follows:

5      "All terms of this Agreement shall terminate ~~the earlier of five years after the date of~~

6      ~~final court approval of this Agreement or three years after the court determines that~~

7      ~~the INS is in substantial compliance with this Agreement,~~ *45 days following defendants'*

8      *publication of final regulations implementing this Agreement*

9      ~~except that~~ *Notwithstanding the foregoing,* the INS shall continue to house the general

10     population of minors in INS custody in facilities that are state-licensed for the care of

11     dependent minors."

12     / / /

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit 8**
**Page 612**

1    2  For a period of six months from the date this Stipulation is filed, plaintiffs shall not

2    initiate legal proceedings to compel publication of final regulations implementing this

3    Agreement  Plaintiffs agree to work with defendants cooperatively toward resolving

4    disputes regarding compliance with the Settlement. The parties agree to confer regularly no

5    less frequently than once monthly for the purpose of discussing the implementation of and

6    compliance with the settlement agreement  However, nothing herein shall require plaintiffs

7    to forebear legal action to compel compliance with this Agreement where plaintiff class

8    members are suffering irreparable injury

9    Dated: December 7, 2001.                    CENTER FOR HUMAN RIGHTS &
                                                 CONSTITUTIONAL LAW
10                                               Carlos Holguín
                                                 Peter A. Schey
11
                                                 LATHAM & WATKINS
12                                               Steven Schulman

13                                               YOUTH LAW CENTER
14                                               Alice Bussière

15

16                                               _____
                                                 Carlos Holguín, for plaintiffs.
17
     Dated: December 7, 2001                     Arthur Strathern
18                                               Office of the General Counsel
                                                 U.S. Immigration & Naturalization Service
19

20
                                                 _____
21                                               Arthur Strathern, for defendants
22                                               Per tax authorization

23

24   IT IS SO ORDERED

25   Dated: December _____ 2001
                                                 _____
                                                 UNITED STATES DISTRICT JUDGE

26

27

28

**Exhibit 8**
**Page 613**

1          2. For a period of six months from the date this Stipulation is filed, plaintiffs shall not

2    initiate legal proceedings to compel publication of final regulations implementing this

3    Agreement. Plaintiffs agree to work with defendants cooperatively toward resolving

4    disputes regarding compliance with the Settlement. The parties agree to confer regularly no

5    less frequently than once monthly for the purpose of discussing the implementation of and

6    compliance with the settlement agreement. However, nothing herein shall require plaintiffs

7    to forebear legal action to compel compliance with this Agreement where plaintiff class

8    members are suffering irreparable injury.

9    Dated: December 7, 2001.                      CENTER FOR HUMAN RIGHTS &
                                                    CONSTITUTIONAL LAW
10                                                  Carlos Holguin
                                                    Peter A. Schey
11

12                                                  LATHAM & WATKINS
                                                    Steven Schulman
13

14                                                  YOUTH LAW CENTER
                                                    Alice Bussiere
15

16

17                                                  _____
                                                    Carlos Holguin, *for plaintiffs*
18   Dated: December 7, 2001.
                                                    Arthur Strathern
19                                                  Office of the General Counsel
                                                    U.S. Immigration & Naturalization Service
20

21

22                                                  _____
                                                    Arthur Strathern, *for defendants*
23                                                  Per fax authorization

24

25   IT IS SO ORDERED

26   Dated: December 7, 2001.

27                                                  _____
                                                    UNITED STATES DISTRICT JUDGE
28

                                      - 3 -

**Exhibit 8**
**Page 614**

PROOF OF SERVICE BY MAIL

I, Carlos Holguin, declare and say as follows:

1  I am over the age of eighteen years and am not a party to this action.  I am employed in the County of Los Angeles, State of California.  My business address is 256 South Occidental Boulevard, Los Angeles, California 90057, in said county and state

2  On December 7, 2001, I served the attached STIPULATION on defendants in this proceeding by placing a true copy thereof in a sealed envelope addressed to their attorneys of record as follows:

Arthur Strathern
Office of the General Counsel
U.S. Immigration & Naturalization Service
425 I St. N.W.
Washington, DC  20536

and by then sealing said envelope and depositing the same, with postage thereon fully prepaid, in the mail at Los Angeles, California; that there is regular delivery of mail between the place of mailing and the place so addressed.

I declare under penalty of perjury that the foregoing is true and correct

Executed this 7th day of December, 2001, at Los Angeles, California

Exhibit 8
Page 615

# Exhibit 9

Exhibit 9
Page 616

CONFIDENTIAL

Page 1

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                         WESTERN DIVISION

4

5     _____

                                          )

6     LUCAS R., et al.,                   )

                                          )

7              Plaintiffs,                )

                                          )   Case No.

8     vs.                                 )

                                          )   2:18-cv-05741

9     ALEX AZAR, Secretary of U.S. )   DMG-PLA

      Department of Health and            )

10    Human Services, et al.,             )

                                          )

11             Defendants.                )

      _____)

12

13

14                         CONFIDENTIAL

15

16          DEPOSITION OF STEPHEN ANTKOWIAK

17                    Washington, DC

18                    October 28, 2019

19

20

21

22

23

24    Reported by:  John L. Harmonson, RPR

25    Job No. 170113

Page 159

1          So I think they're going to be

2    looking, again, at the information contained in

3    the case manager's notes and the clinician's

4    notes, conversations during the case staffings,

5    what's occurring with that individual.  If there

6    are any potential SIRs that may have come in

7    regarding that minor, and having discussions with

8    the staff and the recommendations from the

9    facility that are made to ORR staff.

10        Q.    And are children involved in that

11   process at all?

12        A.    I mean, they're certainly going to be

13   interviewed by the facility staff during that

14   process by the clinicians and the case managers.

15        Q.    And does that interview happen before

16   they're stepped up to the RTC?

17        A.    It certainly should be.

18        Q.    Do you know whether it usually is?

19        A.    I don't know.  I would have to ask my

20   staff for history.

21        Q.    Do you know whether family members are

22   involved in that process at all?

23        A.    Again, I don't know.  I would have to

24   ask my staff, but ideally they should be.

25        Q.    What about a child's attorney, if they

CONFIDENTIAL

Page 160

1    have one?

2         A.    Yes, ideally it would make sense to

3    talk to them.  But I would have to look at the

4    policy or the procedures.

5         Q.    Do decisions to place a kid in RTC, do

6    they ever get escalated to you?

7         A.    They haven't while I've been there.

8    Actually, that's not true.  So I have been

9    involved in one case where they were trying to

10   identify an out-of-network placement for a child.

11   So I was involved in those discussions, but they

12   didn't seek my approval.  They were just giving

13   me a status update on what was going on with this

14   individual.

15        Q.    Why did this case merit updating you

16   on the status of it?

17        A.    Because they were trying to identify

18   an appropriate placement.  First they ended up

19   identifying an out-of-network placement for this

20   individual.

21        Q.    So are you commonly involved in the

22   discussion if a child is going to be placed in an

23   out-of-network facility?

24        A.    I would like to be generally if that's

25   going to be the case.  That one was a

**Exhibit 9**
**Page 619**

CONFIDENTIAL

Page  277

1                    ACKNOWLEDGMENT OF DEPONENT

2

3        I, STEPHEN ANTKOWIAK, have read or have had

4    the foregoing testimony read to me and hereby

5    certify that it is a true and correct

6    transcription of my testimony with the exception

7    of any attached corrections or changes.

8

9

10    _____

11    STEPHEN ANTKOWIAK

12    [ ] No corrections

13    [ ] Correction sheet(s) enclosed

14

15        SUBSCRIBED AND SWORN TO BEFORE ME, the

16    undersigned authority, by the witness, STEPHEN

17    ANTKOWIAK, on this the _____ day of

18    _____, _____.

19

20

21

22

23

24

25

CONFIDENTIAL

Page 278

1                C E R T I F I C A T E

2

3    DISTRICT OF COLUMBIA

4            I, JOHN L. HARMONSON, a Notary Public

5    within and for the District of Columbia, do

6    hereby certify:

7            That STEPHEN ANTKOWIAK, the witness

8    whose deposition is hereinbefore set forth, was

9    duly sworn or affirmed by me and that such

10   deposition is a true record of the testimony

11   given by such witness.

12           That if the foregoing pertains to a

13   federal case, before completion of the

14   proceedings, review and signature of the

15   transcript [x] was [ ] was not requested.

16           I further certify that I am not related

17   to any of the parties to this action by blood or

18   marriage; and that I am in no way interested in

19   the outcome of this matter.

20           IN WITNESS WHEREOF, I have hereunto set

21   my hand this 7th day of November, 2019.

22

23                    _John L. Harmonson_

                      _____

24                    JOHN L. HARMONSON, RPR

                      My commission expires: 11/14/20

25

# Exhibit 10

**Exhibit 10**
**Page 622**

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              WESTERN DIVISION

4

5  --------------------------------x

6  LUCAS R., et al.,                    Case No.

7        Plaintiffs,                    2:18-cv-05741

8  v.

9  ALEX AZAR, Secretary of U.S.

10 Department of Health and Human

11 Services, et al.,

12        Defendants.

13 --------------------------------x

14

15

16

17        * C O N F I D E N T I A L *

18    DEPOSITION OF MICHAEL BARTHOLOMEW, MD

19              Washington, D.C.

20              December 3, 2019

21

22

23

24

25   Job No. 170115

Exhibit 10
Page 623

1  what we prefer.  So those announcements are out.

2  They're open until filled.

3      We suspect that after the major holidays, come

4  springtime, then people are going to start

5  gravitating toward filling those positions, with

6  probably the anticipation of relocating, if that's

7  what's needed, during the summer.  Again, most people

8  do not like to move during the holidays.

9      We've tried to bring on people around this

10  time, and we haven't been successful; however, given

11  the springtime, people tend to start thinking about

12  relocations and changes, particularly those with

13  families and children.

14      So we hope by the end of the summer that we'll

15  have all those positions filled.

16      Q.  And is there a reason that you focus on

17  Commissioned Corps officers for these positions?

18      A.  Well, some of the positions, my

19  understanding, some of the positions are physicians.

20  And ACF, my understanding, is that ACF doesn't have

21  the pay authority that some of the other agencies do

22  to hire civil servants as a physician, at least

23  that's what I recall.

24      So it's easier to bring in a Commissioned

25  Corps physician.  That's why all the physicians

Exhibit 10
Page 624

Confidential

Page 44

1   within ORR are Commissioned Corps officers.  And I

2   think, overall, it's easier to fill positions through

3   Commissioned Corps than it is civil servants, and

4   it's more efficient.

5          Q.  Why is it more efficient?

6          A.  Because I could write up orders,

7   relocation requests for personnel action to

8   Commissioned Corps, and, once I get all the paperwork

9   done and completed, typically 30 days to issue orders

10  for that officer to relocate, which I don't think

11  you'll find in the civil service.  You can't move an

12  officer that quickly.  You can't move somebody that

13  quickly, I don't believe.

14          MS. WELCH:  Okay.  Why don't we take a

15  break.  We've been going about an hour.

16       (Proceedings recessed at 10:34 a.m.)

17       (In session at 10:44 a.m.)

18          THE WITNESS:  I have something to clarify.

19  BY MS. WELCH:

20       Q.  Oh, sure.

21       A.  So you asked whether I had been deposed

22  before.

23       Q.  Okay.

24       A.  I have.

25       Q.  Oh, okay.

**Exhibit 10**
**Page 625**

Confidential

1   The system, the medical module and the portal, is set

2   up so when there's something that is entered into the

3   system in a certain way, then an email will be

4   generated, auto-notification to our system.

5         For instance, if someone was to enter in

6   tuberculosis, we will get auto-notified that someone

7   entered in tuberculosis as a working diagnosis, and

8   we will follow that up.  We will identify the child;

9   we'll look at the record; we'll look at the current

10  medical evaluation and make a determination on what

11  needs to be done next.

12        Chicken pox is the same way, otherwise known

13  as varicella.  So a lot of the communicable diseases

14  that we are getting concerned about we would see

15  auto-notifications for -- STDs, HIV, Hep, all that

16  stuff.  SIRs will come into our system as well.  So

17  SIRs are a product of the policy group; they are not

18  owned by us.  However, programs -- and there's, I

19  think, some confusion about what is an SIR and what

20  needs to be entered in as an SIR.

21        I think some programs are instructed to throw

22  everything and anything into an SIR, which then comes

23  into our resource mailbox, which then we have to

24  review and see if there's anything actionable on it.

25        Q.  So you're getting -- however policy is

Exhibit 10
Page 626

1    refusing psychotropic medications, it's mainly noted,

2    but if we see it happening more times than not, then

3    we'll say -- we'll instruct the program -- we'll

4    provide guidance to the program to reach out to the

5    mental health provider to let them know that the

6    child is refusing the medications and to review the

7    current care being provided and make changes, if

8    appropriate.

9         Q.  So refusing to take meds constitutes an

10   SIR?

11        A.  Not really, but folks will -- programs

12   will put that in an SIR.  I don't think it meets that

13   standard criteria of why an SIR should be

14   implemented.

15        Q.  Did you -- when you first came on the job

16   or since, have you received any specific training for

17   the job?

18        A.  Aside from what the job entailed, I mean,

19   there's a -- I wouldn't say there's a training, you

20   have a week of training or two weeks of training,

21   nothing as standardized as that, but there's an

22   onboarding process that we use to get people up to --

23   up to the task of what we need them to do.

24        I would say a lot of the difficulties is

25   managing mass volumes and email notifications and how

**Exhibit 10**

```
1                 ACKNOWLEDGMENT OF DEPONENT

2

3           I, MICHAEL BARTHOLOMEW, MD, do hereby

4      acknowledge that I have read and examined the

5      foregoing testimony and that the same is a true,

6      correct and complete transcription of the testimony

7      given by me, with the exception of the noted

8      corrections, if any, appearing on the attached errata

9      page(s).

10      _____          _____

11      DATE               MICHAEL BARTHOLOMEW, MD

12

13

14      Subscribed and sworn to before me this _____ day of

15      _____, 20_____  .

16      _____ (Notary Public)

17      My Commission expires: _____

18

19

20

21

22

23

24

25
```

**Exhibit 10**
**Page 628**

Confidential

```
 1                C E R T I F I C A T E

 2

 3        I, LINDA S. KINKADE, Registered Diplomate

 4   Reporter, Certified Realtime Reporter, Registered

 5   Merit Reporter, Certified Shorthand Reporter, and

 6   Notary Public, do hereby certify that prior to the

 7   commencement of examination the deponent herein was

 8   duly sworn by me to testify truthfully under penalty

 9   of perjury.

10        I FURTHER CERTIFY that the foregoing is a true

11   and accurate transcript of the proceedings as reported

12   by me stenographically to the best of my ability.

13        I FURTHER CERTIFY that I am neither counsel for

14   nor related to nor employed by any of the parties to

15   this case and have no interest, financial or

16   otherwise, in its outcome.

17        IN WITNESS WHEREOF, I have hereunto set my hand

18   and affixed my notarial seal this 13th day of December,

19   2019.

20        My commission expires:  July 31, 2022

21   Linda S Kinkade

22   _____

23   NOTARY PUBLIC IN AND FOR

24   THE DISTRICT OF COLUMBIA

25
```

**Exhibit 10**
**Page 629**

# Exhibit 11

**Exhibit 11**
**Page 630**

Page 1

1                  UNITED STATES DISTRICT COURT

                 CENTRAL DISTRICT OF CALIFORNIA

2                        Western Division

3      - - - - - - - - - - - - - -+

                                  |

4     LUCAS, R., et al.,          |

                                  |

5             Plaintiffs,         |     Case Number:

                                  |

6       vs.                       |     2:18-cv-05741

                                  |

7     ALEX AZAR, Secretary of     |

      U.S. Department of Health   |

8     and Human Services, et al.,|

                                  |

9             Defendants.         |

                                  |

10     - - - - - - - - - - - - - -+

11

12                  ***CONFIDENTIAL***

13            Rule 30(b)(6) Deposition of the

14            Office of Refugee Resettlement,

15       by and through its designated representative,

16            MICHAEL E. BARTHOLOMEW, M.D.

17                  Washington, D.C.

18            Friday, February 28, 2020

19                     9:00 a.m.

20

21

22

23     Job No. 177427

24     Reported by:  Laurie Donovan, RPR, CRR, CLR

25

Confidential

Page 43

1       ahead and answer.

2                In addition, we also object as

3       outside the noticed topics, so you can answer

4       in your personal knowledge.

5                THE WITNESS:  So sorry to do this

6       one more time.  I'm trying to maneuver

7       through this --

8   BY MS. SHUM:

9       Q    Please allow me to restate the question.

10      A    Excellent.

11      Q    ORR is not required to go through any

12  sort of formal public rulemaking process in order

13  to update or revise its internal agency policies;

14  is that correct?

15               MR. MOSS:  And for a clear record,

16      the objections are to scope and to the extent

17      it calls for a legal conclusion.

18               You can answer.

19               THE WITNESS:  I'm not -- I would

20      say that my understanding is that public

21      viewing -- just for clarification, you're

22      referencing whether these policies need to

23      go, for instance, in an FRN for public

24      comment before implementing?

25

**Exhibit 11**
**Page 632**

Confidential

Page 44

1  BY MS. SHUM:

2      Q    Correct, mm-hmm.

3      A    My understanding is they don't, but in

4  my personal capacity, that's something that I

5  don't, as a division director, have any expertise

6  in, but my understanding is that they don't.

7      Q    How does ORR communicate updates or

8  revisions to its policies to all of its federal

9  staff?

10     A    Policies --

11          MR. MOSS:  Object to the scope of

12     that question as being outside the scope of

13     the noticed topics that Dr. Bartholomew has

14     been prepared to testify.

15          You can answer in your personal

16     knowledge.

17          THE WITNESS:  So policies that are

18     updated or created and advanced are

19     typically -- current, current structure is

20     that the ORR internal staff will have the

21     opportunity to review and comment.

22          Once final, there is a training and

23     review of those policies so that ORR staff

24     understands what the either new policy is or

25     what the changes are to the current policy,

**Exhibit 11**
**Page 633**

1      understanding the policies and adhering to

2      our policies and procedures.

3  BY MS. SHUM:

4      Q    Is the Manual of Procedures or the MAP,

5  is that intended to offer more specific items to

6  ORR's care providers and grantees about how those

7  policies and practices are supposed to be

8  implemented?

9      A    That's my understanding, yes.

10     Q    And there is an expectation that all of

11 the provider staff should be familiar with and

12 compliant with all of the guidance that is

13 contained in the MAP; is that correct?

14     A    That's my understanding.

15     Q    Is the MAP updated every single time

16 that the ORR policy is updated?

17          MR. MOSS:  Objection to the scope.

18          You can answer in your personal

19     knowledge.

20          THE WITNESS:  Personally, I would

21     say that the MAP is not -- it's not a

22     one-for-one meeting that the policy is

23     updated or changed.  I think that they do

24     their due diligence and try to update the

25     MAP, if applicable, to any updated policy

**Exhibit 11**
**Page 634**

Confidential

Page 47

1    changes, any new policies.  I think there's

2    probably a lag time of getting any type of

3    procedures associated with those policies to

4    provide guidance to the programs.

5  BY MS. SHUM:

6       Q    And how does ORR communicate updates to

7  the MAP to its care providers and grantees and

8  their staff?

9                 MR. MOSS:  Objection to the scope.

10       Outside the noticed topics.

11                 You can answer in your personal

12       knowledge.

13                 THE WITNESS:  Typically, again

14       through email communications and distribution

15       of the notice that procedures have been

16       updated or there are new procedures, et

17       cetera.

18  BY MS. SHUM:

19       Q    So other than the ORR Policy Guide and

20  the MAP, does ORR generate other written documents

21  that outline the expectations for ORR staff and

22  its care providers?

23       A    Can you repeat the question one more

24  time?

25       Q    Sure.  So other than the ORR Policy

**Exhibit 11**
**Page 635**

Confidential

Page 118

1   governing distribution of medications to

2   populations that would encompass unaccompanied

3   children, they need to incorporate those as well.

4        Q    So the --

5        A    I'm sorry.  That, that goes toward the

6   licensure in particular.

7        Q    I apologize for interrupting.

8             So the ORR policy reflected in 3.4.4

9   would essentially map onto the existing state law

10  requirements and licensing requirements that would

11  apply related to the administration and the

12  prescription of psych meds?

13       A    That's correct.

14                 MR. MOSS:  Objection; vague.

15  BY MS. SHUM:

16       Q    Okay.  Does ORR have a policy or

17  practice that children should receive mental

18  health services prior to being administrated

19  psychotropic medications?

20       A    Can you repeat that again?

21       Q    Absolutely.  Does ORR have a policy or

22  practice that children should receive mental

23  health services or interventions prior to being

24  prescribed and administered psychotropic

25  medications?

Confidential

Page 255

1

2

3

4

5

6                  ACKNOWLEDGEMENT OF WITNESS

7                       I, Michael E. Bartholomew, M.D., do

8           hereby acknowledge that I have read and

9           examined the foregoing testimony, and the

10          same is a true, correct and complete

11          transcription of the testimony given by me,

12          and any corrections appear on the attached

13          Errata sheet signed by me.

14

15

16     _____   _____

17     (DATE)                     (SIGNATURE)

18

19

20

21

22

23

24

25

Confidential

Page 257

1

2

3

4

5      CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

6                      I, Laurie Donovan, Registered
       Professional Reporter, Certified Realtime

7      Reporter, and notary public for the District
       of Columbia, the officer before whom the

8      foregoing deposition was taken, do hereby
       certify that the foregoing transcript is a

9      true and correct record of the testimony
       given; that said testimony was taken by me

10     stenographically and thereafter reduced to
       typewriting under my supervision; and that I

11     am neither counsel for, related to, nor
       employed by any of the parties to this case

12     and have no interest, financial or otherwise,
       in its outcome.

13

                       IN WITNESS WHEREOF, I have hereunto

14     set my hand and affixed my notarial seal this
       11th day of March 2020.

15

16     My commission expires:  March 14, 2022

17

18        *Laurie Donovan*

19     _____

20     LAURIE DONOVAN
       NOTARY PUBLIC IN AND FOR

21     THE DISTRICT OF COLUMBIA

22

23

24

25

**Exhibit 11**
**Page 638**

# Exhibit 12

Exhibit 12
Page 639

1                    Confidential

2           FOR THE UNITED STATES DISTRICT COURT

3    CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

4             Case No.  2:18-CV-05741-MG-PLA

5

6    _____

7    LUCAS R., et al.,                    )

8             Plaintiffs,                 )

9          v.                             )

10   ALEX AZAR, Secretary of U.S.         )

11   Department of Health and             )

12   Human Services, et al.,              )

13            Defendants.                 )

14   _____

15                 CONFIDENTIAL

16            DEPOSITION OF TOBY BISWAS

17               Washington, D.C.

18               November 13, 2019

19

20

21

22

23

24   REPORTED BY:  Barbara DeVico, CRR, RMR

25   JOB NO. 170311

Exhibit 12
Page 640

Page 69

1                    Confidential

2    the basis of a decision and then the last paragraph

3    from the page, the care provider documents the

4    basis for stepping up or stepping down a UAC into

5    or from a secure or staff secure care provider in

6    the UAC's case file and provides the information to

7    the youth's attorney of record, legal service

8    provider or child advocate on demand.

9          Q.    That doesn't say the child, does it?

10         A.    "When a UAC is stepped up to a more

11   restrictive setting, secure, staff secure or RTC

12   facility, he or she is provided with a notice of

13   placement and restrictive setting in language he or

14   she understands within a reasonable time either

15   before or after ORR's placement decision."

16         Q.    Okay.  So the first sentence that

17   you read refers to the documentation that the care

18   provider has collected, I guess, or that's the

19   basis for the step-up or step-down?  And that

20   that's provided to, on demand to the attorney,

21   legal services provider or child advocate; correct?

22         A.    Correct.

23         Q.    Okay.  And what the child is

24   provided in the second sentence is the notice,

25   right?

**Exhibit 12**
**Page 641**

Page 70

1                    Confidential

2          A.      Yes.

3          Q.      And so the notice does not contain

4    all the care provider documentation, does it?

5          A.      It provides a summary of the

6    information.

7          Q.      Right.  And it doesn't provide all

8    the documentation, does it?

9          A.      The notice does not.

10         Q.      Okay.  Would you agree that the

11   information that's referred to in the first

12   sentence that would be provided to a youth's

13   attorney, et cetera, on demand would be more

14   detailed and comprehensive than the summary that's

15   in the notice of placement?

16         A.      It may.

17                 MR. WHITE:  Now we can take a

18             break.

19                      (Recess)

20                 MR. WHITE:  We're back on the

21             record.

22   BY MR. WHITE:

23         Q.      So we were just talking about the

24   section of the policy guide that talks about

25   information provided to children in a 30-day

**Exhibit 12**
**Page 642**

Confidential

1

2          A.      That would be something that would

3   be under the evaluation of the licensed

4   psychologist or psychiatrist to determine.

5          Q.      So you don't know what criteria are

6   used?

7          A.      Well, we would -- the four criteria

8   that are listed in this policy are the reasons why

9   a transfer would happen.  I think the individual

10  factors in an individual case would be something

11  that would be made by the professional judgment of

12  a licensed psychologist or psychiatrist.

13         Q.      So given that the children are in

14  ORR custody, I'm trying to understand the

15  difference between outpatient and inpatient in this

16  context.

17         A.      So if the services couldn't be -- if

18  the child had a mental health need that we couldn't

19  just address by having the child go to a

20  psychologist in the community a couple of times a

21  week for therapy sessions or have that therapist

22  come to the shelter, for instance, that their needs

23  couldn't be handled in that manner, that they

24  needed a full residential treatment center, the

25  resources that those types of programs have, then

**Exhibit 12**
**Page 643**

1                        Confidential

2      the child would be transferred.

3            Q.    And are the case managers involved

4      in that determination at all, or is it exclusively

5      that of a psychologist or psychiatrist?

6            A.    The case managers are kind of

7      running down the paperwork.  But the psychologists

8      and psychiatrists are the ones that make the

9      decision.

10           Q.    So the decision whether outpatient

11     or inpatient is appropriate, the case manager has

12     no role in that decision other than running down

13     the paperwork?

14           A.    More or less, yes.

15           Q.    Well, when you say it that way, I

16     need to understand what the "less" is.  What would

17     be the case manager's role?

18           A.    I mean, they would be -- they're

19     managing the child's general case outside their

20     sort of, the mental health piece of it.  So they

21     would be trying to connect the parties that need to

22     talk in these scenarios.

23           Q.    Okay.  But are they making

24     recommendations, inpatient versus outpatient?

25           A.    No.

**Exhibit 12**
**Page 644**

1          Confidential

2     A.      Correct.

3     Q.      So is there any requirement for the

4  supervisor to track these 90-day placements?  Is

5  there any guidance for what their supervision looks

6  like here?

7     A.      I mean, it would be sort of the

8  normal function of their job to ensure the children

9  are properly placed.

10     Q.      Okay.  So that's a no.  There's not

11  any other guidance in the policy?

12     A.      No.

13     Q.      Do attorneys for the children have

14  any role in the step-up process?

15     A.      They request the reasons for the

16  placement that are provided them.  They are

17  provided notices that the children are being

18  transferred.

19     Q.      After the transfers happened?

20     A.      Yes.

21     Q.      Is it the same notice that you give

22  the children, notice of placement?

23     A.      No, the case manager would email or

24  call them to let them know that the child is being

25  transferred.

**Exhibit 12**
**Page 645**

Page 274

Confidential

C E R T I F I C A T E

1

2

3

4   LUCAS R., et al.,              )

5        v.                       )

6   ALEX AZAR, et al.,            )

7

8

9        I, BARBARA DeVICO, a Notary Public within and

10   for the District of Columbia , do hereby certify:

11        That TOBY BISWAS, the witness whose

12   deposition is hereinbefore set forth, was duly

13   sworn by me and that such deposition is a true

14   record of the testimony by such witness.

15        I further certify that I am not related to

16   any of the parties to this action by blood or

17   marriage; and that I am in no way interested in the

18   outcome of this matter.

19        IN WITNESS WHEREOF, I have hereunto set my

20   hand this 27th of November, 2019.

21

22

23   _____

24        BARBARA DeVICO

25

# Exhibit 13

**Exhibit 13**
**Page 647**

1            UNITED STATES DISTRICT COURT
          CENTRAL DISTRICT OF CALIFORNIA
2                Western Division

3    - - - - - - - - - - - - - - -+
                                  |
4    LUCAS, R., et al.,           |
                                  |
5            Plaintiffs,          |    Case Number:
                                  |
6      vs.                        |    2:18-cv-05741
                                  |
7    ALEX AZAR, Secretary of      |
     U.S. Department of Health    |
8    and Human Services, et al.,  |
                                  |
9            Defendants.          |
                                  |
10   - - - - - - - - - - - - - - -+

11

12              ***CONFIDENTIAL***

13         Rule 30(b)(6) Deposition of the

14         Office of Refugee Resettlement,

15    by and through its designated representative,

16            TOBY R.M. BISWAS, ESQ.

17            Washington, D.C.

18         Tuesday, February 18, 2020

19                 9:00 a.m.

20                (VOLUME 1)

21

22

23   Job No. 177358

24   Reported by:  Laurie Donovan, RPR, CRR, CLR

25

Exhibit 13
Page 648

Confidential

Page 14

```
 1   placement options?

 2        A     Yes.

 3        Q     And that is followed by staff secure?

 4        A     Yes.

 5        Q     And then that would be followed -- which

 6   is more secure; the secure placements or RTC

 7   placements?

 8        A     We generally think of them as the same

 9   level of restriction.

10        Q     And out-of-network placements, where do

11   they fall in the hierarchy of security?

12        A     It depends.  So for those facilities

13   that are really hospitals, as secure as any

14   hospital would be; and then for the RTC type

15   facilities, as secure as an RTC would be.

16        Q     Okay, and are children whom ORR receives

17   directly from Border Patrol placed in -- does ORR

18   on occasion place children in all the different

19   types of facilities we've been discussing, or is

20   there some -- are there some facilities where ORR

21   will not place a child initially after receiving

22   him or her from the Border Patrol?

23        A     By practice, it would be very unlikely

24   that we would directly place a child into an RTC

25   facility unless that child had previously been in
```

**Exhibit 13**
**Page 649**

1      A    I guess what do you mean by "dependent

2  children"?

3      Q    Nondelinquent children.

4      A    Yes.

5      Q    So is there any difference in the

6  license that a staff secure facility would have

7  from what a shelter facility has?

8      A    No.

9      Q    What about going to the secure

10 facilities; do they have the same sort of license

11 that a shelter has?

12     A    No.

13     Q    What sort of license, if any, do they

14 have?

15     A    The one secure facility we currently

16 operate is licensed by a juvenile justice agency.

17     Q    Okay, and is that the Shenandoah Valley

18 Juvenile Center?

19     A    Shenandoah Valley, yes.

20     Q    And the Shenandoah Valley facility is a

21 juvenile hall; is that correct?

22     A    I don't know how it's specifically

23 licensed, but it appears and looks like a juvenile

24 justice facility.

25     Q    How does -- how, if any -- how, if at

1  all, does the Shenandoah Valley Juvenile Center

2  differ from a jail?

3      A    Well, its population are just juveniles

4  and not adults.

5      Q    Any other difference you can think of?

6      A    I think the folks that work there are

7  trained in juvenile justice and not in adult

8  detention.

9      Q    Okay, but the, but the security, the

10  level of security in terms of fencing and guards

11  and so forth is equivalent to a jail at Shenandoah

12  Valley; is that correct?

13      A    Yes.

14      Q    All right.  Is there any limit on the

15  amount of time that a child may be placed by ORR

16  at Shenandoah Valley?

17      A    They are required to have a review every

18  30, at least every 30 days of their placement in

19  any restrictive setting.

20      Q    But is there a requirement that at the

21  conclusion of that review, that the child be

22  transferred out of the facility?

23      A    If they're determined to no longer meet

24  the requirements that constitute a placement in

25  that facility, then they would be transferred, and

Confidential

1    ensure that the meetings are taking place?

2        A    So they're meeting at least monthly to

3    go over all the placements and restrictive

4    settings.

5        Q    And who's -- what do you call the unit

6    that conducts these compliance reviews?

7        A    So it's a working group.  It's made up

8    of the supervisory FFS for special populations,

9    members of ORR's division of policy and

10   procedures, ORR's juvenile coordinator, as well as

11   other support staff.

12       Q    Okay.  So these individuals look at

13   every restrictive placement every 30 days?

14       A    Yes.

15       Q    Okay.

16            Now, during the 30-day review, what role

17   does the, the child him or herself play?

18       A    So they're told at the end of the

19   process what their, what the decision has been

20   made regarding their placement, and they're

21   provided a notice of the reasons for either step

22   down or their continued placement.

23       Q    And is that the extent of their

24   involvement?

25       A    I mean they are on a -- leading up to

Confidential

Page 65

```
 1    review.

 2         Q    When is the child provided a Notice of

 3    Placement?

 4         A    They're provided it at the time of their

 5    admission and then subsequently after a 30-day

 6    review has been completed.

 7         Q    So in other words, they are told that

 8    there will be another 30-day review at the time

 9    they receive the results of their first 30-day

10    review?

11         A    Yes, and case managers are required to

12    give updates about the child's case to the child

13    throughout their stay in ORR custody.

14         Q    Does ORR specifically require the case

15    manager to advise a child that a 30-day placement

16    review, restrictive placement review is coming up?

17         A    So that would be part of the general

18    guidance that's given to case managers, that

19    they're supposed to provide case updates to the

20    child on a regular basis.

21         Q    So they're told that they are supposed

22    to provide regular updates to the child, but

23    there's -- are they specifically told that they

24    are to advise the child that a 30-day review is

25    coming up?
```

**Exhibit 13**
**Page 653**

Confidential

Page 69

1      A     No.

2      Q     What role, if any, does a child's lawyer

3   have in the 30-day restrictive placement review

4   process?

5      A     They're informed of the results of the

6   30-day review.

7      Q     What about in advance of the 30-day

8   review; is there any notice given to the child's

9   lawyer that a 30-day review is coming up?

10     A     We require case managers to provide

11  general case updates to attorneys of record, so

12  that would be one of the issues that would be

13  discussed during one of those case updates.

14     Q     And where in the, in the policy guide or

15  the MAP does it instruct case managers to keep

16  lawyers up to date with respect to the progress of

17  their clients' cases?

18     A     It's a general requirement in the

19  description of what a case manager's role is.

20  It's Section 2.3 -- yeah, 2.3.2.

21     Q     So the section you're referring to is

22  the last paragraph of Section 2.3.2 where it says

23  that "stakeholders may include local legal service

24  providers and attorneys of record and other local

25  service providers"; is that correct?

Confidential

Page 70

```
 1        A    Yes.

 2        Q    Now, when you say "may," when the policy

 3   says "may," doesn't that indicate that the case

 4   manager -- well, I suppose it speaks for itself.

 5             Is there anything else, sitting here

 6   today, that you can think of that instructs case

 7   managers to advise attorneys of record or legal

 8   services providers of an upcoming 30-day

 9   restrictive placement review?

10        A    At Section 1.4.2, we talk about what the

11   basis is for stepping up or stepping down a child

12   and share that information with the child's

13   attorney of record or legal service provider on

14   demand.

15        Q    And you're referring to Section 1.4.2 --

16        A    Yes.

17        Q    -- in that response?  All right, but is

18   it fair to say that this information is provided

19   to the youth's attorney of record following the

20   30-day restrictive placement case review?

21        A    Yes.

22        Q    Is the child -- is there any section in

23   this manual or other written ORR policies that

24   requires ORR or any of its contractors to instruct

25   or to advise a child's lawyer that a 30-day review
```

Confidential

1   is going to be conducted?

2       A    So like I said, the case managers are

3   supposed to keep case updates, provide case

4   updates to relevant stakeholders, which would

5   include the attorney of record or legal service

6   provider.

7       Q    If a child's lawyer were to request to

8   be present during the 30-day review, what is ORR's

9   policy with respect to granting or denying that

10  request?

11      A    They're not party to the 30-day

12  placement review process.

13      Q    So they would not be permitted to

14  participate, correct?

15      A    We would be open to receiving

16  information from them, but there's no requirement

17  that they be present during the review process.

18      Q    Now, I believe you mentioned that there

19  were -- the information that's considered during

20  the 30-day restrictive placement review includes

21  information from serious incident reports; is that

22  correct?

23      A    Yes.

24      Q    Now, a serious incident report, how is

25  that generated?

Exhibit 13
Page 656

Confidential

1    enough to warrant a significant incident report?

2         A    Yes.

3         Q    All right, and the underlying facts of a

4    significant incident report, for example, staff

5    reporting that a child has threatened him or her,

6    does that information come from the staff member

7    him or herself?

8         A    Yes.

9         Q    What about when there is a conflict

10   between two youth in ORR care; where does the

11   information about that conflict come from?

12        A    I mean again, if you're defining

13   "conflict" as an incident of violence or a fight

14   or a threat --

15        Q    Say, for example, a threat of violence.

16        A    I mean it would be from any reported

17   witnesses, so the other child, between the

18   children, other children who were present, any

19   staff that were present.

20        Q    So if one child reports that another

21   child has threatened him or her with harm, that

22   would result in the issuance of a significant

23   incident report?

24        A    Yes.

25        Q    Now, prior to the 30-day restrictive

Exhibit 13
Page 657

TSG Reporting - Worldwide    877-702-9580

1    placement review, is the child permitted to

2    examine the evidence that is going to be

3    considered in the 30-day review?

4         A    There's no prohibition, but typically

5    they're provided the evidence after the review

6    decision has been made.

7         Q    In determining whether a child should be

8    stepped down, does ORR prescribe any particular

9    standard or burden of proof?

10        A    We don't have a specific burden of

11   proof, but what information is reviewed is

12   discussed in our manual of procedures in Section

13   1.4.2 of that document.

14        Q    Do you have a page number there?

15        A    Sure, so page 34.

16        Q    34.

17        A    So included in this are interviews with

18   the child and the child's family, as well as other

19   criminal history or other more documentary

20   evidence.

21        Q    Okay.  So you're referring to the top of

22   page 35, or is it the bottom of page 35 that

23   you're referring to?

24        A    I guess the top of page 35.

25        Q    Okay.  So when we have in this section,

1      A     Correct.

2      Q     Okay.  So we have, by my count, eight

3  different categories of information.  Now, which,

4  if any, of these categories of information are

5  shared with the UAC prior to the 30-day case

6  review?

7      A     So there's no requirement that the

8  information be provided prior to the case review

9  other than that information to which the child --

10  the information would have been used to make the

11  child's either initial placement or from a

12  previous 30-day review.

13      Q     Okay.  So in evaluating this evidence,

14  where in the manual of procedures or the policy

15  guide does it -- if anywhere, does ORR instruct

16  the people who are conducting the 30-day

17  restrictive placement review on how to evaluate

18  this evidence?

19      A     Well, they're evaluating it on trying to

20  determine whether they're still -- if the evidence

21  still meets the standards for placement in one of

22  our restrictive settings.

23      Q     Okay, and I believe you said that --

24  just to make sure we're on the same page here --

25  that ORR prescribes no particular standard of

Confidential

1       A     If that were the case, the child is able

2   to appeal that decision for reconsideration by the

3   ORR director in certain instances.

4       Q     And what instances are those?

5       A     In situations where the child's placed

6   in a secure or RTC facility, they can ask for

7   reconsideration of placement.

8       Q     And how does a child go about doing

9   that?

10      A     They notify their case manager, and then

11  the case manager contacts ORR.

12      Q     And where is this process set out in

13  the --

14      A     It's described in Section 1.4.7 of the

15  ORR policy guide, but we don't have specific

16  procedures.

17      Q     Is there a form that a child can fill

18  out to request reconsideration of a secure RTC

19  placement?

20      A     We don't have a form at this time.

21      Q     Is there any requirement that a child be

22  informed that they may request reconsideration of

23  a secure RTC placement?

24      A     Yeah, so it's in the Notice of Placement

25  itself.

**Exhibit 13**
**Page 660**

Confidential

1       Q     And the Notice of Placement is given to

2    the child how?  When?

3       A     So it's given to the child within 48

4    hours of placement in a restrictive setting as

5    well as after the 30-day review.

6       Q     How quickly after the 30-day review are

7    they given it?

8       A     I need to look it up, but -- I mean at

9    least within seven days.  I don't know that we

10   have a specific time limit, but within a

11   reasonable time and at least within seven days.

12      Q     You mean at the longest, within seven

13   days?

14      A     Yeah, at the longest.

15      Q     But you don't recall where in the guide

16   or the MAP that seven-day limit would be

17   specified?

18      A     Well, it would be specified in --

19   Section 1.4.2, again, talks about the time it

20   would take if a child is to be stepped down.  We

21   do occasionally have difficulty transferring

22   children to less restrictive settings, finding

23   available placements, and so there's an outward

24   requirement that at least every seven days, the

25   child be notified of the reasons for the actions

**Exhibit 13**
**Page 661**

Confidential

1   placement.

2        Q    Is the child offered an opportunity to

3   submit evidence in rebuttal to what is going to be

4   considered in the 30-day restrictive placement

5   case review prior to the case review itself?

6        A    Generally, no, but they are able to talk

7   to their case manager.

8        Q    And is there anything in the manuals

9   here or the guide that requires case managers to

10  report that evidence in the 30-day placement

11  review?

12       A    Well, they're required to talk about

13  interviews they have had with the child, so if

14  that information is pertinent to the decision,

15  then it should be included in the discussion.

16       Q    But is there anywhere in these, in these

17  materials of ORR policy that says to a case

18  manager you must report evidence that the child

19  submits or offers in his or her favor for

20  consideration during the 30-day restrictive

21  placement review?

22       A    That would be information that goes to

23  the totality of the decision, so it would be

24  required that the case manager speak to it.

25  That's one of the things about -- talking about

Exhibit 13
Page 662

Confidential

1  these, these 30-day review sessions.  If the

2  child's in a secure RTC, they also can ask for the

3  case to -- for a redetermination of their

4  placement and could bring that up then as well.

5       Q    How many, how many UACs request the ORR

6  director to reconsider their placement?

7       A    Not many, but we also don't have many

8  children placed in secure facilities, generally

9  speaking.

10      Q    How many requests for ORR director

11 reconsideration do you recall children having made

12 during the last year?

13      A    During the last year, I can't recall

14 any.

15      Q    And how many children have -- well,

16 strike that.

17           In the, in the hypothetical, going back

18 to the hypothetical where there's an altercation

19 between two youths, what ensures that the special

20 incident report contains the child's account of

21 the altercation?

22      A    That is just the sort of general

23 guidance that's given when we work with those who

24 are writing significant incident reports.  It's

25 just part of the guidance that's given on how to

**Exhibit 13**
**Page 663**

```
 1        A     Via phone or when they go to do a

 2   facility visit.

 3        Q     Okay, and what contact do children's

 4   lawyers have with case coordinators, if any?

 5        A     They don't typically have direct access

 6   to case coordinators, but case coordinators are

 7   responsible for maintaining stakeholder relations,

 8   so they would, you know, be able to reach out to

 9   attorneys that way.

10        Q     At their discretion?

11        A     Yeah.

12        Q     Okay.  Is there anywhere in the written

13   materials, ORR's written policy statements, guide

14   or MAP, that instructs or encourages case

15   coordinators to speak with children?

16        A     I need to look.

17              So a description of their duties are in

18   Section 2.3.3, I think, yeah.  Yes, in the

19   description of the case coordinator's

20   responsibilities in the ORR policy guide at

21   Section 2.3.3, the third bullet describing their

22   duties is "meeting with individual unaccompanied

23   alien children and care provider staff at

24   designated ORR-funded care provider sites."

25        Q     2.3.3, you said?
```

**Exhibit 13**
**Page 664**

1      Q     Okay, and how does the information about

2   potential sponsors come to the attention of a case

3   manager?

4      A     Typically through the child themselves

5   or through interviews with the child's family.

6      Q     All right, and when does the case

7   manager begin collecting information around the

8   child's family members or potential custodians?

9      A     As soon as the child is admitted into

10  ORR custody.

11     Q     What is ORR's policy with respect to

12  advising children's lawyers of the identity of

13  potential sponsors?

14     A     Case managers are required to provide

15  updates to stakeholders of the child's case and in

16  that role would disclose information related to

17  potential sponsors or sponsors of children.

18     Q     And are case managers instructed to

19  provide children's lawyers with name and contact

20  information for proposed sponsors?

21     A     There's nothing specifically prohibiting

22  them from providing names of sponsors, but

23  generally we don't provide other contact

24  information without a sponsor permission.

25     Q     When a child receives a Notice of

**Exhibit 13**

**Page 665**

Confidential

1    correct?

2        A    Yes.

3        Q    Is there anything in the cooperative

4    agreement that requires clinicians to have

5    communication with children's lawyers?

6        A    No, but there are no prohibitions

7    either.

8        Q    It's up to the facility and the

9    clinician as to whether they want to talk to the

10   lawyer; is that right?

11       A    Yes.  I mean we do encourage that our

12   care providers maintain good stakeholder

13   relationships.

14       Q    Okay.  All right.  So we now have a

15   child who's in ORR custody and who is -- well, for

16   whom a proposed sponsor has appeared.  How long

17   does it take ORR to, to evaluate a proposed

18   sponsor?

19       A    It will vary, depending on the sponsor.

20       Q    Does ORR study or keep statistics on the

21   average length of time it takes from a child

22   providing the name of a sponsor or making first

23   contact with a proposed sponsor to a decision?

24       A    I believe we do have statistics that are

25   kind of kept manually, but it's not, it's not a --

Exhibit 13
Page 666

Confidential

Page 251

1

2

3

4

5

6                ACKNOWLEDGEMENT OF WITNESS

7                I, Toby R.M. Biswas, Esq., do

8         hereby acknowledge that I have read and

9         examined the foregoing testimony, and the

10        same is a true, correct and complete

11        transcription of the testimony given by me,

12        and any corrections appear on the attached

13        Errata sheet signed by me.

14

15

16        _____   _____

17        (DATE)                 (SIGNATURE)

18

19

20

21

22

23

24

25

**Exhibit 13**
**Page 667**

Confidential

Page 253

1    CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

2                        I, Laurie Donovan, Registered

3         Professional Reporter, Certified Realtime

4         Reporter, and notary public for the District

5         of Columbia, the officer before whom the

6         foregoing deposition was taken, do hereby

7         certify that the foregoing transcript is a

8         true and correct record of the testimony

9         given; that said testimony was taken by me

10        stenographically and thereafter reduced to

11        typewriting under my supervision; and that I

12        am neither counsel for, related to, nor

13        employed by any of the parties to this case

14        and have no interest, financial or otherwise,

15        in its outcome.

16                        IN WITNESS WHEREOF, I have hereunto

17        set my hand and affixed my notarial seal this

18        29th day of February 2020.

19

20        My commission expires:  March 14, 2022

21

22        *Laurie Donovan*

23   LAURIE DONOVAN

24   NOTARY PUBLIC IN AND FOR

25   THE DISTRICT OF COLUMBIA

Page 254

1              UNITED STATES DISTRICT COURT
             CENTRAL DISTRICT OF CALIFORNIA
2                  Western Division

3    - - - - - - - - - - - - - - -+
                                  |
4    LUCAS, R., et al.,           |
                                  |
5              Plaintiffs,        |    Case Number:
                                  |
6      vs.                        |    2:18-cv-05741 DMG PLA
                                  |
7    ALEX AZAR, Secretary of      |
     U.S. Department of Health    |
8    and Human Services, et al.,  |
                                  |
9              Defendants.        |
                                  |
10   - - - - - - - - - - - - - - -+

11

12                 ***CONFIDENTIAL***

13           Rule 30(b)(6) Deposition of the

14           Office of Refugee Resettlement,

15      by and through its designated representative,

16              TOBY R.M. BISWAS, ESQ.

17                 Washington, D.C.

18           Wednesday, February 19, 2020

19                    9:30 a.m.

20                  (VOLUME 2)

21

22

23   Job No. 177359

24   Reported by:  Laurie Donovan, RPR, CRR, CLR

25

Confidential

Page 272

1   counter-indicative of a step up?  In other words,

2   it's exculpating evidence, so it's not being used

3   to justify the step up, but it counter-indicates

4   the need for a step up.

5             Is that evidence provided to the child's

6   lawyer?

7        A    As part of a case file request, it would

8   be.  What we're talking about specifically with

9   the 30-day case review and for the Notice of

10  Placement is the justification for placement in

11  secure or other restrictive setting.  It wouldn't

12  contain necessarily exculpatory information.  That

13  would be made with the case file request.

14       Q    All right.  So when is this information

15  provided to the child's lawyer?

16       A    When the child's attorney asks for it.

17       Q    Is that -- will it be provided before

18  the step up is actually effected?

19       A    So it says "on demand," so it will be

20  provided on demand.  If the -- in most instances

21  step ups have to occur fairly quickly because

22  there's an exigent circumstance requiring the

23  placement quickly.

24       Q    All right.  So when there's a step up

25  being contemplated, are you aware of any case in

1   policy that you're referencing is the same policy;

2   in other words, the one appearing on page 34 and

3   35 of the MAP and at Section 1.4.2 of the Guide;

4   is that right?

5        A    1.4.2 in the Policy Guide, yes.

6        Q    All right.

7             Now, when a step up is being considered

8   to an RTC or to a secure facility in which a

9   psychologist's or psychiatrist's report has been

10  prepared, do the case coordinators review that

11  report prior to rendering a recommendation on the

12  step up?

13       A    Yes.

14       Q    And do the case managers have access to

15  the report prior to making a recommendation on

16  step up?

17       A    Yes.

18       Q    And do the federal field specialists

19  have access to the report prior to approving the

20  step up?

21       A    Yes.

22       Q    Is there any requirement that the FFS

23  request a copy of the document, the psychologist's

24  or psychiatrist's report, or is it provided to him

25  or her as a matter of course?

Exhibit 13
Page 670_001

1        A     It would be part of the recommend -- it

2    would be part of the basis for recommending a

3    transfer in the first instance, so it would be

4    considered part of the transfer request documents.

5        Q     And do the case coordinators and case

6    managers receive the same case transfer documents?

7    Is that how you refer to it?

8        A     Yes.

9        Q     Okay.  So do they, do they receive --

10   both the case coordinators and the case managers

11   receive those documents as a matter of course as

12   well?

13       A     Yes, and this is defined, if you care to

14   look, at page 25 of the MAP.  In the section that

15   refers to the transfer request file, this would be

16   considered a supporting documentation.

17       Q     All right.  In terms of file requests,

18   how does a lawyer go about requesting a child's

19   ORR file?

20       A     They fill out a very simple form and

21   submit it to ORR's case file review team.

22       Q     And does ORR have any time limits by

23   which those requests must be answered?

24       A     At this time, no.

25       Q     Why is, why is the lawyer not entitled

Confidential

1    to immediate access to a client's file?

2        A    Because ORR is the custodian of the

3    record.  So we have the file come to headquarters

4    first and then transfer it to the, to the child's

5    attorney.

6        Q    Does ORR believe that a child's lawyer

7    has a right to the complete file it has compiled

8    on a client?

9        A    Yes, and we provide it.

10       Q    So then what's the purpose of having the

11   file request go to headquarters first?

12       A    We ensure that we pull information

13   that's related to other children that might be

14   included in the file as well as a PII or other

15   information that may belong to another individual

16   who is not the child's.

17       Q    All right, but, but my question before

18   said the "complete file," so in other words,

19   you're saying that a child's lawyer has the right

20   to a redacted file?

21       A    They have -- they don't have a right to

22   information that's not their client's, and

23   sometimes there's information in those files

24   that's contained -- that contains information on

25   other children or other adults.

Confidential

1        Q     In the case of a step up, would the file

2   sometimes contain information about children who

3   witnessed behavior that is said to justify the

4   step up?

5        A     Yeah, or victims.

6        Q     And so would that information be

7   redacted from the copy of the file provided to the

8   child's lawyer?

9        A     Yes.

10       Q     If a child's lawyer hasn't the ability

11  to see or identify witnesses to the client's

12  behavior that allegedly justifies step up, how

13  does, how does ORR policy allow the lawyer to

14  effectively represent his or her client?

15       A     Can you clarify the question?

16       Q     Well, as, as a lawyer yourself, when,

17  when we receive information about witnesses to

18  particular events that are said -- that are being

19  used to impair our client's rights, we get the

20  names of witnesses, and we tend to interview those

21  witnesses in order to prepare a defense.

22            So if ORR is withholding the names of

23  these witnesses from a child's lawyer, how is it

24  that ORR expects the lawyer to be able to

25  effectively represent his or her client?

**Exhibit 13**
**Page 672**

Confidential

1    where it's videotaped -- well, let me strike that.

2            Now, when a case coordinator receives a

3    transfer request packet -- am I using the correct

4    term?

5        A    I think it's called a transfer

6    request -- one moment.  Transfer request and

7    tracking form.

8        Q    Okay, but this is, this is more than a

9    form, correct?  It includes the psychologist's or

10   psychiatrist report's if there is one.  What else

11   does it include?

12       A    So the transfer request file includes

13   various assessments, primarily "the UAC Assessment

14   and updated UAC Case Review, medical checklist for

15   transfers, and then various supporting

16   documentation, including case manager notes,

17   intakes and admissions assessment, child

18   trafficking screening results, clinical notes and

19   psychological evaluations and diagnosis."

20       Q    So it's more than --

21       A    And the list goes on.

22       Q    It's more than a form; it's a file?

23       A    It's -- the name is an old, from our

24   older nomenclature when it was just a form, but we

25   maintain the -- the formal name is just called

Exhibit 13
Page 673

1    transfer request.

2         Q    All right.  Transfer request.  It's

3    shorthand.  The transfer request materials, we can

4    say that.

5         A    Okay.

6         Q    All right.  So you've already testified

7    that the case coordinators and the case managers

8    and the FFS all receive the complete transfer

9    request materials.  What, what happens if one of

10   the three or more than one of the three think

11   additional information is required?

12        A    Then one would make such a request.

13        Q    In your experience, how often do case

14   coordinators request additional information in

15   reviewing the transfer request file?

16        A    Not often.

17        Q    Okay.  Are there cases where clinical

18   staff disagree with a recommendation to step up a

19   child?

20        A    Yes, I believe so.

21        Q    Does ORR track how frequently this

22   occurs?

23        A    No.

24        Q    When that happens, how is the

25   conflicting opinion -- how are the conflicting

Confidential

1    opinions resolved either in favor of or against

2    step up, and who resolves them?

3         A    Ultimately, the FFS.

4         Q    What criteria does the FFS use in

5    determining which of the recommendations to heed?

6         A    They look at the case in total and make

7    a decision, including recommendations.  Not one

8    request is weighed more than another or

9    recommendation is weighed more than another.  They

10   look at all the information contained in a case.

11        Q    So, therefore, if a, if a clinical

12   staff -- well, have there been circumstances where

13   the program that the youth is being referred to,

14   such as Shenandoah Juvenile Hall, does not believe

15   that a child belongs there?

16        A    Sorry.  Can you repeat the question?

17        Q    Yes.  Have there been occasions where

18   Shenandoah Valley Juvenile Center has indicated to

19   ORR that it does not believe that a child that it

20   has placed there belongs at Shenandoah Valley

21   Juvenile Center?

22        A    Yes.

23        Q    How often does that happen?

24        A    I don't know with what frequency that

25   happens.

**Exhibit 13**
**Page 675**

Confidential

Page 284

1        Q    Okay.  What, if anything, has ORR done

2    when Shenandoah Valley Juvenile Center staff

3    indicates that a child it wishes to place there,

4    ORR wishes to place there should not be at that

5    facility?

6        A    As with any case, that would be staffed

7    with the FFS and case coordinator.

8        Q    And so the FFS would decide whether to

9    continue the child's placement at Shenandoah

10   Valley Juvenile Center over the Juvenile Center

11   staff's objections?

12       A    Yes.  Ultimately, ORR's FFS is

13   responsible for making placement decisions.

14       Q    Are youth with mental health needs more

15   likely to be stepped up to an RTC than other

16   youth?

17            MR. SHIEH:  Objection to form.

18            THE WITNESS:  I don't know that I

19        could answer that with any particular

20        clarity.  "Mental health" is sort of a very

21        vague term.  It refers to a broad range of

22        conditions.

23   BY MR. HOLGUIN:

24       Q    Okay, but children, children with mental

25   health needs are stepped up to residential

**Exhibit 13**
**Page 676**

Confidential

```
1    instructed to query the children as to their

2    understanding of what appears on the Notice of

3    Placement in a Restrictive Setting?

4         A    I don't understand the question.

5         Q    Well, when someone is trying to figure

6    out whether a child understands something, they

7    might ask them questions, to repeat in their own

8    terms, for example, what their understanding of

9    the Notice of Placement says, something of that

10   nature.

11        A    That would seem to be just common sense

12   child welfare practice.  Our policies don't

13   necessarily go into that level of specificity, but

14   the case managers, you know, as discussed in our

15   Policy Guide and our procedures guide, do discuss

16   this document with the child.

17        Q    Okay.  When a child is stepped up and

18   receives the first Notice of Placement in a

19   Restrictive Setting, how soon after the step up

20   occurs does ORR require the notice to be provided

21   to the child?

22        A    Within 48 hours of placement.

23        Q    And what are the consequences if a care

24   provider fails to provide the Notice of Placement

25   in a Restrictive Setting within 48 hours of the
```

Confidential

Page 348

```
 1    or otherwise, in its facilities?

 2         A     We do for sexual abuse.

 3         Q     But not for other types of abuse?

 4         A     Not in the regular course.

 5                   MR. SHIEH:  Is now a good time for

 6         a break?

 7                   MR. HOLGUIN:  Yeah, that's fine.

 8         We can stop now.  Come back at 1:00.

 9                   (Whereupon, the lunch recess was

10                   taken.)

11    BY MR. HOLGUIN:

12         Q     Okay.  So when a, a child has been

13    approved for step down, say, for example, from

14    Shenandoah, how quickly does ORR policy require

15    the physical transfer of the child out of the

16    secure placement into a less secure placement?

17         A     So we try to transfer the child as

18    expeditiously as possible, but finding a facility

19    that is able to take the child can sometimes take

20    several days.  So our policy requires, our

21    procedures require the child be provided weekly

22    updates or at least -- it's actually written as

23    updates every seven days as to the progress made

24    and try to transfer the child.

25         Q     So what section is that in?
```

Exhibit 13
Page 678

TSG Reporting - Worldwide (877) 702-9580

Confidential

```
 1    without an identified sponsor, and have been

 2    determined to have a potential -- be potentially

 3    eligible for immigration legal relief.

 4        Q    And where are those eligibility

 5    requirements set out?

 6        A    So in the ORR Policy Guide at Section

 7    1.2.6.

 8        Q    Is a child eligible for long-term foster

 9    care directly or -- may a child be transferred

10    directly to long-term foster care from a secure

11    placement?

12        A    There's no prohibition on that.

13        Q    Are you aware of any instance in which a

14    child has been placed into long-term foster care

15    directly from secure placement?

16        A    No cases come to mind.

17        Q    Is a child eligible for long-term foster

18    care placement directly from a residential

19    treatment center?

20        A    Again, there's no prohibition.

21        Q    But are you aware of any child who's

22    actually been transferred to long-term foster care

23    directly from an RTC?

24        A    I am generally aware of children who

25    have been previously placed in an RTC and have,
```

Exhibit 13
Page 679
TSG Reporting - Worldwide (877) 702-9580

Confidential

```
1   have also been placed in long-term foster care,

2   but I can't recall if there was a direct pipeline

3   in all those cases.

4        Q    Okay.  Is there an application form for

5   placement in long-term foster care?

6        A    Yes.

7        Q    And are children provided that

8   application form?

9        A    So it's not so much of -- I guess an

10  "application form" is probably not the best way to

11  describe it.  It's a specialized transfer form

12  that's used internally within ORR.  We solicit

13  feedback from various stakeholders.  It's called

14  the "Long-Term Foster Care Placement Memo."

15       Q    And that appears in the MAP?

16       A    Yes, at Section 1.4.4 on page -- the

17  discussion begins on page 39.  Reference to the

18  document is on the following page, on page 40.

19       Q    Is the MAP a publicly available

20  document?

21       A    I mean it practically is at this point,

22  but no.

23       Q    Are children provided a copy of the MAP?

24       A    No.  I don't know that they would find

25  much use in it.
```

Exhibit 13
Page 680

Confidential

```
 1   have had circumstances where there was a

 2   disruption in the, in the foster home, and they

 3   have requested that the child be transferred.

 4        Q    Have, have you had occasions where a

 5   foster parent refuses to take a particular child?

 6        A    Not that I recall.

 7        Q    When ORR decides to transfer a child to

 8   long-term foster care, does it refer the child to

 9   a foster family agency or directly to foster

10   parents?

11        A    ORR refers to the grantee, and the

12   grantee refers it to one of their local providers,

13   who then work with the foster family.

14        Q    Okay, and do the grantees accept all

15   children that ORR refers to it for placement in

16   long-term foster care?

17        A    No.  I mean they, they look at the case.

18   It can be difficult, especially if you have a

19   child who's perhaps previously been in long-term

20   foster care and ran away or had previously been in

21   long-term foster care and had problems with other

22   children in a particular home, so we run into

23   those types of issues.

24        Q    What about for a child who has been

25   stepped up on account of behavioral issues; will
```

Confidential

1    they on occasion decline to accept those children

2    into the long-term foster care?

3        A    Yes.  That can be a, that can be a

4    concern.

5        Q    What, if anything, constrains the

6    grantees or any of the people they're working

7    with, including foster parents, from refusing to

8    take a child they believe might be a problem?

9        A    I mean we can't force children into

10   people's homes.  We have policies that make

11   certain children ineligible for placement, such as

12   if they're an escape risk or have a significant

13   criminal history, but at the end of the day, ORR

14   can't force a family to take somebody into their

15   house, just like we can't force a sponsor to take

16   a child into their house.

17       Q    Okay.  Well, but the difference is that

18   ORR is paying for long-term foster care, correct?

19       A    Yes.

20       Q    And they're not paying for a sponsor to

21   take a child into their home, correct?

22       A    That's correct.

23       Q    All right.  So does this discretion that

24   long-term foster care providers have to decline to

25   take a child, does that extend to ORR shelter

Confidential

1    Q    Okay, and in the case of children who

2    have been ordered step down but have remained in a

3    secure facility for longer than seven days, is

4    their continued stay in secure placement on

5    occasion the result of a less secure or a number

6    of less secure facilities refusing to take them?

7    A    On occasion.

8    Q    When a decision has been made to step up

9    a child to a more restrictive placement, is there

10   any policy that ORR has regarding the time of day

11   that a child is to be advised that they're going

12   to be transferred to a more restrictive placement?

13   A    I don't know what you mean by "time of

14   day."

15   Q    Is there anything that says, for

16   example, that children should not be disturbed

17   during normal sleeping hours to be told they're

18   going to a more restrictive placement?

19   A    There's no specification regarding when

20   a child is notified of their transfer.

21   Q    So if a facility were to wake a child up

22   at say 2:00 in the morning to advise them that

23   they're going to be transferred to a more

24   restrictive placement, there would be no ORR

25   policy that would be violated by that decision,

Exhibit 13
Page 683

Confidential

1          MR. SHIEH:  Objection to form.

2     BY MR. HOLGUIN:

3          Q    Is there any interpretation of what a

4     legal matter or proceeding is?

5          A    We generally interpret that as

6     immigration proceedings that the child is in, such

7     as a removal proceeding.

8          Q    And is that interpretation contained

9     in -- set out in writing anywhere?

10         A    It's within our -- it's sort of the

11    underlying basis of our legal service contract and

12    the services we provide under that contract.

13         Q    Okay.  So the contract itself restricts

14    ORR -- I mean are these the Vera -- is this the

15    Vera Institute -- the contract with the Vera

16    Institute?

17         A    The contracts with the Vera Institute,

18    yes.

19         Q    Okay, contracts with the Vera -- would

20    it also include the contracts with the Vera

21    Institute provider's subcontractors?

22         A    We only directly contract with Vera.

23         Q    So in the contract with Vera, there is

24    an interpretation of the TVPRA provision that

25    references legal matters and proceedings; is that

Exhibit 13
Page 684

Confidential

1   correct?

2        A    Yes.  It's generally understood that the

3   services provided under that contract are for

4   those types of proceedings.

5        Q    Okay.

6             So you mentioned representation in

7   removal proceedings, but doesn't it also include

8   Know Your Rights presentations?

9        A    That is one of the services that we

10  provide.

11       Q    Okay.  Does one of the legal service

12  categories include legal representation with

13  respect to placement?

14       A    I don't understand.

15       Q    Well, we have legal representation in an

16  immigration proceeding, correct, a removal

17  proceeding?

18       A    Yes.

19       Q    That's one of the things that ORR funds?

20       A    Yes.

21       Q    And it also funds lawyers to prosecute

22  applications for things like special immigrant

23  juvenile status and asylum?

24       A    That would be related to their

25  immigration proceedings.

Exhibit 13
Page 685

Confidential

Page 400

```
 1        Q    Okay.  Does it also fund lawyers to
 2   represent children to advocate on behalf of being
 3   placed in a less restrictive environment?
 4        A    No.
 5        Q    Does it fund lawyers to represent
 6   children with respect to release to available
 7   sponsors?
 8        A    No.
 9        Q    Does it fund legal services providers to
10   represent children with respect to the
11   administration of psychotropic medications?
12        A    No.
13        Q    What is ORR's policy -- I believe we
14   looked at this, actually, that there's a -- I
15   believe you testified that ORR provides children
16   with a copy of the free legal services list.
17        A    Yes, as part of the Legal Resource
18   Guide.
19        Q    Okay, and is there any, anything written
20   in the Guide or the MAP or anywhere else that
21   would require facilities to allow access to
22   non-Vera-funded legal services providers, access
23   to children?
24        A    So we have no prohibition, and some of
25   the providers on the legal -- on a list that's
```

**Exhibit 13**

**Page 686**

Confidential

1

2

3

4

5

6                    ACKNOWLEDGEMENT OF WITNESS

7            I, Toby R.M. Biswas, Esq., do

8      hereby acknowledge that I have read and

9      examined the foregoing testimony, and the

10     same is a true, correct and complete

11     transcription of the testimony given by me,

12     and any corrections appear on the attached

13     Errata sheet signed by me.

14

15

16     _____    _____

17     (DATE)                  (SIGNATURE)

18

19

20

21

22

23

24

25

Confidential

1

2

3

4

5      CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

6               I, Laurie Donovan, Registered
        Professional Reporter, Certified Realtime
7       Reporter, and notary public for the District
        of Columbia, the officer before whom the
8       foregoing deposition was taken, do hereby
        certify that the foregoing transcript is a
9       true and correct record of the testimony
        given; that said testimony was taken by me
10      stenographically and thereafter reduced to
        typewriting under my supervision; and that I
11      am neither counsel for, related to, nor
        employed by any of the parties to this case
12      and have no interest, financial or otherwise,
        in its outcome.

13

14               IN WITNESS WHEREOF, I have hereunto
        set my hand and affixed my notarial seal this
        2nd day of March 2020.

15

16      My commission expires:  March 14, 2022

17

18      *Laurie Donovan*

19

20      LAURIE DONOVAN
        NOTARY PUBLIC IN AND FOR
21      THE DISTRICT OF COLUMBIA

22

23

24

25

**Exhibit 13**
**Page 688**

# Exhibit 14

**Exhibit 14**
**Page 689**

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                     WESTERN DIVISION

 4

 5   LUCAS R. , et al.,

 6
                     Plaintiffs,
 7
     vs.                                NO. 2:18-CV-05741 DMG PLA
 8
     ALEX AZAR, Secretary of U.S.
 9   Department of Health and Human
     Services, et al.,
10
                     Defendants.
11   _____/

12

13

14

15

16              DEPOSITION OF JOSE CASTANEDA

17          Thursday, November 21, 2019, 9:37 a.m.

18                   Woodland, California

19

20

21

22   Reported By:

23   PEGGY A. PORTER, RDR, CRR, CSR No. 6086

24   Job No. 172051

25   PAGES 1 - 196
```

1   demonstrating.

2    Q      So your understanding is the programs to whom

3   the transfer was requested was denying it, not ORR or

4   GDIT?

5    A      It wasn't ORR or GDIT.  When we submit a

6   referral and it's denied, it's coming directly from the

7   program.

8    Q      And the program means another facility, like a

9   RTC or an OON, out-of-network facility?

10   A      Yes.

11   Q      So what happens in an instance if you're unable

12   to transfer a child and they have greater health needs

13   than you think Yolo can really handle?

14   A      We keep bringing it to the attention of ORR to

15   assist in trying to transition the youth to a more

16   appropriate level of care or a program.  For the time

17   being we manage the behavior as best as we can.

18   Q      When you say manage the behavior, what does that

19   mean?

20   A      Just provide more support, more clinical

21   support.  It may require for the youth to be placed on

22   one-on-one direct supervision.  It may require for

23   multiple check-ins daily, daily check-ins by all the

24   clinicians.

25          So, yeah, just providing more direct supervision

**Exhibit 14**
**Page 691**

Page 74

1   determination?

2    A      Not that I'm aware of.  I'm not too sure.

3    Q      How is that determination made?

4    A      If they meet the criteria?

5    Q      Uh-huh.

6           MR. MAY:  Wait.  Are we just talking about just

7   danger to themselves or others or all of the criteria?

8           MS. TARNEJA:  Danger to themselves or others.

9           THE WITNESS:  I guess -- I mean, 'cause I've had

10   conversations with Ms. Burns in the past.  And one of

11   the biggest concerns was that line right there, danger

12   to self and others.

13          It was always reported back to ORR.  The whole

14   danger to self is really difficult for us to see the

15   need for secure placement.

16          Danger to others can mean, you know, they're

17   assaultive, they're assaulting staff, they're making

18   weapons or they're engaging in some sort of behavior

19   that's causing them to be a danger to others.  That's

20   when more so we will say, okay, well, that's -- we can

21   manage -- you know, we can accept a youth like that.

22          When it was specifically just the self part,

23   like self-harming behavior, that's something that needs

24   to be a common conversation piece that Ms. Burns would

25   always have with ORR.

**Exhibit 14**
**Page 692**

1          Just that piece alone, just because of the

2    danger to self, you can't really, you know, see the need

3    for secure placement.  There's other programs that can

4    manage or accept a youth like that.

5    Q       BY MS. TARNEJA:  And why is that?

6    A       I'm not sure.  That was just something she would

7    have her strong opinion on.

8    Q       That was her opinion?

9    A       Yes.

10   Q       Did you share that opinion with Ms. Burns?

11   A       Did I share that?  Well, it's just something she

12   would respond back to ORR with.

13   Q       So you --

14   A       That was more her opinion.

15   Q       Okay.  So you have no opinion about whether, if

16   a youth is dangerous to themself, whether they should be

17   placed at Yolo or not?

18   A       I guess it would depend on the case.  I mean, I

19   kind of shared her same concerns once we had discussed

20   it.  But I have my own personal thoughts on it.  I guess

21   it would be a case-to-case type of situation.

22   Q       I just want to elaborate a little bit more about

23   why Yolo would not be the correct place for a youth who

24   was dangerous to themself.

25   A       Kind of like I mentioned before.  I mean, we

1    have had instances of kids that, you know, just

2    constantly engage in self-harming behavior.  I'm not

3    talking about just every so often.  Just daily, multiple

4    times.  You know, and it's visible, you know, the scars,

5    you know.

6            Those are something that are more -- this would

7    not be appropriate for a youth like that.

8    Q     Where would be appropriate?

9    A     Someone that can manage that behavior or kind of

10   address it or provide the therapeutic support that they

11   would need.

12   Q     Do you know what type of facility would be able

13   to provide that type of support?

14   A     I know they have two RTC programs within the ORR

15   network.  And I know they do have a staff secure that

16   is -- kind of more tends to more of a therapeutic sort

17   of placement.  So those may better manage that behavior.

18   Q     And you also look at the criteria in deciding

19   whether to accept a child, the other criteria you

20   mentioned included charged with a crime?

21   A     Uh-huh.

22   Q     Or chargeable; is that correct?

23   A     Uh-huh.  Yes.  That's correct.

24   Q     And do you at Yolo assess that criteria as well?

25   A     Yes.  So we -- if it meets the criteria for

Exhibit 14
Page 694

Page 81

```
 1    A        I don't know why.

 2             Kind of going back to the parents.  If they're

 3    provided with the notice of placement -- so I can give

 4    you an example.  The youth are provided with a notice of

 5    placement.  The family or the parents are not.  But in

 6    the instance that it's a case that was just referred to

 7    us from intakes that has no other previous placements in

 8    ORR, when we make contact with the family, the reasons

 9    for the placement in ORR or at a secure level is

10    reviewed with them.  They are made aware of why he was

11    referred to us.

12    Q        And does the child have an opportunity to

13    challenge the placement?

14    A        They have the option to do it.

15    Q        How can they challenge that?

16    A        They can request -- I know ORR has a policy that

17    they can request at the 30-day mark to request a hearing

18    with the ORR to see if they want -- to contest their

19    placement in secure.

20             They also have an option to -- for a Flores Bond

21    hearing.  That's something that is reviewed with them at

22    the time of intake within 24 hours of their arrival

23    here.

24             But those usually, they don't sign them.  They

25    don't want to sign them.  The legal service provider,
```

**Exhibit 14**

Page 82

1   Legal Services for Children, they have asked for us not

2   to submit them until they're able to discuss this with

3   the youth.

4           So what we do, we review it with them.  It's

5   both in English and Spanish, depending on what their

6   language is.  But they are reminded of that, that the

7   legal service provider has requested that they speak to

8   them prior to them signing anything.

9   Q     And both of those hearing opportunities are

10  after they've been transferred to Yolo; is that correct?

11  A     That's what we review with them when they arrive

12  here.

13  Q     The 30-day hearing is 30 days after they arrive?

14  A     They can request it 30 days after.  What happens

15  prior to that, I mean, that's -- I don't know how other

16  programs function.

17  Q     Have you ever had a child request a hearing

18  after 30 days?

19  A     From my knowledge there's only been one.  In my

20  time that I've been with the office, only one.

21  Q     Do you remember when that was?

22  A     I don't remember the exact date.

23  Q     Do you remember what happened?

24  A     No.  I don't remember everything that happened

25  on that.  It's been a couple of years.

Exhibit 14
Page 696
TSG Reporting - Worldwide  877-702-9580

1   of seven minors based on a supposed gang affiliation?

2   A      I do recall the topic of the gangs.  But you

3   would have to be more specific as far as what cases.

4   Q      Do you recall what happened to those minors?

5   A      During that period of time I know we did have an

6   influx of referrals that were sent to us.  But from what

7   I remember, the majority of those, I believe all of

8   them, they were transferred to a lower level of care.

9          Once we followed up with the reasons for, did

10  our assessment that we normally do with the youth here,

11  we did transition those youth down to a lower level of

12  care.

13  Q      Do you recall why Yolo disagreed with ORR's

14  placement of those minors?

15  A      From what I remember on that, if we're speaking

16  about the same cases, once the youth were in our care

17  and all this came to light and we started making contact

18  with law enforcement agencies, some of them were on

19  probation, some of them weren't on probation.  And when

20  we started getting more background information as far as

21  what occurred and what happened, we definitely pushed

22  back and started transitioning them.

23         We brought our concerns to ORR, to FFS, let them

24  know that they were -- they met criteria for lower level

25  of care and should be transitioned.

**Exhibit 14**
**Page 697**

Page 90

1   Q      Do you recall why they did not meet the criteria

2   for Yolo's care?

3   A      Well, they did meet the criteria based on the

4   information we got from intakes on the referrals.  But

5   after we -- they arrived here and we had contact with

6   probation or law enforcement and either were given

7   minimal or some information on the background of it, we

8   determined there was no need to have them continue to be

9   in secure level of care.

10   Q      When Yolo decides not to accept a youth, who do

11   you communicate that to?

12   A      It depends on which way we're getting the

13   referral.  If it's through GDIT, we'll respond by email,

14   let them know why we feel we cannot accept a youth.

15          If it's through intakes, it will be just the

16   same thing; email letting them know why we're not

17   accepting a youth.

18   Q      Have you ever gotten pushback for that decision?

19   A      Yes.

20   Q      How did the pushback manifest itself?

21   A      They would ask if we can reconsider or provide

22   us additional information based on the reasoning for

23   requiring placement in secure.

24          And once we reviewed those and we still felt

25   that it was not appropriate or the appropriate placement

1    release him to the community.

2        I can't remember if there was any specific one

3    that wanted to see a psychiatrist or some sort of

4    recommendation from a doctor.  At least from us here.

5    Q     So you're not aware of any ORR or Yolo written

6    policy requiring that a child not be a danger to

7    themselves or others before being released to a sponsor?

8    A     I can't remember.

9    Q     Is there a requirement that a child must have

10   30 days of good behavior before being stepped down?

11   A     Is there a requirement?  No.  I know there was

12   some confusion within the ORR network that a lot of

13   programs would like to see at least a period of 30 days

14   before they were stepped down.  But that was never

15   really in policy to say like, you know, it's a

16   requirement.  You have to meet that.  But I know it's a

17   practice with a lot of programs.  I know we got a lot of

18   kickback for that at times.

19   Q     Did you -- was that a practice of Yolo?

20   A     No.  I wouldn't say it was a practice of Yolo.

21   I know they would want to see a period of time.  I think

22   they just kind of -- I don't know how to even say this.

23   They want to see more than just a week of some change in

24   behavior.  They don't take one week as that's enough to

25   show some sort of change.

**Exhibit 14**
**Page 699**

1    communication.

2    Q      Are you involved in identifying potential

3    sponsors?

4    A      I have been.

5    Q      Are you involved in evaluating those potential

6    sponsors?

7    A      Whoever's the assigned case manager does

8    complete the assessment.  If the sponsor's identified

9    here with us.

10   Q      How about coordinating home studies, are you

11   involved in that?

12   A      The referral's sent out.  We send it out to the

13   home study provider.  But in some cases they already

14   have been through the process or already been -- you

15   know, completed that.  It just depends on what stage the

16   process is at when they arrive here to us.

17   Q      And are you involved in coordinating

18   psychological evaluations?

19   A      The clinicians are.

20   Q      Why would a psychological evaluation be

21   conducted, if you know?

22   A      That would be a better question for somebody who

23   works directly on that side.

24   Q      Are you involved in coordinating risk

25   assessment?

**Exhibit 14**
**Page 700**

1    A      The OYAS assessments, yes.

2    Q      Is an OYAS assessment always conducted prior to

3    release?

4    A      We typically conduct those when we're

5    recommending release or a step-down.

6    Q      Is there anything else involved in a risk

7    assessment outside of OYAS?

8    A      Anything else involved?

9    Q      Is that the entire risk assessment?

10   A      What we do here, it's the OYAS that we conduct.

11          MS. TARNEJA:  Ready for a break?

12          MR. MAY:  Yes.

13          (Recess taken.)

14          MS. TARNEJA:  I think we'll go ahead and mark

15   another exhibit.  I believe we're at 147.

16          (Exhibit 147 was marked.)

17   Q      BY MS. TARNEJA:  Do you recall this email?

18   A      Yes.

19   Q      Do you remember this transfer request?

20   A      Yes.

21   Q      Did you discuss the transfer request with

22   Julie Burns?

23   A      Yes.

24   Q      What do you recall about this transfer request?

25   A      Pretty much what's outlined on here.  The

```
 1   was -- the decision wasn't just the FFS.  It was above

 2   the FFS.  It was the director.  So there was a period of

 3   time that the releases were -- there was a significant

 4   delay.

 5   Q      Because of a backlog or --

 6   A      I'm not sure.

 7   Q      But it's gotten better since they removed that?

 8   A      Yes.

 9   Q      Would a home study increase the amount of time

10   it takes to release a child to a sponsor?

11   A      Typically the kids that we release from here

12   have undergone some sort of home study.

13   Q      And do you think that increases the amount of

14   time --

15   A      Yes.

16   Q      -- for them to be released?

17   A      Yes, it can.  It depends.  If the home study

18   provider doesn't pick up the case right away, it can

19   delay.

20   Q      Does setting up post-release services increase

21   the amount of time it takes for a child to be released

22   to a sponsor?

23   A      At one point it was.  At one point it was.  Now

24   there's been some changes to that.

25   Q      When did that change occur, do you recall?
```

**Exhibit 14**

**Page 702**

1    A       I don't remember the exact date.

2    Q       Would a psychological evaluation increase the

3    amount of time it takes for a child to be released to a

4    sponsor?

5    A       No.

6    Q       How about a child's disciplinary issues?  Would

7    that increase the amount of time it takes to be released

8    to a sponsor?

9    A       On our end, I don't think it would.  I think

10   maybe ORR, maybe if they see some concern with some of

11   the behaviors.

12   Q       Are you aware of any instances when ORR has seen

13   concerns, that it would delay a child's release?

14   A       I can't remember.

15   Q       How are a child's mental health needs considered

16   in the release process?

17   A       Their mental health needs?  If there is a

18   continuing need for service for them, mental health

19   service, it is outlined, also, in the safety plan.  The

20   clinicians typically assist the family, identify the

21   resources.

22   Q       Could it take longer for a child with mental

23   health needs to be released to a sponsor?

24   A       I can see that happening if there's a

25   significant concern and they're trying to, you know,

Page 194

1          DECLARATION UNDER PENALTY OF PERJURY

2          I, Jose Castaneda, do hereby certify under penalty

3  of perjury that I have reviewed the transcript of my

4  deposition taken on November 21, 2019; that I have made

5  such changes and corrections that I deem necessary, and

6  approve the same as now true and correct.

7

8          Dated this _____ day of _____, 2019.

9

10

11          _____

12                    Jose Castaneda

13

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit 14**
**Page 704**

```
 1                 REPORTER'S CERTIFICATE

 2         I, PEGGY A. PORTER, do hereby certify:

 3       That the witness named in the foregoing deposition,

 4                     JOSE CASTANEDA

 5    was present at the time and place therein specified;

 6            That the said proceeding was taken before me at

 7    the said time and place, and was taken down in shorthand

 8    writing by me;

 9            That I am a Certified Shorthand Reporter of the

10    State of California;

11            That the said proceeding was thereafter, under

12    my direction, transcribed into computer-assisted

13    transcription; and that the foregoing transcript

14    constitutes a full, true, and correct report of the

15    proceedings which then and there took place; that I am a

16    disinterested person to the said action.

17            IN WITNESS WHEREOF, I have hereunto subscribed

18    my hand this 5th day of December 2019.

19

20                     _____

21                     PEGGY A. PORTER, CSR 6086

22

23

24

25
```

# Exhibit 15

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Exhibit 15

Page 706

Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


LUCAS R., by his next friend
MADELYN R.; DANIELA MARISOL T.,
by her next friend KATHERINE L.;
et al.,
                                        No. 2:18-CV-05741
            Plaintiffs,                     DMG-PLA

vs.

ALEX AZAR, Secretary of U.S.
Department of Health and Human
Services; E. SCOTT LLOYD,
Director, Office of Refugee
Resettlement of the U.S.
Department of Health & Human
Services,

            Defendants.
_____


        CONFIDENTIAL UNDER PROTECTIVE ORDER
          DEPOSITION OF ███████████████
                OCTOBER 30, 2019
                   9:45 a.m.


          1333 2nd Street, Suite 400
            Santa Monica, California


          Diana Janniere, CSR-10034

Magna Legal Services
866-624-6221
www.MagnaLS.com



**Exhibit 15**
**Page 707**

Page 12

1          A     Yes.

2          Q     Thank you.  We are done with that document.

3                Are you aware of the person whose alias in

4    this case is Lucas R.?

5          A     Yes.

6          Q     Without disclosing that person's true name,

7    who is Lucas R.?

8          A     My brother.

9          Q     Sometime in 2018, Lucas R. was in a U.S.

10   government program in Texas; is that correct?

11         A     Yes.

12         Q     And then, later in 2018, Lucas R. was

13   released from the government program and came into

14   your care; is that correct?

15         A     Yes.

16         Q     Do you believe that the U.S. government

17   harmed Lucas R. in some way?

18               MS. WELCH:  Objection.  Vague.

19               THE WITNESS:  Can I talk to my attorney

20   about that?

21               MR. MOSS:  Yes.  You are welcome to consult

22   with counsel.  We will be off the record while you do

23   that.

24               (Discussion held off the record.)

25               MR. MOSS:  We are back on the record after



Exhibit 15

Page 707_001

Page 31

1              THE WITNESS:  Yes.

2    BY MR. MOSS:

3        Q    Is Lucas R. currently taking any

4    medications?

5        A    No.

6        Q    Do you know if Lucas R. is currently having

7    any trouble sleeping?

8              MS. WELCH:  Objection.  Vague.  Calling for

9    speculation.

10             THE WITNESS:  At the present time, no.

11   BY MR. MOSS:

12       Q    In a previous time, while Lucas R. was in

13   your care, did you ever know if he had trouble

14   sleeping?

15       A    Yes.

16       Q    So previously while in your care, Lucas R.

17   had trouble sleeping, but now, he is doing okay; is

18   that right?

19             MS. WELCH:  Objection.  It mischaracterizes

20   his earlier testimony.  Vague.

21             THE WITNESS:  Now, he is fine, but when he

22   was at the housing facility, he was not.

23   BY MR. MOSS:

24       Q    Did Lucas R. ever have trouble sleeping

25   while he was in your care?



Exhibit 15
Page 708

Page 44

1          (Discussion held off the record.)

2   BY MR. MOSS:

3     Q    Sir, your counsel has pointed out to me that

4   it might be helpful if I ask questions in a slightly

5   different way.

6     A    All right.

7     Q    Thinking about the present time, has Lucas

8   R. given you any reason to believe that he is having

9   any emotional challenges?

10         MS. WELCH:  Objection.  Vague.  Vague as to

11   time.  Lacks foundation.  Calls for expert testimony.

12         THE WITNESS:  Now, that he is living with

13   me, no.

14   BY MR. MOSS:

15     Q    And now, thinking about the time that Lucas

16   R. was in the government program, to your knowledge,

17   did Lucas R. have any emotional problems then?

18         MS. WELCH:  Same objections.

19         THE WITNESS:  When he was in the housing

20   facility, yes.

21   BY MR. MOSS:

22     Q    And now, thinking about the period of time

23   before Lucas R. came to the United States, to your

24   knowledge, did Lucas R. have any emotional problems

25   then?



Exhibit 15
Page 709

Page 51

1              REPORTER'S CERTIFICATION

2

3      I, Diana Janniere, a Certified Shorthand Reporter,

4   in and for the State of California, do hereby certify:

5

6      That the foregoing witness was by me duly sworn;

7   That the deposition was then taken before me at the

8   time and place herein set forth; that the testimony

9   and proceedings were reported stenographically by me

10  and later transcribed into typewriting under my

11  direction; and that the foregoing is a true record of

12  the testimony and proceedings taken at that time.

13

14     IN WITNESS WHEREOF, I subscribed my name

15  this 8th day of November, 2019.

16

17

18

19

20                    _____

21                    Diana Janniere, CSR No. 10034

22

23

24

25



Page 52

1          CERTIFICATE OF READER-INTERPRETER

2

3     I, _____, whose address is

4  _____,

5  a person who speaks the language of the deponent;

6  namely, Spanish, do hereby certify that on the _____

7  day of _____, 20____,

8  I did translate the foregoing deposition from the

9  English language into the Spanish language, reading

10 same to the deponent in his/her native tongue, to the

11 best of my ability;

12     That all corrections and changes requested by the

13 deponent were made and initialed by the deponent;

14     That upon completion of said reading, the

15 deponent did confirm to me that he/she had understood

16 the reading.

17

18

19

20

21           _____

22                  READER-INTERPRETER

23

24

25



Exhibit 15
Page 711

Page 53

```
 1                    DECLARATION ERRATA SHEET

 2

 3

 4      Our Assignment No. 515762

 5      Case Caption:   Lucas R.

 6      vs. Alex Azar, et al.

 7

 8            DECLARATION UNDER PENALTY OF PERJURY

 9             I declare under penalty of perjury that I

10      have read the foregoing transcript of my deposition

11      taken in the above-captioned matter or the same has

12      been read to me, and the same is true and accurate,

13      save and except for the changes and/or corrections, if

14      any, as indicated by me on the DEPOSITION ERRATA SHEET

15      hereof, with the understanding that I offer these

16      changes as if still under oath.

17             Signed on the _____ day of

18      _____, 2019.

19

20

21

                     _____

22

                     ████████████████████████

23

24

25
```



# Exhibit 16

Exhibit 16
Page 713

Page 1

 1

 2               IN THE UNITED STATES DISTRICT COURT

 3                CENTRAL DISTRICT OF CALIFORNIA

 4                      WESTERN DIVISION

 5     -----------------------------------

 6     LUCAS R., et al.,

 7                         Plaintiffs,

 8        -vs-              Case No.:  2:18-CV-05741 DMG PLA

 9      ALEX AZAR, Secretary of U.S.

10     Department of Health and Human

11     Services, et al.,

12                         Defendants.

13     -----------------------------------

14

15

16

17

18              Deposition of CARINA CONTRERAS

19                   Harrisonburg, Virginia

20                  Thursday, January 23, 2020

21                         8:58 a.m.

22

23

24     Reported by:  Valarie L. S. May

25     Job No: 175374

Page 69

1    reunification case.

2         Q    Okay.  And who is involved in finalizing

3    the safety planning -- or sorry.

4              Who is involved in finalizing the safety

5    plan?

6         A    The case manager assigned and the

7    clinician assigned, the sponsor, and the minor.

8         Q    Okay.  You also mentioned that you have

9    recommended against accepting a child at Shenandoah if

10   a legal case is scheduled for a hearing.  So can you

11   tell me a little bit more about why you would make a

12   recommendation against admitting in that circumstance?

13        A    If a minor is waiting to have an asylum

14   hearing in the locality where he's placed, that may

15   cause unnecessary delays in their legal case.

16        Q    Okay.  Has there been a situation where

17   you've recommended against admission but the final

18   decision was to, in fact, admit the child to

19   Shenandoah?

20        A    Yes.

21        Q    Okay.  And who made that final decision?

22        A    FFS or ORR staff.

23        Q    Okay.  Are you and the lead clinician

24   allowed to make separate, independent recommendations

25   about whether to admit or not admit to Shenandoah?

Page 71

1    that facility, for their placement.

2          Q     Right.

3                Okay.  Going back to examples where you

4    have recommended against admission but a child was

5    still placed at Shenandoah, can you recall any

6    specifics about that case?

7          A     Well, there isn't one specific case.

8    There's been a couple maybe.

9          Q     Okay.

10         A     And then I can maybe think about one where

11   I didn't see a behavioral pattern that merited secure

12   placement.

13         Q     Okay.  When the FFS makes a decision to

14   place a child at Shenandoah, are you informed of the

15   FFS's thought process or reasons for wanting to admit

16   the child to Shenandoah?

17         A     Yes.

18         Q     Okay.  How are you informed of that

19   information?

20         A     Through Kelsey, who may be staffed the case

21   over the phone with FFS, or copied in email

22   correspondence regarding the matter.

23         Q     Okay.  At the time a child is added to

24   your caseload, can you determine whether the child is

25   taking any medications?

1    something to consider in placing them.

2        Q    And how would -- how would that be

3    considered?  What changes might be made to that

4    child's housing, for example?

5        A    I mean, just placing them in a unit

6    that -- where there might be more staff present.  Or I

7    can think of, in school, if they need specialized

8    education services, they would be provided, you know,

9    a one-on-one educational service.  So -- that's what I

10   can think of right now.

11       Q    Okay.  When you have found out that a

12   child has been placed on Shenandoah's caseload, can

13   you tell me any other times that you have felt like

14   that child was placed at Shenandoah inappropriately?

15       A    Specific cases?

16       Q    Yeah, specific cases or general categories

17   of reasons why you feel like they might be

18   inappropriate placement.

19       A    My recommendations -- or, like, my

20   concerns that are raised are based off of what is

21   listed on the notice of placement that says where a

22   minor would meet secure criteria.

23            More recently, there was a resident

24   referred that had a nonviolent offense for which, you

25   know, I elevated that.  It didn't seem that he met

1    secure; rather, he met staff secure criteria.

2         Q     Okay.  And do you remember any more

3    details about what happened after you elevated your

4    concern?

5         A     The FFS followed up in an email, but I

6    don't recall exactly what happened.

7         Q     Do you remember whether that child was

8    admitted to Shenandoah or not?

9         A     At this time, the cases are blurring

10   together.

11        Q     Sure.

12        A     So I don't recall if he was.  But -- but

13   that is something that was discussed.  I can't recall

14   if he was or wasn't.

15        Q     Okay.  And when the FFS followed up, did

16   the FFS speak -- or communicate with you specifically?

17        A     Yes.  I was included in correspondence.

18        Q     Okay.  Are there any other examples where

19   you've felt like a child has been placed at Shenandoah

20   inappropriately?

21        A     Yes.

22        Q     Are there any other details you can

23   provide about what you're thinking of?

24        A     Residents with high mental health needs or

25   significant self-harming behavior, psychiatric

1    hospitalization history, behavioral history that was

2    related to escape risk, which meets staff secure

3    criteria.

4              I can't think of any others right now.

5        Q    When you talk about residents with high

6    mental health needs, who have experienced psychiatric

7    hospitalization, what, in particular, stands out to

8    you as concerning about them being at Shenandoah?

9        A    I think for those cases, I recall cases

10   that I've had -- or have been referred who have either

11   an RTC placement recommendation or are pending

12   acceptance at an RTC that's, like, waiting for bed

13   space.  Yeah, that's what I can think of.

14       Q    Okay.  And so in those circumstances where

15   you receive a referral or are reviewing a referral for

16   one of those kids, is your view that they are better

17   off being placed at an RTC instead?

18       A    Ideally, for their mental health needs --

19       Q    Okay.

20       A    -- it would be best -- in their best

21   interest to be in the appropriate placement.

22       Q    Have there been times when there's been a

23   child with those needs, mental health needs, has

24   been -- psychiatric hospitalization, and the FFS has

25   still agreed to accept them at Shenandoah?

1      A      Yes.

2      Q      Do you know why it was that that child was

3   still placed at Shenandoah?  Or any of those children?

4      A      Secure criteria also includes posing a

5   danger to self or others.  It includes -- a part of

6   the secure criteria is self-harming behavior and just

7   threats to others, which some of those cases I can

8   recall had some behavioral issues as well.  So --

9      Q      Okay.  Have you ever communicated to an

10  FFS that you have felt like an RTC placement would

11  have been more appropriate for a youth?

12     A      I recall at least once I had covered while

13  Kelsey was out on vacation and I was the primary point

14  of contact regarding referrals.  With the lead

15  clinician's recommendations, after her review of the

16  mental health portion of the case, yes, I elevated, in

17  an email to the FFS and the case coordinator, the

18  concerns.

19     Q      And in that circumstance, did the FFS

20  respond to you?

21     A      Yes, I'm pretty sure she responded.

22     Q      Do you remember what the FFS's response

23  was or what the FFS's overall view was about that

24  particular case?

25     A      I don't recall exactly.  I believe she

Page 80

1    requirements.

2         Q    Okay.  Are there children who have been

3    admitted to Shenandoah who had criminal charges

4    dropped prior to their admission to Shenandoah?

5         A    Yes.

6         Q    Are those children still eligible or

7    qualified to be at Shenandoah?

8         A    According to the notice of placement, the

9    first criteria says "have been a subject of

10   delinquency proceedings."

11        Q    Do you feel like, in your own independent

12   view, that those kids should be at Shenandoah or a

13   lesser-restrictive placement?

14        A    If the only reason said to place them in

15   secure is the charge that was dropped, no.

16        Q    No, you think they should --

17        A    Not be placed in secure.

18        Q    Okay.  When do you first meet a child who

19   is added to your caseload?

20        A    Within 24 hours of their arrival.

21        Q    And is that 24-hour timeline required by

22   ORR?

23        A    Yes.

24        Q    And what happens at that first meeting

25   with the child?

Page 90

1    significant part of the recommendation is whether --

2    how the sponsor can address these behaviors and how to

3    work with the minor.  Those recommendations are

4    conducted by the psychologist and provided in that

5    evaluation.  So that would be a major part in the

6    final safety planning.

7         Q    I have a similar question but with regard

8    to transfer, so step down.

9              So if a child has been referred to receive

10   an evaluation or another type of service, how, if at

11   all, can that influence when a child is prepared to be

12   transferred to a different facility?

13        A    Can you say that again?

14        Q    Yeah.  So I'm just wondering whether a

15   child might need to complete a psychiatric evaluation

16   before they are approved to be stepped down.  That's

17   one example I'm thinking of.

18             Does a service need to be completed before

19   a child can be approved for a step down or actually

20   step down?

21        A    Depending on the case.  And ORR would

22   determine whether that would be something necessary

23   before step down.

24        Q    Okay.  Are there any specific situations

25   that come to mind that fit that scenario?

Page 91

1          A      That required a psychological for step

2    down or that -- I'm sorry.  Can you clarify that

3    question?

4          Q      Sure.  I'm just curious whether an

5    evaluation needed to be completed before a step down

6    was approved.  And it doesn't have to be an

7    evaluation.  I'm not sure if there might not be

8    another type of service that would have to be

9    completed before a child could be approved for step

10   down.

11         A      Yes, I can recall a couple cases.

12         Q      Okay.  Are there specific details that you

13   can share about those?

14         A      There was a resident who had a medical

15   appointment for surgery.  I don't recall the exact

16   reason for the appointment, but it was very important

17   to his well-being.  And we wanted to make sure that he

18   was seen before.

19                But, again, ORR ultimately decides whether

20   that can be done at another facility.

21         Q      Okay.  Are there any other examples that

22   you can think of?

23         A      A minor displaying sexual predatory

24   behaviors.  That might make minors in a

25   lower-restrictive setting vulnerable and could be a

Page 105

1    BY MS. ADAMS:

2         Q    Okay.  Great.  And Yolo used to be another

3    secure facility in ORR's network; correct?

4         A    Correct.

5         Q    So Jose's email is addressed to Vanessa

6    Jimenez, the case coordinator.  And in the first

7    sentence of the big middle paragraph of that email,

8    Mr. Castaneda states, in part, "this youth would

9    benefit from a lateral transfer to another staff

10   secure placement rather than secure"; is that correct?

11        A    Correct.

12        Q    And Mr. Castaneda cites ORR policy 1.2.4

13   in his explanation of Yolo's decision not to accept

14   the youth; correct?

15        A    I don't know the exact policy, but it

16   appears that he did quote that.

17        Q    Okay.  Thank you.

18             In the third sentence of that paragraph,

19   Mr. Castaneda also notes that the youth "is very young

20   and displays childlike and immature behaviors."

21             Do you see that?

22        A    Yes.

23        Q    And Mr. Castaneda also states that the

24   youth would be "vulnerable in a more sophisticated

25   environment such as a secure program"; correct?

Page 106

1       A       Yes.

2       Q       And as Kelsey confirmed in her email to

3    you on the first page of this document, which was

4    stamped at the bottom right-hand corner with the last

5    digits 091, that this youth was accepted at

6    Shenandoah; correct?

7       A       Correct.

8       Q       How often does Shenandoah accept a

9    placement that Yolo rejects?

10      A       I'm not sure how often, but I recall

11   previously discussing other cases where Yolo was

12   concerned and we also had concerns.  So I can't really

13   say how often that happens.

14      Q       Has that happened more than once?

15      A       What has happened?

16      Q       Has Shenandoah accepted a youth that Yolo

17   decided to reject more than once?

18      A       I can recall it's happened more than once.

19      Q       Okay.  Do you know if that has happened

20   more than five times?

21      A       In the almost seven years, I'm sure it

22   has.

23      Q       Okay.  What about more than 20 times?

24      A       I don't recall.

25      Q       Okay.  Why would Shenandoah decide to

**Exhibit 16**
**Page 725**

Page 113

1      A      Correct.

2      Q      Are there any other factors or

3  considerations outside of the notice of placement that

4  you look at before deciding whether a child would be

5  stepped up?

6      A      Not myself.

7      Q      Okay.  Does -- are you aware that anybody

8  else looks at any other factors outside of the notice

9  of placement?

10     A      I'm aware the clinician reviews, like, the

11 mental health history.

12     Q      Okay.  So you've mentioned that kids can

13 be placed at Shenandoah because they present as a

14 danger to themselves; is that right?

15     A      It's one of the NOP criteria.

16     Q      Okay.  And do you know how that

17 dangerousness assessment is conducted?

18     A      Not prior to their arrival.

19     Q      Okay.  And why is it that children who are

20 assessed or identified as being a danger to themselves

21 are sent to Shenandoah sometimes instead of a

22 therapeutic placement?

23     A      I'm unsure why.  I think if they are

24 presenting with other behaviors that might be a risk

25 to others, or criminal history might be weighing on

1     the decision.  But it's ultimately ORR and the FFS

2     assigned that determines whether to approve that.

3           Q     Okay.  Do you believe that children who

4     are a danger to themselves would be better off in

5     therapeutic settings rather than secure settings?

6           A     Yes.

7           Q     Would you describe Shenandoah as a

8     therapeutic setting?

9           A     Yes, to some extent.  We are

10    trauma-informed, and we can -- we are capable of

11    maintaining their safety.  And because of the level of

12    security, we're able to maintain supervision to keep

13    them safe.

14          Q     Do you think that children who are a

15    danger to themselves are better off in placements that

16    provide therapeutic care and treatment?

17          A     Yes.

18          Q     Are children's mental health needs

19    considered in the step up process?

20          A     In my experience, the clinician has

21    identified, like, mental health concerns about them

22    being placed in secure.

23          Q     Okay.  And when a clinician identifies

24    those concerns, who does the clinician communicate

25    with about them?

1          A      During our intake meeting where we provide

2     them the notice of placement and reason for placement

3     in secure, the minors are not only explained but

4     they're also offered -- they're told their right to an

5     administrative or a judicial review if they would like

6     to appeal the reason for placement in secure.  And

7     they don't have to sign.  They have the right not to

8     sign it, and we've had minors who have done that.

9          Q      Okay.  Have kids ever asked to leave

10    Shenandoah and go to a different facility?

11         A      Yes.

12         Q      And who do kids communicate this request

13    to?

14         A      Their case managers.

15         Q      You mentioned that during the intake

16    process kids are told about a right to administrative

17    review and judicial review.  Do you know whether

18    children understand those rights?

19         A      We explain that an administrative review

20    is through ORR and a judicial review is through their

21    legal service provider and through a court.  So I

22    would say that most minors understand that.

23         Q      Okay.  And when you use the term "we," who

24    are you referring to?

25         A      Case managers.

Page 118

1   phrase that's used to describe what the judicial

2   review process is called or what the process looks

3   like once they're in court?

4        A     No.

5        Q     Okay.  Do you understand whether that's

6   separate from a Flores bond hearing?

7        A     Yes.

8        Q     Okay.  Have kids ever been -- have you

9   ever observed that kids have been confused about their

10  right to an administrative review or a judicial review

11  process?

12       A     Yes.

13       Q     And whenever a child has said that they

14  disagree with their placement or want to leave

15  Shenandoah, do you remind them of their ability to

16  request administrative review and judicial review

17  process?

18       A     Yes.

19       Q     Do you remind them of those rights every

20  single time a child expresses disagreement with their

21  placement?

22       A     I can't speak for the other case managers,

23  but I would say that it's a conversation that is had

24  with the kids.

25       Q     Okay.  So I'd like to talk a little bit

**Exhibit 16**
**Page 729**

1    more about the notice of placement in restrictive

2    setting, and I'd like to just get a sense of whether

3    the case managers receive training on how to explain

4    the notice to the child.

5              So when, if at all, are case managers

6    trained on the notice?

7         A    Well, it's a part of the initial training

8    for case managers.

9         Q    Are there other times when case managers

10   receive training on it?

11        A    When ORR provides updates or reminders.

12        Q    And can you remind me when a child

13   receives the notice of placement?

14        A    The initial notice of placement is within

15   48 hours of their arrival and, thereafter, on or

16   before 30 days.

17        Q    Okay.  Has there ever been an instance

18   when a child has not received the notice of placement

19   within the initial 48 hours?

20        A    Yes.

21        Q    And do you remember how many times that's

22   happened?

23        A    Once or twice.

24        Q    Do you know why that happened?

25        A    Their arrival occurred over a long weekend

Page 120

1    or something related to case managers not being -- or

2    not during business hours.

3           Q      And was anyone at ORR notified about that

4    circumstance where the notice wasn't provided within

5    48 hours?

6           A      Not that I recall.

7           Q      Is the provision of the notice, that

8    initial notice, recorded anywhere or tracked anywhere?

9           A      Can you explain that?

10          Q      Yeah.  So when a notice has been provided,

11   that initial notice has been provided to the child, is

12   that exchange documented or recorded anywhere?

13          A      The notice of placement is either signed

14   or not signed by the minor, and then it's scanned and

15   placed in their file and uploaded to the UAC portal

16   for ORR's review.

17          Q      Okay.  All right.  So we'll move on to

18   another exhibit.

19                 MS. ADAMS:  We'll mark this one 168.

20

21                 (Deposition Exhibit No. 168 was marked for

22   identification and attached to the transcript.)

23

24   BY MS. ADAMS:

25          Q      So please go ahead and review this

Page 138

1    referred to?  So within maybe 15 days or 18 days,

2    something like that?

3          A     Not that I can recall.

4          Q     Okay.  How is good behavior evaluated?

5          A     Through their presenting behavior,

6    significant incident reports.  Just behavioral

7    incidents.

8          Q     Okay.  Is good behavior evaluated

9    differently for children with disabilities?

10         A     Can you say that again?

11         Q     Is good behavior evaluated differently for

12   children with disabilities?

13         A     Yes.

14         Q     How so?

15         A     Taking into consideration -- by taking

16   into consideration their developmental needs or their

17   cognitive delays or specific needs.  The clinician

18   might recommend that the behavior is presenting

19   because of those delays or those special needs, and so

20   that is a part of the recommendation if, as a

21   facility, we concur on that.

22         Q     And so if a clinician concludes that a

23   child is behaving a certain way because that's a

24   manifestation of a delay or some other kind of

25   disability, what happens?  What's the impact of that

1          Q     The first sentence of your email states:

2     Please see below DHS/ICE clearance for the youth;

3     correct?

4          A     Correct.

5          Q     In the next sentence you state:  "Jessie,

6     please advise if this will support your decision to

7     approve a step down.  He has maintained behavior for

8     over 90 days now"; is that right?

9          A     Correct.

10         Q     Why would information about DHS or ICE

11    clearance support an FFS's decision to approve a step

12    down?

13         A     If the minor has disclosed some sort of

14    criminal history and -- outside of the United States,

15    the FFS will indicate a need for this.  Depending on

16    the results, ORR determines their decision to step

17    down.

18         Q     Okay.  What does "maintaining behavior"

19    mean?

20         A     Having no presenting behavioral incidents

21    or concerns.

22         Q     Okay.  And does ORR policy use that

23    phrase?

24         A     I can't specifically say if ORR policy --

25    I don't recall.

Page 142

1        Q      Okay.  Is that a phrase that Shenandoah

2    staff use?  "Maintaining behavior"?

3        A      Yes.

4        Q      Okay.  Why does it matter whether a youth

5    has maintained behavior for 90 days?

6        A      It shows that for an extended period of

7    time the minor has been meriting a step down.

8        Q      Okay.  Would it make a difference if a

9    minor had maintained behavior for 20 days instead?

10       A      No.

11       Q      Okay.  Can a youth be stepped down if they

12   have maintained behavior for 20 days?

13       A      That would be ORR's decision to determine.

14       Q      Is there a situation where you would

15   recommend a step down if a child had maintained

16   behavior for 20 days?

17       A      We ask for the NOPs a week -- or seven to

18   five days -- five to seven days before they reach 30

19   days.  So I could see that happening.

20       Q      Has a youth been stepped down in less than

21   30 days before?

22       A      Yes.

23       Q      Okay.  How many times has that happened?

24       A      I can't say an exact amount, but I can

25   recall one case that was transferred -- or approved

1   for a transfer the 28th or 27th day, something like

2   that.

3          Q     Okay.  Would you say that it's rare for

4   kids to be stepped down before 30 days?

5          A     Yes.

6          Q     We've finished with that document now.

7                When considering whether to recommend a

8   child for step down, do you or any other Shenandoah

9   staff ever refer to a child as stable or unstable?

10         A     Yes.

11         Q     Why do you use that term?

12         A     It's similar to identifying that they've

13   maintained.  They've demonstrated stabilized behavior.

14   It's a similar description.

15         Q     Okay.  And who has the ability or

16   authority to determine whether a youth is stable?

17         A     It's a conversation between the clinician

18   and the case manager to determine whether that's an

19   appropriate word to use or for that particular minor.

20         Q     Okay.  And have you received training on

21   how to make an assessment about stability?

22         A     Not that I can recall.

23         Q     Okay.  Are children ever stepped down from

24   Shenandoah because they are no longer a danger to

25   themselves?

Page 147

1        A       No.

2        Q       Would their evaluations ever be considered

3     in deciding whether to step down a child?

4        A       Yes.  They're a part of the

5     recommendation, but they're not directly involved.

6        Q       Okay.  Would a child be involved in the

7     decision to step down the child?

8        A       I can imagine if they ask for, like, an

9     administrative review, then they would be involved in

10    asking for that.

11       Q       But before a step down decision is made,

12    is the child consulted or involved in any way?

13       A       No, not that I can recall.

14       Q       Is a child's attorney involved in the step

15    down decision process?

16       A       We ask them for their input or

17    recommendation in regards to how a step down may

18    affect their legal case.

19       Q       Okay.  And by "we," are you referring to

20    case managers?

21       A       Yes.

22       Q       Okay.  Who notifies a child if they are

23    not approved for step down?

24       A       The case managers.

25       Q       Who notifies a child's attorney if a child

**Exhibit 16**
**Page 736**

1    is not approved for step down?

2          A     The case managers.

3          Q     What is your understanding of whether an

4    attorney is entitled to review any of the evidence

5    used to justify a child's step down or continued

6    placement at Shenandoah?

7          A     It's my understanding that they have --

8    they have -- like, they can ask for the notice of

9    placement to review the reasons for placement.

10         Q     Okay.  Are the attorneys allowed to look

11   at any other documentation other than the notice of

12   placement?

13         A     It's my understanding they have to file a

14   formal request and have consent from the minor to have

15   the entire case file.  Any other documentation would

16   have to be requested officially through ORR.

17         Q     Do you have any sense of approximately how

18   many children at Shenandoah have legal representation

19   when they are denied step down?

20         A     Can you say that again?

21         Q     Yeah.  Do you have any sense of how many

22   kids have legal representation when they are denied

23   step down at Shenandoah?

24         A     Can you define "legal representation"?

25         Q     Do they -- when a child is -- I'm trying

Page 151

1    50 percent of the time?

2          A     Yes.

3          Q     Okay.   What are some of the reasons

4    facilities have provided when refusing to admit

5    children approved for step down?

6          A     In my experience, I've seen staff secures

7    indicate state licensing limitations, prior history,

8    whether criminal disclosures of violent -- criminal

9    history or just historical behavior.

10         Q     Anything else?

11         A     Not that I can recall.

12         Q     And when facilities provide this refusal

13   or denial to admit a child, they provide that refusal

14   after an FFS has already approved that child for step

15   down; correct?

16         A     Correct.

17         Q     Do you believe the reasons that facilities

18   have provided for denial have been legitimate reasons?

19         A     Not always.

20         Q     Do you have any examples that you can

21   share of the times when you have not believed that

22   there have been legitimate reasons for denial?

23         A     With my current case, he was referred to

24   an RTC in network and was denied based on his previous

25   behavior history prior to his placement in secure and

Page 152

1    the minor had maintained for the less-than-30-day

2    period.

3                In my opinion, that wasn't really a reason

4    because the presenting behavior merited a step down in

5    a placement in therapeutic due to his mental health

6    history.  So them using the reason for his

7    historically behavior -- presenting behavior at other

8    facilities didn't seem like a valid reason.

9         Q    And in that situation, did you have any

10   opportunity to have back-and-forth dialogue with the

11   folks who issued the denial to try to explain why you

12   felt like the step down was appropriate?

13        A    Not directly with the facility but with

14   ORR and my FFS.

15        Q    Okay.  And is that conversation still

16   pending, or has there been resolution around that

17   issue?

18        A    I'm not sure where that was left at the

19   ORR headquarters level.  Other options were explored

20   and are being explored.

21        Q    Okay.  I'd like to just clarify that, most

22   likely all, if not this -- just this portion of the

23   transcript will be marked confidential.  So I want to

24   ask you specific information about this youth, but I

25   just want to clarify that the name and everything

1         Q     Okay.  Would you agree that, if a child

2    remains at Shenandoah after they have already been

3    approved for step down, that child is in an

4    inappropriate placement?

5         A     Yes.

6         Q     Let's move on to talking about

7    reunification.

8              Can you talk to me about the step-by-step

9    process for children to be released from Shenandoah to

10   a sponsor?

11        A     Yes.  It's a lot of steps that are

12   required for family reunification.

13        Q     Okay.

14        A     And, to the best of my ability, I will

15   give you a summary.

16              The first step is to identify a potential

17   sponsor and inform them of the process to reunify,

18   which would include documentation, forms regarding

19   their household composition, their employment status

20   and income, proof of address.  If it's a biological or

21   family -- if there's family relation, proof of

22   relationship; otherwise, if they're not related, we

23   request some sort of proof of bona fide relationship

24   prior to to ensure that this is a person that they

25   know or that would be a -- someone that the parents

Page 160

1    the home study, ten days; safety plan, et cetera.

2         Q    Okay.  You've mentioned that sometimes a

3    minor arrives at Shenandoah without an identified

4    sponsor; correct?

5         A    Yes.

6         Q    So I'm trying to get a sense of the

7    longest amount of time that the reunification process

8    has taken, in your experience.

9              Is it possible that a reunification

10   process has taken over six months?

11        A    Yes.

12        Q    Over one year?

13        A    Yes.

14        Q    Over a year and a half?

15        A    I can't say exactly, but maybe around that

16   time.

17        Q    Okay.  You've mentioned outdated paperwork

18   that you have received.  Can you explain a little bit

19   more about what that paperwork looks like?

20        A    For example, there was an updated version

21   of the ORR application forms in June of 2019.  And so,

22   more recently, a minor arrived with a sponsor that was

23   identified before June; however, in order to proceed

24   with background check results, the agency that

25   processes those requires the updated forms.  And so

1    longer than 45 days?

2         A    Yes.

3         Q    Okay.  Do you know why that is?

4         A    From what I understood, the psychologist

5    was out of the office and had been backed up with

6    multiple evaluations.  I can't think of any other

7    situations that it's happened, but that was one of

8    them.

9         Q    Okay.  And we talked about this a few

10   hours ago, but I just want to make sure I understand.

11            Does a psychological evaluation need to be

12   completed before a child can be stepped down or

13   reunified?

14        A    ORR determines whether that's necessary

15   for a step down or for reunification.

16        Q    Okay.  And can you remember whether a

17   psychological evaluation had to be completed before

18   step down?

19        A    Yes.

20        Q    Okay.  And can you remember whether a

21   psychological evaluation had to be completed before

22   reunification?

23        A    Yes.

24        Q    Do you know what a risk assessment is?

25        A    Can you explain specifically what a risk

1    likely to be reunified with a sponsor if they are

2    eligible to be stepped down?

3         A    No.

4         Q    Is it easier for a child to be reunified

5    with a sponsor if they are in a shelter facility

6    instead of a secure facility?

7         A    There might be less concerns regarding

8    behavior, mental health, which is why they would merit

9    the shelter care facility.  So I can imagine it would

10   be less of a delay to reunify a minor in shelter.

11        Q    Okay.  Would it be easier to reunify a

12   child with a sponsor if they were in an RTC placement

13   instead of a secure placement?

14        A    I can't -- I don't know how the RTC

15   proceeds with the reunification and whether ORR is

16   involved in pushing that forward so I can't say.

17        Q    Okay.  Have you ever disagreed with an

18   FFS's decision not to release a child to a sponsor?

19        A    Yes.

20        Q    Are there any specific details that you

21   can share about any of those situations?

22        A    I can recall a case where I submitted a

23   recommendation for release and had a positive home

24   study, the case coordinator was also in agreement, and

25   FFS denied release.  I can't recall the specific

1          ON BEHALF OF THE DEFENDANTS ALEX AZAR, SECRETARY

2          of U.S. DEPARTMENT of HEALTH and HUMAN

3          SERVICES, and E. SCOTT LLOYD, DIRECTOR,

4          OFFICE of REFUGEE RESETTLEMENT of the

5          U.S. DEPARTMENT of HEALTH and HUMAN

6          SERVICES, in THEIR OFFICIAL CAPACITIES:

7    BY MS. STEVENSON:

8          Q     Okay.  I just want to circle back and just

9    understand a couple of your answers a little bit

10   better.

11              The first issue I wanted to discuss was

12   you said that sometimes you are not -- you cannot

13   provide information to an attorney, sensitive

14   information and/or PII.  Whose sensitive information

15   and/or PII is it that you cannot share?

16         A     The sponsor's.

17         Q     Okay.  So the attorney has the breadth of

18   information about his client or her client?

19         A     Correct, the case plan.

20         Q     Do you share with the attorney if they've

21   asked to appeal a placement?

22         A     Through which process?

23         Q     Any of the processes that are in place.

24         A     I can't recall if I did for the last

25   administrative one, and I've never had a judicial

Page 242

1    COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2              I, Valarie Lee Schmit May,

3    Notary Public for the Commonwealth of Virginia at

4    Large, whose commission expires June 30, 2020, do

5    certify that the aforementioned appeared before me,

6    was sworn by me, and was thereupon examined by

7    counsel; and that the foregoing is a true, correct,

8    and full transcript of the testimony adduced.

9              I further certify that I am neither related

10   to nor otherwise associated with any counsel or

11   party to this proceeding, nor otherwise interested in

12   the event thereof.

13             IN WITNESS WHEREOF, I have hereunto set my

14   hand and affixed my notarial seal this 5th day of

15   February 2020.

16

17

18                 *Valarie May*

19   _____

20     Valarie Lee Schmit May, Notary Public, #242129

21             Commonwealth of Virginia at Large

22

23

24

25

Page 243

1                    ACKNOWLEDGMENT OF DEPONENT

2               I, CARINA CONTRERAS, do hereby acknowledge

3     that I have read and examined the foregoing testimony,

4     and the same is a true, correct and complete

5     transcription of the testimony given by me and any

6     corrections appear on the attached errata sheet signed

7     by me.

8

9     _____         _____

10      (DATE)                           (SIGNATURE)

11

12        COMMONWEALTH OF VIRGINIA at Large, to wit:

13        I hereby certify that the above-named individual

14    appeared before me this _____ day of _____,

15    _____, and executed the above certificate in my

16    presence.

17

18                            _____

19                            NOTARY PUBLIC IN AND FOR

20                            THE COMMONWEALTH OF VIRGINIA

21

22    My Commission Expires:

23    _____

24

25

# Exhibit 17

**Exhibit 17**
**Page 747**

Confidential pursuant to the protective order

Page 1

1

2                 IN THE UNITED STATES DISTRICT COURT

3                   CENTRAL DISTRICT OF CALIFORNIA

4                         WESTERN DIVISION

5        *********************************************************

         LUCAS R., et al.,

6

                         Plaintiffs,

7             v.                        Case Number

                                        2:18-CV-05741 DMG PLA

8        ALEX AZAR, Secretary of U.S.

         Department of Health and Human

9        Services, et al.,

10                       Defendants.

         *********************************************************

11

12         Confidential pursuant to the protective order

13                       DEPOSITION OF

14                       MELISSA COOK

15                     November 18, 2019

16                  9:10 a.m.  -  5:06 p.m.

17                   Harrisonburg, Virginia

18

19

20

21

22

23

24       REPORTED BY:  GWENDA E. APPLEGATE, RPR, CRR

25       Job #:171764

Confidential pursuant to the protective order

Page 66

1    Q    Do you communicate, as part of your job,
2    with attorneys for children?
3    A    No.
4    Q    No.  Okay.  Never?
5    A    Never.
6    Q    Are you aware of any ORR policies that are
7    related to your ability as a clinician to speak with
8    attorneys?
9    A    Possibly.
10   Q    Possibly there's a policy or --
11   A    There may be.  I'm not -- I'm not sure.  I
12   know clinicians do not generally speak to attorneys.
13   Q    Are you allowed to speak with attorneys?
14   A    I don't think it -- I don't -- I don't
15   believe it's recommended.  I don't know if it's a
16   part of policy, but we keep the mental health and the
17   legal completely separate.
18   Q    So if an attorney reached out to you or
19   e-mailed you, what would you do?
20   A    I would send it to Kelsey.
21   Q    Okay.  So we've talked about your
22   communications with your supervisor, with other
23   clinicians, with ORR, with General Dynamics, with the
24   direct care staff at Shenandoah, with psychiatrists
25   and psychologists, and with children family members

**Exhibit 17**
**Page 749**

Confidential pursuant to the protective order

Page 109

1    higher level of secure, security.

2         Q    And what does higher level of secure mean?

3         A    It mean -- it would mean the most -- it

4    would mean whatever level that youth needs to be in

5    to be maintained in a safe manner for themself or

6    others.

7         Q    Is Shenandoah, to your understanding, the

8    highest level of security that ORR --

9         A    Yes.

10        Q    -- uses?  Yes.

11             And it's called a secure facility?

12        A    Yes.

13        Q    What does it mean to be a secure facility?

14        A    It means that the youth have 24-hour

15   supervision.  It means that they are in a locked

16   facility.  They cannot come and go as they please.

17        Q    Anything else?

18        A    I'm sure there are other things, but I

19   can't think of specifics.

20        Q    Do children have any privacy at Shenandoah?

21        A    Yes.

22        Q    When?

23        A    They have their own bedrooms.

24        Q    Are there windows out to the hallway?

25        A    Are there windows out to the hallway?

**Exhibit 17**
**Page 750**

Confidential pursuant to the protective order

Page 110

1      Q      From the bedrooms?

2      A      Yes.  There's a window to the main unit,

3   uh-huh.

4      Q      Are the children allowed to cover them?

5      A      If they choose.  They need to have a little

6   bit of a space so that staff can monitor for

7   self-care -- I mean for self-harm.

8      Q      Do you know what the ratio of staff to

9   children at Shenandoah is?

10     A      No.  Not exactly.

11     Q      Do you know approximately?

12     A      No.  It's not within my area of expertise.

13     Q      When you have a clinical appointment with a

14   child, where does it take place?

15     A      Typically in my office.

16     Q      Does the child come to your office alone or

17   are they with a staff member?

18     A      Typically it will be me and the child.

19     Q      But when the child moves from their room or

20   unit to your office, are they on their own or are

21   they with a staff member?

22     A      They are always with a staff.

23     Q      Are they always with staff whenever they

24   are moving within the facility?

25     A      Yes.

**Exhibit 17**
**Page 751**

Confidential pursuant to the protective order

Page 145

1      Q      Does it depend on anything else?

2      A      It depends on acceptance from the RTC.

3      Q      And why would an RTC not accept a child?

4      A      I can't speak to all the reasons that they

5  wouldn't accept a child.

6      Q      What are the reasons you're aware of?

7      A      They may be at capacity.  It may be out of

8  their expertise.

9      Q      Are you aware of situations where a child

10  needed to be sent to an RTC and was not sent because

11  there was not enough bed space?

12      A      Possibly.

13      Q      Can you remember any time that's happened?

14      A      Not currently.

15      Q      If you wanted to find the answer to that

16  question, where would you look?

17      A      I wouldn't -- I wouldn't know where to look

18  because it's case by case situation, and I would have

19  to have a particular case.

20      Q      Would it be in a child's case file?

21      A      Would what be in a child's case file?

22      Q      If the child needed to go to an RTC and

23  they couldn't go because of a lack of bed space --

24      A      I wouldn't know where that would show up.

25  There is a document trail for that, but I don't know

Confidential pursuant to the protective order

Page 179

1      Q     Do kids ever get stepped down from

2   Shenandoah to long-term foster care?

3      A     No.

4      Q     Do kids ever get stepped down from

5   Shenandoah to an out-of-network facility?

6      A     Yes.  It could happen.

7      Q     Has it happened?

8      A     I do not believe it has yet.

9      Q     Why are children never stepped down to

10  shelters?

11     A     Because shelters have little structure,

12  little to no structure, and the youth in our care

13  need structure.

14          MS. PITTS:  Can we go off the record for

15      just a moment?

16

17          (Discussion off the record, recess)

18

19          MS. PITTS:  Okay.  We're back on the

20      record.

21  BY MS. PITTS:

22     Q     Are you familiar with the term step down?

23     A     Yes.

24     Q     Let me go back a step.  We were talking

25  about when children are sent to different facilities,

Confidential pursuant to the protective order

Page 182

1      A    I don't know.  I work with the kids and

2  their behavior and, you know, as far as their

3  emotions and that kind of thing, so it's something

4  that, you know, the kids may bring up or come up, but

5  it's not something that, you know, I hold to them.  I

6  don't make the decisions, if that answered the

7  question.

8      Q    But the kids have articulated to you that

9  there is a requirement that they have to have 30 days

10  of good behavior to be stepped down?

11      A    At one time I believe that was the case.  I

12  know that we can step kids down if there is a need

13  with a medical need or something else, but I don't

14  know how -- exactly how all the process happens to

15  that because I'm not the one that makes the decision.

16      Q    Do you have any idea who would have been

17  telling the kids that?

18      A    I don't know.  I don't know all the

19  specifics of that.  I really don't.

20      Q    Can you tell me what the children reported

21  to you?

22      A    I don't know the specifics of it.  I know

23  in the past that we've said that they've had to have

24  30 days of good behavior, but I don't know the policy

25  or, you know, exactly what that is.

Confidential pursuant to the protective order

Page 192

1   And we have lots of youth that come in, so it's

2   really hard for me to, like, process, like, which

3   ones at this -- in this type of questioning, I can't

4   give you an honest answer because I don't...

5        Q    Okay.  But you have -- you have had the

6   experience of seeing a child's mental health

7   deteriorate --

8        A    Yes.

9        Q    -- while they're in the setting?

10        And understanding that you can't recall a

11   specific child, what kind of effect does it have on

12   children, prolonged detention in a secure setting?

13        A    I mean, it would have a behavior effect.

14        Q    What kind of behavior effect would it have?

15        A    It depends on the child.

16        Q    Can you give me an example of the behavior

17   effect it might have?

18        A    They might act out more.  They might pick

19   fights more.

20        Q    What other behavior effects might it have?

21        A    Some might become depressed.

22        Q    Anything else?

23        A    There's a lot of things.  There's a

24   plethora of things that it could present as.  Again,

25   that's unique to each individual child and the mental

**Exhibit 17**
**Page 755**

Confidential pursuant to the protective order

Page 193

1  health, their personality.  So it's -- it's a very

2  individualized situation.

3       Q    Might it affect a child's sleep?

4       A    Yes.

5       Q    Might it affect a child's ability to

6  maintain good behavior?

7       A    Yes.

8       Q    Might it affect the child's ability to be

9  able to be stepped down if they couldn't maintain

10  their good behavior?

11       A    Possibly.

12       Q    Might it affect the child's ability to be

13  released to their sponsor if they couldn't maintain

14  their good behavior?

15       A    I don't think so, if it was just general

16  behavior.  If they were a harm to somebody else,

17  possibly.  If it's just normal behavior, I don't

18  think so.  But I don't make the decisions.

19       Q    So you think it would be more likely to

20  affect whether a child would step down than it would

21  be to affect whether they could be released to a

22  sponsor?

23       A    Yes.

24       Q    Who ultimately decides whether a child is

25  going to be stepped down?

**Exhibit 17**
**Page 756**

Confidential pursuant to the protective order

Page 197

1     Q    Would you say you're familiar with all of

2  the staff secure programs in the system?

3     A    Some of them.

4     Q    Which ones?

5     A    I can't list them off the top of my head.

6     Q    Is there one staff secure program that you

7  send kids to more than any other?

8     A    I don't know.

9     Q    Would you communicate with the receiving

10  staff secured program after you stepped a child down?

11     A    If their clinician called and wanted to

12  know what things we were doing with the youth, I

13  would.

14     Q    Can you think of any staff secure facility

15  you've had that conversation with?

16     A    I know I've had that type of a conversation

17  but I can't tell you a specific one.

18     Q    You can't think of the names of any staff

19  secure facilities?

20     A    No.

21     Q    Based on your knowledge and experience, are

22  there times when children are not stepped down

23  because of a lack of capacity at other ORR

24  facilities?

25     A    Yes.

Confidential pursuant to the protective order

Page 209

1       A    I can't say how many times it's happened.

2   I don't know.

3       Q    Can you remember the last time it happened?

4       A    No.

5       Q    Are psychological evaluations required for

6   every child at Shenandoah?

7       A    No.

8       Q    Are they requested for most children at

9   Shenandoah?

10      A    They seem to be requested if a child has a

11  reunification.

12      Q    So they wouldn't be requested if the child

13  had no viable sponsor?

14      A    No.  They could be.  There's many reasons.

15  But they would typically -- typically automatically

16  when a child is going to be released to the

17  community.  And that's to help the sponsors know how

18  to access services and what services specifically

19  that child needed, needs.

20      Q    Okay.  So in your experience, if a child is

21  being considered for release to a sponsor, a

22  psychological evaluation is requested?

23      A    In our setting.

24      Q    At Shenandoah?

25      A    At Shenandoah.

Exhibit 17
Page 758

Confidential pursuant to the protective order

Page 210

1    Q    In your experience, approximately how long

2  does it take to complete a psychological evaluation

3  from the time that you ask for it?

4    A    That depends on the psychologist.  It could

5  take two to three weeks to get it, and it could take

6  at least a month to receive the evaluation.

7    Q    So two to three weeks to identify the

8  evaluator or to get someone to agree to take it?

9    A    To have them have an availability.

10   Q    So just to make sure I'm clear, two to

11  three weeks until the child is seen?

12   A    Yes.

13   Q    And do those psychological evaluations

14  happen on site at the facility or is the child

15  transported to the psychologist's office?

16   A    Both happen.

17   Q    What does that depend on?

18   A    That depends on the psychiatrist -- I mean

19  the psychologist, sorry, and their preference.

20   Q    It's the psychologist's preference?

21   A    Uh-huh.

22   Q    Does it depend on anything else?

23   A    It just depends on their preference.

24   Q    And am I correct in recalling there are two

25  psychologists on contract to conduct evaluations?

**Exhibit 17**
**Page 759**

Confidential pursuant to the protective order

Page 211

1    A    Correct.

2    Q    And you stated that it generally --

3    actually, I don't think I asked this question.

4         How long does it generally take for the

5    psychologist to produce a report?

6    A    Thirty days at least.

7    Q    Thirty days at least.

8         What's the longest you've seen it take?

9    A    Two months.

10    Q    Do you know why that one took so long?

11    A    It has to do with the psychologists and

12    their availability.

13    Q    So the general timeline between when you

14    make the request and when the report is in your hands

15    is two to three weeks plus 30 days or more?

16    A    Yes.

17    Q    Okay.  Has that timeline for completing a

18    psychological evaluation changed at all during your

19    time at Shenandoah?

20    A    No.  That's -- that has to do with the

21    psychologists and their time, their timeline.

22    Q    So that's always been the same?

23    A    Yes.  It's the psychologist's timeline.

24    Q    And who is the psychological evaluation

25    shared with?

Confidential pursuant to the protective order

Page 238

1    that make it go more quickly?

2         A    Our case managers are very efficient.

3         Q    In your experience, what factors might make

4    it go more slowly?

5         A    If the sponsor doesn't send in the required

6    paperwork and stops returning phone calls.

7         Q    Anything else that might make it go more

8    slowly?

9         A    I'm sure there are, but I can't think of

10   any at this moment.

11        Q    Does a home study increase the amount of

12   time it takes for a child to be released to a

13   sponsor?

14        A    It's part of the process.

15        Q    Do all children have home studies?

16        A    In secure they do.  I can't speak to

17   outside of secure.

18        Q    So all of your kids have home studies?

19        A    Yes.

20        Q    Do you know why?

21        A    Because we are -- the children that we work

22   with have a higher level of security and a higher

23   level of needs and higher levels of aggressions.

24        Q    Does finding -- does identifying post-

25   release services for a child increase the amount of

Exhibit 17
Page 761

Confidential pursuant to the protective order

Page 270

1    Q    And how many clinicians were working with

2  those 32 youth?

3    A    Three to two.  I think we were three most

4  of the time, but...

5    Q    So your caseload around that time might

6  have been around 10 children?

7    A    Twelve.

8    Q    Twelve?

9    A    Twelve, fifteen.  It just depended.

10   Q    And your current caseload is around five?

11   A    Yes.

12   Q    In your clinician opinion, what's -- or in

13  your professional opinion, what would be best

14  practice for a caseload for a clinician in a setting

15  like Shenandoah?

16   A    With our kids, it's about eight and it's

17  getting stressful.

18   Q    Are children who leave Shenandoah ever

19  stepped down to an unaccompanied refugee minor foster

20  care program or URM program?

21   A    Directly from us, no.

22   Q    Could they be?

23   A    I don't believe so.

24   Q    Why not?

25   A    That is a policy thing that I don't know

**Exhibit 17**
**Page 762**

Confidential pursuant to the protective order

Page 271

1    about.

2        Q    An ORR policy thing?

3        A    Uh-huh (Indicating in the affirmative).

4        Q    Can you remind me how many case managers

5    currently work with --

6        A    There's four.

7        Q    There are four.

8            Can you tell me their names, please?

9        A    Corina is lead, Emily, Elsa and Jessica.

10       Q    Do you know any of their last names?

11       A    Corina Contreras.  I hope she doesn't read

12   this.

13           I can't pronounce Jessica's last name.

14       Q    Do you know how to spell it?

15       A    No.

16       Q    Do you know what letter it starts with?

17       A    P.

18       Q    P.  It's a start.

19           And what about Elsa and Emily?

20       A    Emily Twigg.  I can't remember Elsa's last

21   name.  I can't remember her last name.  I'm drawing a

22   complete blank.

23       Q    Okay.  And you said Corina is lead, yes?

24       A    Yes.

25       Q    Okay.  In your role as lead clinician --

**Exhibit 17**
**Page 763**

Confidential pursuant to the protective order

Page 294

1    COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2              I, Gwenda E. Applegate, Court Reporter,

3    Notary Public in and for the Commonwealth of Virginia

4    at Large, and whose commission expires November 30,

5    2021, do certify that the aforementioned appeared

6    before me, was sworn by me, and was thereupon examined

7    by counsel; and that the foregoing is a true, correct,

8    and full transcript of the testimony adduced.

9              I further certify that I am neither

10   related to nor associated with any counsel or party

11   to this proceeding, nor otherwise interested in the

12   event thereof.

13             Given under my hand and notarial seal at

14   Palmyra, Virginia, this 3rd day of December 2019.

15

16

17

18

19   *Gwenda E. Applegate*
     _____

20        Gwenda E. Applegate, Notary Public

21        Commonwealth of Virginia at Large

22        Notary Registration Number 115863

23

24

25

**Exhibit 17**
**Page 764**

# Exhibit 18

Exhibit 18
Page 765

Page 1

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                WESTERN DIVISION

4   - - - - - - - - - - - - - - - x

5   LUCAS R., et al.,              :

6          Plaintiffs,             :

7   vs.                            : Case No.

8   ALEX AZAR, Secretary of U.S.   : 2:18-cv-05741 DMG PLA
    Department of Health and Human

9   Services, et al.,              :

10         Defendants.             :

11  - - - - - - - - - - - - - - - x

12

13

14       DEPOSITION OF JAMES DE LA CRUZ

15            Washington, D.C.

16            March 10, 2020

17

18

19

20

21

22  Reported by:
    Misty Klapper, RMR, CRR

23  Job No.: 176920

24

25

Exhibit 18
Page 766

Page 21

1    field specialist as FFS today?

2         A.    Please.

3         Q.    So FFS are acting in a representative

4    capacity on behalf of the director of ORR?

5         A.    Yes, ma'am.

6         Q.    And what kinds of decisions do FFS

7    make?

8         A.    Primarily transfer and release.

9         Q.    Transfer and release.

10             Are we talking about transfer between

11   two different care provider facilities for

12   children?

13        A.    Yes, ma'am.

14        Q.    And then release would be to a

15   sponsor within the United States, correct?

16        A.    Yes, ma'am.

17        Q.    Is there anything else that an FFS is

18   responsible for?

19        A.    Yes, ma'am.

20        Q.    What kinds of things?

21        A.    Site visits to assigned shelters.

22        Q.    What is a site visit?

23        A.    A site visit would be where the FFS

24   travels to a care provider facility, visits with

25   care providers, can provide training, guidance

Page 58

1      Q.    Can you give me an example of what a

2 unique service would be?

3      A.    It could be a child who needs a heart

4 transplant.  It could be a child who has mental

5 health issues and conduct issues and has a --

6 there's a language barrier.  It could be

7 where -- it might be a child who has a family

8 member who might have a violent or criminal

9 history and is trying to find the child and the

10 family.

11          There's many types of reasons, but

12 fortunately, they don't come up frequently.

13      Q.    Are there any circumstances under

14 which someone would need to loop you into the

15 decision about transferring a child from one

16 facility to another?

17      A.    So we would have to clarify need, if

18 that's okay.

19      Q.    Sure.  I'm wondering if there is a

20 list of circumstances or criteria where you

21 would require or at least instruct your direct

22 reports to elevate this type of decision to you.

23      A.    No, ma'am.

24      Q.    So similar to the initial placement

25 decisions, anytime that a transfer decision is

Page 59

1    elevated to you, it's at the discretion of those

2    below you?

3        A.    Yes.

4        Q.    And would it be the FFS supervisors

5    who are deciding to elevate it to you or can an

6    FFS elevate something to you directly?

7        A.    The preference is that the FFS at the

8    field level follow their chain of command, but

9    they all know that if they needed to, they could

10   contact me.

11       Q.    So there are times when you hear from

12   the FFS directly?

13       A.    Yes.

14       Q.    And the same question, in the past

15   six months, approximately how many transfer

16   decisions have been elevated to you?

17       A.    Maybe twice.

18       Q.    And those two times, approximately,

19   in the last six months, who is ultimately

20   responsible for where the child is placed?

21       A.    It would be the FFS.

22       Q.    So even if you disagreed with the

23   FFS, the FFS has final decision-making

24   authority?

25       A.    Well, I can't -- I would say that

Page 60

1    after discussing it with me, we would come to

2    the conclusion that -- we would -- we would, you

3    know, not -- I wouldn't force someone to -- to

4    place a child somewhere, but I think we would

5    discuss what -- what the concerns were if we

6    identified something or a placement.  And then

7    we -- I could even bring someone in.  I mean, I

8    would have to say that I haven't had that

9    situation where we've had to bring in another

10   person to discuss.

11           Most of the time it's the FFS or the

12   FFS supervisor pretty much knows where they want

13   to place -- where they think a child would be

14   appropriately placed.  And so they're really

15   just looking for -- what's the right word to

16   use -- they're -- they're looking for someone to

17   validate that that -- that's probably the best

18   place -- placement decision.

19       Q.    So they may elevate a decision to you

20   for validation?

21       A.    Yes.

22       Q.    And you can't recall a situation in

23   which a transfer decision has been elevated to

24   you and you have disagreed with the ultimate

25   decision made by the FFS?

**Exhibit 18**
**Page 770**

1     Q.    Are they referred to as out of

2 network care providers?

3     A.    Yes, ma'am.

4     Q.    And what makes an out of network care

5 provider different from an RTC?

6     A.    An out of network provider is --

7 okay.  So I guess I want to clarify that it's in

8 two -- two ways different.  Well, so the -- the

9 number one way is it's not part of our network,

10 meaning that they don't have a standing contract

11 and they don't have a cooperative agreement.

12         And the reason why I bring that up is

13 because out of network placements aren't all

14 necessarily exclusively mental health.  We've

15 had some kids who were placed in an out of

16 network facility because of a medical need.

17         And, you know, for instance, we had

18 one child who, you know, unfortunately the

19 doctors had diagnosed that she was probably

20 going to pass away, she would soon, and so what

21 we had to do is find a place for her.  And we

22 also knew where her mother was.  So what we had

23 to do was find an out of network placement where

24 she could go.  And she eventually ended up in

25 hospice care before she passed away.  So we --

**Exhibit 18**
**Page 771**

1      A.    So yeah.  The release process, they

2  are part of that.  They're the -- they're the --

3  yeah.

4      Q.    For step-ups, not release?

5      A.    For step-ups, yeah.

6      Q.    Are they responsible for making that

7  decision whether a child gets stepped up?

8      A.    Yes.

9      Q.    Do FFS supervisors play a role in

10  that decision, whether a child gets stepped up?

11      A.    They'll also sometimes do a review.

12      Q.    Do you have a role in deciding

13  whether a child gets stepped up?

14      A.    Only if it's elevated to me and they

15  make the request.

16      Q.    And what is the criteria for

17  elevating a step-up decision to you?

18      A.    So there's not a criteria where

19  they -- where I say you have to elevate it to

20  me.  I'm available if they're having -- needing

21  to make a decision.

22           But one of the other things that we

23  created is a new position for the secure

24  populations.  We do have one of the supervisors

25  who is assigned to secure populations and he

Exhibit 18
Page 772

1    you have a child who might be in a facility who

2    is not either safe for himself or herself or

3    there might be children who are at risk as well.

4              And so there's a responsibility for

5    that FFS to make sure that that child is -- the

6    placement is located.  And then what would

7    happen is then they have a group of us.  They

8    have the supervisor, they have the special

9    populations and then they have myself.  And they

10   also have the medical staff, if necessary, who

11   can -- who can help identify a placement.

12             So there -- there's a good group of

13   people who can help make step-up decisions.

14   Q.    Does an FFS have to elevate a step-up

15   decision to their FFS supervisor?

16   A.    I'd have to look at the policy about

17   that, but I don't believe they do.  I would need

18   to look that up and see if it hasn't changed,

19   but I don't believe they do.

20   Q.    And so assuming it hasn't changed,

21   it's discretionary on the part of the FFS

22   whether they elevate a step-up decision to an

23   FFS supervisor?

24   A.    Yes.  And, you know, I do want to say

25   this, too:

**Exhibit 18**
**Page 773**

Page 137

1    are -- are limits as far as the kind of kids

2    that they can place and the needs that they can

3    treat.  So -- so there's -- there's discretion,

4    but it's not -- there is -- there is some

5    structure to that that's inherent just by us

6    having programs that are licensed.

7         Q.    And is it your understanding that the

8    state licensing authorities implement the

9    regulations and rules with immigrant children in

10   mind?

11        A.    Not all of them.

12        Q.    Working within that framework that,

13   of course, state licensing has to apply for the

14   facilities, is it similarly discretionary if an

15   FFS supervisor elevates a step-up decision to

16   you?

17        A.    Yes.

18        Q.    Is a child's attorney involved in the

19   decision to step up the child to a more secure

20   facility?

21        A.    They're given notification.

22        Q.    Before or after the decision is made?

23        A.    It should be before.

24        Q.    And do they have an opportunity to

25   challenge that decision?

**Exhibit 18**
**Page 774**

1    Q.    What is in a notice of placement?

2    A.    Okay.  So I do want to say this, is

3 that I've seen that and that's something that I

4 regularly -- usually when somebody asks me that

5 question, I'll access it and I'll look at it to

6 make sure that I reference it properly.

7         But offhand what I will say is that

8 it's going to -- it's going to identify why that

9 child is being stepped up to a secure, staff

10 secure or -- or an RTC.  It's going to give them

11 their notification that they have a right to

12 appeal the decision to place them in -- keep

13 them in that -- that type of placement.  And

14 then there's also notification that there's an

15 expectation that it's -- that it's going to be

16 reviewed periodically.

17         So I can speak to that part, but --

18    Q.    I appreciate that.  You're not on the

19 ground dealing with them every day.

20    A.    Right.

21    Q.    In your experience, if you know, how

22 often do children challenge restrictive

23 placement by seeking ORR director review?

24    A.    To my knowledge, there's only been

25 one occasion.

Exhibit 18
Page 775

Page 162

1       A.      Yeah.

2       Q.      -- we can move on.

3               To your knowledge, does bed space

4   impact the ability to step down a child from a

5   secure facility to staff secure?

6       A.      Could you repeat the question?

7               MS. MAYHUGH:  Do you mind repeating

8       it?

9               (Thereupon, the record was read back

10      as follows):

11              "Q.  We can move on.  To your

12       knowledge, does bed space impact the

13       ability to step down a child from a

14       secure facility to staff secure?"

15      A.      Okay.  So recently it's not been a

16  problem, but has it been in the past?  Yes.

17      Q.      What happens in those cases?

18      A.      So what would happen is if it's from

19  secure to a staff secure, what we would try to

20  do is see if we could transfer a kid from staff

21  secure down to a shelter; you know, is there

22  anybody who we think maybe we could move a

23  little bit faster, like if we're reviewing a

24  case within 30 days and somebody's waiting for

25  that, you know, we don't necessarily have to

Exhibit 18
Page 776

1   wait.  We can say hey, I know this kid's review

2   is coming up in 30 days, can we staff it a

3   little early if you think somebody could do

4   well.  And then what we would do is try to make

5   room by transferring somebody out and then we

6   would be able to step that kid down.

7        Q.    Are you aware of any difficulties in

8   stepping children down from therapeutic staff

9   secure facilities?

10       A.    So I'm going to say this:

11             I am aware that there's been some

12   problems in general stepping kids down.  Now,

13   whether it's been specifically for a therapeutic

14   staff secure, I won't say that it's -- I'm going

15   to be specific and say just exclusively them.

16   I'm going to say that's been a general problem.

17       Q.    And by general problem, do you mean

18   that other facilities don't want to take kids

19   who have been in therapeutic staff secure or

20   other secure facilities?

21       A.    So the information that I have is

22   that some of the programs don't feel like

23   they're capable of taking some of those kids

24   because they feel like some of those kids are

25   beyond the scope of the -- what their -- what

**Exhibit 18**
**Page 777**

1   their facility can provide care for.

2        Q.    Even if the FFS has made the decision

3   that, in their opinion, the child is ready to be

4   stepped down?

5        A.    Yes.

6        Q.    Do you have a day-to-day role in the

7   process of child reunification?

8        A.    It's -- I want to say yes, but it's

9   not on specific cases.

10        Q.    And this is where you get brought in

11   either by an FFS or an FFS supervisor if they

12   want to run a certain decision by you?

13        A.    Sure.  So -- so let me clarify.

14              So what I meant by my answer -- so

15   the answer is yes, but what I want to say is

16   that, you know, we have -- like, say, for

17   instance, at some point in time last year we had

18   15,000 kids in our program.  And we had more

19   kids who were coming in.

20              So, you know, part of my role is to

21   make sure that we have a process that can move,

22   you know, two or 300 kids' cases if that's what

23   we need to do.

24              So, yes, I'm part of that.  That's

25   part of, like, just the spirit of my job, is to

**Exhibit 18**
**Page 778**

Page 200

1    please review what's going on in your program,

2    let us know why we're seeing more of these.

3         Q.    So FFSs are responsible for making

4    the ultimate determination with respect to

5    whether a child gets stepped up or released to a

6    sponsor, right?

7         A.    Yes.

8         Q.    Yet they're not trained in behavioral

9    or mental health needs of children?

10        A.    The FFSs have backgrounds, child

11   welfare backgrounds, and their training would

12   come through their supervisor.

13        Q.    But you just said their supervisor

14   also doesn't get training.

15        A.    Well, they would -- they would --

16   they would have training prior to coming into

17   ORR's care.

18        Q.    So if we had someone who joined ORR

19   in 2004, they wouldn't have had training within

20   the past 15 years on behavioral or mental health

21   needs of children?

22        A.    In 2004?

23        Q.    16 years.  My math is bad.

24        A.    I was going to say I don't know.  I

25   wasn't one who was here.  I had a lot of it at

1      A.    Sure.  Shiloh is -- okay.  Shenandoah

2   Valley is a licensed secure facility that's in a

3   community.  And it has doors and it has locks

4   and it has -- it has kids that are in a pod and

5   they pretty much stay in the building.  And when

6   they go outside and they have recreation, it's

7   in the middle of that facility.

8            Shiloh is located in a community with

9   other homes.  They also don't have all of the

10  security features that Shenandoah Valley has.

11  It is more restrictive because they do have more

12  staff supervision and those types of things, but

13  it doesn't have the same physical restraints as

14  a licensed secure facility does.

15     Q.    Thank you for explaining.  I was

16  asking about whether an RTC is higher security

17  than a shelter.

18     A.    What I would say is how you define

19  security.

20     Q.    Okay.

21            MS. MAYHUGH:  I would like to mark a

22        printout from ORR's website titled

23        Children Entering the United States

24        Unaccompanied, as Exhibit 225.

25            MR. MOSS:  Can we go off the record

Exhibit 18
Page 780

Page 256

1          CERTIFICATE OF DEPONENT

2              I, James S. De La Cruz, do hereby

3     certify that I have read the foregoing pages,

4     5 through 266, inclusive, which contain a

5     correct transcript of the answers given by me

6     to the questions propounded to me herein,

7     except for changes, if any, duly noted on the

8     enclosed errata sheet.

9

10

11          _____

                        WITNESS

12

13

14

15              Sworn and subscribed to before me

16     this ____ day of _____, 2020.

17

18

19     My commission expires:    Notary Public:

20

21     _____      _____

22

23

24

25

Page 257

                    CERTIFICATE OF NOTARY

1          I, MISTY KLAPPER, the officer before

2    whom the foregoing deposition was taken,

3    do hereby certify that the witness whose

4    testimony appears in the foregoing

5    deposition was duly sworn by me; that the

6    testimony of said witness was taken by me

7    in shorthand and thereafter reduced to

8    typewriting by me; that said deposition is

9    a true record of the testimony given by

10   said witness; that I am neither counsel

11   for, related to, nor employed by any of

12   the parties to the action in which this

13   deposition was taken; and, further, that I

14   am not a relative or employee of any

15   attorney or counsel employed by the

16   parties hereto, nor financially or

17   otherwise interested in the outcome of

18   this action.

19   Dated: 3-17-2020

20

                    *Misty Klapper*
                    _____

21                  Misty Klapper

22                  Notary Public in and for

23                  the District of Columbia

24

25

**Exhibit 18**
**Page 782**

# Exhibit 19

Exhibit 19
Page 783

CONFIDENTIAL

Page 1

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                  WESTERN DIVISION

4

5       _____
                                       )
6       LUCAS R., et al.,              )
                                       )
7             Plaintiffs,              )
                                       )  Case No.
8       vs.                            )
                                       )  2:18-cv-05741
9       ALEX AZAR, Secretary of U.S.   )  DMG-PLA
        Department of Health and       )
10      Human Services, et al.,        )
                                       )
11            Defendants.              )
        _____)
12

13

14                   CONFIDENTIAL

15

16          DEPOSITION OF NATASHA DAVID

17              Reston, Virginia

18              October 24, 2019

19

20

21

22

23

24      Reported by:  John L. Harmonson, RPR

25      Job No. 170111

CONFIDENTIAL

Page 72

1      A.     ORR contracts with other agencies to

2  complete the home studies and have outlined in

3  our policy the time frame for it to be completed

4  once it's been accepted.

5      Q.     And what is that time frame?

6      A.     Ten days.

7      Q.     All right.  What happens if a home

8  study is not completed within ten days?

9      A.     Depending on the circumstance, the

10  home study provider can make a request to extend

11  completion to the FFS.

12      Q.     Who makes the request?

13      A.     The home study provider.

14      Q.     The provider.  Okay.

15             So is there an overall time limit for

16  the release process to be completed?

17      A.     Due to, like, the circumstances of a

18  case that may be presented, there is not an

19  overall time frame that I'm aware of.  But as I

20  mentioned before, there's time frames to get

21  certain steps done.

22      Q.     How long does it usually take from

23  start -- from identification of a sponsor to

24  release, a typical case?

25      A.     I don't know.  I mean, cases are

CONFIDENTIAL

Page 73

1  different and they're unique.  You know, I've

2  seen cases with a decision in a few weeks to much

3  longer.

4       Q.    And when you say much longer, how long

5  can it take?

6       A.    There's no defined time.

7       Q.    So there's been cases that you've

8  worked on that have taken over a year?

9       A.    Because I cover the continuum of

10 programs, I've seen children in care for longer

11 than a year.

12      Q.    So that's a yes?

13      A.    Yes.

14      Q.    I want to get a better understanding

15 of when a home study is requested.  Is that

16 something that the case manager decides, that a

17 home study is necessary?  Who decides that?

18      A.    A home study is based on assessments

19 that can originate from the case manager or the

20 clinician.  And it's staffed.

21      Q.    When you use that term "staffed," I

22 just don't understand what that means.  Can you

23 explain it to me?

24      A.    Discussed.

25      Q.    And who discusses it when it's

CONFIDENTIAL

Page 77

1      Q.    And what are the criteria for an ORR

2   discretionary home study?

3      A.    The discretionary is based on concerns

4   other than the other mandated home study

5   processes.

6      Q.    What factors would be the types that

7   would kick in a discretionary home study?

8      A.    It really varies.  It depends if

9   there's concerns of the sponsor.  If there's

10  information that has not been able to be

11  mitigated through the case management process but

12  doesn't necessarily meet TVPRA or a mandated.

13     Q.    When you say concerns of the sponsor,

14  you mean concerns about the fitness or the

15  appropriateness of the sponsor?

16     A.    Yes.

17     Q.    And I just need an example or two of

18  the types of concerns that you are saying haven't

19  been mitigated.  What kind of things are we

20  talking about here?

21     A.    Through the case management process,

22  if the case manager or clinician have identified

23  concerns with the home.  If there's fraudulent

24  information that has been provided that they were

25  able to uncover.

CONFIDENTIAL

Page 82

1    is required, can a sponsor challenge that

2    determination?

3         A.    Our guidance doesn't allow for home

4    studies to be challenged.

5         Q.    So that's a no?

6         A.    No.

7         Q.    Does the child have the ability or

8    right to challenge a discretionary home study?

9         A.    The steps are, you know, discussed

10   with the child and they are advised of the

11   process that's going to be implemented.  But they

12   cannot challenge a home study process.

13        Q.    So the answer to that question is also

14   a no?

15        A.    That's correct.

16        Q.    What's the average length of time that

17   children with identified disabilities stay in ORR

18   custody?

19        A.    I don't know.

20        Q.    If I use the term "child with

21   identified disabilities," what is your

22   understanding of that?

23        A.    It could be physical disabilities.

24        Q.    Going back to home study, I want to

25   understand when a home study comes back, what

CONFIDENTIAL

Page 133

1        Q.    And who reviews it?

2        A.    It's prepared by the care provider.

3   It's likely staffed as well.  It's received by

4   the case coordinator, and a decision is made by

5   the FFS.

6        Q.    Okay.  When it's staffed, who is

7   involved in that consultation?  The case manager?

8        A.    The case manager, clinician,

9   supervisor, the GDIT case coordinator.

10        Q.    But not the FFS?

11        A.    The FFS.

12        Q.    Oh, okay.

13              So is it the FFS in the current

14   placement or the proposed receiving placement

15   after the step-up?

16        A.    When a case that meets or potentially

17   meets step-up criteria, it's staffed with that

18   program, the current program.  It is also staffed

19   with the receiving program and their identical

20   team.

21        Q.    Who makes the decision, then?  When

22   you said the FFS makes the decision, is it --

23        A.    The FFS of the current program.

24        Q.    And do they always consult with the

25   receiving team?

Exhibit 19
Page 789

CONFIDENTIAL

Page 143

1    the receiving facility.

2         Q.    So if I wanted to identify for these

3    lawyers how to find that, how would I describe

4    it?  As a transfer --

5         A.    Packet.

6         Q.    Packet.  And that would include both

7    things that you just described, the transfer

8    request form and the child's record?

9         A.    Yeah.

10        Q.    So in this particular case, was the

11   child allowed to challenge the decision to step

12   up?

13        A.    Children are not allowed to challenge

14   being stepped up in our guidance.

15        Q.    And they're not given any opportunity

16   to rebut any information about whether they're a

17   flight risk or not?

18        A.    Through the case management process,

19   the children are aware that they're going to be

20   stepped up.  The behaviors that could possibly

21   lead to a step-up is discussed with the child.

22        Q.    But the only written notification that

23   a child would receive of a step-up would be the

24   notice of placement that's received within 48

25   hours after they've already been transferred,

CONFIDENTIAL

Page 145

1    think -- We just omitted that.  But I understand.

2    That's helpful.

3        A.    When there is a step-up from shelter

4    to RTC, secure and staff secure, the notice of

5    placement is created and discussed with the minor

6    in their language, and they sign it or they can

7    refuse to sign it.

8        Q.    And all that happens after the

9    transfer?

10       A.    Yes.

11       Q.    And I'm talking about before the

12   transfer.  If discussion took place as part of

13   this consultation that you told me about where

14   the kid is being made aware that a step-up is

15   being considered -- We talked about that, right?

16       A.    Uh-huh.

17       Q.    Yes?

18       A.    Yes.

19       Q.    So is that necessarily documented in

20   the portal or somewhere else that that discussion

21   has taken place with the child?

22       A.    If it is documented, it would be

23   documented in the case review.

24       Q.    But it's not required to be

25   documented --

CONFIDENTIAL

Page 147

1    a requirement to document those interactions.

2         Q.    Are children always told where they're

3    going to be transferred?

4         A.    From my experience providing oversight

5    to programs, they are told -- unless there is a

6    significant concern or safety concern, they're

7    told closer to the time of transition.

8         Q.    How close?

9         A.    I don't know.

10        Q.    Well, is there a required number of

11   days prior to a step-up that the kid is required

12   to be notified?

13        A.    There is no policy on that.

14        Q.    And there is no policy requiring that

15   they be notified at all, is there?

16        A.    There is not explicit policy that says

17   there has to be a written notification to a child

18   on a step-up.  The guidance is that the

19   interaction that care provider staff have should

20   be documented in our system.

21        Q.    Is there a requirement that the child

22   be verbally notified before the transfer?

23        A.    I can't answer that without kind of

24   reviewing the policy.

25        Q.    Are children sometimes transferred in

CONFIDENTIAL

Page 149

1    that others?

2         A.    Case manager and clinician,

3    supervisors, and it's elevated to the case

4    coordinator for review and then elevated to the

5    FFS.

6         Q.    For final sign-off?

7         A.    Final sign-off.  Depending on the

8    length of stay, it would also be staffed with the

9    FFS supervisor.

10        Q.    And what length of stay would kick in

11   that last thing?

12        A.    After 90 days.

13        Q.    So any placement that's been longer

14   than 90 days in duration is going to include that

15   final FFS supervisor level review?

16        A.    Yes, at least staffed.

17        Q.    Or they're staffed in on it?

18        A.    Yes.

19        Q.    Okay.  So what influence do case

20   managers have in the ultimate decision to step

21   someone down or to not step someone down?

22        A.    Case managers work directly one-on-one

23   with the children.  They complete assessments on

24   the children.  So when it comes time for

25   decisions or recommendations or elevation of

CONFIDENTIAL

Page 152

1    recommendations.  It's a recommendation.  It is

2    information -- I mean, it's a decision based on

3    the information received.  So I wouldn't say it's

4    weighted.  It's, you know, additional

5    information.

6          Q.    Just another factor?

7          A.    Part of the process, yeah.

8          Q.    So is the FFS the ultimate

9    decision-maker in whether a step-down occurs or

10   not?

11         A.    For a step-down to LTFC, yes.  For

12   secure, staff secure, RTC, if there is -- if

13   there's complexities in a case, the FFS can staff

14   that with the FFS supervisor prior to making that

15   final decision or they can make a decision to

16   step the minor down.

17         Q.    But ultimately, even after that

18   staffing for the second type of step-down, the

19   ultimate decision-maker is the FFS, correct?

20         A.    Not on all cases.  Because the FFS

21   supervisor might disagree with a decision that

22   the FFS makes.

23         Q.    So if the FFS decides to step someone

24   down but the supervisor disagrees, then the

25   step-down does not take place?

CONFIDENTIAL

Page 153

1    A.    It's likely the FFS supervisor

2    consults with their supervisor as well, and then

3    a decision is made.

4    Q.    Okay.  Other than that circumstance,

5    is there any other circumstance where the FFS is

6    not the ultimate decision-maker in this process?

7    A.    For step-downs, I think that's it.

8    Q.    Is the child given any input into the

9    30-day review?

10    A.    The children discuss their cases with

11    their case managers.

12    Q.    So would that be their role?  Is there

13    any other input that the child would have into a

14    decision about whether to step them down or not?

15    A.    Not any other input that I know.  They

16    discuss their cases and advise of their desires

17    through the reunification process with the case

18    managers, though.

19    Q.    Is there any procedure that provides

20    for the child to be formally providing input into

21    the 30-day review on whether to step them down?

22    A.    Outside of meeting weekly with the

23    case manager, there is not a formal process that

24    I'm aware of.

25    Q.    Okay.  So from that answer, am I

CONFIDENTIAL

Page 154

1    understanding that there is a requirement that

2    the case managers meet once a week with the

3    children?

4         A.    Yes.

5         Q.    Is there any requirement that a

6    child's lawyer be involved in the 30-day review

7    process?

8         A.    No.

9         Q.    Is there any provision for a child to

10   present evidence in support of their position

11   regarding whether a step-down should take place?

12        A.    The children are provided with

13   opportunities to discuss concerning factors in

14   their case that, you know, helps to support

15   step-down decisions.

16        Q.    And that discussion is primarily or

17   exclusively with the case managers, correct?

18        A.    Or the clinician.

19        Q.    You don't discuss your decision-making

20   in step-downs with the children directly, do you?

21        A.    I have.

22        Q.    How many times?

23        A.    Twice.

24        Q.    Tell me about those specific examples.

25   What was the occasion for you to do that?

CONFIDENTIAL

Page 157

1     A.    I don't recall.

2     Q.    If the child disagrees with a decision

3  to not step them down, do they have any appeal

4  rights?

5     A.    Our policy allows for administrative

6  or judicial review where a minor can challenge

7  their placement.

8     Q.    What is the administrative review for

9  challenging a placement?  How does that work?

10    A.    It's a review that's conducted by ORR

11 headquarters.

12    Q.    So any child can request

13 administrative review when their step-down is

14 denied?

15    A.    After 30 days has passed, after a

16 child is placed in secure, and at that 30-day

17 mark there is a review.  So if there is not a

18 decision to step that child down, then they can

19 request a review.

20    Q.    Who informs them of their right to do

21 that request?

22    A.    It's disclosed to them at the time

23 they sign the very first notice of restrictive

24 placement form in their language, and every 30

25 days after they are advised of their right to

CONFIDENTIAL

Page 158

1    review.

2         Q.    And who does that?

3         A.    The care provider.

4         Q.    And is it the case manager?

5         A.    I believe it's the case manager.

6         Q.    Do the sponsors similarly get informed

7    of the opportunity to challenge placement?

8         A.    If a category 1 is denied, they're

9    advised of their rights.

10        Q.    That's referring to release, to the

11   category 1, correct?

12        A.    Yes.

13        Q.    I'm talking about a prospective family

14   member who -- a prospective sponsor family member

15   on the outside who wants to help a child

16   challenge their continued restrictive placement.

17   Are they allowed to do that?

18        A.    I would have to consult the policy to

19   be sure.

20        Q.    Are attorneys informed of the right of

21   a child to challenge their placement if a child

22   has an attorney?

23        A.    If there is an attorney of record,

24   they are advised.

25        Q.    Every 30 days?

CONFIDENTIAL

Page 159

1        A.     I'm not sure.  I would have to consult

2    the regs.  Attorney of records can request the

3    notice of placement on demand.

4        Q.     To whom would that attorney of record

5    make that request?  The care provider?

6        A.     Yes.

7        Q.     And that has to be honored per policy?

8        A.     Per policy, yes.

9        Q.     When the children are informed of

10   their right to challenge placement, are they

11   informed of both their right to review by the

12   director and their right to go to federal court?

13       A.     Yes, they're advised of the

14   administrative and judicial review.  Since

15   working with Shenandoah, it's documented on the

16   notice of placement.

17       Q.     I know that the notice of placement is

18   required to be given to a child within 48 hours

19   of a new placement.  Right?

20       A.     Correct.

21       Q.     Is the notice that's received and

22   provided to the child after that 30-day review,

23   is that the same document or is it a separate

24   notice of continued placement?

25       A.     It's the same document.

CONFIDENTIAL

Page 160

1       Q.     And they sign a new one every time?

2       A.     That's correct.

3       Q.     And the case manager is expected to

4    explain it to them in their preferred language

5    each time?

6       A.     Yes.

7       Q.     How many times have kids in

8    Shenandoah, since you've been working with

9    Shenandoah, requested administrative review?

10      A.     From what I remember, twice.

11      Q.     Out of how many step-up denials?

12   Hundreds?

13      A.     Yeah, hundreds.

14      Q.     And how many kids have requested

15   judicial review in Shenandoah since you've been

16   working there?

17      A.     I don't recall a request for judicial

18   review.

19      Q.     Have children expressed to facility

20   staff that they don't believe they should be in

21   secure placement?

22      A.     Can you repeat that question?

23      Q.     Let me get to it after I ask you --

24             Going back to the administrative

25   review, do you think that children understand

CONFIDENTIAL

1    yeah.

2         Q.    Are children allowed to rebut any

3    information that's stored on the UAC portal about

4    them if they believe the information is

5    incorrect?

6         A.    There's no policy in allowing a child

7    to rebut information.  But if a child is aware

8    there is incorrect information in there, it's

9    discussed with the case manager or there is an

10   attempt to clarify information which I've seen.

11        Q.    Okay.  And so the way that information

12   would make its way into the UAC portal would be

13   if the provider was told information by the child

14   and then the provider chose to include that in a

15   report that they made about the conversation with

16   the child?

17        A.    Children are aware of the

18   circumstances of their case because they're

19   constantly discussing it with their case manager

20   clinician.  They have made common space on, like,

21   a significant incident report that the incident

22   that was reported was not true or incorrect.  And

23   the case manager would add an addendum to that.

24        Q.    But in that example you gave, does the

25   child receive the significant incident report, a

CONFIDENTIAL

Page 177

1    copy of it?

2         A.    No.

3         Q.    So are they told what's in it?

4         A.    Yes.  It's discussed.

5         Q.    Do they have the right to rebut that

6    information?

7         A.    Well, there is no guidance in terms of

8    that, that formal process.  But I've seen often

9    where if there is information that the child

10   believes is incorrect, there is an addendum added

11   to that.

12        Q.    The addendum is added only by the

13   staff person, not the child, correct?

14        A.    Right.

15        Q.    So any decision about whether or not

16   to include any rebuttal information from the

17   child is exclusively that of the staff, not the

18   child, correct?

19        A.    Well, the comments in the addendum is

20   based on what the child is saying is incorrect.

21        Q.    And it's only the determination of the

22   author of that addendum as to which information

23   they choose to include, correct?

24        A.    Yes.  They are authoring the addendum.

25        Q.    The staff person?

CONFIDENTIAL

Page 178

1        A.      Yes.

2        Q.      And there is not a place on an SIR,

3    significant incident report, for a kid to sign or

4    to write in their response to that, right?

5        A.      Not on the SIR.

6        Q.      Is there any place for a kid to write

7    up a rebuttal and turn it in?

8        A.      If they wanted to, they can write it

9    independent and provide it to the case manager.

10       Q.      Have you ever seen that in the UAC

11   portal, child-created documents rebutting

12   information in an SIR?

13       A.      I've seen it, but not in terms of

14   rebutting information.

15       Q.      What child-created or initiated

16   documents have you seen in the UAC portal?

17       A.      I've seen children write statements in

18   terms of their release.

19       Q.      About why they need to be released?

20       A.      Well, this one time was why they

21   didn't want to be released.

22       Q.      Is that the only child-created

23   statement that you can recall sitting here today

24   that you have seen in the UAC portal?

25       A.      There's other things that I've seen,

CONFIDENTIAL

Page 216

1             ACKNOWLEDGMENT OF DEPONENT

2

3        I, NATASHA DAVID, have read or have had the

4   foregoing testimony read to me and hereby certify

5   that it is a true and correct transcription of my

6   testimony with the exception of any attached

7   corrections or changes.

8

9

10  _____

11  NATASHA DAVID

12  [ ] No corrections

13  [ ] Correction sheet(s) enclosed

14

15       SUBSCRIBED AND SWORN TO BEFORE ME, the

16  undersigned authority, by the witness, NATASHA

17  DAVID, on this the _____ day of

18  _____, _____.

19

20

21

22

23

24

25

**Exhibit 19**
**Page 804**

CONFIDENTIAL

Page 217

1                    C E R T I F I C A T E

2

3    COMMONWEALTH OF VIRGINIA

4              I, JOHN L. HARMONSON, a Notary Public

5    within and for the Commonwealth of Virginia, do

6    hereby certify:

7              That NATASHA DAVID, the witness whose

8    deposition is hereinbefore set forth, was duly

9    sworn by me and that such deposition is a true

10   record of the testimony given by such witness.

11             That if the foregoing pertains to a

12   federal case, before completion of the

13   proceedings, review and signature of the

14   transcript [x] was [ ] was not requested.

15             I further certify that I am not related

16   to any of the parties to this action by blood or

17   marriage; and that I am in no way interested in

18   the outcome of this matter.

19             IN WITNESS WHEREOF, I have hereunto set

20   my hand this 6th day of November, 2019.

21             *John L. Harmonson*

22             _____

23             JOHN L. HARMONSON, RPR
               Virginia CCR #0613313
24             Notary Public for the
               Commonwealth of Virginia #7349255
25             My commission expires: 01/31/22

# Exhibit 20

**Exhibit 20**
**Page 806**

1              UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF CALIFORNIA
2                 WESTERN DIVISION

3
    LUCAS R., et al.,          )
4                              )
                               )
5        Plaintiffs,           )
                               )      CASE NO.
6    VS.                       )      2:18-cv-05741 DMG PLA
                               )
7    ALEX AZAR, Secretary      )
     of U.S. Department of     )
8    Health and Human          )
     Services, et al.,         )
9                              )
           Defendants.         )
10

11

12

13                    DEPOSITION

14                       OF

15                  WHITNEY EICH

16     1700 7th Avenue, Seattle, Washington

17              FEBRUARY 27, 2020

18

19

20                  CONFIDENTIAL

21

22

23

24   Reported by:
     Monna J. Nickeson, CRR, CLR, RPR, CRR
25   Job No. 177834

Confidential

Page 46

1      A.    Yes.

2      Q.    And that made it more difficult to

3  release youth to parents?

4      A.    That's correct.

5      Q.    Is your understanding that parents

6  are category 1 --

7      A.    That is correct.

8      Q.    -- sponsors?  Okay.

9            And is this policy still in effect?

10     A.    Generally, broadly, no, that policy

11 is not in effect as the way it previously was.

12     Q.    But it's still in effect -- it's

13 still in effect in some way?

14     A.    It will still be in effect in home

15 study cases.

16     Q.    So if you or someone else recommends

17 a home study --

18     A.    Yes.

19     Q.    -- the parent who was a category 1

20 sponsor must still submit to fingerprints?

21     A.    That's correct.

22     Q.    And the second policy you mentioned

23 was fingerprinting of household members?

24     A.    That's correct.

25     Q.    Can you explain what that is?

Confidential

1        A.      A household member is someone who is

2   residing in the same residence with the

3   sponsor.  So there was a time when all

4   household members had to fingerprint.  That was

5   a burden and a challenge for releasing

6   reunification.

7            At the present time, household

8   members do not have to fingerprint unless it is

9   a home study.

10       Q.    So at the present time, if you or

11  someone else requests a home study for a youth,

12  the household members living in the house still

13  must submit to fingerprints?

14       A.      That's correct.

15       Q.      And how would that delay a youth's

16  release?

17       A.      Previously, when that policy was in

18  place for all household members, regardless of

19  home study status, frequently household members

20  were undocumented and distrustful of the

21  government, especially after the memorandum of

22  ICE and ORR, and especially after the

23  administration change in the President.

24            I, on a personal level, noticed a

25  change in the willingness of sponsors and their

```
1    household members to provide just

2    identification, let alone fingerprints.

3            And so if the requirement is that

4    household members have to fingerprint and

5    there's a household member who is unwilling to

6    fingerprint, that then means that the case is

7    going to be significantly delayed because the

8    sponsor has only a few options.  They either

9    convince that person to fingerprint, they

10   convince that person to move out, or they

11   convince -- or they themselves move out into a

12   new place.  And that process -- any of those

13   options can delay a case.

14       Q.    And just to clarify, you mentioned

15   the fingerprinting working in conjunction with

16   the ORR/ICE memorandum.

17            By that do you mean that household

18   members -- well, can you explain to me the

19   ORR/ICE memorandum and what you understand that

20   to be?

21       A.    Yeah.  So approximately one year

22   ago, I believe, or in the spring a year ago, it

23   was announced that ORR and ICE had entered into

24   a memorandum, and that sponsor immigration

25   information results would be sent to ICE.
```

**Exhibit 20**
**Page 810**

Confidential

1    and Border Patrol gets together on the youth

2    along the southern border, correct?

3        A.    Yes.

4        Q.    Sometime that information is beyond

5    just biographical information; is that correct?

6        A.    Yes.

7        Q.    Has there been a time during your

8    almost four years at YouthCare that you have

9    seen that information used in some way that is

10   detrimental to the youth in the future, whether

11   that be reunification with a sponsor or a

12   step-up to another facility?

13       A.    I have seen cases of things that

14   happened at the border with CBP, and a client

15   then, based on that, went immediately to a

16   Staff Secure facility, and then was eventually

17   stepped down to YouthCare.  So that's how I

18   became aware of that case.

19       Q.    And in that case, what happened with

20   the youth in the Customs and Border Patrol

21   office or officer?

22       A.    Yeah.  Customs and Border Patrol

23   alleged that the minor became violent and was

24   throwing water bottles at the officers.

25       Q.    Okay.  In your opinion, was that

Exhibit 20
Page 811

```
 1    enough, under to -- under ORR policy for the

 2    youth to go directly to a Staff Secure facility

 3    instead of a shelter?

 4         A.    In my personal opinion, I don't

 5    think it was warranted.

 6         Q.    So the notification that you are

 7    getting from ORR intakes --

 8         A.    Yes.

 9         Q.    -- that comes in the form of an

10    email with ICE and CBP included in the email;

11    is that correct?

12         A.    And MVM.

13         Q.    What is MVM?

14         A.    It is the transportation contractor.

15         Q.    And what does MVM stand for, do you

16    know?

17         A.    I don't know.

18         Q.    And that is a contractor that

19    transports youth to and from various shelters

20    or various placements?

21         A.    Typically, MVM is transporting kids

22    from the southern border to their initial

23    placement, not necessarily between placements.

24         Q.    Okay.

25         A.    But just one other piece of the
```

Confidential

1    mental health concerns, would YouthCare reject

2    that youth?

3         A.    I think -- like I said, I review

4    each case on the merits of the case, right.

5    I'm typically looking at the client's behavior

6    in care.  If they do have a mental health

7    diagnosis, like what symptoms are there, what

8    coping skills does the minor have, how has --

9    had the minor been stable recently at that

10   other program?  Does that minor, for example,

11   require monthly psychiatric medication

12   management?  Those would be the things that I'm

13   evaluating.

14        Q.    If you have a youth that is -- in

15   your evaluations, if you had a youth that has

16   significant mental health needs, do you believe

17   YouthCare is the correct facility for that

18   youth?

19             MS. LYON:  Object to the form.

20        A.    No, I do not.

21        Q.    And what would be another type of

22   facility where that youth would be better cared

23   for, if you know?

24        A.    Yeah.  In my opinion, within the ORR

25   network, the level above shelter is Staff

**Exhibit 20**

Confidential

1    Secure, but there's also a type of placement

2    called Therapeutic Staff Secure that's

3    specialized for youth with psychiatric

4    medication or more mental health -- like

5    emerging mental health needs, and I believe

6    that is a better fit for those types of kids.

7         Q.    Do you know if that would be a

8    step-up, technically?

9         A.    Yes.  Technically that is still a

10   step-up from a shelter.

11        Q.    From a shelter?

12        A.    Yes.

13        Q.    So a youth could be technically

14   stepped up to a Staff Secure solely related to

15   mental health?

16        A.    Yes.

17        Q.    Has YouthCare ever received anyone

18   that was previously in a Secure facility?

19        A.    No.

20        Q.    What about in an RTC?

21        A.    No.

22        Q.    You said previously -- well, maybe

23   you didn't.

24             Has a youth ever been stepped up

25   from YouthCare to a Staff Secure?

**Exhibit 20**

TSG Reporting - Worldwide (877) 702-9580        **Page 814**

```
 1          A.     All step-ups are approved by the

 2   FFS, sometimes step-ups can be recommended or

 3   required by the FFS, or sometimes the step-ups

 4   can be recommended by programs, but ultimately

 5   the FFS is the one making the decision

 6   ultimately.

 7          Q.     Who initiates the step-up process?

 8          A.     It can -- like I said, it can either

 9   be -- the program can seek guidance and

10   recommend that the minor should be stepped up

11   based on a variety of factors, or the FFS can

12   require a step-up even if the program is

13   saying, "This client is fine in shelter of

14   care," like the example I provided previously

15   where the client had the disclosure about using

16   a gun in a crime.

17          Q.     Are you familiar with a Notice of

18   Placement?

19          A.     I've heard of that term, yes.

20          Q.     Have you ever seen the form?

21          A.     I've probably seen that form, yes.

22          Q.     But you've never used it?

23          A.     I don't believe so.  If you could

24   maybe ask a more clarifying or specific

25   question.
```

1    And while we were in that process, the minor

2    pulled the fire alarm of the building we were

3    living in or -- Casa Uno, so that entire

4    building with many programs.

5              The fire alarm, you know, caused an

6    evacuation and a major disruption for many

7    programs.  And with that, the FFS decided he

8    needed to be stepped up to Selma Carson Home.

9         Q.    Has a youth from YouthCare ever

10   ended up in a Secure facility, to your

11   knowledge?

12        A.    A youth from YouthCare has never

13   gone directly to a Secure facility, but I have

14   knowledge that a client who was at one time at

15   YouthCare eventually went to a Secure facility.

16        Q.    What about an RTC, do you have

17   knowledge of youth ever ending up in a RTC that

18   was once in YouthCare?

19        A.    No.

20        Q.    Can you describe a little bit your

21   role as an assistant director in deciding

22   whether a child is stepped up or not?

23        A.    Yes.  So if -- we're always

24   evaluated the kids on how they are doing at the

25   program.  Most of the kids almost all of the

**Exhibit 20**

TSG Reporting - Worldwide (877) 702-9580          **Page 816**

Confidential

1    A.    Yes.

2    Q.    So going back to the UAC portal, do

3  you know who has -- who all access to the

4  portal?

5    A.    Yes.

6    Q.    And who would that be?

7    A.    Employees of ORR facilities, ORR,

8  and to my understanding, ICE and CBP have

9  access to some parts of the portal.

10    Q.    And from the YouthCare facility, who

11  uploads documents to the portal?

12    A.    Case managers and mental health

13  therapists and the medical coordinator, or I

14  may upload something on their behalf as well.

15    Q.    Do you know if certain step-up

16  decisions or reunification decisions from the

17  FFS come exclusively from documents in the

18  portal?

19    A.    Largely, yes.

20    Q.    And is there anyone that reviews the

21  documents in the UAC portal after they are

22  uploaded?

23    A.    Within ORR or within YouthCare?

24    Q.    Within YouthCare.  Sorry.

25    A.    Myself.

Confidential

1      Q.    And I may have misunderstood, but it

2  seemed to me that when home studies are

3  requested, that people have to get

4  fingerprinted automatically; is that incorrect?

5      A.    That's correct, uh-huh.

6      Q.    And is that for all three types of

7  home studies --

8      A.    Yes.

9      Q.    -- the ORR, TVPRA and discretionary?

10     A.    Yes.

11     Q.    So if someone were to request a

12  discretionary home study, that means that the

13  potential sponsor would then need to get

14  fingerprinted?

15     A.    That's correct.

16     Q.    And would that, in your experience,

17  delay the case?

18     A.    The fingerprinting or the home study

19  process?

20     Q.    One or the other or both.

21     A.    By the nature of doing a home study,

22  the case is delayed.

23     Q.    Is it an extra delay because

24  fingerprints are also then required?

25     A.    It depends on how quickly

Exhibit 20
Page 818

Confidential

1    fingerprints are being processed.  So in my

2    time at YouthCare, there have been varying

3    degrees of how quickly fingerprints can be

4    processed.

5         Q.    And when you say varying degrees,

6    what's, like, the longest you've seen it take

7    to process fingerprint results?

8         A.    Potentially five weeks.

9         Q.    And for the home studies, are you,

10   as the assistant director, involved in

11   coordinating those at all?

12        A.    Can you explain what you mean by

13   "coordinating"?

14        Q.    So you said that the GDIT, FFS and

15   sometimes the YouthCare facility, they can all

16   request home studies; is that correct?

17        A.    Yes.  Well, the GDIT, no.

18        Q.    They cannot request home studies?

19        A.    No, uh-uh.

20        Q.    So the FFS or the facility requests

21   a home study?

22        A.    Yes.

23        Q.    Is it different in who coordinates

24   the study, who has the care provider do the

25   home study, and who communicates that to the

Confidential

```
 1              C E R T I F I C A T E

 2         STATE OF WASHINGTON )
                              )  ss.
 3         COUNTY OF BENTON    )

 4              This is to certify that I, Monna J.

 5    Nickeson, Certified Court Reporter in and for

 6    the State of Washington, residing at Richland,

 7    reported the within and foregoing deposition;

 8    said deposition being taken before me on the

 9    date herein set forth; that pursuant to RCW

10    5.28.010 the witness was first by me duly

11    sworn; that said examination was taken by me in

12    shorthand and thereafter under my supervision

13    transcribed, and that same is a full, true and

14    correct record of the testimony of said

15    witness, including all questions, answers and

16    objections, if any, of counsel, consisting of

17    231 pages.

18              I further certify that I am not a

19    relative or employee or attorney or counsel of

20    any of the parties, nor am I financially

21    interested in the outcome of the cause.

22              IN WITNESS WHEREOF I have set my

23    hand on March 10, 2020.

24    _____
           MONNA J. NICKESON, CLR, RPR, CRR
25         CCR NO. 3322
```

Exhibit 20
Page 820

# Exhibit 21

## <u>REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL</u>

**Exhibit 21**

**Page 821**

NON-HIGHLY CONFIDENTIAL/ATTORNEYS' EYES ONLY

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


LUCAS R., by his next friend
MADELYN R.; DANIELA MARISOL T.,
by her next friend KATHERINE L.;
et al.,

                       No. 2:18-CV-05741

        Plaintiffs,        DMG-PLA

vs.

ALEX AZAR, Secretary of U.S.
Department of Health and Human
Services; E. SCOTT LLOYD,
Director, Office of Refugee
Resettlement of the U.S.
Department of Health & Human
Services,

        Defendants.
_____


CONFIDENTIAL UNDER PROTECTIVE ORDER

DEPOSITION OF ISABELLA F.

(NON-HIGHLY CONFIDENTIAL/ATTORNEYS' EYES ONLY)

NOVEMBER 23, 2019

9:32 a.m.


1333 2nd Street, Suite 400
Santa Monica, California

Diana Janniere, CSR-10034


Magna Legal Services
866-624-6221
www.MagnaLS.com



Exhibit 21
Page 822

NON-HIGHLY CONFIDENTIAL/ATTORNEYS' EYES ONLY

Page 56

1                   If you recall, he asked you something to the

2       effect of how the U.S. government harmed Benjamin F.,

3       and you responded -- and this isn't a direct quote --

4       but that he fainted while he was in the U.S.

5       government's custody.

6            A    Yes.

7            Q    And I just wanted to ask you a few more

8       questions.

9                   Benjamin F. was really close to his mother

10      in El Salvador; is that correct?

11           A    Yes.

12           Q    And was Benjamin F. separated by -- from his

13      mother?

14           A    Yes.

15           Q    And was it the U.S. government that

16      separated him from his mother?

17           A    Yes.

18           Q    And did that separation harm Benjamin F.?

19                THE WITNESS:  Objection.

20                THE WITNESS:  Yes.

21      BY MS. TARNEJA:

22           Q    And how did it harm Benjamin F.?

23                MR. MOSS:  Objection.

24                THE WITNESS:  It harmed him in the way

25      that -- well, the child had never been separated from



Exhibit 21
Page 823

NON-HIGHLY CONFIDENTIAL/ATTORNEYS' EYES ONLY

Page 57

1    his mother, and the other harm that they caused was

2    once that he was apart from his mother, he wouldn't

3    eat everyday.  He wouldn't eat the food that was given

4    to him.

5           And due to that, that he didn't eat food

6    everyday, that he wouldn't try any food, and they had

7    to go far where they would give them food; and my

8    daughter would carry the child on her back.

9           And one day when they were about to get

10   breakfast, my daughter said that the child fell and he

11   fainted.

12   BY MS. TARNEJA:

13      Q    And Benjamin F. was close to his brother as

14   well; is that correct?

15      A    Yes.

16      Q    And was Benjamin F. separated from his

17   brother?

18      A    Yes, they separated him.

19      Q    And was it the U.S. government that

20   separated him from his brother?

21      A    Yes, the government separated him.

22      Q    And is it your opinion that that separation

23   harmed Benjamin F.?

24           MR. MOSS:  Objection.

25           THE WITNESS:  It caused him a lot of harm.



**Exhibit 21**
**Page 824**

NON-HIGHLY CONFIDENTIAL/ATTORNEYS' EYES ONLY

Page 67

1                    REPORTER'S CERTIFICATION

2

3        I, Diana Janniere, a Certified Shorthand Reporter,

4     in and for the State of California, do hereby certify:

5

6        That the foregoing witness was by me duly sworn;

7     That the deposition was then taken before me at the

8     time and place herein set forth; that the testimony

9     and proceedings were reported stenographically by me

10    and later transcribed into typewriting under my

11    direction; and that the foregoing is a true record of

12    the testimony and proceedings taken at that time.

13

14        IN WITNESS WHEREOF, I subscribed my name

15    this 4th day of December, 2019.

16

17

18

19

20                   _____

21                   Diana Janniere, CSR No. 10034

22

23

24

25



Exhibit 21
Page 825

NON-HIGHLY CONFIDENTIAL/ATTORNEYS' EYES ONLY

Page 68

1          CERTIFICATE OF READER-INTERPRETER

2

3       I, _____, whose address is

4    _____,

5    a person who speaks the language of the deponent;

6    namely, Spanish, do hereby certify that on the _____

7    day of _____, 20____,

8    I did translate the foregoing deposition from the

9    English language into the Spanish language, reading

10   same to the deponent in his/her native tongue, to the

11   best of my ability;

12      That all corrections and changes requested by the

13   deponent were made and initialed by the deponent;

14      That upon completion of said reading, the

15   deponent did confirm to me that he/she had understood

16   the reading.

17

18

19

20

21                   _____

22                        READER-INTERPRETER

23

24

25



Exhibit 21
Page 826

NON-HIGHLY CONFIDENTIAL/ATTORNEYS' EYES ONLY

Page 69

1                    DECLARATION ERRATA SHEET

2

3

4   Our Assignment No. 523953

5   Case Caption:   Lucas R.

6   vs. Alex Azar

7

8              DECLARATION UNDER PENALTY OF PERJURY

9              I declare under penalty of perjury that I

10   have read the foregoing transcript of my deposition

11   taken in the above-captioned matter or the same has

12   been read to me, and the same is true and accurate,

13   save and except for the changes and/or corrections, if

14   any, as indicated by me on the DEPOSITION ERRATA SHEET

15   hereof, with the understanding that I offer these

16   changes as if still under oath.

17              Signed on the _____ day of

18   _____, 2019.

19

20

21

                    _____
22
                         ISABELLA F.
23

24

25



HIGHLY CONFIDENTIAL/ATTORNEYS' EYES ONLY

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


LUCAS R., by his next friend
MADELYN R.; DANIELA MARISOL T.,
by her next friend KATHERINE L.;
et al.,
                                    No. 2:18-CV-05741
          Plaintiffs,                   DMG-PLA

vs.

ALEX AZAR, Secretary of U.S.
Department of Health and Human
Services; E. SCOTT LLOYD,
Director, Office of Refugee
Resettlement of the U.S.
Department of Health & Human
Services,

          Defendants.
_____


CONFIDENTIAL UNDER PROTECTIVE ORDER

DEPOSITION OF ISABELLA F.

(HIGHLY CONFIDENTIAL/ATTORNEYS' EYES ONLY)

NOVEMBER 23, 2019

9:32 a.m.


1333 2nd Street, Suite 400
Santa Monica, California

Diana Janniere, CSR-10034


Magna Legal Services
866-624-6221
www.MagnaLS.com



Exhibit 21
Page 828

HIGHLY CONFIDENTIAL/ATTORNEYS' EYES ONLY

Page 59

1    BY MS. TARNEJA:

2         Q    And could you explain how that harmed

3    Benjamin F.?

4              MR. MOSS:  Objection.

5              THE WITNESS:  It harmed him because the

6    child would cry every morning.  He would cry because

7    he wanted his brother.

8              And the other boy, same thing, he didn't

9    want to let them take his brother away.  And up to a

10   certain moment, ███████████ wanted to go with him, but

11   the nurse said, "I don't think it is good for you to

12   go to where your brother is going because you are a

13   normal child, and the other children are like your

14   brother."

15             (Whereupon, the following testimony

16             is nonconfidential/attorneys' eyes

17             only.)

18

19

20

21

22

23

24

25



Exhibit 21
Page 829

HIGHLY CONFIDENTIAL/ATTORNEYS' EYES ONLY

Page 67

1                    REPORTER'S CERTIFICATION

2

3        I, Diana Janniere, a Certified Shorthand Reporter,

4    in and for the State of California, do hereby certify:

5

6        That the foregoing witness was by me duly sworn;

7    That the deposition was then taken before me at the

8    time and place herein set forth; that the testimony

9    and proceedings were reported stenographically by me

10   and later transcribed into typewriting under my

11   direction; and that the foregoing is a true record of

12   the testimony and proceedings taken at that time.

13

14       IN WITNESS WHEREOF, I subscribed my name

15   this 4th day of December, 2019.

16

17

18

19

20                      _____

21                      Diana Janniere, CSR No. 10034

22

23

24

25



Exhibit 21
Page 830

HIGHLY CONFIDENTIAL/ATTORNEYS' EYES ONLY

Page 68

1          CERTIFICATE OF READER-INTERPRETER

2

3     I, _____, whose address is

4     _____,

5     a person who speaks the language of the deponent;

6     namely, Spanish, do hereby certify that on the _____

7     day of _____, 20___,

8     I did translate the foregoing deposition from the

9     English language into the Spanish language, reading

10    same to the deponent in his/her native tongue, to the

11    best of my ability;

12       That all corrections and changes requested by the

13    deponent were made and initialed by the deponent;

14       That upon completion of said reading, the

15    deponent did confirm to me that he/she had understood

16    the reading.

17

18

19

20

21                     _____

22                          READER-INTERPRETER

23

24

25



Exhibit 21
Page 831

HIGHLY CONFIDENTIAL/ATTORNEYS' EYES ONLY

Page 69

1                    DECLARATION ERRATA SHEET

2

3

4     Our Assignment No. 523953

5     Case Caption:  Lucas R.

6     vs. Alex Azar

7

8            DECLARATION UNDER PENALTY OF PERJURY

9            I declare under penalty of perjury that I

10    have read the foregoing transcript of my deposition

11    taken in the above-captioned matter or the same has

12    been read to me, and the same is true and accurate,

13    save and except for the changes and/or corrections, if

14    any, as indicated by me on the DEPOSITION ERRATA SHEET

15    hereof, with the understanding that I offer these

16    changes as if still under oath.

17            Signed on the _____ day of

18    _____, 2019.

19

20

21

22            _____

23                   ISABELLA F.

24

25



Exhibit 21
Page 832

# Exhibit 22

**Exhibit 22**
**Page 833**

Page 1

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                   WESTERN DIVISION

4


5
    LUCAS R., et al.,            )
6                               )
                 Plaintiffs     )
7                               )
              vs.               ) Case 2:18-CV-
8                               ) 05741 DMG PLA
    ALEX AZAR, Secretary of     )
9   U.S. Department of Health    )
    And Human Services, et al., )
10                              )
                 Defendants.    )
11  --------------------------x

12

13                  CONFIDENTIAL

14      PURSUANT TO PROTECTIVE ORDER 101-19

15    DEPOSITION OF CAPTAIN MARIVIC FIELDS, MSW

16

17                Washington, D.C.

18           Monday, February 24, 2020

19

20

21

22  Reported by:

23  Lori J. Goodin, RPR, CLR, CRR,

24  RSA, California CSR #13959

25  JOB NO. 175375

Confidential

1   facilities.

2            So, they get referred to out of

3   network.  And I know I have seen some children

4   do well in out of network placements.

5        Q.    Are you aware of any children who

6   have a mental health need and also a behavioral

7   problem that have been referred to a secure

8   facility?

9        A.    Yes, I have encountered some of

10   those.

11        Q.    Do you remember any examples?

12        A.    Yes.  There was a child who had

13   severe mental health issues and also had

14   conduct disorder issues and something that the

15   Shenandoah at that time is not able to handle

16   because it is a secure facility.

17            So, they are not able to meet a lot

18   of the mental health needs and that child was

19   referred to the network, out of network care.

20   I think Devereux, who is able to handle both

21   because it is important for the mental health

22   component to also be served on top of the

23   behavioral.

24            So, when it gets to a point where

25   the child's needs are not being met, and the

1    what the psychiatrist's recommendations were.

2              If they are no longer, let's say

3    they are no longer a risk or danger to self or

4    others is one of the criteria.

5              So, a lot of times there is also a

6    recommendation for a, by the psychiatrist to

7    step them down.

8         Q.    And, you concluded that not all of

9    the children that were currently placed at

10   Shiloh posed a risk to themselves or others.

11   Correct?

12        A.    At that time, yes, not all of them

13   were, based on psychiatrist notes.

14        Q.    And besides looking at the

15   psychiatrist notes, did you do any other

16   thinking or evaluation of that?

17        A.    No, that was it.

18        Q.    And based on that review, you

19   concluded that there were quite a few children

20   for whom the psychiatrist had recommended

21   stepdown or reunification, but who were still

22   at Shiloh; is that correct?

23        A.    Yes.

24        Q.    Did you look into why they were

25   still at Shiloh?

Exhibit 22
Page 836

Confidential

1    A.    Yes.

2    Q.    And what did you find?

3    A.    I found that some of them have

4  already been referred for stepdown.  And they

5  are just awaiting placement.

6    Q.    And did you take any other steps to

7  try to assist with stepdown at that point?

8    A.    I did talk to the FFS at that

9  particular time, or supervisor who was in

10  charge of RTC.  And, I asked her the reasons

11  why the children, some of the children were

12  still in RTC.

13         And that is when I found out that

14  some of them were just awaiting placement.  And

15  then I did elevate it to also the supervisor,

16  their overall supervisor, to let him know if

17  they can assist with their transfer.

18    Q.    And do you know what happened next

19  with those children?

20    A.    I knew that they were eventually

21  stepped down or transferred.

22    Q.    And were some of those children

23  awaiting reunification with family?

24    A.    I believe so, yes.

25    Q.    Is it your understanding that

Confidential

1  population.

2      Q.    And do you see under, on 101936 the

3  third bullet that Shenandoah prepared?  It

4  says, "Currently 36 percent of UCN care are in

5  need of a secure RTC."

6      A.    Uh-huh, I see that.

7      Q.    In the bullet point above that, it

8  says, "SVJC," which stands for Shenandoah

9  Valley Juvenile Center, "cannot meet mental

10  health needs of over a third of its current

11  population."

12      A.    I see that.

13      Q.    Do you agree with that bullet?

14      A.    At that time, there was a, that was

15  a concern at that time.

16      Q.    Do you think that concern has been

17  addressed?

18      A.    Yes.

19      Q.    And how has that concern been

20  addressed?

21      A.    Kids are screened better if they are

22  referred to staff secure, especially if the

23  presenting problem is mental health issue.

24      Q.    So, you think that currently

25  Shenandoah is meeting the mental health needs

Confidential

1    have the need for those sorts of mental health

2    services?

3        A.    Well, some will require mental

4    health services, we know that.  But it is a

5    question of how severe their mental health

6    needs are, and whether Shenandoah has the

7    capacity to meet those needs.

8              And if they can't, then they should

9    be looking for another placement for their

10   child.

11             Especially if, let's say, you know,

12   I mean, you can see that it is decompensating

13   for the child.

14             You don't, I mean, you know, like,

15   for example, that one child that we were

16   talking about years ago where it was clear that

17   he had high, complex mental health needs that

18   Shenandoah was not a place for that child.  He

19   was just in and out of the hospital and it is

20   not good for that child.

21             And eventually that child was placed

22   elsewhere.

23             So, some of them will have some

24   mental health issues, but it is just a matter

25   of how severe the mental health issues are.

**Exhibit 22**
**Page 839**

Confidential

1    do or not.

2        Q.    Would you agree that secure

3    placements are inappropriate for children that

4    have serious mental health needs?

5        A.    I don't think it is inappropriate,

6    no.

7        Q.    No.  You think they are appropriate

8    placements for children with serious mental

9    health needs?

10       A.    If they have some conduct disorder

11   as well, then yes, it will be appropriate.

12       Q.    Are you aware of cases where secure

13   placement has exacerbated a child's mental

14   health needs?

15       A.    Can you repeat the question, please?

16       Q.    Are you aware of cases where secure

17   placement has exacerbated a child's mental

18   health needs?

19       A.    I have heard of it.  But I was not

20   consulted with it.  I have heard of some cases.

21       Q.    What do you recall about the cases

22   that you have heard about?

23       A.    Some of them have been, it is just

24   being in a congregate care, it is not, you

25   know, it is not conducive for them.

Confidential

Page 180

1           A lot of these children have been on

2    their own for a long time, they have been out

3    in the streets for a long time, they have taken

4    care of themselves a long time.

5           So, for them to be put in a

6    controlled setting, it is not something that

7    they were expecting.  Much, so much so in a

8    secure setting where the rules are much

9    stricter.

10          So, you know, so, if they come with

11   an idea, to this country where they can be free

12   and be able to do, you know, work and do

13   whatever they initially thought they could do,

14   and then be put in a controlled setting,

15   supervised setting, a lot of times, you know,

16   didn't meet their expectation and their mental

17   health could be affected because of those

18   things.

19       Q.   Do you think their mental health is

20   affected because they are not with their

21   family?

22       A.   Could be.

23       Q.   Any other ways that their mental

24   health might be affected?

25       A.   You know, some of these children

**Exhibit 22**
**Page 841**

Confidential

1    came with, you know, traumatic experiences.

2              The journey was traumatic and some

3    of the experiences that they had are traumatic.

4              So, they, and then they come here

5    with, you know, with some of those untreated

6    mental health issues, underlying mental health

7    issues.

8              And then if they -- I lost my train

9    of thought.

10             So, and -- I will stop it there.

11        Q.    So, we were talking about how being

12   in a secure placement could exacerbate a

13   child's mental health issues.

14        A.    Uh-huh, okay.

15        Q.    So, you talked about children not

16   being accustomed to controlled settings.

17        A.    Uh-huh.

18        Q.    Having underlying trauma, any other

19   reason why being in a secure placement might

20   exacerbate a child's mental health needs?

21        A.    And some of them they come here to

22   join their family members.

23             So, for them not to be with them,

24   also, exacerbates their, not exacerbates, but

25   could impact their mental health as well.

1    appropriate?

2         A.    Yes.

3         Q.    And does the Federal Field

4    Specialist assess whether a child's medical

5    needs are being met?

6         A.    Yes.

7         Q.    Does a Federal Field Specialist

8    assess whether a child's mental health needs

9    are being met?

10        A.    Yes.

11        Q.    You testified earlier that you had

12   heard about situations where secure placement

13   exacerbated mental health needs I think was the

14   phrase.  Do you recall that?

15        A.    Yes.

16        Q.    When a child meets placement

17   criteria for a secure facility and there is no

18   viable sponsor, can ORR simply release the

19   child on her own recognizance?

20        A.    No.

21        Q.    When a child has mental health

22   needs, does ORR provide mental health services

23   to meet those needs?

24        A.    Yes.

25        Q.    And does providing mental health

Confidential

1              C E R T I F I C A T E

2    UNITED STATES OF AMERICA   )
                               ) ss.:
3    DISTRICT OF COLUMBIA       )

4

5              I, Lori J. Goodin, a Notary Public

6    within and for the District of Columbia, do

7    hereby certify:

8              That CAPTAIN MARIVIC FIELDS, the

9    witness whose deposition is hereinbefore set

10   forth, was duly sworn by me and that such

11   deposition is a true record of the testimony

12   given by such witness.

13             I further certify that I am not

14   related to any of the parties to this action by

15   blood or marriage; and that I am in no way

16   interested in the outcome of this matter.

17             IN WITNESS WHEREOF, I have hereunto

18   set my hand this 5th day of March, 2020.

19             *Lori Goodin*

20   _____

21             Lori J. Goodin, RPR, CLR, CRR

22             RSA, California CSR #13959

23

24   My Commission Expires:

25   May 14, 2021

# Exhibit 23

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 23**

**Page 845**

```
 1              UNITED STATES DISTRICT COURT
             CENTRAL DISTRICT OF CALIFORNIA
 2                 WESTERN DIVISION

 3

 4   LUCAS R., et al.,            )
                                  )
 5             Plaintiffs,        )        CASE NO.
                                  )
 6      vs.                       )   2:18-CV-05741 DMG PLA
                                  )
 7   ALEX AZAR, Secretary of      )
     U.S. Department of Health    )
 8   and Human Services, et al., )
                                  )
 9             Defendants.        )
     _____ )
10

11

12          *** C O N F I D E N T I A L ***

13

14          DEPOSITION OF DAVID R. FINK

15               Atlanta, Georgia

16          Wednesday, February 12, 2020

17

18

19

20   Reported by:

21   Judith Leitz Moran

22   CCR, RPR, RSA

23   JOB NO.: 175989

24

25
```

Exhibit 23
Page 846

TSG Reporting - Worldwide (877) 702-9580

Confidential

1    assigned to a specific region?

2         A    Youth?

3         Q    Yeah.

4         A    So basically the kids are referred by DHS

5    to intakes.  And then intakes will usually place

6    kids closest to the point of referral and then they

7    will fan out.  So it's basically based on capacity

8    is where they're placed.  And need.

9         Q    So would you agree that each regional FFS

10   serves as the final approval authority for all

11   placement, transfer and release decisions for the

12   youth that are within their region -- their region

13   or their jurisdiction?

14        A    Yes.

15        Q    When, if ever, is an FFS required to

16   discuss a case with an FFS supervisor prior to

17   making a decision regarding the placement, transfer

18   or release of a youth?

19        A    I'm not sure of any requirements.  I know

20   that if it's a complicated case they will reach out

21   to their supervisor to staff it.

22        Q    As the FFS supervisor for special

23   populations, do you serve as the final approval

24   authority responsible for the placement, transfer

25   and release of children placed in restrictive

**Exhibit 23**

TSG Reporting - Worldwide (877) 702-9580        **Page 847**

Confidential

1      Q      And does ORR place children in

2   therapeutic staff secure programs as well?

3      A      Yes, that's part of the staff secure,

4   yes.

5      Q      Does ORR utilize influx facilities for

6   the care and custody of youth within its custody?

7      A      Within its custody?

8      Q      Yeah.

9      A      Yes.

10     Q      Does ORR place children in therapeutic

11  group homes?

12     A      Yes.  There's one -- I believe there's

13  one in New York.

14     Q      Does ORR place children with the

15  Unaccompanied Refugee Child Program for longer term

16  foster care programs?

17     A      So that would be when they achieve

18  status, and so they would be actually discharged

19  from DUCO custody and then they would go into the

20  URM program.

21     Q      I see.

22            And so of the types of ORR placements

23  that you've described, can you place those on a

24  continuum from least restrictive to more

25  restrictive?

Confidential

1      A      Yes.   So shelter and transitional foster

2   care are least restrictive settings.   Then staff

3   secure.   And RTC and secure.

4      Q      And where would you place therapeutic

5   staff secure in that continuum?   Are you

6   classifying it as a staff secure?

7      A      Yes, it's listed -- it's classified as a

8   staff secure.

9      Q      And where would therapeutic group homes

10   fall within that continuum?

11      A      Usually kids that are from shelter, right

12   above a shelter placement.

13      Q      And you also mentioned out-of-network

14   placements.

15      A      Uh-huh.

16      Q      Are out-of-network placements limited to

17   residential treatment centers or residential

18   treatment programs?

19      A      Yes.

20      Q      I'll have a few questions about that in a

21   moment.

22            But before we get there, would you agree

23   that children in ORR custody are required to be

24   placed in the least restrictive environment

25   appropriate for that child's needs?

Exhibit 23
Page 849

Confidential

1   a transfer?

2        A    It's documented in the case review.

3        Q    And to what extent does ORR evaluate

4   whether a provider has offered a youth or a child

5   more intensive interventions and supportive

6   services prior to a decision to request a transfer

7   or terminating a child from their program?

8        A    So it's done through the case review

9   documentation, significant incident reports, and

10  ongoing staffings with the case coordinator and the

11  federal field specialist.  So they are always

12  looped in to talk about those cases.

13       Q    Are there ever times when a provider is

14  determined to have failed to offer services or

15  interventions prior to a request that a child be

16  terminated from the program?

17       A    Yes.

18       Q    And what is ORR's response if that

19  occurs?

20       A    If we feel that that child can be

21  maintained in that facility, we ask them to provide

22  us a plan to -- with the goal of maintaining that

23  child in care.

24       Q    And if the program refuses to maintain

25  the child in -- in their program, does ORR offer

Confidential

1   not quite as acute as a child in RTC, but they

2   still need more mental health interventions than a

3   regular staff secure or shelter could provide.

4        Q    So how would you describe the

5   distinctions then between a therapeutic staff

6   secure shelter and a staff secure program?

7        A    So the therapeutic staff secure uses DBT,

8   dialectical behavioral therapy, as their system to

9   work with the kids teaching them.  It's a

10  therapeutic intervention that's used and taught to

11  the children to work on mindfulness and kind of

12  self-control and those kind of things.

13            And it's more groups than what's

14  prescribed.  So we prescribe like two groups.  They

15  do groups every day and it's all therapeutic.

16       Q    So you talked a little bit about this,

17  but then how would you describe the distinctions

18  between a therapeutic staff secure shelter and an

19  RTC?

20       A    A shelter might be something where the

21  child might have some mental health issues, but

22  they're not particularly in crisis.  They're not

23  very acute.

24       Q    You described a little bit of the

25  distinction between sort of the treatment modality

Confidential

1   at a staff -- at a therapeutic staff secure and a

2   staff secure shelter program -- staff secure

3   program.

4       A    Uh-huh.

5       Q    In terms of the restrictiveness of the

6   programs, how would you describe the similarities

7   or the differences in terms of the restrictiveness

8   of those two placements?

9       A    So it depends on the staff secure and the

10  locale.  So Friends of Youth, which is the

11  therapeutic staff secure you're talking about, is

12  an open campus and so it's not locked.

13           Whereas, BCFS San Antonio might have a

14  fence -- has a fence around it.

15           And then Children's Village, staff

16  secure, is also an open campus and its our standard

17  staff secure.  So it varies.

18      Q    So how would you describe an open campus?

19      A    It doesn't have a fence around it.

20      Q    Okay.  So that's helpful.  But in terms

21  of the buildings, the residences, the buildings

22  where children are receiving services, they're

23  going to school, are those locked buildings at both

24  an open campus and a fenced campus?

25      A    Yes, they have a delay lock on them, yes.

Confidential

1    Q    Okay.  Do you believe that the FFSs have

2   been trained on and understand the differences

3   between a therapeutic staff secure, a staff secure

4   and a residential treatment program?

5    A    Some have, yes.

6    Q    And to what extent are the placement

7   criteria for placement at a therapeutic staff

8   secure different than the placement criteria for a

9   staff secure shelter?

10   A    So a therapeutic staff secure isn't going

11  to take a child that is aggressive or disruptive,

12  they're going to take children with mental health

13  diagnoses that are amenable to treatment.

14        And staff secure are required to take

15  kids with disruptive and aggressive behavior.

16   Q    And are those criteria reflected in the

17  ORR policy guide or the MAP?

18   A    I don't -- I don't know it off the top of

19  my head.  I couldn't tell you.

20   Q    How many therapeutic staff secure

21  shelters are actually available within the ORR

22  network?

23   A    One.

24   Q    And what is that?

25   A    Friends of Youth.

Exhibit 23
Page 853

Confidential

1        A    I would say it's right above -- it's for

2   kids that are shelter kids that have mental health

3   issues but really are not in crisis and kind of

4   lower level issues that can't be maybe managed in a

5   shelter but need a little bit more therapeutic

6   intervention.

7        Q    So in terms of restrictiveness you would

8   put therapeutic above a shelter but below a staff

9   secure, a therapeutic staff secure?

10        A    Yes, correct.

11        Q    Okay.  And functionally, how is a

12   therapeutic group home different than a group home?

13        A    So in the domestic system, because we

14   only have the one group home, in the domestic

15   system there's various levels of group homes.

16            And some of our programs are actually

17   licensed as group homes, but you can be licensed to

18   be a group home, like a regular group home that

19   takes standard kids, or a therapeutic group home

20   would probably be the difference.

21        Q    I see.

22            And do you believe that the FFS -- so

23   where is -- what is and where is the therapeutic

24   group home?

25        A    It's in Children's Village in Dobbs

Exhibit 23
Page 854

Confidential

1      Q     Okay.

2      A     Yeah.

3      Q     So I apologize, I'm just trying to

4   recall.  So I know you have one therapeutic group

5   home that you have access to.

6           In terms of the therapeutic staff secure,

7   can you remind me what therapeutic staff secure

8   programs are within the ORR network?

9      A     Friends of Youth.

10     Q     Okay.  You mentioned out-of-network

11  facilities.  And I think you also testified before

12  that currently the out-of-network facilities that

13  ORR would utilize would all be at the RTC level of

14  placement; is that correct?

15     A     Yes.

16     Q     Okay.  Who within ORR has the ability to

17  authorize placement or transfer or release of a

18  youth from an out-of-network program?

19     A     So a couple of things with that.  So

20  transfers to an out-of-network, that would have to

21  be staffed by -- with the federal field specialist

22  and their supervisor.

23          So they would have to -- the FFS would

24  have to let the supervisor know they've exhausted

25  all internal placement options that were

**Exhibit 23**
**Page 855**

1    recommended for that youth before going

2    out-of-network.

3         Q    Uh-huh.

4         A    And then once they agree, they would let

5    me know, and then they would refer to

6    out-of-network.

7         Q    Okay.  And just to clarify for the

8    record, what is an out-of-network facility?

9         A    It's a facility that doesn't have a grant

10   with ORR.

11        Q    And why does ORR place youth at

12   out-of-network facilities?

13        A    Because we have children that have

14   recommended RTC placements and our existing RTC

15   placements will not accept those children.

16        Q    Can you describe the criteria that ORR

17   uses to identify sort of a special needs case and

18   how those needs are documented?

19        A    It's usually those -- those

20   recommendations are made by a psychologist and a

21   psychiatrist, and they are specifically

22   recommending that level of care for that child.

23        Q    Can you describe the criteria that is

24   used to be able to identify when a youth might need

25   more specialized services?

Confidential

1    variation in terms of the types of behaviors or

2    incidents that are reflected or documented in a

3    significant incident report?

4         A    They -- they're very broad.

5         Q    In terms of -- is there variation by

6    program in terms of how programs interpret what

7    might constitute a need to document behavior in a

8    significant incident report?

9         A    Yes.

10        Q    And from ORR's perspective, is there any

11   kind of guidance or training provided in terms of

12   what types of behavior should be captured by the

13   significant incident reports?

14        A    So when we rolled out the policy, we did

15   this training, but the other piece of this that

16   makes this a little tricky is that their licensing

17   will also call for different standards of

18   reporting, too.  And so what may not be significant

19   to us might be significant to the state and vice

20   versa.

21        Q    Okay.  So there could be differences

22   between ORR reporting requirements and state

23   licensing reporting requirements?

24        A    And it may require them -- they're going

25   to report to both regardless.

**Exhibit 23**

**Page 857**

Confidential

1   disruptive behavior?

2        A    Again, it goes back to the reports that

3   we might get from the facilities.  If there's

4   fighting, there's property damage, things of that

5   nature, would constitute staff secure placement.

6        Q    You mentioned that's sort of -- the

7   determination begins at the program or provider

8   level.  Do programs vary in terms of how they might

9   define an unacceptably disruptive behavior?

10       A    They vary in terms of how long they will

11  try to manage the behavior as opposed to -- the

12  criteria will be the same, but it will be dependent

13  on the level of tolerance that program might have

14  for their behavior.

15       Q    What, if anything, does ORR do to try to

16  ensure that the criteria or sort of the standards

17  are being applied at the program level in a

18  consistent way?

19       A    Programs -- when a child enters one of

20  those levels of care that requires a notice of

21  placement, they're required to inform that minor

22  within 48 hours of placement of why they're placed

23  in that particular level of care, be it a staff

24  secure or a TC or secure.

25            And then they are to evaluate that

Confidential

Page 106

1    started to talk about this a little before.

2        A    Yes.

3        Q    Okay.  And based on your experience, how

4    frequently does that happen?

5        A    So those -- when those transfers occur,

6    I'm not a part of those discussions.  I only get

7    really involved when there's a potential

8    out-of-network.  So I wouldn't be able to give you

9    that number.

10       Q    So can you remind me who is involved --

11   who recommends whether a child should be

12   transferred to a secure facility?

13       A    So the recommendation would come from the

14   program and the case coordinator, and then the

15   decision to do that would be with the FFS.

16       Q    And so kind of focusing a little more

17   specifically on the secure facility right now, what

18   factors do those individuals consider when they are

19   making recommendations that a youth needs to be

20   transferred to a secure facility?

21       A    Danger to the community and committing

22   chargeable crimes.

23       Q    And is it necessary for -- oh, wait.  I'm

24   sorry.  Danger to the community and then what?

25       A    Chargeable crimes.

**Exhibit 23**
**Page 859**

1    residential treatment programs that you're

2    currently placing at, how many youth do you

3    currently have in out-of-network RTCs?

4        A    I don't know the exact number.  Probably

5    under 10.

6        Q    And I apologize.  I think you said that.

7    And at which programs?

8        A    Again, don't know exactly.  I know

9    there's some at Devereux, and then San Jose

10   Behavioral Health.  And the rest of them I don't

11   remember off the top of my head.

12       Q    Okay.  So you mentioned the notice of

13   placement and the information that's contained in

14   that.  What is the purpose of the notice of

15   placement?

16       A    It's to ensure the programs are in

17   compliance with placement and that they're

18   informing the right -- the child's -- the reasons

19   why that child is in placement to that child.

20       Q    To what extent is a notice of placement

21   also intended to offer a youth protection when

22   they're being stepped up to a more restrictive

23   setting?

24       A    It offers them the right to go through an

25   appeal process to contest their placement.

**Exhibit 23**

Confidential

1    the notice of placement for staff secure is

2    identical to notice of placement for therapeutic

3    staff secure?

4        A    Correct.

5        Q    The therapeutic group home does not

6    require -- does the therapeutic group home require

7    a notice of placement?

8        A    No.

9        Q    Okay.  Is the notice of placement

10   provided to a youth -- let me just take a step

11   back.

12           MS. SHUM:  Okay.  I'm going to just take

13   a look at another document.

14           (Deposition Exhibit 175 marked.)

15   BY MS. SHUM:

16       Q    All right, Mr. Fink, I'm going to ask

17   that you to take a look at what's been marked as

18   Exhibit 175.

19       A    (Witness reviews document.)

20       Q    Okay.  So this appears to be an email

21   from Mr. ████ to Mr. Biswas dated January 9th,

22   2019.  It has the Subject line January NOP

23   Compliance Review: Staff Secure and RTC Facilities;

24   is that right?

25       A    Yes.

**Exhibit 23**

TSG Reporting - Worldwide (877) 702-9580        **Page 861**

Confidential

1      Q      How frequently are these types of reports

2  prepared?

3      A      Monthly.

4      Q      Okay.  And this report indicates that 93

5  out of 128 cases of youth at both staff secure or

6  RTCs were noncompliant with the NOP, correct?

7      A      Correct.

8      Q      So from ORR's perspective, over 70

9  percent of kids in restrictive settings in January

10  of 2019 had not -- were placed there out of

11  compliance with ORR's own policies and a standing

12  court order specific to NOPs; is that correct?

13      A      Correct.

14      Q      Okay.  What was the outcome of this

15  particular month's compliance review?

16      A      I don't -- I don't remember.  This is

17  when they were running -- I wasn't -- I was

18  starting to get involved, ramped up into this

19  process.

20      Q      I see.

21      A      So I don't really remember.

22      Q      And you said these reports are generated

23  monthly?

24      A      Yes.

25      Q      And so the most recent compliance report

Confidential

1    they are in common with the court order.

2         Q    You mentioned before that in terms of a

3    notice of placement it informs a youth of their

4    right to challenge a decision to step them up to a

5    more restrictive setting.

6              What is your understanding of what that

7    involves?

8         A    The minor's right to challenge?

9         Q    Yes.

10        A    It's very limited.  I haven't seen a

11   child challenge a placement yet.  So I've yet to

12   see that process.

13        Q    Does a youth have the right to an

14   attorney in order to challenge that decision to

15   step them up to a more restrictive setting?

16        A    To step them up to a more restrictive

17   setting, no.

18        Q    We've talked a lot about step-up, a

19   little bit about step-down.  But just for the

20   record, can you please define what a step-down

21   would involve?

22        A    A transfer to a least restrictive

23   placement.

24        Q    So given sort of your pretty specific

25   role as FFS for special populations, what is your

**Exhibit 23**

**Page 863**

Confidential

1     A     Yes.

2     Q     And now you have a specific role of FFS

3    for special populations, correct?

4     A     Yes.

5     Q     What expectations or policies does ORR

6    have in terms of what types of decisions an FFS

7    needs to seek approval from their FFS supervisor in

8    order to move forward?

9     A     It's on a case-by-case basis.

10    Q     Okay.  So is an FFS independently

11   authorized to serve as the final decision maker on

12   decisions related to -- final authorizer on

13   recommendations related to release and transfer and

14   step-up and step-down of youth?

15    A     Yes.

16    Q     Okay.

17    A     Except when it comes to out-of-network

18   placements.

19    Q     Okay.

20    A     Yeah, that is the caveat.

21    Q     Okay.

22    A     And then the RTC placements have to

23   become from a -- that has to be recommended by a

24   doctor before they do that.  They can't put a kid

25   into an RTC without that recommendation.

**Exhibit 23**

Confidential

Page 170

```
 1        Q     Okay.  Are there other types of decisions
 2   that an FFS is required to staff and get approved
 3   by an FFS supervisor before they're able to
 4   implement that decision?
 5        A     A release decision?
 6        Q     Other decisions.
 7        A     Like transfers or --
 8        Q     Yeah.
 9        A     No.
10        Q     Okay.
11        A     They can make those independently.
12        Q     So those decisions are within the
13   independent discretion of the individual FFS,
14   correct?
15        A     To my knowledge, yes.
16        Q     With the caveat limitations that you
17   already put on the record?
18        A     Yes.
19        Q     Okay.  You mentioned that there was --
20   and you described the circumstances around a youth
21   who had a viable sponsor and who had been referred
22   to you for an out-of-network placement where you
23   declined to facilitate an out-of-network placement;
24   is that correct?
25        A     The minor from the shelter that you're
```

Confidential

1    to make release determinations without kicking that

2    up to the regional supervisor?

3         A    I would have to review the policy again.

4         Q    Uh-huh.

5         A    So I'm not clear.  So it could be where

6    they have to kick it up to me.

7         Q    Uh-huh.

8         A    But again, I'd have to revisit the

9    policy.  I don't have it on me.

10        Q    Okay.  But when you talk about there

11   being less -- your understanding of current policy.

12   When you're describing less need to engage a

13   supervisory FFS, what kinds of decisions remain in

14   the final purview of an FFS?

15        A    Release decisions are in their purview,

16   transfers are in their purview.

17        Q    Release and transfers.

18        A    Uh-huh.

19        Q    From your understanding of current policy

20   release and transfers remain within the authority

21   of FFS?

22        A    Yes.

23        Q    Okay.  What is your understanding of --

24   let me ask a question before I move on.

25             Going back again for a moment to when you

Confidential

1    she's doing with respect to her regular caseload?

2         A    Correct.

3         Q    Of those 14 cases, how many has she

4    identified as complex enough to engage your

5    assistance on?

6         A    I mean, I think I did one a couple of

7    weeks ago.

8         Q    Okay.

9         A    And -- yeah.

10        Q    And with specific to the residential

11   treatment programs, you had mentioned that an FSS

12   is required to have a psychiatric recommendation

13   supporting residential placement prior to being

14   able to approve the placement of a youth at an RTC;

15   is that correct?

16        A    Yes.

17        Q    Okay.  Is a psychiatric approval also

18   required in order to authorize release or a

19   step-down from a residential treatment program?

20        A    No, I'm not aware of that being anywhere

21   in the policy or anything.

22        Q    Do the out-of-network residential

23   treatment programs require any kind of psychiatric

24   approval of discharge before they're able to step

25   down or transfer a youth from an out-of-network

**Exhibit 23**
**Page 867**

Confidential

1              J U R A T

2

3    I,              , do hereby certify under

4    penalty of perjury that I have read the foregoing

5    transcript of my deposition taken on              ;

6    that I have made such corrections as appear noted

7    herein in ink, initialed by me; that my testimony as

8    contained herein, as corrected, is true and correct.

9

10   DATED this _____ day of _____, 2020,

11   at _____,          .

12

13

14

15

16

17   _____

18          David R. Fink

19

20

21

22

23

24

25

Confidential

1                    DISCLOSURE OF NO CONTRACT

2

3        I, Judith L. Leitz Moran, do hereby disclose
    pursuant to Article 10.B. of the Rules and
4    Regulations of the Board of Court Reporting of the
    Judicial Council of Georgia that TSG Reporting was
5    contacted by the party taking the deposition to
    provide court reporting services for this
6    deposition and there is no contract that is
    prohibited by O.C.G.A. Sections 15-14-37(a) and (b)
7    or Article 7.C. of the Rules and Regulations of the
    Board of Court Reporting for the taking of this
8    deposition.

9        There is no contract to provide reporting
    services between TSG Reporting or any person with
10   whom TSG Reporting has a principal and agency
    relationship nor any attorney at law in this
11   action, party to this action, party having a
    financial interest in this action, or agent for an
12   attorney at law in this action, party to this
    action, or party having a financial interest in
13   this action.  Any and all financial arrangements
    beyond our usual and customary rates have been
14   disclosed and offered to all parties.

15

16       This 25th day of February 2020.

17

18

    _____
19   Judith L. Leitz Moran, B-2312
    Georgia Certified Court Reporter
20

21

22

23

24

25

**Exhibit 23**
**Page 869**

1                CERTIFICATE OF COURT REPORTER

2

3     STATE OF GEORGIA      )

4     COUNTY OF DEKALB      )

5

6          I hereby certify that the foregoing deposition
    was reported as stated in the caption, and the
7     questions and answers thereto were reduced to
    writing by me; that the total transcript pages 1
8     through 281 represent a true, correct, and complete
    transcript of the evidence given on February 12,
9     2020, by the witness, DAVID R. FINK, who was first
    duly sworn by me.

10

11         I further certify that I am not related to any
    of the parties to this action by blood or marriage;
12     and that I am in no way interested in the outcome
    of this matter.

13

14         I certify that I am not disqualified for a
    relationship of interest under O.C.G.A. Section
15     9-11-28(c); I am a Georgia Certified Court Reporter
    here as a representative of TSG Reporting; I was
16     contacted by TSG Reporting to provide court
    reporting services for this deposition; I will not
17     be taking this deposition under any contract that
    is prohibited by O.C.G.A. Sections 15-14-37(a) and
18     (b) or Article 7.C. of the Rules and Regulations of
    the Board of Court Reporting.

19

20         This 25th day of February 2020.

21

22     _____
      Judith L. Leitz Moran, B-2312
23     Georgia Certified Court Reporter

24

25

Exhibit 23
Page 870

# Exhibit 24

Exhibit 24
Page 871

Page 1

1          UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF CALIFORNIA
2                WESTERN DIVISION

3

   LUCAS R., et al.,          )
4                             )
                              )
5       Plaintiffs,           )
                              )    CASE NO.
6       vs.                   )    2:18-cv-05741 DMG PLA
                              )
7   ALEX AZAR, Secretary      )    CONFIDENTIAL
    of U.S. Department of     )
8   Health and Human         )
    Services, et al.,         )
9                             )
           Defendants.        )
10

11

12

13

14              DEPOSITION

15                  OF

16            YESENIA HEATH

17    1700 7th Avenue, Seattle, Washington

18           FEBRUARY 26, 2020

19

20

21              CONFIDENTIAL

22

23

24  Reported by:
    Monna J. Nickeson, CRR, CLR, RPR, CRR
25  Job No. 176785

**Exhibit 24**
**Page 872**

Confidential

Page 28

1       Q.      On step-up?

2       A.      Yes.

3       Q.      Step-down?

4       A.      Yes.

5       Q.      On psychotropic medication?

6       A.      Yes.

7       Q.      And have you received any training

8   on identifying a child with a disability?

9       A.      No.  It's not the expectation that

10   would be in my role.

11       Q.      Whose role would that be?

12       A.      The clinician of the shelter.

13       Q.      How often do these web-based

14   trainings occur?

15       A.      It depends on the policies that are

16   coming out.  It can be like next week, the

17   policy changes, so we have a new training, or

18   you know.

19       Q.      Do the policies change often?

20       A.      Yes.  Nothing stays the same here.

21       Q.      And is that the online policy -- the

22   ORR online policy, that's the one that you're

23   referring to that's constantly changing?

24       A.      Yes.  Now it's online.  It used to

25   be in a big handbook when I started.

Exhibit 24
Page 873

Confidential

Page 50

1      A.    I don't know.  They come to my
2   stakeholder's meetings.  So a few times.  I
3   mean, it's not like, you know.
4      Q.    What are the stakeholder's meetings?
5      A.    The stakeholder meeting is where we
6   get all the stakeholders together that are
7   vested in working with the children and care at
8   ORR.  So the program directors, the consulates,
9   the children attorneys, the immigration
10  officers, representatives, we all come
11  together, court administrator for immigration,
12  we all come together every three or four months
13  to talk about how to best serve our children
14  and get them moving through the process, what
15  are the hiccups that we're seeing, what are the
16  trends; and to communicate to each other in a
17  manner that's very friendly as to how to be
18  able to kind of work together and help make
19  each others' jobs easier.
20     Q.    Have you ever spoken to an attorney
21  about a specific child?
22     A.    No.  I don't -- I can't call and
23  say, you know, "Oh, tell you" -- that's -- no.
24     Q.    Have they ever reached out to you
25  regarding a child's case?

**Exhibit 24**
**Page 874**

Page 60

1    Q.    What does that mean to you?

2    A.    It means that a child will change a

3    level of care, will go from lower level care to

4    a higher level care.

5    Q.    And are you familiar with the term

6    "Secure facility"?

7    A.    Yes.

8    Q.    What does that mean?

9    A.    That's the highest level of care

10   that we have in terms of restrictive settings.

11   Q.    And what does a Secure facility look

12   like?

13   A.    I haven't visited one in a while.

14   But it's similar to a prison, I would say.

15   Q.    At this time is Shenandoah the only

16   Secure facility in ORR's network?

17   A.    Yes.

18   Q.    Previously there were two, correct?

19   A.    Yes.

20   Q.    Yolo?

21   A.    Uh-huh, yes.

22   Q.    Is that a yes?

23   A.    Yes.

24   Q.    If you know, what is the ratio of

25   staff to children in Secure placement?

Confidential

Page 81

1    documentation that is provided by both to make

2    the final decision.  So it doesn't have to do

3    with who is making the recommendation.  It has

4    to do with:  How can you back up your

5    recommendation?

6         Q.   Do the case coordinators have

7    communication with the children?

8         A.   Yes.

9         Q.   But you mentioned earlier it's just

10   sometimes; not often?

11        A.   Uh-huh.

12        Q.   And it's when you request it?

13        A.   Uh-huh.

14        Q.   Or --

15        A.   Yes, yes.

16        Q.   It's when you request it, or the

17   case coordinator takes it upon themselves to

18   meet with the child?

19        A.   Yes.

20        Q.   That's not very often?

21        A.   It's not very often that we

22   disagree.

23        Q.   My question is:  It's not very often

24   that the case coordinator is meeting with the

25   children before making a recommendation,

**Exhibit 24**
**Page 876**

Confidential

Page 82

1    correct?

2         A.    Yes.

3         Q.    And the care providers are the ones

4    having interaction with the children, correct?

5         A.    Yes.

6         Q.    And your understanding is that

7    you -- the title alone doesn't make a

8    distinction for you as to how much weight you

9    give to the recommendation?

10        A.    Yes.

11        Q.    Whether it's the care provider or

12   the case coordinator?

13        A.    Yes.

14        Q.    It all depends on the documentation

15   that they can provide?

16        A.    Yes.

17        Q.    Is the case coordinator creating

18   their own documents or investigations in making

19   their recommendation, or are they relying

20   exclusively on the documents in the minor's

21   file?

22        A.    I don't know exactly.  I know that

23   they are reviewing the documents in the minor's

24   file, and they are relying on any documents

25   that are uploaded into the portal.

**Exhibit 24**
**Page 877**

Confidential

Page 83

1      Q.    Do they ever create their own

2   documents?

3      A.    Only when they put in their

4   recommendation on the portal.

5      Q.    So you mentioned that documents in a

6   portal are reviewed by the case coordinator.

7            Are these the same documents that

8   you reviewed when making a decision for

9   step-up?

10      A.    Yes.

11      Q.    Is anything else reviewed, other

12   than documents contained in this portal?

13      A.    Yes.  Well, sometimes the

14   information is not uploaded, so I have to tell

15   them to upload it.

16      Q.    What kind of information would that

17   be?

18      A.    If needed, an assessment -- a recent

19   psychological assessment, information like

20   that.

21      Q.    Is that usually included in the

22   transfer request?

23      A.    Yes.

24      Q.    But sometimes it's missing and so

25   you have to request it?

**Exhibit 24**
**Page 878**

Confidential

Page 84

1       A.     Yes.

2       Q.     And you said in making decisions,

3   sometimes you interview children?

4       A.     Yes.

5       Q.     But not very often?

6       A.     Yes.

7       Q.     Do you observe the child without

8   interviewing them to make a decision?

9       A.     No.

10      Q.     Can children review what's contained

11  in the portal that you mentioned?

12      A.     No.  They can review their file, but

13  I guess that's the same.

14      Q.     Or at least it's supposed to be

15  matching?

16      A.     Yes, yes.

17      Q.     Have you ever known of a child to

18  request access to their file to review

19  documents?

20      A.     Yes.

21      Q.     How often has that happened?

22      A.     Not very often.

23      Q.     More than five?

24      A.     In the last ten years, about five or

25  six times, if that, yeah.

**Exhibit 24**
**Page 879**

Confidential

Page 85

1      Q.    Do you think they know -- the

2  children know that they can request to see

3  their files?

4      A.    Yes.

5      Q.    And how -- what do you base that

6  opinion on?

7      A.    I don't know.  I just know that, you

8  know, they know.

9      Q.    You have never asked the children if

10  they know they can request their file?

11      A.    No.

12      Q.    Have you ever asked the staff

13  whether that information has been conveyed to

14  the child?

15      A.    No.

16      Q.    Can children dispute what's in their

17  physical file?

18      A.    I would say so, yes.

19      Q.    And what do you base that on?

20      A.    I don't know.

21      Q.    Has that ever happened where a child

22  has disputed what's in their file?

23      A.    No.

24      Q.    In your ten years, no child has ever

25  said, "This is not what happened"?

Page 86

1       A.      Not to my knowledge.  Not to me.

2       Q.      Has a child ever written a

3   declaration or a letter saying that a situation

4   occurred differently than what's reported in

5   their case file?

6       A.      I don't know.

7       Q.      You've never seen that in your

8   review?

9       A.      No, no.

10      Q.      In making a step-up decision, do you

11  interview the potential sponsor?

12      A.      No.

13      Q.      In making a step-up decision, do you

14  communicate with the child's attorney?

15      A.      No.

16      Q.      So when you're making a decision

17  based on the recommendations of the care

18  providers and case coordinators, you're relying

19  exclusively on documents contained in the

20  child's file?

21      A.      Yes.

22      Q.      What factors do you consider in

23  making a step-up decision?

24      A.      A child's behavior, safety to self

25  or others.

Confidential

Page 87

1      Q.     Anything else?

2      A.     Previous history of running away or

3  leaving without authorization; threat to self

4  or others.

5      Q.     Would that be related to safety to

6  self and others?

7      A.     Yes.

8      Q.     Anything else that comes to mind?

9      A.     Recommendation from their therapist,

10  psychologist and psychiatrist.

11      Q.     When are recommendations from a

12  psychiatrist required under ORR policy?

13      A.     Whenever a minor goes to a RTC.

14      Q.     Any other situation?

15      A.     If we are having a minor with

16  multiple mental health issues, like,

17  threatening to hurt themselves, we have to get

18  an evaluation.

19      Q.     But for recommendations for step-up,

20  it's only required when a child is being

21  stepped up to an RTC?

22      A.     Yes, and a Therapeutic Staff Secure.

23      Q.     What about a Secure facility?

24      A.     I don't know.  I have not had to

25  have one done as a requirement to get a kid

Confidential

Page 88

1  into a Secure facility.  But we usually -- by

2  that time that we get there, we usually have

3  multiple evaluations done.

4      Q.   Are ORR staff required to follow the

5  procedures in ORR policy guide?

6      A.   Yes.

7      Q.   Are staff -- are ORR staff required

8  to follow the procedures in the UAC MAP?

9      A.   Yes.

10      Q.   Any other policies ORR staff follow

11  in deciding step-up?

12      A.   (Witness shaking head back and

13  forth.)

14      Q.   Is that a yes or no?

15      A.   No.

16      Q.   Have you ever received something

17  that's called an ORR policy Monday email?

18      A.   Yes.

19      Q.   What is that?

20      A.   It used to be a couple years ago

21  where they would provide an update on any

22  policies, and it would usually come on a

23  Monday.

24      Q.   And you said that was a while back?

25      A.   About two years ago, I want to say,

Confidential

Page 89

1    give or take.

2         Q.    Do they not -- does ORR not use

3    these --

4         A.    I have not seen it recently, no.

5         Q.    So how does ORR communicate policy

6    changes now?

7         A.    We have my weekly meeting with our

8    supervisor where we have our team get together

9    and discuss new policies.  They send an email

10   to all of us letting us know of the new

11   policies, and we also check the policy and

12   policy manual.

13        Q.    How often do you check them?

14        A.    Whenever I'm in a situation where I

15   can't decide whether the case manager is right

16   or the case coordinator is right, so I look at

17   that manual, and I ask my supervisor.  So

18   pretty much all the time.

19        Q.    If there is a change in policy and

20   you haven't received an email, and you find

21   that something different in ORR policy when you

22   are reviewing it to make a decision, what do

23   you do?

24        A.    Call my supervisor.

25        Q.    And that has happened?

**Exhibit 24**
**Page 884**

Confidential

Page 90

1        A.      Yes.

2        Q.      How many times?

3        A.      Often.

4        Q.      Where you weren't aware that there

5   was a change in ORR policy, and you came across

6   it while making a decision?

7        A.      Yes.

8        Q.      Any other policies or procedures,

9   other than the policy guide online, the UAC

10  MAP, and the policy emails that we have

11  discussed that you use in making your

12  decisions?

13       A.      (No verbal response).

14               THE COURT REPORTER:  Your answer?

15       A.      No.

16       Q.      And you said that ORR policies

17  change frequently?

18       A.      Yes.

19       Q.      How frequently would you say?

20       A.      It depends on the year.  So I want

21  to say on a yearly basis.

22       Q.      On a yearly basis, one section of

23  the policy changes, multiple sections?

24       A.      Multiple sections.

25       Q.      And you're updated via email on

Confidential

Page 92

1        Q.     Do you use the UAC MAP?

2        A.     Yes.

3        Q.     How often?

4        A.     Often, like, maybe once -- at least

5    once a week.

6        Q.     Have you ever seen any

7    inconsistencies between ORR policy online, or

8    the ORR guide generally, and the UAC MAP?

9        A.     Yes.

10        Q.     In the last ten years, how many

11    times have you seen that?

12        A.     About five.

13        Q.     Five times?

14        A.     Yeah, at least five.

15        Q.     You were going to say something?

16        A.     Go ahead.

17        Q.     Can you provide an example of when

18    you've seen a difference between the ORR policy

19    guide and the UAC MAP?

20        A.     Nothing that comes immediately to

21    mind.  Forgive me.  I'm like super nervous, but

22    I'm trying to think.  I know it has happened,

23    but, no, I don't have a specific example.

24        Q.     Do you recall if at any time it was

25    related to the release of minors to potential

Page 96

1    themselves made?

2         A.    If a minor continues to hurt

3    themselves or attempts to hurt themselves, and

4    the clinician makes that recommendation, takes

5    him to the therapist, and the therapist or

6    psychiatrist says yes.

7         Q.    Earlier you indicated that a

8    recommendation from a psychiatrist is not

9    required for step-up to Secure; is that

10   correct?

11        A.    To Staff Secure, no.

12        Q.    I was talking about Secure right

13   now.

14        A.    In my experience, no, but 90 percent

15   of the time that's part of the packet.  By the

16   time we're considering a Secure, that kid has

17   gotten some type of psychiatric or

18   psychological evaluation.

19        Q.    Do you know if a specific metric is

20   used by ORR to assess whether a child is a

21   danger to self or others?

22        A.    No.

23        Q.    Have you ever heard of the Ohio

24   Youth Assessment System?

25        A.    No.

Confidential

Page 97

1      Q.     So have you -- so you said you
2   haven't heard about the Ohio Youth Assessment
3   System.  Have you heard of something
4   abbreviated as O-Y-A-S, OYAS?
5      A.     OYAS, I have.  I know that it's a
6   training that was rolled out as a requirement
7   from ORR.
8             But I can tell you that I was not
9   part of it.  Unfortunately, I was out during
10  that time.
11     Q.     When was that training completed?
12     A.     I know that it was in 2018.
13     Q.     And so 2018, you haven't been
14  trained on the OYAS?
15     A.     No.  They keep saying they are going
16  to schedule something for someone to do it.
17     Q.     And is it your understanding that
18  this OYAS tool is supposed to be used by ORR in
19  assessing danger to self or others for
20  children?
21     A.     I don't know.  I can't provide
22  feedback on something that I'm not trained on.
23     Q.     Do you know of any other test or
24  metrics that is used?
25     A.     No.

**Exhibit 24**
**Page 888**

Confidential

Page 98

1    Q.    So you're not trained in any

2    specific criteria to assess danger to self or

3    others before making a step-up decision?

4    A.    No.

5    Q.    When a child is assessed to be a

6    danger to self or others, why is a child

7    sometimes sent to Secure instead of a

8    therapeutic setting?

9    A.    It will depend on the recommendation

10   that his clinician and the psychiatrist is

11   making in the program.  It also sometimes is

12   because RTC will not take them.  And even if we

13   try out of network, at that time that kid could

14   be a danger to the other kids, so we don't

15   have -- we have to move him to a Secure

16   facility.

17   Q.    Have there been instances where a

18   child, in your opinion, should have been sent

19   to a Residential Treatment Center, but because

20   the Residential Treatment Center wouldn't

21   accept them, the child was sent to Secure?

22   A.    Long time ago, yes, I would say.

23   Nowadays, no.  Does that make sense?  The

24   policy was different a while back.  So a Secure

25   would accept them.  But today, no, even if we

Confidential

Page 99

1    tried, they won't.  We have to do it out of

2    network.

3        Q.    So in the past, if an RTC would not

4    accept a child who had mental health needs,

5    they would be transferred to a Secure facility,

6    and the Secure facility would accept them?

7        A.    (Witness nodded head).

8        Q.    But more recently when there's a

9    transfer request for an RTC and RTC will not

10   accept the child, the child is placed in an

11   out-of-network facility?

12       A.    Yes.

13       Q.    I just wanted to make sure that I

14   understood.

15            If an FFS is out during training --

16   trainings and policy changes, does ORR take any

17   steps to make sure they have been updated upon

18   return?

19       A.    Yes.  They send emails to remind you

20   to go and do the training.  But if it's a

21   face-to-face training, like, then they say they

22   will schedule something down the line for you.

23       Q.    And who is "they"?

24       A.    My supervisor and headquarters.

25       Q.    Just so I know where it's coming

**Exhibit 24**
**Page 890**

Page 100

1    from.

2              Is a minor engaging in unacceptably

3    disruptive behavior one of the criteria

4    considered in determining danger to self or

5    others for step-up to Secure facility?

6         A.    No.  Danger to self?

7         Q.    Yes.

8         A.    Danger to others?  Yes.  Danger just

9    solely to self is not a criteria.

10        Q.    But in making that assessment about

11   danger to self or others, making both

12   assessments, does staff take into account

13   unacceptably disruptive behavior?

14        A.    Yes.

15        Q.    What kind of behavior would that

16   entail?

17        A.    Where they're hurting other kids,

18   hurting the staff.

19        Q.    Is self-harming behavior a criteria

20   considered in determining danger to self?

21        A.    Yes.

22        Q.    Why are children who are

23   self-harming sent to Secure facilities rather

24   than therapeutic settings?

25        A.    Like I said, it's one of the

Page 108

1       Q.    I'm trying to picture all of this.

2    So can you, starting from the most restrictive

3    setting to the least restrictive setting in

4    types of facilities, where would Residential

5    Treatment Center, Therapeutic Staff Secure and

6    Staff Secure fall?

7              Starting with Secure, what goes

8    next?  What is the next step-down?

9       A.    Secure, Staff Secure.

10      Q.    And from Staff Secure, what's the

11   next step-down?

12      A.    RTC.

13      Q.    From RTC?

14      A.    Therapeutic Staff Secure and shelter

15   and long-term foster care.

16      Q.    So in terms of how restrictive these

17   facilities are, Secure is the most restrictive?

18      A.    Uh-huh.

19      Q.    Staff Secure is the next highest

20   restrictive?

21      A.    Uh-huh.

22      Q.    Then Residential Treatment Center?

23      A.    Uh-huh.

24      Q.    And Therapeutic Staff Secure?

25      A.    Yes.

Exhibit 24
Page 892

Confidential

Page 109

1      Q.    Okay.  So that was a "yes" to all of

2    those, right?

3      A.    Yes, yes.

4      Q.    And then from Therapeutic Staff

5    Secure, the next step-down would be shelter?

6      A.    Yes.

7      Q.    And from shelter, it would be

8    long-term foster care?

9      A.    Yes.

10     Q.    Did I miss anything?

11     A.    In between shelter and long-term

12   foster, you have residential -- no, staff --

13   what's it called?  Staff managed long-term

14   foster home, so that is a group home, so it's a

15   group home, long-term foster care before you

16   get to long-term foster care.

17     Q.    So it's shelter to group home, from

18   group home to long-term foster care, correct?

19     A.    Yes, yes.

20     Q.    Any other type of distinction?

21     A.    Therapeutic long-term foster care.

22     Q.    That would be Colin-Ferguson?

23     A.    No.  Colin-Ferguson is more of a

24   group home foster care.  Therapeutic foster

25   care is when the person in that home has a

**Exhibit 24**
**Page 893**

Confidential

Page 113

1      A.    No.

2      Q.    Are children with intellectual

3  disabilities more likely to be stepped up?

4      A.    No.

5      Q.    Are children with developmental

6  disabilities more likely to be stepped up?

7      A.    No.  However, they are likely to be

8  transferred.

9      Q.    Transferred to where?

10     A.    To an out-of-network program or

11  whatever the psychiatrist recommends.

12     Q.    We talked --

13     A.    Go ahead.

14     Q.    We talked about the differences in

15  Secure facilities and the restrictiveness.

16     A.    Uh-huh.

17     Q.    Where would out-of-network

18  facilities fall?

19     A.    I have never visited an

20  out-of-network program, so I cannot tell you

21  what it would be like.

22     Q.    But you have transferred -- as an

23  FFS, you have approved the transfer of a child

24  to an out-of-network facility?

25     A.    Yes.

Exhibit 24
Page 894

Confidential

Page 119

1      A.     Staff Secure.

2      Q.     Staff Secure.  Okay.

3             So the child would have to make the

4  criteria for placement in a Staff Secure

5  setting?

6      A.     Yes.  But with staff -- I staff it

7  with my supervisor, and this is something that

8  we have been discussing, that the kids in my

9  therapeutic placement tend to remain there

10  because they need more treatment to -- more

11  time to complete the treatment.  So there has

12  to be a little bit of wiggle room for us to be

13  able to do good work and complete the

14  treatment.

15     Q.     Before the child is released or

16  before the child is transferred to a different

17  facility?

18     A.     Before the child is stepped down to

19  like a shelter-level care.  For release, there

20  isn't another placement to file.  You are

21  released when all the paperwork comes in.

22     Q.     But you were saying sometimes a

23  child needs more time to finish the program?

24     A.     Yes.  So if you have a Notice of

25  Placement on a child in my Therapeutic Staff

**Exhibit 24**
**Page 895**

Confidential

Page 120

1    Secure, and let's just say that we're talking

2    about the program that handles my programs with

3    kids with sex offenders, the sex offenders have

4    a requirement of six months treatment that they

5    have to meet in order for them to be able to go

6    to a regular community setting or to be in the

7    long-term foster community area.

8                So there is different guidances that

9    guide us to being able to do that.  And so

10   every 30 months, we can't just move him and

11   disturb the completion treatment.  We have to

12   maintain.

13               And that is something that I have

14   notified my supervisor about and headquarters

15   is aware that we can't do it in 30 days, so...

16       Q.    So most children placed in the

17   Therapeutic Staff Secure setting won't be

18   stepped down within 30 days?

19       A.    Yes.

20       Q.    How long does it usually take before

21   a child is eligible for step-down from

22   Therapeutic Staff Secure?

23       A.    Case-by-case.

24       Q.    What is the shortest amount of time

25   it has taken for a child to be stepped down

**Exhibit 24**
**Page 896**

Page 121

1    from Friends of Youth?

2          A.     Thirty days.

3          Q.     That's the fastest?

4          A.     Yes.

5          Q.     Does that happen often?

6          A.     Most of the time.  But, again, it's

7    on a case-by-case basis.

8          Q.     What's the longest amount of time a

9    child has been in Therapeutic Staff Secure

10   before they were eligible because of treatment

11   requirements?

12         A.     About a year.

13         Q.     About a year.

14                Who decides if a child is a sex

15   offender?

16         A.     They come in with that.

17         Q.     What do you mean by that?

18         A.      If the child has committed a crime

19   in other regions or by the time he gets picked

20   up, it will be part of their record.  And then

21   they will send it to intake saying, "This kid

22   has committed a crime that's of a sex offense

23   nature."  And they get sent to us.

24         Q.     Does the child have to be convicted

25   of a sex offense?

Page 124

1    it after the first 30 days.

2         Q.    So the notice that they can

3    challenge their placement, you said, is that

4    line --

5         A.    Uh-huh.

6         Q.    -- in the bottom of the form, a

7    child wouldn't receive that until about 30 days

8    after being at the facility?

9         A.    Yes.

10        Q.    Does the Notice of Placement include

11   the documents used to make a decision for

12   placing a child in a restrictive setting?

13        A.    I don't know.  I know that when we

14   review a Notice of Placement, we talk about why

15   he was placed there initially and how the

16   behavior has changed or modified in the last 30

17   days.  So I don't know that they take that

18   document and they tell them.  We take the

19   history into account.  We're looking at the

20   behavior that's happened.

21        Q.    So the child receives a summary or a

22   narrative of why they were placed at the

23   restrictive setting?

24        A.    Yes.

25        Q.    They don't have an opportunity to

Confidential

Page 130

1          Q.     And what do you mean by that?

2          A.     Because some kids don't have the

3   same level of education as others.

4          Q.     So depending on the child's

5   education, the child may or may not understand

6   the Notice of Placement?

7          A.     Yes.

8          Q.     Do you think the children understand

9   that they have a right to challenge their

10  placement?

11         A.     Yes.

12         Q.     And what do you base that on?

13         A.     I've had a couple of kids challenge

14  it.

15         Q.     Just a couple?

16         A.     Yeah.

17         Q.     So like two in the last ten years?

18         A.     Two that I can remember right off

19  the back of my head.

20         Q.     What types of challenges were those?

21         A.     They didn't agree with being in

22  Staff Secure.

23         Q.     And who did they challenge their

24  placement to?

25         A.     They submitted the form and went to

Confidential

Page 133

1      A.     Yes.

2      Q.     And it's the "Office of Refugee

3  Resettlement," and specifically "Children

4  Entering the United States Unaccompanied

5  Section 1."

6           Is that correct?

7      A.     Yes.

8      Q.     Can you read section 1.4.7, for the

9  record?

10     A.     Yes.

11          "After 30 days of placement in the

12 Secure or RTC facility, UAC may request the ORR

13 director or the director designee to reconsider

14 their placement.  The ORR director or designee

15 may deny the request, remand the request to the

16 ORR/FFS for further consideration, or approve

17 the request and order the youth transfer to a

18 Staff Secure or other care provider facility."

19     Q.     Thank you.

20          So would a Therapeutic Staff Secure

21 be considered a Secure facility for purposes of

22 this section?

23     A.     I don't know.  It's Staff Secure

24 Therapeutic facility.

25     Q.     But the policy section that we're

Page 134

1    reading says, "Requesting reconsideration of a

2    Secure or RTC placement designation," correct?

3        A.    Yes.

4        Q.    It doesn't say Secure/Staff Secure

5    or RTC placement, correct?

6        A.    Correct.

7        Q.    So is the request for

8    reconsideration only for children who are

9    placed in Secure and residential treatment

10   facilities?

11       A.    According to what it states here.

12       Q.    Is this the current ORR policy

13   guide?

14       A.    I don't have the most updated one in

15   front of me, so I couldn't tell you.

16       Q.    Do you recall something different

17   than what you just read to me?

18       A.    I recall that I've had kids request

19   their placements to be reconsidered through the

20   NOP process.

21       Q.    Was the challenge to the ORR

22   director, or was it through federal court?

23       A.    I don't remember.

24       Q.    We talked about this earlier about

25   whether a Therapeutic Staff Secure is its own

Confidential

Page 135

1    type of facility, or more like a Staff Secure,

2    or more like a Residential Treatment Center.

3              Since this section doesn't cover

4    Staff Secure, would you consider this

5    Therapeutic Staff Secure to fall under the RTC

6    placement for purposes of challenging

7    placement?

8         A.    I don't know.  I don't -- how can I

9    explain this?  When I look at an RTC and Secure

10   facility, what comes to mind is it's the very

11   least restrict -- the most restrictive setting

12   for placement of a kid.

13             When I think of my Therapeutic Staff

14   Secure program, it's almost as close to a

15   shelter as you can get.  So it's two different

16   levels of care.

17             I don't know if that is what the

18   person writing this intended to be, but I know

19   that the person in the Therapeutic Staff Secure

20   has a lot more access and more freedom to the

21   community.

22        Q.    Okay.

23        A.    It would be difficult for them to

24   want to go back because usually kids that come

25   there really like it.

**Exhibit 24**
**Page 902**

Confidential

Page 137

1    your understanding?

2         A.    It was my understanding.  However,

3    perhaps it's meant to be done the other avenue

4    you were talking.  I just know that it could be

5    challenged.

6         Q.    The other avenue, meaning the

7    federal court process?

8         A.    Yes, yes.

9         Q.    And would the same go for Friends of

10   Youth Therapeutic Staff Secure?

11        A.    Yes.

12        Q.    So you believe that they would be

13   able to challenge it either through ORR

14   director review or court process?

15        A.    Yes.

16        Q.    But you're not sure if there's a

17   specific policy section that speaks to that?

18        A.    Yes.

19        Q.    Thank you.

20              Can a child placed in a Secure

21   facility challenge his or her placement?

22        A.    Secure, I would say, yes, but again,

23   I don't manage Secure facilities.

24        Q.    In your experience, how often do

25   children challenge restrictive placement by

**Exhibit 24**
**Page 903**

Confidential

Page 138

1   seeking ORR director review?

2        A.    Not very often.

3        Q.    Just the two that you mentioned

4   earlier?

5        A.    Yes.

6        Q.    What does that process look like?

7        A.    The minor challenges, the case

8   manager notifies me and notifies the -- sends

9   the documentation through the email.  We have a

10  specific email where those challenges go to,

11  and then that's where those people handle it.

12       Q.    Do you know what specific email

13  these challenges go to?

14       A.    Not off the top of my head.

15       Q.    Do you know if they go to like the

16  division of policy or --

17       A.    No.

18       Q.    Nothing comes to mind.  Okay.

19            When a child makes this type of

20  challenge to placement by requesting that the

21  ORR director review his or her placement, does

22  a child have the opportunity to review adverse

23  evidence?

24       A.    I don't know.

25       Q.    Does the child have the opportunity

**Exhibit 24**
**Page 904**

Page 140

1    director review?

2        A.    I don't know.

3        Q.    Going back to Exhibit 160 that you

4    have in front of you, same section 1.4.7, the

5    first sentence reads, "After 30 days of

6    placement in a Secure or RTC facility."

7             Based on that statement, is it your

8    understanding that a child would have to wait

9    at least 30 days before he or she can request

10   ORR director review his or her placement?

11       A.    Yes.

12       Q.    How long does it take from when the

13   initial request that is made?  So you said the

14   case manager sends it to you.  You then send it

15   to this email designated for challenges to

16   placement.

17            How long does it take before a

18   decision is made?

19       A.    I don't know.  The two that I have,

20   I think it was fairly quick.  I don't know.

21   Maybe -- I can't remember.  Two weeks, I can

22   guesstimation.

23       Q.    But you're not sure?

24       A.    I'm not sure.

25       Q.    And you said in those two cases that

Page 145

1   shelter-level care, because most of the kids

2   that are in therapeutic usually fit the

3   criteria for the TVPRA home study.

4        Q.    Can you repeat that?

5        A.    Children in therapeutic in Staff

6   Secure usually are fitting the criteria of the

7   TVPRA.

8        Q.    What criterion of the TVPRA do they

9   generally fall under?

10       A.    Usually victims of trafficking or

11  victims of abuse.

12       Q.    And so those that fall under the

13  TVPRA categories do require a home study?

14       A.    Yes.

15       Q.    So many of the kids who are placed

16  in Therapeutic Staff Secure would be undergoing

17  a home study of some sort?

18       A.    Yes.

19       Q.    Do you know if -- I know you don't

20  oversee a Residential Treatment Center, but to

21  the extent you have knowledge of this, do you

22  know if an RTC -- placement in an RTC results

23  in a mandatory home study?

24       A.    No.

25       Q.    You don't know, or no, it doesn't?

Confidential

1    you repeat the question?

2         Q.    Sure.

3               Based on the content of the column

4    starting with, "Prior to arriving to Carson

5    Home," and the column right next to it "KS

6    asked Julia to expedite case and she agreed.

7    Sponsor is in Laredo, Texas," which was the

8    note updated as of March 7, 2017, per the

9    document, is it your understanding that no home

10   study was completed during that time frame?

11        A.    By looking at this, yes.

12        Q.    Okay.  Is it common for there to be

13   a home study wait list?

14        A.    In 2017, there was.

15        Q.    But it's no longer the case?

16        A.    It is no longer the case.  Home

17   studies get picked up very quickly nowadays.

18        Q.    How quickly?

19        A.    Depending on how quickly you make

20   the request.  Also it depends on the needs of

21   where the child is located, and they give

22   priority to the kids aging out.

23        Q.    What's the longest time frame you're

24   aware of that a case has been wait listed for a

25   home study?

**Exhibit 24**
**Page 907**

Page 159

1      A.    That I'm aware of, about six months.

2      Q.    Just to get picked up to have the

3 home study completed?

4      A.    Yes.

5      Q.    So in addition to the time it takes

6 for the home study request to be made by the

7 case manager and/or the clinician, it's

8 possible that the home study can delay release

9 even more if the request is wait listed?

10      A.    Back in 2017 or before, yes.  The

11 policy has changed now.

12      Q.    The policy for ORR?

13      A.    Yes, the policy for ORR home studies

14 has changed.

15      Q.    When did that change?

16      A.    I want to say about two and a half

17 years ago when we began to have a big influx.

18      Q.    So cases aren't wait listed, or

19 haven't been wait listed in the last year for a

20 home study?

21      A.    Not to wait six months, no.

22      Q.    Any type of wait list for a month,

23 two months?

24      A.    A month, I want to say 30 days is

25 pretty average.

Confidential

Page 161

1      Q.    In those instances --

2      A.    Yes.

3      Q.    -- the child remains in custody

4  while a home study request is on a wait list --

5      A.    Yes.

6      Q.    -- or pending, generally?

7      A.    Yes.

8      Q.    And the child stays in ORR custody

9  while the home study is completed?

10     A.    Yes.

11     Q.    How long does it take for a home

12 study to be completed?

13     A.    An average of 30 days.

14     Q.    Could it take longer?

15     A.    It's on a case-by-case basis.  I've

16 seen it take longer.  When the sponsor provides

17 a different address, they weren't really --

18 they can't really find the home, and it turns

19 out to be a gas station, you know, things like

20 that.

21           So it's dependent on what the

22 sponsor provides that can trigger the home

23 study process to take more than 30 days, or

24 they are not there for their scheduled

25 appointments, or there's discovery of other

Confidential

Page 186

1   one-to-eight ratio.  This type of kid would

2   need a higher ratio of staff per kid.

3        Q.   Do you know the ratios for staff to

4   care placement for --

5        A.   I know it's more than one to eight.

6   I don't know the specifics.  I'd have to look

7   at the policy, but it's more.  That's why it's

8   called Staff Secure because there's more staff

9   on the floor than the regular shelter level

10  care.

11       Q.   But you don't know the ratio off the

12  top of your head?

13       A.   Not off the top of my head.

14       Q.   I'm almost done with this.  Sorry.

15            Just a few sentences after we left

16  off where it starts, "Given this clinical

17  insight," can you please read just that

18  sentence?

19       A.   "Given this clinical insight from

20  Dr. Cheng, it has become evident at this point

21  the minor's mental health will continue to

22  deteriorate due to his length of care in Staff

23  Secure and Secure level programs."

24       Q.   Perfect.  Thank you.

25            Have you seen any other instances

**Exhibit 24**
**Page 910**

Confidential

Page 187

1    where Secure placement has led to deterioration

2    in a child's mental health?

3         A.    Yes.

4         Q.    Have you seen other instances where

5    Staff Secure placement has led to deterioration

6    in a child's mental health?

7         A.    Yes.

8         Q.    Thank you.  We're moving on to

9    step-down.

10        A.    It's got to be easier, right?

11        Q.    Are you familiar with the term

12   step-down?

13        A.    Yes.

14        Q.    What does it mean?

15        A.    It means that a child's prepared for

16   a less restrictive setting than where they are

17   currently at.

18        Q.    So that's when we were discussing

19   the different levels of facilities from the

20   most restrictive to the least restrictive, it

21   would mean they are going down the chain

22   instead of up --

23        A.    Yes.

24        Q.    -- right?

25              And who prepares the step-down

Confidential

Page 199

1    step-down that ORR staff are required to

2    follow?

3         A.    No.

4         Q.    Is it possible for an ORR staff not

5    to follow the established policies or

6    procedures?

7              MS. STEVENSON:  Objection.  Vague.

8         Personal knowledge.  Speculative.

9         A.    I don't know.

10        Q.    Are you familiar with the

11   requirement that a child must have 30 days of

12   good behavior to be stepped down?

13        A.    Yes.

14             (WHEREUPON, Heath Deposition Exhibit

15        171:  Email, Bates GOV-00038758-38761 was

16        marked for identification.)

17        Q.    Can you review this and let me know

18   when you're ready.

19        A.    (Witness examining document.)

20             Okay.

21        Q.    Let's start with the page that's

22   ending with Bates number 8760, the bottom right

23   corner.

24             Can you read the first four

25   sentences of paragraph 2, and it's kind of hard

**Exhibit 24**
**Page 912**

Confidential

Page 206

1    rule-out criteria based on the parameter that

2    they were licensed by the state.

3        Q.    And it's been a while since we read

4    that section that you read to me, but why does

5    the child, based on your understanding of this

6    lateral request -- lateral transfer request,

7    why did the child have to be transferred to

8    another staff security facility instead of

9    being stepped down?

10            MS. STEVENSON:  Objection.

11       Speculative and calls for -- I'm sorry.

12       Lack of personal knowledge.

13       A.    I don't know.

14       Q.    But what you read to me, the minor

15   does not qualify for a step-down at this time

16   as the minor has not completed his 30 days

17   without an SIR, correct?

18       A.    Yes.

19       Q.    And that's not specifically

20   referencing he's not eligible for a step-down

21   for a specific facility?

22       A.    Uh-huh.

23       Q.    It's an overall conclusion that he's

24   not eligible for step-down --

25       A.    Uh-huh.

Page 207

1      Q.    -- until he has completed 30 days

2   without an SIR; is that correct?

3      A.    Uh-huh.

4           MS. STEVENSON:  Objection.  Personal

5        knowledge, vague and speculative.

6      Q.    Was that a yes?

7      A.    Yes.

8      Q.    If a child has had 25 days of good

9   behavior, does he have to wait until the 30

10  days of good behavior before he or she will be

11  eligible for a step-down?

12     A.    We will put a transfer request

13  together and send it to the facility that's

14  reviewing the acceptance.

15     Q.    And you said you're not aware of any

16  ORR policy that requires currently 30 days of

17  no SIRs before a child is eligible for

18  step-down?

19     A.    No.

20     Q.    And you're not familiar with there

21  having been a policy like that in the 10 years

22  you have been an FFS?

23     A.    I don't know.  I really don't know.

24  I know that for me it's always been the issue

25  of the facility having those specific licensing

Confidential

1  issues.

2      Q.    How is good behavior evaluated?

3      A.    The case manager and the clinician

4  will put together a behavior plan for the

5  minor.  So each facility has a behavior

6  modification type of -- type of thing.  They

7  have particular activities that they are

8  expected to do and complete throughout the day.

9          Many of those activities have to do

10  with the mandated activities that we have such

11  as physical activity, schooling, medical, all

12  of that stuff.  When the minor constantly

13  begins to not follow the behavior, not follow

14  the rules of the program, he becomes

15  oppositional to the rules and to other kids,

16  and it's continually challenging or destructing

17  property or posturing against other staff or

18  attempting to fight with other kids or not

19  following the plan for the day, starting to

20  take off, disrupting activities, disrupting

21  classroom, those are all a multitude of

22  different behaviors that could be used.

23      Q.    Is good behavior evaluated

24  differently for children with disability?

25      A.    It would require a behavior

**Exhibit 24**
**Page 915**

Confidential

Page 210

1    but apparently that was something that was

2    working for one of the kids so he would cool

3    down or something when -- so the clinicians

4    know this stuff.  They have all those tools.  I

5    don't.

6         Q.    Do children placed at -- hold on a

7    second.

8              Is whether a child is stable

9    considered when making a step-down decision?

10        A.    Yes.

11        Q.    And how is stability assessed?

12        A.    If the minor is not disruptive to

13   the program, he's not a safety concern for

14   self, others or the community.

15        Q.    Is there a tool used?

16        A.    The clinician will let me know if --

17   if her assessment is that a minor is ready to

18   be released to a community or released to a

19   least restrictive setting.  I don't know if

20   they have a particular tool they use.

21        Q.    You rely on the clinician's opinion

22   to determine whether the child is stable enough

23   to step-down?

24        A.    Yes.  The clinician and the feedback

25   from the case manager and the case coordinator.

**Exhibit 24**
**Page 916**

Confidential

Page 211

1      Q.    All the clinician and case

2   coordinator's notes are supposed to be uploaded

3   to UAC portal?

4      A.    Yes.

5      Q.    Have you ever found a document in

6   the UAC portal that was inconsistent with your

7   understanding of the child's case?

8      A.    Yes.

9      Q.    So would you agree that not

10  everything in the UAC portal is necessarily

11  accurate?

12     A.    Yes.

13     Q.    But you rely exclusively on the

14  documents in the UAC portal to make your

15  decisions for step-up and step-down?

16     A.    As well as the clinical

17  recommendations and the case manager and the

18  case coordinator recommendations, yes.

19     Q.    The evaluations that you mentioned,

20  those would be in the UAC portal, correct?

21     A.    Yes.

22     Q.    And the case coordinator's

23  recommendations would be in the portal as well,

24  correct?

25     A.    She sends me weekly updates, and

Exhibit 24
Page 917

Confidential

Page 212

1    then we staff the kids.

2        Q.    And the staffing meetings, are those

3    documented in the minor's file?

4        A.    No.  She sends me an email on the

5    cases.  So it doesn't go into portal.

6        Q.    I'm trying to remember.

7              The case coordinator generally

8    relies on the UAC portal documents to make his

9    or her recommendation?

10       A.    She also staffs the cases at the

11   facility with the case manager and the

12   clinician on a weekly basis.

13       Q.    So she staffs it with individuals

14   who create the documents in the portal?

15       A.    Yes.

16       Q.    To your knowledge, does bed space

17   impact ability to step down from Secure to

18   Staff Secure?

19       A.    Yes.

20       Q.    In your ten years as an FFS, have

21   you had to deny step-downs from Secure to Staff

22   Secure because of bed space availability?

23       A.    Yes.

24       Q.    How many times has that happened?

25       A.    If we're talking at the beginning of

**Exhibit 24**
**Page 918**

Confidential

Page 214

1    special needs, mental health concerns or

2    significant histories.

3         Q.    So the fact that a child has been

4    placed in a Therapeutic Staff Secure makes it

5    difficult to place them in other less

6    restrictive settings generally?

7         A.    Yes.

8         Q.    Have you experienced difficulties

9    stepping children down to URM programs --

10   yeah -- to releasing children to URM programs

11   if they've been placed in Therapeutic Staff

12   Secure?

13        A.    Yes.

14        Q.    Does a child need to be stepped down

15   from Staff Secure before a URM program will

16   consider accepting the child into their

17   program?

18        A.    They say it's not a requirement when

19   we request that from URM.  However, we have

20   noticed a trend that if a minor is coming from

21   regular shelter care, it's easier to get him to

22   URM.

23        Q.    It's easier to get a child from

24   shelter to URM than it is to get a child from

25   Therapeutic Staff Secure to a URM?

**Exhibit 24**
**Page 919**

Confidential

Page 215

1      A.    Yes.

2      Q.    What about regular Staff Secure,

3 like Selma Carson to a URM program?

4      A.    Yes.

5      Q.    Same difficulty?

6      A.    Yes.

7      Q.    Is failing to step down a child who

8 is eligible and ready to step down contrary to

9 a child's best interest?

10     A.    Yes.

11     Q.    Who notifies the child if they are

12 not approved for step-down?

13     A.    The case manager.

14     Q.    And when is the child notified?

15     A.    The day that decision is made.

16     Q.    How do you know that?

17     A.    Because they tell me that they did

18 it, and they upload it in the portal.

19     Q.    And by "they" you mean the case

20 manager who told you that?

21     A.    Yes.  They sign the paper, and the

22 document is uploaded into the UAC portal.

23     Q.    But you don't ask the children if

24 they were informed?

25     A.    No.

**Exhibit 24**
**Page 920**

Confidential

Page 241

1     Q.     Has that always been the policy?

2     A.     No.

3     Q.     When did it change?

4     A.     A couple years ago.

5     Q.     Who else is involved in deciding

6  whether to release a child to a sponsor, other

7  than the case manager, clinician, case

8  coordinator and yourself?

9     A.     Only when we have a minor that we

10  are not in agreement on the release decision,

11  we elevate the decision to the supervisor, who

12  then, in turn, can elevate it to her supervisor

13  at headquarters to make that decision.  It can

14  go all the way to the director.

15     Q.     Would a child's attorney be involved

16  in the decision for release?

17     A.     No.

18     Q.     Would a child be involved in the

19  decision?

20     A.     Every step of the process.

21     Q.     In what way?

22     A.     Because he's the one providing the

23  information on the sponsor, so he's the one

24  saying, "Yes, I know my uncle.  He used to do

25  this, and I want to live with my uncle," or, "I

Exhibit 24
Page 921

Confidential

Page 247

1      Q.    But, again, the case coordinators

2   rely on the case managers' and the clinicians'

3   perspective --

4      A.    Yes.

5      Q.    -- to come to a conclusion?

6            And you have to approve home study

7   requests?

8      A.    Yes.

9      Q.    Does the home study increase the

10  amount of time it takes for a child to be

11  released to a sponsor?

12     A.    It depends on how quickly it gets

13  identified that it needs a home study.  If it

14  gets identified after the fact, yes, it can add

15  another 30 days.  If it gets identified early

16  on, it can go simultaneously and get done at

17  the same time it would have gotten done.

18     Q.    Does a home study delay the release

19  of a child?

20     A.    Yes.

21     Q.    Do you recall instances where that

22  has happened?

23     A.    Yes.  The home study will go out to

24  the home and find out things that need to be

25  mitigated before we continue the case.

Exhibit 24
Page 922

Page 252

1    and that a discretionary home study was

2    required, right?

3         A.    Yes.

4         Q.    And that would have been approved by

5    the FFS at that child's placement at the time?

6         A.    Yes.

7         Q.    You couldn't stop it, so it went

8    forward?

9         A.    Yes.

10        Q.    Had the child been in your

11   placement, you would have requested a

12   discretionary home study based on what you

13   know?

14        A.    Based on what I'm reading here, no,

15   I would not have.

16        Q.    And in this case, you did indicate

17   that you believed the home study ended up

18   causing a delay to releasing the child?

19        A.    Yes.

20        Q.    So there are instances where a home

21   study doesn't just run concurrently with the

22   reunification process, and it can add

23   additional time to the release of a child?

24        A.    In 2017, yes, that would have been

25   the case because nowadays home studies have 30

Page 283

1      Q.    And you also read a separate

2    sentence here saying that the UAC case files

3    containing the documents were missing the UAC

4    signatures or the document was signed a month

5    or more after the UAC placement to the program.

6           So you mentioned a bit ago that part

7    of the problem was that the Notice of Placement

8    was just not being uploaded?

9      A.    Uploaded, yes.

10     Q.    But according to the monitoring,

11   visit case files were also missing signatures,

12   correct?

13     A.    Signatures, yes.

14     Q.    And in other cases, some of the

15   documents were signed, but they were signed

16   months -- a month or several months after the

17   child had been placed in the program, correct?

18           MS. STEVENSON:  Objection.

19   Speculative.  Lack of personal knowledge.

20     A.    Yes.

21     Q.    So is it possible that children at

22   Selma Carson were unaware of why they were

23   placed there during this time frame?

24     A.    From what I'm reading, yes.

25     Q.    And is it possible that if they

Page 284

1    didn't receive the Notice of Placement or they

2    received it later in their stay at the

3    facility, that they weren't aware that they

4    could challenge the placement?

5         A.    I don't know.  Maybe.

6         Q.    The notice of their right to

7    challenge the placement is located on the

8    Notice of Placement form, correct?

9         A.    Yes.

10        Q.    So if they did not receive the form,

11   they would not have been aware of their right

12   to challenge the placement?

13             MS. STEVENSON:  Objection.

14        Speculative.

15        A.    Yes.

16             MS. FELT:  That's all I have for

17        now.  I'd like to reserve a few minutes in

18        case I want to follow-up after your

19        questioning.

20             MS. STEVENSON:  You have lots of

21        time.

22                  CROSS-EXAMINATION

23   BY MS. STEVENSON:

24        Q.    Let's see.  I just wanted to go

25   through a couple of things that you testified

Confidential

Page 295

1       A.     Yes.

2       Q.     Can that be confusing when trying to

3    make a decision?

4       A.     Yes.

5       Q.     Can it delay a decision because you

6    have to wait to get clarification?

7       A.     Sometimes.  Honestly, it's more

8    about -- if I didn't get it because I was on

9    leave or if the case coordinator didn't get it

10   because they were on leave, someone on the team

11   is like, "Hey, this is new."  So all that is

12   required is a phone call to my supervisor and I

13   get clarification, and it moves along.  It's

14   not a three-day delay or a one-day delay.  It's

15   just, "Hey, we had this staffing with my case

16   manager, she's saying this is the policy."

17      Q.     You mentioned earlier that you have

18   had to ask questions of the Division of Policy

19   directly, correct?

20      A.     Yes.

21      Q.     How long does that take to get a

22   response?

23      A.     That was about a year and a half

24   ago, and I want to say it was fairly quick.

25   Like if I said the question on Monday, I think

**Exhibit 24**
**Page 926**

Page 297

1

2

3

4

_____

5                    YESENIA HEATH

6    Subscribed and sworn to before me

7    this_____ day of _____ 2020.

8

9    _____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 25

Exhibit 25
Page 928

Page 1

```
 1              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
 2                    WESTERN DIVISION

 3
                CASE NO. 2:18-CV-05741-DMG-PLA
 4

 5   LUCAS R., et al.,

 6             Plaintiffs,

 7   vs.

 8   ALEX AZAR, Secretary of U.S.
     Department of Health and Human
 9   Services; et al.,

10             Defendants.

11   _____

12
                       DEPOSITION OF
13
                       KAREN HUSTED
14

15

16        DATE TAKEN:   Thursday, April 25, 2019
          TIME:         9:34 a.m. - 3:25 p.m.
17        PLACE:        2 South Biscayne Boulevard
                        Suite 3100
18                      Miami, Florida  33131

19

20

21        Taken on behalf of the Plaintiffs before

22   Fanny R. Kerbel, Shorthand Reporter and Notary Public in

23   and for the State of Florida at Large, pursuant to

24   Notice of Taking Deposition in the above cause.

25
```

Page 43

1   those written, if they are?

2        A.    I believe they are in the policy and I do

3   believe they are in the MAP.

4        Q.    Other than the delivery of a family

5   reunification application to the sponsor within

6   24 hours, are you able to recall right now any other

7   guidelines on timing?

8        A.    No.  There are goals they want.  You know, we

9   are looking to Category 1, 2, 3.  Obviously, there are

10  different documents that are required the further away

11  you go from the parent as a sponsor.  So they are

12  supposed to set up the fingerprints.  I don't recall the

13  time that they have to do that.  They are supposed to

14  set up a CA/N check, if necessary.  They are supposed to

15  set that up with the fingerprints so they go

16  hand in hand.  But specific, no.  As I said, the goal is

17  the safe timely release, but there are a lot of

18  variables that come into play.

19       Q.    During the course of your duties, in reviewing

20  the information you received through the portal, have

21  you had occasion to notice that certain case managers

22  were not meeting the guidelines for prompt processing of

23  the children's release?

24            MS. DAVILA:  Objection.  Vague.

25  BY MR. HOLGUIN:

Exhibit 25
Page 930

Page 44

1       Q.    For example, if they took longer than 24 hours

2   to get the family reunification application to the

3   proposed sponsor.

4       A.    Yes.

5       Q.    And what is your process when you notice that?

6       A.    Well, bear in mind that when I notice it, it's

7   at the back end of the case because I do releases.  So I

8   am not looking at the cases prior to the submission.

9   Once they are submitted and I look at the case, I send

10  them an e-mail that says, "What was the delay?  Why was

11  there a delay in this case?"  I have had occasion to ask

12  them those questions.

13      Q.    At Homestead, approximately what percentage of

14  cases do you find that the case managers or the other

15  personnel at Homestead have failed to meet the

16  guidelines, in your judgment, for prompt processing?

17          MS. DAVILA:  Objection.  Mischaracterizes

18      prior testimony.

19          THE WITNESS:  I don't know if I would term

20      fail to follow the timelines in some of the cases

21      because of the fact that, as I said, a lot of the

22      processing of the cases does depend on how good

23      your sponsor is and how diligent the sponsor is in

24      returning the paperwork and following up with the

25      fingerprints, if they are required.

Exhibit 25
Page 931

Page 45

```
 1          So there are issues where I may send an e-mail
 2       asking about the length of stay, per se, and I will
 3       get back an answer from them and a timeline from
 4       them of why.  Not every case is the fault of the
 5       case manager.  Are there some?  Absolutely.
 6  BY MR. HOLGUIN:
 7       Q.   Sitting here today, can you recall any
 8  particular cases where the case managers were dilatory,
 9  in your judgment?
10       A.   If you are speaking about a specific case, I
11  don't know a specific case.  Again, the volume I deal
12  with is rather high.  Have I seen cases recently that I
13  thought were delayed?  Yes.
14       Q.   But you cannot recall the name of any
15  particular case?
16       A.   No, no.
17       Q.   Do you recall the last time you saw one?
18       A.   I probably saw some yesterday.  I probably saw
19  one the day before.  I can't recall specifics, again.
20       Q.   You tend to see them with some frequency; is
21  that correct?
22       A.   There is frequency.  But again, some of the
23  issues have been mitigated due to issues beyond the
24  control of the case manager.
25       Q.   I am only referring to those that, in your
```

Page 46

1    judgment, are within the control of the case manager.

2        A.   I have seen some.

3        Q.   All right.  How many detained children does

4    each case manager at Homestead assist?

5        A.   The ratio at Homestead, I am not sure what

6    they follow.

7        Q.   To your knowledge, does ORR require any

8    minimum or maximum ratio of case worker to children at

9    Homestead?

10       A.   In the shelters, I can speak of ratio, having

11   run one for eight years.  But Homestead is a different

12   contract, and I am not privy to the contract so I can't

13   answer that.

14       Q.   In the shelters that you are familiar with,

15   other than Homestead, what was the ratio, typical ratio,

16   of those places?

17       A.   Are you speaking about case manager ratio in

18   particular?

19       Q.   Yes.

20       A.   One to eight.

21       Q.   Had you ever been advised by caseworkers at

22   Homestead that they simply have too many children to

23   process or manage?

24       A.   Yes.

25       Q.   How often have you heard that?

Page 172

1    married.

2         A.   No.

3         Q.   But you are involved in the decision to step

4    up the child to a staff secure facility?

5         A.   It's myself or whatever FFS is covering, so

6    yes.  But all of them, no.  Probably not.  But yes.

7         Q.   Are there written criteria for who is stepped

8    up to a staff secure facility that ORR has?

9         A.   There is criteria for a step-up, yes, in

10   policy.

11        Q.   In terms of process, where does the initial

12   recommendation for step-up originate?

13        A.   Typically, it originates with the

14   administrators of the program.  CHSI will say -- they

15   will typically send an e-mail to ask us if we could

16   consider a child for step-up.

17        Q.   So then what is your procedure when you

18   receive that kind of an e-mail?

19        A.   I typically read the file, and particularly

20   the SIRs, to see what behaviors they are reporting.

21   Then I will staff what I receive from them as well as

22   the SIR and any other information in the file with my

23   supervisor.

24        Q.   When you say "staff," do you mean you provide

25   that information to the supervisor?

Page 173

1      A.   Yes.   I discuss that information with the

2   supervisor.

3      Q.   Is it your practice to meet with the child

4   during that process of deciding whether to step up?

5      A.   I don't meet with the child, typically.

6      Q.   Is the child told the reasons for the step-up?

7      A.   I can attest that the program is supposed to

8   tell the child the reasons for the step-up.  I am not

9   there physically.  I can't tell you with certainty, but

10   they are supposed to be doing that, yes.

11      Q.   But you don't know for a fact whether they do

12   it or not.

13      A.   They usually notate that they do, so I can say

14   that.  You should ask a CHSI employee more than me about

15   that.

16      Q.   Is the child provided with evidence of the

17   infractions that are being used to justify the step-up?

18          MS. DAVILA:  Objection.  Calls for

19          speculation.

20          THE WITNESS:  I don't know if they physically

21          hand the child something.  I don't know how they

22          process that, to be honest with you.

23   BY MR. HOLGUIN:

24      Q.   Are the facilities required to have an

25   interview with the child to allow the child to explain

Exhibit 25
Page 935

Page 176

1        A.    One.   That is why it's easy, plus the case is

2   much more serious, too, in terms of placement.   So yes,

3   one to secure.

4        Q.    Do you know whether any of the children that

5   you can recall being transferred to staff secure or

6   secure were represented by counsel?

7             MS. DAVILA:   Objection.   Vague.   Objection.

8        Compound.

9             THE WITNESS:   I don't know if there were G-28s

10       there in place.   I honestly don't know.

11  BY MR. HOLGUIN:

12       Q.    So you don't recall seeing any child with a

13  G-28 who was then sent to staff secure?

14       A.    I didn't necessarily look for it either, so I

15  don't know.   To my knowledge, I don't know.

16       Q.    Okay.   Why wouldn't you look for it?

17       A.    Why?   Because it wouldn't be anything that I

18  would look at, normally.   If they had it -- if the child

19  needs to be stepped up, the program is the one that

20  provides the notice if there is a G-28 that the child is

21  being moved.

22       Q.    In the cases you handled of transfers to staff

23  secure, have you ever had to deal with a child's lawyer?

24       A.    I have not personally dealt with the attorney,

25  no.

Exhibit 25
Page 936

Page 187

1    RE:      LUCAS R., et al. vs. ALEX AZAR, et al.
     DEPO OF:   KAREN HUSTED
2    TAKEN:     THURSDAY, APRIL 25, 2019

3
                        EXCEPT FOR ANY CORRECTIONS
4                       MADE ON THE ERRATA SHEET BY
                        ME, I CERTIFY THIS IS A TRUE
5                       AND ACCURATE TRANSCRIPT.
                        FURTHER DEPONENT SAYETH NOT.

6
7                       _____,
                        KAREN HUSTED
8
9    STATE OF FLORIDA        )
                            )  SS:
10   COUNTY OF _____     )

11
            Sworn and subscribed to before me this _____
12   day of _____, 20___.
     PERSONALLY KNOWN_____OR ID._____

13
14
                        _____
15                      Notary Public in and for
                        the State of Florida at
16                      Large.
17   My commission expires:
18
19
20
21
22
23
24
25

Exhibit 25
Page 937

Page 189

1                      CERTIFICATE OF OATH OF WITNESS

2    STATE  OF  FLORIDA    )

     COUNTY OF MIAMI-DADE )

3

4

5             I, Fanny R. Kerbel, Court Reporter and Notary

6    Public in and for the State of Florida at Large, certify

7    that the witness, Karen Husted, personally appeared

8    before me on April 25, 2019 and was duly sworn by me.

9

10   Signed this 1st day of May, 2019.

11

12

13

14

15

16                       _____

                         FANNY R. KERBEL, Court Reporter

17                       Notary Public - State of Florida

18                       Commission No. FF 977791

19                       Expires May 16, 2020.

20

21

22

23

24

25

**Exhibit 25**
**Page 938**

Page 190

1                    CERTIFICATE OF REPORTER

2

3    STATE  OF  FLORIDA   )

     COUNTY OF MIAMI-DADE )

4

5            I, FANNY R. KERBEL, Court Reporter, do hereby

6    certify that I was authorized to and did

7    stenographically report the deposition of Karen Husted;

8    that a review of the transcript was not waived; and that

9    the foregoing transcript, pages 1 through 186, is a true

10   and complete record of my stenographic notes.

11           I FURTHER CERTIFY that I am not a relative,

12   employee, attorney or counsel of any of the parties, nor

13   am I a relative or employee of any of the parties'

14   attorney or counsel connected with the action, nor am I

15   financially interested in the action.

16           Dated this 1st day of May, 2019.

17

18

19

20

     _____

21           FANNY R. KERBEL, Court Reporter

22

23

24

25

Exhibit 25
Page 939

# Exhibit 26

Exhibit 26
Page 940

Confidential

```
 1          IN THE UNITED STATES DISTRICT COURT

 2        FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3                  WESTERN DIVISION

 4

 5  LUCAS R., et al.,

 6          Plaintiffs,

 7  vs.                    CASE NO. 2:18-CV-05741

 8  ALEX AZAR, et al.,                 DMG PLA

 9          Defendants.

10

11

12            REMOTE DEPOSITION OF

13             DONNA LYNN LONDINO

14            Monday, August 3, 2020

15               9:28 a.m. EDT

16

17          *** CONFIDENTIAL ***

18

19

20

21

22  Reported by:

23  GRETA H. DUCKETT, CCR, RPR, CRR, CVR-S, RVR-M-S

24  JOB NO.: 181949

25
```

Confidential

1  informed consent?

2                    MR. MOSS:  Objection.

3             Mischaracterizes.

4     A.     That is the gist.

5     Q.     Okay.  That is the -- can you repeat

6  your answer?  I'm sorry.

7     A.     I would agree that the general gist of

8  that agreement is that appropriate consent should

9  be given for treatment, and that would include

10  psychotropic treatment.

11    Q.     Do you know in specific what the Flores

12  Settlement Agreement provides with respect to that

13  consent in --

14                    MR. MOSS:  Objection.  Asked and

15             answered.

16    A.     I could not, without review.  I would

17  need to bring it up for my review.

18    Q.     Did you tour any of ORR's

19  out-of-network facilities?

20    A.     I did not.

21    Q.     Why not?

22    A.     I wasn't asked to.

23    Q.     Do you know if ORR places children with

24  mental health needs in out-of-network facilities?

25    A.     I have been informed that that could

Confidential

1   happen.

2       Q.      Do you know if ORR places children with

3   disabilities in out-of-network facilities?

4       A.      I do not know the answer to that

5   question.

6       Q.      Would it be helpful to have known

7   information about ORR's placement of children in

8   out-of-network detention centers for your report?

9       A.      I don't believe that that would have

10  changed my opinion unless a visit to that site

11  demonstrated concerns about the care or if

12  interview with the staff working at a facility out

13  of network, again, would suggest that the right

14  thing wasn't being done for children.

15      Q.      So because you didn't visit them, would

16  you know whether or not they were in compliance?

17      A.      I would not.

18      Q.      Okay.  Is your report limited to the

19  two residential facilities that you did visit?

20      A.      It is.

21      Q.      Great.  Did you tour any of ORR's

22  therapeutic staff facilities?

23      A.      I did not.

24      Q.      Would it have been helpful to visit any

25  of ORR's therapeutic staff-secure facilities when

Exhibit 26
Page 943

Confidential

1   you know, perhaps cursing at a staff member.  Those

2   would be specific behaviors of trying to harm

3   oneself, trying to harm others through aggression,

4   use of weapons that were available, albeit, if that

5   was something that was in the shelter, to hit

6   someone with, trying to coerce someone into a

7   sexual type of engagement.

8        So those would be significant incident

9   reports that then would be used to determine

10  whether a change in placement was indicated or

11  additional observation.

12       Q.    What type of actions would you consider

13  to be disciplinary in nature?

14       A.    I consider disciplinary in nature is

15  seclusions.  Those have been utilized in some

16  facilities.  Neither of those residential

17  facilities use that as far as locking up a child

18  against their -- they're allowed to give their own

19  permission, do you think it would be helpful to go

20  into what they oftentimes call a sensory room to

21  calm down and to collect yourself before you enter

22  the milieu again.  Maybe someone would consider

23  that punishment because you get removed from an

24  milieu, but it really is intended to help the

25  individual calm down so that they can re-enter in

Exhibit 26
Page 944

Confidential

Page 238

1    an adaptive fashion.  If the child wasn't bad or,

2    you know, again, I guess they could be struck, but

3    that would be illegal.

4         So those are the biggies that I

5    consider disciplinary or threats.  So threats of

6    malicious intent by staff if a child didn't behave.

7         Q.    If a child is being considered for a

8    step-up to a more restrictive level of placement,

9    do you believe that decision makers should consider

10   the causes of their behavior?

11        A.    It depends on the behavior.  Again, if

12   it warranted what they call the significant

13   incident report, those would be behaviors that

14   should be acted on immediately, because they pose

15   an imminent risk.  That means if something is not

16   done that there could be harm to the UAC or others.

17   So -- but in other behavior, yes, those should be

18   reported to the therapist and in my review of the

19   chart files, were generally addressed in that

20   manner.

21              MS. COOPER:  Okay.  Do you want

22              to take the last break now or do you

23              want to keep going?

24              MR. MOSS:  We're happy to take a

25              short break now if now is a convenient

**Exhibit 26**
**Page 945**

Page 246

1      Q.      Sure.  So the question is whether the

2   1 percent that was told to you at the ORR

3   headquarters for this statistic includes children

4   who were initially placed in RTCs or whether it

5   just includes children who were stepped up from

6   shelters?

7      A.      My testimony would be that my

8   understanding of that number was just 1 percent

9   that referred.  I don't know.  I mean, so I -- I

10  would be remiss to answer that without accurate

11  recollection.

12     Q.      Does this statistic include children

13  who were arrested in the community by Immigration

14  and Customs Enforcement and then placed in an RTC?

15     A.      From my understanding of that statistic

16  is simply as it's stated, that 1 percent of UAC

17  were referred for residential treatment.

18     Q.      And how do you --

19                (Simultaneous speakers.)

20  BY MS. COOPER:

21     Q.      Sorry.  Go ahead.

22     A.      Whether this is relevant to your last

23  question, there were incidences of UAC who were

24  picked up and detained at the border who might go

25  directly into staff-secure and secure.

1      A.      Safe behavior implies that for an

2  amount of time -- which that's not -- that has to

3  be determined by the clinician -- that a child has

4  been free or a youth has been free of ideations of

5  self-harm and even if those are present, that they

6  have not acted upon that, they have not acted in

7  any aggressive fashion.  So, again, people can have

8  thoughts.  So a UAC may say, every time I think of

9  my family, I just wonder if it would be better if I

10  killed myself.  But I would never act on that.

11      So that would be considered safe and

12  that they're able to contract within a reasonable

13  frame of mind, with an established provider who

14  feels that they can attest that that is, you know,

15  a statement that they can believe.  And then make

16  the referral for a step-down.

17      Q.      Thank you.  In paragraph 27 of your

18  initial report on page 12, you note that

19  historically, the average length of stay has been

20  three to six months for domestic residential

21  treatment centers.

22      What is your source for this assertion?

23      A.      I believe my sources were there if they

24  could pull up the page.  So that, again, is based

25  on some data that I pulled up from the foster care

Confidential

Page 272

1      A.      That was reported to me by the facility

2  staff.

3      Q.      The facilities at MercyFirst and

4  Shiloh?

5      A.      Specifically at Shiloh, I believe, is

6  where I documented that information.

7      Q.      Were you able to verify these facts?

8      A.      I could find no manner in which to

9  verify that.

10              MR. MOSS:  If I could just step

11          in really quick.  I'm sorry to

12          interrupt.  I was just hoping to do a

13          time check.

14              MS. COOPER:  A few more questions

15          or do you want me to just -- our

16          timekeeper just left the room, so I

17          don't know.

18              (Off-the-record discussion.

19  BY MS. COOPER:

20      Q.      Do you know whether placement in a

21  residential treatment center contributes to a

22  child's length of stay in ORR custody?

23      A.      It can.

24              MR. MOSS:  Objection to scope.

25              MS. COOPER:  I think that's all

Confidential

1                    REPORTER'S CERTIFICATE

2              I, Greta H. Duckett, Certified Court

3    Reporter, Registered Professional Reporter, and

4    Certified Realtime Reporter, hereby certify that on

5    Monday, August 3, 2020, I reported the deposition

6    of DONNA LYNN LONDINO, who was first duly sworn or

7    affirmed to speak the truth in the matter of the

8    foregoing cause, and that the pages herein contain

9    a true and accurate transcription of the

10   examination of said witness by counsel for the

11   parties set out herein.

12              I further certify that I am neither of kin

13   nor of counsel to any of the parties to said cause,

14   nor in any manner interested in the results

15   thereof.

16              This 13th day of August, 2020.

17

18   _Greta Duckett_

19   _____

     GRETA H. DUCKETT, RPR, CRR, CVR-S, RVR-M-S
20   ACCR-12, GCCR-2891, MCCR-1945, TNLCR-671

21

22

23

24

25

**Exhibit 26**
**Page 949**

# Exhibit 27

**Exhibit 27**
**Page 950**

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3            WESTERN DIVISION

4

5    _____
                                    )
6    LUCAS R., et al.,              )
                                    )
7          Plaintiffs,              )
                                    )   Case No.
8    vs.                            )
                                    )   2:18-cv-05741
9    ALEX AZAR, Secretary of U.S. ) DMG-PLA
     Department of Health and       )
10   Human Services, et al.,        )
                                    )
11         Defendants.              )
     _____)

12

13

14            CONFIDENTIAL

15

16   DEPOSITION OF SHAANAN MEYERSTEIN, M.D.

17            Washington, D.C.

18          February 11, 2020

19

20

21

22

23

24   Reported by:  John L. Harmonson, RPR

25   Job No. 176784

1   getting their issues addressed.

2        Q.   And we were talking before about RTCs'

3   reluctance to care for children you were calling

4   dual diagnosis youth, so kids with both mental

5   health and behavioral health needs.  Do you know

6   whether that's still true, whether they still

7   don't want to house dual diagnoses?

8        A.   I can't speak to it.  I haven't been

9   involved in that kind of analyzing process.

10       Q.   In your opinion, if you have an

11  opinion, is an RTC the correct placement for a

12  dual diagnosis youth?

13       A.   To be honest, I don't think I have an

14  opinion because I don't have enough training or

15  experience in behavioral and mental health issues

16  to know what is and what is not expected of a

17  residential treatment center.  So I would rather

18  defer my opinion.

19       Q.   Do you know or do you remember from

20  some of those cases that came across your desk

21  before if an RTC won't house a dual diagnosis

22  youth, what type of placement those children go

23  to?

24       A.   So if an RTC won't place a child with

25  mental and behavioral health problems, where do

**Exhibit 27**
**Page 952**

Confidential

1    they end up going?

2         Q.    Yes.

3         A.    My assumption is because they have a

4    behavioral problem, they would be transferred to

5    one of the secure or staff secure sites.  That's

6    my working assumption.

7         Q.    Have you ever encountered a situation

8    where there was a child in a secure setting who

9    was eligible for step-down but there was no

10   placement willing to take them because they had

11   behavioral and mental health needs?

12        A.    To like a regular shelter?

13        Q.    To RTC, a shelter or --

14        A.    I can't think of any specific cases.

15        Q.    You were talking about a point in time

16   when you were working on identifying additional

17   residential treatment centers in addition to the

18   two that already exist within the network.  Was

19   that a project based on something you observed or

20   was that -- did someone else raise that issue to

21   your attention?  Do you remember?

22        A.    Well, it was part of my, you know,

23   kind of like what I do now.  It's building

24   capacity.  It's thinking ahead.  You know, you

25   never know the size that the program can grow to.

1   or things that we can't see, actual physiologic

2   changes that occur due to stress.

3           So every child, including my own, is

4   subjected to stress, be it going to the doctor

5   and getting a vaccine.  But the key is if you're

6   repeatedly exposed to a stress and you don't have

7   a remediating protective figure to be a source of

8   support and strength, and that stress is

9   recurrent and happening in extreme forms, like if

10  you live in a neighborhood where there's a lot of

11  gang violence and you don't have a parent, then

12  that's where it crosses the line.

13          Actually, exposure to stress is good.

14  It's important.  It's necessary.  We all do.  It

15  builds reliance -- not reliance.  What's the word

16  I'm thinking of?  Resilience, excuse me.  It's

17  6:00 o'clock.  So it builds resilience.  And

18  without exposure to stress, a child will not

19  learn to navigate the world independently and

20  successfully.

21          Where it becomes toxic is when those

22  external stresses are persistent and unchecked

23  and extreme.  So a child who witnesses the murder

24  of their parent, that is not normal stress that

25  every child should be exposed to.  And if that

**Exhibit 27**
**Page 954**

Confidential

 1   child is not with their family, then that stress

 2   can present itself as becoming toxic.

 3            And we know that physiologically it

 4   affects the body's responses.  It causes

 5   hypertension, release of cortisol.  It can cause

 6   chronic medical conditions, hypertension,

 7   et cetera.  So we know it happens on the

 8   micro level and on the more overt level.

 9            Depending on the age of the child,

10   toxic stress can manifest itself in developmental

11   regression.  So a young child who may have been

12   potty trained might now start soiling their

13   pants.  It can result in acting out excessively

14   beyond what is normal.  It can result in

15   aggressive behavior.

16            So when I think of toxic stress, I

17   think of it on the macro level, the micro level

18   that we won't necessarily see now but might have

19   long-term chronic effects.  Remember, kids' brain

20   plasticity, their brains are at their greatest

21   molding at a young age.  And when those events

22   are happening in childhood and adolescence, those

23   have the greatest ability to mold the brain

24   architecture and affect the neurons and

25   development in the long term.  So we are not

**Exhibit 27**
**Page 955**

Confidential

1            ACKNOWLEDGMENT OF DEPONENT

2

3       I, SHAANAN MEYERSTEIN, M.D., have read or

4    have had the foregoing testimony read to me and

5    hereby certify that it is a true and correct

6    transcription of my testimony with the exception

7    of any attached corrections or changes.

8

9

10   _____

11   SHAANAN MEYERSTEIN, M.D.

12   [ ] No corrections

13   [ ] Correction sheet(s) enclosed

14

15       SUBSCRIBED AND SWORN TO BEFORE ME, the

16   undersigned authority, by the witness, SHAANAN

17   MEYERSTEIN, M.D., on this the _____ day of

18   _____, _____.

19

20

21

22

23

24

25

**Exhibit 27**
**Page 956**

Confidential

Page 308

```
 1              C E R T I F I C A T E

 2

 3   DISTRICT OF COLUMBIA

 4              I, JOHN L. HARMONSON, a Notary Public

 5   within and for the District of Columbia, do

 6   hereby certify:

 7              That SHAANAN MEYERSTEIN, M.D., the

 8   witness whose deposition is hereinbefore set

 9   forth, was duly sworn or affirmed by me and that

10   such deposition is a true record of the testimony

11   given by such witness.

12              That if the foregoing pertains to a

13   federal case, before completion of the

14   proceedings, review and signature of the

15   transcript [X] was [ ] was not requested.

16              I further certify that I am not related

17   to any of the parties to this action by blood or

18   marriage; and that I am in no way interested in

19   the outcome of this matter.

20              IN WITNESS WHEREOF, I have hereunto set

21   my hand this 24th day of February, 2020.

22

23   _____

24              JOHN L. HARMONSON, RPR
                My commission expires: 11/14/20
25
```

**Exhibit 27**
**Page 957**

# Exhibit 28

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 28**

**Page 958**

CONFIDENTIAL

Page 1

1                UNITED STATES DISTRICT COURT

2             IN THE CENTRAL DISTRICT OF CALIFORNIA

3

4      ------------------------------x

5      LUCAS R., et al

6                    Plaintiffs,          CASE NO:

7              v.                         2:18-CV-05741-

8      ALEX AZAR, SECRETARY OF U.S.       DMGPLA

9      DEPARTMENT OF HEALTH AND HUMAN

10     SERVICES, INC.

11                   Defendants.

12     ------------------------------x

13

14                    CONFIDENTIAL

15        TELEPHONIC DEPOSITION OF NIDIA MURRAY

16                   Houston, Texas

17                    9:14 a.m.

18

19

20

21

22

23     Reported by:

24     Paula J. Eliopoulos

25     JOB NO. 170999

CONFIDENTIAL

Page 46

1  perhaps something should happen.

2       Q.     Do you ever recommend what conclusion

3  or what recommendation the case coordinator should

4  come to?

5       A.     No.

6       Q.     Do you ever actually review the

7  information and the documents that the case

8  coordinator is reviewing in coming to their

9  recommendation?

10      A.     Yes.

11      Q.     What documents are those?

12      A.     First from the child, the UAC portal

13  is where we would find many of our documents.

14  That could be all of the documents in the UAC

15  portal, case reviews, significant incident reports

16  and maybe even home studies.  But it really does

17  differ from child to child.

18      Q.     Are there any documents outside of

19  what's in the ORR portal that you review or that

20  your case coordinators review?

21      A.     There were times when case managers

22  don't load everything into the portal that they

23  should be so there may be -- maybe a safety plan

24  that's attached to an e-mail, you know, where they

25  let us know this case is ready for review in the

**Exhibit 28**
**Page 960**

CONFIDENTIAL

Page 47

1   UAC portal.  He's the safety plan.

2            So that may be an example of a time

3   where we're reviewing something outside.

4      Q.    Does GDIT have their own portal or

5   document, I guess, server that they store their

6   own information and documents on related to

7   unaccompanied children?

8      A.    Not documents, no.

9            The only -- that I'm aware of, the

10  only database is Share Point and it's really just

11  to keep track, maybe add an administrative note,

12  but to keep track of when the cases are assigned

13  and when recommendations are provided.

14           I know that data is provided to ORR

15  from that, numbers.

16     Q.    Are there any details about the

17  specific children themselves in Share Point?

18     A.    That really is up to the case

19  coordinator if they add an administrative note or

20  maybe somebody goes on an interview.  That's about

21  it.

22     Q.    So there could be some information?

23     A.    There may be.

24     Q.    You mentioned that you assign specific

25  cases to your different case coordinators?

**Exhibit 28**
**Page 961**

CONFIDENTIAL

Page 59

1  coordinators, what training do they receive as the

2  initial training regarding ORR policy?

3       A.     We may go over some of the main

4  points, but what I encourage is read it.  It's

5  extremely important to actually review and read

6  and study it.

7            And so I realize that policy changes

8  quite often but initially the guidance given is to

9  go ahead and take specific sections of that policy

10 and read them very carefully.

11      Q.     Is it required that they read it, the

12 policy guide?

13      A.     I don't know that it's -- I don't know

14 that there's a written requirement anywhere but I

15 know that as a DOC, yes, I ask them to read it and

16 review it.

17      Q.     Do you followup with them to ask if

18 they do read it?

19      A.     Yes.

20      Q.     Do you know if other DOC supervisors

21 verify that the people they supervise read the

22 policies?

23      A.     I don't know that.

24      Q.     When is the last time that you read

25 the ORR policies?

**Exhibit 28**
**Page 962**

CONFIDENTIAL

Page 67

1   case came in after 5:00 and it was noted

2   incorrectly in Share Point so they may have fixed

3   something or edited dates and said oh, this was --

4   the e-mail shows that it was after 5:00 central

5   time so it should have had a different received

6   date.  Administrative things.

7         Q.     Is it anything besides administrative

8   or logistical details that could be included in

9   Share Point?

10        A.     There may be interviews that happened

11  with children.  If a case coordinator interviewed

12  a child they may add notes in there, other

13  entries.

14        Q.     Are those notes in the ORR portal as

15  well?

16        A.     No.  They're in Share Point.

17        Q.     Okay.  So what would those notes --

18  what are some examples of what notes regarding

19  interviews look like or detail?

20        A.     They are different from case

21  coordinator to case coordinator but it may just be

22  as simple as, you know, interviewed such and such

23  minor on this date.  No concerns were noted.  And

24  that's it.

25               Or it could have more details, the

Exhibit 28
Page 963

CONFIDENTIAL

Page 68

1  minor said X,Y,Z in the actual note somebody put

2  in.

3      Q.    So it could cover things that the

4  minor said?

5      A.    Yes, to the case coordinator.

6      Q.    Could it cover the case coordinator's

7  impressions of the child?

8      A.    Yes.

9      Q.    Could it cover whether the case

10  coordinator thought the child may have a

11  disability?

12      A.    The case coordinator does not

13  determine if the child has a disability.

14      Q.    Right.  But could the case coordinator

15  make a note whether they think there was a

16  disability?

17      A.    They may make a note that the child

18  needs to be either seen by a doctor or gather more

19  information to determine whether the child has a

20  disability.

21      Q.    Does it make note that the child

22  appears like they have full mental capacity or

23  not -- did not have any disabilities?

24      A.    Again it's from case coordinator to

25  case coordinator.  I suppose someone could write

**Exhibit 28**
**Page 964**

CONFIDENTIAL

Page 69

1    something like that down.

2            But most of the interviews are to

3    determine whether the minor wants to go to the

4    sponsor.  If the minor makes -- has any concerns

5    with the sponsor or what their life was like in

6    their home country, we actually have an interview

7    template that we use just as a starting point, but

8    it's not something that we have to use.

9            If there is a concern with a

10   disability, I suppose someone could write it in

11   there, but it's again --

12       Q.    Could the notes cover the case

13   coordinator's thoughts on the potential sponsor?

14       A.    If the case coordinator chose to put

15   it in there, perhaps.

16            But, again, it's sort of a blank space

17   and a case coordinator will choose what they put

18   in there.

19       Q.    Have you ever seen the administrative

20   notes that case coordinators have put in Share

21   Point?

22       A.    Yes.

23       Q.    And anything else besides what you

24   said, have you seen any specific examples related

25   to disabilities or sponsors?

**Exhibit 28**
**Page 965**

CONFIDENTIAL

Page 70

1          MS. CHAPUIS:  Objection to form.

2     A.     Have I seen anything in our Share

3  Point note?

4     Q.     Yes.

5     A.     On disabilities?

6          Yes.  If a case coordinator has

7  received information from a doctor that the minor

8  meets criteria or has a disability then they may

9  add the information stating that maybe the case

10 meets the DPI criteria due to that disability.

11    Q.     And we'll talk a little bit more about

12 that in a little bit.

13    A.     Okay.

14    Q.     You mentioned that there's a kind of

15 standard template that can be used for the, I

16 guess the case coordinator's initial assessment?

17    A.     No.

18    Q.     Well, you just mentioned an initial

19 template.  Can you describe what that was?

20    A.     Yes.  For interviews with minors.  If

21 a case coordinator is going to interview a minor

22 then they may be able to use that template.

23          So I know for any employee I provided

24 that template just as an idea or the suggestion on

25 questions that may be asked.

**Exhibit 28**
**Page 966**

CONFIDENTIAL

Page 103

1    Q.    Would the -- what you refer to as the
2  administrative notes, would those be sent to ORR?
3    A.    No.
4    Q.    Does anyone out of GDIT have access to
5  the administrative notes?
6    A.    Not that I know of.  No.
7    Q.    Are you aware of any time that the
8  administrative notes were sent to someone else
9  outside of GDIT?
10    A.    No.  No.  Not that I know of.
11    Q.    Okay.  I want to transition now to
12  talk about the case coordinators.  Specifically,
13  any kind of -- where they fit into the picture.
14          Can you just go over again what the
15  case coordinator's role is in regards to an
16  unaccompanied child's case?
17    A.    The role or the responsibility, the
18  main responsibility is to provide a recommendation
19  on reunification to ORR.  It would be to provide a
20  recommendation of reunification or transfer to
21  ORR.  So they are third-party reviewers.
22          The -- the facility, the case
23  management of the facility provides a
24  recommendation on whether a minor should reunify
25  with their sponsor or not or step up to a

**Exhibit 28**
**Page 967**

CONFIDENTIAL

Page 104

1  different level of care, step down to a different

2  level of care.

3          The case coordinator is the third

4  party that either concurs or does not concur with

5  that recommendation, and provides that to ORR.

6  ORR makes the final decision.

7      Q.    What would you or how would you

8  describe the case coordinator's objective?

9      A.    It's simply -- the goal is to simply

10  provide a recommendation to ORR.

11     Q.    Okay.

12     A.    And to ensure that the reunification

13  is safe.

14     Q.    You mentioned that case coordinators

15  are independent or third-party, I guess,

16  reviewers.  What makes them independent?

17     A.    They do not work for the facility that

18  houses the immigrant children.  And although we do

19  have a contract with ORR, we are not required to

20  concur with ORR's final decision.  So it could be

21  that our decision is different -- I mean our

22  recommendation is different from their decision.

23          So we are looking at the case facts

24  and not having that close contact with the child

25  or the sponsor.

**Exhibit 28**
**Page 968**

CONFIDENTIAL

Page 117

1      A.     Yes.

2      Q.     Okay.  What does the case coordinator

3    make recommendations on?  I believe we touched on

4    this already.

5      A.     Yes.

6      Q.     But I --

7      A.     Yes.  Of course.

8             Reunification and transfers.  Step up,

9    step down.  As well as any other recommendations

10   on maybe safety planning or resources in the

11   community or anything like that.

12     Q.     Okay.  And let's talk about Shiloh

13   specifically, just to kind of focus our

14   discussion.

15     A.     Okay.

16     Q.     What information or evidence does the

17   case coordinator review in deciding whether to

18   recommend whether a child should be transferred to

19   or from Shiloh?

20     A.     Anything that's in the UAC portal.

21   Various incident reports.  Case reviews.  Clinical

22   notes.  Specifically, the recommendation from the

23   psychiatrist.

24     Q.     Why specifically that recommendation?

25     A.     Because the psychiatrist is the one

**Exhibit 28**
**Page 969**

CONFIDENTIAL

Page 119

1    factors.

2         Q.      Are you able or is the case

3    coordinator able to request more information if

4    they -- if he or she wants to?

5         A.      Yes.  Absolutely.

6         Q.      What kind of information might a case

7    coordinator request that they would not receive in

8    the ordinary process?

9         A.      For a step up?  Step down?  Or

10   reunification?

11        Q.      Let's start with a step up.

12        A.      Okay.  Specifically?  I mean -- okay.

13             There's a very specific listing in our

14   policy of requirements of documents that need to

15   be included when a step up or step down or

16   transfer or reunification is going to occur.  All

17   of those things need to be included.  And so if

18   one of those items is missing or if the case

19   coordinator needs additional information, then,

20   yes, they would request any of that.  And that's

21   just a very specific list in policy.  So if any of

22   that information is needed, is missing, if there

23   are any incident reports or anything like that,

24   that can be requested.

25        Q.      Where is that list that you just

**Exhibit 28**
**Page 970**

CONFIDENTIAL

Page 123

1  psychiatrist indicating the minor was no longer a

2  danger to self or others.  The minor was, let's

3  say, stepped up to RTC because they were a danger

4  to self or others.  That would be something to

5  check for; to make sure that the child was going

6  to be safe.

7      Q.    When you were a case coordinator, did

8  you ever request additional information that was

9  in addition to the checklist items?

10     A.    I know I always requested to see the

11  psychiatric notes.

12     Q.    Anything else besides that?

13     A.    I can't think of anything.

14     Q.    Can the child submit, directly submit

15  information or evidence directly to the case

16  coordinator?

17     A.    No.

18     Q.    Can the child's attorney do that?

19     A.    No.  We had enough of a hard time

20  getting information from them as it was.

21     Q.    Can the child's family or potential

22  sponsor directly submit evidence or information to

23  the case coordinator?

24     A.    They submit -- no, not to the case

25  coordinator.

**Exhibit 28**
**Page 971**

CONFIDENTIAL

Page 124

1      Q.     Do you know why none of those three

2  parties could submit evidence to the case

3  coordinator?

4      A.     The -- let's start with the child.

5      Q.     Sure.

6      A.     The child actually -- if the child

7  ever wants to speak to the case coordinator, they

8  can certainly do that.  The case coordinator does

9  speak to the child.  So I would correct that; that

10  the child is able to speak to the case

11  coordinator.  And so information can be shared

12  verbally.

13           No documents that I've ever seen.

14      Q.     Okay.

15      A.     As far as the sponsor, the sponsor's

16  main contact is the case manager at the facility.

17  And so we only get information from the case

18  manager regarding the sponsor.

19           And as far as attorneys, we just don't

20  have contact with the attorneys.  I know that even

21  case managers at times were just trying to get

22  information.  Like, what else needs to be happen?

23  Is there legal relief?  What is going on?  And the

24  attorneys are usually -- of course, there's, you

25  know, confidential information.

**Exhibit 28**
**Page 972**

CONFIDENTIAL

Page 125

1    Q.    Sure.

2    A.    So...

3    Q.    So is that official policy?  Is it

4  official GDIT policy or official ORR policy that

5  the sponsor cannot directly submit information to

6  the case coordinator?

7    A.    It's not because they cannot.  They

8  don't even -- we don't even communicate.  It's not

9  policy.  It's not written anywhere.  It's just

10 that the main point of contact is the case

11 manager.

12         There's a lot of -- there's a lot of

13 care that goes into protecting the sponsors.

14 Especially from fraud.  And so they are very clear

15 on who their case manager is, so that they can be

16 kept safe.

17    Q.    Do you know what the admission

18 assessment form is?

19    A.    Yes.

20    Q.    For example --

21    A.    Yes.  From Shiloh?

22    Q.    Sure.  At Shiloh.

23    A.    Okay.  Yes.

24    Q.    Does this --

25    A.    I'm going to correct that.

**Exhibit 28**
**Page 973**

CONFIDENTIAL

Page 128

1    Q.    What do you mean by "stabilize" a

2  child?

3    A.    My understanding of that, from what

4  I've heard during staffings, is that the minor is

5  no longer a danger to self or others.

6    Q.    Do you know if a child can be

7  transferred or can be -- let me start over.

8          Can a child be transferred from Shiloh

9  before that 30-day psychiatric evaluation is

10  completed?

11    A.    Can you repeat the question?

12    Q.    Sure.

13          Can a child be transferred from Shiloh

14  before the 30-day psychiatric evaluation is

15  completed?

16    A.    I suppose that if the doctor

17  determined that the child was not a danger to self

18  or others and is stable, then perhaps.  But I

19  don't -- I don't recall any situation like that.

20    Q.    So, to your knowledge, no child has

21  been placed at Shiloh for less than 30 days.  Is

22  that correct?

23          MS. CHAPUIS:  Objection.  Misstates

24      the testimony.

25    A.    I do not know of every single child at

**Exhibit 28**
**Page 974**

CONFIDENTIAL

Page 131

1  evidence or information beyond that which is

2  submitted by the ORR?

3       A.    So -- reviewers.  The evidence or the

4  information is really mostly submitted by -- by

5  the facilities which are contracted.  But it's

6  only the facilities that provide information on

7  the minors.

8            Once in a while the ORR will provide

9  information on the minor.  But it's typically

10 the -- I just wanted to get that flow in the right

11 order.

12      Q.    Okay.

13      A.    But your question was?

14      Q.    Does the case coordinator ever review

15 evidence or information beyond that which is

16 submitted by ORR or the facilities?

17      A.    No.  There's only -- there's only

18 that.  They're the ones that receive the

19 information.  It's in the UAC portal or even

20 sometimes provided by email.  But that's about

21 all.

22      Q.    Does the case coordinator ever review

23 their own -- oh.  Go ahead.

24      A.    I'm sorry.  I just thought of

25 something.

**Exhibit 28**
**Page 975**

CONFIDENTIAL

Page 136

1    A.     At any point during their stay in ORR.

2  I mean, it could be from the very beginning, which

3  we try to avoid that.  Any time.  From the

4  beginning to even a couple of days before release,

5  once we're providing a final recommendation.

6    Q.     Okay.  And so the meeting with the

7  child would likely occur before the case

8  coordinator gave the recommendation?

9    A.     Yes.

10   Q.     Okay.  Who initiates the meeting

11  between the child and the case coordinator?

12   A.     Typically it's the case coordinator

13  that initiates that.

14   Q.     And what's the purpose of the meeting?

15   A.     At one point we were just interviewing

16  all the kids.  That has changed a little bit, and

17  we are now really focusing on interviewing kids

18  where there may be additional questions or any

19  concerns, red flags.  And so those minors who go

20  in an interview, we have a better sense of what's

21  going on.

22   Q.     Have you ever interviewed a child when

23  you were a case coordinator?

24   A.     Yes.

25   Q.     When you were a case coordinator, did

Page 137

1   the child interview ever change what you thought

2   would be your recommendation prior to the

3   interview?

4        A.    I don't -- I don't know.  And I've

5   provided recommendations for probably hundreds of

6   children.  So it's difficult to think of a time.

7        Q.    Sure.  Can the child initiate an

8   interview with the case coordinator?

9        A.    They could.  If their case manager

10  made them very aware of the entire process, they

11  could.  But it's very, very rare.

12       Q.    Are you aware of any child initiating

13  that interview with the case coordinator?

14       A.    I can't think of one.

15       Q.    Okay.  Are there facilities that are

16  specific to therapeutic care?

17       A.    Yes.

18       Q.    All right.  Which facilities -- or

19  kind of what's the label of those facilities?

20       A.    We have a therapeutic staff secure, a

21  therapeutic group home, and a therapeutic shelter.

22       Q.    And how do those differ from one

23  another?

24       A.    The therapeutic -- the therapeutic

25  staff secure, even though it has the name "staff

CONFIDENTIAL

Page 140

1  facility -- I'm trying to figure out where the

2  child would be coming from here.

3      Q.    Okay.  Well --

4      A.    So let's say that the child was in a

5  shelter and we were looking for a therapeutic

6  placement because the minor did not meet criteria

7  to go and be placed in a residential treatment

8  center.  They did not have a recommendation from a

9  psychiatrist.  That psychiatrist or psychologist

10 may have recommended therapeutic placement.  And

11 so that's when a therapeutic placement would be

12 sought.  So it would be that therapeutic group

13 home.

14          So therapeutic staff secure, again,

15 just -- because of the minors that they're able to

16 accept, it just -- the staff secure part almost

17 doesn't even meet the criteria for staff secure.

18     Q.    Do therapeutic staff secure facilities

19 and therapeutic group homes have the same

20 staff-to-child ratio generally?

21     A.    I don't know what the ratios are.

22 Sorry.

23     Q.    Which would you say is more

24 restrictive?

25     A.    Out of therapeutic --

CONFIDENTIAL

Page 141

1     Q.    Out of the two.  Out of therapeutic

2    staff secure and therapeutic group home.

3     A.    I don't know.  I would classify those

4    probably about the same.

5     Q.    Okay.  Do you know why they're

6    classified differently or have different names?

7     A.    I'm not sure.  I'm not sure.  It's a

8    question that I've actually wondered about and

9    asked why that particular facility that I'm

10   thinking about, therapeutic staff secure, has the

11   staff secure piece in it and they don't accept the

12   children that typically would need to go to staff

13   secure.

14     Q.    What was -- oh.  Go ahead.

15        I was going to say:  What was the

16   response you received to that question?

17     A.    I didn't.

18     Q.    Who did you ask?

19     A.    I don't know.  It was just in general.

20     Q.    Okay.

21     A.    I mean, we were discussing placements.

22   I don't even remember when.  But the question has

23   come up why that facility has that name if it

24   really will not accept the children that typically

25   need to be stepped up to staff secure.

CONFIDENTIAL

Page 156

1  facility that would approve the transfer of that

2  minor.

3      Q.     Right.  And then --

4      A.     So the receiving FFS, the receiving

5  facility, would really just -- typically is just

6  observing what's going on.

7      Q.     But the FFS at the receiving

8  facility -- or, excuse me -- the FFS at the

9  transferring facility and making the decision, are

10  they reviewing the information that the case

11  coordinators receive that the transferring

12  facility sent them?

13          MS. CHAPIUS:  Objection to form.

14      A.     I -- I'm not sure if they're reviewing

15  the information.  It is my understanding that they

16  would.  But I don't know what, whether they're

17  actually doing that or not.

18      Q.     (By Mr. Scaife) Okay.  In your

19  experience, has Shiloh refused to receive a child

20  from a secure facility?

21      A.     Yes.  They have denied -- Shiloh has

22  denied placement at Shiloh of kids that are coming

23  from secure facilities in the past.

24      Q.     How many times would you say Shiloh

25  has denied a step-down request?

CONFIDENTIAL

Page 158

1      A.     A run risk or a minor who would be a

2   risk of running away.

3      Q.     Are there any other reasons you can

4   think of?

5      A.     Not that I can think of.

6      Q.     If Shiloh denies placement at Shiloh,

7   what does the secure facility that's seeking to

8   transfer or step down the child, what do they do

9   next?

10      A.     What would the sending --

11      Q.     What would the sending facility do

12   next after Shiloh denies the placement?

13      A.     So that would be up to them.  They can

14   always seek placement at a different RTC, if it's

15   a male child.

16          They can keep the child.

17          There is also an option for the child

18   to be transferred to placement outside of the ORR

19   network.  We don't really have much to do with

20   that.

21          But those are just some options.

22      Q.     How many RTCs are you aware of besides

23   Shiloh?

24      A.     In the ORR network?

25      Q.     In the ORR.

Page 164

1     Q.     Could physical disruptions -- could

2   the child -- let me rephrase.

3           Could it be a sign of a mental health

4   need if a child makes repetitive -- like physical

5   disruptions in interacting with others?

6     A.     I -- that's kind of broad.  I suppose

7   that it could be.  And it's really something that

8   should be asked of maybe a clinician or a

9   psychiatrist or a psychologist, to see if those

10  symptoms would be related to certain diagnoses.

11    Q.     Could threats of suicide be a sign of

12  mental health needs?

13    A.     Again, it could be.  It could be.

14  Suicidal ideations or -- suicidal ideations or

15  self-harm in some of the children that are

16  exhibiting -- that have mental health needs.

17    Q.     In your opinion, are secure facilities

18  or RTCs better equipped to handle mental health

19  needs?

20    A.     Your question is which one is better

21  equipped?

22    Q.     Which one is better equipped?

23    A.     I would believe that an RTC is better

24  equipped to handle mental health needs.

25                 (Exhibit 162 marked for

CONFIDENTIAL

Page 165

1          identification.)

2          Q.      (By Mr. Scaife) All right.  I'm going

3    to hand you what we marked as Exhibit Number 162.

4          A.      Okay.

5          Q.      And specifically I want to ask

6    you about -- we'll start with Pages 4 and 5 of

7    that document.

8          A.      I'm sorry.  What page?

9          Q.      4 and 5.

10         A.      It starts with --

11         Q.      Sure.  Yeah.  We'll start with

12   Page 00033323.

13                 When you've have a chance to review

14   that, Ms. Murray, just describe what the document

15   is.

16         A.      Can you give me a minute?  I'm going

17   to start from the beginning.

18         Q.      Sure.

19         A.      (Reviews document.)

20         Q.      Did you have a chance to review it?

21         A.      Yes.  I did have -- give me just a

22   second.  I'm sorry.

23                 I have not read all of it.  But...

24         Q.      All right.  Ready?

25         A.      Almost.

**Exhibit 28**
**Page 983**

CONFIDENTIAL

Page 166

1      Q.     Okay.  Sorry.

2             Let's first look at the document

3      ending in Bates Number 323.  The number in the

4      lower right.

5      A.     Okay.

6      Q.     Okay.  And on the bottom half of that

7      page, do you see the email from Mr. Douglas

8      Plaeger --

9      A.     Yes.

10     Q.     -- to you?

11     A.     Yes.

12     Q.     Who is Mr. Douglas Plaeger?

13     A.     He is the program director for Shiloh

14     Treatment Center.

15     Q.     And in this email -- what is this

16     email about?

17     A.     He is denying placement of

18     ██████████████████ from Yolo to Shiloh.  And he

19     provides his reasons.

20     Q.     And Yolo is -- is Yolo a secure

21     facility?

22     A.     Yes.

23     Q.     And so I believe you said earlier that

24     to be placed at an RTC like Shiloh there has to be

25     a psychologist or psychiatrist recommendation.  Is

CONFIDENTIAL

Page 167

1    that correct?

2         A.     (No audible response.)

3         Q.     Okay.  So does this mean that a

4    psychologist or a psychiatrist recommended that

5    ████████     be transferred to an RTC?

6         A.     I do not know.  I'd have to look to

7    see if they actually had that.

8         Q.     Well, if ORR policy was followed,

9    would a psychologist or psychiatrist have

10   recommended placement at an RTC?

11        A.     If ORR policy was followed, then yes.

12   They would have to have included that.

13        Q.     What are the reasons that Mr. Plaeger

14   denied placement at Shiloh in this email?

15        A.     Here it says that Shiloh responded to

16   Yolo's initial transfer request on 3/20/17 with

17   concerns regarding ████████ flight risk and

18   aggressive behaviors.  They indicate that, since

19   that time and with the recent transfer request,

20   ████████ continues to engage in physically

21   aggressive, disruptive, and noncompliant

22   behaviors, with the latest incident on 7/8/17,

23   where he manipulated staff by saying he was going

24   to kill himself and then later smeared blood on

25   the door window, disrupting the program, and

CONFIDENTIAL

Page 168

1   showing he can do what he wants.  Shiloh also has

2   concerns of ▓▓▓▓▓ not being receptive to

3   therapeutic treatment, as evidenced by the

4   estimated six incidents of medication

5   noncompliance.

6        Q.    So if ORR policy was followed,

7   psychologists or psychiatrists recommended that

8   ▓▓▓▓▓ be transferred to an RTC.  Right?

9        A.    If --

10       Q.    If ORR policy was followed?

11       A.    Right.

12       Q.    And the reason Shiloh denied placement

13   of ▓▓▓▓▓ at Shiloh was because of his flight

14   risk and aggressive behaviors.  Is that right?

15       A.    According to the email --

16       Q.    According to --

17       A.    -- it states that.  Yes.

18       Q.    As well as physically aggressive,

19   disruptive, and noncompliant behaviors.  Correct?

20       A.    Yes.  And then it goes on to list an

21   incident.

22       Q.    Where he said he was going to kill

23   himself.  Correct?

24       A.    Actually, it says where he manipulated

25   staff by saying he was going to kill himself.

**Exhibit 28**
**Page 986**

CONFIDENTIAL

Page 169

1      Q.      Yes.  Can these factors -- the flight

2  risk, the aggressive behaviors, the physically

3  aggressive, disruptive, and noncompliant behaviors

4  and statements he's going to kill himself be

5  indicative of mental health needs?

6      A.      That's really for his psychiatrist to

7  determine.  I'm not sure of this minor's history

8  or anything at all.  So I don't know if this is

9  behavioral, mental health related.  It really is

10  up to the psychiatrist.

11      Q.      And if this ORR -- and if ORR policy

12  was followed, a psychiatrist would recommend that

13  he be placed at an RTC.  Correct?

14      A.      I would think that, if policy was

15  followed, then there should be a recommendation.

16  Somewhere in the packet there should have been.

17      Q.      Okay.  If we look at the document --

18  it's one page over, ending in 322.

19      A.      Okay.

20      A.      At the very top, do you see the email

21  on July 12, 2017, from Ivonne Velazquez?

22      A.      Yes.

23      Q.      Who is Ivonne Velazquez?

24      A.      It does not say.  On here her

25  signature is not included.  But she -- yeah.  So I

CONFIDENTIAL

Page 170

1  can't say for sure.

2        Q.      Okay.  Do you see Ivonne's statement

3  in the email saying "I have several cases at Yolo

4  that are in need of RTC, but our RTC keep

5  rejecting them.  At this point we are looking for

6  out-of-network placement"?

7        A.      Yes.

8        Q.      In your experience as a case

9  coordinator, was there instances where you viewed

10  RTCs, including Shiloh, as consistently rejecting

11  step-down placements or step-down transfers from a

12  secure facility?

13              MS. CHAPIUS:  Objection to form.

14        A.      I don't know.  You're asking whether

15  Shiloh consistently denies placement of kids from

16  secure --

17        Q.      (By Mr. Scaife) From secure

18  facilities.

19        A.      I would not say they consistently deny

20  placement from secure -- or minors from secure

21  placement.

22        Q.      How often would you say?

23        A.      You'd have to go look back and look at

24  numbers.  But I know that they do accept placement

25  from secure facilities.

**Exhibit 28**
**Page 988**

Page 175

1   where the shelter sometimes requested a step up to

2   staff secure.  And I would not agree, because I

3   did not feel that minor met the criteria.  And

4   they didn't transfer.  That was the decision; not

5   to transfer the minor.

6        Q.    When you did not concur with the

7   transfer request, would you say the transfer

8   request still went through?  Or did not go

9   through?  Or complied with your recommendation as

10  case coordinator or --

11       A.    Sometimes I -- sometimes it would

12  still go through.  It -- really, it was ORR who

13  made the final decision.  So it just depends on

14  what ORR chooses in the end.

15       Q.    When you were a case coordinator would

16  you feel that your recommendation carried weight

17  when it did not concur with the case manager's

18  recommendation?

19       A.    Sometimes it did.  Sometimes it

20  didn't.

21       Q.    Okay.  Sometimes it -- can you just

22  explain how it did sometimes and how it did not?

23       A.    So there were times where I would --

24  going back to -- it might have been me reviewing

25  all the documents that were provided and

CONFIDENTIAL

Page 176

1    determining this minor -- you know.  I've reviewed

2    policy.  This minor does not qualify for step

3    up -- regardless of what the program is saying,

4    does not qualify for step up to staff secure.  I

5    would staff that with the FFS.  Provide my

6    recommendation.  Say I understand they're

7    submitting it.  I am just letting you know I don't

8    agree.  I'm going to document that.

9                And a lot of times the FFS would say

10   "I see your point.  I see it does not meet

11   criteria.  Thank you for the information," and

12   would actually make the final decision not to

13   transfer the child.

14               Other times the child might have been

15   transferred anyway.

16       Q.    Did you ever feel when you were a case

17   coordinator and did not concur with the transfer

18   request that your recommendation was ignored?

19       A.    I don't think it was ignored.  But

20   there were -- there were times when the placement

21   wasn't what I wanted it to be.  But if the FFS

22   wanted to make that decision, then they are able

23   to do that.

24       Q.    Did you ever feel that the case

25   manager's recommendation was given more weight

**Exhibit 28**
**Page 990**

CONFIDENTIAL

Page 177

1    than your recommendation regarding transfer?

2         A.    No.  I think it's pretty equal.

3         Q.    Since you took your new role in I

4    guess April or maybe November of this year, the

5    case coordinators you supervise, have they ever

6    disagreed with the case manager's recommendation

7    regarding transfer?

8         A.    Yes.

9         Q.    How many times?

10        A.    Recommendation for transfer or

11   reunification?  Many.  Like, I can't count them.

12   I don't know how many.  But yes.

13        Q.    Are you saying since April 2019?

14        A.    Yes.  Since April.

15        Q.    Would you say it's more than 100

16   times?

17        A.    No.  Probably less than that.

18   Maybe -- maybe -- maybe around the 50 mark.  And

19   I'm just really guessing here.

20        Q.    And of those around 50 times, about

21   how many times did the -- did the case manager's

22   recommendation be carried out rather than the case

23   coordinator's recommendation?

24        A.    Very few.  Very few.  I think that --

25   very few.  I think I see it more where the FFS

Page 184

1    recommendation by the case manager?

2         A.    It varies from program to program.

3         Q.    Okay.  What would you say is the ideal

4    goal?

5         A.    Ideally, and according to policy, the

6    packet should be submitted to a program.  And

7    within one business day that program should

8    provide a decision.

9         Q.    The receiving program?

10        A.    The receiving program.  Sorry.

11        Q.    Okay.

12        A.    Should provide a decision and say

13   whether they accept that minor or not.  And that

14   minor should be transferred within a certain -- I

15   don't know that time frame, but should be

16   transferred as soon as possible.

17        Q.    All right.  I'm going to hand you

18   another exhibit.

19        A.    Yes.

20        Q.    This is Deposition Exhibit 163.

21              (Exhibit 163 marked for

22        identification.)

23        Q.    (By Mr. Scaife) Are you ready?

24        A.    Yes.

25        Q.    Let's start on the page that ends in

CONFIDENTIAL

Page 185

1    770.  The second-to-last page.

2         A.     All right.

3         Q.     All right.  You see towards the top of

4    the page is an email from Brenda Banda to you?

5         A.     Uh-hum.  Yes.

6         Q.     And what is -- what is Brenda telling

7    you?

8         A.     Brenda is submitting a transfer

9    request for lower level of care.  A shelter

10   placement for ███████████████████████████.

11        Q.     So Brenda -- or Shiloh -- or Brenda is

12   the case manager at Shiloh at this time.  Right?

13        A.     Yes.  That is correct.

14        Q.     Okay.  So Shiloh is submitting a

15   step-down request?

16        A.     Yes.

17        Q.     And you see on that same page, the

18   last paragraph before "Mental Health"?  It says:

19   "████   has made significant progress and has been

20   given the recommendation to step down to a lower

21   level of care by her treating psychiatrist."

22        A.     Yes.

23        Q.     Do you see that?

24        A.     Yes.

25        Q.     And what is the date of that email?

**Exhibit 28**
**Page 993**

CONFIDENTIAL

Page 186

1       A.      That is January 12.

2       Q.      And then on the next page ending in

3    769, do you see an email from you?

4       A.      Yes.

5       Q.      To Bernal Cruz and to other people?

6       A.      Yes.

7       Q.      And do you see where you say in that

8    email -- or end of that first paragraph:  "Please

9    submit this case to the following shelters"?

10      A.      Yes.

11      Q.      And you list six shelters?

12      A.      Yes.

13      Q.      And what is the date of that email?

14      A.      January 22.

15      Q.      Which is ten days after the initial

16   transfer request.  Right?

17      A.      Yes.

18      Q.      Do you know why it took ten days to

19   send this email out?

20      A.      I would have to go back to check.  But

21   I would think that there might have been some

22   documents missing or the packet was not complete

23   or something like that.

24      Q.      What was the purpose of this email

25   being sent out to all these people?

CONFIDENTIAL

Page 187

1    A.    Okay.  So the purpose of this email

2  was to get the packet out to those shelters.  The

3  sending case coordinator to the receiving case

4  coordinator.  And so these people, the group of

5  people in the two lines -- Bernal Cruz,

6  Jennifer Quimi -- are the case coordinators for

7  the shelters that are listed below.  Morrison,

8  Abbott, Crittenton, David and Margaret, Heartland,

9  and Casa Franklin.

10    Q.    Okay.  All right.  Now let's turn

11  together page ending in 768.  The page before

12  that?

13    A.    Uh-hum.

14    Q.    Do you see the email from Jenna

15  Lovejoy to you?

16    A.    Yes.

17    Q.    And do you see in that second

18  sentence?  It says:  "David & Margaret will accept

19  this minor, pending the availability of a female

20  bed"?

21    A.    Right.

22    Q.    And what is the date of that email?

23    A.    February 7.

24    Q.    And the email above that one, which is

25  the next email in the thread.

**Exhibit 28**
**Page 995**

CONFIDENTIAL

Page 188

1     A.     Uh-hum.

2     Q.     Brenda to -- or from you, I'm sorry,

3   to Brenda.

4          Do you see that one?

5     A.     Yes.

6     Q.     And it says, second sentence:  "I will

7   send out the official transfer email once the bed

8   is open"?

9     A.     Yes.

10    Q.     And then on the very first page,

11  ending in 766, what is that?  Or do you see the

12  email from Micaela to a group of people -- or to

13  you and Brenda?

14    A.     Micaela?  Yes.

15    Q.     And what does that email say?

16    A.     The transfer request has been approved

17  in the UAC portal.

18    Q.     Okay.  What is the date of that email?

19    A.     February 13.

20    Q.     Okay.  And that is over a month after

21  the initial transfer request by Shiloh.  Right?

22    A.     Yes.

23    Q.     And that date is also a month after

24  the psychiatrist recommended that placement at

25  Shiloh was no longer justified.  Right?

**Exhibit 28**
**Page 996**

CONFIDENTIAL

Page 189

1       A.      Correct.  Yes.

2       Q.      Would you say this was timely, this

3  email?

4       A.      No.

5       Q.      Is this timeline -- or how often do

6  you see a timeline like this when it comes to

7  step-down transfers?

8       A.      Often.

9       Q.      Often?  And why is that?

10      A.      I -- when you asked me the first

11 question, how long should it take?  I said

12 ideally.

13      Q.      Right.

14      A.      There's great difficulty in placing or

15 getting acceptance of a minor that is being

16 stepped down from Shiloh at shelters.  Even though

17 there's a recommendation for a lower level of care

18 or is indicating that the minor is no longer a

19 danger to self or others, there's still denial

20 after denial from some of these programs.

21             What you don't see here -- and you

22 might have an idea -- are all the denials we know

23 that came through for this child.  And so it

24 likely took this long to get acceptance from a

25 program.  And then -- I see the date.  2018.  I

**Exhibit 28**
**Page 997**

CONFIDENTIAL

Page 190

1    believe that was a pretty busy time also.  And

2    then for an actual bed to become available.  But

3    that wasn't too long, if you give it five days or

4    something like that.

5              But programs provide reasons for not

6    accepting the minors into their shelters.  And

7    many of them -- well, you can go through those.

8    But they list things like they're not able to meet

9    the minor's needs, et cetera.

10        Q.    And what do they mean, they can't meet

11   the minor's needs?

12        A.    It's a question you have to ask them.

13   Because, according to Shiloh, the minor simply

14   would need therapeutic -- or clinical therapy and

15   a psychiatric visit once a month.

16        Q.    Is it your opinion that the step-down

17   process takes too long?

18        A.    Yes.

19        Q.    How would you -- or let me rephrase.

20              Are there steps that can be taken to

21   speed up the process?

22        A.    Yes.

23        Q.    And what kind of steps would those be?

24        A.    Proper training to the program.

25   Gathering the information and providing the proper

**Exhibit 28**
**Page 998**

Page 191

1   information to their case coordinator.  Case

2   coordinators identifying placements that will be

3   able to meet the needs.  And then programs giving

4   these kids a chance.

5       Q.    Has this concern with the timelessness

6   of step down, the step-down process been raised to

7   ORR?

8       A.    Yes.

9       Q.    By who?

10      A.    I have.  I've let the FFS -- for

11  example, Micaela was the FFS at the time.

12  Nickie Heimel.  Let them know constantly of the

13  difficulties in stepping down minors from Shiloh

14  into shelter placements.  As well as I've provided

15  that in my -- there is a weekly report that a case

16  coordinator provides to the FFS.  When I was case

17  coordinator I would provide that in my weekly

18  report.

19      Q.    And what did -- what was the response

20  that you received when you raised this concern?

21      A.    There's really no response other than,

22  you know, let's keep trying.  Let's look for other

23  programs.

24            This shows a list of six -- no.  Six

25  placements that I referred this particular minor

CONFIDENTIAL

Page 192

1   to.  And at the end there, in March and April, I

2   was referring kids to 20, 25 programs, just to try

3   to get placement.

4        Q.    Were any steps taken to try to lower

5   the time frame after you raised these concerns?

6        A.    Not that I know of.

7        Q.    Were there any policy changes that

8   you're aware of that attempted to expedite this

9   process?

10       A.    Not that I know of.  No.

11       Q.    All right.  And so when a child, like

12   ███████  in this situation -- or let me rephrase.

13             While this transfer process is being

14   carried out, the child who is seeking to be

15   transferred, they remain at the current facility

16   that they're placed at.  Is that correct?

17       A.    Yes.

18       Q.    Okay.  So here, ███████ remained at

19   Shiloh during this time.  Right?

20       A.    Yes.

21       Q.    And so do you agree that ███████ was

22   placed in inappropriate placement for over a month

23   while this process carried out?

24       A.    Yes.  The psychiatrist had provided a

25   recommendation to step down.

**Exhibit 28**
**Page 1000**

CONFIDENTIAL

Page 193

1      Q.      And do you agree that that means that

2      there would be a more restrictive placement than

3      necessary?

4      A.      Yes.

5      Q.      In that same document, the page ending

6      in 768, it says:  "David & Margaret will accept

7      this minor, pending the availability of a female

8      bed"?

9      A.      Yes.

10     Q.      How often is a minor unable to be

11     stepped down due to the unavailability of space at

12     other facilities?

13     A.      I actually do see that quite often,

14     especially with minors that are in shelter and

15     need to be stepped down or need to be placed in a

16     long-term foster care.  It's a response we get

17     quite often for those.

18             As it comes to -- from RTC right now?

19     That's not going to be a very typical response.

20     Because ORR, the number of children in ORR custody

21     at this time is very, very low.  And so that is

22     not going to be something that is going to be an

23     issue right now.  But during times of influx or

24     when the programs are at max capacity, then yes,

25     that might be more of an issue.

**Exhibit 28**
**Page 1001**

CONFIDENTIAL

Page 196

1      Q.     And just generally speaking, how much

2  of a delay does the unavailability of space cause

3  in the step-down process?

4      A.     It can be a big delay.

5      Q.     What's the longest that you've seen?

6      A.     Due to space?

7      Q.     Yes.

8      A.     I don't know.  Due to space, I don't

9  know.  That would be probably a long-term foster

10 care situation.  And it would be months where a

11 minor will be in shelter placement because there

12 is no long-term foster care placement or bed.

13     Q.     Would you say more than four months?

14     A.     I've seen more than four months.

15 Yeah.

16     Q.     More than six months?

17     A.     I'm not sure.  Again, due to space.

18     Q.     Are there other reasons that would --

19 all right.  Why do you want to clarify due to

20 space?

21     A.     Because you brought that up.  I just

22 want to make sure we're clear.

23          MR. SCAIFE:  All right.  Are you still

24      okay?

25          THE WITNESS:  I'm fine.

**Exhibit 28**
**Page 1002**

CONFIDENTIAL

Page 197

1          MR. SCAIFE:  Okay.

2      Q.     (By Mr. Scaife) I want to switch gears

3  a little bit and talk about the reunification

4  process.

5          What is the -- pardon.  Let me back

6  up.

7          Does the child have to spend a certain

8  amount of time at Shiloh before they can be

9  released to a sponsor?

10     A.     No.  The only -- no.  The only

11 requirement at that point would be to make sure

12 that they are safe and that the reunification

13 process has been completed or the requirements

14 have been met.

15     Q.     Can a child be released during that

16 30-day psychiatric evaluation that is referenced

17 in the admission assessment forms?

18     A.     I suppose, if the psychiatrist felt

19 the minor was stable.

20     Q.     Has that ever happened, in your

21 experience?

22     A.     Not to -- not to my knowledge.

23     Q.     When a child is stepped up -- or let

24 me back up.

25          When the reunification process begins

**Exhibit 28**
**Page 1003**

CONFIDENTIAL

Page 198

1    at a facility and then that minor is stepped up,

2    what happens to the reunification process?

3         A.    It continues.

4         Q.    Is there any delay from the step up?

5         A.    There may be a delay.  Not

6    because anything stops.  But because -- for

7    example, if a minor now requires a home study,

8    that may make it a little more lengthy.  Because a

9    home study will take ten days to complete.

10        Q.    Does anything have to be redone in the

11   process after a step up?

12        A.    The only thing that I can think of

13   that might need to be redone or really would be

14   more of an addendum, would be maybe an addendum to

15   a home study.  Where -- perhaps the home study was

16   completed when the minor was in a shelter.  And

17   then the minor was stepped up to a staff secure.

18   And an addendum would be completed, just to make

19   sure that the sponsor is really aware of what's

20   going on.  And maybe another visit to the home or

21   something like that.

22        Q.    How much of a delay does this addendum

23   cause to the reunification process?

24        A.    It doesn't necessarily have to be a

25   long time.  The addendum can -- it's not always

**Exhibit 28**
**Page 1004**

CONFIDENTIAL

Page 211

1   since it does not meet one of the other criteria.

2          My question with those is always what

3   answers do you want that cannot be answered by

4   phone?  Why do we have to send someone out to a

5   home?

6        Q.     How often -- in your experience, how

7   often does a discretionary home study occur?

8        A.     They're not rare, but they're not --

9   it's not something that happens all the time.

10       Q.     You mentioned the possibility of a lot

11  of people living in the home or a lack of

12  fingerprints could be a reason for a discretionary

13  home study.  What are some other reasons?

14       A.     Maybe the minor having some special

15  needs.  Trying to find out if the sponsor is able

16  to meet those needs.  Or maybe the minor not

17  qualifying or having a disability or being a

18  victim.  But just -- maybe a child who self-harms

19  all the time and we need to know if the sponsor is

20  able to meet their needs.  That's --

21       Q.     Are you -- go ahead.

22       A.     -- an example.

23       Q.     Are you aware of any children who have

24  been placed at Shiloh who did not have a home

25  study completed?

**Exhibit 28**
**Page 1005**

CONFIDENTIAL

Page 212

1        A.      I don't think so.

2        Q.      Pardon?

3        A.      I don't recall any that have been

4    released without a home study.

5        Q.      Is a home study required for children

6    placed at Shiloh?

7        A.      Yes.  Since those minors have been

8    diagnosed with mental health illness.

9        Q.      So every child placed at Shiloh has a

10   TVPRA-mandated home study?

11       A.      If they get assigned a sponsor, yes.

12       Q.      Okay.

13       A.      Unless -- unless the sponsor is denied

14   for whatever reason before a home study is

15   completed.

16       Q.      And in that situation there just

17   wouldn't be a home study?

18       A.      Right.  It would just be a denial.

19       Q.      Do you interview the child -- or do

20   case coordinators interview the child as part of

21   the reunification process?

22       A.      At times.  Not every child, but yes.

23       Q.      What would be the reason for the

24   interview?

25       A.      Typically if there are concerns with

**Exhibit 28**
**Page 1006**

CONFIDENTIAL

Page 232

1      A.      Perhaps ongoing therapy or continued

2  medication monitoring.  Some examples I've seen in

3  notes.

4      Q.      Would a treating psychiatrist or

5  psychologist have any input on post-release

6  services?

7      A.      Again, I think it would be more of

8  just whether they need to see a psychiatrist or --

9  outside of placement or therapy.  Just to give

10 some examples.

11     Q.      When a case coordinator is deciding

12 whether to recommend release to a sponsor, is the

13 case coordinator required to consider the harm to

14 a child's mental health by remaining in ORR

15 custody?

16     A.      No.  We are not required to look at or

17 consider that.  We consider the safety of the

18 minor.  Will the minor be safe in the sponsor's

19 home and will his needs be met?  Mostly because we

20 consider the minor to be safe in ORR's care.

21     Q.      Do you -- in your experience, is the

22 child always safe in ORR's care?

23     A.      I'm sorry.

24     Q.      In your experience, is the child

25 always safe in ORR's care?

**Exhibit 28**
**Page 1007**

CONFIDENTIAL

Page 286

1                    CERTIFICATE

2     STATE OF MARYLAND  )

3     COUNTY OF BALTIMORE)

4              I, PAULA J. ELIOPOULOS, a Notary

5     Public within and for the State of Maryland, do

6     hereby certify that NIDIA MURRAY, the witness

7     whose deposition is hereinbefore set forth, was

8     duly sworn by me and that such deposition is a

9     true record of the testimony given by such

10    witness.

11             I further certify that I am not

12    related to any of the parties to this action by

13    blood or marriage and that I am in no way

14    interested in the outcome of this matter.

15             In witness whereof, I have hereunto

16    set my hand this 2nd day of January, 2020.

17                      *Paula J. Eliopoulos Weyand*

18                  _____

19                      PAULA J. ELIOPOULOS

20

21

22

23

24

25

CONFIDENTIAL

Page 287

1                    CERTIFICATE

2    STATE OF NEW JERSEY    )

3    COUNTY OF MORRIS        )

4           I, JANET HAMILTON, a Registered

5    Professional Reporter and New Jersey Notary

6    Public, do hereby certify that:

7           I joined this deposition telephonically

8    after the lunch recess, at 12:41 p.m. CST, and

9    ended my reporting at 5:45 p.m. CST, at which time

10   the deposition was concluded.

11          I further certify that I am not related

12   to any of the parties to this action by blood or

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15          In witness whereof, I have hereunto set

16   my hand this 2nd day of January, 2020.

17

18

19          _____

             JANET HALL, RPR, CRC, FPR, NJCCR

20           NJCCR License 30X100240200

             Expires 6/30/2020

21

22

23

24

25

**Exhibit 28**
**Page 1009**

# Exhibit 29

Exhibit 29
Page 1010

Confidential

Page 1

1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4              Case No.  No. 2:18-CV-05741-DMG-PLA

5

6      _____

7      LUCAS R., et al.,                    )

8               Plaintiffs,                 )

9          v.                               )

10     ALEX AZAR, Secretary of U.S.         )

11     Department of Health and             )

12     Human Services, et al.,              )

13               Defendants.                )

14     _____

15

16                    ***CONFIDENTIAL***

17          DEPOSITION OF NITHYA NATHAN-PINEAU, ESQ.

18                    Washington, D.C.

19                    August 20, 2019

20

21

22

23

24     Reported by: BARBARA DE VICO

25     Job No.166052

Exhibit 29
Page 1011

Confidential

Page 13

1    but not -- or they may not know exactly where they

2    are going.  They may be notified that they're

3    leaving but not told of a destination.

4           Q.    When you say "they," are you

5    referring to your lawyers, or are you referring to

6    the children?

7           A.    What the children have reported to

8    our lawyers, that they may have said, in our

9    conversations with them the child may have said I

10   was told I was leaving, I didn't know where I was

11   going.  Or we've also heard children report that

12   they didn't know they were leaving until they were

13   actually transported out of the facility to

14   Shenandoah.

15          Q.    Okay.  So in terms of what you're

16   able to do, has CAIR ever been notified in say, you

17   know, one day in advance of a step-up or two days

18   in advance of a step-up?

19          A.    Usually not that much notice, even

20   when we're the attorney of record for the child.

21          Q.    So what would you say is the amount

22   of notice that CAIR gets when you're attorney of

23   record and there's going to be a step-up?

24          A.    Sometimes it's less than one

25   business day.  Sometimes it's after a child has

Confidential

Page 14

1   already been moved.

2          Q.    Okay.  And let's take, for example,

3   in the circumstances where you've been given notice

4   at least one business day, is there any sort of

5   form, setting in which you're able to advocate for

6   the child, perhaps even to the extent of opposing

7   step-up?  Is there any process?

8          A.    Within the ORR system, we have not

9   been able to advocate for such a step-up.  But we

10  have filed in federal court to have a child

11  transferred back through.  We receive less than one

12  business day notice before that child was

13  transferred to another facility.

14         Q.    Now, in the case of when you have

15  clients stepped up, are you permitted to review the

16  evidence that the government has relied upon to

17  justify the step-up?

18         A.    Typically no.  It hasn't been my

19  experience that we have access to the information

20  that's being reviewed and when that decision is

21  being made.

22         Q.    Okay.

23         Is there also a process for step-down that

24  you mentioned earlier -- well, are you familiar

25  with a provision of the Trafficking Victims

Confidential

Page 15

1    Protection Act which requires 30-day reviews of a

2    child placed in a security facility?

3            A.    I am familiar with that, and in my

4    experience that was the messaging that children

5    were receiving that their cases were being reviewed

6    every 30 days, and so good behavior and other sort

7    of incentives were attached to a 30-day sort of

8    time frame.

9            Q.    Now, when a child at Shenandoah

10   receives one of these reviews, what role, if any,

11   are CAIR lawyers permitted to play in that process?

12           A.    We don't -- we're not permitted to

13   play a role in that process.  That meeting is

14   between the case manager and the child.  And if we

15   would like to learn about what happened in that

16   meeting, we've been instructed that we should ask

17   the child or that we should request an ORR file.

18           Q.    So are you permitted to look at any

19   evidence that's considered in the step-down

20   process?

21           A.    No.

22           Q.    Unless you request the file?

23           A.    Right.  If we request the ORR file,

24   that would be the way in which we could access

25   maybe notes that were made or other things.

Confidential

Page 16

1        Q.      Okay.  Now, when you request an ORR

2    file, what's the process for doing that?

3        A.      We have the child sign a written

4    release form and the G-28 if we don't already have

5    one, and we submit that through ORR's central file

6    request process by email.

7            If it fits into one of the categories where

8    we can request an expedited file request, perhaps

9    there's an upcoming hearing or asylum interview,

10   then we'll expedite the request.  Otherwise it goes

11   into sort of the general pipeline of ORR file

12   requests.

13       Q.      Okay.  And in your experience when a

14   file request is not expedited, how long does it

15   take for you to get the child, to receive the

16   child's, your client's file?

17       A.      Anywhere from three months to over a

18   year.

19       Q.      And when it's expedited?

20       A.      When it's expedited, we've seen

21   recently some files come in in two to three weeks.

22       Q.      Now, is the proximity of the 30-day

23   review justification for expediting a file request?

24       A.      Not to my knowledge.

25       Q.      What's your understanding of -- who

Confidential

Page 17

1   are the actors who decide whether there should be a

2   step-up?

3        A.    It's my understanding that the

4   federal field specialist, the ORR staff person

5   overseeing the facility in conjunction with the

6   staff of the facility are involved in that decision

7   making.

8        Q.    Okay.  To your knowledge, is the

9   child involved in the decision-making process?  Is

10  there an interview with the child where the child

11  can explain well, I got into trouble for this

12  reason?

13       A.    I'm not aware of that being a step

14  of the process.

15       Q.    Now, of the facilities that you've

16  mentioned, is there one federal field specialist

17  responsible for all of them, or are there multiple?

18       A.    There are two federal field

19  specialists that cover the facilities in our area.

20  Natasha David is one and Maria Ivall -- I'm not

21  sure of the pronunciation of her last name -- is

22  the other one.

23       Q.    Which of these two is responsible

24  for overseeing children at Shenandoah?

25       A.    Natasha David.

Confidential

Page 18

1      Q.     What kind of ability do you have to

2   speak with Ms. David in order to advocate for your

3   clients?

4      A.     We're able to communicate with her

5   by email and phone, but we don't have any sort of

6   regular types of meetings or opportunities for

7   discussion.

8      Q.     So in terms of step-up or step-down,

9   is Ms. David available to speak with you so that

10  you can advocate for your clients' interest in

11  either being stepped down or avoiding a step-up?

12     A.     We have reached out to her, and

13  typically the response is that the decision has

14  already been made.  And so there is not a process

15  for review or change of classification.

16     Q.     Now, other actors, for example, case

17  managers, are you familiar with that term?

18     A.     Yes, I'm familiar with the term.

19     Q.     What's the function of case manager?

20     A.     My understanding of their position

21  is that they work principally to find a child a

22  family member or relative who can serve as a

23  sponsor to allow them leave ORR custody.  And in

24  the alternative, to find the least restrictive

25  appropriate placement for the child within the ORR

Confidential

Page 19

1    system.

2              Q.    So least restrictive placement, that

3    would include a step-down, wouldn't it?

4              A.    That's correct.

5              Q.    So the case managers in your

6    experience are involved in the decisions about

7    whether to step-up or step-down a child?

8              A.    I believe so, yes.

9              Q.    Now, are you able to communicate

10   with case managers at Shenandoah?

11             A.    We have limited communication with

12   the case managers.  We don't do regular, what they

13   would call a staffing update to review sort of the

14   statuses of the case anymore.  So when we have

15   specific questions, we do reach out affirmatively,

16   but we don't have regular communication with the

17   case managers to get the status updates.

18             Q.    So case managers are evaluating

19   potential sponsors for the child, people to whom

20   they can be released, typically relatives; is that

21   right?

22             A.    That's right.

23             Q.    And do the case managers at

24   Shenandoah share with you the names and contact

25   information of potential sponsors?

Exhibit 29
Page 1017-001

Confidential

Page 20

1          A.      I don't -- in my experience we are

2     typically asked to request that information from

3     the child.

4          Q.      Okay.  Now, what about the case

5     managers at Youth for Tomorrow?  Will they share

6     the name and contact information of potential

7     sponsors with you?

8          A.      Sometimes, but we have been told

9     more recently that we should request that

10    information from the child and that the child

11    should share that with us.

12         Q.      Was there any explanation as to why

13    they would not provide your lawyers with that

14    information?

15         A.      There was no explanation.  The

16    change happened at Shenandoah first and was

17    explained to me as a change in the procedure.

18         Q.      Okay.  In your experience, do the

19    children themselves always have or uniformly have

20    the name and telephone number, contact information

21    for the proposed sponsors?

22         A.      In my experience, no.  They

23    typically don't have the name, telephone number and

24    address of their sponsor.  They very rarely have

25    that information memorized.

Confidential

Page 21

1      Q.     Do you know who it is that has

2   implemented that policy at Shenandoah or the Youth

3   for Tomorrow with respect to not sharing

4   information about potential sponsors?

5      A.     It's not clear.  We at one point

6   were also receiving pushbacks on receiving copies

7   of birth certificates and notice to appear.  We

8   were able to restore access to those documents but

9   have not been able to restore access to sponsor

10  information.  So I'm not sure where that policy

11  comes from.

12     Q.     So of the facilities that you serve,

13  is it your experience that access to case managers

14  and -- let's just start with case managers --

15  varies from facility to facility?

16     A.     Yes, it varies greatly.

17     Q.     So which is the facility of the ones

18  that you mentioned that affords the greatest access

19  to case managers?

20     A.     I would say both Board of Child Care

21  and Bethany allow us to participate in a weekly

22  staffing call where we discuss status updates and

23  we can ask affirmative questions about the progress

24  in the child's reunification case.

25     Q.     And the facility in which you have

Confidential

Page 22

1    least access to case managers, which would that be?

2         A.      Shenandoah.

3         Q.      Are you familiar with what are

4    called case coordinators?

5         A.      Yes.

6         Q.      What's your understanding of their

7    role?

8         A.      My understanding is that that's a

9    third-party, I believe, through GDIT that does a

10   review of a complete reunification packet and

11   offers what's going to be an independent review and

12   opinion of that reunification case.

13        Q.      Is it your understanding that GDIT

14   stands for General Dynamics Information Technology?

15        A.      Yes.

16        Q.      And do you know the names of any of

17   the case coordinators who work with children at

18   these facilities that CAIR also serves?

19        A.      I don't know the current case

20   support leaders for the local facilities.

21        Q.      Have you ever spoken to a case

22   coordinator?

23        A.      I have in the past.  In my first few

24   years at CAIR Coalition there were stakeholder

25   meetings where ORR, GDIT and CAIR Coalition and ICE

Confidential

Page 23

1   all got together and talked about issues.  Since

2   those meetings stopped about two and a half years

3   ago, I have not spoken face-to-face with a GDIT

4   case coordinator.

5           Q.     With respect to the children that

6   CAIR is representing, do you typically know the

7   name of or identity of the case coordinator

8   assigned to their release?

9           A.     We don't.

10          Q.     Now, in terms of the FFSes that you

11  mentioned, Ms. David and Ms. Ivall, is there a

12  difference between them in terms of their openness

13  to receive communication from CAIR attorneys?

14          A.     We have a newer working relationship

15  with Ms. Ivall.  She seems very open to

16  communicating with us.  And with Ms. David, we used

17  to have sort of regular in-person meetings and I

18  think she's become less -- in my experience she's

19  become less open to communicating with us.

20          Q.     Okay.  Now, let's talk a little bit

21  about what it takes to see a client who's detained

22  at Shenandoah.  Are there -- to your knowledge, are

23  there regular attorney visitation hours for

24  children there that CAIR lawyers are able to show

25  up and speak to clients?

Confidential

Page  24

1          A.      We're not able to show up

2    unannounced.  We are required at the beginning of

3    the month to provide all of our visit dates for the

4    following month.  So, for example, the beginning of

5    August we send an email saying these are the dates

6    that we're coming and the specific hours that we

7    would plan to be there.  Typically it's 10:00 to

8    2:30 when we have access on our visit days.  But

9    we're required to provide advanced notice at the

10   beginning of the month for every visit.

11          Q.      What's the process if there's a

12   development in the court case that was, you didn't

13   know about at the beginning of the month, will they

14   allow an attorney-client meeting?

15          A.      They will.  They have made

16   accommodations where an asylum hearing got

17   rescheduled or there's some other need for an

18   attorney-client meeting that we weren't aware at

19   the beginning of the month.

20          And so if we become aware of something like

21   that, we email the case manager with a copy of the

22   hearing notice and ask for a confidential meeting

23   space to be available and tell them the date and

24   time that we would like to meet with the child.

25          Q.      Okay.  So then when you've set up

Confidential

Page 47

1  interpretation, yes, because the IJ has conducted a

2  review of the facts and both the child and ORR, HHS

3  have an opportunity to present arguments that are

4  considered by the judge in their decision.

5       But it has still been the response and the

6  outcome in terms of practical effect that children

7  are not released or their custody is not changed

8  right away.

9       Q.    Okay.  Now, in terms of placement,

10  step-up, step-down, in your experience what impact

11  have immigration judges' decisions finding children

12  not to be too dangerous for release had on their

13  placement?

14       A.    Unfortunately I have not seen a

15  direct impact between the immigration judge's

16  decision that a child is not dangerous and a move

17  to a less restrictive placement or reunification.

18  We have had the immigration judge find that a child

19  was not dangerous or was not a flight risk and they

20  have continued to remain in custody and secure, in

21  a secure facility.

22       Q.    At Shenandoah?

23       A.    At Shenandoah.

24       Q.    I think we've been going now for an

25  hour, yes.  Take a five-minute break, ten minutes.

Confidential

Page 55

1  removed from the room, their clothing was removed

2  from their room.  And they were kept in there for

3  periods of time such as a day or a day and a half.

4          Q.     Are you familiar with the term

5  "serious incident report" or SIR?

6          A.     Yes, I have heard that term.

7          Q.     What's your understanding of what

8  that refers to?

9          A.     My understanding is that any time

10 that there is any type of incident related to a

11 child in ORR custody that the staff at the facility

12 are required to make a written report detailing

13 what's occurred.  It could be anything from injury

14 to an altercation with another child.  But there's

15 a list of types of incidents is my understanding

16 that are required to be recorded.

17         Q.     And is it your understanding that

18 ORR may delay reunification with family members for

19 a period say 30 days or 60 days where a child needs

20 to be free of SIRs?

21         A.     That is my understanding.  I've

22 heard -- I've heard that a child, I've heard many

23 children say to us that they have been informed

24 that they're not eligible for reunification if

25 they're not without what they would call a report

Confidential

Page 56

1    for a specific period of time.

2          Q.    Now, the term "serious incident

3    report" suggests that those reports should only be

4    issued in the event of something that's serious.

5    But is it your understanding that that's the case,

6    or has it been what you would consider relatively

7    minor infractions resulting in the issuance of a

8    SIR?

9          A.    We've seen a range of conduct

10   reported in SIRs, things like saying something

11   disrespectful to a teacher, crumpling up paper and

12   throwing it on the ground.  Refusing to follow an

13   instruction, which I would consider for less

14   serious conduct also reported in SIRs; but we have

15   also seen serious conduct like physical altercation

16   recorded in a SIR.  So there's a wide range of

17   what's reported in these reports.

18         Q.    And who is it in your understanding

19   who makes the decision about whether a child has, a

20   child's release should be delayed because of SIRs?

21         A.    It's my understanding that it's the

22   case manager and the physical field specialist and

23   the case coordinators who review those SIRs and

24   weigh them in that process.

25         Q.    What types of force have been

Confidential

Page 60

1      Q.      The forms that you've seen of these

2  notice of restrictive placements, have they been in

3  English or Spanish, or what language have they been

4  in?

5      A.      We have seen forms in English and

6  Spanish, and we've reviewed them with the clients

7  and asked them if they saw the form or remembered

8  the form.  And many of the children we speak with

9  don't remember seeing the form or don't recognize

10  it.

11     Q.      Now, are you familiar with a free

12  legal services list, a list that the government

13  compiles of free legal services available to

14  immigrants in a given geographical area?

15     A.      Yes, I have seen that list, but it

16  is compiled city by city or immigration port by

17  immigration port.

18     Q.      So the immigration port in which you

19  represent children who are detained at Shenandoah,

20  there is such a list?

21     A.      Yes, there is.

22     Q.      In your experience, does Shenandoah

23  or ORR provide children who come to Shenandoah with

24  that list?

25     A.      I have seen children with that list

Page 61

1   in their packet of personal items, but that remains

2   in the care of their case manager, so it's not

3   something that they have ready access to in their

4   pods or in their personal items.

5          Q.     So in the times that you've been to

6   Shenandoah Valley Juvenile Center, have you seen

7   other lawyers, lawyers not with CAIR who have been

8   there to represent children?

9          A.     I have not seen other lawyers that

10   provide immigration representation to youth in the

11   ORR program, no.

12          Q.     As far as your recollection goes, if

13   a child is not being represented by CAIR with

14   respect to their immigration status or matters,

15   they're not being represented at all if they're at

16   Shenandoah?

17          A.     The only exception to that, I mean

18   that's, generally the case would be if the child

19   has counsel, another nonprofit legal service

20   provider like us who has decided to stay on the

21   case even though they're not in the same geographic

22   area.  So perhaps they were represented in

23   California or Texas by a nonprofit who has decided

24   to stay on their case even after a transfer to

25   Virginia.  That would be the exception that it

Confidential

Page 62

1    would cede to other attorneys providing immigration

2    representation at Shenandoah.

3            Q.     Why do you think that is?  Is it

4    because children don't have money to retain

5    counsel, because people think that CAIR is able to

6    represent everybody, or what's your sense as to why

7    CAIR is pretty much exclusively the legal service

8    provider there?

9            A.     I'm not sure of all of the reasons.

10   But what I've heard children report is that their

11   families don't have funds to retain private

12   counsel, and that if CAIR Coalition is not able to

13   take their case they wouldn't have another way to

14   access counsel or find an attorney.  And that's the

15   information that children have reported to us.

16           Q.     What's your opinion as to whether

17   children at Shenandoah or any of the other

18   facilities that CAIR covers, what's their ability

19   to represent themselves with respect to release or

20   placement?

21           A.     I think it's extremely challenging

22   for a child to understand the process of

23   reunification or a change in placement.  And so in

24   my experience I haven't seen a young person who was

25   successfully able to advocate on their own for a

**Exhibit 29**
**Page 1027_001**

Confidential

Page 70

1        Q.     And so during the period that CAIR

2    was representing these children, were CAIR lawyers

3    advised that their clients were being medicated?

4        A.     No.  We're not, we're typically not

5    advised in advance, only if a child tells us that

6    they're on medication.  We always ask

7    affirmatively, but sometimes the youth are not able

8    to report that fact accurately.

9        Q.     So as for youth held at Shenandoah,

10   what's your best estimate as to how many of them

11   are on psychotropic medications?

12       A.     The majority report taking at least

13   one medication.  We don't receive ORR files for

14   every child, so I don't know the types of

15   medication and whether they would all be classified

16   as psychotropic meds, but I think that many youth

17   that we meet, the majority of them report taking

18   medication.

19       Q.     And when they report this, do they

20   report that medication is for anxiety or depression

21   or things of that nature that would suggest it was

22   psychotropic?

23       A.      Yes, we hear youth report that we

24   take medication to make me happy, I take this

25   medication when I feel sad, things like that.

Confidential

Page 83

1          Q.     And who performs the home studies,

2     do you know?

3          A.     It's my understanding that there are

4     contractors, I believe it's Lutheran Immigration

5     and Refugee Services and USCCB who hold those

6     contracts, and they subcontract out to local

7     providers in whatever the geographic location is.

8          Q.     So when a home study is being

9     required, are CAIR Coalition lawyers advised of

10    that?

11         A.     If we reach out and ask for that

12    information, we'll be told that a home study is

13    being conducted, but we're not affirmatively

14    notified.

15         Q.     When you learn that a home study is

16    being conducted, are you provided with the name or

17    the contact information of the person who will be

18    conducting the home study?

19         A.     No.

20         Q.     Have CAIR lawyers been, had an

21    opportunity to speak with any persons who are

22    conducting home studies during the process of the

23    home study itself?

24         A.     We haven't, no.

25         Q.     When the results of the home study

**Exhibit 29**
**Page 1029**

Confidential

Page 84

1    are -- when the home study is completed, are CAIR

2    lawyers advised of their results?

3            A.     We are told by the case manager

4    whether it's a positive or negative recommendation.

5    But in order to access the report, we have to

6    request the ORR file to see the written report.

7            Q.     In your experience, is the child

8    applying for release or the proposed sponsor given

9    a copy of the home study report there?

10           A.     I believe the sponsors receive a

11   copy, and if the children receive a copy, it's a

12   possibility, but I don't know if that's a uniform

13   practice.

14           Q.     Okay.  Now, are fingerprints or --

15   yeah, fingerprints typically required of a sponsor

16   or the sponsor's household, people who are living

17   in the sponsor's household as a condition for

18   receiving a child from ORR custody?

19           A.     Yes.  It's my understanding that

20   sponsors are required to submit their fingerprints,

21   and adult household members are required to be

22   fingerprinted.

23           Q.     Now, the people who are seeking to

24   receive children whom CAIR represents, do they all

25   live in this general area here, or are they across

Confidential

Page 110

1  trust.  They feel incredibly isolated.  They talk

2  about feeling like they want to give up, they don't

3  want to stay and continue to fight a case if they

4  need, they have to remain detained.

5       They report feeling like they want to leave

6  detention, like they would rather, you know, go

7  back to their home country than try to proceed with

8  a case if it means that they have to stay in

9  detention.

10      So their ability to sort of make logical

11  well-thought-out decisions is significantly

12  impacted by the length of time that they're in

13  detention.  And that affects the legal strategy

14  that they ask us to pursue.  So they may change

15  their case goals frequently based on the length of

16  detention that they've experienced.

17      Q.    And have you observed that children

18  are more likely to get issued SIRs or be stepped up

19  depending on how long they've been detained?

20      A.    I do think that that is very

21  connected when a child who is in detention for a

22  longer period of time, particularly when they don't

23  see an end to that, they don't see the long-term

24  benefit to maintaining good behavior.  And it

25  becomes like a feedback loop where their behavior

1  suffers and then they receive punishment and then

2  they sort of continue down this path.

3          Q.     Now, whose responsibility is it to

4  keep a child informed as to the progress of their

5  release?

6          A.     It's my understanding that that's

7  the case manager's responsibility.

8          Q.     In your experience, do case managers

9  do a good job of that?

10          A.     In my understanding I think it

11  depends on the individual case manager.  How

12  communicative they are and how often they

13  communicate with the child.

14          Q.     So are you aware of any requirement

15  that ORR has fixed requiring case managers to

16  communicate at any particular interval with

17  children they are handling?

18          A.     I'm not aware of a specific

19  requirement about frequency of communication.

20          Q.     But you have had clients report to

21  you that they don't know where their reunification

22  process stands?

23          A.     We have heard children report to us

24  directly that they don't know what's happening with

25  their reunification or what's going on with their

Page 144

1

2                        C E R T I F I C A T E

3

4    LUCAS right.          )

5          v.              )

6    ALEX AZAR, et al. )

7

8

9         I, BARBARA DeVICO, a Notary Public within and

10    for the District of Columbia, do hereby certify:

11         That NITHYA NATHAN-PINEAU, ESQ., the witness

12    whose deposition is hereinbefore set forth, was

13    duly sworn by me and that such deposition is a

14    true record of the testimony by such witness.

15         I further certify that I am not related to

16    any of the parties to this action by blood or

17    marriage; and that I am in no way interested in

18    the outcome of this matter.

19         IN WITNESS WHEREOF, I have hereunto set my

20    hand this 30th of August, 2019.

21

22

23         _____

24         BARBARA DeVICO

25

# Exhibit 30

Exhibit 30
Page 1034

CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF CALIFORNIA
2                WESTERN DIVISION
3          CASE NO. 2:18-CV-057441-DMG-PLA
4    LUCAS R., et al.,
5         Plaintiffs,
6    vs.
7    ALEX AZAR, Secretary of U.S. Department
     of Health and Human Services, et al.,
8
          Defendants.
9    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _/
10
11                     6355 NW 36th Street
                       Suite 2201
12                     Miami, Florida
                       Thursday, August 22, 2019
13                     9:35 a.m. to 2:48 p.m.
14
15
16
17                 CONFIDENTIAL
18          DEPOSITION OF MICHELLE ORTIZ
19
20
21     Taken on behalf of the Plaintiffs before Carol
22   Hill Weng, FPR, RMR, CRR, CMRS, CPE, CRI, a Notary
23   Public in and for the State of Florida at Large,
24   pursuant to Plaintiffs' Notice of Taking Deposition in
25   the above cause.

Exhibit 30
Page 1035

CONFIDENTIAL

Page 28

1      Q.    Now, are you familiar with a process

2    that's known as family reunification?

3      A.    Yes.

4      Q.    What does that process entail?

5      A.    My understanding of it is that it

6    entails the child identifying a sponsor and then

7    the case manager vetting a sponsor and then

8    recommending a sponsor for family reunification

9    to the case coordinators and to ORR, who

10   ultimately make the decision.

11     Q.    Now, the case managers, what's your

12   understanding of who employs them?  Is that CHS

13   or is that ORR?

14     A.    At Homestead I believe it's CHS.

15     Q.    And do you know who employs the case

16   coordinators?

17     A.    I think that's a third party, GDIT, I

18   believe.

19     Q.    Is that an acronym for General

20   Dynamics Information Technology?

21     A.    I think so.  I'm not sure.  I don't

22   remember the exact name.

23     Q.    Now, in your experience, what was the

24   ability of AIJ lawyers to speak with case

25   managers regarding the release of children at

Exhibit 30
Page 1036

CONFIDENTIAL

Page 29

1    Homestead?

2         A.    Absolutely none.

3         Q.    Were you ever given an explanation as

4    to why that was prohibited?

5         A.    We were given various.

6         Q.    For example?

7         A.    For example -- well, sometimes we were

8    given none.  We were at some point told by

9    Leslie Wood that our communications had to go

10   directly through her, that we could not

11   communicate with anyone except her.

12            At another point we were told that

13   there were just simply too many children and

14   they could not -- they could not facilitate

15   direct communication between legal and case

16   managers.  I think the -- it was mostly around

17   not having capacity to facilitate those

18   communications.

19        Q.    But AIJ lawyers were present at the

20   Homestead site, correct?

21        A.    Yes.

22        Q.    And at Homestead were case managers

23   always present at the site or were some --

24        A.    No.  Some were remote.

25        Q.    Were the majority present at the site?

CONFIDENTIAL

Page 30

1      A.    I think it fluctuated over time, and

2  I'm not entirely sure since we were not

3  permitted to communicate with them.

4      Q.    But on some occasions AIJ lawyers were

5  present on-site contemporaneously with case

6  managers, correct?

7      A.    I'm sure of that, yes.

8      Q.    So in terms of communicating with

9  them, was there anything that would have

10  prevented the AIJ lawyer from simply walking

11  over to where the case manager was stationed and

12  speaking about a client?

13      A.    We didn't know who they were.

14      Q.    So the policy at Homestead was to not

15  share with AIJ lawyers the name of the case --

16  of a client's case manager?

17          MR. MOSS:  Objection, misstates former

18      testimony and foundation.

19      A.    We did not receive the information

20  from CHS that way that we receive it at the

21  permanent shelter.  If we received it, it was

22  from the child.

23      Q.    Now, in interviewing children, was it

24  the practice of AIJ lawyers to inquire as to

25  family members in the United States or abroad?

Exhibit 30
Page 1038

CONFIDENTIAL

Page 31

1      A.    Yes.

2      Q.    And was it also the practice to ask

3   them for telephone numbers and names so that the

4   AIJ lawyers could communicate with their family

5   members?

6      A.    Yes.

7      Q.    To your recollection, did AIJ lawyers

8   learn about potential sponsors for children in

9   the United States through that process?

10     A.    Yes.

11     Q.    Did Homestead permit AIJ lawyers to

12  provide information about potential sponsors in

13  the United States to case managers?

14     A.    I'm not sure if "permit" is

15  appropriate, simply because there was not a

16  channel of communication to facilitate that.

17     Q.    Okay.  So in effect, when AIJ lawyers

18  obtain that information, there wasn't -- they

19  weren't able to provide that to the case

20  managers as a practical matter?

21     A.    Correct.

22     Q.    Were you ever given any explanation as

23  to why case managers -- you couldn't get that

24  information through the case managers?

25     A.    Again, it was addressed multiple times

Exhibit 30
Page 1039

CONFIDENTIAL

Page 32

1   when we requested to be able to have

2   communication with case managers, both to

3   receive information and to provide information.

4   We were told the same things as before, either

5   everything has to go through Leslie Wood or

6   there's too many children to have those types of

7   communications.

8       Q.    What's your recollection as to the

9   ratio of children to case managers at Homestead?

10      A.    I'm not sure of that.

11      Q.    Now, did AIJ lawyers, to your

12  knowledge, were they ever told the names or the

13  name of the case coordinators who were in charge

14  of clients' reunification?

15      A.    By CHS?  No.

16      Q.    By ORR?

17      A.    No.

18      Q.    So to your recollection, did any AIJ

19  lawyer ever communicate directly with a case

20  coordinator?

21      A.    With a case coordinator?  Not to my

22  knowledge.

23      Q.    What's your understanding as to what a

24  case coordinator does?

25      A.    My understanding is that a case

CONFIDENTIAL

Page 37

1   would make a recommendation as to release or not

2   release?

3        A.    That's my understanding.

4        Q.    And is it your understanding that that

5   recommendation was based on evidence that the

6   case managers were gathering regarding the

7   proposed sponsor, the child's needs, information

8   received from clinicians?

9        A.    That's my understanding as to how it's

10  supposed to work.

11       Q.    And in your -- in AIJ's experience,

12  how did it work?

13       A.    It was very inconsistent.  Part of the

14  challenge here is that we couldn't just speak to

15  them direct, so we relied on the children and

16  sometimes the sponsors to tell us what was going

17  on with the status of the reunification.

18             But there were a number of children

19  who we could not figure out why the child had

20  not yet been released when, based on the

21  information that we were able to obtain from the

22  sponsor and the child there should have been no

23  delay in release.

24       Q.    Well, were AIJ lawyers ever provided a

25  copy of the case manager's recommendation either

Exhibit 30
Page 1041

CONFIDENTIAL

Page 38

1   for or against release?

2       A.    No.  Not my knowledge.

3       Q.    And when those recommendations would

4   go to the case coordinators, was AIJ ever

5   provided a copy of the recommendation of the

6   case coordinator with respect to release?

7       A.    No.  Not to my knowledge.

8       Q.    And so then after the case

9   coordinator, the matter would go to the federal

10  field specialist.

11          And did AIJ ever obtain a copy of the

12  federal field specialist recommendation or

13  decision in favor of or against release?

14      A.    Not to my knowledge.

15      Q.    So, then, how did the children's

16  lawyers learn that their release had been either

17  approved or denied?

18      A.    So multiple ways.  Oftentimes through

19  the child.  Sometimes through the sponsor.

20  Sometimes we would do -- we would have to do

21  individual inquiries to CHS asking for

22  reunification status updates.  And sometimes

23  they would respond and sometimes they would tell

24  us that the sponsor was denied or there was no

25  sponsor or that they had recommended for

CONFIDENTIAL

Page 39

1    approval.

2        Q.    So no written explanation of the

3    reasons for the decision, that you can recall,

4    AIJ ever receiving?

5        A.    Beyond short responses to e-mails, no.

6        Q.    So were AIJ lawyers ever permitted --

7    were AIJ lawyers ever privy to the evidence that

8    case managers had gathered regarding proposed

9    sponsors' fitness?

10       A.    No.

11       Q.    Were AIJ lawyers ever privy to

12   information that the case coordinators relied on

13   to recommend for release?

14       A.    No.

15       Q.    Were AIJ lawyers ever privy to

16   information the federal field specialist relied

17   on in deciding whether to release or not?

18       A.    No.

19       Q.    What's your understanding as to the

20   role of clinicians in the release decision?

21       A.    I'm not sure what their role is in

22   release decisions.

23       Q.    So was it -- is it your recollection

24   that AIJ lawyers were told that their clients

25   had undergone psychological evaluations?

1     A.    Staff, on occasion, observed -- I

2    remember one particular instance where they

3    observed a child that appeared drugged, to them,

4    and asked the child if he was taking medication.

5    He confirmed that he was.

6          Then we had children who were

7    thereafter transferred to the permanent

8    facilities in our service area where we were

9    able to have more communication with case

10   managers and such and were informed that a child

11   had been put on medication while at Homestead.

12    Q.    Okay.  Now, are you aware of any

13   process by which an AIJ lawyer could obtain

14   ORR's file on a child at Homestead?

15    A.    Yes.  Do an ORR records request.

16    Q.    Does that entail filling out a form?

17    A.    Yes.

18    Q.    And in AIJ's experience how long did

19   it typically take ORR to provide a copy of the

20   file?

21    A.    A number of months.  I'd have to check

22   with our staff as to how long they've taken most

23   recently, could be many months.

24    Q.    Now, have you had occasion to review

25   the files that ORR has produced in response to a

CONFIDENTIAL

Page 51

1  a case manager is saying that a sponsor has been

2  denied because of X, Y and Z reason but we could

3  not communicate with that case manager to ensure

4  the child is accurately understanding what was

5  said or getting the information directly from a

6  case manager.

7      Q.   Okay.  So as a consequence of that,

8  those sorts of difficulties, were AIJ lawyers

9  required to spend time on nonproductive tasks or

10  tasks that did not contribute to the zealous

11  representation of children?

12          MR. MOSS:  Objection, vague.

13      A.   I think it's in the sense that it

14  limited our ability to most efficiently

15  distribute our resources.  So where would --

16  something that could have been resolved in a

17  5-minute e-mail or 5-minute call to a case

18  manager, often required requesting that child,

19  waiting for that child to come, have the child

20  personally meet with us, try to get as much

21  information from that child, then try to get the

22  sponsor information.

23          Then piece together the puzzle through

24  the child and the sponsor, if possible, rather

25  than a quick exchange of information as we do

Exhibit 30
Page 1045

CONFIDENTIAL

Page 52

1    with the other shelters.

2        Q.    So AIJ was -- did not have the

3    resources -- or did AIJ have the resources to

4    represent every child at Homestead?

5        A.    No.  But not every child, as I

6    mentioned before, required representation while

7    at Homestead, due to the posture of their case.

8        Q.    But you couldn't determine that a lot

9    of times because of the lack of information,

10   correct?

11       A.    For those whose category for

12   sponsorship was unclear.

13       Q.    And so is it fair to say, then, that

14   the lack of information that AIJ lawyers --

15   provided to AIJ lawyers resulted in a reduced

16   ability to represent other children at the

17   facility?

18       A.    I would say that it reduced our

19   ability to advocate for children who needed

20   representation in the sense that we did not have

21   the information that we needed to be equipped to

22   properly advocate for their release or for

23   transfer.

24       Q.    With respect to the physical spaces

25   that AIJ was allowed at Homestead, I believe you

CONFIDENTIAL

Page 59

1      Q.    Did Homestead ever make similar

2   accommodation?

3      A.    I'm not sure that we made the requests

4   at Homestead.

5      Q.    Now, do your lawyers have occasion to

6   speak with case managers for children at either

7   Boys Town or His House?

8      A.    Yes.

9      Q.    And do the facilities permit direct

10  communication between AIJ lawyers and case

11  managers?

12     A.    Yes.

13     Q.    Do those facilities permit AIJ lawyers

14  to have the name and telephone number, contact

15  information for children's proposed sponsors?

16     A.    Yes.

17     Q.    What's the process for requesting that

18  information?

19     A.    Our staff have very close

20  relationships with the case managers.  They also

21  have regular meetings to discuss special cases.

22  And they -- our staff are in constant

23  communication, I think, with the case managers

24  of the permanent facilities.

25     Q.    So is it your impression that the

Exhibit 30
Page 1047

CONFIDENTIAL

Page 60

1   facilities themselves are the ones that get to

2   decide how much information is going to be

3   shared with AIJ lawyers?

4        A.    That's my understanding.

5        Q.    Do you have any information about

6   whether the communication between case managers

7   and/or the facility and AIJ lawyers at Boys Town

8   and His House is due to state licensing

9   requirements?

10       A.    I'm not sure about that.

11       Q.    Now, when a case manager has gathered

12  evidence regarding the proposed sponsors for a

13  child obtained at His House or Boys Town, do AIJ

14  lawyers have access to knowing what that

15  evidence is?

16       A.    So I'm not sure whether they have

17  access to, like, the physical evidence, but, for

18  example, if a sponsor is denied because they

19  refuse to take fingerprints, the case manager

20  would tell us that.  Right?

21            So they would share with us typically

22  why a sponsor had been not considered or

23  rejected or what the holdup is.  Right?  So the

24  sponsor has submitted everything but has not yet

25  gotten their fingerprints done or whatever it is

CONFIDENTIAL

Page 71

1    communicating it to us?

2        Q.    Yes.

3        A.    I think it was every time they planned

4    large transfers.

5        Q.    So when did these -- when you say

6    "large transfers," how many children are you

7    referring to?

8        A.    It varies.  So I'm not sure -- I can't

9    remember the exact number of children who were

10   ultimately transferred.  Right?  But I would be

11   told something like, we're going to be moving

12   some kids out.  Do you have any children that

13   you would prefer we not transfer out?  We will

14   try to accommodate that request.  It usually

15   went along those lines.

16           I'm not sure that I checked the census

17   every time to see how many kids were ultimately

18   transferred.  Right?

19       Q.    But did Homestead -- did CHS also

20   transfer or did ORR also transfer children out

21   individually from Homestead to other facilities?

22       A.    I believe so.

23       Q.    So were you given advance notice of

24   those sorts of transfers, individual transfers?

25       A.    Not if we did not have a G-28 on file

CONFIDENTIAL

Page 72

1  as their representative and not -- for the

2  majority of the time Homestead was open we were

3  not notified, even if we did have a G-28 on

4  file.

5      Q.   So what was AIJ's practice with

6  respect to filing G-28s for children at

7  Homestead?  When would you file them and when

8  would you not?

9      A.   When we were initiating

10  representation.

11      Q.   When you say "representation," does

12  that refer to representing them with respect to

13  affirmative applications for immigration relief,

14  such as asylum?

15      A.   Or advocating for them for transfer or

16  advocating for other purposes for them.  So I

17  would say in the majority of cases it was for

18  representation, but -- in the traditional sense

19  of immigration proceedings, but not in every

20  case.

21           It was simply so that we could be

22  recognized as the attorney of record before CHS

23  to be able to advocate for that child and

24  represent them in terms of advocating for them

25  before CHS.

CONFIDENTIAL

Page 77

1   other part of that is ensuring that children

2   have access to counsel.  I've heard -- I've been

3   at meetings where the FFS has stated such,

4   right, that the kids have to have access to

5   counsel and be able to talk to the children when

6   they need to.

7       Q.   Okay.  Now, what, in your

8   experience -- how often, in your experience, do

9   lawyers, other than AIJ lawyers, represent

10  children -- did they represent children at

11  Homestead?

12      A.   Other than pro bono attorneys secured

13  by AI Justice?

14      Q.   Yes.

15      A.   I'm not sure.  Not often, I believe.

16      Q.   Can you recall seeing any such

17  attorney at Homestead?

18      A.   No.

19      Q.   So -- and would the answer be the same

20  with respect to children at Boys Town or His

21  House?

22      A.   No.  I recall -- I don't recall ever

23  hearing about a child at Homestead who had an

24  outside attorney, but I do recall on a few

25  occasions hearing that a child at Boys Town or

CONFIDENTIAL

Page 110

1   one sponsor not viable, what recourse does

2   that -- that would be a parent or guardian,

3   correct?

4       A.    Yes.

5       Q.    What recourse does that parent or

6   guardian have to challenge ORR's determination

7   that they're not a qualified custodian?

8       A.    I'm not entirely familiar with that

9   process.

10      Q.    What about a category two custodian,

11  which would be a close relative, correct, a

12  grandparent or an adult brother -- adult

13  sibling?

14      A.    In my experience, virtually none,

15  particularly at Homestead.

16      Q.    And why do you say particularly at

17  Homestead?  Why was that recourse there even --

18      A.    Well, we saw a significant number of

19  category two kids being held for a long time at

20  Homestead.  Children reported that they didn't

21  understand why they hadn't been released to the

22  grandparent or the aunt or uncle.

23          I'll give you an example.  We had one

24  child who the sponsor reached out to me and the

25  child who had been at Homestead for various

CONFIDENTIAL

Page 111

1    months and was supposed to have been released to

2    an aunt who is here in Miami.  And the aunt was

3    told that she was not a viable sponsor because

4    they didn't have the same last name.

5              So that kid was at Homestead for many

6    months and then transferred to one of our

7    permanent facilities.  Once transferred to the

8    permanent facility, the child was released

9    within two weeks, and that is a case that I sent

10   multiple inquiries to the shelter director

11   about.

12       Q.   So did the same FFS make the decision

13   not to release to the aunt and then turn around

14   and, say, reverse that decision or was it

15   different?

16       A.   My understanding, in that particular

17   case, was that it never even got to the FFS.  My

18   understanding was that it was the case manager

19   making that determination that it was not a

20   viable sponsor, so they were not presenting that

21   to the FFS.

22              And this is what we heard a lot from

23   the children, that the case manager would say,

24   oh, no, that sponsor is not going to work.

25   We're not going to pursue that or this sponsor

Exhibit 30
Page 1053

CONFIDENTIAL

Page 112

1    doesn't work.

2            So in that particular case my belief

3    is that it was the case manager who was making

4    that determination.  And in various other cases,

5    based on what the children reported to us, it

6    was -- those cases never got to ORR.  They were

7    case manager determinations.

8        Q.    So is it your understanding that that

9    was consistent with ORR policy?  In other words,

10   to seed to case managers the authority to

11   declare a sponsor nonviable and then thereafter

12   to simply stop the process of evaluating that

13   proposed sponsor?

14       A.    My understanding is that the case

15   managers are charged with doing all the initial

16   legwork on preparing the reunification packet or

17   whatever.  So my understanding is that, as part

18   of that process, the case managers are charged

19   with identifying viable sponsors, which would, I

20   think, then also include determining that

21   someone is not a viable sponsor.

22       Q.    Okay.  And so case managers, in

23   essence, exercise discretion to say a particular

24   proposed sponsor is not viable, therefore, the

25   process stops there.

Exhibit 30
Page 1054

CONFIDENTIAL

Page 113

1    A.    That's my understanding, particularly

2    at Homestead.

3    Q.    And that has been, in fact, what has

4    happened with respect to AIJ clients at

5    Homestead?

6    A.    Yes.

7    Q.    Now, has that been the case with

8    respect to AIJ clients housed at either of the

9    permanent shelters?

10   A.    Yes, but it's quite different because

11   we're able to have conversations with the case

12   managers to understand the reasoning behind it,

13   and we've never been given a reason such as they

14   have a different last name.

15        Typically what we're told is, the

16   fingerprints came back with a red flag.  Right?

17   So under the TVPA, they have to do a home study.

18   They have to do further vetting.  But we have a

19   level of communication with them that we're able

20   to understand the process and why a particular

21   sponsor might not be viable and then try to talk

22   to the child to see if there may be other

23   potential sponsors.

24   Q.    Now, in this case where the Homestead

25   case manager are rejected the proposed sponsor

Exhibit 30
Page 1055

CONFIDENTIAL

Page 114

```
 1   because she did not share the same last name

 2   with your client, what recourse was there to

 3   challenge that in terms of procedure that --

 4   what recourse was available to the child or the

 5   sponsor?

 6        A.    I mean, I just sent multiple e-mail

 7   inquiries asking them to explain to me why this

 8   was happening and why the aunt and the aunt's

 9   attorney were reporting that the case manager

10   stated this.  The case manager stated it to the

11   aunt's attorney.

12             And I did not get a response.  And I

13   sent multiple inquiries about this particular

14   case because there was no reason why someone who

15   had taken their fingerprints, had clear

16   fingerprints and gone through the whole process

17   would have that as a sponsor, then that child

18   remain at Homestead for at least three months, I

19   believe.

20        Q.    So then after three months the child

21   was transferred to one of the permanent

22   shelters --

23        A.    Uh-huh.

24        Q.    -- and was assigned a different case

25   manager?
```

Exhibit 30
Page 1056

CONFIDENTIAL

Page 115

1      A.     Uh-huh, yes.

2      Q.     And that case manager approved release

3  to the aunt with a different last name?

4      A.     Right.

5      Q.     And how long did it take once the

6  child was transferred to a permanent shelter for

7  that to happen?

8      A.     Within two weeks.

9      Q.     So in total how long was the child

10  detained?

11      A.     I believe -- if I'm recalling

12  correctly, I believe the child got to Homestead

13  in either March or April and was released in

14  July, end of July.

15      Q.     Was there any change in the aunt's

16  circumstances that would have -- account for a

17  different decision?

18      A.     No.

19      Q.     Were you able to speak with the case

20  manager who had decided against releasing the

21  child to the aunt at any point?

22      A.     No.  We were not permitted to speak to

23  any case managers.

24      Q.     And the e-mails you sent objecting to

25  the decision to continue the child in detention,

Exhibit 30
Page 1057

CONFIDENTIAL

Page 122

1    clinicians and our staff.  But I don't recall

2    whether that was the whole time that we were

3    providing services at Homestead or not.

4        Q.    But today here you cannot recall any

5    instance where an AIJ lawyer had a conversation

6    with a clinician?

7        A.    No.

8        Q.    What's your understanding of the term

9    "home study"?

10       A.    What's my understanding of that term?

11       Q.    Yes.

12       A.    That ORR or GDIT, I'm not sure --

13   can't remember who would do it, but a visit is

14   made to the home to assess the quality and

15   safety of the home, to make sure that it's

16   adequate for the child, and that this would be

17   done if the child has a special need or if

18   there's another red flag.

19       Q.    But it's not done in all cases, home

20   studies?

21       A.    No.

22       Q.    And so has AIJ had occasion to be

23   representing children whose sponsors have been

24   subjected to home studies?

25       A.    Yes.

Page 140

1      A.      Leslie Wood, multiple times.

2      Q.      So if I understand right, AIJ lawyers

3   had her e-mail address -- had Ms. Wood's e-mail

4   address and sent her e-mails, right?

5      A.      We were told that we were not to

6   communicate with anyone, that everything had to

7   go through her, that she was the only person who

8   had reliable, accurate information.  And then we

9   were told that we sent too many e-mails.

10     Q.      So first she told you to e-mail her,

11  and then you did e-mail her, and then she said

12  you're e-mailing too much; is that correct?

13     A.      Absolutely.

14     Q.      In representing minors in ORR custody,

15  have AIJ lawyers had the occasion to e-mail

16  federal field specialists?

17     A.      Yes.

18     Q.      And I think you actually testified

19  about that, happened -- would you say it

20  happened frequently?

21     A.      Yes.

22     Q.      Did you ever hear from FFSs saying you

23  sent too many e-mails?

24     A.      No.

25     Q.      How was your relationship with FFSs?

Exhibit 30
Page 1059

CONFIDENTIAL

Page 156

1  RE:       Lucas R., et al. v. Alex Azar, et al.

   DEPO OF:  Michelle Ortiz

2  TAKEN:    August 22, 2019

3

4                        EXCEPT FOR ANY CORRECTIONS

                         MADE ON THE ERRATA SHEET BY

5                        ME, I CERTIFY THIS IS A TRUE

                         AND ACCURATE TRANSCRIPT.

6                        FURTHER DEPONENT SAITH NOT.

7                        _____

                         Michelle Ortiz

8

9  STATE OF FLORIDA      )

                         )   SS:

10 COUNTY OF MIAMI-DADE  )

11          Sworn and subscribed to before me this

12 _____ day of _____, 2019.

13 PERSONALLY KNOWN _____ or I.D._____

14

15                        _____

                         Notary Public in and for

16                       the State of Florida at

                         Large.

17

18 My commission expires:

19

20

21

22

23

24

25

Exhibit 30
Page 1060

CONFIDENTIAL

Page 158

1          CERTIFICATE OF OATH OF WITNESS

2

3   STATE OF FLORIDA          )

                              ) SS.

4   COUNTY OF MIAMI-DADE      )

5

6       I, Carol Hill Weng, FPR, RMR, CRR, CMRS, CRI, CPE,

7   Notary Public in and for the State of Florida at Large,

8   certify that the witness, Michelle Ortiz, personally

9   appeared before me on August 22, 2019, and was duly

10  sworn by me.

11      WITNESS my hand and official seal this August 31,

12  2019.

13

14

15          Carol Hill Weng, FPR, RMR, CRR, CMRS,

16          CRI, CPE

            Notary Public, State of Florida at Large

17

18  Notary No.: FF 958116

19  My Commission Expires:  March 4, 2020

20

21

22

23

24

25

Exhibit 30
Page 1061

CONFIDENTIAL

Page 159

1          REPORTER'S DEPOSITION CERTIFICATE

2

3      I, Carol Hill Weng, FPR, RMR, CRR, CMRS, CPE, CRI,

4   certify that I was authorized to and did

5   stenographically report the deposition of Michelle

6   Ortiz, the witness herein on August 22, 2019; that a

7   review of the transcript was requested; that the

8   foregoing pages are a true and complete record of my

9   stenographic notes of the deposition of said witness;

10   and that this computer-assisted transcript was prepared

11   under my supervision.

12      I further certify that I am not a relative,

13   employee, attorney or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorney or counsel connected with the action.

16      DATED this August 31, 2019.

17

18

                    _Carol Hill Weng_

19                  Carol Hill Weng, FPR, RMR, CRR

                    CMRS, CPE, CRI

20

21

22

23

24

25

Exhibit 30
Page 1062

# Exhibit 31

Exhibit 31
Page 1063

CONFIDENTIAL

Page 1

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE CENTRAL DISTRICT OF CALIFORNIA
2                WESTERN DIVISION

3

4    LUCAS R., et al.,

5

                Plaintiffs,

6

                                Case No.

7    vs.                        2:18-CV-05741

                                DMG PLA

8

     ALEX AZAR, Secretary of US
9    Department of Health and
     Human Services, et al.,

10

11              Defendants.

12

13

14          C O N F I D E N T I A L

15       DEPOSITION OF JUDETTE PADILLA

16

17     TAKEN ON BEHALF OF THE PLAINTIFFS

18

19              March 3, 2020

20

21

22

23

24

25   JOB NO. 177836

CONFIDENTIAL

Page 84

1        Q.   Who has the authority to make a final

2   decision to step-up a child from The Villages?

3        A.   The Villages doesn't have any final

4   authority.  We make a recommendation.

5        Q.   And you said it was the case manager

6   who makes the recommendation?

7        A.   Correct.

8        Q.   And who does the case manager make the

9   recommendation to?

10       A.   The case coordinator.

11       Q.   From GDIT?

12       A.   Yes.

13       Q.   And do you know what happens at that

14   point?

15       A.   She makes a recommendation and then it

16   goes to the federal field specialist to make a

17   decision.

18       Q.   And so does the federal field

19   specialist have the final decision --

20       A.   Right.

21       Q.   -- regarding the step-up?

22            I'm sorry.

23       A.   Yes.

24       Q.   Have you ever disagreed with the

25   decision to step-up a child from The Villages?

**Exhibit 31**
**Page 1065**

CONFIDENTIAL

Page 89

1    a step-up --

2            A.    Yes.

3            Q.    -- during these conversations?

4                  And how are they informed; is it --

5            A.    Verbal, verbally.

6            Q.    Are they given a certain amount of

7    warnings before a step-up occurs?

8            A.    No.

9            Q.    Is that at the discretion of the case

10   manager?

11           A.    Yes.

12           Q.    Would a parent, relative or potential

13   sponsor have any role in deciding whether a child

14   will be stepped up?

15           A.    No.

16           Q.    And why not?

17           A.    It's a safety issue for The Villages.

18           Q.    Are they informed about the step-up?

19           A.    Yes.

20           Q.    Are they informed prior to the step-up

21   occurring?

22           A.    No.

23           Q.    So they're informed after the step-up?

24           A.    Yes.

25           Q.    How long after are they typically --

**Exhibit 31**
**Page 1066**

Page 90

1        A.    Immediately.

2        Q.    So is that within the same day or --

3        A.    The same day.

4        Q.    Would a child's attorney be involved in

5    the step-up decision?

6        A.    Yes, if they have one.

7        Q.    How so?

8        A.    If they had one.

9        Q.    And how would that look?  Are they

10   involved in multiple conversations or are they just

11   informed and given a chance to opine; how does that

12   play --

13       A.    My answer would be hypothetical.

14   They've never had an attorney.

15       Q.    Okay.  Is there a policy requiring

16   notification of an attorney if a child has one?

17       A.    Yes.

18       Q.    And what is the policy on that?

19       A.    I would have to read the policy.

20       Q.    Do you know if that notification has to

21   happen in advance of the step-up --

22       A.    Yes.

23       Q.    -- during the step-up?

24             And is that an ORR policy?

25       A.    Yes.

**Exhibit 31**
**Page 1067**

CONFIDENTIAL

Page 257

1                          CERTIFICATE

2       STATE OF KANSAS          )

                                 ) ss.

3       CITY OF TOPEKA           )

4

5                  I, Sarah A. Davison, a Certified Court

6       Reporter, within and for the State of Kansas, do

7       hereby certify that the witness whose testimony

8       appears in the foregoing deposition was duly sworn

9       by me; that the testimony of said witness was taken

10      by me to the best of my ability and thereafter

11      reduced to typewriting under my direction; that I am

12      neither counsel for, related to, nor employed by any

13      of the parties to the action in which this

14      deposition was taken, and further that I am not a

15      relative or employee of any attorney or counsel

16      employed by the parties thereto, nor financially or

17      otherwise interested in the outcome of the action.

18      DATED: 3-13-2020

19                       _____

20                       Sarah A. Davison

                         CCR #1397-MO  #1589-KS

21

22

23

24

25

**Exhibit 31**
**Page 1068**

# Exhibit 32

Exhibit 32
Page 1069

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

CASE NO. 2:18-CV-05741-DMG-PLA

LUCAS R., et al.,                    )
                                     )
             Plaintiffs,             )
                                     )
vs.                                  )
                                     )
ALEX AZAR, et al.,                   )
                                     )
             Defendants.             )
_____)
CONFIDENTIAL

DEPOSITION OF
MAE C. QUINN

Taken on Behalf of the Defendants

DATE TAKEN:   July 27, 2020
TIME:         9:30 AM - 5:15 PM
PLACE:        VIA ZOOM

MAGNA LEGAL SERVICES
(866) 624-6221
www.magnaLS.com



**Exhibit 32**
**Page 1070**

Page 17

1       Q.      And what were those opinions?

2       A.      Well, I was asked to review the ORR step-up

3    policies and practices, and to evaluate them from my

4    perspective as someone who knows about proceedings in

5    the domestic juvenile justice system.  So to offer an

6    opinion relating to those practices and policies

7    relating to step-up and how they compare to what I

8    would expect to see in juvenile justice proceedings.

9            My opinions along those lines are that the

10   policies and practices that I reviewed and evaluated

11   were rather confusing, conflicting in parts, and did

12   not seem to present a clear and coherent set of

13   procedures that one might follow or expect to see in

14   the juvenile justice setting.  They also fell short in

15   terms of the protections that are provided, and the

16   procedures do not align with what I would expect to see

17   in the juvenile justice setting and U.S. general

18   courts.

19           I was further asked then to offer

20   recommendations that might align those practices,

21   policies with what I would expect to see in light of my

22   experience.

23      Q.      Okay.  Did you form any other opinions in

24   this case?

25      A.      There may be additional opinions I offer



Page 34

1   in detail a little later, so thank you for that.  Okay.

2           So you identified another opinion, expert

3   opinion you formed in this case which is that there are

4   greater levels of security in the facilities that UACs

5   are stepped up to, and that ORR treats secure, staff

6   secure and RTC facilities as interchangeable at times.

7       A.   And if I may just clarify that now having

8   heard back the way you've summarized what I've said, I

9   want to be clear.  You know, I'm focusing on the

10  step-up facilities.  They are, in my mind, akin to

11  secure settings by and large, the ones I've seen, you

12  know, secure settings.  I can't offer too many thoughts

13  on shelters, let's say, or group homes let's say

14  because they don't -- I didn't have a lot of materials

15  relating to those except to the extent that the

16  policies, practices, depositions say ah, this is more

17  secure.

18      Q.   Okay.  And when you say akin to secure

19  settings, what do you mean by "secure settings"?

20      A.   So the shorthand is the kids can't walk out

21  the door is like a shorthand.  But there's also can

22  they leave the property, is there high fencing, are

23  there constructions and mechanisms in place to retain

24  kids within that space.  You know, that's -- that's

25  what makes something secure, at least, you know, under



Exhibit 32
Page 1072

Page 35

1    the JJDPA and it's commonly understood among

2    stakeholders.

3        Q.    Okay.  So that was to be my follow-up

4    question which is that this understanding of what a

5    secure setting is that you applied, where does that

6    understanding come from?

7        A.    Mostly from the JJDPA and then, you know,

8    trainings and manuals and documents I've seen over time

9    sort of articulating the considerations provided for

10   there.  Some state statutes have embraced that language

11   although not all.

12       Q.    And when you say the JJDPA, I believe there's

13   a definition that you cite in your report.  Are you

14   referring -- so when you reference the JJDPA as a basis

15   for your understanding of what a secure setting is

16   here, is that based on the definition of secure setting

17   that's in the JJDPA?

18       A.    Yes.

19       Q.    Okay.

20       A.    I'll say there are somewhat do you call them,

21   you know, guidances or clarifying comments that I've

22   seen over time.  I don't cite to them here.  You know,

23   I've read them, they are in the storehouse, you know,

24   that -- you know, that offer -- that I've seen over

25   time to offer some further nuance.



**Exhibit 32**

**Page 1073**

Page 91

1    exposed to a secure detention setting for a prolonged

2    period there needs to be a hearing provided in an

3    automatic way, that is the youth shouldn't have the

4    purpose of taking it and in erase the issue of

5    language, particularly a youth whose language is not

6    English and maybe get documents that aren't in English,

7    you know, a hearing before the placement with notice of

8    the allegations warranting that move with access to the

9    information upon which the government is relying upon

10   to make that request, with appointment of counsel prior

11   to that prolonged placement, with a neutral factfinder,

12   with an outcome that is in writing and clear, those are

13   amongst the differences I think that I identified as

14   compared to what you've mentioned.

15       Q.    Okay.   In the state juvenile justice systems,

16   is a standard practice to have the hearing before a

17   child is moved into a more restrictive setting?

18       A.    Yeah.   So the -- the hearing generally

19   happens within two to three days.   So this is that

20   question of, you know, is it 48 hours, is it 72 hours.

21   But yeah, you know, the cases come to the court in two

22   different ways.   You know, there's prior to the move

23   notice, summons, come to court, and now we're going to

24   have a detention hearing, proceed with charges against

25   you, decide if we're going to place you in detention



**Exhibit 32**
**Page 1074**

Page 169

1   requirement reference."

2        A.    Mm-hmm.

3        Q.    Did I read that correctly?

4        A.    You did.  But I will note this is another

5   area I have tabbed because apparently there's a missing

6   quote, and I don't know what I did there.  Hopefully I

7   didn't cut something that was supposed to be there, But

8   it appears as if there is not a full quote situation.

9        Q.    Okay.  Where is the closed quote supposed to

10  go?

11       A.    I don't know.  I don't know.

12       Q.    Okay.

13       A.    Maybe if I had 1.2.4 and 1.4.6 here with me I

14  could answer that better, but I do not.

15       Q.    Okay.  Well, that was not the question I was

16  going to ask.  I actually proofread your report,

17  Professor Quinn, and I'm here to ask you about all the

18  typos.

19       A.    Listen, I have typo problems but I --

20       Q.    So my actual question about this paragraph is

21  do you know if in practice ORR provides notice to youth

22  of the reasons for placement in an RTC facility?

23       A.    Let me say this.  There seem to be

24  inconsistency between the written policy and then this

25  practice manual or whatever -- the manual.  That's as



**Exhibit 32**
**Page 1075**

Page 170

1    written.  As applied, seems to be some inconsistency

2    based on those depositions I read.  Yeah, I mean I

3    didn't get into all of that here, but I'm happy to tell

4    you that, you know, it seems pretty loosey-goosey.

5    Does that answer your question?

6        Q.    Well, so I guess, you know, as applied for in

7    practice do you know if ORR provides notice to youth of

8    the reasons for placement in RTCs?

9        A.    I know that it seems pretty inconsistent,

10   both as applied and in practice.  So, for instance,

11   what I read in one deposition, you know, there was --

12   there are inconsistencies about when notice would

13   happen.  Is it before, is the after, is it way after?

14   There are facilities I guess that are out of compliance

15   with doing the notice and -- which is the -- well,

16   whatever.  I'm jumping ahead.  But -- I've answered the

17   question.

18       Q.    Okay.  And so your understanding regarding

19   whether ORR in practice provides notice is based on

20   those depositions that you read?

21       A.    True.  I have not had the pleasure to speak

22   with all of awful your staff and discuss it in depth.

23   I have read four, I think four, depositions.

24       Q.    Okay.  And is that understanding of yours, is

25   it based upon anything in addition to those



Exhibit 32
Page 1076

Page 243

1                    CERTIFICATE OF REPORTER

2

3  STATE OF FLORIDA              )

4  COUNTY OF BROWARD             )

5

6           I, Michele Anzivino, Court Reporter, do
   hereby certify that I was authorized to and did
7  stenographically report the deposition of MAE C. QUINN,
   that a review of the transcript was not requested; and
8  that the foregoing transcript, pages 1 through
   {End page}, is a true and correct record of my
9  stenographic notes.

10

            I FURTHER CERTIFY that I am not a relative,
11 employee, or attorney, or counsel of any of the
   parties, nor am I a relative or employee of any of the
12 parties' attorney or counsel connected with the action,
   nor am I financially interested in the action.

13

14          DATED this 27th day of July, 2020.

15

16

17

18

19

20         _____

           MICHELE ANZIVINO, Court Reporter
21         Notary Public - State of Florida
           My Commission Expires: 02/23/2023
22         My Commission No.: GG-304081

23

24

25



Exhibit 32
Page 1077

# Exhibit 33

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Exhibit 33
Page 1078

CONFIDENTIAL

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                   WESTERN DIVISION

 4

 5     _____

                                      )

 6     LUCAS R., et al.,              )

                                      )

 7          Plaintiffs,               )

                                      )   Case No.

 8     vs.                            )

                                      )   2:18-cv-05741

 9     ALEX AZAR, Secretary of U.S. ) DMG-PLA

       Department of Health and       )

10     Human Services, et al.,        )

                                      )

11          Defendants.               )

       _____)

12

13

14                   CONFIDENTIAL

15

16             DEPOSITION OF FAITH RAY

17                 Washington, DC

18               October 23, 2019

19

20

21

22

23

24     Reported by:  John L. Harmonson, RPR

25     Job No. 170109
```

**Exhibit 33**
**Page 1079**

CONFIDENTIAL

Page 76

1    prepare that request.

2         Q.    Okay.

3         A.    Or that recommendation.

4         Q.    And a facility, some human in that

5    facility is doing this, right?

6         A.    That's correct.

7         Q.    Who?

8         A.    There is a group of people involved in

9    decisions related to step-ups.  So the case

10   manager, the clinician.  I'm talking about ORR

11   grantees.  The case manager, the clinician, a

12   case coordinator, the federal field specialist,

13   and perhaps a federal field specialist supervisor

14   would come together in what's called when they

15   staff a case.  So if there is a recommendation

16   for a step-up, it should be based on the group's

17   recommendation and the FFS's decision.

18        Q.    So you said -- I'm talking about the

19   ORR grantees.

20        A.    Uh-huh.

21        Q.    Yes?

22        A.    I'm sorry, what's your question?

23        Q.    Well, I was asking if "uh-huh" meant

24   yes.  You said "uh-huh."

25        A.    Let's go back.  What's your question?

**Exhibit 33**
**Page 1080**

CONFIDENTIAL

Page 82

1    recommendation for the step-up?

2        Q.    Correct.

3        A.    It would be either the case manager or

4    the clinician to make the recommendation.

5        Q.    Okay.  And do you know why?

6        A.    It depended on the case.

7        Q.    Well, wouldn't it be fair to say that

8    of those people, the case manager and the

9    clinician are the two of that five that have

10   direct contact with the kid, right?

11       A.    They do have direct contact with the

12   children.

13       Q.    So it's reasonable to assume that they

14   would have more firsthand knowledge about a lot

15   of the factors that are reasons to step up a kid,

16   correct?

17       A.    That's correct.

18       Q.    Okay.  So when you were doing this

19   compliance, the group -- I understood your

20   characterization of the way this process worked

21   was that this group reviewed it but the FFS made

22   the final decision.  Is that correct?

23       A.    That's correct.

24       Q.    And then did the FFS supervisor have

25   input or have to approve the approval?  Or what

**Exhibit 33**
**Page 1081**

CONFIDENTIAL

Page 83

1    was their role?

2         A.    My understanding is that the FFS

3    supervisor does not need to approve the FFS's

4    approval.  The FFS has that authority to -- the

5    FFS alone has the authority to make placement

6    decisions for children.

7              But my understanding is that if it's a

8    particularly complex case, then the FFS

9    supervisor is there for guidance and

10   consultation, an extra layer of review if needed.

11   That's my understanding.

12        Q.    So is it accurate to say that one of

13   the things you were involved in doing compliance

14   review on was whether the minor was informed of

15   the decision to step them up?

16        A.    No.

17        Q.    You didn't have any involvement in

18   that?

19        A.    No.

20        Q.    Okay.  Was that something that you

21   were made aware of in your review of the step-up

22   documentation when you reviewed the UAC portal?

23        A.    What are you asking specifically?

24        Q.    What was your understanding at the

25   time you did this work of whether the minor child

**Exhibit 33**
**Page 1082**

CONFIDENTIAL

Page 84

1  was supposed to be notified of a decision to step

2  them up?

3      A.    My understanding at the time was that

4  a minor may or may not be notified that they were

5  being stepped up to a restrictive setting.

6      Q.    And there was no requirement to do

7  that?

8      A.    So I'm just speaking to secure

9  facilities because that's what my involvement was

10  in.  But there is no requirement to notify a

11  minor before they're getting stepped up to

12  secure.  No, there's not.

13      Q.    That's your understanding of current

14  policy as well?

15      A.    Yes.

16      Q.    Okay.  So it may or may not have been

17  done at the time?

18      A.    It may or may not have been done.  My

19  understanding is that there are complex factors

20  at play including child welfare decisions.  But

21  again, my understanding is that a kid may or may

22  not have been informed that they were getting

23  stepped up to secure.

24      Q.    Okay.  So to your understanding, did

25  the kid have any right to challenge that

**Exhibit 33**
**Page 1083**

CONFIDENTIAL

Page 85

1    decision?

2         A.    They do, yes.

3         Q.    So how would they know to challenge it

4    if they weren't informed?

5         A.    So that's what the notice of

6    placement -- part of the purpose of the notice of

7    placement form is for.  The intention is to tell

8    the minor the reasons why they were placed in a

9    secure facility and to also tell them how to

10   essentially challenge their placement or request

11   reconsideration of their placement.

12        Q.    So just educate me here.  I'm having

13   trouble understanding the difference between the

14   notice of a step-up and notice of placement.  I'm

15   not understanding why that wouldn't be the same

16   thing.

17        A.    I'm not aware that there is notice of

18   a step-up.

19        Q.    Okay.  But if a kid is being stepped

20   up to a different placement, they'll get a notice

21   of placement, right?

22        A.    After they're --

23        Q.    After it's a done deal?

24        A.    After they have already been

25   transferred to the setting.

**Exhibit 33**
**Page 1084**

CONFIDENTIAL

Page 86

1      Q.    Got it.

2      A.    The other setting.

3      Q.    Okay.  And so any appeal or challenge

4 to that would be after the fact?

5      A.    Right.  They can request

6 reconsideration of their placement or challenge

7 their placement after they have already been

8 stepped up.

9      Q.    So the notice of placement, did you

10 say that's within 48 hours?

11      A.    Yes, within 48 hours.

12      Q.    And that's of an initial placement or

13 a step-up or --

14      A.    That's correct.  Regardless of whether

15 it's initial or a step-up, they must receive

16 their notice of placement within 48 hours.

17      Q.    Of arrival at the place, the new

18 facility?

19      A.    That's correct, of arrival.

20      Q.    And what was your understanding of the

21 requirement that the notice of placement be in

22 the native language?

23      A.    My understanding was that the July

24 Flores order required that the notice of

25 placement be in a language that the minor

**Exhibit 33**
**Page 1085**

CONFIDENTIAL

Page 87

1 understands, whereas ORR policies and procedures

2 requires a higher standard that the notice of

3 placement be in the minor's preferred language.

4     Q.   So you're saying that the higher

5 standard that you're describing was already in

6 place when Judge Gee entered this order on

7 July 30, 2018?

8     A.   I don't know.  I was not part of the

9 program at that time.

10     Q.   So you don't know if it was the

11 practice of ORR to provide foreign language

12 notice of placements prior to your work in this

13 area.  Is that right?

14     A.   That's correct.  I can't speak to that

15 before I joined the policy division.

16     Q.   The current language is still

17 preferred language, right?

18     A.   That's correct.

19     Q.   And you don't know when that policy

20 went into effect?

21     A.   I don't know.  But there is a date on

22 the policy guide, the online policy guide.

23     Q.   Do you know the number?

24     A.   The number of?

25     Q.   That policy.

CONFIDENTIAL

Page 88

1        A.      Off the top of my head, no.

2        Q.      Let me do that at lunch.

3        A.      It should be in Section 1.

4        Q.      So if a minor challenges their

5   placement, who reviews the challenge?

6        A.      So if a minor for the secure

7   facilities requests reconsideration, then the ORR

8   director or his or her designee reviews that

9   request.

10       Q.      And do you know who the designee has

11   been when you were working in this?

12       A.      My understanding is that the ORR

13   director would review those cases.

14       Q.      So other than the request for

15   reconsideration, what other way or ways would a

16   minor challenge the placement?

17       A.      So for secure, they can file suit in

18   court.

19       Q.      Did you come across that when you were

20   doing compliance review?

21       A.      Did I come across what?

22       Q.      Kids that had filed something in court

23   to challenge their placement.

24       A.      I don't recall that.

25       Q.      Would that have been information that

CONFIDENTIAL

Page 89

1    would have been input into the UAC portal?

2         A.    I believe so.

3         Q.    And sitting here today, you don't

4    recall having come across that in your review?

5         A.    No, I don't recall.  No.

6         Q.    Did that discussion of that type of a

7    lawsuit come up in the weekly meetings that you

8    had?

9         A.    We discussed the rights of the minors

10   to challenge their placement, yes.

11        Q.    And that was included in some of the

12   training that you and Mr. ███████ did?

13        A.    Yes, that is correct.

14        Q.    Any other context in which that would

15   have been discussed by you and the people in the

16   working group weekly meetings, the federal habeas

17   or lawsuit challenges to placement?

18        A.    We discussed it in the context of the

19   minor's due process rights for their placement in

20   secure facilities.  And we also discussed ways --

21   we discussed whether or not we thought that the

22   minors understood what their rights were.

23        Q.    Okay.  Did you think the minors

24   understood what their rights were?

25        A.    So I can't speak, obviously, for all

**Exhibit 33**
**Page 1088**

CONFIDENTIAL

Page 90

1    of the minors in secure facilities.  I did speak

2    to two of them.  I interviewed two of them when I

3    visited, and no, they did not understand their

4    rights.

5         Q.   Did you speak -- When you did these

6    interviews, did you speak to these two minors in

7    their native language?

8         A.   I did not.  I spoke in English, and

9    there was a Spanish interpreter.

10        Q.   For both of them?

11        A.   Yes, that's correct.

12             MR. WHITE:  Off the record.

13             (Off the record.)

14             MR. WHITE:  Could you mark that next.

15             (Exhibit 113 marked for identification

16        and attached hereto.)

17             MR. SHIEH:  Can we go off the record

18        real quick?

19             MR. WHITE:  Yeah, that's fine.

20             (Off the record.)

21   BY MR. WHITE:

22        Q.   Ms. Ray, what number is that exhibit?

23        A.   Exhibit 113.

24        Q.   So have you had a chance to review

25   Exhibit 113?

CONFIDENTIAL

Page 92

1      Q.    And was she the FFS supervisor for

2   Ms. ████████   and Shenandoah?

3      A.    I believe so.

4      Q.    So on the topic that we were

5   discussing before the break -- So just read the

6   sentence, the first two sentences after the

7   second bullet point that starts "No staff were."

8      A.    So I'm reading:  "No staff were aware

9   of a minor's right to challenge secure placement

10  either through a review by the ORR director or by

11  bringing suit in a federal court.  No one has

12  been communicating this right to minors at

13  Shenandoah."

14     Q.    And that statement was accurate when

15  you made it?

16     A.    That was my understanding, yes, when I

17  wrote that.

18     Q.    So how many staff did you communicate

19  with to reach this understanding?

20     A.    I can't remember.

21     Q.    Was it more than three?

22     A.    Yes.

23     Q.    Was it more than eight?

24     A.    It was maybe around eight staff or

25  less, or fewer.

Exhibit 33
Page 1090

Page 93

1      Q.    But of those more than three, less

2  than eight staff, none of them had an awareness

3  of the kid's right to challenge this?

4      A.    That was my understanding at the time,

5  yes.

6      Q.    Has that understanding changed at all?

7      A.    Yes, it has.

8      Q.    So what's your understanding now?

9      A.    My understanding is that all staff in

10  both secure facilities understand what a minor's

11  rights are.

12      Q.    So that's a different question.  Has

13  anything changed about the information that you

14  had that at the time, January 11th of 2019, no

15  staff at Shenandoah were aware of this?

16          MR. SHIEH:  Objection to form.

17  BY MR. WHITE:

18      Q.    Do you understand the question?

19      A.    No, I don't.

20      Q.    So we're talking about two different

21  time frames.

22      A.    Uh-huh.

23      Q.    Is that a yes?

24      A.    Yes.

25      Q.    You have to answer out loud.

**Exhibit 33**
**Page 1091**

Page 94

1    A.    Yes.

2    Q.    So the time frames are January 11,

3  2019 --

4    A.    Correct.

5    Q.    -- and October 23, 2019.

6    A.    Okay.

7    Q.    I'm not asking about what people know

8  now at Shenandoah.  I'm asking about what they

9  knew on January 11th.  And you wrote in an e-mail

10  at the time that nobody knew about a minor's

11  right to challenge secure placement.

12    A.    That's correct.

13    Q.    And that statement as of

14  January 11th is still correct, is it not?

15    A.    On January 11th when I wrote this,

16  that was correct.

17    Q.    Right.  You haven't found out

18  subsequently that this was wrong and that three

19  other people actually knew about this on January

20  11th of 2019?

21    A.    Oh, I understand your question.  No, I

22  haven't.

23    Q.    Okay.  So it's still accurate as

24  written, that at the time nobody on the staff at

25  Shenandoah that you spoke with were aware of

**Exhibit 33**
**Page 1092**

CONFIDENTIAL

Page 95

1    these rights?

2         A.    Correct, that I spoke with.  The staff

3    were not aware of those rights.

4         Q.    And about how many staff were there at

5    the time you did the site visit?

6         A.    Again, there were around eight.  There

7    were a handful of staff.

8         Q.    Did you speak to all of them?

9         A.    I did not speak to all of them, no.

10        Q.    Who did you not speak to?

11        A.    I don't know who I did not speak to.

12        Q.    I mean, you don't know the job of any

13   of the people that you didn't -- Did you try to

14   interview as many people as you could when you

15   were there?

16        A.    No.  That was not the purpose of the

17   site visit.

18        Q.    What were the positions of the staff

19   that you did speak to?

20        A.    Clinicians and case managers.

21        Q.    And those are the people that would

22   have been in a position -- that are now in a

23   position and they would have been at the time in

24   a position to advise a minor of their rights to

25   challenge this, right?

**Exhibit 33**
**Page 1093**

CONFIDENTIAL

Page 96

1       A.    That's correct.

2       Q.    So is it fair to say that nobody who

3   needed to know knew at the time that a minor had

4   a right to challenge secure placement at

5   Shenandoah?

6       A.    Of the people that I spoke with, they

7   said they did not know.

8       Q.    So this says that you confirmed this

9   "in the interviews that Aaron and I did with the

10  two youth."

11          So did you and Aaron participate in

12  the interviews together?

13      A.    We did.

14      Q.    And did Aaron interview other youth?

15      A.    No.

16      Q.    Did Aaron do other site visits?

17      A.    Aaron visited Yolo.

18      Q.    And did the other policy person do

19  site visits?

20      A.    What other policy person?

21      Q.    The one with the last name no one can

22  pronounce.

23      A.    ██████████████████?

24      Q.    ██████, yes.

25      A.    She did do a site visit.  I cannot

**Exhibit 33**
**Page 1094**

Page 127

1    release services, correct?

2         A.    Yes.

3         Q.    And you don't know when that happened?

4         A.    I don't.

5         Q.    So what is your understanding of the

6    part of that requirement that post release

7    services be required on a particularized needs

8    basis?

9         A.    So if a child is particularly

10   vulnerable or if there is a child welfare

11   concern, then they would do an individualized

12   assessment.  And if the FFS in his or her

13   professional judgment thinks that post release

14   services do need to be in place before the child

15   is released, then they can make that

16   determination but it has to be for a particular

17   child welfare concern.

18        Q.    And who imposes the PRS requirement?

19        A.    What do you mean, imposes the PRS

20   requirement?

21        Q.    When we talked about step-ups, you

22   described what I would refer to as a committee,

23   and you had, like, five different members of that

24   that were involved in the recommendation but the

25   FFS had the ultimate approval.  Correct?

CONFIDENTIAL

1     A.    Yes, FFS has the legal authority.

2     Q.    Okay.  So post release service has to

3  do with when a kid is released from what we

4  call -- I don't know.  What do you call it?  I

5  call it custody or detention.  What do you call

6  it?

7     A.    We call it care and custody.

8     Q.    So when a kid is released, someone is

9  deciding whether there be a post release services

10  requirement as a condition of release, correct?

11     A.    So again, a child is not -- is not

12  denied or delayed release if post release

13  services aren't in place unless there's that

14  caveat that's mentioned in the court order.  ORR

15  is legally mandated to provide post release

16  services for TVPRA cases, but children and their

17  sponsors are not mandated to participate in those

18  support services in the post release services.

19        MR. WHITE:  Could you read my last

20     question?

21        (The record was read back by the

22     reporter as follows:

23        "Question:  So when a kid is released,

24     someone is deciding whether there be a post

25     release services requirement as a condition

Exhibit 33
Page 1096

CONFIDENTIAL

Page 148

1    Q.    That's a different question.  My

2  question is -- it's similar, but did you identify

3  these particular types of compliance problems

4  with secure placement in your review?

5    A.    Yes.  We found the secure facilities

6  or ORR to be noncompliant with criterion 1, for

7  example.

8    Q.    Okay.  And about how many were you

9  personally made aware of during your five months?

10    A.    How many of what, exactly?

11    Q.    Of a kid who was -- Let me ask a

12  different question.

13         Yeah, give me an example of a

14  compliance issue that you would have identified

15  under criterion 1.

16    A.    Well, we found a case of a kid who was

17  charged with a crime; I can't remember the exact

18  crime.  But the charges were later dropped, and

19  that was the basis for the child's placement in

20  secure.  And this happened, obviously, outside of

21  ORR custody.  So that case was found to be

22  noncompliant.

23    Q.    And so is it fair to say that the

24  examples that you used in this PowerPoint came

25  from your experience and that of your colleagues?

**Exhibit 33**
**Page 1097**

CONFIDENTIAL

Page 152

1   the two that are there that were not malicious

2   acts, did either of those come from a real

3   example of a kid who was placed in secure for

4   either slapping someone or bumping someone hard?

5        A.    No, neither of them did.  But again,

6   we had questions from care providers on whether a

7   similar scenario, if a care provider encountered

8   a situation like this, if that met the criteria

9   for stepping up to secure.  So we wanted to be

10  very clear that these examples did not rise to

11  the level of a secure placement.

12       Q.    We're going to move on to another

13  exhibit.

14             (Exhibit 117 marked for identification

15       and attached hereto.)

16             THE WITNESS:  Okay, I'm ready.

17  BY MR. WHITE:

18       Q.    Do you remember this incident?

19       A.    Yes, I do remember it.  I don't

20  remember all the details, but I do remember.

21       Q.    Do you remember what was -- Was the

22  kid stepped down?

23       A.    I don't remember.

24       Q.    And this is an e-mail exchange between

25  you and Elicia Smith, who was the FFS at the time

**Exhibit 33**
**Page 1098**

CONFIDENTIAL

Page 153

1   over the Yolo facility, correct?

2       A.    Yes, that's correct.

3       Q.    Regarding a youth that was detained in

4   Yolo, correct?

5       A.    That's correct.

6       Q.    So it appears that he had been at Yolo

7   for 22 days, from January 24th of 2019, to

8   February 15th of 2019, based on the information

9   that's in the long paragraph in Elicia's e-mail

10  to you that starts "Per intake referral."  Right?

11      A.    Right.

12      Q.    So when you got that e-mail, even

13  though a lot of it is redacted, literally the

14  bottom line in that e-mail was:  "Is there

15  another reason why he should be in secure that

16  you are aware of?"  Correct?

17      A.    Correct.

18      Q.    So is it accurate to state that the

19  reasons that she states in that long paragraph

20  were not adequate or appropriate for placement in

21  secure?

22      A.    Correct.

23      Q.    And you have no recollection as to any

24  follow-up that Elicia did with you?

25      A.    On this case, I don't remember.

**Exhibit 33**
**Page 1099**

CONFIDENTIAL

Page 157

1           (Exhibit 118 marked for identification

2      and attached hereto.)

3   BY MR. WHITE:

4      Q.    Do you remember this child?

5      A.    I don't remember the child.  I

6   remember the e-mail.

7      Q.    Can you tell me what Exhibit 118 is?

8      A.    So it's an e-mail from me to Elicia

9   Smith who was the FFS for Yolo at the time.

10      Q.    And what was your purpose in sending

11   this?

12      A.    I was doing the weekly compliance

13   review for Yolo, and I could not find enough

14   documentation in the portal to understand why he

15   was placed there.  I couldn't tell if he met the

16   criteria for placement in secure.  I reviewed

17   some of the significant incident reports, and

18   from what I recall, they also did not speak to

19   dangerousness.

20      Q.    The subject of the e-mail is "Secure

21   Case Inquiry 2."

22      A.    Yes.

23      Q.    Do you know what the secure case

24   inquiry 1 was?

25      A.    No, I don't.

**Exhibit 33**
**Page 1100**

CONFIDENTIAL

Page 158

1    Q.    Do you think it would have been
2    something similar to this?
3    A.    It would have been -- it most likely
4    would have been just another child's case that I
5    had questions about.
6    Q.    Okay.
7    A.    That I probably sent on the same date.
8    Q.    To Elicia?
9    A.    Uh-huh.
10   Q.    Is that a yes?
11   A.    Yes, that's a yes.
12   Q.    From the material that you reviewed
13   before you sent Ms. Smith this message, you
14   concluded that, from what you could tell, the kid
15   was more of an annoyance than an actual danger
16   when they got stepped up to Yolo?
17   A.    Yes.
18   Q.    Did you learn anything subsequent to
19   this that shed more light on whether the kid was
20   more of an annoyance than an actual danger?
21   A.    I don't.  I don't remember this
22   particular case, what the follow-up to it was.
23   Q.    Do you think Elicia might have written
24   you back about this?
25   A.    Yes, I do.

Exhibit 33
Page 1101

CONFIDENTIAL

Page 162

1   working group.

2        Q.    Got it.

3              So which was the most common

4   noncompliance issue?

5        A.    I'm trying to remember.  So from what

6   I recall, it kind of changed throughout the five

7   months.  In the beginning I saw noncompliance

8   issues with kids just being inappropriately

9   stepped up to secure where they didn't meet the

10  criteria.  Then towards the end of the five

11  months it was more -- more of not enough

12  information, that the step-up might have been

13  allowed under our policy but that there just

14  wasn't enough documentation for me to cross-check

15  that that was an appropriate step-up.

16       Q.    So just so I understand, for that

17  latter situation, once you got into it and probed

18  for the reasons, you felt satisfied that they

19  were there, they just hadn't been noted properly

20  in the portal or on the NOP?

21       A.    So towards the end of the five months

22  I did find a couple of things:  That the care

23  providers might not have uploaded the

24  documentation but had the documentation in a hard

25  copy, or that they just needed more guidance on

**Exhibit 33**
**Page 1102**

CONFIDENTIAL

Page 163

1   how to describe the reasons for the step-up, not

2   necessarily that the kids were being

3   inappropriately stepped up.

4           So it shifted throughout that time

5   period.

6       Q.   So what I'm understanding from that

7   answer is that towards the end it wasn't that the

8   kid was inappropriately placed or stepped up in

9   secure.  It's that there was a lack of

10  documentation and that upon further probing you

11  identified the proper documentation.

12      A.   Right, that was the majority of the

13  cases at the end.  That's correct.

14      Q.   So particularly focusing on the

15  problems that you identified initially where -- I

16  mean, can we agree that that was a significant

17  number of kids who were inappropriately housed in

18  secure at the time?

19      A.   Yes, it was the majority of kids that

20  were inappropriately sheltered.

21      Q.   The majority of the 34 kids in secure

22  placement in around November of 2018 when you

23  first started compliance review were

24  inappropriately placed in secure?

25      A.   Right.  It was 18 out of 34.

**Exhibit 33**
**Page 1103**

Page 164

1      Q.    And some of those 18 have included

2   kids that were placed because of suspected gang

3   activity?

4      A.    Right.  I answered that before, and

5   yes, there were a couple of them, a few of them.

6      Q.    And some were placed based on -- well,

7   at least one based on an arrest and then

8   subsequent dismissal of charges?

9      A.    That's correct.

10     Q.    And another was -- or at least one or

11  more were based on a risk of escape?

12     A.    That's correct.

13     Q.    About how many of those were there?

14     A.    Maybe less than three.

15     Q.    So how were these compliance issues

16  resolved?

17     A.    If the kid was inappropriately placed?

18     Q.    Yes.

19     A.    Then they had to be stepped down

20  immediately.  So the care provider had to find

21  other placement for the child.

22     Q.    Okay.  So did you look at how long

23  these kids had been in secure placement?

24     A.    Yes.

25     Q.    So do you have any kind of

Page 166

1    immediately.

2            Does that make sense?

3        Q.    I understand your answer.

4            Let's take the kid that was there for

5    two years.  When you're going through the web

6    portal, you're looking at every 30-day review, or

7    just the most recent one?

8        A.    The most recent.

9        Q.    You don't go back?

10       A.    I guess it would depend on if there is

11   not enough information.  But I would look to see

12   if they're currently compliant.

13       Q.    Okay.  And so you wouldn't have --

14   your testimony is you wouldn't have any reason to

15   go back and see how long the person had been

16   there inappropriately?

17       A.    No, that's not what I said.

18       Q.    So would you do that?

19       A.    So for example, with the kid that had

20   been there for almost two years, I recall that

21   there wasn't updated information on him.  So yes,

22   I would look back through his case file.

23       Q.    So how long was he there

24   inappropriately?  How long?

25       A.    At the time of the review, I believe

CONFIDENTIAL

Page 167

1   that he was in secure -- So it's a little

2   complicated.  When I first reviewed his case, it

3   had been a couple of months that there wasn't

4   updated information on him.

5       Q.   Okay.  If there is not updated

6   information --

7       A.   So at least a couple of months.

8       Q.   Okay.  I mean, how often did you go

9   back and look at more than just one 30-day

10  review?

11      A.   It depended on the case.  I don't

12  recall exactly, but it would depend on the case.

13      Q.   Approximate for me over the five

14  months how often you -- I think you tried to give

15  me a guesstimate or an estimate of the total

16  number of children whose UAC portal information

17  you reviewed during your five months, did you

18  not?

19      A.   No, I didn't give an estimate.

20      Q.   Do you think you could tell me?  Was

21  it 200?

22      A.   No.

23      Q.   Less?

24      A.   Yes.

25      Q.   Okay.  So would it be more than 50?

**Exhibit 33**
**Page 1106**

CONFIDENTIAL

Page 170

1   to look at the cases in front of me to be able to

2   give you an accurate response.

3        Q.    So in that situation you described,

4   the change during the 30 days might have resulted

5   in a continued circumstance where secure

6   placement was valid and it might have also

7   changed in a way that secure placement was no

8   longer appropriate.  Is that right?

9        A.    Just so I'm clear, so you're asking if

10  during that 30-day period the child's

11  circumstances could have changed where they no

12  longer belong in -- they don't meet the criteria?

13  Yes, that's correct.

14            Or something happened where they --

15       Q.    Beat somebody up.  Stabbed a guard.

16  Whatever, right?  That could keep them there?

17       A.    Yes, that's correct.  So both of those

18  scenarios happened.

19       Q.    And it happened more than once where

20  it changed in a way that secure placement was no

21  longer appropriate but where the kid stayed in

22  secure placement, correct?

23       A.    Correct.

24       Q.    About how many times?

25       A.    I don't remember how many times.

**Exhibit 33**
**Page 1107**

CONFIDENTIAL

Page 196

1      A.    No, I don't think I have anything more

2   to add.

3           MR. WHITE:  I need to take another

4       break.  I'll try to make it quick, but I

5       need to consult with these folks.

6           MR. SHIEH:  Sure.

7           MR. WHITE:  Then we'll hopefully get

8       you out of here in time to get your kid.

9           (Recess taken.)

10  BY MR. WHITE:

11     Q.    Who is responsible for giving a notice

12  of placement to the child within the 48 hours

13  after their placement?

14     A.    The case manager.

15     Q.    And who is responsible for advising

16  the child of their right to challenge that

17  placement?

18     A.    The case manager.

19     Q.    And is it required that the case

20  manager advise the kid of both their right to

21  appeal to the director or file a federal lawsuit

22  about that?

23     A.    Yes.

24     Q.    How is that carried out at the Yolo

25  facility to make sure that that happens, if you

Exhibit 33
Page 1108

CONFIDENTIAL

Page 202

1   reviewing information on these kids in the UAC

2   web portal, did you ever find any information

3   that was submitted by an attorney?

4       A.    I am trying to recall.  I don't recall

5   seeing information from an attorney in the

6   portal.

7       Q.    Do you know if attorneys are allowed

8   to review the web portal?

9       A.    I don't believe that they are.

10      Q.    Do you know if the children are

11  allowed to review the information on them in the

12  web portal?

13      A.    No, they are not.

14      Q.    And on what do you base that

15  testimony?

16      A.    I have never heard of a child being

17  allowed access to the UAC portal.

18      Q.    But sitting here today, you don't know

19  if it's prohibited or not?

20      A.    I know that it would not be allowed.

21  I don't believe that there is specific policy on

22  a child trying to access the portal.

23      Q.    So let's go back and talk a little bit

24  more about corrective action.  It was my

25  understanding from your testimony that at least

CONFIDENTIAL

Page 212

1    Q.    Do you recall anything else that you

2    learned in that five to ten minutes other than

3    what was documented in that e-mail about what

4    they had not been advised of?

5    A.    We asked them how they were being

6    treated at the Shenandoah facility, and they both

7    said that they were being treated well.

8    Q.    But they both indicated problems at

9    other facilities?

10   A.    That's correct.

11         We asked them do they know why they

12   were placed there in the first place.

13   Q.    And they didn't?

14   A.    Neither seemed to really understand

15   why they were there.

16   Q.    Do you think a kid can be provided

17   with a notice of placement and still not

18   understand the reasons for their placement?

19   A.    Yes.

20   Q.    Do you think that a kid may receive a

21   notice of placement and still not understand that

22   they have the right to challenge that placement?

23   A.    Yes.

24   Q.    And does that include that they might

25   not be aware of the right to appeal that

**Exhibit 33**
**Page 1110**

CONFIDENTIAL

Page 213

1    decision?

2         A.    Yes.

3         Q.    And they might not understand the

4    right to file a federal lawsuit?

5         A.    Yes.

6         Q.    And why is that?

7         A.    I think those are very difficult

8    concepts for children to understand.

9         Q.    Is that the only reason?

10        A.    In my professional judgment.  Again,

11   these are very vulnerable children, especially

12   when information is being translated.  There

13   could be interpretation issues.  But I think

14   bottom line, these are very difficult concepts

15   for children to understand.

16        Q.    And just so I understand, your

17   professional judgment is based on two interviews,

18   right?

19        A.    My --

20        Q.    What else do you base your

21   professional judgment on, this opinion?

22        A.    My opinion is based on the notice of

23   placement itself and the language in the notice

24   of placement.

25        Q.    Have you been a witness to the reading

Page 216

1    violation is something that they're likely not to

2    find that difficult?

3        A.    Are you asking if an older teen would

4    understand if they've been convicted of a crime?

5        Q.    Or not, yes.

6        A.    I would think so, yes.

7        Q.    So I'm trying to understand, what are

8    the difficult concepts that you describe in the

9    notice of placement.

10        A.    I don't know if you have the notice of

11    placement form with you, but it has the criteria

12    listed.  But it also has the criteria for the

13    staff secure and the RTC settings and they're

14    different.  So it's a lot of information on the

15    form to begin with.  And the language, it's not

16    child-friendly language.  It's legalese, so to

17    speak.  And the kids are usually -- the cases

18    I've seen that have been referred to step up to

19    secure, it's more than just one criterion.  So to

20    really understand what the two criteria are, for

21    example, the two reasons that they've been

22    stepped up, I think that that can be difficult

23    for children to understand, especially if they

24    are dealing with trauma and they're in this

25    restrictive secure setting.

**Exhibit 33**
**Page 1112**

CONFIDENTIAL

Page 218

1    then there should be an explanation of what that

2    means by the FFS.

3         Q.    But that's a verbal explanation that's

4    off the form?  Or is that explanation also

5    written there?

6         A.    It should be written on the form.

7         Q.    So would that be a difficult concept

8    for most kids in secure placement to understand?

9         A.    I mean, I'm not sure I understand

10   where this is going because these are

11   hypotheticals.

12        Q.    Well, I mean, I'm just really

13   seriously trying to understand your basis for

14   testifying that these are difficult concepts.

15   And if you can elaborate on that, please do so.

16   If you think you've already told me all the

17   reasons for that opinion, we can move on.

18        A.    I think that the -- I think there are

19   areas for improvement on the form itself and the

20   way the notice of placement is communicated to

21   the child.  Those are topics that we've discussed

22   in the working group.  But I don't know that I

23   have more to add than that.

24        Q.    So would that include areas for

25   improvement to the form itself or just in the

**Exhibit 33**
**Page 1113**

CONFIDENTIAL

Page 221

1                  ACKNOWLEDGMENT OF DEPONENT

2

3       I, FAITH RAY, have read or have had the

4  foregoing testimony read to me and hereby certify

5  that it is a true and correct transcription of my

6  testimony with the exception of any attached

7  corrections or changes.

8

9

10  _____

11  FAITH RAY

12  [ ] No corrections

13  [ ] Correction sheet(s) enclosed

14

15      SUBSCRIBED AND SWORN TO BEFORE ME, the

16  undersigned authority, by the witness, FAITH RAY,

17  on this the _____ day of _____,

18  _____.

19

20

21

22

23

24

25

**Exhibit 33**
**Page 1114**

CONFIDENTIAL

Page 222

1              C E R T I F I C A T E

2

3   DISTRICT OF COLUMBIA

4              I, JOHN L. HARMONSON, a Notary Public

5   within and for the District of Columbia, do

6   hereby certify:

7              That FAITH RAY, the witness

8   whose deposition is hereinbefore set forth, was

9   duly sworn or affirmed by me and that such

10  deposition is a true record of the testimony

11  given by such witness.

12             That if the foregoing pertains to a

13  federal case, before completion of the

14  proceedings, review and signature of the

15  transcript [x] was [ ] was not requested.

16             I further certify that I am not related

17  to any of the parties to this action by blood or

18  marriage; and that I am in no way interested in

19  the outcome of this matter.

20             IN WITNESS WHEREOF, I have hereunto set

21  my hand this 4th day of November, 2019.

22                    *John L. Harmonson*

23             _____

24             JOHN L. HARMONSON, RPR

               My commission expires: 11/14/20

25

**Exhibit 33**
**Page 1115**

# Exhibit 34

Exhibit 34
Page 1116

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

LUCAS R., et al.,              )  Case No.:
                              )  2:18-CV-05741-DMG-PLA
         Plaintiffs,          )
                              )
    vs.                       )
                              )
ALEX AZAR, et al.,            )
                              )
         Defendants.          )
_____ )

CONFIDENTIAL VIRTUAL REMOTE DEPOSITION OF

EMILY RYO, Ph.D.

Thursday, August 13, 2020; 9:03 a.m.

Los Angeles, California

Magna Legal Services

866-624-6221   www.MagnaLS.com

Reported by Mimi Murray, CSR No. 13985



Exhibit 34
Page 1117

Page 28

1    later, if you do look at any other pages, we would want

2    to -- we would want you to memorialize on the record

3    what those pages are.  But when it comes up, I think it

4    will be clear.

5         A    I understand.  Thank you.

6         Q    Thank you.

7              Dr. Ryo, did you form any expert opinions in

8    this case?

9         A    I did.

10        Q    What opinions did you form?

11        A    My expert opinions are summarized in my

12   report.  If you'd like, I'd be happy to read them to

13   you.

14        Q    Before we dive into the report, I want to know

15   if any of the expert opinions come to mind.

16        A    Yes.

17        Q    Of the opinions that you can recall, what

18   expert opinions did you form in this case?

19        A    One of them is that the longer the detention

20   length -- well, there's a positive association between

21   step-ups and longer custody periods.

22             There's also a relationship between placement

23   types and step-ups as defined in the report.

24             And there's also a relationship between the

25   prevalence of reunification and voluntary departure and



Exhibit 34
Page 1118

Page 29

1    step-up and placement types.

2        Q    Any other -- do you recall any other -- strike

3    that.

4            Do you recall forming any other expert

5    opinions in this case?

6            MR. HOLGUIN:  Counsel, I'm going to object.

7    The best evidence of this -- of her conclusions are

8    contained in the report.  I'm not exactly sure the --

9    what's to be accomplished by asking -- asking the

10   witness to recite them from memory.

11           You know, we'll let it go forward, but I think

12   the best evidence is the report itself.  And on that

13   basis, we would object.

14   BY MR. ROSS:

15       Q    Dr. Ryo, did you form any other expert

16   opinions in this case?

17       A    Not that I can remember at the moment without

18   referencing my report in terms of specifics.

19       Q    So I recall from your testimony right now one

20   of the expert opinions that you formed was that longer

21   detention lengths have a positive association between

22   step-up and custody periods.

23           Did I say that correctly?

24       A    Yes.  There's a positive relationship between

25   step-ups and detention length.



Page 30

1      Q     What do you mean by a "positive association"?

2      A     Step-ups are associated with longer custody

3    periods or detention length.

4      Q     Okay.  Can you say that again?

5      A     Uh-huh.  Step-ups are associated with longer

6    detention length.

7      Q     And when you say association -- "associated,"

8    what do you mean?

9      A     I mean that there is a relationship that you

10   see when you look at the data between custody periods

11   that include step-ups and the custody length.

12     Q     And so you define an "association" as a

13   relationship that you observe?

14     A     Yes.

15     Q     Is an association the same thing as showing

16   causation?

17     A     No, it's not.

18     Q     Can you explain to me the difference?

19     A     You can have an association without one thing

20   causing the other thing.

21     Q     What do you mean?

22     A     If you have x and y, let's say a particular

23   outcome that you're interested in, you might be able to

24   see that there is a pattern of relationship, whether

25   positive or negative, between x and y, but the mere



**Exhibit 34**
**Page 1120**

Page 31

1   fact of seeing that relationship would not allow one to

2   posit that x caused y.

3       Q    So based on that definition, if I understand

4   you correctly, that you're not able to, based on the

5   data that you considered, show that -- it would not

6   allow you to posit that step-ups and detention lengths

7   have any other type of correlation; correct?

8       A    I am not claiming causation in my report.

9   That's right.

10      Q    When you say "would not allow one to posit,"

11  what do you mean by that?

12      A    I'm sorry.  Could you repeat that question,

13  please?

14      Q    Certainly.  You said that you would not be

15  able -- that when you say "association" in this context

16  and you said it would not allow you to posit, is there

17  a certain level of confidence to your -- strike that.

18          What I'm trying to understand is how

19  confident -- is there a level of confidence that you

20  can associate between this association, as you put it,

21  between step-ups and detention length?

22      A    I -- I have shown in my report what that

23  nature of that relationship is and the relationship is

24  consistent, as shown in the figures that I have

25  included in the expert report.



Exhibit 34
Page 1121

Page 33

1    Q    And what's the -- is a relationship the same

2    thing as a correlation?

3    A    Yes.

4    Q    And you said that one of the other

5    relationships that you formed -- or strike that.

6         You said that one of the other opinions that

7    you formed was a relationship between reunification,

8    voluntary departure, step-ups and placement types.

9         I think that you may have grouped a couple

10   different opinions there.

11        Can you restate that just so I have a better

12   understanding?

13   A    Sure.  If I -- if I remember correctly, I

14   looked at custody periods that ended in reunification,

15   and I've also looked at custody periods that ended in

16   voluntary departure.

17        And among the custody periods that ended in

18   reunification, I found that increasing detention length

19   is generally associated with a lower prevalence of

20   reunification.

21        Whereas in custody periods that end in

22   voluntary departure, increasing detention length is

23   generally associated with a higher percentage of

24   voluntary departures.

25        The other finding, to my memory, is the



Page 97

1    impact on my analysis results.

2           MR. ROSS:  Will the technician please go to

3    page 6 of Exhibit 319.

4    BY MR. ROSS:

5    Q    Dr. Ryo, the -- Figure 1, Program Types By

6    Less Restrictive to More Restrictive, is a figure that

7    you include in your report.  And, further, on page 6 at

8    Note 8, you write, quote:

9           In considering whether a UAC was ever placed

10   in any of these program types during the given custody

11   period, I used the categorizations as they appear in

12   the ORR data.

13          Am I understanding correctly that you sorted

14   the group of UACs in two main groups:  children in less

15   restrictive care and children in more restrictive care?

16   A    Well, a given child can be starting out in a

17   less restrictive care and be, then, placed in a more

18   restrictive care; or a child could start out in more

19   restrictive care initially.

20          So if I wanted to sort by if a child was ever

21   in more restrictive care, then I could do so.

22   Q    So -- so the sorting that you employed and

23   that's represented in Figure 1 is essentially a sorting

24   by restrictiveness level; correct?

25   A    Correct, in the sense that it's indicating



Page 100

```
 1      Q     What do you mean by that?

 2      A     I mean if I had been given a different diagram

 3   to work with in terms of less to more restrictive

 4   placements, then, of course, it would be helpful to

 5   apply that scheme.  But I was given this scheme in

 6   conducting my analysis, so I had no choice in that

 7   matter.

 8            MR. ROSS:  If the technician can go to page 9

 9   of Exhibit 319, please.

10   BY MR. ROSS:

11      Q     Dr. Ryo, on page 9 of Exhibit 319, you write:

12            How long is a UAC typically detained by ORR

13   before the first step-up occurs?

14            I found that the average length of time to the

15   first step-up was 67.3 days.  I'd also found that

16   increasing lengths of custody are associated with

17   higher percentage of custody periods with step-ups.

18            Did I read that correctly?

19      A     Yes.

20            MR. ROSS:  And if the technician can go to

21   page 12, please.

22   BY MR. ROSS:

23      Q     At the end, under Table 1, you write:

24            In summary, based on the data I have reviewed,

25   increasing lengths of custody are associated with
```



**Exhibit 34**
**Page 1124**

Page 102

1          So that was a restriction that was given to me

2     by counsel, so looking at -- that's -- that

3     population -- or sample of custody periods.  Because,

4     again, it's possible for a custody period to begin with

5     an initial placement outside a shelter, as we talked

6     about.

7          But looking at the custody periods that

8     started out initially at a shelter, I was asked how

9     long, you know, is a UAC typically detained by ORR

10    before they get to experience their first step-up.  So

11    that was the question I was asked to address.

12         And when I looked at the length of -- length

13    of detention or custody and looked at what percentage

14    of custody periods result in a step-up across these

15    various lengths of custody categories, what I saw was a

16    positive relationship, meaning an increasing percentage

17    of custody periods resulting in step-ups the longer the

18    custody length or detention length.

19    Q    Dr. Ryo, do you have experience analyzing data

20    sets for children moving through systems of care?

21    A    Do I have experience analyzing data

22    specifically on migrant children moving through ORR

23    care?

24         Is that what you asked?

25    Q    For children moving through systems of care.



Exhibit 34
Page 1125

Page 106

1    periods that included step-ups.

2        Q    In your report, do you record that there is an

3    association between reunification taking longer and

4    whether a child was stepped up?

5        A    In this particular table -- perhaps I'm not

6    understanding the question.  But in this table and in

7    my summary statement, that is what I note is that

8    average time to reunification is higher for those

9    custody periods that have step-ups compared to those

10   that do not have step-ups.

11       Q    I'm not trying to be difficult, but I am

12   trying to understand.

13            I don't see where you list -- where you write

14   that there's an association between reunification

15   taking longer and whether a child was step-upped.

16            You've indicated to the table, if I'm correct,

17   but again, I don't see where you've identified an

18   association; is that correct?

19       A    I don't use the term "association" to describe

20   my findings, but that is what I show in this analysis

21   is that -- you know, is that the average length of

22   detention before reunification is greater for custody

23   periods with step-ups.

24       Q    Is there any reason why you didn't note that

25   association in the text of your report?



Page 108

```
 1    I was uncertain whether there was a correlation or
 2    association.  It's just a different choice in use of
 3    words in how you summarize your findings.
 4             So my summary statement that average time to
 5    unification is higher for custody periods with step-ups
 6    compared to custody periods without step-ups is no
 7    different than saying that there is an association
 8    between step-ups and average length of detention.
 9    Q    And just one last question because -- and I'm
10    not trying to -- I'm really not trying to nail you down
11    here.
12             But am I understanding you correctly that you
13    identify a correlation or an association in your
14    summary?  Because I don't see that there.  Your summary
15    on page 9?
16    A    Oh, I'm sorry.  I'm looking at page 13.
17    Page 9?
18    Q    No.  So we are on page 13, where it says "In
19    Summary."  However, you said in your summary of
20    findings, and I presumed you meant your summary on
21    page 9.
22    A    Oh, I see.
23    Q    Can you point me to where in your report in
24    answering Question 2 you describe an association or a
25    correlation or anything else that would --
```



**Exhibit 34**
**Page 1127**

 1      A    Yeah.

 2      Q    -- give meaning to the data?

 3      A    Sure.  It's both on page 9 and page 13, where

 4  I say average time to reunification was higher for

 5  custody periods with step-ups than custody periods

 6  without step-ups.  That is pointing to that association

 7  between step-ups and time to reunification.

 8      Q    Let's proceed to -- yes?

 9      A    I was just going to say, if it makes it easier

10  to understand, if I may just take another example that,

11  you know, that might be more familiar to us.

12           You know, if we say -- if you look at a set of

13  children and we look at their gender, male or female,

14  and we measure their level of physical activity per

15  day, for example, if you see that in boys the average

16  level of physical activity is higher than in girls,

17  what I have shown is an association between gender and

18  level of physical activity.

19           So for me to summarize that finding by saying

20  the average level of physical activity is higher among

21  boys is, in fact, the same thing as saying that there

22  is a correlation or an association or a positive

23  relationship between male gender and physical activity.

24           And that is true here as well, that logic.

25      Q    Proceeding to page 14, you write below



MAGNA
LEGAL SERVICES

Exhibit 34
Page 1128

Page 110

1    Table 3, quote:

2          In summary, among the placement types without

3    step-ups, the average times to reunification are higher

4    for custody periods that include a stint at a

5    therapeutic group home compared to custody periods that

6    took place only in shelters.

7          Among custody periods that included step-ups,

8    the average times to reunification increase in this

9    order:  Staff Secure, Secure, Residential Treatment

10   Center, therapeutic Staff Secure, and out-of-network

11   facilities.

12         Did I read that correctly?

13   A    Yes.

14   Q    Here again, you didn't use the word

15   "associated" or "correlated" or any other synonym.

16         Is that because you did not find an

17   association between placement type and length of stay?

18   A    No.  My description in the summary statement

19   describing my analysis results is that there is a

20   correlation.

21         I'm basically being much more explicit about

22   the direction of that correlation here, which I think

23   generally is more helpful than saying two variables are

24   correlated.  I'm pointing to the direction of that

25   correlation.



Exhibit 34
Page 1129

Page 116

1          And will the technician please go back to

2     Exhibit 319, page 17.

3     BY MR. ROSS:

4     Q    Dr. Ryo, on page 17 you write:

5          In summary, among the placement types without

6     step-ups, the percent of reunifications are higher for

7     custody periods that took place only in shelters

8     compared to custody periods that included a stint at a

9     therapeutic group home.

10          In addition, the percentage of reunification

11     was higher for custody periods that took place only in

12     shelters compared to custody periods that included a

13     stint at a Residential Treatment Center, therapeutic

14     group home, Staff Secure, Therapeutic Staff Secure,

15     Secure and out-of-network facility.

16          Did I read that correctly?

17     A    Yes.

18     Q    Is there any association between placement

19     type and whether UACs will reunify or elect voluntary

20     departure?

21     A    Yes.  Based on my analysis results, there is a

22     correlation.

23     Q    If you know, what is the significance of UACs

24     reunifying or electing voluntary departure?

25     A    When you say "significance," can you clarify



**Exhibit 34**
**Page 1130**

Page 117

1    what that means for in this context.

2        Q    Well, why does it matter?  You know, what --

3    what -- what are -- why does it matter for your report?

4        A    Well, I was addressing the questions that were

5    posed by counsel.  But in general, based on my research

6    and what I know of the immigration process, voluntary

7    departure is an individual basically choosing to return

8    back to their country of origin and not pursuing

9    potential legal relief they might have from removal.

10            And in this context, that might be a return to

11   a country where they might have experienced extreme

12   forms of violence and poverty, versus reunification

13   allows for a child to proceed with their legal

14   proceedings to the extent that they are out of custody

15   of ORR and are now with a sponsor who is able to

16   support them throughout their process.

17            So the significance of the overall question,

18   which -- I mean, that substantive significance and

19   legal significance, that question has to be posed to

20   counsel.

21            But from my point of view, those are distinct

22   differences in outcome in terms of custodial outcomes

23   that might be of substantial interest to parties

24   litigating this case.

25       Q    You go on to write on page 17, quote:



Exhibit 34
Page 1131

Page 128

1    Figure 11 includes the time period January 1, 2017

2    through October of 2017, the analysis is incorrect, and

3    the results would being wrong as well.

4           MR. HOLGUIN:  Now, turning to page 13, if we

5    could have that on the screen, please.

6    BY MR. HOLGUIN:

7    Q    And directing your attention to paragraph 44.

8           This report states that it is a fact that

9    children who are stepped up to more secure settings

10   spend more time under ORR custody as compared to

11   children that remain only in shelters.

12          And that statement is consistent with your

13   findings; is that right?

14   A    Yes, it is.

15   Q    Okay.  The next sentence says that these

16   children have additional needs and demonstrate

17   behaviors that increase their likelihood of placement

18   in settings more secure than the shelter level.

19          And let's just take that first statement that

20   these children have additional needs and demonstrate

21   behaviors that increase the likelihood of placement in

22   secure setting -- settings more secure than the shelter

23   level.

24          To come to that conclusion, what would be

25   required of -- of an expert?  What sorts of techniques



**Exhibit 34**
**Page 1132**

Page 132

1      I, Mimi Murray, a licensed Certified Shorthand

2   reporter, before whom the foregoing deposition was

3   taken, do hereby certify that the foregoing transcript

4   is a true and correct record of the testimony given;

5   that said testimony was taken by me stenographically

6   and thereafter reduced to writing under my direction;

7   that reading and signing was requested; and that I am

8   neither counsel for, related to, nor employed by any of

9   the parties in this case and have no interest,

10   financial or otherwise, in its outcome.

11        IN WITNESS WHEREOF, I have subscribed my name

12   this 25th day of August 2020.

13

14

15

16        _____

          Mimi Murray, CSR No. 13985

17

18

19

20

21

22

23

24

25



Exhibit 34
Page 1133

Page 133

1                    DEPOSITION ERRATA SHEET

2

3    Assignment No. 602513

     Case Caption:   LUCAS R., et al. vs.

4    ALEX AZAR, et al.

5

6           DECLARATION UNDER PENALTY OF PERJURY

7

8       I declare under penalty of perjury that I have read

9    the entire transcript of my Deposition taken in the

10   captioned matter, or the same has been read to me, and

11   the same is true and accurate, save and except for

12   changes and/or corrections, if any, as indicated by me

13   on the DEPOSITION ERRATA SHEET hereof, with the

14   understanding that I offer these changes as if still

15   under oath.

16

17      Signed on the _____ day of _____, 20___.

18

19                    _____

20                              EMILY RYO, Ph.D.

21

22

23

24

25



**Exhibit 34**
**Page 1134**

# Exhibit 35

Exhibit 35
Page 1135

CONFIDENTIAL

Page 1

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                   WESTERN DIVISION

4    _____

5    LUCAS R., et al.,                    )
                                          )
6              Plaintiffs,                )
                                          )
7      v.                                 )  Case No.
                                          )  2:18-CV-05741-DMG-PLA
8    ALEX AZAR, Secretary of U.S.         )
     Department of Health and Human       )
9    Services, et al.,                    )
                                          )
10                                        )
                                          )
11             Defendants.                )
                                          )
12   _____)

13

14

15        Confidential Pursuant to the Protective Order

16     Deposition of U.S. Department of Health and Human

17    Services, By and through its Designated Representative,

18            DEPOSITION OF ELICIA F. SMITH

19               San Francisco, California

20               Friday, November 22, 2019

21

22

23   Reported Stenographically by:
     MARY J. GOFF
24   CSR No. 13427
     Job No. 170746
25   PAGES 1-225

Page 37

1    Q    Okay.  Similar to these weekly meetings with

2    the supervisor?

3    A    No.  Generally the facilitator is going

4    through a PowerPoint, and then everyone is called in.

5    Q    Okay.  And you know, in the last year, how

6    many of these trainings do you think you have

7    participated in?

8    A    I -- I -- I don't remember.

9    Q    More than three times?

10   A    Probably.

11   Q    Okay.  So who -- who typically provides this

12   training?

13   A    The policy trainings are facilitated by the

14   policy team in D.C.

15   Q    And is that the team that's led by Mr. Biswas?

16   A    Yeah.

17   Q    Other than the policy training, what other

18   types of ongoing training do you receive?

19   A    I'm not undergoing any additional training

20   that I can recall.

21   Q    Okay.  Do you remember receiving any training

22   about step-ups?

23   A    I recall learning -- learning about it and

24   reviewing the policy, but not a formal training.

25   Q    So what -- what can you tell me that you

CONFIDENTIAL

Page 46

1      A      They reach out to me generally with any

2   concerns or issues that they have about specific cases.

3   They also keep me updated on immigration court and

4   general regional issues here in San Francisco that may

5   affect the legal proceedings for the kids.

6      Q      When you communicate with the Vera grantee

7   attorneys about specific children's cases, do you enter

8   that information into the UAC portal?

9      A      No.

10      Q      Why not?

11      A      I have never been asked to do so.

12      Q      Okay.  Are there other reasons that you

13   communicate with the Vera grantee attorneys, other than

14   the ones you have told me about?

15      A      I don't think so.

16      Q      I'm going to -- when a minor is going to be

17   transferred or stepped up to a restrictive setting, who

18   all do you communicate with from ORR about that?

19      A      As the federal field specialist, who do I

20   communicate with?

21      Q      Yep.

22      A      If I am in agreement with a step-up decision,

23   I will approve it in the portal once the child is

24   accepted at the facility that we have referred them to.

25   That's the only notification that I...

Exhibit 35
Page 1138

CONFIDENTIAL

Page 47

1     Q    So you wouldn't communicate with anybody then,
2   other than just entering your approval in the portal?
3     A    Yeah.  Yes.
4     Q    So I guess if you disapprove, with whom would
5   you communicate or would you just enter that into the
6   portal?
7     A    If I disagreed with the recommendation to step
8   a kid up?
9     Q    Disagreed.
10     A    Yes, I would -- I would not approve it in the
11   portal.  I would disapprove it or deny it in the portal.
12     Q    And then would you -- it sounded to me like
13   that disagreement would be after the child had already
14   been transferred, stepped up?
15     A    No.  The kids can't be moved until there's an
16   FFS approval for the transfer.
17     Q    And is the FFS whose approval is required,
18   the -- think in terms of like sending or receiving.  Do
19   you understand what I'm getting at there?
20          Like if the step-up is to Fairfield or Yolo,
21   is your approval required or is it the send -- FFS from
22   the sending location that's -- approval is required?
23     A    The FFS from the sending program is required
24   to approve it, so they are making a referral to another
25   program.

Exhibit 35
Page 1139

Page 49

1   communication or communication about the process in its

2   entirety?

3        Q    (BY ATTORNEY WHITE) I want both things, but

4   the first thing I'm asking is your communication.

5        A    My communication is to approve the -- approve

6   the step-up or step-down in the portal.

7        Q    Okay.  Or perhaps deny it, right?

8        A    Yes.

9        Q    Okay.  And what I am getting at -- the first

10  part of the question is:  You wouldn't typically, like,

11  call somebody to discuss that recommendation or

12  decision; is that right?

13       A    Not at the -- at the point that a referral has

14  come to me.  I would already know it was coming --

15       Q    Got it.

16       A    -- and I would be updated on the case.

17       Q    Okay.  So when you asked about did I want to

18  know about the process, now please tell me about the

19  process.

20            What communication takes place during that

21  process, the step-up process?

22       A    So bulk of the communication is from the

23  referring care provider and the receiving care provider.

24            So for here in California, if Fairfield is

25  making a step-up recommendation, they're putting

CONFIDENTIAL

Page 50

1    together a transfer packet.  They're -- we have already

2    wrote -- reviewed that this child is eligible or

3    appropriate for secure placement.

4           The GDIT case coordinator has also concurred,

5    and we have all agreed in conversation to proceed with a

6    recommendation.

7           And then Yolo would review the transfer

8    request and either accept or deny that child's

9    placement.

10       Q    So how does that conversation come about?

11       A    Those are the staffing -- the weekly staffing

12   conversations about the kids' placement needs and case

13   updates.

14       Q    This is the one that you said was facilitated

15   by the GDIT case coordinator?

16       A    Right.

17       Q    Okay.

18       A    Um-hum.

19       Q    And the conversation or communication between

20   the care providers, is -- is that part of the staffing

21   or is that separate?

22       A    That's a separate transfer referral process

23   via e-mail.

24       Q    Okay.  And is there any other communication

25   that takes place typically when there's a step-up as

**Exhibit 35**
**Page 1141**

CONFIDENTIAL

Page 76

1      A    Yes.

2      Q    With input from these other folks?

3      A    Yes.

4      Q    Okay.  And what's a project officer or is that

5  a term that you use?

6      A    Yes.

7      Q    What is it?

8      A    The project officers are, I believe, mostly in

9  D.C.  The project officer holds the actual cooperative

10  agreement.

11      Q    Do they have input into step-up decisions?

12      A    No.

13      Q    So is the case manager making a recommendation

14  on step-up?  I guess what is the role of the case

15  manager in the step-up decision?

16      A    Yes, they would make the recommendation.

17      Q    Okay.  Do they make a decision on step-up?

18      A    They don't make a final decision, but they

19  have concluded that the child is -- requires a higher

20  level of care.

21      Q    Okay.  So when they make that conclusion, that

22  becomes a recommendation to the FFS or to the case

23  coordinator or where?

24      A    To the case coordinator.

25      Q    Okay.  And does the clinician make a

**Exhibit 35**
**Page 1142**

CONFIDENTIAL

Page 78

1    Q    So I don't understand --

2    A    -- so it really depends on how much I know

3    about case at the point that I'm receiving the

4    recommendation, but...

5    Q    -- I don't understand how your earlier answer

6    was -- needed to be qualified.  The case manager makes a

7    recommendation about the step-up, correct?

8    A    The case manager, yes.

9    Q    Okay.  Are -- you talk about eligibility, but

10   the -- the framework for this, the law requires that the

11   child be held in the least restrictive environment

12   that's appropriate, correct?

13   A    Yes.

14   Q    That's in the best interest of the child,

15   right?

16   A    Yes.

17   Q    So when a -- okay.  What's the clinician's

18   role in a step-up determination, to your understanding?

19   Do they recommend?

20   A    The care provider team, the clinician, and the

21   case manager would be working together to make a

22   placement recommendation for a minor.

23   Q    Is -- the information that you receive about

24   the clinician's recommendation, does that come to you

25   directly from the clinician or indirectly through the

**Exhibit 35**
**Page 1143**

CONFIDENTIAL

1   case manager or in some other form?

2        A     It's the case manager's responsibility to

3   submit the transfer request packet, which includes the

4   clinical recommendation and case updates.

5        Q     And is that always something in writing from

6   the clinician?

7        A     The transfer request would include the

8   clinical updates.

9        Q     Right.  And who prepares that, the case

10  manager or the clinician?

11       A     I'm not sure in the actual transfer document,

12  if they're both entering or if one of them is

13  responsible -- is taking responsibility for updating all

14  of those items.

15       Q     Okay.  And then what's the case coordinator's

16  role in a step-up determination?

17       A     They would review the transfer request packet

18  to see if -- to verify if the minor met the step-up

19  criteria.

20       Q     And is the transfer request packet information

21  that the case coordinator is reviewing contained in the

22  UAC portal?

23       A     Yes.

24       Q     And that's -- their review of that is in the

25  portal?

**Exhibit 35**
**Page 1144**

CONFIDENTIAL

1    A    That's the piece that I was clarifying

2  earlier.  I don't believe they're entering anything in

3  the -- I don't believe the case coordinators are making

4  any enters in the portal for a transfer request -- for

5  a --

6    Q    A step-up?

7    A    -- for a -- yes.  They will enter, in the

8  actual transfer request field of the portal, the case

9  coordinator -- once the kid has been accepted -- so

10  the -- Fairfield does a step-up to Yolo and Yolo accepts

11  them.

12        Then at that time the case coordinator would

13  go back and enter that the kid was being transferred to

14  Yolo, so yeah.

15    Q    Okay.  So the information the case coordinator

16  is using to evaluate a possible step-up is all

17  information the case coordinator is obtaining from the

18  portal; is that correct?

19    A    Yes.

20    Q    And then they make a recommendation to you or

21  to the FFS about whether the step-up should take place?

22    A    Yes.

23    Q    Okay.  And does that just come to you in an

24  e-mail?

25    A    Yes.  If I haven't been -- if I'm not in

Exhibit 35
Page 1145

CONFIDENTIAL

Page 82

1    is that?

2        A    So the transfer packet would be sent to

3    whatever care providers are appropriate for the child's

4    placement needs.  We have many more staff secure

5    facilities than we do secure, so I was just saying that

6    I wouldn't -- I wouldn't know the exact destination for

7    that child until I got an approval for that case.

8        Q    Okay.  And so when it goes out to multiple

9    care providers, then more than one of them might approve

10   the child?

11       A    Yes, they -- it may -- the transfer request

12   may come back that multiple people accept the kid.

13            But once one program accepts them, then the

14   rest are notified that the kid doesn't need placement

15   any longer than.

16       Q    Okay.  And is lack of bed space ever a reason

17   that a step-down does not occur?

18       A    If a care provider doesn't have an available

19   bed, they will deny the transfer request.

20       Q    Okay.  Okay.  And is it ever the case that a

21   kid is eligible to be stepped down and is not stepped

22   down because of lack of available bed space?

23       A    It's not the case now, but bed space could

24   delay a step-down.

25       Q    And it has in the past; is that your

**Exhibit 35**
**Page 1146**

CONFIDENTIAL

Page 83

1   understanding?

2        A     I know when we were in influx and all the

3   facilities were full, it was definitely a longer

4   timeline, but I don't recall any kids that were not

5   stepped down.

6        Q     Okay.  Does a project officer have a role in

7   step-ups?

8        A     No.

9        Q     And step-down?

10       A     No.

11       Q     When is an FFS supervisor included in staffing

12   on case?

13       A     I don't think there's a standard --

14       Q     All right.

15       A     -- for FFS supervisor participation.

16       Q     What would be a likely -- well, what would be

17   an example of when an FFS supervisor would be involved?

18       A     I would invite my supervisor to attend if I

19   wanted her to hear a case update that was maybe a more

20   complex case or...

21       Q     So what would be an example of a more complex

22   case?

23       A     There are some kids who have therapeutic needs

24   that we need to consider placing them in an

25   out-of-network placement, and so I would involve my FFS

**Exhibit 35
Page 1147**

CONFIDENTIAL

Page 84

1    supervisor in that for support in making a referral.

2         Q    Okay.  And what do you mean by the

3    term "therapeutic needs"?

4         A    They may have behavioral or mental health

5    needs that can't be met in the facility that they're in

6    or in that -- you know, outpatient services that are

7    available in that area.

8         Q    And are there situations where these

9    therapeutic needs could be met by one of the residential

10   treatment centers?

11        A    If -- if the -- if -- if we can make a

12   transfer to a -- for a child into one of the ORR

13   residential treatment centers, then we would do so, but

14   sometimes the kids aren't accepted at those programs.

15        Q    And why wouldn't they be accepted?  What would

16   be the reasons given for not accepting a kid in an RTC?

17        A    The most common situation is when the kids --

18   it -- has very recent and ongoing aggressive behaviors

19   along with mental health needs, the RTC programs aren't

20   in a position to manage those behaviors.

21        Q    But some of the out-of-network placements are?

22        A    I have had success in getting children like

23   that placed in out-of-network facilities.

24             ATTORNEY WHITE:  Could you mark this 148,

25   please?

Page 93

1      Q     (BY ATTORNEY WHITE) -- what I think -- any

2  reason not to notify the attorney prior to the child's

3  transfer, to your understanding?

4      A     No.

5      Q     Okay.  Can the attorney challenge the

6  transfer?

7      A     That's never been my experience.

8      Q     Could the attorney request that the transfer

9  be to the local -- more local facility so that the legal

10 representation could continue?

11     A     That's not our job.  I'm not usually -- the

12 attorneys aren't usually engaging with the transfers in

13 that way.

14     Q     Okay.  And -- and I think that's an answer to

15 a different question than the one that I asked.  So is

16 it possible for the attorney to challenge a transfer?

17     A     Yes.

18     Q     Okay.  And where is that in the policy?

19     A     I don't know if it is in the policy or not.

20     Q     Okay.  You said that's not typically the way

21 the attorneys engage in the transfer process, correct?

22     A     Yeah.

23     Q     Okay.  So even though it's possible, is it

24 something that's never done?

25     A     I don't recall being -- being notified of an

CONFIDENTIAL

Page 95

1      Q    Okay.  And so the attorney would typically
2  have that communication with the case manager, not with
3  the FFS?
4      A    Correct --
5      Q    Okay.
6      A    -- yeah.  It would be included as part of
7  their legal update in the transfer recommendation.
8      Q    Got it.  Can a kid be stepped down directly
9  from secure, staff secure to long-term foster care?
10     A    I don't think so.
11     Q    And why is that?
12     A    Long-term foster care in the least restrictive
13 setting, so I believe the foster care providers would
14 want the child to be coming from a shelter, the lower
15 level of care.
16     Q    So the reason that that can't happen is
17 because the long-term foster care providers won't accept
18 a child from other than a shelter, in your
19 understanding?
20     A    I don't know if that's the only reason, but I
21 don't believe we would be successful in placing a child
22 in long-term foster care from staff secure.
23     Q    Okay.  Is it -- is there something in the
24 policy that prohibits that?
25     A    I'm not sure.

**Exhibit 35**
**Page 1150**

CONFIDENTIAL

Page 97

1      A     Not in the final decision to step up or down.

2      Q     What would the child's involvement be in the

3  step-up determination?

4      A     The case manager and the clinician would be in

5  regular communication with the -- with the child and

6  sponsor, if there is one, about the behaviors.

7            The step-up wouldn't just happen out of

8  nowhere.  There would be behaviors and rationale for

9  meeting a step-up criteria, so the child would have been

10 probably on a behavioral plan or working with their case

11 manager to try to mitigate the need to be stepped up.

12     Q     So that plan might look like:  Behave a

13 certain way or you're going to be stepped up?

14     A     Just being able to identify the triggers that

15 are making you aggressive or -- it would be different

16 for individual...

17     Q     Okay.  If everyone involved in the step-up

18 determination doesn't agree, who makes the final

19 decision about a step-up?

20     A     The FFS.

21     Q     Okay.  How do the people involved in making

22 step-up determinations, you know, arrive at the

23 determination of whether the restrictive placement is

24 necessary?

25     A     I'm not sure how the individual case managers

**Exhibit 35**
**Page 1151**

CONFIDENTIAL

Page 98

1    arrive at that decision in --

2        Q    Do you --

3        A    -- choose...

4        Q    -- know what information they're reviewing to

5    make that determination?

6        A    They're interacting with the minors and

7    reviewing any significant incident reports, feedback

8    from the teachers.

9        Q    And is all of this information contained in

10   the UAC portal?

11       A    The -- the information necessary to make a

12   step-up decision?

13       Q    Yes.

14       A    Yes.

15       Q    Okay.  So any feedback that the case manager

16   got from the teacher, to the extent that's reflected in

17   the portal, would be input by the case manager?

18       A    Yes, I believe that's who records that

19   information.

20       Q    And any interaction that the case manager has

21   with the youth regarding the step-up determination, to

22   the extent that that's placed in the portal, that's --

23   that's placed there by the case manager as well, right?

24       A    Yes.

25       Q    And the youth don't have any access to the

**Exhibit 35**
**Page 1152**

CONFIDENTIAL

Page 99

1    portal, right?

2        A    Correct.

3        Q    And they don't have the right to, like, review

4    it or approve or rebut information that's placed in

5    there?

6        A    To rebut that information is included in their

7    file?  I don't believe so.

8        Q    Okay.  So other than what you have already

9    told me, is the case manager looking at anything else in

10   making a step-up recommendation?

11       A    I don't believe so.

12       Q    Do you, as FFS, interview the child in

13   connection with making a step-up determination?

14       A    No.

15       Q    And you rely exclusively on the documents in

16   the portal?

17       A    Yes.

18       Q    But you might also -- would -- would it be

19   fair to say that you're -- in making your step-up

20   determination, you might also consider matters discussed

21   in the staffing?

22       A    I would be looking to see that anything

23   discussed at staffing that related to being eligible for

24   a step-up was in the documentation that was provided to

25   me.

**Exhibit 35**
**Page 1153**

CONFIDENTIAL

Page 100

1     Q    Okay.  So all that's going to be in the
2  portal?
3     A    Yes.
4     Q    Okay.  And is any aspect of your step-up
5  determination based on your observation of the child or
6  exclusively what's in the portal?
7     A    Exclusively what's in the portal and reported
8  to me, yeah.
9     Q    The criteria that ORR uses in making step-up
10  decisions is spelled out in the policy, correct?
11     A    I'm sorry.  Can you repeat that?
12          ATTORNEY WHITE:  Could you repeat it, please?
13          (The Reporter read the record as follows:
14      QUESTION:  The criteria that ORR uses in
15      making step-up decisions is spelled out in the
16      policy, correct?)
17     A    The -- yes, the placement criteria for secure
18  and staff secure is in the policy.
19     Q    (BY ATTORNEY WHITE) Is there anything in the
20  UAC MAP about that?
21     A    I'm not certain.
22     Q    Okay.  Are there any other policies besides
23  what is in the policy guide and possibly in the MAP that
24  ORR would follow in making step-up determinations?
25     A    Not to my knowledge.

**Exhibit 35**
**Page 1154**

CONFIDENTIAL

Page 105

1      A     Facilities at the shelter level -- well, all

2  of the facilities have their own licensing criteria.

3  And there are, you know, aggressive behaviors that are

4  in opposition to licensing criteria at some of the lower

5  levels of care so -- and some of the expressed behaviors

6  that meet secure placement criteria are often better

7  assessed in a more secure setting.

8      Q     Okay.  Is one of the criteria for step-up to

9  secure, that the youth is considered a danger to

10 themselves?

11     A     That is a criteria of secure placement, I

12 believe.

13     Q     Okay.  Do you know how ORR assesses danger?

14     A     I don't have a -- I don't believe I have a

15 strict definition of how ORR assesses danger.

16     Q     Okay.  Do you know if they use any kind of

17 like metric or assessment to determine if a child is a

18 danger -- considered a danger to themselves?

19     A     The secure and staff secure facilities do use

20 the Ohio Youth Risk Assessment, OYAS.

21     Q     Are you involved in administering the

22 assessment -- the Ohio assessment?

23     A     I do not administer the assessment.

24     Q     So is your -- is your knowledge of a

25 particular youth's assessment under that system based on

**Exhibit 35**
**Page 1155**

CONFIDENTIAL

Page 128

1   what you can glean from the document.

2       A    It appears he is saying that the case

3   coordinator, Chris Chavez, stated that the -- Shenandoah

4   would be a preferred placement.

5       Q    (BY ATTORNEY WHITE) Okay.  So he is just

6   asking for guidance as to whether they want to

7   continue -- him to continue reviewing the case, right?

8       A    That's my understanding --

9       Q    Okay.

10      A    -- yes.

11      Q    So is it common for a minor to be referred to

12  secure placement due to behavioral concerns associated

13  with mental health issues?

14      A    The referral to secure would be if the

15  behaviors meet the secure placement criteria.  It's not

16  necessarily about their mental health diagnosis.

17      Q    Okay.  So that -- that may or may not play a

18  role?

19      A    Correct.

20      Q    What's a notice of placement?

21      A    It's the document that the kids receive to

22  explain why they're in a secure or staff secure

23  facility.

24      Q    Is there any other reason or any other

25  function that the notice of placement serves?

CONFIDENTIAL

Page 129

1    A    The case manager records on the document, the

2  rationale for placement.

3    Q    Does it also inform the child of their right

4  to challenge their placement?

5    A    I don't recall if that's on that specific

6  document.

7    Q    When does the child receive the notice of

8  placement?

9    A    When they arrive at the facility and then

10  every 30 days.

11    Q    And is there a specific, like, time that they

12  have to receive it within from their arrival?

13    A    I don't know the ex -- the specific time frame

14  that's outlined in the policy, but it's happening within

15  the first 48 hours, I think.

16    Q    Okay.  Do you know what happens if a child

17  does not receive a notice of placement within that time?

18    A    No.

19    Q    Do you know who provides the notice of

20  placement to the child?

21    A    The case manager.

22    Q    Do you have any experience that would inform

23  whether the children understand the contents of the

24  notice of placement?

25    A    The case manager is meant to provide the

**Exhibit 35
Page 1157**

Page 132

1     A     I think they understand who I am in

2  relationship to the federal government, but I don't know

3  if they understand my role as, like, making decisions on

4  the specific cases.

5     Q     (BY ATTORNEY WHITE) What do you think they

6  understood about your position with the federal

7  government?

8     A     That they're in ORR custody and that I work

9  for ORR.

10    Q     Okay.  So -- all right.

11          Let's -- how often do children challenge their

12  restrictive placement by seeking review from the ORR

13  director of that placement?

14    A     Not often.

15    Q     All right.  Have you seen it?

16    A     Not recently, no.

17    Q     But have you ever seen it?

18    A     Yeah.

19    Q     Okay.  And in the case or cases that you have

20  seen it, was this something that the kid did on their

21  own or did they do it with, like, a legal

22  representative?

23    A     I usually -- I think I was made aware of it

24  by, like, the lead case manager, so I don't know if it

25  was -- if the kid made the decision to request that with

CONFIDENTIAL

Page 138

1    to the director.

2         Q    Okay.  So other than receiving that

3    notification and the forwarding of documents, do you

4    have any other direct involvement in the specific

5    consent process?

6         A    I -- not that I recall --

7         Q    Okay.

8         A    -- no.

9         Q    So do you know if a -- a child being stepped

10   up to secure placement --

11             ATTORNEY WHITE:  Do you need a break?

12             ATTORNEY VERBY:  No.  Just shifting.

13             ATTORNEY WHITE:  That's okay.

14        Q    (BY ATTORNEY WHITE) Does being stepped up to

15   secure result in a mandatory home study?

16        A    No.

17        Q    Has it been your experience that children at

18   Yolo, their sponsors have been required to undergo

19   discretionary home study?

20        A    Yes.

21        Q    And why is that?

22        A    The case managers often request a home study.

23   It could be re -- related to lots of different things.

24   Either the -- possibly something in the sponsor's

25   background.  Oftentimes it's to ensure that the sponsor

**Exhibit 35**
**Page 1159**

CONFIDENTIAL

Page 139

1   is equipped with all the resources to support the minor,

2   the reasons -- related to the reasons that the kid is in

3   secure placement.

4        Q    So is it your experience that kids in secure

5   placement might require greater resources on the part of

6   a potential sponsor than kids who are in other

7   placements?

8        A    Sometimes, yes.

9        Q    And why is that?

10        A    It's -- it's case by case.  But if --

11   sometimes the reasons that the kids are in secure is a

12   history of -- if they have a history of gang

13   involvement, we want to make sure that both the family

14   and the kid are -- get access to, like, gang prevention

15   classes, so make sure that all of that was in place in

16   the community.

17        Q    So the nature of the reasons that many of

18   these youth are housed in secure are also factors that

19   would support the discretionary home study in any

20   circumstances?

21        A    Sometimes, yes.

22        Q    Okay.  Is it more often than not, do you

23   think?

24        A    That we do home studies in secure?

25        Q    Right.

**Exhibit 35**
**Page 1160**

CONFIDENTIAL

Page 140

1       A    Yes.

2       Q    Okay.  So does a home study result in

3  prolonged detention?

4       A    Sometimes it -- it can.

5       Q    Okay.  And any particular reason why it could?

6       A    Sometimes the home studies come back with a

7  positive recommendation, but with qualifications, so

8  they have identified a few things that the sponsor needs

9  further support on that they are recommending be in

10 place before we release the child.

11      Q    Do they sometimes come back positive without

12 qualifications?

13      A    Yes.

14      Q    And in that circumstance, does it delay

15 release?

16      A    No.

17      Q    Okay.  So the circumstances in which it can

18 prolong detention are when these qualifications come

19 back?

20      A    And the sponsor's ability -- you know, the

21 timeline that it takes the sponsor to respond and --

22      Q    Meet the qualifications?

23      A    -- yes.

24      Q    Okay.  How long does a home study take, on

25 average?

**Exhibit 35**
**Page 1161**

CONFIDENTIAL

Page 144

1   to release the child or to deny the sponsor at that

2   point --

3       Q    Okay.  So if it's --

4       A    -- for the most part.

5       Q    -- if it's typically the last thing that

6   happens, it can delay the release decision, right?

7       A    Yes --

8       Q    The --

9       A    -- if there's a lot of conditions.

10      Q    Okay.  Okay.  Have you ever seen any instances

11  where secure placement has led to the deterioration of

12  the mental health of a minor?

13      A    Yes.

14      Q    Can you explain your answer?

15      A    The care provider team -- the clinician and

16  the case manager -- have definitely reported that to me.

17  I can't remember specific cases, but they have used that

18  exact terminology.

19      Q    So when there is this deterioration of mental

20  health, what happens to the -- to the child?  Are they

21  kept in secure?

22      A    Well, it's -- part of the conversation is

23  trying to figure out how to -- they would be making a

24  placement recommendation, usually asking to step them

25  down or transfer them to a therapeutic setting depending

**Exhibit 35**
**Page 1162**

CONFIDENTIAL

Page 149

1     Q    And I just don't understand if -- is the --

2    that's not included in the portal; is that right?

3     A    What isn't included in the portal?

4     Q    Well, is there information that's contained in

5    the transfer request that is not included in the UAC

6    portal?

7     A    No.  The transfer request is a -- has its own

8    place in the portal.

9     Q    So every bit of information -- written

10   information that's being utilized to make a step-down

11   determination is contained somewhere in the UAC portal

12   on a kid?

13    A    Yes.

14    Q    In your decision on step-down, do you ever

15   interview children?

16    A    I don't believe I have ever interviewed a

17   child for a step-down --

18    Q    Do --

19    A    -- decision.

20    Q    -- you ever observe a child when making a

21   step-down determination?

22    A    No.

23    Q    So is your determination -- do you rely

24   exclusively on the documentation in the UAC portal?

25    A    Yes.  For my final decision, yes.

**Exhibit 35**
**Page 1163**

CONFIDENTIAL

Page 156

1   MAP -- are ORR staff following any other policies or

2   procedures in making step-down determinations?

3        A    Not to my knowledge.

4        Q    Do you know if any child's step-down

5   determination has ever been made outside the established

6   policies and procedures?

7        A    No.

8        Q    Do you know if there's a -- there's a

9   requirement that a child must have 30 days of good

10  behavior in order to be stepped down?

11       A    I know that there is not a requirement.

12       Q    How do you know that?

13       A    Because I cover secure facility.  Because I

14  come up against that belief often, and I have to

15  advocate the children are step-down -- when they are

16  eligible for step-down.  Sometimes that's not 30 days

17  without an SIR.

18       Q    And when you come up against that, who --

19  who -- who has that mistaken belief that you are coming

20  up against?

21       A    There's been a lot of effort to mitigate that,

22  so I don't come up against it very often.  The policy

23  team has done a lot of work to clarify not only the

24  placement criteria --

25       Q    Ms. Smith, I need you to answer my question.

Exhibit 35
Page 1164

CONFIDENTIAL

Page 157

1    A    Sorry.

2    Q    When you come up against this, who -- who have

3  you come up against it who -- who has had this mistaken

4  belief?

5    A    Sometimes the facilities that receive a

6  transfer request will deny it, and they will deny it and

7  ask that the minor have 30 days of nonincident behavior

8  before they may reconsider the transfer.

9    Q    And what facilities have made that mistake?

10   A    I don't remember specific facilities but...

11   Q    Okay.  In your -- you -- you have had this

12 experience in an attempt to step someone down from Yolo?

13   A    Yes.

14   Q    And you have had that experience in an attempt

15 to step someone down from BCFS?

16   A    Yes.

17   Q    Okay.  And in your discussion of these efforts

18 to mitigate against this, you believe this process is

19 less prevalent than it used to be?

20   A    That's been my experience, yes.

21   Q    Okay.  Do you have any idea where these people

22 got this mistaken belief that there is a 30-day good

23 behavior policy?

24   A    I don't know.

25   Q    Do you know if that's ever been a part of ORR

CONFIDENTIAL

Page 158

1    practice?

2         A    I don't know if it's been an ORR practice, but

3    it's definitely been something in the -- from the care

4    providers that they have come back requesting.

5         Q    Okay.  But you -- you aren't aware of it ever

6    having been in any kind of written policy, are you?

7         A    I don't remember that, no.

8         Q    So how is good behavior evaluated?

9         A    Like when the programs are considering a

10   transfer request?

11        Q    Yes.

12        A    I think generally they're looking at the

13   significant incident reports.

14        Q    Okay.  So if -- the lack of a significant

15   incident report in a child's file would indicate good

16   behavior?

17        A    Generally, yes.

18        Q    Okay.  Do you know if that good behavior is

19   evaluated differently for children with disabilities?

20        A    No.

21        Q    Do you know if that's ever been the case?

22        A    No.

23        Q    You're not aware of any change in that

24   requirement?

25        A    A change in?  Sorry.  What was the question?

**Exhibit 35**
**Page 1166**

CONFIDENTIAL

Page 159

1    Q    Any change in the requirement that the
2    evaluation of good behavior is different for children
3    with disabilities?
4         ATTORNEY VERBY:  Could you be a little --
5    clarify about disabilities?  Is it mental?  Physical?
6    Both?
7    Q    (BY ATTORNEY WHITE) I just have disabilities,
8    so that's --
9         ATTORNEY VERBY:  Okay.
10   Q    (BY ATTORNEY WHITE) -- the question for now.
11        Do you know of any policy change in that
12   regard?
13   A    Regarding assessing good behavior for kids
14   with disabilities?
15   Q    Correct.
16   A    No.
17   Q    Are you aware of children still being told
18   they have to maintain 30 days of good behavior in order
19   to be stepped down?
20   A    No.
21   Q    So in this process, is there ever a
22   determination as to whether a child is, quote, stable?
23   A    The clinicians do use that language sometimes.
24   Q    What's your understanding of what it means
25   when they use it?

**Exhibit 35**
**Page 1167**

Page 160

1      A      Generally it's being used when they are

2   describing the child making progress and being able to

3   self-regulate and make positive decisions.

4      Q      In your experience, does that factor into the

5   decision about step-down, whether a child would be

6   stepped down?

7      A      If it affects their eligible -- if it -- if it

8   helps them towards meeting, like, step-down placement

9   criteria.

10            (Ben Ross left the deposition room at

11   3:17 p.m.)

12      Q      (BY ATTORNEY WHITE) So some of the step-down

13   placement criteria would coincide with whether or not a

14   child is considered stable?

15      A      I think the discussion around stabilization is

16   more about affirming that the care provider has

17   mitigated -- like at Yolo, that -- the conditions where

18   the child met secure placement criteria, they have

19   stabilized their behavior, meaning they're no longer a

20   danger to themselves or others.  And then yes, they

21   would be eligible for step-down to staff secure.

22      Q      So in that instance being stable would

23   coincide with eligibility for those step-down criteria

24   then, correct?

25      A      Yes, in that -- in that --

CONFIDENTIAL

Page 161

1    Q    So --

2    A    -- instance.

3    Q    -- does that -- do you believe that

4  determination of whether a kid is stable factors into

5  case manager recommendations for step-down?

6    A    It could.

7    Q    Would the mental health status of a child be

8  similarly considered as a factor by a case manager in

9  recommending step-down?

10   A    Possibly, if their -- if that mental health

11 issue was impacting their behaviors.

12   Q    Okay.  Their stabilization, as you referred to

13 it earlier, can that mental health status affect that?

14   A    I don't -- I don't understand the question.

15   Q    Okay.  Well, does that -- when you

16 say "possibly," would that also possibly affect your

17 determination in step-down, the child's mental health

18 status?

19   A    No.  If -- not if -- if they meet step-down

20 placement criteria, I -- I wouldn't.

21   Q    Okay.  So then is it your testimony that the

22 mental health status has nothing to do with whether they

23 meet the placement criteria or not?

24   A    I don't think either secure or staff secure

25 placement criteria refers to their mental health status

CONFIDENTIAL

Page 162

1  specifically.

2      Q    Okay.  And understanding that, can it affect

3  whether or not they meet those criteria?

4      A    I'm never looking at their mental health

5  status on its own when thinking about step-down

6  eligibility.

7          I'm looking at the whole picture and needing

8  to make sure that they meet the placement criteria for

9  the facility.

10     Q    And my question is whether, in some

11 circumstances, the status of their mental health can

12 affect whether or not they meet those criteria or not.

13     A    If part of their mental health issue is

14 behavioral and causes them to be a danger to themselves

15 or others, then possibly, yeah.

16     Q    Okay.  So does bed space availability have an

17 impact on the ability to step-down from secure to staff

18 secure?

19     A    Yes.

20     Q    And in what way?

21     A    If -- if a child in secure is needing to be

22 stepped down to staff secure and all of the facilities

23 were full, then they wouldn't --

24     Q    And how --

25     A    -- be --

CONFIDENTIAL

Page 163

1      Q    -- frequently does that happen?

2           THE COURT STENOGRAPHER:  Then they wouldn't

3      be?

4      A    -- they wouldn't be able to accept another

5      child if all of their beds were full.

6           I do not recall a child not being eventually

7      stepped down because of bed capacity, but it can delay

8      the process.

9      Q    (BY ATTORNEY WHITE) And in your experience,

10     how long can it delay the process?

11     A    I don't recall specific timelines but...

12          ATTORNEY WHITE:  Let's take a five-minute

13     break.

14          ATTORNEY VERBY:  Sure.

15          (A break was taken from 3:24 p.m. to

16     3:37 p.m.)

17     Q    (BY ATTORNEY WHITE) Okay.  What mental health

18     services are available to children at Yolo?

19     A    There are -- there's a clinical team, and they

20     assess the mental health needs of the kids and make the

21     necessary referrals.

22     Q    Okay.  What mental health services are

23     available to children at Yolo?

24     A    I didn't just answer that question?

25     Q    No.  You told me there's a clinical team that

**Exhibit 35**
**Page 1171**

CONFIDENTIAL

Page 223

1

2

3

4        I, ELICIA F. SMITH, do hereby declare under penalty

5    of perjury that I have read the foregoing transcript;

6    that I have made any corrections as appear noted, in

7    ink, initialed by me, or attached hereto; that my

8    testimony as contained herein, as corrected, is true and

9    correct.

10        EXECUTED this_____ day of_____,

11    20_____, at_____, _____.

                (City)                    (State)

12

13

14                    _____

                    ELICIA F. SMITH

15

16

17

18

19

20

21

22

23

24

25

**Exhibit 35**
**Page 1172**

CONFIDENTIAL

1    I, MARY J. GOFF, CSR No. 13427, Certified Shorthand

2    Reporter of the State of California, certify;

3    That the foregoing proceedings were taken before me

4    at the time and place herein set forth, at which time

5    the witness declared under penalty of perjury; that the

6    testimony of the witness and all objections made at the

7    time of the examination were recorded stenographically

8    by me and were thereafter transcribed under my direction

9    and supervision; that the foregoing is a full, true, and

10   correct transcript of my shorthand notes so taken and of

11   the testimony so given;

12   That before completion of the deposition, review of

13   the transcript (  ) was (  ) was not requested:   (XX)

14   that the witness has failed or refused to approve the

15   transcript.

16   I further certify that I am not financially

17   interested in the action, and I am not a relative or

18   employee of any attorney of the parties, nor of any of

19   the parties.

20   I declare under penalty of perjury under the laws

21   of California that the foregoing is true and correct,

22   dated this 6th day of December, 2019.   *Mary J. Goff*

23   _____

     MARY J. GOFF

24

25

# Exhibit 36

Exhibit 36
Page 1174

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION
CAUSE NO. 2:18-CV-05741 DMG PLA


LUCAS R., et al.,                    )
                                     )
               Plaintiffs,           )
                                     )
        vs.                          )
                                     )
ALEX AZAR, Secretary of U.S.         )
Department of Health and             )
Human Services, et al. ,             )
                                     )
               Defendants.           )


THE DEPOSITION UPON ORAL EXAMINATION OF

M E G A N   S T U A R T,
the deponent produced and sworn before me,
Lindsay N. Bola, Notary Public in and for
the County of Hamilton, State of Indiana, taken
on behalf of the defendants, at the Office of
the U.S. Attorney, 10 West Market Street, Suite
2100, Indianapolis, Marion County, Indiana, on the
9th day of July 2019, commencing at approximately
9:30 a.m., pursuant to the Indiana Rules of Trial
Procedure, with written notice as to the
time and place.


Magna Legal Services
866-624-6221
www.MagnaLS.com



Exhibit 36
Page 1175

Page 57

```
 1    A.    Three.

 2    Q.    Looking at the last sentence of paragraph 12,

 3          "At best, ORR's policies and procedures for

 4          determining whether to release a juvenile" --

 5    A.    It's that they're not based on any set

 6          standards, they're just at the whim of the

 7          FFS, like, do they like the client, do they

 8          not like the client.

 9    Q.    Okay.  You said you have read the policies and

10          procedures?

11    A.    At the time.

12    Q.    Do you have an example of, like, deviating

13          from the policy?

14    A.    I mean, the policy doesn't specify -- the

15          policy specifies the mechanics at the time,

16          based on my best recollection, it specified

17          the procedures for release, right, so if a

18          sponsor has been approved, sponsor puts forth

19          what steps do they have to go through, doesn't

20          really talk about how that sponsor's approved,

21          and then upon release what does that process

22          look like.  So it's the gap between, like, how

23          does ORR make that determination about whether

24          or not to release.

25    Q.    Okay.
```



**MAGNA**
LEGAL SERVICES

**Exhibit 36**
**Page 1176**

```
 1          facility, were you given any advance notice of
 2          that by ORR or by anyone else?
 3    A.    No.  In one instance when my client was in
 4          Sandy Pines and was being moved to Shenandoah,
 5          his child advocate had found out that they
 6          were planning on transferring him, and I think
 7          I had three days or maybe a week, not even, to
 8          try to advocate to keep him placed there
 9          because it was a treatment center and that was
10          unsuccessful.
11    Q.    Now, in your experience -- sorry?
12    A.    I said it was unsuccessful.
13    Q.    Now, in your experience did ORR ever disclose
14          any of the evidence that it was relying on to
15          justify a transfer to a more restrictive
16          placement?
17    A.    No.
18    Q.    In your experience were your clients available
19          to testify or otherwise offer evidence on
20          their behalf in contesting, rejecting to a
21          transfer to more restrictive placement?
22    A.    No.  That would be amazing though.
23    Q.    Okay.  And in speaking with -- I mean,
24          informing yourself about others advocating for
25          children in ORR custody, how common was it for
```



MAGNA ▶
LEGAL SERVICES

Exhibit 36
Page 1177

Page 118

```
1        think there is a mention today of government

2        employees who may or may not be supervisory as

3        well as names of government contractors'

4        employees, and the official capacity

5        defendants are going to go ahead and designate

6        those names also.  I think that's probably

7        covered it.  I think this is just redundant,

8        but out of caution.

9              MS. STEVENSON:  I think the entire

10       deposition was designated confidential.

11             MR. MOSS:  Those are all the

12       questions that we have.

13             MS. STEVENSON:  I think we'll close

14       this deposition if that's everything from

15       everyone.  Thank you all very much.

16             AND FURTHER THE DEPONENT SAITH NOT.

17

18       _____

19                   MEGAN STUART

20

21

22

23

24

25
```



Exhibit 36
Page 1178

Page 119

```
1        STATE OF INDIANA      )
                               )   SS:
2        COUNTY OF HAMILTON    )

3

4        I, Lindsay N. Bola, Notary Public in Hamilton
    County, Indiana, do hereby certify that the
5   deponent was by me sworn to tell the truth in the
    aforementioned matter;
6        That the deposition was taken on behalf of the
    defendants at the time and place heretofore
7   mentioned with counsel present as noted;
         That the deposition was taken down by means of
8   Stenograph notes, reduced to typewriting under my
    direction and is a true record of the testimony
9   given by said deponent and was thereafter presented
    to the deponent for signature.
10       I do further certify that I am a disinterested
    person in this cause of action; that I am not a
11  relative or attorney of any of the parties  or
    otherwise interested in the event of this action
12  and am not in the employ of the attorneys for the
    respective parties.
13

14       IN WITNESS WHEREOF, I have hereunto set my
    hand and affixed my notarial seal this _____ day
15  of July 2019.

16

17

18

19              _____
                     Lindsay N. Bola, Notary Public
20

21       County of Residence:  Hamilton
22       My Commission Expires:  March 16, 2024
23

24

25
```



**Exhibit 36**
**Page 1179**

# Exhibit 37

Exhibit 37
Page 1180

Page 1

<pre>
 1                 UNITED STATES DISTRICT COURT

 2         CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3

 4             Case No.  No. 2:18-CV-05741-DMG-PLA

 5

 6    _____

 7    LUCAS R., et al.,                    )

 8              Plaintiffs,                )

 9          v.                             )

10    ALEX AZAR, Secretary of U.S.         )

11    Department of Health and             )

12    Human Services, et al.,              )

13              Defendants.                )

14    _____     )

15                      CONFIDENTIAL

16            DEPOSITION OF JALLYN SUALOG

17                  Washington, D.C.

18                  August 21, 2019

19

20

21

22

23

24    Reported by: BARBARA DE VICO

25    Job No. 166053
</pre>

Confidential

Page 52

1    residential treatment near Manvel, Texas?

2           A.    Yes.

3           Q.    Is one of them at Mercy First in

4    Syosset, New York?

5           A.    Yes.

6           Q.    Are case managers at both of those

7    RTCs?

8           A.    Yes.

9           Q.    And those case managers within,

10   would be in a position to decide whether a child

11   should be stepped down or not based upon the

12   reports of their stability, mental stability?

13                MR. SHIEH:  Object to the form.

14          A.    Case managers do not decide.  Case

15   managers as part of the facility can recommend.

16          Q.    Okay.  And the recommendation for a

17   step-down from an RTC, does that go first to a case

18   coordinator?

19          A.    The routing of any change in

20   placement such as a transfer is routed to a case

21   coordinator.

22          Q.    And then from the case coordinator,

23   it would be routed to the federal field specialist?

24          A.    Yes.

25          Q.    And the federal field specialist

Confidential

Page 53

1  would have the final word on whether to approve the

2  step-down from a residential treatment center,

3  correct?

4          A.     Yes.

5          Q.     Are you aware of any training that

6  ORR has given to federal field specialists on when

7  children should be removed from residential

8  treatment centers?

9          A.     I'm not aware of what training the

10 federal field specialists are provided.

11         Q.     Are you aware of the qualifications

12 that a federal field specialist must have in terms

13 of education to be hired into that position?

14         A.     I don't recall what it is.

15         Q.     Did you ever work as a federal field

16 specialist yourself?

17         A.     No.

18         Q.     And the same question with respect

19 to experience.  Are you aware of what experience

20 someone must have to be hired into the federal

21 field specialist position?

22         A.     I don't know specifically.  I know

23 that federal field specialists are federal

24 employees and based on their GS level meet the

25 minimum requirement.  But specific to FFSs, I do

Confidential

Page 101

1  that state and local child protective services are

2  inadequate to ensure their safety or care?

3        A.    I don't know why they wouldn't.

4        Q.    Okay.

5            MR. HOLGUIN:  We can break now.

6              (Recess)

7  BY MR. HOLGUIN:

8        Q.    Okay.  What is ORR's policy with

9  respect to allowing lawyers access to case

10  managers?

11        A.    We don't have any specific policy, I

12  believe, regarding that.  But the primary point of

13  contact for attorneys are case managers.

14        Q.    Okay.  So who would decide whether a

15  lawyer gets to speak with a case manager?

16        A.    I don't -- all I can say is ORR is

17  not making those determinations.  There's nothing

18  that limits interaction between attorneys and case

19  managers or requests or any, anything that says

20  that a case manager and an attorney needs or has

21  permission to interact.

22        Q.    Does ORR have any policy to require

23  case managers to interact with children's lawyers?

24        A.    I think that ORR may have policies

25  and procedures regarding ensuring that case

Confidential

Page 114

1          A.     I will admit that I -- my knowledge,

2     exact knowledge of what the TVPRA is not as

3     thorough as that.

4          Q.     So you've never seen a memorandum or

5     anything in writing in which ORR has interpreted

6     what legal matter, matters or proceedings are?

7          A.     I don't recall looking at such a

8     document.

9          Q.     Okay.  In terms of the Vera

10    Institute of Justice, what is your role with

11    respect to the work that they do for ORR?

12         A.     They don't have a role, specific

13    role to their work.

14         Q.     Who within ORR supervises Vera

15    Institute of Justice's work?

16         A.     The contracting officer

17    representative assigned to that contract would.

18         Q.     And what's that person' name?

19         A.     I believe currently it is Stacey

20    Terrell.

21         Q.     Have you ever had occasion to

22    supervise or oversee Vera Institute of Justice's

23    contractor work?

24         A.     Yes.

25         Q.     When was that?

Confidential

Page 119

1          Q.     Okay.  In terms of children's

2    lawyers' access to federal field specialists, is

3    there any policy that you're aware of that ORR has

4    adopted?

5          A.     No.

6          Q.     Would it be fair to say that the

7    FFSs then have discretion to speak with children's

8    lawyers or not?

9               MR. SHEIH:  Objection to form.

10         A.     We have no policy prohibiting any

11   contact between FFS and their attorneys.  As a part

12   of -- as part of the program, to me, it seems like

13   there is a lot -- there is communication between

14   those two parties.  I don't know if there's

15   anything that says that what level of discretion

16   is, is exercised.

17         Q.     As a general matter when ORR does

18   not have a policy on a particular subject and

19   there's a decision to be made about that subject,

20   isn't that -- doesn't that decision become

21   discretionary?

22               MR SHEIH:  Objection.

23          Mischaracterizes testimony.

24         A.     I don't know if I would agree with

25   that statement.  I think it's very -- you're asking

Confidential

Page 130

1          A.      They gather information, they staff

2    cases weekly, the facility staff, so they know they

3    have information about sponsors through the case

4    manager and the clinician at the facility level.

5          Q.      Do case coordinators also collect

6    information independently, for example, around a

7    proposed sponsor's prior history with respect to

8    receiving children from ORR care?

9                  MR. SHEIH:  Objection to form.

10         A.      Do case coordinators collect

11   independent information?

12         Q.      Yes.  Do they conduct -- for

13   example, they do additional checks on proposed

14   sponsors that would indicate that this given

15   proposed sponsor has previously received a child

16   from ORR?

17         A.      They do not independently collect

18   that information.  That information is in the, in

19   the, in the ORR database.

20         Q.      But do they search for it?

21         A.      I do not know if they search for it.

22   It's there.

23         Q.      Okay.  But going back to my prior

24   question, is there any ORR policy that says case

25   coordinators should share information that they are

Confidential

Page 131

1    privy to with children's lawyers?

2              MR. SHEIH:  Objection to form.

3         A.    I don't know of any such policies.

4         Q.    Okay.  Now, is there any policy that

5    requires ORR to share information with children's

6    lawyers regarding their taking psychotropic

7    medications?

8         A.    I do not know.

9         Q.    Does ORR have any policy that

10   requires facilities to share information with

11   children's lawyers when they are about to be

12   stepped up?

13        A.    I do not know.

14        Q.    Is there any -- does ORR have any

15   policy with respect to requiring facilities to

16   inform children's lawyers when they're going to be

17   stepped down or being considered for step-down?

18        A.    I'm not aware, I don't know what

19   those policies and procedures surrounding step-ups

20   or step-downs are.  I don't -- as a normal course

21   of the work I do, I don't see that.

22        Q.    Okay.  What is ORR's policy with

23   respect to -- if it has one -- with respect to

24   allowing children to leave facilities to go to the

25   lawyer's office for interviews?

Confidential

Page 136

1        Q.    But sitting here today, do you think

2    there would be any adverse impact on ORR if

3    attorneys were to be told who the case coordinator

4    is and allowed to communicate with them?

5                  MR SHEIH:  Objection.  Calls for

6          speculation.

7        A.    I think attorneys know who the case

8    coordinators are.  I don't think that the

9    information is at all withheld from attorneys.

10        Q.    So there is no adverse impact to the

11    agency from informing attorneys who the case

12    coordinator is for their client, correct?

13                  MR SHEIH:  Objection.

14          Mischaracterizes the testimony.

15        A.    Whether or not it causes an adverse

16    effect, I couldn't say without, without anything

17    knowing what it is specifically, doing something

18    and thinking about it and looking, you know, and

19    consulting other parts of ORR on what the impact,

20    if any, of that is.

21        Q.    But sitting here today, you can't

22    think of any?

23        A.    I don't know any.

24        Q.    Okay.  Would there be any adverse

25    impact that you can think of sitting here today

Page 137

1  were ORR to adopt a policy requiring FFSs to have

2  regular communication with children's lawyers?

3              MR. SHEIH:  Objection to form.

4       A.    The only adverse effect would be I

5  don't know if FFSs know enough about each child's

6  case to have regular contact with their attorneys.

7       Q.    Okay.  Now, the FFSs are the ones

8  who make a final decision regarding release;

9  correct?

10      A.    Correct.

11      Q.    And so what adverse impact would

12 there be, if any, were attorneys allowed to speak

13 with the FFSs prior to their making a decision on

14 the release?

15              MR. PINCHAS:  Objection.

16        Incomplete hypothetical.

17      A.    So, yes, in this hypothetical --

18 maybe you can clarify it about.

19      Q.    Well, what down side to ORR would

20 there be if attorneys were permitted to contact

21 FFSs before they make a decision on release?

22      A.    The only down side would be it's a

23 potential for increasing the length of care,

24 because ORR, ORR releases a large number of

25 children on a daily basis.  And if the attorneys,

Confidential

Page 138

1    if the FFSs were required to speak to attorneys

2    prior to every decision for discharge, that could

3    potentially delay the discharge.

4            Q.    Okay.  What about if they were

5    required to speak with attorneys prior to every

6    denial of discharge?  How would that adversely

7    affect the agency, if at all, that you can think of

8    sitting here today?

9            A.    I don't know enough about how many

10   denials of discharges realistically that the field

11   does to be able to I think accurately answer that.

12           Q.    But you can't think of any adverse

13   impact sitting here today?

14                 MR SHEIH:  Objection.

15          Mischaracterizes testimony.

16           A.    I don't know enough about the

17   process to tell you that there's any adverse

18   impact.

19           Q.    What is ORR's policy with respect to

20   allowing children to telephone their attorneys?

21           A.    Children can telephone their

22   attorneys whenever they want.

23           Q.    Is that in the MAP, is it in the

24   cooperative agreement?  Where have you seen that

25   policy?

Confidential

Page 139

1          A.     I believe it's in the MAP.

2          Q.     Okay.  And so your understanding is

3    that children are permitted to call their attorneys

4    any time of the day whenever they want?

5          A.     Yes.

6          Q.     Okay.  And what would be the

7    consequence if a facility were to disallow a child

8    an opportunity to call his or her lawyer?

9          A.     It would be a noncompliance with ORR

10   requirements.  I would suppose that ORR would hear

11   from attorneys that they are not, their clients

12   were not allowed to contact them at will.

13         Q.     Okay.  Have you ever, do you recall

14   ever seeing a notice of noncompliance when a

15   facility has barred a child from calling his or her

16   lawyer?

17         A.     I don't recall any, seeing anything

18   regarding that specifically.

19         Q.     Okay.  Do you believe that there

20   would be, that -- does ORR have any policy with

21   respect to allowing children's lawyers expedited

22   access to a copy of the ORR file?

23                MR SHEIH:  Objection.  Calls for

24         speculation.

25         A.     A couple things.  I don't know, I

Confidential

Page 140

1   think the answer is that I don't know what the

2   process, the policies are regarding giving

3   attorneys access to the file.  That's one.

4        Secondly, are you referring to during the

5   case file request process?

6        Q.    Yes.

7        A.    I don't know -- I don't know what

8   the time frame it takes are, but I know that there

9   is a process for expedited access to -- expedited

10  provision of case files.

11       Q.    Okay.  But is one of the grounds for

12  expediting production of a case file to your

13  knowledge that a child's attorney is requesting it?

14             MR. SHEIH:  Objection to form.

15       A.    You're asking me if the process is

16  expedited because it's the child's attorney?

17       Q.    Yes.

18       A.    No, that is not a -- I don't believe

19  that is an accurate, being expedited.

20       Q.    Okay.  Are you aware of any child

21  who has sued ORR in federal court over their

22  treatment in, during ORR custody?

23             MR. SHEIH:  Objection to form.

24       A.    I don't recall any, but I want to

25  say that just because I don't recall it doesn't

**Exhibit 37**
**Page 1193**

Confidential

Page 153

1   a set of needs that he -- any child that's younger,

2   a four-year-old might have a different set of

3   needs.  That's what the age of the child would

4   impact that.

5               MR. HOLGUIN:  I'd like to show the

6           witness what'sbeen marked as Plaintiffs'

7           Exhibit 4, please.

8       A.    (Witness complies with request.)

9       Q.    Could you describe what your

10  understanding of this document is.

11      A.    It's an email chain regarding an

12  attorney's request to interview a clinician

13  regarding a case.

14      Q.    Okay.  Is there anything about this

15  email exchange that strikes you as being contrary

16  to ORR policy?

17              MR SHEIH:  Objection.  Lack of

18          foundation.

19      A.    I don't think so, no.

20      Q.    Thank you.  Now, with respect to

21  evaluation of proposed sponsors, does ORR maintain

22  oversight of how long it's taking for facilities to

23  make a recommendation regarding release?

24      A.    Yes.

25      Q.    How does it do that?

Confidential

Page 154

1           A.      The FFS and other ORR staff, the

2    contractor field staff, interacts with, on a

3    regular basis, with case coordinators in general to

4    see how the flow is at the facility.  They can also

5    look at the database, and it has on a status page

6    that looks at all essential, the unification

7    milestones to see what the progress of that is and

8    then follow up with case managers.

9           Q.      And is there -- does ORR generate

10   regular aging reports or reports that would

11   indicate that so many children have remained in

12   custody for particular lengths of time, something

13   of that nature?

14          A.      Regular reports?

15          Q.      Yes.

16          A.      I believe the field gets specific

17   reports about the kids that are in their facilities

18   that have been in care over X amount of days.  And

19   they use it as a follow-up or as a tool to follow

20   up with the programs.

21          Q.      Okay.  And who gets these reports?

22          A.      I believe the FFS supervisors get

23   them, and they disseminate them to the FFS staff.

24          Q.      How many FFS supervisors are there?

25          A.      There are nine supervisory FFSs.

Confidential

Page 210

1          Q.     Does ORR have any time limit on how

2     long it can take the grantee to initiate a home

3     study?

4                      MR. SHEIH:  Objection to form.

5          A.     ORR has received the requirements

6     for the home study grantees.  I'm unaware of the

7     specifics on that.

8          Q.     Okay.  Does ORR have particular

9     qualifications, minimum qualifications it requires

10    for individuals who conduct home studies?

11         A.     Yes.

12         Q.     Where are those written?

13         A.     In the cooperative agreement.

14         Q.     The cooperative agreement between

15    ORR and the --

16         A.     Grantee that provides home studies.

17         Q.     Okay.  What access do detained

18    children have to the individuals who conduct home

19    studies, if any?

20         A.     The children's access?

21         Q.     Yes.

22         A.     I don't believe that they have

23    access.

24         Q.     What access do children's lawyers

25    have to the individuals who perform home studies,

Confidential

Page 211

1    if any?

2            A.     I don't know of any access they have

3    to home study.

4            Q.     When a home study is completed, is

5    the child -- first of all, is the home study

6    memorialized in writing?

7            A.     Yes.

8            Q.     So there's a written report?

9            A.     Yes.

10           Q.     And who receives the written report?

11           A.     The ORR does in terms of the

12   facility, the facility that the child is placed

13   with.  It is uploaded into the ORR system.

14           Q.     So the case manager would see the

15   home study report?

16           A.     Yes.

17           Q.     And would the case coordinator see

18   the home study report?

19           A.     Yes.

20           Q.     Would the federal field specialist

21   see the home study report?

22           A.     Yes.

23           Q.     Would the child's lawyer see the

24   home study report?

25           A.     I am unsure, but in the portal

Exhibit 37
Page 1197

Confidential

Page 214

1  dangerousness.  But since home study doesn't assess

2  a child's dangerousness and the reason for denying

3  release was something that was in the home study

4  report, I'm wondering what recourse a child has to

5  contest the home study's conclusions, if any.

6            MR. SHEIH:  Objection to form.

7        A.    I do not know how often a decision

8  to release relies solely on information in a home

9  study.  And I do not know of any requirements that

10  allows the child to review the home study report.

11        Q.    Okay.  Now, in making a release

12  decision, does ORR have any written policy that

13  requires case managers to take into account the

14  role that detention-induced trauma, the role of

15  detention-induced trauma.  In other words -- let me

16  go back.

17        Does ORR have any policy that requires case

18  managers to consider the impacts of prolonged

19  detention on a child's welfare in making a release

20  decision?

21        A.    ORR has no such policies.

22        Q.    Does ORR track what are called SIRs?

23        A.    Yes.

24        Q.    What does that stand for?

25        A.    Significant incident report.

Confidential

Page 219

1       Does ORR track incidents where children

2   released from its custody have been abused,

3   neglected or abandoned?

4       A.    ORR does not have a means to collect

5   that information for every case, but ORR is

6   sometimes contacted by child welfare entities or a

7   child will make contact to the national call center

8   to ask for resources regarding that or a sponsor.

9       Q.    Is that recorded in a database

10  anywhere as in incidents of post-release abuse,

11  abandonment or neglect?

12      A.    No.

13      Q.    Does ORR have -- has it conducted

14  any studies regarding the incidents of post-release

15  abuse, abandonment or neglect of children formerly

16  in its custody?

17      A.    No.  ORR does not have the means to

18  collect that information after discharge, thirty

19  days after discharge.

20      Q.    So within 30 days of discharge, the

21  agency, ORR does have the ability to collect

22  information about children who have been abused,

23  abandoned or neglected?

24      A.    So ORR conducted a 30-day

25  post-release call to sponsors and children to check

Page 232

C E R T I F I C A T E

3    LUCAS right.            )

4          v.               )

5    ALEX AZAR, et al.,      )

8          I, BARBARA DeVICO, a Notary Public within and

9     for the District of Columbia , do hereby certify:

10         That JALLYN SUALOG, the witness whose

11    deposition is hereinbefore set forth, was duly

12    sworn by me and that such deposition is a true

13    record of the testimony by such witness.

14         I further certify that I am not related to

15    any of the parties to this action by blood or

16    marriage; and that I am in no way interested in

17    the outcome of this matter.

18         IN WITNESS WHEREOF, I have hereunto set my

19    hand this 3rd of September, 2019.

21

22    _____

23                 BARBARA DeVICO

# Exhibit 38

Exhibit 38
Page 1201

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3                  WESTERN DIVISION

 4

 5   LUCAS R., et al.,        )

 6            Plaintiffs,  )  Case No.

 7        vs.               )  2:18-CV-05741 DMG PLA

 8   ALEX AZAR, Secretary  )

 9   of U.S. Department    )

10   of Health and Human   )

11   Services, et al.,      )

12            Defendants.   )

13

14

15                  CONFIDENTIAL

16       DEPOSITION OF STEPHANIE TREVINO

17              Chicago, Illinois

18           Thursday, March 5, 2020

19

20

21

22

23   Reported by:

24   ELIA E. CARRIÓN, CSR, RPR, CRR, CRC

25   JOB NO. 177122
```

**Exhibit 38**

*TSG Reporting - Worldwide   877-702-9580*        **Page 1202**

Confidential

1        A.    No.

2        Q.    If you do communicate with a

3   physician, would that communication be

4   documented somewhere?

5        A.    Yes.

6        Q.    Where would it be documented?

7        A.    Email.

8        Q.    And as we sit here, can you think

9   of any instances where you've communicated

10  with a physician?

11       A.    I cannot remember.

12       Q.    Do you communicate directly with

13  children's family members or sponsors?

14       A.    No.

15       Q.    Why not?

16       A.    That's not my role.

17       Q.    Okay.  Whose role is it to

18  communicate directly with children's family

19  members or sponsors?

20       A.    The case manager.

21       Q.    Do you communicate with attorneys

22  for children?

23       A.    Yes.

24       Q.    What do you communicate with them

25  about?

Exhibit 38
Page 1203

Confidential

1          stakeholder meetings.

2          Q.   And I believe your answer was yes?

3          A.   Yes.

4          Q.   Do you keep a copy of the minutes

5     from any stakeholder meetings you attend?

6          A.   Yes.

7          Q.   And are you required to attend

8     stakeholder meetings?

9          A.   I'm not sure.

10         Q.   Are you aware of any ORR policies

11    or procedures related to how you're supposed

12    to communicate with attorneys?

13         A.   No.

14         Q.   Are you aware of any policies --

15    ORR policies or procedures related to what

16    information you can share with attorneys?

17         A.   I cannot remember.

18         Q.   Other than the people that we've

19    discussed, do you communicate with anyone

20    else for work purposes?

21         A.   I cannot remember.

22         Q.   Have you ever been or are you

23    currently a member of any committees, task

24    forces, or working groups related to your

25    work as an FFS?

Exhibit 38
Page 1204

Page 393

1              REPORTER'S CERTIFICATION

2

3              I, ELIA E. CARRIÓN, CSR, RPR, CRR,

4     CRC, a Certified Shorthand Reporter in and

5     for the state of Illinois, do hereby certify:

6              That the foregoing witness was by

7     me duly sworn; that the deposition was then

8     taken before me at the time and place herein

9     set forth; that the testimony and proceedings

10    were reported stenographically by me and

11    later transcribed into typewriting under my

12    direction; that the foregoing is a true

13    record of the testimony and proceedings taken

14    at that time.

15             That before the conclusion of the

16    deposition, the witness has requested a

17    review of this transcript pursuant to Rule

18    30(e)(1).

19             IN WITNESS WHEREOF, I do hereunto

20    set my hand of office at Chicago, Illinois,

21    this 18th day of March, 2020.

22

23    _____

      ELIA E. CARRIÓN
24    C.S.R. Certificate No. 084.004641.

25

**Exhibit 38**
**Page 1205**

# Exhibit 39

Exhibit 39
Page 1206

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3             WESTERN DIVISION

4    ----------------------------

5    LUCAS R., et al.,
                    Plaintiffs,
6
     vs.                        Case No.
7                      2:18-cv-05741 DMG PLA

8    ALEX AZAR, Secretary of U.S.
     Department of Health and
9    Human services, et al.,

10                  Defendants.
     ----------------------------
11

12

13

14

15   TELECONFERENCE DEPOSITION OF MICAELA VERGARA

16          June 9, 2020

17

18       ***CONFIDENTIAL***

19

20

21

22

23

24   Reported by:  Susan S. Klinger, RMR-CRR, CSR

25   Job No. 180316

Confidential

1  shelters receive mental health services?

2      A.    The minimum requirement is once a

3  week.

4      Q.    And what is the minimum requirement

5  for children at RTC to receive mental health

6  services?

7      A.    My understanding at Shiloh it is

8  twice a week therapy services at a minimum.

9      Q.    Is Shiloh an acute care facility?

10     A.    No.

11     Q.    Are you familiar with therapeutic

12  staff secure placement?

13     A.    Not really.

14     Q.    Do you know whether there are any

15  therapeutic staff secure placements in the ORR

16  network?

17     A.    I wouldn't know.  I would have to

18  look it up.

19     Q.    Have you ever received any training

20  on therapeutic staff secure placements?

21     A.    I can't remember, I can't remember.

22     Q.    Do you know whether any of the FFSs

23  that you supervise have received training about

24  therapeutic staff secure placement?

25     A.    I don't remember.

**Exhibit 39**
**Page 1208**

1        A.        I haven't had that experience, so I

2   don't know.

3        Q.        If a child or a child's sponsor

4   obtained a second opinion as to whether the

5   child should be stepped down, would you or

6   Nikki consider that second opinion in the

7   determination to step a child down or not?

8        A.        Sure, yes.

9        Q.        Has anyone -- are you aware --

10  excuse me, I will start again.

11              Are you aware of whether anyone at

12  Shiloh has ever informed a child or their

13  sponsor as to whether they can obtain a second

14  opinion regarding whether a child should be

15  stepped down from Shiloh?

16       A.        I don't know.

17       Q.        Are there requirements that must be

18  met in order for a child to be stepped down

19  from Shiloh?

20       A.        The only requirement that I am aware

21  of at this time is that they have to -- they

22  cannot be a danger to self or others.

23       Q.        And does anyone besides Dr. Ruiz

24  assess whether the child is a danger to

25  themselves or others?

**Exhibit 39**
Page 1209

Confidential

Page 120

1   or unstable to describe a child at Shiloh?

2        A.    I guess I don't understand what you

3   are trying to ask.

4        Q.    I'm wondering whether you have ever

5   talked about whether a child has been

6   stabilized or is stable when referring to a

7   child at Shiloh?

8        A.    Mental health practitioners use

9   different terminology.  It will -- it could be

10  that I use that term stable to describe that,

11  you know, the child is no longer -- the child

12  is no longer being a danger to self or others.

13       Q.    Does anyone at ORR confirm that Dr.

14  Ruiz's recommendations to step-down a child is

15  consistent with ORR criteria?

16       A.    I don't know.

17       Q.    Do you know whether anyone at ORR

18  monitors Dr. Ruiz's decision to recommend that

19  a child be stepped down from Shiloh?

20       A.    I don't know.

21       Q.    Does ORR require that Dr. Ruiz make

22  a new finding every 30 days that a child is a

23  danger to themselves or others?

24       A.    I don't understand the question.

25       Q.    Is Dr. Ruiz required to make a

Exhibit 39
Page 1210

Confidential

1           And so basically what happens is

2    within one or two weeks, sometimes it is a

3    little bit longer, but the child will get step

4    down to another facility.

5           Q.    What is the longest amount of time

6    that you recall a child has remained at Shiloh

7    pending step down?

8           A.    I don't remember.

9           Q.    You said that sometimes it can take

10   longer than two weeks between a step-down

11   approval decision and an actual placement in a

12   new facility.  Could that period of time be

13   more than a month?

14          A.    Currently, no.

15          Q.    Could it have ever been more than a

16   month in the past?

17          A.    Yes.

18          Q.    Could it have ever been more than

19   six months?

20          A.    Not that I recall.

21          Q.    Could it have ever been more than

22   two months?

23          A.    I don't remember.

24          Q.    Have there been cases where no

25   facility will agree to admit the child who has

**Exhibit 39**
**Page 1211**

Confidential

1    possible for a sponsor to complete a positive

2    home study and then the child is sent to Shiloh

3    and the sponsor may need to complete another

4    home study?

5         A.    What do you mean a positive home

6    study, what do you mean by that?

7         Q.    So for example, if a child was in a

8    shelter placement and the sponsor completed a

9    discretionary home study and received a

10   positive recommendation, and then the child was

11   later transferred to Shiloh, could that sponsor

12   then need to go through another home study?

13        A.    Not necessarily another home study,

14   but maybe an addendum.  So there would be an

15   addendum to the original home study and then

16   this time it would be deemed as a TVPRA

17   mandatory home.  The designation would change,

18   but it would be an addendum.  It would not be a

19   whole another home study report.

20        Q.    What do home study addendums

21   include, what do they require?

22        A.    So they require assessment of the --

23   of the criteria so if it is under abuse.  So if

24   we learn about physical or sexual abuse of the

25   child that time that wasn't known before, they

Exhibit 39
Page 1212

Confidential

Page 222

```
 1         Q.    Earlier you were asked about whether
 2    children at Shiloh who were not meeting
 3    treatment goals can be stepped down.  Do you
 4    recall that testimony?
 5         A.    Yes.
 6         Q.    Let's say a child is not meeting
 7    treatment goals but the child is no longer a
 8    danger to self or others.  Does that child get
 9    stepped down?
10         A.    Yes, the child would get stepped
11    down.
12         Q.    If there is an approved, say,
13    sponsor and the child is not meeting treatment
14    goals but the child is not a danger to self or
15    others, does that child get released?
16         A.    Yes.
17         Q.    Earlier I think you mentioned the
18    word stable, and I just want to make sure I
19    understand what that means.  I think you
20    described stable as shorthand to mean the child
21    is no longer a danger to themself or others.
22               Did I get that right?
23         A.    Yes.
24         Q.    Previously you testified about a
25    child who didn't want to leave Shiloh and
```

Confidential

Page 257

```
 1   placement.

 2              Would you say that the time it takes

 3   for a child to be approved for step down and

 4   then actually transferred to the less

 5   restrictive placement is a delayed process?

 6       A.    Like I mentioned before, that once

 7   the recommendation is made for a child is no

 8   longer a danger to self or others, that at this

 9   point in time, it takes roughly about two weeks

10   that child to be stepped down.

11       Q.    In the past -- you testified earlier

12   today, you testified that in the past the

13   amount of time between an approval for step

14   down and actual transfer of a child to a less

15   restrictive placement could be longer than two

16   weeks.  And I'm wondering if you think that in

17   those circumstances there was a delay in the

18   child being transferred to the less restrictive

19   placements?

20              MR. MOSS:  Objection, beyond the

21         scope of the government's examination.  The

22         government's examination was related to

23         unification not delay in transfers.

24              MR. ROSS:  Mr. Moss, some of your

25         basis cutout.
```

Exhibit 39
Page 1214

Confidential

1          (Deposition adjourned at 7:28 p.m.)

2

3

4                    _____

5                         MICAELA VERGARA

6

7    Subscribed and sworn to before me

8    this     day of              2020.

9

10   ---------------------------------

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit 39**
**Page 1215**

Confidential

1              C E R T I F I C A T E

2

3      I, SUSAN S. KLINGER, a certified shorthand

4   reporter within and for the State of Texas, do

5   hereby certify:

6      That MICAELA VERGARA, the witness whose

7   deposition is hereinbefore set forth, was duly

8   sworn by me and that such deposition is a true

9   record of the testimony given by such witness.

10      I further certify that I am not related to

11   any of the parties to this action by blood or

12   marriage; and that I am in no way interested in

13   the outcome of this matter.

14      IN WITNESS WHEREOF, I have hereunto set my

15   hand this 19th of June, 2020.

16

17   _____

18              Susan S. Klinger,

19              RMR-CRR, CSR

20              Texas CSR# 6531

21

22

23

24

25

Exhibit 39
Page 1216