# Exhibit 40

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**From:** Ray, Faith (ACF)
**Sent:** Wednesday, January 16, 2019 4:55:20 PM
**To:** Fink, David (ACF)
**Subject:** FW: Shenandoah update

Hi David – FYI. You may have heard this before me, but I ran into ▮▮▮▮ in the hall today and she said she's no longer on the FFS squad.

--Faith

_____

**From:** Ray, Faith (ACF)
**Sent:** Wednesday, January 16, 2019 4:54 PM
**To:** Biswas, Toby R M (ACF) <Toby.Biswas@ACF.hhs.gov>; Miranda-Maese, Aurora (ACF) (CTR) <Aurora.Miranda-maese@acf.hhs.gov>
**Cc:** ▮▮▮▮ (ACF) (CTR) <▮▮▮▮▮▮>; ▮▮▮▮▮ (ACF) <▮▮▮▮▮▮>
**Subject:** RE: Shenandoah update

Hi All-

Just a short note to say that ▮▮▮▮▮ has accepted a position on a new UAC case management team and is no longer the FFS for Shenandoah. ▮▮▮▮ said that Natasha David will be the new FFS for Shenandoah. I'll reach out to her shortly to introduce the compliance order and our work on it to date.

Best,
Faith

**Faith Ray,** *Policy Analyst*
Division of Policy & Procedures| Office of the Director
Direct: 202.205.3982

**Office of Refugee Resettlement**
Administration for Children & Families
U.S. Dept. of Health & Human Services
Mary E. Switzer Building
330 C Street SW, Room 5123
Washington DC 20201

_____

**From:** Biswas, Toby R M (ACF) <Toby.Biswas@ACF.hhs.gov>
**Sent:** Wednesday, January 16, 2019 2:58 PM
**To:** Miranda-Maese, Aurora (ACF) (CTR) <Aurora.Miranda-maese@acf.hhs.gov>
**Cc:** ▮▮▮▮ (ACF) (CTR) ▮▮▮▮▮▮; Ray, Faith (ACF) <Faith.Ray@acf.hhs.gov>; ▮▮▮▮ (ACF) <▮▮▮▮>
**Subject:** RE: Shenandoah update

Thanks Aurora!

EXHIBIT __113__
WIT: _RAY_
DATE: _10/23/19_
REPORTER: J. HARMONSON

Exhibit 40



-Toby

Toby R. M. Biswas, ESQ.
Unaccompanied Alien Children Policy Supervisor

U.S. Department of Health and Human Services
Administration for Children and Families
Office of Refugee Resettlement
Office of the Director – Division of Policy and Procedures

(202) 205-4440 (O)
(301) 356-5470 (C)
(202) 401-1022 (F)

**From:** Miranda-Maese, Aurora (ACF) (CTR) <Aurora.Miranda-maese@acf.hhs.gov>
**Sent:** Tuesday, January 15, 2019 11:37 AM
**To:** Biswas, Toby R M (ACF) <Toby.Biswas@ACF.hhs.gov>
**Cc:** ▮▮▮▮▮ (ACF) (CTR) <▮▮▮▮▮▮▮▮▮▮>; Ray, Faith (ACF) <Faith.Ray@acf.hhs.gov>; ▮▮▮▮▮
(ACF) <▮▮▮▮▮▮▮>
**Subject:** RE: Shenandoah update

Hi Toby,

I arrived earlier to the facility to meet the Director and two of the clinicians and after some information provided about some of the UAC, they selected three for me to interview. (They advised there were 9 UAC currently in the facility.)

I interviewed two male UAC and one female UAC and all three advised they understood their rights, they understood the NOP they had signed and were aware of their rights to question their placement there. One UAC does not want to leave the facility and staff advised he prefers the confined setting and would act out and exhibit behavior issues if the notion of moving him out is discussed.

Overall, they all advised being treated well by all staff and had no issues or concerns. This as you know, was my first time interviewing UAC and it went very well with the questions that we had compiled before the interviews. Please advise if you have any questions or concerns and I welcome your feedback and comments as I continue to interview UAC in different facilities.

Thank you,

Aurora
520-444-8170

**From:** Ray, Faith (ACF) <Faith.Ray@acf.hhs.gov>
**Sent:** Friday, January 11, 2019 3:05 PM
**To:** Biswas, Toby R M (ACF) <Toby.Biswas@ACF.hhs.gov>
**Cc:** Moomaw, Sara (ACF) <Sara.Moomaw@ACF.hhs.gov>; ███████ (ACF) (CTR) ██████████████;
████████ (ACF) <████████████████>; Miranda-Maese, Aurora (ACF) (CTR) <Aurora.Miranda-maese@acf.hhs.gov>; Fink, David (ACF) <David.Fink@acf.hhs.gov>; Volovar, Jill (ACF) <Jill.Volovar@ACF.hhs.gov>
**Subject:** Shenandoah update

Hi Toby,

Overall, the meeting yesterday with staff at Shenandoah went well. The clinicians and case managers asked good questions to clarify what is expected of them to be compliant with Flores. They also offered a few suggestions of what would help them. After the meeting, we took a lengthy tour of the facility, including sleeping cells, recreational areas, classrooms, the gym, outside basketball court, staff offices, kitchen, etc.

███████ and I also interviewed two youth, with ███ providing interpretation. Aurora interviewed several youth as well and will be sending us notes on that.

A few things of note:

- The two youth we interviewed said that some staff at their previous placements harassed and discriminated against them (sharing specific examples) and one minor seemed to say there was a case of physical abuse against him. (I will follow up separately with you and Jessi about this.) They did not cite any issues against Shenandoah staff.
- No staff were aware of a minor's right to challenge secure placement either through a review by the ORR Director or by bringing suit in a federal court. No one has been communicating this right to minors at Shenandoah. During the interviews ███ and I did with two youth, this was confirmed. Both youth said they were not aware of any such right to challenge their placement.
    - Staff recommended updating the NOP form to include a section where that states the two ways in which a minor can challenge his/her placement, so that the case manager can document that that was discussed.
- They requested that ORR update the NOP form to make it Spanish/English bilingual. (Some minors have issues with signing a form in a language they can understand yet are asked to sign the form in English – not trusting that both forms say the same thing.)
- Kelsey Wong and that procedures on *when* to upload documentation into the Portal are needed. It seems that staff do have updated NOPs but were not uploading them. (Though ███ said that she has communicated with the program that documentation should be uploaded into the Portal as soon as possible, after it is completed by

program staff.)
- Staff confirmed that they will include 7-day updates for recommended step downs/releases into the UAC Case Review.

████████████████████████████████████████████ Please let me know if you
have any immediate questions before we debrief early next week.

Thanks,
Faith

**Faith Ray,** *Policy Analyst*
Division of Policy & Procedures| Office of the Director
Direct: 202.205.3982

**Office of Refugee Resettlement**
Administration for Children & Families
U.S. Dept. of Health & Human Services
Mary E. Switzer Building
330 C Street SW, Room 5123
Washington DC 20201

# Exhibit 41

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 41**

**Page 1222**



# Office of Refugee Resettlement
## Office of the Director
## Division of Policy & Procedures

## Flores Settlement Agreement Compliance



EXHIBIT _115_
WIT: _RAY_
DATE: _10/23/19_
REPORTER: J. HARMONSON

**Exhibit 41**
**Page 1223**

# Objectives

Why is ORR reviewing placements at secure facilities?

What is involved in the compliance review process?

What is my role in complying with the court order?

**Exhibit 41**

**Page 1224**

## *Motion to Enforce*
## Flores Settlement Agreement

BASIS FOR PLACEMENT and NOTICE OF PLACEMENT

|  | Secure Facilities |
|---|---|
| *Weekly* | Placement Criteria |
| *Monthly* | Notice of Placement |

Exhibit 41
Page 1225

# Basis for Placement

Court ORDERED that a minor shall not be placed in a secure facility **solely** because s/he is or was gang/cartel affiliated or involved in a gang/cartel without probable cause (i.e., evidence) that a crime was committed; or because s/he "may be chargeable" with an offense.

**Exhibit 41**
**Page 1226**

# Notice of Placement

Court: Purpose of the *Notice of Placement* is to provide formal notice to the minor of the justification for their placement in a restrictive care provider facility, which a minor may challenge placement with the ORR Director or file suit in federal court to challenge the decision in certain instances.

Not providing *Notice of Placement* in language a minor understands is a breach of the Flores Settlement Agreement.

**Exhibit 41**
**Page 1227**

# Notice of Placement

Court ORDERED that ORR provide each minor with a *written\**
*Notice of Placement* within a reasonable time\* of ORR's placement
decision.

*Notice of Placement* must be in a language the minor understands\*.

**Exhibit 41**
**Page 1228**

# Compliance Review Process



Exhibit 41
Page 1229

# Compliance Document Review

| (Weekly Review) | Direct Placement | Transfer | Eligible for Step-Down/Release |
|---|---|---|---|
| Intakes referral notes | X | X | |
| **Notice of Placement** | X | X | X |
| UAC Secure Review | | X | X |
| **UAC Case Review** | | X | X* |

*For minors eligible for step-down or release, the UAC Case Review must be updated **every seven days** with information on why the minor remains in secure custody.*

Exhibit 41
Page 1230

# Placement Criteria

*Was the minor placed in a secure facility based <u>solely</u> on one or more of the following?*

1.  Whether the minor *may be* chargeable (as opposed to *is chargeable*) with an offense;

2.  Whether the minor reported gang affiliation while in care, and ORR lacks probable cause (i.e. evidence) to believe that the individual committed any other specified offense; or

3.  Whether the minor self-disclosed gang involvement prior to placement in ORR custody that does not give rise to probable cause to believe that the individual has committed a specified offense.

YES = Not Compliant

**Exhibit 41**
**Page 1231**

# Notice of Placement Requirements

1.   Provided <u>within 48 hours of placement</u> and be *written* in minor's preferred language.

*If minor speaks a language uncommon to general UAC population (e.g., Hindi, Ixil), a translator may be used and this must be documented in the NOP.*

2.   Use updated NOP form (10/26/18) in Spanish **and** English (where applicable)

3.   *Summary of Placement Decision* in the NOP:

Written in minor's preferred language (**and** English, if different).

Clear description of placement basis. Avoid vague language.

### Example:

*Reason for secure placement is that minor is chargeable with an offense.* (Not enough information.)

*Minor was convicted of possession of a controlled substance in California juvenile court & sentenced to detention, according to ICE report, found in the Intakes section of the Portal.*

**Exhibit 41**
**Page 1232**

# Non-Compliant Case Example 1

Janice Doe, who is monolingual in Spanish, was admitted to secure facility mid-October 2018 as a direct placement. She was placed into secure on a basis that she "may be chargeable" with an offense, but no specifics were given.  Per the UAC Case Review, Janice has complied with directions from staff and has had good behavior since placement.

- Only one NOP for this case; filled out on 10/17/18
- NOP form used is outdated (2/05/18) and in English only. Minor signed in language she doesn't understand.
- No staff signature on form.
- Initial placement basis in NOP: "May be chargeable" (not compliant)

Exhibit 41

Page 1233

# Non-Compliant Case Example 2

## Summary of Placement Decision:

*Per ORR Intakes:*

*Minor:  John Smith, A# 123456789*

*Criminal Charges: N/A*

*Adjudicated: N/A*

*Detention Center: N/A*

*Gang Affiliation: **No gang affiliation reported***
Previous ORR Care:  SWK Casa Padre (2/01/18 – 2/21/18) ran away on **1/09/17**

Additional Information: Minor was a collateral arrest during a raid. US Marshall **has decided not to press charges** since he was not in possession of any drugs.

**Exhibit 41**

**Page 1234**

# Thank You!

**Faith Ray**
*Policy Analyst*
Faith.Ray@acf.hhs.gov

*Policy Analyst*

**Exhibit 41**
**Page 1235**

# Exhibit 42

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL



ADMINISTRATION FOR
CHILDREN & FAMILIES

# Office of Refugee Resettlement
## Office of the Director
## Division of Policy & Procedures

## Flores Settlement Agreement Compliance

EXHIBIT _116_
WIT: _RAY_
DATE: _10/23/19_
REPORTER: J. HARMONSON

Page 1237
Exhibit 42

# Objectives

Why did a federal court order ORR to closely review all placements into restrictive settings, and what is my role in complying with the court order?

What is an appropriate placement in a secure setting? When is a step-up to secure not appropriate or allowed?

What rights do minors have to request reconsideration of their placement?

Why is ORR revising the Notice of Placement form?

# *Motion to Enforce* the
# Flores Settlement Agreement

BASIS FOR PLACEMENT

and

NOTICE OF PLACEMENT

# Basis for Placement: Secure Setting

Court ORDERED that a minor shall not be placed in a secure facility **solely** because s/he is or was gang/cartel affiliated or involved in a gang/cartel without probable cause (i.e., evidence) that a crime was committed; or because s/he "may be chargeable" with an offense.

# Inappropriate Placements

*Are you stepping up a minor to a secure facility <u>solely</u> on one or more of the following?*

1. Whether the minor *may be* chargeable (as opposed to *is chargeable*) with an offense;

2. Whether the minor reported gang affiliation while in care, and ORR lacks probable cause (i.e. evidence) to believe that the individual committed any other specified offense; or

3. Whether the minor self-disclosed gang involvement prior to placement in ORR custody that does not give rise to probable cause to believe that the individual has committed a specified offense.

YES = Not Compliant

# Criteria for Secure Placements

**Criterion 1:**

- Is charged with a crime, or has been convicted of a crime; or are the subject of delinquency proceedings, have been adjudicated delinquent, or are chargeable with a delinquent act, *excluding <u>isolated offenses</u>* that were not:

    - Within a <u>*pattern or practice*</u> of criminal activity, **and**

    - Did *not* involve:

        - violence against a person

        - use or of carrying a weapon (e.g., breaking & entering, vandalism)

        - petty offenses (e.g., shoplifting)

# Criteria for Secure Placements

**Criterion 2:**

Have committed or have made credible threats to commit a violent or malicious act while in ORR custody.

**What is a violent act in this context?**

-- Can include destruction of another's property and use of physical force against a person. Examples:

- Breaking a window on purpose (in a non-life-threatening situation)

- Hitting someone with a chair; punching someone in the face

**What is not a violent act in this context?**

- Shoving another person while standing in line.

- Screaming at another person on the soccer field.

# Criteria for Secure Placements

**What is a malicious act is this context?**

-- Not an isolated offense; a *pattern* of acts with the intention to do harm. Examples:

- Intentionally knocking someone down in order to hurt them multiple times

- Repeated threats to hurt another minor's family back in home country

**What is not a malicious act in this context?**

- Slapping someone on the back out of anger after losing a soccer game

- Bumping hard into another minor while standing in line out of momentary irritation.

# Criteria for Secure Placements

**Criterion 3:**

Have committed, threatened to commit, or engaged in serious self-harming behavior that poses a danger to self while in ORR custody.

**If a residential treatment center has custody of a minor for whom they cannot effectively address his or her serious self-harming behavior.**

# Criteria for Secure Placements

**Criterion 4:**

Have engaged in conduct that has proven to be unacceptably disruptive of the normal functioning of a staff secure where a transfer may be necessary to ensure the minor's welfare or that of others.

**What is unacceptably disruptive conduct in this context?**

--Conduct that is part of a larger pattern; not an isolated incident. Examples include (but not limited to):

- Habitual stealing

- Multiple incidences of fighting

- Pattern of intimidating others

# Criteria for Secure Placements

**Criterion 5:**

Have self-disclosed violent criminal history prior to placement in ORR custody that requires further assessment.

  **What constitutes violent criminal history in this context?**

Examples may include:

- Assault

- Attempted murder, murder

- Rape, sexual assault

- Participation in a violent act (e.g., being a lookout for a murder)

# Criteria for Secure Placements

**Criterion 6:**

Have a history or display of sexual predatory behavior, or have inappropriate sexual behavior.

**What is sexual predatory behavior in this context?**
-- *Sexual predatory behavior* refers to a UAC with:
1. a history of sexual assault or sexual harassment,
2. that is part of a pattern of behavior with the goal of committing a sexually based crime, and
3. that is based on a mental disorder or impulse.

ORR may consider case history (e.g., law enforcement or court records, ORR custodial documents such as SIRs) and/or self-disclosures related to the UAC's history to determine whether their conduct is predatory in nature.

# Case Scenario

Johnny and Cody are playing a game of soccer with other minors at an ORR shelter, Johnny knocks Cody over in an attempt to steal the ball. After getting up off the ground, Cody pushes Johnny to the ground and the two children engage in a verbal altercation while Johnny is held back from taking a swing at Cody. Cody and Johnny are both stepped up to secure for engaging in conductive that has proven to be disruptive of the normal functioning of a staff secure facility in which they were placed such that transfer may be necessary to ensure your welfare or the welfare of others, and for having committed a violent or malicious act while in ORR custody.

# Case Scenario

Derek and Andy are friends in a staff-secure facility, one night, Derek tells Andy that while in his country of origin he was a member of a known gang, Andy then told a staff member about Derek's gang involvement, Derek is stepped up to secure for having disclosed involvement in a gang.

# Case Scenario

Roger has a lot of energy, and is routinely given SIRs by staff at his shelter. Over the course of 3-months in ORR care, Roger receives 15 SIRs, some of which include speaking out in class, mocking other children, disrupting art class, and kicking a basketball down a hill. Roger is stepped up to secure, and SIRs are cited as the reason.

# Case Scenario

While in an ORR shelter, James is charged with committing an armed robbery prior to entering ORR care. Before he is stepped up to secure, the Prosecutor drops all charges against James. James is stepped up to Secure because he is chargeable or charged with an offense.

# Case Scenario

Chuck is upset that he has been in a shelter for 6-months, he along with three friends devise a plan to leave their shelter, Chuck and his friends are successful, but Chuck is found less than 24-hours later and is then placed in a staff-secure facility. Chuck successful leaves the staff secure facility without the consent of the staff three times, and when he is picked up after the third time, he tells the staff that no matter how many times they catch him, he will always try to leave the facility.

According to the staff secure care provider, Chuck is stepped-up to secure because he poses an escape risk.

.

# Notice of Placement

Court ORDERED that ORR provide each minor with a *written\**
*Notice of Placement* within a reasonable time\* of ORR's placement
decision.

*Notice of Placement* must be in a language the minor understands\*.

# Notice of Placement

Court: Purpose of the *Notice of Placement* is to provide formal notice to the minor of the justification for their placement in a restrictive care provider facility.

Not providing *Notice of Placement* in language a minor understands is a breach of the Flores Settlement Agreement.

# Right to Placement Reconsideration

*Every minor in a restrictive setting has a right to request reconsideration of his/her placement:*

**Administrative Review:** ORR will review a minor's placement in a *secure facility* or *residential treatment center* every 30 days or less, to determine whether continued placement is necessary. After 30 days of initial placement, a minor can request, through the case manager, that the ORR Director review his/her case to reconsider placement.

If a minor in your care makes this request, the case manager immediately emails UCPolicy@acf.hhs.gov to start the process.*

# Right to Placement Reconsideration

**Judicial Review:** Immediately upon placement in a *secure facility, staff secure facility,* or *residential treatment center*, any minor may file a lawsuit in a Federal District Court if s/he feels s/he has been improperly treated or inappropriately placed in the restrictive setting.

A judge will review the minor's case and determine whether s/he should remain in a restrictive setting. (This is *not* a Flores Bond hearing.)

Separately, a **Flores Bond Hearing** may be requested by any minor in care, regardless of placement, so that an immigration judge can determine whether or not the minor is a danger to the community. The judge's determination does not automatically change the child's placement in a particular care provider facility.

Page 1257
Exhibit 42

# Questions | Comments

# Thank You!

**Faith A. Ray**
*Policy Analyst*
Faith.Ray@acf.hhs.gov

*Policy Analyst*

# Exhibit 43

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 43**

**Page 1260**

| | |
|---|---|
| **From:** | Ray, Faith (ACF) |
| **Sent:** | Friday, February 15, 2019 5:29:17 PM |
| **To:** | Smith, Elicia (ACF) |
| **CC:** | Fink, David (ACF); Thomas, Debra (ACF); Biswas, Toby R M (ACF); Moomaw, Sara (ACF); ███████ (ACF) (CTR); Miranda-Maese, Aurora (ACF) (CTR) |
| **Subject:** | RE: Case inquiry |

Hi Elicia,

Thanks for your quick response. A ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

Is there another reason why he should be in secure that you are aware of?

--Faith

**From:** Smith, Elicia (ACF) <Elicia.Smith@acf.hhs.gov>
**Sent:** Friday, February 15, 2019 5:18 PM
**To:** Ray, Faith (ACF) <Faith.Ray@acf.hhs.gov>
**Cc:** Fink, David (ACF) <David.Fink@acf.hhs.gov>; Thomas, Debra (ACF) <Debra.LaGrow@acf.hhs.gov>; Biswas, Toby R M (ACF) <Toby.Biswas@ACF.hhs.gov>; Moomaw, Sara (ACF) <Sara.Moomaw@ACF.hhs.gov>; ███████ (ACF) (CTR) <███████>
**Subject:** RE: Case inquiry

Hi Faith,

I will ask Yolo CM to update the Case Review in the UACP. Minor was placed at Yolo Secure by intakes on 01/24/19, he has been in care for 22 days.

Per intake referral youth was charged with possession of a forged instrument. This youth was adjudicated and detained in Suffolk County Detention. Intakes also provided the following information, "Minor has been arrested and charged with possession of a firearm and discharge of a firearm on school property in Miami, FL on 01/12/2017. These charges were dropped by the prosecutor. No further details could be given about this charge. Minor was arrested and charged with possession of forged instrument and possession of a controlled substance (Marijuana) on ███████ ████████████ Amount of Marijuana could not be provided by ICE."

He was previously in ORR care 4/27/2016-5/13/2016 when he was released to sponsor.

Best,
Elicia

**Elicia Smith**
Federal Field Specialist
U.S. Department of Health & Human Services
Administration for Children & Families
Office of Refugee Resettlement
Division of Unaccompanied Children Operations
San Francisco, CA

EXHIBIT _117_
WIT: _RAY_
DATE: _10/23/19_
REPORTER: J. HARMONSON

Email: elicia.smith@acf.hhs.gov
Mobile: (202) 746-4477
Monday-Friday 8:30AM-5PM PST (Excluding Official Federal Holidays)

**For after hours, weekend and holiday concerns that require immediate assistance please contact ORR/DUCO Hotline-Intakes 202-401-5709.**

**From:** Ray, Faith (ACF) <Faith.Ray@acf.hhs.gov>
**Sent:** Friday, February 15, 2019 1:46 PM
**To:** Smith, Elicia (ACF) <Elicia.Smith@acf.hhs.gov>
**Cc:** Fink, David (ACF) <David.Fink@acf.hhs.gov>; Thomas, Debra (ACF) <Debra.LaGrow@acf.hhs.gov>; Biswas, Toby R M (ACF) <Toby.Biswas@ACF.hhs.gov>; Moomaw, Sara (ACF) <Sara.Moomaw@ACF.hhs.gov>; (ACF) (CTR)
<
**Subject:** Case inquiry
**Importance:** High

Hi Elicia,

Could you please look into minor A#            ?  He's remains at Yolo due to a marijuana/forged instrument possession charge from back in June of 2018.  There is no UAC case review in the Portal, so I cannot find information or evidence that points to him being a danger to self or others.  Please let me know what you can find out as soon as possible.

Thank you,
Faith

**Faith Ray,** *Policy Analyst*
Division of Policy & Procedures| Office of the Director
Work Cell: 202.365.0048
Landline: 202.205.3982

**Office of Refugee Resettlement**
Administration for Children & Families
U.S. Dept. of Health & Human Services
Mary E. Switzer Building
330 C Street SW, Room 5123
Washington DC 20201

**Exhibit 43**
**Page 1262**
GOV-00022075

# Exhibit 44

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 44**

**Page 1263**

| | |
|---|---|
| **From:** | Ray, Faith (ACF) |
| **Sent:** | Monday, January 14, 2019 12:52:37 PM |
| **To:** | Biswas, Toby R M (ACF) |
| **CC:** | Fink, David (ACF); ███████████(CTR); Moomaw, Sara (ACF) |
| **Subject:** | For corrective actions meeting |

Toby,

In preparation of our meeting with Sarah Viola, I've included a list (below) of the policies and/or procedures that correspond to the compliance issues I've seen with the secure facilities. Note that most of these issues are now being addressed by the FFS and care provider staff.

| Non-Compliance Issue | Policy/Procedure Reference |
|---|---|
| Not providing a Notice of Placement (NOP) within 48 hours of initial placement in secure. | MAP 1.2.4 |
| Care provider not uploading NOP into Portal after it is signed/dated by minor. | MAP 1.2.4 |
| Placement in secure based on risk of escape. | ORR Policy Guide 1.2.5; ORR Policy 1.2.4 |
| Not providing a NOP every 30 days. | MAP 1.2.4 and 1.4.2; ORR Policy 1.2.4 |
| Not providing a NOP written in a language the minor understands. | MAP 1.2.4 and 1.4.2 |
| Not providing a summary in the NOP. | MAP 1.2.4 |
| Not providing a summary in the NOP in a language the minor understands. | MAP 1.4.2 |
| Provider not signing NOP form. | |
| Placement on the basis of suspected gang membership or affiliation *only*. | ORR Policy 1.2.4 |
| Placement based on the arrest and subsequent dismissal of charges. | ORR Policy 1.2.4 |
| Not citing evidence for placement basis on NOP. | MAP 1.2.4 and 1.4.2 |
| No 7-day update on minors recommended for step-down or release. | MAP 1.4.2 |
| UAC Case Review not completed every 30 days. | MAP 1.4.2 |

--Faith

**Faith Ray,** *Policy Analyst*
Division of Policy & Procedures| Office of the Director
Direct: 202.205.3982

**Office of Refugee Resettlement**
Administration for Children & Families
U.S. Dept. of Health & Human Services
Mary E. Switzer Building
330 C Street SW, Room 5123
Washington DC 20201

EXHIBIT  119
WIT:  RAY
DATE:  12/23/19
REPORTER: J. HARMONSON

# Exhibit 45

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 45**

**Page 1265**

| | |
|---|---|
| **From:** | Ray, Faith (ACF) |
| **Sent:** | Wednesday, November 28, 2018 3:45:53 PM |
| **To:** | ███████████ (ACF) |
| **CC:** | Biswas, Toby R M (ACF); ████████ (ACF) |
| **Subject:** | SVJC case |

Hello Jessie,

███████████ and I are now going to be reviewing all cases at Shenandoah on a weekly basis for compliance on placement, per a recent court order.

As we start to go through each case, we'll contact you about individual cases that you will need to follow-up on. We really appreciate your help in this process.

The first case is minor **A#**███████

- Last UAC Secure Review was conducted on 6/30/18; please upload a new review to the Portal
- Minor is monolingual in Spanish; please give the minor a NOP form in Spanish to sign, then upload to the Portal
- Minor needs an updated ISP (last one was completed 10/02/18)
- According to minor's case review, it seems that he may be eligible to be stepped down; we'll be looking next week at his case for any recommendation that you may have for him.

Please let me know if you have questions about this case.  Also, I'd like to set up a time to talk to you about this new court-ordered ongoing compliance review.  **Is there a good time that would work for you this week?**

Thanks again,
Faith

Faith Ray, Program Analyst
*On detail with ORR Division of Policy & Procedures*
Office of Refugee Resettlement | Administration for Children & Families
330 C Street SW, Room 5123 | Washington DC 20201
Direct: 202.205.3982

EXHIBIT 620
WIT: RAY
DATE: 12/25/19
REPORTER: J. HARMONSON

Confidential - Subject to Protective Order

**Exhibit 45**
**Page 1266** 0023206

# Exhibit 46

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 46**

**Page 1267**

# FILE PRODUCED NATIVELY



**Exhibit 46**
**Page 1268**

Confidential - Subject to Protective Order GOV-00034290

## UC with Status Adjustments

| A# | Name of UC | Program | Name of the State legal | LOC | Type of Status | Date Status was Granted | Efforts that has been made to release the UC | Update 3/7/17 | FFS |
|---|---|---|---|---|---|---|---|---|---|
| | | Tumbleweed Desert Cove | Arizona | 279 | I-360 | 2/13/2017 | Had a sponsor but there was no contact between UC and sponsor only through social media. Transferred due to no LTFC beds. Program will be working on URM and post-18 plan. | Aged out 2/26/17. Ct admin closed case on 2/24/17. Atty working on I-485 and URM application | Yesenia Heath |
| | | Tumbleweed Willetta | Arizona | 436 | I-360 | 1/13/2017 | Had two viable sponsors and did not complete the FR process. | Transferred to SWK Sol. Applied for URM. Eligible for SIJ. | Debbie Thomas |
| | | SWK Campbell | Arizona | 443 | pending adjustment for I-360 | Pending | CM has attempted reunification with two sponsors that withdrew from sponsorship. Due to no additional sponsorships, UC was referred to FIRRP where it was identified that UC qualified for legal services | FFS not sure if SIJS was ever filed, another sponsor has appeared, going through process. FU with this one. | Debbie Thomas |
| | | SWK Campbell | Arizona | 247 | pending adjustment for I-360 | Pending | CM has attempted reunification with two sponsors that withdrew from sponsorship. Due to no additional sponsorships, UC was referred to FIRRP where it was identified that UC qualified for legal services | State hearing completed for SIJS, not sure date the I-360 was filed | Debbie Thomas |
| | | SWK Campbell | Arizona | 191 | pending adjustment for I-360 | Pending | CM has attempted reunification with one sponsors that withdrew from sponsorship. Due to no additional sponsorships, UC was referred to FIRRP where it was identified that UC qualified for legal services | Pending admin close to file I-360 app-atty working on it | Debbie Thomas |
| | | SWK Las Palmas | Arizona | 481 | I-360 (SIJS) | 1/13/2017 | Sponsors have been denied or unable to sponsor due to many reasons.Pending URM Acceptance | I-485 filed 2/6/17 | ███ |
| | | SWK Las Palmas | Arizona | 317 | UC with a Trafficking Eligibility Letter | 5/10/2016 | No initial sponsor upon arrival and family in COO has not identidied any family or friend in the US. ORR has approved URM placement | Released to URM on 2/21/17 Lansing, MI | ███ |
| | | Morrison Downtown Shelter | Oregon | 208 | Trafficking Eligibility Letter | 2/16/2016 | Minor does not have any reunification options (this has been assessed by DT Shelter and all past programs). Minor has been pending acceptance into URM since 8/23/16 and LTFC since 10/11/16. | Past placement in Staff Secure. Has been stepped down and URM will reconsider when he has 90 days stable behavior (mid March). Ages out █████ 17. | ███ |

Exhibit 46
Page 1269

| | | | | | | |
|---|---|---|---|---|---|---|
| Morrison PASO | Oregon | 429 | T-VISA Non-immigrant status | 1/9/2017 | Minor is pending temporary custody to DHS order. Attorney is requesting the order this week. Foster placement has been identified recently. Currently a ward of the court. We cannot move him until we have the order for Temporary custody. | Discharged on 2/21/1█ |
| Friends of Youth Colin-Ferguson | Washington | 1042 | Approved I-485 | 4/13/2016 | Youth has no sponsorship options. Youth's URM application has been submitted three times since his arrival to Colin-Ferguson in June (9.19.16, 12.19.16, and 2.6.17). There has been no response from URM other than to say they cannot expedite a youth's case. Youth is not able to be entered onto the Washington State housing list until he is within 6 months of turning 18. Youth turned 16 in December. At this time youth is looking at options with his soccer coach and friends. Updates will be provided in staffing as available. | Began in therapeutic staff secure then moved to therapeutic foster care. Looking at concurrent planning. KIND attys fighting for URM but not good fit. State won't take him since not turning 18. No SIR for a year. **LAWSUIT WAITING TO HAPPEN. Won't** age out until █ 18. Yesenia Heath |
| Selma R. Carson Home | Washington | 263 | Recevied Interim Assistance Letter from OTIP (good for 90 days) | 11/23/2016 | Original FRP and HS was approved then sponsor moved out of state, she discontinued the process. HH member then completed the FRP.  A new HS was required. The referral was submitted on 2/10/17.  H | Received trafficking eligibility letter on 2/21/17. New HS completed, just waiting for release recommendation to new sponsor. Yesenia Heath |
| Selma R. Carson Home | Washington | 538 | Form I-797 Approval of I-360 status (approval of his SIJS; This is uploaded in the portal) | 1/23/2017 | Alexis has been in ORR care since 8/28/15. He has no FRP options. Working on a POST 18 plan. Attempted to move him to FOY and then into a POST 18 placement on his birthday (█ 17) but due to behavior issues he was not moved.  He is signed up for community placment, but this will not be available at the time he turns 18.  He is aware that he will go to the adult facility.  Once an opening has occurred, KIND will contact ICE to release him to the program (KIND have done this before with other kids) . | Accepted at Post 18 facility where he will continue to have case management services. Yesenia Heath |
| Selma R. Carson Home | N/A | 27 | Mother is in the U.S. (Not a U.S. citizen. She is married and to a U.S. citizen and he is completing the FRP. | | Prior to arriving to the Carson Home, his  HS referral was submitted on 1/20/17. Minor is on the H.S. waitlist. On 2/13/17 I asked the HSPRS referral team to please expedite this request as he turns 18 years old on █ '17.  I haven't heard back from them yet. | KS asked Julia to expedite case and she agreed. Sponsor is in Laredo, TX. Yesenia Heath |

**Exhibit 46**
**Page 1270**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Friends of Youth McEachern | Washington | 275 | Trafficking Eligibility Letter | 8/9/2016 | No sponsors identified, URM application has been submitted and updates have been provided. Pending URM placement. | Has trafficking eligibility letter, URM application sent 12/17 and 2/17. Drug history and in staff secure therapeutic so not likely to get URM. State won't look at him until 30 days before he ages out ▮ Yesenia Heath |
| | Friends of Youth McEachern | Washington | 204 | Extension of Interim Assistance Letter | 10/14/2016 | No sponsors identified. Completed Housing intake for Post 18 options; OTIP staffing scheduled for today; Sent email to Case Coordinator in order to receive approval to be re-referred to URM | Final letter of eligibility on 2/17/17. waiting for URM. Yesenia Heath |
| | Friends of Youth McEachern | Washington | 454 | Trafficking Eligibility Letter | 12/23/2015 | No sponsors identified. Denied from LTFC; Pending URM placement | URM won't accept due to mental health needs. Ages out ▮ 17. Post 18 plan set up with state, waiting to see if church member would sponsor him. Yesenia Heath |
| | Friends of Youth McEachern | Washington | 417 | I-360 | 12/27/2016 | No sponsors identified. Pending LTFC, now that step down referral has been made, will be referred to URM before transfer | Dependency order granted; Got placed in URM 2/28/17 in Michigan Yesenia Heath |
| | Friends of Youth LTFC | Washington | 704 | I-360 | 6/27/2016 | No sponsor options. LTFC team was informed that placement information could be sent to Tacoma. CM will discuss the matter with minor and respond promptly. Minor has not been doing well in her coursework. LTFC team will support minor to improve her grades and maintain her status within her Gateway to College Program. | Attending college prep, met with pro bono attys for dependency hearing. URM app still open. Yesenia Heath |
| | Crittenton LTFC | California | 573 | SIJ | 8/30/16 | Applying for URM (application date: 1/23/17) and currenlty pending review regarding previous reunification attempt with mother. In 9/2015 a home study was conducted and submitted to GDIT Case Coordinator with a negative recommendation due to sponsor not able to relocate. | SIJS predicate order approved 8/30/16. I-360 approved 12/2/16. Can't file I-485 since no visas available for Mexican nationals ▮ |

**Exhibit 46**
**Page 1271**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Crittenton LTFC | California | 572 | SIJ | 8/30/16 | In 9/2015 a home study was conducted and submitted to GDIT Case Coordinator with a negative recommendation due to sponsor not able to relocate. Parents are still attempting to a residence that they can afford. Family Reunification is still being explored. URM application will be submitted for review. | Working on reunification with parents | |
| | Crittenton LTFC | California | 707 | SIJ | 6/15/2016 | Application will be submitted on 2/15/17. | Approved for URM 2/23/17 | |
| | Crittenton LTFC | California | 607 | Asylum | 12/12/2016 | UAC does not have any identified sponsors. UAC's guardianship is pending, once secured, a URM application will be submitted. | Crittenton in San Bernardino County is guardian. She has had status since 12/12/16. | |
| | Crittenton LTFC | California | 632 | SIJ | 11/14/16 | Currently applying for URM. URM Application is anticipated to be submitted on 2/15/17 to URM Program. | URM approved 2/24/17 | |
| | Crittenton LTFC | California | 647 | SIJ | 12/1/2016 | Pending the sij approval, the URM application will be submitted. There are no identified sponsors. | I-360 received 12/1/16, still pending | |
| | Crittenton LTFC | California | 497 | SIJ | 5/3/2016 | There were no identified sponsors for UC. Currently applying for URM. URM Application will be submitted on 2/17/17 to URM Program. | I-360 approved in prior placement. No huardianship yet-hearing 4/6/17 | |
| | Crittenton LTFC | California | 220 | Trafficking Eligibility Letter | Eligibility letter received on February 7, 2017 | URM Application is in progress of being finalized to submit to the URM Program by 02/28/2017. | URM approved 3/3/17 | |
| | Crittenton LTFC | California | 358 | SIJ | 1/25/2017 | Currently applying for URM. URM Application will be submitted on 2/16/17 to URM Program. There were no identified sponsors. | URM designation 3/3/17 | |
| | Crittenton LTFC | California | 215 | SIJ | 2/14/2017 | Currently applying for URM. URM Application is anticipated to be submitted on 2/16/17 to URM Program. Sponsor discontinued on 12/11/15. On 12/11/15 FFS recommended to seek another sponsor furthermore to contact family back home and request minor seek reunification with a verified family member. . | SIJS approved 2/4/17 URM designation 2/17/17. I-485 app filed? | |
| | BCFS Fairfield | California | 125 | Trafficking Eligibility Letter: pending | 2/3/2017 | Minor does not have any family residing in the United States therefore Reunification efforts were never initiated. Minor was referred to Legal Services for Children and was found to be Eligible for a T-VISA. LSC is currently in the process of finishing the T-Visa application. Minor was alos referred to OTIP as a possible victim of Trafficking and was issued an interim letter of eligillity. Possible step down will be initiated after minor has been incident free for 30 days. | Pending final Letter of eligibility from OTIP and possible step down SS | Elicia Smith |

Exhibit 46
Page 1272

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | BCFS Fairfield | California | 114 | Trafficking Eligibilty Letter | 2/3/2017 | Reunification efforst were initiated at prior placement. (SWK Nueva Esperanza). Minor arrived to BCFS Fairfield as a new intake on 2/07/17. Reunification efforts have begun, information regarding homestudy was requested from prior placement to be able to proceed accordingly. | HS interview with UC took place 3/9. Report from HS should be done 3/16/17. Sponsor moved states. | Elicia Smith |
| | Yolo Secure | California | 333 | Asylum | 1/10/2017 | The UC was back and forth on repatation. | Huckleberry House has turned him down. State of CA doesn't want to take him since he is in ORR custody. Yolo County can't provide for mental needs. Lawsuit waiting to happen. | Elicia Smith |
| | Yolo Secure | California | 322 | Trafficking Eligibility Letter | 9/23/2016 | The UC was back and forth on repatriation. | Repatriated on 2/27/17 | elicia Smith |
| | Yolo Secure | California | 453 | Trafficking Eligibility Letter | 9/28/2016 | No identified sponsor. | Requesting repatriation, MCH 6/617.Not eligible for step down. | Elicia Smith |
| | A New Leaf- Peterson Residence | Arizona | 264 | Trafficking Letter | Received trafficking letter in November 2016, court is on 5/5/17 | Clients initial sponsor did not go through with completing the sponsorship process. Client referred to LTFC. Client applied to URM program. | Reunified on 3/2/17 | Debbie Thomas |
| | A New Leaf- Peterson Residence | Arizona | 114 | Mother born in US | no status granted, court is on 3/17/17 | Client has had no potential sponsors since in care. Has had a legal screening by attorney. Mother (US Citizen) left to Mexico to avoid criminal prosecution for felony. | MCH 3/17/17.No asylum has been filed. Dad is ICE custody, Mom in Mexico. Possible SIJS case based on mom's abandonment? Child advocate meeting on 3/12 | Debbie Thomas |
| | A New Leaf- Peterson Residence | Arizona | 114 | Mother born in US | no status granted, court is on 3/17/17 | Client has had no potential sponsors since in care. Has had a legal screening by attorney. Mother (US Citizen) left to Mexico to avoid criminal prosecution for felony. | MCH 3/17/17.No asylum has been filed. Dad is ICE custody, Mom in Mexico. Possible SIJS case based on mom's abandonment? Child advocate meeting on 3/12 | Debbie Thomas |

Exhibit 46
Page 1273

| | | | | | | | |
|---|---|---|---|---|---|---|---|
|  | | A New Leaf- Peterson Residence | Arizona | 114 | Mother born in US | no status granted, court is on 4/7/17 | Client has had no potential sponsors since in care. Has had a legal screening by attorney. Mother (US Citizen) left to Mexico to avoid criminal prosecution for felony. | MCH 4/27/17.. No asylum has been filed. Dad in ICE custody, Mom in Mexico. Explore SIJS based on Mom abandonment. Child advocate meeting on 3/12    Debbie Thomas |
| | | A New Leaf-Dorothy Mitchell | Arizona | 480 | I-360 | 1/13/2017 | Client had a potential sponsor initially when put into care, sponsor could not take care of client's baby's medical needs. Client referred to LTFC | URM app filed 2/24/17. LTFC denied many times due to baby's severe medical needs. Asylum app filed. State foster care might take both if asylum granted and then baby would get health benefits    Debbie Thomas |

(Note: the above table columns are: [photo], [blank], A New Leaf name, Arizona, number, status type, date/status, description, notes/advocate.)

| | | |
|---|---|---|
| | 1 | |
| | 1 | |
| | 1 | |
| | 1 | |
| | 1 | |
| | 1 | |
| | 1 | |
| | 1 | |
| | 1 | |
| | 1 | |
| | 1 | |
| | 1 | |
| | 1 | |
| | 1 | |
| | 1 | |
| | 1 | |
| | 1 | |
| | 1 | |
| | 1 | |
| | 1 | |
| | 1 | |
| | 1 | |
| | 1 | |
| | 1 | |
| | 1 | |

Exhibit 46
Page 1274

# Exhibit 47

## ENTIRE DOCUMENT SUBMITTED UNDER SEAL

Exhibit 47
Page 1275

# Exhibit 48

## ENTIRE DOCUMENT SUBMITTED UNDER SEAL

Exhibit 48
Page 1287

# Exhibit 49

## ENTIRE DOCUMENT SUBMITTED UNDER SEAL

**Exhibit 49**
**Page 1302**

# Exhibit 50

## ENTIRE DOCUMENT SUBMITTED UNDER SEAL

**Exhibit 50**
**Page 1307**

# Exhibit 51

Exhibit 51
Page 1312

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LUCAS R., et al., | Case No.  2:18-CV-05741 DMG PLA |
|                 Plaintiffs, | |
| | **EXPERT REPORT OF DR. KEITH CRUISE AND DR. ANDREW RASMUSSEN** |
|    v. | |
| ALEX AZAR, et al., | **PLAINTIFFS' CONFIDENTIAL PERSONAL INFORMATION/CONFIDENTIAL** |
|                 Defendants. | |

Plaintiffs' Confidential Personal Information/Confidential

Expert Report of Dr. Keith Cruise
and Dr. Andrew Rasmussen
Case No. 2:18-CV-05741 DMG PLA

Exhibit 51
Page 1313

**(4) Do children in ORR custody experience delays in release and what are the reasons for such delays?**

There is evidence in the case files of consistent identification of potential sponsors and attempts to contact sponsors during ORR detention. However, the time involved in the process of custodial vetting is lengthy. Initial assessments of sponsors seem to begin in a timely manner but the time to decision on a sponsor in the sample is over 70 days.

The length of this processes is problematic as the literature suggests that longer time in detention provides more opportunity for increasing mental health and behavioral problems. That mental health and behavioral problems are not adequately assessed at intake or addressed during detention likely adds to the distress associated with lengthy detention. In this manner the lengthy vetting process appears to contribute to (1) UACs' increasing mental health distress and (2) some sponsors' willingness to follow through with the vetting process, leading several sponsors to change their minds about sponsorship because of changes in behavior. Although ORR's files attribute some delays to the sponsor, that the median detention for UACs released to sponsors in this sample was over 100 days seems extreme. Measures such as fingerprinting, providing birth certificates, and home visits contributed to delays in the release process.

Longer time in detention is associated with increasing distress and provides more opportunity for increasing mental health and behavioral problems. The cases which appear delayed because of concerns about a child's behavior (from facility staff or sponsors) highlights a troubling cycle of detention, as more time in detention is associated with worsening mental health. Children benefit if they are released as soon as it is feasible to do so.

We declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

_____
Andrew Rasmussen, PhD

June 19, 2020
Date

New York, New York
City, State

Plaintiffs' Confidential Personal Information/Confidential

Expert Report of Dr. Keith Cruise and Dr. Andrew Rasmussen
Case No. 2:18-CV-05741-DMG-PLA

**Exhibit 51
Page 1314**

Keith Cruise, PhD, MLS

June 19, 2020
Date

New York, New York
City, State

23

# Exhibit 52

Exhibit 52
Page 1316

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

LUCAS R. *et al.*,

           Plaintiffs,

    v.

ALEX AZAR, Secretary of U.S. Dep't of Health and Human Services, *et al.*,

           Defendants.

Case No.: 2-18-CV-05741 DMG (PLA)

## EXPERT REPORT OF DR. ILZE EARNER, PH.D., LCSW

**I.   Scope of the report**

1.   I was asked to produce an expert witness report on the care and treatment of unaccompanied alien children (UACs) in federal custody at the Office of Refugee Resettlement (ORR) funded grantee care facilities.  Specifically, in this report, I address the policies, procedures and standards of: A) release of UACs from care and B) placement of UACs in different levels of care (i.e., restrictiveness).

2.   I also opine on whether the policies, procedures, practices and standards of care of UACs in ORR-funded grantee care facilities adhere to the principles of best practices in child welfare to ensure the prompt release of children from ORR's care and custody, and ensure safety and well-being of the children.

**II.   Findings**

3.   It is my opinion that ORR policies, procedures and practices concerning UACs either meet or exceed the standards of care for domestic children in

**Exhibit 52**
**Page 1317**

Confidential - Under Protective Order

53.    Staff reported that children who remained in placement longer because family, relatives or appropriate sponsors could not be located or had especially complicated histories such that it took longer to ensure the safety of the potential sponsor, did show signs of deteriorating mental health (personal communication, January 17, 2020 San Antonio).  It was evident from discussion with shelter staff that every effort is made to locate a viable sponsor for a UAC as detailed in the ORR Policy Guide, § 2.2.1 for identification of qualified sponsors.

54.    Wraparound services, according to staff, for UACs while in congregate care include off-site medical, psychological and psychiatric evaluation by community-based providers, as is needed.  In domestic child welfare services, wraparound services would include families, relatives or other individuals or agencies with whom a child has a significant relationship. UACs can call their parents or family members through phone lines that provide privacy.

55.    Legal services for immigration proceedings are available to UACs through a network of pro bono and Vera-funded providers.   UACs are advised of their ability to access legal services as soon as they arrive. Notice of access to legal services for immigration are posted prominently in common areas.

56.    Children in domestic child welfare are automatically assigned an attorney by the state, known as a guardian ad litem, to represent their interests in any family or juvenile court proceeding.   In 15 states and Puerto Rico, state legislatures have enacted a Foster Children Bill of Rights designed to inform foster children of their rights within the child welfare system. Many children's bills of rights provide that they must be posted in a place where children will see them and include provisions requiring foster children to be informed about why they are in foster care and how the process will proceed.

Confidential - Under Protective Order

**Exhibit 52**
**Page 1318**

In addition, participation in extracurricular or community activities, efforts to maintain educational stability, access to guardians ad litem, access to mental, behavioral and physical health care, access to or communication with siblings and family members are major features of the foster children's bill of rights.[20] At each shelter I visited there was evidence that UACs were informed of their rights and how to make reports if they felt violated; how to access an attorney and information about immigration proceedings.

57. At each of the UAC facilities that I visited there were materials posted on how to report sexual abuse, a child abuse hotline and information and forms for filing grievances.  When asked what the nature of the grievances the children filed, staff reported that "they complained about the food," "they didn't like the movie selections," or "they felt that they were unfairly denied points for good behavior."

58. Unification Services: Permanency planning is a goal-oriented activity in child welfare to maintain children in their families of origin or place them with other responsible, long-term caregivers.[21]  Concurrent planning is the accepted standard of best practices in child welfare services.[22]  Concurrent planning, required in the domestic setting by the Adoption and Safe Families Act of 1997, is an approach that seeks to eliminate delays in attaining permanent families for children and youth in foster care. Effective implementation requires comprehensive and early assessment. It involves identifying and working toward a child's primary permanency goal (such as

---

[20] National Conference of State Legislatures, https://www.ncsl.org/research/human-services/foster-care-bill-of-rights.aspx#Children.

[21] Child Welfare Information Gateway, https://www.childwelfare.gov/topics/permanency/overview/.

[22] https://www.childwelfare.gov/topics/permanency/planning/concurrent/

19

Confidential - Under Protective Order

**Exhibit 52
Page 1319**

other services following release, ORR contracts with various post-release social service provider organizations that provide case management services to UACs following release in order to link them to community services.

72.   To be consistent with best practices in child welfare, all UACs, their families, and sponsors should receive post-release services.  Both UACs and their families or sponsors represent a vulnerable and at-risk population with multiple challenges for safety, stability and well-being of children.  In domestic child welfare cases, unification is closely followed with referral to wraparound services in the community to ensure placement stability.  As noted, however, one key difference for UACs is that ORR's custody ends at the time of release, and ORR cannot resume custody. While beyond the scope of this litigation, it is my recommendation that Congress provide additional funding for post-release services to enable more UACs and their families to be linked to community resources.[27]

Dated:  June 19, 2020

Ilze Earner, Ph.D., L.C.S.W.

---

[27] Supporting Successful Reunifications (October 2017)
https://www.childwelfare.gov/pubPDFs/supporting_reunification.pdf.

24

Confidential - Under Protective Order

Exhibit 52
Page 1320

# Exhibit 53

Exhibit 53
Page 1321

1

UNITED STATES DISTRICT COURT

2

CENTRAL DISTRICT OF CALIFORNIA

3

WESTERN DIVISION

4

5    LUCAS R., et al.,                          Case No.  2:18-CV-05741 DMG PLA

6                    Plaintiffs,
                                                **DECLARATION OF**
7             v.                                **JUDGE LEONARD EDWARDS**

8    ALEX AZAR, et al.,

9                    Defendants.

10

11       1.  The facts set forth below are based on my personal knowledge and, if called

12   as a witness, I could and would competently testify to them. I am over eighteen years

13   of age.

14       2.  Attached as Exhibit A is a true and accurate copy of my Expert Report, dated

15   June 15, 2020, which I hereby reaffirm and verify under penalty of perjury as

16   containing the opinions that I am offering in this case.

17       3.  If called to testify at trial, I anticipate that I will testify to the matters and

18   opinions as set forth in my Expert Report.

19       I declare under penalty of perjury under the laws of the State of California and the

20   United States that the foregoing is true and correct.  Executed on this 28th day of

21   September, 2020.

22

23   _____

24                Judge Leonard Edwards

25

26

27

28

# EXHIBIT A

**Exhibit 53**

**Page 1323**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LUCAS R., et al.,<br><br>                Plaintiffs,<br><br>     v.<br><br>ALEX AZAR, et al.,<br><br>                Defendants. | Case No.  2:18-CV-05741 DMG PLA<br><br><br>**REPORT OF JUDGE LEONARD EDWARDS** |

**Exhibit 53**
**Page 1324**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................... 1

II.   RELEVANT PROFESSIONAL BACKGROUND AND EXPERTISE ........................ 1

III.  COMPENSATION ................................................................................. 1

IV.   MATERIALS CONSIDERED................................................................... 2

V.    SUMMARY OF OPINIONS................................................................... 2

VI.   EXPERT OPINIONS ............................................................................ 3

    A.   FEDERAL CHILD WELFARE STATUTES AFFORD PROCEDURAL SAFEGUARDS TO CHILDREN IN GOVERNMENT CUSTODY. ............................................................ 3

        *1.   Key Federal Child Welfare Statutes Protect the Rights of Children.* ............................ 3

            a.   The Child Abuse Prevention and Treatment Act established the right of foster children to a Guardian Ad Litem. ............................................................ 4

            b.   The Adoption Assistance and Child Welfare Act empowered juvenile courts to oversee child welfare agencies and protect the procedural rights of foster children. ......... 5

            c.   The Adoption and Safe Families Act and subsequent legislation have expanded the oversight role of the juvenile courts ................................................ 8

        *2.   Juvenile Court Oversight Provides Critical Protections for Children in the Child Welfare System.* ........................................................................ 11

    B.   CALIFORNIA'S CHILD WELFARE STANDARDS AFFORD PROCEDURAL SAFEGUARDS TO CHILDREN AND YOUTH IN GOVERNMENT CUSTODY. ........................................ 13

        *1.   California's Juvenile Courts Have Jurisdiction and Oversight in Child Welfare Cases, Providing Critical Procedural Protections for Children and Youth.* .................................. 13

            a.   Children and youth in the child welfare system have the right to notice and an opportunity to be heard. ................................................................ 14

            b.   Children and youth in the child welfare system have the right to a trained neutral adjudicator who applies clear evidentiary standards. .......................................... 16

            c.   Children and youth in the child welfare system have appellate rights. ................... 17

        *2.   Children and Youth in the Child Welfare System Have the Right to an Attorney.* ....... 17

        *3.   California's Juvenile Courts Oversee Statutory Timelines in Child Welfare Cases.* ... 18

        *4.   Juvenile Court Oversight Ensures that Children and Youth in the Child Welfare System Are Placed in the Least Restrictive Setting.* ................................................ 20

    C.   DUE PROCESS PROTECTIONS IN THE CHILD WELFARE SYSTEM ARE CRITICALLY IMPORTANT TO CHILDREN AND YOUTH. ................................................ 21

        *1.   Due Process Protections Minimize the Risk of Erroneous Deprivation of the Rights of Children and Youth.* ................................................................ 21

        *2.   The Due Process Protections in the Child Welfare System Protect Children from Harm.* ........................................................................ 22

    D.   ORR'S POLICIES LACK THE ESSENTIAL DUE PROCESS PROTECTIONS AFFORDED TO CHILDREN IN U.S. CHILD WELFARE SYSTEMS. ............................................ 23

VII.  CONCLUSION ................................................................................. 25

**Exhibit 53**
**Page 1325**

**Report of Judge Leonard Edwards**
***Lucas R. v. Azar*, Case No. 2:18-cv-05741-DMG-PLA**

## I.        Introduction

I have been retained by counsel for the Plaintiffs in *Lucas R. v. Azar*, Case No. 2:18-cv-05741, to provide my expert opinion regarding the procedural protections afforded to children and youth in the child welfare system under federal and California law, and to assess whether the family reunification policies for children and youth in the custody of the Office of Refugee Resettlement (ORR) afford children adequate procedural protections as compared to accepted child welfare practice and policy in the United States.  I attach my Curriculum Vitae to this report as Appendix A.  My Curriculum Vitae includes a complete list of my publications.

## II.        Relevant Professional Background and Expertise

I am a retired judge now working as a consultant, educator, and trainer after having served as a Superior Court Judge in Santa Clara County for twenty-six years and then for six years as Judge-in-Residence at the Center for Families, Children and the Courts, a division of the Judicial Council of California.  As a judge, I worked in the juvenile court for over twenty years.  As Judge-in-Residence, I served California's courts as a consultant specializing in juvenile and family law, domestic violence, drug courts, mediation, judicial ethics, and other issues relating to children and families within the court system.  From 2002 to 2003, I served as the President of the National Council of Juvenile and Family Court Judges.

I graduated from Wesleyan University in 1963 and the University of Chicago Law School in 1966.  I then dedicated my professional life to working in the court system to improve outcomes for children and families. I have also taught at the University of Santa Clara Law School, Stanford Law School, and the California Judicial College.  I have conducted trainings in forty-eight states and thirteen foreign countries as well as over 500 invited presentations in the United States.

I have written widely and created teaching videos that have been used for training throughout the United States.  My most recent book, <u>Reasonable Efforts: A Judicial Perspective</u>, was published in 2014.  My book entitled, <u>The Role of the Juvenile Court Judge: Practice and Ethics</u>, has been distributed to all California judges working in juvenile and family court as well as to all appellate justices in the state.  In 2004, I was awarded the William H. Rehnquist Award for Judicial Excellence, and was honored to be the first juvenile court judge to receive that award.

I have not testified as an expert witness, either at trial or by deposition, during the past four years.

## III.        Compensation

I am not being compensated for preparation of this report.  Should I need to testify either at a deposition or at trial, my hourly rate for testimony is $300 per hour, plus expenses.

**Exhibit 53**
**Page 1326**

## IV.    Materials Considered

In order to prepare this report, I have reviewed the following materials:

- First Amended Complaint, Docket Number 81 (September 7, 2018)
- Amended Order re Defendants' Motion to Dismiss [101] and Plaintiffs' Motion for Class Certification [97], Docket Number 141 (December 27, 2018)
- Office of Refugee Resettlement, Children Entering the United States Unaccompanied: Section 2: Safe and Timely Release from ORR Care (January 30, 2015)
- Office of Refugee Resettlement, The UAC Manual of Procedures: Section 2: Safe and Timely Release from ORR Care, and Appendices 2.1-2.5 (July 2019)
- Defendants' First Set of Responses to Plaintiffs' Requests for Admission (March 14, 2019)
- Defendants' Supplemental Objections and Responses to Plaintiffs' Requests for Admission (July 10, 2019)
- Transcript of the deposition of Jallyn Sualog (August 21, 2019)

## V.    Summary of Opinions

Based on my experience, knowledge, and training, and in particular my understanding of the procedural protections afforded to children in the child welfare system under federal and California law, and based on my review of ORR's policies governing the release of children to parents and other available custodians, I conclude that ORR's policies fall far short of the procedures provided in federal and California child welfare statutes and prevailing child welfare standards.

Through my decades of teaching, training, and lecturing across the United States, I am generally familiar with relevant policies and practices in other states. In my opinion, California's policies and practices are generally consistent with those of other jurisdictions in the United States, and my conclusions with respect to California law, in combination with my analysis of federal law, are therefore relevant in assessing ORR's policies relative to child welfare practices nationally.

Over the past several decades, there has been a steady increase in due process rights for children who have been removed from their parents and placed in government custody. These due process protections have been largely established by federal law and have been reinforced and, in some instances, enhanced by state law. Most relevant for purposes of this report are: (1) the oversight provided by juvenile courts, including affording youth evidentiary hearings conducted using clear evidentiary standards, the right to review and rebut evidence, the right to examine witnesses, decisions by a trained judicial officer, appellate rights, and the benefit of statutory timelines to ensure decisions are made promptly; (2) the entitlement to a guardian *ad litem* (GAL), and in most cases an attorney, to assist with advocacy; and (3) the right to trial court review to ensure placement in the least restrictive setting.

**Exhibit 53**
**Page 1327**

My research and experience both confirm that these due process protections allow children to meaningfully participate in processes directly impactful to their lives, minimize the risk of the erroneous deprivation of children's rights, and protect children from harm inherent in government custody and family separation by accelerating their placement in a permanent home. These protections are extremely limited or missing altogether in ORR's policies governing the placement and release of children in its custody.  In my opinion, ORR's policies are contrary to the standard of practice in the federal and California child welfare systems.

## VI.   Expert Opinions

### A.  Federal Child Welfare Statutes Afford Procedural Safeguards to Children in Government Custody.

Over the past fifty years, various federal statutes have provided the foundation for the operation of child welfare systems across the United States.  Through the passage of statutes such as the Child Abuse Prevention and Treatment Act (CAPTA) in 1974, the Adoption Assistance and Child Welfare Act (AACWA) in 1980, and the Adoption and Safe Families Act (ASFA) in 1997, among others, Congress has charged the nation's juvenile courts with oversight of state child welfare systems.  In fulfilling this duty, juvenile courts undertake oversight and monitoring of child welfare agencies' actions, including their efforts to prevent removal of children from their homes, to reunify families when they are separated, to place children in home-like settings, including with relatives, rather than congregate care, and to achieve timely permanency for children.

In placing these responsibilities in the purview of the juvenile courts, Congress has afforded children in the child welfare system robust procedural protections.  These protections include: access to a qualified, neutral arbiter who makes decisions on the basis of defined, consistent judicial standards according to set timelines; formal hearings and notice of the proceedings that will determine their placement; the right to appeal adverse decisions; and the assistance of a trained advocate, whether a GAL or, in most states, an attorney.  The involvement of the juvenile courts in child welfare cases is designed to ensure transparency and fairness and to improve outcomes for vulnerable children.

#### 1.  Key Federal Child Welfare Statutes Protect the Rights of Children.

The modern child welfare system originates from concerns about child maltreatment raised by Dr. Henry Kempe and other pediatricians in the 1960s.[1]  These concerns and the policy considerations around "battered-child syndrome" resulted in maltreatment reporting laws, which required those who became aware that a child was being maltreated to report the information to child protective services or law enforcement.  By 1967, all states in the country had enacted mandatory child maltreatment reporting laws.[2]

---

[1] *See* C. Henry Kempe et al., *The Battered-Child Syndrome*, 181 J. OF THE AM. MED. ASS'N 17 (1962).

[2] Jack L. Walker, *The Diffusion of Innovations Among American States*, 63 AM. POL. SCI. REV. 880, 895 (1969); VINCENT DE FRANCIS, CHILD ABUSE LEGISLATION IN THE 1970S (1970).

**Exhibit 53**
**Page 1328**

signaled Congress's rejection of a paradigm in which the executive branch enjoyed unbridled
authority.

AACWA also established a framework for juvenile court oversight of child welfare
agencies.  First, AACWA instructed juvenile courts to review the facts which surrounded the
removal of a child from parental care and to determine whether the child welfare agency made
"reasonable efforts" to prevent the removal.[20]  Second, AACWA required that, before approving
the removal, courts make a finding that ". . . continuation in the home from which the child was
removed would be contrary to the welfare of the child."[21]  Third, AACWA required the courts to
determine whether the agency provided adequate services to assist parents in their efforts to
reunify with their children who had been removed from their custody.[22]  Fourth, AACWA
required review of a child's case every six months and a determination of a child's permanency
within eighteen months after the initial placement.[23]  "The purpose of this dispositional review is
to identify children who have been in placement a substantial period of time and to assess the
appropriateness of their placement," in recognition that, without this oversight, "many children,
because of the inadequacies of [the then] current review procedures, and lack of family
reunification services, [were becoming] 'lost' in foster care."[24]  Finally, AACWA required that
child welfare agencies' case plans be designed to place children in the "least restrictive . . .
setting."[25]

As described below, since the passage of AACWA, many federal laws have stressed the
importance of placing children in the least restrictive, most family-like setting to ensure they are
not "deprived of the benefits of family life."[26]  More restrictive levels of placement, such as
group homes and residential treatment centers, should only be used when necessary to meet the

---

[20] 42 U.S.C. § 672(a)(2)(A)(ii); 45 C.F.R. § 1356.21(b); H.R. REP. NO. 96-136, at 6 (1979) ("[N]o child will be
placed in foster care, except in emergency situations, either voluntarily or involuntarily, unless services aimed at
preventing the need for placement have been provided or refused by the family.").

[21] 42 U.S.C. § 672(a)(2)(A)(ii); 45 C.F.R. § 1356.21(c).

[22] 42 U.S.C. § 671(a)(15)(B)(ii); 45 C.F.R. § 1356.21(b).

[23] Pub. L. No. 96-272, § 475(5)(B)-(C), 94 Stat. 500, 511 (1980).  The eighteen-month timeline was later shortened.
See 42 U.S.C. § 675(5)(B)-(C).

[24] H.R. REP. NO. 96-136, at 50 (1979); see also 125 CONG. REC. S11704 (daily ed. Aug. 3, 1979) (statement of Sen.
Cranston) ("[T]he provision for a dispositional hearing after a set period of time is, I believe, of critical importance.
One of the prime weaknesses of our existing foster-care system is that, once a child enters the system and remains in
it for even a few months, the child is likely to become "lost" in the system.").

[25] 42 U.S.C. § 675(5)(A); 45 C.F.R. § 1356.21(g)(3).  Congress recognized that "[c]hildren who enter care are too
often inappropriately placed in institutions when their needs could better be met in less restrictive settings, including
foster family homes and group homes [and] to appropriately meet the needs of children, different types of foster care
placements must be established."  H.R. REP. NO. 96-136, at 48 (1979); see also 125 CONG. REC. S11704 (daily ed.
Aug. 3, 1979) (statement of Sen. Cranston) ("There is widespread agreement that many children are inappropriately
placed in foster care institutions and deprived of the benefits of family life as a result of such placements.  The
proposed legislation addresses this particular problem—the over institutionalization of foster children—by requiring
that the child be placed in the least restrictive, most family-like setting consistent with the best interests and special
needs of the child.")

[26] 125 CONG. REC. S11704 (daily ed. Aug. 3, 1979) (statement of Sen. Cranston).  See discussion of the Safe and
Timely Interstate Placement of Foster Children Act of 2006, Fostering Connections to Success and Increasing
Adoptions Act of 2008, Preventing Sex Trafficking and Strengthening Families Act of 2014, and Family First
Prevention Services Act of 2018 in Section VI.A.1.c, infra.

Exhibit 53
Page 1329

mental health needs of a child, and then only for a limited time.[27]  Often, however, youth are
placed in higher levels of care not because it will meet their needs, but because more appropriate
placements are not being identified.[28]

The least restrictive setting requirement is also tied to Congress's conclusion that children
need permanency—preferably with their own parents, but, if that is not possible in a reasonable
amount of time, then with another permanent family.[29]

c. <u>The Adoption and Safe Families Act and subsequent
legislation have expanded the oversight role of the juvenile
courts.</u>

In 1997, Congress held additional hearings on the status of children in the child welfare
system and found that they continued to languish in government custody and were not receiving
timely permanency.[30]  Congress also concluded that family preservation policies placed some
children at risk of recurring abuse.[31]  In the resulting legislation, ASFA,[32] Congress declared that
the health and safety of children are paramount.[33]  ASFA recognized the need for promptness in
achieving permanency and implemented additional procedural safeguards to achieve this goal.
Notably, the legislation added a new issue for the courts to review—whether the agency is
making reasonable efforts to make and finalize alternate permanency plans for each foster child
in a timely fashion.[34]

AACWA and ASFA placed great responsibility squarely on the nation's juvenile and
family courts.  The courts must decide whether the child welfare agency made reasonable efforts
regarding three key issues: prevention of placement with the agency; reunification of the family;

---

[27] *See* PETER J. PECORA & DIANA J. ENGLISH,  CASEY FAMILY PROGRAMS, ELEMENTS OF EFFECTIVE PRACTICE FOR
CHILDREN AND YOUTH SERVED BY THERAPEUTIC RESIDENTIAL CARE (2016); Gary M. Blau, et al., *The Building
Bridges Initiative: Residential and Community-Based Providers, Families, and Youth Coming Together to Improve
Outcomes*, 89 CHILD WELFARE 21-38 (2010).
[28] *See* CHADWICK CENTER & CHAPIN HALL, USING EVIDENCE TO ACCELERATE THE SAFE AND EFFECTIVE
REDUCTION OF CONGREGATE CARE FOR YOUTH INVOLVED WITH CHILD WELFARE 10 (2016) (to avert the use of
congregate care placements, states must substantially increase their capacity to provide home-based placements,
particularly for older youth and other specialized populations); CHILDREN'S BUREAU, A NATIONAL LOOK AT THE
USE OF CONGREGATE CARE IN CHILD WELFARE 17-18 (2015) (encouraging states to, inter alia, increase their supply
of family-like settings and increase recruitment for and training of therapeutic foster homes, in order to ensure that
children are cared for in the least restrictive, most family-like setting possible).
[29] H.R. REP. NO. 96-136, at 50 (1979) (expressing "concern[] that foster care . . . becomes a long-term holding
situation rather than a short-term program as it was originally conceived," and making clear that "[l]ong-term foster
care should be regarded as an option only when neither a return to the family nor adoption is possible).
[30] H.R. REP. NO. 105-77, at 12 (1997) ("Children are experiencing increasingly longer stays in foster care. . . .  The
emerging statistical picture shows that young children are spending substantial portions of their childhood in a
system that is designed to be temporary.").
[31] *See* RICHARD J. GELLES, THE BOOK OF DAVID: HOW PRESERVING FAMILIES CAN COST CHILDREN'S LIVES (1996).
[32] Pub. L. No. 105-89, 111 Stat. 2115 (1997).
[33] *See* 42 U.S.C. §§ 629, 671(a)(15); 45 C.F.R. § 1356.21(b).
[34] 42 U.S.C. §§ 671(a)(15), 672(a)(2)(A)(ii), 673(b), 675; 45 C.F.R. § 1356.21(b).  For a guide regarding finalizing a
permanent plan, *see* CECILIA FIERMONTE, ET AL., MAKING IT PERMANENT: REASONABLE EFFORTS TO FINALIZE
PERMANENCY PLANS FOR FOSTER CHILDREN (2002).

8

**Exhibit 53
Page 1330**

likely know the relatives, relative placement minimizes trauma.  Children with relatives experience better stability, and have fewer placement changes, fewer behavior problems, and fewer school changes than children in foster homes.[46]  Living with relatives also helps preserve a child's cultural identity.[47]

The Preventing Sex Trafficking and Strengthening Families Act of 2014 added the requirement that juvenile courts must determine what efforts child welfare agencies make to place children in a home-like setting.[48]  Under this statute, if a child's permanency plan is "Another Planned Permanency Living Arrangement," or "APPLA," the plan must contain both documentation of intensive, ongoing, unsuccessful efforts for family placement and redetermination of the appropriateness of the placement at each permanency hearing.[49]  At the permanency hearing, the court must make a determination explaining that APPLA is the best permanency plan for the child based on compelling reasons from the child welfare agency that it is still not in the best interests of the child to (1) return home; (2) be placed for adoption; (3) be placed with a legal guardian; or (4) be placed with a fit and willing relative.[50]  By compelling the agency to explain, in detail, to the court why each child does not have a permanent home, and by requiring the juvenile court to issue a written decision articulating its reasoning, these mechanisms intensify judicial oversight.  This law demonstrates clear Congressional intent to pressure child welfare agencies to move children into permanent placements and to empower juvenile courts to hold agencies accountable for doing so.

Most recently, Congress passed the Family First Prevention Services Act ("Family First Act") in 2018.[51]  The Family First Act reflects a significant change in the federal government's approach to funding services for families struggling with issues of abuse and neglect.  This new law prioritizes preventing the unnecessary removal of children from their families and, notably, allows federal child welfare financing streams (through Title IV-E and Title IV-B of the Social Security Act) to provide services to families who are at risk of entering the child welfare system.[52]  The statute also aims to prevent children from entering the child welfare system by allowing federal reimbursement for mental health services, substance use treatment, and in-home parenting skill training.[53]

In addition, the Family First Act explicitly disfavors placement of children in congregate care facilities.  In creating financial consequences for child welfare agencies that inappropriately place children in congregate care settings, this law reinforces that reliance on congregate care

---

[46] *See* Leonard Edwards, *Relative Placement: The Best Answer for Our Foster Care System*, 69 JUV. & FAM. CT. J. 55 (2018) (*citing* David Rubin et al., *Impact of Kinship Care on Behavioral Well-Being for Children in Out-of-Home Care*, 162 ARCHIVES OF PEDIATRIC & ADOLESCENT MED. 550-56 (2008); GENERATIONS UNITED, CHILDREN THRIVE IN GRANDFAMILIES (2016); CALIFORNIA CHILD WELFARE INDICATORS PROJECT, cwwip.berkeley.edu); Robert M. Gordon, *Drifting Through Byzantium: The Promise and Failure of the Adoption and Safe Families Act of 1997*, 83 MINN. L. REV. 637 (1999).

[47] *See, e.g., Kinship Care*, CASEY FAMILY PROGRAMS (Nov. 18, 2019), https://www.casey.org/kinship-care-topical-page/; NCJFCJ Enhanced Resource Guidelines, *supra* note 7, at 137.

[48] Pub. L. No. 113-183, 128 Stat. 1919 (2014).

[49] 42 U.S.C. § 675a.

[50] *Id.*

[51] Pub. L. No. 115-123, tit. 7, 132 Stat. 170 (2018).

[52] *Id.* §§ 50711-13, 50721-23.

[53] *Id.* § 50711.

**Exhibit 53**
**Page 1331**

runs counter to the policy judgment of the federal government over the past several decades.[54]
Specifically, the the Act disallows Title IV-E foster care reimbursement for any child starting the
third week of placement in a congregate care setting unless the placement provides for the
mental health treatment needs of the child and is selected following a thorough assessment.[55]
These new treatment facilities, referred to as Qualified Residential Treatment Programs
(QRTPs), must be twenty-four-hour residential treatment providers working with trauma-
informed treatment models; they must have registered or licensed nursing staff on-site 24-7; and
they must involve the child's family members in treatment, if that is in the child's best
interests.[56]  There must be discharge planning and after-care services available for six months.[57]
The QRTP must be licensed and accredited.[58]

The Family First Act also demonstrates the federal government's lack of trust in child
welfare agencies.  The law expands the oversight role of the juvenile court, requiring additional
procedural protections when a child is placed in a QRTP and requiring that placement decisions
be reviewed and approved by the judge.[59]  In particular, the court must consider the assessment,
a written report, and documentation in the child's case plan.[60]  The court must also address:
whether the child's needs can be met in a family, foster family, or relative placement; whether
the QRTP is the most effective and appropriate placement; and whether the QRTP is consistent
with the child's goals in the case plan.[61]  The court then determines whether there is a discharge
plan and a provision for six months of after-care services.  This requires an additional court
hearing.  The court's decision to approve or disapprove of the placement must be documented in
the child's case plan.[62]  These judicial review requirements are intended to provide meaningful
oversight of agency actions.[63]

## 2. Juvenile Court Oversight Provides Critical Protections for Children in the Child Welfare System.

As noted above, with the passage of AACWA, Congress selected juvenile and family
courts to oversee the operation of the nation's child welfare system.  When Congress chose the
nation's juvenile courts to oversee the actions of child welfare agencies, it anticipated that these
courts would seriously undertake the responsibilities placed on them by the federal legislation.[64]

---

[54] *Id.* § 50741.
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] *Id.* § 50742.
[60] *Id.*
[61] *Id.*
[62] *Id.*
[63] *Testimony of Jerry Milner on Family First Prevention Services Act*, Office of Leg. Affairs & Budget (July 24,
2018), https://www.acf.hhs.gov/olab/resource/testimony-of-jerry-milner-on-family-first-prevention-services-act
 ("There are additional requirements, such as court approval, for children placed in these programs that may reduce
or eliminate federal participation for children placed there").
[64] S. REP. No. 96-336, at 16 (1979) ("The committee is aware of allegations that the judicial determination
requirement can become a mere *pro forma* exercise in paper shuffling to obtain Federal funding.  While this could
occur in some instances, the committee is unwilling to accept as a general proposition that the judiciaries of the

Exhibit 53
Page 1332

Under federal law, in order for a state to recover federal funding, juvenile courts must make critical decisions regarding whether children should be removed from their parent or guardian and whether a child welfare agency made reasonable efforts to prevent removal.[65] Courts must also determine whether the agency provided adequate services to assist parents in their efforts to reunify with their children.[66]  Depending on state statutes, this determination may occur at review hearings, status hearings, permanency planning hearings, and/or termination of parental rights hearings.  In addition, courts must determine whether, in situations where a child cannot be reunified with the parents, the child welfare agency made reasonable efforts to finalize alternate permanency plans.[67]  If the juvenile court finds that the agency did not make reasonable efforts, the agency loses federal funding for the case.[68]  Affording the juvenile court the power to review whether the agency made reasonable efforts demonstrates the federal government's recognition that child welfare agencies do not have unfettered discretion and require oversight to ensure that children are not needlessly removed from family or left to languish in care.

Federal law also establishes the minimum timelines for judicial review, which have been supplemented by state law, as discussed with respect to California in Section VI.B.3.  With seventy-two-hour hearings to determine whether a child should be removed from home, sixty-day custody determinations, six-month case reviews, and twelve-month to eighteen-month termination of parental rights hearings, juvenile courts play a crucial role in determining the trajectory of a child's time in the child welfare system from the point of removal of the child from his or her home to a determination of the child's permanent plan.  Clear timelines are crucial for moving a child's case forward toward permanency.  Because a child's sense of time differs from that of an adult, delays in ensuring permanency risk causing further harm to a child.[69]

In sum, in mandating juvenile courts' oversight of these crucial decisions, Congress recognized the significance of the rights at issue and the need for an over-arching judicial structure to ensure fundamental fairness.  Juvenile courts afford children and parents various procedural protections rooted in federal and/or state law, such as:

- The right to notice of proceedings;
- The right to a hearing, including the right to see and hear witnesses;

---

States would so lightly treat a responsibility placed upon them by Federal statute for the protection of children."); NCJFCJ, Enhanced Resource Guidelines, *supra* note 7, at 16 ("Juvenile and family court judges have a responsibility to provide individual case oversight as well as system oversight and leadership. . . . Judges must provide fair, equal, effective, and timely justice for children and their families throughout the life of the case, continually measuring the progress toward permanency for children.").

[65] 42 U.S.C. § 672(a)(2)(A)(ii); 45 C.F.R. § 1356.21(b), (c).

[66] 42 U.S.C. §§ 671(a)(15)(B)(ii); 672(a)(2)(A)(ii).

[67] 42 U.S.C. §§ 671(a)(15), 672(a)(2)(A)(ii), 673(b), 675; 45 C.F.R. § 1356.21(b).

[68] 42 U.S.C. § 671(a); 45 C.F.R. § 1356.21.

[69] JOSEPH GOLDSTEIN ET AL., THE BEST INTERESTS OF THE CHILD 7, 9 (1996).  It is important to note that in the child welfare context, timelines must take into consideration the child's rights and need for safety and timely permanency and the parent's fundamental right to custody of the child.  Children are removed from their parents or guardians due to abuse and neglect, and the federal timelines take into consideration the need for parents to have adequate time to address the challenges that led to their child's removal.  In the immigration context, where a child is not in government custody due to allegations of abuse or neglect, timelines should be in place to ensure prompt release of the child to the sponsor.

**Exhibit 53**
**Page 1333**

- The right to counsel;
- The right to a GAL or CASA;
- The right to a judicial determination of "reasonable efforts" on the part of the child welfare agency; and
- The right to appeal.

State statutes across the country require these procedural protections, including prompt notice of a child welfare hearing, an opportunity to be heard, the right to counsel and/or a GAL, and the right to appeal.[70]

### B. California's Child Welfare Standards Afford Procedural Safeguards to Children and Youth in Government Custody.

The due process protections established under federal law are solidified and, in some cases, enhanced in state law. For example, the formal structures, statutory requirements, and practices that make up California's child welfare system work together to afford procedural protections to the children and youth whose lives and futures are on the line. Juvenile courts actively oversee child welfare cases, providing children with: notice of the nature of the proceedings and an opportunity to be heard; the right to have decisions made by a trained, neutral adjudicator applying clear evidentiary standards; and the right to appeal adverse decisions. Throughout the process, children in California's child welfare system have the right to an attorney to protect their interests. Statutory timelines allow the juvenile courts to move cases forward toward permanency for children. At each step, juvenile courts provide oversight, evaluating the efforts of the child welfare agency to place children in the least restrictive, most family-like setting consistent with their needs.

Given my background and extensive experience training judges across the country, I am generally familiar with the policies and practices of child protection agencies in other states. Because California's policies and practices are generally consistent with those of other U.S. jurisdictions, they are informative in evaluating ORR's approach.

### 1. California's Juvenile Courts Have Jurisdiction and Oversight in Child Welfare Cases, Providing Critical Procedural Protections for Children and Youth.

In California, the child welfare system is administered by the state's fifty-eight counties. Almost all decisions regarding dependency cases are made locally, with the state's Department of Social Services providing some, mainly financial, oversight. Under California's Welfare and Institutions Code, when a county child welfare agency removes a child from their home, it must promptly involve the juvenile court by filing a petition to declare the child dependent.[71]

---

[70] HON. WILLIAM G. JONES, U.S. DEP'T OF HEALTH & HUMAN SERVS., WORKING WITH THE COURTS IN CHILD PROTECTION 13, 39 (2006); NCJFCJ Enhanced Resource Guidelines, *supra* note 7, at 15 ("Children and parents must have the opportunity to be present in court and meaningfully participate in their case planning and in the court process. It is the responsibility of judges to see that all children and each parent are afforded their constitutional rights to due process.").
[71] CAL. WELF. & INST. CODE §§ 300, 325.

**Exhibit 53**
**Page 1334**

The immediate involvement of the juvenile court provides oversight and guarantees procedural protections for both children and their parents, whether a child is ultimately reunited with the parent or guardian from whose custody they were removed or placed in a new temporary or permanent home.  Procedural protections for children in California's child welfare system include the right to notice and an opportunity to be heard, the right to a trained, neutral adjudicator who applies consistent evidentiary standards, and the right to appeal.  The court's role is both to protect the rights of children and their families and to provide oversight and accountability for the county child welfare agencies.  In performing this role, the juvenile court is assisted by reports from the social service agency, which include: background information about the child and family; a summary of the facts of the case; and, if the petition is sustained, recommendations for services and placement.

From the outset, before any court hearings take place, and then continually throughout the case, federal and state law require the agency to provide services to prevent removal.  The primary goal in all but exceptional cases is to return the child safely to the parents and, if not, to find a permanent home for the child.  A permanent home could be with parents, an adoptive family, a guardian, or with a relative.  Neither foster care nor congregate care can be a permanent placement.

> a. <u>Children and youth in the child welfare system have the right to notice and an opportunity to be heard.</u>

Children and youth in California's child welfare system have the right to meaningfully participate in their dependency cases.

Dependency cases are structured around a series of formalized mandatory hearings.  First, at an initial or detention hearing, the juvenile court either approves or disapproves a child's temporary removal from the home.[72]  Second, in cases where the child is in custody outside of the home, the juvenile court conducts a jurisdiction hearing to determine whether abuse or neglect has occurred.[73]  Unless the court sustains the abuse or neglect allegations made in the dependency petition, the child is released from care.[74]  If the juvenile court does sustain the allegations, it then conducts a disposition hearing to determine the child's placement and to establish a plan for services.[75]  The next step is a dependency status review to evaluate progress in completing the child's case plan, and to determine whether the child can be returned to their parents' home.[76]  Unless the court finds that it would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child, the child returns home.[77]  If not, the child remains in out-of-home care, and the court sets an additional hearing.  The purpose of this permanency hearing is to determine whether the child can be reunited with their parents, and if not, to identify the long-term alternative plan.[78]  The juvenile court then holds regular

---

[72] CAL. WELF. & INST. CODE §§ 315, 319.
[73] CAL. WELF. & INST. CODE § 355.
[74] CAL. WELF. & INST. CODE § 356.
[75] CAL. WELF. & INST. CODE § 358.
[76] CAL. WELF. & INST. CODE § 366(a).
[77] CAL. WELF. & INST. CODE § 366.21(e)(1).
[78] CAL. WELF. & INST. CODE § 366.21(f)(1).

**Exhibit 53**
**Page 1335**

permanency planning and review hearings to monitor the implementation of this long-term plan and determine whether the agency is following court orders regarding the permanency plan until the dependency case is closed.[79]

This structure of regular hearings gives the child notice of the decisions being made at each step in the case, the information being considered, and an opportunity to participate in the decision-making process. Children have a right to be present at all hearings in their dependency cases.[80] At the initial hearing, the juvenile court has a responsibility to make certain that the parties, including the child, understand the nature of the proceedings and the possible consequences.[81] Children are also advised that they have the right to address the court and participate in the hearing.[82] Moving forward, if a child aged ten or older is not present at a hearing in a dependency case, the juvenile court must determine whether the child received proper notice of the hearing and ask whether they were given the opportunity to attend.[83] If a child was not properly notified, or if they wanted to be present and were not given that opportunity, the juvenile court must continue the hearing so that the child has an opportunity to participate, absent a finding that it is in the child's best interest to proceed.[84]

Critically, the dependency process involves formal evidentiary hearings, where children have the right to review and rebut adverse evidence, including by rebutting the evidence of adverse witnesses.[85] Through their attorneys, children also have the right to independently investigate the facts, including by interviewing witnesses, and to introduce their own witnesses at both adjudicatory and dispositional hearings.[86] In California, the court provides interpreters in juvenile dependency cases.[87]

Before each regularly scheduled hearing, county child welfare agencies must file reports and recommendations with the juvenile court, including for the disposition hearing, review hearings, and permanency planning hearings. For example, before each dependency status review, a child's social worker must file a court report detailing the child's progress in out-of-home care. The juvenile court uses this report to inform its decision on the child's placement. The child and the child's attorney are entitled to review this report at least ten days before each status review hearing.[88] Failure to timely provide the report is grounds for a continuance, with the court presuming that children are prejudiced by the lack of timely service of the report absent clear and convincing evidence to the contrary.[89] This requirement gives children a meaningful opportunity to review, understand, and, if appropriate, contest the information presented to and considered by the juvenile court in making placement decisions.

---

[79] CAL. WELF. & INST. CODE §§ 366.21(g), 366.22, 366.25, 366.26, 366.3.
[80] CAL. WELF. & INST. CODE § 349(a).
[81] Cal. Rule of Court 5.668(a).
[82] CAL. WELF. & INST. CODE § 349(c).
[83] CAL. WELF. & INST. CODE § 349(d).
[84] CAL. WELF. & INST. CODE § 349(d).
[85] See Cal. Rule of Court 5.674(c).
[86] CAL. WELF. & INST. CODE § 317(e).
[87] Overview of Laws Regarding Language Access and Provision of Court Interpreters, at 5 (December 2015), https://www.courts.ca.gov/documents/BTB_23_3P_2.pdf; CAL. GOV. CODE § 68092.1; CAL. EVID. CODE § 756.
[88] CAL. WELF. & INST. CODE §§ 366.05, 366.21(c).
[89] CAL. WELF. & INST. CODE § 366.05.

**Exhibit 53
Page 1336**

of the next court day after the filing of the petition, the initial hearing takes place to either approve or deny the child's temporary removal from the home.[110]  If this initial hearing does not take place in the prescribed timeframe, the child must be released from custody.[111]

Assuming that the child is outside of the home, the juvenile court must conduct the jurisdiction hearing to determine whether abuse or neglect has occurred and whether to release the child from care within fifteen court days of the initial hearing.[112]  If the court sustains the abuse or neglect allegations and the child remains in custody, the juvenile court must then, within ten court days of the jurisdiction hearing, conduct a disposition hearing to determine the child's placement and to establish a plan for services based on the needs of the child and family.[113]  The disposition hearing may take place on the same day as the jurisdictional hearing. Within six months of the disposition hearing, the juvenile court must then conduct a dependency status review hearing to evaluate progress in completing the child's case plan, and to determine whether the child can be returned to the parents' home.[114]  If the child remains in an out-of-home placement, then within twelve months of the date the child entered foster care, the juvenile court conducts a permanency planning hearing to determine whether the child can go home or, if not, to identify the long-term alternative plan.[115]  If the juvenile court is unsure about reunification, it can extend this timeline for six months.[116]  If a juvenile court determines that reunification with a parent will not happen, it must conduct a selection and implementation hearing within 120 court days after reunification services have ended in order to determine whether parental rights should be terminated.[117]  Post-permanency, courts then hold review hearings at least every six months until a dependency case is closed.[118]

Clear statutory timelines are critical for children in the child welfare system because they move children's cases forward toward timely permanency.  Children need permanency as soon as possible.  They cannot wait.  For this reason, judges work hard to get the agency to file reports on time and to engage parents in reunification services as soon as possible.  If the child is very young, judges limit services for parents to six months, because of the developmental needs of the child.  By providing for a prompt determination of parental fitness and, if necessary, identification of an alternative permanency plan, these timelines prevent children from waiting indefinitely in out-of-home care while their cases stall and the agency makes no progress in identifying, developing, and implementing a permanency plan.

---

[110] CAL. WELF. & INST. CODE §§ 315, 319(b).

[111] CAL. WELF. & INST. CODE § 315.

[112] CAL. WELF. & INST. CODE §§ 334, 355, 356.

[113] CAL. WELF. & INST. CODE § 358(a)(1).

[114] CAL. WELF. & INST. CODE §§ 366(a).

[115] CAL. WELF. & INST. CODE § 366.21(f).  Note that timelines may be shortened for children under three years old and their siblings, in recognition of children's sense of time and the importance of the caregiver relationship to the developing brain of a very young child.  *See* CAL. WELF. & INST. CODE §§ 361.5(a), 366.21(e)(3).

[116] CAL. WELF. & INST. CODE § 366.21(g)(1).

[117] CAL. WELF. & INST. CODE §§ 361.5(f), 366.21(g)(4), 366.22(a)(3), 366.25(a)(3), 366.26.

[118] CAL. WELF. & INST. CODE § 366.3(d).

Exhibit 53
Page 1337

laws, does not reside in a home that meets health and safety requirements, or has not completed required orientation or training.[126]

### C. Due Process Protections in the Child Welfare System are Critically Important to Children and Youth.

#### 1. Due Process Protections Minimize the Risk of Erroneous Deprivation of the Rights of Children and Youth.

In practice, the procedural protections afforded to children and youth in the U.S. child welfare system improve the quality of the decisions made in dependency proceedings and minimize the risk of erroneous deprivation of the rights of children in the child welfare system.

At a foundational level, the oversight of the juvenile courts provides accountability for child welfare agencies, who must answer to judges for the decisions they make, including placement and case planning decisions. Juvenile court judges are neutral, independent, and make decisions that are constrained by legal standards and presumptions and based on a defined universe of information known to the parties. The involvement of a neutral arbiter who must consider evidence presented by multiple parties avoids a procedure where an agency merely rubber stamps its own decisions without seeking and considering input from other parties, including the child involved. In the event that an incorrect decision is made, an avenue for appeal to an independent, neutral appellate court creates an opportunity to remedy the outcome.

The formal hearings and notice requirements create a framework to ensure that youth are aware of the decisions being made and the information being considered by decisionmakers. With this framework in place, youth have an opportunity to voice concerns, correct misunderstandings, and present their own information and opinions to the decisionmaker. Making sure that youth have an opportunity to participate and to share relevant information, including, in some cases, information that only they hold, expands the universe of information available to the decisionmaker and improves the quality of the decisions made.

At each step, the involvement of advocates, including attorneys, GALs, and CASAs, reduces the risk of an erroneous decision. Advocates for children are able to: advise young people about the proceedings, their rights, and their options; help them present information, arguments, and their preferences about their placement and case plans to the court; and, generally, advocate for their interests. Advocates for children provide an important counterweight to child welfare agency workers and attorneys, who might otherwise present one-sided information to the court.

Procedural protections are not just a checklist of steps to nominally involve children and families in dependency proceedings. Improving notice and the opportunity for children and their families to be heard meaningfully improves the outcomes of child welfare proceedings. For

---

[126] *See* Cal. Dep't of Soc. Servs., All County Letter No. 12-71 re: Relative and Nonrelative Extended Family Member (NREFM) Assessment/Approval (Dec. 14, 2012). County agencies must use a standardized form, the "Notice of Action-Denial of Home Assessment/Approval" to provide notice to relatives and NREFMs of denial and their right to a state hearing. *Id.*

**Exhibit 53**
**Page 1338**

example, the National Council of Juvenile and Family Court Judges' Permanency Planning for
Children Department conducted an experiment in three juvenile courts in which the judicial
officers spent additional time at the initial hearing and asked specific questions from a
benchcard.  The study demonstrated that an enhanced initial hearing resulted in fewer children
being removed from parental care, more family placements, and fewer children placed in non-
relative foster homes.[127]

Procedural protections in dependency proceedings thus result in more meaningful
hearings, more attention to critical issues, a strong voice for parents and children during
proceedings, and more accountability for the child welfare agency, ultimately serving the best
interests of the children involved.

## 2.   The Due Process Protections in the Child Welfare System Protect Children from Harm.

The procedural protections described in this report are bulwarks of child welfare practice
in the United States.  As a juvenile court judge, I have seen these due process protections, in
particular, those afforded in California's child welfare system, in action.

Based on my experience, children benefit from these procedural protections.  As a judge,
I want to make the best decisions possible.  Just hearing from the social worker does not ensure
that I make a good decision for the child and family.  I always learn important information from
the attorneys for the parents and child.  Judges need as much information as possible from
different sources to make good decisions for the child.  Moreover, as a trained judge, I am able to
use my own expertise to evaluate the family situation.  I can ask important questions of the social
worker and family members.  In most of the thousands of cases I heard, what happened at the
court hearing and the voices I heard modified in some way the recommendation of the social
worker.  In my experience, if these or similar protections were not in place in the child welfare
system, harm to children and youth could result.

In my experience, it is important to consider that children experience the passage of time
differently than adults do.[128]  The longer courts take to make placement decisions, the more
trauma a child likely suffers, particularly in situations where the child is housed in a congregate
care setting pending the court's placement decision.  Delays are, in and of themselves, harmful to
children.  Consequently, a system of strict structured timelines that move cases forward is itself
protective of children.

In sum, the due process protections afforded to children in the U.S. child welfare system
protect children because they tend to result in quicker placement with stable, loving families, and
less time spent in congregate care, ultimately leading to better outcomes for children and families
and resulting in a faster, fairer, more effective child welfare system.

---

[127] NAT'L COUNCIL OF JUV. & FAM. CT. JUDGES, RIGHT FROM THE START: THE CCC PRELIMINARY PROTECTIVE
HEARING BENCHCARD STUDY REPORT: TESTING A TOOL FOR JUDICIAL DECISION MAKING 3 (2011).
[128] JOSEPH GOLDSTEIN, ET AL., BEYOND THE BEST INTERESTS OF THE CHILD 40-42 (1973); NCJFCJ Enhanced
Resource Guidelines, *supra* note 7, at 15-16, 29.

**Exhibit 53
Page 1339**

### D. ORR's Policies Lack the Essential Due Process Protections Afforded to Children in U.S. Child Welfare Systems.

I have reviewed, *inter alia*, Section 2 of the ORR Guide, "Children Entering the United States Unaccompanied," Section 2 of the UAC Manual of Procedures,[129] and a selection of ORR's responses to Plaintiffs' Requests for Admission. I have compared the policies laid out in these documents with the due process protections provided to children and youth in the child welfare system under federal and state law. I have also reviewed my extensive writings in child welfare law. I understand that ORR is responsible for the placement, care, custody and release of unaccompanied immigrant children. As such, ORR performs a role similar to state child welfare systems in that it aims to move children safely and promptly from government custody, including congregate care settings, to stable placements with family members or other caregivers. ORR should therefore provide equivalent procedural protections.

Based on my experience and training, I conclude that, with respect to the procedural protections afforded to children and youth, ORR's procedures for releasing children to sponsors fall far short of the procedures provided in the U.S. child welfare system, where children are likewise held in government custody and, often, separated from their families. Specifically:

(1) **No Neutral Factfinder:** As discussed below, ORR's policies governing release of children to sponsors do not provide for decisions about the placement of children with family members and other sponsors to be made by a trained and experienced judge, following detailed statutory requirements and timelines, and providing independent oversight of agency decision-making.

Instead, decisions about release to sponsors are made internally by the Federal Field Specialists alone, without review by a neutral third party.[130] While a third-party "Case Coordinator" reviews information concurrently with the case manager who is directly liaising with the proposed custodian and makes a recommendation, this person does not independently review the decision of the agency decisionmaker, the Federal Field Specialist.[131] The Federal Field Specialist is far from neutral—these agency staff members not only "have the authority to approve all unaccompanied alien children transfer and release decisions," but also are directly involved in "ensur[ing] all services are properly provided and implemented," "provid[ing] guidance, direction, and technical assistance to care providers," and "coordinat[ing] all aspects of a child's case."[132]

ORR provides Federal Field Specialists with "assessment criteria" and sources of information to consider, but does not provide them with formal standards for weighing this information and reaching a decision.[133]

---

[129] ORR, CHILDREN ENTERING THE UNITED STATES UNACCOMPANIED: SECTION 2: SAFE AND TIMELY RELEASE FROM ORR CARE (2015), https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2 [hereinafter "ORR Guide"].
[130] ORR Guide § 2.7.
[131] ORR Guide § 2.3.
[132] ORR Guide § 2.3.1.
[133] ORR Guide §§ 2.4.1, 2.7.

Exhibit 53
Page 1340

(2) **No Hearing:**  ORR's policies governing release to sponsors do not include any form
of evidentiary hearing at which children participate in decision-making, present their
own evidence and arguments, and gain an understanding of the decisions being made
and the evidence available to and relied upon by the decisionmaker.

(3) **No Notice or Opportunity to be Heard:**  ORR's policies governing release to
sponsors do not afford children the right to review or rebut evidence that forms the
basis for a decision not to reunify them with their family members or other sponsors,
including by responding to the testimony of adverse witnesses.  Because ORR is not
required to disclose to the children in its custody the evidence it is relying on in
denying a sponsor's application or, except in limited circumstances, even to explain
the rationale behind a denial, they have no opportunity to meaningfully challenge a
denial or to present their own evidence and witnesses.[134]

While ORR's Case Managers are directed to provide weekly or monthly "status
updates" to children "on the child's case and provision of services, preferably in
person," ORR's policies do not require that these updates include the opportunity to
review and challenge evidence that the agency is relying on or will rely on to deny a
potential sponsor's application.[135]  Discretionary policies that permit, but do not
require, ORR staff to provide children with notice and an opportunity to be heard if,
when, and however individual ORR staff may choose are no substitute for mandatory
procedural protections built into the system for every child.

(4) **No Counsel, Guardian Ad Litem, or Interpreter:**  ORR's policies governing
release to sponsors do not provide for all children's interests to be represented by
appointed counsel, GALs, or other advocates, or for children to receive the services of
an interpreter in navigating the release process.

Pursuant to ORR's policies, ORR "may appoint Child Advocates for victims of
trafficking and other vulnerable children," but these advocates are available only at
ORR's discretion and even then only to certain categories of children.[136]

Without an advocate, children simply do not understand the proceedings that are
affecting their lives.  I know this because I represented children as an attorney and as
a judge I presided over thousands of children's cases.

(5) **No Timelines:**  ORR's policies governing release to sponsors do not include
mandatory timelines to keep cases moving toward resolution or require a prompt
determination of a proposed custodian's fitness within a specified timeline.

---

[134] Pursuant to ORR Guide Section 2.7.7, the ORR Director sends a denial letter to the child only if "the sole reason
for denial of release is concern that the unaccompanied alien child is a danger to himself/herself or the community."
Children do not receive an explanation of a denial related to concerns with their potential sponsors.
[135] ORR Guide § 2.3.2.
[136] ORR Guide § 2.3.4.

**Exhibit 53**
**Page 1341**

(6) **No Appeal:**  With one very narrow exception, ORR's policies governing release to sponsors do not afford children the right to appeal adverse decisions denying reunification with their sponsors.[137]  In denying children the right to appeal the sufficiency of the evidence supporting ORR's decisions, ORR contradicts child welfare practice across the country.  In every state's child welfare system, the child has the right to appeal.  Denying this right deprives children in ORR's system of fundamental procedural protections.

## VII.   Conclusion

Based on my review of ORR's policies and my experience and training in federal and state child welfare law, I conclude that, with respect to the procedural protections afforded to children and youth, ORR's procedures for releasing children to sponsors fall far short of the procedures provided in federal and California child welfare statutes and prevailing child welfare standards.

Date:  June 15, 2020

_____
     Judge Leonard Edwards

---

[137] Pursuant to ORR Guide Section 2.7.8, a child may appeal the denial of a sponsor's application if: (1) "the sole reason for denial of release is concern that the unaccompanied alien child is a danger to himself/herself or the community" and (2) the parent/legal guardian is not seeking an appeal.  This avenue of appeal is not available if there are any other factors at play in ORR's decision.

Exhibit 53
Page 1342

# Exhibit 54

Exhibit 54
Page 1343

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

LUCAS R., et al.,

          Plaintiffs,

     v.

ALEX AZAR, et al.,

          Defendants.

Case No.  2:18-CV-05741 DMG PLA

**DECLARATION OF JESSICA HELDMAN**

1. The facts set forth below are based on my personal knowledge and, if called as a witness, I could and would competently testify to them. I am over eighteen years of age.

2. Attached as Exhibit A is a true and accurate copy of my Expert Report, dated June 19, 2020, which I hereby reaffirm and verify under penalty of perjury as containing the opinions that I am offering in this case.

3. If called to testify at trial, I anticipate that I will testify to the matters and opinions as set forth in my Expert Report.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct. Executed on this 28 day of September, 2020.

Jessica Heldman

DECLARATION OF JESSICA HELDMAN
CASE NO. 2:18-CV-05741 DMG PLA

**Exhibit 54**
**Page 1344**

# EXHIBIT A

Exhibit 54
Page 1345

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LUCAS R., et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br> ALEX AZAR, et al.,<br><br>          Defendants. | Case No.  2:18-CV-05741 DMG PLA<br><br><br>EXPERT REPORT OF PROFESSOR JESSICA HELDMAN |

**Exhibit 54**
**Page 1346**

I.      Introduction ...................................................................................................... 3

II.     Qualifications ................................................................................................... 3

III.    Compensation .................................................................................................. 6

IV.     Methodology ..................................................................................................... 6

        A. Definitions ................................................................................................. 6

        B. Materials Reviewed ................................................................................... 6

        C. Method of Analysis .................................................................................... 8

V.      Summary of Opinions ...................................................................................... 9

VI.     Research and Findings Overview .................................................................. 10

        A. Overview of Juvenile Justice and Child Welfare Policy and Procedure ................... 10
           1. Key Overarching Policies Regarding Placement .................................... 10
           2. Federal Policy Regarding Procedural Protections Specific to Secure and Staff
              Secure Placement ............................................................................. 11
              a. Right to representation ................................................................. 12
              b. Additional rights under In re Gault within juvenile proceedings: right to a
                 hearing, right to confront and cross-examine witnesses, and right to notice .. 13
           3. Procedural requirements in state juvenile justice proceedings ............................. 13
              a. Right to a detention hearing within a time certain in front of a neutral arbiter
                 13
              b. Right to Notice of Detention Hearing ................................................. 15
              c. Right to Counsel at Detention Hearing ............................................... 15
              d. Right to an interpreter ...................................................................... 16
              e. Right to present evidence, witnesses and the opportunity to be heard .......... 16
              f. Right to continued review .................................................................. 18
              g. Procedural protections in adjudicatory and dispositional hearings................. 18
           4. Procedural requirements in state child welfare proceedings............................... 19
           5. Majority State Policy ......................................................................... 20

        B. ORR Procedures for Secure or Staff Secure Placement ............................................. 21
           1. ORR Policy Does Not Provide a Right to a Hearing Before a Neutral Arbiter to
              Challenge Placement in a Restrictive Setting ............................................ 21
           2. ORR Policy Does Not Provide a Right to Adequate Notice................................ 22
           3. ORR Policy Does Not Provide a Right to Counsel............................................ 22
           4. ORR Policy Does Not Provide an Opportunity to be Heard and the Right to
              Present Evidence .............................................................................. 23
           5. ORR Policy Does Not Provide a Right to an Interpreter ..................................... 23
           6. ORR Policy Does Not Provide a Right to Appeal ........................................... 24
           7. ORR Policy Provides a Cursory Right to Continued Review of Secure Placement
              24

VII.    Analysis: Comparison of ORR Policy with Juvenile Justice and Child Welfare
        Procedures ...................................................................................................... 25

**A.** ORR Procedures Do Not Align with Key Federal Juvenile Justice and Child Welfare Policy ................................................................................................. 25

**B.** ORR procedures for placement in a secure or staff secure setting do not align with procedures in the majority of states .......................................................... 25
  1. Right to a hearing before a neutral arbiter ........................................... 25
  2. Right to Counsel ................................................................................... 26
  3. Opportunity to be heard and the right to present evidence, and right to interpreter 27
  4. Right to review of placement .............................................................. 27

**VIII.** **Conclusion** ................................................................................................. **28**

To answer the research questions, I reviewed federal law codified in the Social Security Act and key federal child welfare legislation, including the Child Abuse Prevention and Treatment Act (CAPTA) and the Adoption and Safe Families Act. I also reviewed the Juvenile Justice Delinquency Prevention Act (JJDPA), a key federal juvenile justice statute, and its corresponding regulations. These statutes and regulations mandate core requirements with which states must comply and some procedural protections states must provide for children and families in state systems supported by federal funds. Through a review of the text of the statutes and the use of keyword searches, I identified provisions detailing principles and policies related to secure or staff secure placements of children, as well as required procedures or limitations for placing children in such settings.

In addition, I reviewed state law and policy in all 50 states and the District of Columbia—including state statutes and court rules—related to detention and placement of children and youth in secure and staff secure settings within juvenile justice systems. I examined the table of contents for each state's code to identify code sections and court rules related to juvenile court and juvenile justice (delinquency). Using keyword searches, I examined provisions related to required processes for detaining or placing a child or youth in a secure or staff secure setting. I identified required procedural protections, specifically identifying required court hearings and whether the hearing procedures provided the child notice, an opportunity to be heard, and an opportunity for review or reconsideration by a court.

In addition to the examination of federal and state law and policy, I reviewed these materials in forming the opinions discussed herein:

- Publications from government agencies including the Government Accountability Office and the Administration for Children and Families;

key state provisions, attached to this report as Appendix B. From this compilation, I was able to identify procedures required by at least a majority of states (26 or more). This provided the basis for the "majority state policy" in Section VI.A.5 of this report.

I reviewed ORR policy and similarly identified procedural components related to secure or staff secure placement.  I compared ORR policy to the majority state policy in order to determine whether ORR policy is in alignment with child welfare, juvenile justice and juvenile court law, policy and procedures. This comparison provided the basis for my final analysis and stated opinions.

## V.        SUMMARY OF OPINIONS

It is my opinion that the procedural protections afforded children in the juvenile justice and child welfare systems minimize the risk of erroneous and unnecessarily lengthy placements in secure and staff secure settings which can be harmful and traumatic. The most basic state law protections providing the right to a hearing, representation by an attorney, and an opportunity to be heard with testimony, witnesses and presentment of evidence in determinations regarding placement in a staff secure or secure facility exceed the procedural protections within ORR's written policies and procedures regarding the placement of children in restrictive settings.

It is my opinion that ORR's written policies are substandard when compared to state and federal law for child-serving systems. Based on my review of materials listed above as well as on my experience, knowledge, and training, and in particular, my understanding of the procedural protections afforded to children in the juvenile justice and child welfare systems, I conclude that ORR's policies and procedures for transferring and keeping children in restrictive settings are far more informal and prone to error when compared to the procedures provided in state and federal juvenile justice and child welfare statutes.

**b. *Additional rights under In re Gault within juvenile proceedings: right to a hearing, right to confront and cross-examine witnesses, and right to notice***

The Court in *In re Gault* established that juveniles have a right to a full adjudicatory hearing on the merits of the case, including the right to confront and cross-examine witnesses. It also established the right to notice in these proceedings. Specifically, the court restated its view from an earlier case that "the hearing must measure up to the essentials of due process and fair treatment."[9] As discussed below, states have applied the Court's due process analysis and provided procedural protections outside of the adjudicatory hearing such as in detention hearings and disposition hearings, both of which impact the placement of the youth.

3.  Procedural requirements in state juvenile justice proceedings

Federal law and policy mandate certain procedures when placing a youth in a secure or staff secure setting while state laws and court rules guide the implementation of those federal mandates, often creating additional or expanded requirements. My review of state law and policy identified state provisions on key procedural processes related to secure or staff secure placement of children. My review provided me the ability to document the number of states providing these key protections, forming the basis of a majority state policy detailed below.

**a. *Right to a detention hearing within a time certain in front of a neutral arbiter***

In all 50 states and the District of Columbia, children and youth are entitled to a hearing when they are placed in a secure detention facility in order to determine whether they can be released. In some jurisdictions this detention hearing is held coincident with an initial hearing in the juvenile justice system, at which arraignment or a probable cause determination occurs.

---

[9] *In re* Gault, 387 U.S. 1, 30 (1967).

### b. *Right to Notice of Detention Hearing*

My review revealed that the majority of states have written policies—through statute, court rules, or both—indicating that all juveniles have a right to notice prior to their detention hearing.[18] In addition, the state of Washington requires notice of the detention hearing for all youth above age 12.[19] Four states that do not explicitly indicate a child's right to notice do, however, have statutory provisions requiring that the juvenile's parent or guardian receive notice before the detention hearing.[20]

### c. *Right to Counsel at Detention Hearing*

As noted above, the U.S. Supreme Court in *In re Gault* established a juvenile's right to counsel in adjudicatory hearings.[21] States have expanded this right to include representation at juvenile justice detention hearings as well. My review indicated that all 50 states and the District of Columbia have state law or court rules that provide juveniles with a right to counsel that extends beyond the *In re Gault* requirement. My review revealed that 41 states and the District of Columbia explicitly provide the right to an attorney in a detention hearing.[22] The remaining 9 states provide counsel either "at all proceedings" or "at all stages of proceedings" under the juvenile delinquency code.[23]

As noted above, federal law affords juveniles the right to counsel in probation violation hearings before a youth who has not committed a crime (i.e. a status offender) can be held in a secure detention center. Although it was not within the scope of my 50 state review to examine

---

[18] Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Georgia, Idaho, Indiana, Iowa, Kansas, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, New Jersey, New Mexico, North Dakota, Ohio, Oregon, Pennsylvania, Rhode Island, Texas, Utah, Vermont, Virginia, Wisconsin, Wyoming.
[19] Wash. Rev. Code Ann. § 13.40.050(2)
[20] Florida, Hawaii, Illinois, and South Dakota.
[21] *In re Gault*, 387 U.S. 1, 36-37 (1967).
[22] *See* chart at Appendix B for citations.
[23] Georgia, Hawaii, Maine, Maryland, Nevada, Oklahoma, South Dakota, Utah, Wyoming. *See* Chart at Appendix B for citations.

**Exhibit 54**
**Page 1352**

addition, 17 states have provisions specifically allowing juveniles to confront the evidence against them or cross-examine witnesses.[32]

### f.   Right to continued review

My review indicated that in a majority of states, statutes or court rules explicitly ensure that detention of a juvenile in a secure detention facility does not continue indefinitely without court review.[33] Although the provisions vary, in the states with such provisions, detention is either time-limited by a statutory expiration date absent rehearing or by failure to hold the next hearing in the juvenile justice process within statutorily prescribed timeframes, or the juvenile is entitled to a detention rehearing by the court upon request or motion. Eighteen of these states explicitly require reconsideration of detention at a hearing within 21 days or fewer.[34]

### g.   Procedural protections in adjudicatory and dispositional hearings

Following the detention and probable cause phase of juvenile proceedings, a youth will have an adjudicatory hearing at which all the requirements determined in *In re Gault* are applicable. A youth cannot continue to be held in a secure facility absent an adjudication, which is a finding that the youth committed the alleged offense. Final orders of adjudication are appealable.[35]

If the youth is adjudicated delinquent, the court will hold a dispositional hearing at which the court has a range of dispositional options, including the ability to order the placement or

---

[32] Alabama, California, Georgia, Illinois, Iowa, Kentucky, Michigan, Massachusetts, North Carolina, Pennsylvania, South Carolina, Tennessee, Vermont, Virginia, W. Virginia, Wisconsin, Wyoming. *See* chart at Appendix B for citations.

[33] Alabama, Alaska, Arizona, California, Connecticut, Delaware, Florida, Hawaii, Illinois, Indiana, Iowa, Kansas, Maine, Maryland, Minnesota, Missouri, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Texas, Utah, West Virginia, Wisconsin.

[34] Arizona, California, Connecticut, Delaware, Florida, Hawaii, Iowa , Maryland, New Jersey, New York, North Carolina, Oregon, South Carolina, Texas, Rhode Island, Indiana, Illinois, Maine, Minnesota, Ohio, Oklahoma, Pennsylvania, and Utah. *See* chart at Appendix B for citations.

[35] Although not part of the 50 state review conducted for this report, secondary sources confirm that adjudicatory judgments are appealable within all states either by statute, court rule or case law.  *See* Megan Annitto, JUVENILE JUSTICE ON APPEAL, 66 U. MIAMI L. REV. 671, 682-83 (2012).

commitment of a youth to an agency for placement in a non-secure or secure residential facility.

A case will not proceed to disposition unless an adjudicatory hearing has occurred, which

provides the youth with all procedural protections required by *In Re Gault*, including right to

notice of the charges, right to counsel, and the right to confront and cross-examine witnesses.

Juveniles are entitled to representation by counsel in disposition hearings in the majority of

states.[36] In some jurisdictions, disposition hearings themselves are full evidentiary hearings,

while in other jurisdictions they are non-evidentiary, but still provide an opportunity for the

juvenile to be heard through written submissions or oral arguments.[37]

### 4.   Procedural requirements in state child welfare proceedings

In the child welfare system, procedural protections center on the rights of parents and

children to maintain the parent-child relationship. This results in the right to a hearing when a

child is detained (i.e. removed from parental custody). Following this hearing, a court will hold

another hearing to determine whether the child will be adjudicated dependent (i.e. whether the

court takes jurisdiction over a child who has been removed from his or her parents and placed

out of home). Following adjudication of the child as a dependent, the juvenile or family court in

each state holds a disposition hearing at which the court determines custody and placement of the

child as the family works toward reunification. The disposition hearing provides the opportunity

for the court to approve recommended plans and order placements for the youth. The court also

holds required post-disposition hearings in which the child's placement is regularly reviewed or

can be reviewed upon motion for a change in placement hearing.

---

[36] *See* chart at Appendix B for citations.
[37] Randy Hertz, Martin Guggenheim & Anthony G. Amsterdam, Trial Manual for Defense Attorneys in Juvenile
Delinquency Cases, p. 1135 (2019).

Exhibit 54
Page 1354

Under federal law, children in dependency proceedings are entitled to a *guardian ad litem* (GAL) who may or not be an attorney. In 34 states and the District of Columbia, state law or court rules require the GAL to be an attorney.[38] In addition, in all but 12 states, children are given party status in the dependency proceedings.[39] Party status ensures that children are afforded basic due process, including notice of all proceedings and decisions and the right to appear and fully participate in court.[40]

     5.  <u>Majority State Policy</u>

The following Majority State Policy[41] presents a summary of the procedural protections under federal law and the majority of state laws and policies afforded juveniles facing secure or staff secure detention.

- If a youth is detained in a secure facility, a court shall hold a detention hearing within 48 hours of the youth's detention. If a child is placed in a staff secure facility, a shelter care hearing shall be held within 72 hours of placement.

- The youth must be given notice of the detention or shelter care hearing.

- The youth has the right to counsel at the detention or shelter care hearing and an interpreter will be appointed if the child is of Limited English Proficiency.

- The detention hearing will provide the youth with the opportunity to be heard in response to the evidence presented, including the opportunity to present evidence of his own.

- Detention in a secure or staff secure facility cannot be indeterminate. A court must review the detention decision either as part of a probable cause or adjudicatory hearing at a time certain, or during a mandated detention review hearing, or upon motion of the child or his parent.

---

[38] Alabama, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Georgia, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Nebraska, Nevada, New Jersey, New Mexico, New York, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, West Virginia, Wyoming. *See* chart at Appendix B for citations.

[39] *See* Children's Advocacy Institute & First Star Institute, *A Child's Right to Counsel*, 4th ed. (2019).

[40] *Id.* at 13.

[41] As previously stated, in reviewing the statute and code sections related to placement in secure or staff secure facilities within the juvenile justice and child welfare systems, I identified which provisions were present in a majority of states reviewed.

## VII.     ANALYSIS: COMPARISON OF ORR POLICY WITH JUVENILE JUSTICE AND CHILD WELFARE PROCEDURES

### A.     ORR Procedures Do Not Align with Key Federal Juvenile Justice and Child Welfare Policy

ORR Policy is based on federal legal requirements to ensure placement of a child in the least restrictive setting appropriate for the child's needs[48] and in the best interests of the child.[49] However, ORR Policy is inconsistent with procedures afforded within the juvenile justice and child welfare system when facing placement in a secure or staff secure facility. In RFA No. 151 of Defendant's Second Set of RFA Responses, Defendants state that ORR's decisions to transfer a UAC to a more staff secure placement are not themselves "legal proceedings or matters…." This is in conflict with the federal principle and policy that requires due process for youth facing detention or placement.

### B.     ORR procedures for placement in a secure or staff secure setting do not align with procedures in the majority of states

In comparing the majority state rule with ORR written policies and procedures, it is my opinion that ORR procedures are inconsistent with the procedures provided in the majority of states with regard to placement in secure facilities. The basis for my opinion is detailed in the following sections.

1.     Right to a hearing before a neutral arbiter

State law review revealed that all 50 states and the District of Columbia require a hearing before a neutral arbiter to be held within 48 hours of a juvenile being detained in a secure

---

[48] Office of Refugee Resettlement, Children Entering the United States Unaccompanied: Section 1, Policy 1.1 (January 30, 2015) at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-1#1.2

[49] Office of Refugee Resettlement, Children Entering the United States Unaccompanied: Section 1, Policy 1.2.1 (January 30, 2015) at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-1#1.2

facility. In addition, the majority of states require a hearing if a child is placed in a staff secure

facility. In contrast with the procedures in jurisdictions across the nation, ORR does not provide

youth with a hearing when placing or transferring UAC to a secure or staff secure facility. UAC

are entitled to bond hearings, but these proceedings are not dispositive with respect to placement,

nor do they include a review of the UAC's placement. The UAC may request a review by a

federal court, but this is not an automatic right. A UAC child in ORR custody is not appointed

counsel to assist in seeking federal court review and there is no further indication within the

materials I reviewed whether this review comports with the procedural components in the

majority state policy.

The placement of a youth in a secure or staff secure facility beyond temporary detention

can only occur within the child welfare and juvenile justice systems following adjudicatory and

dispositional hearings held in court before a neutral arbiter. ORR policy does not provide such

hearings and thus does not comport with this procedural requirement.

Because ORR does not provide UAC's with the right to a hearing before a neutral arbiter

upon detention in a secure facility, ORR policy is out of step with the majority state policy.

2.   Right to Counsel

Federal case law requires youth to have legal counsel at all critical stages of juvenile

proceedings where liberty is at stake. The majority of states have interpreted this to mean that

youth are entitled to counsel at detention hearings and state law and policy reflect this. In

addition, the majority of states share a policy which indicates that within the juvenile justice and

child welfare systems, placement beyond temporary detention occurs following required

adjudicatory and dispositional hearings in which the counsel is provided to the child. ORR policy

does not provide UAC with legal representation in the determination of a UAC's secure or staff

Exhibit 54
Page 1357

facility or RTC, the UAC can request the ORR Director to reconsider the placement if after the

30 day case review they are not stepped down.[50] The ability to challenge placement through

reconsideration by the ORR Director is deficient as compared to the majority state policy

because it does not entitle a UAC to a hearing in front of a neutral and detached decision-maker.

The lack of a hearing, the lack of an opportunity to present evidence, and the lack of counsel fails

to ensure the UAC an opportunity to be heard on the matter of his release.

## VIII.       CONCLUSION

Based on my review of ORR's policies and procedures and my experience and training in

federal and state juvenile justice and child welfare law, I conclude that ORR's procedural

process for placing children in secure and staff secure settings are deficient compared to the

procedures provided in the U.S. juvenile justice and child welfare system in situations where

children are held in government custody and separated from their families.

Date: June 19, 2020

_____

Jessica K. Heldman

Professor in Residence

---

[50]  Office of Refugee Resettlement, UAC Manual of Procedures, Version 2, Section 1.2.4 (2018).

APPENDIX B
Court Procedures Provided by State Statutes, Rules, Agency Policy
**Juvenile Justice Procedures**

| | Right to detention hearing | Right to counsel | Right to notice of hearing | Right to present evidence | Right to present witnesses | Right to interpreter | Right to confront evidence | Right to continued review | Right to counsel at disposition |
|---|---|---|---|---|---|---|---|---|---|
| AL | Ala. Code § 12-15-207 | Ala. Code §§12-15-202(f)(1); 12-15-207(c) | Ala. Code. § 12-15-207(b) | Ala. Code §12-15-207(d) ( ct. may admit relevant evidence) | | | Ala. Code §12-15-202(f) | Code of Ala. §12-15-221 (a)(1) (modification of order can be requested) | Ala. Code §§12-15-202; 12-15-221(b) |
| AK | Alaska Stat. §47.12.250<br><br>Alaska Delinq. Rule 12 | Alaska Stat. §47.12.250(c) | Alaska Delinq. R. 3 | Alaska Delinq. R. 10 | | Alaska R. of Admin. 6 | | Alaska Delinq. R. 12 | Alaska Stat. §47.12.090(a)<br><br>Alaska Delinq. R. 24(c); R. 25 |
| AZ | Ariz. Juv. Ct. R. P 23(C) | Ariz. Rev. Stat. §8-221(A) | | | | | | Ariz. Juv. Ct. R. P 23(J) (court may review upon motion of juvenile, prosecutor or court) | Ariz. Juv. Ct. R. P.10(A) |
| AR | Ark. Code Ann. § 9-27-313(d)(1)(C) | Ark. Code Ann. § 9-27-326(b)(2) | Ark. Code. Ann.§ 9-27-326(a) | Ark. Code. Ann.§ 9-27-326(d) (ct shall admit relevant evidence) | Ark. Code. Ann.§ 9-27-326(d) | | | | |
| CA | Cal. Welf. & Inst. Code §632(b) | Cal. Welf & Inst. Code §§ 633, 634 | Cal. Welf. & Inst. Code §630(a) | Cal. Welf & Inst. Code §§630(b); 635(a) | Cal. Welf. & Inst. Code §630(b); 635(a) | CA Const. Art. 1 §14 (in de. Hearing)<br><br>CA Evid. Code §756 | Cal. Welf. & Inst. Code §§630(b); 635 | Cal. Welf. & Inst. Code §636 (a) | Cal. Welf. & Inst. Code §634 |
| CO | Colo. Rev. Stat. Ann. § 19-2-508(3)(a)(I) | Colo. Rev. Stat. Ann. § 19-2-508(2) | Colo. R. Juv. P. 3.7 (c) | Colo. Rev. Stat. Ann. § 19-2-508(3(a)(v) (court shall receive any probative info) | | CO Judicial Branch website | | | Colo. Rev. Stat. Ann §§ 21-1-103; 19-2-706(1) |
| CT | Conn. Gen. Stat. Ann. § 46b-133(e)<br><br>Conn. R. Super. Ct. Juv. 30-5 | Conn. R. Super. Ct. Juv. 30-3 | Conn. Practice Book §30-4 | Conn. Practice Book §30-4 (court may consider any relevant information) | | | | Conn. Gen. Stat. Ann. § 46b-133 | Conn. Gen. Stat. Ann. § 46b-135(A) |
| DE | Del. Fam. Ct. R. Crim. P. 5.1(a)(1) | Del. Fam. Ct. R. Crim. P. 5.1(a)(2) | Del. Fam. Ct. R. Crim. P. 5.2 | Del. Fam. Ct. R. Crim. P. 5.1(b) (ct. shall consider all available info) | | | | 10 Del. C. §1007(f) | Del. Fam. Ct. R. Crim. P. 44.1(a) |

**Exhibit 54**<br>**Page 1359**

APPENDIX B

Court Procedures Provided by State Statutes, Rules, Agency Policy

| | Right to detention hearing | Right to counsel | Right to notice of hearing | Right to present evidence | Right to present witnesses | Right to interpreter | Right to confront evidence | Right to continued review | Right to counsel at disposition |
|---|---|---|---|---|---|---|---|---|---|
| DC | D.C. Code § 16-2312(a)(2) | D.C. Code § 16-2304(a)<br><br>Super. Ct. Juv. R. 44(a)(1) | D.C. Code §16-2312 (b) | | | D.C. Code §2-1902 (in juvenile proceedings) | | | D.C. Code § 16-2304(a) |
| FL | Fla. Stat. Ann. § 985.255(1) | Fla. Stat. Ann. § 985.033(1)<br><br>Fla. R. Juv. P. 8.010 | Fla. R. Juv. Proced. Rule 8.010 (d) (parents noticed) | Fla. R. Juv. Proced. Rule 8.010 (a) (opportunity to be heard) | Fla. R. Juv. Proced. Rule 8.010 | Fla. R. Jud. Admin. R. 2.560 (a) (in juvenile delinquency) | | Fla Stat. §985.26 (21 days unless adjudicated) | Fla. Stat. Ann. § 985.033(1) |
| GA | Ga. Code Ann. § 15-11-506(b) | Ga. Code Ann. § 15-11-475(a) (at all proceedings) | Ga. Code Ann. §15-11-506(d) | Ga. Code Ann. § 15-11-506 (f)(5) | Ga. Code Ann. § 15-11-506 (f)(5) | GA Sup. Ct. Appx. A (V) (including juveniles) | Ga. Code Ann. § 15-11-506 (f)(5) | | Ga. Code Ann. § 15-11-475(a) |
| HI | Haw. Rev. Stat. §571-32(d) | Haw. Fam. Ct. R., r. 155. (at all stages of proceedings) | Haw. Rev. Stat. §571-32(c) (parent given notice of right to prompt hearing) | Haw. Rev. Stat. §571-32 (ct. may admit testimony or other evidence) | Haw. Rev. Stat. §571-32 (ct. may admit testimony or other evidence) | | | Hawaii Family Court Rules R. 136 (Review of detention order at least every 8 days) | |
| ID | Idaho Code §20-516(4)<br><br>Idaho Juv. R., r. 7(c) | Idaho Juv. R., r. 9(d)<br><br>Idaho Code Ann. § 20-514(1) | Idaho Juv. R., r. 9(d) | | | Idaho Code §9-205 | | | Idaho Code § 20-514(1)(a), (2) |
| IL | 705 Ill. Comp. Stat. Ann. 405/5-415(1) | 705 Ill Comp. Stat. Ann. 405/5-501 | 705 Ill. Comp. Stat. Ann. 405/5-415(2) (parents are given notice of hearing) | 705 ILCS 405/5-501 (ct. shall receive all relevant info) | 705 ILCS 405/5-501 | | 705 ILCS 405/1-5(1) | 705 ILCS 405/5-501 (7) (any party can file motion to vacate detention or shelter care order; hearing w/i 14 days) | 705 Ill. Comp. Stat. Ann. 405/1-5(1) |
| IN | Ind. Code Ann. § 31-37-6-2 | Ind. Code Ann. § 31-32-4-2 | Ind. Code Ann. §31-37-6-3 (a)(1) | Ind. Code Ann. §31-37-6-3(b) (opportunity to be heard) | | Ind. Code Ann. §34-45-1-3 | | Burns Ind. Code Ann §31-34-5-5 (May petition for additional detention hearings)<br><br>Burns Ind. Code Ann. § 31-37-11-7 (child released if petition not filed) | Ind. Code Ann. §§ 31-32-4-1, 31-32-2-2 |
| IA | Iowa Code Ann. § 232.44(1)(a) | Iowa Code Ann. § 232.11(1) | Iowa Code Ann. §232.44(3) | Iowa R. Juv. Proc. 8.16 | | Iowa Ct. R. 47.3 | Iowa R. Juv. Proc. 8.16 | Iowa Code Ann §§232.44(6); 232.44(7) | Iowa Code Ann. § 232.11(1) |
| KS | Kan. Stat. Ann. § 38-2343(a) | Kan. Stat. Ann. §§ 38-2306(a)-(b), 38-2343(e) | Kan. Stat. Ann. §38-2343(d) | Kan. Stat. Ann. §38-2343(f) (ct. shall allow contrary evidence) | | Kan. Stat. Ann §75-4351 | | Kan. Stat. Ann 38-2343(i) | Kan. Stat. Ann. §§ 38-2306(a)-(b), 38-2343(e) |

**Exhibit 54**<br>**Page 1360**

APPENDIX B

Court Procedures Provided by State Statutes, Rules, Agency Policy

| | Right to detention hearing | Right to counsel | Right to notice of hearing | Right to present evidence | Right to present witnesses | Right to interpreter | Right to confront evidence | Right to continued review | Right to counsel at disposition |
|---|---|---|---|---|---|---|---|---|---|
| KY | Ky. Rev. Stat. Ann.§§ 610.265; 610.280(1)(a) | Ky. Rev. Stat. Ann. §§ 610.290(2), 31.110. | | Ky. Rev. Stat. Ann.§610.265 (ct. shall consider information) | | Ky. Rev. Stat. §30A.410 | Ky. Rev. Stat. §610.280(1)(a) Ky. Rev. Stat. Ann. §§ 610.060 (1)(c) | | Ky. Rev. Stat. Ann. §§ 610.060, 610.290(2), 31.110. |
| LA | La. Child. Code Ann. art. 819, 820 | La. Child. Code Ann. art. 809 | | | La Child. Code Ann. Art. 821(B) | La. Code Civ. Proc. Art 192.2 | | | La. Child. Code Ann. art. 809, 848 |
| ME | Me. Rev. Stat. Ann. tit. 15 § 3203-A(5) | Me. Rev. Stat. Ann. tit. 15 § 3306(1)(A) (at every stage of proceedings) | | Me. Rev. Stat. Ann. tit. 15 § 3203-A(5)(A) | Me. Rev. Stat. Ann. tit. 15 § 3203-A(5)(A) | Maine Sup. Ct. Admin. Order JB-06-03 (inc. juvenile actions) | | Me. Rev. Stat. Ann. tit. 15 §3203-A(11) (attny for juvenile can petition for conditional release) | Me. Rev. Stat. Ann. tit. 15 § 3306(1)(A) |
| MD | Md. Code Ann., Cts. & Jud. Proc. § 3-8A-15(d)(1), (2) | Md. Code Ann., Cts. & Jud. Proc. § 3-8A-20(a), (d) (at every stage of any proceeding) Md. R. Juv. Causes r. 11-106(a) | Md. Code Ann., Cts. & Jud. Proc. § 3-8A-15 (d)(3) | | | Md. Rules for Courts, Judges and Attorneys, Rule 1-333 | Md. Code Ann. Cts & Jud Proc §3-8A-15(d)(6)(2)Detention. can be extended in inc. of 14 days with hearing | | Md. Code Ann., Cts. & Jud. Proc. § 3-8A-20(a), (d) Md. R. Juv. Causes r. 11-106(a) |
| MA | Mass. Dist. Ct. Standing Order 2-88 Mass. R. Crim. P. 3.1(a) | Mass. R. Crim. P. 8 | | | | Mass. Gen. Laws ch. 221C §2 | | | |
| MI | Mich. Ct. R. 3.935(A)(1) | Mich. Comp. Laws Ann. § 712A.17c (1) ; Mich. R. Spec. P. 3.935(B)(1) | Mich. Ct. R. 3.921 | Mich. Ct. R. 3.935 (3) | Mich. Ct. R. 3.935 (3) | | Mich. Ct. R. 3.935 (3) | | Mich. Comp. Laws Ann. § 712A.17c (1); |
| MN | Minn. Stat. Ann. § 260B.178(1) | Minn. Stat. Ann. § 260B.163(4) Minn. R. Juv. Delinq. Proc. 3.02(6) | MN Rules of Juv. Delinq. Proc. Rule 5.07 | MN Rules of Juv. Delinq. Proc. Rule 5.07 (ct. may hear any evidence) | | Minn. Stat. Ann. §546.43 | | Minn. Stat. Ann. § 260B.178 (subdiv 4) | Minn. Stat. Ann. § 260B.163(4) Minn. R. Juv. Delinq. Proc. 3.02(1), 3.02(2), 3.02(3)) |
| MS | Miss. Code Ann. § 43-21-307 | Miss. Code Ann.§ 43-21-201(1) | Miss. Code Ann. §43-21-309(2) | Miss. Code Ann. §43-21-309(3) | | Miss Code Ann §9-21-79 | Miss. Code Ann. §43-21-309(3) | | Miss. Code Ann.§ 43-21-201(1) |
| MO | Mo. Ann. Stat. § §211.063(1); 211.061(4) | Mo. Sup. Ct. R. 128.02 Mo. Sup. Ct. R. 127.08 | Mo. Ann. Stat. § §211.061(4) | MO R JUV P Rule 127.08 (ct. shall receive evidence) | | Mo. Ann. Stat §476.803 | | MO R JUV P Rule 127.08(g) | Mo. Ann. Stat. § 211.211(6) |

Exhibit 54
Page 1361

APPENDIX B
Court Procedures Provided by State Statutes, Rules, Agency Policy

| | Right to detention hearing | Right to counsel | Right to notice of hearing | Right to present evidence | Right to present witnesses | Right to interpreter | Right to confront evidence | Right to continued review | Right to counsel at disposition |
|---|---|---|---|---|---|---|---|---|---|
| MT | Mont. Code Ann. § 41-5-332 (1) | Mont. Code Ann. §41-5-333 (2) | | | | | | | Mont. Code Ann. § 41-5-1413<br><br>Mont. Code Ann. § 41-5-332 |
| NE | Neb. Rev. Stat. Ann. § 43-253(3) | Neb. Rev. Stat. Ann. § 43-253(3) | | | | Neb. Rev. Stat. Ann. §25-2403 | | | Neb. Ct. R. § 6-1706(B)(1)(m) |
| NV | Nev. Rev. Stat. Ann. § 62C.040(1)(b)-(d) | Nev. Rev. Stat. Ann. § 62D.030(1) (at all stages of the proceedings) | | | | Nev. Rev. Stat. Ann. §62D.405(1)(a) (in delinquency proceedings) | | | Nev. Rev. Stat. Ann. § 62D.030(1). |
| NH | N.H. Rev. Stat. Ann. § 169-B:12(IV)(b) | N.H. Rev. Stat. Ann. § 169-B:12(IV) | | | | | | | N.H. Rev. Stat. Ann. § 169-B:12(I). |
| NJ | N.J. Ct. R. 5:21-3(a)<br><br>N.J. Stat. Ann. §§ 2A:4A-38(e) | N.J. Stat. Ann.§ §2A:4A-38(h);  2A:4A-39<br><br>N.J. Ct. R. 5:3-4(a); 5:21-3(a) | N.J. Ct. R. 5:21-3(a) | | | | | N.J. Stat. Ann. §§ 2A:4A-38(i) | N.J. Stat. Ann. § 2A:4A-39 |
| NM | N.M. Stat. Ann. § 32A-2-13(2)-(3) | N.M. Child. Ct. R. 10-223 | N.M. Stat. Ann. § 32A-2-13 (C) | N.M. Stat. Ann. § 32A-2-13 (H) (ct. may consider all relevant evidence) | | N.M. Child. Ct. R 10-167 (in children's court) | | N.M. Stat. Ann. § 32A-2-13 (J) (ct. may review) | |
| NY | N.Y. Fam. Ct. Act § 307.4(5) | N.Y. Fam. Ct. Act § 249(a) | | | | 22 N.Y. Comp. Codes R. & Reg. Part 217.1 (in family court) | | NY CLS Family Ct. Act §340.1 (1) (fact finding hearing must happen within a span of time det. By level of offense, all timeframes are within 14 days) | N.Y. Fam. Ct. Act § 249(a) |
| NC | N.C. Gen. Stat. Ann. § 7B-1906(a) | N.C. Gen. Stat. Ann. § 7B-2000(a) | | N.C. Gen. Stat. Ann. § 7B-1906(d) | N.C. Gen. Stat. Ann. § 7B-1906(d) | Standards for Language Access Services, Sect. 5, N.C. Judicial Branch | N.C. Gen. Stat. Ann. § 7B-1906(d) | N.C. Gen. Stat. Ann. § 7B-1906(b) | N.C. Gen. Stat. Ann. § 7B-2000(a) |

Exhibit 54
Page 1362

APPENDIX B
Court Procedures Provided by State Statutes, Rules, Agency Policy

| | Right to detention hearing | Right to counsel | Right to present notice of hearing | Right to present evidence | Right to present witnesses | Right to interpreter | Right to confront evidence | Right to continued review | Right to counsel at disposition |
|---|---|---|---|---|---|---|---|---|---|
| ND | N.D. Cent. Code §27-20-17 (2)<br><br>N.D.R. Juv. P. Rule 2 (1)(A) | N.D. Cent. Code §27-20-17 (2) | N.D. Cent. Code §27-20-17 (2) | | | North Dakota Court System Policy 522 (in juvenile hearings) | | | N.D. Cent. Code Ann. § 27-20-26(1) |
| OH | Ohio Rev. Code Ann. § 2151.314(A)<br><br>OH ST JUV P Rule 7 | Ohio Rev. Code Ann. §§ 2151.314(A); 2151.352<br><br>OH ST JUV P Rule 7(F)(2) | Ohio Rev. Code Ann. § 2151.314 (A)<br><br>OH ST JUV P Rule 7(F)(1) | OH ST JUV P Rule 7(F)(3) (ct. may consider any evidence) | | | | OH ST JUV P Rule 7(F)(1) (child may file a motion requesting release, and hearing must be held within 72 hrs) | Ohio Rev. Code Ann. § 2151.352 |
| OK | Okla. Stat. Ann. tit. 10A § 2-2-101(B) | Okla. Stat. Ann. tit. 10A § 2-2-301(D) (at all proceedings) | | | | | | 10A Okl. Stat. Ann. Tit. §2-3-101 (A)(1)(b) | Okla. Stat. Ann. tit. 10A § 2-2-301(D) |
| OR | Or. Rev. Stat. Ann.  § 419C.139 | Or. Rev. Stat. Ann. § 419C.109(3)(b)(A) | Or. Rev. Stat. Ann §419C.142 | | | Or. Rev. Stat. Ann §45.275 | | Or. Rev. Stat. Ann. §419C.153<br><br>Or. Rev. Stat. Ann. §419C.150 | Or. Rev. Stat. Ann § 419C.200(1)(a) |
| PA | 42 Pa. Stat. and Cons. Stat. Ann. § 6332(a) | Pa. R. Juv. Ct. P. 242(A)(2) | 42 Pa. Stat. and Cons. Stat. Ann. § 6332(a)<br><br>PA ST JUV CT Rule 241 | PA ST JUV CT Rule 242(B)(4)(b) | PA ST JUV CT Rule 242(B)(4)(b) | 42 Pa. Cons. Stat. §4401 | PA ST JUV CT Rule 242 (B)(4)(a) | PA ST JUV CT Rule 243 | 42 Pa. Stat. and Cons. Stat. Ann. §§ 6337 |
| RI | R.I. R. Juv. Proc. 8(a) | R.I. R. Juv. Proc. 8(b) | R.I. R. Juv. Proc. 8(c) | | | | | R.I. R. Juv. Proc. 8(b) | R.I. Gen. Laws Ann. § 14-1-31 |
| SC | S.C. Code Ann. §§ 63-19-830(A); 63-7-710(A) | S.C. Fam. Ct. R.36.<br><br>S.C. Code Ann. § 63-19-830(A) | | S.C. Code Ann. §63-7-710 (D) | | S.C. Code Ann §15-27-155 | S.C. Code Ann. §63-7-710 (D) | S.C. Code Ann. § 63-19-830 (A) | S.C. Fam. Ct. R.36. |
| SD | S.D. Codified Laws § 26-7A-14 | S.D. Codified Laws §§ 26-7A-30 (in delinquency proceedings) | S.D. Codified Laws §26-7A-15 (notice to parent) | | | | | | S.D. Codified Laws §§ 26-7A-30, 26-7A-44(2) |
| TN | Tenn. Code Ann. §37-1-177 (a)(2)<br><br>Tenn. R. Juv. P. 203(b)(2) | Tenn. R. Juv. P. 203(c)(2)(c); 205(a)(1) | | Tenn. R. Juv. P. 205(b) ; 203(d)(1) | Tenn. R. Juv. P. 205(b); 203(d)(1) | | Tenn. R. Juv. P. 205(b); 203(d)(1) | | Tenn. Code Ann. § 37-1-126(a)(1) |
| TX | Tex. Fam. Code §54.01 | Tex. Fam. Code §§54.01; 51.10 | Tex. Fam. Code §54.01(b) | | | Tex. Fam. Code § 51.17 (d) (in delinquency proceedings) | | Tex. Fam. Code §54.01(h) | Tex. Fam. Code § 51.10 |

Exhibit 54
Page 1363

APPENDIX B

Court Procedures Provided by State Statutes, Rules, Agency Policy

| | Right to detention hearing | Right to counsel | Right to notice of hearing | Right to present evidence | Right to present witnesses | Right to interpreter | Right to confront evidence | Right to continued review | Right to counsel at disposition |
|---|---|---|---|---|---|---|---|---|---|
| UT | Utah R. Juv. P. 9(b)<br><br>Utah Code Ann. §78A-6-113(4)(a) | Utah Code Ann. §§ 78A-6-1111 (in an action filed…under this title)<br><br>Utah R. Juv. P. 9(f) (may appoint at detention hearing) | Utah R. Juv. P. 9(b) | Utah R. Juv. P. 9(e) (ct. may receive any information relevant) | Utah R. Juv. P. 9(e) | Utah Judicial Council Code of Judicial Administration, R. 3-306.04 | | Utah R. Juv. P. 9 (j) | Utah Code Ann. §§ 78A-6-1111(1)(a) & (1)(e) |
| VT | Vt. Stat. Ann. tit. 33, §5255 | Vt. Stat. Ann. tit. 33, §5225(a). | Vt. Stat. Ann. tit. 33, §5254 | Vt. Stat. Ann. tit. 33, §5255(f) | Vt. Stat. Ann. tit. 33, §5255(f) | | Vt. Stat. Ann. tit. 33, §5255 (f) | | Vt. Stat. Ann. tit. 33, § 5112(a)<br><br>Vt. R. Fam. Pro. 6. |
| VA | Va. Code Ann. § 16.1-250(A) | Va. Code Ann. § 16.1-266(B) | Va. Code Ann. § 16.1-250(c) | Va. Code Ann. § 16.1-250(d), (g) (opportunity to be heard; all relevant evidence may be admitted) | Va. Code Ann. § 16.1-250(g) | | Va. Code Ann. § 16.1-250(d) | | Va. Code Ann. § 16.1-266 (C) |
| WA | Wash. Rev. Code Ann. § 13.40.050(1)(b) | Wash. Rev. Code. Ann. § 13.40.050(3)<br><br>Wash. Juv. Ct. R. 7.4(b) | Wash. Rev. Code Ann. § 13.40.050(2) (above age 12) | Wash. Juv. Ct. R. 7.4 (c) | | Wash. Rev. Code Ann. § 4.43.040 | | | Wash. Rev. Code Ann. § 13.40.140(2) |
| WV | W. Va. Code Ann. § 49-4-705(c)(4) | W. Va. Code Ann. § 49-4-706(a) | | W. VA. Code § 49-4-701(i)(1) | W. VA. Code § 49-4-701(i)(1) | W. VA Code §57-5-7 | W. VA. Code § 49-4-701(i)(1) | W. VA Code §49-4-707 | W. Va. R. Juv. P. 5(a) |
| WI | Wis. Stat. Ann. § 938.21(1)(a) | Wis. Stat. Ann. § 938.23 | Wis. Stat. Ann. § 938.21(2)(b) | Wis. Stat. Ann. § 938.21(2)(c) | Wis. Stat. Ann. § 938.21(2)(c) | Wis. Stat. Ann § 885.37 | Wis. Stat. Ann. § 938.21(2)(c) | Wis Stat §938.21<br><br>Wis Stat §938.21(2)(c) | Wis. Stat. Ann. §§ 938.23(1m)(a); 48.23(1m)(a) |
| WY | Wyo. Stat. Ann. § 14-6-209(a) | Wyo. Stat. Ann. § 14-6-222(a) (at every stage) | Wyo. Stat. Ann. § 14-6-209(a) | Wyo. Stat. Ann. § 14-6-209(b)(iv) | Wyo. Stat. Ann. § 14-6-209(b)(iv) | | Wyo. Stat. Ann. § 14-6-209(b)(iv) | | Wyo. Stat. Ann. § 14-6-222(a) |

**Child Welfare Proceedings**

| State | Right to hearing re. non-secure placement at a time certain | Right to Counsel |
|---|---|---|
| AL | Ala Code §12-15-304 | Ala Code §§12-15-304; 26-14-11 |
| AK | | Alaska Stat. §47.10.050(a)(discretionary) |
| AZ | Ariz. Rev. Stat. §8-824 (A) | Ariz. Rev. Stat. §8-221(I) (discretionary) |
| AR | Arkansas Code Ann. § 9-27.314 | Ark. Code Ann. §9-27-316(f)(3)(A) |
| CA | Ca. Welf. & Inst. Code §315 | Cal. Wel. & Ins. Code §317(c)(1) |

Exhibit 54<br>Page 1364

APPENDIX B

Court Procedures Provided by State Statutes, Rules, Agency Policy

| CO | Colo. Rev. Stat. 19-3-403(2) | C.R.S. §19-3-203(1) |
|---|---|---|
| CT | | Conn, Gen. Stat § 46b-129a(2)(A) |
| DE | Del. Fam. Ct. Civ. R. 214 (a) | 13 Del. C. §2504(f) |
| DC | D.C. Code Ann. § 16-2312 (B) | D.C. Code Ann. §16-2304(b)(5) |
| FL | Fla. Stat. §39.402 | Fla. Stat. §39.01305(3) (discretionary unless child is being considered for placement in an RTC. See Fla. R. Juv. P. 8.350 (a)(3)) |
| GA | Ga. Code. Ann. §15-11-145 (a) | Ga. Code. Ann. §§15-11-103(a), 15-11-103(f) |
| HI | | HRS §§587A-16(a); 587A-4 (discretionary) |
| ID | Idaho Juv. R. 39 (48 hours) | Idaho Code §16-1614(1), required for children over 12, but exceptions allowed |
| IL | 705 ILCS 405/2-9 | 705 ILCS 405/1-5(1) (discretionary) |
| IN | Burns Ind. Code Ann §31-34-5-1 (a) | Burns Ind. Code Ann. §31-32-4-2(b) (discretionary) |
| IA | | Iowa Code §232.89(2) |
| KS | | K.S.A. §38-2205(a) |
| KY | Kansas Stat. Ann. §620.080(1) (a) (72 hrs) | Kansas Stat. Ann. §620.100(1)(a) |
| LA | La. Ch. C. Ann. Art. 624 (a) | La. Ch. C. Ann.  Art. 551 |
| ME | | 22 M.R.S. §4005(1)(A); Me. R. Guardians Ad Litem Rule 2(a)(2) (discretionary) |
| MD | Md. Code Ann., Cts. and Jud. Proc. §3-8A-15(d)(2) | Md. Code Ann., Cts. and Jud. Proc. 3- 813(d)(1) |
| MA | | Mass. Gen. Laws Ann. 119 § 29 |
| MI | Mich. Comp. Laws § 3.974 (C) | Mich. Comp. Laws § 722.630 |
| MN | Minn Stat. §260C.178 | Minn. Stat. § 260C.163(3)(d) (a right for children 10 and above) |
| MS | Miss. Code Ann. §43-21-309(3) | Miss. Code Ann. §43-21- 121(4) |
| MO | | Mo. Rev. Stat. § 210.160(1); Mo. Sup. Ct., Standards with Comments for Guardians Ad Litem in Missouri, Standard 1.0 |
| MT | | Mont. Code Anno., § 41-3-112(1) (discretionary) |
| NE | | Neb. Rev. Stat. § 43- 272(3) |
| NV | | Nev. Rev. Stat. Ann. § 432B.420(2) |
| NH | | RSA 169-C:10(I) (discretionary) |
| NJ | | N.J. Stat. Ann. §§9:6- 8.23(a); 9:6-8.21(d) |
| NM | | N.M. Stat. Ann. § 32A-4-10(C) |
| NY | | NY Family Ct Act § 249(a) |
| NC | | N.C. Gen. Stat. § 7B-601(a) |
| ND | | N.D. Cent. Code, § 27-20-26(1) (required at post-petition stages) |
| OH | Ohio Rev. Code Ann. §2151.314 | Ohio Rev. Code Ann. 2151.352 |
| OK | | Okla. St. 10A§ 1-4- 306(A)(5) |
| OR | Or. Rev. Stat §419B.183 | Or. Rev. Stat § 419B.195 (only upon request) |
| PA | 42 Pa. Cons. Stat. § 6332 (a) | 42 Pa. Cons. Stat. § 6311(a) |
| RI | | R.I. Gen. Laws § 40-11-14(a); 2009 RI Regulation Text 3795; RI Dept. of Children, Youth and Families, Policy Manual (2018-2019), Reg. 1100.0000(A) |
| SC | S.C. Code Ann. §63-7-710 | S.C. Code Ann. § 63-7-1620(1) (GAL is entitled to counsel) |
| SD | | S.D. Codified Laws § 26-8A-18 |
| TN | Tenn. Code Ann. §37-1-117(b) | Tenn. Code Ann. § 37-1-126(a)(1); Tenn. Sup. Ct. Rules, Rule 40(b)(1) |

Exhibit 54
Page 1365

APPENDIX B

Court Procedures Provided by State Statutes, Rules, Agency Policy

| TX | Tex. Fam Code §262.106(a) | Tex. Fam. Code § 107.012 |
|----|---------------------------|--------------------------|
| UT | Utah Code Ann. 78A-6-306(a) | Utah Code Ann. § 78A-6-1111(1)(d) |
| VT | | Vt. Stat. Ann. 33 § 5112(a) |
| VA | Va. Code Ann §16.1-250(a) | Va. Code Ann. § 16.1-266(A) |
| WA | Wash. Rev. Code §13.34.065 | Rev. Code Wash. § 13.34.100(7)(c) (mandated for children age 12+) |
| WV | | W. Va. Code Ann. § 49-4-601(f) |
| WI | Wis. Stat. §48.21(1)(a) | Wis. Stat. § 48.23(1m) (b) (req. for children age 12+) |
| WY | Wyo. Stat. Ann. § 14-3-409 (a) | Wyo. Stat. Ann. § 14-3-211(a) |

**Exhibit 54**

**Page 1366**

# Exhibit 55

**Exhibit 55**
**Page 1367**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

LUCAS R. *et al.*,

        Plaintiffs,

    v.

ALEX AZAR, Secretary of U.S. Dep't
of Health and Human Services, *et al.*,

        Defendants.

Case No.: 2-18-CV-05741 DMG (PLA)

**REBUTTAL REPORT
OF DR. DONNA LONDINO**

**Exhibit 55
Page 1368**

1    Medical Exam) for UACs and have few questions surrounding trauma.[4]

2    14.Despite Drs. Cruise and Rasmussen's concern that UACs with trauma are not
3        appropriately identified to receive services to target potential sequelae of
4        trauma, I found that the prevalence of reported trauma in this subset of cases
5        (63%) is consistent with the prevalence rate of trauma in domestic children
6        (60% - see above).  In addition, approximately one third of these UACs (9/30)
7        were later diagnosed with post-traumatic stress disorder (PTSD).   This is
8        consistent with Drs. Cruise and Rasmussen's citation to the Latino Adolescent
9        Migration, Health, and Adaptation Project (LAMHA) findings that 29% of
10       youth with trauma were found to be "at risk" for Post-Traumatic Stress Disorder
11       (PTSD), showing that ORR screening tools are capable of identifying and
12       providing information that aids diagnosis in children with special needs.   These
13       prevalence rates are consistent and suggest that while many youths, including
14       those in ORR custody, may have experienced trauma, those who develop
15       symptoms to the severity of meeting criteria for dysfunction are only a portion
16       of the population.

17   15.It was difficult to ascertain the exact methodology Drs. Cruise and Rasmussen
18       utilized for determining the nature of therapeutic services offered to UACs.  My
19       review of the case files found documentation of the content of session notes,
20       but the specific therapeutic strategy (i.e. cognitive behavioral therapy,
21       behavioral management) was rarely identified.   That does not mean these
22       different types of therapy did not occur, and it would be problematic if Drs.
23       Cruise and Rasmussen extrapolated that such care did not occur simply based
24       on a lack of detail in the therapy notes.   Although best practice may recommend
25       documentation of the specific therapeutic approach and sometimes

---

27  [4] Beidas, R. S., Stewart, R. E., Walsh, L., Lucas, S., Downey, M. M., Jackson, K.,
28  Fernandez, T., & Mandell, D. S. (2015). Free, brief, and validated: Standardized
    instruments for low-resource mental health settings. Cognitive and behavioral
    practice, 22(1), 5–19. https://doi.org/10.1016/j.cbpra.2014.02.002.

- 6 -

parents, family members, and other potential sponsors is even greater. The individuals who are being considered as possible caretakers of a youth, especially youth with mental health concerns, should demonstrate an ability to understand the mental health care needs of the youth in their care and to provide appropriately for such needs.

**6.      Vulnerable/Difficult Populations at MercyFirst**

55. It is difficult to change the engrained patterns of behavior of minors with conduct disorder. As compared to children with depression or maladaptive behavior secondary to past trauma, minors with conduct disorder demonstrate behavior that poses more risks to individuals and property external to the youth. This has been associated with multiple negative outcomes in treatment to include false allegations, attacks on other residents and staff, and manipulative behaviors to negatively influence therapeutic services. The prognosis for minors with conduct disorder has historically been quite guarded.[25]

56. When UACs have no identifiable safe sponsor, length of stay may be longer, and there are some UACs who have negative adjustment responses to the extended stay and may demonstrate disruption of behavior (worsening of clinical course). As noted, MercyFirst works from the date of admission to unify each child with a safe sponsor. If despite these efforts no safe sponsor is available, correlated negative adjustment responses to the length of stay are inherent to the UAC population. Although the development of symptoms in response to the stressor of prolonged stay is concerning, it still suggests the

---

Care After Psychiatric Hospitalization for Youths With Mood Disorders. Psychiatric Services. Volume 67, Issue 3, pgs. 324-331.

[25]*See* https://www.aacap.org/AACAP/Families_and_Youth/Facts_for_Families/FFF-Guide/Conduct-Disorder-033.aspx. *See also* Steiner H. Practice parameters for the assessment and treatment of children and adolescents with conduct disorder. American Academy of Child and Adolescent Psychiatry. J Am Acad Child Adolesc Psychiatry. 1997 Oct;36(10 Suppl):122S-39S.

Expert Report of Dr. Donna Londino; confidential; under protective order

Exhibit 55
Page 1370

1    behalf of Plaintiffs.

2

3    Dated:   July 17, 2020

*DocuSigned by:*
*Donna Londino MD*
E596DF45AD2F40C...

4                                                  Donna Londino, M.D.

5

6              **Materials Considered In Preparing This Rebuttal Report**

7

8 The materials I considered in forming my opinions as referenced in my June

9 19, 2020 report in this matter, as well as the following materials:

10 1.      Drs. Cruise & Rasmussen's expert report in this matter.

11 2.      Dr. Bellonci's expert report in this matter.

12 3.      Dr. Block & Mr. Farley's expert report in this matter.

13 4.      ORR's policies and procedures

14 5.      UAC Psychotropic Medication Data (GOV-00235763)

15 6.      Texas Psychotropic Medication Utilization Parameters (6th edition), https://hhs.texas.gov/sites/default/files/documents/doing-business-with-hhs/provider-portal/facilities-regulation/psychiatric/psychotropic-medication-utilization-parameters.pdf.

16

17 7.      https://www.acf.hhs.gov/orr/resource/unaccompanied-alien-children-information

18

19 8.      Administration for Children & Families ORR Statement of Goals, Priorities, Standards, and Guidelines, 2012.

20

21 9.      American Academy of Child & Adolescent Psychiatry (AACAP) Position Statement on Oversight of Psychotropic Medication Use for Children in State Custody: A Best Principles Guideline, https://www.aacap.org/App_Themes/AACAP/docs/clinical_practice_center/systems_of_care/FosterCare_BestPrinciples_FINAL.pdf.

22

23

24

25 10.     American Academy of Child & Adolescent Psychiatry (AACAP) Principles of Care for Treatment of Children and Adolescents with Mental Illnesses in Residential Treatment Centers (2010) https://www.aacap.org/App_Themes/AACAP/docs/clinical_practice_center/principles_of_care_for_children_in_residential_treatment_centers.pdf.

26

27

28

- 24 -

11. Beidas, R. S., Stewart, R. E., Walsh, L., Lucas, S., Downey, M. M., Jackson, K., Fernandez, T., & Mandell, D. S. (2015). Free, brief, and validated: Standardized instruments for low-resource mental health settings. Cognitive and behavioral practice, 22(1), 5–19. https://doi.org/10.1016/j.cbpra.2014.02.002.

12. https://www.childwelfare.gov/pubPDFs/foster.pdf, pg. 4.

13. Dixon-Woods, M., Shaw, R. L., Agarwal, S., & Smith, J. A. (2004). The problem of appraising qualitative research. Quality & safety in health care, 13(3), 223–225. https://doi.org/10.1136/qhc.13.3.223

14. Dosreis, S., Yoon, Y., Rubin, D. M., Riddle, M. A., Noll, E., & Rothbard, A. (2011). Antipsychotic treatment among youth in foster care. Pediatrics, 128(6), e1459–e1466. https://doi.org/10.1542/peds.2010-2970

15. Findling RL, Stepanova E. The Workforce Shortage of Child and Adolescent Psychiatrists: Is It Time for a Different Approach?. J Am Acad Child Adolesc Psychiatry. 2018;57(5):300-301. doi:10.1016/j.jaac.2018.02.008

16. Finkelhor et. al.  Violence, Abuse, and Crime Exposure in a National Sample of Children and Youth.  Pediatrics Nov 2009, 124 (5) 1411-1423; DOI: 10.1542/peds.2009-046.

17. Hair, H.J. Outcomes for Children and Adolescents After Residential Treatment: A Review of Research from 1993 to 2003. J Child Fam Stud 14, 551–575 (2005). https://doi.org/10.1007/s10826-005-7188-9

18. J. AM. ACAD. CHILD ADOLESC. PSYCHIATRY, 48:9, SEPTEMBER 2009.

19. https://journalofethics.ama-assn.org/article/informed-consent-what-must-physician-disclose-patient/2012-07

20. Mayo Clinic Proceedings:  Benefits and Challenges of Informed Consent. DOI: https://doi.org/10.4065/83.3.272.

21. https://masteraba.com/token-economy/

22. https://medical-dictionary.thefreedictionary.com/consent

23. Noble H, Smith J, Issues of validity and reliability in qualitative research. Evidence-Based Nursing 2015;18:34-35.

24. Pappadopulos, E., et al., Treatment Recommendations for the Use of Antipsychotics for Aggressive Youth (TRAAY). Part II, Journal of the

- 25 -

American Academy of Child & Adolescent Psychiatry, Volume 42, Issue 2, February 2003, Pages 145-161, https://doi.org/10.1097/00004583-200302000-00008

25.   https://www.psychcongress.com/article/antipsychotics-regularly-dispensed-kids-foster-care

26.   GOV-00241056, GOV-00241060 (C.J.A.L. case excerpts)

27.   Other materials as may be referenced elsewhere in this rebuttal report.

# Exhibit 56

Exhibit 56
Page 1374

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

1

2

3

4

5 LUCAS R., et al.,

6          Plaintiffs,

7      v.

8 ALEX AZAR, et al.,

9          Defendants.

Case No. 2:18-CV-05741 DMG PLA

**DECLARATION OF DR. RYAN MATLOW**

10

11     1. The facts set forth below are based on my personal knowledge and, if called as a witness, I could and would competently testify to them. I am over eighteen years of age.

12

13

14     2. Attached as Exhibit A is a true and accurate copy of my Expert Report, submitted on June 19, 2020, which I hereby reaffirm and verify under penalty of perjury as containing the opinions that I am offering in this case.

15

16

17     3. If called to testify at trial, I anticipate that I will testify to the matters and opinions as set forth in my Expert Report.

18

19     I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct. Executed on this 28th day of September, 2020.

20

21

22

23

24

                        Dr. Ryan Matlow

25

26

27

28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LUCAS R., et al., | Case No.  2:18-CV-05741 DMG PLA |
| Plaintiffs, | **DECLARATION OF DR. NANCY E. WANG** |
| v. | |
| ALEX AZAR, et al., | |
| Defendants. | |

1. The facts set forth below are based on my personal knowledge and, if called as a witness, I could and would competently testify to them. I am over eighteen years of age.

2. Attached as Exhibit A is a true and accurate copy of my Expert Report, submitted on June 19, 2020, which I hereby reaffirm and verify under penalty of perjury as containing the opinions that I am offering in this case.

3. If called to testify at trial, I anticipate that I will testify to the matters and opinions as set forth in my Expert Report.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.  Executed on this 28th day of September, 2020.

Dr. Nancy E. Wang

DECLARATION OF DR. NANCY E. WANG
CASE NO. 2:18-CV-05741 DMG PLA

**Exhibit 56
Page 1376**

# EXHIBIT A

Exhibit 56
Page 1377

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

LUCAS R., et al.,

    Plaintiffs,

  v.

ALEX AZAR, et al.,

    Defendants.

Case No.  2:18-CV-05741 DMG PLA

**EXPERT REPORT OF DRS. RYAN MATLOW AND NANCY EWEN WANG**

**PLAINTIFFS' CONFIDENTIAL PERSONAL INFORMATION/CONFIDENTIAL**

## Table of Contents

I.      Assignment
II.     Summary of Qualifications
        A.  Dr. Ryan Matlow
        B.  Dr. Nancy Wang
III.    Sources of Information
IV.     Compensation
V.      Prior Testimony
VI.     Summary of Opinions
VII.    Expert Opinions
        A.  Brain development and the brain's response to stress
                1.  Brain development
                2.  The brain and body's response to stress
        B.  Traumatic stress, toxic stress, and adverse childhood events
                1.  Traumatic stress
                2.  Positive, tolerable, and toxic stress
        C.  The profound impact of traumatic stress on children
        D.  Institutionalized care and detention impose immediate and long-lasting harm to children
                1.  Harm of institutionalized care
                2.  Harm of immigration detention
                        a.  Restrictive placements are particularly harmful
                        b.  Prolonged detention is particularly harmful
                3.  Long-lasting harm of institutional care and detention
        E.  Characteristics that make it more likely for children to experience traumatic stress while in ORR detention
                1.  Limited sense of control or personal agency
                2.  Limited knowledge or information about current circumstances or expected outcomes
                3.  Perceived lack of predictability and consistency in the environment
                4.  Limited access to social and family supports
                5.  Perceived constant and pervasive threat of danger in the environment
                6.  Experience of fear or helplessness
        F.  Evidence-based accommodations required in the presence of traumatic stress and related disabilities
                1.  Care providers must provide a safe and predictable environment and maximize children's control, autonomy, and opportunities for agency.
                2.  Care providers must offer children appropriate supports to meet realistic goals in the least restrictive setting.
                3.  Care providers must consider individual context and trauma history in placement and release decisions.
VIII.   Appendices

1

**Exhibit 56**
**Page 1379**

physical or emotional distress following trauma reminders), avoidance (i.e., efforts to avoid
trauma-related content or physical reminders), negative mood and cognition (i.e., negative
thoughts about oneself or the world, hopelessness, memory difficulty, emotional numbing,
difficulty with relationships, difficulty maintaining positive activities), and hyperarousal (i.e.,
hypervigilance, risky behavior, sleep difficulty, being easily startled or frightened) (APA, 2013).
Once again, the cognitive, emotional, and physiological disturbances associated with PTSD
symptoms can disrupt an individual's ability to engage in academic or occupational activities,
such as when intrusive thoughts or memories interfere with concentration or communication;
when nightmares and physiological arousal interrupt sleep; and when symptoms of avoidance or
negative self-attributions result in withdrawal from activities of daily living or self-care
activities.

   The experiences and presentations of children in ORR custody appear consistent with the
expected effects and manifestations of traumatic stress.[5]  Melissa Cook, a clinician at an ORR-
contracted detention facility, Shenandoah Valley Juvenile Center, states that "approximately 99
percent of the children [she] work[s] with have trauma."[6]  In 2018 and 2019, we visited and
interviewed unaccompanied children in ORR custody at Southwest Key Casa Padre
(Brownsville, Texas), BCFS Tornillo Influx Facility (El Paso, Texas), and Homestead Influx
Facility (Homestead, Florida).  Over the course of these visits we interviewed approximately 30
children and we frequently observed the signs and symptoms of anxiety, depression, and PTSD
that are consistent with prior research on mental health outcomes of immigration detention.  In
many cases, these symptoms were directly related to children's experiences in detention.  In our
interviews, children demonstrated anxiety symptoms (including worry, agitation, difficulty
relaxing, nervousness) related to concerns and uncertainty about their own personal well-being,
or that of a loved one.  They reported feeling overwhelmed by their circumstances (which
included limited access to support resources) that results in emotion dysregulation corresponding
with behavioral impulsivity and, in some cases, self-harming behaviors.  Children in our

---

[5] *See, e.g.*, Lucas R._Experts_11689-94 (Declaration of A.J.V.M., Oct. 4, 2019) ("A.J.V.M. Decl.") at 11690-92, ¶¶
10-13; Lucas R._Experts_11695-99 (Declaration of A.R.V.L., Dec. 11, 2019) ("A.R.V.L. Decl.") at 11696-98, ¶¶ 6-
12; Lucas R._Experts_11447-50 (Declaration of Jaime D., June 11, 2018) ("Jaime D. Decl.") at 11447-49, ¶¶ 9, 17;
Lucas R._Experts_11700-04 (Declaration of B.D.H.G., Jan. 22, 2020) ("B.D.H.G. Decl.") at 11701-03, ¶¶ 6, 12, 15-
16; Lucas R._Experts_11705-07 (Declaration of B.D.A.C., Sept. 21, 2018) ("B.D.A.C. Decl.") at 11705-06, ¶¶ 5-7;
Lucas R._Experts_11708-11 (Declaration of C.M.V.C., Mar. 12, 2020) ("C.M.V.C. Decl.") at 11708-09, ¶¶ 4-5, 11;
Lucas R._Experts_11712-14 (Declaration of C.C.L.H., Feb. 7, 2019) ("C.C.L.H. Decl.") at 11712, ¶¶ 6-9; Lucas
R._Experts_11715-20 (Declaration of C.J.A.L., Sept. 25, 2020) ("C.J.A.L. Decl.") at 11716-17, ¶¶ 7, 10, 13-14;
Lucas R._Experts_11721-24 (Declaration of D.C.J.M., Mar. 12, 2020) ("D.C.J.M. Decl.") at 11721-22, ¶¶ 5, 10;
Lucas R._Experts_11725-27 (Declaration of D.F., Feb. 7, 2019) ("D.F. Decl.") at 11726, ¶¶ 13-16; Lucas
R._Experts_11728-30 (Declaration of D.A.L.I.) ("D.A.L.I. Decl.") at 11728-29, ¶¶ 4-5; Lucas R._Experts_11734-38
(Declaration of D.D.R.O., Sept. 25, 2019) ("D.D.R.O. Decl.") at 11734-36, ¶¶ 3, 10; Lucas R._Experts_11739-42
(Declaration of E.J.V.L., Feb. 6, 2019) ("E.J.V.L. Decl.") at 11739-41, ¶¶ 6, 9, 13-15; Lucas R._Experts_11753-56
(Declaration of J.D.P.P., Oct. 26, 2018) ("J.D.P.P. Decl.") at 11754-55, ¶¶ 13, 18; Lucas R._Experts_11757-59
(Declaration of K.L.F., Dec. 1, 2017) ("K.L.F. Decl.") at 11757-58, ¶¶ 5, 7, 12-17; Lucas R._Experts_11475-78
(Declaration of Gabriela N., June 8, 2018) ("Gabriela N. Decl.") at 11475, 77, ¶¶ 6, 9-10; Lucas R._Experts_11768-
71 (Declaration of O.A.A.T., Oct. 26, 2018) ("O.A.A.T. Decl.") at 11770, ¶¶ 12, 14-19; Lucas
R._Experts_11772-76 (Declaration of P.D.O.P., Sept. 25, 2019) ("P.D.O.P. Decl.") at 11772, 74-75, ¶¶ 3, 16-17.
[6] Deposition of Melissa Cook ("Cook Dep.") at 89:2-9 ("Q: Based on your knowledge and experience as a clinician
at Shenandoah, is it common for children arriving at Shenandoah to have a history of trauma? A: Yes. I would say it
is. Q: And how often do you think – how often do you encounter children who have a history of trauma? A:
Clinically I would say that approximately 99 percent of the kids that I work with have trauma.").

Plaintiff's Confidential Personal Information/Confidential

**Exhibit 56
Page 1380**

interviews also reported PTSD symptoms including intrusive thoughts and memories of past traumas (including those stemming from forced family separation), nightmares, and chronic states of arousal and hypervigilance.  The interviews we conducted in 2018 and 2019 revealed similar experiences and presentations of trauma symptoms as those described in the sworn declarations of children in ORR custody at other facilities including residential treatment centers, secure, and staff-secure facilities.[7]

Effortful avoidance of distress and trauma-related content is another prevalent trauma symptom reported and demonstrated by many children in our interviews with them.  In many cases, children showed the signs and symptoms of being in a state of ongoing trauma, with psychological functioning deteriorating over time.  In addition to effortful avoidance, many children have difficulty identifying and expressing their emotional distress.  This trauma-related avoidance (related to children's ongoing lack of perceived physical and emotional safety) is likely an adaptive coping response for children – by minimizing psychological distress while a trauma is ongoing, individuals are prevented from having to manage the emotional and psychological impact of fully confronting the gravity and severity of their situation (Freyd, 1996).  It is our clinical observation and judgment, after reviewing the sworn declarations of children in ORR custody and our first-hand observations and interviews of children in ORR custody, that children in ORR custody often under-report or minimize their distress due to the psychological risks of acknowledging the severity of threat, and also due to general perceived fears that open acknowledgement of distress severity could impact their placement or timeline for reunification.[8]

We frequently observed that increased length of time in ORR custody was associated with increased severity of depressive symptoms marked by desperation, hopelessness, and helplessness. As children experience prolonged delays in release (and, in many cases, family reunification) along with limited personal agency and autonomy, they become increasingly despondent over time. Consistent with theories of learned helplessness (Seligman, 1972, 1975), children become increasingly withdrawn, lethargic, and detached.  These symptoms and outcomes have lasting consequences on children's motivation, behavior, and functioning. These findings are consistent with research and observations in other contexts of immigration detention.

### D.  Institutionalized care and detention impose immediate and long-lasting harm to children

The experience of being detained in government custody has clear, demonstrated negative consequences for the psychological health and general functioning of children.  These consequences are due both to the inherent harms of detention as well as of institutionalized care. For many children, detention constitutes a form of traumatic stress and toxic stress exposure that puts them at increased risk of suffering the various health and psychological harms described above.  The harm to children only increases when detention is prolonged or occurs in a restrictive environment.

---

[7] *See* Appendix B.

[8] *See, e.g.,* E.J.V.L. Decl. at Lucas R._Experts_11740, ¶ 9 ("I have tried to behave well so that I can get out of here soon.  I try not to show how sad I am.").

Plaintiff's Confidential Personal Information/Confidential

**Exhibit 56**
**Page 1381**

1.  *Harm of institutionalized care*

Research on the impact of child-care and child-rearing in institutionalized settings and congregate care settings demonstrates profound short- and long-term harm.  Although there has not been a peer-reviewed study conducted on the impacts of detention in ORR custody, it is our expert opinion that the findings on institutional care would apply.

Institutionalized care refers to child-rearing in government or other institutionally-sponsored facilities, as opposed to adoption, kinship care, or placement in another family-like setting (Dozier et al., 2012).  ORR custody is a form of institutionalized care as defined here because most children in ORR custody live in congregate facilities that are not family-like settings.  While specific institutionalized care conditions are highly variable and diverse, there are common features of institutionalized care, including: generally high child to caregiver ratios; rotating caregivers who lack formal education and training in child development and generally receive low wages; regimented and non-individualized care; and a lack of psychological investment in children (Dozier et al., 2012, p. 3).  Institutionalized care has been deemed a form of child neglect because of the failure to provide appropriate levels of individualized attention, caregiving support, and secure relationships that are typical and required for healthy child development (Center on the Developing Child, 2013; Annie E. Casey Foundation, 2013; Dozier et al., 2012).  Experts conclude that providing for children's basic needs (e.g., food, sleep, health) is insufficient for promoting typical development in the absence of individualized and reliable caregiver-child relationships (Center on the Developing Child, 2013).  Indeed, the Center on the Developing Child at Harvard University (2013) found that "children who experience significantly limited caregiver responsiveness may sustain a range of adverse physical and mental health consequences that actually produce more widespread developmental impairments than overt physical abuse" (p. 1).

The conditions of child-rearing in institutional settings have demonstrated negative consequences on child health and well-being, including attachment and relationship disruption, atypical social behavior, impaired physical development, impaired intellectual and cognitive development, and abnormalities in functioning of the stress response system (Dozier et al., 2012; van IJzendoorn et al., 2011).  These developmental impairments are associated with short- and long-term difficulties in psychological functioning, including symptoms of depression, anxiety, PTSD, and general behavioral difficulty (Lupien et al., 2009; National Scientific Council on the Developing Child, 2005/2014).

Placement in congregate care settings (i.e., residential care facilities with more than 12 children) within the U.S. child welfare system is associated with a three-fold increase in prevalence of psychiatric diagnosis (Children's Bureau, 2015).  While the nature of causality in this association is unconfirmed, there is general consensus among child mental health and child welfare experts that institutionalized care and congregate care is inappropriate for children with psychiatric disabilities, and there has been a reduction in the rates of placement in congregate care in the U.S. since 2004 (Children's Bureau, 2015; Dozier et al., 2012).

Plaintiff's Confidential Personal Information/Confidential

**Exhibit 56
Page 1382**

2. *Harm of immigration detention*

Immigration detention has been associated with elevated rates and severity of anxiety, depression, and PTSD in adults, adolescents, and children (for review of research, see MacLean et al., 2019; Keller et al., 2003; von Werthern et al., 2018; Robjant, Hassan, & Katona, 2009). For some children and adolescents, the psychological symptoms associated with detention have manifested in thoughts of suicide and self-harming behaviors (Robjant et al., 2009; von Werthern, et al., 2018). Children's distress related to immigration detention has also manifested in significant behavioral difficulties, including disruptive conduct, behavioral regression, mutism, and social and behavioral withdrawal (Robjant et al., 2009). These findings are consistent with predictions from the science of toxic stress and developmental trauma (e.g., Lupien et al., 2009; National Scientific Council on the Developing Child, 2005/2014; Sege et al., 2017) as well as with our observations and experiences, discussed below, interviewing children in ORR custody.

A systematic review of prior research on immigration detention demonstrates that children in particular experience somatic symptoms and health complaints in detention (i.e., headache, stomachache), as well as difficulties with sleeping and eating (von Werthern et al., 2018). Researchers attribute these psychological and health problems specifically to the experience of detention, as multiple studies in the review demonstrated that such problems onset or intensified following placement in detention (von Werthern et al., 2018). Furthermore, comparison studies indicated that children who are separated from family members due to detention or deportation have worse mental health outcomes than children who stay with caregivers or family members (von Werthern et al., 2018). However, being detained even with family members still has a negative impact on child health and functioning. A 2019 study of Central American immigrant children detained in an ICE facility with a caregiver showed that these children demonstrated two times the rates of abnormal emotional and behavioral difficulties, and three to four times the rates of PTSD prevalence compared with children in the general U.S. population (MacLean et al., 2019).

Children in immigration detention are also at risk of exposure to additional trauma including abuse and threat from facility staff, physical and sexual violence from other detainees, social isolation, and family separation and loss (von Werthern et al., 2018; Linton et al., 2017). It is our professional opinion that these experiences of trauma while detained, coupled with prior experiences of pre- and peri-migration traumas, combine to have a cumulative and lasting impact on psychological functioning.

a. *Restrictive placements are particularly harmful*

Some children in ORR custody are detained in restrictive placements, i.e. placements that maintain heightened security measures, increased supervision, secure or locked structures, and/or 24-hour surveillance and monitoring.[9] Detaining children in restrictive environments is exceedingly harmful to their physical and mental health (Sege et al., 2017; Barnert, 2016). A well-established body of research has demonstrated that detaining children in restrictive

---

[9] Office of Refugee Resettlement, *ORR Guide: Children Entering the United States Unaccompanied*, https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied

Plaintiff's Confidential Personal Information/Confidential

**Exhibit 56**
**Page 1383**

environments interferes with healthy development, exacerbates pre-existing trauma, puts children at greater risk of self-harm, and exposes children to abuse (Holman & Ziedenberg, 2006). In a 2013 report, the National Academy of Sciences presented the myriad ways in which incarceration disrupts healthy development for adolescents (National Research Council).

Testimony and reporting from HHS's OIG Report (2019) and the ORR Northern California Federal Field Specialist, as well as the ORR files for individual children, confirm that placement and detention in secure facilities is associated with deterioration in psychological functioning over time.[10]  Furthermore, many restrictive care settings operate as juvenile detention facilities that are not designed for rehabilitation and treatment; therefore, there is a lack of services and treatments to adequately address children's psychological distress and trauma.[11] Thus, psychological symptoms continue untreated and, in many cases, worsen.[12]

### b.  Prolonged detention is particularly harmful

Furthermore, research has demonstrated that increased time in immigration detention is associated with greater psychological distress and increased impairment in mental health

---

[10] *See* Lucas R._Experts_ 11794–18280 (Named Plaintiff ORR files); *See also* Deposition of Elicia Smith ("Smith Dep.") at 144:10-18 ("Q: . . .Have you ever seen any instances where secure placement has led to the deterioration of the mental health of a minor? A: Yes. Q: Can you explain your answer? A: The care provider team – the clinician and the case manager – have definitely reported that to me. I can't remember specific cases, but they have used that exact terminology.").

[11] *See* Cook Dep. at 106:20-25, 107:10-108:8 ("Q: Do you develop a treatment plan for the child? A: No, not a technical treatment plan. We're not a treatment facility. Q: Do you create a service plan? A: No. . . we're more of a triage, so we're not coming up with a specific plan for each kid. We're triaging and helping them adjust and supporting them. And we're not a treatment facility. Q: What do you mean by triage? A: The kids who come to us usually could be having behavior difficulties if they're coming straight from a crisis situation or if they've been incarcerated in the local setting or something. There's – there could be behavior issues, so we're just dealing with what's there. We're not doing deep psychological fixing or counseling or, you know, if they're borderline, we're not coming up with treatment plans on treating them because we're not a treatment facility. We're just taking care of them while they're there. And it should be a short time. Q: So you're not providing treatment to youth there? A: We're providing treatment. We are not providing treatment for a specific diagnosis. We're not working on specific things as if you were a clinician in an outpatient setting or if you were in a residential treatment facility. It's a different type of setting.").

[12] *See* Smith Dep. at 144:10-18, 145:3-10 ("Q: . . .Have you ever seen any instances where secure placement has led to the deterioration of the mental health of a minor? A: Yes. Q: Can you explain your answer? A: The care provider team – the clinician and the case manager – have definitely reported that to me. I can't remember specific cases, but they have used that exact terminology. . . Q: Do you think Yolo is an appropriate placement for youth with serious trauma histories? A: No. Q: Why is that? A: It's a juvenile hall facility. It's – they—the staff at a detention facility have, you know – they're not experts in trauma treatment for children."); Cook Dep. at 189:25-190:12, 191:7-12, 192:16-193:11 ("Q: Do you think that being in a secure setting has an impact on the mental health of the children that you serve? A: Yes. It has a mental health effect on any child placed in secure, whether they're local ORR or… Q: In your clinical experience, what kind of effect does it have? A: What kind of effect does it have? Q: Yes. A: Well, you have your separation. You have loss of freedom to do whatever they want. So it has lots of effects. . . Q: In your clinical experience, is it possible for a child's mental health to deteriorate while they're in a secure setting? A: Yes. Q: Have you seen that happen? A: Yes. . . Q: Can you give me an example of the behavior effect it might have? A: They might act out more. They might pick fights more. . . Some might become depressed. . . They're a plethora of things that it could present as. Again, that's unique to each individual child and the mental health, their personality. So it's – it's a very individualized situation. Q: Might it affect a child's sleep? A: Yes. Q: Might it affect a child's ability to maintain good behavior? A: Yes. Q: Might it affect the child's ability to be able to be stepped down if they couldn't maintain their good behavior? A: Possibly.").

Plaintiff's Confidential Personal Information/Confidential

**Exhibit 56
Page 1384**

functioning for children (Mares, 2016; Newman & Steel, 2008; Robjant et al., 2009; von Werthern et al., 2018).  While this research has not been specifically conducted in ORR facilities, the broad consensus around the harms of detaining immigrant children against their will in locked and restricted facilities justifies extrapolation of findings to the ORR context.  The data indicates that things do not "get better with time" for children in immigration detention; rather than experiencing positive or healthy adjustment to detention, children's adaptations are associated with psychological deterioration and increased symptom severity (Mares, 2016; von Werthern et al., 2018; Robjant et al., 2009).  In our observations and interviews in ORR facilities (Southwest Key Casa Padre (Brownsville, Texas), BCFS Tornillo Influx Facility (El Paso, Texas), and Homestead Influx Facility (Homestead, Florida), children with longer lengths of stay had the most concerning psychological presentations.  During our interviews, children indicated that their physical and mental well-being increasingly deteriorated as they spent more days in detention.  For example, children at the facilities we visited demonstrated anxiety symptoms (including worry, agitation, difficulty relaxing, nervousness) related to concerns and uncertainty about their own personal well-being, or that of a loved one.  They also reported feeling overwhelmed by their circumstances.

Our findings are corroborated by the report from the U.S. Office of Inspector General (2019), which states that "some children [in ORR custody] who did not initially exhibit mental health or behavioral issues began reacting negatively as their stays grew longer . . . longer stays resulted in higher levels of defiance, hopelessness, and frustration among children, along with more instances of self-harm and suicidal ideation" (p. 12).  Mental health clinicians "described that a child's mental health often deteriorates as the length of their stay in ORR custody increases" (Office of Inspector General [OIG], 2019, p. 20).

With increased time in custody, children experience longer chronicity of symptoms of depression and anxiety, which increases the burden on their stress response systems and exacerbates symptom severity.  Chronic and prolonged stress exposure alters hormonal and physiological systems, with long-term consequences for neurological development and immune functioning (Lupien et al., 2009; National Scientific Council on the Developing Child, 2005/2014; Teicher et al., 2016; *see also*, *supra*, VII.A.2.).  Furthermore, with prolonged and repeated delays in release or family reunification, children become increasingly desperate and despondent.

We personally observed an increased severity of hopelessness in children with longer stays when we visited ORR facilities, especially in Tornillo (2018) where many children had been in custody for prolonged periods due to new fingerprinting requirements.  Many children reported feeling helpless in their situation.  As children are continually confronted with the strict rules, rigid routines, and lack of personalized support in the institutional care setting, their capacity to cope deteriorates and declines over time, often resulting either in increased frustration and behavioral disinhibition, or in increased numbing and detachment.  Our observations of children's distress associated with detention is consistent with research on 'learned helplessness' (Seligman, 1972, 1975), in which exposure to inescapable and repeated pain or threat leads to generalized beliefs and behaviors associated with a lack of perceived control, resulting in reduced efforts for change or resolution, and associated symptoms of depression and behavioral withdrawal.  These disruptions and disturbances in psychological functioning associated with

18

prolonged detention become a source of ongoing distress and – through developmental adaptation – can become a 'way of being' for many children that extends beyond their time in custody.

### 3. *Long-lasting harm of institutional care and detention*

While release from detention has been shown to correspond with some relative alleviation in psychological distress, the psychological consequences of detention are clearly demonstrated to endure post-release, and may result in long-term impact (von Werthern et al., 2018).  Multiple research studies have shown that symptoms of depression, anxiety, and PTSD endure for years beyond release from detention, with many enduring symptoms being directly related to the detention experience (e.g., avoidance of detention reminders, nightmares and flashbacks from detention) (von Werthern et al., 2018).  Similarly, institutionalized child-rearing has been shown to have long-term negative effects on children's development and functioning in multiple domains (Dozier et al., 2012).  Based on existing science and our clinical experience, we expect the psychological impact of child immigration detention to be life-long in some cases, consistent with exposure to traumatic stress.

Once again, the severity of symptoms post-release has been associated with length of time in detention (Steel et al., 2006).  Based both on the current science and on our personal observations conducting interviews of children in ORR custody, we expect the psychological consequences of the trauma of child detention to have a lasting impact in the form of ongoing/unresolved symptoms, impaired sense of personal agency, feelings of worthlessness and self-blame, impaired sense of trust and safety within interpersonal relationships, and alterations in worldview.  Furthermore, it is our professional opinion that the experience of toxic stress in childhood due to detention is, in some cases, expected to alter a child's developmental trajectory due to the psychological impact (described above), health impairment, neurobiological alterations, and general lost opportunities to practice and hone life skills during critical periods of development (Linton et al., 2017; Wood, 2018).

Therefore, the detention of immigrant children is expected to have long-term (including potentially life-long) impacts on mental health, psychological functioning, and general health and achievement (Linton et al., 2017; Wood, 2018).

### E.  Characteristics that make it more likely for children to experience traumatic stress while in ORR detention

It is our professional opinion that several aspects of ORR custody make it more likely that children will experience ORR detention as traumatic.  Children's experiences of stress, threat, and adversity are likely to be traumatic when such experiences entail: (1) a limited sense of control, autonomy, or personal agency over what is happening; (2) limited knowledge or information about current circumstances or expected outcomes; (3) perceived lack of predictability, consistency, or security in the environment; (4) limited access to social and family supports and/or protective resources; (5) perceived constant and pervasive threat of danger in the environment; and (6) experiences of fear or helplessness.

Plaintiff's Confidential Personal Information/Confidential

**Exhibit 56**
**Page 1386**

*had already packed all of my things and prepared for my departure and so I started to cry because I didn't understand what was going on."*[52]

In this process, they experience a sense of helplessness and lack of control that often exacerbates traumatic stress reactions and can worsen an existing disability.  The lack of consistency in response or knowledge of what to expect creates uncertainty and distress for children thereby exacerbating their existing disability (e.g., by heightening anxiety, shame, self-blame, or impulsive behaviors).  As discussed below, a predictable environment in and of itself is not a sufficient support in the absence of system accommodations that help children achieve a sense of safety.  It is our professional opinion that in the absence of appropriate supports and accommodations, expectations for consistent "good behavior" are unrealistic.  Additionally, the administration of medication without a child's (or legal representative's) consent (*supra* VII.D.1) undermines children's sense of personal autonomy and sense of agency, thereby rendering the entire detention and care experience more traumatic.

> 2.   *Care providers must offer children appropriate supports to meet realistic goals in the least restrictive setting*

While an appropriate response to disability requires an adjustment of capacity and achievement expectations, this does not mean that individuals with disabilities (whether trauma-related or otherwise) are inherently or permanently incapable of meeting such expectations.  Rather, they may simply require different supports or timelines for reaching the specified goals or expectations.  Therefore, a care system that adequately responds to the disabilities associated with traumatic stress must provide support and scaffolding in skill domains impacted by trauma exposure (most commonly, the skills of emotion identification, emotion expression, and emotion regulation).

Due to the impact of traumatic stress on cognitive, emotional, and behavioral regulation skills, it is our professional opinion that expectations for perfect behavior (i.e. no impulsive behavior, no defiant behavior, no rule breaking, etc.) over extended periods of time are unrealistic.  Children, particularly those with disabilities or traumatic stress, must be given opportunities to gradually develop skills within a given domain, which inherently involve expected occasional deviations from behavioral norms (Steinberg, 2014; Sege et al., 2017).  Over-reliance on punishment to address behavioral deviations exacerbates traumatic stress and impedes skill development (SAMHSA, 2014).  For example, in the case of D.D.R.O., an incident of peer conflict resulted in the punishment of social isolation for over 15 days, in which the client could not benefit from social support or access to staff who spoke his language (D.D.R.O. Decl. at Lucas R._Experts_11736, ¶ 12: "I would feel more supported here if the staff were a bit more understanding and gave me and my peers more detailed guidance about how we can improve our behavior.").

Care providers must also provide services that are specific to a child's condition and needs.  However, some children with psychiatric disabilities and disorders in ORR settings do not appear to receive treatment services that are specific to their condition unless they are

---

[52] *See* B.D.H.G. Decl. at Lucas R._Experts_11700-01, ¶ 5.

Plaintiff's Confidential Personal Information/Confidential

**Exhibit 56
Page 1387**

Based on our observations interviewing children at ORR facilities, and our review of ORR records, depositions of ORR care providers and staff, and the declarations of children in ORR custody, the highly structured placements of children in ORR custody generally *do not* come with sufficient information, support, or skill-building opportunities that would reasonably allow children with disabilities to attain stated goals. This opinion is corroborated by conclusions made by the Office of Inspector General (2019). With high structure and high expectations in the absence of adequate support or scaffolding, children are destined to fail. Such children are likely to deteriorate and escalate behaviors and symptoms, often leading to step-up to more restrictive placement within the ORR care system, with high cost both to the child and to the system. In many cases, restrictions and punishments appear so severe (e.g., extended isolation, physical or medical restraint) so as to increase client psychological distress and impair functioning to cause further regression that will prevent the child from ever attaining the initial stated goal of release from detention.

3. *Care providers must consider individual context and trauma history in placement and release decisions*

The development of an effective behavioral support program requires careful consideration of an individual's history and context, including family, social, educational, and cultural history as well as history of trauma exposure. According to testimony, ORR programs have had limited success with behavioral support programs because they have failed to adequately consider and address children's experiences in the context of their community of origin.[62] Specifically, the provision of supports and services that adequately address and provide accommodations for disabilities stemming from traumatic stress begin with an understanding of the nature of trauma-related emotional and behavioral difficulties.

When considered with a trauma-informed perspective, all behaviors and emotions have a meaning or function, including: (1) communication or expression of distress or need for support (due to limited skill development), (2) best efforts to cope or obtain a basic need (including a sense of safety), or (3) re-enactment as an effort to process and make sense of past experiences. In order to appropriately respond to a behavior that manifests in the care setting, the care provider must first understand the function of that behavior.

Given the nature of trauma-related psychological disability – in which there is an expected propensity for threat sensitivity, fear-based reactivity, impulsive behavior, and general self-regulation difficulty – it is unreasonable to expect that a child will not make mistakes or have lapses in judgement in the care setting. We found in our review of ORR files and declarations of children in ORR custody that without appropriate accommodations and

---

[62] *See* Fink Dep. at 217:18-218:13 ("Q: And for youth who – for the youth – the population of youth that ORR is responsible for, when they are in a program that is relying on the point/level behavior management system, what is the – what tends to be the outcome – what is the consequence for those kids? What have you observed? A: Just limited – a limited ability to teach the kids the social skills to replace the ones that they're struggling to – you know, that brought them in there. So if they're having issues with authority, they don't have the – they don't really understand how to like teach that kid how to like work with people who are authority figures. And especially coming from countries where, you know, they had a lot of independence and were treated like adults. So, like, having those skill sets is really important to work with kids that have behaviors.").

Plaintiff's Confidential Personal Information/Confidential

**Exhibit 56**
**Page 1388**

their environment.[72]  Of note, some ORR staff have acknowledged that secure placements are
inappropriate for youth with trauma histories.[73]  Such facilities do not offer the safe
environments that are necessary for children to be able to manage or ameliorate posttraumatic
stress symptoms.[74]

In general, based on their declarations, our interviews with children in ORR custody, and
a review of ORR files, children in ORR custody appear to experience minimal sense of control
or agency in the potentially life-altering processes of placement and release to community; this
lack of agency becomes a significant source of distress that increases likelihood and severity of a
posttraumatic stress reaction to children's experience in ORR care.  In our interviews with
children, many have exhibited symptoms of sadness, despair, helplessness, and chronic anxiety
and worry that are directly related to (1) their separation from family and community, and (2)
their uncertainty about the placement process and how their situation can be resolved.  Over
time, these symptoms tend to increase in severity and generalize to other contexts, leading to
broad and pervasive negative outcomes.

Release or step-down requirements that depend upon demonstration of emotional,
psychological, or behavioral stability are contradictory in that the facility setting itself is often
the source of the child's distress and dysregulation.[75]  Children report psychological distress
(including symptoms of depression, anxiety, and PTSD) that are directly related to being
detained in a restrictive setting, often due to chronic and pervasive threats to personal well-
being.[76]  Therefore, this setting is rendered an inappropriate context for treatment and recovery:
no amount or quality of mental health service or treatment will resolve the distress save for a
change in placement setting.[77]  The absence of appropriate treatment or support services in many

---

[72] See Fink Dep. at 218:14-23 ("Q: And from what I understood, many – could a youth who was struggling with the
point system behavior system exhibit behaviors that led a staff secure program to terminate them from the program –
terminate them from the program? A: You mean, would – are you asking if, like, a kid is disrupted from placement
due to behaviors? Q: Yes. A: Yes. Yes.").

[73] See e.g., Smith Dep. at 144:10-18, 145:3-10 ("Q: . . .Have you ever seen any instances where secure placement
has led to the deterioration of the mental health of a minor? A: Yes. Q: Can you explain your answer? A: The care
provider team – the clinician and the case manager – have definitely reported that to me. I can't remember specific
cases, but they have used that exact terminology. . . Q: Do you think Yolo is an appropriate placement for youth
with serious trauma histories? A: No. Q: Why is that? A: It's a juvenile hall facility. It's – they—the staff at a
detention facility have, you know – they're not experts in trauma treatment for children."); Fink Dep. at 223:9-25
("Q: . . .What is your understanding of the type of mental health training, specific mental health training, that is
provided to staff at the staff secure facilities? A: So in my understanding is what they're provided, what they're told,
because we pay them to, you know, get these trainings. But they are supposed to get trauma-informed care, all of
them. They're supposed to – the clinicians also get their own set of training to keep up with their licensing. That's
separate from them. The staff get behavior management training. I don't know what that entails. I know we've
talked about the level token system, but in terms of kind of – again, I don't know what they mean by that, but they
say they get behavior management training.").

[74] See V.H.G.C. Decl. at Lucas R._Experts_11784, ¶ 33 ("I get nervous when the other kids yell and fight with each
other.  It reminds me of when narcos threatened by brother, who is now dead.").

[75] See K.L.F. Decl. at Lucas R._Experts_11757-58, ¶¶ 3, 7, 15-17.

[76] See D.D.R.O. Decl. at Lucas R._Experts_11735, ¶ 7 ("Once I leave ORR custody, I will be working or studying,
and I won't need to take the medications because I won't be anxious anymore.  I am anxious because I am in ORR
custody.").

[77] See Gabriela N. Decl. at Lucas R._Experts_11475, ¶ 6 ("I don't need to take them [pills]; I need to leave
detention"); V.H.G.C. Decl. at Lucas R._Experts_11786, ¶5 ("I don't know how I can improve my mental health if I
am kept in a cage.").

Plaintiff's Confidential Personal Information/Confidential

**Exhibit 56
Page 1389**

restrictive care facilities renders these behavioral requirements exceedingly problematic.  The psychological distress that children experience in restrictive care settings are expected and normal reactions to detention, and therefore do not warrant punishment, increased restriction, and/or extended time in detention.  The mere experience of being held or detained against one's own will is a potential source of traumatic stress, no matter the conditions of the placement.

In these circumstances, a child's functioning while detained cannot be assumed to be inherently predictive of their functioning in family or community contexts (where they are likely to experience an increased sense of agency, individualized supports, and accompanying reductions in distress), and therefore should not be the basis for denying release.

Our expert opinion – based on evidence and records submitted in this case as well as our own experiences working with detained children – is that ORR placement settings do not provide a trauma-sensitive environment that is appropriate for children with trauma histories and related disabilities (i.e., disabilities stemming from prolonged exposure to toxic stress).  The ensuing result is that such placement settings often serve to exacerbate psychological stress.  For many children (especially those experiencing traumatic stress and other disabilities), the psychological effects, health consequences, and functional impairments stemming from their experiences in ORR custody are expected to endure beyond the duration of the child's stay in ORR with potential for long-term negative impact and impairment.

Ryan Matlow, Ph.D.
Clinical Assistant Professor, Department of Psychiatry and Behavioral Sciences
Stanford University School of Medicine
Email: rmatlow@stanford.edu
Telephone: (650) 724-8113

Dr. Nancy E. Wang
Professor Emergency Medicine
Associate Director Pediatric Emergency Medicine
Stanford University School of Medicine
Email: ewen@stanford.edu
Telephone: (650) 723-0757

Plaintiff's Confidential Personal Information/Confidential

**Exhibit 56**
**Page 1390**

# Exhibit 57

Exhibit 57
Page 1391

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LUCAS R., et al., | Case No.  2:18-CV-05741 DMG PLA |
| Plaintiffs, | **DECLARATION OF DR. EMILY RYO** |
| v. | |
| ALEX AZAR, et al., | |
| Defendants. | |

1.  The facts set forth below are based on my personal knowledge and, if called as a witness, I could and would competently testify to them. I am over eighteen years of age.

2.  Attached as Exhibit A is a true and accurate copy of my Expert Report, dated June 16, 2020, which I hereby reaffirm and verify under penalty of perjury as containing the opinions that I am offering in this case.

3. If called to testify at trial, I anticipate that I will testify to the matters and opinions as set forth in my Expert Report.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.  Executed on this 28 day of September, 2020.

_____

Emily Ryo, JD., PhD.

# EXHIBIT A

Exhibit 57
Page 1393

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LUCAS R., et al., | Case No.  2:18-CV-05741 DMG PLA |
| Plaintiffs, | |
| v. | EXPERT REPORT BY DR. EMILY RYO |
| ALEX AZAR, et al., | |
| Defendants. | |

# Table of Contents

I.    **Introduction** ...................................................................................................... **3**
    A.  Assignment ........................................................................................................ 3
    B.  Summary of qualifications ................................................................................ 3
    C.  Compensation ................................................................................................... 3

II.   **Data Considered & Key Terms Defined** ........................................................ **4**
    A.  Data ................................................................................................................... 4
    B.  A-Numbers and personal characteristics ......................................................... 5
    C.  Initial placements, stints, and custody periods ................................................ 5
    D.  Program types and restrictive placements ....................................................... 6

III.  **Methodology** ...................................................................................................... **7**
    A.  Data cleaning relating to A-Numbers ............................................................. 7
    B.  Data cleaning relating to date variables .......................................................... 8
    C.  Data cleaning relating to stints ........................................................................ 8
    D.  Data cleaning relating to discharge types ....................................................... 9
    E.  Outcome of data cleaning measures ................................................................ 9

IV.   **Summary of Findings** ....................................................................................... **9**

V.    **Analysis** .......................................................................................................... **10**
    A.  Question 1. How long is a UAC typically detained by ORR before the first step-up occurs? ...... 10
    B.  Question 2. How is step-up associated with detention length before reunification? .................... 12
    C.  Question 3. How is placement type associated with detention length before reunification? ......... 13
    D.  Question 4. How does the prevalence of reunification vary by length of detention among UACs who reunified, and how does the prevalence of voluntary departure vary by length of detention among UACs who elected voluntary departure? ........................................................................ 14
    E.  Question 5. How is placement type associated with whether or not UACs will reunify or elect voluntary departure? ........................................................................................................................ 16

**Appendix A. Curriculum Vitae** ........................................................................... **18**

**Appendix B. List of Flores Data Reviewed and Relied Upon** ............................... **30**

**Appendix C. Definitions for ORR Program Types** ................................................. **31**

**Appendix D. Time to reunification for custody periods with and without step ups** ............. **33**

**Appendix E. Time to reunification by placement type** ............................................. **34**

given facility as a "stint," and the total time spent in ORR custody from initial placement to final discharge as a "custody period."

As explained in section III.A, I cannot assume a one-to-one relationship between UACs and A-Numbers. This means that I cannot guarantee that a UAC will be assigned the same A-Number for each custody period that he or she may experience. Due to this limitation, I have treated each custody period as independent of one another, and all of the analysis presented in this report is at the level of custody periods, rather than at the level of UACs.[7] For example, average detention lengths refer to the average length of detention for individual custody periods, rather than the average total length of detention for individual UACs.

### D. Program types and restrictive placements

ORR facilities impose varying levels of restrictions on UACs. Definitions for the various program types are provided in Appendix C.[8] Figure 1 shows the ORR program types, with "less restrictive" program types on the left and "more restrictive" program types on the right.[9]



*Figure 1. Program types by less restrictive to more restrictive.*

For the purposes of this report, a "step-up" occurs when (1) a UAC is transferred from a less restrictive program and placed in any one of the more restrictive programs, or (2) when a UAC is

---

[7] Analysis conducted at the level of custody periods may have the effect of understating the amount of time a UAC spends in custody. For example, consider a UAC with two 100-day custody periods. Our analysis at the level of custody periods treats each 100-day custody period as independent of one another. In contrast, a UAC-level analysis would consider the total length of detention for this UAC to be 200 days.

[8] In considering whether a UAC was ever placed in any of these program types during a given custody period, I used the categorizations as they appear in the ORR Data. I do not provide any opinions as to whether the facilities in which the UACs were placed do in fact fit the definitions provided.

[9] The classifications presented in Figure 1 were provided by Plaintiffs' counsel based on ORR's classification of more and less restrictive facilities. I understand that there is disagreement among the parties, and even amongst Defendants' own employees, as to how to categorize program types from least restrictive to most restrictive. Since my analyses consider only whether a child was ever placed in a "more restrictive" program, I need not delineate where each program falls in a spectrum of least to most restrictive. I also do not provide any opinions as to the level of restrictiveness of these facilities in practice.

Expert Report by Dr. Emily Ryo
Case No. 2:18-CV-05741 DMG-PLA
**Exhibit 57**
**Page 1396**

initially placed in a program that is more restrictive.[10] Although some UACs may experience multiple step-ups during a custody period, or may be stepped-up and later stepped-down to a less restrictive program, this report considers only whether a UAC was ever stepped up during a custody period.

# III.  Methodology

I describe in detail below the four key steps that I undertook to generate a cleaned, reliable dataset for analysis. These steps were necessary to address the data entry errors and other unexplained aberrations present in the ORR Data.

## A.  Data cleaning relating to A-Numbers

There are a number of issues relating to A-Numbers in the ORR Data. There are 19 records in the ORR Data that are associated with "fake" A-Numbers. I identified these records by checking for A-Numbers that are outside the normal range of values and then manually inspecting the UACs' names associated with those A-Numbers. For example, UACs named "TEST TEST," "FAKE FAKE," and "FAKIMUS KIDIUMUS" were removed from the ORR Data.

I next sought to identify when an A-Number is associated with more than one UAC. An A-Number may be associated with more than one UAC due to either (1) data entry errors, or (2) an A-Number being "reused" for an entirely different child. If there were records associated with a given A-Number that varied across four of the five personal characteristics (first name, last name, date of birth, country of birth, and gender), I manually inspected these records to ensure that the same A-Number was not used to identify two different UACs. I ensured that each of the 6 UACs whom I determined had non-unique A-Numbers in the ORR Data were assigned unique A-Numbers.

I also sought to identify UACs who are associated with more than one A-Number. A UAC may be associated with more than one A-Number due to either (1) data entry errors, or (2) a UAC being assigned a different A-Number upon re-admission after a discharge. I manually inspected records relating to 104 combinations of first name, last name, date of birth, country of birth, and gender that were associated with more than one A-Number. Combining these records was sometimes necessary to create a complete account of a UAC's time in ORR custody. For example, a referral record may have a different A-Number than the discharge record for the same UAC. If these A-Numbers are not linked to each other, the UAC represented by the A-Number in the referral record would be considered to still be in custody. I ensured that each of the 64 UACs whom I determined had two different A-Numbers in the ORR Data and whose records would be incomplete without being linked were assigned a single unique A-Number.

I linked A-Numbers only when it was necessary to avoid a falsely open-ended custody period (i.e., when a UAC appears to still be in custody but has actually been discharged, as indicated in the monthly discharges spreadsheet). In other cases, it is likely that the government used two different A-Numbers to identify the same UAC in different custody periods. I did not link these A-Numbers in those cases, since my goal was to clean the ORR Data only as necessary to

---

[10] This definition of step-up was provided by Plaintiffs' counsel.

Expert Report by Dr. Emily Ryo
Case No. 2:18-CV-05741 DMG-PLA
**Exhibit 57**
**Page 1397**

## D.   Data cleaning relating to discharge types

In July 2018, several data columns were mis-labeled by ORR. The column labeled as discharge
type in July 2018's discharges spreadsheet actually contained the program type, and the
discharge type was not provided elsewhere. For this month only, I assumed that the presence of
sponsor data (first name, last name, and state) indicates that the UAC was reunified with an
individual sponsor. This is a reasonable assumption given that in the other monthly data that do
not contain this data error (i.e., omission of discharge type), 95.9% of final discharges that
contain sponsor information are designated as individual reunifications.

## E.   Outcome of data cleaning measures

The ORR Data described in Section II.A. represents all UACs who were initially admitted to
ORR, regardless of whether they were placed in-network or out-of-network, on or after
November 1, 2017 and discharged on or before February 29, 2020. Incorporating the data
cleaning measures described in Sections III.A-D, and excluding 2 UACs who were recorded as
being transferred from one ORR facility to another but were missing all subsequent records,
generates a clean dataset for my analysis ("Clean Dataset"). This Clean Dataset is composed of
123,743 custody periods relating to 123,573 unique A-Numbers.

# IV.   Summary of Findings

Question 1. How long is a UAC typically detained by ORR before the first step-up occurs? I
found that the average length of time to the first step-up was 67.3 days.[12] I also found that
increasing lengths of custody are associated with higher percentage of custody periods with step-
ups.

Question 2. How is step-up associated with detention length before reunification? The average
time to reunification was higher for custody periods with step-ups (i.e., average of 183.8 days)
than custody periods without step-ups (i.e., average of 52.6 days).

Question 3. How is placement type associated with detention length before reunification? I found
that among the custody periods without step-ups, the average time to reunification was higher for
custody periods that included a stint at a therapeutic group home (i.e. average of 184.6 days)
compared to custody periods that took place only in shelters (i.e. average of 52.9 days). I also
found that among custody periods that included step-ups, the average times to reunification
increased in this order: staff secure (i.e., average of 176.5 days); secure (i.e. average of 185.9
days); residential treatment center (i.e., average of 236.3 days); therapeutic staff secure (i.e.,
average of 246.3 days); and out-of-network facilities (i.e., average of 327.2 days).

Question 4. How does the prevalence of reunification vary by length of detention among UACs
who reunified, and how does the prevalence of voluntary departure vary by length of detention
among UACs who elected voluntary departure? Among the custody periods resulting in
reunification, I found that increasing detention length is generally associated with a lower

---

[12] All references to "average" in this report refer to mean values. Wherever relevant, I also provided median values
in the appendix section.

Expert Report by Dr. Emily Ryo
Case No. 2:18-CV-05741 DMG PLA
**Exhibit 57**
**Page 1398**

percentage of reunifications (i.e., only 28.53% of these custody periods resulted in reunification on or after 61 days, whereas 71.47% of these custody periods resulted in reunification on or before 60 days). In contrast, among custody periods resulting in voluntary departure, increasing detention length is generally associated with a higher percentage of voluntary-departure discharges (i.e., 94.68% of these custody periods resulted in voluntary departure on or after 61 days, whereas only 5.32% of these custody periods resulted in voluntary departure on or before 60 days).

Question 5. How is placement type associated with whether or not UACs will reunify or elect voluntary departure? I found that the reunification rate is higher for custody periods that took place only in shelters (92.97%) compared to custody periods that included a stint at a residential treatment center (71.58%), therapeutic group home (53.33%), staff secure (47.76%), therapeutic staff secure (43.48%), secure (41.74%), and out-of-network facility (25.00%). In contrast, the percentage of voluntary departures is higher for custody periods that included a stint at out-of-network facility (31.25%), therapeutic group home (26.67%), therapeutic staff secure (21.74%), staff secure (10.30%), secure (6.96%), and a residential treatment center (5.26%), compared to custody periods that took place only in shelters (1.10%).

## V.  Analysis[13]

### A.  Question 1. How long is a UAC typically detained by ORR before the first step-up occurs?

For Question 1, I was asked to restrict the Clean Dataset to include only those custody periods that have an initial placement at a shelter.[14] I did not restrict this analysis to any particular type of discharge. This restricted sample is composed of 109,803 custody periods relating to 109,708 unique A-Numbers.

Of the 578 custody periods (pertaining to 575 unique A-Numbers) that included step-ups, the average length of time to the first step-up was 67.3 days, and the maximum time to the first step-up was 318 days.

---

[13] Because the questions presented ask that I restrict the Clean Dataset in various ways to provide the average lengths of time to reunification or discharge, I would like to note that for the Clean Dataset, the average time to discharge regardless of discharge type was 56.4 days, and the maximum time to discharge regardless of discharge type was 834 days.

[14] This analysis, therefore, does not include instances where a UAC was initially placed in a more restrictive facility upon referral to ORR.

Expert Report by Dr. Emily Ryo
Case No. 2:18-CV-05741 DMG PLA
**Exhibit 57**
**Page 1399**

Figure 2 below shows the percentage of custody periods that included step-ups within each range of custody lengths.[15]



*Figure 2. Percentages of custody periods that included a step-up, by length of custody.*

---

[15] The range of custody lengths used in Figure 2 (e.g., 0-6 days, 7-13 days, 14-29 days, 30-59 days, etc.) was provided by Plaintiffs' counsel.

Expert Report by Dr. Emily Ryo
Case No. 2:18-CV-05741-DMG-PLA
**Exhibit 57**
**Page 1400**

Table 1 below provides more detailed information on the custody periods that included step-ups. The first row of Table 1 shows that 15 of the 109,803 custody periods that lasted at least 0-6 days included step-ups between day 0 and day 6 (inclusive). The last row of the table shows that 59 of the 6,140 custody periods that lasted at least 150+ days included step-ups on or after day 150.[16]

| Length of custody | # of custody periods | # of step-ups | % of custody periods including a step-up |
|---|---|---|---|
| **0-6 days** | 109,803 | 15 | 0.01% |
| **7-13 days** | 108,766 | 84 | 0.08% |
| **14-29 days** | 101,500 | 116 | 0.11% |
| **30-59 days** | 71,252 | 113 | 0.16% |
| **60-89 days** | 34,338 | 87 | 0.25% |
| **90-119 days** | 17,759 | 57 | 0.32% |
| **120-149 days** | 10,076 | 47 | 0.47% |
| **150+ days** | 6,140 | 59 | 0.96% |

*Table 1. Percentages of custody periods that included a step-up, by length of custody.*

In summary, based on the data I have reviewed, increasing lengths of custody are associated with higher percentage of custody periods with step-ups.

## B.    Question 2. How is step-up associated with detention length before reunification?

For Question 2, I was asked to restrict the Clean Dataset to include only those custody periods that have a final discharge type of individual-sponsor reunification (as opposed to voluntary departures, removal orders, age outs, runaways, reunifications with program/facility, or other discharge types included in the Clean Dataset), regardless of whether there was a step-up. This restricted sample is composed of 114,589 custody periods relating to 114,544 unique A-Numbers.

I was also asked to compare the average times to reunification for custody periods that ended in reunification and did not include step-ups with custody periods that ended in reunification and did include step-ups.

---

[16] The last range of custody, 150+ days, includes the maximum custody length in this analytic sample, which is 813 days. This custody period ended in an individual-sponsor reunification.

Expert Report by Dr. Emily Ryo
Case No. 2:18-CV-05741 DMG-PLA
**Exhibit 57**
**Page 1401**

Table 2 below shows the average length of detention before reunification by custody periods with and without step-ups. Further analysis of the time to reunification for custody periods with and without step-ups can be found in Appendix D.

| Less Restrictive (No Step-Ups) versus More Restrictive (Step-Ups) | Average (days) |
| --- | --- |
| **No Step-ups** | 52.6 |
| **Step-ups** | 183.8 |

*Table 2. Average days to reunification, with and without step-ups.*

In summary, the average time to reunification is higher for custody periods with step-ups (i.e., average of 183.8 days) than custody periods without step-ups (i.e., average of 52.6 days).

### C.   Question 3. How is placement type associated with detention length before reunification?

For Question 3, I was asked to apply the same restrictions to the Clean Data set as Question 2, and therefore the restricted sample remained the same: 114,589 custody periods relating to 114,544 unique A-Numbers.

I was also asked to compare the average times to reunification for custody periods without step-ups that included only shelter placements, custody periods without step-ups that included a stint at a therapeutic group home, and custody periods with step-ups that included stints at each of the more restrictive facility types.[17]

---

[17] The placement types that include step-ups are not mutually exclusive. For example, a custody period with a stint at a secure facility can also have a stint at a residential treatment center.

Expert Report by Dr. Emily Ryo
Case No. 2:18-CV-05741-DMG-PLA
**Exhibit 57**
**Page 1402**

Table 3 below shows the average days to reunification for each placement type. Further analysis of the time to reunification by placement type is provided in Appendix E.

| Placement type | Average (days) |
|---|---|
| **Only shelter placements, no step-ups** | 52.9 |
| **Stint at a staff secure facility** | 176.5 |
| **Stint at a therapeutic group home, no step-ups** | 184.6 |
| **Stint at a secure facility** | 185.9 |
| **Stint at a residential treatment center** | 236.3 |
| **Stint at a therapeutic staff secure facility** | 246.3 |
| **Stint at an out-of-network facility** | 327.2 |

*Table 3. Days to reunification by placement type.*

In summary, among the placement types without step-ups, the average times to reunification are higher for custody periods that include a stint at a therapeutic group home (i.e., average of 184.6 days) compared to custody periods that took place only in shelters (i.e., average of 52.9 days). Among custody periods that included step-ups, the average times to reunification increase in this order: staff secure (i.e., average of 176.5 days); secure (i.e., average of 185.9 days); residential treatment center (i.e., average of 236.3 days); therapeutic staff secure (i.e., average of 246.3 days); and out-of-network facilities (i.e., average of 327.2 days).

### D.    Question 4. How does the prevalence of reunification vary by length of detention among UACs who reunified, and how does the prevalence of voluntary departure vary by length of detention among UACs who elected voluntary departure?

For Question 4, since discharge type data was not provided by the government for July 2018, I excluded 4,334 custody periods that ended in a July 2018 discharge. Therefore, the restricted sample for this question is composed of 119,409 custody periods relating to 119,255 unique A-Numbers.

Expert Report by Dr. Emily Ryo
Case No. 2:18-CV-05741 DMG-PLA
**Exhibit 57
Page 1403**

Table 5 below shows the percentage of custody periods for each placement type that ended in these varying discharge types.

| Discharge Type | Only shelter placements, no step-ups | Stint at a therapeutic group home, no step-ups | Stint at a staff secure facility | Stint at a secure facility | Stint at a residential treatment center | Stint at a therapeutic staff secure facility | Stint at an out-of-network facility |
|---|---|---|---|---|---|---|---|
| **Reunified** | 92.97% | 53.33% | 47.76% | 41.74% | 71.58% | 43.48% | 25.00% |
| **Voluntary Departure** | 1.10% | 26.67% | 10.30% | 6.96% | 5.26% | 21.74% | 31.25% |
| **Removal Order** | 0.03% | 0.00% | 5.67% | 6.52% | 0.00% | 0.00% | 0.00% |
| **Age Out / Redetermination** | 4.57% | 13.33% | 22.54% | 32.61% | 8.42% | 8.70% | 12.50% |
| **Reunified (Program / Facility)** | 0.82% | 0.00% | 3.43% | 3.48% | 10.53% | 17.39% | 12.50% |
| **Other** | 0.52% | 6.67% | 10.30% | 8.70% | 4.21% | 8.70% | 18.75% |
| **# of custody periods** | **104,846** | **15** | **670** | **230** | **95** | **23** | **16** |

***Table 5. Discharge type by placement type.***

In summary, among the placement types without step-ups, the percentage of reunifications are higher for custody periods that took place only in shelters (92.97%) compared to custody periods that include a stint at a therapeutic group home (53.33%). In addition, the percentage of reunification was higher for custody periods that took place only in shelters (92.97%) compared to custody periods that included a stint at a residential treatment center (71.58%), therapeutic group home (53.33%), staff secure (47.76%), therapeutic staff secure (43.48%), secure (41.74%), and out-of-network facility (25.00%).

In contrast, the percentage of voluntary departures by placement type not involving a step-up shows a higher percentage of voluntary departures for custody periods that included a stint at a therapeutic group home (26.67%) compared to custody periods that took place only in shelters (1.10%). In addition, the percentage of voluntary departures was higher for custody periods that included a stint at out-of-network facility (31.25%), therapeutic group home (26.67%), therapeutic staff secure (21.74%), staff secure (10.30%), secure (6.96%), and a residential treatment center (5.26%), compared to the small percentage of voluntary departures for custody periods that took place only in shelters (1.10%).

June 16, 2020

*Emily Ryo*
_____
Emily Ryo, JD., PhD.

# Appendix D. Time to reunification for custody periods with and without step ups

### Custody periods that ended in reunification and did not include step-ups

Of the 114,133 custody periods that ended in reunification and did not include step-ups, the average time to reunification was 52.6 days, the median time to reunification was 39 days, and the maximum time to reunification was 813 days.[24]

### Custody periods that ended in reunification and included step-ups

Of the 456 custody periods that ended in reunification and included step-ups, the average time to reunification was 183.8 days, the median time to reunification was 163.5 days, and the maximum time to reunification was 611 days.

Like Table 2, Figure 3 shows the average length of detention before reunification by custody periods with and without step-ups.



*Figure 3. Average days to reunification, with and without step-ups.*

---

[24] The child with the maximum custody period prior to reunification spent time at a long-term foster care placement.

# Appendix E. Time to reunification by placement type

### Custody periods that ended in reunification, did not include step-ups, and included only shelter placements

Of the 101,163 custody periods that ended in reunification, did not include step-ups, and included only shelter placements, the average time to reunification was 52.9 days, the median time to reunification was 40 days, and the maximum time to reunification was 738 days.

### Custody periods that ended in reunification, did not include step-ups, and included a stint at a therapeutic group home

Of the 8 custody periods that ended in reunification, did not include step-ups, and included a stint at a therapeutic group home, the average time to reunification was 184.6 days, the median time to reunification was 168.5 days, and the maximum time to reunification was 353 days.

### Custody periods that ended in reunification, included step-ups, and included a stint at a staff secure facility

Of the 354 custody periods that ended in reunification, included step-ups, and included a stint at a staff secure facility, the average time to reunification was 176.5 days, the median time to reunification was 157 days, and the maximum time to reunification was 611 days.

### Custody periods that ended in reunification, included step-ups, and included a stint at a secure facility

Of the 106 custody periods that ended in reunification, included step-ups, and included a stint at a secure facility, the average time to reunification was 185.9 days, the median time to reunification was 173.5 days, and the maximum time to reunification was 498 days.

### Custody periods that ended in reunification, included step-ups, and included a stint at a residential treatment center

Of the 73 custody periods that ended in reunification, included step-ups, and included a stint at a residential treatment center, the average time to reunification was 236.3 days, the median time to reunification was 211 days, and the maximum time to reunification was 551 days.

### Custody periods that ended in reunification, included step-ups, and included a stint at a therapeutic staff secure facility

Of the 12 custody periods that ended in reunification, included step-ups, and included a stint at a therapeutic staff secure facility, the average time to reunification was 246.3 days, the median time to reunification was 256.5 days, and the maximum time to reunification was 451 days.

*Custody periods that ended in reunification, included step-ups, and included a stint at an out-of-network facility*

Of the 4 custody periods that ended in reunification, included step-ups, and included a stint at an out-of-network facility, the average time to reunification was 327.2 days, the median time to reunification was 378 days, and the maximum time to reunification was 422 days.

Figure 4 below illustrates the average days to reunification for each placement type using the data described above and in Table 3.



*Figure 4. Average days to reunification, by placement type.*

# Exhibit 58

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 58**
**Page 1408**

1    I, ▓▓▓▓▓▓▓▓▓▓▓▓    declare as follows:

2

3    1.    This declaration is based on my personal knowledge. If called to testify in this

4    case, I would testify competently about these facts.

5    2.    I am 16 years old. I came by myself to the United States from Honduras on April

6    19, 2017. I was fleeing violence and hoped I would live a better life with my cousin here.

7    I have been detained at three different ORR facilities. I am currently detained at

8    Northern Virginia Juvenile Detention Center (NoVA) in Alexandria, Virginia.

9    3.    When I first arrived at the border, I was taken to a Southwest Key shelter in

10   Phoenix, Arizona, where I stayed for approximately two days.

11   4.    One morning at 4:00am, officials came and took me from the shelter and

12   transferred me to Yolo County Juvenile Detention Center (Yolo) in California. I didn't

13   know why the staff was forcing me to leave the shelter; I hadn't caused any trouble when

14   I was there. No one told me where I was going or why. The staff just told me to pick up

15   my things and go. At first, I thought I was going to see my family because they didn't

16   tell me what was happening or where I was going, but they just took me to Yolo instead.

17   I asked the staff why I had been transferred. I wanted to challenge the transfer and tell

18   the staff that I didn't want to be at Yolo, but I was not given any prior notice of the

19   transfer or any opportunity to challenge the transfer. I still don't know why I was

20   transferred to Yolo.

21   5.    While at Yolo, I did not receive a thirty-day review of the status of my detention. I

22   was not provided a written or oral explanation of why I continued to be detained there. I

23   was never told whether I had the right to challenge my detention.

24   6.    Being detained at Yolo was a physically and emotionally devastating experience

25   that I still think about. I was subjected to physical abuse from staff on countless

26   occasions. The staff hurt me so many times, I can't even remember the details of every

27   incident. The staff were really rough with me. They would throw me on the ground, and

28   my body would be bruised afterward. On five different occasions, the staff shackled my

1

Exhibit 58
Page 1409
Lucas R._Experts_11626

Plaintiff's Confidential
Personal Information/Confidential

1   arms behind my back for thirty minutes each time.  It was very painful.  One time, an
2   officer sprayed me with pepper spray from three feet away, and I couldn't see for a long
3   time.  Everything was white.  When I went to the nurse, the nurse refused to help me.
4   The nurse did not even give me water to wash the spray out of my eyes.  I tried to use a
5   little bit of water from the sink in my bedroom, but there wasn't enough water to wash
6   my eyes out.  The pain lasted for about forty minutes.

7   7.      After being detained at Yolo for six or seven months, I was transferred to NoVA in
8   November 2017.  I was told that I was being transferred because I had been behaving
9   well, and I would be able to go outside at NoVA.  Like my transfer from shelter to Yolo,
10  when I was transferred to NoVA, I was not given prior notice of the transfer or any
11  opportunity to challenge the transfer.  The staff me that I continue to be detained here
12  because of my behavior.  I was never told whether I had the right to challenge my
13  detention.

14  8.      At NoVA, I have been in constant fear of my life.  I have been subjected to
15  physical abuse from staff and other youth at NoVA.  I have received death threats from
16  other youth.  For example, some of the other youth have threatened to hurt me if I refuse
17  to join them in harassing or harming other youth.  I have told the staff about these threats
18  and have requested the staff to stay near me, but the staff have not done enough to protect
19  me.  On one occasion, a staff member physically assaulted me and hurt my shoulder and
20  thumb.  The staff scream at me and try to provoke me so that I will get in trouble.

21  9.      I have also seen staff members harm other youth.  One time, a staff member
22  punched a youth with a mental disability in the eye in an attempt to control the youth.
23  Afterward, the staff member wrestled the youth to the floor.  If I had been in that youth's
24  shoes, I would not have wanted to have been treated that way.  I don't think staff should
25  treat youth with mental disabilities that way.  I also know that a number of other youth
26  bully a youth with mental disabilities.  They hit him often, and the staff refuse to move
27  him to another unit away from the youth who bully him.  I don't like that the bullies hurt
28  him.  I'm afraid I could be bullied and physically assaulted too.

2

Exhibit 58
Page 1410
Lucas R._Experts_11627

Plaintiff's Confidential
Personal Information/Confidential

10. In November 2017, my cousin has applied to be my sponsor so that I can live with him. He is like a father to me and we speak regularly. He usually visits me at NoVA every two weeks. My mom, who lives in Honduras, wants my cousin to be my sponsor. My cousin has done everything the government has asked of him, including providing fingerprints and receiving a positive home study report. The home study occurred several months later than it was supposed to. The government and staff have not communicated clearly about the reunification process. I don't know whether my cousin knows what's going on with the process. The reunification process is taking too long. I feel like the government has delayed my release for no legitimate reason.

11. At Yolo, I took an antidepressant, which I was told would help control my depression and anger. At NoVA, I continue to take that antidepressant in addition to two medications that are supposed to help me concentrate in class. I don't want to take any more medications because they don't help me. I have told the staff that I want to stop taking the medications, but they tell me I can't stop taking them. They tell me that if I stop taking the medications, they will write a bad report about me. As far as I know, the staff did not ask my cousin for permission to give me the medications.

12. I try hard to be on my best behavior and avoid trouble. When I am released from detention, I plan to get a good education and live with my cousin.

13. I really want to live with my cousin. I know I would feel happier and safer if I were living with him.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 6th day of June, 2018, at _____Alexandria_____, Virginia.

3

Exhibit 58
Page 1411
Lucas R._Experts_11628

Plaintiff's Confidential
Personal Information/Confidential

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CERTIFICATE OF TRANSLATION

I, MARIA IGNACIA KLOPF , hereby certify that I am proficient in both Spanish and English, and that I accurately translated the foregoing statement and read it back to ████████████ in its entirety in Spanish on June 6, 2018 .

Maria Ignacia Klopf

Maria Klopf

4

Exhibit 58
Page 1412
Lucas R._Experts_11629

Plaintiff's Confidential
Personal Information/Confidential

# Exhibit 59

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Exhibit 59
Page 1413

1  I, ████████████████████  declare as follows:

2

3  1.      This declaration is based on my personal knowledge. If called to testify in this
4  case, I would testify competently about these facts.

5  2.      I am 14 years old. I came to the United States from Honduras in August 2017 with
6  my mom. When I arrived at the border, I was taken to a Southwest Key shelter in
7  Arizona, where I was detained for four months.

8  3.      I took three medications per day when I was at the shelter. I think they were all
9  supposed to help with anxiety. I told the staff that I didn't want to take them because
10  they made me tired, dizzy, and nauseous, and I gained weight when I took them. The
11  staff just said that I had to take them because it was for my own good. I was scared. I
12  felt like I had to keep taking the medication to help my case.

13  4.      Then, one morning around 5:00am, I was transferred to Shiloh. I didn't know I
14  was leaving the shelter until the day before the transfer. The staff told me that they were
15  taking me somewhere else, but I didn't know where. I was sad when they told me that I
16  was leaving. I told the staff that I didn't want to leave; I had friends at the shelter and
17  had gotten used to being there. The staff just told me that I had no choice and had to
18  leave.

19  5.      I take three medications per day at Shiloh. When I got here, the doctor changed
20  the prescription, but I don't know why. I would prefer not to take the medications, but if
21  I don't take them, then I won't be released. I don't feel like I'm able to refuse to take
22  them.

23  6.      I liked the shelter much more than Shiloh. At the shelter, I got to participate in
24  more activities, go outside more often, and spend time with more kids. I also liked that
25  we learned how to speak English. We don't have English classes at Shiloh.

26  7.      I want to live with my sister. She lives in Miami, Florida and applied to be my
27  sponsor. We talk once a week on the phone. We lived together in Honduras, and we
28  were really close. She moved to the United States when I was nine. She started sending

Exhibit 59
Page 1414
Lucas R._Experts_11630

Plaintiff's Confidential
Personal Information/Confidential

1   the paperwork when I was detained at the shelter.  She has done everything the

2   government has asked her to.  She just completed a home study this past Sunday, June 3,

3   2018, but I don't know how it went.  I have asked my case worker how much longer I

4   will have to wait until I can live with my sister, and my case worker tells me that

5   everything is fine with my sister's paperwork.  We have to wait for the doctor to release

6   me.  The doctor says that he will approve my release when the home study is approved.

7   Then two federal government officials have to review my file and approve my release.

8   8.      I am ready to live with my sister now.  I want to leave Shiloh.  I miss my sister and

9   know that I will be happier and healthier when I finally get to live with her.

10

11   I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

12   8th day of June, 2018, at  Manvel , Texas.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

Exhibit 59
Page 1415
Lucas R._Experts_11631

Plaintiff's Confidential
Personal Information/Confidential

1

CERTIFICATE OF TRANSLATION

2

3       I, _KARINA  MARQUEZ_, hereby certify that I am proficient in both

4  Spanish and English, and that I accurately translated the foregoing statement and read it

5  back to ███████████████ in its entirety in Spanish on _June 8, 2018_ .

6

7                                        _Keus Mm_

8                                        Karina Marquez

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25        *

26

27

28

3                                    **Exhibit 59**
                                                        **Page 1416**
Plaintiff's Confidential                                  Lucas R._Experts_11632
Personal Information/Confidential

# Exhibit 60

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 60**
**Page 1417**

I, ███████████████████████████, declare as follows:

1.     This declaration is based on my personal knowledge.  If called to testify in this case, I would testify competently about these facts.

2.     I am 17 years old.  I came to the United States from Honduras in May 2018.  When I arrived at the border, I believe I was taken to a shelter in Harlingen, Texas, where I remained for approximately 18 days.  I was then transferred to Tornillo in Texas, where I stayed for about 31 days.  From Tornillo, I was sent to Casa Franklin in El Paso, Texas, where I remained for roughly six months.  During my time at Casa Franklin, I was sent to two different psychiatric hospitals: one for two weeks and the second for two months.  From the second hospital, I was sent to MercyFirst RTC in Syosset, New York.  I stayed in the RTC program for about three months, and now I am in MercyFirst's shelter program in Syosset, New York, where I have been detained for about two months.

Transfer to Different Facilities

3.     My case manager told me that I was being moved from the shelter in Harlingen to Tornillo because the facility in Harlingen was running out of bed space.  My case manager said that my reunification process would be completed more quickly at Tornillo.

4.     At Tornillo, most of the kids there were reunited with their family members really quickly because the paperwork process was more streamlined, and the government did not require home studies for those sponsors.  For some reason, though, my reunification process did not move forward in a significant way while I was there.

5.     At Tornillo, there was a young man who was very confrontational and trying to bother me a lot.  The staff at Tornillo decided to transfer me to Casa Franklin in El Paso so I could escape the confrontation with my peer.  I felt that my peer should have left Tornillo because he was the one causing the problem.  I didn't want to leave Tornillo because I had friends there and got along with the staff well.  I also thought that I might

1

Exhibit 60
Page 1418
Lucas R._Experts_11715

Plaintiff's Confidential
Personal Information/Confidential

1  be able to be released to my family more quickly if I stayed there because so many other
2  kids were being released.
3  6.      Each time I was transferred to a new facility, I was told that I had to leave.  I was
4  not given an option to disagree with or appeal the transfer decision.
5
6  Transfer to MercyFirst RTC
7  7.      After spending roughly six months in Casa Franklin, I started becoming very
8  depressed and frustrated with how long I had already been in ORR custody.  When I was
9  at Casa Franklin, my dad had informed me that he was no longer going to be my sponsor,
10 and once I heard that, I became incredibly upset because I had really been looking
11 forward to living with him.  As a result, I was admitted to a psychiatric hospital.  My case
12 manager and counselor at Casa Franklin and the doctor at the hospital all explained that I
13 needed to go to an RTC.  I didn't know the name of the RTC.  I did not want to go to the
14 RTC, but I had no chance to appeal or disagree with the decision.
15 8.      My counselor at MercyFirst has shown me a written document explaining why I
16 continue to remain here.  My doctor has told me that I need to stay at MercyFirst until I
17 am not as anxious anymore.
18 9.      After a few months, I was allowed to be in the MercyFirst shelter program.  My
19 counselor told me that I was stepped down to the shelter program because my behavior
20 had improved.  My case manager told me that my reunification process would move
21 more quickly now that I am in the shelter.
22
23 Mental Health Services
24 10.     When I first arrived MercyFirst, I took two pills, one in the evening and one at
25 night.  I believe the pills are supposed to treat depression.  The medications make me
26 extremely tired.  Now, I just take the one pill in the morning, so I'm not as tired every
27 single day.
28

2

Exhibit 60
Page 1419
Lucas R._Experts_11716

Plaintiff's Confidential
Personal Information/Confidential

11.     If it were up to me, I would not take the pills.  I don't want to become dependent
on medicine.  I know I may need some help, but I would prefer to get help through some
means other than medication first.

12.     When I was in the RTC program, I met with the psychiatrist every two weeks.  The
psychiatrist had initially predicted that I would need to be in the RTC program for three
to six months; I felt like that was a really long amount of time, and that made me feel
even more anxious.

13.     When I feel really upset, and I feel like I might want to hurt myself, the staff do not
help me.  It would be helpful if I could talk with someone when I feel this way, but there
is no communication with anyone.  I don't feel like I'm able to talk with anyone or get
the help that I need.

14.     I am so desperate to leave this place.  I want to leave and live my family.  This
place is terrible; there are consequences for everything we do.

Access to Counsel

15.     I do not recall receiving a list of free attorneys at any of the shelters, but I know
that I did not receive the list at MercyFirst.

Lack of Private Phone Calls

16.     When I speak to my family on the phone, I am not in a private room.  There is no
door to the room, so staff or my peers can hear my conversations.  I would prefer to make
phone calls in a private room with a door so no one else can listen to my conversations.  I
am allowed to make two phone calls per week.  Each phone call is about 10-15 minutes
long.

Sponsorship Process

17.     I have had multiple sponsor since I arrived in the United States.

3

Exhibit 60
Page 1420
Lucas R._Experts_11717

Plaintiff's Confidential
Personal Information/Confidential

18.     First, my aunt began the process.  While I was at Tornillo, my aunt traveled to the
Dominican Republic, and her trip slowed down the reunification process.  My case
manager told me that the government was waiting to receive my aunt's mother's birth
certificate.  By the time I arrived at Casa Franklin, my aunt was still struggling to produce
the birth certificate -- in the meantime, her fingerprints expired.

19.     My dad, who lives in San Antonio, TX, was considering serving as a sponsor.  But
on the day that my dad was scheduled to get his fingerprints taken, my dad called me at
Casa Franklin to explain that he was no longer interested in serving as my sponsor.  I was
devastated by this news and became very depressed.  Then I was transferred to the
psychiatric hospital.  Once I arrived at the hospital, the doctor there told me that my
reunification process would stop moving while I was there.  I'm not exactly sure why the
reunification process stopped, but I think it was because of certain government
procedures.

20.     After my dad withdrew as a potential sponsor, my aunt tried to move her
application forward once again.  However, she stopped the process after her husband
explained that he was afraid to submit fingerprints.

21.     Recently, my uncle told me that he is trying to apply to be my sponsor, but I do not
know much about the status of this application.  My case manager confirmed with me
that my uncle is in the process of applying.  My uncle told me that he was looking for a
new place to live because his household members did not want to submit fingerprints.  I
believe once my uncle finds his new home, the government will conduct a home study.

22.     My counselor at MercyFirst told me that the reunification process was generally
much slower, if not completely halted, when you are in the RTC program because you
are receiving treatment.  They told me that the law required that I complete my RTC and
then step back down to a shelter before I could be reunited with family.

23.     Now I have been in the shelter level for the past two months, but I have still not
been released to my family.  I am so desperate to leave.  I just want to live with my loved
ones.  I am so frustrated and wish I didn't have to wait any longer to reunite with them.  I

4

Exhibit 60
Page 1421
Lucas R._Experts_11718

Plaintiff's Confidential
Personal Information/Confidential

1 | am certain that when I am finally able to leave here, I will be traumatized from the
2 | experience I have had in detention.

3

4 | I declare under penalty of perjury that the foregoing is true and correct.  Executed on this
5 |    25th    day of September, 2019, at Syosset, New York.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

Exhibit 60
Page 1422
Lucas R._Experts_11719

Plaintiff's Confidential
Personal Information/Confidential

1                             CERTIFICATE OF TRANSLATION

2         I, Glykeria Tsiokanou , hereby certify that I am proficient in both

3 Spanish and English, and that I accurately translated the foregoing statement and read it

4 back to                    in its entirety in Spanish on September 25, 2019.

5

6

7                           Glykeria Tsiokanou

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6

Exhibit 60
Page 1423
Lucas R._Experts_11720

Plaintiff's Confidential
Personal Information/Confidential

# Exhibit 61

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Exhibit 61
Page 1424

1   I, ███████████████████████, declare as follows:

2

3   1.      This declaration is based on my personal knowledge.  If called to testify in this

4   case, I would testify competently about these facts.

5   2.      I am 17 years old.  I came to the United States from Guatemala in December 2018.

6   When I arrived at the border, I believe I was taken to the Southwest Key Brownsville

7   shelter in Texas, where I remained for approximately two months.  I am currently

8   detained at MercyFirst RTC in Syosset, New York, where I have been detained for about

9   seven months.

10

11   Transfer to MercyFirst RTC

12   3.      My clinician and case manager at Southwest Key noticed that I was cutting myself,

13   and they recommended that I be sent to a psychiatric hospital, where I stayed for about 24

14   days.  The doctor at the psychiatric hospital recommended that I come to a residential

15   treatment center and receive necessary treatment.   I don't remember seeing a written

16   document that explained why I was being transferred to the psychiatric hospital and to

17   MercyFirst.  I was not given an opportunity to disagree with or appeal the transfer.  If I

18   had refused to leave Southwest Key, I knew the staff would call the police to forcibly

19   remove me from the shelter.  I knew that this would happen because I had seen other kids

20   refuse transfers, and then the police would come and force other kids to go to the airport.

21   So I knew that I should not try to resist the transfer; I was scared that if I did, the police

22   would come for me.

23

24   Mental Health Services

25   4.      I have not noticed much of a difference between the services I received at

26   Southwest Key and those I have been receiving at MercyFirst.

27   5.      At Southwest Key, I met with my counselor once a week.  I found the counseling

28   sessions helpful because we talked about how I could improve my behavior.  My

1

Exhibit 61
Page 1425
Lucas R._Experts_11680

Plaintiff's Confidential
Personal Information/Confidential

1  counselor gave good advice on how to act in a better way.  After I met with my
2  counselor, I usually felt better.  Every 15 days, I also met with a psychiatrist at Southwest
3  Key.

4  6.      At Southwest Key, I took psychotropic medications, but I am unable to remember
5  how many different medications I took – I think I took between three and five per day.
6  The medications were supposed to help me with my depression, anxiety, and bad
7  thoughts.  The medications made me sleepy.

8  7.      Here at MercyFirst, I take psychotropic medications as well.  My doctor at
9  MercyFirst told me that I am taking the same medications that I received at Southwest
10 Key.  The medications I take here also make me very tired, especially in the morning.  If
11 I were able to decide for myself, I would not take the medications.  Once I leave ORR
12 custody, I will be working or studying, and I won't need to take the medications because
13 I won't be anxious anymore.  I am anxious *because* I am in ORR custody.

14 8.      At MercyFirst, I meet with a counselor once a week.  These sessions are very
15 similar to the counseling sessions I had in Southwest Key.  I also meet with a psychiatrist
16 every month.  My sessions with the psychiatrist at Southwest Key were very similar to
17 the sessions I have with the psychiatrist here.

18 9.      The main difference between the psychiatric sessions at the shelter compared to
19 here is I met with the psychiatrist more frequently at the shelter than I do now.  I liked
20 seeing the psychiatrist more frequently, and I preferred being at Southwest Key for that
21 reason.  The psychiatrist at MercyFirst has told me that I must remain in the RTC
22 program until I finish my treatment.  The psychiatrist says that I will have completed my
23 RTC treatment once I have been able to go an entire month without misbehaving.

24 10.     About fifteen days ago, I was punished because I was trying to take a shower and
25 one of my peers jumped the line before me and forced me to wait; so I got angry and
26 acted out.  Now I am being punished for that incident and I am forced to be in a room all
27 by myself without being allowed to participate in any activities.  I am not allowed to
28 watch the television or play video games, and I am not allowed to speak with my peers.  I

2

Exhibit 61
Page 1426
Plaintiff's Confidential
Personal Information/Confidential

Lucas R._Experts_11681

1   am not allowed to go to the cafeteria; I have to eat alone in my room.  I can only go out

2   for a walk alone, go to school and attend my counselor meetings.  I also have a hard time

3   communicating with the staff because now that I am being punished, I am mainly around

4   English-speaking staff.  The Spanish-speaking staff spend most of their time with my

5   peers.  Because I am separated from my peers, I have a hard time interacting with the

6   English-speaking staff because we don't really understand each out.  It isn't fair.  I have

7   been punished this way for the past fifteen days.  The peer who upset me and led me to

8   act out wasn't punished at all; the staff just separated us.

9   11.      Today, I am supposed to meet with my counselor, my case manager, other senior

10   program staff, and security supervisors to talk about my behavior.  During the meeting,

11   the staff will decide whether I will be allowed to return to participating in activities like I

12   used to or whether I will continue to be punished for a longer period of time.  The staff

13   told me that I might be punished like this for an additional 25 days if I don't improve my

14   behavior.  I have seen other kids punished this way as well.  For example, one of my

15   friends got in trouble for making noise and banging on the wall of his unit sometimes.

16   He was separated from the rest of us, and he was later transferred to a more secure

17   facility in Florida.

18   12.      I would feel more supported here if the staff were a bit more understanding and

19   gave me and my peers more detailed guidance about how we can improve our behavior.

20

21   <u>Access to Counsel</u>

22   13.      I do not recall receiving a list of free attorneys either at the shelter or at MercyFirst.

23

24   <u>Lack of Private Phone Calls</u>

25   14.      When I speak to my family on the phone, I am not in a private room.  There is no

26   door to the room, so staff or my peers can hear my conversations.  I would prefer to make

27   phone calls in a private room with a door so no one else can listen to my conversations.  I

28

3

**Exhibit 61**
**Page 1427**
Lucas R._Experts_11682

Plaintiff's Confidential
Personal Information/Confidential

1   am allowed to make three phone calls per week.  Each phone call is about 10-20 minutes

2   long.

3

4   <u>Sponsorship Process</u>

5   15.    My cousin in Florida applied to be my sponsor, but there were issues with the

6   process, and he was denied.  I don't know why my cousin was denied.  I don't know very

7   much about his application or what the issues were.  Before my cousin was denied, I

8   asked my case manager about the status of the application, and she said that my cousin

9   needed to complete a home study and provide the fingerprints of his household members.

10  16.    I think I would be happier and healthier if I were living with my cousin.  I have

11  known him my entire life.  We are close; I trust him and know that he would take good

12  care of me.  When he still lived in Guatemala, the two of us would work together every

13  week.  My mom wants me to live with my cousin as well, and she told my case managers

14  at Southwest Key and MercyFirst that she wants me to live with him.  She has known

15  him her whole life.  My case managers told me and my mom that they would do

16  everything they could to make sure that I could live with my cousin, but for some reason,

17  that wasn't possible.

18  17.    My case manager has talked to me about long-term foster care, and I would like to

19  apply so I can leave MercyFirst.  My case manager says that I first need to step down to

20  the shelter level before I can apply for long-term foster care.  I want to step down as soon

21  as I can because I am so tired of being here.

22

23  I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

24      25th    day of September, 2019, at Syosset, New York.

25

26

27

28

4

Exhibit 61
Page 1428
Lucas R._Experts_11683

Plaintiff's Confidential
Personal Information/Confidential

1

## CERTIFICATE OF TRANSLATION

2  I, Glykeria Tsiokanou, hereby certify that I am proficient in both

3  Spanish and English, and that I accurately translated the foregoing statement and read it

4  back to ▆▆▆▆▆▆▆▆▆ in its entirety in Spanish on September 25, 2019.

5

6

7  Glykeria Tsiokanou

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

Plaintiff's Confidential
Personal Information/Confidential

Exhibit 61
Page 1429
Lucas R._Experts_11684

# Exhibit 62

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Exhibit 62
Page 1430

I, ████████████████████████████, declare as follows:

1.      This declaration is based on my personal knowledge.  If called to testify in this case, I would testify competently about these facts.

2.      I am 13 years old. I am from El Salvador. I am currently being held in ORR custody in the Shiloh Residential Treatment Facility.

3.      I was taken into the Office of Refugee Resettlement ("ORR") custody in about August of 2017. I was held at a Southwest Key shelter in Texas for about two months.

4.      I was verbally told about my transfer to Shiloh Residential Treatment Facility approximately one day before my transfer. I was also told that I was going to a place that was better for me, but no one explained why they thought it was better. I did not receive any papers that explained why I was transferred to Shiloh. I did not want to leave the Southwest Key shelter, but I was told that the government had already made a decision. I don't remember receiving any document that explained that I had the right to challenge the government's decision to send me to Shiloh. If I had, I would have challenged the decision.

5.      I have spent approximately one month and half at the Shiloh Residential Treatment Center. During this time, I have not been told about, and I have not received a 30-day review.

6.      In the three months I have been living in the U.S., I have not had a court hearing. No one has told me who my attorney is or when I will be going to court.

7.      I take pills every morning and night. I take four pills in the morning and about four to six pills in the evening. I don't know what all the pills are for, but I think the ones I take at night are for depression and anxiety.  When I have asked about the additional medication, I have been told that the pills are vitamins. I am also told that the pills are recommended by my doctor. As far as I know, ORR did not ask my mother for permission before they gave me the medication.

1

Exhibit 62
Page 1431
Lucas R._Experts_11613

Plaintiff's Confidential
Personal Information/Confidential

8.     I do not want to take the pills because I don't think they help me and they make me sleepy. I have not refused taking the pills because I was told that the doctor will see that I refused the medication and that would make my stay at Shiloh longer because it would make it harder for the doctor to release me.

9.     I don't feel safe here because the staff are mainly men and because sometimes the staff scream at me.  I feel afraid all the time.  My father was abusive and I was bullied a lot by other boys in the past, so it is hard for me to be around men all day long.  I have asked to spend less time around men, but I have been told that it is not possible.

10.    My worst experience at Shiloh Residential Treatment Center occurred at the end of October 2017. I gathered things inside a bag and I tried to escape from the center. The Shiloh staff stopped me before I could escape. They told me to not try to escape because if I did, I would be sent to jail. The Shiloh staff then told me to go to my room. They called a supervisor. The staff pulled my arms behind my back. Eventually I was taken to my room. Once inside my room I tried to open the window. The supervisor saw me do this, and in response, he violently threw me against the door. I felt faint. At some point the supervisor placed me against the wall, but the top of my head touched the wall, so from my head to my back, my body was in a backwards C-shape. The supervisor pushed me against the wall with all of his weight and this caused my neck to compress. This made me feel like I was choking and it was hard for me to breathe. I told the supervisor to stop because I couldn't breathe. All I could hear the supervisor say was "No stop." I don't remember for how long I was held in this painful position, but it was a long time. I briefly fainted. As I recovered consciousness a staff person violently threw me on my bed and this caused my head to bang against the wall. I did not receive medical attention to my head. The doctor checked for fractures in my arms but I did not have fractures. I had purple bruises on my arms.

11.    After the doctor came, the supervisor told me I was going to get a medication injection to calm me down. Before they gave me the injection, I was feeling dizzy and was still having a hard time breathing.  I was in a lot of pain with bruises all over, and I

2

**Exhibit 62**
**Page 1432**
Lucas R._Experts_11614

Plaintiff's Confidential
Personal Information/Confidential

1  did not want the injection. Two staff grabbed me, and the doctor gave me the injection

2  despite my objection and left me there on the bed.

3  12.     I miss my mother, and I really want to be reunited with her.  My mother lives in

4  Los Angeles, and is in the process of trying to reunify with me.  My sister and my niece

5  were reunited with my mother recently, and I want to be with them, too.  I think my

6  mother is doing a home study.  I want to be sent to a shelter in California so that I can be

7  closer to her. I hope to soon reunify with her, but I have not been told how long it will

8  take. I haven't seen her in three months, and it is very hard for me not to know when I

9  will be able to see her again.

10

11  I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

12  30th day of November, 2017, at Manvel, Texas.

13  

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

Plaintiff's Confidential
Personal Information/Confidential

Exhibit 62
Page 1433
Lucas R._Experts_11615

CERTIFICATE OF TRANSLATION

I certify that I am fluent in the Spanish and English languages and that I truthfully and accurately translated the above declaration from English to Spanish from ███████ ████████████████, before he signed the declaration.

Dated: November 30, 2017

*Maria Martinez Campos*

Maria Jose Martinez Campos

4

Plaintiff's Confidential
Personal Information/Confidential

**Exhibit 62**
**Page 1434**
Lucas R._Experts_11616

# Exhibit 63

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 63**
**Page 1435**

I, ████████████████████████████, declare as follows:

1.    This declaration is based on my personal knowledge.  If called to testify in this case, I would testify competently about these facts.

2.    I am 16 years old. I am from Mexico. I came to the United States when I was twelve or thirteen years old with my father.  He was detained when we arrived and I was sent to BCFS.  I am currently being held in ORR custody in the Shiloh Residential Treatment Facility.

3.    I am not sure, but I think I came to Shiloh Residential Treatment Facility in June 2017. They told me I had to come here because I had tried to hurt myself.

4.    I think I have spent approximately five months at the Shiloh Residential Treatment Center.

5.    At Shiloh I have to take pills in the morning, afternoon, and night.  I take 4 or 5 pills in the morning, 1 pill in afternoon, and 1 pill at night. In the morning, one of the pills is for anxiety. I don't know what the other pills are for.  I don't like taking the medicine because it makes me sleepy and dizzy.  But, if I don't take the pills, they will give me a report and I will have to stay at Shiloh longer.  I do not know if they have talked to anyone in my family about the medications.

6.    Sometimes they give me forced injections. The last time was a few weeks ago.  I have been given injections many times.  When I get upset, one or two staff hold my arms and the nurse gives me an injection.  I think the injection has trazedone and Benadryl, but I am not sure. The injection makes me tired.

7.    They told me that if I am good, I can have a phone call with my family.  I haven't talked to my family in a long time.  I really want to talk to them.

1

Exhibit 63
Page 1436
Lucas R._Experts_11623

Plaintiff's Confidential
Personal Information/Confidential

8.      I miss my Dad and want to live with him.  He lives in Arkansas. I think my grandmother is in Texas.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 1st day of December, 2017, at Manvel, Texas.



Plaintiff's Confidential
Personal Information/Confidential

Exhibit 63
Page 1437
Lucas R._Experts_11624

1  CERTIFICATE OF TRANSLATION

2      I certify that I am fluent in the Spanish and English languages and that I truthfully

3  and accurately translated the above declaration from English to Spanish.

4

5  Dated: December 1, 2017

6

7  _____

8                    Karina Marquez

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

Exhibit 63
Page 1438
Lucas R._Experts_11625

Plaintiff's Confidential
Personal Information/Confidential

# Exhibit 64

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 64**

**Page 1439**

1  I, ███████████████████████████  declare as follows:

2

3  1.      This declaration is based on my personal knowledge.  If called to testify in this
4  case, I would testify competently about these facts.

5  2.      I am 14 years old.  I came to the United States from Honduras.  First, I was placed
6  in Southwest Key Kokopelli in Phoenix, Arizona.  I am currently detained at Children's
7  Village staff secure in Dobbs Ferry, New York.

8

9  Transfer from Kokopelli to Children's Village

10  3.      One day, the staff told me that I would be leaving Kokopelli and going to a
11  different facility.  I didn't know the name or location of the facility, and I didn't know
12  whether the facility was a shelter or a more secure facility.  I was transferred to
13  Children's Village the day after I was told that I would be leaving.

14  4.      I was not provided any written explanation explaining why I was being transferred,
15  but my case manager from Kokopelli told me that I was going to Children's Village
16  because of the language that I had used while at Kokopelli.

17  5.      I didn't want to leave Kokopelli, but I was not given the opportunity to disagree
18  with or appeal the transfer decision.  I just had to leave right away.

19

20  Discipline at Children's Village

21  6.      When I arrived at Children's Village, a staff member explained that there were
22  different behavior levels that corresponded to different colors.  The first two weeks of my
23  arrival, I was automatically placed in the worst behavior level, which is red.  In the red
24  level, I was not allowed to go outside or go to the activity center; buy items at the store;
25  and I had to stay in my room for long periods of time.  I've also been placed on
26  restriction, which lasts for seven days in a row.  Restriction was awful.  I wasn't allowed
27  to leave my room all day.  I had to eat in my room, and I couldn't talk to any of my peers.
28  I feel like I've been treated unfairly here.

1

**Exhibit 64**
**Page 1440**
Lucas R._Experts_11749

Plaintiff's Confidential
Personal Information/Confidential

7.    The staff make you prove that you can behave well before they decide whether to move you to the middle level, which is yellow.  I was then required to spend two weeks in the yellow level before the staff lowered me to the best level: green.

Sponsorship Process

8.    I wanted to live with my stepdad, who lives in Florida.  He wanted me to live with him, as well, as did my mom, who is in Honduras, but his sponsor application was denied.  My case manager told me that my stepdad was automatically unqualified because I haven't met him in person.  He and I have spoken to each other on a roughly weekly basis over the past few years, but that didn't matter; he was not allowed to move forward with the application process.

9.    My uncle is now trying to have me live with him in Florida.  He and I are very close.  I've known him my entire life; we used to spend time together when he lived in Honduras.  Everyone in my family, including my parents, wants me to live with my uncle.

10.    I'm not sure what the status of my uncle's application process is.  My case manager has told me some details about the process, but I don't really understand what needs to happen.

Phone Calls

11.    I am allowed to make two phone calls per week.  Each phone call is about 20 minutes long.  When I speak to my family on the phone, I am not in a private room.  There is no door to the room, so staff or my peers can hear my conversations.  I would prefer to make phone calls in a private room with a door so no one else can listen to my conversations.

2

Plaintiff's Confidential
Personal Information/Confidential

**Exhibit 64**
**Page 1441**
Lucas R._Experts_11750

<u>Access to Counsel</u>

12.     I do not recall receiving a list of free attorneys either at the shelter or at Children's Village.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this ___27th___ day of September, 2019, at Dobbs Ferry, New York.

3

Exhibit 64
Page 1442
Lucas R._Experts_11751

Plaintiff's Confidential
Personal Information/Confidential

1

## CERTIFICATE OF TRANSLATION

2     I, Katy Alvarado Hernandez, hereby certify that I am proficient in both

3     Spanish and English, and that I accurately translated the foregoing statement and read it

4     back to ████████████████ in its entirety in Spanish on September 27, 2019.

5

6

7                                   Katy Alvarado Hernandez

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

Exhibit 64
Page 1443
Plaintiff's Confidential
Personal Information/Confidential
Lucas R._Experts_11752

# Exhibit 65

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 65**
**Page 1444**

1          DECLARATION OF ███████████████████████

2

3    I, ████████████████████████, declare as follows:

4

5    1.    This declaration is based on my personal knowledge.  If called to testify in this

6    case, I would testify competently about these facts.

7    2.    I am 17 years old.  I came to the United States from Guatemala about 11 months

8    ago.  When I arrived at the border, I was taken to Southwest Key in Brownsville, Texas,

9    where I was detained for six months. I then was taken to another smaller Southwest Key

10    program, where I lived for two weeks, and then I was transferred to Mercy First.

11    3.    I am currently detained Mercy First in Syosset, NY, and I have been here for five

12    months.

13    <u>Transfer to Mercy First</u>

14    4.    When I was at the shelter in Texas, I struggled with depression. I was cutting

15    myself on my arms and having thoughts of trying to kill myself. The shelter staff at

16    Southwest Key told me that I was going to be moved to somewhere else that would help

17    me. I was told that I was going to be transferred a few days before I was actually moved,

18    but I did not receive anything in writing about why I was being transferred and no one

19    told me that I could appeal the transfer decision. They said that I had to be transferred – it

20    wasn't a choice.

21    5.    Since being transferred to Mercy First, I have been hospitalized seven times for

22    different things. I haven't cut myself for three months. The staff here told me that if I cut

23    myself then I would have to go to the hospital, so I stopped cutting myself. The staff says

24    that I have to follow the rules in order to leave Mercy First RTC.

25    6.    I have never had a thirty-day review to review my custody classification since I

26    have been here. No one has formally sat down with me and reviewed whether I should be

27    stepped down to a lower level of security.

28

1

**Exhibit 65**
**Page 1445**
Lucas R._Experts_11666

Plaintiff's Confidential
Personal Information/Confidential

7.      I have known since I was eight years old that I am not male, but I couldn't tell
anyone in my village in Guatemala about it. I never saw any transgender people so I
didn't really know what it meant to be transgender. After I came to the United States, I
told my family that I am really a woman and not a man. After I told them this, they said
that I was no longer part of the family.

8.      After I came to the United States I started my change my voice and my clothes to
be more feminine. Mercy First doesn't have placement for girls, so I am forced to live
with boys. I feel uncomfortable all the time here. The staff make me wear clothes that
doesn't match my gender identity. I have asked for a wig, but they won't give me a wig
to wear. Once I tried to wear women's shoes, but I got into trouble for it. I would like to
wear tights, but staff say that I cannot wear tights even though I have seen other girls
wearing them.

9.      When I started wearing fake breasts, the staff were really mean to me. They made
fun of me and told me that I should go live with girls. One day, when a staff member
made fun of my breasts, I felt so upset that I ended up hitting the staff member. After
that, I spent two weeks in the hospital and then they placed me on "black" security level.
I have to be stepped down to green before I can be placed back in shelter.

10.     The other boys here bully me all the time. Once I explained to them that I am a
woman and not a man, they started to harass me. They grope my breasts, touch me
inappropriately, and one of them even exposed his genitalia to me. The staff has
separated me from the other boys because it wasn't safe to be around them. Now I'm not
allowed to participate in activities and I feel so alone. I don't have any friends and I don't
have anyone that I can talk to. I feel discriminated against because of my gender identity.

11.     This program doesn't have any support for me. There is nothing for me to do with
my mind, I feel shut in all the time. One time, a staff member told me that I could go on a
trip, but then later told me the trip was cancelled. I felt that the staff member had lied to
me and got really upset and scratched the staff member on the neck. Staff then held me

2

Exhibit 65
Page 1446
Lucas R._Experts_11667

Plaintiff's Confidential
Personal Information/Confidential

down for twenty minutes until the police arrived and they filed criminal charges against me.

12.    It has been really hard here, but what scares me the most is that if I am forced to return to Guatemala, I cannot be myself because I cannot be a woman there. My father would hit me if I dressed like a woman.

<u>Sponsorship Process</u>

13.    My family is not supportive of my gender identity, and so I do not currently have anyone that is applying to be my sponsor.

14.    My case manager has talked to me about foster care placement, but I don't know how long it will take for me to be released.

15.    When I was in Texas, the staff told me that I would be released to foster care in a month, but that didn't happen. I am really upset and frustrated because I feel that no one is telling me the truth. A month ago, I signed some papers to get the foster family process started, but nothing has changed.

<u>Psychotropic Medications</u>

16.    When I lived in Guatemala, I did not take any medications. When I was in the shelter in Texas, I was prescribed medication but I don't know what it was called.

17.    Here at Mercy First, I take three or four medications every day. I don't know all their names, but I know that one is Zoloft. One medication is for anxiety, one is for depression, one is for bad dreams, and I don't know what the other one is for.

18.    One time, I told the staff that I felt fine and that I didn't want to take the medications any longer. Four days later, when I was still not taking my medications, the staff sent me to the hospital. When I asked why I was being sent to the hospital, the staff told me that it was because I refused to take my medication. They said that medication is part of my treatment and that I need to follow the rules in my treatment plan. If I told the doctor I didn't want to take the medications any longer, they would send me to the hospital and make them take them.

3

Exhibit 65
Page 1447
Lucas R._Experts_11668

Plaintiff's Confidential
Personal Information/Confidential

19.     I feel that the medications make me feel worse. Once, I asked the staff if I could stop taking the medication for a week or a month to see how it would feel, but they said that I couldn't.

20.     As far as I know, my parents and family members have not given permission for me to take the medication. As far as I know, ORR did not go to a judge or court to obtain permission to prescribe the medication.

21.     As far as I know, I have never been given an official mental health diagnosis.

Counsel

22.     I have never received a list of free lawyers that I could call for help.

23.     I had an attorney when I was in the shelter in Texas. I have been told that I have an attorney here, but I have never met them. I would like to contact them for help, but I don't know how. I really need help from someone who will help me to get out of here.

Other

24.     I have always wanted to be a police officer. I want to be a police officer because I want to defend and protect people who are harassed by other people. I want to make sure children's parents aren't hurting them.

25.     I want to leave Mercy First because I think I will be much happier in another placement that supports my gender identity.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 23rd day of October, 2018, at Syosset, New York.



4

Exhibit 65
Page 1448
Lucas R._Experts_11669

Plaintiff's Confidential
Personal Information/Confidential

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF TRANSLATION

I, Paula Garcia-Salazar, hereby certify that I am proficient in both Spanish and English, and that I accurately translated the foregoing statement and read it back to ███████████████████ in its entirety in Spanish on   10/24/18   .

_____
Paula Garcia-Salazar

5

Plaintiff's Confidential
Personal Information/Confidential

Exhibit 65
Page 1449
Lucas R._Experts_11670

# Exhibit 66

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Exhibit 66
Page 1450

DECLARATION OF ██████████████████████████

I, ██████████████████████, declare as follows:

1.     This declaration is based on my personal knowledge.  If called to testify in this case, I would testify competently about these facts.

2.     I am 15 years old.  I came to the United States from Honduras about six months ago. I left Honduras because it was very unsafe there. When I was eleven I left home and went to live with my uncle. I felt very alone and had to take care of myself. There were a lot of gangs in my area and it was hard to defend myself. I knew that if I stayed in Honduras, I would die, so I decided to come to the United States. I walked with a caravan of people; it was a difficult journey and at times I was very cold and hungry, but we supported and protected each other.

3.     When I arrived at the border, I was taken to a Southwest Key shelter in Phoenix, Arizona. I was then sent to another Southwest Key shelter.

4.     I am currently detained Mercy First in Syosset, NY, and I have been here for almost two months.

Transfer to Mercy First

5.     I liked the Southwest key shelters in Arizona; there were always a lot of daily activities planned and I was able to learn English. Sometimes there were talent shows where everyone could share their talents. Sometimes I felt depressed, but I behaved myself and participated in all of the shelter programs.

6.     One day, I told another girl at the Southwest Key shelter that I wanted to cut myself and she told the staff. The staff then sent me to the hospital, where I told them that I felt fine and I was allowed to return to the shelter. About a month after I got back from the hospital, my case manager told me that I was going to be sent to Mercy First. She said that I had to be transferred out of the shelter because of my depression. I was very confused because I had felt fine for the past month and I hadn't expressed wanting to cut

1

Plaintiff's Confidential
Personal Information/Confidential

**Exhibit 66**
**Page 1451**
Lucas R._Experts_11671

1  myself or feeling depressed. On the same day that I was told that I was going to be
2  transferred, I was moved from the facility at 2:00 pm.

3  7.      I did not receive anything in writing about why I was being transferred and no one
4  told me that I could appeal the transfer decision.

5  8.      I don't like being at Mercy First. There aren't enough staff here to properly
6  supervise the children – one day, there were only two staff members to twelve kids and
7  there were fights. One day, right after I had my wisdom teeth removed, another kid hit
8  me in the face and it was really painful. There aren't enough activities to do here and we
9  get bored. I have only been to church once since I have been here. This makes me really
10  upset because I am Evangelical, I take my religion seriously, and I like going to church.

11  9.      I don't feel that I need to be in this level of care. I am hopeful that I will be stepped
12  down to shelter level next month because I have been well behaved. I was told that if I
13  behaved well, I would be stepped down to a shelter. My case manager has told me that
14  being placed in an RTC is not the appropriate level of care for me any longer, and that I
15  should be stepped down to shelter. I am disappointed because I was told that being
16  transferred here was supposed to help me, but I actually feel much worse.

17  10.     I have never had a thirty-day review to review my custody classification since I
18  have been here. No one has formally sat down with me and reviewed whether I should be
19  stepped down to a lower level of security. Any time that I have talked to a staff member
20  about being stepped down, I have initiated the conversation. I have to find my counselor
21  or case manager and ask them what is going on with my case and when I can be stepped
22  down.

23  11.     When I was in Arizona, I met with my counselor twice a week and my case
24  manager twice a week. It makes me frustrated and mad that now I don't have as much
25  support here at Mercy First.

26  Sponsorship Process

27  12.     I want my cousin to be my sponsor. Her name is ███████████
28  and she lives in North Carolina. She is the only person that I want to be released to,

2

**Exhibit 66**
**Page 1452**
Lucas R._Experts_11672

Plaintiff's Confidential
Personal Information/Confidential

1  because she has always helped me with everything and I know that she would take good
2  care of me.

3  13.     My cousin started the process to be my sponsor immediately after I arrived in the
4  United States. She has submitted all of her paperwork, her fingerprints, and has received
5  a positive home study recommendation. She has done everything that she needs to do in
6  order to be my sponsor. My cousin is a legal permanent resident.

7  14.     I have been told that the only reason that I haven't been released yet is because I do
8  not have a back-up sponsor. When I was in Arizona, at first my case manager didn't say
9  anything about needing a back-up sponsor. But then, about a month after I arrived, the
10  case manager said that I needed a back-up sponsor in order to be released.

11  15.     My cousin has been trying to find a back-up sponsor to submit their fingerprints,
12  but she has not been able to find anyone that is willing to be my back-up sponsor. She has
13  been looking for a back-up sponsor for two months.

14  16.     The delay in my case makes me feel very desperate, anxious, and worried. I am
15  worried that if my cousin is unable to sponsor me, then I will be released to a foster
16  family that I don't know. I know my cousin and I know that she would be a great
17  caregiver for me.

18  <u>Psychotropic Medications</u>

19  17.     I was first given medication when I was at the Southwest Key Shelter in Arizona. I
20  don't know what the medication was for, but it made me feel very sleepy and very
21  hungry.

22  18.     Here at Mercy First, I take one medication every day.  I don't know the name of
23  the medication, but I know that it is for depression.

24  19.     I do not want to take the medications. I take the pills because I know I have to take
25  them, not because I want to take them. If I refused to take the medication, the staff would
26  give me a "report," or a penalty, and I would get into trouble.

27  20.     There were three days that I didn't take the medication, and I felt normal. I'm not
28  sure why they didn't give me the medication for three days, but I felt fine without it.

3

**Exhibit 66**
**Page 1453**
Lucas R._Experts_11673

Plaintiff's Confidential
Personal Information/Confidential

21.    As far as I know, my family has not given permission for me to take the
medication. As far as I know, ORR did not go to a judge or court to obtain permission to
prescribe the medication.

<u>Counsel</u>

22.    I have never received a list of free lawyers that I could call for help.

23.    When I was in Arizona, someone from the Florence Project was helping me with
my case, but then I was transferred here.

24.    Now, I think I have an attorney from Catholic Charities but I don't know their
name. I think I'm supposed to have a *Flores* bond hearing this Friday but I'm not sure. I
think my attorney is helping me apply for asylum and SIJS. My attorney is not helping
me reunify with my cousin.

25.    I would like to be a deejay or a radio host when I grow up. I absolutely love music.
I like all kinds of music, but I mostly like slow, old-fashioned romantic songs. I play the
piano and the drums, but the thing I love best is to sing. When I sing, I am happy. I also
like to write my own songs, because when my mind is occupied, I don't feel as worried
about my case. I think music is good therapy for me.

26.    I am ready to live with my cousin right now. I know that I would be happier and
healthier if I lived with her.


I declare under penalty of perjury that the foregoing is true and correct.  Executed on this
23rd day of October, 2018, at Syosset, New York.

4

Plaintiff's Confidential
Personal Information/Confidential

Exhibit 66
Page 1454
Lucas R._Experts_11674

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF TRANSLATION

I, Paula Garcia-Salazar, hereby certify that I am proficient in both Spanish and English, and that I accurately translated the foregoing statement and read it back to ████████████████████ in its entirety in Spanish on 10/24/18 .

_____

Paula Garcia-Salazar

5

Exhibit 66
Page 1455
Lucas R._Experts_11675

Plaintiff's Confidential
Personal Information/Confidential

# Exhibit 67

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 67**
**Page 1456**

1    I, ███████████████████, declare as follows:

2

3    1.      This declaration is based on my personal knowledge.  If called to testify in this

4    case, I would testify competently about these facts.

5    2.      I am 16 years old.  I am from Honduras.  I am currently being held in ORR custody

6    detained at the Shiloh Residential Treatment Center.  I have been here for about two

7    months.  Shiloh is a locked facility with 24-hour surveillance and monitoring.  The

8    children are detained here and no one is free to leave.

9    3.      My mom lives in Houston and comes to see me when she can, but she has to

10   complete a lot of requirements before I can live with her.  I talk to my mom about two

11   times a week.  They have already checked my mom's house and she passed the home

12   study.  I was told that my case is finished and once the doctor says I'm ready, I can be

13   released.  The doctor has said I can't leave until I can control myself.  He hasn't told me a

14   time frame for how long it will be before I'm ready.

15   4.      I was taken into immigration custody in Texas about six months ago in May 2017.

16   5.      My dad was assassinated with 16 gunshots in front of me at age 5.  I was also

17   raped when I was 5.  It was so traumatic that since that time I suffer from extreme

18   anxiety. I also have epilepsy and asthma.

19   6.      I still dream though. I one day I dream of being a pilot and flying. I don't want to

20   fail my mom. I know that one day I will realize my dreams.

21   7.      I was first detained in Southwest Key, a shelter facility.  I suffered an anxiety attack

22   there and was sent to this psychiatric facility called the "Shiloh."  My heart beats very

23   fast and hands sweat when I have an anxiety attack.  I think the anxiety would be better if

24   I was with my mother.

25   8.      I don't remember ever being told or reading that I could appeal or challenge the

26   government's decision to put me into this treatment facility, or that I could go to court

27   about it.

28

---

1

**Exhibit 67**
**Page 1457**
Lucas R._Experts_11757

Plaintiff's Confidential
Personal Information/Confidential

9.     I have never had a thirty-day review while I've been at Shiloh to review my custody classification since I have been here.  No one has formally sat down with me and reviewed whether I should be stepped down to a lower level of security or told me how I'm doing here or what I have to do in order to step down.

10.     I was supposed to have a court date on November 8th but it was cancelled.

11.     A lawyer named "Juana" comes to our facility once a month, but not sure what the progress is on my immigration case or my release. I really want a lawyer who can help me.

12.     At Shiloh, I am given seven pills every day. In the morning, I take 4 pills and then 3 in the evening. The medicine is supposed to help with epilepsy and anxiety.  The doctor has changed my pills a couple of times.  The medicine makes me feel dizzy and sometimes makes it hard to concentrate. I have no appetite.

13.     I talk to a therapist two times a week.

14.     I have seen another youth get an injection that he didn't want. A staff member had to grab him first and then give him the injection.

15.     I don't like to be around other kids because of my anxiety.  I smile with a fake smile so everyone thinks I'm ok.

16.     Sometimes I have no desire to do anything. I try and keep a diary of my days.

17.     I just want to be with my mother.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 1st day of December, 2017, at Manvel, Texas.

CERTIFICATE OF TRANSLATION

2

**Exhibit 67**
**Page 1458**

Plaintiff's Confidential
Personal Information/Confidential

Lucas R._Experts_11758

1  My name is Karina Marquez and I swear that I am fluent in both the English and Spanish
2  languages and I translated the foregoing declaration from English to Spanish to the best
3  of my abilities.

4

5  Dated: December 1st 2017

6                                              Karina Marquez

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

Plaintiff's Confidential
Personal Information/Confidential

**Exhibit 67**
**Page 1459**
Lucas R._Experts_11759

# Exhibit 68

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 68**

**Page 1460**

1   I, ██████████████████████   declare as follows:

2

3   1.      This declaration is based on my personal knowledge. I execute this declaration to

4   update the declaration made in February 2018. If called to testify in this case, I would

5   testify competently about these facts.

6   2.      I am 17 years old. I am currently detained at St. Michael's Home for Children in

7   Houston, Texas. I have been detained in ORR facilities for approximately one and a half

8   years. I am miserable and am so tired of being detained. I just want to live with my

9   family.

10  3.      Before arriving at St. Michael's, I was detained at Shiloh Residential Treatment

11  Center in Manvel, Texas. I was transferred from Shiloh to St. Michael's on April 26,

12  2018. The staff at Shiloh told me that I didn't need to be at Shiloh anymore. The doctor

13  at Shiloh approved me to leave. When I left Shiloh, I didn't know where I was being

14  taken. The staff just told me that I was being taken somewhere else.

15  4.      The Shiloh staff told me that I did not qualify to live in long-term foster care. Now

16  that I am at St. Michael's, the staff tell me that I can't live in long-term foster care

17  because I aged out.

18  5.      Since being at St. Michael's, I have asked to meet with attorneys, but the staff says

19  that no one is here to help me. I haven't met with any attorneys since I arrived here. I

20  liked the attorney I worked with when I was at Shiloh. Now that I've been transferred, I

21  don't know what's going on with my case. I have to try and investigate and research on

22  my own.

23  6.      I still have to take medication here. At night, I take one Prozac pill, and in the

24  morning, I take one pill that is supposed to help me focus. The pills don't help me. I

25  take the pills because I know I have to take them, not because I want to take them. I

26  don't want to take the medications. I don't need to take them; I need to leave detention.

27  The staff wants me to meet with a psychiatrist, and I don't want to go. I feel fine; I don't

28  need to meet with a psychiatrist. I'm ready to leave.

1

**Exhibit 68**
**Page 1461**

7.    I desperately want to live with my grandfather. I love him, and I know that he would take care of me. I'm very sad because he and I recently learned that his sponsorship application was denied because he had a negative home study. The official who completed the home study did not take into account everything that my grandfather did to prepare. He bought me a new bed to show that I'd have my own nice place to sleep. The official who completed the home study made many wrong assumptions about my grandfather. The official concluded that my grandfather did not have enough dishes and food in his kitchen and therefore he couldn't afford to take care of me. My grandfather explained that he works all the time and buys food at work, so he doesn't need to buy a lot of dishes and food to keep at home. When the official asked my grandfather whether he would make sure that I went to school, the official was bothered that my grandfather responded that I was old enough to know to go to school. Of course, my grandfather cares about education and would make sure that I went to school, but the official twisted his words and held his statements against him. The official seemed worried about how much money my grandfather makes, but he makes enough money to support me. During the eight months that I was at Shiloh, he sent me money regularly, a total of about $800-$900. He can clearly support me financially and take care of me. He is in good health and he loves me. He has done everything the government asked of him. I know I would feel cared for if I lived with him.

8.    Now that my grandfather has been denied, I think my case worker is trying to work with my cousin to serve as my sponsor. He is about 21 or 22 years old and lives with another one of our cousins and that cousin's wife. I think that the government may decide that it would be ok for me to live with my cousin because the wife lives with them, so I wouldn't be the only woman in the home. I'd rather live with my grandfather because we're really close and I would be happier with him. I'm so sad because I don't think I'll be able to live with him. My hope is that I can leave detention and live with family. I know that my grandfather will continue to support me financially no matter where I live.

2

Exhibit 68
Page 1462
Lucas R._Experts_11476

Plaintiff's Confidential
Personal Information/Confidential

9.     Here at the shelter, I can't cry because the staff ask me why I'm crying.  And if I laugh loud, they tell me to shut up.  The staff yell at us all the time.  The staff don't really care about us; they live totally different lives from us.  They work here for a few hours a day, and then they get to go outside and live their lives.  We just stay here locked up.  We don't have any privacy.  We can't be in our bedrooms for more than five minutes.  We only have five minutes in the morning to get dressed and ready for the day.  We can't chew gum.  We have to wear ugly clothes, and when we walk outside, I feel like people stare at me and think that I'm someone who's done bad things.

10.    I can't stand being locked up any more.  I feel so helpless and desperate.  I don't know what to do.  I want to be released so badly.  I want to live with my family.  I know I will be so happy when I am finally free.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this
8th day of June, 2018, at _____Houston_____, Texas.

3

Exhibit 68
Page 1463

Plaintiff's Confidential
Personal Information/Confidential

Lucas R._Experts_11477

1

CERTIFICATE OF TRANSLATION

2

3    I, __Karina Marquez__, hereby certify that I am proficient in both

4    Spanish and English, and that I accurately translated the foregoing statement and read it

5    back to ▮▮▮▮▮▮ in its entirety in Spanish on __June 8, 2018__.

6

7

8    Karina Marquez

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

Exhibit 68
Page 1464
Lucas R._Experts_11478

Plaintiff's Confidential
Personal Information/Confidential

# Exhibit 69

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 69**
**Page 1465**

1    I, ████████████████████████████████, declare as follows:

2

3    1.    This declaration is based on my personal knowledge.  If called to testify in this

4    case, I would testify competently about these facts.

5    2.    I came to the USA fleeing sexual violence and child abuse. In El Salvador, I

6    suffered a lot and was in and out of shelters throughout my childhood. I experienced

7    some very horrible violence at a young age, and I haven't really told my story until now.

8    I was gang raped when I was 15 years old. The rapists told me not to tell anyone or they

9    would kill me. My biological dad is deceased, and my mom was involved with a man

10   who was abusive to me, and I did not feel safe at home. My older sister is paralyzed –she

11   suffered horrible abuse and can no longer speak or walk. I also have two little brothers. I

12   decided to leave my country for safety and opportunity in the United States.

13   3.    I am 16 years old.  I am currently being held in ORR custody detained at the

14   Shiloh Residential Treatment Center. I arrived here on September 7, 2017. Shiloh is a

15   locked facility with 24-hour surveillance and monitoring. The children are detained here

16   and no one is free to leave.

17   4.    I was taken into immigration custody in Texas about eleven months ago in January

18   2017. I was first detained at Southwest Key, a shelter, but then I became increasingly

19   stressed, because I felt like I was going to be detained forever. I just want to live in

20   Oakland, California with my grandpa—I don't want to be detained. My grandfather is in

21   the beginning of process of sponsoring me.

22   5.    One time a staff member began yelling at me at Southwest Keys and I broke a

23   mirror. The staff accused me of trying to hurt myself and sent me to a psychiatric

24   hospital.  Then a psychologist recommended that I come here to Shiloh because there is

25   more one-on-one attention here.

26   6.    I don't remember ever being told or reading that I could appeal or challenge the

27   government's decision to put me into this treatment facility, or that I could go to court

28   about it.

1

Exhibit 69
Page 1466
Lucas R._Experts_11472

Plaintiff's Confidential
Personal Information/Confidential

7.      I have never had a thirty-day review to review my custody classification since I have been here.  No one has formally sat down with me and reviewed whether I should be stepped down to a lower level of security or told me how I'm doing here or what I have to do in order to step down.

8.      I have had about three court hearings. My attorney is Paola, I think I met with her recently but I don't remember.

9.      At Shiloh, I am given three pills every day. In the morning I take one pill, I don't know what it is. In the evening, I take Prozac and Melatonin.  The staff checks our mouths to make sure that we have taken our medicine.  I don't think that my family was asked before giving me medicine. My understanding is that the government makes those decisions.

10.     I think I would get a "report" if I didn't take my medicine.  Getting a report impacts your privileges and delays when you can get released.

11.     The staff hold down and inject youth who aren't able to calm down.

12.     I am only allowed two 15-minute calls per week. The calls have no privacy. Sometimes I talk to my mother and sometimes I talk to my grandfather.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this first day of December 2017, at Manvel, Texas.



Plaintiff's Confidential
Personal Information/Confidential

Exhibit 69
Page 1467
Lucas R._Experts_11473

1

2

3                              CERTIFICATE OF TRANSLATION

4   My name is Karina Marquez and I swear that I am fluent in both the English and Spanish

5   languages and I translated the foregoing declaration from English to Spanish to the best

6   of my abilities.

7

8   Dated: December 1, 2017                          _____

9                                                          Karina Marquez

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

Exhibit 69
Page 1468
Lucas R._Experts_11474

Plaintiff's Confidential
Personal Information/Confidential

# Exhibit 70

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 70**
**Page 1469**

Declaration of ████████████████

I, ███████████████, declare as follows:

1.      This declaration is based on my personal knowledge.  If called to testify in this case, I would testify competently about these facts.

2.      I was born in Honduras in 2006. I am 11 years old.  I have been in the United States since I was 8 years old.  My alien # is ███████████ I speak Spanish and some English. I have been detained at the Shiloh Regional Treatment Center in Manvel, Texas ("Shiloh"), since October 24, 2017. Shiloh is a locked facility, and none of the people who live here are free to leave. I have not been told how long I will be here or why I am being detained here. I do not want to be in this shelter.  I was here once before and I don't want to be here again. I also once stayed at a foster home which was much better than here. The staff at Shiloh scream and get mad easily, they say bad words, they go crazy. I do not feel safe here.

3.      Before I was detained at Shiloh, I was at Saint PJ's Children's Home in San Antonio, Texas. While at Saint PJ's, the doctor there had me on only three medications. I took all three of these medications at night.

4.      At Shiloh, Dr. Ruiz has me on many more medications, and I have to take them during the day and at night. I take 4 pills in the morning, I do not know what they are for. I take another pill at 4pm and then I have to take 5 more pills at night. I have not been told why I am required to take all this medication.

5.      When I was in Honduras, I did not take any pills and I was good.  I was a normal kid.  When I take medicine, I do not have any mood.  It is disgusting.  I do not like being on this many medications and I have suffered side effects including headaches, loss of appetite and nausea. I have complained about receiving too many medications and Dr. Ruiz says it is not within his control but because of another doctor that I am receiving all these medications. The doctor is another female doctor who works in the facility.

1

Plaintiff's Confidential
Personal Information/Confidential

Exhibit 70
Page 1470
Lucas R._Experts_11617

6.      When other girls refuse to take the medication, they get threatened by staff members. They threaten to "give then a report." The report is similar to a write up and every time I receive one, my time in this facility gets extended by 30 days.

7.      To the best of my knowledge I have never signed any informed consent or other form granting permission to the doctors to give me medication.  I don't think anyone in my family was asked if it was okay for me to take medicine.

8.      Also, I witnessed staff members forcefully give medication four times.  Today, one of the girls was upset and someone was trying to calm her down but then the teacher said don't talk to her, just give her a shot. Once I saw staff give an injection by force, two staff members pinned down the girl while she was sitting down and a doctor gave her one or two injections in the arm. The injections were given against their will.

9.      One time I was in the bathroom crying and I didn't want to come out, and then one of the staff members pulled me out forcefully and it really hurt.

10.     I always feel really sad here. I feel so sad that I want to hurt myself; I want to kill myself; and I want to cut myself, but I haven't learned how to cut myself.

11.     Staff members say bad words here.  When the girls are crying, the staff says things like, "I'm going to fuck her up" or "I'm going to kick your little ass." And then if we say bad words, we get in trouble.

12.     On at least two occasions staff members have tried to hurt me.  One time a staff member put her two thumbs up to my throat and her hands around my neck.  It hurt and I was gasping for breath.  The staff member said she was just "playing" but I felt scared.

<u>Education Issues</u>

13.     At Shiloh, we attend school on week days. My teacher is a man we call "Mister George." Mr. George does not treat me well and he has been verbally abusive to me the entire time he has been my teacher. He repeatedly tells me "shut up." On at least ten occasions he has called me a "dumb ass" and "you're stupid." He also tells me, "no one likes you here."

2

**Exhibit 70**
**Page 1471**
Lucas R._Experts_11618

Plaintiff's Confidential
Personal Information/Confidential

Case 2:18-cv-05741-DMG-PLA   Document 272-3   Filed 10/02/20   Page 223 of 284   Page ID #:10909

14.     When I have complained to other staff at Shiloh about the way Mr. George treats me, they tell me that he treats everyone that way. I know that this is not true; that he treats me worse than the others because I have not heard him call anyone else a "dumb ass."

<u>Communication with family</u>

15.     When I was at Saint PJ's, I was allowed regular telephone calls to my family. Since I have been at Shiloh, the staff has repeatedly told me that my family is not answering the phone and I have only had one call with them. I have only seen them call my family members three times, and I have not been allowed to call them myself.

16.     I have no idea why I'm here or why I've been here for so long when other kids get to go with their families. I would rather go back to Honduras and live on the streets than be at Shiloh.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 30th day of November, 2017, at Manvel, Texas.

 

I certify that I am fluent in the Spanish and English languages and that I truthfully and accurately translated the above declaration from English to Spanish for ███████ ███████ before she signed the declaration.

Dated: November 30th, 2017

Saira Salazar

3

**Exhibit 70**
**Page 1472**
Lucas R._Experts_11619

section type="boilerplate">Plaintiff's Confidential
Personal Information/Confidential

# Exhibit 71

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 71**
**Page 1473**

1    I, ██████████████████, declare as follows:

2

3    1.    This declaration is based on my personal knowledge.  If called to testify in this

4    case, I would testify competently about these facts.

5    2.    I am 9 years old.  My grandma and I came to the United States from Guatemala in

6    April 2018.  When we arrived at the border, I was separated from my grandma, and I was

7    taken to the Southwest Key El Presidente shelter in Brownsville, Texas, where I was

8    detained for about two months.

9    3.    At the shelter, the staff were really strict.  Certain things staff members did really

10   bothered me, and I began to act out.  I would throw things at the staff.  When I started

11   misbehaving, the staff would grab me so hard that I couldn't breathe.  Each time the staff

12   grabbed me, I was in more and more pain.

13   4.    One night, the staff told me to get in the car because we were going to go look at

14   the stars outside.  It was really late at night, and I was tired and fell asleep.  When I woke

15   up, I was furious because I realized that they had lied to me.  They had taken me to

16   Shiloh and left all my personal belongings behind at the shelter.  No one had told me that

17   I would be transferring to a new facility.  I had no prior notice of the transfer and neither

18   did my family.

19   5.    I have been at Shiloh since July, and I have no idea when I'll be allowed to leave.

20   6.    I want to live with my uncle.  He lives in Houston and applied to be my sponsor

21   once I arrived at the other shelter.  We usually speak on the phone twice a week and we

22   get along really well.  These phone calls are not in private; my case manager is always in

23   the room.

24   7.    My grandma, aunt, and cousins live with my uncle too. ·They've all come to visit

25   me here many times.

26   8.    As far as I know, my uncle has done everything the government has asked him to.

27   He completed a home study and received a positive recommendation.

28

1

**Exhibit 71**
**Page 1474**
Lucas R._Experts_11653

Plaintiff's Confidential
Personal Information/Confidential

9.      I am still waiting for the doctor to approve my release.  I've been told that I behave
badly, and I won't be allowed to live with uncle until I improve my behavior.

10.     I take multiple medications in the morning, afternoon, and night.  I don't know
what they're for or how many I take.  Sometimes, I feel like I've been given twenty pills
in one day.  As far as I know, my uncle and other family members have not given
permission for me to take the medication.

11.     Since July 30, 2018, I do not remember receiving a psychiatric evaluation to
determine whether I am at risk of harming myself or others.

12.     I miss the field trips we used to take at the shelter.  I enjoyed getting out into the
community.  At Shiloh, we only take trips to the store.

13.     I am ready to live with my uncle right now.  I'm so unhappy here.  I know I would
be happier and healthier if I lived with him.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this
18th day of October, 2018, at _____Manvel_____, Texas.

Plaintiff's Confidential
Personal Information/Confidential

**Exhibit 71**
**Page 1475**
Lucas R._Experts_11654

1
2

## CERTIFICATE OF TRANSLATION

3
    I, _____Lexie Villa_____, hereby certify that I am proficient in both

4
Spanish and English, and that I accurately translated the foregoing statement and read it

5
back to ████████████_____ in its entirety in Spanish on _October 18, 2018_ .

6
7
                           *Lexie V. Villa*

8
                    Lexie Villa

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3

Exhibit 71
Page 1476
Lucas R._Experts_11655

Plaintiff's Confidential
Personal Information/Confidential

# Exhibit 72

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 72**
**Page 1477**

I, ██████████████, declare as follows:

1.      This declaration is based on my personal knowledge.  If called to testify in this case, I would testify competently about these facts.

2.      I am 13 years old.  I came to the United States from Mexico in December 2017. When I arrived at the border, I was taken to a Southwest Key shelter in Arizona, where I was detained for two months.

3.      One day, the staff at the shelter said that they were taking me to a new place in Texas.  I cried and told them that I didn't want to leave.  I had friends in Southwest Key, and I had gotten used to being there.  The staff just told me that I had to leave.  The next morning, the staff woke me up around 3:00am and took me to Shiloh.

4.      I want to live with my sister.  She lives in Alabama and applied to be my sponsor when I was detained in the shelter.  We usually speak on the phone twice a week and we get along really well.  These phone calls are not in private; my case manager is in the room.  She has done everything the government has asked her to.  She had a home study, and my case manager told me that it went well, but my case manager says that she needs to have another home study and I don't know why.  My sister still lives in the same place where she had the first home study.  My case manager says that the doctor has to approve my release, but I don't know when the doctor will let me leave.

5.      At Shiloh, I take one medication in the morning and three medications at night.  I don't know what the one in the morning is for.  One of the medications at night is supposed to help me sleep, but I don't know what the other two at night are supposed to help with.  As far as I know, my sister has not given permission for me to take the medication.  If I didn't have to take the medication, I wouldn't.

6.      Since July 30, 2018, I do not remember receiving a psychiatric evaluation to determine whether I am dangerous.

Plaintiff's Confidential
Personal Information/Confidential

**Exhibit 72**
**Page 1478**
Lucas R._Experts_11637

7.     I liked the shelter much more than Shiloh.  I could talk to everyone at the shelter, and I could go outside more often.  There were more activities; for example, I could take classes to learn English.  At Shiloh, I don't learn anything.  I was happier at the shelter.

8.     I am ready to live with my sister right now.  I miss her very much, and I know I would be happier and healthier if I lived with her.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 24th day of August, 2018, at ___Manvel___, Texas.

2

**Exhibit 72**
**Page 1479**
Lucas R._Experts_11638

Plaintiff's Confidential
Personal Information/Confidential

1

## CERTIFICATE OF TRANSLATION

2

3    I, ___Lexie Villa_____, hereby certify that I am proficient in both

4    Spanish and English, and that I accurately translated the foregoing statement and read it

5    back to ███████████ in its entirety in Spanish on ___8/24/2018___.

6

7    _Lexie V. Villa_____

8    Lexie Villa

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

Plaintiff's Confidential
Personal Information/Confidential

**Exhibit 72**
**Page 1480**
Lucas R._Experts_11639

# Exhibit 73

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Exhibit 73
Page 1481

I, █████████████████████ declare as follows:

1.      This declaration is based on my personal knowledge.  If called to testify in this case, I would testify competently about these facts.

2.      I am 16 years old. I am from Mexico. I am currently being held in ORR custody in the Shiloh Residential Treatment Facility, in Texas.

3.      I first entered the United States when I was approximately 7 years old.

4.      Until I was approximately 12 years old, I lived with my aunt and my sister in San Jacinto, California. I ran away from home because my aunt hit me with a belt and she tied me to the gate for about one to two hours. I explained to a friend my reasons for running away. My friend then told the school's principal about my aunt and the police came to my aunt's house.

5.      I do not remember how I came to be under the custody of the Office of Refugee Resettlement ("ORR"). It was a very confusing time.

6.      In total, I have been in ORR custody for almost 4 years. I spent approximately two years at a shelter in Santa Fe, New Mexico. I then went to live at Crittenton in Los Angeles.  I was then transferred to the Shiloh Residential Treatment Center. I was told that they were sending me to live with my mom. I was not told that they were sending me to a treatment center. I was also not told that they were sending me outside California.

7.      I arrived at the Shiloh in about June of 2016. During this time, I was not told about, and I did not receive a 30-day review.

8.      At Shiloh, I take medication every morning and night. In the morning, I take seven pills. I think there are four vitamins, a trazedone, and two other pills. At night, I take 7 pills: one to sleep and I'm told that the other six are vitamins.  The evening medications make me feel sleepy.  I don't like taking the medicine because it makes me feel angry. It makes me feel like hitting a wall or ripping up paper.  I was told that I cannot refuse to take the medication because an incident report would be written up. I'm told that each

1

Exhibit 73
Page 1482
Lucas R._Experts_11620

Plaintiff's Confidential
Personal Information/Confidential

1 | time I refuse, it would mean I have to spend a couple more days at Shiloh. So, I take the
2 | pills every time.
3 | 9.      During my time in ORR custody, my aunt was identified as a potential sponsor.
4 | However, I told ORR that I did not want my aunt to sponsor me because this was the
5 | same aunt who used to abuse me. I do not have any potential sponsors.
6 | 10.     I have been in ORR custody for four years. That is far too long, and I want to be
7 | free again. My dream is to live with my mom.
8 |
9 | I declare under penalty of perjury that the foregoing is true and correct.  Executed on this
10 | 30th day of November, 2017, at Manvel, Texas.



Plaintiff's Confidential
Personal Information/Confidential

**Exhibit 73**
**Page 1483**
Lucas R._Experts_11621

1

## CERTIFICATE OF TRANSLATION

2     I certify that I am fluent in the Spanish and English languages and that I truthfully

3  and accurately translated the above declaration from English to Spanish for ███████

4       ██████████████ before she signed the declaration.

5

6  Dated: November 30, 2017            *Maria Martes Campos*

7                                Maria Jose Martinez Campos

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

Plaintiff's Confidential
Personal Information/Confidential

Exhibit 73
Page 1484
Lucas R._Experts_11622

# Exhibit 74

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 74**
**Page 1485**

1   I, ███████████████████, declare as follows:

2

3   1.      This declaration is based on my personal knowledge.  If called to testify in this

4   case, I would testify competently about these facts.

5   2.      I am currently 17 years old. I was born on ██████ 2002 in San Marcos

6   Ocotepeque, Honduras. I am currently being detained in ORR custody at the Yolo Secure

7   Facility in Woodland, California ("Yolo").

8   3.      I arrived in the U.S. on or about May 2, 2019 in El Paso, Texas. They took me to

9   an immigration facility where they took everything that we had, just left us with the close

10  we had on. Then they took me to an *hielera* for about 2 hours, then I went to a *perrera* for

11  two days. There were lots of us there, almost on top of each other. They gave us thin

12  mattresses to lay on, but I didn't sleep at all. I ate terribly; they would only give us a

13  cookie and jell-o for dinner. While I was there, they asked me to sign a paper to see a

14  judge, but it was only in English and I didn't want to sign it. They told me I needed to

15  sign it in order to see a judge and to know if I could stay or if I would be deported.

16  4.      After the two days in *perrera,* they told me I was going to a shelter where I would

17  get clothes and shoes and everything I needed. They told me I would be going to Miami,

18  but I was still nervous about the papers I had signed. I thought they would be deporting

19  me.

20  5.      When I arrived at the Homestead facility, at first I liked it. There were clothes, but

21  the food was terrible. I only ate the French fries and sometimes the fish. During the day, I

22  mostly ate the fruit that they offered us. It was strange to living with so many people in

23  one space too. There were around 150 kids in the room where I slept. Some kids went

24  around saying they were part of the gangs, and I was scared when I heard that because the

25  gangs were the reason I left Honduras. No pens were allowed, but many kids had pens

26  and while they could be used to write, they can also hurt people.

27  6.      I would get upset with the Youth Care workers at Homestead because many kids

28  were bullying me while I was there and they wouldn't do anything. I would say, "you're

1

**Exhibit 74**
**Page 1486**
Lucas R._Experts_11760

Plaintiff's Confidential
Personal Information/Confidential

1  supposed to be here to help us and take care of us and you do nothing." Then they would

2  write a report about it. I never did anything but speak my mind and ask for more help.

3  7.      One day, after my case worker had been telling me for several days that I was close

4  to be released to my sister, things changed. She told me that the government would not

5  accept my sister as my sponsor because we did not have the same last name and they

6  didn't believe that she was my sister. The case worker was on the computer, through

7  video, from Texas and I was in a trailer talking with her. When I heard the news about

8  my sister, I told her I was leaving and I walked quickly out of the trailer, upset. The staff

9  was following me and told me to stop and try to relax. I told them I just needed to be

10  alone and kept walking.

11  8.      The security people saw me and stopped me. I found out the next day that they told

12  the staff workers that I was trying to escape, but because the security people only spoke

13  English, I couldn't defend myself and I didn't know what they were saying. They next

14  day when I met with my counselor, I found out that they had written a report about me

15  trying to escape. After that, I was put on one-on-one for two days so that I was never

16  alone because they said I was trying to escape, but I wasn't. I just wanted to get away for

17  a minute after I got the bad news about my sister.

18  9.      On another day, a staff member got upset with me because I told him he wasn't

19  good at solving problems, just for writing reports. He held up his two fists and said "This

20  is the cemetery and this is the hospital... which one do you want?" That same staff

21  member later got fired for trying to make a kid take off his pants so he could check if he

22  was stealing food from the cafeteria.

23  10.    There were several times that I made a complaint. Another day, a staff member

24  told me that if I didn't get out of bed, he would write a report and they would send me

25  back to my country. Many of the reports that I was written up for were times that I was

26  being bullied and I believe the reports make it seem like I was instigating or involved in

27  the bad behavior.

28

2

**Exhibit 74**
**Page 1487**
Lucas R._Experts_11761

Plaintiff's Confidential
Personal Information/Confidential

11.     After Homestead closed, two immigration officials came to pick me up. They said
that I needed an escort to the airport because I had tried to escape. They told me I was
going to a facility where kids were released really quickly to their sponsors. I thought I
was already going to be released to my sister so I was disappointed to go to another
facility, but I was glad that I would be released soon.

12.     It wasn't until I arrived in San Antonio that I released I was now at a staff secure
facility and that it was more restrictive. At BCSF San Antonio, because I was new most
of the other kids picked on me. They would make fun of me and try to make my life
difficult. None of the staff would take my side. When I asked to call my mother, they said
I couldn't and I got upset, "why do you have a *pinche* phone if I can't use it?"

13.     Later, one youth played a joke by stealing someone's clothes and putting it on top
of my closet while I was in the shower. I told the youth that it wasn't me, that I wasn't a
thief. The next day, a staff member told me that the youth had accused me of
masturbating in front of him. I told the staff that I would never do that and that the youth
was mad about the misunderstanding about the clothes. The staff member said they
believed me and they would change the report.

14.     Not long after that, I had an incident with the same youth. He lifted up his shirt and
told me that he had a knife and was going to cut me. I saw something sharp and reported
it to the staff. They looked at the video and saw that it was true. I kept having problems
with that youth, who would insult me and my mother. Still, the staff moved him into the
room directly in front of mine. I told them they couldn't do that, after saying he would
kill me and all the insults—but they said that same youth had problems with other youths
and it was the only place to put him. I got upset and told the staff that they weren't good
for anything and they wrote me up in a report.

15.     Then, later that day, I was sitting in a seat and a staff member sat next to me, very
close, right by my elbow. I spoke to another staff member and said "Look how close he's
sitting next to me," and they both laughed. So I got up to move and when I got up, I
tripped over the staff member's foot. I apologized and the staff member laughed and said

3

Plaintiff's Confidential
Personal Information/Confidential

**Exhibit 74**
**Page 1488**
Lucas R._Experts_11762

1   "That's all I need." I thought he had accepted my apology and went to my room. A few
2   hours later, close to midnight, the police showed up after I'd already gone to sleep. The
3   told me to tell them what had happened. I told them that the staff member was mad that I
4   had insulted him about not doing anything when the youth was moved to the room in
5   front of me and that the staff member had invaded my private space, and I had tripped
6   over his foot. None of the police officers spoke Spanish and so when I was done talking,
7   they put me in handcuffs and took me away. I didn't know where they were taking me or
8   what had happened.

9   16.   After that, I spent twelve days in jail. They took me in front of a judge. An attorney
10  was appointed to represent me and this attorney read the report. The report said that I had
11  kicked the staff very hard in the leg and that he had a serious injury to his leg. He told me
12  that I could spend up to a year in jail and be fined $4,000, or I could accept the blame and
13  everything would go away. I said the report wasn't true. I asked if I would get deported
14  and the attorney said ICE meant come for me. The next day, they let me out because I
15  accepted the blame, even if it wasn't true, because I couldn't be there any longer. The
16  judge accepted what I said. Then immigration came for me and put me in handcuffs and
17  leg shackles and I was taken to a holding cell. I spent a day there and then two officials
18  came to get me; one of them told me that I should write a book when I get back to
19  Honduras to tell everyone that nobody should come here to break the laws and that I
20  didn't have a case and neither did anyone that was just fleeing gang violence.

21  17.   Those two officials took me to the airport and I got on a plane. When I landed, they
22  handed me over to another official who asked if he had a gun and that he should be
23  prepared to use it.

24  18.   After I arrived at Yolo, there were several youth that were bullying me. The staff
25  thought it was funny and they would laugh and say "No, they are just joking around with
26  you." From then on, the staff never believed anything I said. When I told the case
27  workers, they said that I had traumas and that I couldn't go around thinking that everyone
28  was making fun of me.

4

**Exhibit 74**
**Page 1489**
Lucas R._Experts_11763

Plaintiff's Confidential
Personal Information/Confidential

19.     One day, I started to try and cover up my windows as a form of protest—if they weren't going to listen to me, I would not listen to them. One of the staff members started filming me with a camera and laughing at me. Then we went outside and I asked to go to the bathroom, and I had to go to the bathroom really badly so I started walking quickly towards the door. One staff member grabbed my arm and another one grabbed me and they twisted my arm so hard that I thought it would break. They dragged me to the room and then wrote a report saying I was being physically aggressive.

20.     I went to my room and started covering the window again with papers as a form of protest. After thirty minutes or so, I calmed down. Then it was time to shower. I saw everyone going to take their showers and I asked the staff members if I would be taking a shower because no one had opened my door. The staff said no, I wouldn't be getting out because of my attitude and for being a jerk. I went back to try and cover up my window and I said something else to the staff member. Then, three or four staff came into my room and took everything out of my room. I was upset so I threw a cup of water at them and an orange that I had in my room. The staff members then grabbed me roughly and one slammed me against a wall. They started hitting me, including in sensitive areas. After that, they left me in my room without offering me help. After a few hours, I couldn't stand the pain in my groin any more and I asked the staff to help me but they wouldn't. When the nurse came at 7:15 in the morning to give out medication, I asked her to help me, but because she didn't speak English, the staff told her that I didn't want any help. About ten o'clock at night, after crying of pain all day, they finally took me to a hospital where they took x-rays and they gave me medication. The doctor asked what happened and because the doctor didn't speak English, the staff member said some things that I couldn't understand.

21.     When I got back to the facility, I asked to be changed to a different pod because I had a problem with a youth that was threatening me. Two days after the incident with the water and the orange, one of my shoes had broken and I was going to throw it into a trash can. One of the staff members saw it and grabbed my arm and asked what I was doing.

5

Plaintiff's Confidential
Personal Information/Confidential

**Exhibit 74**
**Page 1490**
Lucas R._Experts_11764

1  Another staff member that speaks Spanish came up to us and I explained I was just trying
2  to throw away my shoe, but still they grabbed both my arms and twisted them hard again.
3  22.      The next day, on September 25, 2019, there was another misunderstanding when
4  they twisted my arms again and then they threw the handcuffs on me. My arms were
5  hurting and hands were pulling against the handcuffs. They told me they were trying to
6  help me but I yelled at them, how could they be helping me?
7  23.      The day after that, I was told that someone had filed charges against me again in
8  criminal court. They told me it was for throwing water and urine at the guards and the
9  orange too. I had to go back to criminal court again, but this time my public defender had
10  my interests at heart and the charges were dismissed after a restorative justice process.
11  24.      While I was at Homestead, my sister applied to be my sponsor. She filled out all
12  the paperwork, but the government said they wouldn't accept her as my sponsor because
13  we had different last names. Before I could work with the case manager on getting this
14  changed and explained, Homestead closed and I was sent to the staff secure in San
15  Antonio. I started the process again with my sister, but then the issue with the staff
16  member where I was sent to jail happened and I was sent to Yolo. Here at Yolo, I am told
17  that they are working on it, but that it has been delayed because of my behavior. Now
18  they say that all that is left is to put fingerprints and do a home study. They are asking her
19  what kind of disciplinary measures she will implement if I don't want to go to school and
20  other things as well. They also asked her for a backup sponsor because she is in
21  immigration court proceedings; she found one and now we are just waiting on
22  fingerprints and the home study to take place.
23  25.      About two months ago, they started giving me medication. I had never taken
24  medication before until I had come to Yolo. They told me I need the medication to not be
25  aggressive and impulsive; they gave me another for anxiety and two other for sleeping
26  and my stomach. Now I'm only taking the one for impulsivity and to sleep. Since I've
27  been taking them, I've been feeling really strange and without the will to do many things.
28  I want to be taken off of these medications.

6

Exhibit 74
Page 1491
Lucas R._Experts_11765

Plaintiff's Confidential
Personal Information/Confidential

26.     The counselors here tell me that my mother gave them permission over the phone to give me these medications, but I don't know when that happened. I haven't asked my mother about that.

27.     I want to leave here as soon as possible, whether that's to be with my sister or to go to a staff secure facility. Everyday I try to write because I want to be a writer. A lot has happened to me and it helps me to write about these things.

28.     I swear under penalty of perjury that the foregoing is true and correct.  Executed on this 15th day of November, 2019, at Woodland, California.

7

**Exhibit 74**
**Page 1492**
Lucas R._Experts_11766

Plaintiff's Confidential
Personal Information/Confidential

Case 2:18-cv-05741-DMG-PLA   Document 272-3   Filed 10/02/20   Page 244 of 284   Page ID
#:10930

1  CERTIFICATE OF TRANSLATION

2   My name is Jonathan Mulligan and I swear that I am fluent in both the English and

3  Spanish languages and I translated the foregoing declaration from English to Spanish to

4  the best of my abilities.

5

6  Dated: November 15, 2019

7          Jonathan Mulligan

8

8

Exhibit 74
Page 1493
Lucas R._Experts_11767

Plaintiff's Confidential
Personal Information/Confidential

# Exhibit 75

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 75**
**Page 1494**

I, ███████████████████████, declare as follows:

1.     This declaration is based on my personal knowledge.  If called to testify in this case, I would testify competently about these facts.

2.     I was born in Honduras in 2001. My alien # is ███████. I arrived to the United States with my 31 year old sister. We were both detained by customs and I was placed in Casa Norma Linda in Brownsville, Texas. I asked to stay with my sister, but they did not let me. They separated me from her and I have not been able to see her since I have been in custody. From Casa Norma Linda, I was transferred to the Shiloh Regional Treatment Center in Manvel, Texas ("Shiloh"). I was transferred to Shiloh in September 2017.

### Witnessed Force Medication

3.     Here in Shiloh, I saw girl receive an injection by force. Her name is ███████ ███████████. One time I saw the staff members pin her down and give her an injection in her arm. After receiving the injection, she appeared sedated.

### Medication Compliance

4.     I take medication here in the facility. I take ~~1~~ 2 MYR pill in the morning and ~~2~~ 3 MYR pills at night. I was told by staff members that if I take my medication, Dr. Ruiz would release me and I would be placed on a foster care list. I am not eligible for foster care unless I take my medication and Dr. Ruiz releases me. Dr. Ruiz is the psychiatrist who works here.

### PREA Phone

5.     I do not know what a Prison Rape Elimination Act (PREA) phone is or where it is located. The staff have never informed about how to access this phone or how to file a complaint. They did not give me this information upon arrival.

### Shared Living Space with non-~~ROR~~ ORR MYR Detainees

6.     I am currently sharing a room with an "American girl" named ███. She is not one of the girls in ORR custody. We share a room together. She has been in the room with me

1

Exhibit 75
Page 1495
Lucas R._Experts_11550

Plaintiff's Confidential
Personal Information/Confidential

1  for about a week. There is another American girl here as well. Her name is ▮▮▮. She also
2  lives in the home with me, but in a separate room. She has been in Shiloh for about a
3  year.

4

5  I declare under penalty of perjury that the foregoing is true and correct. Executed on this
6  $21$ day of November, 2017, at Manvel, Texas.

7

8

9

10

11       I certify that I am fluent in the Spanish and English languages and that I truthfully

12  and accurately translated the above declaration from English to Spanish for ▮▮▮

13
       ▮▮▮▮▮▮ before she signed the declaration.
14

15  Dated: November $21$____, 2017

16

17

18                                        Mayra Sandoval

19

20

21

22

23

24

25

26

27

28

2

Exhibit 75
Page 1496
Lucas R._Experts_11551

Plaintiff's Confidential
Personal Information/Confidential

# Exhibit 76

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Exhibit 76
Page 1497

1  I, ███████████████████████████, declare as follows:

2  1.    This declaration is based on my personal knowledge.  If called to testify in this
3  case, I would testify competently about these facts.

4  2.    I am 16 years old and from Honduras. I have been detained for 8 months and am
5  desperate to get out of detention.  I am currently being held in ORR custody detained at
6  the David & Margaret Center and have been here since around February 17, 2018. This is
7  a shelter facility, but I am not free to leave. Prior to this, I was detained at the Shiloh
8  Residential Treatment Center in Texas. Shiloh was a locked facility with 24-hour
9  surveillance and monitoring. I was transfered from Shiloh to David & Margaret because
10 they said I was getting better.

11 3.    My sister, ██████████, who is 31 or 32 years old, lives in Minnesota, but
12 ORR told me I couldn't live with her. I don't fully understand why ORR won't let me
13 live with my sister, but I think it is because ORR thinks she doesn't have enough money.
14 I would prefer to live with my sister or family over foster care, and I believe even poor
15 families have the right to live together. ████ and I lived in Honduras for 15 years, and I
16 consider her like a second mother.

17 4.    ORR is still giving me medication for depression and anxiety. I receive 3 pills a
18 day.

19 5.    I have met with a lawyer here in La Verne, California at the David & Margaret
20 Shelter, but not sure what her name is. I haven't been told by her that she is helping me
21 with my release or to secure any immigration defense. I don't remember any lawyer
22 helping me during the transfer or helping me get released. I would very much like for a
23 lawyer to help me get released to my sister and to help me if ORR wants to send me back
24 to Shiloh or some other place that is not a shelter.

25 I declare under penalty of perjury that the foregoing is true and correct.  Executed on this
26 _11_ day of _May_ , 2018, at La Verne, California.

27

28                                    ████████████████

Exhibit 76
Page 1498
Lucas R._Experts_11552

Plaintiff's Confidential
Personal Information/Confidential

1
2
3
4
5                          CERTIFICATE OF TRANSLATION
6   My name is _Holly Cooper_ and I swear that I am proficient in both the English
7   and Spanish languages and I translated the foregoing declaration from English to Spanish
8   to the best of my abilities.
9
10  Dated: May 11, 2018
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff's Confidential
Personal Information/Confidential

Exhibit 76
Page 1499
Lucas R._Experts_11553

# Exhibit 77

**<u>REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL</u>**

**Exhibit 77**
**Page 1500**

1    I, ██████████████████████ , declare as follows:

2

3    1.    This declaration is based on my personal knowledge.  If called to testify in this

4    case, I would testify competently about these facts.

5    2.    I am 17 years old.  I came to the United States from Guatemala over a year ago.

6    When I arrived at the border, I was taken to a Southwest Key shelter in Brownsville,

7    Texas, where I was detained for about seven months.  I have now been living at Shiloh

8    for seven months.

9    3.    One day, the staff at the Southwest Key shelter said that they were taking me to a

10   new place in Texas because I was hurting myself.  I was sad because I didn't want to

11   leave.  I had friends in Southwest Key, and I had gotten used to being there.  The staff

12   told me that I had to leave because they could not help me.  One morning, the staff woke

13   me up around 3:00 a.m. and took me to Shiloh.  They had not told me the night before

14   that I would be leaving that morning.

15   4.    I want to live with my mom.  She lives in Indiana and applied to be my sponsor

16   when I was detained in the shelter.  My mom has done everything the government has

17   asked her to do.  She has had two home studies, and has received a positive

18   recommendation both times.  I guess the first home study expired.  My case manager has

19   told me that they are waiting on the fingerprints for my twenty-year-old brother to clear

20   because he lives with my mother.  It has been a month since they had the fingerprinting

21   done. I am not sure why they didn't do my brother's fingerprints sooner.

22   5.    I speak on the phone twice a week with my mom.  These phone calls are not in

23   private; my case manager is in the room. My case manager doesn't give me the choice to

24   speak to my mom in private, which I would prefer.  I don't think any kids here are having

25   private phone conversations.

26   6.    At Shiloh, I take three medications in the morning, one at noon, and three at night.

27   One in the morning is for anxiety and one at night is to help me sleep, but I don't know

28   what the others are for.  I have been told that the medications are supposed to help me,

1

Exhibit 77
Page 1501
Lucas R._Experts_11647

Plaintiff's Confidential
Personal Information/Confidential

1   but I don't remember why.  My stomach hurts almost every day.  I don't know if it is
2   related to the medication.  I also think the medication makes me feel tired and
3   unmotivated.  As far as I know, my mom has not given permission for me to take the
4   medication.  If I were able to live with my mom and not have to take the medications any
5   more, I wouldn't take them.
6   7.      I used to see the psychiatrist, Dr. Ruiz, every week, but now I see him once a
7   month.  A couple weeks ago, the doctor told me that I was dropping to a lower level and
8   that I was ready to be released. The doctor has told me that as soon as my brother's
9   fingerprints clear, he will give his permission for me to leave. But I don't know when my
10  brother's fingerprints will be ready.  I know that many other youth are also here because
11  they are waiting on fingerprints.
12  8.      Since July 30, 2018, I have not received a psychiatric evaluation to determine
13  whether I am a risk to myself or others. I do not believe I am either. It has been a long
14  time since I felt like I wanted to hurt myself, and more than two months since I cut
15  myself.
16  9.      I am ready to live with my mom right now. I miss her very much, and I know I
17  would be happier and healthier if I lived with her. I love school, and look forward to
18  studying a lot. I would like to be a doctor. I want to help my mom so that she doesn't
19  have to work so hard.
20
21  I declare under penalty of perjury that the foregoing is true and correct.  Executed on this
22  18th day of October, 2018, at Manvel, Texas.
23
24  
25
26
27
28

2

Exhibit 77
Page 1502
Plaintiff's Confidential
Personal Information/Confidential
Lucas R._Experts_11648

1

## CERTIFICATE OF TRANSLATION

2

3     I, _KARINA MARQUEZ_ , hereby certify that I am proficient in both

4 Spanish and English, and that I accurately translated the foregoing statement and read it

5 back to ████████████ in its entirety in Spanish on _10·18·18_ .

6

7                _____

8                Karina Marquez

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

Exhibit 77
Page 1503
Lucas R._Experts_11649

Plaintiff's Confidential
Personal Information/Confidential

# Exhibit 78

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 78**
**Page 1504**

1  I, ████████████████████, declare as follows:

2

3  1.      This declaration is based on my personal knowledge.  If called to testify in this
4  case, I would testify competently about these facts.

5  2.      I am 14 years old and am currently detained at Shiloh Residential Treatment
6  Center, where I have been locked up since early June 2018.

7  3.      I came to the United States from Mexico in April 2018 with my siblings.  When I
8  arrived at the border, I was taken to a Southwest Key shelter in Arizona, where I was
9  detained for about two months.

10  4.      One day, the staff at the shelter said that they were taking me to a new place in
11  Texas.  I was sad because I didn't want to leave.  I had friends in Southwest Key, and I
12  had gotten used to being there.  My case manager and counselor just told me that I had to
13  leave.  The staff woke me up around 3:00am one morning and took me to Shiloh.

14  5.      I want to live with my mom and dad.  They live in California and applied to be my
15  sponsor when I was still detained in the shelter.  We speak on the phone twice a week and
16  we get along really well.  These phone calls are not in private; my case manager sits in
17  the room with me.  My parents have done everything the government has asked them to.
18  They had a home study before I arrived at Shiloh, and they received a positive
19  recommendation.  I remain locked up at Shiloh because my case manager says that the
20  doctor has to approve my release.  I don't know when the doctor will let me leave.  My
21  siblings already live with my parents, and I want to be released so we can all be reunited.

22  6.      At the shelter and at Shiloh, I take one medication.  I don't know what it's called or
23  what it's for.  I think it might be for anxiety, but I'm not sure.  The medication makes me
24  feel tired.  As far as I know, my parents have not given permission for me to take the
25  medication.

26  7.      Since July 30, 2018, I have not received a psychiatric evaluation to determine
27  whether I am dangerous.

28

1

Exhibit 78
Page 1505
Lucas R._Experts_11600

Plaintiff's Confidential
Personal Information/Confidential

8.   I liked the shelter much more than Shiloh.  I liked the staff, my case manager, my counselor.  They were funny and tell me jokes.  They were nice and gave me good advice.  I could go outside more often; we would go on field trips.  There were more activities and classes; for example, I could take classes to learn English.  At Shiloh, the classes are only okay.  I was a lot happier at the shelter.

9.   I am ready to live with my parents and siblings right now.  I miss them very much, and I know I would be happier and healthier if I lived with them.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 24ᵗʰ day of August , 2018, at _____Manvel_____, Texas.



**Exhibit 78**
**Page 1506**
Lucas R._Experts_11601

Plaintiff's Confidential
Personal Information/Confidential

## CERTIFICATE OF TRANSLATION

1

2

3    I, _Lexie Villa_____, hereby certify that I am proficient in both

4    Spanish and English, and that I accurately translated the foregoing statement and read it

5    back to ████████████ in its entirety in Spanish on _August 24, 2018_.

6

7    _Lexie V. Villa_ (signature)

8    Lexie Villa

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

Plaintiff's Confidential
Personal Information/Confidential

Exhibit 78
Page 1507
Lucas R._Experts_11602

# Exhibit 79

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 79**
**Page 1508**

1    I, ████████████████████████ , declare as follows:

2

3    1.    This declaration is based on my personal knowledge.  If called to testify in this

4    case, I would testify competently about these facts.

5    2.    I am 17 years old.  I turn 18 on ████████ 2019.  I came to the United States from

6    Mexico in July 2018.  When I arrived at the border, I spent four months living homeless

7    in Texas.  One day, I made a mistake, and the police found me and asked me for my

8    identification documents.  When the police found out that I did not have any

9    documentation, they picked me up, and I eventually arrived at a BCFS shelter in Texas,

10   where I remained for approximately four months.  I am currently detained at MercyFirst

11   RTC in Syosset, New York, where I have been for approximately three months.

12

13   Transfer to MercyFirst RTC

14   3.    I was told that I was transferred from the BCFS shelter to MercyFirst RTC because

15   I behaved badly.  I broke a lot of glass, such as windows and picture frames.  I would cut

16   myself with the broken glass.  One of the reasons I cut myself is because I was angry that

17   the staff at BCFS would not let me live with my family.  I remember my clinician at the

18   shelter showed me a written document that explained that I was being transferred to a

19   different facility because I had various mental traumas.

20   4.    I did not want to leave the shelter.  Two police officers came and physically forced

21   me to leave.  I felt terrible.  I told the shelter supervisor that I did not want to come here,

22   but they said that I had to come because it was a treatment center.  I was not given an

23   opportunity to appeal or dispute the reasons for my transfer to MercyFirst RTC.

24

25   Mental Health Services

26   5.    I was not treated well at the BCFS shelter, and the staff at MercyFirst RTC treat

27   me even worse.

28

1

Exhibit 79
Page 1509
Lucas R._Experts_11772

Plaintiff's Confidential
Personal Information/Confidential

6.    At MercyFirst RTC, there are too many restrictive and unfair rules. There is a three-strike system – after your third strike, you are no longer allowed to participate in field trips or activities, and you have to go to bed earlier than your peers.

7.    All of my teachers yell at me all the time and treat me like a dog. It makes me feel terrible. Sometimes I fear that my teacher is going to hit me. I worry about how I might respond if my teacher actually hit me.

8.    Every school day, three other staff members join my teacher in class. The staff enforce the class homework policies, and they give me a score of zero on assignments that I fail to complete in English. I feel nervous about writing or speaking English because I don't want to embarrass myself. One staff member noticed that I was submitting assignments in Spanish instead of English, and she asked, "Why did you come to the U.S. if you won't learn English? It's the country's native language." I feel like I'm being discriminated against because I don't speak English. The staff don't offer to help me understand any of the lessons.

9.    If you behave very poorly at MercyFirst RTC, you could be sent to the psychiatric hospital, and those hospital trips can have a negative consequence on your case. For example, if they take me to the hospital, then I won't be able to leave the RTC program and transfer to some kind of foster care program. The foster care program is so much better because the young people have a lot more independence and freedom. I have been to the psychiatric hospital about six times. My longest stay in the hospital was about one month; I don't remember how short my shortest stay was. The longest a kid can stay at the hospital is roughly two months.

10.   One time, I was in the psychiatric hospital, and I was supposed to return to MercyFirst, but the doctor at the hospital told me that there was an insufficient number of staff at the RTC facility at the time, so I had to stay at the hospital for a longer period of time.

11.   At BCFS, I took one psychotropic medication. I believe it was supposed to help me think positively and calm down.

Exhibit 79
Page 1510
Lucas R._Experts_11773

Plaintiff's Confidential
Personal Information/Confidential

12.     At MercyFirst, I also take one psychotropic medication, but it is different than the one I took at BCFS. My psychiatrist told me that the medication is intended to address my mental health needs. I am so tired of taking this medication. The medication makes me feel weird and very tired. I have told my clinician, doctor, and the supervising staff of my living unit that I do not want to take the medication. All three staff members have explained to me that I need to take the medication because the medication is a requirement of the RTC program, and I would get in trouble if I refused to take the medication.

13.     My family knows that I take the medication; I know this because I heard the supervising staff of my living unit speak to my family about the medication. My family does not want me to take the medication. None of my family members ever consented for me to take the medication. I am old enough to decide whether I should take medication or not. I don't think that I need to take the medication.

14.     At the BCFS shelter, I met with my clinician once a week, and we talked about my wellbeing. At MercyFirst, I also meet with a counselor, and we have similar conversations as the ones I had at BCFS. At BCFS, whenever I wanted to speak with a counselor, I could. At MercyFirst, when I want to see my counselor, my counselor does not seem to want to meet with me. She seems to only want to meet with me when I don't want to meet with her.

15.     I would probably feel a little better at MercyFirst if the staff stopped yelling at me all time. If the staff didn't make the rules so strict, and if I didn't have to keep taking the medicine, I would feel a little bit healthier and happier. This place makes me so angry.

16.     When I came to the U.S., I thought that I would be free. I have never been incarcerated like this in my life. I'm not allowed to use the phone or the computer. If it were up to me, I would live in a place where I can be free. I want my freedom so badly. I want to go to school and work and have a life outside of this facility. I don't want to spend my entire life confined. I felt anxious in the BCFS shelter, and I continue to feel anxious here.

3

**Exhibit 79**
**Page 1511**
Lucas R._Experts_11774

Plaintiff's Confidential
Personal Information/Confidential

1    17.    I know that the staff, and maybe some of my peers, think that I'm crazy. I feel like
2    I'm discriminated against because people here think that I am a crazy. I have heard staff
3    talk to my peers about me; the staff say, "Don't act like ▮▮▮▮. He's a bad kid." All of
4    this makes me feel terrible. No one should say those things about anyone else.

5

6    Sponsorship Process

7    18.    Originally, my uncle considered sponsoring me, but he told me that he needed to
8    stop participating in the application process because his wife did not want to complete
9    certain paperwork; she is afraid that if she participates in the reunification process that
10    she will be deported.

11    19.    I don't have any other family in the United States.

12    20.    I would like to try to be accepted into a foster care program. My case worker and
13    my lawyer from Catholic Charities have been working with me on this. I think that we
14    have submitted my application, and we are waiting to hear back from the foster care
15    program.

16

17    I declare under penalty of perjury that the foregoing is true and correct. Executed on this
18    __25th__  day of September, 2019, at Syosset, New York.

19

20

21

22

23

24

25

26

27

28

4

Exhibit 79
Page 1512
Lucas R._Experts_11775

Plaintiff's Confidential
Personal Information/Confidential

1

## CERTIFICATE OF TRANSLATION

2      I, _Glykeria Tsiokanou_, hereby certify that I am proficient in both

3  Spanish and English, and that I accurately translated the foregoing statement and read it

4  back to ▮▮▮▮▮▮▮▮▮▮▮ in its entirety in Spanish on September 25, 2019.

5

6

7                      Glykeria Tsiokanou

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

Exhibit 79
Page 1513
Lucas R._Experts_11776

Plaintiff's Confidential
Personal Information/Confidential

# Exhibit 80

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 80**

**Page 1514**

I, ██████████████████████████, declare as follows:

1.      This declaration is based on my personal knowledge. If called to testify in this case, I would testify competently about these facts.

2.      I am 13 years old. I came to the United States a few months ago.

3.      I fled from Honduras with my six-year-old sister and ten-year-old aunt.  My mother was murdered by my stepfather when I was seven years old.  I went to live with my grandmother, but my life was very difficult, and I feared I would be killed if I stayed in Honduras.  My sister, aunt and I traveled together from Honduras and turned ourselves in at the border.

4.      After that, my sister, aunt, and I were sent to a shelter in Texas. Then we were all transferred to a shelter in New York.

5.      I did not want to talk to the people at the shelter in New York. I wanted them to leave me alone, so about a week after we arrived at the shelter I made up a story that I had hurt people in Honduras. I never hurt anyone in Honduras, I just wanted the shelter staff to stop talking to me. The staff made me feel very nervous.

6.      Soon after, I was transferred to Yolo. I was woken up at 4:00 in the morning and put on a plane. The staff did not tell me where I was going. The staff put very heavy shackles on my feet and they really hurt. They kept the shackles on for the whole plane ride, which was six hours long.

7.      When I was sent to Yolo, I did not have a chance to tell my sister and aunt good bye. This made me very sad. I was worried that they thought I had abandoned them.

8.      I did not receive anything in writing about why I was being transferred and no one told me that I could appeal the transfer decision.

9.      Yolo was a terrible place. The doors were always locked, and it was really scary. All the other kids were much older than me, and there were some that picked on me and hit me. I told the staff that other kids were hurting me but the staff said that they didn't

1

Exhibit 80
Page 1515
Lucas R._Experts_11447

Plaintiff's Confidential
Personal Information/Confidential

believe me. I saw other kids get pepper sprayed and hit by the staff. I was only allowed outside my room for short periods of time. I missed my sister and aunt a lot.

10.     After I was detained for about a month at Yolo, I was told that I was going to be going back to New York. My case worker told me that I was too young to be at Yolo.

11.     Now I am at Children's Village. I don't like it here. They put us in detention in our rooms. I have spent fifteen days stuck in my room and haven't been outside. I have only left my room to get food and go to class and then I go back upstairs to my room.

Sponsorship Process

12.     I have an aunt in DC who wants to be my sponsor. She has completed all of the paperwork for the sponsorship application. She started the paperwork the first time that I was in New York, before I went to Yolo. She has also submitted her fingerprints. She completed a home study in late May and she says that it went well. I know that she will do whatever she needs to do to be my sponsor. She was just approved to be my sister and aunt's sponsor, and my sister and aunt were just released to live with her.

13.     I want my aunt to be my sponsor. I feel safe with my aunt and think that she would be a good sponsor for me. If I got to live with her I would get to go to school. I really like going to school, and my favorite subjects are Science and English. I want to go to school to get an education and to have a better future. I take my classes very seriously. When I grow up I want to be a lawyer and help people.

14.     I speak with my aunt on Saturdays and Mondays, and we talk for ten minutes each time.

Counsel

15.     I have never received a list of free lawyers that I could call for help.

16.     I do not currently have legal representation for my immigration case, but I would like a lawyer to help me.

2

**Exhibit 80**
**Page 1516**
Lucas R._Experts_11448

Plaintiff's Confidential
Personal Information/Confidential

17.    I miss my sister and my aunt. I haven't been able to talk to them since we were separated. I think about them all the time and worry about whether they are okay and if they are safe. I hope they know that I love them very much.

18.    I want to leave Children's Village and live with my aunt in D.C. with my sister and aunt.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 11th day of June, 2018, at Dobbs Ferry, New York.

3

Exhibit 80
Page 1517
Lucas R._Experts_11449

Plaintiff's Confidential
Personal Information/Confidential

1

CERTIFICATE OF TRANSLATION

2 My name is Itzel Almazan and I swear that I am fluent in both the English and Spanish

3 languages and I translated the foregoing declaration from English to Spanish to the best

4 of my abilities.

5

6 Dated: June 11, 2018

7 Itzel Almazan

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

Exhibit 80
Page 1518
Lucas R._Experts_11450

Plaintiff's Confidential
Personal Information/Confidential

# Exhibit 81

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Exhibit 81
Page 1519

1    I, ███████████, declare as follows:

2

3    1.    This declaration is based on my personal knowledge. If called to testify in this

4    case, I would testify competently about these facts.

5    2.    I am 12 years old. In February 2018, I came to the United States from Guatemala

6    by myself.

7    3.    When I got to the border, I was taken to a shelter in Arizona, where I was detained

8    for three months.

9    4.    At the shelter, I took one pill in the morning and two pills at night. I think they

10 were supposed to help with anxiety and sleeping. The doctor said I had to take the pill in

11 the morning so I wouldn't be so emotional. I told the staff that I didn't want to take the

12 medication, but they told me that I had to, that the medication was important for me. I

13 refused to take the medication two or three times, and I think it probably hurt my case.

14 5.    I was unhappy at the shelter. My case was getting complicated, and I was upset. I

15 didn't want to be detained. I told a staff member that I was thinking of hurting myself,

16 and the staff member told his supervisor. They sent me to a hospital. The staff at the

17 hospital told me that I was going to be taken to a new detention center in Texas. I told

18 my case worker that I didn't want to leave, but my case worker said that someone else

19 had already approved the transfer and I had to go. The day of the transfer, I was woken

20 up at 1:00am and brought to Shiloh.

21 6.    At Shiloh, I take two pills: one in the morning and one a night. I think one is

22 supposed to help with anxiety and the other is supposed to help me sleep. As far as I

23 know, the staff never asked my family for permission to give me the medication. If I

24 didn't have to take the medication in order to be released, I wouldn't. I don't feel like I

25 need the medication.

26 7.    I liked the shelter better than Shiloh. There were more activities at the shelter. We

27 were allowed to go in and out to the patio, and we took classes to learn how to speak

28 English. I had more freedom at the shelter.

1

**Exhibit 81**
**Page 1520**
Lucas R._Experts_11562

Plaintiff's Confidential
Personal Information/Confidential

8.    I want to live with my brother. He lives in California and applied to be my sponsor when I was at the shelter. We speak to each over the phone once or twice a week. He moved to a new place so that he could qualify to be my sponsor. My case manager says that my brother has sent all the paperwork that he has been asked to. About two or three weeks ago, the staff told me that I have to be at Shiloh for about two or three more months before I can be transferred to a different detention center or be released to live with my brother. The staff say my release depends on my behavior and the medications I'm taking. They tell me that I need to take the medication when I'm asked to. I don't know why my release depends on my behavior – I don't misbehave or get in trouble.

9.    Before my brother applied to be my sponsor, my sister applied. She lives in California and received a negative home study. I'm not exactly sure why the home study was negative. I think it might be because when the government official came to conduct the home study, my sister had visitors at her house, and the official thought that they were living with my sister. For this reason, I think my sister was denied the ability to be my sponsor.

10.   I don't want to be at Shiloh anymore. If I could leave Shiloh tomorrow to live with my brother, I would.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 8th day of June, 2018, at ___Manvel___, Texas.

_____

2

Exhibit 81
Page 1521

Plaintiff's Confidential
Personal Information/Confidential
Lucas R._Experts_11563

1

## CERTIFICATE OF TRANSLATION

2

3        I, ___Karina Marquez___, hereby certify that I am proficient in both

4    Spanish and English, and that I accurately translated the foregoing statement and read it

5    back to ▮▮▮▮▮▮▮ in its entirety in Spanish on _June 8, 2018_ .

6

7                                    _Kuue MM_

8                                    Karina Marquez

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

Exhibit 81
Page 1522
Lucas R._Experts_11564

Plaintiff's Confidential
Personal Information/Confidential

# Exhibit 82

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Exhibit 82
Page 1523

1    I, ███████████████████████ declare as follows:

2

3    1.    This declaration is based on my personal knowledge. If called to testify in this

4    case, I would testify competently about these facts.

5    2.    My name is ██████████████████, and I was born on ████ 2000 in

6    Agua Blanca, Jutiapa, Guatemala. I speak Spanish and am unable to fluently speak, or

7    read English. I began my journey to the United States around January 6, 2016 to escape

8    child abuse, forced child labor, and forced recruitment from gangs in Guatemala. I was

9    only 15 years old when I began my journey. My father severely beat me from the time

10    that I was a young child, and I wanted to find safety, hope, and a new life in the United

11    States. The journey up through Mexico took about 10 days. I traveled on buses all the

12    way to the U.S. border. I was scared, but I hoped to seek safety and a better life in the

13    U.S.

14    3.    On January 16, 2016, the U.S. Border Patrol apprehended me as I crossed the Rio

15    Grande along the Texas border. I spent one night in the custody of Border Patrol (CBP).

16    The following day, the Office of Refugee Resettlement ("ORR") picked me up in

17    Houston, Texas. I was detained in a place called "Southwest Key," which is located in

18    Houston, Texas.

19    4.    I have been in custody for almost two years. During that time I have been forced to

20    take medication that I do not want to take, handcuffed, and experienced long delays in the

21    reunification process.

22    **Southwest Key**

23    5.    I spent approximately 6 months at Southwest Key. This was the first time in my

24    life I was ever detained. It was a completely new experience. I felt so desperate to get out.

25    I could not sleep at night because I thought about getting out, and I thought about my

26    family and how they were doing. After approximately 1 month of detention, I spoke with

27    my brother and told him that I was going to ask for deportation because I was desperate

28    to get out of detention. My brother told me to stay strong and that the process is not easy

1

**Exhibit 82**
**Page 1524**
Lucas R._Experts_11603

Plaintiff's Confidential
Personal Information/Confidential

1  to get out of detention. I took my brother's advice to heart. I decided to stay and fight for
2  my case.

3  6.      On ████ 2016, I had my birthday in the detention center. It was very sad to be
4  alone. Some of my family called me from Guatemala and sang to me for my birthday. I
5  wanted so bad to cry but the Southwest Key staff was watching me on the phone and I
6  tried to hold back my tears.

7  7.      Around May 2016, a counselor informed me that my mother was seriously sick
8  back in Guatemala. Because my mom has cholesterol and heart problems I believed that
9  my mom suffered a heart attack. In reaction to the news, I fainted and had a breakdown,
10  to the point where I urinated on myself. I became conscious at a hospital and did not have
11  any idea how I got there. At the hospital, a staff person from Southwest Key told me that
12  my reaction to my mom's illness was not normal. When she said my reaction was not
13  normal I felt confused. I was worried about my mom. I asked her to not tell my mom
14  about my hospitalization because I was afraid that the news would worsen my mother's
15  illness. Someone told my mom that I was hospitalized and I talked with her over the
16  phone. My mom cried during our phone call.

17  8.      A Southwest Key staff member stayed with me at the hospital day and night. The
18  Southwest Key staff member translated for the doctor. Unfortunately, I do not recall what
19  the doctor told me. I felt scared and confused because I did not understand what was
20  happening to me. I spent approximately one week at the hospital, which was located in
21  Texas. My blood pressure was checked and I was connected to an IV drip - which I was
22  told contained a saline solution. I recall seeing the hospital staff inject substances into the
23  IV drip but I didn't know what they were.

24  9.      I was placed in a wheelchair and transferred to another location by ambulance. A
25  Southwest Key staff member was with me and I asked them why I was being transferred
26  but the person told me they didn't know why I was being transferred. There were
27  American children and I saw many with cuts on their wrists. I was sad because this was

28

2

Plaintiff's Confidential
Personal Information/Confidential

Exhibit 82
Page 1525
Lucas R._Experts_11604

1  the first time I was detained and surrounded by strangers. I missed my family. I usually

2  sat on the sofa and listened to the radio. I could not tell if it was night or day.

3  10.     I asked the staff at the psychiatry center why I was moved there, but they did not

4  give me an answer. Instead they told me that I was at a psychiatry hospital. My case

5  manager, Pedro, informed me that I would return to Southwest Key. Instead, I was taken

6  to Shiloh in the city of Manvel, in Texas. I later learned that Shiloh is a residential

7  treatment center.

8  **Shiloh**

9  11.     I hated being at Shiloh, it was an awful place. I wanted to return to Southwest Key.

10  Instead, I remained at Shiloh for approximately 6 months and there I became more

11  depressed and anxious. I was forced to take medication that I did not want to take. The

12  staff was very aggressive. On one of the most awful occasions, they threw me down to

13  the ground, held me down for approximately 30 minutes, and injured my elbow.

14  12.     When I arrived at Shiloh I was told to sign a document. No one explained the

15  document and I did not understand what I signed.

16  13.     Shiloh was different from Southwest Key, because it seemed like it was just kids

17  who were being medicated. It included houses for males and females. Each house had 4

18  rooms; each room had approximately 8 beds. All the children at Shiloh received

19  medication. All of us were angry because the staff forced us to take medication.

20  14.     We were told that the medication consisted of vitamins and that we had to take

21  them in order to grow. Staff said that we would not develop normally if we did not take

22  them.

23  15.     In my case, I was forced to take medication twice a day – in the morning and in the

24  afternoon. Most days I received 4 pills and sometimes more. The staff threatened to

25  throw me on the ground and force me to take the medication. I also saw staff throw

26  another youth to the ground, pry his mouth open and force him to take the medicine.

27  16.     They told me that if I did not take the medicine I could not leave, that the only way

28  I could get out of Shiloh was if I took the pills. I only took the medication because I

3

Plaintiff's Confidential
Personal Information/Confidential

**Exhibit 82**
**Page 1526**
Lucas R._Experts_11605

1  wanted to leave the facility. I understood them to mean that I may be detained there
2  forever if I didn't obey them. I never knew exactly what the pills were and was only told
3  they were "vitamins" but I was sure this was not true.

4  17.   My throat hurt from the daily intake of pills. On one occasion, I refused to take the
5  daily dose of medication. That day, the staff forced my mouth open to get me to take the
6  medication. On other occasions, the staff indicated that if I did not take the medication,
7  they would force my mouth open like they did that time. I felt like I had no one to help
8  me and no option but to take the daily medication.

9  18.   After taking the medication, I was more tired, I felt sad and my eyes got teary. I
10  thought more about my family and I felt alone. I felt depressed and stressed.  I began to
11  gain a lot of weight. At the beginning of my stay in Shiloh, I weighed 140 pounds. In
12  approximately 60 days, I gained 45 pounds. I noticed that my shirts were tighter. In an
13  attempt to lose weight, I ran frequently. However, that did not help and it is my belief that
14  the medication I was being given caused my drastic weight gain.

15  19.   I talked to a clinician at Shiloh about my feelings of sadness but she did not help.
16  When I asked her why I was being forced to take the medication, she said that she could
17  not answer my questions because she was not a doctor.

18  20.   About once a week a doctor came to Shiloh.  I tried to ask him why I was being
19  forced to take the medications but he would ignore my questions ask to move on to the
20  next youth he needed to meet with. I wasn't told of any way that I could challenge the
21  decision to be on the medications. As far as I know, no judge or anyone else ever
22  reviewed the decision to have me on the medications.

23  21.   Even outside of forcing us to take medication, the staff at Shiloh was very
24  aggressive. For example, there was one staff person in particular who forcibly denied us
25  access to water.  There was water located in the living room and the staff person would
26  not allow us to go there; he said we had to stay up front where we could be seen.  If we
27  attempted to leave the area to go and get water, the staff person pushed us.

28

4

Plaintiff's Confidential
Personal Information/Confidential

**Exhibit 82**
**Page 1527**
Lucas R._Experts_11606

22.     On one occasion, I was inside my room and I wanted water. The water was
located outside my room so I asked a staff member if I could go get some water but he
said no. I attempted to leave my room three times. Each time he pushed me back inside
my room. The third time I held my ground and in response he grabbed me, threw me on
the ground, and held me down. While he held me down another staff member came and
he put his foot on my face. When the first staff member threw me on the ground I
scrapped my elbow very badly and bled a lot. The staff members called a nurse so that
she could inject me, because according to them, I needed to calm down. The nurse
arrived thirty minutes later and during that time I was held down.  After she injected me,
I didn't receive treatment for my elbow. After I was injected I went to the bathroom. A
staff member pushed the bathroom door open and as I quickly pulled my pants up I hit
my elbow on the door. This aggravated my injury. The injury on my elbow left a scar,
and whenever I see it, the scar reminds me of this incident.

23.     Another example of the aggressiveness of the staff members occurred when a
phone call I had with my parents went over my allotted time. I think the phone call went
over my allotted time for about 3 minutes. A staff member told me to hang up the phone.
The staff member grabbed the phone so roughly that the phone broke.

24.     I even saw a staff member once push a 12-year-old so hard that the plaster on the
walls cracked. That happened on the last day that the 12-year-old was at Shiloh. I washed
a power drink bottle and used it to hold water. The 12-year-old was asking for water so I
gave him my bottle.

25.     In addition, the Shiloh staff used crude and offensive language when they
addressed me and the other children. The staff said to us "fuck you bitch." The staff told
me that they would marry my mother and have sexual relations with her. One of these
occasions occurred when I found out my mother was ill. I became angry because of the
emotions I was feeling from my mother's illness and confronted the staff.

Plaintiff's Confidential
Personal Information/Confidential

Exhibit 82
Page 1528
Lucas R._Experts_11607

26.     I had many concerns and complaints against staff at Shiloh but I was not aware of
a mechanism, such as a confidential locked box, at Shiloh for us to file complaints
against the staff.

**Yolo**

27.     I arrived at the Yolo County Juvenile Detention Center in December 2016 and
have been detained here ever since. It has been 11 months of misery. My experience at
Yolo County Detention Center is even worse than Shiloh. Yolo County Detention is a
juvenile jail where we are kept in cells, forced to wear uniforms and treated like
criminals. The detention center makes me feel like an animal.

28.     The conditions at the detention center are terrible. The food is bad and it is not
uncommon to find hair in the food. When we take showers, the water runs too hot and
burns us. If we run out of toilet paper and request more, the staff frequently ignores us or
takes a couple of hours to give us the toilet paper. If we request medication for
headaches, or other injuries, we are ignored.

29.     I sleep in a locked jail cell. The beds are thin mattresses on top of a block of
cement and we don't get pillows. I have a make-shift pillow that I make out of my
sweaters or other clothes. When I am sitting at the tables in the common areas I am
required to ask permission before I can stand up.

30.     We are allowed outside to see the sun one hour per day, in the morning from
approximately 8:00 a.m. to 9:00 a.m. The teachers arrive around 12:15 p.m. School is
then in session until approximately 3:00 p.m. Then we spend about half an hour in our
rooms until dinner. There is a recess that is supposed to occur at 6:15 p.m, however,
frequently the recess is pushed until 7:30 p.m. or 8:00 p.m. The guards rob us of our
recess time.

31.     The guards also push us, pepper spray us, and place the handcuffs excessively tight
– to the point that wrist injuries frequently occur. If we do not want to go into our rooms,
the guards push us into our rooms. I asked the guards why they use pepper spray and I
was told that it is for their protection. Although the guards have not used pepper spray on

6

**Exhibit 82**
**Page 1529**
Lucas R._Experts_11608

Plaintiff's Confidential
Personal Information/Confidential

1  me, the other children that experienced it tell me that they would rather die than
2  experience the burning in their eyes. I live in constant fear that I will be pepper sprayed,
3  especially because I saw the severe effect it has on other children at the detention center.
4  32.    On three different occasions, the guards handcuffed me. My hands were
5  handcuffed behind my back. The guards pushed me down without the opportunity to
6  break my fall. On one occasion, I asked for water. I stretched my leg and the guard
7  pushed me. I banged my head on my way down to the ground. On a different occasion
8  the guards injured my elbow and then handcuffed me despite my injury. I have a scar
9  from this incident and whenever I see it, the scar reminds me of the incident.
10 33.    I and the other children are given $25 per week to place phone calls. I use my
11 allotted money to speak with my brother and my mother. The phone calls are extremely
12 important to me because I derive my strength from my family. I want to eventually work
13 and help my mom.
14 34.    When I speak with my brother on the phone I feel comfortable telling him about
15 my detention conditions. Usually I can only call my brother at 8:00 p.m., however,
16 because my brother is in New York, that is 11:00 p.m. for my brother. I feel bad when I
17 call my brother at 8:00 p.m. because my brother wakes up early to go to work. I asked the
18 guards if I can call my brother at an earlier time, but the guards have not accommodated
19 me.
20 35.    In contrast, when I speak with my mother I am both happy and sad. I am happy to
21 speak with her because my mother raised me and so I feel more trust with her. I feel sad
22 because I miss her. I do not tell her about my detention conditions. I lie to my mother and
23 tell her that everything is okay because I do not want to worry her. My mother always
24 cries and tells me that she does not believe me. I want to work and in turn help my
25 mother. My dream is to study and become an attorney. I want to help children that are
26 also in juvenile detention.
27 36.    In ████ 2017, I turned 17 years of age. It was my second birthday that I celebrated
28 while in detention. I mentioned in passing my birthday to a friend that is also detained

7

Exhibit 82
Page 1530
Lucas R._Experts_11609

Plaintiff's Confidential
Personal Information/Confidential

1  with me. My friend remembered my birthday and told the teacher. To celebrate my
2  birthday my teacher then brought pizza for everyone. I received two slices of pizza and
3  everyone else received one slice of pizza. I thanked my teacher, especially because not
4  everyone would do something like this for me. I was also happy because I had not had
5  pizza in a long time. Although the pizza and celebration was nice, it was still hard for me
6  to have another birthday away from my family.

7  37.    The guards frequently yell "cover" which indicates to the rest of us that we have to
8  get on the ground face down with our hands on our heads. The number of times the
9  guards yell "cover" varies on each day, and there were times when the guards yelled
10  "cover" twice in one day.

11  38.    One "cover" incident occurred in the last week of August 2017. The guards also
12  use the chokehold on one of the children. The other children and I laid on the floor face
13  down. We complained, but we could not do much because we feared the use of pepper
14  spray. The guards stated that the use of the chokehold was to keep the child calm.

15  39.    I witnessed another scary "cover" incident that occurred in first week of September
16  2017. A child was getting books when the guard asked the child to go to his room. The
17  incident escalated to the point that the child received injuries on his elbow and on one of
18  his eyes. The rest of us heard the screams of the child. This incident contributed to my
19  fear and the feeling that I will also be thrown down and that the guards will use force
20  against me.

21  **Court Process**

22  40.    Throughout the 6 months that I spent at Southwest Key, I never saw a judge. I was
23  not permitted to attend the one hearing I did have, scheduled for May 23, 2016, because I
24  was hospitalized after my counselor informed me that my mom was seriously ill. My
25  hearing was then rescheduled for approximately 3 months later. Although I entered into
26  ORR custody in January 2016, it was not until August 2016 – after approximately seven
27  months of detention passed – that I first saw an immigration judge.

28

Exhibit 82
Page 1531
Lucas R._Experts_11610

Plaintiff's Confidential
Personal Information/Confidential

41.     Although I told the Yolo County Juvenile Detention Center staff that I wanted to see a judge, it was not until after I spent approximately 3 months at the detention center that I appeared before an Immigration Judge in San Francisco. So, since the Border Patrol apprehended me in January 2016, I appeared before an Immigration Judge a handful of times.

42.     While I have been detained at Yolo County Juvenile detention center, the ORR has not provided me with the opportunity to review my detention classifications every 30 days as provided by law and they have not allowed my lawyer to participate. At the beginning of my detention, I went two months without a report. I speak with my ORR case manager about why I am here, but I have never gone to a more formal proceeding regarding my detention classification. I have never been told why I am here, had a chance to present any evidence on why I should not be here, or been given any notice of any classification review. Any 30-day review afforded on the basis of Flores Settlement or law has not and is not provided in any way, shape, or form to me.

43.     In total, my detention constitutes approximately 1 year and 11 months. During that time: I appeared before an Immigration Judge a handful of times, I had 3 attorneys, I celebrated two birthdays and one Christmas away from my family.


I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 13 day of November, 2017, at Woodland, California.

9

Plaintiff's Confidential
Personal Information/Confidential

Exhibit 82
Page 1532
Lucas R._Experts_11611

CERTIFICATE OF TRANSLATION

I, Gladys Hernandez, certify that I am fluent in the Spanish and English languages and

hereby certify that the above information is a true, complete and accurate translation of

██████ ██████████████████ Declaration.

Dated: 11/13/2017

Gladys Hernandez

Plaintiff's Confidential
Personal Information/Confidential

Exhibit 82
Page 1533
Lucas R._Experts_11612