# REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCAS R. *et al.*,<br>　　　　　　Plaintiffs,<br>　　v.<br>ALEX AZAR, Secretary of U.S. Dep't of<br>Health and Human Services, *et al.*,<br>　　　　　　Defendants.<br>_____ | ) Case No.: 2-18-CV-05741 DMG (PLA)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## EXPERT REPORT OF DR. ROY LUBIT

## I.　EXECUTIVE SUMMARY OF OPINIONS

1.　　I have been retained by the U.S. Department of Justice ("DOJ") and the U.S. Department of Health and Human Services ("HHS"), to serve as an expert witness in the litigation involving the Office of Refugee Resettlement ("ORR"), an office of the Administration for Children and Families ("ACF"), an HHS subdivision. I was asked to review ORR documents, visit ORR's two residential treatment centers ("RTC") known as Shiloh and Mercy First, review 23 case files of unaccompanied alien children ("UACs") who have been in ORR care and custody including in residential treatment centers ("RTCs"), review Plaintiffs' first amended complaint and defendants' answer, and render a report containing my expert opinions, and if asked to do so, testify about those opinions and the bases for them. This is my expert report and opinions concerning the appropriateness of care of UACs in ORR custody. I reserve the right to amend my opinion based on new information that is presented to me at any time.

2.　　I have specifically been asked to provide my expert opinions concerning: (A) Whether the prescription of psychotropic medications to UACs in ORR custody is appropriate and within the standards of care in medicine and psychiatry; (B) Whether ORR's decisions to "step-up" UACs to

more structured settings (such as transfer from a shelter to an RTC), including those with disabilities, are appropriate and within the standards of care in child and adolescent psychiatry; (C) Whether ORR's decisions regarding the "step-down" of UACs (including those with disabilities) from RTC placements to less restrictive settings, and their release to potential sponsors, are appropriate and consistent with standards of care in child and adolescent psychiatry; and (D) Whether the residential care provided by RTCs in ORR's network (Mercy First and Shiloh), including the prescription of psychotropic medications and provision of therapy and other services, is appropriate and consistent with standards of care in child and adolescent psychiatry.

3.      For the reasons set forth in this report, it is my opinion that, concerning UACs in ORR's care and custody:

a.      Overall, use of psychotropic medication met or exceeded community standards, and was within the standards of care in child and adolescent psychiatry.  Review of multiple cases did not show that psychotropic medication was prescribed instead of psychotherapy or other interventions.  There was considerable talking therapy (e.g., at a minimum, three hours weekly of group and individual), plus milieu therapy.  Not to prescribe psychotropic medication for the types and degrees of problems the children had would have been outside of the standard of care.  Most of the UACs in the RTCs had suffered severe trauma in the countries of origin and had serious emotional or behavioral problems.  Psychopharmacological assistance was needed for the safety of these children and those around them, and so that they could effectively engage in psychotherapy and benefit from therapy sessions.

b.      ORR's policies and procedures for stepping up UACs to a higher level of care (going from a shelter to an RTC or an RTC to a hospital) are appropriate and within the standards of care in child and adolescent psychiatry.  When UACs pose a threat to the health and safety of themselves or others, and the UACs cannot be maintained safely in a less restrictive setting, the UACs should go to a higher level of care.  Delaying step-ups to RTCs in these situations is contrary to acceptable practice because serious avoidable harm could occur during the period of delay.  Decisions to "step-up" UACs to a higher level of care (including decisions concerning UACs with disabilities) were appropriate, as they were consistent with applicable, appropriate ORR guidelines and within the standard of care in child and adolescent psychiatry.

c.      Decisions concerning whether to release a UAC to a potential sponsor or to "step-down" UACs from RTCs to less restrictive settings, or to release them to potential sponsors, were

appropriate.  For the cases I reviewed, children were either released to a sponsor in due course or there was good reason to reject a potential sponsor or to seek further information before releasing the child, in order to ensure the safety of the child.  Delay in the process was generally the result of sponsor delay, not avoidable delay by ORR.  Concerning stepping down from an RTC to a shelter, on several occasions when UACs were stepped down to shelters they returned to their problematic behavior and needed to be stepped up to a higher level.  This supports two conclusions.  It suggest that UACs with serious emotional/behavioral issues did better while in higher levels of care and had fewer issues.  It also indicates that ORR RTCs were not holding on to UACs for too long.

4.      In sum, in any setting in which children are being treated, inevitably, different child psychiatrists may disagree with each other about specific medication decisions, and psychiatrists and psychologists may differ in their opinion about the best placement of a child.  Moreover, in any setting, errors may occur.  With respect to the treatment and care of UACs in ORR's custody, the medical records of the UACs, and the policies and procedures of ORR do not indicate a general problem.  In fact, I find that decisions concerning UAC treatment, placement (including step-ups and step-downs), and release appear to be done with greater care, thoughtfulness, and appropriateness than the community levels of care I have observed in other settings.  In community psychiatry, for instance, unlike in the ORR setting, I have repeatedly seen excess use of anti-psychotic medications, failure to give appropriate informed consent, and failure to change dosage or medication when someone is not responding to anti-depressant medication.

## II.      SUMMARY OF BACKGROUND AND RELEVANT EXPERIENCE

5.      My name is Dr. Roy Lubit.  I am a physician board certified in psychiatry (a diplomate of the American Board of Psychiatry and Neurology), board certified in child and adolescent psychiatry, and board certified in forensic psychiatry.  I attended medical school at New York University School of Medicine, did my residency in psychiatry at Yale School of Medicine, did a residency in child and adolescent psychiatry at Boston Children's (a Harvard teaching Hospital), an advanced psychotherapy fellowship at Faulkner Hospital, and later a forensic fellowship at St. Vincent's Hospital in New York City.  I have held academic appointments at medical schools and supervised residents.  I was part of a group that received a grant from the Substance Abuse and Mental Health Services Administration ("SAMHSA"), an HHS agency, to treat traumatized children. For a complete summary of my academic background, training, professional experience, and skills, please see my curriculum vitae incorporated herein as Addendum 1.

6.      Currently I am in private practice.  I do clinical work and forensic psychiatric evaluations.  I frequently turn down or withdraw from cases because I believe my opinion will go against the side retaining me, and/or have rendered opinions contrary to the hopes of the side retaining me.

7.      I have lectured and written book chapters and peer-reviewed articles on a variety of topics, most importantly on emotional trauma and custody issues; a list of publications is included in Addendum 1 (my CV).  I have performed hundreds of custody evaluations, in which I was asked to opine on the best placement for a child, the competency of parents to take care of a child, and any treatment needs the child may have.

8.      Over the course of my career, I have had more than a thousand occasions when I assessed adults and children to determine whether they should be voluntarily admitted to a psychiatric hospital, involuntarily committed, or allowed to return home.  When working on hospital wards, I decided when patients were ready for discharge, and when acting medical director of Danvers State Hospital, I supervised such decisions by the roughly ten hospital psychiatrists.  In addition, on a number of occasions I was retained by Mental Health Legal Services in New York, or by courts, to assess if people committed to a psychiatric unit should be released even though the hospital psychiatrist felt the patient was not ready for discharge.  I frequently opined that the patients no longer needed hospital level care and could be released to the community.

9.      My background, education, training, and professional experiences have given me knowledge of best practices and standards of care for treatment, custody, and release decisions.

10.     I am being compensated for my work in this case at my standard rate of $600 per hour and $6000 for a day of deposition and/or trial testimony.  My compensation is not affected by the outcome of this matter.

### III.     INFORMATION AND MATERIALS CONSIDERED

11.     In providing my opinions herein, I have considered a number of documents, which are listed in Addendum 2.  Throughout this report, I cite portions of these and other documents.  These citations are intended only as examples, however, and I reserve the right to rely on all portions of these documents in addition to those cited in this report. Additionally, I may use the cited materials to assist me in preparing exhibits and posters or power point slides for my testimony.  My opinions are also based on visiting ORR's two RTCs, Mercy First and Shiloh, where I observed the facilities and interviewed a variety of ORR federal and facility staff.  I have had conversations with ORR staff to orient me to the project and the system.  Above all else, my opinion is based upon my review of

medical records and ORR's policies and procedures; my education, training, and experience; and the medical literature (see Addendum 3).

12.     This report is based on information known to me as of the date I signed this report, and I reserve the right to amend or supplement this report in view of any additional discovery, reports, and testimony that I subsequently receive.

## IV.     OPINIONS

**A. It is my opinion that in general the prescription of psychotropic medications to UACs in ORR custody is appropriate and within the standards of care in child and adolescent psychiatry.**

13.     Interviews of the child psychiatrist at Shiloh and the psychiatric nurse practitioner at Mercy First, and my review of the medical records of 23 UACs, did not support the Plaintiffs' allegation of excessive prescription of psychotropic medications to UACs.

14.     In their FAC, ECF No. 81, ¶¶ 140-142, Plaintiffs complain about UACs receiving psychiatric medications, but they have not pointed out any inappropriate prescriptions or poorly handled cases. Rather, they simply claim that use of various medications is harmful (or traumatic) and list potential side effects.  Plaintiffs' general statements about psychiatric medications and their use give an inaccurate overall picture of the benefit-risk ratio of appropriately prescribed psychotropic medication.  Plaintiffs fail to note that the serious potential side effects that they report are rare and that the more common ones are generally short lived or are not problematic for youths, once they become accustomed to the medication.   Plaintiffs do not note that a competent physician would only prescribe a medication if the potential benefit outweighed the potential risk, and that a competent physician would cease or change a medication if the side effects outweighed the benefit.  Plaintiffs fail to note the dangers of not taking needed medication.

15.     Plaintiffs note that use of antidepressants increases the risk of suicidal ideation when first used.  Plaintiffs fail, however, to note that the use of antidepressants decreases the incidence of suicide, demonstrated by the fact that after selective serotonin reuptake inhibitor medications (SSRIs) (the most commonly used antidepressants) were introduced in 1988 the rate of suicides in teenagers declined.  When the black box warning on antidepressants came out in 2004 and SSRIs were, as a result, prescribed less frequently, the rate of suicide increased.[1]

---

[1] https://www.cdc.gov/mmwr/volumes/66/wr/mm6630a6.htm.

16.     Based on my interviews of the psychiatrist and nurse practitioner at Shiloh and Mercy First, respectively, and my review of medical records, monitoring of medication is within community standards at these RTCs.   Children on psychotropic medications at both RTCs have weekly psychopharmacology visits for the first month and then monthly visits as required by the RTCs' policies.   The initial visit is one to one and a half hours.   The children's weight is checked at each visit.   Abnormal Involuntary Movement Scales (AIMS) are filled out at appropriate intervals to assess for tardive dyskinesia (TD), a side effect of antipsychotic medication use.   In community psychiatry, children are generally seen much less frequently than they are at the RTCs and for shorter periods of time.

17.     The psychiatrist and nurse practitioner at the RTCs use antipsychotics less and more wisely than I have seen in community psychiatry.

18.     Concerning informed consent for psychotropic medications, as of July 2018, ORR's policy and practice is that informed consent is sought from parents or legal guardians whenever possible. For instance, MercyFirst's policy is that verbal consent must be obtained from a UAC's parent(s) or legal guardian(s) if they can be located in the United States or in their home country for the following:   implementation of medication management (psychotropics); medication adjustments/titration (increase or decrease); and termination of psychotropic treatment.   At Shiloh, if a parent or legal guardian cannot be reached for decisions around starting/stopping, or titrating medications, other relatives are sought to give written consent, as is consistent with Texas law and a July 2018 Court Order in the *Flores* litigation. In addition, at both RTCs, children are generally only given medication if they assent.   At times, per the case files that I reviewed, children refused medication.   I saw no reports of children forced to take medications other than very rare emergency occasions (at Shiloh) where the child was violent and the medication was necessary for the immediate safety of the child and others.   In addition, it is appropriate to continue to offer medication to a child who says he does not want it.   The child can then refuse or assent.

19.     In their FAC, ECF No. 81, ¶¶ 141, 186, Plaintiffs allege that there is no "neutral" person involved in decisions to prescribe psychotropic medication.   The complaint that there is no "neutral" person is essentially a claim that the doctors are not neutral, are biased, and do not perform objective assessments and make objectively-based decisions concerning medication.   Plaintiffs provide no reason or data to support their contention of doctor bias.   In psychiatric hospitals, outpatient clinics, and private practice, medication decisions are made by the patient's doctor, not by a "neutral" outside

doctor.  Doctors who know the patient well and will continue to follow the patient are in a better position to make good decisions, all else being equal.  Requiring second opinions from another psychiatrist for medication decisions would severely drain resources, delay needed care and is neither required nor part of standard practice.

20.     The level of care at the ORR RTCs is better than what I often see in community psychiatry. For example, a key issue in giving informed consent for antipsychotic mediation is noting the risk of tardive dyskinesia and doing frequent assessments for it.  Tardive dyskinesia is a neurological movement disorder most commonly caused by use of antipsychotic medication.  Tardive dyskinesia causes repetitive, involuntary movements, such as grimacing and eye blinking, choreoathetoid movements of the tongue and pill rolling motion of fingers.  I have frequently seen antipsychotic medications given in the community without informed consent about tardive dyskinesia.  As noted, ORR's policy and practice is that informed consent is sought from parents or legal guardians.

21.     In their FAC, ECF No. 81, ¶¶ 64, 68, Plaintiffs complained that Gabriela N.'s Adderall dosage was repeatedly raised, suggesting they believe that doing so was inappropriate.  Plaintiffs did not note the doses, the child's response, or the side effects.  They simply complained the dosage was repeatedly raised.  Appropriate use of Adderall is to start low and repeatedly raise the dose based on improvement and side effects.  It would have been concerning if the child was kept on the same dose she was first prescribed, since this would have suggested the child was started on too high a dose or the dose was not titrated to maximum effectiveness.  Upon review of Gabriela N.'s records, prescription of that medication to her was within the standard of care.  *See* Addendum 4.

22.     In their FAC, ECF No. 81, ¶ 138, Plaintiffs allege that psychotropic medication is used instead of therapy.  Reviewing case files and consulting with ORR and facility staff reveals that this is not accurate.  Records indicate that UACs generally had three hours a week of talking therapy (group and individual therapy). UACs can ask for more individual therapy time.  In addition, there is continual milieu therapy, *i.e.*, staff in an RTC monitor the behavior of the youths, and provide guidance as the youths deal with each other and the tasks of life.

23.     The type and severity of problems youths are suffering from when placed in the RTCs frequently call for the use of psychotropic medication.  Moderate and severe levels of depression are more effectively treated by medication, or medication and psychotherapy, than by psychotherapy alone (*Arch Gen Psychiatry.* 2007; 64(10):1132-1143).  Markedly depressed, anxious, or agitated patients will benefit far more from therapy once their emotional state is improved by medication.

24.     Plaintiffs do not sufficiently acknowledge the potential, and often probable, negative impacts
and risks of not prescribing medications for children who need medication, failing to promptly place
children in higher levels of care who are a risk to themselves or others, releasing children to potential
sponsors without adequate investigation to ensure that the potential sponsor can safely care for the
child, and releasing a child to a sponsor who might abuse the child. Delay in treatment harms
patients.  Depression and anxiety, whether from trauma or constitutional make up, or a combination
of the two, are painful and sometimes lead patients to harm themselves.  Children who need to be
on medication or who need to be in secure settings often suffer harm, or at least are at a substantial
risk of harm, if treatment is delayed.  There is ongoing oversight of children in foster care.  There is
not ongoing oversight of children sent to a sponsor.  If sponsors are not adequately screened and
vetted, children will suffer.

**B.  It is my opinion that ORR's decisions to "step-up" UACs, including those with disabilities,
to RTCs are appropriate and within the standards of care in child and adolescent psychiatry.**

25.     In their FAC, ECF No. 81, ¶¶ 121-131, the Plaintiffs allege widespread inappropriate
decisions placing children in higher levels of care than is optimal for them.  Notably, Plaintiffs do
not allege incompetence leading to frequent errors.  Rather, Plaintiffs are essentially asserting that
there is a bias toward step-ups.  I have studied and written about the roots of biased decision making.
Biased decision-making can come from a variety of factors including the person benefitting from
selecting one of the options, and various mechanisms of cognitive error.  Based on my review of
UAC cases, and discussions with ORR and facility staff, I see no basis for either a motivation for
the biased decisions the Plaintiffs allege, or a set of biased beliefs by decision makers that would
lead to inappropriate step-ups.  Moreover, the UAC case files I reviewed reflect step-ups that are
medically appropriate.

26.     The Plaintiffs make conclusory assertions that it was the placement in an RTC, rather than
prior trauma or other pre-existing psychiatric problems that led UACs to have psychiatric problems.
*See e.g.*, FAC ECF No. 81, ¶¶ 42, 69, 82-83.  They fail to provide adequate data to support their
hypotheses.  Scientific analysis requires creation of competing hypotheses and then working to see
how the available data supports or contradicts the conclusion.  There are several readily apparent
hypotheses one should examine when assessing why someone became depressed.  One is that the
person has a history of depression and the current depression is either a continuation or recurrence
of the history of depression from biological vulnerability and/or trauma and stress in the past.

Another hypothesis is that there are other stressful issues other than the separation from family that are leading the person to become depressed. Another hypothesis is that there is a medical problem such as low thyroid hormone levels that are leading to the depression. Data that one should try to find and use to assess the competing hypotheses include: (1) the individual's prior history of depression and emotional trauma; (2) what other stresses the person faces; and (3) a medical evaluation. What the individual speaks about in therapy and what she says about various things will help the evaluator to know what things are bothering her. The children who ORR is caring for generally faced tremendous traumas in their home country and during their journey to the U.S. and so will be expected to have much higher rates of PTSD, depression, and anxiety than the population at large. A teenager being kept in an RTC and not being able to join family members who the child has not seen in years or who mistreated the child is far less psychologically damaging than the repeated physical and sexual assaults many of the teenage UACs suffered in their home country and on their way to the US. Their treatment in RTCs was a vast improvement over what they had previously experienced.

27.     In any setting, teenage children often have psychiatric problems. In 2017, 13% of U.S. teens ages 12 to 17 (or 3.2 million) said they had experienced at least one major depressive episode in the past year.[2] An estimated 2.9% of adolescents had bipolar disorder, and 2.6% had severe impairment.[3] In 2017 2.4% of children in grades 9-12 attempted suicide and needed medical attention.[4] The percentage of children who cross the border and eventually are placed in RTCs is less than the percentage of American children who have severe impairment.[5] This indicates that a far greater percentage of children have serious psychiatric issues than the percentage of UACs in RTCs. One would expect UACs to have much higher rates of psychiatric problems as a result of the complex trauma they typically have experienced. This supports a conclusion that UACs are not being inappropriately placed in RTCs.

---

[2] https://www.pewresearch.org/fact-tank/2019/07/12/a-growing-number-of-american-teenagers-particularly-girls-are-facing-depression.

[3] https://www.nimh.nih.gov/health/statistics/bipolar-disorder.shtml.

[4] See, e.g., https://www.childtrends.org/indicators/suicidal-teens; *see also generally* https://www.cdc.gov/healthyyouth/data/yrbs/pdf/2017/ss6708.pdf.

[5] See Perou, R., Bitsko, R., Blumberg, S., Pastor, P., Ghandour, R., Gfoerer, J., Hedden, S., Crosby, A., Visser, S., Schieve, L., Parks, S., Hall, J., Brody, D., Simile, C., Thompson, W., Baio, J., Avenevoli, S., Kogan, M., Huang, L., Centers for Disease Control and Prevention, Mental Health Surveillance Among children--United States, 2005-2011, MMWR Suppl. 2013 May 17;62(2):1-35, available at https://pubmed.ncbi.nlm.nih.gov/23677130/.

28.     Maintaining a child who is under poor behavioral control and at risk of self-harm and harming others, in a facility that is not designed to meet those needs, would pull staff away from the more stable children, denying them the staff time they need and creating risks for all children in the facility.  When a UAC with significant emotional or behavioral problems is released to a sponsor, for the child to be safe and appropriately cared for, the sponsor needs more available time and greater skills than the average child requires.

29.     When considering the loss of freedom children experience when they go to an RTC, and its impact on the child, it is important to remember that minors, especially those who are troubled, already have limited freedom. Moreover, society has a greater ability and responsibility to make choices for minors than for adults.  For example, a child may wish to stay at home, but his or her parents have the right to send the child to a camp, or a boarding school or military academy with strict rules, against the child's will.  A child is always subject to the control of a caregiver who without professional credentials and training, and without a neutral decision-maker, can restrict the child's movements and send the child to a structured environment.

30.     In any setting, adults who care for children make important decisions about where they reside, receive education, and socialize.  For good reasons, children do not have all of the same rights of self-determination that adults have.  In the context of children receiving treatment in institutions, the question therefore becomes not whether adults should make decisions, but which adults will make the decisions.  The case manager and psychologist/psychiatrist and others who work with the child, and who know the child and who have special training, are in the best position to make these decisions.  While it is reasonable to have a means of appeal, such as ORR's 30-day review policy for restrictive placements, *see* ORR Policy Guide § 1.4.2, to generally bring in an outside person who does not know the child well will absorb enormous resources that are far better used taking care of the children.

31.     In reviewing case files and consulting with ORR and facility staff, I also assessed whether there were indications of, as Plaintiffs contend, children being stepped up not because of a medical need, but instead simply because they had (or were regarded as having) a disability.  I did not find any evidence to support this claim, and certainly not on a categorical basis.  Rather, my review reflects that ORR's placement (including step-up) decisions are based on a child's behaviors and needs.  In my review of files I did not see inappropriate step ups.

**C**.  **My review of files, interviews of staff, and review of ORR's policies and procedures did not provide evidence of inappropriate methods of assessing whether to step children down or inappropriate delays in sending a child to a potential sponsor.  I did not see patterns of violation of the standard of care in child and adolescent psychiatry.**

32.     The Plaintiffs repeatedly assert that separation from their families traumatizes the children sent to RTCs, and that their depression and even psychosis is the result of such separation.  *See e.g.*, FAC ECF No. 81, ¶¶ 42, 69, 82-83.  Plaintiffs allege that not moving with adequate speed to place the children with potential sponsors traumatizes them.  Moreover, Plaintiffs assert that being in a more restrictive setting than necessary hurts them.  There are serious problems with each of these assertions.

33.     The Plaintiffs write as if it is ORR policy to keep children longer than necessary.  My consultation with ORR and facility staff, and review of ORR policies and procedures, and UAC case files does not support the Plaintiffs' allegation.  ORR policy is to ensure UACs in its care are released in a safe, efficient, and timely manner to a suitable adult sponsor or other appropriate organization. *See* ORR UAC Policy Guide Section 2 and ORR Manual of Procedures ("MAP") Section 2 (*Safe and Timely Release from ORR Care*).  It is also ORR's policy to place UACs in its care in the least restrictive setting appropriate for the child's needs (ORR Policy Guide § 1.2 – Standards for Placement and Transfer Decisions, 1.4.1 – Least Restrictive Setting).  Plaintiffs have not demonstrated that policy guidelines are inappropriate or lead to improper delay, and they have not posited or substantiated any alleged motivation or reason for bias.  When an ORR Federal Field Specialist ("FFS") approves a step-up to an RTC, it is generally the result of the opinion of the psychiatrist or psychologist treating the child (ORR Policy Guide § 1.4.6 – Residential Treatment Center Placements).  How long they stay is again based on the decision by the treating doctor in consultation with stakeholders such as federal and facility staff.  The mental healthcare decisions are made by physicians and psychologists.  In any setting, it is possible that there are physicians and psychologists who may make one or more poor choices.  But that is very different than saying there is a systemic, continual problem.  I did not observe any such ongoing problem in my review of ORR's care of children.  Plaintiffs' call for a "neutral" decision maker, someone who does not know the child as well as the referring physician or therapist does, is problematic.  Good medical decisions require having a thorough knowledge of the patient's issues, preferences, and overall condition,

which can be even more challenging given that there is typically less information about UACs in ORR care as compared with the domestic population. Someone who does not know the child well will be less able to make the best decision. In addition, considerable resources would be absorbed that can better be used treating children.

34.     In their FAC, ECF No. 81, ¶ 131, the Plaintiffs argue that children are prevented from going to their families based on "qualifications" that Plaintiffs consider "novel and superfluous," such as "being cancer-free" or "having income sufficient to supply released children with psychotropic drugs." The fundamental issue is not being cancer-free or having sufficient funds to pay for psychiatric treatment. The issue is being able to meet the child's needs. If a child needs psychiatric treatment or medical treatment and would probably suffer harm (or fail to heal) without it, the sponsor needs to be able and willing to acquire that medical/psychiatric help. If a child is diabetic and a potential sponsor does not believe in using insulin or cannot for any reason arrange for needed medical visits, the potential sponsor is not a suitable sponsor. Similarly, if a child has been suffering from a psychosis or bipolar disorder or serious depression and ceasing medication would lead to decompensation, being able to obtain medication and therapy is a crucial issue to the child's physical and mental well-being.

35.     I have seen no evidence of ORR having a policy that having cancer precludes someone from being a sponsor. However, if a potential sponsor has any health issue that impairs the caretaker's ability to take care of the child, or that could lead to the caretaker's death before the child is 18, it is a relevant issue. A potential sponsor having any issue that impairs the potential sponsor's ability to properly parent a child, is a factor to consider, just as one would consider the potential sponsor's availability. It would be appropriate to reject a business consultant who is away most nights of the week; the issue is availability, not that he is a business consultant. Plaintiffs complained that in Gabriela N's case, her grandfather having cancer was noted as a consideration for release. Gabriela N.'s case file indicates that ORR was not provided information about the prognosis or degree of impairment from the cancer, only that her grandfather appeared to terminate treatment early on and that he did not appear to know much about his cancer. This is reason for concern. Moreover, this was only one of a number of reasons for concern that were discussed. *See also* Addendum 4.

36.     The Plaintiffs label the financial ability of a sponsor to continue psychiatric care and the health of a sponsor as spurious issues. *See, e.g.*, FAC ECF No. 81, ¶ 131. This contention is gravely mistaken. ORR is statutorily required to engage in suitability determinations to ensure that children

are released to sponsors who can provide for their physical and mental well-being.  The Plaintiffs
are ignoring the serious harm that is likely to occur in such cases, and will befall many children, if
Plaintiffs' policy proposals were implemented.  If a potential sponsor does not have the funds to pay
for psychiatric care, and there are no other funds available for the child to receive needed psychiatric
care, psychiatric treatment will end.  This would generally be very harmful to children who need
psychiatric care.  ORR policy is not to simply reject potential sponsors who cannot readily arrange
for needed psychiatric treatment.  ORR attempts to help sponsors to find community resources and
services for the child by linking them to post-release case management services as is needed, *see*
ORR Guide § 6.2, but ORR cannot directly pay for the care once the child leaves ORR custody.
ORR works to help the potential sponsor by looking for low-cost/free local community service
providers.  *See* ORR Guide § 4.2.  ORR does not, however, have the funding to pay for therapy of
children who had been in their care, once they are living with a sponsor.  It would be outside of the
standard of care to send a child, who needed ongoing treatment, to a residence where the child could
not get the needed treatment.

37.     In their FAC, ECF No. 81, ¶¶ 126, 141, the Plaintiffs argue that "neutral" decision-makers
should be involved in the RTC treatment, placement, and perhaps they also argue, release process.
Plaintiffs' request is not the standard of care for the placement of children in RTCs and hospitals.
In the domestic setting, if a child objects to going to an RTC or psychiatric hospital, and the parents
and doctor decide the child should go, the child would have to go.  I am not aware of any state having
a mechanism by which a minor can demand that an unaffiliated psychiatrist must agree for the child
to go to an RTC or psychiatric hospital.  Plaintiffs request for a "neutral" decision maker suggests
that the Plaintiffs believe that the psychiatrists and psychologists who are closely involved in these
decisions are biased.  I have done research on the origins of bias.  *See* Addendum 1 (C.V. containing
list of publications).  Bias can come from cognitive errors, distorted views of people or situations or
benefitting more from one course being selected rather than another.  I do not see evidence for any
of these.

38.     Shiloh RTC can accommodate up to 32 children from ORR.  It had 15 at the time of my site
visit.  Both RTCs (Shiloh and Mercy First) are paid for the number of beds they have *available* for
ORR, whether or not they are filled.  They do get money for food, clothing and services based on
the number of children they have, but there is no monetary incentive to hold children longer than is
optimal for their care.  Therefore, there is no incentive to keep children longer than needed.

39.     The average length of stay in the RTCs is 120 days.  After leaving the RTC, about one third of children go to a shelter and two thirds are released directly to a sponsor or placement outside of ORR.  The need for treatment and stabilization of the patient generally determines the length of stay. One study showed that in 1/4 of domestic facilities the average length of stay was one to six months, in 1/3 the average length of stay was seven to twelve months, in 1/5 the stay was more than a year, and data was not available for the remainder.[6]  Children who come in on insurance are generally already in therapy, while those coming from ORR are just beginning therapy.  Already being in therapy and being able to return to the therapist and parents, rather than starting therapy and being with a sponsor the child may not know well, is one reason stays are sometimes longer in ORR RTCs, although often the lengths of stay are comparable or shorter.  This reflects the realities of treating the population that ORR serves.

40.     Plaintiffs propose asking outside decision-makers to assess ORR's conclusion that a potential home or potential sponsor would not be safe for the child; this proposal is problematic.  *See, e.g.*, FAC ECF No. 81, ¶ 110.  First, as discussed, I have seen no evidence of bias or problems in the decision making on this issue.  Second, Plaintiffs' proposal would likely delay the process of moving on and eventually finding an appropriate sponsor.  My review of 23 UAC cases showed that decisions by ORR staff to not send a child to a potential sponsor's home were appropriate, unlike many decisions I have seen done by protective services.

41.     Plaintiffs propose allowing potential sponsors who are rejected to see the source of negative comments about them.  *See* FAC ECF No. 81, ¶ 111(b).  This proposal is problematic.  State child protective service organizations generally do not release the source of reports of child mistreatment. When people make allegations about a parent to state child protective services, the parent does not have the right to find out the source of the information.  If biological parents of domestic children do not have the right to find out who made an anonymous report, then a potential sponsor of a UAC, who may not even be the UAC's parent, does not have that right.  If parents and potential sponsors could find out who reported concerns about them, many people would not provide information, and

---

[6] Ireys, H., Achman, L., & Taky, A., State Regulation of Residential Facilities for Children with Mental Illness (2003), US Dept HHS, https://www.academia.edu/5304423/State_Regulation_of_Residential_Facilities_for_Children_with _Mental_Illness._Rockville_MD_Center_for_Mental_Health_Services_Substance_Abuse_and_Me ntal_Health_Services_Administration, at 19-20; *see also* https://www.mathematica-mpr.com/- /media/publications/pdfs/residfacilchildren.pdf

as a result many children would be placed at avoidable risk. Rejected potential sponsors, including parents, should know the reason they are rejected and have the opportunity to respond to the issues. Review of the cases shows that rejected potential sponsors have been given the opportunity to respond to allegations. ORR policies are consistent with the way decisions are made about children across the U.S. The Plaintiffs want to set up a different set of rules for children in ORR custody. Moreover, non-parents who never had custody of a child do not have the rights of a parent. Plaintiffs' proposed changes would have serious negative consequences for the safety of children in ORR's care.

42.      In their FAC, ECF No. 81, ¶¶ 114-116, Plaintiffs assert that ORR is too slow to move children to potential sponsors. Plaintiffs claim there is substantial literature supporting home care over group home care. I have been told that they have not provided the studies so we can assess if these studies are relevant. *See* FAC, ECF No. 81, ¶ 102. The belief that in general, home-based care is better than group home care, does not mean that *any* home is better than *any* RTC for every child. It is not scientific to assume that a general finding applies to specific cases within the group. For example, if we took two hundred people, had half vigorously exercise more and eat less, the average health of those in the exercise and diet group would be better than that in the control group. However, this does not mean that doctors should blindly tell all patients to cut calories and exercise more. There are people who are underweight. There are people who will suffer heart attacks or other problems by engaging in vigorous exercise. Even if the average child in domestic care is better off in a traditional home than in a group home, it does not mean that the children who are referred to RTCs for treatment are better off living with any sponsor than being in Shiloh or Mercy First. The needs of the individual child, the parenting ability of the specific sponsor and the quality of the RTC are very important factors.

43.      Plaintiffs assert that children are having serious psychiatric problems as a result of being separated from relatives. *See e.g.*, FAC ECF No. 81, ¶¶ 42, 69, 82-83, 102. The overwhelming majority of the ORR cases do not involve children separated from their parents because of risk of harm. The great majority involve trying to find sponsors, who the children have not seen in years, to take the children. ORR is statutorily required to engage in suitability determinations to ensure that children are only released to sponsors who can provide for their physical and mental well-being. Prudence also requires assessing if a child will be safe with a potential sponsor and if the potential sponsor can safely provide for the needs of a troubled child. Plaintiffs do not sufficiently weigh the

risk of children being abused or trafficked if ORR does not take adequate care when screening potential sponsors.

44.     In case after case, Plaintiffs claim that a youth is depressed and sometimes suicidal because of separation from family, failing to even note that the child has a history of depression and one or more suicide attempts, as well as serious trauma preceding their entry into the U.S. Plaintiffs also fail to note that frequently the potential sponsor is someone the youth has not seen in years.  If Plaintiffs believe that separation from their nuclear family and historic caretakers is the key stress on the children in HHS facilities, they should generally advocate for a return to their home country to be with their prior caretakers.  A UAC saying that the UAC is depressed because the UAC misses the UAC's family does not prove that that is actually the reason for the depression.  When people feel depressed, whether for biological reasons, or because of past trauma, or current stress, their minds grab onto something prominent that could be causing the depression.  Fix the current stress and they may be feel better for a few days, but then they will often be depressed again.  Being apart from family is an easy reason to grab onto.  Teenagers go to camp and boarding school and generally do not fall into severe depression.  In the case records, I have seen UACs claiming depression because of separation from family when they had not seen that family member in years.  Teenagers who suffered severe trauma do become very depressed, and suffer anxiety and behavioral acting out and will suffer those symptoms regardless of the state of current stresses.

45.     When I do custody evaluations, I am tasked with assessing the parenting abilities of parents.  If a parent told me that s(he) felt it was superfluous whether a summer camp or private school or relative that the parent was sending the child to be with for an extended period could see to the continuation of needed psychiatric care, I would find the parent to have terrible judgment.  Similarly, if a parent told me that it was superfluous whether s(he) would place the child indefinitely with a caretaker who had serious illnesses that could markedly compromise the caretaker's ability to care for the child, and could likely lead the child to suffer the loss of the caretaker when the caretaker dies, I would find the parent to have terrible judgment.  I am not saying that someone with cancer cannot appropriately take care of a child.  I am saying that one needs to know how any medical problem a potential sponsor has affects the person's functioning and if there is a significant chance of the individual becoming incapacitated or dying while the child remained in the individual's care.

46.     Based upon my review of the case files and conversations with federal and facility staff, the potential sponsors who are turned down by ORR had serious weaknesses and it would have been

inappropriate for the children to be placed in their care.[7]  It is also crucial to remember that the needs of children with serious emotional problems, such as those who were transferred from a shelter to an RTC, are very different than the needs of children without those problems.  While I would agree that a home situation is better than a group home or RTC for children without serious emotional and behavioral issues, this is not the case with children with certain types of serious issues.  There is a good reason that when children are having serious issues they are at times sent to hospitals or RTCs where, in addition to individual therapy, they have group therapy and milieu therapy.  Milieu therapy is a crucial modality for troubled teens.  Milieu therapy is the use of the whole physical, social, and cultural environment in the therapeutic process.  In milieu therapy, the environment is the essential treatment component.  The environment is designed to foster appropriate behavior, opportunities to develop needed social and self-control skills, and to have staff available for support and guidance at all times.  Group pressure, and the continual availability of staff to help children deal with social interactions and self-control issues, are very important for troubled children.

47.     In the domestic setting, when children are in foster care, or with a parent who is being or has been investigated by protective services, there will be multiple home visits over a substantial period of time.  In stark contrast, ORR has very limited follow up after a child is placed with a sponsor – only a 30-day follow up call to the child and sponsor - as ORR no longer retains custody of the child, unlike domestic care systems.  As a result, it is crucial for ORR to do an adequate evaluation before release can occur.  If a sponsor fails to take the child for therapy, or the child does not do well in the placement or is mistreated after the first month it is unlikely that state child welfare authorities will realize there is a problem and become involved.  Significant harm to the child and others can occur as a result.  In addition, without oversight, caretakers are less likely to be on their best behavior.  Therefore, it is necessary for ORR to be cautious when releasing children, to minimize the possibility of a child decompensating and harming herself, or suffering mistreatment.

48.     For these reasons, it is my opinion that ORR's decisions concerning release to suitable sponsors, are generally appropriate and consistent with standards of care in child and adolescent psychiatry.

---

[7] Staff also confirmed that the decision to turn down a potential sponsor is not necessarily final, and staff are willing to work with the potential sponsor to see if the potential sponsor can address any necessary issues so that it can be reevaluated whether release to the potential sponsor would now be safe for the child.

**D.   Residential care provided by RTCs in ORR's network (MercyFirst and Shiloh) is appropriate and consistent with the applicable standards of care in medicine, psychiatry and child welfare.**

49.      In their FAC, ECF No. 81, ¶ 120, the Plaintiffs claim "a vast body of research" shows the harm of being in a restrictive setting.  Plaintiffs do not mention any specific papers or books, however.  There is good reason to question the applicability of the research they speak about.  Did the research consist of children randomly sent to shelters or RTCs or to questionable homes with people they had not seen in many years?  This is unlikely.  Taking a child from a stable home, school, friends and therapist entails a great loss to a child.  It is likely that many children in such situations would be better off staying with their family, therapist, school and friends than going to an RTC.  However, comparing children left in their homes to those placed in an RTC for a month does not tell us anything about whether a UAC leaving an RTC quickly to go to a sponsor would be helpful.  Stepping down or releasing a child too soon from an RTC to go to a shelter or a sponsor does not decrease the instability in the child's life, as leaving a troubled child in a stable family home with adequate supports does.

50.      Plaintiffs claim that being in ORR's care and custody hurts the children's education.  To assert this one needs to compare the child's education at the RTC to the education the child would receive once in the care of a sponsor.  The education at Shiloh and MercyFirst appears to be better than what the children would likely get in the community.  They receive roughly 30 hours of instruction per week with a very high teacher-student ratio.  The classrooms are large and quiet, unlikely many public schools.

51.      In their FAC, ECF No. 81, ¶ 17, Plaintiffs claim that having longer time in restrictive settings and medication add to trauma.  This use of the word trauma is evocative rhetoric but is contrary to professional use.  Children are at risk for trauma if they are not in a setting that can keep them safe, and they do not receive appropriate needed medication.   In addition to therapy at least three times weekly and educational services, RTCs offer high staff-patient ratios and closer supervision in a therapeutic milieu than the UACs would generally receive in a less restrictive setting.  Plaintiffs do not provide literature explaining their assertion, or explain how they believe that the way the children live and are treated at Shiloh and MercyFirst leads to trauma, or how their psychological health would benefit more by being in a less restrictive setting.

52.      The concept of the least restrictive setting has different significance for children and for adults.  For an adult, a restrictive setting curbs liberty.  Children, by contrast, are not free to make

Roy Lubit, M.D., Expert Report          - 18 -          Confidential – Under Protective Order

their own decisions and travel and live where they wish; they are always subject to the supervision and decision-making of an adult. Therefore, placing children in a restrictive setting does not massively decrease their liberty. Being in the RTC provides the benefit of higher staff-patient ratios, greater safety, and greater services. Contrary to Plaintiffs' assertion, this is not harmful, it is beneficial. A crucial aspect of freedom is freedom from fear of harm (by self or others), and freedom from risk of harm. Moreover, Plaintiffs' blanket assertion that RTC placement is harmful overlooks the harm that can befall children if they are not in a sufficiently secure setting or sent to a sponsor who cannot adequately provide for the child's physical and mental needs. Moreover, keeping a child who is under poor control in a setting that cannot adequately monitor the child places the other children at risk and not only risks another child being hurt or exposed to a child harming himself (which is a destructive experience to witness) but can lead the child to not feel safe. Furthermore, the child who needs greater structure, if kept in the shelter, will absorb staff time and energy that other children need. Many children are harmed if a child remains in a setting that does not have the proper structure. To place a child in a setting without the structure needed to meet the child's needs and keep the child and other children safe would be outside of the standard of care.

53.     Review of ORR policies and procedures, visits to the RTCs, and review of 23 UAC case files indicate that placement of children in the RTCs, step down and release decisions, and treatment of children in the RTCs is within the standard of care in child and adolescent psychiatry.

## V.     CONCLUDING COMMENTS

54.     The Plaintiffs allege widespread inappropriate decisions placing or keeping children in higher levels of care than Plaintiffs believe is optimal for them; prescribing more medication than Plaintiffs believe is appropriate; failing to obtain informed consent; inappropriately delaying release to sponsors; rejecting  potential sponsors; using medication instead of talking therapy; and not supporting calls to family members, among other charges. Plaintiffs do not allege incompetence leading to frequent errors; they are essentially asserting there is a bias toward the problematic decisions that they allege occur. UAC case file records, my review of ORR's policies and procedures, and site visits to the RTCs contradict the allegations.

55.     Psychotropic medication use at ORR grantee care facilities is at least as good as the use of psychiatric medications I have generally seen in community psychiatry. Medication is not being used instead of talk therapy and other interventions. Children generally had at least three hours a week of group and individual therapy, as well as ongoing milieu therapy. Children with the level

and types of serious mental health problems that the children placed in the RTCs exhibited generally need, and are typically treated with, a combination of medication and psychotherapy, as they are at Shiloh and MercyFirst.  It is significant to note that the medication decisions were frequently made by hospitals and the medications were continued at the RTCs.

56.    Plaintiffs' assertions about medications are markedly misleading.  When speaking about specific patients they note long lists of possible side effects giving the reader the impression that the patient suffered all of the side effects, although they did not.  All medical care poses potential problems.  Most medications have side effects, some serious.  Penicillin can cause anaphylaxis and death.  Doctors weigh the potential risks and benefits before prescribing medication, and monitor patients to see if the medication is helpful, what negative side effects may exist, and if the benefit cost ratio supports continuation of the medication. Plaintiffs give lists of possible side effects of medication but do not speak about the harm that may occur if a depressed child with a history of suicidality does not receive medication.  To treat moderate and severe depression only with psychotherapy is contrary to current guidelines.  Plaintiffs' complaints about use of medication indicates a lack of knowledge of standard medical practice and of the benefits and risks of psychotropic medication.  Plaintiffs stated that antidepressants increase the incidence of suicidal ideation, but fail to note the more important issue, that they decrease the risk of actual suicide. Plaintiffs repeatedly questioned the use of medications when it was completely appropriate.  They complained, for instance, that a UAC's ADHD medication was repeatedly raised.  One is supposed to start low and progressively increase the dose depending upon benefit and side effects.

57.    The UAC records reflect diligent efforts to locate potential sponsors, assess whether releasing the children to such sponsors would be safe, and assess the capabilities of sponsors to meet the children's physical and mental health needs.  As to RTC placement, my review confirmed that the children who were placed in the RTCs needed to be there.

58.    I saw no evidence of bias on the part of ORR favoring placing children unnecessarily in restrictive settings, keeping them in such settings longer than is appropriate, and failing to send them to appropriate sponsors.

59.    There is additional evidence of bias held by Plaintiffs.  Plaintiffs give vague descriptions of situations, put the most negative possible spin on situations, fail to discuss different hypotheses concerning what is happening in the situation, and fail to note important data that contradicts their opinions.

60.    Plaintiffs' summaries of medical records contained markedly misleading statements. Plaintiffs repeatedly described UACs as doing well before being in the RTC and having not had problems prior to being in the RTC, when in reality they had serious psychiatric issues prior to even entering the U.S.  For instance, Plaintiffs asserted that Gabriela N. was reported to be fine when in the U.S. until ORR decided not to release her to her grandfather. *See* FAC, ECF 80, ¶¶ 61-62. Plaintiffs did not note that Gabriela N. had suffered abuse including rape in her home country and had suicidal ideation in her home country. They claimed a close relationship although Gabriela N. had not seen her grandfather for years.  In my opinion, it would have been inappropriate to release her to her grandfather. (See Addendum 4).  Further, concerning Daniela Marisol T., Plaintiffs write in their FAC, ECF 80, ¶ 39 that, "According to Katherine, when Daniela Marisol lived in Honduras with her family, she did not seem to have mental health issues."  However, her chart noted a history of abuse by her mother, sexual assaults, being threatened by gangs and having homicidal and suicidal ideation in the weeks before coming to the U.S.  Failing to note such serious information, and instead saying a family member did not see mental health issues, raises serious questions about Plaintiffs' awareness of the relevant facts or willingness to cherry pick data providing an inaccurate picture of situations.

61.    Plaintiffs repeatedly fail to discuss the likely negative impact of the policy changes they recommend and that what they recommend is at odds with the way care is given to children in the U.S. in general.  When individuals present significant danger to themselves or others, they should be placed in settings in which their safety and that of others can be protected.  Plaintiffs want there to be a neutral decision maker and time for the UAC to challenge a restrictive placement before being moved.  They fail to note that delaying the move risks harm to the individual child and others; the risk of harm to self or others that led to the decision to transfer to a more secure setting does not disappear while waiting for the decision of an outside person.  It is not standard practice for courts or other "neutrals" to become involved before the person is even sent to a structured facility.  This is especially the case with children.

62.    Plaintiffs want potential sponsors to know who provided information against them.  When children's protective services receives calls about possible child neglect by parents, the parents do not have a right to know who called in negative comments about them to protective services. However, Plaintiffs want to give this right to non-parent potential sponsors of UACs.  Plaintiffs do not provide a discussion of the costs and benefits of this approach.  Plaintiffs' proposal would lead

many people to fail to provide important information needed for the child's safety.   Plaintiffs'
proposal would be harmful, and not helpful, to children.

63.   Plaintiffs contend that the medical state and finances of potential sponsors are irrelevant,
ignoring that medically compromised individuals are at significant risk for being compromised in
their ability to safely care for a child and that it is important to assess this.   Plaintiffs also assert that
knowing about a potential sponsor's financial situation is irrelevant.   However, adequate finances
are necessary for the children to remain in treatment crucial to their welfare.   Concerning their wish
for faster release and greater tolerance for potentially concerning issues, Plaintiffs appear to ignore
or undervalue the risks of the children being abused, trafficked and poorly cared for, in their
complaints about ORR not releasing UACs to potential sponsors quickly enough.

64.   Plaintiffs want to speed up the process of UACs going to sponsors, but their proposed policy
changes would probably lengthen the process.   Plaintiffs want "neutral" decisions makers involved
in medication and placement decisions.   Domestic children do not have a neutral psychiatrist opine
on what to do, they have a psychiatrist and their parents need to consent, and the children need to
assent. Moreover, bringing in another psychiatrist, who is unlikely to ever know the child as well as
their existing psychiatrist will drain needed resources, and delay needed treatment lengthening the
amount of time UACs spend in congregate care.

65.   Plaintiffs want to speed up children leaving RTCs because of unspecified general literature
about RTCs interfering with certain aspects of development.   Plaintiffs ignore that without needed
treatment and protection terrible things can happen.   Plaintiffs also do not speak about the specific
children and the specific RTCs to support this theory, but rather rely on generalities they say are
grounded in literature they have not referenced.   To the extent Plaintiffs do speak of specific children,
my analysis of the case files shows that Plaintiffs are frequently mistaken and often overlook crucial
facts, and that ORR's placement, treatment, and release decisions are justified and within the
standard of care.   *See* Addenda 4 and 5.   It is not scientific to make assertions based on generalities,
ignoring important specific aspects of a situation.

66.   Plaintiffs' argument that "neutrals" should be involved in decision-making suggests that
Plaintiffs believe that the psychiatrists and psychologists are biased or are committing malpractice.
I have done research on the origins of bias.   Bias can come from cognitive errors, distorted views of
people or situations, or benefitting more from one course being selected rather than another.   I do
not see evidence for any of these.

67.    HHS's Dr. Bartholomew noted that oversight of mental health decisions and issues throughout the ORR system is being developed.  The (at least) temporary loss of a key child psychiatrist at ORR headquarters who was developing training and measurement abilities, in combination with difficulty hiring a replacement, has slowed the process.  I am told that ORR has attempted to fill the position, and that these efforts are ongoing.

68.     Conversations with ORR staff reflect also that ORR has been trying to build a network of professionals to whom they can refer children for psychiatric care after the children leave ORR's care and custody.  This effort, once implemented, would facilitate releases to some potential sponsors who otherwise would have difficulty meeting a child's needs.  This effort by ORR also undercuts Plaintiffs' allegations that there is a culture of trying to keep children longer than appropriate.

69.    Over the course of my career I have come across, complained about and sometimes was the expert for plaintiffs who complained about incompetent and inappropriate psychiatrists, psychologists, and other mental health staff working with children.  I also was the expert on many cases for Mental Health Legal Services helping patients to leave psychiatric hospitals when they were inappropriately committed there.  After reviewing case file records, visiting RTCs and meeting with ORR and key facility staff, I found no incompetent or inappropriate caretakers.  Rather, I found caring and appropriate caretakers who were thoughtful and knowledgeable.  Interview of the child psychiatrist providing medication at one of the RTCs (Shiloh) demonstrated knowledge of best practices.  His approach is better than most of what I have seen at community mental health centers.  I have frequently seen psychiatrists and psychiatric nurse practitioners making poor medication choices and failing to adequately monitor patients with important tests such as AIMS.  As to Mercy First, the nurse practitioner was competent.[8]  The allegation that medications were used instead of therapy was false.  There were standard amounts of talking therapy.

70.    FAC ¶ 17 states that "many of the children and youth whom the Children Center serves have suffered multiple psychological and physical traumas, first in their countries of origin, next during

---

[8] I acknowledge that the MercyFirst psychiatric nurse practitioner tended to stay with medication regimens decided at hospitals by psychiatrists and was not as active in changing medications when they were not optimally effective as I would prefer to see.  He should use symptom inventories for assessing depression, rather than simply an interview and asking the child's self-assessed mood.  That said, these critiques do not mean his treatment of children was outside the standard of care.  After careful review, for reasons discussed in this report, the care received by children at MercyFirst is within the standard of care.

their journeys through Mexico, and then again, upon being arrested and detained for immigration violations." Plaintiffs claim that the more time already traumatized children and youth remain detained, separated from their parents and families, the more their mental and physical health deteriorates. "The trauma that immigration detention causes children and youth is greater still when ORR places them in restrictive settings such as juvenile halls and RTCs, or medicates them involuntarily or without their parents' consent or other lawful authority. The additional trauma such detention inflicts requires the Children Center to devote commensurately greater resources, particularly mental health resources, to assist such children and youth to recover." Plaintiffs' statement is conclusory, and presents an inaccurate picture of the situation. Plaintiffs fail to show that the children were harmed by the actions of ORR and its grantee care providers. It is not true that the more time that they spend separated from their parents and families, the more their mental and physical health deteriorates. Children do not automatically deteriorate psychologically and physically when they are sent to sleep away camps or boarding schools. Whether they benefit or regress depends upon their biological make up, past experiences, the environment of their family's home, the environment of where they are staying, and what outsiders say to them about the new place they are staying and the reason they are there. Moreover, none of the named cases was being kept away from parents in the U.S. If Plaintiffs' lawyers believe that being kept away from their families is leading to their clients' physical and psychological health deteriorating, the logical thing to do is to send them back to their countries of origin, where they allege their clients were doing well and did not have psychological problems. However, Plaintiffs are not asking for that relief. Instead they want more rapid release to relatives that the named Plaintiffs have not seen in many years.

71.    Plaintiffs' allegations that UACs are traumatized, and their physical and mental state deteriorates the longer they are in RTCs, *see* FAC ¶ 17, misrepresents the situation. To the contrary, UACs, who often were traumatized in their home country or along the journey to the U.S. prior to coming into ORR's care and custody, are placed in RTCs and prescribed psychotropic medication for the purpose of treatment to address acute mental health symptoms. My review of the case files, including medical records, shows the UACs doing better, not worse after being in ORR custody and receiving appropriate mental health treatment and other services in RTCs.

72.    Several of the Named Plaintiffs (e.g., Lucas R and Gabriela N) attribute their experience of serious psychological problems to ORR's failure to unite them with relatives in the U.S. However, the medical records reveal a contrary story. They show that it is false that these UACs first developed

such problems while in ORR care and custody, but rather that their severe mental health issues began much earlier in their home countries, and that the UACs received effective treatment in the RTCs to address them. Also, as detailed in my case review summaries in Appendix 4, there were good reasons for not releasing UACs to denied sponsors.

73.     It is also notable that the Plaintiffs have not pointed to specific medication decisions, or argued these decisions were incorrect or had significant negative consequences.  Instead they render broad attacks that the medicines have side effects and caused harm, without pointing out the specific harm resulting from giving the medication to a particular UAC.  As noted above, based on my review of various medical records in the case files, the administration of psychotropic medications to UACs at the Shiloh and Mercy First RTCs, including obtaining informed consent and assent, was within the standard of care.

74.     Except in an emergency, medicines are not being given involuntarily.  Informed consent is sought from parents.  UACs must assent to medication, except in an emergency to avoid imminent harm.  The allegation of physical deterioration is opposite to the truth.  While in ORR custody the UACs receive medical and sometimes dental care that was badly needed.  Moreover, the treatment the children receive likely decreases the cost to outside organizations that serve the children, not increases such costs.

75.     Plaintiffs assert that the named UACs developed serious psychological problems as a result of the incompetent treatment they received.  Plaintiffs allege that the UACs were frivolously and arbitrarily kept away from family members, given medications they should not have been given, were denied reasonable and needed emotional support, sent to harmful restrictive settings for no valid reason, and in the case of Miguel Angel S (no longer a Named Plaintiff) was repeatedly assaulted by multiple people.  Their papers claim that several UACs stated that all of their emotional problems were the result of ORR preventing them from uniting with relatives.  The medical records show that it is false that they first had serious problems in the U.S. when not allowed to go to potential sponsors.  There were good reasons for not sending them to sponsors that ORR denied.  The UACs were not denied reasonable support, they were not medicated instead of given therapy.

76.     Given the marked disconnect between what the Named Plaintiffs allege in the FAC, and what the medical records, psychological evaluations, and other records found in their case files demonstrates, the only source for Plaintiffs' allegations were the statements of the UACs themselves.

77.     This is a serious problem.  For the UACs to make statements to their legal counsel that were drastically different from multiple consistent statements they made in therapy and evaluation sessions as reflected in the case file records, their counsel (assuming they accurately relayed what the UACs said) likely asked leading and suggestive questions.  Such questioning, leading the UACs to have very inaccurate, negative beliefs about those taking care of them, can cause significant psychological harm.  Believing that people who are supposed to take care of you are mistreating you and cannot be trusted leads to a phenomenon called betrayal trauma, a subject I have written about. *See* Addendum 1.  Whether the person actually was betrayed or mistakenly believes that people he believed he could rely on mistreated him, the psychological result will be the same.  When betrayal trauma compounds the trauma the youths suffered in their countries of origin, the psychological outcome is worse.  It is bad enough that the world contains bad people who would hurt you.  It is far worse if when you escape those people and go to the place where you believe you can start a new life and be treated well, that you are led to believe that the people you must rely on repeatedly do things that harm you.  Being led to believe that authority figures you need to rely on are incompetent or worse creates a view of the world as empty and the person as being alone, unable to trust and rely on others.  This is very psychologically damaging.  It is standard teaching in child psychiatry that at the same time that we step in to protect children from abuse, we do not seek to instill distrust in their parents and absolutely do not seek to foster inaccurate negative impressions of their parents and teachers.  Doing so would be psychologically destructive, leaving the child to feel alone in the world with no one to whom they can turn.

78.     There is an additional problem.  The betrayal trauma resulting from believing that their doctors mistreated them and caused them harm fosters negative impressions of the state, of doctors and of medications.  This can interfere with UACs obtaining psychiatric help they will need in the future.  It also sets UACs up for great distress and disappointment when they find that their problems do not disappear upon release.

_____

Roy Lubit, M.D., Ph.D.


Dated:  June 19, 2020

**Addendum 1**
**Curriculum Vitae**

In the past four years, I have testified as an expert at trial or by deposition in the following cases:

- Baird v Baird NJ, No. FM-10-217-14, July 27 and August 3, 2016 (custody)
- Banta v Banta; NY; Orange County Family Court; file 63196  custody June 29, 2016
- Brock v City of NY 15 CV 1832 (VSB) February 5, 2019
- Caldwell, Ken; deposition, personal injury case; July 18, 2016 (defense)
- Cambell v Rite Aide, NJ Docket no. MON-L-004790-08 August 2019
- Deleon v Rockland County Correctional Facility; Deposition Personal Injury; US District
- Dekany v Akron Police and Stowe; Case no. 5:16CV01829 US District Court N Ohio. March 9, 2018. (plaintiff)
- Doe v Sharma  NY June 7, 2018 Index No. 01324/2014 (plaintiff)
- Doe v Boys and Girls Village NO. FBT CV 17 5032485 S and v The Children's Center NO. FBT CV 17 5032966 S  deposition, February 11, 2019
- Dukes v MEAC, No. 3:16-cv-00303 CRS  November 7, 2017 (plaintiff, deposition)
- Eginoire vs Indionola School District, Case no 4:16cv 00567  Aug 17, 2017 (plaintiff, deposition)
- Evans v. New York City Transit Authority, et al., E.D.N.Y. 16-cv-4560, trial testimony 1/18/18. (plaintiff)
- Grimes v Lasham, 17-1-098K-FC-P, February 8, 2019 & June 21, 2019  (trial, custody)
- Incardone et al vs Royal Caribbean Cruises; US District Court Miami CASE NO.: 16-cv-20924  September 27 & 28, October 4 and 9, 2018 (plaintiff, depositions)
- Jalal v Nasser Staten Island January 31, 2017 (custody, trial)
- Kiefer et al v Midgley Utah Civil No. 173900675, March 9, 2020  Depo in NY.
- Klincevic v Ardsley Prof Complex  NYS 60527/15  Sept 24, 2019
- Geraldo Herrara as Admin of E/O Leslie Lebron v. Kane NJ Docket No. L-2922-15    July 30, 2018 (plaintiff, deposition)
- Hansen v Rite Aide June 13, 2019 Docket No. MON-L-004790-08, NJ (plaintiff, trial, personal injury)
- Howard v Demo Salvage Civil Action No. 1:18-cv-00150-JAW November 19, 2018 (injury, deposition)
- Landry v Hartford Hospital No. NNH-CV-14-6046822S  October 1, 2018. (plaintiff, deposition)
- Lasalle v NYC.  Index No.: 250L45 / L6  June 19, 2019 (personal injury, defense, trial)
- Laws, Et Al. V. Alexander Youth Network, Et Al. 16-CVS-5970 Sept 27, 2017 (plaintiff)
- Massage Board v Eagle New Mexico No.: FC2011-090965 October 21, 2019
- Mento v. Mento UWY FA 19-6046312-S  custody case, trial. Waterbury, CT April 26, 2019
- Mohamed, Walid v City of NY index no 154808 2013 Nov 2016 (plaintiff, personal injury custody)
- Morgan v US   NY No 14 Civ 7921 February 26, 2019 deposition, defense
- Morgan v US  US Federal Court Southern District NY No 14 Civ 7921 April 5, 2019

(personal injury defense)
- NY v Lahkani Docket 16050426 Dec 4, 2018  (criminal, trial)
- NY v Santiago  June 4, 2019, criminal defense
- Nir, Orly v Liberty Moving Storage Index no. 003739/2014 car accident personal injury case. Suffolk County NY, November 13 and 15, 2017 (plaintiff, personal injury plaintiff)
- Nolfi v Skelley Custody Case, Springfield MA, Court Testimony By Phone Docket no HD/5R0/40AB; Aug 27, 2018 (custody)
- Owunna v US Civil Action 1:18-cv-00536 February 10, 2019, deposition plaintiff
- P.D. infant by mother and natural guardian TYNECCA VELEZ, et ano vs. Montefiore Medical Center.   Supreme Court, Bronx County, Index # 20707/13  Sept 25, 2019
- Peri v City of NY  15 CV 3683 (AKH) April 3, 2019, trial, personal injury, plaintiff
- Pozner v Fetzer  Wisconsin Case No. 18-CV-3122 October 5, 2019
- Rychlik v Sodergren Arizona No.: FC2011-090965 Oct 22, 2019
- Seraswat v Integra US District Court Eastern District of NY No. 15-cv-4680  March 9, 2018 (defense, deposition)
- State vs Edward Mendez. Case number 134351C  March 19, 2018.
- Stocker/Hudson v DCF Docket 476-8-14  November 17, 2018 (personal injury, defense, deposition)
- Stocker/Hudson v DCF Docket 476-8-14  November 17, 2018 (personal injury, defense, deposition) Trial Testimony in Vermont
- US v Hoffman by telephone Fort Leonard Wood Dec 12, 2018 (criminal)
- US v Hoffmann March 28, 2019 courts martial Fort Leonard Wood March 28, 2019
- Vinogradsky v Blau   New Jersey DOCKET NO: FV-02-891-19 December 19, 2018 (custody, trial)
- Watson v Durham School Services Docket 17C1130 Tennessee 11th Circuit July 9, 2019 (plaintiff, personal injury case, deposition)

# **CURRICULUM VITAE**

Roy H. Lubit MD, Ph.D.
165 West End Ave.  Suite 3K
New York, NY 10023
917-846-7829
roylubit@rcn.com

UNDERGRADUATE EDUCATION

JUNE 1975    BA, Cornell University, Ithaca, NY.
             Academics: double major in history and chemistry.


MEDICAL EDUCATION

June 1979    MD, New York University School of Medicine, New York, NY.


POSTDOCTORAL TRAINING IN PSYCHIATRY

6/79-6/83    Psychiatry Residency, Yale University School of Medicine, New Haven.

7/83-6/85    Child Psychiatry Residency, The Children's Hospital, Boston, MA.

7/85-6/87    Advanced Psychotherapy Fellowship, Adams House, Boston, MA.

7/01-6/02    Forensic Psychiatry Fellowship, St. Vincent's Hospital, New York, NY.


INTERNATIONAL RELATIONS
1997         Ph.D. in Political Science, GSAS, Harvard University, Cambridge.
             Dissertation explored impact of organizational learning on international
             conflict.


CERTIFICATIONS
Diplomate, American Board of Psychiatry and Neurology
Board Certified in Psychiatry, 1984.
Board Certified in Child and Adolescent Psychiatry, 2003 renewed 2012.
Board Certified in Forensic Psychiatry, 2003, renewed 2012.

New York State Medical License 205720-1.
National Board of Medical Examiners, 1980.


1

CLINICAL EXPERIENCE

| | |
|---|---|
| 1984-present | Private practice (child, adult and forensic psychiatry) [other than 1999-2001] |
| 2017-2018 | NYC Traumatic Brain Injury Center. |
| 2006-2008 | Clinical Faculty NYU School of Medicine, Dept. of Child Psychiatry. |
| 2003-2004 | Assistant Professor of Psychiatry, Mt. Sinai School of Medicine, Dept of Child Psychiatry. |
| 2002-2003 | National Child Traumatic Stress Network, funded by SAMHSA and Assistant Professor of Psychiatry, Saint Vincents Hospital, NY Medical College, Dept of Child Psychiatry. Consortium for Effective Trauma Treatment, funded by NY Times Foundation. |
| 2001-2002 | Forensic Psychiatry Fellow, Saint Vincents Hospital, NY Medical College. |
| 2001 | ADD and Behavioral Disorders Clinic: Child and Adult Psychiatry. |
| 1999-2001 | Sabbatical from psychiatry to work as a management consultant for PricewaterhouseCoopers. |
| 1998-1999 | Psychiatrist, Jewish Board of Family and Children's Services. |
| 1997-1998 | On-call work for On-Site Psychiatric Services at various hospitals including Metro-West Medical Center and Faulkner Hospital. |
| 1996-1997 | Vinfen Corporation-Child and adult psychiatry at Fall River State Hospital and Beverly Hospital. |
| 1993-1996 | Psychiatrist, on-call and locum tenens ward coverage Charles River Hospital, Solomon Carter Fuller and Corrigan Mental Health:. Different summers I went wherever there was the greatest need.  During the academic year I returned to my research and teaching. |
| 1987-1992 | Psychiatrist for Scoville and Schwager which placed me at various state hospitals they staffed including Danvers State, Northhampton State, Cape and the Islands, Solomon Carter Fuller.  I served as Acting Medical Director at Danver's State and at Cape and the Islands.  As noted above, I went wherever there was the greatest need, and during the academic year I returned to research and teaching. |

2

PUBLICATIONS

<u>Book Chapters</u>

What is SEL and Why Should Schools Care, with Lubit, R.A. In Mendelson, R. & Stabile C. (eds.) *New Directions for Teaching & Learning*. Jossey Bass: San Francisco. Forthcoming. 2019.

Psychopharmacology (co author) in Carrion V. (editor). *Assessing and Treating Youth Exposed to Traumatic Stress*. Washington DC: American Psychiatric Association Publishing. 2018.

The Emotional Intelligence Response to Coping with Narcissism in the Work Place. In R. Burke and C. Cooper (Eds) *The Fulfilling Workplace: The Organization's role in Achieving Individual and Organizational Health*, Gower Publishing. 2013.

Psychotropic medications and crime: The seasoning of the Prozac defense. With Michael Welner and Jada Stewart in Mozayani, A & Raymon, L. (Eds.) *Handbook of Drug Interactions*: A Clinical and Forensic Guide. Humana Press: NY, NY. 2011.

Ethics in Psychiatry in Ed. B. Sadock and V. Sadock (eds.) *Comprehensive Textbook of Psychiatry*. 9th edition. Phil: Lippincott, Williams & Wilkins. 2009.

Recognizing and Assisting Traumatized Children with Jonathan Cohen In J. Devine, (ed.) *Making Your Schools Safe: Strategies to Protect Children and Promote Learning*. New York: Teacher's College Press. 2007.

Assessing and Treating Traumatized Children in A. Hosen (ed.) *Responding to Traumatized Children*. Palgrave. 2006.

Cognitive Therapy of Children with PTSD, in A. Hosen (ed.) Responding to Traumatized Children. Palgrave. 2006.

Child Custody Evaluations in Ed. K. Cheng and K. Myers (ed.) *Child and Adolescent Psychiatry: The Essentials*. Lippincott Williams & Wilkins. 2005.

Diagnosis and Treatment of Trauma on Children in K. Cheng and K. Myers (ed.) *Child and Adolescent Psychiatry: The Essentials*. Lippincott Williams & Wilkins. 2005.

Children, Disasters, and the September 11th World Trade Center Attack (with Eth S.) In A. Norwood and B. Ursano (eds.) *Trauma and Disaster Response and Management*. Wash DC: APA Annual Review of Psychiatry, Volume 22, 2003.

Forensic Evaluation of Trauma Syndromes by Lubit R, Hartwell N, van Gorp WG, Eth S. in *Child and Adolescent Psychiatric Clinics of North America*, 11(4), 823-57. 2002.

Ethics in Psychiatry (with Eth S. and Ladds B.) In B. Sadock & V. Sadock (eds.) Comprehensive Textbook of Psychiatry. 8th edition. Phil: Lippincott, Williams & Wilkins. 2004.

Adolescent Moral Development (with Billick S.) in R. Rosner (ed.) *Textbook of Adolescent Psychiatry*. 2003.

Juvenile Delinquency, (with Billick S.) In S. Rosner (ed.) *Principles and Practice of Forensic Psychiatry*. 2003.

Office Politics (with Gordon R) In J. Kahn (ed.) Mental Health and Productivity in the Workplace. 2002.

Using Emotional Intelligence To Deal With Difficult People and Organizations. In S. Osland (ed) *The Organizational Behavior Reader* (7th ed) Saddle River: Prentiss Hall. 2001.


Articles

Integrating Our Understanding of Classical and Betrayal Trauma. Submitted for consideration for publication

Valid and Invalid Ways to Assess the Reason a Child Rejects a Parent: The Continued Malignant Role of "Parental Alienation Syndrome". Journal of Child Custody. Forthcoming 2019.

Avoiding and Recognizing Bias in Forensic Custody Evaluations. Submitted for consideration for publication.

Post Traumatic Stress Disorder in *Medscape*, (along with Gore TA and Lucas, JZ) 2017

Post Concussive Syndrome Psychiatric Care in *Medscape*, 2017.

Borderline Personality Disorder in *Medscape*, 2016.

Post Traumatic Stress Disorder in Children in *Medscape*, 2016.

Acute Stress Disorder in *Medscape* 2016.

Sleep Disorders. *Medscape World Medical Library*, 2015.

Oppositional Defiant Disorder in *Medscape* 2015.

Attachment Disorders in *Medscape* 2015.

Acute Treatment of Disaster Survivors in *eMedicine World Medical Library*, 2010.

Reactive Attachment Disorder.  *eMedicine World Medical Library*, 2009.

Review of Anxiety Disorders in *eMedicine's Depression & Anxiety Feature Series*, July 2006.

Impact of Trauma on Children (with Rovine D, DeFrancisci L., and Eth S.) *Journal of Psychiatric Practice*, 9(2),128-138.  2003.

Preserving Children's Protection While Enhancing Justice for Parents in Abuse and Neglect Evaluations by Lubit R., Billick S. & Pizarro R. *APPL Journal* 30 (2), 287-290.  2002.

The Long-Term Organizational Effects of Narcissistic Managers and Executives. *Academy of Management Executive*, Spring 2002.

Tacit Knowledge and Knowledge Management: The Keys to Competitive Advantage. *Organizational Dynamics*, winter 2001.

The Crimean Imbroglio. *East European Review*, August 1995.

4

The Effects of Drugs on Decision-Making (with Bruce Russett). *Journal of Conflict
Resolution*, March 1984.


Books

*Coping with Toxic Managers and Subordinates: Using Emotional Intelligence to Survive
and Prosper* (2003) Prentiss-Hall.


Other Publications

"Using Emotional Intelligence to Deal with Difficult Client Personnel (and Colleagues)"
*Consulting to Management* 15(2) 2004.

"The tyranny of toxic managers: An emotional intelligence approach to dealing with
difficult personalities" *Ivey Business Journal,* spring 2004.

"Curbing the Tide of Islamic Radicalism in Europe." White Paper requested by CIA
1/1/04.

Psychiatrist's Role in Involuntary Hospitalization. Commentary 2.  *Virtual Mentor.*2003;
5(10),310-311.
https://journalofethics.ama-assn.org/article/psychiatrists-role-involuntary-
hospitalization-commentary-2/2003-10

Book Review (with Billick S.) of S. Goldstein & C. Reynolds. (eds) *Handbook of
Neurodevelopmental and Genetic Disorders in Children***,** New York: The Guildford
Press, 1999) for *The Journal of Psychiatry & Law.*

Book Review (with Eth S.) of Children's Interests/Mother's Rights: The Shaping of
*America's Child Care Policy*, by Michel S (New Haven: Yale University: 1999) for
*Psychiatry* .

Book Review of *The Big Five* by Alexander Saveliev. *MeiMO* (Journal of the Institute for
International Economics and International Relations), winter 1996.

Book Review of *Hidden Illness in the White House* by Kenneth Crispell and Carlos
Gomez. *Politics and the Life Sciences,* February 1991.

Seven Easy Peaces (with Catherine Perlmutter). *Children Magazine*, Rodale Press,
September 1988.

PRESENTATIONS

Interviewed by Catherine Shin of NBC news concerning why women stay with abusive men April 7, 2019 for Lifetime's "Surviving R. Kelly" to be aired May 4, 2019.

Quoted in Charlotte Observer about "Scarred Straight" February 26, 2019.

"Recognizing and Reporting Child Abuse", CME lecture for doctors, sponsored by Coverys, Waltham, MA, November 9 & 10, 2018.

Interviewed by Dave Cohen, guest host on WWL radio in New Orleans on abuse of Olympic gymnasts by Nasser. January 25, 2018.

Interviewed by BBC Radio on the Turpin Case. January 23, 2018

Interviewed by Dan Whitcome of Reuters on the Turpin Case including why parents would deny food and the impact on the child. Jan 18, 2018.

Interviewed live by Canadian Broadcasting television on the children in California who were shackled and isolated for years. January 18, 2018.

"Forensic Evaluations More Prejudicial Than Probative?" at the Division of Law, Ethics & Psychiatry of Columbia Univ. College of Physicians & Surgeons, Jan. 16, 2018.

Interviewed by NY Times concerning sexual abuse of Olympic gymnasts. Jan 16 2018.

Interviewed by Jonathan Allan of Reuters concerning the 13 children abused in California for years. Jan 16, 2018.

Interviewed by Boston Herald about emotional impact of the false alarm of a missile strike in Hawaii for article on January 16, 2018.

"Social and Emotional Learning and Classroom Management" at meeting of the Center for Research for Emotional Intelligence in Organizations. Boston Nov 17, 2017.

"Secondary Traumatization and Mental Well Being of Emergency Staff", a day long Workshop at the Second International Emergency Medicine Conference, Abu Dhabi October 25, 2017

"Car Accidents, PTSD and Head Trauma" at Second International Emergency Medicine Conference, Intercontinental Hotel, Abu Dhabi October 24, 2017

Presentation on Diagnosing Parental Alienation at Inns at Court, North Caldwell, NJ. May 16, 2017

Interviewed by Alexis Sachdev of Metro NY on the children of presidents March 29, 2017

"Dealing With Difficult Managers" for Occupational Clinical Professionals' Group, February 10, 2017.

Interviewed about PTSD for an article entitled 'Patriots Day' Boston premiere inspires conflicting emotions, in the Boston Herald, December 15, 2016.

Quoted in PennLive on "Trigger warnings: A campus code of decency or an overused guise to censor?" Sept 14, 2016

Filmed for the TV Show "Unraveled" on the Bernie Crucza case. October 6, 2015; on air September 8, 2016 on Investigation Discovery Channel (of NBC)

Interviewed by Fox News concerning a father urging his son to fight another child.  May 28, 2014.

Interviewed by Muriel Alarcon of El Mercurio on PTSD. April 9, 2015.

Cited in Huffington Post on "5 Ways Successful Leaders Handle Toxic People" March 19, 2015. https://www.huffingtonpost.com/tracy-crossley/5-ways-successful-leaders_b_6882966.html

Interviewed by CKGSB Knowledge, a journal of the Cheung Kong Graduate School of Business in Beijing on narcissistic managers April 11, 2014.

Quoted in "Daughter said she lied and sent dad to prison for rape, but DA upholds conviction" 16 Dec 2013 by Dan Slepian

"Post Traumatic Stress Disorder" Emergency Medicine Conference Abu Dhabi Dec 8, 2013

Interviewed by Gulf News concerning Difficult Managers. February 26, 2013.

Interviewed by Kevin Hilliker of Wall Street Journal on suicide rates in NYC schools July 2013.

Interviewed by Catherine Langley of Aquarius (aquarius.ae), on Difficult Managers, February 2013.

Canadian Broadcasting Company, interviewed by 5 of their radio stations concerning collapse of shopping mall in Ontario June 27, 2012

Interviewed by Pittsburg Post-Gazette May 11, 2012, http://www.post-gazette.com/pg/12071/1215971-455.stm

Interviewed by NY Daily News May 9, 2012,

http://www.nydailynews.com/new-york/bronx-girl-11-texts-pals-hangs-room-article-1.1074849

Quoted in Mens Health about sexual abuse November 2011.

Interviewed by Michelle Murillo Reporter FM News New York on Sandusky Sex Abuse Scandal November 10, 2011

Quoted in Wall Street Journal by Michael Rothfeld "Stanford Says He Lost His Memory" September 15, 2011.

Interviewed by Kevin Maurer of Star News on sexual abuse of children, June 19, 2011

Interviewed by Emily Cohen of ABC News about stress and problematic behavior at work, June 24, 2010. http://abcnews.go.com/Business/MindMoodResourceCenter/mouthing-off-boss-fired/story?id=10993015

Interviewed Pittsburg Post Gazzette on Acute Stress Disorder March 10, 2010

Assessing Forensic Evaluations, CME talk to Nassau County Bar Association 12/15/2010

7

Interview on Parental Alienation by Sarah Wallace of ABC Television 11/30/2010

Canadian Broadcasting Company, interviewed on television concerning Chilean Mining Disaster: August 24, 2010

Canadian Broadcasting Company, interviewed by 8 of their radio stations concerning Chilean Mining Disaster: August 24, 2010

Quoted in The McChrystal Effect: Mouthing Off To Your Boss Can Get You Fired: on ABCnews.com June 24, 2010  HYPERLINK "http://abcnews.go.com/Business/MindMoodResourceCenter/mouthing-off-boss-fired/story?id=10993015&page=2" \t "_blank" http://abcnews.go.com/Business/MindMoodResourceCenter/mouthing-off-boss-fired/story?id=10993015&page=2

Podcast Concerning Child Custody Issues by EVDense. April 9, 2010. http://www.evdense.com/mp3/Dr_Roy_Lubit_Podcast.mp3

Interviewed by Dow Jones concerning authoritarian managers. April 7, 2010

Lectures on Ethics to Child Psychiatry Fellows at Einstein School of Medicine Winter 2010

Lectures on Psychiatry for Navy Physicians (ADHD, PTSD, Forensic Psychiatry, Ethics in Psychiatry, Clinical Assessment of Children, Severe Personality Disorders), Columbia, Missouri October 11 and 12, 2009.

Use of Narratives and Storytelling in Treating PTSD, Trauma Psychiatry & Psychology, International Center For Psychosocial Trauma, Columbia, MO September 30, 2009

Interviewed by Star News Online Concerning Sexual Abuse of Children, http://www.starnewsonline.com/news/20110620/rc-soles-accused-of-taking-advantage-of-troubled-teens-ex-senator-denies-allegations

Lectures on Ethics to Child Psychiatry Fellows, Einstein School of Medicine, Winter 2009

Impact of the Lehman Crisis on People, Fox Business News, September 15, 2008

Assessing Forensic Evaluations Rose Seminar, Minneapolis September 11, 2008

Developing Emotional Intelligence Rose Seminar Minneapolis September 11, 2008

"Assessing and Dealing With Corporate Threats" at ATAP North East Chapter, 6/23/08.

"Family Courts and Child Custody: A System Needing Change: Zigler Center at Yale April 11, 2008.

"Sex Abuse Evaluations" Symposium sponsored by Children and Family Law Committee of the Bar Association of the City of NY, January 23, 2008.

"Experiencing the Trauma of 9/11 and Understanding the Recovery" University of Missouri-Columbia International Center for Psychosocial Trauma" St Louis 6/29/06.

"Doing Forensic Evaluations" Joint Conference of the British Arab Psychiatric Association and American Arab Psychiatric Associations in Bahrain April 16, 2006.

"Evaluation and Treatment of PTSD in Children" Joint Conference of the British Arab Psychiatric Association and American Arab Psychiatric Associations in Bahrain April 16, 2006.

"Evaluation and Treatment of PTSD in Children" The First Annual Medical Conference of the International Iraqi Medical Association; Dubai, UAE April 12, 2006.

"Doing Forensic Evaluations" The First Annual Medical Conference of the International Iraqi Medical Association; Dubai, UAE April 12, 2006.

"Assessing and Treating Emotional Trauma" at International Academy of Law and Mental Health; Paris July 2005.

"Assessing Sexual Abuse Allegations" at International Academy of Law and Mental Health; Paris July 2005.

"New Thoughts on Leadership Development" at Society of Human Resource Management annual national meeting; San Diego June 20, 2005

"Dealing w. Toxic Managers" at NJ OD Network; Sharing Day; May 9, 2005
Problems in the Child Custody System on Dateline NBC April 15, 2005

"Group Dynamics and Decision Disasters" at annual meeting of In2In Thinking Network: Los Angeles, April 9, 2005

"Assessment of Dangerousness" Hudson River Psychiatric Hospital February 2, 2005

"Improving the Quality of Evaluations for Sexual Abuse" Queens ACS lawyers; 1/10/05.

"Improving the Quality of Child Custody Decisions " The Second National Battered Mother's Custody Conference; Albany; January 8, 2005.

"Evaluating Forensic Child Custody Evaluations" to Women's Bar Association of the State of New York; June 8, 2003; Brooklyn, NY.

"Assessing Dangerousness" Grand Rounds at Hudson River Psychiatric Center 4/7/04.

"Radical Islam in Europe: Ideological, Psychological and Political Foundations and Potential Responses" invited presentation to Workshop on Radical Islam in Europe sponsored by CIA Office of Russian and European Analysis; McLean, VA 12/12/03

"Rethinking the Role of Psychology in Understanding Terrorism" invited presentation to Psychology of Terrorism Workshop sponsored by CIA Counterterrorism Center, Office of Terrorism Analysis; McLean, VA Nov 21, 2003.

"Assessment and Treatment of Traumatized Children" Grand Rounds MSSM Pediatrics Nov 20, 2003.

"Phenomenology, Psychopathology and Treatment of Emotional Trauma" Grand Rounds Walter Reed Army Hospital, Nov 19, 2003.

"Assessment and Treatment of Traumatized Children" Grand Rounds Pediatrics Elmhurst Hospital Nov 17, 2003.

With John Kastan "Organization of Disaster Mental Health Services in Post 9/11 New York City" Annual Meeting of APHA, San Francisco, November 15-19, 2003

9

"Doing Child Custody Evaluations" Bronx 18B Lawyers Retreat; Nov 2003.

"Parental Alienation Syndrome" Bronx 18B Lawyers Retreat; Nov 2003.

"Wide Ranging Impact of Emotional Trauma on Children"; William Allanson White
　　Psychoanalytic Institute Sept 25, 2003

"Violence in the Workplace" UPN 9, 7/25/03.

"Understanding Terrorism" Chair of Panel, International Society of Political Psychology,
　　Boston, July 9, 2003.

"Mind of the Modern Day Terrorist" Paper Presented at the International Society of
　　Political Psychology, Boston, July 9, 2003.

"Limiting the Trauma of Terrorism" Paper Presented at the International Society of
　　Political Psychology, Boston; July 8, 2003.

"Children and Disasters" American Psychiatric Association, San Francisco, May 20,
　　2003.

"Treatment of Trauma" Grand Rounds, Hudson River Psychiatric Institute, 4/23/2003.

"Evaluation and Treatment of Children After Disasters" at Families, Trauma and
　　Forensic Psychiatry Symposium at Walter Reed Army Hospital, April 16, 2003

"Children and Disasters" Maryland APA, April 9, 2003.

"Ethics in Psychiatry" Grand Rounds, Hudson River Psychiatric Institute, 2/26/2003.

Chair of panel on "Biological and Chemical Terrorism" at John Jay College's symposium
　　on Homeland Security After 9/11.  January 23, 2003.

"Assessment and Treatment of Traumatized Children", Children's National Medical
　　Center, Dec 11, 2002.

"Children's Needs and Obstacles to Meeting Them After Disasters", LA Child
　　Development Center. November 23, 2002

"School Based Mental Health Screening" International Society of Traumatic Stress
　　Studies November 10, 2002

"Assessment of Traumatized Children and Adolescents" International Society of
　　Traumatic Stress Studies November 7, 2002

"Suicide and Suicide Prevention in Children and Adolescents" Safehorizon. Nov 5, 2002

"Fundamentalism and Terrorism" Group for the Advancement of Psychiatry November
　　1, 2002

"Bereavement and Trauma: Assisting Adolescents After Loss", Covenant House, NYC
　　October 25, 2002

"Living With Uncertainty and Violence: Helping Youth Cope With Trauma" JBFCS
　　Symposium. Oct 7, 2002. "Treatment of Emotional Trauma" Beth Israel Hospital, 3
　　half-day sessions in Sept. and Oct. 2002.

"Impact of 9/11" BBC Sept 12, 2002

"Long term impact of 9/11", NPR Sept 8, 2002

"Recognizing Troubled Children" Private Schools (HALB and HAFTR) September 3, 2002.

"Recognizing Troubled Children" NYC School Nurses, August 27, 2002

"Coping with Stress in the Modern World" NY Life Insurance, August 22, 2002

"Ethics and Leadership" Brookings Institution, Washington DC July 30, 2002.

"Treatment of Children Who Lose Parents" Easthampton Camp. July 10, 2002

"Assessing the Impact Of 9/11 On Children in Schools" Meeting of NYC school psychiatrists and supervising nurses. June 28, 2002

"Impact of WTC Disaster on Firefighters" CBS Evening News May 26, 2002

"Psychological Impact of Trauma" for Montclair NJ School District. May 16, 2002

"Origins of Delinquent Behavior" at Update on Juvenile Delinquency for Society for Adolescent Psychiatry.  May 11, 2002

"Impact of Violence On Child Development and Remedial Strategies" at Conference on

"Responding to the crisis…Partnering for Violence Prevention" Summit Country Children Services. April 16, 2002

"Terrorism, Trauma and Treatment Options" for the S. Michigan branch of the International Society for the Study of Dissociation Annual Conference Livonia Michigan. April 12, 2002.

Interviewed by Psychiatric News for Stoic Firefighters Wrestle with Post-Disaster Emotions March 1, 2002.

Public Radio WNYC: Interview on psychiatric impact of WTC Disaster, 1/18/02.

"Healing a Traumatized City", invited speaker at the symposium on "The Trauma of Terror in Children", Dec 1, 2001 sponsored by the Southern California Society of Child and Adolescent Psychiatry and the Southern California Psychiatric Society.

NY1 Television: 1 hour interview program on psychiatric impact of WTC Disaster, 12/19/01.

Disaster Recovery: Worked with CEOs and HR to help companies recover from Sept 11, 2001 disaster.  Also gave presentations to groups of 5 to 170 workers: First American Title, NYC, Sept. 14; Costa Kondylis, NYC, Sept 14; Credit Lyonnais, NYC Sept 21; Financial Models, NYC, Sept 21; Coalition for the Homeless. Oct 3; Sadlier Publishing Oct 4; Queller, Fisher, Dienst Oct 10; Village Voice, Oct 17; May Davis Investment Bank, Nov. 5; NY Life Nov 12; Jacqueline Onassis H.S., Oct 19; PS 89, Nov 6; H.S. of Economics and Finance Nov 14, 2001.

"Juvenile Delinquency" invited speaker, Tri-State Forensic Psychiatry Review Course, 3/2/01.

Chairman of panel on "Political Psychology and War", annual meeting of the International Society of Political Psychology, Washington, DC  6/21/85.

"Altered Metabolic States and Decision-Making", annual meeting of the International Society of Political Psychology, Toronto  6/25/84.Discussant on papers on the

"Effects of Alcohol and Drugs on Leadership Behavior", annual meeting of the International Society of Political Psychology, Toronto  6/27/84.

ORGANIZATIONAL <u>AFFILIATIONS</u>

| | |
|---|---|
| 2011-present | American Academy of Child and Adolescent Psychiatry |
| 2007-2011 | Consultant to Accountability Review Panel of NYC Administration for Children's Services |
| 2004-2010 | Consultant to Association of the Bar of the City of NY Children and Law Committee |
| 2005-2006 | Disaster and Trauma Issues Committee of Am Acad of Child and Adolescent Psych |
| 2006-2008 | Dept of Child Psychiatry, NYU School of Medicine |
| 2004-2010 | Dept of Psychiatry, Mt Sinai School of Medicine |
| 2004-2005 | NY State Interdisciplinary Forum on Mental Health and Family Law |
| 2003-present | Consortium for Research on Emotional Intelligence in Organizations |
| 2002-2004 | Senior Consultant on Psychoeducation and Program Development, Center for Social and Emotional Education ( HYPERLINK "http://www.csee.net" www.csee.net) |
| 2002-2003 | Senior Researcher, Center on Terrorism and Public Safety. John Jay College, CUNY |
| 2003-2005 | Consultant to International Relations and Terrorism Committees of the Group for the Advancement of Psychiatry |
| 2002-2004 | Manhattan Task Force to End Child Abuse and Domestic Violence |
| 2001-2003 | National Child Traumatic Stress Network |
| 2001-2003 | New York Times Consortium for Effective Trauma Treatment |
| 1985-1991 | Institute of Social and Behavioral Pathology, fellow. |
| 1981-1988 | American Psychiatric Association, member. |
| 1983-1987 | International Society of Political Psychology, member. |
| 1982-1983 | Yale Edward Zigler Center in Child Development and Social Policy |

<u>AWARDS</u>

| | |
|---|---|
| 1990-1991 | Harvard-MacArthur Scholar in International Security. |

ORGANIZATIONAL DEVELOPMENT EXPERIENCE

| | |
|---|---|
| 1999-2001 | Consulted to: Mitsubishi, Delta Airlines, PricewaterhouseCoopers, Morgan Stanley, Sadlier Publishing, First American Title, Costa Kondylis, Credit Lyonnais, Financial Models, Coalition for the Homeless. |

13

| 1999-2001 | Management consultant in PricewaterhouseCoopers' Strategic and Organizational Change practice. |
| 1997-1998 | Visiting Scholar at Columbia Business School, New York, NY. |
| 1997 | Ph.D. in Political Science, GSAS, Harvard University, Cambridge. |
| | Ph.D. dissertation on the role of learning and politics in organizational change. |

TEACHING EXPERIENCE

| 2005-2008 | Supervisor for residents in child psychiatry, NYU School of Medicine Department of Psychiatry |
| 2003-2004 | Supervisor for residents in child psychiatry and medical students at Mount Sinai School of Medicine |
| 2001-2003 | Supervisor for residents in psychiatry at St. Vincent's Hospital. |
| 2004 | Adjunct Assistant Professor, Zicklin School of Business, New York, NY. Taught course on Managerial and Leadership Skills in the MBA program. |
| 1990-1996 | Teaching fellow at Harvard University, for International Conflicts in the Modern World, Ethics and International Relations, Europe After 1945, and The Stalin Era. |
| 1998 | Teaching assistant at Columbia Business School, for Organizational Behavior and Building the Learning Organization. |

Roy Lubit, M.D.
Expert Report June 19, 2020
Addendum 1 Page  16

**Addendum 2**
**List of Documents Considered**

- *Lucas R.* First Amended Complaint (FAC)
- *Lucas R.* Answer to First Amended Complaint
- *Lucas R.* November 2, 2018 Order ECF No. 126
- J. Sualog August 21, 2019 Deposition
- September 2019 Office of Inspector General Report
- Defendants' Supplemental Objections & Responses To Plaintiffs' Requests For Admissions
- Defendants First Set of Responses to Plaintiffs' Request for Admission
- Defendants Second Set of Responses
- UAC Case Files (as noted elsewhere in this report)
- UAC Manual of Procedures
- ORR Guide
- Dr. Michael Bartholomew December 3, 2019 Deposition Transcript
- Cooperative Agreement Between ORR and Grantees
- Defendants' Second Set Of Responses To Plaintiffs' Requests For Admission

## Addendum 3
## Medical Literature

Miller, Piscopo, *et al.* "Measurement of Suicidal Thoughts, Behaviors, and Related Health Outcomes in the United States: Comparison of NSDUH Estimates with Other Data Sources." SAMHSA.GOV, CBHSQ Data Review, July 2015, p. 9, www.samhsa.gov/data/sites/default/files/NSDUH-DR-N20Suicide-2015/NSDUH-DR-N20Suicide-2015.pdf.

Geiger, A.W., and Leslie Davis. "A Growing Number of American Teenagers – Particularly Girls – Are Facing Depression." Pew Research Center, Pew Research Center-FactTank, 12 July 2019, www.pewresearch.org/fact-tank/2019/07/12/a-growing-number-of-american-teenagers-particularly-girls-are-facing-depression/.

Hedman, LC *et al. State Laws on Emergency Holds for Mental Health Stabilization*. Psychiatric Services. 67(4) 2016, pp. 529-535.

"Bipolar Disorder." *National Institute of Mental Health* (NIMH), U.S. Department of Health and Human Services, Nov. 2017, www.nimh.nih.gov/health/statistics/bipolar-disorder.shtml.

Newton, H. J. et al.: A therapeutic community for adolescents. Hospital & Community Psychiatry Vol. 19, 4: 106-107, 1968.
Schwartz, A. H. et al.: Providing milieu treatment in a military setting. Hospital & Community Psychiatry Vol. 19, 9: 271- 276, 1968.

https://www.cambridge.org/core/journals/the-british-journal-of-psychiatry/article/response-of-psychopaths-to-a-therapeutic-community/8E9CCFD611DC608BDBB76F4D3E520C4A

Stauble, W. J.: Milieu Therapy and the Therapeutic Community. Canad. Psychiat, Ass. l. 16: 139-202, 1971.

Wells, K. (1991) Placement of Emotionally Disturbed Children in Residential Treatment . *Am J of Orthopsychiatry,* Vol 61(3), 339-347
In view of the growing concern over the number of disturbed children in residential treatment centers, identification of the kinds of children best treated in such centers is important. A review of the literature reveals that criteria for placement are inadequate and information on outcomes insufficient for guidance on the placement problem. Implications and recommendations for practice and research are delineated.

**Modernizing Residential Treatment Centers for Children and Youth--An Informed Approach to Improve Long-Term Outcomes: The Damar Pilot.**

- **Source:** Child Welfare. Mar/Apr2010, Vol. 89 Issue 2, p115-130. 16p.
- **Author(s):** Holstead, Jenell; Dalton, Jim; Horne, Anita; Lamond, Diane

- **Abstract:** Much controversy exists regarding the effectiveness of residential treatment. Recently, emerging research has demonstrated that community-based residential treatment has more positive long-term outcomes for youth. This article describes a community-based program that was implemented at a residential treatment agency serving youth. Targeted recidivism variables that were used to guide the study are described. Results demonstrated significant behavioral improvements, as well as improved post-discharge status. Conclusions and recommendations are also provided.

Robert Foltz PsyD (2004) The Efficacy of Residential Treatment: An Overview of the Evidence, Residential Treatment for Children & Youth, 22:2, 1-19, DOI: 10.1300/J007v22n0201

McCurdy, B,  McIntyre, E.K.  (2004) 'And what about residential…?' Re-conceptualizing residential treatment as a stop-gap service for youth with emotional and behavioral disorders. *Wiley Online Library* 19 (3), 137-158.

The need for residential services for youth with the most intractable emotional and behavioral problems continues to exist despite advances made in developing community-based systems of care. Residential treatment centers (RTCs), considered one of the most restrictive service settings, have changed little over the years and have not fared well in outcome evaluations. Despite these factors, admissions to RTCs continue to increase. In an attempt to contemporize and bring the RTC more in line with current practice, a stop-gap model of service delivery is recommended. The stop-gap model, incorporating evidence-based practices, is intended to have an immediate and positive impact on the barrier behaviors that keep youths in the most restrictive environments. The twofold goal of the stop-gap model is to interrupt the youth's downward spiral imposed by increasingly disruptive behavior and, simultaneously, to prepare the post-discharge environment for the youth's timely reintegration. Strategies for evaluating the effectiveness of the stop-gap model are recommended. Copyright © 2004 John Wiley & Sons, Ltd.

Additional sources cited in body of report

**Addendum 4**
**Review of Named Plaintiffs' Case Files**

1.  My review of the Named Plaintiffs' case files made available to me contradicts the Plaintiffs' allegations.  My review of the treatment records in the case files demonstrates that children who were sent to a residential treatment center (RTC) while in ORR custody needed a higher level of care.  When potential sponsors were rejected there were sound reasons. Sending children to the rejected sponsors would have been poor judgment and placed the children at risk.  My review indicated that the RTCs seek informed consent from parents and do not give medication if children do not assent, with rare exceptions.  Use of psychotropic medicines was appropriate.  Review of the records describing the children's functioning before they came to the U.S., how they were doing when first in the U.S. and in the various facilities, and how they were doing after being in the facilities showed that the children in ORR care got better, not worse, when they received treatment in the RTCs.  Medication was not used instead of psychotherapy.  They received a considerable amount of psychotherapy, generally 3 sessions a week including individual and group therapy. There was also milieu therapy, a key aspect of adolescent treatment.  UACs were allowed calls twice a week with relatives.  Delays in release generally arose from the potential sponsors not getting papers in quickly or needing to accomplish things to provide an appropriate setting for the UAC.

2.  In case after case, the Plaintiffs massively cherry picked data to give an impression of how the UACs were doing at different points in time that was opposite to what the medical records indicated. For example, Plaintiffs state that relatives of Lucas, Daniela, and Gabriela said that they did not seem to have any psychological problems before coming to the U.S., *see* First Amended Complaint (FAC), ECF 80, although the medical records for each of these UACs noted ████████████████████ ███████████████████████████████████. Plaintiffs then claimed the UACs became depressed because they were being prevented from reuniting with relatives, ignoring ████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████

3.  Plaintiffs argue that several of the Named Plaintiffs (Lucas R, Gabriela N, Sirena P, Daniela Marisol T, and Benjamin F) were harmed by being placed in RTCs while in ORR custody and given psychotropic medication, although the medical records show them being in much better condition at the end of their time in an RTC than before they came to the U.S. or before they were given

Roy Lubit, M.D.
Expert Report June 19, 2020
Addendum 4 Page  1

medication.  Additionally, when discussing the prescription of a certain medication to a particular UAC, Plaintiffs misleadingly listed all of the potential side effects of the medication, giving the impression that the UAC suffered these side effects, when in fact they were simply a list of possible side effects and no UAC actually suffered those serious side effects or if there were side effects appropriate steps were taken.  See FAC ¶¶ 32, 43, 48, 138-139.  When Lucas R was given the medication (Zoloft) he developed an upset stomach and it was stopped.  *Id.* at ¶ 27.  Plaintiffs' lawyers fail to note the distress and risk that the children would have continued to suffer had they not been given appropriate medication.  Children with Attention Deficit Hyperactivity Disorder (ADHD), psychosis, and major depression, in addition to being distressed by their symptoms and having impaired functioning which can impair learning and social interactions and damage their self-esteem, are at increased risk for self-harm.  Mild depression and ADHD can sometimes be handled simply with psychotherapy, but moderate to severe cases generally require medication.  Decades of research have shown when medications are warranted and the problems children have when not receiving medication.  Doctors are trained to carefully assess and consider the risk-benefit ratios for an individual child before prescribing medication and to monitor for side effects and benefits to see if the medication dosage should be changed or the medication should be stopped or changed.  The general attitude of rejection of medication presented by the Plaintiffs' lawyers is outside of standard medical care and is harmful to children.

**Lucas R (DOB ███ /2005)**

4.      Lucas R. came to the U.S. on 1/9/18.  Plaintiffs assert that Lucas R.'s father abandoned him.  His mother died when he was two years old.  He was raised by his aunt and his sister (Madelyn).  Plaintiffs assert that Lucas R. was doing well until the RTC (Shiloh) did not release him soon enough.  Plaintiffs write (FAC, ECF 80, ¶ 25): "According to Madelyn, in Guatemala, Lucas was a thriving, happy child who liked to joke, play, and talk with people. When he arrived at Hacienda del Sol, facility staff noted that Lucas appeared cooperative, calm, and alert, and showed "'no behavioral concerns.'" Plaintiffs write that, "As his confinement wore on, however, Lucas became depressed, fearing that ORR would never release him to his family." *Id.* at ¶ 26.

5.      Medical records present a different picture. Plaintiffs, often by omission of important facts, mislead the reader as to the actual situation.  Rather than being a happy child who liked to play, and showing no indication of problems, the chart reports ███████████████████████

Roy Lubit, M.D.
Expert Report June 19, 2020
Addendum 4 Page  2

████████████████. He left Guatemala on 1/5/18, entered the U.S. on 1/9/18, and surrendered to officials.  He was 12 at the time.  Although Plaintiffs write that Madelyn said he was a happy child in their home country, the chart notes ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

6.     Directly contradicting the Plaintiff's allegations as to when and why Lucas R. became depressed, his medical record states ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

7.     His medical record states ████████████████████████████████████████

████████████████████████████████████     He was taken to Banner Thunderbird Medical Center Emergency Room on that date.  He was assessed and met criteria for hospitalization.  While in the hospital he spoke about ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████.  He was diagnosed with ████████████

████████████████████████████████     He had an outpatient psychiatric appointment on 3/6/18 during which he was diagnosed with ████████████████████████████████████

████████████████████     On 4/3/18 he refused the medication. He received a follow-up psychiatric visit on 4/17/18 in which his Sertraline was discontinued and the doctor recommended he go to an RTC.  He went to Shiloh on 4/21/18.

8.     When a child with a history of ████████████████████████████████████

████████████████████████████████, the child must be seen by a psychiatrist.  To do

otherwise would be contrary to standard practice.  If the hospital then says the child needs admission, admission should occur.  It is appropriate to prescribe an antidepressant to ███████████ ████████ Psychotherapy without medication is generally not adequate for ████████████ ████████  When Lucas R. refused the medication, it was stopped.  Given that ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████ it was medically necessary for him to be in a more secure setting such as an RTC.

9.     Plaintiffs assert, "Without obtaining Madelyn's informed consent, the informed consent of any other adult family member, or judicial authorization, ORR administered Lucas psychotropic drugs . . . ." *Id.* In Paragraph 32, Plaintiffs state that Lucas R. has been administered Zoloft. "Zoloft's side-effects include rigidity in the muscles, high fever, sweating, confusion, agitation, hallucinations, overactive reflexes, tremors, nausea, vomiting, diarrhea, loss of appetite, fainting, and seizures." *Id.* These are *potential* side effects. They do not occur in each patient.  Listing all of the potential side effects of a medication in a paragraph about a specific individual, and failing to note they are only potential side effects, can give the impression that the Lucas had all of these side effects.  The Plaintiffs do not tell the reader that Lucas R. did not develop the long list of possible side effects which they list in their papers.  Plaintiffs do not note that the serious symptoms occur with an incidence of less than one in one thousand and those are usually the result of doctors making a serious medication error, giving more than one serotonergic agent at the same time leading to serotonin syndrome.  Plaintiffs fail to note that the risk of a suicide is higher in those who are *not* treated with anti-depressants than in those who are treated with antidepressants, and that untreated depression has serious and potentially enduring negative impacts on the brain and psychological well-being.  Lucas' ██████████ ███████████████████████████.  There is an extensive literature on the negative alterations of PTSD on the brain, in significant part caused by increased cortisol levels.[1]  Antidepressants have been shown to increase neurogenesis.[2]

---

[1] Bremner J. D. (2006). Traumatic stress: effects on the brain. *Dialogues in clinical neuroscience*, *8*(4), 445–461.

[2] Anacker, C., Zunszain, P., Cattaneo, A. *et al.* Antidepressants increase human hippocampal neurogenesis by activating the glucocorticoid receptor. *Mol Psychiatry* 16, 738–750 (2011).

10.   Lucas complained of stomach pain and refused the medication. *Id.* at ¶ 27.  Stomach distress is a relatively common side effect of Zoloft (Sertraline), and often goes away in a matter of days.  He was not forced to take the medication.  As noted, the medication was stopped.

11.   Plaintiffs write that "ORR orally advised Madelyn that it would not release Lucas to her because her roommate's brother had failed to appear for fingerprinting." *Id.* at ¶ 29.  Plaintiffs write, "Rather than attempting to help Lucas manage his feelings, Hacienda del Sol personnel responded to his pleas for support by hospitalizing Lucas and requesting that ORR transfer him to a more secure facility." *Id.* at ¶ 30, "Shiloh denied Lucas his right to speak with Madelyn on a weekly basis without providing him or his sister any explanation for the denial." *Id.* at ¶ 33.  The Plaintiffs fail to note that the issue was not simply that the roommate's brother would not come for fingerprinting, but that he was staying with them.  There is no indication that ORR was told when the brother, who refused fingerprinting, would leave.   Moreover, Plaintiffs fail to note that there was concern Madelyn could not take care of Lucas R.'s mental health needs.  His sister left their home country a year before he did, and was only 18 when she was considered as a potential sponsor.  Of note, she had ███████████████████████████.  Furthermore, as noted above, she reportedly claimed that Lucas was a happy child when in Guatemala, when ██████████████████ ████████████████████ It would create great risk for a child's welfare for a child with ████ ████████████ to be taken care of by an individual who either fails to notice signs of serious distress in the child, or who is willing to lie about such an issue.  There are good reasons for concern about his sister's ability to notice and respond to Lucas R.'s psychiatric needs.

12.   Plaintiffs write that "Lucas' experiences in ORR custody, including prolonged separation from his family and administration of psychotropic medications over his objection and without informed consent, exacerbated his mental health symptoms and made this approval less likely, thereby delaying his release." *Id.* at ¶ 33.  These assertions are not accurate.  To the contrary, Lucas ████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████  The data does not support the conclusion, however, that separation from

---

https://doi.org/10.1038/mp.2011.26. Neurogenesis is the process by which nervous system cells (neurons) are produced by neural stem cells.

his family caused his depression. Moreover, the medication was not given to him over his objection, and he was not forced to take medication.

13. Plaintiffs assert that rather than helping Lucas to manage his feelings they hospitalized him and recommended a higher level of care. The basis for claiming they did not attempt to help him manage his feelings is unknown. Children at the facilities have multiple therapy sessions a week, as well as the continual presence of mental health staff to speak with. Shelters do not provide adequate protection for adolescents who ██████████████████████████████████ ███████████████████████████████.

14. Plaintiffs allege that Lucas R. was denied weekly calls to his sister. However, there were multiple notes about phone calls twice a week, and family sessions by phone calls. There was also a note that "Sponsor proceeded to tell the minor not to disclose any further information." An individual urging a minor patient to withhold information is compromising the welfare of the child. To take appropriate care of the child, the child must speak about how he is feeling, how he was been over time, and how various relatives have treated him. Ongoing contact with someone urging the child to not provide information decreases the likelihood the child will provide all needed information.

15. The decision to send Lucas R. to the hospital when ████████████████████████████████ ████████████████████████████████████████ was appropriate. Similarly, when he did not improve sufficiently with hospitalization and refused medication prescribed by an outpatient psychiatrist, the prognosis was for continued problems. The outpatient psychiatrist appropriately recommended he go to an RTC. ORR would have been remiss if they did not send him to an RTC in this situation. While at Shiloh, he accepted antidepressant medication (Lexapro) and received therapy services. With treatment in the RTC, Lucas R's mental health symptoms improved. A medical record note from 8/30/18 stated ████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████ Reports of Lucas' Global Assessment of Functioning (GAF)[3] by doctors increased from 40s to 70s during his time at Shiloh. GAF of 40s stands for serious impairment while 70s are no more than slight impairment. At Shiloh,



---

[3] The Global Assessment of Functioning (GAF) score is used to rate how serious a mental illness may be. It measures how much a person's symptoms affect his or her daily life on a scale of 1 to 100. Higher scores indicate higher functioning.

Lucas' GAF scores steadily increased over time:  5/22/18 GAF 40; 6/5/18 GAF 50; 6/19/18 GAF 60; 7/10 GAF 65; 8/7/18 GAF 70; and 8/28/18 GAF 75.

### Daniela Marisol T. (DOB ███/01)

16.     Plaintiffs assert that Daniela Marisol T is a partially deaf, 17 year old who was separated at the border from her older sister and nephew.  FAC, ECF 80, ¶ 37. Plaintiffs state that separation was so traumatic that she was hospitalized.  *Id.* Plaintiffs write that, "According to Katherine, when Daniela Marisol lived in Honduras with her family, she did not seem to have mental health issues.  However, Daniela Marisol's psychological state rapidly deteriorated after her family separation.  It was further exacerbated when caseworkers told Daniela Marisol that she was not going to be released to her sister.  Daniela Marisol lost hope that she would ever be released to her family.  Depressed and suicidal, she was admitted to a psychiatric hospital where she suffered a psychotic breakdown." *Id.* at ¶ 39. "ORR administered numerous psychotropic medications to Daniela Marisol, including atypical antipsychotics and antidepressants, starting when she was in the Norma Linda shelter, and continuing while she was at Shiloh RTC and the David and Margaret shelter in Los Angeles County, and through her present placement, Bethany Christian Services in Michigan. In the approximately thirteen months that she has been in ORR custody, Daniela Marisol has been given multiple psychotropic medications, including Prozac, Abilify, Clonidine, Risperdal, Seroquel, and Zyprexa. While in ORR custody, Daniela Marisol has been the subject of numerous, changing diagnoses, including 'Bipolar disorder, MRE, Mixed, with psychosis, GAD, PTSD;' 'major depressive disorder, recurrent episode, severe with mood-congruent psychotic features;' and 'bipolar II disorder, generalized anxiety disorder, PTSD.'" *Id.* at ¶ 42. "ORR has frequently given Daniela Marisol an atypical antipsychotic and an antidepressant in combination. Research demonstrates that the number and severity of side effects, such as thoughts of suicide and intentional self-harm, increases as the number of concurrent medications increases. Daniela Marisol has become suicidal while being forced to take such antidepressants and drug combinations." *Id.* at ¶ 43. She was not released in a timely way because her potential sponsor could not show $500/month disposable income.  Plaintiffs claim that an expert psychologist said she should be reunited. *Id.* at ¶ 45. Plaintiffs assert that ORR has placed arbitrary, expensive, and excessive conditions on Daniela Marisol's release, which preemptively dissuaded Katherine from applying to be her sponsor.

17.     Plaintiffs wrote that Katherine said Daniela Marisol did not seem to have mental health issues while in her country of origin, giving the reader a false impression that Daniela's problems began when

she came to the US and was separated from her sister. ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

18.     The Plaintiffs' assertion that Daniela was so traumatized by the separation from her sister that she

had to be hospitalized is inconsistent with the medical record. ██████████████████

████████████████████████████████████████████████████████████

████████ ██████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████

19.     Daniela had a long history of ████████████████████████████. According to the

medical record, ██████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████

20.     ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

21.     Two months before Daniela Marisol T.'s departure to the U.S.███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████ She left Honduras after ████████████████████████████████████

████████████████████████████████ In August 2017, ███████████████████████████, left

Honduras and entered the U.S. on 8/3/17.

22.   Plaintiffs' claim that Daniela Marisol T. first developed suicidal ideation when on medication, *see*

FAC, ECF 80, ¶ 43   However, the medical records state ████████████████████████████

███████████████████████████████████████████████████████████████   Plaintiffs

claim she suffered a psychotic breakdown in the hospital.  However, the records state that ████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████   A note from

the shelter from 8/8/17 states: █████████████████████████████████████████

████████████████████ A medical record note from 8/8/17 stated ████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████ On 8/8/17, she was prescribed Abilify and Prozac.

23.   A note from 8/11/17 ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████

24.   She reported ████████████████████████████████████████████████████ She reported

████████████████████████████████████████████████████ The clinician noted that Daniela

Marisol T. ███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████.  On August 22, 2017, Daniela Marisol T.

stated ███████████████████████████████████████████████████

███████████████████████████████████████ She said that ██████████████████

████████████████████████████████████████████████████████████████

████  She said ███████████████████████████████.  On August 27, 2017, Daniela Marisol

T.'s clinician ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

25.   On September 1, 2017, Daniela Marisol T. was diagnosed with ████████████.  She discontinued

Abilify and started Risperdal.  On September 8, 2017, the notes state Daniela Marisol T. was referred

to Shiloh Residential Treatment Center for a 30-day psychiatric evaluation following:  ████████

████████████████████████████████████████████████████████████████████

████████████████  She was referred to Shiloh as an emergency admission due to displaying

behaviors that are an immediate danger to herself that could not be served at the current shelter level.

26.   Plaintiffs state that Daniela Marisol T. was the "subject of numerous, changing diagnoses."  FAC at

¶ 42.  In my opinion, the actual changes or differences were minor and understandable.  They were

not a sign of incompetence.  Specifically, Plaintiffs list three diagnoses:  ████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████

27.   ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████ Daniela was not given "numerous changing diagnoses."

28.   According  to  the  records,  Daniela  Marisol  T.  ██████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████  ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ People can reasonably disagree as to which is the more appropriate specification in a given situation. What is puzzling is not the changes, but that someone would complain that there were numerous changing diagnoses. Doing so suggests either a significant lack of knowledge regarding psychiatry and mental illness, and/or a deliberate attempt to misrepresent the situation to make the Daniela's treating clinician appear incompetent.

29.     The medications that were prescribed to Daniela Marisol T. were appropriate. Changing medications is common as clinicians see whether the individual responds to the medication and if it has side effects. Staying on the same medication which is not working or has problematic side effects would have been poor care. Making changes if there are adverse side effects or a medication is not effective is appropriate care. Plaintiffs correctly note that combining medications increases the risk of side effects since each medication has side effects. They fail to note, however, that it is standard practice to use a combination of an antidepressant and an antipsychotic medication if someone has ██████████████████████████████████. *See* Rothschild A. J. (2013). Challenges in the treatment of major depressive disorder with psychotic features. *Schizophrenia bulletin*, *39*(4), 787–796. To not prescribe both an antidepressant and an antipsychotic medication would be outside of standard treatment. ██████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

30.     According to her case file, Daniela Marisol T. entered the U.S. with her older sister, Katherine, and her sister's son. Katherine and her child were released to live with the child's father. But, he would not take her. Her sister, therefore, sought her own place. However, initially, Katherine was not accepted as a sponsor because she could not meet the financial requirements for adequate disposable income needed to support Daniela Marisol T.'s intensive medical and psychiatric needs. Her brother was not accepted as a sponsor because ██████████████████████████████████████████

Roy Lubit, M.D.
Expert Report June 19, 2020
Addendum 4 Page  11

██████████████████████████████████████████████████████████
██████████████

31.    Given the seriousness and type of psychiatric problems that Daniela Marisol T. had, it was very important that she continue to take medication.  And, given that Katherine initially did not have adequate funds to enable Daniela Marisol T. to continue psychiatric care if Daniela Marisol T. lived with her, it would have placed her life at risk to live with the sister, since ceasing her psychiatric care presented a high risk of ████████████████████████████████.  Going to her brother's house where ████████████████ also presented an unacceptable risk.  ████████ ████████████████████████████████████████████████████ ████████████████████████████████

32.    There is another reason for ORR's initial concern about Daniela Marisol T.'s older sister Katherine being her sponsor.  Katherine asserts that Daniela Marisol T. had no psychological issues back in their home country, see FAC, ECF 80, ¶ 39, although there were very serious problems.  This raises concerns that Katherine did not have sufficient psychological mindedness to appreciate her sister suffered great distress, and did not have sufficient psychological mindedness to see to it that Daniela Marisol T. continued to receive the psychiatric care she desperately needed.  Katherine needed psycho-education about the importance of ongoing psychiatric care for Daniela Marisol T. before she could be released to her.

33.    When Daniela Marisol T. ████████████████████, the doctor said ████████████ ██████████████████████ Her doctor said ██████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ Children do not need to consent to medication.  They only need to assent to medication.  Daniela Marisol T. ████████ ████████████████████████████████████ I saw no indication of threats or punitive action if she did not take her medication.  This was appropriate care.

34.    Contrary to Plaintiffs' general allegation that medications are used instead of therapy at the RTCs, Daniela Marisol T.'s therapy had individual and group therapy.   ORR guidelines call for at least three hours of therapy a week (combination of group and individual).  And, there is milieu therapy which is ongoing interaction with staff about proper behavior and social interactions. She also had weekly calls with her family.

35.     The Plaintiffs saying an expert psychologist recommended reunification tells the reader little, and risks misleading the reader.  The Plaintiffs did not say who the psychologist was, or the basis for the opinion, or the time frame for the recommended reunification.

36.     Plaintiffs' assertion that Daniela Marisol T.'s psychological state deteriorated after her case manager told her that she would not be released to her sister is contrary to the medical record.  Medical records state ███████████████████████████████████████████████████████████.

37.     Based upon my review of the records, Daniela Marisol T.'s psychiatric problems were not the result of a failure to reunite her with her family as quickly as she would have liked.  Rather, they were ███ ████████████████████████████████████████████████  There were very good reasons to not send her to the home of her brother, or to release her to her sister until she had sufficient resources and understanding of her mental health needs to ensure continuous psychiatric care.  Doing so would have presented great risk to her welfare.  The care she received was appropriate and within the standard of care.  She was in appropriate settings given her psychiatric issues and the risk to her safety.  Appropriate medications were prescribed and she received psychotherapy.  On 9/12/17, Daniela Marisol T.'s psychiatrist asserted her GAF to be 40 and in 2018 it was in the 60s.  A GAF score in the 40s indicates serious symptoms and a GAF score in the 60s represents mild symptoms.  The medical record indicates great improvement, rather deterioration, during her time in the RTC placement.


**Gabriela N.  (DOB ████/2000)**

38.     According to the Plaintiffs, Gabriela N. was fine when in the U.S. until she was not allowed to go to live with her grandfather. FAC, ECF 80, ¶¶ 61-62. She was given Prozac and Adderall. *Id.* at ¶ 63.  Plaintiffs allege various side effects including that Adderall causes depression. Id. at ¶ 64.  Plaintiffs complained that Gabriela N.'s Adderall dosage was repeatedly raised. *Id.*

39.     Plaintiffs assert that the home study investigator's report acknowledges the close relationship between Isaac (her grandfather) and Gabriela N., credits Isaac for having "adequate housing," "access to transportation," and "maintain[ing] stable employment," and notes that Isaac is committed to "oversee[ing] [Gabriela's] arrival to school each day and . . . provid[ing] afterschool supervision," is aware of a local "hospital where he could take [Gabriela] for any medical needs," and has "identified a local mental health provider . . . where he intends to connect Gabriela. After

being detained for over one and a half years, Gabriela is miserable and desperately wants to live with her grandfather.  Her grandfather is ready and eager to care for her."  The plaintiffs, at least by omission, misrepresent the relationship between Gabriela and her grandfather.  The statement they have a close relationship is misleading.  Gabriela had not seen her grandfather in 14 years, and so they do not have a history of doing things together.  They had had phone contact.  He did not know ███████████████████████████████████

40.  Assessing a sponsor's home to be adequate and safe for a child requires more than finding several positive attributes of the potential home.  It also requires that there not be any serious risks.  One must look at potential negatives as well as positives.  Moreover, an individual asserting that they are committed to doing something, does not mean that they have the psychological, intellectual, financial or organizational ability to do it.  Plaintiffs' lawyers fail to provide an adequate argument that ORR's concerns about grandfather's home were not valid.  Instead, they simply asserted the concerns lacked validity.

41.  Plaintiffs do not discuss that risk to Gabriela that her fantasies and hopes for what it would be like to live with her grandfather would likely lead to disappointment, and that the disappointment and collapse of the fantasy could have devastating consequences.

42.  Plaintiffs' allegation that Gabriela N. was fine when in the U.S. until she was not allowed to live with her grandfather, *Id.* at ¶ 61-62, is opposite to what Gabriela N.'s medical records state.  ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████  ███████████████████ ████████████████████  She decided to go to the U.S. ██████████ ██████████████████████████████████████.  In the U.S., Gabriela N. turned herself in to border patrol.  She was initially placed at SW Keys in Clint.

43.  Gabriela N. reported ███████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████.  She arrived in the U.S. on 1/6/17.  ████████████████████████████████ ███████████████████████████████████████  Records state that on 4/29/17 ██████████████████████████████████████

Roy Lubit, M.D.
Expert Report June 19, 2020
Addendum 4 Page  14

██████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ She was sent for evaluation, denied █████████████

████████ and was returned to SWK.

44.   Records from May 2017 state that it came out her grandfather had been in jail for two years for alleged kidnapping.  On 5/21/17, Gabriela N. ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

45.   Plaintiffs' complaint that Gabriela N. became depressed because ORR inappropriately blocked Gabriela N. from being with her grandfather leaves out crucial information.  ORR was making appropriate decisions.  Plaintiffs fail to mention the problems created by the behavior of her grandfather and mother.  Plaintiffs do not mention the problems with Gabriela's grandfather not promptly sending the crucial papers showing his incarceration had been a mistake and the difficulty staff had reaching him and Gabriela N's mother. This failure by grandfather to be reachable and to send the crucial papers, at a key time in making decisions on Gabriela N.'s future and when she would understandably be stressed about her future raises questions about whether he can meet Gabriela N.'s needs. Grandfather should have proactively been reaching out to the people taking care of Gabriela if he had difficulty getting the papers.

46.   On 6/27/17, Gabriela expressed ████████████████████████████████████████ It was reported on July 7, 2017 ████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████. On July 7, 2017 she reported ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████
██████████████████████████████████████████████

47.   Gabriela N. was at El Paso Behavioral Health (a psychiatric hospital) from 8/3/17 to 8/14/17.

48.   A 7/7/2017 note stated Gabriela N. █████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████.

49.   ████████████████████████████████████████████████████████████████████
████████   Gabriela disclosed ███████████   on 8/02/2017, ████████████████████
██████████████████████████████   Gabriela was assessed by El Paso Behavioral
Health System (EPBHS) mobile on August 2, 2017, with the recommendation that she be
transported to EPBHS the morning of 8/3/2017.

50.   Gabriela N. was discharged on 8/14/2017, with diagnosis of ████████████████████
████████████████████████████████   She was seen for a Psychiatric Evaluation and
was diagnosed with ████████████████████████████████████████████████████
████████████████████, and recommended an RTC to target her therapeutic needs as follows:
Gabriela ████████████████████████████████████████████████████████████
████████████████████   Gabriela N. ███████████████████████████████████
█████████████████████████   This was a reasonable recommendation by the doctor and
decision by ORR. ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████

51.   She accepted other options well and is looking forward to being stepped down to a new placement.
On 8/21/17, the medical record indicates Gabriela N. ██████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████.
On 9/7/17 Gabriela N. was referred to Shiloh a 30-day psychiatric evaluation following
████████████████████████████████

52.     Contrary to Plaintiffs' general allegation that RTCs are harmful to youths, Gabriela N. was doing much better after having been at Shiloh for 8 months. She improved greatly while at Shiloh. On 4/26/18, it was reported that she had shown continuous improvement in decreasing her symptoms for which she was originally admitted. ███████████████████████████████████ ███████████████████████████████████████████████████ She reported ███████████████████████████████. Moreover, when approached about going to a lower level of care Gabriela N. did not want to, since she felt comfortable at Shiloh. She received residential treatment, behavior modification, individual counseling, group counseling, recreation and leisure skills, vocational skills, medication training, and psychiatric medication monitoring. She was provided with psychoeducation on safe sex, conflict resolution, and positive communication skills. She was also provided with different positive coping techniques such as anger management skills, relaxation skills, and mindful meditation techniques to use when she was/is feeling frustrated, anxious, and/or angry. She was also provided with positive communication skills to assist with communicating well with others.

53.     Contrary to Plaintiffs' complaint that medications are used instead of psychotherapy, and that communication with family was not facilitated, at Shiloh the plan for Gabriela N. was for two calls a week to family members, two individual therapy sessions a week and one group therapy session a week. In addition, she had milieu therapy which is a key aspect of the treatment of adolescents.

54.     The record does not support Plaintiffs' conclusion that she became depressed as a result of her grandfather being rejected as a sponsor. The chart notes that ██████████████████ ████████████████████████████████████ Moreover, review of records showed ██ █████████████████████████████████████████████████████████ ███████████████ Importantly, therapy notes reported █████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████

55.     The record does not support the Plaintiffs' assertion that ORR fails to give potential sponsors an opportunity to respond to allegations. It was noted that her prior placement ceased pursuing sponsorship by the maternal grandfather because of his criminal history back in El Salvador and his being slow in the process of evaluation. Her grandfather being a sponsor was reexamined. He and Gabriela N.'s mother presented evidence that he had been exonerated of the crime for which he had

been incarcerated.  This indicates that he was informed of the reason for the initial rejection and given the opportunity to respond.

56.   The Plaintiffs' description of the home study gives an inaccurate impression of the situation. Plaintiffs say the study found a close relationship between Isaac and Gabriela N.  I could not find statements in the report indicating this.  There was data contradicting Plaintiffs' assertion.  Gabrielle had not seen her grandfather in 14 years, and ███████████████████████████.  Records I reviewed stated that Gabriela N. stated that she has been fond of her grandfather.  This is not synonymous with the "close" relationship claimed by Plaintiffs.

57.   Plaintiffs also said the home study reported that the grandfather is committed to "oversee[ing] [Gabriela's N.] arrival to school each day and provid[ing] afterschool supervision."  However, her grandfather reportedly said that if she did not want to go to school she was old enough to decide. Her grandfather reported he will provide for Gabriela N.'s daily supervision, as his work schedule corresponds with her school day and will allow him to be available for afterschool care.  However, the lack of consistency of the sponsor's work schedule raised concern about his ability to be available for her daily care and supervision.  In addition, he said he would be getting a second job to pay for the added expenses she would bring to the house.  Unless he was able to work from home, additional work would interfere with his supervision of Gabriela N.

58.   The record indicates that her grandfather did not appreciate the seriousness of Gabriel N's psychiatric issues and did not have the experience or knowledge needed to deal with her significant psychiatric issues.  ORR found that Gabriela N.'s grandfather had failed to raise his own children because of his drinking. The home study said that grandfather denied having any parenting experience and was unable to articulate any information regarding parenting skills or abilities and struggled to articulate any disciplinary methods or plans to address potential behavioral issues. He voiced confidence that Gabriela N. would not display any behavioral issues as she had reported to him that she would comply with all rules and laws. Additionally, he noted her age and level of understanding contribute toward her change and ability to know between good and bad.  Her grandfather recalled that in her country of origin (COO), Gabriela N. displayed behavioral issues including rebellion and smoking marijuana, in addition "being in the streets." He attributed her past behavior was related to her mother's inability to manage her behaviors and be firm. When asked how he might confront similar situations, her grandfather took time to consider the question then responded, "That's difficult, I would probably call her worker (PRS)." Her grandfather was unable

Roy Lubit, M.D.
Expert Report June 19, 2020
Addendum 4 Page  18

to articulate any details of how he would implement structure and consistency for Gabriela N., including any plans for rules and discipline. He is confident she will not present with any challenging behaviors. Her grandfather noted in event of challenges, he would call the Psychosocial Rehabilitation Specialist worker.

59.   At his home, her grandfather's kitchen space appeared to be bare of dishes, cooking supplies and only a few items were in the refrigerator. He noted he eats out, including meals at work and did not voice intent to make adjustments following reunification, as he stated if Gabriela N. wanted to eat at home, she could cook in the kitchen. This raised concern about her grandfather's ability to provide a structured home environment with predictable meals and a regular supply of groceries. It also raises serious questions about whether he would actually spend much time with Gabriel N.

60.   Her grandfather's employment income appeared to barely cover his current monthly expenses. Moreover, the current budget does not account for costs related to Gabriela N.'s needs including food, clothing, therapy and medication. The home study worker inquired with her grandfather on his plan to handle additional expenses related to Gabriela N. and he stated that he would obtain a second job. A second job would reduce his availability to Gabriela, and perhaps prevent the level of supervision he said he would provide.  Another concern is that Gabriela N's grandfather had cancer, was not knowledgeable about his condition, and he stopped treatment after three chemotherapy sessions.  His health was a serious reason for concern. Serious health problems often compromise parenting.  Teenage children with ill guardians can wind up taking care of the sick relative, rather than being taken care of themselves. Compounding his minimization of her issues (he was reportedly confident Gabriela N. would not present challenging behaviors and her issues on her mother not being firm) her grandfather's lack of knowledge about his own illness and apparently ceasing treatment prematurely raises serious questions about whether he has the ability, diligence and willingness to see to it that Gabriela N will receive the care she needs.  The home study concluded, that overall, it was evident that her grandfather did not present with the capacity to meet Gabriela N.'s high level of needs, and it appears that he could not ensure the structured and stable home environment that she requires, thus a negative recommendation was warranted.

61.   I have been an expert in hundreds of custody evaluations.  The information in the home study would generally have led me to say that the sponsor was not adequate for any child, much less a child with serious mental health issues.

62.    Contrary to Plaintiffs' allegations, to a reasonable degree of medical certainty, ███████████ ███████████████████████████████████████████████████████████████████████████ Her psychiatric care and placement decisions were appropriate.  It was appropriate to refer her to the hospital when ████████████████████████.  Her grandfather was not an appropriate caretaker for her, for reasons discussed above.  When at Shiloh RTC, after her hospitalization, ORR tried to move her to a lower level of care, but no shelter would take her initially; she was stepped down to a shelter (Catholic Charities, Houston, St. Michael's Home for Children) in April 2018, however. Psychiatric records indicate a great improvement, rather than a decline, in her functioning over the months she was at the RTC.  Concerning the overall impact of being in the RTC on her psychological functioning, her GAF scores steadily improved throughout her stay:  Her GAF score was  40 (severe symptoms) on 9/8/17, 47 on 9/36/17, 50 on 10/10/17 and 11/7/17, 60 on 12/18/17, 63 on 1/23/18, 65 in 2/18, and 70 on 3/27/18.  A GAF of 40 is on the borderline of serious symptoms and either some impairment in reality testing or major impairment in several areas of functioning. In contrast, later reports from February, March and April of 2010 showed ████████████████████████ ████████.  Overwhelmingly, the reported incidents of mood instability during those months was being hyper-talkative.

### Jaime D. (DOB ████/04)

63.    Plaintiffs assert that when Jaime D. was 13 he came to the U.S. with his younger sister and 10 year old aunt.  See FAC, ECF 80, ¶ 70. Jaime D. lied about experiences in his home country.  *Id.* at ¶71. He was sent from a shelter in the Bronx to Yolo a secure facility in California in shackles after being awoken at 4AM.  *Id.* at ¶ 72. According to the Plaintiffs, Reyna D., an aunt who he wanted to live with and who wanted to sponsor him, was not told until a week later. *Id.* Reyna D. was found to be a suitable custodian for Jaime D.'s six year old sister and ten year old aunt. *Id.* at ¶ 73. Plaintiffs assert that Jaime D. was abused by older children at Yolo, staff was told but did not believe him. *Id.* at 74. He was transferred from Yolo to Children's Village (a staff-secure facility) and stayed there. *Id.* at ¶ 75.

64.    Jaime D. left his COO 3/9/18, and traveled for about a month to enter the U.S. On 4/8/18 he entered Cayuga Centers. His 4/9/18 medical record states ████████████████████████ ████████████████████████████████████████.  His medical records stated that Jaime D. ████████████████████████

Roy Lubit, M.D.
Expert Report June 19, 2020
Addendum 4 Page  20

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████ A note from two

days later (4/11/18) said that a case manager was assigned, identified a sponsor (maternal aunt) and

started screening.  Jaime D.'s aunt resides in a three bedroom apartment in Riverdale, MD. The

sponsor lives with husband, her 14 year old son and 11 year old daughter.

65.     Also on 4/11/18, Jaime D. reported █████████████████ He said ████

███████████████████████████████████ He reported ████

██████████████████████████████████████████████████

████████████. At Cayuga Centers (a shelter), on 4/16/18, Jaime D. and clinician discussed ███

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████ On 4/18/18, he was admitted to Yolo.  He later stated he made

the story up.  On 10/5/18, he reported █████████████████████████

█████████████████████

66.     On 4/20/18, Jaime D. reported █████████████. He said ████████

████████████ On 4/25/18 and 4/30/18 there were altercations with other youths and minor

injuries.  Jaime D. reported spitting up blood.  He first said it was the first time it happened and then

said it began in his country of origin.  In the second incident he was kicked in the back of his right

leg.

67.     The note from 5/10/18 stated ███████████████████████████

██████████████████████████████████████████████████.

A sponsor assessment was scheduled for 5/26/18, however, Jaime D. was accepted at Children's

Village and the sponsor assessment would not be completed prior to this time due to the sponsor's

lack of availability. Records state t████████████████████████████

██████████ █████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████ In the U.S. he wanted to live with his

maternal aunt whom he had had contact with but never met.

68.    On 4/18/18, Jaime D. was sent to Yolo (a secure facility) for one and a half months after stating at Cayuga Centers that ███████████████████████████████. He reportedly mimicked negative behaviors of older residents.  On 4/24/18, he stated in Spanish, ███████ ████████████████████████████████████████" On 5/24/18, Jaime D. was stepped down to Children's Village Staff Secure.  On 7/19/18, he was stepped down again to a shelter, Children's Village.

69.    A note from 8/13/18 stated ████████████████████████████████████████████ ████████████████████████ he was prescribed Kapvay and Concerta. ████████████████ ██████████████████████████████████████████████████

70.    The chart stated that permission to administer medications had been given by his aunt, Reyna D. He denied any dizziness or daytime sedation. His primary diagnosis was ████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████. ORR discussed the reason for the medication and reviewed possible side effects and how he was doing.  On 8/22/18, Jaime D. reported ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████. His teacher reported improvement in his focus and he can be redirected more easily. He was also less hyperactive and less oppositional.

71.    He reported ████████████████████████████████████████ Staff reported the same but added that he had one near physical altercation with a peer over the weekend. A note on 8/27/18 stated ████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████. He reported ██████████████████████████████████████████████████████████████ ██████████████████████████████████. ████████████████████████████ ████████████████████████████. ████████████████████████████████████████. A note dated 10/2/18 reported ██████████████████████████████████████████

72.    A note dated 10/10/18 stated ████████████████████████████████████████████ ██████████████████████████. This followed the closing of his cottage, where he had become familiar and comfortable, and a move to a new cottage 5 days later.  Jaime D also recently disclosed

████████████████████████████████████████. He stated ████████████

████████████████████████████████████████████. He

reports ████████████████████████████████████

██████████████████. ██████████████████████████

████████████████████████████████████████████

██████████████████ He reported ████████████████████

████████████████████████████████████████████. On

10/11/18, the note stated ████████████████████ He was placed on

Sertraline (Zoloft) 25 mg.  On 10/17/18 he stated ████████████████

████████████.

73.   Review of the medical records indicates that the decisions about Jaime D.'s placements, care, and medications were appropriate and within the standard of care.  After saying that he ███████ ████████████████████████, Jaime D. needed to be in a secure placement.  In addition, his report that ██████████████████████████ ██████ also required a greater level of security than he had in a shelter.  If he told other youths he ████████████████████████████████████████████ ████████████, it would likely cause others fear and potentially provoke confrontations. Moreover, there was the risk he would start or provoke confrontations with youths in the placement.

74.   Capvay and Concerta are standard medicines for ██████ and it was appropriate to prescribe them to Jaime D.  He was reported to do better after the medications were prescribed.  The prescription of the antidepressant (Sertraline) in October of 2018 was appropriate given his symptoms of ████████ ██████████████. ██████████████████████████████ ████████████████████████████████████████████ ██████████████████████. He reported ████████████████.

Roy Lubit, M.D.
Expert Report June 19, 2020
Addendum 4 Page  23

**Sirena P. (DOB ████/03)**

75.   Plaintiffs asserted that Sirena P. came to the U.S. with two siblings who were released to her parents,
but Sirena P. was not released due to mental health issues. *See* FAC, ECF 80, ¶ 78. She was
hospitalized twice in May and allegedly explained that the only reason she was having mental health
issues was the separation from her family. Id. at ¶ 79. Plaintiffs alleged she was given Hydroxyzine,
Prozac, Abilify and Zoloft without informed consent of her father or a family member. *Id.* at ¶ 80.
She was transferred to Shiloh and given Bupropion. Plaintiffs alleged that the separation and
medications had made things worse.

76.   Sirena P's case file states ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████

77.   Sirena P. was hospitalized at St. Luke's for ████████████ from 5/4/18-5/10/18 and 5/28/18-
6/1/18. She went to Shiloh on 6/4/18. She reportedly ████████████████████████
████████ Her diagnoses were ████████████████████████████████
████████████████████████████. She was prescribed Prozac at
one point.  The chart noted that she had two prior medication trials and then was prescribed
Bupropion because of concern for ████████████████.

78.   Plaintiffs provide no support for their assertion that the medication Sirena P. was given and the
separation from her family adversely affected her much less that that her mental health needs were
fueled solely by the agony she felt as a result of her ongoing separation from her parents. *See* FAC
¶ 79. Sirena P. had ████████████████████. She had ████████████████
████████████████████████ She had ████████████████████████
████████████████████████████████████████
████████████████████████████. After she ████████████████

██████████████████████████████ she told her clinician █████████████████

████████████ She reported ██████████████████████████. She reported ████

███████████████████████████ She reported ██████████████████████████████

████████████████████████████████ Sirena P. presented as ████████████████

█████████████████████████ She reported at the end of the session she ███████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████ She indicated she ███████████████

███████████████████████████████ She stated ███████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████

79.   It is standard practice to ████████████████████████████████████████████
████████████████████████████████████████████████ The hospital is
very unlikely to have taken her had she not needed to be in the hospital.  If a program sends a child
to the hospital for evaluation and the hospital accepts the patient, either the hospital is confirming
the need for admission or, if the primary evaluation was done at the hospital, the hospital is the one
responsible for the decision, not the referring entity.

80.   The note from 4/24/18 shows █████████████████████████████████████████
████████████ She indicated ███████████████████████████████████████████████
████████████ She stated ██████████████████████████████████████████████████
████████████████████ She reported ███████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████ She shared ██████████████████████████████████████████████████
████████████████████████ She states ████████████████████████████████████████
██████████████████████████████████ She stated ██████████████████████████████
██████████████████████████████ She also is ████████████████████████████████
████████████████ She agreed ████████████████████████████████████████████ She
reported ████████████████████████████████████████████████████████████████
████████████ This presents a high risk for █████████████████████████████████
████████████████████████████████████████████████████████████████████████
███████████

Roy Lubit, M.D.
Expert Report June 19, 2020
Addendum 4 Page  25

81.   On 5/1/18, the Assistant Clinical Director agreed that Sirena P. would benefit from receiving a psychiatric evaluation due to ██████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████ and Sirena presenting as ██████████████████████████████ ████████ On 5/3/2018, she was taken to Phoenix Children's Hospital due to ██████████████████. On 5/4/2018, the crisis team recommended transferring Sirena P. to a Psychiatric Hospital. On 5/5/2018, Sirena P. was moved to the St. Luke's Behavioral Health and was diagnosed with ████████████████ ████████████████████████████████████████████████████████████████████ ██████████████

82.   On 5/9/18, the psychiatrist informed Sirena P. that she was diagnosed with ██████████ and was prescribed with Prozac.  She was informed that her siblings, who had been with her at the shelter, had reunified with their parents.  Given the seriousness of Sirena P.'s problems and the risk from ██████████████████████, she remained in the shelter while a home study was done.  In the days immediately after discharge from the hospital, she repeatedly ██████████████ Sirena P. shared that ██ ████████████████████████████████████████████████████████. She stated ██████ ████████████████████████████████████████ Sirena P. had signs of ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████

83.   On 5/17/18, all the team members agreed that Sirena P. may benefit from an RTC placement due to her elevated symptoms that she was demonstrating on an on-going basis at the shelter. On 5/24/18, Sirena P. ██████████████████████████████████████████████████████████████ ████████████████████████████. She was ██████████████████████████████████████ ████████████████████████████████████. Abilify was begun and Sertraline stopped, for ██████ ██████████. Shelter staff determined Sirena P. needed to go to an RTC for her safety.  On 5/28/18, Sirena P. made a note saying ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████. She then requested ██████████████████████████████████████████████████████████████ ██████████ Sirena P. talked with her mother and sister for approximately seven minutes. Sirena P. then was taken to St. Luke's Behavioral Hospital where she was admitted on 5/28/2018 due to ████████████

██████████████████████████████████████.  Her case was referred for a home study due to ████████████████████████████████.

84.   Sirena P. continued to █████████ and so was transferred to Shiloh on 6/4/18, although the home assessment was going well.   She was switched to Buproprion because █████████████████████████████████████████████████████████  Her individual counseling notes showed ████████████████████████████████.  Her GAF on 8/30/18 was 75 (indicating only minor problems) and was markedly improved from the time of admission to Shiloh when her GAF was 35.   She was transferred to her father's care on 9/16/18.

85.   Sirena P.'s treatment and placements were appropriate.  ████████████████████ ██████████████████████████████ she needed more structure and treatment than she would have obtained in a shelter or living with her family.   Given █████████████████████████ ████████████████████████████████ made it appropriate to switch from an SSRI to Buproprion. ██████████████████████████████.  Her records show marked improvement while at Shiloh.

86.   Contrary to the assertions of the Plaintiffs, review of Sirena P.'s GAF scores show marked improvement during her time at Shiloh:  On 6/5/18 her GAF 35; 6/19/18 her GAF was 45; 6/26/18 her GAF was 50, 7/24/18 her GAF was 60; and 8/30/18 her GAF was 75.   A GAF of 35 indicates some impairment in reality testing or major impairment in several areas.   Symptoms are transient and come as a result of stresses.

**Benjamin F. (D.O.B. ████/08)**

87.   Plaintiffs assert that Benjamin F. and his brother were separated from their mother at a Texas facility.   *See* FAC, ECF 80, ¶ 86. He is autistic, developmentally delayed, and has difficulty speaking when not around his mother.   *Id.* at ¶ 87.   Plaintiffs alleged that the traumatic separation has led to additional problems that were not being addressed.   *Id.* However, they do not discuss his baseline behavior before coming to the U.S.  Plaintiffs complain that he was prescribed Guanfacine and Risperidone without a neutral decision maker being involved. *Id.* at ¶ 89. His brother was released to their grandmother and Benjamin F. went to Shiloh.   *Id.* at ¶ 90. Plaintiffs assert that he was not placed in the least restrictive setting that would accommodate his needs.

88.     Medical records do not support Plaintiffs' allegations.  Benjamin F. was at St PJ's Children's Home from 7/2/18 to 7/23/18 and at Shiloh from 7/23/18 to 9/15/2018.  Benjamin F. was referred to Shiloh on an emergency basis for evaluation as a result of ████████████████████████████████.  His mother reported that ████████████████████████████████████████████████████ ████████████████████████████████████████████

89.     He would ██████████████████████████████ His mother stated she noted that Benjamin F. would ██████████████████████████ Per his mother, ████████ ████████ His mother also reported that Benjamin F. ██████████████████████████ ████████████████████████████████████████████████████ His mother reported that Benjamin F. ██████████████████████████ She also stated that Benjamin F. ██████████████████. She stated ██████████████████ His mother stated ██████████████████████████. She noted ████████████████████████████████████████████ ██████████████ Benjamin F.'s mother stated that Benjamin F. ████████████████ ██████████████ His mother stated ██████████████████████████ ████████████████████████████

90.     Benjamin F.'s mother reported that they left El Salvador because ████████████████ ██████████████  Benjamin F. travelled to the U.S. with his mother and 13-year-old brother. Mother, brother and Benjamin F. were apprehended by ICE. Benjamin F. and his older brother were separated from their mother when she was placed at South Texas Detention Facility in Pearsall, TX. Benjamin F. and his older brother were transferred to St. PJ's Children's home on 7/2/18. Benjamin F.'s mental health and behavior declined once at St. PJ's.

91.     Benjamin F.'s mother reported ██████████████████████████████████ ████████████████████████████████████████████ His mother stated that Benjamin F. ██████████████████████████████. His mother stated that Benjamin F.'s ██████████████████████████

92.     Chart review shows that Benjamin F. (DOB ████/08) was admitted on 7/23/18 to Shiloh for ████████ ██████████████████████████████████ He had a history of ████████████████ ██████████████████████████ He was noted to have developmental delays.  He was in first grade when he was 7.

Roy Lubit, M.D.
Expert Report June 19, 2020
Addendum 4 Page  28

93.   In his country of origin, Benjamin F. ███████████████████. ███████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
███████   He and his brother were separated from their mother at the border.  He was noted to have
██████████████████████████████████████████████   He went to St PJ's,
threw things at people, and engaged in ████████████████. He was given guanfacine 1 mg bid
with improvement but another provider stopped it due to daytime somnolence (sleepiness) and he
went downhill.  On 7/18/18, he had a psychological evaluation and an RTC was recommended.  On
July 19, 2018, he was seen by a psychiatrist and guanfacine was begun again 0.5 mg bid.  With
increased ████████████████, a decision was later made to start Risperdal 0.25 mg bid.  In
time he was on guanfacine ER 4mg, Lexapro 10 mg and Risperdal 0.25 mg bid.  AIMS test for
Tardive Dyskenesia was done.

94.   Benjamin F. was tried on and off medication.  Off medication, his self-care deteriorated and he was
more aggressive.  Aggressive behaviors and taking other's things led to problematic peer relations.
His  treatment  plan  included ███████████████████████████████████
████████████████████████. Concerning other care, he had psychological testing,
and a high level of school support.  He had calls with his mother and grandmother.  Benjamin F.
was released to his  grandmother's care.

95.   The problems Plaintiffs complained of were not present.  He clearly needed a higher level of care
and it did not interfere with his education and development.  He was significantly improved on
discharge.

96.   Review of the medical records indicates that Benjamin F's care was within the standard of care.
Plaintiff's complaints about his treatment are not supported by the medical record.  Contrary to the
assertions of the Plaintiffs, Benjamin F.'s medications were appropriate.  He was given medication,
it was stopped, it was given again, and it was clear he was better when on medication.  In his home
country █████████████████. In America he was treated with guanfacine and Lexapro as well
as Risperdal.  This permitted lower doses of Risperdal, which is the medication with the most serious
side effects.  The medications used were appropriate.  Benjamin F. was in the least restrictive setting
in his best interest.  He had psychotherapy as well as medication.

97.   Contrary to Plaintiffs' allegations that children go downhill in congregate care, Benjamin F. was
deemed to have improved at the time he was discharged.  Due to ████████████████████

████████████████ Shiloh was a correct placement for him.  Moreover, guanfacine, Lexapro and Risperdal was an appropriate combination of medications for the issues he had.

98. Contrary to the assertions of the Plaintiffs, review of Benjamin F.'s GAF scores show significant improvement during his time at Shiloh:  7/24/18  GAF 45; 8/7/18 GAF 50;  8/21/18 GAF 55; and 9/11/18 GAF 60.

**Miguel Angel S. (DOB ████ /2002) (No longer named plaintiff)**

99. Plaintiffs state that Miguel Angel S. was told that he would be released in 3 months to his father. *See* FAC, ECF 80, ¶ 47.  On July 17, 2017, ORR transferred Miguel Angel S. to Shiloh RTC in Texas due to his mental health needs.  *Id.* at ¶ 48. At Shiloh, Miguel was administered several psychotropic medications, including Remeron, Trazadone, Seroquel, and Lexapro. Side effects of these medications include stomach pain, dizziness, nausea, drowsiness, unusual weight gain, blurred vision, and insomnia. *Id.* Plaintiffs contend that Miguel Angel S. objected to taking the medications because they made him feel itchy, dizzy, aggressive, nauseous, and caused him to gain an unusual amount of weight in a short period of time.  Plaintiffs assert that Shiloh staff insisted that he take the medication. *Id.* at ¶ 49.

100. Plaintiffs assert staff assaulted Miguel and further contend that in March 2018, shortly after the assault, ORR transferred Miguel Angel S. to Yolo Juvenile Detention Center, affording him neither notice nor opportunity to be heard, and that he was transferred to Yolo in retaliation for reporting the assaults, and that at Yolo, facility staff attacked Miguel Angel S. with pepper spray.  *Id.* at ¶¶ 51-53. Plaintiffs state that he was repeatedly assaulted by staff, and that psychotropic medications were given over his objection and without informed consent.  *Id.* at ¶ 56.

101. Plaintiffs assert that Gerardo S., Miguel Angel S.'s ████ father, was told he had to show proof of school enrollment for Miguel to be released to him, but he could not enroll Miguel Angel S. because the school said Miguel Angel S. had to be there to be enrolled.  *Id.* at ¶ 57. Gerardo S. was also allegedly told he needed to provide the name of a psychiatric clinic, but Gerardo S. could not find one.  *Id.* The complaint alleges they have not given him written notice of the refusal, the reason, an opportunity to review the underlying evidence and Miguel Angel S. was not in the least restrictive setting.  *Id.* at ¶ 58.

102.   My record review presents a drastically different picture than what the Plaintiffs allege.  Miguel Angel S. was born in Mexico. ███████████████████████████████████████ ██████████████████ He had lived in the United States (El Paso, Texas) since he was four months old. He decided to visit Juarez, Mexico alone in 2015 and was apprehended by Customs and Border Protection (CBP) and sent to ORR custody.

103.   Miguel said ███████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████. On 2/29/16, Miguel Angel S. ███████████████ ████████████████████████████████████.

104.   When living with his paternal aunt and three cousins, in Mexico ████████████████ ████████████████████████████████████████████████████████ ██████████████ He reports ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████ he reports ████████ ████████████████████████████████████████████████████████ ██████████████ He fled to the U.S. arriving on 5/17/17 where he turned himself in to ICE in order to evaluate his legal options. He was placed in a shelter with Southwest Key in San Diego where he was given a psychological evaluation after complaining of ████████████████████████ ████████████████████████████. He was ████████████████████ ████████████████████████████████████. He had been showing ███████████████ ████████████████████████████████████████ placed in a psychiatric hospital on 6/14/17, ████████████████ ████████████████████████ A psychological evaluation was completed on 6/19/17 and residential treatment was recommended. On 7/17/17 he went to Shiloh for a 30 day psychiatric evaluation.

105.   Miguel Angel S. was tried on a number of different medications (Remeron, Seroquel, and Trazadone).   [Remeron is an anti-depressant. Seroquel is an antipsychotic medication used for psychosis and agitation/aggression.  Trazadone can be used for sleep.] The chart notes that he often refused medications, but also that he often asked for medication.  Plaintiffs' allegation that he was

forced to take medication is not supported by the medical record. Medical staff do not force patients to take oral medications. They do not shove pills in patients' mouths. In an emergency, medication can be administered over objection to avoid violence. Courts can also order medication over objection. I did not see records of this being done to Miguel Angel S. Urging a patient to take medication and the patient assenting is different than forcing the patient. The chart notes he refused medication at times. The records show that facility staff did not force it. In addition, records show responsiveness by medical staff to his assertions about whether the medications were working, and doctors stopping medication because Miguel Angel S. was not taking them. The record supports the conclusion that Miguel Angel S. has serious psychiatric problems and needed medication and intensive treatment for the safety of himself and others.

106. Plaintiffs complain that ORR would not release Miguel Angel S. to his ███████████ father because he could not find a mental health clinic. It is common practice in the U.S., even for adult psychiatric patients, to be required to have an outpatient appointment scheduled prior to discharge. Requiring that the father at least find the name of a psychiatric clinic that he could take his son to was reasonable. If there is no clinic available, it would be a very bad placement for Miguel. If his father could not even find a clinic, and there was one available, it is a very serious sign that his father will not be able to get Miguel Angel S. into therapy and have him stay in therapy. The psychiatric issues that the records describe Miguel Angel S. ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████ If his parent brought him to a psychiatrist, and after one or a few meetings the parent said that he had decided to no longer have Miguel Angel S. in any type of mental health treatment, the psychiatrist, as a mandated reporter, would be required by law to contact protective services for medical neglect. If failing to get Michel Angel S. mental health treatment is medical neglect then it would have been wrong for ORR to release him to a parent who could not or would not get him the treatment he needs.

107. Contrary to Plaintiffs' allegations that medications were used instead of therapy, at the various facilities Miguel Angel S. generally received weekly psychotherapy and group therapy twice a week.

108. It is highly unlikely that staff at multiple institutions assaulted Miguel Angel S. and that he was punitively transferred for reporting it. I have almost 40 years of experience in psychiatry. I worked on wards for many years, served as acting medical director of a large state hospital, and have almost 2 decades of experience as a forensic psychiatrist. While there are inappropriate staff in some

institutions who have assaulted patients, it is far more common for patients to assault staff. It is far more likely that a single individual was violent toward multiple staff at multiple places than that multiple staff at multiple places assaulted the same person. The unlikelihood of this reduces further if there are no other reports of staff at the facilities assaulting patients. It should also be noted that on June 28, 2018, the Texas Health and Human Services conducted an investigation of Miguel's claims, and found the claims were not substantiated.

109.   Plaintiffs failed to even note that the medical records report that it was Miguel Angel S. who assaulted multiple staff and that the police arrested him. The allegation by Plaintiffs that the transfer to Yolo was because of retaliation for Miguel Angel S. reporting staff had assaulted him, ignores the staff's report that Miguel Angel S. assaulted staff, and that transferring an assaultive individual to a higher level of care is standard practice. Keeping a violent individual in a setting that is inadequate to contain the person's violence presents an immediate and ongoing danger. In addition, the normal response to having been assaulted in an institution is to want to leave, to avoid another assault. His complaining that he was sent elsewhere points in the direction that his complaint of being assaulted was false. Plaintiffs' complaint that he was not given an opportunity to contest the transfer, ignores the level of violence and danger he presented, and would continue to present until he was in a more secure facility. Moreover, one would expect that someone who had been assaulted by various staff members would want to be transferred.

110.   Review of the records indicates that Miguel Angel S.'s care and placement decisions were within the standard of care. As discussed, the records do not support the Plaintiffs' various allegations. Miguel Angel S.'s records indicate that he was a very disturbed and violent teenager who was under much better control in a more restrictive setting. Given the violence it was appropriate to try various medications for the safety of staff, patients and Miguel.

111.   Contrary to the allegations of Plaintiffs that UACs deteriorated in RTCs, Miguel Angel S's GAF scores showed great improvement over time: 7/25/17 GAF 45; 7/28/17 GAF 40; 8/1/17 GAF 50; 8/8/17 GAF 55; 8/15/17 GAF 55; 9/8/17 GAF 60-65; 9/21/17 GAF 65; 10/10/17 65; 10/24/17 GAF 70; 11/21/17 GAF 70; 1/4/18 GAF 75; 2/6/18 65; and 3/13/18 GAF 70.

**Addendum 5**
**UACs who spent time in an RTC**

Contrary to Plaintiffs' assertion, review of the cases demonstrates that the decision-making on placement and use of medication were within the standard of care of child and adolescent psychiatry.  Stepping up occurred when UACs were acting out in ways that put themselves or other UACs or staff at significant risk.  Medication decisions and doses were within the standard of care.  Children who received medication all needed psychotropic medication in addition to psychotherapy.  The UACs all had individual, group and milieu therapy.  Medication was needed, however, to decrease the risk of harm, and/or to improve functioning so that the UACs could be released or stepped down to a less restrictive setting, and/or to improve functioning so that psychotherapy would be effective.  Medications and their impacts were monitored.  Informed consent was sought for medications.

As is typical and appropriate in child and adolescent psychiatry, diagnoses and medications prescribed to each UAC evolved over time based on additional information becoming available, the UAC going to the hospital and changes being made there, and/or the UAC's reaction to medication being assessed.  I have endeavored to write down medication use and diagnoses at various points in time, but I am not presenting an exhaustive list of diagnoses and changes to medications and diagnoses.

Decisions concerning the stepping down of UACs from RTCs to less restrictive settings or their release to sponsors in the community were within the standard of care in child and adolescent psychiatry, and child welfare.  Notably, several of the UACs were not returned to a parent who was in the U.S.  In each of these cases, the parent did not want to reunify with the child because it would affect their legal status, or they had been abusive or otherwise clearly unfit.

1.  **HFPC** (DOB ██████████ )

Psychiatric Issues and Trauma in Home Country

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

Placements
BCFS Harlington – 8/18-9/17/18
Tornillo - 9/18/18-9/24/18
SWK Canutillo – 9/24/18-11/20/18
El Paso Psychiatric Center – 9/28/18 – 10/2/18 & 10/9/18-10/15/18
MercyFirst – 11/20/18-6/18/19
Nassau University Medical Center (psychiatric hospitalization, (12/22-12/31/18)
MercyFirst, Release Request (6/18/19)

Placement and Psychiatric History
SWK Canutillo – HFPC went on 9/27/18 and 10/9/18 to El Paso Psychiatric Center for ███████
███████

10/19/18 He said he did not mind staying at the shelter indefinitely.

A psychiatrist recommended RTC and UAC's mother agreed.
11/20/18 He was stepped up to an RTC (MercyFirst).

12/19/18 His ████████████████ decreased but had not stopped over the prior 30 days.  He
continued to ██████████████████████████ and was sent to a psychiatric
emergency room (ER).  He was not admitted because he presented as stabilized.

12/22/18-12/31/18 He was psychiatrically hospitalized at Nassau University Medical Center
(NUMC) because ████████████████████.

1/24/19 note stated that in the past month he had ██, was placed on 1-1 supervision, had extra
sessions with his clinician, and by 1/16/19 was doing better.

5/20/19 Discussions began about his release to his mother's care.

6/3/19 MercyFirst:  He was nervous to leave but believes he is ready, and said it is hard to say
goodbye to those who have been most supportive to him while in care.

6/18/19 He was released to his sponsor, his mother.

Diagnoses
█████████████████████████████████████████

Medication
It appears Abilify 4 mg was begun at El Paso Psychiatric Center and continued 4 mg on 10/10/18.
He was hospitalized 12/22/18 and when he returned to MercyFirst he was prescribed Abilify 10 mg
starting 12/31/18 and later 15 mg a day starting 1/24/19.
Prozac was begun 11/22/18 at 30 mg and increased to 60 mg on 1/24/19.
3/16/19 Concerta 18 mg was begun.

2. **PDOP** (DOB ███/01)

Psychiatric Issues and Trauma in Home Country
████████████████████████████████████████████
███████████████████████████████

Placements
BCFS Chavaneaux (3/16/19 – 6/4/19)
Laurel Ridge Treatment Center 3/20-3/26/19

Roy Lubit, M.D.
Expert Report June 19, 2020
Addendum 5 Page 2

MercyFirst RTC (6/4/19 - )
Nassau University Med Center 6/30/19-7/17/19
[Four hospitalizations]

Placement and Psychiatric History
PDOP was stepped up to MercyFirst RTC after having had 4 psychiatric hospitalizations during his 2 ½ months at BCFS Chavaneaux, a shelter.  He was diagnosed at Laurel Ridge Psychiatric Center with █████████████ Stonebridge Behavioral Health subsequently diagnosed ██████ █████████████████████  On arrival at MercyFirst he was on Zoloft 100 mg and Risperdal 1 mg.

At the shelter, he had auditory and visual hallucinations, destroyed property, made sexual gestures and comments, threatened to hit staff, and refused medication.  In June 2019, Zoloft was stopped and Seroquel 150 mg continued when PDOP appeared to be ████████. 6/30/19 he went to NUMC for admission.  7/7/19 after hospital discharge he continued to ███████████████████████████████████████. 8/2/19 note reported he was on Risperdal 3 mg.

BCFS Chavaneaux (shelter): PDOP received many Significant Incident Reports (SIRs), most of them for physical violence toward property, threats to hit people, ███████████, and defiance. A number of his SIRs at MercyFirst were for making false allegations that staff had mistreated him.
SIR 215665 – ████████████████████████████████████████████████████
SIR 215643 – kicked two holes in walls
SIR 212192 – ████████████████████████████████████████████
SIR 207434 – transported to Laurel Right Treatment Center for psychiatric evaluation due to ███████████████████████████████████████████
SIR 221538 (6/10) – Since he was admitted to MercyFirst, he ██████████████████████ █████████████████████ He was sent to the hospital.
SIR 222911 (6/14) – He reported that ██████████████████████████
SIR 223228 (6/15) – He cursed at teachers and threatened staff. He was placed in a therapeutic hold; he complained they used excessive force.

Sponsor
A viable sponsor was never identified.

Diagnoses
████████████████████████████████████
████████████████████████

Medication & Therapy
Abilify (Laurel Ridge) changed to Seroquel 150mg and Zoloft 100 mg and then Risperdal and Zoloft
5/19 Risperidol and Zoloft discontinued and Zoloft and Seroquel restarted
6/19 Zoloft was discontinued because PDOP was ████████████

Roy Lubit, M.D.
Expert Report June 19, 2020
Addendum 5 Page 3

The Notice of Placement (NOP) dated 7/17 indicates that he had agreed to being prescribed Seroquel.
6/28/19 Zoloft was discontinued because ███████████████████████████
7/30/19 He was sent NUMC for ███████████████████████████
His father or grandfather sent a letter consenting to his mental health treatment.

The Chavaneaux and MercyFirst treatment plans included individual therapy weekly and group therapy twice a week, but minor reportedly was not receptive to therapy.

3. **EEBG** (DOB ████/2002)

Psychiatric Issues and Trauma in Home Country

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████

Placements
South West Keys 12/14/2018)-2/14/19
Charter Palms Hospital 1/12/19-2/18/19 ███████████████
MercyFirst 2/14/2019
South Oaks Hospital 4/10/19-4/18/19

Placement and Psychiatric History
1/09/19: ███████████████████████████
1/12/19: ████████████████████████████████████
Chester Palms Hospital diagnosed ███████████████████ and prescribed Risperdal, total of 1.5 mg a day.
1/29/19: He exhibits physical and verbal aggression towards other minors.
1/30/19: He engages in ██████████ and then is put in a CPI therapeutic hold.

He was stepped up on recommendation of Francisco Torres MD at Palms Behavioral Health on 2/6/19.
2/14/19 Transferred to RTC.  He had ███████████████████████ Arrived on Risperdal 1mg Qhs and .5 mg QAM (in the morning).

3/12/19 He engaged in two incidents of physical aggression and two of ████████████
██████████. Began Risperdal 1mg.
3/27/19 He began Lexapro 10mg, which was increased to 20 mg on 4/9/19.
3/29/19 note says ███████████████████████████████████████
4/8/19 began Prazosin 1 mg Qam (morning) and Qhs (bedtime) due to ████████████████████
██████████
4/9/19 Risperdal dosage increased to 3 mg QD (daily), and Lexapro dosage increased to 20 mg.

In April 2019, he had problems with ███████████████████████████. He was sent to South Oaks Hospital.

5/7/19 Risperdal increased to 4 mg after mood swings.

May 2019 After South Oaks Discharge he continued to have behavioral problems including verbal and physical aggression, property destruction, attempted AWOL, and ███████████████ ███████████

June 25, 2019 Risperdal decreased to 2 mg. and Seroquel 100 mg begun.

Resident and parents reportedly in agreement with medications.

MercyFirst diagnosis was ██████████

EEBG received individual counseling twice weekly and medication management.

**4. GLPC** DOB ████/03

Psychiatric Issues and Trauma in Home Country



Placements

Board of Child Care shelter: 3/23/19 – 3/29/19

Shenandoah secure: 3/29/19 – 6/6/19

MercyFirst RTC: 6/6/19 – 7/25/19

MercyFirst shelter: 7/25/19 – 9/22/19

Placement and Psychiatric History

GLPC was stepped up from Board of Child Care (shelter) to Shenandoah (RTC) after he reported that ███████████████████████████████████████████████████ ████

His therapist advised that ████████████████████████

Shenandoah: GLPC engaged in threatening behavior leading to physical restraint.

Shenandoah: Dr. Gorin (4/30/19) recommended transfer to an RTC.  GLPC was transferred from

Shenandoah to MercyFirst.  He arrived at the RTC on Zoloft 50 mg and Trazadone 200 mg.  A note from 7/5/19 reported that he was doing well, and that he was diagnosed with PTSD and prescribed Seroquel 200mg.

He was stepped down to MercyFirst Shelter on 7/25/19.

<u>Sponsor Possibilities</u>
3/28/19 – 4/10/19 -- His sister was a potential sponsor but a house member refused finger printing.
4/10/19 – 9/22/19 – GLPC was released to his brother as sponsor.

<u>Diagnoses</u>
████████████████████
████████████

<u>Medication & Therapy</u>
*SVJC*
4/19/19 – Zoloft 50 mg PO QAM and Trazodone 50 mg PO QHS.
5/15/19 - Trazodone increased to 100 mg QHS.
5/31/19: Case note and authorizing affidavit reflect that GLPC's mother provided verbal informed consent to his RTC placement and related treatment.
6/5/19 –Trazodone increased to 200 mg QHS.

*MercyFirst*
6/11/19 Came to MercyFirst on Zoloft 50 mg and Trazadone 100 mg
6/10/19 –Trazodone discontinued.  Seroquel 100 mg begun.  Change because of his complaint about falling asleep.

6/19/19 –Zoloft 50 mg was discontinued.

7/5/19 –Seroquel was increased to 200 mg.

7/16/19 Cleared for step down to shelter.

Records show that GLPC received individual counseling once weekly, and group counseling twice weekly (or once weekly with community meeting) while in ORR care.

**5.  JVPJ** DOB ████ 01

Psychiatric Issues and Trauma in Home Country
████████████████████████████████████████
████████████████████████████████████████
████████████████████████

Placements
Harlingen, 12/17/18 – 5/16/19
MercyFirst RTC, 5/16/19 –

Placement and Psychiatric History
5/6/19 A psychologist said JVPJ was at a high risk of ███████████ and recommended an
RTC placement.

5/16/19 He was stepped up to MercyFirst (RTC) because of ███████████ and ██████
██████ in the Harlingen shelter. He also was reportedly defiant.

5/28/19 report:  During his third and fourth weeks he was noted to ██████ and went to the ER ████
██████████ Seroquel 100mg was begun for ███████ symptoms.

Between 5/16 and 6/17/10, JVPJ had 3 SIRs for s██████ and 2 for an ER visit for ██████
██████

Between 6/17 and 7/17/19, JVPJ had another 3 SIRs for ███████

7/17/19 report: He engaged in 3 more ██████████████, but they were assessed as decreasing.
Prazosin 2mg was begun for PTSD symptoms.

Sponsor
His family had difficulty identifying a sponsor for him.

Diagnosis
██████████

Medication & Therapy
*Harlingen:* none

*MercyFirst*
5/28/19 Seroquel 100 mg

6/21/19 Prazosin HCl 1 mg for PTSD symptoms.

7/17/19 Seroquel 100 mg and Prazosin 2 mg (for PTSD).  The Prazosin dosage was increased at
JVPJ's request because of ███████████

MercyFirst provided individual counseling once a week and group counseling twice a week.

6.  **AAMT** (DOB ███ /07)

Psychiatric Issues and Trauma in Home Country

████████████████████████████████████████████████
████████████████

Placements
Southwest Key Estrella: 9/10/18–10/17/18
Hartland IYC: 10/17/2018– 1/22/19
Chicago Lakeshore Hospital: 1/22/19–2/01/19
Millcreek RTC: 2/1/19 –6/27/2019
Heartland IYC: 6/27/2019–

Placement and Psychiatric History
10/10/18 –He reported ██████████████████ ██████████████████████
██████████████████

12/16/18 He spoke about ████████████████████████████████████
████████████████ engaged in aggressive behavior, and threatened to destroy property.

2/1/19 AAMT went to Millcreek due to ██████████████████████
He was noted to have disruptive behavior in SWK Estrella, including making gun gestures with his hand.  He also had a tattoo purportedly representative of a drug cartel.
Diagnosis: █████████████████████████
Medications: Prazosin 8 mg; Adderall 10 mg; Prozac 20 mg; and Risperdal 1.5 mg.

6/14/19 He engaged in physical altercations and had contraband, and spoke about ██████████
████████████████████████ He was eligible for asylum and special immigrant juvenile status.  He attempted to hit people with a curtain rod.
Heartland SIRs include: ████████████████████████████████████
████████████

7/7 and 78/19 He threw an object at staff and ██████████████████████
7/14/19 He engaged in ██████████████████████ .
7/14/19 He engaged in physical altercations and reportedly had contraband.

7/25/19 AAMT was accepted into a Partial Hospitalization Program in Hoffman Estates.  The program is 6 hours/daily for 5 days a week for at least 2 weeks.

Medication
*Heartland Alliance IYC*
11/1/18 – Clonidine 0.05 mg in am, 0.05 mg at 2 pm, and 0.1 mg at bedtime.
11/27/18 – Risperidone 0.5 mg in AM, 0.5 at 2 pm, and .5 at 8 pm.
12/12/18 – Prozac 10 mg; Risperidone increased to 1 mg am, 1 mg 2-3 pm, and .5 mg in evening.

1/15/19 – Record shows improved mood and less anger after increasing fluoxetine (Prozac) to 20 mg.

1/22-2/1/19 –Chicago Lakeshore Hospital: Clonidine .2 mg/nightly; Prozac (Fluoxetine) 20 mg/daily; Melatonin 3 mg/nightly; and Risperdal 1 mg/daily.

*Millcreek RTC*
2/4/19 –Medications prescribed at RTC:  Prozac 20 mg; Risperidone 1 mg 2x day and .5 mg/daily; Clonidine .2 mg and Melatonin 3 mg.

*Heartland Alliance*
7/1/19 – Risperidone 1.5 mg at 8 am, 1.5 mg at 2 pm, and .5 mg at 8 pm; Dextroamphetemine 20 mg (generic Adderall); and Prazosin 8 mg.
7/5/19 – Risperidone dosage was reduced to 1 mg am, 1 mg at 2 pm, and .5 mg at 8 pm; Prazosin 8 mg at bedtime; and Buproprion XL 150 mg.

Therapy Services
SW Key Estrella clinical notes say ███████████████████████████████████████
████████████████████████████

At HIYC, AAMT received individual counseling 1x/week, and group counseling 2x/week.

7. **DDRO**  DOB ██████ 2002

Psychiatric Issues and Trauma in Home Country

██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

Placements
SW Key Casa Padre: 12/13/2018 – 3/6/2019
MercyFirst RTC 3/6/2019 –

Placement and Psychiatric History

On 12/18/2018, DDRO went from SWK Casa Padre to Palms Behavioral Health (hospital). ████
██████████████████████████████████████████ Symptoms included
████████████████████████████████████████████████
██████████████████████████████████████ He had had symptoms of
████████████████████████████████████████████ symptoms
included: ████████████████████████████████████████

12/18/18 Risperdal .25 mg bid (later 1.5 mg), Melatonin 5 mg HS
12/24/18 Prozac 20 mg AM
1/6/2019-1/14/19 re-admitted to hospital for ████████████████

1/16/2019 said ███████████████ and punched lockers.
1/25/2019 argument with youth and tried to fight.
2/6/2019 punched wall and scratched himself with a pencil.
2/8/2019 ██████████████████████████████████
2/11/2019 ████████████████████████
2/12/2019 ██████████████████████████. He said ████████████████████████
████████████
2/14/2019 aggressive behavior. Stood in boxing stance add said in Spanish: "I'm going to hit you, I'm going to hit you." Minor stated that he acted this way because it is fun for him and he thought it was funny. Minor states that he acts out because he gets bored. Minor states that he wanted to punch the staff member because she took his ball away.
2/17 and 2/18/2019 ██████████████████████████████████
2/18/2019 – He was admitted to the hospital
██████████████████████████████████████████████████████
████████████████████████████████
2/19/19 ████████████████████████████████ psychiatric hospitalization.
2-28-19 Discharge diagnosis (from hospital): ████████████████████████████
████████████████████████████████████
3/02/2019: ████████████████████████████████████
3/5/2019 ████████████████████████.

Despite psychotropic medication he continued ██████████████████████████████
████████████████. He was increasingly ████████████████████████. A psychiatrist opined that an RTC was needed.

3/22/19 (MercyFirst): He came to RTC on Risperdal 1 mg bid (2x/daily), Buspar 5 mg tid (3x/daily), and melatonin 10 mg. His mood was ██████████████████████. Discontinued Buspar and replaced with Lexapro 10 mg in morning. Resident was in agreement to medication changes and medication compliant.

4/16/2019 ████████████████████████. Prazosin prescribed 1mg 2x/day.
4/24/2019 Punched another minor on the nose.
4/24/2019 Assaulted a peer, jumped the gate; and was brought to Syosset Hospital. He appeared to be ████████; at the hospital he was physically aggressive towards hospital staff and stated ████████████████████████████████████████; He was transferred to Zucker Hillside for psychiatric assessment; and was discharged on 5/1/2019.
5/1/2019 At MercyFirst said he would attempt runaway, destroy property and harm staff. ████████████████████████████████████████ He was restrained due to safety concerns and sent to NUMC. He continued to make AWOL comments and made unauthorized movement after the meeting. He was put on one-on one supervision and AWOL protocol.
5/5/2019 He was sent to psychiatric ER; ████████████████████████████████
5/6/2019 Admitted to NUBH; discharged 5/28/2019.
MercyFirst requested transfer to staff secure but it was denied.
5/28/2019 Discharged from NUBH. Diagnosis: ████████████████████████

Roy Lubit, M.D.
Expert Report June 19, 2020
Addendum 5 Page 10

6/10/2019 ███████████████████████████████████████

6/11/2019 Attempted AWOL.

6/21/2019 Discontinued Risperdal 1 mg.

8/2/19 AWOL attempts and threats, testing of boundaries, recommended staff secure.

Diagnoses/Symptoms

*Palms Behavioral Health* –

█████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

2/28/19 - Palms Behavioral Health, DDRO ████████████████████████████████████

The hospital psychiatrist felt that an RTC was needed.

5/28/2019 – NUMH (hospital) - ████████████████████.

██████████████████████████

Medication

12/18/18 – *Palms Behavioral Health*: Risperdal .25 mg for ███████████████ and Melatonin 5 mg ████████.

12/24/18 –Prozac 20 mg.

1/14/19 –Risperdal .5 mg once/day (psychosis); Risperdal 1 mg at bed time ████████; and melatonin 5 mg ████████.

2/12/19 –Risperdal 1.5 mg po and Prozac 40 mg/day.

2/18/19 –Prescribed BuSpar 5 mg 3x/day ████████; Risperdal 1 mg 2x daily ████████; and melatonin 10 mg ████████.

3/22/2019 – *MercyFirst:* Discontinued Buspar, began taking Lexapro 10 mg.

4/16/19 –Prazosin 1 mg 2x/day.

5/14/19 Prozac prescribed.

6/21/2019 DDRO discontinued Risperdal 1 mg.

At MercyFirst he had individual therapy with a CBT focus.  Also milieu, art and dog therapy.

<u>Sponsor</u>
1/3/19 Attempted to contact potential sponsor but no answer.

1/29/2019 Sponsor closed out due to Sponsor stating that he would have minor work since he is not financially well to have minor just at school. Sponsor also stated that he has household members that did not want to provide identification nor get fingerprinted.

2/6/2019 Case Manager spoke to minor's mother again. Mother said she was speaking to another potential sponsor but did not give contact information.

The case worker at MercyFirst facilitated contact between DDRO and his mother in their home country (Guatemala) on multiple occasions.  The case worker explored sponsorship options with mother but none were viable.

3/14/19 DDRO's mother said that she would like him to go to Long Term Foster Care.


8. **AMMM** (DOB ███/2002)

Psychiatric Issues and Trauma in Home Country

███████████████████████████████████████████

███████████████████████████████████████████

<u>Placements</u>
Southwest Key Canutillo 6/1/2015-6/22/2015
SWK Processing Center Staff Secure 6/22/2015-7/18/2015
BCFS San Antonio Staff Secure 7/20/2015-9/25/2015
Shenandoah Valley Juvenile Center 9/25/2015-4/12/2016
NOVA secure 4/12/2016-8/2/2016
NOVA staff secure 8/2/2016 – 11/24/2016
NOVA 11/24/2017 – 12/22/2016
Southwest Key Mesa 12/22/2016 – 1/14/2017
Yolo County Juvenile Detention 1/14/2017-4/18/2017
MercyFirst RTC 4/18/2017 – 7/1/2017
Yolo County Juvenile Detention 7/1/17 – 8/8/2017
Shiloh Treatment Center 8/8/2017 – 7/10/2019
Friends of Youth McEarchern 7/10/2019 – 9/18/2019
Friends of Youth Colin Ferguson 9/18/2019-present (no case file)

<u>Placement and Psychiatric History</u>
At SVJC he refused to participate in class and programs. ████████████████████
████████████████████████████████████████████████████████████

He went to NOVA on 4/12/16. He then had more issues and was prescribed Seroquel, Depakote, and Adderall. His behavior improved and he began to participate in therapy but the improvement did not last. He was transferred to Yolo to be closer to his family. At Yolo he often refused medications and ████████████████. He was transferred to MercyFirst 4/18/17 and back to Yolo on 7/1/17. He then transferred to Shiloh on 8/8/17.

<u>Shiloh RTC Admission 8/8/17</u>
Diagnosis: PTSD and ADHD; R/O Mood Disorder, Bipolar Disorder
General Assessment Functioning (GAF)[1] 40

6/4/19: He was less oppositional, showed better concentration, and had better school compliance.

<u>Shiloh Discharge 7/10/19</u>
Diagnosis: ████████████████████████
GAF 80
Medication: Adderall 15 mg on week days; Seroquel 25 mg 8PM.


**9. MDCFM** DOB ████02

Psychiatric Issues and Trauma in Home Country

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

<u>Placements</u>
Homestead influx shelter 12/13/18 to 02/4/19
Baptist Homestead (hospital), Larkin Hospital – 12/7/18 to 2/3/19
Shiloh RTC from 2/4/19 to 7/19/19



---

[1] The Global Assessment of Functioning (GAF) score is used to rate how serious a mental illness may be. It measures how much a person's symptoms affect his or her daily life on a scale of 1 to 100. Higher scores indicate higher functioning.

Shiloh Admission 2/4/19

Diagnosis 2/26/19: ███████████████████████████████████████████. Her GAF score at intake was 55.

Medications at intake included:  Cogentin 1 mg BID; Depakote 750 mg a day divided; Prozac, 10 mg; and Zyprexa 15 mg.

12/7/18 note stated MDCFM was admitted to Baptist Homestead after ███████████████ ████████████████████████████████████ She was transferred to Larkin Hospital, evaluated and given a diagnosis of ███████████████████████

12/19/18 She stated ██████████████████████████████████████████ ████████████████████████████████████████████████████

She reported ████████████████████████████████████████
12/24/18 she was transferred to Nichlaus Children's Hospital and was there until 12/28/18.

Shiloh, DC note 7/19/19
Discharge Diagnosis: ███████████████████████████████
His GAF score had increased to 75.

7/19/19:  At the time of discharge, MDCFM was taking the following medications:  Depakote 750 mg; Latuda 80 mg; Cogentin 1mg; and Prozac10 mg. AIMS was done.

While placed at Shiloh, MDCFM received individual counseling twice weekly, as well as group therapy, family therapy, educational services, and behavior group management.  Records show ███ ████████████████████████████████████.  MDCFM met with the psychiatrist weekly, or as needed.

Sponsor
MDCFM wanted her cousin to be her sponsor, but the potential sponsor had trouble finding a psychiatrist.

**10. ACH** (DOB ██████3)

Psychiatric Issues and Trauma in Home Country

████████████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████████████████████████████
███████████

Placements
Southwest Key Casa Montezuma shelter: 2/22/19 – 6/12/19
Kingwood Pines Hospital 4/28--5/9/19 [prescribed Seroquel 50 mg at bedtime ("QHS")]
Woodland Spring Hospital 5/14/19-5/28/19  [diagnosed ████████████████; prescribed
Seroquel 100mg QHS]
Shiloh 6/12/19 – 8/26/19

Psychiatric Issues
4/10/2019 ACH said ███████████████████████████████████████████████
███████████████████████████████████
4/28/19 ███████████████████████████████████████████████ She was sent
to Kingwood Pines Hospital for an emergency psychiatric evaluation.

5/9/19 She was discharged from Kingwood Pines Hospital and was prescribed Seroquel 50 mg
QHS.

She refused the medication on 5/14/19, ████████████████ and attempted to hit staff.

5/14/19-5/28/19 She was hospitalized again at Woodland Spring Hospital and diagnosed with
████████████████████████████████████████ and given Seroquel 100mg
QHS.

5/28-5/29/19 She was transferred to Shiloh due to ███████████████████

4/26/19 – ACH ████████████████████████████████

4/28-5/9/19 ACH █████████████████████████████████████████████████
████████████████████ She was sent to Kingwood Pines Hospital for an emergency
psychiatric evaluation.

5/14-5/28/19 – ACH ████████████████ and attempted to hit staff. █████████████
████████████████████████████████████ ACF was hospitalized again at Woodland
Spring Hospital.

6/4/19 – ACH █████████████████████████████

6/5/19 – ACH ███████████████████████████████████. ACH was transported
to the hospital for further evaluation.

6/12/19 - ACH was stepped up to Shiloh due to ██████████████████████████████
██████████████████████████

Roy Lubit, M.D.
Expert Report June 19, 2020
Addendum 5 Page 15

7/9/19 – Clinical notes from therapist report ███████████████████████████
████████████████████████████████████████████

Admission Shiloh 6/12/19
████████████████████████████████████████████████████
GAF 40

Shiloh Note
7/16/19
Her GAF increased to 50.
She was prescribed Seroquel 150 mg.

7/16/19 –Her mood improved mood -- more subdued, less anxious.  She was stepped down from acute care to residential treatment.

At Shiloh, ACH's Individual Service Plan said that she was to receive individual counseling once weekly, and group counseling twice weekly (or once weekly with community meeting). The Notice of Placement (6/14/19) stated that ACH was to be seen by the psychiatrist once weekly, and by her clinician twice weekly.

Sponsor
ACH's mother has not been proactive in completing the Family Reunification Application and providing the supporting documents. ████████████████████████████████████████
████████████████████


**11. AMIQ** DOB ████09

Psychiatric Issues and Trauma in Home Country
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

Placements
SWK Sole 6/26/18-9/19/18
SWK Campbell: 9/19/18-3/25/19
Shiloh 3/25/2019

Placement and Psychiatric History
9/19/18 She transferred from SWK Sole to SWK-Campbell; she exhibited oppositional and defiant
behavior and ███████████████████████████████████████████████████████████
███████████████████

9/23/18 She had difficulty adapting to the shelter's environment and had consistent behavioral
issues; not participating in the shelter's daily routine; pulled staff's hair, bit, kicked and threw items
that she found in her way. She did not listen to the staff when they attempted to redirect her.
10/25/18 An RTC was recommended.
11/29/18 Diagnosed with █████ and prescribed Focalin XR 5 mg and melatonin 3 mg.
12/19/18 Focalin XR was increased to 5 mg bid and Intuniv 1mg was begun.
1/2/19 She ran from staff, caused a scene and later said ████████████████████████
████████████████████████████████

1/3/19 Her medications were stopped and Abilify 2 mg was begun.
1/18/19 █████████████████████████████████████████████████
████████████████████████████████

2/20/19 She presented ███████████████████████████████████
███████████████

2/25/19 ██████████████████████████████████████
Intuniv ER 1 mg was added to Abilify 2 mg. She reported ████████████████████████████
████████████

3/3/19 She was sent to St Luke's ER.
3/28/19 She was transferred to Shiloh.

Shiloh Admission 3/28/19
4/2/19 Psychiatric Assessment:  Her diagnosis was ████████████████████████████
██████████████████████████

GAF 40

Her GAF scores increased over time:
4/9/19 GAF 45
4/23/19 GAF 50
4/30/19 and 5/21/19 GAF 55
6/23/19 GAF 60

In May 2019 she engaged in ██████████████████████

7/23/19 note
Diagnosis: ████████████████████████████████████████
████████████████████████

Medications:  Abilify 10mg; Intuniv 2mg; and Lexapro 20 mg
GAF 55-60 ██████████████████████

She had individual and group therapy.

<u>Sponsor Issues</u>
During the sponsorship process, additional information came out about father's criminal history and abuse of AMIQ.  Child reported ███████████████████████  Various relatives in the U.S. were considered as sponsors. ███████████████████████████████████████ ████████████████   The mother's sister was in discussions about sponsorship 7/22/19, but 6/24/19 the sister was concerned she could not meet the child's health needs.


**12. CJEM** (DOB ██████ 2004)

<u>Psychiatric Issues and Trauma in Home Country</u>
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████   She traveled to the U.S. with her father to live with her stepmother in Tennessee and continue her education.  She was apprehended at the border and separated from her father.

<u>Placements</u>
Southwest Key Antigua 5/5/2018 to 12/10/2018
Palm Behavioral Health 8/2/2018 to 8/9/2018 (hospital then returned to SWK Antigua)
Shiloh Treatment Center (12/10/2018 to 07/23/2019)
Discharged to ICE for repatriation (voluntary departure)

<u>Placement and Psychiatric History</u>
7/28/209 note says ███████████████████████████████████████
Youth was placed on 1:1 supervision.

8/2/18 She went to Palms Behavioral for an emergency psychiatric hospitalization and was diagnosed with ███████████████████████████████████████████████
███████████████████████████████████████   Prescribed
Lexapro 10 mg and Trazadone 50 mg and discharged on 8/9/18.

*Palms Behavioral*  8/2-8/9/18 – Diagnosis ██████████████████.  Medications prescribed were: Lexapro 10 mg and Trazadone 50mg

8/20/18 She was diagnosed with ████████████ and was prescribed Trileptal.

9/4/18 An RTC was recommended.

9/4/18 – Trileptal was discontinued.  She began Abilify 2mg Qhs; dosage was increased to 5mg on 9/18/18.

12/10/18 She was stepped up to Shiloh for ████████████████████████████████████ ████████████████████████████████ .

Shiloh Admission 12/10/18
Stepped up for █████████████████████████████
Diagnosis: █████████████████████████████████████████
Her GAF score at admission was 50.

12/10/18-1/8/19 - Abilify 5 mg, Lexapro started 1/7/19), and Trazodone 50 mg (started 12/10/18). CJEM reported ██████████████ . ████████████████████ ████████████████████████████ Tardive Dyskenesia (TD) and EPS were assessed to be negative.

Verbal authorization provided by father on 12/11/18. Father also signed consent to administer medications.

1/4/19 –Lexapro was increased to 20mg.

1/15/2019: CJEM reportedly had ████████████████████████████ ████████████████ On Lexapro 20 mg and not seeing much improvement. Therefore, augmented with Abilify 10mg. Side effects re-explained; reasons for treatment discussed. ████████████ ████████████████ She agrees to increase.
1/22/19 Discontinued Trazodone and started Remeron to assist sleep.
2/7/2019: "Client (CE) reported to staff ████████████████████████
3/5/19 –Cymbalta increased to 60mg Qam and 30 mg Q noon.
3/19/19 –Remeron added.
4/03/2019 She stated, ████████████████████████████
4/23/19 Medications were: Abilify 10 mg, Cymbalta 60 mg QAM and 30 mg at noon, and Prazosin 2 mg.  Remeron was weaned since it was believed it caused her significant weight gain.
4/23/19 She was prescribed Abilify 15 mg, Cymbalta 60 mg QAM and 30 at noon, and Prazosin 2 mg.  Remeron weaned due to weight gain.  Abilify was increased because of ████████████████
4/30/19 She said ████████████████████ .
5/22/2019: CJEM ████████████████████████████ Staff intervened.
6/12/19: CJEM ████████████████████████████████████████

At Shiloh, CJEM had individual therapy twice a week and weekly group counseling. CJEM received a one-on-one to close-proximity level of supervision at school and in her residential treatment home. She also received behavior management and educational services.

Shiloh Discharge 7/23/19 to ICE
Diagnosis: █████████████████████████████████████████
GAF score increased to 65
Medications: Abilify 10mg; Cymbalta 60mg; Lamictal 100 mg; Prazosin 1mg and 2 mg.

Sponsors
CJEM's stepmother was initially considered for sponsorship but declined to continue with the reunification process due to her partner's (CJEM's biological father) impending release and upon advice of his attorney.

She was granted voluntary departure on 4/16/19 and given until 8/14/19 to leave the U.S. ████
████████████████████████████████████████████████████████

**13. CYIC** (DOB ████ 2003)

Psychiatric Issues and Trauma in Home Country

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

Placements
SWK San Diego 2/16/19-4/4/19
Sharp Mesa Vista Hospital  02/22/19-03/13/19 (psychiatric hospitalization)
Shiloh RTC  04/04/19-

Placement & Psychiatric History
2/19/19 reported ████████████████████████
Reported ████████████████████████████████████████████████

2/21/19 said ████████████████████████████████████████████

2/22/19 until 03/13/19 hospitalized at Sharp Mesa Vista Hospital for ████████████. Reported ████████████████████████████████████████████████████

2/27/19 psychiatrist told her ████████████████████████████████
████████████████████████████████████████████████████████
████████ Shortly after (04/04/19) she was admitted to Shiloh.
2/28/19 Both parents were contacted to obtain consent to placement in an RTC (she was on waitlist for Shiloh).
Her peers filed a grievance because they felt threatened by her.  She was on one-to-one supervision.

██████████████████████████████████████████████

3/27/19 –She reports ██████████████████████████████████
████. She was provided two individual therapy sessions weekly until she is transferred to a higher level of care.

4/4/19 – CYIC was admitted to Shiloh (sub-acute level of treatment).

Shiloh Admission

████████████████████████████████████████
████████████

GAF 40

4/9/19 Prescribed Depakote 500mg BID (twice daily)
4/30/19 GAF 50
5/1/19 Prescribed Intuniv 3 mg QHS
5/21/19 GAF 50
Seroquel 250 QHS (at bedtime)

6/2/19 CYIC was stepped down to residential care at Shiloh.  The placement continues to be recommended for psychotropic medication monitoring and stabilization.

6/4/19 GAF 55

6/18/19 Her GAF score increased to 55-60.

7/12/19 –She ██████████████████████████████████████.

███████████████████████████████████████████████
████████.

Records show that CYIC received regular individual, group, and family therapy services.

Sponsor
Father who stated that he has not seen her in 11 years and his attorney advised that he not sponsor her. Father in the U.S. for 11 years, married to a US citizen and working on his residency.  Her father said that he has other relatives in Houston, Texas such as cousins that are US citizens.

**14. JDCC** (DOB████ 2004)

Psychiatric Issues and Trauma in Home Country

████████████████████████████████████████████████
████████████

Placements
10/30/18–6/11/19 Shelter [six psychiatric hospitalizations while in shelter care]
2/4/19-2/13/19 – Palms Behavioral Hospital
2/27/19 – 4/5/19 – Palms Behavioral Hospital
3/14/19 – 3/17/19 – Doctors Renaissance Hospital
3/22/19 – 3/27/19 – Palms Behavioral Hospital
4/15/19 – 4/26/19 – Doctors Renaissance Hospital
4/27/19 – 5/10/19 – Doctors Renaissance Hospital
Shiloh: 6/11/19 –

Placement & Psychiatric History
JDCC has had ██████████████████████████
12/26/18 He became upset because he had to move rooms and as a result punched the wall.
1/11/19 He asked to change rooms, and when told no he ████████████████████████.
He reportedly ███████████████████████ He reported ████████████████
███████████████████████████████████
2/4/19 He was hospitalized at Palm Springs Hospital; Diagnosis: ███████ he was prescribed Abilify 5mg.
2/27/19 He returned to Palm Springs Hospital.
3/22/19 – He was sent again to Palms Behavioral Hospital after ███████████████████
Diagnosis: ████████. Medications:  Depakote 250 BID; Tenex 1mg BID (2x/daily); and Abilify 5mg.
4/13/19 He said ███████████████████████
4/15/19 ██████████████████████
4/14/19 He was sent to Palms Behavioral.  Medications: Risperdal 1mg BID and Depakote 500mg.
█████████████████
4/27/19 Admitted to Palms Behavioral.  Diagnosis: ████████ Medications: Risperdal 1 BID and Depakote 750 mg.
█████████████████████████████
6/11/19 He was stepped up to Shiloh because of ██████████████████████. He had previously had six psychiatric hospitalizations while in shelter care.

Shiloh Admissions 6/14/19
Diagnosis ████████████████████
GAF 45

June 2019 Depakote dosage was increased and switch was made from Risperdal to Abilify.
7/2/19 GAF 50
Prescribed Abilify 5mg and Depakote ER 500mg.
7/16/19 GAF 55

Case manager notes show that JDCC's father consented to his placement and that JDCC himself also consented. He had many Significant Incident Reports (SIRS), most of them for ███████ ████████████  or for physical aggression toward property.

SIRs
12/26/18, punched a wall
2/2/19, ████████████████████████████████████████ (led to first hospitalization).
2/17/19, ████████████████
2/27/19, ██████████████████████████ (this led to his second hospitalization).
3/5/19, ████████████████
3/7/19, punched a desk in his classroom
3/11/19, ███████████████████████████████████████████████████████
██████████ (led to his third hospitalization)
3/14/19, ████████████████████
3/18/19, ███████████████████████████
3/22/19, ██████████████████████████ (led to his fourth hospitalization).
4/13/19, ██████████, destruction of property
4/15/19, ██████████████████ (led to fifth hospitalization)
4/26/19, ██████████████████████████████.
4/27/19, admitted to hospital for sixth time for s████████
5/11/19, punched a wall
5/13/19, punched and ████████████████████
5/16/19, verbal threat against another UAC
6/10/19 – JDCC was put in a therapeutic "CPI hold" after ███████████████████████████████
███████████████████████

A Case Update from Shiloh also identifies JDCC as having a disability, but ████████████ Disruptive Mood Dysregulation Disorder, r/o Bipolar 1 Disorder, r/o ADHD.

8/19/19 – Wellbutrin SR 100 mg was also added to JDCC's medication regimen.

He had individual therapy and group therapy.

**15. NAAL** (DOB ██████ 2001)

Psychiatric Issues and Trauma in Home Country

███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
████████████████████████   His father immigrated to the U.S. when he was one year old.  He lived in his home country with his mother, stepfather, and a younger sister. He traveled to the U.S. for a better life; he

originally planned to reunify with his brother. █████████████████████████████████
██████████

He has a past history of ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████

He left his COO on 11/28/18 and entered the U.S. on 12/1/18.

███████████████████████████████████
███████████████████████████████
████████████████████████
█████████████████████████████
███████████████████████
███████████████████
███████████████████████
██████████████████████████████

Placements and Hospital Visits

Southwest Key Casa Padre (shelter) – 12/8/18-3/28/19
12/9/18 SIR due to UAC's ███████████████████████
12/16/18 & 12/19/18 SIRs due to punching the walls.
1/13/19 ███████████████████████████████████
1/13/19-1/21/19 While hospitalized at Palms Behavioral, he was prescribed:  Lexapro 10Qhs and Melatonin 3m Qhs.
1/23/19 ████████████████████████████████████████.
███.
1/28/19 Outpatient evaluation for punching walls and ██████████████.  Medication: Abilify 2mg.
2/7/19 At discharge, his medications were:  Abilify and Lexapro; started Risperdal .25mg BID. An RTC was recommended.
2/14/19 He was hospitalized at Palms Behavioral due to █████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████. His behavior had improved since last SIR documented on 2/3/19 and so he was stepped down from one-to-one close observation.

Roy Lubit, M.D.
Expert Report June 19, 2020
Addendum 5 Page 24

3/5/19 He was again hospitalized at Palms Behavioral Health Psychiatric Hospital due to █████

3/7/2019 Case Review says that ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████ Displays frustration regarding the status of his case, as he continues without a sponsor.  He is hospitalized at Palms Behavioral Health.

3/5/19-3/21/19 He returned to Palms Behavioral Health for ██████████████████████████ ██████████████████████

Medications: Risperdal 0.5 mg BID and Melatonin 3mg Qhs.

Shiloh RTC – 3/28-8/7/19
Shiloh Admission Assessment 4/2/19
Diagnosis: ████████████████████████████████████
GAF 40

He had group and individual counseling, and other services at Shiloh.

7/16/19 Psychiatric Assessment
Diagnosis, ██████████
Medications: Intuniv 2 mg; Zoloft 50 mg; and Melatonin 3mg.
GAF score increased to 70.

8/7/19 Shiloh Discharge, went to David and Margaret.


**16. JMG** (DOB ████/2004)

Psychiatric Issues and Trauma in Home Country

███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

Placements
SW Key Sol 1/3/2018 – 1/6/2018
Shenandoah Valley Juvenile Center (SVJC) 1/6/2018 – 12/18/2018
BCFS San Antonio Staff Secure 12/18/2018 – 4/10/2019
Shenandoah Valley Juvenile Center 4/10/2019
Shiloh Treatment Center 7/12/- 7/20/2019
Shenandoah Valley Juvenile Center 7/20/2019

A transfer request from SW Key Sol was made for ███████████████ She reportedly ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████

Roy Lubit, M.D.
Expert Report June 19, 2020
Addendum 5 Page 25

SIRs
JMG received many SIRs about ██████████████████████████████████████
████████████████████████████████████████

She also had many SIRs for disruptive and threatening behavior, some of which required that she be restrained.   Here are some of them.

2/7/18 –Flashed gang signs and discussed opposing gangs with female peers on unit.
2/9/18 - ██████████████████████████████████████████
████████████████████████████████

3/08/18 – Removed from regular programming for disruptive behavior. Physical restraint.
4/14/18 – ████████████████████████████
5/1/18 – ████████████████████████
5/6/18 –Disruptive behavior, physical restraint.
5/11/18 – Threatening behavior, ████████████████████.
5/18/18 – Disruptive behavior, physical restraint.
5/22/18 – ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████

6/3/2018 – ████████████████████████████████████

Transfer request to Shiloh – ████████████████████████████████████████.

7/3/18 –She tried to recruit other girls to fight local residents.
████████████████████████████

9/25/18 – She assaulted staff.
11/6/18 ████████████████████████████████████

3/14/19 –She was admitted to Laurel Ridge for ████████████████████████. It was recommended that she be placed in an RTC.
3/28/19 – She threw a rock which shattered a glass door, and picked up the glass against staff directions; attempted to throw another rock at glass door; was assaultive toward staff; and was transferred back to SVJC.
5/1/19 – JMG had to be physically restrained for ████████████████
5/2/19 – JMG engaged in aggressive and ████████████████.

5/8/19 – JMG reported ████████████. The legal service provider reported ████████████████████████████████████████.
5/20/19 A Psychologist evaluated JMG. She was diagnosed with the following: ████████████████████████
████████████████████████████████

7/10/19 Shiloh twice denied placement but then JMG was accepted at Shiloh.

██/19 SVJC held party for her birthday and she said it was the best birthday ever. She was excited and happy she was accepted to RTC.

7/12/19 Note states that ████████████████████████████████████████████
███████████████████████████████████████████████

Shiloh 7/16/19
Diagnosis: ████████████████████████████████
Medications:  Seroquel 200 mg (began 6/26/19) and Prozac 40 mg (7/6/19).
GAF 40

Case Management note states: ████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████

JMG's immigration attorneys sought a temporary restraining order to return JMG to SVJC from Shiloh.  UAC said on plane that she felt regret for allowing her attorneys to request a stop on her transfer. JMG was ordered to be returned July 20, 2019 to either SVJC or a less restrictive setting in Virginia.



7/30/18 JMG ████████████████████████████.

8/5/19 Shiloh denied re-placement of JMG, ████████████████████████████████████
███████████████████████████████████████████████████████████████████

Roy Lubit, M.D.
Expert Report June 19, 2020
Addendum 5 Page 27

8/8/18 – Father spoke to JMG;

Potential Sponsor

## Addendum 6

### Evaluation of Dr. Amy Cohen's Report for Gabriela N. and Lucas R.

1. Dr. Cohen's reports regarding Gabriela N. and Lucas R. do not change my opinion expressed in my report and in Addendum 4 that Lucas and Gabriela's placement, treatment, and sponsor evaluations, while in ORR custody, were appropriate and within the standard of care of Child and Adolescent Psychiatry.

2. There are serious problems with Dr. Cohen's reports regarding Gabriela N. and Lucas R. Dale Martindale wrote "[T]he defining attributes of an expert opinion relate not to the credentials held by the individual whose fingers type the words or from whose mouth the words flow; rather, the requisite characteristics relate to the procedures that were employed in formulating the opinion and the body of knowledge that forms the foundation upon which those procedures were developed."[1]  The procedures for forming an expert opinion include obtaining and fairly presenting all available, significant data; doing a rigorous analysis of the data, presenting where data comes from, and explaining the analytic process that led to the expert opinion.  Dr. Cohen cherry-picks and spins the available data, fails to tell the reader the source of significant information, appears to have failed to obtain crucial data (the recollections and perspective of her therapist and others staff) and does not explain why her stated opinion is more likely true than alternative hypotheses.  I will provide examples.  I am not giving an exhaustive list of the problems.

3. Dr. Cohen writes, "According to those in regular touch with [Gabriela], she has grown increasingly distraught as her incarceration in government facilities has dragged on and she has been kept away from family and freedom."  For this information to have any use, the reader needs to know who Dr. Cohen is referring to when she writes "According to those in regular touch with [Gabriela]".  It is difficult to understand why she would not say who they are.  Dr. Cohen accepting the opinion of unnamed others, failing to note contradictory medical record information, and apparently failing to obtain and report information from Gabriela N.'s professional caretakers, is not a scientific basis for an expert opinion.  According to the medical records, Gabriela N. was doing much better after having been at Shiloh for 8 months.  On 4/26/18 it was reported ████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████  Psychiatric records indicate a great improvement, rather than a decline, in her functioning over the months she was at the RTC. Concerning the overall impact of being in the RTC on her psychological functioning, her

---

[1] Martindale, D.A. (2001). Cross-examining mental health experts in child custody litigation. *The Journal of Psychiatry and Law*, 29, 483-511 p 503.

Roy Lubit, M.D.
Expert Report June 19, 2020
Addendum 6 Page  1

Global Assessment of Functioning (GAF) score[2] was 40 (severe symptoms) on 9/8/17, 47 on 9/36/17, 50 on 10/10/17 and 11/7/17, 60 on 12/18/17, 63 on 1/23/18, 65 in 2/18, and 70 on 3/27/18.

4. Dr. Cohen appears to assume that Gabriela N's stress is the result of her release not moving forward more quickly.  For example, Dr. Cohen wrote that ███████████████████████ ████████████████████████████████████████████████████████████████████Dr. Cohen does not explain the basis for her speculation that ██████████████████████ ████████████████████████████  There is important material in the medical record, and even in Dr. Cohen's report, indicating that other factors are the primary cause of Gabriela's distress.  Dr. Cohen herself wrote ████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ███████████████████████████ Also ████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ███████████████████████████████ On 6/27/17, Gabriela expressed ███████████████ ██████████████████████████████████████████  Based on my professional experience with patients, my experience with people in various contexts, my opinion is that her concerns about ████ ████████████████████████████████████████████████ are (as a group) the predominant reason for ████████████ . ████████████████████████████████████████ ████████████████████████████████████  if concern about her release was the major reason for distress she should have gotten worse over time, but she got better.

5. Dr. Cohen says that ███████████████████████████████████████████████████ ████████████████████████████████████ The medical record ████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████

6. Dr. Cohen spends much of her report on Gabriela criticizing her therapist ████████████ ████████████████████████████████████████████████████  There is no

---

[2] The Global Assessment of Functioning (GAF) score is used to rate how serious a mental illness may be.  It measures how much a person's symptoms affect his or her daily life on a scale of 1 to 100.  Higher scores indicate higher functioning.

Roy Lubit, M.D.
Expert Report June 19, 2020
Addendum 6 Page  2

indication Dr. Cohen spoke with Gabriela's therapist to hear her version of events, prior to
writing down what she believes are the facts.  Without hearing the therapist's version of
events there is insufficient data to opine on whether Gabriela's therapy met standards of care.
In addition, Dr. Cohen's repeatedly criticizes Gabriela's therapist ██████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████  Dr. Cohen's recommendations for what should have been
done are contrary to current scientific knowledge and best practice.  Children who have
████████████████████████████████████████████████████████████████████████
████████████ generally need to learn self-soothing skills (such as dialectical behavioral therapy
(DBT) or Marylene Cloitre's "Skills Training in Affective and Interpersonal Regulation"
(STAIR) prior to being able to engage in more classical trauma therapy.  Classical trauma
therapy was designed for single incident trauma and not for the more complex issues
Garbriela N. suffered.  The proper action for a therapist faced with a patient who is
overwhelmed with painful feelings is first to help the client learn self-soothing techniques.
Consistent with this, in August of 2017, Gabriela's therapist recommended ████████████████
████████████████████████████████████████████████████████████████

7. Dr. Cohen frequently writes that she has "no doubt" concerning things about which there is
   doubt.  Dr. Cohen having "no doubt" about these things indicates a failure to engage in
   scientific assessment, since there is reason for doubt and no analysis is presented.  And, there
   is very good reason for doubt about that which she is certain. Dr. Cohen writes:

   a. "[Gabriela's grandfather] was criticized for his failure to have stocked his kitchen
      with equipment and food." "I've *no doubt* he will fill his kitchen with whatever is
      needed to prepare meals for them both."
   b. "There is no doubt that [Gabriela] is absolutely not getting what she needs in
      terms of support and care."
   c. "I believe that the 'high level of needs' described in the report are overstated.
      Further, there is absolutely no doubt that those needs are able to be met by the
      support services readily available to [Gabriela] and the support that her
      grandfather has already demonstrated."

There is actually considerable reason for doubt about each of these.
   a) Dr. Cohen may have no doubt grandfather will fill his kitchen and prepare meals for
      them, but there is considerable reason for doubt.  I do not know how one could be
      sure of what someone else will do.  Contrary to Dr. Cohen's belief, Gabriela's
      grandfather, in the first home study, said that he eats at work and would get more
      food so his granddaughter could cook.
   b) To know whether Gabriela is getting what she needs in terms of support and care, one
      needs to know what she is getting and what her issues are. Without speaking to staff
      and hearing their version of events, and without the court making a determination on
      contested facts, one cannot be certain she is not getting the support and care she

needs.  In addition, Dr. Cohen believes Gabriela is not getting proper care because she is mistaken on current recommendations for treating complex trauma.

    c)  Dr. Cohen does not present a sound basis for saying she is certain Gabriela's needs will be met by support services readily available to Gabriela when in her grandfather's home and by her grandfather.  One cannot be certain of the quality of the therapist Gabriela will get, or of how her grandfather will treat her, or if there could be a long waiting list once Gabriela is with her grandfather.  I have done hundreds of custody evaluations.  Poor parents generally express wonderful sentiments and plans.  It is unscientific to assume the expression of good intentions means a caretaker will definitely be a good caretaker.  There is another issue. As discussed, Dr. Cohen ███████████████████████████████████████████████ ███████████████████████ Gabriela's needs are considerably greater than Dr. Cohen asserts.

    d)  It seems doubtful that outpatient therapy can begin to match the services Gabriela has had when in ORR care.  Three hours a week of individual and group therapy (combined), plus milieu therapy (a very powerful method for helping adolescents) with continual availability of staff is far more support than a grandfather who works, and has a history of poor self-care and poor care of his own children.

8.  There are many reasons to be concerned about grandfather's ability to care for Gabriela, as I discuss in my report.  I'll mention one here.  In the first home study, her grandfather voiced confidence that Gabriela N. would not display any behavioral issues as she had reported to him that she would comply with all rules and laws.  For her grandfather to believe this raises serious reasons for concern including his ability to understand her needs, whether they actually had a close relationship, his willingness to meet the high level of needs she has, and whether he is proactive enough to meet her needs.

9.  It is therefore still my opinion, after reviewing Dr. Cohen's report, that Gabriela's placement, treatment, and sponsor evaluations while in ORR custody were appropriate and within the standard of care.

10.  Dr. Cohen's report for Lucas R. also does not meet scientific standards for rendering expert opinions, making the same type of scientific errors she made with Gabriela N.  She reports speaking with Lucas and members of his family, and seeing records, but made no mention of speaking with staff who had taken care of him, or his therapist.

Dr. Cohen asserts that Lucas's depression is from his extended stay in ORR custody and his functioning has diminished because he was not released to family more quickly.  This is contrary to the sum and substance of the facts in his case file records.  His medical record states ████████████████████████████████████████████████ ████████████████ according to his medical records, █████████████████

Roy Lubit, M.D.
Expert Report June 19, 2020
Addendum 6 Page  4

11. The record shows, however, that his functioning improved during his time in ORR custody
compared to what it was back in his country of origin (COO) and to the early period in ORR
custody, including significant improvements in his mental health as reflected in his GAF
score.  Reports of Lucas' GAF score by doctors increased from in the 40s to the 70s from his
admission until the end of his stay.  A GAF in the 40s stands for serious impairment while a
GAF in the 70s indicates no more than slight impairment. A medical record note from
8/30/18 stated that ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████ .

12. Dr. Cohen wrongly criticizes the medical care Lucas received in ORR custody.  Dr. Cohen
criticizes the therapists and institutions for not adequately appreciating his trauma history and
not speaking with him more about past traumatic events.  There are multiple problems with
this criticism.  Lucas R initially denied a trauma history.  People also frequently avoid
speaking about traumatic events.  Moreover, standard trauma treatment for complex trauma
is to help the person learn self-soothing and self-control skills before delving into traumatic
memories that can flood the individual.  If Dr. Cohen did not speak to staff, she is on shaky
ground for saying what staff did and did not appreciate about Lucas' history.

13. In her August 31, 2018 declaration, Dr. Cohen makes multiple comments criticizing those
who took care of Lucas for ████████████████████████ .  She writes, ██████████████
████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████ She herself writes that
he felt that he ████████████████████████████████████████████████████████████
███████████████████████ While at SW Key Sol, on 2/20/18, six weeks after coming to the U.S. he
asserted ████████████████████████████████████ Banner Thunderbird Medical
Center records state ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████ Medical documents also reported ████████████████ .

14. In her August 31, 2018 declaration, Dr. Cohen criticizes the diagnoses Lucas received.  Dr.
Cohen states, █████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████

15. Dr. Cohen's criticisms of the diagnoses is inaccurate. ███████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████

16. Dr. Cohen further writes in her August 31, 2018 declaration that, "ORR's delivery of mental
health care to Lucas has failed to meet acceptable standards of competency, and in fact
appears to have harmed him. Chief among ORR's failings: misdiagnosing his mental health
condition, administration of medication for inaccurate diagnosis and with failure to follow
response to identified symptoms."  As I explain above, her claim he was misdiagnosed is not
supported by the available data.  Moreover, even if it were true that there was redundancy,
calling it a misdiagnosis would be misleading. ████████████████████████
████████████████████████████. Contrary to Dr. Cohen's claim of
inappropriate use of medication for inaccurate diagnoses, selective serotonin reuptake
inhibitors (SSRIs) are the most common medications prescribed for ██████████████
██████ Dr. Cohen herself diagnoses ██████. SSRIs are proper medications for ██████,
especially if there is considerable ████████████.

17. Dr. Cohen also claims that there was no trauma-informed treatment.  However, consistent
with the care Lucas received in ORR custody, the first step for those feeling overwhelmed
with symptoms is helping them to ease the symptoms by learning techniques for handling the
powerful negative emotions multiply traumatized children generally experience.  The
treatment of single incident trauma can begin with trauma focused-cognitive behavioral
therapy (CBT).  But, as discussed above, someone who suffered multiple traumas and is
overwhelmed needs treatment to deal with the flood of feelings (such as DBT or STAIR)
prior to jumping into painful events that could flood the individual more.

18. Dr. Cohen writes, "It appears from the notes that SWK continued to fail to understand the
underlying issues behind [Lucas'] distress, appear to have been consistently over-reactive to
it, and thought, somehow, that medication was the answer."  Prescribing antidepressants for
very depressed adolescents is standard care.[3]  March (2007) wrote: "Conclusions: In
adolescents with moderate to severe depression, treatment with fluoxetine alone or in
combination with CBT accelerates the response. Adding CBT to medication enhances the
safety of medication. Taking benefits and harms into account, combined treatment appears
superior to either monotherapy as a treatment for major depression in adolescents."  Dr.
Cohen also claims, "Future notes substantiate the notion that SWK came to view any distress
on [Lucas'] part as dangerous and requiring medication."  Dr. Cohen does not provide data

---

[3]  March et al 2007. The Treatment for Adolescents with Depression Study (TADS): Long-term effectiveness and
safety outcomes. *Archives of General Psychiatry.* 64(10), 1132-1144.

supporting her impression.  It is hard to imagine the information that could reasonably lead to this conclusion.  She does not report on interviews or statements of those who prescribed Lucas's medication.  That he was depressed and treated with anti-depressants does not mean that any distress was seen as dangerous and requiring medication.

19. Dr. Cohen's criticism of ORR's reunification denial for Lucas R. is unfounded. Dr. Cohen claims ORR "seiz[ed] upon his willingness to disclose his feelings and the reasons for those feelings to deny him reunification with his family." Her choice of words is highly unusual for a forensic report.  The wording "seized upon…to deny him reunification" suggests she believes the staff's intention was to unreasonably deny him reunification with his family, and to do this they looked for reasons to do so.  I have not seen a reasonable basis for rendering such an expert opinion.  A more likely explanation is that the staff created an atmosphere in which Lucas was willing to speak about his feelings and information came out indicating that quick release to his 18 year old sister, ██████████████████████████████████ ████████████████████████████████████████████████████ was not in his interests.

20. It is therefore still my opinion, after reviewing Dr. Cohen's report, that Lucas R's placement, treatment, and sponsor evaluations while in ORR custody were appropriate and within the standard of care.