# REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

### UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCAS R. *et al.*, | ) Case No.: 2-18-CV-05741 DMG (PLA) |
|         Plaintiffs, | ) |
|     v. | ) |
| ALEX AZAR, Secretary of U.S. Dep't of | ) |
| Health and Human Services, *et al.*, | ) |
|         Defendants. | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |

## EXPERT REBUTTAL REPORT OF DR. ROY LUBIT

**I.**     **Rebuttal of Dr. Anthony Joseph Urquiza Expert Report**

### A. Executive Summary

1. Dr. Urquiza claims that children in ORR care do not receive trauma informed treatment, formal psychological evaluations, or Evidence Based Psychotherapy. Dr. Urquiza also asserts that if the children in ORR care had received EBT they would not have needed higher levels of care. Dr. Urquiza states that the children in Residential Treatment Centers (RTCs) deteriorated and suffered enduring psychological damage. Dr. Urquiza's assertions are contrary to current psychiatric literature and contrary to the data found in the children's medical charts.

2. Although harshly criticizing the children's therapists for failing to do Evidence Based Psychotherapy (EBP), it is not clear what he means by Evidence Based Psychotherapy. Given his criticisms of the children's therapists, it appears to believe that the only acceptable therapies are the protocols used when researching the effectiveness of therapy, and continually focusing on processing traumatic memories. Contrary to this point of view, the eclectic mix of teaching emotional regulation skills, processing of traumatic events and dealing with daily issues is standard of care. Various publications state that integrative/eclectic therapy (using evidence based techniques shown to be effective by empirical research, modified and combined to meet the needs of the specific patient being treated) is EBP.

3. Dr. Urquiza writes in great generalities about the harm detention causes children, citing literature on prison-like settings. However, RTCs are not prison-like settings, they are intensive psychiatric treatment settings. Moreover, Dr. Urquiza fails to tell the reader that

1

the articles he cites for support state specific aspects of detention centers that are particularly harmful, and that these harmful elements are not present in RTCs (extreme boredom and exposure to serious violence). Dr. Urquiza fails to note that there is literature about the effectiveness of RTCs and that it says RTCs are beneficial.

4. Dr. Urquiza does not provide data supporting his claims that the psychological functioning of children in RTCs generally deteriorates.   In depth review of the UACs' charts shows that his claim they deteriorate is contrary to what is found in the children's medical records. The records show that they generally greatly improved in RTC care.  Dr. Urquiza generally does not tell the reader if his basic data comes from the children's charts, or from speaking with the children or from other sources.

5. Dr. Urquiza renders opinions on issues about which he may not have professional expertise. Prescription of medication, making diagnoses via interviews, assessing for bipolar disorder, and deciding what is a safe placement for a child are central to psychiatric expertise.  Dr. Urquiza is a psychologist.  His assertions that evaluations were not adequate, and multiple critical assertions about the use of medication and diagnosis are contrary to current scientific knowledge.

6. Dr. Urquiza frequently makes assertions about what staff thought and what occurred in therapy sessions although he did not speak with these staff members.  He also makes assertions about how children would have done had they received different treatment, which are contrary to the literature and the clinical experience of psychiatrists. He repeatedly complains about the type of evaluations that were done, although what was done was standard practice, and what he proposed had serious short comings.  After asserting one cannot properly diagnose without doing substantial psychological testing, he makes pronouncements about diagnoses being incorrect and what the diagnoses should be, although he does not have psychological testing data.

7. Clinical thinking, making decisions about how to best help patients, involves evaluating the benefits, risks and costs of realistic treatment options.  Dr. Urquiza does not do this. Instead, he claims that there are problems with what is being done and then opines that other options must therefore be implemented.  He does not discuss the risks, costs and benefits of the alternative placements and treatment options for the children who are stepped up and prescribed medication.  He also does not discuss whether his proposed options are possible (within ORR's control), and whether the children would accept the options.  As a result, his opinions about decisions on stepping-up lack key elements of what is generally considered necessary to render an expert opinion.

8. Dr. Urquiza frequently rendered opinions that were actually speculations since the scientific logic that led to the opinions was not explained, and the data necessary to make the statements was either not presented or was not accurate.  In essence, Dr. Urquiza did not actually do a scientific analysis of the cases.  He made general statements criticizing the use of RTCs and other step up options, and then claimed the patient's histories supported these statements, although the history in the patient charts contradicts his general premise and assertions about the children.

9. Throughout his report, Dr. Urquiza speaks in great generalities about what he believes to be optimal placement and treatment, ignoring key aspects of the actual situations of the children, and what is written in professional literature. This is not good

2

medical/psychological care.  The core of medical training and analysis is to weigh both the risks and benefits of possible alternative courses of action.  Dr. Urquiza repeatedly ignores the likely negative impacts of his prescriptions, what is within ORR's power to do, and ignores specific aspects of the cases that contradict his assertions of the situations.  His prescriptions, if used, would likely cause considerable harm to the children in RTCs. His prescriptions, if used, would likely cause considerable harm.  The core of medical training and analysis is to weigh both the risks and benefits of possible alternative courses of action for a specific patient, by combining research and generally accepted knowledge within the medical community concerning the relevant issues for the specific patient.  Dr. Urquiza repeatedly ignores the likely negative impacts of his prescriptions for children with the issues, histories and situations of the children in RTC care.

10. His criticisms of ORR are based upon cherry-picked data, ignoring outside realities that make his prescriptions difficult if not impossible, and ignoring the serious risks his recommendations would entail.  For example, Dr. Urquiza repeatedly says that Benjamin F. should not have been taken from his mother, should have been quickly returned to his mother, and would probably not have needed medication had he remained in his mother's care.  However, the choice to separate mother and child was not up to ORR.  His claim Benjamin would probably not have needed medication if he had stayed in his mother's care is doubtful, given that Benjamin was prescribed antipsychotic medication for ████████ ███████████ when in Mexico before he even came to this country.  It is concerning that Dr. Urquiza did not even note this important fact.  Perhaps most remarkably, Dr. Urquiza's claim that Benjamin deteriorated in care is contradicted by the record.  His Global Assessment of Functioning (GAF)[1] scores greatly improved during his time at Shiloh, going from GAF 45 on 7/24/18 to GAF of 60 on 9/11/18.

11. Concerning Jaime D., Dr. Urquiza said that he was harmed by being sent to secure care. Dr. Urquiza fails to tell the reader the reason he was sent to Yolo.  Jaime was sent to Yolo after telling staff ████████████████████████████████████████████████ When in Yolo he said it was not true and was stepped back down. Jaime also reported ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████.  Jaime's initial claim that ████████ ████████████████████████ presented serious risks to the physical and psychological safety of other youths, and to his own safety, given that he communicated this to other youths.  ████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

---

1 Global Assessment of Functioning has been a widely used way of providing a general impression of an individual's functioning.

**61-70** Some mild symptoms *or* some difficulty in social, occupational, or school functioning, but generally functioning pretty well.

**51-60** Moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic.

attacks) *or* moderate difficulty in social, or school functioning (e.g., few friends, conflicts with peers).

**41 – 50** Serious symptoms (e.g., suicidal ideation, frequent shoplifting) *or* any serious impairment in social, or school functioning (e.g., no friends, cannot work).

**31 – 40** Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) *or* major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (child frequently beats up younger children, is defiant at home, and is failing at school).

████████████████████████████████████████████

████████

12. Concerning Gabriela N., Dr. Urquiza said that ORR ignored her trauma history, the treatment Gabriela received at Shiloh was not evidence-based and did not directly or effectively address Gabriela's presenting concerns that she deteriorated at Shiloh, and would have greatly improved had she received Trauma Focused–Cognitive Behavioral Therapy (TF-CBT).  Contrary to Dr. Urquiza's assertion that she deteriorated while at Shiloh, while in Shiloh her Global Assessment of Functioning Scores improved substantially.  Her GAF score was 40 (severe symptoms) on 9/8/17, 47 on 9/36/17, 50 on 10/10/17 and 11/7/17, 60 on 12/18/17, 63 on 1/23/18, 65 in 2/18, and 70 (mild symptoms) on 3/27/18.  Contrary to Dr. Urquiza's assertion that her trauma history was ignored, her chart noted ████████████████████████████████████████ ████████  Moreover, Dr. Urquiza acknowledged that the therapist used techniques associated with Evidence-Based Therapy (EBT) (e.g., mindfulness exercise techniques and psychoeducation).  The same contradictions between what Dr. Urquiza claims and what is in the chart occurs with child after child.

13. The training of psychiatrists and psychologists is rather different. Central to medical training is to consider the risks and benefits of any intervention.  Every time we give a medication, decide to hospitalize, and decide to release from the hospital, we are obligated to give serious consideration of the risks and benefits of each reasonable possibility.  I have had over a thousand occasions when I have had to opine on whether someone should or should not be committed and/or released from commitment.  I have been an expert in cases in which people were not committed and went home and killed themselves or others, and also repeatedly opined that contrary to the views of the doctors on the psychiatric ward, a patient should not be forced to remain in the hospital.  I have been appointed by courts to be the neutral expert in retention cases and repeatedly been awarded expert status to opine on these issues.  I have supervised residents concerning these issues and supervised fully trained psychiatrists concerning these issues when I was acting medical director of a state hospital.  I am not aware of psychologists regularly needing to make the final decision on where a patient should be, knowing that there would be risk of harm no matter what the choice.  Throughout his report, Dr. Urquiza ignores the risks of his recommendations.

14. Dr. Urquiza asserts that ORR does not operate in a trauma-informed manner and that the named Plaintiffs likely would have experienced alleviation of their symptoms had they received trauma-informed, evidence-based care and/or had been released from custody in a more timely manner.  Dr. Urquiza's criticism does not have a sound basis. Contrary to the allegation that ORR does not operate in a trauma-informed manner, policy guidelines note that the children's history of trauma should be gathered.  Therapy records note that therapy techniques used to treat trauma are used, including teaching skills to manage painful feelings and processing of traumatic memories.  Medical records on UACs contain extensive notes on the prior traumatic experiences of UACs.  Comments by staff showing concern about the potential negative impact on UACs of delving into their history of extreme trauma when it was unclear how long the minors would be at the current placement demonstrates trauma informed analysis of the youths' needs.  Dr. Urquiza at times acknowledges that therapists used evidenced based techniques.

15. Although Dr. Urquiza repeatedly complains that therapy notes do not provide clear evidence that EBP was used, Dr. Urquiza is not fully clear what he thinks is and is not EBP. Based on his criticisms of what he believes occurs at RTCs, he appears to believe that the protocols used in research trials should be applied.

16. It is crucial for the reader to understand what EBP is, and what it is not. There are protocols for the psychotherapeutic treatment of various problems that have been shown by research studies to have efficacy in the treatment of various emotional issues. Saying a practice is not "evidence-based" does not mean it is ineffective or less effective, and does not mean that there is no evidence supporting it. Eclectic therapy, the use of various techniques to fit the specific needs and style of a particular patient are not "evidence based" because one cannot run a controlled study using it since each patient is different. "Eclecticism, or integration, is now the most common theoretical orientation among counselors and psychotherapists in the United States."[2] In other words, integrative/eclective therapy is standard of care treatment.

17. Cook et al (2017)[3] write "concerns have been raised about the generalizability of the findings, given that the conditions and characteristics of randomized controlled treatment outcome research *versus* those of real-world clinical practice differ significantly [34]… evidence-based psychotherapies often are not effective for individuals with complex multimorbidities or from sociodemographic groups for which the intervention has yet to be tested [30]. In addition, many psychotherapy trials for depression and anxiety recruit participants with limited psychosocial stressors given their confounding nature. However, in actual practice, most patients face these stressors and it is unclear how well the purported evidence-based psychotherapies will treat these individuals [34]. Evidence-based psychotherapy is also challenging to apply to individuals given that the evidence is based on a composite of multiple subjects, with limited attention to the impact of individual factors and influences on the patient's health…. when evidence-based psychotherapies are applied too rigidly, there is risk of diminishing their value, particularly if applied to patients for whom effectiveness will be limited."[4]

18. EBP for the treatment of Post Traumatic Stress Disorder (PTSD) is not standard community practice: "Few patients with PTSD received evidence-based psychotherapy for PTSD during their first six months of treatment at a VA specialty PTSD clinic."[5]  Sternberg

[2] http://psychology.iresearchnet.com/counseling-psychology/counseling-therapy/integrative-eclectic-therapy/)

[3] Cook, S. C., Schwartz, A. C., & Kaslow, N. J. (2017). Evidence-Based Psychotherapy: Advantages and Challenges. *Neurotherapeutics : the journal of the American Society for Experimental NeuroTherapeutics*, *14*(3), 537–545. Also Greenhalgh T, Howick J, Maskrey N. Evidence based medicine: a movement in crisis? *BMJ*. 2014;348:g3725; Kazdin AE. Evidence-based treatment and practice: new opportunities to bridge clinical research and practice, enhance the knowledge base, and improve patient care. *Am Psychol*. 2008;63:146–159.

[4] Cook, S. C., Schwartz, A. C., & Kaslow, N. J. (2017). Evidence-Based Psychotherapy: Advantages and Challenges. *Neurotherapeutics : the journal of the American Society for Experimental NeuroTherapeutics*, *14*(3), 537–545. https://doi.org/10.1007/s13311-017-0549-4

[5] Watts BV, Shiner B, Zubkoff L, Carpenter-Song E, Ronconi JM, Coldwell CM. (2014) Implementation of evidence-based psychotherapies for posttraumatic stress disorder in VA specialty clinics. *Psychiatr Serv*. 65(5):648-653.

colorfully names his chapter "Evidence-Based Practice: Gold Standard, Gold Plated, Or Fool's Gold?"

19. Sackett presents a less rigid and clinically more valuable definition of evidence-based medicine than the rigid adherence to treatment protocols used in research. "Evidence based medicine is the conscientious, explicit, and judicious use of current best evidence in making decisions about the care of individual patients. The practice of evidence based medicine means integrating individual clinical expertise with the best available external clinical evidence from systematic research. .....Good doctors use both individual clinical expertise and the best available external evidence, and neither alone is enough. Without clinical expertise, practice risks becoming tyrannized by evidence, for even excellent external evidence may be inapplicable to or inappropriate for an individual patient."[6] Similarly, Gerson's et al 2013 write, "Brief eclectic psychotherapy for PTSD (BEPP) is an evidence-based therapeutic approach that combines and integrates elements from psychodynamic, cognitive-behavioral, and directive psychotherapy."[7]

20. Another issue, is that teenagers are frequently resistant to therapy, especially if they have limited education, have not grown up in a culture in which psychotherapy is not common, and have spent their lives trying to survive rather than discussing feelings.  It is unlikely they will follow a narrowly focused treatment protocol focused on processing past traumas and ignoring daily issues.

21. There are a variety of trauma-informed treatments.  When people have complex trauma or are for any reason overwhelmed and acting out in dangerous ways, one needs to first help the person learn to tolerate their feelings so that they are not overwhelmed, act out, and harm themselves or others.  For example, Marsha Linehan's Dialectical Behavior Therapy (DBT) and Marylene Cloitre's Skills Training in Affective and Interpersonal Regulation (STAIR) are designed to help people develop the emotional control skills needed to tolerate speaking about traumatic events without being so triggered and overwhelmed by emotions that they act out in dangerous ways, and/or flee therapy or refuse to speak about the traumatic events.

22. In addition, the first part of trauma treatment for complex trauma is teaching coping/emotional control skills, as medical records indicated therapists did in treating the Named Plaintiffs while in ORR care.  Dr. Urquiza appeared to be recommending that therapists immediately jump into speaking about and processing traumatic events.  This would likely flood the children, lead some of them to self-harm, and lead many to refuse to cooperate in treatment.

23. As Cohen, Mannarino and Deblinger (2017)[8] write, before processing traumatic events with a child with complex trauma who self-harms or has suicidal ideation, one should work

[6]Sackett et al (1996) Evidence based medicine: what it is and what it isn't. *BMJ* ;312:71.
https://www.bmj.com/content/312/7023/71.

[7] Gersons, B. P., & Schnyder, U. (2013). Learning from traumatic experiences with brief eclectic psychotherapy for PTSD. *European journal of psychotraumatology*, *4*, 10.3402/ejpt.v4i0.21369.
https://doi.org/10.3402/ejpt.v4i0.21369.

[8] Cohen, Mannarino and Deblinger (2017) Trauma-Focused Cognitive-Behavioral Therapy for Traumatized Children, in John R. Weisz and Alan E. Kazdin (eds). *Evidence-Based Psychotherapies for Children and Adolescents Third Edition,* discussing their evidence-based protocol for treating traumatized children.

with the youth on Relaxation skills, Affective modulation skills, and Cognitive coping skills so that they can handle the pain of discussing the events without becoming flooded and self-harm, or seal over or flee therapy.[9]  This opinion is widely held.  The notes of therapists who treated UACs indicated this is what they were doing.  Dr. Urquiza, at times, criticizes such activities and appears to want to quickly start discussing and processing their traumatic events.  This would lead many of the children to become emotionally flooded and self-harm, or seal over and flee treatment.

24. Cohen, Mannarino and Deblinger (2017) wrote a chapter on TF-CBT in John R. Weisz and Alan E. Kazdin (eds). *Evidence-Based Psychotherapies for Children and Adolescents Third Edition,* discussing their evidence-based protocol for treating traumatized children.  They write that TF-CBT consists of a number of modules generally should be done in order.  The acronym for the modules is PRACTICE: Psychoeducation, Parenting skills, Relaxation skills, Affective modulation skills, Cognitive coping skills, Trauma narrative and cognitive processing of the traumatic event(s), in vivo mastery of trauma reminders, conjoint child-parent sessions, and enhancing safety and future developmental trajectory.  They write that children who have suicidal ideation or self-harm should deal with those issues first.  Children with complex trauma and children in residential care need more sessions than those with simple trauma and those living at home.  Putting it all together, for children in RTCs who have a history of self-harm or suicidal ideation, and are seen twice a week, it would be expected to take more than two months before processing of traumatic events would begin.  If the teenagers, as frequently occurs, do not wish to speak about the traumatic events it will take longer.

25. To productively engage in in-depth discussion of the actual traumatic events, the therapy needs to continue for a significant period during which the traumatic events can be processed.  One needs to know that the therapy can continue for a substantial period before opening up the patient's memories of traumatic events.  To delve into the patient's traumatic memories, have them flooded with feelings, and then have the therapy end suddenly risks causing considerable harm.  There is an inherent contradiction between Dr. Urquiza wanting people to be discharged as fast as possible and wanting them to engage in speaking about their traumatic memories.

26. Without having significant amounts of time to continue working with the patient it would be harmful to have the patient open themselves and share the details of traumatic events.  In situations of perhaps limited time for therapy, one should focus on developing emotional control skills and not open up the patient's memories of trauma.  Teaching emotional control skills before jumping into discussions of traumatic memories *is* trauma-informed therapy.  To jump into speaking about traumatic memories before developing emotional control skills and/or when there may not be an adequate period of ongoing treatment (especially when working with youths) is *not* trauma-informed therapy.

27. I have done forensic evaluations of numerous teenagers who suffered complex trauma for personal injury suits and/or sexual abuse, as well as adults who have suffered trauma, as well consulted on cases of children who suffered such trauma.  Almost none had engaged

---

[9] Ibid.

in therapy during their teenage years despite their parents urging them and lawyers urging them.

28. Beliefs that children under poor behavioral control could, in shelters, receive the same treatment they would receive in RTCs, is not true.  Moreover, children under poor control will not have greater freedom if they stay in shelters.  While both shelters and RTCs have 3 hours a week of individual and group therapy, there are important differences between RTCs and shelters.[10]  Both shelter and RTC staff at MercyFirst receive ongoing education.  The RTC staff, however, receives more training that is specific to the problems they deal with, such as aggression, self-harm and conflict de-escalation.  The RTC staff has more experience dealing with these issues.  The far greater staff to youth ratio enables them to provide more services to youths who are acting out in dangerous ways.  A youth at the shelter who is acting out in dangerous ways would have less freedom and fewer activities at the shelter than at the RTC.  The time spent in outside activities is not a factor of whether one is in the MercyFirst shelter or RTC.  The amount of time outside is a factor of how stable the youth is and whether they are safe outside with limited staff.  The RTC is able to have a single staff member accompany a youth who is acting out, enabling the youth to go outside.  In a shelter a youth who is acting out would face higher levels of restriction than in an RTC.  The suggestion by plaintiffs that acting out youths should simply be kept on 1-1 is not practical because there is not enough staff available.  In addition, the MercyFirst RTC has dog and art therapy, which are beneficial to traumatized children.[11]

**B. Jaime D.**

29. In his case file summary for Jaime D., Dr. Urquiza fails to note the reason for Jaime's transfer to Yolo, and fails to discuss the risks to Jaime and others if he was not transferred quickly.  Dr. Urquiza simply says the transfer harmed Jaime.  Dr. Urquiza's criticism is analogous to claiming a doctor harmed a patient by cutting the patient, without noting that the doctor was draining an area of pus, or removing an inflamed appendix.  Moreover, Dr. Urquiza has not presented clear evidence Jaime D. was harmed by the transfer.

30. On 4/18/18, Jaime D. was sent to Yolo (a secure facility) for one and a half months after stating at Cayuga Centers that ███████████████████████████████████████ ███████.  He was observed writing 13 on the wall while at Cayuga Centers and then erasing it. He was also noted to have a long-term history of ███████████████████ ██████████████████████████ He also reported ████████████ which created risks if he was in a placement with limited security. There were other serious reasons for concern about his safety in the limited security of a shelter.  On 4/24/18, he stated in Spanish, ███████████████████████████████████████████ █████████████████ He also in time reported ██████████████████████████.

31. Given his history, Jaime presented a risk to the safety and welfare of other UACs and himself.  Other UACs had a right to a safe placement without risk of threats or assault, █████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ██████████.  To not protect society and other children from potentially violent individuals

---

[10] My information comes from speaking with the leadership of Shiloh and of MercyFirst which has both an RTC and a shelter.  I also received ORR, state and facility guidelines.

would be malpractice. For a forensic evaluator to not tell the reader the reason for the transfer provides a truncated, incomplete understanding of the situation that prevents the reader from assessing the appropriateness of decisions made.

32. One can question whether the report meets scientific standards when it criticizes an action without discussing the reason for the action or the pros and cons of taking the action. As noted above, a forensic report in a malpractice case saying a doctor should not have cut the patient, without noting the reason the doctor cut the patient, would be seen as so flawed its use could be questioned.

33. Dr. Urquiza criticizes Jaime being separated from his sister and younger aunt. He does not, however, speak about whether Jaime's aunt (Reyna D.) was willing at the time to take Jaime in, along with Jaime's sister and younger aunt. Once she took in Jaime's sister and younger aunt, Reyna had four children under the age of 11 in her home. Jaime would have been the fifth child in the house and would not only have potentially presented a threat to the welfare of the younger children, but would have likely so burdened Reyna and her husband that the other children would have received much less attention. It is difficult to imagine how Reyna and her husband could have managed the situation, given Jaime's serious issues.

34. Dr. Urquiza writes, "None of [Jaime's] three placements (Cayuga Centers, Yolo County Juvenile Detention, Children's Village) noted completion of a comprehensive, standardized assessment of trauma history and trauma symptoms. As such, the opportunity to identify and treat symptoms in this domain were missed." As will be discussed, a comprehensive, standardized assessment of trauma history and trauma symptoms is not needed to effectively identify and treat symptoms. Dr. Urquiza asserts that Jaime's psychiatric issues were not adequately identified, or treated, and as a result his symptoms worsened during his time in ORR custody. Dr. Urquiza, however, does not specify what issues were missed, and specifically what was not done that should have been done.

35. Psychologists tend to over-rely upon standardized assessments. In my experience, such testing uses up a tremendous amount of resources that are needed for actually engaging in therapy, and generally render little value to the therapy beyond what could be gained by good interviews. Symptoms inventories are useful in certain situations (such as research, and when clinicians have limited interview skills and limited knowledge of the diagnostic criteria, and when wanting to quantify the impact of medication or therapy). They are not, however, necessary to reasonably and competently evaluate and treat PTSD.

36. Dr. Urquiza's assertion that testing was necessary to identify Jaime D.'s problems is contradicted by his own actions. Dr. Urquiza diagnosed ███ and identified symptoms, even though no symptom inventory was done. This contradicts his assertion that the opportunity to identify symptoms was lost by ORR because a comprehensive standardized trauma assessment was not done. If psychological testing was necessary to identify and diagnose, then Dr. Urquiza's statements about Jaime D.'s problems, and what treatment he should have, would have no scientific value since testing was not done. Dr. Urquiza cannot have it both ways. There is a logical contradiction in his claim that identification of issues and treatment of the issues were not reasonably accomplished since testing was not done, and claiming that although testing was not done, he sufficiently understands Jaime D.'s issues and what treatment should have been done to criticize ORR.

37. Dr. Urquiza asserted that the evaluation of Jaime D's ███████████ ████████████ symptoms was insufficient. When diagnosing ██████, a well-trained clinician is not required to do inventories. One needs to get information about behavior in various settings and it is appropriate to speak to people who have observed the child in other settings, but formal rating scales do not have to be used.

38. An example of Dr. Urquiza cherry-picking and spinning information is his failure to mention that Jaime did significantly better when given medication for ██████. Contrary to Dr. Urquiza's assertion that Jaime deteriorated in ORR care, and at odds with his complaint about the assessment of ██████, on 8/22/18, Jaime D. reported ███████████ ████████████████████████████████████████████████████████████████. He also reported ████████████████████████████. ████████████████████████ ████████████████████████████████████████████████████████ This is a strong indication that the combination of therapy and medication were very effective. But, Dr. Urquiza does not mention it. Forensic reports are supposed to present unbiased presentations of the available, significant data, and an unbiased scientific assessment of the meaning of the data. Dr. Urquiza did not do this.

39. On 10/11/18, a medical record note stated that ████████████████████████ ████████████████ He was placed on Sertraline (Zoloft) 25 mg. On 10/17/18 he stated ██ ████████████████████████████

40. Dr. Urquiza asserts that Jaime ██████████████████████████████████ ████████████████████████████s. He provides no explanation for this opinion. There is useful knowledge and data concerning this issue. ████████████████████████████████████████████ ████████████████████████████████ ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ Once again, he makes diagnostic

12 Clifford G, Dalgleish T, Hitchcock C. Prevalence of auditory pseudohallucinations in adult survivors of physical and sexual trauma with chronic post-traumatic stress disorder (PTSD). *Behav Res Ther*. 2018;111:113-118.
13 OConghaile A, DeLisi LE. Distinguishing schizophrenia from posttraumatic stress disorder with psychosis. *Curr Opin Psychiatry*. 2015;28(3):249-255.

pronouncements without having the appropriate information or tests or meeting the client, but complains when others, who have met Jaime multiple times and gathered interview data, fail to do tests.

41. Dr. Urquiza asserts, "[Jaime D] should have received a full hour (50-60 min) of weekly therapy, and the type of services should have been evidence-based therapy targeting his specific symptoms/diagnosis (e.g., Trauma-Focused Cognitive Behavioral Therapy)." Dr. Urquiza asserts that "[m]edication management likely would not have been needed had he received evidence-based services, or had he not been placed in a more restrictive level of care where problematic behaviors appear to have increased." This is highly speculative at best. I am not aware of Dr. Urquiza having sufficiently specific data to be able to say what symptoms were ignored and that they were not addressed. Dr. Urquiza's claim that problematic behaviors increased in a restrictive setting is not supported by the evidence. Jaime did not first develop serious symptoms when placed in a restrictive setting. He had serious symptoms when in a less restrictive setting and when in his home country. Jaime's ▮▮▮▮ responded very well to Capvay, Concerta and his emotional distress responded to Sertraline. TF-CBT does not cure ▮▮▮▮. It is highly unlikely psychotherapy alone could have aborted the need for a more secure setting or the need for medication. Psychotherapy of complex trauma takes substantial amounts of time. And, when first speaking about traumatic events people often experience increased distress, rather than decreased distress, especially if they have not had extended therapy to learn coping skills.

42. Dr. Urquiza's statement is also contrary to current knowledge. Jaime was ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮. American Academy of Child & Adolescent Psychiatry (AACAP)'s position on the treatment of depression for adolescents, written by John March MD, states that "The TADS study showed that an SSRI and CBT were more effective than therapy for depression, SSRI was next best and CBT alone was not statistically better than no therapy." AACAP states "despite calls to restrict access to medications, medical management of major depression with fluoxetine, including careful monitoring for adverse events, should be made widely available, not discouraged."[14]

43. Dr. Urquiza complained about therapists working with patients such as Jaime on management of their emotions and appears to have wanted therapists to very quickly jump into speaking about the children's traumatic experiences. This would likely have led them to develop more symptoms or more intense symptoms, at least initially. First working on emotional regulation skills is trauma-informed therapy. Jumping into discussions of traumatic events with a child with complex trauma without first developing adequate emotional regulation skills is not trauma-informed therapy, is not EBP, and is not standard of care. If you do not know if the child will be able to continue to see the therapist for a substantial period, and if the child does not want to speak about the events (as is often the case) one is even further outside of standard, trauma-informed care.

44. To begin to make an assessment of how an individual would be if a given stress was removed, one needs to discuss the range of stresses the individual faces. Dr. Urquiza fails to note what may well have been Jaime's biggest stress, fear of deportation. It seems likely that someone facing deportation, and being sent back to his home country ▮▮▮▮▮

[14] https://www.aacap.org/aacap/families_and_youth/Resources/Psychiatric_Medication/The_Treatment_for_Adolescents_with_Depression_Study_TADS.aspx

███████████████████████████████████
████████████████████ would be far more stressed by the prospect of deportation than by how long he may be in congregate care.  Therefore, it is unlikely that Jaime would have had a significant diminution of stress as long as the issue of deportation was a possibility.  A different type of therapy or placement in a less restrictive setting would have been unlikely to have led to substantially less significant symptoms and might well have led to more symptoms.

## C. Benjamin F.

45. Concerning Benjamin F., Dr. Urquiza speaks in very general terms criticizing ORR for things that were not within its control, launches criticisms that are so vague they are unfalsifiable, and/or are at odds with other things he asserts, or strong data.

46. Dr. Urquiza asserts that Benjamin F. was traumatized by being separated from his mother and that being reunited more quickly would have been beneficial.  Dr. Urquiza fails to tell the reader that ORR did not separate mother and child, ICE did, and his mother was in ICE custody and unavailable for a period to take care of him.  Moreover, his mother and grandmother decided Benjamin should go to his grandmother, not his mother, when he was released.  When Benjamin was released to his grandmother, his mother did not immediately leave Houston to join them in California.

47. Dr. Urquiza complains that a full evaluation of Benjamin was not done and asserts medications would not have been needed had mother and child been reunited more quickly.  As noted, psychologists often do needlessly detailed assessments draining resources from doing therapy.  Dr. Urquiza's claim medications would not have been needed had mother and child been reunited more quickly ignores the fact that Benjamin had a history of serious psychological problems in his home country and had been prescribed Risperdal in his country of origin.  Prior to coming to the U.S., Benjamin F. ████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████ Dr. Urquiza fails to tell the reader of the extent of Benjamin's behavioral difficulties in his home country or that a physician placed Benjamin on Risperdal in his home country to treat such symptoms.  Without this information, the reader cannot begin to assess the validity of Dr. Urquiza's criticisms of ORR.  Benjamin F. was at St PJ's Children's Home from 7/2/18 to 7/23/18 and at Shiloh from 7/23/18 to 9/15/2018.  Benjamin F. was referred to Shiloh on an emergency basis for evaluation as a result of ███████████████████. Between 7/2/18-7/23/18, he received several Significant Incident Reports (SIRs)/Incident Reports (IRs) each week due to ████████████████. On 7/6/18, Benjamin ████████ ███████████████████ On 7/5, Benjamin "tried biting peer on shoulder."  He also "screamed and punched his brother twice on the cheek."  On 7/6, he "punched [case manager] on left arm and pinched her."  On 7/18, he stated ███████████ On 7/23/18, Benjamin's case manager explained to grandmother that he "has lots of issues that need to be managed by a qualified group of people." Benjamin had serious psychiatric issues in his home country and was prescribed Risperdal when in his home country.  Problems did not start with separation from his mother when they came to the U.S.  Therefore, Dr. Urquiza's assertion that medications would not have been needed had he been reunited with his mother more quickly, does not have a scientific basis.

48. Dr. Urquiza writes, "In summary, while [Benjamin F.] received many types of services, most of the services he received were inappropriate, ineffective, and/or designed to medicate him – without the addition of any type of psychotherapeutic intervention. His behavioral problems were eventually eased only because he was prescribed a range of psychiatric medications to sedate him. Further, any effort to address his problems with effective psychotherapeutic interventions (i.e., EBTs) was not present." Dr. Urquiza's criticisms are at odds with the material in the record. Benjamin F.'s treatment plan included therapy to deal with problematic behaviors and guidance throughout the day, not simply medication. Concerning other care, he had psychological testing, and a high level of school support.

49. Contrary to Dr. Urquiza's assertion that Benjamin's functioning declined in ORR care, Benjamin F.'s GAF scores show significant improvement during his time at Shiloh: 7/24/18 GAF of 45; 8/7/18 GAF of 50; 8/21/18 GAF of 55; and 9/11/18 GAF of 60.

50. Dr. Urquiza's claim that the medication prescribed to Benjamin F. was to sedate him is contrary to the record. Benjamin was given guanfacine 1 mg bid with improvement. Another provider stopped it due to daytime somnolence. This indicates it was not given to sedate him. Rather, it was stopped because it sedated him. Dr. Urquiza, repeatedly claims he knows what was done or not done and why people did things when he does not have a reasonable basis for the assertions. Even if the medication had not been stopped, it was inappropriate to speculate that it was given for sedation rather than for its ability to decrease hyperactivity and impulsivity in autism ███████████.

51. Benjamin deteriorated when the medication was stopped. On 7/19/18, Benjamin was seen by a psychiatrist and guanfacine was begun again at a lower (very low) level 0.5 mg BID. With increased aggression and outbursts, a decision was later made to start Risperdal 0.25 mg bid. In time he was on guanfacine ER 4mg (a standard dose), Lexapro 10 mg and Risperdal 0.25 mg bid. These were appropriate medications to treat Benjamin F.'s symptoms.

52. Dr. Urquiza makes broad ranging general criticisms of Benjamin's psychotherapy, but does not tell us what therapy should have been done. His claim that most of the services were inappropriate and ineffective is meaningless without statements of what was done and what should have been done. He does not tell us what evidence-based therapy he would have used, how long it takes, and whether it could be done with a child with Benjamin's limitations. Benjamin was seen as being on the autism spectrum. Applied Behavioral Analysis is used to treat autism. Positive reinforcement is used to encourage skill development. This existed in his placements, and was appropriate treatment for Benjamin.

53. Dr. Urquiza writes, "[Benjamin's] care in his ORR placements could hardly be considered trauma-informed. First of all, it would be grossly inappropriate to remove a young child from the care of their parent especially if they had limited intellectual abilities and autism, were in a strange environment, and had a pattern of disruptive behavior problems." Dr. Urquiza is either unaware or ignores the fact that ORR did not separate mother and child and it was not within ORR's power to get mother out of ICE custody.

54. Dr. Urquiza further writes, "While it appears that [Benjamin] had behavioral problems prior to entering the United States, it is likely that separation from his mother significantly exacerbated his problems, and made him much more difficult to manage." This is a

speculative statement.  Benjamin's records state ████████████████████ ████████████████ Benjamin's mother reported ████████████████████ ██████████████████ His mother stated ████████████████████████████ █████████████████████████████████████ His mother also reported ████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████ His mother also stated ████████████████████ ████████████████████████████████████████████████ He also had very limited speech.  Dr. Urquiza's statement that it is likely the separation significantly exacerbated his problems is simply speculation. There is data available. As noted, the data shows that Benjamin improved during his time at Shiloh.

**D. Gabriela N.**

55. Dr. Urquiza claims that Gabriela's mental health problems significantly increased while she was in ORR custody.  He claims that she was not formally assessed for trauma symptoms during her 8 months at SWK Cassita and she was not offered accommodations or treatment tailored to her mental health needs.  He wrote that if she had had TF-CBT or CBT she would have had an alleviation of her trauma symptoms.  Dr. Urquiza's report contains misinformation and contradictory assertions.

56. Dr. Urquiza stated that key components of TF-CBT include psychoeducation about trauma, trauma symptoms, and associated developmental considerations; individualized stress management skills; emotional regulation skills including identifying and modulating feelings; cognitive coping skills including increasing helpful and accurate thought patterns; personal safety skills; and gradual exposure and processing of thoughts and emotions directly related to trauma.  I agree with him.

57. Dr. Urquiza writes, "After spending eight months at the shelter, [Gabriela] was hospitalized for ██████████████████████████████. Rather than assessing whether Gabriela could receive relevant mental health services at the shelter level, she was transferred to Shiloh Treatment Center (Shiloh).  The treatment provided at Shiloh was not evidence-based and did not directly or effectively address [Gabriela's] presenting concerns. Moreover, the treatment [Gabriela] did receive could have been provided in a less restrictive setting."  Dr. Urquiza's overly general statements do not provide the data one needs to assess the validity of his views.  The basis for his assertion that there was no assessment of whether Gabriela could receive relevant mental health services at the shelter level, is unclear.  He does not report on having had conversations with staff, much less what they said.

58. Dr. Urquiza's statement that the treatment Gabriela received could have been provided in a less restrictive setting is not accurate.  At the time someone is on 1-1, the individual is restricted beyond the level of the average RTC patient and so being on 1-1 in the shelter would not have been less restrictive.  Moreover, an individual might need to be on 1-1 longer in a shelter, where the staffing is half of what it is in an RTC and so the RTC could be less restrictive than the RTC for such a child.  Dr. Urquiza does not say how her mental health would have been better served being 1-1 in a shelter than in an RTC.  Dr. Urquiza also does not note the differences between an RTC and a shelter.

59. Contrary to Dr. Urquiza's claim, Gabriela N. did receive appropriate treatment. She received residential treatment, behavior modification, individual counseling, group counseling, recreation and leisure skills, vocational skills, medication training, and psychiatric medication monitoring. She was provided with psychoeducation on safe sex, conflict resolution, and positive communication skills. She was also provided with different positive coping techniques such as anger management skills, relaxation skills, and mindful meditation techniques to use when she was/is feeling frustrated, anxious, and/or angry. She was also provided with positive communication skills to assist with communicating well with others.

60. Dr. Urquiza writes, ███████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████ Dr. Urquiza also writes, ████████████████████████████████
███████████████████████████████████████████████████
He goes on to claim that, however, ██████████████████████████
███████████████████████████████

61. Dr. Urquiza saying that Gabriela does not have a documented history of these depressive symptoms is of unclear meaning. It was clear in her records that she reported serious emotional issues beginning long before she came to the U.S. It was reported ████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████ On July 7, 2017, she reported ████████████████
███████████████████████████████████████████████████
█████████████████████████ Perhaps Dr. Urquiza is only saying that there are no medical records from her home country stating this. It is standard practice to accept reports of prior symptoms when records are not available or the individual did not see a doctor during the periods of symptoms. It is not clear what Dr. Urquiza means that Gabriela likely does not meet criteria for ████████████████████. It is not clear if he is saying she ██████████████████████

62. Dr. Urquiza also writes, "It was recommended that [Gabriela] participate in weekly group therapy due to ████████████████ and ██████████████████████████
███████████████████ It should be noted that these concerns had never been documented for [Gabriela] in the past." It is not clear if Dr. Urquiza means it was not

documented in Gabriela's country of origin or at the shelter.  It is not clear what significance he gives to this.  Meanwhile, he fails to note that contrary to his repeated opinion that ORR failed to identify and treat symptoms, this data shows symptom identification and active treatment.

63. Dr. Urquiza states that Gabriela does not appear to have received therapy tailored to her needs, and that Gabriela "would have best been supported by some form of CBT."  Dr. Urquiza does not explain what it is that gives this appearance.  Contrary to his criticism, Gabriela's records note her symptoms and note therapy techniques appropriate to the issues.  Moreover, elsewhere in his report he wrote that she did receive evidenced based therapy.  Dr. Urquiza acknowledges "the therapist documented utilizing some techniques associated with EBTs (e.g., mindful exercise techniques, psychoeducation)."

64. At Shiloh, the Admission Assessment stated that Gabriela had a history of ███████ ████████████████████████████ ████████████████ and a ████████████████ It was therefore recommended that she receive one-on-one supervision (initially, as her mood stabilized) and counseling specifically focused on increasing safety and to address her history of trauma, as well as psychiatric services. While in this placement, Gabriela received psychiatric medication services, individual therapy, and group therapy. This is a specific statement of her issues, and acknowledgement of the importance of addressing her history of trauma.  This contradicts Dr. Urquiza's assertions that ORR did not attend to Gabriela's trauma.

65. Dr. Urquiza writes, ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ Dr. Urquiza fails to address the costs to other children and benefits of treating Gabriela in the shelter.  The drain on resources would have been harmful to other children.  Meanwhile, being on 1-1 in a shelter would have limited her activities to the same level as being on 1-1 in an RTC.  Moreover, the greater staff to patient ratio of an RTC can enable patients to come off of 1-1 observation sooner than would be safe in a shelter.

66. Dr. Urquiza writes, "It was also recommended that [Gabriela] participate in twice weekly individual therapy (for a total of two hours). Identified treatment goals included ████████ ████████████████████████████████ Although the therapist documented utilizing some techniques associated with EBTs (e.g., mindful exercise techniques, psychoeducation), Dr. Urquiza writes that "there was no mention of the type of EBT [Gabriela] participated in for any presented issue. For example, [Gabriela] at times appeared to discuss her trauma history in her individual sessions; however, written notes provide minimal context as to how this was addressed (e.g., 'She processed feelings and emotions to her past traumatic events.'). Further, [Gabriela's] sessions were reduced to 30 minutes (each) approximately one month after she arrived; despite the decrease in service, [Gabriela] remained at Shiloh for six additional months. The individual therapy [Gabriela] received at Shiloh could also have been provided in a shelter setting."  Once again, RTCs are therapeutic communities, while shelters are communities in which therapy is available. It is important to remember that Gabriela's psychological state deteriorated in the shelter

and markedly improved while at Shiloh. This is not surprising. A key element of therapeutic milieus are to encourage children, in part by peer pressure and in part via lots of adult interaction, to actively work on their issues.

67. In the above paragraph, contrary to his prior criticisms, Dr. Urquiza notes that there were specific treatment goals, and the therapist documented using evidenced-based therapy techniques. This contradicts his statements that the treatment provided at Shiloh was not evidence-based and did not directly or effectively address Gabriela's presenting concerns. His criticism comes down to the therapist not giving a name to the type of EBT Gabriela participated in and that written notes provide what he felt was inadequate discussion as to how this was addressed. In sum, he contradicts his statements that proper therapy was not given. It appears the actual complaint should have been that he felt the documentation was not adequate.

68. Dr. Urquiza claims, "Overall, the treatment provided at Shiloh did not directly or effectively address [Gabriela's] presenting concerns. ██████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████

69. A lack of what he feels is optimal documentation is not the same as her not having had appropriate therapy. ██████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ He does not say what in the records is not convincing. He does not even suggest another reason for her doing well, despite her history of ██████████████████████████ Moreover, given that he says RTCs are inherently harmful one would expect she would have gone downhill, rather than improved at the RTC. It is not at all clear what data would convince him that ORR staff did something correct.

70. In addition, although Dr. Urquiza claimed the services Gabriela received were not what she needed, his description of TF-CBT is consistent with what Gabriela received. Another error Dr. Urquiza made was to say Gabriela ████████████████████████████. Also surprising, despite noting she was doing better after being in ORR custody, Dr. Urquiza writes that Gabriela's mental health appears to have suffered from her prolonged detention and uncertainty about her future. This is contrary to his own statements and contrary to the data in her record, highlighted by her Global Assessment of Functioning scores. Her GAF scores steadily improved throughout her stay: Her GAF score was 40 (severe symptoms) on 9/8/17; 47 on 9/36/17; 50 on 10/10/17 and 11/7/17; 60 on 12/18/17; 63 on 1/23/18; 65 in 2/18; and 70 on 3/27/18.

71. Dr. Urquiza then writes that the "deterioration was exacerbated by the fact that during her seven-month stay at Shiloh, [Gabriela] and her grandfather were actively seeking reunification. The sworn declarations of [Gabriela] and her grandfather make clear they have a stable and supportive relationship and [Gabriela] likely would have benefitted from release to her grandfather where she could have received community-based mental health." Dr. Urquiza wrote that reunification with her grandfather likely would have reduced many of her mental health symptoms and expedited her recovery. Their sworn declaration can

support, but does not make clear, that they have a stable and supportive relationship. It also does not make certain that release to her grandfather would have benefitted her. Moreover, Dr. Urquiza ignores the multiple and serious reasons Gabriela's grandfather was found to not be a fit sponsor. Dr. Urquiza's tremendous faith that her grandfather will do the right thing, based on trivial evidence, stands in marked contrast to his insistence the wrong thing was done by ORR since there was not very solid evidence that the right thing was done. Using different ways of assessing information, depending upon the conclusion you wish to draw, indicates severe bias.

72. Dr. Urquiza asserts a shelter would have been better than an RTC for Gabriela, but he does not discuss how shelters are different from RTCs and what about the difference is harmful.

73. Dr. Urquiza (who is not a physician and cannot prescribe medication) incorrectly claims that medication is typically only useful as long as a client takes it. Anti-depressant medication is generally not given forever. The expectation is that after one or two years it can be stopped and the individual will continue to do well.

74. Dr. Urquiza wrote that Gabriela "trauma history was not effectively assessed" and that "[t]he administered assessments failed to assess for trauma or utilize any measures of trauma or PTSD." As I discussed earlier one does not need to administer formal testing to assess for trauma. A good clinical interview is better.

75. Dr. Urquiza writes that despite the fact that Gabriela ████████ ██████████████, travelled to a new country where she did not speak the language, and had no social support system, there is no indication that ORR recognized that these events may have been traumatizing for her. Dr. Urquiza provides no statements made by her therapist which could have provided information about what the therapist was thinking and doing, and what the therapist considered important. However, there is indication. He himself wrote: some of her mental health providers recognized and discussed, albeit minimally, her history of trauma. The record does not indicate minimal recognition of the importance of trauma. Dr. Urquiza himself wrote, ████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████" Moreover, Dr. Urquiza acknowledges ██████████████████████ He also wrote that the chart stated, ████████████████████████████████ ████████████████ Despite noting this, Dr. Uquiza also wrote that Gabriela was not provided any evidence-based treatment to address such concerns. This is a direct contradiction.

76. Dr. Urquiza also wrote that Gabriela was given varied reasons as to why her grandfather was rejected for sponsorship. There are often multiple reasons for decisions. There were multiple reasons her grandfather was an inappropriate choice to sponsor her. Dr. Urquiza also does not state the basis for saying what she was told. Patients' reports of what they have been told are often not fully accurate.

77. Dr. Urquiza's interpretation of the data is not scientific. The case of Gabriela is particularly notable. As discussed, Gabriela N. reported ██████████████████████████ ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████. Gabriela reported ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████   While in a shelter, ██████ she  again  ████████████████████████   She  was  evaluated  at  EBPSH,  was psychiatrically hospitalized there and the facility recommended she go to an RTC.  ██████ ████████████████████████████████████████████████████████████. Dr. Urquiza, asserts that the problems that sent her to the RTC were not seen during her time in the RTC.  Given that Dr. Urquiza asserts that putting her in a restrictive setting and not letting her go to her grandfather were harmful to her, it is surprising that the serious symptoms that led her to go to the RTC were not seen there.  Although he does not note it, Gabriela actually greatly improved while at the RTC reaching a level of functioning that appears to be the best she had had in any years.  Her GAF markedly improved during her time at the RTC.  Her GAF was 40 (severe symptoms) on 9/8/17, 47 on 9/36/17, 50 on 10/10/17 and 11/7/17, 60 on 12/18/17, 63 on 1/23/18, 65 in 2/18, 70 (only mild symptoms) on 3/27/18.  When an individual undergoes marked improvement, doing better than they have in years, the general interpretation is that something occurred that was helpful. Nevertheless, Dr. Urquiza claims that the records are not convincing that her doing well is the result of the services she received at Shiloh. In each of the named cases the medical records show great improvement while the children are in RTCs, and in each case he says that the treatment they receive is not appropriate.  Dr. Urquiza's reporting of the data and interpretation of the data are not scientific.

## E. Daniela Marisol T.

78. The claim that traumatic experiences were ignored is not true.  Daniela's Shiloh admission evaluation gives a prominent place to her history of trauma: █████████████████████ ████████████████████████████████  █████████  ██████████  ██ ████████████████████████████████████████████████████████████ ████████████████████████  ██████  ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████

79. Moreover, the admission note at David and Margaret Shelter on 2/22/18 indicates appropriate concern about traumatic events: ██████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████



The note shows primary focus on trauma, even though there were other issues of considerable importance.

80. There was extensive recording of symptoms.  Comments by her therapist about trauma included:



81. Daniela disclosed ████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████

82. ████████████████████████████████████████████████████
████████████████████ In the weeks prior to coming to the U.S., Daniela ██
███████████████████████████████ She was hospitalized on August 8,
2017, five days after arriving in the U.S., because ████████████████████
████████████████████████████ She reportedly ████████████████████████
████████████████████████ She stated ██████████████████████████████
████████████████████████████████████████████████████████
██████████████ She reported ████████████████████████████████████
████████ She reported ██████████████████████████████████████

83. On August 22, 2017, Daniela Marisol T. stated she ██████████████████
████████████████████ She said that ██████████████████████████████
█████████████████████████████████████████. She said ████████████
████████████████████

84. Dr. Urquiza wrote that staff did not consider the benefit to Daniela of being in a less
restrictive setting for care.  It is unclear how Dr. Urquiza can know what they may or may
not have considered without interviewing them.  Clinicians do not need to write down all
they considered.  It is highly speculative to claim someone did not consider something
because they did not choose it.

85. It is notable that Dr. Urquiza opines that since people did not write down all that they
considered he assumes they did not consider alternatives.  Clinicians are not required to
write down all they considered.  Forensic evaluators, however, are supposed to explain
their thinking, which generally means explaining why their conclusion has a stronger
scientific foundation than other options.  Dr. Urquiza gives no indication he considered the
costs and risks of Daniela being in a less restrictive setting.  By his method of analysis of
documents, he did not consider alternative hypotheses.

86. It is clear that Daniela was ██████████████████████████████████████
██████  and needed careful monitoring and intensive treatment.  It would have been
malpractice to leave her in the shelter or send her to a sponsor at that time.

87. After leaving Shiloh Daniela went to David and Margaret Shelter.  The admission note
from David and Margaret shelter also shows that Daniela had made marked improvement
while in Shiloh RTC.  Subsequent notes at the shelter do not indicate significant further
improvement.  In the first therapy note at David and Margaret Shelter, on 2/17/18, her
therapist wrote, ██████████████████████████████████████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████████████████████ 3/3/18 Clinician discussed ████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████ .5/8/18  UAC ███████████████████
███████████████████████████

88. Dr. Urquiza writes, "While in ORR custody, [Daniela] was prescribed several psychiatric medications (without a meaningful informed consent process) based, in part, on incorrect diagnoses of ████████████████████████████████████. There was minimal effort to involve her family in her treatment process, including in the decision to prescribe psychiatric medication. The stress of several custodial placements and [Daniela's] lengthy release process likely impacted her mental health and lead to a decline in [Daniela's] functioning. Additionally, it is likely that the stress of being separated from her sister, who she travelled to the U.S. with and with whom she was very close, affected her mental health and also led to a decline in functioning."

89. Dr. Urquiza writes, "[Daniela's] treatment (including decisions to put her in more restrictive care and administer psychotropic medication) in ORR custody was improperly guided by informal diagnoses."  It is standard practice for patients to be admitted into outpatient or inpatient therapy by psychiatrists and diagnosed based on interviews without the use of psychological tests.  Psychiatrists are trained to formulate diagnoses based on interviews.  Psychologists (which is the training Dr. Urquiza has) generally use testing.  Psychological tests are not as good as interviews by a well-trained psychiatrist.  Psychological tests are validated based on whether they agree with the diagnostic decisions of experts.  One can question whether Dr. Urquiza, who as a psychologist is not licensed to prescribe medication, has the expertise to opine on medication decision-making by a psychiatrist.

90. Dr. Urquiza writes, ███████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████

91. Dr. Urquiza is not correct.  While ████████████████████ is certainly a possibility, ████████ ████████ is a stronger possibility.  He fails to note the reports she had of ██████████

██████████████████████████████████████████████████████████████████

These symptoms, and ████████████████, are more common in ████████████ than in ███████████████. ██████████████████ is another possibility.

92. There is a logical contradiction between Dr. Urquiza saying the people who knew and met with her many times could not diagnose her, since they did not do what he refers to as a formal assessment, but he feels he can diagnose her without doing a formal assessment. I do not know if he even met with her.

93. Dr. Urquiza writes that "[t]he current 'best practices' standard for determining this diagnosis is administration of a standardized symptom-specific measure (i.e., Child Depression Inventory, Trauma Symptom Checklist for Young Children) and/or broadband measure of emotions and behaviors (i.e., Behavior Assessment Scale for Children or Child Behavior Checklist). Use of this assessment strategy minimizes the likelihood of failing to recognize the presence or severity of a child's mental health concern. There is no indication that [Daniela] was administered any of these measures, even though she was diagnosed with this disorder.  The lack of formal evaluation is especially problematic given that [Daniela] was prescribed multiple psychotropic medications based on these diagnoses."

94. Several of his statements are not correct or irrelevant.  The issue for a forensic evaluator is reasonable practice, not best practice. In addition, Daniela was not a young child, she was 16, which is generally considered too old for the TSCYC.[15]  Checklists can be useful but are not as good as the skills of a well-trained psychiatrist.  Furthermore, Dr. Urquiza fails to suggest tests for ████████████ and for ████████████ which are in the differential diagnosis.  One does not have to use a printed test.  But, it is crucial that further information is gathered to assess the diagnosis.

95. Concerning the psychological tests he felt should have been administered, Dr. Urquiza wrote, "Use of this assessment strategy minimizes the likelihood of failing to recognize the presence or severity of a child's mental health concern."  It is clear based on the history gathered by interviews, that her clinicians were aware she had a mental illness and that it was very severe.  Interviews are markedly better than symptom inventories for assessing the seriousness of psychological problems.  Dr. Urquiza is correct that symptom inventories can be useful for recognizing the presence and severity of a child's mental illness, when the child is seeing someone with limited mental health training, or limited time to conduct an interview.  For example, when seeing a pediatrician or family practitioner or internist, having people fill out symptom inventories in the waiting room can be very helpful.

96. Dr. Urquiza wrote ███████████████████████████████████████████████████
████████████████████████████████████████████████████████████
He rejects the diagnosis of ████████ despite the four symptoms of ████████████
████████████████████████████ He wrote that ██████████████████████
████████ are better explained by ████████, in which an individual often ████████████

_____

[15] The TSCYC is used through age twelve based on behavior during the prior month.  Therefore, it was not appropriate, and even if an age appropriate form was used diagnosis could not occur for a month. That would be a very problematic delay in treatment.

██████████████████████.”[16]  Contrary to what Dr. Urquiza appears to suggest, ████
███████████████████████████████████████████████████████████
████████████  Moreover, Dr. Urquiza does not deal with the symptoms of ████████
█████████████, which he mentioned.  Dr. Urquiza also does not deal with other important symptoms that were in the record, including ███████████████████████████
██████████████████████████  These symptoms, and █████████████████████████████, are more common in █████████████████████████ than in ██████████████████.  Dr. Urquiza does not discuss the significance of her positive response to ██████ medications, indicating she has ████████.  ██████████████████ and █████████ often come together and so there is additional support for a diagnosis of ████████████.  It is notable that Dr. Urquiza rejects the diagnosis of ████████████, and appears to pay no attention to the possibility of █████████████████, although he does not have symptom inventories for these disorders.  If one needs symptom inventories to diagnose and evaluate ████████, then they are necessary to evaluate, and/or rule/out ████████ and ███████████████████.  Dr. Urquiza appears to be violating his own guidelines.

97.  Dr. Urquiza goes further and incorrectly claims that Daniela's diagnosis of ████████████ and ██████████████████████████ were unsupported by her documented symptoms and were the result of a lack of formal assessment and trauma-informed practices.  Dr. Urquiza is incorrect.  Daniela has symptoms documented in her chart that are in the diagnostic criteria for both disorders.  Dr. Urquiza states that Daniela's ██████████████████████, are better explained by ███████ than ██████.  One can have both █████ and █████.  One only diagnoses ██████ if the symptoms are the result of ████████████████████████.  Unless these anxiety symptoms come and go depending upon the presence of traumatic reminders, ██████ is an appropriate diagnosis. Of note, both ████████ and █████ may be the result of traumatic experiences.  Dr. Urquiza's assertion that the diagnoses of █████ and ████████ are the result of the lack of a formal assessment does not fulfill the requirements of expert opinions,   Since he does not have the results of psychological testing for these disorders or for ██████, he does not have the data to say that psychological testing would have ruled them out. Once again, Dr. Urquiza is violating his own rules, i.e., he is diagnosing someone without using psychological testing.  He also does not provide sufficient argument to claim that the diagnosis of ████████ was incorrect and that the symptoms were simply the result of her ██████████████████.

98.  ████████████████████████████████████████████████████████████
████████████████████  is sufficient to diagnose ██████████, if her symptoms lasted long enough, and if she does not meet criteria for s████████████ or █████████████.  ███
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████

■ Her medical record note from 10/17/17 described her as '████████████████████████
████████████████████████████████

99. His claim that the system was not trauma informed, that there was a lack of knowledge of the full range of traumatic symptoms and behaviors and failure to pay attention to all of her symptoms, is incorrect. I am well familiar with the full range of traumatically-induced symptoms and behaviors. I have published on the evaluation of ███. Dr. Urquiza is so focused on trauma that he fails to discuss the possibility of ████████████ and dismisses symptoms that are more likely to be part of █████ or ███████████████████ as █████ symptoms, and shows no indication of considering other symptoms of these disorders. The issue is a crucial one for treatment.

100. "Dr. Urquiza writes, "Though her individual therapy sessions were labeled as 'CBT' (Cognitive Behavioral Therapy, an evidence-based treatment for children and adolescents), minimal information was provided about the actual content of these sessions, though it appears as though ██████████████ were discussed. As such, though CBT is an appropriate and evidenced-based strategy/technique, the lack of detail regarding the content of these sessions raises concern about the appropriateness of these mental health services. There is no indication in the records that [Daniela] received any evidence-based treatment while in custody at IES. The lack of effective mental health services provided to [Daniela] is concerning because there are many problems associated with youth who are provided inadequate or ineffective mental health treatment." Dr. Urquiza makes an unscientific leap in his logic. He notes that the therapist wrote that she used an evidenced based technique, CBT. Dr. Urquiza then says the lack of detail of the therapy notes raises concern about the appropriateness of the services. He then claims that there is no evidence she received EBT. This is clearly false. The therapist saying she provided CBT is evidence, although it is not conclusive evidence that the therapy was exactly what Dr. Urquiza would consider to be appropriate. Dr. Urquiza takes a step further and says that "the lack of effective mental health services provided to [Daniela] is concerning." To review, after acknowledging that Daniela's therapist wrote that she provided CBT, which he acknowledges is EBT, he concludes that she did not receive effective mental health services, although her medical records showed marked improvement. Dr. Urquiza's deductions are not scientific.

101. Dr. Urquiza states that there are three essential components of DBT: 1) adolescents attend weekly group therapy sessions, during which they learn new skills, 2) adolescents attend weekly individual therapy, during which they discuss their use of the skills during the week, problem-solve any negative events, and practice the skills learned in group, and 3) therapists provide 24-hour phone coaching to help adolescents avoid risky decisions and utilize appropriate coping skills. The 24 hour availability of clinicians that Dr. Urquiza says is an important part of DBT is available in an RTC, but is unlikely to be available once the child is living in foster care or with a sponsor.

102. Dr. Urquiza states that "there is concern that the mental health services she received while at Behavioral Hospital and the IES shelter were not appropriate and care providers did not consider evidence-based treatment prior to transferring [Daniela]. Had [Daniela] received evidence based treatment in a trauma-informed setting at the shelter, she could have avoided transfer to a more restrictive setting."

103. Dr. Urquiza's statement that she could have avoided transfer if she had received EBT is incorrect. Daniela was referred to an RTC 3 ½ weeks after entering the U.S. During those 3 ½ weeks she spent time in a psychiatric hospital. Therapy sessions were needed to

gather basic information, and continually assess her safety.  It is not within the realm of possibility that  she could have functioned well enough to avoid an RTC.  Treatment with DBT and follow on TF-CBT is usually done for months.  Immediately speaking of her traumatic history would likely have further flooded her with psychological distress and led to further decompensation. In addition, it is solidly established within the medical community that severe depression needs to be treated with medication and not simply therapy.  Medication takes a minimum of 3 weeks to work, and usually significantly longer for full benefit.  Only in 1/3 of patients does the first medication have adequate effectiveness. More often than not medication changes are needed.  Moreover, she ███████████████████████████████████████, which is more difficult to treat.  And, it is likely she has ██████████████, which is yet again more difficult to treat.  All three require medication.  It is hard to imagine the basis for Dr. Urquiza opining that a few weeks of psychotherapy could have resolved her ████████████████████ and would have avoided the need for an RTC.

104.    Dr. Urquiza writes, "[Daniela] remained at Shiloh for over five months. [Daniela] appeared to be doing better approximately three months into her placement (early December 2017). Her mental health then deteriorated, which raises the concern about the length of her stay in this restrictive placement."  Dr. Urquiza does not explain the basis of his assessment that her mental health deteriorated beginning in December. Her Global Assessment of Functioning scales increased and were higher in January than in December. 9/12/17 her GAF was 40.  12/12/17 her GAF was 60.  1/9/18 her GAF was 65.

105.    Dr. Urquiza writes, "It appears as though group therapy addressed a number of appropriate topics, including aggression, strengths, honesty, boundaries, healthy competition, resolving conflict, and communicating feelings. However, most of the sessions involved the use of crafts or playing games to address these topics. Additionally, group therapy consisted of learning about traditions and holidays in the United States through crafts. As such, it does not appear as though [Daniela] received appropriate group therapy services while at Shiloh."  That the children learned about American traditions and holidays, better preparing them to integrate into American society, as well as the 7 topics Dr. Urquiza said were appropriate, does not mean that they did not receive appropriate services. Moreover, engaging in activities, providing an opportunity to interact with other youths around a task is a very good way to launch discussions of boundaries, competition, conflict, aggression and communicating feelings.  Therapy is much more affective when there is real time discussion of issues rather than discussion of how the individual felt a few days before when there was a conflict or competition.

106.    Dr. Urquiza wrote that Daniela was "in twice weekly individual therapy to address ███████████████████████. Her goals were to █████████████████████████████████. Though many of these techniques are associated with EBTs, there is no mention of any type of EBT [Daniela] participated in during individual therapy sessions…. on 09/25/17, [Daniela]

26

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
█████████████████████.  In early October 2017, an individual therapy note
mentioned ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████.  On 11/28/17, her individual therapist noted
that [Daniela] ███████████████████████████████████████
███████████████████████████████████████  Overall,
it does not appear that [Daniela] received appropriate mental health services while
at Shiloh…..  It also appears as though [Daniela's] placement at Shiloh negatively affected
her mental health."  Once again, we see Dr. Urquiza's complaint coming down to the
therapist not writing as much in notes as he would have liked.

107.     Dr. Urquiza's assertion that many of the techniques the therapist used are associated
with EBTs.  As noted earlier, standard of care and best practice is to use EBT techniques
in an eclectic manner meeting the child's particular needs.  With other children Dr. Urquiza
simply says that EBT was not done, although the therapists noted learning coping skills,
emotional management skills and processing traumatic memories, as this therapist did.

108.     It is also remarkable Dr. Urquiza claims that Daniela did not receive appropriate
mental health services although ███████████████████████████████████████
███████████████████████████████, because the therapy notes were not as detailed
as he wished.  It is ironic that Dr. Urquiza continually makes definitive statements about
what did and did not happen, and the quality of the care that was rendered without
presenting the material supporting his conclusion as is required in forensic evaluations, yet
he continually criticizes therapy work and eventually claims appropriate work was not done
because therapy notes are not as detailed as he believes is appropriate.

109.     Dr. Urquiza writes that "[Daniela] did not receive evidence-based assessments of
her need for continued placement at Shiloh and it is not clear why she was not released
earlier."  It is unclear what he means by an evidence based assessment of her continued
placement.  There was a very good reason to not release her sooner.  Suddenly switching
therapists and group experiences and therapeutic environments could have led to
regression.  Gains need to be solidified.  Clearly, Daniela was making remarkable gains at
the RTC.

110.     In his paragraph claiming that her mental health was harmed by her time at Shiloh,
Dr. Urquiza wrote that she was ███████████████████████████████████████
███████████████████████████████████████
███████████████  Dr. Urquiza shows a remarkable willingness to spin the most positive
things about progress and therapy into support that the children received inappropriate care
and got worse.

111.     Dr. Urquiza writes, "There is no indication that anyone considered whether
[Daniela's] prolonged placement at Shiloh was detrimental to her treatment or weighed the
possible benefits of reunification or placement in a less restrictive setting for [Daniela's]
mental health. [Daniela's] prolonged placement in Shiloh's restrictive setting, as well as
the lack of progress in reuniting her with her sister with whom she had a close relationship

27

and was eager to be reunited, likely exacerbated [Daniela's] mental health symptoms and led to her further deterioration." There are serious problems with Dr. Urquiza's assertions. Dr. Urquiza fails to note the reasons Daniela could not be reunited with her sister. Dr. Urquiza's assertion that failure to reunite with her sister and her prolonged placement in the RTC led to further deterioration is completely contrary to the data, and other things he wrote. Once again, both the Shiloh and Margaret and David Shelter records show marked improvement from when she entered the U.S.

112.     Dr. Urquiza writes that "it appears as though she received both individual and group therapy that included components from EBTs (e.g., coping/relaxation skills, emotion expression, processing her trauma). It is also worth noting that after only two months in this placement, [Daniela] was considered stable enough to be transferred to long-term foster care, the least restrictive setting offered to adolescent youth in ORR care, suggesting that she received some level of mental health services in this placement that may have been beneficial to her." It is not clear why Dr. Urquiza interprets her discharge after two months as indicating she may have benefited from some level of mental health services she received there, but the enormous improvement her records show she had at Shiloh is somehow not an indication of good treatment. Daniela's GAF score of 65 before she left Shiloh supports a conclusion that she was then functioning well enough to go to long term foster care. It would, nevertheless, given her history, be appropriate for her to stay in congregate care for two months, where she was receiving intensive treatment, to solidify gains and decrease the possibility of regression when she left the RTC and went to the community where she would receive much less therapy.

113.     Dr. Urquiza claims that her mental health improved at the David and Margaret shelter and that this shows that being in a less restrictive setting helped her mental status improve. This is not a scientifically based conclusion. He fails to describe her functioning sufficiently to demonstrate she improved. He assumes she improved since she was released. He does not discuss other possibilities such as she was released although she did not improve at the shelter, or that it was the work at Shiloh that fostered improvement that continued over time, or that she improved at Shiloh and was sent to the shelter to solidify the improvement, or that no improvement was occurring at the shelter and they discharged her. Abandoning the scientific method, Dr. Urquiza ignores that there are multiple possible hypotheses, does not present data that would show which was accurate and simply presents a conclusion that is consistent with the Plaintiff's argument.

114.     Dr. Urquiza writes that "it appears as though [Daniela] received some level of mental health services that were beneficial to her while at Bethany USCCB. Of note, [Daniela] later reported ████████████████████ while at this placement and continued to experience symptoms of ████████████████████."

115.     In other words, after leaving Shiloh, she developed significant symptoms. Despite the concerning regression, Dr. Urquiza says her mental health treatment was beneficial at a USCCB shelter. He is using a drastically different method of assessing the care she received at different places. He claims she went downhill at Shiloh (despite her GAF markedly improving, ██████████████████████), but then speaks favorably about a placement in which she ███████████ and noted renewed ████ symptoms. This suggests that Dr. Urquiza is so intent on supporting the Plaintiff's claims

that less restrictive settings are better than more restrictive ones that he interprets similar facts in drastically different ways.

116.      **F. Lucas R.** Lucas stated ████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

Concerning the issues that upset him and led to his continuing symptoms of █████
once he was in the U.S., he said that ████████████████████████████████████
████████████████████████████████████████████████████████████. On
2/20/18, six weeks after coming to the U.S., he asserted ███████████████████
████████████ He was taken to Banner Thunderbird Medical Center Emergency Room
on that date.  He was assessed and met criteria for hospitalization.  On February 25, 2018,
he stated ████████████████████████████████████████████████████████████
████████████████████████████████ He reportedly █████████████████████████
████████████████████████ He told staff (5/22/18) ██████████████████████
████████████████████████ He was diagnosed with ████████████████████
████████, and discharged on 2/27/18. He had an outpatient psychiatric appointment on
3/6/18  during  which  he  was  diagnosed  with  ██████████████████████████
████████████████████████████████ He presented with ██████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████, he was admitted to Banner for
and states that █████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████ On
4/3/18 he refused the medication. He received a follow-up psychiatric visit on 4/17/18 in
which his Sertraline was discontinued and the doctor recommended he go to an RTC.  He
went to Shiloh on 4/21/18.

117.      Dr. Urquiza claims that Lucas R. "deteriorated further as he was put in more
restrictive settings and his mental health needs were exacerbated. The decision to move
[Lucas] from a shelter setting to a more restrictive placement (Shiloh Treatment Center),
the prescription of psychotropic medications (which may not have been warranted) despite
[Lucas's] reluctance and refusal to take medication and without an informed consent
process, and the delays in managing his case in a timely manner (which likely added to his
████████████████████████████) indicate that ORR did not take a trauma informed approach
to [Lucas's] care."

118.      Dr. Urquiza assertions are contrary to what is found in the record.  Lucas did not
deteriorate when moved to a more restrictive placement.  His ███████████████ resolved
when he was in the psychiatric hospital and he had great improvement during his time at
Shiloh RTC.  Reports of Lucas' Global Assessment of Functioning (GAF) by doctors
increased from 40s to 70s during his time at Shiloh.  GAF of 40s stands for serious
impairment while 70s are no more than slight impairment. At Shiloh, Lucas' GAF scores

steadily increased over time:  5/22/18 GAF 40; 6/5/18 GAF 50; 6/19/18 GAF 60; 7/10 GAF 65; 8/7/18 GAF 70; and 8/28/18 GAF 75.

119.    Dr. Urquiza writes, "These decisions reduced [Lucas's] sense of choice and control, disrupted the social connections he had made with peers and staff in his first placement, and may have been seen as punitive from [Lucas's] perspective. As such, his increasing disruptive behaviors, mistrust of staff and disengagement from therapy services, as well as not being forthcoming with trauma-related information, are an expected response. If trauma-informed practices (e.g., regular assessments, monitoring of trauma symptoms, delivery of trauma-focused evidence based treatment programs) were a central part of his care - [Lucas] likely would have had fewer problems while in care, may not have been transferred to a more restrictive level of care, and would have had an alleviation of his trauma-related symptoms……The opportunity to accurately identify [Lucas's] relevant mental health needs was missed, as was the opportunity to provide therapeutic services directed to his identified needs. As a result, [Lucas's] mental health symptoms went untreated."

120.    Lucas' mental health needs were not missed and were not untreated.  Dr. Urquiza's apparent preference would have left them untreated. ██████████████████████ ████████████████████████████████████████████████████████████ ████████████████  The statement the transfer may have been seen as punitive is marked speculation and not an expert opinion.

121.    Dr. Urquiza provides no data to support his claim that Lucas disengaged from therapy, and became increasingly disruptive and mistrustful of staff.  The record presents the opposite picture.  A medical record note from 8/30/18 stated ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████  His discharge summary provides a markedly different description than Dr. Urquiza provides: ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████

122.    Dr. Urquiza also provided no data to back up his claim that his being moved to a more restrictive setting was the cause.  No evidence or discussion is presented to support these statements.  Contrary to these assertions, Lucas did better over time, engaged in treatment and shared more about his trauma. ██████████████████████ ███████████████████████████████.  Furthermore, the claim that his trauma related symptoms, after ████████████████████████████ would have been

markedly improved by leaving him in the shelter in which he had a recurrence of ██, does not make sense.

123.     Contrary to Dr. Urquiza's assertions that Lucas had increasing disruptive behaviors, mistrust of staff and disengagement from therapy services, as well as not being forthcoming with trauma-related information, are an expected response.  His discharge note from Shiloh provided a drastically different description.  It stated, "█████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

124.     Dr. Urquiza fails to note that when in the RTC he took medication and he markedly improved.  Dr. Urquiza's statements are not consistent with the record or scientific knowledge.

125.     Lucas R. came to the U.S. on 1/9/18. He reported ████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████  His medical record states ████████████████████████████
████████████████████████████████████████████████. Concerning the issues that upset him and led to his continuing symptoms of ████████ once he was in the U.S., he said ████████████████████████████████████
████████████████████████████████  On 2/25/18, he stated ████
████████████████████████████████████████████████
████████████████████████████████████████  He told staff on 5/22/18 that ████████████████████████████████

126.     Lucas R. showed enormous improvement in his time in care. In addition to the GAF scores showing marked improvement, it is worthwhile noting that a medical record note from 8/30/18 stated ████████████████████████████████████████
████████████     ████████████████████████████████

███████████████████████████████ The medical records are drastically at odds with what Dr. Urquiza claimed was the case.

## G. Sirena P.

127.　　　　Dr. Urquiza writes, "Prior to entering the United States, [Sirena] ███████████ ████████████████████████████████████████████████████ and "the shelter noted serious mental health concerns and had [Sirena] hospitalized based on those concerns but did not offer her any accommodations or treatment tailored to her mental health needs. Moreover, at no point during [Sirena's] five-month stay in ORR custody did anyone seem to consider the benefit reunification with her siblings and biological parents would have for [Sirena's] mental health (in spite of assertions from [Sirena] that she was missing her parents). Had [Sirena] been promptly reunified with her parents and/or received empirically-based treatment (such as Cognitive Behavioral Therapy or Trauma-Focused Cognitive Behavioral Therapy), she would likely have experienced a significant alleviation of her mood and trauma-related problems."

128.　　　　Dr. Urquiza's criticism that at no point "did anyone seem to consider the benefit reunification with her siblings and biological parents would have for [Sirena's] mental health" is not scientific. I do not know what sort of evidence he would expect to find. It is not surprising that given ███████████████, that people felt she needed to be in a more secure setting. That no one wrote down, perhaps she would be better off going to her family, when the evidence is so strong she needed a secure setting, does not mean no one considered it. Dr. Urquiza's claim that prompt reunification and CBT would have given significant alleviation of her ███████████████████████, is highly unlikely. Dr. Urquiza fails to note very important information to the contrary that is in the record.

129.　　　　Sirena had a substantial history of ████████████████. In her country of origin, ██████████████████████████████. She stated ████████████████████ ███████████████████████████████ Sirena's case file states that her parents left their home country for the U.S., leaving her in the care of her grandparents and other family members when she was a toddler. Her mother went back and forth, but had not been in the U.S. since she was 9. Her sister and brother (ages 12 and 11) lived in the U.S. Her oldest sibling was an American citizen. She last saw her mother in 2016 and her father in 2005. She left her home country on 4/9/18. ████████████████

130.　　　　Far more is going on than missing one's parents when a child, raised by the grandparents, ████████████████████. Knowing that she will be reunited with her parents when she is safe should have led her to function better, if missing her parents actually was the issue. Her chart makes it clear far more was going on. A note from 4/24/18 shows ████████████████████████ ██████████ She indicated she is aware she will be reunifying with her parents but ███████████ ██████████████. She stated████████████████████ She reported ████████████████████████,



131.  Therapists do not need to write down each thing they consider.  Forensic evaluators, however, need to write down the pros and cons of actions and should discuss both before criticizing clinical decisions.  Dr. Urquiza provides no evidence of considering the tremendous risk of releasing Sirena to her family before her psychiatric issues improved.

132.  Dr. Urquiza writes, "It is my opinion that Sirena did not receive appropriate or effective mental health treatment at Shiloh and the failure to quickly reunify Sirena with her biological parents adversely affected her mental health."  Dr. Urquiza claims that little of the counseling Sirena received was specific to the types of problems she exhibited and services did not include any type of evidence-based intervention and that "while it can reasonably be stated that [Sirena] frequently met with staff for some type of pseudo-counseling sessions, it would be difficult to assert that she received any type of psychotherapeutic/mental health treatment for her problems." As with each case, Dr. Urquiza does not present a reasonable basis for his contention that the UAC did not receive appropriate or effective mental health treatment at Shiloh.

133.  It is difficult to understand how he can say that her therapy was all but useless given that during her time at Shiloh she experienced marked improvement.  Sirena's individual counseling notes showed great improvement of her behavior and mood while at Shiloh.  At the end of her stay in RTC care, on 8/30/18, Sirena's GAF was 75 (indicating only minor problems).  This was a marked improvement from the time of admission to Shiloh when her GAF was 35, as well as significantly better than it had been for at least several years in her home country.  This is strong evidence that she received proper treatment, both in terms of medications and psychotherapy.  It seems very unlikely that her mental health markedly improved from what it had been for the prior five or more years unless treatment was effective. Moreover, one should note that the improvement occurred in an RTC, despite the repeated assertions by Dr. Urquiza that that level of secure care is harmful.

134.  In this and in other cases, Dr. Urquiza suggests that children suffered because there was delay in treating their issues.  It is doubtful that problems that have gone on for five years would become substantially worsened by another few month delay.  Moreover, as noted, Sirena's issues markedly improved, they did not get worse, during her time in an RTC.

135.    Dr. Urquiza writes that "[a]fter [Sirena's] first placement at St. Luke's Behavioral Health, ORR decided to transfer [Sirena] to a more restrictive placement, Shiloh. This transfer likely could have been avoided had [Sirena] been provided with effective treatment at SWK Campbell and/or St. Luke's Behavioral Health." I disagree. The level and type of problems she was dealing with were unlikely to resolve in short order regardless of the quality of treatment. Moreover, Dr. Urquiza has not provided a reasonable basis for his complaint that treatment was of poor quality.

136.    Dr. Urquiza's assertion that a short period of good treatment could have largely resolved Sirena's mental health symptoms is in contradiction with his repeated statements that having problems for a prolonged period makes them harder to treat. The children whose records he and I have reviewed suffered high levels of symptoms for years. If he is correct that a prolonged period of symptoms makes them hard to treat, then they would not be expected to resolve in a matter of weeks.

137.    Dr. Urquiza writes,



. Although [Sirena's] records suggest

Dr. Urquiza statement

is not an accurate depiction of what is in the record. Moreover, there may be much that is not in the record.

Also suggesting        , she was described, at an evaluation or therapy session as

138.    Dr. Urquiza writes,

Dr. Urquiza does not state which symptoms are better explained by these other factors and explain why he thinks this is the case.

139.    Sirena P. presented as

She reported

. She indicated

She stated

140. Dr. Urquiza writes that "[Sirena's] Wellbutrin was later increased, but the reasons for this increase were unclear (i.e., there is no documented records of an increase in her mental health symptoms)." Dr. Urquiza's statements indicate a lack of understanding regarding proper psychiatric treatment. Anti-depressants should be titrated until the patient achieves full remission. Increasing an antidepressant could possibly occur if someone slid into depression after being stable. This, however, would be rare. Increasing medication indicates that the doctors were observing her progress, seeing her current level of functioning and adjusting medications to achieve full remission.

141. Dr Urquiza writes, "

█████████ Despite these stressors, it does not appear that Shiloh staff or ORR considered whether reunification would lead to improvements in [Sirena's] mental health. It is my opinion that [Sirena] did not receive appropriate or effective mental health treatment at Shiloh and the failure to quickly reunify [Sirena] with her biological parents adversely affected her mental health."

142. In the days immediately after discharge from the hospital, ████████████████ ███████. On 5/17/18, all the team members agreed that Sirena P. may benefit from an RTC placement due to her elevated symptoms that she was demonstrating on an on-going basis at the shelter. On 5/24/18, Sirena P. ████████████████████████████ ████████████████████████████████████████████████████ ████████. Abilify was begun and Sertraline stopped, for ██████████. Shelter staff determined Sirena P. needed to go to an RTC for her safety. On 5/28/18, Sirena P. ███ ████████████████████████████████████████████████████████ Given that she███████████████ had elevated symptoms that were continuing, the appropriate medical decision was for her to go to an RTC ████████████████████████ ████████████████████████████████████████████████

143. Dr. Urquiza fails to discuss the differences between shelters and RTCs, how they differ from shelters, and what is available in an RTC that is not available in a shelter or when a child leaves to live with a sponsor. He simply claims that children in ORR are in detention centers, asserts that there is literature showing detention centers are harmful and therefore assumes RTCs are harmful. However, as was discussed above, RTCs are much better than shelters at protecting the safety of acting out youths and treating them, than shelters. Moreover, the harmful aspects of detention centers are more likely to be present in shelters and sponsor care than in an RTC. RTCs are very different than the detention centers discussed in the articles he cites. One cannot reasonably claim that children's experience in juvenile detention is informative of children's experience in elite boarding schools and camps. Similarly, one cannot reasonably opine that the harmful impacts of detention centers also apply to RTCs.

144. Releasing Sirena to her family at the time she entered Shiloh, as Dr. Urquiza says should have occurred, would not have been trauma informed treatment. ████████

35

███████████████████████████████████████████

███. ████████████████████████████████████

███████████████████████████████████████████

██████████████ The medical record stated ████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████ Trauma-informed treatment planning required that she first have the treatment necessary to be functioning at a higher level ████████

███████████████████████████████████████

**Conclusion**

145.    The core of plaintiffs' complaint is that RTCs are harmful and youths would be better off remaining in shelters, being transferred to potential sponsors more quickly than they currently are, and being more readily stepped back down to shelters. To support this position, they argue that greater restriction is inherently bad and that RTCs are more restrictive than shelters or living in the community with a sponsor. In addition, they assert that the children in RTCs deteriorate psychologically, and do better when not in an RTC. Plaintiffs also argue that all therapy available in RTCs can be provided outside of the RTC.

146.    Dr. Urquiza presents information that he asserts support these arguments. As I have attempted to show, there are serious problems with each of the arguments, with the use of empirical research that plaintiffs' experts claims supports their case, with the data Dr. Urquiza presents, and with the opinions he renders. Reasonable people can disagree about the proper interpretation of data, and about the significance of empirical findings to a specific situation. People can also, however, be deeply affected by confirmation bias and motivated bias, and interpret, vet, and value information in ways that support their existing beliefs or what they wish to be true. At times, forensic evaluators engage in confirmation distortion and deliberately spin and cherry pick information so that it supports what they wish to believe.[17] There are also professionals who do not appreciate that expert opinions and speculations are not the same thing, and that experts should only present opinions that result from scientific analysis.[18]

147.    Asserting someone did not consider something because they did not do what you would have done, is speculative. Asserting that people did not consider something, without having spoken with the person, is speculation. Asserting that someone deteriorated as the result of an action or inaction, simply based on one's theoretical belief it would be harmful,

[17] Martindale, D.A. (2005). Confirmatory Bias and Confirmatory Distortion. *Journal of Child Custody: Research,Issues, and Practices*, 2(1-2), 31-48; Lubit, submitted for consideration to a journal.

[18] Martindale, D.A. (2001). Cross-examining mental health experts in child custody litigation. *The Journal of Psychiatry and Law*, 29, 483-511. (2001: 503). "[T]he defining attributes of an expert opinion relate not to the credentials held by the individual whose fingers type the words or from whose mouth the words flow; rather, the requisite characteristics relate to the procedures that were employed in formulating the opinion and the body of knowledge that forms the foundation upon which those procedures were developed".

and failing to present available data showing that actually the person did better, is unscientific and misleading.

148.     A central part of an argument stating that RTCs harm children, and that shelters and living with a sponsor are better for children, involves knowing what each of the placements and therapy opportunities is like.  In addition, if saying that research shows detention is bad for youths (and so RTCs are bad for youths), one needs to see if the type of detention centers studied are actually similar to RTCs, and if the elements of detention centers found to be destructive to youths are also present in RTCs.  In addition, one should also pay attention to the children's specific needs and backgrounds.  For example, taking a child from competent parents, friends who are good for his growth and development that he is connected to, and from a good therapist he is connected to, to place the child in a psychiatric treatment facility for a period, with the intention of returning him to his prior life, has great costs.  It may be necessary or more helpful than harmful.  Regardless, it has costs.  Taking a child from such a situation is markedly different than taking a UAC from a shelter the child has been in for a few weeks, and which the child will leave in the near future.  To do a scientific or appropriate clinical analysis of the situations and what is in the child's best interests, one needs to consider these factors.

149.     To forge and present true expert opinions, forensic evaluators need to fairly present the relevant available data (both when it supports and when it contradicts the ultimate conclusion), use empirical literature that actually applies to the situation being addressed, generate competing hypotheses, assess which hypothesis is best supported by the data (and is least at odds with the available data), and when possible look for additional data that could affect the opinion.  In particular, one should search for data that could disprove the preferred hypothesis.  Cherry picking and spinning information to create convergent data is generally relatively easy.  As a result, convergent data is not dispositive.  Therefore, rather than looking for data to support their preferred hypothesis, experts should look for information to support each hypothesis, and even more important, search for information to disconfirm each hypothesis.  Disconfirming data are particularly powerful in hypothesis testing (Koriat, Lichtenstein, & Fischhoff 1980; Popper 1959).

150.     As I have described above, Dr. Urquiza fails to present and analyze data in the ways necessary to come up with scientifically based, expert opinions.  He frequently makes statements without presenting even illustrative data, fails to present available data that contradicts his speculation, and fails to explain the scientific analysis that led to his opinions.  There is also no indication that he considers alternative hypotheses or tests them.  Therefore, Dr. Urquiza's statements are generally speculations, rather than expert opinions.  Moreover, his speculations are frequently at odds with the available data.  The data in the UACs. RTC files shows that they made considerable progress while in the RTCs.  In particular, their GAF scores showed marked improvement.  Forensic evaluators are cherry picking data if they ignore such powerful facts.  If a forensic evaluator has an opinion that is contrary to key facts, the evaluator needs to note the discrepant facts and explain why, despite these facts, (s)he holds the opinion (s)he does.

151.     To not consider whether there are important differences between RTCs and other potential placements, and to assume that whatever applies to detention centers applies to RTCs, is not scientific analysis.

152.      Dr. Urquiza fails to report important information about the level of therapy
available in shelters, RTCs and the community.  RTCs are designed as intensive treatment
centers with 3 hours a week of individual and group therapy, staff continually receiving
training on relevant issues such as helping children who self-harm, are aggressive, and in
conflict de-escalation.  There are monthly reviews of progress toward treatment goals.
Children are seen far more frequently by a psychiatrist or nurse practitioner than they
would be in the community.  In the community, rather than three hours a week of group
and individual therapy there would be one session every one or two weeks.  The greater
staff patient ratio of RTCs provides more staff contact, support and safety than is available
in shelters, increasing the children's safety.  MercyFirst RTC has additional therapeutic
modalities including dog and art therapy helpful to traumatized youth.  While ORR shelters
have three hours of group and individual therapy a week, they do not have all of the
treatment modalities and supports for traumatized, acting out children found in RTCs.
There are also higher levels of educational requirements for key staff at RTCs compared
to shelters.  Dr. Urquiza should not have ignored this information.  If, despite this
information he maintains his position that the children are better off in shelters and the
community, he needs to explain why.  His failing to explain why suggests that he failed to
appreciate this important difference.  If indeed, he failed to realize or consider this
information, the scientific foundation of his opinion is greatly undermined.

153.      Dr. Urquiza strongly criticizes the treatment of the named plaintiffs, repeatedly
saying that UACs did not receive EBP, the therapy they received was essentially worthless,
and that if they had had EBP for trauma they would likely not have been stepped-up or
needed medication.   As discussed, his criticism is unjustified and is counter to current
scientific knowledge. In brief, when treating a real individual, both community practice
and best practice is to engage in integrative/eclectic therapy, drawing on the research on
evidence-based treatment to find and use techniques that are effective in working with that
particular individual.  Rigidly applying a therapy protocol used for research is not good
patient care.  My opinion is widely supported in the literature.  I cited, paraphrased and
quoted several publications, to support my position on this.  The materials I cited, and
whose ideas I presented, explain why integrative/eclectic therapy (drawing from research
on EBP to design a therapy to help a specific individual) is preferable to rigid adherence to
research protocols.

154.      In stark contrast, Dr. Urquiza simply announced that the therapists not only did not
use EBP, but that what they did was generally worthless.  He did not provide a scientific
explanation for his assertion that what they were doing was not helpful.  He did not present
literature saying that non evidence-based treatments have no value.  He did not present and
counter the powerful position in the scientific literature that integrative/eclectic therapy
was superior to rigid adherence to EBP protocols for clients with multiple issues.  He did
not even explain what he considers to be EBP and how what therapists did with UACs is
not EBP.  Instead, he simply announced that what the therapists did was not EBP and was
almost worthless.  His assertion on this matter is therefore a speculation or an opinion, but
it is not an "expert opinion".

155.      Rigid adherence to EBP protocols is very unlikely to work with the majority of
UACs in RTCs, for several reasons. Teenagers are often not interested in therapy and will
often not participate in protocol based therapy.  They will generally want to speak about

what is happening in their lives, and often avoid all discussion of feelings and stressful events. Teenagers are frequently resistant to therapy, in any form. Teenagers who have limited education, have not grown up in a culture in which psychotherapy is common, and have spent their lives trying to survive rather than discussing feelings are particularly unlikely to agree to follow a rigid therapy protocol. Supporting these statements, therapy notes often report UACs not being motivated to talk about issues, denying their issues and not wanting to speak about traumatic events.

156.     It is inappropriate to criticize a therapist for failing to conduct a certain EBP, if a client is not ready to speak about traumatic events and refuses to do so, or does not want to speak about issues. Moreover, more often than not, people who suffered █████████ ████████████████████ do not enter therapy for years.

157.     There are times when therapists are poor and fail to create an atmosphere conducive to motivating teenagers. However, one should not assume that the reason a child is not connecting in therapy is that the therapist is incompetent, or that the child is resentful about being in the RTC, as Dr. Urquiza speculated.

158.     Dr. Urquiza at times advocates for things and then criticizes ORR and therapists when they do what he advocates. Dr. Urquiza wrote about the importance of giving traumatized teenagers control of what happens to them to such a degree that he objects to taking ███████████ teenagers from shelters and moving them to RTCs. When it comes to what the teenagers wish to speak about in therapy however, rather than advocating for them being able to speak about what they wish to speak about and letting them avoid what they do not yet wish to speak about and would find very hard to speak about, Dr. Urquiza harshly criticizes therapists for allowing this to occur. Specifically, he harshly criticizes therapists if they do not follow EBP protocols.

159.     Dr. Urquiza's assertion that doing something other than EBPs is essentially useless is highly unusual. I have found no literature suggesting this. It also makes no sense. If, in fact, the only therapy that is helpful was rigidly following EBP protocols, then all therapy done prior to recent years would have been worthless. Dr. Urquiza claiming that what therapists did with UACs was essentially worthless, without providing any explanation other than that it was not evidence-based, shows a willingness to present opinions that are contrary to logic and contrary to what is generally believed by professionals. While one can take a position that is contrary to the mainstream, one needs to point that out, and one needs to provide a scientific explanation for why the mainstream belief is false. Dr. Urquiza did not point out that his opinion is not the mainstream opinion and did not explain the scientific basis for his opinion.

160.     Quickly jumping into discussing and processing traumatic events prior to the child developing adequate emotional regulation skills is outside of the standard of care. Rigidly following EBT protocols regardless of the child's specific issues, and ability to tolerate the pain of discussing past traumas is not within the acceptable standard of care.

161.     Dr. Urquiza's assertion that if the children had received appropriate EBP and processed their traumatic events they would likely not have needed to be stepped up and likely would not have needed medicine is false. A typical history for the plaintiffs is ███████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████  years before coming to the

US. The majority of parents of UACs in RTCs were not in the US, chose not to have the UAC live with them, or were unfit. These children are very unlikely to recover in a few weeks of EBP to the point they would be safe outside of a highly structured and supportive setting such as an RTC.  It takes far more than a few weeks of EBP, or any therapy, before the children are sufficiently stable to be safe outside of an RTC or hospital or staff secure placement.  If they jumped into attempting to process their traumatic experiences before learning emotional control and self-soothing techniques they are likely to deteriorate and become more dangerous to themselves than they had been.  Another problem with Dr. Urquiza's opinion, is that research clearly shows that moderate to severe depression should be treated with medication and CBT.  CBT alone is statistically no better than no treatment for moderate to severe depression in youths. To have failed to prescribe anti-depressant medication would have been outside of acceptable practice and current scientific knowledge.

162.      Dr. Urquiza repeatedly said youths should have spent less time in an RTC and gone to sponsors.  He fails to note that there often were not appropriate potential sponsors or that the potential sponsors or the child's family were slow in gathering crucial information.

163.      Dr. Urquiza fails to note that once a child left the RTC, instead of having three therapy sessions a week (group and individual combined), and the constant availability of staff who are experienced in working with troubled children, ████████████████████ ███████████████████████████████████████████████████████████████████████████ ██████, the child would have only one hour of therapy every one to two weeks.  This marked reduction in treatment intensity, before a child has sufficiently developed the psychological skills to be safe and has significantly resolved their trauma, would lead many to do poorly.  To send these children back to a shelters which are not as specifically designed as RTCs██ ███████████████████████████████████████████████████████████, or to send them to sponsors who are not mental health trained and to community mental health centers whose therapists may not be trauma trained and could only see the children once every week to two weeks, is not trauma informed decision making.

164.      Dr. Urquiza writes that "according to the National Child Traumatic Stress Network (Administered through the Substance Abuse and Mental Health Service Administration [SAMHSA]; see Attachment C for a description of Trauma- Informed Systems): A trauma-informed child and family service system is one in which all parties involved recognize and respond to the impact of traumatic stress on those who have contact with the system including children, caregivers, and service providers. Programs and agencies within such a system infuse and sustain trauma awareness, knowledge, and skills into their organizational cultures, practices, and policies.  They act in collaboration with all those who are involved with the child, using the best available science, to maximize physical and psychological safety, facilitate the recovery of the child and family, and support their ability to thrive."

165.      I was part of the National Child Traumatic Stress Network and, had a grant from SAMHSA after 9/11/01.  It is my opinion that the work at ORR supported RTCs is trauma focused.  At the time of 9/11 I was at St. Vincent's Hospital, the largest medical center near the World Trade Centers.  The NYTimes gave millions of dollars for training in the treatment of PTSD.  We had roughly 30 full days of training provided by the top experts

in the world in PTSD. Among the trainings provided were sessions by Cohen and Mannarino (who designed TF-CBT), and Marylene Cloitre (who designed the Skills Training in Affective and Interpersonal Regulation plus Modified Prolonged Exposure (STAIR/MPE) which seeks to treat emotion-regulation deficits, interpersonal difficulties and PTSD symptoms. It is important to note that Cloitre's trauma treatment includes both work on emotion regulation and interpersonal difficulties, as well as PTSD symptoms. I left the NCTSN when I was recruited by Mt. Sinai School of Medicine to teach what I had learned about trauma. Contrary to Dr. Urquiza's criticism of the therapists who treat the UACs, the experts in the treatment of adolescent trauma do not support quickly processing traumatic memories. Rather, they begin with emotional regulation skills, and with Marylene Cloitre's program, also seek to work on interpersonal difficulties. Before STAIR/MPE Cloitre advocated an extended period of Dialectical Behavior Therapy (DBT) to learn emotional regulation skills prior to processing traumatic experiences. My interviews of people at Shiloh and Mercy First, and my review of records indicates to me that staff recognized the importance of trauma in their lives, and therapy had a significant focus on treating their traumatic experiences. For example, evaluation records speak about the multiple traumas the UACs suffered over the years, and treatment plans were appropriate for their symptoms and for someone who had been traumatized. Specifically, teaching emotional regulation and coping skills is central to the early treatment of trauma. Avoiding high levels of discussions of trauma (which are likely to flood an individual), prior to achieving adequate levels of emotional regulation and coping skills, indicates lack knowledge of appropriate trauma treatment.

166.    Dr. Urquiza repeatedly criticizes therapists saying they did not engage in Evidence Based Psychotherapy. It is not clear on what he means by EBP[19] but he appears to see it as using the protocols that are used in research studies. This is neither standard care, nor optimal care, nor appropriate care, nor the general consensus in the literature.

167.    Sackett et al writes that Evidenced Based Treatment is "the conscientious, explicit and judicious use of current best evidence in making decisions about the care of individual patients. ... [It] means integrating individual clinical expertise with the best available external clinical evidence from systematic research." This branch of evidence-based medicine aims to make individual decision making more structured and objective by better reflecting the evidence from research. Population-based data are applied to the care of an individual patient, while respecting the fact that practitioners have clinical expertise reflected in effective and efficient diagnosis and thoughtful identification and compassionate use of individual patients' predicaments, rights, and preferences.

168.    In 1995 Rosenberg and Donald defined individual level evidence-based medicine as "the process of finding, appraising, and using contemporaneous research findings as the basis for medical decisions."

169.    When designing guidelines applied to large groups of people in settings where there is relatively little opportunity for modification by individual physicians, evidence-based

---

[19] People use a variety of terms when discussing evidence based psychotherapy (EBP). EBP is a subset of Evidence Based Treatment (EBT) which can refer to medical treatment as well as psychotherapy. The term Evidence Based Medicine (EBM) is also used. The term Evidence Based Therapy (also EBT) is sometimes used. For the purpose of this report there is no difference between EBP and EBT.

policymaking stresses that there should be good evidence to document a test's or treatment's effectiveness. In the setting of individual decision-making, practitioners can be given greater latitude in how they interpret research and combine it with their clinical judgment. In 2005, Eddy offered an umbrella definition for the two branches of EBM: "Evidence-based medicine is a set of principles and methods intended to ensure that to the greatest extent possible, medical decisions, guidelines, and other types of policies are based on and consistent with good evidence of effectiveness and benefit."

170.    Research produced by EBM, such as from randomized controlled trials (RCTs), may not be relevant for all treatment situations. Research tends to focus on specific populations, but individual persons can vary substantially from population norms. Since certain population segments have been historically under-researched (racial minorities and people with co-morbid diseases), evidence from RCTs may not be generalizable to those populations. Thus EBM applies to groups of people, but this should not preclude clinicians from using their personal experience in deciding how to treat each patient. One author advises that "the knowledge gained from clinical research does not directly answer the primary clinical question of what is best for the patient at hand" and suggests that evidence-based medicine should not discount the value of clinical experience. Another author stated that "the practice of evidence-based medicine means integrating individual clinical expertise with the best available external clinical evidence from systematic research."

171.    An example may help.  There is information on the relative effectiveness of procedures and medications for back pain with sciatica.  A physician who took a patient and did what was most effective, regardless of the details of the rest of the patient's life and condition would be committing malpractice.  Other information is needed to know what is going on, and what medicines and procedures could hurt a given patient.  For example, for most patients, one does not need to do an MRI, and treatment should be conservative with brief bedrest, use of non-steroidal anti-inflammatory agents, and physical therapy if it persists.  However, things become more complicated if the individual has persistent or serious neurological signs (weakness), if the person has been immunocompromised, is older, has had a cancer that could metastasize to the area.  Moreover, the choice of medication will depend on the individual's cardiovascular status and kidney function.  Moreover, exercise plans need to be tailored to various factors of the specific patient including what the patient can do and is willing to do.  Similarly, psychiatric treatment plans need to take into account many specific aspects of the individual.

172.    Dr. Urquiza's criticism of evaluations because they were based on interviews rather than psychological testing is not justified.  A psychiatrist or other well-trained experienced clinician is not required to use psychological testing. I have done numerous forensic psychiatric evaluations of people who had suffered emotional trauma.  My reports and testimony on this issue has always been accepted by courts as expert testimony.  These reports contained detailed discussions of the psychiatric harm the individuals suffered as a result of the traumatic events.  I have always been given expert status, although I frequently do no psychological testing and almost never use psychological tests focused on PTSD.  I have also repeatedly seen the serious weaknesses in relying on psychological tests rather than interviews.

173.     Keeping a child in a setting, or releasing a child to a setting in which the child does not have adequate structure and an adequate staff patient ratio to protect the child's physical and psychological safety, indicates a lack of trauma informed treatment.

174.     Psychiatrists and psychologists do things differently. Psychologists have extensive training in using psychological testing, whereas psychiatrists have extensive training in using interviews to gather the needed information. In comparison to the skills of a well-trained psychiatrist, psychological testing has serious weaknesses. It is simply not true that extensive psychological testing must be done to render treatment for PTSD. The information provided beyond what a well-trained psychiatrist obtains is generally of very limited use early in treatment. As treatment progresses more information will come out. There is a great deal that good interviews obtain that psychological testing does not. Interviews have therapeutic value, filling out psychological testing forms generally does not. The time and energy put into testing is best spent on doing good interviews.

175.     In doing forensic evaluations it is inherently biased to have double standards for how to interpret information that is not sufficiently detailed to be certain of the entire situation. For example, it is not appropriate to assume that a potential sponsor saying that (s)he will take good care of a child is adequate reason to entrust a child to his or her care. It is a double standard to then go to the opposite extreme and to assert that trauma-informed therapy was not done and/or that it was markedly inadequate, because the records are not highly detailed as to what was done. Analyzing data in this way is not the basis for an expert opinion. The opinions of even highly credentialed individuals are only expert opinions if the data was fairly presented and scientifically analyzed.

176.     Contrary to the statements of Dr. Urquiza that evaluations were unacceptable, they are as good or better than the majority of evaluations I have read.

177.     Broad ranging vague statements that the services provided were inappropriate and ineffective, without saying what should and could have been done, and how it differs from what actually was done, is not an expert opinion.

178.     Standard of care refers to what is generally considered by the professional community to be acceptable care. It is not appropriate for an "expert" to use one's personal preferences and beliefs about what is best as the baseline for what is acceptable, when the community standard is different and there is reasonable debate about what should be done. Moreover, one should note the reasonable differences of opinion that exist in the community and in the literature.

## II.     Rebuttal of Drs. Ryan Matlow and Nancy Ewen Wang

Executive Summary

Drs. Matlow and Wang claim that secure settings such as Residential Treatment Centers (RTCs) cause psychological harm and so children in the custody of the Office of Refugee Resettlement (ORR) should be kept in shelters rather than being stepped up to RTCs, and should be sent more rapidly to potential sponsors. Their paper is not a scientific or clinical assessment of the situation. The literature they cite to support their argument is based on populations and experiences that are drastically different than what UACs experience in the RTCs to which unaccompanied alien children (UACs) in ORR custody are sometimes placed. Specifically, they

cite research on infants in institutions, and children and adults in detention centers where they had little to do and were exposed to high levels of violence. UACs are stepped up from shelters to RTCs when they pose significant danger to themselves. Youths are less likely to engage in self harm in an RTC than in a shelter because of the high staff to youth ratio. Decreasing the incidence of self-harm not only spares the youth self-inflicted trauma, it also spares other minors in the facility exposure to violence. As noted by the literature cited by Drs. Matlow and Wang, witnessing violence is a key cause of harm to those in detention centers. The second key mechanism of harm in detention centers noted by the authors of the cited articles is extreme boredom. In RTCs youths have high far more education and recreation than occurs in detention centers.

Drs. Matlow and Wang claim children in ORR care deteriorate psychologically. However, detailed review of cases shows that they are doing much better at the end of their stays in RTCs than before they went to the RTCs.

Drs. Matlow and Wang fail to engage in clinical assessment. They fail to discuss the risks and benefits of the alternative options. They fail to note that the children need high levels of psychological care, which they get in the RTCs, and would almost certainly not receive in the community once they go to live with a sponsor. They have 3 hours of individual and group therapy, very frequent monitoring of medication if they are on medication and milieu therapy. In the community it is unlikely that youths would have more than an hour every one to two weeks. Drs. Matlow and Wang do not note or discuss the risk that potential sponsors might not provide adequate supervision and support. They do not note or discuss the harm to the UAC in question, and other children in ORR care, of being in a lower level of care in which there would be a greater likelihood of self-harm or assault on others. Their opinions lack what is required for an opinion to be an actual expert opinion, i.e., accurate presentation of the data, hypothesis testing, and appropriate use of the results of empirical research. Decisions on placement are almost always made by psychiatrists and require complex analysis of risks and benefits. Psychiatrists receive extensive training during their years in medicine learning clinical thinking skills, assessing the risks and benefits of the possible courses of action, and have extensive experience and supervision concerning the issue of committing and releasing people who present a danger to themselves and others. Drs. Matlow and Wang's paper suggests that they do not have expertise concerning this issue.

1. The majority of Drs. Matlow and Wang's report discusses the research on the impact of trauma on children, pointing out that it is very serious. I do not disagree that emotional trauma adversely affects children in multiple ways. Their long exegesis on this topic gives the report the patina of being scientific. While the exegesis is scientific, their analysis of the impact of placement in congregate care facilities and their opinion that such placement is traumatic is not scientific. The literature they cite (research about detention centers) is not relevant and they fail to cite the relevant literature on RTCs, which has found that RTCs are often helpful. The issue for the psychiatric and psychological experts in this case is what placement is most appropriate for the children in ORR custody, not whether trauma is harmful.

The research on the impact of trauma on the brain focuses on trauma that fulfills Diagnostic and Statistical Manual of Mental Disorder, Fifth Edition (DSM V) criteria for Post Traumatic Stress Disorder (PTSD). The criteria begin with the causal criteria: exposure to actual or threatened death, serious injury or sexual violence. There are then four types of

44

symptoms.  One must have at least one from the first two categories and two from the last two categories.  The four categories are: (B) intrusive distressing recollections of the event, (C) avoidance of traumatic reminders, (D) negative alterations in mood or cognition, and (E) trauma related changes in arousal and reactivity.[20]

2.  Being in ORR care is markedly different from, and does not come close to, the type of trauma referred to in most of the studies that Drs. Matlow and Wang cite.  Being seriously assaulted, suffering sexual violence, witnessing someone engage in serious self-harm or seriously harming someone else, being kidnapped, or losing a parent to violence, are all very different than being in ORR care.  It is not scientific to suggest that research studies on the impact of sexual violence, and accidents that risk or cause serious injury or death, apply to being in ORR care in a shelter or RTC which does not meet DSM V criteria for PTSD.  Assuming that being in an RTC causes harm similar to that of PTSD (which requires exposure to actual or threatened death, serious injury or sexual violation, and developing sufficient symptoms that fulfill the symptom requirements for PTSD) is not scientific and misleads the reader about key scientific knowledge.

3.  Plaintiff's experts also fail to tell the reader that of those who suffer events sufficient to cause PTSD, only 15% develop PTSD, and that of those who do develop PTSD, those who do not suffer sexual assault or permanent physical trauma, the majority recover in a matter of months.[21]

4.  There is a bigger error in Drs. Matlow and Wang's report.  The issue is not simply whether ORR care causes enduring significant harm to children, the issue is weighing the risks and benefits of care options for the children in ORR care.  Medical decision making entails complex assessments of the likelihood and severity of benefits and risks from the various possible courses of action.  Analogies may be helpful.  When someone has appendicitis,

---

[20]The "B" criteria, intrusive, distressing recollections (nightmares, intrusive thoughts about the event, dissociative reactions, and marked emotional distress or physiologic reaction when exposed to traumatic reminders) are the hallmark of PTSD. They result from a variety of processes, including unusual memory handling and storage caused by the intense emotions connected with the memory. Stimuli and thoughts associated with the traumatic event serve as traumatic triggers, bringing it into the forefront of the victim's mind, and leading the individual to experience intense emotional distress. When reminded of the event, the individual may feel as if he or she is reliving it rather than simply thinking about it.

The "C" criteria is avoidance of thoughts, feelings, or conversations associated with the event, and/or avoidance of people, places or activities that remind the person of the event.  This symptom is an attempt to avoid the pain that arises when memories of the event are triggered by associations.

The "D" criterion is 2 or more negative alterations in cognitions and mood associated with the traumatic event(s). Inability to remember an important aspect of the event is the result of dissociation blocking out parts of the memory. Negative beliefs about oneself or the world are the result of having an extremely negative experience that challenges more positive preexisting beliefs about oneself and the world. Victims sometimes experience inappropriate self-blame. Persistent negative emotions, inability to experience positive emotions, loss of interest in significant activities and detachment from others can also occur.  She cannot remember parts of the appointment in which she was abused, indicating dissociation.

The "E" criteria (trauma related changes in arousal and reactivity): consists of irritable behavior and angry outbursts, hyper-vigilance, sleep disturbance, increased startle reaction, and concentration problems, arise from a victim's fight flight mechanism being turned up to very high levels and staying at high levels. Reckless and self-destructive behavior can also occur.

[21] Galatzer-Levy IR, Ankri Y, Freedman S, Israeli-Shalev Y, Roitman P, et al. (2013) Early PTSD Symptom Trajectories: Persistence, Recovery, and Response to Treatment: Results from the Jerusalem Trauma Outreach and Prevention Study (J-TOPS). PLOS ONE 8(8):

the historic course of action is an appendectomy. The harm caused if the surgery goes well and the risk of something going seriously wrong, is small compared to the risk of an appendix bursting and causing peritonitis. Similarly, blood pressure medicines have side effects, but the likely benefit (decreased risk of premature death) is clearly worth the risk of the side effects of the medication. Moreover, committing a person to a psychiatric hospital against his or her will clearly has adverse impacts. However, for people who are at high risk of suicide or homicide, the risk benefit ratio is clearly on the side of commitment.

5. When discussing the appropriateness of various care options for UACs, Drs. Matlow and Wang ignore the reasons why children are placed in more restrictive congregate care facilities, including RTCs. Their report does not address the benefits of residential care and they do not discuss the risk of serious harm if children are not placed in a facility that can provide the level of care they need. The calculus they use, focusing solely on the possible negative impacts of congregate care, ignoring where the children would be and what might happen if they are not in an appropriate placement, is equivalent to a forensic expert writing a report accusing all surgeons and internists of malpractice for performing surgery (since cutting people clearly causes some harm) and prescribing medication (since essentially all medications can have negative side effects) regardless of the reasons for the surgery or prescription of medication.

6. Without adequate evaluation of potential sponsors, some children might be sent to homes in which they will be abused, neglected, or even trafficked. Without a sponsor who has sufficient knowledge, energy, and time to adequately supervise and support the minor, some will cut, and some will attempt suicide. Without a sponsor who can afford the costs of therapy and medication, and who understands the importance and is committed to getting the child to therapy, the children with serious mental health issues will often suffer relapse or deterioration. Sponsors who are not able to handle a child with serious mental health issues and respond with anger to a child's behavior would be very harmful. Being abused and engaging in self-harm are traumatic to children.

7. Not placing a child in an RTC when he or she needs a higher level of care to treat serious mental health symptoms and avoid harm to self or others is contrary to good medical judgment. Keeping a child who is at high risk for self-harm or harm to others in a shelter, rather than an RTC, increases the risk of self-harm and harm to others by assault. Moreover, other children in the shelter have a right to be kept safe from assault and from witnessing violence by an out of control child. Keeping the other children safe from traumatic experiences is also important.

8. While being in a secure setting, such as an RTC, may be more difficult in some ways for a minor than being in a shelter, it is often necessary for the safety of the minor and safety of others. Drs. Matlow and Wang systematically ignore the dangers of failing to have children in an adequately secure setting and of release to less secure settings.

9. Drs. Matlow and Wang also make serious errors of scientific analysis. They conflate causation and correlation. They assert that children who spent more time at RTCs had greater problems. It would be surprising if this was not a general finding, since those with greater problems are going to need a greater period of stabilizing and intensive treatment. Moreover, children who do not have a sponsor who is able to ensure their emotional and

physical well-being will tend to both spend more time in congregate care and to have greater anxiety about where they will eventually be staying.

10. To do a reliable forensic evaluation of whether youths should be placed in RTCs, and whether they should be released to lower levels of care or families sooner, one needs to assess the costs, risks and benefits of the alternative options.  In addition, one needs to look to see if in general, and specifically what types of children, improve or deteriorate in RTCs and in other levels of congregate care.

11. Drs. Matlow and Wang have presented a hypothesis: Children would be better off if they spent less time in RTCs and other types of congregate care.  There are alternative hypotheses that are also viable: If children spent less time in RTCs and other congregate care and were sent to live with sponsors without the current level of due diligence, (1) a number would likely wind up suffering from being placed with sponsors who cannot provide the care they need or might harm them, (2) some would likely not progress as fast in therapy in the community as they do in RTCs and other congregate care settings since they would have much less therapy, and (3) some would likely harm themselves and others at higher rates since they would have less adult supervision.

12. As discussed, children in ORR care receive significant therapy services which are superior for children who self-harm or are aggressive to the services of shelters or the community.

13. Research has shown that children in RTCs generally benefit from the experience.[22]

14. I reviewed 23 ORR cases for children who were placed in RTCs at some point while they were in ORR care.  In every instance when a potential sponsor was not accepted, it was the proper decision to not accept the potential sponsor.  I have considerable experience doing custody evaluations and have on numerous occasions been declared an expert for the purpose of advising a court on the benefits and risks of the parents' households, and whether a parent was fit to take care of a child.  I have also been an expert on cases in which protective services removed children from a parent's care and there were questions about whether the children should be returned to the home.

15. I have expertise and considerable experience with the issue of when it is appropriate to commit someone to the hospital and when people were safe being in the community.  As a psychiatrist, I have evaluated over a thousand individuals for admission or commitment to a psychiatric hospital.  I have also been asked by courts to be a neutral evaluator of whether someone could leave the hospital when the doctors wanted them to stay and testified in over a hundred cases about whether someone needed to be retained in the hospital or could be released.   Decisions on commitment and retention are almost always made by psychiatrists, not by psychologists.  Drs. Matlow and Wang's report shows a lack of crucial clinical analysis of the issue.

16. Drs. Matlow and Wang begin by saying that "some ORR placement settings do not provide a trauma-sensitive environment that is appropriate for children with trauma histories and disabilities stemming from prolonged exposure to toxic stress (as defined below). As a result, placement in ORR custody, in many cases, exacerbates psychological stress resulting in further decline that is likely to continue beyond a child's stay in ORR custody." This is a vague statement for which they do not provide a reasonable basis. They have not

---

[22] https://www.ojjdp.gov/mpg/litreviews/Residential_Treatment_Centers.pdf.

provided data or explanations of their opinion that provide reasonable support for a conclusion that ORR placements do not provide trauma-sensitive environments.  Review of records shows that ORR staff gathers data about traumatic experiences and therapists teach coping skills the children need to tolerate the psychological distress they feel, and also help youths process their traumatic experiences.  Drs. Matlow and Wang did not demonstrate that placement in ORR custody exacerbates the stress of UACs (compared to other options) or that it leads to psychological decline, or that the decline is likely to continue beyond the children's time in ORR custody.  The articles they cite both fail to support and even contradict their assertions.

17. Drs. Matlow and Wang further claim, "Detention in and of itself constitutes a traumatic stress and toxic stress exposure and therefore puts children at increased risk of suffering various health and psychological harms. These harms only increase when detention is prolonged or occurs in a restrictive environment."   Detention centers are very different than RTCs.  Being placed in a shelter or RTC with education, medical and psychological care, and relative safety from abuse, after years of physical and sexual abuse, neglect, lack of education, constant fear of assault, would not be expected to cause toxic stress, much less traumatic stress.  Detailed review of 23 cases of children who spent time in an ORR RTC showed that, in general, their psychological condition greatly improved.

18. Drs. Matlow and Wang claim, "Without appropriate accommodations, such as realistic behavioral goals and treatment goals that account for a child's trauma history, and consideration of their trauma history, children are likely to be stepped-up to more restrictive facilities because of behavioral difficulties that are symptoms of their psychological distress and pre-existing disability (e.g., depression, anxiety, PTSD). Placement in restrictive residential or rehabilitative settings while in ORR custody is contraindicated for addressing children's disabilities related to trauma exposure, traumatic distress, and corresponding functional impairments. Moreover, secure facilities and other restrictive care settings are associated with deterioration in psychological functioning over time therefore children in ORR custody who are placed in these restrictive care settings often experience worsening psychological symptoms."  Drs. Matlow and Wang are wrong for multiple reasons.

19. The authors' opinion is contrary to medical practice and contrary to the articles they present to support their argument. A child at home or in a classroom should be given extra tolerance for problematic behavior arising from trauma, and not be punished for things one might punish other children.  However, going to a higher level of care is not punishment.  It is for security and intensified treatment.  If a child is cutting or at risk of suicide or assault, the child needs to be protected from himself or herself.  Moreover, other children need protection from exposure to violence.  All children who are acting out, whether because of having experienced trauma, or because of predominantly biologically-based psychiatric issues such as bipolar disorder, should be in facilities that are sufficiently secure to protect them and those around them.  In my decades of practice in psychiatry, I have not heard a colleague say that someone who presented a substantial risk of harm to themselves or others should not be placed in a secure facility because their problems arise from trauma, as opposed to some other reason.

20. In addition, the articles that Drs. Matlow and Wang present to support their work do not support their argument.  The articles they cite assert that infants in institutional settings and

48

children in detention centers or prisons who have little to do leading to great boredom and who witness high levels of violence, suffer decline.  Research on infants in orphanages doing poorly as a result of inadequate attention is not relevant to teenagers in RTCs who get more attention than they would in shelters.  RTCs are drastically different than the detention centers discussed in the articles that Drs. Matlow and Wang cite. RTCs are for treatment.  They are not prisons filled with violence and nothing to do leading to extreme boredom.  The children in RTCs have a great deal of education and other activities.

21. In addition, all children in ORR custody are safer under a policy in which children who are at significant risk of harm to themselves and others are placed in a facility with a level of security where the risk of harm is adequately controlled.

22. Drs. Matlow and Wang's assertion that "children in ORR custody who are placed in these restrictive care settings often experience worsening psychological symptoms" and "ORR's release requirements that depend upon demonstration of emotional, psychological, or behavior stability are contradictory because the facility setting itself is often the source of the child's distress."  Drs. Matlow and Wang's statements are contrary to the available data.  My detailed review of these 22 cases of children placed in RTCs demonstrated that the children who were sent to RTCs considerably improved during their time in the RTCs. Plaintiffs repeatedly claimed children were stressed by the placement or being kept from relatives when the statements in their charts often noted other causes for their distress such as missing people in their country of origin (COO) and fear for the safety of their family in their COO, or upset over being confronted about rule breaking, or memories of traumatic events in their COO.

23. Statements by the children that their stress is from being in the placement require analysis, rather than being unequivocally accepted.  I frequently need to assess the meaning of statements made to others, and to myself, when doing abuse allegations and custody evaluations.  Leading and suggestive questions by detectives, parents and others can lead children to say all sorts of things and provide all sorts of quotes that do not actually reflect what they actually think and feel.  In abuse cases, leading and suggestive questions not only invalidate the child's statements, but can so corrupt the child's thinking that statements in future interviews, done correctly, need to be questioned.  The minors' alleged statements in this case are particularly suspect, because they contain wording and words that are far more sophisticated than are likely to come from teenagers who have limited English ability, and often have very similar wording.  If I had seen the statements from a parent and child in a case I would state there was a high likelihood they had coordinated answers.  One needs to know how questions were asked and what was spontaneously said.

24. For example, in ¶ 4 of her Declaration C.M.V.C. states, "Two days before I was transferred to Shiloh, the shelter staff told me that I would be leaving the shelter and going to a new place, where I would receive help with my depression and anxiety. Once I was at Shiloh for a while, I realized that I would not receive the help that I needed here."  (Drs. Matlow & Wang at 13).  We do not know if she spontaneously said this, or if she said that after being asked how she felt about going and how she felt after being there for awhile, or if she was asked something like "After you were at Shiloh did you feel that they were not helpful?" In addition, it is critical to know why she felt she would not be receiving the help she felt she needed.  Is she speaking about the help she needed for her depression or for her

immigration case?  Perhaps she did not connect with her specific therapist?  Perhaps she does not believe in psychotropic medication.

25. One has to be careful of the tendency of people having emotional distress to seek "geographic cures."  People often believe that their current situation is the cause of all of their distress and that going elsewhere will somehow lead them to do much better.  If the reason for distress is not where they are, and they attempt to fix things by going elsewhere, they are likely to suffer significantly greater symptoms when they go to a new environment and find that it does not solve their problems.

26. Medical and psychiatric treatment often causes some distress, whether it is doing painful exercises necessary after surgery, or talking about painful events, or looking at self-destructive behavior and personality traits, or needing to go to meetings to talk about issues rather than being outdoors playing.  Even if the facility causes some of the distress, sending a child out to a facility or potential sponsor who cannot adequately ensure the minor's safety is medically inappropriate, since the risk of harm is greater than the benefit.[23]

27. A prominent complaint in the UACs' alleged statements reported by their lawyers is that their therapist at shelters were more helpful than the therapist at Shiloh.  This does not mean that children should, in general, be kept at the shelter.  It means that the children were not comfortable with the therapist at Shiloh. It is possible that these UACs happened to have an unusually great therapist at their shelters.  This is not a reason to, in general, keep children in shelters.  It is possible the therapist at the RTC is poor.  The solution is to change that particular therapist.  It is possible that the RTC therapist confronted the UAC about self-destructive behavior or other issues that were difficult to speak about, while the shelter therapist ignored these issues, and supported the UAC blaming others for all problems.  The real issue is not which therapist the youth was more comfortable with or found more pleasant to speak with.  The real issue is who was, in fact, more helpful.  To assess this one needs to look at the level of improvement in the shelter and in the RTC.

28. Drs. Matlow and Wang claim, "Children in ORR custody have frequently already had traumatic and toxic stress exposure and in our opinion, they are likely to experience additional traumatic and toxic stress while detained."  I disagree.  The detention center literature they repeatedly cite states that extreme boredom, exposure to violence, and fear of being sent back to their home countries are the key stresses.  These stresses are not descriptive of RTCs.  Children are less likely to suffer these issues in an RTC than in a shelter or sponsor's home.  They are more likely to suffer traumatic events and high levels of stress if in a placement that cannot adequately meet their needs for support and structure, either lower levels of care or release to potential sponsors who may harm them, may not be able to protect them from self-harm, or cannot ensure that their mental health needs are met in the community.

29. Drs. Matlow and Wang assert, "As explained in detail below, our personal interviews as well as the sworn declarations provided by children in ORR custody reveal that many of these children experience factors associated with an increased likelihood of trauma while in ORR custody. Specifically, many of the children expressed their limited sense of control or personal agency, lack of knowledge as to what would happen to them, a lack of

---

[23] One could also not connect with one's particular therapist.  This does not mean that the therapist is poor.  And, even if the therapist is poor, it does not mean that the entire program should be closed.

predictability regarding their day and treatment, and feelings of fear and helplessness. These perceptions of fear, lack of agency, and lack of information influence the biological stress response, related psychological reactions, and subsequent psychiatric symptomatology (Ford et al., 2015; SAMHSA, 2014)."

30. Throughout their paper, Drs. Matlow and Wang's assertions demonstrate a failure to engage in clinical assessment.[24] They fail to discuss the risks and benefits of the alternative options, and whether the specific mechanisms of harm that they worry about are more or less likely in alternative placements. The lack of predictability of their day and treatment would, in all likelihood, be worse outside of an RTC or other structured congregate care settings. Concerning lack of control of their situation, children do not make choices for themselves as to where they will be. Whether living with parents or other caretakers, or in a shelter, children are told where they can and cannot go, and with whom they can and cannot associate. Children who are under poor control will wind up being punished in school and by parents. The fear of punishment and the reality of punishment does far more damage to one's sense of control than being in a highly structured environment. Staff are likely to be more patient than sponsors who may not expect or understand the children's mental health issues and who do not have the backup that staff in an RTC or other congregate care settings have. Concerning lack of knowledge as to what will happen, this will be no greater in an RTC than in a shelter, and depends upon the family being able to find appropriate sponsors.[25]

---

[24] The training of psychiatrists and psychologists is rather different. Central to medical training is to consider the risks and benefits of any intervention. Every time we give a medication, decide to hospitalize, and decide to release from the hospital, we are obligated to give serious consideration of the risks and benefits of each reasonable possibility. I had extensive experience under supervision when I was a resident in psychiatry at Yale. I have had over a thousand occasions when I have had to opine on whether someone should or should not be committed and/or released from commitment. I have been an expert in cases in which people were not committed and went home and killed themselves or others, and also repeatedly opined that contrary to the views of the doctors on the psychiatric ward, a patient should not be forced to remain in the hospital. I have been appointed by courts to be the neutral expert in retention cases and repeatedly been awarded expert status to opine on these issues. I have supervised residents concerning these issues and supervised fully trained psychiatrists concerning these issues when I was acting medical director of a state hospital. I am not aware of psychologists regularly needing to make the final decision on where a patient should be, knowing that there would be risk of harm no matter what the choice.

[25] See, e.g., C.J.A.L. Decl. at ¶ 7 (Drs. Matlow & Wang, page 13) ("After spending roughly six months in Casa Franklin, I started becoming very depressed and frustrated with how long I had already been in ORR custody. When I was at Casa Franklin, my dad had informed me that he was no longer going to be my sponsor, and once I heard that, I became incredibly upset…As a result, I was admitted to a psychiatric hospital. My case manager and counselor at Casa Franklin and the doctor at the hospital all explained that I needed to go to an RTC…I did not want to go to the RTC, but I had no chance to appeal or disagree with the decision.") A clinical note from C.J.A.L's therapist at Casa Franklin stated that he "continues to struggle with his emotional well-being from the lack of support from his family [including recent rejection by mother and father], which UC believes is the cause of his continuous instability and defiant behavior, as per PEAK Behavioral Health hospital. Ultimately, UC's regular severe crises in the program is a reflection of his unstable mental well-being and is evidence that this program is not equipped to provide him with the level of mental health services that he needs at this time." (GOV-00241049). The transfer recommendation states that CJAL "has been diagnosed with Major Depressive Disorder and requires ongoing and intense therapy that can no longer be provided in an outpatient setting. As per PEAK's psychiatrist . . . and their clinical team, [CJAL] has been determined to be a danger to himself. [CJAL] has not demonstrated progress in current acute setting, requires therapeutic-based intensive supervision as he has had several suicide ideations and history of suicide attempts that intervene with his daily functioning and participation in daily activities, has been provided with various short-term clinical interventions such as three hospitalizations to mental health hospitals, mental health medication regimen, intensive counseling and therapeutic services, and constant

31. Drs. Matlow and Wang claim, "It is clear from our 2018 and 2019 interviews of children in ORR custody, the sworn declarations of children in ORR custody and our review of ORR case files, that children in ORR custody similarly suffer from parental separation, physical and emotional neglect, and experiences of physical and sexual abuse either before or during their time in ORR custody."  Drs. Matlow and Wang produced no credible evidence of abuse or neglect of children in ORR custody.  The very rare allegations they presented were not credible.  Physical, emotional and sexual abuse occurred before the children came to the US.  ORR made appropriate protective decisions to not send children to potential sponsors who posed a risk of emotional or physical abuse or neglect.  Placing children in more secure settings decreases the risk of self-harm and suicide, and thereby reduces the risk of further trauma.  Moreover, stepping-up children who are dangerous to themselves and others, decreases the risk of other children being exposed to violence and spares them further trauma.  Concerning parental separation, few of the children in the 23 cases I reviewed were kept from parents.  When they were, the parents were markedly inappropriate caretakers and the children generally did not want to be with them.  If they were suffering from parental separation or separation from their primary caretakers, one can wonder why Plaintiffs' lawyers are not working to send them back to their home countries.  Lawyers fighting to keep them in the US was repeatedly the cause of separation from historic caretakers, not ORR actions.  If Drs. Matlow and Wang are not aware of the information I present in this paragraph then they do not understand the situation about which they are opining.  If they are aware of this information and, nevertheless, use it to support their argument, they are not engaging in scientific analysis.

32. Drs. Matlow and Wang assert, "Over the course of these visits we interviewed approximately 30 children and we frequently observed the signs and symptoms of anxiety, depression, and PTSD that are consistent with prior research on mental health outcomes of immigration detention. In many cases, these symptoms were directly related to children's experiences in detention.  In our interviews, children demonstrated anxiety symptoms (including worry, agitation, difficulty relaxing, nervousness) related to concerns and uncertainty about their own personal well-being, or that of a loved one. They reported feeling overwhelmed by their circumstances (which included limited access to support resources) that results in emotion dysregulation corresponding with behavioral impulsivity and, in some cases, self-harming behaviors."

33. There are serious problems with the foundation of their opinion.  First, correlation does not prove causation.  The UACs who went to RTCs generally suffered very high levels of trauma before they came to the US.  The children generally had high levels of anxiety, depression and PTSD before the came into ORR care.  The authors do not mention this.  They then write that the symptoms were directly related to their experiences in detention.  This assertion does not meet the requirements for an opinion to be an expert opinion.  Not all opinions by experts are expert opinions.  Opinions are expert opinions when an expert uses scientific methods to analyze data.  This includes appropriate use of empirical research, avoidance of logical fallacies (such as the fallacy that correlation indicates

modification to his level of supervision. Current placement is no longer capable to provide the appropriate services to meet UC's current mental health needs as all efforts have been unsuccessful as UC continues demonstrating high-risk concerning behavior." (GOV-00241053).  CJAL signed acknowledgement (in Spanish and English) of Notice of Placement at Mercy First RTC (GOV-00234061-64).

causation), fair presentation of the data, hypothesis generation, often search for additional data, and hypothesis testing. Moreover, experts are generally required to explain the scientific thinking that was the basis for their opinion. They do not provide an adequate scientific basis for the statement "these symptoms were directly related to children's experiences in detention." The statement "children demonstrated anxiety symptoms (including worry, agitation, difficulty relaxing, nervousness) related to concerns and uncertainty about their own personal well-being, or that of a loved one" does not prove that detention was the cause of their symptoms. Concerns about the welfare of a loved one was not the result of the UAC being in detention. Moreover, "concerns and uncertainty about their own personal well-being" is also not necessarily the result of being in an RTC. In fact, it is likely that other issues are predominant. For example, children who suffered the level of trauma these children did are likely to be concerned about their personal well-being wherever they go. Second, some were concerned about the possibility of deportation. Third, it seems likely that there would be concerns about what life would be like outside of the RTC living with relatives they often did not know very well, sometimes having people they did not know in the house, not knowing the children in the school they would go to, having limited English and knowing that would cause problems, integrating into a new culture and society, etc.

34. An analogy may help. A child who had been bullied the prior year at camp who is going off to camp, or changing schools is likely to be concerned about their personal well-being in the new school or camp. Drs. Wang and Matlow's methods of analysis would blame their home for their anxiety and would lead to a recommendation that they be taken from their home as soon as possible.

35. It is not adequate in a forensic report to simply claim that they believe symptoms were related to certain experiences, when there are other possibilities. They need to explain the analysis that leads them to assert that it was being in congregate care, rather than the trauma they sustained in their home countries, and not knowing if a suitable sponsor would be found, that is causing their symptoms. My analysis of the data, provided in Addendum 4 and 5 of my expert report, comes to the opposite conclusion. Moreover, as noted, immigrant detention experiences are drastically different than being in an RTC. The children's concerns about family in their home country will not disappear if they are in lower levels of care. Concerns about their own well-being may well be greater in lower levels of care. Their risk of harm would be greater in lower levels of care. Moreover, the children came to RTCs because they already had serious emotional and behavioral issues, generally for years. That the issues did not disappear when they entered the RTC or shelter does not mean the RTC or shelter caused it. Drs. Matlow and Wang write that one of the problems was limited access to support resources. As I say above, the level of support services in an RTC is much greater than the patient will have in the community. Drs. Matlow and Wang's arguments support RTC treatment.

36. Drs. Matlow and Wang assert, "We frequently observed that increased length of time in ORR custody was associated with increased severity of depressive symptoms marked by desperation, hopelessness, and helplessness. As children experience prolonged delays in release (and, in many cases, family reunification)." Correlation does not prove causation. Frequently, correlation only means that two things have the same cause. Children with more severe mental health issues would be expected to stay in care longer. The level of

emotional difficulties leads both to longer stays and to higher levels of problems being observed. The issues are correlated. Moreover, delay in finding an appropriate sponsor, or lack of an appropriate sponsor, is likely to lead to greater stress, but it is not the fault of ORR. Finally, my review of 23 cases showed that children in ORR care with serious mental health needs improved over time. Drs. Matlow and Wang's claim that time in congregate care led to deterioration is contrary to the data. Drs. Matlow and Wang go on, apparently giving examples found in the children's Declarations, to state that anxiety symptoms related to concerns and uncertainty about their own personal well-being, or that of a loved one. The children's fears about loved ones, clearly a serious issue, was for relatives in their home country subject to gangs, abuse, and food shortages. Their fears about loved ones is not the result of being in an RTC and would not be reduced by them leaving the RTC or other congregate care. Uncertainty about their own personal well-being, is likely to be about what life will be like outside of ORR care as well as when they will leave. Some children were worried about immigration issues. And, once in the community, this fear is likely to continue as they try to acclimate to a less structured and less supportive environment.

37. Drs. Matlow and Wang claim, "Immigration detention has been associated with elevated rates and severity of anxiety, depression, and PTSD in adults, adolescents, and children (for review of research, see MacLean et al., 2019; Keller et al., 2003; von Werthern et al., 2018[26]; Robjant, Hassan, & Katona, 2009[27]).…. Children in immigration detention are also at risk of exposure to additional trauma including abuse and threat from facility staff, physical and sexual violence from other detainees, social isolation, and family separation and loss (von Werthern et al., 2018; Linton et al., 2017). It is our professional opinion that these experiences of trauma while detained, coupled with prior experiences of pre- and peri-migration traumas, combine to have a cumulative and lasting impact on psychological functioning."

38. Drs. Matlow and Wang's applying empirical research from prison like detention centers to intensive psychiatric treatment centers is not scientific. Prison like detention centers and RTCs are markedly different. The articles they cite say more than that people deteriorate in detention centers. Robjant and von Werthern assert that extreme boredom and witnessing violence are the key mechanisms of harm. RTCs provide high levels of education and therapy as well as recreational opportunities. If children at risk for self-harm and violence to others are in kept in shelters, rather than transferred to more secure settings, they and all children in shelters would be at increased risk for witnessing or otherwise experiencing violence. The children would also be at increased risk for experiencing a traumatic event in the community either because of their own actions or someone victimizing them in a setting with far less adult supervision than exists in an RTC.

39. The actual mechanisms of harm that cause problems for those in detention centers are less of a problem in RTCs than in other options. It is surprising that Drs. Matlow and Wang

---

[26] von Werthern, M., Robjant, K., Chui, Z. *et al.* The impact of immigration detention on mental health: a systematic review. *BMC Psychiatry* **18,** 382 (2018).

[27] Katy Robjant, Rita Hassan and Cornelius Katona (2009) Mental health implications of detaining asylum seekers: systematic review. *The British Journal of Psychiatry* 194, 306–312.

fail to note this, and simply try to generalize from detention centers to RTCs which are markedly different.

40. In addition, there is literature about RTCs and statements by professional organizations which is relevant.  Drs. Matlow and Wang do not mention this literature.  The literature asserts that RTCs are generally helpful, not harmful.[28]  Bettmann and Jasperson (2009)[29] conducted a review of the outcome literature on adolescent residential treatment programs, including RTCs. Examining 13 studies they found to fit their review criteria, they concluded that "the outcome literature of adolescent residential and inpatient treatment indicates that these therapeutic settings are successful interventions for many clients" (2009, 174). Moreover, the American Academy of Child and Adolescent Psychiatry (AACAP)'s position is that AACAP states, "Residential treatment can help children and adolescents whose health is at risk while living in their community. For example, the programs are helpful for those who have not responded to outpatient treatments, who have education needs that cannot be met in less restrictive settings at their local schools, or who are in need of further intensive treatment following inpatient psychiatric care."

41. Applying empirical research from one setting to a second setting that does not apply, failing to mention that the mechanism of harm the research found in the first setting does not exist in the second setting, and failing to present empirical research about the specific type of setting you are opining on that shows the opposite of what you are saying destroys the scientific foundation of the opinion.

42. Drs. Matlow and Wang state, "Detaining children in restrictive environments is exceedingly harmful to their physical and mental health (Sege et al., 2017; Barnert, 2016). A well-established body of research has demonstrated that detaining children in restrictive environments interferes with healthy development, exacerbates pre-existing trauma, puts children at greater risk of self-harm, and exposes children to abuse (Holman & Ziedenberg, 2006). In a 2013 report, the National Academy of Sciences presented the myriad ways in which incarceration disrupts healthy development for adolescents (National Research Council) . . . . Furthermore, many restrictive care settings operate as juvenile detention facilities that are not designed for rehabilitation and treatment; therefore, there is a lack of services and treatments to adequately address children's psychological distress and trauma. Thus, psychological symptoms continue untreated and, in many cases, worsen."  Once again, generalizing across very different populations and very different types of detention is not scientific.

43. Other articles they cite are not relevant to their argument.  Sege is about children up to age 6.  Holman and Zeidenberg (2006) is about detention.  The article states "Detention: A form of locked custody of youth pre-trial who are arrested— juvenile detention centers are the juvenile justice system's version of 'jail.'" This is not relevant to RTCs.  Barnert is about incarceration not about treatment centers. Moreover, Barnert notes that there may be correlation but no causal connection between being in a detention center and having psychiatric issues since those with mental problems are more likely to be incarcerated. They say it is "plausible" incarceration contributes to health problems.  Among the causal

[28] https://www.ojjdp.gov/mpg/litreviews/Residential_Treatment_Centers.pdf
[29] Bettmann, J. E., & Jasperson, R. A. (2009). Adolescents in residential and inpatient treatment: A review of the outcome literature. Child & Youth Care Forum, 38(4), 161–183.

mechanisms for detention centers causing harm, they note sexual and physical trauma. As noted, sexual and physical trauma are less likely to occur if children under poor control are in higher levels of care. They add that it is likely that confinement adversely affects health. It is important to remember that incarceration of a minor takes the child from his family, school, and causes embarrassment. UACs are not taken from their family, school and friends, they choose to come to the US, and their family and friends are generally not here. Children in RTCs are not kept in cells. They live in rooms with ongoing access to peers, TV, recreation, support and therapy.

44. Drs. Matlow and Wang state, "While this research has not been specifically conducted in ORR facilities, the broad consensus around the harms of detaining immigrant children against their will in locked and restricted facilities justifies extrapolation of findings to the ORR context." Their deduction is not scientific. While there may be a broad consensus that placing children in prison like detention centers with adults is harmful, there is no broad consensus that RTCs are harmful. Drs. Wang and Matlow are making an error of logic. Specifically, if placement A is markedly different than placement B, it does not matter whether the consensus about placement A is broad or narrow. One cannot say that research about A tells us anything about B. One cannot generalize across markedly different situations.

45. They go on to write that "[t]he data indicates that things do not 'get better with time' for children in immigration detention; rather than experiencing positive or healthy adjustment to detention, children's adaptations are associated with psychological deterioration and increased symptom severity (Mares, 2016; von Werthern et al., 2018; Robjant et al., 2009)." In our observations and interviews in ORR facilities (Southwest Key Casa Padre (Brownsville, Texas), BCFS Tornillo Influx Facility (El Paso, Texas), and Homestead Influx Facility (Homestead, Florida), children with longer lengths of stay had the most concerning psychological presentations."

46. There are serious problems with this opinion. First, Drs. Matlow and Wang do not present even illustrative data. Second, they say that their observations and interviews support their opinions, but they do not say how many times they saw each child, over what length of time they observed and interviewed each child, and how much time they spent with each child each time. Without this information it is not possible for the reader to know if they have a valid basis for rendering opinions. Third, they do not mention reviewing the UACs' charts or how long was the expanse of time. This is crucial information for the reader. Third, they do not discuss what the charts show. Ignoring crucially important data is not scientific. Fourth, the charts show that the children generally had substantial improvement. Most of the 23 files I reviewed provided GAF scores (Global Assessment of Functioning) scores for the children. The scores always improved over time. This is important data. Drs. Matlow and Wang may disagree with these scores. It is appropriate for experts to note the scores and then explain why they disagree with them. Experts are not supposed to simply ignore significant material that disagrees with their statements. Ignoring significant material is cherry picking. In addition, my review of charts shows that children, in fact, were doing much better.

47. Drs. Matlow and Wang note, "Testimony and reporting from HHS's OIG Report (2019) and the ORR Northern California Federal Field Specialist, as well as the ORR files for individual children, confirm that placement and detention in secure facilities is associated

with deterioration in psychological functioning over time." They further note, "Our findings are corroborated by the report from the U.S. Office of Inspector General (2019), which states that 'some children [in ORR custody] who did not initially exhibit mental health or behavioral issues began reacting negatively as their stays grew longer . . longer stays resulted in higher levels of defiance, hopelessness, and frustration among children, along with more instances of self-harm and suicidal ideation' (p. 12). Mental health clinicians 'described that a child's mental health often deteriorates as the length of their stay in ORR custody increases' (Office of Inspector General [OIG], 2019, p. 20)."

48. These statements do not support plaintiffs' arguments or the report of Drs. Matlow and Wang. As noted, one cannot generalize from prison like settings to RTCs or from highly secure settings to facilities that are designed for treatment. Research on RTCs indicates they are helpful and the position of the American Academy of Child and Adolescent Psychiatry is that they can be helpful. An additional problem with Drs. Matlow and Wang using this to support their argument is that the questions asked and the answers given are not the basis for an expert opinion. Experts need to use good data. The speculation of one or more staff members is not the basis for an expert opinion. The speculation of a staff member cannot scientifically be turned into an expert opinion by having an expert repeat it. Moreover, without interviewing the staff members one cannot know what the staff member actually thinks. Perhaps the staff member(s) simply means that some youths went downhill in custody. Perhaps the staff member assumed the child went downhill because he or she was in custody. One needs an expert to take a close look at the situation to assess what is happening. The observation was that some children became frustrated and began acting out. This is not an uncommon experience in children's lives. It does not support the conclusion by Drs. Matlow and Wang that the children suffer enduring psychological damage. An additional problem is that over time, in any setting, one expects some youths to be doing better and some worse, as a result of random changes in functioning. It is not scientific to say there were some who did worse and so it is harmful. One also needs to look at how many did worse and how many did better. An additional issue is that even if, on the whole, detention had an adverse impact, it does not mean that one should cease using the placements. One needs to engage in clinical analysis and consider the relative risks, costs and benefits of keeping a child in the placement longer versus sending the child to potential sponsors without adequate vetting, which would likely lead to some being neglected, mistreated and possibly abused. Moreover, stepping-down runs a risk of the youth engaging in self-harm and suffering greater damage, and harming other youths.

49. The data from OIG is not a scientific analysis. It points to the need for a scientific analysis. There is a basis for a scientific analysis. My review of 22 cases of children in RTCs, and in particular the named cases, shows that in RTCs children improved greatly. Moreover, studies of RTCs, noted above, have generally shown they are beneficial.

50. Drs. Matlow and Wang state, "While release from detention has been shown to correspond with some relative alleviation in psychological distress, the psychological consequences of detention are clearly demonstrated to endure post-release, and may result in long-term impact (von Werthern et al., 2018). Multiple research studies have shown that symptoms of depression, anxiety, and PTSD endure for years beyond release from detention, with many enduring symptoms being directly related to the detention experience (e.g., avoidance of detention reminders, nightmares and flashbacks from detention) (von

Werthern et al., 2018)." Von Werthern and Robjant note that there were serious traumatic experiences in detention centers such as seeing people self-harm, being assaulted and riots. There was also extreme boredom. The experiences which von Werthern and Robjant assert are traumatic are far less likely to occur in RTCs and shelters if children who are under poor control are sent to RTCs than if they are kept in shelters or prematurely sent to sponsors.

51. Throughout their report, Drs. Matlow and Wang fail to discuss the benefits and risks of different alternative placements for children with certain types of needs. Instead they simply point out what they think is negative about congregate care. I agree that placing children in congregate care could be harmful. Taking children from a stable, supportive home, and placing them in a restrictive setting, will cause significant stress and adversely affect a child. However, if a child comes from an abusive and chaotic environment and for the first time in his or her life has a stable environment with appropriate and caring adults, lots of therapy, individual instruction in school, and a safe environment for interacting with peers, as well as milieu therapy to help the child to learn appropriate behavior, it would not be traumatizing. Releasing a child who is acting hurting herself or suicidal or assaultive to an environment without adequate support and structure will lead to deterioration. Releasing a child to sponsors who have not been properly vetted, and without the intensive therapy available in an RTC, will lead to deterioration. Giving anti-depressants to people who do not need them will often lead to side effects and no benefit. But, giving anti-depressants to people who are depressed will generally be more beneficial than harmful.

52. Drs. Matlow and Wang write, "In order to appropriately respond to children with trauma histories and trauma related disabilities, ORR must have trauma informed systems that adequately address children's disabilities related to trauma exposure. This includes, but is not limited to, providing a safe, consistent, and predictable environment for children. Children in ORR custody must be provided appropriate accommodations and support (e.g. appropriate behavioral goals and evidence-based therapeutic treatment) to meet realistic goals in the least restrictive settings. Finally, ORR must consider a child's trauma history and potential for ongoing trauma when evaluating placement and release options." I am in agreement. My review of 23 cases showed that this occurs.

53. Drs. Matlow and Wang assert that "institutionalized child-rearing has been shown to have long-term negative effects on children's development and functioning in multiple domains" (Dozier et al., 2012)[30] and that "[r]esearch on the impact of child-care and child-rearing in institutionalized settings and congregate care settings demonstrates profound short- and long-term harm." "Although there has not been a peer-reviewed study conducted on the impacts of detention in ORR custody, it is our expert opinion that the findings on institutional care would apply."

54. There are serious problems with these statements and the supporting literature they use. Dozier's article states, *"Millions of infants and toddlers are in institutional care around the world, care that is poorly suited to meet young children's developmental needs."* Research on infants and toddlers, comparing them to normal homes, is not relevant. Moreover, infants need great amounts of attention and do not receive such attention in

[30] Dozier, M., Zeanah, C. H., Wallin, A. R., & Shauffer, C. (2012). Institutional care for young children: Review of literature and policy implications. Social Issues and Policy Review, 6(1), 1–25.

institutional care.   Teenagers in RTCs receive more attention than they would in other settings.

55. They go on to write, "Placement in congregate care settings (i.e., residential care facilities with more than 12 children) within the U.S. child welfare system is associated with a three-fold increase in prevalence of psychiatric diagnosis (Children's Bureau, 2015). While the nature of causality in this association is unconfirmed, there is general consensus among child mental health and child welfare experts that institutionalized care and congregate care is inappropriate for children with psychiatric disabilities, and there has been a reduction in the rates of placement in congregate care in the U.S. since 2004 (Children's Bureau, 2015; Dozier et al., 2012)."

56. There are two serious problems with this statement.   Drs. Matlow and Wang do not provide a basis for saying there is a general consensus that institutional care is not appropriate for children with disabilities.   It is precisely children with psychiatric issues who are sent to RTCs.   Moreover, one must consider the options that are possible and not simply say this particular option has problems and so send the child to anything but this option.

57. Their report contains vague comments that the most secure facilities are not designed for the children's needs. They write, "Some of the behavioral reinforcement systems that are utilized in ORR 'step up' facilities have been deemed ineffective for the population served."   The footnote reports Mr. Fink was referring to a token economy.   For this complaint to support their overall position, they would need to show that other settings do a significantly better job in this area and that the issue has a greater impact on the children's welfare than the issues of safety and availability of intensive treatment.

58. When Drs. Matlow and Wang switch from broad generalities to specific data, it turns out that the data does not support their arguments.   For example, they write, "D.D.R.O. Decl. at Lucas R._Experts_11735, ¶ 7 ('Once I leave ORR custody, I will be working or studying, and I won't need to take the medications because I won't be anxious anymore. I am anxious because I am in ORR custody.')."   This is a good example of the tendency to blame one's current situation for one's problems and deny that the problems are due to psychiatric issues.   In his home country, DDRO ███████████████████. He was sent to an RTC because of his severe problems in a lesser setting.   He was eventually diagnosed with ███████████████████.   A medical record note from 2/14/2019 noted ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████. The note from 2/18/2019  stated ██████████████████████████████████ ███████████████████████████████████████████ █████████████████████████ DDRO's files show ██████████ ███████████████████████████ DDRO at one point asserted ███████████████████████████████ At another point he said ████ ███████████████████████████████████████████ ████████████████████████ It is common for people with serious psychiatric problems to deny the problems and blame current situations.

59. Furthermore, the delay in getting DDRO a sponsor was not the fault of ORR being excessively picky.  Case manager notes included the following entries: "1/3/19 Attempted to contact potential sponsor but no answer.  1/29/2019 Sponsor closed out due to Sponsor stating that he would have minor work since he is not financially well to have minor just at school. Sponsor also stated that he has household members that did not want to provide identification nor get fingerprinted. 2/6/2019 Case Manager spoke to minor's mother again. Mother said she was speaking to another potential sponsor but did not give contact information. The case worker at MercyFirst facilitated contact between DDRO and his mother in their home country on multiple occasions.   The case worker explored sponsorship options with mother but none were viable.  3/14/19 DDRO's mother said that she would like him to go to Long Term Foster Care."  The case of DDRO is an excellent example of the problems with Drs. Matlow and Wang's argument.  DDRO had a ███████ ██████████████, and was ███████████████████████ before he came to the U.S. While in a shelter he ███████████████████████████████ that placed him at risk and the other UACs at risk.  He was having great difficulty prior to going to an RTC.  There was no viable sponsor.

60. It is notable that when trying to find an example to support their belief that the higher levels of structure of RTCs caused harm, Drs. Matlow and Wang present a case where the data does not support their argument.   The degree of cherry picking entailed in ignoring DDRO's history and relying on a single statement by DDRO that is clearly false (that his problems are caused by the RTC and will go away when he leaves), ignoring all of the important information about his difficulties. ███████████████████████████████ ████████████████████████████████████████████████ It is also notable that Drs. Matlow and Wang do not tell the reader what they would do with such troubled children.  They do not address the risks if ████████████████████ ███████████████ is not in a restrictive setting.  Containment and prevention of harm to self and others must come first.  While it is true that containment may increase the child's stress at the moment, letting the child hurt himself or others would do far more harm.

61. The core of plaintiffs' argument is that RTCs are harmful and youths would be better off remaining in shelters, being transferred to potential sponsors more quickly than they currently are, and being more readily stepped back down to shelters.  To support this position, they argue that greater restriction is inherently bad and that RTCs are more restrictive than shelters or living in the community with a sponsor.  In addition, they assert that the children in RTCs deteriorate psychologically, and do better when not in an RTC. Plaintiffs also argue that all therapy available in RTCs can be provided outside of the RTC.

62. Reasonable people can disagree about the proper interpretation of data, and about the significance of empirical findings to a specific situation.  People can also, however, be deeply affected by confirmation bias and motivated bias, and interpret, vet, and value information in ways that support their existing beliefs or what they wish to be true.  At times, forensic evaluators engage in confirmation distortion and deliberately spin and cherry pick information so that it supports what they wish to believe.[31]  There are also

---

[31] Martindale, D.A. (2005). Confirmatory Bias and Confirmatory Distortion. *Journal of Child Custody: Research,Issues, and Practices*, 2(1-2), 31-48; Lubit, submitted for consideration to a journal.

professionals who do not appreciate that expert opinions and speculations are not the same thing, and that experts should only present opinions that result from scientific analysis.[32]

63. A central part of an argument stating that RTCs harm children, and that shelters and living with a sponsor are better for children, involves knowing what each of the placements and therapy opportunities is like.  In addition, if saying that research shows detention is bad for youths (and so RTCs are bad for youths), one needs to see if the type of detention centers studied are actually similar to RTCs, and if the elements of detention centers found to be destructive to youths are also present in RTCs.  In addition, one should also pay attention to the children's specific needs and backgrounds.  For example, taking a child from competent parents, friends who are good for his growth and development that he is connected to, and from a good therapist he is connected to, to place the child in a psychiatric treatment facility for a period, with the intention of returning him to his prior life, has great costs.  It may be necessary or more helpful than harmful.  Regardless, it has costs.  Taking a child from such a situation is markedly different than taking a UAC from a shelter the child has been in for a few weeks, and which the child will leave in the near future.  To do a scientific or appropriate clinical analysis of the situations and what is in the child's best interests, one needs to consider these factors.

64. To forge and present true expert opinions, forensic evaluators need to fairly present the relevant available data (both when it supports and when it contradicts the ultimate conclusion), use empirical literature that actually applies to the situation being addressed, generate competing hypotheses, assess which hypothesis is best supported by the data (and is least at odds with the available data), and when possible look for additional data that could affect the opinion.  In particular, one should search for data that could disprove the preferred hypothesis.  Cherry picking and spinning information to create convergent data is generally relatively easy.  As a result, convergent data is not dispositive.  Therefore, rather than looking for data to support their preferred hypothesis, experts should look for information to support each hypothesis, and even more important, search for information to disconfirm each hypothesis.  Disconfirming data are particularly powerful in hypothesis testing (Koriat, Lichtenstein, & Fischhoff 1980; Popper 1959).

65. Drs. Matlow and Wang fail to present and analyze data in the ways necessary to come up with scientifically based, expert opinions.  They make statements without presenting even illustrative data, fail to present available data that contradicts their speculation, and fail to explain the scientific analysis that led to their opinions.  There is also no indication that they considered alternative hypotheses or tests them.  Therefore, their statements are generally speculations, rather than expert opinions.  Moreover, the speculations are frequently at odds with the available data.  The data in the UACs' RTC files shows that they made considerable progress while in the RTCs.  In particular, their GAF scores showed marked improvement.  Forensic evaluators are cherry picking data if they ignore such powerful facts.  If a forensic evaluator has an opinion that is contrary to key facts, the

---

[32] Martindale, D.A. (2001). Cross-examining mental health experts in child custody litigation. *The Journal of Psychiatry and Law*, 29, 483-511. (2001: 503). "[T]he defining attributes of an expert opinion relate not to the credentials held by the individual whose fingers type the words or from whose mouth the words flow; rather, the requisite characteristics relate to the procedures that were employed in formulating the opinion and the body of knowledge that forms the foundation upon which those procedures were developed".

evaluator needs to note the discrepant facts and explain why, despite these facts, (s)he holds the opinion (s)he does.

66. The literature cited by Plaintiffs' experts, and literature cited by the articles they cite, does not support a conclusion that being in an RTC is harmful.  RTCs are very different than detention centers.  RTCs are treatment centers.  Domestic children are sent to RTCs to obtain psychiatric help when their problems cannot be handled on an outpatient basis, but they do not require hospital level care.  RTCs are not simply holding areas.

67. Steele et al (2004) researched what about detention centers caused harm.  The factors that they found were particularly harmful are not descriptive of RTCs.  In fact, what they found supports having the more troubled children in RTCs, rather than in shelters.  In brief, they noted that both adults and children were harmed by seeing serious violence against detainees and seeing detainees self-harm.  Moving children who are at increased risk of violence to themselves or others to more secure facilities with higher staff-child ratios, decreases the risk of violence, by these individuals and greatly decreases the risk that the other children in the facility will be exposed to the violence.  Plaintiffs' desire to keep children who are at risk for violence in shelters which are less able to contain violence will lead to avoidable, substantial psychological harm occurring.

68. In addition, other key issues that Steel et al highlight as being problematic about detention centers are not true of RTCs.  The children in RTCs have many activities and school.  They have good access to medical treatment and counseling.

69. Steel et al 2004 write that "[a]ll families described traumatic experiences in detention, such as witnessing riots in which guards in riot uniform hit detainees with batons; detainees fighting each other; fire breakouts; detainees publicly committing acts of self-harm; and witnessing suicide attempts…..Children commonly reported distress associated with witnessing acts of self-harm and suicide by other detainees. All of the children witnessed the same act of self-harm by an adult detainee who repeatedly mutilated himself with a razor- blade in the main compound of the detention centre. Children also described having witnessed detainees who had slashed their wrists, jumped from buildings and attempting to strangle or hang themselves with electric cords. At times, children witnessed suicide attempts by their parents, or their parents being struck by batons. A number also witnessed their friends and family members harming themselves (eight children). All children reported boredom, isolation and poor-quality food in detention. They also identified poor access to medical and dental services and counselling." [33]  The mechanisms of harm of the detention centers von Werthern, Robjant and others studied do not exist in RTCs.

70. There are other serious problems with the Plaintiffs' experts' use of the von Werthern article to support their case.  Von Werthern specifically notes there is a dearth of quantitative data on unaccompanied minors.  Von Werthern found that only one of four studies found that mental health issues increased with time spent in detention.  Robjant (2009) wrote that a prominent fear of those in detention centers was being sent home.  In other words, immigration status uncertainty was a major stress.  Robjant also writes that detainees are preoccupied with time and have extreme boredom. They cannot use normal coping skills. 90% of children reported threatening or humiliating events in detention

[33] Zachary Steel, Shakeh Momartin, Catherine Bateman, Atena Hafshejani, Derrick M. Silove (2004). Psychiatric status of asylum seeker families held for a protracted period in a remote detention centre in Australia. *Australian And New Zealand Journal Of Public Health* v 28(6), 527-536.

centers.  Once again, these stresses are no more likely to occur in RTCs than shelters and being with a sponsor, and are actually less likely to occur in RTCs. Concerning humiliating events, I have not seen evidence that children are more likely to be humiliated in the RTCs than in any other environment.  In all likelihood, humiliation would be more likely for a child who was release to a potential sponsor to go to a local school prior to the child having sufficient therapy to be in good self-control, and who also have communication difficulties. RTCs are more controlled environments than public schools.  Bullying is a very serious problem in public schools.  New students who have limited English speaking skills and do not know the culture are likely targets for bullies.  They are less likely to experience humiliation in an RTC than in a public school.

71. Ian Lambie & Isabel Randell (2013) discuss the harm of incarceration.  The aspects that they note are harmful are very different from what exist in RTCs and so one cannot scientifically claim that the harm of incarceration applies to youths in RTCs.  They write that "[d]uring incarceration, isolation, boredom, bullying, and victimization are pervasive stressors (Greve, 2001) and, given the permeable and transitory nature of adolescent identity and self-esteem, incarceration can have a negative long-term effect on a young person's sense of self and self-worth (Lane et al., 2002). In addition to existing difficulties and stressors associated with an incarceration environment, these youth also lose their lives outside of the facility, which adds to their distress and deteriorating mental health (Ng et al., 2011). Mental health problems are often not identified or addressed during periods of incarceration (Altschuler & Brash, 2004; Soler, 2002), and mental health services and juvenile justice systems are often not well integrated (Rapp-Paglicci, 2007). This suggests that in many cases services are not equipped to cope with preexisting mental health problems, nor those that may worsen or develop during incarceration…. There is evidence that juveniles who are confined in an adult prison environment may have particular difficulty in adjusting and that they may require specially targeted care (Kuanliang et al., 2008). Staff within the adult justice system lack knowledge and training in child and adolescent development and, therefore, are ill equipped to understand the needs of the youth (Soler, 2002)."[34]

72. Directly contradicting the argument of Drs. Matlow and Wang that people become worse in congregate care, Lambie and Randell (2013) note that research has shown that when youths are in facilities exclusively for youthful offenders and are not with adults, they do not deteriorate.  "There is some research to suggest that mental problems experienced by incarcerated youth may not be long-lasting and decrease over time. Brown and Ireland (2006), in a study of male adolescent prisoners in the United Kingdom, found significant decreases in both anxiety and depression during the six weeks following incarceration. The authors explain that this could be a result of acculturation, as incarcerated youth develop more adaptive strategies to incarceration over time (2006). Similar findings were reported by Shulman and Cauffman (2011), who found that symptoms of psychopathology declined over the first month of incarceration among male juvenile offenders held in the California Department of Juvenile Justice correctional reception facility. However, both samples of youth offenders involved in the research of Brown and Ireland (2006), and Shulman and Cauffman (2011) were confined to Juvenile Justice Facilities in England and the United

[34] Ian Lambie & Isabel Randell (2013) The impact of incarceration on juvenile offenders. *Clinical Psychology Review* v 33(3), 448-459.

States, which house juvenile offenders alone. In contrast, the sample of youth offenders involved in the study conducted by Ng et al. (2011) were confined in adult prisons. It may be likely that for youth offenders confined in adult prisons, particularly if juvenile inmates are integrated with the prison population, there is a heightened degree of stress and potential threat in comparison to offenders imprisoned in juvenile justice settings. Juvenile offenders may find it more difficult to adapt to life inside an adult prison, which may explain the negative effects of incarceration on juvenile mental health found by Ng et al. (2011)."[35]

73. Highlighting the value of the increased security and safety of secure settings, the authors note that research has found that although rates of suicidal ideation are higher in incarcerated youths, successful attempts are lower.  The authors write that "Victimization has also been identified as a key driver, with those who experienced being bullied in custody being over nine times more likely to attempt suicide than those who were not (Kiriakidis, 2008)."  Victimization is less likely to occur in an RTC than in a shelter or outside of congregate care.

74. Psychiatrists and psychologists have a responsibility to society as well as the individuals that they treat.  If an individual in psychiatric care presents a danger to others and the therapist fails to take reasonable action to protect society, the therapist is liable. The responsibility is particularly high if the possible victims are also in the care of the psychiatrist, as is the case in congregate care.

75. While it is true that both therapy occurs at both RTCs and shelters, RTCs are better prepared to deal with youths who have more serious psychiatric problems.  The training requirements for staff are greater at RTCs.  Of particular importance, the staffing levels at RTCs are twice that at shelters.  As a result, children can get more attention and there is greater safety.  It is less likely that a child can harm himself or harm others either by mistreating another child or by self injury, leading the other child to witness the child hurting himself.  The articles by Robjant, Von Werthern and Steel, noted above, all note that witnessing someone self harm is one of the psychologically destructive events that caused harm in the detention centers they studied.

.

_____

Roy Lubit, M.D., Ph.D.
Dated: July 17, 2020

---

[35] Ian Lambie & Isabel Randell (2013) The impact of incarceration on juvenile offenders. *Clinical Psychology Review* v 33(3), 448-459.

<u>Materials Considered In Preparing This Rebuttal Report</u>

1.  The materials I considered in forming my opinions as referenced in my June 19, 2020 report in this matter.
2.  Drs. Matlow & Wang's expert report in this matter.
3.  Certain declarations cited by Drs. Matlow & Wang in their expert report in this matter.
4.  Key articles cited by Drs. Matlow & Wang in their expert noted below.
5.  Dr. Urquiza's expert report in this matter.
6.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 5th ed. (2013) ("DSM "V).
7.  Barnert, E. S., Dudovitz, R., Nelson, B. B., Coker, T. R., Biely, C., Li, N., & Chung, P.J. (2017). How does incarcerating young people affect their adult health outcomes? Pediatrics, 139(2). https://doi.org/10.1542/peds.2016-2624
8.  Bettmann, J. E., & Jasperson, R. A. (2009). Adolescents in residential and inpatient treatment: A review of the outcome literature. Child & Youth Care Forum, 38(4), 161–183.
9.  Clifford G, Dalgleish T, Hitchcock C. Prevalence of auditory pseudohallucinations in adult survivors of physical and sexual trauma with chronic post-traumatic stress disorder (PTSD). Behav Res Ther. 2018;111:113-118.
10. Cohen, Mannarino and Deblinger (2017) Trauma-Focused Cognitive-Behavioral Therapy for Traumatized Children, in John R. Weisz and Alan E. Kazdin (eds). Evidence-Based Psychotherapies for Children and Adolescents Third Edition, discussing their evidence-based protocol for treating traumatized children.
11. Cook, S. C., Schwartz, A. C., & Kaslow, N. J. (2017). Evidence-Based Psychotherapy: Advantages and Challenges. Neurotherapeutics : the journal of the American Society for Experimental NeuroTherapeutics, 14(3), 537–545. https://doi.org/10.1007/s13311-017-0549-4
12. Dozier, M., Zeanah, C. H., Wallin, A. R., & Shauffer, C. (2012). Institutional care for young children: Review of literature and policy implications. Social Issues and Policy Review, 6(1), 1–25. https://doi.org/10.1111/j.1751-2409.2011.01033.x
13. Gersons, B. P., & Schnyder, U. (2013). Learning from traumatic experiences with brief eclectic psychotherapy for PTSD. European journal of psychotraumatology, 4, 10.3402/ejpt.v4i0.21369. https://doi.org/10.3402/ejpt.v4i0.21369.
14. Galatzer-Levy IR, Ankri Y, Freedman S, Israeli-Shalev Y, Roitman P, et al. (2013) Early PTSD Symptom Trajectories: Persistence, Recovery, and Response to Treatment: Results from the Jerusalem Trauma Outreach and Prevention Study (J-TOPS). PLOS ONE 8(8):
15. Greenhalgh T, Howick J, Maskrey N. Evidence based medicine: a movement in crisis? BMJ. 2014;348:g3725;
16. Alison Hendricks, Judith A. Cohen, Anthony P. Mannarino, and Esther Deblinger, Trauma-Focused Cognitive Behavioral Therapy (TF-CBT) workbook, https://tfcbt.org/wp-content/uploads/2014/07/Your-Very-Own-TF-CBT-Workbook-Final.pdf

17. Holman, B., & Ziedenberg, J. (2006). The dangers of detention: The impact of incarcerating youth in detention and other secure facilities. Justice Policy Institute. http://www.justicepolicy.org/uploads/justicepolicy/documents/dangers of detention.pdf

18. https://www.ojjdp.gov/mpg/litreviews/Residential_Treatment_Centers.pdf.

19. Katy Robjant, Rita Hassan and Cornelius Katona (2009) Mental health implications of detaining asylum seekers: systematic review. The British Journal of Psychiatry 194, 306–312.

20. Kazdin AE. Evidence-based treatment and practice: new opportunities to bridge clinical research and practice, enhance the knowledge base, and improve patient care. Am Psychol. 2008;63:146–159.

21. Koriat, A., Lichtenstein, S., & Fischhoff, B. (1980). Reasons for confidence. *Journal of Experimental Psychology: Human Learning and Memory*, 6(2), 107-118.

22. Lambie, I. & Randell, I. (2013) The impact of incarceration on juvenile offenders. *Clinical Psychology Review* v 33(3), 448-459.

23. Martindale, D.A. (2005). Confirmatory Bias and Confirmatory Distortion. Journal of Child Custody: Research, Issues, and Practices, 2(1-2), 31-48;

24. https://www.aacap.org/aacap/families_and_youth/Resources/Psychiatric_Medication/The_Treatment_for_Adolescents_with_Depression_Study_TADS.aspx

25. Martindale, D.A. (2001). Cross-examining mental health experts in child custody litigation. The Journal of Psychiatry and Law, 29, 483-511. (2001: 503).

26. OConghaile A, DeLisi LE. Distinguishing schizophrenia from posttraumatic stress disorder with psychosis. Curr Opin Psychiatry. 2015;28(3):249-255.

27. Popper, K.R. (1959). *The Logic of the Scientific Discovery*. London: Hutchinson.

28. Rosenberg, W., & Donald, A. (1995). Evidence based medicine: an approach to clinical problem-solving. *BMJ (Clinical research ed.), 310*(6987), 1122–1126. https://doi.org/10.1136/bmj.310.6987.1122

29. Steel, Z., Momartin, S., Bateman, C., Hafshejani, A., Silove, D. (2004). Psychiatric status of asylum seeker families held for a protracted period in a remote detention centre in Australia. Australian And New Zealand Journal Of Public Health v 28(6), 527-536.

30. Sackett et al (1996) Evidence based medicine: what it is and what it isn't. BMJ ;312:71. https://www.bmj.com/content/312/7023/71.

31. Sternberg, R. J. (2006). Evidence-Based Practice: Gold Standard, Gold Plated, Or Fool's Gold? In C. D. Goodheart, A. E. Kazdin, & R. J. Sternberg (Eds.), Evidence-based psychotherapy: Where practice and research meet (p. 261–271). American Psychological Association. https://doi.org/10.1037/11423-011

32. http://psychology.iresearchnet.com/counseling-psychology/counseling-therapy/integrative-eclectic-therapy/

33. Sege, R. D., Amaya-Jackson, L., AAP Committee on Child Abuse and Neglect, Council on Foster Care, Adoption, and Kinship Care, AACAP Committee on Child Maltreatment and Violence, & National Center for Child Traumatic Stress. (2017). Clinical considerations related to the behavioral manifestations of child maltreatment. Pediatrics, 139(4). https://doi.org/10.1542/peds.2017-0100

34. Watts BV, Shiner B, Zubkoff L, Carpenter-Song E, Ronconi JM, Coldwell CM. (2014) Implementation of evidence-based psychotherapies for posttraumatic stress disorder in VA specialty clinics. Psychiatr Serv. 65(5):648-653.

35. von Werthern, M., Robjant, K., Chui, Z. et al. The impact of immigration detention on mental health: a systematic review. BMC Psychiatry 18, 382 (2018).

36. Texas Minimum Standards for General Residential Operations, https://hhs.texas.gov/sites/default/files/documents/doing-business-with-hhs/provider-portal/protective-services/ccl/min-standards/chapter-748-gro.pdf.

37. ORR Funding Opportunity Announcement (FOA) for RTCs: https://protect2.fireeye.com/url?k=f17b29b5-ad2f009e-f17b188a-0cc47a6d17cc-2b1068199be42001&u=https://ami.grantsolutions.gov/files/HHS-2017-ACF-ORR-ZU-1154_1.pdf.

38.  FOA for general shelter: https://protect2.fireeye.com/url?k=09a620a9-55f20982-09a61196-0cc47a6d17cc-d9567bb73991329f&u=https://ami.grantsolutions.gov/files/HHS-2017-ACF-ORR-ZU-1132_3.pdf.

39. Personal communication with Brooke Gonzales, LMSW, Vice President of Immigration Services, MercyFirst.

40. Deposition of David Fink, February 12, 2020

41. NY licensing rules, GOV-00242713 to GOV-00242762

42. MercyFirst documents received by Plaintiffs' counsel and shared with Defendants' counsel, GOV-00242657 to GOV-00242712

43. Excerpts from UAC case files:
     a.   C.J.A.L., GOV-00241049, GOV-00241053, GOV-00234061-64.

44. Other materials as may be referenced elsewhere in this rebuttal report.