JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
ERNESTO H. MOLINA, JR.
Deputy Director
CHRISTOPHER A. BATES
Senior Counsel to the Assistant Attorney General
W. DANIEL SHIEH
BENJAMIN MARK MOSS
Senior Litigation Counsel
NANCY K. CANTER
ANTHONY J. MESSURI
JONATHAN K. ROSS
Trial Attorneys
Office of Immigration Litigation
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-9802
Daniel.Shieh@usdoj.gov

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Lucas R., *et. al.*,<br><br>    *Plaintiffs,*<br><br>        v.<br><br>Alex M. Azar,<br>Secretary of U.S. Dep't of Health and Human Services, *et al*.<br><br>        *Defendants.* | Case No.: 18-cv-05741-DMG-PLA<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT UNDER F.R.C.P. 56.**<br>Hearing Date: Dec. 11, 2020<br>Time: 3:00PM PT<br>Location: Courtroom 8C, 8th Floor<br>350 West 1st Street<br>Los Angeles, CA 90012<br><br>Honorable Dolly M. Gee<br>United States District Judge |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................1

II.     ARGUMENT ........................................................................................7

     A.    The Court should deny Plaintiffs' motion for partial summary judgment on the step-up, unfit-custodian, and legal-representation claims because all three are barred by *res judicata*.................................................8

     B.    *Mathews* applies to the procedural-due-process claims raised by the step-up and unfit-custodian classes..................................................9

     C.    The Court should deny Plaintiffs' motion for partial summary judgment on the step-up claim. .................................................11

          1.    ORR's policies and procedures for the step-up class satisfy due process as a matter of law..................................................11

             a.    Private interests .................................................11

             b.    Risk of erroneous deprivation.................................17

             c.    The government's interest and the balance of *Mathews* factors .................................................31

          2.    ORR's policies and procedures for the step-up class comport with the APA..................................................33

     D.    The Court should deny Plaintiffs' motion for partial summary judgment on the unfit-custodian claim.................................................35

          1.    ORR's policies and procedures for the unfit-custodian class satisfy due process as a matter of law.................................35

             a.    Private interests .................................................35

             b.    Risk of erroneous deprivation.................................40

             c.    The government's interest and the balance of *Mathews* factors .................................................50

          2.    ORR's policies and procedures for the unfit-custodian class comport with the APA..................................................52

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

E.    The Court should deny Plaintiffs' motion for partial summary judgment
on the legal-representation claim.................................................................52

    1.    ORR's policies and procedures for the legal-representation class
comport with the TVPRA...............................................................52

    2.    ORR's policies and procedures for the legal-representation class
satisfy due process as a matter of law............................................54

    3.    Plaintiffs fail to show that ORR has denied Plaintiffs' right to
effective counsel. ...........................................................................55

F.    The Court should deny Plaintiffs' request for a permanent injunction and
the extraordinary relief that Plaintiffs' seek in their ten-page proposed
order.................................................................................................................58

III.    CONCLUSION ...............................................................................................60

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

# TABLE OF AUTHORITIES

## CASES

*Al Otro Lado, Inc. v. McAleenan*,
    423 F. Supp. 3d 848 (S.D. Cal. 2019) ........................................................ 19, *passim*

*Aristotle P. v. Johnson*,
    721 F. Supp. 1002 (N.D. Ill. 1989) ........................................................................ 38

*ASSE Int'l, Inc. v. Kerry*,
    803 F.3d 1059 (9th Cir. 2015) ................................................................................ 10

*Beltran v. Cardall*,
    222 F. Supp. 3d 476 (E.D. Va. 2016) ........................................................ 4, 37, 38, 44

*Bethel Sch. Dist. No. 403 v. Fraser*,
    478 U.S. 675 (1986) ................................................................................................ 11

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ............................................................................................ 6, 59

*Cassim v. Bowen*,
    824 F.2d, 791 (9th Cir. 1987) ................................................................................ 34

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................................ 46

*Chevron U.S.A., Inc. v. NRDC*,
    467 U.S. 837 (1984) ................................................................................................ 54

*Cheyenne Tribe v. Norton*,
    503 F.3d 836 (9th Cir. 2007) .................................................................................. 58

*Cleveland Bd. of Educ. v. Loudermill*,
    470 U.S. 532 (1985) ................................................................................................ 34

*Cochran v. Quest Software, Inc.*,
    328 F.3d 1 (1st Cir. 2003) ...................................................................................... 57

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

*Flores v. Barr*,
   407 F. Supp. 3d 909 (C.D. Cal. 2019) ............................................................. 25, 46

*Flores v. Lynch*,
   828 F. 3d 898 (9th Cir. 2016) ............................................................................ 17

*Flores v. Sessions*,
   862 F.3d 863 (9th Cir. 2017) ................................................... 10, 24, 27, 48

*Gibson v. Merced Cty. Dep't of Human Res.*,
   799 F.2d 582 (9th Cir. 1986) ............................................................................ 38

*Girard v. Klopfenstein*,
   930 F.2d 738 (9th Cir. 1991) ..................................................................... 10, 34

*Goldberg v. Kelly*,
   397 U.S. 254 (1970) ........................................................................... 5, *passim*

*Ham v. Pennington Cty. Bd. of Comm'rs*,
   158 Fed. App'x 761 (8th Cir. 2005) ............................................................. 15, 59

*Henry v. Cty. of Shasta*,
   132 F.3d 512 (9th Cir. 1997) ............................................................... 13, *passim*

*Hernandez v. Sessions*,
   872 F.3d 976 (9th Cir. 2017) ............................................................................ 12

*Hicks v. Commissioner of Social Security*,
   909 F.3d 786 (6th Cir. 2018) ....................................................................... 9, 10

*In re Gault,*
   387 U.S. 1 (1967) .............................................................................. 11, *passim*

*J.D.B. v. North Carolina*,
   564 U.S. 261 (2011) .......................................................................................... 54

*J.E.C.M. v. Lloyd*,
   352 F. Supp. 3d 559 (E.D. Va. 2018) .............................................................. 38

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

*Kentucky Dep't of Corrections v. Thompson*,
    490 U.S. 454 (1989) ..................................................................................16, 40

*King v. Atiyeh*,
    814 F.2d 565 (9th Cir. 1987) ................................................... 19, *passim*

*L.V.M. v. Lloyd*,
    318 F. Supp. 3d 601 (S.D.N.Y. 2018) ....................................................45

*Lin v. Ashcroft*,
    377 F.3d 1014 (9th Cir. 2004)............................................................ 5, 54

*Marathon Oil Co. v. EPA*,
    564 F.2d 1253 (9th Cir. 1977)................................................... 33, 34, 52

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) .......................................................................1, *passim*

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) .................................................................................58

*Moore v. City of East Cleveland*,
    431 U.S. 494 (1977) .................................................................................38

*Morrissey v. Brewer*,
    408 U.S. 471 (1972) .................................................................................33

*N. Cheyenne Tribe v. Norton*,
    505 F.3d 836 (9th Cir. 2007) ....................................................11, *passim*

*Orantes-Hernandez v. Thornburgh*,
    919 F.2d 549 (9th Cir. 1990) ...............................................................7, 60

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
    810 F.3d 631 (9th Cir. 2015) ....................................................20, 56, 57

*Parham v. J.R.*,
    442 U.S. 584 (1979) ..................................................................22, 23, 29

*Parra v. Perryman*,
    172 F.3d 954 (7th Cir. 1999) ...................................................................12, 30

*Pension Ben. Guar. Corp. v. LTV Corp.*,
    496 U.S. 633 (1990) ...................................................................................33

*Perez-Funez v. District Director*,
    619 F. Supp. 656 (C.D. Cal. 1985) .......................................................5, 54

*Portland Audobon Soc. v. Endangered Species Comm.*,
    984 F.2d 1534 (9th Cir. 1993)......................................................................33

*ProtectMarriage.com v. Bowen*,
    599 F. Supp. 2d 1197 (E.D. Cal. 2009)...................................................7, 60

*Reno v. Flores*,
    507 U.S. 292 (1993)......................................................................4, *passim*

*Rosenbaum v. Washoe Cty.*,
    663 F.3d 1071 (9th Cir. 2011).................................................................15, 37

*Santos v. Smith*,
    260 F. Supp. 3d 598 (W.D. Va. 2017).............................................36, 38, 44

*Saravia v. Sessions*,
    905 F.3d 1137 (9th Cir. 2018).....................................................................23

*Singh v. Holder*,
    638 F.3d 1196 (9th Cir. 2011).....................................................................12

*Smith v. Org. of Foster Families For Equal. & Reform*,
    431 U.S. 816 (1977) ...................................................................................39

*Smith v. Sumner*,
    994 F.2d 1401 (9th Cir. 1993).....................................................................17

*Spencer v. Knapheide Truck Equip. Co.*,
    183 F.3d 902 (8th Cir. 1999) .................................................................13, 14

*United States v. Asarco Inc.*,
  430 F.3d 972 (9th Cir. 2005) ....................................................................17

*United States v. BNS, Inc.*,
  858 F.2d 456 (9th Cir. 1988) ...............................................................7, 60

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ..................................................................................58

*Wong Yang Sung v. McGrath*,
  339 U.S. 33 (1950)....................................................................................34

*Zadvydas v. Davis*,
  533 U.S. 678 (2001) ...........................................................................12, 36

*Zerezghi v. U.S. Citizenship and Immigr. Serv.*,
  955 F.3d 802 (9th Cir. 2020) ....................................................................10

*Zinermon v. Burch*,
  494 U.S. 113 (1990) ...........................................................................23, 28

## **STATUTES**

### **Immigration and Nationality Act of 1952, as amended:**

5 U.S.C. § 554.....................................................................................33, 34

5 U.S.C. § 554(a) ..........................................................................33, 34, 52

6 U.S.C. § 279.....................................................................................19, 43

8 U.S.C. § 1229c.................................................................................12, 30

8 U.S.C. § 1232.........................................................................................43

8 U.S.C. § 1232(a)(1) ...............................................................................51

8 U.S.C. § 1232(a)(2)(A) ..........................................................................55

8 U.S.C. § 1232(a)(5)(D) .................................................................................12, 30

8 U.S.C. § 1232(c)(2)(A) ........................................................................ 16, 24, 39

8 U.S.C. § 1232(c)(3)(A) ................................................................... 37, *passim*

8 U.S.C. § 1232(c)(5) ...................................................................... 6, 53, 60

8 U.S.C. § 1362 ..........................................................................................53, 54

8 U.S.C. § 1522(d) ............................................................................................ 16

42 U.S.C. § 405 ..................................................................................................9

42 U.S.C. § 671(a)(12) ......................................................................................42

42 U.S.C. § 675(5)(B) ......................................................................................50

42 U.S.C. § 675(5)(C) ........................................................................ 36, 41, 47

## Cal. Welf. & Inst. Code:

Section § 366.21(f)(1) .......................................................................................47

Section § 366.25(a) ...........................................................................................47

## REGULATIONS

8 C.F.R. § 240.25 .........................................................................................12, 30

45 C.F.R. § 1356.21 ..........................................................................................49

## MISCELLANEOUS

Davidson, Howard A., *New ABA Policies Protect Children*,
  30 No. 8 Child L. Prac. 127, 128 (Oct. 2011)........................................49

84 Fed. Reg. 44392 .....................................................................................52, 54

ORR Guide at § 1.2.4 .................................................................................24, 25

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

ORR Guide § 1.4.2 .................................................................................................... 15

ORR Guide § 2.7.7 .................................................................................................... 43

ORR Guide 3.3.7 ...................................................................................................... 21

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

## I.    INTRODUCTION

In their motion for partial summary judgment, Plaintiffs seek a judicial rewrite of almost every aspect of the Office of Refugee Resettlement's (ORR's) unaccompanied alien children (UAC) program.  This extends to where, when, and how step-up and release decisions are made and what standard applies; to when, how, and to whom ORR must provide notice of such decisions; and to when, how, and under what circumstances information must be communicated to counsel, and what that information must include.  Plaintiffs' requested relief far exceeds what was sought in the operative complaint and the scope of the claims raised by the step-up, unfit-custodian, and legal-representation classes.   Those claims involved additional hearings for placement and release decisions and prohibiting the obstruction of children's attorneys of record, not a rewrite of the entire UAC program based upon Plaintiffs' policy preferences, and certainly not the extensive procedures that Plaintiffs now seek in their sprawling 10-page proposed order.   Plaintiffs' proposed remedy appears nowhere in any statute or settlement agreement—rather, according to Plaintiffs, the procedures they seek must be created by the Court because due process *demands* them.

But Plaintiffs ignore the policies and procedures that they themselves previously negotiated in a nationwide settlement agreement that resolved due process claims for placement, release, and legal representation.  Rewriting those procedures now under the same due-process theory as the prior suit would contravene settled principles of *res judicata*.  Even if the Court were to reach Plaintiffs' claims despite *res judicata*, it should deny their summary-judgment request because all three claims fail as a matter of law under *Mathews v. Eldridge*, 424 U.S. 319 (1976).  Plaintiffs' asserted liberty interests are of limited weight given the characteristics and context of the UAC population—minors who enter the United States without a parent or legal custodian and are in federal custody solely due to their immigration status.   Plaintiffs disregard key aspects of the UAC program, which already provides substantial procedural protections to UACs.  Plaintiffs' description of the government's interest is woefully inadequate: they downplay that interest as merely administrative, when the procedures Plaintiffs now seek (raised for the first time in their motion) would overwhelm

the UAC program by converting routine decisions on care and custody into adversarial proceedings, result in significant delays, and endanger child safety.  And Plaintiffs' failure to balance the probable value of their newly-raised, intrusive procedures in reducing the risk of erroneous deprivation against the government's significant interests is fatal to their claims.  In any event, Plaintiffs' motion relies on a host of factual errors that are unsupported by the evidentiary record and cannot support summary judgment. The Court should deny Plaintiffs' motion for summary judgment on the step-up, unfit-custodian, and legal-representation claims, and their request for a permanent injunction.

*First,* the Court should deny Plaintiffs' motion because ORR's policies and procedures for the step-up class satisfy due process as a matter of law.  As Defendants have explained, Defs.' Br. 18-33, under *Mathews*, the liberty interests at stake for the step-up class are limited because minors in ORR care are children who entered the United States without a parent or legal custodian and are in federal custody because they lack lawful immigration status (and thus are situated differently from minors in the domestic juvenile-justice context).  ORR's existing procedures fully protect these interests, which are decisively outweighed in any event by the government's strong interest in safe placements and the efficient allocation of its resources. Defs.' Br. 18-33.  ORR's policies and procedures for the step-up class thus satisfy due process as a matter of law.

Plaintiffs argue that "ORR's restrictive placement policies and procedures are constitutionally inadequate."  Pls.' Br. 37; *see also id.* at 37-51.  But Plaintiffs fundamentally misrepresent ORR's policies and procedures and the *Flores* Settlement, and their argument is refuted by a plain reading of both.  To support their argument, Plaintiffs confuse correlation with causation, *see, e.g.,* Pls.' Br. 37, and cherry-pick isolated incidents of harm, *see, e.g.,* Pls.' Br. 38, 41, without establishing that the incidents they identify, even if they happened as Plaintiffs claim, show an ORR custom or practice for purposes of obtaining class-wide injunctive relief.  And instead of balancing "the risk of an erroneous deprivation" against the "probable value" of the procedures they seek, *Mathews*, 424 U.S. at 335, Plaintiffs simply assert that the complex scheme of procedures they demand in their ten-page proposed order

is *mandated* by due process, because ORR (allegedly) provides no process at all.  But ORR already affords extensive process for minors who are stepped-up, including *Flores* bond hearings, separate administrative hearings before a placement review panel, 30-day Director review, and judicial review.  *See* Defendants' Statement of Uncontroverted Facts (Defs.' U.F.) ¶¶ 63-67.  Moreover, as the parties agree, the likelihood that a UAC will be stepped up is exceedingly low, Joint Stipulation (J.S.) ¶ 91, and the record shows that in most cases this happens only after the minor has spent more than two months in shelter care, underscoring that ORR already takes efforts to keep minors in less restrictive placements, Defs.' U.F. ¶ 104. Given ORR's multi-layered internal review, coupled with the availability of *Flores* bond hearings (which Plaintiffs themselves negotiated for), the probable value of additional procedures is low, and is outweighed by the government's legitimate interests in child safety and proper resource allocation.  Plaintiffs' Administrative Procedures Act (APA) claim for the step-up class likewise fails as a matter of law because the Trafficking Victims Protection Act of 2008 (TVPRA) does not provide for a hearing on placement, and their APA claim is merely their procedural-due-process claim recast as a statutory violation.  Because there is no due-process violation, Plaintiffs' APA claim fails.

**Second**, the Court should deny Plaintiffs' motion because ORR's policies and procedures for the unfit-custodian class also satisfy due process as a matter of law.  As with the step-up class, the liberty interests at stake for the unfit-custodian class are limited because children in ORR care enter the United States without a parent or legal custodian (and thus are situated differently from minors in the domestic child-welfare context, who are removed from their home when they enter state custody) and because many class members are not seeking release to parents or other close family members. In addition, these limited interests are already adequately protected by ORR's existing procedures and are decisively outweighed by the government's interest in safe release and the sound allocation of resources. Defs.' Br. 38-49.  ORR's policies for the unfit-custodian class thus satisfy due process as a matter of law.

Plaintiffs argue that "ORR's custodial vetting policies and procedures are constitutionally inadequate under *Mathews*." Pls.' Br. 28; *see also id.* at 28-37. But Plaintiffs'

procedural-due-process claim is overbroad and is unsupported by the law or the undisputed facts. To start, no court has recognized the sort of broad and unqualified liberty interest in family association that the unfit-custodian class asserts, which includes association with distant relatives and unrelated adults the child has never met, nor has any court ordered the extensive procedures that Plaintiffs demand. As Defendants have explained, Defs.' Br. 41, *Reno v. Flores* forecloses a liberty interest for UACs that extends to distant relations. 507 U.S. 292, 303 (1993) ("Where a juvenile has no available parent, close relative, or legal guardian, where the government does not intend to punish the child, and where the conditions of governmental custody are decent and humane, such custody surely does not violate the Constitution."). Further, the "prevailing state and federal child welfare practices" Plaintiffs rely upon to support their unfit-custodian claim, Pls.' Br. 35, all involve dependency or permanency hearings where the government removes the child from his or her *parents* due to allegations of abuse or neglect, or moves to *terminate* parental rights. Such hearings are not analogous to the ORR context, where the minor is not removed from the home when the minor enters ORR care (because the minor was already unaccompanied when he or she entered the United States). And unlike permanency hearings, ORR's release decisions have nothing to do with the removal of a child from the home or the termination of parental rights—the basis for the rigorous proceedings required in the domestic child-welfare context. Rather, ORR's release decisions are far more limited—whether safe release to a proposed sponsor is possible. And for parents and legal guardians, ORR already provides an administrative, evidentiary hearing before the Assistant Secretary for Children and Families. J.S. ¶¶ 21-29. This satisfies due process. *See Beltran v. Cardall*, 222 F. Supp. 3d 476, 489 (E.D. Va. 2016) ("[w]here no parent is seeking custody of their child, the cases [involving domestic permanency hearings] have no application"). Plaintiffs' APA claim for the unfit-custodian class likewise fails as a matter of law because the TVPRA does not provide for a hearing on release, and their claim is merely their procedural-due-process claim recast as a statutory violation. Because there is no due-process violation, Plaintiffs' APA claim fails.

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

***Third***, the Court should deny Plaintiffs' motion because their legal-representation claims are unsupported by the Constitution or the TVPRA, and the undisputed evidentiary record does not support Plaintiffs' claim that ORR obstructs access to counsel.  On due process, no courts have recognized the right of minors in immigration proceedings to government-funded counsel.  *See Lin v. Ashcroft*, 377 F.3d 1014, 1027 (9th Cir. 2004) (holding that a minor in immigration proceedings "is entitled to counsel of his own choice at his own expense").  And Plaintiffs' statutory claim under the TVPRA is defeated by a plain reading of the statute.  Defs.' Br. 57-59.  Plaintiffs' legal-representation claim thus fails as a matter of law.

Plaintiffs raise three arguments in support of their legal-representation claim.  All three fail.  To start, Plaintiffs argue that "[t]he TVPRA grants plaintiffs a comprehensive right to counsel."  Pls.' Br. 52; *see also id.* at 52-53.  This is wrong.  The plain text of the TVPRA imposes an obligation on ORR only to ensure to the extent practicable that UACs are able to retain *pro bono* counsel to represent them in immigration proceedings.  It does not require ORR to provide government-funded counsel to challenge routine ORR decision-making that has nothing to do with adjudication of immigration status.  Next, Plaintiffs argue they "are entitled to counsel as a matter of due process."  Pls.' Br. 53; *see also id.* at 53-54.  Plaintiffs engage in no *Mathews* balancing in arguing that due process requires government-funded counsel to contest routine ORR-decision-making, and the cases they cite establish only the right to *retain* an attorney—which Defendants do not dispute—not the right to government-paid representation.  *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 270 (1970) (holding that "the recipient must be allowed to retain an attorney if he so desires.").  Indeed, the cases that have addressed the issue of whether government-funded counsel is required in *immigration proceedings* have recognized no such right.  *See Lin v. Ashcroft*, 377 F.3d at 1027, *see also Perez-Funez v. District Director*, 619 F. Supp. 656, at 665 (C.D. Cal. 1985).  Plaintiffs fail to acknowledge, let alone address, these cases calling for rejection of their claim that UACs in ORR care have a right to government-funded counsel.  Finally, Plaintiffs argue that "ORR violates Plaintiffs' right to counsel by denying effective assistance of counsel," and relatedly,

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

that "ORR unlawfully bars legal service providers from using federal funding to represent children with respect to release, placement, and administration of psychotropic medication." Pls.' Br. 54; *see also id.* at 54-56.  But evidence disclosed over the course of discovery in this case has conclusively established that ORR does *not* bar legal-service providers from representing UACs.  And the new factual allegations Plaintiffs raise for the first time in their motion—on how ORR uses its funding, how often ORR requires agency decision-makers to communicate with UAC attorneys, and how ORR provides information to and receives information from UAC attorneys, Pls.' Br. 54-55—are not fairly within the scope of the operative complaint.  In any event, none of the new factual allegations establishes that Defendants have violated Plaintiffs' right to retain counsel at no expense to the government. Even if those new factual allegations were undisputed, which they are not, *see* Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts (Fact Response) ¶¶ 234-47, 249, 251, 260-64, they do not support summary judgment for Plaintiffs.

 ***Finally***, the Court should reject Plaintiffs' requested relief in their ten-page proposed order, which would violate basic limitations on equitable relief.  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs").  Plaintiffs' extraordinary proposed order is a detailed regulatory scheme for micro-managing ORR decision-making cloaked as a judicial order, which Plaintiffs assert is *mandated* by due process.  On the step-up claim, Plaintiffs seek (1) the imposition of automatic, pre-placement, trial-like evidentiary hearings for step-up to any "secure, staff secure, therapeutic staff secure, therapeutic group home, RTC or OON facility," and (2) another full trial-like evidentiary hearing every 30-days.  Pls.' Proposed Order ¶¶ 9-11.  On the unfit-custodian claim, Plaintiffs seek the imposition of a full evidentiary hearing for any potential sponsor "within thirty (30) days following submission of a family reunification application," regardless of the sponsor's relationship to the minor or whether the application is even complete.  *Id.* ¶¶ 1-3.  And on the legal-representation claim, Plaintiffs seek an order requiring ORR to allow attorneys to use "funds appropriated in furtherance of 8 U.S.C. § 1232(c)(5)" (currently designated for use in obtaining *pro bono*

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

representation for immigration proceedings) to represent minors in actions against ORR "with respect to release, placement, or the administration of psychotropic medications." *Id.* ¶ 16. And Plaintiffs' request would entail extensive monthly reporting requirements and oversight by a group of private attorneys, including the right for class counsel to attend *any* hearing they choose in order "to monitor compliance," *in perpetuity. Id.* ¶¶ 4 (release), 13 (step-up). These burdensome demands far exceed relief proportional or tailored to Plaintiffs' claims. Injunctive relief must be narrowly drawn to remedy the specific harms alleged, not a sprawling regulatory document that mimics legislation. *ProtectMarriage.com v. Bowen*, 599 F. Supp. 2d 1197, 1226 (E.D. Cal. 2009) (denying injunctive relief where "any contrary holding would require the Court to legislate from the bench and to act contrary to the law"); *see also United States v. BNS, Inc.*, 858 F.2d 456, 460 (9th Cir. 1988) (an overbroad injunction is an abuse of discretion). Moreover, most of the relief Plaintiffs seek in their proposed order is not identified in their complaint, and thus, would *per se* exceed a narrowly tailored remedy for the harms they allege. *See Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 558 (9th Cir. 1990) ("an injunction must be narrowly tailored to give only the relief to which plaintiffs are entitled"). And Plaintiffs fail to satisfy the four-part test for a permanent injunction.

The Court should deny Plaintiffs' motion for partial summary judgment and extraordinary request for relief on the step-up, unfit-custodian, and legal-representation claims. If the Court determines that injunctive relief is warranted, it should order only narrowly-tailored relief necessary to remedy the specific violations the Court finds.

## II.   ARGUMENT

The Court should deny Plaintiffs' motion for partial summary judgment on the step-up, unfit-custodian, and legal-representation claims. *Res judicata* bars all three claims and warrants judgment for Defendants on that ground alone. Even if the Court concludes otherwise and reaches the merits of Plaintiffs' claims, the Court should deny Plaintiffs' motion because it rests on a host of factual errors that are unsupported by the record.

**A. The Court should deny Plaintiffs' motion for partial summary judgment on the step-up, unfit-custodian, and legal-representation claims because all three are barred by *res judicata*.**

As Defendants have explained, the claims raised by all three classes for procedural protections were conclusively resolved in *Flores v. Reno*, No. 85-cv-04544, where this Court approved a nationwide settlement agreement (the *Flores* Settlement or Settlement) that "set[ ] out nationwide policy for the detention, release, and treatment of minors in the custody of the INS" (¶ 9) for "[a]ll minors who are detained in the legal custody of the INS" (¶ 10). *See* Defs. Br. 14-18 (step-up class), 34-37 (unfit-custodian class), 51-53 (legal-representation class). In their motion, Plaintiffs do not even address the preclusive effect of the *Flores* Settlement, and instead make the extraordinary claim that "neither the TVPRA nor the [Settlement] prescribes *procedures* pursuant to which Defendants must transparently and rationally determine: (1) whether children's parents or other available custodians are fit; or (2) whether a child may be consigned to a restrictive placement." Pls. Br. 2. This claim is contradicted by a plain reading of the Settlement.

For the step-up class, the *Flores* Settlement provides that a minor may seek "a bond redetermination hearing before an immigration judge" (¶ 24A) to determine dangerousness or whether they are a flight risk, and "[a]ny minor who disagrees with the INS's determination to place that minor in a particular type of facility . . . may seek judicial review in any United States District Court with jurisdiction and venue over the matter to challenge that placement determination" (¶ 24B). For the unfit-custodian class, the Settlement requires ORR to avoid "unnecessary delay" in releasing minors from its custody (¶ 14), sets forth criteria for ORR to consider in making a suitability determination for potential sponsors (¶ 17), requires ORR to "make" and "record" release efforts (¶ 18), and sets forth a procedure for a UAC's attorney to contact a "juvenile coordinator" to "investigate" any case where "Plaintiffs' counsel have reasonable cause to believe a minor . . . should have been released" (¶ 28B).[1] For the legal-representation class, the Settlement provides that UACs must receive information regarding

---

[1] Indeed, under the Settlement, the release determination is based on a "positive suitability assessment" (¶17), not a determination of whether the proposed sponsor is or is not "fit."

the "right to be represented by counsel at no expense to the government," and that ORR must provide "[l]egal services information regarding the availability of free legal assistance" (Ex. 1, ¶ 14).  All three claims involve substantially the same evidence, allege infringement of the same rights, and arise out of the same transactional nucleus of facts as *Flores*, which set forth "nationwide policy for the detention, release, and treatment of minors in the custody of the INS" (¶ 9).  Rewriting these procedures now under the same due-process theory on claims that were advanced, or that could have been advanced, in *Flores* would contravene settled principles of *res judicata*.  The claims raised by the step-up, unfit-custodian, and legal-representation classes are therefore barred by *res judicata*, which alone warrants judgment for Defendants as a matter of law.

**B.** ***Mathews*** **applies to the procedural-due-process claims raised by the step-up and unfit-custodian classes.**

The *Mathews* balancing test applies to the procedural-due-process claims raised by the step-up and unfit-custodian classes.  In their motion, Plaintiffs argue that *Mathews* does not apply *at all* to the step-up and unfit-custodian claims because Defendants purportedly do not provide *any* opportunity to challenge restrictive placements.  Pls.' Br. 24-26.  Citing *Hicks v. Commissioner of Social Security*, 909 F.3d 786 (6th Cir. 2018), Plaintiffs assert that "where, as here, the government's decision depends on factual findings and plaintiffs are ***denied the opportunity to be heard at all***, the court need not weigh the interests at stake under the *Mathews* balancing test."  Pls.' Br. 25 (emphasis in original).  That is wrong.

To start, *Hicks* is wholly inapposite to this case.  *Hicks* involved an agency's categorical refusal to consider evidence that the court determined was "relevant" to the plaintiffs' claims, not a dispute over the types of procedures the agency provided.  909 F.3d at 798. In *Hicks*, the Social Security Administration reconvened hearings that were authorized by statute to determine the plaintiffs' eligibility for benefits, *id.* at 791-94 (applying 42 U.S.C. § 405); it did not order the creation from whole cloth administrative hearings that are mentioned nowhere in the agency's authorizing statute.  In *Hicks*, during the hearing process, the Social Security Administration "disregarded all medical evidence" previously submitted "on the

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

ground that such evidence was tainted by fraud," gave the plaintiffs "no opportunity to rebut the agency's assertion of fraud as to this medical evidence," and terminated the plaintiffs' benefits. *Id.* at 792. Here, by contrast, Plaintiffs do not allege that ORR refuses to consider certain types of evidence when making and reviewing step-up and release decisions. Rather, they challenge the adequacy of the procedures that ORR provides in making certain decisions—a claim at the heart of *Mathews* balancing. *See Girard v. Klopfenstein*, 930 F.2d 738, 742 (9th Cir. 1991) (explaining that *Mathews* has "become the standard for determining whether certain challenged administrative procedures comply with the requirements of due process.").[2]

Indeed, *Hicks* itself did not dispense with *Mathews*. *Hicks*, 909 F.3d at 799-804 (applying *Mathews* balancing). *Hicks* faulted an agency for categorically refusing to consider evidence supporting a benefits recipient's claim. *Id.* at 798. And even if it did support an argument that *Mathews* could be dispensed with when someone is denied any hearing at all, that teaching would not support Plaintiffs here because there is no credible claim that Plaintiffs are denied an opportunity to be heard under current ORR procedures. In asserting that they receive no opportunity to be heard under current ORR procedures, Plaintiffs fail to even acknowledge the previously-negotiated procedures under the *Flores* Settlement. *See, e.g.*, ¶¶ 24A (bond hearing), 24B (judicial review). Indeed, Plaintiffs' claim that ORR affords *no* process at all is foreclosed by *Flores v. Sessions*, 862 F.3d 863, 868 (9th Cir. 2017), which said that a "hearing under Paragraph 24A [*i.e.*, a *Flores* bond hearing] provides meaningful protections." Moreover, as Defendants have explained, ORR provides both the step-up and

___

[2] Plaintiffs' reliance on *Zerezghi v. U.S. Citizenship and Immigr. Serv.*, 955 F.3d 802 (9th Cir. 2020), and *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059 (9th Cir. 2015), is also misplaced. Pls.' Br. 26. Both cases applied *Mathews*, and stand for the unremarkable proposition that the agency must provide the individual who is purportedly being deprived of a liberty interest the evidence upon "which [the agency] based its decision." *Zerezghi*, 955 F.3d at 810; *see also ASSE Int'l, Inc.*, 803 F.3d at 1073-74 (applying *Mathews*). Plaintiffs' claim that ORR "refus[es] to permit children and their custodians the opportunity to inspect and rebut evidence material to ORR's decision-making before a neutral factfinder," Pls.' Br. 26, is unsupported by the record and is contrary to settled ORR policy. *See* Fact Response ¶¶ 73, 75, 197, 216.

10

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

the unfit-custodian classes with additional process beyond what the *Flores* Settlement requires.  *See* Defs.' Br. 26-29 (step-up class), 43-45 (unfit-custodian class); *see also* J.S. ¶¶ 21-29; Defs.' U.F. ¶¶ 28, 30, 33, 64-67.  And as Defendants have explained, Defs.' Br. 18-33, 38-49, ORR's procedures satisfy *Mathews* balancing as a matter of law.  Thus, Plaintiffs' argument that the Court need not engage in *Mathews* balancing on their procedural-due-process claims fails.

## C. The Court should deny Plaintiffs' motion for partial summary judgment on the step-up claim.

### 1. ORR's policies and procedures for the step-up class satisfy due process as a matter of law.

If the Court determines that *res judicata* does not bar Plaintiffs' claims, the Court should deny Plaintiffs' motion for summary judgment on the step-up class's due-process claim because ORR's policies and procedures for step-up decisions satisfy due process as a matter of law.  The *Mathews* factors—the private interests at stake, the risk of erroneous deprivation, and the government's interest, *Mathews*, 424 U.S. at 335—all confirm that ORR's policies and procedures comport with the Fifth Amendment.

#### a. Private interests

As Defendants have explained, the private interests at stake for the step-up class—which comprises minors who enter the United States without a parent or legal custodian and without lawful immigration status—are limited.  Defs.' Br. 19-25.  Children, "unlike adults, are always in some form of custody."  *Reno v. Flores*, 507 U.S. at 302; *see also Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986) ("the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings").  And minors in ORR care differ in significant ways from minors in the juvenile-justice context.  As Defendants have explained, Defs.' Br. 22, a minor who is detained in the domestic juvenile-justice system is coercively confined with no ability to secure release, other than through the procedural protections afforded under *In re Gault*, 387 U.S. 1 (1967), to prove his or her innocence.  In contrast, minors in the ORR context can obtain release through multiple

11
Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

avenues, including by obtaining lawful immigration status, voluntarily departing the United States, or being released to a sponsor.  8 U.S.C. §§ 1229c, 1232(a)(5)(D); 8 C.F.R. § 240.25; *cf. Parra v. Perryman*, 172 F.3d 954, 958 (7th Cir. 1999) ("An alien in Parra's position can withdraw his defense of the removal proceeding and return home to his native land, thus ending his detention immediately.  He has the keys in his pocket.").  Thus, all four of Plaintiffs' asserted liberty interests have limited weight as applied to the step-up class, Pls.' Br. 21-24, 37-38,[3] and are decisively outweighed by the other *Mathews* factors.

> ***First***, Plaintiffs assert that the step-up class has a liberty interest in freedom from "physical restraint" and a related interest in freedom from placement in residential care.  Pls.' Br. 20-21 (quoting *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001)); *see also* Pls.' Br. 37-38.  In making this argument, however, Plaintiffs fail to address the fact that children "are always in some form of custody," *Reno v. Flores*, 507 U.S. at 302, and the cases they cite in support all pertain to adults, not children.  *See* Pls.' Br. at 20-21 (citing *Zadvydas*, 533 U.S. at 690; *Hernandez v. Sessions*, 872 F.3d 976, 981 (9th Cir. 2017); *Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011)).  Further, as explained, the liberty interest of minors in ORR custody is different from (and entitled to less weight than) the liberty interest of minors in the juvenile-detention context because of the numerous options available to the former for securing their release, none of which pertains to proof of innocence, as in *Gault*, 387 U.S. at 33.  Further, as Defendants have explained, Defs.' Br. 23-24, Plaintiffs erroneously treat secure, staff-secure, and residential-treatment-center facilities indiscriminately.  As compared with shelters, staff-secure facilities merely provide a greater staff-to-child ratio, increased communications, and more services to control problem behaviors.  Defs.' U.F. ¶¶ 37-39.  And contrary to Plaintiffs' assertion that placement at an ORR state-licensed residential treatment center "amount[s] to

---

[3] Because Plaintiffs combine the private interest analysis under *Mathews* for both the step-up and unfit-custodian classes in Part IV.A of their brief, it is unclear which of their identified interests purportedly apply to which class.  Pls.' Br. 20-24.  It is also unclear why Plaintiffs then address the private interests for the step-up and unfit-custodian classes in two separate parts of their brief.  *See* Pls.' Br. 20-24 (both), 28-29 (unfit-custodian class), 37-38 (step-up class).  Regardless, neither class is entitled to the relief sought.

civil commitment," Pls.' Br. 21, the two residential treatment centers in the ORR network differ significantly from the inpatient-hospitalization context.   ORR's two residential treatment centers are based on a group-home model where residents sleep without locked doors and security is provided by means of a higher staff-to-minor ratio, and both facilities maintain significant community connections. Defs.' U.F. ¶¶ 44, 48.

In an attempt to bolster their asserted liberty interest in freedom from physical restraint, Plaintiffs point to a list of harms that members of the step-up class allegedly experience in ORR care.   Even if true, however, these alleged harms do not meaningfully strengthen their asserted liberty interest. Pls.' Br. 38.   To start, Plaintiffs assert that UACs in secure facilities "are subject to being pepper sprayed by guards," and that minors in RTCs "may be required to undergo mandatory behavior modification" and are "forced to take psychotropic medications." Pls.' Br. 21, 38.   But Plaintiffs adduce no evidence that any of these isolated emergency measures, even if they happened as Plaintiffs claim, violate applicable state-licensing requirements, and isolated incidents do not support a class-wide finding that Defendants have violated Plaintiffs' due process rights.   *See Henry v. Cty. of Shasta*, 132 F.3d 512, 517 (9th Cir. 1997) (a government entity is liable only when "the unlawful actions of its employees or agents were taken pursuant to that defendant's policies or customs, including a policy of being deliberately indifferent to the rights of its inhabitants") (internal citations omitted); *see also Spencer v. Knapheide Truck Equip. Co.*, 183 F.3d 902, 905 (8th Cir. 1999) (to find municipality liable requires proof of constitutional violation pursuant to official policy or misconduct so pervasive among employees as to constitute custom or usage).   In any event, these factual assertions are unsupported by the record and do not bolster their liberty claim. *See* Fact Response ¶¶ 130, 133-34 (ORR does not have a policy or practice of forcible medication), 135 (only children who have been charged with a sex offense undergo such treatment); J.S. ¶ 51 (only the Yolo secure facility permitted the use of pepper spray, and Yolo is no longer an ORR grantee).   Plaintiffs further assert that "restrictive placements can lead to deterioration of children's mental health (SUF ¶ 136)" and "that failing to step-down children who are ready for step-down can be detrimental to their long-term psychological well-being

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

1   and contrary to their best interest[ ]. (SUF ¶ 138)." Pls.' Br. 38. But Plaintiffs provide no

2   evidence that ORR, as a matter of policy or practice, fails to step-down children who are ready

3   for step-down, and Plaintiffs' factual assertions are again unsupported by the record. *See*

4   *Henry*, 132 F.3d at 517; *see also Spencer*, 183 F.3d at 905; Fact Response ¶¶ 136, 138.

5           To further bolster their asserted liberty interest in freedom from physical restraint,

6   Plaintiffs provide another list of alleged harms that purportedly arise from ORR's existing

7   policies and procedures regarding step-up. Pls.' Br. 38. To start, Plaintiffs' list challenges

8   the adequacy of ORR's procedures, and thus, should be applied to the second *Mathews* factor,

9   not the first. In any event, this list fails to support Plaintiffs' claimed liberty interest. Plaintiffs

10  allege that once stepped up, "children spend significantly longer detained and separated from

11  family—on average 131.2 days longer than children not stepped up (SUF ¶ 141)." *Id.*

12  Relatedly, Plaintiffs allege that "children detained in secure, staff-secure, therapeutic staff-

13  secure, RTCs, OON facilities, or therapeutic group homes are less likely to be reunified with

14  a proposed custodian (SUF ¶¶ 144-45), and more likely to voluntarily depart the United States

15  than children who are only ever placed in shelter care (SUF ¶¶ 146-47)." *Id.* Neither

16  allegation supports Plaintiffs' charge that ORR's step-up decisions harm their asserted liberty

17  interest in freedom from physical restraint. Although stepped-up minors on average have

18  longer lengths of care, there is no evidence that restrictive placements *cause* the increased

19  time in care or affect the likelihood of release to a particular sponsor. *See* Fact Response ¶

20  115, Defendants' Exhibit (DX) 30 [Dr. Ryan Rep. ¶ 44] ("any correlation between such

21  placement and length of stay does not support a finding that such placements *cause* prolonged

22  stay") (emphasis in original). As one child-welfare expert explained, "these children have

23  additional needs and demonstrate behaviors that (1) increase their likelihood of placement in

24  settings more secure than the shelter level and (2) decrease the likelihood of a safe potential

25  sponsor coming forward or being identified, being vetted, and being approved as quickly."

26  *Id.* Thus, Plaintiffs' assertion that step-up is correlated with longer lengths of care—and the

27  implication that moving children out of secure, staff-secure, or residential treatment would

28  therefore *reduce* lengths of care—does not buttress their claimed liberty interest in freedom

from physical restraint because it is unsupported by their own evidence.  *See* DX-77 [Dr. Ryo Dep.] 31:8 ("I am not claiming causation in my report.").  Next, Plaintiffs allege that "children remain in restrictive placements despite ORR's having found them suitable for step-down (SUF ¶ 137)."  Pls.' Br. 38.  But ORR policy expressly provides that "[i]f the care provider and ORR/FFS determine that a new level of care is appropriate, the care provider *must* use the ORR process for transferring the youth to another care provider."  ORR Guide § 1.4.2 (emphasis added).  That delays may at times occur during the transfer process, without more, does not support their liberty interest.  *See Ham v. Pennington Cty. Bd. of Comm'rs*, 158 Fed. App'x 761, 762 (8th Cir. 2005) (finding no liability against county even when plaintiff "presented evidence that his condition worsened as a result of treatment delays" because he "did not allege an unconstitutional policy, and he did not present evidence establishing an unconstitutional custom, or pervasive misconduct").  Finally, Plaintiffs allege that "children who are stepped up are unlikely to be released to URM [Unaccompanied Refugee Minors] programs (SUF ¶¶ 148-49), and are ineligible for step-down to long-term foster care programs (SUF ¶ 139)."  Pls.' Br. 38.  But this allegation does not describe ORR policy or practice, to the extent this is accurate, it is reflective of local programs' own hesitancy to accept children with a history of significant mental health or behavioral needs.  *Compare* Pls.' Br. 38 (citing Plaintiffs' Statement of Uncontroverted Facts and Conclusions of Law (Pls.' U.F.) ¶ 139), *with* Pls.' U.F. ¶ 139 (citing the following as supporting evidence: "Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 371:8-372:3 (no prohibition but not aware of this happening)"); *see also* Fact Response ¶ 148.  None of these alleged harms establishes that, as applied to ORR step-up decisions, Plaintiffs have anything more than a limited interest in freedom from physical restraint, or that this limited interest outweighs the other *Mathews* factors.

      ***Second***, Plaintiffs assert a liberty interest in "family integrity or . . . familial association."  Pls.' Br. 21 (quoting *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011)).  Any such interest, however, is again limited.  To the extent Plaintiffs claim that their interest in family integrity or association is affected by ORR's step-up practices because such practices lead to longer lengths of stay, Pls.' Br. 38, as explained, Plaintiffs have not proffered

any evidence that ORR's step-up practices *cause* longer lengths of stay.  *See* Fact Response ¶¶ 141, 144-47.  Further, the relationships between the named Plaintiffs and their proposed sponsors vary substantially, and *Reno v. Flores* forecloses Plaintiffs' asserted liberty interest for step-up class members with "no available parent, close relative, or legal guardian."  507 U.S. at 303 ("We are unaware, however, that any court—aside from the courts below—has ever held that a child has a constitutional right not to be placed in a decent and humane custodial institution if there is available a responsible person unwilling to become the child's legal guardian but willing to undertake temporary legal custody.").

*Third*, Plaintiffs assert a liberty interest under the TVPRA, 8 U.S.C. § 1232(c)(2)(A), in being "'promptly' placed 'in the least restrictive setting that is in the best interest of the child,' generally with 'a suitable family member' or other available guardian or entity."  Pls.' Br. 22.  This claimed liberty interest fails as a matter of law.  To start, Plaintiffs misquote 8 U.S.C. § 1232(c)(2)(A), which provides that "an unaccompanied alien child in the custody of the Secretary of Health and Human Services shall be promptly placed in the least restrictive setting that is in the best interest of the child" and that "[p]lacement of child trafficking victims may include placement in an Unaccompanied Refugee Minor program, pursuant to section 412(d) of the Immigration and Nationality Act (8 U.S.C. § 1522(d)), if a suitable family member is not available to provide care."  Under this statutory language, the requirement to place a UAC with a "suitable family member" relates to "placement of child trafficking victims," and is not a condition for restrictive placement decisions in general.  Further, as Defendants have explained, Defs.' Br. 19-20, a statute creates a protected liberty interest only when it: (1) establishes "'substantive predicates' to govern official decision-making," and (2) uses "'explicitly mandatory language,' *i.e.*, specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 462-63 (1989) (internal citations omitted).  The TVPRA uses broad language that directs the Secretary to consider "danger" to self or others in making placement decisions without mandating a particular outcome, 8 U.S.C. § 1232(c)(2)(A), and thus, does not create a protected liberty interest.

16

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

**Fourth**, Plaintiffs assert "a constitutionally protected liberty interest in non-secure, licensed facilities" under the *Flores* Settlement. Pls.' Br. 23-24. This claimed liberty interest similarly fails. As Defendants have explained, Defs.' Br. 20-21, the Ninth Circuit has never held that a consent decree can expand on itself, creating protected liberty interests that mandate *additional* procedures that the parties never negotiated or agreed upon; to hold otherwise would contravene the rule that a "consent decree, like a contract, must be discerned within its four corners." *United States v. Asarco Inc.*, 430 F.3d 972, 980 (9th Cir. 2005). It would also conflict with this Court's ruling in *Flores* that procedural remedies (like the ones sought here) are not available to Plaintiffs for violations of the Settlement, as well as the Ninth Circuit's ruling that the TVPRA "codified" the standards already included in the Settlement. *See Flores v. Barr*, Case No. 2:85-cv-04544, ECF No. 470 at 2-3 (July 30, 2018); *Flores v. Lynch*, 828 F. 3d 898, 904 (9th Cir. 2016). This is particularly true given that the *Flores* Settlement *already* provides procedures for contesting restrictive placements under paragraphs 24A ("a bond redetermination hearing before an immigration judge") and 24B ("judicial review"), and set "the standard of review for the INS's exercise of its discretion [to] be the abuse of discretion standard of review" (¶ 24C). Thus, even if a consent decree could confer a protected liberty interest in certain limited instances, *see Smith v. Sumner*, 994 F.2d 1401 (9th Cir. 1993), the Settlement does not do so here.

In sum, all of Plaintiffs' asserted liberty interests either fail or have limited weight as applied to the step-up class.

**b. Risk of erroneous deprivation**

As Defendants have explained, Defs.' Br. 25-31, ORR's policies and procedures for the step-up class already minimize the risk of erroneous deprivation, and adding the further procedures that Plaintiffs seek will not meaningfully reduce that risk (to say nothing of the fact that Plaintiffs' requested relief is not remotely tailored to the harms they allege). There is no dispute that the probability of step-up to a more restrictive facility for any individual UAC is very low, particularly compared to children in the domestic child-welfare system. *See* Defs.' U.F. ¶¶ 98-103; J.S. ¶ 91. Further, of the small fraction of children in ORR care who

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

are stepped up, most are stepped up only after more than two months in shelter care (86%), reflecting the fact that ORR first seeks to accommodate the needs of children in a less restrictive placement.  *See* Defs.' U.F. ¶ 104 (citing DX-30 [Dr. Ryan Expert Rep.] ¶ 35 ("one would likely conclude, as I do, that stepping UAC up to more secure settings is not overused")).   Plaintiffs assert that "ORR's opaque process also has resulted in numerous erroneous decisions—either sending children to unnecessarily restrictive detention centers where children suffer long lasting harms or keeping children in restrictive placements even after a step-down decision is made."  Pls.' Br. 38-39.  But to the extent that Plaintiffs assert that, for the small percentage of UACs in ORR care who are stepped-up, "numerous erroneous decisions" have been made, this claim is not supported by the record.  *See* Fact Response ¶¶ 137, 218-19.  In any event, ORR's policies and procedures already provide for extensive monitoring and oversight to reduce the risk of error.  This includes: (1) a review of the placement decision at least every 30 days by the case manager, case coordinator, and federal field specialist, documented in the Notice of Placement; (2) 30 day Director review; (3) a separate review by an internal ORR monitoring panel for compliance with ORR requirements on notice and placement criteria; and (4) for any UAC who has been in a secure or residential-treatment-center facility for more than 90 days, consultation between the federal field specialist and supervisory ORR staff regarding the reasons for the continued placement. Defs.' U.F. ¶¶ 58-60, 64, 86.  Plaintiffs do not explain how adding the extraordinarily onerous procedures they seek will meaningfully reduce the risk of error.

Instead, in an effort to illustrate the alleged risk of error under current procedures, Plaintiffs point to the only class representative who was placed in a secure facility, Jaime D., and assert that he was kept in the secure facility "three weeks *after* it was determined that he had been erroneously placed there in the first place."  Pls.' Br. 39 (emphasis in original).  That is not correct.  ORR staff agreed, after Jaime D. recanted his earlier story that he was a member of a dangerous gang and had murdered multiple people, that he should no longer remain in a secure facility, but that does not mean the initial placement decision was erroneous.  Rather, Jaime D.'s initial placement was based on his detailed account of how, as a gang member, he

had murdered four people in his home country at the gang's behest—shelter staff, the third-party case coordinator, and the federal field specialist *all* concurred in the placement. Defs.' U.F. ¶¶ 114-17. Given the seriousness of Jaime D.'s claims, the need to corroborate his recantation, and the need to identify an appropriate less restrictive placement, the fact that he was stepped down to a less restrictive placement within three weeks shows that ORR's robust review process was both responsive and effective, not the opposite. Defs.' U.F. ¶¶ 119-22.

Plaintiffs also identify seven alleged deficiencies in ORR's policies and procedures regarding step-up that they claim create a risk of erroneous deprivation. Pls.' Br. 40-51. None of these alleged deficiencies—whether taken individually or together—establishes a risk of erroneous deprivation, and Plaintiffs' arguments to the contrary rest on a host of legal and factual errors.

As an initial matter, to the extent the seven purported deficiencies pertain to procedures that exceed what Plaintiffs identified in their complaint and what is covered by the Court's certified class definition, any relief predicated on the alleged deficiencies is waived and beyond the scope of available injunctive relief. *See King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987) ("All causes of action alleged in an original complaint which are not alleged in an amended complaint are waived."); *see also Al Otro Lado, Inc. v. McAleenan*, 423 F. Supp. 3d 848, 878 (S.D. Cal. 2019) (holding that "the scope of the injunctive relief is limited by the class definition"). Plaintiffs' complaint alleges that "[d]ue process requires that ORR give Plaintiffs and their proposed class members meaningful notice and an opportunity to be heard before it places them in RTCs, medium-secure or secure facilities and an ongoing review with commensurate protections every thirty days." Plaintiffs' First Amended Complaint, ECF No. 81 (Compl.) ¶ 122. In accordance with this claim, the Court certified the step-up class as comprising "minors in ORR custody pursuant to 6 U.S.C. section 279 and/or 8 U.S.C. section 1232 who are or will be placed in a secure facility, medium-secure facility, or RTC, or whom ORR has continued to detain in any such facility for more than 30 days, *without being afforded notice and an opportunity to be heard before a neutral and detached decisionmaker* regarding the grounds for such placement." ECF No. 141, Amended Order (Order) at 27 (emphasis

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

added).  Thus, all of the relief that Plaintiffs now seek for the first time in their motion that exceeds "notice and an opportunity to be heard" before placement in a more restrictive facility fails as a matter of law.  This includes "pre-deprivation hearings and notice [notice and hearing prior to step-up]," Pls.' Br. 43; "the right to counsel" through government-funded legal service providers, Pls.' Br. 46; "an automatic hearing" rather than one requested by the minor or their attorney, Pls.' Br. 46; and "individualized periodic review" where the minor can "participate," can "submit evidence," and is "allowed an opportunity to cross-examine witnesses," Pls.' Br. 48-49.  *See Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636-37 (9th Cir. 2015) (holding that the district court lacks authority to grant injunctive relief absent a "sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth in the underlying complaint").  Plaintiffs are also precluded from seeking injunctive relief with respect to placements not covered in the certified class definition, such as placements in therapeutic staff-secure, therapeutic group home, or out-of-network facilities mentioned in Plaintiffs' proposed order.  *See, e.g.*, Pls.' Proposed Order ¶ 9; *see also* Compl. ¶¶ 123-24.  In any event, none of the seven purported deficiencies Plaintiffs identify gives rise to a due process violation.  Pls.' Br. 40-51.

    ***First,*** Plaintiffs argue that ORR fails "to provide Class Members adequate notice and an opportunity to be heard."  Pls.' Br. 40-44.  This argument fails because ORR's policies and procedures regarding notice satisfy due process: within 48 hours of placement, a Notice of Placement must be provided to all minors who are stepped up setting forth the grounds for the placement decision and the minor's right to challenge the placement, in a language the minor understands.  Defs.' U.F. ¶¶ 54, 56-57.  To the extent that Plaintiffs claim that due process requires "prior notice that [a minor] may be stepped up or the reasons for step-up," Pls.' Br. 41, they cite no case law for that proposition.  *Gault* only held that notice "must be given sufficiently in advance of *scheduled court proceedings*," 387 U.S. at 33 (emphasis added), not prior to the placement decision, and *Gault* certainly does not require notice that there is a *possibility* the minor "may be stepped up" at some point in the future.

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs' further arguments on notice also fail.  Plaintiffs argue that "ORR procedures do not require that the notice be provided within the same time frame to children placed in out-of-network facilities, or to children placed in therapeutic group homes at all."  Pls.' Br. 41.  But this claim is unsupported by the record, and ORR requires a Notice of Placement to issue within 48 hours of step-up to any restrictive setting, including out-of-network placements.  *See* Fact Response ¶ 184. In any event, out-of-network facilities are not mentioned in their complaint and are therefore beyond the scope of this litigation.  *See* Compl. ¶¶ 123-24.  Further, Plaintiffs proffer no evidence that notice is not provided sufficiently in advance of the placement review, which, as explained, is all that *Gault* requires for placement in a secure juvenile-detention facility.  387 U.S. at 33.  Plaintiffs also assert that "[c]hildren do not always receive a NOP within 48 hours after arrival at a restrictive placement." Pls.' Br. 41. But Plaintiffs proffer no evidence that this occurs "pursuant to [ORR's] policies or customs" or is the result of deliberate indifference on the part of ORR.  *Henry*, 132 F.3d at 517.  To the contrary, the record conclusively establishes that upon learning that some children did not receive an NOP within 48 hours of placement, ORR established "a central office compliance review team," whose duties include ensuring that "a notice of placement has been timely provided," and since compliance reviews began two years ago, "the reviews have resulted in almost 100 percent compliance."  DX-10 [Biswas Decl.] ¶¶ 51-52.  Plaintiffs next argue that "[c]hildren do not consistently know or understand the reasons for restrictive placement and are not consistently informed and sometimes do not understand the contents of the notice." Pls.' Br. 41.  This claim again flies directly in the face of ORR's policies and practices.  ORR provides the Notice of Placement in English and Spanish; maintains extensive translation requirements for all care-provider facilities under ORR Guide 3.3.7 (discussed further *infra*); and requires the case manager to explain the Notice to the child in a language he or she understands, which the child then signs.  Defs.' U.F. ¶¶ 54, 57.  Plaintiffs adduce no evidence that ORR has a policy or practice of failing to ensure that children understand the Notice, or is "deliberately indifferent" to whether children do so.  Plaintiffs also argue that "[t]he NOP does not include documents or other evidence supporting the step-up decision."

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

Pls.' Br. 41.  But this too does not support Plaintiffs' claim, because it is undisputed that ORR's policies and procedures already require the case manager "to share all of the information used in assessing the restrictive placement with the UAC's attorney of record, Legal Service Provider or Child Advocate, on demand." DX-10 [Biswas Decl.] ¶ 44.  Further, as a matter of practice, the Notice of Placement for "secure placements such as Shenandoah Valley Juvenile Center" (the only secure ORR facility at present) includes "all the information that the case manager and case coordinator reviewed in recommending whether a child should be stepped up or remain in a more restrictive placement." *Id.* ¶ 43.  Finally, Plaintiffs argue that "[c]hildren are not given adequate opportunity to respond to the [Notice]." Pls.' Br. 41. But this is merely their request for a hearing recast as a failure to provide notice.  And in any event, ORR provides numerous opportunities to respond to the Notice of Placement, including: regular meetings between UACs and their case manager, 30 day Director review, *Flores* bond hearings, administrative hearings before the placement review panel, and judicial review.  Defs.' U.F. ¶¶ 18, 61, 63-65, 67.  Nothing Plaintiffs point to establishes that ORR's notice procedures are constitutionally deficient.

Plaintiffs also assert that Defendants fail to provide a "constitutionally adequate opportunity to be heard." Pls.' Br. 42-44.  But as discussed above, and as Defendants have previously explained, Defs.' Br. 26-29, ORR's policies and procedures provide multiple avenues for meaningful hearings regarding step-up decisions.  Plaintiffs now assert (for the first time) that due process requires a *pre-deprivation* hearing "prior to initial placement or step-up to a restrictive setting." Pls.' Br. 42.  But Plaintiffs did not allege in their complaint that due process requires a pre-deprivation hearing, nor does the class definition (minors in a restrictive setting "for more than 30 days") reflect any such alleged requirement.  Plaintiffs' request for mandatory pre-deprivation hearings is thus beyond the scope of this case.  *See King*, 814 F.2d at 567; *see also Al Otro Lado, Inc.*, 423 F. Supp. 3d at 878.  Moreover, Plaintiffs cite no case establishing that a pre-deprivation hearing is required in this context. As noted, *Gault* does not require a pre-deprivation hearing in the juvenile-justice context, nor does *Parham v. J.R.*, 442 U.S. 584 (1979) require a pre-deprivation hearing in the involuntary-

commitment context.  *See Gault*, 387 U.S. at 31-34 (requiring only notice in advance of the hearing); *see also Parham*, 442 U.S. at 607 ("It is not necessary that the deciding physician conduct a formal or quasi-formal, hearing.").[4]  And Plaintiffs' unsupported assertion that it is "feasible to provide pre-deprivation hearings and notice where ORR steps up relatively few children" ignores operational realities.  As the Director of ORR's Division of Unaccompanied Children Operations explained, "children who know they are leaving the current care provider may escalate behaviors—either because they know they will no longer be subject to the behavior plans of the current shelter, or because they disagree with the transfer."  DX-09 [Antkowiak Decl.] ¶ 33.  Further, "[i]f the minor hurts other children or staff through such behavior, this creates additional risk for the program, as well as potential liability for grantee care providers, potentially affecting their willingness to participate as licensed care providers in the program."  *Id.*  And contrary to Plaintiffs' assertion that *Saravia v. Sessions*, 905 F.3d 1137, 1140-41 (9th Cir. 2018), applies here, Pls.' Br. 44, that case involved the re-arrest of UACs who had *already* been placed with sponsors.  This case, by contrast, involves minors who are still in ORR custody.

Plaintiffs' related arguments for why ORR's post-placement hearings are "inadequate" similarly fail.  Pls.' Br. 43.  To start, Plaintiffs' assertion that "[o]nly children placed in RTCs and secure facilities are afforded [post-placement hearings], but not children placed in staff-secure, therapeutic staff-secure, or therapeutic group homes," *id.*, is simply wrong.  *Flores* bond hearings and judicial review are available to *any* minor in ORR custody seeking reconsideration of a placement decision, regardless of the type of facility.  *See* ORR Guide § 2.9; Defs.' U.F. ¶¶ 63, 65.  Moreover, to the extent that Plaintiffs argue that ORR is legally required to provide the opportunity to seek reconsideration from the ORR Director of placements in non-secure facilities, the TVPRA only requires such review for secure facilities.

---

[4] To the extent the Court in *Zinermon v. Burch*, 494 U.S. 113, 127 (1990), suggested that *Parham* requires a pre-deprivation "hearing" because *Parham* requires a "determination by a neutral physician whether the statutory admission standard is met before confinement of child in mental hospital," ORR provides such a "hearing" by requiring a licensed psychologist or psychiatrist to approve the placement.  *See* Defs.' U.F. ¶¶ 46-47; J.S. ¶¶ 54-55.

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

8 U.S.C. § 1232(c)(2)(A) ("The placement of a child in a secure facility shall be reviewed, at a minimum, on a monthly basis, in accordance with procedures prescribed by the Secretary."). Plaintiffs further argue that ORR's post-placement hearings are inadequate because minors "are not heard by a neutral factfinder"; "have no ability to inspect or rebut information relied upon in making a placement decision"; "have no opportunity to present witnesses or evidence on their own behalf"; and "have no chance to cross-examine adverse witnesses." Pls.' Br. 43. These factual allegations are not supported by the record, *see, e.g.,* Fact Response ¶¶ 204, 216, and in any event, Plaintiffs' arguments are all foreclosed by *Flores v. Sessions*, 862 F.3d at 867-68. There, the Ninth Circuit held that *Flores* bond hearings, which are available to all members of the step-up class, provide each of these features Plaintiffs (wrongly) claim are lacking: among other things, the Ninth Circuit said that a *Flores* bond hearing "is a forum in which a child has the right to be represented by counsel, and to have the merits of his or her detention assessed by an *independent* immigration judge," and is "an opportunity for counsel to bring forth the reasons for the minor's detention, *examine and rebut the government's evidence*, and *build a record* regarding the child's custody." *Id.* (emphasis added). Plaintiffs' claim that they lack a meaningful opportunity to be heard because they lack access to a "neutral factfinder" and have "no opportunity to present" and rebut evidence is without merit.

**Second**, Plaintiffs argue that ORR fails to "articulate clear standards to initially place, step-up, or step-down children." Pls.' Br. 44-46. To start, Plaintiffs' assertion that ORR's standards are not "clear" is plainly contradicted by the record and ORR's policies and procedures, and Plaintiffs proffer no evidence as to why the standards are not "clear." *See* ORR Guide §§ 1.2.4 (criteria for secure and staff-secure placements), 1.4.6 (criteria for residential treatment center placements).

Plaintiffs' arguments in support of this claim also fail. To begin, Plaintiffs argue that "ORR admits that it does not use any type of evidentiary standard in making detention placement decisions." Pls.' Br. 45. This misrepresents what Defendants actually said. *See* Pls.' U.F. ¶ 177. In their response to Plaintiffs' request for admission, Defendants stated "ORR does not use a specific evidentiary standard in assessing whether, for the child's own

protection and/or the protection of others, the child should be transferred to a more restrictive setting."  Plaintiffs' Exhibit (Ex.) 5 [RFA 1st set] No. 97 at 508-09.  Rather, "[t]he decision to transfer an unaccompanied alien child to a more restrictive placement is based on consideration of multiple factors as articulated in the ORR Guide at § 1.2.4." *Id.*  This response reflects Defendants' fundamental disagreement with the premise of Plaintiffs' request for admission, which suggested that ORR is "a judicial body." *Id.*  Consistent with other child-welfare contexts, care provider facilities are staffed with social workers, who make placement decisions guided by child-welfare principles and the factors articulated in the ORR Guide.   Further, the *Flores* Settlement itself articulates no "evidentiary standard" for placement decisions, yet Plaintiffs have never argued (at least until now) that that renders the Settlement unconstitutional.  Next, Plaintiffs argue that "ORR's written policies offer only limited guidance to case staff for initially placing, stepping up or stepping down children, and no guidance whatsoever on how to weigh information relevant to placement decisions." Pls.' Br. 45.  But the sections in the ORR MAP pertaining to step-up and release are 219 pages long and provide detailed operational instructions on how to implement the Guide. *See* Exs. 2, 3 [ORR MAP Sections 1 and 2].  Plaintiffs' further assertion that "not all FFS receive formal training on the differences between all of the different restrictive detention centers," Pls.' Br. 45, is similarly unsupported by the record based upon Plaintiffs' misreading of the evidence. *See* Fact Response ¶ 175.  Plaintiffs also claim that "ORR's written policies and procedures on initial placements, step-up, and step-down change frequently, are not always consistent, and are not published in the Federal Register or a Notice of Proposed Rulemaking and are therefore shielded from public scrutiny."  Pls.' Br. 45.  Plaintiffs' assertions that ORR's policies "change frequently" and are "not always consistent" are statements of opinion, not fact, and Plaintiffs nowhere explain how ORR's policies and procedures, which are publicly available, are "shielded from public scrutiny."  And ORR published a proposed and final rule in the Federal Register but was enjoined by the *Flores v. Barr* Court at the initiative of Plaintiffs' counsel here.  407 F. Supp. 3d 909 (C.D. Cal. 2019).

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

Next, Plaintiffs argue that "FFS make placement decisions based on information and evidence provided by case staff, which is not always accurate, and do not independently interview the children and/or their potential sponsor to aid in their decision-making." Pls.' Br. 45.  Due process, however, does not require federal field specialists, who are responsible for multiple care provider facilities located in multiple geographic locations, J.S. ¶¶ 5-7, to separately interview each minor, when that responsibility has already been entrusted to care provider staff.  Plaintiffs provide no case support to the contrary.  Moreover, federal field specialists, as a matter of practice, *do* meet with children.[5]  Finally, Plaintiffs argue that "in most cases, FFS placement decisions are not subject to review, and FFS may disregard recommendations of case staff when making such decisions." Pls.' Br. 45.  But this ignores the operational realities of how placement decisions are made.  Placement decisions are collaborative endeavors subject to multiple levels of internal review, as well as multiple avenues for external review, as discussed above.  Defs.' U.F. ¶¶ 60-67.  That federal field specialists may, in theory, "disregard recommendations of case staff" does not mean that they do so in practice—indeed, this assertion contradicts Plaintiffs' assertion elsewhere that "FFS make placement decisions based on information and evidence provided by case staff." Pls.' Br. 45.

***Third***, Plaintiffs argue that ORR fails to "provide counsel to challenge restrictive placements." Pls.' Br. 46.  But government-funded counsel is not required in this context, as recognized by federal statutes and court decisions declining to impose a right to government-funded counsel in analogous situations.  *See, e.g.*, *Goldberg*, 397 U.S. at 270 ("We do not say

---

[5] *See* Defs.' U.F. ¶ 13 (citing DX-20 [David Dep.] 7:17-8:12 ("Q. Do you have much direct contact with the children?  A. Yes.  Q. Can you explain just the circumstances where that would occur?  A. There are times where I would meet with children or they request to meet with me.  Q. What would be the type of thing that a child would ask to meet with you about?  A. To discuss their case.  Q. And would that include your decision on their safe and timely release?  A. It allows them to provide me with information or talk to me about their case.  That supports decisions that I make.  Q. Okay.  So other than the decision on release, what other types of decisions that you make would a child have occasion to talk to you about?  A. I've spoken to children in regards to their placement.").

that counsel must be provided at the pre-termination hearing, but only that the recipient must be allowed to retain an attorney if he so desires."). Nor is there a right to government-funded counsel for UACs in the ORR context created by statute or appropriation. *See infra* Part E. Indeed, the right to counsel in such proceedings has always been understood to mean the right to *retain* counsel, not the right to government-funded counsel. *See, e.g.*, *Flores v. Sessions*, 862 F.3d at 867 (describing *Flores* bond hearings as "a forum in which a child has the right to be represented by counsel").

**Fourth**, Plaintiffs argue that ORR fails "to provide automatic hearings before a neutral factfinder." Pls.' Br. 46-47. But this alleged deficiency again was not raised in the complaint, is not reflected in the class definition, and is beyond the scope of this case. *See King*, 814 F.2d at 567; *see also Al Otro Lado, Inc.*, 423 F. Supp. 3d at 878. Further, Plaintiffs' suggestion that the lack of an automatic hearing leads to erroneous step-up decisions is unsupported by the evidentiary record. The record conclusively establishes that once a minor is stepped up, the minor is provided a Notice of Placement within 48 hours informing the minor of his or her right to challenge the placement; shelter staff review the Notice with the minor in a language the minor understands; and the minor signs and dates the Notice to indicate he or she understood it. Defs.' U.F. ¶¶ 57-58. Further, in matters pending before placement review panel, ORR encourages the facility to seek assistance for the child from an attorney or a child advocate, and if the child does not have an attorney, the Juvenile Coordinator acts as an advocate for the child as needed. Defs.' U.F. ¶¶ 72-73. Plaintiffs point to no evidence that suggests the lack of an automatic hearing means that a hearing does not occur when the minor wants one.

Plaintiffs also proffer no evidence that the majority of states automatically provide the sort of trial-like hearings before step-up in secure, staff-secure, and residential-treatment-center facilities that Plaintiffs request in their proposed order, in which: minors have the right to present and cross-examine witnesses; ORR must establish by clear and convincing evidence that a less restrictive placement would be inconsistent with the child's interests; and the hearing officer must issue a written decision with "detailed, specific, and individualized

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

reasoning." Pls.' Proposed Order ¶ 10.  As to staff-secure placements, Plaintiffs rely upon one report, and that report does not even use the right definition of "staff secure." Pls.' Br. 46 (citing Pls.' U.F. ¶ 207).  The report defines "staff secure" as a "residential facilit[y] in which physical restriction is provided solely by staff."  DX-82 [Heldman Rep.] at p. 6; *see also* DX-70 [Heldman Dep.] 104:16-20 ("The staff secure facility would be one in which staff are primarily—or staff are given the ability to physically restrain children from leaving").  But that is not what an ORR staff-secure facility is, which is a facility where no physical restraints of any kind are used to prevent escape. Defs.' U.F. ¶ 39.  Plaintiffs point to *no* evidence that automatic hearings are required by the majority of states for such placements.  As to residential treatment centers, the author of the same report testified that she was not offering an opinion on residential care.  DX-70 [Heldman Dep.] 16:12-15 (Q. "Did you render any expert opinion on the placement of children in the residential treatment centers? A. No, I did not.").  Further, even if an automatic hearing is required for residential treatment, ORR already satisfies this requirement because it requires a psychiatrist or psychologist to approve every placement in residential care.  Defs.' U.F. ¶¶ 46-47; J.S. ¶¶ 54-55; *see also Zinermon*, 494 U.S. at 127 (stating that a "determination by a neutral physician whether the statutory admission standard is met" is a pre-deprivation hearing that satisfies *Parham*).  Further, as explained above, Plaintiffs' reliance on domestic juvenile-justice case law does not advance their position that due process requires an automatic hearing for all step-up decisions because the liberty interests of minors in the juvenile-detention context and minors in the ORR-context are fundamentally different—in the former, the minor is coercively confined with no ability to secure his or her release absent a showing of innocence, meaning that additional procedural safeguards are necessary to ensure that this greater loss of liberty comports with due process. *See, e.g.*, *In re Gault*, 387 U.S. at 31-34.  Minors in the ORR context, by contrast, can obtain release from a restrictive placement without proof of innocence, including through placement with a sponsor.

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

***Fifth***, Plaintiffs argue that ORR fails "to provide interpreters." Pls.' Br. 47-48. This is factually incorrect. ORR's policies and procedures clearly mandate comprehensive languages services:

> Care providers must make every effort possible to provide comprehensive services and literature in the native language of each unaccompanied alien child; provide on-site staff or interpreters as needed; and allow unaccompanied alien children to communicate in their preferred language when they choose. All ORR-required documents provided to unaccompanied alien children must be translated in the unaccompanied alien child's preferred language, either written or verbally. Translation services should be used when no written translation (assuming the child is literate) or on-site staff or interpreters are available.

ORR Guide § 3.3.7. Plaintiffs do not acknowledge, let alone explain, this clear policy. Moreover, Plaintiffs point to no record evidence that interpreters are not provided as a matter of practice.

***Sixth***, Plaintiffs argue that ORR fails "to provide periodic hearings on placement decisions." Pls.' Br. 48-49. Once again, this alleged deficiency was not raised in the complaint, is not reflected in the class definition, and is beyond the scope of this case. *See King*, 814 F.2d at 567; *see also Al Otro Lado, Inc.*, 423 F. Supp. 3d at 878. Plaintiffs' argument is also factually incorrect. As Defendants have explained, Defs.' Br. 26-29, ORR policy requires *multiple* levels of periodic review, including: (1) all restrictive placements are reviewed at least every 30 days by the case manager, third-party case coordinator, and the federal field specialist; (2) ORR separately reviews each placement at least every 30 days through an internal monitoring panel; (3) ORR Director review is available after 30 days; and (4) if a UAC has been in a secure or residential-treatment-center facility for more than 90 days, ORR requires the federal field specialist to consult with supervisory ORR staff about the reasons for the continued placement. Defs.' U.F. ¶¶ 58, 60, 64; J.S. ¶ 86. In addition, for UACs in a residential-treatment-center facility, ORR requires review every 30 days by a psychiatrist or psychologist to determine whether the minor should remain in residential care. Defs.' U.F. ¶ 47; J.S. ¶ 55. This is exactly the sort of review described in *Parham*. 442 U.S. at 607 ("a staff physician will suffice, so long as he or she is free to evaluate independently

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

the child's mental and emotional condition and need for treatment").  Plaintiffs point to no authority that these existing periodic review procedures do not satisfy due process, nor do they provide support for their (newly-raised) argument that periodic hearings "must include the full panoply of procedural rights," Pls.' Br. 48, which apparently means a full mini-trial every 30 days in which ORR must justify the continued placement by clear and convincing, *see* Pls.' Proposed Order ¶ 11.  Plaintiffs also assert that "ORR has failed to provide the reviews [under its existing procedures] under the mandated timeframe." Pls.' Br. 48-49.  But they base this argument on one incident from more than two years ago, *see* Pls.' U.F. ¶ 212, and since that time, ORR has implemented 30-day internal compliance reviews that have "resulted in almost 100 percent compliance," Defs.' U.F. ¶ 59.  Plaintiffs also argue that "even when [ORR] does provide a 30-day review, the review is meaningless where children are not permitted to and do not participate or submit evidence and are not allowed an opportunity to cross-examine witnesses."  Pls.' Br. 49.  This is simply a restatement of their claim that due process requires a full trial-like hearing every 30-days, for which they provide no legal support.

  *Seventh*, Plaintiffs argue that "ORR's failure to afford adequate due process protections runs contrary to prevailing state and child welfare practices" in state "juvenile justice systems." Pls.' Br. 49-51.  But as explained, the ORR context differs in significant ways from the domestic juvenile-justice context: minors in the domestic juvenile-justice system are coercively confined with no ability to secure their release other than through the procedural protections provided under *Gault* to prove their innocence.  In contrast, minors in the ORR context can obtain release from custody in a variety of ways that do not require proof of innocence.  *See* 8 U.S.C. §§ 1229c, 1232(a)(5)(D); 8 C.F.R. § 240.25; *cf. Parra*, 172 F.3d at 958.  Further, ORR operates under different statutory requirements, as well as a nationwide settlement agreement that addresses the precise matters at issue in this case.  *Gault* was decided in 1967 and *Parham* in 1979, long before the *Flores* Settlement was reached in 1997 in satisfaction of the plaintiffs' due process claims on placement, release, and conditions of care.  *See* Settlement at 3-4 (stating that "Plaintiffs have filed this action against Defendants,

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

challenging, *inter alia*, the constitutionality of Defendants' policies, practices and regulations regarding the detention and release of unaccompanied minors" and the parties "stipulate that it constitutes a full and complete resolution of the issues raised in this action").  Plaintiffs' counsel in *Flores* did not negotiate for the additional procedures that Plaintiffs now (belatedly) claim that due process requires, and Congress did not mandate the procedures for minors in ORR care under either the TVPRA or the Homeland Security Act.  Nor do *Gault*, *Parham*, or any other authority Plaintiffs point to mandate the sort of trial-like hearings every 30 days that Plaintiffs demand, in which ORR must justify continued placement by "clear and convincing" evidence, and where the "hearing officer" must issue a written decision "setting forth detailed, specific, and individualized reasoning for the decision."  Pls.' Proposed Order ¶ 11.  These facts weigh heavily against the conclusion that, 23 years after the *Flores* Settlement was entered, due process now mandates the extraordinary procedures Plaintiffs seek.

Moreover, as explained, Defs.' Br. 23-25, there are significant differences between secure, staff-secure, and residential-treatment-center facilities, and Plaintiffs adduce no evidence that states provide the same procedures for each placement.  As to staff-secure placements, the report Plaintiffs rely on does not even use the correct definition of "staff secure."  Pls.' Br. 46 (citing Pls.' U.F. ¶ 207).  ORR staff-secure facilities maintain the same state licensing and physical set-up as a shelter, with the primary difference being a higher staff-to-minor ratio in staff-secure facilities.  Defs.' U.F. ¶¶ 38, 40.  As to residential treatment centers, the author of the same report offered no opinion.  DX-70 [Heldman Dep.] 16:12-15 ("Q. Did you render any expert opinion on the placement of children in the residential treatment centers? A. No, I did not.").  This does not establish any sort of state practice for all but one facility that Plaintiffs challenge in their step-up claim.  *See* J.S. ¶ 51 ("Currently, the only secure juvenile center facility in which ORR places class members is SVJC.").

### c.  The government's interest and the balance of *Mathews* factors

As Defendants have explained, Defs.' Br. 31-32, the government's interests weigh heavily against Plaintiffs' requested relief as to the step-up class.  First, Defendants have a strong interest in the prompt and safe placement of minors to avoid serious harm to the child

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

and others in ORR's care.  Defs.' U.F. ¶¶ 41-43, 75-78.  The additional procedures that Plaintiffs seek would result in significant delays in making and implementing step-up decisions, and such delays could "put the children themselves at risk, other minors, and staff." Defs.' U.F. ¶¶ 77-78 (citing DX-09 [Antkowiak Decl.] ¶ 33).

Second, the government has a substantial interest in the sound allocation of its resources.[6]  As Defendants have explained, Defs.' Br. 32, in contrast to the Department of Homeland Security (DHS), which has approximately 1,100 attorneys and 350 support personnel funded by congressional appropriations to represent DHS in administrative proceedings, ORR has traditionally funded only two dedicated attorneys—thus, any appreciable increase in administrative hearings would significantly burden the agency.  Defs.' U.F. ¶ 80.  Indeed, to implement *all* of the procedures Plaintiffs now demand (raised for the first time in their motion) would overwhelm the ORR UAC program.  *See* DX-09 [Antkowiak Decl.] ¶ 35 ("Adding automatic hearings… would increase workload" and "detract[ ] from the time that would otherwise be spent caring for the minor"); *id.* ¶ 36 (for residential treatment centers, "additional demands on case managers . . . could reduce the availability of such settings, and/or the willingness of independent licensed care providers to work with the ORR federal program"); DX-67 [Biswas 30(b)(6) Dep. Supp.] 445:7-20 (listing as costs "time," "funding," and ORR's "ability to open new programs").  These burdensome procedures include: (1) full trial-like evidentiary hearings that are conducted automatically and pre-placement for step-up to any "secure, staff secure, therapeutic staff secure, therapeutic group home, RTC or OON facility," from which a "detailed" written decision must issue within two business days; and (2) another full trial-like evidentiary hearing every 30 days

---

[6] Contrary to Plaintiffs' assertion that "[t]he government denies that its decision to provide children with no notice or opportunity to be heard is rooted in economic burdens or administrative inconvenience," Pls.' Br. 51, Defendants denied only that the "principal reason" ORR does not "afford class members greater procedural protection against" step-up "is because doing so would entail greater expense and administrative inconvenience," Ex. 6 [RFA 2nd Set] No. 107 at 529-30.  This is plainly *not* an admission that "economic burdens or administrative convenience" is unrelated to Defendants' decision not to provide additional procedures.

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

following step-up, from which another "detailed" written decision must issue within two business days.  Pls.' Proposed Order ¶¶ 9-11.  And these demands, seemingly made without any consideration of the varied liberty interests at stake or the extreme burdens that would be placed on the agency, ignore that "[d]ue process is flexible and calls for such procedural protections as the particular situation demands."  Id.  (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).   The procedures that Plaintiffs seek exceed any semblance of proportionality, are not tailored to remedy the harms alleged in this case, and are required by neither due process nor common sense.  Thus, the balance of *Mathews* factors conclusively favor Defendants, and Plaintiffs' motion for summary judgment on the step-up class's due-process claim should be denied.

## 2.  ORR's policies and procedures for the step-up class comport with the APA.

The Court should also deny summary judgment for Plaintiffs on the step-up class's APA claim because that claim fails as a matter of law.  Pls.' Br. 26-27, 56-58.  First, Plaintiffs argue that the APA prescribes certain hearing requirements for ORR placement decisions.  *Id.* at 26-27.  But the APA's formal-hearing requirement under 5 U.S.C. § 554 applies only in "case[s] of adjudication *required by statute* to be determined on the record *after opportunity for an agency hearing*."  5 U.S.C. § 554(a) (emphasis added).  By its terms, this formal-hearing requirement applies only to administrative proceedings that are: (1) an adjudication; (2) determined on the record; and (3) after the opportunity for an agency hearing.  *Portland Audobon Soc. v. Endangered Species Comm.*, 984 F.2d 1534, 1540 (9th Cir. 1993).  Agencies are not required to provide trial-like procedures unless mandated to do so by Congress.  *See Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 655–56 (1990).  The TVPRA contains no such requirements for placement decisions, and thus, does not trigger section 554.  Plaintiffs argue that under *Marathon Oil Co. v. EPA*, 564 F.2d 1253 (9th Cir. 1977), they are entitled to a formal hearing because "adjudicatory decisions are those that 'determine the specific rights of particular individuals.'"  Pls.' Br. 26 (quoting 564 F.2d at 1261).  But in *Marathon Oil*, the Ninth Circuit stated that "[t]he failure of Congress to provide for any hearing whatsoever within an administrative process may well be a valid indication that

Congress did not feel that it was providing for an 'adjudication' in the traditional sense of the word or did not intend the APA procedures to apply." 564 F.2d at 1263. Here, in contrast with *Marathon Oil*—where the agency "agree[d] that the challenged proceedings were adjudications," *id.* at 1262—no statute requires a hearing to contest placement decisions, and ORR does *not* agree that placement decisions are adjudications within the meaning of the APA. Indeed, Plaintiffs concede that the TVPRA does not "prescribe[ ] procedures" for "whether a child may be consigned to a restrictive placement." Pls.' Br. 2. Thus, Plaintiffs' APA claim, which is predicated on the existence of a statutory hearing requirement for placement decisions, fails.

Second, Plaintiffs argue that the APA's hearing requirements apply to ORR placement decisions because "[w]here the Constitution requires a hearing, as it does here, the APA prescribes the procedures that must be provided." Pls.' Br. 27 (citing *Wong Yang Sung v. McGrath*, 339 U.S. 33, 50 (1950)). This argument is entirely derivative of Plaintiffs' claim that due process requires additional procedures beyond what ORR already provides. Because, as explained, that claim fails as a matter of law, Plaintiffs' APA claim under 5 U.S.C. § 554(a) fails as a matter of law, too. Further, even if due process required a hearing, the formal-hearing requirements under 5 U.S.C. § 554 do not automatically apply. As the Ninth Circuit has recognized, the *Mathews* balancing test has "become the standard for determining whether certain challenged administrative procedures comply with the requirements of due process," *Girard*, 930 F.2d at 742, and under *Mathews*, "the courts have upheld numerous procedural schemes other than the one in the APA," *id.* at 743 (citing *Cassim v. Bowen*, 824 F.2d, 791, 798 (9th Cir. 1987) (citing cases upholding administrative procedures that did not comport with the APA)); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985) ("In general, 'something less' than a full evidentiary hearing is sufficient prior to adverse administrative action.") (citing *Mathews*, 424 U.S. at 343). And as explained above, a *Mathews* analysis weighs heavily against the procedures Plaintiffs seek in their motion. Thus, Plaintiffs' claim that, if the Court held that due process required a hearing, the APA's formal hearing requirements under Section 554 must apply, fails as a matter of law.

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

**D. The Court should deny Plaintiffs' motion for partial summary judgment on the unfit-custodian claim.**

**1. ORR's policies and procedures for the unfit-custodian class satisfy due process as a matter of law.**

The Court should deny Plaintiffs' motion for summary judgment on the unfit-custodian class's due-process claim because ORR's policies and procedures for release decisions satisfy due process as a matter of law.  The *Mathews* factors—the private interests at stake, the risk of erroneous deprivation, and the government's interest, *Mathews*, 424 U.S. at 335—all confirm that ORR's policies and procedures satisfy the requirements of procedural due process.

**a. Private interests**

As with the step-up class, the private interests at stake for the unfit-custodian class—comprised of minors who enter the United States without a parent or legal custodian and without lawful immigration status—are limited.  *See* Defs.' Br. 38-43.  The Supreme Court already held in *Reno v. Flores* that there is no constitutional right for children to be in a "non-custodial" setting, and "[w]here a juvenile has no available parent, close relative, or legal guardian, where the government does not intend to punish the child, and where the conditions of governmental custody are decent and humane, such custody surely does not violate the Constitution."  507 U.S. at 302-03.[7]  Indeed, no court has recognized the sort of broad and unqualified liberty interest in family association asserted by the unfit-custodian class, which includes association with distant relatives and unrelated adults the child has never met.  Further, the liberty interests of the unfit-custodian class differ in substantial respects from the liberty interests of minors in the domestic child-welfare context.  "UACs are not placed in congregate care due to allegations or findings of abuse and neglect by their parents or legal guardians."  DX-13 [Dr. Earner Expert Rep.] ¶ 27.  "Rather they are placed in congregate care shortly after apprehension by a federal agency . . . and remain in federal custody . . . until they

---

[7] Incredibly, Plaintiffs cite *Reno v. Flores* just once in their brief, and then only the concurrence rather than the majority opinion that squarely addresses key issues raised in this litigation.  *See* Pls.' Br. 29.

can be safely released." *Id.* Dependency or permanency hearings in the domestic child-welfare context involve different considerations (the removal of the child from the home based upon allegations or abuse of neglect, or the termination of parental rights), and implicate fundamentally different liberty interests (most centrally, whether an individual can remain the child's legal parent). *See* 42 U.S.C. § 675(5)(C). Thus, all four of Plaintiffs' asserted liberty interests have limited weight as applied to the unfit-custodian class, Pls.' Br. 21-24, 37-38—and are decisively outweighed by the other *Mathews* factors.

*First*, Plaintiffs assert that the unfit-custodian class has a liberty interest in freedom "from government custody." Pls.' Br. 20 (quoting *Zadvydas*, 533 U.S. at 690); *see also* Pls.' Br. 28-29. This interest is limited, because children are always in some form of custody. *Reno v. Flores*, 507 U.S. at 302-03. Thus, courts have recognized that the interest in freedom from ORR custody for UACs is not the ability of the minor to live outside a state-licensed facility, but rather, "to be raised and nurtured by . . . parents," *Santos v. Smith*, 260 F. Supp. 3d 598 611-12 (W.D. Va. 2017)—an interest not shared by the class representatives for the unfit-custodian class, none of whom sought release to a parent. Further, as explained above, children who enter ORR custody are not removed from their parents; rather, they are children who enter the United States *without* a parent or legal custodian and without lawful immigration status, and they remain in ORR care only until ORR can safely release them to an appropriate sponsor. Defs.' U.F. ¶¶ 1-2, 5.

Plaintiffs attempt to bolster their asserted liberty interest in freedom from government custody by claiming "that children are at risk of harm in ORR custody." Pls.' Br. 28. Plaintiffs point to no evidence that the risk of harm to UACs is greater in ORR custody than in any other state-licensed facility, they ignore ORR's robust procedures for protecting children from abuse while in ORR care, and their factual assertions rest on a host of unsupported claims. Defs.' U.F. ¶¶ 10-11. Further, any (unproven) risk of harm from ORR custody is far less than the risk of harm from release to an unvetted sponsor. *See* DX-13 [Dr. Earner Expert Rep.] ¶ 31 ("Screening potential sponsors is a serious child safety issue."). In enacting the TVPRA, Congress recognized the danger of release to an unsuitable sponsor, and thus imposed no

affirmative obligation for expeditious release while mandating that "an unaccompanied alien child *may not be placed with a person or entity* unless the Secretary of Health and Human Services makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being."   8 U.S.C. § 1232(c)(3)(A) (emphasis added). Plaintiffs also assert that "[t]he profound harm that detention causes for children is uniformly recognized." Pls.' Br. 28.  But "[t]he child welfare literature about institutional care and whether it is harmful or not is far more nuanced when looking at populations of older children, or children with traumatic life events, poverty, stigma, physical and sexual violence, and a lack of educational resources." Fact Response ¶ 1 (citing DX-64 [Dr. Earner Rebuttal Rep.] ¶ 6); *see also* DX-31 [Dr. Ryan Rebuttal Rep.] ¶ 9 ("It is impossible to generalize the findings of [the studies cited by Plaintiffs' experts] to the UAC shelter care experience.").   Indeed, research has also shown that "[t]emporary or short-term placement in a therapeutic shelter or specialized care facility with appropriate services in place can help stabilize children with chaotic histories, traumatic experiences, or substance abuse issues." Fact Response ¶¶ 1, 3; DX-64 [Dr. Earner Rebuttal Rep.] ¶ 6; *see also* DX-36 [Dr. Lubit Rebuttal Rep.] ¶ 17 ("Detailed review of 23 cases of children who spent time in an ORR RTC showed that, in general, their psychological condition greatly improved."). Thus, Plaintiffs' asserted liberty interest in freedom from ORR custody is limited.

> **Second**, Plaintiffs assert that the unfit-custodian class has a liberty interest in "family integrity or familial association." Pls.' Br. 21 (quoting *Rosenbaum*, 663 F.3d at 1079); *see also* Pls.' Br. 28-29.  Any such interest, however, is again limited.  The unfit-custodian class comprises "parents or other available custodians," Order 27, which include distant relatives and unrelated adults whom the child has never even met.  As explained, *Reno v. Flores* forecloses a liberty interest for such distant relations.  507 U.S. at 303 ("Where a juvenile has no available parent, close relative, or legal guardian, where the government does not intend to punish the child, and where the conditions of governmental custody are decent and humane, such custody surely does not violate the Constitution.").  The two cases that Plaintiffs cite in support of their asserted interest in family association, *Beltran*, 222 F. Supp. 3d at 476, and

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

*Santos*, 260 F. Supp. 3d at 598, both involved the child's *mother*. The *Beltran* court expressly stated that "[t]his case concerns the fundamental right of a parent to the custody of her child, and that child's reciprocal right to his parent's care." 222 F. Supp. 3d at 489. Although courts have recognized *some* limited liberty interest in familial association with immediate relatives beyond parents, the cases Plaintiffs cite are all off-point. Pls.' Br. 22. In *Moore v. City of East Cleveland*, 431 U.S. 494, 495-96, 504-06 (1977), the court struck down a city ordinance that categorically limited "occupancy of a dwelling unit to members of a single family," defined as members of the nuclear family, and where the grandmother already had a history of sharing a household with her son and grandsons. ORR, however, has not imposed a ban on release to particular types of sponsors. *J.E.C.M. v. Lloyd*, 352 F. Supp. 3d 559 (E.D. Va. 2018), in turn, held merely that the plaintiffs could proceed on their due-process claim and said that "family relationships" with "siblings, aunts or uncles, grandparents, or first cousins" are "constitutionally significant." *Id.* at 585. The court did not analyze the strength of such an interest, nor did it suggest that it extends to the distant relations at issue here. And *Aristotle P. v. Johnson*, 721 F. Supp. 1002, 1004 (N.D. Ill. 1989), involved a challenge to a state-foster-care policy that mandated visits between parents and children, but not visits with siblings. Plaintiffs' claims and requested relief sweep far more broadly than providing similar visitation rights for parents and siblings. Significantly, none of these cases held, or even suggested, that a minor's liberty interest in family association with parents versus other relatives—particularly distant relatives—was equal, or that due process demands the same procedural protections for every type of affected family relationship (as Plaintiffs seek). Nor do Plaintiffs cite any cases holding that a child has a liberty interest in choosing who will become his or her custodian when there is not already a parent or legal guardian acting as such and when the child is in the custody of the state. *Cf. Gibson v. Merced Cty. Dep't of Human Res.*, 799 F.2d 582, 589 (9th Cir. 1986) (citation omitted) (holding that a foster parent, with long relationship caring for a child, had limited due process rights, since the "the area of foster care involves issues of unusual delicacy, . . . where professional judgments regarding desirable procedures are constantly and rapidly changing. Consequently, federal courts should be hesitant to import

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

1   rigidity of procedure in an area where the state's interest is not only great, but where there
2   also exists a need for flexibility in order to accomplish what is best for a particular child");
3   *see also Smith v. Org. of Foster Families For Equal. & Reform*, 431 U.S. 816, 845, (1977)
4   ("whatever emotional ties may develop between foster parent and foster child have their
5   origins in an arrangement in which the State has been a partner from the outset").

6       ***Third***, Plaintiffs assert that the unfit-custodian class has a liberty interest under the
7   TVPRA in being "'promptly' placed 'in the least restrictive setting that is in the best interest
8   of the child,' generally with 'a suitable family member' or other available guardian or entity."
9   Pls.' Br. 22 (quoting 8 U.S.C. § 1232(c)(2)(A)).   This claimed liberty interest fails as a matter
10  of law.   As Defendants have explained, Defs.' Br. 38-39, the provision of the TVPRA cited
11  by Plaintiffs concerns the level of *restrictiveness* of the facility in which a minor is placed,
12  not the circumstances under which the minor is released.   And the TVPRA provision
13  applicable to release decisions provides broad discretion to the Secretary to ensure *safe*, not
14  expeditious, release. *See* 8 U.S.C. § 1232(c)(3)(A) ("an unaccompanied alien child may not
15  be placed with a person or entity unless the Secretary of Health and Human Services makes a
16  determination that the proposed custodian is capable of providing for the child's physical and
17  mental well-being").   Because the TVPRA does not impose any affirmative obligation on
18  ORR to expeditiously release UACs to potential sponsors, Plaintiffs' claimed liberty interest
19  in being "promptly" released under the TVPRA fails as a matter of law.

20      ***Fourth***, Plaintiffs assert that the unfit-custodian class has a liberty interest under the
21  *Flores* Settlement in "release from [ORR] custody without unnecessary delay."   Pls.' Br.
22  23- 24.   This claimed liberty interest similarly fails.   As Defendants have explained, Defs.'
23  Br. 20-21, Plaintiffs may not seek injunctive relief to rewrite a settlement they negotiated to
24  include additional procedures they never bargained for.   Plaintiffs assert that "the rights
25  created by the [*Flores*] Settlement are not tethered to the degree of relation to the prospective
26  sponsor."   Pls.' Br. 23.   But that is irrelevant to their asserted liberty interest because the
27  Settlement does not provide a right to the additional procedures Plaintiffs seek at all.   Nor
28  does the phrase "without unnecessary delay" in the *Flores* Settlement create a liberty interest

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

in additional procedures beyond what the Settlement provides, because the phrase is broad and permissive, does not mandate a particular set of procedures, and is cabined by Paragraph 17, which gives the agency wide discretion to conduct a "positive suitability assessment" prior to release.  *See Kentucky Dep't of Corrections*, 490 U.S. at 463 (to create protected liberty interest, statute must use "explicitly mandatory language").

Thus, all of Plaintiffs' asserted liberty interests for the unfit-custodian class either fail or have limited weight.

### b.  Risk of erroneous deprivation

As Defendants have explained, Defs.' Br. 43-47, ORR's policies and procedures for the unfit-custodian class minimize the risk of erroneous deprivation, and adding the further procedures Plaintiffs request would not meaningfully reduce that risk (nor is Plaintiffs' requested relief remotely tailored to the harms they allege).  ORR's policies and procedures provide for extensive oversight and review to reduce the risk of error in release decisions. This includes: (1) weekly meetings between the case manager, case coordinator, and federal field specialist to discuss possible release and sponsorship options; (2) the vetting of multiple sponsors concurrently (where applicable); (3) regular monitoring by supervisors; (4) regular communications with potential sponsors and the child; (5) an administrative appeal process for parents and legal guardians; and (6) judicial review for all children in care.  Defs.' U.F. ¶¶ 24-29, 63; J.S. ¶¶ 21-29, 94-95.  Plaintiffs never explain why these procedures are inadequate to prevent the risk of erroneous deprivation.  Rather, they simply assert *ipse dixit* that "[t]he prejudice and risk of an erroneous deprivation of a child's liberty without adequate procedural safeguards is high."  Pls.' Br. 29.  That comes nowhere near to satisfying the standard for summary judgment.

Indeed, Plaintiffs' failure to provide any explanation for why ORR's current procedures are inadequate, or how the burdensome procedures that they demand would reduce the (unexplained) risk of error, is particularly glaring given that Defendants have proffered record evidence from experienced child-welfare experts that Plaintiffs' proposed procedures would add little value to the decision-making process and would result in delay.  *See* DX-13 [Dr.

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

Earner Expert Rep.] ¶ 30 ("The proposal for a quasi-judicial 'fair' hearing would do nothing to further the safety of the UAC.  Hearings are court-like processes that create an adversarial environment and only prolong the length of time that UAC spend in care."); *see also* DX-30 [Dr. Ryan Expert Rep.] ¶ 46 ("[I]t is unclear what problem would be solved by injecting additional requirements of consulting with a child's legal representative at any instance that a . . . release was under consideration.").  Nor do Plaintiffs address the fact that the average length of stay for children in ORR care is low, *see* Defs.' U.F. ¶ 96 (48.4 days, on average, between June 2019 and March 2020), and generally far lower than for children in the domestic foster-care context, where it can take up to 6 months to place a child with a relative.  *See, e.g.*, Interstate Compact on the Placement of Children, ICPC State Pages, California, http://icpcstatepages.org/california/licensingcertificationapproval (last visited October 30, 2020) (in California, foster parents who are relatives of the child must be licensed, and the process can take 3-6 months).  This undercuts the view that adding procedures similar to those found in the domestic child-welfare context would reduce the risk of erroneous deprivation in ORR release decisions.

Important differences between the domestic child-welfare context and the ORR context further undermine the probable value of the additional procedures that Plaintiffs seek.  Plaintiffs attempt to analogize ORR release decisions to state permanency proceedings and argue that similar procedures should apply to both. Pls.' Br. 35-36.  But state permanency hearings are held after the child has been removed from a parent based upon substantiated allegations of abuse or neglect, and ultimately seek to resolve the issue of whether parental rights should be terminated.  *See* DX-13 [Dr. Earner Expert Rep.] ¶ 27; *see also* Adoption and Safe Families Act of 1997, 42 U.S.C. § 675(5)(C) (requiring a permanency hearing within 12 months of removal from parents, which "shall determine [a] permanency plan for the child that includes whether, and if applicable when, the child will be returned to the parent, placed for adoption [while] the State . . . file[s] a petition for termination of parental rights, or referred for legal guardianship").  ORR's release process is far more limited in scope and effect: ORR determines whether to place children who arrived in the United States without a parent or

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

legal custodian with a sponsor, many of whom are not the child's parent or legal guardian, based on a review of whether that the proposed sponsor is capable of providing for the child's physical and mental well-being, as required under the TVPRA.  8 U.S.C. § 1232(c)(3)(A). Plaintiffs adduce no evidence that states have ordered mandatory permanency hearings in analogous situations for release to relatives who are not parents, particularly release to distant relatives whom the child has never met.  Indeed, under federal law, neither foster parents nor relative caregivers have a right to a fair hearing under the Social Security Act, 42 U.S.C. § 671(a)(12), regarding adverse placement decisions.  *See* Fact Response ¶ 92.  Rather, "[t]he title IV-E agency determines where and with whom the child will be placed by virtue of its placement and care responsibility."  Administration for Children and Families, Child Welfare Policy Manual, 8.4G General Title IV-E Requirements, Fair Hearings, https://www.acf.hhs.gov/cwpm/public_html/programs/cb/laws_policies/laws/cwpm/policy_dsp_pf.jsp?citID=5 (last viewed October 30, 2020).  Further, to the extent that parental rights are involved when a parent applies as the child's sponsor, ORR already provides an evidentiary hearing for parents and legal guardians before the Assistant Secretary for Children and Families.  J.S. ¶¶ 21-29.  And the probable value of an evidentiary hearing is limited.  As one child-welfare expert testified, "child welfare—and I'm talking about domestic child welfare—has tried to move away from putting cases into court just simply because it ridiculously prolonged the process, and there's absolutely no benefit to the child."  DX-6 [Dr. Earner Dep.] 134:3-8. Thus, the second *Mathews* factor strongly favors Defendants.

Plaintiffs point to six alleged deficiencies in ORR's release decisions that they claim create a risk of erroneous deprivation.  Pls.' Br. 29-36.  None of the alleged deficiencies—whether taken individually or together—establishes a risk of erroneous deprivation, and Plaintiffs' arguments to the contrary again rest on a host of legal and factual errors.

To start, to the extent that the six purported deficiencies pertain to procedures that exceed what Plaintiffs identified in their complaint and what is covered by the Court's certified class definition, any relief predicated on the alleged deficiencies is waived and beyond the scope of available injunctive relief.  *See King*, 814 F.2d at 567; *see also Al Otro*

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

*Lado, Inc.*, 423 F. Supp. 3d at 878.  Plaintiffs' complaint alleges that ORR "delays or refuses to make determinations about whether proposed custodians are or may be unfit" and that the failure "to release children to their parents' custody or to the custody of adult siblings and other family members . . . without reasonable justification or legitimate purpose" violates due process.  Compl. ¶¶ 108, 116.  In accordance with this claim, the Court certified the unfit-custodian class as comprising "all minors in ORR custody pursuant to 6 U.S.C. section 279 and/or 8 U.S.C. section 1232 whom ORR is refusing or will refuse to release to parents or other available custodians within 30 days of the proposed custodian's submission of a complete family reunification packet on the ground that the proposed custodian is or may be unfit."  Order 27-28.  Thus, all of the relief that Plaintiffs now seek for the first time in their motion that exceeds ensuring timely procedures for "fitness" determinations and the provision of explanations for denials fails as a matter of law.  This includes a full-blown evidentiary hearing within thirty days of "submission of a family reunification application" (which may or may not even be complete) in which the burden is on ORR to establish by clear and convincing evidence that the proposed sponsor is *not* fit.  *See* Pls.' Proposed Order ¶ 1.  In any event, none of the six purported deficiencies Plaintiffs identify in their motion constitutes a due-process violation.  Pls.' Br. 29-36.

   ***First***, Plaintiffs argue that ORR fails "to provide adequate notice and an opportunity to be heard" regarding release determinations.  Pls.' Br. 29-31.  But ORR's policies and procedures regarding notice and the opportunity to be heard readily satisfy due process.  To start, ORR provides adequate notice of release determinations.  When ORR denies release to a parent or legal guardian, the proposed sponsor receives a denial letter from the ORR Director with "[a]n explanation of the reason(s) for the denial; [i]nstructions on how to obtain the child's case file; [t]he supporting materials and information that formed the basis for ORR's decision; and [a]n explanation of the process for requesting an appeal of the denial."  ORR Guide § 2.7.7.  ORR also "informs the prospective sponsor that he or she may submit additional information to support an appeal request."  *Id.*  Children, in turn, receive written notice when "the sole reason for denial of release is concern that the unaccompanied alien

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

child is a danger to himself/herself or the community." *Id.* Other potential sponsors who are not parents or legal guardians receive verbal notice of the reasons for the denial, and ORR allows potential sponsors to review a negative home study recommendation and provide additional information in support of sponsorship. Defs.' U.F. ¶¶ 32-33. Moreover, case managers are required to meet weekly with minors to discuss their cases, including the reasons why a proposed sponsor was denied. Defs.' U.F. ¶¶ 15, 18. And although two of the unfit-custodian class representatives, Lucas R. and Gabriela N., did not receive written notice of the denial of their potential sponsors, the record establishes that they received actual notice through multiple, regular meetings with shelter staff. *See* DX-41 [De La Cruz LR Decl.] ¶ 35, DX-52 [Vergara GN Decl.] ¶ 90.

ORR also provides a meaningful opportunity to be heard, as Defendants have explained. Defs.' Br. 43-45. This includes an administrative appeal process for parents and legal guardians; regular meetings between staff and sponsors, where sponsors can submit additional evidence in favor of release and seek reconsideration of release denials based upon new information; and judicial review. Defs.' U.F. ¶¶ 30, 33, 63; J.S. ¶¶ 21-29, 94-95. Significantly, the two cases that Plaintiffs cite in support of their claim that ORR's hearing procedures violate due process, *Beltran* and *Santos*, both involved the child's *mother*. And even then, neither case held that due process requires the extensive procedures Plaintiffs seek in this case. *See Beltran*, 222 F. Supp. 3d at 476 ("But nobody has suggested that due process requires a live, trial-like proceeding on each of these children before ORR can proceed."); *cf. Santos*, 260 F. Supp. 3d at 614 ("The court will not seek to define the parameters of such a hearing or to state what it must look like.").

***Second***, Plaintiffs argue that ORR fails "to apply clear standards for determining custodial fitness." Pls.' Br. 31-32. This again is plainly incorrect. To start, the section in the ORR MAP on release is 143 pages long and provides detailed instructions to staff on how to implement the Guide, *see* Ex. 3 [ORR MAP Section 2], and ORR "also sends out emails to the care provider network ('Policy Monday' emails) providing additional assistance on Policy or Procedure, and maintains an inbox for answering questions from [federal field specialists]

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

or care provider staff," DX-10 [Biswas Decl.] ¶ 14.  Plaintiffs' unsupported assertion that ORR's assessment criteria are not "clear" is merely a statement of opinion, not fact, and is unsupported by the evidentiary record.  In support of their claim that ORR's release procedures are not clear, Plaintiffs' cite to *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601 (S.D.N.Y. 2018).  *See* Pls.' Br. 31.  But the policy enjoined in *L.V.M.* bears no resemblance to the policies and procedures at issue in this case.  In *L.V.M.*, the ORR Director adopted a policy that required director approval of every release decision, despite having "no expertise or experience to evaluate the propriety of the release decision made by a skilled FFS," and without providing any "indication whatsoever of what facts or factors should be considered in making his decision."  *Id.* at 613.  By contrast, the factors an FFS considers in making release decisions are publicly available in the ORR Guide, *see* ORR Guide § 2.4.1, and each FFS makes release decisions in collaboration with the case manager and the case coordinator, after deliberation and discussion at weekly staffing meetings, and in consultation with guidance issued by ORR.  Defs.' U.F. ¶¶ 24-25, 27, 29; J.S. ¶¶ 94-95.

Plaintiffs' related arguments likewise fail.  Plaintiffs first assert that "ORR admits that, in making release decisions, 'ORR does not use an 'evidentiary' standard such as is more appropriately applied in formal court proceedings.'"  Pls.' Br. 32.  But as explained above, Plaintiffs provide no authority for why ORR must employ an express "evidentiary standard" in a child-welfare context that is not adversarial in nature, particularly when neither the TVPRA nor the *Flores* Settlement requires any sort of "evidentiary standard."  *See* 8 U.S.C. § 1232(c)(3)(A) (HHS must determine whether "the proposed custodian is capable of providing for the child's physical and mental well-being"); *see also* Settlement ¶ 14 (ORR must avoid "unnecessary delay" in release decisions).  Plaintiffs also argue that "ORR's written policies offer only limited instructions to case staff in making reunification decisions" and that because the instruction are not "published in the Federal Register or a Notice of Proposed Rulemaking" they are "therefore shielded from public scrutiny."  Pls.' Br. 32.  But as explained, the section in the ORR MAP on release is 143 pages long and provides detailed operational instructions on how to implement the Guide.  *See* Ex. 3 [ORR MAP Section 2].

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

And Plaintiffs nowhere explain how ORR's policies and procedures, which are publicly available in the ORR Guide, are "shielded from public scrutiny."  And as noted above, ORR published a proposed and final rule in the Federal Register but was enjoined by the *Flores v. Barr* Court at the initiative of Plaintiffs' counsel here.  407 F. Supp. 3d 909.

Plaintiffs next assert that "the undisputed evidence confirms that the vast discretion afforded to case staff has resulted in arbitrary, inconsistent, and shifting reasons for denial." Pls.' Br. 32.  But Plaintiffs point to only two examples to support this claim, neither of which, even if they happened as Plaintiffs claim (which they did not, *see* Fact Response ¶¶ 38, 82), comes anywhere close to establishing that ORR has a policy or practice of "arbitrary, inconsistent, and shifting reasons for denial," or that as a matter of practice, ORR is "deliberately indifferent" to inconsistent release decisions.  *Compare Henry*, 132 F.3d at 517 (a government entity is liable only when "the unlawful actions of its employees or agents were taken pursuant to that defendant's policies or customs, including a policy of being deliberately indifferent to the rights of its inhabitants") *with* Defs.' U.F. ¶ 24 (citing DX-6 [Earner Dep.] 146:25-147:3 ("What I see here is a great deal of concern about doing the home studies, about contacting sponsors, about vetting sponsors, about having reviews of who the sponsor is.").  To the contrary, as one expert found based on a comprehensive review of the record, ORR's release decisions are reasonable, and any purported outliers are just that—outliers.  *See* DX-35 [Dr. Lubit Expert Rep.] ¶ 4 ("For the cases I reviewed, children were either released to a sponsor in due course or there was good reason to reject a potential sponsor or to seek further information before releasing the child, in order to ensure the safety of the child."); *see also id.* Add. 4.  In any event, to obtain summary judgment, Plaintiffs bear the burden to show that ORR's policies and procedures have led to "arbitrary, inconsistent, and shifting reasons for denial," Pls.' Br. 32, on a class-wide basis, such that due process demands the class-wide relief they seek.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").  Plaintiffs have not come close to meeting this burden.  Certainly they have

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

1   come nowhere close to establishing that due process requires ORR to prove by "clear and

2   convincing evidence" that a "proposed sponsor is unfit"—the standard Plaintiffs ask the Court

3   to adopt.  Pls.' Proposed Order ¶ 3.  Indeed, Plaintiffs' proposed standard defies the TVPRA,

4   which prohibits ORR from releasing a UAC to a proposed sponsor unless ORR determines

5   "that the proposed custodian is capable of providing for the child's physical and mental well-

6   being."  8 U.S.C. § 1232(c)(3)(A).  Plaintiffs' attempt to flip the TVPRA on its head and place

7   the burden on ORR to show that a proposed sponsor is *not* fit underscores the extraordinary,

8   improper nature of the relief that they request.

9         ***Third***, Plaintiffs argue that ORR fails "to provide for prompt release."  Pls.' Br. 33-34.

10  In particular, they assert that "children are often in ORR custody for significant periods of

11  time even when they have available sponsors."  Pls.' Br. 33.  But an "available sponsor" is

12  not the same thing as an "approved sponsor," and Congress entrusted "the Secretary of Health

13  and Human Services," not Plaintiffs' counsel, with determining whether "a proposed

14  custodian is capable of providing the child's physical and mental well-being."   8 U.SC.

15  § 1232(c)(3)(A).  The examples of Lucas R. and Gabriela N., whom Plaintiffs highlight,  Pls.'

16  Br. 33, do not establish that ORR unduly delays release.  As Defendants have explained,

17  Defs.' Br. 45-46, the undisputed facts show that significant and serious issues surrounded the

18  potential sponsors for both minors, including the fact that both sponsors had failed a TVPRA-

19  mandated home study.  Defs.' U.F. ¶¶ 106-08, 134-38.  And, as noted, the undisputed facts

20  establish that from June 2019 through March 2020, the average length of stay of UACs in

21  ORR care was less than two months (48.4 days), Defs.' U.F. ¶ 96; Plaintiffs point to no

22  analogue where release to a custodian occurs on average in a shorter period.  *See, e.g.*,

23  http://icpcstatepages.org/california/licensingcertificationapproval   (in   California,   foster

24  parents who are relatives of the child must be licensed, and the process can take 3-6 months).

25  Indeed, state permanency hearings can often take *far* longer.  *See, e.g.*, 42 U.S.C. § 675(5)(C)

26  (permanency hearings must be held at least every 12 months); Cal. Welf. & Inst. Code

27  § 366.21(f)(1) (explaining that the "permanency hearing shall be held no later than 12 months

28  after the date the child entered foster care"); *id.* § 366.25(a) (providing that continuance of a

47

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

permanency hearing for up to 24 months is available under some circumstances).  Moreover, even if ORR release times were slower than some domestic child-welfare settings, the populations at issue are different, including because there are heightened child-trafficking concerns with the UAC population.  *See* DX-13 [Dr. Earner Expert Rep.] ¶ 29 ("This is a higher standard of vetting than that which would occur within a domestic child welfare situation, as to my knowledge, no state routinely screens family, kin or potential legal guardians for trafficking prior to release of a domestic child from congregate care."); *see also* DX-14 [Dr. Mohn Expert Rep.] ¶ 23 ("To implement strict length of stay timelines would violate ORR's commitments to child safety and well-being—both in the short term and long term.").  That a small percentage of minors remain in ORR care longer than a few months is insufficient to establish a class-wide due-process violation justifying the extraordinary, class-wide procedural remedies that Plaintiffs seek.  *See Henry*, 132 F.3d at 517.  To the contrary, the record conclusively establishes that release delays generally occur because a viable sponsor is not available or because potential sponsors are unresponsive.  Defs.' U.F. ¶ 34.  Plaintiffs have provided no evidence that additional procedures would remedy those situations (in the small percentage of cases where they cause delays).  Defs.' U.F. ¶ 34.  Nor have they cited any authority establishing that due process requires a full-blown evidentiary hearing regarding a proposed sponsor's fitness within thirty days following the sponsor's submission of a "family reunification application," which may or may not even be complete.  Pls.' Proposed Order ¶ 1.

**Fourth**, Plaintiffs argue that ORR fails "to provide counsel to challenge release denials." Pls.' Br. 34.  But as explained above, government-funded counsel is not required in this context, as recognized by federal statutes and court decisions declining to impose a right to government-funded counsel in analogous situations.  *See, e.g.*, *Goldberg*, 397 U.S. at 270.  As discussed below, *infra* Part E, no court has recognized the due-process right to government-funded counsel to contest release or other routine ORR decision-making that Plaintiffs seek, *Flores v. Sessions*, 862 F.3d at 867, and Congress has not created such a right by statute or appropriation.

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

**Fifth**, Plaintiffs argue that ORR fails "to provide interpreters." Pls.' Br. 34-35. As noted above, this is factually incorrect. Plaintiffs assert that "[i]t is undisputed that ORR's written policies do not guarantee the right to an interpreter." Pls.' Br. 35. But ORR Guide § 3.3.7 provides for the translation services that Plaintiffs seek. Thus, contrary to Plaintiffs' assertion, the undisputed facts demonstrate that ORR's written policies *do* guarantee the right to an interpreter.

**Sixth**, Plaintiffs argue that "ORR's failure to afford due process runs contrary to prevailing state and federal child welfare practices." Pls.' Br. 35-36. But Plaintiffs provide no evidence that "prevailing state and federal child welfare practices" provide evidentiary hearings for release to sponsors who are not parents or legal guardians, and, as explained, ORR already provides evidentiary hearings for sponsors who *are* parents or legal guardians. J.S. ¶¶ 20-29. ORR release decisions also differ in significant ways from decisions in the domestic child-welfare context. As explained, unlike dependency decisions in the domestic child-welfare context, ORR release decisions do not involve a determination of whether a parent is unfit based upon allegations of abuse and neglect, or the removal of a child from the home, but rather, only whether a potential sponsor can provide for the child's physical and mental well-being. *See* 8 U.S.C. § 1232(c)(3)(A). Dependency or permanency decisions in the domestic child-welfare context are therefore fundamentally unlike ORR release decisions, because these decisions involve different considerations and implicate a fundamentally different set of rights. For example, under the Adoption and Safe Families Act, a permanency hearing must take place within twelve months of the child's removal from his or her parents, and "shall determine [a] permanency plan for the child that includes whether, and if applicable when, the child will be returned to the parent, placed for adoption [while] the State . . . file[s] a petition for termination of parental rights, or referred for legal guardianship." 42 U.S.C. § 675(5)(C); *see also* Davidson, Howard A., New ABA Policies Protect Children, 30 No. 8 Child L. Prac. 127, 128 (Oct. 2011) (describing ABA model plan calling for 75% of all cases to have a permanency hearing within 270 days of the child's removal from the home); *cf.* 45 C.F.R. § 1356.21 (judicial determination that remaining in the home is "contrary to the

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

welfare" of the child must be made in first court ruling that sanctions the child's removal from the home in order for the child to be eligible to receive IV-E foster care maintenance payments). By contrast, ORR does not remove children from their families, nor does ORR make a determination on whether to terminate parental rights or whether a child should be placed for adoption, and ORR's release process occurs on a far more expeditious schedule. The interests at stake in the domestic child-welfare system are markedly different from those at stake in ORR release decisions, which do not purport to alter parental rights. Thus, the differences between ORR policies and procedures on release and the procedures that apply in the domestic child-welfare context do not support the view that ORR's policies violate due process. Nor do they establish that due process requires the extraordinary measures that Plaintiffs' request in their ten-page proposed order, which would provide hearings within a far shorter timeframe than state or federal child-welfare law. *Compare, e.g.*, 42 U.S.C. § 675(5)(B) ("the status of each child is reviewed periodically but no less frequently than once every six months by either a court or by administrative review"), *with* Pls.' Proposed Order ¶ 1 ("within thirty (30) days following submission of a family reunification application").

### c. The government's interest and the balance of *Mathews* factors

As Defendants have explained, Defs.' Br. 48-49, the government's interests weigh heavily against Plaintiffs' requested relief for the unfit-custodian class. Plaintiffs' attempt to minimize the government's interests as merely "fiscal, administrative or otherwise," Pls.' Br. 37, defies the facts and law. First, Congress has entrusted ORR with the safe release of children in its custody and care, and ORR seeks to accomplish that expeditiously and without unnecessary delay. Defs.' U.F. ¶ 1. Requiring an evidentiary hearing for every potential sponsor, including distant relatives whom the child has never meet or seen in many years, would result in significant delay and divert resources needed to vet potential sponsors. *See* DX-13 [Dr. Earner Expert Rep.] ¶ 30 ("Hearings are court-like processes that create an adversarial environment and only prolong the length of time that UAC spend in care.").

Second, the government has a substantial interest in the sound allocation of its resources. As explained above, ORR has traditionally funded only two dedicated attorneys

for legal matters, Defs.' U.F. ¶ 80, and so any appreciable increase in administrative proceedings would significantly affect the agency's finances and resource allocation. As with the step-up class, to implement *all* the procedures Plaintiffs seek for the unfit-custodian class (raised for the first time in their motion and extraordinary ten-page proposed order) would overwhelm the ORR UAC program. As noted, those procedures include the imposition of full, trial-like evidentiary hearings "within thirty (30) days following submission of a family reunification application," regardless of: (1) the relationship of the sponsor to the minor, (2) whether ORR has conducted a TVPRA-mandated home study, (3) whether ORR has denied the sponsor, and (4) whether the proposed sponsor has even submitted a *complete* application. Pls.' Proposed Order ¶¶ 1-3.

Third, as noted above, Plaintiffs' proposed relief would upend the TVPRA's requirement that ORR make an affirmative determination that the sponsor is "capable of providing for the child's physical and mental well-being." 8 U.S.C. § 1232(c)(3)(A). Instead, Plaintiffs' proposal would require ORR to affirmatively prove (by "clear and convincing evidence") a negative—"that the minor's proposed sponsor is unfit," Pls.' Proposed Order ¶ 3, a requirement found *nowhere* in the TVPRA and a determination ORR does *not* make. This burden is compounded by the fact that, under Plaintiffs' proposal, the hearing can be triggered even before the sponsor has submitted a *completed* application, allowing a proposed sponsor to submit a barebones application, wait 30 days, and then challenge ORR to prove they are unfit. Given the TVPRA's overarching concern with ensuring that UACs are kept away from traffickers, *see* 8 U.S.C. § 1232(a)(1) ("to prevent trafficking in persons"), such a result defies the statute's purpose and intended effect. Plaintiffs' inflexible insistence upon a rigid set of procedures—without regard for operational realities or the safety of children in ORR care—contravenes both the TVPRA and the Supreme Court's admonition in *Mathews* that "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." 424 U.S. at 334. As explained, ORR's robust procedures for release decisions already minimize the risk of erroneous deprivation, and Plaintiffs' proposed procedures would further delay release and upend ORR's efforts without any increase in

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

positive child-welfare outcomes, while simultaneously overwhelming the UAC program.
Thus, the balance of the *Mathews* factors conclusively favors Defendants and Plaintiffs'
motion for summary judgment on the unfit-custodian class's due-process claim should be
denied.

### 2. ORR's policies and procedures for the unfit-custodian class comport with the APA.

The Court should also deny summary judgment for Plaintiffs on the unfit-custodian
class's APA claim because that claim similarly fails as a matter of law.  Pls.' Br. 26-27, 56-
58.  As explained, *see supra* 33-34, the APA's formal-hearing requirements apply only in
"case[s] of adjudication required by statute to be determined on the record after opportunity
for an agency hearing."  5 U.S.C. § 554(a).  As with the ORR step-up decisions, Congress did
not "provide for any hearing whatsoever within an administrative process" for ORR release
and sponsor decisions.  *Marathon Oil*, 564 F.2d at 1263.  And Plaintiffs themselves concede
that the TVPRA does not "prescribe[ ] procedures" for "whether children's parents or other
available custodians are fit."  Pls. Br. 2 (emphasis omitted).  Thus, 5 U.S.C. § 554(a) does not
require a hearing to contest ORR release decisions.  Further, as also explained above, *see
supra* 34, because due process does not require additional procedures beyond what ORR
already provides, Plaintiffs' derivative APA claim based on an asserted due-process hearing
requirement likewise fails as a matter of law, and a *Mathews* balancing does not require the
APA's formal-hearing procedures.

### E. The Court should deny Plaintiffs' motion for partial summary judgment on the legal-representation claim.

#### 1. ORR's policies and procedures for the legal-representation class comport with the TVPRA.

As Defendants have explained, Defs.' Br. 58-60, ORR's policies and procedures for the
legal-representation class satisfy the requirements of the TVPRA, which nowhere grants a
right to government-funded counsel to challenge routine ORR decision-making on placement,
release, and medical care.  *See* 84 Fed. Reg. 44392, 44427 (Aug. 23, 2019) (counsel is at no
expense to the Government); *id.* at 44481 ("Congress did not require the government to pay

1   for counsel in any circumstance, and that counsel may be present at no expense to the

2   Government.").  Indeed, any argument that the TVPRA requires *government-funded* counsel

3   in such circumstances conflicts with a plain reading of the statute, its legislative history, and

4   congressional appropriations.  *See* Defs.' Br. 58-59.  The TVPRA instructs ORR to "ensure,

5   to the greatest extent practicable and consistent with section 292 of the Immigration and

6   Nationality Act (8 U.S.C. § 1362), that all unaccompanied alien children who are or have been

7   in the custody of [HHS] . . . have counsel to represent them in legal proceedings or matters

8   and protect them from mistreatment."  8 U.S.C. § 1232(c)(5).  Section 292 of the INA provides

9   that "[i]n any removal proceedings before an immigration judge and in any appeal proceedings

10   before the Attorney General from any such removal proceedings, the person concerned shall

11   have the privilege of being represented (at no expense to the Government) by such counsel,

12   authorized to practice in such proceedings, as he shall choose."  8 U.S.C. § 1362 (emphasis

13   added).  These provisions do not create a right to government-funded counsel to challenge

14   routine ORR decisions involving step-up, release, and medical care.  Rather, these provisions

15   obligate ORR to connect UACs with *pro bono* counsel in their immigration proceedings and

16   to work to ensure, "to the greatest extent practicable," that UACs have access to counsel for

17   legal proceedings.  ORR satisfies both requirements.  *See* Defs.' U.F. ¶ 81 (affirming that

18   ORR works to ensure "to the greatest extent practicable" that UACs are able to access legal

19   representation).  Thus, Plaintiffs' claim that ORR's policies and practices on legal

20   representation violate the TVPRA fails as a matter of law.

21        Plaintiffs argue that the TVPRA grants a statutory right to government-funded counsel

22   in "legal proceedings or matters and [to] protect them from mistreatment."  Pls.' Br. 52

23   (quoting 8 U.S.C. § 1232(c)(5)).  They also contend that "ORR unlawfully bars legal service

24   providers from using federal funding to represent children with respect to release, placement,

25   and administration of psychotropic medication."  Pls.' Br. 56.  But as explained, the TVPRA

26   does not provide a right to government-funded counsel, and requiring ORR to allow legal

27   service providers to use ORR funds to represent UACs in such proceedings is no different

28   than requiring ORR to pay for that representation directly.  Plaintiffs' further complaint that

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

ORR has not issued regulations or other written guidance defining the meaning of "legal proceedings or matters," Pls.' Br. 52-53, is incorrect—Defendants issued regulations, *see* 84 Fed. Reg. 44392 (Aug. 23, 2019), which, though enjoined by this Court, represent the agency's judgment on the meaning of the statute.  *See Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 844 (1984) ("Considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer."); *see also* Fact Response ¶ 270.   In short, the TVPRA does not provide the relief that Plaintiffs seek.[8] Because the legal-representation class's TVPRA claim fails as a matter of law, the Court should deny summary judgment for Plaintiffs.

### 2. ORR's policies and procedures for the legal-representation class satisfy due process as a matter of law.

The Court should also deny summary judgment for Plaintiffs on the legal-representation class's due-process claim because ORR's policies and procedures on access to counsel for UACs satisfy due process as a matter of law.   In *Lin v. Ashcroft*, the Ninth Circuit stated that a UAC simply has the right "'to be represented (*at no expense to the government*) by such counsel.'"   377 F.3d at 1027 (quoting 8 U.S.C. § 1362; emphasis added); *see also Perez-Funez v. District Director*, 619 F. Supp. 656, at 665 (C.D. Cal. 1985).   Plaintiffs fail to acknowledge, let alone address, these cases calling for rejection of their claim that UACs in ORR care have a right to government-funded counsel.   Instead, Plaintiffs assert that "Courts have found that individuals have a due process right to legal counsel in a host of scenarios" and that "children detained by ORR have a right to counsel to protect the liberty interests implicated by decisions concerning release, placement, and medication." Pls.' Br. 53-54.   But the cases that Plaintiffs case—*Goldberg*, 397 U.S. at 254, and *J.D.B. v. North Carolina*, 564

---

[8] Plaintiffs' reliance on the *Flores* line of rulings to argue that ORR decisions involving UAC placement, release, and medical care are "'legal proceedings or matters' within the meaning of the TVPRA" because they are "routinely disputed and litigated" is circular, Pls.' Br. 53, as those are suits that Plaintiffs themselves initiated.   In any event, those cases involved enforcement of the *Flores* Settlement, not an interpretation of legal rights and obligations under the TVPRA.

U.S. 261, 272 (2011)—address only the right to "*retain* an attorney," *Goldberg*, 397 U.S. at 270, not the right to a *government-funded* attorney.  Neither case held that government-funded counsel is required for either the termination of welfare benefits or in immigration proceedings.  To the extent that Plaintiffs assert a right to retain their own counsel for immigration proceedings at no expense to the government, Defendants already have extensive policies and procedures in place to ensure they are able to do so.  *See* Defs.' U.F. ¶ 81.  If, however, Plaintiffs seek something more, they must establish some statutory or constitutional basis for that requirement.  Because they have not done so, and because ORR's existing legal-representation procedures fully satisfy due process, the legal-representation class's due-process claim fails as a matter of law.

### 3.  Plaintiffs fail to show that ORR has denied Plaintiffs' right to effective counsel.

In their complaint, Plaintiffs allege that ORR "blocks" access to counsel "in legal matters and proceedings involving ORR's decision on custody, release, medication, and placement." Compl. ¶ 189; *see also id.* ¶¶ 143-52, 188-90.  The complaint specifies two ways in which ORR allegedly does this.  First, Plaintiffs claim that "[a]s a matter of policy and practice, ORR routinely bars VIJ-funded legal services providers from representing unaccompanied children from non-contiguous countries in legal proceedings involving ORR's custody, release, placement, and medication decisions, even when such legal service providers have the time and desire to undertake such representations."[9] *Id.* ¶ 148.  Second, Plaintiffs claim that "[i]n blocking Plaintiffs and those similarly situated from receiving assistance in legal matters and proceedings involving ORR's custody, placement, medication, and release decisions, ORR acts arbitrarily, capriciously, abusively of discretion, and contrary to children's best interests, and obstructs lawyers from discharging their duty of zealous representation." *Id.* ¶ 151.  Discovery in this litigation has refuted these claims.  All four class representatives received screenings for legal relief, legal-rights presentations, and a list of *pro*

---

[9] It is unclear why Plaintiffs used the phrase "non-contiguous" in their Complaint, as UACs from Mexico may also be referred to ORR custody in certain circumstances. 8 U.S.C. § 1232(a)(2)(A).

*bono* legal service providers while in ORR custody, and met with an attorney or a child advocate.  Defs.' U.F. ¶¶ 105, 110, 113, 118, 124, 126-28, 133, 141.   None of the class representatives produced any evidence that ORR had blocked lawyers from representing them, Defs.' U.F. ¶¶ 112, 123, 129, 142, nor did the legal service providers who had submitted declarations on Plaintiffs' behalf, Defs.' U.F. ¶¶ 90, 94.  The parties agree that ORR-funded legal service providers "have appeared as counsel of record in federal court cases." J.S. ¶ 100. These undisputed facts defeat Plaintiffs' claim that ORR "blocks" access to counsel.

Rather than withdrawing this claim, Plaintiffs instead seek to reframe it, arguing for the first time in their motion that "ORR obstructs Plaintiffs from receiving *effective* legal representation," "thereby implicating their rights relating to release, placement, and medication decisions."  Pls.' Br. 54 (emphasis added).  Plaintiffs base this reframed claim on four new allegations, none of which appear in the operative complaint: (1) "ORR limits its funding to immigration matters only"; (2) "ORR grants a host of actors and decision-makers . . . broad discretion to communicate (or not) with children's legal representatives"; (3) ORR does not provide "all the evidence and information that ORR relied upon for its decision"; and (4) "ORR's policies and practices deny attorneys any meaningful opportunity to present affirmative evidence to rebut ORR's decisions."  Pls.' Br. 54-55.  As explained, however, "[a]ll causes of action alleged in an original complaint which are not alleged in an amended complaint are waived."  *King*, 814 F.2d at 567.  If Plaintiffs wish to challenge how ORR distributes its funding, how ORR staff and grant recipients communicate with lawyers, or what information ORR provides to lawyers, Plaintiffs must fairly allege those claims in their complaint to give Defendants a fair opportunity to respond.  *See Pac. Radiation*, 810 F.3d at 636-37 (district court lacks authority to grant injunctive relief absent a "sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth in the underlying complaint").  Plaintiffs did not do so.  Instead, Plaintiffs alleged that "ORR routinely bars VIJ-funded legal services providers from representing unaccompanied children from non-contiguous countries in legal proceedings involving ORR's custody, release, placement, and medication decisions, even when such legal service providers have the time

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

and desire to undertake such representations." Compl. ¶ 148.  Now that discovery has plainly refuted that claim, *see supra*, Plaintiffs may not belatedly allege a new set of facts to create a new claim for the legal-representation class.  *See Pac. Radiation*, 810 F.3d at 636-37; *cf. Cochran v. Quest Software, Inc.*, 328 F.3d 1, 11 (1st Cir. 2003) ("Litigation is not a game of hopscotch.  It is generally accepted that a party may not, on a motion for reconsideration, advance a new argument that could (and should) have been presented prior to the district court's original ruling.").  Plaintiffs' attempt to do so should be denied.

In any event, none of Plaintiffs' new allegations establishes that ORR's legal-representation procedures violate due process, any statute, or the *Flores* Settlement.  *First*, Plaintiffs argue that "ORR limits its funding to immigration matters only."  Pls.' Br. 54; *see also id.* at 54-55.  But as explained above and in Defendants' motion, Def.' Br. 58-59, the funding that Congress provided under the TVPRA is limited to immigration proceedings, based on the plain text of the statute, its legislative history, and congressional appropriations.  *Second*, Plaintiffs argue that "ORR grants a host of actors and decision-makers . . . broad discretion to communicate (or not) with children's legal representatives."  Pls.' Br. 55.  But the ORR Guide requires case managers to coordinate communications with all stakeholders throughout the time UACs are in ORR care, including the UAC and UAC's attorney (if the UAC has one).  *See* ORR Guide § 2.3.2.  Specifically, the case manager is required to communicate with the UAC's counsel to "keep the attorney up-to-date on the minor's case, and to provide the attorney on demand of any 30-day review of a more restrictive placement."  DX-10 [Biswas Decl.] ¶¶ 91, 93.  The other "decision-makers" in the ORR review process, federal field specialist and cases coordinators, have different job responsibilities that do not lend themselves as naturally to regular communication with UAC attorneys about individual cases as case managers, who are at the shelter and meet regularly with the minor.  Federal field specialists are "located regionally throughout the country and are assigned to a *group* of [ORR] care providers within a particular region."  J.S. ¶ 6 (emphasis added).  "Case Coordinators are non-governmental contractor field staff assigned to one or more care providers primarily to review [UAC] cases and provider transfer and release

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

recommendations to ORR staff."   J.S. ¶ 9.   Plaintiffs proffer no evidence why regular communication with the case manager, who works closely the federal field specialist and case coordinator, is inadequate.   *Third*, Plaintiffs argue that ORR does not provide "all the evidence and information that ORR relied upon for its decision."  Pls.' Br. 55.  But ORR policy *requires* all evidence and information that the agency relies upon in making its decisions to be provided to attorneys of record upon demand, DX-10 [Biswas Decl.] ¶¶ 48, 51, 59, and Plaintiffs provide no evidence that this does not happen.   *Fourth*, Plaintiffs argue that "ORR's policies and practices deny attorneys any meaningful opportunity to present affirmative evidence to rebut ORR's decisions."  Pls.' Br. 55.  This is their due-process claims for the step-up and unfit-custodian classes recast under the guise of the legal-representation class, and fails for the reasons explained above.  The Court should deny summary judgment for Plaintiffs on the legal-representation class's claims.

## F. The Court should deny Plaintiffs' request for a permanent injunction and the extraordinary relief that Plaintiffs' seek in their ten-page proposed order.

Even if the Court concludes that Plaintiffs are entitled to judgment as a matter of law, it should reject Plaintiffs' request for a permanent injunction and the sprawling relief set forth in their proposed order.  An injunction is an "extraordinary remedy" that "should issue only where the intervention of a court of equity is essential in order effectually to protect . . . against injuries otherwise irremediable."   *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  Permanent "injunctive relief is not automatic, and there is no rule requiring automatic issuance of a blanket injunction when a violation is found."   *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843 (9th Cir. 2007).  To obtain a permanent injunction, a party must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."   *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-58 (2010).

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs have failed to make this showing.  On the first factor, Plaintiffs argue that "[t]he harm caused by unlawful detention without adequate process is particularly severe given that Class Members are unaccompanied children detained for prolonged periods of time, some in jail-like conditions separated from their families."  Pls.' Br. 58.  As explained above, however, the interests of class members vary widely, and the overwhelming majority of class members are released in less than two months, Defs.' U.F. ¶¶ 96-97, and are not placed in a secure juvenile-detention facility, Defs.' U.F. ¶ 101.  Plaintiffs have failed to show class-wide harm that would support the sweeping class-wide relief they seek.  On the second factor, Plaintiffs assert only that "money damages" are not "an option in this case."  Pls.' Br. 58.  But given the small number of minors who spend "prolonged periods of time" in ORR custody or who are placed in a secure juvenile-detention facility, a nationwide permanent injunction is the wrong remedy for a class of minors who do not share the same risk of harm.  *See Ham*, 158 Fed. App'x at 762 (finding no liability against county even when plaintiff made an individualized showing of harm because he "did not allege an unconstitutional policy, and he did not present evidence establishing an unconstitutional custom, or pervasive misconduct").  On the third and fourth factors, Plaintiffs argue that "given the substantiality of the interests involved and the minimal burden that would be imposed on the government to revise its policies and procedures, a permanent injunction would not hurt the public interest, but instead promote it; the balance therefore tips significantly in Plaintiffs' favor."  Pls.' Br. 58-59.  But as explained above and in Defendant's motion, a proper *Mathews* balancing of interests and harms decisively favors Defendants.  Defs.' Br. 32-33 (step-up claim), 49 (unfit-custodian claim), 56-57 (legal-representation claim).

Plaintiffs' requested relief would also violate basic limitations on equitable relief.  *Califano*, 442 U.S. at 702 ("injunctive relief should be no more burdensome to the defendants than necessary to provide complete relief to the plaintiffs").  Plaintiffs' extraordinary ten-page proposed order would require a sweeping rewrite of ORR's policies and procedure.  It would mandate: (1) a full evidentiary hearing for any potential sponsor "within thirty (30) days following submission of a family reunification application"; (2) an automatic, pre-placement,

trial-like evidentiary hearing, for step-up to any "secure, staff secure, therapeutic staff secure, therapeutic group home, RTC or OON facility," and another full trial-like evidentiary hearing every 30 days; and (3) that ORR allow attorneys to use "funds appropriated in furtherance of 8 U.S.C. § 1232(c)(5)" (currently designated for use in obtaining *pro bono* representation for immigration proceedings) to represent minors to challenge routine ORR decision-making relating to placement, release, and medical care. Pls.' Proposed Order ¶¶ 1-3, 9-11, 16. And Plaintiffs' request would also entail extensive monthly reporting requirements and oversight by a group of private attorneys, including the right for class counsel to attend *any* hearing they choose in order "to monitor compliance," *in perpetuity. Id.* ¶¶ 4 (release), 13 (step-up). But injunctive relief must be tailored to remedy the specific harms alleged. *ProtectMarriage.com*, 599 F. Supp. 2d at 1226 (denying injunctive relief where "any contrary holding would require the Court to legislate from the bench and to act contrary to the law."); s*ee also BNS, Inc.*, 858 F.2d at 460 (an overbroad injunction is an abuse of discretion). Plaintiffs' extraordinary proposed order is not remotely tailored to what due process could conceivably require. And most of the relief that Plaintiffs request in their proposed order is not even mentioned in their complaint, and so would *per se* exceed a narrowly-tailored remedy for the harms alleged. *See Orantes-Hernandez*, 919 F.2d at 558 ("an injunction must be narrowly tailored to give only the relief to which plaintiffs are entitled"). The Court should therefore deny Plaintiffs' requested relief. If the Court determines that injunctive relief is warranted, it should order only the narrowly-tailored relief that is necessary to remedy the specific violations the Court finds. Any such relief should preserve ORR's discretion and operational ability to vet potential sponsors, protect child safety, and fulfill ORR's statutory mandate under the TVPRA.

## III.   CONCLUSION

The Court should deny Plaintiffs' motion for partial summary judgment on the step-up, unfit-custodian, and legal-representation claims, and their request for a permanent injunction.

Dated: November 6, 2020                    Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

SCOTT G. STEWART
Deputy Assistant Attorney General

ERNESTO H. MOLINA
Deputy Director

CHRISTOPHER A. BATES
Senior Counsel to the
Assistant Attorney General

*/s/ W. Daniel Shieh*
W. DANIEL SHIEH
BENJAMIN MARK MOSS
Senior Litigation Counsel

NANCY K. CANTER
JONATHAN K. ROSS
ANTHONY J. MESSURI
Trial Attorneys
Office of Immigration Litigation
United States Department of Justice
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-9802
*Counsel for Defendants*                   Email: Daniel.Shieh@usdoj.gov

61
Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment