JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
ERNESTO H. MOLINA, JR.
Deputy Director
CHRISTOPHER A. BATES
Senior Counsel to the Assistant Attorney General
W. DANIEL SHIEH
BENJAMIN MARK MOSS
Senior Litigation Counsel
NANCY K. CANTER
ANTHONY J. MESSURI
JONATHAN K. ROSS
Trial Attorneys
Office of Immigration Litigation
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-9802
Daniel.Shieh@usdoj.gov

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Lucas R., *et. al.*,<br><br>    *Plaintiffs*,<br><br>  v.<br><br>Alex M. Azar,<br>Secretary of U.S. Dep't of Health and Human Services, *et al.*<br><br>    *Defendants*. | Case No.: 18-cv-05741-DMG-PLA<br><br>**DEFENDANTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL MATERIAL FACTS**<br>Hearing Date: Dec. 11, 2020<br>Time: 3:00PM PT<br>Location: Courtroom 8C, 8th Floor<br>350 West 1st Street<br>Los Angeles, CA 90012<br><br>Honorable Dolly M. Gee<br>United States District Judge |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| 1. | The harm that detention causes for children is uniformly recognized by scholars and researchers.<br><br>Ex. 133[1] [Joanne M. Chiedi, *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody*, OFFICE OF INSPECTOR GENERAL (Sept. 2019) ("Office of Inspector General Mem.")] at 1991; Ex. 56 [Expert Report of Drs. Ryan Matlow and Nancy Ewen Wang ("Matlow & Wang Expert Rep.")] at 1381–86; Ex. 51 [Expert Report of Drs. Keith Cruise and Andrew Rasmussen ("Cruise & Rasmussen Expert Rep.")] at 1314 ("[l]onger time in detention is associated with increasing distress and provides more opportunity for increasing mental health and behavioral problems"); Ex. 53 [Expert Report of Judge Leonard Edwards ("Edwards Expert Rep.")] at 1329–33; Ex. 55 [Expert Report of Dr. Donna | Disputed.  Plaintiffs' assertion that "detention" *causes* harm to children ignores prior trauma or other pre-existing psychiatric problems that often predate the migration of Unaccompanied Alien Children (UACs) to the United States, and/or are experienced during the UACs' journey and lead to the UACs' long-term psychiatric problems.  Plaintiffs also misleadingly assert that the alleged harm is "uniformly recognized."  For many UACs, their treatment in ORR care "was a vast improvement over what they had previously experienced" in their home country or during their journey to the United States.  DX-35 [Dr. Lubit Expert Rep.] ¶ 26.  Finally, Plaintiffs ignore that, as Defendants' experts note, UACs' length of stay in ORR care may be longer when UACs have no identifiable safe sponsor notwithstanding ongoing efforts made by ORR care providers to identify viable sponsors for the UACs.<br><br>*See* DX[1]-30 [Dr. Ryan Expert Rebuttal Rep.] ¶¶ 2-9, 13 (disputing that Matlow & Wang's conclusions about the harm of ORR care are grounded in the literature which is wholly inapposite); DX-62 [Dr. Londino Expert Rep.] ¶ 56; DX-13 [Dr. Earner Expert Rep.] ¶ 53. |

---

[1] Reference to exhibits "DX-01" to "DX-61" refers to exhibits submitted in connection with Defendants' Statement of Uncontroverted Facts and Conclusions of Law (ECF No. 263-2) ("Defs.' U.F.").  References to Exhibits beginning with "Ex." refers to exhibits submitted in connection with Plaintiffs' Statement of Uncontroverted Facts and Conclusions of Law in Support of Plaintiffs/ Motion for Partial Summary Judgment (ECF No. 271-2).  New exhibits submitted in support of this Response will begin with DX-62.

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Londino ("Londino Expert Rep.")] at 1370, ¶ 56 ("correlated negative adjustment responses to the length of stay are inherent to the UAC population" and "the development of symptoms in response to the stressor of prolonged stay is concerning"); Ex. 52 [Expert Report of Dr. Ilze Earner ("Earner Expert Rep.") at 1318, ¶ 53 (reporting Office of Refugee Resettlement ("ORR") staff observations that children with longer lengths of stay "did show signs of deteriorating mental health"); *see also* Ex. 135 [Julie M. Linton et al., *Detention of Immigrant Children*, PEDIATRICS (Mar. 13, 2017)] at 1999 ("[E]xpert consensus has concluded that even brief detention can cause psychological trauma and induce long-term mental health risks for children.") | |
| 2. | "According to facility staff, longer stays resulted in higher levels of defiance, hopelessness, and frustration among children, along with more instances of self-harm and suicidal ideation." | Disputed.  The Office of the Inspector General Mem.[2] (OIG Mem.) acknowledges that the facilities "visited were purposively selected and may not represent the experiences of staff in other facilities."  The OIG Mem. further concedes that it "did not independently verify information provided by facility staff during |

---

[2] September 2019 OIG Report ("OIG Mem."), Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody, *available at* https://oig.hhs.gov/oei/reports/oei-09-18-00431.pdf

3

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Ex. 133 [Office of Inspector General Mem.] at 1991 | interviews and did not reconcile conflicting information from different employees within a facility."  The OIG Mem. also qualifies that section using the word "some": "Care provider facilities reported that longer lengths of stay resulted in deteriorating mental health for *some* children and increased demands on staff." OIG Mem. at Introduction, pp. 8, 12 (emphasis added). |
| 3. | Research shows that even a short amount of time in detention is seriously harmful to children, particularly those who have already experienced trauma in their home countries or during their journey to the United States.<br><br>Ex. 56 [Matlow & Wang Expert Rep.] at 1380–81, 1383, 1389 | Disputed.  Plaintiffs' cited experts concede that their opinions are not based on "a peer-reviewed study conducted on the impacts of detention in ORR custody."  DX-63 [Dr. Matlow Dep.] 132:1-7.  Rather, the cited report is based on a review of literature, the bulk of which "specifically addresses the detrimental effects that toddlers and young children experience who are placed in institutional care in the domestic child welfare system because of parental abuse, neglect or abandonment.  This population neither shares the same life history, age range, demographics or experiences with the majority of the UAC population."  DX-64 [Dr. Earner Expert Rebuttal Rep.] ¶ 4; *see* DX-36 [Dr. Lubit Expert Rebuttal Rep.] pp. 43-44 (noting that Drs. Matlow and Wang's "paper is not a scientific or clinical assessment of the situation").  Furthermore, child welfare experts who have visited and observed the practices of UACs in ORR's custody and care have observed that for many UACs, their treatment in ORR care "was a vast improvement over what they had previously experienced" in their home country or during their journey to the United States; DX-35 [Dr. Lubit Expert Rep.] ¶ 26; DX-31 [Dr. Ryan Expert Rebuttal Rep.] ¶ 2 (stating that "the majority of literature cited |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | by Drs. Matlow and Wang focused on populations that are significantly different (in terms of both individual demographics and life circumstances) from the UAC population"). |
| 4. | Stress from detention can have long-term effects in children.<br><br>Ex. 56 [Matlow & Wang Expert Rep.] at 1380–85 ("Chronic and prolonged stress exposure alters hormonal and physiological systems, with long-term consequences for neurological development and immune functioning."); *see* Ex. 27 [Deposition Transcript of Shaanan Meyerstein ("Meyerstein Dep. Tr.")] at 303:16–25 | Disputed. Plaintiffs' cited experts fail to provide "data or explanations of their opinion that provide reasonable support for a conclusion … that placement in ORR custody … leads to psychological decline [that] is likely to continue beyond the children's time in ORR custody." DX-36 [Dr. Lubit Expert Rebuttal Rep.] ¶ 16; *see* DX-31 [Dr. Ryan Expert Rebuttal Rep.] ¶ 13 ("The authors note the 'long lasting harm' from institutional placement…[but the cited] studies were of older asylum seekers that spent a significantly longer time in 'detention' as compared with the average UAC…and focused on young children separated from their parents as part of the zero tolerance policy, which is no longer in effect."). |
| 5. | Class Representative Gabriela N. experienced verbal abuse and harassment and suicidal ideation while in the custody of ORR. As a result of her suicidal ideation, she was hospitalized on August 3, 2017.<br><br>ECF No. 62-2 [Decl. of Gabriela N., Feb. 2018] ¶ 9 ("The staff yell at us all the time. The staff don't really care about us; they live totally different lives from us."); ECF No. 62-3 [Decl. of Gabriela N., Jun. 8, 2018] ¶ 7 ("The staff [were] so mean; they tease[d] me an tr[ied] to | Disputed to the extent it implies a correlation between Class Representative Gabriela N.'s time in custody and harm.  The abuse Gabriela N. experienced was by her mother, and she also experienced physical and emotional abuse by her step father in her home country.  In December 2016, Gabriela N. and two female peers were ████████ MS-13 members.  Gabriela N. first ████████████████████ at the age of 12 while still in her home country.  Gabriela N. "report[ed] that she ████████████ ████████, without intent or plan, following the arrest of her stepfather for allegedly abusing her sibling and telling her that he had gang ties and could have her killed, if he wished." Gabriela N. was psychiatrically hospitalized |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | embarrass me.") ECF No. 50-32 [Decl. and Verified Report of Dr. Amy Cohen, M.D. In Support of Preliminary Injunction Re: Plaintiff Gabriella N.] at 21 <br><br> ████████████ <br> ████████████ <br> ████████████ <br><br> ECF No. 62-18 at 2 ("Minor disclosed suicidal thoughts on 8/02/2017, related to increased frustration over her case as well and extended stay in the program.") | on August 3, 2017.  DX-52 [Vergara GN Decl.] ¶¶ 15, 17, 22, 32, 37; DX-83 at 4. |
| 6. | Class Members have been physically abused in ORR custody. <br><br> Ex. 6 [Defendants' Second Set of Responses to Plaintiffs' Requests for Admission ("RFA 2nd Set")] RFA No. 43 at 516–17 | Undisputed in that Defendants admit that individual allegations of physical abuse of UACs in ORR custody (by other minors or adult staff members) have at times been reported and that, at times, these allegations have been substantiated.  ORR policies, however, are set up to address such allegations quickly and fully. <br><br> Ex. 6 [RFA 2nd Set] No. 43 at 516-17; ORR Guide[3] § 5.5.4 (ORR's Abuse Review Team "quickly reviews allegations of abuse that are particularly serious or egregious in nature" and, "[i]n response to substantiated reports of physical or sexual abuse, ORR may limit placement at a care provider facility, stop placement, and even remove children currently placed at the care provider facility"). |

---

[3] The ORR Guide: Children Entering the United States Unaccompanied is *available at*: https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| 7. | Class Members have been sexually abused in ORR custody.<br><br>Ex. 6 [RFA 2nd Set] Nos. 44, 53–55, 58 at 517–18, 522–26 | Undisputed.  Defendants admit that there have been individual allegations of sexual abuse of UACs in ORR custody.  However, ORR has a zero-tolerance policy for all forms of sexual abuse, sexual harassment, and inappropriate sexual behavior at all care provider facilities, including secure care provider facilities and long term foster care providers, and makes every effort to prevent, detect, and respond to such conduct.<br><br>Ex. 6 [RFA 2nd Set] Nos. 44, 53-55, 58 at 517-18, 522-26 (noting that "serious allegations rising to the level of 'sexual abuse' are rare and are reported to ORR, the Department of Justice (DOJ)," and HHS's OIG). |
| 8. | While in ORR custody, children experience separation from their parents, siblings, grandparents, and other family members.<br><br>Ex. 5 [Defendants' First Set of Responses to Plaintiffs' Requests for Admission ("RFA 1st Set")] Nos. 15–17 at 475–79 | Disputed to the extent it implies ORR separates children from their parents, siblings, grandparents, and other family members.  Rather, UACs enter the United States unaccompanied, and Congress, in the Homeland Security Act and TVPRA, requires that children who meet the UAC definition, and who are in custody by reason of their immigration status, be referred to ORR's care and custody until appropriate sponsors can be identified and the UAC can be safely released.<br><br>6 U.S.C. §§ 279(a), (b)(1)(A), (g)(2); 8 U.S.C. § 1232(b)(1); DX-09 [Antkowiak Decl.] ¶ 50 (Congress has continuously accepted that ORR takes into custody children who may have parents residing in the United States); DX-13 [Dr. Earner Expert Rep.] ¶ 27. |
| 9. | Separating children from their family is inimical to their well-being. | Disputed to the extent it implies ORR separates UACs from their family.   UACs enter the United States unaccompanied, and do not enter |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Ex. 56 [Matlow & Wang Expert Rep.] at 1380–83; *id.* at 1389 ("In our interviews with children, many have exhibited symptoms of sadness, despair, helplessness, and chronic anxiety and worry directly related to ... their separation from family and community") | into ORR custody until after it has been determined by a Border Patrol Officer, or other immigration official, that the child is unaccompanied and an initial placement decision has been made.<br><br>DX-10 [Biswas Decl.] § 21-23; *see* Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts ("Fact Response") ¶ 8. |
| 10. | In February 2018, ORR detained Plaintiff Lucas R. at the Hacienda del Sol facility ("HdS") in Youngtown, Arizona.<br><br>ECF No. 40-1 [HdS Admission Record] at 2 | Undisputed. |
| 11. | On February 20, 2018, ORR hospitalized Lucas R., purportedly due to suicidal ideation. According to the emergency room report, Lucas R. had "[suicidal ideation] x8 days since being moved to southwest key . . . 'and being removed from family.'"<br><br>ECF No. 40-3 [Banner Thunderbird Medical Center Emergency Room Report] at 2 | Disputed to the extent it implies Lucas R.'s suicidal ideations began only after entering ORR's care.  Lucas R. ██████████ ██████ within one week of entering ORR's care.  Medical records from his subsequent hospitalization and other records show that as early as age 10 or 11 ████████ ███████████████████████ ██████, and that he had a ████ ██████████████████████ the last instance of which occurred in December 2017 when he attempted to ███████████████████<br><br>DX-41 [De La Cruz LR Decl.] ¶¶ 14, 36; DX-83 at 23, 36; *see also* DX-36 [Dr. Lubit Expert Rebuttal Rep.] pp. 29-32, ¶¶ 116-126. |
| 12. | The emergency room report from Lucas R.'s February 20, 2018 admission further states that Lucas "denie[d] [suicidal | Disputed to the extent it implies Lucas R.'s ███████████████████ state were due solely to separation from his family.  Lucas R. arrived in ORR custody with a significant |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | ideation] at this time [and] just state[d] he is sad and depressed being away from his family in Guatemala [sic]." | history of trauma, mental health issues, and ██████████████ Lucas R. was also physically and emotionally abused, and neglected in his home country. |
| | ECF No. 40-3 [Banner Thunderbird Medical Center Emergency Room Report] at 2 | DX-41 [De La Cruz LR Decl.] ¶¶ 36, 52; *see also* DX-36 [Dr. Lubit Expert Rebuttal Rep.] pp. 29-32, ¶¶ 116-126. |
| 13. | Upon being returned to HdS, a nurse practitioner placed Lucas R. on sertraline (brand name: Zoloft), a psychotropic drug with severe potential side effects. The medication caused Lucas stomach pain, and he periodically resisted taking it.<br><br>ECF No. 40-2 [Southwest Key Psychiatric Report]; Ex. 81 [Decl. of Lucas R, Jun. 8, 2018 ("Lucas R. Decl.")] ¶ 4 ("I refused to take the medication two or three times, and I think it probably hurt my case.") | Disputed.  After Lucas R.'s hospitalization and ███████████████████ Lucas R. was prescribed ████████████ The prescriber reviewed possible side effects with Lucas R., confirmed that he understood the information and Lucas R. agreed to take the medication.  On March 20, 2018, it was documented that Lucas R. refused to take his medicines and understood the risks.  The program did not require him to take medications and, on March 27, 2018, he was switched from a pill to a liquid form to alleviate mild stomach-related illness.  Lucas R. did not, however, develop any severe side effects.<br><br>DX-41 [De La Cruz LR Decl.] ¶¶ 16, 17; DX-83 at 19, 21, 32; *see also* DX-36 [Dr. Lubit Expert Rebuttal Rep.] pp. 29-32, ¶¶ 116-126. |
| 14. | No one from the shelter or ORR asked Lucas's sister, Madelyn, for her consent to administer Lucas R. psychotropic drugs.<br><br>ECF No. 37-13 [Decl. of Madelyn R., July 19, 2018 ("Madelyn R. Decl.")] ¶ 14 | Undisputed that Madelyn applied to be a sponsor for Lucas R. as a non-parental sponsor, was denied, and was not asked to consent to Lucas R.'s psychotropic medications.<br><br>DX-41 [De La Cruz LR Decl.] ¶ 16; DX-83 at 20-22. |
| 15. | ORR transferred Lucas R. to Shiloh Residential Treatment | Undisputed. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Center ("Shiloh").<br><br>ECF No. 33 [ORR Transfer Request and Tracking Form, May 21, 2018] at 37–38 | |
| 16. | At Shiloh, ORR continued to confine him and medicate him without his or his family's consent until he was finally released to his brother on September 4, 2018.<br><br>Ex. 81 [Lucas R. Decl.] ¶¶ 4, 7, 8]; ECF No. 37-13 [Madelyn R. Decl.] ¶ 14; Ex 15 [Deposition Transcript of ███████ ("A.C. Dep. Tr.")] at 12:3–15 | Disputed. Lucas R. was transferred to Shiloh after displaying behaviors that were an immediate danger to himself and that could not be served in a shelter setting. ███████ was discontinued the day Lucas R. entered Shiloh and the case files do not support the assertion that Lucas R. was prescribed medication without his consent or over his objection.  While Lucas R. at times refused his medication, there is no evidence in his case file that he categorically did so, and he was not forced to take it. Lucas R. was discharged from Shiloh when he was "no longer a danger to himself or others and no longer presented with the symptoms he was admitted for."  DX-41 [De La Cruz LR Decl.] ¶¶ 33, 38, 41-43, 55; DX-83 at 16. |
| 17. | While in ORR custody, Lucas R. had trouble sleeping and psychological issues until reunified with his brother.<br><br>Ex. 15 [A.C. Dep. Tr.] at 31:16–22, 44:17–20 | Disputed to the extent it implies Lucas R's reunification with his brother resolved all behavioral and psychological issues, or that such issues were the result of being in ORR custody.  During a well-being follow-up call, Lucas R.'s brother reported that "minor has strong personality and can be difficult managing."  DX-83 at 17. |
| 18. | Defendants admit "that Sirena P.'s separation from her family was noted as a trigger for her mental health symptoms."<br><br>ECF No. 144 [Defendants' Answer to First Amended | Undisputed. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Complaint ("Answer")] ¶ 83 | |
| 19. | Defendants admit "that Benjamin F.'s separation from his mother and placement into ORR's legal custody led to physical and emotional challenges."<br><br>ECF No. 144 [Answer] ¶ 87 | Undisputed. |
| 20. | Without the presence of family members or otherwise trusted caregivers, children are sometimes unable to cope with the psychological trauma and stress associated with custody.<br><br>ECF No. 144 [Answer] ¶ 102; Ex. 27 [Meyerstein Dep. Tr.] at 302:21– 303:19; Ex. 21 [Deposition Transcript of Isabella F. ("Isabella F. Dep. Tr.")] at 56:12–57:23, 59:2–7; Ex. 15 [A.C. Dep. Tr.] at 31:16–22, 44:7–20; Ex. 22 [Deposition Transcript of Maviric Fields ("Fields Dep. Tr.") ] at 180:19–22, 181:11–25 | Undisputed that some children experience stress with custody.  However, disputed to the extent it ignores that prior trauma or other pre-existing psychiatric problems often predate children's placement in ORR custody and lead to long-term mental health issues.<br><br>DX-31 [Dr. Ryan Rebuttal Report] ¶ 6 ("historical traumas and prior life experiences can cascade and create long-term emotional and behavior issues"). |
| 21. | ORR denies that there is "a greater risk of harm to children who reside for longer period of times in the legal custody of ORR (and the physical custody of a grantee care provider), as compared to release to any and all potential sponsors."<br><br>Ex. 6 [RFA 2nd Set] No. 154 at | Undisputed, except Plaintiffs have failed to include objections lodged by Defendants in response to RFA No. 154. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | 541 | |
| 22. | "[T]he best practice in child welfare would be to discharge the [child] within 30 days of admission. In ordinary cases, ORR generally does not recommend keeping [a child] in care for longer than 60 days."<br><br>Ex. 83 at 1537 | Disputed to the extent Plaintiffs mischaracterize Ex. 83 by omitting relevant language.  The full paragraph provides that "increase in the median length of care presents child welfare considerations for ORR.  *In ordinary cases, where a suitable sponsor is available and discharge presents no risks to the health or safety of the UAC or the public, ORR's experience is* that the best practice in child welfare would be to discharge the UAC within 30 days of admission.  *In ordinary cases*, ORR generally does not recommend keeping UAC in care for longer than 60 days."  Further, a "too-hasty release to an un-vetted sponsor poses unwarranted potential danger to a UAC" and "[t]o implement strict length of stay timelines would violate ORR's commitments to child safety and well-being – both in the short term and long term."  Ex. 83 at 1537 (emphasis added). |
| 23. | As of March 13, 2020, ORR had 3,622 minors in custody, 1,193 of whom were in congregate settings after having been detained for 30 days or more.<br><br>*Flores et al., v. Barr et al.*, No. 85-4544-DMG (Px) (C.D. Cal. Mar. 28, 2020), ECF No. 740 [Order re Plaintiffs' *Ex Parte* Application] at 9. | Disputed.  Defendants cannot verify Plaintiffs' statement, which is based upon a Court opinion citing a declaration from an attorney, Peter Schey, in a separate case, in which data was found to be errant in some respects.  *See Flores et al., v. Barr et al.*, No. 85- 4544-DMG (Px) (C.D. Cal. Mar. 28, 2020), ECF No. 746-1 (discussing flaws in Plaintiffs' data).   Defendants respectfully refer the Court to publicly available statistical data, available at: https://www.acf.hhs.gov/orr/about/ucs/facts-and-data, and showing an average length of care of 66 days. |

12

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| 24. | Children may remain in ORR custody for a year or more.<br><br>Ex. 5 [RFA 1st Set] No. 36 at 492; Ex. 19 [Deposition Transcript of Natasha David ("David Dep. Tr.")] at 72:22–73:13; Ex. 16 [Deposition Transcript of Carina Contretas ("Contreras Dep. Tr.")] at 160:6–13 | Undisputed.  However, to the extent this implies stays of more than one year are common, Defendants respond as follows.  In 2019, the average stay was 66 days, which is significantly shorter than the average length of stay in domestic foster care (2 years) or congregate care (8 months).  DX-13 [Dr. Earner Expert Rep.] ¶ 63.  Further, the length of stay can increase due to factors beyond the control of ORR or facility staff, including: failure by parents, relatives, or sponsors to complete home studies and all required paperwork; the existence of severe mental, health, or physical disabilities which may require stabilization before UACs can be safely placed with a parent, relative, or sponsor; or children who do not have any parent, relative, or sponsor to care for them.<br><br>DX-64 [Dr. Earner Expert Rebuttal Rep.] ¶ 4 ("[T]he overwhelming majority of UACs in ORR care … spend less than two months in care before release to a sponsor."); *see also* DX-30 [Dr. Ryan Expert Rep.], App. B (discussing data concerning time."); DX-09 [Antkowiak Decl.] ¶ 47 (In fiscal year 2019, children released to Category 1 sponsors were in care for an average of 43 days; Category 2, 59 days; Category 3, 107 days. Overall average length of care equaled 56 days in fiscal year 2019.). |
| 25. | ORR detained Class Representative Gabriela N. for approximately 633 days.<br><br>ECF No. 62-6 [Initial Intake Form] at 2 (noting arrival date of | Undisputed.  *But see* Fact Response ¶ 24. |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Jan. 8, 2017]; Ex. 101 at 1802 ██████████████████; Ex. 141 at 2036 ██████████████████████; ██████████████████████; Ex. 140 at 2031 ██████████████; Ex. 102 at 1806–07 | |
| 26. | ORR detained Class Representative Lucas R. for approximately 208 days.<br><br>Ex. 143 at 2045 ████████████ ██████████████████; Ex. 142 at 142 ████████████ ██████████████████████ ██████████████ | Undisputed. *But see* Fact Response ¶ 24. |
| 27. | ORR has detained at least one Class Member in congregate care for at least 1,570 days, or more than four years.<br><br>Ex. 122 at 1923 | Undisputed.  *But see* Fact Response ¶ 24. |
| 28. | ORR's Policy Guide mandates "that children are released timely and safely from ORR custody to parents, other family members, or other adults (often referred to as 'sponsors'). . . ."<br><br>Joint Stipulation of Facts for Motion and Cross-Motion for Partial Summary Judgment ("Joint Stip.") ¶ 5; Ex. 1 [Policy Guide, Children Entering the United States Unaccompanied, Office of Refugee Resettlement ("ORR Policy Guide")] § 2.1 at | Undisputed. |

14

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | 34 | |
| 29. | ORR is required to make "prompt and continuous efforts" toward family reunification and release children to custodians "without unnecessary delay."<br><br>Ex. 8 [Flores Settlement Agreement] ¶¶ 14, 18 at 573–74, 576 | Undisputed.  Defendants acknowledge that this is required under the Flores Settlement Agreement. |
| 30. | ORR's written policies govern the release of children to potential custodians or sponsors, which include parents or legal guardians (Category 1 sponsors), immediate relatives (Category 2A/B sponsors), or more distant relatives and individuals designated by the child's parent (Category 3 sponsors).<br><br>Joint Stip. ¶ 3; Ex. 1 [ORR Policy Guide] §§ 2.1, 2.2.1 at 34–35 | Undisputed. |
| 31. | Cases with no identified sponsors are referred to as Category 4.<br><br>Joint Stip. ¶ 3; Ex. 1 [ORR Policy Guide] § 2.2.1 at 34–35 | Undisputed. |
| 32. | Case Managers, Case Coordinators, and Federal Field Specialists ("FFS") all participate in the release of children to family members and other potential sponsors, referred | Undisputed. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | to as the "family reunification process." Ex. 3 [The UAC Manual of Procedures (UAC MAP) ("ORR MAP")] § 2.2 at 140–42; Ex. 1 [ORR Policy Guide] § 2.3 at 39 | |
| 33. | ORR's Policy Guide provides that "Case Managers perform a variety of duties, including coordinating the completion of assessments of unaccompanied alien children, completing individual service plans, assessing potential sponsors, making transfer and release recommendations, and coordinating the release of a child or youth from ORR care and custody." The Policy Guide also provides: "The Case Manager's role is also to ensure that information is gathered or shared with the appropriate staff and stakeholders during the sponsor assessment process." Joint Stip. ¶ 8; Ex. 1 [ORR Policy Guide] § 2.3.2 at 39–40 | Undisputed. |
| 34. | ORR's Policy Guide provides that Case Coordinators are "non-governmental contractor field staff assigned to one or more care providers primarily to review unaccompanied alien children cases and provide transfer and release | Undisputed. |

16

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | recommendations to ORR staff."<br><br>Joint Stip. ¶ 94 | |
| 35. | FFS "are ORR's field staff located regionally throughout the country and are assigned to a group of [ORR] care providers within a particular geographic region."<br><br>Joint Stip. ¶ 6 | Undisputed. |
| 36. | ORR's Policy Guide defines "Care Provider" as "any ORR funded program that is licensed, certified or accredited by an appropriate State agency to provide residential care for children, including shelter, group, foster care, staff-secure, secure, therapeutic or residential treatment care for children."<br><br>Joint Stip. ¶ 4; Ex. 1 [ORR Policy Guide], Guide to Terms at 19. | Undisputed. |
| 37. | ORR's Policy Guide provides that "[ORR/FFS] have the authority to approve all unaccompanied alien children transfer and release decisions; oversee care providers to ensure all services are properly provided and implemented; and serve as a local liaison to community stakeholders, including other Federal agencies, local legal | Undisputed. |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | service providers, communities, Child Advocates, etc. ORR/FFS also provide guidance, direction, and technical assistance to care providers. ORR/FFS also make final decisions as to whether home studies are conducted and/or post- release services are provided.  ORR/FFS coordinate all aspects of a child's case with care provider staff, Case Coordinators, stakeholders, and other Federal agencies."<br><br>Joint Stip. ¶ 7; Ex. 1 [ORR Policy Guide] § 2.3.1 at 39 | |
| 38. | Although Case Managers are the first of three actors involved in release decisions, they also have unilateral authority to declare a potential sponsor "non-viable," which ends the vetting process.<br><br>Ex. 30 [Deposition Transcript of Michelle Ortiz ("Ortiz Dep. Tr.")] at 110:24–113:2 ("And the aunt was told she was not a viable sponsor because they didn't have the same last name. Once transferred to the permanent facility, the child was released within two weeks…"). | Disputed.  Plaintiffs' only evidence in support of this statement is Ex. 30 [Ortiz Dep. Tr.] – hearsay testimony by a legal service provider – and comes nowhere close to establishing this as a statement of uncontroverted fact regarding ORR's policy or practice.  Moreover, this statement is erroneous, and is contravened by both ORR policy and ORR Rule 30(b)(6) testimony. Case managers coordinate the completion of UAC assessments, complete individual service plans, assess potential sponsors, communicate with potential sponsors, make transfer and release recommendations, and coordinate the release of children from ORR care and custody.  It is ORR's practice and policy that the release process is collaborative in nature and requires coordination between the case manager, third-party case coordinator, the FFS, and other stakeholders. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | *See* Defs.' U.F. ¶¶ 15, 24; DX-02 [Biswas 30(b)(6) Dep.] 128: 9-10 ("I wouldn't characterize them [case managers] as the primary evaluator of a sponsor."). |
| | | *See* Defs.' Evidentiary Objection ¶ 38. |
| 39. | ORR's Policy Guide provides that "[a]ll potential sponsors must complete an application in order for a child to be released to them from ORR custody (the 'Family Reunification Application')." Joint Stip. ¶ 37; Ex. 1 [ORR Policy Guide] § 2.2.3 at 35–36 | Undisputed. |
| 40. | ORR's Policy Guide provides that the "care provider also informs potential sponsors that they may submit additional information to support the application and reminds potential sponsors of the deadlines for completing the forms." Joint Stip. ¶ 39; Ex. 1 [ORR Policy Guide] § 2.2.3 at 35–36 | Undisputed. |
| 41. | Potential sponsors also undergo a background check and may be required to submit fingerprints. Ex. 1 [ORR Policy Guide] § 2.5 at 44; Ex. 3 [ORR MAP] § 2.5 at 177 | Undisputed. |
| 42. | Under certain circumstances ORR policy requires a home | Undisputed. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | study before releasing a child—for example, ORR requires a home study if a child is 12 years and under and the proposed sponsor is a non-relative.<br><br>Ex. 1 [ORR Policy Guide] § 2.4.2 at 42–44 | |
| 43. | ORR's MAP provides that Case Managers may recommend a discretionary home study of a proposed custodian prior to release.<br><br>Joint Stip. ¶ 13; Ex. 3 [ORR MAP] § 2.4.2. at 172–77 | Undisputed. |
| 44. | Home studies can significantly prolong the time children spend in ORR custody.<br><br>Ex. 24 [Deposition Transcript of Yesenia Heath ("Heath Dep. Tr.")] at 158:12–159:1, 159:18–25, 161:11–13 (On average, it takes 30 days to complete a home study), 252:10–19; Ex. 28 [Deposition Transcript of Nidia Murray ("Murray Dep. Tr.")] at 197:7–198:9; Ex. 14 [Deposition Transcript of Jose Castaneda ("Castaneda Dep. Tr.")] at 167:9–15; Ex. 50 [Heath Dep. Ex. 172] at 1310 ███████<br>████████████<br>████████████<br>██████ Ex. 99 at 1771 ██████ | Disputed to the extent Plaintiffs' use of the term "significantly" is a statement of opinion, not fact, and also to the extent it implies the home study itself is the sole source of any release delay.  Delays in the release process are often attributable to the UAC's lack of an available sponsor, or the potential sponsor being unresponsive and/or failing to provide the required documentation.  These factors are beyond the control of ORR or facility staff.  Further disputed to the extent that Plaintiffs imply any delay resulting from a TVPRA-mandated or a discretionary home study is unnecessary.<br><br>DX-03 [Padilla Dep.] 117:2-5, 247:16-25; DX-22 [Fields Dep.] 73:20-74:8; DX-24 [Heath Dep.] 238:25-239:15; DX-14 [Dr. Mohn Expert Rep.] ¶ 45; DX-10 [Biswas Decl.] ¶ 68; DX-13 [Dr. Earner Expert Rep.] ¶¶ 64, 65 ("There is abundant need for caution in ensuring that |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| |  *id.* at 1777 ( *id.* at 1774 ( ); *id.* at 1791 | appropriate home studies (both those mandated by law and on a discretionary basis) . . . are conducted prior to a UAC's release to a parent, relative or potential sponsor.  Unlike domestic children in out of home care, the families, relatives and potential sponsors of the UAC are unknown to any agency or institution in any meaningful way."); DX-30 [Dr. Ryan Expert Rep.] ¶¶ 48, 55 ("[T]he home study process [is] evidence that ORR seriously considers potential sponsors and the best interest of the child prior to discharge . . . "), 58 ("[I]t would be a mistake to conclude . . . that getting a home study causes a longer stay when it is also possible that factors leading to the need for a home study may also make it more difficult to locate a potential sponsor and ensure that this person is capable of safely providing for the child's needs, including any special needs), 60 ("It is critical to note that along with keeping children safe while in ORR's custody and care, the pathway to sponsorship and the home study process are perhaps the most important activities of the ORR grantee care provider system.  It is by necessity both time-consuming and comprehensive."). |
| 45. | ORR staff can order a discretionary home study and the only requirements for doing so are that the sponsor be potentially viable and that the ORR staff "have a reasonable expectation that the results of the home study process . . . will provide additional information, other than what has already been gathered via the sponsor | Disputed.  ORR policy states: "Care providers should only request home studies for potentially viable sponsors. Concerns related to moving violations and DUI/DWIs (unless there are multiple charges in a relatively short period) unconnected to a well-founded child welfare concern are not to be used as the underlying basis for a discretionary home study. The home study must focus on potential sponsor's ability to appropriately care for the UAC and the sponsor's ability to ensure the |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | assessment process, which will mitigate concerns." Joint Stip. ¶ 13; Ex. 3 [ORR MAP] § 2.4.2 at 172–77; Ex. 19 [David Dep. Tr.] at 77:1–16 | safety and well-being of the UAC."  Ex. 3 [ORR MAP] § 2.4.2 at 175; *Flores v. Sessions*, No. CV-854544-DMG-AGRX, 2018 WL 10162328, at *18 (C.D. Cal. July 30, 2018) (revised policies on home studies did not lead to unnecessary delay and were "reasonably calculated to protect Class Members from harm and neglect and to ensure they have an adequate standard of care"). |
| 46. | FFS make the final decision as to whether a discretionary home study of a child's proposed custodian will be required. Joint Stip. ¶ 11 | Undisputed. |
| 47. | An FFS can authorize an extension of the time it takes to complete a home study. Joint Stip. ¶ 12 | Undisputed. |
| 48. | ORR's policy of requiring all household members to submit fingerprints in the event of a home study can cause "significant[] delay[]" in releasing children to available custodians. Ex. 20 [Deposition Transcript of Whitney Eich ("Eich Dep. Tr.")] at 46:22–48:13, 184:11–185:8 (it could take "[p]otentially five weeks" to receive fingerprint results). | Disputed as it implies that obtaining the fingerprint result itself is what leads to delay, which does not accurately reflect the cited evidence.  Rather, the deponent testified that the delay can result from a household member being unwilling to submit to fingerprinting and five weeks was the "longest…seen… to process fingerprint results," not the normal processing time for obtaining results.  Ex. 20 [Eich Dep. Tr.] at 48:3-13 ("household member who is unwilling to fingerprint, that then means that the case is going to be significantly delayed"), 185:5-7; *see also* DX-13 [Dr. Earner Expert Rep.] ¶ 66 ("In contrast to ORR procedures where fingerprinting is not standard, most states require fingerprinting of all household members prior to licensing a |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | home for foster care placements. These standards are recommended as best practices by the National Association of Regulatory Administration."). |
| | | Further disputed as Plaintiffs' cited passage does not stand for the proposition that ORR's current policy of requiring all household members to submit fingerprints in the event of a home study (rather than a prior policy of fingerprints of all household members in all circumstances) causes "significant delay," and therefore does not stand for the proposition that such a policy currently causes delays. Ex. 20 [Eich Dep Tr.] at 47:7 to 48:13 (clarifying that her testimony about the impact of the policy referred to "*[p]reviously*, when that policy was in place for all household members . . . .") (emphasis added). |
| | | *See* Defs.' Evidentiary Objection ¶ 48. |
| 49. | When Lucas R.'s sister, Madelyn, learned of his arrest, she asked ORR to release Lucas R. to her. Madelyn gave ORR all the documents it requested and applied to be his sponsor.<br><br>ECF No. 37-13 [Madelyn R. Decl.] ¶ 6 | Disputed to the extent it implies Madelyn completed all of the required documentation on a timely basis. By March 1, 2018, Madelyn had submitted only a partially completed application. Madelyn's household member did not submit forms until April 19, 2018 so a commercial background check could not be ordered until April 22, 2018. During this period of delay, Lucas R. began exhibiting mental health concerns.<br><br>DX-41 [De La Cruz LR Decl.] ¶ 13-14; DX-83 at 26-29, 36. |
| 50. | On or about March 15, 2018, ORR arranged a home study to assess Madelyn's suitability as a | Disputed to the extent it implies the home study was ordered due to concerns regarding Madelyn's suitability as a sponsor. Rather, a |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | custodian for Lucas R.<br><br>ECF No. 40-4 [Decl. of A.C.] at 4, ¶ 4; ECF No. 37-13 [Madelyn R. Decl.] at 7, ¶ 10 | mandatory TVPRA-required home study was ordered on March 15, 2018 due to Lucas R.'s psychiatric issues and, on March 16, 2018, the third party case reviewer, who serves as an independent check on recommendations, concurred that the case mandated a home study.  On March 17, 2018, FFS approved the home study request.<br><br>DX-41 [De La Cruz LR Decl.] ¶ 21; DX-83 at 30-31. |
| 51. | Following the March home study, ORR's home investigator recommended against releasing Lucas R. to Madelyn.<br><br>ECF No. 37-13 [Madelyn R. Decl.] ¶¶ 10–13 | Disputed to the extent it implies that ORR performed the home study, that only one home study visit occurred, and that ORR's recommendation against releasing Lucas R. to Madelyn was final.  Rather, a home study visit was conducted by an independent, non-profit home study agency, with an initial visit on March 22, 2018, a follow-up visit March 30, 2018, and a third home visit on April 5, 2018.  An approximately 30-page report issued on April 12, 2018, detailing the reasons for denying release to Madelyn, including Madelyn minimizing concerns about Lucas R.'s mental health, Madelyn's "habit or desire to omit information" including regarding the number of individuals living in the home, and the discovery that Madelyn had abused Lucas R. in their home country.  After involving an independent third party review and the lead case manager, the FFS denied Madelyn's application to act as a sponsor on April 30, 2018.  The denial noted that the decision could be revisited once Lucas R. was stabilized and home study concerns had been addressed. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | DX-41 [De La Cruz LR Decl.] ¶¶ 21-32; DX-83 at 18, 24-25, 33-35. |
| 52. | Prior to making release decisions, ORR may also conduct additional assessments of minors in custody, such as psychological evaluations.<br><br>Ex. 3 [ORR MAP] § 2.4.2 at 172–77 | Undisputed. |
| 53. | ORR has no written standards on when it will require a Class Member to undergo a psychological evaluation as a prerequisite to release.<br><br>Ex. 16 [Contreras Dep. Tr.] at 175:11-23 | Disputed. Plaintiffs' sole supporting evidence, Ex. 16, does not support Plaintiffs' assertion of uncontroverted fact. *See* Ex. 16 [Contreras Dep. Tr.] at 175:11-23 ("Q: Does a psychological evaluation need to be completed before a child can be stepped down or reunified? A: ORR determines whether that's necessary for a step down or for reunification."). ORR MAP § 3.3.1 provides, in pertinent part, that "[f]or UAC with known, disclosed, or alleged violent criminal history, clinicians must request a psychologist perform a psychological risk assessment as described below. Where appropriate, collect criminal history information and the completed psychological assessment." Ex. 3 [ORR MAP] § 3.3.1 at 302.<br><br>Further disputed to the extent it implies that when a psychological evaluation is requested for a UAC, it is necessarily a prerequisite to release, or that the recommendations of such an evaluation are the sole determinants of release decisions. ORR Guide § 2.4.1 provides that, among other considerations in evaluating family |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
|  |  | members or other sponsors for release, are the UAC's current functioning and strengths in relation to any risk factors or special concerns such as mental health issues.  Ex. 3 [ORR MAP] § 2.4.1 at 169-70.<br><br>*See* Defs.' Evidentiary Objection ¶ 53. |
| 54. | Notwithstanding the lack of written standards, ORR's practice is to delay releasing children detained at Shenandoah Valley Juvenile Center ("SVJC") to available custodians until they have had a psychological evaluation, which takes at least 30 days to complete.<br><br>Ex. 17 [Deposition Transcript of Melissa Cook ("Cook Dep. Tr.")] at 209:5–211:23 | Disputed.  *See* contrary testimony of SVJC lead case manager, DX-16 [Contreras Dep.] 177:5-8 ("Q: Okay.  Can a child be released to a sponsor if a psychiatrist or psychologist does not recommend the child to be released? A: Yes."), 177:13-17 ("Q: Do psychiatric evaluations or psychological evaluations have to be completed before a child can be released to a sponsor? A: No, that would be ORR to determine whether that's necessary.").  Also disputed that ORR has no written standards that inform the need to obtain a psychological evaluation in order to understand a UAC's mental health needs and ensure that a potential sponsor can meet them.  ORR Guide § 2.7.2.<br><br>*See* Defs.' Evidentiary Objection ¶ 54. |
| 55. | ORR's Policy Guide provides that "Case Managers communicate with potential sponsors, gather necessary information and documentation, talk to any relevant stakeholders, and assess sponsors to formulate a recommendation to the Case Coordinator."<br><br>Joint Stip. ¶ 42; Ex. 1 [ORR Policy Guide] § 2.3 at 40 | Undisputed. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| 56. | ORR's Policy Guide provides that "Case Coordinators concurrently review all assessment information on an unaccompanied alien child and sponsor to also make a recommendation."<br><br>Joint Stip. ¶ 43; Ex. 1 [ORR Policy Guide] § 2.3 at 40 | Undisputed. |
| 57. | ORR's Policy Guide provides that "the ORR/FFS makes a final release decision."<br><br>Joint Stip. ¶ 44; Ex. 1[ORR Policy Guide] § 2.3 at 39; *id.* § 2.7 at 47 | Undisputed. |
| 58. | ORR's Policy Guide contains limited guidance to Case Managers, Case Coordinators, and FFS concerning family reunification decisions—consisting of a short list of factors such as "[t]he sponsor's understanding of the . . . child's needs, as identified by ORR and the care provider."<br><br>Ex. 1 [ORR Policy Guide] § 2.4.1 at 41 | Disputed to the extent Plaintiffs' use of the terms "limited" and "short" are statements of opinion, not fact. The guidance offered by the ORR Guide speaks for itself and Plaintiffs fail to acknowledge that ORR Guide sections are accompanied by MAP Provisions operationalizing the policy. Ex. 3 [ORR MAP] § 2.4.1 at 169-72 (including "sponsor assessment interviewing guidance" at Appendix 2.5; sponsor assessment form at Appendix 2.6; a "Quick Glance" box including "Tips for Interviewing Sponsors.").<br><br>*See* Defs.' Evidentiary Objection ¶ 58. |
| 59. | ORR's Policy Guide contains no guidance on how to weigh information collected from proposed sponsors or the short list of factors included in the Policy Guide before making | Disputed to the extent Plaintiffs' use of the term "short" is a statement of opinion, not fact. Also disputed as ORR Guide § 2.7.4 describes standards of when release may or will be denied. In addition, the ORR MAP operationalizes the Guide, and |

27
Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | release decisions.<br><br>Ex. 1 [ORR Policy Guide] §§ 2.2.4, 2.4.1 at 36–38, 41 | provides extensive instructions, and is meant to be read together with the Guide, which contains "various assessments" and "a series of questions related to the child's family in home country, identifying who they are, their contact information."  Finally, care provider facilities are staffed with social workers, not lawyers, who make placement decisions guided by established child-welfare principles, clinical judgment, and multiple factors articulated in the ORR Guide.<br><br>ORR Guide §§ 2.7; 2.4.1; DX-67 [Biswas 30(b)(6) Dep. Supp.] 167:4-8 (referencing ORR MAP § 3.3.1).<br><br>*See* Defs.' Evidentiary Objection ¶ 59. |
| 60. | ORR's written policies do not require Case Managers to consider the impacts of prolonged detention on a child's welfare in making a release decision.<br><br>Ex. 37 [Deposition Transcript of Jallyn Sualog ("Sualog Dep. Tr.")] at 214:17–21; Ex. 28 [Murray Dep. Tr.] at 232:11–20; Ex. 1 [ORR Policy Guide] §§ 2.4–2.7 at 41–50; Ex. 3 [ORR MAP] §§ 2.4–2.7 at 168–212 | Undisputed insofar as ORR does not discount or shortchange safety considerations based on how long a UAC has been in custody.  ORR applies safety protocols to all potential sponsors to ensure that children in care are "released in a safe, efficient, and timely manner."  ORR Guide § 2.1; DX-13 [Dr. Earner Expert Rep.] ¶¶ 31 ("Screening potential sponsors of UACs is a serious child safety issue.  Safety cannot be sacrificed for speed of release of a UAC."), 32 ("For UACs who may have no viable sponsor, or a sponsor claiming a distant or vague relationship, the question then becomes of whether the UAC is being trafficked for some other purpose."). |
| 61. | ORR's written policies do not require that any particular standard be applied in determining whether a proposed custodian is capable of | Disputed. The standard ORR applies is set forth by Congress under the TVPRA, 8 U.S.C. § 1232(c)(3)(A), in which ORR must weigh the evidence to determine whether they believe the sponsor can provide for the child's |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | caring for the physical and mental wellbeing of a child.<br><br>Ex. 1 [ORR Policy Guide] § 2 at 34–56; Ex. 3 [ORR MAP] § 2 at 139–277; Ex. 5 [RFA 1st Set] No. 22 at 480–81 ("ORR does not use an 'evidentiary' standard….") | physical and mental-being and otherwise meets the requirements of the statute. ORR Guide § 2.7.4 explains when ORR will or may deny release to an applicant sponsor. ORR Guide § 2.4.1 provides guidelines regarding how case managers should go about assessing and working with potential sponsors.  The remainder of sections 2 of the ORR Guide and MAP contain detailed guidance on release and deadlines for grantee care providers to ensure safe and timely release. |
| 62. | ORR does not use an evidentiary standard in making release decisions.<br><br>Ex. 4 [RFA 1st Set] No. 22 at 480–81; *see also* Ex. 36 [Deposition Transcript of Megan Stuart ("Stuart Dep. Tr.")] at 57:2–8 (release decisions "at the whim of the FFS") | Disputed to the extent it implies ORR is required to employ an evidentiary standard in a child-welfare context, which is not adversarial in nature.<br><br>*See* 8 U.S.C. § 1232(c)(3)(A) ("Subject to the requirements of subparagraph (B) (regarding home studies), an unaccompanied alien child may not be placed with a person or entity unless the Secretary of Health and Human Services makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being. Such determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child."). |
| 63. | None of ORR's limited guidance to Case Managers, Case Coordinators, and FFS | Disputed to the extent Plaintiffs' use of the term "limited" is a statement of opinion, not fact.  Further disputed as ORR published a |

29

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | concerning family reunification decisions is published in the Federal Register or a Notice of Proposed Rulemaking.<br><br>Ex. 11 [Deposition Transcript of 30(b)(6) Witness, Michael E. Bartholomew ("Bartholomew (30)(b(6) Dep. Tr.")] at 43:11–44:6; *Flores v. Sessions*, 862 F.3d 863, 871–72 (9th Cir. 2017) | proposed and final rule in the Federal Register but was enjoined by the *Flores v. Barr* Court at the initiative of Plaintiffs' counsel in this case. 407 F. Supp. 3d 909 (C.D. Cal. 2019).<br><br>*See* Defs.' Evidentiary Objection ¶ 63. |
| 64. | ORR's release decisions are based on factual determinations.<br><br>Ex. 1 [ORR Policy Guide] § 2.7.1 at 48 (FFS may approve release "after a thorough assessment of the sponsor, the sponsor's family unit, and the needs of the child or youth" if "he/she determines," *inter alia*, "that the release is a safe release"); *id*., § 2.7.4 at 48 (FFS may deny release to a potential sponsor if, *inter alia*, "[t]he physical environment of the home presents risks to the child's safety and well-being" or "[r]elease . . . would present a risk to [the child], the sponsor, household, or the community"); *see also id*. § 2.5 at 44 | Undisputed, to the extent ORR's release decisions are based, in part, on factual determinations as applied to legal requirements laid out in the TVPRA. |
| 65. | ORR's written policies set no limit on how long it may take to decide to release a child to an available custodian. | Disputed.  The ORR MAP recognizes that while unexpected delays may occur, ORR expects the care provider to complete the evaluation process within a certain timeframe. However, a policy requiring a hard timeline |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Ex. 5 [RFA 1st Set] No. 4 at 469–70 | upon which release is mandatory, and/or a hearing officer is arrogated responsibility for children, would prevent the complete vetting of a sponsor needed for safe release of UACs.<br><br>Ex. 3 [ORR MAP] § 2.2.2 at 148 (Cat 1 and Cat 2A: 10 calendar days; Cat 2B: 14 calendar days; Cat 3: 21 calendar days); *see* DX-14 [Dr. Mohn Expert Rep.] ¶ 51; DX-09 [Antkowiak Decl.] ¶ 55-58 (discussing case deadlines outlined in MAP). |
| 66. | "[I]t may take several months before ORR reaches a conclusion concerning whether a proposed sponsor is capable of providing for a child's physical and mental well-being and is otherwise suitable."<br><br>Ex. 5 [RFA 1st Set] No. 19 at 479_001-002; *see* Ex. 14 [Castaneda Dep. Tr.] at 154:2–16, 167:9–24 | Undisputed that this is a possibility.  Disputed to the extent Plaintiffs' cited evidence does not support this assertion.<br><br>*See* Ex. 5 [RFA 1st Set] No. 19 (ORR includes timelines for assessing potential sponsors in Section 2 of the ORR MAP); Ex. 14 [Castaneda Dep.] at 154:2-16, 167:9-24 (recognizing that a home study could increase time required to reach a conclusion regarding release to a proposed sponsor). |
| 67. | Case Managers have at times unnecessarily delayed issuing recommendations regarding children's release to available custodians.<br><br>Ex. 25 [Deposition Transcript of Karen Husted ("Husted Dep. Tr.")] at 43:19–46:2 | Disputed.  Plaintiffs' cited evidence does not support this assertion.  ORR's policy is that within one calendar day of a sponsor's completion of the family reunification documentation, the case manager is required to submit a release recommendation.  When a case manager has not met the guidelines for prompt processing of release, delay is often "mitigated due to issues beyond the control of the case manager."  Ex. 25 [Husted Dep.] at 44:19-25 ("I don't know if I would term fail to follow the timelines in some of the cases because of the fact that, as I said, a lot of the process of the cases does depend on how good |

31

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | your sponsor is and how diligent the sponsor is in returning the paperwork and following up with the fingerprints, if they are required."), 45:23-24;  Ex. 3 [ORR MAP] § 2.7 at 198; DX-09 [Antkowiak Decl.] ¶¶ 44, 54-58.<br><br>*See* Defs.' Evidentiary Objection ¶ 67. |
| 68. | ORR has delayed releasing children to available and fit sponsors until they have shown "good behavior" for some amount of time.<br><br>Ex. 28 [Deposition Transcript of Nithya Nathan-Pineau ("Nathan-Pineau Dep. Tr.")] at 55:17–56:24 | Disputed.  Plaintiffs' only cited evidence, Ex. 28, discusses being free from "significant incident reports" for a period of time.  However, the ORR Guide provides that a "serious incident report" or SIR issues "any time that there is any type of incident related to a child in ORR custody…[i]t could be anything from injury to an altercation with another child."  *See* DX-10 [Biswas Decl.] ¶ 49 ("SIRs are merely a tool for care providers to report a number of different kinds of incidents to ORR in an efficient manner, including incidents entirely unrelated to a child's behavior such as experiencing a fall or accident.  They do not necessarily have any impact on step-up or release."); DX-79 [Dr. Ruiz Dep.] 272:2-6 ("Q: And was there ever a time in the past where there was a policy that a child needed to maintain 30 days of good behavior before you would recommend step down? A: No, no, no.").<br><br>*See* Defs.' Evidentiary Objection ¶ 68. |
| 69. | Some children designated as Category 4 may have had identified sponsors that were denied or deemed non-viable by ORR. | Undisputed, except to note that the "identified sponsor" is an identified *potential sponsor* or *applicant* sponsor who may or may not have followed up on documentation needed.<br><br>*See, e.g.,* DX-10 [Biswas Decl.] ¶ 68. |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Ex. 116 at 1894–95 (███████████████); *id.* at 1896 ███████████████; ███████████████); Ex. 100 at 1799 (███████████ ███████████████ ███) | |
| 70. | ORR's written policies do not require providing children with a written denial of a proposed custodian's release request, unless the sole reason for the denial is a concern that the unaccompanied alien child is a danger to themself or the community.<br><br>Joint Stip. ¶ 17 | Undisputed. |
| 71. | ORR does not require that children be provided notice of the reasons for denying release to a proposed sponsor unless the sole reason for continued detention is that ORR believes the child to be a danger to themself or the community.<br><br>Ex. 5 [RFA 1st Set] No. 25 at 470–71; Ex. 1 [ORR Policy Guide] §§ 2.7.7, 2.7.8 at 49–50 | Disputed.  Case managers are required to provide weekly summaries to UACs (monthly for those in Long-Term Foster Care).  During these weekly meetings, UACs are informed of why a home study is being done and they are also given the "opportunity to express their views about a potentially negative release decision (before the decision is actually finalized)."  DX-10 [Biswas Decl.] ¶ 75; Defs.' U.F. ¶ 18; Ex. 4 [ORR MAP] § 3.3.1 at 301; ORR Guide § 2.3.2. ("The Case Manager provides weekly status updates (monthly for children in LTFC) to the UAC on the child's case and provision of services, preferably in person. The Case Manager informs other stakeholders of the progress of a child's case, including notification that an unaccompanied alien child may not have a potential sponsor, |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | and any final release decisions. . . ."). |
| 72. | ORR's written policies do not require that proposed custodians other than a parent or legal guardian (*i.e.*, Category 1 sponsor) be provided written notice that their release request has been denied.<br><br>Joint Stip. ¶ 18 | Undisputed. |
| 73. | ORR's written policies do not require that ORR give children any opportunity to offer input designed to rebut a conclusion that a proposed custodian's release request should be denied.<br><br>Ex. 1 [ORR Policy Guide] § 2.7 at 47–48; Ex. 3 [ORR MAP] § 2.7.4 at 48–49 | Disputed.  "Under the cooperative agreement, ORR requires case managers to provide the UAC with ongoing information as to what the status of his or her release is, including any explanation for delays and case status."  DX-10 [Biswas Decl.] ¶ 75.  During weekly case manager meetings, UACs have the opportunity to express their views about a potentially negative release decision before the decision is finalized. *See* DX-09 [Antkowiak Decl.] ¶ 61; DX-41 [De La Cruz LR Decl.]  ¶ 35. |
| 74. | ORR does not provide children a hearing before a neutral factfinder before denying release.<br><br>Ex. 5 [RFA 1st Set] No. 30 at 489–90 | Disputed.  Whether ORR provides "a neutral factfinder" is a legal conclusion, not a statement of fact.  Further disputed to the extent it implies there is no neutral factfinder in determining whether a child should be released, and that ORR and grantee care providers are not neutral despite having no financial incentive "to either release UAC too quickly without adequate vetting of sponsors so as to increase head counts, or, on the other hand, to prolong the stay of UACs in care in order to secure a filled bed reimbursement arrangement." DX-14 [Dr. Mohn Expert Rep.] ¶ 18 ("[B]udgets negotiated between ORR and grantee care providers pursuant to ORR |

34

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | cooperative agreements are not based on a per capita or per filled bed basis."); DX-09 [Antkowiak Decl.] ¶ 61 (ORR "engages an independent, third-party case coordinator to ensure there is an independent voice in determining whether a minor should be released."). *See* Defs.' Evidentiary Objection ¶ 74. |
| 75. | ORR's written policies do not provide all proposed custodians an opportunity to inspect or rebut the evidence it relies on to declare them unfit. Ex. 1 [ORR Policy Guide] § 2.7.7 at 49–50; Ex. 3 [ORR MAP] § 2.7.7 at 209–11 (comparing denial notification requirements between different categories of sponsors). | Disputed to the extent it implies that denied applicants are not permitted to seek reconsideration if circumstances change. Also disputed as ORR does not use the term "unfit," which is generally used when a state foster care agency is removing a child from a parent, and terminating the parental rights of an "unfit" parent. 8 U.S.C. § 1232(c)(3)(A); Ex. 3 [ORR MAP] § 2.7.7 at 209 (home study report sent to denied Category 1 sponsor); DX-41 [De La Cruz LR Decl.] ¶ 32; *see* DX-09 [Antkowiak Decl.] ¶ 50 (ORR is unique among agencies given (1) children are in ORR custody only as part of the Federal government's authorities over immigration – that is, because the children lack lawful immigration status and (2) they arrive *already* unaccompanied and ORR does not terminate parental rights in any respect). |
| 76. | ORR's written policies do not require that ORR provide proposed custodians a hearing before a neutral factfinder before deciding whether to grant the proposed custodian's release request. | Disputed.  Whether ORR provides "a neutral factfinder" is a legal conclusion, not a factual statement.  Further disputed to the extent it implies that decisionmakers are not neutral in determining whether a child should be released to a proposed custodian. DX-09 [Antkowiak Decl.] ¶ 61 (ORR |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Ex. 1 [ORR Policy Guide] §§ 2.7–2.7.7 at 49–50 | "engages an independent, third-party case coordinator to ensure there is an independent voice in determining whether a minor should be released."); *see also* DX-10 [Biswas Decl.] ¶¶ 62 ("ORR has a multi-step process, involving a number of different independent players, to evaluate potential sponsors' ability to provide for the child's physical and mental well-being as required by law. The Policy and Procedure are in section 2 of the ORR Guide and MAP."), 69-71; Fact Response ¶ 74. |
| 77. | ORR's written policies fail to provide children an opportunity to appeal or otherwise challenge adverse decisions regarding release in all but the most limited circumstances.<br><br>Ex. 1 [ORR Policy Guide] § 2.7.8 at 50; Ex. 5 [RFA 1st Set] No. 8 at 472–73; *see also* ECF No. 37-13 [Madelyn R. Decl.] ¶ 13 ("She told me nothing could be done, that the denial was a final decision. They didn't give me an opportunity to appeal the denial, or to ask that the decision be changed.") | Disputed. ORR maintains policies for appeals with respect to release, including that children can request bond hearings to determine if the child is a danger to the community, for appeals by parents or legal guardians, and for appeals where the sole reason for the denial is concern that the unaccompanied alien child is a danger to himself/herself or the community. Further, ORR's Policy Guide provides that notwithstanding an adverse decision, "if there is new information or a change in circumstances regarding the reunification application of a parent/legal guardian, or regarding the unaccompanied alien child's circumstances, a new reunification application may be submitted that highlights the change(s) and explains why such changes should alter the initial decision. Similarly, if ORR discovers new information or becomes aware of a change in the circumstances of the parent/legal guardian and/or the unaccompanied alien child, ORR may assess the case anew." ORR Guide at §§ 2.7.7; 2.7.8; 2.9; Joint Stip. ¶ 30. |
| 78. | ORR's written policies limit children's rights to appeal an adverse decision only if the sole | Disputed. Children who are being held solely due to danger *always* have available bond hearings before an immigration judge. A |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | reason for the denial is a concern that the child is a danger to themselves or the community and the denied sponsor is not already appealing the decision.<br><br>Joint Stip. ¶ 29; Ex. 1 [ORR Policy Guide] § 2.7.8 at 50 | UAC may also challenge placement or release by seeking judicial review in federal court at any time.<br><br>ORR Guide § 2.9; Defs.' U.F. ¶ 63. |
| 79. | ORR's written policies do not require that ORR provide proposed custodians other than parents and legal guardians an appeal or other administrative recourse from a finding by ORR that a proposed custodian is unfit.<br><br>Ex. 1 [ORR Policy Guide] § 2.7.8 at 50; Ex. 5 [RFA 1st Set] Nos. 6, 9 at 471–74 | Disputed. ORR's Policy Guide provides that notwithstanding an adverse decision, "if there is new information or a change in circumstances regarding the reunification application of a parent/legal guardian, or regarding the unaccompanied alien child's circumstances, a new reunification application may be submitted that highlights the change(s) and explains why such changes should alter the initial decision.  Similarly, if ORR discovers new information or becomes aware of a change in the circumstances of the parent/legal guardian and/or the unaccompanied alien child, ORR may assess the case anew."  Further, ORR does not use the term "unfit" in evaluating applicant sponsors, as ORR is not removing children from a household and legal guardian and parental rights are not being terminated.  Rather, ORR speaks of "safe and timely release" that "must promote public safety and ensure that sponsors are able to provide for the physical and mental well-being of children."<br><br>Joint Stip. ¶ 30; ORR Guide § 2.7.8; DX-09 [Antkowiak Decl.] ¶ 60; DX-41 [De La Cruz LR Decl.] ¶ 27. |
| 80. | Even for parents and legal guardians, ORR's written | Disputed. Section 2.7.8. of the ORR MAP includes deadlines for appeals, including |

37

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
|  | policies do not require that ORR provide a hearing on an appeal or other challenge to an adverse decision within any time certain.<br><br>Ex. 5 [RFA 1st Set] No. 10 at 474; Ex. 1 [ORR Policy Guide] § 2.7.8 at 50 | acknowledging the appeal within 5 business days of receipt and completing the appeal process within 30 days whenever possible.<br><br>Ex. 3 [ORR MAP] § 2.7.8 at 211. |
| 81. | ORR denies that the principal reason it fails to provide adequate procedural protections is due to any greater expense or administrative inconvenience.<br><br>Ex. 5 [RFA 1st Set] No. 73 at 496–97 | Undisputed given use of the word "principal." However, the cost of procedures Plaintiffs request would be expensive and require resources Congress has not funded.<br><br>*See* DX-09 [Antkowiak Decl.] ¶ 53. |
| 82. | In at least one case, a Case Manager at one ORR facility rejected a child's aunt as a proposed sponsor because they did not share the same last name. Once the child was transferred to a new facility, the new Case Manager expressed no concerns about the aunt's last name and approved release within two weeks.<br><br>Ex. 30 [Ortiz Dep. Tr.] at 110:23–112:7 | Disputed to the extent Plaintiffs' cited evidence is hearsay, does not identify the case name, and in any event, does not support Plaintiffs' assertion that the "new Case Manager expressed no concerns about the aunt's last name."<br><br>Ex. 30 [Ortiz Dep.] at 110:23-111:11 ("I'll give you an example. We had one child who the sponsor reached out to me and the child who had been at Homestead for various months and was supposed to have been released to an aunt who is here in Miami. And the aunt was told that she was not a viable sponsor because they didn't have the same last name. So that kid was at Homestead for many months and then transferred to one of our permanent facilities. Once transferred to the permanent facility, the child was released within two weeks, and that is a case that I sent multiple inquiries to the shelter director |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | about."). *See* Defs.' Evidentiary Objection ¶ 82. |
| 83. | In another case, a Case Manager rejected a child's sister as a proposed sponsor because the sister and child did not share the same last name. Ex. 74 [M.R.M. Decl.] ¶ 7 | Disputed. While there was a discrepancy in the mother's name in the birth certificates of M.R.M.'s alleged half sister and M.R.M., the case manager did not deny sponsorship on that basis, and continued to work with the (half) sister in an attempt to establish her relationship with M.R.M. (*e.g.*, family therapy). Moreover, M.R.M.'s clinician continued to recommend that he work on his main goal to be discharged from the shelter and reunified with his sister. DX-83 at 82-84. |
| 84. | Class Member A.N.P.C.'s case worker informed her that release to her proposed sponsor was denied because A.N.P.C. did not have an official birth certificate. ECF No. 37-14 [A.N.P.C. Decl.] ¶ 8 | Disputed. A.N.P.C. was released to her proposed sponsor, a great aunt, once ORR was able to obtain a birth certificate from her home country. A.N.P.C.'s mother had passed away a few months after she was born and never registered her birth. DX-84 at 2-3. *See* Defs.' Evidentiary Objection ¶ 84. |
| 85. | Class Representative Gabriela N.'s proposed custodian, Isaac, was not provided written notice of his rejection or the reasons for that rejection. Ex. 138 [Isaac N. Decl.] ¶ 11 ("I contacted ORR to ask for orientation information and completed the orientation last month. I have not heard anything | Undisputed that Gabriela N.'s grandfather was not provided written notice that his sponsorship of her was denied. However, Gabriela N. had the opportunity to speak with her grandfather after the independent case coordinator recommended that ORR not work with him in light of his rejection by two different care providers. *See* DX-83 at 2. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | from ORR since then. I have never received the results of the home study."); *id.* ¶ 12 ("ORR has never officially told me that they are looking at other sponsors or that my application has been rejected.") | |
| 86. | Class Representative Lucas R. did not know the reasons why his sister and proposed custodian, Madelyn, was rejected, and was not provided a written explanation of the reasons for the rejection.<br><br>Ex. 81 [Lucas R. Decl.] ¶ 9 | Undisputed that Lucas R. was not provided a written explanation of the reasons why a negative recommendation was made concerning Madelyn's sponsorship.  However, Lucas R. had the opportunity to speak with his case manager about his sister's potential sponsorship of him.<br><br>*See, e.g.*, DX-83 at 15. |
| 87. | Madelyn, Lucas R.'s sister and proposed custodian, was not provided any written explanation for why she was rejected.<br><br>ECF No. 37-13 [Madelyn R. Decl.] ¶ 13 | Undisputed that Madelyn was not provided written notification of the negative recommendation concerning her sponsorship of Lucas R.  Madelyn was, however, provided information about why the home study worker had concerns about her ability to care for Lucas R., including her lack of commitment to obtaining mental health services for him upon release.  Madelyn also could have chosen to address the deficiencies in her sponsorship application if she wanted to try again to sponsor him.<br><br>*See* DX-41 [De La Cruz LR Decl.] ¶¶ 23-26, 28, 32. |
| 88. | The limited appeal rights granted to proposed custodians who are parents or legal guardians are rarely exercised.<br><br>Ex. 5 [RFA 1st Set] No. 28 at | Disputed to the extent Plaintiffs' use of the terms "limited" and "rarely" are statements of opinion, not fact.<br><br>*See* Defs.' Evidentiary Objection ¶ 88. |

40

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | 485–87 ("a relatively low proportion of proposed sponsors elect to pursue an administrative appeal process") | |
| 89. | From January 1, 2017 to May 17, 2019, no proposed custodians requested an administrative appeal of a denial of request for release.<br><br>Ex. 5 [RFA 1st Set] No. 28 at 485–87; Ex. 7 [Defendants' Supplemental Responses to Plaintiffs' Requests for Admission ("RFA Supp. Response")] No. 28 at 560 | Undisputed that no parental or legal guardian sponsors submitted requests for appeal under § 2.7.8 of the ORR Guide during this time. |
| 90. | From January 1, 2017 to May 17, 2019, only one administrative appeal was filed by a child through his attorney.<br><br>Ex. 5 [RFA 1st Set] No. 28 at 485– 87; Ex. 7 [RFA Supp. Response] No. 28 at 560 | Undisputed.  There was one appeal filed under § 2.7.8 of the ORR Guide during this time. |
| 91. | From January 1, 2017 to May 17, 2019, there were no reversals on administrative appeal of adverse suitability determinations.<br><br>Ex. 5 [RFA 1st Set] No. 29 at 487– 88; Ex. 7 [RFA Supp. Response] No. 29 at 5660 | Undisputed.  There were no reversals under ORR Guide § 2.7.8 during this time. |
| 92. | Contrary to child welfare practices across the country, ORR's policies do not provide for a neutral factfinder. | Disputed.  Whether ORR provides "a neutral factfinder" is a legal conclusion, not a factual statement.  Further disputed because Plaintiffs point to no evidence that "child welfare practices across the country" afford evidentiary |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Ex. 53 [Edwards Expert Rep.] at 1340 | hearings to non-parental relatives and distant relations.[4]  Further disputed to the extent it implies that domestic child welfare practices can be applied indiscriminately to UACs in ORR care. A hearing before a neutral factfinder "would do nothing to further the safety of the UAC" who, unlike children in domestic care situations, often lack prior information about their family relationships.  Furthermore, "[h]earings are court-like processes that create an adversarial environment that prolongs the length of time that UACs spend in care."  DX-13 [Dr. Earner Expert Rep.] ¶ 30; DX-69 [Dr. Earner Dep. Supp.] 134:14-18 ("You can look at that in child welfare. In child welfare, every child is appointed an attorney, and the average length of stay in child welfare, in congregate care, out-of-home care is quite extensive."); DX-30 [Dr. Ryan Expert Rep.] ¶ 48 ("[M]andating plaintiffs' proposed additional procedural safeguards across the board would not improve child welfare outcomes."). |

---

[4] Under federal law neither foster parents nor relative caregivers have a right to a fair hearing under section 471(a)(12) of the Social Security Act (the Act) with regard to adverse placement decisions. In particular, the provisions for relative preference at section 471(a)(19) of the Act and an opportunity to be heard for foster parents and relative caretakers at section 475(G) of the Act do not create fair hearing rights. Rather, "[t]he title IV-E agency determines where and with whom the child will be placed by virtue of its placement and care responsibility." Likewise, "Section 471(a)(12) of the Act does not grant prospective adoptive parents the right to a fair hearing under 45 CFR 205.10, for the purposes of challenging the title IV-E agency's exercise of its placement and care responsibilities pursuant to section 472(a)(2)(B) of the Act." *See* https://www.acf.hhs.gov/cwpm/public_html/programs/cb/laws_policies/laws/cwpm/policy _dsp.jsp?citID=5; *see also* 45 CFR § 1356.21(g)(3) (specifying that Federal financial participation (FFP) for title IV-E foster care maintenance payments may not be claimed when a court orders a placement with a specific foster care provider).

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | *See* Defs.' Evidentiary Objection ¶ 92. |
| 93. | Contrary to child welfare practices across the country, ORR's policies do not include any form of evidentiary hearing at which children participate in the decision-making and present their own evidence and arguments.<br><br>Ex. 53 [Edwards Expert Rep.] at 1341 | Disputed.  The Edwards report conflates juvenile detention, parental termination, and state foster care permanency planning hearings (which are as much about terminating parental rights, if necessary, to free a child for adoption as placement, and are mandated to be conducted, at least within 18 months per federal law). Ex. 53 [Edwards Expert Rep.] at 1327-28 (comparing ORR policies with federal and California child welfare systems). Furthermore, Plaintiffs point to no evidence of "child welfare practices *across the country*" that include evidentiary hearings in which "children participate in the decision-making and present their own evidence and arguments." (emphasis added).  Further disputed to the extent it fails to recognize that domestic child welfare practices are increasingly moving away from putting cases into court due to its tendency to prolong the progress and the lack of benefit to the child. DX-69 [Dr. Earner Dep. Supp.] 135:3-8 ("I'm citing the fact that child welfare – and I'm talking about domestic welfare – has tried to move away from putting cases into court just simply because it's ridiculously prolonged the process, and there's absolutely no benefit to the child.").<br><br>*See* Defs.' Evidentiary Objection ¶ 93. |
| 94. | Contrary to child welfare practices across the country, ORR's policies do not afford children the opportunity to meaningfully challenge the | Disputed.  Plaintiffs point to no evidence of "child welfare practices across the country" that require ORR to allow UACs to review a negative release decision, before the decision is actually finalized.  Furthermore, ORR allows |

43

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | denial of a sponsor because ORR is not required under its policies to disclose the evidence it relies upon in denying a sponsor's application.<br><br>Ex. 53 [Edwards Expert Rep.] at 1341–42 | the UAC (and potential sponsor) to review a negative home study recommendation. ORR also allows a sponsor to provide additional information in support of sponsorship after a negative home study recommendation and/or before ORR renders a release decision.<br><br>Defs.' U.F. ¶¶ 32, 33.  *See also* Ex. 4 [ORR MAP] § 3.3.1 at 301 ("The case manager maintains direct contact with each UAC in care and meets at least once a week with each UAC to discuss reunification options. The case manager documents the weekly meetings with the UAC and communication with potential sponsors in the UAC case file.") (emphasis added).<br><br>*See* Defs.' Evidentiary Objection ¶ 94. |
| 95. | Contrary to child welfare practices across the country, ORR's policies do not require that children's interests be represented by counsel or any other advocates.<br><br>Ex. 53 [Edwards Expert Rep.] at 1341 | Disputed.  Plaintiffs point to no evidence of "child welfare practices across the country" that require representation on release to non-parental relatives and distant relations. ORR's practice and policy is to provide children in ORR's care and custody with legal services information, including the availability of pro bono services, a know-your-rights presentation, a legal screening, a legal resource guide (which provide a state- by-state listing of attorneys), and the right to be represented by counsel at no expense to the government.  *See* Defs.' U.F. ¶ 81.<br><br>Further, child advocates may be available at ORR's discretion to, among other things, help children with decisionmaking and understanding legal issues and to advocate for a child's best interests in certain cases, such as |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | for victims of trafficking and other vulnerable children.  *See* Defs.' U.F. ¶ 73.  Once appointed, "ORR provides Child Advocates with access to information necessary to effectively advocate for the best interests of children with whom they are working . . . ."  ORR Guide § 2.3.4.  Congressional appropriators, however, have not funded child advocates for every child in ORR's care.  The TVPRA is likewise written with the expectation that advocates will not be at all sites or fully funded by taxpayers.  *See, e.g.,* 8 U.S.C. §§ 1232(c)(6)(B)(iii) (rules for prioritizing sites for child advocates); 1232(c)(6)(C)(iii) (requiring child advocate organizations to contribute 25% of funding with only 40 percent of the match provided through "in-kind" donations).<br><br>*See* Defs.' Evidentiary Objection ¶ 95. |
| 96. | Contrary to child welfare practices across the country, ORR's policies do not include timelines that allow the case to keep moving toward resolution.<br><br>Ex. 53 [Edwards Expert Rep.] at 1341 | Disputed. The Edwards report conflates juvenile detention, parental termination, and state foster care permanency planning hearings (which are as much about terminating parental rights, if necessary, to free a child for adoption as placement, and are mandated to be conducted, at least within 12 months per federal law).  42 U.S.C. § 675(5)(C); Ex. 53 [Edwards Expert Rep.] at 1327-28 (comparing ORR policies with federal and California child welfare systems).  Further disputed as Plaintiffs point to no evidence of "child welfare practices across the country" that include mandatory timelines for release to non-parental relatives and distant relations or even non-relatives. Further, the ORR MAP provides guidelines which "enable a critical determination that a potential sponsor is capable of providing for a |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | child's physical and mental well-being, as required by law.  To implement strict length of stay timelines would violate ORR's commitments to child safety and well-being – both in the short term and long term."  Ex. 3 [ORR MAP] § 2.7 at 198-201 (prescribing deadlines for when release recommendations must be made, including: requiring case manager to make recommendation within 1 calendar day of completion of all family reunification packet documentation and all other required information, independent, third-party case coordinator reviews recommendation within 1 business day and updates with his or her recommendation, and FFS review and final release decision within 1 business day (2 business days for home study cases)).  *See also* Ex. 3 [ORR MAP] §§ 2.2-2.5 at 140-198 (prescribing detailed procedures and deadlines for locating potential sponsors, working with them, referring for home studies (where applicable), home study reports, and fingerprint results (where applicable)); DX-14 [Dr. Mohn Expert Rep.] ¶ 23; Defs.' U.F. ¶¶ 20, 22, 23.<br><br>*See* Defs.' Evidentiary Objection ¶ 96. |
| 97. | Contrary to child welfare practices across the country, ORR's policies do not universally afford children the right to appeal adverse decisions denying reunification with their sponsors.<br><br>Ex. 53 [Edwards Expert Rep.] at 1342 | Disputed.  The Edwards' report covers two disanalogous scenarios to ORR, involving: (1) termination of parental rights hearings and/or (2) reunification with parents from whom children have been removed based upon allegations of abuse or neglect.  *See* Ex. 53 [Edwards Expert Rep.] at 1329.  ORR makes neither determination.<br><br>Further, dependency hearings for children in |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | foster care need only be held in California at least once every six months, as calculated from the original disposition hearing. Cal. Welf. & Inst. Code § 366 (West).  Under federal law (Title IV-E), permanency hearings need only be held at least once every 12 months, and such hearings may involve the termination of parental rights in order for the child to become eligible for adoption.  42 U.S.C. § 675(5)(C). Plaintiffs point to no evidence that "child welfare practices across the country" universally afford the right to appeal adverse decisions" on release to non-parental relatives and distant relations. |
| | | Finally, for non-parental relatives and distant relations, ORR's Guide provides that notwithstanding an adverse decision, ORR will consider new information or changed circumstances to reconsider the case.  Joint Stip. ¶ 30; ORR Guide § 2.7.8; DX-09 [Antkowiak Decl.] ¶ 60. |
| | | *See* Defs.' Evidentiary Objection ¶ 97. |
| 98. | ORR's Policy Guide requires care providers to conduct a "Well Being Follow Up Call" 30 days after a child is released to a sponsor.  If the care provider believes the child is unsafe, it must comply with mandatory reporting laws for reporting to local child protective agencies and/or law enforcement.<br><br>Joint Stip. ¶ 15; Ex. 1 [ORR Policy Guide] § 2.8.4 at 53 | Undisputed. |

47

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| 99. | Following reports to state or local child protection agencies that children released from ORR custody have been abused or neglected, state or local protection agencies can take steps to try to protect those children from abuse or neglect following release from ORR custody.<br><br>Joint Stip. ¶ 16 | Undisputed. |
| 100. | ORR does not know or otherwise try to track how frequently, if at all, sponsors abuse or neglect children after they are released from ORR custody.<br><br>Ex. 37 [Sualog Dep. Tr.] at 219:1–19 | Disputed.  ORR's policy and practice is to conduct a Safety and Well Being Follow Up call with a UAC and his/her sponsor 30 days after release.  If the care provider believes that the child is unsafe, the care provider must comply with mandatory reporting laws, state licensing requirements, and federal laws and regulations.<br><br>Joint Stip. ¶ 15; *see also* Defs.' U.F. ¶ 12 (ORR does not maintain custody post-release and is not funded by Congress to do so.  Thus, it lacks the authority and the appropriations to formally track incidents of abuse or neglect by sponsors to whom UACs are released.). |
| 101. | ORR includes within its in-network system the following types of care provider facilities: shelter, short-term foster care, long-term foster care, group homes, therapeutic group homes, staff-secure, therapeutic staff-secure, secure and residential treatment centers ("RTC"). | Undisputed. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Ex. 93 [*Flores* Census Data] at 1633– 1745 (see column J under Census tab listing different types of ORR "Program Types") | |
| 102. | There are two types of placement decisions: (1) initial placement into an ORR care provider and (2) transfer placement between ORR care providers.<br><br>Ex. 1 [ORR Policy Guide] § 1.1 at 22 | Undisputed. |
| 103. | A child can be initially placed in a restrictive setting.<br><br>Ex. 1 [ORR Policy Guide] §§ 1.3.2, 1.2.4 at 24–25, 27; Ex. 2 [ORR MAP] § 1.3.2 at 69; Ex. 26 [Deposition Transcript of Dr. Donna Lynn Londino ("Londino Dep. Tr.")] at 246:22–25; Ex. 34 [Deposition Transcript of Dr. Emily Ryo ("Ryo Dep. Tr.")] at 97:16–19 | Undisputed that in specified circumstances a child can be initially placed in a restrictive setting.  However, "ORR only places an unaccompanied alien child in a secure facility if the child: 1. poses a danger to self or others; or 2. has been charged with or convicted of a criminal offense, or is chargeable with such an offense."  ORR Guide § 1.2.4; Joint Stip. ¶ 60. |
| 104. | ORR "steps up" Class Members.<br><br>Ex. 5 [RFA 1st Set] No. 74. | Undisputed that ORR occasionally "steps up" Class Members in the course of caring for thousands of UAC. However, such "step ups" are rare – less than one percent of the total UAC population experiences a step-up.  Ex. 5 [RFA 1st Set] No. 74; DX-30 [Dr. Ryan Expert Rep.] ¶ 37; *see also* DX-31 [Dr. Ryan Expert Rebuttal Rep.] ¶ 6 & n. 2 ("Despite the long and tragic histories of trauma experienced by UACs, and despite the serious emotional and behavioral issues often displayed by UACs (because of such trauma), very few UACs escalate to a secure facility (less than 1%)"); |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | Defs.' U.F. ¶ 102 ("A separate analysis of the data provided in *Flores* similarly indicates that only a small percentage of children placed in ORR's care and custody are stepped up."). |
| 105. | A "step-up" is a transfer to a more restrictive level of care.<br><br>Joint Stip. ¶ 47 | Undisputed. |
| 106. | A "step-down" is a transfer to a less restrictive level of care.<br><br>Joint Stip. ¶ 58 | Undisputed. Defendants note that the citation should be to Joint Stip. ¶ 48. |
| 107. | According to ORR policy, ORR may place a child in a shelter facility, foster care, group home, staff-secure or secure care facility, RTC, or other special needs care facility.<br><br>Ex. 1 [ORR Policy Guide] §§ 1.1, 1.2 at 22–23 | Undisputed. |
| 108. | ORR also places children in therapeutic staff-secure facilities, therapeutic group homes, and out- of-network ("OON") facilities, some of which are RTCs.<br><br>Ex. 93 [*Flores* Census Data] at 1633– 1745 (column J under Census tab listing different types of ORR "Program Types"); *id.* at 1746 (listing OON placements); Ex. 24 [Heath Dep. Tr.] at 103:18–25; Ex. 23 [Deposition Transcript of David R. Fink ("Fink Dep. Tr.")] at | Undisputed. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | 37:22– 38:19, 61:10–15; Ex. 20 [Eich Dep. Tr.] at 124:24–125:12; Ex. 13 [Deposition Transcript of 30(b)(6) Witness, Toby R.M. Biswas ("Biswas 30(b)(6) Dep. Tr.")] at 13:1–21; Ex. 5 [RFA 1st Set] No. 79 at 499–501; Ex. 26 [Londino Dep. Tr.] at 152:23–153:1 | |
| 109. | ORR policy provides definitions for "shelter care," "transitional foster care," "long-term foster care," "group home," "staff-secure care," "secure care," and "residential treatment center, but does not define "other special needs care facility," "therapeutic staff-secure," "therapeutic group home," or "out-of-network" facility.<br><br>Ex. 1 [ORR Policy Guide] Guide to Terms at 19–21 | Undisputed. |
| 110. | ORR MAP refers to OON RTC placements as Treatment Authorization Request ("TAR") RTC placements.<br><br>Ex. 2 [ORR MAP] § 1.4.6 at 99–101; Ex. 95 at 1754 (email from Toby Biswas to David Fink stating "See MAP section 1.4.6 which explains the procedures for administering and documenting the NOP in the case of out-of-network (TAR based) placements") | Undisputed. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| 111. | The ORR Policy Guide provides that "ORR only places an unaccompanied alien child in a secure facility if the child: [1] poses a danger to self or others; or [2] has been charged with or convicted of a criminal offense, or is chargeable with such an offense."<br><br>Joint Stip. ¶ 60; Ex. 1 [ORR Policy Guide] § 1.2.4 at 24–25 | Undisputed. |
| 112. | The ORR Policy Guide provides that "[i]n determining whether to place a youth in a staff secure facility, ORR considers if the child: [1] has been unacceptably disruptive to the normal functioning of a shelter care provider facility such that transfer is necessary to ensure the welfare of the UAC or others; [2] is an escape risk; [3] has reported gang involvement (including prior to placement into ORR custody) or displays gang affiliation while in care; [4] has non-violent criminal or delinquent history not warranting placement in a secure care provider facility, such as isolated or petty offenses as described above; or [5] is ready for step-down from a secure facility."<br><br>Ex. 1 [ORR Policy Guide] § 1.2.4 at 24–25 | Undisputed. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| 113. | ORR's Policy Guide provides that a child "may only be placed into an RTC if the youth is determined to be a danger to self or others by a licensed psychologist or psychiatrist.     In addition, ORR will consider transfer to an RTC only if a licensed psychologist or psychiatrist has determined the following: [1] The unaccompanied alien child has not shown reasonable progress in the alleviation of his/her mental health symptoms after a significant period of time in outpatient treatment. (Note: the amount of time within which progress should be demonstrated varies by mental health diagnosis). [2] The child's behavior is a result of his/her underlying mental health symptoms and/or diagnosis and cannot be managed in an outpatient setting. [3] The unaccompanied alien child requires therapeutic- based intensive supervision as a result of mental health symptoms and/or diagnosis that prevent him or her from independent participation in the daily schedule of activities. [4] The child presents a continued and real risk of harm to self, others, or the community, despite the | Undisputed. |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | implementation of short-term clinical interventions (such as medications, a brief psychiatric hospitalization, intensive counseling, behavioral management techniques, 24 hour supervision, supportive services or therapeutic services)." Joint Stip. ¶ 54; Ex. 1 [ORR Policy Guide] § 1.4.6 at 30 | |
| 114. | ORR policy does not provide placement criteria for therapeutic staff-secure facilities, therapeutic group homes, or OON facilities. Ex. 1 [ORR Policy Guide] § 1 at 22– 33 (providing placement criteria for secure, staff-secure and RTCs, but not therapeutic staff secure, therapeutic group homes or out-of-network facilities) | Disputed.  The ORR Guide contains placement considerations that apply to all placement determinations or recommendations.  "ORR makes every effort to place children and youth within the ORR funded care provider network. However, there may be instances when ORR determines there is no care provider available within the network to provide specialized services needed for special needs cases. In those cases, ORR will consider an alternative placement. An ORR Supervisor and ORR Project Officer must approve these placements."  ORR Guide §1.2; *see also* ORR Guide §§ 1.2.1, 1.2.2, 1.2.4, and 1.4.6. *See* Defs.' Evidentiary Objection ¶ 114. |
| 115. | The longer ORR detains a child, the more likely he or she will be "stepped up" to a secure, staff-secure, therapeutic staff secure, OON facility, or RTC. Ex. 57 [Expert Report of Dr. Emily Ryo ("Ryo Expert Rep.")] at 1398– 1401; Ex. 56 [Matlow | Disputed to the extent it implies that causation exists between length of time in ORR custody and step-up to a higher level of care.  ORR's placement decisions, including step-up decisions, are based on a child's behaviors and needs.  While children who are stepped-up to a more secure setting spend more time under ORR custody and supervision as compared to children that remain only in shelters, these children also have additional needs and |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | & Wang Expert Rep.] at 1388 ("Such children are likely to deteriorate and escalate behaviors and symptoms, often leading to step-up to more restrictive placement . . . with high cost both to the child and to the system."); Ex. 29 [Nathan-Pineau Dep. Tr.] at 110:17–111:2; Ex. 35 [Ryo. Dep. Tr.] at 100:14–19, 102:7–18 | demonstrate behaviors that (1) increase their likelihood of placement in settings more secure than the shelter level and (2) decrease the likelihood of a safe potential sponsor coming forward or being identified, being vetted, and being approved as quickly.<br><br>DX-77 [Ryo Dep. Tr.] at 31:8; *see also id.* at 38:13-15 ("I am not making any causal inferences or causal claims in my report, nor does the data allow for that kind of an inference or conclusion."); DX-30 [Dr. Ryan Expert Rep.] ¶ 44 ("With regard to the argument that placing children in ORR custody in settings more restrictive than the shelter level prolongs their length of stay, any correlation between such placement and length of stay does not support a finding that such placements *cause* prolonged stays."); DX-31 [Dr. Ryan Expert Rebuttal Rep.] ¶ 23 ("In my opinion, the evidence confirms that the length of stay is largely determined by the characteristics of individual children. Similar, if not identical to children in domestic foster care settings, serious mental and behavioral health challenges explain the overall time in care."); *see also* DX-35 [Dr. Lubit Expert Rep.] ¶ 33; DX-36 [Dr. Lubit Expert Rebuttal Rep.] pp. 46-47 ¶ 9.<br><br>*See* Defs.' Evidentiary Objection ¶ 115. |
| 116. | Unnecessarily stepping up children may be contrary to their best interest and detrimental to their long-term psychological well-being.<br><br>Ex. 6 [RFA 2nd Set] Nos. 169– | Undisputed to the extent the unnecessary stepping-up of UACs "may be contrary to their best interests," which is why ORR policy only allows step-up when a more restrictive level of care *is* necessary for the safety of the UAC or others.  Disputed to the extent that stepping up children unnecessarily is categorically |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | 70 at 542–44 | "detrimental to their long-term psychological well-being."  It is ORR's policy and practice to make every effort to place UACs "in the least restrictive setting that is in the best interest of the child."<br><br>Ex. 6 [RFA 2nd Set] Nos. 169-70 at 542-44; *see* Defs.' U.F. ¶¶ 36, 52; DX-10 [Biswas Decl.] ¶¶ 51-52; DX-09 [Antkowiak Decl.] ¶¶ 7-8; DX-30 [Dr. Ryan Expert Rep.] ¶ 43 ("[F]rom a careful review of the policy and procedures, interviews with staff, and from a review of the sampled case files . . . clinical staff appear to make decisions that place children (and try to maintain children) in the least restrictive setting.  This is in line with the best interest of the child."); DX-31 [Dr. Ryan Expert Rebuttal Rep.] ¶ 6 (ORR's system "is working quite effectively to manage a highly traumatized population in the least restrictive setting"); DX-35 [Dr. Lubit Expert Rep.] ¶ 25 ("[T]he UAC case files I reviewed reflect step-ups that are medically appropriate."); DX-79 [Dr. Ruiz Dep.] 257:21-23 ("Well, it's our code that patients have to be in the least restrictive environment possible, and we try to fulfill that."). |
| 117. | Secure juvenile detention facilities are the most restrictive facilities to which ORR steps up Class Members.<br><br>Joint Stip. ¶ 50 | Undisputed. |
| 118. | RTCs are highly restrictive psychiatric facilities, which are similarly restrictive as secure facilities. | Disputed.  The two ORR RTCs are based on a group home model, and differ significantly from involuntary, acute inpatient psychiatric hospitalization.  ORR RTCs are sub-acute, |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Ex.13 [Biswas 30(b)(6) Dep. Tr.] at 14:5–9 (secure and RTCs are generally the same level of restriction); Ex. 24 [Heath Depo. Tr.] at 135:9–12 (RTCs and secure facilities are the most restrictive settings for placement). | more home-like, and less institutional than a hospital with community linkages.  A child who requires inpatient hospitalization would have to have shown some stability of symptoms to be placed at an RTC.<br><br>DX-09 [Antkowiak Decl.] ¶¶ 13-14; DX-10 [Biswas Decl.] ¶ 32 (An ORR residential treatment center is subacute, children live in cottages or double rooms, with attached kitchens for eating and differs from inpatient psychiatric hospitalization).  *See, e.g.*, DX-62 [Dr. Londino Expert Report] ¶¶ 19, 20 (discussing "home-like" environment of MercyFirst RTC);  93 ("Both MercyFirst and Shiloh were conducive to a feeling of comfort and safety with attention to privacy and gender issues as well as the provision of food, shelter, religious freedom, education, recreation, and sexual health education."); Defs.' U.F. ¶¶ 44-45. |
| 119. | Formerly, ORR maintained three in-network secure juvenile detention centers: Yolo County Juvenile Center ("Yolo") in Woodland, California, Shenandoah Valley Juvenile Center ("SVJC") in Staunton, Virginia, and Northern Virginia Juvenile Detention Center ("NOVA") in Alexandra, Virginia. ORR's grant with Yolo ended in January 2020. ORR's grant with NOVA ended in September 2017. Currently, the only secure juvenile center facility in which ORR places | Undisputed. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Class Members is SVJC.<br><br>Joint Stip. ¶ 51 | |
| 120. | ORR currently maintains two in-network RTCs: MercyFirst Residential Treatment Center in Syosset, New York, and Shiloh Resident Treatment Center in Manvel, Texas.<br><br>Joint Stip. ¶ 52 | Undisputed. |
| 121. | OON facilities, are often RTCs that are similarly restrictive as in-network RTCs.<br><br>Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 14:5–15; Ex. 23 [Fink Dep. Tr.] at 61:10–15; Ex. 18 [Deposition Transcript of James De La Cruz, Mar. 10, 2020 ("De La Cruz Dep. Tr.")] at 125:4–16 | Undisputed.<br><br>*See* Defs.' Evidentiary Objection ¶ 121. |
| 122. | Therapeutic staff-secure facilities are more restrictive than shelters.<br><br>Ex. 23 [Fink Dep. Tr.] at 37:22–38:8; Ex. 24 [Heath Dep. Tr.] at 108:7– 109:6; Ex. 20 [Eich Dep. Tr.] at 124:24–125:12 | Undisputed.<br><br>*See* Defs.' Evidentiary Objection ¶ 122. |
| 123. | Staff-secure facilities are more restrictive than shelters.<br><br>Joint Stip. ¶ 53 | Undisputed. |
| 124. | Staff-secure facilities may have fences around them.<br><br>Ex. 23 [Fink Dep. Tr.] at 53:24– 54:17; Ex. 128 at | Undisputed. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | 1957; Ex. 129 at 1960–61; Ex. 130 at 1966–69 | |
| 125. | Therapeutic group homes are more restrictive than shelters.<br><br>Ex. 23 [Fink Dep. Tr.] at 38:9-12, 57:7-10; Ex. 28 [Murray Dep. Tr.] at 140:23–141:4 (classifying therapeutic group homes and therapeutic staff- secure facilities as equally restrictive); Statement of Uncontroverted Fact ("SUF") ¶ 122, *supra* ("Therapeutic staff-secure facilities are more restrictive than shelters.") | Disputed.  Therapeutic group homes are no more restrictive than non-secure shelters.  DX-67 [Biswas 30(b)(6) Dep. Supp.] 328:16-25 ("A therapeutic group home . . . [is] a smaller scale shelter that . . . has a therapeutic component to it so more clinical services that might be more -- that are more specialized or targeted to a particular population."); DX-71 [De La Cruz Dep. Supp.] 45:24-46:3 ("Therapeutic group homes more closely aligned with long-term foster care, but with a more therapeutic setting or milieu").  Further disputed to the extent Plaintiffs' cited evidence does not state that a therapeutic group home is restrictive, but rather that a therapeutic staff-secure facility is *not* restrictive and thus, "therapeutic staff secure…doesn't even meet the criteria for staff-secure."  DX-72 [Murray Dep. Supp.] 138:22-25, 139:1-12, 140:14-17.<br><br>*See* Defs.' Evidentiary Objection ¶ 125. |
| 126. | Foster care programs, where children reside with a foster family, are one of the least restrictive settings in which ORR places Class Members.<br><br>Joint Stip. ¶ 56 | Undisputed. |
| 127. | ORR considers a secure facility to be a juvenile detention center or a highly structured therapeutic facility.<br><br>Joint Stip. ¶ 58 | Undisputed. |

59
Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| 128. | Secure facilities are like jails or prisons but for minors.

Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 29:25–30:13; Ex. 24 [Heath Dep. Tr.] at 60:11–14; Ex. 18 [De La Cruz Dep. Tr.] at 209:1–7; Ex. 82 [Y.A.M.S. Decl.] ¶ 27 ("Yolo County Detention is a juvenile jail where we are kept in cells, forced to wear uniforms and treated like criminals. The detention center makes me feel like an animal."); *id.* ¶¶ 29–30 ("I sleep in a locked jail cell. The beds are thin mattresses on top of a block of cement and we don't get pillows…We are allowed outside to see the sun one hour per day…") | Disputed.  A secure facility is the most restrictive placement option for a UAC who poses a danger to self or others or has been charged with having committed a criminal offense.  A secure facility *may* be a licensed juvenile detention center or a highly structured therapeutic facility.

*See* DX-09 [Antkowiak Decl.] ¶ 11; *see also* ORR Policy Guide, Guide to Terms.[5] |
| 129. | ORR's Policy Guide provides that secure facilities "have a secure perimeter, major constraining construction inside the facility, and procedures typically associated with correctional facilities."

Joint Stip. ¶ 57; Ex. 1 [ORR Policy Guide] § 1.2.4 at 24 | Undisputed. |
| 130. | Class Members stepped up to secure facilities have been pepper sprayed. | Undisputed. Defendants admit that staff at Yolo used pepper spray, but aver that the use of pepper spray is part of security protocols and was an option of last resort.  Furthermore, Yolo |

---

[5] The ORR Guide to Terms is *available at*: https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | ECF No. 144 [Answer] ¶ 53; Ex. 94 at 1750 | is no longer a part of the ORR network and Plaintiffs provide no evidence of use at SVJC, the only secure facility currently in the ORR network.<br><br>ECF No. 144 ¶ 53; Joint Stip. ¶ 51 ("ORR's grant with Yolo ended in January 2020."); Ex. 94 at 1750; DX-73 [Castaneda Dep. Supp.] 179:21; DX-74 [Fink Dep. Supp.] 60:10; DX-75 [Nathan-Pineau Dep. Supp.] 54: 3-7; *see also* DX-44 [Fink MAS Decl.] ¶ 36 (discussing a specific use of pepper spray after several warnings and aggressive behavior). |
| 131. | Yolo and SVJC secure are locked facilities with 24-hour surveillance and monitoring.<br><br>Joint Stip. ¶ 61 | Undisputed. |
| 132. | Shiloh RTC is a locked facility with 24-hour surveillance and monitoring.<br><br>*Flores v. Session*, No. 2:85-cv-04544- DMG-AGR, July 30, 2018 Order ECF 470 at 13; Ex. 70 [K.S.G.P. Decl.] ¶ 2; Ex. 69 [K.N.A.T. Decl. Dec, 2017] ¶ 3; Ex. 76 [M.Y.R.M. Supp. Decl.] ¶ 2 | Undisputed, except to the extent it implies that Shiloh RTC is similar to a juvenile detention center. Rather, Shiloh RTC is based on a group home model: "the children live in cottages with an attached kitchen, generally have a roommate, and sleep in a bedroom without locked doors. The RTC offers a higher staff-minor ratio than does a non-secure shelter.  In addition, the RTC makes available intensive therapy and on-site psychiatric care, and is accredited by a nationally recognized accrediting organization such as the Joint Commission on the Accreditation of Hospital Organizations ("JCAHO")."  DX-09 [Antkowiak Decl.] ¶ 13.  Moreover the treatment of an RTC such as Shiloh "is interdisciplinary, psycho-educational, and therapeutic, and it is designed to have a 24-hour-a-day structured program with community |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | linkages to provide the support necessary for those with significant emotional needs or intellectual and developmental needs." *Id.* at ¶ 14; DX-10 [Biswas Decl.] ¶ 32; *see also* ORR Guide § 1.4.6 (criteria for placement in RTCs). |
| 133. | Children who ORR steps up to secure juvenile detention facilities or RTCs report feeling compelled to take psychotropic medications against their will.<br><br>Ex. 59 [A.M.R.A. Decl.] ¶ 5; Ex. 62 [D.S.J.L. Decl.] ¶ 8; Ex. 63 [E.G.G.J. Decl.] ¶ 5; Ex. 65 [J.M.R.R. Decl.] ¶¶ 18–19; Ex. 66 [J.S.C.M. Decl.] ¶ 19; Ex. 68 [K.N.A.T. June 2018 Decl.] ¶ 6; Ex. 73 [M.M.H. Decl.] ¶ 8; Ex. 77 [N.B.C.R. Decl.] ¶ 6; Ex. 82 [Y.A.M.S. Decl.] ¶¶ 11–21; Ex. 72 [M.H.S. Decl.] ¶ 5; Ex. 81 [Lucas R. Decl.] ¶ 6; Ex. 58 [A.D.A. Decl.] ¶ 11; Ex. 60 [C.J.A.L. Decl.] ¶ 11; Ex. 79 [P.D.O.P. Decl.] ¶¶ 12–13; Ex. 61 [D.D.R.O. Decl.] ¶ 7 | Undisputed that UACs have made such reports to Plaintiffs' counsel.  However, disputed to the extent it implies that it is ORR's policy and practice to compel UACs to take psychotropic medications against their will.  ORR seeks informed consent from patients and does not give medications if UACs who have been stepped up to secure juvenile detention facilities or RTCs do not assent, with rare exceptions on an emergency basis.  *See* DX-35 [Dr. Lubit Expert Rep.] Add. 4, ¶ 1.<br><br>Furthermore, contrary to statements in the cited declarations, case file records do not show that the declarant UACs were compelled to take psychotropic medications against their will, except in rare emergency circumstances when the child was dangerous to self or others. To the contrary, at times children found their mental health symptoms so distressing that they requested PRN medications to alleviate them or asked for an increased dosage of a prescribed medication. *See*, *e.g.*, DX-84 at 41-42 (A.M.R.A. was placed at Shiloh RTC for ▬▬▬▬▬▬▬▬▬; adjusted well to her medications, was medication compliant, and was ready to reunify with her family); DX-84 at 130-36 (M.M.H. expressed ▬▬▬▬▬▬▬▬▬, made runaway threats, and was diagnosed ▬▬▬▬▬; symptoms were managed |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
|   |   | effectively with medication and she was medication compliant; sought re-admission to Shiloh and the familiarity of that placement by claiming that she was ███████ ███████ again when she was not); DX-84 at 137-41 (N.B.C.R. was medication compliant; symptoms ███████████ ███████████ improved with treatment; did not complain of stomach pain or any other side effects); DX-84 at 122-29 (M.H.S. engaged in self-injurious behavior and expressed suicidal ideation ███████████ ███████; responded well to medications while placed at Shiloh RTC and was compliant in taking them); DX-84 at 46-109 (on numerous occasions while placed at Shiloh RTC, E.G.G.J. asked for ███████████ Benadryl, or Benadryl combined with another medication) to help relieve ███████████ ███████████, or to help ███████████████; oftentimes specifically requesting ███████ ██████████████████████ ███████████ threats to staff); DX-84 at 110-18 (J.M.R.R. refused medication three times on 3/20, 3/21, and 4/15/18 but was not forced to take it, and did not take it); DX-84 at 119-21 (J.S.C.M. understood his mental health diagnosis and medication needs, was medication compliant; agreed to return to his original ███████ ███████ when titration of his medication at his request resulted in increased depressive and anxious symptoms); DX-84 at 43-45 (D.S.J.L. "has required personal restraints and PRN medications to prevent harmful escalation"; on |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | 1/19/18 D.S.J.L. requested to be administered PRN medication to control his anxious thoughts); DX-84 at 142-45 (no indication that Y.A.M.S. ever refused to take his psychotropic medication; even when Y.A.M.S. was administered PRN medications on an emergency basis for physical aggression, agitation, or anxious behavior; file notes indicate "client took cooperatively"); DX-84 at 4-40 (A.D.A. was involved in assessing the effectiveness of various medications prescribed to him at Yolo and NOVA; A.D.A. occasionally refused medications but also acknowledged at times an improvement in his serious psychiatric symptoms with medication); DX-83 at 85 (C.J.A.L. refused medication on several occasions while placed at MercyFirst RTC despite psycho-education about its benefits; however, following ███████████ ██████, he agreed to resume his medication regimen after some adjustments); DX-64 [Dr. Londino Expert Rebuttal Rep.], p. 14 n. 9; (P.D.O.P. who exhibited self-harming behaviors and was psychiatrically hospitalized four times, was resistant to medication at times while placed at MercyFirst RTC but was not forced to take medication; with psycho-education, P.D.O.P. eventually agreed to take medication and showed significant improvement in his psychiatric symptoms); DX-83 at 43-47 (P.D.O.P. case file excerpts); DX-35 [Dr. Lubit Expert Rep.], Add. 5, pp. 2-4 (discussing P.D.O.P.'s medical records); DX-83 at 40 (D.D.R.O. expressed agreement with new medication regimen in meeting with psychiatric nurse practitioner); DX-83 at 41-42 (D.D.R.O. verbally consented to medication for |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | anxiety, depression, and PTSD); DX-35 [Dr. Lubit Expert Rep.] Add. 5, pp. 9-12 (discussing D.D.R.O.'s medical records); DX-36 [Dr. Lubit Expert Rebuttal Rep.], p. 59 ¶¶ 58-60; DX-83 at 3 (After meeting with a psychiatrist, K.N.A.T. shared with her clinician "that she feels good w[ith] the medication and sees positive changes in [her]self… Minor and psychiatrist agree to keep medication at the same dosage."); DX-52 [Vergara GN Decl.] ¶ 69.<br><br>*See* Defs.' Evidentiary Objection ¶ 133. |
| 134. | Children stepped up to Shiloh RTC report being forced to take psychotropic medication or seeing other children forced to take psychotropic medication.<br><br>Ex. 62 [D.S.J.L. Decl.] ¶ 11; Ex. 82 [Y.A.M.S. Decl.] ¶ 22; Ex. 63 [E.G.G.J. Decl.] ¶ 6; Ex. 70 [K.S.G.P. Decl.] ¶ 8; Ex. 69 [K.N.A.T. Dec. 1, 2017 Decl.] ¶ 11; Ex. 67 [K.L.F. Decl.] ¶ 14; Ex. 75 [M.Y.R.M. Decl.] ¶ 3. | Undisputed that UACs have made such reports to Plaintiffs' counsel. Disputed that it is Shiloh RTC's policy and practice to force UACs to take psychotropic medications after being stepped up. Shiloh RTC seeks informed consent from patients and "[a]ssent by the UAC is required to administer psychotropic medications. Children who refuse medications are not required to take it unless there is a crisis posing an immediate safety risk to the UAC or others, and this is only permitted on an emergency basis at Shiloh, as is consistent with state licensing guidelines, and rarely occurs." DX-62 [Dr. Londino Expert Rep.] ¶¶ 17, 37 ("Assent is required by the UAC before administering psychotropic medications. If the UAC requests discontinuance, medications are discontinued. UACs are not forced to take medications."); DX-76 [Lawrence Dep.] 176:12-16 ("Q: Once a child is admitted to Shiloh, may the family member or the child withdraw the consent that they previously provided regarding psychotropic medication? A: Absolutely, at any time."), 193:18-22 ("Q: |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | Are youth at Shiloh administered psychotropic medications before written informed consent has been obtained? A: No. Q: Has that ever occurred? A: No, not to my knowledge."); 198:5-9 ("The medication isn't forced."); DX-79 [Ruiz Dep.] 190:6-11 ("Q: And are you able to, or must you under your policies, obtain informed consent from a parent or guardian prior to prescribing a psychotropic medication? A: Absolutely.  That's what we do prior to giving the medication, yes."), 197:11 ("But they have the right to refuse medications.").<br><br>Furthermore, contrary to statements in the declarations, case file records do not support UACs' allegations that they or other children were "forced" to take psychotropic medications at Shiloh, aside from occasional emergency situations during which the UAC posed a danger to themselves or others and medications were administered for safety reasons as is consistent with Texas state law and licensing standards for residential programs.  *See* Texas Minimum Standards for General Residential Operations (July 29, 2018), pp. 162-63; Tex. Family Code § 266.009 (emergency medical care); 26 Tex. Admin. Code § 748.2257 (requirements for emergency administration of psychotropic medication); Fact Response ¶ 133.  *See, e.g.,* DX-84 at 43-45 (D.S.J.L. "has ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮ ▮▮▮▮▮▮▮▮▮ to prevent harmful escalation"; on 1/19/18 D.S.J.L. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ to control his anxious thoughts); DX-84 at 142-48 (case files do not indicate Y.A.M.S. ever refused to take |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | psychotropic medication; even when Y.A.M.S. was ████████████████████████, file notes indicate "client took cooperatively"; incident on 9/5 or 9/6/16 which Y.A.M.S. references at ¶ 22 of the cited declaration involved Y.A.M.S. being given a ████████████████████ on staff, and was unable to calm down by verbal prompt); DX-84 at 46-109 (E.G.G.J. asked for ████████████ combined with another medication) on numerous occasions to help ████████████████████ or to avert attempts to harm her peers and staff; oftentimes E.G.G.J. specifically requested ████████. E.G.G.J.'s medical records also indicate that she had periods of physical aggression with peers and staff when it became necessary, for E.G.G.J.'s safety and that the staff, to put her in a therapeutic hold). Nor do case file records support that the Plaintiffs were "forced" to take psychotropic medications.  *See* DX-52 [Vergara GN Decl.] ¶ 60 (case records do not reflect that Gabriela N. voiced a concern about taking her medications to her treating psychiatrist, her clinician, or other staff at Shiloh, although her treatment was discussed with her and the treatment team regularly, and she continued to take her medication); DX-83 at 5-13 (Gabriela N. case file excerpts); DX-47 [Vergara DMT Decl.] ¶¶ 26, 48 (case record does not support Daniela's allegation that that she was "forced" |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | to take medications while at Shiloh; "Daniela's individualized service plan, which Daniela participated in developing with a multi-disciplinary team, included goals and objectives for medication education. It was also reported that she was responding well to her medication regimen." (citations omitted); DX-35 [Dr. Lubit Expert Rep.], Add. 4, ¶¶ 10 (Lucas R. was not forced to take medication; 33 (no indication of threats or punitive action if Daniela Marisol T. did not take her medication); 105 (Miguel Angel S. was not "forced" to take medication; he often refused medication, but was encouraged to take it, and sometimes asked for it).<br><br>*See* Defs.' Evidentiary Objection ¶ 134. |
| 135. | Children stepped up to therapeutic staff-secure facilities may be required to undergo sex offender treatment.<br><br>Ex. 24 [Heath Dep. Tr.] at 119:24– 122:15 | Undisputed to the extent it acknowledges that ORR may require that children determined to have committed a sex offense crime undergo a sex offender treatment program, before being placed in a regular community setting or long-term foster community area.<br><br>Ex. 24 [Heath Dep. Tr.] at 120:24-120:7, 122:1-8 ("But what I see is intake makes that decision before they get to us.  So intake says, 'This kid was picked up for committing this crime.'  Instead of, like, putting them in the domestic system, they find out [that they] are undocumented, so they refer them to us.  So we have to move forward with providing the treatment.").<br><br>*See* Defs.' Evidentiary Objection ¶ 135. |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| 136. | Secure or staff secure placements have led to deterioration of children's mental health.<br><br>Ex. 35 [Deposition Transcript of Elicia F. Smith ("Smith Dep. Tr.")] at 144:10–13; Ex 24 [Heath Dep. Tr.] at 186:14–187:7; Ex. 24 [Heath Depo. Ex. 170] at 6030; Ex. 22 [Fields Dep. Tr.] at 176:3–13, 179:16–20, 180:10–18, 231:11–15; Ex. 17 [Cook Dep. Tr.] at 192:5–193:11; Ex. 103 at 1818; Ex. 120 at 1915; Ex. 121 at 1918 ("  Ex. 122 at 1924. | Disputed to the extent it implies secure or staff secure placement necessarily *causes* deterioration of children's mental health.<br><br>DX-30 [Dr. Ryan Expert Rep.] ¶ 45 ("One simply cannot compare the length of stay in shelters with the length of stay in more secure settings and conclude that it was the placement decision that increased the overall length of stay.  This is a serious problem of selection bias that undoubtedly leads to erroneous conclusions about causation when the most that might be shown is correlation."); DX-31 [Dr. Ryan Expert Rebuttal Rep.] ¶ 20 ("Dr. Ryo never states that the type of placement *causes* children to remain longer in ORR custody, but the repeated use of the term 'associated' may unintentionally encourage one to think about a cause and effect relationship.  A more accurate statement would be: while placement types may be correlated by length of time in care, there is insufficient evidence of a causative effect.") (emphasis in original); Ex. 102 at 1910 (noting that the current placement is "perpetuating some behaviors that RTC finds prohibitive"). *See also* DX-62 [Dr. Londino Expert Rep.] ¶¶ 24-25 (discussing inherent challenges in providing residential treatment to children with mental health disorders who also have a conduct disorder diagnosis and/or an intellectual disability).<br><br>Furthermore, the UAC discussed in Ex. 120, D.J.N, repeatedly engaged in aggressive and assaultive behaviors that posed serious risk of harm to others in the shelter setting (SWK Casa Blanca), and he attempted to run away from the |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | shelter.  D.J.N. was diagnosed with ███ ████████████████████ and his ███████████████████ it particularly difficult for shelter staff to locate and identify family members who might sponsor him.  He was stepped up to a staff-secure facility (BCFS San Antonio SS) to better meet his developmental needs. His aggressive behaviors continued in the staff-secure environment, however, and he was psychiatrically hospitalized and stepped up to SVJC based on a clinical recommendation for a more restrictive setting.  D.J.N.'s aggressive behavior continued to escalate at SVJC and facility staff recommended that he be stepped down to a group home for intellectually disabled children or an out-of-network facility because of his disability's impact on his aggressive behavior. He was transferred to an OON RTC (Devereux) that could meet his mental health and behavioral needs; he was ultimately discharged from ORR's care when an age redetermination showed him to be 24 years old.  *See* Ex. 120 at 1915, DX-84 at 247-63. <br><br> Likewise, the UAC in Ex. 122, A.M.M.M., also had a significant trauma history in his home country, exhibited particularly severe mental health and behavioral issues while in ORR care and custody that made him a danger to himself and others, and thus necessitated restrictive placements in secure settings and RTCs. Specifically, A.M.M.M. made homicidal threats against care provider staff, was charged with a Class C misdemeanor for assaulting staff, and ███████████████████████ |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | ███████████ A.M.M.M.'s mental health and behavioral difficulties were exacerbated by his lack of sponsorship options, despite ORR's many efforts to work with various potential sponsors. *See* Ex. 22 at 1922; *see also* DX-35 [Dr. Lubit Expert Rep.], Add. 5, pp. 12-13 (discussing A.M.M.M.'s psychiatric and placement history); DX-83 at 48-81 (summary of case file information); DX-84 at 204-37.<br><br>Finally, the UAC in Ex. 121, D.C.P., had depressive symptoms and frustration that coincided with challenges in the sponsorship process, not placement in a staff-secure setting *per se*. At the shelter level, his case manager was working with his potential sponsor aunt to obtain documentation from the Mexican consulate of a household member's relationship to her. D.C.P. was stepped up to staff-secure for his own safety when anticipating release to his aunt he threatened multiple times to run away, but was stepped back down to the shelter level when staff determined he was no longer a flight risk and that his behavior was appropriate for a shelter-level facility. *See* Ex. 121 at 1918; DX-84 at 238-46; *see also* DX-14 [Mohn Expert Rep.] ¶ 45 (discussing potential barriers in the sponsorship process that may increase length of time in care); DX-35 [Dr. Lubit Expert Rep.] ¶ 3.c (discussing delays in the sponsorship process attributable to sponsors). |
| 137. | Children remain in restrictive placements despite ORR's having found them suitable for step-down. | Disputed to the extent it implies that children are often unable to step-down once ORR has found them suitable to do so, or that, as a matter of policy and practice, ORR does not make every effort to adjust UACs' placements |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Ex. 6 [RFA 2nd Set] No. 199 at 555–56; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 348:12–24, 390:24–391:4; Ex. 28 [Murray Dep. Tr.] at 158:6-21; Ex. 14 [Castaneda Dep. Tr.] at 66:2–17; Ex. 22 [Fields Dep. Tr.] at 148:18–23; Ex. 39 [Deposition Transcript of Micaela Vergara ("Vergara Dep. Tr.")] at 129:15–130:17, 257:6–10; Ex. 18 [De La Cruz Dep. Tr.] at 163:7–164:5; *see also* Ex. 2 [ORR MAP] § 1.4.2 at 90–91; Ex. 46 [Heath Dep. Ex. 169] at 1270 | based on their changing needs and circumstances.  Further disputed as the full text of Defendants' admission provides that there were four cases in which children were placed at Shiloh and ORR was not able to timely step down the UAC because of space availability in a less restrictive appropriate placement.  In each of those cases, for reasons beyond ORR's control, ORR made extensive efforts to timely transfer the UAC to a less restrictive placement but could not find an appropriate place willing to accept the UAC, even outside of ORR's network of care providers.  The reasons for this were varied, but included lack of available beds, the form of legal relief available to the UAC, and the limited availability of necessary mental health supports required by the child.

Ex. 6 [RFA 2nd Set] No. 199 at 555–56.  *See also* DX-02 [Biswas 30(b)(6) Dep.] 79:18-80:17; ORR Guide § 1.3.3; DX-10 [Biswas Decl.] ¶ 26 ("Placement may be dependent on the licensing requirements of a facility. For example, some facilities can only take males, or some facilities can only take children between the ages of 6 and 17."). |
| 138. | Failing to step-down children who are ready for step-down can be detrimental to their long-term psychological well-being and is contrary to their best interests.

Ex. 6 [RFA 2nd Set] Nos. 172–73 at 544–46; Ex. 24 [Heath Dep. Tr.] 215:7–10 | Undisputed to the extent failing to step-down UACs who are ready for step down may be contrary to their best interests, which is why ORR, as a matter of both policy and practice, makes every effort to adjust a UAC's placement as necessary and appropriate based on the UAC's changing needs and circumstances.  Disputed to the extent it implies that failing to step-down UACs who are ready for step down is categorically detrimental to their long-term psychological |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | well-being.<br><br>Ex. 6 [RFA 2nd Set] Nos. 172-73 at 544-46; DX-26 [Heath Dep.] 213:7-18 ("Q: Are children's mental health needs considered in a step-down process? A: Yes. Q: How? A: If we have a minor in a Therapeutic Staff Secure facility like Friends of Youth, and we know that he would benefit from a therapeutic foster home, that would be the recommendation. So we always are looking at a placement that's going to meet the kids's mental health, as well as the rest of his needs."). |
| 139. | Children in restrictive placements are generally ineligible for step-down directly to long-term foster care.<br><br>Ex. 1 [ORR Policy Guide] § 1.2.6 at 25; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 371:8–372:3 (no prohibition but not aware of this happening), 390:24– 391:16; Ex. 17 [Cook Dep. Tr.] at 179:1–3; Ex. 35 [Smith Dep. Tr.] at 95:8–22; Ex. 24 [Heath Dep. Tr.] at 214:3–7; Ex. 46 [Heath Dep. Ex. 169] at 1270 (following statement with respect to minor F.J.M. who was placed in a therapeutic staff secure facility: "Denied from LTFC") | Disputed.  ORR has no prohibition on placing a child in long-term foster care (LTFC) directly from a restrictive placement such as a residential treatment center (RTC), a secure placement, or a staff-secure facility.  However, despite ORR's best efforts, in some cases, "[p]lacement may be dependent on the licensing requirements of a facility."  *See* DX-10 [Biswas Decl.] ¶ 26; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 371:8-372:3. |
| 140. | The average length of care of unaccompanied children who were in secure, staff-secure, or RTC care is longer than the average length of care of | Undisputed. |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | unaccompanied children who were never stepped up.<br><br>Joint Stip. ¶ 64 | |
| 141. | The average time to reunification was higher for custody periods with step-ups to secure, staff-secure, therapeutic, RTCs, and OONs (*i.e.*, average of 183.8 days) than custody periods without step-ups (*i.e.*, average of 52.6 days).<br><br>Ex. 57 [Ryo Expert Rep.] at 1396–97 (providing step-up definition used in report); *id.* at 1398, 1401–02 (summary and analysis regarding time to reunification for custody periods with and without step-ups); *id.* at 1405 (Appendix D. Time to reunification for custody periods with and without step-ups); Ex. 34 [Ryo Dep. Tr.] at 106:6–23, 108:4–109:7; *see also* Ex. 5 [RFA 1st Set] No. 81 at 502–03 (admitting average length of care for children who were in secure and staff secure is longer than average length of care for children who were never in secure or staff secure care) | Undisputed. However, to the extent it implies that causation exists as to a child's level of care and the average time to release a UAC to a proposed custodian, Defendants note that the author of Plaintiffs' expert report, Dr. Ryo, testified as follows: "I am not claiming causation in my report." DX-77 [Ryo Dep.] 31:8.<br><br>*See also* DX-30 [Dr. Ryan Expert Rep.] ¶ 44 ("With regard to the argument that placing children in ORR custody in settings more restrictive than the shelter level prolongs their length of stay, any correlation between such placement and length of stay does not support a finding that such placements *cause* prolonged stays."); *id.* ("[T]hese children have additional needs and demonstrate behaviors that (1) increase their likelihood of placement in settings more secure than the shelter level and (2) decrease the likelihood of a safe potential sponsor coming forward or being identified, being vetted, and being approved as quickly."); DX-31 [Dr. Ryan Expert Rebuttal Rep.] ¶ 22 ("Rather than placement restrictiveness causing increases in length of care, it is the characteristics of the individual child (e.g. serious mental health diagnosis) that are causally related to the treatment decision to change settings (i.e., step-up) – and perhaps most critical to the question here is that these same characteristics are also responsible for treatment outcomes (e.g., length of stay as one |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | example)."); DX-35 [Dr. Lubit Expert Rep.] ¶ 2 ("Delay in the [release] process was generally the result of sponsor delay, not avoidable delay by ORR. Concerning stepping down from an RTC to a shelter, on several occasions when UACs were stepped down to shelters they returned to their problematic behavior and needed to be stepped up to a higher level. This supports two conclusions. It suggests that UACs with serious emotional/behavioral issues did better while in higher levels of care and had fewer issues. It also indicates that ORR RTCs were not holding on to UACs for too long."). |
| 142. | From November 2017 to March 13, 2020, children spent the following average lengths of time in ORR custody before reunification: (1) average of 52.9 days for shelter only placements; (2) average of 176.5 days for children who spent time detained in a staff- secure facility; (3) average of 184.6 days for children who spent time detained in a therapeutic group home; (4) average of 185.9 days for children who spent time detained in a secure facility; (5) average of 236.3 days for children who spent time detained in a RTC; (6) average of 246.3 days for children who spent time in a therapeutic staff-secure facility; and (7) average of 327.2 days for children who were detained in out-of-network placements. | Undisputed. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Ex. 57 [Ryo Expert Rep.] at 1402–03, 1406–07 (Appendix E. Time to reunification by placement type); Ex. 34 [Ryo Dep. Tr.] at 81:19–82:6, 110:2–25 | |
| 143. | ORR has detained at least one Class Member in restrictive placements for a total period of over four years.<br><br>Ex. 122 at 1923 (████████ ████████████████ ████████████████ ████████████████ ████████████████ ███████████ ) | Undisputed.  However, to the extent it implies stays of more than one year are common or due to issues within ORR's control, Defendants respond as follows.  In 2019, the average stay was 66 days, which is significantly shorter than the average length of stay in domestic foster care (2 years) or congregate care (8 months). Further, the length of stay can increase due to factors which are beyond the control of ORR or facility staff, including failure of parents, relatives, or sponsors to complete home studies and all required paperwork or the existence of severe mental, health, or physical disabilities which may require stabilization before UACs can be safely placed with a parent, relative, or sponsor.  *See, e.g.*, Defs.' U.F. ¶ 34. A.M.M.M., who had a significant trauma history in his home country, exhibited particularly severe mental health and behavioral issues while in ORR care and custody which made him a danger to himself and others, and thus necessitated restrictive placements in secure settings and RTCs. Specifically, A.M.M.M. made ████████ ██████ against care provider staff, was charged with a Class C ████████████ ████████████████████████████ ████████████████ A.M.M.M.'s mental health and behavioral difficulties were exacerbated by his lack of sponsorship options, despite ORR's many efforts to work with |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | various potential sponsors. DX-35 [Dr. Lubit Expert Rep.], Add. 5, pp. 12-13 (discussing A.M.M.M.'s psychiatric and placement history); DX-83 at 48-81 (summary of case file information); DX-84 at 204-37. *See also* DX-13 [Dr. Earner Expert Rep.] ¶ 63; DX-64 [Dr. Earner Expert Rebuttal Rep.] ¶ 4 ("[T]he overwhelming majority of UACs in ORR care … spend less than two months in care before release to a sponsor."); Defs.' U.F. ¶¶ 96 (from June 2019 through March 2020, average length of time in ORR's custody and care was 48.4 days), 97 (from June 2019 through May 2020, average length of time in ORR's custody and care was 54 days). |
| 144. | Children who ORR steps to secure, staff-secure, therapeutic staff-secure, RTCs, and OONs are less likely to be reunified with proposed custodians than children who are not stepped up.<br><br>Ex. 57 [Ryo Expert Rep.] at 1404; Ex. 34 [Ryo Dep. Tr.] at 33:17–20, 116:4–117:24 | Disputed to the extent it implies UAC placement has a negative causal impact on release to a proposed custodian. The author of Plaintiffs' expert report, Dr. Ryo, testified as follows: "I am not claiming causation in my report."<br><br>DX-77 [Ryo Dep.] 31:8; *see also* DX-30 [Dr. Ryan Expert Rep.] ¶ 44 ("With regard to the argument that placing children in ORR custody in settings more restrictive than the shelter level prolongs their length of stay, any correlation between such placement and length of stay does not support a finding that such placements *cause* prolonged stays."); *id.* ("[T]hese children have additional needs and demonstrate behaviors that (1) increase their likelihood of placement in settings more secure than the shelter level and (2) decrease the likelihood of a safe potential sponsor coming forward or being identified, being vetted, and being approved as quickly."). |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | *See* Defs.' Evidentiary Objection ¶ 144. |
| 145. | Children who ORR places in therapeutic group homes are less likely to be reunified with proposed custodians than children who were only ever in shelter placement.<br><br>Ex. 57 [Ryo Expert Rep.] at 1404; Ex. 34 [Ryo Dep. Tr.] at 116:4– 117:24 | Disputed to the extent it implies UAC placement has a negative causal impact on release to a proposed custodian.  The author of Plaintiffs' expert report, Dr. Ryo, testified as follows: "I am not claiming causation in my report."<br><br>DX-77 [Ryo Dep.] 31:8; *see also* DX-30 [Dr. Ryan Expert Rep.] ¶ 44 ("With regard to the argument that placing children in ORR custody in settings more restrictive than the shelter level prolongs their length of stay, any correlation between such placement and length of stay does not support a finding that such placements *cause* prolonged stays."); *id.* ("[T]hese children have additional needs and demonstrate behaviors that (1) increase their likelihood of placement in settings more secure than the shelter level and (2) decrease the likelihood of a safe potential sponsor coming forward or being identified, being vetted, and being approved as quickly."); DX-31 [Dr. Ryan Expert Rebuttal Rep.] ¶ 19.<br><br>*See* Defs.' Evidentiary Objection ¶ 145. |
| 146. | Children who ORR steps up to secure, staff-secure, therapeutic staff-secure, RTCs and OONs are more likely to voluntarily depart the United States than children whom it does not step-up.<br><br>Ex. 57 [Ryo Expert Rep.] at 1404 | Disputed to the extent it implies UAC placement has a causal impact on voluntary departure from the United States.  The author of Plaintiffs' expert report, Dr. Ryo, testified as follows: "I am not claiming causation in my report."  DX-77 [Ryo Dep.] 31:8.<br><br>*See* Defs.' Evidentiary Objection ¶ 146. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| 147. | Children who ORR places in therapeutic group homes are more likely to voluntarily depart the United States than children who only ever spent time in ORR shelters.<br><br>Ex. 57 [Ryo Expert Rep.] at 1404 | Disputed to the extent it implies UAC placement has a causal impact on voluntary departure from the United States. The author of Plaintiffs' expert report, Dr. Ryo, testified as follows: "I am not claiming causation in my report." DX-77 [Ryo Dep.] 31:8.<br><br>*See* Defs.' Evidentiary Objection ¶ 147. |
| 148. | ORR does not release children directly from restrictive placements to Unaccompanied Refugee Minor ("URM") programs.<br><br>Ex. 17 [Cook Dep.] 270:18–271:3; Ex. 111 at 1859; Ex. 107 at 1839; Ex. 97 at 1761 ("ORR is rarely able to place minors into the URM program out of a staff secure placement"); Ex. 105 at 1830; Ex. 24 [Heath Dep. Tr.] at 214:8–215:6; Ex. 46 [Heath Dep. Ex. 169] at 1271 (stating the following with respect to minor F.M.J., "URM application sent 12/17 and 2/17. Drug history and staff secure | Disputed. ORR has no prohibition against release of UACs directly from restrictive placements to URM programs.[6] *See* DX-10 [Biswas Decl.] ¶ 84 ("ORR has no requirement that a child must be stepped down prior to release."). However, state-licensed URM programs may not accept a UAC for placement until the UAC steps-down to a less restrictive settings. *Id.*, DX-84 at 368-69 (Case file for J.R.Q.E, referenced in Ex. 107, reflecting that "UC had been referred to URM as a potential option but given his behavior, it was unlikely for them to accept him"). *See also* DX-84 at 370 (Case file excerpt for R.D.E.C., referenced in Ex. 97, indicating that minor ran away before URM placement or release could be completed); DX-84 at 362-67 (email from URM program, regarding minor referenced in |

---

[6] By law, URM programs are distinct from UAC programs. They are authorized under a different statute, the Refugee Act of 1980, which primarily authorizes grants to States to provide services to refugees (including unaccompanied refugee minors). 8 U.S.C. §§ 1522(a)(4)(B), (d)(2). The children are in the legal custody of the State, not Federal, government. *See* 8 U.S.C. § 1522(d)(2)(B)(ii) (ORR Director shall attempt to arrange for the placement under the laws of the States); 45 C.F.R. §§ 400.112 (requirements for State grantees); 400.115 (requiring the State grantee to ensure that "legal responsibility is established, including legal custody and/or guardianship, as appropriate, in accordance with applicable State law.").

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | therapeutic so not likely to get URM."); *id.* (stating the following with respect to minor F.J.M. who is placed at Friends of Youth McEachern therapeutic staff secure, "Pending URM placement" but "URM won't accept due to mental health needs.") | Ex. 111, inquiring as to whether "minor is ready to step down" based on UAC's "recent history of inappropriate sexual behavior/boundaries, physical aggression and self-injurious behavior when outside of the controlled environment of the hospital"); Ex. 105 at 1829 ("Minor's URM application was submitted on 2/24/2016.  URM was at one point considering him for a Michigan placement, but after he was stepped back up to FOY Therapeutic Staff Secure they did not consider him for that placement.").<br><br>*See* Defs.' Evidentiary Objection ¶ 148. |
| 149. | A child may be more likely to be accepted by a local URM program after the child has been stepped down to a less restrictive placement.<br><br>Joint Stip. ¶ 63 | Undisputed. |
| 150. | ORR and case staff exercise discretion to determine whether a child is "stable" enough to step- down.<br><br>Ex. 39 [Vergara Dep. Tr.] at 113:17– 22, 120:4–12, 222:17–23; Ex. 24 [Heath Dep. Tr.] at 210:8–10; Ex. 16 [Contreras Dep. Tr.] at 143:7– 22; Ex. 35 [Smith Dep. Tr.] at 159:21–161:6; Ex. 26 [Londino Dep. Tr.] at 269:1–16; SUF 176 *infra* ("Although ORR uses the criteria whether a child is a "danger to self or others" to determine step-up or | Disputed to the extent it implies that ORR and case staff have unchecked discretion with respect to step-down or that "stability" is a factor in step-down.  Rather, ORR and case staff exercise discretion to assess whether a child's needs can be safely and appropriately met in a less restrictive level of care such that step-down is appropriate.  ORR does not make step-down decisions without adequate professional judgment or guidelines.  "[A]s required by the [TVPRA] and consistent with child welfare considerations, ORR and care providers spend extensive efforts assessing the safety of a placement prior to referral." Among others, the ORR Guide provides that step downs occur when "the UAC no longer poses a |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | step- down eligibility, ORR employs no standardized metric to determine whether a child meets this standard, *i.e.*, the child is a danger to self or others.") | danger to himself or others, or no longer presents an escape risk (for staff secure step downs only)" and also considers "criteria identified in making a secure placement and takes into consideration any mitigating factors based on an assessment of the UAC's current functioning and behavior, previous conduct, self-disclosures, and criminal/delinquent history." ORR also considers an "immigration judge's decision in a bond hearing about the youth's level of danger when assessing the youth's placement and conditions of placement."  ORR Guide §§ 1.4.2, 1.4.6 (criteria for placement in an RTC); 2.9 (bond hearings); DX-78 [Dr. Londino Expert Rebuttal Rep.] ¶ 43.  *See also* DX-62 [Dr. Londino Expert Rep.] ¶100 (noting that discharge planning at Shiloh and MercyFirst RTCs for step-down (or release) begins at admission and continues throughout a child's therapeutic stay). |
| 151. | ORR policy does not provide standardized metrics to determine whether a particular Class Member is adequately stabilized to merit step-down.<br><br>Ex. 1 [ORR Policy Guide] § 1 at 22– 33 (providing no standardized metric to assess step down eligibility); s*ee also* Ex. 6 [RFA 2nd Set] No. 198 at 555; Ex. 16 [Contreras Dep. Tr.] at 143:11–22 | Disputed to the extent it asserts that "adequately stabilized" is a metric by which ORR determines whether UACs are eligible for step-down.  *See* Fact Response ¶ 150. |
| 152. | As a matter of practice, ORR and its care providers require that children have at least 30 days of | Disputed. The criteria for step-downs, as set forth in the ORR Guide § 1.4.2, does not contain a "good behavior" requirement, *see* |

81

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | good behavior before they may be stepped down.<br><br>Ex. 14 [Castaneda Dep. Tr.] at 145:9–18; Ex. 35 [Smith Dep. Tr.] at 156:8–158:7; Ex. 24 [Heath Dep. Tr.] at 199:10–13, 204:13–17, 206:14–208:1; Ex. 49 [Heath Dep. Ex. 171] at 1305 ("The minor does not qualify for a step down at this time, as the minor has not completed his 30 days without an SIR."); *id.* at 1303 (FFS Supervisor directing programs to accept lateral transfer); Ex. 16 [Contreras Dep. Tr.] at 141:18–143:5;<br>Ex. 17 [Cook Dep. Tr.] at 181:10– 182:15 | DX-73 [Castaneda Dep. Supp.] 149:9-17.  Nor have Plaintiffs offered evidence that such a requirement exists more often than not as a matter of practice.  To the contrary, Plaintiffs' cited evidence confirms that there is *not* a practice of requiring 30 days of good behavior before step down. While it is true that at times, "facilities that receive a transfer request will deny it, and they will deny it and ask that the minor have 30 days of nonincident behavior before they may reconsider the transfer," there is simply "not a requirement" imposed by ORR that a child must have 30 days of good behavior in order to be stepped down."  Ex. 35 [Smith Dep. Tr.] at 156:8-11, 157:5-8.  *See also* Ex. 24 [Heath Dep. Tr.] 207:15-19 ("Q. And you said you're not aware of any ORR policy that requires currently 30 days of no SIRs before a child is eligible for step-down? A. No."); Ex. 16 [Contreras Dep. Tr.] at 142:20-22 (confirming at SVJC that children have indeed been stepped down prior to 30 days); Ex. 17 [Cook Dep. Tr.] 181:14-17 ("Q: Is that a current requirement? A: I don't know if it's a direct policy. Q: Was it a direct policy before? A: I'm not sure."); DX-79 [Ruiz Dep.] 272:2-9 ("Q: And was there ever a time in the past where there was a policy that a child needed to maintain 30 days of good behavior before you would recommend step down? A: No, no, no. Q: And is – A: No, that would be based on clinical information and how they're doing."); DX-78 [Dr. Londino Expert Rebuttal Rep.] ¶ 49 (disputing that UACs need to demonstrate "good behavior" to be transferred from an RTC to a shelter and noting that "the documentation in the files that I reviewed indicated instead |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | that criteria for transfer or step-down was to demonstrate more adaptive coping skills to mitigate risk of an undesired and potentially tragic outcome through harm to self or harm to another" ).<br><br>*See* Defs.' Evidentiary Objection ¶ 152. |
| 153. | ORR evaluates a child's "good behavior" on, among other things, the number of SIRs the child has received.<br><br>Ex. 16 [Contreras Dep. Tr.] at 138:4– 7; Ex. 26 [Londino Dep. Tr.] at 236:22–237:11 | Disputed.  The criteria for step-downs, as set forth in the ORR Guide, does not contain a "good behavior" requirement.  Furthermore, Significant Incident Reports (SIRs) are not determinative of step-down.<br><br>ORR Guide § 1.4.2; DX-10 [Biswas Decl.] ¶ 49 ("SIRs are merely a tool for care providers to report a number of different kinds of incidents to ORR in an efficient manner, including incidents entirely unrelated to a child's behavior such as experiencing a fall or accident.").  *See also* Fact Response ¶ 152; DX-78 [Dr. Londino Expert Rebuttal Rep.] ¶ 49 (disputing that UACs need to demonstrate "good behavior" to be transferred from an RTC to a shelter); Ex. 26 [Londino Dep Tr.] at 236:22-237:11 (explaining that serious unsafe behavior such as self-harm, aggression or use of weapons to harm others, or inappropriate sexual activity -- as distinguished from more minor behaviors such as cursing at staff-- may be documented in a SIR and considered in determining a UAC's level of care).<br><br>*See* Defs.' Evidentiary Objection ¶ 153. |
| 154. | The behavior that triggers an SIR varies from program to program.<br><br>Ex. 10 [Bartholomew Dep. Tr.] | Undisputed to the extent that programs may have differences in how they report; however, disputed to the extent statement implies there are no standards for SIRs.  The ORR Guide |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | at 83:18–22, 85:9–14; Ex. 23 [Fink Dep. Tr.] at 73:5–9 | contains a non-exhaustive list of examples of significant incidents and different ORR programs may vary in terms of what behavior necessitates a SIR due to differences between ORR reporting requirements and state licensing reporting requirements.<br><br>ORR Guide § 5.8.2; DX-74 [Fink Dep. Supp.] 73:5-25. |
| 155. | The step-down process can take several weeks and sometimes even several months.<br><br>Ex. 28 [Murray Dep.Tr.] at 190:16–18; 191:5–192:18, 193:10–17, 196:1–17; Ex. 33 [Deposition Transcript of Faith Ray ("Ray Dep. Tr.")] at 166:23–167:7; Ex. 39 [Vergara Dep. Tr.] at 129:15–130:17, 257:6–10 | Disputed to the extent it implies that step-downs routinely take several weeks and sometimes even several months and that ORR is responsible for the delay.  ORR "steps down kids as soon as possible.  Once they receive that determination that they're no longer a danger to self or others, they will immediately, even prior, work on a transfer to a less restrictive environment. And so basically what happens is within one or two weeks, sometimes it is a little bit longer, but the child will get step down to another facility."  Ex. 39 [Vergara Dep. Tr.] at 129:20-130:4, Ex. 28 [Murray Dep. Tr.] at 193:10-17; DX-10 [Biswas Decl.] ¶ 26 ("Placement may be dependent on the licensing requirements of a facility. For example, some facilities can only take males, or some facilities can only take children between the ages of 6 and 17."); ORR MAP § 1, p. 38 (outlining steps that must be taken if step down to a less restrictive environment is not completed within 7 days). |
| 156. | ORR generally requires home studies or home study addendums of proposed custodians of children it detains in restrictive placements. | Disputed. ORR has no policy of requiring discretionary home studies in cases involving children in restrictive placements.  Rather, the case manager and case coordinator "must have a reasonable expectation that results of the home study process (i.e., home visit, face-to- |

84

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Ex. 35 [Smith Dep. Tr.] at 138:17– 139:3, 139:22–140-1; Ex. 17 [Cook Dep. Tr.] at 238:15–23; Ex. 28 [Murray Dep. Tr.] at 198:4-21, 211:23-212:11; Ex. 39 [Vergara Dep.] at 159:7-19; Ex. 24 [Heath Dep.] 145:15-18; Ex. 92 at 1610; Ex.104 at 1822 (minor being stepped up to who was placed in secure was referred for a home study shortly before step up); Ex. 106 at 1833; Ex 109 at 1845; Ex. 112 at 1865; Ex. 137 [F.R.A. Declaration] ¶ 14; Ex. 113 at 1872; Ex. 114 at 1879–80; Ex. 115 at 1887; Ex. 118 at 1904; Ex. 119 at 1910; Ex 127 at 1951 | face interviews with the potential sponsor and household members) will provide additional information, other than what has already been gathered via the sponsor assessment process, which will mitigate concerns."  Furthermore, some home studies of children placed in restrictive settings are required by the TVPRA – *e.g.*, for victims of human trafficking or child abuse/neglect, or children with disabilities.

ORR Guide § 2.4.2; Ex. 2 [ORR MAP] § 2.4.2 at 175; DX-30 [Dr. Ryan Expert Rep.] ¶ 57 ("Not all potential sponsors require a home study.  In contrast with the domestic system child welfare system, in which all families experience a home evaluation/study, only a small percentage (7%) of UAC cases actually receive a home study."); *see also* DX-14 [Dr. Mohn Expert Rep.] ¶ 43 (noting that home studies can be "required by law, or in discretionary situations where a home study is appropriately requested for important safety reasons").

Further disputed to the extent that in the cases cited by Plaintiffs, ORR either was *required* to provide a home study under the TVPRA, or there were critical reasons why ORR concluded that a discretionary home study was necessary in order to assess whether the potential sponsors could protect the children's safety upon release, and provide for their physical and emotional well-being.  *See*, *e.g.*, Ex. 104 at 1824-26 ("Given the minor's disclosures, history of gang involvement[,] mental health concerns and current behavioral issues a discretionary home study was requested to |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | assess the sponsors' ability to appropriately provide supervision for the minor and ensure his safety and well-being."); Ex. 106 at 1833-35 (discretionary home study requested for child who exhibited disruptive, threatening, and aggressive behavior while in ORR care, witnessed significant violence in his home country, ███████████████████████ ██████████████████████████); Ex. 109 at 1845-47 (discretionary home study for child who "reported to ORR shelter that he was ████ ██████████████████████████ ███████████████████████"); Ex. 112 at 1864-65 (request for TVPRA- mandated home study for child with a disability); Ex. 113 at 1872-75 (TVPRA-mandated home study for child who experienced physical and sexual abuse); Ex. 114 at 1879-83 (TVPRA-mandated home study for a victim of a severe form of trafficking); Ex. 115 at 1887-90 (discretionary home study for child who inconsistently ███████████████████████████ ███████████████████████ Ex. 118 at 1904-07 (TVPRA- mandated home study was required for multiple reasons, including that: the child was found to be a victim of a ███████████████████ ████████████████████████████ ████████████████████████████ ██████████████████████ Ex. 119 at 1911 ("The minor's case has been referred for a discretionary home study to ensure the sponsor is prepared to meet the minor's needs due to the behavioral challenges |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | that have presented since his placement in ORR care."). |
| | | Furthermore, Plaintiffs fail to mention that in several of the cases that they cite, the completed home studies revealed significant concerns about the potential sponsor's capability to care for the child's physical and mental well-being as is required by the TVPRA. *See, e.g.*, DX-84 at 264-91 (B.G.S.S. home study worker expressed concern about, among other things, the potential sponsor's stated discipline plan ███████████ ████████████████████████████ ████")); DX-84 at 292-334 (F.D.G.O. home study worker found that potential sponsor did not understand child's extensive trauma history, which included trafficking and abuse, and the impact of this and his mental health issues upon his behavior); DX-84 at 335-63 (T.G.Y. home study indicated concern about potential sponsor's lack of understanding of extent of youth's involvement in criminal gang activities). *See also* DX-52 [Vergara GN Decl.] ¶ 86 (discussing many concerns expressed by home study worker concerning Gabriela N.'s grandfather's ability to care for her); DX-35 [Dr. Lubit Expert Rep.] Add. 4 ¶¶ 56-61 (describing serious issues with Gabriela N.'s grandfather as a sponsor which were discussed at length in the home study). |
| 157. | ORR's written policies and procedures govern ORR's placement and transfer decisions.<br><br>Ex. 1 [ORR Policy Guide] § 1 at | Undisputed. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | 22 (title "Placement in ORR Care Provider Facilities); *id.* § 1.1 at 22 (heading, "Summary of Policies for Placement and Transfer of Unaccompanied Alien Children in ORR Care Provider Facilities"); Ex 2 [ORR MAP] § 1 at 58 (Manual of Procedures on "Placement in ORR Case Provider Facilities"); *id.* § 1.1 at 62 ("Summary of Procedures for Placement and Transfer of UAC") | |
| 158. | None of ORR's policies or practices concerning step-ups or step-downs is formally published in the Federal Register or a Notice of Proposed Rulemaking.<br><br>Ex. 5 [RFA 1st Set] No. 2 at 468; ECF 144 [Azar Answer] ¶¶ 109, 123; Ex. 11 [Bartholomew 30(b)(6) Dep. Tr.] at 43:11–44:6 | Disputed.  ORR published proposed and final rules in the Federal Register regarding implementation of the Flores Settlement Agreement, but it is currently enjoined by the Central District of California in the case, *Flores v. Barr*.  In addition, the ORR Guide implements the Flores Settlement Agreement, and is posted online and available to the public. Furthermore, ORR regularly holds stakeholder meetings where interested parties have the opportunity to comment on ORR's policies.<br><br>*See* Defs.' Evidentiary Objection ¶ 158. |
| 159. | ORR's online Policy Guide and ORR MAP are not always consistent.<br><br>Ex. 24 [Heath Dep. Tr.] at 92:6–14, 294:19–295:4; Ex. 11 [Bartholomew 30(b)(6) Dep. Tr.] at 46:15–47:4; Ex. 32 [Deposition Transcript of Mae C. Quinn ("Quinn Dep. Tr.")] at 17:9–14, 169:23–170:4 | Undisputed only to the extent that the ORR Guide and MAP have been inconsistent due to a time delay between an update or change to the Guide and updating the MAP to reflect those changes.  ORR does communicate updates to the MAP to its care providers, grantees, and their staff "through email communications and distribution of the notice that procedures have been updated or there are new procedures." Ex. 24 [Heath Dep. Tr.] at 294:19-295:4. |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | *See* Ex. 11 [Bartholomew 30(b)(6) Dep. Tr.] at 46:20-47:4 ("I would say that the MAP is not – it's not a one-for-one meeting that the policy is updated or changed.  I think that they do their due diligence and try to update the MAP, if applicable, to any updated policy changes, any new policies. I think there's probably a lag time of getting any type of procedures associated with those policies to provide guidance to the programs."), 47:6-17.  *See* Defs.' Evidentiary Objection ¶ 159. |
| 160. | ORR frequently changes the policies and procedures set out in its Policy Guide and MAP.  Ex. 24 [Heath Dep. Tr.] at 28:19–20, 90:16–18; Ex. 28 [Murray Dep. Tr.] at 59:7–8; *see* Ex. 132 (reflecting changes to ORR Policy Guide); Ex. 136 (reflecting to changes to ORR MAP) | Disputed to the extent Plaintiffs' use of the term "frequently" is a statement of opinion, not fact.  Defendants do not dispute that ORR has updated its policies and procedures in the ORR Guide and the MAP over time, to better effectuate ORR's mission in response to ever evolving needs and circumstances, to implement Congressional directives, and to implement Court orders.  *See* Defs.' Evidentiary Objection ¶ 160. |
| 161. | Case Managers are tasked with recommending that children be stepped up and stepped down.  Ex. 35 [Smith Dep. Tr.] at 76:13–24, 78:17–22; Ex. 31 [Deposition Transcript of Judette Padilla ("Padilla Dep. Tr.")] at 84:1–7; Ex. 28 [Murray Dep. Tr.] at 103:22–104:2; Ex. 19 [David Dep. Tr.] at 149:19–150:1; Ex. 33 [Ray Dep. Tr.] at 82:3–4 | Disputed.  ORR's practice and policy is that when ORR transfers a UAC from one facility to another, it does so only after a consultation process occurs between the case manager, the case coordinator, and the FFS.  Defs.' U.F.  ¶¶ 49, 51, 53. |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| 162. | Case Managers compile the information and evidence ORR uses to decide whether children will be stepped up or stepped down.<br><br>Ex. 2 [ORR MAP] § 1.4 at 79; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 276:9–16, 281:8–282:1; Ex. 35 [Smith Dep. Tr.] at 49: 20–50:3 | Disputed to the extent Plaintiffs' use of the word "the" implies that the only information or evidence that is considered in stepping up or down a child is compiled by Case Managers. It is ORR's practice and policy that when ORR transfers a UAC from one facility to another, it does so only after a consultation process occurs between the case manager, the case coordinator, and the FFS. Furthermore, in determining whether a step-up is appropriate, the case manager, case coordinator, and FFS staff the case and confer to determine whether the UAC's behavior, criminal history, or self-disclosures require placement in a more restrictive environment, using the factors identified in the ORR Guide.<br><br>Defs.' U.F. ¶¶ 49, 51, 53. |
| 163. | Case Coordinators rely almost exclusively on written documentation compiled and provided by Case Managers in formulating their recommendations regarding step-up or step-down.<br><br>Ex. 35 [Smith Dep. Tr.] at 80:15–22; Ex. 24 [Heath Dep. Tr.] at 81:23– 82:25; Ex. 28 [Murray Dep.] 46:6– 47:3, 104:14-25, 117:16–23, 119:2–24, 131:14–21 | Disputed to the extent Plaintiffs' use of the phrase "almost exclusively" is a statement of opinion, not fact. Case coordinators are available to meet with the UAC and can share information at any point during their stay in ORR's custody and care. Also disputed to the extent Plaintiffs' use of the phrase "almost exclusively on written documentation" implies that case coordinators consider all information on the papers. To the contrary, case coordinators participate in weekly staffing meetings to discuss each child's case, including with clinicians.<br><br>DX-25 [Murray Dep.] 135:20-136:13 (confirming that case coordinators can meet with UACs "before the case coordinator [gives] the recommendation"); DX-09 [Antkowiak Decl.] ¶ 24; DX-10 [Biswas Decl.] ¶ 38. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | *See* Defs.' Evidentiary Objection ¶ 163. |
| 164. | ORR's written policy does not mandate that Case Coordinators interview children before they make a recommendation on step-up or step-down. Joint Stip. ¶ 66 | Undisputed. |
| 165. | In practice, Case Coordinators rarely speak with children before making step-up and step-down recommendations. Ex. 28 [Murray Depo. Tr.] at 67:10– 68:8, 69:2–3, 70:18–22, 136:10–13, 137:7–14 | Disputed to the extent Plaintiffs' evidence of "practice" is based on the fact deposition testimony of just one case coordinator, who cannot speak to the practice of all case coordinators in the ORR program. *See* Defs.' Evidentiary Objection ¶ 165. |
| 166. | FFS are ORR staff members. Joint Stip. ¶ 67 | Undisputed. |
| 167. | FFS make final step-up and step-down decisions without further review by any other official, even when the FFS's decisions depart from a Case Manager's, Clinician's and/or Case Coordinator's recommendation. Ex. 1 [ORR Policy Guide] §§ 1.4, 2.3.1 at 28, 39; Ex. 2 [ORR MAP] § 1.4 at 79, 84–85; *id.* § 1.4.6 at 100– 01; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 282:24– 284:13; Ex. 23 [Fink Dep. Tr.] at 23:9–14, 106:10–15, 169:10– 15, 170:1–11, 177:19–22; Ex. 20 [Eich Dep. Tr.] at 154:1–6; Ex. | Disputed to the extent it implies an FFS has unilateral authority to make step-up or step-down decisions even contrary to recommendation.  The case manager's summary notes are required to include "[t]he FFS's name, decision and basis for it" and if the "FFS decides that a UAC should continue in a more restrictive placement," the ORR MAP requires that "the information justifying the UAC's placement in a restrictive setting is summarized by the case manager and provided in a new *Notice of Placement in a Restrictive Setting*."  The MAP further provides that if "the case manager is unclear what the rationale for the FFS decision is, the case manager contacts the FFS for clarification and assistance in drafting language into the summary portion of |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | 18 [De La Cruz Dep. Tr.] at 21:6–8, 59:4–60:21, 132:23–133:21, 200:3–7; Ex. 31 [Padilla Dep. Tr.] at 84:1– 86:18; Ex 37 [Sualog Dep. Tr.] at 52:9–53:4; Ex. 33 [Ray Dep. Tr.] at 76:8–17, 83:2–11, 127:21–128:1; Ex. 35 [Smith Depo. Tr.] at 46:16–47:16, 97:17–20; Ex. 16 [Contreras Dep. Tr.] at 69:16–22; Ex. 84 at 1562, 1566, 1568; Ex. 85 at 1573, 1575 | the form." Furthermore, if "a UAC has resided in a secure or RTC facility for over 90 straight calendar days the FFS consults with Supervisory ORR staff on the case regarding the reasons for the UAC's continued placement, and thereafter after every 30 day restrictive placement review (unless the UAC is stepped down or discharged)." Ex. 2 [ORR MAP] § 1.4.2 at 83; DX-09 [Antkowiak Decl.] ¶¶ 24, 25; |
| 168. | FFS rely exclusively on information and evidence provided by Case Managers in making step-up and step-down decisions.

Ex. 35 [Smith Dep. Tr.] at 99:12–17, 100:4–8, 149: 9–25; Ex. 24 [Heath Dep. Tr.] at 83:5–10, 86:16–21; Ex. 20 [Eich Dep. Tr.] at 170:15–19 | Disputed to the extent it implies that placement decisions are made exclusively based on the information gathered by case managers. In making placement decisions, the FFS can meet with children and reviews "information provided at the UAC's referral/transfer request and the information gathered by the case manager/FFS." DX-09 [Antkowiak Decl.] ¶ 24 (emphasis added). This includes information discussed at staff meetings related to a UAC's eligibility for step-up or step-down. Furthermore, transfers to residential treatment centers also include psychiatric or psychological evaluations; psychiatric hospitalization records and discharge summary (if applicable); and clinical, psychological and psychiatric progress notes which are typically provided by the clinician. Ex. 2 [ORR MAP] § 1.4.2 at 83; Ex. 35 [Smith Dep. Tr.] at 99:12-100:8; DX-26 [Heath Dep.] 216:8-22 ("Q: Can a child present any additional information to you that you can take into consideration for step-down? A: Always."). *See also* DX-20 [David Dep.] 7:17-8:12 ("Q: Do you have much direct contact with the children? A: Yes. |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | Q: Can you explain just the circumstances where that would occur?  A: There are times where I would meet with children or they request to meet with me.  Q: What would be the type of thing that a child would ask to meet with you about?  A: To discuss their case.  Q: And would that include your decision on their safe and timely release?  A: It allows them to provide me with information or talk to me about their case.  That supports decisions that I make.  Q: Okay.  So other than the decision on release, what other types of decisions that you make would a child have occasion to talk to you about?  A: I've spoken to children in regards to their placement."); DX-41 [De La Cruz LR Decl.] ¶ 35 ("Since my employment in 2004, I have been personally involved in children's cases when a concern about a case has been elevated by a parent, a care provider staff, an attorney, medical providers, consular staff, or the child him or herself.  This concern and attention to transparency continue today; and all FFS are attentive to stakeholder concerns.  In fact, on almost any day, I am working with an FFS to resolve a case brought to their attention by an attorney, sponsor, child advocate, or other interested party.").  *See* Defs.' Evidentiary Objection ¶ 168. |
| 169. | The information and evidence FFS rely on in making step-up and step-down decisions is not always accurate.  Ex. 24 [Heath Dep. Tr.] at 211:5–12 | Disputed to the extent it implies that FFS decisions are based on inaccurate information.  While "not everything in the UAC portal is necessarily accurate" and there have been times where "a document in the UAC portal [ ] was inconsistent with [the FFS's] understanding of the case," placement decisions are made based on the documents in the UAC portal as well as |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | "clinical recommendations and the case manager and the case coordinator recommendations."  Ex. 24 [Heath Dep. Tr.] at 211:5-18.  Plaintiffs point to no evidence that the information itself that ORR relies upon is inaccurate.<br><br>*See* Defs.' Evidentiary Objection ¶ 169. |
| 170. | ORR's written policy does not require FFS to interview children before making a final step-up and step-down decision.<br><br>Joint Stip. ¶ 68 | Undisputed. |
| 171. | An FFS did not interview Class Representatives Lucas R., Gabriela N., Daniela Marisol, Sirena P., or Benjamin F. before stepping them up to Shiloh RTC. Notes in their case files show they met with their Case Managers to discuss their case.<br><br>Joint Stip. ¶ 69 | Undisputed. |
| 172. | An FFS did not interview Class Representative Jaime D. before stepping him up to Yolo secure. Jaime D. met with his Case Manager to discuss his case.<br><br>Joint Stip. ¶ 70 | Undisputed. |
| 173. | ORR's policy does not require FFS to communicate with a child's potential custodian before making a step-up or step-down decision. | Undisputed. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Joint Stip. ¶ 71 | |
| 174. | ORR policies do not require an FFS to consult with an FFS Supervisor or anyone else regarding step-up except for placement into OON facilities.<br><br>Ex. 23 [Fink Dep. Tr.] at 23:15–21, 169:5–25; Ex. 1 [ORR Policy Guide] § 1.2 at 22–23; Ex. 2 [ORR MAP] § 1.4, at 89; Ex. 18 [De La Cruz Dep. Tr.] at 58:19–59:3, 133:16–21, 135:14–24, 137:12–17; Ex. 35 [Smith Dep. Tr.] at 83:11–84:1 | Disputed to the extent it implies that it is ORR's policy and practice for FFS to make unilateral step-up decisions.  It is ORR's policy and practice that when ORR transfers a UAC from one facility to another, or determines a more restrictive level of placement remains warranted, it does so only after a consultation process occurs between the case manager, the case coordinator, and the FFS.  The FFS (along with the case manager and case coordinator) can also consult with the FFS Supervisor for Special Populations, the Senior Advisor for Child Well-Being, the Senior FFS Supervisor, the Division of Health and Unaccompanied Children, members of the ORR Division of Policy and  Procedure, and the Deputy Director of ORR on step-up decisions.<br><br>Defs.' U.F. ¶¶ 49, 51, 53; Ex. 35 [Smith Dep. Tr.] at 83:16-20 ("I would invite my supervisor to attend if I wanted her to hear a case update that was maybe a more complex case."); Ex. 23 [Fink Dep. Tr.] at 23:19-21 ("I'm not sure of any requirements.  I know that if it's a complicated case they will reach out to their supervisor to staff it.").<br><br>*See* Defs.' Evidentiary Objection ¶ 174. |
| 175. | FFS have not received formal training on the differences between therapeutic staff-secure, staff- secure, and RTC placements.<br><br>Ex. 35 [Smith Dep. Tr.] at | Disputed to the extent Plaintiffs' use of the word "formal" is a statement of opinion, not fact and to the extent it mischaracterizes testimony by omitting relevant portions of the transcript.  *See* Ex. 35 [Smith Dep. Tr.] at 37:21-24 ("Q: Do you remember receiving any training up step-ups? A: I recall learning – |

95

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | 37:21–24; Ex. 23 [Fink Dep. Tr.] at 55:1–5; Ex. 39 [Vergara Dep. Tr.] at 97:11–25 | learning about it and reviewing the policy, but not a formal training."); Ex. 23 [Fink Dep. Tr.] at 55:1-5 ("Q: Do you believe that the FFSs have been trained on and understand the differences between a therapeutic staff secure, a staff secure and a residential treatment program?  A: Some have, yes."); Ex. 39 [Vergara Dep. Tr.] at 97:22-25 ("Q: Do you know whether any of the FFSs that you supervise have received training about therapeutic staff secure placement? A: I don't remember."); DX-16 [De La Cruz Dep.] 233:2-13 ("Q: As the senior FFS supervisor, do you ensure that FFS receive the guidance they need to do their jobs?  A: Yes, sir. Q. Do you expect that FFS will ensure that grantee care provider programs know and follow ORR policy? A: Yes, sir. Q: And in your experience, do FFS ensure that grantee care provider programs know and follow ORR policy? A: Yes.").<br><br>ORR's Division of Policy and Procedures develops training on matters of policy and for "step up in particular, the Policy team ensures that personnel that are involved in step-up, including ORR care providers, case managers and clinicians, case coordinators, and ORR federal staff (specifically FFS and FFS Supervisors), are adequately trained."  DX-10 [Biswas Decl.] ¶ 14.<br><br>*See* Defs.' Evidentiary Objection ¶ 175. |
| 176. | Although ORR uses the criteria whether a child is a "danger to self or others" to determine step-up or step-down eligibility, ORR employs no standardized metric | Disputed. The standard ORR applies is set forth by Congress under the TVPRA, 8 U.S.C. § 1232(c)(2)(A), in which ORR is required to determine that a child "poses a danger to self or others" prior to placing the child in a secure |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
|  | to determine whether a child meets this standard, *i.e.*, the child is a danger to self or others.<br><br>Ex. 24 [Heath Dep. Tr.] at 96:19–22, 97:23-25, 98:1-4; Ex. 1 [ORR Policy Guide] § 1.2.1 at 23 (placement consideration "danger to self" and "danger to the community"); *id.* § 1.2.4 at 24 (secure placement criteria includes "danger to self or others"); *id.* § 1.4.2 at 29 ("[s]tep downs may occur when ORR, in its discretion, determines the UAC no longer poses a danger to himself or others"); *id.* § 1.4.6 at 30 (RTC placement criteria – danger to self or others) | facility.  8 U.S.C. §1232(c)(2)(A) ("A child shall not be placed in a secure facility absent a determination that the child poses a danger to self or others or has been charged with having committed a criminal offense.").<br><br>The multiple factors articulated in the ORR Guide § 1.2.4 are meant to determine, whether when taken together, a child is a danger to self or others.<br><br>*See* Defs.' Evidentiary Objection ¶ 176. |
| 177. | ORR employs no evidentiary standard in deciding whether a child should be stepped up or stepped down.<br><br>Ex. 1 [ORR Policy Guide] § 1 (no evidentiary standard articulated for step-up or step-down decisions); Ex. 5 [RFA 1st Set] No. 97 at 508–09; Ex. 6 [RFA 2nd Set] No. 112 at 531; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 74:7-11, 76:23–77:22 | Disputed to the extent it implies ORR is required to employ a legal evidentiary standard in a child-welfare context, which is not adversarial in nature.  *See* 8 U.S.C. § 1232(c)(2)(A) (A UAC in the custody of HHS "shall be promptly placed in the least restrictive setting that is in the best interest of the child… A child shall not be placed in a secure facility absent a determination that the child poses a danger to self or others or has been charged with having committed a criminal offense.").  The decision to transfer an unaccompanied alien child to a more restrictive placement is based on consideration of multiple factors as articulated in the ORR Guide at §1.2.4, which are documented in the case files |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | and provided upon demand to the child's counsel of record, legal services organization, or Child Advocate." Ex. 5 [RFA 1st Set] No. 97 at 508-09. |
| 178. | ORR provides no guidance on how to weigh placement considerations under ORR Policy Guide § 1.2.1.<br><br>Ex. 1 [ORR Policy Guide] § 1.2.1 at 23 (absence of guidance or direction on how to weigh these factors); Ex. 2 [ORR MAP] § 1.2.1 at 65 (same) | Disputed.  Whether the ORR Guide provides guidance is a statement of opinion, not fact.  In addition, the ORR MAP operationalizes the Guide, and provides extensive instructions, and is meant to be read together with the Guide.  Placement decisions are made based on established child-welfare principles and multiple factors articulated by the ORR Guide and the ORR Policy Team provides guidance and training on how to implement ORR policy.<br><br>ORR Guide §§1.2.4, 1.4.2; DX-10 [Biswas Decl.] ¶ 14; DX-67 [Biswas 30(b)(6) Dep. Supp.] 435:19-436:18.<br><br>*See* Defs.' Evidentiary Objection ¶ 178. |
| 179. | ORR does not require that a child be provided prior notice that he or she may be stepped up or the reasons for step-up.<br><br>Joint Stip. ¶ 73 | Undisputed. |
| 180. | Class Representatives Lucas R. Gabriela N., Daniela Marisol, Sirena P., Jaime D., and Benjamin F. were stepped up without being provided written notice of the basis for restrictive placement prior to step-up.<br><br>Joint Stip. ¶ 74 | Undisputed. |

98

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| 181. | ORR does not require that a parent or other potential custodian receive prior written notice that a child is going to be stepped up.<br><br>Ex. 1 [ORR Policy Guide] § 1 (absence of any reference to notice to a child's parent or potential sponsor); Ex. 2 [ORR MAP] § 1.4 at 88 (only referring to verbal notification to "UAC's approved contacts"); Ex. 31 [Padilla Dep. Tr.] at 89:12–24 | Undisputed. |
| 182. | Class Representatives Lucas R., Gabriela N., Daniela Marisol, Sirena P, Jaime D., and Benjamin F.'s potential sponsors were not provided written notice of the basis for restrictive placement prior to the child being stepped-up.<br><br>Joint Stip. ¶ 75 | Undisputed. |
| 183. | ORR requires that children be given a form notice of placement ("NOP") within 48 hours following step-up to a secure, staff secure or in-network RTC placement. The NOP is the means by which ORR informs a child of the reason for step-up.<br><br>Ex. 2 [ORR MAP] § 1.2.4 at 65; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 65:2–6, 79:1–5, 330:17–22; Ex. 35 [Smith Dep. Tr.] at 129:7–15; | Disputed to the extent it states the NOP is only provided within 48 hours *following* placement. The ORR Guide provides that "[w]hen a UAC is stepped up to a more restrictive setting (secure, staff-secure or RTC facility), he/she is provided with a *Notice of Placement in Restrictive Setting* in a language that he/she understands within a reasonable time either *before* or *after* ORR's placement decision." ORR Guide § 1.4.2 (emphasis added). |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Ex. 19 [David Dep. Tr.] at 145:3–10, 147:10–20; Ex. 23 [Fink Dep. Tr.] at 83:19–24; Ex. 16 [Contreras Dep. Tr.] at 116:1–3 | |
| 184. | ORR's procedures do not require that a child receive a NOP within 48 hours of placement in TAR or RTC facilities (*i.e.*, out-of-network facilities).<br><br>Ex. 2 [ORR MAP] § 1.2.4 at 65; *id.* § 1.4.6 at 100–01 (no reference to the same "within 48-hour" language). | Disputed. It is ORR's policy and practice that when a UAC is stepped up to a more restrictive setting, he/she is provided with a NOP of the grounds for their placement in a language that he/she understands within a reasonable time (48 hours) either before or after the placement. ORR Guide § 1.4.2; Defs.' U.F. ¶ 54. |
| 185. | A child placed in a therapeutic group home does not receive a NOP.<br><br>Ex. 2 [ORR MAP] § 1.2.4 at 65–66 (no mention of whether a child in a therapeutic group home would receive a NOP); Ex. 23 [Fink Dep. Tr.] at 151:5–8 | Undisputed to the extent a therapeutic group home is no more restrictive than non-secure shelters and thus, ORR MAP § 1.2.4 "Secure and Staff Secure Care Provider Facilities" requirements would not apply.  DX-67 [Biswas 30(b)(6) Dep. Supp.] 328:16-25 ("A therapeutic group home . . . [is] a smaller scale shelter that . . . has a therapeutic component to it so more clinical services that might be more - - that are more specialized or targeted to a particular population."); DX-71 [De La Cruz Dep. Supp.] 45:24-46:3 (Therapeutic group home more closely aligned with long-term foster care, but with a more therapeutic setting or milieu.).<br><br>*See* Defs.' Evidentiary Objection ¶ 185. |
| 186. | The NOP is supposed to inform a child in a restrictive setting of the reason for the placement and their right to challenge the placement. | Undisputed. |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Ex. 41 [Ray Dep. Ex. 115] at 122728; *see* Ex. 1 [ORR Policy Guide] § 1.2.4 at 24 ("ORR provides the youth notice of the reasons for placement in a secure or staff secure facility."); Ex. 18 [De La Cruz Dep. Tr.] at 154:1–16; Ex. 33 [Ray Dep. Tr.] at 85:5–11 | |
| 187. | The NOP states that: "ORR will review your placement at a minimum, every 30 days to determine whether your placement in a restrictive level of care is still necessary. If you remain in a secure facility or RTC after 30 days, you may request that the ORR Director reconsider your placement. For more information on the process, please ask your case manager. If you believe you have not been properly placed or that you have been treated improperly, you may also ask a Federal District court to review your case. You may call a lawyer to assist you."<br><br>Joint Stip. ¶ 76 | Undisputed. |
| 188. | Stepped up children do not always receive a NOP within 48 hours after arrival at a restrictive placement.<br><br>Ex. 16 [Contreras Dep. Tr.] at 119:17–20; Ex. 33 [Ray Dep. Ex. 119]; Ex. 126 at 1948 (█████) | Disputed to the extent it implies that it is common for stepped-up children not to receive a NOP within 48 hours of placement in a restrictive setting, or that ORR has a practice of not providing notice within 48 hours.<br><br>Ex. 16 [Contreras Dep. Tr.] at 119:17-120:2 ("Q: Has there ever been an instance when a |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| |  Ex. 123 at 1928 (▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 124 at 1934, 1936 (▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 125 at 1940, 1943 (▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ ); Ex. 29 [Nathan-Pineau Dep. Tr.] at 60:1–10 | child has not received the notice of placement within the initial 48 hours? A: Yes. Q: And do you remember how many times that's happened? A: Once or twice. Q: Do you know why that happened? A: Their arrival occurred over a long weekend or something related to case managers not being – or not during business hours."); DX-10 [Biswas Decl.] ¶ 52 ("When ORR first started doing the compliance reviews [for secure placements, including timely notice], it did return noncompliant cases, but since then, the reviews have resulted in almost 100 percent compliance."). *See also* DX-11 [ORR Juvenile Coord. Rep.] at 30 (Flores compliance team reviews every NOP to ensure compliance); DX-74 [Fink Dep. Supp.] 85:13-16 (noncompliance more regarding uploading and reporting NOPs to ORR); Defs.' U.F. ¶ 59 ("In November 2018, when ORR first started doing its compliance reviews through the monitoring panel, there were noncompliant cases, but since then, the reviews have resulted in almost 100 percent compliance for secure placements."). <br><br> *See* Defs.' Evidentiary Objection ¶ 188. |
| 189. | Stepped up children do not consistently know or understand the reasons for restrictive placement. <br><br> Ex. 24 [Heath Depo. Tr.] at 283:21– 284:15; Ex. 70 [K.S.G.P. Decl.] ¶ 2; Ex. 82 [Y.A.M.S. Decl.] ¶ 42; Ex 65 [D.S.J.L. Decl.] ¶ 4; Ex. 44 [Ray Dep. Ex. 119] at 1264 (noting | Disputed to the extent Plaintiffs' use of the phrase "do not consistently know or understand" is speculative.  It is ORR's practice and policy that when a UAC is stepped up to a more restrictive setting, the UAC is provided with a NOP regarding the grounds for their placement in a language that he/she understands.  Furthermore, the assigned case manager at the ORR grantee care facility reviews the NOP with the UAC in a language the UAC understands, which the minor is asked |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | non- compliance issue of "[n]ot citing evidence for placement basis in NOP") | to sign and date. The case manager is available to answer the child's questions about placement and reunification efforts, among others.<br><br>Defs.' U.F. ¶¶ 54, 56, 57; DX-09 [Antkowiak Decl.] ¶¶ 26, 27 (describing what is contained in the NOP).  *See also* DX-50 [Fink MAS Decl.] ¶ 27 (minor received NOPs at least monthly), DX-44 [Fink JD Decl.] ¶¶ 15-17 (Jaime D. received and signed NOPs, Jaime D. signed that he withdrew request for bond hearing).<br><br>The declarations that Plaintiffs cite are from children who have long, complex and severe mental health histories and for whom acute psychiatric symptoms made them a danger to themselves or others, and necessitated their immediate step-up to an RTC for safety reasons. The children had an opportunity to participate in meetings with care provider staff and to ask questions about their own care and need for intensive psychiatric treatment, as evidenced by their signatures on acute case review meeting notes, although the severity of their mental illness may have compromised their full understanding.  *See, e.g.*, DX-84 at 385-409 (K.S.G.P.'s clinician at St. PJs shelter recommended that she be stepped up for the second time to Shiloh RTC because she had been " |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | ███████████"; K.S.G.P. was stepped up to Shiloh RTC following an ████████████ ██████████████████████████████ and upon the recommendation of the hospital's psychiatrist; once placed at Shiloh RTC, K.S.G.P. participated in individual therapy sessions, and in treatment team meetings to discuss her own care.); DX-84 at 142-48, 410-26 (Y.A.M.S was stepped up to Shiloh RTC from SWK Mesa shelter when he ████ ██████████████████████████ he was able to participate in meetings at Shiloh RTC concerning his care, but despite the ██████ ███████████████████████████████ ████); DX-84 at 43-45, 371-84 (D.S.J.L who was diagnosed with ███████████████ ████████, was stepped up to Shiloh RTC from SWK Rio Grande because ████████████ ████████ Upon intake, D.S.J.L.'s judgment was ████████████████████████ ████████████." D.S.J.L., however, was likewise able to participate in meetings regarding his care.)

*See* Defs.' Evidentiary Objection ¶ 189. |
| 190. | Stepped up children are not consistently informed and sometimes do not understand that they may contest restrictive placement.

Ex. 33 [Ray Dep. Tr.] at 89:14– | Disputed.  It is ORR's practice and policy that when a UAC is stepped up to a more restrictive setting, he/she is provided with a NOP that explains, among others, the UACs ability to challenge their placement before the ORR Director or in federal court, in a language that he/she understands.  Furthermore, the assigned |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | 90:4, 92:8–93:5, 94:17–95:3, 95:18–96:1, 212:16–213:15, 216:7-25; 218:12-23; Ex. 40 [Ray Dep. Ex. 113] at 1120 ("No staff were aware of minor's right to challenge secure placement . . . No one has been communicating this right to minors"); Ex. 24 [Heath Dep. Tr.] at 283:21-284:15; Ex. 65 [J.M.R.R. Decl.] ¶ 4; Ex. 67 [K.L.F. Decl.] ¶ 8; Ex. 62 [D.S.J.L. Decl.] ¶ 4 | case manager at the ORR grantee care facility reviews the NOP with the UAC in a language the UAC understands, which the minor is asked to sign and date.<br><br>Defs.' U.F. ¶¶ 54, 56, 57, 59; DX-09 [Antkowiak Decl.] ¶¶ 26, 27 (describing what is contained in the NOP); DX-10 [Biswas Decl.] ¶ 52 ("When ORR first started doing the compliance reviews [for secure placements, including timely notice], it did return noncompliant cases, but since then, the reviews have resulted in almost 100 percent compliance."). |
| 191. | ORR's written policy does not require that a child's NOP be provided to the child's parents or other potential sponsors.<br><br>Joint Stip. ¶ 77 | Undisputed. |
| 192. | ORR's policy does not require that the NOP include documents or other evidence supporting the step-up decision.<br><br>Ex. 13 [Biswas Dep. Tr.] at 69:16– 70:9; *see* Ex. 1 [ORR Policy Guide] § 1.2.4 at 24 (no reference to including these documents or evidence); Ex. 2 [ORR MAP] § 1.2.4, at 65–66 (same); *id.* § 1.4.2 at 91 (same); *id.* § 1.4.2, Fig. 1.12 at 94 (evidence used for 30-day review available upon demand by UAC's attorney); *id.* at 123–24 | Undisputed.  However, as a matter of practice, "secure placements such as Shenandoah Valley Juvenile Center include in the NOP the full summary of information presented by the case manager to the FFS used to make the decision. Thus, the NOP in these cases contains all the information that the case manager and case coordinator reviewed in recommending whether a child should be stepped up or remain in a more restrictive placement."  DX-10 [Biswas Decl.] ¶ 43.  In addition, all information used in assessing a 30-day Case Review decision is shared with the UAC's attorney of record, legal service provider or Child Advocate on demand and does not require a prior Authorization for Release of |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | Records, only proof of representation.  Ex. 2 [ORR MAP] at § 1.4.2 at 89. |
| 193. | ORR's policy does not afford children an opportunity to challenge a step-up prior to placement in a restrictive setting.<br><br>Ex. 5 [RFA 1st Set] No. 93 at 506–07; Ex. 1 [ORR Policy Guide § 1 at 22–33; *id.* § 1.4.7 at 30; Ex. 19 [David Dep. Tr.] at 143:10-14; Ex. 55 [Londino Expert Rep.] ¶ 14 at 1369 | Disputed.  Before a child is stepped up, the case manager will have met with the child, often repeatedly, to discuss the child's placement and reunification efforts, and it is during that time that the child would provide information regarding step-up.<br><br>DX-62 [Dr. Londino Expert Rep.] ¶ 14; Ex. 35 [Smith Dep. Tr.] at 97:7-16 ("The step up wouldn't just happen out of nowhere. There would be behaviors and rationale for meeting a step-up criteria, so the child would have been probably on a behavioral plan or working with their case manager to try to mitigate the need to be stepped up."); DX-26 [Heath Dep.] 76:9-13 ("Q: Aside from your understanding that the child is notified, is the child involved in the staffing of a step-up decision? A: Yes. Q: Is that always the case? A: When it's feasible, yes.").  *See also* Fact Response ¶ 197; Defs.' U.F. ¶ 50 ("ORR's practice [is] that when assessing a possible transfer, care providers must consider[, among others,] … information from stakeholders such as the UAC's legal service provider, attorney of record, or child advocate."). |
| 194. | In practice, ORR does not provide an opportunity to challenge a step-up prior to placement in a restrictive setting.<br><br>ECF 144 [Answer] ¶¶ 52, 81, 90; Ex. 79 [P.D.O.P. Decl.] ¶ 4; Ex. 66 [J.S.C.M. Decl.] ¶ 6-7; Ex. 60 | Undisputed.  However, before a child is stepped up, the case manager will have met with the child, often repeatedly, to discuss the child's placement and reunification efforts, and it is during that time that the child would provide information regarding step-up.<br><br>DX-62 [Dr. Londino Expert Rep.] ¶ 14; DX-28 |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | [C.J.A.L. Decl.] ¶ 7; Ex. 61 [D.D.R.O. Decl.] ¶ 3; Ex. 64 [H.A.R.M. Decl.] ¶ 5 | [Smith Dep.] 97:7-16 ("The step up wouldn't just happen out of nowhere. There would be behaviors and rationale for meeting a step-up criteria, so the child would have been probably on a behavioral plan or working with their case manager to try to mitigate the need to be stepped up."); DX-26 [Heath Dep.] 76:9-13 ("Q: Aside from your understanding that the child is notified, is the child involved in the staffing of a step-up decision? A: Yes. Q: Is that always the case? A: When it's feasible, yes."). *See also* Fact Response ¶ 197. |
| 195. | Class Representatives Lucas R., Gabriela N., Daniela Marisol, Sirena P., and Benjamin F. were stepped up to an RTC, and Jaime D. was stepped up to secure juvenile detention without being provided an evidentiary hearing to challenge the step-up decision.<br><br>Joint Stip. ¶ 79 | Undisputed. |
| 196. | ORR's policy does not allow children to present evidence on their own behalf before they are stepped up.<br><br>Ex. 1 [ORR Policy Guide] § 1 at 22–33; Ex. 5 [RFA 1st Set] No. 99 at 510–12; Ex. 29 [Nathan-Pineau Dep. Tr.] at 17:8–14; Ex. 36 [Stuart Dep. Tr.] at 100:13–22 | Disputed.  Before a child is stepped up, the case manager will have met with the child, often repeatedly, to discuss the child's placement and reunification efforts, and it is during that time that the child would provide information on their own behalf regarding step-up.<br><br>DX-28 [Smith Dep.] 97:7-16 ("The step up wouldn't just happen out of nowhere. There would be behaviors and rationale for meeting a step-up criteria, so the child would have been probably on a behavioral plan or working with their case manager to try to mitigate the need to be stepped up."); DX-26 [Heath Dep.] 76:9-13 ("Q. Aside from your understanding that the |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | child is notified, is the child involved in the staffing of a step-up decision? A. Yes. Q. Is that always the case? A. When it's feasible, yes."). *See also* DX-62 [Dr. Londino Expert Rep.] ¶ 14 (ORR's policy concerning step-ups in care to restrictive settings for UACs "with significant mental health needs are consistent with the management of acute mental health needs in domestic children in foster care, where assent by the minor is not required for placement, and decisions are made by the state child welfare agency to prioritize safety."); Fact Response ¶ 197; Defs.' U.F. ¶ 50. |
| 197. | ORR's policy does not provide children with the opportunity to inspect or rebut adverse evidence before step-up. Ex. 1 [ORR Policy Guide] § 1 at 22–33; Ex. 35 [Smith Dep. Tr.] at 97:21– 99:17; Ex. 36 [Stuart Dep. Tr.] at 100:13-22; Ex. 33 [Ray Dep. Tr.] at 202:10–22; Ex. 24 [Heath Dep. Tr.] at 85:16–23, 86:2–9; Ex. 19 [David Dep. Tr.] at 176:2–14 | Disputed.  Before a child is stepped up, the case manager will have met with the child, often repeatedly, to discuss the child's placement and reunification efforts, and it is during that time that the child would provide information regarding step-up. DX-62 [Dr. Londino Expert Rep.] ¶ 14; DX-28 [Smith Dep.] 97:7-16 ("The step up wouldn't just happen out of nowhere. There would be behaviors and rationale for meeting a step-up criteria, so the child would have been probably on a behavioral plan or working with their case manager to try to mitigate the need to be stepped up."); DX-26 [Heath Dep.] 76:9-13 ("Q: Aside from your understanding that the child is notified, is the child involved in the staffing of a step-up decision? A: Yes. Q. Is that always the case? A: When it's feasible, yes."); DX-67 [Biswas 30(b)(6) Dep. Supp.] 54:25-55:4-7 (Leading up to 30-day review, the child is "meeting with their case·manager who goes over their case with the child and talks to |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | them about, you know, their behavior and that sort of thing."). *See, e.g.*, DX-52 [Vergara DMT Decl.] ¶¶ 34 (Case notes show case manager, lead clinician, and assigned clinician met with Daniela Marisol T. to notify her and explain the reasons for transfer), 41 (at Shiloh Daniela Marisol T. met with her Case Manager on a weekly basis), 47 (her placement was sometimes reviewed weekly), 54 (Daniela Marison T. met with her case manager on at least a weekly basis); DX-52 [Vergara GN Decl.] ¶¶ 28, 42, 44; DX-50 [Fink MAS Decl.] ¶ 16; DX-41 [De La Cruz LR Decl.] ¶¶ 8, 30, 35. |
| 198. | Class Representatives Lucas R., Gabriela N., Daniela Marisol T., Sirena P., and Benjamin F. were stepped up to an RTC, and Jaime D. was stepped up to secure juvenile detention without being provided an opportunity to inspect or rebut adverse evidence in an evidentiary hearing regarding step- up or placement in a restrictive setting.<br><br>Joint Stip. ¶ 80 | Undisputed. |
| 199. | ORR does not provide children the opportunity to cross-examine witnesses in an evidentiary hearing regarding step-up or placement in a restrictive setting.<br><br>Joint Stip. ¶ 81 | Undisputed with respect to formal cross-examination. *But see* Fact Response ¶ 216 (discussing Placement Review Panel hearing in which minor may provide evidence and review evidence against him or her). |
| 200. | Class Representatives Lucas R., Gabriela N., Daniela Marisol, Sirena P., and Benjamin F. were | Undisputed. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | stepped up to an RTC, and Jaime D. was stepped up to secure juvenile detention without being provided an opportunity to cross-examine witnesses in an evidentiary hearing regarding step-up or placement in a restrictive setting.<br><br>Joint Stip. ¶ 82 | |
| 201. | ORR does not permit children to request reconsideration or otherwise challenge step-up until after they have spent 30 days in a secure facility or RTC.<br><br>Ex. 5 [RFA 1st Set] No. 99 at 510–12; Ex. 6 [RFA 2nd Set] No. 105 at 528–29; *id.* No. 120 at 536; Ex. 1[ORR Policy Guide] § 1.4.7 at 30; Ex. 2 [ORR MAP] at Appendix 1.3 Notice of Placement in Restrictive Setting 123–24; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 77:23–78:7; Ex. 24 [Heath Dep. Tr.] at 140:3–11; Ex. 19 [David Dep. Tr.] at 157:12–19; Ex. 55 [Londino Expert Rep.] ¶ 14 at 1369 | Disputed.  ORR continually assesses minors in its care and documents significant updates in its records.  There is no prohibition against children requesting reconsideration or otherwise challenging a step-up until after they have spent 30 days in a secure facility or RTC.  Furthermore, as Plaintiffs negotiated in the *Flores* Settlement Agreement, a UAC may challenge placement by seeking judicial review in federal court at any time.  UACs may also request a bond hearing to challenge their placement in secure and staff secure facilities if they have been placed there based upon a finding of dangerousness to self or others.<br><br>Defs.' U.F. ¶¶ 63, 64; ORR Guide §§ 1.4.7; 2.9; Ex. 13 [Biswas 30(b)(6) Dep.] 73:25-74:13. *See* Fact Response ¶¶ 202, 216. |
| 202. | ORR policy does not afford children an opportunity to request reconsideration or otherwise challenge step-up to staff-secure, therapeutic staff-secure facilities or therapeutic group homes. | Disputed.  As Plaintiffs negotiated in the *Flores* Settlement Agreement, a UAC may challenge placement by seeking judicial review in federal court at any time.  UACs may also request a bond hearing to challenge their placement in secure and staff secure facilities if they have been placed there based upon a finding of |

110

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Ex. 1 [ORR Policy Guide] § 1.4.7 at 30 (only referring to ORR director review option for secure and RTC placements); Ex. 2 [ORR MAP] § 1.4.7 at 102 (same); Ex. 24 [Heath Dep. Tr.] at 133:20–134:11 | dangerousness to self or others. Furthermore, it is ORR's policy and practice that UACs placed in a secure facility or a residential treatment center can challenge that placement by the ORR Director or the ORR Director's designee after 30 days of placement.<br><br>Defs.' U.F. ¶¶ 63, 64, 65; ORR Guide §§ 1.4.7; 2.9. *See* Fact Response ¶¶ 203, 216.<br><br>*See* Defs.' Evidentiary Objection ¶ 202. |
| 203. | Stepped up children rarely seek reconsideration or otherwise challenge step-up through ORR's director review process.<br><br>Ex. 13 [Biswas 30(b)(6) Dep.] 94:5– 14; Ex. 24 [Heath Dep. Tr.] at 130:13–19, 137:24–138:5; Ex. 35 [Smith Dep. Tr.] at 132:11–18; Ex. 14 [Castaneda Dep. Tr.] at 81:12– 82:20; Ex. 19 [David Dep. Tr.] at 160:7–18; Ex. 23 [Fink Dep. Tr.] at 155:2–12 | Disputed to the extent Plaintiffs' use of the term "rarely" is a statement of opinion, not fact.<br><br>*See* Defs.' Evidentiary Objection ¶ 203. |
| 204. | The request for reconsideration by the ORR Director does not include a hearing with the right to present evidence or confront adverse evidence.<br><br>Ex. 1 [ORR Policy Guide] § 1.4.7 at 30 (no mention of right to request hearing or any form of hearing with right to present evidence or confront evidence); *compare with id.* § 2.7.8 at 50 | Disputed. The Placement Review Panel (PRP) comprises three ORR staff-personnel with several years of professional experience in the fields of child welfare, mental health, and related policy. ORR Director review occurs through the PRP and ensures that the UAC (or his/her attorney of record) reviews any evidence supporting the UACs continued placement at the secure setting. UACs are permitted to provide the PRP with a written statement and/or request a hearing and it is the UACs decision whether to have either a written |

111

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | (when appealing a denial of release to a parent or legal guardian, policy is clear that the person challenging the decision can request a hearing with an opportunity to present evidence and testimony) | statement or a hearing or both.  After reviewing the evidence, the PRP provides the UAC with a written decision regarding their placement.<br><br>DX-10 [Biswas Decl.] ¶ 59; DX-11 [ORR Juvenile Coord. Rep.] at 32; Defs.' U.F. ¶¶ 67-74. |
| 205. | Although a child who ORR steps up may request a *Flores* bond hearing before an immigration judge, the outcome of the bond hearing has no determinative outcome on the child's level of placement in ORR custody.<br><br>Ex. 6 [RFA 2nd Set] No. 105 at 528–29 ("ORR…takes into consideration the immigration judge's decision"); Ex. 1 [ORR Policy Guide] § 1.4.2 at 28–29 (same); *id.* § 2.9 at 54 ("An immigration judge does not rule on any of the following…the unaccompanied alien child's placement… while in ORR custody."); Ex. 29 [Nathan-Pineau Dep. Tr.] at 47:9–23; Ex. 42 [Ray Dep. Ex. 116] at 1257 ("The judge's determination does not automatically change the child's placement in a particular care provider facility) | Disputed.  While ORR is not bound by the immigration judge's bond hearing determination, ORR takes the immigration judge's decision into consideration in determining whether a UAC should be stepped down.<br><br>Defs.' U.F. ¶ 66.  *See also* DX-02 [Biswas 30(b)(6) Dep.] 106:8-13 (An immigration judge's decision that a child is not too dangerous to be released is "considered as evidence that the child is not a danger to self or others" for purposes of placement.).<br><br>*See* Defs.' Evidentiary Objection ¶ 205. |
| 206. | Stepped up children rarely, if ever, seek federal court review of restrictive placement without the assistance of counsel. There were | Disputed to the extent Plaintiffs' use of the phrase "rarely, if ever" is a statement of opinion, not fact.  Further disputed as Plaintiffs' assertion is based on a limited universe of |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | only 9 instances of habeas petitions found within the Defendants hundreds of thousands of produced documents.<br><br>Ex. 86 at 1579; Ex. 87 at 1583; Ex. 88 at 1586; Ex. 89 at 1589; Ex. 90 at 1593; Ex. 91 at 1596; Ex. 108 at 1842–43 (▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮); Ex. 110 at 1851 (▮▮▮▮▮▮▮▮▮▮▮); Ex. 98 at 1764 (subject line "BDAC habeas case") | documents produced in discovery based largely on search terms (proposed by Plaintiffs) for electronic discovery negotiated between the parties that cannot purport to capture the entire universe of habeas petitions filed by minors in ORR custody.<br><br>*See* Defs.' Evidentiary Objection ¶ 206. |
| 207. | All 50 states and the District of Columbia require a hearing before a neutral factfinder before a child can be detained in a secure facility.<br><br>Ex. 54 [Expert Report of Professor Jessica Heldman ("Heldman Expert Rep.")] at 1356–57 | Disputed.  Plaintiffs' cited report does not support Plaintiffs' assertion that all jurisdictions require a pre-placement, not post-placement, hearing.  Ex. 54 [Heldman Expert Rep.] at 1356–57 ("[A]ll 50 states and the District of Columbia require a hearing before a neutral arbiter *to be held within 48 hours* of a juvenile being detained in a secure facility.") (emphasis added).  *See also* DX-35 [Dr. Lubit Expert Rep.] ¶ 61 ("It is not standard practice for courts or other 'neutrals' to become involved before the person is even sent to a structured facility.  This is especially the case with children.").<br><br>Further disputed to the extent it implies that the Juvenile Justice Delinquency Prevention Act, which governs the juvenile justice system, applies to ORR placement decisions, rather than the TVPRA (particularly 8 U.S.C. § 1232(c)(2)(A) directing the Secretary to prescribe procedures for monthly review of |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | secure placement), the Homeland Security Act, and the *Flores* Settlement Agreement. *See* Defs.' Evidentiary Objection ¶ 207. |
| 208. | A majority of states also require a hearing before a neutral factfinder before a child can be detained in a staff-secure facility. Ex. 54 [Heldman Expert Rep.] at 1356–57 | Disputed.  Plaintiffs' cited report is premised on an incorrect definition of "staff secure." The report defines "staff secure" as a "residential facilit[y] in which physical restriction is provided solely by staff."  DX-82 [Heldman Expert Rep.] at p. 6.  *See* also DX-70 [Heldman Dep. Supp.] 104:16-20 ("The staff secure facility would be one in which staff are primarily – or staff are given the ability to physically restrain children from leaving"). But, an ORR staff-secure facility employs no physical restraints of any kind.  Rather, ORR staff-secure facilities maintain the same state licensing and physical set-up as a shelter, with the primary difference being a higher staff-to-minor ratio in the former.  Plaintiffs point to *no* evidence that automatic hearings are required by the majority of states for such placements, let alone that automatic hearings are required by due process.  Defs.' U.F. ¶¶ 38, 39, 40.  *See also* DX-12 [ORR Juvenile Coord. Rep.] at 27 ("staff-secure providers maintain identical type of licensure as a non-secure provider"); DX-10 [Biswas Decl.] ¶ 30 (staff-secure facilities provide heightened level of staff supervision, increased communication, and services to control problem behavior and prevent escape). *See* Defs.' Evidentiary Objection ¶ 208. |
| 209. | ORR's Policy Guide requires that stepped up children receive a placement review at least once every thirty days they spend in a | Undisputed. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | restrictive placement.<br><br>Joint Stip. ¶ 84; Ex. 1 [ORR Policy Guide] § 1.4.2 at 28 ("At least every 30 days, the care provider staff, in collaboration with the Case Coordinator and the ORR/FFS, reviews the placement of a UAC") | |
| 210. | ORR's Policy Guide provides that step-downs may occur when ORR, in its discretion, determines the UAC no longer poses a danger to himself or others, or no longer presents an escape risk (for staff secure step downs only).<br><br>Joint Stip. ¶ 49; Ex. 1 [ORR Policy Guide] § 1.4.2 at 29 | Undisputed. |
| 211. | Stepped up children may receive a placement review earlier than 30 days only if an FFS approves the request.<br><br>Ex. 1 [ORR Policy Guide] § 1.4.2 at 28 ("FFS may allow the review to take place earlier than 30 days") | Disputed to the extent it implies that ORR's policy and practice is for an FFS to reject requests for a placement review despite care providers showing that "new information makes clear an alternate placement is more appropriate so that the UAC may be transferred to a more appropriate care setting without delay." ORR Guide § 1.4.2. |
| 212. | ORR sometimes fails to provide children with a 30-day placement review.<br><br>Ex. 44 [Ray Dep. Ex. 119] at 1264 (citing non-compliance issue of "[n]ot providing a NOP every 30 days"); Ex. 45 [Ray | Disputed to the extent it implies it is a common occurrence or that ORR's practice or policy is to fail to provide children with a 30-day placement review. *See* DX-11 [ORR Juvenile Coord. Rep.] at 30 (Flores compliance team reviews every NOP to ensure compliance); DX-74 [Fink Dep. Supp.] 26:7-11 (Flores compliance team), 85:13-16 (noncompliance |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Dep. Ex. 120] at 1266 (email from policy analyst Faith Ray to FFS on 11/28/18 regarding a UAC who had not had a case review since 6/30/18) | more regarding uploading and reporting NOPs to ORR); DX-02 [Biswas 30(b)(6) Dep.] 53:19-24; 54:2-4 (same); DX-10 [Biswas Decl.] ¶ 51 (central office compliance team reviews placements in and step-ups to secure, staff-secure, and RTC facilities); Ex. 44 [Ray Dep. Ex. 119] at 1264 ("[I]ssues are now being addressed by the FFS and care provider staff."); Ex. 45 [Ray. Dep. Ex. 120] at 1266 (noting just one case where Portal failed to show a secure review). *See* Defs.' Evidentiary Objection ¶ 212. |
| 213. | Stepped up children are not permitted to participate in or submit evidence for 30-day placement reviews.\n\nEx. 1 [ORR Policy Guide] § 1; Ex. 2 [ORR MAP] § 1; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 54:16–22, 92:2–7; Ex. 16 [Contreras Dep. Tr.] at 147:11–13; Ex. 6 [RFA 2nd Set] No. 114 at 532–33 ("Defendants admit that unaccompanied alien children do not have the opportunity to present witnesses or evidence before they are stepped down to a less restrictive setting") | Disputed.  "Leading up to the time of the 30-day review, ORR requires that the case manager meet with the UAC on a weekly basis to go over the UAC's case with him or her, and discuss their behavior and improvements." DX-10 [Biswas Decl.] ¶ 48; Defs.' U.F. ¶ 61.  The minor's account of improvements and their behaviors is evidence that the case manager, case coordinator, and FFS consider.  *See also* Fact Response ¶ 204 (discussing PRP process).\n\n*See* Defs.' Evidentiary Objection ¶ 213. |
| 214. | Class Representatives Lucas R., Gabriela N., Daniela Marisol, Sirena P., Jaime D., and Benjamin F. participated in case management meetings with their Case Managers, but they were not a part of the case staffing | Undisputed. |

116

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | meetings that occurred between Case Managers, Clinicians, Case Coordinators, and the FFS to discuss their cases.<br><br>Joint Stip. ¶ 87 | |
| 215. | ORR does not require that children be allowed an opportunity to inspect the evidence ORR personnel will consider in conducting 30-day placement reviews.<br><br>Ex. 1 [ORR Policy Guide] § 1.4.2 at 28–29; Ex. 2 [ORR MAP] § 1.4.2 at 90–95; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 76:2–12; 73:25–74:6 | Disputed.  "Leading up to the time of the 30-day review, ORR requires that the case manager meet with the UAC on a weekly basis to go over the UAC's case with him or her, and discuss their behavior and improvements. . . . Although the child does not participate in the 30-day review, they are provided with the outcome and the evidence that is relied on in determining that continued placement is warranted." Biswas Decl. ¶ 48; Defs.' U.F. ¶ 61.  *See also* Fact Response ¶¶ 204 (discussing PRP process), 213. |
| 216. | ORR does not allow children an opportunity to cross-examine witnesses who supply information considered in determining whether they will be stepped down.<br><br>Ex. 1 [ORR Policy Guide] § 1 at 22–33; *id.* § 1.4.2 at 28–29; Ex. 2 [ORR MAP] § 1 at 90–95; Ex. 6 [RFA 2nd Set] No. 116 at 534–35 | Disputed to the extent it implies there is no opportunity for children to rebut FFS statements in examining step-down. *See* DX-11 [ORR Juvenile Coord. Rep.] at 32 (holding a hearing (if elected); DX-10 [Biswas Decl.] ¶ 59; Fact Response ¶ 204 (discussing PRP process). |
| 217. | Class Representatives Lucas R., Gabriela N., Daniela Marisol, Sirena P., Jaime D., and Benjamin F. were not provided an opportunity to cross-examine witnesses in an evidentiary hearing regarding eligibility for step-down. | Undisputed. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Joint Stip. ¶ 89 | |
| 218. | ORR has erroneously stepped up children to restrictive placements.<br><br>ECF No. 144 [Answer] ¶ 75; Ex. 33 [Ray Dep. Tr.] at 148:16–22, 152:14–153:22; 157:10–158:17, 162:7–10, 163:14–164:12; 166:23–167:7; Ex. 43 [Ray Dep. Ex. 117] at 1261–62; Ex. 139 [Ray Dep. Ex. 118] at 2028 ("the NOP was so vague and did not contain enough information to know if [minor] is an actual danger to self or others"); Ex. 44 [Ray Dep. Ex. 119]; Ex. 16 [Contreras Dep. Tr.] at 71:3–12, 75:11–76:1, 76:18–77:3, 77:5–78:1, 80:2–17, 105:5–106:22, 113:12–114:17; Ex. 22 [Fields Dep. Tr.] at 123:5–16, 172:7–15; Ex. 23 [Fink Dep. Tr.] at 40:13–17, 153:8–13; Ex. 24 [Heath Dep. Tr.] at 98:5–16, 99:3–7; Ex. 14 [Castaneda Dep. Tr.] at 74:13-76:7, 88:21–90:9; Ex. 27 [Meyerstein Dep. Tr.] at 225:19– 226:6; Ex. 20 [Eich Dep. Tr.] at 108:7–109:5; Ex. 96 at 1757 ("some of the minors were inappropriately placed in secure") | Disputed to the extent it omits relevant information or mischaracterizes evidence and implies that it is common or ORR's policy or practice to erroneously step up children to restrictive placements.<br><br>*See, e.g.,* Ex. 16 [Contreras Dep. Tr.] at 155:1-5 ("Q: Okay.  Would you agree that, if a child remains at Shenandoah after they have already been approved for step down, that child is in an inappropriate placement? A: Yes."); DX-44 [Fink JD Decl.] ¶¶ 24-27; (Shortly after being stepped up to Yolo, Jaime D. recanted his account of committing violent acts in his home country, the basis for his step-up to Yolo, thus leading the staff to conclude that Yolo was not the correct placement); Ex. 33 [Ray Dep. Tr.] at 148:16-22 (noting that one instance of noncompliance was for a child that had been charged with a crime, but "the charges were later dropped, and that was the basis for the child's placement in secure"); Ex. 16 [Contreras Dep. Tr.] at 71:3-22 (discussing an instance where case manager recommended against admission but FFS made the decision to place the child at Shenandoah and "informed [the case manager] of the FFS's thought process or reasons for wanting to admit the child to Shenandoah"); DX-81 [Fields Dep. Supp.] at 172:7–173:6 (noting that UACs are "screened better if they are referred to staff secure, especially if the presenting problem is mental health" and "if they require a higher level of treatment on top, that is not being met, then they are referred to a facility that would |

118

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | accommodate that need"). |
| 219. | ORR has erroneously refused children step-down from restrictive placement.<br><br>Ex. 16 [Contreras Dep. Tr.] at 155:1– 5; ECF No. 144 [Answer] ¶ 75; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 348:12–24, 393:1–7; Ex. 33 [Ray Dep. Tr.] at 170:19–23; Ex. 35 [Smith Dep. Tr.] at 82:20–83:5, 162:16–163:8; Ex. 24 [Heath Dep. Tr.] at 212:16–23; Ex. 18 [De La Cruz Dep. Tr.] at 162:3–16, 163:7–164:5; Ex. 17 [Cook Dep. Tr.] at 197:21–25; Ex. 28 [Murray Dep. Tr.] at 193:10–17, 156:18–23, 158:6–21, 170:3–7, 184:20-189:4, 192:18–193:4; Ex. 47 [Murray Dep. Ex. 162] ("I have several cases at yolo that are in need of RTC but our RTC keep rejecting them."); Ex. 16 [Contreras Dep. Tr.] at 151:17–152:8; Ex. 22 [Fields Dep. Tr.] at 148:8–23; Ex. 39 [Vergara Dep. Tr.] at 129:15–130:17, 257:6–10 | Disputed to the extent it omits relevant information or mischaracterizes evidence and implies that it is common or ORR's policy or practice to erroneously refused children step-down from restrictive placements.<br><br>*See, e.g.,* DX-67 [Biswas 30(b)(6) Dep. Supp.] 348:12-24 (discussing that it can take "several days" to find a facility to take the child, but not supportive of conclusion that such operational realities make the determination a "refusal" or "erroneous"; nor that any real-world system could instantaneously find placement for a child immediately after a determination is made), 349:1-21 (discussing procedures to ensure minor is stepped down expeditiously), 351:12-23 (seeking additional facilities, additional beds and bringing them on line can take up to nine months); ORR Guide § 1.3.3 ("After ORR requests a placement in a particular facility, the care provider may only deny ORR's request for placement" for reasons outside of ORR's control.").<br><br>Further, Plaintiffs assert that two weeks after Jaime D. was transferred to Yolo, the Yolo staff were "all in agreement that [Jaime] isn't appropriately placed in a secure setting," but that Jaime D. remained at Yolo for another three weeks following that determination. The determination that Jaime D. was not appropriately placed in a secure setting, however, came only after Jaime D. arrived at Yolo and "recanted his account of committing violent acts in his home country," thus |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | requiring the case manager to begin the process of seeking a less restrictive setting.  Ex. 16 [Contreras Dep. Tr.] at 155:1-5; DX-44 [Fink JD Decl.] ¶¶ 24-27; DX-83 at 14. *See* Defs.' Evidentiary Objection ¶ 219. |
| 220. | ORR policies and practices for placing children in restrictive settings are inconsistent with accepted state and federal child welfare practice. Ex. 54 [Heldman Expert Rep.] at 1350 | Disputed to the extent it implies ORR's policies and practices should be adjudged as compared to juvenile justice systems or dependency proceedings for children removed from their family homes, rather than the TVPRA (particularly 8 U.S.C. § 1232(c)(2)(A) directing the Secretary to prescribe procedures for monthly review of secure placement), the Homeland Security Act, and the *Flores* Settlement Agreement.  DX-70 [Heldman Dep. Supp.] 25:10-16 (juvenile justice and state child welfare systems governed by Federal statutes: the Social Security Act, the Child Abuse Prevention and Treatment Act, the Adoption and Safe Families Act; and the Juvenile Justice Delinquency Prevention Act.). *See* Fact Response ¶¶ 207, 208. Further disputed to the extent it implies that ORR policies and practices for placing children in restrictive settings falls below accepted standards for state and federal child welfare practice.  ORR's policies, procedures, and practices "concerning UACs either meet or exceed the standards of care for domestic children in out of home care in the United States with regard to placement in the least restrictive environment."  DX-13 [Dr. Earner Expert Rep.] ¶¶ 3, 4 ("ORR policies, procedures, and practices ensure that UACs are maintained safely in the least restrictive |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | environment."), 42 ("ORR-funded facilities follow child welfare practices in assessment, placement and unification of UAC"), 47 (noting that the "type of case management that is present at the ORR facilities is in keeping with the standards of excellence in domestic child welfare"); DX-14 [Dr. Mohn Expert Rep.] ¶ 21 ("I'm able to conclude that the ORR standards are best practice – and also that the standards are also followed in practice."). *See* Defs.' Evidentiary Objection ¶ 220. |
| 221. | ORR's placement of children in RTCs is more financially expensive than placing them in shelters. Joint Stip. ¶ 90 | Undisputed. |
| 222. | ORR steps up relatively few children. Joint Stip. ¶ 91 | Undisputed. |
| 223. | As of March 13, 2020, 14 of the total 3,621 children in ORR in-network care were detained in a secure facility, 17 were placed in an RTC, 30 were placed in a staff- secure facility, 6 were placed in a therapeutic staff-secure facility, and 13 were placed in therapeutic group homes. Ex. 93 at Ex. 93 at Census Tab, at Row J at 1630–1745 (Program_Type) (number of children detained in ORR custody | Disputed to the extent the count fails to account for individuals in staff-secure or other settings who are reflected in the Out-of-Network tab, but have as their home-shelter the facility listed in census tab. *See* Ex. 93 at 1630. *See* Defs.' Evidentiary Objection ¶ 223. |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | as of March 13, 2020) | |
| 224. | As of March 13, 2020, 11 children were placed in out-of-network RTCs.<br><br>Ex. 93 at Out of Network Placements Tab, at Row A at 1746 (children placed in OON RTC as of March 13, 2020) | Disputed, as the report notes, "This data is in reference to all UAC referred to ORR care in the month of February 2020." *See* Ex. 93 at 1630.<br><br>*See* Defs.' Evidentiary Objection ¶ 224. |
| 225. | ORR denies that the principal reason it does not afford Class Members greater procedural protections against unnecessary step-ups is because it would entail greater expense and administrative inconvenience.<br><br>Ex. 6 [RFA 2nd Set] No. 107 at 529–30 | Disputed to the extent it states that ORR does not afford Class Members procedural protection. *See* DX-10 [Biswas Decl.] ¶¶ 57-60 (discussing PRP process for seeking Director review and how children are reminded of such right). Further disputed to the extent it implies that cost and administrative inconvenience are dispositive factors in whether ORR provides "great procedural protections" as opposed to the lack of any evidence suggesting that "greater procedural protections" would meaningfully improve child welfare outcomes. *See* DX-35 [Dr. Lubit Expert Rep.] ¶¶ 3, 61 ("Plaintiffs want there to be a neutral decision maker and time for the UAC to challenge a restrictive placement before being moved. They fail to note that delaying the move risks harm to the individual child and others; the risk of harm to self or others that led to the decision to transfer to a more secure setting does not disappear while waiting for the decision of an outside person. It is not standard practice for courts or other 'neutrals' to become involved before the person is event sent to a structured facility. This is especially the case with children."); DX-30 [Dr. Ryan Expert Rep.] ¶ 47 ("[P]laintiffs have not offered any evidence that |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | categorical, mandatory consultation with a child's legal representative before decisions are made would improve child welfare outcomes in the areas of placement, release, and other ORR decisions."); DX-09 [Antkowiak Decl.] ¶¶ 33-37 (discussing how time and expenditures on additional procedures would detract from current responsibilities, limit willingness of licensed care providers to work with ORR, require hiring of numerous additional attorneys and interfere with inability to predict census); DX-67 [Biswas 30(b)(6) Dep.]  444:16-446:12 (costs of more adversarial process include interfering with collaborative process and would be detrimental to children. Also costs of time, as FFS's and care providers would have less time to work on cases of other children if spending time on an adversarial process; taking funding away from other services; distrust between children and ORR ("they're kids and we're trying to do what's in their best interest, and I don't think that always means sitting in a courtroom.")). |
| 226. | Plaintiff Class Members are typically indigent, speak little or no English, and have little or no knowledge of the United States' legal system.<br><br>ECF No. 144 [Answer] ¶ 146; Ex. 6 [RFA 2nd Set] No. 141 at 538-39 | Disputed to the extent Plaintiffs' use of the phrase "little or no knowledge" is speculative and Plaintiffs' proffered evidence does not support this statement.  Defendants further note that ORR provides all UACs with "[l]egal services information, including the viability of free legal assistance, the right to be represented by counsel at no expense to the government, the right to a removal hearing before an immigration judge, the right to apply for voluntary departure or to request voluntary departure in lieu of deportation."  ORR Guide §3.3; Defs.' U.F. ¶ 81. |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | *See* Defs.' Evidentiary Objection ¶ 226. |
| 227. | ORR is required to ensure "to the greatest extent practicable" that children from noncontiguous countries have counsel to represent them "in legal proceedings or matters and protect them from mistreatment." <br><br> 8 U.S.C. § 1232(c)(5) | Disputed, to the extent the statement limits access to counsel to UACs "from noncontiguous countries." 8 U.S.C. § 1232(c)(5) contains no such limitation, instead commanding that the "Secretary of [HHS] shall ensure, to the greatest extent practicable and consistent with [8 U.S.C. § 1362], that all unaccompanied alien children who are or have been in the custody of the Secretary or the Secretary of Homeland Security, and who are not described in section (a)(2)(A), have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." <br><br> *See* Defs.' Evidentiary Objection ¶ 227. |
| 228. | ORR and care provider facilities are required to provide children with information about the availability of free legal assistance and their right to be represented by counsel. <br><br> Ex. 1 [ORR Policy Guide] § 2.2.5 at 38-39; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 400:13–18 | Undisputed with respect to Plaintiffs' assertion that ORR and its care provider facilities are required to provide children with information about the availability of free legal assistance and the right to representation by counsel. Disputed to the extent Plaintiffs' suggest that class members have a right to government-paid counsel to challenge ORR placement or release. Further disputed to the extent it implies that ORR Guide § 2.2.5 discusses legal services for children, when, in fact, it concerns the legal orientation program for children's custodians and not legal representation for children. Further disputed as Plaintiffs' cited testimony merely states that children receive a list of free legal services. Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 400:13–18. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| 229. | The U.S. Department of Health and Human Services ("HHS") contracts with the Vera Institute of Justice ("VIJ"), a non-profit organization, to coordinate the delivery of free legal services to children who are or have been in ORR custody.<br><br>Ex. 6 [RFA 2nd Set] No. 138 at 537 | Undisputed. |
| 230. | ORR has a legal services contract with VIJ that funds limited scope direct representation for children in immigration-related matters.<br><br>Joint Stip. ¶ 97 | Undisputed. |
| 231. | VIJ in turn subcontracts with non- profit legal aid providers to counsel and represent children in immigration proceeding.<br><br>Ex. 6 [RFA 2nd Set] No. 138 at 537 | Undisputed. |
| 232. | VIJ is a contractor whose scope of work is to implement regional programs providing limited scope legal services to children.<br><br>Joint Stip. ¶ 98 | Undisputed. |
| 233. | The vast majority of Class Members are represented, if at all, by legal service providers under subcontract with VIJ.<br><br>Ex. 30 [Ortiz Dep. Tr.] at 77:7–18; Ex. 29 [Nathan-Pineau Dep. | Undisputed, to the extent reference is to representation relating to immigration status or proceedings. DX-02 [Biswas 30(b)(6) Dep.] 68:2-8; 400:1-8. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Tr.] at 61:5–62:2 | |
| 234. | ORR does not require Case Coordinators to communicate with Class Members' legal counsel.<br><br>Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 118:3–11; Ex. 37 [Sualog Dep. Tr.] at 130:23–131:21 | Disputed to the extent it implies case coordinators do not meet with UACs' legal counsel.  Case coordinators are responsible for maintaining stakeholder relations and thus, are able to communicate with legal counsel for UACs at their discretion.<br><br>Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 118:3-11; ORR Guide. § 2.3.3.  *See* Fact Response ¶ 260; Defs.' U.F. ¶ 16. |
| 235. | In practice, children's counsel rarely, if ever, communicate with Case Coordinators or FFS.<br><br>Ex. 28 [Murray Dep. Tr.] at 124:1– 25; Ex. 30 [Ortiz Dep. Tr.] at 32:11- 22; Ex. 29 [Nathan-Pineau Dep. Tr.] at 22:16–23:9; Ex. 24 [Heath Dep. Tr.] at 50:20–51:10; Ex. 25 [Husted Dep. Tr.] at 176:4–25 | Disputed to the extent Plaintiffs' use of the phrase "rarely, if ever" is a statement of opinion, not fact.  *See also* Fact Response ¶ 260. |
| 236. | Although ORR policy provides that "Case Manager[s] inform[] other stakeholders of the progress" toward releasing a child, it does not require Case Managers to inform children's lawyers of such progress. Instead, ORR policies say that "other stakeholders" "may include local legal service providers and attorneys of record."<br><br>Ex. 1 [ORR Policy Guide] § 2.3.2 at 39-40 | Disputed. The ORR Guide's requirement that case managers inform "other stakeholders of the progress of a child's case" includes a UAC's attorney of record, and this requirement is mandatory.<br><br>ORR Guide § 2.3.2; DX-10 [Biswas Decl.] ¶¶ 18, 44, 91; DX-02 [Biswas 30(b)(6) Dep.] 69:10-70:1 ("We require case managers to provide general case updates to attorneys of record"); DX-09 [Antkowiak Decl.] ¶ 61 ("Attorneys of record are always permitted to be in contact with care provider case managers to determine the status of release."); DX-68 |

126
Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
|  |  | [Sualog Dep. Supp.] 101:24-102:4 ("ORR may have policies and procedures regarding ensuring that case managers or facilities update, update attorneys and in my experience attorneys and case managers who have been on site visits in the past interacting in the facility."), 102:9-19 ("Q: Would there be any consequences if a facility as a whole were to preclude case managers from speaking directly with children's lawyers? A: There would be consequences …ORR has requirements that basically mandates access to facilities, to children and to the facility as a whole to legal service providers."). |
| 237. | In practice, Case Managers have discretion to communicate—or not—with Class Members' lawyers. In some facilities, children's lawyers do not even know who a client's Case Manager is.<br><br>Ex. 37 [Sualog Dep. Tr.] at 101:8–21; Ex. 30 [Ortiz Dep. Tr.] at 28:4–30:22; Ex. 29 [Nathan-Pineau Dep. Tr.] at 20:4–25 | Disputed to the extent Plaintiffs' use of the phrase "in practice" is a statement of opinion, not fact and because the ORR Guide's requirement that case managers inform "other stakeholders of the progress of a child's case" includes a UACs attorney of record.<br><br>ORR Guide § 2.3.2; DX-10 [Biswas Decl.] ¶¶ 18, 44, 91;  DX-02 [Biswas 30(b)(6) Dep.] 69:10-70:1 ("We require case managers to provide general case updates to attorneys of record"); DX-09 [Antkowiak Decl.] ¶ 61 ("Attorneys of record are always permitted to be in contact with care provider case managers to determine the status of release.").<br><br>*See* Defs.' Evidentiary Objection ¶ 237. |
| 238. | ORR does not require FFS to communicate directly or regularly with children's legal counsel.<br><br>Ex. 37 [Sualog Dep. Tr.] at | Disputed.  It is ORR's practice that FFS serve as a local liaison to community stakeholders (including other federal agencies, local legal service providers, communities, child advocates, etc.). |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | 119:1–16; Ex. 38 [Deposition Transcript of Stephanie Treviño, Mar. 5, 2020 ("Treviño Dep. Tr.")] at 100:10–13 | Defs.' U.F. ¶ 13; DX-09 [Antkowiak Decl.] ¶ 15 ("The process for stepping up a child is multi-disciplinary and iterative, based on the observations and input of numerous professionals – most of whom are independent of the care providers making the requests to transfer the child – and where attorneys can weigh in, informally, if they wish."). *See also* Fact Response ¶ 241 (ORR policy and practice of FFS openness to communicating with attorney of record); DX-66 [Ortiz Dep.] 62:4-12, 68:4-14; 70:10-19 (discussion with FFS). |
| 239. | In practice, FFS exercise discretion to communicate or not with children's lawyers.<br><br>Ex. 24 [Heath Dep. Tr.] at 50:20–23, 86:13–15, 241:15–17; Ex. 38 [Treviño Dep. Tr.] at 95:21–23; Ex. 25 [Husted Dep. Tr.] at 176:22–25; Ex. 35 [Smith Dep. Tr.] at 46:12– 47:3; Ex. 29 [Nathan-Pineau Dep. Tr.] at 18:1–15 | Disputed as Plaintiffs have mischaracterized by omitting relevant language. *See, e.g.*, DX-65 [Heath Dep. Supp.] 49:24-51:14 ("Q: Have they ever reached out to you regarding a child's case? A: I've had attorneys ask me about – via email, like 'Can you tell me why it's taking this –this is taking so long to unify?' Yes…Q: And do you ever respond to those emails? A: I do sometimes.  But first I let my supervisor know to make sure that I can."); Ex. 38 [Treviño Dep. Tr.] at 95:21–23 ("Q: Do you communicate with attorneys for children? A: Yes."); Ex. 25 [Husted Dep. Tr.] at 176:22–25 ("Q: In the cases you handled of transfers to staff secure, have you ever had to deal with a child's lawyer? A: I have not personally dealt with the attorney, no."); DX-28 [Smith Dep.] 45:21-24 ("Q: Okay.  Do you communicate with attorneys for the children or the sponsors? A: I communicate with the VERA grantee attorneys here."); Ex. 29 [Nathan-Pineau Dep. Tr.] at 18:8–15 ("Q: So in terms of step-up or step-down, is Ms. David available to speak with you so that you |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | can advocate for your clients' interest in either being stepped down or avoiding a step-up? A: We have reached out to her, and typically the response is that the decision has already been made."). *See also* DX-41 [De La Cruz LR Decl.] ¶35 (Experience of working collaboratively with attorneys and other stakeholders); DX-52 [Vergara GN Decl.] ¶ 11 ("Under ORR policy, when making step-up and release decisions, information provided from a child's stakeholders, including the child's attorney, are taken into consideration. *See* ORR Guide § 1.4, 2.3, 2.3.1, 2.7. I follow these policies in making such decisions. In addition, I am open to communicating with UAC counsel, and will consider any input they offer."). <br><br> *See* Defs.' Evidentiary Objection ¶ 239. |
| 240. | ORR leaves it up to facilities and clinicians to communicate or not with children's legal counsel. <br><br> Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 181:3–13; Ex. 17 [Cook Dep. Tr.] at 66:1–17 | Disputed.  ORR's practice is to require care provider staff to communicate with UAC's attorney of record, legal services provider, or child advocates. <br><br> Defs.' U.F. ¶¶  62, 85; DX-09 [Antkowiak Decl.] ¶¶ 15, 61; DX-10 [Biswas Decl.] ¶¶ 18, 44, 91. <br><br> *See* Defs.' Evidentiary Objection ¶ 240. |
| 241. | Case Managers do not regularly provide children's legal representatives with evidence relied upon in recommending for or against release, nor do children's lawyers receive a copy of the Case Manager's | Disputed to the extent Plaintiffs' use of the word "regularly" is speculative and unsupported by Plaintiffs' cited evidence. Further disputed as ORR's practice is that when a "UAC has his or her own attorney of record, there should be open lines of communication with the case manager to keep the attorney up- |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | recommendation for or against release.<br><br>Ex. 30 [Ortiz Dep. Tr.] at 37:4–38:7 | to-date on the minor's case, and to provide the attorney on demand of any 30-day review of a more restrictive placement."  DX-10 [Biswas Decl.] ¶ 91; DX-09 [Antkowiak Decl.] ¶ 61. *See also* Fact Response ¶ 242. |
| 242. | Case Managers sometimes allow children's counsel to submit affirmative evidence in support of release or non-restrictive placement and sometimes they do not.<br><br>Ex. 30 [Ortiz Dep. Tr.] at 31:11–21, 140:2–9 | Disputed. Plaintiffs' cited evidence does not support this assertion.  DX-66 [Ortiz Dep.] 31:11–21 ("Q. Did Homestead permit AIJ lawyers to provide information about potential sponsors in the United States to case managers? A. I'm not sure if 'permit is the appropriate, simply because there was not a channel of communication to facilitate that."), 140:2–9 ("Q. So if I understand right, AIJ lawyers had her e-mail address -- had Ms. Wood's e-mail address and sent her e-mails, right? A. We were told that we were not to communicate with anyone, that everything had to go through her, that she was the only person who had reliable, accurate information. And then we were told that we sent too many e-mails.").  "ORR policy [is that] when making step-up and release decisions, information provided from a child's stakeholders, including the child's attorney, are taken into consideration."  DX-52 [Vergara GN Decl.] ¶ 11 ("I follow these policies in making such decisions. In addition, I am open to communicating with UAC counsel, and will consider any input they offer."); DX-41 [De La Cruz LR Decl.] ¶ 35 (Experience of working collaboratively with attorneys and other stakeholders); DX-02 [Biswas 30(b)(6) Dep.] 69:10-20 (case managers keep attorneys of record up-to-date on child's case).<br><br>*See* Defs.' Evidentiary Objection ¶ 242. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| 243. | ORR does not permit children's lawyers to see a Case Coordinator's recommendation regarding a client's release.<br><br>Ex. 30 [Ortiz Dep. Tr.] at 38:3–7 | Disputed to the extent the statement implies such disclosure is prohibited.  Plaintiffs' only cited evidence does not support the assertion that there is a prohibition.  Ex. 30 [Ortiz Dep. Tr.] at 38:3–7 ("Q: And when those recommendations would go to the case coordinators, was AIJ ever provided a copy of the recommendation of the case coordinator with respect to release? A: No. Not to my knowledge.").  Lack of knowledge on the part of a single service provider does not establish a policy or practice of not permitting a child's attorney to see the case coordinator's recommendation.<br><br>*See* Defs.' Evidentiary Objection ¶ 243. |
| 244. | FFS are under no obligation to receive evidence regarding a client's release or placement from children's legal counsel, and they rarely, if ever, do so.<br><br>Ex. 29 [Nathan-Pineau Dep. Tr.] at 18:1–7 | Disputed to the extent Plaintiffs' use of the phrase "rarely, if ever" is speculative and unsupported by the evidence Plaintiffs cite.  Ex. 29 [Nathan-Pineau Dep. Tr.] at 18:1–7 ("Q: What kind of ability do you have to speak with Ms. David in order to advocate for your clients? A: We're able to communicate with her by email and phone, but we don't have any sort of regular types of meetings or opportunities for discussion.").  That are no "regular types of meetings or opportunities for discussion" does not establish that FFS's "rarely, if ever" receive evidence of a client's release or placement.<br><br>To the extent it implies that FFS routinely refuse to receive evidence regarding a child's release or placement from children's legal counsel, Defendants respond as follows. FFS serve as local liaison to community stakeholders and coordinate all aspects of a child's case with care provider staff, case |

131
Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | coordinators, and stakeholders.  In making placement decisions, ORR's practice is to require care providers to consider information from a variety of sources, including the UAC's legal service provider, attorney of record, or child advocate. Defs.' U.F. ¶¶ 13, 50.  *See also* DX-66 [Ortiz Dep.] 62:4-12; 68:4-14; 70:10-19; DX-71 [De La Cruz Dep. Supp.] 137:21-138:7.<br><br>*See* Defs.' Evidentiary Objection ¶ 244. |
| 245. | In practice, Class Members' legal representatives are sometimes permitted to provide information about potential custodians for their clients to Case Managers and sometimes they are not.<br><br>Ex. 30 [Ortiz Dep. Tr.] at 31:11–21, 140:2–9 | Disputed.  Plaintiffs' cited evidence does not support this assertion.  *See* Fact Response ¶ 242.<br><br>Furthermore disputed as case managers coordinate the completion of UAC assessments, complete individual service plans, assess potential sponsors, communicate with potential sponsors, make release and transfer recommendations, and coordinate the release of children from ORR custody. When a UAC has his or her own attorney of record, there is an open line of communication with the case manager to keep the attorney up to date on the minor's case.<br><br>Defs.' U.F. ¶¶ 15, 24, 50, 85; DX-10 [Biswas Decl.] ¶ 91; DX-09 [Antkowiak Decl.] ¶ 61 (noting that "[a]ttorneys of record are always permitted to be in contact with care provider case managers to determine the status of release").<br><br>*See* Defs.' Evidentiary Objection ¶ 245. |
| 246. | As a matter of policy and practice, ORR does not regularly provide | Disputed.  Plaintiffs' use of the phrase "does not regularly" is speculative.  Further disputed |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | children's legal representatives a copies of FFS decisions for or against releasing the legal representatives' clients to available custodians.<br><br>Ex. 30 [Ortiz Dep. Tr.] at 38:3–7 | as Plaintiffs' only cited evidence does not support this assertion as the testimony concerns case coordinator recommendations, not FFS decisions.  *See* Fact Response ¶ 243.  The lack of knowledge on the part of a single service provider does not establish a policy or practice of not permitting a UAC's attorney copies of FFS decisions.<br><br>*See* Defs.' Evidentiary Objection ¶ 246. |
| 247. | If a child's counsel wishes to see the evidence and information ORR has for restrictive placement, she or he must formally request a copy of the client's file.<br><br>Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 272:14–23 | Disputed.  It is ORR's policy that when there is a step-up or continued placement in a restrictive placement, that the case manager is required to share all of the information used in assessing the restrictive placement with the UAC's attorney of record, legal service provider, or child advocate, on demand.  "This does not require a request for the full case file, *only proof of representation*.  Such information will include the recommendations of the case manager and case coordinator as well."  DX-10 [Biswas Decl.] ¶¶ 44 (emphasis added), 91; Defs.' U.F. ¶ 85 (requiring case managers to provide case updates to a UAC attorney/LSP in step-up placement); DX-09 [Antkowiak Decl.] ¶¶ 19, 22, 27; Ex. 2 [ORR MAP] § 1.4.2 at 90–91.<br><br>*See* Defs.' Evidentiary Objection ¶ 247. |
| 248. | ORR has no limit on how long it may take to disclose a child's file after counsel requests it and will not release it to counsel until after its headquarters office approves release.<br><br>Ex. 13 [Biswas 30(b)(6) Dep. Tr.] | Undisputed to the extent statement references a formal, written policy.  *See also* Fact Response ¶ 249. |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | at 276:17–277:16; Ex. 37 [Sualog Dep. Tr.] at 139:19–140:19 | |
| 249. | In practice, children's counsel may wait several weeks or months before ORR produces a client's file.<br><br>Ex. 29 [Nathan-Pineau Dep. Tr.] at 16:13–21; Ex. 30 [Ortiz Dep. Tr.] at 41:18–23 | Disputed to the extent it implies it is ORR's policy or practice to take several weeks or months to produce a UAC's file to counsel.<br><br>*See* Defs.' Evidentiary Objection ¶ 249. |
| 250. | When it does produce a client's file, ORR gives children's counsel a version from which the names and contact information of third parties, including those of a child's potential custodians and witnesses to events ORR alleges justify restrictive placement, have been redacted.<br><br>Ex. 16 [Contreras Dep. Tr.] at 228:11–16; Ex. 29 [Nathan-Pineau Dep. Tr.] at 19:23–21:11; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 278:1–9 | Undisputed to the extent statement references practice of redacting personally identifiable information of an applicant sponsor or other children when such individual has not consented to disclosure of his or her information, as would be required under the Privacy Act of 1974.  ORR "ensure[s] compliance with all requirements imposed by Federal statutes concerning the collection and maintenance of data that includes personal identifying information."  ORR Guide § 5.6.2. *See also* ORR Requests for UAC Case File Information at n. 1, *available at:* https://www.acf.hhs.gov/orr/resource/requests-for-uac-case-file-information |
| 251. | ORR allows Class Members' legal representatives no role in the course of its deciding to place or continue a child in staff-secure, residential treatment, or secure facilities.<br><br>Ex. 6 [RFA 2nd Set] No. 146 at 539; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 71:7–17; Ex. 23 [Fink Dep. Tr.] at 155:13–17; Ex. 19 [David Dep. Tr.] at 154:5–8; Ex. 29 | Disputed.  ORR's practice is that when assessing a possible transfer, care providers must consider information from assessment tools, interviews, the location of the UAC's sponsor or family in the United States, applicable records and information from stakeholders such as the UAC's legal service provider, attorney of record, or child advocate.  Furthermore, should the UAC seek to challenge a placement decision via ORR's PRP, the UAC's attorney is given the opportunity to review ORR's evidence in support of continued |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | [Nathan-Pineau Dep. Tr.] at 15:9–21 | placement and the UAC's attorney can provide the PRP with a written statement concerning the UAC's placement.<br><br>Defs.' U.F. ¶¶ 50, 69-71, 69-71; DX-10 [Biswas Decl.] ¶¶ 59, 91; DX-09 [Antkowiak Decl.] ¶¶ 15, 16. *See also* Fact Response ¶¶ 257, 258; ORR Guide § 2.3.2. |
| 252. | ORR affords children's legal representatives no right to submit evidence material to release or non-restrictive placement to Case Coordinators.<br><br>Ex. 28 [Murray Dep. Tr.] at 123:14– 20 | Undisputed to the extent it is limited to a UAC's legal representatives' ability to *directly* submit information to a case coordinator. *But see* Fact Response ¶¶ 251, 257, 258 (regarding ability to share information with case managers, which would then be included in the case files). |
| 253. | ORR does not affirmatively disclose its evidence for placing or continuing clients in staff-secure, residential treatment, or secure facilities to children's counsel.<br><br>Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 272:14–23; Ex. 29 [Nathan-Pineau Dep. Tr.] at 14:14–21 | Undisputed to extent it is limited to whether ORR automatically and affirmatively discloses its evidence concerning placement. *But see* Fact Response ¶ 257 (discussing practice and procedure of sharing information with attorneys of record). *See also* Ex. 2 [ORR MAP] 1.4.2 at 94 ("The case manager uploads all information used in assessing the restrictive placement case review (including the signed Summary Notes) in the UAC Portal. All information used in assessing a 30-day Case Review decision is considered evidence. This information must be shared with the UAC's attorney of record, LSP or Child Advocate, on demand and does not require a prior *Authorization for Release of Records* only proof of representation. "); DX-10 [Biswas Decl.] ¶¶ 43 (Shenandoah Valley Juvenile Center in practice includes in the NOP the full summary of information presented by the case manager to the FFS used to make the |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | decision. Thus, the NOP contains all the information that the case manager and case coordinator reviewed in recommending whether a child should be stepped up or remain in a more restrictive placement.), 44 (emphasis added), 91; Defs.' U.F. ¶ 85 (requiring case managers to provide case updates to a UAC attorney/LSP in step-up placement); DX-09 [Antkowiak Decl.] ¶¶ 19, 22, 27. |
| 254. | ORR does not disclose a child's psychological report to his or her legal representative before relying on it to step-up a child to a secure or psychiatric facility.<br><br>Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 70:5–21 | Disputed to the extent Plaintiffs' cited evidence does not discuss psychological reports.  *See* Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 70:5–21. Further disputed as the UAC's psychological report is included in the evidence the case manager is required to share upon proof of representation.  *See* DX-10 [Biswas Decl.] ¶¶ 44 (emphasis added), 91; Defs.' U.F. ¶ 85 (requiring case managers to provide case updates to a UAC attorney/LSP in step-up placement); DX-09 [Antkowiak Decl.] ¶¶ 19, 22, 27; Ex. 2. [ORR MAP] § 1.4.2 at 94.<br><br>*See* Defs.' Evidentiary Objection ¶ 254. |
| 255. | ORR policy does not require that a child's lawyer be informed that his or her client is being stepped up until transfer to a restrictive placement has been completed, or nearly so.<br><br>Ex. 12 [Deposition Transcript of Toby Biswas ("Biswas Dep. Tr.")] at 233:13–20; Ex. 29 [Nathan-Pineau Dep. Tr.] at 13:15–14:13; Ex. 30 [Ortiz Dep. Tr.] at 71:23–72:4 | Undisputed to extent it is limited to a written policy concerning an affirmative obligation to inform a UAC's lawyer that UAC is being stepped up until transfer to a restrictive placement has been completed, or nearly so. *But see* Fact Response ¶ 257 (discussing practice of informing attorneys prior to transfer and considering their input). |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| 256. | ORR often wakes children in the middle of the night or early in the morning, sending them to psychiatric facilities, juvenile halls, and medium-secure facilities—*i.e.*, unlicensed facilities—without any prior notice or an opportunity to be heard.<br><br>Ex. 80 [Jaime D. Decl.] at ¶¶ 6–7; Ex. 81 [Lucas R. Decl.] at ¶ 5; Ex. 78 [Sirena P. Decl.] at ¶ 4 | Disputed to the extent Plaintiffs' use of the term "often" is a statement of opinion, not fact. Nor do Plaintiffs point to any evidence in support of their assertion that this practice is commonplace, or unnecessary to accommodate early flight times.  *See* DX-44 [Fink JD Decl.] ¶¶ 13("On the day of Jaime D.'s transfer to Yolo, Jaime D. was awakened at approximately 4:00 a.m. to ensure that he was able to depart Cayuga Centers shelter by 7:00 a.m. to make his scheduled flight."), 14 ("Jaime D. was aware that he would be leaving Cayuga Centers shelter, at least two days prior to the date the transfer took place.").<br><br>*See* Defs.' Evidentiary Objection ¶ 256. |
| 257. | ORR has identified no reason for failing to advise Class Members' legal representatives that their clients are to be stepped up prior to transfer.<br><br>Ex. 35 [Smith Dep. Tr.] at 93:1–4; Ex. 9 [Deposition Transcript of Stephen Antkowiak ("Antkowiak Dep. Tr.")] at 159:10–160:4 | Disputed as to whether legal representatives as a matter of practice and procedure are not advised that their clients are to be stepped up prior to transfer.  DX-71 [De La Cruz Dep. Supp.] 137:21-138:7 (attorneys involved before step-up; experience with attorneys); DX-22 [Contreras Dep.] 112:5-16 (facility consults with attorney to determine how transfer will affect legal case).  *See also* Fact Response ¶ 260.<br><br>*See* Defs.' Evidentiary Objection ¶ 257. |
| 258. | ORR policy does not require that a child's lawyer be informed that it will keep a client in a restrictive placement until after a "30-day review" is complete, and then, only if counsel inquires.<br><br>Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 70:5–16; Ex. 16 [Contreras Dep. | Undisputed to extent it is limited to a written policy concerning an affirmative obligation to notify, rather than an obligation to provide information to a UACs attorney of record who requests it and facilities remaining open to receiving information from said attorneys of record. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Tr.] at 148:3–9; Ex. 19 [David Dep. Tr.] at 158:20–159:6 | DX-02 [Biswas 30(b)(6) Dep.] 71:2-6; 72:15-17; 101:19-23 (Counsel are "fairly sophisticated parties," and know how to obtain access.); DX-20 [David Dep.] 158:20-24 (attorneys notified of right to challenge placement), 159:7-8. |
| 259. | ORR does not require that Class Members' legal representatives be informed that their clients are being administered psychotropic drugs.<br><br>Ex. 29 [Nathan-Pineau Dep. Tr.] at 70:1–8 | Undisputed to the extent it is limited to a formal policy concerning a requirement and automatic obligation. Disputed to the extent the sole evidence cited by Plaintiffs in support of this assertion is by an attorney for the Capital Area Immigrant Rights organization, which provides ORR-funded legal representation for UACs on immigration related issues – not other aspects of ORR care and custody. Attorneys representing children *pro bono* or without ORR funding, including for issues like psychotropic medication, always have access to case managers. DX-02 [Biswas 30(b)(6) Dep.] 69:10-13 ("We require case managers to provide general case updates to attorneys of record"), 69:18-29 ("It's a general requirement in the description of what a case manager's role is."); ORR Guide § 2.3.2. |
| 260. | ORR has identified no burden that would result were Class Members' legal representatives to have access to Case Coordinators, which it has permitted in at least some instances in the past.<br><br>Ex. 37 [Sualog Dep. Tr.] at 136:1–23; Ex. 29 [Nathan-Pineau Dep. Tr.] at 23:20–24:24 | Disputed to the extent it implies UAC legal representatives have no access to case coordinators. See DX-02 [Biswas 30(b)(6) Dep.] 118:7-9 ("Case coordinators are responsible for maintaining stakeholder relations, so they would, you know, be able to reach out to attorneys that way."); DX-83 at 37 (Case Coordinators participate in collaborative meetings with stakeholder – which would include attorneys); DX-83 at 38 (Subtask 5.2 of the GDIT Contract requires case coordinator to participate in quarterly stakeholder meetings with legal service providers.). Further disputed |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | to the extent it asserts ORR has identified no burden. *See* DX-67 [Biswas 30(b)(6) Dep. Supp.] 445:7-25; 446:1-12 (Costs of a "more adversarial" process, including FFS time taken away from other services, taking funding away from other services impacts ability to open new programs, award grants, creates distrust between a child and their case manager.).<br><br>*See* Defs.' Evidentiary Objection ¶ 260. |
| 261. | Children's legal counsel have no access to the persons who perform home studies of potential custodians, even though such home studies may be determinative in deciding whether ORR releases a child.<br><br>Ex. 37 [Sualog Dep. Tr.] at 210:24– 11:3; Ex. 30 [Ortiz Dep. Tr.] at 122:4–7; Ex. 29 [Nathan-Pineau Dep. Tr.] at 83:8–84:6; ECF No. 37-13 [Madelyn R. Decl.] ¶¶ 10–13 | Disputed to the extent it implies ORR is obligated to connect a home study worker with UAC's legal counsel.  Further disputed to the extent it implies that as a matter of practice and policy, ORR prohibits a UAC's legal counsel from working with a potential sponsor (or the sponsor's attorney) in connection with a home study.<br><br>*See* Defs.' Evidentiary Objection ¶ 261. |
| 262. | As a matter of policy and practice, ORR leaves it up to Case Managers to provide children's legal representatives with information about potential custodians.<br><br>Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 122:11–24; Ex. 16 [Contreras Dep. Tr.] at 228:11–16; Ex. 29 [Nathan- Pineau Dep. Tr.] at 19:23–21:11 | Disputed to the extent it suggests ORR, as a matter of policy and practice, should affirmatively release the personally identifiable information of applicant sponsors, absent consent from the applicant to share information. Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 122:18-24 ("Q: And are case managers instructed to provide children's lawyers with name and contact information for proposed sponsors?  A: There's nothing specifically prohibiting them from providing names of sponsors, but generally we don't provide other contact information without a sponsor permission."). |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| 263. | ORR's written policies do not guarantee children's counsel's involvement in release and placement decisions.<br><br>*See generally* Ex. 1 [ORR Policy Guide] | Disputed. To the extent UACs have counsel representing them in release and placement decisions, ORR Policies require involvement of attorneys of record.  *See, e.g.,* Ex. 2 [ORR MAP] §§ 1.4 at 79 (transfers involve attorneys and child advocates as appropriate); 1.4.2 at 94 (information must be shared with attorney of record, LSP or Child Advocate on demand and does not require a prior authorization for release of records); 3.2.2 at 290 (notify attorney of discrepancy in birth certificate); 3.3.1 at 301 (notify the UAC's attorney of record or local legal service provide, and child advocate, if applicable, if there is a violent criminal history);  Appendix 3.6 at 348 (interview guidelines for case managers and clinicians to ensure they learn if UAC has or had an attorney); 2.7.1 at 204 (approval of releases emailed to legal services provider or attorney of record); 2.7.4. at 208 (notification of attorney of record, legal service provider, child advocate and home study provider if Category 2A/B or 3 Sponsor is denied); 2.7.8 at 211  (appeal of Category 1 denial); 2.9 at 224 (advise UAC to consult with an attorney, or legal service provider for any legal advice regarding *Flores* bond hearings). |
| 264. | ORR's written policies do not guarantee the right to an interpreter.<br><br>*See generally* Ex. 1 [ORR Policy Guide]; Ex. 53 [Edwards Expert Rep.] at 1341 | Disputed.  ORR requires care providers to provide on-site staff or interpreters as needed and to allow UACs to communicate in their preferred language when they choose. Furthermore, all ORR-documents provided to UAC must be translated in the UAC's preferred language, either written or verbally.  When no written translation (assuming UAC is literate), on-site staff or interpreters are available, translation services should be used. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | ORR Guide § 3.3.7; Defs.' U.F. ¶¶ 54, 57; Ex. 4 [ORR MAP] § 3.3.7 at 312 ("Care providers must make every effort to provide on-site staff or interpreters who speak the native language of each UAC. If staff or on-site interpreters are unavailable in the geographic region of the care providers, they may utilize a paid translation services, such as a telephone-accessible language line."). <br><br> *See* Defs.' Evidentiary Objection ¶ 264. |
| 265. | ORR provided Plaintiffs Lucas R., Daniela Marisol T., Gabriela N., Jaime D., and Sirena P. no legal assistance with respect to release, administration of psychotropic medications, or restrictive placement. <br><br> ECF No. 144 [Answer] ¶¶ 35, 46, 69, 77, 85 | Disputed to the extent it implies ORR did not provide Plaintiffs with access to legal screenings and access to free legal services as described in its policies; or, that case managers, clinicians, case coordinators, and FFSs failed to assist UACs with ensuring proper placement and treatment. <br><br> Lucas R. was provided a know-your-rights presentation, a list of pro bono legal services provider, and a legal screening for possible legal relief from the Cabrini Center 10 days after his arrival at Shiloh on May 31, 2018. *See* Defs.' U.F. ¶ 110. On August 9, 2018, an attorney entered an appearance on his behalf. *Id.* Jaime D., on his first day in ORR custody, received a know-your-rights presentation, was legally screened by a legal services provider, and was provided a list of pro bono legal services provider. *Id.* ¶ 113. Similarly, Daniela Marisol T. provided a signed acknowledgment that she had received a know-your-rights presentation, was legally screened by legal service provider Pro-Bar on August 8, 2016, and provided a list of pro bono legal service |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | providers and received a second know-your-rights presentation upon entering Shiloh. Defs.' U.F. ¶¶ 124-25.  She was also provided a list of pro bono legal service providers and was referred to a child advocate.  *Id.*  ¶ 126. Gabriela N. also received multiple know-your-rights presentations, a legal screening, and was provided the opportunity to meet with attorneys while at Shiloh.  *Id.* ¶¶ 133, 141.  Sirena P. was also apprised of her right to counsel, acknowledged receipt of a know-your-rights presentation, and worked with an attorney to prepare a declaration in connection with this litigation while being treated at Shiloh.  DX-55 [De La Cruz SP Decl.] ¶ 8. |
| 266. | HHS's Administration for Children and Families ("ACF")— of which ORR is a subordinate entity— states, "Numerous studies and reports point to the importance of competent legal representation for parents, children, and youth in ensuring that salient information is conveyed to the court, parties' legal rights are protected and that the wishes of parties are effectively voiced." The ACF exhorts "all child welfare agencies . . . to work together to ensure parents, children and youth . . . receive high quality legal representation at all stages of child welfare proceedings."  Ex. 134 [ACF, High Quality Legal Representation for All | Undisputed that this document states as cited. However, the document is not a fact material to the case, as the current case does not challenge child welfare proceedings, in which children are removed by the state from their custodial homes, often due to abuse or neglect, parental rights may be terminated, and children may be freed for adoption after such termination, thus altering the dynamic of their families.   Ex. 134 at 1995 ("Once a child is removed from home . . . federal law requires that judges make a number of determinations about the safety of the home of removal, the welfare of the child, and that child's permanency plan. . . . A court must review agency decisions about the family, the suitability of the child or youth's temporary placement, and the child's permanency plan that will result in family preservation, reunification, or another permanency goal. . . . The decisions courts make in child welfare proceedings are serious and life changing. Parents stand the possibility of permanently |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Parties in Child Welfare Proceedings Policy] at 1994-95 | losing custody and contact with their children. Children and youth are subject to court decisions that may forever change their family composition."). *See also* DX-09 [Antkowiak Decl.] ¶¶ 50-51 (describing ways in which "ORR is unique among agencies with care and custody of unaccompanied children…"). |
| 267. | In responding to Plaintiffs' Requests for Admission, Defendants failed to identify any state or local jurisdiction that denies children appointed counsel in proceedings to determine whether they may be detained, whether their parents are fit, whether they may be placed in secure juvenile detention facilities or psychiatric treatment centers, or whether they may be administered psychotropic medications.<br><br>Ex. 6 [RFA 2nd Set] Nos. 178–82 at 547-52 | Disputed.  Plaintiffs have failed to include objections lodged by Defendants in response to RFA Nos. 178-82 and Defendants' response to the RFAs stated that "[i]n light of these objections, Defendants are unable to admit this request as worded, and therefore deny it."  Ex. 6 [RFA 2nd Set] Nos. 178–82 at 547-52.<br><br>*See* Defs.' Evidentiary Objection ¶ 267. |
| 268. | ORR's policies and practices regarding the role of counsel in release, step-up, and step-down decisions require Class Members' legal representatives to devote more time and resources to piece together the reasons for clients' restrictive placement or continued detention than they otherwise would. This reduces the ability of children's lawyers to advocate for release or transfer | Disputed to the extent Plaintiffs' use of the term "policies and practices," "devote more time," "pieces together," and "reduces ability" are statements of opinion, not fact.  Further disputed as Plaintiffs' cited evidence pertains to only the experience of a single service provider at one particular facility and does not establish a general policy or policy.  Ex. 30 [Ortiz Dep. Tr.] at 51:7–52:23.  This is particularly true as the individual later praises other facilities for a "very close relationships" with "regular meetings," and "constant communication." Ex-30 [Ortiz Dep. Tr.] at 59:19-24. |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | to a less restrictive setting.<br><br>Ex. 30 [Ortiz Dep. Tr.] at 51:7– 52:23 | *See* Defs.' Evidentiary Objection ¶ 268. |
| 269. | Apart from possibly delaying release, ORR has identified no governmental interest that would be adversely affected were FFS required to have regular communication with Class Members' legal representatives.<br><br>Ex. 37 [Sualog Dep. Tr.] at 136:24– 138:18 | Disputed as Plaintiffs' have mischaracterized by omitting relevant language.  Plaintiffs' assert that the only harm ORR has identified is "possibly delaying release."  But, routine delays in release would adversely affect ORR's ability to provide for the physical and mental well-being of all UACs in its care as undue delay "could affect the minor's behavior toward him or herself, toward other children, and finally toward staff." *See* DX-09 [Antkowiak Decl.] ¶ 34 ("[I]t is important to place the child in a location where their needs can be met without undue delay.  A hearing would prolong placement at a site that cannot meet the individual's needs…This could affect the minor's behavior toward him or herself, toward other children, and finally toward staff.").  *See also* Fact Response ¶ 225 (discussing additional costs associated with Plaintiffs' requested "procedural protections").<br><br>*See* Defs.' Evidentiary Objection ¶ 269. |
| 270. | ORR has not promulgated a regulation nor issued any formal interpretation of "legal proceedings or matters" as that phrase is used in the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232(c)(5).<br><br>Ex. 13 [Biswas 30(B)(6) Dep. | Disputed.  ORR's legal interpretation is within its contract with Vera.  *See* Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 398:10-12 ("It's within our -- it's sort of the underlying basis of our legal service contract. . . ."); DX-83 at 39 (recognizing that UACs are "particularly vulnerable…[and] face a complicated legal system").  Plaintiffs' proposed fact overlooks that ORR has formally stated in notice and comment rulemaking that: "[T]he TVPRA, 8 U.S.C. § 1232(c)(5), does not require that |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Tr.] at 398:3–399:4; Ex. 37 [Sualog Dep. Tr.] at 114:4–9 | counsel be provided at government expense to UACs. Rather, HHS is encouraged to use pro bono services, and the statute specifically says that counsel is at no expense to the government." 84 Fed. Reg. 44392, 44427 (Aug. 23, 2019); *see also id.* at 44481; DX-10 [Biswas Decl.] at ¶ 90 (explaining that the term "proceedings," is also used within the Homeland Security Act, and interpreted by ORR to mean "immigration" "proceedings."); *see generally* DX-85 [Vera Contract Scope of Work]. <br><br> *See* Defs.' Evidentiary Objection ¶ 270. |
| 271. | ORR prohibits legal services providers from using federal funds appropriated in furtherance of the TVPRA to represent children with respect to (i) release to available custodians, (ii) restrictive placement, and (iii) the appropriateness of their taking psychotropic drugs. <br><br> ECF No. 144 [Answer] ¶ 111; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 400:1– 12 | Undisputed, as to the Vera contract as funded per 8 U.S.C. § 1232(c)(5). |
| 272. | ORR views its Congressional appropriation for legal services funding as funding immigration- related legal services. ORR does not view the appropriation as funding other attorney work to represent children with respect to (i) release, (iii) step-up or | Undisputed.  *See* DX-10 [Biswas Decl.] ¶ 90 (stating that decisions on medication, step-up, and release are not legal matters or proceedings, as they are not before an administrative or federal judge; nor do ORR attorneys appear when these decisions are being made, as would occur in a typical "legal" matter or proceeding).  Defendants aver as well that Congress views the appropriation in this |

145

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | step-down, and/or (iii) the administration of psychotropic medications.<br><br>Joint Stip. ¶ 99 | way as well.  *See, e.g.,* EMERGENCY SUPPLEMENTAL APPROPRIATIONS FOR HUMANITARIAN ASSISTANCE AND SECURITY AT THE SOUTHERN BORDER ACT, 2019, 165 Cong. Rec. H5147-01, H5148 (funding for legal services is for the "same purposes" as in fiscal year 2017); H.R. REP. 116-450, 116th Cong., 2nd. Sess., Committee on Appropriations Report on appropriations for FY 2021 ("[L]egal services for unaccompanied children . . . . provided by qualified and independent legal counsel . . .  can increase the efficiency and effectiveness of immigration proceedings, significantly reduce the failure-to-appear rate of children who are released from HHS custody, and help relieve the immigration court backlog. . . . In addition, the Committee strongly encourages ORR to work with legal service providers to develop a strategy to minimize the risks of any child having to go to immigration court without independent legal counsel. . . . The recommendation includes an additional $5,500,000 for legal service providers to recruit and train additional attorneys for the purposes of building the capacity necessary to provide independent representation to unaccompanied children with pending immigration cases."). |
| 273. | Some facilities permit Case Managers to communicate regularly with Class Members' legal representatives, regularly share potential custodians' contact information with children's legal representatives, and freely disclose the basis for any delay in release. | Disputed only to the extent it implies that not all facilities are expected to work with children's legal representatives.  DX-68 [Sualog Dep. Supp.] 102:12 (describing consequences when a shelter precludes case managers from speaking with attorneys), 102:16-19 ("ORR has requirements that basically mandates access to facilities, to |

146

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | Ex. 30 [Ortiz Dep. Tr.] at 59:5–60:4 | children and to the facility as a whole to legal services providers."). |
| 274. | Case Managers are not federal employees but are employed by "care providers": *i.e.*, private facilities with which ORR enters into cooperative agreements to place and care for children in ORR legal custody.<br><br>Joint Stip. ¶ 92; Ex. 1 [ORR Policy Guide] § 2.3.2 at 39-40 | Undisputed. |
| 275. | Case Managers, Case Coordinators, and FFS all routinely review psychological reports before step-up to a restrictive setting is approved.<br><br>Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 275:7–276:16 | Undisputed. |
| 276. | *Flores* Bond hearings put the onus to initiate the hearing and the burden of proof on the unaccompanied child.<br><br>Evidence: Ex. 1 (ORR Policy Guide) § 2.8 at 54-55 ("unaccompanied alien children have the opportunity to seek a bond hearing with an immigration judge…The burden is on the requestor to demonstrate that the child can be released because he or she is not a danger to the community.") | Undisputed.  ORR has explained the policy on bond hearings in its final rule on "Apprehension, Processing, Care, and Custody of Alien Minors." *See, e.g.,* 84 Fed. Reg. 44392, 44477 (Aug. 23, 2019) (explaining that: "In accordance with the Flores district court's order analogizing Flores custody hearings to bond hearings for adults, immigration judges currently apply the standard of . . . . Thus, under current practice, the burden is on the UAC to demonstrate that he or she would not be a danger to the community (or flight risk) if released. Due to the unique vulnerabilities of children and subsequent enactment of the TVPRA, however, HHS requested comments on whether the burden of proof should be on |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | ORR to demonstrate that the UAC would be a danger or flight risk if released."). |
| | | In the final rule, ORR explained that it would alter the burdens that currently are applied by immigration judges in bond hearings – in order to "balance the equities of UACs in care with its responsibility under the FSA to ensure public safety." *Id.* at 44481 (explaining that under the final rule HHS will assume the burden of producing documentation and evidence, which the UAC must then successfully rebut under a preponderance of the evidence standard). ORR has also previously explained that it uses an "opt-in rather than opt-out right" but each minor receives a "notice of the procedures" for bond hearings, and a "form . . . to make a written request for a hearing." Proposed 45 C.F.R. § 410.810(a)(2). Requests can be made by children or their "parents, legal guardians, or legal representatives." 84 Fed. Reg. 44,478. ORR explained that many minors prefer *not* to have a custody hearing given that such a hearing can make placement more difficult, and make a minor's history of danger part of a permanent immigration record. *Id.* (hearings "provid[e] no benefit for the overwhelming majority of UACs" who "are not considered dangerous or flight risks to begin with"). This is borne out by the case files in this case. *See, e.g.,* DX-50 [Fink MAS Decl.] ¶ 28 ("Miguel Angel S.'s attorney requests Yolo not submit request for bond hearing, even after Miguel Angel S. notified Yolo that he would be requesting one.). *Flores* counsel have also |

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|---|
| | | admitted they agreed to an opt-in process under the *Flores* settlement agreement. *See* https://www.ca9.uscourts.gov/media/view_video.php?pk_vid=0000017417 at 47.01-03 ("That was an agreement between the parties."). |

## KEY TO CITATION REFERENCES

| Declaration |
|---|
| Declaration of Attorney W. Daniel Shieh |

| Depositions | |
|---|---|
| Biswas Dep. Supp. (DX-80) | Deposition of Toby Biswas, November 13, 2019 (Supplemental Excerpts) |
| Biswas 30(b)(6) Dep. Supp. (DX-67) | Rule 30(b)(6) Deposition of Toby Biswas, February 18-19, 2020 (Supplemental Excerpts) |
| Castaneda Dep. Supp. (DX-73) | Deposition of Jose Castaneda, November 21, 2019 (Supplemental Excerpts) |
| De La Cruz Dep. Supp. (DX-71) | Deposition of James De La Cruz, March 10, 2020 (Supplemental Excerpts) |
| Dr. Earner Dep. Supp. (DX-69) | Deposition of Dr. Ilze Earner, August 10, 2020 (Supplemental Excerpts) |
| Fields Dep. Supp. (DX-81) | Deposition of Captain Marivic Fields, February 24, 2020 (Supplemental Excerpts) |
| Fink Dep. Supp. (DX-74) | Deposition of David Fink, February 12, 2020 (Supplemental Excerpts) |
| Heath Dep. Supp. (DX-65) | Deposition of Yesenia Heath, February 26, 2020 (Supplemental Excerpts) |

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| Heldman Dep. (DX-70) | Deposition of Prof. Jessica Heldman, July 13, 2020 (Excerpts) |
| Lawrence Dep. (DX-76) | Deposition of Rocio Lawrence, October 1, 2020 (Excerpts) |
| Dr. Matlow Dep. (DX-63) | Deposition of Dr. Ryan Matlow, July 30, 2020 (Excerpts) |
| Murray Dep. Supp. (DX-72) | Deposition of Nidia Murray, December 17, 2019 (Supplemental Excerpts) |
| Nathan-Pineau Dep. Supp. (DX-75) | Deposition of Nithya Nathan-Pineau, August 20, 2019 (Supplemental Excerpts) |
| Ortiz Dep. (DX-66) | Deposition of Michelle Ortiz, August 22, 2019 (Excerpts) |
| Dr. Ruiz Dep. (DX-79) | Deposition of Dr. Javier Ruiz, September 25, 2020 (Excerpts) |
| Dr. Ryo Dep. (DX-77) | Deposition of Dr. Emily Ryo, August 13, 2020 (Excerpts) |
| Sualog Dep. Supp. (DX-68) | Deposition of Jallyn Sualog, August 21, 2019 (Supplemental Excerpts) |

| Expert Reports | |
| --- | --- |
| Dr. Earner Expert Rebuttal Rep. (DX-64) | Expert Rebuttal Report of Dr. Ilze Earner, July 17, 2020[1] |
| Heldman Rep. (DX-82) | Report of Prof. Jessica Heldman, June 19, 2020 |
| Dr. Londino Expert Rep. (DX-62) | Expert Report of Dr. Donna Londino, June 19, 2020[1] (filed under partial seal) |
| Dr. Londino Expert Rebuttal Rep. (DX-78) | Expert Rebuttal Report of Dr. Donna Londino, July 17, 2020[1] |

[1] *Defendants are able to submit a full copy of all documents reviewed by the respective experts in preparing their reports should the Court determine that said documents would aid in the resolution of this motion.*

150

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts

| Exhibits | | |
|---|---|---|
| DX-83 | Case File Excerpts | |
| | (filed under seal) | |
| DX-84 | Case File Excerpts for Fact Response ¶¶ 84, 133, 134, 136, 148, 156, 189 | |
| | (filed under seal) | |
| DX-85 | Vera Contract for Fact Response ¶ 270 | |

Dated November 6, 2020    Respectfully submitted,

           JEFFREY BOSSERT CLARK
           Acting Assistant Attorney General

           SCOTT G. STEWART
           Deputy Assistant Attorney General

           ERNESTO H. MOLINA
           Deputy Director

           CHRISTOPHER A. BATES
           Senior Counsel to the
           Assistant Attorney General

           */s/ W. Daniel Shieh*
           W. DANIEL SHIEH
           BENJAMIN MARK MOSS
           Senior Litigation Counsel

           NANCY K. CANTER
           JONATHAN K. ROSS
           ANTHONY J. MESSURI
           Trial Attorneys
           Office of Immigration Litigation
           United States Department of Justice
           P.O. Box 878
           Ben Franklin Station
           Washington, D.C. 20044
           Telephone: (202) 305-9802
*Counsel for Defendants*     Email: Daniel.Shieh@usdoj.gov

Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts