# DX-62

Expert Report of Dr. Donna Londino, June 19, 2020

** Filed Under Partial Seal

JEFFREY B. CLARK
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
ERNESTO H. MOLINA, JR.
Deputy Director
CHRISTOPHER A. BATES
Senior Counsel to the Assistant Attorney General
BENJAMIN MARK MOSS
W. DANIEL SHIEH
Senior Litigation Counsel
NANCY K. CANTER
ANTHONY J. MESSURI
JONATHAN K. ROSS
Trial Attorneys
Office of Immigration Litigation
U.S. Department of Justice
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-9802
Daniel.Shieh@usdoj.gov

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Lucas R., *et. al.*,<br><br>                    *Plaintiffs*,<br><br>            v.<br><br>Alex M. Azar,<br>Secretary of U.S. Dep't of Health and<br>Human Services, *et al.*<br><br>                    *Defendants*. | Case No.: 18-cv-05741-DMG-PLA<br><br>**DECLARATION OF DR. DONNA L. LONDINO IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

## DECLARATION OF DR. DONNA L. LONDINO

I, Donna L. Londino, declare and state as follows:

1.      I have expertise in child and adolescent psychiatry.  I received my M.D. from the Medical College of Georgia.  I have over 20 years of clinical experience including residential and impatient care of children and adolescents as well as outpatient treatment of both adults and pediatric patients.  I am board certified in both general, and child and adolescent psychiatry.  I am a professor of psychiatry at Augusta University.  I make this Declaration in support of Defendants' Motion for Summary Judgment.

2.      Counsel for Defendants contacted me to provide expert opinion and testimony on the policies and procedures of United States Department of Health and Human Services, Office of Refugee Resettlement ("ORR") with respect to the care and supervision of unaccompanied alien children.  Counsel asked me to review certain materials and thereafter render my opinions, which I did in a June 19, 2020 Expert Report.  On August 3, 2020, I appeared for a deposition and testified regarding the contents of my June 19, 2020 Expert Report.

3.      If called as a witness to this action, I could and would testify competently to the facts and opinions set forth herein, including my June 19, 2020 Expert Report and my August 3, 2020 deposition.

I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct.

Executed this September 18, 2020 at Augusta, Georgia.

Donna L. Londino, M.D.
Declarant

1
Declaration of Dr. Donna L. Londino in Support of Defendants' Motion for Summary Judgment

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

LUCAS R. *et al.*,

        Plaintiffs,

    v.

ALEX AZAR, Secretary of U.S. Dep't of Health and Human Services, *et al.*,

        Defendants.

Case No.: 2-18-CV-05741 DMG (PLA)

**EXPERT REPORT
OF DR. DONNA LONDINO**

## I. BACKGROUND AND RELEVANT EXPERIENCE

1. My name is Donna Londino. My specialist field is child and adolescent psychiatry. I am a professor of psychiatry at Augusta University in Augusta, Georgia. I am a board-certified physician in both general, and child and adolescent psychiatry. I have 20 years of clinical experience including residential and inpatient care of children and adolescents as well as outpatient treatment of both adults and pediatric patients. I am a current provider of inpatient and residential services to children and teens at Lighthouse Care Center of Augusta. I also have expertise in the treatment of individuals with autism and other developmental delays as well as severe mental illness such as bipolar disorder and early onset psychosis.

2. Through my clinical experience providing care and administrative oversight in both inpatient and residential settings, I am aware of the mandates of compliance with practicing standards (i.e., staffing requirements, safety, consent for care, supervision of services, quality improvement) issued by accreditation bodies such as Joint Commission, and the Centers for Medicare and Medicaid Services.

3. I have almost twenty years of clinical experience providing inpatient, outpatient, emergency room and consult services to adults, children, teenagers and families at Augusta University (previously Georgia Regents University, Georgia Health Sciences University and the Medical College of Georgia). This has included providing psychiatric care to youth in the child welfare system, some of whom have or were suspected of having physical, mental health, and/or developmental disabilities.

4. I am also familiar with the practical aspects of providing clinical care to children and adolescents with severe mental health needs requiring acute and often longer-term care. I have worked with a diverse population of individuals from younger children to teens in domestic foster care in the states of Georgia, South Carolina, and most recently, referrals for long term care from the state of West Virginia. Caring for patients in the child welfare system has increasingly and appropriately required more attention to details surrounding the following: proper use of psychotropic medications; assurance of the appropriate delivery of such medications and enhanced understanding of requirements for informed consent for treatment; and efforts to ensure proper follow-up for treatment after discharge from acute and sub-acute treatment.

5. I was the Medical Director for inpatient child and adolescent psychiatric services at Georgia Health Sciences University (formerly Medical College of Georgia), Children's Medical Center from 2000-2014. As Medical Director of this unit, I served on the quality control committee for both the Department of Psychiatry and Health Behavior, and the hospital at large. I also served on the committee to ensure that our unit as well as the hospital provided care that was patient-and family-centered. To do so, we surveyed patients about their care and overall experience, convened focus groups with patient representation to discuss areas of care that could be improved, and formulated performance improvement plans.

- 2 -

6. In 2011, I served as a member on the Medication Utilization Parameters Workgroup examining psychotropic medication use in Georgia's foster care population for the Georgia Department of Behavioral Health and Developmental Disabilities.  Recommendations from this workgroup[1] are consistent with the policies of many, if not all child welfare agencies; this includes documentation and oversight of psychotropic use, especially if individuals are prescribed multiple psychotropic medications, are prescribed medications for which FDA approval is not available, or if antipsychotics are being prescribed to very young children.

7. I have been the coordinator and supervisor of the school consultation rotation for child fellows in training for my entire academic career.  I continue to offer these services to the educational community and provide education in this specific and important domain to child and adolescent psychiatry trainees. I also have twenty years of experience providing school consultation services to children and teens in the Augusta, Georgia and surrounding school districts. My involvement includes participating in developing individualized education programs (IEPs) for students in the traditional school setting, and consulting on diagnostic and behavioral questions for the psychoeducational and special education services in the area.  In order to be effective in these roles, I have kept up-to-date on special education law and the provision of care to children with disabilities in the educational setting extending from standard Section 504 plan modifications under the Rehabilitation Act to IEPs under the Individuals with Disabilities Education Act (IDEA).  My longstanding work in the area of education has been a tremendous adjunct to my care of children and adolescents with autism spectrum disorders.  I believe this experience enables me to give

---

[1] Karen Worthington, Psychotropic Meds for Georgia Youth in Foster Care: Who Decides? Published by the Georgia Supreme Court Committee on Justice for Children, January 2011.

Expert Report of Dr. Donna Londino; confidential; under protective order

specific insight with regard to ORR policy concerning the initial assessments of unaccompanied alien children (UACs) with disabilities as well as continued assessments of UACs that includes awareness and appropriate referral of those youth, who with time, may indicate behavior suggestive of developmental disabilities.

8. Lastly, I am familiar with evidence-based clinical care, issues in practice (i.e., quality improvement, safety), and systems of care including administration and public policy. This familiarity derives from numerous years of teaching general psychiatry residents and child and adolescent psychiatry fellows in training, and service to the American Board of Psychiatry and Neurology writing questions for board examinations and most recently as a test item writer for the American College of Psychiatrists. I have also been a member of the Liaison Committee on Medical Education (LCME) for the medical school (Georgia Regents University at that time). The LCME reviews the medical school training program for medical students to determine continued accreditation.

9. My complete academic background, training, and professional experience are further detailed and set forth in my Curriculum Vitae in Appendix A, attached. I am being compensated for my work in this case at my standard rate of $600 per hour, a rate within the range common among specialists with my level of experience. My compensation is not affected by the outcome of this matter. I have not testified as an expert at deposition or trial as an expert in any matter within the past four years.

## II. FACTS AND DATA CONSIDERED

10. I prepared this synopsis of my anticipated testimony in support of Defendant, the United States Department of Health and Human Services, Office of Refugee Resettlement (ORR). I have been asked to provide my expert opinions (at deposition and potentially trial) concerning: (1) whether ORR's policies, procedures, and practices for obtaining informed consent for the

- 4 -

administration of psychotropic medications to UACs are consistent with the standards of care in child and adolescent psychiatry; (2) whether ORR's policies and procedures for placement of UACs, including those with disabilities, in RTCs (in ORR's network and one out-of-network case), fall within the standards of care in child and adolescent psychiatry; and (3) whether children with disabilities as defined under Section 504 of the Rehabilitation Act whom ORR places in RTCs generally are placed and remain in such placements only as long as is medically necessary, and whether such children who no longer need such a restrictive level of care are stepped down to a less restrictive setting, or released to a suitable sponsor if one is available, without unnecessary delay.

11. In providing my opinions herein, I have considered and cite to the documents listed in Appendix B, attached. Below is a summary of additional facts and data I considered during the outlined visits to ORR headquarters and various ORR grantee care facilities, including some of my opinions on those facts and data.

**A. Visit to Washington, DC – ORR and Policy**

12. On January 6-7, 2020, I visited ORR headquarters in Washington, DC. ORR personnel provided a history of the office, its purpose, and its mission. They also shared information on ORR's organization, policies, and procedures.

13. I learned the different levels of ORR care:  shelter, staff secure, secure, transitional foster care, long term foster care (often for Category 4 minors without a sponsor), and residential treatment centers (RTCs).[2] Most UACs are placed and cared for in shelters with only a small number (less than 1%)

---

[2]  *See* ORR Policy Guide, Guide to Terms, available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms.

Expert Report of Dr. Donna Londino; confidential; under protective order

being referred to RTCs for the treatment of serious mental health care needs when they are deemed by a licensed psychiatrist or psychologist to be a danger to self or others. *See* ORR Guide § 1.4.6. This compares favorably to 2017 statistics for state domestic foster care, noting that 7% of children and adolescent in domestic foster care required treatment in a residential setting.[3]

14. Step-ups in care to RTCs for UACs with significant mental health needs are consistent with the management of acute mental health needs in domestic children in foster care, where assent by the minor is not required for placement, and decisions are made by the state child welfare agency to prioritize safety.[4] ORR care providers take steps to assist UACs in understanding the reasons for the recommendation of placement in an RTC and the goals that are being targeted through a higher level of care. A Notice of Placement is completed and provided to the UAC in his or her own language. *See* ORR Guide § 1.2.4. UACs can challenge placement after they are housed in an RTC (or secure facility) for 30 days. *Id.* at § 1.4.7. UACs' placement in an RTC is reviewed at least as frequently as every 30 days, and only UACs who are determined to be dangerous to themselves or others by licensed mental health professionals may remain in care in an RTC. *Id.* at § 1.4.2.

15. There are two RTCs within the ORR network: MercyFirst in Syosset, New York and Shiloh in Manvel, Texas, both of which I have visited, and where I met and interviewed staff, toured the facilities, and spoke directly with their leadership. Both facilities are state licensed and accredited. Both apply standard criteria for admission consistent with what is required in domestic

---

[3] https://www.childwelfare.gov/pubPDFs/foster.pdf, pg. 4

[4] https://pediatrics.aappublications.org/content/pediatrics/136/4/e1142.full.pdf.

- 6 -

care; for instance, RTC placement is proper only if a less restrictive level of care is insufficient to ensure safety against self-harm or harm to others.[5] These facilities exist to offer heightened medical and psychiatric attention through closer supervision and more intensive services.

16. I also met with Dr. Michael Bartholomew, the Director of the Division of Health for Unaccompanied Children (DHUC) in ORR's UAC Program, who has specific infectious disease expertise. Dr. Bartholomew provided an overview of ORR's medical assessment policies and procedures, including the Initial Medical Examination (IME), which is administered to all UACs within 48 hours of admission. *See* ORR Guide § 3.4.2. The IME Form includes some screening questions for depression, anxiety, and Post Traumatic Stress Disorder (PTSD) as well as thoughts of hurting self and others. *Id*. The IME also includes screening for past physical abuse and neglect, sexual activity and abuse, and substance use. *Id.* If indicated in the IME or later ongoing assessments, UACs are referred to pediatric specialists (i.e., cardiology, nephrology). Intermittently, there may be hurdles posed by a lack of willingness of states to collaborate in continuity of care, but DHUC continues to work towards viable solutions for obtaining the medical care that UACs need while in federal custody, including specialty care. All UACs are provided a minimum of one individual therapy session and two group therapy sessions weekly. *Id.* at § 3.3. All UACs are provided with six hours per day of education. *Id.* at § 3.3.5. The IME and initial assessment are designed to assess, in part, whether the child has any special needs, including disabilities, which may manifest at the time of admission.

---

[5] See the American Academy of Child and Adolescent Psychiatry's (AACAP) Principles of Care for Children in Residential Treatment Centers (hereinafter "AACAP Principles of Care for Children in RTCs"), available at https://www.aacap.org/App_Themes/AACAP/docs/clinical_practice_center/principles_of_care_for_children_in_residential_treatment_centers.pdf

Expert Report of Dr. Donna Londino; confidential; under protective order

17. ORR's consent policy for psychotropic medication decisions involves an effort to obtain parental consent whenever feasible. Challenges to obtaining parental consent include: finding the parent, translation of multiple dialects, ensuring the identity of the person giving consent, and difficulty obtaining written consent where the parent lives in remote areas of the home country and may not have access to communication equipment. Assent by the UAC is required to administer psychotropic medications.   Children who refuse medication are not required to take it unless there is a crisis posing an immediate safety risk to the UAC or others, and this is only permitted on an emergency basis at Shiloh, as is consistent with state licensing guidelines, and rarely occurs.  Psychoeducation is provided to children by clinicians about the risks and benefits of taking prescribed medication.   RTCs and other care providers are generally required to engage in routine review of the frequency and dosing of medications as is required by state licensing.   Accepted parameters for the prescription of psychotropic medication (e.g., only using one antipsychotic) should be consistent with state licensing guidelines for prescribers where the care provider facility is located.   More generally, all ORR grantee care providers must have policies and procedures for safe medication administration and management. *See* ORR Guide § 3.4.4.  ORR personnel also provided briefing on ORR's compliance and monitoring policies and procedures.   Grievance processes are available for all UACs onsite at RTCs and other placements, and legal service providers notify UACs of their legal rights.[6] There are weekly staffing meetings or other communications between Federal Field Specialists (FFS), case managers from grantee care providers, and independent case coordinators for all UACs in

---

[6] A  legal  resource  guide  for  UACs  is  available  at, https://www.acf.hhs.gov/orr/resource/unaccompanied-childrens-services.

- 8 -

ORR care to review placement, reunification, and other conditions of care. *See* ORR Guide § 2.3. Additionally, as set out in the ORR Guide § 5.5.1, monitoring site visits from ORR federal field staff occur 1-2 times per month, visits from ORR's monitoring team occur biennially, and Project Officers regularly review programs for quality and compliance.

**B. Visit to MercyFirst**

18. On January 24, 2020, I toured the MercyFirst campus in Syosset, New York, which cares for UACs in both RTC and shelter programs, as well as domestic children in the state's foster care system; the two populations do not intermingle. During my visit, I spoke with staff and clinicians in the UAC program, including the doctoral-level psychiatric nurse practitioner, Dr. ████████████ who prescribes medication if indicated and is responsible for medication management for UACs.

19. In the domestic setting, residential psychiatric treatment is most commonly provided in one of two settings: hospital-based or in settings more closely modeled after home environments. Although rigorous research into the potential advantages of residential treatment in home environments versus a hospital setting is limited, it has been suggested that treatment in a home-like environment provides for more comfort and ease for the resident than larger hospital-like settings. Home-like settings also allow for the development of self-care skills such as caring for shared living spaces and meal preparation.

20. My tour of MercyFirst reflected that MercyFirst provides a home-like environment, as compared with traditional hospital-based care. The facility is spacious and clean, and extensive attention is paid to safety. The facility makes available opportunities to learn life skills (e.g., cooking, wood working). MercyFirst also provides opportunities for adaptive coping, such as reflection rooms, walking, games, and other opportunities.

- 9 -

21. MercyFirst is accredited by the Council on Accreditation (COA)[7] and is Sanctuary Certified[8] as a trauma-informed organization.

22. MercyFirst has 18 RTC beds for males between the ages of 12 to 18 in the UAC Program. At the time of my visit, only 9 beds were filled.

23. Per ORR policy, *see* ORR Guide § 1.4.6, all UACs placed in MercyFirst's RTC had been determined to be a danger to themselves or others by a licensed psychiatrist or psychologist prior to admission. UACs in the RTC program had the following diagnoses in order of prevalence: PTSD, depressive disorders, anxiety disorders (with significant impact on daily life), bipolar disorder, and psychotic disorders.

24. On top of standard admission considerations, populations that require special consideration prior to admission to MercyFirst's RTC include UACs with intellectual disability and UACs with conduct disorder. The therapeutic goals of residential treatment are significantly impacted by the presence of patients with severe mental health issues who are also violent or aggressive, are sexual predators, or have a serious past criminal history. For UACs who exhibit aggressive behavior once placed at MercyFirst, the staff work with the child to help maintain the continuity of the placement in attempts to avoid a move to a more restrictive setting or another out of network RTC, although sometimes such transfers are necessary.

25. MercyFirst's admission criteria are consistent with domestic principles of care for the treatment of children and adolescents with mental illnesses in RTCs set forth by the American Academy of Child and Adolescent Psychiatry (AACAP) where the diagnoses of intellectual disability and conduct disorder

---

[7] *See* http://coanet.org/home/.

[8] *See* http://thesanctuaryinstitute.org/.

Expert Report of Dr. Donna Londino; confidential; under protective order

fall under "special populations."[5] The AACAP's principles of care are based upon the knowledge that the behavior of minors with conduct disorder (by definition of the Fifth Edition of the Diagnostic Statistical Manual which includes the criteria and symptoms that must be present to make a psychiatric diagnosis) includes disregard for the rights of others.   Minors with a conduct disorder often refuse to obey rules with limited remorse, making their presence in a therapeutic milieu disruptive and potentially unsafe for others, including residents and staff.   Minors with intellectual disability require modifications of staffing, behavioral strategies and therapeutic approaches often impacting the treatment milieu at large.   Both diagnoses are considered long term, with only fair prognosis for improvement. Unless hospitalization is required for acute stabilization of aggression posing a risk to others, suicidality, or other severe self-injurious behavior, these two sub-groups are better served in facilities with specific training or with in-home services where care providers can be educated while interacting with the minor on the most appropriate ways to handle the disruptive behavior.[9] [10]

26. MercyFirst staff have routine training appropriate and consistent with other RTCs in the domestic setting (i.e., de-escalation techniques, abuse), as mandated by both state accreditation bodies and ORR.

27. The average length of stay for UACs in residential care at MercyFirst (by facility report) is 2-4 months.   This average length of stay at MercyFirst is

---

[9] *See* David Porter, D., DSM-5 Category: Disruptive, Impulse-Control, and Conduct Disorders, available at https://www.theravive.com/therapedia/conduct-disorder-dsm--5-312.81-(f91.1),-312.82-(f91.2),-and-312.89-(f91.9)

[10] Righi, G., Benevides, J., Mazefsky, C., Siegel, M., Sheinkopf, S. J., Morrow, E. M., & Autism and Developmental Disabilities Inpatient Research Collaborative (ADDIRC) (2018), Predictors of Inpatient Psychiatric Hospitalization for Children and Adolescents with Autism Spectrum Disorder, Journal of Autism and Developmental Disorders, 48(11), 3647–3657, available at https://doi.org/10.1007/s10803-017-3154-9.

Expert Report of Dr. Donna Londino; confidential; under protective order

consistent with current models of residential care in domestic settings – both for children in state child welfare systems, and domestic children and teens where intensive treatment of significant mood and behavioral disturbance is requested by parents or relatives.[11]   Historically, the average length of stay has been three to six months for care in domestic residential treatment centers. This anticipated length of stay in residential care is quoted on many residential websites and is generally presented to the patient and caretaker by both the outpatient provider and residential facility at time of admission.[11]   Both commercial and government insurance providers have traditionally been structured to begin intensive case review after 120 days.[12]   These lengths of stay have been consistent with the philosophy behind the benefit of long-term treatment, which posits that this length of time is the minimum needed to produce long term changes in maladaptive thinking and behavior patterns, and is what separates this level of treatment from less restrictive settings.[13]   The reported length of stay at MercyFirst is below previously reported lengths of stay for children in domestic care, including out-of-home placements (see above).  A 2009 survey of national residential programs noted that the average length of stay was between six and twelve months with 12% of children and teens residing in a therapeutic residential treatment center for over 13 months.

---

[11]  *See* https://adolescentgrowth.com/treatment-services/residential-treatment/.

[12] http://valueoptions.com/providers/Network/NCC/Residential_Lev_I_IV_Final_07_01_01.pdf.

[13] https://lindnercenterofhope.org/blog/advantages-of-adolescent-psychiatric-residentialtreatment/.

Expert Report of Dr. Donna Londino; confidential; under protective order

28. The most common reasons for longer stays at MercyFirst prior to step-down to a less restrictive setting or release to a sponsor (per facility information) are medical comorbidities, lack of safe sponsorship options, and failed home studies. This is consistent with published data about the length of stay for youth in residential care in the domestic setting (residential treatment facilities and group homes), where chronic health problems and a greater number of placements were associated with longer stays.[14]  In the domestic setting, difficulties with family involvement, especially from issues of substance use, are frequently cited reasons for prolonged stay in treatment, and medical co-morbidities have been noted as a reason for extended stays in inpatient psychiatric programs.[15] In such situations, safety must be considered to ensure appropriate stability and competency of parents or other caretakers, or stabilization of medical concerns prior to discharge.

### 1. Provision of Care at MercyFirst

29. MercyFirst follows the philosophy of trauma-based care consistent with domestic child welfare systems which asserts that safe, secure, and trusting therapeutic relationships support recovery processes and encourages children and caretakers to do the hard work of dealing with the impact of traumatic exposure.[16] The MercyFirst staff and therapists have a solid understanding of the different phases of treating trauma and focus on establishing rapport with

---

[14] Sigrid S. James PhD MSW, Jin Jin Zhang MS & John Landsverk PhD (2012) Residential Care for Youth in the Child Welfare System: Stop-Gap Option or Not?, Residential Treatment for Children & Youth, 29:1, 48-65, DOI: 10.1080/0886571X.2012.643678

[15] Hussey, D.L., Guo, S. Forecasting Length of Stay in Child Residential Treatment. Child Psychiatry Hum Dev 36, 95–111 (2005). https://doi.org/10.1007/s10578-004-3490-9. See also Zeshan, M., Waqas, A., Naveed, S., Ghulam, H., & Manocha, P. (2018). Factors Predicting Length of Stay in an Adolescent Psychiatric Unit, South Bronx, NY: A Short Report. Journal of the Canadian Academy of Child and Adolescent Psychiatry = Journal de l'Academie canadienne de psychiatrie de l'enfant et de l'adolescent, 27(2), 142–147.

[16] See https://www.apa.org/pi/families/resources/children-trauma-update.

Expert Report of Dr. Donna Londino; confidential; under protective order

the UAC and stabilizing acute symptoms that led to a referral for more intensive mental health treatment.  Therapists understand how trauma therapy could be significantly impacted by the step-down of a UAC who has begun talking about traumatic experiences without significant time to fully complete the therapeutic work targeting past trauma.

30. MercyFirst's treatment goals include stabilization of mental health needs such as severe mood disruption and reducing maladaptive behavior considered severe enough to disrupt functioning in a less restrictive setting or which poses a significant safety risk to the UAC or others.  Additionally, for the minor to be placed at MercyFirst, the identified mood disruption and/or maladaptive behavior has been unable to be acutely resolved through outpatient treatment or acute psychiatric hospitalization.  This is consistent with the domestic philosophy on residential psychiatric treatment as a continuum of care for minors with mental health disturbances who may need separation from the stressors in their lives that are creating severe disruption in their functioning.  Such minors benefit from the therapeutic community of a residential placement where they have the opportunity to practice more adaptive coping in their daily life with the direct encouragement of staff and formal therapeutic guidance from assigned therapists, especially when interpersonal conflicts or crisis situations arise in the youth's life.[17]

31. MercyFirst has also made improvements based on UAC feedback, e.g., adding a satellite dispensary for UACs to utilize without needing to go outside in inclement weather; and hiring additional medical staff.

32. At MercyFirst, when needed the doctoral level psychiatric nurse practitioner prescribes medications as permitted under state law, and there are two

---

[17] Kennard, D. The Therapeutic Community as an Adaptable Treatment Modality Across Different Settings. Psychiatr Q 75, 295–307 (2004). https://doi.org/10.1023/B:PSAQ.0000031798.95075.26

- 14 -

psychiatrists assigned to the domestic program who are available for supervision/collaboration as is needed. A pediatrician provides medical care, and there is both a Registered Nurse and Medical Director on staff as well.

33. MercyFirst follows New York law regarding avoiding multiple antipsychotic medications and restricts the use of physical and chemical restraints. MercyFirst does not use chemical restraint PRNs at all. When warranted, MercyFirst may use behavioral interventions, including therapeutic holds.

34. Psychotherapeutics: During my visit, there were nine children in treatment, and eight were on psychotropic medications. One had been discontinued off medications that had already been prescribed prior to the UAC's admission. MercyFirst's medication treatment philosophy is to administer the lowest dose that offers the most benefit with the fewest side effects. MercyFirst views adjunct therapy and behavioral modification as equally if not more important than medications. The most frequently used medications were Prazosin (for Post-Traumatic Stress Disorder (PTSD) – nightmares, evidence based); Clonidine for sleep – provided at appropriate dosages and indication; and quetiapine (trade name Seroquel – provided at a reasonable dose and indication).

## 2.    Consent for Medication at MercyFirst

35. MercyFirst's consent policy is consistent with care standards outlined by child advocacy and government oversight agencies as well as guidelines approved by organizations dedicated to the clinical care of children (i.e., American Academy of Child and Adolescent Psychiatry (AACAP)).[18] Based on my site

---

[18]See AACAP's psychotropic medication recommendations, available at: http://www.aacap.org/App_Themes/AACAP/docs/clinical_practice_center/systems_of_care/AACAP_Psychotropic_Medication_Recommendations_2015_FINAL.pdf . Refer also to AACAP's Foster Care Best Principles, at: https://www.aacap.org/App_Themes/AACAP/docs/member_resources/practice_information/foster_care/FosterCare_BestPrinciples_FINAL.

Expert Report of Dr. Donna Londino; confidential; under protective order

visit and discussions with medical personnel, and my review of select case files, some challenges are evident in family involvement and obtaining consent for medications prescribed. Despite these obstacles, clinicians make consistent attempts to contact family and if available, to provide them with psychoeducation and involve them in discussions surrounding the entirety of treatment, including psycho-pharmacotherapy.

36. Hurdles for obtaining consent include difficulty accessing the UAC's parent or guardian. This is particularly difficult for UACs who do not have Category I potential sponsors (parents or legal guardians). MercyFirst considered ORR guidance on the provisions of consent when a parent or guardian is not available as potentially helpful, although the facility staff reported that consent is generally obtained. In some states, New York for example, if a parent or guardian is not available or fails to respond to repeated requests for informed consent, the social services commissioner or his designee may consent.

37. Assent is required by the UAC before administering psychotropic medications. If the UAC requests discontinuance, medications are discontinued. UACs are not forced to take medications.

38. MercyFirst also takes steps to confirm the identity of the person giving consent (birth certificate and other ID, video conferencing with observation of UAC's response) and provide education on the UAC's targeted diagnosis and treatment recommendations.

39. The UAC's response to and tolerance of the recommended psychopharmacologic treatment is monitored by a prescribing doctoral level psychiatric nurse practitioner at a minimum of once per month. The UAC is monitored more frequently when first starting medications. This is consistent with practice parameters issued by the American Academy of Child &

- 16 -

Adolescent Psychiatry (AACAP)[18] and accreditation bodies such as the Joint Commission.

40. MercyFirst noted that most parents or legal guardians consent to pharmacologic treatment recommendations.

41. Antipsychotic use is appropriately monitored using an AIMS (Abnormal Involuntary Movement Scale).

### 3.    Psychotherapy at MercyFirst

42. Psychotherapy is provided as an important and necessary complement to prescribed medications at MercyFirst.

43. Clinicians employ an array of psychotherapeutic approaches in working with UACs, including interventions designed to benefit all individuals in care and those more specific to a particularly problematic symptom or diagnosis (i.e., psychoeducation and supportive therapy for all children and teenagers, Cognitive Behavioral Therapy for children and adolescents with depression, Trauma based therapy if indicated).   This is in addition to art and woodworking which contribute to skill building and offer adaptive alternatives to more maladaptive behavior.

44. When at capacity, the clinician-to-UAC caseload at MercyFirst is 12:1, which allows for a weekly minimum of one individual session per client as well as two sessions of group work, five hours per week attending treatment rounds, and time spent communicating with assigned UACs' family/potential sponsors about current treatment and sessions targeting post-release mental health care needs.

45. Clinicians at MercyFirst use the SPARCS program: Structured Psychotherapy for Adolescents Responding to Chronic Stress. Therapists routinely engage group members in discussions around the ways in which trauma has impacted their lives and what it means to them in the context of their culture.   The treatment regimen includes sixteen one-hour sessions, which is appropriate

- 17 -

for an RTC.  This treatment program is culturally based, which is consistent with both ORR mandates for the services provided by care providers (ORR Guide § 3.3) and with a core tenet of principles regarding the care of children at large, and particularly for those in out-of-home care.[19]

46. Clinicians at MercyFirst also use the Attachment, Regulation, and Competency (ARC) intervention program.  This framework is a flexible, components-based intervention developed for children and adolescents who have experienced complex trauma, along with their caregiving systems.  This involves caregivers, builds on the child's identified strengths, and has shown to benefit participants, even in those with developmental concerns.[20]

47. Clinicians are aware of the risks associated with trauma therapy, and approach care with that awareness, including understanding the impact of the limited length of the probable stay and stirring up emotional issues without enough time to fully process them.

### 4.    Family Involvement Principles at MercyFirst

48. MercyFirst incorporates principles of family involvement.  Consistent with the principles guiding the assessment and management of youth involved in domestic child welfare systems and multiple other guidelines and standards of care, involvement with the family (or guardian/foster family) has been associated with more positive outcomes including engagement and motivation

---

[19] Practice parameter for the assessment and management of youth involved with the child welfare system. Lee T, Fouras G, Brown R; American Academy of Child and Adolescent Psychiatry (AACAP) Committee on Quality Issues (CQI). J Am Acad Child Adolesc Psychiatry. 2015 Jun;54(6):502-17. doi: 10.1016/j.jaac.2015.03.005 (Principle 2).  Principle 6 states that given that the optimal placement of a child or adolescent is safe placement with a parent or family member, that involvement of the family is crucial in assessing their functioning in order to make the most appropriate treatment and planning recommendations.

[20] Kristine Jentoft Kinniburgh, LICSW; Margaret Blaustein, PhD; Joseph Spinazzola, PhD; Bessel A. van der Kolk, MD.  Attachment, Self-Regulation, and Competency: A comprehensive intervention framework for children with complex trauma. Psychiatric Annals. 2005;35(5):424-430, available at: https://doi.org/10.3928/00485713-20050501-08.

Expert Report of Dr. Donna Londino; confidential; under protective order

in treatment.[21]  A family engagement approach to casework views families as the experts on their unique challenges and seeks to support them in developing solutions.   Including families in decision-making and planning processes enhances the fit between family needs and services, and makes it more likely the family will participate in services and complete the case plan.[22]  This important aspect of treatment is complicated in the cases of UACs as frequently, family is distant, difficult to locate, or both.  Some evidence-based therapies such as Parent-Child Interaction Therapy and Alternatives for Families that otherwise might be of benefit are limited by lack of access to family.  Despite this difficulty, which is inherent in the nature of the UAC population and is not caused by ORR or its grantee care providers, throughout the course of treatment at MercyFirst, clinicians seek to identify the person who will be providing the care for the UAC post-release so that they may provide psychoeducation on the UAC's diagnosis and treatment, and involve the potential sponsor in monthly treatment meetings.  Clinicians also educate the UAC's family/sponsor about the UAC's outpatient treatment needs, as well as strategies for changing maladaptive family response patterns (i.e., avoidance of high expressed emotion and physical aggression in response to conflict) that might lead to decompensation of the UAC's mental health symptoms.

49. MercyFirst tries to identify parents and involve them in treatment.

50. If the parent can be located and has access to a phone or other form of communication, the parent can contact the facility daily to check on the status

---

[21]https://www.childwelfare.gov/pubPDFs/f_fam_engagement.pdf#page=2& view=The benefits of family engagement.

[22]Bossard, N., Braxton, A., & Conway, D. (2014). Meaningful family engagement. In G. Mallon & P. Hess (Eds.), Child welfare for the 21st century: A handbook of practices, policies, and programs (pp. 70–85). New York: Columbia University Press.

Expert Report of Dr. Donna Londino; confidential; under protective order

of the child.

51. If the parent can be located and has access to a phone or other form of communication, UACs are given two opportunities a week to call their family. *See* ORR Guide § 3.3.10. Monthly treatment team meetings are held.  If the parent can be located, the parent is encouraged to participate (consistent with RTC guidelines).

### 5.  MercyFirst's Release Policies and Practices Are Consistent with the Principles of Care for Treatment of Children and Adolescents with Mental Illness in Residential Treatment Centers

52. MercyFirst's release policies are consistent with the Principles of Care for Treatment of Children and Adolescents with Mental Illness in Residential Treatment Centers.[23]

53. At MercyFirst, discharge planning begins at admission, and generally includes the referral to post-release case management services that connect UACs to available community resources such as mental health professionals for pharmacologic oversight and continued counseling. *See* ORR Guide § 6.2. Discharge paperwork reflects the working diagnosis that is being targeted in treatment.

54. Important differences exist between ORR custody and domestic foster care. In domestic foster care, minors continue to have provisions for oversight, whereas UACs are no longer in ORR custody and thus they and their families cannot be forced to engage in treatment after discharge.  In the domestic setting, discharge to foster care with subsequent oversight from the child protective service organization has been cited as a factor predictive of follow-up.[24]  As ORR does not retain custody after release, the importance of vetting

---

[23] *See* AACAP, Principles of Care for Children in RTCs, *supra* n.5.

[24] Cynthia A. Fontanella, Ph.D., Danielle L. Hiance-Steelesmith, M.S.W., Jeffrey A. Bridge, Ph.D., Natalie Lester, M.D., Helen Anne Sweeney, M.S., Mark Hurst, M.D., John V. Campo, M.D.  Factors Associated with Timely Follow-Up

Expert Report of Dr. Donna Londino; confidential; under protective order

parents, family members, and other potential sponsors is even greater.  The individuals who are being considered as possible caretakers of a youth, especially youth with mental health concerns, should demonstrate an ability to understand the mental health care needs of the youth in their care and to provide appropriately for such needs.

**6.    Vulnerable/Difficult Populations at MercyFirst**

55. It is difficult to change the engrained patterns of behavior of minors with conduct disorder.  As compared to children with depression or maladaptive behavior secondary to past trauma, minors with conduct disorder demonstrate behavior that poses more risks to individuals and property external to the youth.  This has been associated with multiple negative outcomes in treatment to include false allegations, attacks on other residents and staff, and manipulative behaviors to negatively influence therapeutic services.  The prognosis for minors with conduct disorder has historically been quite guarded.[25]

56. When UACs have no identifiable safe sponsor, length of stay may be longer, and there are some UACs who have negative adjustment responses to the extended stay and may demonstrate disruption of behavior (worsening of clinical course).  As noted, MercyFirst works from the date of admission to unify each child with a safe sponsor.  If despite these efforts no safe sponsor is available, correlated negative adjustment responses to the length of stay are inherent to the UAC population.  Although the development of symptoms in response to the stressor of prolonged stay is concerning, it still suggests the

---

Care After Psychiatric Hospitalization for Youths With Mood Disorders. Psychiatric Services.  Volume 67, Issue 3, pgs. 324-331.

[25] *See* https://www.aacap.org/AACAP/Families_and_Youth/Facts_for_Families/FFF-Guide/Conduct-Disorder-033.aspx. *See also* Steiner H.  Practice parameters for the assessment and treatment of children and adolescents with conduct disorder. American Academy of Child and Adolescent Psychiatry.  J Am Acad Child Adolesc Psychiatry. 1997 Oct;36(10 Suppl):122S-39S.

Expert Report of Dr. Donna Londino; confidential; under protective order

need for the UAC to develop more adaptive coping skills when the manifested coping skills in times of stress are sufficiently maladaptive to pose a safety risk to the UAC or others.

**C. Visit to Shiloh**

57. On January 27, 2020, I toured Shiloh RTC facilities, and spoke with staff, clinicians, and psychiatrist Dr. Javier Ruiz, and therefore offer the following observations.

58. Shiloh has 54 beds licensed for children ages 3-21, but only accepts children between the ages of 6-17.

59. There were 15 UACs at Shiloh when I visited: seven boys and eight girls, between ages 12 and 17.

60. Shiloh is licensed for and able to support the admission of children with autism and intellectual or cognitive disabilities.

61. The average length of stay when I visited Shiloh was 4 months.  As noted above, this reported length of stay is consistent with the historical length of stay for domestic youth in residential treatment and is in many cases less than the average length of stay for foster care children being housed in congregate care, including residential and group home settings.[26]

62. Length of stay at Shiloh may be increased (per facility information) by refusal of a shelter to accept the UAC for step-down if the shelter believes the minor does not meet step-down criteria or the shelter's licensing requirements, difficulty finding and vetting a safe sponsor, and aggressive behavior by the UAC posing a risk of harm to self or others.  Another important factor is the relative lack of prior treatment (in comparison to the domestic RTC population), which complicates treatment by making access to an accurate

---

[26] *See* supra n.2; *see also*
http://valueoptions.com/providers/Network/NCC/Residential_Lev_I_IV_Final_07_01_01.pdf

Expert Report of Dr. Donna Londino; confidential; under protective order

history difficult.  Despite the potential disadvantage to residential treatment for ORR's population in terms of longer stays in care, certain behaviors such as chronic suicidality, self-injurious behavior, aggressive coping responses, and impaired thinking processes must be stabilized before a placement at a less restrictive level of care or release to a sponsor can be expected to be safe or successful.  This does not mean that a child who has mental health needs or is not meeting treatment objectives cannot be stepped down or released. These cases, however, will need additional clinical attention and subsequent multi-disciplinary treatment planning to ensure safety to the extent possible after discharge.  Regardless, if RTC level of treatment is required to provide for a child's mental health needs, then ORR is acting within the accepted standard of care in placing or continuing to care for children in such a setting.

63. The staff to resident ratio at Shiloh is 4:1 (according to licensing standards). Extra staff are called in if needed to ensure safety.  The work schedule for youth care staff is four days on and four days off; staff function as house parents and educational aides; staff are given opportunity to sleep during days on by extra security staff that work at night.

64. Staff at Shiloh have routine training appropriate and consistent with other RTCs (i.e., trauma-based, common mental health diagnoses, de-escalation techniques, as well as prevention, identification, and response to abuse) and as mandated by accreditation bodies and ORR.

65. The process of referring children for placement at Shiloh is consistent with domestic referrals to a residential level of care (i.e., failure in less restrictive environment, usually previous psychiatric hospitalization, referral from a hospital or outpatient provider). Referrals are screened and acceptance may be denied if there is a poor fit (i.e., conduct disorder, severe aggression or sexual acting out).  Referrals for UACs may be difficult to triage as there is

- 23 -

often a paucity of information on symptoms and prior treatment as is typically available in domestic child welfare systems to determine the level of need. Per ORR policy, *see* ORR Guide § 1.4.6, all UACs placed at Shiloh have been determined to be a danger to themselves or others by a licensed psychiatrist or psychologist prior to admission.

## 1. Provision of Care at Shiloh

66. Shiloh does not allow the use of physical restraints.  Staff may use therapeutic holds and are trained to use de-escalation techniques.   UACs may be offered a PRN (i.e., diphenhydramine) if medically indicated and agreed to for the specific purpose of acute agitation and insomnia, but this occurs rarely. This policy is more restrictive than policies at some facilities serving the domestic population, which authorize the utilization of chemical restraints through the frequent use of antipsychotic medications. Shiloh's policy is consistent with Texas Psychotropic Medication Utilization Parameters for Children and Youth in Foster Care and the specific use of diphenhydramine electively offered and not forced is supported by the FDA and clinical research both because of its calming effect and more favorable side effect profile.[27]

67. Consistent with recommendations presented in the practice guidelines for youth in residential treatment developed by the American Academy of Child and Adolescent Psychiatry (AACAP), discharge planning for youth admitted to Shiloh Residential Treatment Center starts at the time of admission.  This provision facilitates an efficient planning of the goals of this level of treatment.  Discharge planning at Shiloh is directed at interventions that will

---

[27] https://www.dfps.state.tx.us/Child_Protection/Medical_Services/document s/reports/2016-03_Psychotropic_Medication_Utilization_Parameters_for_Foster_Children.pdf. *See also* Gerson, R., Malas, N., Feuer, V., Silver, G. H., Prasad, R., & Mroczkowski, M. M. (2019). Best Practices for Evaluation and Treatment of Agitated Children and Adolescents (BETA) in the Emergency Department: Consensus Statement of the American Association for Emergency Psychiatry. The western journal of emergency medicine, 20(2), 409–418. https://doi.org/10.5811/westjem.2019.1.41344.

Expert Report of Dr. Donna Londino; confidential; under protective order

allow an expeditious release or step-down to limit overall time in this restrictive setting of care.[28]

68. Shiloh features multiple healthcare providers, including a child and adolescent psychiatrist to prescribe and oversee medications if needed; a Registered Nurse (RN), recreational therapist, licensed counselor, and other services (i.e., child advocate, legal services) as indicated.

69. Shiloh closely monitors outcome measures through service plans, weekly treatment team rounds (confirmed on review of records), and monthly treatment team meetings.

70. A strength of the Shiloh program is the ability to provide educational assessments with individualized plans for remediation and approaches to teaching. Four special education teachers provide educational services, while youth care workers also serve as classroom aides.

## 2. Psychotherapeutics at Shiloh

71. When UACs arrive at Shiloh, they are usually already on medications. Following an initial evaluation at intake by an appropriate healthcare provider, these medications are generally continued (if appropriate) until a more formal evaluation can occur, usually shortly after admission.

72. Per facility report and my review of the records of UACs placed at Shiloh Residential Center, Shiloh aims to minimize polypharmacy where appropriate. I found no records where multiple medications were newly prescribed at the same time unless the UAC had been prescribed multiple medications prior to admission to Shiloh and these were continued as part of the initial treatment plan. Where present, the most frequent notation of polypharmacy was the concomitant use of a sleep medication with a pharmacologic agent to address another mental health concern such as

---

[28] *See* AACAP, Principles of Care for Children in RTCs, *supra* n.5.

Expert Report of Dr. Donna Londino; confidential; under protective order

attention deficit hyperactivity disorder, depression or anxiety.

73. UACs at Shiloh, if prescribed psychotropic medication, are seen by a psychiatrist at a minimum once monthly, and more if medically indicated. The initial visit is approximately 90 minutes, the subsequent visit is approximately 45 minutes, and future visits are generally about 20 minutes once the UAC is stabilized. The healthcare provider also considers the child's medical file as well as reports of staff and behavioral monitoring forms to assess the child's progress. In addition to medication, children at Shiloh receive individual therapy and group therapy consistent with ORR Policy Guide § 3.3 and consistent with the guidelines for the provision of therapeutic services to children and youth hospitalized in domestic psychiatric residential facilities.

74. To obtain consent for the prescription of psychotropic medications, if an appropriate healthcare provider believes such medications are medically indicated, relevant information is explained in the language of the parent/guardian and obtained by the RN. The parent/guardian is always notified if a PRN medication is given to the UAC. In contrast to the consent required for some youth in domestic residential treatment, even medication adjustments at Shiloh require consent—meaning that Shiloh provides greater protections in this regard than in the domestic setting.

75. Shiloh psychiatrist Dr. Ruiz reported that family members rarely (less than 5% of the time) refuse consent for medications.

76. Consistent with practice parameters regarding psychotropic medications, medication use at Shiloh is monitored through a clinical interview related to side effects (i.e., as well as lab work and monitoring scales (i.e., AIMS)).[18]

77. Shiloh rarely uses PRNs, including injectable medications.

**3.      Psychotherapy at Shiloh**

78. Shiloh features the strong use of behavioral interventions (i.e., contingency

- 26 -

plans) and does not use medication as a sole therapeutic intervention.

79. Shiloh uses a trauma-informed approach to treatment. This approach includes allowing the UAC to establish a trauma narrative, a psychological technique used to help survivors of trauma make sense of their experiences and one that has been proposed by the American Psychological Association as beneficial for individuals who have experienced trauma as a result of political, cultural or social forces (such as refugees).[29]

80. In our meetings, therapeutic staff at Shiloh displayed their training in and knowledge of issues surrounding trauma and developmental considerations, including cognitive impairment and how such impairment can affect the ability of a minor to engage in various treatment approaches. Staff were aware that youth with cognitive impairment, either from intellectual impairment or past head trauma, are less able to show proficiency in abstract thinking which allows youth without cognitive impairment to more accurately perceive a situation and engage in problem solving strategies. They demonstrated an understanding that children and adolescents with intellectual disability and cognitive impairment need more concrete direction and immediate feedback in regards to the appropriateness of behavior and respond positively to interventions such as token economy where positive behaviors result in the ability to acquire rewards and maladaptive behaviors may be associated with the loss of tangible items or privileges.[30]

81. When UACs at Shiloh present with acute decompensation (for instance, as manifested by a recurrence of symptoms such as suicidal ideations, aggression, or attempts at self-harm which had previously been clinically

---

[29] https://www.apa.org/ptsd-guideline/treatments/narrative-exposure-therapy.

[30] https://pro.psychcentral.com/why-and-how-to-be-a-therapist-for-the-intellectually-disabled/.

Expert Report of Dr. Donna Londino; confidential; under protective order

stable), Shiloh's approach includes exploration of external events in the life of the UAC that may be contributing to the acute disruption of thinking, feeling and behavior.  This approach assists in limiting the use of potentially unnecessary psychotropic medication use.

**4. Shiloh's Release Policies and Practices are Consistent with the Principles of Care for Treatment of Children and Adolescents with Mental Illness in Residential Treatment Centers.**

82. As is the case with MercyFirst, release from Shiloh Residential Center is consistent with ORR Guide § 2.4.2 as well as the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) which only permits release to a sponsor who can provide for the physical and mental well-being of the UAC.  *See* 8 U.S.C. § 1232(c)(3)(A).  Like MercyFirst, release services at Shiloh are consistent with those stated in the Principles of Care for Treatment of Children and Adolescents with Mental Illnesses in Residential Treatment Centers and include trying to ensure that the sponsor is aware of the UAC's mental health needs to include an understanding of medications, how to access necessary outpatient follow-up care, and extensive release plans that include emergency contact numbers as wells as the dates and times of follow-up appointments.[31]

**D. Case File Reviews—Named Plaintiffs**

83. I reviewed the UAC case files for the named Plaintiffs Gabriela N., Lucas R., Benjamin F., Sirena P., Daniela Marisol T., and Jaime D, as well as former named Plaintiff Miguel Angel S.  Based on my review of these case files, the minors' treatment while placed at the RTCs was within the standard of care.  My additional observations from these reviews are included in Appendix C, attached.

---

[31] *See* AACAP, Principles of Care for Children in RTCs, *supra* n.5.

- 28 -

**E. Case File Review—Selected Files from Step-Up Facilities**

84. In addition to reviewing UAC case files for the named Plaintiffs, I also reviewed a set of selected UAC case files that were provided to me by counsel for Defendants, which are the same set of 75 selected files that Defendants shared with Plaintiffs—a set of files that over represents children in step-up facilities (secure, staff-secure, and RTCs) and underrepresents children in shelters.

85. Based on my review of these selected case files, I concluded that the large percentage of the UACs represented by the selected charts for review were male and were over the age of 15.  Over 50% were over the age of 17 and less than 10% of the selected files for review were of UACs younger than the age of thirteen.[32]  Older children generally have had experiences involving separation and are subsequently less vulnerable to the same effects of parental separation experienced by younger children.  Residential treatment is best utilized with older children who can identify individual goals and where the intensive individual therapy can be directed at correcting dysfunctional thinking and behavioral patterns.

86. I found the assessment of UAC medical and mental health needs to be thorough and the standardization of these assessments important in ensuring that important areas of evaluation are covered.  My review of the selected files leads me to conclude that overall, appropriate management and treatment of the mental health needs including placement, step-up and step-down decisions were based on a regular assessment of those needs and was consistent with the practice of other domestic out-of-home child welfare agencies.   My

---

[32] https://www.nctsn.org/sites/default/files/resources//children_with_traumatic_separation_professionals.pdf.

- 29 -

additional observations from these reviews are included in Appendix D, attached.

### F.     Psychotropic Medications Data Review (GOV-00235763)

87. I reviewed the psychotropic medication data compiled from insurance claims made to Point Comfort Underwriters from January 2019 through January 2020 and made two primary observations. At the outset, I note that while monitors compare similar groups of hospitals or doctors in the United States to review medication practices, comparison of a domestic population with youth in ORR custody is complicated by the innate differences in ORR's population. Many of these youth have experienced significant trauma in their home countries or during the journey to the U.S., and thus have a higher prevalence of mental health symptoms and associated diagnoses related to that severe trauma than seen in the domestic population where trauma, although present, is not as common and may be different from the trauma experienced by UACs. Comparing data from two very different populations is problematic. The most reliable review is to look at the specific child's symptoms and their response to medications, in order to determine whether treatment is medically appropriate.

88. Despite the limitations inherent in this methodology for assessing whether children in ORR care were properly treated, I find that medications at ORR facilities were generally appropriate and within the standard of care, insofar as dosages and durations were consistent with best medical practices for their intended use. Antidepressants appeared to be the most commonly prescribed class of pharmacologic treatment. I did not note any antidepressant dosing that exceeded dosing ranges recommended by clinical parameters, federal drug administration (FDA) recommendations or drug manufacturers. Fluoxetine (Prozac) and escitalopram (Lexapro) were prescribed more than

- 30 -

other antidepressants most likely secondary to the FDA's approval of these agents (fluoxetine in 2003 and escitalopram in 2009) for the treatment of depression in children and adolescents.  The prevalence of the use of certain classifications of antidepressants (i.e., selective serotonin reuptake inhibitors (SSRIs), mixed serotonergic noradrenergic agents (NRSIs)) indicated that as per clinical recommendations for the treatment of depression determined by the level of evidence of benefit from use, initial treatment starts with a SSRI.[33] As with the dosing ranges observed for antidepressant use, the dosing ranges for antipsychotics as well as for psychostimulants and alpha-agonists including guanfacine and clonidine were appropriate.  There was limited use of first-generation antipsychotics with preferential use of second-generation antipsychotics as currently recommended secondary to decreased risk of extrapyramidal side effects, and because of evidence-based studies suggesting benefit in youth with aggressive behavior.[34]

89. A review of the psychotropic data revealed no preference of treatment from any given provider.  There was a broad use of different therapeutic agents from respective categories that spoke against any bias in the use of a particular medication.

90. The use of benzodiazepines was very limited and when prescribed, appears to have been for short term use based on the number of tablets prescribed and the length of treatment documented.  Two UACs appeared to be prescribed lorazepam for more long-term treatment based on prescriptions for a month supply of medications.  All doses of benzodiazepines were well within the standard of care.

---

[33] Am Fam Physician. 2012 Sep 1;86(5):442-448.

[34] https://www.ncbi.nlm.nih.gov/entrez/eutils/elink.fcgi?dbfrom=pubmed&retmode=ref&cmd=prlinks&id=22360933.

Expert Report of Dr. Donna Londino; confidential; under protective order

91. The use of hypnotics was limited to the use of phenobarbital which may have been prescribed for seizure management.  One UAC was prescribed Rozerem at the lowest dose (8 mg) of the recommended dosing range.

## III.    OPINIONS

### A. Overview

92. Based on my clinical and administrative knowledge of residential treatment from my years of experience previously noted, my review of the literature cited relevant to the issues in this case, my review of the ORR Guide,[35] my review of the assigned case files, psychotropic drug data and visits to ORR, MercyFirst, and Shiloh (see the previous section of this expert report entitled "Facts and Data Considered"), which included numerous interviews and meetings with clinicians, staff, and medical personnel, and my experience, review and knowledge of the requirements of accreditation bodies and clinical practice guidelines, I came to the analyses, opinions, and conclusions presented in this expert report.

93. Under the provisions and oversight of ORR, as well as mandates set forth through the Flores Settlement Agreement and the Trafficking Victims Protection Reauthorization Act, it is my opinion that both MercyFirst and Shiloh residential treatment centers offered services to children and adolescents served through ORR that are comparable with or better than services to children and adolescents served in domestic settings.  The referral process for this level of services is consistent with the referral process for residential treatment in the domestic population.  Both MercyFirst and Shiloh were conducive to a feeling of comfort and safety with attention to privacy and gender issues as well as the provision of food, shelter, religious freedom, education, recreation, and sexual health education.  Although there were

---

[35]   https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied.

Expert Report of Dr. Donna Londino; confidential; under protective order

differences between the use of PRN (as needed) medications, the policies for both MercyFirst and Shiloh were more cautious than in many domestic residential facilities where the frequent use of antipsychotics to manage agitation and aggression is still common practice. Consent for treatment also differed according to state guidelines for each respective facility. Although the therapeutic models may have differed, all were evidence-based and provided by individuals with appropriate years of experience and training, as is consistent with domestic child welfare systems. Of significance was the observation of fewer numbers of psychotropic medications on average (1-2) being prescribed at MercyFirst and Shiloh than I have observed in my clinical experience in the domestic setting (3-4) and has been reported in multiple sources.[36]

94. My overall conclusion concerning the identified RTCs is that both MercyFirst and Shiloh provided services consistent with the principles of care proposed for the Treatment of Children and Adolescents with Mental Illnesses in Residential Treatment Centers.[37] Both programs consist of a multidisciplinary, culturally competent treatment team providing safe, evidence-based care that is medically monitored and led by mental health professionals and staff who have requisite experience and training in the field of child and adolescent mental health, and in trauma-informed care. Both programs are designed to provide for the child's developmental, emotional, physical and educational needs, and both offer modalities of evidence-based treatment specific to the child's psychiatric, educational, developmental and medical disorders.

---

[36]*See* https://advocacyinaction.casaforchildren.org/well-being/psychotropic-medication-and-children-in-foster-care/; https://firstfocus.org/overuse-psychotropics-foster-youth. *See also,* AACAP, Principles of Care for Children in RTCs, *supra* n.5.

[37] *See* AACAP, Principles of Care for Children in RTCs, *supra* n.5.

Expert Report of Dr. Donna Londino; confidential; under protective order

**B. I find that ORR's policies, procedures, and practices for obtaining informed consent for the administration of psychotropic medications to UACs are consistent with the standards of care in child and adolescent psychiatry, especially considering ORR's unique population.**

95. At MercyFirst and Shiloh residential treatment centers, due diligence is clearly given to obtain consent from a parent or legal guardian.  The consent process is consistent with what occurs with the psychiatric care of the domestic population, including those in child welfare custody.  Although the use of psychotropic medications is monitored closely in domestic child welfare cases, and the initial consent reviewed if the use meets criteria for concern as previously discussed (i.e., use in young children, use of multiple antipsychotics), in a domestic setting, consent may be given by a worker who has limited background information on the child, and who may not have the vested interest in a child that a parent or guardian has.  Even if the plan is for reunification of the child and parent, my experience in working with child protective services in both Georgia and South Carolina is that while the child is in custody, the child welfare agency may provide consent whether the parent agrees or not.  A parent in the domestic setting may or may not even be informed of the use of a medication at the time it is prescribed.

96. A strength of the ORR requirements and process is that ORR seeks consent for medication use from a person with a vested interest in the child (such as a parent or legal guardian).  While acknowledging the benefit of ORR's current consent policy, it also creates a potential delay in delivering treatment to a child who needs the benefit that a psychotropic medication may provide.  Especially in a facility such as MercyFirst, for example, where non-elective medication use is prohibited, acute symptoms of psychosis, anger and agitation with severe aggression, and severe depression must be managed with behavioral and cognitive strategies that do not include the use of medications.

Expert Report of Dr. Donna Londino; confidential; under protective order

97. As noted above, the use of medications for acute management of symptoms while placed in both ORR RTC facilities is more stringent than in many states (including Georgia), where facility staff alone may determine the need for a PRN medication and review their impressions with the on-call physician.[38] Many children and teens in the domestic population are given antipsychotics as needed to target acute symptoms that often are creating disruption to the entire treatment milieu, a practice which is coming under increasing scrutiny, with child welfare agencies in many states (West Virginia, for example) mandating against the practice.  In that regard, ORR policy and procedure is ahead of the curve in adopting best practices for child welfare.

98. ORR's consent policy for RTC placement is also consistent with, or more stringent than, current consent policies of some state child welfare agencies. In the domestic setting, parental consent is not required in many states for admission to an RTC, and the referral for admission may occur when the behavior of the child or teen is severely interfering with permanency planning and disrupting current placement in foster care.[39]  ORR depends on reports from the referring agency in collaboration with medical professionals to determine the level of need to target problematic psychiatric symptoms which pose risk of harm to the UAC or others.  If indicated, the UAC may be admitted to MercyFirst while consent is being obtained; however, as to Shiloh,

---

[38] Asogwa K, Okudo J, Idowu J.,  The use and effectiveness of pro re nata psychotropic medications in children and adolescents: A systematic review.  Indian J Psychiatry. 2017 Jul-Sep;59(3):264-274. doi: 10.4103/psychiatry.IndianJPsychiatry_34_17.

[39] *See e.g.,* https://www.ncsl.org/research/human-services/the-child-welfare-placement-continuum-what-s-best-for-children.aspx; https://www.adoptuskids.org/adoption-and-foster-care/overview/foster-parenting; and

https://www.washingtonpost.com/national/we-are-just-destroying-these-kids-the-foster-children-growing-up-inside-detention-centers/2019/12/30/97f65f3a-eaa2-11e9-9c6d-436a0df4f31d_story.html.

Expert Report of Dr. Donna Londino; confidential; under protective order

recent changes in the state of Texas have mandated that even if a minor is in ORR custody, consent must be obtained from a parent before RTC placement occurs.

**C. I find that ORR's policies and procedures for placement of UACs, including those with disabilities, in RTCs (in ORR's network and out-of-network), are within the standards of care in child and adolescent psychiatry.**

99. My program visits and review of ORR's policies, procedures, and case files, noted a program that is evidence-based, structurally very well-organized, and developed with an understanding of child welfare needs and with appropriate oversight procedures.  There was uniform agreement by individuals who spoke during my visits that the goal for UACs in ORR custody is to be medically and psychiatrically stable, and to be placed with a parent, family member, or other individual as soon as that placement is safe for the UAC.  In addition, there was uniform acknowledgement that the best place for children and adolescents is at home with their families, when such placements are safe.

100.    My review indicates that discharge planning begins at the point of admission and is addressed throughout the therapeutic stay.   Whether facilitating movement into long term foster care for UACs who began as Category 4 or became Category 4 while in the care of ORR (see e.g., case files for UACs ONH and AAMT), providing intensive family work for children with severe mental health disturbance (e.g., CYIC), or caring for a UAC who has never had contact with their proposed sponsor (e.g., HARR), efforts to facilitate discharge or step-down to a less restrictive setting were evident in my case file review.

101.    At both MercyFirst and Shiloh RTCs, the initial treatment plan is developed in collaboration with the child or adolescent who is being admitted and his or her family when available.  This plan focuses on the goals of treatment and strategies to accomplish those goals, as well as provides a

- 36 -

timeframe for anticipated improvement and possible discharge.   Subsequent care is directed towards determining when symptoms have improved to the extent that the individual can be placed in a less restrictive setting or safely released to a sponsor.  Once this target goal is met, the youth is released to a safe sponsor if one is available or referred for step-down to a less restrictive setting.  Delays in discharge might occur to avoid a risk of mistreatment after discharge and to ensure understanding by the sponsor of the youth's mental health needs; this delay is necessary to ensure the safety of the child and is not an undue delay.  A minor with a severe mental illness such as bipolar disorder, severe depression with suicidality, or psychosis would be anticipated to decompensate without continued psychiatric medication and therapeutic services.  If a potential sponsor is unable or unwilling to address these issues, it would be potentially unsafe to release such a child to this individual.  A strength of both MercyFirst and Shiloh is their commitment to working with the families of UACs (including foster families if recommendations are made for long term foster care) to ensure that the continued need for mental health treatment is underscored and understood.  Given that UACs and their sponsors are no longer in ORR's custody once released, it is imperative that appropriate diligence be given to linking UACs and their families to necessary community resources.

**D. I find that children who evidence disabilities and whom ORR places in RTCs are placed and remain in such placements only if it is medically necessary, and that such children who no longer need such a restrictive level of care are stepped down or released to a suitable sponsor.**

102.   I find that the placement of UACs with disabilities such as autism and/or intellectual disability were managed in a less restrictive setting unless their behavior presented a substantial risk to the safety of the UAC themselves or to others such that a more restrictive setting was warranted.  I found no files of UACs who were placed in restrictive settings solely because of their

- 37 -

Expert Report of Dr. Donna Londino; confidential; under protective order

diagnosis or solely because they had or were viewed as having a disability. Likewise, where UACs might have disorders such as Attention Deficit Hyperactivity Disorder (ADHD) or bipolar disorder that may qualify for a disability under other health impaired or severe emotional disturbance, there was no evidence that a UAC was placed in a more restrictive setting solely because of that diagnosis.  UACs were referred for intensive psychiatric treatment in residential facilities when deemed medically appropriate by a mental health professional for more intensive treatment of cognitive and behavior patterns.  UACs with a history of severely aggressive behavior and a history of criminal activity were appropriately referred to secure and staff secure settings until their behavior while in ORR custody could be more formally evaluated and decisions related to readiness for step-down could be determined.

103.    I also found in my review that many delays in release were related to UAC Category status (especially if not 1 or 2A), that is, comparative unavailability of a safe sponsor, rather than due to a disability such as autism or intellectual disability.  Another contributing factor is that, by definition, youth in residential treatment have greater treatment needs than most children who reside in shelter care, necessarily extending the time required for treatment of their mental health needs and in finding a suitable sponsor or step-down facility equipped to meet those needs.  In the domestic setting, agencies specializing in the care of individuals with intellectual disabilities are aware that the care of such individuals requires lengthier stays to address problematic behaviors and to provide additional resources.[40]

104.    Children with potential or identified disabilities who manifest severe emotional disturbance are a difficult sub-population to treat regardless of the

---

[40]https://www.uptodate.com/contents/intellectual-disability-in-children-management-outcomes-and-prevention#!

- 38 -

Expert Report of Dr. Donna Londino; confidential; under protective order

treatment setting, as these individuals are less able to utilize cognitive processes to understand the reasons for their symptoms or to use more adaptive coping when distressed.  Although commonly used to describe individuals with co-occurring substance use disorders and other mental health diagnoses, "dual diagnosis" can also be used to describe the co-occurrence of mood disturbance, ADHD, and other psychiatric disorders with intellectual disability.  A primary diagnosis of intellectual disability without comorbidity is not sufficient to warrant an RTC placement, and I found no indication in my case file review that this had happened to any UAC in ORR custody.

105.    Review of the Benjamin F. case file (further details outlined below) is one example of a UAC with a developmental disability of autism and intellectual disability where RTC placement was determined to be in the best interest of the child and other UACs.  His young age (9) and non-verbal state contributed to behaviors that were difficult to optimally control in a less restrictive setting where the child was housed with older, less impaired UACs. He was transferred to a more restrictive setting to provide him with closer supervision and therapeutic care where more structured behavioral interventions could be implemented.  I found his care consistent with the guidelines established for children with autism and intellectual disability published by the AACAP.[41] [42]  I also found his care to follow the guidelines outlined by ORR that appropriately require, in addition to an individualized care plan, an individualized in-care safety plan for youth with disabilities (ORR Guide  § 3.3.4).  The referral was appropriate, considering all relevant

---

[41]https://www.aacap.org/App_Themes/AACAP/Docs/practice_parameters/autism.pdf.

[42]Kishore, M. T., Udipi, G. A., & Seshadri, S. P. (2019). Clinical Practice Guidelines for Assessment and Management of intellectual disability. Indian journal of psychiatry, 61(Suppl 2), 194–210. https://doi.org/10.4103/psychiatry.IndianJPsychiatry_507_18.

Expert Report of Dr. Donna Londino; confidential; under protective order

factors, including his age and development.  His behavior in the Children's Home shelter (aggression and self-injurious behavior) was unable to be managed in this level of less restrictive care, and his symptoms posed a significant risk to other children as well as to the resident himself.  Following a recommendation from a mental health professional, he was admitted to Shiloh.  In addition to being diagnosed with autism, his admitting diagnoses also included severe anxiety and ADHD.  He was placed at the RTC level only long enough for stabilization of his symptoms and his treatment was appropriately modified with consideration of his young age, his intellectual disabilities, and his relative lack of communicative language.  His treatment incorporated a multidisciplinary approach with an emphasis on behavioral modification, following an applied behavioral analysis model (ABA – standard care for young people with autistic spectrum disorders)[43] and education.  Despite efforts to facilitate discharge, there was some delay related to his mother's detention. This led to his grandmother pursuing sponsorship. Visits with his mother were arranged as soon as possible to address this minor's anxiety over separation from her.  His overall length of stay was consistent with the length of stay of other UACs in RTC care, which as noted compares favorably to such placements for children in domestic child welfare systems, and there is no indication his placement was made or release was delayed by reason of his disability.

## IV.   ADDITIONAL CONCLUSIONS

106.     I find that the challenges in meeting the mental health care needs of UACs (especially regarding expeditious consent for treatment, medications, identifying disabilities and discharge planning) are innate in the population

---

[43] https://www.centerforautism.com/services/aba/.

- 40 -

Expert Report of Dr. Donna Londino; confidential; under protective order

being served by ORR.  I have noted numerous times the complications posed by difficulty finding the parent of a UAC in order to plan and collaborate on treatment with family.  Collateral history is difficult to obtain and thus there is limited pre-existing knowledge about the child's functioning or clinical needs, adding additional lack of clarity when trying to assess the acuity of symptoms and prior functioning as a predictor of current treatment or in determining disability status.

107.    The closest analogy to potentially offering guidelines for providing mental health care to UACs in ORR custody, both in and out of residential care, would be guidelines for the care and treatment of children in the domestic foster care system; multiple references and comparisons were made throughout this report.  Although an imperfect analog because of differences compared with ORR's unique population and mission, the domestic population serves as a potential model for mental health treatment in some respects, since many children and teens in child protective services are in out-of-home placements and a subset are in situations where family reunification will either be delayed or terminated completely.  Accordingly, some of the principles providing guidelines for the care of children and youth in foster care may be used to gauge the appropriateness of care currently being offered to this similar group of minors.  I found the overall development and structure of ORR as well as the goals of mental health provisions in multiple settings (shelters, secure and staff secure, residential) consistent with the practice guidelines provided by the American Academy of Child and Adolescent Psychiatry.[44] In particular, my assessment (through facility visits and UAC file reviews) found ORR, Shiloh, and MercyFirst to exceed expectations in the following areas (modified to fit the UAC model) discussed across several

---

[44] *See supra* n.5.

Expert Report of Dr. Donna Londino; confidential; under protective order

key child welfare principles, below.

    a.  Principle 1:  Clinicians should understand the child welfare system and how youth and family may interact with it.  On multiple levels (administrative and locally), the individuals responsible for developing and implementing the ORR program as well as the mental health care workers providing services demonstrated a solid understanding of the entire process to include why children and adolescents may come to the United States unaccompanied, what their needs are, both from a mental health perspective and in general, and how to best provide the services in the context of a different language and culture.

    b.  Principle 3:  Clinicians should have knowledge of who has the authority to consent for evaluation and treatment.  ORR demonstrated due diligence to ensure appropriate informed consent for the prescription of psychotropic medications.

    c.  Principle 7:  Clinicians should be aware of special considerations in the evaluation and treatment of youth involved in the child welfare system.  Especially in residential settings, clinicians and staff at MercyFirst and Shiloh understood the co-morbidity of severe and complex trauma that UACs have often experienced, potential attachment disruption and adjustment responses to changes in placement, and separation from family.

    d.  Principle 10:   Clinicians should be knowledgeable about evidence-based psychosocial interventions for youth in the child welfare system.  This principle is difficult to accomplish in the ORR population as many evidence-based models include family involvement.  For many UACs, family is often difficult to find, and distance and family's access to communication technology can preclude optimal participation.  I was

- 42 -

impressed however, with the knowledge that the program at large and facility administration and treatment providers had that was relevant to this important need. I was also impressed by the diligence given to try to obtain a plan for permanency that would facilitate more interventions that included family involvement.

e. Principle 11: Clinicians should be familiar with regulations and procedures for prescribing psychiatric medications to youth involved with the child welfare system and should follow evidence-based and best prescribing practices. Upon reviewing UAC case files (e.g., A.C. was properly prescribed sertraline 50-100 mg for depression; A.A. was prescribed an appropriate dose of 27 mg of Concerta for symptoms associated with his diagnosis of attention-deficit hyperactivity disorder; and M.S. was properly prescribed escitalopram 10-20 mg for depression and anxiety and mirtazapine 15-30 mg for sleep disturbance and anxiety), and the psychotropic data file, I found prescription of medications to be evidence-based on the diagnosis being treated, within the standard dosing ranges recommended by clinical practice parameters, federal drug administration recommendations and drug manufacturer inserts, and monitored with appropriate frequency and with side effect assessments. Pharmacologic management was modified as indicated based on response to treatment and tolerance of the medication. Polypharmacy, when present, appeared to follow evidence-based treatment guidelines with documentation of clinical reasoning.

108.    Despite these comparisons, unique challenges are present in ORR's release process and the population of children in ORR's care that make it difficult to form perfect parallels to the reunification of children with parents or

- 43 -

alternative permanency options (e.g., guardianship, adoption) in state child welfare agencies. The ORR release process is greatly complicated by the need to appropriately find and identify parents of the UAC, and if parents are unavailable, vet other potential sponsors of children in ORR custody who may not have a meaningful pre-existing or current relationship with the child. Locating and screening potential caretakers and guardians of children in domestic care is made easier as these individuals are generally in the same geographic area. Additionally, whereas domestic child welfare agencies already have foster parents and systems that have been established and assessed prior to placing a child in care, this is often not the case for children in ORR custody whose potential sponsors have not had assessments to ensure that the UAC is safe from the potential of trafficking and/or abuse.

109. I reserve the right to amend or supplement this Report, including but not limited to my review of any further expert statements or reports submitted on behalf of Plaintiffs. In addition, I expect that I may be asked to testify in rebuttal to issues that may be raised in the reports of Plaintiffs' experts, or to issues that may be raised by fact witnesses and experts at trial.

Dated: June 19, 2020

DocuSigned by:

*Donna Londino MD*

E596DF45AD2F40C...

Donna Londino, M.D.

- 44 -

Expert Report of Dr. Donna Londino; confidential; under protective order

# **Appendix A: Curriculum Vitae**

Donna Lynn Londino

Professor

Department of Psychiatry & Health Behavior

Section of Child and Adolescent Psychiatry

Medical College of Georgia

Augusta University

997 St. Sebastian Way

Augusta, Georgia 30912

EG1000A

(706) 721-6697

(706) 721-6602 FAX

dlondino@augusta.edu


<u>EDUCATION</u>

  Undergraduate

      Bachelor of Science in Biology 1984

      Augusta State University, Augusta, Georgia

      Augusta College Certificate of Achievement, Dean's List

      Advanced Placement – Math, Organic chemistry, Human behavior & Psychology


  Graduate

      1988: Graduate work in Calculus and Computers

          Augusta State University, Augusta, Georgia

      1988: Dale Carnegie Course in Effective Speaking and Human Behavior

          Augusta, Georgia

Expert Report of Dr. Donna Londino; confidential; under protective order

1

2 EDUCATION, Cont.

3    Doctor of Medicine

4       Medical College of Georgia

5       Augusta, Georgia (1991 – 1995)

6       E.J. McCranie Award for Academic & Clinical Excellence in Psychiatry -

7          1995

8

9   Internship and Residency in Psychiatry

10       Medical College of Georgia Department of Psychiatry

11       Medical College of Georgia, Augusta, Georgia

12       Categorical 7-95 to 6-99

13       Psychiatry Resident of the Year Award – 1998

14

15   Child and Adolescent Psychiatry Fellowship

16       Medical College of Georgia Department of Psychiatry

17       Medical College of Georgia, Augusta, Georgia

18       Categorical 7-1998 to 6-2000

19       Psychiatry Resident of the Year Award – 1999

20       E.J. McCranie Award for Clinical Excellence - 1999

21       Child and Adolescent Chief Resident – 7-99 to 6-00

22

23 PROFESSIONAL LICENSURE

24       Georgia Board of Medical Examiners

25       License # 047343

26       General Medicine and Surgery

27       DEA# BL6820256

28

Expert Report of Dr. Donna Londino; confidential; under protective order

BOARD CERTIFICATION

Board Certified – American Board of Neurology and Psychiatry

Certificate # 48886 – Awarded September 2000

Recertification completed February 2012

Board Certified – American Board of Neurology and Psychiatry

Child and Adolescent Psychiatry

Certificate # 5062 – Awarded December 2001

Recertification completed April 2011

EMPLOYMENT HISTORY

September 1980 – May 1984:  Bookkeeper, Barton & Barton Contractors

May 1984 to July 1984: Medical College of Georgia Laboratory Assistant/Research

Dr. A. Latif – Department of Ophthalmology

July 1984 to August 1991:    NutraSweet Co, Augusta, Ga.

Quality Control Chemist / Emergency Response Team

June 1994 to May 1995:        Augusta Area Psychiatric Associates

Contracted to perform History and Physicals at Humana Hospital

FORENSIC WORK

2003  Expert Witness – Fairleigh vs. Fairleigh – Child Custody Hearing

VOLUNTEER WORK

2011-2015   SAI Volunteer Clinic – provided monthly mental health consultation at a
grant sponsored free clinic

PROFESSIONAL

Academic appointments:

August 2000 to July 2007:  Assistant Professor, Medical College of Georgia

- 47 -

Department of Psychiatry and Health Behavior

July 2007 to June 2016: Associate Professor, Medical College of Georgia at Georgia Health Sciences University, Department of Psychiatry and Health Behavior

July 2017 to present:  Professor, Medical College of Georgia at Augusta University Health Care System, Department of Psychiatry and Health Behavior

October 2000 to 2014:  Medical Director, Inpatient child and adolescent psychiatric services, Georgia Health Sciences University (formerly Medical College of Georgia), Children's Medical Center

December 2002 to September 2004: Interim Training Director, Child and Adolescent Fellowship, Medical College of Georgia Department of Psychiatry and Health Behavior

March 2001 – present:  Course Director/Codirector – Phase I Clinical Neuroscience and Behavioral Health for first year medical students

COMMITTEES

Department of Psychiatry & Health Behavior Child & Adolescent Inpatient Services Quality Unit Council (Chairperson)

Department of Psychiatry & Health Behavior Faculty Senate Representative

Department of Psychiatry & Health Behavior Promotion & Tenure Committee

Department of Psychiatry & Health Behavior Electronic Medical Record Committee

Department of Psychiatry & Health Behavior Medical Student Education Committee

Department of Psychiatry & Health Behavior Residency Interview Committee

Department of Psychiatry & Health Behavior Child and Adolescent Residency Training Committee

- 48 -

Augusta University Pediatric Behavior Health Task Force Committee

Medical College of Georgia School of Medicine Admissions Committee

Medical College of Georgia School of Medicine Curriculum Oversight Committee

Medical College of Georgia Liaison Committee on Medical Education (LCME) Self-Study Group and Site Visit Participant

Medical College of Georgia Neuroscience Curriculum Committee

Medical College of Georgia Family & Patient Centered Care Committee

Medical College of Georgia Palliative Care Curriculum Committee

Medical College of Georgia Problem Based Learning Committee

Medical College of Georgia Dean's Student Research Committee (Chair 2011-2013)

Medical College of Georgia Translational Research Curriculum Committee

Georgia Department of Behavioral Health and Developmental Disabilities Medication Utilization Parameters Workgroup

American Board of Neurology & Psychiatry Child and Adolescent Subspecialty Examination Committee

The American College of Psychiatrists Psychiatry Resident-In-Training Examination (PRITE) and Child PRITE Committee


GRANTS/AWARDS AND HONORS/PROFESSIONAL ADVANCEMENT

| | |
|---|---|
| 2000 - 2002 | Alcohol Medical Scholars Program |
| 2002 | Didactic Teacher of the Year, Dept. of Psychiatry and Health Behavior |
| 2002 | Educational Excellence Award, Dept. of Psychiatry and Health Behavior |
| 2003 | Outstanding Lecturer Award – Psychiatry, Phase I medical students, Medical College of Georgia |

- 49 -

| | | |
|---|---|---|
| 2005 | Didactic Teacher of the Year, Dept. of Psychiatry and Health Behavior |
| 2006 – 2008 | Harvard Macy Scholarship for physician-educators |
| 2007 | Lasdon Scholarship to support a summer research project in child and adolescent psychiatry |
| 2007 | Association of American Medical Colleges Mid-Career Women Faculty Seminar |
| 2008 | Appointed to the Academy of Medical Educators, Georgia Health Sciences University |
| 2010-2011 | Nominated for Clinical Excellence Award in Teaching – Medical College of Georgia |
| 2017 | Clinical Supervisor of the Year, Child and Adolescent Fellowship, Dept. of Psychiatry and Health Behavior |

PROFESSIONAL SOCIETIES
American Academy of Child and Adolescent Psychiatry
National Alliance for the Mentally Ill
Medical College of Georgia Alumni Association
Augusta State University Alumni Association
Team Based Learning Collaborative

REVIEWER FOR:
Journal of Studies on Alcohol
Psychiatry Research
Journal of Clinical Psychiatry
Journal of the American Medical Women's Association
Journal of Clinical Psychopharmacology
Academic Psychiatry
International Journal of Psychiatry in Medicine
DejaReview: Behavioral Sciences. New York: McGraw-Hill Publishers, 2006
MedEdPORTAL
AAMC
Community Mental Health Journal

- 50 -

PRESENTATIONS
Multiple presentations locally, regionally, and nationally on: Asperger's disorder and autistic spectrum disorder; acute stabilization of severe psychiatric illness in children and adolescents; psychotropic use in children and adolescents; depression, suicidality, homicidality, substance use, and psychosis in children and adolescents; as well as school consultation and curriculum development.

PUBLICATIONS
**Non-refereed:**

Rausch JL, Sirota E, <u>Londino DL</u>, Corley K.  The phenotype of Asperger's as a negative symptom spectrum disorder:  comparison with autism, schizophrenia, schizoid personality, and schizotypal personality disorder.  Presented at the Georgia Psychiatric Physician's Association Meeting, 2003

Rausch JL, Carr B, Sirota E, <u>Londino DL</u>, Corley KM, Johnson ME.  Autism, Asperger's, and schizophrenia:  common endophenotypic and genetic characteristics of negative symptom spectrum disorders.  Presented at the Georgia Psychiatric Physicians Association Meeting, 2005.

Londino DL.  "The medical student educator".  Department of Psychiatry and Health Behavior Faculty Career Development Manual.  2007

Londino DL.  "Autism", Children's Hospital of Georgia on-line blog.  2016

Londino DL.  Content expert for Redline e-books.  Mental Health for Adolescent Females 2017

**Refereed**
<u>Londino DL</u>, Wiggins L, Buckley P.  Child and Adolescent Psychiatry: Atypical antipsychotics.  Current Psychiatry 2002; 1(10):45-63

Rausch JL, Sirota E, <u>Londino DL</u>, Carr BM, Bathia R, Miller S.  Negative symptom spectrum disorders responsive to pharmacotherapy:  the case for Asperger's disorder.  A 12-week, open trial of risperidone in subjects ages 8 – 18 sponsored by Janssen Pharmaceuticals.  J Clin Psychiatry 2005; 98(12):1592-1597.

Foster A, <u>Londino D</u>, Psychiatry Clerkship Self-Assessment: Psychosis, Dementia and Child & Adolescent Practice Vignettes. MedEdPORTAL; 2010. Available

- 51 -

from:
http://services.aamc.org/30/mededportal/servlet/s/segment/mededportal/?subid=80
54

Shah H, Rossen B, Lok B, <u>Londino D</u>, Lind SD, Foster A. Interactive Virtual
Patient Scenarios: An Evolving Tool in Psychiatric Education.  2012, Academic
Psychiatry, 36(2): 146-150.

Thomassin K, Shaffer A, Madden A, <u>Londino DL</u>.  Specificity of childhood
maltreatment and emotion deficit in nonsuicidal self-injury in an inpatient sample
of youth.  2016, Psychiatry Res., Oct 30;244:103-8

Londino DL.  Suicidal Ideation in Children and Adolescents.  Audio-Digest
Pediatrics 2017; Vol 63 Issue 12.

Londino DL, Molitor P, Slocumb C, Burchett K.  The Association between Length
and Number of Deployments on the Emotional Health and Behavior of Children
and Adolescents in Military Families.  Journal of the American Academy of Child
& Adolescent Psychiatry, 2017. DOI: 10.1016/j.jaac.2017.09.408.

**Book Chapters**
Londino DL, Mabe PA, Josephson AM. Child and adolescent psychiatric
emergencies:  family psychodynamic issues. Child Adolesc Psychiatric Clin N Am
2003;12:629-647.

Londino DL, Wiggins L, Dallas J, Stirewalt E, Buckley PF.  Evolving use of
atypical antipsychotic medications in childhood psychiatric conditions.  In:
Csernansky JG, Lauriello J, eds.  Atypical Antipsychotics:  From Bench to
Bedside.  New York:  Marcel Dekker, Inc. 2004

Londino DL, Janowsky DS, Mattingly D.  Biological Management of Asperger's
Disorder.  In:  Rausch JL, Johnson ME, Casanova, MF, eds.  Asperger's Disorder.
New York:  Informa Healthcare.  2008

**Grant Proposals**
Sexson, S, Bonham C, Cohen M, <u>Londino D</u>, Mabe A.  White paper document -
Providing ABA Therapy to Children with Autism Spectrum Disorder in Georgia:
A Proposed Concept from Georgia Regents University (Total Grant Proposal $ 3
million).  Submitted to the governor of Georgia, Nathan Deal, 2014.

Expert Report of Dr. Donna Londino; confidential; under protective order

RESEARCH
**Current**
Examining the occurrence and perceptions of conversion disorder diagnoses and
autism among adolescents and young adults in the emergency department.  Jester
K, Hayman J, Londino D.

Pre and post quantitative EEG in adolescents with attention-deficit/hyperactivity
disorder after treatment with transcranial magnetic stimulation.  Camino R,
Londino D, Okeleji W, Deal J.   In preparation for IRB submission.

**Past**
SPRITES: SERTRALINE PEDIATRIC REGISTRY FOR THE EVALUATION
OF SAFETY - A Non-interventional, Longitudinal, Cohort Study to Evaluate the
Effects of Long-term Sertraline Treatment in Children and Adolescents.  Londino
D, Carson C.

The association between length and number of deployments on the emotional
health and behavior of children and adolescents in military families.  Londino D,
Molitor P, Slocumb C., Bajpayi P, Sharma S, Stewart A

Relation of Childhood Relation of Childhood Maltreatment to Non—suicidal Self-
injury in an Inpatient Sample of Adolescents. Londino D, Thomassin K, Hammock
B, Harris M

Examination of quantitative EEG in a Normal Population. Londino D, Saini A,
Fitzgerald T.

Best estimate diagnosis used to evaluate quantitative EEG in association with
ADHD in a multi-site, clinical sample of children and adolescents. Londino D,
Sexson  S, Mabe A, Gowans A, Hutcheson J, Westbrook J, Floyd G.  Sponsored by
Lexicor Medical Technology, Inc.

Epidemiology of Mental Illnesses Represented on MySpace.com.  Ellis M, Messias
E, Londino D.

Social support for mothers of mentally ill children.  Scharer K, Londino DL, et al.
Sponsor: National Institute of Nursing Research.

Expert Report of Dr. Donna Londino; confidential; under protective order

Efficacy and Safety of Duloxetine in Adolescent Depression.  Londino D, Rausch JL, Hutcheson J, Westbrook J, Floyd G.  Sponsored Lilly Pharmaceuticals.  Back-up site

Pre and Post risperidone treatment changes in pre-frontal n-acetic acid, creatine, phosphocreatine, and choline as determined by magnetic resonance spectroscopy.  Rausch JL, Londino DL, Johnson ML, Pallai J, Hessenthaler  M, Bhatia R, Hutchinson J.  Sponsored by Janssen Pharmaceuticals.

Efficacy, safety and tolerability of zolpidem in the treatment of children aged 6 to 17 years with ADHD-associated insomnia.  A multicentre, randomized, double-blind, placebo-controlled study.  Rausch JL, Londino DL, Pezeshpour M, Johnson ME, Hutchinson J, Sanders C.  Sponsored by Sanofi-aventix pharmaceuticals.

Comparison of a Standard Psychiatric Diagnostic Evaluation to a Quantitative Electroencephalographic Assessment and to Behavior Rating Scales in the Diagnosis of Children and Adolescents (6 to 18  years of age) with Attention Deficit Hyperactivity Disorder.  Sexson  S, Londino D, Pezeshpour M, Lewkowiez E.  Sponsored by Lexicor Medical Technology, Inc.

A 3-week, 6-week, and Multicenter, Double-blind, Parallel-group, Placebo-controlled study of the    Efficacy and Safety of Quetiapine Fumarate (SEROQUEL) in the Treatment of Children and Adolescents with Acute Bipolar I Mania.  Sponsored by AstraZeneca Pharmaceuticals.

REFERENCES:  Available upon request

TESTIMONY AS EXPERT WITHIN PREVIOUS 4 YEARS:  None

Expert Report of Dr. Donna Londino; confidential; under protective order

**<u>Appendix B: Documents Considered</u>**

1. UAC case files—named Plaintiffs

2. 75 selected UAC case files that Defendants shared with Plaintiffs

3. First Amended Complaint

4. Answer to First Amended Complaint

5. Defendants' Responses to Plaintiffs' Requests for Admissions

6. The UAC Policy Guide (ORR Policy Guide: Alien Children Entering the United States Unaccompanied)

7. The UAC Manual of Procedures (MAP)

8. American Academy of Child & Adolescent Psychiatry Principles of Care for Treatment of Children and Adolescents with Mental Illnesses in Residential Treatment Centers

9. American Academy of Pediatrics Council on Foster Care, Adoption, and Kinship Care and the Committee on Adolescence and Council on Early Childhood Technical Report on Health Care Issues for Children and Adolescents in Foster Care and Kinship Care

10. American Academy of Child & Adolescent Psychiatry Executive Summary on Recommendations about the Use of Psychotropic Medications for Children and Adolescents Involved in Child-Serving Systems

11. American Academy of Child & Adolescent Psychiatry Position Statement on Oversight of Psychotropic Medication Use for Children in State Custody: A Best Principles Guideline

12. American Academy of Child & Adolescent Psychiatry Practice Parameter for the assessment and management of youth involved with the child welfare system

13. American Academy of Child & Adolescent Psychiatry Practice parameters for the assessment and treatment of children and adolescents with conduct disorder

14. Texas Department of Family and Protective Services Psychotropic Medication

- 55 -

Utilization Parameters for Children and Youth in Foster Care (5th edition)

15. Psychotropic Medication Utilization Parameters for Children and Youth in Texas Public Behavioral Health (6th Version)

16. American Academy of Child & Adolescent Psychiatry Practice Parameter for the Assessment and Treatment of Children and Adolescents with Autism Spectrum Disorder

17. National Institute of Mental Health and Neurosciences in India Clinical Practice Guidelines for Assessment and Management of intellectual disability

18. Cooperative Agreement

19. RTC Addendum to Cooperative Agreement

20. PowerPoint presentations GOV-00235752, GOV-00235753, GOV-00235755, GOV-00235757, and GOV-00235758

21. UAC Psychotropic Medication Data - Excel spreadsheet GOV  00235763

Expert Report of Dr. Donna Londino; confidential; under protective order

## Appendix C: Reviews of UAC Case Files for Named Plaintiffs

1. Gabriela N. (17 years old; El Salvador, Category 4, released to Unaccompanied Refugee Minor program): Minor was admitted to Shiloh for self-harm and suicidal ideation.  She was diagnosed with Post Traumatic Stress Disorder (PTSD), anxiety (review of records supports the diagnoses), and Attention Deficit Hyperactivity Disorder (ADHD) added adjunct during treatment. Her length of stay was 7-8 months (behavioral ratings improved throughout; physician continued to recommend residential care).  She was prescribed fluoxetine (Prozac) and melatonin for sleep and placed on Adderall for ADHD.  Resident had a broad differential diagnosis on presentation. Minor was referred to long term foster care but was refused due to age and prior elopement attempts.  Based on my review of this file, the minor's treatment given her complicated mental health history while in ORR custody and specifically within the Residential Treatment Center was within the standard of care.

2. Lucas R. (12 years at time of entry into care; Guatemala, Category 2A – released to half-brother):  Minor was admitted to Shiloh after a hospitalization two months earlier (February 2018) for suicidal ideations with a plan. Transfer to Shiloh did not occur for several months but patient's behavior was monitored closely at the shelter prior to transfer.  Minor had been diagnosed with Major Depression and was prescribed sertraline (Zoloft) by the outpatient provider prior to admission to Shiloh.  His medication was changed to Lexapro during his initial course of treatment.  Intuniv was added with appropriate requests for an electrocardiogram (EKG).  Minor's length of stay was 3.5 months (improved depression noted but behavioral scales noted significant worsening in oppositional behaviors).  Minor has a history of head trauma and marijuana use.  Based on my review of this file, the minor's

- 57 -

treatment while in ORR custody and specifically within the RTC was within the standard of care.

3. Benjamin F. (9 years old at entry; El Salvador, Category I but mother declined sponsorship due to immigration status, Category 2A – grandmother Isabella). Minor was admitted to Shiloh for a multitude of behavioral disturbances in the context of autism – Level 2 and developmental delay (aggression, mood instability and temper tantrums when redirected or not allowed to do as he desired, sexual behavior – poorly defined, self-injurious behavior – hitting head, and ADHD). He was unable to be managed at the St. PJ's Children's Home shelter and was referred to Shiloh emergently. He was diagnosed with autism, ADHD, disruptive behavior, probable adjustment disorder secondary to separation from his mother who was detained and separated from the patient after crossing the border. Minor had received services in his country of origin to include care from a neurologist who had assessed the patient with the use of imaging and a psychiatrist who had prescribed risperidone to address the patient's agitation. His length of stay at Shiloh was 46 days. Initial plans were to release minor to his mother upon her release. His grandmother eventually applied for reunification and sponsorship. Discharge medications included: Intuniv 4 mg once per day; Lexapro 10 mg once per day and risperidone 0.25 mg twice per day. His care was notable for modifications based on diagnosis and functioning (closer monitoring to include 1:1 close observation, functional behavioral assessments to identify precipitants to outbursts). The file includes notations of improvement in symptoms with treatment. Based on my review of this file, the minor's treatment while in ORR custody and specifically within the RTC was within the standard of care.

4. Sirena P. (14 years at time of entry, Mexico; released to Category 1 sponsor, father Eduardo P.). Minor was admitted to Shiloh for severe mood instability,

Expert Report of Dr. Donna Londino; confidential; under protective order

self-injurious behavior, and suicidal ideations.  On admission, she endorsed plans to hang self and was unable to contract against self-harm.  Minor was diagnosed with Major Depression, rule out Bipolar Disorder (history of agitation with serotonergic antidepressant treatment), Generalized Anxiety Disorder, and borderline traits.  She had two hospitalizations prior to transfer to Shiloh for more intensive, longer-term treatment.  Symptoms had been present in the UAC's country of origin with the reported stressor cited as separation from parents. UAC's father moved to California when the UAC was an infant.  Her mother left her at a young age as well but would visit intermittently until permanently moving to the United States at the patient's age of nine.  Collateral history revealed that the UAC had been engaging in self-injurious behavior for several years prior to leaving for the United States and her grandparents and aunt gave a history of melancholy from a young age. While hospitalized at Shiloh, an appropriate and notable work-up regarding a possible diagnosis of bipolar disorder (family history, use of bupropion as the pharmacologic agent to treat the UACs depression) was conducted.  UAC verbalized contribution of length of stay to worsening of symptoms (confirmed by the behavioral scales utilized at monthly meetings – mood lability and anxiety noted as worsened) but was unable to maintain ample stability of mood as demonstrated by restraining from self-injurious behavior and endorsement of suicidal ideations to ensure her success if stepped down to a less restrictive level of care.   Staff were aware of the patient's propensity for impaired frustration tolerance and focused treatment on tolerance of negative mood states and use of more adaptive coping when stressed. Minor's length of stay was 3.5 months, which was warranted (given diagnosis of borderline personality traits) and the UAC's severity of symptoms on presentation. The treatment of adolescents with borderline personality

- 59 -

disorder is often complex secondary to significantly higher rates of both internalizing disorders such as anxiety and depression and externalizing disorders such as oppositional defiant behavior.[45]   Children and teens with borderline personality disorder have developed severely maladaptive ways of coping with stress and benefit from a more extended treatment course to practice newly learned behaviors.  By the patient's time of discharge, she self-endorsed significant improvement in her self-esteem and self-worth as well as her depression (noted to socialize and engage more with others) that would be protective against self-harm.  She also had learned to engage in more adaptive behaviors such as listening to music when stressed.  Family work was done to ensure a goodness of fit with the UAC and to ensure understanding of her mental health needs by the family. Based on my review of this file, the minor's treatment while in ORR custody and specifically within the RTC was within the standard of care.

5. Daniela Marisol T. (16 years, Honduras, released to half-sister Katherine L.): Minor was admitted to Shiloh for depression, psychotic symptoms, self-injury, possible dissociative episodes, and homicidal ideations.  She was diagnosed with depression with psychotic features and rule out bipolar disorder.  Her length of stay at Shiloh was 5 months.  Her family history was significant for suicide of her brother; she also reported surviving a prior attempted sexual assault by a gang member in Honduras.  She failed the hearing and vision screen; uncorrected in country of origin.  Her discharge medications were Prozac 30 mg every day and Seroquel 300 mg every night (changed from risperidone during treatment, dose of Seroquel optimized throughout).  Minor's behavioral records note clear improvement of psychotic

---

[45]   Ha, C., Balderas, J. C., Zanarini, M. C., Oldham, J., & Sharp, C. (2014). Psychiatric comorbidity in hospitalized adolescents with borderline personality disorder. J Clin Psychiatry, 75(5), 457-64.

Expert Report of Dr. Donna Londino; confidential; under protective order

symptoms with pharmacotherapy.  She displayed less improvement and possible worsening of mood instability and despondency that the UAC specifically attributed to her length of stay.  This was addressed in an individual counseling session that targeted more adaptive coping when disappointed or frustrated with life events.  An episode of self-injurious behavior occurred several months into treatment underscoring the concerns about the UAC's ability to demonstrate stability of mood or behavior that would provide a reasonable assurance of safety if stepped down to a less restrictive environment.  Psychotherapy focused on behavioral strategies exclusively and may have benefited from a more cognitive focus.  Based on my review of this file, however, the minor's treatment within the RTC was within the standard of care.

6.  Miguel Angel S. (16 years, Mexico):  Minor came to the United States to escape violence from the cartel in his country of origin.  He turned himself in after crossing the border.  He has a history of anxiety with one presentation for psychiatric services at the age of 14 prior to coming to the United States.  Minor was referred for intensive psychiatric services related to severe depression and mood lability, suicidality and behavioral disturbance thought to be directly related to the traumatic death of his brother.  He was admitted to Shiloh where he resided from July 2017 to March 2018 with treatment directed at stabilizing his mood symptoms with the use of psychotropic management (escitalopram implemented at an appropriate dose of 10 mg each day and increased to 20 mg throughout his treatment as well as mirtazapine which was also started at an appropriate dose of 15 mg each night to assist with anxiety and sleep.  This medication was increased as tolerated to 30 mg and adjusted based on staff and patient report).  A notable strength of this UAC's treatment was the individualized and comprehensive service plan (pg.

- 61 -

7) that presented his case in a formulated manner that addressed his biologic, psychologic, and social risk factors as well as considering and integrating the youth's strengths and skills (training in auto mechanics). This UAC received intensive therapy directed at his past trauma and his case file documents improvement in the relationship between the UAC and his mother with whom he had a considerable conflictual relationship prior to admission. His case was complicated by the results of DNA testing that showed that the individual that the UAC thought was his father was not his biological father. An acute decompensation in behavior during the early part of February led to concern over the safety of staff and other residents at Shiloh, and a request was made for the UAC to be transferred to Yolo County Juvenile Detention Facility. He continued to have his mental health issues addressed after transfer through psychotherapy and other counseling as well as pharmacologic oversight. Based on my review of this file, the minor's treatment within the RTC and upon transfer to the secure facility was within the standard of care.

7. Jaime D. (Honduran male age 13 at time of initial ORR custody): UAC was placed in shelter care at Cayuga Center. His comments about criminal behavior in his country including gang involvement, substance use and murder prompted a referral to the secure setting of Yolo County Juvenile Detention Facility. UAC spent 1 ½ months there where he later recanted his initial report of gang involvement stating that he endorsed this behavior so that he would not be returned to his country of origin. He was stepped down to a staff secure placement at Children's Village before being released to a Category 2 sponsor (maternal aunt). Post-release, he was enrolled in public school but was expelled for bringing a weapon to school and at this time, sponsor asked that child protective services take custody. UAC was subsequently placed in the Greentree Adolescent Group Home. In January

Expert Report of Dr. Donna Londino; confidential; under protective order

2019, UAC required hospitalization for the acute stabilization of depression associated with paranoia. Additional differential diagnoses noted during custody have included oppositional defiant disorder, separation anxiety disorder, with rule out diagnoses of conduct disorder and attention deficit hyperactivity disorder. His medications throughout his course of treatment included the use of sertraline 100 mg, Intuniv 1 mg, melatonin 3 mg at night, and hydroxyzine for anxiety. An additional area of focus for this UAC has been his educational struggles. He came to the United States with only a 4th grade education and a noted inability to read or write. Subsequent testing in July of 2019 using standard assessments including the Wechsler Intelligence Scale for Children and the Woodcock-Johnson Tests of Achievement noted his intellect in the borderline range with a full-scale IQ of 71. His performance on achievement tests, even when administered in Spanish noted his functioning in domains of math and reading as below average with weaknesses in fluid reasoning and processing speed. Additional formalized assessments including the Children's Depression Inventory (CDI), Behavioral Assessment Scale for Children (BASC), and a Child Behavior Checklist (CBCL) noted the UACs responses to be either at risk or clinically significant for multiple emotional disturbances and maladaptive behaviors. The UAC was placed in the Arrow Center for Education for four months where his educational deficiencies could be addressed through modified learning strategies and attention to his emotional needs. At time of review, the findings of the UAC's psychological testing, progress at the Arrow Center for Education and other history as relevant had been compiled and reviewed by an education team with the subsequent development of an Individualized Educational Plan (IEP) to further address the UAC's learning needs as he completes his education. Based on my review of this file, the minor's

Expert Report of Dr. Donna Londino; confidential; under protective order

treatment while in ORR custody including the identification and assessment of the UAC's learning difficulties, as well as recommendations to address them, are consistent with the standard of care.

Expert Report of Dr. Donna Londino; confidential; under protective order

## **Appendix D: Case File Review-Selected Files from Step-Up Facilities**

1.  79% of Selected Files for Review were for male UAC; 21% were female.

2.  The county of origin (COO) of UAC whose files were selected for review are
    as follows:
    a.  Honduras    32
    b.  Guatemala   27
    c.  Mexico      8
    d.  El Salvador 6
    e.  China       1
    f.  India       1

    (See Appendix E.1 - General Age Distribution of UACs)

Expert Report of Dr. Donna Londino; confidential; under protective order

3.  Over 50% of the selected files for review were for UACs over the age of 17; Less than 10% of selected files for review were for UACs younger than the age of thirteen.

(See Appendix E.2 - General Age Distribution of UACs)

The age breakdown of UAC whose files were selected for review is as follows:

| Age | Male | Female | Total |
|---|---|---|---|
| Seventeen | 32 | 6 | 38 |
| Sixteen | 13 | 2 | 15 |
| Fifteen | 7 | 2 | 9 |
| Fourteen | 3 | 0 | 3 |
| Thirteen | 1 | 3 | 4 |
| Twelve | 2 | 0 | 2 |
| Eleven | 1 | 2 | 3 |
| Ten | 0 | 0 | 0 |
| Nine | 0 | 1 | 1 |
| Totals | 59 | 16 | 75 |

(See Appendix E.3 - Specific Age Distribution of UACs)

4.  20% of UAC whose files were selected for review had referrals for residential care to include one referral to Millbrook Treatment Center (an out of network facility), six referrals to MercyFirst's Residential Treatment Center (RTC) and nine referrals to Shiloh RTC.  The symptoms or diagnoses targeted for treatment through residential care included suicidality, and decompensation of mood stability in UACs with a diagnosis of major depression, bipolar disorder, psychosis, and post-traumatic stress disorder (PTSD). Based on my experience and expertise, as well as familiarity with guidelines for pediatric psychiatric

- 66 -

systems of care and treatment parameters for specific diagnoses, UACs were appropriately placed and discharged from different placements based on an assessment of safety as well as emotional and health-care needs.

5. The diagnosis of oppositional defiant disorder (ODD) was common. My review of symptoms noted in the selected case files also suggest that the diagnoses of conduct disorder and adult antisocial behavior would be warranted as differential diagnoses. These UACs were more likely to have referrals for treatment in secure and staff secure facilities where their needs could be addressed while offering safety for staff and peers alike. Some of the specific behaviors identified and potentially consistent with conduct disorder were destruction of property, sexually inappropriate behavior towards staff and peers, and assault on others with limited remorse. Some UACs also had a reported history of gang involvement.

6. 42.6% of UACs whose files were selected for review were receiving medications. All UACs who were referred for residential care received pharmacotherapy.

7. Medications prescribed to UACs included: psychostimulants for attention deficit hyperactivity disorder (ADHD); antidepressants for depression and anxiety; guanfacine for impulsivity; prazosin for nightmares associated with post-traumatic stress disorder (PTSD); antipsychotics and mood stabilizers as indicated for mood stabilization; hydroxyzine for agitation and sleep; and trazodone and melatonin for sleep. In my opinion, indications and dosing ranges were generally appropriate and consistent with the standard of care for prescribing practices of psychotropic medications to youth.

8. The following UACs were noted to have co-morbid medical problems that were appropriately addressed during and after time in ORR custody through pediatric specialist referrals to cardiologists and a neurologist, respectively, as well as post-release services addressing education related to the medical diagnosis and

Expert Report of Dr. Donna Londino; confidential; under protective order

assistance with access to services.

| UAC Initials | Medical diagnosis |
|---|---|
| BASR | Cardiomyopathy |
| GNGC | Cardiac murmur |
| LFAH | Head trauma |

9.   Longer stays in ORR custody were often associated with category status, which may have changed during a UAC's stay in ORR care if concerns about the potential sponsor or the environment to which a UAC might be discharged arose.  In these cases, further investigation into the safety of the discharge environment was conducted, as is appropriate, and intensive family involvement encouraged prior to release in order to decrease potential for harm to the UAC after discharge.

10. The length of stay in ORR custody was as short as 24 days for a UAC, for example AALA, who was Category 1 and with an uncomplicated presentation. This was particularly important for this UAC who is only eleven years of age, an age where separation from a parent can be especially anxiety provoking.  The longest length of stay that I noted on review of the selected charts was for UAC, initials AMMM, who had been in ORR care since 2015 with multiple step-ups and step-downs for severe behavioral disruption in the context of past abuse and critical efforts towards stabilizing an environment that would be suitable in addressing the minor's intensive mental health needs.  Attempts to place the UAC into a least restrictive environment on more than one occasion led to decompensation with resultant aggressive behavior towards staff, destruction of property, and self-harm attempts.  His history was notable for multiple adverse childhood events which are known to be associated with significant mental health disturbances in particularly vulnerable individuals.  Treatment is

Expert Report of Dr. Donna Londino; confidential; under protective order

complex and prolonged secondary to trust and attachment issues. Release efforts were ongoing throughout the UAC's time in ORR custody with many attempts to match the UAC with a sponsor to whom release would be safe for both parties.

11. My case file review demonstrated consistency in many domains. There are standard ORR initial evaluation and ongoing risk assessment tools that are subsequently utilized by care providers to direct medical treatment through both a review of past medical diagnoses such as asthma and seizures, and a review of symptoms that frequently elicited medical concerns such as hyperglycemia or dental needs. These evaluation and assessment tools are also appropriately utilized to assess whether the child has any other needs (including any disabilities) so that ORR can meet them. *See* ORR Guide § 3.4 (Medical Services). I found these assessment tools similar to those used in both routine domestic medical and psychiatric care. Risk assessment tools included content consistent with most risk assessment measures, including questions pertaining to past events known to be associated with high incidences of risky behavior (i.e. childhood trauma), questions pertaining to past self-injurious and aggressive behavior, and screening of current ideations related to death and hostility towards others.

12. Efforts were made throughout the UACs' time in ORR custody to identify youth with disabilities particularly through the use of educational assessments. If a UAC was identified with a disability, modifications in the approach to education and behavioral management were implemented. Educational modifications used were consistent with federal guidelines (extra testing time, quiet work areas) and also with strategies proposed in the clinical and educational literature on how to optimize educational opportunities for individuals with intellectual disability and/or emotional and behavioral disturbances impairing educational progression.

- 69 -

13. Similar to my experience working in residential care, I found the decision making as it pertained to step-ups in care to be driven by the essential goals of safety for the individual youth and others.  For the domestic population, both in out-of-home placements and those who are not, residential care is reserved primarily for adolescents who have engrained patterns of thinking and behavior that significantly interfere with daily functioning.   The infrequency of residential referral for the files reviewed as well as the time in more restrictive care indicated that step-ups were appropriate, and were directed towards the placement where the most therapeutic benefit could be obtained while providing for the safety of the UAC and others.  In particular, determination of the need for secure and staff-secure placements were based not only on a history of severe aggression and violence, but also based on direct observations of staff, and documentation of such incidents through significant incident reports (SIR). In cases where there was reason to believe that past trauma was contributing to maladaptive behavior, attempts were made to refer the UAC for more long-term mental health treatment instead of referrals to secure or staff-secure settings.

14. As noted, discharge planning and family reunification begin at the time of admission through identification of potential sponsors for UACs, including parents, legal guardians, and other relatives.  It is a mutual success in treatment when caretakers for children in out-of-home placements can be expeditiously identified so that the family works to build trust and relationships as soon as possible.  This goal in care is consistently identified and documented on the initial assessment regardless of the level of care in which UACs are placed. Regular meetings with therapists and case managers as well as treatment teams facilitate UACs' reunification with family whenever possible, and while they are in ORR custody, their placement in the least restrictive environment that can meet their individual needs.

Expert Report of Dr. Donna Londino; confidential; under protective order

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>Appendix E: Selected Charts</u>**

### E.1 - Countries of Origin of Selected UACs

India | 1
China | 1
El Salvador | 6
Mexico | 8
Guatemala | 27
Honduras | 32

(0, 5, 10, 15, 20, 25, 30, 35)

Expert Report of Dr. Donna Londino; confidential; under protective order





Expert Report of Dr. Donna Londino; confidential; under protective order



## Certificate Of Completion

Envelope Id: 035107FD4EDD400B9E2CC27F9C191312
Subject: Please DocuSign: 2019 06 19 - Report of Donna Londino - NEEDS SIGNATURE (1).pdf
Source Envelope:

Status: Completed

Document Pages: 72
Certificate Pages: 1
AutoNav: Disabled
EnvelopeId Stamping: Disabled
Time Zone: (UTC-05:00) Eastern Time (US & Canada)

Signatures: 1
Initials: 0

Envelope Originator:
Donna Londino
1120 15th Street
Augusta, GA  30912
DLONDINO@augusta.edu
IP Address: 67.173.221.109

## Record Tracking

Status: Original
                6/19/2020 4:07:48 PM

Holder: Donna Londino
                DLONDINO@augusta.edu

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Donna Londino MD<br>dlondino@augusta.edu<br>Augusta University<br>Security Level: Email, Account Authentication (None) | *Donna Londino MD*<br>E596DF15AD2F40C...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 67.173.221.109 | Sent: 6/19/2020 4:08:01 PM<br>Viewed: 6/19/2020 4:08:08 PM<br>Signed: 6/19/2020 4:11:15 PM<br>Freeform Signing |

**Electronic Record and Signature Disclosure:**
        Not Offered via DocuSign

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 6/19/2020 4:08:01 PM |
| Certified Delivered | Security Checked | 6/19/2020 4:08:08 PM |
| Signing Complete | Security Checked | 6/19/2020 4:11:15 PM |
| Completed | Security Checked | 6/19/2020 4:11:15 PM |

| Payment Events | Status | Timestamps |
|---|---|---|