# DX-64

Expert Rebuttal Report of Dr. Ilze Earner, July 17, 2020

JEFFREY B. CLARK
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
ERNESTO H. MOLINA, JR.
Deputy Director
CHRISTOPHER A. BATES
Senior Counsel to the Assistant Attorney General
BENJAMIN MARK MOSS
W. DANIEL SHIEH
Senior Litigation Counsel
NANCY K. CANTER
ANTHONY J. MESSURI
JONATHAN K. ROSS
Trial Attorneys
Office of Immigration Litigation
U.S. Department of Justice
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-9802
Daniel.Shieh@usdoj.gov

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Lucas R., *et. al.*, | Case No.: 18-cv-05741-DMG-PLA |
| *Plaintiffs*, | **DECLARATION OF DR. ILZE EARNER IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Alex M. Azar, Secretary of U.S. Dep't of Health and Human Services, *et al*. | |
| *Defendants*. | |

# DECLARATION OF DR. ILZE EARNER

I, Ilze Earner, declare and state as follows:

1. I have expertise in child welfare, specifically with immigrant populations. I have a Ph.D. from Columbia University and a M.S.W. from California State University – Fresno. I am an Associate Professor of Social Work at the Hunter College Silberman School of Social Work in New York City, where I have taught social work graduate and undergraduate students since 2001. I make this Declaration in support of Defendants' Motion for Summary Judgment.

2. Counsel for Defendants contacted me to provide expert opinion and testimony on the policies and procedures of United States Department of Health and Human Services, Office of Refugee Resettlement ("ORR") with respect to the care and supervision of unaccompanied alien children. Counsel asked me to review certain materials and thereafter render my opinions, which I did in a June 19, 2020 Expert Report. On August 10, 2020, I appeared for a deposition and testified regarding the contents of my June 19, 2020 Expert Report.

3. If called as a witness to this action, I could and would testify competently to the facts and opinions set forth herein, including my June 19, 2020 Expert Report and my August 10, 2020 deposition.

I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct.

Executed this September 18, 2020 at Martindale, New York.

Ilze Earner, Ph.D., LCSW
Declarant

1
Declaration of Dr. Ilze Earner in Support of Defendants' Motion for Summary Judgment

Ilze Earner

July 17, 2020

**Rebuttal Report to Drs. Ryan Matlow and Nancy Ewen Wang's Expert Report**

1. My rebuttal report will first address Section VII (D) of Drs. Matlow and Wang's report titled, "Institutionalized care and detention impose immediate and long lasting harm to children."

2. I reach the following opinions with respect to Section VII(D): 1) The potential detriments of placing adolescent unaccompanied alien children (UACs) in institutionalized care do not, and should not, outweigh concerns for UAC safety and well-being; and 2) Inadequate, rushed, poor or premature assessment of family or sponsors can place UACs at risk of: a) Being reunified with family members or a sponsor who cannot appropriately take care of them; b) Not having appropriate linkages or referrals for community resources to meet their specific needs; c) Being engaged in exploitative activities to repay smuggling debts; and/or d) Becoming victims of human trafficking.

**Rationale**

3. The placement of children in institutional care is considered the least preferential form of out-of-home care options[1]. Young children, under the age of five years old, in particular, are most likely to experience harm across measures of health, emotional, psychological and physical well-being especially if left in institutional care settings for long periods of time during the early years of their development[2][3].

4. However, the overwhelming majority of UACs in ORR care are adolescents between 13-18 years of age when they are placed in ORR shelter facilities and who spend less than two months in care before release to a sponsor. The bulk of the literature cited by Drs. Matlow and Wang specifically addresses the detrimental effects that toddlers and young children experience who are placed into institutional care in the domestic child welfare system because of parental abuse, neglect or abandonment. This population neither

---

[1] van IJzendoorn, M. H., Palacios, J., Sonuga-Barke, E. J., Gunnar, M. R., Vorria, P., McCall, R. B., LeMare, L., Bakermans-Kranenburg, M. J., Dobrova-Krol, N. A., & Juffer, F. (2011). Children in Institutional Care: Delayed Development and Resilience. *Monographs of the Society for Research in Child Development*, 76(4), 8–30. https://doi.org/10.1111/j.1540-5834.2011.00626.x.

[2] Dozier, M., Zeanah, C. H., Wallin, A. R., & Shauffer, C. (2012). Institutional Care for Young Children: Review of Literature and Policy Implications. *Social issues and policy review*, 6(1), 1–25. https://doi.org/10.1111/j.1751-2409.2011.01033.x.

[3] Johnson R, Browne K, Hamilton-Giachritsis C. Young children in institutional care at risk of harm. *Trauma Violence Abuse*. 2006;7(1):34-60. doi:10.1177/1524838005283696.

shares the same life history, age range, demographics or experiences with the majority of the UAC population.

5. Research on the long term effects of institutional placement of migrating children is scarce and typically focuses on refugee populations residing in camps, shelters or other forms of congregate care[4]; The International Organization for Migration (2011) recommends protocols and guidelines on the placement of all types of migrating children and while it generally recommends against institutional placement, advises that "the safety of the child and his/her family must be paramount" (p. 53)[5].

6. The child welfare literature about institutional care and whether it is harmful or not is far more nuanced when looking at populations of older children, or children with traumatic life events, poverty, stigma, physical and sexual violence, and a lack of educational resources[6]. Temporary or short-term placement in a therapeutic shelter or specialized care facility with appropriate services in place can help stabilize children with chaotic histories, traumatic experiences, or substance abuse issues. Other research indicates it is important to explore whether these children were first exposed to traumatic life events while living with their families, or subsequent to separation from their families in an out-of-family placement (e.g., an institution or foster care), or after ending up homeless, living on the street or some other unstructured situations.[7]

7. Regardless of the timing of traumatic life events, the professional literature emphasizes the importance of building on the strengths of these children and fostering their growth and well-being through their participation in evidence-based, multidisciplinary interventions aimed at improving their health, education, and psychosocial development with well-trained caregivers and appropriate adult-to-child ratios, regardless of placement setting.[8] These are the goals of the ORR shelter programs for UACs based upon my personal observations, the materials I reviewed, and my discussions with staff and directors during on-site visits.

8. Before UACs can be released from ORR shelter care, a viable family member or sponsor needs to be identified and appropriately assessed. This is in keeping with all standardized processes in domestic child welfare prior to the placement of a child in

---

[4] UNICEF (May, 2017). A Child is a Child: Protecting Children on the Move from Violence, Abuse and Exploitation.
[5] International Organization for Migration (2011). Unaccompanied Children on the Move.
[6] Cluver, L, Meinck, F, Yakubovich, A, Doubt, J, et al (2016). Reducing child abuse amongst adolescents in low- and middle-income countries: A pre-post trial in South Africa. BMC Public Health. 13;16(1):567.
[7] Atwoli et al (2014). Impact of Domestic Care Environment on Trauma and Posttraumatic Stress Disorder among Orphans in Western Kenya. https://doi.org/10.1371/journal.pone.0089937.
[8] Kutlesic, V. (2016). "The Effects of Institutionalization and Living Outside of Family Care on Children's Early Development". National Academies of Sciences, Engineering, and Medicine. 2016. *Reaching and Investing in Children at the Margins: Summary of a Joint Workshop by the National Academies of Sciences, Engineering, and Medicine*; Open Society Foundations; and the International Step by Step Association (ISSA). Washington, DC: The National Academies Press. https://doi.org/10.17226/23491.

care either with: adoptive families, foster families, kinship guardians or legal guardians. Any individual with whom a child in the domestic child welfare system may be placed must undergo a home assessment, psycho-social evaluations, background checks as well as submit to fingerprinting (the only individuals not required usually to submit fingerprints are bio-parents). These assessments are not punitive – they are tools to assess the viability of a potential placement for successful permanency outcomes. Importantly, ORR must assess whether families are ready and capable of integrating the UAC into their midst. There is no reason UACs deserve less safeguards prior to placement than children in the domestic context.

9. Moreover, the dynamics of how individuals migrate through irregular channels, especially children, is little understood nor has it been extensively studied. The few existing studies of international irregular migration have focused on adults and are challenged by concerns over sample size, validity, generalizability, and methodology.[9] There needs to be more concern for how UACs arrive at the border, who has guided or arranged their journey, and under what circumstances, because this has substantial implications for what happens to UACs once they are released from ORR custody. Smugglers have to be paid – and they are either paid upfront or arrange for payment over time once the migrant has reached their destination. In the past, UACs have been found, post release, in very exploitative labor situations, which lead to calls for reform and the institution of more rigorous screening. Better assessment of the family or sponsor of a UAC might prevent the UAC from being subject to abuse and exploitation. Children who have few opportunities to migrate legally are more likely to be involved with smugglers who in turn may or may not have ties to organized human trafficking criminal networks. Europol (2017)[10] estimates that globally, 20% of all children who migrate are involved with smugglers; the International Organization for Migration cites data that 62% of Central American and Caribbean children are trafficking victims. [11]

10. The difference between 'smugglers' and organized human trafficking networks is questionable. While studies often refer to 'smugglers' in broad terms as a more benign set of actors – sometimes they are neighbors, individuals who live in the same villages as the migrants, some may even be related to the migrant – they are nevertheless individuals engaged in a dangerous and illicit business which is to facilitate irregular migration. Heyman et al. (2018) describes smugglers as "active participants in the

---

[9] UNICEF (September, 2017). Harrowing Journeys. https://www.unicef.org/publications/files/Harrowing_Journeys_Children_and_youth_on_the_move_across_the_Mediterranean.pdf
[10] UNICEF (May, 2017). A Child is a Child: Protecting Children on the Move from Violence, Abuse and Exploitation. https://data.unicef.org/resources/child-child-protecting-children-move-violence-abuse-exploitation/.
[11] McAuliff ML, Laczko F. (Eds). Migrant Smuggling Data and Research: A Global Review of the Emerging Evidence Base. IOM: Geneva, Switzerland.

narrative building" (pg.9)[12] on how to succeed in obtaining the goal of staying in the United States. For example, smugglers will coach migrants on what to say when apprehended, how to behave in custody, how to ask for immigration relief such as asylum, and what specific stories to tell in order to support that claim.

11. International studies have expressed growing concern that as borders are becoming more difficult to cross and avenues for immigration relief are increasingly more stringent, desperate migrants, especially adolescents, also increasingly fall to criminal networks engaged in human trafficking.[13] It is in the best interests of UACs and their family members to carefully and thoroughly assess whether or not there are issues of smuggling or human trafficking related to the migration journey prior to the UAC's release from ORR custody. While this may increase time in ORR care, it is important to ensure the safety and well-being of the UAC. [14]

12. Second, my rebuttal report will address Section VII (E) (b) of Drs. Matlow and Wang's report titled, "Prolonged detention is particularly harmful."

13. I reach the following opinions with respect to Section VII(E)(b): Deteriorating mental health observed in UACs while in ORR shelter facilities may be due to a number of factors outside of simply 'prolonged detention': 1) There are no prior 'baseline' assessments on which to ascertain mental health status and functioning of the UACs prior to placement in an ORR facility; 2) UACs are adolescents with many adult life experiences; and 3) UACs may experience rejection by family or sponsors.

**Rationale**

14. Unlike children in the domestic child welfare system, there is no prior history or documentation of what the life story, experiences, assessments of mental health or other markers of functioning of the UACs are prior to apprehension. For perhaps the first time in their lives, UACs in ORR shelters encounter therapeutic interventions to assess their mental health status and psycho-social functioning. Pre-existing conditions such as depression, bi-polar disorder, intellectual and cognitive disabilities may not immediately be evident, but manifest over time.

15. It is well-documented that children with a history of severe traumatic life events may also experience disassociation for a period of time. They may appear initially to be normatively functioning in affect and behavior. Then, suddenly and only in the context

---

[12] Heyman J, Slack J, Guerra E. (2018, Winter). Bordering a 'crisis': Central American Asylum Seekers and the Reproduction of Dominant Border Enforcement Practices. *Journal of the Southwest*, 60, 4, 754-786
[13] UNICEF (2017), *supra*, note 9.
[14] For instance, D.M.M.R. who submitted a Declaration cited by Drs. Matlow and Wang alleged that two of her sponsors (her mother and maternal aunt) trafficked young girls and that she did not want to live with them. GOV-0024180; *see also* GOV-00231765 (letter dated 8/13/19 determining that D.M.M.R. was "subjected to a severe form of trafficking in persons" and, as a result, eligible for benefits).

of a structured and stable environment do they may begin to manifest symptoms of mental and behavioral disturbance.[15]

16. Children who migrate across borders on their own are also subject to pressures that are largely outside the normative expectations of adolescents in the United States. According to several reports by the United Nations International Children's Emergency Fund (UNICEF), child migrants may be subject to peer pressures to migrate; they may be fulfilling family obligations to support ill, impoverished, or aging family members.  Other studies have cited that migration may be a "rite of passage" into adulthood or that child migrants are responding to a collective benefit to the family as opposed to individual agency.  Lastly, the definition of who is a "child" is cultural; according to some reports it is evident in some cultures by the age of 14 years many adolescents are expected to take on adult roles.[16]  With any one of these goals thwarted by a seemingly protracted stay in an ORR shelter, it is not difficult to see how a UAC may at times react with depressed affect, frustration, or even anger.

17. Lastly, one of the hardest and most disturbing experiences in the life of any child is the experience of being rejected by their family of origin.  It is the untold story of migration. In the declarations by UACs cited in Drs. Matlow and Wang's report, this is evident: A.J.V.M. (17), his aunt declines to sponsor; Jaime D. (13), aunt is a 'potential' sponsor; C.M.V.C. (17), no family and no sponsor; and C.J.A.L. (17), father declines to sponsor. This is not an unfamiliar experience for children whose parents have left them behind, with the best intentions, but time and distance make reunification impossible.  Memoirs attest to the historical precedent for this experience;[17] I also have both personal and professional experience. [18]

18. All of these factors play important roles in the mental health of UACs rather than alleged deterioration that arises from time spent in ORR care.

---

[15] Mitchell, M. B. (2018). "No one acknowledged my loss and hurt": Non-death loss, grief, and trauma in foster care: C & A C & A. *Child & Adolescent Social Work Journal, 35*(1), 1-9. doi:http://dx.doi.org.proxy.wexler.hunter.cuny.edu/10.1007/s10560-017-0502-8.

[16] International Organization for Migration. (2018) World Migration Report 2018. https://www.iom.int/wmr/

[17] Talese G. (1992). Unto the Sons.  New York: Random House.

[18] Fong, R. and Earner, I. (2016) Multiple traumas of undocumented immigrants:  Crisis re-enactment play therapy:  The case of Julia.  In Nancy Boyd Webb (Ed), Play therapy with children in crisis, fourth edition.  New York:  The Guilford Press.

Materials Considered In Preparing This Rebuttal Report

1. The materials I considered in forming my opinions as referenced in my June 19, 2020 report in this matter.
2. Drs. Matlow and Wang's expert report in this matter.
3. Certain declarations cited by Drs. Matlow and Wang in their expert report in this matters, as noted in this report.
4. Atwoli et al (2014). Impact of Domestic Care Environment on Trauma and Posttraumatic Stress Disorder among Orphans in Western Kenya. https://doi.org/10.1371/journal.pone.0089937.
5. Cluver, L, Meinck, F, Yakubovich, A, Doubt, J, et al (2016). Reducing child abuse amongst adolescents in low- and middle-income countries: A pre-post trial in South Africa. BMC Public Health. 13;16(1):567.
6. Dozier, M., Zeanah, C. H., Wallin, A. R., & Shauffer, C. (2012). Institutional Care for Young Children: Review of Literature and Policy Implications. *Social issues and policy review*, *6*(1), 1–25. https://doi.org/10.1111/j.1751-2409.2011.01033.x
7. Fong, R. and Earner, I. (2016) Multiple traumas of undocumented immigrants:  Crisis re-enactment play therapy:  The case of Julia.  In Nancy Boyd Webb (Ed), Play therapy with children in crisis, fourth edition.  New York:  The Guilford Press.
8. Heyman J, Slack J, Guerra E. (2018, Winter). Bordering a 'crisis':  Central American Asylum Seekers and the Reproduction of Dominant Border Enforcement Practices. Journal of the Southwest, 60, 4, 754-786
9. van IJzendoorn, M. H., Palacios, J., Sonuga-Barke, E. J., Gunnar, M. R., Vorria, P., McCall, R. B., LeMare, L., Bakermans-Kranenburg, M. J., Dobrova-Krol, N. A., & Juffer, F. (2011). Children in Institutional Care: Delayed Development and Resilience. *Monographs of the Society for Research in Child Development*, *76*(4), 8–30. https://doi.org/10.1111/j.1540-5834.2011.00626.x
10. International Organization for Migration (2011). Unaccompanied Children on the Move.
11. International Organization for Migration. (2018) World Migration Report 2018. https://www.iom.int/wmr/
12.  Talese G. (1992). Unto the Sons.  New York: Random House.
13. Johnson R, Browne K, Hamilton-Giachritsis C. Young children in institutional care at risk of harm. *Trauma Violence Abuse*. 2006;7(1):34-60. doi:10.1177/1524838005283696.
14. Kutlesic, V. (2016).  "The Effects of Institutionalization and Living Outside of Family Care on Children's Early Development".  National Academies of Sciences, Engineering, and Medicine. 2016. *Reaching and Investing in Children at the Margins: Summary of a Joint Workshop by the National Academies of Sciences, Engineering, and Medicine*; Open Society Foundations; and the International Step by Step Association (ISSA). Washington, DC: The National Academies Press. https://doi.org/10.17226/23491.
15. McAuliff ML, Laczko F. (Eds). Migrant Smuggling Data and Research: A Global Review of the Emerging Evidence Base.  IOM: Geneva, Switzerland.
16. Mitchell, M. B. (2018). "No one acknowledged my loss and hurt": Non-death loss, grief, and trauma in foster care: C & A C & A. Child & Adolescent Social Work Journal, 35(1), 1-9. doi:http://dx.doi.org.proxy.wexler.hunter.cuny.edu/10.1007/s10560-017-0502-8.
17. UNICEF (May, 2017).  A Child is a Child:  Protecting Children on the Move from Violence, Abuse and Exploitation. https://data.unicef.org/resources/child-child-protecting-children-move-violence-abuse-exploitation/.

18. UNICEF (September, 2017). Harrowing Journeys. https://www.unicef.org/publications/files/Harrowing_Journeys_Children_and_youth_on_the_move_across_the_Mediterranean.pdf
19. GOV-0024180  (D.M.M.R. case file excerpt)
20. GOV-00231765 (D.M.M.R. case file excerpt)
21. Other materials as may be referenced elsewhere in this rebuttal report.

*[signature]*  July 17 2020

Dr. Ilze Earner, Ph.D, LCSW