# DX-67

Rule 30(b)(6) Deposition of Toby Biswas, February 18-19, 2020
(Supplemental Excerpts)

Page 1

```
 1              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
 2                    Western Division

 3   - - - - - - - - - - - - - - -+
                                   |
 4   LUCAS, R., et al.,            |
                                   |
 5              Plaintiffs,        |   Case Number:
                                   |
 6      vs.                        |   2:18-cv-05741
                                   |
 7   ALEX AZAR, Secretary of       |
     U.S. Department of Health     |
 8   and Human Services, et al.,   |
                                   |
 9              Defendants.        |
                                   |
10   - - - - - - - - - - - - - - -+

11

12                 ***CONFIDENTIAL***

13          Rule 30(b)(6) Deposition of the

14           Office of Refugee Resettlement,

15     by and through its designated representative,

16              TOBY R.M. BISWAS, ESQ.

17                 Washington, D.C.

18            Tuesday, February 18, 2020

19                     9:00 a.m.

20                    (VOLUME 1)

21

22

23   Job No. 177358

24   Reported by:  Laurie Donovan, RPR, CRR, CLR

25
```

1  as in foreign countries, and assistance in

2  obtaining legal guardianship when necessary for

3  release of the unaccompanied alien child."

4           And then the various assessments, the

5  UAC assessment -- the UAC case review has a series

6  of questions related to the child's family in home

7  country, identifying who they are, their contact

8  information.

9      Q    Which section is that?

10     A    So this again would be Section 3.

11 Section 3.3.1 refers to the UAC assessment and

12 case review.  I don't have the assessment in front

13 of me.  The MAP may go into some more specifics.

14          Yeah, so in the MAP, Section 3 of the

15 MAP, which is "Services," page 20 gives a quick

16 guide, a "quick glance guide to the UAC

17 assessment," and includes a "Family and

18 Significant Relationships" section, and here case

19 managers are instructed to "document familial and

20 other significant relationships in the UAC's

21 country of origin and in the United States," and

22 we have an accompanying interviewing guidance for

23 clinicians and case workers, which is also

24 referenced in this document.

25     Q    All right.  So what types of familial

1   objecting to having their staff execute the Notice
2   of Placement in a Restrictive Setting?
3       A    In the past, I recall there generally
4   being some objection by Yolo staff, but I can't
5   remember it.  It was a while ago, so I can't
6   recall the specific concern.
7       Q    Who was it that was responsible for
8   addressing Yolo's concerns?
9       A    I think ultimately the Division of
10  Policies and Procedures consulted with Yolo on
11  their concern.
12      Q    I believe you testified that children
13  placed in staff secure also receive a Notice of
14  Placement, correct?
15      A    Yes.
16      Q    Okay.  What is a therapeutic group home?
17      A    A therapeutic group home, so that would
18  be -- we have, we have it listed in our Guide to
19  Terms, which I don't think made it into the
20  printout we have here, but it's a group home, so a
21  smaller scale shelter that offers -- has a
22  therapeutic component to it, so more clinical
23  services that might be more -- that are more
24  specialized or targeted to a particular
25  population.

```
                                                             Page 348
 1   or otherwise, in its facilities?
 2        A     We do for sexual abuse.
 3        Q     But not for other types of abuse?
 4        A     Not in the regular course.
 5              MR. SHIEH:  Is now a good time for
 6        a break?
 7              MR. HOLGUIN:  Yeah, that's fine.
 8        We can stop now.  Come back at 1:00.
 9              (Whereupon, the lunch recess was
10              taken.)
11   BY MR. HOLGUIN:
12        Q     Okay.  So when a, a child has been
13   approved for step down, say, for example, from
14   Shenandoah, how quickly does ORR policy require
15   the physical transfer of the child out of the
16   secure placement into a less secure placement?
17        A     So we try to transfer the child as
18   expeditiously as possible, but finding a facility
19   that is able to take the child can sometimes take
20   several days.  So our policy requires, our
21   procedures require the child be provided weekly
22   updates or at least -- it's actually written as
23   updates every seven days as to the progress made
24   and try to transfer the child.
25        Q     So what section is that in?
```

 1        A    So this is back in the MAP, Section
 2   1.4.2, and this is discussed at page 38.  So third
 3   bullet down, "Step Downs."
 4             "The UAC is provided notice that they
 5   are prepared for step down and given updates by
 6   the case manager and efforts made to transfer the
 7   UAC to a less restrictive environment.  A summary
 8   of the information contained in the UAC Case
 9   Review justifying the step down is provided to the
10   UAC on demand and signed and dated by the case
11   manager."
12             And then "Note:  If a step down to a
13   less restrictive environment is not completed
14   within seven days due to problems finding a
15   suitable care provider to transfer the UAC to, the
16   case manager explains what efforts have been
17   undertaken to transfer the UAC, in writing, in
18   updates to the UAC Case Review notes.  The case
19   manager provides these updates to the UAC's
20   attorney of record, legal service provider, and/or
21   child advocate on demand."
22        Q    All right.  So does ORR track how often
23   step downs, the physical transfer of a child from,
24   from a more secure to a less secure facility, does
25   it track delays in, in those physical transfers?

1      A     It tracks individual cases, and it is
2   one of the items that the compliance work group is
3   looking at.
4      Q     Does the compliance work group know how
5   often children are not transferred from more to
6   less secure environments within seven days?
7      A     Yes.  Roughly speaking, yes.
8      Q     And when a step down to a less
9   restrictive environment is not completed within
10  seven days, what action -- other than informing
11  the child of the reasons of the delay, what
12  actions other than that does ORR take?
13     A     Well, ORR is working with various care
14  providers to work on accepting the child, so if an
15  individual program is identified that appears to
16  be suitable for that child, ORR's staff is working
17  with that program to ensure that they receive any
18  additional documentation that they are requesting
19  in order to accept the placement of the child.
20     Q     So in other words, ORR basically tries
21  to find a less secure facility that will accept
22  the child?
23     A     Correct.
24     Q     Does it do anything else?
25     A     To find a less restrictive setting?

Page 351

1    Q    Well, to remove the child from -- yes,
2  to remove the child from the restrictive setting
3  that they've been, that they have been in, that
4  they have been determined to not need.
5    A    Yes.  I mean the efforts are made to try
6  to transfer the child, so ORR makes efforts to
7  transfer the child to the less restrictive
8  setting.
9    Q    Okay.  Does it do anything else?
10   A    I guess I don't know what you're
11 referring to, what else would they do.
12   Q    Well, for example, there could be some
13 sort of a process whereby ORR would seek out
14 additional facilities, additional beds, you know,
15 consider releasing the child.  I'm wondering, you
16 know, apart from continuing to look for a less
17 restrictive facility, what else does ORR policy --
18   A    So looking for new beds and bringing a
19 new program online is a process that can take up
20 to nine months, so, you know, we're always in the
21 process of looking for new beds, so as an
22 expedient, you know, mechanism for trying to
23 transfer a child, that is not going to work.
24        And then as far as releasing the child,
25 yes, ORR is always looking for ways to release a

Page 435

1    questions are like highly technical.
2         Q    Are these individual calls with care
3    providers or one big call or regional calls?
4         A    So it kind of depends.  It's usually
5    network-wide large calls with, you know, 600 to
6    800 participants.  Sometimes we'll break them up
7    by region, and some policies that may be very
8    specific to a certain type of care provider, we
9    may also additionally hold a separate call just
10   with that type of provider.
11             So, for instance, we've had some changes
12   to our policies regarding restrictive settings, so
13   we've held network-wide calls with all of our
14   networks, but then to sort of re-hammer in the
15   changes, we've held individual calls with
16   individual staff secure facilities and secure
17   facilities to ensure that everybody was on the,
18   you know, sort of on the same path.
19        Q    You testified earlier about the
20   difficulty of ORR issuing policies to address
21   every possible scenario.
22             Do you recall that testimony?
23        A    Yes.
24        Q    If ORR doesn't put it in its written
25   policy, how does ORR ensure that its policies are

```
                                                         Page 444
 1   use non-ORR funding to challenge ORR decisions?

 2       A    Never, nor have we ever threatened to.

 3       Q    Does ORR permit attorneys using non-ORR

 4   funding to challenge ORR decisions?

 5       A    Sorry.  Can you repeat the question?

 6       Q    Does ORR permit attorneys using non-ORR

 7   funding to challenge ORR decisions?

 8       A    Yes, we do.

 9       Q    One last question.  This is kind of

10   high-level.

11            Does ORR view access to counsel as an

12   "unmitigated good," meaning, all things being

13   equal, is it always better to provide children

14   with more legal representation, or are there other

15   costs and considerations ORR weighs?

16       A    So one of the costs we consider is a lot

17   of the attorneys -- our process is really designed

18   to be collaborative in nature.  The work that

19   we've done is not, is not intended to be

20   adversarial, and some of the process that we hear

21   from legal service providers advocating for really

22   would make our process much more adversarial,

23   which we think is really to the detriment of

24   children.

25            This is a collaborative process.  We're
```

Confidential

Page 253

```
 1   CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC
 2                I, Laurie Donovan, Registered
 3      Professional Reporter, Certified Realtime
 4      Reporter, and notary public for the District
 5      of Columbia, the officer before whom the
 6      foregoing deposition was taken, do hereby
 7      certify that the foregoing transcript is a
 8      true and correct record of the testimony
 9      given; that said testimony was taken by me
10      stenographically and thereafter reduced to
11      typewriting under my supervision; and that I
12      am neither counsel for, related to, nor
13      employed by any of the parties to this case
14      and have no interest, financial or otherwise,
15      in its outcome.
16                IN WITNESS WHEREOF, I have hereunto
17      set my hand and affixed my notarial seal this
18      29th day of February 2020.
19
20      My commission expires:  March 14, 2022
21      _Laurie Donovan_____
22
23   LAURIE DONOVAN
24   NOTARY PUBLIC IN AND FOR
25   THE DISTRICT OF COLUMBIA
```

```
 1
 2
 3
 4
 5     CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

 6                 I, Laurie Donovan, Registered
       Professional Reporter, Certified Realtime
 7     Reporter, and notary public for the District
       of Columbia, the officer before whom the
 8     foregoing deposition was taken, do hereby
       certify that the foregoing transcript is a
 9     true and correct record of the testimony
       given; that said testimony was taken by me
10     stenographically and thereafter reduced to
       typewriting under my supervision; and that I
11     am neither counsel for, related to, nor
       employed by any of the parties to this case
12     and have no interest, financial or otherwise,
       in its outcome.
13
                   IN WITNESS WHEREOF, I have hereunto
14     set my hand and affixed my notarial seal this
       2nd day of March 2020.
15

16     My commission expires:  March 14, 2022

17

18     _____
19     [signature: Laurie Donovan]

20     LAURIE DONOVAN
       NOTARY PUBLIC IN AND FOR
21     THE DISTRICT OF COLUMBIA

22
23
24
25
```