# DX-78

Expert Rebuttal Report of Dr. Donna Londino, July 17, 2020

JEFFREY B. CLARK
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
ERNESTO H. MOLINA, JR.
Deputy Director
CHRISTOPHER A. BATES
Senior Counsel to the Assistant Attorney General
BENJAMIN MARK MOSS
W. DANIEL SHIEH
Senior Litigation Counsel
NANCY K. CANTER
ANTHONY J. MESSURI
JONATHAN K. ROSS
Trial Attorneys
Office of Immigration Litigation
U.S. Department of Justice
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-9802
Daniel.Shieh@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Lucas R., *et. al.*,<br><br>                 *Plaintiffs*,<br><br>        v.<br><br>Alex M. Azar,<br>Secretary of U.S. Dep't of Health and Human Services, *et al.*<br><br>                 *Defendants*. | Case No.: 18-cv-05741-DMG-PLA<br><br>**DECLARATION OF DR. DONNA L. LONDINO IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

## DECLARATION OF DR. DONNA L. LONDINO

I, Donna L. Londino, declare and state as follows:

1.      I have expertise in child and adolescent psychiatry.  I received my
M.D. from the Medical College of Georgia.  I have over 20 years of clinical
experience including residential and impatient care of children and adolescents as
well as outpatient treatment of both adults and pediatric patients.  I am board
certified in both general, and child and adolescent psychiatry.  I am a professor of
psychiatry at Augusta University.  I make this Declaration in support of
Defendants' Motion for Summary Judgment.

2.      Counsel for Defendants contacted me to provide expert opinion and
testimony on the policies and procedures of United States Department of Health
and Human Services, Office of Refugee Resettlement ("ORR") with respect to the
care and supervision of unaccompanied alien children.  Counsel asked me to
review certain materials and thereafter render my opinions, which I did in a June
19, 2020 Expert Report.  On August 3, 2020, I appeared for a deposition and
testified regarding the contents of my June 19, 2020 Expert Report.

3.      If called as a witness to this action, I could and would testify
competently to the facts and opinions set forth herein, including my June 19, 2020
Expert Report and my August 3, 2020 deposition.


I declare under penalty of perjury under the laws of the United States that
the forgoing is true and correct.

Executed this September 18, 2020 at Augusta, Georgia.


Donna L. Londino, M.D.
Declarant

1
Declaration of Dr. Donna L. Londino in Support of Defendants' Motion for
Summary Judgment

1
2
3
4
5

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

6

LUCAS R. *et al.*,

Case No.: 2-18-CV-05741 DMG (PLA)

7

Plaintiffs,

**REBUTTAL REPORT**
**OF DR. DONNA LONDINO**

8

v.

9

ALEX AZAR, Secretary of U.S. Dep't

10

of Health and Human Services, *et al*.,

11

Defendants.

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Donna L. Londino MD**

Augusta University Health Care

Department of Psychiatry and Health Behavior

997 St. Sebastian Way

Augusta, Georgia 30912

**<u>Rebuttal Report</u>**

1. As a part of this litigation, I was asked by Defendants to offer a rebuttal to the following three reports submitted by Plaintiffs' experts: (1) Drs. Keith Cruise and Andrew Rasmussen; (2) Dr. Christopher Bellonci; and (3) Dr. Paul Block and Mr. John Farley.

2. Drs. Cruise and Rasmussen were asked to review and analyze 30 selected case files with the following defined goals: (1) whether children in Office of Refugee Resettlement (ORR) custody have behavioral, mental health, intellectual, and/or developmental disabilities or are regarded by ORR as having such disabilities; (2) whether children in ORR custody receive appropriate mental health services and reasonable accommodations for their disabilities to enable them to remain in less restrictive placements; (3) whether children in ORR custody are stepped up to residential treatment centers, staff-secure facilities, or secure facilities because of their disabilities and whether these step-ups are necessary and clinically appropriate to meet the child's needs or protect the safety of others; and (4) whether children in ORR custody experience delays in release and the reasons for such delays.

3. Dr. Bellonci's report addressed oversight for the administration of psychotropic medications for children in ORR care, and the adequacy of ORR's policies and procedures for ensuring that children are not harmed by psychotropic medications.

4. Dr. Block and Mr. Farley submitted a report on: "(1) whether children with

- 1 -

mental health, behavioral, and intellectual disabilities can be appropriately served in non-secure placements with community-based services; and (2) whether [ORR] has adequate policies and practices to ensure children with such disabilities are placed in the least restrictive and most integrated environment appropriate to their needs."

5. I reviewed all three reports, and as a board-certified specialist in child and adolescent psychiatry, as well as my prior experience and qualifications submitted in my expert witness testimony, I offer the following rebuttal to the concerns and data offered.

## I.   REBUTTAL FOR THE DRS. KEITH CRUISE AND ANDREW RASMUSSEN REPORT

6. I agree with Drs. Cruise and Rasmussen's report that UACs have behavioral and mental health concerns.  I also agree that migration is a risk factor for the development or worsening of behavioral and mental health problems.  I do not agree, however, that all UACs with a mental health diagnosis as documented by a clinician necessarily meet the specific legal criteria for having a disability under the Rehabilitation Act or the American with Disabilities Act (ADA). According to the ADA, to be diagnosed with a disability, an individual must show evidence that the physical or mental impairment is "substantially" limiting their ability to function in one or more areas. 42 U.S.C. § 12102. Additionally, a designation of "disabled" should not be assigned if the impairment is considered "transient (less than six months) and minor" (i.e. adjustment disorder).  Unfortunately, the nature of the ORR program does not always allow for an evaluation that is long enough to accurately assess the criteria that determine whether a true disability exists.

7. Drs. Cruise and Rasmussen appropriately note that trauma and poly-victimization (the experience of multiple victimizations of different kinds) is common among UACs.  It should be noted that trauma is also common in

- 2 -

domestic children younger than the age of 18, with some sources citing that as many as 60% of children and youth in a nationally representative sample had experienced at least 1 direct or witnessed victimization.[1] A proportion of UACs have experienced multiple adverse childhood events (ACEs) and multiple traumas.  This is not to say the two populations have experienced the same degree or kinds of trauma, but issues related to the care of the domestic population has applicability to the ORR population as well.

8. I do not agree with Drs. Cruise and Rasmussen's reliance on literature that posits length of stay in congregate care is associated with worsening of behavior and mental health symptoms.  The literature surrounding this issue is limited, and most references they cite were from the juvenile justice context.  It is also widely accepted that studies in this area in the domestic context are fraught with methodological challenges in discerning the causal nature of length of stay, given that there are many other variables that include other risk factors (e.g., trauma history, genetic risk of psychopathology).

9. Drs. Cruise and Rasmussen provide qualitative data based on the analysis of 30 case files in an effort to provide a foundation for opinions related to the four primary questions posed by Plaintiffs.  Qualitative research is a growing field of scientific assessment that can offer valuable insight into different domains of service provision, including health care.  Qualitative research, however, has been associated with concerns about how findings should be critiqued and interpreted.[2] [3]  Data obtained through qualitative research is often used to

---

[1] Finkelhor et. al.  Violence, Abuse, and Crime Exposure in a National Sample of Children and Youth.  Pediatrics Nov 2009, 124 (5) 1411-1423; DOI: 10.1542/peds.2009-046.

[2] Dixon-Woods, M., Shaw, R. L., Agarwal, S., & Smith, J. A. (2004). The problem of appraising qualitative research. Quality & safety in health care, 13(3), 223–225. https://doi.org/10.1136/qhc.13.3.223

[3] Noble H, Smith J, Issues of validity and reliability in qualitative research. Evidence-Based Nursing 2015;18:34-35.

- 3 -

formulate subsequent hypotheses that can be further examined through quantitative analysis, and so methodological rigor is imperative.

10. Some of Drs. Cruise and Rasmussen's findings with respect to the demographic data concerning the 30 case files are consistent with my findings on the larger sample of 75 UAC case files that I reviewed.  Most UACs represented in the file review were males.  The average age was 15.4 years.  The average length of stay was reported to be 142 days (however, there was an outlying data point of 1,521 days for one UAC and this may have biased the resulting mean towards a greater length of stay).

11. However, I view the data and demographics in the report as positive:

   a.  Most UACs (93%) were initially referred to shelters, and those later transferred were only referred to staff-secure or secure per ORR policy 1.2.4.  Step-ups to a more restrictive level of residential care only occur when there is inability to provide for the UAC's safety in a less restrictive setting or per policy, after staff spend weeks or even months working with the minor with no progress towards goals (i.e. adaptive coping that is absent safety risks of suicidality and potential harm to others) that is compatible with discharge to a parent or other identified sponsor.  This shows that UACs are given the opportunity to function without impairment prior to a referral for more intensive services and is consistent with care for domestic children, with treatment referrals generally reserved for those with demonstrated symptoms that pose a disruption to their ability to function in a less restrictive setting.

   b.  Most UACs who were stepped up only required one step-up, showing that the child benefited in terms of overall functioning, and step-up did not have to occur again.

   c.  The odds of being stepped up with a Significant Incident Report (SIR) reflecting a danger to self or others was 9.6 times the odds of being

- 4 -

stepped up without an SIR reflecting a danger to self or others.  This is consistent with best practices in child psychiatry that support more restrictive levels of care when an individual presents a significant risk of harm to themselves or others.

12. The report by Drs. Cruise and Rasmussen emphasizes the importance of using validated instruments for screening and further assessment of specific mental health diagnoses but fails to recognize their limitations or identify which instruments they are referencing.  The use of some validated instruments is cost prohibitive, and other instruments only screen for certain disorders such as depression, Attention Deficit Hyperactivity Disorder (ADHD), or anxiety. The use of multiple validated screening instruments seems impractical, and is inconsistent with screening among other subsets of children in the domestic context.  Only the most comprehensive assessment in a clinical setting would include a screening measure for each of the disorders that may present in youth, and Drs. Cruise and Rasmussen do not indicate which assessments they would require or prioritize.  They also fail to account for what a skilled clinician can accomplish in an interview, as noted by the fact that the majority of children in Drs. Cruise and Rasmussen's report not only were found to have a history of trauma, but also received a mental health diagnosis.

13. In addition, some screening tools developed for use in the domestic context are to be completed by a caretaker (i.e. Child Behavior Checklist), and for this reason may be unsuitable to the UAC population, where children are not with their caretakers and where their medical history is not readily obtainable.  Other screening tools, which are based on a youth's self-report, such as the Pediatric Symptom Checklist and Strength and Weaknesses Questionnaire, although validated, are not much more comprehensive than the screening form (Initial

- 5 -

Medical Exam) for UACs and have few questions surrounding trauma.[4]

14. Despite Drs. Cruise and Rasmussen's concern that UACs with trauma are not appropriately identified to receive services to target potential sequelae of trauma, I found that the prevalence of reported trauma in this subset of cases (63%) is consistent with the prevalence rate of trauma in domestic children (60% - see above). In addition, approximately one third of these UACs (9/30) were later diagnosed with post-traumatic stress disorder (PTSD). This is consistent with Drs. Cruise and Rasmussen's citation to the Latino Adolescent Migration, Health, and Adaptation Project (LAMHA) findings that 29% of youth with trauma were found to be "at risk" for Post-Traumatic Stress Disorder (PTSD), showing that ORR screening tools are capable of identifying and providing information that aids diagnosis in children with special needs. These prevalence rates are consistent and suggest that while many youths, including those in ORR custody, may have experienced trauma, those who develop symptoms to the severity of meeting criteria for dysfunction are only a portion of the population.

15. It was difficult to ascertain the exact methodology Drs. Cruise and Rasmussen utilized for determining the nature of therapeutic services offered to UACs. My review of the case files found documentation of the content of session notes, but the specific therapeutic strategy (i.e. cognitive behavioral therapy, behavioral management) was rarely identified. That does not mean these different types of therapy did not occur, and it would be problematic if Drs. Cruise and Rasmussen extrapolated that such care did not occur simply based on a lack of detail in the therapy notes. Although best practice may recommend documentation of the specific therapeutic approach and sometimes

---

[4] Beidas, R. S., Stewart, R. E., Walsh, L., Lucas, S., Downey, M. M., Jackson, K., Fernandez, T., & Mandell, D. S. (2015). Free, brief, and validated: Standardized instruments for low-resource mental health settings. Cognitive and behavioral practice, 22(1), 5–19. https://doi.org/10.1016/j.cbpra.2014.02.002.

Rebuttal Report of Dr. Donna Londino; confidential; under protective order

reimbursement requirements mandate documentation of therapeutic modality, many providers may not document this detail and instead document the themes of the session and content covered.  They further opine that the therapeutic services provided to UACs are lacking in their attention to trauma and are mostly supportive in nature. However, my visits to ORR Residential Treatment Centers (RTCs), and my conversations with the residential facility staff, demonstrated that supportive therapy, in addition to the provision of more adaptive coping skills, was implemented so that symptoms requiring an elevated level of care could be stabilized and the UAC stepped back down to a less restrictive setting or released to an appropriate sponsor.  Residential facility staff expressed an understanding of the sensitive nature of trauma work that requires formation of rapport with a UAC, and the ability to work through issues over an extended period of time, before it is appropriate to begin such counseling.  Efforts to limit the amount of time in the restrictive residential setting is in direct conflict with the need for time to process the emotional scars of trauma.  This helps explain Drs. Cruise and Rasmussen's finding that trauma-focused psychotherapy was less likely to be utilized in the residential setting when the aim is also to either step down or release the child as expeditiously as possible.

16. Despite assertions that trauma-focused psychotherapy was lacking, staff at MercyFirst discussed two trauma-focused programs that they utilize with the UAC population.   Clinicians at MercyFirst use the SPARCS program: Structured Psychotherapy for Adolescents Responding to Chronic Stress, a program used in group therapy where individuals discuss ways in which trauma has impacted their lives and what it means to them in the context of their culture. Clinicians at MercyFirst also use the Attachment, Regulation, and Competency (ARC) intervention program.  This framework is a flexible, components-based intervention developed for children and adolescents who have experienced

- 7 -

complex trauma, including poly-victimization.  It is my opinion that both are appropriate for ORR's population.

17. I disagree with Drs. Cruise and Rasmussen's finding that a mental health diagnosis was the primary criteria upon which step-up recommendations and eventual decisions were made.  My review of the case files noted  that the criteria for step-up to a residential level of care requires that the individual demonstrate behavior that poses a risk of safety to the UAC or others, consistent with the criteria outlined in ORR policy (1.2.1) and domestic child welfare policies.  Step-ups to secure and staff-secure were consistent with ORR policy 1.2.4 that require a step-up to a facility with the ability to provide closer supervision for a UAC with a known or reported history of violence and/or repeated threats to harm others while in ORR custody.  If a co-morbid mental health disorder was suspected, efforts to provide care in a residential care facility consistent with ORR policy 1.4.6 are made unless precluded by more significant safety concerns.

18. In summary, I agree that many UACs in ORR's care have behavioral and mental health needs that require considerable care and attention, but I disagree with many of Drs. Cruise and Rasmussen's prescriptions for how to address these needs.  I believe a strength of the ORR program is the requirement that all UACs receive both individual and group therapy.  The more difficult task is determining when a UAC may need more intensive treatment specific to their individual situation and mental health needs.  I find that ORR has policies in place that define when step-up should occur. ORR policy also underscores the position that the least restrictive level of care is most desirable.  Decisions to step a UAC in ORR custody up to a more restrictive level of care is not based on the presence of a mental health diagnosis alone, but on level of impairment and safety considerations.

- 8 -

## II.     REBUTTAL FOR THE DR. CHRISTOPHER BELLONCI REPORT

19. In his report, Dr. Bellonci opines on two issues: a.) whether ORR's policies and procedures governing the prescription and administration of psychotropic medications to children in its custody, including procedures for informed consent, oversight, and monitoring, are adequate to meet the standard of care and prevent children from coming to harm, and b.) whether ORR is providing a reasonable standard of oversight of the administration of psychotropic medication to children in its custody.

20. I disagree with Dr. Bellonci's conclusions that ORR failed to meet the standard of care as it pertains to the two identified issues above.  My disagreement is based upon the reports that I received from, and interviews I conducted with, the medical providers at each ORR RTC facility; a review of ORR's policies and procedures; a review of UAC Psychotropic Medication Data (Excel spreadsheet GOV-00235763); the Texas Psychotropic Medication Utilization Parameters (6th edition)[5]; and the American Academy of Child & Adolescent Psychiatry (AACAP) Position Statement on Oversight of Psychotropic Medication Use for Children in State Custody: A Best Principles Guideline.[6]

21. Data has demonstrated an increase in the use of psychotropic medication in the pediatric population, and has prompted questions about the reasons for such increases, and the appropriate prescribing practices as it relates to the treatment of mental health disturbances in youth.

22. Dr. Bellonci cites the AACAP Position Statement on Oversight of Psychotropic Medication Use for Children in State Custody, which acknowledges challenges in providing care to children, especially those with disrupted families and the

---

[5] https://hhs.texas.gov/sites/default/files/documents/doing-business-with-hhs/provider-portal/facilities-regulation/psychiatric/psychotropic-medication-utilization-parameters.pdf.

[6] https://www.aacap.org/App_Themes/AACAP/docs/clinical_practice_center/systems_of_care/FosterCare_BestPrinciples_FINAL.pdf.

Rebuttal Report of Dr. Donna Londino; confidential; under protective order

need for out of home placement. The statement begins by acknowledging that these "children (referring to those in state custody) often have biological, psychological, and social risk factors that predispose them to emotional and behavioral disturbances. These risk factors can include genetic predisposition, in utero exposure to substances of abuse, medical illnesses, cognitive deficits, a history of abuse and neglect, disrupted attachments, and multiple placements. Resources for assessing and treating these children are often lacking. Due to multiple placements, medical and psychiatric care is frequently fragmented. These factors present profound challenges to providing high quality mental health care to this unique population." In the introduction to their practice parameter on the use of psychotropic medication in children, the authors, members of American Academy of Child and Adolescent Psychiatry, note their hopes that use of the parameter will help clinicians "use medications with the potential for pharmacological benefit in children safely and to reduce the use of ineffective and inappropriate medications or medication combinations."[7] There is no disagreement that the safe and limited use of psychotropic medication in children is an appropriate goal; however, the multitude of associated variables that confound both research and clinical practice in this area are most appropriately addressed by providing minimal standards, recommendations, and ideal practices. It is my testimony and rebuttal that ORR had procedures in place to meet the required standards of care in the provision of mental health care to UACs to include psychotropic medication use.

23. The Texas Psychotropic Medication Utilization Parameters guidelines for the prescription of medications to children in foster care notes additional hurdles in optimal prescribing in youth, including but not limited to the lack of providers

---

[7] J. AM. ACAD. CHILD ADOLESC. PSYCHIATRY, 48:9, SEPTEMBER 2009.

Rebuttal Report of Dr. Donna Londino; confidential; under protective order

qualified to perform comprehensive mental health evaluations; the lack of U.S. Federal Drug Administration approval for many pediatric medications (not just psychotropic medications); and limited research about medications utilized in children.  These well-established facts further confound the ability to provide optimal mental health care for all children, both domestic and non-domestic. These facts should be considered when determining whether the standard of care is met.  It is my testimony and rebuttal that ORR has procedures in place to meet the required standards of care in the provision of mental health care to UACs to include psychotropic medication use.

24. Given the considerations noted above, oversight bodies have increasingly implemented guidelines and standards for the prescribing and oversight of psychotropic use in youth, and especially those in state custody and out of home placements.   This population of youth have been noted to have a higher incidence of psychotropic use, especially antipsychotics, as compared to other domestic youth.[8]   I agree that these same concerns and attention to safe practicing should apply to youth in ORR custody.  It is important to recognize that, as noted above, these systems all have significant limitations.  Decisions regarding the use of psychotropic medication are most often based on a multitude of factors that balance the risks and benefits of treatment.  My review of case files found no evidence that children in ORR care are improperly prescribed psychotropic medications, and found the practices regarding psychotropic prescribing by the care providers at Mercy First and Shiloh Treatment Centers to meet the standard of care.

25. According to the AACAP Position Statement on Oversight of Psychotropic Medication Use for Children in State Custody, the following are basic

---

[8] Dosreis, S., Yoon, Y., Rubin, D. M., Riddle, M. A., Noll, E., & Rothbard, A. (2011). Antipsychotic treatment among youth in foster care. Pediatrics, 128(6), e1459–e1466. https://doi.org/10.1542/peds.2010-2970.

- 11 -

principles of care that should be followed when prescribing psychotropic medications to children:

    a.   Youth should be screened for behavioral and mental health disturbance;

    b.   Youth with identified behavioral and mental health disturbances should receive a comprehensive mental health evaluation;

    c.   Youth with behavioral and mental health disturbances are entitled to a continuity of care, case management, and treatment planning;

    d.   Youth with behavioral and mental health disturbances are entitled to treatment that includes both non-pharmacologic treatment through psychotherapy and pharmacotherapy as indicated;

    e.   Use of psychotropic medication follows a rational consent process that includes consent by an authorized individual and assent by the youth;

    f.   Appropriate pharmacotherapy identifies the target symptoms being addressed through pharmacotherapy, includes oversight and monitoring of efficacy and possible side effects; and

    g.   Assurance that youth with behavioral and mental health disruption can receive pharmacotherapy in a timely manner.

26. The following are guidelines of care (proposed as minimal requirements, recommended, and ideal) outlined in the AACAP Position Statement referenced above:

    a.   A minimal requirement is to identify the parties empowered to consent for treatment for youth in state custody in a timely fashion;

    b.   A minimal requirement is to establish a mechanism whereby UACs give assent for treatment;

    c.   A recommendation for care is for the provision of psychoeducation and medication information for the purpose of facilitating the consent process;

    d.   A recommendation for care is made for continued documentation of a

- 12 -

1    child's medical and psychiatric history;

   e.    A recommendation for care is for a consulting psychiatrist to be available
2    to provide education to those providing consent and care; and

   f.    An ideal goal of psychotropic prescribing in this position statement is to
4    provide training for all involved parties so that these individuals can
5    advocate for the most effective treatment for children in their care.

27. My interviews with the care providers at MercyFirst and Shiloh, my interviews
with federal and care provider staff on the ground, as well as information from
my review of case files, showed that ORR has procedures in place to comply
with the above principles of care, and met all but the ideal standards for
prescribing medications to UACs in ORR custody.

28. Care providers with cooperative agreements to provide mental health care to
youth in ORR custody met requirements outlined in the guidelines for
administering psychotropic medications to children placed out of the home (i.e.
foster care, state welfare).  The Initial Medical Exam Form, in addition to the
Intake Assessment Form, includes screening questions about depression, mood
lability, attentional problems, anxiety, and trauma that flag areas for further
review.  The case files confirm that UACs are given access to a range of
services, both non-pharmacologic and pharmacologic, and I found UACs were
receiving services through a continuity of care and at different levels of
restrictive oversight appropriate to the UACs' individual needs.  I found the
documentation of care in the residential files to include a thorough initial
assessment with a subsequent differential diagnosis and formulation of needs
and treatment recommendations.  Follow-up psychiatric notes included a
review of target symptoms and efficacy from the current treatment, a review of
collateral history from staff, a review of potential side effects, and the utilization
of scales such as the Abnormal Involuntary Movement Scale (AIMS) as
indicated.  Follow-up notes, weekly team meetings, and additional case notes

- 13 -

included information relevant to placement and long-term treatment planning. Changes in placement either through step-up or step-down decisions included documentation of the UACs' medical and psychiatric needs and prior treatment. All of these factors play important roles in ensuring children in ORR care are not improperly prescribed psychotropic medications.

29. Dr. Bellonci's report makes extensive mention of the issues of consent, and youth assent and refusal.  I agree that the principles of autonomy and subsidiarity are a mainstay of medical practice and appropriate consent and assent.  ORR mandates provision of medical, mental health, and dental care that comply with state law and oversight by clinical accreditation bodies such as Joint Commission responsible for ensuring appropriate prescribing practices by licensed physicians, including the obtainment of consent and assent. Prescribers at both the MercyFirst and Shiloh facilities stated that consent and assent were obtained prior to the administration of medications, and that information on medications is provided to parents or guardians in their native language and assistance is provided in obtaining consent in verbal and/or written form.[9]

30. In accordance with prescribing guidelines specifically pertaining to consent, I found that UACs are assigned a case manager who has the responsibility of

---

[9] For instance, Dr. Bellonci cites a Declaration submitted by P.D.O.P. (Lucas R. Experts_11772-75) (*see* Appendices A, B, and C) in which the minor asserts (¶ 12) that "staff members [a clinician, doctor, and supervising staff of his living unit] have explained to me that I need to take [my] medication because the medication is a requirement of the RTC program, I would get in trouble if I refused to take the medication." P.D.O.P.'s case file, however, shows that P.D.O.P. did have the opportunity to refuse his medication and was not forced to take it despite receiving psycho-education about its benefits.  (GOV-00190251). Notably, P.D.O.P. was transferred to MercyFirst RTC due to self-harming behaviors and he had a history of 4 prior psychiatric hospitalizations. (GOV-00190218-219). Initially, he was not receptive to therapy and treatment services but did eventually agree to medication changes.  (GOV-00190281-282). Two months after his admission to the RTC, P.D.O.P. was compliant with his medication regimen, his symptoms of mood instability and aggressive and defiant behaviors "greatly minimized", and he was willing to participate in program activities, including art therapy. (GOV-00190224-225).

- 14 -

working with the prescribing provider to give consent for treatment if a parent or guardian is unable to be found.  Unique characteristics of the UAC population, including the unavailability and unreachability of parents or guardians, provides unique challenges to meeting the competing standards of attempting to locate a parent or guardian for consent when the child or adolescent also has rights to treatment without undue delay.

31. Discussions about consent and the benefits and challenges of defining and implementing consent are not new.[10]  Despite the necessity of the same in order to ensure that individuals under medical care and their families have the right to understand what is happening to them, the definition of informed consent varies by state, and can be as rigid and formal as a waiver required to participate in research, or as simple as what is defined by law (i.e., voluntary agreement with an action proposed by another).[11]   The movement in medicine towards a more collaborative approach in treatment has been met by challenges, and the best way to ensure the patient understands the risk and benefits involved, is a continually evolving issue.[12]

32. It is now generally accepted that the primary components of consent for medical care includes the following elements:  (1) competence to understand and to decide, (2) voluntary decision making, (3) disclosure of material information, (4) recommendation of a plan, (5) comprehension of terms needed to make a decision in favor of a plan, and (6) authorization of the plan.

33. I disagree with Dr. Bellonci that ORR failed to provide provisions for consent and assent to UACs recommended for mental health treatment.  The facilities

---

[10] Mayo Clinic Proceedings:  Benefits and Challenges of Informed Consent. DOI: https://doi.org/10.4065/83.3.272.

[11] https://medical-dictionary.thefreedictionary.com/consent

[12] https://journalofethics.ama-assn.org/article/informed-consent-what-must-physician-disclose-patient/2012-07

- 15 -

that I visited were both knowledgeable of guidelines and requirements surrounding consent and assent, and committed to following these both for the purpose of compliance, and as an endorsement of their agreement with the ethical principles surrounding medication use in youth. The charts I reviewed noted multiple attempts by case workers to contact family members in order to engage them in treatment, including consent.

34. Dr. Bellonci's report includes opinions about the occurrences of polypharmacy. My review of the case files found multiple occasions where the use of a sleep aid may have been concomitantly prescribed with another psychotropic medication.  There were cases of concomitant use of benztropine, a medication to lessen the risk of extrapyramidal side effects from antipsychotics, but this was appropriate and recommended in guidelines for antipsychotic use. Although these examples would technically be defined as polypharmacy, more problematic polypharmacy includes occasions where multiple psychotropic medications (instead of an adjunct sleep aid or medication to lessen side effects) are prescribed.  Case files from RTCs were more likely to reflect more extensive use of psychotropic medications, including sometimes polypharmacy, but this was consistent with the symptoms necessitating that level of care.  Additionally, risperidone has been studied and found to be beneficial in youth with aggressive behavior.[13]

35. I disagree that youth in ORR custody are overprescribed antipsychotics.  Dr. Bellonci cites data from Point Comfort Underwriters (PCU) between January 1, 2019 and January 31, 2020 documenting that over 300 children were prescribed antipsychotic medication.   During this same time period, the

---

[13]Pappadopulos , E., et al., Treatment Recommendations for the Use of Antipsychotics for Aggressive Youth (TRAAY). Part II, Journal of the American Academy of Child & Adolescent Psychiatry, Volume 42, Issue 2, February 2003, Pages 145-161, https://doi.org/10.1097/00004583-200302000-00008.

Rebuttal Report of Dr. Donna Londino; confidential; under protective order

number of children in ORR custody ranged from 11,151 in January of 2019 to slightly over 4,000 at the end of the referenced period.[14]  If all 300 of these children were being treated at the same time (unlikely), this would still only translate to a prevalence rate of antipsychotic use ranging between 2.7 and 7.5 percent, which is lower than the 10% or greater prevalence rate that has been published for domestic children in foster care.[15]

36. As noted in my report, I found the dosages of psychotropics prescribed to children in ORR custody as reflected in the PCU data to be appropriate and well within the range recommended by clinical guidelines and manufacturer recommendations.

37. In conclusion, I found that the Office of Refugee Resettlement has met the standards of care for the provision of pharmacologic treatment of children in their custody.  The case file of Gabriela N. while in residential care serves as an example of care that demonstrates compliance with multiple aspects of treatment, but in particular, medication prescribing and oversight.  Gabriela was a 17-year-old female admitted to Shiloh Residential Treatment Center for stabilization of self-harm to include threats of committing suicide.  Because the UAC had no identifiable sponsor, her caseworker signed consent for treatment.   The chart includes a written consent for over the counter medications that offers the UAC the option of refusing the use of these medications.  There was documentation of psychoeducation that was provided to the UAC about the use of her prescribed birth control and the hepatitis vaccination that she received.   Although she was prescribed three psychotropic medications while in care, one was appropriately prescribed for

---

[14] https://www.acf.hhs.gov/orr/resource/unaccompanied-alien-children-information

[15]  https://www.psychcongress.com/article/antipsychotics-regularly-dispensed-kids-foster-care

Rebuttal Report of Dr. Donna Londino; confidential; under protective order

a diagnosis of ADHD (Adderall), one was prescribed for depression, and the third was prescribed for sleep (melatonin). The initial treatment assessment was thorough, presented a differential diagnosis, recommendations were made for continued evaluation through the gathering of collateral data, and considerations for treatment including psychotherapy and other non-pharmacologic interventions. The dosages of each medication noted above were appropriate and did not exceed the recommended dosing ranges. Follow-up notes clearly document attention to the target symptoms of treatment and a standardized rating scale (AIMS) was used as an adjunct for side effect assessment. A clear safety plan including the purpose of each medication and importance of compliance were underscored at time of discharge.

## III. REBUTTAL TO THE DR. PAUL BLOCK AND MR. JOHN FARLEY REPORT

38. The expert testimony of Dr. Paul Block and Mr. John Farley was requested by Plaintiff for the following purpose: to provide expert opinions in relation to (1) whether children with mental health, behavioral, developmental, and intellectual disabilities can be appropriately served in non-secure placements with community-based services; and (2) whether ORR has adequate policies and practices to ensure children with such disabilities are placed in the least restrictive and most integrated environment appropriate to their needs.

39. I agree with some of the opinions rendered by Dr. Block and Mr. Farley that advocate for alternative provisions for youth with mental health disturbance, especially those with disabilities. These include pilot programs in states such as Rhode Island, and include an emphasis on integrated, less restrictive placements and greater access to community resources in efforts to limit referrals to more restrictive environments for treatment. I disagree that all

- 18 -

youth can be served through these services.    As the Vice President for Residential Services at Family Service of Rhode Island (FSRI), Dr. Farley understands the importance of this level of care.  He must also understand that in the Principles of Care for Treatment of Children and Adolescents with Mental Illnesses in Residential Treatment Centers developed by the American Academy of Child and Adolescent Psychiatry, the authors note that "the best intervention for serious mental health issues that cannot be treated in the child's home environment is a facility that has a multidisciplinary treatment team providing safe, evidence based care that is medically monitored."[16]  Drs. Block and Farley even cite a reference that defines least restrictive care as the goal "if manageable."[17]

40. In forming my opinions, I was able to review the select case files forwarded to me by Defendant's counsel.  This review allows me to offer a rebuttal opinion about the conclusions formulated by Drs. Block and Farley.

41. I found no evidence that UACs were transferred to a more restrictive level of care based solely on a diagnosis of disability.  Although I primarily reviewed the files of UACs referred for more restrictive care, the percentage of youth reportedly referred for care in a residential facility is only less than 1%, comparing favorably to statistics from the domestic population.    2017 statistics note that 7% of children and adolescent in domestic foster care

---

[16] American Academy of Child & Adolescent Psychiatry (AACAP) Principles of Care for Treatment of Children and Adolescents with Mental Illnesses in Residential Treatment                    Centers                    (2010) https://www.aacap.org/App_Themes/AACAP/docs/clinical_practice_center/principles_of_care_for_children_in_residential_treatment_centers.pdf

[17] Administration for Children & Families ORR Statement of Goals, Priorities, Standards, and Guidelines, 2012.

- 19 -

required treatment in a residential setting.[18]   The referrals to a level of residential care were based on assessment of safety risk and failure to respond to less restrictive levels of care.  ORR specifies that these criteria be met for referral to this level of restrictive care and this is consistent with criteria established for referrals to restrictive care for domestic youth receiving mental health treatment.

42. I disagree that ORR does not appear to have an effective evidence-based system to evaluate or address children's clinical needs (Block and Farley report, page 4).  UACs are screened upon entrance into the program.  Based on responses to the initial screening questions, recommendations are made for placement.  Most UACs are generally placed initially in the least restrictive level of care, and provided secondary prevention interventions aimed at limiting the development of disorders until impairments in functioning (as required per ADA criteria for disability and the Diagnostic and Statistical Manual (DSM) 5 criteria for most disorders) become evident and necessitate tertiary interventions targeting the specific diagnosis.

43. I disagree that step-down and transfer decisions were made solely based on current functioning.  As required by the Trafficking Victims Protection Reauthorization Act (TVPRA) and consistent with child welfare considerations, ORR and care providers spend extensive effort assessing the safety of a placement prior to referral and are careful in efforts to investigate sponsors to lessen the chances of exploitation and/or abuse after discharge. This is particularly important as ORR does not retain custody after discharge. Additionally, files included clear documentation of efforts by therapists assigned to UACs to integrate families and sponsors when available to ensure knowledge of the UACs' mental health needs and competence to provide

---

[18] https://www.childwelfare.gov/pubPDFs/foster.pdf, pg. 4.

Rebuttal Report of Dr. Donna Londino; confidential; under protective order

compliance with recommended treatment.

44. I agree with the opinion by Drs. Block and Farley that some safety concerns can be addressed and managed in less restrictive settings. I disagree that all safety concerns can be resolved without referral for more intensive treatment and disagree that residential treatment is never beneficial for the treatment of emotionally and behaviorally disturbed youth. Studies have shown reduction in high risk behaviors such as aggression, and improvement in serious mental health symptoms of depression, suicidality and psychosis through residential care.[19]

45. Drs. Block and Farley opine that to serve children in less restrictive placements and avoid unnecessarily prolonged residential care, children's individual needs must be timely identified and addressed. They follow this with a statement that "to the extent *it is possible* to provide needed services that can meet a child's needs while that child is in a less restrictive setting," which indicates they would agree with my previous opinion that although ideal, access to community resources is not always available. This problem is not unique to youth in ORR custody. The inadequacy of psychiatric services to meet the mental health needs for children and adolescents has been consistently documented.[20]

46. I agree that maintaining children who pose safety concerns in a less restrictive setting requires initial and ongoing evaluation of the context and factors driving the child's unsafe behaviors. I disagree that this goal can be optimally met given the unique constraints of working with the UAC population. Drs.

---

[19] Hair, H.J. Outcomes for Children and Adolescents After Residential Treatment: A Review of Research from 1993 to 2003. J Child Fam Stud 14, 551–575 (2005). https://doi.org/10.1007/s10826-005-7188-9

[20] Findling RL, Stepanova E. The Workforce Shortage of Child and Adolescent Psychiatrists: Is It Time for a Different Approach?. J Am Acad Child Adolesc Psychiatry. 2018;57(5):300-301. doi:10.1016/j.jaac.2018.02.008

Rebuttal Report of Dr. Donna Londino; confidential; under protective order

Block and Farley state in their report on page 13 that there is a lack of assessment tools and interventions specifically adapted to the population of unaccompanied children. I disagree. ORR utilizes an Intake Screening Form that asks questions in a variety of domains to provide an initial understanding of the youth's migration to the United States, adverse events that may have occurred before, during, and after migration and a review of symptoms that might indicate the presence of an underlying mental health disorder. I also disagree that a comprehensive understanding of the drivers of behavior (which they assert should be accomplished on page 15) can be achieved for UACs during the time they are in ORR care and custody. In my clinical experience, this may take months to years of individual work and attempts to achieve this admirable goal would be in direct contrast with the desire to move youth out of ORR custody as quickly as possible.

47. I disagree with the opinion that it is the responsibility of a system of care to ensure the availability of integrated less restrictive placements by seeking out and contracting with shelters and foster care providers who are willing and able to accept and serve children with mental health needs. Access to these recommended resources, as noted above can be limited by many factors including the "resistance by external providers and systems responsible for serving youth with disabilities and other needs," cited by Dr. Block and Mr. Farley on page 11. I disagree with their opinion that the barriers to providing services necessary to maintain youth in less restrictive, integrated settings often have less to do with the child than the limitations presented by bureaucratic or political considerations. In my clinical experience, the biggest hurdle to implementing new and adjunctive services for many areas of healthcare, including mental health, are financial and other resource constraints.

- 22 -

Rebuttal Report of Dr. Donna Londino; confidential; under protective order

48. I disagree with the opinion that care facilities did not attempt to manage potentially dangerous behavior, either to the UAC or others through less restrictive care.  There was evidence from the case files, including the case file of Lucas R., who was unable to be transferred to Shiloh Residential Center for several months.  While awaiting transfer, closer levels of observation were implemented to protect the UAC.  The referral to Shiloh was to assist Lucas in developing more adaptive coping when upset to lessen his risk of harm to himself.

49. Lastly, I disagree with the opinion of Drs. Block and Farley that UACs had to "demonstrate good behavior in order to earn privileges or be transferred to a shelter or long-term foster care placement."  While this may have been the perception of the UAC, the documentation in the files that I reviewed indicated instead that criteria for transfer or step-down was to demonstrate more adaptive coping skills to mitigate risk of an undesired and potentially tragic outcome through harm to self or harm to another.[21]  Moreover, the expectation that a UAC demonstrate certain positive behaviors is similar to token economy, a well-known strategy used in behavioral therapy to pair behavior with consequences and rewards, which is one tool of many that a care facility can effectively use in working with children.[22]

50. I reserve the right to amend or supplement this Report, including but not limited to my review of any further expert statements or reports submitted on

---

[21] For instance, C.J.A.L., a UAC who submitted a Declaration cited by Drs. Block and Farley (see page 18, citing ¶ 9), was stepped-up "due to suicidal ideation, plan, and one attempt while in placement, in the form of hanging himself." The goals of the step-up RTC program to be met for step-down were for CJAL to "learn about his mental health needs, receive psycho-education on his diagnoses and medication management, identify and implement positive coping skills to manage his depression and anxiety." (GOV-00241056, GOV-00241060).

[22] https://masteraba.com/token-economy/

- 23 -

behalf of Plaintiffs.

Dated:   July 17, 2020

*Donna Londino MD*
DocuSigned by:
E596DF45AD2F40C...

Donna Londino, M.D.

## Materials Considered In Preparing This Rebuttal Report

The materials I considered in forming my opinions as referenced in my June 19, 2020 report in this matter, as well as the following materials:

1. Drs. Cruise & Rasmussen's expert report in this matter.

2. Dr. Bellonci's expert report in this matter.

3. Dr. Block & Mr. Farley's expert report in this matter.

4. ORR's policies and procedures

5. UAC Psychotropic Medication Data (GOV-00235763)

6. Texas Psychotropic Medication Utilization Parameters (6th edition), https://hhs.texas.gov/sites/default/files/documents/doing-business-with-hhs/provider-portal/facilities-regulation/psychiatric/psychotropic-medication-utilization-parameters.pdf.

7. https://www.acf.hhs.gov/orr/resource/unaccompanied-alien-children-information

8. Administration for Children & Families ORR Statement of Goals, Priorities, Standards, and Guidelines, 2012.

9. American Academy of Child & Adolescent Psychiatry (AACAP) Position Statement on Oversight of Psychotropic Medication Use for Children in State Custody: A Best Principles Guideline, https://www.aacap.org/App_Themes/AACAP/docs/clinical_practice_center/systems_of_care/FosterCare_BestPrinciples_FINAL.pdf.

10. American Academy of Child & Adolescent Psychiatry (AACAP) Principles of Care for Treatment of Children and Adolescents with Mental Illnesses in Residential Treatment Centers (2010) https://www.aacap.org/App_Themes/AACAP/docs/clinical_practice_center/principles_of_care_for_children_in_residential_treatment_centers.pdf.

- 24 -

11. Beidas, R. S., Stewart, R. E., Walsh, L., Lucas, S., Downey, M. M., Jackson, K., Fernandez, T., & Mandell, D. S. (2015). Free, brief, and validated: Standardized instruments for low-resource mental health settings. Cognitive and behavioral practice, 22(1), 5–19. https://doi.org/10.1016/j.cbpra.2014.02.002.

12. https://www.childwelfare.gov/pubPDFs/foster.pdf, pg. 4.

13. Dixon-Woods, M., Shaw, R. L., Agarwal, S., & Smith, J. A. (2004). The problem of appraising qualitative research. Quality & safety in health care, 13(3), 223–225. https://doi.org/10.1136/qhc.13.3.223

14. Dosreis, S., Yoon, Y., Rubin, D. M., Riddle, M. A., Noll, E., & Rothbard, A. (2011). Antipsychotic treatment among youth in foster care. Pediatrics, 128(6), e1459–e1466. https://doi.org/10.1542/peds.2010-2970

15. Findling RL, Stepanova E. The Workforce Shortage of Child and Adolescent Psychiatrists: Is It Time for a Different Approach?. J Am Acad Child Adolesc Psychiatry. 2018;57(5):300-301. doi:10.1016/j.jaac.2018.02.008

16. Finkelhor et. al.  Violence, Abuse, and Crime Exposure in a National Sample of Children and Youth.  Pediatrics Nov 2009, 124 (5) 1411-1423; DOI: 10.1542/peds.2009-046.

17. Hair, H.J. Outcomes for Children and Adolescents After Residential Treatment: A Review of Research from 1993 to 2003. J Child Fam Stud 14, 551–575 (2005). https://doi.org/10.1007/s10826-005-7188-9

18. J. AM. ACAD. CHILD ADOLESC. PSYCHIATRY, 48:9, SEPTEMBER 2009.

19. https://journalofethics.ama-assn.org/article/informed-consent-what-must-physician-disclose-patient/2012-07

20. Mayo Clinic Proceedings:  Benefits and Challenges of Informed Consent. DOI: https://doi.org/10.4065/83.3.272.

21. https://masteraba.com/token-economy/

22. https://medical-dictionary.thefreedictionary.com/consent

23. Noble H, Smith J, Issues of validity and reliability in qualitative research. Evidence-Based Nursing 2015;18:34-35.

24. Pappadopulos, E., et al., Treatment Recommendations for the Use of Antipsychotics for Aggressive Youth (TRAAY). Part II, Journal of the

- 25 -

American Academy of Child & Adolescent Psychiatry, Volume 42, Issue 2, February 2003, Pages 145-161, https://doi.org/10.1097/00004583-200302000-00008

25. https://www.psychcongress.com/article/antipsychotics-regularly-dispensed-kids-foster-care

26. GOV-00241056, GOV-00241060 (C.J.A.L. case excerpts)

27. Other materials as may be referenced elsewhere in this rebuttal report.

Rebuttal Report of Dr. Donna Londino; confidential; under protective order