# Exhibit 156

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

Exhibit 156
Page 112

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                    WESTERN DIVISION

 4

 5
    LUCAS R., et al.,            )
 6                               )
               Plaintiffs        )
 7                               )
            vs.                  ) Case 2:18-CV-
 8                               ) 05741 DMG PLA
    ALEX AZAR, Secretary of      )
 9  U.S. Department of Health    )
    And Human Services, et al.,  )
10                               )
               Defendants.       )
11  -----------------------------x

12

13                    CONFIDENTIAL

14      PURSUANT TO PROTECTIVE ORDER 101-19

15   DEPOSITION OF CAPTAIN MARIVIC FIELDS, MSW

16

17                  Washington, D.C.

18              Monday, February 24, 2020

19

20

21

22  Reported by:

23  Lori J. Goodin, RPR, CLR, CRR,

24  RSA, California CSR #13959

25  JOB NO. 175375
```

1  what the psychiatrist's recommendations were.

2  　　　　　If they are no longer, let's say

3  they are no longer a risk or danger to self or

4  others is one of the criteria.

5  　　　　　So, a lot of times there is also a

6  recommendation for a, by the psychiatrist to

7  step them down.

8  　　Q.　　And, you concluded that not all of

9  the children that were currently placed at

10  Shiloh posed a risk to themselves or others.

11  Correct?

12  　　A.　　At that time, yes, not all of them

13  were, based on psychiatrist notes.

14  　　Q.　　And besides looking at the

15  psychiatrist notes, did you do any other

16  thinking or evaluation of that?

17  　　A.　　No, that was it.

18  　　Q.　　And based on that review, you

19  concluded that there were quite a few children

20  for whom the psychiatrist had recommended

21  stepdown or reunification, but who were still

22  at Shiloh; is that correct?

23  　　A.　　Yes.

24  　　Q.　　Did you look into why they were

25  still at Shiloh?

Page 149

```
 1       A.    Yes.
 2       Q.    And what did you find?
 3       A.    I found that some of them have
 4   already been referred for stepdown.  And they
 5   are just awaiting placement.
 6       Q.    And did you take any other steps to
 7   try to assist with stepdown at that point?
 8       A.    I did talk to the FFS at that
 9   particular time, or supervisor who was in
10   charge of RTC.  And, I asked her the reasons
11   why the children, some of the children were
12   still in RTC.
13             And that is when I found out that
14   some of them were just awaiting placement.  And
15   then I did elevate it to also the supervisor,
16   their overall supervisor, to let him know if
17   they can assist with their transfer.
18       Q.    And do you know what happened next
19   with those children?
20       A.    I knew that they were eventually
21   stepped down or transferred.
22       Q.    And were some of those children
23   awaiting reunification with family?
24       A.    I believe so, yes.
25       Q.    Is it your understanding that
```

Page 150

1  children at Shiloh often have challenges
2  stepping down to a less restrictive placement?
3      A.    Yes, there are some challenges.
4      Q.    And why is that?
5      A.    There are some shelters that, based
6  on their licensing, cannot receive children
7  that were just released from RTC placement or
8  psychiatric hospital, depending on the
9  licensing requirements.
10        So, it all depends on the state
11 licensing.
12     Q.    Are you aware of any other
13 challenges to stepdown besides licensing
14 requirements?
15     A.    From what I understand there are
16 some facilities or shelters that cannot meet
17 the complexity of the mental health issues of
18 the child.
19        I don't know the reasons why, but I
20 know that that was one of the reasons why a
21 child cannot be transferred to that particular
22 shelter is they cannot meet the mental health
23 needs.  Because they would still have ongoing
24 mental health needs.
25     Q.    And why do you think they would have

Page 166

```
 1   decision-making around whether a child should
 2   be stepped up to a secure facility?
 3        A.   Just consultation, if I'm even
 4   consulted.
 5        Q.   And are there categories of children
 6   for whom your role is required before step-up
 7   happens?
 8        A.   No.
 9        Q.   And did there used to be children
10   for whom your role was, your consultation was
11   required before a step-up decision was made?
12        A.   No.
13        Q.   And how often would you estimate you
14   are consulted on step-up to secure for children
15   who are in custody?
16        A.   Prior to separations, maybe two or
17   three times a year.
18        Q.   And currently?
19        A.   I haven't done anything currently.
20        Q.   Since you --
21        A.   Since I transitioned, yes.
22        Q.   Okay.  And was there a reason for
23   your visit to Shenandoah in November?
24        A.   We had a one of the members of
25   NCTSN.  We wanted her to visit some of the
```

```
 1        while she is reading, we will reserve the
 2        right to read and sign, the 30-day review.
 3               MS. WELCH:  Great, thank you.
 4   BY MS. WELCH:
 5        Q.    Okay.  So, Captain Fields, are you
 6   familiar with this document?
 7        A.    Yes.
 8        Q.    And, it is marked
 9   Government 00124/713 and 14.  I'm talking about
10   Exhibit 184 now.
11               And looking at 124/714.
12        A.    Uh-huh.
13        Q.    Is that an e-mail from you to
14
15        A.    Yes.
16        Q.    And, in the first paragraph you say,
17   "Please note that not all UACs are referred to
18   Shiloh or any RTC for reasons that they pose a
19   risk to self or others, and it shouldn't be
20   just for these reasons, but primarily for
21   safety reasons and these UACs require a higher
22   level of care."
23               Is that still your opinion?
24        A.    I would say yes.
25        Q.    And then the next sentence you say,
```

Exhibit 156
Page 118

```
 1    "Some UACs were referred because of autism."
 2    And then other issues.
 3              Is it your understanding that some
 4    UACs have been referred to Shiloh because of
 5    autism?
 6        A.    Not just for autism, but there is a
 7    psychosis that is related, or associated or
 8    another diagnosis, other than the autism.
 9        Q.    So, it is your understanding that
10    for a child with autism to be referred to
11    Shiloh there needs to also be a presentation of
12    psychotic symptoms?
13        A.    Not just psychotic symptoms, but
14    mental health disorder, not necessarily
15    psychotic.
16        Q.    And then, looking at Exhibit 185,
17    the chart, did you prepare this chart?
18        A.    I don't know where the chart came
19    from.  But I added that column for my notes.
20        Q.    Which column was that?
21        A.    The one that is highlighted in
22    yellow.
23        Q.    That says ORR Notes Recommendations
24    Regarding Continued Placement?
25        A.    Yes.
```

1      Q.   So, that column consists of your
2   notes; is that correct?
3      A.   Yes, uh-huh.
4      Q.   And then there is a final column
5   that is called Child Psychiatrist Comments and
6   Recommendations?
7      A.   Uh-huh.
8      Q.   Whose notes are those?
9      A.   Those are Dr. Sickle's.
10     Q.   And what role did he play in the
11  review of the children at Shiloh?
12     A.   For medication review, primarily for
13  medication review.  But, also appropriateness
14  for a referral to RTC.
15     Q.   And in your e-mail you say, "There
16  are a couple of cases where I am somewhat
17  concerned with the number of psychotropic
18  medications, but this will have to be reviewed
19  by a prescribing provider, i.e. psychiatrist or
20  psychiatric nurse practitioner who
21  understanding psychotropic medications."
22          So, did you write that before
23  Dr. Sickle did his review in this last column?
24     A.   Yes.
25     Q.   Okay.  In your e-mail you said, "One

Page 191

1   case that I'm also concerned about is the
2   sibling of a UAC with Down's syndrome."
3       A.    Uh-huh.
4       Q.    "It looks like reunification is
5   being worked on, but the sibling does not
6   present any psychological concerns unless he is
7   in Shiloh to be with the sibling with Down's
8   syndrome."
9             Did you, and then you say, "I will
10  ask FFS for the reason for this UAC's
11  placement."
12            Do you recall this child?
13      A.    I do recall this child, yes.
14      Q.    And did you ask the FFS about the
15  reason for the child's placement at Shiloh?
16      A.    Yes, I did.
17      Q.    And what did you learn?
18      A.    I cannot remember the reasons that
19  were provided to me.
20      Q.    And then you say, "Another concern
21  is a UAC who has been at Shiloh for a year.
22  Perhaps this is warranted, but will ask FFS for
23  the reason for his extended length of stay in
24  RTC."  Do you recall that child?
25      A.    Yes, I do.

```
                                                    Page 192
 1        Q.    And did you ask the FFS the reason
 2   for the extended length of stay?
 3        A.    Yes, I did.
 4        Q.    What did you learn?
 5        A.    I recall the FFS telling me that
 6   this child was basically doing well in that
 7   type of placement.
 8              He has been referred to many other
 9   placements in the past and it was all failed
10   placement.
11              So, this placement, after he had the
12   treatment and everything, he seems to be doing
13   very well, thriving with the structure and
14   everything that they decided to just keep him
15   there until, until, because I think they were
16   working on reunification.
17              So, it is better to just keep him
18   there and then reunify rather than having him
19   get tossed around in placement again.
20        Q.    And, do you know if it was ████
21   ████ who filled out the rest of these columns in
22   or someone else?
23        A.    I would say it is someone else.
24        Q.    But you are not sure who?
25        A.    I'm not sure who.
```

Exhibit 156
Page 122

```
 1        Q.    And in terms of the current Shiloh
 2   recommendation, and current medications and
 3   authorization for psychotropic meds, that was
 4   someone else that filled out the chart, not
 5   you?
 6        A.    Now that I am looking at it, I think
 7   I was the one who put together all of this
 8   different columns.
 9        Q.    So --
10        A.    So, the white one, I didn't do that,
11   that must have came from an existing list.
12        Q.    Okay.
13        A.    And then when I reviewed, these are
14   the things that I looked for.
15        Q.    Okay.  So, the RTC recommendation
16   received.
17        A.    Yes.
18        Q.    Initial recommender for RTC
19   placement?
20        A.    Yes.
21        Q.    Reason for placement, initial psych
22   assessment at Shiloh, current Shiloh
23   recommendation, current medications,
24   authorization for psych meds and ORR notes, all
25   of those columns is you?
```

1  determine these types of cases early on so
2  there is no delay in the release.
3           But, sometimes you just can't help
4  it, because you find out about the disability
5  maybe towards the end of, you know, the latter
6  part of their care.
7      Q.   And for children whose disability is
8  based on their mental or behavioral needs, at
9  what point are they assessed for a disability?
10     A.   Children are always assessed.  I
11 mean, that is part of having a case manager and
12 clinician.
13          So, they are continually assessed
14 for any type of needs, whether it is mental
15 health, medical, or some behavioral needs.
16          So, like I said, some of the
17 programs are proactive in terms of determining
18 that this is something that would require a
19 home study based on these current needs.
20          And you may have some programs that
21 are probably, especially the new programs that
22 don't know all of the rules and may, may
23 stagger in terms of their ability to make that,
24 you know, assessment right away.
25     Q.   So, the programs have discretion

1    over when they make that assessment about

2    disability?

3         A.    I would say yes.

4         Q.    We talked a little bit about the

5    policy on disability that is in the process of

6    being finalized.

7               As we sit here today, does ORR have

8    an assessment tool to determine whether a youth

9    in ORR custody meets the ADA definition of a

10   child with a disability?

11        A.    We do.  But it is not clear yet.

12        Q.    So, the assessment tool is part of

13   this process for the new policy on disability?

14        A.    Yes.  Uh-huh.

15        Q.    And, is there, besides consultation

16   with you, is there another tool out there that

17   is being used or piloted to assess disability?

18        A.    No.  There isn't.

19        Q.    We talked a little bit about

20   children placed on psychotropic medications

21   whose files you reviewed at Shiloh.

22        A.    Uh-huh.

23        Q.    So, I know you have some familiarity

24   with the fact that children are placed on

25   psychotropic meds in ORR custody.

Page 242

```
 1   column there appears to be one child that the
 2   reason for placement says Down Syndrome.
 3        A.    Yes.
 4        Q.    So, it your understanding that that
 5   child was also hearing voices?
 6        A.    I don't think so.
 7        Q.    And then right underneath that,
 8   "Sibling to UAC with down syndrome."
 9        A.    Yes.
10        Q.    "No SIHI, worried about family and
11   anger issues in minor, has heart murmur."
12              Do you have any reason to believe
13   that that child was hearing voices or having
14   other auditory or visual hallucinations?
15        A.    I don't think it is for that
16   particular child.
17        Q.    And then we were just talking again
18   about the RTC policy.
19        A.    Uh-huh.
20        Q.    1.4.6.
21              So, previously when we were, when
22   you and I were talking about it and we were
23   looking at the four bullets --
24        A.    Uh-huh.
25        Q.    You testified that it was your
```

Page 243

1  opinion that you would need to have two of
2  those bullets in order to be considered for RTC
3  placement.
4          But, you were just talking about it
5  with your counsel and you said one or more
6  bullets would be needed.
7          Can you clarify?
8     A.   Yes.  It is, it is a, it is one for
9  sure.  And sometimes they will have a
10 combination of two or three.  We don't know.
11         But, at least one of that criteria
12 has to be met.
13    Q.   And how would a program know that
14 given that there are no connectors between the
15 bullets?
16    A.   I have no idea.
17    Q.   Would you agree this policy is
18 pretty unclear?
19         MR. MOSS:  Objection, argumentative.
20 BY MS. WELCH:
21    Q.   I mean given that your testimony has
22 differed based on the meaning of the bullets,
23 does it seem clear to you?
24    A.   Perhaps it needs some clarification.
25         MS. WELCH:  Okay.  That is it for

```
 1                C E R T I F I C A T E

 2   UNITED STATES OF AMERICA    )
                                 ) ss.:
 3   DISTRICT OF COLUMBIA        )

 4

 5             I, Lori J. Goodin, a Notary Public

 6   within and for the District of Columbia, do

 7   hereby certify:

 8             That CAPTAIN MARIVIC FIELDS, the

 9   witness whose deposition is hereinbefore set

10   forth, was duly sworn by me and that such

11   deposition is a true record of the testimony

12   given by such witness.

13             I further certify that I am not

14   related to any of the parties to this action by

15   blood or marriage; and that I am in no way

16   interested in the outcome of this matter.

17             IN WITNESS WHEREOF, I have hereunto

18   set my hand this 5th day of March, 2020.

19                      Lori Goodin
20             _____

21             Lori J. Goodin, RPR, CLR, CRR

22             RSA, California CSR #13959

23

24   My Commission Expires:

25   May 14, 2021
```