# Exhibit 162

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Exhibit 162
Page 185

CONFIDENTIAL

Page 1

1                 UNITED STATES DISTRICT COURT

2          IN THE CENTRAL DISTRICT OF CALIFORNIA

3

4       -------------------------------x

5       LUCAS R., et al

6                   Plaintiffs,        CASE NO:

7               v.                     2:18-CV-05741-

8       ALEX AZAR, SECRETARY OF U.S.     DMGPLA

9       DEPARTMENT OF HEALTH AND HUMAN

10      SERVICES, INC.

11                  Defendants.

12      -------------------------------x

13

14                   CONFIDENTIAL

15        TELEPHONIC DEPOSITION OF NIDIA MURRAY

16                  Houston, Texas

17                    9:14 a.m.

18

19

20

21

22

23      Reported by:

24      Paula J. Eliopoulos

25      JOB NO. 170999

Exhibit 162
Page 186

CONFIDENTIAL

Page 151

1    one.

2              So, yes, they should be following

3    policy.  But I do not know what other programs

4    have done or other case coordinators have done.

5         Q.    Sure.

6              Can a child be placed at Shiloh

7    without a psychologist or psychiatric

8    recommendation?

9         A.    According to policy, no.

10        Q.    Are you aware of any situation where a

11   child was placed at Shiloh without a psychologist

12   or psychiatrist recommendation?

13        A.    I was aware.  One child comes to mind.

14   I do not know if this is the only one.  But one

15   child comes to mind.  That was elevated to ORR

16   headquarters for additional guidance.  And my

17   understanding is that that minor was placed

18   without such recommendation, but had to be seen by

19   a psychiatrist within a very short period of time

20   after.

21        Q.    Did you say he was placed at ORR

22   headquarters?

23        A.    No, no, no.  He was -- the case was

24   elevated --

25        Q.    Okay.

Exhibit 162
Page 187

CONFIDENTIAL

Page 152

1      A.     -- or was evaluated by ORR

2   headquarters prior to.

3      Q.     Okay.  Are you aware, besides this

4   child, any other children who were placed in RTC

5   without a psychologist or psychiatrist

6   recommendation?

7      A.     There were some that were placed with

8   a nurse practitioner recommendation.  But at the

9   time that was in policy; that a nurse practitioner

10  could also be the one to provide that

11  recommendation -- I'm sorry.  Mental health nurse

12  practitioner.

13     Q.     When you say it was "in policy," do

14  you mean ORR policy?

15     A.     Yes.

16     Q.     Is that still the policy today?

17     A.     I'm taking a bit to answer just

18  because I need to look at the manual of

19  procedures.  But I don't believe so.  I don't

20  remember seeing it.

21            I would have to go back and check, so

22  I'm going to say I'm not sure.

23     Q.     Okay.  When was the most recent time

24  that you can remember where a child was placed at

25  RTC without a psychologist or psychiatrist

Exhibit 162
Page 188

CONFIDENTIAL

Page 153

1  recommendation?

2      A.      That one I'm talking about, that I

3  just mentioned.  And -- maybe two years ago.

4  Maybe.  I'm not sure.

5              MS. CHAPUIS:  It's about time for a

6      short break.

7              MR. SCAIFE:  Sure.  We can take a

8      break.

9              Let's go off the record.

10             (Recess, 1:51 p.m. to 2:04 p.m.)

11             CONTINUED DIRECT EXAMINATION

12  BY MR. SCAIFE:

13     Q.      In the process of transferring a kid

14  or a child to a new facility, the transferring

15  facility sends information or a packet of

16  information to the receiving facility's case

17  coordinator.  Right?

18     A.      Yes.

19     Q.      What -- and I think earlier you

20  referred to this information as a packet or packet

21  of information.  What -- can you describe what's

22  in that packet of information?

23     A.      Yes.  And again, it's listed in the

24  policy -- not that policy, but the manual

25  procedures.  But things like case reviews.

Exhibit 162
Page 189

CONFIDENTIAL

Page 199

1   needed.  It's just an example.  But that

2   addendum -- I mean, a home study worker might be

3   able to do that in about a week.  It just depends.

4        Q.     Does Shiloh require a child to be

5   stabilized before he or she can be released?

6        A.      My understanding, yes, that the

7   psychiatrist makes a recommendation for

8   reunification once the minor is no longer a danger

9   to self or others.

10        Q.     The case manager and the case

11  coordinator cannot make recommendation regarding

12  release until the child is stabilized?

13        A.      I don't know about -- I don't know

14  about Shiloh case management, what they can do.  I

15  know a case coordinator might be able to provide a

16  recommendation.  But I don't know that I would

17  provide a recommendation to reunify the minor if I

18  knew that the minor was a danger to the community

19  or self or others.

20        Q.     So you personally would not -- would

21  likely not recommend a release if the child had

22  not been stabilized yet, according --

23        A.      Not if the psychiatrist is saying the

24  child is a danger to self.  That would be a safety

25  concern.

Exhibit 162
Page 190

CONFIDENTIAL

Page 200

1      Q.      To your knowledge, what is the longest

2   a child has remained in ORR custody so that he or

3   she may be stabilized?

4      A.      Stabilized?  Do you mean remain in

5   Shiloh's care?  Or in RTC's care?

6      Q.      Just ORR's care.

7      A.      I -- I don't know.  I mean, I guess it

8   would depend on the psychiatrist.

9      Q.      What about Shiloh's care?

10     A.      A long time.

11     Q.      More than a year?

12     A.      Yes.

13     Q.      More than two years?

14     A.      I don't know if it reached the

15  two-year mark.

16     Q.      Would you say more than 18 months?

17     A.      I would have to look in the portal.

18  But it's very specific.

19     Q.      Do you remember the child's name that

20  you're thinking of?

21     A.      There's one that sticks with me.

22  Carrie Lonetti.  I can't remember...

23     Q.      Is she still in ORR's custody?

24     A.      Yes.

25     Q.      And where is she placed at right now?

Exhibit 162
Page 191

CONFIDENTIAL

Page 223

1   not delay any of those steps that you just

2   mentioned?

3        A.      That continues.  Absolutely.

4        Q.      Would a step up to any other facility

5   delay the completion of those steps that you just

6   referenced?

7        A.      Not that I would think, because it

8   should be continuous.  I mean, the information is

9   in the UAC portal.  And the next program should

10  pick up where the other left off.

11       Q.      Generally, how long or how much time

12  does a home study delay the reunification process?

13              MS. CHAPUIS:  Objection to form.

14       A.      I would have to say that, when it

15  delays the reunification process, it becomes the

16  reunification process.

17              So when a minor meets criteria for a

18  home study, then a home study is part of their

19  reunification process.

20              However, I believe policy says that a

21  home study should take approximately ten business

22  days.

23       Q.      (By Mr. Scaife) In your experience, do

24  case managers sometimes take longer than you think

25  necessary to request a home study?

Exhibit 162
Page 192

CONFIDENTIAL

Page 224

1     A.    Yes.

2     Q.    And why is that?  Why do you say that?

3     A.    Because there have been times when I,

4 as a case coordinator, have had to ask why has

5 this case not been submitted for a home study?

6 And it could be that they were pending something

7 that wasn't necessarily needed or that you can

8 easily say let's go ahead and make that

9 recommendation so that the home study can be

10 worked on.

11     But -- I can't think of a specific

12 example.  But, yes, I know that I've asked that

13 question.

14     Q.    And so when you asked that question,

15 was it after -- well, let me back up.

16     Who makes the decision a home study is

17 needed?

18     A.    As always, ORR is the final word.

19     Q.    Who at ORR makes that decision?

20     A.    The FFS.

21     Q.    So when the FFS makes the decision a

22 home study is needed, is it then up to the case

23 manager to execute the home study or to make sure

24 it happens?

25     A.    So the case manager would provide a

Exhibit 162
Page 193

CONFIDENTIAL

Page 264

1    Q.     (By Mr. Scaife) On the first page of

2    Exhibit 164, who is the child that this Service

3    Plan refers to?

4    A.     ████████ ███████ ██████ ███████

5    Q.     And can you turn to the last page in

6    this document?

7    A.     Yes.

8    Q.     In about the middle of the page, do

9    you see where it says "Discharge Plan"?

10   A.     Yes.

11   Q.     And I'm just going to read the first

12   sentence.

13   A.     Okay.

14   Q.     "At this time, ██████ does not have

15   a viable sponsor.  She stated she would like to

16   reunify with her maternal grandfather in

17   California but previous shelter stated they

18   discontinued working with him."

19        Do you see where that is?

20   A.     Yes.

21   Q.     What does it mean for a shelter to

22   discontinue working with a sponsor?

23   A.     Again, this is a different shelter,

24   but -- so I'm not sure what they meant by this.

25   But it typically means that no more efforts to

Exhibit 162
Page 194

CONFIDENTIAL

Page 265

1  reunify with the sponsor are being made.  They're

2  no longer considered a sponsor.

3      Q.     All right.  Does that mean that the

4  sponsor has -- or that there's been a decision not

5  to release the child to the sponsor?

6      A.     No.  They did not deny.

7      Q.     So it just means that the sponsor is

8  no longer being considered as a potential sponsor.

9  Is that correct?

10     A.     According this sentence.  Yes.

11     Q.     Are you aware of any other cases where

12 the decision was made to discontinue working with

13 the potential sponsor?

14     A.     I've seen some shelters do that.

15 But -- it's not something that I would see at

16 Shiloh.

17     Q.     How often would you say this happens?

18     A.     I don't know.  But it's not something

19 that I typically see.

20     Q.     Does a sponsor have any options to

21 appeal the decision to discontinue working with

22 him or her?

23     A.     I don't -- no.  Since it is not a

24 denial.

25     Q.     Can anyone contest the decision to

**Exhibit 162
Page 195**

CONFIDENTIAL

Page 287

1                      CERTIFICATE

2    STATE OF NEW JERSEY    )

3    COUNTY OF MORRIS       )

4           I, JANET HAMILTON, a Registered

5    Professional Reporter and New Jersey Notary

6    Public, do hereby certify that:

7           I joined this deposition telephonically

8    after the lunch recess, at 12:41 p.m. CST, and

9    ended my reporting at 5:45 p.m. CST, at which time

10   the deposition was concluded.

11          I further certify that I am not related

12   to any of the parties to this action by blood or

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15          In witness whereof, I have hereunto set

16   my hand this 2nd day of January, 2020.

17

18

19          _____

             JANET HALL, RPR, CRC, FPR, NJCCR

20           NJCCR License 30X100240200

             Expires 6/30/2020

21

22

23

24

25

Exhibit 162
Page 196