# Exhibit 145

Exhibit 145
Page 7

11/2/2020                Children Entering the United States Unaccompanied: Section 3 | Office of Refugee Resettlement | ACF

 **Visit coronavirus.gov   for the latest Coronavirus Disease (COVID-19) updates.**
**View ACF COVID-19 Responses and Resources**

# OFFICE OF REFUGEE RESETTLEMENT
An Office of the Administration for Children & Families

# Children Entering the United States Unaccompanied: Section 3
Services

Published: April 20, 2015

**Categories: Unaccompanied Children's Services**

## 3.1 Summary of Services

Care provider facilities are State licensed and must meet ORR requirements to ensure a high level of quality care. The facilities, which operate under cooperative agreements and contracts, provide children with classroom education, health care, socialization/recreation, vocational training, mental health services, access to legal services, access to Child Advocates where applicable, and case management. They also undertake ongoing efforts to identify and assess relatives or other individuals in the United States as sponsors to whom children can be safely released. Care provider facilities' case management teams use standardized screening tools to assess children for mental health and victims of trafficking issues.

*Revised 8/1/16*

## 3.2 Care Provider Admissions and Orientation for Unaccompanied Alien Children

Once the care provider has physical custody of the unaccompanied alien child, the care provider must complete the admissions and orientation process. Care provider staff must be trained in techniques for child-friendly and trauma-informed interviewing, assessment, observation and other techniques. Care providers must also be trained to identify suspected victims of trafficking and children who have been smuggled into the country. Foster parents are not responsible for conducting admissions procedures, but they must be trained on the above topics in order to identify issues that may arise and report them to the care provider.

Care providers who operate secure or staff secure facilities must ensure that the unaccompanied alien children initially placed or transferred to their facility are provided a notice in a format and language accessible to the child as to why they were placed in the facility.

If the care provider staff determines during the admissions and intake process that the unaccompanied alien child's health or life is in imminent risk or their condition places the safety of others at imminent risk, the care provider must contact 9-1-1 for crisis response and transportation to the nearest emergency room.

If the care provider determines that the unaccompanied alien child requires medical attention, the care provider arranges for the unaccompanied alien child to be evaluated by a medical and/or mental health provider as soon as possible upon the unaccompanied alien child's arrival at the facility.

Where available, the care provider or any stakeholder may request the appointment of a Child Advocate for an unaccompanied alien child who is a victim of trafficking or is found to be especially vulnerable (See **Section 2.3.4 (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.3.4)**). ORR decides whether to appoint a Child Advocate.

*Revised 8/1/16*

### 3.2.1 Admissions for Unaccompanied Alien Children

After obtaining physical custody of an unaccompanied alien child, the care provider must immediately ensure the physical and mental well-being of the child by:

**Exhibit 145**
**Page 8**

- Ensuring that the unaccompanied alien child receives food and beverages and bathes or showers within two hours of entering the care provider facility.
- Providing the unaccompanied alien child, at a minimum, with the following items: clean clothing, clean bedding, and personal hygiene items.
- Assisting the unaccompanied alien child in contacting family members or other relatives, if contact is considered safe, following ORR and the care provider's internal safety procedures.
- Ensuring that to the extent practical under the circumstances, the child eats and bathes before interacting with other children.
- Ensuring that the unaccompanied alien child receives a complete initial medical exam, including screening for infectious diseases by a licensed physician or physician's assistant, within 48 hours of admission (excluding weekends and holidays).
- Creating an inventory list for all cash and other property obtained from the unaccompanied alien child upon admission.

To identify any of the child's immediate needs or issues, a trained staff member with the care provider must use the *Initial Intakes Assessment* to interview the child within 24 hours of the child's admission to the facility. The *Initial Intakes Assessment* guides the interviewer through a series of questions to obtain information about family members, any immediate medical or mental health concerns, current medications, and any concerns about personal safety that the child may have at that time.

Prior to interviewing the UAC using the *Initial Intakes Assessment,* the care provider informs the youth that providing honest answers to all assessments is essential. The care provider also informs the UAC that self-disclosure of previously unreported criminal history or violent behavior to any other children, care provider staff, ORR, or others, may result in the child's transfer to another care provider facility and may affect their release.

If the unaccompanied alien child's responses to questions during the *Initial Intakes Assessment*, initial medical examination, or other assessments indicate the possibility that the child may have been a victim of human trafficking, the care provider notifies the Office of Trafficking in Persons (OTIP) within 24 hours.

*Revised 04/3/2018*

### 3.2.2 Orientation

Care providers must have a standardized orientation that is provided to all admitted unaccompanied alien children. The orientation must be provided within 48 hours of admission and must be presented in a fashion that is appropriate for the age, culture, and language of the child or youth. The orientation must be provided in formats that are accessible to unaccompanied alien children who are limited English proficient, deaf, visually impaired or otherwise disabled, as well as those who have limited reading skills.

If the unaccompanied alien child is not literate, the care provider must verbally explain all the documents in the unaccompanied alien child's native or preferred language. If forms are not translated into a language that the unaccompanied alien child can read, the care provider staff must verbally translate the document for the child or youth. Care providers lacking staff who speak an unaccompanied alien child's native or preferred language must make every attempt to utilize a professional translation service for the unaccompanied alien child's orientation. In cases where no such service exists, or is unavailable, then care providers must consult with the ORR FFS, the Care Coordinator, and other relevant stakeholders to create and implement a strategy for communicating with the unaccompanied alien child as effectively as possible.

As part of the orientation, the care provider must also provide the unaccompanied alien child a tour of the facility and note emergency evacuation routes and exits. The orientation must include the following information: an explanation of the nature of the unaccompanied alien child's custody in ORR; the care provider's rules, responsibilities, and procedures; the unaccompanied alien child's rights and responsibilities, including general legal-related information; the care provider's behavior management policies; the care provider's grievance policies and procedures; emergency and evacuation procedures; and other policies and procedures to help the child or youth adjust to the new setting.

*Posted 1/28/15*

## 3.3 Care Provider Required Services

Care providers must comply with all applicable State child welfare laws and regulations and all State and local building, fire, health and safety codes. Care providers must deliver services in a manner that is sensitive to the age, culture, native language, and needs of each unaccompanied alien child. Care providers must develop an **individual service plan (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Individual Service Plan)** for the care of each child.

Care providers are also required to maintain records of case files and make regular reports to ORR. Care providers must have accountability systems in place which preserve the confidentiality of client information and protect the records from unauthorized use or disclosure.

**Exhibit 145
Page 9**

Under the terms of the Flores Settlement Agreement, care providers must provide the following minimum services[1] for each unaccompanied alien child in their care:

- Proper physical care and maintenance, including suitable living accommodations, food, appropriate clothing and personal grooming items.
- Appropriate routine medical and dental care, family planning services, including pregnancy tests and comprehensive information about and access to medical reproductive health services and emergency contraception, and emergency health care services, including a complete medical examination (including screenings for infectious disease) within 48 hours of admission, excluding weekends and holidays, unless the unaccompanied alien child was recently examined at another ORR care provider facility; appropriate immunizations in accordance with recommendations of the U.S. Department of Health and Human Services /U.S. Public Health Service (PHS), Centers for Disease Control and Prevention (CDC); administration of prescribed medication and special diets; appropriate mental health interventions when necessary.
- An individualized needs assessment, which includes the various initial intake forms, collection of essential data relating to the identification and history of the child and his or her family, identification of the unaccompanied alien child's special needs including any specific problems which appear to require immediate intervention, an educational assessment and plan, an assessment of family relationships and interaction with adults, peers and authority figures; a statement of religious preference and practice; an assessment of the unaccompanied alien child's personal goals, strengths and weaknesses; identifying information regarding immediate family members, other relatives, godparents or friends who may be residing in the United States and may be able to assist in connecting the child with family members.
- Educational services appropriate to the unaccompanied alien child's level of development and communication skills in a structured classroom setting Monday-Friday, which concentrates primarily on the development of basic academic competencies and secondarily on English Language Training. The educational program shall include instruction and educational and other reading materials in such languages as needed. Basic academic areas should include Science, Social Studies, Math, Reading, Writing and Physical Education. The program must provide unaccompanied alien children with appropriate reading materials in languages other than English for use during leisure time.
- Activities according to a recreation and leisure time plan that include daily outdoor activity, weather permitting, with at least one hour per day of large muscle activity and one hour per day of structured leisure time activities (that should not include time spent watching television). Activities should be increased to a total of three hours on days when school is not in session.
- At least one individual counseling session per week conducted by trained social work staff with the specific objective of reviewing the child's progress, establishing new short term objectives, and addressing both the developmental and crisis-related needs of each child.
- Group counseling sessions at least twice a week. Sessions are usually informal and take place with all unaccompanied alien children present. The sessions give new unaccompanied alien children the opportunity to get acquainted with staff, other children, and the rules of the program. It is an open forum where everyone gets a chance to speak. Daily program management is discussed and decisions are made about recreational and other activities. The sessions allow staff and unaccompanied alien children to discuss whatever is on their minds and to resolve problems.
- Acculturation and adaptation services which include information regarding the development of social and inter-personal skills which contribute to those abilities necessary to live independently and responsibly.
- A comprehensive orientation regarding program intent, services, rules (written and verbal), expectations and the availability of legal assistance.
- Whenever possible, access to religious services of the child's choice.
- Visitation and contact with family members (regardless of their immigration status), which is structured to encourage such visitation. The staff must respect the child's privacy while reasonably preventing the unauthorized release of the unaccompanied alien child.
- A reasonable right to privacy, which includes the right to wear his or her own clothes when available, retain a private space in the residential facility, group or foster home for the storage of personal belongings, talk privately on the phone and visit privately with guests, as permitted by the house rules and regulations, receive and send uncensored mail unless there is a reasonable belief that the mail contains contraband.
- Services designed to identify relatives in the United States as well as in foreign countries and assistance in obtaining legal guardianship when necessary for the release of the unaccompanied alien child.
- Legal services information, including the availability of free legal assistance, the right to be represented by counsel at no expense to the government, the right to a removal hearing before an immigration judge, the right to apply for asylum or to request voluntary departure in lieu of deportation. (This information is included in the **Legal Resource Guide for Unaccompanied Alien Children (https://www.acf.hhs.gov/programs/orr/resource/unaccompanied-childrens-services#legal)**)

*Revised 5/23/16*

### 3.3.1 UAC Assessment and Case Review

**Exhibit 145
Page 10**

Within 5 days of an unaccompanied alien child's admission, a trained staff member conducts an assessment that covers biographic, family, legal/migration, medical, substance abuse, and mental health history (the UAC Assessment).

The UAC Assessment is used by the care provider as the basis for an initial release plan for the unaccompanied alien child and is the initial form used to evaluate the child or youth for services. An unaccompanied alien child may not be transferred to another ORR care provider or released from ORR custody to a sponsor until the care provider has completed the assessment.

The care provider continues to update the child or youth's case file using another assessment tool (the UAC Case Review). This form is used to make sure that the case is continually updated (initially on the unaccompanied alien child's 30th day in the care provider's care and subsequently every 30 days or every 90 days in a long term foster care provider's care). This information is entered into the child's case management record in a timely fashion to identify any changes that impact a release care plan or individual service plan.

*Posted 12/16/16*

### 3.3.2 Long Term and Concurrent Planning

Care providers create long term plans to address the individual needs of each unaccompanied alien child following release from ORR. Whenever possible, this involves releasing an unaccompanied alien child to the care of a family member.

In some cases, care providers may conduct concurrent planning for the child's future. Concurrent planning is the exploring of alternative options to the sponsorship process (including multiple sponsorship options) during the process of preparing to release children to parents, other relatives, or family friends.

In some situations, release to a family member is not an option for the child or youth. In those instances, the care provider must explore other planning options for the future. These include:

- Release to an unrelated sponsor
- Release to a licensed program or other entity
- Preparation for discharge and repatriation
- Planning for teens turning 18 years of age, and "aging out" of ORR custody
- Residential Treatment Center (RTC) or ORR Long Term Foster Care (LTFC) or transfer to another care provider within the ORR continuum of care that is most appropriate for meeting the unaccompanied alien child's immediate and longer term needs.

*Posted 1/28/15*

### 3.3.3 Screening for Child Trafficking and Services for Victims

Care providers must screen all unaccompanied alien children to identify potential victims of a severe form of trafficking.  The law recognizes two forms of trafficking: labor trafficking and sex trafficking.[2]  Labor trafficking of a child has three elements:

- **Action**: the child was recruited, harbored, transported, provided, or obtained
- **Means**: through the use of force, fraud, or coercion
- **Purpose**: for involuntary servitude, peonage, debt bondage, or slavery.

Sex trafficking of a child has two elements:

- **Action**: the child was recruited, harbored, transported, provided, obtained, patronized, or solicited
- **Purpose**: for a commercial sex act. A commercial sex act is defined as any sex act on account of which anything of value is given to or received by any person.

    *Force, fraud, or coercion (means) is not a required element for sex trafficking of a child.*

The UAC assessment tool has questions designed to assist care providers in identifying victims of trafficking and children vulnerable to being trafficked.  The questions in the assessment tool cover a wide range of indicators of trafficking.

Care providers must distinguish between the elements of a trafficking offense and indicators that trafficking may have occurred.  A child may have experienced an indicator of trafficking, such as owing a financial debt, but may not be a victim of trafficking.  A child is not a victim of trafficking unless there is forced labor or commercial sex.

**Trafficking vs. Smuggling**

Smuggling is a distinct crime from human trafficking.  Smuggling involves a person being transported illegally over a national border.  A child who was smuggled into the United States could have been trafficked while they were smuggled or smuggled as part of a trafficking scheme, but being smuggled does not automatically make the child a victim of trafficking.

**Exhibit 145
Page 11**

**Actions when care provider suspects trafficking**

If a care provider suspects that a child is a trafficking victim, the care provider must refer the child's case to the Office on Trafficking in Persons (OTIP) for further assessment.  This referral is appropriate if the care provider suspects the child was a victim of trafficking at any point in the child's life and in any country.  In addition, ORR must refer any trafficking concerns to the Homeland Security Investigations division (HSI) and the Human Smuggling and Trafficking Center (HSTC), at the Department of Homeland Security.  Referrals to OTIP, HSI, and HSTC may include supporting documents relevant to investigative purposes.  ORR may also request assistance from other federal agencies (e.g., Department of Labor) in assessing a child's case for potential trafficking concerns.

If OTIP identifies the child as a victim of a severe form of trafficking, OTIP issues the child an *Eligibility Letter*, which makes the child eligible for federally funded benefits and services to the same extent as a refugee, without regard to immigration status.  Prior to issuing an *Eligibility Letter*, upon receipt of credible information that a child who is seeking assistance may have been subjected to a severe form of trafficking in persons, OTIP issues an *Interim Assistance Letter*, making the child or youth eligible for such benefits and services for a 90-day period (which may be extended for an additional 30 days).  OTIP issues *Eligibility* and *Interim Assistance Letters* to children by name, in care of the care providers.  The care providers retain the original letter until release, and keep copies after release (See Section **5.6.2 (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-5#5.6.2)** for care provider responsibilities relating to retention of original *Eligibility* and *Interim Assistance Letters*).

**Additional Measures**

Care providers must take additional safety steps when caring for child victims of trafficking, including:

- Carefully verifying all family and sponsor relationships in order to screen for traffickers who may attempt to coerce or threaten a child;
- Adjusting the in-care safety plan as appropriate, to allow for only supervised phone calls or to revise the list of approved phone/visitation contacts for the unaccompanied alien child (See Section **3.3.4 (http://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-3#3.3.4)**);
- Training staff and volunteers on how victims of trafficking are subject to many different methods of coercion and control, including strong bonds with an abuser and not understanding the full reality of abuse;
- Supporting unaccompanied alien children in an age-appropriate manner to identify healthy relationships and to understand common recruitment and deception tactics used by traffickers;
- Implementing additional safety measures, such as increased staff supervision or in-depth trauma-informed interviews during the planning process;
- Creating a safety plan that includes a list of safe persons, phone numbers, places to contact, and list of unsafe persons and places;
- Engaging the unaccompanied alien child in developing a plan of action for the child to take if he or she feels threatened or unsafe..

*Revised 7/3/17*

### 3.3.4 Safety Planning

Care providers are responsible for safety planning for the facility as a whole and for developing in care individual safety plans for those children for whom it is appropriate.

**Overall Safety Planning**

Care providers must develop a written safety plan that includes policies and procedures for all unaccompanied alien children in its care and program staff. The safety plan must address emergency situations covering the following areas: evacuations (for example due to a hurricane, fire, or other emergency), medical and mental health emergencies, disease outbreaks, and unaccompanied alien children leaving premises without permission.

Care providers and foster care programs must meet the safety requirements maintained by State and/or local licensing entities, fire code regulations, and local zoning and building code regulations.

Care providers (with the exception of individual foster care homes) must meet the following minimum safety and security related requirements:

- Controlled entry and exit from the premises to ensure unaccompanied alien children remain within the facility perimeter and to prevent access by the public without proper authorization.
- Video monitoring in common and living areas.
- A communications system and alarm system for all areas of the residential structure.

**Exhibit 145**
**Page 12**

- Effective video monitoring of the exterior of the building and surrounding premises, including the ability to permanently download footage when necessary.
- A system for physically counting the residents and a written policy that provides that staff regulate resident movement.
- A daily log on resident population movement (for example, arrivals and departures, room assignments).
- "Mirrored windows" or small windows in the doors of any rooms used for one-on-one meetings with the children.
- A facility inspection checklist that includes the safety related components of all residential operations and program functions.
- Quarterly conducted safety assessments which document any deficiencies that could impact the safety of staff or children and corrective action plans for any outstanding deficiencies.
- Spot inspections in order to note safety concerns through day-to-day observations, which are tracked and incorporated into the quarterly safety assessment.

**Individualized In Care Safety Plans**

Care providers must create in care safety plans for unaccompanied alien children for whom such plans are appropriate, including but not limited to those who:

- Are victims of trafficking, at high risk for trafficking, or victims of other crimes
- Have a history of criminal, juvenile justice, or gang involvement
- Have a history of behavioral issues or violence
- Have special needs, disabilities or medical or mental health issues
- Have a history of substance abuse
- Are parenting or pregnant
- May be subject to bullying (e.g., transgender youth)
- Present a risk of flight

**Safety Planning for Field Trips or Other Off-Site Outings**

Prior to approving a child's participation in an off-site outing (including off-site religious services) care providers must assess the child's current behavior and level of functioning to identify potential safety risks. As part of the assessment, care providers must take into consideration individualized safety plans created for children with specific safety or behavioral concerns. In addition, care providers must ensure that all staff involved in the outing are aware of and understand any individual needs of or concerns about each child being considered for participation in the outing.

Children who are currently identified as presenting a safety risk or risk of flight are not permitted to participate in outings.  All assessments for safety risk or risk of flight will be evaluated on an individual basis and in no event will a care provider use a safety plan to bar children from outings based on factors unrelated to the child's behavior or a specific safety concern.  If a child previously posed a risk of flight from ORR custody, the child must be assessed for thirty days leading up to the planned outing before the care provider approves or denies participation in the outing. During those thirty days, if the child exhibits any degree of behavior indicating an elevated risk of flight or other safety concern, the child is not permitted to participate in the outing. As with other assessments, care providers must keep a record of their behavioral assessments in preparation for outings.

If a child is not permitted to participate in an off-site outing, care providers must make reasonable efforts to provide comparable, comprehensive services on-site in accordance with State licensing regulations and child welfare best practices. For children approved to participate in outings, care providers must explain to the children the program's expectations for appropriate behavior during the off-site outing.

*Revised 4/24/17*

**3.3.5 Academic Educational Services**

Care providers must conduct an educational assessment within 72-hours of a UAC's admission into the facility in order to determine the academic level of the child and any particular needs he or she may have. Care providers must provide educational services based on the individual academic development, literacy level, and linguistic ability of each unaccompanied alien child.

Each unaccompanied alien child must receive a minimum of six hours of structured education, Monday through Friday, throughout the entire year in basic academic areas (Science, Social Studies, Math, Reading, Writing, Physical Education, and English as a Second Language (ESL), if applicable). Care providers adapt or modify local educational standards to develop curricula and assessments, based on the average length of stay for UAC at the care provider facility, and provide remedial education and after school tutoring as needed. Learning materials must reflect cultural diversity and sensitivity. Any academic breaks must be approved in advance by the care provider's Project Officer. In no event will any academic break be approved that is over two (2) weeks in duration.

**Exhibit 145
Page 13**

Unaccompanied alien children may be separated into class groups according to their academic development, level of literacy, and linguistic ability rather than by chronological age. As needed, unaccompanied alien children must be provided an opportunity for learning advancement, such as independent study, special projects, pre-GED classes and college preparatory tutorials, among others. Academic reports and progress notes are included and updated in the unaccompanied alien child's case file which is either sent to another care provider in the event of a transfer or released to the unaccompanied alien child upon discharge.

*Revised 4/24/17*

### 3.3.6 Vocational Educational Services

Care providers are encouraged to create vocational training opportunities that will provide unaccompanied alien children with practical and competitive job skills and assist in the preparation for adulthood. Vocational programs may not replace academic education or be a substitute for the basic subject areas.

Care providers must document all vocational programs, including the name of the vocation or trade, staff or volunteer qualifications, frequency and duration of courses, community partnerships, course curriculum, and student capacity. If funds are generated from the sale of items made by unaccompanied alien children in the program they must be provided to the unaccompanied alien child upon release from the facility. These funds may not be used to supplement the facility's program. If care providers plan to regularly sell items made by unaccompanied alien children, they must have written standardized procedures for the sale, accounting, and dispensing of funds to unaccompanied alien children upon release.

*Posted 1/28/15*

### 3.3.7 Services Related to Culture, Language, and Religious Observation

Unaccompanied alien children entering ORR custody come from a wide array of cultures, practices, languages, and beliefs. Care providers must have the cultural awareness and systems in place to support the cultural identity and needs of each unaccompanied alien child.

ORR requires care providers to respect and support the cultural identity of unaccompanied alien children by:

- Allowing unaccompanied alien children regular contact with safe family members or other support systems through telephone calls, letters and visits.
- Addressing the unaccompanied alien child by his or her given name.
- Inclusion of cultural awareness in daily activities, such as food menus, choice of clothing, and hygiene routines.
- Celebration of culture-specific events and holidays.
- Academic education that covers various cultures within a classroom setting.

Care providers must make every effort possible to provide comprehensive services and literature in the native language of each unaccompanied alien child; provide on-site staff or interpreters as needed; and allow unaccompanied alien children to communicate in their preferred language when they choose. All ORR-required documents provided to unaccompanied alien children must be translated in the unaccompanied alien child's preferred language, either written or verbally. Translation services should be used when no written translation (assuming the child is literate) or on-site staff or interpreters are available.

Care providers must provide opportunities for unaccompanied alien children to observe and practice their spiritual or religious beliefs, including but not limited to, the celebration of religious holidays, displaying religious art, wearing religious articles of jewelry, following certain food preparation and/or dietary restrictions and attending services and activities (as long as it is safe for the unaccompanied alien child and staff). Care providers are encouraged to work with clergy or other members of the religious community to provide spiritual/religious services to unaccompanied alien children in ORR's custody. Care providers must provide access to recognized members and leaders of religious communities to ORR care provider facilities in accordance with safety policies and procedures. Upon request from an unaccompanied alien child, assuming that the request is reasonable and the safety of the unaccompanied alien child and staff is not adversely impacted, care providers must transport unaccompanied alien children to places of worship.

If an unaccompanied alien child requests religious information or other religious items, such as books or clothing, the care provider must provide the applicable materials in the unaccompanied alien child's native language, as long as the request is reasonable.

Care provider services also help unaccompanied alien children obtain the skills necessary to acculturate to the United States and to live independently and responsibly. Acculturation services include:

- Providing English language classes
- Access to community services
- Academic education, including, for example, geography
- Celebration of U.S. holidays

**Exhibit 145
Page 14**

- Discussion of US. laws
- Food and entertainment
- Field trips to local historical, scientific or cultural points of interest

*Posted 1/28/15*

### 3.3.8 Recreation and Leisure Time Services

Care providers must develop recreation and leisure plans that include daily outdoor activities, weather permitting, for unaccompanied alien children in their care. The plan includes at least one hour per day of large muscle activity and one hour per day of structured leisure time activities other than television (three hours per day on weekends or holidays).

Recreation and leisure time activities are separate from the required physical educational requirement.

Care providers that do not have sufficient on-site recreation areas must take unaccompanied alien children to off-site parks, community recreation centers or other suitable locations and provide a higher staff-to-child ratio in those instances.

Care providers must screen television, movies, and video games for appropriateness before being provided to unaccompanied alien children and these may not be substituted for recreational or leisure activities. (Television viewing limitations and other related policies vary from facility to facility.)

*Posted 1/28/15*

### 3.3.9 Nutritional Services

Care providers must provide nutritional services in accordance with U.S. Department of Agriculture and U.S. Department of Health and Human Services nutritional guidelines and State licensing requirements. They also must establish procedures to accommodate dietary restrictions, food allergies, health issues, and religious or spiritual requirements.

*Posted 1/28/15*

### 3.3.10 Telephone Calls, Visitation, and Mail

Care providers must ensure the privacy and safety of all unaccompanied alien children by having internal policies and procedures for telephone calls, such as verifying the identity of telephone callers and the recipient of outgoing telephone calls. Unaccompanied alien children must be provided the opportunity to make a minimum of two telephone calls per week (10 minutes each) to family members and/or sponsors, in a private setting.

Unaccompanied alien children are allowed to call both family members and sponsors living in the United States and abroad. Attorneys representing unaccompanied alien children have unlimited telephone access to unaccompanied alien children and the child or youth may speak to other appropriate stakeholders, such as their consulate, the case coordinator, or child advocate.

Care providers must create a list of approved and prohibited persons that an unaccompanied alien child may contact and may only prohibit telephone calls if they can document valid reasons for concern (for example, suspected smuggler or trafficker or past trauma with a particular individual). Care providers encourage visitation between unaccompanied alien children and family members (unless there is a documented reason to believe that there is a safety concern) and have policies in place to ensure safety and privacy of unaccompanied alien children and staff. Care provider policies include those that ensure that the UAC and care provider staff are safe and that the unaccompanied alien child may communicate with the visitor in private. Care providers must have an alternative public place for visits. Visitation must be supervised by staff in a way that ensures safety but respects the unaccompanied alien child's privacy and reasonably prevents the unauthorized absence of the child or youth.

Potential sponsors may only visit with the approved child, not with other unaccompanied alien children in the facility. Prior to any visitation, all visitors must be informed of visiting hours and the circumstances that could result in the termination of the visit. Visitors must provide their name, address, and relationship to the unaccompanied alien child they are visiting. All visitors must present acceptable government-issued photo identification upon entry.

Care providers also ensure that all mail, letters, packages, baggage and any other items delivered to the care provider and addressed to the unaccompanied alien child are promptly delivered to the unaccompanied alien child and that children and youth have access to postage and if possible to email in order to send letters to family members, sponsors, legal representatives, and others. (Care providers must confirm the identity of the sender prior to release of the mail.)

If there is reason to believe that contraband is included in a package or the mailed item presents a safety issue, the unaccompanied alien child must be required to open the item in the presence of a care provider staff member who may conduct an inspection. If there is reason to believe it would be dangerous for the unaccompanied alien child to open an item, the care provider must call the appropriate authorities to properly handle suspicious packages.

**Exhibit 145**
**Page 15**

*Posted 1/28/15*

### 3.3.11 Clothing and Personal Grooming

Care providers must provide new clothing and footwear, items for personal hygiene, grooming, and hair as deemed appropriate and needed.

If the child arrives at the care provider facility with appropriate clothing the UAC will be allowed to wear it. Care providers will not use footwear as a means to control behavior.

Care providers also ensure that unaccompanied alien children have the appropriate time, space, and items for personal grooming and hygiene. Shaving facial hair may not be required if it violates the unaccompanied alien child's cultural norms, religious beliefs, or personal preferences, and head scarves may be worn for religious reasons.

Care providers must have standardized policies and procedures regarding gang-related symbols and tattoos. While the unaccompanied alien child is in the custody of ORR, care providers must ensure that any gang-related symbols, tattoos, accessories, or paraphernalia on an unaccompanied alien child are covered or confiscated.

*Revised 4/24/17*

### 3.3.12 Assignment of Chores

Care providers may assign individual chores to unaccompanied alien children to teach them responsibility for their own living environment, but unaccompanied alien children may not be required to clean areas they do not occupy or use, such as administrative offices. Care providers must have written policies and procedures regarding chores, chore assignments, and schedules.

*Posted 1/28/15*

### 3.3.13 Behavior Management

Behavior management strategies used by the care provider must meet child welfare best practice standards. ORR approves care provider written policies and procedures for behavior management, including rules for the program, rewards and consequences for behavior.

*Posted 1/28/15*

### 3.3.14 Transportation Services

Care providers are required to provide the following transportation services:[3]

- Individual transfers from one ORR care provider to another
- Group transfers due to an emergency situation or an **influx (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Influx)**
- ORR requests for special initial placements
- Local services and appointments, such as medical and dental appointments, immigration court hearings, or community services as part of the individual service plan
- Release of unaccompanied alien children to sponsors who are not able to pick up the unaccompanied alien child, as approved by ORR

The care provider must comply with all local licensing requirements and State and Federal regulations, such as meeting or exceeding the minimum staff/child ratio required by the care provider's licensing agency, maintaining and inspecting all vehicles used for transportation, etc.

Unaccompanied alien children must be transported in a manner that is appropriate to the child's physical and mental needs, including the proper use of car seats for young children.

To the greatest extent possible under the circumstances, when transporting unaccompanied alien children care providers will assign transport staff of the same gender as the child or youth.

**NOTE:** Sexual abuse and sexual harassment-related issues are addressed in separate policies implementing the interim final rule on standards to prevent, detect, and respond to sexual abuse and sexual harassment. See **Section 4: Preventing, Detecting, and Responding to Sexual Abuse and Harassment (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-4)**.

*Posted 1/28/15*

**Exhibit 145
Page 16**

**3.3.15 Use of Restraints or Seclusion in Emergency Safety Situations In Residential Treatment Centers (RTCs)**

**Summary**

Restraints or seclusion should only be used in limited situations in which an unaccompanied alien child presents a risk of imminent physical harm to themselves or others, unless the use of restraints or seclusion is prohibited by State law. Restraints or seclusion should be a last resort and must be terminated as soon as the physical safety of the child and others can be ensured. This policy applies only to emergency safety situations in residential treatment centers.

**Emergency Safety Situations**

An emergency safety situation is a situation in which an unaccompanied alien child presents a risk of imminent physical harm to themselves or others as demonstrated by overt acts or expressed threats.

**Restraints and Seclusion**

Restraints may include:

- A personal restraint, which is the application of physical force without the use of any device, for the purpose of restraining the free movement of a child's body. This does not include briefly holding a child without undue force in order to calm or comfort him or her.
- A drug when it is administered to manage the child's behavior in a way that (1) reduces the safety risk to the child or others; (2) modifies their behavior; and is (3) not a standard treatment for the child's condition.[4]

Seclusion is the involuntary confinement of a child alone in a room or area from which the child is physically prevented from leaving.[5]

**Use of Restraints During an Emergency Safety Situation[6]**

Restraints or seclusion may only be used to ensure the immediate physical safety of the child and others during an emergency safety situation. Restraints or seclusion may never be used as a means of coercion, discipline, convenience, or retaliation by staff.

Restraints or seclusion should be a last resort and used only when less restrictive interventions prove ineffective in ensuring the immediate physical safety of the child and others. The use of restraints or seclusion must be performed in a manner that is safe, proportionate, and appropriate to the severity of the behavior and the child's chronological and developmental age; size; gender; physical, medical, and psychiatric condition; and personal history.

The use and implementation of restraints or seclusion must be in accordance with State law and licensing requirements.[7] If ORR providers have any questions about this guidance in relation to their State law, they should contact their Project Officer.

The use of restraints or seclusion must terminate when the emergency safety situation has ended and the physical safety of the child and others can be ensured.

**Types of Restraints Used During an Emergency Safety Situation**

The type or technique of restraint or seclusion used must be the least restrictive intervention that will be effective to protect the unaccompanied alien child and others from immediate physical harm.

ORR does not authorize the use of mechanical restraints. A mechanical restraint is any device attached or adjacent to the child's body that he or she cannot easily remove that restricts freedom of movement or normal access to his or her body.[8]

**Post Intervention**

Staff must provide the child with an opportunity to discuss the emergency safety situation no later than 48 hours after the child's release from restraints or seclusion. The discussion must be held in private as soon as possible and should include the staff involved. Additionally, the supervisor(s) of the staff involved in the emergency safety situation must review the use of restraints or seclusion within 72 hours of their use.

**Reporting the Use of Restraints or Seclusion**

Staff must report the use of restraints or seclusion during an emergency safety situation within 24 hours. The report must include a description of the circumstances that created the basis for the use of restraint or seclusion and a description of the restraint, including the length of time used. Additionally, the report must document the interventions used by staff prior to the use of restraints or seclusion.

**Restraints and Seclusion Prevention Strategies**

**Exhibit 145**
**Page 17**

Restraints and seclusion are largely preventable, costly and traumatizing practices for children and staff that can impede the therapeutic alliance, and foster a culture of distrust and violence. For children who have experienced traumatic events, the use of restraints and seclusion often replicates the experience of abuse and poses a barrier to healing and recovery. Therefore, every effort should be made to prevent the need for use of restraints and seclusion.

Effective strategies include the following:

- Workforce development: Workforce training on trauma and its impact on the developing brain and behavior can help staff understand and address the underlying cause or reason for unsafe behavior, recognize the signs of trauma before immediate safety concerns arise, and provide non-aversive interventions, such as sensory regulation, positive behavioral interventions and supports, crisis prevention, and culturally responsive de-escalation techniques to prevent the need for use of restraints or seclusion.
- Organizational leadership support: There are a number of steps that organizations can take to support a prevention first approach to the use of restraints and seclusion. These include incorporating an understanding of the prevalence and impact of trauma, as well as the complex paths to healing and recovery, into all aspects of service delivery; reviewing agency policies, procedures and practices to ensure that the organizational culture emphasizes non-coercive, trauma-informed approaches promoting safety and respect; using data to inform practice; and incorporating prevention tools, such as crisis plans, comfort rooms, and sensory tools.

**How can an ORR provider learn more about alternatives to restraints and seclusion?**

The Substance Abuse and Mental Health Services Administration's (SAMHSA) National Center for Trauma-Informed Care and Alternatives to Seclusion and Restraint (**www.samhsa.gov (http://www.samhsa.gov)**) is a technical assistance center dedicated to promoting alternatives to seclusion and restraint, and building the knowledge base on the implementation of trauma-informed approaches in programs, services, and systems.

*Posted 3/2/15*

### 3.3.16 Notification and Reporting of the Death of an Unaccompanied Alien Child
**Summary**

To appropriately respond to the death of an unaccompanied alien child in the care and custody of ORR, ORR and its care providers must immediately report the death to appropriate Federal, State, and local authorities. ORR must also notify the child or youth's parent, legal guardian, or next-of-kin; attorney; Congressional officials, and consulate officials of the death.

If an investigation is conducted, both ORR and care providers must follow-up with all investigations in order to remain informed of the progress and results of any investigation. Once ORR receives the results of any investigation, ORR will inform the unaccompanied alien child's parents, legal guardian, or next-of-kin of the results in a timely manner.

**Reporting to Local Authorities and ORR**

**To whom must the care provider immediately report a UAC death?**
The care provider must immediately report the death to:

1. Local law enforcement, as appropriate;
2. The care provider's State or local licensing authority;
3. Child Protective Services, as applicable; and
4. ORR via a Significant Incident Report.

**Notification and Reporting within the US Department of Health and Human Services (HHS)**

**Who must ORR immediately notify after receiving a report of a UAC death?**
ORR must immediately notify the appropriate staff in ORR, ACF and HHS.

**Notifications to External Parties**
**Who must ORR notify within 24 hours of an unaccompanied alien child's death?**

ORR must notify:

1. The unaccompanied alien child's parent, legal guardian, or next-of-kin;
2. The unaccompanied alien child's attorney of record or the care provider's local legal service provider;
3. The applicable consulate;
4. The child advocate, if applicable;

**Exhibit 145**
**Page 18**

5. Congressional officials
6. The local U.S. Immigrations and Customs Enforcement (ICE), Field Office Juvenile Coordinator (FOJC); and
7. The Department of Homeland Security, ICE, Enforcement and Removal Operations, Juvenile and Family Residential Management Unit (ERO/JFRMU).

**Method of Notification**

**How must care providers and ORR make notifications?**

Care providers and ORR must make all notifications telephonically and follow-up within 24 hours with a written notification that includes documentation of the initial telephonic notification. Notifications must be provided in a language the recipient can understand. ORR must utilize translation services as appropriate when making notifications to individuals who may not understand or read English. All reports, notifications, and acknowledgements of receipt (if possible) must be documented and maintained in the unaccompanied alien child's case file.

**Notifications to Congress**

Upon certification by medical doctor of a UAC's death from an ORR care provider, ORR notifies Congressional points of contact within 24 hours of the reported death. However, if ORR has been unable to reach the child's next of kin, HHS notifies Congressional points of contact, but withholds the deceased child's name until after notifications are made to the child's next of kin.

**Ongoing Reporting and Follow-Up**

**Are there ongoing reporting requirements?**
Yes, both ORR and care providers must make reasonable efforts to remain informed of the progress and results of any investigation and post-mortem medical examination. ORR will timely inform the decedent's parents, legal guardian, or next-of-kin of the results of any investigations, examinations, and reports. ORR will provide the final investigation results, if applicable, and the original death certificate to the UAC's parents, legal guardian, or next-of-kin. The care provider must maintain a copy of the death certificate and any reports in the UAC's case file.

**Will ORR internally review the care provider who had physical custody of the decedent at the time of the death?**
Yes, ORR will review all investigation results, the decedent's case file and records, and any other available information. ORR will determine whether ORR policies and procedures were properly followed and whether the care provider appropriately responded to any related issues that arose prior to the death and to the death itself.

*Revised 7/22/19*

**3.3.17 Use of Restraints during Transport and in Immigration Court**

Physical restraints are devices used to physically restrict the movement of an individual at the hands, wrists, ankles, feet, waist or elsewhere on the body. ORR only allows the use of soft restraints (e.g., zip ties and leg or ankle weights) during transport when a child poses a serious risk of physical harm to self or others or a serious risk of escape from ORR custody.

Any situation involving transportation of an unaccompanied alien child to or from a secure care facility must be completed by appropriately trained care provider staff or an agency experienced in secure transportation of minors. Transportation staff must be trained in conflict resolution without the use of physical restraints, the safe and effective use of approved soft restraints, and the emergency use of safe and approved physical restraints during an emergency response.

When care providers (or transport agencies) use soft restraints when transporting an unaccompanied alien child, they must take into account the child's medical and/or mental health issues. If the care provider (or transport agency) believes the child cannot be transported safely in soft restraints to a non-emergency appointment or hearing due to the existing serious risk of violence or escape, the ORR/FFS and the secure care provider must work with the appropriate parties to schedule a new appointment or hearing for the child at a later date. In the event of a medical emergency, the care provider must safely and appropriately transport the child to the emergency room for evaluation using soft restraints or must contact 9-1-1 for crisis response and transportation to the nearest emergency room.

Care providers that provide secure transport must submit to their designated ORR Project Officer the program's internal written policies and procedures concerning secure transportation services.

Care providers must document all instances of the use of restraints in transportation logs.

**Exhibit 145
Page 19**

Revised 7/12/16

### 3.3.18 Restraints in Immigration Court and Asylum Interviews

Generally, care providers must not restrain children during immigration court proceedings or asylum interviews. However, restraints may be used in the following instances:

- During transport to immigration court or an asylum interview under the guidelines at section 3.3.17.
- While at the immigration court or the asylum interview if the unaccompanied alien child exhibits imminent escape behavior, makes violent threats, or demonstrates violent behavior.
- While at the immigration court or asylum interview if the secure care provider and ORR have made an individualized determination that the unaccompanied alien child poses a serious risk of violence or escape if the child is unrestrained in court or the interview.

**Notification of the Use of Restraints**

If a secure care provider restrains a child during his/her hearing or interview because of events that occur during the hearing or interview, the care provider must notify the ORR/FFS through the SIR process and detail the reasons for applying the soft restraints.

If a care provider believes a child will need to be restrained at a future court appearance or interview, the care provider must notify the child and his/her attorney or legal service provider and the ORR/FFS. The care provider and the ORR/FFS must work with the attorney or legal service provider and DOJ or DHS to request a later court hearing or asylum interview. The child or his/her attorney or legal service provider may also request to have the soft restraints removed if the child or his/her attorney or legal service provider believes that there are medical, physical, or psychological reasons that would prevent the safe and humane application of soft restraints. The child or his/her attorney or legal service provider should make the request in writing to the ORR/FFS as soon as practicable before the next hearing or interview. At the time of this request, ORR and the secure care provider will conduct an individualized assessment to determine if the child poses a serious risk of violence or escape.

*Posted 7/12/16*

### 3.4 Medical Services

ORR facilitates and funds health care for all unaccompanied alien children in its custody. ORR has developed its health care policies with the goals of ensuring the children's physical and mental well-being and the safety of care providers, medical personnel and communities. Through its care providers and other health care professionals, ORR provides the following services:

- Routine medical and dental care
- Family planning services, including pregnancy tests and comprehensive information about and access to medical reproductive health services and emergency contraception
- Emergency health services
- A complete medical examination (including screening for infectious diseases) within 48 hours of admission (excluding weekends and holidays and unless the youth was recently examined at another facility)
- Immunizations
- Administration of prescribed medications and special diets
- Appropriate mental health interventions

Care providers must deliver services in a standardized manner that is sensitive to the age, culture, native language, and needs of each unaccompanied alien child. Care providers also must meet State and local licensing and public health requirements.

*Revised 5/23/16*

### 3.4.1 Health Care Eligibility and General Standards

Health care eligibility is effective on the first day that a child has been placed in the physical custody of ORR. Eligibility for ORR coverage ends on the day the child leaves ORR's custody.

Care providers create collaborative partnerships with medical professionals and organizations to ensure children have access to medical care. To ensure quality care, ORR requires licensed medical practitioners (physicians, physician assistants, nurse practitioners) acting within their scope of practice to provide or supervise all medical evaluation and management. In addition, a licensed mental health professional must deliver mental health services. Any hospital providing services to unaccompanied alien children must be accredited by the Joint Commission or other nationally recognized accrediting body.

*Posted 5/11/15*

**Exhibit 145**
**Page 20**

### 3.4.2 Initial Medical Examination

Each unaccompanied alien child must receive an initial general medical examination within 48 business hours of admission. The purposes of the initial examination are to assess general health, administer complete immunizations in keeping with U.S. standards, find out about health conditions that require further attention, and detect contagious diseases, such as influenza or tuberculosis. Care providers must ensure that healthcare professionals are following ORR's latest medical guidance and reporting the findings on ORR forms. Payment for the initial examination is pre-approved.

*Revised 1/24/16*

### 3.4.3 Requests for Health Care Services

Care providers have a responsibility to initiate health care services when they observe children in need of medical attention. As important as observing a child's need for medical care is creating an atmosphere that allows a child to request care. Therefore, care providers must have policies and procedures for unaccompanied alien children to convey written and verbal requests for emergency and non-emergency health care services. Children who have language and literacy barriers also must have the opportunity to communicate their needs. All requests from a child must be documented and maintained in the child's medical case file. Care providers must respond to non-emergency requests within 24 to 48 hours, excluding weekends and holidays. To the best of their ability, care provider staff should address questions and concerns from unaccompanied alien children regarding current or past medical care.

*Posted 5/11/15*

### 3.4.4 Medication Administration and Management

Care providers must have policies and procedures based on State or local laws and regulations to ensure the safe, discreet, and confidential provision of prescription and nonprescription medications to unaccompanied alien children, secure storage of medications, and controlled administration and disposal of all drugs.

This includes:

- Locking cabinets, closets, and refrigeration units.
- Recording all prescribed medications in the child's file.
- Training all staff or foster parents who dispense medications in the "Five Rights of Medication Administration" (right recipient, right medication, right dose, right time, and right route of administration).
- Confirming that the child has ingested the medication.
- Documenting that prescribed or over-the-counter medications have or have not been administered (by whom, and if not, for what reason, including the date, time of administration, name of medication, and dosage).
- Prohibiting one child to deliver medications to another.
- Disallowing an unaccompanied alien child's self-administration of medications, either orally or topically, outside the presence of a staff member.

A licensed health care provider (a nurse, physician, physician's assistance, nurse practitioner) must write or verbally order all nonprescription medications. Verbal orders must be documented in the child's file.

*Revised 9/12/15*

### 3.4.5 Responding to Medical Emergencies

All medical emergencies must be immediately addressed. A medical emergency is a serious medical condition caused by injury, illness, or toxic exposure that is life threatening in nature. In other words, if a child does not receive immediate medical attention his or her medical condition is likely to worsen and result in damage to vital body functions or death.

Care provider staff must follow these steps in the event of a medical emergency.

1. Contact 9-1-1 and arrange for transportation for the child to the nearest emergency room (ER) for evaluation.
2. Render first aid as necessary until 9-1-1 responders arrive on the scene. Staff providing CPR should use a mouthpiece or do hand-only CPR.
3. Employ Standard Precautions (use of protection barriers, such as gloves, gowns, aprons, masks or protective eyewear) to reduce the risk of exposure to potentially infectious materials.
4. Notify the care provider's Program Director immediately and the actions employed.
5. Submit an SIR to ORR within 4 hours of ER visit.
6. If hospitalization is recommended by the ER physician, contact the unaccompanied alien child on a daily basis by telephone and visitation.
7. Provide ORR with regular updates on the child's health status and progress.

**Exhibit 145**
**Page 21**

8. If hospitalization is not required, obtain medical records or documentation verifying that the child is stable enough for release to the care provider (for example, written doctor authorization or order, discharge instructions recommending release to the program with follow-up care).
9. Discuss the case with the care provider's case management and clinical staff. Evaluate whether the care provider can meet the child's medical needs. Review the ER or hospital discharge plan and implement treatment recommendation.
10. Request medical records related to the emergency treatment and any inpatient treatment from the medical services provider.
11. Maintain records in the child's health files.

*Posted 5/11/15*

### 3.4.6 Management of Communicable Diseases

From intake to release, care providers must observe all children for signs or symptoms of communicable diseases and act accordingly to protect others against possible infection.

Facilities must be aware of the list of notifiable diseases in their States. Each facility must have policies and procedures for identifying, reporting, and controlling communicable diseases that are consistent with State and local laws and regulations. Further, each facility must inform ORR about each suspected or confirmed case and follow ORR medical guidance on managing cases and contacts, which is prepared and disseminated to care providers by the ORR/Medical Services Team. ORR has protocols for diseases of public health concern that have been diagnosed in unaccompanied alien children, including varicella and tuberculosis. The care provider is responsible for training all staff about its current communicable disease plan.

Care providers must have an identified space within the shelter facility that may be used for quarantine or isolation in the event that an unaccompanied alien child must be separated from the general population for a medical reason. The space must be suitable to house a child for days or weeks.

Unaccompanied alien children must be admitted to a hospital if clinically indicated, if public health needs require it, or if isolation at the facility cannot be achieved safely and effectively. An unaccompanied alien child's refusal of treatment that puts others at risk for spread of the disease is considered a public health justification for isolation.

Facilities must provide regular updates to ORR regarding the mental and physical health of children in isolation. Children should continue to receive tailored services (educational, recreational, social, and legal services) when feasible.

*Posted 5/11/15*

### 3.4.7 Maintaining Health Care Records and Confidentiality

Care providers are responsible for procuring and maintaining records of health care services received by unaccompanied alien children while in their care. Care providers must request records for all office visits (medical, dental, mental health), hospitalizations, radiology and lab results, and procedures.

Care providers must maintain the children's individual health files separately from the children's case files, unless State licensing requirements dictate otherwise. In addition, care providers must report health information to ORR as directed and retrieve records upon ORR's request, even after a child's release. Upon an unaccompanied alien child's transfer to another ORR program, care providers must transfer with the child all medical, dental, and mental health records. Upon release from ORR custody, unaccompanied alien children are entitled to receive copies of their health records. At a minimum, all children at release must receive:

- Initial medical screening documentation;
- Immunization records; and
- Lab test results or radiograph readings.

Also upon release, unaccompanied alien children who have been hospitalized for any medical or mental health issues must receive copies of their relevant health records, including hospitalization admission note and discharge summary.[9]

The care provider must have written policies, procedures, and practices that protect the confidentiality of medical information. To safeguard children's privacy, care providers must use discretion when communicating with an unaccompanied alien child about medical appointments in the presence of others. Care provider staff also must dispense medication in a private location. Similarly, medical disclosure to staff about a child's health condition should be determined by the Program Director on a need-to-know basis.

*Posted 5/11/15*

### 3.4.8 Medical Clearance Prior to Release or Transfer

Unaccompanied alien children who have serious physical or mental health issues or have had exposure to a communicable disease may not be transferred or moved until they have been medically cleared by a physician or ORR is consulted. Pregnant unaccompanied

**Exhibit 145**
**Page 22**

alien children should be medically cleared for travel by plane if required by the air carrier (generally, after 36 weeks of pregnancy) or if they delivered within the past 7 days. Children with medical needs must have follow-up services or other arrangements in place prior to their discharge.

Unaccompanied alien children who need to remain on prescription medication must receive a minimum of a 30 day supply of medication, or the remainder of their medication if on a time-limited course, prior to transfer or release. The unaccompanied alien child and the accepting care provider (in the case of a transfer) or a sponsor (in the case of release) must be instructed in the proper administration of medications. Care providers may not release unaccompanied alien children with any narcotic medications. As part of release planning, if an unaccompanied alien child is on any chronic psychotropic medications, the care provider must address the unaccompanied alien child's situation, including likelihood of maintaining medications upon release from ORR custody, with the prescribing psychiatrist to determine if medications should be continued or if a period of weaning off the medication is required before release.

Children who are infectious with communicable diseases of public health concern, which have potential to cause outbreaks, will not be released from ORR care until they are non-infectious. However, if an infectious child must be moved internally within a facility, to another facility, or to the hospital, care providers and others having interaction with the child must follow Standard Precautions, depending on the mode of disease transmission (e.g., surgical mask should be worn by children with diseases spread by the respiratory route). The care provider must provide the medical, dental, and mental health records to the unaccompanied alien child upon release or to the accepting care provider in the event of a transfer.

*Posted 5/11/15*

### 3.4.9 Provider Reimbursement

Reimbursement of health care claims for services for children in ORR custody is paid to vendors through the Veterans Administration (VA) Financial Services Center. Reimbursement for medical and mental health services is at the Medicare or lower rate. Only ORR may approve a reimbursement rate higher than the Medicare rate, which must be negotiated prior to the provision of services and only granted in extenuating circumstances. It is not necessary for providers serving unaccompanied alien children to be Medicare participating physicians.

As of September 1, 2013, ORR no longer reimburses care providers and medical providers for transportation costs associated with mobile medical providers. Transportation for services, including but not limited to medical, radiology, laboratory, and dental services, are at the care provider's expense. Programs should take transportation fees into consideration when contracting with mobile medical providers.

Treatment authorization requests for office visits (primary care, specialty consultations, mental health, and dental care), laboratory tests, surgeries and procedures, physical therapy, and other specialized health treatments must be pre-approved before non-emergency services are rendered. Considering the high turnover and short term stay of most unaccompanied alien children in ORR custody, some services are not appropriate (e.g., cosmetic treatment, medical consultations for minor health concerns where safe and effective home remedies exist, specialty consultation for a stable condition that cannot be resolved before discharge and will not affect treatment or care while in custody, etc.) Care providers must follow ORR medical guidance, which is prepared and disseminated to care providers by the ORR/Medical Services Team.

*Posted 5/11/15*

## 3.5 Guiding Principles for the Care of Unaccompanied Alien Children Who are LGBTQI

All children and youth in ORR care are entitled to human rights protections and freedom from discrimination and abuse. Care providers must ensure that children who are lesbian, gay, bisexual, transgender, questioning, or intersex (LGBTQI) are fairly treated and served during their time in ORR custody.

ORR requires care providers to operate their programs following the guiding principles below. Care providers must ensure that LGBTQI children and youth:

- are treated with the same dignity and respect as other unaccompanied alien children
- receive recognition of sexual orientation and/or gender identity
- are not discriminated against or harassed based on actual or perceived sexual orientation or gender identity
- are cared for in an inclusive and respectful environment

Care providers must:

- maintain the privacy and confidentiality of information concerning sexual orientation and gender identity
- use correct names and pronouns in accordance with the youth's gender identity

**Exhibit 145 Page 23**

- house LGBTQI youth according to an assessment of the youth's gender identity and housing preference, health and safety needs, and State and local licensing standards
- offer an individualized assessment to determine whether additional or alternate restroom accommodations should be provided
- allow LGBTQI youth to dress and express themselves according to their gender identity
- allow LGBTQI youth to choose the gender of staff to conduct a pat-down search if one is necessary

More details about the protections of LGBTQI children can be found below and in **Section 4 (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-4)** of this guide.

*Posted 6/17/15*

### 3.5.1 Zero Tolerance for Discrimination and Harassment

LGBTQI children have the right to be free from discrimination and harassment based on actual or perceived sexual orientation or gender identity. More specifically, care providers may not label a child or youth as a likely abuser or punish a child for his or her sexual orientation, gender identity, or gender expression. All children and youth must be treated fairly and equally and provided with inclusive, safe, and nondiscriminatory services.

*Posted 6/17/15*

### 3.5.2 Prohibition on Segregation and Isolation

Care providers must be responsive to the needs of LGBTQI children and youth in an inclusive and respectful environment. Care providers may not isolate or involuntarily segregate children solely because of their sexual orientation, gender identity, or gender expression. In addition, one-on-one supervision may only be utilized in exigent circumstances.

*Posted 6/17/15*

### 3.5.3 Confidentiality with Regard to Sexual Orientation and Gender Identity

As noted above, the privacy and confidentiality of youth with regard to sexual orientation and gender identify must be protected. Care providers must ensure that information about sexual orientation and gender identity is kept confidential and is only shared when disclosure is necessary for medical or mental health treatment or the youth requests the information be shared for a particular purpose. As with all information gathered during the course of service provision, care providers must implement appropriate controls on information dissemination within the care provider facility in order to ensure that sensitive information is not exploited to any youth's detriment by staff or other unaccompanied alien children.

*Posted 6/17/15*

### 3.5.4 Housing

When making housing assignments for a transgender or intersex youth, the care provider must consider the youth's gender self-identification and the effects of a housing assignment on the youth's health and safety. Care providers must not base housing assignment decisions of transgender or intersex youth solely on the identity documents or physical anatomy of the youth. The child's self-identification of his or her gender and self-assessment of safety needs must always be taken into consideration as well. The care provider's housing assignment of a transgender or intersex child must be consistent with the safety and security considerations of the care provider facility and State and local licensing standards. If State and local licensing standards conflict with the care provider's determination for a youth's housing assignment, the care provider should immediately contact the ORR/FFS for further guidance.

*Posted 6/17/15*

### 3.5.5 Restroom and Dressing Area Accommodations

If a youth expresses safety or privacy concerns or the care provider otherwise becomes aware of privacy or safety concerns related to restrooms or dressing areas, the care provider must take reasonable steps to address those concerns. This may include, for example: the addition of a privacy curtain or partition; provision to use a nearby restroom or office; or a separate changing schedule. The care provider should contact the ORR/FFS for further guidance if the care provider is uncertain about the appropriate steps to take.

*Posted 6/17/15*

## 3.6 ORR Long Term Foster Care

ORR provides long term foster care placements for certain children who meet the requirements under section **1.2.6 Long Term ORR Foster Care (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-1#1.2.6)**. ORR long term foster care is defined as an ORR-funded and administered family placement in a community based setting. Children placed into ORR long term foster care remain in the care and custody of ORR. ORR long term foster care programs are not

**Exhibit 145
Page 24**

State funded and are not part of the State child welfare system. However, ORR long term foster care families are licensed by the State to serve as foster families, and as such, adhere to standards of care as outlined by the State licensed child placement agency, State licensing regulations, and any ORR policies related to long term foster care. Foster care providers must comply with all applicable State child welfare laws and regulations and all State and local building, fire, health and safety codes. Foster care providers must deliver services in a manner that is sensitive to the age, culture, native language, sexual orientation and special needs of each child. The child attends community based school and receives on-going case management and counseling services, as well as other services as needed.

*Posted 10/5/15*

### 3.6.1 ORR Long Term Foster Care Service Provision

In ORR long term foster care placements, long term foster care providers must offer every child the following services:

- A comprehensive program orientation
- Case management services
- Educational services in a community based school
- Weekly individual counseling sessions
- Legal services and representation , as applicable
- Individualized Safety Plans
- Services related to culture, language, and religious observation
- Recreation and Leisure Time Services
- Acculturation and Adaptation services
- Telephone Calls, Visitation, and Mail
- Opportunities for vocational education and independent Living

For information regarding transfers into ORR long term foster care, please see section **1.2.6 ORR Long Term Foster Care (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-1#1.2.6)**.

For information about monitoring of ORR long term foster care programs please see section **5.5.3 Foster Care Monitoring (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-5#5.5.3)**.

*Posted 10/5/15*

### 3.6.2 Change in Placements while in ORR Long Term Foster Care

Foster care providers must make every effort to place and keep children in the least restrictive setting. Foster care provider facilities must provide support services and appropriate interventions, when necessary, to help keep a child in the placement. A change of placement from long term foster care to a more restrictive setting or a more therapeutic setting may be considered after reasonable efforts have first been made to provide additional services or manage the child's behavior in order to maintain the current placement. If it is determined that a child requires transfer into a more restrictive placement, please see section **1.2 ORR Standards for Placement and Transfer Decisions (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-1#1.2)**. For placements into an RTC please see section **1.4.6 Residential Treatment Center Placements (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-1#1.4.6)**.

*Posted 10/5/15*

### 3.6.3 Additional Questions and Answers about this Topic

**Is release to a sponsor possible after a transfer to ORR long term foster care?**

Yes. In the event that a sponsor is identified after a transfer to ORR long term foster care has occurred, the sponsorship process must be pursued. Case managers must be continually assessing cases for potential sponsors in long term foster care. Please refer to **Section 2 Safe and Timely Release from ORR Care (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.1)** for further information.

*Posted 10/5/15*

### Footnotes

1. The Flores Settlement Agreement also specifies what care provider may NOT do when meeting minimum service requirements.

**Exhibit 145**
**Page 25**

These include: Unaccompanied alien children shall not be subjected to corporal punishment, humiliation, mental abuse, or punitive interferences with the daily functions of living, such as eating or sleeping. Any sanctions employed by the care provider must not adversely affect either the health or physical or psychological well-being of the child or youth or deny the child or youth regular meals, sufficient sleep, exercise, medical care, correspondence privileges, or legal assistance.

2. 22 U.S.C. § 7102

3. ORR transportation requirements are based on standards cited in "Caring for Our Children: National Health and Safety Performance Standards for Out-of-Home Child Care Programs", 2nd Ed., released by the American Academy of Pediatrics, American Public Health Association and the National Resource Center for Health and Safety in Child Care.

4. *See* 42 CFR §483.352

5. *See* 42 CFR §483.352

6. The Children Health Act of 2000, (42 USC §290ii et seq.) imposed procedural reporting and training requirements regarding the use of restraints and involuntary seclusion in facilities that receive Medicaid and Medicare funding, specifically including facilities that provide inpatient psychiatric services for children under the age of 21 years. The Centers for Medicare & Medicaid Services (CMS) issued regulations implementing these requirements at 42 CFR 483, Subpart G, which establishes the federal minimum standard for restraints and seclusion in these facilities. The language in this document parallels the CMS restraints and seclusion standard.

7. Some States prohibit the use of restraints and seclusion. States may also prohibit the use of certain types of restraints (such as chemical restraints) or impose limitations on the implementation of restraints or seclusion, such as specific time limits or requirements for a written order by licensed physicians.

8. *See* 42 CFR §483.352

9. For hospitalizations, discharge instructions are not considered the complete medical records.

**<Back (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2) - Next> (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-4)**

Last Reviewed: July 22, 2019

**Exhibit 145
Page 26**

# Exhibit 146

Exhibit 146
Page 27

 **Visit coronavirus.gov   for the latest Coronavirus Disease (COVID-19) updates.**
**View ACF COVID-19 Responses and Resources**

# OFFICE OF REFUGEE RESETTLEMENT
An Office of the Administration for Children & Families

## Children Entering the United States Unaccompanied: Section 4
Preventing, Detecting, and Responding to Sexual Abuse and Harassment

Published: November 16, 2015

**Categories: Unaccompanied Children's Services**

### 4.1 Definitions

*Posted 2/5/18*

### 4.1.1 Sexual Abuse

For the purposes of Section 4, sexual abuse is defined at 34 U.S.C. § 20341 and in ORR regulations at 45 C.F.R. 411.6.  Sexual abuse includes different acts depending on whether the perpetrator is a minor or an adult.

Sexual abuse of a minor by another MINOR includes the following acts:

1. The employment, use, persuasion, inducement, enticement, or coercion of a child to engage in, or assist another person to engage in, (2) or (3) below or the rape, molestation, prostitution, or other form of sexual exploitation of children, or incest with children;
2. Actual or simulated sexual intercourse, including sexual contact in the manner of genital-genital, oral-genital, anal-genital, or oral-anal contact, whether between persons of the same or opposite sex;
3. Intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or the buttocks of another person, excluding contact incidental to a physical altercation;
4. Penetration of the anal or genital opening of another person, however slight, by a hand, finger, object, or other instrument;
5. Bestiality;
6. Masturbation;
7. Lascivious exhibition of the genitals or pubic area of a person or animal;
8. Sadistic or masochistic abuse; or
9. Child pornography or child prostitution.

Sexual abuse of a minor by an ADULT includes the following acts:

1. The employment, use, persuasion, inducement, enticement, or coercion of a child to engage in, or assist another person to engage in, (2) or (3) below or the rape, molestation, prostitution, or other form of sexual exploitation of children, or incest with children;
2. Actual or simulated sexual intercourse, including sexual contact in the manner of genital-genital, oral-genital, anal-genital, or oral-anal contact, whether between persons of the same or opposite sex;
3. Intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or the buttocks that is unrelated to official duties or where the staff member, grantee, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;
4. Contact between the mouth and any body part where the staff member, grantee, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;
5. Penetration of the anal or genital opening of another person, however slight, by a hand, finger, object, or other instrument that is unrelated to official duties or where the staff member, grantee, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

**Exhibit 146
Page 28**

6. Any attempt, threat, or request by a staff member, grantee, contractor, or volunteer to engage in activities (1) through (5) above;
7. Any display by a staff member, grantee, contractor, or volunteer of his or her uncovered buttocks or breast in the presence of a child;
8. Bestiality;
9. Masturbation;
10. Lascivious exhibition of the genitals or pubic area of a person or animal;
11. Sadistic or masochistic abuse;
12. Child pornography or child prostitution; or
13. Voyeurism by a staff member, grantee, contractor, or volunteer (See definition below).

*Posted 2/5/18*

## 4.1.2 Voyeurism

Voyeurism is an invasion of privacy of a child by a staff member, grantee, contractor, or volunteer for reasons unrelated to official duties. Examples include inappropriately viewing a child perform bodily functions or bathing; or requiring a child to expose his or her buttocks, genitals, or breasts; or recording images of all or part of a child's naked body or part of a child performing bodily functions.

*Posted 2/5/18*

## 4.1.3 Sexual Harassment

Sexual harassment is defined in ORR regulations at 45 C.F.R. 411.6.  Sexual harassment includes different acts depending on whether the perpetrator is a minor or an adult.

Sexual harassment of a minor by another MINOR includes: repeated and unwelcome sexual advances, requests for sexual favors, or verbal comments, gestures, phone calls, emails, texts, social media messages, pictures sent or shown, other electronic communication, or actions of a derogatory or offensive sexual nature.

Sexual harassment of a minor by an ADULT includes: repeated verbal comments, gestures, phone calls, emails, texts social media messages, pictures sent or shown, or other electronic communication of a sexual nature to a child by a staff member, grantee, contractor, or volunteer, including demeaning references to gender, sexually suggestive or derogatory comments about body or clothing, or obscene language or gestures.

*Posted 2/5/18*

## 4.1.4 Inappropriate Sexual Behavior

Inappropriate sexual behavior is behavior that does not meet the definition of sexual abuse or sexual harassment but is sexual in nature.

*Posted 2/5/18*

## 4.1.5 Questions and Answers about the Definitions

**Q: Can an act be considered sexual abuse or sexual harassment if the perpetrator is a minor, but not a UAC?**

A: Yes, a minor perpetrator can include another UAC, another child or youth residing at the same care provider facility (e.g., a participant in the URM program), or a child or youth with whom a UAC may have contact (e.g., a classmate at school).  If a minor perpetrates an act that meets the definition of sexual abuse as described above, whether the minor is a UAC or not, the care provider must report the incident to all appropriate entities according to federal, state, and ORR reporting policy and procedures,

**Q: Can an act be considered sexual abuse or sexual harassment if the act is perpetrated by a UAC on a care provider staff member?**

A: The definitions of sexual abuse and sexual harassment described above are intended to be broad to ensure the safety and wellbeing of unaccompanied alien children in the care of ORR.  However, acts perpetrated on staff do not fall under these definitions.  Care providers should still report these incidents according to state law and ORR reporting policy and procedures.  For example, a care provider may need to report the incident to ORR as a SIR as a behavioral incident.

**Q: Can an act that occurred between two UAC fall under the definition of sexual abuse if both UAC claim the act was consensual?**

**Exhibit 146
Page 29**

A: The definitions provided above do not distinguish between consensual and nonconsensual acts. Care providers should follow the reporting policies described in Section 4 regardless of whether the act was consensual or nonconsensual.

*Posted 2/5/18*

## 4.2 Zero Tolerance Policy

ORR has a zero-tolerance policy for all forms of sexual abuse, sexual harassment, and inappropriate sexual behavior at all care provider facilities, including secure care provider facilities and long term foster care providers, and will make every effort to prevent, detect, and respond to such conduct.  Section 4 of the ORR Guide provides an outline for and guidance on ORR's approach to preventing, detecting, and responding to such conduct.

*Posted 2/22/15*

### 4.2.1 Application

**To Whom Does This Policy Apply?**
ORR policies apply not only to all care provider facilities and their staff, but also to any volunteer, contractor, sub-contractor, grantee, sub-grantee or other individual that may have regular contact with children or youth at the facility.

Adherence to ORR's policies must be included in all care provider facility agreements with volunteers, contractors, sub-contractors, grantees, and sub-grantees that may have regular contact with children or youth at the facility.  Care provider facilities must also include in these agreements provisions for monitoring and evaluation to ensure that all volunteers, contractors, sub-contractors, grantees, and sub-grantees comply with ORR policies.

ORR includes provisions in all new contracts, contract renewals, cooperative agreements, or cooperative agreement renewals to ensure compliance with Interim Final Rule (IFR) standards.  All current contractors and grantees with cooperative agreements must comply with Section 4 of the ORR Guide within six (6) months of the IFR's publication.

*Posted 2/22/15*

### 4.2.2 Care Provider Requirements

**What Is Required of Care Provider Facilities?**
All care provider facilities must have a written zero tolerance policy for all forms of sexual abuse, sexual harassment, and inappropriate sexual behavior.  The policy must outline the facility's approach to preventing, detecting, and responding to such conduct through written policies and procedures that are approved by ORR.

The care provider facility's policies, procedures, and services must:

- Be culturally-sensitive and knowledgeable;
- Be age appropriate;
- Be tailored for a diverse population of children and youth, including children or youth who are LGBTQI (lesbian, gay, bisexual, transgender, questioning, and intersex);
- Ensure that children or youth with disabilities, including but not limited to children or youth who are deaf, hard of hearing, blind, or have low vision and children or youth with intellectual, psychiatric, or speech disabilities, have an equal opportunity to participate in or benefit from all care provider facility policies and procedures;
- Ensure that children or youth with limited reading ability or who are limited English proficient (LEP) have an equal opportunity to participate in or benefit from all care provider facility policies and procedures;
- Provide for effective communication with children or youth with disabilities or who are LEP, including access to in-person, telephonic, or video interpretive services that enable effective, accurate, and impartial interpretation, both receptively and expressively, using any necessary specialized vocabulary;
- Require quality in-person or telephonic interpretation services that enable effective, accurate, and impartial interpretation services; and
- Ensure that any written materials, including but not limited to notifications, orientation materials, and instruction, are translated either verbally or in written form in the child or youth's preferred language.

*Posted 2/22/15*

## 4.3 Personnel

This section covers requirements related to personnel issues. This section applies to all care provider facilities, including long-term foster care.  Secure facilities are subject to the U.S. Department of Justice's National Standards to Prevent, Detect, and Respond to Prison Rape, 28 CFR part 115, and are not covered by this section.

**Exhibit 146**
**Page 30**

*Revised 3/11/19*

### 4.3.1 Prevention of Sexual Abuse Coordinator and Compliance Manager

ORR's Prevention of Sexual Abuse Coordinator (PSA Coordinator) oversees compliance with the Interim Final Rule (IFR) and related policies and procedures at all care provider facilities.

Each care provider facility must have a Prevention of Sexual Abuse Compliance Manager (PSA Compliance Manager), who is responsible for compliance with the IFR and related policies.  The PSA Compliance Manager must have the time and authority to oversee compliance efforts program-wide. The PSA Compliance Manager also serves as a point of contact for ORR's PSA Coordinator and must promptly respond to all requests. The PSA Compliance Manager position requires ORR pre-hire approval.

*Revised 1/14/19*

### 4.3.2 Applicant Screening

Applicant screening is critical to identifying qualified staff.  Integrating sexual abuse prevention into the applicant screening and selection process is critical to ensuring the safety of children and youth.  Care provider facilities must consider sexual abuse prevention as one of the components when deciding which applicant to select for a staff, contractor, or volunteer position.

Care provider facilities must take several steps to show their commitment to preventing sexual abuse. These steps may help deter some individuals who are at risk of abusing children and youth from applying for employment. One such step is to inform each applicant in writing of policies to prevent and report sexual abuse and harassment. An applicant must sign a document indicating that they have read and understood the policies. Care provider facilities must also share a copy of the code of conduct in **Section 4.3.3** with each applicant. Care provider facilities must keep a copy of these documents in the applicant's personnel file.

Care provider facilities must use a written application to collect critical information to assess the suitability of each applicant.  A written application should ask open-ended questions that encourage answers that can be further clarified during a personal interview.  Conducting in-depth personal interviews is another way to look for risk factors or "red flags" in applicants.  Care provider facilities may also create scenarios to use in the written application or in personal interviews to assess an applicant's judgement by revealing potential concerns or boundary issues.

Care provider facilities must ask applicants for at least one personal reference. Personal references can provide additional information about an applicant's suitability for working with children and help a care provider facility assess if the applicant has mature, adult relationships.

A written application must ask about past work and volunteer experiences.  Professional reference checks can provide more information about an applicant and verify their employment and volunteer history. Care provider facilities must contact an applicant's past employers. In particular, care provider facilities must make their best efforts, consistent with the law, to contact past employers that were ORR care provider facilities, child care entities, correctional facilities, pretrial detention facilities, community-based homes, or juvenile residential facilities.

Care provider facilities should focus on contacting past employers that provided an applicant with access to children and youth. These past employers can provide information about an applicant's judgement and how an applicant interacts with youth.  As part of the screening process, a care provider facility must ask past employers about any substantiated allegations of sexual abuse and sexual harassment.  A care provider facility must also ask if the applicant resigned during a pending investigation of alleged sexual abuse or sexual harassment.  Care provider facilities must document any effort to contact past employers and the results in the applicant's personnel file.

Care provider facilities must ask all applicants in written applications or interviews about any previous misconduct.  Misconduct includes but is not limited to any criminal behavior, abuse, and/or neglect investigation, charge, arrest, civil adjudication, administrative adjudication, or conviction. Care provider facilities can ask an applicant to clarify or provide more information about disclosed misconduct during a personal interview.  Care provider facilities must document any effort to ask applicants about previous misconduct and the applicant's response in the applicant's personnel file.

*Revised 3/11/19*

### 4.3.3 Employee Background Investigations

Completing background investigations is another critical component of the screening process.  Background checks provide more information about the suitability of an applicant to work with children and youth in ORR care.  However, care provider facilities cannot rely solely on background checks to assess the suitability of an applicant to work with children and youth in ORR care.

ORR has minimum standards for the scope of background checks because State licensing requirements vary from State to State. Care provider facilities must complete background investigations according to ORR's minimum standards and State licensing requirements

**Exhibit 146**
**Page 31**

on all staff, contractors, and volunteers before their hire.

The care provider facility must complete the fingerprint check using a public or private vendor, if State licensing requirements do not require a national criminal history fingerprint check. If there is an additional cost associated with this fingerprint check, the care provider facility may include the cost in its budget plan.

Care provider facilities cannot utilize the U.S. Department of Health and Human Services, Program Support Center (HHS/PSC) to complete staff, contractor, and volunteer background checks. HHS/PSC's priority is to complete background investigations for potential sponsors of unaccompanied alien children and lacks authority to provide background checks on behalf of care providers.

Care provider facilities must keep the results of all background checks in the employee's personnel file.  The care provider must document the review and conclusions about a background investigation and keep it in the employee's personnel file.  The care provider facility must provide all information about a background investigation, including the background check and conclusions, to ORR if requested.

**Who Must Complete a Background Investigation?**

ORR regulations require that care provider facilities conduct a background investigation prior to hiring new staff to determine whether the applicant is suitable for employment with minors in a residential setting. If State law or licensing regulations prohibit a care provider facility from conducting background checks before hiring an applicant, the care provider facility must notify ORR's Prevention of Sexual Abuse Coordinator and provide documentation of the State law or licensing requirement.

The following individuals must complete background checks before they are hired and gain access to children or youth:

- Executive and program management staff as well as administrative staff with direct access to children or youth;
- All temporary, part-time, or full-time employees and contractors with direct access to children or youth;
- Anyone who may have unsupervised, direct access to children or youth, including volunteers;
- Immigration advocates and legal service providers under policies established in an agreement between the care provider facility and service provider. ORR must approve the organization's background check policies and procedures before granting it access to any child or youth. Care provider facilities may have additional requirements according to their State licensing requirements; and
- Foster parents (transitional and long-term) and all foster parent household members aged 18 and over.

Attorneys of record do not need to complete a background check, but care provider facilities must  have policies to confirm the identity and the status of attorneys of record before providing them access.

Medical and mental health professionals (e.g., doctors, nurses, nurse practitioners, psychiatrists, licensed clinicians) who provide services on site but are not employed by the care provider facility do not need to complete background investigations. Such professionals must, however, have up to date applicable state licensure requirements.

**At a Minimum, What Must the Background Investigation Include?**

The scope of background investigations must comply with State licensing requirements and ORR minimum standards, which include:

- A FBI fingerprint check of national and state criminal history repositories;
- A child protective services check with the staff's State(s) of U.S. residence for the last five years; and
- Background investigation updates at a minimum of every five years of the staff/contractor/volunteer's start date or last background investigation update. Care provider facilities may require the updated background investigation more frequently as necessary.

Care provider facilities must notify ORR's Prevention of Sexual Abuse Coordinator in writing if they are unable to complete all the required background investigation components. ORR will work with the care provider facility to ensure that background checks are completed.

*Revised 3/11/19*

**4.3.4 Hiring Decisions**

Care provider facilities must establish policies and procedures about hiring decisions.  These policies and procedures must include clear criteria for determining an applicant's suitability and addressing barrier issues and recent criminal convictions in policy.  Barrier issues are criminal convictions or child abuse and neglect findings that may prevent an applicant from working in a licensed child care facility where access to children is a part of their duties. Such policies and procedures must also comply with State licensing requirements.

**Exhibit 146**
**Page 32**

Care provider facilities must submit the name of each potential staff member to ORR for final approval.  This includes any applicant who will have direct access to children, such as youth care worker positions. ORR will check to see if the applicant has previously been terminated by a care provider facility for a substantiated allegation of sexual abuse, sexual harassment, or inappropriate sexual behavior. Care provider facilities do not need to submit the names of foster care parents for approval because they are subject to State licensing requirements.

**How Should Care Provider Facilities Handle Possible Barrier Issues or Convictions?**

If an applicant's arrest report or State child protective services check shows a potential barrier issue or recent conviction, the care provider facility's human resources representative and/or Program Director must review the arrest report with the applicant and take action consistent with State licensing requirements.  The care provider facility must document this information and action in personnel files. ORR may review the care provider facility's actions to ensure consistency with both State licensing standards and ORR policies and procedures.

Care provider facilities are prohibited from hiring or utilizing the services of any applicant, contractor, or volunteer who has engaged in, attempted to engage in, or has been civilly or administratively adjudicated to have engaged in sexual abuse, sexual harassment, intimate partner (domestic) violence, or any type of inappropriate sexual behavior. Care providers facilities are also prohibited from hiring or utilizing the services of any applicant, contractor, or volunteer who, as an adult, perpetrated any crime involving a child, regardless of how long ago the incident occurred, or a violent crime within the past 10 years.

In considering whether to hire an applicant or utilize the services of any applicant, contractor, or volunteer when the screening indicates a conviction of other crimes or questionable behavior, the care provider facility must consider the following factors:

- The relationship between the incident and the type of employment or service that the applicant will provide.
- The applicant's employment or volunteer history before and after the incident.
- The applicant's efforts and success at rehabilitation.
- The likelihood that the incident would prevent the applicant from performing their responsibilities in a manner consistent with the safety and welfare of UAC.
- The circumstances and/or factors indicating the incident is likely to be repeated.
- The nature, severity, number, and consequences of the incidents disclosed.
- The circumstances surrounding each incident, including contributing societal or environmental conditions.
- The age of the individual at the time of the incident.
- The amount of time elapsed since the incident occurred.

Omitting a material fact about misconduct or providing false information during the screening process is grounds for termination or withdrawal of an offer of employment, as appropriate.  Misconduct includes but is not limited to any criminal behavior, abuse, and/or neglect investigation, charge, arrest, civil adjudication, administrative adjudication, or conviction.

**What Should a Care Provider Facility Do When Asked About A Former Employee?**
If contacted by another care provider facility or institutional employer, such as a community-based home or correctional institution, for a reference check, a care provider facility must provide information about substantiated allegations of sexual abuse, sexual harassment, and inappropriate sexual behavior unless prohibited by law. Care provider facilities must also disclose if the former employee resigned during a pending investigation of alleged sexual abuse, sexual harassment, or inappropriate sexual behavior. If State laws prevent a care provider facility from sharing information about former employees without written permission, we encourage care provider facilities to ask employees to sign a release of information so this information can be shared in the future.

*Revised 3/11/19*

**4.3.5 Staff Code of Conduct**

ORR is committed to providing a safe environment to all UAC in its care, including protecting UAC from sexual abuse and sexual harassment. In order to ensure the safety of UAC, who are under the age of 18, care provider facility staff, contractors, and volunteers must comply with the following Code of Conduct. This code of conduct does not apply to foster parents, who are subject to State licensing requirements.

1. Staff will not engage in any form of sexual abuse or sexual harassment, as defined at Section 4.1 of ORR's UAC Policy Guide.
2. Staff will not verbally or physically abuse any unaccompanied alien child.
3. Staff will not engage in sexual contact with anyone while on duty or while acting in the official capacity of their position.
4. Staff will not exchange letters, gifts, pictures, phone numbers, e-mail addresses, or social media information with any UAC in ORR care or within three years of the child's discharge. Requests for exceptions must be submitted in writing to and approved by care provider management.

**Exhibit 146**
**Page 33**

5. Staff may not have contact with any unaccompanied alien children outside of the care provider facility beyond that necessary to carry out job duties while the child is in ORR care or within three years of the child's discharge. Requests for exceptions must be submitted in writing to and approved by care provider management.
6. Staff must confine their relationships with UAC families and sponsors to those activities which fall within the scope of the staff's job duties. Requests for exceptions must be submitted in writing to and approved by care provider management.
7. Staff may not engage in a romantic or sexual relationship with a UAC while the child is in ORR care or within three years of the child's discharge.
8. Staff may not live with a UAC within three years of the child's discharge.
9. Staff must report knowledge, suspicion, or information about sexual abuse, sexual harassment, or inappropriate sexual behavior according to mandatory reporting laws, Federal laws and regulations, and ORR policies and procedures.
10. Staff with knowledge or information of a staff violating this Code of Conduct must report this knowledge or information to their supervisor.
11. Staff have a continuing affirmative duty to disclose any misconduct that occurs on or off duty.

Care provider facilities must immediately terminate any staff member who violates this Code of Conduct. Care provider facilities must suspend any staff member suspected of violating this Code of Conduct pending investigation.

*Revised 3/11/19*

### 4.3.6 Staff Training

Care provider facilities must provide training to all staff, contractors, and volunteers.  Training ensures that employees understand their obligations under ORR policies. Care provider facilities must tailor trainings to the unique needs, attributes, and gender of the unaccompanied alien children in care at the individual care provider facility. For example, an employee must receive additional training if reassigned from a care provider facility that houses only male unaccompanied alien children to a care provider facility that houses only females.  Care provider facilities must document the completion of all trainings in personnel files.

Care provider facilities must review and revise their training and development plan annually based on their training needs.

**What Trainings Are Employees Required to Complete?**

All employees who may have contact with unaccompanied alien children must complete trainings on the following:

- ORR and the care provider facility's zero tolerance policies for all forms of sexual abuse, sexual harassment, and inappropriate sexual behavior;
- The right of unaccompanied alien children and staff to be free from sexual abuse, sexual harassment, and inappropriate sexual behavior;
- Definitions and examples of prohibited and illegal sexual behavior;
- Recognition of situations where sexual abuse, sexual harassment, and inappropriate sexual behavior may occur;
- Recognition of physical, behavioral, and emotional signs of sexual abuse and methods of preventing and responding to such occurrences;
- How to avoid inappropriate relationships with unaccompanied alien children;
- How to communicate effectively and professionally with unaccompanied alien children, including unaccompanied alien children who are lesbian, gay, bisexual, transgender, questioning, or intersex;
- Procedures for reporting knowledge or suspicion of sexual abuse, sexual harassment, or inappropriate behavior as well as how to comply with relevant laws related to mandatory reporting;
- The requirement to limit reporting of sexual abuse, sexual harassment, and inappropriate sexual behavior to staff with a need-to-know in order to make decisions concerning the victim's welfare and for law enforcement, investigative, or prosecutorial purposes;
- Cultural sensitivity toward diverse understanding of acceptable and unacceptable sexual behavior and appropriate terms and concepts to use when discussing sex, sexual abuse, sexual harassment, and inappropriate sexual behavior with a culturally diverse population;
- Sensitivity regarding trauma commonly experienced by unaccompanied alien children;
- Knowledge of existing resources for unaccompanied alien children inside and outside the care provider facility, such as  trauma-informed treatment, counseling, and legal advocacy for victims;
- General cultural competency and sensitivity to the culture and age of unaccompanied alien children; and
- Proper procedures for conducting professional pat-down searches, including cross-gender pat-down searches and searches of transgender and intersex unaccompanied alien children in a respectful and least intrusive manner.

New employees must complete training before gaining access to children and youth.  All employees must complete refresher trainings on the above topics every year or with any policy change or update, whichever comes first. All employees must receive ORR-provided

**Exhibit 146**
**Page 34**

refresher training about avoiding inappropriate relationships and reporting sexual abuse and sexual harassment every six months.

**What Trainings Are Required For Medical and Mental Health Care Staff?**

Medical and mental health care staff employed or contracted by care provider facilities must, in addition to the trainings required above, receive specialized trainings on working with victims and potential victims of sexual abuse and sexual harassment as medical and mental health care practitioners. Care provider facilities must ensure that all full- and part-time medical and mental health care practitioners are trained on the following additional topics specific to providing medical and mental health care:

- How to detect and assess signs of sexual abuse and sexual harassment
- How to preserve physical evidence of sexual abuse
- How to respond effectively and professionally to juvenile victims of sexual abuse and sexual harassment

If medical staff employed by a care provider facility conduct forensic examinations, they must receive training to conduct such forensic examination **FOOT** for victims of sexual abuse. Care provider facilities must maintain documentation that medical and mental health care practitioners have received the specialized training listed in the previous paragraph as well as the training mandated for all employees.

**What Trainings are Required for Contractors and Volunteers?**

Care provider facilities must provide all trainings listed for employees to all new contractors and volunteers if they provide services on a regular basis and have contact with unaccompanied alien children. Volunteers who provide services for one day or less, such as holiday events, are not required to complete the above trainings. However, the volunteers must be directly supervised by staff at all times. Care provider facilities must maintain documentation confirming that contractors and volunteers received all required trainings and pre-service trainings and understood the training they completed.

*Revised 3/11/19*

**4.3.7 Employee Performance Evaluations and Promotion Decisions**

Care provider facilities must, at a minimum, conduct employee performance evaluations once a year. When evaluating staff and making promotion decisions, care provider facilities must again ask all staff in interviews or written self-evaluations about any prior misconduct or misconduct that arose since the staff member's last background investigation. This misconduct includes, but is not limited to:

1. Any civil or criminal convictions, charges, arrests, investigations, or adjudications;
2. Having engaged in or attempted to engage in sexual abuse, sexual harassment, or inappropriate sexual behavior, a crime involving a minor, or any violent crime;
3. Having been civilly or administratively adjudicated to have engaged in or attempted to engage in any of the activities listed above.

Care provider facilities are prohibited from promoting any employee or continuing to enlist the services of any contractor or volunteer who has engaged in any activity listed under number 2 above. The care provider facility may use discretion, depending on the type or nature of the activity, and the factors listed in section 4.3.4 if the employee, contractor, or volunteer has engaged in any activity listed under number 1 and 3 above.

All employees must be given the opportunity to read the evaluation report, to obtain a copy of the report, and to include written comments before the report is entered into the personnel record. The final signed evaluation, which includes the employee's written comments, must be placed in the employee's personnel file and provided, upon request, to ORR.

The care provider facility's efforts to ask applicants about previous misconduct and the employee's response must be documented in personnel files.

*Posted 1/14/19*

**4.3.8 Disciplinary Sanctions and Corrective Actions**

**Disciplinary Sanctions for Staff**

A care provider facility must take disciplinary action up to and including termination against any staff member with a substantiated allegation of sexual abuse or sexual harassment against them or for violating ORR's or the care provider facility's sexual abuse-related policies and procedures. Termination must be the presumptive disciplinary sanction for staff who engaged in sexual abuse or sexual harassment. All terminations for violations of ORR and/or the care provider facility's sexual abuse-related policies and procedures or resignations by staff who would have been terminated if not for their resignation must be reported to  law enforcement agencies and to any relevant licensing bodies. All disciplinary sanctions, remedial measures, and follow-up actions must be documented in the employee's personnel file.

**Exhibit 146**
**Page 35**

Care provider facilities must report to ORR all terminations against any staff member with a substantiated allegation of sexual abuse or sexual harassment or any staff member who was terminated for violating ORR's or the care provider facility's sexual abuse-related policies.

**Corrective Actions for Contractors and Volunteers**

Any contractor or volunteer who engaged in sexual abuse or sexual harassment must be prohibited from contact with unaccompanied alien children and terminated from the contract or not be allowed to volunteer at the care provider facility. Such incidents must be immediately reported in accordance with Section 4.10. Contractors and volunteers suspected of perpetrating sexual abuse or sexual harassment must be removed from all duties requiring contact with children or youth pending the outcome of the investigation in accordance with Section 4.6.3. Care provider facilities must take appropriate remedial measures and must consider whether to prohibit further contact with unaccompanied alien children by any contractor or volunteer who has not engaged in sexual abuse but violated other provisions of ORR's sexual abuse-related policies and procedures or the care provider facility's sexual abuse-related policies and procedures. All corrective actions and follow-up must be documented.

*Revised 3/11/19*

**4.3.9 Questions and Answers**

Q: Can a care provider facility hire an applicant before receiving the results of both the FBI fingerprint check and the child protective services check?

A: A care provider facility may extend a conditional offer of employment prior to receiving the results of both components of the background check. However, the applicant's start date must be after the care provider facility receives the results of both the FBI fingerprint check and the child protective services check.

Q: Can an applicant begin the mandatory trainings outlined in Section 4.3.6 and the Cooperative Agreement before the care provider facility has received the results of the FBI fingerprint check and the child protective services check?

A: The care provider cannot provide a start date to an applicant before receiving the results of both components of the background check. Orientation and mandatory trainings cannot begin until after the care provider facility has received the results of both background checks. However, a care provider may begin providing trainings before receiving the results of both components of the background check if the trainings are provided in a facility that is completely separate from the facility in which they provide care to children and youth. Care providers must provide documentation to their PO showing that the training facility will not provide direct access to children and youth.

Q: Can reference checks be completed after an applicant is hired?

A: ORR regulations require that care provider facilities make their best efforts, consistent with law, to contact past employers before hiring an applicant. A care provider facility can show they made their "best effort" by providing documentation that they attempted to contact a reference several times. The care provider facility must show that these attempts occurred prior to the start date of the applicant. A care provider facility may, however, continue attempting to contact a reference after an applicant has started employment, if the facility was previously unable to contact the reference.

Q: When does a care provider facility request final approval of an applicant?

A: Care provider facilities must submit the name of an applicant as a last step before they extend an offer of employment. This submission should be after the care prover facility has completed reference checks and received the results of both components of the background check.

Q: Section 4.3.4 prohibits care provider facilities from hiring an applicant or enlisting the services of a contractor or volunteer who was convicted of violent crime in the last 10 years. What is a violent crime?

A: Violent crime includes simple assault, and aggravated assault. Violent crime also includes burglary or robbery, which is the unlawful or forcible entry or attempted entry of a permanent residence, other residence (e.g., a hotel room or vacation room), or other structure (e.g., a garage or shed) by a person who had no legal right to be there. Care providers are prohibited from hiring staff or enlisting the services of a contractor or volunteer who was convicted of murder.

*Posted 3/11/19*

## 4.4 Staffing and Supervision

This section covers requirements related to staffing and supervision; video monitoring; searches; and facility and technology upgrades. This section applies to all care provider facilities, unless indicated otherwise.  This section does not apply to individual foster care homes but does apply to foster care provider facilities where children and youth may receive group services during the day.

**Exhibit 146**
**Page 36**

*Posted 3/16/15*

### 4.4.1 Staffing Levels

ORR requires that care provider facilities supervise children and youth in their facilities in accordance with State licensing requirements.  Staff-children ratios, however, must be maintained at a minimum of:

- One (1) on-duty Youth Care Worker for every eight (8) children or youth during waking hours; and
- One (1) on-duty Youth Care Worker for every sixteen (16) children or youth during sleeping hours[2]

On-duty Youth Care Workers must provide line of sight and sound supervision of children in order to be counted towards ratio requirements.  In addition, the primary responsibility of on-duty Youth Care Workers must be the supervision of children in order to be counted towards ratio requirements.

Additional or backup personnel should be available for emergency situations or to meet the special needs of children or youth during busier periods.  Rotating after-hours and holiday coverage personnel must also be available in crisis situations.  Same gender supervision must be provided when indicated by individual treatment needs.

*Revised 5/31/16*

### 4.4.2 Staffing Plans and Video Monitoring Restrictions

**Staffing Plans**

Care provider facilities must develop and document staffing plans that provide for adequate levels of staffing that includes, at a minimum, the above required staffing ratio levels at all times.  Additionally, ORR requires that, where available under State and local licensing standards, care provider facilities must have video monitoring technology to assist in supervising and protecting children and youth at the care provider facility.  Any video monitoring system should include the ability to permanently download footage when necessary.  Care provider facilities must provide video monitoring footage to ORR upon request.

In creating a staffing plan and determining the placement of video monitoring technology, care provider facilities must take into consideration the following:

- The physical layout of the facility, including the exterior of the building and the surrounding premises;
- The composition of the population of children and youth;
- The prevalence of substantiated and unsubstantiated incidents of sexual abuse and sexual harassment in certain physical areas;
- The prohibition of cross-gender pat-down searches of children and youth except in exigent circumstances;
- If a child or youth has special needs and requires assistance with showering, performing bodily functions, and changing clothing, the care provider staff member assisting the child or youth must be of the same gender when assisting with such activities;
- Viewing restrictions as described below; and
- Any other relevant factors

As part of staffing plans, care provider facilities must conduct frequent unannounced rounds during both day and night shifts to identify and deter sexual abuse and sexual harassment.  Care providers must prohibit staff from alerting others that rounds are occurring, unless the announcement is related to the legitimate operational function of the facility.  For example, staff may announce their presence before entering a restroom.

Care provider facilities must assess their personnel and staffing needs as part of annual planning and prepare for anticipated needs by comparing the composition of facility's current workforce with projected workforce needs.  If a care provider facility's staffing plan does not meet the cultural and racial diversity needs of the population of children and youth at the facility, the care provider facility must document the reasons why they are not meeting these needs and work with local communities to meet the needs of children and youth through other means, such as working with diverse local service providers.

**Viewing and Video Monitoring Restrictions**

Video monitoring equipment may not be placed in any bathroom, shower or bathing area, or other area where children or youth routinely undress.  Care provider facilities must permit children and youth to shower and bathe, perform bodily functions, and change clothing without being viewed by staff members, except:

- In exigent circumstances;
- When such viewing is incidental to routine room checks;
- Is otherwise appropriate in connection with a medical examination or monitored bowel movement;
- If a child or youth is under age 6 and needs assistance;
- If a child or youth with special needs is in need of assistance; or
- If a child or youth requests and requires assistance.

**Exhibit 146
Page 37**

If a child or youth requires assistance with using the bathroom, showering or bathing, or changing clothes for any of the reasons listed above, then the staff member assisting the child or youth must be of the same gender as the child or youth.

*Posted 3/16/15*

### 4.4.3 Searches of Children and Youth

Care provider facilities are prohibited from conducting strip searches or visual body cavity searches of children or youth.  Secure care providers may conduct such searches in accordance with the Department of Justice's Final Rule to Prevent, Detect, and Respond to Prison Rape.

Care providers may conduct pat-down searches.  All pat-down searches:

- Must be conducted by a staff member that is the same gender as the child or youth being searched unless the child or youth identifies as transgender or intersex.  Cross-gender pat-down searches are prohibited except in exigent circumstances.  An exigent circumstance is any set of temporary or unforeseen circumstances that require immediate action in order to combat a threat to the security of a care provider facility or a threat to the safety and security of any person.
- Must be conducted in the presence of one additional care provider facility staff member that is the same gender as the child or youth being searched unless there are exigent circumstances.
- Must be documented and reported to ORR via a significant incident report.

**If a child or youth identifies as transgender or intersex, who may conduct a pat-down search, if necessary?**
Care provider facilities must ask the child or youth to identify the gender of staff with whom he/she would feel most comfortable conducting the search.  The care provider facility must then respect the child or youth's selection and provide a staff member of the selected gender to conduct the search and a second staff member of the same selected gender to be present when the search is conducted.

**Are there other restrictions on searches generally?**
Care provider facilities may not search or physically examine a child or youth for the sole purpose of determining the child or youth's sex.  If the child or youth's sex is unknown, it may be determined during conversations with the child or youth, by reviewing medical records, or, if necessary, learning that information as part of a broader medical examination conducted in private by a medical practitioner.

*Posted 3/16/15*

### 4.4.4 Upgrades to Facilities and Technologies

**What must care provider facilities consider when upgrading facilities?**
When designing or acquiring any new facility and in planning on any substantial expansion or modification of existing facilities, care provider facilities must consider, as appropriate,  the effect of the design, acquisition, expansion, or modification of the physical building on their ability to protect children and youth from sexual abuse and sexual harassment.  Consideration must be made to ensure clear line-of-sight and elimination of rooms or spaces that prevent visual access.  Care provider facilities must document these considerations and actions or inactions taken.

**What must care provider facilities consider when upgrading technologies?**
When installing or updating a video monitoring system, electronic surveillance system, or other monitoring technology, the care provider facility, as appropriate, must consider how such technology may enhance its ability to protect children and youth from sexual abuse and sexual harassment while maintaining the privacy and dignity of children and youth.  Care provider facilities must document these considerations and actions or inactions taken.

*Posted 3/16/15*

## 4.5 Responsive Planning

All children and youth receive, among other services, weekly individual and group counseling; an initial medical examination; ongoing and emergency medical and dental services; referrals to local legal service providers; and case management services.  Any child or youth who has notified ORR of sexual abuse or harassment that occurred prior to ORR care and custody is provided the services listed above and additional crisis intervention and trauma-focused services as needed.  For any child or youth that is a victim of sexual abuse or sexual harassment that occurred in ORR care and custody, care provider facilities must offer the services of external, independent service providers so the child or youth has an opportunity to speak with someone outside of the care provider facility if he/she prefers.

**Exhibit 146**
**Page 38**

Responsive planning refers to care provider facility preparations to work with outside service providers in the event there is an incident of sexual abuse or sexual harassment that occurs at the care provider facility.  This section applies to all care provider facilities, including secure care provider facilities, but does not apply to long term foster care provider facilities unless otherwise specified.

*Posted 3/23/15*

### 4.5.1 Access to Community Service Providers and Resources

Care provider facilities must develop written policies and procedures to include community service providers and other external resources, such as child advocacy centers or rape crisis centers, to provide valuable expertise and support to victims of sexual abuse and sexual harassment incidents that occur in ORR care and custody.  Care provider facilities must establish specific written procedures to offer any victim of sexual abuse or sexual harassment that occurred in ORR care and custody the services of a confidential external victim advocate from a community or immigrant service provider to provide:

- Crisis intervention and trauma-focused services;
- Counseling and medical referrals;
- Emotional support and processing of the event; and
- Legal support and other assistance during any investigation and prosecution.

If a community or immigrant service provider is not available or if the victim prefers, the care provider facility may provide a licensed clinician at the care provider facility to provide the services listed above for the child or youth.  Care provider facilities must document that they offered the above services and the child or youth's response for any child or youth that was sexually abused or harassed at the care provider facility.

**Memoranda of Understanding or Other Agreements with Service Providers**
In order to establish the required procedures above, care provider facilities must maintain or attempt to enter into memoranda of understanding (MOUs) or other agreements with local child advocacy centers, rape crisis centers, immigrant victim service providers, and/or other community service providers to provide services to victims of sexual abuse and sexual harassment that occurred at the care provider facility.  If local service providers are not available, care provider facilities must maintain or attempt to enter into MOUs or other agreements with national service provider organizations.  All agreements must have provisions that require the community or immigrant service provider to report any allegations received to ORR.  Care provider facilities must maintain copies of its agreements or documentation showing attempts to enter into such agreements and provide copies to ORR upon request.

**Informing Children and Youth of Service Providers**
During every child or youth's orientation, care provider facilities must provide information about the local and/or national service providers and organizations available to assist them.  Care provider facilities must provide this in writing to every child or youth and document it in the child or youth's case file.  The written information must include:

- Names and descriptions of the organizations;
- Mailing addresses; and
- Telephone numbers, including toll-free hotline numbers where available.

Care provider facilities must also explain to the child or youth the extent to which communications with the service providers will be confidential and provide access to pre-programmed telephones at the care provider facility to provide direct access to service providers without the assistance of staff at the care provider facility.

*Posted 3/23/15*

### 4.5.2 Forensic Medical Examinations

If an allegation involves oral, genital, or anal contact by or to another person or object, then the care provider facility, with the victim's consent, must arrange for the victim to undergo a forensic medical examination as soon as possible at a local hospital.  Any minor age 14 and over may provide consent for him- or herself.  For any minor under the age of 14 and where the location and contact information of a parent is known, the care provider facility must obtain parental consent to conduct the examination.  If the care provider facility has documentation to show, however, that contacting a parent would present a safety risk or if the location of a parent is unknown, then the ORR/FFS will provide consent to conduct the examination.  Where possible, the forensic medical examination must be performed by a Sexual Assault Forensic Examiner (SAFE) or a Sexual Assault Nurse Examiner (SANE).  If a local SAFE or SANE is not available, the examination may be performed by a qualified medical professional at a local hospital.  Long term foster care providers are required to arrange a forensic medical examination.

Care provider facilities must ask the child or youth if he/she would like his/her victim advocate, other external service provider, or the care provider facility's clinician to be present during any forensic examination or investigatory interview, to the extent possible.  Other

**Exhibit 146**
**Page 39**

external service providers may also include victim advocacy services offered at a hospital conducting a forensic medical examination. Care provider facilities must document that they offered the above services and the child or youth's response.

To the extent possible and with consideration of the child or youth's preference, care provider facilities must request that the investigating agency and medical examiner allow victim advocates, other external service providers, or the care provider facility's clinicians to be present and provide support to any child or youth during any medical examination or other investigation.

*Posted 3/23/15*

## 4.6 Coordinated Response

This section addresses the responsibilities of care provider facilities immediately following an incident of sexual abuse or sexual harassment as well as the follow-up necessary to ensure the safety of all children and staff. This section applies to all care provider facilities, including secure care providers and long term foster care providers.

*Posted 4/6/15*

### 4.6.1 Coordinated Response Policies and Procedures

Care provider facilities must develop written policies and procedures to coordinate actions taken by staff first responding to an incident; emergency services providers; medical and mental health practitioners; community service providers; outside investigators such as Child Protective Services and local law enforcement, as needed; facility leadership; and any other relevant parties as necessary to ensure that: victims receive all necessary immediate and ongoing medical, mental health, and support services; all required services and examinations are complete; and investigators are able to obtain usable evidence. The policies and procedures should address sexual abuse that occurs in ORR care and custody as well as sexual abuse that occurs prior to ORR care and custody and the necessary response. The care provider facility's policies and procedures must utilize a coordinated, multi-disciplinary team approach and be approved by ORR.

*Posted 4/6/15*

### 4.6.2 Responder Duties

The written policies and procedures must include a provision that requires any staff member that learns of an incident of sexual abuse that occurs in ORR care and custody to immediately and in accordance with state laws and licensing requirements:

1. Separate the alleged victim, perpetrator, and any witnesses and ensure the safety of all children and staff;
2. Ensure the alleged perpetrator is separated from all children and youth until the safety of all children and staff is established and a safety plan is developed and implemented;
3. Contact emergency services as needed;
4. Preserve and protect, to the greatest extent possible, any crime scene until the appropriate authorities are called and arrive to collect evidence;
5. Request that the alleged victim, perpetrator, and any witnesses not take any actions that could destroy physical evidence, including, as appropriate, washing, brushing teeth, changing clothes, urinating, defecating, drinking, or eating if the abuse occurred within a time period that still allows for the collection of physical evidence; and
6. Work with the appropriate authorities to arrange a forensic medical examination in accordance with section **4.5.2** Forensic Medical Examinations as soon as possible.

The time period to collect physical evidence may vary depending on the nature of the incident and the type and location of the evidence. If there could be any possible traces of evidence, protect the item, location, or person, to the extent possible, until the proper investigating authority is contacted and able to physically collect the evidence.

After the safety of all minors and staff is secured and the crime scene and any evidence, as appropriate, are protected, the staff member must immediately call emergency services, if necessary, report the incident to all appropriate investigating authorities, report the incident to all necessary staff at the care provider facility, and report the incident to ORR in accordance with significant incident reporting policies and procedures.

For an allegation of past sexual abuse, the care provider facility must ensure that the allegation is reported to all appropriate authorities and provide any necessary follow-up services, including emergency and ongoing medical and mental health services; referrals to local legal service providers; and case management services. If there could be any possible traces of evidence from the allegation of past abuse, care provider facilities must ensure that the proper investigating authorities are called and a forensic medical examination is arranged in accordance with section **4.5.2** Forensic Medical Examinations so that any evidence may be properly collected. Note that time limits for obtaining evidence may vary due to factors such as the location of the evidence or the type of sample collected. For example, evidence on clothing may be collected long after an incident occurs.

**Exhibit 146**
**Page 40**

*Posted 4/6/15*

### 4.6.3 Protecting Children and Youth

Following an allegation of sexual abuse or sexual harassment, care provider facilities must ensure that alleged victims are safe and provided a supportive environment in the least restrictive housing option and setting possible while considering the safety and security of the child or youth as well as other children and youth at the care provider facility.

To ensure the continued safety and well-being of a child or youth who is an alleged victim of sexual abuse or sexual harassment, the care provider must consider if the following actions should be taken:

- Change housing assignments within the care provider facility;
- Transfer the victim and/or perpetrator to another care provider facility in order to better meet the needs of a particular child or youth or to ensure the safety and security of the child or youth or other children or youth.  If there is an ongoing investigation, the care provider facility should work with the investigating agency prior to any transfer to ensure that all investigatory needs have been met;
- Prevent perpetrators from being in contact with victims; and/or
- Provide support services for children, youth, and staff who fear retaliation for reporting sexual abuse or harassment or cooperating with an investigation.

Care provider facilities should make every effort to protect an alleged victim without placing the child or youth on one-on-one supervision.  If there is an exigent circumstance, however, care provider facilities may place an alleged victim on one-on-one supervision to protect the safety and security of the child or youth.  An exigent circumstance is defined as any set of temporary or unforeseen circumstances that require immediate action in order to combat a threat to the security of a care provider facility or a threat to the safety and security of any person.  Once an alleged victim is on one-on-one supervision, the care provider facility clinician must re-assess the minor as soon as possible but no later than 48 hours after placing the child or youth on one-on-one supervision so that the child or youth is not on one-on-one supervision longer than necessary.  The child or youth may not be taken off one-on-one supervision until the clinician has completed the re-assessment.  The clinician must consider any increased vulnerabilities as the result of the sexual abuse or sexual harassment when assessing the child or youth and create a safety plan that is documented in the child or youth's case file.  The care provider facility must ensure that any child or youth placed on one-on-one supervision continues to receive all required services, education services, and recreation time.

If the alleged perpetrator is a care provider facility staff member, contractor, or volunteer, the care provider facility must immediately suspend that individual from all duties that would involve or allow any contact or access to unaccompanied alien children until the investigation of the incident is completed.  If the alleged perpetrator is a child or youth, the care provider facility must develop and implement a safety plan for the child or youth that may include one-on-one supervision if the child or youth continues to pose a threat to self or others.  If an alleged perpetrator is placed on one-on-one supervision, the care provider facility must ensure that the child or youth continues to receive all required services, education services, and recreation time.

**Protection Against Retaliation**

Care provider facility staff, contractors, volunteers, and all children and youth are prohibited from retaliating against any person who reports, complains about, or participates in an investigation of alleged sexual abuse or harassment.  For any child, youth, staff member, contractor, or volunteer that is involved in an allegation of sexual abuse or sexual harassment, whether he or she was a victim, perpetrator, reporter, witness, or other participant, the ORR/FFS, ORR/PO, and care provider facility staff must monitor the individual to see if there is any indication that there is possible retaliation against him/her.  Monitoring for retaliation must continue for the remainder of the child or youth's stay at the care provider facility.

The care provider facility staff should monitor, among other things, the following:

- Child or youth behavioral reports or loss of behavioral points;
- Child or youth housing or service changes;
- Negative staff performance reviews; and
- Reassignments of staff.

The existence of any of the above actions alone does not necessarily indicate retaliation.  The ORR/FFS, ORR/PO, and the care provider facility must determine if any of the above actions are taking place, and, if so, whether the actions were properly taken.  To determine if actions are properly taken, the care provider facility must discuss any actions taken with the appropriate child, youth, staff member, contractor, or volunteer to determine if retaliation is taking place.  If retaliation is taking place, the care provider facility must take steps to ensure the protection and safety of the individual.  Care provider facilities must document their monitoring efforts to ensure retaliation is not taking place at the facility and any steps taken if retaliation is taking place.

**Ongoing Protection Duties**

**Exhibit 146**
**Page 41**

If a care provider facility staff member reasonably believes that a particular child or youth is subject to substantial risk of imminent sexual abuse or harm, he or she must immediately take action to protect the minor.  To protect the child or youth, the staff member should immediately:

- Remove the child or youth from a situation that would expose him or her to risk of abuse if the risk appears to be imminent and immediate;
- Report the concern of suspected risk of abuse to the appropriate staff at the care provider facility and request assistance in enacting measures to ensure child or youth safety; and
- Report the risk and actions taken to ORR.

*Posted 4/6/15*

### 4.6.4 Interventions for Children or Youth Who Engage in Sexual Abuse

If a child or youth perpetrates sexual abuse or sexual harassment against another child, youth, or staff member while in ORR care and custody or admits to perpetrating prior sexual abuse, the care provider facility must respond with appropriate interventions for the child or youth.  The goal of intervention is to achieve improved behavior and ensure the safety and well-being of other children and youth. Possible types of intervention could include but is not limited to specialized counseling, treatment, and/or educational programming and must take into account the social, sexual, emotional, and cognitive development of the child or youth as well as the child or youth's mental health status.

*Posted 4/6/15*

## 4.7 Educating Children and Youth

Care providers must inform all unaccompanied alien children of policies for preventing, detecting, and responding to sexual abuse and harassment.  This includes educating children and youth in a manner that is appropriate for their age and culture on a variety of topics, including but not limited to, the care provider's zero tolerance policy, how to report incidents of sexual abuse and harassment, and the services provided to victims of sexual abuse and harassment.  Care providers also must have policies and procedures in place and appropriate materials available to ensure that information related to sexual abuse and harassment reporting and response is readily available to all children and youth.  This section applies to all care providers, including secure and long term foster care providers.

*Posted 6/22/15*

### 4.7.1 Educating Children and Youth on Sexual Abuse and Sexual Harassment

#### Orientation

Within 48 hours of admission, care providers must provide every unaccompanied alien child with an orientation on topics related to preventing, detecting, and responding to sexual abuse and harassment.  Care providers also must provide a refresher orientation to children and youth every 90 days from the initial orientation.  The orientation must include, at a minimum, the following topics:

- The care provider's zero tolerance policy towards sexual abuse and sexual harassment;
- The child's right to be free from sexual abuse or sexual harassment;
- The child's right to be free from retaliation for reporting sexual abuse or sexual harassment;
- The child's rights and responsibilities related to sexual abuse and sexual harassment;
- Definitions, explanations, and examples of:  child on child sexual abuse, adult on child sexual abuse, coercive sexual activity, inappropriate sexual behavior, appropriate and inappropriate relationships, and sexual harassment;
- How to report sexual abuse and sexual harassment, including:
  - Reporting to any care provider staff member, volunteer, or contractor either verbally, in writing, or via a grievance;
  - Reporting to ORR by telling an FFS or calling the ORR Hotline;
  - Informing an outside community service provider via telephone or in writing;
  - Reporting to consular officials via telephone or in writing;
- The child's right to receive treatment, services, and counseling if the child or youth has been sexually abused or harassed and what those services include; and
- Boundaries and respecting one another.

In accordance with **Section 4.2.2 Care Provider Requirements**, the orientation must be provided by properly trained care provider staff in an age and culturally appropriate manner and in a language that the child understands.  The orientation must be separate from any immigration-related orientation that a child receives.  The care provider must document the completion of the orientation and any refresher orientations in the child or youth's case file.

#### Accessible Policies and Procedures

The care provider is responsible for ensuring that every child and youth in its care understands the orientation and materials provided.

**Exhibit 146**
**Page 42**

If the care provider has concerns about a child or youth's ability to comprehend the orientation or any other materials provided, the care provider should consult with a Clinician, the care provider's Prevention of Sexual Abuse Compliance Manager, and/or the care provider's assigned ORR/FFS.  Efforts to ensure comprehension should be documented in the child or youth's case file (e.g. use of translation services, accommodations provided, etc.).

Care provider staff must ensure that all children and youth understand how to report any incident of sexual abuse, sexual harassment, or inappropriate sexual behavior and request assistance without fear of retaliation.  The care provider must ensure that the child understands that he/she can report at any time any concerns, allegations, information, or suspicions of sexual abuse or sexual harassment.  The child may also request and utilize the assistance of another individual to make a report, including any adult, youth, or staff member inside or outside the care provider facility.  If a child requests the assistance of another child, care provider staff member, family member, legal representative, or any other individual, the care provider must take reasonable steps to expedite the request for assistance.

*Posted 6/22/15*

### 4.7.2 Bulletin Board Postings

Care providers must display **ORR posters (https://www.acf.hhs.gov/programs/orr/resource/orr-guide-children-entering-the-united-states-unaccompanied-section-473)** and notices in prominent locations throughout the facility, including on housing bulletin boards, next to telephones, and throughout the care provider facility.  The posters must contain at a minimum the phone numbers for care provider staff, ORR, Child Protective Services, and a community service provider that children and youth can contact if they are a victim of sexual abuse or sexual harassment, feel in danger, or feel unsafe. The bulletin board notice should be posted in prominent and visible places throughout the facility where children and youth may easily see it.  Posters must be in English and Spanish and any other language, as needed, if the care provider regularly provides services to a specific population of children and youth.

*Posted 6/22/15*

### 4.7.3 Pamphlets on Sexual Abuse and Harassment

Within 48 hours of admission, the care provider must provide every child and youth an **ORR pamphlet (https://www.acf.hhs.gov/programs/orr/resource/orr-guide-children-entering-the-united-states-unaccompanied-section-473)** as well as a care provider pamphlet that contains, at a minimum, the following:

- The care provider's policies and procedures related to sexual abuse and sexual harassment;
- The child or youth's rights and responsibilities related to sexual abuse and sexual harassment and
- How to contact diplomatic or consular personnel.

The pamphlets must be made available throughout the care provider facility and accessible to any child or youth in the event he/she loses the original pamphlet or would like an additional copy.  Care providers must document in case files that every child and youth received the pamphlet.  Pamphlets must be in English and Spanish and any other language, as needed, if the care provider regularly provides services to a specific population of children and youth.

*Posted 6/22/15*

## 4.8 Assessment for Risk

Care providers must assess all children and youth for risk of being a victim or a perpetrator of sexual abuse while in ORR care and custody and use the results of the assessment to inform the minor's housing, education, recreation, and other service assignments. This section applies to all care providers, including secure care providers and long term foster care providers, unless otherwise stated.

*Posted 6/22/15*

### 4.8.1 Assessment for Risk

To reduce the risk that a child or youth is sexually abused or abuses someone else while in ORR care and custody, all care providers must individually assess every child or youth within 72 hours of admission and every 30 days thereafter via the *Assessment for Risk*. Care providers must then use the *Assessment for Risk*, along with any other completed assessments, to inform the child's housing, education, recreation, and other service assignments by making an individualized determination on how to ensure the safety and health of each child and youth.  If other assessments are completed at a later date that would change the housing, education, recreation, and other service assignments of the child or youth, the care provider must update the *Assessment for Risk* accordingly.  Completion of the initial *Assessment for Risk* and all updates must be documented in the child's case file.  Information obtained in the *Assessment for Risk* should also be used to inform later assessments conducted on the child, such as the *UAC Assessment*.

Long term foster care providers must complete the *Assessment for Risk* for all children and youth within 72 hours of admission and every 90 days thereafter.

**Exhibit 146**
**Page 43**

**Who May Conduct the Assessment**
The Assessment for Risk must be completed by the child or youth's Clinician or a Qualified Case Manager.  A qualified Case Manager is a Case Manager with at least a Bachelor's degree in psychology, counseling, social work, or a related human services field and at least 5 years of experience providing direct social services to child clients and training in conducting child assessments.  Care providers must provide children and youth an opportunity to discuss any safety concerns or sensitive issues privately while they are completing the assessments.

**How to Conduct the *Assessment for Risk***
The *Assessment for Risk* must be conducted in a private space and in a child-friendly, culturally sensitive manner.  Clinicians and Qualified Case Managers must consider, at a minimum, the following information to assess children and youth for risk of sexual victimization or sexual abusive behaviors:

- Prior sexual abusive behaviors;
- Any current charges or offense history;
- Prior sexual victimization;
- Age;
- Level of emotional and cognitive development;
- Physical size and stature;
- Any mental, physical, or developmental disability or illness;
- Any gender nonconforming appearance or manner or identification as lesbian, gay, bisexual, transgender, questioning, or intersex;
- The child or youth's own perception of vulnerability; and
- Any other specific information that may indicate heightened needs for supervision, additional safety precautions, or separation from other specific youth.

The assessment must be completed in a holistic manner informed from a variety of sources, including but not limited to:

- Conversations with the youth or child during the intake process and when completing various assessments and screenings ; and
- Court records, case files, care provider and other facility behavioral records, and other relevant documentation from the child or youth's record/case file.

*Posted 6/22/15*

**4.8.2 Use of Assessment Information**

Care providers must use information gathered in the *Assessment for Risk* to inform a child or youth's housing, education, recreation, and other activity or service assignments by making an individualized determination on how to ensure the safety and health of each child.

If the *Assessment for Risk* indicates that the child experienced prior sexual victimization or perpetrated sexual abuse, the Clinician must ensure to follow-up, as appropriate, with any necessary medical or mental health services.  Qualified Case Managers must ensure such cases are referred to the Clinician for further evaluation or follow-up.  If the Clinician determines that a medical or mental health referral is necessary, the child must receive a medical and/or mental health evaluation no later than 72 hours after the referral.

Care providers must implement appropriate controls on disseminating information contained in the *Assessment for Risk* within the care provider facility in order to ensure that sensitive information is not exploited to the child or youth's detriment by staff or other children or youth.  Care providers must ensure that information about sexual orientation and gender identity is kept confidential and is only shared when disclosure is necessary for medical or mental health treatment or the youth requests the information be shared for a particular purpose.

**Determining Housing and Other Service Assignments for Transgender and Intersex Youth**
When making housing and other service assignments for transgender or intersex youth, care provides must consider the youth's gender self-identification and the effects of housing and service assignments on the youth's health and safety.  Care providers must not base housing and other service assignment decisions of transgender and intersex youth solely on identity documents (e.g., official U.S. or foreign government documents, birth certificates, etc.) or the physical anatomy of the youth.  The child's self-identification of his or her gender and safety needs must always be taken into consideration as well.  The care provider's housing assignment of a transgender or intersex child must be consistent with the safety and security considerations of the care provider and State and local licensing standards.  If State and local licensing standards conflict with the care provider's determination for a youth's housing assignment, the care provider should immediately contact the ORR/FFS for further guidance.

If a youth expresses safety or privacy concerns or the care provider otherwise becomes aware of privacy or safety concerns related to restrooms or dressing areas, the care provider must take reasonable steps to address those concerns.  This may include, for example:

**Exhibit 146
Page 44**

the addition of a privacy curtain or partition; provision to use a nearby restroom or office; or a separate changing or restroom schedule. The care provider should contact the ORR/FFS for further guidance if the care provider is uncertain about the appropriate steps to take.

**One-On-One Supervision**

Care providers may not use the results of the *Assessment for Risk* to place a child on one-on-one supervision unless there are exigent circumstances that require it to keep the child or youth, other children or youth, or staff safe. An exigent circumstance is any set of temporary or unforeseen circumstances that require immediate action in order to combat a threat to the security of the care provider facility or a threat to the safety and security of any person. This does not restrict a care provider's ability to place a child or youth on one-on-one supervision for other reasons, such as a medical quarantine.

If a child or youth is placed on one-on-one supervision because of exigent circumstances as a result of this assessment, the care provider may only keep the minor on one-on-one supervision until an alternative means of keeping all children, youth, and staff safe can be arranged. Care providers must document in the child's case file all actions taken as a result of this assessment, including placing the child on one-on-one supervision and the exigent circumstance that required it. Placing a child on one-on-one supervision does not include physically separating the child from other minors but means providing the child direct line-of-sight-and-sound supervision by an individual staff member. During any period of one-on-one supervision, care providers must provide the child all required services. Care providers must ensure that any child or youth on one-or-one supervision receives daily reviews by a Clinician. Before taking a child off of one-on-one supervision, the care provider must create an in care safety plan for the child. Care providers may never isolate or involuntarily segregate children solely because of their sexual orientation, gender identity, or gender expression.

*Posted 6/22/15*

## 4.9 Medical and Mental Health Care

ORR provides routine and emergency medical and mental health care for all unaccompanied alien children in its care, including an initial medical examination, any appropriate follow-up care, and weekly individual and group counseling sessions with care provider Clinicians. If a child is sexually abused while in ORR care, the care provider must ensure that the child is offered and/or provided, with specific medical and mental health care services.

This section applies to all care provider facilities, including secure care providers and long term foster care providers.

*Posted 6/22/15*

### 4.9.1 Emergency Medical and Mental Health Care Services Following an Incident of Sexual Abuse

If a child is sexually abused while in ORR care, the care provider must ensure the child is provided immediate, unimpeded access to the following:

- Emergency medical treatment at a local hospital or urgent care facility;
- Crisis intervention services in accordance with **Section 4.5**;
- Emergency contraception; and
- Sexually transmitted infections prophylaxis.

These services must be provided in accordance with professionally accepted standards of care, where appropriate under medical or mental health professional standards.

**Emergency Contraception**

When an allegation involves penetration, no matter how slight, of the vagina with any body part, the care provider must ensure that the child victim is provided information on emergency contraception within 24 hours of the incident; and has access to lawful emergency contraception within 72 hours. To ensure the minor makes an informed decision, care provider staff should engage the minor in discussions with a medical provider, family member, and/or attorneys of record to provide complete and comprehensible information about the types of emergency contraception available and the risks and benefits of each. Care provider facilities must follow applicable Federal and State laws regarding parental consent and notification.

**Sexually Transmitted Infections Prophylaxis**

Care providers must ensure that unaccompanied alien children who are victims of sexual abuse that occurred while in ORR care and custody are offered tests for sexually transmitted infections when the allegation involves oral, genital, or anal contact by or to another person.

Care providers must ensure the minor is provided complete and comprehensible information about the types of sexually transmitted infections prophylaxis available to ensure the youth makes an informed decision. Care provider facilities must follow applicable State laws regarding age of consent, parental consent, and parental notification for sexually transmitted infections testing.

**Exhibit 146**
**Page 45**

*Posted 6/22/15*

### 4.9.2 Medical Services for Victims at Risk of Pregnancy

If a minor is sexually abused while in ORR care, care providers must ensure that victims who are at risk of pregnancy are offered pregnancy tests when the allegation involves penetration, no matter how slight, of the vagina with any body part.

If pregnancy results from an instance of sexual abuse, the care provider must ensure that the victim receives comprehensive information about all lawful pregnancy-related medical services within 24 hours of the positive pregnancy test.  Care providers also must ensure the victim has access to all lawful pregnancy-related medical services within the time frame the services may be provided under applicable State laws.

To ensure the minor makes informed decisions, care provider staff should engage the minor in discussions with medical providers, family members, and/or attorneys of record to understand the risks and benefits of pregnancy-related medical services.  Care provider facilities must follow applicable State laws regarding age of consent, parental consent, and parental notification. If parental consent or notification is not required by State law, care provider staff should still encourage the minor to involve parents or family members in the decision-making process.

*Posted 6/22/15*

### 4.9.3 Ongoing Medical and Mental Health Care

Care providers must offer ongoing medical and mental health evaluations and treatment to all unaccompanied alien children who are victimized by sexual abuse or sexual harassment while in ORR care and custody.  The evaluation and treatment of victims must include, as appropriate, follow-up services, treatment plans, and, when necessary, referrals for continued care following their transfer to or placement in other care provider facilities or their release from ORR care and custody.  The care provider must provide victims with medical and mental health services consistent with the community level of care.

The care provider must conduct a mental health evaluation of all known minor-to-minor abusers within 72 hours of learning of such abuse and/or abuse history and offer treatment when deemed appropriate by mental health practitioners.

*Posted 6/22/15*

### 4.9.4 Religious Objections

If a care provider has a religious objection to providing information for and/or access to any of the required services for a child victim of sexual abuse as outlined in this policy, the care provider must immediately notify its ORR/PO, ORR/FFS, and the ORR/PSA Coordinator.  The care provider must work with ORR to put in place a plan to ensure every child victim will be provided all required information and services in an equal, fair, and timely manner that is respectful to the principles and beliefs of the care provider.  The plan must be pre-approved by ORR.

*Posted 6/22/15*

## 4.10 Reporting and Follow-up

This section discusses care provider requirements to report sexual abuse, sexual harassment, and inappropriate sexual behavior occurring in ORR care, any retaliatory actions resulting from reporting allegations, and staff neglect or violations of responsibilities that have contributed to incidents. The ability of unaccompanied alien children, staff, volunteers, and contractors to freely and immediately report sexual abuse, sexual harassment, and inappropriate sexual behavior is essential for the protection and safety of all children at a care provider. This section applies to all care providers, including secure and long term foster care providers and individual foster homes.

*Revised 3/21/16*

### 4.10.1 Methods for Children and Youth to Report

ORR is committed to providing multiple, easily accessible methods for children and youth to report sexual abuse, sexual harassment, and inappropriate sexual behavior. The care provider must develop policies and procedures to ensure that minors, including minors with disabilities and minors with limited English proficiency, have multiple ways to report the following:

- Sexual abuse, sexual harassment, or inappropriate sexual behavior;
- Retaliation for reporting sexual abuse, sexual harassment, or inappropriate sexual behavior; and
- Staff neglect or violations of responsibilities that may have contributed to incidents of sexual abuse, harassment, or inappropriate sexual behavior.

**Exhibit 146**
**Page 46**

The care provider's policies and procedures must include provisions for staff to accept reports made verbally, in writing, anonymously, and via a grievance. Staff must promptly document any verbal reports.

In accordance with section **4.7 Educating Children and Youth (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-4#4.7)**, care providers must provide youth access and instructions on how youth may report incidents to:

- Care provider staff;
- Child Protective Services (CPS);
- The UAC Sexual Abuse Hotline;
- A local community service provider or national rape crisis hotline if a local provider is unavailable; and
- Consular officials.

The care provider must ensure that the local community service provider or rape crisis hotline is able to immediately forward reports of sexual abuse and harassment to ORR.

Care providers must provide unaccompanied alien children access to telephones with preprogrammed numbers for the UAC Sexual Abuse Hotline, CPS, and the local community service provider or national rape crisis hotline.  Care providers should include other preprogrammed telephone numbers, such as telephone numbers for consulates or a legal service provider, in order to avoid any stigma in using the preprogrammed telephones.  Preprogrammed telephones must be placed in areas of the facility where children may easily access them without assistance from staff but where they are also afforded some level of privacy so that other children and staff cannot easily listen to telephone conversations.  The care provider must ensure that all youth are taught how to access and use preprogrammed telephones as part of educational sessions when describing available reporting methods.

Secure care providers may have modified requirements for preprogrammed telephones to ensure the security of the facility.  Secure care providers seeking a modification must obtain approval from their assigned Project Officer.

**Grievances**

All care providers must have a grievance process to handle any type of complaint or grievance a child may have. Children and youth may use the care provider's current grievance process to report sexual abuse, sexual harassment, and inappropriate sexual behavior to the care provider.

Care providers must implement policies and procedures to identify and handle time-sensitive incidents reported through a grievance that involve an immediate threat to the health, safety, or welfare of a child or youth. In the case of medical emergencies, staff must ensure the minor receives proper medical attention for further assessment. This may include providing the minor with an assessment by a qualified health practitioner or calling emergency services when appropriate.

Although the care provider must issue a written decision or response to the grievance within 5 days of receipt, all allegations of sexual abuse or harassment reported via a grievance must be immediately responded to in accordance with the reporting policies described below. If the grievance involves an immediate threat to the health, safety, or welfare of an unaccompanied alien child, the care provider must immediately respond as needed.

Youth may obtain assistance from another youth, care provider staff, family members, or legal representatives to prepare a grievance. Care provider staff must take reasonable steps to expedite requests for assistance from these other parties.

*Revised 3/21/16*

**4.10.2 Care Provider Reporting Requirements**

Care provider staff, volunteers, and contractors must immediately report the following to all appropriate investigating entities as described below:

- Any knowledge, suspicion, or information regarding an incident of sexual abuse, sexual harassment, or inappropriate sexual behavior;
- Retaliation against children, staff, volunteers, or contractors for reporting an incident of sexual abuse, sexual harassment, or inappropriate sexual behavior; and
- Any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation.

Care providers must have written reporting policies and procedures that are approved by ORR.

**Reporting to State and Local Authorities**

In accordance with mandatory reporting laws, State licensing requirements, Federal laws and regulations, and ORR policies and procedures, the above must be reported immediately but no later than 4 hours after learning of the allegation to:

**Exhibit 146**
**Page 47**

- The State licensing agency;
- CPS; and/or
- Local law enforcement.

If the State licensing or CPS agency directly reports an allegation to local law enforcement, the care provider does not need to make a separate report but must confirm and document when such a report has been made. Care providers must report allegations of sexual abuse involving an adult to local law enforcement, regardless of whether State licensing or CPS reports the allegation.

Care providers must report allegations of sexual abuse involving an adult to local law enforcement.  If the State licensing or CPS agency directly reports an allegation to local law enforcement, the care provider does not need to make a separate report but must confirm and document when such a report has been made.

Care providers must maintain or attempt to enter into a written memorandum of understanding or other agreement specific to investigations of sexual abuse and harassment with CPS, the State licensing agency, and the local law enforcement agency. Care providers must maintain a copy of the agreement or documentation showing attempts to enter into an agreement.

**Reporting to ORR**

Care providers must report immediately but no later than 4 hours after learning of the allegation any knowledge, suspicion, or information regarding an incident of sexual abuse, sexual harassment, or inappropriate sexual behavior; retaliation; or staff neglect/violation of responsibilities that occurs in ORR care via the Sexual Abuse Significant Incident Report (SA/SIR). Allegations of prior sexual abuse and harassment that occurred in the minor's home country, during the journey to the U.S., in the U.S., in DHS custody, or in any other context must be reported to ORR via the Significant Incident Report (SIR) according to ORR's policies and procedures.[3]

Care providers must use the official SA/SIR for the timely reporting and documentation of allegations of sexual abuse, sexual harassment, and inappropriate sexual behavior that occur in ORR care. Care providers must ensure that SA/SIRs include sufficient detail regarding the incident, including a list of witnesses, the reporter, and all parties involved. Care providers must create an Addendum to an existing SA/SIR when information in the original SA/SIR was incorrect, incomplete, or new or more detailed information has become available since the care provider submitted the original report. Care providers must submit an SA/SIR Addendum within 24 hours of learning of incorrect, incomplete, or new information.

An SA/SIR must be filed for each child involved in an incident, and multiple SA/SIR Addendums may be required to provide all updated and additional information. SA/SIRs must not be provided to any outside entity or individual unless it is expressly stated in this policy, or the care provider obtained prior permission from ORR.

Care providers must submit a completed SA/SIR to ORR immediately but no later than 4 hours after becoming aware of the allegation and maintain a copy in the child's case file. The SA/SIR and any SA/SIR Addendums must be sent to:

- Project Officer
- Federal Field Specialist
- Case Coordinator
- Contract Field Specialist

If a victim of sexual abuse is transferred between ORR care providers, the ORR/FFS must inform the receiving care provider of the incident and the victim's need for medical and/or other services and follow-up care to the extent necessary.

**Reporting to the Federal Bureau of Investigation (FBI)**

Care providers must report immediately but no later than 4 hours after learning of an allegation of sexual abuse as defined in 34 U.S.C. § 20341 to the FBI. Care providers must submit a completed SA/SIR to the FBI, HHS' Office of the Inspector General (OIG), and to ORR's SA/SIR mailbox. The SA/SIR must include, at a minimum, the following information:

- A summary of the alleged abuse;
- Date of the alleged incident;
- Date of the report;
- Names and contact information for potential witnesses;
- Names and contact information for appropriate contacts at the care provider; and
- Relevant contact information for all other parties receiving the report, including but not limited to:
  - CPS;
  - The State licensing agency; and
  - Local law enforcement.

**Exhibit 146
Page 48**

For any incident that is reported to the FBI, all related SA/SIR Addendums should be reported to OIG and to ORR's SA/SIR mailbox. SA/SIR Addendums should not be reported to the FBI.

**Reporting an Allegation of Sexual Abuse or Harassment that Occurred at Another Care Provider**

Upon receiving an allegation that a child was sexually abused or harassed at another care provider, the care provider that received the allegation must report the allegation to CPS and State licensing and to ORR according to the reporting procedures described above. The care provider must report the allegation to both the CPS and State licensing agencies where the abuse or harassment occurred and to the CPS and State licensing agency where the care provider making the report is located, if the care providers are located in different states. ORR will then notify the care provider where the alleged abuse or harassment occurred. The receiving care provider must then take all appropriate actions to protect the health and safety of any minors involved in the incident that are still at the facility and make all appropriate reports in accordance with ORR reporting policies and procedures.

**QUICK REFERENCE CHART: Reporting Incidents Related to Sexual Abuse and Sexual Harassment**

**NOTE:** The chart is intended as a quick reference guide and does not cover every type of reportable incident.

| TYPE OF INCIDENT | CARE PROVIDER REPORTING REQUIREMENTS |
|---|---|
| **INCIDENTS THAT OCCURRED IN ORR CARE** | |
| **SEXUAL ABUSE IN ORR CARE** | 1. Report to CPS and/or state licensing in the state of the reporting care provider<br>2. Report to CPS and/or state licensing in the state where the allegation took place, if in a different state<br>3. Report to local law enforcement if the perpetrator is an adult or if required by state licensing<br>4. Send an SA/SIR to the FBI within 4 hours by emailing **VCACU_ORR_Reporting@ic.fbi.gov**<br>5. Send an SA/SIR to HHS/OIG within 4 hours by emailing **UAC@oig.hhs.gov**<br>6. Submit an SA/SIR to ORR within 4 hours by emailing **PSAC@acf.hhs.gov** and appropriate ORR staff |
| **SEXUAL HARASSMENT IN ORR CARE** | 1. Report to state licensing according to state licensing requirements<br>2. Submit an SA/SIR to ORR within 4 hours |
| **INAPPROPRIATE SEXUAL BEHAVIOR IN ORR CARE** | 1. Report to state licensing according to state licensing requirements<br>2. Submit an SA/SIR to ORR within 4 hours |
| **INCIDENTS THAT DID NOT OCCUR IN ORR CARE** | |
| **SEXUAL ABUSE THAT OCCURRED IN THE UNITED STATES (BUT NOT IN ORR CARE)** | 1. Report to CPS and/or state licensing according to state licensing requirements<br>2. Report to local law enforcement according to state licensing requirements<br>3. Submit an SIR to ORR within 4 hours by emailing **PSAC@acf.hhs.gov** and appropriate ORR staff |
| **SEXUAL ABUSE THAT OCCURRED OUTSIDE THE UNITED STATES** | 1. Report to CPS and/or state licensing according to state licensing requirements<br>2. Submit an SIR to ORR within 4 hours |
| **SEXUAL ABUSE THAT OCCURRED IN DHS CUSTODY** | 1. Report to CPS in the state of the reporting care provider according to state mandatory reporting laws<br>2. Report to CPS in the state where the allegation took place, if in a different state, according to state mandatory reporting laws<br>3. Submit an SIR to ORR within 4 hours by emailing **PSAC@acf.hhs.gov** and appropriate ORR staff |

*Revised 1/07/19*

#### 4.10.3 Sexual Abuse and Harassment Follow-up

Care providers must remain informed of and track any CPS, State licensing, and/or local law enforcement investigation that results from reports of sexual abuse and harassment and cooperate with all investigating authorities. Communications from these agencies, particularly information regarding the investigation, must be documented and retained by the care provider and provided to ORR via an SA/SIR or SA/SIR Addendum. Care providers must attach to the SA/SIR any documentation received from any investigating agency or issued by the care provider, such as a warning to staff or termination letter. Additionally, care providers must respond immediately to information requests from ORR regarding the incident.

**Exhibit 146**
**Page 49**

After an investigation by appropriate investigating authorities is complete, the ORR/FFS must notify the victim of the result of the investigation if the minor is still in ORR care. If the minor has been released when the investigation is completed, the ORR/FFS should attempt to notify the minor at his/her last known address. The ORR/FFS should notify the investigating agency of any individuals involved in the incident, such as other complainants or other additional parties and encourage the investigating agency to notify the other individuals involved.

*Revised 3/21/16*

### 4.10.4 Notification and Access to Attorneys/Legal Representatives, Families, Child Advocates, and Sponsors

**Notification and Access to Attorneys and Legal Service Providers**

If a minor has an attorney of record, the care provider must notify the attorney of any allegations of sexual abuse or harassment that occur in ORR care within 48 hours, provided the child consents to the disclosure of information and is 14 years old or older. If a child does not have an attorney of record and is 14 years old or older, the care provider must inform the child that the allegation may affect his/her eligibility for immigration relief and ask whether the minor would like to speak with an attorney. If the child agrees, the care provider must notify its local legal service provider within 48 hours of the allegation. If the child is under 14 years old, the care provider must notify the child's attorney of record or the local legal service provider. If the child has a diagnosed developmental disability and is 14 years old or older, the care provider must notify its ORR/FFS prior to asking the child for consent to notify the child's attorney of record or asking whether the child would like to speak with a local legal service provider. Care providers must provide a notification only and may not send SA/SIRs.

Figure 4.10.1: Notification to Attorneys and Legal Service Providers

| MINOR'S AGE | DOES THE MINOR HAVE AN ATTORNEY OF RECORD? | CARE PROVIDER REQUIREMENTS |
|---|---|---|
| 14 Years Old or Older | Yes | Follow minor's decision |
| 14 Years Old or Older | No | 1. Inform minor that the allegation may affect the minor's eligibility for immigration relief<br>2. Ask whether the minor would like to speak with an attorney<br>3. Follow minor's decision |
| 14 Years Old or Older with a Diagnosed Developmental Disability | Yes or No | Notify the ORR/FFS prior to speaking with the minor |
| Under 14 Years Old | Yes or No | Notify the minor's attorney of record or if the minor does not have an attorney of record the local legal service provider |

Care providers must ensure minors have access to their attorney or other legal representative in accordance with the care provider's attorney-client visitation policies and procedures. These visitation policies and procedures must include provisions for immediate access in the case of an emergency or exigent circumstance. The care provider's attorney-client visitation policies and procedures must be approved by ORR to ensure the policies and procedures are reasonable and appropriate.

**Notification and Access to Families and Sponsors**

Care providers must notify a child's parent or legal guardian of any allegations of sexual abuse or harassment that occur in ORR care within 48 hours unless the care provider has evidence showing the parents or legal guardians should not be notified or the victim is 14 years old or older and does not consent to the disclosure. If a minor is released to a sponsor or a non-ORR facility, care providers must notify the sponsor or receiving facility of the incident and the victim's potential need for medical and/or social services unless the child is 14 years old or older and does not consent to the disclosure. If the child is under 14 years old, the care provider must notify the ORR/FFS to ensure disclosure to a child's parent, legal guardian, sponsor, or receiving facility is safe. If the child has a diagnosed developmental disability and is 14 years old or older, the care provider must notify its ORR/FFS prior to asking the child for consent to notify the child's parent or legal guardian, sponsor, or receiving facility. Care provider facilities must ensure children have access to their families, including legal guardians, unless ORR has documentation that certain family members or legal guardians should not be provided access due to safety concerns. Care providers must provide a notification only and may not send SA/SIRs.

Figure 4.10.2: Notification to Parents/Legal Guardians and Sponsors

| MINOR'S AGE | CARE PROVIDER REQUIREMENTS |
|---|---|
| 14 Years Old or Older | 1. Follow minor's decision whether to notify the parent or legal guardian unless there is evidence showing they should not be notified<br>2. Follow the minor's decision whether to notify the sponsor or receiving facility, if different from the parent or legal guardian |
| 14 Years of Age or Older with a Diagnosed Developmental Disability | Notify the ORR/FFS prior to speaking with the minor |
| Under 14 Years of Age | 1. Notify the minor's parent or legal guardian unless there is evidence showing they should not be notified<br>2. Notify the minor's sponsor or receiving facility, if different from the parent or legal guardian |

**Notification to Child Advocates**

Care providers must notify, if applicable, child advocates of any allegations of sexual abuse or harassment that occur in ORR care within 48 hours if the minor is 14 years old or older and consents to the disclosure. If the minor is under 14 years old, the care provider

**Exhibit 146**
**Page 50**

must notify the child advocate, if applicable. If the minor has a diagnosed developmental disability and is 14 years of age or older, the care provider must notify the ORR/FFS prior to asking the child for consent to notify the minor's child advocate, if applicable. Care providers must notify child advocates of incidents by sending a copy of the SA/SIR.

Figure 4.10.3: Notification to Child Advocates

| MINOR'S AGE | CARE PROVIDER REQUIREMENTS |
|---|---|
| 14 Years Old or Older | Follow minor's decision |
| 14 Years of Age or Older with a Diagnosed Developmental Disability | Notify the ORR/FFS prior to speaking with the minor |
| Under 14 Years of Age | Notify the minor's child advocate |

*Revised 3/21/16*

### 4.10.5 Confidentiality

Care providers must ensure that any information related to a sexual abuse or harassment report is protected and kept confidential within the care provider facility and is only disclosed to the extent necessary for medical and mental health treatment, investigations, notice to local law enforcement, or for other security and management decisions. As with all information gathered during the course of service provision, care providers must implement appropriate controls on information dissemination within the care provider facility in order to ensure that sensitive information is not exploited to any youth's detriment by staff or other children.

*Posted 9/28/15*

### 4.10.6 UC Sexual Abuse Hotline

Any child or third party, including family members, sponsors, legal service providers, child advocates, and any other individual with knowledge or suspicion of sexual abuse or harassment occurring at a care provider may report allegations of sexual abuse and harassment to the UAC Sexual Abuse Hotline at 1-855-232-5393.

ORR will immediately notify the care provider, CPS, the State licensing agency, and/or the Department of Justice and the HHS Office of the Inspector General, as appropriate, of any allegations received directly from any child or third party. The care provider must immediately follow-up to ensure all children and youth are safe and provided with appropriate services and that all required reports to ORR and outside entities are completed in accordance with this section.

*Revised 3/21/16*

## 4.11 Incident Reviews and Data Collection

This section covers requirements related to sexual abuse and sexual harassment incident reviews and data collection. This section applies to all care provider facilities, including secure facilities and long-term foster care.

*Posted 7/08/19*

### 4.11.1 Incident Reviews

Care provider facilities must conduct incident reviews of all allegations of sexual abuse and sexual harassment that occur in ORR care and custody. Incident reviews are internal reviews completed by care provider facilities and are separate from investigations completed by an oversight entity (i.e., by CPS, a state or local licensing authority, or law enforcement). Incident reviews provide care provider facilities the opportunity to review an incident and determine whether any change in policy, procedure, or practice could prevent a similar incident from occurring again. Incident reviews ensure that care provider facilities and ORR develop best practices to better prevent, detect, and respond to sexual abuse and sexual harassment.

A care provider facility's incident review team should be multi-disciplinary and include staff involved in detecting, reporting, and responding to an incident. This may include first responders, medical and mental health practitioners, security staff, and facility leadership. The incident review team must include the care provider facility's Prevention of Sexual Abuse (PSA) Compliance Manager.

Incident reviews must be conducted within 30 days of the conclusion of every investigation of sexual abuse and sexual harassment completed by an oversight entity. Incident reviews must not interfere with any ongoing investigation. The goals of an incident review are to:

- Identify any ways in which the incident could have been prevented;
- Ensure appropriate actions were taken to protect the victim and provide follow up services;
- Ensure appropriate actions were taken for the perpetrator to protect the victim and other children and staff at the facility; and
- Consider whether any policies or procedures can be improved or changed in light of the allegation or incident.

*Posted 7/08/19*

**Exhibit 146
Page 51**

**Written Incident Reviews**

Care provider facilities must provide a written incident review report for certain types of sexual abuse and sexual harassment incidents. Written incident reviews collect specific information about the incident, including information about when and where the incident occurred, actions taken with regard to the perpetrator, and services provided to and actions taken for the victim. The completed incident review must include recommendations for changes in policy, procedures, or practices that could lead to improvements in preventing, detecting, and responding to sexual abuse and sexual harassment in the future. These recommendations may result from the internal review or from an outside investigation. The care provider facility must implement the recommendations included in the incident review or document why it is unable to do so.

Care provider facilities must conduct an incident review and complete an incident review form within 30 days of the conclusion of every investigation by an oversight entity of minor-on-minor sexual abuse or sexual harassment where the allegation was substantiated or unsubstantiated. Please see the definitions section below for more information on when an allegation is considered substantiated or unsubstantiated.

For allegations of sexual abuse and sexual harassment involving an adult (i.e., staff or non-staff adults), care provider facilities must conduct an incident review and complete an incident review form within 30 days of the conclusion of any investigation or 60 days after reporting the allegation. Care provider facilities must subsequently update the initial incident review every 90 days as appropriate until the conclusion of all investigations by oversight entities.

For allegations of inappropriate sexual behavior involving an adult, care provider facilities must conduct an incident review and complete an incident review form within 30 days of the conclusion of every investigation by an oversight entity where the allegation was substantiated or unsubstantiated.

The completed incident review form must be forwarded to ORR's Prevention of Sexual Abuse Coordinator. ORR will review the care provider facility's incident review and any attached investigation reports to determine whether additional action is required, including monitoring, compliance audits, or corrective actions.

**Definitions**

A *substantiated allegation* is an allegation that was formally investigated and determined to have occurred. For example, an outside investigative entity determined there was sexual abuse sexual harassment or determined the allegation did occur.

An *unsubstantiated allegation* is an allegation that was formally investigated and the investigation produced insufficient evidence to make a final determination as to whether or not the event occurred. Allegations may be unsubstantiated for a variety of reasons, including lack of evidence or that a victim refuses to cooperate or is unavailable.

An *unfounded allegation* is an allegation that was formally investigated and determined not to have occurred. For example, an allegation was investigated but an outside investigative entity determined abuse did not occur or the allegation did not occur, even if a deficiency was issued related to another licensing requirement.

An allegation is *administratively closed* if a state agency did not complete a formal investigation. After conducting an initial review, a state agency may administratively close a case for a number of reasons, including when the allegation does not meet the criteria for a formal investigation, lack of jurisdiction or lack of information about the alleged perpetrator.

*Posted 7/08/19*


## 4.12 Compliance Audits

This section outlines a care provider facility's responsibilities during a compliance audit and explains the auditor certification process. This section applies to all care provider facilities, except long-term foster care, secure facilities, and influx facilities.  Secure facilities are subject to the audit process described in the U.S. Department of Justice's National Standards to Prevent, Detect, and Respond to Prison Rape, 28 CFR part 115.

*Posted 12/10/18*

### 4.12.1 Compliance Audit Process

Compliance audits determine a care provider facility's compliance with standards in the IFR and relevant ORR policies and procedures during the preceding 12 months. Each care provider facility must undergo a compliance audit by February 22, 2019, as required by the IFR. After February 2019, care provider facilities must be undergo a compliance audit once every three years. ORR may expedite a compliance audit for a particular care provider facility that is experiencing problems related to sexual abuse or sexual harassment. For

Exhibit 146
Page 52

example, ORR may expedite a compliance audit after a particularly serious or egregious incident of sexual abuse at a care provider facility.

Auditors request relevant information and documentation before beginning a compliance audit. Auditors review policies and a sampling of relevant documents and records, such as SA/SIRs or video footage, during the audit. During the onsite visit, auditors tour the facility and interview a representative sample of unaccompanied alien children and staff.  Auditors also work with the FFS to solicit input from members of the community who may have relevant information regarding the care provider facility.

For each standard in the IFR, auditors determine whether a care provider facility reaches one of the following findings:

- Exceeds standard (substantially exceeds requirement of standard)
- Meets standard (substantial compliance; complies in all material ways with the standard for the relevant review period)
- Does not meet standard (requires corrective action)

Care provider facilities bear the affirmative burden of demonstrating to the auditor compliance with IFR standards and relevant ORR policies and procedures. After completing a compliance audit, the auditor produces a report indicating whether the care provider facility's policies and procedures comply with the IFR standards and relevant ORR policies and procedures.

ORR and the auditor develop a corrective action plan if a care provider facility receives a finding of "does not meet standard." The purpose of the corrective action plan is to ensure that the care provider facility achieves compliance with the standard. The care provider facility has 90 days to comply with the corrective action plan. After the 90-day corrective action period, the auditor issues a final determination.

A care provider facility may appeal a specific audit finding that it believes is incorrect. To request an appeal, the care provider facility must contact ORR's Prevention of Sexual Abuse Coordinator within 90 days of the auditor's final determination. If ORR determines there is good cause for re-evaluation, the care provider facility is re-audited by a mutually agreed upon auditor. The care provider facility is responsible for the costs of the re-audit. The findings of the re-audit are final.

*Posted 12/10/18*

### 4.12.2 Care Provider Facility Responsibilities

Care provider facilities must be responsive to and work with auditors in scheduling an audit. Additionally, care provider facilities must do the following during a compliance audit:

- Provide the auditor with access to all areas of the care provider facility;
- Provide all relevant documentation requested by the auditor;
- Provide space to the auditor for interviews of staff and unaccompanied alien children;
- Allow the auditor to conduct private interviews with unaccompanied alien children; and
- Allow unaccompanied alien children to send confidential information or correspondence to the auditor.

The auditor must retain all the documentation reviewed during the compliance audit. The auditor takes appropriate measures to safeguard sensitive information. The care provider facility is not provided with confidential information related to an audit, such as interviews with staff or youth. The auditor must provide all documentation and information related to an audit to ORR upon request. The auditor must, however, have independent authority to conduct an audit and to draw their own conclusions about the facility's compliance.

*Posted 12/10/18*

### 4.12.3 Auditor Certification

Auditors must have relevant monitoring, evaluation, and/or child welfare experience. When possible, auditors should be proficient in Spanish.

In order to prevent a conflict of interest all auditors must be external to ORR.  Additionally, no individual may audit a care provider facility if the individual has received financial compensation from that care provider facility, the care provider's agency, or ORR (except for compensation for conducting reviews) within three years prior to becoming an ORR auditor.

**Training**
Prior to certification, auditors must complete an ORR-approved training, which covers each of the standards in the IFR, including ORR's zero tolerance policies; definitions and examples of sexual abuse, sexual harassment, and inappropriate sexual behavior; and procedures for reporting allegations of sexual abuse, sexual harassment, or inappropriate behavior. The training also covers the following topics:

**Exhibit 146**
**Page 53**

- Building competency regarding the culture and age of unaccompanied alien children;
- Communicating effectively and professionally with unaccompanied alien children, including unaccompanied alien children who are lesbian, gay, bisexual, transgender, questioning, or intersex;
- Understanding past trauma that unaccompanied alien children may have experienced;
- Recognizing situations where sexual abuse, sexual harassment, and inappropriate sexual behavior may occur; and
- Recognizing physical, behavioral, and emotional signs of sexual abuse.

**Background Investigations**

Prior to certification, each auditor must undergo a background investigation, the scope of which complies with ORR's minimum requirements described in Section **4.3.2 (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-4#4.3.2)**. ORR does not certify as an auditor any individual who has engaged in, attempted to engage in, or has been civilly or administratively adjudicated to have engaged in sexual abuse, sexual harassment, or any type of inappropriate sexual behavior. ORR does not certify as an auditor any applicant who, as an adult, perpetrated any crime involving a child, regardless of how long ago the incident occurred, or any violent crime within the past 10 years.

Auditors have a continuing affirmative duty to disclose any misconduct that arises after certification, whether the conduct occurs on or off duty.  Misconduct includes but is not limited to any criminal behavior, abuse, and/or neglect investigation, charge, arrest, civil adjudication, administrative adjudication, or conviction.

**Certification Process**

To be certified to perform ORR compliance audits, auditors must submit the following documentation to ORR's Prevention of Sexual Abuse Coordinator:

- Resume;
- Conflict of interest form;
- Background check documentation; and
- Documentation that the applicant completed required training.

ORR reviews the submitted documentation and makes a determination regarding the applicant's suitability to conduct compliance audits.

*Posted 12/10/18*

---

**Footnotes**

1. In order to preserve the integrity of the exam, if the allegation of abuse is against a care provider facility employee, forensic examinations should be conducted by an outside provider.

2. If a care provider facility must adjust its staff-children ratios to meet this requirement and the adjustment increases a care provider facility's current budget, then the care provider facility may request an exemption from this requirement until the start of fiscal year 2016. The care provider facility must obtain written approval from its assigned Project Officer for this exemption. During the exemption period, care provider facilities must continue following their state licensing minimum requirements.

3. Please see **5.8 Significant Incident Reports and Notification Requirements (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-5#5.8)**.

---

**<Back (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-3) - Next> (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-5)**

---

Last Reviewed: July 8, 2019

**Exhibit 146**
**Page 54**

# Exhibit 147

Exhibit 147
Page 55

CARLOS R. HOLGUÍN (Cal. Bar No. 90754)
Center for Human Rights & Constitutional Law
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.org

*Listing continues on next page*

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| LUCAS R., *et al.*, | Case No. 2:18-CV-05741 |
| Plaintiffs, | PLAINTIFFS' REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT ALEX AZAR, SECRETARY OF U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, SET ONE |
| v. | |
| ALEX AZAR, Secretary of U.S. Department of Health and Human Services; *et al.*, | |
| Defendants. | |

Exhibit 147
Page 56

45.    Please produce for inspection and copying all DOCUMENTS discussing time limits or targets RELATING TO ORR's releasing CLASS MEMBERS to PROPOSED CUSTODIANS.

46.    Please produce for inspection and copying all DOCUMENTS discussing any measures YOU have taken to reduce the time CLASS MEMBERS spend in ORR custody before being released to PROPOSED CUSTODIANS.

47.    Please produce for inspection and copying all DOCUMENTS RELATING TO STEP UP or STEP DOWN of the NAMED PLAINTIFFS.

48.    Please produce for inspection and copying all DOCUMENTS stating and/or discussing ORR POLICIES AND PRACTICES  RELATING TO STEP UP or STEP DOWN of CLASS MEMBERS.

49.    Please produce for inspection and copying all form templates used to inform CLASS MEMBERS of the reasons for STEP UP or STEP DOWN employed at any time from January 1, 2017 to the PRESENT.

50.    Please produce for inspection and copying all DOCUMENTS RELATING TO POLICIES AND PRACTICES ORR uses in validating, corroborating, evaluating, or otherwise assessing evidence it relies on in determining whether to STEP UP or STEP DOWN CLASS MEMBERS.

51.    Please produce for inspection and copying all DOCUMENTS RELATING TO the amendment to § 1.2.4 of the UAC PROGRAM MANUAL, which added whether a CLASS MEMBER "[h]as reported gang involvement or displays gang affiliation while in care" or "[h]as self-disclosed violent criminal history or gang involvement" to the criteria warranting STEP UP of CLASS MEMBERS.

52.    Please produce for inspection and copying all DOCUMENTS RELATING TO the October 10, 2018 amendment to § 1.2.4 of the UAC PROGRAM MANUAL, which added whether a CLASS MEMBER "[h]as reported

Exhibit 147
Page 57

## **PROOF OF SERVICE**

I am a citizen of the United States and a resident of the State of California.  I am employed in Los Angeles County, State of California, in the office of a member of the bar of this Court, at whose direction the service was made.  I am over the age of eighteen years, and not a party to the within action.  My business address is Cooley LLP, 1333 Santa Monica Blvd., Suite 400, California 90401-4100.  On February 12, 2019, I served the documents described below in the manner described below:

PLAINTIFFS' REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT ALEX AZAR, SECRETARY OF U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, SET ONE

☒ (BY U.S. MAIL) I am personally and readily familiar with the business practice of Cooley LLP for collection and processing of correspondence for mailing with the United States Postal Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at Santa Monica, California.

on the following parties in this action:

Andrew Brenner Insenga
US Department of Justice
Civil Division Office of Immigration Litigation
P O Box 878
Washington, DC 20044
202-305-7816
Fax: 202-307-8781
Email: andrew.insenga@usdoj.gov

Benjamin M Moss
US Department of Justice
Office of Immigration Litigation - Civil Division
PO Box 868 Ben Franklin Station
Washington, DC 20044-0878
202-307-8675
Fax: 202-307-8698
Email: benjamin.m.moss2@usdoj.gov

*Attorneys for Defendant*
***Alex Azar***
*Secretary of U.S. Department of Health and Human Services*

PLAINTIFFS' REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEF. ALEX AZAR, SET ONE
NO. 2:18-CV-05741-DMG-PLA

**Exhibit 147**
**Page 58**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Marina C Stevenson
US Department of Justice
Office of Immigration Litigation -
Appellate Section
Benjamin Franklin Station
P O Box 878
Washington, DC 20044
202-305-3797
Fax: 202-307-8781
Email: marina.c.stevenson@usdoj.gov

Sherry Denise Soanes
United States Department of Justice
Office of Immigration Litigation
P O Box 868 Ben Franklin Station
Washington, DC 20044
202-532-4108
Fax: 202-616-8962
Email: sherry.soanes@usdoj.gov

David E Pinchas
Andrew Brenner Insenga
Benjamin M Moss
Marina C Stevenson
Sherry Denise Soanes
AUSA - Office of US Attorney
Civil Division
300 North Los Angeles Street Suite 7516
Los Angeles, CA 90012
213-894-2920
Fax: 213-894-7819
Email: usacac.civil@usdoj.gov

*Attorneys for Defendant*
**E. Scott Lloyd**
*Director, Office of Refugee Resettlement of the U.S. Department of Health & Human Services*

Executed on February 12, 2019, at Los Angeles, California.

_____
Susan Byrd

25

PLAINTIFFS' REQUESTS FOR PRODUCTION OF
DOCUMENTS TO DEF. ALEX AZAR, SET ONE
NO. 2:18-CV-05741-DMG-PLA

**Exhibit 147
Page 59**

# Exhibit 148

Exhibit 148
Page 60

CONFIDENTIAL

```
 1            UNITED STATES DISTRICT COURT
 2            CENTRAL DISTRICT OF CALIFORNIA
 3                  WESTERN DIVISION
 4
 5   _____
                                     )
 6   LUCAS R., et al.,               )
                                     )
 7          Plaintiffs,              )
                                     )  Case No.
 8   vs.                             )
                                     )  2:18-cv-05741
 9   ALEX AZAR, Secretary of U.S. )  DMG-PLA
     Department of Health and        )
10   Human Services, et al.,         )
                                     )
11          Defendants.              )
     _____)
12
13
14                  CONFIDENTIAL
15
16         DEPOSITION OF STEPHEN ANTKOWIAK
17                Washington, DC
18                October 28, 2019
19
20
21
22
23
24   Reported by:  John L. Harmonson, RPR
25   Job No. 170113
```

Exhibit 148
Page 61

CONFIDENTIAL

Page 91

1      A.    I mean, there's a variety of things

2  that could fall in that category.  It would

3  really be any policy or procedure that the

4  facility is not following.

5      Q.    Could delays in the reunification

6  process constitute a deficiency?

7      A.    Not in my experience.  But I think

8  factors such as staffing that might feed into

9  that theoretically would be identified as a

10 deficiency.

11     Q.    Could any aspect of a -- Let's back up

12 for a second.

13          Are you familiar with the phrase

14 "step-up"?

15     A.    Yes.

16     Q.    And what does that mean to you?

17     A.    Moving a child from one level of care

18 to a different level of care based on their

19 needs.

20     Q.    And by "level of care," what do you

21 mean?

22     A.    So most of our programs are shelters.

23 So traditional shelter beds, nonsecure beds.  We

24 have staff secure beds, which has a higher ratio

25 of staff to kids.  And then we also have some

Exhibit 148
Page 62

CONFIDENTIAL

Page 139

1   policies about in what circumstances a child

2   should be placed in a staff secure facility?

3       A.   I haven't looked at the detail in

4   terms of what's in there.

5       Q.   Where would you look for that policy?

6       A.   I would go on the intranet site again

7   to look at the policies document, and then again

8   the intranet site to look at the MAP to see what

9   procedures are available there.

10      Q.   Who is the first person on your staff

11   that you would ask for an answer to that

12   question?

13      A.   Usually I would go over to Jim and ask

14   him questions.  And then if he's not around, I

15   would go to Sarah Viola as well.

16      Q.   Say that last one again.

17      A.   Sarah Viola.

18      Q.   Thank you.

19      Do children get placed in staff secure

20   at the outset, like through the intake process?

21      A.   Sometimes, but generally no.  It's

22   usually a step-up because they have been placed

23   in a shelter first.  And then whatever behaviors

24   are occurring in that shelter may result in their

25   step-up to staff secure.

Exhibit 148
Page 63

CONFIDENTIAL

Page 259

1      A.     I believe so.

2      Q.     Would they need to be stepped down to

3  a shelter before being transferred to that

4  placement?

5      A.     I don't know.  I would have to check

6  on that, actually.

7      Q.     Is it more difficult for a child who

8  has been placed in an RTC to find a foster care

9  or URM placement or some other less restrictive

10 placement?

11     A.     It might be.  It might be hard to find

12 a foster family that has the ability to provide

13 services and to care for a child who has

14 significant mental health issues.

15     Q.     Does ORR have trauma-informed

16 practices and procedures applicable to children

17 in its custody?

18     A.     Yes, we do have a child welfare

19 specialist.  So she's a subject matter expert

20 that works in ORR, and she's working to provide

21 trauma training to ORR and working to kind of

22 improve our practices and policies in that area.

23     Q.     What is her name?

24     A.     Marivic Fields.

25     Q.     And where is she in the org chart in

Exhibit 148
Page 64

CONFIDENTIAL

Page 278

1                        C E R T I F I C A T E

2

3        DISTRICT OF COLUMBIA

4                I, JOHN L. HARMONSON, a Notary Public

5        within and for the District of Columbia, do

6        hereby certify:

7                That STEPHEN ANTKOWIAK, the witness

8        whose deposition is hereinbefore set forth, was

9        duly sworn or affirmed by me and that such

10       deposition is a true record of the testimony

11       given by such witness.

12               That if the foregoing pertains to a

13       federal case, before completion of the

14       proceedings, review and signature of the

15       transcript [x] was [ ] was not requested.

16               I further certify that I am not related

17       to any of the parties to this action by blood or

18       marriage; and that I am in no way interested in

19       the outcome of this matter.

20               IN WITNESS WHEREOF, I have hereunto set

21       my hand this 7th day of November, 2019.

22

23                        *John L. Harmonson*

         _____

24                        JOHN L. HARMONSON, RPR

                          My commission expires: 11/14/20

25

**Exhibit 148
Page 65**

# Exhibit 149

## <u>REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL</u>

**Exhibit 149**
**Page 66**

1                        Confidential

2           FOR THE UNITED STATES DISTRICT COURT

3     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

4              Case No.  2:18-CV-05741-MG-PLA

5

6     _____

7     LUCAS R., et al.,                    )

8              Plaintiffs,                 )

9          v.                              )

10    ALEX AZAR, Secretary of U.S.         )

11    Department of Health and             )

12    Human Services, et al.,              )

13              Defendants.                )

14    _____

15                    CONFIDENTIAL

16              DEPOSITION OF TOBY BISWAS

17                 Washington, D.C.

18                 November 13, 2019

19

20

21

22

23

24    REPORTED BY:  Barbara DeVico, CRR, RMR

25    JOB NO. 170311

Exhibit 149
Page 67

Page 247

1                          Confidential

2      principles?

3              A.      Yes.

4              Q.      And you think that even if a kid who

5      is going to be transferred to an RTC that that kid

6      also is a run risk?

7              A.      Yes.

8              Q.      Why is that?

9              A.      Because I don't think most children

10     want to be at RTC --

11             Q.      Because.

12             A.      -- or a secure provider.  They just

13     want to stay where they are.

14             Q.      Do the kids in the RTC want to stay

15     where they are?

16             A.      Some do.

17                     MR. WHITE:  We're going to take a

18             five-minute break.

19                            (Recess)

20                            (Exhibit 132, email, was

21                            marked for identification.)

22     BY MR. WHITE:

23             Q.      Have you looked at 132?

24             A.      Yes.

25             Q.      Is that an email to ███  ███████  that

Confidential

1

2       Q.      So where is this provision in the

3  policy guide that states that ORR provides that

4  once the FFS denies a sponsor or release to a

5  sponsor that the change in circumstance can be

6  considered?

7       A.      I'm trying to look it up.  But I

8  can't find it at this moment.

9       Q.      But you're convinced, you believe

10 that's in the policy guide?

11      A.      It's either in the policy guide, the

12 MAP or one of our corresponding guidance that we

13 provided in the past.

14      Q.      That would be of the FAQs?

15      A.      Yes.

16      Q.      So to the extent that there's emails

17 that document this case that you remembered when

18 Mr. Molina was asking you about it, that -- would

19 that refer to the particular section of policy that

20 allows that?

21      A.      I believe so.  There's also nothing,

22 to my knowledge, prohibiting it.

23      Q.      Right.  But then similarly like the

24 other time you answered that way, there's nothing

25 that would alert a denied sponsor of their ability

**Exhibit 149**
**Page 69**

1                         Confidential

2    to present the evidence of change of circumstances,

3    correct?

4          A.      Correct.

5          Q.      So does ORR require that denied

6    sponsors be informed in writing of their ability to

7    present information about a change of

8    circumstances?

9          A.      ORR doesn't notify sponsors in

10   writing except for their parent or legal guardian.

11         Q.      Okay.  So if they're a parent or

12   legal guardian, what they're given in writing does

13   or does not, or is or is not required to include

14   their right or ability to present information about

15   a change of circumstances in the case of a denial?

16         A.      It tells them how they can appeal a

17   decision.

18         Q.      Which is different than what you're

19   talking about, right?  An appeal is different than

20   presenting a change of circumstance to get the FFS

21   to reconsider their choice, right?

22         A.      Yes.

23         Q.      So that's not given in writing in

24   the notice of denial, is it?

25         A.      I don't recall.

Exhibit 149
Page 70

Page 274

1                        Confidential

2                   C E R T I F I C A T E

3

4   LUCAS R., et al.,                )

5        v.                          )

6   ALEX AZAR, et al.,               )

7

8

9        I, BARBARA DeVICO, a Notary Public within and

10   for the District of Columbia , do hereby certify:

11        That TOBY BISWAS, the witness whose

12   deposition is hereinbefore set forth, was duly

13   sworn by me and that such deposition is a true

14   record of the testimony by such witness.

15        I further certify that I am not related to

16   any of the parties to this action by blood or

17   marriage; and that I am in no way interested in the

18   outcome of this matter.

19        IN WITNESS WHEREOF, I have hereunto set my

20   hand this 27th of November, 2019.

21

22

23        _____

24             BARBARA DeVICO

25

**Exhibit 149**
**Page 71**

# Exhibit 150

Exhibit 150
Page 72

Confidential

Page 254

```
 1              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
 2                   Western Division

 3    - - - - - - - - - - - - - -+
                                 |
 4    LUCAS, R., et al.,         |
                                 |
 5            Plaintiffs,        |    Case Number:
                                 |
 6       vs.                     |    2:18-cv-05741 DMG PLA
                                 |
 7    ALEX AZAR, Secretary of    |
      U.S. Department of Health  |
 8    and Human Services, et al.,|
                                 |
 9            Defendants.        |
                                 |
10    - - - - - - - - - - - - - -+

11

12                 ***CONFIDENTIAL***

13            Rule 30(b)(6) Deposition of the

14            Office of Refugee Resettlement,

15      by and through its designated representative,

16               TOBY R.M. BISWAS, ESQ.

17                  Washington, D.C.

18            Wednesday, February 19, 2020

19                    9:30 a.m.

20                   (VOLUME 2)

21

22

23    Job No. 177359

24    Reported by:  Laurie Donovan, RPR, CRR, CLR

25
```

Exhibit 150
Page 73

Confidential

Page 428

1    in that type of -- what should we call it -- like

2    a pseudo denial, or --

3         A    So I mean as part of any case staffing,

4    the case manager and case coordinator and FFS are

5    discussing this type of -- this stuff.

6         Q    But the FFS doesn't have to approve that

7    type of a denial of the nonviable sponsor?

8         A    No.

9         Q    Does the case coordinator make a

10   recommendation on that?

11        A    I think in the -- I think it would vary

12   case to case, but in the matter of course, I'm

13   sure a case manager would talk to their case

14   coordinator and be like "this aunt is not pursuing

15   the paperwork, I'm going to go ahead and replace

16   the first cousin as the sponsor in the system."

17        Q    Okay, and, and issue this pro forma

18   denial?

19        A    Right.

20        Q    So is there any guidance in, in the MAP

21   or the Policy Guide given to case managers as to

22   how many, for example, how many attempts they must

23   make to communicate with a proposed sponsor before

24   determining they're not viable?

25        A    No.

Exhibit 150
Page 74

Confidential

Page 466

```
 1

 2

 3

 4

 5    CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

 6              I, Laurie Donovan, Registered
         Professional Reporter, Certified Realtime
 7       Reporter, and notary public for the District
         of Columbia, the officer before whom the
 8       foregoing deposition was taken, do hereby
         certify that the foregoing transcript is a
 9       true and correct record of the testimony
         given; that said testimony was taken by me
10       stenographically and thereafter reduced to
         typewriting under my supervision; and that I
11       am neither counsel for, related to, nor
         employed by any of the parties to this case
12       and have no interest, financial or otherwise,
         in its outcome.
13
                 IN WITNESS WHEREOF, I have hereunto
14       set my hand and affixed my notarial seal this
         2nd day of March 2020.
15

16       My commission expires:  March 14, 2022

17

18       Laurie Donovan

19

20       LAURIE DONOVAN
         NOTARY PUBLIC IN AND FOR
21       THE DISTRICT OF COLUMBIA

22

23

24

25
```

Exhibit 150
Page 75

# Exhibit 151

Exhibit 151
Page 76

Page 1

1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3                     WESTERN DIVISION

4

5    LUCAS R. , et al.,

6

                     Plaintiffs,
7
     vs.                              NO. 2:18-CV-05741 DMG PLA
8
     ALEX AZAR, Secretary of U.S.
9    Department of Health and Human
     Services, et al.,
10
                     Defendants.
11    _____/

12

13

14

15

16              DEPOSITION OF JOSE CASTANEDA

17         Thursday, November 21, 2019, 9:37 a.m.

18                  Woodland, California

19

20

21

22   Reported By:

23   PEGGY A. PORTER, RDR, CRR, CSR No. 6086

24   Job No. 172051

25   PAGES 1 - 196

Page 60

 1  requested further information on a child's mental

 2  health?

 3   A     There's been a few instances.  I can't remember

 4  specific cases.  But it may be something that -- for

 5  instance, we may have been missing some information on a

 6  psychological evaluation that was conducted during the

 7  time that they were under their care that our mental

 8  health staff will want to review.  Yeah, so there has

 9  been a few instances.

10   Q     And your mental health staff would want to

11  review that before determining whether to accept a

12  placement?

13   A     So, yeah, they would.

14         So, for instance, when Julie Burns was in her

15  role, with her background being a clinician and in the

16  mental health side of things, she would do a lot of

17  review on that end.  If she had any questions regarding

18  any sort of concerns that came up, anything she may have

19  read, she would request additional information or base

20  the decision whether or not to accept or deny on that as

21  well.

22   Q     And how is the mental health information used to

23  accept or deny a placement?

24   A     Well, if it's a continued need for like a

25  residential treatment center or if the mental health

**Exhibit 151**
**Page 78**

1   need is higher than we can address here, then we would

2   ask that they send the referral to the appropriate

3   parties.  Maybe another RTC or maybe something out of

4   network or maybe -- you know, whatever may be needed at

5   that time.  If it's above what we can manage here.

6    Q      Who makes the -- so who makes the determination

7   of whether the mental health needs are above what you

8   can manage here?

9    A      It just depends on what -- when it was.  I mean,

10  like I said, it is -- usually if it's something that's

11  really high needs or mental health needs, that we may

12  see maybe an issue with long term or placement, even if

13  it's short term here in the secure facility, that's

14  usually discussed.  Like I said, Julie, she would

15  primarily take the lead in that and she would determine

16  whether or not it would be appropriate to place the

17  youth here with us.

18   Q      Have you ever accepted youth that ORR or GDIT

19  requested come to Yolo that ended up having greater

20  mental health needs than you felt Yolo could handle?

21   A      Yes.

22   Q      How often?

23   A      It's not too often.  Usually the times that that

24  did happen, we didn't have all the background

25  information or some of it may not have been present

**Exhibit 151**
**Page 79**

Page 62

1    during that time and it kind of came to light during the

2    time here.

3    Q     So what -- can you describe when a mental health

4    need would be greater than Yolo can handle?

5    A     I guess I would say something that would require

6    for like hospitalization or just something that required

7    direct supervision at all times with a youth.  Maybe

8    self-injurious, like constant self-injurious behavior

9    such as like cutting that will require for a higher

10   level of care or a more appropriate level of care.

11   Q     What type of mental health needs do you feel

12   Yolo is equipped to handle?

13   A     I wouldn't -- I mean, I wouldn't know.  That's

14   above me.  I don't make -- I mean, I'm not -- I don't

15   work -- that's not my line of work.  I couldn't say

16   what's the appropriate level or what we can or cannot

17   serve.

18   Q     So I guess I want to go back a little bit to

19   what we were talking about about who at Yolo makes the

20   determination, when you do get an intake, of what level

21   Yolo can handle based on the paper records you receive.

22   A     So anything mental health related, like I said,

23   up until I believe it was September of this year, it was

24   Julie Burns that was reviewing that.

25   Q     Who reviews it now?

Page 88

```
1    I failed to mention it.  They are offered an opportunity
2    to contact their attorney if they have an attorney prior
3    to arriving here.
4          They also are allowed time to shower.  Provided
5    with clothing, linen at the time they walk in.
6    Q     Thank you.
7          I want to go back a little bit to talking about
8    the dangerousness assessment and when Yolo's determining
9    whether to accept a youth.
10          When you're deciding whether a child is dangerous
11   to themselves or others, is mental health taken into
12   account in that determination?
13   A     Yes.
14   Q     How so?
15   A     Well, if it's a danger to self or others, we do
16   take into consideration all of that.  So if there is any
17   records or documents of some sort of mental health
18   history or if these issues are something that we see or
19   something underlying that hasn't been identified, we do
20   request additional information.
21   Q     And is it correct that in 2017 Yolo disagreed
22   with ORR's placement of seven minors based on a supposed
23   gang affiliation?  If you recall.
24   A     Can you say that again?
25   Q     In 2017 did Yolo disagree with ORR's placement
```

**Exhibit 151
Page 81**

1  of seven minors based on a supposed gang affiliation?

2   A     I do recall the topic of the gangs.  But you

3  would have to be more specific as far as what cases.

4   Q     Do you recall what happened to those minors?

5   A     During that period of time I know we did have an

6  influx of referrals that were sent to us.  But from what

7  I remember, the majority of those, I believe all of

8  them, they were transferred to a lower level of care.

9        Once we followed up with the reasons for, did

10  our assessment that we normally do with the youth here,

11  we did transition those youth down to a lower level of

12  care.

13   Q     Do you recall why Yolo disagreed with ORR's

14  placement of those minors?

15   A     From what I remember on that, if we're speaking

16  about the same cases, once the youth were in our care

17  and all this came to light and we started making contact

18  with law enforcement agencies, some of them were on

19  probation, some of them weren't on probation.  And when

20  we started getting more background information as far as

21  what occurred and what happened, we definitely pushed

22  back and started transitioning them.

23        We brought our concerns to ORR, to FFS, let them

24  know that they were -- they met criteria for lower level

25  of care and should be transitioned.

**Exhibit 151**
**Page 82**

1    Q       Do you recall why they did not meet the criteria

2    for Yolo's care?

3    A       Well, they did meet the criteria based on the

4    information we got from intakes on the referrals.  But

5    after we -- they arrived here and we had contact with

6    probation or law enforcement and either were given

7    minimal or some information on the background of it, we

8    determined there was no need to have them continue to be

9    in secure level of care.

10   Q       When Yolo decides not to accept a youth, who do

11   you communicate that to?

12   A       It depends on which way we're getting the

13   referral.  If it's through GDIT, we'll respond by email,

14   let them know why we feel we cannot accept a youth.

15           If it's through intakes, it will be just the

16   same thing; email letting them know why we're not

17   accepting a youth.

18   Q       Have you ever gotten pushback for that decision?

19   A       Yes.

20   Q       How did the pushback manifest itself?

21   A       They would ask if we can reconsider or provide

22   us additional information based on the reasoning for

23   requiring placement in secure.

24           And once we reviewed those and we still felt

25   that it was not appropriate or the appropriate placement

1   is we submit an Interpol check to the federal field

2   specialist and they run a check through the juvenile

3   coordinator with ICE with the country of origin to

4   determine if there's any record of that.

5          And, also, aside from that, we do have contact

6   with the family to try to get some background

7   information on it as well.

8   Q     Do you know if probable cause is required, that

9   the youth was involved in a gang or had a criminal

10  history, before approving their placement?

11  A     Now there's change in the policy that does list

12  that.

13  Q     Is that a change in ORR policy or your --

14  A     ORR policy.

15  Q     When did that change occur?

16  A     I don't know the exact date.  I can't remember.

17  Q     Do you know why it occurred?

18  A     I don't.  I'm not sure why.

19  Q     In your experience do youth usually

20  self-disclose gang involvement to people that they

21  trust?

22  A     Like to us here, or just in general?

23  Q     Just in general.

24  A     I can see it happening.  I can see them

25  disclosing information like that if they build that

1   trust with somebody.

2    Q     Do you know if youth often disclose gang

3   involvement to a psychologist or a clinician?

4    A      I know they've made disclosures to different

5   people.  Not just here.  Prior to here.  It could be

6   caseworkers.  It could be direct care staff.

7    Q     Do you know if youth are told the difference

8   between a treatment evaluation and a forensic evaluation

9   when they meet with the psychologist?

10   A      I'm not aware.

11   Q     Are you aware of any youth that have

12   self-disclosed crimes or gang involvement as part of a

13   treatment evaluation and then had a youth stepped up to

14   a more secured facility?

15   A      Not that I can remember.

16   Q     Are you aware of any firewall in the information

17   you disclose in a psych evaluation?

18   A      From another program or --

19   Q     Yes.  So if a youth discloses something in a

20   psychological evaluation, is there any wall in that

21   information getting to ORR or to GDIT?

22   A      Prior to being here or -- I'm trying to figure

23   out -- like are you talking about when they're here in

24   our care?

25   Q     When they're here, yes.

**Exhibit 151**
**Page 85**

1    own opinion on that.

2    Q      So it sounds like in your opinion -- and correct

3    me if I'm wrong -- that the vague criteria previously

4    led to an increased number of referrals to a secure

5    facility?

6    A      Yes.

7    Q      And do you recall any changes other than this

8    addition of probable cause that have reduced the number

9    of referrals?

10   A      No.  I mean, the MAP pretty much covered a lot

11   of this stuff.  That section of the MAP pretty much

12   broke down each criteria.  So I think it just kind of

13   explained more to these programs what would actually

14   meet the criteria and make them understand the reason

15   for our denial at times.

16   Q      In your view, under the vague standards before,

17   were a number of the referrals to the secure facility

18   inappropriate?

19   A      It's hard for me to say that.  I'm not sure.  It

20   would just depend on what case specifically you're

21   talking about.  I couldn't say yes or no to that.

22   Q      Have you ever felt like you had youth that ended

23   up being accepted in your care that aside from mental

24   health didn't end up meeting the criteria for being in a

25   secure facility?

1    A       I think a lot of questions were raised after the

2    fact, after the youth arrived and after we conducted our

3    assessments or at least intake.

4            We would question why this was, you know,

5    referred to us.  Maybe it could be in a staff secure.

6    Maybe it could have been mitigated at a lower level of

7    care.

8            But, again, that's what we would work with the

9    FFS to work on transitioning that youth back out to

10   another program.

11   Q       What do you mean mitigated at a lower level of

12   care?

13   A       So if it's something that was really probably

14   misrepresented or misdocumented, maybe they -- the issue

15   could have been resolved at a lower level of care.

16   Maybe the way it was documented made it seem more than

17   what it was I guess you would say.

18   Q       What do you mean by the issues documented?

19   A       So, for instance, I'm giving not any specific

20   example.

21   Q       Yes.

22   A       But if a youth is referred to us for an increase

23   in behavioral issues, so they're saying assaultive

24   behavior, he's engaging in destruction of property, and

25   then once we get more information once he's in our care

**Exhibit 151**
**Page 87**

1   and we start seeing that the property was very

2   minimal -- let's say like a pencil.  Maybe a picture was

3   knocked off the wall.  Maybe the assault was actually a

4   shoulder bump.  It's kind of like, okay, well, this

5   could have been still managed at a lower level.  But the

6   way it was documented, it presented it as being a more

7   larger scale problem when it probably wasn't.

8   Q      Do you think it would be more helpful to have

9   more information prior to making a determination of

10  whether to accept a youth into your care?

11         MR. MAY:  Objection.  Vague and ambiguous.

12  Calls for a hypothetical.

13  Q      BY MS. TARNEJA:  You can answer it.

14  A      Say the question one more time.

15  Q      Do you think that it would be helpful to have

16  more information on a youth before making the

17  determination of acceptance?

18  A      It's hard to say.  It's hard to say.  It depends

19  on the case.  It really does.  It's hard for me to say

20  yes or no to something like that.

21  Q      Do you think there's sufficient documentation of

22  the incidents occurring at lower level facilities in

23  order to make determinations as to step-ups?

24  A      Yeah, at times there is.  Sometimes the reason

25  for it is obvious based on all the information we have.

Exhibit 151
Page 88

1    Q       What factors would make the process go more

2   quickly?

3    A       Make it go more quickly?  The response.  The

4   sponsor responding in a timely manner.  Completing

5   everything that's required.  Submitting the paperwork.

6   That makes everything -- it expedites the whole process.

7    Q       How about the converse, what factors would make

8   the process go more slowly?

9    A       If the sponsor's not responsive to requests.  If

10  there's a delay with any other household member or maybe

11  just the sponsor's really not putting that effort to

12  kind of move things along.

13   Q       Have you ever experienced delays on ORR's end,

14  as opposed to the sponsor's end?

15   A       To delaying --

16   Q       In terms of release.

17   A       Oh, yeah.  I've seen that.

18   Q       So what would be examples of ORR delaying the

19  release?

20   A       What I've seen in the past has been delay in the

21  fingerprint results, delay in the child abuse and

22  neglect check results.  That has caused a significant --

23  fingerprint results.

24   Q       Anything else you can think of?

25   A       I know there was a period of time that ORR

**Exhibit 151**
**Page 89**

1               REPORTER'S CERTIFICATE

2          I, PEGGY A. PORTER, do hereby certify:

3      That the witness named in the foregoing deposition,

4                    JOSE CASTANEDA

5   was present at the time and place therein specified;

6          That the said proceeding was taken before me at

7   the said time and place, and was taken down in shorthand

8   writing by me;

9          That I am a Certified Shorthand Reporter of the

10  State of California;

11         That the said proceeding was thereafter, under

12  my direction, transcribed into computer-assisted

13  transcription; and that the foregoing transcript

14  constitutes a full, true, and correct report of the

15  proceedings which then and there took place; that I am a

16  disinterested person to the said action.

17         IN WITNESS WHEREOF, I have hereunto subscribed

18  my hand this 5th day of December 2019.

19

20  _____

          PEGGY A. PORTER, CSR 6086

21

22

23

24

25

# Exhibit 152

Exhibit 152
Page 91

Page 1

1

2                    IN THE UNITED STATES DISTRICT COURT

3                       CENTRAL DISTRICT OF CALIFORNIA

4                            WESTERN DIVISION

5      -----------------------------------

6      LUCAS R., et al.,

7                         Plaintiffs,

8        -vs-              Case No.:  2:18-CV-05741 DMG PLA

9      ALEX AZAR, Secretary of U.S.

10     Department of Health and Human

11     Services, et al.,

12                         Defendants.

13     -----------------------------------

14

15

16

17

18                    Deposition of CARINA CONTRERAS

19                       Harrisonburg, Virginia

20                     Thursday, January 23, 2020

21                            8:58 a.m.

22

23

24     Reported by:  Valarie L. S. May

25     Job No: 175374

**Exhibit 152**
**Page 92**

Page 124

1    a history, a delinquent history, and be in a staff

2    secure.

3         Q     Is there ever a circumstance -- is there

4    ever a circumstance where it would be appropriate to

5    step a child down from secure to a shelter placement?

6         A     Can you repeat that again?

7         Q     Would there ever be a circumstance where

8    it would be appropriate to step a child down from

9    secure to a shelter placement?

10        A     I don't recall a case like that, but I --

11   it would have to be determined by ORR whether that

12   would be appropriate.

13        Q     Okay.  Please look at the bullets below

14   the RTC placement.  Does a youth have to satisfy each

15   of those bullets in order to be placed in an RTC?

16        A     No.

17        Q     No.  Okay.

18              Only one -- sorry.  Let me start again.

19              Only three of the bullets on this entire

20   notice have been checked; is that right?

21        A     Correct.

22        Q     And all of those checked bullets are under

23   secure placement; right?

24        A     Correct.

25        Q     Does a youth have to satisfy each of the

**Exhibit 152**
**Page 93**

Page 174

1        Q     Okay.  And what is the difference between

2   a psychological and psychiatric evaluation?

3        A     I -- it's my understanding psychiatric

4   evaluations are regarding complaints and medication

5   management.  And then psychological are thorough

6   evaluations and identifying specific needs for the

7   minor.

8        Q     Okay.  Sorry.  Just to clarify, when you

9   were talking about psychiatric evaluations, did you

10  say that they involve complaints?

11       A     Yes.  Sorry.  The minors, if they have

12  complaints regarding sleeping issues or hallucinations

13  or et cetera.

14       Q     Okay.  Are psychological evaluations

15  required for every child at Shenandoah?

16       A     No.

17       Q     Okay.  Do you know approximately how long

18  it takes to complete a psychological evaluation?

19       A     Can you clarify from when to when?

20       Q     Sure.  So from the time that there is an

21  initial approval from the FFS to the time an

22  evaluation has been completed, what is that length of

23  time usually?

24       A     Thirty to 45 days.

25       Q     Okay.  Has that window of time ever been

Exhibit 152
Page 94

Page 175

1    longer than 45 days?

2        A    Yes.

3        Q    Okay.  Do you know why that is?

4        A    From what I understood, the psychologist

5    was out of the office and had been backed up with

6    multiple evaluations.  I can't think of any other

7    situations that it's happened, but that was one of

8    them.

9        Q    Okay.  And we talked about this a few

10   hours ago, but I just want to make sure I understand.

11            Does a psychological evaluation need to be

12   completed before a child can be stepped down or

13   reunified?

14       A    ORR determines whether that's necessary

15   for a step down or for reunification.

16       Q    Okay.  And can you remember whether a

17   psychological evaluation had to be completed before

18   step down?

19       A    Yes.

20       Q    Okay.  And can you remember whether a

21   psychological evaluation had to be completed before

22   reunification?

23       A    Yes.

24       Q    Do you know what a risk assessment is?

25       A    Can you explain specifically what a risk

**Exhibit 152**
**Page 95**

Page 242

1    COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2            I, Valarie Lee Schmit May,

3    Notary Public for the Commonwealth of Virginia at

4    Large, whose commission expires June 30, 2020, do

5    certify that the aforementioned appeared before me,

6    was sworn by me, and was thereupon examined by

7    counsel; and that the foregoing is a true, correct,

8    and full transcript of the testimony adduced.

9            I further certify that I am neither related

10   to nor otherwise associated with any counsel or

11   party to this proceeding, nor otherwise interested in

12   the event thereof.

13            IN WITNESS WHEREOF, I have hereunto set my

14   hand and affixed my notarial seal this 5th day of

15   February 2020.

16

17

18

19   _____
                *Valarie May*

20      Valarie Lee Schmit May, Notary Public, #242129

21            Commonwealth of Virginia at Large

22

23

24

25

**Exhibit 152
Page 96**

# Exhibit 153

Exhibit 153
Page 97

Confidential pursuant to the protective order

Page 1

1

2            IN THE UNITED STATES DISTRICT COURT

3              CENTRAL DISTRICT OF CALIFORNIA

4                   WESTERN DIVISION

5    ********************************************************

     LUCAS R., et al.,

6

                     Plaintiffs,

7           v.                        Case Number

                                      2:18-CV-05741 DMG PLA

8    ALEX AZAR, Secretary of U.S.

     Department of Health and Human

9    Services, et al.,

10                   Defendants.

     ********************************************************

11

12       Confidential pursuant to the protective order

13                   DEPOSITION OF

14                   MELISSA COOK

15               November 18, 2019

16               9:10 a.m.  -  5:06 p.m.

17               Harrisonburg, Virginia

18

19

20

21

22

23

24   REPORTED BY:  GWENDA E. APPLEGATE, RPR, CRR

25   Job #:171764

Exhibit 153
Page 98

Confidential pursuant to the protective order

Page 106

BY MS. PITTS:

    Q    Can you remind me when you complete this assessment form?

    A    When we meet with the youth the first time, and then we fill it out every 30 days.

    Q    Thank you.

    So after your initial meeting with a youth who is being added to your caseload, what happens next from your perspective as the clinician?

    A    What was that again?

    Q    After your initial meeting with the child, you've met with them, you've explained their rights, you've gone through this risk assessment and that meeting has concluded, what's the next step from your perspective as a clinician?

    A    We continue meeting with them.

    Q    How frequently do you meet with them?

    A    As needed.  We meet with them once a week and as needed.

    Q    Do you develop a treatment plan for the child?

    A    No, not a technical treatment plan.  We're not a treatment facility.

    Q    Do you create a service plan?

    A    No.

Exhibit 153
Page 99

Confidential pursuant to the protective order

Page 107

1    Q    Is there any written document that lays out

2  what services a child will receive?

3    A    We have the case review.

4    Q    And what information about services is in

5  the case review?

6    A    What type of services would you be

7  referring to?

8    Q    Your clinical services.

9    A    Clinical services?  Clinical services,

10  we're more of a triage, so we're not coming up with a

11  specific plan for each kid.  We're triaging and

12  helping them adjust and supporting them.  And we're

13  not a treatment facility.

14    Q    What do you mean by triage?

15    A    The kids who come to us usually could be

16  having behavior difficulties if they're coming

17  straight from a crisis situation or if they've been

18  incarcerated in the local setting or something.

19  There's -- there could be behavior issues, so we're

20  just dealing with what's there.  We're not doing deep

21  psychological fixing or counseling or, you know, if

22  they're borderline, we're not coming up with

23  treatment plans on treating them because we're not a

24  treatment facility.  We're just taking care of them

25  while they're there.  And it should be a short time.

Exhibit 153
Page 100

Confidential pursuant to the protective order

Page 294

1    COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2              I, Gwenda E. Applegate, Court Reporter,

3    Notary Public in and for the Commonwealth of Virginia

4    at Large, and whose commission expires November 30,

5    2021, do certify that the aforementioned appeared

6    before me, was sworn by me, and was thereupon examined

7    by counsel; and that the foregoing is a true, correct,

8    and full transcript of the testimony adduced.

9              I further certify that I am neither

10   related to nor associated with any counsel or party

11   to this proceeding, nor otherwise interested in the

12   event thereof.

13             Given under my hand and notarial seal at

14   Palmyra, Virginia, this 3rd day of December 2019.

15

16

17

18

19   *Gwenda E. Applegate*
     _____

20        Gwenda E. Applegate, Notary Public

21        Commonwealth of Virginia at Large

22        Notary Registration Number 115863

23

24

25

Exhibit 153
Page 101

# Exhibit 154

Exhibit 154
Page 102

Page 1

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                   WESTERN DIVISION

4    - - - - - - - - - - - - - - - x

5    LUCAS R., et al.,              :

6             Plaintiffs,           :

7    vs.                            : Case No.

8    ALEX AZAR, Secretary of U.S.   : 2:18-cv-05741 DMG PLA
     Department of Health and Human

9    Services, et al.,              :

10            Defendants.           :

11   - - - - - - - - - - - - - - - x

12

13

14         DEPOSITION OF JAMES DE LA CRUZ

15              Washington, D.C.

16              March 10, 2020

17

18

19

20

21

22   Reported by:

     Misty Klapper, RMR, CRR

23   Job No.: 176920

24

25

Exhibit 154
Page 103

Page 131

1   really small.

2            But what we do do is we put a lot of

3   care and time into making sure that those

4   facilities have visits by an FFS or a CFS.  We

5   also make sure that, you know, we have services

6   in place for -- for the kids.  Yeah.

7        Q.    Are there any cases where a child has

8   been stepped up from a shelter to an RTC based

9   on their mental health diagnosis?

10       A.    Yeah, I'm sure there has.  Yeah.

11       Q.    Even if that mental health diagnosis

12  does not involve danger to the child or others?

13       A.    So an RTC doesn't necessarily -- kids

14  don't necessarily have -- RTCs aren't designed

15  to exclusively deal with kids who have violent

16  or aggressive behavior.  I can think of one kid

17  who, for the most part, did well in a shelter.

18  And then one day he just, you know, escalated

19  his behavior.  He started swallowing batteries,

20  eating glass, that kind of thing.  So we

21  hospitalized him.  Even the hospital had a hard

22  time trying to make sure he wouldn't, you

23  know -- or in this case, there was a girl who

24  was, like, eating her mattresses and stuff like

25  that.

Exhibit 154
Page 104

Page 149

1   recall.

2         Q.    But you did at one time?

3         A.    I'm sure I have.

4         Q.    Are children ever stepped up to a

5   secure facility because they are a danger to

6   themselves?

7         A.    I'm not aware that that's happened

8   because they're exclusively a danger to

9   themselves.

10        Q.    Would they be stepped up to an RTC?

11        A.    Okay.  I have to give a little bit of

12  context to that.

13              So generally what happens is if a

14  child has been determined to be a danger to

15  themselves, usually what's going to happen is

16  that they're -- that's an acute type of

17  situation where that child is demonstrating at

18  that moment that they're a danger to themselves.

19              So what would happen is that child

20  would be referred from wherever they're placed

21  to an acute facility who could take care of that

22  acute need.  And then using the recommendation

23  from the psychiatrist or the psychologist who is

24  providing a service in that acute facility, then

25  we would make a determination about what's best

Exhibit 154
Page 105

1    for that particular child.

2              So generally I would say that childs

3    [sic] who are actually a danger to themselves

4    are going to remain in that acute facility until

5    they can be released and not be in imminent

6    danger to themselves.

7         Q.    And an acute facility is not the ORR

8    network of facilities that we've been

9    discussing, correct?

10        A.    Well --

11        Q.    What's an example of an acute

12   facility?

13        A.    An acute facility is a mental health

14   facility like a hospital.

15        Q.    Could it be an RTC?

16        A.    So there's a reason why I gave pause,

17   is because I'm trying to think of like Mercy

18   First.  You know, I think they have -- their own

19   facility is -- is an RTC and they're close by a

20   hospital setting where they could go into acute.

21   So that's the reason why I gave pause.  Because

22   sometimes there might be -- there might be two

23   separate facilities under the umbrella of the

24   same agency.

25        Q.    What happens when the mental or

Exhibit 154
Page 106

Page 257

1          CERTIFICATE OF NOTARY

2          I, MISTY KLAPPER, the officer before

3   whom the foregoing deposition was taken,

4   do hereby certify that the witness whose

5   testimony appears in the foregoing

6   deposition was duly sworn by me; that the

7   testimony of said witness was taken by me

8   in shorthand and thereafter reduced to

9   typewriting by me; that said deposition is

10  a true record of the testimony given by

11  said witness; that I am neither counsel

12  for, related to, nor employed by any of

13  the parties to the action in which this

14  deposition was taken; and, further, that I

15  am not a relative or employee of any

16  attorney or counsel employed by the

17  parties hereto, nor financially or

18  otherwise interested in the outcome of

19  this action.

20  Dated: 3-17-2020

21

                *Misty Klapper*
          _____

22        Misty Klapper

          Notary Public in and for

23        the District of Columbia

24

25

Exhibit 154
Page 107

# Exhibit 155

Exhibit 155
Page 108

Confidential

Page 1

```
 1              UNITED STATES DISTRICT COURT
             CENTRAL DISTRICT OF CALIFORNIA
 2                  WESTERN DIVISION


 3
    LUCAS R., et al.,          )
 4                             )
                               )
 5        Plaintiffs,          )
                               )    CASE NO.
 6   VS.                       )    2:18-cv-05741 DMG PLA
                               )
 7   ALEX AZAR, Secretary      )
     of U.S. Department of     )
 8   Health and Human          )
     Services, et al.,         )
 9                             )
          Defendants.          )
10

11

12

13                    DEPOSITION

14                        OF

15                   WHITNEY EICH

16      1700 7th Avenue, Seattle, Washington

17              FEBRUARY 27, 2020

18

19

20                   CONFIDENTIAL

21

22

23

24   Reported by:
     Monna J. Nickeson, CRR, CLR, RPR, CRR
25   Job No. 177834
```

Exhibit 155
Page 109

Confidential

Page 207

```
 1        A.    That's correct.

 2        Q.    Are those notes confidential?

 3        A.    It's my understanding that nothing

 4   in ORR is confidential.

 5        Q.    You mentioned earlier there was only

 6   one youth at YouthCare who had been on

 7   psychotropic meds; is that correct?

 8        A.    That's correct.

 9        Q.    And in that case, the youth

10   continued to be housed at YouthCare?

11        A.    That's correct.

12        Q.    And who was providing the diagnoses

13   and the prescription for those?

14        A.    I don't recall if in that case the

15   prescription was prescribed by the primary care

16   physician or a psychiatrist or psychologist.  I

17   can't recall, but a medical provider.

18        Q.    Do you know if that medical provider

19   obtained any consent from the youth's parents

20   or guardian?

21        A.    I don't recall.

22        Q.    So going back to the mental health

23   notes, I believe you said it is your

24   understanding that nothing in ORR is

25   confidential; is that correct?
```

**Exhibit 155**
**Page 110**

Confidential

```
 1              C E R T I F I C A T E

 2         STATE OF WASHINGTON )
                               )  ss.
 3         COUNTY OF BENTON    )

 4              This is to certify that I, Monna J.

 5    Nickeson, Certified Court Reporter in and for

 6    the State of Washington, residing at Richland,

 7    reported the within and foregoing deposition;

 8    said deposition being taken before me on the

 9    date herein set forth; that pursuant to RCW

10    5.28.010 the witness was first by me duly

11    sworn; that said examination was taken by me in

12    shorthand and thereafter under my supervision

13    transcribed, and that same is a full, true and

14    correct record of the testimony of said

15    witness, including all questions, answers and

16    objections, if any, of counsel, consisting of

17    231 pages.

18              I further certify that I am not a

19    relative or employee or attorney or counsel of

20    any of the parties, nor am I financially

21    interested in the outcome of the cause.

22              IN WITNESS WHEREOF I have set my

23    hand on March 10, 2020.

24    _____
                MONNA J. NICKESON, CLR, RPR, CRR
25              CCR NO. 3322
```

Exhibit 155
Page 111

# Exhibit 156

## <u>REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL</u>

**Exhibit 156**
**Page 112**

Page 1

1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                  WESTERN DIVISION

4

5
   LUCAS R., et al.,            )
6                               )
                  Plaintiffs    )
7                               )
            vs.                 ) Case 2:18-CV-
8                               ) 05741 DMG PLA
   ALEX AZAR, Secretary of      )
9  U.S. Department of Health    )
   And Human Services, et al., )
10                              )
                  Defendants.   )
11 --------------------------x

12

13                 CONFIDENTIAL

14    PURSUANT TO PROTECTIVE ORDER 101-19

15   DEPOSITION OF CAPTAIN MARIVIC FIELDS, MSW

16

17               Washington, D.C.

18          Monday, February 24, 2020

19

20

21

22 Reported by:

23 Lori J. Goodin, RPR, CLR, CRR,

24 RSA, California CSR #13959

25 JOB NO. 175375

**Exhibit 156
Page 113**

1    what the psychiatrist's recommendations were.

2              If they are no longer, let's say

3    they are no longer a risk or danger to self or

4    others is one of the criteria.

5              So, a lot of times there is also a

6    recommendation for a, by the psychiatrist to

7    step them down.

8         Q.    And, you concluded that not all of

9    the children that were currently placed at

10   Shiloh posed a risk to themselves or others.

11   Correct?

12        A.    At that time, yes, not all of them

13   were, based on psychiatrist notes.

14        Q.    And besides looking at the

15   psychiatrist notes, did you do any other

16   thinking or evaluation of that?

17        A.    No, that was it.

18        Q.    And based on that review, you

19   concluded that there were quite a few children

20   for whom the psychiatrist had recommended

21   stepdown or reunification, but who were still

22   at Shiloh; is that correct?

23        A.    Yes.

24        Q.    Did you look into why they were

25   still at Shiloh?

Confidential

1    A.    Yes.

2    Q.    And what did you find?

3    A.    I found that some of them have

4  already been referred for stepdown.  And they

5  are just awaiting placement.

6    Q.    And did you take any other steps to

7  try to assist with stepdown at that point?

8    A.    I did talk to the FFS at that

9  particular time, or supervisor who was in

10  charge of RTC.  And, I asked her the reasons

11  why the children, some of the children were

12  still in RTC.

13          And that is when I found out that

14  some of them were just awaiting placement.  And

15  then I did elevate it to also the supervisor,

16  their overall supervisor, to let him know if

17  they can assist with their transfer.

18    Q.    And do you know what happened next

19  with those children?

20    A.    I knew that they were eventually

21  stepped down or transferred.

22    Q.    And were some of those children

23  awaiting reunification with family?

24    A.    I believe so, yes.

25    Q.    Is it your understanding that

Exhibit 156
Page 115

Confidential

1    children at Shiloh often have challenges

2    stepping down to a less restrictive placement?

3         A.    Yes, there are some challenges.

4         Q.    And why is that?

5         A.    There are some shelters that, based

6    on their licensing, cannot receive children

7    that were just released from RTC placement or

8    psychiatric hospital, depending on the

9    licensing requirements.

10              So, it all depends on the state

11   licensing.

12        Q.    Are you aware of any other

13   challenges to stepdown besides licensing

14   requirements?

15        A.    From what I understand there are

16   some facilities or shelters that cannot meet

17   the complexity of the mental health issues of

18   the child.

19              I don't know the reasons why, but I

20   know that that was one of the reasons why a

21   child cannot be transferred to that particular

22   shelter is they cannot meet the mental health

23   needs.  Because they would still have ongoing

24   mental health needs.

25        Q.    And why do you think they would have

Exhibit 156
Page 116

Confidential

1    decision-making around whether a child should

2    be stepped up to a secure facility?

3        A.    Just consultation, if I'm even

4    consulted.

5        Q.    And are there categories of children

6    for whom your role is required before step-up

7    happens?

8        A.    No.

9        Q.    And did there used to be children

10   for whom your role was, your consultation was

11   required before a step-up decision was made?

12       A.    No.

13       Q.    And how often would you estimate you

14   are consulted on step-up to secure for children

15   who are in custody?

16       A.    Prior to separations, maybe two or

17   three times a year.

18       Q.    And currently?

19       A.    I haven't done anything currently.

20       Q.    Since you --

21       A.    Since I transitioned, yes.

22       Q.    Okay.  And was there a reason for

23   your visit to Shenandoah in November?

24       A.    We had a one of the members of

25   NCTSN.  We wanted her to visit some of the

1        while she is reading, we will reserve the

2        right to read and sign, the 30-day review.

3             MS. WELCH:  Great, thank you.

4    BY MS. WELCH:

5        Q.    Okay.  So, Captain Fields, are you

6    familiar with this document?

7        A.    Yes.

8        Q.    And, it is marked

9    Government 00124/713 and 14.  I'm talking about

10   Exhibit 184 now.

11            And looking at 124/714.

12       A.    Uh-huh.

13       Q.    Is that an e-mail from you to ████

14   ████

15       A.    Yes.

16       Q.    And, in the first paragraph you say,

17   "Please note that not all UACs are referred to

18   Shiloh or any RTC for reasons that they pose a

19   risk to self or others, and it shouldn't be

20   just for these reasons, but primarily for

21   safety reasons and these UACs require a higher

22   level of care."

23            Is that still your opinion?

24       A.    I would say yes.

25       Q.    And then the next sentence you say,

**Exhibit 156**
**Page 118**

1    "Some UACs were referred because of autism."

2    And then other issues.

3              Is it your understanding that some

4    UACs have been referred to Shiloh because of

5    autism?

6         A.    Not just for autism, but there is a

7    psychosis that is related, or associated or

8    another diagnosis, other than the autism.

9         Q.    So, it is your understanding that

10   for a child with autism to be referred to

11   Shiloh there needs to also be a presentation of

12   psychotic symptoms?

13        A.    Not just psychotic symptoms, but

14   mental health disorder, not necessarily

15   psychotic.

16        Q.    And then, looking at Exhibit 185,

17   the chart, did you prepare this chart?

18        A.    I don't know where the chart came

19   from.  But I added that column for my notes.

20        Q.    Which column was that?

21        A.    The one that is highlighted in

22   yellow.

23        Q.    That says ORR Notes Recommendations

24   Regarding Continued Placement?

25        A.    Yes.

Confidential

1       Q.      So, that column consists of your

2   notes; is that correct?

3       A.      Yes, uh-huh.

4       Q.      And then there is a final column

5   that is called Child Psychiatrist Comments and

6   Recommendations?

7       A.      Uh-huh.

8       Q.      Whose notes are those?

9       A.      Those are Dr. Sickle's.

10      Q.      And what role did he play in the

11  review of the children at Shiloh?

12      A.      For medication review, primarily for

13  medication review.  But, also appropriateness

14  for a referral to RTC.

15      Q.      And in your e-mail you say, "There

16  are a couple of cases where I am somewhat

17  concerned with the number of psychotropic

18  medications, but this will have to be reviewed

19  by a prescribing provider, i.e. psychiatrist or

20  psychiatric nurse practitioner who

21  understanding psychotropic medications."

22              So, did you write that before

23  Dr. Sickle did his review in this last column?

24      A.      Yes.

25      Q.      Okay.  In your e-mail you said, "One

**Exhibit 156**
**Page 120**

Confidential

1    case that I'm also concerned about is the

2    sibling of a UAC with Down's syndrome."

3         A.    Uh-huh.

4         Q.    "It looks like reunification is

5    being worked on, but the sibling does not

6    present any psychological concerns unless he is

7    in Shiloh to be with the sibling with Down's

8    syndrome."

9              Did you, and then you say, "I will

10   ask FFS for the reason for this UAC's

11   placement."

12             Do you recall this child?

13        A.    I do recall this child, yes.

14        Q.    And did you ask the FFS about the

15   reason for the child's placement at Shiloh?

16        A.    Yes, I did.

17        Q.    And what did you learn?

18        A.    I cannot remember the reasons that

19   were provided to me.

20        Q.    And then you say, "Another concern

21   is a UAC who has been at Shiloh for a year.

22   Perhaps this is warranted, but will ask FFS for

23   the reason for his extended length of stay in

24   RTC."  Do you recall that child?

25        A.    Yes, I do.

Page 192

1      Q.      And did you ask the FFS the reason

2   for the extended length of stay?

3      A.      Yes, I did.

4      Q.      What did you learn?

5      A.      I recall the FFS telling me that

6   this child was basically doing well in that

7   type of placement.

8              He has been referred to many other

9   placements in the past and it was all failed

10   placement.

11             So, this placement, after he had the

12   treatment and everything, he seems to be doing

13   very well, thriving with the structure and

14   everything that they decided to just keep him

15   there until, until, because I think they were

16   working on reunification.

17             So, it is better to just keep him

18   there and then reunify rather than having him

19   get tossed around in placement again.

20      Q.      And, do you know if it was ███████

21   ████ who filled out the rest of these columns in

22   or someone else?

23      A.      I would say it is someone else.

24      Q.      But you are not sure who?

25      A.      I'm not sure who.

Exhibit 156
Page 122

Confidential

```
1        Q.      And in terms of the current Shiloh
2   recommendation, and current medications and
3   authorization for psychotropic meds, that was
4   someone else that filled out the chart, not
5   you?
6        A.      Now that I am looking at it, I think
7   I was the one who put together all of this
8   different columns.
9        Q.      So --
10       A.      So, the white one, I didn't do that,
11  that must have came from an existing list.
12       Q.      Okay.
13       A.      And then when I reviewed, these are
14  the things that I looked for.
15       Q.      Okay.  So, the RTC recommendation
16  received.
17       A.      Yes.
18       Q.      Initial recommender for RTC
19  placement?
20       A.      Yes.
21       Q.      Reason for placement, initial psych
22  assessment at Shiloh, current Shiloh
23  recommendation, current medications,
24  authorization for psych meds and ORR notes, all
25  of those columns is you?
```

Exhibit 156
Page 123

Confidential

1   determine these types of cases early on so

2   there is no delay in the release.

3           But, sometimes you just can't help

4   it, because you find out about the disability

5   maybe towards the end of, you know, the latter

6   part of their care.

7       Q.   And for children whose disability is

8   based on their mental or behavioral needs, at

9   what point are they assessed for a disability?

10      A.   Children are always assessed.  I

11  mean, that is part of having a case manager and

12  clinician.

13          So, they are continually assessed

14  for any type of needs, whether it is mental

15  health, medical, or some behavioral needs.

16          So, like I said, some of the

17  programs are proactive in terms of determining

18  that this is something that would require a

19  home study based on these current needs.

20          And you may have some programs that

21  are probably, especially the new programs that

22  don't know all of the rules and may, may

23  stagger in terms of their ability to make that,

24  you know, assessment right away.

25      Q.   So, the programs have discretion

Confidential

1    over when they make that assessment about

2    disability?

3         A.    I would say yes.

4         Q.    We talked a little bit about the

5    policy on disability that is in the process of

6    being finalized.

7              As we sit here today, does ORR have

8    an assessment tool to determine whether a youth

9    in ORR custody meets the ADA definition of a

10   child with a disability?

11        A.    We do.  But it is not clear yet.

12        Q.    So, the assessment tool is part of

13   this process for the new policy on disability?

14        A.    Yes.  Uh-huh.

15        Q.    And, is there, besides consultation

16   with you, is there another tool out there that

17   is being used or piloted to assess disability?

18        A.    No.  There isn't.

19        Q.    We talked a little bit about

20   children placed on psychotropic medications

21   whose files you reviewed at Shiloh.

22        A.    Uh-huh.

23        Q.    So, I know you have some familiarity

24   with the fact that children are placed on

25   psychotropic meds in ORR custody.

**Exhibit 156**
**Page 125**

1    column there appears to be one child that the

2    reason for placement says Down Syndrome.

3         A.    Yes.

4         Q.    So, it your understanding that that

5    child was also hearing voices?

6         A.    I don't think so.

7         Q.    And then right underneath that,

8    "Sibling to UAC with down syndrome."

9         A.    Yes.

10        Q.    "No SIHI, worried about family and

11   anger issues in minor, has heart murmur."

12             Do you have any reason to believe

13   that that child was hearing voices or having

14   other auditory or visual hallucinations?

15        A.    I don't think it is for that

16   particular child.

17        Q.    And then we were just talking again

18   about the RTC policy.

19        A.    Uh-huh.

20        Q.    1.4.6.

21             So, previously when we were, when

22   you and I were talking about it and we were

23   looking at the four bullets --

24        A.    Uh-huh.

25        Q.    You testified that it was your

Exhibit 156
Page 126

Confidential

1  opinion that you would need to have two of

2  those bullets in order to be considered for RTC

3  placement.

4          But, you were just talking about it

5  with your counsel and you said one or more

6  bullets would be needed.

7          Can you clarify?

8      A.   Yes.  It is, it is a, it is one for

9  sure.  And sometimes they will have a

10  combination of two or three.  We don't know.

11          But, at least one of that criteria

12  has to be met.

13     Q.   And how would a program know that

14  given that there are no connectors between the

15  bullets?

16     A.   I have no idea.

17     Q.   Would you agree this policy is

18  pretty unclear?

19          MR. MOSS:  Objection, argumentative.

20  BY MS. WELCH:

21     Q.   I mean given that your testimony has

22  differed based on the meaning of the bullets,

23  does it seem clear to you?

24     A.   Perhaps it needs some clarification.

25          MS. WELCH:  Okay.  That is it for

Exhibit 156
Page 127

Confidential

1                C E R T I F I C A T E

2   UNITED STATES OF AMERICA   )
                               ) ss.:
3   DISTRICT OF COLUMBIA       )

4

5            I, Lori J. Goodin, a Notary Public

6   within and for the District of Columbia, do

7   hereby certify:

8            That CAPTAIN MARIVIC FIELDS, the

9   witness whose deposition is hereinbefore set

10  forth, was duly sworn by me and that such

11  deposition is a true record of the testimony

12  given by such witness.

13            I further certify that I am not

14  related to any of the parties to this action by

15  blood or marriage; and that I am in no way

16  interested in the outcome of this matter.

17            IN WITNESS WHEREOF, I have hereunto

18  set my hand this 5th day of March, 2020.

19                    *Lori Goodin*

20  _____

21            Lori J. Goodin, RPR, CLR, CRR

22            RSA, California CSR #13959

23

24  My Commission Expires:

25  May 14, 2021

**Exhibit 156**
**Page 128**

# Exhibit 157

Exhibit 157
Page 129

Confidential

```
 1              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
 2                   WESTERN DIVISION

 3

 4   LUCAS R., et al.,          )
                                )
 5             Plaintiffs,      )        CASE NO.
                                )
 6        vs.                   ) 2:18-CV-05741 DMG PLA
                                )
 7   ALEX AZAR, Secretary of    )
     U.S. Department of Health  )
 8   and Human Services, et al.,)
                                )
 9             Defendants.      )
     _____)
10

11

12         *** C O N F I D E N T I A L ***

13

14         DEPOSITION OF DAVID R. FINK

15              Atlanta, Georgia

16         Wednesday, February 12, 2020

17

18

19

20   Reported by:

21   Judith Leitz Moran

22   CCR, RPR, RSA

23   JOB NO.: 175989

24

25
```

Exhibit 157
Page 130

1    A    If a minor runs away, tries to run away

2 or has a very detailed plan and they find out they

3 have a very detailed plan of running away.

4    Q    And what is considered a detailed plan of

5 running away?

6    A    Writing maps, having phone calls that

7 they might hear of the kid talking about running

8 away.

9    Q    And what is a youth's ability to

10 challenge an allegation that they intended to

11 escape from a program or facility?

12    A    That would -- they would discuss it with

13 the case -- the team.  And then if they had an

14 issue, they, I guess, could file a grievance with

15 the program.

16    Q    And have you ever seen that before?  Has

17 that ever happened in your experience?

18    A    No.

19    Q    So the staff secure shelters are required

20 to provide services to control problem behavior and

21 prevent escape, but what are the specific services

22 that the staff secure programs provide that meet

23 that specific requirement?

24    A    So the staff secure, the physical plant,

25 like we had discussed earlier, is a smaller

Exhibit 157
Page 131

Confidential

1    environment so it's a smaller capacity and it's a

2    higher staff to child ratio.  So the staff to child

3    ratio is 1 to 4 which is very high.

4              And they also provide the clinical --

5    weekly clinical services in the two groups a week

6    for those children.

7              MS. SHUM:  Okay.  I'm going to have us

8    just take a look at a document that I'm going to

9    mark as Exhibit No. 171.

10             (Deposition Exhibit 171 marked.)

11   BY MS. SHUM:

12       Q    So just for the record, Exhibit 171 is

13   marked Government 214656.  That's the Bates number.

14             Just take a moment to kind of review this

15   email.

16       A    (Witness reviews document.)

17       Q    Okay.

18       A    Yep.

19       Q    All right.  I just have a couple of

20   questions about this email.

21             So this is an email that you sent to

22   Mr. De La Cruz and others dated July 1st, 2019,

23   correct?

24       A    Yes.

25       Q    It has the Subject line IYC Site Visit.

**Exhibit 157**
**Page 132**

Confidential

Page 96

1    more training of youth care workers in mental

2    health.  What is a youth care worker?

3         A    A youth care worker is the floor staff

4    that provides the line of sight supervision to the

5    children.

6         Q    So what types of interactions might youth

7    care workers have with the children that are placed

8    in the program?

9         A    They're the ones that have the most

10   contact with the children.

11        Q    And you observed in this email that the

12   staff were provided with very little training in

13   the area of mental health beyond what they received

14   during orientation or on an ad hoc basis; is that

15   correct?

16        A    Yes, for this particular facility, yes.

17        Q    Okay.  And what was the consequence of

18   that from your perspective?

19        A    Very limited.  It was basically reduction

20   in bed size, bed capacity.  So the project officer

21   reduced the number of beds they could have for

22   kids.

23        Q    So was the issue related to training in

24   the area of mental health, especially for youth

25   care workers who might have a great deal of

1   interaction with kids, was that concern -- do you

2   believe that that concern is unique to IYC or is

3   this an issue that you've actually observed at

4   other staff secure programs as well?

5        A    This is another -- this is an issue I've

6   observed at other staff secures as well?

7        Q    And can you just briefly identify the

8   other staff secure programs that you've observed

9   experiencing this issue as well?

10        A    Primarily with the behavior issues in

11   mental health like being able to manage behavior

12   issues and manage some of those mental healths.

13   Carson Home is one of those programs.  Fairfield is

14   one of those programs.  BCFS San Antonio.  And

15   Children's Village is staff secure.

16        Q    Thank you.

17             You also observed that like many

18   specialized programs, Heartland youth care workers

19   do not have a behavioral model to deal with the

20   behavioral needs of children.

21             Can you describe a little bit more about

22   what that means?

23        A    Yes.  So, and you'll see in Bullet 3 they

24   use a level and point system like we had talked

25   about earlier.

Confidential

Page 98

```
 1        Q    Yes.

 2        A    And my issue is that it -- based on my

 3   visits and interviews with the programs, this

 4   system is not working.

 5        Q    Would you say that that behavioral system

 6   is unique to staff secure programs or is that a

 7   model that's utilized at other facilities and

 8   programs as well?

 9        A    It's utilized with the staff secure

10   programs and the shelters, but the kids at shelter

11   it works fine for them.  They're much higher

12   functioning.

13        Q    You also stated in the email that IYC

14   staff had not received any gang training.  Sort of

15   what are the implications of that concern given the

16   population of ORR kids who might be placed in that

17   type of a program?

18        A    Recruitment, intimidating, inside slang

19   jargon, things like that.

20        Q    Sure.

21             And what is the implication of a failure

22   to provide sufficient training in gang or cartel

23   culture to line staff at a program?

24        A    To ensure that they're effectively

25   working with that youth to kind of work through
```

Confidential

Page 128

1   recommendation for a residential treatment program?

2        A    I don't know -- I don't know the answer

3   to that question.

4        Q    Okay.  What is your understanding of the

5   criteria that ORR uses in order to determine that a

6   child's needs cannot be managed in an outpatient

7   setting?

8        A    In an outpatient setting?

9        Q    Correct.

10       A    Most of the services that we provide are

11  in -- in the facility.  And, you know, if a child

12  has to be stabilized in a hospital, so I guess that

13  would be, you know, another thing.

14            If we -- if that doesn't work, then we

15  would -- and we get recommendations for a higher

16  level of care, then we'll -- we'll act on that

17  recommendation.

18       Q    So with respect to whether there's

19  compliance with placement criteria for a

20  residential treatment program, are you able to

21  describe the process that ORR uses to ensure that

22  those criteria are met?

23       A    Yes.  So in the notice of placement, it

24  looks at, you know, their mental health status and

25  danger to self or others, I believe.  And we

**Exhibit 157
Page 136**

Confidential

```
 1   would -- the program would let us know in their NOP

 2   if this child still meets criteria for an RTC.

 3        Q    Are you aware of how ORR evaluates

 4   whether a child has shown reasonable progress in

 5   addressing or alleviating their mental health

 6   symptoms?

 7        A    I'm not involved in that process.

 8        Q    Are you aware of how ORR determines

 9   whether a child might require therapeutic intensive

10   supervision as a result of their mental health

11   symptoms or diagnosis?

12        A    That would also be done by a psychologist

13   or psychiatrist.

14        Q    Does a psychologist or a physician

15   consider whether it's possible for a child to

16   participate in the daily schedule of activities at

17   a less restrictive placement with additional

18   services or accommodations?

19             So what I'm wondering is, to what extent,

20   if any, does a treatment recommendation have to

21   consider whether the treatment might be available

22   at a less restrictive level of program?

23        A    It would depend on the psychologist.  And

24   I wouldn't know exactly like whatever a

25   psychologist is saying.
```

Confidential

Page 148

```
 1        Q     What happens when a child with a physical
 2   disability might require more services or
 3   accommodations than are available in their current
 4   placement?
 5        A     I don't have a -- I don't have a -- I'm
 6   not involved in those kids.
 7        Q     Before a child is referred to an RTC,
 8   does ORR -- or do you as an FFS supervisor for
 9   special populations, do you consider whether the
10   child's currently receiving benefits from being at
11   the shelter level of placement?
12        A     So I don't review those necessarily
13   unless they come to me where they've exhausted all
14   the options.  So I'm not aware of, you know, when
15   they're requesting just RTC.
16        Q     By the time a case or a child is referred
17   to you, there's already been attempts at
18   recommendation --
19        A     Yes.
20        Q     -- that that child is, in fact, needing
21   that level of placement?
22        A     There already was, too.  It's just by the
23   time it comes to me, the programs in our network
24   have denied that child placement.
25        Q     And in terms of the out-of-network
```

Confidential

1              CERTIFICATE OF COURT REPORTER

2

3    STATE OF GEORGIA      )

4    COUNTY OF DEKALB      )

5

6         I hereby certify that the foregoing deposition
     was reported as stated in the caption, and the
7    questions and answers thereto were reduced to
     writing by me; that the total transcript pages 1
8    through 281 represent a true, correct, and complete
     transcript of the evidence given on February 12,
9    2020, by the witness, DAVID R. FINK, who was first
     duly sworn by me.

10

11        I further certify that I am not related to any
     of the parties to this action by blood or marriage;
12   and that I am in no way interested in the outcome
     of this matter.

13

14        I certify that I am not disqualified for a
     relationship of interest under O.C.G.A. Section
15   9-11-28(c); I am a Georgia Certified Court Reporter
     here as a representative of TSG Reporting; I was
16   contacted by TSG Reporting to provide court
     reporting services for this deposition; I will not
17   be taking this deposition under any contract that
     is prohibited by O.C.G.A. Sections 15-14-37(a) and
18   (b) or Article 7.C. of the Rules and Regulations of
     the Board of Court Reporting.

19

20        This 25th day of February 2020.

21

22        _____
          Judith L. Leitz Moran, B-2312
23        Georgia Certified Court Reporter

24

25

**Exhibit 157
Page 139**

# Exhibit 158

Exhibit 158
Page 140

Confidential

Page 1

1          UNITED STATES DISTRICT COURT
          CENTRAL DISTRICT OF CALIFORNIA
2               WESTERN DIVISION
3

    LUCAS R., et al.,          )
4                              )
                               )
5        Plaintiffs,           )
                               )    CASE NO.
6        vs.                   )    2:18-cv-05741 DMG PLA
                               )
7    ALEX AZAR, Secretary      )    CONFIDENTIAL
    of U.S. Department of      )
8    Health and Human          )
    Services, et al.,          )
9                              )
        Defendants.            )
10
11
12
13
14                    DEPOSITION
15                        OF
16                  YESENIA HEATH
17      1700 7th Avenue, Seattle, Washington
18              FEBRUARY 26, 2020
19
20
21                  CONFIDENTIAL
22
23
24    Reported by:
    Monna J. Nickeson, CRR, CLR, RPR, CRR
25    Job No. 176785

Exhibit 158
Page 141

Confidential

Page 103

1    a disability before the child is placed in a

2    facility?

3        A.    No, I don't know.

4        Q.    What happens when the mental and

5    behavioral services a child needs are not

6    available at the facility where the child is

7    housed?

8        A.    We try to locate a program that's

9    going to provide those needs.

10       Q.    And by program, do you mean a

11   program like a different facility within ORR?

12       A.    Yes.

13       Q.    So if the facility that the child is

14   placed at can't provide the services the child

15   needs, the child will be transferred to a

16   different facility?

17       A.    Yes.

18       Q.    What types of facilities are

19   children transferred to to receive the mental

20   or behavioral services they need?

21       A.    Therapeutic Staff Secure, RTC, out

22   of network, sometimes they go to a psychiatric

23   hospital, and they remain there until we find

24   the right place, to local psychiatric

25   hospitals.  Emergency medical mobile units come

Exhibit 158
Page 142

Confidential

Page 256

1      Q.    Does the psychological evaluation

2  increase the amount of time it takes for a

3  child to be released to a sponsor?

4      A.    No.

5      Q.    Why not?

6      A.    Because if the recommendation is

7  done on a timely basis, we are able to work

8  with the family to quickly identify services to

9  be able to release kid.  So the evaluation is a

10 tool for to us follow on what to do when the

11 kid gets released.

12     Q.    Could a psychological evaluation

13 increase the amount of time?

14     A.    If we're waiting for the evaluation

15 to get done, yes.

16     Q.    How long do psychological

17 evaluations take to get back?

18     A.    Sometimes up to 30 days.

19     Q.    Not longer than 30 days?

20     A.    I don't know.

21     Q.    Have you ever had an instance where

22 it's taken longer than 30 days to get a

23 psychological evaluation back?

24     A.    I've had instances where it's taken

25 longer to a get a minor scheduled to get a

Exhibit 158
Page 143

Confidential

Page 269

1      A.     Yes.

2      Q.     What mental health services do they

3  provide?

4      A.     They have a clinician that works

5  there, and they also can refer the child for

6  emergency.  So they can take the child to a

7  psychiatric emergency hospital.  And when

8  needed and identified that a child needs an

9  evaluation, they can schedule an appointment

10  and have the child seen for a psychiatric

11  evaluation.

12      Q.     How is that different from the

13  mental health services provided at Friends of

14  Youth and Therapeutic Staff Care?

15      A.     They have a therapist that does the

16  assessments, but they also have a psychiatrist

17  that comes to the facility every two weeks.

18      Q.     How is the therapist different from

19  the clinician at YouthCare?

20      A.     I believe she's licensed.

21      Q.     So she's a licensed therapist?

22      A.     Therapist, yes.

23      Q.     And the clinician at YouthCare is

24  not licensed?

25      A.     It's an MSW person in training.

Exhibit 158
Page 144

Confidential

Page 298

1                    C E R T I F I C A T E

2    STATE OF WASHINGTON            )

                                    )

3    COUNTY OF BENTON               )

4              I, Monna J. Nickeson, a Certified

5    Court Reporter within and for the State of

6    Washington, do hereby certify:

7              YESENIA HEATH, the witness whose

8    deposition is hereinbefore set forth, was duly

9    sworn by me and that such deposition is a true

10   record of the testimony given by such witness.

11             I further certify that I am not

12   related to any of the parties to this action by

13   blood or marriage; and that I am in no way

14   interested in the outcome of this matter.

15             IN WITNESS WHEREOF, I have hereunto

16   set my hand this day, March 11th, 2020.

17

18

19                    *Monna Nickeson*

20   _____

     MONNA J. NICKESON, CRR, CLR, RPR, CCR 3322

21

22

23

24

25

**Exhibit 158
Page 145**

# Exhibit 159

Exhibit 159
Page 146

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

LUCAS R., an individual,

                          No. 2:18-CV-05741-

        Plaintiff,            DMG-PLA

vs.

ALEX AZAR, et al.

        Defendants.

_____

CONFIDENTIAL

REMOTE DEPOSITION OF PROFESSOR JESSICA HELDMAN

JULY 13, 2020

9:05 a.m.

Diana Janniere, CSR-10034

Magna Legal Services

866-624-6221

www.MagnaLS.com



Exhibit 159
Page 147

Page 33

```
 1    principles to not hold a placement hearing -- forget

 2    24 hours -- immediately?

 3          Would there be any child principles that

 4    would say, some amount of time is perhaps useful, or

 5    the faster you can do it, the better?

 6    A     I don't -- there are child welfare

 7    principles that -- that support timely permanency and

 8    decision-making, but not at the exclusion of process

 9    and procedures established to support fundamental

10    rights.

11    Q     I guess -- I guess I am still looking for an

12    answer to the question, though.

13          So is it your testimony that the sooner the

14    hearing can happen, the better, without any limiting

15    principle than that?

16          So in other words, is a 24-hour hearing

17    better than 72?

18          And would there be any reasons why you

19    wouldn't want to do it that quickly, that you can

20    think of --

21    A     Can you clarify --

22    Q     -- the child welfare --

23    A     Okay.  So you are referencing child welfare,

24    and I note that my review also focuses on juvenile

25    justice process and particularly the circumstances in
```



**Exhibit 159**
**Page 148**

Page 185

1    risk to re-offend and the child is deemed a -- a risk

2    to the safety of others or himself, that would -- that

3    would be the -- the criteria that would be looked at

4    by a judge in determining placement for the youth.

5         Q    Do you think those criteria are appropriate?

6         A    I do think the criteria is appropriate, yes.

7              MR. SHIEH:  Jeff, can you turn to Page 7 of

8    the report, and can we zoom in on -- wait, that's not

9    Page 7.

10             (Discussion held off the record.)

11             MR. SHIEH:  Do you see the text "Trauma

12   Screening & Treatment," kind of the header?  Could we

13   just zoom in on that paragraph.

14   BY MR. SHIEH:

15        Q    You write there that there are "methods to

16   specifically screen and assess youth for trauma-based

17   concerns."

18             Can you describe what some of those

19   screening methods would entail?

20        A    Yes.  There are some screening instruments

21   that have been developed and some that have been

22   validated to be used with children in the juvenile

23   justice system or the child welfare system to identify

24   exposure to trauma.

25             There are also assessments that are used to



Exhibit 159
Page 149

Page 192

1                           EXAMINATION

2    BY MR. WHITE:

3        Q     So Professor Heldman, I hope I just have a

4    few questions.

5              You spoke about counsel in the juvenile

6    justice system being provided under the structure

7    based on In re Gault; is that correct?

8        A     Correct.

9        Q     And what about counsel in the child welfare

10   setting, do you think counsel in the child welfare

11   setting system is necessary?

12       A     Yes, I believe that counsel in the child

13   welfare system leads to better outcomes and better

14   protects the interests of children; and there is

15   research to that effect as well.

16             And, of course, --

17       Q     Does it -- go ahead.

18       A     -- the majority of states, as I note in my

19   report, does provide counsel to children in the child

20   welfare system.

21       Q     Does the utilization of counsel in that

22   system slow down placement?

23       A     No.  In fact, the research that I was noting

24   indicates that children -- children get to permanency

25   more quickly when counsel is involved.



**Exhibit 159**
**Page 150**

Page 194

```
 1                    REPORTER'S CERTIFICATION

 2

 3      I, Diana Janniere, a Certified Shorthand Reporter,

 4  in and for the State of California, do hereby certify:

 5

 6      That the foregoing witness was by me remotely duly

 7  sworn; that the remote deposition was then taken

 8  before me at the time and place herein set forth; that

 9  the remote testimony and remote proceedings were

10  reported stenographically by me and later transcribed

11  into typewriting under my direction; and that the

12  foregoing is a true record of the remote testimony and

13  remote proceedings taken at that time.

14

15      IN WITNESS WHEREOF, I subscribed my name

16  this 26th day of July, 2020.

17

18

19

20

21                  _____

22                  Diana Janniere, CSR No. 10034

23

24

25
```



**Exhibit 159**
**Page 151**

# Exhibit 160

Exhibit 160
Page 152

```
 1                UNITED STATES DISTRICT COURT

 2                CENTAL DISTRICT OF CALIFORNIA

 3                    WESTERN DIVISION

 4

 5   LUCAS R., et al.,            §
                                  §
 6             Plaintiffs,        §
                                  §
 7      VS.                       §      CIVIL ACTION NO.:
                                  §      2:18-cv-05741 DMG PLA
 8   ALEX AZAR, Secretary of      §
     U.S. Department of Health    §
 9   and Human Services, et al.,  §
                                  §
10             Defendants.        §

11

12

13

14             DEPOSITION OF ROCIO LAWRENCE

15                  Houston, Texas

16             Tuesday, September 22, 2020

17                     Volume 1

18                (REPORTED REMOTELY)

19

20

21

22

23      REPORTED BY:

24      Linda Russell, CSR

25      JOB NO:  184392
```

**Exhibit 160**
**Page 153**

1          A.  No, not if it was already submitted.

2    If the sponsor voices that they submitted these

3    documents and the previous case manager can

4    confirm that, then we would get the documents

5    from them.

6          Q.  Have there been instances when

7    there's been some issue and Shiloh hasn't been

8    able to get prior documents and needs to request

9    them again?

10         A.  There's usually no issues with

11   obtaining documents straight from another case

12   manager if they were actually submitted by the

13   sponsor.

14         Q.  Are you involved in coordinating home

15   studies?

16         A.  The case managers are the ones that

17   submit the requests for home studies.

18         Q.  Do you review requests for home

19   studies before they are submitted?

20         A.  Usually I would review what we call

21   the release request, which is where we're asking

22   for a home study to be done.

23         Q.  Do you ever disagree with a case

24   manager's decision to request a home study?

25         A.  No.

**Exhibit 160**
**Page 154**

1   which a child was reunified with a sponsor but

2   the case manager did not provide a recommendation

3   for reunification?

4          A.   I have not seen that in my time at

5   Shiloh.

6          Q.   Can a child be released to a sponsor

7   if Dr. Ruiz does not explicitly recommend in

8   favor that that child be released to the sponsor?

9          A.   It's -- I'm trying to -- if the minor

10  has a sponsor, and as a treatment team, including

11  the psychiatrist, feels like we've helped them as

12  much as we could, and, again, there is a sponsor

13  and everything has been done per policy, we do

14  usually have that recommendation from -- from the

15  doctor.

16          However, the doctor can also

17  recommend, you know, if something is pending on

18  the case, if the doctor feels Shiloh is no longer

19  needed or no longer has least restrictive

20  setting, then we would transfer the minor.

21          So we do always take Dr. Ruiz's

22  recommendation to then be able to give our

23  recommendation and talk to the clinician and what

24  does she think.

25          So it is -- it is a process that, you

1    know, for the most part usually goes that way.

2          Q.  Has a child ever been released to a

3    sponsor if Dr. Ruiz has provided a negative

4    recommendation in terms of release?

5          A.  At my time at Shiloh, that has not

6    occurred.

7          Q.  Does Dr. Ruiz make recommendations

8    about whether a child can be released from Shiloh

9    in general or does Dr. Ruiz provide specific

10   recommendations about specific sponsors?

11         A.  Can you clarify the question?

12         Q.  Does Dr. Ruiz make recommendations as

13   to whether a child should be released to a

14   specific sponsor or does Dr. Ruiz just make

15   general recommendations as to whether a child is

16   ready to be released from Shiloh generally?

17         A.  So the recommendations we would get

18   from Dr. Ruiz would be ready to be released to

19   sponsor or really released to community, or if

20   the minor doesn't have a sponsor, it would be

21   release to a least-restrictive setting.

22             So he doesn't make recommendations on

23   specific sponsors, it's just a general

24   recommendation.  And basically the point is they

25   no longer need to be at Shiloh.

Exhibit 160
Page 156

1                    CERTIFICATE

2

    STATE OF TEXAS    )
3                     )
    COUNTY OF HARRIS  )

4

5         I, LINDA RUSSELL, a Certified Court

6    Reporter within and for the State of Texas, do

7    hereby certify:

8         That ROCIO LAWRENCE, the witness whose

9    deposition is hereinbefore set forth, was duly

10   sworn by me and that such deposition is a true

11   record of the testimony given by such witness.

12        I certify that review of the transcript by

13   the deponent was requested.

14        I further certify that I am not related to

15   any of the parties to this action by blood or

16   marriage; and that I am in no way interested in

17   the outcome of this matter.

18        IN WITNESS WHEREOF, I have hereunto set my

19   hand this 2nd day of October, 2020.

20

21   _____
     LINDA RUSSELL, Texas CSR #2965
22   Expiration Date:  4/30/2021

23   TSG Reporting, Inc.
     Firm Registration No. 615
24   228 E. 45th Street, Suite 810
     New York, New York 10017

25

1            ROCIO LAWRENCE - 10/1/2020

2            UNITED STATES DISTRICT COURT

3            CENTRAL DISTRICT OF CALIFORNIA

4                 WESTERN DIVISION

5            Case No. 2:18-cv-05741 DMG PLA

6     ---------------------------------------x

7     LUCAS R., et al.,

8                        Plaintiffs,

9          V.

10    ALEX AZAR, Secretary of U.S. Department

11    Of Health and Human services, et al.,

12                       Defendants.

13    ---------------------------------------x

14

15

16               ORAL DEPOSITION OF

17               ROCIO LAWRENCE

18          (Via Remote Teleconference)

19           Thursday, October 1, 2020

20                  VOLUME 2

21

22

23    Reported by:

24    KIM A. McCANN, RMR, CRR, CSR

25    JOB NO. 184610

**Exhibit 160**
**Page 158**

1          ROCIO LAWRENCE - 10/1/2020

2    the question.

3          Q.  In the RTC placement recommendation

4    letters that you have seen, have you ever seen

5    the language that "a child is a danger to

6    themselves or others"?

7          A.  I can't confirm whether I've seen

8    that, because, again, I also haven't seen -- I

9    haven't seen every recommendation letter.  But I

10   can't recall if the ones I've -- I have seen said

11   that.

12         Q.  Are those recommendation letters

13   included in each child's file?

14         A.  Yes.

15         Q.  Do you recall whether any of the RTC

16   placement recommendations that you have seen did

17   not include the language "danger to themselves or

18   others"?

19         A.  I -- yeah, I can't confirm.

20              MS. SHEEDY:  Crystal?

21              MS. ADAMS:  Yes.

22              MS. SHEEDY:  Do you mind if we take a

23   quick break when you're done with this line of

24   questioning, the RTC questions or whatever, if we

25   could take a five- or ten-minute break.

1          ROCIO LAWRENCE - 10/1/2020

2               MS. ADAMS:  Absolutely.  Let's just

3     go ahead and take it here.  That's fine with me.

4               MS. SHEEDY:  Okay.  Thank you.

5               MS. ADAMS:  Yeah.  So do you want ten

6     minutes?

7               MS. SHEEDY:  Yeah, ten minutes would

8     be perfect.

9               MS. ADAMS:  Great.  Let's turn back

10    at ten minutes.  Thanks so much.

11               (Break from 10:43 a.m. to 10:55 a.m.)

12          Q.  (BY MS. ADAMS)  So before we took a

13    break, we were talking about the RTC

14    recommendation placement letters to be made so

15    that a child can be referred to Shiloh.  And we

16    were talking about whether any of those letters

17    ever explicitly state that a child is a danger to

18    themselves or others.

19               I'm wondering if Shiloh requires

20    those letters to contain any language stating

21    that the child is a danger to themselves or

22    others?

23          A.  I don't know if Shiloh requires any

24    certain language to be in the letters other than

25    a RTC placement is recommended.

1             ROCIO LAWRENCE - 10/1/2020

2        Q.  Do you know whether the psychiatrist

3   or the psychologist that make RTC placement

4   recommendations are required to review ORR's RTC

5   placement criteria before they make a

6   recommendation for RTC placement?

7        A.  I wouldn't be able to answer that

8   question.

9        Q.  Do you know whether Shiloh requires

10  that the recommending psychiatrist or

11  psychologist has reviewed the ORR's placement

12  criteria?

13       A.  Yeah, I wouldn't be able to answer

14  that question.

15       Q.  Do you think it is important for

16  recommending psychiatrists and psychologists to

17  understand ORR's placement criteria before they

18  make a recommendation for RTC placement?

19       A.  Can you re -- can you clarify your

20  question?

21       Q.  I'm wondering if you believe it's

22  important for the psychiatrists and psychologists

23  who recommend RTC placement to have an

24  understanding of ORR's RTC placement criteria?

25       A.  I don't -- you know, we follow ORR

1              ROCIO LAWRENCE - 10/1/2020

2     pursuant to the -- the subpoena in this case?

3          A.   I'm not aware.

4          Q.   If the psychiatric note attached to

5     this email was not produced in this case, do you

6     know why it would not have been produced?

7              MS. SHEEDY:   She was not involved in

8     this.   We worked directly with Scott Ruiz to

9     obtain these documents.

10         Q.   (BY MS. ADAMS) When case managers

11    complete the Notice of Placement forms, do the

12    case managers always include all of the

13    information that Dr. Ruiz provides to them in the

14    Notice of Placement form itself?

15         A.   Our guidelines were -- we tried to

16    just state what the recommendation is for Shiloh,

17    GDIT gives us their recommendation, and FFS gives

18    us their recommendation, and that's what's

19    documented.

20         Q.   Let's go ahead and look at another

21    exhibit.   This one will be marked 338.

22              (Exhibit 338 was marked.)

23         Q.   And this one will be a Notice of

24    Placement document.

25         A.   Okay.

1          ROCIO LAWRENCE - 10/1/2020

2          Q.  Let's go ahead and turn to the second

3     page, and that includes the Bates number ending

4     in 307.  There is a paragraph in the bottom half

5     of the page with the heading "FFS Decision."

6          A.  Uh-huh.

7          Q.  And beneath that heading is the date

8     08/07/18; correct?

9          A.  Yes.

10         Q.  Were you the lead case manager for

11    Shiloh in August 2018?

12         A.  Yes.

13         Q.  Looking a few lines above that

14    paragraph is a paragraph with the heading "Care

15    Provider Recommendation."  The sentence following

16    that heading states:  "At this time, Shiloh

17    continues to recommend current placement as

18    supported by the minor's psychiatrist."

19              Did I read that correctly?

20         A.  Yes.

21         Q.  Let's go ahead and turn to the third

22    page.  This page is titled "Summary Notes: Thirty

23    -- Thirty Day Placement Review.  And the date on

24    the top right of the page is 08/02/18; is that

25    correct?

Exhibit 160
Page 163

1                ROCIO LAWRENCE - 10/1/2020

2          A.  Yes.

3          Q.  In the middle of the page, there is

4     the heading "Summary of Assessments/Evidence."

5              And there's no evidence listed under

6     that heading; is that correct?

7          A.  Right.

8          Q.  Is the explanation for the child's

9     continued placement that is provided in these

10    documents similar to explanations that are

11    provided in notices of placement and summary

12    notes for all children at Shiloh?

13         A.  Every notice of placement would be

14    different.  Every case is different.  Every, you

15    know, kiddo is different.  So not every notice of

16    placement would be the same.

17         Q.  Are there notices of placement or

18    summary notes that you have seen that has

19    provided more detail than this one?

20         A.  Sure.  That -- that's adequate if the

21    minor has received SIR's for that reporting

22    period.

23         Q.  Is a case manager required to provide

24    evidence in the Summary Notes section for every

25    child at Shiloh?

1            ROCIO LAWRENCE - 10/1/2020

2          A.  They're required to list what is

3    acting, which is in the SIR's.

4          Q.  Is there any other type of evidence

5    that the case manager might note as justification

6    for continued placement at Shiloh?

7          A.  Not in that area.

8          Q.  Is there anyplace within the Summary

9    Notes section of the document where the case

10   manager would provide more information about the

11   continued placement of a child at Shiloh?

12         A.  If -- they would document it wherever

13   it's appropriate.

14         Q.  Is there a spot within this summary

15   note that you think it would be appropriate to

16   document any additional information?

17         A.  Sure.  I mean, if the case requires

18   that, depending on, you know, what -- if there

19   are any SIR's, any IR's that -- sure, yes.

20         Q.  In the Care Provider Recommendation

21   section of the Summary Notes, have you ever seen

22   any more detail provided regarding why the

23   psychiatrist recommends continued placement?

24         A.  Have I ever seen it, yes.

25         Q.  What is an example of the additional

**Exhibit 160
Page 165**

1              ROCIO LAWRENCE - 10/1/2020

2     detail that would be provided to explain the

3     psychiatrist's justification for continued

4     placement at Shiloh?

5              A.  Can you repeat your question?

6              Q.  Sure.  We were talking about whether

7     you've ever seen any additional detail provided

8     in the Care Provider Recommendation of the

9     Summary Notes document.  And I'm wondering what

10    examples you can provide of more detail regarding

11    the psychiatrist's recommendation for continued

12    placement at Shiloh?

13             A.  If he's still recommending -- if

14    there's been a recent medication change and he

15    wants to kind of keep an eye on if the change is

16    -- how that medication change is going, that

17    could be an example.

18             Q.  Are case managers required to provide

19    more detail than is currently listed in the Care

20    Provider Recommendation portion of the Summary

21    Notes in this example?

22             A.  We have not been provided that

23    guidance from ORR.

24             Q.  Were you supervising the case manager

25    Brenda Banda who completed these documents in

**Exhibit 160**
**Page 166**

1          ROCIO LAWRENCE - 10/1/2020

2          Q.  Have you observed children exhibiting

3    self-injurious behaviors because they are tired

4    of being at Shiloh?

5          A.  No.

6          Q.  Once a child has been approved for

7    step down, how long can it take before the child

8    is actually transferred to a different facility?

9          A.  Once the minor's -- you know, again,

10   it's a process -- a transfer request is

11   submitted, our third-party reviewer sends out

12   that information to other facilities.  Once the

13   minor is admitted to another shelter, just a

14   couple of days just planning the logistics, just

15   the flight would be the only thing that would --

16   that would hold it back.  But that would just

17   take a couple of days.

18          Q.  Have there ever been cases where a

19   child has remained at Shiloh after being approved

20   or recommended for step down because they have

21   not yet been accepted by a less restrictive

22   placement?

23          A.  Yes.

24          Q.  What is the longest amount of time a

25   child has remained at Shiloh pending step down

1              ROCIO LAWRENCE - 10/1/2020

2    for that reason?

3         A.  The longest that -- and what I can

4    remember, the longest a minor has stayed at

5    Shiloh after their recommendation was probably

6    about six months.

7         Q.  Have there been cases --

8         A.  And that would be due to -- I was

9    just going to say, Shiloh continues their effort,

10   and it's just up to another shelter accepting

11   them.

12        Q.  Have there been times when a less

13   restrictive placement has declined to accept a

14   child for step down?

15        A.  Sure.

16        Q.  Has a less restrictive placement ever

17   refused to admit a child because they felt ill

18   equipped to care for the child's mental health

19   ability?

20        A.  Sure.

21        Q.  Do you believe some facilities are

22   reluctant to accept children with a history of

23   RTC placement because the children have elevated

24   mental health needs?

25        A.  I mean, I don't know -- you know, it

**Exhibit 160**
**Page 168**

 1                ROCIO LAWRENCE - 10/1/2020

 2     can be different reasons.  I mean, sometimes it's

 3     staffing issues like -- you know, but I think the

 4     main thing -- in regards to the mental health,

 5     which would be if they would have difficulty in

 6     obtaining a psychiatrist for medication

 7     management.

 8          Q.  Turning back to reunification for a

 9     moment.  In determining whether to recommend

10     release from Shiloh, has Dr. Ruiz -- has Dr. Ruiz

11     ever discussed with you the benefits that the

12     child would obtain from reunification?

13          A.  Can you repeat your question?

14          Q.  When Dr. Ruiz is communicating with

15     you about whether a child should be released from

16     Shiloh, has Dr. Ruiz ever discussed with you the

17     benefit that the child would obtain from

18     reunification?

19          A.  Yeah, sure.

20          Q.  What benefits have been discussed?

21          A.  Maybe having more, you know,

22     face-to-face therapy, having that as more of an

23     option.  Again, we deal with kiddos that have a

24     mental health issue, so having -- you know,

25     there's a sponsor, Shiloh does prevet -- provide

1              ROCIO LAWRENCE - 10/1/2020

2    kids we will be submitting for home study, and

3    the other kiddo is pending further medical

4    clearance.

5              Q.  How long -- so starting with the

6    first child who will be submitted for a home

7    study.  How long has that child been at Shiloh,

8    approximately?

9              A.  Maybe about 35 days.

10             Q.  Why has the home study not been

11   submitted yet?

12             A.  The sponsor recently moved.

13             Q.  Do you know how recently?

14             A.  I believe on the 27th.

15             Q.  For the other child, you said that

16   there was medical clearance pending; is that

17   correct?

18             A.  Yes.  Yes.

19             Q.  What kind of medical clearance?

20             A.  There's a psychological evaluation

21   that we're pending a report for.

22             Q.  How long has that child been at

23   Shiloh?

24             A.  Maybe about three months.

25             Q.  And when was that psychological

**Exhibit 160**
**Page 170**

1          ROCIO LAWRENCE - 10/1/2020

2    evaluation requested?

3          A.  A couple of weeks ago.  It's actually

4    an outside provider that's doing it, but we --

5    we're just putting in the report now.

6          Q.  Do all children at Shiloh go through

7    psych evals?

8          A.  No.

9          Q.  How is it decided that a child should

10   go through a psych eval?

11         A.  ORR requested this one.

12         Q.  Do you know why?

13         A.  The case is very complicated.

14   There's a lot of issues, a lot of mental health

15   concerns with the minor.

16         Q.  When did ORR decide to request the

17   psych eval?

18         A.  While the minor was at her previous

19   placement.

20         Q.  And when was the psych eval

21   conducted?

22         A.  While she was at our placement.

23         Q.  And do you recall how much time

24   lapsed between the psych eval taking place until

25   now?

**Exhibit 160**
**Page 171**

1               ROCIO LAWRENCE - 10/1/2020

2          A.  From it takes place until now?

3          Q.  Yes.

4          A.  So Shiloh has -- in the last couple

5     of weeks, she's had a couple of sessions.  It's

6     only been a couple of weeks now since -- since

7     it's been initiated.

8          Q.  Do you know when the report will be

9     complete?

10         A.  There's no estimated time.  We're

11    hoping soon.

12         Q.  Is anyone at Shiloh qualified to

13    complete psych evals?

14         A.  So we -- if the psych evaluation is

15    asked by ORR, historically we've usually gone

16    with an outside provider.

17         Q.  Why?

18         A.  I don't know why, actually.  We've

19    just always done it that -- that way.

20         Q.  When you make the request for the

21    psych eval, how long does it take for the psych

22    eval -- sorry.  Let me say that again.

23              When Shiloh submits the request for

24    the psych eval, how long does it take for the

25    administrator of the psych eval to accept?

**Exhibit 160**
**Page 172**

1               ROCIO LAWRENCE - 10/1/2020

2    do lower level placement, just regular shelter,

3    and in this case, because he is eligible for URM,

4    we would do both.

5          Q.  Have children ever been denied

6    placement at URM?

7          A.  Yes.

8          Q.  Do you know why?

9          A.  The only time I remember them being

10   denied is because URM stated they wanted to see

11   how the minor would do in a more community-based

12   environment before they are accepted to more of a

13   long-term placement.

14         Q.  Did the concern that the URM raised

15   relate to mental health needs at all?

16         A.  I'm not sure if it was just mental

17   health or just going straight from an RTC to a

18   URM.  Some URM's use public schools, so they

19   wanted to see more how the minor would do in a

20   shelter placement before, again, placing them in

21   a long-term -- longer term placement at URM.

22         Q.  And my last question is do you know

23   of long-term foster care placements that are

24   available for children without sponsors?

25         A.  Yes.  So I know the long-term foster

1           ROCIO LAWRENCE - 10/1/2020

2    care placements are out there.  Usually our kids

3    from Shiloh will be accepted to a regular

4    shelter, and then they would proceed to long-term

5    foster care once they're at -- at a shelter.  It

6    usually does not happen, again, within straight

7    from RTC to long-term foster care.

8           Q.  Is that a requirement, that a child

9    transfer to a shelter before entering long-term

10   foster care?

11          A.  No.  Again, it would all just depend

12   on what -- the feedback we get from URM.

13          Q.  For the long-term faster care

14   placement, for example?

15          A.  Exactly.

16          Q.  Has the long-term foster care

17   placement requested that a child be in a shelter

18   setting before transferring to long-term foster

19   care?

20          A.  It has happened in the past.  It

21   hasn't happened in the last couple of years, but

22   it has occurred.  And, again, it's kids moving on

23   to an RTC, again, for longer placement, they'd

24   like to see -- make sure that the minor does

25   well, kind of take it slow kind of thing, see how

**Exhibit 160**
**Page 174**

1              ROCIO LAWRENCE - 10/1/2020

2    he does in a lower level placement like a

3    shelter.

4         Q.  Okay.

5              MS. ADAMS:  That concludes my

6    questioning.  I'll just say before passing over

7    to the witness's counsel, Plaintiffs reserve the

8    right to reconvene the deposition pending the

9    resolution of the dispute regarding the document

10   production pursuant to the Plaintiff's subpoena.

11             Thank you so much for being here and

12   lasting the entire time.  I really appreciate it.

13   I'll go ahead and pass to counsel now, if there

14   are any additional questions.

15             MR. MOLINA:  If the line is quiet,

16   should I interpret that you are passing it to me,

17   or will witness' counsel actually be weighing in?

18             MS. SHEEDY:  We won't be asking any

19   questions.

20             THE REPORTER:  Thank you.

21             MS. ADAMS:  I believe Mr. Molina

22   might have some questions.

23             MR. MOLINA:  That is correct.  I know

24   we've kept Ms. Lawrence a long time.  I'd like to

25   just ask her a couple of questions just to

1          ROCIO LAWRENCE - 10/1/2020

2            C E R T I F I C A T E

3          I, Kim A. McCann, RMR, CRR, CSR in and

4    for the State of Texas, do hereby certify:

5          That ROCIO LAWRENCE, the witness

6    whose deposition is hereinbefore set forth, was

7    duly sworn by me and that such deposition is a

8    true record of the testimony given by such

9    witness;

10          That pursuant to FRCP Rule 30,

11   signature of the witness was not requested by the

12   witness or other party before the conclusion of

13   the deposition;

14          I further certify that I am not

15   related to any of the parties to this action by

16   blood or marriage; and that I am in no way

17   interested in the outcome of this matter.

18          IN WITNESS WHEREOF, I have hereunto

19   set my hand this October 15, 2020.

20

21

22   _____

23     Kim A. McCann, RMR, CRR, CSR

24

25

**Exhibit 160**
**Page 176**

# Exhibit 161

Exhibit 161
Page 177

Confidential

1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                 WESTERN DIVISION

4

5     _____
                                    )
6     LUCAS R., et al.,             )
                                    )
7           Plaintiffs,             )
                                    )  Case No.
8     vs.                           )
                                    )  2:18-cv-05741
9     ALEX AZAR, Secretary of U.S.  )  DMG-PLA
      Department of Health and      )
10    Human Services, et al.,       )
                                    )
11          Defendants.             )
      _____)

12

13

14                 CONFIDENTIAL

15

16      DEPOSITION OF SHAANAN MEYERSTEIN, M.D.

17                 Washington, D.C.

18                 February 11, 2020

19

20

21

22

23

24    Reported by:  John L. Harmonson, RPR

25    Job No. 176784

Confidential

1   those situations.

2        Q.    We talked about this a little bit

3   earlier, but are you aware of any role that the

4   health unit has in decisions to step a child up

5   to a more restrictive setting?

6              MR. MOLINA:  Objection; asked and

7         answered.

8              THE WITNESS:  Sorry?

9              MR. MOLINA:  I said I object, it's

10        asked and answered.  You can answer.  I just

11        have to record that.

12             THE WITNESS:  Okay.

13             MR. MOLINA:  It's a worthless

14        objection, but I have to show you I'm paying

15        attention.

16             MS. PITTS:  He can object --

17             THE WITNESS:  Yeah, I know he can

18        object.  I just didn't understand what the

19        objection was.

20             MR. MOLINA:  Asked and answered.

21             THE WITNESS:  So you asked currently?

22   BY MS. PITTS:

23        Q.    Yes.  Does the health unit have a

24   role?

25        A.    I don't think so.  We don't have a

Exhibit 161
Page 179

Confidential

Page 254

```
 1    child psychiatrist.
 2          Q.    Do you know whether children who are
 3    being stepped up to a more restrictive placement
 4    have an opportunity to contest that step-up?
 5          A.    I have no visibility on that.
 6          Q.    Do you know whether children's
 7    families have the opportunity to contest a
 8    step-up?
 9          A.    I have no visibility on that.
10          Q.    Do you know whether the step-up
11    process -- never mind.  Strike that.
12                Do you know whether a child's
13    behavioral or mental health, intellectual or
14    developmental disability would affect a decision
15    to step them up to a more restrictive facility?
16          A.    I can't speak to that.
17          Q.    Do you know whether the step-up
18    procedure looks the same or different for
19    children with disabilities as opposed to children
20    without disabilities?
21          A.    On the medical side, I would be
22    involved if I was requested to try to
23    accommodate.  So, you know, we had a child I
24    remember in a staff secure who had a urologic
25    issue and I made sure that his urologic issue was
```

Exhibit 161
Page 180

Confidential

1    restrictive setting, in my understanding.

2         Q.    And to your knowledge, does the health

3    unit have a role in deciding whether a child will

4    be stepped down?

5         A.    I don't think so.  Again, it might

6    have been different with Dr. Sickel, but he

7    likely would have followed recommendations by the

8    medical professional on the ground treating the

9    child.

10        Q.    Do you know who decides how long a

11   child who is placed in an RTC should stay there?

12        A.    I do not know that.

13        Q.    Do you know whether when a child is

14   being considered to be stepped down, children

15   have the opportunity to explain why they should

16   be stepped down?

17        A.    I don't know.

18        Q.    Do you know whether families have an

19   opportunity to weigh in?

20        A.    I don't know.

21        Q.    Do you know whether there are any

22   specific requirements that have to be met for

23   children to be stepped down from an RTC?

24        A.    I don't know.

25        Q.    Do you know whether a step down from

**Exhibit 161**
**Page 181**

1    an RTC requires a sign-off from a psychiatrist?

2         A.    I don't know.

3         Q.    Do you know whether children are ever

4    required to stay in an RTC for a specific length

5    of time before they can be considered to be

6    stepped down?

7         A.    I don't know.

8         Q.    Do you know whether it's more

9    difficult to find a shelter placement for a child

10   stepping down from an RTC than it is for a child

11   who has never been in a restrictive setting?

12        A.    I don't know.

13        Q.    And do you know whether a child who

14   has been in an RTC is eligible for placement in

15   long-term foster care?

16        A.    No idea.

17        Q.    Do you know what a URM program is?

18        A.    Yes.

19        Q.    Can you tell me what it is?

20        A.    My understanding is that it's a

21   program where children who meet certain criteria

22   based on their asylum status, something as it

23   relates to their legal situation, if they apply

24   before the age of 16 I think, then they're placed

25   in this longer term care where they actually are

Confidential

1    the medical decision-making by the doctor or the

2    surgeon.

3         Q.    Are you aware of any situations where

4    a child's release to a sponsor has been delayed

5    because of delays in obtaining a psychological

6    evaluation?

7         A.    One more time.

8         Q.    Are you aware of any situations where

9    a child's release to a sponsor has been delayed

10   because of delays in obtaining a psychological

11   evaluation?

12        A.    I would probably say yes.  It's

13   somewhat circuitous thinking, but if a child is

14   presenting with a developmental delay that

15   seemingly seems to be a disability but we're not

16   exactly sure, you have to request a psychological

17   evaluation to document that the child is

18   developmentally delayed to know what the

19   accommodations are which might delay

20   reunification.  So yes.  Those are the scenarios

21   that I recall.

22        Q.    Okay.  That's more about the number of

23   steps than difficulty in accessing a provider to

24   complete the evaluation?

25        A.    Well, no.  It's all going to be

Exhibit 161
Page 183

Confidential

1             C E R T I F I C A T E

2

3   DISTRICT OF COLUMBIA

4             I, JOHN L. HARMONSON, a Notary Public

5   within and for the District of Columbia, do

6   hereby certify:

7             That SHAANAN MEYERSTEIN, M.D., the

8   witness whose deposition is hereinbefore set

9   forth, was duly sworn or affirmed by me and that

10  such deposition is a true record of the testimony

11  given by such witness.

12            That if the foregoing pertains to a

13  federal case, before completion of the

14  proceedings, review and signature of the

15  transcript [X] was [ ] was not requested.

16            I further certify that I am not related

17  to any of the parties to this action by blood or

18  marriage; and that I am in no way interested in

19  the outcome of this matter.

20            IN WITNESS WHEREOF, I have hereunto set

21  my hand this 24th day of February, 2020.

22

23  _____

24            JOHN L. HARMONSON, RPR
              My commission expires: 11/14/20

25

Exhibit 161
Page 184

# Exhibit 162

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 162**
**Page 185**

CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT

2       IN THE CENTRAL DISTRICT OF CALIFORNIA

3

4    ------------------------------x

5    LUCAS R., et al

6              Plaintiffs,        CASE NO:

7         v.                      2:18-CV-05741-

8    ALEX AZAR, SECRETARY OF U.S.    DMGPLA

9    DEPARTMENT OF HEALTH AND HUMAN

10   SERVICES, INC.

11             Defendants.

12   ------------------------------x

13

14              CONFIDENTIAL

15     TELEPHONIC DEPOSITION OF NIDIA MURRAY

16              Houston, Texas

17              9:14 a.m.

18

19

20

21

22

23   Reported by:

24   Paula J. Eliopoulos

25   JOB NO. 170999

Exhibit 162
Page 186

CONFIDENTIAL

Page 151

1    one.

2           So, yes, they should be following

3    policy.  But I do not know what other programs

4    have done or other case coordinators have done.

5           Q.    Sure.

6           Can a child be placed at Shiloh

7    without a psychologist or psychiatric

8    recommendation?

9           A.    According to policy, no.

10          Q.    Are you aware of any situation where a

11   child was placed at Shiloh without a psychologist

12   or psychiatrist recommendation?

13          A.    I was aware.  One child comes to mind.

14   I do not know if this is the only one.  But one

15   child comes to mind.  That was elevated to ORR

16   headquarters for additional guidance.  And my

17   understanding is that that minor was placed

18   without such recommendation, but had to be seen by

19   a psychiatrist within a very short period of time

20   after.

21          Q.    Did you say he was placed at ORR

22   headquarters?

23          A.    No, no, no.  He was -- the case was

24   elevated --

25          Q.    Okay.

Exhibit 162
Page 187

CONFIDENTIAL

Page 152

1      A.      -- or was evaluated by ORR

2  headquarters prior to.

3      Q.      Okay.  Are you aware, besides this

4  child, any other children who were placed in RTC

5  without a psychologist or psychiatrist

6  recommendation?

7      A.      There were some that were placed with

8  a nurse practitioner recommendation.  But at the

9  time that was in policy; that a nurse practitioner

10  could also be the one to provide that

11  recommendation -- I'm sorry.  Mental health nurse

12  practitioner.

13      Q.      When you say it was "in policy," do

14  you mean ORR policy?

15      A.      Yes.

16      Q.      Is that still the policy today?

17      A.      I'm taking a bit to answer just

18  because I need to look at the manual of

19  procedures.  But I don't believe so.  I don't

20  remember seeing it.

21          I would have to go back and check, so

22  I'm going to say I'm not sure.

23      Q.      Okay.  When was the most recent time

24  that you can remember where a child was placed at

25  RTC without a psychologist or psychiatrist

Exhibit 162
Page 188

CONFIDENTIAL

Page 153

1    recommendation?

2        A.    That one I'm talking about, that I

3    just mentioned.  And -- maybe two years ago.

4    Maybe.  I'm not sure.

5              MS. CHAPUIS:  It's about time for a

6        short break.

7              MR. SCAIFE:  Sure.  We can take a

8        break.

9              Let's go off the record.

10             (Recess, 1:51 p.m. to 2:04 p.m.)

11             CONTINUED DIRECT EXAMINATION

12   BY MR. SCAIFE:

13       Q.    In the process of transferring a kid

14   or a child to a new facility, the transferring

15   facility sends information or a packet of

16   information to the receiving facility's case

17   coordinator.  Right?

18       A.    Yes.

19       Q.    What -- and I think earlier you

20   referred to this information as a packet or packet

21   of information.  What -- can you describe what's

22   in that packet of information?

23       A.    Yes.  And again, it's listed in the

24   policy -- not that policy, but the manual

25   procedures.  But things like case reviews.

Exhibit 162
Page 189

CONFIDENTIAL

Page 199

1   needed.  It's just an example.  But that

2   addendum -- I mean, a home study worker might be

3   able to do that in about a week.  It just depends.

4        Q.     Does Shiloh require a child to be

5   stabilized before he or she can be released?

6        A.     My understanding, yes, that the

7   psychiatrist makes a recommendation for

8   reunification once the minor is no longer a danger

9   to self or others.

10        Q.     The case manager and the case

11   coordinator cannot make recommendation regarding

12   release until the child is stabilized?

13        A.     I don't know about -- I don't know

14   about Shiloh case management, what they can do.  I

15   know a case coordinator might be able to provide a

16   recommendation.  But I don't know that I would

17   provide a recommendation to reunify the minor if I

18   knew that the minor was a danger to the community

19   or self or others.

20        Q.     So you personally would not -- would

21   likely not recommend a release if the child had

22   not been stabilized yet, according --

23        A.     Not if the psychiatrist is saying the

24   child is a danger to self.  That would be a safety

25   concern.

Exhibit 162
Page 190

CONFIDENTIAL

Page 200

1      Q.      To your knowledge, what is the longest

2   a child has remained in ORR custody so that he or

3   she may be stabilized?

4      A.      Stabilized?  Do you mean remain in

5   Shiloh's care?  Or in RTC's care?

6      Q.      Just ORR's care.

7      A.      I -- I don't know.  I mean, I guess it

8   would depend on the psychiatrist.

9      Q.      What about Shiloh's care?

10     A.      A long time.

11     Q.      More than a year?

12     A.      Yes.

13     Q.      More than two years?

14     A.      I don't know if it reached the

15  two-year mark.

16     Q.      Would you say more than 18 months?

17     A.      I would have to look in the portal.

18  But it's very specific.

19     Q.      Do you remember the child's name that

20  you're thinking of?

21     A.      There's one that sticks with me.

22  Carrie Lonetti.  I can't remember...

23     Q.      Is she still in ORR's custody?

24     A.      Yes.

25     Q.      And where is she placed at right now?

Exhibit 162
Page 191

CONFIDENTIAL

Page 223

1   not delay any of those steps that you just

2   mentioned?

3       A.      That continues.  Absolutely.

4       Q.      Would a step up to any other facility

5   delay the completion of those steps that you just

6   referenced?

7       A.      Not that I would think, because it

8   should be continuous.  I mean, the information is

9   in the UAC portal.  And the next program should

10  pick up where the other left off.

11      Q.      Generally, how long or how much time

12  does a home study delay the reunification process?

13          MS. CHAPUIS:  Objection to form.

14      A.      I would have to say that, when it

15  delays the reunification process, it becomes the

16  reunification process.

17          So when a minor meets criteria for a

18  home study, then a home study is part of their

19  reunification process.

20          However, I believe policy says that a

21  home study should take approximately ten business

22  days.

23      Q.      (By Mr. Scaife) In your experience, do

24  case managers sometimes take longer than you think

25  necessary to request a home study?

Exhibit 162
Page 192

CONFIDENTIAL

Page 224

1      A.     Yes.

2      Q.     And why is that?  Why do you say that?

3      A.     Because there have been times when I,

4   as a case coordinator, have had to ask why has

5   this case not been submitted for a home study?

6   And it could be that they were pending something

7   that wasn't necessarily needed or that you can

8   easily say let's go ahead and make that

9   recommendation so that the home study can be

10  worked on.

11         But -- I can't think of a specific

12  example.  But, yes, I know that I've asked that

13  question.

14     Q.     And so when you asked that question,

15  was it after -- well, let me back up.

16         Who makes the decision a home study is

17  needed?

18     A.     As always, ORR is the final word.

19     Q.     Who at ORR makes that decision?

20     A.     The FFS.

21     Q.     So when the FFS makes the decision a

22  home study is needed, is it then up to the case

23  manager to execute the home study or to make sure

24  it happens?

25     A.     So the case manager would provide a

Exhibit 162
Page 193

CONFIDENTIAL

Page 264

1     Q.      (By Mr. Scaife) On the first page of

2     Exhibit 164, who is the child that this Service

3     Plan refers to?

4     A.      ████████  ████████  ████████  ████████

5     Q.      And can you turn to the last page in

6     this document?

7     A.      Yes.

8     Q.      In about the middle of the page, do

9     you see where it says "Discharge Plan"?

10    A.      Yes.

11    Q.      And I'm just going to read the first

12    sentence.

13    A.      Okay.

14    Q.      "At this time, ████████  does not have

15    a viable sponsor.  She stated she would like to

16    reunify with her maternal grandfather in

17    California but previous shelter stated they

18    discontinued working with him."

19            Do you see where that is?

20    A.      Yes.

21    Q.      What does it mean for a shelter to

22    discontinue working with a sponsor?

23    A.      Again, this is a different shelter,

24    but -- so I'm not sure what they meant by this.

25    But it typically means that no more efforts to

**Exhibit 162**
**Page 194**

CONFIDENTIAL

Page 265

1   reunify with the sponsor are being made.  They're

2   no longer considered a sponsor.

3        Q.     All right.  Does that mean that the

4   sponsor has -- or that there's been a decision not

5   to release the child to the sponsor?

6        A.     No.  They did not deny.

7        Q.     So it just means that the sponsor is

8   no longer being considered as a potential sponsor.

9   Is that correct?

10       A.     According this sentence.  Yes.

11       Q.     Are you aware of any other cases where

12  the decision was made to discontinue working with

13  the potential sponsor?

14       A.     I've seen some shelters do that.

15  But -- it's not something that I would see at

16  Shiloh.

17       Q.     How often would you say this happens?

18       A.     I don't know.  But it's not something

19  that I typically see.

20       Q.     Does a sponsor have any options to

21  appeal the decision to discontinue working with

22  him or her?

23       A.     I don't -- no.  Since it is not a

24  denial.

25       Q.     Can anyone contest the decision to

Exhibit 162
Page 195

CONFIDENTIAL

Page 287

1                          CERTIFICATE

2     STATE OF NEW JERSEY    )

3     COUNTY OF MORRIS       )

4          I, JANET HAMILTON, a Registered

5     Professional Reporter and New Jersey Notary

6     Public, do hereby certify that:

7          I joined this deposition telephonically

8     after the lunch recess, at 12:41 p.m. CST, and

9     ended my reporting at 5:45 p.m. CST, at which time

10    the deposition was concluded.

11         I further certify that I am not related

12    to any of the parties to this action by blood or

13    marriage and that I am in no way interested in the

14    outcome of this matter.

15         In witness whereof, I have hereunto set

16    my hand this 2nd day of January, 2020.

17

18

19         _____

           JANET HALL, RPR, CRC, FPR, NJCCR

20         NJCCR License 30X100240200

           Expires 6/30/2020

21

22

23

24

25

Exhibit 162
Page 196

# Exhibit 163

Exhibit 163
Page 197

1            UNITED STATES DISTRICT COURT

2            CENTAL DISTRICT OF CALIFORNIA

3                WESTERN DIVISION

4

5   LUCAS R., et al.,           §
                                §
6            Plaintiffs,        §
                                §
7      VS.                      §      CIVIL ACTION NO.:
                                §   2:18-cv-05741 DMG PLA
8   ALEX AZAR, Secretary of     §
    U.S. Department of Health   §
9   and Human Services, et al., §
                                §
10           Defendants.        §

11

12

13

14            DEPOSITION OF DR. JAVIER RUIZ

15                 Houston, Texas

16            Friday, September 25, 2020

17               (REPORTED REMOTELY)

18

19

20

21

22

23    REPORTED BY:

24    Linda Russell, CSR

25    JOB NO:  184383

**Exhibit 163**
**Page 198**

1    his social living, the family history, genetic

2    history.  So as you're doing the interview you're

3    going in your mind through all the processes of

4    the patient's suicidality and what led to it.

5            Q.  And with regard to that issue of

6    dangerousness, are there particular scales that

7    you use for that?

8            A.  There are suicide scales, but it's

9    like I've been doing this for 32 years so it's

10   already ingrained in my mind about what to look

11   for.

12           Q.  And you're the one that's doing that

13   dangerousness assessment for Shiloh?

14           A.  Right.  And we do it every week.

15           Q.  And does ORR require you to

16   explicitly state that the child is a danger to

17   themselves or others in your RTC recommendation?

18           A.  Okay.  Repeat that, please.

19           Q.  Is it a requirement that you state

20   that the child is a danger to themselves or

21   others in order for you to accept that child into

22   the Shiloh program?

23           A.  No, no, because they could be coming

24   in for a different reason other than suicidality,

25   for example, psychoses or aggression.  But I

1   think one of the biggest complaints is when a

2   patient is suicidal they'd have to be admitted to

3   acute care because of that, and normally that's

4   when we'll get them.

5          Q.  And is this -- the dangerousness

6   assessment, is it conducted at regular intervals

7   for a child?

8          A.  Weekly by meeting them when the

9   therapist meets with them.  And it's documented,

10  or Douglas will let me know that the therapist

11  had a session and expressed suicidality.  But

12  mainly it's something that's being monitored

13  continuously.

14         Q.  And is that something that's required

15  by ORR policy, as far as you know?

16         A.  No, it's just common practice that

17  that's -- if that's the symptom that granted you

18  into the facility, then that's something that has

19  to be monitored.

20         Q.  Is that something that you have to

21  communicate to ORR, that there was this

22  assessment done at X interval and this is what

23  was found?

24         A.  I don't communicate that to them.

25  It's in my notes.  And that would go into the

1   portal.

2        Q.  So in order to be admitted to Shiloh,

3   does it -- does there have to be a finding that

4   the child is either a danger to themselves or

5   others?

6        MS. VAUGHAN:  Objection.  Asked and

7   answered.

8        A.  Yeah, a danger to themself or others,

9   aggression, psychotic, complications of medical

10  issues with psychiatric issues.  There is an

11  array, but one of the most common ones is

12  psychoses, aggression, self-injury, and danger to

13  others.

14  BY MS. WELCH:

15       Q.  And to keep a child at Shiloh at

16  these assessments that you're saying happen

17  weekly, does there have to be a determination

18  each time that the child continues to be a danger

19  to themselves or others for the child to stay at

20  Shiloh?

21       A.  The -- well, if that's the main

22  component of what made them come in, then

23  definitely we will assess it.  And if it's

24  evident, we have the documents, of course, and

25  that signifies that the patient is not ready to

1  program before coming to us, the -- it would have

2  been more productive to complete treatment there

3  at the medical center than to transfer this

4  patient to family members that they wouldn't be

5  able to carry out.  And those are things that

6  would weigh on the decision.

7            From their symptoms that brought them

8  in, like depression or suicidality, they were

9  better, but then we have this big medical issue

10  about, you know, getting treatment and -- but

11  what we tend to do, it's like we refer, you know,

12  we try to get the most acute care done and then

13  immediately, you know, look at resources in their

14  own community to be able to follow up with these

15  procedures, for example, like gynecological

16  follow-up or anything that they would need,

17  neurological follow-up.

18       Q.  And we were talking earlier about

19  subacute to residential in a one-week period of

20  good behavior.  If a child is -- if they're in

21  residential and, you know, as you said you're

22  kind of looking towards discharge planning for

23  that child, is there -- is the child at Shiloh

24  required to demonstrate a certain period of good

25  behavior before they can be stepped down to

1   another placement?

2        A.  Yes.  The -- for example, if they are

3   in subacute and they're doing well, they're not

4   suicidal, but they're still having depressive

5   symptoms they can transfer to the residential.

6   We're still doing the stabilization but they

7   don't require that acuteness of, you know, once

8   one is being supervised all the time, and then so

9   we immediately transition to a lower care.  So

10  we're still working with them but we're already

11  informing ORR that they are close to discharge.

12       Q.  And in terms of, you know, for the

13  children that are in residential, do you want to

14  see a certain period of time where they are

15  exhibiting good behavior before you would

16  recommend step down?

17       A.  Yes, definitely.  Normally it would

18  be like two weeks, three weeks.  But the beauty

19  about the residential treatment is that in

20  working through the social issues and working on,

21  you know, stabilization of the signs and

22  symptoms, but that's when you're acutely working

23  with where are you going to go, who are you going

24  to go with.  So the indication of a step down,

25  it's clear, you know, that we're looking at

**Exhibit 163
Page 203**

1   discharge soon.

2        Q.  And was there ever a time in the past

3   where there was a policy that a child needed to

4   maintain 30 days of good behavior before you

5   would recommend step down?

6        A.  No, no, no.

7        Q.  And is --

8        A.  No, that would be based on clinical

9   information and how they're doing.

10       Q.  And is that step down determination,

11  is that ultimately made by you?

12       A.  Yes, uh-huh.

13       Q.  Are you familiar with the 30-day

14  placement reviews of ORR?

15       A.  Not really.  I think I've probably

16  heard of it, but not -- not really.

17       Q.  So you're not -- you don't know what

18  a 30-day placement review is?

19       A.  No, no.

20       Q.  And when you -- when you make a

21  determination that a child is ready to step down

22  from Shiloh, what -- what are the steps that you

23  follow?  How is that communicated to ORR?

24       A.  I mean, it's documented in my notes.

25  And then in the treatment team it's discussed

**Exhibit 163**
**Page 204**

1    that the staff notices that the growth has been

2    achieved, from a psychopharmacological standpoint

3    the patient is stable, the symptoms are -- the

4    frequency of the symptoms are diminished and

5    that's when you start making decisions about

6    transitioning to a lower level of care.

7           Q.  And when you're considering making

8    these recommendations for transfer to a lower

9    level of care are you -- are you basing your part

10   on the clinical interview that you're doing --

11          A.  Right, yes.

12          Q.  And are there other -- are there

13   scales or scores that other members of the team

14   are using to make their, you know, kind of

15   recommendation about whether a child is ready for

16   step down?

17          A.  It's a clinical determination that

18   it's made there at the treatment team meetings.

19          Q.  Is there -- are there -- I mean, are

20   you familiar with GAS scores?

21          A.  Yes.

22          Q.  And who on staff would be scaling

23   using that assessment?

24          A.  (Raising hand.)

25          Q.  You would?

Exhibit 163
Page 205

1        A.  Yes.

2        Q.  So is that -- so is GAS scores part

3   of your process in terms of making a

4   determination that a child is ready for

5   discharge?

6        A.  It was with -- it was, but with the

7   changing of DSM-5, I mean, the GAS scores are

8   really not utilized as often as with the DSM-IV.

9   But, you know, the goal assessment function is

10  important, yes.

11       Q.  So now that the DSM-5 doesn't use

12  those scores, that's not something that you would

13  regularly use?

14       A.  Right.  We assess the patient as a

15  whole every time, so it's like -- so it gives us

16  where they are and where they're functioning.

17       Q.  And are you required to make a new

18  finding every 30 days that an ORR child is a

19  danger to themselves or others?

20       A.  It's done whenever we meet with the

21  patient, but it's not a requirement from ORR that

22  something like that has to be found.

23       Q.  And we talked about this a little bit

24  before, but you're -- so you're involved

25  obviously in making the recommendation for step

**Exhibit 163**
**Page 206**

1  down, but in terms of where the child goes next,

2  do you have a role in that decision?

3        A.  No, no.  We have -- we don't.  It's

4  like once we're talking about transitioning to

5  the community and the process is going form acute

6  to residential, then ORR will determine where the

7  patient would go afterwards.

8        Q.  And what if there's a child who is,

9  you know, kind of getting ready to go to a

10  sponsor, does Shiloh have any role in

11  determining, you know, whether and how that

12  transition happens?

13        A.  You know, we -- normally if we

14  have -- because that's what happens, we have an

15  identified sponsor, then the role is to contact

16  the sponsor, making sure first that the family is

17  okay with this and they have consented for that.

18              Then we try to meet with the family

19  verbally, if they're local at times inviting them

20  to Shiloh so we can see the interactions.  So

21  it's a very -- we're going to transition a child

22  to a new environment, so we have to make sure

23  that, you know, that the process goes well.  And

24  normally that's through like family therapy and

25  talking with the families that are to take the

Exhibit 163
Page 207

1    patient.

2           Q.   And when you have a family member --

3    I mean, obviously most of these sponsors are

4    family members, if not all of them.  When you

5    have family members who are, you know, kind of

6    close to being approved, moving their way through

7    the approval process that ORR has, are you ever

8    involving those family members in informed

9    consent in any way for medication?

10          A.   Right, they have to be informed.  If

11   we know that they are the prospective family to

12   take care of the child, they have to know about

13   the medications and then we have to inform them

14   about, okay, what happens with that child, like,

15   for example, the child needs further care, needs

16   to see a therapist, you know, needs to see a

17   psychiatrist, having to take care of the

18   medications.

19               So I think that's one of the biggest

20   roles that we have to play.  And sadly enough, at

21   times it's when the family who is a potential

22   say, "No, no, no, this is probably too much for

23   me," and chooses to withdraw from being -- from

24   taking the patient.

25          Q.   And so until that child is actually

**Exhibit 163**
**Page 208**

1   with the sponsor, I mean, that's not the person

2   that you're seeking informed consent from, right?

3   Because the process we talked about all involved

4   the parent or guardian, so you're just talking

5   about informing that sponsor of the need but not

6   technically obtaining informed consent from that

7   sponsor, correct?

8         A.  Not at all.  Right.  It's just

9   informing them about what the needs are and what

10  would be their role and following up with that.

11        Q.  In your experience -- I mean, we've

12  kind of already talked about this but we might

13  need to break it down kind of in terms of timing

14  for you to be able to answer, but once -- once

15  Shiloh has made its determination and approved a

16  child to step down, how long does it generally

17  take before the child is actually transferred to

18  a different facility?

19        A.  All right.  It could be --

20        MS. VAUGHAN:  Objection.  Calls for

21  speculation.

22        A.  It is speculative, but normally it

23  would be from one week to three weeks or more,

24  depending on what the situation is.

25  BY MS. WELCH:

1          Q.  And if we're talking about a child

2    who has an approved sponsor, how long would you

3    estimate it would take that child to be

4    transferred once they've been approved for step

5    down?

6          A.  Right.  Those are the beautiful cases

7    that normally within less than a week they're

8    gone, you know, because they have a sponsor we

9    know and we've been talking with them.  So those

10   are very quick because they already have somebody

11   to sponsor them.

12         Q.  So then -- so the ones that take

13   longer are when the child is stepping down to a

14   different facility?

15         A.  Right.  When they're stepping to an

16   alternative placement like, for example, a group

17   home or because of their age, developing into

18   long-term foster care, those are the ones that

19   take a little bit longer.

20         Q.  And what's the longest you've seen it

21   take for a child to step down to another

22   facility?

23         A.  That was the young man we talked

24   about that he was 16 years old.  And he was

25   probably 18 months there.  And that was a

**Exhibit 163**
**Page 210**

1    nightmare.

2         Q.  And do you have a sense -- I mean,

3    given the low numbers in ORR right now, what are

4    you seeing maybe let's say in the past six months

5    in terms of how long it takes to step down to a

6    residential facility?

7         A.  Normally in weeks, one to two weeks,

8    yeah.  It's been much improved.

9         Q.  And if you were asked that question a

10   year ago, what would you have said?

11        A.  Probably --

12             MS. VAUGHAN:  Objection.  Calls for

13   speculation.

14        A.  It is speculative, but probably four

15   to six weeks, depending on -- not the patient

16   that you talked about that already has a

17   guardian.  Those are easy and transfers very

18   quickly.  But there those that have to go find

19   alternative living arrangements.

20   BY MS. WELCH:

21        Q.  And in terms of, you know, what

22   you're seeing right now, is it most common for

23   children to be transferred to a different

24   placement or unified with a sponsor?  Can you

25   break it down in terms of those two?

**Exhibit 163**
**Page 211**

1          A.   Again, the most common thing right

2     now is a reunification with a family member, a

3     designee.   And I think in the last several months

4     it has been transitioned to their family members

5     or family that are seeking deportation or

6     returning back to their country of origin.

7               And even with that there's a wait,

8     because we have to -- they have to go to court

9     and then petition for returning back to their

10    country.   And so we're -- that would depend on

11    the court's availability.

12         Q.   And in your experience, when children

13    are admitted to Shiloh are they -- are they

14    generally referred to Shiloh for a certain amount

15    of time?

16         A.   No, there's no time specific, it's

17    the presentation of illness and the time it takes

18    for us to stabilize.

19         Q.   Have you ever heard of a child being

20    referred to Shiloh for a 30-day psychiatric

21    evaluation?

22         A.   Not -- no, I've never had that

23    constraint or restraint of time, like I have to

24    treat them in 30 days.

25         Q.   And so you're saying there's not a --

1    there's not a certain amount of time that a child

2    would have to spend at Shiloh before release?

3    So, for example, there's not a requirement that a

4    child spend a minimum of 30 days at Shiloh before

5    they can be released; is that correct?

6         A.  Yeah, that is correct.  That's

7    correct.  If the patient comes on medication,

8    then we assess the symptoms are stable, then

9    immediately we work on transitioning to lower

10    levels of care.

11         Q.  And do you have to specifically

12    recommend that a child be released to a

13    particular sponsor or are you just making a

14    recommendation that the child is ready to be

15    discharged from Shiloh, if you understand my

16    distinction?

17         A.  Yes, the second is correct.  Thereby

18    being that the patient is ready, then my order

19    would say, "Allow transition to the community."

20    And --

21         Q.  And it's ORR that makes the

22    determination that the child is ready to go to

23    the sponsor in particular?

24         A.  That is correct.

25         Q.  And has there ever been a situation

**Exhibit 163**
**Page 213**

1    where a child at Shiloh has been released where

2    you or -- well, I guess it's going to be you,

3    since you're the one that's working with the ORR

4    children.  But has there ever been a child who

5    has been released without you making a

6    recommendation that the child is ready to be

7    released?

8         A.  No, never.

9         Q.  And if the child is not progressing

10   in their treatment goals would that impede their

11   release?

12        A.  Well, if it's a clinical

13   determination, like, for example, they have

14   depression or bipolar disorder and their symptoms

15   are still prevalent, it's actually an indication,

16   you know, that they're not improving.  But you

17   have to consider what's happening, other factors,

18   genetics.  I mean, so there's a lot of

19   consideration to why that's happening.

20             Let me give you an example.  For

21   example, we have this patient, this young lady

22   that she was doing really well, but then after,

23   you know, talking with her family we noticed a

24   dramatic change in her behavior.  And it's

25   normally the mother -- when -- when the patient

**Exhibit 163**
**Page 214**

1                    CERTIFICATE

2

STATE OF TEXAS    )
3                   )
COUNTY OF HARRIS )

4

5        I, LINDA RUSSELL, a Certified Court

6    Reporter within and for the State of Texas, do

7    hereby certify:

8        That JAVIER RUIZ, the witness whose

9    deposition is hereinbefore set forth, was duly

10   sworn by me and that such deposition is a true

11   record of the testimony given by such witness.

12       I certify that review of the transcript by

13   the deponent was requested.

14       I further certify that I am not related to

15   any of the parties to this action by blood or

16   marriage; and that I am in no way interested in

17   the outcome of this matter.

18       IN WITNESS WHEREOF, I have hereunto set my

19   hand this 7th day of October, 2020.

20

21   _____
     LINDA RUSSELL, Texas CSR #2965
22   Expiration Date:  4/30/2021

23   TSG Reporting, Inc.
     Firm Registration No. 615
24   228 E. 44th Street, Suite 810
     New York, New York 10017
25   (212) 702-9580

# Exhibit 164

Exhibit 164
Page 216

Confidential

1           IN THE UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF CALIFORNIA
2                  WESTERN DIVISION

3

     LUCAS R., et al.,              )
4                                   )
                 Plaintiffs,        )
5                                   )
            vs.                     )     Case No.
6                                   )     2:18-cv-05741-DMG-PLA
     ALEX AZAR, Secretary of        )
7    U.S. Department of             )
     Health and Human              )
8    Services, et al.,              )
                                    )
9                Defendants.        )

10

11            * C O N F I D E N T I A L *

12

13   VIDEOCONFERENCE DEPOSITION OF JOSEPH RYAN, PH.D.

14                 Ann Arbor, Michigan

15                 Friday, July 31, 2020

16

17

18

19

20

21

22

23   Reported by:

24   RACHEL F. GARD, CSR, RPR, CLR, CRR

25   JOB NO. 182306

Confidential

1    a foster home or foster placement into

2    residential facility, in state practice, that

3    would be considered a step-up?

4         A.    That's correct.

5         Q.    In your report -- let's see.  Where

6    is it?  Yeah, in paragraph 35 of your report --

7    I'll wait for that to come on the screen, okay,

8    you say there that the frequency of stepping up

9    is .3 percent.  Does this .3 percent take into

10   account the percent of children who are stepped

11   up to foster care from shelters in the ORR

12   system?

13        A.    I think I was looking at a list of

14   types of placements down at the bottom, so

15   foster care is not included.

16        Q.    So then the actual rate of step-ups,

17   since we've established that transfer from

18   foster care to shelter is also a step-up, the

19   actual rate of step-up is probably different

20   from what you have listed here in paragraph 35;

21   isn't that fair to say?

22             MR. MOSS:  Objection.

23        Mischaracterizes of the document.

24        A.    That's right.  It could be lower.

25        Q.    It could be lower, and it could be

Exhibit 164
Page 218

Confidential

1    higher?

2        A.    Right.

3        Q.    So what is it -- why is it that we

4    should have confidence in the step-up figure

5    you give us?

6        A.    I think it's -- I believe it's --

7    (A), I believe that the number of children in

8    foster care is so small that I don't actually

9    think it's going to impact that estimate at

10   all.  But I think it's reflective of the vast

11   majority of the children in the ORR system.  I

12   didn't include foster care and I don't think I

13   mentioned foster care, so ...

14       Q.    You do agree that children in ORR

15   custody sometimes are placed in foster care?

16       A.    Yes.

17       Q.    And do you have any reason to

18   suspect that they are not sometimes stepped up

19   to shelters or other types of facilities?

20       A.    If I were to guess or suspect

21   anything, I would suspect that they step-up

22   even less.

23       Q.    And what evidence do you base that

24   on?

25       A.    You asked me to suspect, I guess.  I

Exhibit 164
Page 219

Confidential

1          hadn't finished the question.  I'm sorry.

2          Please proceed.

3          Q.    Okay.  So my question is:  Does the

4    data represented in figure 11 correspond to the

5    same period as figure 10?  In other words,

6    January 1, 2017, to December 31st, 2019.

7          A.    I would have to go back and open the

8    files.  I'm -- you know, even though the title

9    of that references January through December,

10   I'm wondering if it's 2 years.  I referenced

11   earlier in the document that we dropped cases

12   from 2017 or most of 2017, so it's possible it

13   only includes 2 years and the date range on

14   that is not correct.  It's not going to go --

15   whether it's 2017 to 2019 or 2018 to 2019, it's

16   not going to change the overall percentages.

17         Q.    And how do you know that?

18         A.    It seems to be the -- I mean, I

19   guess they could go up or down a little bit,

20   but ...

21         Q.    You don't know how much they could

22   go up or down?

23         A.    That's correct.

24         Q.    Okay.  Going back to the three

25   domains of evidence you talk about in

Confidential

1    paragraph 34 of your report --

2         A.    Do you know what page that's on?

3         Q.    Yeah, page 10.

4         A.    Okay.

5         Q.    All right.  So you have three

6    domains of evidence.  First, the frequency or

7    risk of transfer or step-up, right, because

8    we're talking about staff secure, RTC, or

9    secure.  And we've already established that

10   your numbers don't account for children taken

11   out of foster care and placed into any other

12   kind of facility, correct?

13        A.    That's correct.

14        Q.    And we're not sure whether your

15   numbers are based upon January 2017 to

16   November 2019 or December 2019, and we're not

17   sure whether it includes only data from 2018

18   through 2019; is that correct?

19        A.    I would have to go back and make

20   sure whether it includes 2 or 3 years' worth of

21   data.

22        Q.    All right.  So we're not really able

23   to say with much certainty what the risk of

24   transfer is at this point?

25             MR. MOSS:  Objection.

Confidential

1      Q.    Correct?

2            MR. MOSS:  Objection.

3      Argumentative.

4      A.    No, that's not accurate.

5      Q.    Well, if you haven't included

6  step-ups from out of foster care, how can

7  you -- how is your number accurate?

8      A.    It's accurate for the programs that

9  I reference, which I believe are the vast

10 majority of children in the ORR network, so I

11 would say we could estimate.

12     Q.    Okay.  But there is no estimate

13 based upon complete data in your report here,

14 that's correct, isn't it?

15           MR. MOSS:  Objection.  Vague.

16     A.    It does not include -- foster

17 care -- I'm getting an echo.  It does not

18 include the foster care unit.

19     Q.    And we don't know whether it

20 includes data from various --

21           MR. MOSS:  I'm sorry, Counsel.  I

22        think there's feedback.  I'm not sure who's

23        causing it, but we've got to figure that

24        out because I can't hear.

25           MR. HOLGUIN:  I'm not hearing it for

```
 1              C E R T I F I C A T E

 2   STATE OF ILLINOIS  )
                        ) ss.:
 3   COUNTY OF COOK     )

 4        I, RACHEL F. GARD, CSR, RPR, CLR, CRR,

 5   within and for the State of Illinois do hereby

 6   certify:

 7        That JOSEPH RYAN, PH.D., the witness whose

 8   deposition is hereinbefore set forth, was

 9   duly sworn by me and that such deposition

10   is a true record of the testimony given by

11   such witness.

12        I further certify that I am not

13   related to any of the parties to this

14   action by blood or marriage; and that I am

15   in no way interested in the outcome of this

16   matter.

17        IN WITNESS WHEREOF, I have hereunto

18   set my hand this 13th day of August, 2020.

19   Rachel F Gard

20   ----------------------------------

21   RACHEL F. GARD, CSR, RPR, CLR, CRR

22

23

24

25
```

# Exhibit 165

Exhibit 165
Page 224

Confidential

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                  WESTERN DIVISION

4

5    LUCAS R., et al.,        )

6              Plaintiffs,  )  Case No.

7        vs.                 )  2:18-CV-05741 DMG PLA

8    ALEX AZAR, Secretary  )

9    of U.S. Department     )

10   of Health and Human    )

11   Services, et al.,       )

12            Defendants.  )

13

14

15                  CONFIDENTIAL

16       DEPOSITION OF STEPHANIE TREVINO

17             Chicago, Illinois

18           Thursday, March 5, 2020

19

20

21

22

23   Reported by:

24   ELIA E. CARRIÓN, CSR, RPR, CRR, CRC

25   JOB NO. 177122

**Exhibit 165**
**Page 225**

Page 366

```
 1        A.   Well, all children receive mental
 2   health services --
 3        Q.   Okay.
 4        A.   -- per ORR policy and procedures.
 5        Q.   Per ORR policy, every child
 6   receives mental health service?
 7        A.   Yes.  And by mental health
 8   services, I mean individual and group
 9   therapy.
10        Q.   Okay.  Could a child decline
11   individual or group therapy?
12        A.   Yes.
13        Q.   If they decline individual or group
14   therapy, is that documented anywhere?
15        A.   Yes.
16        Q.   Where is it documented?
17        A.   I don't know.
18        Q.   Do you ever review if a child is
19   receiving individual or group therapy?
20        A.   No.
21        Q.   Is there someone that's responsible
22   for tracking whether or not children are
23   receiving mental health services?
24        A.   I don't know.
25        Q.   Do you track whether children
```

1    receive mental health services?

2         A.    No.

3         Q.    Do children have an opportunity to

4    give input on the kinds of services they

5    receive?

6         A.    Yes.

7         Q.    How do they give input?

8         A.    In writing or verbal.

9         Q.    Okay.  So did I understand

10   correctly, children are allowed to refuse

11   participating in mental health services?

12        A.    Yes.

13        Q.    Are they allowed to stop

14   participating in mental health services?

15        A.    Yes.

16        Q.    Are children told that they have a

17   right to refuse or stop participating in

18   mental health services?

19        A.    I don't know.

20        Q.    What does a child have to do in

21   order to decline or to end mental health

22   services?

23        A.    Notify their clinician.

24        Q.    Is there a particular form that has

25   to be filled out?

Confidential

1               REPORTER'S CERTIFICATION

2

3          I, ELIA E. CARRIÓN, CSR, RPR, CRR,

4     CRC, a Certified Shorthand Reporter in and

5     for the state of Illinois, do hereby certify:

6               That the foregoing witness was by

7     me duly sworn; that the deposition was then

8     taken before me at the time and place herein

9     set forth; that the testimony and proceedings

10    were reported stenographically by me and

11    later transcribed into typewriting under my

12    direction; that the foregoing is a true

13    record of the testimony and proceedings taken

14    at that time.

15               That before the conclusion of the

16    deposition, the witness has requested a

17    review of this transcript pursuant to Rule

18    30(e)(1).

19               IN WITNESS WHEREOF, I do hereunto

20    set my hand of office at Chicago, Illinois,

21    this 18th day of March, 2020.

22

23    _____

      ELIA E. CARRIÓN
24    C.S.R. Certificate No. 084.004641.

25

**Exhibit 165**
**Page 228**

# Exhibit 166

Exhibit 166
Page 229

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


LUCAS R., et al.,                    )
                                     )
            Plaintiffs               )
                                     )
vs.                                  ) Case No. 2:18-cv-05741
                                     )
ALEX AZAR, et al.,                   )
                                     )
            Defendants               )
_____)




CONFIDENTIAL PURSUANT PROTECTIVE ORDER


REMOTE ZOOM DEPOSITION OF ANTHONY J. URQUIZA, PHD

August 11, 2020




Reported by: Carrie LaMontagne, CSR No. 13393



Exhibit 166
Page 230

Page 111

1   verbatim, but he said something like you don't want to

2   open up the door and have these children exposed by

3   starting treatment and then not being able to finish it.

4       And I think that is not an opinion that I would

5   have and I think a naive perspective of the real

6   practice of psychotherapy and outpatient clinics.

7       Q.   Is it the case that it's either TF-CBT versus

8   doing nothing for the child in terms of providing

9   therapy?

10      A.   You should do something.  I would struggle

11  with the argument -- and I'm resisting -- this is the

12  third time I've said it today -- I'm resisting the urge

13  to be sarcastic here, but some of the progress notes,

14  therapy progress notes where they talked about things

15  that they did in therapy are nowhere in the realm of

16  evidence-based anything.

17      So the Temper in a Jar thing or the dominos or the

18  Unos that I mentioned before, yeah, you can spend time

19  with a child, great.  But any staff person can do that.

20  Any of the frontline shelter people can do that.  I'm

21  talking therapy.  And if you're going to provide a

22  therapy service, and you should, then you should do

23  something that's therapeutic, not play dominos.

24      If you have kids and you take them to a therapist,

25  you don't want either to pay money for that therapist to



Exhibit 166
Page 231

Page 132

1          MR. SHIEH:  Well, we're at the 40-minute mark.

2     I don't know if folks want to take a break, like a

3     five-minute break, or we want to go -- because I'm going

4     to -- we're going to go to the report now.  So the

5     memory test is over.

6          Do you folks want to take a five-minute break and

7     regroup, or what do you want to do?

8          MS. WROE:  Yeah.

9          THE WITNESS:  Okay.

10         MR. SHIEH:  All right.  Great.  Five minutes

11    and we'll come back.

12                    (A break was taken.)

13         MR. SHIEH:  Eileen, would you mind bringing up

14    document C in your queue.

15         We can mark that -- Carrie, if you don't mind, we

16    can mark that as Exhibit 316.

17         (Defendants' Exhibit Number 316 marked for

18     identification purposes and made part of the record.)

19         MR. SHIEH:  And, Eileen, would you mind

20    flipping it two pages so Dr. Urquiza can get a better

21    sense of what this document is.

22         That's fine too.

23    BY MR. SHIEH:

24         Q.   Dr. Urquiza, do you recognize this document?

25         A.   I do, yes.



Exhibit 166
Page 232

Page 133

1          Q.    What is it?

2          A.    It's a little bit small and I do not think I

3     have the capacity to increase its size.

4          But right now I'm looking at the cover page for

5     Expert Report of Dr. Anthony Joseph Urquiza.

6          Q.    So is this your expert report that you

7     submitted in this case?

8          A.    I believe it is, yes.

9          Q.    Okay.  Well, we'll be going through the

10    report, so it is what was turned over to us.  If at any

11    point a sentence seems like, oh, do you like that, we

12    can go off the record and talk about it, but this is

13    what was submitted to us from plaintiffs.

14         And we'll go through your report.

15         A.    More concerning is just the size of the

16    document itself because it's a little bit small on my

17    screen.  I'm an old person.  So the -- like, that is

18    really difficult.

19         That's much better.

20         Q.    So what we're going to do is we're going to go

21    through the report and we'll zoom in on different

22    paragraphs, and if you want to see the paragraph above

23    or below, obviously let us know.  But I agree, it's

24    going to be much easier to see if we just zoom in.

25              MR. SHIEH:  Eileen, would you mind turning to



Exhibit 166
Page 233

Page 134

1   page 2 of the PDF.

2   BY MR. SHIEH:

3       Q.   And so what -- I think what would be the

4   easiest way to reference the materials in this report is

5   there are PDF page numbers that correspond to the PDF

6   document.

7       And I noted that you separately numbered the report

8   for each of the six reports, which is kind of why I

9   asked you are these six reports or one report.  So I'll

10  give both numbers.  I'll give the number that

11  corresponds to the PDF for Eileen's sake, and then I

12  will give you the PDF -- sorry, the number that

13  corresponds to your report so that you can track with me

14  as we're going through it.

15      Is that all right?

16      A.   Fine.

17      Q.   Under Roman numeral II --

18           MR. SHIEH:  Can we just zoom on that

19  paragraph.

20  BY MR. SHIEH:

21      Q.   -- this is a summary of your opinions.  And

22  you write:

23           "Based on a review of the records I was

24           provided and my extensive experience as

25           a clinical psychologist, it is my



Exhibit 166
Page 234

Page 135

1          opinion that many of the named

2          Plaintiffs had behavioral, mental

3          health, intellectual, and/or

4          developmental disabilities while in ORR

5          custody.  Moreover, the named Plaintiffs

6          were routinely not provided

7          evidence-based treatment tailored to

8          their needs and, in several instances,

9          this lack of treatment contributed to

10         the children being placed in more

11         restrictive facilities based on their

12         mental health needs."

13     Did I read that correctly?

14     A.   You did.

15     And when you were first questioning me this

16 morning, this would have been a very helpful reminder.

17          MR. SHIEH:  Carrie, is that a good enough pace

18 for you?

19          THE REPORTER:  That was great.  Nice job.

20 Thank you for asking.

21          MR. SHIEH:  Okay.  Great.

22 BY MR. SHIEH:

23     Q.   Dr. Urquiza, how do you define disabilities?

24     A.   That which leads the individual to have some

25 dysfunction.  As a mental health provider, that often is



Exhibit 166
Page 235

Page 140

1  evidence-based, is there a single definition of

2  evidence-based treatment?

3       A.   There is a couple of definitions.  I don't

4  know that you can say that this is a single definition.

5  I think it is the Office of Victims Research, OVC,

6  Office of Victims of Crime came out with some of the

7  early standard for what was determined to be an

8  evidence-based treatment.  And that's why I put --

9  again, that's why I put that -- I don't have it in front

10  of me -- that's why I put that attachment attached to my

11  report.

12      There was also the Chadwick Center, which is part

13  of San Diego Children's Hospital, has a child welfare

14  clearinghouse in which they post evidence-based

15  treatment for different child mental health

16  interventions.

17      Q.   You mentioned in your report that

18  evidence-based treatments are supposed to be tailored to

19  the individual needs of children, correct?

20      A.   Not necessarily specifically for the child,

21  but for the class of child.  So it may be for that child

22  but, you know, if you have a child who's traumatized,

23  that's a class of traumatized children and, therefore,

24  the evidence-based treatment would be that which is

25  appropriate for that class of child.



Exhibit 166
Page 236

Page 150

1  A. I'm saying we have a process, we researchers,

2 university people, where we have a process that we have

3 been working for, for decades to develop interventions

4 to help kids, and there's a lot of them and they're

5 effective.

6   I'm saying you can do something else.  But you're

7 doing something in many cases, at least when I reviewed

8 some of the files in the ORR records, you're doing

9 something, Temper in a Jar, or something, Temper

10 Tantrums in a Jar, for which there is no research

11 support.  And we know that there are for kids who, let's

12 say, have temper tantrums, may have diagnostic criteria

13 for oppositional defiant disorder.  We know that there

14 are interventions for those kinds of kids.  Why would

15 you do Temper in a Jar, or Temper Tantrums in a Jar.

16 That is baffling to me.

17  Q. I appreciate that, Dr. Urquiza, and with all

18 due respect, I don't know that it --

19  A. -- the weird metaphor where I go to my car --

20  Q. -- answers my question.

21  A. But that's like the level that I see it as is

22 because we have things that work.  And it's not very

23 expensive.  And it is highly beneficial to the clients

24 that they receive those interventions.

25  Q. So if it's not EBT, it doesn't work?



Exhibit 166
Page 237

Page 277

1

2                      REPORTER'S CERTIFICATE

3              I, Carrie LaMontagne, Certified Shorthand

4    Reporter in and for the State of California, License No.

5    13393, hereby certify that the deponent, ANTHONY J.

6    URQUIZA, PHD,  was by me first duly sworn and the

7    foregoing testimony was reported by me and was

8    thereafter transcribed with Computer-Aided

9    Transcription; that the foregoing is a full, complete,

10   and true record of said proceeding.

11             I further certify that I am not of counsel or

12   attorney for either or any of the parties in the

13   foregoing proceeding and caption named or in any way

14   interested in the outcome of the cause in said caption.

15             The dismantling, unsealing, or unbinding of

16   the original transcript will render the reporter's

17   certificates null and void.

18             In witness whereof, I have hereunto set my

19   hand this day: August 22, 2020.

20        _____ Reading and Signing was requested.

21        _____ Reading and Signing was waived.

22        __X__ Reading and Signing was not requested.

23

24        _____

                  CARRIE LAMONTAGNE, CSR

25



Exhibit 166
Page 238

# Exhibit 167

Exhibit 167
Page 239

```
 1              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
 2                   WESTERN DIVISION
    _____
 3                              )
    LUCAS R., et al.,           )
 4                              )
              Plaintiffs,       )
 5                              )
         -vs-                   )  Case No. 2:18-CV-05741 DMG PLA
 6                              )
    ALEX AZAR, Secretary of )
 7  U.S. Department of          )
    Health and Human            )
 8  Services, et al.,           )
                                )
 9            Defendants.       )
    _____
10

11

12         SAUL EWING ARNSTEIN & LEHR LLP
    CENTRE SQUARE WEST - 1500 MARKET STREET, 38TH FLOOR
13        PHILADELPHIA, PENNSYLVANIA  19102
                 MARCH 2, 2020
14                 9:40 A.M.

15

16

                 ORAL DEPOSITION
17                     OF
              RUTH ESTHER VASQUEZ
18

19

20

21

22

23    REPORTED BY:

24    DEBRA SAPIO LYONS, RDR, CRR, CRC, CCR, CLR, CPE

25    JOB NO. 177835
```

**Exhibit 167**
**Page 240**

Page 220

1    to be a release recommendation?

2         A.    Again, that is something that the

3    clinician would have already voiced prior to

4    the end of the case.  And if there would have

5    been a need for a medication or evaluation, it

6    would have already been conducted.

7         Q.    Okay.  So the -- does the -- if

8    there's an ongoing mental health concern at

9    the time when a Case Manager is considering

10   making a release request, would that affect

11   the Case Manager's decision?

12        A.    It wouldn't.  It would affect

13   the -- maybe the recommendation of the release

14   because there are different types of

15   recommendations; and it would also affect if

16   the Case Manager would have to have

17   appointments in the community or provide a

18   resource list or make -- or ensure that the

19   sponsor knows about appointments in the

20   community, things like that.

21        Q.    And you said that there are

22   different types of release requests.

23        A.    Yes.

24        Q.    Can you explain that?

25        A.    There can be a straight release,

**Exhibit 167**
**Page 241**

1    release with a safety plan, release with PRS,

2    a home study release, or a denial.

3           Q.    And what is a home study release?

4           A.    Requesting a home study be

5    conducted.

6           Q.    Oh, requesting.

7           A.    Uh-huh.

8           Q.    Before a release?

9           A.    Correct.

10          Q.    Okay.  And is it the Case Manager

11   that decides what type of release request to

12   make?

13          A.    Not the Case Manager solely, no.

14          Q.    Who makes that decision?

15          A.    The Treatment Team.

16          Q.    And when does that decision

17   happen?

18          A.    It happens, again, throughout the

19   process.

20          Q.    So when -- is there a time when it

21   needs to be decided, what type of release

22   request, a deadline when it needs to be

23   decided what type of release request is going

24   to be made?

25          A.    Not necessarily, no.

Exhibit 167
Page 242

```
                                                     Page 282
1                   CERTIFICATE

2    COMMONWEALTH OF PENNSYLVANIA      )

3                            ) ss:

4    COUNTY OF PHILADELPHIA            )

5          I, Debra Sapio Lyons, a Registered
     Diplomat Reporter, a Certified Realtime Reporter,
6    a Certified Realtime Captioner, an Approved
     Reporter of the United States District Court for
7    the Eastern District of Pennsylvania, a Certified
     Court Reporter for the State of New Jersey; and
8    Notary Public within and for the States of New
     Jersey, New York and the Commonwealth of
9    Pennsylvania do hereby certify:

10         That Ruth Esther Vasquez, the witness
     whose deposition is hereinbefore set forth, was
11   duly sworn by me and that such deposition is a
     true record of the testimony given by such
12   witness, to the best of my ability and thereafter
     reduced to typewriting under my direction.
13
           I further certify that I am not related
14   to any of the parties to this action by blood or
     marriage and that I am in no way interested in
15   the outcome of the matter.

16         In witness whereof, I have hereunto set
     my hand this 12th day of March, 2020.
17

18
                         _____
19                       DEBRA SAPIO LYONS
20                       CRR, RDR, CRC, CCR, CPE

21

22

23

24

25
```

**Exhibit 167**
**Page 243**

# Exhibit 168

Exhibit 168
Page 244

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              WESTERN DIVISION

4     -----------------------------

5     LUCAS R., et al.,
                    Plaintiffs,
6
      vs.                          Case No.
7                          2:18-cv-05741 DMG PLA

8     ALEX AZAR, Secretary of U.S.
      Department of Health and
9     Human services, et al.,

10                    Defendants.
      -----------------------------
11

12

13

14

15    TELECONFERENCE DEPOSITION OF MICAELA VERGARA

16          June 9, 2020

17

18          ***CONFIDENTIAL***

19

20

21

22

23

24    Reported by:  Susan S. Klinger, RMR-CRR, CSR

25    Job No. 180316

Confidential

1       A.      I don't know if we're required to,

2   but I do.

3       Q.      And when are the FFS under your

4   supervision required to elevate cases to you?

5       A.      It depends.

6       Q.      Does ORR require FFS to elevate

7   certain types of cases to FFS supervisors?

8       A.      Yes, yes.

9       Q.      And do you know what those types of

10  cases are?

11      A.      I'm trying to think.  There is --

12  there are the ones that are required and then

13  my staff will just talk to me about cases, so I

14  have to think about the required ones.

15  Typically transfers step up, trying to think,

16  you know, complicated like parent denials,

17  those are cases that would be elevated.

18      Q.      Is there any deadline or point in

19  time after which an FFS is required to elevate

20  a case to your attention?

21      A.      Well, it depends.  I know that there

22  are some timeframes with some cases, but with

23  my staff I tell them to, you know, elevate it

24  as soon as possible.

25      Q.      Do you ever look at any of Nikki's

Confidential

1   responsible once that child is in their

2   program.

3       Q.    Have you ever stepped a child down

4   from Shiloh because they were placed at Shiloh

5   for inappropriate reasons?

6       A.    I don't remember.

7       Q.    Do you know whether Nikki has ever

8   decided to step a child down from Shiloh

9   because they were placed at Shiloh for

10  inappropriate reasons?

11      A.    I don't know.

12      Q.    Are children ever placed at Shiloh

13  because they are a danger to themselves?

14      A.    Yes, the children are placed in

15  Shiloh because they are either a danger to

16  themselves or others.

17      Q.    Do you know how that dangerousness

18  assessment is made?

19      A.    It is made by typically a physician,

20  a psychiatrist or another mental health

21  practitioner that -- that would make that

22  determination, that is licensed to make that

23  determination.

24      Q.    Does ORR require the recommending

25  mental health professional to explicitly state

Confidential

1    that a child is a danger to themselves or

2    others in their RTC recommendations?

3              MR. MOSS:  Objection, foundation.

4         Q.    You may respond.

5         A.    What I do know is that a

6    psychiatrist or a psychologist they make that

7    recommendation for residential treatment

8    centers.  What they include in that -- in that

9    recommendation, you know, that is up to the

10   physician because they're licensed and they

11   have to meet their licensing criteria when they

12   make recommendations.

13        Q.    Does ORR require Shiloh staff to

14   determine whether a child is a danger to

15   themselves at regular intervals once the child

16   has been admitted to Shiloh?

17        A.    The psychiatrist is the one that

18   makes that recommendation that is of their

19   work.  That is what falls under their services

20   is to make that determination.

21        Q.    And do you know how frequently the

22   psychiatrist at Shiloh is assessing whether a

23   child is a danger to themselves?

24        A.    I think all the time.

25        Q.    Do you know whether ORR policy

Confidential

1    requires psychiatrists at Shiloh to make that

2    assessment?

3         A.    Can you ask the question again?

4         Q.    Do you know whether ORR policy

5    requires psychiatrists at Shiloh to make an

6    assessment as to whether a child is a danger to

7    themselves at a certain regular interval?

8         A.    I don't know if that is a policy.

9         Q.    How does ORR ensure that the

10   psychiatrist or psychologist recommending RTC

11   placement satisfies ORR criteria for placement

12   in an RTC?

13             MR. MOSS:  Objection, no foundation.

14        A.    Can you repeat the question?

15        Q.    How does ORR ensure that the

16   psychiatrist or psychologist recommending RTC

17   placement meets ORR criteria for placement in

18   an RTC?

19             MR. MOSS:  Objection, no foundation.

20        A.    I still don't understand the

21   question.

22        Q.    Does ORR have certain criteria for

23   placement in an RTC?

24        A.    Yes.

25        Q.    Does ORR require that a psychiatrist

**Exhibit 168**
**Page 249**

Confidential

1        A.     Okay, it disconnected.

2        Q.     Please feel free -- it looks like

3    you're coming back.

4        A.     Okay.  Can you ask your question

5    again, I'm sorry, I lost my train of thought.

6        Q.     That is okay.  I'm wondering whether

7    you have ever observed situations where

8    children have been denied step down from Shiloh

9    and their mental health needs have worsened

10   after that denied step down?

11            MR. MOSS:  Objection, calls for

12        expert testimony.

13       A.     So basically again, I think we are

14   using terminology a little different.  So a

15   child will be stepped down if they're found to

16   be no longer a danger to self or others.  So

17   what you're asking me it sounds like is what

18   happens when someone who is still a danger to

19   themselves or others isn't taken off that

20   status; is that correct?

21       Q.     I'm asking you whether the decision

22   not to step down a child has an impact on that

23   child's mental health when they are still

24   required to remain at Shiloh?

25            MR. MOSS:  Objection, calls for

**Exhibit 168**
**Page 250**

1       expert testimony.

2       A.     So again, if a child is still a

3   danger to self or others, and they're told that

4   they can't, that they are still considered to

5   be needing placement there, yes, the children

6   do get upset.  And so I'm sure that those

7   emotions do affect them in some way.

8       Q.     When a child leaves Shiloh to go to

9   a new facility, what information about them is

10  sent to the new facility?

11      A.     Basically information from their

12  files, from their ORR files, oftentimes, there

13  are conference calls that occurred that take

14  place in order to let the program know kind of

15  what best practices are with a certain child,

16  like, what rewards or kind of what are triggers

17  for the child in order to provide a seamless

18  transition to a less restricted environment.

19      Q.     If a child has a disability, does

20  Shiloh communicate to the new facility about

21  the child's mental health needs?

22      A.     That would be -- yes, they report

23  everything regarding the child.  They're

24  required to let the receiving facility know all

25  details about the care and diagnoses of that

1    seamlessly stepped down to a shelter.

2        Q.    What factors might attribute to a

3    delay between a step-down decision and a

4    child's actual transfer to take less

5    restrictive facility?

6        A.    In the past it has been capacity and

7    also licensing, licensing requirements that the

8    shelters have.  So if a child has a cognitive

9    delay sometimes that is a challenge because of

10   the shelter is licensing requirements.  But at

11   this time, transfers that don't happen within

12   one to two weeks from once they have been

13   identified as no longer a danger to self or

14   others.

15       Q.    Have there ever been cases where a

16   child has remained at Shiloh after being

17   approved for step down because they have not

18   been accepted by a less restrictive placement?

19            MR. MOSS:  Objection, foundation.

20       A.    Like I mentioned, the program steps

21   down kids as soon as possible.  Once they

22   receive that determination that they're no

23   longer a danger to self or others, they will

24   immediately, even prior, work on a transfer to

25   a less restrictive environment.

Confidential

Page 130

1              And so basically what happens is

2    within one or two weeks, sometimes it is a

3    little bit longer, but the child will get step

4    down to another facility.

5         Q.    What is the longest amount of time

6    that you recall a child has remained at Shiloh

7    pending step down?

8         A.    I don't remember.

9         Q.    You said that sometimes it can take

10   longer than two weeks between a step-down

11   approval decision and an actual placement in a

12   new facility.  Could that period of time be

13   more than a month?

14        A.    Currently, no.

15        Q.    Could it have ever been more than a

16   month in the past?

17        A.    Yes.

18        Q.    Could it have ever been more than

19   six months?

20        A.    Not that I recall.

21        Q.    Could it have ever been more than

22   two months?

23        A.    I don't remember.

24        Q.    Have there been cases where no

25   facility will agree to admit the child who has

1    but I do know that they have a public records

2    check as well.

3         Q.    Can the public records check process

4    impact the length of time of the reunification

5    process?

6         A.    I'm not aware of that.

7         Q.    Let's go ahead and take another

8    break for 10 minutes and go off the record.

9              (Recess, 4:21 to 4:38 p.m.)

10        Q.    So I have a bit more to discuss on

11   reunification.  Can a child be released from

12   Shiloh if a psychiatrist or psychologist does

13   not explicitly recommend that the child be

14   released to a sponsor?

15        A.    So the psychiatrist will only make

16   the recommendation regarding if the child is a

17   danger to themselves or others.

18        Q.    And can a child be released to a

19   sponsor from Shiloh if the psychiatrist has not

20   made a recommendation about whether a child is

21   no longer a danger to themselves or others?

22        A.    So for a child to be released that

23   would be going against medical advice, so that

24   would be AMA.  So we make a release decision

25   once the child is no longer a danger to

Confidential

1 themself or others, that means that they would

2 be a danger to the community.

3     Q.    And does the FFS make final

4 decisions regarding reunification?

5     A.    In all cases except for parent

6 denial.

7     Q.    Does an FFS ever decide to release a

8 child to a sponsor if the psychiatrist at

9 Shiloh has determined that the child is still a

10 danger to themselves or others?

11     A.    Can you repeat the question?

12     Q.    Has an FFS ever decided to release a

13 child to a sponsor in a situation where the

14 psychiatrist has determined that the child is a

15 danger to themselves or others?

16           MR. MOSS:  Objection to foundation.

17     A.    I don't -- I don't know.

18     Q.    When you were an FFS, did you ever

19 recommend a child be released to a sponsor even

20 though the psychiatrist concluded that the

21 child was a danger to themselves or others?

22     A.    Not that I recall.

23     Q.    Do you know whether Nikki has ever

24 released a child from Shiloh even though the

25 psychiatrist concluded that the child was still

Exhibit 168
Page 255

1          C E R T I F I C A T E

2

3      I, SUSAN S. KLINGER, a certified shorthand

4  reporter within and for the State of Texas, do

5  hereby certify:

6      That MICAELA VERGARA, the witness whose

7  deposition is hereinbefore set forth, was duly

8  sworn by me and that such deposition is a true

9  record of the testimony given by such witness.

10     I further certify that I am not related to

11  any of the parties to this action by blood or

12  marriage; and that I am in no way interested in

13  the outcome of this matter.

14     IN WITNESS WHEREOF, I have hereunto set my

15  hand this 19th of June, 2020.

16

17         _____

18              Susan S. Klinger,

19              RMR-CRR, CSR

20              Texas CSR# 6531

21

22

23

24

25

**Exhibit 168**
**Page 256**

# Exhibit 169

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Exhibit 169
Page 257

Message

| | |
|---|---|
| **From:** | ▬▬▬▬▬▬▬ [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=D405522C35EF4B90A7C40BA649BD9D82-SUH, GA-YOO] |
| **Sent:** | 8/2/2018 10:10:30 PM |
| **To:** | Fields, Marivic (Maria) (ACF) [mariavictoria.fields@acf.hhs.gov] |
| **Subject:** | RE: Review of Shiloh Cases |
| **Attachments:** | 20180802 Shiloh Placements.xlsx |

EXHIBIT _184_
WIT:_____
DATE: 2/24/20
Lori Goodin, CRR

With attachment

**From:** ▬▬▬▬▬▬▬
**Sent:** Thursday, August 02, 2018 6:10 PM
**To:** Fields, Marivic (Maria) (ACF) <MariaVictoria.Fields@acf.hhs.gov>
**Subject:** RE: Review of Shiloh Cases

Hi Marivic,
Here's the updated table for your review. On the phone, we discussed you (1) filling in the information for the missing minor ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, and (2) inputting your opinion on whether the minors should continue to be placed at RTC.

Thanks!
▬▬▬▬

**From:** Fields, Marivic (Maria) (ACF)
**Sent:** Thursday, August 02, 2018 4:52 PM
**To:** ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
**Subject:** RE: Review of Shiloh Cases

Sure.  Please call me on my cell.

v/r

Marivic Fields, LMSW, BCD
CAPT, United States Public Health Service
Senior Advisor for Child Well-being and Safety
Unaccompanied Alien Children Program
Administration for Children and Families
(202) 795-7566 (office)
(202) 617-0801 (cell)
maria.fields@acf.hhs.gov
_____

**From:** ▬▬▬▬▬▬▬
**Sent:** Thursday, August 02, 2018 4:52 PM
**To:** Fields, Marivic (Maria) (ACF) <MariaVictoria.Fields@acf.hhs.gov>
**Cc:** Sualog, Jallyn (ACF) <Jallyn.Sualog@ACF.hhs.gov>; Bena, Anna Marie (HHS/OGC) (ACF) <Annamarie.Bena@HHS.GOV>; De LA Cruz, James (ACF) <James.DeLACruz@acf.hhs.gov>
**Subject:** RE: Review of Shiloh Cases

Marivic, are you available to discuss your findings? I want to make sure I understand what this table is saying.

Thanks,

Confidential - Subject to Protective Order

**From:** Fields, Marivic (Maria) (ACF)
**Sent:** Thursday, August 02, 2018 4:34 PM
**To:** ███████
**Cc:** Sualog, Jallyn (ACF) <Jallyn.Sualog@ACF.hhs.gov>; Bena, Anna Marie (HHS/OGC) (ACF) <Annamarie.Bena@HHS.GOV>; De LA Cruz, James (ACF) <James.DeLACruz@acf.hhs.gov>
**Subject:** Review of Shiloh Cases

Hi ████,

I completed the review of Shiloh cases, it appears that placement of these UACs to a residential treatment facility is appropriate based on case notes and recommendations that I read from licensed providers. Please note that not all UACs are referred to Shiloh or any RTC for reasons that they pose a risk to self or others and it shouldn't be just for these reasons but primarily for safety reasons and these UACs require a higher level of care. Some UACs were referred because of Autism, Psychosis (which can potentially be classified as a risk to self or others) but their primary diagnosis is due to presentation of psychotic symptoms, i.e., auditory/visual hallucination.

Here is the summary of what I found:

1. There is no consent form signed by a legal guardian authorizing administration of psychotropic medication to UAC. The only thing that is consistent in all cases is the Authorization for Medical, Dental, Mental Health Care form signed by Scott Lloyd. There was one case with an authorization from parent.
2. Recommendation for an RTC placement is referenced in case review notes but I did not see anything in the UAC documents. It's probably in the portal somewhere but it's not readily available to access for review.
3. There are a couple cases where I am somewhat concerned with the number of psychotropic medications but this will have to be reviewed by a prescribing provider, i.e., psychiatrist or psychiatric nurse practitioner who understands psychotropic medications.
4. One case that I am also concerned about is the sibling of a UAC with down syndrome. It looks like reunification is being worked on but the sibling does not present any psychological concerns unless he is in Shiloh to be with the sibling with Down Syndrome. I will ask FFS about the reason for this UAC's placement.
5. Another concern is a UAC who has been in Shiloh for a year, perhaps this is warranted but will ask the FFS for reason for his extended length of stay in RTC.

Overall, the UACs in Shiloh receives a monthly evaluation/medication management by the psychiatrist and some receive more frequent follow-ups depending on their psychological state/condition and level of functioning. Based on the psychiatrist notes, there seems to be improvement in psychological functioning and there is proper monitoring of symptoms and there is appropriate recommendation for reunification, lower level of care or release to shelter if warranted.

I hope I captured everything that is required pertaining to judge's order. Please let me know if you have questions.

v/r

Marivic Fields, LMSW, BCD
CAPT, United States Public Health Service
Senior Advisor for Child Well-being and Safety
Unaccompanied Alien Children Program
Administration for Children and Families
(202) 795-7566 (office)
(202) 617-0801 (cell)
maria.fields@acf.hhs.gov

Confidential – Subject to Protective Order

GOV-00124714

**Exhibit 169**
**Page 259**

# Exhibit 170

## <u>REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL</u>

**Exhibit 170**
**Page 260**

| S# | A # | First Name | Last Name | DOB | COB | Admitted Date | UAC Assess. Date | RTC Recommendation Received? | Initial Recommender for RTC Placement | Reason for Placement | Initial Psych assessment at Shiloh? | Current Status Recommendation | Current Medications | Authorization for Psychotropic Meds | ORR Notes/Recommendation regarding continued placement | Child Psychiatrist's Comments and Recommendations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | /2002 | El Salvador | 7/24/2018 | 7/27/2018 | Yes | Psychologist | Physical Aggression; Danger to others ("PD'D") | Yes | Continued Treatment | Trazodone | | UAC new to RTC; Concur with Shiloh recommendation | |
| | | | | /2008 | El Salvador | 7/23/2018 | 7/25/2018 | Yes | Psychiatrist | Autistic; Aggressive; Developmental Delay; No Suicidal ideation/Homicidal Ideation ("SI/HI") | Yes | Continued Treatment | Intuniv; Risperdal | | UAC new to RTC; Concur with Shiloh recommendation | Pervasive developmental disorder is listed as an initial diagnosis--this is an old term. It is updated in subsequent psychiatric progress notes. No baseline labs or EKG. |
| | | | | /2003 | Honduras | 7/18/2018 | 7/24/2018 | Somewhat | Psychiatrist | Auditory/Visual Hallucinations ("A/VH"?); DTO; Anxiety, SI | Yes | Continued Treatment | Abilify; | MD | UAC new to RTC; Concur with Shiloh recommendation | |
| | | | | /2010 | Guatemala | 7/17/2018 | 7/25/2018 | Yes | PMHNP | 7 yrs old; DTO | Yes | Continued Treatment | Risperadol | ORR General Authorization for Medical Treatment | UAC new to RTC; Once UAC is stable, reunification with mother is recommended; I would recommend pursuing reunification. This minor is too young to be in an RTC placement. | Has baseline labs, has EKG. No mood or ADHD rating scales. |
| | | | | /2009 | Guatemala | 7/5/2018 | 7/10/2018 | No written documentation found; appears to have been a telephonic recommendation | Psychiatrist | HI/SI | Yes | Continued Treatment | Prozac, Adderall | ORR General Authorization for Medical Treatment | UAC still needs to stabilize, concur with Shiloh recommendation | ADHD rating scale. No other rating scales in chart including at intake. Does have baseline labs, does have baseline EKG. |
| | | | | /2007 | Honduras | 6/27/2018 | 7/2/2018 | Yes | Psychiatrist | Aggression; Self-harm | Yes | Continued Treatment | Abilify, Focalin, Intuniv | ORR General Authorization for Medical Treatment | UAC still not stable; concur with Shiloh recommendation | has baseline labs, has EKG. No rating scales. Last 3 psychiatric progress notes do not have diagnoses listed. Initial evaluation does have diagnoses listed. |
| | | | | /2007 | Guatemala | 6/21/2018 | 6/27/2018 | Yes | Nurse Practitioner | Aggression; Self-harm; Anxiety | Yes | Continued Treatment | Lexapro, Risperidal | ORR General Authorization for Medical Treatment | UAC continues to be anxious, father deported and UAC wants to go back home; no identified sponsor so once UAC is stable, recommend returning to family in home country | No diagnosis listed on most recent progress note. No symptoms specific rating scale. Does have baseline labs and baseline EKG. |
| | | | | /2008 | Guatemala | 6/13/2018 | 6/20/2018 | Yes | Psychiatrist | SI with Hx of Suicidal Attempts ("SA") | Yes | Continued Treatment | Lexapro, Zyprexa | ORR General Authorization for Medical Treatment | Need to get status of reunification with father; per notes, UAC can be stepped down; concur with Shiloh recommendation | |
| | | | | /2008 | Mexico | 6/5/2018 | 6/11/2018 | Yes | Border Medical | Down Syndrome | | Step-down or reunification | Intuniv | ORR General Authorization for Medical Treatment | Does have EKG in cart. Does have baseline labs. Do not see a r/o adhd diagnosis on subsequent progress notes and no rating scales. | Does have EKG in cart. Does have baseline labs. Do not see a r/o adhd diagnosis on subsequent progress notes and no rating scales. |
| | | | | /2008 | Mexico | 6/5/2018 | 6/11/2018 | Yes | Border Medical | Sibling to UAC w/ down syn drome; No SI/HI; worried about family and anger issues and minor has heart murmur | | Step-down or reunification | None | ORR General Authorization for Medical Treatment | Does not meet criteria for RTC; needs to be either stepped down or reunified with sponsor; UPDATE: MO has open CPS case, FA has negative home study | No baseline rating scales. |
| | | | | /2003 | Mexico | 6/4/2018 | 6/8/2018 | Yes; Didn't see document but indicated in the Case Review and Transfer Request | PMHNP | SI; Self-harm | Yes | Step-down or reunification | Hydroxyzine, Welbutrin | ORR General Authorization for Medical Treatment | Concur with stepdown or reunification; UPDATE 8/6/18: reunification in progress; HS completed 8/3/18 | |
| | | | | /2000 | Guatemala | 6/4/2018 | 6/7/2018 | Yes | | SI w/ plan; Seizures | Yes | Continued Treatment | Lexapro | ORR General Authorization for Medical Treatment | Needs continued stabilization with psych symptoms; concur with Shiloh recommendation | |
| | | | | /2002 | Honduras | 5/29/2018 | 6/22/2018 | Yes | | SI; aggression | Yes | Continued Treatment | | ORR General Authorization for Medical Treatment | Will need psychiatrist to review this record due to its psychotropic medications prescribed. This UAC has been in ORR care since 2013. | 1. Medical record alludes to cardiologist clearing EKG/cardiac results, but no documentation of that original cardiology eval. 2. Topamax-unclear justification. 3. Cogentin-unclear justification. Appears to be a holdover from when individual was treated with injectable risperidone. 4. On 07/11/18 thorazine IM documented as 500mg when first given. What is rationale for dose higher than 25mg IM when first given? 5. Could not find documentation in the medication record that the thorazine was administered except for the psychiatrist progress note. The IM emergency medication report was found in the case file. 6. Documentation of real-time follow up is not found in medical notes section. There is a follow up noted in the next day physician note but nothing with a time stamp either written out or with a computerized time stamp. 7. Should have repeat psychoeducational testing as last comprehensive testing documented in 2015. Did have a brief assessment on 05/25/18. |
| | | | | /2001 | Honduras | 5/24/2018 | 5/25/2018 | Yes | Psychiatrist | SI; Self-harm | Yes | Continued Treatment | Trazodone, Zoloft | ORR General Authorization for Medical Treatment | Concur with Shiloh recommendation | |
| | | | | /2005 | Guatemala | 5/21/2018 | 5/30/2018 | Yes per case review | Unknown | SI w/ plan; Hx SA | Yes | Continued Treatment | Lexapro | ORR General Authorization for Medical Treatment | No depression rating scales. | No depression rating scales. |
| | | | | /2001 | Guatemala | 5/2/2018 | 5/7/2018 | Yes | PMHNP | SI/Self-harm; aggression | Yes | Step-down | Zoloft | ORR General Authorization for Medical Treatment | UAC is eligible for step-down. | |
| | | | | /2001 | Guatemala | 4/30/2018 | 5/3/2018 | Yes | PMHNP | SI;SA | Yes | Step-down or Reunification | Abilify, Lexapro, Prazosin | ORR General Authorization for Medical Treatment | Step-down or reunification; UPDATE 8/6/18: reunification in progress--waiting on HS | |

EXHIBIT 185
WIT:
DATE: 2/24/20
Lori Goodin, CRR

Exhibit 170
Page 261

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ■ | 2001 | Mexico | 4/19/2018 | 4/24/2018 | Yes per Case Review | SI; SA; Chemical Dependency ("CD") | Yes | Continued Treatment | Abilify, Zoloft, Prazosin | ORR General Authorization for Medical Treatment | Concur with Shiloh recommendation | |
| ■ | 2002 | Guatemala | 4/5/2018 | 4/17/2018 | Yes per Case Review | PMHNP | A/H/VH; Self-Harm | Yes | Continued Treatment | Abilify, Zoloft | ORR General Authorization for Medical Treatment | Concur with Shiloh recommendation |
| ■ | 2003 | Guatemala | 3/16/2018 | f | Yes per Case Review | Psychiatrist | SI; Self-harm; Yes A/H | Yes | Step down | Abilify, Clonidine | ORR General Authorization for Medical Treatment | UAC is eligible for step-down since 7/17/18 |
| ■ | 2002 | Guatemala | 2/28/2018 | 3/2/2018 | Yes | Psychiatrist | A/H, DTO per voices | Yes | Reunification | Cogentin, Lithium, Zyprexa | ORR General Authorization for Medical Treatment | Reunification is recommended; UPDATE 8/6/18: reunification is in progress |
| ■ | 2004 | Mexico | 2/19/2018 | 2/26/2018 | YES | BHMP/NP | Self-harm/DTS | Yes | Step down | Lexapro, Prozosin | ORR General Authorization for Medical Treatment | Step-down or lower level of care recommended since 7/17/18; UPDATE 8/6/18:  Per FFS, working on step-down. |
| ■ | 2001 | El Salvador | 1/18/2018 | 1/23/2018 | Yes | Psychologist | Self-harm; SI; Anxiety | Yes | Step-down or Reunification | Abilify, Zoloft | ORR General Authorization for Medical Treatment | Step-down or reunification recommended since 7/17/18; UPDATE 8/6/18:  pending post release services |
| ■ | 2000 | Honduras | 1/4/2018 | 1/9/2018 | Yes | NP/Psychiatrist | A/H; Self-harm | Yes | Step-down or Reunification | Zoloft | ORR General Authorization for Medical Treatment | Reunification is in progress |
| Reunification ■ | 2004 | Honduras | 12/19/2017 | 12/27/2017 | Yes | PMHNP | A/H; SI; Self-Harm | Yes | Reunification | Abilify, Lexapro | ORR General Authorization for Medical Treatment | Reunification is possible; UPDATE 8/6/18: Per FFS, case approved for reunification pending TVPRA post reunification. |
| ■ | 2002 | Mexico | 11/30/2017 | 12/4/2017 | Yes per case notes | Unknown | Sexual Assault -Perp; A/H; SI w/ plan | Yes | Continued Treatment | Adderall | ORR General Authorization for Medical Treatment | Concur with Shiloh recommendation; will need psychosexual evaluation for treatment and risk to other children | Does have baseline labs and EKG.  ADHD rating scale in chart, but no PTSD or depression rating scales. |
| ■ | 2000 | Mexico | 8/8/2017 | 8/11/2017 | No recommendation found | Unknown | DTO-Assaultive | Yes | Continued Treatment | Adderall, Seroquel | ORR General Authorization for Medical Treatment | This UAC has been in RTC for 360 days; will need to inquire with FFS reason for extreme length of care in RTC setting; UPDATE 8/6/18: FFS working on legal update for URM referral or LTFC referral.  Per FFS moving to another shelter is detrimental to his mental health.  Doing extremely well in Shiloh and poorly in secure/staff placements.  MO has withdrawn reunification. | Does have baseline labs and EKG.  No follow up fasting glucose (should be q6months when taking a secondary generation antipsychotic like seroquel which ■ is taking.  Is due for follow up lipid next month--annual.  No rating scales in chart (? |

Exhibit 170
Page 262