# Exhibit 171

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Exhibit 171
Page 263

| From: | ████████ (ACF) (CTR) |
|---|---|
| Sent: | Wednesday, January 9, 2019 11:43:42 AM |
| To: | Biswas, Toby R M (ACF) |
| CC: | Ray, Faith (ACF); Fink, David (ACF); Moomaw, Sara (ACF); ████████ (ACF); Miranda-Maese, Aurora (ACF) (CTR) |
| Subject: | January NOP Compliance Review: Staff Secure and RTC Facilities |
| Attachments: | Jan 2019 Compliance Review_Staff Secure_RTC Populations.xlsx |

Hi All,

I have completed the monthly review for Staff Secure and RTC facilities for the Month of January.

- 93 out of 128 cases were Non-Compliant
- There were 40 Discharges from Staff Secure and RTC facilities
- There were 39 Step ups, down, or placements into Staff Secure or RTC

As a reminder, all minors in ORR custody in Staff Secure and RTC facilities must have a monthly Notice of Placement for why they are in a Staff Secure or RTC facility. This NOP must be conducted in a language of the minor's preference, and the written form must be completed in the minor's preferred language as well. In the event that the minor's preferred language is not available via ORR standard form, Staff Secure and RTC personnel may use an interpreter, but this must be noted on the NOP form.

████████████ applies to this spreadsheet.

I will be reaching out to the FFS for these facilities individually.

████████████

**Policy Analyst**
U.S. Department of Health and Human Services
Administration for Children and Families
Office of Refugee Resettlement
Office of the Director – Division of Policy and Procedures
████████████
████████████████

EXHIBIT: 175
NAME: Fink
DATE: 2-12-20
J Leitz Moran

**Exhibit 171**
**Page 264**

# Exhibit 172

## ENTIRE DOCUMENT SUBMITTED UNDER SEAL

**Exhibit 172**
**Page 265**

# Exhibit 173

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 173**
**Page 270**

| | |
|---|---|
| **From:** | Ray, Faith (ACF) |
| **Sent:** | Tuesday, January 22, 2019 12:54:03 PM |
| **To:** | David, Natasha (ACF) |
| **Subject:** | RE: Flores Compliance Review for Shenandoah, 1/18/19 |

Hi Natasha,

My Outlook calendar is up-to-date, so please choose a date/time to meet that works best for you.

Best,
Faith

**Faith Ray,** *Policy Analyst*
Division of Policy & Procedures| Office of the Director
Direct: 202.205.3982

**Office of Refugee Resettlement**
Administration for Children & Families
U.S. Dept. of Health & Human Services
Mary E. Switzer Building
330 C Street SW, Room 5123
Washington DC 20201

---

**From:** David, Natasha (ACF) <Natasha.David@acf.hhs.gov>
**Sent:** Monday, January 21, 2019 12:59 PM
**To:** Ray, Faith (ACF) <Faith.Ray@acf.hhs.gov>
**Cc:** Shireena, Tanzeena (ACF) <Tanzeena.Shireena@ACF.hhs.gov>; Volovar, Jill (ACF) <Jill.Volovar@ACF.hhs.gov>; Biswas, Toby R M (ACF) <Toby.Biswas@ACF.hhs.gov>; Fink, David (ACF) <David.Fink@acf.hhs.gov>; Miranda-Maese, Aurora (ACF) (CTR) <Aurora.Miranda-maese@acf.hhs.gov>; █████████████████
**Subject:** RE: Flores Compliance Review for Shenandoah, 1/18/19

Hello Faith,

I would like to follow up with you this week to better understand this process and areas that may not be outlined in P & P. I will be in PA all of this week. Please let me know your availability this next and next week.

Thank you

Natasha David, MSW
Federal Field Specialist
U.S. Department of Health & Human Services
Administration for Children & Families
Office of Refugee & Resettlement
Division of Unaccompanied Children Operations

202-205-4949 (Office)
202-779-2957 (Cell)
natasha.david@acf.hhs.gov

EXHIBIT _121_
WIT: _RAY_
DATE: _10/23/19_
REPORTER: J. HARMONSON

Confidential - Subject to Protective Order

<< OLE Object: Picture (Device Independent Bitmap) >>
* In case of emergency, after hours please contact the DUCO hotline at (202) 401-5709

---

**From:** Ray, Faith (ACF) <Faith.Ray@acf.hhs.gov>
**Sent:** Friday, January 18, 2019 1:24 PM
**To:** David, Natasha (ACF) <Natasha.David@acf.hhs.gov>
**Cc:** Shireena, Tanzeena (ACF) <Tanzeena.Shireena@ACF.hhs.gov>; Volovar, Jill (ACF) <Jill.Volovar@ACF.hhs.gov>; Biswas, Toby R M (ACF) <Toby.Biswas@ACF.hhs.gov>; Fink, David (ACF) <David.Fink@acf.hhs.gov>; Miranda-Maese, Aurora (ACF) (CTR) <Aurora.Miranda-maese@acf.hhs.gov>; ███████████████████████
**Subject:** Flores Compliance Review for Shenandoah, 1/18/19

Hi Natasha,

It was nice meeting you yesterday at the office.  I've attached the weekly compliance review that I do for Shenandoah (I also do a weekly review for Yolo, which I email out separately).

This compliance review is in its 7th week and is a response to a Court order (U.S. District Court, Central District of California) where Plaintiffs claimed that ORR was out of compliance with several elements of the Flores Settlement Agreement. So the judge issued a Motion to Enforce certain elements of the FSA, which is why ORR is now reviewing the secure facilities (as well as the staff secures & RTCs).

For my part, I review the **basis for placement** *every week* and the **Notice of Placement** forms *every month*, for all secure cases.

This week, Shenandoah had <u>three non-compliant cases</u>, due to a lack of a 7-day update for each of these minors (who have been recommended for step down).  Please let the program know of these compliance issues, so they will be corrected by the time I check again next week, **but note that this spreadsheet is for ORR internal use only.**  (Use ██████ ███████████ password to view the spreadsheet.)

Also, I wanted to let you know that this week the Policy team working on the Flores compliance court order met with Sarah Viola and the UAC monitoring team to discuss corrective actions for programs not fully in compliance by the start of March (secure, staff secure, and RTCs).  You should know that Shenandoah has worked hard to come into compliance over the past seven weeks, so continued support will really help them.

If you have any questions, don't hesitate to reach out.  We can set up a meeting to talk more in person if that would be helpful.  Looking forward to working with you!

Thanks,
Faith

<< File: 01.18.19 Shenandoah Flores Compliance Review.xlsx >>

**Faith Ray**, *Policy Analyst*
Division of Policy & Procedures | Office of the Director
Direct: 202.205.3982

**Office of Refugee Resettlement**
Administration for Children & Families
U.S. Dept. of Health & Human Services
Mary E. Switzer Building

Confidential - Subject to Protective Order

**Exhibit 173**
**Page 272**

330 C Street SW, Room 5123
Washington DC 20201

Confidential - Subject to Protective Order

GOV-00022452

Exhibit 173
Page 273

# Exhibit 174

Exhibit 174
Page 274

1   UNITED STATES DISTRICT COURT

2   CENTRAL DISTRICT OF CALIFORNIA

3   WESTERN DIVISION

4

5   LUCAS R., et al.,                          Case No.  2:18-CV-05741 DMG PLA

6              Plaintiffs,
                                               **DECLARATION OF DR. PAUL BLOCK**
7        v.

8   ALEX AZAR, et al.,

9              Defendants.

10      1.  The facts set forth below are based on my personal knowledge and, if called

11  as a witness, I could and would competently testify to them. I am over eighteen years

12  of age.

13      2.  Attached as Exhibit A is a true and accurate copy of my Expert Report,

14  submitted on June 19, 2020, which I hereby reaffirm and verify under penalty of

15  perjury as containing the opinions that I am offering in this case.

16      3.  If called to testify at trial, I anticipate that I will testify to the matters and

17  opinions as set forth in my Expert Report.

18      I declare under penalty of perjury under the laws of the State of California and the

19  United States that the foregoing is true and correct.  Executed on this  _29th__  day of

20  October, 2020.

21

22                                        _Paul Block, Ph.D._
                                          _____
23
                                          Dr. Paul Block
24

25

26

27

28

                                                           **DECLARATION OF DR. PAUL BLOCK**
                                                           **CASE NO. 2:18-CV-05741 DMG PLA**

**Exhibit 174**
**Page 275**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LUCAS R., et al., | Case No.  2:18-CV-05741 DMG PLA |
| Plaintiffs, | **DECLARATION OF JOHN FARLEY, ESQ.** |
| v. | |
| ALEX AZAR, et al., | |
| Defendants. | |

1.  The facts set forth below are based on my personal knowledge and, if called as a witness, I could and would competently testify to them. I am over eighteen years of age.

2.  Attached as Exhibit A is a true and accurate copy of my Expert Report, submitted on June 19, 2020, which I hereby reaffirm and verify under penalty of perjury as containing the opinions that I am offering in this case.

3.  If called to testify at trial, I anticipate that I will testify to the matters and opinions as set forth in my Expert Report.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.  Executed on this 29th day of October, 2020.

John Farley

**DECLARATION OF JOHN FARLEY, ESQ.**
**CASE NO. 2:18-CV-05741 DMG PLA**

**Exhibit 174**
**Page 276**

# EXHIBIT A

**Exhibit 174**
**Page 277**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

LUCAS R., et al.,

                Plaintiffs,

v.

ALEX AZAR, et al.,

                Defendants.

Case No.  2:18-CV-05741 DMG PLA

**EXPERT REPORT OF DR. PAUL BLOCK AND JOHN FARLEY, ESQ.**

**PLAINTIFFS' CONFIDENTIAL PERSONAL INFORMATION/CONFIDENTIAL**

Plaintiffs' Confidential Personal Information/Confidential

Expert Report of
Dr. Paul Block and John Farley, Esq.
Case No. 2:18-CV-05741 DMG PLA

**Exhibit 174
Page 278**

1.  **Community-based services are effective for serving children with a wide range of mental health, behavioral, developmental, and intellectual disabilities, including those disabilities likely to be identified among unaccompanied children.**

Community-based services generally refer to a wide range of services and supports that might allow a child to remain in a community setting or a less restrictive level of care.  Evidence-based services are those that have been evaluated in controlled research and found to be effective for specific psychological disorders and problems that have been identified through evidence-based evaluation.[9] A significant number of community-based service approaches have been evaluated in controlled research (called "evidence-based community-based services") and shown to be cost-effective for children with mental health, behavioral, developmental and intellectual disabilities (The Washington State Institute for Public Policy [WSIPP], 2019).  This includes evidence-based outpatient and community-based interventions for traumatic experiences, depression and anxiety, disturbances of attachment, and behavioral problems including delinquent and even violent misconduct (see, e.g., Underwood et al., 2006, p. 286; Orchard Human Services, Inc.).

Although many evidence-based community-based interventions are designed to work with families, there are also individually focused treatments for specific problem behaviors and disorders that could be delivered to children in shelters and group home settings, including for children with intellectual or developmental disabilities (Lee & Miller, 2009). These include Trauma Focused Cognitive Behavioral Therapy (Deblinger et al., 2011; O'Callaghan et al., 2013), as well as Coping Cat for anxiety, Interpersonal Psychotherapy, Adolescent Skills Training for depression, Aggression Replacement Training, Dialectical Behavior Therapy (DBT) for severely impaired self-regulation, and Motivational Interviewing (see the California Evidence-Based Clearinghouse for Child Welfare, https://www.cebc4cw.org/, for more details on these programs). Most of these interventions also coach caregivers if they are available, but these treatments can be applied in the absence of a caregiver and could be delivered to children in shelters or group homes who do not have stable relationships with identified caregivers.

Some interventions that were not initially designed for children in congregate care can be adapted to this population. For example, programs such as Trauma Systems Therapy (TST), an initially community-based service, is in the process of being implemented within residential settings such as those provided in Family Service of Rhode Island programs.  TST is applicable across all trauma types and is often used with children and teens who have experienced complex, chronic traumatic events (Saxe, 2016; Saxe et al., 2015; Brown et al., 2013). TST has been used with specialized populations including immigrants and refugees and can be delivered in settings such as foster care, inpatient units, and residential treatment (Saxe, 2016).

Community-based services are most likely to be successful when they are matched with the individual needs of each child as determined through evidence-based evaluation.  Evidence-based

---

[9] Evidence-based evaluation tools and strategies, and evidence-based services are those that have been directly evaluated through research and shown to have scientific reliability and validity.  When such direct scientific testing is not available, research-informed evaluation and services are selected and applied with explicit reference to scientifically demonstrated causes of presenting problems and evidence about those causes' response to interventions.  For purposes of this report, the term "evidence-based" is used to refer to tools and approaches that have been directly evaluated through research or, where not available, chosen as best practices through explicit reference to relevant research information (Bond et al., 2009; Bornstein, 2017).

Plaintiffs' Confidential Personal Information/Confidential Case

Expert Report of
Dr. Paul Block and John Farley, Esq.
No. 2:18-CV-05741 DMG PLA

**Exhibit 174
Page 279**

evaluation uses tools and methods that have been directly evaluated and shown to be effective for identifying and quantifying presenting problems.

Community-based services are likely to be successful if:
- delivered with clinical fidelity to an evidence-based treatment,
- individualized to address the needs and circumstances of each child,
- provided in a timely fashion and for long enough to have the intended effects, and
- are not standalone services but are rather part of a larger grouping of services designed to address a series of needs in sufficient quantities to serve the needs of all of those who require them.

When evidence-based services are delivered with fidelity to address needs that have been identified through an evidence-based evaluation, they generally result in better outcomes than treatment as usual (Institute of Medicine, 2006; Weiss et al., 2000; Weisz et al., 2006).[10] Usual care ("treatment as usual") has been defined as "psychotherapy, counseling, or case management provided as part of the regular services of providers, agencies, organizations, programs, or facilities for youth" (Weisz et al., 2006, p. 674).

There are effective, evidence-based community-based services available across the country. Cognitive Behavioral Therapy, for instance, is a treatment approach that has been "demonstrated to be effective for a range of problems," including depression and anxiety (American Psychological Association, 2017), and is available in every state.[11] Forty-one states and D.C. have formal funding mechanisms to support evidence-based programs in behavioral health and thirty-eight states and D.C. have such funding mechanisms for evidence-based child welfare programs (Pew-MacArthur, 2017, pp. 23-26). Although children in ORR custody are not eligible for Medicaid, which typically funds many of the most widely available services, ORR has mechanisms to secure external medical and mental health services through Point Comfort Underwriters, including paying Medicare-like rates at or above to place children in out-of-network residential treatment centers (Rule 30[b][6] Deposition of Michael Bartholomew, pp. 104-09). Medicare reimbursements rates are generally higher than the Medicaid rates that many community-based service providers currently accept. Where research-informed community-based services are not already available as alternatives in particular facilities, in our professional experience, federal and state authorities can use the influences of contracting and outcomes-based oversight to stimulate development of needed services (see also, Children's Bureau, 2015; Meltzer et al., 2019).

Placement in a residential treatment center (RTC) is typically far more expensive than community-based services (e.g., Development Services Group, Inc., 2011; Magellan Health Services Children's Services Task Force, 2008; Mercer, 2008) but has little evidence for bringing about sustainable gains (Burns et al., 1999; Mercer, 2008). In our experience, RTC costs per day can range from four hundred dollars ($400.00) to more than eight hundred dollars ($800.00). ORR officials acknowledge that RTCs are significantly more expensive than shelters, (Deposition of James De La Cruz, p. 207), and that out-of-network RTC placements can be even more costly

---

[10] Weisz et al. (2006) addressed this question through an analysis of 32 randomized trials that directly compared evidence-based treatment (EBTs) with usual care. EBTs outperformed usual care, including for minority youths and youths with high severity (Weisz et al., 2006). Usual care showed an average of no impact on children's functioning or symptoms (Weisz et al., 2006).

[11] For a non-exhaustive list of cognitive behavioral therapists, see the Association for Behavioral and Cognitive Therapies provider list at https://www.findcbt.org/FAT/.

(Rule 30[b][6] Deposition of Michael Bartholomew, pp. 108-09). Community-based services are generally more cost-effective than residential treatment (Washington State Institute for Public Policy, 2019).

As a result, community-based services can be prioritized for contracting and use within a system of care without undue hardship to ORR.  This is the case even when more intensive services are needed for maintaining children in shelters or foster care placement.

> **2. Safety concerns, management challenges and elopement risk are the most common considerations used to justify placement in more restrictive settings.  However, these risks can often be managed in less restrictive settings, and thus are not justifications in themselves for such placements.**

When children are identified as needing placement in more restrictive settings, these decisions are often made based on presenting behaviors and risks that are challenging to manage while keeping children safe.  Specifically, safety concerns about potential for self-harm or harm to others are often given as justifications for stepping children up to more intensive programming and/or placing them in more restrictive settings.

Behaviors that raise safety concerns can, however, often be managed effectively with evidence-based services and behavior management strategies in lower levels of care. This can include community-based services as well as intensive outpatient or partial hospital programs where children remain in their placements and continue with daily routines. Increased staffing and targeted supervision in care facilities can also address self-harm, predatory behavior and disruptive behavior without the need for transfer.

When safety is effectively managed in this fashion, *community-based services* can serve the goals of community protection, child protection, and beneficial treatment more effectively than residential treatment (e.g., Huey et al., 2004; Magellan Health Services Children's Services Task Force, 2008; WSIPP, 2019). Residential treatment is not associated with improvements for children with aggressive behavior and can actually increase the risks for future behavioral problems by depriving children of positive peer examples, and instead, segregating them with other youth with mental health and behavioral challenges (Mercer, 2008; Magellan Health Services Children's Services Task Force, 2008). To the extent youth do show improvement in residential treatment, there is little evidence of any long-term gains, and youth often re-enter residential treatment or the juvenile justice system. (Magellan Health Services Children's Services Task Force, 2008).

In Massachusetts, for example, we have observed the Massachusetts Department of Youth Services  substantially reduce its secure treatment beds for court-involved youth who, as a result, are instead largely served with community-based services or in non-secure settings such as foster care homes that the Department subsequently had to develop. The Department of Mental Health similarly reduced state hospital care for children and adolescents to a single adolescent inpatient unit.  By limiting the number of residential beds and developing community-based alternatives, the mental health system forced itself to create a set of resources and procedures that would support its changing culture to implement its policy directed at placing children in the least restrictive alternative.  Together, these results reflect a shift in philosophy and implementation of a series of supports, policies, and activities that would enact more aggressive commitment to serving and

Plaintiffs' Confidential Personal Information/Confidential Case

10

Expert Report of
Dr. Paul Block and John Farley, Esq.
No. 2:18-CV-05741 DMG PLA

**Exhibit 174
Page 281**

managing children in the least restrictive setting possible (as happened in Tennessee, Meltzer et al., 2019) since Jerry Miller decided in 1971 to initiate the "Massachusetts Experiment" by closing residential care facilities and maintaining children in community settings.[12] To complete a similarly successful shift, ORR would not have to change its total number of beds, but rather limit its use of more restrictive placements, driving a culture shift that focuses on keeping children in the least restrictive placements while they are in ORR custody and securing long-term foster care placements for children without viable sponsors.

In sum, safety risk alone is insufficient to establish that a child cannot be appropriately served in a less restrictive setting. The criteria for escalation or retention of youth in placements at higher levels of care must include the documented evaluation of the origins, causes, drivers, and contexts of concerning threats or misconduct; it must also identify the interventions attempted, and the specific reasons why the risk cannot be managed in a less restrictive setting. As discussed in section C, ORR lacks sufficient policy guidance or institutional oversight of mental health services to ensure that this type of evaluation occurs for children in its custody.

### C. A system of care designed to maintain children with disabilities in integrated and non-secure settings must take proactive steps to identify children's needs and explore alternatives to restrictive care.

In our professional experience, accommodating children with disabilities in non-secure placements is demonstrably achievable when accompanied by an active commitment to effective research-based and flexible service planning. The barriers to providing services necessary to maintain youth in less restrictive, integrated settings often have less to do with the child than the limitations presented by bureaucratic or political considerations, or resistance by the external providers and systems responsible for serving youth with disabilities and other needs.

To ensure that children are placed in the least restrictive setting appropriate for their needs, the system of care must have tools to identify children's needs, placement criteria that require consideration of alternatives to restrictive residential care, and oversight mechanisms to ensure children are not unnecessarily placed or continued in restrictive placements.

### 1. To serve children in less restrictive placements and avoid unnecessarily prolonged residential care, children's individual needs must be timely identified and addressed.

As discussed above, community-based services are capable of maintaining children in less restrictive settings when these services are tailored to a child's particular needs. To the extent it is *possible* to provide needed services that can meet a child's needs while that child is in a less restrictive setting, the system of care should proactively identify needs and provide services that permit the child to be maintained in the lowest possible level of care where their needs can be appropriately addressed. Adequate assessments are critical to enable a system of care to accommodate individual children's needs, avoid unnecessary transfers to more restrictive facilities, and plan for a child's timely release.

---

[12] See the presentation for the Vera Institute by Barry Krisberg of The Warren Institute at the University of California Berkeley Law School, former president of the National Council on Crime and Delinquency, "Jerry Miller Eat Your Heart Out", on reforms in Massachusetts and how California later took similar steps, at https://www.vera.org/research/barry-krisberg-jerry-miller-eat-your-heart-out-part-1-of-3.

**Exhibit 174
Page 282**

Without evidence-based evaluation (Bornstein, 2017), providers have been found to misdiagnose children far more often than is acceptable, due to errors in data gathering and in judgments made from the resulting available data (Merten et al., 2017).  For instance, Regier et al. (2013) found "questionable" agreement for diagnosis of Major Depressive Disorder and Disruptive Mood Dysregulation Disorder, and "unacceptable" agreement for Mixed Anxiety-Depressive Disorder and non-suicidal self-injury in children in the field trials on which the final DSM-5 was based, and too little confidence to determine whether agreement was sufficient for three other disorders. Merten et al. (2017) attribute these mistakes in part to provider use of short cuts and assumptions, including inappropriate treatment of symptoms that are associated with particular disorders as sufficient indication that the disorder is present. Individual provider judgment thus cannot be relied upon without a structured process for scientifically-based data gathering and judgment.

Evidence-based assessment (EBA) emphasizes the use of research and theory to inform the selection of assessment targets based on the presenting concerns for each child, the methods and measures used in the assessment, and the assessment process itself (Hunsley & Mash, 2007, p. 29). The determination of which tools and methods to use is based on research about the possible nature of presenting concerns (e.g., sadness can indicate depression, post traumatic reactions, adjustment to life circumstances including other mental health disorders, and effects of substances or medical conditions) and about the known causes of those problems (e.g., anxiety is caused by factors related to temperament, parenting, social and physical environments including real and perceived threats, behavioral and thought patterns and coping strategies, and certain substances and medical conditions) (Bornstein, 2017).

When following these processes, there is no need for children's disabilities to result in placement of the children in restrictive settings.  Rather, individual children's needs and strengths would be determined through evidence-based evaluation and service planning, and identified in the individualized service plan. Need-based treatment would be delivered in any placement that is appropriate for the child.

Children in ORR custody are provided an Initial Medical Examination, Initial Intakes Assessment, Assessment for Risk, UAC Assessment, Individual Service Plan, and UAC Case Review (UAC MAP Sec. 3 Appendix; Initial Medical Exam – V5; Rule 30[b][6] Deposition of Michael Bartholomew, pp. 65-67, 167-170). These forms, however, resemble checklists and seem more attuned to the gathering of lower level demographic data and history, rather than the analysis of clinical information for the purposes of creating an individualized care plan and assessing the need for additional services.[13] Without deeper evaluation of the clinical needs specific to each child, it is not possible to determine what services would appropriately address the child's needs, including whether it is possible to place the child in a less restrictive setting.

---

[13] Certain forms such as the UAC Assessment ask whether the child has a disability, "based on the most recent screening for disabilities." (UAC MAP Sec. 3 Appendix 3.7). Yet ORR officials and care providers report that there is no standard screening, guidance, or training on how to identify whether a child has a disability (Rule 30[b][6] Deposition of Michael Bartholomew, pp. 172-75; Deposition of Melissa Cook, pp. 97-98; Deposition of David Fink, pp. 180-83; Deposition of James De La Cruz, pp. 82-88; Deposition of Marivic Fields, pp. 93-96, 215-16). Given that ORR requires care providers to make a determination as to whether a child has a disability under the Americans with Disabilities Act, it is highly problematic that there is no standard methodology to determine who is and who is not covered by the Act's provisions.

Plaintiffs' Confidential Personal
Information/Confidential Case

Expert Report of
Dr. Paul Block and John Farley, Esq.
No. 2:18-CV-05741 DMG PLA

Exhibit 174
Page 283

Maintaining children who pose safety concerns in a less restrictive setting requires initial and ongoing evaluation of the context and factors driving the child's unsafe behaviors. (see, e.g., AACAP, 2010; Children's Bureau, 2015; Friedman, 2004; Mercer, 2008).   Although there is a lack of assessment tools and interventions specifically adapted to the population of unaccompanied children, existing evidence-based assessments and interventions could address factors such as post-traumatic triggers, despair and desperation, interpersonal conflict, new stressful experiences, or acute psychiatric deterioration.   Identification of the specific drivers of the child's safety risk allows for child-specific interventions that can rapidly reduce risk and forestall avoidable transfer to higher levels of security and/or intensive care.

ORR programs are in theory able to provide individualized services that could help mitigate the need for a transfer to a more restrictive facility. The availability of such services, however, appears to vary considerably across the ORR network (e.g., Deposition of Marivic Fields, pp. 107-11 [explaining that available mental health services "depends on the program" and that "one program in Miami . . . is able to connect with a community based organization that would provide more trauma-focused type of treatment]; Deposition of David Fink, pp. 242-44 [noting that additional services, such as a behavior coach, an additional clinician, or crisis intervention services could help avoid placement disruptions, and that staff-secure providers can request those services]).

A lack of effective or timely assessments also creates a high risk of inappropriate transfers to more restrictive settings based on a misunderstanding or misdiagnosis of a child's behaviors. This appears to be an issue within the ORR system. Federal Field Specialist Supervisor David Fink, for example, testified that children with intellectual and cognitive disabilities are sometimes inappropriately placed at secure facilities because the transferring facility "might not have the bandwidth or the capacity to evaluate [the child], so they might get misdiagnosed when they come in" (Deposition of David Fink, p. 122). As a result, ORR may not identify a child's disability or evaluate the appropriateness of the child's placement until *after* the child has already been placed in a restrictive facility (Deposition of David Fink, p. 122). Fink further testified that he was not aware of any ORR policies or practices "to guard against inappropriate placement of youth with a cognitive or intellectual disability at a secure level of placement" and that ORR defers to clinicians at the facility level to determine whether a child requires evaluation for a possible disability (Deposition of David Fink, pp. 122-23).

In addition to placing children in least restrictive placements, the primary responsibility of a system of care is to release children from its care as promptly as possible to permanent, home-like settings where the child's safety and well-being can be maintained (AACAP, 2010). To achieve this, a child's anticipated post-discharge needs must be timely identified, and release and step-down planning must begin immediately upon entry into the system (e.g., AACAP, 2010), and be renewed on an ongoing basis and at each transition in placement or services.

In the ORR system, a child's identified disability triggers requirements for a home study and post-release services (ORR Policy Guide, sections 2.4.2; 6.2). These requirements make it especially critical that a child's disability be promptly identified. Post-release services include referrals to mental health resources in the sponsor's community (ORR Policy Guide, section 6.2.2). Once a potential sponsor is identified, referral planning should begin immediately to coordinate the

Plaintiffs' Confidential Personal Information/Confidential Case

Expert Report of Dr. Paul Block and John Farley, Esq. No. 2:18-CV-05741 DMG PLA

**Exhibit 174**
**Page 284**

services and supports that will be sufficient post-release to enable the child to be released and maintained successfully in their new home community.[14]

Based on our experience, waiting for a child to reach the point of planning imminent release before planning for his or her transition to the community is likely to delay release as well as threaten successful reunification. Post-release planning may be best facilitated by those with professional expertise or familiarity with community-based services.  It is not appropriate or realistic to expect sponsors to identify the child's needs and put in place services by themselves prior to a home study or approval of a child's release.

### 2. ORR's criteria regarding transfers to restrictive residential settings do not adequately consider whether a child could safely remain in their current placement with effective individualized services.

A determination as to the least restrictive placement appropriate for a child must include specification of which community-based services and supports have been identified as possibly relevant, which have been provided, why they have been ineffective despite being delivered with fidelity to an evidence-based approach, and whether additional services could be provided.  If services can be identified that have the potential to maintain a child safely and treat the child effectively at a lower level of care but have not yet been offered, the system of care must ensure that the child receive that intervention before step-up. Lastly, these decisions and the reason for the decision must be tracked by provider, so as to understand the reason why transfers are requested and are being made, and to provide programs with assistance to maintain youth in their care.

Although ORR purports to require care providers to make efforts to keep children in a least restrictive setting through effective interventions and support services "when appropriate," (ORR Policy, section 1.4.1), this general policy is vague and does not require the specific determinations necessary to ensure that alternatives to restrictive placement are actually considered and attempted. Further, as discussed in section C.4, ORR lacks sufficient oversight of mental health services to ensure that children are kept in the least restrictive setting.

ORR's policies on step-up to specific restrictive facilities do not appear to adequately consider affirmative supports that could enable a child to remain in a less restrictive setting.  Section 1.2.4 provides that for a transfer to secure facility, it must be determined that a youth either poses a danger to him or herself or others, or, that he or she has been charged with or has been convicted of a crime or is chargeable with such an offense.

The section provides further guidance to assess each youth seeking a determination if the UAC:

- Has been charged with a crime, is chargeable with a crime, or has been convicted of a crime or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act and assess whether the crimes or delinquent acts were:
  - Isolated offenses that (1) were not within a pattern or practice of criminal activity and (2) did not involve violence against a person, or the use or carrying of a weapon (e.g. breaking and entering, vandalism, DUI, status offense, etc): or

---

[14] This includes identification of positive youth developmental assets, types and manner of caregiver and community supports, available treatment options and, if necessary, risk management planning based on each child's individual service plan (Benson et al., 2011).

Plaintiffs' Confidential Personal Information/Confidential Case

14

Expert Report of
Dr. Paul Block and John Farley, Esq.
No. 2:18-CV-05741 DMG PLA

**Exhibit 174
Page 285**

- o petty offenses which are not considered grounds for a stricter means of detention in any case (e.g., shoplifting, joy riding, disturbing the Peace)
- Has committed or has made credible threats, to commit a violent or malicious act while in ORR custody
- Has committed, threatened to commit, or engaged in serious, self-harming behavior that poses a danger to self while in ORR custody.
- Has engaged in conduct that has proven to be unacceptably disruptive of the normal function of a staff secure facility in which the youth is placed such that transfer may be necessary to ensure the welfare of the UAC or others,
- Has self-disclosed violent criminal history in ORR custody that requires further assessment or,
- Has a history of or displays sexual predatory behavior or has engaged in inappropriate sexual behavior.

As discussed above, acute safety risk does not necessarily justify transfer to restrictive care because this can often be effectively managed in less restrictive settings by community-based services or stabilization programs. Most youth with even these more challenging behaviors should be provided effective services determined to address the factors causing their safety risks for sufficient time to determine whether they truly require higher levels of care, with additional supports in place to ensure their safety in the meantime. For instance, Dialectical Behavior Therapy can be administered in residential programs (DBT-LBC) and has good effectiveness for reducing self-injurious behavior.

Significantly, consideration of dangerousness in this policy fails to take into consideration the application of less drastic responses such as the use of additional staffing or one to one supervision. This approach is frequently used in the types of settings from which transfer is sought and is possible in the ORR context (Deposition of James De La Cruz, p. 217 [acknowledging that adding additional staff to a shelter could be an alternative to transfer to a secure or staff secure facility so long as the staff is properly trained]).

Although the policy notes that a child with a severe mental health issue may be transferred to an RTC or other therapeutic placement, it does not require consideration of the sources of a child's unsafe behavior and post-traumatic triggers or other mental health drivers of safety risk that could be safely addressed in a less restrictive setting (see ORR Policy, section 1.2.4). Vague descriptions in the step-up criteria, such as "unacceptably disruptive," make this lack of consideration of mental health drivers even more worrisome because it permits step up based on behaviors that the child may have difficulty understanding or controlling because of their disabilities.

The provisions of the staff secure transfer process in ORR Policy, section 1.2.4 are subject to the same analysis, particularly the criteria that a child is "unacceptably disruptive." This section is more unclear in that it seeks to encompass both stepping down from higher levels of care and stepping up to this level.

With regard to transfers to residential treatment centers, section 1.4.6 specifies that:

Care providers request a transfer to an RTC for an unaccompanied alien child who has a psychiatric or psychological issue that cannot be addressed in an outpatient setting.

Plaintiffs' Confidential Personal Information/Confidential Case

Expert Report of Dr. Paul Block and John Farley, Esq. No. 2:18-CV-05741 DMG PLA

**Exhibit 174 Page 286**

A UAC may only be placed into an RTC if the youth is determined to be a danger to self or others by a licensed psychologist or psychiatrist. In assessing dangerousness, ORR uses the criteria for secure placement in section 1.2.4. In addition, ORR will consider a transfer to an RTC only if a licensed psychologist or psychiatrist has determined the following:

- The unaccompanied alien child has not shown reasonable progress in the alleviation of his/her mental health symptoms after a significant period of time in outpatient treatment. (Note: the amount of time within which progress should be demonstrated varies by mental health diagnosis).
- The child's behavior is a result of his/her underlying mental health symptoms and/or diagnosis and cannot be managed in an outpatient setting.
- The unaccompanied alien child requires therapeutic-based intensive supervision as a result of mental health symptoms and/or diagnosis that prevent him or her from independent participation in the daily schedule of activities.
- The child presents a continued and real risk of harm to self, others, or the community, despite the implementation of short-term clinical interventions (such as, medications, a brief psychiatric hospitalization, intensive counseling, behavioral management techniques, 24-hour supervision, supportive services or therapeutic services).

It is our professional opinion that these criteria fail to ensure that an RTC placement is truly the least restrictive setting appropriate for that child for several reasons. As we discussed above, with research-based assessment, intervention, and risk management strategies, many children whose disabilities' manifest in aggressive, self-injurious, or other behavior that is difficult to manage, can be served through community-based services, or certainly at less restrictive, shorter-term levels than residential treatment centers (Mercer, 2008; WSIPP, 2019). Interventions that address the mental health condition underlying a child's problems can mitigate the need to seek a step-up to more restrictive placements.

Second, a child can be placed in an RTC without explicit consideration of possible accommodations in the less restrictive placement. Under ORR's policy, a child need only satisfy one of the bullet-pointed criteria (Notice of Placement in a Restrictive Setting; Deposition of Marivic Fields, pp. 133-34; 242-43). A determination that a child "requires therapeutic-based intensive supervision as a result of mental health symptoms and/or diagnosis that prevent him or her from independent participation in the daily schedule of activities" focuses only on the child's level of impairment and does not require any assessment of whether the child could participate in the shelter's daily activities with additional accommodations (ORR Policy, section 1.4.6).

Additionally, the criteria do not appear to require the clinician to consider whether a child could benefit from alternative outpatient treatments. In our experience, the fact that a child has not made progress in existing outpatient treatment does not necessarily indicate a need for restrictive residential care; it may instead require an evaluation of whether a different type of treatment would be more effective. Similarly, a brief psychiatric hospitalization cannot be expected to resolve a child's mental health concerns unless paired with individualized treatment.

Finally, the criteria leave substantial room for subjective interpretation. What is reasonable or significant in terms of duration? What are the presenting behaviors that cannot be managed in an outpatient setting? What are the items within the daily schedule of activities that are impacted by the symptoms and/or diagnosis? How severely are they impacted? Is it necessary to participate in these activities? Lastly has each of the described attempts to ameliorate the issues been attempted

Plaintiffs' Confidential Personal Information/Confidential Case

and for what duration? As explained, even children with seriously disruptive or aggressive behavior can be served through appropriate outpatient treatments.

Based on our review, ORR's criteria for placing a child in a therapeutic staff-secure facility or therapeutic group home are even less clear. The ORR Policy Guide does not describe placement criteria for these facilities, and it is not apparent that ORR provides consistent guidance to determine whether children are sent to these placements. More specifically, therapeutic group homes are alternatively characterized by ORR and contract officials as about as restrictive as a therapeutic staff-secure placement, (Deposition of Nidia Murray, pp. 140-41), more restrictive than a shelter but less restrictive than a therapeutic staff-secure, (Deposition of David Fink, pp. 56-57), similar to a shelter with more clinical services, (Rule 30[b][6] Deposition of Toby Biswas, pp. 328-29), and more closely aligned with a long-term foster care placement, (Deposition of James De La Cruz, pp. 45-46).

Children placed in the Children's Village Therapeutic Group Home describe this facility as more restrictive than their prior placements in shelters and other facilities (Declaration of Y.F.S.V. ¶¶ 6-9; Declaration of E.A.R.S. ¶¶ 6-8; Declaration of E.J.L.C. ¶¶ 8-9). Like children in other restrictive placements, children at the Therapeutic Group Home describe having to demonstrate good behavior in order to earn privileges or be transferred to a shelter or long-term foster care placement (Declaration of A.R.V.L. ¶¶ 8-9; Declaration of E.A.R.S. ¶¶ 6-8; Declaration of Y.F.S.V. ¶¶ 9, 13-14). This facility therefore appears to be a restrictive residential placement in practice, and it is highly concerning that ORR and contract officials responsible for placement decisions are unaware of this.

Therapeutic staff-secure facilities are classified by ORR as staff-secure facilities, but the placement criteria for these facilities is similarly ill-defined and appears to differ from that of an ordinary staff-secure (Deposition of David Fink, pp. 53-55; Deposition of James De La Cruz, pp. 45-48; Deposition of Nidia Murray, pp. 140-44; Deposition of Marivic Fields, pp. 156-57). What does appear evident is that children are transferred to therapeutic staff-secure and therapeutic group home facilities when they have elevated mental health needs but do not satisfy the criteria for placement in a residential treatment center (Deposition of David Fink, pp. 52-57; Deposition of Marivic Fields, pp. 156-57; Deposition of James De La Cruz, pp. 45-48; Deposition of Nidia Murray, pp. 139-44). Given the absence of any clear criteria requiring consideration of alternative outpatient treatment options prior to transfer, there is an unacceptable high risk that children are transferred to segregated therapeutic group homes and therapeutic staff-secure facilities based on mental health needs that could be safely addressed in a less restrictive and more integrated setting.

### 3. ORR's criteria for step-down and release inappropriately focus on a child's current functioning rather than a determination that the child cannot be safely transitioned to a less restrictive or community placement.

A child's stability, functioning, or safety while in a highly structured residential care setting is not a good predictor of whether they will do well or poorly after release and should not be used as a criterion for release to community placements or step down to lower levels of care (Mercer, 2008). Facility-based care can cause lasting damage to children, including "institutionalization". In children, institutionalization can result in developmental delays in physical, cognitive and emotional functioning and impairments in capacities for attachment to caregivers and others

(Ijzendoorn et al., 2011; Zaccagnino et al., 2014). Further, compliance-driven behavior management systems used in some restrictive residential facilities are retraumatizing for many youths and can contribute to a loss of sense of control and further escalation of children's behaviors (AACRC, 2014; Forrest et al., 2018). Moreover, there is little evidence that short-term clinical, academic, and social gains made during residential care endure past discharge or transfer to the community environment (Burns et al., 1999; Mercer, 2008; Magellan Health Services Children's Services Task Force, 2008).

In our experience, children need not remain in residential care simply because they are continuing to struggle in their current placement. Rather, any determination about the safety of a child's release must also consider the harms of continued institutionalization, the strengths of the sponsor's home and community, and the likelihood that the child could benefit from community placement. For unaccompanied children in particular, acculturation stress is best handled by helping children adapt to their new communities while in their new communities (Crea et al., 2018).

Decision-making surrounding transfers to lower levels of care must similarly assess the child's potential to benefit from a less restrictive setting rather than the child's current functioning.  Each child's individualized service plan should proactively identify the anticipated services and supports (e.g., AACAP, 2010) that will enable the child to step down to a less restrictive setting.  Once those supports are identified, it is possible to evaluate children's readiness for step-down based on how they will fare with those supports in place, rather than basing this decision on how they are doing in the restrictive settings where they have been placed while in ORR custody absent such supports.

ORR's step-down policies, however, appear to focus entirely on a child's behavior and mental health at their current placement. ORR Policy, section 1.4.1 generally requires care providers at restrictive facilities to "provide services to facilitate the unaccompanied alien child's successful transfer to a less restrictive setting to allow the child to move when he or she is ready." ORR Policy, section 1.4.2 states that "step-downs may occur when ORR, in its discretion, determines the UAC no longer poses a danger to himself or others, or no longer presents an escape risk (for staff secure step downs only) . . . In making a step-down decision, ORR considers criteria identified in making a secure placement and takes into consideration any mitigating factors based on an assessment of the UAC's current functioning and behavior, previous conduct, self-disclosures, and criminal/delinquent history. The care provider documents the underlying assessment used to make this determination in the UAC's case file." It does not appear that these policies require the consideration of specific safety measures or additional supports that would enable a child's safe transition to a lower level of care.

In practice, ORR and program staff and children in ORR custody report that children are often formally or informally required to demonstrate consistent good behavior, or a lack of significant incidents, in order to qualify for a step-down from a restrictive facility (Deposition of Elicia Smith, pp. 157-59; Deposition of Melissa Cook, pp. 181-85; Declaration of A.R.V.L ¶ 9; Declaration of B.D.H.G. ¶¶ 13-14; Declaration of C.J.A.L. ¶ 9). This is a poor proxy for determining whether a child can be maintained safely in a less restrictive setting with effective services, as some children whose disabilities manifest in difficulties controlling their behavior can nonetheless be safely served in a less restrictive environment. The lack of clear criteria for providers' judgment that a

**Exhibit 174 Page 289**

child is "ready for step down from a secure facility" leaves this judgment dependent on the inconsistent views of individual providers (ORR policy section 1.2.4).

For children without available sponsors, ORR's policy regarding long-term foster placements is similarly concerning. Under section 1.2.6, risk of escape and threat of harm to self or others presumptively rules out the child's eligibility for a foster care placement. A child with past behavioral or safety concerns —even if they are not a threat to self or others—must demonstrate "safe behavior in a non-secure setting" before being considered for long-term foster care (ORR Policy, section 1.2.6). Such criteria can effectively block children with mental health disabilities from access to long-term foster care, even though services such as Multidimensional Treatment Foster Care  (Treatment Foster Care Oregon, Åström et al., 2020) and other evidence-based community services such as Multisystemic Therapy (MST) (Henggeler et al., 1999; Henggeler & Schaeffer, 2017; Huey et al., 2004), have been shown to manage these risks for children in family or substitute care placements.[15] Children placed in therapeutic foster care programs have been shown to have better long-term outcomes at lower cost than children placed in residential treatment centers or therapeutic group homes, including improved behavior and lower risk of delinquency (Magellan Health Services Children's Services Task Force, 2008).

Children in ORR custody also face delays in step-down because shelters reject children on the basis of their mental health needs, even if ORR has determined that the child could be appropriately and safely placed in a shelter (Deposition of Nidia Murray, pp. 188-93; Deposition of Marivic Fields at 149-51).

It is the responsibility of a system of care to ensure the availability of integrated less restrictive placements by seeking out and contracting with shelters and foster care providers who are willing and able to accept and serve children with mental health needs. The system can also reframe providers' and placements' concerns about accepting the referral of every child to "what would it take".  This creates a partnership between the system and providers or placements that might otherwise be reluctant to accept a child who does not fit easily into their existing service patterns. For instance, in the child welfare network in which we both participated as leaders, foster care providers and parents were willing to accept referrals of children with demanding behavior management needs if community-based providers agreed to provide 24 hour in-home support and other means to manage challenging behaviors that the foster parents would need to understand, tolerate, and manage those behaviors effectively and safely.

### 4.  Ensuring children with disabilities can be placed in less restrictive settings requires institutional oversight by the system of care.

In our opinion, ORR is responsible for overseeing effective service delivery by its providers (Stroul et al., 2012). This requires effective mechanisms for assessing children's needs and monitoring the services provided and the appropriateness of placements (Children's Bureau, 2015). Research shows that successful transition to an evidence-based system depends mostly on leadership commitment and effectiveness (Aarons et al., 2014; Beidas et al., 2015; Bonham et al., 2014; Williams et al., 2012), including leaders' use of research evidence as a guiding resource for service design and maintenance (Palinkas et al., 2017) despite the complexities of the services it oversees. Reliance on the judgment and recommendations of individual contracted providers is insufficient to ensure matching and effectiveness of clinical services for meeting children's mental health

---

[15] The Multisystemic Therapy (MST) website (mstservices.com) lists 33 states and D.C. where teams are available.

needs (especially in a nationwide system, where providers are unfamiliar with one another and their programming) and to ensure children are not unnecessarily placed or maintained in restrictive residential care.

There is a well-documented tendency for providers to overvalue their judgment and fail to recognize limits or errors in their assessments and treatment decisions (e.g., Walfish et al., 2012). This has been attributed to lack of accountability at the provider level (e.g., Rosenberg et al., 2015), leading to a lack of corrective feedback and consequences, and at the system level (e.g., Fee & Morse, 2016; National Academies of Sciences, Engineering, and Medicine, 2018). Psychiatrists and psychologists may also be unfamiliar with available community-based alternatives to residential treatment or mistakenly assume that more restrictive settings will necessarily have better services, leading to "a well-intentioned, but often problematic tendency to refer any youth with complex needs to" residential treatment (Mercer, 2008, p. 5).

In our experience, the interests and incentives of various actors in a system of care may not be aligned with the broader system goal of ensuring least restrictive placements. Individual providers, for example, may have an incentive to transfer out children with special needs or behavioral difficulties because they do not wish to make the accommodations needed to maintain that child in their current placement, even if such accommodations are possible. Providers at restrictive placements, in our experience, often become complacent when youth who could be stepped down remain in their care. Decisions about whether individualized services could keep children safe and meet their needs at less restrictive levels of care must therefore not be left to the staff at more restrictive settings without participation of staff from the less restrictive settings, consideration of additional supports that would enable them to be served at a lower level of care, and mechanisms for child-specific and overall accountability.  Without the requirement to consider alternative perspectives, staff biases, self-interest, and lack of familiarity with community-based services that can effectively manage children in lower levels of care may limit their ability to recognize the potential for effective, safe step-down.

Monitoring by the system of care is not a substitute for independent judicial and medical oversight of a child's placement or a child's right to advocate for their own wishes with the assistance of counsel.  Meaningful oversight by the system of care is additionally necessary, however, to standardize decision making, minimize unnecessary transfer requests in the first instance, more quickly transition children to lower levels of care, and create a level of understanding about what is going on across the system that allows for a robust development of resources.

System management and oversight are realistically achievable through outside review by system staff and/or independent reviewers with relevant expertise and experience with making relevant decisions regarding matching of evidence-based care with client needs, access to individualized community-based positive youth development assets, and levels of care required for clinical effectiveness and to address safety and risk management needs (Meltzer et al., 2019; Stroul et al., 2012).  These staff must review individualized service plans for provider rationales for their clinical and placement decisions, and alternatives to any recommendations for a higher level of care.  These staff and independent reviews should examine individual clinical decisions according to criteria and metrics universally used by all programs comprising the system of care.  This is particularly the case for youth with legally or clinically identified disabilities.

20

Exhibit 174
Page 291

June 19, 2020

_____
Paul Block, Ph.D.

_____
John Farley, Esq.

Plaintiffs' Confidential Personal
Information/Confidential Case

Expert Report of
Dr. Paul Block and John Farley, Esq.
No. 2:18-CV-05741 DMG PLA

**Exhibit 174
Page 292**

# Exhibit 175

Exhibit 175
Page 293

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

LUCAS R., et al.,

                    Plaintiffs,

v.

ALEX AZAR, et al.,

                    Defendants.

Case No.  2:18-CV-05741 DMG PLA

**EXPERT REPORT OF DR. KEITH CRUISE AND DR. ANDREW RASMUSSEN**

**PLAINTIFFS' CONFIDENTIAL PERSONAL INFORMATION/CONFIDENTIAL**

Plaintiffs' Confidential Personal Information/Confidential

Expert Report of Dr. Keith Cruise
and Dr. Andrew Rasmussen
Case No. 2:18-CV-05741 DMG PLA

**Exhibit 175
Page 294**

**(2) Do children in ORR custody receive appropriate mental health services and reasonable accommodations for their disabilities to enable them to remain in less restrictive placements?**

Regular counseling sessions are a common feature in ORR case files; however, the focus of these sessions are best described as supportive counseling, psychoeducation on coping, and practicing problem-solving skills. This level of service is inconsistent with both the high rates of trauma exposure and high rates of mental health disorders. In short, the most common therapeutic intervention is not matched to the level of mental health need documented in the case files.

Most UACs in the sample seemed to warrant more intensive, trauma-informed psychotherapy. Trauma-informed psychotherapies were provided to only seven UACs, and mostly at the shelter level. Only one UAC was provided trauma-informed psychotherapy at an RTC—odd given the supposed therapeutic nature of RTCs. That so few UACs with trauma were provided trauma-focused psychotherapy, and that most of these few were provided trauma-focused psychotherapy at shelter facilities suggest that trauma-informed treatment (1) is not being provided for UACs who need it, (2) can be implemented at the shelter level, and (3) is not commonly available for most UACs at higher levels, even for those UACs that are referred for mental health reasons. In other words, UACs with trauma-related disabilities could be getting appropriate therapy in the least restrictive settings available, and the few that are getting this treatment there are usually being stepped up and in the process stepped *away* from it.

UACs in the sample were regularly prescribed medications suggesting this is a common treatment approach used within the ORR facilities. The proportion of UACs with mental health disorders receiving medications indicates that pharmacology is most likely the front line add-on intervention for UAC mental health problems.

**(3) Are children in ORR custody stepped-up to residential treatment centers, staff-secure facilities, or secure facilities because of their disabilities and are these step-ups necessary and clinically appropriate to meet the child's needs or protect the safety of others?**

Children in ORR custody are stepped-up to residential treatment centers, staff-secure facilities, or secure facilities because of documented mental health disabilities. In our review of ORR files, mental health disabilities were used as justification for two thirds of the step ups documented. We were concerned that perhaps these justifications masked behavioral reasons for step-ups, as the odds of being stepped up with an SIR reflecting a danger to self or others was 9.6 times the odds of being stepped up without an SIR reflecting a danger to self or others.

However, that weekly SIRs reflecting a danger to self or others were not associated with staff citing mental health as a reason for step-up suggest that UACs who are being stepped up for mental health disabilities do not have any different patterns of behavior compared to those not stepped up for this reason. In other words, behavioral concerns are not a driving factor among all UACs stepped up for mental health reasons.

20

Given the data in the file review on the length of time between SIRs reflecting a danger to self or others and recording a concern about a UAC's mental health, ORR does not appear to treat these SIRs as a red flag for mental health problems except in a small number of cases. Most concerns arose long after such SIRs were documented. SIRs reflecting a danger to self should be considered a reason for an in-depth psychological evaluation, and it appears that for most cases they are not. This likely delays implementing accommodations that could prevent step up or mitigate the frequency and severity of later mental health problems.

The median number of days between first SIR reflecting a danger to self or others and step up was 58 days, indicating that there is a reasonable time period to develop and implement accommodations to prevent a step up.  However, besides UACs being prescribed medication, there seems to be no discernible pattern of recommendations being followed or not. These recommendations were focused on what could be done within the facility and did not include accessing community mental health treatment. Provided accommodations did not prevent step up. All 14 UACs for whom at least some part of the recommendations were put into place following initial mental health concerns were later stepped up.

Step-ups justified by mental health diagnoses do not seem to be necessary to meet the UACs' needs or protect the safety of others. First, prior to step up, there is uneven implementation of recommended accommodations (aside from pharmacology). If ORR staff more consistently addressed recommended accommodations, step ups may have been prevented.  Second, there is no evidence that accessing community mental health treatment services was considered during the accommodations process.  Failure to consider community-based treatment options, particularly at lower levels of restrictive placement (e.g., shelters) indicates these ORR facilities failed to explore treatment options that could have prevented further mental health decline and avoid step up to more restrictive levels of care.  Third, before step up, and after step up, there is no discernible match between services, accommodations in response to continued SIRs for harm to self or others, or documented mental health needs. Across the files we reviewed, step ups did not increase the likelihood that UACs were provided with more specialized mental health treatments that better matched their documented mental health diagnoses. To illustrate, access to trauma-informed psychotherapy demonstrates the failure to match treatment services to mental health needs.  Trauma-related needs were prevalent in the cases reviewed: 19 UACs had documented histories of trauma and nine were diagnosed with PTSD. And yet, trauma-informed treatments were only documented as being delivered in seven cases with this treatment service being scattered across different placement levels (i.e., shelters, a staff secure facility, and an RTC). Better identification of mental health needs at facility intake, more comprehensive assessments (either based on screening or upon evidence of increased distress or behavioral disruption), and more consistent follow-through with recommended services that are matched to identified mental health diagnoses, should prevent step ups and ensure that UACs with mental health needs receive treatment in the least restrictive setting.

21

Plaintiffs' Confidential Personal
Information/Confidential

Expert Report of Dr. Keith Cruise
and Dr. Andrew Rasmussen
Case No. 2:18-CV-05741 DMG PLA

**Exhibit 175
Page 296**

**(4) Do children in ORR custody experience delays in release and what are the reasons for such delays?**

There is evidence in the case files of consistent identification of potential sponsors and attempts to contact sponsors during ORR detention. However, the time involved in the process of custodial vetting is lengthy. Initial assessments of sponsors seem to begin in a timely manner but the time to decision on a sponsor in the sample is over 70 days.

The length of this processes is problematic as the literature suggests that longer time in detention provides more opportunity for increasing mental health and behavioral problems. That mental health and behavioral problems are not adequately assessed at intake or addressed during detention likely adds to the distress associated with lengthy detention. In this manner the lengthy vetting process appears to contribute to (1) UACs' increasing mental health distress and (2) some sponsors' willingness to follow through with the vetting process, leading several sponsors to change their minds about sponsorship because of changes in behavior. Although ORR's files attribute some delays to the sponsor, that the median detention for UACs released to sponsors in this sample was over 100 days seems extreme. Measures such as fingerprinting, providing birth certificates, and home visits contributed to delays in the release process.

Longer time in detention is associated with increasing distress and provides more opportunity for increasing mental health and behavioral problems. The cases which appear delayed because of concerns about a child's behavior (from facility staff or sponsors) highlights a troubling cycle of detention, as more time in detention is associated with worsening mental health. Children benefit if they are released as soon as it is feasible to do so.

We declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

_____
Andrew Rasmussen, PhD

June 19, 2020
Date

New York, New York
City, State

Plaintiffs' Confidential Personal
Information/Confidential

Expert Report of Dr. Keith Cruise
and Dr. Andrew Rasmussen
Case No. 2:18-CV-05741 DMG PLA

**Exhibit 175
Page 297**

_____

Keith Cruise, PhD, MLS

June 19, 2020
Date

New York, New York
City, State

Plaintiffs' Confidential Personal
Information/Confidential

Expert Report of Dr. Keith Cruise
and Dr. Andrew Rasmussen
Case No. 2:18-CV-05741 DMG PLA

**Exhibit 175
Page 298**

# Exhibit 176

Exhibit 176
Page 299

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

LUCAS R. *et al.*,

   Plaintiffs,

  v.

ALEX AZAR, Secretary of U.S. Dep't of Health and Human Services, *et al.*,

   Defendants.

) Case No.: 2-18-CV-05741  DMG (PLA)
)
)
)
)
)
)
)
)
)
)
)

## EXPERT REPORT OF DR. ILZE EARNER, PH.D., LCSW

**I.** **Scope of the report**

1. I was asked to produce an expert witness report on the care and treatment of unaccompanied alien children (UACs) in federal custody at the Office of Refugee Resettlement (ORR) funded grantee care facilities.  Specifically, in this report, I address the policies, procedures and standards of: A) release of UACs from care and B) placement of UACs in different levels of care (i.e., restrictiveness).

2. I also opine on whether the policies, procedures, practices and standards of care of UACs in ORR-funded grantee care facilities adhere to the principles of best practices in child welfare to ensure the prompt release of children from ORR's care and custody, and ensure safety and well-being of the children.

**II.** **Findings**

3. It is my opinion that ORR policies, procedures and practices concerning UACs either meet or exceed the standards of care for domestic children in

Confidential - Under Protective Order

Exhibit 176
Page 300

apprehended inside the United States and engaged in illicit activities (personal communication, February 10, 2020, Shenandoah).  These UACs would most likely be placed in a secure facility pending further assessment (personal communication, February 10, 2020, Shenandoah).

49. Best practices in recent years have focused on a number of models proven to be more effective with behavioral and conduct disorders such as Multi-Systemic Therapy, Wraparound Services and Therapeutic Foster Care.[17] Clinical services and therapeutic interventions for children in congregate care settings vary greatly across states and even within different agencies.  In recent years, in recognition of the prevalence of trauma in the child welfare population, 'trauma-informed' perspectives have been increasingly prescribed in child welfare settings.[18]

50. Clinical services are offered to the UACs at all of the ORR-funded facilities I am aware of, including those I visited.  The range and type of clinical services described to me are in keeping with what a domestic child in care might experience, including individual and group counseling every week.  In the therapeutic shelter facility I visited in McAllen, Texas, in which the staff to child ratio was 1:4, the staff told me that UACs attended group therapy once a week and individual counseling twice a week. Some facilities include art therapy or recreational therapy along with psycho-social therapy.

51. Behavioral management models used at the facilities I visited are based on accepted therapeutic, cognitive and positive behavioral reinforcement models

---

[17] James, S. (2017).  Implementing Evidence-Based Practice in Residential Settings:  How Far Have We Come. https://dx.doi.org/10.1080%2F0886571X.2017.1332330
[18] CW360, Winter 2013, Trauma-Informed Child Welfare Practice, http://www.traumacenter.org/products/pdf_files/Complex%20Trauma%20in%20Child%20Welfare.pdf.

Confidential - Under Protective Order

Exhibit 176
Page 301

other services following release, ORR contracts with various post-release social service provider organizations that provide case management services to UACs following release in order to link them to community services.

72. To be consistent with best practices in child welfare, all UACs, their families, and sponsors should receive post-release services. Both UACs and their families or sponsors represent a vulnerable and at-risk population with multiple challenges for safety, stability and well-being of children. In domestic child welfare cases, unification is closely followed with referral to wraparound services in the community to ensure placement stability. As noted, however, one key difference for UACs is that ORR's custody ends at the time of release, and ORR cannot resume custody. While beyond the scope of this litigation, it is my recommendation that Congress provide additional funding for post-release services to enable more UACs and their families to be linked to community resources.[27]

Dated:  June 19, 2020

Ilze Earner, Ph.D., L.C.S.W.

_____

[27] Supporting Successful Reunifications (October 2017)
https://www.childwelfare.gov/pubPDFs/supporting_reunification.pdf.

24

Confidential - Under Protective Order

Exhibit 176
Page 302

# Exhibit 177

Exhibit 177
Page 303

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LUCAS R., et al.,<br><br>                   Plaintiffs,<br><br>         v.<br><br>ALEX AZAR, et al.,<br><br>                   Defendants. | Case No.  2:18-CV-05741 DMG PLA<br><br>**DECLARATION OF JUDGE LEONARD EDWARDS** |

1.  The facts set forth below are based on my personal knowledge and, if called as a witness, I could and would competently testify to them. I am over eighteen years of age.

2.  Attached as Exhibit A is a true and accurate copy of my Expert Report, dated June 15, 2020, which I hereby reaffirm and verify under penalty of perjury as containing the opinions that I am offering in this case.

3.  If called to testify at trial, I anticipate that I will testify to the matters and opinions as set forth in my Expert Report.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.  Executed on this 28th day of September, 2020.

_____

Judge Leonard Edwards

# EXHIBIT A

Exhibit 177
Page 305

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LUCAS R., et al.,<br><br>        Plaintiffs,<br><br>   v.<br><br>ALEX AZAR, et al.,<br><br>        Defendants. | Case No.  2:18-CV-05741 DMG PLA<br><br><br>**REPORT OF JUDGE LEONARD EDWARDS** |

Exhibit 177
Page 306

likely know the relatives, relative placement minimizes trauma. Children with relatives experience better stability, and have fewer placement changes, fewer behavior problems, and fewer school changes than children in foster homes.[46] Living with relatives also helps preserve a child's cultural identity.[47]

The Preventing Sex Trafficking and Strengthening Families Act of 2014 added the requirement that juvenile courts must determine what efforts child welfare agencies make to place children in a home-like setting.[48] Under this statute, if a child's permanency plan is "Another Planned Permanency Living Arrangement," or "APPLA," the plan must contain both documentation of intensive, ongoing, unsuccessful efforts for family placement and redetermination of the appropriateness of the placement at each permanency hearing.[49] At the permanency hearing, the court must make a determination explaining that APPLA is the best permanency plan for the child based on compelling reasons from the child welfare agency that it is still not in the best interests of the child to (1) return home; (2) be placed for adoption; (3) be placed with a legal guardian; or (4) be placed with a fit and willing relative.[50] By compelling the agency to explain, in detail, to the court why each child does not have a permanent home, and by requiring the juvenile court to issue a written decision articulating its reasoning, these mechanisms intensify judicial oversight. This law demonstrates clear Congressional intent to pressure child welfare agencies to move children into permanent placements and to empower juvenile courts to hold agencies accountable for doing so.

Most recently, Congress passed the Family First Prevention Services Act ("Family First Act") in 2018.[51] The Family First Act reflects a significant change in the federal government's approach to funding services for families struggling with issues of abuse and neglect. This new law prioritizes preventing the unnecessary removal of children from their families and, notably, allows federal child welfare financing streams (through Title IV-E and Title IV-B of the Social Security Act) to provide services to families who are at risk of entering the child welfare system.[52] The statute also aims to prevent children from entering the child welfare system by allowing federal reimbursement for mental health services, substance use treatment, and in-home parenting skill training.[53]

In addition, the Family First Act explicitly disfavors placement of children in congregate care facilities. In creating financial consequences for child welfare agencies that inappropriately place children in congregate care settings, this law reinforces that reliance on congregate care

---

[46] *See* Leonard Edwards, *Relative Placement: The Best Answer for Our Foster Care System*, 69 JUV. & FAM. CT. J. 55 (2018) (*citing* David Rubin et al., *Impact of Kinship Care on Behavioral Well-Being for Children in Out-of-Home Care*, 162 ARCHIVES OF PEDIATRIC & ADOLESCENT MED. 550-56 (2008); GENERATIONS UNITED, CHILDREN THRIVE IN GRANDFAMILIES (2016); CALIFORNIA CHILD WELFARE INDICATORS PROJECT, cwwip.berkeley.edu); Robert M. Gordon, *Drifting Through Byzantium: The Promise and Failure of the Adoption and Safe Families Act of 1997*, 83 MINN. L. REV. 637 (1999).

[47] *See, e.g., Kinship Care*, CASEY FAMILY PROGRAMS (Nov. 18, 2019), https://www.casey.org/kinship-care-topical-page/; NCJFCJ Enhanced Resource Guidelines, *supra* note 7, at 137.

[48] Pub. L. No. 113-183, 128 Stat. 1919 (2014).

[49] 42 U.S.C. § 675a.

[50] *Id.*

[51] Pub. L. No. 115-123, tit. 7, 132 Stat. 170 (2018).

[52] *Id.* §§ 50711-13, 50721-23.

[53] *Id.* § 50711.

Exhibit 177
Page 307

runs counter to the policy judgment of the federal government over the past several decades.[54] Specifically, the Act disallows Title IV-E foster care reimbursement for any child starting the third week of placement in a congregate care setting unless the placement provides for the mental health treatment needs of the child and is selected following a thorough assessment.[55] These new treatment facilities, referred to as Qualified Residential Treatment Programs (QRTPs), must be twenty-four-hour residential treatment providers working with trauma-informed treatment models; they must have registered or licensed nursing staff on-site 24-7; and they must involve the child's family members in treatment, if that is in the child's best interests.[56]  There must be discharge planning and after-care services available for six months.[57] The QRTP must be licensed and accredited.[58]

The Family First Act also demonstrates the federal government's lack of trust in child welfare agencies.  The law expands the oversight role of the juvenile court, requiring additional procedural protections when a child is placed in a QRTP and requiring that placement decisions be reviewed and approved by the judge.[59]  In particular, the court must consider the assessment, a written report, and documentation in the child's case plan.[60]  The court must also address: whether the child's needs can be met in a family, foster family, or relative placement; whether the QRTP is the most effective and appropriate placement; and whether the QRTP is consistent with the child's goals in the case plan.[61]  The court then determines whether there is a discharge plan and a provision for six months of after-care services.  This requires an additional court hearing.  The court's decision to approve or disapprove of the placement must be documented in the child's case plan.[62]  These judicial review requirements are intended to provide meaningful oversight of agency actions.[63]

### 2.    Juvenile Court Oversight Provides Critical Protections for Children in the Child Welfare System.

As noted above, with the passage of AACWA, Congress selected juvenile and family courts to oversee the operation of the nation's child welfare system.  When Congress chose the nation's juvenile courts to oversee the actions of child welfare agencies, it anticipated that these courts would seriously undertake the responsibilities placed on them by the federal legislation.[64]

---

[54] *Id.* § 50741.
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] *Id.* § 50742.
[60] *Id.*
[61] *Id.*
[62] *Id.*
[63] *Testimony of Jerry Milner on Family First Prevention Services Act*, Office of Leg. Affairs & Budget (July 24, 2018), https://www.acf.hhs.gov/olab/resource/testimony-of-jerry-milner-on-family-first-prevention-services-act ("There are additional requirements, such as court approval, for children placed in these programs that may reduce or eliminate federal participation for children placed there").
[64] S. REP. NO. 96-336, at 16 (1979) ("The committee is aware of allegations that the judicial determination requirement can become a mere *pro forma* exercise in paper shuffling to obtain Federal funding.  While this could occur in some instances, the committee is unwilling to accept as a general proposition that the judiciaries of the

Exhibit 177
Page 308

that the child would not benefit from representation.[102]  In addition to an attorney, a juvenile court may also appoint a special child advocate, or CASA, to represent the child's best interests and provide the juvenile court with independent information about the child's case.[103]

The child's attorney is charged, in general, with the representation of the child's interests throughout the dependency proceedings.[104]  The attorney investigates the facts, participates in hearings, including by examining and cross-examining witnesses, and makes recommendations to the court regarding the child's welfare.[105]  Attorneys for children who are four years old or older must interview their child clients to determine their wishes and to assess their well-being, and are required to advise the court of their clients' wishes.[106]  Throughout their cases, children in the child welfare system have the right to send and receive unopened mail and to communicate privately with their attorneys.[107]

Counsel to children in child welfare proceedings protect important constitutional legal rights.  Even the most mature young people most likely will not understand the legal standards that the court applies to the facts of their cases or the strategies available to advocate for themselves in dependency proceedings.  Well-prepared counsel give children the opportunity to participate meaningfully in their court hearings, provide support to their clients, and ensure that judges receive balanced information from multiple sources and perspectives, rather than leaving the courts to make decisions based on the recommendations of the agency and its lawyers alone.  Recent studies confirm that children get better results in dependency proceedings when they are represented by an attorney.[108]

### 3. California's Juvenile Courts Oversee Statutory Timelines in Child Welfare Cases.

California's juvenile courts are governed by strict timelines designed to immediately involve the juvenile courts in dependency cases and to propel individual cases forward towards resolution and a safe, stable, and permanent home for every child.

County agencies must file a petition to declare a child dependent in juvenile court within forty-eight hours (excluding non-court days) of removing a child from their home.[109]  By the end

---

[102] CAL. WELF. & INST. CODE § 317(c)(1).  For a comprehensive examination of state legislative acts regarding the appointment of attorneys to represent children in juvenile dependency cases, refer to FIRST STAR INST., *supra* note 7, at 20, 23-25.
[103] CAL. WELF. & INST. CODE § 102.  "'CASA' means a Court-Appointed Special Advocate.  'CASA' also refers to a Court Designated Child Advocate in programs that have utilized that title.  A CASA has the duties and responsibilities described in this chapter and shall be trained by and function under the auspices of a Court-Appointed Special Advocate program as set forth in this chapter." CAL. WELF. & INST. CODE § 101(c).
[104] CAL. WELF. & INST. CODE § 317(e)(1).
[105] CAL. WELF. & INST. CODE § 317(e)(1).
[106] CAL. WELF. & INST. CODE § 317(e)(2).
[107] CAL. WELF. & INST. CODE § 16001.9(a)(11), (13).
[108] CHILDREN'S BUREAU, U.S. DEP'T OF HEALTH & HUMAN SERVS., HIGH QUALITY LEGAL REPRESENTATION FOR ALL PARTIES IN CHILD WELFARE PROCEEDINGS (2017) (citing, *inter alia*, DONALD D. DUQUETTE ET. AL., CHILDREN'S JUSTICE: HOW TO IMPROVE LEGAL REPRESENTATION OF CHILDREN IN THE CHILD WELFARE SYSTEM (2016)).
[109] CAL. WELF. & INST. CODE § 313.

Exhibit 177
Page 309

(6) **No Appeal:**  With one very narrow exception, ORR's policies governing release to
sponsors do not afford children the right to appeal adverse decisions denying
reunification with their sponsors.[137]  In denying children the right to appeal the
sufficiency of the evidence supporting ORR's decisions, ORR contradicts child
welfare practice across the country.  In every state's child welfare system, the child
has the right to appeal.  Denying this right deprives children in ORR's system of
fundamental procedural protections.

## VII.   Conclusion

Based on my review of ORR's policies and my experience and training in federal and
state child welfare law, I conclude that, with respect to the procedural protections afforded to
children and youth, ORR's procedures for releasing children to sponsors fall far short of the
procedures provided in federal and California child welfare statutes and prevailing child welfare
standards.

Date:  June 15, 2020

_____

Judge Leonard Edwards

---

[137] Pursuant to ORR Guide Section 2.7.8, a child may appeal the denial of a sponsor's application if: (1) "the sole
reason for denial of release is concern that the unaccompanied alien child is a danger to himself/herself or the
community" and (2) the parent/legal guardian is not seeking an appeal.  This avenue of appeal is not available if
there are any other factors at play in ORR's decision.

25

**Exhibit 177**
**Page 310**

# Exhibit 178

Exhibit 178
Page 311

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

LUCAS R., et al.,

          Plaintiffs,

    v.

ALEX AZAR, et al.,

          Defendants.

Case No.  2:18-CV-05741 DMG PLA

**DECLARATION OF JESSICA HELDMAN**

1.  The facts set forth below are based on my personal knowledge and, if called as a witness, I could and would competently testify to them. I am over eighteen years of age.

2.  Attached as Exhibit A is a true and accurate copy of my Expert Report, dated June 19, 2020, which I hereby reaffirm and verify under penalty of perjury as containing the opinions that I am offering in this case.

3.  If called to testify at trial, I anticipate that I will testify to the matters and opinions as set forth in my Expert Report.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.  Executed on this $28$ day of September, 2020.

Jessica Heldman

DECLARATION OF JESSICA HELDMAN
CASE NO. 2:18-CV-05741 DMG PLA

Exhibit 178
Page 312

# EXHIBIT A

Exhibit 178
Page 313

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LUCAS R., et al., | Case No.  2:18-CV-05741 DMG PLA |
| Plaintiffs, | |
| v. | EXPERT REPORT OF PROFESSOR JESSICA HELDMAN |
| ALEX AZAR, et al., | |
| Defendants. | |

**Exhibit 178**
**Page 314**

### III.        COMPENSATION

I am being compensated for preparation of this report at the rate of $250 per hour. Should I need to testify either at a deposition or trial, my hourly rate for testimony is $300 per hour.

### IV.        METHODOLOGY

#### A.        Definitions

Throughout this report, I use the terms "secure" and "staff secure." In this report, the term "secure" is used as it is in federal juvenile justice regulations.  "Secure" is used to describe "residential facilities which include construction features designed to physically restrict the movements and activities of persons in custody such as locked rooms and buildings, fences, or other physical structures."[1] This encompasses juvenile detention and juvenile correctional facilities. "Staff secure" is used to describe residential facilities in which physical restriction is provided solely by staff.[2] This includes non-secure shelter care facilities and non-secure residential treatment centers.

#### B.        Materials Reviewed

The questions guiding my research for this report were as follows: (1) What are key state and federal policies regarding placement of children within the child welfare and juvenile justice systems?; and (2) What procedural processes are required to place a child or youth in a secure or staff secure placement in child welfare and juvenile justice systems in all 50 states and the District of Columbia and how do they compare to ORR's procedures for placing a child in a restrictive setting?

---

[1] 28 C.F.R §31.304(b).
[2] *See* 28 C.F.R §31.304(b). The definition of "secure" in federal regulations specifically notes that it does not include facilities in which "physical restriction of movement or activity is provided solely through facility staff." 28 C.F.R §31.304(b).  For the purpose of this report, I use the language in this section to define "staff secure."

secure placement, as there is no legal proceeding associated with—or as a prerequisite to—the determination of such placement.

Because ORR does not provide UAC's with legal representation in determinations related to detention or placement in a secure or staff secure facility, ORR policy is out of step with the policy that a majority of states employ.

        3.  <u>Opportunity to be heard and the right to present evidence, and right to interpreter</u>

In the majority of states, there is policy which provides youth with an opportunity to be heard or to present evidence at a detention hearing relevant to the determination of the appropriateness of secure confinement. There is no indication within the ORR policy and procedure I reviewed that UAC's are provided with the opportunity to be heard or present information or evidence to support discontinuation of secure placement. There is no ORR policy that indicates procedures associated with the request for reconsideration, if granted, that allow the UAC an opportunity to be heard. In addition, the majority of states require that a youth is provided with an interpreter in detention hearings to ensure understanding of the proceedings, effective representation by counsel, and an opportunity to provide relevant information. Without a hearing with assistance from an interpreter, there does not appear to be an effective right to be heard for a UAC on the matter of placement.

Because ORR does not provide UAC with an opportunity to be heard or the right to present evidence in the determination of secure or staff secure detention or placement, ORR policy is out of step with the majority state policy.

        4.  <u>Right to review of placement</u>

ORR policy states that a UAC's placement in a secure or staff secure facility will be reviewed within 30 days and at least every 30 days thereafter; and that if the UAC is in a secure

facility or RTC, the UAC can request the ORR Director to reconsider the placement if after the
30 day case review they are not stepped down.[50] The ability to challenge placement through
reconsideration by the ORR Director is deficient as compared to the majority state policy
because it does not entitle a UAC to a hearing in front of a neutral and detached decision-maker.
The lack of a hearing, the lack of an opportunity to present evidence, and the lack of counsel fails
to ensure the UAC an opportunity to be heard on the matter of his release.

## VIII.        CONCLUSION

Based on my review of ORR's policies and procedures and my experience and training in
federal and state juvenile justice and child welfare law, I conclude that ORR's procedural
process for placing children in secure and staff secure settings are deficient compared to the
procedures provided in the U.S. juvenile justice and child welfare system in situations where
children are held in government custody and separated from their families.

_____                     Date: June 19, 2020

Jessica K. Heldman

Professor in Residence

---

[50] Office of Refugee Resettlement, UAC Manual of Procedures, Version 2, Section 1.2.4 (2018).

Exhibit 178
Page 317

# Exhibit 179

Exhibit 179
Page 318

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

LUCAS R., et al.,

       Plaintiffs,

    v.

ALEX AZAR, et al.,

       Defendants.

Case No.  2:18-CV-05741 DMG PLA

**DECLARATION OF DR. RYAN MATLOW**

1. The facts set forth below are based on my personal knowledge and, if called as a witness, I could and would competently testify to them. I am over eighteen years of age.

2. Attached as Exhibit A is a true and accurate copy of my Expert Report, submitted on June 19, 2020, which I hereby reaffirm and verify under penalty of perjury as containing the opinions that I am offering in this case.

3. If called to testify at trial, I anticipate that I will testify to the matters and opinions as set forth in my Expert Report.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.  Executed on this 28th day of September, 2020.

Dr. Ryan Matlow

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LUCAS R., et al., | Case No.  2:18-CV-05741 DMG PLA |
| Plaintiffs, | **DECLARATION OF DR. NANCY E. WANG** |
| v. | |
| ALEX AZAR, et al., | |
| Defendants. | |

1.  The facts set forth below are based on my personal knowledge and, if called as a witness, I could and would competently testify to them. I am over eighteen years of age.

2.  Attached as Exhibit A is a true and accurate copy of my Expert Report, submitted on June 19, 2020, which I hereby reaffirm and verify under penalty of perjury as containing the opinions that I am offering in this case.

3.  If called to testify at trial, I anticipate that I will testify to the matters and opinions as set forth in my Expert Report.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.  Executed on this 28th day of September, 2020.


Dr. Nancy E. Wang

DECLARATION OF DR. NANCY E. WANG
CASE NO. 2:18-CV-05741 DMG PLA

Exhibit 179
Page 320

# EXHIBIT A

Exhibit 179
Page 321

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LUCAS R., et al.,<br><br>   Plaintiffs,<br><br>v.<br><br>ALEX AZAR, et al.,<br><br>   Defendants. | Case No.  2:18-CV-05741 DMG PLA<br><br>**EXPERT REPORT OF DRS. RYAN MATLOW AND NANCY EWEN WANG**<br><br>**PLAINTIFFS' CONFIDENTIAL PERSONAL INFORMATION/CONFIDENTIAL** |

EXPERT REPORT OF DRS. RYAN MATLOW AND NANCY EWEN WANG
CASE NO. 2:18-CV-05741 DMG PLA

**Exhibit 179**
**Page 322**

transferred to a residential treatment center.[53]  In one example, a child with diagnoses of autism spectrum disorder and intellectual disability did not appear to receive services or interventions that specifically address these disabilities.[54]

The lack of appropriate care to address a given disability without interrupting a child's placement is likely to result in the continuation of associated symptoms, and, in many cases, exacerbation of symptom severity and frequency over time.

In current form and practice, children's placement in restrictive residential or rehabilitative settings while in ORR custody is contraindicated for addressing children's disabilities related to trauma exposure, traumatic distress, and corresponding functional impairments.  Highly-structured institutionalized care environments are contraindicated when there are less restrictive care options (such as family or community-based placements) that offer resources, individualized supports, and responsive caregiving.  Particularly for children with trauma-related disabilities, highly-structured care environments prove problematic and harmful when they are not equipped with procedures and practices that provide appropriate individualized supports so that children are realistically able to meet system goals and are not punished for their disabilities.

The more restrictive facilities in ORR's network, i.e. residential treatment centers, staff-secure, and secure facilities, do not appear to have appropriate services and resources to address children's disabilities based on our review of ORR case files and policies, and children experience restrictions in their daily activities and personal autonomy that induce stress.  Furthermore, even with appropriate supports and services, such facilities can cause stress and trauma due to the forced and restrictive nature of the placement, as described above.  A concerning example is that of Shenandoah Valley Juvenile Center ("Shenandoah"), which operates with the highest level of security ("secure" facility) and structure within ORR but does not offer individually-tailored treatment services.  Melissa Cook, a clinician at Shenandoah, stated in her deposition that Shenandoah does not develop treatment plans, service plans, or provide treatment for specific diagnoses.[55]  A "one size fits all" approach to service is insufficient for caring for populations of children with wide variation in type and degree of disability.

---

[53] *See* Cook Dep. at 108:1-8 ("Q: So you're not providing treatment to youth there? A: We're providing treatment. We are not providing treatment for a specific diagnosis. We're not working on specific things as if you were a clinician in an outpatient setting or if you were in a residential treatment facility. It's a different type of setting.")
[54] *See* ORR case file of Benjamin F. at Lucas R._Experts_12400-12789.
[55] Cook Dep. at 106:20-25, 107:10-108:8 ("Q: Do you develop a treatment plan for the child? A: No, not a technical treatment plan. We're not a treatment facility. Q: Do you create a service plan? A: No. . . we're more of a triage, so we're not coming up with a specific plan for each kid. We're triaging and helping them adjust and supporting them. And we're not a treatment facility. Q: What do you mean by triage? A: The kids who come to us usually could be having behavior difficulties if they're coming straight from a crisis situation or if they've been incarcerated in the local setting or something. There's – there could be behavior issues, so we're just dealing with what's there. We're not doing deep psychological fixing or counseling or, you know, if they're borderline, we're not coming up with treatment plans on treating them because we're not a treatment facility. We're just taking care of them while they're there. And it should be a short time. Q: So you're not providing treatment to youth there? A: We're providing treatment. We are not providing treatment for a specific diagnosis. We're not working on specific things as if you were a clinician in an outpatient setting or if you were in a residential treatment facility. It's a different type of setting.").

Plaintiff's Confidential Personal Information/Confidential

Exhibit 179
Page 323

Some of the behavioral reinforcement systems that are utilized in ORR "step up" facilities have been deemed ineffective for the population served,[56] a common outcome when such systems are not tailored to an individual's needs based on their specific disability or trauma history.  For example, the Federal Field Specialist Supervisor for Special Populations David Fink indicates that children in ORR staff-secure facilities do not receive adequate support and opportunity for social skill development to address the behavioral challenges that resulted in their placement in such facilities;[57] these difficulties in effectively building social skills commonly result when intervention approaches do not sufficiently address and consider the client's past cultural context and related social norms.

Children in ORR custody also report not having access to the tools, spaces, and opportunities that they know can help them with their disability (i.e., tools that are effective for emotional and behavioral regulation).[58]  Any person in a moment of stress can attest to the benefit of quiet, uninterrupted spaces to help them settle and gather themselves in order to reduce risk for overstimulation or escalation; children who have difficulties with emotion regulation, or who are accustomed to accessing quiet or open spaces as a means of self-regulation, are in particular need for these sorts of accommodations.

> *"I know that I get worked up and angry because there is nothing else that I am allowed to do here that will help me calm myself."*[59]

> *"At Shiloh, when I feel bad, I just have to deal with it.  I can't walk around or distract myself to help myself feel better."*[60]

Children report feeling more supported and having better access to care in lower level facilities.[61]  In general, based on our review of ORR policies, ORR files, and the declarations of children in ORR custody, care systems for immigrant children in ORR custody do not appear to offer appropriate levels and forms of scaffolding and supports necessary to sufficiently address children's traumatic stress and other disabilities.

---

[56] Fink Dep. at 215:14-24 ("Q: You mentioned one of your observations has been sort of a mismatch between the behavior management systems used at these programs and the population of kids that ORR has in its custody, is that correct, in terms of summarizing your testimony? A: Yeah, that the system, the level of token economy system – Q: Right. A: – is not really working for the population that they're serving.").

[57] Fink Dep. at 217:18-218:13 ("Q: And for youth who – for the youth – the population of youth that ORR is responsible for, when they are in a program that is relying on the point/level behavior management system, what is the – what tends to be the outcome – what is the consequence for those kids? What have you observed? A: Just limited – a limited ability to teach the kids the social skills to replace the ones that they're struggling to – you know, that brought them in there. So if they're having issues with authority, they don't have the – they don't really understand how to like teach that kid how to like work with people who are authority figures. And especially coming from countries where, you know, they had a lot of independence and were treated like adults. So, like, having those skill sets is really important to work with kids that have behaviors.").

[58] *See e.g.*, A.J.V.M. Decl. at Lucas R._Experts_11692, ¶ 13; A.R.V.L. Decl. at Lucas R._Experts_11697, ¶ 9; B.D.H.G. Decl. at Lucas R._Experts_11703, ¶ 16.

[59] B.D.H.G. Decl. at Lucas R._Experts_11703, ¶ 16.

[60] C.M.V.C. Decl. at Lucas R._Experts_11708, ¶ 5.

[61] *See* E.A.R.S. Decl. at Lucas R._Experts_11743, ¶¶ 4-7; D.D.R.O. Decl. at Lucas R._Experts_11734-35, ¶¶ 4-5, 8-9.

Plaintiff's Confidential Personal Information/Confidential

Exhibit 179
Page 324

restrictive care facilities renders these behavioral requirements exceedingly problematic. The psychological distress that children experience in restrictive care settings are expected and normal reactions to detention, and therefore do not warrant punishment, increased restriction, and/or extended time in detention. The mere experience of being held or detained against one's own will is a potential source of traumatic stress, no matter the conditions of the placement.

In these circumstances, a child's functioning while detained cannot be assumed to be inherently predictive of their functioning in family or community contexts (where they are likely to experience an increased sense of agency, individualized supports, and accompanying reductions in distress), and therefore should not be the basis for denying release.

Our expert opinion – based on evidence and records submitted in this case as well as our own experiences working with detained children – is that ORR placement settings do not provide a trauma-sensitive environment that is appropriate for children with trauma histories and related disabilities (i.e., disabilities stemming from prolonged exposure to toxic stress). The ensuing result is that such placement settings often serve to exacerbate psychological stress. For many children (especially those experiencing traumatic stress and other disabilities), the psychological effects, health consequences, and functional impairments stemming from their experiences in ORR custody are expected to endure beyond the duration of the child's stay in ORR with potential for long-term negative impact and impairment.

Ryan Matlow, Ph.D.
Clinical Assistant Professor, Department of Psychiatry and Behavioral Sciences
Stanford University School of Medicine
Email: rmatlow@stanford.edu
Telephone: (650) 724-8113

Dr. Nancy E. Wang
Professor Emergency Medicine
Associate Director Pediatric Emergency Medicine
Stanford University School of Medicine
Email: ewen@stanford.edu
Telephone: (650) 723-0757

36

Plaintiff's Confidential Personal Information/Confidential

Exhibit 179
Page 325

# Exhibit 180

Exhibit 180
Page 326

1

2

3

4

5

6

7

8

9

10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

LUCAS R., et al.,

    Plaintiffs,

  v.

ALEX AZAR, et al.,

    Defendants.

Case No.  2:18-CV-05741 DMG PLA

**DECLARATION OF MAE QUINN**

  1.  The facts set forth below are based on my personal knowledge and, if called as a witness, I could and would competently testify to them. I am over eighteen years of age.

  2.  Attached as Exhibit A is a true and accurate copy of my Expert Report, which I hereby reaffirm and verify under penalty of perjury as containing the opinions that I am offering in this case.

  3.  If called to testify at trial, I anticipate that I will testify to the matters and opinions as set forth in my Expert Report.

  I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.  Executed on this 28th day of September, 2020.

*Mae C. Qu____*

Mae Quinn

**DECLARATION OF EXPERT NAME**
**CASE NO. 2:18-CV-05741 DMG PLA**

**Exhibit 180**
**Page 327**

# EXHIBIT A

Exhibit 180
Page 328

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LUCAS R., et al.,<br><br>        Plaintiffs,<br><br>   v.<br><br>ALEX AZAR, et al.,<br><br>        Defendants. | Case No.  2:18-CV-05741 DMG PLA<br><br><br>EXPERT REPORT OF PROFESSOR MAE QUINN |

Exhibit 180<br>Page 329

being investigated, and two were deemed unfounded.[14] Reports of resident on resident sexual harassment were also noted in the report. *Id.*

(b) Staff Secure Facilities

Children's Village in Dobbs Ferry, New York provides both ordinary shelter care for UACs and Staff Secure placements.  *See* Class Action Complaint at 7, *LVM v. Lloyd*, 18-cv-01453 (N.D.N.Y. 2/16/18) (alleging Children's Village ORR shelter has 183 beds for UAC while its Staff Secure facility houses 28 UAC). I was unable to find any photographs or written documents that compare the Staff Secure units with ordinary shelter facilities at Children's Village.

However, I was able to review at least one child's description of Children's Village Staff Secure facility. After being overheard talking about running away, one UAC was apparently transferred from a shelter in another state to Children's Village Staff Secure without any process. A.F.B.L. Decl. at 1. According to the youth, the Staff Secure placement at "Children's Village is like a prison" with a much stricter environment than shelter care and fencing to make sure youth remain within the perimeter. *Id.* The UAC further described a two-week introductory period equivalent to solitary confinement, during which time the youth was restricted to their sleeping quarters. *Id.* 1-2.

In addition, a video was recently posted online, depicting the interior of one Children's Village's dormitory. Zach Williams (July 17, 2018) *360° Video: What Does a Close to Home Facility Look Like?*, NYN MEDIA, available at:   https://nynmedia.com/content/close-home-facility-360-video-childrens-village. The video shows that all the unit's windows are covered with metal mesh. *Id.* The narrator explains that extra heavy furniture is utilized throughout the

---

[14]    Shenandoah's PREA report further states the facility maintains an average daily population of only 33 youth ages 12 to 17 when the facility's website indicates an average daily population of 46 youth aged 10 to 17.  *Compare* 2019 Annual PREA Report at 3 *with* Shenandoah Valley Juvenile Center Website, About Webpage.

dormitories. *Id.* Beyond this, the video shows that the furniture is secured to the floor and that surveillance cameras permeate the rooms and halls. *Id.*

Interestingly, the Office of the Inspector General (OIG) for the Department of Health and Human Services (HHS) (hereinafter collectively referred to as HHS-OIG) recently audited Children's Village. *See* Department of Health and Human Services-Office of the Inspector General (April 26, 2019) *The Children's Village, Inc., An Administration for Children and Families Grantee, Did Not Always Comply with Applicable Federal and State Policies and Requirements* at 1 (noting that between 2014 and 2015 alone, Children's Village received $16.7 million in funds to provide placements for approximately 483 ORR placed youth), available at: https://oig.hhs.gov/oas/reports/region2/21602013.asp. In addition to demanding a refund to the federal government of $2.6 million relating to services that were not properly rendered, it also claimed the facility violated numerous ORR policies and requirements. *See id.* at 17.

For instance, without specifically indicating whether the violations applied to ordinary shelter care or other placements, HHS-OIG found numerous violations relating to security for youth and demanded even higher restrictiveness for youth placed at the facility. *See id. generally.* For instance, HHS-OIG said Children's Village improperly maintained an unlocked laundry room where UAC could freely access laundry detergent and cleaning supplies. *Id.* at 7. In addition, despite security fencing around the perimeter of the 186-acre property, HHS-OIG imposed even more levels of restrictiveness by requiring Children's Village to add more security features, including the addition of a permanent guard at the rear entrance gate. *Id.* at 17, 25.

For its part, Children's Village agreed to make the requested changes but defended alleged deficiencies by pointing out a lack of clarity in ORR practices, policies, and written procedures.

Expert Report of Professor Mae Quinn
          Case No. 2:18-CV-05741 DMG PLA

**Exhibit 180
Page 331**

*Id.* at 16-17, 37-48. In fact, it argued, it was trying to meet its legal duty to provide youth with the least restrictive setting possible under the circumstances. *Id.* at 16.

Morrison Child and Family Services in Oregon operates "Paso," a Staff Secure facility in Portland for boys age 13 to 17 who have been stepped-up from other ORR facilities. *See* Kelly Kenoyer (July 4, 2018) *Underage, Undocumented, and Detained in Portland*, PORTLAND MERCURY, available at:https://www.portlandmercury.com/news/2018/07/04/21059162/underage-undocumented-and-detained-in-portland. Recent requests to tour the facility, made by the press and elected officials alike, have been declined. *Id.*

According to at least one former staff member, however, "Paso is 'like a smaller version of a detention center that has paint on the walls to make it feel warmer.'" *Id.* All doors at the facility are locked and youth are monitored at all times through surveillance cameras and otherwise. *See id.* The Morrison Child and Family Services website, https://morrisonkids.org/, does not reference its Paso program. However, based on my experience visiting and analyzing secure institutional facilities, online photographs depicting the facility (below), suggest the facility is highly secure and institutional in nature:



Aerial imagery further suggests Paso maintains a secure perimeter with interior courtyards for sports or outdoor activities:



45                     Expert Report of Professor Mae Quinn
                       Case No. 2:18-CV-05741 DMG PLA

Exhibit 180
Page 333

of many juvenile detention centers, which are local facilities connected to the place of the alleged wrongdoing and residence of the youth. When UACs accused of alleged misconduct or supposedly in need of therapeutic intervention are sent to ORR restrictive settings, which may be far away from family connections, such placement impedes family contact and associational freedoms.

### 2.     RTCs Additionally Impose Involuntary Treatment

It is not at all clear what kind of therapy or treatment, beyond medication, is being provided to UACs placed at RTCs like Shiloh. For instance, while Shiloh's website declares youth there are properly "cared for and treated," it does not mention any kind of therapeutic or other intervention offered beyond medications. But ORR's materials all suggest that youth placed in such settings—with the possible exception of non-TAR RTC youth—are there for purposes of psychiatric or related therapeutic treatment. Thus, whatever kind of treatment might be provided to UACs at RTCs on an ongoing, non-emergency basis—medical, mental health, or otherwise—generally requires a showing of parental or child consent, beyond any findings made that would support placement in secure detention. Absent such consent—given ORR's failure to demonstrate UACs lack a parent who can make medical decisions for them, lack of court-ordered legal custody, and family separation protocols at the border and other practices that suggest a history of less than good faith concern for such youth—heightened neutral factfinding must support such extraordinary intervention.

### B.     Deficiencies in ORRs Current Regulatory, Policy, and Practice Framework

### 1.     ORR's Regulations, Policies, Procedures, and Forms are Incoherent

As noted above, current ORR regulations, policies, procedures, and forms relating to UAC step-up, in addition to being largely obscured from the public and UACs to whom they apply, are highly confusing and inconsistent. Even as an expert in the field I struggled to try to interpret the

- Continued step-up to RTC must be re-evaluated by way of a meaningful hearing process also conducted before a neutral factfinder. Given the heightened concerns involved in forced mental health and medical treatment, at the very least, such hearings should be conducted every 14 days. [17]

Mae C. Quinn, JD, LLM

---

[17]    Although not constitutionally required, depending upon the nature of the alleged rationale for ongoing residential treatment and/or location where the child is being forcibly treated, the government may need to be held to a guilt beyond a reasonable doubt standard. See Cal. Welf. & Inst. Code § 6604; Texas Health & Safety Code § 841.003

Expert Report of Professor Mae Quinn
Case No. 2:18-CV-05741 DMG PLA

**Exhibit 180
Page 335**

# Exhibit 181

Exhibit 181
Page 336

|  | |
| --- | --- |
| 1 | UNITED STATES DISTRICT COURT |
| 2 | CENTRAL DISTRICT OF CALIFORNIA |
| 3 | WESTERN DIVISION |

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    WESTERN DIVISION

4

5   LUCAS R., et al.,                    Case No.  2:18-CV-05741 DMG PLA

6                Plaintiffs,       **DECLARATION OF DR. EMILY RYO**

7         v.

8   ALEX AZAR, et al.,

9                Defendants.

10

 1.  The facts set forth below are based on my personal knowledge and, if called

11  as a witness, I could and would competently testify to them. I am over eighteen years

12  of age.

13   2.  Attached as Exhibit A is a true and accurate copy of my Expert Report, dated

14  June 16, 2020, which I hereby reaffirm and verify under penalty of perjury as

15  containing the opinions that I am offering in this case.

16   3.  If called to testify at trial, I anticipate that I will testify to the matters and

17  opinions as set forth in my Expert Report.

18   I declare under penalty of perjury under the laws of the State of California and the

19  United States that the foregoing is true and correct.  Executed on this 28 day of

20  September, 2020.

21

22

23   _____

24   Emily Ryo, JD., PhD.

25

26

27

28

# EXHIBIT A

Exhibit 181
Page 338

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LUCAS R., et al.,<br><br>                Plaintiffs,<br><br>        v.<br><br>ALEX AZAR, et al.,<br><br>                Defendants. | Case No.  2:18-CV-05741 DMG PLA<br><br><br>EXPERT REPORT BY DR. EMILY RYO |

Discharge types were categorized in the following way:

- "Reunified" refers to "Reunified (Individual Sponsor)"
- "Voluntary Departure" refers to "Voluntary Departure"[18]
- "Removal Order" refers to "Ordered Removed"
- "Age Out/Redetermination" refers to "Age Out" or "Age Redetermination"
- "Reunified (Program/Facility)" refers to reunifications not with Individual Sponsors
- "Other" refers to "DHS Family Shelter," "Immigration Relief Granted," "Local Law Enforcement," "Marshals Service," "Other," "Ranaway from Facility," or "Ranaway on Field Trip"

Table 4 below shows the distribution of custody period lengths for each discharge type.

| Length of custody | Reunified | Voluntary Departure | Removal Order | Age Out / Redetermination | Reunified (Program / Facility) | Other |
|---|---|---|---|---|---|---|
| **0-20 days** | 20.98% | 0.70% | 12.50% | 35.68% | 13.53% | 17.16% |
| **21-30 days** | 18.02% | 0.76% | 7.50% | 10.26% | 15.08% | 4.26% |
| **31-60 days** | 32.47% | 3.86% | 32.50% | 19.50% | 29.43% | 15.53% |
| **61-90 days** | 14.46% | 10.16% | 10.00% | 11.27% | 11.79% | 18.68% |
| **91-120 days** | 6.56% | 15.77% | 8.75% | 6.97% | 7.13% | 11.68% |
| **121-150 days** | 3.26% | 18.81% | 15.00% | 4.40% | 3.38% | 6.19% |
| **151-180 days** | 1.70% | 16.82% | 7.50% | 2.88% | 1.83% | 4.57% |
| **181-365 days** | 2.36% | 31.13% | 3.75% | 6.81% | 9.69% | 15.13% |
| **366-547 days** | 0.17% | 1.99% | 2.50% | 1.87% | 5.12% | 4.47% |
| **548-730 days** | 0.02% | 0.00% | 0.00% | 0.37% | 2.83% | 2.03% |
| **731+ days** | 0.00% | 0.00% | 0.00% | 0.00% | 0.18% | 0.30% |
| **# of custody periods** | **110,400** | **1,712** | **80** | **5,138** | **1,094** | **985** |

*Table 4. Length of custody by discharge type.*

---

[18] Voluntary departure is when the U.S. Attorney General permits an alien to voluntarily depart from the United States at his or her own expense without being subject to removal proceedings or a removal order. 8 U.S.C. § 1229c(a)(1).

Expert Report by Dr. Emily Ryo
Case No. 2:18-CV-05741 DMG PLA

**Exhibit 181**
**Page 340**

Table 5 below shows the percentage of custody periods for each placement type that ended in these varying discharge types.

| Discharge Type | Only shelter placements, no step-ups | Stint at a therapeutic group home, no step-ups | Stint at a staff secure facility | Stint at a secure facility | Stint at a residential treatment center | Stint at a therapeutic staff secure facility | Stint at an out-of-network facility |
|---|---|---|---|---|---|---|---|
| **Reunified** | 92.97% | 53.33% | 47.76% | 41.74% | 71.58% | 43.48% | 25.00% |
| **Voluntary Departure** | 1.10% | 26.67% | 10.30% | 6.96% | 5.26% | 21.74% | 31.25% |
| **Removal Order** | 0.03% | 0.00% | 5.67% | 6.52% | 0.00% | 0.00% | 0.00% |
| **Age Out / Redetermination** | 4.57% | 13.33% | 22.54% | 32.61% | 8.42% | 8.70% | 12.50% |
| **Reunified (Program / Facility)** | 0.82% | 0.00% | 3.43% | 3.48% | 10.53% | 17.39% | 12.50% |
| **Other** | 0.52% | 6.67% | 10.30% | 8.70% | 4.21% | 8.70% | 18.75% |
| **# of custody periods** | 104,846 | 15 | 670 | 230 | 95 | 23 | 16 |

***Table 5. Discharge type by placement type.***

In summary, among the placement types without step-ups, the percentage of reunifications are higher for custody periods that took place only in shelters (92.97%) compared to custody periods that include a stint at a therapeutic group home (53.33%). In addition, the percentage of reunification was higher for custody periods that took place only in shelters (92.97%) compared to custody periods that included a stint at a residential treatment center (71.58%), therapeutic group home (53.33%), staff secure (47.76%), therapeutic staff secure (43.48%), secure (41.74%), and out-of-network facility (25.00%).

In contrast, the percentage of voluntary departures by placement type not involving a step-up shows a higher percentage of voluntary departures for custody periods that included a stint at a therapeutic group home (26.67%) compared to custody periods that took place only in shelters (1.10%). In addition, the percentage of voluntary departures was higher for custody periods that included a stint at out-of-network facility (31.25%), therapeutic group home (26.67%), therapeutic staff secure (21.74%), staff secure (10.30%), secure (6.96%), and a residential treatment center (5.26%), compared to the small percentage of voluntary departures for custody periods that took place only in shelters (1.10%).

June 16, 2020

*Emily Ryo*
_____
Emily Ryo, JD., PhD.

17

Expert Report by Dr. Emily Ryo
Case No. 2:18-CV-05741 DMG PLA

**Exhibit 181**
**Page 341**

# Exhibit 182

## ENTIRE DOCUMENT SUBMITTED UNDER SEAL

Exhibit 182
Page 342

# Exhibit 183

## <u>REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL</u>

**Exhibit 183**
**Page 349**

I, ██████████████████, declare as follows:

1.     This declaration is based on my personal knowledge.  If called to testify in this case, I would testify competently about these facts. This declaration is an update to the declaration I provided in June 2018.

**Yolo**

2.     I have been in detention since the summer of 2017.  I was previously at Casa Padre and NoVa and am currently at Yolo.  I hated Casa Padre and NoVa but Yolo is even worse.  A male staff member has hit on my back three times, each time in my room.  I do not know why he hit me.

3.     Once, I was pepper sprayed outside on the soccer field. The staff threw me on the ground and then pepper sprayed me. My shoulder was hurt and my eyes were burning.  I felt so awful and I started crying.  I couldn't see and couldn't open my eyes the whole day and throughout the night.  I asked staff for help, but no one helped me. They didn't even bring me water or anything to help my eyes.  Some of my friends tried to help by splashing water in my eyes but it didn't help.

4.     I have never spoken to a therapist here or anyone else to help me with my emotions or about the many difficult experiences I have had.

**Transfer from Casa Padre**

5.     I was miserable at Casa Padre because I missed my family so much.  I had a lot of intense emotions because I missed my family.  Sometimes, I cut myself. Sometimes my feeling made me feel aggressive and led to fights.  I never spoke to a therapist.  No one at Casa Padre tried to help me with my feelings.  I was transferred directly from Casa Padre to NoVa.  They didn't warn me that I was being moved and they didn't tell me why I was being moved.

1

Plaintiff's Confidential
Personal Information/Confidential

**NoVa**

6.     When I was at NoVa I didn't want to leave my room. I missed my family so much and was upset all the time. The staff at NoVa didn't help me with these feelings. They did not provide me with a therapist. I don't know why I was transferred from NoVa to Yolo.

**Family**

7.     All I want is to be with my mother and sister in Ohio. I haven't seen my family in over a year and I miss them terribly. I know they are doing everything they can to have me released to them. No one has provided me with updates on the reunification process.

8.     I talk to my mom and sister on the phone only once a month. I want to speak with them every day, twice a day – once in the morning and once in the evening.

9.     I don't know why I haven't been released, I think I have to wait to talk to a doctor first, but I don't know why.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 21 day of September 2018, at ___woodland___, California.

2

Plaintiff's Confidential
Personal Information/Confidential

Lucas R._Experts_11706

**Exhibit 183
Page 351**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### CERTIFICATE OF TRANSLATION

I, _Karen Pedraza_____, hereby certify that I am proficient in both Spanish and English, and that I accurately translated the foregoing statement and read it back to ▮▮▮▮▮▮▮▮▮ in its entirety in Spanish on _September 21st, 2018__.

Karen Pedraza

3

Plaintiff's Confidential
Personal Information/Confidential

Lucas R._Experts_11707

**Exhibit 183**
**Page 352**

# Exhibit 184

## <u>REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL</u>

**Exhibit 184**
**Page 353**

DECLARATION OF █████████████████████

I, ██████████████████████████████, declare as follows:

1.      This declaration is based on my personal knowledge.  If called to testify in this case, I would testify competently about these facts.

2.      I am 17 years old.  I came to the United States from Honduras about 8 months ago. When I arrived at the border, I was taken to a Southwest Key shelter in California, where I was detained for 2 months.

3.      I am currently detained in the Children's Village Therapeutic Group Home in Dobbs Ferry, NY, and I have been here for 6 months.

Transfer to Children's Village Therapeutic Group Home

4.      I was told that I was transferred to Children's Village because I needed more help with my mental health. This was the only explanation I was given.

5.      I see my therapist once a week here. This is the same as at Southwest Key, but my therapist at Southwest Key helped me more. I would have liked to receive more therapy at Southwest Key, but nobody offered that option to me.

6.      I preferred the Southwest Key shelter to being here at Children's Village. The staff at Southwest Key treated me better and I had more freedom. There was no color system to measure behavior and we could wear our own clothes. At Children's Village I feel like I am locked up. There are rules for everything and there is more security. We are not allowed to leave the house by ourselves. I am so bored here.

7.      When I first arrived at Children's Village I was placed on 1 to 1 supervision for a month and a half. A staff member followed me at all times. I was very frustrated by this because I had no privacy. I am not crazy, but I feel like the staff treat me as if I am crazy.

8.      In order to get stepped down to a shelter, I was told that I need to behave well all the time. I do not remember any review of my placement here.

1

Plaintiff's Confidential
Personal Information/Confidential

<u>Psychotropic Medications</u>

9.      I take medication to calm my nerves. I started taking this medication at Children's Village.

10.     I once refused to take medication, and the staff put this in a report and told the government that I did not want to take the medication. I think refusing medication could hurt my case.

<u>Sponsorship Process</u>

11.     I do not have family in the United States able to sponsor me. I have good friends in the United States willing to sponsor me and I want to live with them. But my case manager told me this is not possible because they are not family.

12.     I have been waiting for a long-term foster care placement for 7 months and have not yet heard back. I have been waiting so long and I am so tired of being in detention that I am considering giving up and going back to my country.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 11th day of December, 2019, at Dobbs Ferry, New York.

2

Plaintiff's Confidential
Personal Information/Confidential

Lucas R._Experts_11744

**Exhibit 184**
**Page 355**

CERTIFICATE OF TRANSLATION

1

2    I, _Amy Rivadeneira_____, hereby certify that I am proficient in both

3  Spanish and English, and that I accurately translated the foregoing statement and read it

4  back to _____ in its entirety in Spanish on December 11, 2019.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

Plaintiff's Confidential
Personal Information/Confidential

Lucas R._Experts_11745

**Exhibit 184**
**Page 356**