# Exhibit 185

Exhibit 185
Page 357

**DECLARATION OF ANTHONY ENRIQUEZ, ESQ.**

I, Anthony Enriquez, declare as follows:

1.      This declaration is based on my personal knowledge. If called to testify in this case, I would testify competently about the following facts.

2.      My name is Anthony Enriquez, Esq. and I am an attorney licensed to practice in the State of New York. This declaration describes my experiences and observations working with unaccompanied migrant youth detained in the Residential Treatment Center program at the MercyFirst facility in New York State.

Experience Serving Youth in ORR Custody

3.      Since January of 2018, I have been the Director of the Unaccompanied Minors Program of Catholic Charities Community Services of the Archdiocese of New York, (CCCS-NY), a legal service provider that serves youth at MercyFirst and a number of other programs that house unaccompanied minors in New York, including Lutheran Social Services, Rising Ground, Catholic Guardian Services, Children's Home of Kingston and Children's Home of Poughkeepsie, and Lincoln Hall.  I supervise the work of a team of 40 attorneys, paralegals, and other staff who represent unaccompanied migrant youth seeking relief before immigration courts and agencies. Over the last 10 years, Catholic Charities has represented hundreds of youth in ORR custody. Although the majority of these youth come from Honduras, Guatemala and El Salvador, youth placed in ORR custody in New York may come from all over the world.

4.      As the legal service provider for MercyFirst, our legal staff maintain regular contact with the youth at the facilities. We provide ongoing consultations and presentations concerning the legal rights of detained minors, as well as direct legal

representation to youth who request it.

Lack of Means to Reconsider Placement in Residential Treatment

5.     Residential treatment at MercyFirst is among the most restrictive forms of custody available to ORR. In some cases, it can provide access to care and services for children in serious mental health distress.

6.     But some children, including our clients, have lingered in residential treatment for extended periods of time. Far from improving their symptoms, restrictive placement for prolonged periods has exacerbated symptoms of fear and hopelessness.

7.     In specific cases, we have raised our clients' concerns over prolonged placement to case workers at MercyFirst, the employees who provide daily care to minors placed there. In response, one caseworker told us that if a child complains about initial placement in residential treatment, he or she can schedule a meeting with the child's clinician and a call with parents, if accessible, to explain why the child has been placed. But the caseworker was not aware of a protocol for requesting reconsideration of placement, as described in the ORR Policy Guide at 1.4.7. Nor was he aware how to submit a formal request for reconsideration to the Director or his designee.

8.     After reviewing the government's motion for summary judgment and supporting exhibits in *Lucas R. v. Azar*, I became aware that the government asserts that it has initiated a new procedure for placement review called the Placement Review Panel (PRP). Neither I nor my staff have ever heard of the PRP's existence or are aware of any child at MercyFirst who has accessed the PRP.

9.     In one case of a client we currently represent, we emailed a caseworker to ask if our client's 30-day Restrictive Placement Case Review was proceeding as planned and whether he might be eligible for transfer to a less restrictive form of custody given his record of good behavior. We did not receive a response.

Declaration of Anthony Enriquez

Exhibit 185
Page 359

<u>Delays in Release of Unaccompanied Children</u>

10.     Many children who have been placed in residential treatment have family members who are prepared to sponsor them from ORR custody. Others are waiting for release to a long-term foster care program. And others, including victims of trafficking and Special Immigrant Juveniles, are seeking release to an Unaccompanied Refugee Minor program, a form of long-term foster care available in certain states.

11.     Unfortunately, we have seen numerous delays in release to family and programs for children in residential treatment without adequate explanation. Though the ORR Policy Manual at 2.3.2 requires case managers to provide weekly status updates to children on the status of their sponsor assessment process, some of our clients have told us that several weeks have passed without any updates from their case managers. In some cases, we have spoken directly to the proposed sponsors, who have told us that their calls to MercyFirst caseworkers go unanswered. In some cases, case managers have not responded to our emails asking for updates about family reunification or have given only vague, terse responses such as "reunification pending."

12.     This lack of information is distressing for many of our clients. One recent client cried in frustration to us because of the unexplained delays in his release, which included multiple home studies, even after previous studies had not returned worrying information. Our client repeatedly told us that the case manager would not provide him with updates about his sponsor and the case manager refused to return our inquiries. We were therefore unable to determine the basis for additional home studies. This client remained in ORR custody for over nine months and was finally released after we sent a demand letter threatening to sue at habeas.

13.     Up-to-date information on family reunification is also essential for the immigration relief cases for many children. Staying informed on their likely date of release helps them determine the viability of obtaining relief in New York prior to that date. If a child's release is delayed without good reason, she might age out of eligibility for Special

1  Immigrant Juvenile Status. If a child's release occurs midway though an ongoing case for

2  relief in New York, it can also cause serious delay in the case's resolution. In order to

3  provide informed direction to their counsel, children need timely, regular updates

4  regarding their sponsor approval process.

5  14.     In multiple cases, we have also seen unexplained delays of several months in

6  submission by case managers to long-term foster care and Unaccompanied Refugee

7  Minor programs. The lack of response from case managers to our inquiries about the

8  status of these applications makes it difficult to monitor their timely submission. For

9  these reasons, we copy the lead case managers and directors of MercyFirst on our

10  inquiries. Often, responses are still not forthcoming.

11

12  I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

13  30th day of October, 2020, at New York, New York.

14

15  _____

16                          ANTHONY ENRIQUEZ

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Anthony Enriquez

Exhibit 185
Page 361

# Exhibit 186

Exhibit 186
Page 362

1   UNITED STATES DISTRICT COURT

2   CENTRAL DISTRICT OF CALIFORNIA

3   WESTERN DIVISION

4

5   LUCAS R., et al.,                     Case No.  2:18-CV-05741 DMG PLA

6            Plaintiffs,
                                          **DECLARATION OF DR. EMILY RYO**
7       v.

8   ALEX AZAR, et al.,

9            Defendants.

10      1.  I, Dr. Emily Ryo, under 28 U.S.C. § 1746, declare, under penalty of perjury,
11
    as follows.
12
        2.  I am a Professor of Law and Sociology at the University of Southern California
13
    Gould School of Law, in Los Angeles, California.
14
        3.  The facts set forth below are based on my personal knowledge and, if called
15
    as a witness, I could and would competently testify to them. I am over eighteen years
16
    of age.
17
        4.  Exhibit 57 of ECF 272-3 contains a true and accurate copy of my Expert
18
    Report in this matter, which I hereby reaffirm and verify under penalty of perjury as
19
    containing the opinions that I am offering in this case.
20
        5.  If called to testify at trial, I anticipate that I will testify to the matters and
21
    opinions as set forth in my Expert Report.
22
        6.  I submit this declaration to correct an inaccuracy in the Defendants'
23
    interpretation of the data analyzed in my Expert Report.
24
        7.  In Defendants' Uncontroverted Facts Document, ECF 263-2, Defendants
25
    inaccurately cite my Expert Report and Dr. Ryan's Rebuttal Report as support for the
26
    following with respect to fact No. 104:
27
        A separate analysis of the Flores data indicates that 86% of all
28

**Exhibit 186
Page 363**

children who are placed in ORR's care and custody and who are stepped up to a more restrictive setting than the shelter level were stepped up only after they had been in ORR's care and custody for more than two months. Dr. Ryan Expert Rebuttal Rep. ¶ 19; Dr. Ryo Expert Rep. at 9.

8. I do not make this statement anywhere in my Expert Report, and this figure (86%) cannot be derived from any content in my Expert Report, *see* Expert Report at 9-12. Defendants also cite to Dr. Ryan's rebuttal report for Fact No. 104, but Dr. Ryan only (incorrectly) cites to my Report. *See* Dr. Ryan Expert Rebuttal Rep. ¶ 19.

   a. Table 1 of my Expert Report shows the percentages of custody periods that included a step-up. The data is presented by length of custody (i.e., 0-6 days, 7-13 days, and so forth up to 150+ days). I have reproduced that table below:

| Length of custody | # of custody periods | # of step-ups | % of custody periods including a step-up |
|---|---|---|---|
| 0-6 days | 109,803 | 15 | 0.01% |
| 7-13 days | 108,766 | 84 | 0.08% |
| 14-29 days | 101,500 | 116 | 0.11% |
| 30-59 days | 71,252 | 113 | 0.16% |
| 60-89 days | 34,338 | 87 | 0.25% |
| 90-119 days | 17,759 | 57 | 0.32% |
| 120-149 days | 10,076 | 47 | 0.47% |
| 150+ days | 6,140 | 59 | 0.96% |

*Table 1. Percentages of custody periods that included a step-up, by length of custody.*

   b. From Table 1, one can derive the percentage of custody periods with step ups that occurred before or after a specific length of care. For example, after two months of custody (i.e. 60 days or more in custody), the result is 43.3%—which is nowhere near the 86% that Defendants' fact No. 104 states.

**Exhibit 186**
**Page 364**

c. To do the calculation I describe in 8b, we would need to look at columns 1 (length of custody) and 3 (number of step-ups by length of care) of Table 1.

d. By adding up all of the step ups in Column 3, we get the total number of 578 custody periods involving step ups (15 + 84 + 116 + 113 + 87 + 57 + 47 + 59 = 578). *See also* page 10 of my Expert Report, which notes that of 109,804 custody periods in the restricted sample, 578 custody periods included step-ups.

e. To determine what percentage of 578 step-ups occurred in 59 days or less, we would first add up the first four rows in Column 3 of Table 1 (i.e., number of step-ups that occurred during the following lengths of custody: 0-6 days, 7-13 days, 14-29 days, 30-59 days). The total number of step-ups that occurred between 0-59 days of custody is 328 (15 + 84 + 116 + 113 = 328). Next, we would divide the total number of custody periods with step-ups that occurred between 0-59 days in custody (328) by the total number of custody periods that included step-ups (578). That calculation shows that 56.7% of custody periods with step-ups occurred between 0-59 days in ORR custody.

f. To determine what percentage of 578 step-ups occurred in 60 days or more, you would first add up the last four rows in Column 3 of Table 1 (i.e., number of step-ups that occurred during the following lengths of custody: 60-89 days, 90-119 days, 120-149 days, 150+ days). The total number of step-ups that occurred between 60 or more days in custody is 250 (87 + 57 + 47 + 59 = 250). Next, you would divide the total number of custody periods with step-ups that occurred at 60 days or more in custody (250) by the total number of custody periods that included step-ups (578). That calculation shows that 43.3% of custody periods with step-ups occurred at or *after* 60 days in ORR custody.

3

Declaration of Dr. Emily Ryo
Case No. 2:18-CV-05741 DMG PLA

Exhibit 186
Page 365

g. In other words, using my Expert Report, which Defendants and Defendants' expert, Dr. Ryan, purport to rely on for their allegedly uncontroverted fact, 43.3%, not 86%, of custody periods including step-ups occurred after a child had been in custody for 2 months or more, and a majority (56.7%) of custody periods involving step-ups occurred *before* the child had been in custody for 2 months.

9. After repeated examination of my Expert Report and attempts to figure out where Dr. Ryan could have pulled the 86% he claims comes from my Expert Report, I was unable to do so. The closest I could come to such a figure was by adding up the row percentages in Table 1, Column 4 (percentage of custody periods including step-up). To the extent Defendants expert, Dr. Ryan, added up the row percentages in Table 1, Column 4, to reach the 86%—or 84.7% by my calculations as described below—such calculation is flawed because the row percentages include overlapping custody periods.

a. For example, and as listed in Column 2 (number of custody periods), Row 1's percentage in Column 4 is based on 109,803 custody periods, Row 2's percentage in Column 4 is based on 108,766 custody periods, Row 3's percentage in Column 4 is based on 101,500 custody periods, and so on. Row 2's custody periods of 108,766 include the same custody periods accounted for in Row 1's 109,803 custody periods. Row 3's custody periods of 101,500 custody periods include the same custody periods accounted for in Row 1's 109, 803 custody periods and Row 2's 108,766 custody periods, and so on and so on.

b. As such, the row percentages in Column 4 of Table 1 (0.01%, 0.08%, 0.11%, 0.16%, 0.25%, 0.32%, 0.47%, and 0.96%) should not be added up to determine the percentage of custody periods that involved a step-up by length of custody. In other words, we should not add up the last 4 rows in Column 4 and divide by the total percentage to determine the

Declaration of Dr. Emily Ryo
Case No. 2:18-CV-05741 DMG PLA

**Exhibit 186**
**Page 366**

1   percentage of custody periods that included a step-up at or after 60 days

2   in custody, which is what I suspect Defendants' Expert tried to do

3   (0.25%, 0.32%, 0.47%, and 0.96% = 2.0%; divided by total percentage

4   in Column 4, 0.01% + 0.08% + 0.11% + 0.16% + 0.25% + 0.32% +

5   0.47% + 0.96% = 2.36%; 2.0% divided by 2.36% equals 84.7%).

6   10.Accordingly, for the reasons stated above, Defendants' statement in their fact

7   No. 104 cannot be derived from my Expert Report.

8

9   I declare under penalty of perjury under the laws of the State of California and the

10   United States that the foregoing is true and correct. Executed on this 2 day of

11   November 2, 2020.

12   *Emily Ryo*

13   Emily Ryo, JD., PhD.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

# Exhibit 187

Exhibit 187
Page 368

# Children Entering the United States Unaccompanied: Section 1

## Placement in ORR Care Provider Facilities

Published: January 30, 2015

## 1.1 Summary of Policies for Placement and Transfer of Unaccompanied Alien Children in ORR Care Provider Facilities

The majority of unaccompanied alien children come into ORR custody because they were apprehended by border patrol officers with the Department of Homeland Security (DHS) while trying to enter the United States without legal authorization. DHS (and in rare circumstances other federal agencies) may refer unaccompanied alien children to ORR's care 24 hours a day, 7 days a week.

ORR has procedures in place to obtain background information on the unaccompanied alien child from the referring Federal agency to assess whether the unaccompanied alien child is a danger to self or others, whether there are any known medical and/or mental health issues, and whether other special concerns or needs are known, and then to designate an available care provider. ORR uses this information to determine an appropriate placement in the least restrictive setting for the unaccompanied alien child.

ORR policies for placing children and youth in its custody into care provider facilities are based on legal requirements as well as child welfare best practices  in order to provide a safe environment and place the child in the least restrictive setting appropriate for the child's needs. ORR may place a child in a **shelter facility, foster care or group home (which may be therapeutic), staff-secure** or **secure care facility, residential treatment center,** or other special needs care facility.

There are two types of placement decisions:  (1) the initial placement into an **ORR care provider** facility or setting and (2) transfer placement between ORR care providers. Although the circumstances and procedures for initial placement and transfer vary, ORR applies the same child welfare principles in its decision making process.

The referring Federal agency generally transports the unaccompanied alien child to the ORR care provider. ORR takes custody of the unaccompanied alien child when the child or youth physically arrives at the designated ORR care provider.

*Posted 1/27/15*

## 1.2 ORR Standards for Placement and Transfer Decisions

ORR policies for placing children and youth in its custody into care provider facilities are based on child welfare best practices in order to provide a safe environment and place the child in the least restrictive setting appropriate for the child's needs. ORR may place a child in a **shelter facility, foster care or group home (may be therapeutic), staff secure** or **secure care facility, residential treatment center,** or other special needs care facility.

Confidential - Subject to Protective Order

There are two types of placement decisions: the initial placement into an **ORR care provider** facility or other setting and transfer placement between ORR care providers. Although the circumstances and procedures for initial placement and transfer vary, ORR applies the same child welfare model to both types of care delivery. ORR makes every effort to place children and youth within the ORR funded care provider network. However, there may be instances when ORR determines there is no care provider available within the network to provide specialized services needed for special needs cases. In those cases, ORR will consider an alternative placement. An ORR Supervisor and ORR Project Officer must approve these placements.

ORR must approve all transfers and releases while a child or youth is in its custody, except in emergency situations where a care provider may temporarily transfer placement of an unaccompanied alien child. In these emergency situations the care provider must notify ORR of the transfer within 8 hours.

*Posted 1/27/15*

## 1.2.1 Placement Considerations

As mandated by law, ORR places an unaccompanied alien child in the least restrictive setting that is in the best interests of the child.

When making a placement determination or recommendation, ORR and care providers consider the following factors as they pertain to the child or youth:

- Trafficking or other safety concerns
- Any special needs or issues requiring specialized services (for example, a child with language needs, mental health or medical concerns, or a youth who is pregnant or parenting)
- Possibility of heightened vulnerability to sexual abuse due to prior sexual victimization
- Prior sexual abusiveness
- Identification as lesbian, gay, bisexual, transgender, questioning or intersex, or gender non-conforming appearance or manner
- Location of potential sponsor and family sponsorship options
- Siblings in ORR custody
- Immigration issues (for example, legal representation needs, immigration proceedings)
- Behavior
- Criminal or juvenile background
- Danger to self
- Danger to the community
- Escape risk
- Age
- Gender
- Length of stay in ORR custody
- Location where the child or youth was apprehended

*Posted 1/27/15*

## 1.2.2 Children with Special Needs

GOV-00025109
**Exhibit 187
Page 370**

Whenever possible, ORR places a child with special needs in a facility serving the general population but that is able to provide services and treatment for special needs. In all instances, ORR strives for a least restrictive setting in the best interests of the child.

For children in the following special situations, ORR gives priority for transitional foster care placements to:

- Children who are under 13 years of age
- Sibling groups with one sibling under 13 years of age
- Teens who are pregnant or are parenting
- Children or youth with other special needs

*Posted 1/27/15*

### 1.2.3 Safety Issues

The safety and well-being of a child or youth is a primary consideration in placement decisions. Issues related to safety include a child or youth being fearful of others, such as specific individuals who would seek to harm or exploit the child (e.g., smugglers, traffickers, drug cartels, or other organized crime groups), and a child or youth who is a material witness or a victim of crime. ORR collaborates with law enforcement officials on the placement of an unaccompanied alien child who has information that may be relevant to a criminal proceeding (e.g., "material witness").

*Posted 1/27/15*

### 1.2.4 Secure and Staff Secure Care Provider Facilities

ORR has two levels of care for unaccompanied alien children who are assessed to be a danger to themselves or others, or who have been charged with having committed a criminal offense. Staff secure facilities provide a heightened level of staff supervision, increased communication, and services to control problem behavior and prevent escape. Secure facilities are for youth who require the strictest level of supervision. Secure care providers have a secure perimeter, major restraining construction inside the facility, and procedures typically associated with correctional facilities.

ORR may place youth in a staff secure or a secure setting either at initial placement or through a transfer to another facility from the initial placement. ORR provides the youth notice of the reasons for placement in a secure or staff secure facility.

If a child has a mental health issue in addition to behavioral concerns or criminal history warranting placement into a restrictive level of care, ORR may place the youth in a residential treatment center or other therapeutic setting.

### Secure Care Facility

ORR only places an unaccompanied alien child in a secure facility if the child:

1. poses a danger to self or others; or
2. has been charged with having committed a criminal offense.

In determining whether to place a youth in secure care, ORR considers if the unaccompanied alien child:

GOV-00025110
**Exhibit 187**
**Page 371**

- Has been charged with, may be chargeable, or has been convicted of a crime; or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act; and assesses whether the crimes or delinquent acts were:

  - isolated offenses that (1) were not within a pattern or practice of criminal activity and (2) did not involve violence against a person, or the use or carrying of a weapon (e.g., breaking and entering, vandalism, DUI, status offenses, etc.); or
  - petty offenses which are not considered grounds for a stricter means of detention in any case (e.g., shoplifting, joy riding, disturbing the peace).

- Has committed, or has made credible threats, to commit a violent or malicious act while in ORR custody;
- Has committed, threatened to commit, or engaged in serious, self-harming behavior that poses a danger to self while in ORR custody;
- Has engaged in conduct that has proven to be disruptive of the normal functioning of a staff secure facility in which the youth is placed such that transfer may be necessary to ensure the welfare of the UAC or others;
- Has reported gang involvement or displays gang affiliation while in care;
- Has self-disclosed violent criminal history or gang involvement prior to placement in ORR custody that requires further assessment; or
- Has a history of or displays sexual predatory behavior, or has engaged in inappropriate sexual behavior.

**Staff Secure Facility**

A staff secure facility is a licensed child care facility for UAC who require close supervision, but do not require placement in a secure care provider facility.

In determining whether to place a youth in a staff secure facility, ORR considers if the child:

- has been disruptive to the normal functioning of a shelter care provider facility such that transfer is necessary to ensure the welfare of the UAC or others;
- is an escape risk;
- has non-violent criminal or delinquent history not warranting placement in a secure care provider facility, such as isolated or petty offenses as described above; or
- Is ready for step-down from a secure facility.  For details on the criteria for step-down from a secure facility, see section **1.4.2**.

*Revised 06/12/2017*

### 1.2.5 Unaccompanied Alien Children Who Pose a Risk of Escape

ORR does not place a child or youth in secure care solely because he or she may pose a risk of escape from ORR custody. However, ORR may place a child in a staff secure facility solely because he or she poses a risk of escape. In all cases, ORR must assess whether an unaccompanied alien child is an escape risk in order to make an informed placement decision.

Confidential - Subject to Protective Order

Indicators of escape risk include:

- The unaccompanied alien child has displayed behaviors indicative of escape or has expressed intent to escape.
- The unaccompanied alien child is within one month of turning 18 years of age.
- The unaccompanied alien child has previously escaped or attempted to escape from detention or government custody.
- An unaccompanied alien child with an immigration history that includes:
    - A final order of removal (UAC has a legal duty to report for deportation);
    - A prior breach of a bond;
    - Failure to appear before Department of Homeland Security or the immigration courts;
    - Previous repatriation (return to the home country) through a grant of voluntary departure or a final order of removal from an immigration judge.

*Revised 6/12/17*

**1.2.6 ORR Long Term Foster Care**

An unaccompanied alien child may be placed in a long term care setting, such as community based foster care or extended care group homes. A child is a candidate for long term care if he or she:

- Is expected to have a protracted stay of four months or more in ORR custody because he or she does not have a viable sponsor, AND
- A legal service provider has identified the child or youth as potentially eligible for immigration relief (unless waived by ORR),[1] AND
- Is under the age of 17 and 6 months at the time of placement.

ORR also considers a long term care placement on a case-by-case basis for an unaccompanied alien child who will have a longer stay due to other circumstances.

ORR considers the following when making long term placement decisions:

- The child's mental, emotional, behavioral, and physical health needs
- The child's ability and commitment to live in a family and community-based setting
- The child's age
- Availability of an appropriate placement that meets the individual's needs

Unaccompanied alien children who are ineligible for long term placement include:

- An unaccompanied alien child with a moderate to high escape risk
- An unaccompanied alien child with a history of significant criminal activity or violence who may pose a threat of harm to self, others (including the foster family), or community
- A child or youth who is seeking voluntary departure

Confidential - Subject to Protective Order

However, a child or youth with past behavioral or safety concerns but who does not pose a threat to self, others (including the foster family) or the community may be considered for long term foster care after demonstrating safe behavior in a non-secure setting.

*Revised 10/15/15*

### 1.2.7 Placing Family Members (Siblings and Children of Unaccompanied Alien Children)

Under most circumstances, ORR places siblings together and unaccompanied alien children who are parents with their children. The following cases would be an exception to family grouping:

- The unaccompanied alien child wishes otherwise (evaluated on a case-by-case basis)
- The placement would be contrary to the developmental, treatment, or safety needs of the unaccompanied alien child or his or her children
- There is an unusual or emergency situation

In addition to the ones listed above, there are other exceptional circumstances that would prevent unaccompanied alien youth from residing with their children in the same care provider facility. These circumstances include an unaccompanied alien child who is a parent who:

- Requires specialized placement in a setting that cannot provide appropriate care for an infant or young child; for example, a residential treatment center or hospital
- Does not want his or her child to reside in the same place
- Is the subject of open or substantiated allegations of abuse or neglect against his or her child

If siblings or children of an unaccompanied alien child must be placed separately, the care provider tries to maintain regular ongoing contact, unless a mental health or child welfare professional deems the contact harmful, or unless the contact is contrary to the wishes of the UAC.

The separation of an unaccompanied alien child from his or her siblings or from his or her child requires prior authorization of ORR.

*Posted 1/27/15*

## 1.3 Referrals to ORR and Initial Placement

Unaccompanied alien children may be referred by Federal agencies to ORR's care at any time. **ORR's Intakes Team** operates 24 hours a day, 7 days a week, year round to accept referrals and find a placement for children and youth within ORR's network of care providers.

*Posted 1/27/15*

### 1.3.1 Request for Information from the Referring Federal Agency

As a first step, ORR requests background information from the referring Federal agency to assess whether the unaccompanied alien child is a danger to self or others, whether there are any known medical and/or mental health issues, and whether other special concerns or needs are known. ORR uses this information to determine an appropriate placement for the child or youth in the least restrictive setting.

ORR requests the following information from the referring agency:

- How the referring agency made the determination that the minor is an unaccompanied alien child.

Confidential - Subject to Protective Order

- Health related information including, but not limited to, if the unaccompanied alien child is pregnant or parenting and whether there are any known physical or mental health concerns. If there are significant medical concerns (i.e., the unaccompanied alien child is not fit for travel), ORR requests that the referring Federal agency medically clear the child before ORR will designate placement. In its discretion, ORR may designate placement for unaccompanied alien children who are pending medical clearance.
- Whether the child has any medication or prescription information, including how many days' supply of the medication will be provided with the child or youth when transferred into ORR custody.
- Biographical and biometric information, such as name, gender, alien number, date of birth, country of birth and nationality, date(s) of entry and apprehension, place of entry and apprehension, manner of entry, and the unaccompanied alien child's current location.
- Any information concerning whether the child or youth is a victim of trafficking or other crimes.
- Whether the unaccompanied alien child was apprehended with a sibling or other relative.
- Identifying information and contact information for a parent, legal guardian, or other related adult providing care for the child or youth prior to apprehension, if known.
- If the unaccompanied alien child was apprehended in transit to a final destination, what the final destination was and who the child or youth planned to meet or live with at that destination, if known.
- Whether the unaccompanied alien child is an escape risk, and if so, the escape risk indicators.
- Any information on a history of violence, juvenile or criminal background, or gang involvement known or suspected, risk of danger to self or others, State court proceedings, and probation.
- Any special needs or other information that would affect the care and placement for the child or youth.

*Posted 1/27/15*

### 1.3.2 ORR Placement Designation

The ORR/Intakes Team identifies appropriate and available bed space at a **care provider**, the ORR funded facility or other setting that provides care for the child, and contacts the care provider to confirm availability. ORR attempts to identify and designate a placement for the unaccompanied alien child within 24 hours of the initial referral whenever possible.

In cases where a child or youth may present a danger to self or others, ORR staff use a standardized tool (the "Placement Tool") to input all available information on the unaccompanied alien child's history and condition.

The ORR/Intakes Team uses the Placement Tool if the unaccompanied alien child has:

- A juvenile or adult criminal history
- Prior acts of violence or threats in government custody
- Gang involvement
- Prior escape(s) or attempted escape(s) from government custody
- Human Trafficking or Smuggling
- Drug Smuggling

A placement score is automatically generated based on the answers provided.

Based on the scores, the placement tool will suggest a level of care for the unaccompanied alien child. The ORR/Intakes Team reviews the placement tool, consults with an **ORR/FFS Supervisor**, selects the level of care, and designates the unaccompanied alien child's placement. The ORR Intakes Team considers all factors in the placement decision and may, in consultation with other ORR staff, override the score generated by the tool in special circumstances on a case-by-case basis.

For placement of an alien unaccompanied alien child with medical or mental health issues, the ORR/Intakes Team consults with the ORR/FFS, the **ORR/Medical Services Team**, or an ORR Supervisor on the placement.

*Revised 4/22/16*

### 1.3.3 Care Provider Placement Acceptance

After ORR requests a placement in a particular facility, the care provider may only deny ORR's request for placement based on the following reasons:

- Lack of available bed space.
- Placement of the unaccompanied alien child would conflict with the care provider's State or local licensing rules.
- Placement of an unaccompanied alien child with a significant physical or mental illness for which the referring Federal agency does not provide a medical clearance and/or medications that would conflict with the care provider's State or local licensing requirements.

ORR may follow up with a facility about a placement denial, if needed, to find a solution to the reason for the denial.

*Posted 1/27/15*

### 1.3.4 Transfer of Custody to ORR

The referring Federal agency generally transports the unaccompanied alien child to the ORR care provider. ORR takes custody of the unaccompanied alien child when the child physically arrives at the designated ORR care provider.

Upon arrival, the care provider requests from the referring Federal agency the unaccompanied alien child's prescriptions and medications, as applicable; personal belongings, and any necessary Department of Homeland Security (DHS) or other Federal agency documentation.

If exceptional circumstances prevent the referring Federal agency from providing complete documentation, the care provider may not deny or delay admitting the child or youth.

If a care provider receives a child or youth with special concerns that were not reported in the referral, the care provider must contact ORR immediately.

*Posted 1/27/15*

### 1.3.5 Initial Placements in the Event of an Emergency or Influx

Historically, ORR has experienced periods when DHS apprehends a significantly greater number of unaccompanied alien children than at other times of the year. These periodic intervals are called an "influx." In

GOV-00025115
**Exhibit 187
Page 376**

addition to an influx, a natural disaster or other emergency may prevent the prompt (within 24 hours), initial placement of unaccompanied alien children in care provider facilities.

ORR has procedures in place to make sure that care providers are available to accommodate these influx intervals and make initial placements as quickly as possible while successfully providing the range of services that ORR requires for every unaccompanied alien child.

ORR annually reviews its contingency plans based on the actual and anticipated number of unaccompanied alien children referrals to monitor available resources in light of expected needs.

For more information, see **1.7 Placement and Operations During an Influx**.
*Revised 5/5/16*

## 1.4 Transfers within the ORR Care Provider Network

Because an unaccompanied alien child's placement needs can change, the care provider conducts ongoing assessments of his or her needs throughout the child or youth's stay in ORR custody. Care providers also take into consideration information from the referring Federal entity, child assessment tools, interviews, location of the child's sponsor or family in the U.S., records from local, State, and Federal agencies, and information from stakeholders, including the child's legal service provider, attorney of record or Child Advocate, as applicable, when making transfer recommendations.

If an alternate placement would better meet the child's individual needs, care providers must promptly make transfer recommendations—within 3 days of identifying the need for a transfer for routine transfers and immediately in urgent situations.

The **Case Coordinator** identifies the most appropriate care provider based upon the individual's needs and the bed capacity within the ORR network.
Once the Federal Field Specialist approves a transfer request, the referring and receiving care providers coordinate logistics, including the transfer date (generally within 3 days). The referring care provider notifies all designated stakeholders of the transfer (for example, the child's attorney).

*Revised 4/22/16*

### 1.4.1 Least Restrictive Setting

Care providers must make every effort to place and keep children and youth in a least restrictive setting. For children who are initially placed in a least restrictive setting, care providers must provide support services and effective interventions, when appropriate, to help keep a child in the setting.

If a child or youth is placed in a restrictive setting, care providers provide services to facilitate the unaccompanied alien child's successful transfer to a less restrictive setting to allow the child to move when he or she is ready.

*Posted 1/27/15*

### 1.4.2 Further Assessment Swift Track (FAST) Process

At the time of referral, the ORR/Intakes Team uses a standardized "Placement Tool" to determine the initial placement of an unaccompanied alien child with a juvenile or criminal background, violent offenses, serious behavioral concerns, and/or potential for escape. The results of the Placement Tool may indicate that the child should be placed into secure, staff secure, or shelter level care. The ORR/Intakes staff discusses the Placement Tool outcome with the ORR/FFS. The ORR/FFS may override the placement recommendation of the Placement Tool.

Every 30 days, the care provider staff, in collaboration with the Case Coordinator and the ORR/FFS, reviews the placement of a UAC into a secure or staff secure facility to determine whether a new level of care is more appropriate. The ORR/FFS may allow the review to take place earlier than 30 days, particularly if new information indicates an alternative placement is more appropriate. The care provider staff documents the basis for continued placement in a secure or staff secure facility in the UAC's case file and provides the information to the youth's attorney of record, legal service provider, or Child Advocate, on demand. Supervisory ORR staff review the placement of UAC who have resided in a secure care facility for over 90 days, and continue to review the placement every 30 days thereafter.

An unaccompanied alien child does not require a review of the placement if he or she is in custody for less than one month from the date of the initial placement designation to the date of his/her 18th birthday. Children and youth who are in ORR care less than 30 days do not require a review of their placement.

**Step-ups and Step-downs**

Step-ups and step-downs refer to the transfers within the ORR network of care to a more restrictive level of care or to a less restrictive level of care, respectively.

Step-ups may occur when a more restrictive level of care is needed for the safety of the UAC or others. The care provider Case Manager, Case Coordinator and ORR/FFS staff the case to determine whether the UAC's behavior, criminal history, or self-disclosures require placement in a more restrictive environment, using the factors identified in section **1.2.4**.

If a UAC self-discloses criminal or violent history to other UAC or to care provider staff, ORR investigates the veracity of the claim with the assistance of the care provider. ORR may contact federal, state and local law enforcement to determine the veracity of the self-disclosed criminal history and request assistance in contacting foreign law enforcement agencies where alleged crimes or incidents took place outside of the United States. ORR may also work with mental health professionals and other specialists as appropriate to determine whether the UAC's claims are credible.

Step-downs may occur when ORR, in its discretion, determines the UAC no longer poses a danger to himself or others, or no longer presents an escape risk (for staff secure step downs only). In making a step-down decision, ORR considers criteria identified in making a secure placement and takes into consideration any mitigating factors based on an assessment of the UAC's current functioning and behavior, previous conduct, self-disclosures, and criminal/delinquent history. The care provider documents the underlying assessment used to make this determination in the UAC's case file.

UAC determined to have sexual predatory behavior may not be stepped down below staff secure unless the ORR/FFS and the receiving care provider can document specific steps to protect other UAC, staff, and the community.

If the care provider and ORR/FFS determine that a new level of care is appropriate, the care provider must use the ORR process for transferring the youth to another care provider. The care provider must notify stakeholders and, if applicable, apply for a change of address or change of venue for a timely and safe transport.

The care provider documents the basis for stepping up or stepping down a UAC into or from a secure or staff secure care provider in the UAC's case file and provides the information to the youth's attorney of record, legal service provider, or Child Advocate, on demand.

*Revised 06/12/2017*
### 1.4.3 Long Term Care
In some cases, unaccompanied alien children stay in ORR custody for 4 months or more. ORR considers a stay of 4 months or longer to be an "extended stay" case. Extended stay cases generally occur due to the following combination of factors:

- The child or youth has no viable sponsor AND
- A legal service provider or attorney has screened the child or youth as eligible for immigration relief, OR
- Another reason prevents return of the unaccompanied alien child to the home country, such as the child's country of origin is in a state of emergency, indicating that the child will likely not be repatriated for an extended period of time.

If there is an indication that an unaccompanied alien child may fall into this extended stay category, the care provider makes a recommendation to ORR regarding long term care placement. Care providers try to minimize the number of transfers for a child or youth in order to facilitate continuity of relationships with caregivers.

Care providers continue to assess a child or youth placed in long term care to ensure that best efforts are being made to move the unaccompanied alien child toward release from ORR custody into a more permanent arrangement.

*Posted 1/27/15*
### 1.4.4 Transfer to Long Term Foster Care
Foster care providers must ensure that each child is placed in a licensed foster home and consider the child's cultural and linguistic needs when making placements.

Prior to a transfer to long term foster care, the care providers must notify all stakeholders. Of particular importance, the long term foster care provider informs the legal service providers from the referring placement as well as those in the receiving placement to ensure arrangements are made for legal services, including representation, for the child in the new jurisdiction.

Confidential - Subject to Protective Order

Notifications to stakeholders are required of any transfer in the ORR care provider network.

*Posted 1/27/15*
## 1.4.5 Group Transfers
Group transfers may occur because of changes in a care provider's bed capacity, through changes in program requirements that would eliminate a care provider from the list of approved facilities, or through an emergency event or natural disaster. ORR tries to minimize the number of transfers resulting from bed capacity limitations. ORR considers the circumstances of the individual unaccompanied alien child's case, including the progress of the sponsorship effort and the status of the legal case, when identifying children and youth for group transfers.

*Revised 4/22/16*
## 1.4.6 Residential Treatment Center Placements
Care providers request a transfer to an RTC for an unaccompanied alien child who has a psychiatric or psychological issue that cannot be addressed in an outpatient setting. ORR will consider a transfer to an RTC if a licensed psychologist or psychiatrist has indicated the following:

- The unaccompanied alien child has not shown reasonable progress in the alleviation of his/her mental health symptoms after a significant period of time in outpatient treatment. (Note: the amount of time within which progress should be demonstrated varies by mental health diagnosis).
- The child's behavior is a result of his/her underlying mental health symptoms and/or diagnosis and cannot be managed in an outpatient setting.
- The unaccompanied alien child requires therapeutic-based intensive supervision as a result of mental health symptoms and/or diagnosis that prevent him or her from independent participation in the daily schedule of activities.
- The child presents a continued and real risk of harm to self, others, or the community, despite the implementation of short-term clinical interventions (such as, medications, a brief psychiatric hospitalization, intensive counseling, behavioral management techniques, 24 hour supervision, supportive services or therapeutic services).

*Posted 1/27/15*
## 1.4.7 Requesting Reconsideration of a Secure or RTC Placement Designation
After 30 days of placement in a secure or RTC facility, UAC may request the ORR Director, or the Director's designee, to reconsider their placement. The ORR Director, or designee, may deny the request, remand the request to the ORR/FFS for further consideration, or approve the request and order the youth transferred to a staff secure or other care provider facility.

*Posted 6/12/17*
## 1.5 Placement Inquiries
Individuals looking for an unaccompanied alien child who may be in ORR custody may contact the **ORR National Call Center, at 1 (800) 203-7001,** and leave a message that includes the unaccompanied alien

child's information, caller's name, contact information, and relationship to the child or youth.(This hotline is operated by an ORR grantee.)

*Revised 9/06/16*

### 1.5.1 ORR National Call Center

The ORR National Call Center staff reviews the information to see if the unaccompanied alien child is currently in ORR custody. The call center staff contacts the caller and notifies him or her whether or not the child or youth is in ORR custody, taking safety issues into consideration, as described below.

If the unaccompanied alien child is in ORR custody, the call center staff does not provide information to the caller regarding where the child or youth is located or with which care provider until communication is deemed safe and appropriate.

The steps in the process include:

- The call center staff notifies the corresponding care provider with the caller's name, contact information and relationship to the unaccompanied alien child.
- The care provider determines whether the individual is a safe and approved contact. As deemed appropriate and following ORR's procedures, the care provider may facilitate communication between the caller and the unaccompanied alien child.
- The care provider contacts the individual and informs him/her that the unaccompanied alien child is safe and in ORR custody.

*Posted 1/27/15*

### 1.6 Determining the Age of an Individual without Lawful Immigration Status

The Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) instructs HHS to devise age determination procedures for individuals without lawful immigration status in consultation with the U.S. Department of Homeland Security (DHS). ***To carry out the TVPRA provision, HHS and DHS worked jointly to develop the age determination policies and procedures in this section.***

Typically, DHS is the agency that apprehends individuals without lawful immigration status, including unaccompanied alien children (UAC), while HHS is the agency responsible for the care and custody of UAC transferred to its care. HHS authority to provide care and custody applies only to individuals who have not attained 18 years of age.

Each agency acknowledges the challenges in determining the age of individuals in custody. These challenges include, but are not limited to:

- Unavailable  documentation;
- Contradictory or fraudulent identity documentation and/or statements;
- Physical appearance of the individual; and
- Diminished capacity of the individual.

The TVPRA requires the age determination procedures, at a minimum, to take into account multiple forms of evidence. Accordingly, under these procedures, each case must be evaluated carefully based on the totality of all available evidence, including the statement of the individual in question.

*Revised 8/31/15*

**1.6.1 Unaccompanied Alien Children in HHS Custody**

HHS may make age determinations of UAC when they are in HHS custody on a reasonable suspicion that a child in HHS custody is 18 years or older.

In the event there is conflicting evidence regarding the age of an unaccompanied alien child in HHS custody, the HHS funded care provider case worker shall immediately notify the HHS Federal Field Specialist (FFS). The FFS will make the age determination based on his/her review of the multiple forms of evidence collected by the care provider. Until the age determination is made, the unaccompanied alien child is entitled to all services provided to UAC in HHS care and custody.

There may be occasions when an unaccompanied alien child's age is questioned at the time of admission to an HHS funded care provider facility during the intakes process. In those cases, the case manager does not complete the intakes process, but consults with the HHS FFS to make the age determination.

*Revised 8/31/15*

**1.6.2 Instructions**

Case managers should seek the following as evidence when conducting age determinations. Information from each category is not required.

Documentation:

- Official government-issued documents, including birth certificates. If the unaccompanied alien child in question is not in possession of original documentation, or if the authenticity of the original documentation is in question, government officials of the unaccompanied alien child's home country must be consulted in order to verify the validity of the documentation.
- Other reliable records (e.g., baptismal certificates, school records, medical records) that indicate the unaccompanied alien child's date of birth.

Statements by individuals (including the unaccompanied alien child) determined to have personal knowledge of the unaccompanied alien child's age, and who HHS concludes can credibly attest to the age of the unaccompanied alien child:

- Statements provided by the unaccompanied alien child regarding his or her age or birth date. (An unaccompanied alien child's uncorroborated declaration regarding age is not used as the sole basis for an age determination.)
- Statements from the unaccompanied alien child's parent(s) or legal guardian(s), if such persons can be identified and contacted.
- Statements from other persons.
- Information from another government agency (Federal, State, local or foreign)
- State/local arrest records.
- Child welfare agency records.

Confidential - Subject to Protective Order

Medical Age Assessments:

Medical Age Assessments include both the use of imaging technology, such as radiography, and physical examinations. Regarding these assessments:

- A medical professional experienced in age assessment method(s) must perform the examination, taking into account the individual's ethnic and genetic background.
- Dental and skeletal (bone) maturity assessments using radiographs may be used to determine age, but only in conjunction with other evidence.
- As no current medical assessment method can determine an exact age, best practice relies on the estimated probability that an individual is 18 or older. The examining doctor must submit a written report indicating the probability percentage that the individual is a minor or an adult.

ORR Response to Medical Age Assessments:

- The FFS supervisor must review the determination regarding the age submitted by the examining doctor.
- If an individual's estimated probability of being 18 or older is 75 percent or greater according to a medical age assessment, and this evidence has been considered in conjunction with the totality of the evidence, ORR may refer the individual to DHS. The 75 percent probability threshold applies to all medical methods and approaches identified by the medical community as appropriate methods for assessing age.
- The FFS compiles all pertinent information (e.g., how reasonable suspicion was raised that the subject is over 18, the information referenced, the individuals or agencies consulted, statements and conclusions) and documents it in a memorandum for review and approval by the FFS Supervisor.
- The FFS then will forward the memo to the care provider facility case manager to be included in the unaccompanied alien child's case file and to the ICE Detention and Removal Office (DRO) Field Office Juvenile Coordinator (FOJC) for inclusion in the unaccompanied alien child's A-file.

At any time, an unaccompanied alien child in ORR care or his/her designated legal representative may present new information or evidence that he/she is 18 or older for re-evaluation of an age determination. New information will be reviewed and evaluated by the FFS and, if necessary, the FFS Supervisor, in a timely manner and shared with the DRO FOJC to determine if the current placement is appropriate. If the new information or evidence indicates that an individual who is presumed to be an unaccompanied alien child is actually an adult, then HHS will coordinate with the assigned FOJC to immediately transfer the individual to an adult DRO facility.

*Revised 7/05/16*

## 1.7 Placement and Operations During an Influx

As noted in subsection 1.3.5, ORR may experience periods of **influx** in which the number of unaccompanied alien children coming into the United States exceeds the standard capabilities of ORR to process them timely and to shelter them with existing resources.

During an influx, ORR may not have sufficient bed space available within its licensed care provider network to place unaccompanied alien children. In this situation, ORR arranges for **Influx Care Facilities** to meet the need.

An Influx Care Facility is a type of care provider facility that is opened to provide temporary emergency shelter and services for UAC during an influx or emergency. Because of the temporary and emergency nature of Influx Care Facilities, they may not be licensed or may be exempted from licensing requirements by State and local licensing agencies. Influx Care Facilities may also be opened on Federal properties, in which case, the facility would not be subject to State or local licensing standards.

Certain Influx Care Facilities may require a 72-hour medical waiting period prior to receiving unaccompanied alien children. Therefore, ORR may also activate **HHS Processing Centers (HPC)** to initially screen and vaccinate children prior to their placement in Influx Care Facilities. Unaccompanied alien children remain in an HPC until they are medically cleared for movement to and placement in an Influx Care Facility. During an influx, ORR also uses HPCs to more efficiently handle the transfer of unaccompanied alien children from DHS border patrol custody into HHS custody.

HPCs must provide the services as described in subsection 1.7.5 and 1.7.6. **Standard ORR facilities** that are designated as HPCs or as Influx Care Facilities are required to meet the same standards applicable to all ORR State-licensed programs.

*Posted 3/21/16*

## 1.7.1 Activation of HPCs

During an influx or in preparation for an influx, ORR may designate some standard ORR facilities or Influx Care Facilities as HPCs. If ORR determines that the re-designated HPCs are not sufficient to manage the number of referrals that need transfer into Influx Care Facilities, ORR may also designate temporary sites as HPCs.

ORR's goal is to operationalize an HPC within 30 days of the site's designation so that the HPC can begin processing children for transfer to Influx Care Facilities or standard shelters.

*Posted 3/21/16*

## 1.7.2 Placement into HPCs

Upon receipt of a DHS referral during an influx, ORR/Intakes may designate an unaccompanied alien child for initial placement into an HPC or for direct placement into a standard ORR facility or Influx Care Facility.

Unaccompanied alien children designated for an HPC should meet the initial criteria below based on the information available at the time of designation. The unaccompanied alien child should:

- Be between 13-17 years of age
- Speak either English or Spanish
- Have no known behavioral or medical issues, including contagious diseases or health issues requiring immediate evaluation or medical treatment by a healthcare provider
- Have no known special needs (mental health or identified disabilities)

Confidential - Subject to Protective Order

- Not be a danger to self or others
- Not have a criminal history (i.e., not charged with having committed a criminal offense)
- Not be involved as a perpetrator or victim of smuggling or trafficking activities
- Not be subject to a pending age determination
- Not be part of a sibling group with a sibling(s) age 12 years or younger
- Not be pregnant or parenting

If ORR becomes aware after placement into an HPC that a child doesn't meet the criteria above, the FFS covering the site will transfer the unaccompanied alien child to a placement appropriate for his or her needs.

ORR makes every effort to put children who do not meet the criteria above into a standard ORR facility.

*Posted 3/21/16*

### 1.7.3 Placement into Influx Care Facilities

Unaccompanied alien children designated for an Influx Care Facility should meet the criteria for placement into HPCs described at section 1.7.2 but must also:

- Be medically cleared and vaccinated as required by the Influx Care Facility (for instance, if the Influx Care Facility is on a Department of Defense site):
  - Have completed the Medical Checklist for Influx Transfers
  - Have no known medical issues, including contagious diseases or health issues requiring additional evaluation, treatment, or monitoring by a healthcare provider
- Be able to be discharged from ORR expeditiously
- Not be involved in an active State licensing, law enforcement, or PREA investigation
- Not be turning 18 years old within 30 days of the transfer
- Not be scheduled to be discharged in 3 days or less
- Not have a pending Home Study
- Not have a current set docket date in immigration court or State/family court (juvenile included); not have a pending adjustment of legal status; not have an attorney of record

*Posted 3/21/16*

### 1.7.4 Admission and Orientation for HPCs and Influx Care Facilities

As expeditiously as possible, but within four (4) hours of an unaccompanied alien child's placement into the HPC or Influx Care Facility, the provider will:

- Admit the child to the program in the ORR database.
- Offer the child a meal and/or snack.
- Offer the child an opportunity to shower, provide lice treatment, and give clean clothing.
- Complete an inventory of the child's belongings and DHS paperwork.

Within twenty-four (24) hours, the HPC or Influx Care provider:

- Provides the UAC with all documents from the **Legal Resource Guide**

GOV-00025124
**Exhibit 187**
**Page 385**

- Explains to the child or youth the HPC:
  - Rules and responsibilities;
  - Grievance procedures;
  - Sexual abuse reporting procedures.
- Completes the Initial Intakes Assessment in the ORR database.
- Contacts the child's family (following safety protocols) to notify them of the child's placement and determines if the child has a potential sponsor who resides in the United States.
- Informs the child's family about the application process for the Safe and Timely Release of an unaccompanied alien child to a sponsor (See **Section 2.2.4 Required Documents for Submission with the Application for Release**).
- Informs the child's parent/legal guardian and identified potential sponsor that the placement is temporary and that when the child is transferred to a final ORR placement, the parent/legal guardian and potential sponsor will be notified.

*Posted 3/21/16*

## 1.7.5 Medical Services

HPCs and Influx Care Facilities must at a minimum provide medical services that include the following:

- Initial medical examination (unless the youth was recently examined at another facility), including but not limited to: vaccinations per the Advisory Committee on Immunization Practices catch-up immunization schedule, tuberculosis screening, and pregnancy tests for all eligible females; (ORR provides HPCs the latest guidance with specific requirements and billing codes.)
- Emergency health care;
- Other medical care, as needed;
- Administration of prescribed medication and special diets; and
- Mental health interventions when necessary.

HPCs must complete the initial medical examination within 24 hours of the unaccompanied alien child's admission, including weekends and holidays. Influx Care Facilities must complete the initial medical examination within 48 hours, per section **3.4.2**.

When the unaccompanied alien child is transferred, the HPC or Influx Care provider must transfer all medical documents, including immunization records.

*Posted 3/21/16*

## 1.7.6 HPC and Influx Care Facility Services

At the minimum, HPCs and Influx Care Facilities must follow the required basic standards of care, including:

- Maintain facilities that are safe and sanitary;
- Provide access to toilets, sinks, and showers;
- Provide drinking water and food;
- Maintain adequate temperature control and ventilation;
- Provide adequate supervision;

- Provide same gender supervision for any area where unaccompanied alien children regularly undress, including restrooms and showers;
- Provide unaccompanied alien children with appropriate clothing and personal grooming items;
- Provide unaccompanied alien children a reasonable access to privacy, which includes the opportunity to wear his or her own clothes, as appropriate; retain a space for storage of personal belongings; talk privately on the phone, as appropriate; visit privately with guests, as appropriate; and receive and send uncensored mail unless there is a reasonable belief that the mail contains contraband;
- Separate unaccompanied alien children who are subsequently found to have past criminal/juvenile history and/or who exhibit behavior that presents a danger to themselves or to others from other unaccompanied alien children;
- Adhere to a zero tolerance policy towards sexual abuse and assault per ORR regulations and policy;
- Adhere to ORR policy and procedures on significant incident and sexual abuse reporting and follow-up;
- Allow reasonable access to legal services providers or unaccompanied alien children's attorneys of record that have provided proper documentation, subject to time and place restrictions;
- Provide for either an in-person Know Your Rights presentation by a legal service provider or video Know Your Rights presentation;
- Provide case management services for safe and timely release;
- Follow ORR transport policies;
- Allow access to religious services, if available;
- Provide emergency clinical services;
- Comply with reporting requirements as specified by ORR in consultation with HPC and Influx Care Facility providers;
- Provide children the right to be free from discrimination on the basis of gender, race, religion, national origin or sexual orientation; and
- Keep children free from any cruel, harsh, unnecessary, demeaning or humiliating punishment.

To the extent practicable, non-State licensed HPCs and Influx Care Facilities are encouraged to provide the following services:

- Educational services; and
- Daily Recreational/Leisure time that includes one hour of large muscle activity and one hour of structured leisure time activities.

*Posted 3/21/16*

### 1.7.7 Transportation During Influx

In order to facilitate and expedite the additional transportation of children from HPCs to Influx Care Facilities, ORR may require transportation services to be provided by grantees or through task orders to contractors.

The HPC must coordinate with the assigned Federal staff to ensure that unaccompanied alien children are transferred expeditiously from designation for transfer or release. The HPC must also communicate any transportation related changes in a timely manner.

Confidential - Subject to Protective Order

The care provider must consult with ORR/FFS if the proposed transportation plan involves 8 hours or more travel time for an unaccompanied alien child.

*Posted 3/21/16*

### 1.7.8 Federal Staffing Plan

To facilitate operations for Influx Care Facilities and any temporary HPC sites, ORR will identify Federal staff to deploy to each Influx Care Facility to oversee the implementation of all policies and procedures during the duration of their use.

*Posted 3/21/16*

---

### Footnotes

1. Other circumstances which would result in a longer stay, such as the child's country of origin is in a state of emergency, indicating that the child will likely not be repatriated for an extended period of time.

---

**<Back - Next>**

Confidential - Subject to Protective Order

# Exhibit 188

Exhibit 188
Page 389

Appointment

| | |
|---|---|
| **From:** | Irizarry, Tania (ACF) [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=778B15D0281E428391BC4FB1AA60B391-IRIZARRY, T] |
| **Sent:** | 5/23/2017 2:41:18 PM |
| **To:** | Irizarry, Tania (ACF) [tania.irizarry@acf.hhs.gov]; Davis, Gregory (ACF) [gregory.davis@acf.hhs.gov]; Gnipp, Gregg (ACF) [gregg.gnipp@acf.hhs.gov]; Hooban, Tala (ACF) [tala.hooban@acf.hhs.gov]; White, Jonathan (ACF) [jonathan.white@acf.hhs.gov]; Sualog, Jallyn (ACF) [jallyn.sualog@acf.hhs.gov]; Viola, Sarah (ACF) [sarah.viola@acf.hhs.gov]; Crespo, Hilda (ACF) [hilda.crespo@acf.hhs.gov]; Misegades, Lara (ACF) [lara.misegades@acf.hhs.gov] |
| **Subject:** | (old) temporary shelter contracts meeting |
| **Attachments:** | Homestead After Action Contractors ORR Summary FINAL.docx; 00 Temporary Shelter Contracts Summary.docx; COR transition overview guide.docx; Agenda 6.8.docx; Share drive outline.docx |
| **Location:** | 5225B |
| **Start:** | 6/8/2017 6:00:00 PM |
| **End:** | 6/8/2017 6:30:00 PM |
| **Show Time As:** | Tentative |

| | |
|---|---|
| **Required Attendees:** | Davis, Gregory (ACF); Gnipp, Gregg (ACF); Hooban, Tala (ACF); White, Jonathan (ACF); Sualog, Jallyn (ACF); Viola, Sarah (ACF); Crespo, Hilda (ACF); Misegades, Lara (ACF) |

 Share drive outline.docx
 00 Temporary Shelter Contract...
 Agenda 6.8.docx
 Homestead After Action Contracto...
 COR transition overview guide.d...

S:\ORR\DCS\Shared\Temp Shelter (5) Contracts\PENDING
S:\ORR\DCS\Shared\Temp Shelter (5) Contracts\16. Deployment Activation resources

**You are scheduled to host this WebEx meeting:**


When it's time, start your meeting from here:
**Start the meeting**

When: Thursday, June 8, 2017, 2:00 pm (1 hr), Eastern Daylight Time (New York, GMT-04:00).





Confidential - Subject to Protective Order

GOV-00111110
**Exhibit 188**
**Page 391**

# Exhibit 189

Exhibit 189
Page 392

GOV-00126305–
GOV-00126503

Intentionally Omitted

Exhibit 189
Page 393

Name: Art Tel

Title: Director II

Address: 619 54th Ave E, Tacoma, WA 98424

Telephone: (253) 922-7005

Fax: (253) 922-7208

Email: art.tel@p-h-s.com

ORR designates the following person as ORR Project Officer for this cooperative agreement:

| | |
|---|---|
| Name: | **Trudi Grant** |
| Address: | **330 C Street SW, Washington, DC 20201** |
| Telephone: | **(202) 401-9250** |
| Fax: | **(202) 401-1022** |
| Email: | **trudi.grant@acf.hhs.gov** |

**SECTION XI**: <u>Duration of Agreement</u>

This agreement will be effective October 1, 2014- September 31, 2017. Annual continuations will be entertained on a non-competitive basis, subject to availability of funds, satisfactory performance of the project, capacity needs and a determination that continued funding is in the best interest of the Federal Government.

_____          **MAY 0 2 2017**
                                          _____
**E. Scott Lloyd**                        **Date**
**Director**
**Office of Refugee Resettlement**

_____          4|13|17
                                          _____
Name: _STEPHANIE WELTY_                    **Date**
Title: _CFO_
**Pioneer Human Services**

32

Confidential - Subject to Protective Order

GOV-00126504

**Exhibit 189
Page 394**

and regulations, including Standards to Prevent, Detect, and Respond to Sexual Abuse and Sexual Harassment involving Unaccompanied Children, 45 C.F.R. 411, and ORR policies and procedures. Other applicable federal regulations are discussed in the attached Standard Terms and Conditions.

**SECTION IX**: <u>Records and Reports</u>

For quarterly performance reports, Pioneer Human Services will use the ACF Performance Progress Report ACF-OGM SF-PPR form. Performance Reports are due quarterly based on the project period start date.

For financial status reports, Pioneer Human Services will use the attached SF-425 form, which will include report of expenditures and unliquidated obligations. Quarterly financial reports are due every 90 days based on the project period start date.. The Annual Financial Status and Performance report is due 90 days after the end of the budget period. The Final Financial Status and Performance report is due 90 days after the end of the project period.

Funds awarded under this Cooperative Agreement shall be accounted for and reported upon separately from all other grant activities.

Pioneer Human Services must use the current version of all reporting forms. Current versions of the forms are available at:https://www.grants.gov

All correspondence and reports related to this agreement must include the Grant Number and should be uploaded to GrantSolutions at <u>https://home.grantsolutions.gov/home/</u>. Notification of submission should be sent via email to the ORR Project Officer.

**SECTION X**: <u>Project Contacts</u>

Pioneer Human Services designates the following person as project contact for this cooperative agreement:

31

GOV-00126505
**Exhibit 189
Page 395**

COOPERATIVE AGREEMENT

BETWEEN

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,

ADMINISTRATION FOR CHILDREN AND FAMILIES (ACF),

OFFICE OF REFUGEE RESETTLEMENT (ORR)

DIVISION OF UNACCOMPANIED CHILDREN'S OPERATIONS (DUCO)

AND

Pioneer Human Services

## SECTION I: Summary

The Director of the Office of Refugee Resettlement (ORR) of the Department of Health and Human Services (HHS) has responsibility for the care and placement of unaccompanied children (UC) in accordance with Section 462 of the Homeland Security Act of 2002 (HSA of 2002), 6 U.S.C. § 279. An unaccompanied child is defined under 6 U.S.C. § 279(g)(2) as a child who is: under 18 years old, who has no lawful immigration status in the United States, and no parent or legal guardian in the United States or no parent or legal guardian in the United States available to provide care and physical custody.

Within ORR, the Division of Unaccompanied Children's Operations (DUCO) has delegated authority for the care and placement of UC.

1

The DUCO's primary objectives are to provide a safe, appropriate, and placement in the least restrictive environment for UC, taking into consideration the risk of harm to the UC or others, the community and the risk of flight,  while in ORR custody until they are released to a sponsor, obtain immigration legal relief, age out, or are discharged to the Department of Homeland Security (DHS).

ORR  provides residential care and services through contracts or through the competitive or non-competive grant process to organizations incorporated under State law which have demonstrated child welfare, social service, or related experience and are appropriately licensed to provide care and related services to dependent children. Recipients of ORR funding, that provide residential services for UC, must comply with State residential care licensing requirements; the Flores Settlement Agreement, Case No. CV85-4544-RJK (C.D. Cal. 1996) (Flores settlement agreement); pertinent federal laws and regulations, and all ORR policies and procedures.

Pursuant to 6 U.S.C. §279 the Director of the ORR, hereinafter called the Director, approves awards for  residential services to UC. In accordance with this award and pursuant to the aforementioned laws, **Pioneer Human Services** has  funding approved to provide residential services for UC, which meets the requirements in the previous paragraph.

Pursuant to the aforementioned laws, Pioneer Human Services, hereinafter called Pioneer Human Services has submitted an application and has been approved for funding to provide residential services for UC.

By signing this Cooperative Agreement, the Director agrees to make a grant award in accordance with approved annual continuation applications and quarterly reviews of program performance and financial reports for the project period of the grant.  Under the terms of this agreement, Pioneer Human Services will provide residential services for UC.

This Cooperative Agreement and the Terms and Conditions, listed in Pioneer Human Services Notice of Award (NoA), establish the  requirements and responsibilities for implementing Pioneer Human Services residential services for UC. Continued funding is contingent upon

2

Confidential - Subject to Protective Order

satisfactory performance, availability of funds, and determination that continuation is in the best interests of the Federal Government.

**SECTION II**: Purpose and Objective

The purpose of this agreement is to support the provision of residential services for UC according to the objectives and activities outlined in the application and consistent with State residential care licensing requirements.

In making decisions on placement and residential services provided to UC, the Director is governed by §462 of the HSA of 2002, 6 U.S.C. §279; § 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA of 2008), 8 U.S.C. §1232, as amended [1]; relevant portions of the Prison Rape Elimination Act of 2003 (PREA of 2003), 42 U.S.C. §15607, as amended [2]; and when it is not inconsistent with subsequent law, the Flores settlement agreement and the Perez-Olano Settlement Agreement, Case No. CV85-4544RJK (C. D. Cal. 1996) (Perez-Olano settlement agreement).

In December 2014, HHS released an Interim Final Rule (IFR) on standards to prevent, detect, and respond to sexual abuse and sexual harassment involving UC.  The IFR sets forth standards to prevent, detect, and respond to sexual abuse and sexual harassment in ORR care provider facilities that house unaccompanied children (UCs) in accordance with section 1101(c) of the Violence Against Women Reauthorization Act of 2013, Pub. L. 113-4 (VAWA 2013).  VAWA 2013 directed the Secretary of the Department of Health and Human Services (HHS) to adopt national standards for the detection, prevention, reduction, and punishment of rape and sexual assault in facilities that maintain custody of UCs.  The standards apply to all ORR care provider facilities housing UCs except secure care provider facilities and individual foster care homes.  The standards build upon and enhance existing State and local laws, regulations, and licensing standards.

---

[1]  Section 235 of the TVPRA of 2008 was amended in part by section 1262 of the Violence Against Women Reauthorization Act of 2013.
[2]  Section 8 of PREA of 2003, was amended in part by section 1101(c) of the Violence Against Women Reauthorization Act of 2013.

Confidential - Subject to Protective Order

**SECTION III**: <u>Authority</u>

As provided by the terms of the Federal Grant and Cooperative Agreement Act of 1977 (FGCAA), 31 U.S.C. §6301, as amended, the grant awarded establishes a Cooperative Agreement between the Office of Refugee Resettlement (ORR) and Pioneer Human Services. Pursuant to the FGCAA, this cooperative agreement (hereinafter "agreement") provides for substantial involvement and collaboration of ORR in activities related to cooperative agreements for residential services.

Furthermore, ORR is authorized to enter into this agreement under 6 U.S.C. §279 and 8 U.S.C. §1232(i) of the TVPRA of 2008.

**SECTION IV**: <u>Description of Activities</u>

### A. **Residential and Other Services**

1. **Pioneer Human Services** must provide residential shelter and services for UC in compliance with respective State residential care licensing requirements, the <u>Flores</u> settlement agreement, pertinent federal laws and regulations, and the ORR policies and procedures, unless otherwise expressly waived (in writing) by authorized ORR staff.

2. Under the terms of the <u>Flores</u> settlement agreement, care providers must provide the following services for each UC in their care:

   - Proper physical care and maintenance, including suitable living accommodations, food, appropriate clothing and personal grooming items.

   - Appropriate routine medical and dental care, family planning services, and emergency health care services, including a complete medical examination (including screenings for infectious disease) within 48 hours of admission, excluding weekends and holidays, unless the UC was recently examined at another ORR care provider facility; appropriate immunizations in accordance with recommendations of the U.S. Department of Health and Human Services / U.S. Public Health Service (PHS), Centers for Disease Control and Prevention (CDC) Advisory Committee on

4

Confidential - Subject to Protective Order

Immunization Practices; administration of prescribed medication and special diets; appropriate mental health interventions when necessary.

- An individualized needs assessment, which includes the various initial intake forms, collection of essential data relating to the identification and history of the child and his or her family, identification of the UC's special needs including any specific problems which appear to require immediate intervention, an educational assessment and plan, an assessment of family relationships and interaction with adults, peers and authority figures; a statement of religious preference and practice; an assessment of the unaccompanied child's personal goals, strengths and weaknesses; identifying information regarding immediate family members, other relatives, godparents or friends who may be residing in the United States and may be able to assist in connecting the child with family members.

- Educational services appropriate to the unaccompanied child's level of development and communication skills in a structured classroom setting Monday through Friday, which concentrates primarily on the development of basic academic competencies and secondarily on English Language Training. The educational program must include instruction and educational and other reading materials in such languages as needed. Basic academic areas should include Science, Social Studies, Math, Reading, Writing and Physical Education. The program must provide unaccompanied children with appropriate reading materials in languages other than English and spoken by the UC in care for use during leisure time.

- Activities according to a recreation and leisure time plan that include daily outdoor activity, weather permitting, with at least one hour per day of large muscle activity and one hour per day of structured leisure time activities (that should not include time spent watching television). Activities should be increased to a total of three hours on days when school is not in session.

- At least one individual counseling session per week conducted by trained social work staff with the specific objective of reviewing the child's progress, establishing new short term objectives, and addressing both the developmental and crisis-related needs of each child.

5

Confidential - Subject to Protective Order

- Group counseling sessions at least twice a week.

- Acculturation and adaptation services which include information regarding the development of social and inter-personal skills which contribute to those abilities necessary to live independently and responsibly.

- A comprehensive orientation regarding program intent, services, rules (written and verbal), expectations and the availability of legal assistance.

- Whenever possible, access to religious services of the child's choice, and in an environment that ensures children feel free to ask for such access.

- Visitation and contact with family members (regardless of their immigration status), which is structured to encourage such visitation.

- A reasonable right to privacy, which includes (1) the right to wear his or her own clothes when available, (2) retain a private space in the residential facility, group or foster home for the storage of personal belongings, (3) talk privately on the phone and visit privately with guests, as permitted by ORR policy and applicable regulations, (4) receive and send uncensored mail unless there is a reasonable belief that the mail contains contraband.

- Services designed to identify relatives in the United States as well as in foreign countries and assistance in obtaining legal guardianship when necessary for the release of the unaccompanied child.

- Legal services information, including the availability of free legal assistance, the right to be represented by counsel at no expense to the government, the right to a removal hearing before an immigration judge, the right to apply for asylum or to request voluntary departure in lieu of deportation.

B. **Organizational Capacity and Structure**

1. **Pioneer Human Services** must have the infrastructure and organizational capacity (governance structure, procedures, standards, and accountability controls) to meet all

6

GOV-00126511
**Exhibit 189
Page 401**

ORR program requirements and to properly manage all program resources (finances, personnel, physical plant structures, technology) and other provisions within the scope of this agreement.

2.  Unless waived by ORR, **Pioneer Human Services** should be accredited  by a nationally recognized accreditation organization, at ORR's discretion.[3]

3.  **Pioneer Human Services** must have an effective program management structure that designates clear lines of authority and responsibility and promotes the effective use of organizational resources and positive outcomes, including the safe and timely release of unaccompanied children.

4.  **Pioneer Human Services** must have internal policies and procedures in place for monitoring and evaluating their program and conducting ongoing quality assurance activities to identify areas in need of improvement and/or modification.

5.  **Pioneer Human Services** must provide services in a culturally sensitive and knowledgeable manner. The majority of staff responsible for direct service delivery must be bilingual in English and Spanish. Staff who routinely work with unaccompanied children who speak other languages must be proficient in that language. Care providers must have access to interpreters for other languages that unaccompanied children in their care may speak.

6.  **Pioneer Human Services** must maintain internal policies and procedures in electronic and hard copy form and readily accessible for all care provider and ORR staff. Internal policies and procedures are subject to ORR approval and must comply with all applicable federal law, regulations, and ORR's policies and procedures. The care provider's internal policies and procedures must address the following:

    - Provision of services that is specific to the type/level of care;

---

[3]  As applicable: The Council on Accreditation (COA), the Joint Commission (TJC), the Commission on Accreditation of Rehabilitation Facilities (CARF) or the American Correctional Association (ACA).

7

- State mandated placement criteria, including licensing-related restrictions;

- Population of children and youth served and facility capacity;

- Personnel policies and procedures[4], including training requirements;

- Emergency and evacuation policies and procedures;

- Physical plant requirements and maintenance policies and procedures (inspections for safety and maintenance, review of heating and cooling systems, plumbing, etc.);

- Health policies and procedures for unaccompanied children;

- Procedures for meeting mandated reporting requirements (reporting suspected neglect, maltreatment and/or abuse and sexual abuse and/or sexual harassment);

- Zero tolerance policy for sexual abuse and harassment;

- Grievance policies and procedures for both unaccompanied children and staff;

- Financial management policies and procedures (including internal controls for errors, mismanagement or fraud and provisions for regular audits performed by an outside, independent auditor)[5];

- Internal monitoring, evaluation, and continued quality assurance policies and procedures;

- Relationships with key external stakeholders; and,

- "Drug Free Workplace" policies.

---

[4] Including equal employment policies, prohibitions against nepotism and favoritism, policies on benefits, insurance protections, promotions and professional development, reporting requirements, sanctions and discipline of staff, working conditions, wage, time-off and lay off policies, activities and behaviors that require immediate suspension and possible termination.

[5] All modifications to award budgets require prior approval from both the Administration for Children and Families Office of Grants Management (ACF/OGM) and an ORR PO.

8

Confidential - Subject to Protective Order

7. **Pioneer Human Services** must maintain or attempt to enter into memoranda of understanding (MOUs) or other agreements with local child advocacy centers, rape crisis centers, immigrant victim service providers, and/or other community service providers to provide services to victims of sexual abuse and sexual harassment that occurred at the care provider facility. If local service providers are not available, **Pioneer Human Services** must maintain or attempt to enter into MOUs or other agreements with national service provider organizations. All agreements must have provisions that require the community or immigrant service provider to report any allegations of mistreatment or abuse to ORR. Care provider facilities must maintain copies of its agreements or documentation showing attempts to enter into such agreements and provide copies to ORR upon request.

C.  **Management of Personnel and Volunteers**

1. **Pioneer Human Services** must develop, implement, and document a staffing plan based on the populations served, the scope and type of provided services, anticipated requirements, current and projected staff vacancies, and project budgets. The staffing plan must:

    a.  Include staffing ratios in accordance with State licensing requirements, and as required by ORR's policies and guidelines;

    b.  Include a UC to Case Manager ratio of 8:1, unless waived by ORR; and,

    c.  Include a UC to Clinician ratio of 12:1, unless waived by ORR.

2. **Pioneer Human Services** must complete background investigations on all staff, contractors, and volunteers prior to hire to ensure the candidate is suitable for employment to work with minors in a residential setting. Background checks must be completed in accordance with ORR's minimum standards and State licensing requirements. The results must be included in the employee's personnel file. If State licensing requirements do not require a national criminal history fingerprint check, **Pioneer Human Services** must complete the check using a public or private vendor. If

9

there is an additional cost associated with this fingerprint check, the cost may be included in **Pioneer Human Services** budget plan.

3. Requirements for all hired staff. All staff must:

   - Be at least 21 years of age;

   - Exhibit integrity and good moral character to provide appropriate care to UC;

   - Possess the relevant experience and/or qualifications to work with UC and UC  with special needs; and,

   - Be properly trained and licensed, as necessary.

4. **Pioneer Human Services** may not hire, continue employment, or enlist the services of any contractor or volunteer who:

   - Has engaged in any form of child abuse or neglect, including domestic violence;

   - Has been convicted of engaging or attempting to engage in sexual abuse facilitated by force, overt or implied threats of force, coercion or if the victim did not consent or was unable to consent or refused; and/or,

   - Is undergoing civil or administrative adjudication or has been civilly or administratively adjudicated for engaging in an activity listed above.

5. **Pioneer Human Services** must consider incidents of sexual harassment in determining whether to hire anyone or to enlist the services of any contractor or volunteer. **Pioneer Human Services** must ask all applicants about previous misconduct in written applications or interviews for hiring. Applicants or employees must disclose any misconduct, whether the conduct occurs on or off duty. **Pioneer Human Services personnel policies and procedures must provide that** material omissions regarding such misconduct or providing materially false information will be grounds for termination.

10

Confidential - Subject to Protective Order

6. **Pioneer Human Services** must have job descriptions and selection criteria for all staff positions that state the qualifications, performance standards, and responsibilities for each position. (Each job description must include a section on Essential Functions as mandated by the Americans with Disabilities Act).

7. **Pioneer Human Services** must obtain prior approval for the positions noted in the table below. The table also includes job descriptions and minimum qualifications for positions that require ORR approval as well as those that do not. Exceptions to the minimum qualifications require ORR's explicit written approval prior to hire and ORR may require supervision plans and additional training.

| Positions Requiring ORR Prior Approval | | |
|---|---|---|
| **Position** | **Job Description** | **Minimum Qualifications** |
| Program Director | Overall management of the programmatic, administrative, financial, and operational systems related to the provision of care and services; provision of regular and timely reports to ORR regarding operations, services, and finances; establishing a respective and supportive workplace environment; elevating any issues or concerns to ORR. | Master's degree in social work or an equivalent degree in education, psychology, sociology, or other relevant behavioral science degree or bachelor's degree plus 5 years' experience in child welfare administration, child protective services; and, 2 years of experience in program management or as director of a licensed child care program.<br><br>Possess the administrator's license for the care provider's facility |
| Assistant Program Director | Serves as secondary liaison with ORR. The need for an Assistant Program Director will vary depending on the number of | Bachelor's degree in education, psychology, sociology or other relevant behavioral science plus 5 years of progressive employment |

11

Confidential - Subject to Protective Order

| Positions Requiring ORR Prior Approval | | |
|---|---|---|
| **Position** | **Job Description** | **Minimum Qualifications** |
| | unaccompanied children served at a care provider facility. | experience with a social services or childcare agency or organization. |
| Clinician | Conducts mental health assessments; provides ongoing individual and group counseling services, screens for human trafficking concerns, and provides crisis intervention services. | Master's degree in social work with clinical experience in the program, or Master's degree in psychology, sociology, or other relevant behavioral science in which direct clinical experience is a program requirement, or a bachelor's degree plus 5 years clinical employment experience. Must be licensed or eligible for licensure. |
| Lead Clinician | Coordinating clinical services, training new clinicians, and supervising the clinical staff. | Master's degree in social work, 2 years of postgraduate direct service delivery experience or a Master's degree or Ph.D. in psychology, sociology, or other relevant behavioral science in which clinical experience is a program requirement, plus 2 years of postgraduate direct service delivery experience/or bachelor's degree plus 5 years clinical employment experience in the behavioral sciences. Must have supervisory experience and be licensed to provide clinical services in the State where the care provider is located. |
| Lead Case Manager | Responsible for coordinating case | Master's degree in the behavioral |

12

Confidential - Subject to Protective Order

GOV-00126517

**Exhibit 189
Page 407**

| Positions Requiring ORR Prior Approval | | |
|---|---|---|
| **Position** | **Job Description** | **Minimum Qualifications** |
| | management and safe and timely release services, training new case managers, and supervising the work of other case manager. | sciences, human services or social services fields or bachelor's degree and at least 3 years progressive employment experience that demonstrates supervisory and case management experience. |
| Prevention of Sexual Abuse (PSA) Compliance Manager | Oversees implementation and ongoing compliance with <u>Interim Final Rule on UC Sexual Abuse and Sexual Harassment [hyperlink]</u> standards at care provider facilities. | Bachelor's degree in behavioral sciences, human services, or social service fields and at least 1 year experience working with child welfare standards, best practices, and compliance issues. |
| **Positions Not Requiring ORR Approval But Must Meet Minimum Qualifications** | | |
| Case Manager[6] | Assesses the needs of unaccompanied children in care, develops Individual Service Plans, screens for human trafficking concerns, facilitates the safe and timely release or discharge of children and youth, documents the provision of services in case files. | Bachelor's degree in the behavioral sciences, human services or social services fields.<br><br>Child welfare and/or case management experience is strongly encouraged. |
| Medical Coordinator (if the size of the program does not justify a full time Medical Coordinator, | Arrange or partners with other health professionals regarding health and safety standards for out-of-home child care, child care licensing requirements, disease | High school diploma or equivalent degree and a minimum of 1 year employment experience in the child welfare field working with children and/or adolescents in a social |

---

[6] This position may require ORR approval if the staff person is conducting clinical assessments.

13

Confidential - Subject to Protective Order

GOV-00126518
**Exhibit 189
Page 408**

| Positions Requiring ORR Prior Approval | | |
|---|---|---|
| **Position** | **Job Description** | **Minimum Qualifications** |
| the roles and responsibilities may be incorporated into another position description) | reporting requirements for care providers, immunizations for children, injury prevention for children, medication management and knowledge of community health and mental health resources for children. | service setting. |
| Teacher | Provides educational services and assessments, including curriculum building meeting Flores standards for education requirements. | Bachelor's degree; certification by the relevant governing authority, Teaching English as a Second Language/Teaching English to Speakers of Other Languages certification or  other appropriate accrediting body and additional training to meet the special needs of unaccompanied children. |
| Trainer (does not have to be fulltime and may be combined with other positions) | Conduct trainings, select or develop training materials; maintain records on training program attendance, trainings offered, and evaluation measures. | Bachelor's degree. |
| Youth Care Worker | Provide direct supervision of children in care, and maintain line-of-sight at all times | High school diploma or equivalent degree and a minimum of 1 year employment experience in the child welfare field working with children and/or adolescents in a social service setting. |

Confidential - Subject to Protective Order

GOV-00126519

**Exhibit 189**
**Page 409**

8. **Pioneer Human Services** must maintain a personnel file for each employee, whether part-time or full-time, that documents the employee's credentials, competencies, and performance, and provide access to ORR upon request. The employee personnel file must be up-to-date and must include the criteria for the employee's selection, hiring, suspension, or termination.

   a. Personnel files must include at the minimum:

     o   Resume;

     o   Job Description

     o   Employment application;

     o   Professional references;

     o   Educational records/diploma;

     o   Professional licensure (if applicable);

     o   Form I-9, Employment Eligibility Verification, and appropriate identification documentation;

     o   Results of medical examination (as required by State licensing, including results of TB tests and immunization records);

     o   Child Abuse Mandated Reporter agreement (signed);

     o   Confidentiality policy acknowledgement;

     o   Most recent performance review (signed);

     o   Child abuse and neglect record check results (for all jurisdictions lived in for the past 5 years);

     o   National FBI criminal background check and State repository check results (for all jurisdictions lived in for the past 5 years);

15

Confidential - Subject to Protective Order

  o Driver's Record and Clearance (if transporting children and youth); and,

  o Record of completion of mandated trainings and required acknowledgements.

 b. **Pioneer Human Services** must have policies and procedures for using and managing volunteers and interns (this includes those working in foster care).[7] This includes:

  o Establishing requirements for their selection;

  o Ensuring that each volunteer and intern complete pre-service and annual  training, if applicable;

  o Using paid staff to supervise all volunteers and interns;

  o Requiring authorization for any volunteers or interns to accompany unaccompanied children and care provider staff outside the facility for trips, medical appointments, or other visits;

  o Requiring all volunteers and interns to complete a volunteer application, provide disclosures, and references; and,

  o Conducting background checks on all volunteers and interns.

**D. Code of Conduct and Conflict of Interest Requirements**

1. **Code of Conduct**

 a. **Pioneer Human Services** must create and implement a Code of Conduct that reflects the ethical standards of a reputable professional organization, such as the National Association of Social Workers, Child Welfare League of America, or the American Public Health Human Services Association. The Code of Conduct must specifically

---

[7] Family and friends of the foster family may interact with unaccompanied children as they would in a normal community setting without having to complete the volunteer requirements listed above.

16

GOV-00126521
**Exhibit 189**
**Page 411**

address the employee's obligations with respect to interactions and interventions with unaccompanied children, staff, and external stakeholders.

b. **Pioneer Human Services** must train all employees on the Code of Conduct and have a "whistleblower policy" that provides staff an opportunity to report suspicious unethical, inappropriate or illegal activities without negative consequence. **Pioneer Human Services** must include proof in the employee's file that the employee has received training in the Code of Conduct. **Pioneer Human Services** must have policies and procedures for the discipline or termination of personnel who violate the Code of Conduct.

c. The Code of Conduct is required to indicate that staff must:

   o Respect the boundaries inherent in the relationship between unaccompanied children and care provider staff both while in ORR care and after release (for example staff should not take an unaccompanied child to his or her home (with the exception of community-based foster care parents) or the home of the employee's personal acquaintances);

   o Enforce zero tolerance and other policies to prevent, detect and respond to sexual abuse and harassment by not engaging in any kind of sexual activity or personal relationship with unaccompanied children, or former unaccompanied children; or parents, guardians, or sponsors of unaccompanied children;

   o Not provide legal advice to UC;

   o Only provide therapeutic counseling if properly licensed and authorized;

   o Maintain professional standards and manner when dealing with children and youth, visitors or fellow employees by dressing appropriately and refraining from giving money or gifts, using inappropriate language, proselytizing religion or making unauthorized disclosures of confidential information, or campaigning on behalf of a political party, politician or interest group;

17

Confidential - Subject to Protective Order

- o   Not discriminate against any person on the basis of race, color, religion, national origin, or sex; lesbian, gay, bisexual, transgender, questioning or intersex status; veteran status, age, or disability;

- o   Employ strength-based behavior management approaches and never hit, harass, humiliate or degrade an unaccompanied child or other staff member;

- o   Cooperate with official investigations (Child Protective Services, State licensing, etc.) as well as other legally sanctioned investigations, such as those conducted by law enforcement;

- o   Report any criminal or inappropriate conduct of other staff and never participate in the activities of a criminal gang; and,

- o   Protect fellow care provider staff and unaccompanied children from retaliation if they disclose or threaten to disclose the existence of an illegal or unsafe practice.

2. **Pioneer Human Services** staff are required to timely report to care provider management any misconduct (on or off duty). Failure to report misconduct or reporting false information will be grounds for termination.

   a.   Misconduct may include but is not limited to:

   - o   Any criminal arrests and/or convictions;

   - o   Any child abuse and/or neglect allegations, adjudications, or convictions (whether criminal, civil or administrative); and,

   - o   Any engagement or attempt to engage in sexual activities facilitated by force, overt or implied threats of force or coercion; or if the victim did not consent or was unable to consent or refuse.

   b.   Timely reporting is defined as no later than 24 hours from when a subject has knowledge of an arrest, conviction, or allegation, or earlier if the subject has unsupervised access to unaccompanied children. Other unethical conduct may also be

18

the basis for disciplinary action and/or termination. Program Directors or other care provider management officials must report any disciplinary action and/or termination of any employee to ORR.

3. **Conflict of Interest**

   a. **Pioneer Human Services** staff are prohibited from taking unfair advantage of any professional or personal relationship or from exploiting their position to further their personal, religious, political, financial, or business interests.

   b. **Pioneer Human Services** must establish and maintain a written Conflict of Interest policy applicable to all staff, board members, contractors, sub-contractors, sub-grantees, volunteers, and other internal stakeholders. The policy must:

      o Identify and define conduct that creates a conflict of interest or a potential conflict of interest;

      o Prohibit employees from having any direct or indirect financial interests in the transactions of services of the program;

      o Require staff to recuse themselves from the decision-making process if there is a conflict of interest or a potential conflict of interest;

      o Require staff to disclose any conflicts of interest prior to their involvement in a decision related to or affected by the conflict; and,

      o State that failure to disclose conflicts of interest or potential conflicts of interest may result in discipline or termination of employment.

E. <u>Training</u>

1. **Pioneer Human Services** must ensure all prospective employees meet all required educational and professional experience qualification and demonstate that ability to provide culturally competent services and all employees, contractors, and volunteers

19

Confidential - Subject to Protective Order

complete pre-service training prior to having direct contact with UC and complete the required annual training.

2. Newly hired employees must complete pre-service training prior to having direct contact with unaccompanied children. **Pioneer Human Services** must provide pre-training on the following:

   - ORR's Standards to Prevent, Detect, and Respond to Sexual Abuse and Sexual Harassment involving Unaccompanied Children;

   - All State and local licensing requirements; and,

   - State license required trainings (for example, CPR, first aid, mandatory reporting).

3. Staff who are required to have professional certifications must abide by continuing education requirements necessary to maintain licensure. In addition, all care provider staff must complete 40 hours of training annually of which 2 hours must involve training on the Flores settlement agreement, the HSA of 2002, the TVPRA of 2008, the Perez-Olano settlement agreement, and 10 hours on ORR policies and procedures. Foster care providers and foster families are subject to all ORR training and documentation requirements. In addition, the foster care providers must ensure that foster parents meet the competencies required at the time of licensing and focus the foster parent pre-service and ongoing training on developing these competencies.

4. **Pioneer Human Services** must develop annual staff trainings based on the following areas[8]:
   - State licensing requirements, laws, regulations, and policies relevant to the ORR UC Program;

   - ORR operational policies and relevant guidance[9];

   - The Safe and Timely Release process;

---

[8] Care providers have two years to complete. They are not required to cover all topic areas within the same year.
[9] Care providers must have policies and procedures for the prompt dissemination, training, and implementation of new or updated ORR policies and procedures.

20

GOV-00126525
**Exhibit 189**
**Page 415**

- Cultural competency, including awareness of and sensitivity to different cultural backgrounds;

- Prohibition against providing legal advice or counsel;

- Strength-based behavior management approaches, such as using conflict resolution, problem solving skills, using rewards and consequences and de-escalation techniques and helping children and youth learn accountability and self-control;

- Prohibition against conflicts of interest;

- Crisis/intervention procedures and techniques;

- Immigration and child welfare systems (local, national, international);

- Child development theory;

- Issues related to loss and family separation;

- Common health and mental health issues;

- First aid and cardiopulmonary resuscitation (CPR);

- Medication management;

- Infection control procedures and Occupational Safety and Health Administration (OSHA) or equivalent course that covers blood borne pathogens, airborne pathogens, and employee safety;

- Working with victims of human trafficking and other crimes;

- Mandatory child abuse and neglect reporting requirements: prevention, signs, and reporting;

- Professional boundaries;

- Emergency and disaster preparedness;

21

Confidential - Subject to Protective Order

GOV-00126526
**Exhibit 189**
**Page 416**

- Code of Conduct and Conflicts of Interest;

- Grievance policies and procedures; and,

- Incident reporting.

5. **Pioneer Human Services** must provide training to all new contractors and volunteers, where the level and type of training provided is based on the services they provide and the level of contact they have with unaccompanied children. Contractors hired for a term that is expected to last one year or more must undergo the standard 40 hours of training required for all care provider employees. All contractors and volunteers must undergo pre-service training prior to having direct contact with UC.

6. **Pioneer Human Services** must document all trainings completed by staff and place a copy in the staff's personnel file, including:

- The date, number of hours, and subject-matter of the employee's orientation training;

- The date and number of hours of in-service training completed by the employee in each topic area listed above;

- A confirmation that the employee understood each training that he/she completed; and,

- The name of the individual and/or entity providing the training.

F. **Grant Administration**

1. **Pioneer Human Services** must submit a detailed project plan of the approach, activities, staffing, and timelines which is approved by ORR and is in compliance with respective State residential care licensing requirements, the Flores settlement agreement, applicable federal laws and regulations, and the ORR policies and procedures. Any modifications must be discussed with the ORR Project Officer prior to implementation.

22

Confidential - Subject to Protective Order

2. **Pioneer Human Services** must submit a program budget for ORR and ACF's Office of Grants Management (OGM) approval that accurately reflects proposed activities as described in the project plan.

3. **Pioneer Human Services** must notify the ORR Project Officer of any significant delays or issues regarding implementation of grant activities.

4. **Pioneer Human Services** must regularly consult with the ORR Project Officer and other ORR staff while implementing grant activities during each phase of the project. Consultation shall include, but is not limited to, participation in status meetings by telephone to review project implementation or as required by ORR.

5. **Pioneer Human Services** must provide ORR with unrestricted access to clear, timely, and accurate information about all aspects of the program. This access includes, but is not limited to: activities, policies, and financial information; documentation on individual UC and provided services; and unrestricted physical access to **Friends of Youth's** premises, buildings, staff and UC in the programs physical custody; and any physical property on the premises, such as video monitoring equipment and footage.

6. **Pioneer Human Services** must ensure that all Sub-Recipients comply with respective state residential care licensing requirements, the <u>Flores</u> settlement agreement, pertinent federal laws and regulations, and the ORR policies and procedures, unless otherwise expressly waived (in writing) by authorized ORR staff.

7. **Pioneer Human Services** must submit the following documents to the ORR Project Officer:

    a. All applicable State and local licensures, incorporations, and/or authorizations for **Pioneer Human Services** and any Sub-Recipient at the beginning of each Federal fiscal year.

23

GOV-00126528
**Exhibit 189
Page 418**

b. A description of responsibilities and activities of all organizations, individuals, or Sub- Recipients providing services to UC within 30 days of ORR's award date. All Sub- Recipients are subject to approval by the ORR Project Officer and must include the following considerations:

- o Memoranda of Understanding (MOU) or similar instrument, with organizations or individuals selected for receipt of sub-awarded funds;

- o A detailed description of the Sub-Recipients' activities, if not adequately described in the MOUs (or similar instrument) or project plan (may include a monitoring tool jointly developed by Project Officer and Grantee);

- o Complete budget for each Sub-Recipient;

- o Schedule for monitoring Sub-Awardees with respect to location, dates, and agenda will be reported in **Pioneer Human Services** quarterly reports to ORR;

- o Reports following monitoring visits of sub-awardees and immediately notifies the ORR Project Officer of any serious concerns and will submit the final report within 30 days following the monitoring visit; and,

- o Prompt notification to ORR Project Officer of any changes regarding Sub-Recipient.

c. Report of all State defined residential care placement restrictions to be submitted within 7 days of date of ORR award.

d. Notify the ORR Project Officer immediately but no later than 24 hours after the care provider, service provider/contractor or Sub- Recipient receives a revocation or suspension of a license, incorporation or authorization to provide services.

e. Notify the ORR Project Officer immediately but no later than 24 hours after the care provider, service provider/contractor or Sub-Recipient receives any citiation from a State or local licensing agency or other accrediting agency and any citation for health, safety or enviornemental code violations violaitons.

24

Confidential - Subject to Protective Order

f.  List of all State mandated staff trainings, including required timeline for completion dates within 30 days of date of ORR award.

g.  All materials (e.g., forms and other tools) used or created for residential services for UC.  Materials are subject to approval by ORR Project Officer and must be submitted to the Project Officer 30 days prior to being implemented.

h.  Quarterly performance and financial reports are to be uploaded into GrantSolutions unless otherwise directed by OGM or ORR..

8.  **Pioneer Human Services** also agrees:

a.  To comply with HHS policy and regulations, unless otherwise expressly waived in the approved application and all other applicable Federal statutes and regulations in effect during the time that it is receiving grant funding.

b.  To amend the approved project plan as needed to comply with standards, goals, and priorities established by the Director;

c.  To submit quarterly performance and financial reports in a timely fashion based on the schedule that is described in Section VIII of this agreement.

d.  To abide by provisions of the Service Contract Act, Code of Federal Regulations (CFR) Title 29 and abide by applicable State wage determination guidelines in its program.

G.  **Adherence to ACF Policy on Grants to Faith-Based Organizations**

Consistent with the ACF Policy on Grants to Faith-Based, ACF is mindful that potential grantees may have religious objections to providing certain kinds of services.  ACF is committed to providing the full range of legally permissible services to people who need them, and to do so in a timely fashion and in a manner that respects the diverse religious and cultural backgrounds of those we serve. At the same time, ACF is also committed to

25

GOV-00126530
**Exhibit 189
Page 420**

exploring ways for organizations to partner with ACF and other grantees even if they object to providing specific services on religious grounds.

The following are ways in which organizations with such objections may be able to participate in human services programs:

- Serve as subgrantees:  In many cases, subgrantees do not need to provide every service for which the grantee is responsible, so long as all clients served have access to all services required under the grant in a timely and respectful manner.  Grantees must ensure that their overall program provides all of the required services, but grantees can use subgrantees to provide some services.  Under this arrangement, as long as other subgrantees are readily available to provide clients with the objected-to services, a subgrantee may participate in the grant program while declining to provide services to which they have religious objection.

- Apply in a consortium: A second possibility is for faith-based organizations to apply in a consortium with one or more partners.  The consortium would allow for a division of responsibility consistent with each organization's principles.  Again, as long as clients have timely access to all required services, different organizations could divide up the services provided.

- Notify grantor: A third possibility in some circumstances would be for the grantee to notify the federal program office responsible for the grant if a client's needs or circumstances may require services, including referrals, to which the organization has a religious objection.  It would then be the federal agency's responsibility to follow through with the needed services, or, if appropriate, transfer the case to another provider.

ACF will consider any combination of these approaches and is open to considering other approaches that would accomplish the goal of ensuring that people have access to a full range of services while enabling qualified faith-based organizations to participate in the delivery of those services in a manner consistent with their principles.

## H.  Responsibilities of ORR

ORR hereby agrees to the following:

26

1. To confirm project plan (which includes approach, activities, timelines, and results expected) and budget, and discuss minor modifications;

2. To submit and/or review FFR SF-425 to be sure it accurately reflects proposed activities;

3. To participate in status meetings by telephone to review project implementation (monthly, or as required by the ORR Project Officer or other ORR staff);

4. To keep Pioneer Human Services informed of policy, regulatory and legal developments as they affect the implementation of the project;

5. To review and approve Pioneer Human Services Sub-awards of organizations providing residential services;

6. To review and approve additions or hiring of key personnel, including those of Sub-Awardee of organizations providing residential services, in a timely manner;

7. To review all internal policies, procedures, and protocols used or created for the residential services for DUCO in a timely fashion;

8. To provide training and technical assistance, as needed, regarding project implementation, and residential service delivery; and,

9. To promptly review written requests for prior approval of deviations from the project plan or approved budget. Any changes that affect the terms and conditions of the grant award or revisions/amendments to the Cooperative Agreement or to the approved scope of activities will require prior approval by the ORR Project Officer and the Grants Management Specialist in the Office of Grants Management (OGM).

**SECTION V:** Budget and Financial Arrangement

The approved budget is reflected in the Notice of Award (NoA). The award will be based on the ORR and the OGM approved negotiated budget and project plan.

The Government shall not be obligated to reimburse the recipient for costs incurred in excess of the total amount allotted to this project, and the recipient shall not be obligated to continue

27

GOV-00126532
**Exhibit 189**
**Page 422**

performance under the Agreement (including actions under the termination clause) or otherwise to incur costs in excess of the amount allotted to this Agreement unless and until ORR and the OGM have notified the recipient in writing that additional funds have been awarded. No notice, communication, or representation from any person other than the Grants Management Specialist shall authorize the expenditure of additional funds. The United States Government will not be obligated for any excess costs in the absence of a written notice of authorization from the Grants Management Officer. Changes issued pursuant to this Agreement shall not be considered an authorization to the recipient to exceed the allotted amount of this Agreement unless specifically stated by the Grants Management Officer.

**SECTION VI:** Monitoring

ORR will conduct announced and unannounced monitoring activities throughout the project period. The purpose of ORR monitoring is to ensure compliance with the Flores settlement agreement, pertinent federal laws and regulations, and ORR policies and procedures. Performance and compliance measures are reflected in:

- The grant application, as funded;

- Program requirements contained in the authorizing statutes;

- Program regulations and guidelines incorporated in the grant award;

- Program grant and administrative requirements contained in regulations and policy;

- Relevant public policy requirements (assurances, certifications);

- This agreememt;

- The ORR Policy Guide and relevant procedures; and,

- Special programmatic terms and conditions, if any.

ORR monitoring activities will include desk and on-site (announced and unannounced) monitoring and site visits. ORR will monitor or conduct site visits on programs based on some of the following factors:

28

Confidential - Subject to Protective Order

- Costs and Total Support – high cost projects

- Complexity – projects with multiple service components;

- Age and Experience of Program – newly established program, one receiving Federal funds for the first time, one with inexperienced key personnel, or one whose legislation has recently undergone substantial change, may require closer scrutiny than a long established program;

- Prior Indication of Compliance issues – available audit or evaluation findings, recipient requests for assistance, or data on financial stability of an organization;

- Length of Grant – multi-year award, particularly one up for continuation awards that have never been visited may take precedent over new ones;

- Time Since Last Visit – if program has not been recently or previously visited;

- Geographic Location – proximity to other recipients, accessibility to program office;

- Agency Priority – high priority / visibility projects within the agency, high interest to Congress, the executive branch, or the public; and,

- Potential for Dissemination – programs / projects that show potential for developing exemplary practices suitable for dissemination.

ORR will provide Pioneer Human Services with a monitoring report following formal monitoring visits or if required site visits, that will include citations for noncompliance, recommendations, a corrective action plan if needed, timelines for reporting, and consequences for not responding.

The monitoring report is not exhaustive of all that is reviewed during the monitoring visit. Rather, the report highlights the key issues in need of attention, as determined by the monitor and based on the review of all ORR policies and procedures. After review of the monitoring report, a formal corrective action plan should be submitted to the designated Project Officer within 30

29

GOV-00126534

**Exhibit 189
Page 424**

business days.  The corrective action plan will identify objectives, specific actions, persons responsible and date of completion for each monitoring citation.

**SECTION VII:** Continuation Applications

Pioneer Human Services must submit an ORR provided continuation application by June 1, or a later date determined by ORR.   For continuation applications, Pioneer Human Services will provide the following information:

1.  Standard Forms: SF 424 Application for Federal Assistance, SF 424A Budget Information for Non-Construction Programs, and SF 424B Assurances for Non-Construction Programs;
2.  Certification Regarding Lobbying
3.  Budget worksheets and narrative;
4.  Program Description and Work plan;
5.  Current State Residential Care License;
6.  Proof of Insurance;
7.  Facility lease or bank mortgage note on property (as applicable);
8.  Indirect Cost Rate approval, if any;
9.  Current Program Organizational Chart;
10.  Staffing and Volunteer Roster;
11. Copy of all Child Protective Services reports, allegations and CPS investigations;
12.  Property/Inventory List;
13.  Project/Performance Site Location(s) form

Pioneer Human Services must use the current version of all standard applications and reporting forms.

Current versions of the forms are available at: https://www.grants.gov
http://www.whitehouse.gov/omb/grants_forms/

**SECTION VIII:** Applicable Regulations

Pioneer Human Services must provide all residential services for UC in compliance with respective state residential care licensing, the Flores settlement agreement, pertinent federal laws

Confidential - Subject to Protective Order

# Exhibit 190

## <u>REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL</u>

**Exhibit 190
Page 426**

**From:** Biswas, Toby R M (ACF)
**Sent:** Friday, December 7, 2018 9:24:37 AM
**To:** Ray, Faith (ACF)
**CC:** ███████████████; ███████████; Moomaw, Sara (ACF)
**Subject:** RE: Week 1: Secure compliance review

Thanks for working on this, I know this was a big pull.

I agree that the FFS should be approached after the meeting.

Toby R. M. Biswas, ESQ.
Unaccompanied Alien Children Policy Supervisor

U.S. Department of Health and Human Services
Administration for Children and Families
Office of Refugee Resettlement
Office of the Director – Division of Policy and Procedures

(202) 205-4440 (O)
(301) 356-5470 (C)
(202) 401-1022 (F)

---

**From:** Ray, Faith (ACF) <Faith.Ray@acf.hhs.gov>
**Sent:** Thursday, December 06, 2018 4:49 PM
**To:** Biswas, Toby R M (ACF) <Toby.Biswas@ACF.hhs.gov>
**Cc:** ███████████████████████████; ███████████████████
**Subject:** Week 1: Secure compliance review

Hi Toby,

We've completed week one of the secure facilities compliance review.  (I've attached the spreadsheet in case you want to see it.) <u>Eighteen out of 34 cases</u> were not compliant in the placement criteria and/or the Notice of Placement requirement.

Our next step is to email the FFs, after the Wednesday meeting, about these individual compliance issues.  (If you think we should email the FFSs earlier, please let me know, but there's a lot we're going to need to cover in the compliance review meeting next week with the supervisors and the FFSs on this.)

Please let me or Aaron know if you have any questions about the initial review we conducted this week.

Thanks,
Faith


<< File: Compliance Review_Secure Populations.xlsx >>

Faith Ray, Program Analyst
*On detail with ORR Division of Policy & Procedures*
Office of Refugee Resettlement | Administration for Children & Families
330 C Street SW, Room 5123 | Washington DC 20201
Direct: 202.205.3982

Confidential - Subject to Protective Order

# Exhibit 191

## <u>REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL</u>

**Exhibit 191**
**Page 428**

Message

| | |
|---|---|
| **From:** | Vergara, Micaela (ACF) [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=5A23FD4A08FD40759BA2F28D91A18248-VERGARA, MI] |
| **Sent:** | 6/5/2018 7:25:34 PM |
| **To:** | Hogle, Olivia (ACF) [olivia.hogle@acf.hhs.gov]; Gonzalez, Jose (ACF) [jose.gonzalez@acf.hhs.gov] |
| **CC:** | De LA Cruz, James (ACF) [james.delacruz@acf.hhs.gov]; ACF Orrducs_Intakes (ACF) [orrducs_intakes@acf.hhs.gov]; Acevedo, Sathya (ACF) [sathya.acevedo@acf.hhs.gov] |
| **Subject:** | RE: Expedited Placement |

Good afternoon,

Shiloh did an internal review of their licensing standards/requirements and they reported that they would be able to accept him (justify placement to licensing) based on medical necessity of the sister due to the sister being non-verbal and the brother being the only person UC can communicate with.

Thank you,

*Micaela Vergara MSW, LCSW*
*Federal Field Specialist – Houston*
*DHHS/Administration of Children and Families*
*Office of Refugee and Resettlement*
*Division of Unaccompanied Children Operations*
*202-450-8917*

---

**From:** Hogle, Olivia (ACF)
**Sent:** Tuesday, June 05, 2018 2:18 PM
**To:** Vergara, Micaela (ACF); Gonzalez, Jose (ACF)
**Cc:** De LA Cruz, James (ACF); ACF Orrducs_Intakes (ACF); Acevedo, Sathya (ACF)
**Subject:** RE: Expedited Placement

Hi everyone,

Just discussing this case with Jim and Shaanan, and wanted to make sure there are no concerns related to their licensing in accept the sibling who appears to have no special needs?

Thanks,
**Olivia Hogle, MSW**
Lead Intakes Program Specialist
Office of Refugee Resettlement
Division of Unaccompanied Children Operations
330 C Street SW
Washington, DC 20447
Desk: (202) 260-0962
Cell: (202) 823-3005
Fax: (202) 401-1022
Olivia.Hogle@acf.hhs.gov

*\*Please note: I telework on Fridays and can be reached by email or cell.*

---

**From:** Vergara, Micaela (ACF)
**Sent:** Tuesday, June 05, 2018 11:47 AM
**To:** Hogle, Olivia (ACF) <Olivia.Hogle@acf.hhs.gov>; Gonzalez, Jose (ACF) <Jose.Gonzalez@ACF.hhs.gov>

Confidential - Subject to Protective Order

**Cc:** De LA Cruz, James (ACF) <James.DeLACruz@acf.hhs.gov>; ACF Orrducs_Intakes (ACF)
<Orrducs_Intakes@acf.hhs.gov>; Acevedo, Sathya (ACF) <Sathya.Acevedo@acf.hhs.gov>
**Subject:** RE: Expedited Placement

Hi everyone,

We have two females at Shiloh that will be seeing the psychiatrist and will likely receive a recommendation for step-
down.  SWK Casa Houston had one female bed available and has not arrived yet.  The program will be sending an e-mail
to you to see if the female can be placed at another program so SWK Casa Houston can receive the step-down from
Shiloh opening up female bed at Shiloh.

Hope this makes sense.

Thank you,

*Micaela Vergara MSW, LCSW*
*Federal Field Specialist – Houston*
*DHHS/Administration of Children and Families*
*Office of Refugee and Resettlement*
*Division of Unaccompanied Children Operations*
*202-450-8917*

---

**From:** Hogle, Olivia (ACF)
**Sent:** Tuesday, June 05, 2018 9:57 AM
**To:** Vergara, Micaela (ACF); Gonzalez, Jose (ACF)
**Cc:** De LA Cruz, James (ACF); ACF Orrducs_Intakes (ACF)
**Subject:** RE: Expedited Placement

Thank you Micaela. Jose, I believe you reached out to Bokenkamp TFC, and we have requested some additional
information for them regarding the minor's ability to perform ADLs.

Mpinga is also exploring if there is any other capacity in the network that may be able to take these kiddos. We will let
you know if anyone else looks able to accept.

**Olivia Hogle, MSW**
Lead Intakes Program Specialist
Office of Refugee Resettlement
Division of Unaccompanied Children Operations
330 C Street SW
Washington, DC 20447
Desk: (202) 260-0962
Cell: (202) 823-3005
Fax: (202) 401-1022
Olivia.Hogle@acf.hhs.gov

*Please note: I telework on Fridays and can be reached by email or cell.*

---

**From:** Vergara, Micaela (ACF)
**Sent:** Tuesday, June 05, 2018 10:50 AM
**To:** Hogle, Olivia (ACF) <Olivia.Hogle@acf.hhs.gov>; Gonzalez, Jose (ACF) <Jose.Gonzalez@ACF.hhs.gov>
**Cc:** De LA Cruz, James (ACF) <James.DeLACruz@acf.hhs.gov>; ACF Orrducs_Intakes (ACF)
<Orrducs_Intakes@acf.hhs.gov>
**Subject:** RE: Expedited Placement

GOV-00030424
**Exhibit 191**
**Page 430**

Placement for minors is not possible at SWK Casa Reliant, they received 6 intakes yesterday and were trying to rearrange beds and were unable to accommodate. I believe they only had 2 boy and 1 girl bed available as of yesterday.

**Micaela Vergara MSW, LCSW**
*Federal Field Specialist – Houston*
*DHHS/Administration of Children and Families*
*Office of Refugee and Resettlement*
*Division of Unaccompanied Children Operations*
*202-450-8917*

**From:** Hogle, Olivia (ACF)
**Sent:** Monday, June 04, 2018 3:00 PM
**To:** Gonzalez, Jose (ACF); Vergara, Micaela (ACF)
**Cc:** De LA Cruz, James (ACF); ACF Orrducs_Intakes (ACF)
**Subject:** RE: Expedited Placement

Hi all-

I've seen the long chain of emails- thank you for looking into placement for these kids! To make sure I understand correctly, Shiloh cannot take the minors and Micaela is looking into if they can be placed together at Casa Reliant.   Is there any update as to the feasibility of placement there? If it is not possible, we need to utilize those beds for other minors.

Thanks,

**Olivia Hogle, MSW**
Lead Intakes Program Specialist
Office of Refugee Resettlement
Division of Unaccompanied Children Operations
330 C Street SW
Washington, DC 20447
Desk: (202) 260-0962
Cell: (202) 823-3005
Fax: (202) 401-1022
Olivia.Hogle@acf.hhs.gov

*\*Please note: I telework on Fridays and can be reached by email or cell.*

**From:** Gonzalez, Jose (ACF)
**Sent:** Monday, June 04, 2018 1:04 PM
**To:** Vergara, Micaela (ACF) <Micaela.Vergara@ACF.hhs.gov>
**Cc:** De LA Cruz, James (ACF) <James.DeLACruz@acf.hhs.gov>; Hogle, Olivia (ACF) <Olivia.Hogle@acf.hhs.gov>
**Subject:** Re: Expedited Placement

Jim and intakes. Mica is looking for a back up for the twins. We have open beds at swk casa reliant so please allow Mica to work some magic and get twins in at casa reliant.

GOV-00030425
**Exhibit 191**
**Page 431**

On: 04 June 2018 11:41,
"Douglas Plaeger" <dplaeger@shilohtreatmentcenter.com> wrote:

Jose,

Due to Shiloh being at capacity for female beds, we reached out to our PO for approval to adjust the number of girl to boy beds. In response from the PO, *"I corresponded with Bernard at OGM and he stated that it would be allowable, but is an extenuating process since it would be a OPDIV or grantee-initiated Change of Scope depending on how all of this was brought up. Shiloh would need to provide an application describing this alteration and ORR would have to submit deviation memos for approval. So, even if we initiated this process Shiloh would not be able to take the girl in today since it would not be a simple modification of activities. And the same process would have to be used to revert back to 16 females and 16 males at a later date (or to any different capacity)."*

I will keep you updated on the progress. In the meantime, the minor and brother may need to go to a shelter placement in the interim before being transferred to Shiloh.

Douglas Plaeger MA, LPC
Program Director
Shiloh Treatment Center
713-417-8218

CONFIDENTIALITY NOTICE:  This email and any files transmitted with it may be legally privileged and confidential and is intended solely for the use of the individual or entity named above.  If you are not the intended recipient, you are hereby notified that any review, dissemination or copying of this email, or taking any action in reliance on the contents of this information is strictly prohibited.  If you received this transmission in error, please notify us immediately by e-mail or telephone to arrange for the return of this email and any files to us or to verify it has been deleted from your system.

**From:** Luis Valdes [mailto:lvaldes@shilohtreatmentcenter.com]
**Sent:** Monday, June 04, 2018 10:41 AM
**To:** Gonzalez, Jose (ACF) <Jose.Gonzalez@acf.hhs.gov>
**Cc:** Doug Plaeger <dplaeger@shilohtreatmentcenter.com>; De LA Cruz, James (ACF) <james.delacruz@acf.hhs.gov>; Hogle, Olivia (ACF) <Olivia.Hogle@acf.hhs.gov>
**Subject:** Re: Expedited Placement

I was able to get through. The nurse is getting some additional information for us. She also said the brother communicates for her because she is non-verbal. She stresses when she is not with him. She is on 0.1 clonidine for sleep and anxiety. Nurse suggested sending both because he understands and can communicate her needs and she is more comfortable with him. They are twins. We are agreeable to having them both. We can bring him in for evaluation. A lot information that needs to be gathered on both.

Is it ok to bring them both in?

Thanks,

On Mon, Jun 4, 2018, 10:23 AM Gonzalez, Jose (ACF) <Jose.Gonzalez@acf.hhs.gov> wrote:

Sir this number answered me. Sandra is waiting.
956-632-8007

On: 04 June 2018 10:19,
"Luis Valdes" <lvaldes@shilohtreatmentcenter.com> wrote:

Confidential - Subject to Protective Order

I called both numbers and neither one of them picked up or went to voicemail I will try again shortly

On Mon, Jun 4, 2018, 10:15 AM Gonzalez, Jose (ACF) <Jose.Gonzalez@acf.hhs.gov> wrote:

Dr Valdez. The CBP pic is listed below. Please call her and let us know the out come of your call.

On: 04 June 2018 10:09,
"SOLIS, LUIS A" <LUIS.A.SOLIS@cbp.dhs.gov> wrote:

The POC is Sandra (medical Staff at the RGV CPC) 956-632-8007.  She will be standing by for the call.

Thank you,

Luis A. Solis
Operations Officer
RGV Juvenile Coordinator
Rio Grande Valley Centralized Processing Center
3700 W. Ursula Ave
McAllen, Texas 78503
Luis.a.solis@cbp.dhs.gov
(O) 956-928-4060
(C) 956-632-8071

**From:** Gonzalez, Jose (ACF) [mailto:Jose.Gonzalez@ACF.hhs.gov]
**Sent:** Monday, June 04, 2018 9:52 AM
**To:** SOLIS, LUIS A <LUIS.A.SOLIS@cbp.dhs.gov>
**Subject:** Re: Expedited Placement

Luis can you call me. I may have found a bed.
2026313777

On: 04 June 2018 09:27,
"SOLIS, LUIS A" <LUIS.A.SOLIS@cbp.dhs.gov> wrote:

ORR , requesting expedited local placement for below UAC siblings

Subject ███████████████████████ is a 10 year old Mex juvy with Down syndrome.

Mother listed below is being held as material witness for a smuggling case being presented in Corpus Christi, Texas Magistrate Court.

███████████████
MEXICO
██████████

Confidential - Subject to Protective Order

Thank you,

Luis A. Solis
Operations Officer
RGV Juvenile Coordinator
Rio Grande Valley Centralized Processing Center
3700 W. Ursula Ave
McAllen, Texas 78503
Luis.a.solis@cbp.dhs.gov
(O) 956-928-4060
(C) 956-632-8071

# Exhibit 192

**ENTIRE DOCUMENT SUBMITTED UNDER SEAL**

Exhibit 192
Page 435

# Exhibit 193

## ENTIRE DOCUMENT SUBMITTED UNDER SEAL

Exhibit 193
Page 447

# Exhibit 194

## <u>ENTIRE DOCUMENT SUBMITTED UNDER SEAL</u>

**Exhibit 194**
**Page 500**

# Exhibit 195

## ENTIRE DOCUMENT SUBMITTED UNDER SEAL

Exhibit 195
Page 506

# Exhibit 196

## ENTIRE DOCUMENT SUBMITTED UNDER SEAL

Exhibit 196
Page 538

# Exhibit 197

## ENTIRE DOCUMENT SUBMITTED UNDER SEAL

Exhibit 197
Page 545

# Exhibit 198

Exhibit 198
Page 647

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA WESTERN

DIVISION

------------------------------------
LUCAS R, et al,

               Plaintiffs,

               vs.                    Index No.
                                      2:18-CV-
ALEX AZAR, et al,                     05741 DMG
                                      PLAx

               Defendants.
------------------------------------




CONFIDENTIAL DEPOSITION OF LORILEI WILLIAMS
              New York, New York
              Tuesday, July 2, 2019

            MAGNA LEGAL SERVICES
               Magnals.com
              (866) magna21

Reported by:
Jeremy Frank, MPM
JOB NO. 489369



Page 83

1                     Williams

2    experiences within the organization that

3    worked at both Catholic Charities Houston and

4    Catholic Charities New York would not allow me

5    to engage in certain legal actions because

6    they feared that it would cause us to lose our

7    funds.

8            Based on my conversations with

9    them I believe that they had referenced Vera

10   and ORR in those conversations, but I don't

11   recall the exact words used.

12       Q.    You mentioned Catholic Charities

13   would not allow, can you elaborate what they

14   would not allow?

15       A.    Specifically I think I had brought

16   up the idea of filing a writ for habeas corpus

17   on behalf of one or more clients.  And I do

18   recall a very specific declaration from one of

19   my supervisors in Houston where she said we

20   cannot sue ORR in any capacity because we will

21   lose our funding if we do so.

22            She also told me that of an

23   organization that had done that at some point

24   in the past.  She said that there was I

25   believe a Catholic Charities in San Antonio



Exhibit 198
Page 649

Page 84

1                              Williams
2    who had done that and they lost their funding,
3    and that's when the contract was then awarded
4    to Raices, R-A-I-C-E-S, which is a nonprofit
5    in that area.
6                    I did not confirm any of this
7    information, but I then heard this warning of
8    do not sue ORR because you can lose your
9    funding, an organization had gone through that
10   from multiple sources throughout my time as a
11   detained UAC attorney from September 2012 to
12   January 2016.
13        Q.    I would like to learn more about
14   what you just said.
15                    You mentioned a supervisor who
16   told you that your organization would lose
17   funding if you, I believe you said something
18   to the effect of challenged ORR decisions.
19                    Is that right?
20        A.    It was more specific to engaging
21   in litigation against ORR.
22        Q.    You had a supervisor who said that
23   if you engage in litigation against ORR that
24   that would put your Vera funding at risk.
25                    Is that right?



Exhibit 198
Page 650

Page 159

```
 1                    Williams
 2          C E R T I F I C A T E
 3
 4  STATE OF _____:
 5  COUNTY/CITY OF_____:
 6
 7  Before me, this day, personally appeared
 8  LORILEI WILLIAMS, who, being duly sworn,
 9  states that the foregoing transcript of her
10  Deposition, taken in the matter, on the date,
11  and at the time and place set out on the title
12  page hereof, constitutes a true and accurate
13  transcript of said deposition.
14
15                        _____
16                        LORILEI WILLIAMS
17
18  SUBSCRIBED and SWORN to before me this
19  _____ day of _____, 2019, in the
20  jurisdiction aforesaid.
21
22
23
24  _____  _____
25  My Commission Expires        Notary Public
```



Exhibit 198
Page 651