JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
ERNESTO H. MOLINA, JR.
Deputy Director
CHRISTOPHER A. BATES
Senior Counsel to the Assistant Attorney General
W. DANIEL SHIEH
BENJAMIN MARK MOSS
Senior Litigation Counsel
NANCY K. CANTER (263198)
ANTHONY J. MESSURI
JONATHAN K. ROSS
Trial Attorneys
Office of Immigration Litigation
U.S. Department of Justice
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-9802
Daniel.Shieh@usdoj.gov
*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Lucas R., *et. al.*,<br><br>     *Plaintiffs*,<br><br>    v.<br><br>Alex M. Azar,<br>Secretary of U.S. Dep't of Health and Human Services, *et al*.<br><br>     *Defendants*. | Case No.: 18-cv-05741-DMG-PLA<br>**DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW**<br>Hearing Date: Dec. 11, 2020<br>3:00PM PT<br>Location: Courtroom 8C, 8th Floor<br>350 West 1st Street<br>Los Angeles, CA 90012<br>Honorable Dolly M. Gee<br>United States District Judge |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| **Defendants' Uncontroverted Facts: Custody/Release** ||
| 1. It is ORR's practice to seek the safe and timely release of unaccompanied alien children (UACs) in its care.<br><br>Antkowiak Dep.  202:4-19; Sualog Dep. 80:4-14; Vergara Dep. 215:18-22; Biswas 30(b)(6) Dep. 147:7-21; Dr. Earner Dep. 117:1-21; Dr. Mohn Dep. 116:17-22; Antkowiak Decl. ¶ 38; Biswas Decl. ¶ 63; ORR Juvenile Coord. Rep. at 1. | **Disputed.** In practice, children may remain in ORR custody for a year or more. Ex. 5[1] [RFA 1st Set] No. 36 at 492; Ex.19 [David Dep. Tr.] at 72:22–73:13[2]; Ex. 16 [Contreras Dep. Tr.] at 160:6–13. ORR has detained at least one Class Member in congregate care for at least 1,570 days, or more than four years. Ex. 122 at 1923. ORR detained Class Representative Gabriela N. for approximately 633 days. ECF No. 62-6 [Initial Intake Form] at 2 (noting arrival date of Jan. 8, 2017); Ex. 101 at 1804 (noting departure date of Oct. 2, 2018); Ex. 141 at 2036 (length of stay at Southwest Key 243 days); Ex. 140 at 2031 (noting transfer to URM on Oct. 2, 2018); Ex. 102 at 1806–07. ORR detained Class Representative Lucas R. for approximately 208 days. Ex. 143 at 2045 (Southwest Key entry date of Feb. 11, 2018); Ex. 142 at 2040 (admitted to Shiloh Treatment center May 21, 2018 and discharged Sept. 8, 2018). Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Plaintiffs' Objections to Defendants' Evidence ("Evidentiary Objections") ¶ 2. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as, for the reasons stated in Fact Response ¶¶ 24-27, Plaintiffs' cited evidence does not demonstrate that Defendants do not seek the safe and timely release of UACs in its care. ||
| 2. It is ORR's practice to affirmatively determine potential sponsors are able to | **Disputed.** Plaintiffs dispute that Defendants' cited evidence establishes a practice or that |

[1] All citations to "Ex." refer to Plaintiffs' exhibits.  All citations to "DX" refer to Defendants' exhibits.  Citations to "Fact Response" refer to Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts, ECF No. 283-1.  Citations to "Fact Reply" refer to this document, Defendants' Reply in Support of Defendants' Statement of Uncontroverted Facts.

[2] Citations to deposition transcripts refer to original pagination.

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| provide for the physical and mental well-being of children before release.<br><br>Biswas Dep. 173:25-174:19; Biswas 30(b)(6) Dep. 130:5-11, 131:13-15, 152:8-24, 155:14-20; Sualog Dep. 110:5-11; Vergara Dep. 193:6-9, 194:8-17; Dr. Ryan Dep. 92:16-24, 94:3-8; Dr. Earner Dep. 119:8-12; Antkowiak Decl. ¶ 55; Biswas Decl. ¶ 64; ORR Juvenile Coord. Rep. at 1. | such alleged "determinations" actually determine whether a proposed sponsor is able to provide for the physical and mental well-being of a child prior to release. Plaintiffs further dispute this statement as the cited evidence discusses policy language that is either not applicable or is not followed in practice because ORR's release determinations are sometimes arbitrary. *See, e.g.*, Ex. 30 [Ortiz Dep. Tr.] at 110:24–113:2 ("And the aunt was told she was not a viable sponsor because they didn't have the same last name . . . Once transferred to the permanent facilities, the child was released within two weeks."); Ex. 19 [David. Dep. Tr.] at 77:1–12 (discretionary home study criteria "is based on concerns other than the other mandated home study processes"); Ex. 116 at 1896 (FFS overruling positive release recommendation). Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 2. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs' cited evidence does not demonstrate that ORR's release decisions are arbitrary. Indeed, Plaintiffs' citation to the Ortiz deposition is hearsay testimony by a legal service provider and fails to include that the case manager made a determination that the aunt was "not a viable sponsor" without any indication the different last names was the reason for the decision. *See* Fact Response ¶¶ 38, 82. The two additional pieces of evidence cited by Plaintiffs not only do not support Plaintiffs' assertion that ORR's release decisions are arbitrary, but in fact support Defendants' assertion that it is ORR's practice to affirmatively determine potential sponsors are able to provide for the physical and mental well-being of children before release. *See* Ex. 19 [David. Dep. Tr.] at 77:6-16 ("Q: What factors would be the types that would kick in a discretionary home study? A: It really varies. It depends if there's concerns of the sponsor. If there's information that has not been able to be mitigated through the case management process but doesn't necessarily mean TVPRA or a mandated. Q: When you say concerns of the sponsor, *you mean concerns about the fitness or the appropriateness of the sponsor?* A: yes.") (emphasis added); Ex. 116 at 1896 (UAC's

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| "release has been denied" and a home study addendum has been requested "before making a release decision" after UAC reports, and sponsor confirms, "that [UAC's] older brother was released from jail and since last week he is residing at [the minor's] proposed sponsor's home"). | |
| 3. It is ORR's policy and practice to seek the safety of UACs in its custody and to protect them from trafficking and other forms of exploitation, abuse, and neglect upon release from ORR's care and custody.<br><br>ORR Guide §§ 1.2.3, 2.1, 2.2.5, 3.1, 3.3.3; Biswas 30(b)(6) Dep. 147:7-14, 438:25-440:14; Sualog Dep. 160:7-25, 198:9-199:3; Husted Dep. 33:6-12, 79:13-20; Padilla Dep. 248:24-249:22; Dr. Ryan Dep. 246:11-247:7; Antkowiak Decl. ¶ 39. | **Partially Disputed.** Plaintiffs do not dispute that the ORR Policy Guide addresses the safe release of minors in its custody vis-a- vis concerns of trafficking and other forms of exploitation, abuse, and neglect upon release from ORR's care and custody, but do dispute Defendants' application of those policies. *See, e.g.*, Ex. 53 [Edwards Expert Rep.] at 1340–42 (discussing significant shortcomings in ORR's policies). Defendants' cited evidence does not establish a "practice", nor does it establish that the cited policy is followed in practice. *See* Ex. 37 [Sualog Dep. Tr.] at 219:1–19 (ORR does not track incidents or conduct studies related to post- release abuse or neglect). |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs do not dispute that ORR's policy is to seek the safety of UACs in its custody and to protect them from trafficking and other forms of exploitation, abuse, and neglect upon release from ORR's care and custody.  For the reasons stated in Fact Response ¶¶ 17, 83, and 100, Plaintiffs' cited evidence does not demonstrate that Defendants do not apply those policies in practice. | |
| 4. The majority of UACs referred to ORR custody are apprehended after crossing the border between ports of entry without lawful admission.<br><br>Antkowiak Decl. ¶ 50; Southwest Border Data. | **Undisputed** for purposes of this motion. |
| 5. ORR's system of care is unique from the domestic child welfare context in that it provides care to an exclusively immigrant, minor population who enter ORR custody unaccompanied, and are in | **Partially Disputed.** Plaintiffs do not dispute that ORR serves an immigrant, minor population who are generally in custody solely by reason of their immigration status. Plaintiffs dispute that all children in ORR |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| custody solely by reason of their lack of lawful immigration status.<br><br>Sualog Dep. 80:4-14; Antkowiak Decl. ¶ 50; Biswas Decl. ¶ 87; 2016 Senate Staff Rep.; Dr. Earner Dep. 101:12-15, 252:9-12. | custody are there solely by reason of their lack of lawful immigration status; indeed, some children in ORR custody have legal immigration status. Ex. 46 [Heath Dep. Ex. 169] at 1270 (Minor with an approved I-485 since April 2016 still in ORR custody in March 2017); *id*. at 1272 (UAC with asylum status as of December 2016 still in ORR custody in March 2017); *id*. at 1273– 74 (Minor in ORR custody despite fact that UACs mother was born in the U.S.); *id*. at 1273 (UAC with granted asylum as of January 10, 2017, still in custody on March 7, 2017). Plaintiffs further dispute that ORR's system of care is unique because it provides care to immigrants who enter ORR custody unaccompanied; unlike children in the domestic child welfare system, UACs have not been removed from their homes and placed into congregate care due to allegations of abuse, neglect or abandonment. DX-13 [Dr. Earner Expert Rep.] ¶ 27. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact. *See* Fact Response ¶¶ 8, 9. That children may remain in ORR custody after obtaining lawful immigration status for lack of a viable sponsor does not change the fact that they enter ORR custody solely by reason of their lack of lawful immigration status. *See* Ex. 46 [Heath Dep. Ex. 169] at 1270 ("Youth has no sponsorship options" and "is not able to be entered onto the Washington State housing list until he is within 6 months of turning 18….At this time youth is looking at options with his soccer coach and friends."); *id.* at 1272 ("UAC does not have any identified sponsors. UAC's guardianship is pending, once secured, a URM application will be submitted."); *id.* at 1273 (UAC "back and forth" on repatriation, "State of CA doesn't want to take him," and "Yolo County can't provide for mental needs"). Furthermore, Plaintiffs' cited example of a "[m]inor in ORR custody despite fact that UACs mother was born in the U.S." does not support Plaintiffs' disputed assertion as the UAC has no status, has not filed an asylum application, and the "Mother (US Citizen) left to Mexico to avoid criminal prosecution for felony." *Id.* at 1273-74.

| 6.  UACs in ORR custody are uniquely vulnerable to trafficking and exploitation | **Partially Disputed.** Plaintiffs do not dispute that UACs in ORR custody may be |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| because many migrants engage with criminal gangs and organizations to facilitate the border crossing and are required to repay smuggling fees.<br><br>Dr. Earner Expert Rep. ¶¶ 25-27; Dr. Earner Dep. 120:9-22, 123:14-125:8, 125:13-25; Antkowiak Decl. ¶ 52. | vulnerable to trafficking. Plaintiffs dispute the asserted fact to the extent it implies that all children in ORR custody are trafficked across the United States border.  *See, e.g.*, Ex. 21 [Isabella F. Dep. Tr.] at 56:9– 17 (Benjamin F. crossed the border with his mother and was separated from her by the United States government). Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 16. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs do not dispute that UACs in ORR custody may be vulnerable to trafficking and Plaintiffs' cited evidence does not demonstrate that UACs in ORR's custody are not ever trafficked across the United States border.

| | |
|---|---|
| 7.  Neither ORR nor the grantee care providers have any financial incentive to keep children in care longer than appropriate, as care providers are paid on a funded capacity basis regardless of whether they have minors in custody or not.<br><br>Dr. Mohn Dep. 180:2-14; Dr. Ryan Dep. 195:25-196:3; Dr. Mohn Expert Rep. ¶¶ 15-19; Antkowiak Decl. ¶ 40; Cooperative Agmt (GOV-00126506-126535). | **Disputed.** Plaintiffs dispute this statement insofar as it implies transparent accounting, payment, and contract and grant award practices between ORR and care providers. *Review of Office of Refugee Resettlement's Awarding of a No-Bid Contract for the Unaccompanied Alien Children Program*, U.S. Dep't of Health and Human Services Office of Inspector General, https://oig.hhs.gov/reports- and-publications/workplan/summary/wp-summary-0000410.asp (last visited Nov. 6, 2020) ("The contract that ORR awarded to CHS was a 7-month no-bid contract totaling over $341 million"); *see also* Staff of S. Comm. on the Judiciary, 81st Cong., *Rep. on Antitrust Law* 17 (Comm. Print 1950), available at https://www.finance.senate.gov/imo/media/doc/2019-05-09%20CEG%20RW%20to%20HHS%20ACF%20(Grantee%20Oversight).pdf ("Southwest Key paid managers and its chief executive—Juan Sanchez—excessive salaries, and |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | engaged in self-dealing regarding property and leases in Conroe and Brownsville, Texas.") |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs' cited evidence does not demonstrate that ORR or the grantee care providers have any financial incentive to keep children in care longer than appropriate. *See* Fact Response ¶ 74. Indeed, Plaintiffs' reliance on the No-Bid Contract is misguided as that contract was to "operate a *temporary influx care facility* located in Homestead, Florida" and payments of excessive salaries to chief executives does not establish that a connection exists between salaries and length of UAC time ORR care. *See also* DX-14 [Dr. Mohn Expert Rep.] ¶ 17 ("The amount awarded to grantees each year by ORR is a fixed amount, whether the maximum number of beds are filled or not.").

| 8. ORR has established grantee relationships with a variety of state licensed grantee facilities where UACs reside and are cared for until they can be released to a sponsor.<br><br>ORR Guide §§ 3.1, 3.3.14, 4.4.1, 5.3.2, 5.5; *see* Cooperative Agmts. | **<u>Partially Disputed.</u>** Plaintiffs do not dispute that ORR has established grantee relationships with a variety of state licensed grantee facilities where UACs reside and are cared for until release. Plaintiffs dispute that UACs are held until released to a sponsor. Some children are released from ORR custody without being reunified. Ex. 181 [Ryo Expert Rep.] at 340 (listing 12 different discharge types, including but not limited to sponsor reunification). Plaintiffs also dispute Defendants' statement to the extent it suggests all ORR grantee programs are licensed as required under the *Flores* Settlement Agreement ("FSA"). This Court has already determined that RTCs and juvenile detention centers are not "licensed programs" within the meaning of the FSA. *Flores v. Sessions*, No. CV 85-4544-DMG(AGRx), 2018 WL 10162328, at *8-11 (C.D. Cal. July 30, 2018). |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs do not dispute that ORR has established grantee relationships with a variety of state licensed grantee facilities where UACs reside and are cared for until release. That some UACs leave ORR's care without being released to a sponsor or that some ORR grantee relationships are not "licensed" within the meaning of the *Flores* Settlement Agreement does

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| not alter the fact that ORR operates pursuant to established grantee relationships with state licensed grantee facilities for the purpose of caring for UACs until they can be released to a sponsor and that the facilities are fully licensed in the states in which they operate and thus are, as Defendants assert, state licensed grantee facilities. | |
| 9.  ORR does not directly own or operate any facilities where UACs reside and are cared for, but rather operates under cooperative agreements, which are governed by grant regulations.<br><br>ORR Guide § 3.1; De La Cruz Dep. 22:3-11; Biswas Decl. ¶ 28. | **Partially Disputed.** Plaintiffs do not dispute that ORR does not own any facilities where UACs reside and are cared for, but rather operates under cooperative agreements. Plaintiffs dispute this statement to the extent it suggests that ORR only places children in facilities where ORR has a cooperative agreement in place. ORR's procedures allow for UACs to be placed in out-of-network facilities, which do not hold cooperative agreements or contracts with ORR. Ex. 2 [ORR MAP] § 1.4.6 at 99–101 ("TAR Placements: UAC placed in an RTC not affiliated with ORR through a Cooperative Agreement or contract, do not fill out the Notice of Placement in a Restrictive Setting form."); Ex. 95 at 1754 (email from Toby Biswas to David Fink stating "See MAP section 1.4.6 which explains the procedures for administering and documenting the NOP in the case of out-of- network (TAR based) placements"). Moreover, Temporary Shelters like Homestead have held contracts rather than cooperative agreements with ORR. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs do not dispute that ORR does not own or operate any facilities where UACs reside and are cared for.  Nor does Plaintiffs' citation to ORR MAP § 1.4.6 create a genuine dispute of material fact to the extent Plaintiffs suggest that a NOP is not provided to a UAC when placed at an out-of-network facility.  Ex. 2 [ORR MAP] § 1.4.6 at 100 ("Non-TAR placements will follow the procedures set forth in the previous sub-section 1.4.2 for secure and staff secure placements, however the RTC provider marks the appropriate box in the 'RTC' section of the first page of the form justifying placement into the RTC.").

| 10.ORR has a zero-tolerance policy for all forms of sexual abuse, sexual | **Partially Disputed.** Plaintiffs do not dispute that ORR has a "zero-tolerance policy" |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| harassment, and inappropriate sexual behavior at all care provider facilities that house UACs, and ORR maintains broad reporting requirements for all care provider facilities.<br><br>ORR Guide § 4.10.6. | though Plaintiffs seek to clarify that Defendants' "zero-tolerance policy" is located at § 4.10.2 of the Policy Guide, not § 4.10.6. Plaintiffs dispute this statement to the extent it suggests children do not experience abuse in ORR custody. In fact, Class Members have been physically and sexually abused in ORR custody. *See* Ex. 6 [RFA 2nd Set] Nos. 43–44, 53–55, 58 at 516–18, 522–27. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs do not dispute that ORR has a "zero-tolerance policy" for all forms of sexual abuse, sexual harassment, and inappropriate sexual behavior at all care provider facilities that house UACs, and that ORR maintains broad reporting requirements for all care provider facilities. *See* Fact Response ¶¶ 6, 7. | |
| 11. ORR requires care provider facilities to conduct incident reviews of all allegations of sexual abuse and sexual harassment that occur in ORR care and custody.<br><br>ORR Guide § 4.11.1. | **Partially Disputed.** Plaintiffs do not dispute that the ORR Policy Guide requires care providers to "conduct incident reviews of all allegations of sexual abuse and sexual harassment that occur in ORR care and custody." Ex. 146 [ORR Policy Guide] § 4.11.1 at 51–52. Plaintiffs dispute the asserted fact to the extent Defendants intend to construe the phrase "ORR requires" to mean anything beyond the requirement in ORR's Policy Guide. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs do not dispute that the ORR Guide requires care providers to conduct incident reviews of all allegations of sexual abuse and sexual harassment that occur in ORR care and custody. *See* Fact Response ¶ 7. | |
| 12. ORR does not maintain custody post-release, is not funded by Congress to do so, and has neither the ability nor the responsibility to formally track incidents of abuse or neglect by sponsors to whom UACs are released. | **Partially Disputed.** Plaintiffs dispute this statement to the extent that it implies ORR keeps no record or conducts no follow-up with sponsors and children. While Plaintiffs do not dispute that ORR no longer has custody over children following their release from ORR detention, ORR's own policy guide details several post-release services |

9

Defendants' Reply in Support of Defendants' Statement of Uncontroverted Facts

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| Sualog Dep. 198:9-199:24; 223:14-19; Dr. Earner Dep. 237:6-11; Antkowiak Decl. ¶ 50. | provided to sponsors and children, many of which are designed to curtail or uncover abuse and neglect. *See* Office of Refugee Resettlement, *Guide to Children Entering the United States Unaccompanied: Section 6*, §§ 6.1–6.2 (last reviewed Sept. 5, 2018), https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-6. Indeed, ORR conducts post-release services through a network of post- release service providers that it funds specifically to have the "ability" to address instances of abuse and neglect. *See id.* § 6.2. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs do not dispute that ORR does not maintain post-custody release over UACs. *See* Fact Response ¶ 100; *see also* Pls.' Opp. 45.

| | |
|---|---|
| 13. It is ORR's practice that federal field specialists (FFS) approve UAC transfer and release decisions; oversee care providers to ensure all services are properly provided and implemented; serve as a local liaison to community stakeholders (including other federal agencies, local legal service providers, communities, child advocates, etc.); provide guidance, direction, and technical assistance to grantee care providers; make final decisions as to whether home studies are conducted and/or post-release services are provided; and coordinate all aspects of a child's case with care provider staff, case coordinators, and stakeholders.<br><br>Biswas Dep. 56:9-12, 65:23-66:9, 87:22-25, 121:2-7, 127:7-128:3, 209:17-21, 231:11-15; Biswas 30(b)(6) Dep. 205:13-15, 218:8-14, 404:6-13; Fink Dep. 23:9- | **<u>Partially Disputed.</u>** Plaintiffs do not dispute that FFS may approve UAC transfer and release decisions, serve as local liaison to a limited community of stakeholders, provide guidance to care providers, make final decisions as to whether home studies are conducted and/or post release services are provided, and coordinate aspects of a child's case with care provider staff and case coordinators. Plaintiffs dispute that Defendants' cited evidence establishes a practice that FFS "oversee care providers to ensure all services are properly provided and implemented." Ex. 165 [Treviño Dep. Tr.] at 366:18–367:2 (Treviño does not review or track if a child is receiving therapy and does not know if anyone at ORR is responsible for tracking whether children receive mental health services). Plaintiffs dispute that Defendants' cited evidence establishes a practice that FFS "serve as local liaison to a community of stakeholders" that includes |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| 14; Sualog Dep. 163:3-18; David Dep. 7:17-8:23; Cook Dep. 49:7-18; Biswas Decl. ¶ 70; ORR Juvenile Coord. Rep. at 4. | "federal agencies, local legal service providers, communities, child advocates" or that this occurs in practice. Ex. 24 [Heath Dep. Tr.] at 50:20–23, 86:13–15, 241:15–17; Ex. 25 [Husted Dep. Tr.] at 176:22–25; Ex. 35 [Smith Dep. Tr.] at 46:12–47:11; Ex. 29 [Nathan-Pineau Dep. Tr.] at 18:1–15. Plaintiffs dispute that Defendants' cited evidence establishes a practice that FFS "provide direction, and technical assistance to grantee care providers" because the cited evidence only addresses FFS decision-making authority and interactions with case managers and case coordinators. *See* Defendants' Uncontroverted Fact ("DUF") No. 13. Plaintiffs dispute that Defendants' evidence establishes a practice that FFS "coordinate all aspects of a child case with ... stakeholders" or that this occurs in practice. *See* Ex. 29 [Nathan-Pineau Dep. Tr.] at 18:1–15; Ex. 24 [Heath Dep. Tr.] at 50:20–23, 86:13–21. Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 2. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs do not dispute that FFS may approve UAC transfer and release decisions, serve as local liaisons to a limited community of stakeholders, provide guidance to care providers, make final decisions as to whether home studies are conducted and/or post release services are provided, and coordinate services and aspects of a child's case with care provider staff and case coordinators. Furthermore, the testimony of a single FFS who is unclear as to whether someone is "responsible for tracking whether or not children are receiving mental health services," Ex. 165 [Trevino Dep. Tr.] at 366:21-24, does not create a genuine dispute against overwhelming evidence that ORR's practice is that FFS: (1) oversee care providers, including ensuring all services – and not just mental health services – are properly provided and implemented; and (2) to provide technical assistance when needed. *See, e.g.*, DX-41 [De La Cruz LR Decl.] ¶¶ 4 ("I have held the position of Senior Federal Field Specialist Supervisor since 2013."), 5 ("Prior to assuming my current position, I held the position of FFS. In that capacity, I worked with care providers to ensure appropriate and

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| safe care for children, I responded to requests to assist care providers, [and] I provided training and technical assistance to colleagues and care providers."); DX-50 [Fink MAS Decl.] ¶ 5 ("My role as FFS required me to provide training and technical assistance to ORR care providers and colleagues."); DX-52 [Vergara GN Decl.] ¶ 5 ("Prior to assuming my current position, I held the position of Federal Field Specialist (FFS), and in that capacity…I also provided technical assistance on policy and procedure standards, consulted regularly with program clinicians and administrators providing care to children with complex medical and mental health needs, and debriefed with staff directly involved with these cases."). It is also ORR's practice for FFS to serve as local liaison to community stakeholders (including other federal agencies, local legal service providers, communities, child advocates, etc.). *See* Fact Response ¶¶ 238, 239, 244. | |
| 14. It is ORR's policy and practice that grantee care facilities employ case managers who are approved by ORR and are required to take 40-hours of annual training on all aspects of the UAC program.<br><br>ORR Guide §§ 2.3.2, 3.1, 4.5; ORR Juvenile Coord. Rep. at 4; Cooperative Agmt.; Biswas Decl. ¶¶ 14, 17. | **Partially Disputed.** Plaintiffs do not dispute that it is ORR's policy that grantee care facilities employ case managers and that its Cooperative Agreement with grantee facilities requires 40 hours of annual training. Plaintiffs dispute that Defendants' cited evidence establishes such a practice or that this occurs in practice. Moreover, neither policy nor practice supports Defendants' statement that all case managers must be approved by ORR. Ex. 189 [Cooperative Agreement] at 408 n.6 ("This position ***may*** require ORR approval if the Case Manager is conducting clinical assessments.") (emphasis added). Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 2. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs do not dispute that it is ORR's policy that grantee care facilities employ case managers and that ORR's Cooperative Agreements with grantee facilities require annual training. Furthermore, Plaintiffs cite no evidence that this does not occur in practice or that case managers are not approved by ORR as a matter of policy and practice. Indeed, per ORR Guide § 3.1, grantee care providers, including their employed case managers, must be approved in that they "must meet ORR requirements to ensure a high level of quality care." Further, it is ORR's practice that case managers are approved by ORR and required to fulfill annual training requirements. *See* DX-10 [Biswas Decl.] ¶¶ 14 (ORR's Division of Policy and Procedures develops training on matters of policy and for "step up in particular, the

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| Policy team ensures that personnel that are involved in step-up, including ORR care providers, case managers and clinicians, case coordinators, and ORR federal staff (specifically FFS and FFS Supervisors), are adequately trained."), 17 ("Case managers are governed by the cooperative agreement, are approved by ORR, and are considered grantee employees."); *see also* Fact Response ¶ 178. | |
| 15. It is ORR's practice that case managers coordinate the completion of UAC assessments, complete individual service plans, assess potential sponsors, communicate with potential sponsors, make transfer and release recommendations, and coordinate the release of children from ORR custody.<br><br>Biswas Dep. 253:12-254:4; Biswas 30(b)(6) Dep. 34:11-15, 128:11-18, 322:17; Contreras Dep. 58:7-20; David Dep. 53:25-54:3; Antkowiak Dep. 63:19-64:3; Eich Dep. 181:17-24; Vasquez Dep. 78:7-79:11, 79:22-80:3; Dr. Ryan Dep. 247:25-248:11; Antkowiak Decl. ¶ 56; Biswas Decl. ¶ 67; ORR Juvenile Coord. Rep. at 4. | <u>**Partially Disputed.**</u> Plaintiffs do not dispute that case managers "assess potential sponsors, communicate with potential sponsors," make "release recommendations, and coordinate the release of children from ORR custody." Plaintiffs dispute that Defendants' cited evidence establishes that case managers in practice "coordinate the completion of UAC assessments" or "complete individual services plans"; Defendants cited evidence describes other aspects of case managers' roles. *See* DX-15 [Biswas Dep. Tr.] at 253:12–254:4; DX-02 [Biswas 30(b)(6) Dep. Tr.] at 34:11–15, 128:11–18, 322:8–17; DX-22 [Contreras Dep. Tr.] at 58:7–20; DX-20 [David Dep. Tr.] 53:25–54:3; DX-01 [Antkowiak Dep. Tr.] at 63:19– 64:3; DX-23 [Eich Dep. Tr.] at 181:17–24; DX-24 [Vasquez Dep. Tr.] at 78:7–79:11, 79:22–80:3; DX-08 [Dr. Ryan Dep. Tr.] at 247:25–248:11; DX-09 [Antkowiak Decl.] ¶ 56; DX-10 [Biswas Decl.] ¶ 67; DX-11 [ORR Juvenile Coord. Rep.] at 4. Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 2. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs do not dispute that case managers assess and communicate with potential sponsors, make release recommendations, and coordinate the release of children from ORR custody. Plaintiffs cite no evidence in support of their assertion that case managers do not, in practice "coordinate the completion of UAC assessments" or "complete individual service plans." *See* Fact Response ¶¶ 38, 245. | |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| 16. It is ORR's practice that the case coordinator, a third party contractor, integrates all areas of assessment from the case manager, child advocates, where applicable, and other stakeholders into a release plan that provides for the child's physical and mental well-being.<br><br>Biswas Dep. 53:11-20; Biswas 30(b)(6) Dep. 118:12-24, 403:18-22; Murray Dep. 63:7-11, 124:6-12, 135:20-136:13, 212:19-213:18; *see also* GDIT Contract. | **Disputed.** In practice, case coordinators rarely speak to key stakeholders such as sponsors, children, or their legal representatives. *See* Ex. 35 [Smith Dep. Tr.] at 80:15–22 (case managers rely on information in portal); Ex. 24 [Heath Dep. Tr.] at 81:23–82:25 (same); Ex. 28 [Murray Dep. Tr.] at 104:14–25, 124:1–20; Ex. 30 [Ortiz Dep. Tr.] at 32:11–22; Ex. 29 [Nathan-Pineau Dep. Tr.] at 22:16– 23:9. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as, for the reasons stated in Fact Response ¶¶ 165, 234, 252, 260, Plaintiffs' cited evidence does not establish that in practice, case coordinators rarely speak to key stakeholders such as sponsors, children, or their legal representatives.

| | |
|---|---|
| 17. It is ORR's policy and practice that the UAC's views of the sponsor are taken into consideration when assessing a potential sponsor.<br><br>*Flores* Settlement ¶ 17; Biswas Dep. 98:5-12, 140:14-141:11, 142:12-19; Padilla Dep. 76:24-77:5; Heath Dep. 241:18-242:5; Biswas Decl. ¶ 80. | **Partially Disputed.** Plaintiffs do not dispute that ORR's written policies provide that "ORR considers" "[t]he child's or youth's views on the release and whether he or she wants to be released to the individual" "when evaluating family members and other potential sponsors . . ." Ex. 1 [ORR Policy Guide] § 2.4.1 at 41. Plaintiffs dispute that Defendants' cited evidence establishes such a practice or that this occurs in practice. In practice, there is no way to know what information is considered in sponsor suitability determinations as that information is not made available to children, their sponsors, or their attorneys. *See* Joint Stipulation Regarding Motion and Cross-Motion for Partial Summary Judgment ("Joint Stip.") ECF No. 262 ¶ 17; Ex. 5 [RFA 1st Set] No. 5 at 470–71; Ex. 1 [ORR Policy Guide] §§ 2.7.7, 2.7.8 at 49–50. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs do not dispute that ORR's written policies provide that ORR takes into

14

Defendants' Reply in Support of Defendants' Statement of Uncontroverted Facts

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| consideration the UAC's views of the sponsor when assessing a potential sponsor.  In practice, the UAC's views of the sponsor are taken into consideration when assessing a potential sponsor and Plaintiffs cite no contrary evidence, arguing simply that "there is no way to know what information is considered."  *See, e.g.*, DX-41 [De La Cruz LR Decl.] ¶ 46 ("Shiloh continuously worked to reunify Lucas R. with a sponsor.  When he first arrived at Shiloh, Shiloh discussed reunification with Madelyn."); DX-83 at 15 ("Case manager explained to minor that if his sister wanted to sponsor him she would have to go through the appeal process…Minor appeared to be upset."); DX-93 at 3 ("Minor is seeking to be reunified with his sister…"); DX-52 [Vergara GN Decl.] ¶ 90 (Gabriela N. and her case manager had "regular meetings…to discuss the progress of her reunification cases and the concerns regarding her grandfather's potential sponsorship of her); DX-47 [Vergara DMT Decl.] ¶ 92 (reflecting that minor expressed gratitude to the case manager for working on her case and helping her to reunify with her sister). | |
| 18. It is ORR's practice that case managers provide weekly summaries to UACs on the child's case and provision of services.<br><br>Biswas Dep. 98:13-99:7; Husted Dep. 71:1-3; Dr. Earner Dep. 203:9-19; Sualog Dep. 105:19-106:7; Antkowiak Decl. ¶ 61. | **Disputed.** Plaintiffs dispute that Defendants' cited evidence establishes such a practice. Case managers have, at times, failed to provide weekly summaries to UACs on the child's case and provision of services. *See* Ex. 66 ¶ 10 at 1452 ("Any time that I have talked to a staff member about being stepped down, I have initiated the conversation. I have to find my counselor or case manager and ask them what is going on with my case and when I can be stepped down."); *see also* Ex. 183 [B.D.A.C. Decl.] ¶ 7 at 351 ("No one has provided me with updates on the reunification process."). Plaintiffs further dispute this fact to the extent Defendants seek to imply youth understand the status of their cases based on these purported "weekly summaries." *See* Ex. 64 ¶ 10 at 1441 ("My case manager has told me some details about the process, but I don't really understand what needs to happen."); Ex. 65 ¶ 14 at 1447 ("My case manager has talked to me about foster care placement, but I don't know how long it will take for me to be released."). Plaintiffs further dispute that |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 26. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact for the reasons stated in Fact Response ¶¶ 71, 73, 94. Indeed, contrary to Plaintiffs' assertions that B.D.A.C. was not "provided with updates on the reunification process," case files indicate that B.D.A.C. was provided numerous updates on the reunification process. *See* DX-93 at 10, 11-16, 17; *see also* DX-93 at 18 (H.A.R.M.'s case manager noted, "Minor reported having plans to live with an uncle, however, sponsorship was denied due to sponsor's lack of pro-activeness for submitting FRP with supporting documents as well as lack of communication with CM and Minor. As a result, the minor is currently pursuing LTFC at this time."); DX-93 at 24-29 (J.S.C.M. regularly reviewed his placement and his progress towards his mental health treatment goals at MercyFirst RTC in treatment team meetings, and signed acknowledgement of his Notice of Placement on 9-4, 9-21, and 10-31-18); DX-52 [Vergara DMT Decl.] ¶¶ 34 (case notes show case manager, lead clinician, and assigned clinician met with Daniela Marisol T. to notify her and explain the reasons for transfer), 41 (at Shiloh Daniela Marisol T. met with her Case Manager on a weekly basis), 47 (her placement was sometimes reviewed weekly), 54 (Daniela Marisol T. met with her case manager on at least a weekly basis). To the extent Plaintiffs allege that UACs are not able to "understand the status of their cases," child advocates may be available to, among other things, help children with decisionmaking and understanding legal issues and to advocate for a child's best interest in certain cases. *See* Fact Response ¶ 95.

| | |
|---|---|
| 19. It is ORR's policy and practice that potential sponsors must verify the identity of all adults residing with the sponsor and all adult caregivers identified in a sponsor care plan.<br><br>ORR Guide § 2.2.4; Biswas Dep. 129:3-12; Biswas 30(b)(6) Dep. 212:8-15, 361:11-17; ORR Juvenile Coord. Rep. at 3. | **Undisputed** for purposes of this motion except to the extent Defendants rely on inadmissible evidence. *See* Evidentiary Objections ¶ 2. |
| 20. It is ORR's practice that ORR immediately begins the process of finding family members and others who may be qualified to care for the UAC when the child enters ORR's care. | **Undisputed** for purposes of this motion except to the extent Defendants rely on inadmissible evidence. *See* Evidentiary Objections ¶ 2. |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| Meyerstein Dep. 106:25-107:2; Biswas Dep. 112:17-113:14; Biswas 30(b)(6) Dep. 122:6-10; Biswas Decl. ¶ 66; ORR Juvenile Coord. Rep. at 2. | |
| 21. It is ORR's practice that if there are multiple potential sponsors, the ORR grantee care provider will evaluate all potential sponsors concurrently.<br><br>Biswas 30(b)(6) Dep. 415:14-17, 415:22-416:19; Husted Dep. 147:15-25, 148:1-2; ORR Juvenile Coord. Rep. at 2. | **Undisputed** for purposes of this motion except to the extent Defendants rely on inadmissible evidence. *See* Evidentiary Objections ¶ 2. |
| 22. It is ORR's practice that within 24 hours of identifying a potential sponsor, the case manager is required to explain to the potential sponsor the requirements of the sponsorship process, and the case manager must remain in regular and frequent contact with the potential sponsor.<br><br>Biswas Dep. 253:12-254:4; Biswas 30(b)(6) Dep. 231:20-232:18, 234:4-15; Contreras Dep. 59:25-60:7; Eich Dep. 146:3-147:19; Padilla Dep. 246:19-247:10; Antkowiak Decl. ¶ 55; Biswas Decl. ¶ 82; ORR Juvenile Coord. Rep. at 2. | **Disputed.** Case managers do not always remain in regular and frequent contact with potential sponsors given that case managers can choose to cease contact with a potential sponsor without formally denying the sponsor. Ex. 162 [Murray Dep. Tr.] at 264:14– 265:24 (case manager can discontinue working with potential sponsor without a denial); Ex. 150 [Biswas 30(b)(6) Dep. Tr.] at 428:20– 25 (there is no policy guidance provided to case managers as to how many attempts they must make to communicate with a proposed sponsor before determining the sponsor is not viable). Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 2. |

**Defendants' Response:** Plaintiffs' cited evidence does not create a genuine issue of material fact with respect to whether case managers always remain in regular and frequent contact with potential sponsors. Indeed, Plaintiffs' cited evidence does not reflect that "case managers can choose to cease contact with a potential sponsor without formally denying the sponsor." Rather, Plaintiffs' cited evidence reflects only that a prior placement "discontinued working" with a potential sponsor after determining that the individual was not a viable sponsor, Ex. 162 [Murray Dep. Tr.] at 264:14-265:2 (indicating that previous shelter "discontinued working" with UAC's maternal grandfather after determining that he was not a viable sponsor), and that a case manager can stop communicating with a potential sponsor

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| should the potential sponsor decline to pursue the required paperwork, Ex. 150 [Biswas 30(b)(6) Dep. Tr.] at 428:12-19 ("A: I'm sure a case manager would talk to their case coordinator and be like 'this aunt is not pursuing the paperwork, I'm going to go ahead and replace the first cousin as the sponsor in the system.' Q: Okay, and, and issue this pro forma denial? A: Right."). | |
| 23.It is ORR's policy and practice that within 1 calendar day of a sponsor's completion of the FRP documentation, the case manager is required to submit a release recommendation.<br><br>ORR Guide § 2.7; ORR MAP § 2.7; Biswas 30(b)(6) Dep. 231:20-232:18, 234:8-15; Antkowiak Decl. ¶ 58; Biswas Decl. ¶ 69. | **<u>Partially Disputed.</u>** Plaintiffs do not dispute that ORR's policy provides that "[w]ithin 1 calendar day of the completion of the FRP documentation, the Case Manager uses the *Release Request Completion Guidance* to complete the requester information, sponsor information, and Case Manager recommendation in the *Release Request*." Ex. 3 [ORR MAP] at 199. Plaintiffs dispute that this "Release Request" must include a recommendation regarding release; the case manager can instead use the Release Request to recommend that a home study be completed prior to a release decision. *See* Ex. 3 [ORR MAP] § 2.4.2 at 172–177; Ex. 160 [Lawrence Dep. Tr.] at 105:16–22; Ex. 167 [Vasquez Dep. Tr.] at 220:21–221:9. Plaintiffs further dispute that the cited evidence establishes ORR's practice generally. *See* Ex. 167 [Vasquez Dep. Tr.] at 220:21–221:25 (no deadline to determine what type of release request to make). Children at Shiloh RTC, for example, require a psychiatrist's approval for release even if their family reunification packet is complete. *See* Ex. 163 [Ruiz Dep. Tr] at 281:11– 282:8 (no child has been released without his recommendation); Ex. 168 [Vergara Dep. Tr.] at 176:18–177:2 ("[W]e make a release decision once the child is no longer a danger to themselves or others"); Ex. 162 [Murray Dep. Tr.] at 199:4–25; Ex. 160 [Lawrence Dep. Tr.] at 148:21– 149:6 ("[W]e do always take |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | Dr. Ruiz's recommendation to then be able to give our recommendation"), 243:15–245:11 (child at Shiloh is pending psych evaluation and no estimated time for completion). |

**Defendants' Response:** Plaintiffs' cited evidence does not create a genuine dispute of material fact as Plaintiffs do not dispute that ORR's policy is that within 1 calendar day of a sponsor's completion of the FRP documentation, the case manager is required to submit a release recommendation. That case managers may recommend a "home study release" instead of a "straight release" only underscores the efforts ORR takes to ensure the safety and well-being of UACs in its custody. *See, e.g.*, Ex. 167 [Vasquez Dep. Tr.] at 220:25-221:2 ("A: There can be a straight release, release with a safety plan, release with PRS, a home study release, or a denial."); DX-30 [Dr. Ryan Expert Rep.] ¶¶ 48, 55 ("[T]he home study process [is] evidence that ORR seriously considers potential sponsors and the best interest of the child prior to discharge...."). Furthermore, ORR has no written standards that preclude a child from release without a psychiatrist's approval. *See* Fact Response ¶¶ 53, 54.

| 24. It is ORR's policy and practice that the release process is collaborative in nature and necessitates coordination between care provider staff, nongovernmental third-party reviewers (case coordinators), ORR staff, other federal agencies, legal service providers, stakeholders, and child advocates, where applicable.<br><br>ORR Guide § 2.3; Biswas Dep. 16:12-23, 56:16-19, 253:12- 254:3; Antkowiak Dep. 225:4-13; Sualog Dep. 154:1-8; Trevino Dep. 382:6-383:17; Murray Dep. 240:21-241:16; Contreras Dep. 29:18-23, 62:5-63:4, 177:1-178:14; Eich Dep. 41:2-23; Heath Dep. 169:13-170:4; Fields Dep. 198:16-25; Smith Dep. 206:17-208:1; Nathan-Pineau Dep. 66:10-68:1, 79:13-25, 80:1-6; Dr. Earner Dep. 146:23-147:13, 192:4-12, 237:1-22; Dr. Mohn Dep. 126:2-18, 188:18-189:8; Biswas Decl. ¶ 70; ORR Juvenile Coord. Rep. at 3. | **Disputed.** Plaintiffs dispute that "the release process is collaborate in nature." ORR's written policies do not require that ORR give children an opportunity to offer input designed to rebut a conclusion that a proposed custodian's release request should be denied. Ex. 1 [ORR Policy Guide] § 2.7 at 47–48; Ex. 3 [ORR MAP] § 2.7.4 at 48–49. ORR's written policies do not provide all proposed custodians an opportunity to inspect or rebut the evidence it relies on to declare them unfit. Ex. 1 [ORR Policy Guide] § 2.7.7 at 49–50; Ex. 3 [ORR MAP] § 2.7.7 at 209–11 (comparing denial notification requirements between different categories of sponsors). FFS can and have overruled positive release recommendations from case managers and case coordinators. *See, e.g.,* Ex. 116 [Release Request] at 1896. Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 2. |

Defendants' Reply in Support of Defendants' Statement of Uncontroverted Facts

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| **Defendants' Response:** Plaintiffs' cited evidence does not create a genuine dispute of material fact as Plaintiffs cite to no contrary evidence regarding the collaborative nature of ORR's release process.  First, Plaintiffs allege that "ORR's written policies do not require that ORR give children an opportunity to offer input" regarding a proposed custodian's release.  But case managers are required to "maintain[] direct contact with each UAC in care and **meets at least once a week** with each UAC to discuss reunification options."  Ex. 4 [ORR MAP] § 3.3.1 at 301 (emphasis in original).  Furthermore, the absence of "written policies" providing all potential sponsors with the opportunity to inspect or rebut the evidence ORR relies on in making placement decisions does not alter the collaborative nature of ORR's release process.  *See* Fact Response ¶¶ 38, 75.  Finally, Plaintiffs' cited example of an instance where "FFS can and have overruled positive release recommendations" fails to note that the FFS requested a home study addendum "before making a release decision" after the UAC reported, and sponsor confirmed, "that [UAC's] older brother was released from jail and since last week he is residing at [the minor's] proposed sponsor's home."  Ex. 116 at 1896. | |
| 25. In the release process, case managers and FFS can consult with FFS Supervisors, members of ORR's Division of Policy and Procedure, and the Deputy Director of ORR.<br><br>De La Cruz Dep. 61:8-63:18, 232:15-233:1; Vergara Dep. 26:7-19; Fink Dep. 23:15-21; Biswas Decl. ¶ 16. | <u>**Partially Disputed.**</u> Plaintiffs do not dispute that "FFS can consult with FFS Supervisors" and "members of ORR's Division of Policy and Procedure." Plaintiffs dispute that the cited evidence establishes that case managers can consult with the Deputy Director of ORR. *See* DX-16 [De La Cruz Dep. Tr.] at 61:8–63:18, 232:15–233:1; DX-05 [Vergara Dep. Tr.] at 26:7–19; DX-19 [Fink Dep. Tr.] at 23:15–21; DX-10 [Biswas Decl.] ¶ 16. |
| **Defendants' Response:** Plaintiffs' cited evidence does not create a genuine dispute of material fact as Plaintiffs do not dispute that FFS can consult with FFS Supervisors and members of ORR's Division of Policy and Procedure.  Moreover, Plaintiffs cite no evidence indicating that case managers cannot consult with the Deputy Director of ORR.  *See* Fact Response ¶ 174. | |
| 26. In the release process, FFS Supervisors monitor the cases of the FFS whom they supervise and assist them on tasks that require additional supervision and oversight.<br><br>De La Cruz Dep. 26:9-27:5, 61:8 -63:18; Antkowiak Dep. 225:4-13; Vergara Dep. | <u>**Disputed.**</u> Plaintiffs dispute that FFS Supervisors monitor every case for every FFS whom they supervise, and in practice, only assist on tasks that require additional supervision or oversight, given that FFS have discretion to elevate issues to their supervisors in some circumstances. *See* Ex. 168 [Vergara Dep. Tr.] at 28:3–24. |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| 26:7-19, 260:20-261:12; Trevino Dep. 114:13-17; Heath Dep. 20:12-23. | |

**Defendants' Response:** Plaintiffs' cited evidence does not create a genuine dispute of material fact with respect to FFS Supervisors monitoring the cases of the FFS whom they supervise and assisting them on tasks that require additional supervision and oversight. Indeed, the job duties of an FFS Supervisor include "supervision of the FFS Team," DX-41 [De La Cruz Decl.] ¶ 4, and FFS's do not have "discretion to elevate issues to their supervisors," Ex. 168 [Vergara Dep. Tr.] at 28:6-8 ("Q: Does ORR require FFS to elevate certain types of cases to FFS supervisors? A: Yes, yes.").

| 27. It is ORR's practice that the case manager provides weekly status updates to the case coordinator and FFS on the UAC's release status.<br><br>ORR Juvenile Coord. Rep. at 3; Antkowiak Dep. 225:4-13; Biswas 30(b)(6) Dep. 239:17-24; Dr. Ryan Dep. 250:10-251:2; Biswas Decl. ¶¶ 18, 83. | **<u>Undisputed</u>** for purposes of this motion except to the extent Defendants rely on inadmissible evidence. *See* Evidentiary Objections ¶ 2. |
| 28. It is ORR's practice that in the sponsor assessment and release process, case managers communicate with potential sponsors, gather information and documentation, and assess sponsors to formulate a recommendation to the case coordinator and the FFS.<br><br>Biswas Dep. 253:12-254:4, 262:5-9; Biswas 30(b)(6) Dep. 122:11-17, 129:22-25; David Dep. 51:24-52:15, 60:8-19; Dr. Mohn Dep. 160:1-4; Antkowiak Dep. 63:19-64:3; Biswas Decl. ¶¶ 18, 67; ORR Juvenile Coord. Rep. at 3. | **<u>Disputed.</u>** Plaintiffs dispute that the cited evidence establishes ORR's practice generally. In practice, case managers have unilateral authority to declare a potential sponsor "non-viable," which ends the vetting process. *See e.g.*, Ex. 30 [Ortiz Dep. Tr.] at 110:24–113:2; Ex. 162 [Murray Dep. Tr.] at 264:14– 265:24; Ex. 150 [Biswas 30(b)(6) Dep. Tr.] at 428:20–25. In other words, a sponsor can be effectively denied without any involvement by the case coordinator or FFS. Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 2. |

**Defendants' Response:** Plaintiffs' cited evidence does not create a genuine dispute of material fact as Plaintiffs offer no evidence disproving that in the sponsor assessment and release process, case managers communicate with potential sponsors, gather information and documentation, and assess sponsors to formulate a recommendation to the case coordinator and the FFS. Moreover, for the reasons stated in Fact Response ¶ 38, ORR's policy and

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| practice does not grant case managers "unilateral authority" to declare a potential sponsor non-viable. | |
| 29. It is ORR's policy and practice that in the sponsor assessment and release process, case coordinators are required to review assessment information on a UAC and the potential sponsor to make an independent recommendation concerning release.<br><br>ORR Guide §§ 2.3, 2.7; Biswas Dep. 16:12-23, 53:11-20, 57:5-58:21, 65:19-22, 107:10-108:14, 255:9-256:5; Sualog Dep. 163:3-18; Murray Dep. 31:19-23; Biswas Decl. ¶ 19. | **<u>Partially Disputed.</u>** Plaintiffs do not dispute that ORR's written policy provides that "Case Coordinators concurrently review all assessment information on an unaccompanied alien child and sponsor to also make a recommendation" and that "the Case Coordinator must make a recommendation to the ORR/FFS on the release of the unaccompanied alien child to a particular sponsor." Ex. 1 [ORR Policy Guide] §§ 2.3, 2.7 at 39, 47. Plaintiffs dispute that Defendants' cited evidence establishes that ORR's policy is always effectuated in practice; in practice, case managers have unilateral authority during the sponsor assessment process to declare a potential sponsor "non-viable," which ends the vetting process. *See, e.g.*, Ex. 30 [Ortiz Dep. Tr.] at 110:24–113:2; Ex. 162 [Murray Dep. Tr.] at 264:14–265:24; Ex. 150 [Biswas 30(b)(6) Dep. Tr.] at 428:20– 25. |
| **Defendants' Response:** Plaintiffs' cited evidence does not create a genuine dispute of material fact as Plaintiffs do not dispute that ORR's policy provides that case coordinators must concurrently review all assessment information on a UAC and the potential sponsor to make an independent release recommendation and because, for the reasons stated in Fact Response ¶ 38, ORR's policy and practice does not grant case managers "unilateral authority" to declare a potential sponsor non-viable. | |
| 30. ORR will reconsider release denials based upon changed circumstances or new information.<br><br>David Dep. 62:2-12; Sualog Dep. 184:5-186:5; Biswas Dep. 254:2- 255:8, 265:4-266:8; Husted Dep. 102:11-24; Vergara Dep. 168:13-22, 215:18-22, 218:1-20; | **<u>Partially Disputed.</u>** Plaintiffs do not dispute that ORR may occasionally reconsider release denials based upon changed circumstances or new information in specific situations. To the extent this fact implies that this is ORR's practice, Plaintiffs dispute that ORR routinely or regularly "reconsider[s] release denials based upon changed circumstances or new information," especially in light of ORR's |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| Vasquez Dep. 210:6-211:4; Biswas Decl. ¶ 76. | policies which provide for appeals only by parents or legal guardians and do not require ORR to inform denied sponsors of the opportunity to present new information or evidence of changed circumstances. *See* DX-04 [Sualog Dep. Tr.] at 184:21–185:2 (Deputy Director noting no denial appeals in the last year and that appeals are a "rare occurrence"); Ex. 1 [ORR Policy Guide] § 2.7.8 at 50; Ex. 5 [RFA 1st Set] Nos. 6, 9 at 471– 74; *see also* ECF No. 37-13 [Madelyn R. Decl.] ¶ 13 at 251 (Class Representative Lucas R.'s sponsor was denied following a home study and told "nothing could be done, that the denial was a final decision."); Ex. 149 [Biswas Dep. Tr.] at 268:23– 269:10 (ORR does not alert denied sponsor of their ability to present evidence of changed circumstances). |

**Defendants' Response:** Plaintiffs' cited evidence does not create a genuine dispute of material fact as to whether ORR will reconsider release denials based upon changed circumstances or new information. *See* Joint Stip. ¶ 30 ("[I]f ORR discovers new information or becomes aware of a change in the circumstances of the parent/legal guardian and/or the unaccompanied alien child, ORR may assess the case anew."). Indeed, that no denial appeals occurred in the past year is not a reflection on ORR's practice, *see* DX-04 [Sualog Dep. Tr.] at 184:21-185:2, and case files reflect that Madelyn was expressly advised that she could go through an "appeals process" to pursue sponsorship of Lucas R.  *See* DX-41 [De La Cruz LR Decl.] ¶¶ 32 (FFS denied Madelyn's sponsor application, "not[ing] that the denial could be revisited once Lucas R. was stabilized and the concerns noted in the home study had been addressed.  The home study is valid for one year, so an addendum could be offered if Madelyn still seemed like a viable option once Lucas R. was stable."), 46 ("The Assessment of Lucas R. notes that Madelyn was told that if she was interested in sponsorship she would have to go through an 'appeals process to continue the case.'"); Fact Response ¶¶ 51, 87 (Madelyn was "provided information about why the home study worker had concerns about her ability to care for Lucas R., including her lack of commitment to obtaining mental health services for him upon release.").

| 31. Home studies can be mandated by the TVPRA or requested by a case manager | **Undisputed** for purposes of this motion. Plaintiffs also note that FFS make the final |

23

Defendants' Reply in Support of Defendants' Statement of Uncontroverted Facts

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| and recommended by a case coordinator on a case-by-case basis.<br><br>ORR Guide § 2.4.2; ORR MAP § 2.4.2; Biswas Decl. ¶¶ 72-74. | decision as to whether a discretionary home study will be required. Joint Stip. ¶ 11. |
| 32. ORR allows the UAC and a potential sponsor to review a negative home study recommendation.<br><br>David Dep. 100:1-101:7; Padilla Dep. 139:4-20; Husted Dep. 100:14-22; Contreras Dep. 169:6-25; Eich Dep. 196:6-197:1; Vasquez Dep. 207:13-23; Biswas Decl. ¶ 75. | **Disputed.** Defendants' cited evidence does not support this statement. Moreover, following a home study of Madelyn R., Class Representative Lucas R.'s proposed sponsor, Madelyn R. was never provided a written explanation of the reasons she was denied custody of Lucas R. ECF No. 37-13 [Madelyn R. Decl.] ¶ 13 at 251; Ex. 81 [Lucas R. Decl.] ¶ 9 at 1521 ("I'm not exactly sure why the home study was negative."). |

**Defendants' Response:** Contrary to Plaintiffs' assertion, Defendants' cited evidence demonstrates that ORR's practice is to permit the UAC and potential Category 1 sponsors to review a negative home study determination. *See, e.g.*, DX-20 [David Dep.] 100:1-7 ("Q: So are the sponsors allowed to view the home study reports? A: Yes.  Q: Who informs the sponsors of their ability to view the home study reports?  A: In our guidance it states that if it's denied, then the sponsor can view it."); DX-12 [Husted Dep.] 100:14-22 ("Q: When a home study comes back negative, is that information shared with the proposed custodian?  A: If it's a denial, it is shared.  If there are issues that the proposed sponsor can mitigate that the home study – the reason for the denial, then yes, the case manager will speak to them about what we can mitigate from that.  So a negative home study would not necessarily mean a denial."); DX-22 [Contreras Dep.] 169:6-14 ("Q: If a home study evaluator provides a negative recommendation, is the sponsor notified of the recommendation before ORR denies the sponsor? A: The sponsor is notified of the negative home study when the report is received. Q: Okay.  And is the sponsor given an opportunity to address any issues identified in that report? A: Yes."); DX-24 [Vasquez Dep.] 209:10-15 (following a negative home study, "[t]he Case Manager works with the sponsor in order to find ways to correct whatever qualifications may have been recommended in the home study.").  Non-Category 1 sponsors are given a verbal reason for the denial, and, as discussed *supra*, Fact Reply ¶ 17, Lucas R. was informed of the reasons Madelyn's sponsorship was denied and Madelyn was "provided information about why the home study worker had concerns about her ability to care for Lucas R."  Fact Response ¶ 87.

| 33. ORR allows a sponsor to provide additional information in support of | **Disputed.** |
|---|---|

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| sponsorship after a negative home study recommendation and/or before ORR renders a release decision.<br><br>David Dep. 101:8-102:2; Padilla Dep. 143:12-144:11, 246:19-247:10; Husted Dep. 100:14-22; Vergara Dep. 167:12-169:22, 171:1-11, 215:18-22; Sualog Dep. 185:3-186:5; Trevino Dep. 217:8-12, 219:2-22; Murray Dep. 241:17-242:2; Contreras Dep. 169:6-25; Eich Dep. 196:6-197:1; Vasquez Dep. 209:2-15; Biswas Decl. ¶ 76. | Madelyn R., Class Representative Lucas R.'s proposed sponsor, was denied after a negative home study. ECF No. 37-13 [Madelyn R. Decl.] ¶ 13 at 251. She was told "nothing could be done, that the denial was a final decision." *Id.*; *see also* Ex. 193 at 473 (denying Isaac N., Gabriela N.'s proposed sponsor, and discontinuing his application when documentation not provided quickly enough). |

**Defendants' Response:** Plaintiffs' cited evidence does not create a genuine dispute of material fact where, as here, the denial of Madelyn's sponsor application was accompanied by a note that the "denial could be revisited once Lucas R. was stabilized and the concerns noted in the home study had been addressed. Ex. 41 [De La Cruz LR Decl.] ¶ 32; Fact Response ¶ 87. And, as discussed *supra*, Fact Reply ¶¶ 17, 30, and 32, Madelyn was "provided information about why the home study worker had concerns about her ability to care for Lucas R.," and "was told that if she was interested in sponsorship she would have to go through an 'appeals process to continue the case.'" *See also* Fact Response ¶ 87.

Nor does the evidence establish, as Plaintiffs assert, that Isaac N., Gabriela N.'s grandfather and proposed sponsor, was denied sponsorship "when documentation not provided quickly enough." *See* DX-93 at 4 ("Minor does not have a viable sponsor…Sponsor/maternal grandfather has been discontinued due to kidnap charges and 2 years of prison time in HC and El Salvador after CM and CC recommendation.  Sponsor ***and minor's grandfather*** and mother have been informed as well as minor, they agree minor will seek LTFC.") (emphasis added); *see also* Ex. 52 [Vergara GN Decl.] ¶¶ 86-88 (discussing negative home study of Gabriela's grandfather), 88 ("Overall, the sponsor's lack of comprehension and skills, paired with the minor's high and specific needs, made it clear that he is not an appropriate sponsor for this particular UC.").

| 34. Delays in the release process are most often attributable to the UAC's lack of an available sponsor, or the potential sponsor being unresponsive and/or failing to provide the required documentation. | **Disputed.** Plaintiffs dispute that such delays are "most often attributable" to Defendants' cited reasons. ORR's policy of requiring all household members and adults identified in a sponsor care plan to submit fingerprints in every case involving a home study also |

Defendants' Reply in Support of Defendants' Statement of Uncontroverted Facts

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| Padilla Dep. 117:2-5, 247:16-25;  Fields Dep. 73:20-74:8; Heath Dep. 238:25-239:15; Dr. Ryan Expert Rep. ¶ 48; Dr. Mohn Expert Rep. ¶ 45; Biswas Decl. ¶ 68. | causes "significant[] delay[]" in releasing children to available custodians. Ex. 20 [Eich Dep. Tr.] at 46:22–48:13, 184:11–185:8 (it could take "[p]otentially five weeks" to receive fingerprint results); Ex. 1 [ORR Policy § 2.5.1] at 44–45; Ex. 151 [Castaneda Dep. Tr.] at 166:18–23. Children also have remained in custody longer than necessary because case managers have failed to timely request home studies. Ex. 162 [Murray Dep. Tr.] at 223:23–224:10 (case managers sometimes take longer than necessary to request home study); Ex. 156 [Fields Dep. Tr.] at 215:7–216:3 (some programs are proactive in determining that child will require home study, others may stagger); Ex. 24 [Heath Dep. Tr.] at 247:9–20 (home study effect on length of stay depends on how quickly case is identified as needing a home study).  ORR also delays releasing children detained at Shenandoah Valley Juvenile Center to available custodians until they have had a psychological evaluation, which takes at least 30 days to complete. Ex. 17 [Cook Dep. Tr.] at 209:5–211:23; Ex. 152 [Contreras Dep. Tr.] at 174:20– 175:23. ORR has also delayed the release of children in other facilities pending the results of a psychological evaluation. Ex. 158 [Heath Dep. Tr.] at 256:12–18; Ex. 161 [Meyerstein Dep. Tr.] at 285:8–21 (psych eval can delay reunification as attempt to determine whether child has a disability); Ex. 160 [Lawrence Dep. Tr.] at 243:15–245:11 (child at Shiloh is pending psych evaluation and no estimated time for completion). Case Managers also have at times unnecessarily delayed issuing recommendations regarding children's release |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | to available custodians. Ex. 25 [Husted Dep. Tr.] at 43:19–46:2. ORR has delayed releasing children to available and fit sponsors until they have shown good behavior for some amount of time.  Ex. 29 [Nathan-Pineau Dep. Tr.] at 55:17–56:24. |

**Defendants' Response:** Plaintiffs' cited evidence does not create a genuine dispute of material fact.  First, the fingerprint requirement itself is not what leads to release delays, but rather, the household member's unwillingness to submit to fingerprinting.  *See* Fact Response ¶ 48.  Furthermore, home studies are requested only when there is "a reasonable expectation that results of the home study process (*i.e.*, home visit, face-to-face interviews with the potential sponsor and household members) will provide additional information" and thus, home study concerns that arise later may prolong the release process.  *See* Fact Response ¶ 156.  And, as discussed *supra*, Fact Reply ¶ 23, ORR has no written standards that preclude a child from release without a psychiatrist's approval.  *See* Fact Response ¶¶ 53, 54.  Finally, Plaintiffs' assertion that case managers delay issuing release recommendations until UACs have shown "good behavior" for some amount of time is unsupported by the evidence.  *See* Fact Response ¶ 68.

| 35. Preparing for and appearing at additional administrative hearings would take ORR and grantee care provider staff away from their day-to-day responsibilities and delay their ability to pursue releases.<br><br>Dr. Earner Dep. 133:8-23; Dr. Ryan Dep. 277:14-25; Antkowiak Decl. ¶ 53. | **Disputed.** ORR denies that the principal reason it fails to provide adequate procedural protections is due to any greater expense or administrative inconvenience. Ex. 5 [RFA 1st Set] No. 73 at 496–97. Nor does Defendants' cited evidence support the proposition that the same ORR staff would necessarily be involved in the hearings Plaintiffs request through this action. Indeed, ORR now presents that it has set up a Placement Review Panel for step up as of March 2020. *See* DUF Nos. 67–74.  Defendants refer to the process as "administrative hearings" and have not alleged that this takes grantee care provider staff away from their day-to-day responsibilities. Plaintiffs also dispute this statement to the extent it implies additional administrative hearings would delay pursuit of release. Given that the purpose of a hearing would be to "pursue" release, the FFS and |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | staff attendance at the hearing would be time spent in "pursuit of release." Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 17. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs cite to no contrary evidence indicating that additional administrative hearings would not take ORR and grantee care provider staff away from their day-to-day responsibilities and delay their ability to pursue releases. *See* Fact Response ¶¶ 81, 225.

| Defendants' Uncontroverted Facts: Step-Up | |
|---|---|
| 36. It is ORR's policy and practice to place a UAC in the least restrictive setting that is in the best interest of the child based on consideration of child welfare factors set forth in ORR Guide § 1.2.1.<br><br>8 U.S.C. § 1232(c)(2)(A); ORR Guide § 1.2.1; Biswas Dep. 47:7-48:5; De La Cruz Dep. 158:2-9, 233:22-234:14; ORR Juvenile Coord. Rep. at 26, 27; Dr. Mohn Dep. 132:19-133:1; Antkowiak Decl. ¶¶ 7-8. | <u>**Partially Disputed.**</u> Plaintiffs do not dispute that the ORR Policy Guide and ORR MAP provide for the placement of a UAC in the least restrictive setting that is in the best interest of the child and consistent with placement considerations set forth in ORR Guide § 1.2.1. Plaintiffs dispute that the ORR Guide (or other cited evidence) establishes that the factors listed under ORR Policy Guide § 1.2.1 are "child welfare factors." 8 U.S.C. § 1232(c)(2)(A) (nothing in the TVPRA suggesting that the listed factors in ORR Policy Guide § 1.2.1 are child welfare factors); Ex. 1 [ORR Policy Guide] § 1.2.1 at 23 (nothing in ORR policy suggesting that the listed factors are child welfare factors); DX-15 [Biswas Dep. Tr.] at 47:7–48:5 (no testimony regarding these factors being child welfare factors); DX-16 [De La Cruz Dep. Tr.] at 158:2–9 (same), 233:22- 234:14 (same); DX-11 [ORR Juvenile Coord. Rep.] at 26–27 (discussing placement criteria but no indication that these placement considerations are child welfare factors); DX-07 [Mohn Dep. Tr.] at 132:19–133:1 (regarding care provider interviews that steps are taken to only step up when there are safety concerns); DX-09 [Antkowiak Decl.] ¶¶ 7–8 (referring to ORR |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | Policy Guide § 1.4.1 not 1.2.1). Plaintiffs also dispute that Defendants' cited evidence establishes a "practice" of placing UACs in the least restrictive setting that is in the best interest of the child. In practice, ORR has erroneously stepped up children to restrictive placements and erroneously refused children step-down from restrictive placements. ECF No. 144 [Answer] ¶ 75; Ex. 33 [Ray Dep. Tr.] at 148:16–22, 152:14–153:22, 157:10–158:17, 162:7–10, 163:14–164:12, 166:23–167:7, 170:19–23; Ex. 43 [Ray Dep. Ex. 117] at 1261–62; Ex. 139 [Ray Dep. Ex. 118] at 2028; Ex. 44 [Ray Dep. Ex. 119] at 1264; Ex. 16 [Contreras Dep. Tr.] at 71:3–12, 75:11–76:1, 76:18–77:3, 77:5–78:1, 80:2–17, 105:5–106:22, 113:12– 114:17, 151:17–152:8, 155:1–5; Ex. 22 [Fields Dep. Tr.] at 123:5–16, 148:8–23, 172:7–15; Ex. 23 [Fink Dep. Tr.] at 40:13–17, 153:8–13; Ex. 24 [Heath Dep. Tr.] at 98:5–16, 99:3– 7, 212:16–23; Ex. 14 [Castaneda Dep. Tr.] at 74:13-76:7; Ex. 151 [Castaneda Dep. Tr.] at 88:21–90:9; Ex. 20 [Eich Dep. Tr.] at 108:7– 109:5; Ex. 96 at 1757 ("some of the minors were inappropriately placed in secure"); Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 348:12–24, 393:1–7; Ex. 35 [Smith Dep. Tr.] at 82:20–83:5, 162:16–163:8; Ex. 18 [De La Cruz Dep. Tr.] at 162:3–16, 163:7–164:5; Ex. 17 [Cook Dep. Tr.] at 197:21–25; Ex. 28 [Murray Dep. Tr.] at 193:10– 17, 156:18–23, 158:6–21, 170:3–7, 184:20-189:4, 192:18–193:4; Ex. 47 [Murray Dep. Ex. 162] at 1278 ("I have several cases at yolo that are in need of RTC but our RTC keep rejecting them."); Ex. 168 [Vergara Dep. Tr.] at 129:15–130:17; Ex. 39 [Vergara Dep. Tr.] at 257:6–10; Ex. 182 |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | [Urquiza Expert Rep.] at 346. Unnecessarily stepping up children may be contrary to their best interest and detrimental to their long-term psychological well-being. Ex. 6 [RFA 2nd Set] Nos. 169–70 at 542–44.  Failing to step-down children who are ready for step-down can be detrimental to their long-term psychological well-being and is contrary to their best interest. *Id*., Nos. 172–73 at 544–46; Ex. 24 [Heath Dep. Tr.] at 215:7–10. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Defendants' child welfare experts unambiguously concluded that "ORR policies, procedures, and practices ensure that UACs are maintained safely in the least restrictive environment" and in "follow[ing] child welfare practices in assessment, placement and unification of UAC." DX-13 [Dr. Earner Expert Rep.] ¶¶ 4, 42, 47 ("This type of case management that is present at the ORR facilities is in keeping with the standards of excellence in domestic child welfare."), 47; *see also* DX-30 [Dr. Ryan Expert Rep.] ¶¶ 30 ("It is my opinion that when ORR places children in settings more restrictive than the shelter level, the ORR program does so appropriately."), 42 ("From [my] interviews [with clinical staff] and the from the policy protocols in place, I conclude that step-up decisions are only made after a comprehensive review of the case and with connection back to established procedural guidelines.").  And, for the reasons in Fact Response ¶¶ 218 and 219, Plaintiffs' citations fail to establish that Defendants, in practice, erroneously step up children to restrictive placements or that Defendants act contrary to UACs' best interest in unnecessarily stepping up children or failing to step down children who are ready for step down.  *See* Fact Response ¶¶ 218 (detailing extent to which Plaintiffs' citations to evidence omit relevant information or mischaracterize evidence), 219.  To the extent Plaintiffs imply that Defendants act contrary to UACs' best interests and detrimental to their long-term psychological well-being, these allegations are also without merit as demonstrated in Fact Response ¶¶ 116 and 138.

Nor do Plaintiffs' citations to the deposition testimony (and exhibits) of Faith Ray create a genuine dispute of material fact with respect to whether it is ORR's policy and practice to place a UAC in the least restrictive setting that is in the best interest of the child based on consideration of child welfare factors set forth in ORR Guide §1.2.1 as the deposition testimony (and exhibits) largely concern ORR's compliance reviews which began in November 2018, and since then have resulted in almost 100 percent compliance for secure placements.  *See* Fact Reply ¶¶ 41, 59.  To the extent Plaintiffs cite to an instance where "a

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| kid who was charged with a crime…[b]ut the charges were later dropped, and that was the basis for the child's placement in secure," it simply cannot be said that ORR has a practice of not placing children in the least restrictive setting that is in the best interest of the child as that "happened, obviously, outside of ORR custody." Ex. 33 [Ray Dep. Tr.] at 148:16-22. | |
| 37. Staff-secure facilities are for children who require close supervision but do not require placement in a secure facility.<br><br>ORR Guide § 1.2.4; ORR Guide to Terms; ORR Juvenile Coord. Rep. at 26-27; Biswas 30(b)(6) Dep. 12:16-22; Antkowiak Decl. ¶ 12; Biswas Decl. ¶ 30 | **Partially Disputed.** Plaintiffs do not dispute that ORR Policy provides "A staff secure facility is…for UAC who require close supervision, but do not require placement in a secure care provider facility." Ex 1 [ORR Policy Guide] § 1.2.4 at 24; *see also id.* at 21; DX- 11 [ORR Juvenile Coord. Rep.] at 26–27 (summarizing ORR policy). To the extent it is implied, Plaintiffs dispute that in practice ORR always places children in staff-secure facilities in compliance with its own policy criteria. *See* Ex. 23 [Fink Dep. Tr.] at 153:8–13; Ex. 20 [Eich Dep. Tr.] at 108:7–109:5. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as to whether staff-secure facilities are for children who require close supervision but do not require placement in a secure facility as Plaintiffs' cited evidence concerns "restrictive settings" generally, Ex. 23 [Fink Dep. Tr.] at 153:8-13, and a situation in which a UAC "went immediately to a Staff Secure facility, and then was stepped down to YouthCare," Ex. 20 [Eich Dep. Tr.] at 108:7-109:5. | |
| 38. It is ORR's policy and practice that staff-secure facilities provide a heightened level of staff supervision with a 1:4 caregiver to child ratio, increased communication, and services to control problem behavior and prevent escape.<br><br>ORR Guide § 1.2.4; Biswas 30(b)(6) Dep. 12:16-19, 28:17-22; De La Cruz Dep. 121:20-122:7, 217:2-7; Vergara Dep. 88:18-20, 89:8-23; Antkowiak Dep. 146:2-6, 157:1-5; ORR Juvenile Coord. Rep. at 26-27; Antkowiak Decl. ¶ 12. | **Partially Disputed.** Plaintiffs do not dispute that staff- secure facilities provide a heightened level of staff supervision and behavioral plans and that the environment and structure is guarded to prevent escape. Ex. 23 [Fink Dep. Tr.] at 53:24–54:17; Ex. 128 at 1957 (recommending gated staff-secure placement); Ex. 129 at 1960–61 (same); Ex. 130 at 1969 (same). Plaintiffs dispute that Defendants' cited evidence establishes that staff- secure facilities provide a caregiver to child ratio of 1:4, "increased communication, and services to control problem behavior and prevent escape." *See, e.g.,* Ex. 1 [ORR Guide] |

Defendants' Reply in Support of Defendants' Statement of Uncontroverted Facts

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | § 1.2.4 at 24–25 (Section 1.2.4 does not provide guidance on staff ratio, increased communication, services to control problem behavior or prevent escape, or how to address behavior or escape risk stemming from disruptive behavior, non-violent criminal history, or reported gang involvement); DX-02 [Biswas 30(b)(6) Dep. Tr.] at 12:16–19 (mentioning a higher staff-to-child ratio but not what that ratio is), 28:17–22 (same); DX-16 [De La Cruz Dep. Tr.] at 121:20–122:7 (focusing on staff-secures having "more structure" and staff being trained to focus on behavior management, but nothing else), 217:2–7 (regarding more staff supervision); DX-05 [Vergara Dep. 88:18–20, 89:8–23 (staff-secure facilities address behavioral issues and some kids with criminal backgrounds); DX-01 [Antkowiak Dep. Tr.] at 146:2–6 (staff secures have more staff and more supervision, but no reference to actual staff ratio), 157:1-5 (staff- secures have higher ratio but doesn't know the actual ratio); DX- 11 [ORR Juvenile Coord. Rep.] at 26–27 (same); DX-09 [Antkowiak Decl.] ¶ 12 (staff secures have higher ratio and provide behavioral plans); *see also* Ex. 157 [Fink Dep. Tr.] at 96:11–98:4 (behavioral management systems at staff secure facilities are not working). |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs do not dispute that staff-secure facilities provide a heightened level of staff supervision and behavior plans and service to control problem behavior and prevent escape. Plaintiffs' cited evidence does not establish that staff-secure facilities do not provide a caregiver to child ratio of 1:4. Indeed, ORR's cooperative agreements with staff-secure facilities plainly set forth the requirement for a specific enhanced caregiver to child ratio of 1:4 that Defendants' proffered evidence references more generally. *See, e.g.*, DX-96 at GOV-00126336 (staff-secure addendum to BCFS cooperative agreement with ORR); *see also*

Defendants' Reply in Support of Defendants' Statement of Uncontroverted Facts

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| ORR Standing Announcement for Residential (Staff Secure) Services for Unaccompanied Alien Children p. 6, *available at https://ami.grantsolutions.gov/files/HHS-2021-ACF-ORR-ZU-1786_0.pdf* ("ORR requires the following ratios: One on-duty staff for every four UAC during waking hours").  Plaintiffs' citation to testimony which does include discussion regarding "increased communication, and services to control problem behavior and prevent escape" does not establish the absence of such services.  Finally, Defendants dispute Plaintiffs' assertion that staff-secure facilities are, as a general practice, "guarded to prevent escape" as this not only misstates Defendants' statement of fact, but is also unsupported by, and in fact contrary to, Plaintiffs' cited evidence.  *See* Ex. 23 [Fink Dep. Tr.] at 54:15-19 (Children's Village is our "standard staff secure," and is an open campus and "doesn't have a fence around it."); DX-10 [Biswas Decl.] ¶ 30 ("Staff-secure facilities are licensed shelters with the same kind of state license as any shelter, and merely provide a heightened level of staff supervision, increased communication, and services to control problem behavior and prevent escape."); *see also* DX-09 [Antkowiak Decl.] ¶ 12 ("[A] staff secure setting is not viewed as significantly more restrictive than a non-secure setting… The only difference between a staff-secure and non-secure shelter is generally behavioral plans and that staff-secure care providers are required to maintain a higher ratio of staff to minors, as the children placed there require a greater level of supervision given past attempts to run away or past disruptive behavior."). | |
| 39. The staff-secure atmosphere reflects a shelter facility: they are not equipped internally with multiple locked pods or cell units, physical restraints, or employ other security devices typically found in secure settings.<br><br>ORR Juvenile Coord. Rep. at 27; ORR Guide to Terms; Cook Dep. 113:5-14; Dr. Ryan Dep. 260:19-261:16; Dr. Earner Dep. 93:1-12; Antkowiak Decl. ¶ 12. | **Partially Disputed.** Plaintiffs do not dispute that staff- secure facilities are not equipped internally with multiple locked pods or cell units. Plaintiffs dispute that staff-secure facilities do not use physical restraints or security measures like gates or fencing which are typically found in secure settings. Staff-secure facilities can be gated, enclosed, fenced facilities. Ex. 23 [Fink Dep. Tr.] at 53:24–54:17; Ex. 128 at 1957 (recommending gated staff-secure placement); Ex. 129 at 1960–61 (same); Ex. 130 at 1969 (same); Ex 180 [Quinn Expert Rep.] at 330–333. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Defendants' uncontroverted fact addressed the absence of *internal* restraints at staff-secure facilities – not *external* gates, fencing, or other enclosures as cited in Plaintiffs' response.  *See* Fact Response ¶ 208; Ex. 23 [Fink Dep. Tr.] at 54:15-19 (Children's Village is our "standard staff secure," and is an open campus and "doesn't have a fence around it."). | |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| 40. In almost all states, staff-secure facilities have the same state licensing requirements as shelters.<br><br>Biswas Dep. 234:24-25; Biswas 30(b)(6) Dep. 12:16-18, 28:17-22, 29:5-8; De La Cruz Dep. 136:4-8; Antkowiak Dep. 146:2-6; ORR Juvenile Coord. Rep. at 27; Antkowiak Decl. ¶ 12; Biswas Decl. ¶ 30. | **Partially Disputed.** Plaintiffs do not dispute that in almost all states, staff-secure facilities have the same state licensing requirements as shelters. Plaintiffs dispute this fact to the extent Defendants suggest the same state licensing requirements means the two different types of facilities are equally restrictive or have the same criteria for admission. Joint Stip. ¶ 53 ("Staff-secure facilities are more restrictive than shelters."); Ex. 1 [ORR Policy Guide] § 1.2.4 at 24 (one criteria for staff-secure placement is being unsuitable for shelter placement); Ex. 64 [H.A.R.M. Decl.] ¶¶ 2, 6–7 at 1440–41 (describing restrictions at Children's Village staff-secure); DX-02 [Biswas 30(b)(6) Dep. Tr.] at 12:16–19 ("We have what are known as staff secure facilities, which are essentially just licensed shelters. However, the ratio of staff is higher to maintain security and prevent escape."), 28:17–22 (same); Ex. 148 [Antkowiak Dep. Tr.] at 91:22–25 ("So most of our programs are shelters. So traditional shelter beds, nonsecure beds. We have staff secure beds, which has a higher ratio of staff to kids."), 139:19–25 (children are not generally placed in a staff secure placement first. "It's usually a step-up because they have been placed in a shelter first. And then whatever behaviors are occurring in that shelter may result in their step-up to staff-secure."). |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs concede "that [i]n almost all states, staff-secure facilities have the same state licensing requirements as shelters." *See also* Fact Reply ¶ 38. And, while Plaintiffs submit a declaration purporting to show that a UAC placed at Children's Village was "not allowed to go outside or go to the activity center" and that he was "placed on restriction which lasts for seven days in a row," Ex. 64 [H.A.R.M. Decl.] ¶ 6, a review of the case files reflects that the

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| UAC received "weekly individual therapy sessions," that he "acclimated to environment/milieu" and that the UAC was placed into "room restriction for seven days from 9/2-9/9" only after the UAC got "involved in a physical altercation with another minor in his milieu while playing a game of dominos in the cottage."  DX-93 at 30-35. | |
| 41. It is ORR's policy and practice that secure facilities are for youth who require the strictest level of supervision, and must have access to specialized services for UACs with substance abuse problems, anger management issues, mental health issues, and/or other special behavioral needs.<br><br>ORR Guide § 1.2.4; Cook Dep. 109:7-16; Antkowiak Decl. ¶ 11. | **Partially Disputed.** Plaintiffs do not dispute that ORR's Policy Guide states that "[s]ecure facilities are for youth who require the strictest level of supervision." Ex. 1 [ORR Policy Guide] § 1.2.4 at 24. Nor do Plaintiffs dispute that ORR funding announcements include a requirement that secure facilities have access to specialized services for UACs with substance abuse problems, anger management issues, mental health issues, and/or other special behavioral needs. DX-09 [Antkowiak Decl.] ¶ 11. Plaintiffs dispute that Defendants' cited evidence supports the statement that it is ORR's policy and practice to require that secure facilities have access to these "specialized services." *See, e.g.*, Ex. 153 [Cook Dep. Tr.] at 106:20–107:25 (SVJC is "not a treatment facility" and "we're not coming up with treatment plans on treating them because we're not a treatment facility."); Ex. 151 [Castaneda Dep. Tr.] at 60:24–61:5 (referrals to Yolo secure are inappropriate when mental health needs are greater than they can handle); *id.* at 62:3–10 (Yolo not equipped to house youth that require direct supervision and have self-injurious behavior); Ex. 14 [Castaneda Dep. Tr.] 74:13–75:4 (Yolo did not agree with secure placement for youth that are considered a danger to self and did not consider secure placement appropriate for those youth). Plaintiffs also dispute that it is ORR's "practice" to only place youth who require the strictest supervision in secure |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
|  | facilities. In practice, ORR has erroneously stepped up children to restrictive settings, including secure detention facilities. Ex. 33 [Ray Dep. Tr.] at 148:16–22, 152:14–153:22(reasons for placement in secure stated, "were not adequate or appropriate for placement in secure"), 157:10–158:17 (ORR policy analyst explained that "I couldn't tell if he met the criteria for placement in secure. I reviewed some of the significant incident reports, and from what I recall, they also did not speak to dangerousness." She also confirmed that she concluded that "the kid was more of an annoyance than an actual danger when they got stepped up to Yolo."), 162:7–10 ("In the beginning I saw noncompliance issues with kids just being inappropriately stepped up to secure where they didn't meet the criteria."), 163:14–164:12; 166:23–167:7; Ex. 43 [Ray Dep. Ex. 117] at 1261–62; Ex. 139 [Ray Dep. Ex. 118] at 2028; Ex. 44 [Ray Dep. Ex. 119] at 1264 (Email from Policy Analyst Ray to Senior Supervisory Policy Counsel for ORR, Toby Biswas, regarding a list of compliance issues she has seen with respect to secure facilities, including compliance issues with respect to ORR Policy Guide sections 1.2.4 and 1.2.5 where children have been placed "in secure based on risk of escape" or "suspected gang membership or affiliation only."); Ex. 16 [Contreras Dep. Tr.] at 71:3–12 (Secure facility lead case manager admitting that there have been situations where a youth's behavioral pattern did not merit secure placement), 75:11–76:1 (Youth have been referred to Shenandoah secure based solely on nonviolent offenses where youth would |

Defendants' Reply in Support of Defendants' Statement of Uncontroverted Facts

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
|  | better fit criteria for staff-secure placement.), 76:18–77:3, 77:5–78:1, 105:5–106:22; Ex. 24 [Heath Dep. Tr.] at 99:3–7 (In the past, when an RTC would not accept a child who had mental health needs, the child would be transferred to a secure facility.). Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 3. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs' cited evidence omits relevant information and mischaracterizes testimony. First, Plaintiffs conflate a secure facility's ability to provide the "strictest level of supervision" with a facility's ability to care for heightened medical issues such as "a child who is actively suicidal and had just attempted suicide." DX-86 [Cook Dep. Supp.] 118:1-10. Defendants do not dispute that a secure facility would not be an appropriate placement in those circumstances – the child would "either need to be hospitalized or [] they need to look at RTC placement." *Id.* Furthermore, Cook testified that while SJVC is not a "treatment facility" in the sense that they are "not doing deep psychological fixing or counseling," SJVC does provide the highest level of supervision as "youth have 24-hour supervision," are monitored "for self-harm," and receive individual counseling, medication management, and mental health testing and risk assessment testing in order to "stabilize kids' behavior." DX-86 [Cook Dep. Supp] 107:15-24, 109:7-16, 110:5-7, 119:14-18, 133:19-134:20; *see also* DX-94 [Yolo Budget Narrative] at Yolo-00468 (reflecting that "Clinicians will facilitate Interactive Journaling, and group counseling for substance use disorder treatment, anger management and social skills development.").

Nor do Plaintiffs' citations to the deposition testimony (and exhibits) of Faith Ray create a genuine dispute of material fact with respect to whether it is ORR's practice to only place youth who require the strictest level of supervision in secure facilities as the deposition testimony (and exhibits) concern ORR's compliance reviews which began in November 2018, and since then have resulted in almost 100 percent compliance for secure placements. *See* Fact Reply ¶¶ 36, 59.

| 42. It is ORR's policy and practice that ORR may place a child in a secure facility only if the child poses a danger to self or others, has been charged with or convicted of a criminal offense, or is chargeable with such an offense. | **Partially Disputed.** Plaintiffs do not dispute that it is ORR's current policy that "ORR only places an unaccompanied alien child in a secure facility if the child: 1. Poses a danger to self or others; or 2. has been charged with or convicted of a criminal offense, or is |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| ORR Guide § 1.2.4; Biswas 30(b)(6) Dep. 12:19-22, 265:18-266:21, 437:23-438:24; Fink Dep. 106:16-22, 118:21-25; Cook Dep. 124:20-24; ORR Juvenile Coord. Rep. at 28; Antkowiak Decl. ¶ 11. | chargeable with such an offense." Ex. 1 [ORR Policy Guide] § 1.2.4 at 24. Plaintiffs dispute that it is ORR's "practice" to "only" place children in secure facilities when the criteria under ORR Policy § 1.2.4 are satisfied. In practice, children have been detained in secure settings despite the fact that placement violates the FSA and does not meet ORR's secure placement policy requirements. Ex. 33 [Ray Dep. Tr.] at 152:14–153:22 (reasons stated for placement in secure "were not adequate or appropriate for placement in secure"); 157:10–158:17 (ORR policy analyst explained that "I couldn't tell if he met the criteria for placement in secure. I reviewed some of the significant incident reports, and from what I recall, they also did not speak to dangerousness." She also confirmed that she concluded that "the kid was more of an annoyance than an actual danger when they got stepped up to Yolo."), 162:7–10 ("In the beginning I saw noncompliance issues with kids just being inappropriately stepped up to secure where they didn't meet the criteria."), 163:14–164:12 ("the majority of kids were inappropriately sheltered"); Ex. 16 [Contreras Dep. Tr.] at 71:3–12 (Secure facility lead case manager admitting that there have been situations where a youth's behavioral pattern did not merit secure placement), 80:2–17; *Flores*, 2018 WL 10162328, at *14 ("Defendants have breached the Flores Agreement insofar as ORR has placed Class Members in secure facilities solely on the basis of one or more of the italicized portions of the Notice of Placement form and absent probable cause to believe that the individual |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | has committed a specified offense.") Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 4. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as to whether it is ORR's practice to place a child in a secure facility only if the child poses a danger to self or others, has been charged with or convicted of a criminal offense, or is chargeable with such an offense as Plaintiffs' cited evidence omits relevant information or mischaracterizes evidence and fails to establish that it is common for ORR to erroneously place children to secure facilities. *See* Fact Response ¶¶ 218 (detailing extent to which Plaintiffs' citations to evidence omit relevant information or mischaracterize evidence); Fact Reply ¶ 59. Nor does Plaintiffs' citation to *Flores v. Sessions*, 2018 WL 10162328, at * 14 (C.D. Cal. July 30, 2018), create a genuine issue of material fact as the cited portion does not make any findings of fact regarding actual placement of UACs, but instead, rules on policy language concerning secure placement in for UACs who "may be chargeable" with a crime.

| 43. There are child welfare experts who hold the view that secure settings are not the preferred treatment environment, but are necessary for the safety and well-being of children.<br><br>Dr. Ryan Expert Rep. ¶ 36; Dr. Earner Dep. 96:18-97:10. | **Partially Disputed.** Plaintiffs do not dispute that Defendants' purported experts hold this view, but dispute Defendants' statement to the extent it suggests Defendants purported experts are, in fact, experts qualified to render an opinion in this case or that child welfare experts hold the view that secure placements are always necessary for the safety and well-being of children. DX-06 [Earner Dep. Tr.] at 96:18–97:10 (there are instances when children are a danger to themselves and others that you do have to have secure facilities for them); Ex. 174 [Block & Farley Expert Rep.] at 284 ("A lack of effective or timely assessments also creates a higher risk of inappropriate transfer to more restrictive settings based on misunderstanding or misdiagnosis of a child's behavior…[FFF Supervisor] David Fink…testified that children with intellectual and cognitive disabilities are sometimes inappropriately placed at secure facilities because the transferring facility 'might not have the |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | bandwidth or the capacity to evaluate [the child], so they might get misdiagnosed when they come in."); *id.* at 15 (consideration of dangerousness for secure placements "[f]ails to take into consideration the application of less drastic responses such as the use of additional staffing or one to one supervision"). |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs provide only a conclusory assertion that Defendants' witnesses are not qualified to serve as child welfare experts. Nor does Plaintiffs' citation to their own purported experts establish an issue of material fact as Plaintiffs' cited experts (Block & Farley) do not opine that it *always* possible to provide needed services to children in less restrictive settings. To the contrary, they acknowledge that in some cases it may not actually be possible. *See* DX-78 [Dr. Londino Expert Rebuttal Rep.] ¶ 45 ("Drs. Block and Farley opine that to serve children in less restrictive placements and avoid unnecessarily prolonged residential care, children's individual needs must be timely identified and addressed. They follow this with a statement that 'to the extent *it is possible* to provide needed services that can meet a child's needs while that child is in a less restrictive setting,' which indicates they would agree with my previous opinion that although ideal, access to community resources is not always available. This problem is not unique to youth in ORR custody. The inadequacy of psychiatric services to meet the mental health needs for children and adolescents has been consistently documented.") (emphasis in original); *id.* at ¶ 46 ("I agree that maintaining children who pose safety concerns in a less restrictive setting requires initial and ongoing evaluation of the context and factors driving the child's unsafe behaviors. I disagree that this goal can be optimally met given the unique constraints of working with the UAC population. Drs. Block and Farley state in their report on page 13 that there is a lack of assessment tools and interventions specifically adapted to the population of unaccompanied children. I disagree. ORR utilizes an Intake Screening Form that asks questions in a variety of domains to provide an initial understanding of the youth's migration to the United States, adverse events that may have occurred before, during, and after migration and a review of symptoms that might indicate the presence of an underlying mental health disorder. I also disagree that a comprehensive understanding of the drivers of behavior . . . can be achieved for UACs during the time they are in ORR care and custody. In my clinical experience, this may take months to years of individual work and attempts to achieve this admirable goal would be in direct contrast with the desire to move youth out of ORR custody as quickly as possible.").

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| Moreover, Plaintiffs' challenge to the qualification of Defendants' experts is a *Daubert* or Fed. R. Evid. 702 challenge, and therefore a legal argument.  As the Court's standing order envisioned no legal arguments in the parties' factual exchanges, ECF No.17 § 5.d.i ("No legal argument should be set forth in this document"), Defendants do not here present legal arguments in response, but Defendants reserve the right to do so elsewhere or in the future. Regardless, Plaintiffs' response does not create a genuine material factual dispute concerning whether there are child welfare experts who hold the view that secure settings are not the preferred treatment environment, but are necessary for the safety and well-being of children.  Dr. Ryan and Dr. Earner have significant expertise and publications in child welfare, *e.g.*, DX-30 [Dr. Ryan Expert Rep.] at ¶¶ 4-8 & C.V., DX-13 [Dr. Earner Expert Rep.] at ¶¶ 7-14 & C.V., and Plaintiffs identify no factual basis to dispute the doctors' expertise.  *See also, e.g.*, Ex. 164 [Ryan Dep Tr.] 238:14-239:21 (discussing expertise and stating in part:  "Q. Are you an expert in social work and child welfare?  A. Yes."). | |
| 44. A residential treatment center is a sub-acute, time limited, interdisciplinary, psycho-educational, and therapeutic 24-hour-a-day structured program with community linkages, is provided through individualized care, specialized services and interventions, and differs significantly from involuntary, acute inpatient psychiatric hospitalization.<br><br>ORR Guide to Terms; ORR Juvenile Coord. Rep. at 28; Vergara Dep. 202:12-20; Cook Dep. 113:14-114:4; De La Cruz Dep. 47:14-21; Antkowiak Decl. ¶ 14; Biswas Decl. ¶ 32. | **Disputed.** Plaintiffs dispute that a residential treatment center is a subacute program. DX-02 [Biswas 30(b)(6) Dep. Tr.] at 13:7–11 ("Residential treatment centers are facilities for children with pretty severe, *acute* mental health, psychiatric problems, who are determined to be a danger to self or others by a licensed psychiatrist.") (emphasis added). Plaintiffs dispute that a residential treatment center is a "time limited" program. DX-02 [Biswas 30(b)(6) Dep. Tr.] at 32:5–13 (no strict time limit for RTC placement); Ex. 162 [Murray Dep. Tr.] at 200:1–16 (child held at Shiloh more than a year); Ex. 163 [Ruiz Dep. Tr.] at 278:12–25 (child at Shiloh probably 18 months). To the extent the term "community linkages" is meant to indicate that children have access to the community, Plaintiffs dispute this fact. *See* Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 14:5–9 (ORR generally thinks of RTCs as the same level of restriction as a secure placement); Ex. 160 [Lawrence Dep. Tr.] at 256:5– 258:3 (explaining that it is difficult for child to step down directly from RTC to URM or LTFC because programs like |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | to see child in "more community-based environment" first); Ex. 78 [Sirena P. Decl.] ¶ 8 at 1506 (preferred shelter because could go on field trips); Ex. 79 [P.D.O.P. Decl.] ¶ 16 at 1511 (feels incarcerated and wants to have a life outside the facility); Ex. 69 [K.N.A.T. Decl. Dec. 1, 2017] ¶ 3 at 1466 (Shiloh is locked and no one is free to leave). Plaintiffs dispute that a residential treatment center differs from ***involuntary*** inpatient care. Children have reported that they did not want to be at the residential treatment center but had no choice in the matter. Ex. 149 [Biswas Dep. Tr.] at 247:4–10 (children that are going to be transferred to an RTC are a run risk "[b]ecause I don't think most children want to be at RTC"); Ex. 168 [Vergara Dep. Tr.] at 126:21– 127:7 (children get upset when told they need to stay at Shiloh); Ex. 82 [Y.A.M.S. Decl.] ¶¶ 11, 16 at 1526–1527 (child reports that he hated being at Shiloh and that he only took his medication because he was told if he did not he would not leave the facility and he wanted to leave); Ex. 67 [K.L.F. Decl.] ¶¶ 2, 3 at 1457 (children at Shiloh are not free to leave; "[t]he doctor has said I can't leave until I can control myself."); Ex. 69 [K.N.A.T. Decl.] ¶ 3 at 1466 ("the children are detained here and not free to leave"); Ex.70 [K.S.G.P. Decl.] ¶ 2 at 1470 (child stating that she does not want to be at Shiloh); Ex. 75 [M.Y.R.M. Decl.] ¶ 4 at 1495 (minor was told that if she took her medication the doctor would release her so she took her medication). Plaintiffs dispute that RTCs provide individualized care, specialized services and interventions. *See* Ex. 166 [Urquiza Dep. Tr.] at 111:12–23, |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | 134:21–135:14, 150:6–16; Ex. 175 [Cruise & Rasmussen Expert Rep.] at 296 ("Across the files we reviewed, step ups did not increase the likelihood that UACs were provided with more specialized mental health treatments that better matched their documented mental health diagnoses."). Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶¶ 6, 18. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as to Defendants' definition of a residential treatment center.  First, "subacute" and "time limited" refer to the level of care provided by the center and the reconsideration, every 30 days, of the appropriateness of the placement, not the degree of severity of the patient's illness.  *See* HHS, Office of the Assistant Secretary for Planning and Education, *Subacute Care: Review of the Literature* (12/01/1994), available at https://aspe.hhs.gov/basic-report/subacute-care-review-literature#people (Joint Commission on Accreditation of Healthcare Organizations defines subacute care as "comprehensive inpatient care designed for someone who has had an acute illness, injury, or exacerbation of a disease process [whose condition] requires the coordinated services of an interdisciplinary team."); DX-02 [Biswas 30(b)(6) Dep.] 32:5-13 (There is no "hard time limit" as to how long UACs can be placed at a residential treatment center, but "their placement is reviewed every 30 days, and so there's not a strict time limit, but there's a review every, at least every 30 days to the appropriateness of the placement;"); DX-09 [Antkowiak Decl.] ¶ 14 ("A child who required inpatient hospitalization would have to have shown some stability of symptoms to be placed at an RTC; otherwise, and RTC would not necessarily be able to meet the needs of an actively suicidal or homicidal minor.").   The two in-network RTCs where ORR places UACs (Shiloh and MercyFirst) are based on a group home model, are less institutional than a hospital, and provide linkages to the community for outside activities.  *See* Fact Response ¶ 118. The amount of time that youth spend in outside activities "is a factor of how stable the youth is and whether they are safe outside with limited staff." *See, e.g.,* DX-36 [Dr. Lubit Expert Rebuttal Rep.] ¶ 28 ("The RTC is able to have a single staff member accompany a youth who is acting out, enabling the youth to go outside.  In a shelter a youth who is acting out would face higher levels of restriction than in an RTC.  The suggestion by plaintiffs that acting out youths should simply be kept on 1-1 is not practical because there is not enough staff available.").

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|

Nor do Plaintiffs create a genuine dispute of material fact with respect to Defendants' distinction between a residential treatment center and "involuntary, acute inpatient psychiatric hospitalization" as the fact that children may not choose placement at a residential treatment center does not liken ORR's placement decision to that of involuntary civil commitments. *See* Fact Response ¶¶ 16 (Lucas R. was not prescribed medication without his consent or over his objection), 133 ("ORR seeks informed consent from patients and does not give medications if UACs who have been stepped up to secure juvenile detention facilities or RTCs do not assent, with rare exceptions on an emergency basis."), 134; *see also* Fact Response ¶ 189 ("The declarations that Plaintiffs cite are from children who have long, complex and severe mental health histories and for whom acute psychiatric symptoms made them a danger to themselves or others, and necessitated their immediate step-up to an RTC for safety reasons. The children had an opportunity to participate in meetings with care provider staff and to ask questions about their own care and need for intensive psychiatric treatment, as evidenced by their signatures on acute case review meeting notes, although the severity of their mental illness may have compromised their full understanding."); Fact Reply ¶ 151.

Finally, Plaintiffs' cited evidence from their own purported experts does not create a genuine dispute as to whether RTCs provide individualized care, specialized services, and interventions. *See* Ex. 166 [Urquiza Dep. Tr.] at 111:21-23 ("if you're going to provide a therapy service, and you should, then you should do something that's therapeutic, not play dominos"), 134:21-135:14 (stating that "lack of treatment contributed to the children being placed in more restrictive facilities," not that UACs did not receive individualized care or specialized services upon placement in RTCs), 150:6-16 (stating in general that "Temper in a Jar" is not research-based treatment for children with oppositional defiant disorders, but not limited to UACs in RTCs); Ex. 175 [Cruise & Rasmussen Expert Rep.] at 296 (basing conclusion that "step ups did not increase the likelihood that UACs were provided with more specialized mental health treatments that better matched their documented mental health diagnoses" on whether "trauma-informed treatments" as they defined them were provided). This is particularly true where, as here, Defendants' psychiatric experts found based on their review of case file records, and visits to Shiloh and MercyFirst RTCs, that the approach to therapy taken by these facilities demonstrated sensitivity to the UACs' experience of trauma. DX-78 [Dr. Londino Expert Rebuttal Rep.] ¶ 15 ("[M]y visits to [Shiloh and MercyFirst], and my conversations with the residential facility staff, demonstrated that supportive therapy, in addition to the provision of more adaptive coping skills, was implemented so that symptoms requiring an elevated level of care could be stabilized and the UAC stepped back down to a less restrictive setting or released to an appropriate sponsor.  Residential facility

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|

staff expressed an understanding of the sensitive nature of trauma work that requires formation of rapport with a UAC, and the ability to work through issues over an extended period of time, before it is appropriate to begin such counseling. Efforts to limit the amount of time in the restrictive residential setting is in direct conflict with the need for time to process the emotional scars of trauma. This helps explain Drs. Cruise and Rasmussen's finding that trauma-focused psychotherapy was less likely to be utilized in the residential setting when the aim is also to either step down or release the child as expeditiously as possible."); *id.* ¶ 16 ("Despite assertions that trauma-focused psychotherapy was lacking, staff at MercyFirst discussed two trauma-focused programs that they utilize with the UAC population. Clinicians at MercyFirst use the SPARC program: Structured Psychotherapy for Adolescents Responding to Chronic Stress, a program used in group therapy where individuals discuss ways in which trauma has impacted their lives and what it means to them in the context of their culture. Clinicians at MercyFirst also use the Attachment, Regulation, and Competency (ARC) intervention program. This framework is a flexible, components-based intervention developed for children and adolescents who have experienced complex trauma, including poly-victimization. It is my opinion that both are appropriate for ORR's population."); *see also* DX-36 [Dr. Lubit Expert Rebuttal Rep.] ¶ 22 ("[T]he first part of trauma treatment for complex trauma is teaching coping/emotional control skills, as medical records indicated therapists did in treating the Named Plaintiffs while in ORR care. Dr. Urquiza appeared to be recommending that therapists immediately jump into speaking about and processing traumatic events. This would likely flood the children, lead some of them to self-harm, and lead many to refuse to cooperate in treatment.").

| | |
|---|---|
| 45. Residential treatment centers provide highly-customized care and services to individuals following either a community based placement or more intensive intervention, with the aim of moving individuals toward a stable, less intensive level of care or independence.<br><br>ORR Guide to Terms; ORR Juvenile Coord. Rep. at 28; Sualog Dep. 76:13-18; Vergara Dep. 88:18-89:23, 105:5-12; De La Cruz Dep. 236:21-25; Dr. Lubit Dep. 51:21-52:9, 86:19-24; Antkowiak Decl. ¶ 13; Biswas Decl. ¶ 34. | **<u>Disputed.</u>** Plaintiffs dispute that RTCs provide "highly-customized care and services to individuals". *See* Ex. 166 [Urquiza Dep. Tr.] at 111:12–23, 134:21–135:14, 140:17–25; 150:6–16; *see* Ex. 175 [Cruise & Rasmussen Expert Rep.] at 296 ("Across the files we reviewed, step ups did not increase the likelihood that UACs were provided with more specialized mental health treatments that better matched their documented mental health diagnoses"). Some children are placed in residential treatment centers directly from Border Patrol custody. *See* Ex. 170 [Fields Dep. Ex. 185] at 261 (listing the "Initial Recommender for RTC Placement" for two UACs as "Border Medical"); Ex. 156 [Fields |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | Dep. Tr.] at 189:1–193:25 (authenticating Fields Dep. Ex. 185); Ex. 191 (CBP referral to place two children into ORR; emails among ORR intakes members and other ORR officials to try to place these children directly into Shiloh RTC). In some instances, a provider has failed to offer services or intervention before step-up. *See* Ex. 23 [Fink Dep. Tr.] at 40:13–17 (There have been times when a provider has failed to offer services or intervention prior to requesting transfer out of their program); *see also* Ex. 175 [Cruise & Rasmussen Expert Rep.] at 296 ("Step-ups justified by mental health diagnoses do not seem to be necessary to meet the UACs' needs or protect the safety of others. First, prior to step up, there is uneven implementation of recommended accommodations (aside from pharmacology). If ORR staff more consistently addressed recommended accommodations, step ups may have been prevented. Second, there is no evidence that accessing community mental health treatment services was considered during the accommodations process. Failure to consider community-based treatment options, particularly at lower levels of restrictive placement (e.g., shelters) indicates these ORR facilities failed to explore treatment options that could have prevented further mental health decline and avoid step up to more restrictive levels of care.") |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact with respect to whether RTCs provide "highly-customized care and services" to UACs in ORR custody because none of it contradicts that conclusion. *See also* Fact Reply at ¶ 44; DX-36 [Dr. Lubit Expert Rebuttal Rep.] ¶ 28 ("Beliefs that children under poor behavioral control could, in shelters, receive the same treatment they would receive in RTCs, is not true . . . . There are important differences between RTCs and shelters. . . . The RTC staff . . .

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| receives more training that is specific to the problems they deal with, such as aggression, self-harm and conflict de-escalation.  The RTC staff has more experience dealing with these issues.  The far greater staff to youth ratio enables them to provide more services to youths who are acting out in dangerous ways.").  Furthermore, Plaintiffs' citation to events which occur prior to placement in a residential treatment center do not change the treatment provided by residential treatment centers or the ultimate goal of moving UACs towards a stable, less intensive level of care or independence. ||
| 46.It is ORR's practice that a child may be placed at a residential treatment center only if a licensed psychologist or psychiatrist determines that the child is danger to themself or others, and that the child requires therapeutic-based intensive supervision as a result of mental health symptoms.<br><br>Meyerstein Dep. 232:4-16, 233:7-15, 235:9-237:10; Biswas Dep. 189:17-191:9, 217:6-8, 219:18-220:5; Biswas 30(b)(6) Dep. 13:5-11, 14:20-15:5, 267:16-20; Fink Dep. 127:13-17, 147:10-25, 248:10-16; De La Cruz Dep. 211:12-23, 236:21-25; Sualog Dep. 76:13-18; Vergara Dep. 104:14-23, 105:5-12; ORR Juvenile Coord. Rep. at 27-28; Antkowiak Decl. ¶ 14; Biswas Decl. ¶ 34. | **Partially Disputed.** Plaintiffs do not dispute that ORR's policy currently states "A UAC may only be placed into an RTC if the youth is determined to be a danger to self or others by a licensed psychologist or psychiatrist…In addition, ORR will consider a transfer to an RTC only if a licensed psychologist or psychiatrist has determined" the UAC satisfies additional criteria listed in ORR Policy Guide § 1.4.6. Ex. 1 [ORR Policy Guide] § 1.4.6 at 30. However, prior to October 10, 2018, ORR did not require a recommendation from a licensed psychologist or psychiatrist in order to place a child in an RTC. Ex. 187 at 380; Ex. 132 [ORR Policy Record of Posting and Revision Dates] at 1975. Plaintiffs do not dispute that one of the criteria in § 1.4.6 is "[t]he unaccompanied alien child requires therapeutic-based intensive supervision as a result of mental health symptoms and/or diagnosis that prevent him or her from independent participation in the daily schedule of activities." Ex. 1 [ORR Policy Guide] § 1.4.6 at 30. However, Plaintiffs dispute that those policies (or any of the cited evidence) also reflect ORR's practice to "only" place a child in an RTC "if the child requires therapeutic based intensive supervision as a result of mental health symptoms." Ex. 152 [Contreras Dep. Tr.] at 124:13–16 (child does not have |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | to satisfy all four bullets of RTC placement criteria); Ex. 156 [Fields Dep. Tr.] at 242:17–243:16 (need to meet one or more bullets in RTC criteria). Plaintiffs dispute that, to the extent ORR now has policies related to the above subject-matter, that those policies (or any of the cited evidence) also reflect ORR's past and current practices. Defendant have placed UACs in RTCs without a recommendation from a licensed psychiatrist or psychologist. ECF No. 144 [Azar Answer] ¶ 31 ("Defendants admit that ORR transferred Lucas R to Shiloh RTC at the end of May 2018 based on the recommendation of a psychiatric mental health nurse practitioner."); Ex. 162 [Murray Dep. Tr.] at 151:6– 152:15. Plaintiffs dispute that all children placed in residential treatment centers have been determined to be a danger to themselves or others by a licensed psychologist or psychiatrist. *See* Ex. 156 [Fields Dep. Tr.] at 188:9–24 (agreeing that "not all UACs are referred to Shiloh or any RTC for reasons that they pose a risk to self or others"); *see also* Ex. 169 [Fields Dep. Ex. 184] at 259; Ex. 163 [Ruiz Dep. Tr.] at 259:19–25 (indicates that it is not a requirement that a child be a danger to themselves or others to be accepted at Shiloh "because they could be coming in for a different reason other than suicidality, for example, psychoses or aggression"); Ex. 160 [Lawrence Dep. Tr.] at 209:3–211:8 (cannot confirm whether RTC placement recommendation letters state that a child is a danger to themselves or others); Ex. 168 [Vergara Dep. Tr.] at 104:23–105:12 (same); Ex. 195 at 534–537 (Sept. 2019 RTC |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
|  | recommendation letter and approved Transfer Request; with no mention of danger to self/others). A child who is an immediate danger to themselves or others is transferred to a hospital rather than an RTC. DX- 09 [Antkowiak Decl.] ¶ 14 ("ORR only uses an RTC at the referral of a psychiatrist or psychologist. A child who required inpatient hospitalization would have to have shown some stability of symptoms to be placed at an RTC; otherwise, an RTC would not necessarily be able to meet the needs of an actively suicidal or homicidal minor."); Ex. 154 [De La Cruz Dep. Tr.] at 149:13–150:6 (child will remain in hospital until not an imminent danger to themselves). |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs concede that "ORR's current policy states 'A UAC may only be placed into a RTC if the youth is determined to be a danger to self or others by a licensed psychologist or psychiatrist . . . . In addition, ORR will consider a transfer to an RTC only if a licensed psychologist or psychiatrist has determined' the UAC satisfies additional criteria listed in ORR Policy Guide § 1.4.6 Ex. [ORR Policy Guide] § 1.4.6 at 30." While the July 2018 court order in *Flores* made explicit that ORR must only place children in an RTC if a licensed psychologist or psychiatrist *has determined that the child poses a risk of harm to self or others*, and ORR changed the language at Section 1.4.6 of its Policy Guide accordingly, it has been and continues to be ORR's policy and practice that children are only stepped up to RTCs upon the recommendation of a licensed psychologist or psychiatrist. *See Flores v. Sessions*, 2018 WL 10162328, at * 8 (recognizing that prior to July of 2018 the Notice of Placement stated "A licensed psychologist or psychiatrist has indicated that you:• Have not shown reasonable progress in the alleviation of your mental health symptoms after a significant period of time in outpatient treatment;• Demonstrate behavior that is a result of your underlying mental health symptoms and/or diagnosis and cannot be managed in an outpatient setting;• Require therapeutic-based intensive supervision as a result of mental health symptoms and/or diagnosis that prevent you from independent participation in the daily schedule of activities; *and/or*,• Present a continued and real risk of harm to self, others, or the community, despite the implementation of short-term interventions."); Ex. 132 [ORR Policy Record of Posting and Revision Dates] at 1975.

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|

Nor does Plaintiffs' cited evidence create a genuine dispute of material fact with respect to whether all children placed in residential treatment centers have been determined to be a danger to themselves or others by a licensed psychologist or psychiatrist: Plaintiffs' cited evidence omits relevant information and mischaracterizes testimony. Indeed, when asked directly whether "in order to be admitted to Shiloh, does it – does there have to be a finding that the child is either a danger to themselves or others," Dr. Ruiz responded "Yeah, a danger to themselves or others, aggression, psychotic, complications of medical issues with psychiatric issues. There is an array, but one of the most common ones is psychoses, aggression, self-injury, and danger to others." Ex. 163 [Ruiz Dep. Tr.] at 261:2-13; *see also* Ex. 156 [Fields Dep. Tr.] at 188:16-22 (testifying that UACs should not be referred to Shiloh or any RTC just because they post a risk to self or others, "but primarily for safety reasons and these UACs require a higher level of care"); Fact Reply ¶ 47.

Furthermore, Plaintiffs' evidence does not create a genuine dispute of material fact by implying that it is common or ORR's policy or practice to erroneously step up children to restrictive placements such as RTCs. *See* Fact Response ¶ 218. And, Plaintiffs' assertion that a child who is having an acute mental health emergency and is an immediate danger to themselves or others is in need of hospitalization to stabilize him/her before transfer to an RTC for longer-term treatment does not change the fact that it is ORR's practice to place a child at a residential treatment center only if a licensed psychologist or psychiatrist determines that the child is danger to themselves or others, and that the child requires therapeutic-based intensive supervision as a result of mental health symptoms. Nor is it disputed. *See* DX-09 [Antkowiak Decl.] ¶ 14 ("ORR only uses an RTC at the referral of a psychiatrist or psychologist. A child who required inpatient hospitalization would have to have shown some stability of symptoms to be placed at an RTC; otherwise an RTC would not necessarily be able to meet the needs of an actively suicidal or homicidal minor.").

| 47. It is ORR's practice that a child may remain in a residential treatment center placement only if a licensed psychiatrist or psychologist determines that the child continues to be a danger to themselves or others.<br><br>Biswas Dep. 199:22-200:6; Biswas 30(b)(6) Dep. 13:7-11; Fink Dep. 122:3-18; ORR Juvenile Coord. Rep. at 27, 28; | **Disputed.** Plaintiffs dispute Defendants' statement insofar as Defendants misstate the evidence. Plaintiffs further dispute that ORR's practice is to keep a child in an RTC *only* if a licensed psychiatrist or psychologist determines the child continues to be a danger to themselves or others. *See* Ex. 163 [Ruiz Dep. Tr.] at 274:17–22 (assessment of whether child is a danger to themselves or others is "done whenever we meet with the |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| Antkowiak Decl. ¶ 29; Biswas Decl. ¶ 47. | patient, but it's not a requirement from ORR that something like that has to be found"); *id.* 259:19–261:23 (dangerousness assessment not required by ORR policy; will assess danger to self or others *if* that is the reason they were admitted); *id.* 270:20–272:19; *see also* Ex. 172 [Lawrence Dep. Ex. 338] at 266–269 (Lucas R. NOP, no reference to danger to self/others); Ex. 160 [Lawrence Dep. Tr.] at 227:20– 231:23. Children also remain at RTCs even after a psychiatrist or psychologist has determined that the child is ready to step down to a less restrictive placement.  Ex. 163 [Ruiz Dep. Tr.] at 278:12–279:19; Ex. 160 [Lawrence Dep. Tr.] at 238:18–239:6 (children have remained at Shiloh up to six months after step-down recommendation); Ex. 28 [Murray Dep. Tr.] at 188:20–189:20; Ex. 156 [Fields Dep. Tr.] at 148:8–150:3. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as to whether it is ORR's practice that a child may remain at a residential treatment center only if a licensed psychiatrist or psychologist determines that the child continues to be a danger to themselves or others as Plaintiffs' cited evidence omits relevant information and mischaracterizes testimony.  Indeed, when asked directly whether "in order to be admitted to Shiloh, does it – does there have to be a finding that the child is either a danger to themselves or others," Dr. Ruiz responded "Yeah, a danger to themselves or others, aggression, psychotic, complications of medical issues with psychiatric issues.  There is an array, but one of the most common ones is psychoses, aggression, self-injury, and danger to others."  Ex. 163 [Ruiz Dep. Tr.] at 261:2-13. When Lucas R., who expressed suicidal ideation, and had a history of serious suicide plans and self-injurious behaviors, failed to improve sufficiently with hospitalization and refused medication prescribed by an outpatient psychiatrist, the psychiatrist recommended an RTC for him.  DX-35 [Dr. Lubit Expert Rep.] ¶¶ 6-7. And, while Lucas R.'s Notice of Placement from Shiloh does not reference danger to self/others, it does indicate that the continued placement is "supported by" and "recommended by psychiatrist."  Ex. 172 [Lawrence Dep. Ex. 338] at 266-269  Finally, Plaintiffs' assertion that children "also remain at RTCs even after a psychiatrist or psychologist has determined that the child is ready to step down to a less restrictive placement" fails to acknowledge that

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|

once a child is approved for step down, the logistics alone and factors outside of ORR's control can delay placement in a less restrictive environment.  Ex. 160 [Lawrence Dep. Tr.] at 238:9-17 ("Once the minor's - you know, again, it's a process – a transfer request is submitted, our third party reviewer sends out that information to other facilities.  Once the minor is admitted to another shelter, just a couple days just planning the logistics, just the flight would be the only thing that would – that would hold it back.  But that would just take a couple days."); Ex. 163 [Ruiz Dep. Tr.] at 279:14-19 (noting that it can take "four to six weeks" for "those that have to go find alternative living arrangements"); Ex. 28 [Murray Dep. Tr.] at 189:14-20 ("There's great difficulty in placing or getting acceptance of a minor that is being stepped down from Shiloh at shelters.  Even though there's a recommendation for a lower level of care or is indicating that the minor is no longer a danger to self or others, there's still denial after denial from some of these programs."); Ex. 156 [Fields Dep. Tr.] at 148:18-149-5 ("Q: And based on that review, you concluded that there were quite a few children for whom the psychiatrist had recommended step down or reunification, but who were still at Shiloh; is that correct? A: Yes. Q: Did you look into why they were still at Shiloh? A: Yes. Q: And what did you found? A: I found that some of them have already been referred to stepdown. And they are just awaiting placement."); *see also* Fact Response ¶ 137 (discussing ORR's extensive efforts to timely transfer UACs to a less restrictive placement but being unable to find an appropriate place willing to accept the UAC, even outside of ORR's network of care providers due to lack of space availability, the form of legal relief available to the UACs, and limited availability of necessary mental health supports required by the UAC).

| | |
|---|---|
| 48. ORR's two residential treatment centers, Shiloh and MercyFirst, are based on a group home model where residents sleep without locked doors and there is a higher staff-to-minor ratio than in shelters, and are accredited by an accrediting organization.<br><br>Meyerstein Dep. 223:23-225:1; Sualog Dep. 51:20-52:5; Antkowiak Decl. ¶ 13; ORR Juvenile Coord. Rep. at 28. | **Partially Disputed.** Plaintiffs do not dispute that "ORR's two residential treatment centers, Shiloh and MercyFirst" have "higher staff-to-minor ratio than in shelters, and are accredited by an accrediting organization." Plaintiffs dispute that children detained in RTCs sleep "without locked doors." As noted by this Court, "Shiloh RTC is a locked facility with 24-hour surveillance and monitoring." *Flores*, 2018 WL 10162328, at *10. Children detained in these ORR RTCs also report the facilities are locked facilities. Ex. 70 [K.S.G.P. Decl.] ¶ 2 at 1470; Ex. 69 [K.N.A.T. Decl. Dec. 1, 2017] ¶ 3 at 1466; Ex. 76 [M.Y.R.M. Supp. Decl.] ¶ 2 at 1498. Moreover, Defendants have admitted that |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | RTCs are similarly restrictive as secure facilities, the most restrictive level of detention provided by ORR. Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 14:5–9 (secure and RTCs are generally the same level of restriction); Ex. 24 [Heath Dep. Tr.] at 135:9–12 (RTCs and secure facilities are the most restrictive settings for placement); Joint Stip. ¶ 50. Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 5. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Defendants' uncontroverted fact is that ORR's two residential treatment centers are based on group home models where children sleep without locked doors.  That the residential treatment center as a whole may be "a locked facility with 24-hour surveillance and monitoring" does not change that fact, nor does the level of restriction.  *See* Fact Response 132. | |
| 49. It is ORR's policy and practice that when ORR transfers a UAC from one facility to another, or determines a more restrictive level of placement remains warranted, it does so only after a consultation process occurs between the case manager, the case coordinator, and the FFS.<br><br>ORR Guide § 1.4.2, *see also id.* § 1.4; Biswas Dep. 65:23-66:9, 104:16-105:9, 199:22-200:6; Sualog Dep. 45:11-16; De La Cruz Dep. 247:8-248:9; Vergara Dep. 110:13-111:4; Contreras Dep. 98:19-99:25; ORR Juvenile Coord. Rep. at 26, 27, 30; Antkowiak Decl. ¶ 15; Biswas Decl. ¶¶ 39, 45. | **Undisputed** for purposes of this motion except to the extent Defendants rely on inadmissible evidence. *See* Evidentiary Objections ¶¶ 7, 21. |
| 50. It is ORR's practice that when assessing a possible transfer, care providers must consider information from assessment tools, interviews, the location of the | **Partially Disputed.** Plaintiffs dispute Defendants' use of the words "must" and "practice." Plaintiffs dispute that the ORR Policy Guide § 1.4 includes the term "must" |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| UAC's sponsor or family in the United States, applicable records, and information from stakeholders such as the UAC's legal service provider, attorney of record, or child advocate.<br><br>Biswas Dep. 209:17-25; Biswas 30(b)(6) Dep. 71:13-17, 112:16-113:4; Contreras Dep. 61:20-62:20, 147:14-21; De La Cruz Dep. 247:8-248:9; Trevino Dep. 358:23-25; Heath Dep. 213:7-18; Smith Dep. 94:6-95:7; ORR Juvenile Coord. Rep. at 30; Antkowiak Decl. ¶ 23. | when describing factors a care provider considers in assessing a possible transfer, thereby giving discretion to consider these factors and/or other things. Ex. 1 [ORR Policy Guide] § 1.4 at 28 ("Care providers also take into consideration information from the referring Federal entity, child assessment tools, interviews, location of the child's sponsor or family in the U.S., records from local, State, and Federal agencies, and information from stakeholders, including the child's legal service provider, attorney of record or Child Advocate, as applicable, when making transfer recommendations.") Moreover, Plaintiffs dispute that the Policy Guide § 1.4, which lists factors that can be considered, as well as Defendants' cited evidence, establishes a practice of *requiring* care providers to consider all of the listed factors. *See* DX-15 [Biswas Dep. Tr.] at 209:17–25 (no indication of what factors care providers "must" consider in practice); DX-02 [Biswas 30(b)(6) Dep. Tr.] at 71:13–17 (same), 112:16-113:4 (same); DX-22 [Contreras Dep. Tr.] at 61:20–62:20, 147:14–21 (same); DX-16 [De La Cruz Dep. Tr.] at 247:8–248:9 (same); DX-18 [Treviñ o Dep. Tr.] at 358:23–25 (same); DX-26 [Heath Dep. Tr.] at 213:7–18 (same); DX-28 [Smith Dep. Tr.] at 94:6–95:7 (same); DX-11 [ORR Juvenile Coord. Rep.] at 30 (listing what evidence must be considered under policy but not establishing a practice of following policy); DX-09 [Antkowiak Decl.] ¶ 23 (no indication of what factors care providers "must" consider in practice). |

Defendants' Reply in Support of Defendants' Statement of Uncontroverted Facts

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact.  That the ORR Guide does not include the word "must" in describing factors a care provider considers in making a placement determination or recommendation does not change the fact that grantees are required by their cooperative agreements to provide services in compliance with State residential care licensing requirements, and the ORR policies and procedures, unless otherwise expressly waived by ORR, *see, e.g.*, DX-95 [Shiloh Cooperative Agreement] at Shiloh 000094.  Nor does it change the fact that the ORR Guide provides that ORR is "mandated by law" to place UACs "in the least restrictive setting" and that "ORR and care providers consider the following factors as they pertain to the child or youth" in making placement determinations or recommendations.  *See also* ORR Guide §§ 1.2.1, 1.4, 1.4.1 ("Care providers must make every effort to place and keep children and youth in a least restrictive setting.").  Finally, sections of the ORR Guide are referenced throughout Defendants' submitted Declarations in discussing placement determinations, *see* DX-09 [Antkowiak Decl.] ¶¶ 7, 8, 16; DX-10 [Biswas Decl.] ¶ 36, evidencing that the factors listed in the ORR Guide are factors considered by ORR in practice in making placement decisions.

| 51. It is ORR's policy and practice that in assessing whether a step-up is appropriate or remains warranted, the case manager, case coordinator, and FFS staff the case and confer to determine whether the UAC's behavior, criminal history, or self-disclosures require placement in a more restrictive environment, using the factors identified in the ORR Guide.<br><br>ORR Guide § 1.4.2; Biswas Dep. 53:21-25, 104:16-105:9; Biswas 30(b)(6) Dep. 117:4-7; Vergara Dep. 87:4-16, 110:13-111:4; ORR Juvenile Coord. Rep. at 27, 30; Contreras Dep. 98:19-99:25; Padilla Dep. 81:1-17; Ray Dep. 76:8-17, 150:1-11; Antkowiak Decl. ¶¶ 15-16, 24; Biswas Decl. ¶ 45. | **<u>Partially Disputed.</u>** Plaintiffs dispute this fact to the extent it implies self-disclosures are always voluntary or that the youth knows such statements made in the confidence of a licensed psychologist or psychiatrist or case worker are not confidential and can be used against them. *See, e.g.*, Ex. 151 [Castaneda Dep. Tr.] at 110:19–111:15 (youth are likely to self-disclose gang involvement if they have built trust with somebody, but not aware if youth are told about this information being used against them); Ex. 155 [Eich Dep. Tr.] at 207:3–4 ("It's my understanding that nothing in ORR is confidential."). Plaintiffs also dispute this statement to the extent it implies that case managers, case coordinators, and FFS have correct and sufficient information to assess the appropriateness of the step-up and continued restrictive placement, or that the ORR Policy Guide is sufficient guidance to make these determinations. Ex. 151 [Castaneda Dep. Tr.] 116:22–117:17 (misrepresented or mis-documented reports |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | can lead to unnecessary step ups and the way things are documented can "make it seem like more than what it was"); *id.* 116:2–6 (vague criteria for step up has led to increased number of referrals to secure placements); *id.* 117:22–118:7 (misrepresentation of issues in documentation—like destruction of property being destruction of a pencil or assault was really a "shoulder bump"—"the way it was documented, it presented it as being a more larger scale problem when it probably wasn't"). Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶¶ 7, 21. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Defendants' uncontroverted fact pertains to the categories of information the case manager, case coordinator, and FFS consider in determining whether step-up is appropriate or remains warranted, not the source of the information (and whether or not UACs are aware that self-disclosures may be used in making placement determinations).  Furthermore, the opinion of a single case manager at a facility that is no longer part of the ORR network is not evidence sufficient to establish a practice of ORR case managers, case coordinators, and FFS relying on incorrect or insufficient information in making placement decisions.  *See* Joint Stip. ¶ 51 ("ORR's grant with Yolo ended in January 2020.").  Finally, ORR takes affirmative steps to determine the veracity of UACs' self-disclosures of criminal or violent history.  *See* ORR Guide §1.4.2 ("If a UAC self-discloses criminal or violent history to other UAC or to care provider staff, ORR investigates the veracity of the claim with the assistance of the care provider.  ORR may contact federal, state and local law enforcement to determine the veracity of the self-disclosed criminal history and request assistance in contacting foreign law enforcement agencies where alleged crimes or incidents took place outside of the United States.  ORR may also work with mental health professionals and other specialists as appropriate to determine whether the UAC's claims are credible.").

| 52. It is ORR's policy and practice that step-ups may occur when a more restrictive level of care is in the best interests of the child and necessary for the safety of the child and others. | **Partially Disputed.** Plaintiffs do not dispute that the ORR Policy Guide and the ORR MAP provide for the placement of a UAC in the least restrictive setting that is in the best interest of the child. Plaintiffs dispute |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| ORR Guide § 1.4; ORR Juvenile Coord. Rep. at 26; Padilla Dep. 81:15-19; Murray Dep. 118:5-9; Fink Dep. 40:13-41:6; Smith Dep. 109:14-17; Antkowiak Decl. ¶ 18. | Defendants' statement to the extent is suggests that ORR in "practice" places UACs in the least restrictive setting that is in the best interest of the child. In practice, ORR has erroneously stepped up children to restrictive placements. ECF No. 144 [Answer] ¶ 75; Ex. 33 [Ray Dep. Tr.] at 148:16–22, 152:14–153:22, 157:10– 158:17, 162:7–10, 163:14–164:12, 166:23–167:7; Ex. 43 [Ray Dep. Ex. 117] at 1261–62; Ex. 139 [Ray Dep. Ex. 118] at 2028 ("the NOP was so vague and did not contain enough information to know if [minor] is an actual danger to self or others"); Ex. 44 [Ray Dep. Ex. 119] at 1264; Ex. 16 [Contreras Dep. Tr.] at 71:3–12, 75:11–76:1, 76:18–77:3, 77:5–78:1, 80:2–17, 105:5–106:22, 113:12– 114:17; Ex. 22 [Fields Dep. Tr.] at 123:5–16, 172:7–15; Ex. 23 [Fink Dep. Tr.] at 40:13–17, 153:8–13; Ex. 24 [Heath Dep. Tr.] at 98:5–16, 99:3– 7; Ex. 14 [Castaneda Dep. Tr.] at 74:13-76:7; Ex. 151 [Castaneda Dep. Tr.] at 88:21–90:9; Ex. 20 [Eich Dep. Tr.] at 108:7–109:5; Ex. 96 at 1757 ("some of the minors were inappropriately placed in secure"); Ex. 182 [Urquiza Expert Rep.] at 346. Unnecessarily stepping up children may be contrary to their best interest and detrimental to their long-term psychological well-being. Ex. 6 [RFA 2nd Set] Nos. 169–70 at 542–44. Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 8. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as to whether ORR's policy and practice is that step ups may occur when a more restrictive level of care is in the best interests of the child and necessary for the safety of the child and others as Plaintiffs' cited evidence omits relevant information and mischaracterizes testimony. *See* Fact Response ¶¶ 116, 218 (detailing extent to which Plaintiffs' citations to

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| evidence omit relevant information or mischaracterize evidence).  Finally, Plaintiffs' citation to the deposition testimony of Faith Ray does not create a genuine dispute of material fact as to whether ORR's policy and practice is that step ups may occur when a more restrictive level of care is in the best interests of the child and necessary for the safety of the child and others as the deposition testimony (and exhibits) largely concern ORR's compliance reviews which began in November 2018, and since then have resulted in almost 100 percent compliance for secure placements.  *See* Fact Reply ¶¶ 41, 59. ||
| 53. In the placement process, case managers, case coordinators, and FFS can consult with the FFS Supervisor for Special Populations, the Senior Advisor for Child Well-Being, the Senior FFS Supervisor, the Division of Health and Unaccompanied Children, members of the ORR Division of Policy and Procedure, and the Deputy Director of ORR on step-up decisions.

Fink Dep. 16:1-6, 17:13-23, 23:15-21, 24:16-25:1, 78:2-20, 134:16-25, 168:1-16, 174:14-175:6; De La Cruz Dep. 232:15-233:1; Biswas Decl. ¶ 35. | **Partially Disputed.** Plaintiffs do not dispute that "case managers, case coordinators, and FFS can consult with the FFS Supervisor for Special Populations Supervisor" and "members of ORR's Division of Policy and Procedure." Plaintiffs dispute that the cited evidence establishes that case managers, case coordinators and FFS can consult with the Deputy Director of ORR or that anyone other than an FFS supervisor can consult with the Division of Health and Unaccompanied Children. *See* DX-19 [Fink Dep. Tr.] at 16:1–6 (defining special populations but not who is involved in the decision-making), 17:13–23 (only testifying that FFS supervisors can consult with the FFS Supervisor for special populations; no other consultation referenced), 23:15–21 (merely testifying that there is no requirement for when an FFS must consult with an FFS Supervisor), 24:16–25:1 (testifying that the role of the FFS Supervisor of Special Populations is to consult and not make decisions), 78:2–20 (FFS or FFS supervisor can reach out to the FFS Supervisor for Special Populations), 134:16–25 (explaining that the FFS Supervisor of Special populations provides consults on out-of-network placements), 168:1–16 (FFS would reach out to his or her direct supervisor in complex cases), 174:14–175:6 (cases with conflicting recommendations might get |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | staffed with the FFS Supervisor for Special populations and another FFS Supervisor to discuss; FFS Supervisor might reach out to the case coordinator for more details); DX-16 [De La Cruz Dep. Tr.] at 232:15–233:1 (FFS can consult with their supervisor and policy division; care provider can consult with FFS and policy division); DX-10 [Biswas Decl.] ¶ 35 (MAP provides that an FFS supervisor can consult with the Division of Health of Unaccompanied Children (DHUC)); *see also* Ex. 161 [Meyerstein Dep. Tr.] at 257:2–9 (not aware of a Health Division role in step-ups or step-downs). Plaintiffs further dispute that anyone currently consults with the Senior Advisor for Child Well-being regarding step up decisions to secure facilities. Ex. 156 [Fields Dep. Tr.] at 166:13–19 (not currently consulted on step-up to secure; prior to family separations was consulted two or three times a year). |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs do not dispute that the FFS Supervisor can consult with the Deputy Director of ORR or the Division of Health and Unaccompanied Children and placement decisions are made only after a consultation process occurs between the case manager, the case coordinator and the FFS and there are no limitations on the FFS's ability to reach out to their supervisor should the need arise. *See* Fact Response ¶ 174. Nor does the fact that the current Senior Advisor for Child Well-Being and Safety has not recently been consulted on placement decisions establish that it is ORR's practice not to permit consultation when the need arises.

| 54. It is ORR's policy and practice that when a UAC is stepped up to a more restrictive setting, he/she is provided with a Notice of Placement in Restrictive Setting (NOP) of the grounds for their placement in a language that he/she understands within a reasonable time (48 hours) either before or after the placement. | **Partially Disputed.** Plaintiffs do not dispute that ORR Policy Section 1.4.2 states "[w]hen a UAC is stepped up to a more restrictive setting (secure, staff-secure or RTC facility), he/she is provided with a Notice of Placement in Restrictive Setting in a language that he/she understands within a reasonable time either before or after ORR's placement |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| ORR Guide § 1.4.2; Ray Dep. 73:22-74:14, 86:9-87:3; De La Cruz Dep. 154:1-16; Biswas Dep. 68:23-69:15, 224:17-225:7, 229:25-230:7, 239:2-11; Biswas 30(b)(6) Dep. 65:2-6, 78:21-79:5, 126:17-127:24, 330:17-331:8, 335:2-10; Fink Dep. 83:15-24; Eich Dep. 161:3-162:1; ORR Juvenile Coord. Rep. at 5, 30; Antkowiak Decl. ¶ 26; Biswas Decl. ¶¶ 40-42. | decision." Plaintiffs dispute that a child is always provided a NOP when he or she is stepped-up to a more restrictive setting; for example, therapeutic group homes are more restrictive than shelters but a child stepped up from a shelter to a therapeutic group home is not provided a NOP. Ex. 23 [Fink Dep. Tr.] at 38:9–12, 57:7–10; Ex. 28 [Murray Dep. Tr.] at 140:23–141:4; Ex. 197 at 570–571 (case notes from Children's Village therapeutic group home, states that minor wants to "step down to shelter" but case manager explained that "he was not ready yet"); Ex. 184 [E.A.R.S. Decl.] ¶¶ 3–4, 6–8 (no explanation for step up to Children's Village therapeutic group home, which has more security and restrictions than shelter; child wants to be stepped down to shelter). Plaintiffs dispute that it is ORR's practice to provide a NOP *either* 48 hours *before* or after the placement. Defendants' own evidence supports that in practice the NOP is provided only after placement in a restrictive setting, and sometimes provided after the 48-hour timeframe. DX-33 [Ray Dep. Tr.] at 196:11–14 (case manager is responsible for giving a NOP to the child within 48 hours *after* their placement); DX-19 [Fink Dep. Tr.] at 83:15–24 ("*when a child enters* one of the levels of care that requires a notice of placement, they're required to inform that minor within 48 hours of placement of why they're placed in the particular level of care" (emphasis added)); DX-11 [ORR Juvenile Coord. Rep.] at 30 ("*Once a UAC enters* a specialized level of care such as a Staff Secure, RTC, Secure, or OON placement setting, the ORR care provider must review the Notice of Placement |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | (NOP) with the UAC within 48 hours of placement.") (emphasis added); DX-02 [Biswas 30(b)(6) Dep. Tr.] at 335:2–10 (NOPs have been late, especially when child transferred on Friday and the NOP is not signed until Monday or Tuesday). Plaintiffs dispute that ORR's written policies contemplate notice before a child's arrival at a new placement. Ex. 2 [ORR MAP] § 1.4.2 at 95 ("The UAC is provided specific information regarding the placement decision in a language he or she understands *upon arrival at the* receiving care provider facility, which is included in the summary portion of the Notice of Placement in Restrictive Setting." (emphasis added)). Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 19. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as a therapeutic group home is no more restrictive than non-secure shelters. *See* Fact Response ¶ 185. Plaintiffs also dispute that ORR's written policies contemplate notice before a child's arrival at a new placement. ORR Guide § 1.4.2 provides that "[w]hen a UAC is stepped up to a more restrictive setting (secure, staff-secure or RTC facility), he/she is provided with a *Notice of Placement in Restrictive Setting* in a language that he/she understands within a reasonable time either *before* or *after* ORR's placement decision." ORR Guide § 1.4.2 (emphasis added); Fact Response ¶ 183. In any event, Plaintiffs' assertion that "Defendants' own evidence supports that in practice the NOP is provided only after placement in a restrictive setting" does not create a genuine dispute of fact, as Paragraph 24C of the *Flores* Agreement has been construed "as requiring notice within a reasonable time after ORR renders its placement decision." *Flores v. Sessions*, 2018 WL 10162328, at * 12 n. 19. Finally, Defendants acknowledge instances in which children have not received their NOP within 48 hours after arrival at a restrictive placement, however, isolated occurrences do not establish that ORR has a practice of not providing notice within 48 hours. *See* Fact Response ¶ 188.

| 55. It is ORR's practice that when UACs are represented by counsel, ORR provides the NOP to counsel on demand. | **Disputed.** Plaintiffs dispute that the NOP is provided to counsel "on demand." In practice, ORR takes several weeks and often months to |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| De La Cruz Dep. 250:5-251:12; Biswas Dep. 233:13-20; Biswas 30(b)(6) Dep. 70:10-71:6, 272:20-23; Antkowiak Decl. ¶ 27; Biswas Decl. ¶ 44. | provide documents requested by a child's attorney. Ex. 29 [Nathan-Pineau Dep. Tr.] at 16:13–21. Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 20. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as the experience of one legal practitioner is not evidence sufficient to establish a practice of ORR taking several weeks or months to produce a UAC's file to counsel. *See* Fact Response ¶¶ 192, 247, 249, 253; Ex. 2 [ORR MAP] § 1.4.2 at 90–91.

| | |
|---|---|
| 56. It is ORR's policy and practice that the NOP explains to a UAC their ability to challenge their placement before the ORR Director or in federal court.<br><br>ORR Guide § 1.4.2; ORR MAP § 1.4.2; David Dep. 159:9-16; Contreras Dep. 116:1-22; Ray Dep. 84:24-85:11; Antkowiak Decl. ¶ 26; Biswas Decl. ¶ 58. | **<u>Partially Disputed.</u>** Plaintiffs do not dispute that the NOP, which policy requires be provided to children in restrictive settings shortly after arrival and every thirty days thereafter, contains the following statement: "If you remain in a secure facility or RTC after 30 days, you may request that the ORR Director reconsider your placement. For more information on this process, please ask your case manager." Ex. 2 [ORR MAP] at Appendix 1.3 Notice of Placement in Restrictive Setting 123–24. Plaintiffs dispute that the NOP "explains to the UAC their ability to challenge their placement" where the following occur. ***First***, Plaintiff Class Members are typically indigent, speak little or no English, and have little or no knowledge of the United States' legal system. ECF No. 144 [Answer] ¶ 146; Ex. 6 [RFA 2nd Set] No. 141 at 538–39. ***Second***, children in a therapeutic group home are not provided an NOP. Ex. 2 [ORR MAP] § 1.2.4 at 65–66 (no mention of whether a child in a therapeutic group home would receive a NOP); Ex. 23 [Fink Dep. Tr.] at 151:5–8. ***Third***, stepped up children are not consistently informed and sometimes do not understand that they may contest restrictive placement. Ex. 33 [Ray Dep. Tr.] at 89:14–90:4, 92:8–93:5, 94:17– |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | 95:3, 95:18–96:1, 212:16–213:15, 216:7–25; 218:12–23; Ex. 40 [Ray Dep. Ex. 113] at 1220 ("No staff were aware of minor's right to challenge secure placement . . . No one has been communicating this right to minors"); Ex. 24 [Heath Dep. Tr.] at 283:21- 284:15; Ex. 65 [J.M.R.R. Decl.] ¶ 4 at 1445; Ex. 67 [K.L.F. Decl.] ¶ 8 at 1457; Ex. 62 [D.S.J.L. Decl.] ¶ 4 at 1431. ***Fourth***, ORR's policy does not require that the NOP include documents or other evidence supporting the step-up decision. Ex. 12 [Biswas Dep. Tr.] at 69:16–70:9; *see* Ex. 1 [ORR Policy Guide] § 1.2.4 at 24 (no reference to including these documents or evidence); Ex. 2 [ORR MAP] § 1.2.4, at 65–66 (same); *id.* § 1.4.2 at 91 (same); id. § 1.4.2, Fig. 1.12 at 94 (evidence used for 30-day review available upon demand by UAC's attorney); *id.* at 123–24. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact.  First, it is ORR's practice and policy that when a UAC is stepped up to a more restrictive setting, the UAC is provided with a NOP regarding the grounds for their placement in a language that he/she understands and the assigned case manager reviews the NOP with the UAC in a language the UAC understands.  The case manager is available to answer the child's questions about placement and reunification efforts, among others.  *See* Fact Response ¶¶ 189, 190.  To the extent Plaintiffs "have little or no knowledge of the United States' legal system," ORR provides all UACs with "[l]egal services information, including the viability of free legal assistance, the right to be represented by counsel at no expense to the government, the right to a removal hearing before an immigration judge, the right to apply for voluntary departure or to request voluntary departure in lieu of deportation." ORR Guide §3.3; Fact Response ¶ 226.  Second, as discussed in Fact Response ¶ 185, therapeutic group homes are no more restrictive than non-secure shelters so there is no expectation that children placed in a therapeutic group home would receive a NOP.  Third, ORR's practice does not require that the NOP include documents or other evidence supporting the step-up decision, however, the lack of supporting evidence regarding the step-up decision does not create a genuine dispute of material fact regarding whether the NOP "explains to a UAC their ability to challenge their placement before the ORR Director or in federal court."  In any event, Defendants note that as a matter of practice, "secure placements

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| such as Shenandoah Valley Juvenile Center include in the NOP the full summary of information presented by the case manager to the FFS used to make the decision. Thus, the NOP in these cases contains all the information that the case manager and case coordinator reviewed in recommending whether a child should be stepped up or remain in a more restrictive placement." DX-10 [Biswas Decl.] ¶ 43; *see also* Fact Response ¶ 192. | |
| 57. It is ORR's policy and practice that the assigned case manager at the ORR grantee care facility will review the NOP with the UAC in a language the UAC understands, which the minor is asked to sign and date.<br><br>ORR MAP § 1.4.2; Biswas 30(b)(6) Dep. 65:2-20, 79:1-14, 80:18-81:7, 81:17-82:8, 83:12-23; Contreras Dep. 81:23-82:11, 116:1-22; Vasquez Dep. 145:6-15, 145:22-25, 146:15-19; Ray Dep. 98:8-99:1, 196:11-23, 197:9-14; ORR Juvenile Coord. Rep. at 30, Antkowiak Decl. ¶ 28. | **Partially Disputed.** Plaintiffs do not dispute that the ORR MAP Section 1.4.2 states that a UAC is provided with a NOP in the language he/she understands and the ORR MAP lays out the procedures for the case manager to provide the NOP to the child in a language he/she understands and asks the minor to sign and date it. Plaintiffs dispute that Defendants adhere to their policies in practice. Plaintiffs further dispute that any "review" that takes place is meaningful. In practice, stepped up children do not consistently know or understand the reasons for restrictive placement, Ex. 24 [Heath Depo. Tr.] at 283:21–284:15; Ex. 70 [K.S.G.P. Decl.] ¶ 2 at 1470; Ex. 82 [Y.A.M.S. Decl.] ¶ 42 at 1532; Ex 62 [D.S.J.L. Decl.] ¶ 4 at 1431; Ex. 44 [Ray Dep. Ex. 119] at 1264 (noting non-compliance issues of not (1) "providing a NOP every 30 days," (2) "providing a NOP written in a language the minor understands," (3) "providing a summary in the NOP," (4) "providing a summary in the NOP in a language the minor understands," and (5) "citing evidence for placement basis in NOP"), and are not consistently informed and sometimes do not understand that they may contest restrictive placement, Ex. 33 [Ray Dep. Tr.] at 89:14–90:4, 92:8–93:5, 94:17–95:3, 95:18–96:1, 212:16–213:15, 216:7- 25; 218:12-23; Ex. 40 [Ray Dep. Ex. 113] at 1220 ("No staff were aware of minor's right to challenge secure placement . . . No one has |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | been communicating this right to minors"); Ex. 24 [Heath Dep. Tr.] at 283:21–284:15; Ex. 65 [J.M.R.R. Decl.] ¶ 4 at 1445; Ex. 67 [K.L.F. Decl.] ¶ 8 at 1457; Ex. 62 [D.S.J.L. Decl.] ¶ 4 at 1431. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as to ORR's practice of reviewing a NOP with a UAC.  As demonstrated in Fact Response ¶ 189, the declarations that Plaintiffs cite are from children who have a long, complex and severe mental health histories and for whom acute psychiatric symptoms made them a danger to themselves or others, or necessitated their immediate step-up to an RTC for safety reasons. | |
| 58. It is ORR's policy and practice that ORR separately reviews each NOP at least once every 30 days through an internal monitoring panel to ensure the NOPs are compliant with ORR policy and that the placement decisions continue to meet ORR criteria for placement in a restrictive setting.<br><br>ORR Guide § 1.4.2; Fink Dep. 28:20-29:13, 84:2-7, 87:14-19; Biswas Dep. 29:23-31:7, 31:20-23, 34:2-7; Biswas 30(b)(6) Dep. 32:5-12, 33:14-34:9, 53:16-54:14, 86:23-87:5, 259:20-260:1, 313:12-20, 308:7-14; Ray Dep. 70:8-71:1; Biswas Decl. ¶ 51; ORR Juvenile Coord. Rep. at 30. | <u>**Partially Disputed.**</u> Plaintiffs do not dispute that ORR has a compliance review work group that is tasked with reviewing NOPs at least once every 30 days. Plaintiffs dispute that Defendants' cited evidence supports the existence of any written policy regarding an internal monitoring panel. Nor does the ORR Policy Guide or ORR MAP include any reference to an internal monitoring panel with respect to placement decisions. Ex 1 [ORR Policy Guide] at 22–33; Ex 2 [ORR MAP] at 58–133. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as to the existence of an internal monitoring panel.  DX-10 [Biswas Decl.] ¶ 51 (ORR "has a central compliance review team that reviews placements in and step-ups for secure, staff-secure, and RTC facilities."); *see also* Fact Response ¶ 212. | |
| 59. In November 2018, when ORR first started doing its compliance reviews through the monitoring panel, there were noncompliant cases, but since then, the reviews have resulted in almost 100 | <u>**Partially Disputed.**</u> Plaintiffs do not dispute that in November 2018, when ORR first started doing its compliance reviews through the monitoring panel, there were noncompliant cases. In fact, the majority of kids placed in secure facilities were |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| percent compliance for secure placements.<br><br>Ray Dep. 109:24-113:7, 115:6-116:4, 164:15-21; Biswas Decl. ¶ 52. | inappropriately placed. Ex 33 [Ray Dep. Tr.] at 163:19–25; Ex. 190 at 427. Plaintiffs dispute that "the reviews have resulted in almost 100 percent compliance for secure placements." There is evidence of continued compliance issues. Ex. 139 [Ray Dep. Ex. 118] at 2028; Ex. 44 [Ray Dep. Ex. 119] at 1264; Ex 173 [Ray Dep. Ex. 121] at 272; *see also* DX-33 [Ray Dep. Tr.] at 109:24–110:25. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as to whether ORR's compliance reviews have resulted in almost 100 percent compliance for secure placement except to the extent it omits relevant testimony. *See, e.g.*, DX-33 [Ray Dep.] 109:17-110:2 ("Q: And by the time your five-month tenure doing compliance review ended, there were about ten kids in secure placement and you had zero issues of noncompliance? A: That's correct. Q: So do you know anything about the current levels? A: I don't know what last week's compliance review was, for example, but I believe that the secure facilities are still in full compliance."), 110:16-24 ("Q: And is it your testimony that of the ones that you recall sitting here today, these e-mails regarding compliance in the secure facilities between March and October of 2019, you believe that every single one of them has been 100 percent compliant? A: No, I'm not sure about that. Q: So it's possible there have been some noncompliance issues? A: I mean, it's possible."). Plaintiffs' cited evidence also includes an inquiry regarding possible compliance, but no evidence that a compliance issue existed, Ex. 139 [Ray Dep. Ex. 118] at 2028, as well as two January 2019 emails concerning compliance issues a mere two months after ORR's compliance work began, Ex. 44 [Ray Dep. Ex. 119] at 1264, Ex. 173 [Ray Dep. 121] at 272.

| 60. It is ORR's policy and practice that at least every 30 days, care provider staff, in collaboration with the case coordinator and FFS, reviews the placement of a UAC who is placed in a secure, staff-secure, or residential treatment center facility to determine whether a new level of care is more appropriate.<br><br>ORR Guide § 1.4.2; Biswas Dep. 198:11-14, 221:3-10; Biswas 30(b)(6) Dep. 30:14-19, 31:11-17, 32:5-13, 33:14-34:9, 51:23-52:7, 356:3-7; David Dep. 148:11- | **Partially Disputed.** Plaintiffs do not dispute that ORR policy provides that "[a]t least every 30 days, the care provider staff, in collaboration with the Case Coordinator and the ORR/FFS, reviews the placement of a UAC into a secure, staff secure, or RTC facility to determine whether a new level of care is more appropriate." Ex 1 [ORR Policy Guide] § 1.4.2 at 28. Plaintiffs dispute that it is ORR's practice to conduct 30-day placement reviews at least every 30 days. Ex. 44 [Ray Dep. Ex. 119] at 1264 (citing non-compliance issue of "[n]ot providing a NOP |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| 149:5; Smith Dep. 146:6-15; Contreras Dep. 136:15-25, 137:6-25; Fink Dep. 83:15-84:1, 137:1-138:4; Heath Dep. 126:2-8; ORR Juvenile Coord. Rep. at 21, 30; Antkowiak Decl. ¶¶ 15-16, 20-21. | every 30 days"); Ex. 45 [Ray Dep. Ex. 120] at 1266 (email from policy analyst Faith Ray to FFS on November 28, 2018 regarding a UAC who had not had a case review since June 30, 2018). Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶¶ 7, 9. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as to ORR's practice and policy of performing a 30-day placement review. *See* Fact Response ¶ 212.

| | |
|---|---|
| 61. Prior to a UAC's 30-day Restrictive Placement Case Review, the case manager meets with the UAC to discuss their behavior and needs, inform them of their upcoming 30-day review, and provide the reason for whether continued placement in a more restrictive setting is warranted.<br><br>Biswas 30(b)(6) Dep. 54:16-55:4, 64:15-20, 74:7-75:6, 88:21-25, 92:16-93:2; Vergara Dep. 116:13-21, 117:13-22; Contreras Dep. 137:17-25; Vasquez Dep. 145:6-15, 145:22-25; Heath Dep. 73:10-74:16, 75:16-20, 76:9-13, 77:11-14, 216:8-217:11; Smith Dep. 97:2-16; Biswas Decl. ¶ 48. | <u>**Partially Disputed.**</u> Plaintiffs dispute this fact insofar as Defendants' statement suggests that the "reasons for whether continued placement in a more restrictive setting is warranted" is provided prior to the 30-day restrictive placement review. Defendant's own evidence suggests that a child is provided reasons for continued placement only after the completion of the 30-day review process. DX-02 [Biswas 30(b)(6) Dep. Tr.] at 54:16–22 ("they're told at the end of the process what their, what the decision has been made regarding their placement, and they're provided a notice of the reasons for either step-down or their continued placement"); DX-26 [Heath Dep. Tr.] at 216:25–217:11 (NOP "is reviewed with the child when they are denied step-down"); DX-10 [Biswas Dec.] ¶ 48 ("Although the child does not participate in the 30-day review, they are provided with the outcome and the evidence that is relied on in determining that continued placement is warranted."). Plaintiffs further dispute this fact insofar as it is not supported by the cited evidence. DX-02 [Biswas 30(b)(6) Dep. Tr.] at 64:15-20 (child informed 30-day review coming up), 74:7–75:6 (going over Policy Guide section 1.4.2; |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | no reference to when basis for placement is provided to a child) , 88:21–25 (child is interviewed by the case manager prior to 30 day review), 92:16–93:2 (case manager would relay information obtained during interview with child conducted prior to 30 day review); DX-05 [Vergara Dep. Tr.] at 116:13–21 children at Shiloh have "the opportunity to discuss placement with their team whenever they want to"), 117:13–22 (children have opportunity to meet with their treatment team regarding placement); DX-22 [Contreras Dep. Tr.] at 137:17–25 (regarding fact that 30-day case reviews at Shenandoah have occurred before the 30th day); DX-24 [Vasquez Dep. Tr.] at 145:6– 15 (regarding fact that case manager and clinicians inform child after a step up decision has been made), 145:22–25 (the reasons for step up are explained); DX-26 [Heath Dep. Tr.] 73:10–74:16 (discussing roles of case managers, clinicians, case coordinators and FFS in placement decisions), 75:16–20 (children are informed they are being considered for step up but no indication they are provided reasons for step up prior to final decision), 76:9–13 (when feasible, children are involved in the staffing of a step-up decision but no indication they are informed of the possible reasons for step up or continued placement prior to final decision), 77:11–14 (FFS testifying that it is her goal to try several behavioral modification plans with kids before they actually get stepped up); DX-28 [Smith Dep. Tr.] at 97:2– 16 (case managers and clinicians communicate regularly with a child about their behaviors; child may have been on a behavioral plan or working to |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | mitigate the need for step up, but no indication minor is informed of basis for possible step up prior to 30-day review). Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 23. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as to whether a case manager meets with the UAC prior to a 30-day review.  Plaintiffs' cited examples establish that UACs are informed of the outcome of a 30-day review after a decision has been made.  That a UAC is provided with a placement decision notice after the completion of the 30-day review process, however, does not mean that the case manager does not meet with the UAC prior to the 30-day review to discuss their continued placement. DX-10 [Biswas Decl.] ¶ 48 ("Leading up to the time of the 30-day review, ORR requires that the case manager meet with the UAC on a weekly basis to go over the UAC's case with him or her, and discuss their behavior and improvements. . . . Although the child does not participate in the 30-day review, they are provided with the outcome and the evidence that is relied on in determining that continued placement is warranted."); Fact Response ¶¶ 197, 213, 215.

| 62. It is ORR's practice that upon conducting the 30-day review, if it is determined that continued placement in a secure, staff-secure, or residential treatment center facility is appropriate, care provider staff document the basis for continued placement in a new NOP and provides the information to the UAC, along with the UAC's attorney of record, legal services provider, or child advocate upon request by these parties.<br><br>Biswas 30(b)(6) Dep. 69:2-6, 70:17-21; David Dep. 158:20-159:3; Vergara Dep. 221:20-25; Eich Dep. 162:10-15;  Fink Dep. 196:23-197:5, Smith Dep. 39:1-20; Antkowiak Decl. ¶ 27. | **<u>Partially Disputed.</u>** Plaintiffs do not dispute that under ORR's MAP a child is supposed to receive a NOP shortly after arriving at a restrictive placement and every 30-days thereafter. Ex. 2 [ORR MAP] § 1.2.4 at 65–66; *id.* § 1.4.2 at 93–95.  Plaintiffs dispute that the cited evidence supports the statement that "care provider staff" in practice provide a new NOP to the UAC with the basis for continued placement. Ex. 29 [Nathan-Pineau Dep. Tr.] at 60:1–10 (After receiving the notice of placement and showing them to their clients, "many of the children [they] speak with don't remember seeing the form or don't recognize it."). Ex. 44 [Ray Dep. Ex. 119] at 1264 (noting non-compliance issues of not (1) "providing a NOP every 30 days," (2) "providing a summary in the NOP," and (3) citing evidence for placement basis in NOP"). Plaintiffs dispute Defendants' |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | statement to the extent it suggests UACs understand the information on the NOP. Stepped up children do not consistently know or understand the reasons for restrictive placement. Ex. 24 [Heath Depo. Tr.] at 283:21–284:15; Ex. 70 [K.S.G.P. Decl.] ¶ 2 at 1470; Ex. 82 [Y.A.M.S. Decl.] ¶ 42 at 1532; Ex 62 [D.S.J.L. Decl.] ¶ 4 at 1431; Ex. 44 [Ray Dep. Ex. 119] at 1264 (noting non-compliance issues of not (1) "providing a NOP every 30 days," (2) "providing a NOP written in a language the minor understands," (3) "providing a summary in the NOP," (4) "providing a summary in the NOP in a language the minor understands," and (5) "citing evidence for placement basis in NOP"), and are not consistently informed and sometimes do not understand that they may contest restrictive placement. Ex. 33 [Ray Dep. Tr.] at 89:14–90:4, 92:8–93:5, 94:17–95:3, 95:18–96:1, 212:16– 213:15, 216:7–25; 218:12–23; Ex. 40 [Ray Dep. Ex. 113] at 1220 ("No staff were aware of minor's right to challenge secure placement . . . No one has been communicating this right to minors"); Ex. 24 [Heath Dep. Tr.] at 283:21–284:15; Ex. 65 [J.M.R.R. Decl.] ¶ 4 at 1445; Ex. 67[K.L.F. Decl.] ¶ 8 at 1457; Ex. 62 [D.S.J.L. Decl.] ¶ 4 at 1431. Plaintiffs also dispute Defendants' statement to the extent it suggests or implies that a new NOP is provided to a child's attorney automatically. The NOP is only provided to a child's attorney upon request and that request process can take several weeks and sometimes even a year. Ex. 29 [Nathan-Pineau Dep. Tr.] at 16:13–21 (non-expedited file requests take 3– |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | 12 months; expedited request takes 2–3 weeks). |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as the experience of one legal practitioner is not evidence sufficient to establish that, as a matter of practice, ORR does not provide a new NOP to the UAC with the basis for continued placement following a 30-day review. Furthermore, as discussed *supra*, Fact Reply ¶ 57, the declarations that Plaintiffs cite are from children who have a long, complex and severe mental health histories and for whom acute psychiatric symptoms made them a danger to themselves or others, or necessitated their immediate step-up to an RTC for safety reasons. These individual incidents do not establish that it is a common occurrence for UACs to not consistently know or understand the reasons for restrictive placement. *See* Fact Response ¶¶ 189, 190, 192, 241, 247, 253, 263

| | |
|---|---|
| 63. A UAC may challenge placement or release at an ORR grantee care facility by seeking judicial review in federal district court.<br><br>*Flores* Settlement Agreement ¶ 24B; Biswas Dep. 225:9-14; David Dep. 159:9-16; Contreras Dep. 116:1-6, 118:13-18; Biswas Decl. ¶ 61. | **Disputed.** Plaintiffs dispute that the evidence cited supports the statement that a UAC may challenge a release decision through a *Flores* 24B hearing, as that can only be used to seek judicial review of a placement decision, not a release decision. Ex. 8 [*Flores* Settlement Agreement] ¶ 24B at 578–79. Plaintiffs also dispute that a child may challenge his or her placement or release where Plaintiff Class Members are typically indigent, speak little or no English, and have little or no knowledge of the United States' legal system. ECF No. 144 [Answer] ¶ 146; Ex. 6 [RFA 2nd Set] No. 141 at 538–39. And where ORR prohibits legal service providers from using federal funds appropriated in furtherance of the TVPRA to represent children with respect to (i) release to available custodians, (ii) restrictive placement, …" ECF No. 144 [Answer] ¶ 111; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 398:3–400:12; *see also* DX-29 [Nathan-Pineau Dep. Tr.] at 125:16-127:11 (discussing restrictions placed on Vera-funded legal service providers' ability to represent clients; Vera-funded legal service providers can't initiate representation solely |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
|  | for the purpose of representing a child in a bond or custody review). Plaintiffs further dispute this fact to the extent Defendants rely on inadmissible evidence. *See* Evidentiary Objections ¶ 26. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact. As Plaintiffs negotiated in the *Flores* Settlement Agreement (¶ 24B), a UAC may challenge placement by seeking judicial review in federal court at any time. UACs may also request a *Flores* bond hearing, during which an immigration judge decides whether the child poses a danger to the community. A decision by an immigration judge that a UAC is not a danger to the community "supersedes an ORR determination on that question, unless the immigration judge's decision is overturned by the Board of Immigration Appeals (BIA)." ORR, in turn, "takes into consideration the immigration judge's decision in the bond hearing about the youth's level of danger when assessing the youth's placement and conditions of placement." *See* ORR Guide § 2.9; DX-10 [Biswas Decl.] ¶ 53 ("Children also have the opportunity to request '*Flores* bond hearings" before immigration judges."); DX-15 [Biswas Dep.] 225:3-14; DX-02 [Biswas 30(b)(6) Dep.] 106:8-13; Fact Response ¶¶ 66, 201, 202. Defendants do not dispute that Plaintiffs are "typically indigent" and "speak little or no English," but, as discussed *supra*, Fact Reply ¶ 56, the UAC is provided with a NOP regarding the grounds for their placement in a language that he/she understands and the assigned case manager reviews the NOP with the UAC in a language the UAC understands and is available to answer the child's questions about placement and reunification efforts, among others. *See* Fact Response ¶¶ 189, 190. And, to the extent Plaintiffs "have little or no knowledge of the United States' legal system," ORR provides all UACs with "[l]egal services information, including the viability of free legal assistance, the right to be represented by counsel at no expense to the government, the right to a removal hearing before an immigration judge, the right to apply for voluntary departure or to request voluntary departure in lieu of deportation." ORR Guide § 3.3; Fact Response ¶ 226.

Finally, Plaintiffs' contention that funds have been "appropriated in furtherance of the TVPRA to represent children with respect to (i) release to available custodians, [and] (ii) restrictive placements" is a legal argument. As the Court's standing order envisioned no legal arguments in the parties' factual exchanges, ECF No. 17 § 5.d.i ("No legal argument should be set forth in this document"), Defendants do not here present legal arguments responding to Plaintiffs' legal argument, but Defendants reserve the right to do so elsewhere or in the future.

| 64. It is ORR's policy and practice that a UAC placed in a secure facility or a | **<u>Partially Disputed.</u>** Plaintiffs do not dispute that ORR policy states that "After 30 days of |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| residential treatment center can challenge that placement by requesting review by the ORR Director or the ORR Director's designee after 30 days of placement.<br><br>ORR Guide § 1.4.7; Biswas 30(b)(6) Dep. 77:23-78:7; David Dep. 159:9-16; Antkowiak Decl. ¶ 9; Biswas Decl. ¶ 57. | placement in a secure or RTC facility, UAC may request the ORR Director, or the Director's designee, to reconsider their placement." Ex 1 [ORR Policy Guide] § 1.4.7 at 30.  As Defendants' evidence only speaks to Defendants' alleged policies, Plaintiffs dispute that ORR's policy (or any of the cited evidence) also reflect ORR's practices. ORR Guide § 1.4.7 (ORR policy); DX-02 [Biswas 30(b)(6) Dep. Tr.] at 77:23–78:7 (referring to ORR Policy guide on request for reconsideration); DX-20 [David Dep. Tr.] at 159:9–16 (regarding notice to children of right to seek reconsideration or judicial review); DX-09 [Antkowiak Decl.] ¶ 9 (referring specifically to what is provided under ORR Policy Guide section 1.4.7); DX-10 [Biswas Decl.] ¶ 57 (same). |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs point to no evidence that class members have sought to appeal to the ORR Director or the ORR Director's designee after 30 days of placement and that ORR denied such an appeal as a matter of practice. | |
| 65. It is ORR's practice that a UAC may request a bond hearing where an immigration judge will assess whether the UAC poses a danger to the community, and are notified of this shortly upon entering the shelter and during their review of the NOP.<br><br>Biswas Dep. 183:20-23, 225:9-14; Biswas 30(b)(6) Dep. 106:3-7; Castaneda Dep. 81:12-23; ORR Juvenile Coord. Rep. at 31; *Flores* Settlement Agreement ¶ 24A; Biswas Decl. ¶¶ 53-55. | <u>**Partially Disputed.**</u> Plaintiffs do not dispute that evidence supports the existence a policy for allowing minors to request a bond hearing and that policy states that minors are to be informed of the opportunity. However, Plaintiffs dispute that the evidence supports Defendants' statement that it is "ORR's practice" that a UAC may request a bond hearing. *See* DX-15 [Biswas Dep. Tr.] at 183:20–23 (merely stating that children have a right to a bond hearing), 225:9–14 (same); DX-02 [Biswas 30(b)(6) Dep. Tr.] at 106:3–7 (child can seek a bond hearing); DX-34 [Castaneda Dep. Tr.] at 81:12–23 (same); Dx-11 [ORR Juvenile Coord. Rep.] at 31 (same); Ex. 8 [*Flores* Settlement Agreement] ¶ 24A at |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
|  | 578 (minor has right to request a *Flores* bond hearing); DX- 10 [Biswas Decl.] ¶ 53 (referring to sections 1.4.2 and 2.9 of the ORR Policy Guide; *id.* ¶¶ 54–55 (see objection). Plaintiffs dispute that children are informed of this right where Plaintiff Class Members are typically indigent, speak little or no English, and have little or no knowledge of the United States' legal system, ECF No. 144 [Answer] ¶ 146; Ex. 6 [RFA 2nd Set] No. 141 at 538–39, and stepped up children are not consistently informed and sometimes do not understand that they may contest restrictive placement. Ex. 33 [Ray Dep. Tr.] at 89:14–90:4, 92:8–93:5, 94:17–95:3, 95:18–96:1, 212:16–213:15, 216:7- 25; 218:12-23; Ex. 40 [Ray Dep. Ex. 113] at 1220 ("No staff were aware of minor's right to challenge secure placement . . . No one has been communicating this right to minors"); Ex. 24 [Heath Dep. Tr.] at 283:21–284:15; Ex. 65 [J.M.R.R. Decl.] ¶ 4 at 1445; Ex. 67 [K.L.F. Decl.] ¶ 8 at 1457; Ex. 62 [D.S.J.L. Decl.] ¶ 4 at 1431. Plaintiffs also dispute that in practice UACs are informed of their right to request a bond hearing during the review of the NOP. The NOP only refers to a minor's ability to challenge his or her placement through the ORR Director review or through Federal District Court review, not through an immigration bond hearing before an immigration judge. Ex. 2 [ORR MAP] Appendix 1.3 Notice of Placement in Restrictive Setting at 123–24. Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶¶ 24–25. |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs point to no evidence that ORR prohibited class members from applying for a bond hearing as a matter of practice.  Nor do Plaintiffs present any evidence that in practice, UACs are not informed of their right to request a bond hearing during the review of the NOP, other than to note that the NOP does not expressly provide for that right.  As discussed *supra*, Fact Reply ¶¶ 56, 63, Defendants do not dispute that Plaintiffs are "typically indigent" and "speak little or no English," but the UAC is provided with a NOP regarding the grounds for their placement in a language that he/she understands and the assigned case manager reviews the NOP with the UAC in a language the UAC understands and is available to answer the child's questions about placement and reunification efforts, among others.  *See* Fact Response ¶¶ 189, 190.  And, to the extent Plaintiffs "have little or no knowledge of the United States' legal system," ORR provides all UACs with "[l]egal services information, including the viability of free legal assistance, the right to be represented by counsel at no expense to the government, the right to a removal hearing before an immigration judge, the right to apply for voluntary departure or to request voluntary departure in lieu of deportation." ORR Guide § 3.3; Fact Response ¶ 226; *see also* Fact Response ¶¶ 202, 203, 216, and 276 (discussing how ORR rule implementing the *Flores* Settlement Agreement described the process for bond hearings). | |
| 66. While ORR is not bound by the immigration judge's bond hearing determination, ORR takes the immigration judge's decision into consideration in determining whether the UAC should be stepped down.<br><br>Biswas Dep. 225:9-14; Biswas 30(b)(6) Dep. 106:8-13; Biswas Decl. ¶ 53. | **Undisputed** for purposes of this motion. |
| 67. UACs seeking to challenge a placement decision in a secure or residential treatment center facility may also seek administrative review by ORR's Placement Review Panel (PRP), beginning 30 days after the child's initial placement.<br><br>ORR Juvenile Coord. Rep. at 31, 32; Biswas Decl. ¶ 59. | **Disputed.** Plaintiffs dispute this fact for at least four reasons. First, Plaintiffs dispute that children in RTCs may seek administrative review by ORR's Placement Review Panel where legal advocates who provide services to children in RTCs are unaware of the existence of such a program. Ex 185 [Enriquez Decl.] ¶ 8 at 359 ("Neither I nor my staff have ever heard of the PRP's existence or are aware of any child at MercyFirst who has accessed the PRP."). |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | Second, despite Defendants' statement, Defendants have no actual policy implementing the alleged program, and it is not referenced in ORR's Policy Guide nor its MAP. *See* Ex. 1 [ORR Policy Guide] § 1 at 22–23; Ex. 2 [ORR MAP] § 1 at 58–133. There is no reference to a PRP program or a process by which a UAC and/or his attorney can request a *hearing* concerning continued placement at an RTC or secure facility. *See* Ex. 1 [ORR Policy Guide] § 1; Ex. 2 [ORR MAP] § 1.  Third, the ORR's NOP form makes no reference to review by "ORR's Placement Review Panel (PRP)"). Ex. 2 [ORR MAP] Appendix 1.3 Notice of Placement at 123–24.  Finally, Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶¶ 1–2. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as the experience of one legal practitioner does not create a genuine dispute of material fact suggesting that, as a matter of practice, UACs are not permitted to seek administrative review.  Plaintiffs also complain that the PRP is not mentioned in the ORR Guide, the ORR MAP, or the NOP, however, Defendants' uncontroverted fact does not assert that it is, merely that the vehicle exists for UACs to challenge placement decisions.  DX-10 [Biswas Decl.] ¶ 59 ("Starting in March 2020, ORR has a pilot project for the Director Review to occur through the [PRP]."); Fact Response ¶ 204; *see also* Fact Reply ¶ 153.

| 68. The PRP comprises three ORR staff members with several years of experience as professionals in the fields of child welfare, mental health, and related policy.<br><br>ORR Juvenile Coord. Rep. at 32; Biswas Decl. ¶ 59. | <u>**Disputed.**</u> Plaintiffs dispute this fact for at least three reasons. First, Plaintiffs dispute that children in RTCs may seek administrative review by ORR's Placement Review Panel where legal advocates who provide services to children in RTCs are unaware of the existence of such a program. Ex 185 [Enriquez Decl.] ¶ 8 at 359.  Plaintiffs also dispute the statement to the extent such program is not referenced in ORR's Policy Guide nor its MAP. *See* Ex. 1 [ORR Policy |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | Guide] § 1 at 22−33; Ex. 2 [ORR MAP] § 1 at 58−133. Indeed, there is no reference to a PRP program or a process by which a UAC and/or his attorney can request a *hearing* concerning continued placement at an RTC or secure facility. *See id.* Finally, Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶¶ 1–2. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material for the same reasons stated in Fact Reply ¶ 67. *See also* Fact Reply ¶ 153. | |
| 69. Before the PRP is conducted, the UAC (or the UAC's attorney) is given the opportunity to review ORR's evidence in support of continued placement at a residential treatment center or secure facility.<br><br>ORR Juvenile Coord. Rep. at 32; Biswas Decl. ¶ 59. | <u>**Disputed.**</u> Plaintiffs dispute this fact for at least three reasons. First, Plaintiffs dispute that children in RTCs may seek administrative review by ORR's Placement Review Panel where legal advocates who provide services to children in RTCs are unaware of the existence of such a program. Ex 185 [Enriquez Decl.] ¶ 8 at 359. Plaintiffs also dispute the statement to the extent such program is not referenced in ORR's Policy Guide nor its MAP. *See* Ex. 1 [ORR Policy Guide] § 1 at 22−33; Ex. 2 [ORR MAP] § 1 at 58−133. Indeed, there is no reference to a PRP program or a process by which a UAC and/or his attorney can request a *hearing* concerning continued placement at an RTC or secure facility. *See id.* Finally, Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶¶ 1–2. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact for the same reasons stated in Fact Reply ¶¶ 67, 68. *See also* Fact Reply ¶ 153. | |
| 70. The UAC (or the UAC's attorney) can provide the PRP with a written statement concerning continued placement at a residential treatment center or secure facility. | <u>**Disputed.**</u> Plaintiffs dispute this fact for at least three reasons. First, Plaintiffs dispute that children in RTCs may seek administrative review by ORR's Placement Review Panel where legal advocates who |

77

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| ORR Juvenile Coord. Rep. at 32; Biswas Decl. ¶ 59. | provide services to children in RTCs are unaware of the existence of such a program. Ex 185 [Enriquez Decl.] ¶ 8 at 359.  Plaintiffs also dispute the statement to the extent such program is not referenced in ORR's Policy Guide nor its MAP.  *See* Ex. 1 [ORR Policy Guide] § 1 at 22−33; Ex. 2 [ORR MAP] § 1 at 58−133. Indeed, there is no reference to a PRP program or a process by which a UAC and/or his attorney can request a *hearing* concerning continued placement at an RTC or secure facility. *See id.*  Finally, Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶¶ 1–2. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact for the same reasons stated in Fact Reply ¶¶ 67, 68, 69.  *See also* Fact Reply ¶ 153. | |
| 71. It is ORR's policy and practice that the UAC (or the UAC's attorney) can request a hearing concerning continued placement at a residential treatment center or secure facility.<br><br>ORR Juvenile Coord. Rep.  at 32; Biswas Decl. ¶ 59. | **Disputed.** Plaintiffs dispute this fact for at least three reasons. First, Plaintiffs dispute that children in RTCs may seek administrative review by ORR's Placement Review Panel where legal advocates who provide services to children in RTCs are unaware of the existence of such a program. Ex 185 [Enriquez Decl.] ¶ 8 at 359.  Plaintiffs also dispute the statement to the extent such program is not referenced in ORR's Policy Guide nor its MAP. *See* Ex. 1 [ORR Policy Guide] § 1 at 22−33; Ex. 2 [ORR MAP] § 1 at 58−133. Indeed, there is no reference to a PRP program or a process by which a UAC and/or his attorney can request a *hearing* concerning continued placement at an RTC or secure facility. *See id.*  Finally, Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶¶ 1–2. |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact for the same reasons stated in Fact Reply ¶¶ 67, 68, 69, 70. *See also* Fact Reply ¶ 153. | |
| 72. In matters pending before the PRP, where the child does not have an attorney, ORR encourages the grantee care program to seek assistance for the child from a contracted legal service provider or child advocate.<br><br>ORR Juvenile Coord. Rep. at 32; Biswas Decl. ¶ 59. | <u>**Disputed.**</u> Plaintiffs dispute this fact for at least three reasons. First, Plaintiffs dispute that children in RTCs may seek administrative review by ORR's Placement Review Panel where legal advocates who provide services to children in RTCs are unaware of the existence of such a program. Ex 185 [Enriquez Decl.] ¶ 8 at 359. Plaintiffs also dispute the statement to the extent such program is not referenced in ORR's Policy Guide nor its MAP. *See* Ex. 1 [ORR Policy Guide] § 1 at 22−33; Ex. 2 [ORR MAP] § 1 at 58−133. Indeed, there is no reference to a PRP program or a process by which a UAC and/or his attorney can request a *hearing* concerning continued placement at an RTC or secure facility. *See id.* Finally, Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶¶ 1–2. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact for the same reasons stated in Fact Reply ¶¶ 67, 68, 69, 70, 71. *See also* Fact Reply ¶ 153. | |
| 73. In matters pending before the PRP, where the child does not have an attorney, ORR arranges for ORR's Juvenile Coordinator to act as an advocate for the child, if needed.<br><br>ORR Juvenile Coord. Rep. at 32; Biswas Decl. ¶ 59. | <u>**Disputed.**</u> Plaintiffs dispute this fact for at least three reasons. First, Plaintiffs dispute that children in RTCs may seek administrative review by ORR's Placement Review Panel where legal advocates who provide services to children in RTCs are unaware of the existence of such a program. Ex. 185 [Enriquez Decl.] ¶ 8 at 359. Plaintiffs also dispute the statement to the extent such program is not referenced in ORR's Policy Guide nor its MAP. *See* Ex. 1 [ORR Policy Guide] § 1 at 22−33; Ex. 2 [ORR MAP] § 1 at 58−133. Indeed, there is no reference to a |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
|  | PRP program or a process by which a UAC and/or his attorney can request a *hearing* concerning continued placement at an RTC or secure facility. *See id.*  Finally, Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶¶ 1–2. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact for the same reasons stated in Fact Reply ¶¶ 67, 68, 69, 70, 71, 72.  *See also* Fact Reply ¶ 153. | |
| 74. In matters pending before the PRP, after reviewing the evidence, statements, and holding a hearing if the child (or child's attorney) requested one, the PRP provides the child a written decision regarding placement.<br><br>ORR Juvenile Coord. Rep. at 32; Biswas Decl. ¶ 59. | **Disputed.** Plaintiffs dispute this fact for at least three reasons. First, Plaintiffs dispute that children in RTCs may seek administrative review by ORR's Placement Review Panel where legal advocates who provide services to children in RTCs are unaware of the existence of such a program. Ex 185 [Enriquez Decl.] ¶ 8 at 359.  Plaintiffs also dispute the statement to the extent such program is not referenced in ORR's Policy Guide nor its MAP. *See* Ex. 1 [ORR Policy Guide] § 1 at 22−33; Ex. 2 [ORR MAP] § 1 at 58−133. Indeed, there is no reference to a PRP program or a process by which a UAC and/or his attorney can request a *hearing* concerning continued placement at an RTC or secure facility. *See id.* Finally, Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶¶ 1, 2. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact for the same reasons stated in Fact Reply ¶¶ 67, 68, 69, 70, 71, 72, and 73.  *See also* Fact Reply ¶ 153. | |
| 75. ORR seeks to avoid unnecessary delay in stepping up a UAC who requires a more restrictive placement due to potential harm the delay in step-up could cause to the UAC or others at the current facility. | **Disputed**. Plaintiffs dispute that providing sufficient due process prior to step up would cause "unnecessary delay," especially considering that children who are stepped up spend, on average, more time in custody than |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| Biswas 30(b)(6) Dep. 325:12-20, 267:21-268:9; De La Cruz Dep. 249:12-250:4; Dr. Lubit Expert Rep. ¶ 3(b); Antkowiak Decl. ¶¶ 33-34. | those who are not stepped up. Ex. 57 [Ryo Expert Rep.] at 1403. Plaintiffs further dispute Defendants' statement to the extent it implies that the determination regarding harmfulness is always correct. In practice, ORR has erroneously stepped up children. ECF No. 144 [Answer] ¶ 75; Ex. 33 [Ray Dep. Tr.] at 148:16–22, 152:14–153:22; 157:10–158:17, 162:7–10, 163:14–164:12; 166:23–167:7; Ex. 43 [Ray Dep. Ex. 117] at 1261–62; Ex. 139 [Ray Dep. Ex. 118] at 2028; Ex. 44 [Ray Dep. Ex. 119]; Ex. 16 [Contreras Dep. Tr.] at 71:3–12, 75:11–76:1, 76:18–77:3, 77:5–78:1, 80:2–17, 105:5–106:22, 113:12– 114:17; Ex. 22 [Fields Dep. Tr.] at 123:5–16, 172:7–15; Ex. 23 [Fink Dep. Tr.] at 40:13–17, 153:8–13; Ex. 24 [Heath Dep. Tr.] at 98:5–16, 99:3– 7; Ex. 14 [Castaneda Dep. Tr.] at 74:13-76:7, 88:21–90:9; Ex. 20 [Eich Dep. Tr.] at 108:7–109:5; Ex. 96 at 1757.  Plaintiffs also dispute Defendants' statement to the extent the cited evidence implies ORR makes an appropriate "dangerousness determination." Although ORR uses the criteria whether a child is a "danger to self or others" to determine step-up or step-down eligibility, ORR employs no standardized metric to determine whether a child meets this standard, i.e., the child is a danger to self or others. Ex. 24 [Heath Dep. Tr.] at 96:19–22 (not aware of the use of a specific metric to assess dangerousness), 97:23-25 (aware of OYAH tool but not trained in it), 98:1-4 (FFS testifying she is not trained in any specific criteria to assess danger to self or others before making a step-up decision); Ex. 1 [ORR Policy Guide] § 1.2.1 at 23 (placement consideration |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | "danger to self" and "danger to the community"); *id.* § 1.2.4 at 24 (secure placement criteria includes "danger to self or others"); *id.* § 1.4.2 at 29 ("[s]tep downs may occur when ORR, in its discretion, determines the UAC no longer poses a danger to himself or others"); *id.* § 1.4.6 at 30 (RTC placement criteria – danger to self or others)). Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶¶ 12–13. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs' cited evidence that "children who are stepped up spend, on average, more time in custody than those who are not stepped up" does not establish a causal relationship between step-up and longer stays in ORR care. DX-77 [Ryo Dep. Tr.] 31:8, 38:13-15 ("I am not making any causal inferences or causal claims in my report, nor does the data allow for that kind of an inference or conclusion."); *see also* DX-31 [Dr. Ryan Expert Rebuttal Rep.] ¶ 20 ("One may read Dr. Ryo's report and walk away with the idea that certain ORR placement types directly increase a child's length of stay in care. . . . A more accurate statement would be: while placement types may be correlated with length of time in care, there is insufficient evidence of a causative effect."); *id.* at ¶ 23 ("In my opinion, the evidence confirms that length of stay is largely determined by the characteristics of the individual children. Similar, if not identical to children in domestic foster care settings, serious mental and behavioral health challenges explain the overall time in care."). Plaintiffs' cited evidence also omits relevant information or mischaracterizes evidence and implies that it is common or ORR's policy or practice to step up children erroneously to restrictive placements. *See* Fact Response ¶ 218 (detailing extent to which Plaintiffs' citations to evidence omit relevant information or mischaracterize evidence). Finally, Plaintiffs' assertion that there is no "standardized metric" does not create a dispute of material fact with respect to ORR's assessment criteria in assessing whether a child's needs can be safely and appropriately met when those decisions are made consistent with and as required by the TVPRA and child welfare considerations. *See* Fact Response ¶ 150.

| | |
|---|---|
| 76. Residential treatment centers are better equipped to care for youths with more serious psychiatric problems given their greater staff training levels and higher staff-to-child ratios. | **Partially Disputed.** Plaintiffs do not dispute that residential treatment centers have higher staff-to-child ratios. Plaintiffs dispute this statement insofar as the evidence cited does not support the statement that RTCs are "better equipped to care for youth with more |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| Dr. Lubit Expert Rebuttal Rep. ¶ 75; Antkowiak Decl. ¶¶ 13-14. | serious psychiatric problems" or that RTC staff receive greater training. *See* Ex. 175 [Cruise & Rasmussen Expert Rep.] at 296 ("Across the files we reviewed, step ups did not increase the likelihood that UACs were provided with more specialized mental health treatments that better matched their documented mental health diagnoses. … trauma- informed treatments were only documented as being delivered in seven cases with this treatment service being scattered across different placement levels (i.e. shelters, a staff secure facility, and an RTC)."). Moreover, youth have stated they have experienced very poor treatment from RTC staff. *See* Ex. 60 [C.J.A.L. Decl.] ¶ 13 at 1420 ("When I feel really upset, and I feel like I might want to hurt myself, the staff do not help me."); Ex. 61 [D.D.R.O. Decl.] ¶¶ 10–12 at 1426–27; Ex. 62 [D.S.J.L. Decl.] ¶¶ 9–11 at 1432–33 ("I don't feel safe here because the staff are mainly men and because sometimes the staff scream at me. I feel afraid all the time." And describing violent abusive incident with Shiloh staff).  Plaintiffs dispute the statement to the extent it implies that higher staff-to- child ratios and more training necessarily result in better care for children with serious psychiatric problems. *See* Ex. 175 [Cruise & Rasmussen Expert Rep.] at 295 (children more likely to receive trauma-informed therapy at shelter level than at RTCs); Ex. 179 [Matlow & Wang Expert Rep.] at 323–324 (children can feel better supported at less restrictive facilities); Ex. 174 [Block & Farley Expert Rep.] at 280–281, 288–289, 291 (little evidence of effectiveness of RTCs and problematic |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | tendency to equate more restrictive settings with better care).  Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶¶ 5–6. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as to whether residential treatment centers are better equipped to care for youths with more serious psychiatric issues.  First, Plaintiffs concede that RTCs have higher staff-to-child ratios.  Plaintiffs dispute that the cited evidence supports the assertion that RTCs are "better equipped to care for youth with more serious psychiatric problems" or that RTC staff receive greater training, but Plaintiffs' evidence in support of this assertion, Ex. 175 [Cruise & Rasmussen Expert Rep.] at 296, does not support Plaintiffs' assertion that "step ups did not increase the likelihood that UACs were provided with more specialized mental health treatments that better matched their documented mental health diagnoses" was based solely on their own definition of what constitutes "trauma informed" psychotherapy.  *See* Fact Reply ¶ 44.

Plaintiffs further dispute that higher staff-to-child-ratios and more training necessarily result in better care for children with serious psychiatric problems, but, this fails to create a genuine dispute of material fact because "Drs. Matlow and Wang fail to engage in clinical assessment.  They fail to discuss the risks and benefits of the alternative options.  They fail to note that the children need high levels of psychological care, which they get in the RTCs, and would almost certainly not receive in the community once they go to live with a sponsor."  DX-36 [Dr. Lubit's Expert Rebuttal Rep.] at pg. 44. ("[D]etailed review of the cases shows that [children in ORR care] are doing much better at the end of their stays in RTCs than before they went to the RTCs.")

Furthermore, Plaintiffs fail to create a genuine dispute of material fact by citing to their alleged child welfare and mental health experts (Block & Farley) for their allegation that there is "little evidence of effectiveness of RTCs and [there is a] problematic tendency to equate more restrictive settings with better care" as not *all* youth who pose acute safety issues can be safely placed in such settings, even with accommodations in place.  *See* DX-78 [Dr. Londino Expert Rebuttal Rep.] ¶ 39 ("I agree with some of the opinions rendered by Dr. Block and Mr. Farley that advocate for alternative provisions for youth with mental disturbance, especially those with disabilities. . . . I disagree that all youth can be served through [integrated, less restrictive placements that provide greater access to community resources].");  *id.* ("the best intervention for serious mental health issues that cannot be treated in the child's home environment is a facility that has a multidisciplinary treatment

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|

team providing safe, evidence based care that is medically monitored.") (citation and internal quotation marks omitted).  *See also* Fact Reply ¶ 44.

Nor do Plaintiffs' citation to UAC declarations in which the "youth have stated that they have experienced very poor treatment from RTC staff" create a genuine dispute of material fact.  In marked contrast to the UACs' statements in their declarations, the case file records tell a very different story that the youth had severe mental health issues and received ongoing therapeutic and medication management services in order to help them cope with their distressing symptoms.  *See* Fact Response ¶¶ 133, 134, 189; DX-93 at 10-23 (C.J.A.L. expressed suicidal ideation and made a suicide attempt by trying to hang himself while in shelter care; he received a variety of therapeutic interventions at MercyFirst RTC, including: individual, art, and group therapy, and medication management services; case records indicate that, contrary to his claims that RTC staff did not help him, C.J.A.L. improved in his emotional regulation during his stay in the RTC and actively participated in therapy); *see also* DX-93 at 6-9 (D.D.R.O. had suicidal ideation, engaged in self-harm, and heard voices telling him to hurt himself and others; D.D.R.O. received milieu, as well as medication management while placed at the RTC; D.D.R.O was receptive to therapy services but was non-compliant and refused to implement the skills he learned); DX-35 [Dr. Lubit Expert Rep.] Add. 5, pp. 9-12 (discussing D.D.R.O.'s medical records); DX-36 [Dr. Lubit Expert Rebuttal Rep.], p. 59 ¶¶ 58-60; DX-93 at 36-54  (D.S.J.L., who has a history of physical and sexual abuse, and neglect in his home country, was fearful of males due to his past trauma; he was admitted to Shiloh RTC due to depressed mood, self-injurious behavior and suicidal ideation; while at Shiloh, D.S.J.L. received a significant incident report for physical aggression against staff necessitating two therapeutic holds for safety reasons and emergency medication; although the case records do not substantiate his claims of injuries or violence on the part of Shiloh staff, they do show he made false allegations; the only indication of a head injury in his case file stemmed from D.S.J.L.'s history of assault by his father; at Shiloh, D.S.J.L. received therapy services and psychiatric medication monitoring; he reportedly engaged well with his therapist in sessions, and was released to his mother sponsor directly from Shiloh).

| 77. Requiring a hearing before being moved to a restrictive placement would likely result in delay and could increase the risk of harm to the individual and others.<br><br>Dr. Lubit Expert Rep. ¶ 61; Antkowiak Decl. ¶¶ 33, 35-36. | **Disputed.** Plaintiffs dispute that a hearing could increase the risk of harm where there is harm in erroneously stepping up a child. Unnecessarily stepping up children may be contrary to their best interest and detrimental to their long- term psychological well-being. Ex. 6 [RFA 2nd Set] Nos. 169–70 at 542–44; |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | *see also* Ex. 182 [Urquiza Expert Rep.] at 346; DX-46 [Jaime D. Transfer Request] at GOV-0008702 (explaining that Jaime D. is not appropriately placed at Yolo and "[s]taff have also observed his peers provoking this youth due to his young age and size . . . This youth would greatly benefit from a more diverse placement with other youths in the same age range as him.").  Child welfare and mental health experts also hold the view that children who pose acute safety concerns can often be safely maintained in less restrictive settings with appropriate accommodations while alternative interventions are attempted. *See* Ex. 174 [Block & Farley Expert Rep.] at 285–287; *see also* Ex. 175 [Cruise & Rasmussen Expert Rep.] at 296 ("Step-ups justified by mental health diagnoses do not seem to be necessary to meet the UACs' needs or protect the safety of others.").  Plaintiffs also dispute the statement to the extent Defendants presume the truth of their "dangerousness assessment," which is not determined based on the use of a standardized metric. Ex. 24 [Heath Dep. Tr.] at 96:19–22 (admitting she is unaware of any standardized metric used by ORR to assess whether a child is a danger to self or others), 98:1–4 (admitting she is not trained in any specific criteria to assess danger to self or others before making a step-up decision); Ex. 1 [ORR Policy Guide] § 1.2.1 at 23 (placement consideration "danger to self" and "danger to the community"); *id.* § 1.2.4 at 24 (secure placement criteria includes "danger to self or others"); *id.* § 1.4.2 at 29 ("[s]tep downs may occur when ORR, in its discretion, determines the UAC no longer poses a danger to himself |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | or others"); *id.* § 1.4.6 at 30 (RTC placement criteria – danger to self or others); Ex. 1 [ORR Policy Guide] § 1 at 22–33 (providing no standardized metric to assess step down eligibility). Plaintiffs further dispute the asserted fact to the extent Defendants rely on inadmissible evidence. *See* Evidentiary Objections ¶¶ 12, 14–15. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as to whether requiring a hearing before being moved to a restrictive placement would likely result in delay and could increase the risk of harm to the individual and others. First, Plaintiffs' citation to their purported expert Dr. Urquiza's fails to include all pertinent facts relating to Jaime D.'s transfer to Yolo, *see* Ex. 182 [Urquiza Expert Rep.] at 346, is unavailing, and actually underscores Defendants' important concerns about safety issues. As Defendants' expert noted, "Dr. Urquiza said that [Jaime D.] was harmed by being sent to secure care. Dr. Urquiza fails to tell the reader [that] . . . . Jaime was sent to Yolo after telling staff that he had been in the MS-13 gang and had killed four gang members. When in Yolo he said it was not true and was stepped back down." Jaime D.'s initial claims "presented serious risks to the physical and psychological safety of other youths, and to his own safety, given that he communicated this to other youths." *See* DX-36 [Dr. Lubit Expert Rebuttal Rep.] ¶ 11 ("Given the high levels of trauma suffered by UACs, to find out that someone in their midst was potentially an MS-13 gang member who had killed other youths would likely trigger their traumatic memories, especially in the limited structure and security of a shelter, with a far lower staff-to-child ratio than alternative settings."); *see also* DX-44 [Fink JD Decl.] ¶¶ 24-27 (shortly after being stepped up to Yolo, Jaime D. recanted his account of committing violent acts in his home country the basis for his step-up to Yolo, thus leading the staff to conclude that Yolo was not the correct placement); Fact Response ¶ 218.

Furthermore, Plaintiffs fail to create a genuine dispute of material fact by citing their alleged child welfare and mental health experts for their "view that children who pose acute safety concerns can often be safely maintained in less restrictive settings with appropriate accommodations while alternative interventions are attempted" because not *all* youth who pose acute safety issues can be safely placed in such settings, even with accommodations in place. *See* DX-78 [Dr. Londino Expert Rebuttal Rep.] ¶ 39 ("I agree with some of the opinions rendered by Dr. Block and Mr. Farley that advocate for alternative provisions for youth with mental disturbance, especially those with disabilities. . . . I disagree that all youth can be served through [integrated, less restrictive placements that provide greater access to community resources]." *See also* Fact Reply ¶ 44, 76. Plaintiffs' citation to Ex. 175 [Cruise

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| & Rasmussen's Expert Report] at 296 is similarly unavailing as the report's conclusions were based solely on their own definition of what constitutes "trauma informed" psychotherapy. *See* Fact Reply ¶ 44.<br><br>Finally, as discussed *supra*, Fact Reply ¶ 75,  Plaintiffs' assertion that there is no "standardized metric" does not create a genuine dispute of material fact with respect to ORR's assessment criteria in assessing whether a child's needs can be safely and appropriately met when those decisions are made consistent with and as required by the TVPRA and child welfare considerations.  *See* Fact Response ¶ 150; *see also* DX-78 [Dr. Londino Expert Rebuttal Rep.] ¶ 12 ("The report by Drs. Cruise and Rasmussen emphasizes the importance of using validated instruments for screening and further assessment of specific mental health diagnoses but fails to recognize their limitations or identify which instruments they are referencing."). | |
| 78. To delay step-up when it is necessary for the safety of the child and others is contrary to the way care is given to children in the U.S. in general and could increase the risk of harm to the individual and others.<br><br>Dr. Lubit Expert Rep. ¶ 61; Antkowiak Decl. ¶¶ 33-34. | **Disputed.** Plaintiffs dispute that delaying step- up could increase the risk of harm where there is harm in erroneously stepping up a child. Ex. 6 [RFA 2nd Set] Nos. 169–70 at 542–44.  Child welfare best practices favor community-based services over restrictive residential placement, including for children who pose safety concerns. *See* Ex. 174 [Block & Farley Expert Rep.] at 279–282, 285–287, 290 (discussing evidence- based community-based treatment, including safety benefits); Ex.176 [Dr. Earner Expert Rep.] ¶ 49 at 301 (therapeutic foster care and Multi- Systemic Therapy are best practices proven to be more effective with behavioral and conduct disorders); Ex. 177 [Edwards Expert Rep.] at 307–308 (explaining that federal law disfavors congregate care placement and requires oversight of juvenile court for placements in Qualified Residential Treatment Programs). Plaintiffs also dispute this statement to the extent Defendants presume the truth of their "dangerousness assessment," which is not determined based on the use of a standardized metric. Ex. 24 |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | [Heath Dep. Tr.] at 96:19–22 (not aware of the use of a specific metric to assess dangerousness), 97:23–25 (aware of OYAH tool but not trained in it), 98:1–4 (FFS testifying she is not trained in any specific criteria to assess danger to self or others before making a step-up decision); Ex. 1 [ORR Policy Guide] § 1.2.1 at 23 (placement consideration "danger to self" and "danger to the community"); *id.* § 1.2.4 at 24 (secure placement criteria includes "danger to self or others"); *id.* §1.4.2 at 29 ("[s]tep downs may occur when ORR, in its discretion, determines the UAC no longer poses a danger to himself or others"); *id.* §1.4.6 at 30 (RTC placement criteria – danger to self or others)). Finally, Plaintiffs dispute this statement to the extent that it implies ORR policy and practice are currently in line with the way care is given to children in the U.S. in general and that delaying step-up in exigent or dangerous circumstances would require ORR to operate contrary to U.S. standards in general. Ex. 159 [Heldman Dep. Tr.] at 33:6–10 ("there are child welfare principles that support timely permanency and decision-making, but not at the exclusion of process and procedures established to support fundamental rights."); *id.* at 185:1–4 (even when considering risk and safety, there are "criteria that would be looked at by a judge in determining placement for a youth."). Plaintiffs further dispute the asserted fact to the extent Defendants rely on inadmissible evidence. *See* Evidentiary Objections ¶¶ 12–13. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as to whether delaying step-up when it is necessary for the safety of the child and others | |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|

is contrary to the way care is given to children in the U.S. in general and could increase the risk of harm to the individual and others.

First, Plaintiffs fail to create a genuine dispute of material fact by citing to their alleged child welfare and mental health experts as "favor[ing] community-based services over restrictive residential placement, including for children who pose safety concerns," because not *all* youth who pose acute safety issues can be safely placed in such settings, even with accommodations in place. *See* DX-78 [Dr. Londino Expert Rebuttal Rep.] ¶ 39 ("I agree with some of the opinions rendered by Dr. Block and Mr. Farley that advocate for alternative provisions for youth with mental disturbance, especially those with disabilities. . . . I disagree that all youth can be served through [integrated, less restrictive placements that provide greater access to community resources]."); *see also* Fact Reply ¶ 44, 76.

Plaintiffs also cite Defendants' expert, Dr. Earner, for the proposition that "therapeutic foster care and Multi-Systemic Therapy are best practices proven to be more effective with behavioral and conduct disorders," while failing to note Dr. Earner's conclusion that ORR's policies, procedures, and practices "concerning UACs either meet or exceed the standards of care for domestic children in out of home care in the United States with regard to placement in the least restrictive environment." DX-13 [Dr. Earner Expert Rep.] ¶¶ 3, 4 ("ORR policies, procedures, and practices ensure that UACs are maintained safely in the least restrictive environment."), 42 ("ORR-funded facilities follow child welfare practices in assessment, placement and unification of UAC"), 47 (noting that the "type of case management that is present at the ORR facilities is in keeping with the standards of excellence in domestic child welfare"); *see* Fact Response ¶ 220 (disputing that "ORR policies and practices for placing children in restrictive settings falls below accepted standards for state and federal child welfare practice").

Nor does Plaintiffs' citation to their purported expert, Edwards, create a genuine dispute of material fact as the Edwards report compares ORR policies with federal and state child welfare laws and practices. Ex. 177 [Edwards Expert Rep.] at 310 ("ORR's procedures for releasing children to sponsors fall far short of the procedures provided in federal and California child welfare statutes and prevailing child welfare standards."); *see* Fact Reply ¶¶ 43, 76; Fact Response ¶¶ 3 (discussing how children in the domestic child welfare system do not share the same life history, age range, demographics or experiences with the majority of the UAC population), 220 (disputing that "ORR's policies and practices should be adjudged as compared to juvenile justice systems or dependency proceedings for children removed from their family homes, rather than the TVPRA (particularly 8 U.S.C.

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|

§ 1232(c)(2)(A) directing the Secretary to prescribe procedures for monthly review of secure placement), the Homeland Security Act, and the *Flores* Settlement Agreement").

Finally, as discussed *supra*, Fact Reply ¶¶ 75, 77,  Plaintiffs' assertion that there is no "standardized metric" does not create a genuine dispute of material fact with respect to ORR's assessment criteria in assessing whether a child's needs can be safely and appropriately met when those decisions are made consistent with and as required by the TVPRA and child welfare considerations.  *See* Fact Response ¶ 150; *see also* DX-78 [Dr. Londino Expert Rebuttal Rep.] ¶ 12 ("The report by Drs. Cruise and Rasmussen emphasizes the importance of using validated instruments for screening and further assessment of specific mental health diagnoses but fails to recognize their limitations or identify which instruments they are referencing.").

| | |
|---|---|
| 79. There are child welfare experts who hold the view that ORR's practice of having each child's case jointly reviewed on a regular basis by a team of program staff and supervisors in consultation with ORR federal representatives ensures that placements and transfers reflect sound clinical practice, and that it is unclear what problems would be solved by requiring ORR to consult with a child's attorney of record whenever placement and release decisions are considered.<br><br>Dr. Ryan Expert Rep. ¶¶ 46-47; Dr. Ryan Dep. 172:4-173:4, 174:19-176:6, 210:5-18, 212:2-6, 249:14-250:9, 255:5-256:3, 277:14-25; Dr. Earner Dep. 133:8-23, 134:3-8, 141:17-142:10, 146-23-147:14, 192:4-12; Dr. Lubit Expert Rep. ¶ 54. | **Partially Disputed.** Plaintiffs do not dispute that Defendants' purported experts hold this view, though it is not widely held and is contradicted by Plaintiffs' expert Professor Heldman, who found that "in 41 states plus the District of Columbia, there is an explicit right to an attorney in a detention hearing; in the 9 other states, counsel is provided "either 'at all proceedings' or 'at all stages of proceedings' under the juvenile delinquency code." Ex. 54 [Heldman Expert Rep.] at 1352. Accordingly, ORR's policy, which does not provide UAC's with legal representation in determinations related to detention or placement in restrictive settings, is out of step with the policy that a majority of states employ. Ex. 178 [Heldman Expert Rep.] at 316.  Plaintiffs also dispute that it is "unclear what problem would be solved by requiring ORR to consult with a child's attorney of record whenever placement and release decision are considered." Ex. 159 [Heldman Dep. Tr.] at 192:9–25 (stating that counsel in the child welfare system leads to better outcomes and better protects the interest of children, and that there is research |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | to that effect as well that children get permanency more quickly when counsel is involved); Ex. 177 [Edwards Expert Rep.] at 309 (describing benefits of counsel in dependency proceedings, as well as supporting this practice of right to counsel in such cases based on recent studies which "confirm that children get better results in dependency proceedings when they are represented by an attorney.").  Plaintiffs also dispute that the review of a child case by a team of staff and federal representatives "ensures that placement and transfers reflect sound clinical practice," particularly where ORR has erroneously stepped up children to restrictive placements and erroneously refused children step- down from restrictive placements. ECF No. 144 [Answer] ¶ 75; Ex. 33[Ray Dep. Tr.] at 148:16–22, 152:14–153:22; 157:10–158:17, 162:7–10,163:14–164:12; 166:23–167:7,170:19–23; Ex. 43 [Ray Dep. Ex. 117] at 1261–62; Ex. 139 [Ray Dep. Ex. 118] at 2028; Ex. 44 [Ray Dep. Ex. 119] at 1264; Ex. 16 [Contreras Dep. Tr.] at 71:3–12, 75:11–76:1, 76:18–77:3, 77:5–78:1, 80:2–17, 105:5–106:22, 113:12–114:17, 151:17–152:8, 155:1–5; Ex. 22 [Fields Dep. Tr.] at 123:5–16, 148:8–23; 172:7–15; Ex. 23 [Fink Dep. Tr.] at 40:13–17, 153:8–13; Ex. 24 [Heath Dep. Tr.] at 98:5–16, 99:3–7, 212:16–23; Ex. 14 [Castaneda Dep. Tr.] at 74:13-76:7, 88:21–90:9; Ex. 20 [Eich Dep. Tr.] at 108:7–109:5; Ex. 96 at 1757; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 348:12–24, 393:1–7; Ex. 35 [Smith Dep. Tr.] at 82:20–83:5, 162:16–163:8;  Ex. 18 [De La Cruz Dep. Tr.] at 162:3–16, 163:7–164:5; Ex. 17 [Cook Dep. Tr.] at 197:21–25; Ex. 28 |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
|  | [Murray Dep. Tr.] at 193:10– 17, 156:18–23, 158:6–21, 170:3–7, 184:20-189:4, 192:18–193:4; Ex. 47 [Murray Dep. Ex. 162] at 1278 ("I have several cases at yolo that are in need of RTC but our RTC keep rejecting them."); Ex. 168 [Vergara Dep. Tr.] at 129:15–130:17, 257:6–10; Ex. 182 [Urquiza Expert Rep.] at 346. |

**Defendants' Response:** Plaintiffs' evidence likewise does not create a genuine dispute of material fact as Plaintiffs' purported experts compare ORR policies with disanalogous state and federal child welfare and juvenile delinquency laws, policies, and practices. *See* Fact Reply ¶ 76; Fact Response ¶¶ 92 (disputing that "domestic child welfare practices can be applied indiscriminately to UACs in ORR care"), 220 (disputing that "ORR's policies and practices should be adjudged as compared to juvenile justice systems or dependency proceedings for children removed from their family homes, rather than the TVPRA (particularly 8 U.S.C. § 1232(c)(2)(A) directing the Secretary to prescribe procedures for monthly review of secure placement), the Homeland Security Act, and the *Flores* Settlement Agreement"); *see also* DX-69 [Dr. Earner Dep. Supp.] 133:14-18 ("You can look at that in child welfare. In child welfare, every child is appointed an attorney, and the average length of stay in child welfare, in congregate care, out-of-home care is quite extensive.").

Moreover, to the extent Plaintiffs' response implicates staff-secure facilities, it does not create a genuine dispute of material fact as Plaintiffs' cited report defines "staff secure" as a "residential facilit[y] in which physical restriction is provided solely by staff." DX-82 [Heldman Expert Rep.] at p. 6; *see also* DX-70 [Heldman Dep. Supp.] 104:16-20 ("The staff secure facility would be one in which staff are primarily – or staff are given the ability to physically restrain children from leaving"). But, an ORR staff-secure facility employs no physical restraints of any kind and ORR staff-secure facilities maintain the same state licensing and physical set-up as a shelter, with the primary difference being a higher staff-to-minor ratio in the former. Plaintiffs point to *no* evidence that automatic hearings are required by the majority of states for such placements, let alone that automatic hearings are required by due process. *See* Fact Response ¶ 208.

Finally, Plaintiffs' evidence does not create a genuine dispute of material fact as to whether "ORR's practice of having each child's case jointly reviewed on a regular basis by a team of program staff and supervisors in consultation with ORR federal representatives ensures that placements and transfers reflect sound clinical practice," as there is simply no evidence that it is common or ORR's policy or practice to step up children erroneously to restrictive

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| placements, or to refuse children step down from such placements.  Fact Reply ¶¶ 77, 28; Fact Response ¶¶ 116, 218, 219. | |
| 80. Congress has not funded attorneys to represent ORR in hearings challenging routine decisionmaking, and in contrast with the Department of Homeland Security, which funds approximately 1,100 attorneys and 350 personnel to support such attorneys in immigration proceedings, ORR has traditionally funded two attorneys.<br><br>Antkowiak Decl. ¶ 37. | **Partially Disputed.** Plaintiffs do not dispute that Congress has not funded attorneys to represent ORR in hearings challenging decision-making.  Plaintiffs dispute statement to the extent it implies funding for 1,100 attorneys and 350 personnel would be necessary to represent ORR in hearings challenging routine decisionmaking. The number of immigration cases filed with EOIR is significantly higher than the number of possible challenges to step ups. *See* Transactional Records Access Clearinghouse (TRAC), *More Immigrants in Limbo as Government Shutdown Due to COVID-19 Leads to Widespread Immigration Court Hearing Cancellations* (June 4, 2020), https://trac.syr.edu/immigratio n/reports/612/ (in March and April of 2020 alone, EOIR recorded an average of 40,000 *new* cases filed by ICE each month), *with* Ex. 93 at Census Tab, at Row J at 1630–1745 (Program_Type) (total of 80 detained in ORR secure, RTC, staff-secure, therapeutic staff-secure, and therapeutic group home custody as of March 13, 2020) and *id.* at Out of Network Placements Tab, at Row A at 1746 (children placed in OON RTC as of March 13, 2020) (total of 11 children detained in ORR out-of-network facilities as of March 13, 2020). Similarly, the number of administrative appeals regarding release is very small. Ex. 5 [RFA 1st Set] No. 28 at 485–87 ("a relatively low proportion of proposed sponsors elect to pursue an administrative appeal process"); Ex. 7 [Defendants' Supplemental Responses |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | to Plaintiffs' Requests for Admission ("RFA Supp. Response")] No. 28 at 560. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Defendants did not indicate that 1,100 attorneys and 350 personnel was required, but rather that ORR's two funded attorneys is not sufficient to represent ORR in hearings challenging routine decision making, especially give wide variation in census, which can vary by more than 20,000 from year to year (https://www.acf.hhs.gov/orr/about/ucs/facts-and-data); and, if trial-like hearings (and potentially administrative appeals of such hearings) were to be required as a matter of course for: (a) all staff-secure, secure, and RTC placements on a pre-placement basis and every 30 days thereafter; (b) all cases where individuals (including those who are distantly-related and unrelated) have applied, but not yet been approved, to act as children's custodians; and (c) whether certain medical services (including psychotropic medication prescriptions) should be provided to youth.

| **Defendants' Uncontroverted Facts: Legal Representation** ||

| | |
|---|---|
| 81. It is ORR's policy and practice that children in ORR's care and custody are provided with legal services information, including the availability of pro bono services, a know-your-rights presentation, a legal screening, a legal resource guide (which provide a state-by-state listing of attorneys), and the right to be represented by counsel at no expense to the government.<br><br>ORR Guide § 3.3; Biswas 30(b)(6) Dep. 68:20-22, 101:24-102:11, 375:20-376:5, 399:6-10, 400:13-18; Castaneda Dep. 85:14-86:15; Contreras Dep. 80:18-81:3; De La Cruz Dep. 218:17-219:7; Sualog Dep. 116:4-13, 121:10-14; Eich Dep. 99:15-23; Dr. Earner Dep. 225:25-226:9; Biswas Decl. ¶ 88; ORR Juvenile Coord. Rep. at 11. | <u>**Undisputed**</u> for purposes of this motion except to the extent Defendants rely on inadmissible evidence. *See* Evidentiary Objections ¶ 2. |
| 82. It is ORR's policy and practice to encourage all potential sponsors to attend | <u>**Partially Disputed.**</u> Plaintiffs do not dispute that the ORR Policy Guide states that potential sponsors "should attend a |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| a Legal Orientation Program for Custodians (LOPC). <br><br> ORR Guide § 2.2.5; ORR Juvenile Coord. Rep. at 2-3. | presentation provided by the Legal Orientation Program for Custodians." Plaintiffs dispute this statement insofar as the evidence cited by Defendants does not support that it is ORR's practice to encourage such attendance. *See* Ex. 1 [ORR Policy Guide] § 2.2.5 at 38 (explaining legal orientation policy); DX-11 [ORR Juvenile Coordinator Annual Rep.] at 2–3 (explaining how "the potential sponsor *should* attend a presentation known as the Legal Orientation Program for Custodians." (emphasis added)). Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 2. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as to whether it is ORR's policy and practice to encourage all potential sponsors to attend a Legal Orientation Program for Custodians (LOPC) as Plaintiffs point to no contrary evidence. | |
| 83. The purpose of the LOPC is to inform potential responsibilities in ensuring the child's appearance at all immigration proceedings, as well as protecting the child from mistreatment, exploitation, and trafficking. <br><br> ORR Guide § 2.2.5; ORR Juvenile Coord. Rep. at 2-3. | **Undisputed** for purposes of this motion, except to the extent Defendants rely on inadmissible evidence, *see* Evidentiary Objections ¶ 2, and, assuming Defendants' statement is read to refer to informing potential *sponsors* of *their* responsibilities. To the extent Defendants intend a different meaning, Plaintiffs dispute the statement. |
| 84. The LOPC provides information about possible free legal counsel (pro bono legal services) for the child during the immigration court process. <br><br> ORR Guide § 2.2.5; ORR Juvenile Coord. Rep. at 2-3. | **Partially Disputed.** Plaintiffs do not dispute that the Policy Guide states that the LOPC is intended to provide this information. Plaintiffs dispute this statement to the extent Defendants imply the LOPC does actually provide this information, which is not supported by the cited evidence. *See* Ex. 1 [ORR Policy Guide] § 2.2.5 at 38 (citing policy that "[t]he program also provides information about possible free legal counsel |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | (pro bono legal services) for the youth or child during the immigration court process."); DX-11 [ORR Juvenile Coordinator Annual Rep.] at 2–3 (same). Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 2. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs point to no contrary evidence.

| 85. ORR requires case managers to provide case updates to a child's attorney of record or legal service provider while the child is placed at a residential treatment center, staff-secure, or secure placement.<br><br>Biswas 30(b)(6) Dep. 69:7-13, 70:22-71:6; Castaneda Dep. 47:21-48:9, 81:15-82:8; Contreras Dep. 112:1-16, 147:14-21; Smith Dep. 94:6-13, 147:22-148:9; Sualog Dep. 134:22-25; Vergara Dep. 221:20-25. | **Disputed.** ORR policy does not require Case Managers to inform children's lawyers of such progress. Instead, ORR policies say that "other stakeholders" "may include local legal service providers and attorneys of record," but do not require ORR to inform them. Ex. 1 [ORR Policy Guide] § 2.3.2 at 39–40. In practice, Case Managers have discretion to communicate—or not—with Class Members' lawyers. Moreover, Case Managers do not regularly provide children's legal representatives with evidence relied upon in recommending for or against release, nor do children's lawyers receive a copy of the Case Manager's recommendation for or against release. Ex. 30 [Ortiz Dep. Tr.] at 37:4–38:7. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as to whether ORR requires case managers to provide case updates to a child's attorney of record or legal service provider while the child is placed at a residential treatment center, staff-secure, or secure placement. Indeed, the experience of one legal practitioner is not evidence sufficient to establish that, as a matter of practice, case managers are not required to provide case updates to a child's attorney of record or legal service provider while the child is placed at a residential treatment center, staff-secure, or secure placement. This is particularly true in light of the overwhelming evidence that when a UAC has his or her own attorney of record, there is an open line of communication with the case manager to keep the attorney up to date on the minor's case. Plaintiffs' focus on language stating that the stakeholders whom the case manager informs about the case "may include" local legal service providers and attorneys of record, ORR Guide § 2.3.2, does not prove that case managers have discretion to exclude Class Members' attorneys of record; rather, it shows

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| that "stakeholders" can include a wide range of individuals.  *See* Fact Response ¶¶ 236, 237, 241, 242, 245, 247, 259, 262. | |
| 86. It is ORR's policy and practice that ORR grantee care provider facilities provide attorneys with the ability to meet with children in ORR's care and custody.<br><br>ORR Guide § 3.3.10; Biswas 30(b)(6) Dep. 100:24-101:3; Contreras Dep. 147:14-21; De La Cruz Dep. 218:21-219:7; Sualog Dep. 126:13-127:22. | **Disputed.** ORR policy only requires that attorneys have unlimited *telephone* access to their clients. It contains no requirement that care provider facilities provide attorneys with the ability to meet with their clients. ORR Policy Guide § 3.3.10. ORR also testified that there is merely a "general expectation . . . that children have access to counsel." DX-02 [Biswas 30(b)(6) Dep. Tr.] at 101:4–12. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as to whether it is ORR's policy and practice that ORR grantee care provider facilities provide attorneys with the ability to meet with children in ORR's care and custody. Plaintiffs point to no contrary evidence and Plaintiffs' deposition testimony citation omits testimony stating: "[t]he understanding is that [children] have access to counsel." DX-02 [Biswas 30(b)(6) Dep.] 101:8-9. Furthermore, "ORR has requirements that basically mandates access to facilities, to children, and to the facility as a whole to legal service providers."  DX-68 [Sualog Dep.] 102:9-19. | |
| 87. It is ORR's policy and practice that attorneys representing UACs have unlimited telephone access to the children.<br><br>ORR Guide § 3.3.10; ORR Juvenile Coord. Rep. at 11; Castaneda Dep. 85:14-86:4, 87:25-88:3; Wood Dep. 146:21-147:14; Sualog Dep. 138:19-139:5; Fink Dep. 273:25-274:9, 277:10-25; Biswas Decl. ¶ 92. | **Undisputed** for purposes of this motion except to the extent Defendants rely on inadmissible evidence. *See* Evidentiary Objections ¶ 2. |
| 88. ORR allows children to contact an attorney if they wanted to consult with an attorney regarding their placement decision.<br><br>Fink Dep. 273:2-20, 273:25-274:9, 277:10-25; Biswas 30(b)(6) Dep. 443:15- | **Undisputed** for purposes of this motion. |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| 444:8; Smith Dep. 147:22-148:9; Eich Dep. 209:12-15; Biswas Decl. ¶ 91. | |
| 89. ORR allows children to contact an attorney if they want to consult with an attorney regarding being released from ORR custody.<br><br>Fink Dep. 273:21-274:9, 277:10-25; Biswas 30(b)(6) Dep. 443:15-444:8; Biswas Decl. ¶ 91. | **Undisputed** for purposes of this motion. |
| 90. It is ORR's policy and practice that ORR allows ORR-funded legal providers to use non-ORR funds to challenge ORR decisions, and such actions have been brought against ORR.<br><br>Sualog Dep. 118:2-10; Biswas 30(b)(6) Dep. 443:15:444:8; Eich Dep. 209:12-15, 210:9-13; Stuart Dep. 75:10-13; Mixon Dep. 154:2-8; Nathan-Pineau Dep. 75:19-76:11, 125:16-127:11, 129:6-10, 130:10-20; Biswas Decl. ¶ 93; ORR Juvenile Coord. Rep. at 11. | **Disputed.** Defendants cite no evidence that ORR permits children's attorneys to challenge ORR decisions administratively with respect to release, placement, or medication— quite the opposite. *See* DX-23 [Eich Dep. Tr.] at 210:5–8 ("Q. Has it been your experience that KIND attorneys advocate for children with respect to their release to sponsors?" A. No."); DX-39 [Mixon Dep. Tr.] at 154:2–15 ("For some reason getting involved in placement decisions on behalf of children who want a different result, I don't know anybody ever doing that successfully."). ORR has threatened to terminate legal services providers' Vera funding should they challenge ORR's decisions regarding release or placement. *See, e.g.*, Ex. 198 [Williams Dep. Tr.] at 83:1–84:12. Defendants offer no evidence that ORR could not or would not do so again. Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 2. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as to whether it is ORR's policy and practice that ORR allows ORR-funded legal providers to use non-ORR funds to challenge ORR decisions, and whether such actions have been brought against ORR as Plaintiffs point to no contrary evidence apart from the hearsay testimony of a legal services provider who expressly admits that she "did not confirm any of

Defendants' Reply in Support of Defendants' Statement of Uncontroverted Facts

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| this information." DX-87 [Williams Dep.] 84:6-7; *see also* Joint Stip. ¶ 100 ("CAIR (in Virginia and Maryland) and LSC (in Northern California) have appeared as counsel of record in federal court cases. CAIR represented a UAC in an administrative appeal before the Assistant Secretary."); DX-11 [ORR Juvenile Coord. Rep.] at 32 ("ORR encourages the program to seek assistance from a contracted legal service provider or a Child Advocate," for the Director Review/panel review process); DX-10 [Biswas Decl.] ¶ 93 ("I am not aware of any case in which ORR blocked attorneys from providing services to UACs, cut funding for legal service providers who represent UACs in actions against ORR, or otherwise refuse to work with such attorneys after such representation. ORR may not fund the activities, but it does not block them."). ||
| 91. It is ORR's practice that ORR-funded legal providers may represent a child who wishes to seek a *Flores* bond hearing if representation has already been initiated for immigration proceedings.<br><br>Biswas Dep. 184:17-21; Nathan-Pineau Dep. 36:1-6. | **Undisputed** for purposes of this motion. |
| 92. Mandating ORR-funded legal representation to challenge ORR placement, release, and medication decisions would divert valuable program resources currently used to connect children with legal service providers for other purposes (such as seeking immigration relief) and used to fund other essential activities.<br><br>Antkowiak Decl. ¶¶ 37, 53. | **Disputed.** Defendants' cited evidence consists of a single declaration, which states only that ORR does not have "hundreds or thousands of attorneys to represent the agency in administrative hearings." DX-09 [Antkowiak Decl.] ¶ 53. Defendants' evidence says nothing about the resources of legal services providers at all, much less whether legal services providers should have the prerogative to advocate for children's licensed placement or reunification with family over other legal services delivery, should their resources in fact prove inadequate to cover all. As for diverting ORR's own resources, Defendants' cited evidence speculates, but does not establish, that ORR would need hundreds or thousands of attorneys to oppose children's lawyers in administrative hearings. Defendants also offer no evidence from which to conclude that an |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | administrative hearing would be required each time an attorney advocates for a child's release or licensed placement.  Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 17. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs point to no evidence disputing that mandating ORR-funded legal representation to challenge ORR placement, release, and medication decisions would divert valuable program resources currently used to connect children with legal service providers for other purposes (such as seeking immigration relief) and used to fund other essential activities.

| 93. ORR continues to work with attorneys after they have challenged ORR decisionmaking for UACs.<br><br>Biswas 30(b)(6) Dep. 443:18-23; David Dep. 158:20-159:8; De La Cruz Dep. 219:11-16; Castaneda Dep. 81:15-82:8; Eich Dep. 210:9-13, 214:1-4; Heath Dep. 49:21-50:19; Smith Dep. 45:21-46:5; Trevino Dep. 382:25-383:9; Wood Dep. 76:18-77:1, 77:12-20; Williams Dep. 122:23-123:2, 123:5-9; Biswas Decl. ¶ 93. | **<u>Disputed.</u>** Defendants' cited evidence demonstrates at most that *sometimes* ORR communicates with legal service providers and that Mr. Biswas, Senior Supervisory Policy Counsel for ORR, is not personally aware of ORR refusing to work with attorneys after they "provid[e] services to UACs." DX-10 [Biswas Decl.] ¶ 93. Defendants fail to cite a single instance of ORR continuing to work with an attorney after that attorney has advocated on behalf of a child with respect to decisions concerning release, placement, or medication. ORR has on occasion threatened to terminate legal services providers' Vera funding should they challenge ORR's decisions regarding release or placement. *See, e.g.*, Ex. 198 [Williams Dep. Tr.] at 83:1–84:12. Defendants offer no evidence that ORR could not or would not do so again. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs point to no evidence that ORR does not continue to work with attorneys after they have challenged ORR decisionmaking for UACs, relying instead on hearsay testimony of a legal services provider who expressly admits that she "did not confirm any of this information."  DX-87 [Williams Dep.] 84:6-7; *see also* Fact Reply ¶ 90.

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| 94. ORR does not to cut funding for ORR-funded legal service providers for using non-ORR funding to challenge ORR decisionmaking for UACs.<br><br>Biswas 30(b)(6) Dep. 443:24-444:2; Williams Dep. 96:20-97:9; Mixon Dep. 133:16-21, 150:23-151:4; Biswas Decl. ¶ 93. | **Partially Disputed.** ORR has on occasion threatened to terminate legal services providers' Vera funding should they challenge ORR's decisions regarding release or placement. *See, e.g.*, Ex. 198 [Williams Dep. Tr.] at 83:1–84:12. Defendants offer no evidence that ORR could not or would not in the future cut funding for ORR-funded legal service providers for using non- ORR funding to challenge ORR decisionmaking for UACs. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs point to no contrary evidence apart from the hearsay testimony of a legal services provider who expressly admits that she "did not confirm any of this information." DX-87 [Williams Dep.] 84:6-7; *see also* Fact Reply ¶¶ 90 and 93. | |
| **Defendants' Uncontroverted Facts: Supporting Data** | |
| 95. Care providers and children in care are actively monitored, and ORR runs numbers on specific care providers to determine location, average length of care, and how a particular care provider compares to other care providers: a pattern of inexplicably long length of care could lead to non-renewal or termination of the grant.<br><br>Antkowiak Decl. ¶¶ 41-43. | **Partially Disputed.** Plaintiffs do not dispute that ORR monitors care providers.  Plaintiffs dispute Defendants' statement to the extent it implies that a care provider's history related to the well-being of children in their care can and/or has impacted the renewal or termination of grants. U.S. Gov't Accountability Off., GAO-20-609, *Unaccompanied Children: Actions Needed to Improve Grant Application Reviews and Oversight of Care Facilities* 24 (2020), https://www.gao.gov/assets/710/709402.pdf, (19 of paginated report) ("We identified some ORR grantees with a history of significant incidents related to the safety and well-being of children in their care that subsequently received new or continuation grants."). Plaintiffs further dispute Defendants' statement to the extent it (or the cited evidence) implies "actively" monitoring actually results in ORR providing immediate or timely monitoring reports to its care providers. U.S. Gov't Accountability Off., |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | GAO-20-609, *Unaccompanied Children: Actions Needed to Improve Grant Application Reviews and Oversight of Care Facilities* 39–34 (2020), https://www.gao.gov/assets/710/709402.pdf ("ORR policy further states that the monitoring team should send a monitoring report documenting any necessary corrective actions to a facility within 30 days after the site visit, but the monitoring team did not meet this timeframe for many of the facilities that received site visits in fiscal year 2018 and 2019.      Our analysis of these data found that monitoring teams took more than 30 business days to send reports to 77 percent of facilities they visited in fiscal year 2018 and 78 percent of facilities they visited in fiscal year 2019. Some reports took much longer; one report for a site visit conducted in fiscal year 2018 was not sent to the facility until early 2020, well over a year after the site visit."). Plaintiffs further dispute Defendants' statement to the extent it (or the cited evidence) implies "actively" monitoring actually results in immediate or timely corrective action by the care provider. U.S. Gov't Accountability Off., GAO-20-609, *Unaccompanied Children: Actions Needed to Improve Grant Application Reviews and Oversight of Care Facilities* 24 n.44 (2020), https://www.gao.gov/assets/710/709402.pdf ("we found that the grantee did not take action on many of the corrective actions until after it received the report, 8 months after the monitoring visit and 5 months after ORR awarded the grantee a new grant."); *id*. at 35 ("ORR Primarily Addresses Grantee Noncompliance by Requiring Corrective Actions, but Monitoring and Corrective |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | Actions Have Not Always Been Timely"). The cited evidence does not reflect any actual evidence of non-renewal or termination based on "inexplicably long length of care." Plaintiffs are unaware of a care provider grant ever having been denied renewal or terminated for this stated reason. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs conflate Defendants' active monitoring of care providers and children in its care for the purposes of identifying patterns of inexplicably long lengths of care with the routine activities of ORR in monitoring grantee care providers pursuant to ORR Guide § 5.5.1, as well as follow-up and corrective action efforts specified in Section 5.5.2 of the Guide. Plaintiffs' claim that active monitoring must result in a grant termination does not create a genuine dispute of material fact as to whether such monitoring occurs.

| | |
|---|---|
| 96. Data from June 2019 through March 2020 demonstrates that a child's average length of time in ORR's care and custody was 48.4 days.<br><br>ORR Juvenile Coord. Rep. at 22. | <u>**Partially Disputed.**</u> Plaintiffs do not dispute that the ORR Juvenile Coordinator report provides a child's average length of time in ORR custody from June 2019 to March 2020 was 48.4 days. DX-11 [ORR Juvenile Coord Rep.] at 20 (Table 1). Plaintiffs dispute this fact because the cited evidence relies on data which is unclear. For example, it is unclear whether the average length of care includes only children discharged or if it also includes children still in ORR care at the time of the data collection. In the past, ORR has reported the average length of care in inconsistent manners. For Fiscal Year 2019, ORR reported that the average length of time a UAC *remained* in ORR care was 66 days. Ex 131 [ORR Facts and Data] at 1972. For Fiscal Year 2018, ORR reports indicate that the average length of care (for those discharged) was 63.5 days, and separately indicate that the average length of care (for those still in care) was 72.7 days. U.S. Dep't of Health & Human Servs., *Unaccompanied Children: Latest UAC Data–FY2018* (2019), |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
|  | https://www.hhs.gov/programs/social-services/unaccompanied-alien-children/latest-uac-data-fy2018/index.html#overall-data. Plaintiffs also dispute Defendants' statement to the extent it suggests that this data reflects the average length of care prior to reunification. Defendants' cited data captures average length of ORR custody regardless of discharge type, which generally include reunification with sponsor, voluntary departure, removal order, age out, age redetermination, as well as other discharge categories. DX-11 [ORR Juvenile Coord. Rep.] at 20; *see* Ex. 181 [Ryo Expert Rep.] at 340.  Plaintiffs also dispute Defendants' statement to the extent it is inconsistent with HHS's own published data for the same timeframe. *See* U.S. Dep't of Health & Human Servs., *Unaccompanied Children: Latest UAC Data – FY2020* (2020), https://www.hhs.gov/programs/social-services/unaccompanied-alien-children/latest-uac-data- fy2020/index.html (HHS's reported average length of care for those discharged between October 2019 and May 2020 is higher than the ORR Juvenile Coordinator's reported average length of care for each month by anywhere from 9–22 days). |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs' cited evidence is simply insufficient to rebut the report prepared by the Juvenile Coordinator.  DX-11 [ORR Juvenile Coord. Rep.] at 1 ("The role of the Juvenile Coordinator is to review, assess, and report to ORR and the court-appointed Special Master and, when necessary, the Court on compliance with the terms of Paragraph 28A of the Flores Settlement Agreement.").  Furthermore, a review of the docket in *Flores* reveals that Plaintiffs raised no objections to the Juvenile Coordinator's Report and the information

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| contained therein in *Flores et al., v. Barr et al.*, No. 85-4544-DMG (Px), and Plaintiffs in this case jointly stipulated that the Report was filed in *Flores*. Joint Stip. ¶¶ 102, 103. ||
| 97. Data from June 2019 through May 2020 demonstrates that a child's average length of time in ORR's care and custody was 54 days.<br><br>ORR Juvenile Coord. Rep at 22. | **Partially Disputed.**<br>Plaintiffs do not dispute that the ORR Juvenile Coordinator report provides that a child's average length of time in ORR care and custody from June 2019 to May 2020 was 54 days. DX- 11 [ORR Juvenile Coord Rep.] at 20 (Table 1).  Plaintiffs dispute this data to the extent it is unclear whether the average length of care includes data only for children discharged or also includes the average for children still in ORR care at the time of the data collection. In the past, ORR has reported the average length of care in inconsistent manners. For Fiscal Year 2019, ORR reported that the average length of time a UAC *remained* in ORR care was 66 days. *See* Ex. 131. For Fiscal Year 2018, ORR reports indicate that the average length of care (for those discharged) was 63.5 days, and separately indicate that the average length of care (for those still in care) was 72.7 days. U.S. Dep't of Health & Human Servs., *Unaccompanied Children: Latest UAC Data –FY2018* (2019), https://www.hhs.gov/programs/social-services/unaccompanied-alien-children/latest-uac-data-fy2018/index.html#overall-data.  Plaintiffs also dispute Defendants' statement to the extent it suggests that this data reflects the average length of care prior to reunification. Defendants' cited data captures average length of ORR custody regardless of discharge type, which generally include reunification with sponsor, voluntary departure, removal order, age out, age |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | redetermination, as well as other discharge categories. DX-11 [ORR Juvenile Coord. Rep.] at 20; *see* Ex. 181 [Ryo Expert Rep.] at 340.  Plaintiffs also dispute Defendants' statement to the extent it is inconsistent with HHS's own published data for the same timeframe. *See* U.S. Dep't of Health & Human Servs., *Unaccompanied Children: Latest UAC Data – FY2020* (2020), https://www.hhs.gov/ programs/social-services/unaccompanied-alien-children/latest-uac-data- fy2020/index.html (HHS's reported average length of care for those discharged between October 2019 and May 2020 is higher than the ORR Juvenile Coordinator's reported average length of care for each month by anywhere from 9-22 days). |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs' cited evidence is simply insufficient to rebut the report prepared by the Juvenile Coordinator, who ORR was required to hire under the *Flores* Settlement Agreement.  DX-11 [ORR Juvenile Coord. Rep.] at 1 ("The role of the Juvenile Coordinator is to review, assess, and report to ORR and the court-appointed Special Master and, when necessary, the Court on compliance with the terms of Paragraph 28A of the Flores Settlement Agreement.").  Furthermore, Plaintiffs have raised no objections to the Juvenile Coordinator's Report and the information contained therein in *Flores et al., v. Barr et al.*, No. 85-4544-DMG (Px).  *See also* Fact Reply ¶ 96. | |
| 98. In fiscal year 2020 (through June 2020), ORR has made a total of 14,421 UAC placements.  Antkowiak Decl. ¶ 31. | **Undisputed** for purposes of this motion except to the extent Defendants rely on inadmissible evidence. *See* Evidentiary Objections ¶ 11.  Plaintiffs do not dispute that the table contained in paragraph 31 of DX-09 contains this information. Plaintiffs, however, seek to clarify that "placements" in Defendants' statement refers to placements into ORR custody rather than placements with sponsors. |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| 99. In fiscal year 2020 (through June 2020), ORR has placed a total of 156 UAC in staff-secure facilities.<br><br>Antkowiak Decl. ¶ 31. | **<u>Partially Disputed.</u>** Plaintiffs do not dispute that the table contained in paragraph 31 of DX-09 contains this information.  Plaintiffs dispute the accuracy of the table contained in paragraph 31 of DX-09 to the extent that the evidence cited does not define "staff-secure facilities" and does not indicate whether this number includes children placed in "therapeutic staff- secure" facilities. Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 11. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as "staff-secure facilities" are defined in ¶ 12 of the Exhibit and a therapeutic staff secure facility is a kind of staff-secure facility.  DX-09 [Antkowiak Decl.] ¶12; *see, e.g.,* Funding Opportunity Announcement explaining that "therapeutic staff-secure" group homes service a population who "require a staff-secure" placement, *available at* https://ami.grantsolutions.gov/files/HHS-2014-ACF-ORR-ZU-0608_0.htm (last visited Nov. 17, 2020).

| | |
|---|---|
| 100.   In fiscal year 2020 (through June 2020), ORR has placed a total of 24 UAC in residential treatment centers.<br><br>Antkowiak Decl. ¶ 31. | **<u>Partially Disputed.</u>** Plaintiffs do not dispute that the table contained in paragraph 31 of DX-09 contains this information.  Plaintiffs dispute the accuracy of the table contained in paragraph 31 of DX-09 to the extent that the evidence cited does not define "residential treatment centers" and does not indicate whether this number includes children placed in "therapeutic group homes" or "out-of-network" residential treatment centers. Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 11. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs "residential treatment centers" are defined in ¶¶ 13-14 and therapeutic group homes are no more restrictive than non-secure shelters.  Therapeutic group homes are for children who do not require "the intensive mental health placement services of a residential treatment center." https://ami.grantsolutions.gov/files/HHS-2014-ACF-ORR-ZU-0608_0.htm (last visited Nov. 17, 2020).  *See also* Fact Response ¶ 125.

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| 101.  In fiscal year 2020 (through June 2020), ORR has placed a total of 56 UAC in secure facilities.<br><br>Antkowiak Decl. ¶ 31. | **<u>Partially Disputed.</u>** Plaintiffs do not dispute that the table contained in paragraph 31 of DX-09 contains this information.  Plaintiffs dispute the accuracy of the table contained in paragraph 31 of DX-09 to the extent that the evidence cited does not define "secure" facilities.  Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 11. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as "secure facilities" are defined in ¶ 11 as "secure juvenile detention" – centers "for those children in ORR care and custody who require a restricted environment for their own and the community's safety."  *See* DX-09 [Antkowiak Decl.] ¶ 11.

| | |
|---|---|
| 102.  A separate analysis of the data provided in *Flores* similarly indicates that only a small percentage of children placed in ORR's care and custody are stepped up.<br><br>Dr. Ryan Expert Rep. ¶ 35; Dr. Ryan Dep. 102:5-11, 244:2-12. | **<u>Partially Disputed.</u>** Plaintiffs do not dispute, for purposes of this motion, that only a small percentage of children placed in ORR's care and custody are stepped up. *See* Ex. 57 [Ryo Expert Rep.] at 1399 (out of 109,803 custody periods, only 578 related to step-ups).  Plaintiffs dispute the accuracy of Dr. Ryan's data analysis particularly given that it does not include all ORR placements from which a child may be stepped up and is therefore not reliable. *See* Ex. 164 [Ryan Dep. Tr.] at 141:5–142:2, 183:3–23, 184:5–185:18. |

**Defendants' Response:** Plaintiffs' cited evidence does not create a genuine dispute of material fact as to whether "only a small percentage of children placed in ORR's care and custody are stepped up."  To the extent Plaintiffs assert that Dr. Ryan's data analysis is not accurate "give that it does not include all ORR placements from which a child may be stepped up," Dr. Ryan responds that "Dr. Ryo is correct in that I read the percentages in Figure 2 as cumulative.  The correct estimates are that 62.8% of children experienced a step-up after approximately one month (30 days) and 43.3% of children experienced a step-up after approximately two months (60 or more days) in the care and custody of ORR.  This declaration does not change the overall argument made in my rebuttal report.  First, both Dr. Ryo and I agree that very few children are stepped-up.  Second, and perhaps equally if not more important, step-up does not happen automatically.  Despite some differences in denominator counts, Dr. Ryo notes that the average time to step up is 67.3 days (page 10 of

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| Dr. Ryo expert report) and I note that the median time to step up is 60 days."  DX-92 [Dr. Ryan Decl.] at 1. | |
| 103.  Approximately 14% of all children placed in domestic child welfare systems are stepped up to a more restrictive level of setting than the shelter level.<br><br>Dr. Ryan Expert Rep. ¶ 35; Dr. Ryan Dep. 102:12-103:15. | **Disputed.** Plaintiffs dispute that the statement is supported by the cited evidence. Dr. Ryan's report refers to "the risk of **congregate care** placement with children in the domestic child welfare system..." not **restrictive placements**. DX-30 [Dr. Ryan Expert Rep.] ¶ 35 (emphasis added). Moreover, Dr. Ryan's cited deposition testimony refers to Michigan specifically and does not discuss the "domestic child welfare system" generally. DX-8 [Ryan Dep. Tr.] at 102:12–103:15. |
| **Defendants' Response:** Plaintiffs are correct that the expert report described the prevalence of congregate care in the foster care population. However, Plaintiffs' evidence does not create a genuine dispute of material fact as a useful comparison point for Dr. Ryan's conclusion that "stepping UAC up to more secure settings is not overused."  *See* DX-30 [Dr. Ryan Expert Rep.] ¶ 35.  Nor does the fact that Dr. Ryan referenced Michigan during his deposition change the fact that Dr. Ryan's report contains no similar mention or limitation. *Id.* | |
| 104.  A separate analysis of the *Flores* data indicates that 86% of all children who are placed in ORR's care and custody and who are stepped up to a more restrictive setting than the shelter level were stepped up only after they had been in ORR's care and custody for more than two months.<br><br>Dr. Ryan Expert Rebuttal Rep. ¶ 19; Dr. Ryo Expert Rep. at 9. | **Disputed.** Plaintiffs dispute that Dr. Ryo's analysis concluded that "86% of all children who are placed in ORR's care and custody and who are stepped up to a more restrictive setting than the shelter level were stepped up only after they had been in ORR's care and custody for more than two months." Dr. Ryan misstates Dr. Ryo's data analysis. Table 1 of Dr. Ryo's report clearly states that of the 578 custody periods that included step-ups, 328 occurred in 59 days or less, meaning that a majority (56.7%) of step-ups occurred before a child had been in custody for at least 2 months. Ex. 186 [Ryo Decl.] ¶¶ 7–10 at 363–367; *see also* Ex. 57 [Ryo Expert Rep.] at 1401. And of the 578 custody periods that included step ups, 250 occurred after 60 days or more in custody, meaning less than half |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | (43.3%) of step-ups occurred after 2 months in custody. *Id.* |

**Defendants' Response:** Plaintiffs' citation to evidence does not create a genuine issue of material fact. Dr. Ryan acknowledges that he "read the percentages in Figure 2 [of Dr. Ryo's Report] as cumulative" and that the "correct estimates are that 62.8% of children experienced a step-up after approximately one month (30 days) and 43.3% of children experienced a step-up after approximately two months (60 or more days) in the care and custody of ORR." However, that "does not change the overall argument made in [his] rebuttal report," nor does it change the fact that "both Dr. Ryo and [Dr. Ryan] agree that very few children are stepped-up" and "equally if not more important, step-up does not happen automatically." DX-92 [Dr. Ryan Decl.] at 1 ("Despite some differences in denominator counts, Dr. Ryo notes that the average time to step up is 67.3 days (page 10 of the Dr. Ryo expert report) and I note that the median time to step up is 60 days.").

| Defendants' Uncontroverted Facts: Named Plaintiffs | |
|---|---|
| 105. On February 14, 2018, Lucas R. received a know-your-rights presentation from a non-profit, independent group, a list of pro bono legal service providers, and attorneys conducted a legal screening of Lucas R. and found he likely was not eligible for immigration legal relief.<br><br>De La Cruz LR Decl. ¶ 12; GOV-00010486; GOV-00010498; GOV-00009343, GOV-00009501. | **Undisputed** for purposes of this motion. |
| 106. Southwest Key Sol began working with Lucas R.'s half-sister, Madelyn (who had entered the U.S. one year before) to apply as a sponsor and by March 1, 2018, she had submitted a partially complete application, but her household member, at that time, had not submitted his forms to investigate his background (until at least April 19, 2018).<br><br>De La Cruz LR Decl. ¶¶ 13, 32; GOV-00010520, GOV-00010527, GOV- | **Partially Disputed.** Plaintiffs do not dispute that Southwest Key Sol worked with Madelyn R. in her sponsorship application to sponsor Lucas R. Plaintiffs dispute that the cited evidence supports the statement that Madelyn "had entered the U.S. one year before" and it is disputed that the "household member" referenced actually lived with Madelyn. *See* ECF No. 37-13 [Decl. of Madelyn R., July 19, 2018 ("Madelyn R. Decl.")] ¶¶ 3, 10. |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| 00010529; GOV-00010594-10595, GOV-00010615-10616, GOV-00010620-10625. | |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Defendants' cited evidence reflects multiple instances in which Madelyn indicated that she entered the U.S. approximately one year prior to applying to sponsor Lucas R. and that Madelyn confirmed that the household member lived with her on a number of occasions throughout the sponsorship process. *See* DX-43 at GOV-00010595, GOV-00010615-16, GOV-00010620, GOV-00010624-25. | |
| 107.  In mid-March, a TVPRA-mandated home study was recommended for Lucas R. by the case manager and third-party case coordinator, and was ordered by the ORR FFS on March 17, 2018.<br><br>De La Cruz LR Decl. ¶ 21; GOV-00010563-10564. | **<u>Undisputed</u>** for purposes of this motion. |
| 108.  A home visit was conducted by a third-party non-profit home study agency for Madelyn R., with the initial visit taking place on March 22, 2018, a follow-up visit on March 30, 2018, and a third home visit on April 5, 2018, and a negative recommendation was on issued April 12, 2018, with which both the case coordinator and FFS were in agreement.<br><br>De La Cruz LR Decl. ¶¶ 22-23; GOV-00010500-10501, GOV-00010581-10583. | **<u>Undisputed</u>** for purposes of this motion. |
| 109.  On May 21, 2018, Lucas R. was placed at Shiloh Residential Treatment Center at the recommendation of a qualified medical professional, and with the consultation and recommendation of ORR and shelter staff. | **<u>Partially Disputed.</u>** Plaintiffs do not dispute that on May 21, 2018, Lucas R. was placed at Shiloh Residential Treatment Center. Plaintiffs dispute that Lucas R.'s placement was "at the recommendation of a qualified medical professional" as that statement is not supported by the evidence cited. *See* DX-41 [De La Cruz LR Decl.] ¶ 33 ("ORR |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| De La Cruz LR Decl. ¶¶ 33-45; GOV-00009222-9223, GOV-00009228, GOV-00009304-9305, GOV-00010638. | determined that Lucas R could not be treated through outpatient services in a shelter-setting...").  Plaintiffs further dispute this statement to the extent it implies Lucas R. was stepped up to an RTC based on the recommendation of a licensed psychologist or psychiatrist. Lucas R was stepped up based on the recommendation of a psychiatric mental health nurse practitioner, not a licensed psychologist or psychiatrist. *See* ECF No. 144 [Azar Answer] ¶ 31.  Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 29. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as DX-43 at GOV-00009223 reflects that Lucas R. "received a follow-up psychiatric visit on 7/17/18 in which his Sertraline was discontinued but Melatonin remained to assist with sleeping; doctor provided a recommendation for RTC placement." | |
| 110.  At Shiloh, Lucas R. received a know-your-rights presentation and legal screening for possible legal relief from the Cabrini Center 10 days after arrival on May 31, 2018, had his own attorney of record who entered an appearance for him as of August 9, 2018, and he had multiple meetings with counsel.<br><br>De La Cruz LR Decl. ¶ 45; GOV-00009338, GOV-00009428, GOV-00009760, GOV-00009762. | <u>**Undisputed**</u> for purposes of this motion except to the extent Defendants rely on inadmissible evidence. *See* Evidentiary Objections ¶ 29. |
| 111.  On June 11, 2018, Lucas R.'s half-brother was identified as a potential sponsor for Lucas R. and a family reunification packet was sent to the potential sponsor.<br><br>De La Cruz LR Decl. ¶ 47; GOV-00009506, GOV-00009591. | <u>**Undisputed**</u> for purposes of this motion. |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| 112.  Lucas R. stated during the course of this litigation: "Plaintiff answers that he was not privy, and accordingly can neither identify nor describe, the factual circumstances in which Defendants blocked VERA lawyers from representing you regarding custody, medication, placement, or release from ORR custody.  Plaintiff further answers that to the best of his knowledge and recollection no lawyer ever represented him with respect to custody, medication, placement, or release at any time while he was in ORR custody."<br><br>Plaintiff Lucas R.'s Answers at 7-8. | **Undisputed** for purposes of this motion. |
| 113.  On his first day in ORR custody, Jaime D. received a know-your-rights presentation, was legally screened by legal service provider, and was provided a list of pro bono legal service providers.<br><br>GOV-00008821-8836 | **Partially Disputed,** Plaintiffs do not dispute that Jaime D. was provided a list of pro bono legal services providers.  Plaintiffs dispute the remainder of this statement as unsupported by the cited evidence. *See* DX-46 at GOV-00008821–8836 (list of legal services providers and immigration case documents). |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as DX-46 at GOV-00008594 indicates that Jaime D. received a know-your-rights presentation by a legal services provider and DX-46 at GOV-00008702 reflects that Jaime D. "has been working with Legal Services for Children (LSC) since his placement at Yolo Secure.  [Jaime D.] has been found eligible for asylum and SIJS, and a legal memo is on file." | |
| 114.  On or around April 9, 2018, Jaime D. met with a clinician for an individual mental health session, where he reported he had no history of violence towards others and made no mention of any gang involvement.<br><br>Fink JD Decl. ¶ 7; GOV-00008809. | **Undisputed** for purposes of this motion. |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| 115. On or around April 11, 2018, during an assessment, Jaime D. disclosed that he was a part of a gang in Honduras, and provided a detailed statement that while in Honduras, he killed four gang members, sold and consumed marijuana, and was observed writing gang symbols on the wall.<br><br>Fink JD Decl. ¶ 8; GOV-00008786, GOV-00008793, GOV-00008800, GOV-00008875-8876, GOV-00008879-8881. | **<u>Partially Disputed.</u>** Plaintiffs dispute this statement to the extent it describes Jaime D.'s disclosure as "detailed" because the cited evidence does not support that characterization. Plaintiffs further dispute that Jaime D. wrote "gang symbols" as the evidence cited does not support those statements. Plaintiffs further dispute this fact to the extent Defendants rely on inadmissible evidence. *See* Evidentiary Objections ¶ 30. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact. *See* DX-46 at GOV-00008876 ("During assessment, UC was observed to write '13' on a whiteboard and then quickly erase it."). | |
| 116. On the same day Jaime D. made these disclosures, a case manager at Cayuga Centers shelter recommended that Jaime D. be transferred to a secure facility due to the risk he posed to himself and others, and the case coordinator concurred, noting that Jaime D.'s disclosures of a violent criminal history warranted an immediate transfer to guarantee the safety of the minor and others.<br><br>Fink JD Decl. ¶¶ 9-10; GOV-00008810, GOV-00008786, GOV-00008793-8794. | **<u>Disputed.</u>** Plaintiffs dispute this fact because the evidence cited indicates the case manager recommended "transfer … to a Staff secured facility..." not a secure facility. DX-46 at GOV- 00008701. Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 31. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact. *See* DX-46 at GOV-00008793 ("CC agrees with the program's recommendation to transfer the minor to a *secure* facility. . . . CC recommends immediate transfer to guarantee safety of the minor, foster parent and program staff.") (emphasis added). | |
| 117. On or around April 16, 2018, an ORR FFS approved Jaime D.'s transfer to Yolo County Juvenile Detention Center, a secure facility, in Woodland, California due to these disclosures. | **<u>Undisputed</u>** for purposes of this motion. |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| Fink JD Decl. ¶ 11; GOV-00008794. | |
| 118.  On or around April 19, 2018, Jaime D. received an NOP, which was provided to him in English and Spanish and contained the reasoning for his placement at Yolo, and which he signed acknowledging receipt, and he attended a know-your- rights presentation on April 25, 2018.<br><br>Fink JD Decl. ¶ 15; GOV-00008522-8525, GOV-00008594. | **Undisputed** for purposes of this motion. |
| 119.  On or around April 24, 2018, after residing at Yolo for about a week, Jaime D. changed his story about his life in his home country, and reported that he had never been in a gang or murdered anyone, and that he made up the story because he believed it would help him remain in the United States.<br><br>Fink JD Decl. ¶ 18; GOV-00008666-8667. | **Disputed.** The statement that Jaime D. "changed his story about his life in his home country" is not supported by the cited evidence. Further, in discussing his prior incorrect statements, Jaime D. said he felt "very nervous" around the shelter staff and "wanted the shelter staff to stop talking to [him]." *See* Ex. 80 [Jaime D. Decl.] ¶ 5. Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 32. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Defendants' cited evidence unambiguously reflects that following his transfer to Yolo, Jaime D. changed his story about his life in his home country, and reported that he had never been in a gang or murdered anyone, and that he made up the story because he believed it would help him remain in the United States.  Indeed, Jaime D. transferred to Yolo after he "reported being part of the MS-13 gang in COO (Honduras).  UC also reported selling and consuming Marijuana, as well as killing 4 male gang members in COO.  Minor reported he was threatened, and forced to commit these acts by the gang members and stated he complied out of fear of being killed."  DX-46 at GOV-00008666.  Following transfer, on April 24, 2018, Jaime D. "reported he had made up the information due to fearing that he would be returned to home country and his half-sister's father finding him… Youth reported he has never been a part of any gangs or caused any harm to anyone.  Youth also reported to CM that he decided to make the information up of being a part of a gang and killing individuals as he thought it would help him remain in the U.S."  *Id.* at GOV-00008666-8667.

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| 120.  On or around May 3, 2018, after Jaime D. had recanted his account of committing violent acts in his home country, his case manager noted that Yolo staff agreed he should not be in a secure facility.<br><br>Fink JD Decl. ¶ 24; GOV-00008667. | **<u>Undisputed</u>** for purposes of this motion, except to the extent the fact is incomplete. The evidence cited indicates that on May 3, 2018, the case manager informed Jaime D. that "his case has been staffed with our FFS and CC, and we are all in agreement that he isn't appropriately placed in secure setting." *See* DX-46 at GOV-00008667. |
| 121.  On or about May 14, 2018, a case manager submitted a formal request that Jaime D. be transferred to a less restrictive setting, which the case coordinator concurred with on May 16, 2018, and which an ORR FFS approved that same day.<br><br>Fink JD Decl. ¶ 25; GOV-00008701-8702. | **<u>Undisputed</u>** for purposes of this motion, except that Plaintiffs seek to clarify that the evidence cited indicates the case manager submitted a formal request for a "Staff Secure" program. *See* DX-46 at GOV-00008701. |
| 122.  On or about May 24, 2018, Jaime D. arrived at Children's Village staff-secure.<br><br>Fink JD Decl. ¶ 28; GOV-00008699-8700. | **<u>Undisputed</u>** for purposes of this motion. |
| 123.  Jaime D. stated in a sworn interrogatory response: "Plaintiff answers that he was not privy, and accordingly can neither identify nor describe, the factual circumstances in which Defendants blocked VERA lawyers from representing you regarding custody, medication, placement, or release from ORR custody.  Plaintiff further answers that to the best of his knowledge and recollection no lawyer ever represented him with respect to custody, medication, placement, or release at any time while he was in ORR custody." | **<u>Undisputed</u>** for purposes of this motion. |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| Plaintiff Jaime D.'s Answers at 7-8. | |
| 124.  Daniela Marisol T. provided a signed acknowledgment that she had received a know-your- rights presentation, was legally screened by legal service provider Pro-Bar on August 8, 2016, and provided a list of pro bono legal service providers.<br><br>Vergara DMT Decl. ¶ 22; GOV-00001839, GOV-00001847-1892, GOV-00001985, GOV-00002374. | **Undisputed** for purposes of this motion, except to the extent the evidence cited provides conflicting information as to whether Daniela Marisol T. "was legally screened by legal service provider Pro-Bar on August 8," 2016 or 2017. *Compare* DX-47 [Vergara Decl.] ¶ 22 (stating Daniela Marisol T.'s screening occurred August 6, 2017) *with* DX-49 at GOV-00002374 (stating Daniela Marisol T.'s screening occurred August 6, 2016). |
| 125.  On or around September 8, 2017, Daniela Marisol T. was placed at Shiloh at the recommendation of a qualified medical professional, and with the consultation and recommendation of ORR and shelter staff.<br><br>Vergara DMT Decl. ¶¶ 32, 36; GOV-00002145-2148, GOV-00002151-2152, GOV-00003122. | **Undisputed** for purposes of this motion. |
| 126.  At Shiloh, Daniela Marisol T. Daniela received a know-your-rights presentation, a copy of a list of pro bono legal service providers in Texas, and was referred to a child advocate on October 4, 2017.<br><br>Vergara DMT Decl. ¶ 44; GOV-00003189-3194, GOV-00003216-3222, GOV-00003282. | **Undisputed** for purposes of this motion. |
| 127.  On February 22, 2018, Daniela received a second know-your-rights presentation from Immigration Defenders Law Center, was provided a list of legal service providers, and on February 27, 2018, she received a legal screening and | **Undisputed** for purposes of this motion. |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| was found likely to be eligible for legal relief, including Special Immigrant Juvenile Status and Asylum.<br><br>Vergara DMT Decl. ¶ 58; GOV-00002948-2950, GOV-00002964. | |
| 128.  On March 13, 2018, Daniela was informed she had been assigned a child advocate, whom she met with at the shelter on April 14 and May 12, 2018.<br><br>Vergara DMT Decl. ¶ 58; GOV-00002965, GOV-00002966, GOV-00002968. | **Undisputed** for purposes of this motion. |
| 129.  Daniela Marisol T. stated during the course of this litigation: "Plaintiff answers that she was not privy, and accordingly can neither identify nor describe, the factual circumstances in which Defendants blocked VERA lawyers from representing you regarding custody, medication, placement, or release from ORR custody.  Plaintiff further answers that to the best of her knowledge and recollection no lawyer ever represented her with respect to custody, medication, placement, or release at any time while she was in ORR custody."<br><br>Plaintiff Daniela Marisol T.'s Answers at 7-8. | **Disputed.** Plaintiffs dispute this fact insofar as it misquotes the cited evidence.  *See* DX-48 at 7-8. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs admit that Daniela Marisol T. stated that "she was not privy, and accordingly can neither identify nor describe, the factual circumstances in which Defendants blocked Vera Institute lawyers from representing her regarding custody, medication, placement, or release from ORR custody."  DX-48 at 8.

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| 130.  On July 17, 2017, following a psychological evaluation, Miguel Angel S. was recommended and approved for a transfer for a step-up to Shiloh Residential Treatment Center due to his mental health and behavioral issues.<br><br>Fink MAS Decl. ¶¶ 16-17; GOV-00011218-11220. | **<u>Undisputed</u>** for purposes of this motion, except that Plaintiffs seek to clarify that the evidence cited indicates the Transfer Request noted that "Psychologist Dr. Sonia Carbonell has provided a *verbal diagnosis and recommendation* for treatment. Program is still pending the official evaluation summary." *See* DX-51 at GOV-00011219 (emphasis added). |
| 131.  Miguel Angel S.'s mood escalated in January 2018 and after he engaged in verbal and physical aggression against his peers and staff, Shiloh staff and the FFS met to discuss Shiloh's recommendation that Miguel Angel S. be transferred up to a higher level of case.<br><br>Fink MAS Decl. ¶¶ 23, 26; GOV-00011476, GOV-00011589, GOV-00011527-11528. | **<u>Undisputed</u>** for purposes this motion except to the extent Defendants rely on inadmissible evidence. *See* Evidentiary Objections ¶ 33. |
| 132.  Miguel Angel S. was approved for transfer from Shiloh to Yolo on March 23, 2018 and, on October 11, 2018, was released from ORR custody into the custody of his sponsor.<br><br>Fink MAS Decl. ¶¶ 26, 38; GOV-00011306. | **<u>Undisputed</u>** for purposes this motion except to the extent Defendants rely on inadmissible evidence. *See* Evidentiary Objections ¶ 33. |
| 133.  On January 19, 2017, Gabriela N. was provided a know-your-rights presentation by a legal services provider, Diocesan Migrant & Refugee Services, Inc.<br><br>Vergara GN Decl. ¶ 20; GOV-00006152. | **<u>Undisputed</u>** for purposes of this motion. |
| 134.  Isaac N. applied as a sponsor for Gabriela N. but had never previously been Gabriela N.'s primary caregiver and | **<u>Partially Disputed.</u>** Plaintiffs do not dispute that Isaac N. applied as a sponsor for Gabriela N. and had never previously been her primary caregiver.  Plaintiffs dispute this fact to the |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| she had not seen him in approximately 14 years.<br><br>Vergara GN Decl. ¶¶ 79, 86; GOV-00006628, GOV-00006641-6642, GOV-00006548-6549. | extent it is intended to suggest that Isaac N. and Gabriela N. did not have a close relationship. *See* Ex. 138 ¶ 4 at 2022 ("We have a very close relationship. I spent a lot of time with [Gabriela N.] when we both lived in El Salvador. I came to the United States when she was five years old…"). Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 35. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs' assertion that Isaac N. and Gabriela N. had a "close relationship" does not create a genuine dispute of material fact as to Defendants' assertion that Gabriela N. had not seen her grandfather in approximately 14 years. | |
| 135.  Isaac N. had a serious medical condition.<br><br>Vergara GN Decl. ¶ 86; GOV-00006626, GOV-00006641-6642, GOV-00006548-6549. | **Undisputed** for purposes of this motion except to the extent Defendants rely on inadmissible evidence. *See* Evidentiary Objections ¶ 35. |
| 136.  Isaac N.'s household members refused to provide IDs or fingerprints.<br><br>Vergara GN Decl. ¶ 80; GOV-00007610. | **Undisputed** for purposes of this motion. |
| 137.  Isaac N. disclosed prior kidnapping charges against him in his home country of El Salvador, and did not immediately provide the requested exonerating documentation.<br><br>Vergara GN Decl. ¶ 81; GOV-00007276, GOV-00007618. | **Partially Disputed.** Plaintiffs do not dispute that Isaac N. disclosed prior kidnapping charges against him in his home country. Plaintiffs dispute that Isaac N. "did not immediately provide the requested exonerating documentation" to the extent it suggests he did not provide exonerating documentation as soon as he was able to and because that statement is not supported by the cited evidence. *See* Ex. 138 ¶ 8 at 2023 ("I don't remember exactly when I initially applied to be [Gabriela N's] sponsor. In the fall of 2017 I tried to submit my fingerprints. However, ORR told me that I needed to |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | submit documentation (the "carta de libertad") from El Salvador that explained my time in prison. I requested the documentation from El Salvador, and it arrived one month and eight days later. I immediately submitted it to ORR, and ORR told me to go and get my fingerprints taken again."). |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as to whether Isaac N. immediately provided requested exonerating evidence. | |
| 138.  In February 2018, ORR ordered a mandatory TVPRA home study, due to Gabriela N.'s disclosures of abuse in her home country.<br><br>Vergara GN Decl. ¶ 86; GOV-00006543-6544. | **Partially Disputed.** Plaintiffs do not dispute ORR mandated a mandatory TVPRA home study.  Plaintiffs dispute that the cited evidence supports the statement that ORR ordered the mandatory TVPRA home study "In *February* 2018." *See* DX-52 [Vergara GN Decl.] ¶ 86 ("On January 10, 2018, a mandatory TVPRA Home Study was requested…"); DX-54 at GOV-00006543–6544 (no date listed).  Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 35. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as to whether ORR ordered a mandatory TVPRA home study, due to Gabriela N.'s disclosures of abuse in her home country. | |
| 139.  Isaac N. received a negative home study recommendation stating that he was not a suitable sponsor.<br><br>Vergara GN Decl. ¶ 86; GOV-00006639-6642. | **Undisputed** for purposes of this motion except to the extent Defendants rely on inadmissible evidence. *See* Evidentiary Objections ¶ 35. |
| 140.  On August 21, 2017, Gabriela N. was evaluated by a psychiatrist from Texas Tech University Psychiatry, and the psychiatrist recommended that she be placed in an residential treatment center to target her therapeutic needs. | **Undisputed** for purposes of this motion except to the extent Defendants rely on inadmissible evidence. *See* Evidentiary Objections ¶ 34. |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| Vergara GN Decl. ¶ 38; GOV-00007656, GOV-00007724, GOV-00007372-7373. | |
| 141.  While placed at Shiloh, Gabriela N. received a know-your-rights presentation, received legal screenings, and met with attorneys.<br><br>Vergara GN Decl. ¶ 59; GOV-00006151, GOV-00006527, GOV-00006813-6820. | **Undisputed** for purposes of this motion. |
| 142.  Gabriela N. stated during the course of this litigation:  "Plaintiff answers that she was not privy, and accordingly can neither identify nor describe, the factual circumstances in which Defendants blocked VERA lawyers from representing you regarding custody, medication, placement, or release from ORR custody.  Plaintiff further answers that to the best of her knowledge and recollection no lawyer ever represented her with respect to custody, medication, placement, or release at any time while she was in ORR custody."<br><br>Plaintiff Gabriela N.'s Answers at 7-8. | **Disputed.** Plaintiffs dispute this statement insofar as this fact misquotes the cited evidence. Gabriela N.'s Response to Plaintiffs' Revised First Set of Interrogatories actually states: "Plaintiff answers that she was not privy, and accordingly can neither identify nor describe, all of the factual circumstances in which Defendants blocked VERA lawyers from representing you regarding custody, medication, placement, or release from ORR custody. Plaintiff further answers that while she was placed at St. Michael's Home for Children in Houston, Texas, she asked the care provider staff on numerous occasions if she could call Paola Perez, her immigration attorney. Plaintiff states that the staff repeatedly denied her the ability to call Ms. Perez. Plaintiff further answers that to the best of her knowledge and recollection no lawyer ever represented her with respect to custody, medication, placement, or release except for Plaintiffs' counsel." *See* DX-53 [Gabriela N.'s Responses to Defendants' Revised First Set of Interrogatories] at 7–8. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as Plaintiffs admit that Gabriela N. "was not privy, and accordingly can neither identify nor describe, all of the factual circumstances in which Defendants blocked Vera Institute lawyers from representing you regarding custody, medication, placement, or release from

123
Defendants' Reply in Support of Defendants' Statement of Uncontroverted Facts

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| ORR custody… Plaintiff further answers that to the best of her knowledge and recollection no lawyer ever represented her with respect to custody, medication, placement, or release except for Plaintiffs' counsel."  DX-53 at 7-8. ||
| 143.  While Sirena P. was at a Southwest Key facility, she was recommended and approved for placement at Shiloh Residential Treatment Center due to mood instability, self-injurious behavior, and suicidal ideation, which made her a danger to herself.  De La Cruz SP Decl. ¶¶ 11-17; GOV-00014399, GOV-00014401, GOV-00014406, GOV-00014408, GOV-00014410, GOV-00014653, GOV-00015040. | **Partially Disputed.** Plaintiffs do not dispute that Sirena P. was placed at both Southwest Key facility and Shiloh Residential Treatment Center. Plaintiffs dispute this fact insofar as none of the cited evidence supports the statement that "she was recommended and approved for placement at Shiloh Residential Treatment Center."  Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 36. |
| **Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact with respect to whether Sirena P. was recommended and approved for placement at Shiloh Residential Treatment Center due to mood instability, self-injurious behavior, and suicidal ideation.  DX-56 at GOV-00013743 ("She received a follow-up psychiatric visit on 5/24/18 and recommendation for RTC placement was provided"); *id.* at GOV-00014427 ("Psychiatrist/psychologist recommendations. . . . Client will still need to be transferred to RTC once space is available as she remains a danger to herself"). ||
| 144.  On June 4, 2018, Sirena P. was transferred to Shiloh upon the recommendation of a licensed psychiatrist and the approval of the ORR FFS, and ORR informed her father, Eduardo P., of the transfer.  De La Cruz SP Decl. ¶ 21; GOV-00014426-14427, GOV-00014450-14460, GOV-00013742-13743, GOV-00013748; Eduardo P. Dep. 29:25-30:1-2. | **Undisputed** for purposes of this motion. |
| 145.  Benjamin F. was initially placed in the St. PJ's Children's Home shelter and shortly after entering, exhibited | **Partially Disputed.** Plaintiffs do not dispute that Benjamin F. was initially placed in St. PJ's Children Home.  Plaintiffs dispute this |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| symptoms suggesting a need for a higher level of placement.<br><br>De La Cruz BF Decl. ¶¶ 5, 8, 18-19, 23-30; GOV-00000681-686; GOV-00000834, GOV-00000925-937. | statement insofar as the cited evidence does not support that Benjamin F. "exhibited symptoms suggesting a need for a higher level of placement." The evidence cited makes no reference of a recommendation or referral to more restrictive placement but instead states that St. PJ's Children's Home staff requested moving Benjamin F. Plaintiffs further dispute that the asserted fact is supported by admissible evidence. *See* Evidentiary Objections ¶ 41. |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact as to whether Benjamin F. exhibited symptoms suggesting a need for a higher level of placement.  DX-59 at GOV-00000684-685 (St. PJ's intake assessment form indicating that child is "agitated," "uncooperative," "sad," and has "outbursts" requiring "increased levels of support" and "supervision"); *id.* at GOV-00000017 ("[Benjamin F] requires placement in a residential treatment center in order to be properly supervised and manage his mood symptoms, aggressive behaviors, inappropriate sexual behavior, and daily living skills."); *id.* at GOV-00000018 (Psychological Evaluation by a PsyD); DX-93 at 2 (Psychological evaluation concluding that "increased intervention provided through a highly structured residential/therapeutic environment appear to be indicated at this time.").

| 146.  On July 23, 2018, Benjamin F. was placed at Shiloh Residential Treatment Center at the authorization of a qualified medical professional, and with the consultation and recommendation of shelter staff.<br>De La Cruz BF Decl. ¶¶ 31, 32, 34; GOV-00000017-18. | <u>**Partially Disputed.**</u> Plaintiffs do not dispute that on July 23, 2018, Benjamin F. was placed at Shiloh Residential Treatment Center. Plaintiffs dispute that the cited evidence supports that Benjamin F.'s placement was "at the authorization of a qualified medical professional, and with the consultation and recommendation of shelter staff." *See* DX-58 [De La Cruz Decl.] ¶ 31 ("Benjamin F. transferred to Shiloh, a Residential Treatment Center that treats children with emotional disorders, as well as children with intellectual and developmental disabilities, on July 23, 2018, where he resided until September 15, 2018, at which time ORR released him to his grandmother-sponsor."), ¶ 32 (describing Benjamin F.'s |

| Defendants' Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| | prior medication history); ¶ 34 (describing treatment goals); GOV-00000017-18 (Shiloh intake form with treatment goals). |

**Defendants' Response:** Plaintiffs' evidence does not create a genuine dispute of material fact.  DX-59 at GOV-00000017-18 (reflecting that Benjamin D. was recommended for transfer on July 9, 2018 by a case worker at St. PJ's, evaluated by a psychologist and psychiatrist on July 18 and July 19, 2018, while at St. PJ's, before being transferred to Shiloh on July 23, 2018).  *See* Fact Reply ¶ 145.

| Plaintiffs' Additional Fact | Defendants' Response and Supporting Evidence |
|---|---|
| 147. Neither the ORR Policy Guide nor the ORR MAP requires an independent review, such as an independent examination and interview of the child, by an admissions team at the receiving RTC.<br><br>Ex. 1 [ORR Policy Guide] § 1.4.6 at 30; Ex. 2 [ORR MAP] at 100. | **Undisputed,** except to the extent it implies an independent review by an admissions team at a receiving RTC is required under the TVPRA, or that no independent review is conducted by an independent psychologist or psychiatrist, or that the receiving RTC does not evaluate the request for transfer to ensure the admission is appropriate.  *See* DX-91 [Ruiz Dep.] 96:15-25 ("[I]f a patient comes in and we deem that being in an acute care or subacute care like Shiloh wouldn't be necessary because he wouldn't meet the criteria, then obviously by regulation we have to keep the patient in the least restrictive environment.  So they wouldn't be admitted."). |
| 148. In November 2018, the majority of kids placed in secure facilities were inappropriately placed.<br><br>Ex. 33 [Ray Dep. Tr.] at 163:19–25 at 1103; Ex. 190 at 427. | **Undisputed.** |
| 149. In January 2019, over 70 percent of kids in staff-secure facilities and RTCs | **Disputed** to the extent it implies that over 70 percent of kids in staff-secure facilities and |

| Plaintiffs' Additional Fact | Defendants' Response and Supporting Evidence |
|---|---|
| were placed out of compliance with ORR's own policies.<br><br>Ex. 23 [Fink Dep. Tr.] at 153:8–13; Ex. 171 [Fink Dep. Ex.175] at 264. | RTCs were placed out of compliance with ORR's own policies.  DX-90 [Fink Dep. Supp.] 264:20-22 ("Does this mean there were 93 improperly placed UACs? A. No."), 264:25-265:1-10 ("In some way they were noncompliant with the notice of placement.  That could be they didn't the child didn't sign the form, the form wasn't uploaded within the 30-day time frame, the form might have been not explained, the form might not have been explained to him in the language, his native language, her native language, that kind of thing.  Q. So that did not mean an improperly placed child? A. Correct."), 265:16 (such noncompliance declined). |
| 150. At Yolo secure, children are detained in small cells with concrete beds layered with only a thin mattress and pillow.<br><br>Ex. 82 [Y.A.M.S. Decl.] ¶¶ 29–30 at 1529. | **Disputed.**  Plaintiffs' cited evidence does not support that children are detained in "small" cells and that they receive only a thin mattress and "pillow."  Ex. 82 [Y.A.M.S. Decl.] ¶¶ 29-30 at 1529.  *See also* Fact Response ¶¶ 128, 133, 134 (discussing credibility of Ex. 82); Joint Stip ¶ 51 ("ORR's grant with Yolo ended in January 2020."). |
| 151. Children have reported that they did not want to be housed at an ORR residential treatment center but had no choice in the matter.<br><br>Ex. 82 [Y.A.M.S. Decl.] ¶¶ 11, 16 at 1526–27; Ex. 67 [K.L.F. Decl.] ¶¶ 2, 3, 8 at 1457; Ex. 69 [K.N.A.T. Decl.] ¶¶ 3, 6 at 1466; Ex.70 [K.S.G.P. Decl.] ¶ 2 at 1470; Ex. 75 [M.Y.R.M. Decl.] ¶ 4 at 1495. | **Undisputed** that UACs have made such reports to Plaintiffs' counsel.  However, *see* Fact Response ¶¶ 133, 134, 189, which plainly show these children had significant mental health issues that could not be addressed safely at the shelter level and necessitated RTC placement.  *See also* DX-93 at 55-67, 71-80 (K.L.F.'s trauma history includes sexual abuse by her mother's boyfriend at age 5 and her grandfather and father's murders, and her serious mental health issues, including a suicide attempt, began in her home country about three years before she ever began the journey to the U.S.; K.L.F. was placed at Shiloh RTC on an |

| Plaintiffs' Additional Fact | Defendants' Response and Supporting Evidence |
|---|---|
| | emergency basis due to behaviors that were an immediate danger to herself, including: "aggression, property destruction, suicidal ideations and attempts, self-injurious behaviors and mood swings and possible seizures"; before her transfer to Shiloh, K.L.F.'s clinician at the shelter level explained to her mother in family therapy the need for the RTC placement to address K.L.F.'s severe mental health symptoms, and her mother agreed to attend family counseling sessions and assist with the reunification process; while at Shiloh, K.L.F. was psychiatrically hospitalized due to a suicide attempt by medication overdose; K.L.F. received individual, group, and family therapy services, and medication management at the RTC which significantly improved the severity of her mental health symptoms, and she was able to participate in meetings about her own care; she was safely released directly from the RTC to her sponsor mother who was provided psycho-education by K.L.F.'s clinician about her mental health needs); DX-52 [Vergara GN Decl.] ¶¶ 44, 46 (Gabriela N. "was referred to Shiloh RTC following 'depressed mood suicidal ideation and self-injurious behaviors'""; before she was transferred to Shiloh, Gabriela met with staff at the SWK shelter staff and "said that she understood the reason for the transfer to an RTC"; "Gabriela was '[a] bit sad due to the people that have care[d] for her in the program and happy that she will get the help that she needs as she has learned from clinicians and CM about the program and what it provides minors like her.'"); DX-47 [Vergara DMT Decl.] ¶¶ 34-36 (Daniela was |

| Plaintiffs' Additional Fact | Defendants' Response and Supporting Evidence |
|---|---|
| | transferred to Shiloh RTC on an emergency basis following her exhibition of the following symptoms that were an immediate danger to herself, including: "depressed mood, suicidal ideations and attempts, auditory and visual hallucinations, self-injurious behavior, and homicidal ideations"; prior to being transferred to Shiloh, Daniela met with her case manager, the lead clinician at the Casa Norma Linda shelter, and her assigned clinician who "notif[ied] her about and explain[ed] the reasons for the transfer"). *See also* DX-35 [Dr. Lubit Expert Rep.] at ¶¶ 77-79 (Noting UAC statements made to legal counsel were "drastically different from multiple consistent statements they made in therapy and evaluation sessions as reflected in the case file records," and significance and potential harm of such divergence due to betrayal trauma.) |
| 152. Children in ORR's care can and have been placed in psychiatric hospitals involuntarily.<br><br>Ex. 13 [Biswas 30(b)(6) Dep. Tr.] 14:10-15 at 649; Ex. 154 [De La Cruz Dep. Tr.] at 131:13–21; Ex. 158 [Heath Dep. Tr.] at 103:18–25; 269:2–11; Ex. 60 [C.J.A.L. Decl.] ¶ 2 at 1418; Ex. 65 [J.M.R.R. Decl.] ¶ 5 at 1445; Ex. 66 [J.S.C.M. Decl.] ¶ 6 at 1451; Ex. 82 [Y.A.M.S. Decl.] ¶¶ 7–8 at 1525. | **Disputed**. Plaintiffs' cited deposition testimony does not establish that children can and have been "placed" in psychiatric hospitals involuntarily. *See* Ex. 13 [Biswas 30(b)(6) Dep. Tr.] 14:10-15 at 649 (discussing out of network placements in the hierarchy of security but no mention of emergency voluntary or involuntary hospitalizations); Ex. 154 [De La Cruz Dep. Tr.] at 131:13-21 (no indication that UAC who "started swallowing batteries, eating glass, that kind of thing" or UAC that was "eating her mattress" were hospitalized involuntarily); Ex. 158 [Heath Dep. Tr.] at 103:18-25 (children can be taken to a hospital but no mention of involuntary hospitalization), 269:2-11 (same). Furthermore, ORR policy concerning the |

| Plaintiffs' Additional Fact | Defendants' Response and Supporting Evidence |
|---|---|
| | placement of children and youth in its custody, does not discuss acute emergency psychiatric hospitalizations (whether voluntary or involuntary) that may be needed to immediately stabilize a child who is in imminent danger of harming self and/or others, regardless whether that child is actually *placed* in a shelter or a more restrictive setting.  *See* ORR Guide § 1.2.<br><br>Further disputed to the extent Plaintiffs' use of the term "involuntary" implies that UACs are placed in psychiatric hospitals without medical necessity.  Indeed, the UAC declarations that Plaintiffs cite do not establish that when children go to a psychiatric hospital on a short-term emergency basis for an evaluation because they pose an acute danger to themselves or others, it necessarily constitutes an *involuntary* "placement" of such children.  When a child in ORR custody experiences such severe psychiatric symptoms that a care provider fears the child is at imminent risk of seriously harming themselves, or others, and seeks the immediate, emergency stabilization of the child in an inpatient psychiatric unit, such hospitalization may be considered to be *voluntary.  See, e.g.,* DX-93 at 24-29 (J.S.C.M., whose trauma history included sexual and physical abuse, as well as gang threats, was voluntarily psychiatrically hospitalized when he experienced active suicidal ideations at his Southwest Key shelter placement; he was admitted to the psychiatric hospital on an emergency basis to ensure his safety and stabilization);  DX-84 at 110-118 (J.M.R.R., a transgender male with |

| Plaintiffs' Additional Fact | Defendants' Response and Supporting Evidence |
|---|---|
|  | severe depression, was psychiatrically hospitalized on five occasions while placed at MercyFirst RTC when she was determined to pose an imminent risk of harm to herself and she assaulted RTC staff; hospital records show psychiatric admission to inpatient unit on 7-5-18 was considered voluntary per NY state law). Regardless, most critically, in such cases, children may exhibit psychiatric symptoms that are so severe that a failure to hospitalize them expeditiously could be extremely dangerous or even fatal. *See* DX-84 at 410-26 (Y.A.M.S. was psychiatrically hospitalized following an incident during which he exhibited extreme catatonic behavior, was completely unresponsive, and had a fever approaching 103 degrees); DX-93 at 68-70 (C.J.A.L. who had been rejected by his family was psychiatrically hospitalized on three occasions while placed at the Casa Franklin shelter because he expressed suicidal ideations, had a history of suicide attempts, and voiced a specific plan to hang himself with a shower curtain); *see also* DX-35 [Dr. Lubit Expert Rep.] ¶ 61 ("When individuals present significant danger to themselves or others, they should be placed in settings in which their safety and that of others can be protected."); DX-36 [Dr. Lubit Expert Rebuttal Report] pg. 51 n. 25 (discussing C.J.A.L.'s case); Fact Response ¶¶ 133, 134, 189; Fact Reply ¶ 76.<br><br>Finally, Defendants acknowledge the Court's standing order, which envisions that evidentiary objections be succinctly stated in a separate statement of evidentiary objections in a two-column format. ECF No. 17 |

Defendants' Reply in Support of Defendants' Statement of Uncontroverted Facts

| Plaintiffs' Additional Fact | Defendants' Response and Supporting Evidence |
|---|---|
| | § 5.d.iii.  Given that this is the only evidentiary objection raised in response to Plaintiffs' additional facts, Defendants submit, for the record, that Plaintiffs' asserted fact is beyond the scope and lacks relevance as the First Amended Complaint does not mention the involuntary (or, for that matter, voluntary) inpatient psychiatric hospitalization of UACs, and no certified class in this case concerns such acute, short-term emergency hospital visits which may be necessitated by imminent risk of harm to self/others, *see* ECF No. 141 at 27-28. |
| 153. Legal advocates, that provide services to children in restrictive settings, like MercyFirst RTC, are unaware of any Placement Review Panel pilot program or any other opportunity to seek an administrative hearing to challenge restrictive placement.<br><br>*See e.g.*, Ex. 185 [Enriquez Decl.] ¶ 8 at 359. | **Undisputed** to the extent one legal advocate, Anthony Enquirez, appears to be unaware of an administrative review process that has been in place since March 2020.  **Disputed** to the extent the Enriquez Declaration fails to acknowledge that Director Review has been part of the ORR Guide since 2017, fails to discuss whether Mr. Enriquez is unaware of the availability of Director Review in § 1.4.7 of the ORR Guide, and fails to acknowledge that the placement review panel is the pilot for procedures for the already-existing Director Review.  DX-10 [Biswas Decl] ¶ 59; *See* Fact Response ¶¶ 204, 213, 215, 216, 225, 251; Fact Reply ¶ 67. |

**KEY TO CITATION REFERENCES**

| Declaration |
| --- |
| Declaration of Attorney W. Daniel Shieh |

| Depositions | |
| --- | --- |
| Cook Dep. Supp. (DX-86) | Deposition of Melissa Cook, November 18, 2019 (Supplemental Excerpts) |
| Fink Dep. Supp. (DX-90) | Deposition of David Fink, February 12, 2020 (Supplemental Excerpts) |
| Quinn Dep. (DX-89) | Deposition of Mae C. Quinn, July 27, 2020 (Excerpts) |
| Ruiz Dep. (DX-91) | Deposition of Dr. Javier Ruiz, September 25, 2020 (Excerpts) |
| Williams Dep. (DX-87) | Deposition of Lorilei Williams, July 2, 2019 (Excerpts) |

| Expert Reports | |
| --- | --- |
| Quinn Expert Rep. (DX-88) | Expert Report of Mae C. Quinn, June 19, 2020 (Excerpts) |

| Exhibits | |
| --- | --- |
| Dr. Ryan Decl. (DX-92) | Declaration of Dr. Joseph P. Ryan, November 18, 2020 |
| DX-93 | Case File Excerpts |
| DX-94 | Yolo Budget Narrative |
| DX-95 | Shiloh Cooperative Agreement |
| DX-96 | Staff Secure Addendum to Cooperative Agreement |

Defendants' Reply in Support of Defendants' Statement of Uncontroverted Facts

Dated November 20, 2020       Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ERNESTO H. MOLINA
Deputy Director

CHRISTOPHER A. BATES
Senior Counsel to the
Assistant Attorney General

*/s/ W. Daniel Shieh*
W. DANIEL SHIEH
BENJAMIN MARK MOSS
Senior Litigation Counsel

NANCY K. CANTER (263198)
JONATHAN K. ROSS
ANTHONY J. MESSURI
Trial Attorneys
Office of Immigration Litigation
United States Department of Justice
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-9802
*Counsel for Defendants*    Email: Daniel.Shieh@usdoj.gov

Defendants' Reply in Support of Defendants' Statement of Uncontroverted Facts