# DX-86

Deposition of Melissa Cook, November 18, 2019 (Supplemental Excerpts)

Case 2:18-cv-05741-DMG-PLA   Document 295-3   Filed 11/20/20   Page 2 of 10   Page ID
#:16714
Confidential pursuant to the protective order

Page 1

```
 1

 2           IN THE UNITED STATES DISTRICT COURT

 3            CENTRAL DISTRICT OF CALIFORNIA

 4                  WESTERN DIVISION

 5     ************************************************

       LUCAS R., et al.,

 6

                      Plaintiffs,

 7           v.                      Case Number

                                     2:18-CV-05741 DMG PLA

 8     ALEX AZAR, Secretary of U.S.

       Department of Health and Human

 9     Services, et al.,

10                  Defendants.

       ************************************************

11

12        Confidential pursuant to the protective order

13                 DEPOSITION OF

14                  MELISSA COOK

15               November 18, 2019

16             9:10 a.m.  -  5:06 p.m.

17             Harrisonburg, Virginia

18

19

20

21

22

23

24     REPORTED BY:  GWENDA E. APPLEGATE, RPR, CRR

25     Job #:171764
```

Confidential pursuant to the protective order

1    Q     Is there any written document that lays out

2  what services a child will receive?

3    A     We have the case review.

4    Q     And what information about services is in

5  the case review?

6    A     What type of services would you be

7  referring to?

8    Q     Your clinical services.

9    A     Clinical services?  Clinical services,

10  we're more of a triage, so we're not coming up with a

11  specific plan for each kid.  We're triaging and

12  helping them adjust and supporting them.  And we're

13  not a treatment facility.

14    Q     What do you mean by triage?

15    A     The kids who come to us usually could be

16  having behavior difficulties if they're coming

17  straight from a crisis situation or if they've been

18  incarcerated in the local setting or something.

19  There's -- there could be behavior issues, so we're

20  just dealing with what's there.  We're not doing deep

21  psychological fixing or counseling or, you know, if

22  they're borderline, we're not coming up with

23  treatment plans on treating them because we're not a

24  treatment facility.  We're just taking care of them

25  while they're there.  And it should be a short time.

Confidential pursuant to the protective order

Page 109

1    higher level of secure, security.

2         Q    And what does higher level of secure mean?

3         A    It mean -- it would mean the most -- it

4    would mean whatever level that youth needs to be in

5    to be maintained in a safe manner for themself or

6    others.

7         Q    Is Shenandoah, to your understanding, the

8    highest level of security that ORR --

9         A    Yes.

10        Q    -- uses?  Yes.

11             And it's called a secure facility?

12        A    Yes.

13        Q    What does it mean to be a secure facility?

14        A    It means that the youth have 24-hour

15   supervision.  It means that they are in a locked

16   facility.  They cannot come and go as they please.

17        Q    Anything else?

18        A    I'm sure there are other things, but I

19   can't think of specifics.

20        Q    Do children have any privacy at Shenandoah?

21        A    Yes.

22        Q    When?

23        A    They have their own bedrooms.

24        Q    Are there windows out to the hallway?

25        A    Are there windows out to the hallway?

Confidential pursuant to the protective order

Page 110

1    Q    From the bedrooms?

2    A    Yes.  There's a window to the main unit,

3    uh-huh.

4    Q    Are the children allowed to cover them?

5    A    If they choose.  They need to have a little

6    bit of a space so that staff can monitor for

7    self-care -- I mean for self-harm.

8    Q    Do you know what the ratio of staff to

9    children at Shenandoah is?

10   A    No.  Not exactly.

11   Q    Do you know approximately?

12   A    No.  It's not within my area of expertise.

13   Q    When you have a clinical appointment with a

14   child, where does it take place?

15   A    Typically in my office.

16   Q    Does the child come to your office alone or

17   are they with a staff member?

18   A    Typically it will be me and the child.

19   Q    But when the child moves from their room or

20   unit to your office, are they on their own or are

21   they with a staff member?

22   A    They are always with a staff.

23   Q    Are they always with staff whenever they

24   are moving within the facility?

25   A    Yes.

Confidential pursuant to the protective order

Page 118

1  somebody is stepping up a child that has had multiple

2  hospitalizations within a month, then we're going to

3  say we're going to assess it and be, like, the child

4  is too high, too high maintenance medically for us,

5  so we would recommend that they either need to be

6  hospitalized or that they need to look at RTC

7  placement.  So we would not accept a child who is

8  actively suicidal and had just attempted suicide,

9  like, the day before.  We would recommend that go to

10 an appropriate placement.

11     Q    Are there other reasons you would recommend

12 against a child coming to Shenandoah other than

13 suicide risk?

14     A    If their -- if their behavior didn't appear

15 to be as severe, as concerning as possibly the

16 placement referring was deeming it.

17     Q    Okay.  So you might be looking both at does

18 this child have needs that Shenandoah can't meet, and

19 also, is this an appropriate placement?

20     A    Correct.

21     Q    So am I correct that you might make

22 recommendations both -- am I correct that you would

23 make recommendations against step-up if you thought

24 it was inappropriate?

25     A    Yes.

Confidential pursuant to the protective order

Page 119

1      Q      Would you ever make a recommendation for a

2  step-up?

3      A      Yes.

4      Q      And when would you make a recommendation

5  for a step-up?

6      A      I mean, I wouldn't make the recommendation.

7  I would just be in agreement with it.  I wouldn't --

8  I don't make the decisions.  That would be if a kid

9  has been violent and aggressive and has been

10  dangerous for other people or to himself and needed

11  to be stabilized as far as his behavior.

12     Q      Is Shenandoah a place where you stabilize

13  kids' behavior?

14     A      I would say that we do stabilize kids'

15  behavior by the dynamics that we are programmed,

16  we're a predictable setting for kids so it creates a

17  sense of safety for them, and they tend to calm down

18  and tend to be able to process a little bit better.

19     Q      Because of the structure?

20     A      Because of the structure.

21     Q      If you are making a recommendation either

22  for step-up or against step-up, who are you making

23  that recommendation to?

24     A      Again, we're the highest level, so I don't

25  make recommendations.  I just review it to see if

Confidential pursuant to the protective order

Page 133

1      Q     Does the youth have to consent to family
2    counseling?
3      A     Does the youth have to consent to family
4    counseling?
5      Q     To family counseling?
6      A     Yes.
7      Q     And whose decision is it whether to provide
8    family counseling?
9      A     It's a clinical decision.
10     Q     It's your decision?
11     A     It's a clinical decision.  It's based on
12   the needs.
13     Q     If one of the two clinicians who is not a
14   lead clinician wants to provide family counseling,
15   can they do that on their own or do they need to get
16   approval from you?
17     A     No.  They can do that on their own.
18     Q     They can do that on their own.
19           Okay.  So we've talked about individual
20   counseling, group counseling, and family counseling.
21   What other mental health related services might a
22   child at Shenandoah receive?
23     A     Medication management.
24     Q     Anything else?
25     A     As far as mental health?

Confidential pursuant to the protective order

Page 134

1      Q     Yes.

2      A     Just medication management, or they can

3  have a psychological evaluation if that is requested.

4      Q     Do children ever receive psychiatric

5  services that aren't medication management?

6      A     No.

7      Q     And if a child is receiving medication

8  management, that's Dr. Cane?

9      A     Yes, Dr. Cane and his associates.

10      Q     And you mentioned the children might

11  receive a psychological evaluation --

12      A     Correct.

13      Q     -- if one was requested.  Who would request

14  a psychological evaluation?

15      A     That would be the FFS.

16      Q     And what does a psychological evaluation

17  entail?

18      A     I don't know the specific testing, but it

19  would -- it would provide mental health testing and

20  risk assessment testing.

21      Q     And what's the purpose in getting a

22  psychological evaluation for a child at Shenandoah?

23      A     To help -- to help the decisions that are

24  made as to the -- as far as the placement and what's

25  going to be in their best health, what is the needs.

Confidential pursuant to the protective order

Page 294

1  COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2            I, Gwenda E. Applegate, Court Reporter,

3  Notary Public in and for the Commonwealth of Virginia

4  at Large, and whose commission expires November 30,

5  2021, do certify that the aforementioned appeared

6  before me, was sworn by me, and was thereupon examined

7  by counsel; and that the foregoing is a true, correct,

8  and full transcript of the testimony adduced.

9            I further certify that I am neither

10  related to nor associated with any counsel or party

11  to this proceeding, nor otherwise interested in the

12  event thereof.

13            Given under my hand and notarial seal at

14  Palmyra, Virginia, this 3rd day of December 2019.

15

16

17

18

19  *Gwenda E. Applegate*
   _____

20      Gwenda E. Applegate, Notary Public

21      Commonwealth of Virginia at Large

22      Notary Registration Number 115863

23

24

25