1   CENTER FOR HUMAN RIGHTS
    & CONSTITUTIONAL LAW
2   CARLOS R. HOLGUÍN (90754)
    256 South Occidental Boulevard
3   Los Angeles, CA 90057
    Telephone: (213) 388-8693
4   Email: crholguin@centerforhumanrights.email

5   *Attorneys for Plaintiffs*

6   *Additional counsel listed on following pages*

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11  LUCAS R., et al.,                     Case No.  2:18-CV-05741 DMG PLA

12          Plaintiffs,                   **PLAINTIFFS' RESPONSE TO
                                          DEFENDANTS' STATEMENT OF
13      v.                                GENUINE DISPUTES OF
                                          MATERIAL FACT**
14  ALEX AZAR, et al.,

15          Defendants.                   Date:    Dec. 11, 2020
                                          Time:    3:00 p.m.
16                                        Place:   Courtroom 8C, 8th Floor

17
                                          Complaint Filed: June 29, 2018
18                                        Pretrial Conference Date: March 2, 2021
                                          Trial Date:  March 30, 2021
19                                        Judge: Hon. Dolly M. Gee

20

21

22

23

24

25

26         **REDACTED VERSION OF DOCUMENT PROPOSED TO BE
27                        FILED UNDER SEAL**

28

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

PLAINTIFFS' RESPONSE TO DEFENDANTS'
STATEMENT OF GENUINE DISPUTES
CASE NO. 2:18-CV-05741 DMG PLA

HOLLY S. COOPER (197626)
Co-Director, Immigration Law Clinic
CARTER C. WHITE (164149)
Director, Civil Rights Clinic
DAISY O. FELT (307958)
JONATHAN P. MULLIGAN (CAL RLSA NO. 803383)
MONICA J. JULIAN (265075)
University of California Davis School of Law
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email:  hscooper@ucdavis.edu
        ccwhite@ucdavis.edu
        dofelt@ucdavis.edu
        jmulligan@ucdavis.edu
        mjulian@ucdavis.edu

NATIONAL CENTER FOR YOUTH LAW
LEECIA WELCH (208741)
NEHA DESAI (CAL. RLSA NO. 803161)
POONAM JUNEJA (300848)
FREYA PITTS (295878)
MISHAN WROE (299296)
MELISSA ADAMSON (319201)
1212 Broadway, Suite 600
Oakland, CA 94612
Telephone: (510) 835-8098
Email:  lwelch@youthlaw.org
        ndesai@youthlaw.org
        pjuneja@youthlaw.org
        fpitts@youthlaw.org
        mwroe@youthlaw.org
        madamson@youthlaw.org

NATIONAL CENTER FOR YOUTH LAW
BRENDA SHUM *(ADMITTED PRO HAC VICE)*
CRYSTAL ADAMS (308638)
1313 L St. NW, Suite 130
Washington, DC 20005
Telephone: (202) 868-4785
Email: bshum@youthlaw.org
        cadams@youthlaw.org

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

PLAINTIFFS' RESPONSE TO DEFENDANTS'
STATEMENT OF GENUINE DISPUTES
CASE NO. 2:18-CV-05741 DMG PLA

1  COOLEY LLP
   SUMMER J. WYNN (240005)
2  MICHAEL J. MCMAHON (*ADMITTED PRO HAC VICE*)
   REBECCA L. TARNEJA (293461)
3  ALEXANDRA R. MAYHUGH (300446)
   JAYME B. STATEN (317034)
4  1333 2nd Street, Suite 400
   Santa Monica, CA  90401
5  Telephone:   (310) 883-6400
   Facsimile:   (310) 883-6500
6  Email:  swynn@cooley.com
           mmcmahon@cooley.com
7          rtarneja@cooley.com
           amayhugh@cooley.com
8          jstaten@cooley.com

9  *Attorneys for Plaintiffs*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' RESPONSE TO DEFENDANTS'
STATEMENT OF GENUINE DISPUTES
CASE NO. 2:18-CV-05741 DMG PLA

Pursuant to Section 5(d)(i) of this Court's Initial Standing Order, Plaintiffs Lucas R. *et al.* hereby submit their Response to Defendants' Statement of Genuine Dispute of Material Fact and Additional Material Facts.

| ¶ | Plaintiffs' Uncontroverted Facts and Supporting Evidence | Defendants' Disputed Facts and Supporting Evidence | Plaintiffs' Response |
|---|---|---|---|
| 1. | The harm that detention causes for children is uniformly recognized by scholars and researchers.<br><br>Ex. 133 [Joanne M. Chiedi, *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody*, OFFICE OF INSPECTOR GENERAL (Sept. 2019) ("Office of Inspector General Mem.")] at 1991; Ex. 56 [Expert Report of Drs. Ryan Matlow and Nancy Ewen Wang ("Matlow & Wang Expert Rep.")] at 1381–86; Ex. 51 [Expert Report of Drs. Keith Cruise and Andrew Rasmussen ("Cruise & Rasmussen Expert | Disputed. Plaintiffs' assertion that "detention" *causes* harm to children ignores prior trauma or other pre-existing psychiatric problems that often predate the migration of Unaccompanied Alien Children (UACs) to the United States, and/or are experienced during the UACs' journey and lead to the UACs' long-term psychiatric problems. Plaintiffs also misleadingly assert that the alleged harm is "uniformly recognized." For many UACs, their treatment in ORR care "was a vast improvement over what they had previously experienced" in their home country or during their journey to the United States. DX-35 [Dr. Lubit Expert Rep.] ¶ 26. Finally, Plaintiffs ignore that, as Defendants' experts note, UACs' length of stay in ORR care may be longer when UACs have no identifiable safe sponsor | **Remains Undisputed.**[2] Defendants' response and cited evidence does not create a genuine dispute of fact. That children may have experienced "prior trauma or other pre-existing psychiatric problems" that predate their detention in ORR custody does not create a genuine dispute that detention itself causes harm to children. Defendants cite to no evidence that "prior trauma or other pre-existing psychiatric problems" affects the uniformly recognized harms of detention.<br><br>Defendants' cited evidence does not create a genuine dispute that researchers and scholars uniformly recognize the harm that detention |

[2] References to Plaintiffs' Uncontroverted Facts and Supporting Evidence are cited as "UF". Footnotes contained in Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts (ECF No. 283-1) begin with the notation "[DX fn]:".

| | | |
|---|---|---|
| Rep.")] at 1314 ("[l]onger time in detention is associated with increasing distress and provides more opportunity for increasing mental health and behavioral problems"); Ex. 53 [Expert Report of Judge Leonard Edwards ("Edwards Expert Rep.")] at 1329–33; Ex. 55 [Expert Report of Dr. Donna Londino ("Londino Expert Rep.")] at 1370, ¶ 56 ("correlated negative adjustment responses to the length of stay are inherent to the UAC population" and "the development of symptoms in response to the stressor of prolonged stay is concerning"); Ex. 52 [Expert Report of Dr. Ilze Earner ("Earner Expert Rep.") at 1318, ¶ 53 (reporting Office of Refugee Resettlement ("ORR") staff | notwithstanding ongoing efforts made by ORR care providers to identify viable sponsors for the UACs.<br><br>*See* DX[1]-30 [Dr. Ryan Expert Rebuttal Rep.] ¶¶ 2-9, 13 (disputing that Matlow & Wang's conclusions about the harm of ORR care are grounded in the literature which is wholly inapposite); DX-62 [Dr. Londino Expert Rep.] ¶ 56; DX-13 [Dr. Earner Expert Rep.] ¶ 53. | causes. *See* DX-30 [Ryan Expert Rep.] ¶¶ 2–9, 13 (discussing scope, qualifications, and approach to opinion). Defendants' cited evidence that addresses the reasons for a child's length of detention, such as because he or she has "no identifiable safe sponsor," fails to dispute that the harm detention causes is uniformly recognized by scholars and researchers. *See* DX-62 [Londino Expert Rep.] ¶ 56; DX-13 [Earner Expert Rep.] ¶ 53.<br><br>Likewise, that children may experience purported "improvement[s]" while detained does nothing to dispute that scholars and researchers have uniformly recognized the harm that detention may cause; notably, the "vast improvement" referenced by Dr. Lubit is in the context of children who had experienced |

---

[1] [DX fn]: Reference to exhibits "DX-01" to "DX-61" refers to exhibits submitted in connection with Defendants' Statement of Uncontroverted Facts and Conclusions of Law (ECF No. 263-2) ("Defs.' U.F."). References to Exhibits beginning with "Ex." refers to exhibits submitted in connection with Plaintiffs' Statement of Uncontroverted Facts and Conclusions of Law in Support of Plaintiffs/ Motion for Partial Summary Judgment (ECF No. 271-2). New exhibits submitted in support of this Response will begin with DX-62.

PLAINTIFFS' RESPONSE TO DEFENDANTS'
STATEMENT OF GENUINE DISPUTES
CASE NO. 2:18-CV-05741 DMG PLA

| | | | |
|---|---|---|---|
| | observations that children with longer lengths of stay "did show signs of deteriorating mental health"); *see also* Ex. 135 [Julie M. Linton et al., *Detention of Immigrant Children,* PEDIATRICS (Mar. 13, 2017)] at 1999 ("[E]xpert consensus has concluded that even brief detention can cause psychological trauma and induce long-term mental health risks for children.") | | "repeated physical and sexual assaults…" DX-35 [Lubit Expert Rep.] ¶ 26. |
| 2. | "According to facility staff, longer stays resulted in higher levels of defiance, hopelessness, and frustration among children, along with more instances of self-harm and suicidal ideation."<br><br>Ex. 133 [Office of Inspector General Mem.] at 1991 | Disputed. The Office of the Inspector General Mem.[3] (OIG Mem.) acknowledges that the facilities "visited were purposively selected and may not represent the experiences of staff in other facilities." The OIG Mem. further concedes that it "did not independently verify information provided by facility staff during interviews and did not reconcile conflicting information from different employees within a facility." The OIG Mem. also qualifies that section using the word "some": "Care provider facilities reported that longer lengths of stay resulted | **Remains Undisputed.** Defendants' cited evidence does not create a genuine dispute of fact. Regardless of whether "staff in other facilities" have different experiences, the Office of Inspector General's conclusions were formed after "site visits at 45 ORR-funded facilities, nearly half of all facilities in ORR's network at the time," and "relies primarily on data collected from interviews with approximately 100 mental |

---

[3] [DX fn]: September 2019 OIG Report ("OIG Mem."), Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody, *available at* https://oig.hhs.gov/oei/reports/oei-09-18-00431.pdf

3.

| | | in deteriorating mental health for some children and increased demands on staff." OIG Mem. at Introduction, pp. 8, 12 (emphasis added). | health clinicians who had regular interaction with children," as well as medical coordinators, 28 FFS, and facility leadership, "including the program director and lead mental health clinician." Ex. 133 [Office of Inspector General Mem.] at 1986. |
|---|---|---|---|
| 3. | Research shows that even a short amount of time in detention is seriously harmful to children, particularly those who have already experienced trauma in their home countries or during their journey to the United States.<br><br>Ex. 56 [Matlow & Wang Expert Rep.] at 1380–81, 1383, 1389 | Disputed. Plaintiffs' cited experts concede that their opinions are not based on "a peer-reviewed study conducted on the impacts of detention in ORR custody." DX-63 [Dr. Matlow Dep.] 132:1-7. Rather, the cited report is based on a review of literature, the bulk of which "specifically addresses the detrimental effects that toddlers and young children experience who are placed in institutional care in the domestic child welfare system because of parental abuse, neglect or abandonment. This population neither shares the same life history, age range, demographics or experiences with the majority of the UAC population." DX-64 [Dr. Earner Expert Rebuttal Rep.] ¶ 4; *see* DX-36 [Dr. Lubit Expert Rebuttal Rep.] pp. 43-44 (noting that Drs. Matlow and Wang's "paper is not a scientific or clinical assessment of the situation"). | **Remains Undisputed.**<br>Plaintiffs' experts formed their conclusions after not only "[a] systematic review of prior research on immigration detention," but also after a review of the "evidence and records submitted in this case as well as [their] own experiences working with detained children." Ex. 56 [Matlow & Wang Expert Rep.] at 1383, 1390. Contrary to Defendants' assertion, Drs. Matlow and Wang's report specifically addresses the harm of immigration detention. *See id.* at 1383 (subheading "2. Harm of immigration detention."). And the remainder of Defendants' cited facts are irrelevant and fail to create a genuine dispute of fact. |

4.

|  |  | Furthermore, child welfare experts who have visited and observed the practices of UACs in ORR's custody and care have observed that for many UACs, their treatment in ORR care "was a vast improvement over what they had previously experienced" in their home country or during their journey to the United States; DX-35 [Dr. Lubit Expert Rep.] ¶ 26; DX-31 [Dr. Ryan Expert Rebuttal Rep.] ¶ 2 (stating that "the majority of literature cited by Drs. Matlow and Wang focused on populations that are significantly different (in terms of both individual demographics and life circumstances) from the UAC population"). | Plaintiffs further respond that evidence cited by Defendants is inadmissible. *See* Plaintiffs' Objections to Opposition ¶ 12. |
| 4. | Stress from detention can have long-term effects in children.<br><br>Ex. 56 [Matlow & Wang Expert Rep.] at 1380–85 ("Chronic and prolonged stress exposure alters hormonal and physiological systems, with long-term consequences for neurological development and immune functioning."); *see* Ex. 27 [Deposition Transcript of | Disputed. Plaintiffs' cited experts fail to provide "████████████████████████████████████████████████████████████████" DX-36 [Dr. Lubit Expert Rebuttal Rep.] ¶ 16; *see* DX-31 [Dr. Ryan Expert Rebuttal Rep.] ¶ 13 ("The authors note the 'long lasting harm' from institutional placement...[but | **Remains Undisputed**. Defendants do not dispute that stress from detention *can* have long-term effects in children. To the extent Defendants have a dispute, the dispute is limited to the "likelihood" of the long-term effects and the effect of age of children in measuring long-term effects. *See* DX-36 [Lubit Expert Rebuttal Rep.] ¶ 16 at 47; DX-31 |

| | | | |
|---|---|---|---|
| | Shaanan Meyerstein ("Meyerstein Dep. Tr.")] at 303:16–25[4] | the cited] studies were of older asylum seekers that spent a significantly longer time in 'detention' as compared with the average UAC...and focused on young children separated from their parents as part of the zero tolerance policy, which is no longer in effect."). | [Ryan Expert Rebuttal Rep.] ¶ 13. Moreover, Drs. Matlow and Wang provided robust support for their findings. *See, e.g.*, Ex. 56 [Matlow & Wang Expert Rep.] at 1381 ("We frequently observed that increased length of time in ORR custody was associated with increased severity of depressive symptoms marked by desperation, hopelessness, and helplessness. …These symptoms and outcomes have lasting consequences on children's motivation, behavior, and functioning. These findings are consistent with research and observations in other contexts of immigration detention."). |
| 5. | Class Representative Gabriela N. experienced verbal abuse and harassment and suicidal ideation while in the custody of ORR. As a result of her suicidal ideation, she was hospitalized on August 3, 2017. ECF No. 62-2 [Decl. of Gabriela N., Feb. 2018] ¶ 9 | Disputed to the extent it implies a correlation between Class Representative Gabriela N.'s time in custody and harm. The abuse Gabriela N. experienced was by her mother, and she also experienced physical and emotional abuse by her step father in her home country. In December 2016, ███████████████████ | **Remains Undisputed.** The fact that ███████ ████████████ in ORR custody does not create a genuine dispute of fact that Gabriela disclosed "suicidal thoughts on 08/02/2017, related to increased frustration over her case as well and extended stay in the |

---

[4] All citations to deposition transcripts refer to original pagination.

("The staff yell at us all the time. The staff don't really care about us; they live totally different lives from us."); ECF No. 62-3 [Decl. of Gabriela N., Jun. 8, 2018] ¶ 7 ("The staff [were] so mean; they tease[d] me an tr[ied] to embarrass me.") ECF No. 50-32 [Decl. and Verified Report of Dr. Amy Cohen, M.D. In Support of Preliminary Injunction Re: Plaintiff Gabriella N.] at 21



; ECF No. 62-18 at 2 ("Minor disclosed suicidal thoughts on 8/02/2017, related to increased frustration over her case as well as extended stay in the program.")

Gabriela N. was psychiatrically hospitalized on August 3, 2017. DX-52 [Vergara GN Decl.] ¶¶ 15, 17, 22, 32, 37; DX-83 at 4.

program." ECF No. 62-18 at 2. In fact, Defendants' cited evidence supports this fact. *See* DX-52 [Vergara Decl.] ¶ 37.

Moreover, Defendants' response that "                                    " does nothing to rebut Plaintiffs' cited evidence of the abuse Gabriela N. experienced while in ORR custody. *See* ECF No. 62-2 [Gabriela N. Decl., Feb. 2018] ¶ 9 at 55 ("The staff yell at us all the time. The staff don't really care about us; they live totally different lives from us."); ECF No. 62-3 [Gabriela N. Decl., Jun. 8, 2018] ¶ 7 at 58 ("The staff [were] so mean; they tease[d] me an tr[ied] to embarrass me.").

| 6. | Class Members have been physically abused in ORR custody.<br><br>Ex. 6 [Defendants' Second Set of Responses to Plaintiffs' | Undisputed in that Defendants admit that individual allegations of physical abuse of UACs in ORR custody (by other minors or adult staff members) have at times been reported and that, at times, these allegations | **Remains Undisputed.**<br>Defendants' assertion as to the purported effect of ORR's policies with respect to physical abuse is irrelevant and fails  to rebut the |

7.

| | | | |
|---|---|---|---|
| | Requests for Admission ("RFA 2nd Set")] RFA No. 43 at 516–17 | have been substantiated. ORR policies, however, are set up to address such allegations quickly and fully.<br><br>Ex. 6 [RFA 2nd Set] No. 43 at 516-17; ORR Guide[5] § 5.5.4 (ORR's Abuse Review Team "quickly reviews allegations of abuse that are particularly serious or egregious in nature" and, "[i]n response to substantiated reports of physical or sexual abuse, ORR may limit placement at a care provider facility, stop placement, and even remove children currently placed at the care provider facility"). | fact that Class Members have been physically abused in ORR custody. |
| 7. | Class Members have been sexually abused in ORR custody.<br><br>Ex. 6 [RFA 2nd Set] Nos. 44, 53–55, 58 at 517–18, 522–26 | Undisputed. Defendants admit that there have been individual allegations of sexual abuse of UACs in ORR custody. However, ORR has a zero-tolerance policy for all forms of sexual abuse, sexual harassment, and inappropriate sexual behavior at all care provider facilities, including secure care provider facilities and long term foster care providers, and makes every effort to prevent, detect, and respond to such conduct. | **Remains Undisputed.**<br>Defendants' assertion that ORR has a "zero-tolerance policy" as to sexual abuse fails to rebut the fact that Class Members have been sexually abused in ORR custody. |

[5] [DX fn]: The ORR Guide: Children Entering the United States Unaccompanied is *available at*: https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied

8.

| | | Ex. 6 [RFA 2nd Set] Nos. 44, 53-55, 58 at 517¬18, 522-26 (noting that "serious allegations rising to the level of 'sexual abuse' are rare and are reported to ORR, the Department of Justice (DOJ)," and HHS's OIG). | |
|---|---|---|---|
| 8. | While in ORR custody, children experience separation from their parents, siblings, grandparents, and other family members.<br><br>Ex. 5 [Defendants' First Set of Responses to Plaintiffs' Requests for Admission ("RFA 1st Set")] Nos. 15–17 at 475–79 | Disputed to the extent it implies ORR separates children from their parents, siblings, grandparents, and other family members. Rather, UACs enter the United States unaccompanied, and Congress, in the Homeland Security Act and TVPRA, requires that children who meet the UAC definition, and who are in custody by reason of their immigration status, be referred to ORR's care and custody until appropriate sponsors can be identified and the UAC can be safely released.<br><br>6 U.S.C. §§ 279(a), (b)(1)(A), (g)(2); 8 U.S.C. § 1232(b)(1); DX-09 [Antkowiak Decl.] ¶ 50 (Congress has continuously accepted that ORR takes into custody children who may have parents residing in the United States); DX-13 [Dr. Earner Expert Rep.] ¶ 27. | **Remains Undisputed.**<br>Defendants admit that while in ORR's custody, children may "experience separation from their parents" "siblings" and "relatives." Ex. 5 [RFA 1st Set] Nos. 15–17 at 475–79.<br><br>Plaintiffs' statement does not imply that ORR separates UACs from their families upon entering the United States, though Defendants' evidence shows that accompanied minors have been separated from their parents by Border Patrol Officers and thus entered ORR custody as UACs after this forced separation. DX-31 [Ryan Expert Rebuttal Rep.] ¶ 13 ("young children [have been] separated from their parents as part of the zero tolerance policy"). |

9.

| 9. | Separating children from their family is inimical to their well-being.<br><br>Ex. 56 [Matlow & Wang Expert Rep.] at 1380–83; *id.* at 1389 ("In our interviews with children, many have exhibited symptoms of sadness, despair, helplessness, and chronic anxiety and worry directly related to ... their separation from family and community") | Disputed to the extent it implies ORR separates UACs from their family. UACs enter the United States unaccompanied, and do not enter into ORR custody until after it has been determined by a Border Patrol Officer, or other immigration official, that the child is unaccompanied and an initial placement decision has been made.<br><br>DX-10 [Biswas Decl.] § 21-23; *see* Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts ("Fact Response") ¶ 8. | **Remains Undisputed.**<br>Defendants do not cite evidence that children's separation from their families, which is continued by detention in ORR custody, is not inimical to children's well-being. Nor does Plaintiffs' UF ¶ 9 imply that ORR separates UACs from their families upon entering the United States, though Defendants' evidence demonstrates that accompanied minors have been separated from their parents by Border Patrol Officers and thus entered ORR custody after this forced separation. DX-31 [Ryan Expert Rebuttal Rep.] ¶ 13 ("young children [have been] separated from their parents as part of the zero tolerance policy"). |
|----|----|----|----|
| 10. | In February 2018, ORR detained Plaintiff Lucas R. at the Hacienda del Sol facility ("HdS") in Youngtown, Arizona.<br><br>ECF No. 40-1 [HdS Admission Record] at 2 | Undisputed. | **Undisputed.** |

10.

| | | | |
|---|---|---|---|
| 11. | On February 20, 2018, ORR hospitalized Lucas R., purportedly due to suicidal ideation. According to the emergency room report, Lucas R. had "[suicidal ideation] x8 days since being moved to southwest key . . . 'and being removed from family.'" <br><br> ECF No. 40-3 [Banner Thunderbird Medical Center Emergency Room Report] at 2 | Disputed to the extent it implies Lucas R.'s suicidal ideations began only after entering ORR's care. Lucas R. expressed suicidal ideation within one week of entering ORR's care. Medical records from his subsequent hospitalization and other records show that ██████████ ██████████████████ ██████████████████ ████████████████ <br><br> DX-41 [De La Cruz LR Decl.] ¶¶ 14, 36; DX-83 at 23, 36; *see also* DX-36 [Dr. Lubit Expert Rebuttal Rep.] pp. 29-32, ¶¶ 116-126. | **Remains Undisputed.** Defendants' response and cited evidence is irrelevant and does not rebut Plaintiffs' UF ¶ 11. Regardless of Lucas R.'s previous medical history, Lucas R. experienced suicidal ideation "x8 days since being moved to southwest key" and the "exacerbating factor" was being away from family. ECF No. 40-3 [Banner Thunderbird Medical Center Emergency Room Rep.] at 2–3. <br><br> *See* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 29. |
| 12. | The emergency room report from Lucas R.'s February 20, 2018 admission further states that Lucas "denie[d] [suicidal ideation] at this time [and] just state[d] he is sad and depressed being away from his family in Guatemala [sic]." | Disputed to the extent it implies Lucas R.'s suicidal ideation and depressive state were due solely to separation from his family. ██████████████████ ██████████████████ ██████████████████ ██████████████████ . | **Remains Undisputed.** Defendants' response and cited evidence does not create a genuine dispute of fact. To the extent Defendants dispute the fact, they do so only on the basis of an "implication" that does not exist. Defendants' cited evidence does not rebut the undisputed fact that at the time Lucas R. was admitted to the emergency room on February |

11.

| | | | |
|---|---|---|---|
| | ECF No. 40-3 [Banner Thunderbird Medical Center Emergency Room Report] at 2 | DX-41 [De La Cruz LR Decl.] ¶¶ 36, 52; *see also* DX-36 [Dr. Lubit Expert Rebuttal Rep.] pp. 29-32, ¶¶ 116-126. | 20, 2018, he denied *current* suicidal ideation and "just state[d] he is sad and depressed being away from his family in Guatemala [sic]." ECF No. 40-3 [Banner Thunderbird Medical Center Emergency Room Report] at 2. |
| 13. | Upon being returned to HdS, a nurse practitioner placed Lucas R. on sertraline (brand name: Zoloft), a psychotropic drug with severe potential side effects. The medication caused Lucas stomach pain, and he periodically resisted taking it.<br><br>ECF No. 40-2 [Southwest Key Psychiatric Report]; Ex. 81 [Decl. of Lucas R, Jun. 8, 2018 ("Lucas R. Decl.")] ¶ 4 ("I refused to take the medication two or three times, and I think it probably hurt my case.") | Disputed. After Lucas R.'s hospitalization and major depressive disorder diagnosis, Lucas R. was prescribed sertraline HCL, 50 mg. ████████████████████████████████████████████ . Lucas R. did not, however, develop any severe side effects.<br><br>DX-41 [De La Cruz LR Decl.] ¶¶ 16, 17; DX-83 at 19, 21, 32; *see also* DX-36 [Dr. Lubit Expert Rebuttal Rep.] pp. 29-32, ¶¶ 116-126. | **Remains Undisputed.**<br>Defendants attempt to create a dispute of fact by importing details that misconstrue and are not relevant to Plaintiffs' UF ¶ 13. Defendants' cited evidence is consistent with Plaintiffs' undisputed fact and therefore does not create a genuine dispute. |
| 14. | No one from the shelter or ORR asked Lucas's sister, | Undisputed that Madelyn applied to be a sponsor for Lucas R. as a non-parental | **Undisputed.** |

| | | | |
|---|---|---|---|
| | Madelyn, for her consent to administer Lucas R. psychotropic drugs.<br><br>ECF No. 37-13 [Decl. of Madelyn R., July 19, 2018 ("Madelyn R. Decl.")] ¶ 14 | sponsor, was denied, and was not asked to consent to Lucas R.'s psychotropic medications.<br><br>DX-41 [De La Cruz LR Decl.] ¶ 16; DX-83 at 20-22. | |
| 15. | ORR transferred Lucas R. to Shiloh Residential Treatment Center ("Shiloh").<br><br>ECF No. 33 [ORR Transfer Request and Tracking Form, May 21, 2018] at 37–38 | Undisputed. | **Undisputed.** |
| 16. | At Shiloh, ORR continued to confine him and medicate him without his or his family's consent until he was finally released to his brother on September 4, 2018.<br><br>Ex. 81 [Lucas R. Decl.] ¶¶ 4, 7, 8]; ECF No. 37-13 [Madelyn R. Decl.] ¶ 14; Ex 15 [Deposition Transcript of ████████ ("A.C. Dep. Tr.")] at 12:3–15 | Disputed. Lucas R. was transferred to Shiloh after displaying behaviors that were an immediate danger to himself and that could not be served in a shelter setting. Sertraline was discontinued the day Lucas R. entered Shiloh and the case files do not support the assertion that Lucas R. was prescribed medication without his consent or over his objection. While Lucas R. at times refused his medication, there is no evidence in his case file that he categorically did so, and he was not forced to take it. Lucas R. was discharged from Shiloh when he was "████████████████████████ | **Remains Undisputed.**<br>Defendants' cited evidence does not create a genuine dispute of fact. Defendants nevertheless attempt to create a dispute of fact by importing details that misconstrue and are not relevant to Plaintiffs' UF ¶ 16.<br><br>Defendants' cited evidence presupposes that care providers always follow ORR policies for recording medications in a child's file, and improperly relies on that assumption rather than citing to |

13.

██████████████████████████ "
DX-41 [De La Cruz LR Decl.] ¶¶ 33, 38, 41-43, 55; DX-83 at 16.

evidence that contradicts Plaintiffs' undisputed fact.

Moreover, the De La Cruz Declaration acknowledges that Lucas R. was provided psychotropic medication at Shiloh. DX-41 ¶ 55. Defendants' cited evidence does not support that Lucas R. consented to medication or rebut his sworn declaration that ████████████████████████████. Ex. 81 [Lucas R. Decl.] ¶¶ 6, 8 at 1520–21.

Finally, Defendants' evidence points to a policy that was implemented after Lucas R. arrived at Shiloh and discusses Shiloh's practices generally rather than those specific to Lucas R., and improperly assumes that the absence of evidence in Lucas R.'s case file definitively means he did consent, notwithstanding Lucas' sworn statement that "[i]f I didn't

14.

| | | | have to take the medication in order to be released, I wouldn't." *Id.* ¶ 6 at 1520.<br><br>*See* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 29. |
|---|---|---|---|
| 17. | While in ORR custody, Lucas R. had trouble sleeping and psychological issues until reunified with his brother.<br><br>Ex. 15 [A.C. Dep. Tr.] at 31:16– 22, 44:17–20 | Disputed to the extent it implies Lucas R's reunification with his brother resolved all behavioral and psychological issues, or that such issues were the result of being in ORR custody. During a well-being follow-up call, Lucas R.'s brother reported that "██████████████████████ ████████████████" DX-83 at 17. | **Remains Undisputed.** Defendants' cited evidence does not create a genuine dispute of fact. Additionally, Defendants misquote and omit relevant portions of the cited evidence. *See* DX-83 at 17 ("████████████████████ ████████████████████ ████████████████████ ████████████████" (emphasis added)) Nor does Defendants' cited evidence support that a "██████ ████████" indicates the existence of psychological issues. |
| 18. | Defendants admit "that Sirena P.'s separation from her family was noted as a trigger for her mental health symptoms." | Undisputed. | **Undisputed.** |

15.

| | | | |
|---|---|---|---|
| | ECF No. 144 [Defendants' Answer to First Amended Complaint ("Answer")] ¶ 83 | | |
| 19. | Defendants admit "that Benjamin F.'s separation from his mother and placement into ORR's legal custody led to physical and emotional challenges." <br><br> ECF No. 144 [Answer] ¶ 87 | Undisputed. | **Undisputed.** |
| 20. | Without the presence of family members or otherwise trusted caregivers, children are sometimes unable to cope with the psychological trauma and stress associated with custody. <br><br> ECF No. 144 [Answer] ¶ 102; Ex. 27 [Meyerstein Dep. Tr.] at 302:21– 303:19; Ex. 21 [Deposition Transcript of Isabella F. ("Isabella F. Dep. Tr.")] at 56:12–57:23, 59:2–7; Ex. 15 [A.C. Dep. Tr.] at 31:16– 22, 44:7–20; Ex. 22 [Deposition Transcript of Maviric Fields ("Fields Dep. | Undisputed that some children experience stress with custody. However, disputed to the extent it ignores that prior trauma or other pre-existing psychiatric problems often predate children's placement in ORR custody and lead to long-term mental health issues. <br><br> DX-31 [Dr. Ryan Rebuttal Report] ¶ 6 ("historical traumas and prior life experiences can cascade and create long-term emotional and behavior issues"). | **Remains Undisputed.** <br> Defendants' response and cited evidence does not create a genuine dispute of fact. That a child may have "prior trauma or other pre-existing psychiatric problems" that *predate* his or her placement in ORR custody does not diminish the further psychological trauma and stress associated with custody without the presence of family members or otherwise trusted caregivers. To the contrary, ORR custody can exacerbate the psychological stress on children with trauma histories. Ex. 56 [Matlow & Wang Expert Rep.] at 1389–90. |

16.

| | | | |
|---|---|---|---|
| | | Tr.") ] at 180:19– 22, 181:11–25 | | |
| 21. | ORR denies that there is "a greater risk of harm to children who reside for longer period of times in the legal custody of ORR (and the physical custody of a grantee care provider), as compared to release to any and all potential sponsors."<br><br>Ex. 6 [RFA 2nd Set] No. 154 at 541 | Undisputed, except Plaintiffs have failed to include objections lodged by Defendants in response to RFA No. 154. | **Undisputed.** |
| 22. | "[T]he best practice in child welfare would be to discharge the [child] within 30 days of admission. In ordinary cases, ORR generally does not recommend keeping [a child] in care for longer than 60 days."<br><br>Ex. 83 at 1537 | Disputed to the extent Plaintiffs mischaracterize Ex. 83 by omitting relevant language. The full paragraph provides that "increase in the median length of care presents child welfare considerations for ORR. *In ordinary cases, where a suitable sponsor is available and discharge presents no risks to the health or safety of the UAC or the public,* ORR's experience is that the best practice in child welfare would be to discharge the UAC within 30 days of admission. *In ordinary cases,* ORR generally does not recommend keeping UAC in care for longer than 60 days." Further, a "too-hasty release to an un-vetted sponsor poses unwarranted potential | **Remains Undisputed.** |

17.

| | | | |
|---|---|---|---|
| | | danger to a UAC" and "[t]o implement strict length of stay timelines would violate ORR's commitments to child safety and well-being – both in the short term and long term." Ex. 83 at 1537 (emphasis added). | |
| 23. | As of March 13, 2020, ORR had 3,622 minors in custody, 1,193 of whom were in congregate settings after having been detained for 30 days or more.<br><br>*Flores et al., v. Barr et al.*, No. 85- 4544-DMG (Px) (C.D. Cal. Mar. 28, 2020), ECF No. 740 [Order re Plaintiffs' *Ex Parte* Application] at 9. | Disputed. Defendants cannot verify Plaintiffs' statement, which is based upon a Court opinion citing a declaration from an attorney, Peter Schey, in a separate case, in which data was found to be errant in some respects. *See Flores et al., v. Barr et al.*, No. 85- 4544-DMG (Px) (C.D. Cal. Mar. 28, 2020), ECF No. 746-1 (discussing flaws in Plaintiffs' data). Defendants respectfully refer the Court to publicly available statistical data, available at: https://www.acf.hhs.gov/orr/about/ucs/facts-and-data, and showing an average length of care of 66 days. | **Remains Undisputed.**<br>Defendants' cited evidence does not create a genuine dispute of fact. To the extent Defendants attempt to dispute the fact, the alleged errors referenced are irrelevant to Plaintiffs' undisputed fact. |
| 24. | Children may remain in ORR custody for a year or more.<br><br>Ex. 5 [RFA 1st Set] No. 36 at 492; Ex. 19 [Deposition Transcript of Natasha David ("David Dep. Tr.")] at 72:22–73:13; Ex. 16 [Deposition Transcript of Carina Contretas | Undisputed. However, to the extent this implies stays of more than one year are common, Defendants respond as follows. In 2019, the average stay was 66 days, which is significantly shorter than the average length of stay in domestic foster care (2 years) or congregate care (8 months). DX-13 [Dr. Earner Expert Rep.] | **Undisputed.**<br>Defendants' cited evidence does not create a genuine dispute of fact. Indeed, Defendants' cited evidence is irrelevant to and fails to rebut Plaintiffs' undisputed fact. |

18.

| | | | |
|---|---|---|---|
| | ("Contreras Dep. Tr.")] at 160:6–13 | ¶ 63. Further, the length of stay can increase due to factors beyond the control of ORR or facility staff, including: failure by parents, relatives, or sponsors to complete home studies and all required paperwork; the existence of severe mental, health, or physical disabilities which may require stabilization before UACs can be safely placed with a parent, relative, or sponsor; or children who do not have any parent, relative, or sponsor to care for them.<br><br>DX-64 [Dr. Earner Expert Rebuttal Rep.] ¶ 4 ("[T]he overwhelming majority of UACs in ORR care ... spend less than two months in care before release to a sponsor."); *see also* DX-30 [Dr. Ryan Expert Rep.], App. B (discussing data concerning time."); DX-09 [Antkowiak Decl.] ¶ 47 (In fiscal year 2019, children released to Category 1 sponsors were in care for an average of 43 days; Category 2, 59 days; Category 3, 107 days. Overall average length of care equaled 56 days in fiscal year 2019.). | |
| 25. | ORR detained Class Representative Gabriela N. for approximately 633 days. | Undisputed. *But see* Fact Response ¶ 24. | **Undisputed.** Defendants' cited evidence in response to Plaintiffs' UF ¶ 24 is |

19.

| | | | |
|---|---|---|---|
| | ECF No. 62-6 [Initial Intake Form] at 2 (noting arrival date of Jan. 8, 2017]; Ex. 101 at 1802 ███████████ ); Ex. 141 at 2036 ██████████ ; Ex. 140 at 2031 ████████ ; Ex. 102 at 1806–07 | | irrelevant to and fails to rebut Plaintiffs' UF ¶ 25. |
| 26. | ORR detained Class Representative Lucas R. for approximately 208 days.<br><br>Ex. 143 at 2045 (█████████ ; Ex. 142 at 142 ███████████ | Undisputed. *But see* Fact Response ¶ 24. | **Undisputed.** Defendants' cited evidence in response to Plaintiffs' UF ¶ 24 is irrelevant to and fails to rebut Plaintiffs' UF ¶ 26. |
| 27. | ORR has detained at least one Class Member in congregate care for at least 1,570 days, or more than four years.<br><br>Ex. 122 at 1923 | Undisputed. *But see* Fact Response ¶ 24. | **Undisputed.** Defendants' cited evidence in response to Plaintiffs' UF ¶ 24 is irrelevant to and fails to rebut Plaintiffs' UF ¶ 27. |
| 28. | ORR's Policy Guide mandates "that children are released timely and safely from ORR | Undisputed. | **Undisputed.** |

20.

| | | | |
|---|---|---|---|
| | custody to parents, other family members, or other adults (often referred to as 'sponsors'). . . ."<br><br>Joint Stipulation of Facts for Motion and Cross-Motion for Partial Summary Judgment ("Joint Stip.") ¶ 5; Ex. 1 [Policy Guide, Children Entering the United States Unaccompanied, Office of Refugee Resettlement ("ORR Policy Guide")] § 2.1 at 34 | | |
| 29. | ORR is required to make "prompt and continuous efforts" toward family reunification and release children to custodians "without unnecessary delay."<br><br>Ex. 8 [Flores Settlement Agreement] ¶¶ 14, 18 at 573–74, 576 | Undisputed. Defendants acknowledge that this is required under the Flores Settlement Agreement. | **Undisputed.** |
| 30. | ORR's written policies govern the release of children to potential custodians or sponsors, which include parents or legal guardians | Undisputed. | **Undisputed.** |

21.

| | | | |
|---|---|---|---|
| | (Category 1 sponsors), immediate relatives (Category 2A/B sponsors), or more distant relatives and individuals designated by the child's parent (Category 3 sponsors).<br><br>Joint Stip. ¶ 3; Ex. 1 [ORR Policy Guide] §§ 2.1, 2.2.1 at 34–35 | | |
| 31. | Cases with no identified sponsors are referred to as Category 4.<br><br>Joint Stip. ¶ 3; Ex. 1 [ORR Policy Guide] § 2.2.1 at 34–35 | Undisputed. | **Undisputed.** |
| 32. | Case Managers, Case Coordinators, and Federal Field Specialists ("FFS") all participate in the release of children to family members and other potential sponsors, referred to as the "family reunification process."<br><br>Ex. 3 [The UAC Manual of Procedures (UAC MAP) ("ORR MAP")] § 2.2 at 140– | Undisputed. | **Undisputed.** |

| | | | |
|---|---|---|---|
| | 42; Ex. 1 [ORR Policy Guide] § 2.3 at 39 | | |
| 33. | ORR's Policy Guide provides that "Case Managers perform a variety of duties, including coordinating the completion of assessments of unaccompanied alien children, completing individual service plans, assessing potential sponsors, making transfer and release recommendations, and coordinating the release of a child or youth from ORR care and custody." The Policy Guide also provides: "The Case Manager's role is also to ensure that information is gathered or shared with the appropriate staff and stakeholders during the sponsor assessment process."

Joint Stip. ¶ 8; Ex. 1 [ORR Policy Guide] § 2.3.2 at 39–40 | Undisputed. | **Undisputed.** |
| 34. | ORR's Policy Guide provides that Case Coordinators are "non- governmental contractor field staff assigned to one or | Undisputed. | **Undisputed.** |

23.

| | | | |
|---|---|---|---|
| | more care providers primarily to review unaccompanied alien children cases and provide transfer and release recommendations to ORR staff." Joint Stip. ¶ 94 | | |
| 35. | FFS "are ORR's field staff located regionally throughout the country and are assigned to a group of [ORR] care providers within a particular geographic region." Joint Stip. ¶ 6 | Undisputed. | **Undisputed.** |
| 36. | ORR's Policy Guide defines "Care Provider" as "any ORR funded program that is licensed, certified or accredited by an appropriate State agency to provide residential care for children, including shelter, group, foster care, staff-secure, secure, therapeutic or residential treatment care for children." | Undisputed. | **Undisputed.** |

24.

| | | | |
|---|---|---|---|
| | Joint Stip. ¶ 4; Ex. 1 [ORR Policy Guide], Guide to Terms at 19. | | |
| 37. | ORR's Policy Guide provides that "[ORR/FFS] have the authority to approve all unaccompanied alien children transfer and release decisions; oversee care providers to ensure all services are properly provided and implemented; and serve as a local liaison to community stakeholders, including other Federal agencies, local legal service providers, communities, Child Advocates, etc. ORR/FFS also provide guidance, direction, and technical assistance to care providers. ORR/FFS also make final decisions as to whether home studies are conducted and/or post- release services are provided. ORR/FFS coordinate all aspects of a child's case with care provider staff, Case Coordinators, stakeholders, and other Federal | Undisputed. | **Undisputed.** |

25.

| | | | |
|---|---|---|---|
| | agencies." Joint Stip. ¶ 7; Ex. 1 [ORR Policy Guide] § 2.3.1 at 39 | | |
| 38. | Although Case Managers are the first of three actors involved in release decisions, they also have unilateral authority to declare a potential sponsor "non-viable," which ends the vetting process.<br><br>Ex. 30 [Deposition Transcript of Michelle Ortiz ("Ortiz Dep. Tr.")] at 110:24–113:2 ("And the aunt was told she was not a viable sponsor because they didn't have the same last name. Once transferred to the permanent facility, the child was released within two weeks…"). | Disputed. Plaintiffs' only evidence in support of this statement is Ex. 30 [Ortiz Dep. Tr.] – hearsay testimony by a legal service provider – and comes nowhere close to establishing this as a statement of uncontroverted fact regarding ORR's policy or practice. Moreover, this statement is erroneous, and is contravened by both ORR policy and ORR Rule 30(b)(6) testimony. Case managers coordinate the completion of UAC assessments, complete individual service plans, assess potential sponsors, communicate with potential sponsors, make transfer and release recommendations, and coordinate the release of children from ORR care and custody. It is ORR's practice and policy that the release process is collaborative in nature and requires coordination between the case manager, third-party case | **Remains Undisputed.** Defendants' response and cited evidence does not create a genuine dispute of fact. Defendants' citation to ORR's policy and testimony of ORR's designated Rule 30(b)(6) witness regarding what ORR's policy states about the role of a Case Managers does not establish "ORR's practice," nor does it rebut that Case Managers have exercised unilateral authority to declare a sponsor "non-viable," which ends the vetting process. Ex. 30 [Ortiz Dep. Tr.] at 110:24–113:2.<br><br>Further, Defendants' own testimony establishes that Case Managers unilaterally determine that a sponsor is non-viable. *See* Ex. 150 [Biswas 30(b)(6) Dep. Tr.] |

26.

| | | coordinator, the FFS, and other stakeholders. *See* Defs.' U.F. ¶¶ 15, 24; DX-02 [Biswas 30(b)(6) Dep.] 128: 9-10 ("I wouldn't characterize them [case managers] as the primary evaluator of a sponsor."). *See* Defs.' Evidentiary Objection ¶ 38. | at 428:20–25 (there is no policy guidance provided to Case Managers as the how many attempts they must make to communicate with a proposed sponsor before determining the sponsor is not viable). *See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 38. |
|---|---|---|---|
| 39. | ORR's Policy Guide provides that "[a]ll potential sponsors must complete an application in order for a child to be released to them from ORR custody (the 'Family Reunification Application')." Joint Stip. ¶ 37; Ex. 1 [ORR Policy Guide] § 2.2.3 at 35–36 | Undisputed. | **Undisputed.** |
| 40. | ORR's Policy Guide provides that the "care provider also informs potential sponsors that they may submit additional information to support the application and reminds potential sponsors of the | Undisputed. | **Undisputed.** |

27.

| | | | |
|---|---|---|---|
| | deadlines for completing the forms." Joint Stip. ¶ 39; Ex. 1 [ORR Policy Guide] § 2.2.3 at 35–36 | | |
| 41. | Potential sponsors also undergo a background check and may be required to submit fingerprints. Ex. 1 [ORR Policy Guide] § 2.5 at 44; Ex. 3 [ORR MAP] § 2.5 at 177 | Undisputed. | **Undisputed.** |
| 42. | Under certain circumstances ORR policy requires a home study before releasing a child—for example, ORR requires a home study if a child is 12 years and under and the proposed sponsor is a non-relative. Ex. 1 [ORR Policy Guide] § 2.4.2 at 42–44 | Undisputed. | **Undisputed.** |
| 43. | ORR's MAP provides that Case Managers may recommend a discretionary | Undisputed. | **Undisputed.** |

28.

| | | | |
|---|---|---|---|
| | home study of a proposed custodian prior to release.<br><br>Joint Stip. ¶ 13; Ex. 3 [ORR MAP] § 2.4.2. at 172–77 | | |
| 44. | Home studies can significantly prolong the time children spend in ORR custody.<br><br>Ex. 24 [Deposition Transcript of Yesenia Heath ("Heath Dep. Tr.")] at 158:12–159:1, 159:18–25, 161:11–13 (On average, it takes 30 days to complete a home study), 252:10–19; Ex. 28 [Deposition Transcript of Nidia Murray ("Murray Dep. Tr.")] at 197:7–198:9; Ex. 14 [Deposition Transcript of Jose Castaneda ("Castaneda Dep. Tr.")] at 167:9–15; Ex. 50 [Heath Dep. Ex. 172] at 1310 ██████ ████████████████████ ████████████████████ ████████ ) Ex. 99 at 1771 (██████████████████ ██████████████████ | Disputed to the extent Plaintiffs' use of the term "significantly" is a statement of opinion, not fact, and also to the extent it implies the home study itself is the sole source of any release delay. Delays in the release process are often attributable to the UAC's lack of an available sponsor, or the potential sponsor being unresponsive and/or failing to provide the required documentation. These factors are beyond the control of ORR or facility staff. Further disputed to the extent that Plaintiffs imply any delay resulting from a TVPRA-mandated or a discretionary home study is unnecessary.<br><br>DX-03 [Padilla Dep.] 117:2-5, 247:16-25; DX-22 [Fields Dep.] 73:20-74:8; DX-24 [Heath Dep.] 238:25-239:15; DX-14 [Dr. Mohn Expert Rep.] ¶ 45; DX-10 [Biswas Decl.] ¶ 68; DX-13 [Dr. Earner Expert Rep.] ¶¶ 64, 65 ("There is abundant need for caution in ensuring that appropriate home studies (both those mandated by law | **Remains Undisputed.**<br>Defendants' response and cited evidence does not create a genuine dispute of fact.<br><br>That other factors also may prolong the time a child spends in ORR custody does not rebut the fact that home studies prolong the time children spend in ORR custody. *Cf.* DX-03 [Padilla Dep. Tr.] at 117:2–5 (discussing other factors that could cause delay), 247:16–25 (same); DX-14 [Mohn Expert Rep.] ¶ 45 (same); DX-10 [Biswas Decl.] ¶ 68 (same); DX-13 [Earner Expert Rep.] ¶¶ 64–65 (same); DX-30 [Ryan Expert Rep.] ¶ 48 (same); *id.* ¶ 55 (*not* discussing home studies vis-à-vis length of stay).<br><br>In fact, Defendants' cited evidence and Defendants' own purported |

██████████████████ ; *id.* at 1777 (████████████); *id.* at 1774 ██████████████████████ ); *id.* at 1791 ("████████████████████████████ ")

and on a discretionary basis) . . . are conducted prior to a UAC's release to a parent, relative or potential sponsor. Unlike domestic children in out of home care, the families, relatives and potential sponsors of the UAC are unknown to any agency or institution in any meaningful way."); DX-30 [Dr. Ryan Expert Rep.] ¶¶ 48, 55 ("[T]he home study process [is] evidence that ORR seriously considers potential sponsors and the best interest of the child prior to discharge . . . "), 58 ("[I]t would be a mistake to conclude . . . that getting a home study causes a longer stay when it is also possible that factors leading to the need for a home study may also make it more difficult to locate a potential sponsor and ensure that this person is capable of safely providing for the child's needs, including any special needs), 60 ("It is critical to note that along with keeping children safe while in ORR's custody and care, the pathway to sponsorship and the home study process are perhaps the most important activities of the ORR grantee care provider system. It is by necessity both time-consuming and comprehensive.").

experts' opinions each *support* Plaintiffs' UF ¶ 44. *See* DX-30 [Ryan Expert Rep.] ¶ 58 ("Home studies increase a child's length of stay."); *id.* ¶ 60 (home studies are "by necessity both time-consuming…"); *id.* at Figure 12 ("The median time in care among youth without a home study is about 36 days. Among youth with a home study, the median time in care is 93 days.").

Plaintiffs further respond that evidence cited by Defendants is inadmissible. *See* Plaintiffs' Objections to Opposition ¶¶ 6, 7.

30.

| 45. | ORR staff can order a discretionary home study and the only requirements for doing so are that the sponsor be potentially viable and that the ORR staff "have a reasonable expectation that the results of the home study process . . . will provide additional information, other than what has already been gathered via the sponsor assessment process, which will mitigate concerns."

Joint Stip. ¶ 13; Ex. 3 [ORR MAP] § 2.4.2 at 172–77; Ex. 19 [David Dep. Tr.] at 77:1–16 | Disputed. ORR policy states: "Care providers should only request home studies for potentially viable sponsors. Concerns related to moving violations and DUI/DWIs (unless there are multiple charges in a relatively short period) unconnected to a well-founded child welfare concern are not to be used as the underlying basis for a discretionary home study. The home study must focus on potential sponsor's ability to appropriately care for the UAC and the sponsor's ability to ensure the safety and well-being of the UAC." Ex. 3 [ORR MAP] § 2.4.2 at 175; *Flores v. Sessions*, No. CV-854544-DMG-AGRX, 2018 WL 10162328, at *18 (C.D. Cal. July 30, 2018) (revised policies on home studies did not lead to unnecessary delay and were "reasonably calculated to protect Class Members from harm and neglect and to ensure they have an adequate standard of care"). | **Remains Undisputed.** Defendants' cited evidence does not create a genuine dispute of material fact. Defendants attempt to dispute a fact to which they have stipulated. *See* ECF No. 262 [Joint Stip.] ¶ 13. |
| 46. | FFS make the final decision as to whether a discretionary home study of a child's proposed custodian will be required.

Joint Stip. ¶ 11 | Undisputed. | **Undisputed.** |

31.

| 47. | An FFS can authorize an extension of the time it takes to complete a home study.  Joint Stip. ¶ 12 | Undisputed. | **Undisputed.** |
| 48. | ORR's policy of requiring all household members to submit fingerprints in the event of a home study can cause "significant[] delay[]" in releasing children to available custodians.  Ex. 20 [Deposition Transcript of Whitney Eich ("Eich Dep. Tr.")] at 46:22–48:13, 184:11–185:8 (it could take "[p]otentially five weeks" to receive fingerprint results). | Disputed as it implies that obtaining the fingerprint result itself is what leads to delay, which does not accurately reflect the cited evidence. Rather, the deponent testified that the delay can result from a household member being unwilling to submit to fingerprinting and five weeks was the "longest…seen… to process fingerprint results," not the normal processing time for obtaining results. Ex. 20 [Eich Dep. Tr.] at 48:3-13 ("household member who is unwilling to fingerprint, that then means that the case is going to be significantly delayed"), 185:5-7; *see also* DX-13 [Dr. Earner Expert Rep.] ¶ 66 ("In contrast to ORR procedures where fingerprinting is not standard, most states require fingerprinting of all household members prior to licensing a home for foster care placements. These standards are recommended as best practices by the National Association of Regulatory Administration."). | **Remains Undisputed.** Defendants' response and cited evidence does not create a genuine dispute of fact. Contrary to Defendants' response, Plaintiffs' asserted fact demonstrates how ORR's policy of requiring all household members to submit fingerprints in the event of a home study ***can*** cause delay—it does not reflect "the normal processing time for obtaining results."  Defendants' citation to Dr. Earner's report is irrelevant to dispute that ORR's policy of requiring all household members to submit fingerprints in the event of a home study can cause significant delay. *See* DX-13 [Earner Expert Rep.] ¶ 66.  Defendants' cited evidence also (i) does not disprove the statement |

PLAINTIFFS' RESPONSE TO DEFENDANTS'
STATEMENT OF GENUINE DISPUTES
CASE NO. 2:18-CV-05741 DMG PLA

| | | Further disputed as Plaintiffs' cited passage does not stand for the proposition that ORR's current policy of requiring all household members to submit fingerprints in the event of a home study (rather than a prior policy of fingerprints of all household members in all circumstances) causes "significant delay," and therefore does not stand for the proposition that such a policy currently causes delays. Ex. 20 [Eich Dep Tr.] at 47:7 to 48:13 (clarifying that her testimony about the impact of the policy referred to "*[p]reviously*, when that policy was in place for all household members….") (emphasis added).<br><br>*See* Defs.' Evidentiary Objection ¶ 48. | that fingerprints "…in the event of a home study…" cause significant delay and (ii) does not distinguish between whether the delay of household members unwilling to fingerprint is based on current or former policy. Ex. 20 [Eich Dep Tr.] at 47:7–13 ("…At the present time, household members do not have to fingerprint *unless it is a home study.* (emphasis added); *id.* at 48:3–8.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 48. |
|---|---|---|---|
| 49. | When Lucas R.'s sister, Madelyn, learned of his arrest, she asked ORR to release Lucas R. to her. Madelyn gave ORR all the documents it requested and applied to be his sponsor.<br><br>ECF No. 37-13 [Madelyn R. Decl.] ¶ 6 | Disputed to the extent it implies Madelyn completed all of the required documentation on a timely basis. ██████████████ | **<u>Remains Undisputed.</u>** Defendants attempt to create a dispute of fact by importing details that misconstrue and are not relevant to Plaintiffs' UF ¶ 59. Plaintiffs do not assert how "timely" Madelyn R.'s completion of all required documentation was. Nor is Lucas R.'s mental health relevant to Plaintiffs' UF ¶ 49. Therefore, Defendants do not raise |

33.

| | | | DX-41 [De La Cruz LR Decl.] ¶ 13-14; DX-83 at 26-29, 36. | a genuine dispute as to Plaintiffs' undisputed fact. |
|---|---|---|---|---|
| 50. | | On or about March 15, 2018, ORR arranged a home study to assess Madelyn's suitability as a custodian for Lucas R.<br><br>ECF No. 40-4 [Decl. of A.C.] at 4, ¶ 4; ECF No. 37-13 [Madelyn R. Decl.] at 7, ¶ 10 | Disputed to the extent it implies the home study was ordered due to concerns regarding Madelyn's suitability as a sponsor. Rather, a mandatory TVPRA-required home study was ordered on March 15, 2018 ███████████████████ ███████████████████ ███████████████████ ███████████████████ ███████████████████ ██████████████ .<br><br>DX-41 [De La Cruz LR Decl.] ¶ 21;  DX-83 at 30-31. | **Remains Undisputed.** |
| 51. | | Following the March home study, ORR's home investigator recommended against releasing Lucas R. to Madelyn.<br><br>ECF No. 37-13 [Madelyn R. Decl.] ¶¶ 10–13 | Disputed to the extent it implies that ORR performed the home study, that only one home study visit occurred, and that ORR's recommendation against releasing Lucas R. to Madelyn was final. Rather, a home study visit was conducted by an independent, non-profit home study agency, with an initial visit on March 22, 2018, a follow-up visit March 30, 2018, and a third home visit on April 5, 2018. An approximately 30-page report issued on April 12, 2018, detailing the reasons for denying release to | **Remains Undisputed.**<br>Defendants' cited evidence does not rebut the fact that ORR's home investigator recommended against releasing Lucas R. to Madelyn following the March home study. Whether the home study was performed by ORR itself or ORR's contractor, and the number of home visits are not relevant to Plaintiffs' UF ¶ 51. Defendants also admit that the investigator |

34.

| | | Madelyn, ███████████ | recommended against releasing Lucas R. to Madelyn. |
|---|---|---|---|
| | | ███████████████████████████████████████████████████████████████████████████ DX-41 [De La Cruz LR Decl.] ¶¶ 21-32; DX-83 at 18, 24-25, 33-35. | |
| 52. | Prior to making release decisions, ORR may also conduct additional assessments of minors in custody, such as psychological evaluations. Ex. 3 [ORR MAP] § 2.4.2 at 172–77 | Undisputed. | **Undisputed.** |
| 53. | ORR has no written standards on when it will require a Class Member to undergo a | Disputed. Plaintiffs' sole supporting evidence, Ex. 16, does not support Plaintiffs' assertion of uncontroverted fact. See Ex. 16 [Contreras Dep. Tr.] at 175:11- | **Remains Undisputed.** Defendants' cited evidence and response does not create a genuine dispute of fact. ORR has no written |

35.

| | | |
|---|---|---|
| psychological evaluation as a prerequisite to release.<br><br>Ex. 16 [Contreras Dep. Tr.] at 175:11-23 | 23 ("Q: Does a psychological evaluation need to be completed before a child can be stepped down or reunified? A: ORR determines whether that's necessary for a step down or for reunification."). ORR MAP § 3.3.1 provides, in pertinent part, that "[f]or UAC with known, disclosed, or alleged violent criminal history, clinicians must request a psychologist perform a psychological risk assessment as described below. Where appropriate, collect criminal history information and the completed psychological assessment." Ex. 3 [ORR MAP] § 3.3.1 at 302.<br><br>Further disputed to the extent it implies that when a psychological evaluation is requested for a UAC, it is necessarily a prerequisite to release, or that the recommendations of such an evaluation are the sole determinants of release decisions. ORR Guide § 2.4.1 provides that, among other considerations in evaluating family members or other sponsors for release, are the UAC's current functioning and strengths in relation to any risk factors or special concerns such as mental health | standard for when a psychological evaluation is required *as a prerequisite to release.*<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 53. |

36.

| | | | |
|---|---|---|---|
| | | issues. Ex. 3 [ORR MAP] § 2.4.1 at 169-70.<br><br>*See* Defs.' Evidentiary Objection ¶ 53. | |
| 54. | Notwithstanding the lack of written standards, ORR's practice is to delay releasing children detained at Shenandoah Valley Juvenile Center ("SVJC") to available custodians until they have had a psychological evaluation, which takes at least 30 days to complete.<br><br>Ex. 17 [Deposition Transcript of Melissa Cook ("Cook Dep. Tr.")] at 209:5–211:23 | Disputed. *See* contrary testimony of SVJC lead case manager, DX-16 [Contreras Dep.] 177:5-8 ("Q: Okay. Can a child be released to a sponsor if a psychiatrist or psychologist does not recommend the child to be released? A: Yes."), 177:13-17 ("Q: Do psychiatric evaluations or psychological evaluations have to be completed before a child can be released to a sponsor? A: No, that would be ORR to determine whether that's necessary."). Also disputed that ORR has no written standards that inform the need to obtain a psychological evaluation in order to understand a UAC's mental health needs and ensure that a potential sponsor can meet them. ORR Guide § 2.7.2.<br><br>*See* Defs.' Evidentiary Objection ¶ 54. | **Remains Undisputed.**<br>Defendants' cited evidence does not rebut the stated fact that ORR's *practice* is to delay releasing children detained at SVJC to available custodians until they have had a psychological evaluation. *See* Ex. 17 [Cook Dep. Tr.] at 209:20–25 ("Q. Okay. So in your experience, if a child is being considered for release to a sponsor, a psychological evaluation is requested?  A.  In our setting. Q. At Shenandoah? A. At Shenandoah.").<br><br>Defendants' statement and evidence with respect to its written standards similarly fails to rebut the stated fact. *See also* Plaintiffs' Response to UF ¶ 53. |

| | | | Defendants also do not dispute that it takes at least 30 days to complete a psychological evaluation.<br><br>Plaintiffs further respond that evidence cited by Defendants is inadmissible.  *See* Plaintiffs' Objections to Opposition ¶ 5; *see also* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 54. |
| 55. | ORR's Policy Guide provides that "Case Managers communicate with potential sponsors, gather necessary information and documentation, talk to any relevant stakeholders, and assess sponsors to formulate a recommendation to the Case Coordinator."<br><br>Joint Stip. ¶ 42; Ex. 1 [ORR Policy Guide] § 2.3 at 40 ORR's Policy Guide provides that "Case Coordinators concurrently review all assessment information on an unaccompanied alien child and | Undisputed. | **Undisputed.** |

38.

| | | | |
|---|---|---|---|
| | sponsor to also make a recommendation." Joint Stip. ¶ 43; Ex. 1 [ORR Policy Guide] § 2.3 at 40 | | |
| 56. | ORR's Policy Guide provides that "Case Coordinators concurrently review all assessment information on an unaccompanied alien child and sponsor to also make a recommendation." Joint Stip. ¶ 43; Ex. 1 [ORR Policy Guide] § 2.3 at 40 | Undisputed. | **Undisputed.** |
| 57. | ORR's Policy Guide provides that "the ORR/FFS makes a final release decision." Joint Stip. ¶ 44; Ex. 1[ORR Policy Guide] § 2.3 at 39; *id.* § 2.7 at 47 | Undisputed. | **Undisputed.** |
| 58. | ORR's Policy Guide contains limited guidance to Case Managers, Case Coordinators, and FFS concerning family reunification decisions— consisting of a short list of factors such as "[t]he sponsor's | Disputed to the extent Plaintiffs' use of the terms "limited" and "short" are statements of opinion, not fact. The guidance offered by the ORR Guide speaks for itself and Plaintiffs fail to acknowledge that ORR Guide sections are accompanied by MAP Provisions operationalizing the policy. Ex. | **Remains Undisputed.** Defendants' cited evidence does not rebut the stated fact.  Section 2.4.1 of the ORR Policy Guide contains only a short list of 10 bullets spanning one-third of a page, and is thus both "limited" |

39.

| | | | |
|---|---|---|---|
| | understanding of the . . . child's needs, as identified by ORR and the care provider."<br><br>Ex. 1 [ORR Policy Guide] § 2.4.1 at 41 | 3 [ORR MAP] § 2.4.1 at 169–72 (including "sponsor assessment interviewing guidance" at Appendix 2.5; sponsor assessment form at Appendix 2.6; a "Quick Glance" box including "Tips for Interviewing Sponsors.").<br><br>*See* Defs.' Evidentiary Objection ¶ 58. | and "short."  Defendants' references to the ORR MAP are irrelevant because the stated fact refers only to the ORR Policy Guide.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 58. |
| 59. | ORR's Policy Guide contains no guidance on how to weigh information collected from proposed sponsors or the short list of factors included in the Policy Guide before making release decisions.<br><br>Ex. 1 [ORR Policy Guide] §§ 2.2.4, 2.4.1 at 36–38, 41 | Disputed to the extent Plaintiffs' use of the term "short" is a statement of opinion, not fact. Also disputed as ORR Guide § 2.7.4 describes standards of when release may or will be denied. In addition, the ORR MAP operationalizes the Guide, and provides extensive instructions, and is meant to be read together with the Guide, which contains "various assessments" and "a series of questions related to the child's family in home country, identifying who they are, their contact information." Finally, care provider facilities are staffed with social workers, not lawyers, who make placement decisions guided by established child-welfare principles, clinical judgment, and multiple factors articulated in the ORR Guide. | **<u>Remains Undisputed.</u>** Defendants' cited evidence does not create a genuine dispute. Section 2.7.4 of ORR's Policy Guide contains no guidance *on how to weigh* such information before making release decisions. Defendants' references to the ORR MAP are irrelevant because the stated fact refers only to the ORR Policy Guide. Defendants do not cite to any section of the ORR MAP to rebut Plaintiffs' undisputed fact; to the extent Defendants point to § 3.3.1, it is irrelevant, as it too provides no guidance on *how to weigh* or balance such information. |

40.

| | | ORR Guide §§ 7; 2.4.1; DX-67 [Biswas 30(b)(6) Dep. Supp.] 167:4-8 (referencing ORR MAP § 3.3.1).<br><br>*See* Defs.' Evidentiary Objection ¶ 59. | That social workers staff care provider facilities (a point which Defendants fail to support) is also irrelevant, particularly where ORR's Policy Guide provides no guidance *on how to weigh* or balance such information.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 59. |
|---|---|---|---|
| 60. | ORR's written policies do not require Case Managers to consider the impacts of prolonged detention on a child's welfare in making a release decision.<br><br>Ex. 37 [Deposition Transcript of Jallyn Sualog ("Sualog Dep. Tr.")] at 214:17–21; Ex. 28 [Murray Dep. Tr.] at 232:11–20; Ex. 1 [ORR Policy Guide] §§ 2.4–2.7 at 41–50; Ex. 3 [ORR MAP] §§ 2.4–2.7 at 168–212 | Undisputed insofar as ORR does not discount or shortchange safety considerations based on how long a UAC has been in custody. ORR applies safety protocols to all potential sponsors to ensure that children in care are "released in a safe, efficient, and timely manner." ORR Guide § 2.1; DX-13 [Dr. Earner Expert Rep.] ¶¶ 31 ("Screening potential sponsors of UACs is a serious child safety issue. Safety cannot be sacrificed for speed of release of a UAC."), 32 ("For UACs who may have no viable sponsor, or a sponsor claiming a distant or vague relationship, the question then becomes of whether the UAC is being trafficked for some other purpose."). | **Remains Undisputed.** Defendants' cited evidence does not create a genuine dispute. Defendants do not cite to any ORR written policy that requires Case Managers to consider the impacts of prolonged detention on a child's welfare in making a release decision. ORR Policy Guide § 2.1 contains no such policy, and Dr. Earner did not testify to ever having reviewed any such policy. Defendants also cite nothing to support their claim that "ORR does not discount or shortchange safety considerations based on how long a UAC has been in custody." |

41.

| 61. | ORR's written policies do not require that any particular standard be applied in determining whether a proposed custodian is capable of caring for the physical and mental wellbeing of a child. Ex. 1 [ORR Policy Guide] § 2 at 34–56; Ex. 3 [ORR MAP] § 2 at 139–277; Ex. 5 [RFA 1st Set] No. 22 at 480–81 ("ORR does not use an 'evidentiary' standard….") | Disputed. The standard ORR applies is set forth by Congress under the TVPRA, 8 U.S.C. § 1232(c)(3)(A), in which ORR must weigh the evidence to determine whether they believe the sponsor can provide for the child's physical and mental-being and otherwise meets the requirements of the statute. ORR Guide § 2.7.4 explains when ORR will or may deny release to an applicant sponsor. ORR Guide § 2.4.1 provides guidelines regarding how case managers should go about assessing and working with potential sponsors. The remainder of sections 2 of the ORR Guide and MAP contain detailed guidance on release and deadlines for grantee care providers to ensure safe and timely release. | **Remains Undisputed.** Defendants' cited evidence does not create a genuine dispute; nor could it as Defendants agreed in their RFA responses that "ORR does not use an 'evidentiary' standard…." *See* Ex. 5 [RFA 1st Set] No. 22 at 480–81. <br><br> Defendants' references to the TVPRA, ORR Guide, and MAP likewise confirm Defendants have no written policy requiring any particular *standard* be applied in determining whether a proposed custodian is capable of caring for the physical and mental wellbeing of a child. |
| 62. | ORR does not use an evidentiary standard in making release decisions. <br><br> Ex. 4 [RFA 1st Set] No. 22 at 480–81; *see also* Ex. 36 [Deposition Transcript of Megan Stuart ("Stuart Dep. Tr.")] at 57:2–8 (release | Disputed to the extent it implies ORR is required to employ an evidentiary standard in a child-welfare context, which is not adversarial in nature. <br><br> *See* 8 U.S.C. § 1232(c)(3)(A) ("Subject to the requirements of subparagraph (B) (regarding home studies), an unaccompanied alien child may not be placed with a person or entity unless the Secretary of Health and Human Services | **Remains Undisputed (with correction).** Plaintiffs correct the citation to UF ¶ 62, which should be Exhibit 5 [RFA 1st Set] No. 22 at 480–81, not Exhibit 4. <br><br> Defendants' cited evidence does not create a genuine dispute, nor could it as Defendants agreed in |

| | | | |
|---|---|---|---|
| | decisions "at the whim of the FFS") | makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being. Such determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child."). | their RFA responses that "ORR does not use an 'evidentiary' standard…."). *See* Ex. 5 [RFA 1st Set] No. 22 at 480–81.<br><br>Defendants' citation to the TVPRA fails to rebut the fact that ORR does not use an evidentiary standard in making release decisions. Defendants likewise fail to support their statement that release decisions are "not adversarial in nature," which is in any event incorrect. |
| 63. | None of ORR's limited guidance to Case Managers, Case Coordinators, and FFS concerning family reunification decisions is published in the Federal Register or a Notice of Proposed Rulemaking.<br><br>Ex. 11 [Deposition Transcript of 30(b)(6) Witness, Michael E. Bartholomew ("Bartholomew (30)(b)(6) Dep. Tr.")] at 43:11–44:6; *Flores v. Sessions*, 862 F.3d 863, 871–72 (9th Cir. 2017) | Disputed to the extent Plaintiffs' use of the term "limited" is a statement of opinion, not fact. Further disputed as ORR published a proposed and final rule in the Federal Register but was enjoined by the *Flores v. Barr* Court at the initiative of Plaintiffs' counsel in this case. 407 F. Supp. 3d 909 (C.D. Cal. 2019).<br><br>*See* Defs.' Evidentiary Objection ¶ 63. | **Remains Undisputed.**<br>Defendants do not dispute that ORR's guidance is not published in the Federal Register or a Notice of Proposed Rulemaking. Defendants' citation to the *Flores v. Barr* decision is inapposite. Even if Defendants' enjoined regulations were relevant, Defendants have not identified any specific provision of the enjoined regulations that incorporates ORR's current limited guidance to Case Managers, Case |

43.

| | | | Coordinators, and FFS concerning family reunification decisions.<br><br>*See also* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 63. |
|---|---|---|---|
| 64. | ORR's release decisions are based on factual determinations.<br><br>Ex. 1 [ORR Policy Guide] § 2.7.1 at 48 (FFS may approve release "after a thorough assessment of the sponsor, the sponsor's family unit, and the needs of the child or youth" if "he/she determines," *inter alia*, "that the release is a safe release"); *id.*, § 2.7.4 at 48 (FFS may deny release to a potential sponsor if, *inter alia*, "[t]he physical environment of the home presents risks to the child's safety and well-being" or "[r]elease . . . would present a risk to [the child], the sponsor, household, or the community"); *see also id.* § 2.5 at 44 | Undisputed, to the extent ORR's release decisions are based, in part, on factual determinations as applied to legal requirements laid out in the TVPRA. | **<u>Undisputed.</u>** |

44.

| 65. | ORR's written policies set no limit on how long it may take to decide to release a child to an available custodian.<br><br>Ex. 5 [RFA 1st Set] No. 4 at 469–70 | Disputed. The ORR MAP recognizes that while unexpected delays may occur, ORR expects the care provider to complete the evaluation process within a certain timeframe. However, a policy requiring a hard timeline upon which release is mandatory, and/or a hearing officer is arrogated responsibility for children, would prevent the complete vetting of a sponsor needed for safe release of UACs.<br><br>Ex. 3 [ORR MAP] § 2.2.2 at 148 (Cat 1 and Cat 2A: 10 calendar days; Cat 2B: 14 calendar days; Cat 3: 21 calendar days); see DX-14 [Dr. Mohn Expert Rep.] ¶ 51; DX-09 [Antkowiak Decl.] ¶ 55-58 (discussing case deadlines outlined in MAP). | **Remains Undisputed.**<br>Notwithstanding the fact that Defendants' RFA responses admitted "ORR does not have a policy requiring it to make a final suitability determination regarding a proposed sponsor within any specific timeline," Ex. 5 [RFA 1st Set] No. 4 at 469–70, Defendants' response engages in improper and unsupported argument. *See* Initial Standing Order at 7 ("No legal argument should be set forth in this document.").<br><br>Defendants' cited evidence sets forth the timeframes in which ORR's procedures, not policies, expect the care provider to complete the evaluation process, and provides no limit on how long ORR itself may take to vet a child's release to an available custodian. *See* Ex. 3 [ORR MAP] § 2.2.2 at 148. |
| 66. | "[I]t may take several months before ORR reaches a conclusion concerning whether a proposed sponsor is capable | Undisputed that this is a possibility. Disputed to the extent Plaintiffs' cited evidence does not support this assertion. | **Undisputed.** |

| | | | |
|---|---|---|---|
| | of providing for a child's physical and mental well-being and is otherwise suitable."<br><br>Ex. 5 [RFA 1st Set] No. 19 at 479_001-002; *see* Ex. 14 [Castaneda Dep. Tr.] at 154:2–16, 167:9–24 | *See* Ex. 5 [RFA 1st Set] No. 19 (ORR includes timelines for assessing potential sponsors in Section 2 of the ORR MAP); Ex. 14 [Castaneda Dep.] at 154:2-16, 167:9-24 (recognizing that a home study could increase time required to reach a conclusion regarding release to a proposed sponsor). | |
| 67. | Case Managers have at times unnecessarily delayed issuing recommendations regarding children's release to available custodians.<br><br>Ex. 25 [Deposition Transcript of Karen Husted ("Husted Dep. Tr.")] at 43:19–46:2 | Disputed. Plaintiffs' cited evidence does not support this assertion. ORR's policy is that within one calendar day of a sponsor's completion of the family reunification documentation, the case manager is required to submit a release recommendation. When a case manager has not met the guidelines for prompt processing of release, delay is often "mitigated due to issues beyond the control of the case manager." Ex. 25 [Husted Dep.] at 44:19-25 ("I don't know if I would term fail to follow the timelines in some of the cases because of the fact that, as I said, a lot of the process of the cases does depend on how good your sponsor is and how diligent the sponsor is in returning the paperwork and following up with the fingerprints, if they are required."), 45:23- | **Remains Undisputed.**<br>Defendants' cited evidence fails to rebut the fact that, *at times*, Case Managers have unnecessarily delayed issuing recommendations regarding children's release to available custodians.<br><br>Defendants' assertions and evidence regarding ORR policy and procedures are irrelevant to Plaintiffs' undisputed fact regarding ORR's practice. Defendants also selectively cite from Ms. Husted's deposition, omitting her testimony that there are "[a]bsolutely" cases where delay was caused by the Case Manager. Ex. 25 [Husted Dep. Tr.] at 45:5, 45:12–13 ("A. Have I seen |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF GENUINE DISPUTES CASE NO. 2:18-CV-05741 DMG PLA**

| | | | |
|---|---|---|---|
| | | 24; Ex. 3 [ORR MAP] § 2.7 at 198; DX-09 [Antkowiak Decl.] ¶¶ 44, 54-58.<br><br>*See* Defs.' Evidentiary Objection ¶ 67. | cases recently that I thought were delayed? Yes."), 45:25–46:2 ("Q. I am only referring to those that, in your judgment, are within the control of the case manager. A. I have seen some.").<br>*See* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 67. |
| 68. | ORR has delayed releasing children to available and fit sponsors until they have shown "good behavior" for some amount of time.<br><br>Ex. 28 [Deposition Transcript of Nithya Nathan-Pineau ("Nathan- Pineau Dep. Tr.")] at 55:17–56:24 | Disputed. Plaintiffs' only cited evidence, Ex. 28, discusses being free from "significant incident reports" for a period of time. However, the ORR Guide provides that a "serious incident report" or SIR issues "any time that there is any type of incident related to a child in ORR custody…[i]t could be anything from injury to an altercation with another child." *See* DX-10 [Biswas Decl.] ¶ 49 ("SIRs are merely a tool for care providers to report a number of different kinds of incidents to ORR in an efficient manner, including incidents entirely unrelated to a child's behavior such as experiencing a fall or accident. They do not necessarily have any impact on step-up or release."); DX-79 [Dr. Ruiz Dep.] 272:2-6 ("Q: And was there ever a time in the past where there was a | **Remains Undisputed (with correction).**<br>Defendants' cited evidence, which only speaks to a lack of ORR policy regarding a 30-day good behavior requirement, does not address Plaintiffs' undisputed fact or evidence.<br><br>Indeed, Defendants' own cited evidence establishes that some children are required to show "good behavior" for some amount of time. *See* Ex. 163 [Ruiz Dep. Tr.] at 271:13–17 ("Q. [D]o you want to see a certain period of time where they are exhibiting good behavior before you would recommend step down? A. Yes, definitely."); *see also id.* at 278:1– |

47.

| | | policy that a child needed to maintain 30 days of good behavior before you would recommend step down? A: No, no, no."). | 11 (discussing transfer to sponsor once child is approved for step down). |
|---|---|---|---|
| | | *See* Defs.' Evidentiary Objection ¶ 68. | Plaintiffs note that the Nathan-Pineau Deposition Transcript is Exhibit 29. |
| | | | *See* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 68. |
| 69. | Some children designated as Category 4 may have had identified sponsors that were denied or deemed non-viable by ORR.<br><br>Ex. 116 at 1894–95 ██████████████████ ); *id.* at 1896 ████████████ ; Ex. 100 at 1799 ( ████ | Undisputed, except to note that the "identified sponsor" is an identified *potential sponsor* or *applicant* sponsor who may or may not have followed up on documentation needed.<br><br>*See, e.g.,* DX-10 [Biswas Decl.] ¶ 68. | **Undisputed.** |
| 70. | ORR's written policies do not require providing children with a written denial of a proposed custodian's release request, | Undisputed. | **Undisputed.** |

| | | | |
|---|---|---|---|
| | unless the sole reason for the denial is a concern that the unaccompanied alien child is a danger to themself or the community.<br><br>Joint Stip. ¶ 17 | | |
| 71. | ORR does not require that children be provided notice of the reasons for denying release to a proposed sponsor unless the sole reason for continued detention is that ORR believes the child to be a danger to themself or the community.<br><br>Ex. 5 [RFA 1st Set] No. 25 at 470–71[6]; Ex. 1 [ORR Policy Guide] §§ 2.7.7, 2.7.8 at 49–50 | Disputed. Case managers are required to provide weekly summaries to UACs (monthly for those in Long-Term Foster Care). During these weekly meetings, UACs are informed of why a home study is being done and they are also given the "opportunity to express their views about a potentially negative release decision (before the decision is actually finalized)." DX-10 [Biswas Decl.] ¶ 75; Defs.' U.F. ¶ 18; Ex. 4 [ORR MAP] § 3.3.1 at 301; ORR Guide § 2.3.2. ("The Case Manager provides weekly status updates (monthly for children in LTFC) to the UAC on the child's case and provision of services, preferably in person. The Case Manager informs other stakeholders of the progress of a child's case, including notification that an unaccompanied alien child may not have | **Remains Undisputed.**<br>Defendants' cited evidence fails to rebut Defendants' own admission that: "[c]hildren are not provided a written denial of a proposed custodian's release request, unless the sole reason for the denial is a concern that the unaccompanied alien child is a danger to himself/herself or the community (see 2.7.7 and 2.7.8 of the ORR Guide)." Ex. 5 [RFA 1st Set] No. 25 at 482–84.<br><br>Defendants cite no evidence to support that "weekly meetings" include any discussion of the *reasons for denying release* to a proposed sponsor. |

---

[6] Plaintiffs inadvertently cited incorrect record page numbers, although the citation to Ex. 5 [RFA 1st Set] No. 25 is correct. The correct page citation is 482–84.

PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF GENUINE DISPUTES CASE NO. 2:18-CV-05741 DMG PLA

| | | a potential sponsor, and any final release decisions. . . ."). | |
|---|---|---|---|
| 72. | ORR's written policies do not require that proposed custodians other than a parent or legal guardian (*i.e.,* Category 1 sponsor) be provided written notice that their release request has been denied.<br><br>Joint Stip. ¶ 18 | Undisputed. | **Undisputed.** |
| 73. | ORR's written policies do not require that ORR give children any opportunity to offer input designed to rebut a conclusion that a proposed custodian's release request should be denied.<br><br>Ex. 1 [ORR Policy Guide] § 2.7 at 47–48; Ex. 3 [ORR MAP] § 2.7.4 at 48–49 | Disputed. "Under the cooperative agreement, ORR requires case managers to provide the UAC with ongoing information as to what the status of his or her release is, including any explanation for delays and case status." DX-10 [Biswas Decl.] ¶ 75. During weekly case manager meetings, UACs have the opportunity to express their views about a potentially negative release decision before the decision is finalized. *See* DX-09 [Antkowiak Decl.] ¶ 61; DX-41 [De La Cruz LR Decl.] ¶ 35. | **Remains Undisputed.**<br>Defendants fail to cite any written policy that requires ORR to give children an opportunity to rebut a conclusion that a proposed custodian's release request should be denied.<br><br>*See* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 29. |
| 74. | ORR does not provide children a hearing before a neutral factfinder before denying release. | Disputed. Whether ORR provides "a neutral factfinder" is a legal conclusion, not a statement of fact. Further disputed to the extent it implies there is no neutral factfinder in determining whether a child | **Remains Undisputed.**<br>Defendants' cited evidence does not dispute that ORR does not provide a hearing before denying release; thus, by extension, |

50.

| | | | |
|---|---|---|---|
| | Ex. 5 [RFA 1st Set] No. 30 at 489–90 | should be released, and that ORR and grantee care providers are not neutral despite having no financial incentive "to either release UAC too quickly without adequate vetting of sponsors so as to increase head counts, or, on the other hand, to prolong the stay of UACs in care in order to secure a filled bed reimbursement arrangement." DX-14 [Dr. Mohn Expert Rep.] ¶ 18 ("[B]udgets negotiated between ORR and grantee care providers pursuant to ORR cooperative agreements are not based on a per capita or per filled bed basis."); DX-09 [Antkowiak Decl.] ¶ 61 (ORR "engages an independent, third-party case coordinator to ensure there is an independent voice in determining whether a minor should be released."). <br><br> *See* Defs.' Evidentiary Objection ¶ 74. | Defendants also do not provide a hearing before a neutral factfinder. *See* Ex. 5 [RFA 1st Set] No. 30 at 488–90 ("Defendants acknowledge that ORR does not provide children a hearing to challenge an anticipated denial of a proposed custodian's release request."). Because Defendants do not provide a hearing before a neutral factfinder, Defendants' incorrect and improper arguments regarding the purported neutrality of care provider staff and Case Coordinators are irrelevant, especially where FFS, not care provider staff or Case Coordinators, are final decision-makers. *See* Plaintiffs' UF ¶ 57. <br><br> *See* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 74. |
| 75. | ORR's written policies do not provide all proposed custodians an opportunity to inspect or rebut the evidence it relies on to declare them unfit. | Disputed to the extent it implies that denied applicants are not permitted to seek reconsideration if circumstances change. Also disputed as ORR does not use the term "unfit," which is generally used when a state foster care agency is removing a | **Remains Undisputed.** <br> ORR does not dispute that its written policies do not provide all custodians an opportunity to inspect or rebut evidence. |

| | | | |
|---|---|---|---|
| | Ex. 1 [ORR Policy Guide] § 2.7.7 at 49–50; Ex. 3 [ORR MAP] § 2.7.7 at 209–11 (comparing denial notification requirements between different categories of sponsors). | child from a parent, and terminating the parental rights of an "unfit" parent.<br><br>8 U.S.C. § 1232(c)(3)(A); Ex. 3 [ORR MAP] § 2.7.7 at 209 (home study report sent to denied Category 1 sponsor); DX-41 [De La Cruz LR Decl.] ¶ 32; *see* DX-09 [Antkowiak Decl.] ¶ 50 (ORR is unique among agencies given (1) children are in ORR custody only as part of the Federal government's authorities over immigration – that is, because the children lack lawful immigration status and (2) they arrive *already* unaccompanied and ORR does not terminate parental rights in any respect). | Nor do Defendants cite any evidence supporting the suggestion that it is ORR's policy or practice to "permit[]"all denied custodians an opportunity to seek reconsideration if circumstances change.<br><br>That ORR may use a term other than "unfit" is irrelevant.<br><br>*See* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 29. |
| 76. | ORR's written policies do not require that ORR provide proposed custodians a hearing before a neutral factfinder before deciding whether to grant the proposed custodian's release request.<br><br>Ex. 1 [ORR Policy Guide] §§ 2.7–2.7.7 at 49–50 | Disputed. Whether ORR provides "a neutral factfinder" is a legal conclusion, not a factual statement. Further disputed to the extent it implies that decisionmakers are not neutral in determining whether a child should be released to a proposed custodian.<br><br>DX-09 [Antkowiak Decl.] ¶ 61 (ORR "engages an independent, third-party case coordinator to ensure there is an independent voice in determining whether a minor should be released."); *see also* DX-10 [Biswas Decl.] ¶¶ 62 ("ORR has a multi-step process, involving a number of | **Remains Undisputed.**<br>ORR does not dispute that its written policies do not provide proposed custodians a hearing before deciding whether to grant the proposed custodian's release request. Moreover, ORR's suggestion that the Case Coordinator or Case Manager satisfies the role of a "neutral factfinder" is disingenuous, especially given that while Case Coordinators and Case Managers make release recommendations, |

| | | different independent players, to evaluate potential sponsors' ability to provide for the child's physical and mental well-being as required by law. The Policy and Procedure are in section 2 of the ORR Guide and MAP."), 69-71; Fact Response ¶ 74. | they are not responsible for final decisions. *See* Plaintiffs' UF ¶ 57; *see also* DX-10 [Biswas Decl.] ¶ 70 ("An FFS makes final release decisions for UAC."). |
|---|---|---|---|
| 77. | ORR's written policies fail to provide children an opportunity to appeal or otherwise challenge adverse decisions regarding release in all but the most limited circumstances.<br><br>Ex. 1 [ORR Policy Guide] § 2.7.8 at 50; Ex. 5 [RFA 1st Set] No. 8 at 472–73; *see also* ECF No. 37-13 [Madelyn R. Decl.] ¶ 13 ("She told me nothing could be done, that the denial was a final decision. They didn't give me an opportunity to appeal the denial, or to ask that the decision be changed.") | Disputed. ORR maintains policies for appeals with respect to release, including that children can request bond hearings to determine if the child is a danger to the community, for appeals by parents or legal guardians, and for appeals where the sole reason for the denial is concern that the unaccompanied alien child is a danger to himself/herself or the community. Further, ORR's Policy Guide provides that notwithstanding an adverse decision, "if there is new information or a change in circumstances regarding the reunification application of a parent/legal guardian, or regarding the unaccompanied alien child's circumstances, a new reunification application may be submitted that highlights the change(s) and explains why such changes should alter the initial decision. Similarly, if ORR discovers new | **<u>Remains Undisputed.</u>**<br>Defendants' attempt to equate bond hearings to a right to appeal or otherwise challenge release decisions is disingenuous. As ORR has explained, it does not consider itself "bound by the immigration judge's bond hearing determination." *See* ECF No. 263-2 [Defendants' Statement of Uncontroverted Facts and Conclusions of Law] ¶ 66.<br><br>That ORR points out the limited circumstances under which a child may appeal—if the sole reason for the denial is a concern that the child is a danger to themselves or others—does not refute the fact that there is no opportunity to |

53.

| | | information or becomes aware of a change in the circumstances of the parent/legal guardian and/or the unaccompanied alien child, ORR may assess the case anew." ORR Guide at §§ 2.7.7; 2.7.8; 2.9; Joint Stip. ¶ 30. | appeal in the vast majority of circumstances.<br><br>Finally, that a parent or legal guardian may submit *new* information in support of a release request, does not equate to a right to appeal. Nor is there any evidence that ORR communicates this possibility to children or their proposed sponsors. |
|---|---|---|---|
| 78. | ORR's written policies limit children's rights to appeal an adverse decision only if the sole reason for the denial is a concern that the child is a danger to themself or the community and the denied sponsor is not already appealing the decision.<br><br>Joint Stip. ¶ 29; Ex. 1 [ORR Policy Guide] § 2.7.8 at 50 | Disputed. Children who are being held solely due to danger always have available bond hearings before an immigration judge. A UAC may also challenge placement or release by seeking judicial review in federal court at any time.<br><br>ORR Guide § 2.9; Defs.' U.F. ¶ 63. | **Remains Undisputed.** Defendants' attempt to equate bond hearings to a right to appeal is disingenuous. As ORR has explained, it does not consider itself "bound by the immigration judge's bond hearing determination." *See* ECF No. 263-2 [Defendants' Statement of Uncontroverted Facts and Conclusions of Law] ¶ 66.<br><br>That a child can file a habeas petition does not place in dispute that ORR's written policies do not provide for an administrative appeal except for in limited circumstances." *See* ECF No. 289 |

54.

| | | | [Plaintiffs' Opposition to Defendants' Motion for Summary Judgment] at 9–10, n.7. |
|---|---|---|---|
| 79. | ORR's written policies do not require that ORR provide proposed custodians other than parents and legal guardians an appeal or other administrative recourse from a finding by ORR that a proposed custodian is unfit.<br><br>Ex. 1 [ORR Policy Guide] § 2.7.8 at 50; Ex. 5 [RFA 1st Set] Nos. 6, 9 at 471–74 | Disputed. ORR's Policy Guide provides that notwithstanding an adverse decision, "if there is new information or a change in circumstances regarding the reunification application of a parent/legal guardian, or regarding the unaccompanied alien child's circumstances, a new reunification application may be submitted that highlights the change(s) and explains why such changes should alter the initial decision. Similarly, if ORR discovers new information or becomes aware of a change in the circumstances of the parent/legal guardian and/or the unaccompanied alien child, ORR may assess the case anew." Further, ORR does not use the term "unfit" in evaluating applicant sponsors, as ORR is not removing children from a household and legal guardian and parental rights are not being terminated. Rather, ORR speaks of "safe and timely release" that "must promote public safety and ensure that sponsors are able to provide for the physical and mental well-being of children." | **Remains Undisputed.**<br>Defendants' assertions further reinforce that ORR's policies only provide some recourse for "parents and legal guardians." Ex. 1 [ORR Policy Guide] § 2.7.8 at 50 (repeatedly emphasizing the appeal opportunity "of a parent/legal guardian" and no other type of proposed custodian.).<br><br>That ORR may use terms other than "unfit" is irrelevant and does not create a genuine dispute. |

55.

| | | | |
|---|---|---|---|
| | | Joint Stip. ¶ 30; ORR Guide § 2.7.8; DX-09 [Antkowiak Decl.] ¶ 60; DX-41 [De La Cruz LR Decl.] ¶ 27. | |
| 80. | Even for parents and legal guardians, ORR's written policies do not require that ORR provide a hearing on an appeal or other challenge to an adverse decision within any time certain.<br><br>Ex. 5 [RFA 1st Set] No. 10 at 474; Ex. 1 [ORR Policy Guide] § 2.7.8 at 50 | Disputed. Section 2.7.8. of the ORR MAP includes deadlines for appeals, including acknowledging the appeal within 5 business days of receipt and completing the appeal process within 30 days whenever possible.<br><br>Ex. 3 [ORR MAP] § 2.7.8 at 211. | **Remains Undisputed.**<br>Defendants stated as follows in their RFA responses: "ORR's policies do not presently require that ORR provide a hearing on an appeal or other challenge to a decision by ORR finding a proposed custodian who is a parent or legal guardian unfit within any time certain." Ex. 5 [RFA 1st Set] No. 10 at 474. That ORR's practice manual encourages completion of the appeal process "within 30 days" does not amount to a "time certain," especially where it qualifies with use of the phrase "whenever possible." Nor do Defendants cite any evidence demonstrating that there are consequences for failing to meet the suggested timeline or even a requirement to show good cause to delay beyond the suggested timeline. |

56.

| 81. | ORR denies that the principal reason it fails to provide adequate procedural protections is due to any greater expense or administrative inconvenience.<br><br>Ex. 5 [RFA 1st Set] No. 73 at 496–97 | Undisputed given use of the word "principal." However, the cost of procedures Plaintiffs request would be expensive and require resources Congress has not funded.<br><br>*See* DX-09 [Antkowiak Decl.] ¶ 53. | **Remains Undisputed.** Responding to Defendants' improper argument, however, Defendants' cited evidence does not support any specific cost or resource allocation associated with Plaintiffs' requested relief.<br><br>*See also* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 17. |
|---|---|---|---|
| 82. | In at least one case, a Case Manager at one ORR facility rejected a child's aunt as a proposed sponsor because they did not share the same last name. Once the child was transferred to a new facility, the new Case Manager expressed no concerns about the aunt's last name and approved release within two weeks.<br><br>Ex. 30 [Ortiz Dep. Tr.] at 110:23–112:7 | Disputed to the extent Plaintiffs' cited evidence is hearsay, does not identify the case name, and in any event, does not support Plaintiffs' assertion that the "new Case Manager expressed no concerns about the aunt's last name."<br><br>Ex. 30 [Ortiz Dep.] at 110:23-111:11 ("I'll give you an example. We had one child who the sponsor reached out to me and the child who had been at Homestead for various months and was supposed to have been released to an aunt who is here in Miami. And the aunt was told that she was not a viable sponsor because they didn't have the same last name. So that kid was at Homestead for many months and then transferred to one of our permanent | **Remains Undisputed.** Defendants' evidentiary objections do not refute the fact itself. *See* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 82.<br><br>Notwithstanding Defendants' other objections, the sworn testimony shows at a minimum that two different ORR facilities took very different approaches to a sponsorship application, with one facility rejecting the application because the proposed sponsor and child did not share the same last name and another facility granting it within two weeks. |

57.

| | | | |
|---|---|---|---|
| | | facilities. Once transferred to the permanent facility, the child was released within two weeks, and that is a case that I sent multiple inquiries to the shelter director about.").<br><br>*See* Defs.' Evidentiary Objection ¶ 82. | *See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 82. |
| 83. | In another case, a Case Manager rejected a child's sister as a proposed sponsor because the sister and child did not share the same last name.<br><br>Ex. 74 [M.R.M. Decl.] ¶ 7 | Disputed.<br><br>■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■.<br><br>DX-83 at 82-84. | **Remains Undisputed.**<br>Class Member M.R.M. understood that ORR initially rejected his sister as a sponsor based on the fact that they did not share the same last name. Plaintiffs note that Defendants' cited evidence is a Release Request dated July 17, 2019 but M.R.M. remained in ORR custody at the time of his declaration on November 15, 2019. Ex. 74 [M.R.M. Decl.] ¶ 7. |
| 84. | Class Member A.N.P.C.'s case worker informed her that release to her proposed sponsor was denied because A.N.P.C. did not have an official birth certificate. | Disputed.<br><br>■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■<br><br>DX-84 at 2-3. | **Remains Undisputed.**<br>Defendants' cited evidence demonstrates that Class Member A.N.P.C.'s ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■.<br><br>*See* DX-84 at 2–3. That ■■■■■■■■ |



58.

| | | |
|---|---|---|
| | ECF No. 37-14 [A.N.P.C. Decl.] ¶ 8 | *See* Defs.' Evidentiary Objection ¶ 84. | ████████████ does not change this fact.

*See* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 84. |
| 85. | Class Representative Gabriela N.'s proposed custodian, Isaac, was not provided written notice of his rejection or the reasons for that rejection.

Ex. 138 [Isaac N. Decl.] ¶ 11 ("I contacted ORR to ask for orientation information and completed the orientation last month. I have not heard anything from ORR since then. I have never received the results of the home study."); *id.* ¶ 12 ("ORR has never officially told me that they are looking at other sponsors or that my application has been rejected.") | Undisputed that Gabriela N.'s grandfather was not provided written notice that his sponsorship of her was denied. However, ██████████████████████ ██████████████████████ ██████████████████████ ██████████████████████ ██████████.

*See* DX-83 at 2. | **Remains Undisputed.**
████████████████████ ████████████████████ is irrelevant and fails to rebut the fact that Isaac N. was not provided written notice of the reasons for rejecting his application to sponsor Gabriela N. |
| 86. | Class Representative Lucas R. did not know the reasons why his sister and proposed custodian, Madelyn, was | Undisputed that Lucas R. was not provided a written explanation of the reasons why a negative recommendation was made concerning Madelyn's sponsorship. | **Remains Undisputed.**
Defendants' evidence does not create a genuine dispute of Plaintiffs' UF ¶ 86. The single |

| | | | |
|---|---|---|---|
| | rejected, and was not provided a written explanation of the reasons for the rejection.<br><br>Ex. 81 [Lucas R. Decl.] ¶ 9 | However, ████████████<br>████████████<br>████████████<br><br>*See, e.g.,* DX-83 at 15. | page cited says nothing about Lucas R.'s knowledge of the reasons for ORR denying his sister as a proposed sponsor. And an "████████████<br>████████" is not equivalent to notice. |
| 87. | Madelyn, Lucas R.'s sister and proposed custodian, was not provided any written explanation for why she was rejected.<br><br>ECF No. 37-13 [Madelyn R. Decl.] ¶ 13 | Undisputed that Madelyn was not provided written notification of the negative recommendation concerning her sponsorship of Lucas R. Madelyn was, however, ████████████<br>████████████<br>████████████<br>████████████ Madelyn also could have chosen to address the deficiencies in her sponsorship application if she wanted to try again to sponsor him.<br><br>*See* DX-41 [De La Cruz LR Decl.] ¶¶ 23-26, 28, 32. | **Undisputed.**<br>Defendants do not dispute that Madelyn, Lucas R.'s sister and proposed custodian, was not provided a written explanation for why she was rejected.<br><br>Moreover, none of the evidence cited by Defendants shows how, when, or whether Madelyn was informed of the bases for the negative home study and recommendation against release. Nor do Defendants cite any evidence demonstrating that Madelyn was informed that she could address the deficiencies in her sponsorship application and ask ORR to reconsider its rejection of her request for release. |

60.

| 88. | The limited appeal rights granted to proposed custodians who are parents or legal guardians are rarely exercised.<br><br>Ex. 5 [RFA 1st Set] No. 28 at 485–87 ("a relatively low proportion of proposed sponsors elect to pursue an administrative appeal process") | Disputed to the extent Plaintiffs' use of the terms "limited" and "rarely" are statements of opinion, not fact.<br><br>*See* Defs.' Evidentiary Objection ¶ 88. | **Undisputed.**<br>*See* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 88. |
|---|---|---|---|
| 89. | From January 1, 2017 to May 17, 2019, no proposed custodians requested an administrative appeal of a denial of request for release.<br><br>Ex. 5 [RFA 1st Set] No. 28 at 485–87; Ex. 7 [Defendants' Supplemental Responses to Plaintiffs' Requests for Admission ("RFA Supp. Response")] No. 28 at 560 | Undisputed that no parental or legal guardian sponsors submitted requests for appeal under § 2.7.8 of the ORR Guide during this time. | **Undisputed.**<br>Parents and legal guardians are the only custodians entitled to appeal adverse decisions under the ORR Policy Guide. *See* Ex. 1 [ORR Policy Guide] § 2.7.8 at 50. There is no other administrative appeal pathway outside of § 2.7.8 of the Policy Guide. |
| 90. | From January 1, 2017 to May 17, 2019, only one administrative appeal was filed by a child through his attorney. | Undisputed. There was one appeal filed under § 2.7.8 of the ORR Guide during this time. | **Undisputed.**<br>There is no other administrative appeal pathway outside of § 2.7.8 of the Policy Guide. |

61.

| | | | |
|---|---|---|---|
| | Ex. 5 [RFA 1st Set] No. 28 at 485–87; Ex. 7 [RFA Supp. Response] No. 28 at 560 | | |
| 91. | From January 1, 2017 to May 17, 2019, there were no reversals on administrative appeal of adverse suitability determinations.<br><br>Ex. 5 [RFA 1st Set] No. 29 at 487–88; Ex. 7 [RFA Supp. Response] No. 29 at 5660 | Undisputed. There were no reversals under ORR Guide § 2.7.8 during this time. | **Undisputed.**<br>There is no other administrative appeal pathway outside of § 2.7.8 of the Policy Guide. |
| 92. | Contrary to child welfare practices across the country, ORR's policies do not provide for a neutral factfinder.<br><br>Ex. 53 [Edwards Expert Rep.] at 1340 | Disputed. Whether ORR provides "a neutral factfinder" is a legal conclusion, not a factual statement. Further disputed because Plaintiffs point to no evidence that "child welfare practices across the country" afford evidentiary hearings to non-parental relatives and distant relations.[7] Further disputed to the extent it implies that | **Remains Undisputed.**<br>Defendants' cited evidence fails to show that ORR's policies provide for a neutral factfinder—because they do not. Nor does Defendants' improper argument about the value of hearings or neutral factfinders rebut the fact that ORR's policies |

[7] [DX fn.]: Under federal law neither foster parents nor relative caregivers have a right to a fair hearing under section 471(a)(12) of the Social Security Act (the Act) with regard to adverse placement decisions. In particular, the provisions for relative preference at section 471(a)(19) of the Act and an opportunity to be heard for foster parents and relative caretakers at section 475(G) of the Act do not create fair hearing rights. Rather, "[t]he title IV-E agency determines where and with whom the child will be placed by virtue of its placement and care responsibility." Likewise, "Section 471(a)(12) of the Act does not grant prospective adoptive parents the right to a fair hearing under 45 CFR 205.10, for the purposes of challenging the title IV-E agency's exercise of its placement and care responsibilities pursuant to section 472(a)(2)(B) of the Act." *See* https://www.acf.hhs.gov/cwpm/public_html/programs/cb/laws_policies/laws/cwpm/policy_dsp.jsp?citID=5; *see also* 45 CFR § 1356.21(g)(3) (specifying that Federal financial participation (FFP) for title IV-E foster care maintenance payments may not be claimed when a court orders a placement with a specific foster care provider).

domestic child welfare practices can be applied indiscriminately to UACs in ORR care. A hearing before a neutral factfinder "would do nothing to further the safety of the UAC" who, unlike children in domestic care situations, often lack prior information about their family relationships. Furthermore, "[h]earings are court-like processes that create an adversarial environment that prolongs the length of time that UACs spend in care." DX-13 [Dr. Earner Expert Rep.] ¶ 30; DX-69 [Dr. Earner Dep. Supp.] 134:14-18 ("You can look at that in child welfare. In child welfare, every child is appointed an attorney, and the average length of stay in child welfare, in congregate care, out-of-home care is quite extensive."); DX-30 [Dr. Ryan Expert Rep.] ¶ 48 ("[M]andating plaintiffs' proposed additional procedural safeguards across the board would not improve child welfare outcomes.").

*See* Defs.' Evidentiary Objection ¶ 92.

themselves do not provide for neutral factfinders; indeed, contrary to child welfare practices across the country allowing for hearings before neutral factfinders, Defendants' purported expert takes the astonishing, biased, and constitutionally incorrect position that "[f]air hearings give false hope." *See* Ex. 199 [Earner Dep. Tr.] at 143:6.

Defendants likewise fail to rebut Plaintiffs' expert's opinions with respect to the state of child welfare practices across the country. *See* Ex. 53 [Edwards Expert Rep.] at 1335 ("Procedural protections for children in California's child welfare system include the right to . . . [a] neutral adjudicator who applies consistent evidentiary standards, . . . ."), 1338 ("Juvenile court judges are neutral, independent, . . . ."), 1340 (comparing ORR's policies with "child welfare system[s] under federal and state law" and

63.

concluding "ORR's policies governing release…do not provide for decisions about the placement of children with family members and other sponsors to be made by a trained and experienced judge…); Ex. 54 [Heldman Expert Rep.] at 1357 ("The placement of a youth in a secure or staff secure facility beyond temporary detention, can only occur within the child welfare and juvenile justice systems following adjudicatory and dispositional hearings held in court before a neutral arbiter. ORR policy does not provide such hearings and thus does not comport with this procedural requirement.").

Plaintiffs further respond that evidence cited by Defendants is inadmissible.  *See* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 27; Plaintiffs' Objections to Opposition ¶ 16; *see also* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 92.

64.

| 93. | Contrary to child welfare practices across the country, ORR's policies do not include any form of evidentiary hearing at which children participate in the decision-making and present their own evidence and arguments. Ex. 53 [Edwards Expert Rep.] at 1341 | Disputed. The Edwards report conflates juvenile detention, parental termination, and state foster care permanency planning hearings (which are as much about terminating parental rights, if necessary, to free a child for adoption as placement, and are mandated to be conducted, at least within 18 months per federal law). Ex. 53 [Edwards Expert Rep.] at 1327-28 (comparing ORR policies with federal and California child welfare systems). Furthermore, Plaintiffs point to no evidence of "child welfare practices *across the country*" that include evidentiary hearings in which "children participate in the decision-making and present their own evidence and arguments." (emphasis added). Further disputed to the extent it fails to recognize that domestic child welfare practices are increasingly moving away from putting cases into court due to its tendency to prolong the progress and the lack of benefit to the child. DX-69 [Dr. Earner Dep. Supp.] 135:3-8 ("I'm citing the fact that child welfare – and I'm talking about domestic welfare – has tried to move away from putting cases into court just simply because it's ridiculously prolonged | **Remains Undisputed.** Defendants' cited evidence fails to show that ORR's policies include any form of evidentiary hearing at which children participate in the decision-making process and present their own evidence and arguments. Defendants likewise fail to rebut Plaintiffs' expert's opinions with respect to the state of child welfare practices across the country. *See* Ex. 53 [Edwards Expert Rep.] at 1336 ("Children are also advised that they have the right to address the court and participate in the hearing."); *id.* ("the dependency process involves formal evidentiary hearings, where children have the right to review and rebut adverse evidence,…"); *id.* at 1338 ("Making sure that youth have an opportunity to participate and to share relevant information, including, in some cases, information that only they hold, expands the universe of information available to the |

65.

| | | the process, and there's absolutely no benefit to the child."). <br><br>*See* Defs.' Evidentiary Objection ¶ 93. | decisionmaker and improves the quality of the decisions made."). Defendants' arguments and opinions regarding Judge Edwards' Report are also incorrect and irrelevant. <br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 93. |
|---|---|---|---|
| 94. | Contrary to child welfare practices across the country, ORR's policies do not afford children the opportunity to meaningfully challenge the denial of a sponsor because ORR is not required under its policies to disclose the evidence it relies upon in denying a sponsor's application. <br><br>Ex. 53 [Edwards Expert Rep.] at 1341–42 | Disputed. Plaintiffs point to no evidence of "child welfare practices across the country" that require ORR to allow UACs to review a negative release decision, before the decision is actually finalized. Furthermore, ORR allows the UAC (and potential sponsor) to review a negative home study recommendation. ORR also allows a sponsor to provide additional information in support of sponsorship after a negative home study recommendation and/or before ORR renders a release decision. <br><br>Defs.' U.F. ¶¶ 32, 33. *See also* Ex. 4 [ORR MAP] § 3.3.1 at 301 ("The case manager maintains direct contact with each UAC in care and meets at least once a week with each UAC to discuss reunification options. The case manager documents the weekly | **Remains Undisputed.** Defendants' cited evidence fails to rebut any aspect of the stated fact and therefore Defendants do not create a genuine dispute. Defendants point to no child welfare practices contrary to those identified by Plaintiffs' expert. *See* Ex. 53 [Edwards Expert Rep.] at 1340–41 (comparing ORR's policies "with the due process protections provided to children and youth in the child welfare system under federal and state law," and finding ORR's policies "do not include any form of evidentiary hearing at which children participate in the decision-making," and that ORR is not |

| | | meetings with the UAC and communication with potential sponsors in the UAC case file.") (emphasis added).<br><br>*See* Defs.' Evidentiary Objection ¶ 94. | required "even to explain the rationale behind a denial."). Defendants likewise fail to point to any ORR policy that allows children the opportunity to meaningfully challenge the denial of a sponsor. Finally, Defendants fail to point to any policy requiring ORR to disclose evidence it relies upon in denying a sponsor's application.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 94. |
|---|---|---|---|
| 95. | Contrary to child welfare practices across the country, ORR's policies do not require that children's interests be represented by counsel or any other advocates.<br><br>Ex. 53 [Edwards Expert Rep.] at 1341 | Disputed. Plaintiffs point to no evidence of "child welfare practices across the country" that require representation on release to non-parental relatives and distant relations. ORR's practice and policy is to provide children in ORR's care and custody with legal services information, including the availability of pro bono services, a know-your-rights presentation, a legal screening, a legal resource guide (which provide a state- by-state listing of attorneys), and the right to be represented by counsel at no | **Remains Undisputed.** Defendants' cited evidence fails to rebut any aspect of the stated fact and therefore does not create a genuine dispute. Defendants point to no child welfare practices contrary to those identified by Plaintiffs' experts. *See* Ex. 53 [Edwards Expert Rep.] at 1340–41 (comparing ORR's policies "with the due process protections provided to children and youth in the child welfare system under |

67.

expense to the government. *See* Defs.' U.F. ¶ 81.

Further, child advocates may be available at ORR's discretion to, among other things, help children with decisionmaking and understanding legal issues and to advocate for a child's best interests in certain cases, such as for victims of trafficking and other vulnerable children. *See* Defs.' U.F. ¶ 73. Once appointed, "ORR provides Child Advocates with access to information necessary to effectively advocate for the best interests of children with whom they are working . . . ." ORR Guide § 2.3.4. Congressional appropriators, however, have not funded child advocates for every child in ORR's care. The TVPRA is likewise written with the expectation that advocates will not be at all sites or fully funded by taxpayers. *See, e.g.,* 8 U.S.C. §§ 1232(c)(6)(B)(iii) (rules for prioritizing sites for child advocates); 232(c)(6)(C)(iii) (requiring child advocate organizations to contribute 25% of funding with only 40 percent of the match provided through "in-kind" donations).

*See* Defs.' Evidentiary Objection ¶ 95.

federal and state law," and finding ORR's policies "do not provide for all children's interests to be represented by appointed counsel, GALs, or other advocates."); *see also* Ex. 54 [Heldman Expert Rep.] at 1355 ("Under federal law, children in dependency proceedings are entitled to a guardian ad litem (GAL) who may or not be an attorney. In 34 states and the District of Columbia, state law or court rules require the GAL to be an attorney. In addition, in all but 12 states, children are given party status in the dependency proceedings. Party status ensures that children are afforded basic due process, including notice of all proceedings and decisions and the right to appear and fully participate in court.").

Defendants likewise fail to point to any ORR policy that requires children's interests be represented by counsel or any other advocates, other than to claim that ORR

| | | |
|---|---|---|
| | | provides children with "legal services information." Defendants further admit that child advocates only "may be available at ORR's discretion," and are not required.<br><br>*See also* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 95. |
| 96. | Contrary to child welfare practices across the country, ORR's policies do not include timelines that allow the case to keep moving toward resolution.<br><br>Ex. 53 [Edwards Expert Rep.] at 1341 | Disputed. The Edwards report conflates juvenile detention, parental termination, and state foster care permanency planning hearings (which are as much about terminating parental rights, if necessary, to free a child for adoption as placement, and are mandated to be conducted, at least within 12 months per federal law). 42 U.S.C. § 675(5)(C); Ex. 53 [Edwards Expert Rep.] at 1327-28 (comparing ORR policies with federal and California child welfare systems). Further disputed as Plaintiffs point to no evidence of "child welfare practices across the country" that include mandatory timelines for release to non-parental relatives and distant relations or even non-relatives. Further, the ORR MAP provides guidelines which "enable a critical determination that a potential sponsor is capable of providing for a | **Remains Undisputed.**<br>Defendants' cited evidence fails to rebut any aspect of the stated fact. Defendants point to no child welfare practices contrary to those identified by Plaintiffs' expert. *See* Ex. 53 [Edwards Expert Rep.] at 1340–41 (comparing ORR's policies "with the due process protections provided to children and youth in the child welfare system under federal and state law," and finding "ORR's policies governing release to sponsors do not include mandatory timelines to keep cases moving toward resolution or require a prompt determination of a |

69.

child's physical and mental well-being, as required by law. To implement strict length of stay timelines would violate ORR's commitments to child safety and well-being – both in the short term and long term." Ex. 3 [ORR MAP] § 2.7 at 198-201 (prescribing deadlines for when release recommendations must be made, including: requiring case manager to make recommendation within 1 calendar day of completion of all family reunification packet documentation and all other required information, independent, third-party case coordinator reviews recommendation within 1 business day and updates with his or her recommendation, and FFS review and final release decision within 1 business day (2 business days for home study cases)). *See also* Ex. 3 [ORR MAP] §§ 2.2-2.5 at 140-198 (prescribing detailed procedures and deadlines for locating potential sponsors, working with them, referring for home studies (where applicable), home study reports, and fingerprint results (where applicable)); DX-14 [Dr. Mohn Expert Rep.] ¶ 23; Defs.' U.F. ¶¶ 20, 22, 23.

*See* Defs.' Evidentiary Objection ¶ 96.

proposed custodian's fitness within a specified timeline.").

Defendants' argument that Plaintiffs point to no evidence of "child welfare practices across the country" that include mandatory timelines for release to non-parental relatives and distant relations or even non-relatives is irrelevant and does nothing to rebut the uncontroverted fact.

Defendants' citation to ORR MAP (*i.e., procedures*) sections fails to rebut the fact that ORR's formal, stated *policies* do not include timelines that allow the case to keep moving toward resolution. Rather, these ORR MAP sections only indicate ORR has some suggested *procedures* or "guidelines" that involve suggested timelines.

*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 96.

70.

| 97. | Contrary to child welfare practices across the country, ORR's policies do not universally afford children the right to appeal adverse decisions denying reunification with their sponsors.<br><br>Ex. 53 [Edwards Expert Rep.] at 1342 | Disputed. The Edwards' report covers two disanalogous scenarios to ORR, involving: (1) termination of parental rights hearings and/or (2) reunification with parents from whom children have been removed based upon allegations of abuse or neglect. *See* Ex. 53 [Edwards Expert Rep.] at 1329. ORR makes neither determination.<br><br>Further, dependency hearings for children in foster care need only be held in California at least once every six months, as calculated from the original disposition hearing. Cal. Welf. & Inst. Code § 366 (West). Under federal law (Title IV-E), permanency hearings need only be held at least once every 12 months, and such hearings may involve the termination of parental rights in order for the child to become eligible for adoption. 42 U.S.C. § 675(5)(C). Plaintiffs point to no evidence that "child welfare practices across the country" universally afford the right to appeal adverse decisions" on release to non-parental relatives and distant relations. | **Remains Undisputed.**<br>Defendants' improper argument and cited evidence do not rebut the fact that ORR's policies do not universally afford children the right to appeal adverse decisions denying reunification with sponsors.<br><br>Defendants' reference to dependency hearings and permanency hearings similarly do nothing to rebut the fact that ORR does not universally afford children the right *to appeal* adverse decisions denying reunification with sponsors.<br><br>Defendants' cited evidence likewise fails to rebut Plaintiffs' expert's opinion that "[i]n every state's child welfare system, the child has the right to appeal." Ex. 53 [Edwards Expert Rep.] at 1342. |

71.

| | | Finally, for non-parental relatives and distant relations, ORR's Guide provides that notwithstanding an adverse decision, ORR will consider new information or changed circumstances to reconsider the case. Joint Stip. ¶ 30; ORR Guide § 2.7.8; DX-09 [Antkowiak Decl.] ¶ 60.<br><br>*See* Defs.' Evidentiary Objection ¶ 97. | *See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 97. |
|---|---|---|---|
| 98. | ORR's Policy Guide requires care providers to conduct a "Well Being Follow Up Call" 30 days after a child is released to a sponsor. If the care provider believes the child is unsafe, it must comply with mandatory reporting laws for reporting to local child protective agencies and/or law enforcement.<br><br>Joint Stip. ¶ 15; Ex. 1 [ORR Policy Guide] § 2.8.4 at 53 | Undisputed. | **Undisputed.** |
| 99. | Following reports to state or local child protection agencies that children released from ORR custody have been abused or neglected, state or local protection agencies can | Undisputed. | **Undisputed.** |

72.

| | | | |
|---|---|---|---|
| | take steps to try to protect those children from abuse or neglect following release from ORR custody.<br><br>Joint Stip. ¶ 16 | | |
| 100. | ORR does not know or otherwise try to track how frequently, if at all, sponsors abuse or neglect children after they are released from ORR custody.<br>Ex. 37 [Sualog Dep. Tr.] at 219:1–19 | Disputed. ORR's policy and practice is to conduct a Safety and Well Being Follow Up call with a UAC and his/her sponsor 30 days after release. If the care provider believes that the child is unsafe, the care provider must comply with mandatory reporting laws, state licensing requirements, and federal laws and regulations.<br><br>Joint Stip. ¶ 15; *see also* Defs.' U.F. ¶ 12 (ORR does not maintain custody post-release and is not funded by Congress to do so. Thus, it lacks the authority and the appropriations to formally track incidents of abuse or neglect by sponsors to whom UACs are released.). | **Remains Undisputed.** Defendants' statement and evidence regarding some form of follow up post-release, does not rebut Plaintiffs' statement regarding ORR's failure to *track the frequency* of sponsor abuse or neglect post-release. |
| 101. | ORR includes within its in-network system the following types of care provider facilities: shelter, short-term foster care, long-term foster care, group homes, therapeutic | Undisputed. | **Undisputed.** |

73.

| | | | |
|---|---|---|---|
| | group homes, staff-secure, therapeutic staff-secure, secure and residential treatment centers ("RTC").<br><br>Ex. 93 [*Flores* Census Data] at 1633–1745 (see column J under Census tab listing different types of ORR "Program Types") | | |
| 102. | There are two types of placement decisions: (1) initial placement into an ORR care provider and (2) transfer placement between ORR care providers.<br><br>Ex. 1 [ORR Policy Guide] § 1.1 at 22 | Undisputed. | **Undisputed.** |
| 103. | A child can be initially placed in a restrictive setting.<br><br>Ex. 1 [ORR Policy Guide] §§ 1.3.2, 1.2.4 at 24–25, 27; Ex. 2 [ORR MAP] § 1.3.2 at 69; Ex. 26 [Deposition Transcript of Dr. Donna Lynn Londino ("Londino Dep. Tr.")] at 246:22–25; Ex. 34 | Undisputed that in specified circumstances a child can be initially placed in a restrictive setting. However, "ORR only places an unaccompanied alien child in a secure facility if the child: 1. poses a danger to self or others; or 2. has been charged with or convicted of a criminal offense, or is chargeable with such an | **Undisputed.** |

74.

| | | | |
|---|---|---|---|
| | [Deposition Transcript of Dr. Emily Ryo ("Ryo Dep. Tr.")] at 97:16–19 | offense." ORR Guide § 1.2.4; Joint Stip. ¶ 60. | |
| 104. | ORR "steps up" Class Members.<br><br>Ex. 5 [RFA 1st Set] No. 74. | Undisputed that ORR occasionally "steps up" Class Members in the course of caring for thousands of UAC. However, such "step ups" are rare – less than one percent of the total UAC population experiences a step-up. Ex. 5 [RFA 1st Set] No. 74; DX-30 [Dr. Ryan Expert Rep.] ¶ 37; *see also* DX-31 [Dr. Ryan Expert Rebuttal Rep.] ¶ 6 & n. 2 ("Despite the long and tragic histories of trauma experienced by UACs, and despite the serious emotional and behavioral issues often displayed by UACs (because of such trauma), very few UACs escalate to a secure facility (less than 1%)"); Defs.' U.F. ¶ 102 ("A separate analysis of the data provided in *Flores* similarly indicates that only a small percentage of children placed in ORR's care and custody are stepped up."). | **Undisputed.** |
| 105. | A "step-up" is a transfer to a more restrictive level of care.<br><br>Joint Stip. ¶ 47 | Undisputed. | **Undisputed.** |
| 106. | A "step-down" is a transfer to a less restrictive level of care. | Undisputed. Defendants note that the citation should be to Joint Stip. ¶ 48. | **Undisputed (with correction).** Plaintiffs correct their citation in |

75.

| | | | |
|---|---|---|---|
| | Joint Stip. ¶ 58 | | Plaintiffs' UF ¶ 106 to reference Joint Stip. ¶ 48. |
| 107. | According to ORR policy, ORR may place a child in a shelter facility, foster care, group home, staff-secure or secure care facility, RTC, or other special needs care facility.<br><br>Ex. 1 [ORR Policy Guide] §§ 1.1, 1.2 at 22–23 | Undisputed. | **Undisputed.** |
| 108. | ORR also places children in therapeutic staff-secure facilities, therapeutic group homes, and out- of-network ("OON") facilities, some of which are RTCs.<br><br>Ex. 93 [*Flores* Census Data] at 1633–1745 (column J under Census tab listing different types of ORR "Program Types"); *id.* at 1746 (listing OON placements); Ex. 24 [Heath Dep. Tr.] at 103:18–25; Ex. 23 [Deposition Transcript of David R. Fink ("Fink Dep. Tr.")] at 37:22–38:19, 61:10– | Undisputed. | **Undisputed.** |

76.

| | | | | |
|---|---|---|---|---|
| | | 15; Ex. 20 [Eich Dep. Tr.] at 124:24–125:12; Ex. 13 [Deposition Transcript of 30(b)(6) Witness, Toby R.M. Biswas ("Biswas 30(b)(6) Dep. Tr.")] at 13:1–21; Ex. 5 [RFA 1st Set] No. 79 at 499–501; Ex. 26 [Londino Dep. Tr.] at 152:23–153:1 | | |
| 109. | ORR policy provides definitions for "shelter care," "transitional foster care," "long-term foster care," "group home," "staff-secure care," "secure care," and "residential treatment center, but does not define "other special needs care facility," "therapeutic staff-secure," "therapeutic group home," or "out-of-network" facility.<br><br>Ex. 1 [ORR Policy Guide] Guide to Terms at 19–21 | Undisputed. | | **Undisputed.** |
| 110. | ORR MAP refers to OON RTC placements as Treatment | Undisputed. | | **Undisputed.** |

77.

| | | | |
|---|---|---|---|
| | Authorization Request ("TAR") RTC placements.<br><br>Ex. 2 [ORR MAP] § 1.4.6 at 99–101; Ex. 95 at 1754 (email from Toby Biswas to David Fink stating "*See* MAP section 1.4.6 which explains the procedures for administering and documenting the NOP in the case of out-of-network (TAR based) placements") | | |
| 111. | The ORR Policy Guide provides that "ORR only places an unaccompanied alien child in a secure facility if the child: [1] poses a danger to self or others; or [2] has been charged with or convicted of a criminal offense, or is chargeable with such an offense."<br><br>Joint Stip. ¶ 60; Ex. 1 [ORR Policy Guide] § 1.2.4 at 24–25 | Undisputed. | **Undisputed.** |
| 112. | The ORR Policy Guide provides that "[i]n determining whether to place a youth in a staff secure facility, ORR considers if the child: [1] has | Undisputed. | **Undisputed.** |

78.

| | | | |
|---|---|---|---|
| | been unacceptably disruptive to the normal functioning of a shelter care provider facility such that transfer is necessary to ensure the welfare of the UAC or others; [2] is an escape risk; [3] has reported gang involvement (including prior to placement into ORR custody) or displays gang affiliation while in care; [4] has non-violent criminal or delinquent history not warranting placement in a secure care provider facility, such as isolated or petty offenses as described above; or [5] is ready for step-down from a secure facility."<br><br>Ex. 1 [ORR Policy Guide] § 1.2.4 at 24–25 | | |
| 113. | ORR's Policy Guide provides that a child "may only be placed into an RTC if the youth is determined to be a danger to self or others by a licensed psychologist or psychiatrist. In addition, ORR will consider | Undisputed. | **Undisputed.** |

79.

transfer to an RTC only if a licensed psychologist or psychiatrist has determined the following: [1] The unaccompanied alien child has not shown reasonable progress in the alleviation of his/her mental health symptoms after a significant period of time in outpatient treatment. (Note: the amount of time within which progress should be demonstrated varies by mental health diagnosis). [2] The child's behavior is a result of his/her underlying mental health symptoms and/or diagnosis and cannot be managed in an outpatient setting. [3] The unaccompanied alien child requires therapeutic-based intensive supervision as a result of mental health symptoms and/or diagnosis that prevent him or her from independent participation in the daily schedule of activities. [4] The child presents a continued

80.

| | | | |
|---|---|---|---|
| | and real risk of harm to self, others, or the community, despite the implementation of short-term clinical interventions (such as medications, a brief psychiatric hospitalization, intensive counseling, behavioral management techniques, 24 hour supervision, supportive services or therapeutic services)."<br><br>Joint Stip. ¶ 54; Ex. 1 [ORR Policy Guide] § 1.4.6 at 30 | | |
| 114. | ORR policy does not provide placement criteria for therapeutic staff-secure facilities, therapeutic group homes, or OON facilities.<br><br>Ex. 1 [ORR Policy Guide] § 1 at 22–33 (providing placement criteria for secure, staff-secure and RTCs, but not therapeutic staff secure, therapeutic group homes or out-of-network facilities) | Disputed. The ORR Guide contains placement considerations that apply to all placement determinations or recommendations. "ORR makes every effort to place children and youth within the ORR funded care provider network. However, there may be instances when ORR determines there is no care provider available within the network to provide specialized services needed for special needs cases. In those cases, ORR will consider an alternative placement. An ORR Supervisor and ORR Project Officer must approve these placements." ORR Guide | **<u>Remains Undisputed.</u>** Defendants do not dispute that ORR Policy Guide § 1.2.1 provides placement *considerations* for all types of placements. Nor do Defendants dispute that §§ 1.2.4 and 1.4.6 provide placement *criteria* for secure, staff secure, and RTC placements. Moreover, Defendants do not dispute that ORR does not provide specific placement *criteria* for other restrictive placements like therapeutic staff-secure, therapeutic |

81.

| | | | |
|---|---|---|---|
| | | § 1.2; *see also* ORR Guide §§ 1.2.1, 1.2.2, 1.2.4, and 1.4.6.<br><br>*See* Defs.' Evidentiary Objection ¶ 114. | group homes, or OON facilities. Ex. 1 [ORR Policy Guide] § 1 at 22–33 (providing placement criteria for secure, staff-secure and RTCs, but not therapeutic staff secure, therapeutic group homes or out-of-network facilities).<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 114. |
| 115. | The longer ORR detains a child, the more likely he or she will be "stepped up" to a secure, staff-secure, therapeutic staff secure, OON facility, or RTC.<br><br>Ex. 57 [Expert Report of Dr. Emily Ryo ("Ryo Expert Rep.")] at 1398– 1401; Ex. 56 [Matlow & Wang Expert Rep.] at 1388 ("Such children are likely to deteriorate and escalate behaviors and symptoms, often leading to step-up to more restrictive placement . . . with high cost both to the child and to the | Disputed to the extent it implies that causation exists between length of time in ORR custody and step-up to a higher level of care. ORR's placement decisions, including step-up decisions, are based on a child's behaviors and needs. While children who are stepped-up to a more secure setting spend more time under ORR custody and supervision as compared to children that remain only in shelters, these children also have additional needs and demonstrate behaviors that (1) increase their likelihood of placement in settings more secure than the shelter level and (2) decrease the likelihood of a safe potential sponsor coming forward or being identified, being vetted, and being approved as quickly. | **Remains Undisputed.** Defendants attempt to create a dispute of fact by importing details that misconstrue and are not relevant to Plaintiffs' UF ¶ 115. Plaintiffs' UF ¶ 115 does not imply causation. It states that "[t]he longer ORR detains a child, the more likely he or she will be 'stepped up' to a secure, staff-secure, therapeutic staff-secure, OON facility, or RTC."<br><br>Defendants' contention that children who are stepped up have "additional needs and demonstrated behaviors" that may impact the length of stay does not |

82.

| | | |
|---|---|---|
| system."); Ex. 29 [Nathan-Pineau Dep. Tr.] at 110:17–111:2; Ex. 35 [Ryo. Dep. Tr.] at 100:14–19, 102:7–18 | DX-77 [Ryo Dep. Tr.] at 31:8; *see also id.* at 38:13-15 ("I am not making any causal inferences or causal claims in my report, nor does the data allow for that kind of an inference or conclusion."); DX-30 [Dr. Ryan Expert Rep.] ¶ 44 ("With regard to the argument that placing children in ORR custody in settings more restrictive than the shelter level prolongs their length of stay, any correlation between such placement and length of stay does not support a finding that such placements cause prolonged stays."); DX-31 [Dr. Ryan Expert Rebuttal Rep.] ¶ 23 ("In my opinion, the evidence confirms that the length of stay is largely determined by the characteristics of individual children. Similar, if not identical to children in domestic foster care settings, serious mental and behavioral health challenges explain the overall time in care."); *see also* DX-35 [Dr. Lubit Expert Rep.] ¶ 33; DX-36 [Dr. Lubit Expert Rebuttal Rep.] pp. 46-47 ¶ 9.<br><br>*See* Defs.' Evidentiary Objection ¶ 115. | change the fact that there is a positive association between length of care and likelihood of step-up.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 115. |
| 116. | Unnecessarily stepping up children may be contrary to their best interest and | Undisputed to the extent the unnecessary stepping-up of UACs "may be contrary to their best interests," which is why ORR | **Remains Undisputed.** Defendants' assertions regarding ORR policy and practice do not |

83.

| | | |
|---|---|---|
| detrimental to their long-term psychological well-being.<br><br>Ex. 6 [RFA 2nd Set] Nos. 169–70 at 542–44 | policy only allows step-up when a more restrictive level of care is necessary for the safety of the UAC or others. Disputed to the extent that stepping up children unnecessarily is categorically "detrimental to their long-term psychological well-being." It is ORR's policy and practice to make every effort to place UACs "in the least restrictive setting that is in the best interest of the child."<br><br>Ex. 6 [RFA 2nd Set] Nos. 169-70 at 542-44; *see* Defs.' U.F. ¶¶ 36, 52; DX-10 [Biswas Decl.] ¶¶ 51-52; DX-09 [Antkowiak Decl.] ¶¶ 7-8; DX-30 [Dr. Ryan Expert Rep.] ¶ 43 ("[F]rom a careful review of the policy and procedures, interviews with staff, and from a review of the sampled case files . . . clinical staff appear to make decisions that place children (and try to maintain children) in the least restrictive setting. This is in line with the best interest of the child."); DX-31 [Dr. Ryan Expert Rebuttal Rep.] ¶ 6 (ORR's system "is working quite effectively to manage a highly traumatized population in the least restrictive setting"); DX-35 [Dr. Lubit Expert Rep.] ¶ 25 ("[T]he UAC case files I reviewed reflect | create a genuine dispute and are irrelevant because Plaintiffs' UF ¶ 116 is not making a statement with respect to ORR's policies and practices.<br><br>Plaintiffs also do not make a categorical statement. *See* Plaintiffs' UF ¶ 116 ("Unnecessarily stepping up children *may* be contrary to their best interest…").<br><br>Plaintiffs further respond that evidence cited by Defendants is inadmissible. *See* Plaintiffs' Objections to Opposition ¶ 17. |

84.

| | | | |
|---|---|---|---|
| | | ███████████████████████████████.”); DX-79 [Dr. Ruiz Dep.] 257:21-23 (“Well, it's our code that patients have to be in the least restrictive environment possible, and we try to fulfill that.”). | |
| 117. | Secure juvenile detention facilities are the most restrictive facilities to which ORR steps up Class Members.<br><br>Joint Stip. ¶ 50 | Undisputed. | **Undisputed.** |
| 118. | RTCs are highly restrictive psychiatric facilities, which are similarly restrictive as secure facilities.<br>Ex.13 [Biswas 30(b)(6) Dep. Tr.] at 14:5–9 (secure and RTCs are generally the same level of restriction); Ex. 24 [Heath Depo. Tr.] at 135:9–12 (RTCs and secure facilities are the most restrictive settings for placement). | Disputed. The two ORR RTCs are based on a group home model, and differ significantly from involuntary, acute inpatient psychiatric hospitalization. ORR RTCs are sub-acute, more home-like, and less institutional than a hospital with community linkages. A child who requires inpatient hospitalization would have to have shown some stability of symptoms to be placed at an RTC.<br><br>DX-09 [Antkowiak Decl.] ¶¶ 13-14; DX-10 [Biswas Decl.] ¶ 32 (An ORR residential treatment center is subacute, children live in cottages or double rooms, with attached kitchens for eating and differs from inpatient psychiatric hospitalization). *See, e.g.,* DX-62 [Dr. Londino Expert Report] | **Remains Undisputed.** Defendants' statements regarding alleged differences between ORR RTCs and psychiatric hospitals does not undermine or detract from the evidence that shows ORR RTCs are highly restrictive. Ex.13 [Biswas 30(b)(6) Dep. Tr.] at 14:5–9; Ex. 24 [Heath Dep. Tr.] at 135:9–12.<br><br>*See* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶¶ 5–6, 18. |

| | | ¶¶ 19, 20 (discussing "home-like" environment of MercyFirst RTC); 93 ("Both MercyFirst and Shiloh were conducive to a feeling of comfort and safety with attention to privacy and gender issues as well as the provision of food, shelter, religious freedom, education, recreation, and sexual health education."); Defs.' U.F. ¶¶ 44-45. | |
|---|---|---|---|
| 119. | Formerly, ORR maintained three in-network secure juvenile detention centers: Yolo County Juvenile Center ("Yolo") in Woodland, California, Shenandoah Valley Juvenile Center ("SVJC") in Staunton, Virginia, and Northern Virginia Juvenile Detention Center ("NOVA") in Alexandra, Virginia. ORR's grant with Yolo ended in January 2020. ORR's grant with NOVA ended in September 2017. Currently, the only secure juvenile center facility in which ORR places Class Members is SVJC.<br><br>Joint Stip. ¶ 51 | Undisputed. | **Undisputed.** |

86.

| 120. | ORR currently maintains two in- network RTCs: MercyFirst Residential Treatment Center in Syosset, New York, and Shiloh<br><br>Resident Treatment Center in Manvel, Texas.<br>Joint Stip. ¶ 52 | Undisputed. | **Undisputed.** |
| 121. | OON facilities, are often RTCs that are similarly restrictive as in- network RTCs.<br><br>Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 14:5–15; Ex. 23 [Fink Dep. Tr.] at 61:10–15; Ex. 18 [Deposition Transcript of James De La Cruz, Mar. 10, 2020 ("De La Cruz Dep. Tr.")] at 125:4–16 | Undisputed.<br><br>*See* Defs.' Evidentiary Objection ¶ 121. | **Undisputed.**<br>*But see* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 121. |
| 122. | Therapeutic staff-secure facilities are more restrictive than shelters.<br><br>Ex. 23 [Fink Dep. Tr.] at 37:22–38:8; Ex. 24 [Heath Dep. Tr.] at 108:7– 109:6; Ex. 20 [Eich Dep. Tr.] at 124:24–125:12 | Undisputed.<br><br>*See* Defs.' Evidentiary Objection ¶ 122. | **Undisputed.**<br>*But see* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 122. |

87.

| 123. | Staff-secure facilities are more restrictive than shelters.<br><br>Joint Stip. ¶ 53 | Undisputed. | **Undisputed.** |
|---|---|---|---|
| 124. | Staff-secure facilities may have fences around them.<br><br>Ex. 23 [Fink Dep. Tr.] at 53:24– 54:17; Ex. 128 at 1957; Ex. 129 at 1960–61; Ex. 130 at 1966–69 | Undisputed. | **Undisputed.** |
| 125. | Therapeutic group homes are more restrictive than shelters.<br><br>Ex. 23 [Fink Dep. Tr.] at 38:9-12, 57:7-10; Ex. 28 [Murray Dep. Tr.] at 140:23–141:4 (classifying therapeutic group homes and therapeutic staff-secure facilities as equally restrictive); Statement of Uncontroverted Fact ("SUF") ¶ 122, supra ("Therapeutic staff-secure facilities are more restrictive than shelters.") | Disputed. Therapeutic group homes are no more restrictive than non-secure shelters. DX-67 [Biswas 30(b)(6) Dep. Supp.] 328:16-25 ("A therapeutic group home . . . [is] a smaller scale shelter that . . . has a therapeutic component to it so more clinical services that might be more -- that are more specialized or targeted to a particular population."); DX-71 [De La Cruz Dep. Supp.] 45:24-46:3 ("Therapeutic group homes more closely aligned with long-term foster care, but with a more therapeutic setting or milieu"). Further disputed to the extent Plaintiffs' cited evidence does not state that a therapeutic group home is restrictive, but rather that a therapeutic staff-secure facility is not restrictive and thus, "therapeutic staff secure…doesn't | **Remains Undisputed.**<br>Plaintiffs' cited evidence confirms that therapeutic staff-secures are the same as therapeutic group homes. DX-72 [Murray Dep. Tr.] at 139:10–12 ("So I really don't see too much of a difference between the two, even though the classification is there."); Ex. 28 [Murray Dep. Tr.] at 140:23–141:4 ("I would classify those as probably the same.") Since Defendants concede that therapeutic staff-secure facilities are more restrictive than shelters, *see* Plaintiffs' UF ¶ 122, the evidence, together, shows that |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
STATEMENT OF GENUINE DISPUTES
CASE NO. 2:18-CV-05741 DMG PLA**

| | | | |
|---|---|---|---|
| | | even meet the criteria for staff-secure." DX-72 [Murray Dep. Supp.] 138:22-25, 139:1-12, 140:14-17.<br><br>*See* Defs.' Evidentiary Objection ¶ 125. | therapeutic group homes are more restrictive than shelters.<br><br>Moreover, ORR's FFS Supervisor for Special Populations testified that therapeutic group homes are more restrictive than shelters. Ex. 23 [Fink Dep. Tr.] at 38:9–12 (therapeutic group homes fall right above shelter in the continuum from least restrictive to most restrictive placements), 57:7–10 (therapeutic group homes are above shelters in terms of restrictiveness).<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 125. |
| 126. | Foster care programs, where children reside with a foster family, are one of the least restrictive settings in which ORR places Class Members.<br><br>Joint Stip. ¶ 56 | Undisputed. | **Undisputed.** |
| 127. | ORR considers a secure facility to be a juvenile detention | Undisputed. | **Undisputed.** |

89.

| | | | |
|---|---|---|---|
| | center or a highly structured therapeutic facility.<br><br>Joint Stip. ¶ 58 | | |
| 128. | Secure facilities are like jails or prisons but for minors.<br><br>Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 29:25–30:13; Ex. 24 [Heath Dep. Tr.] at 60:11–14; Ex. 18 [De La Cruz Dep. Tr.] at 209:1–7; Ex. 82 [Y.A.M.S. Decl.] ¶ 27 ("Yolo County Detention is a juvenile jail where we are kept in cells, forced to wear uniforms and treated like criminals. The detention center makes me feel like an animal."); *id.* ¶¶ 29–30 ("I sleep in a locked jail cell. The beds are thin mattresses on top of a block of cement and we don't get pillows…We are allowed outside to see the sun one hour per day…") | Disputed. A secure facility is the most restrictive placement option for a UAC who poses a danger to self or others or has been charged with having committed a criminal offense. A secure facility may be a licensed juvenile detention center or a highly structured therapeutic facility.<br><br>*See* DX-09 [Antkowiak Decl.] ¶ 11; *see also* ORR Policy Guide, Guide to Terms.[8] | **Remains Undisputed.**<br>Defendants' response and cited evidence does not refute Plaintiffs' evidence that secure facilities are like jails or prisons for minors.<br><br>*See* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 4. |
| 129. | ORR's Policy Guide provides that secure facilities "have a | Undisputed. | **Undisputed.** |

[8] [DX fn.]: The ORR Guide to Terms is *available at*: https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms

| | | | |
|---|---|---|---|
| | secure perimeter, major constraining construction inside the facility, and procedures typically associated with correctional facilities." Joint Stip. ¶ 57; Ex. 1 [ORR Policy Guide] § 1.2.4 at 24 | | |
| 130. | Class Members stepped up to secure facilities have been pepper sprayed. ECF No. 144 [Answer] ¶ 53; Ex. 94 at 1750 | Undisputed. Defendants admit that staff at Yolo used pepper spray, but aver that the use of pepper spray is part of security protocols and was an option of last resort. Furthermore, Yolo is no longer a part of the ORR network and Plaintiffs provide no evidence of use at SVJC, the only secure facility currently in the ORR network. ECF No. 144 ¶ 53; Joint Stip. ¶ 51 ("ORR's grant with Yolo ended in January 2020."); Ex. 94 at 1750; DX-73 [Castaneda Dep. Supp.] 179:21; DX-74 [Fink Dep. Supp.] 60:10; DX-75 [Nathan-Pineau Dep. Supp.] 54: 3-7; *see also* DX-44 [Fink MAS Decl.] ¶ 36 (discussing a specific use of pepper spray after several warnings and aggressive behavior). | **<u>Undisputed.</u>** |

| 131. | Yolo and SVJC secure are locked facilities with 24-hour surveillance and monitoring.<br><br>Joint Stip. ¶ 61 | Undisputed. | **Undisputed.** |
|------|-------------|-------------|-----------------|
| 132. | Shiloh RTC is a locked facility with 24-hour surveillance and monitoring.<br><br>*Flores v. Session*, No. 2:85-cv-04544- DMG-AGR, July 30, 2018 Order ECF 470 at 13; Ex. 70 [K.S.G.P. Decl.] ¶ 2; Ex. 69 [K.N.A.T. Decl. Dec, 2017] ¶ 3; Ex. 76 [M.Y.R.M. Supp. Decl.] ¶ 2 | Undisputed, except to the extent it implies that Shiloh RTC is similar to a juvenile detention center. Rather, Shiloh RTC is based on a group home model: "the children live in cottages with an attached kitchen, generally have a roommate, and sleep in a bedroom without locked doors. The RTC offers a higher staff-minor ratio than does a non-secure shelter. In addition, the RTC makes available intensive therapy and on-site psychiatric care, and is accredited by a nationally recognized accrediting organization such as the Joint Commission on the Accreditation of Hospital Organizations ("JCAHO")." DX-09 [Antkowiak Decl.] ¶ 13. Moreover the treatment of an RTC such as Shiloh "is interdisciplinary, psycho-educational, and therapeutic, and it is designed to have a 24-hour-a-day structured program with community linkages to provide the support necessary for those with significant emotional needs or intellectual and developmental needs." *Id.* at ¶ 14; DX-10 | **Remains Undisputed.** Defendants do not dispute Plaintiffs' UF ¶ 132 but instead attempt to create a dispute of fact by proposing an implication that does not exist.<br><br>*See* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶¶ 5, 18. |

92.

| | | [Biswas Decl.] ¶ 32; *see also* ORR Guide § 1.4.6 (criteria for placement in RTCs). | |
|---|---|---|---|
| 133. | Children who ORR steps up to secure juvenile detention facilities or RTCs report feeling compelled to take psychotropic medications against their will.<br><br>Ex. 59 [A.M.R.A. Decl.] ¶ 5; Ex. 62 [D.S.J.L. Decl.] ¶ 8; Ex. 63 [E.G.G.J. Decl.] ¶ 5; Ex. 65 [J.M.R.R. Decl.] ¶¶ 18–19; Ex. 66 [J.S.C.M. Decl.] ¶ 19; Ex. 68 [K.N.A.T. June 2018 Decl.] ¶ 6; Ex. 73 [M.M.H. Decl.] ¶ 8; Ex. 77 [N.B.C.R. Decl.] ¶ 6; Ex. 82 [Y.A.M.S. Decl.] ¶¶ 11–21; Ex. 72 [M.H.S. Decl.] ¶ 5; Ex. 81 [Lucas R. Decl.] ¶ 6; Ex. 58 [A.D.A. Decl.] ¶ 11; Ex. 60 [C.J.A.L. Decl.] ¶ 11; Ex. 79 [P.D.O.P. Decl.] 13 ¶¶ 12–13; Ex. 61 [D.D.R.O. Decl.] ¶ 7 | Undisputed that UACs have made such reports to Plaintiffs' counsel. However, disputed to the extent it implies that it is ORR's policy and practice to compel UACs to take psychotropic medications against their will. ORR seeks informed consent from patients and does not give medications if UACs who have been stepped up to secure juvenile detention facilities or RTCs do not assent, with rare exceptions on an emergency basis. *See* DX-35 [Dr. Lubit Expert Rep.] Add. 4, ¶ 1.<br><br>Furthermore, contrary to statements in the cited declarations, case file records do not show that the declarant UACs were compelled to take psychotropic medications against their will, except in rare emergency circumstances when the child was dangerous to self or others. To the contrary, at times children found their mental health symptoms so distressing that they requested PRN medications to alleviate them or asked for an increased dosage of a prescribed medication. *See, e.g.,* DX-84 at 41-42 ▮▮▮▮▮▮▮▮▮▮▮▮▮ | **Remains Undisputed.**<br>Defendants do not dispute Class Members' reported experiences.<br><br>Defendants' contention that ORR seeks assent from a child does not change children's reported experiences. Ex. 59 [A.M.R.A. Decl.] ¶ 5 at 1414 ("I would prefer not to take the medication, but if I don't take them, then I won't be released."); Ex. 62 [D.S.J.L. Decl.] ¶ 8 at 1432 ("I have not refused taking the pills because I was told that the doctor will see that I refused the medication and that would make my stay at Shiloh longer because it would make it harder for the doctor to release me."); Ex. 63 [E.G.G.J. Decl.] ¶ 5 at 1436 ("I don't like taking the medicine because it makes me sleepy and dizzy. But, if I don't' take the pills, they will give me a report and I will have to stay at Shiloh longer."); Ex. 65 [J.M.R.R. |



; DX-84 at 130-36

(

; DX-84 at 137-41 (

; DX-84 at 122-29 (

; DX-84 at 46-109 (

Decl.] ¶ 19 at 1448 ("Once, I asked the staff if I could stop taking the medication for a week or a month to see how it would feel, but they said that I couldn't"); Ex. 66 [J.S.C.M. Decl.] ¶ 19 at 1453 ("I take the pills because I know I have to take them, not because I want to take them. If I refused to take the medication, the staff would give me a 'report,' or a penalty, and I would get into trouble"); Ex. 68 [K.N.A.T. June 2018 Decl.] ¶ 6 at 1461 ("I take the pills because I know I have to take them, not because I want to take them."); Ex. 73 [M.M.H. Decl.] ¶ 8 at 1482–83 ("I was told that I cannot refuse to take the medication because an incident report would be written up. I'm told that each time I refuse, it would mean I have to spend a couple more days at Shiloh. So, I take the pills everyday."); Ex. 77 [N.B.C.R. Decl.] ¶ 6 at 1501–02 ("If I were able to live with my mom and not have to take the

94.



; DX-84 at 110-18 (

; DX-84 at 43-45

; DX-84 at 142-45

medications any more, I wouldn't take them."); Ex. 82 [Y.A.M.S. Decl.] ¶ 11 at 1526 ("I was forced to take medication I did not want to take"), ¶ 13 at 1526 ("[a]ll of us were angry because the staff forced us to take medication"; "I was forced to take medication twice a day…The staff threatened to throw me on the ground and force me to take the medication. I also saw staff throw another youth to the ground, pry his mouth open and force him to take the medicine"), ¶ 16 at 1526–27 ("[t]hey told me that if I did not take the medicine I could not leave, that the only way I could get out of Shiloh was if I took the pills. I only took the medication because I wanted to leave the facility."), ¶ 17 at 1527 ("[o]n one occasion, I refused to take the daily dose of medication. That day, the staff forced my mouth open to get me to take the medication. On other occasions, the staff indicated that if I did not take the medication, they would

95.



); DX-84 at 4-40 (

); DX-83 at 85 (

); DX-64 [Dr. Londino Expert Rebuttal Rep.], p. 14 n. 9; (P.D.O.P. who exhibited self-harming behaviors and was psychiatrically hospitalized four times, was resistant to medication at times while placed at MercyFirst RTC but was not forced to take medication; with

);

DX-83 at 43-47 (P.D.O.P. case file excerpts); DX-35 [Dr. Lubit Expert Rep.],

force my mouth open like they did that time. I felt like I had no one to help me and no option but to take the daily medication."); Ex. 72 [M.H.S. Decl.] ¶ 5 at 1478; Ex. 81 [Lucas R. Decl.] ¶ 6 at 1520 ("If I didn't have to take the medication in order to be released, I wouldn't."); Ex. 58 [A.D.A. Decl.] ¶ 11 at 1411 ("I don't want to take any more medications because they don't help me. I have told the staff that I want to stop taking the medications, but they tell me I can't stop taking them. They tell me that if I stop taking the medications, they will write a bad report about me."); Ex. 79 [P.D.O.P. Decl.] ¶¶ 12–13 at 1511 ("I have told my clinician, doctor, and the supervising staff of my living unit that I do not want to take the medication. All three staff members have explained to me that I need to take the medication because the medication is a requirement of the RTC program, and I would get in trouble if I

| | | | |
|---|---|---|---|
| | | Add. 5, pp. 2-4 (discussing P.D.O.P.'s medical records); DX-83 at 40 (██████████████████████ ; DX-83 at 41-42 (██████████████████████); DX-35 [Dr. Lubit Expert Rep.] Add. 5, pp. 9-12 (discussing D.D.R.O.'s medical records); DX-36 [Dr. Lubit Expert Rebuttal Rep.], p. 59 ¶¶ 58-60; DX-83 at 3 (██████████████████████); DX-52 [Vergara GN Decl.] ¶ 69.<br><br>*See* Defs.' Evidentiary Objection ¶ 133. | refused to take the medication."); Ex. 61 [D.D.R.O. Decl.] ¶ 7 at 1426.<br><br>The fact that the minors' case files, which are controlled entirely by ORR, do not reflect that UACs were compelled to take psychotropic medications against their will does not mean UACs gave consent nor does it change the fact that UAC declarants felt this way.<br><br>Plaintiffs further respond that evidence cited by Defendants is inadmissible. *See* Plaintiffs' Objections to Opposition ¶¶ 8, 10, 13, 18-22; *see also* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 133. |
| 134. | Children stepped up to Shiloh RTC report being forced to take psychotropic medication or seeing other children forced to take psychotropic medication. | Undisputed that UACs have made such reports to Plaintiffs' counsel. Disputed that it is Shiloh RTC's policy and practice to force UACs to take psychotropic medications after being stepped up. Shiloh RTC seeks informed consent from patients and "[a]ssent by the UAC is required to | **Undisputed.**<br>Plaintiffs' UF ¶ 134 does not make a statement with respect to ORR's policy and therefore remains undisputed.<br><br>Defendants' statement that Shiloh RTC seeks informed consent from |

Ex. 62 [D.S.J.L. Decl.] ¶ 11; Ex. 82 [Y.A.M.S. Decl.] ¶ 22; Ex. 63 [E.G.G.J. Decl.] ¶ 6; Ex. 70 [K.S.G.P. Decl.] ¶ 8; Ex. 69 [K.N.A.T. Dec. 1, 2017 Decl.] ¶ 11; Ex. 67 [K.L.F. Decl.] ¶ 14; Ex. 75 [M.Y.R.M. Decl.] ¶ 3.

administer psychotropic medications. Children who refuse medications are not required to take it unless there is a crisis posing an immediate safety risk to the UAC or others, and this is only permitted on an emergency basis at Shiloh, as is consistent with state licensing guidelines, and rarely occurs." DX-62 [Dr. Londino Expert Rep.] ¶¶ 17, 37 ("Assent is required by the UAC before administering psychotropic medications. If the UAC requests discontinuance, medications are discontinued. UACs are not forced to take medications."); DX-76 [Lawrence Dep.] 176:12-16 ("Q: Once a child is admitted to Shiloh, may the family member or the child withdraw the consent that they previously provided regarding psychotropic medication? A: Absolutely, at any time."), 193:18-22 ("Q: Are youth at Shiloh administered psychotropic medications before written informed consent has been obtained? A: No. Q: Has that ever occurred? A: No, not to my knowledge."); 198:5-9 ("The medication isn't forced."); DX- 79 [Ruiz Dep.] 190:6-11 ("Q: And are you able to, or must you under your policies, obtain informed consent from a

patients and assent by UACs is irrelevant particularly where ORR concedes that under certain circumstances UACs can and have been administered psychotropic medication against their will. *See* ECF No. 283-1 [Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts] ¶ 134; s*ee also* DX-62 [Londino Expert Rep.] ¶ 77. Defendants' statement is also unsupported by the cited evidence. DX- 79 [Ruiz Dep.] 190:6–11 (referring to informed consent from parent not patients); DX-62 [Londino Expert Rep.] ¶ 17 (same).

The absence of documentation regarding the compulsory medication use does not change the sworn affidavits of minor Class Members and doesnot mean UACs gave consent.

Moreover, Defendants' own response and Plaintiffs' cited evidence supports the statement that Class Members were forcibly

98.

parent or guardian prior to prescribing a psychotropic medication? A: Absolutely. That's what we do prior to giving the medication, yes."), 197:11 ("But they have the right to refuse medications.").

Furthermore, contrary to statements in the declarations, case file records do not support UACs' allegations that they or other children were "forced" to take psychotropic medications at Shiloh, aside from occasional emergency situations during which the UAC posed a danger to themselves or others and medications were administered for safety reasons as is consistent with Texas state law and licensing standards for residential programs. *See* Texas Minimum Standards for General Residential Operations (July 29, 2018), pp. 162-63; Tex. Family Code § 266.009 (emergency medical care); 26 Tex. Admin. Code § 748.2257 (requirements for emergency administration of psychotropic medication); Fact Response ¶ 133. *See, e.g.,* DX-84 at 43-45 ███████████████████

injected with psychotropic medications. *See* ECF No. 283-1 [Defendants' Statement of Genuine Disputes of Material Fact and Additional Material Facts] ¶ 134; DX-62 [Londino Expert Rep.] ¶ 77; DX-84 at 43 ███████████████████ ).

*See* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 134.

99.

; DX-84 at 142-48 (

); DX-84 at 46-109 (

100.

).

Nor do case file records support that the Plaintiffs were "forced" to take psychotropic medications. *See* DX-52 [Vergara GN Decl.] ¶ 60 ████████████████████████████████████████████████████████████████████████████████████████████ ; DX-83 at 5-13 (Gabriela N. case file excerpts); DX-47 [Vergara DMT Decl.] ¶¶ 26, 48 (████████████████████████████████████████ : ████████████████████████████████ (citations omitted); DX-35 [Dr. Lubit Expert Rep.], Add. 4, ¶¶ 10 (████ 33 ████████

101.

|  |  |  |  |
|---|---|---|---|
|  |  | ); 105 ███████<br><br>███████████████<br><br>███████████████<br><br>.<br><br>*See* Defs.' Evidentiary Objection ¶ 134. |  |
| 135. | Children stepped up to therapeutic staff-secure facilities may be required to undergo sex offender treatment.<br><br>Ex. 24 [Heath Dep. Tr.] at 119:24–122:15 | Undisputed to the extent it acknowledges that ORR may require that children determined to have committed a sex offense crime undergo a sex offender treatment program, before being placed in a regular community setting or long-term foster community area.<br><br>Ex. 24 [Heath Dep. Tr.] at 120:24-120:7, 122:1-8 ("But what I see is intake makes that decision before they get to us. So intake says, 'This kid was picked up for committing this crime.' Instead of, like, putting them in the domestic system, they find out [that they] are undocumented, so they refer them to us. So we have to move forward with providing the treatment.").<br><br>*See* Defs.' Evidentiary Objection ¶ 135. | **Undisputed**.<br>ORR concedes it may require children to undergo a sex offender treatment program before being placed in a regular community setting or long-term foster community areas.<br><br>ORR's use of the term "determined" reflects only a unilateral designation by ORR, not a formal adjudication of guilt after a formal, adversarial hearing to determine whether a minor has committed a sex offense. Moreoever, this "determination" does not change that children in therapeutic staff-secure facility may be required to undergo sex offender treatment. Ex. 200 [Heath Dep. Tr.] at 121:24–122:1 (Q. |

| | | |
|---|---|---|
| | | Does the child have to be convicted of a sex offense? A. No….).<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 135. |
| 136. | Secure or staff secure placements have led to deterioration of children's mental health.<br><br>Ex. 35 [Deposition Transcript of Elicia F. Smith ("Smith Dep. Tr.")] at 144:10–13; Ex 24 [Heath Dep. Tr.] at 186:14–187:7; Ex. 24 [Heath Depo. Ex. 170] at 6030; Ex. 22 [Fields Dep. Tr.] at 176:3–13, 179:16–20, 180:10–18, 231:11–15; Ex. 17 [Cook Dep. Tr.] at 192:5–193:11; Ex. 103 at 1818; Ex. 120 at 1915; Ex. 121 at 1918 (███████████████████ ███████████████████ ███████████████████ ███████████████████ ) | Disputed to the extent it implies secure or staff secure placement necessarily causes deterioration of children's mental health.<br><br>DX-30 [Dr. Ryan Expert Rep.] ¶ 45 ("One simply cannot compare the length of stay in shelters with the length of stay in more secure settings and conclude that it was the placement decision that increased the overall length of stay. This is a serious problem of selection bias that undoubtedly leads to erroneous conclusions about causation when the most that might be shown is correlation."); DX-31 [Dr. Ryan Expert Rebuttal Rep.] ¶ 20 ("Dr. Ryo never states that the type of placement causes children to remain longer in ORR custody, but the repeated use of the term 'associated' may unintentionally encourage one to think about a cause and effect relationship. A more accurate statement would be: while placement types may be correlated by length of time in care, there is | **Remains Undisputed**.<br>Defendants' do not dispute that there have been specific instances where restrictive placements have led to a child's deterioration in mental health. Ex. 35 [Smith Dep. Tr.] at 144:10–13 (FFS testifying that she has seen instances where secure placement has led to deterioration of a child's mental health); Ex 24 [Heath Dep. Tr.] at 186:14–187:7 (testifying to a case where the clinician indicated that the minor's mental health will continue to deteriorate due to his length of care in Staff secure and secure level programs, as well as being aware of other instances where secure and staff secure placement has led to deterioration in a child's mental health); Ex. 48 [Heath Dep. Ex. 170] at 1299 ("Given this clinical insight from |

insufficient evidence of a causative effect.") (emphasis in original); Ex. 102 at 1910 ( ▮▮▮▮▮▮▮▮▮▮▮▮ . *See also* DX-62 [Dr. Londino Expert Rep.] ¶¶ 24-25 (discussing inherent challenges in providing residential treatment to children with mental health disorders who also have a conduct disorder diagnosis and/or an intellectual disability).

Furthermore, the UAC discussed in Ex. 120, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ ; Ex. 122 at 1924.

Dr. Cheng, it has become evident at this point, the minor's mental health will continue to deteriorate due to his length of care in staff-secure and secure level programs."); Ex. 22 [Fields Dep. Tr.] at 179:16–20 (testifying that she has heard of cases where secure placement has exacerbated a child's mental health needs), 231:11–15 (same); Ex. 17 [Cook Dep. Tr.] at 192:5–193:11 (Shenandoah secure clinician testifying that she has seen a child's mental health deteriorate at Shenandoah); Ex. 120 at 1915 (letter from Shenandoah Executive Director indicating that ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ; Ex. 121 at 1918–19 ( ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

104.



*See* Ex. 120 at 1915,
DX-84 at 247-63.

Likewise, the UAC in Ex. 122,

Defendants' additional statements regarding D.J.N. are irrelevant. Even if a minor engaged in behavior that ORR believed warranted step up, that does not rebut the evidence that the minor's mental health deteriorated in secure placement. Ex. 120 at 1915 (letter from Shenandoah Executive Director indicating 

.

Defendants' additional statements regarding D.C.P. are also irrelevant. That a minor's mental health issues could have several causes does not rebut the fact that one of the causes of his deterioration was his placement in a staff-secure facility and that the clinician believed his deterioration could be alleviated by stepping him down from staff-secure. Ex. 121 at 1918–19 ("

105.



*See* Ex. 22 at 1922; *see also* DX-35 [Dr. Lubit Expert Rep.], Add. 5, pp. 12-13 (discussing A.M.M.M.'s psychiatric and placement history); DX-83 at 48-81 (summary of case file information); DX-84 at 204-37.

Finally, the UAC in Ex. 121,

*See* Ex. 121 at 1918; DX-84 at 238-46; *see also* DX-14 [Mohn Expert Rep.] ¶ 45 (discussing potential barriers in the sponsorship process that may increase

Plaintiffs further respond that evidence cited by Defendants is inadmissible. *See* Plaintiffs' Objections to Opposition ¶ 8.

106.

| | | length of time in care); DX-35 [Dr. Lubit Expert Rep.] ¶ 3.c (discussing delays in the sponsorship process attributable to sponsors). | |
|---|---|---|---|
| 137. | Children remain in restrictive placements despite ORR's having found them suitable for step-down.<br><br>Ex. 6 [RFA 2nd Set] No. 199 at 555–56; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 348:12–24, 390:24–391:4; Ex. 28 [Murray Dep. Tr.] at 158:6-21; Ex. 14 [Castaneda Dep. Tr.] at 66:2–17; Ex. 22 [Fields Dep. Tr.] at 148:18–23; Ex. 39 [Deposition Transcript of Micaela Vergara ("Vergara Dep. Tr.")] at 129:15–130:17, 257:6–10; Ex. 18 [De La Cruz Dep. Tr.] at 163:7–164:5; *see also* Ex. 2 [ORR MAP] § 1.4.2 at 90–91; Ex. 46 [Heath Dep. Ex. 169] at 1270 | Disputed to the extent it implies that children are often unable to step-down once ORR has found them suitable to do so, or that, as a matter of policy and practice, ORR does not make every effort to adjust UACs' placements based on their changing needs and circumstances. Further disputed as the full text of Defendants' admission provides that there were four cases in which children were placed at Shiloh and ORR was not able to timely step down the UAC because of space availability in a less restrictive appropriate placement. In each of those cases, for reasons beyond ORR's control, ORR made extensive efforts to timely transfer the UAC to a less restrictive placement but could not find an appropriate place willing to accept the UAC, even outside of ORR's network of care providers. The reasons for this were varied, but included lack of available beds, the form of legal relief available to the UAC, and the limited availability of necessary | **<u>Remains Undisputed</u>**. Plaintiffs' UF ¶ 137 does not imply anything with respect to ORR's policy and therefore remains undisputed.<br><br>Defendants' dispute with respect to the full text of Defendants' admission is not relevant and misstates Defendants' own admission. In response to Plaintiffs' Request for Admissions No. 199, Defendants admitted that it has failed to release or transfer Class Members from Shiloh RTC even after Shiloh RTC medical personnel declared such class member stabilized. Ex. 6 [RFA 2nd Set] No. 199 at 555–56. Defendants further specified that this was the case "[i]n four cases where children are *currently* placed at Shiloh RTC" and not that there have only ever been four cases at Shiloh where this has been the |

mental health supports required by the child.

Ex. 6 [RFA 2nd Set] No. 199 at 555–56. *See also* DX-02 [Biswas 30(b)(6) Dep.] 79:18-80:17; ORR Guide § 1.3.3; DX-10 [Biswas Decl.] ¶ 26 ("Placement may be dependent on the licensing requirements of a facility. For example, some facilities can only take males, or some facilities can only take children between the ages of 6 and 17.").

case. *Id.* Indeed, Plaintiffs' evidence shows that children are often unable to be stepped down. Ex. 22 [Fields Dep. Tr.] at 148:18–23 (testifying that she had concluded that there were *quite a few* children for whom the psychiatrist had recommended stepdown or reunification, but who were still at Shiloh); Ex. 18 [De La Cruz Dep. Tr.] at 163:11–12 ("I am aware that there's been some problems *in general* stepping kids down.").

Defendants' assertions as to the reasons for delay in step-down are irrelevant. Plaintiffs' UF ¶ 137 does not discuss the reason for delay but rather states that in practice children remain in restrictive settings when they have been determined eligible for step down. Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 348:12–24 (testifying that it can take several days for a facility to take a step down from Shenandoah), 390:24–391:4 (long-term foster care has on occasion

108.

declined to accept children eligible for step down if they had been stepped up on account of behavioral issues); Ex. 28 [Murray Dep. Tr.] at 158:6–21 (a child who is no longer a danger to self or others could be kept in RTC if rejected from other programs, could be sent to OON, or they can be referred to another RTC); Ex. 14 [Castaneda Dep. Tr.] at 66:11–17 (children eligible for step down remain in secure until a program will take them); Ex. 22 [Fields Dep. Tr.] at 148:18–23 (testifying that she had concluded that there were quite a few children for whom the psychiatrist had recommended stepdown or reunification, but who were still at Shiloh); Ex. 168 [Vergara Dep. Tr.] at 129:15–130:17 (child gets stepped down in one to two weeks, sometimes longer after they have been determined to no longer be a danger to self or others); Ex. 39 [Vergara Dep. Tr.] at 257:6–10 (same); Ex. 18 [De La Cruz Dep.

109.

| | | | Tr.] at 163:11–12 ("I am aware that there's been some problems *in general* stepping kids down."). |
|---|---|---|---|
| 138. | Failing to step-down children who are ready for step-down can be detrimental to their long-term psychological well-being and is contrary to their best interests.<br><br>Ex. 6 [RFA 2nd Set] Nos. 172–73 at 544–46; Ex. 24 [Heath Dep. Tr.] 215:7–10 | Undisputed to the extent failing to step-down UACs who are ready for step down may be contrary to their best interests, which is why ORR, as a matter of both policy and practice, makes every effort to adjust a UAC's placement as necessary and appropriate based on the UAC's changing needs and circumstances. Disputed to the extent it implies that failing to step-down UACs who are ready for step down is categorically detrimental to their long-term psychological well-being.<br><br>Ex. 6 [RFA 2nd Set] Nos. 172-73 at 544-46; DX-26 [Heath Dep.] 213:7-18 ("Q: Are children's mental health needs considered in a step-down process? A: Yes. Q: How? A: If we have a minor in a Therapeutic Staff Secure facility like Friends of Youth, and we know that he would benefit from a therapeutic foster home, that would be the recommendation. So we always are looking at a placement that's going to meet the kids's mental health, as well as the rest of his needs."). | **Remains Undisputed**.<br>Defendants' additional statements regarding ORR policy and practice do not create a genuine issue of dispute where Plaintiffs are not making a categorical statement.<br><br>Defendants' assertions regarding ORR policy and practice are irrelevant because Plaintiffs' UF ¶ 138 does not make a statement with respect to ORR's policies and practices.<br><br>Further, Defendants do not provide any cited evidence to contradict Plaintiffs' UF ¶ 138. |

110.

| 139. | Children in restrictive placements are generally ineligible for step-down directly to long-term foster care.<br><br>Ex. 1 [ORR Policy Guide] § 1.2.6 at 25; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 371:8–372:3 (no prohibition but not aware of this happening), 390:24–391:16; Ex. 17 [Cook Dep. Tr.] at 179:1–3; Ex. 35 [Smith Dep. Tr.] at 95:8–22; Ex. 24 [Heath Dep. Tr.] at 214:3–7; Ex. 46 [Heath Dep. Ex. 169] at 1270 (following statement with respect to minor F.J.M. who was placed in a therapeutic staff secure facility: "Denied from LTFC") | Disputed. ORR has no prohibition on placing a child in long-term foster care (LTFC) directly from a restrictive placement such as a residential treatment center (RTC), a secure placement, or a staff-secure facility. However, despite ORR's best efforts, in some cases, "[p]lacement may be dependent on the licensing requirements of a facility." *See* DX-10 [Biswas Decl.] ¶ 26; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 371:8-372:3. | **Remains Undisputed.**<br>Defendants' statement that ORR has no *prohibition* on placing a child in LTFC directly from a restrictive placement such as RTCs, secure and staff-secure facilities does not change that "children in restrictive placements are *generally* ineligible for step-down directly to long-term foster care." (emphasis added). Even ORR policy notes this in § 1.2.6. Ex. 1 [ORR Policy Guide] § 1.2.6 at 25 ("a child or youth with past behavioral or safety concerns but who does not pose a threat to self, others (including the foster family) or the community *may be considered* for long term foster care *after* demonstrating safe behavior in a non-secure setting." (emphasis added)).<br><br>That placements may be dependent on licensing also does not refute the fact that children in restrictive settings are generally ineligible for step-down directly to LTFC. |

111.

| 140. | The average length of care of unaccompanied children who were in secure, staff-secure, or RTC care is longer than the average length of care of unaccompanied children who were never stepped up. <br><br> Joint Stip. ¶ 64 | Undisputed. | **<u>Undisputed.</u>** |
| 141. | The average time to reunification was higher for custody periods with step-ups to secure, staff- secure, therapeutic, RTCs, and OONs (*i.e.,* average of 183.8 days) than custody periods without step-ups (*i.e.,* average of 52.6 days). <br><br> Ex. 57 [Ryo Expert Rep.] at 1396–97 (providing step-up definition used in report); *id.* at 1398, 1401–02 (summary and analysis regarding time to reunification for custody periods with and without step-ups); *id.* at 1405 (Appendix D. Time to reunification for custody periods with and | Undisputed. However, to the extent it implies that causation exists as to a child's level of care and the average time to release a UAC to a proposed custodian, Defendants note that the author of Plaintiffs' expert report, Dr. Ryo, testified as follows: "I am not claiming causation in my report." DX-77 [Ryo Dep.] 31:8. <br><br> *See also* DX-30 [Dr. Ryan Expert Rep.] ¶ 44 ("With regard to the argument that placing children in ORR custody in settings more restrictive than the shelter level prolongs their length of stay, any correlation between such placement and length of stay does not support a finding that such placements cause prolonged stays."); *id.* ("[T]hese children have additional needs and demonstrate behaviors that (1) increase their likelihood of | **<u>Undisputed.</u>** <br> Plaintiffs' UF ¶ 141 does not imply causation and therefore there is no dispute. |

112.

| | |
|---|---|
| without step-ups); Ex. 34 [Ryo Dep. Tr.] at 106:6–23, 108:4–109:7; *see also* Ex. 5 [RFA 1st Set] No. 81 at 502–03 (admitting average length of care for children who were in secure and staff secure is longer than average length of care for children who were never in secure or staff secure care) | placement in settings more secure than the shelter level and (2) decrease the likelihood of a safe potential sponsor coming forward or being identified, being vetted, and being approved as quickly."); DX-31 [Dr. Ryan Expert Rebuttal Rep.] ¶ 22 ("Rather than placement restrictiveness causing increases in length of care, it is the characteristics of the individual child (e.g. serious mental health diagnosis) that are causally related to the treatment decision to change settings (*i.e.,* step-up) – and perhaps most critical to the question here is that these same characteristics are also responsible for treatment outcomes (e.g., length of stay as one example)."); DX-35 [Dr. Lubit Expert Rep.] ¶ 2 ("Delay in the [release] process was generally the result of sponsor delay, not avoidable delay by ORR. Concerning stepping down from an RTC to a shelter, on several occasions when UACs were stepped down to shelters they returned to their problematic behavior and needed to be stepped up to a higher level. This supports two conclusions. It suggests that UACs with serious emotional/behavioral issues did better while in higher levels of care and had fewer issues. It also indicates that ORR |

113.

| | | RTCs were not holding on to UACs for too long."). | |
|---|---|---|---|
| 142. | From November 2017 to March 13, 2020, children spent the following average lengths of time in ORR custody before reunification: (1) average of 52.9 days for shelter only placements; (2) average of 176.5 days for children who spent time detained in a staff-secure facility; (3) average of 184.6 days for children who spent time detained in a therapeutic group home; (4) average of 185.9 days for children who spent time detained in a secure facility; (5) average of 236.3 days for children who spent time detained in a RTC; (6) average of 246.3 days for children who spent time in a therapeutic staff-secure facility; and (7) average of 327.2 days for children who were detained in out-of-network placements. | Undisputed. | **Undisputed.** |

114.

| | | | |
|---|---|---|---|
| | Ex. 57 [Ryo Expert Rep.] at 1402–03, 1406–07 (Appendix E. Time to reunification by placement type); Ex. 34 [Ryo Dep. Tr.] at 81:19–82:6, 110:2–25 | | |
| 143. | ORR has detained at least one Class Member in restrictive placements for a total period of over four years.<br><br>Ex. 122 at 1923 ( ████████ | Undisputed. However, to the extent it implies stays of more than one year are common or due to issues within ORR's control, Defendants respond as follows. In 2019, the average stay was 66 days, which is significantly shorter than the average length of stay in domestic foster care (2 years) or congregate care (8 months). Further, the length of stay can increase due to factors which are beyond the control of ORR or facility staff, including failure of parents, relatives, or sponsors to complete home studies and all required paperwork or the existence of severe mental, health, or physical disabilities which may require stabilization before UACs can be safely placed with a parent, relative, or sponsor. *See, e.g.,* Defs.' U.F. ¶ 34. A.M.M.M., who had a significant trauma history in his home country, exhibited particularly severe mental health and behavioral issues while in ORR care and custody which made him | **<u>Undisputed.</u>**<br>Defendants attempt to create a dispute of fact by proposing an implication that does not exist and therefore have not created a genuine dispute of fact.<br><br>Additionally, Defendants mischaracterize the cited evidence. For example, A.M.M.M. did not have a "lack of sponsorship options." Rather, ORR denied release to A.M.M.M.'s grandmother despite the positive recommendation of his home study provider, his Case Manager, and the Case Coordinator. *See* Ex. 116 [A.M.M.M. Release Request] at 1894–96.<br><br>Plaintiffs further respond that evidence cited by Defendants is |

115.

| | | a danger to himself and others, and thus necessitated restrictive placements in secure settings and RTCs. Specifically, A.M.M.M. made homicidal threats against care provider staff, was charged with a Class C misdemeanor for assaulting staff, and expressed suicidal ideation and engaged in self-harm. A.M.M.M.'s mental health and behavioral difficulties were exacerbated by his lack of sponsorship options, despite ORR's many efforts to work with various potential sponsors. DX-35 [Dr. Lubit Expert Rep.], Add. 5, pp. 12-13 (discussing A.M.M.M.'s psychiatric and placement history); DX-83 at 48-81 (summary of case file information);  DX-84 at 204-37. *See also* DX-13 [Dr. Earner Expert Rep.] ¶ 63; DX-64 [Dr. Earner Expert Rebuttal Rep.] ¶ 4 ("[T]he overwhelming majority of UACs in ORR care … spend less than two months in care before release to a sponsor."); Defs.' U.F. ¶¶ 96 (from June 2019 through March 2020, average length of time in ORR's custody and care was 48.4 days), 97 (from June 2019 through May 2020, average length of time in ORR's custody and care was 54 days). | inadmissible.  *See* Plaintiffs' Objections to Opposition ¶ 8. |

116.

| 144. | Children who ORR steps to secure, staff-secure, therapeutic staff-secure, RTCs, and OONs are less likely to be reunified with proposed custodians than children who are not stepped up.<br><br>Ex. 57 [Ryo Expert Rep.] at 1404; Ex. 34 [Ryo Dep. Tr.] at 33:17–20, 116:4–117:24 | Disputed to the extent it implies UAC placement has a negative causal impact on release to a proposed custodian. The author of Plaintiffs' expert report, Dr. Ryo, testified as follows: "I am not claiming causation in my report."<br><br>DX-77 [Ryo Dep.] 31:8; *see also* DX-30 [Dr. Ryan Expert Rep.] ¶ 44 ("With regard to the argument that placing children in ORR custody in settings more restrictive than the shelter level prolongs their length of stay, any correlation between such placement and length of stay does not support a finding that such placements *cause* prolonged stays."); *id.* ("[T]hese children have additional needs and demonstrate behaviors that (1) increase their likelihood of placement in settings more secure than the shelter level and (2) decrease the likelihood of a safe potential sponsor coming forward or being identified, being vetted, and being approved as quickly.").<br><br>*See* Defs.' Evidentiary Objection ¶ 144. | **Undisputed.**<br>Defendants attempt to create a dispute of fact by proposing an implication that does not exist, and therefore have not created a genuine dispute of fact. *See* Ex. 57 [Ryo Expert Rep.] at 1404 (finding 92.97% likelihood of reunification for shelters only placements compared to 71.58%, 47.76%, 43.48%, 41.74%, and 25.00% for custody periods with stints in RTCs, staff-secure, therapeutic staff-secure, secure and OONs, respectively).<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 144. |
| 145. | Children who ORR places in therapeutic group homes are less likely to be reunified with | Disputed to the extent it implies UAC placement has a negative causal impact on release to a proposed custodian. The author | **Undisputed.**<br>Defendants attempt to create a dispute of fact by proposing an |

117.

| | | |
|---|---|---|
| proposed custodians than children who were only ever in shelter placement.<br><br>Ex. 57 [Ryo Expert Rep.] at 1404; Ex. 34 [Ryo Dep. Tr.] at 116:4– 117:24 | of Plaintiffs' expert report, Dr. Ryo, testified as follows: "I am not claiming causation in my report."<br><br>DX-77 [Ryo Dep.] 31:8; *see also* DX-30 [Dr. Ryan Expert Rep.] ¶ 44 ("With regard to the argument that placing children in ORR custody in settings more restrictive than the shelter level prolongs their length of stay, any correlation between such placement and length of stay does not support a finding that such placements *cause* prolonged stays."); *id.* ("[T]hese children have additional needs and demonstrate behaviors that (1) increase their likelihood of placement in settings more secure than the shelter level and (2) decrease the likelihood of a safe potential sponsor coming forward or being identified, being vetted, and being approved as quickly."); DX-31 [Dr. Ryan Expert Rebuttal Rep.] ¶ 19.<br><br>*See* Defs.' Evidentiary Objection ¶ 145. | implication that does not exist, and therefore have not created a genuine dispute of fact. *See* Ex. 57 [Ryo Expert Rep.] at 1404 (finding 92.97% likelihood for shelters versus 53.33% for custody periods with a stint in a therapeutic group home).<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 145. |
| 146. | Children who ORR steps up to secure, staff-secure, therapeutic staff-secure, RTCs and OONs are more likely to voluntarily depart the United States than | Disputed to the extent it implies UAC placement has a causal impact on voluntary departure from the United States. The author of Plaintiffs' expert report, Dr. Ryo, testified as follows: "I am not claiming | **<u>Undisputed.</u>**<br>Defendants attempt to create a dispute of fact by proposing an implication that does not exist and therefore have not created a |

118.

| | | |
|---|---|---|
| children whom it does not step-up.<br><br>Ex. 57 [Ryo Expert Rep.] at 1404 | causation in my report." DX-77 [Ryo Dep.] 31:8.<br><br>*See* Defs.' Evidentiary Objection ¶ 146. | genuine dispute of fact. *See* Ex. 57 [Ryo Expert Rep.] at 1404 (finding voluntary departure percentages of only 1.10% for shelter only placement compared to 31.25%, 21.74%, 10.30%, 6.96%, and 5.26% for custody periods including stints in OON, therapeutic staff-secure, staff-secure, secure and RTC facilities, respectively).<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 146. |
| 147. | Children who ORR places in therapeutic group homes are more likely to voluntarily depart the United States than children who only ever spent time in ORR shelters.<br>Ex. 57 [Ryo Expert Rep.] at 1404 | Disputed to the extent it implies UAC placement has a causal impact on voluntary departure from the United States. The author of Plaintiffs' expert report, Dr. Ryo, testified as follows: "I am not claiming causation in my report." DX-77 [Ryo Dep.] 31:8.<br>*See* Defs.' Evidentiary Objection ¶ 147. | **<u>Undisputed.</u>**<br>Defendants attempt to create a dispute of fact by proposing an implication that does not exist and therefore have not created a genuine dispute of fact. *See* Ex. 57 [Ryo Expert Rep.] at 1404 (finding 26.67% of voluntary departures for custody periods with a stint in a therapeutic group home, compared to 1.10% for shelter only placements). |

119.

| | | *See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 147. |
|---|---|---|
| 148. | ORR does not release children directly from restrictive placements to Unaccompanied Refugee Minor ("URM") programs.<br><br>Ex. 17 [Cook Dep.] 270:18–271:3; Ex. 111 at 1859; Ex. 107 at 1839; Ex. 97 at 1761 ("ORR is rarely able to place minors into the URM program out of a staff secure placement"); Ex. 105 at 1830; Ex. 24 [Heath Dep. Tr.] at 214:8–215:6; Ex. 46 [Heath Dep. Ex. 169] at 1271 (stating the following with respect to minor F.M.J., "URM application sent 12/17 and 2/17. Drug history and staff | Disputed. ORR has no prohibition against release of UACs directly from restrictive placements to URM programs.[9] *See* DX-10 [Biswas Decl.] ¶ 84 ("ORR has no requirement that a child must be stepped down prior to release."). However, state-licensed URM programs may not accept a UAC for placement until the UAC steps-down to a less restrictive settings. *Id.*, DX-84 at 368-69 (Case file for J.R.Q.E, referenced in Ex. 107, reflecting that ███████████████. *See also* DX-84 at 370 (Case file excerpt for R.D.E.C., referenced in Ex. 97, indicating that ███████████████); DX-84 at 362-67 (email from URM | **Remains Undisputed.** Defendants' assertion that ORR has no *prohibition* against release of UACs directly from restrictive placements to URM programs does not change the fact that once stepped up, ORR is *generally* unable to place children directly into URM programs. Ex. 97 at 1761 ("ORR is rarely able to place minors into the URM program out of a staff secure placement"); Ex. 24 [Heath Dep. Tr.] at 214:8–22 (FFS testifying that she has experienced difficulties stepping children down directly to URM programs if the child is in a therapeutic staff-secure or staff-secure program), 214:23–215:4 |

[9] [DX fn]: By law, URM programs are distinct from UAC programs. They are authorized under a different statute, the Refugee Act of 1980, which primarily authorizes grants to States to provide services to refugees (including unaccompanied refugee minors). 8 U.S.C. §§ 1522(a)(4)(B), (d)(2). The children are in the legal custody of the State, not Federal, government. *See* 8 U.S.C. § 1522(d)(2)(B)(ii) (ORR Director shall attempt to arrange for the placement under the laws of the States); 45 C.F.R. §§ 400.112 (requirements for State grantees); 400.115 (requiring the State grantee to ensure that "legal responsibility is established, including legal custody and/or guardianship, as appropriate, in accordance with applicable State law.").

| | | | |
|---|---|---|---|
| | secure therapeutic so not likely to get URM."); *id.* (stating the following with respect to minor F.J.M. who is placed at Friends of Youth McEachern therapeutic staff secure, "Pending URM placement" but "URM won't accept due to mental health needs.") | program, regarding minor referenced in Ex. 111, inquiring as to whether "  ; Ex. 105 at 1829 (" "). <br><br>*See* Defs.' Evidentiary Objection ¶ 148. | (it's easier to get a child from shelter to a URM program than it is to get a child from staff-secure or therapeutic staff-secure to a URM). <br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 148. |
| 149. | A child may be more likely to be accepted by a local URM program after the child has been stepped down to a less restrictive placement. <br><br>Joint Stip. ¶ 63 | Undisputed. | **Undisputed.** |
| 150. | ORR and case staff exercise discretion to determine whether a child is "stable" enough to step- down. | Disputed to the extent it implies that ORR and case staff have unchecked discretion with respect to step-down or that "stability" is a factor in step-down. Rather, ORR and case staff exercise discretion to assess whether a child's needs can be safely and | **Remains Undisputed.** Defendants do not cite any specific evidence in support of their contentions and therefore do not create a genuine dispute. Defendants' citation to ORR Policy |

121.

| | | |
|---|---|---|
| Ex. 39 [Vergara Dep. Tr.] at 113:17– 22, 120:4–12, 222:17–23; Ex. 24 [Heath Dep. Tr.] at 210:8–10; Ex. 16 [Contreras Dep. Tr.] at 143:7– 22; Ex. 35 [Smith Dep. Tr.] at 159:21–161:6; Ex. 26 [Londino Dep. Tr.] at 269:1–16; SUF 176 infra ("Although ORR uses the criteria whether a child is a "danger to self or others" to determine step-up or step-down eligibility, ORR employs no standardized metric to determine whether a child meets this standard, *i.e.,* the child is a danger to self or others.") | appropriately met in a less restrictive level of care such that step-down is appropriate. ORR does not make step-down decisions without adequate professional judgment or guidelines. "[A]s required by the [TVPRA] and consistent with child welfare considerations, ORR and care providers spend extensive efforts assessing the safety of a placement prior to referral." Among others, the ORR Guide provides that step downs occur when "the UAC no longer poses a danger to himself or others, or no longer presents an escape risk (for staff secure step downs only)" and also considers "criteria identified in making a secure placement and takes into consideration any mitigating factors based on an assessment of the UAC's current functioning and behavior, previous conduct, self-disclosures, and criminal/delinquent history." ORR also considers an "immigration judge's decision in a bond hearing about the youth's level of danger when assessing the youth's placement and conditions of placement." ORR Guide §§ 1.4.2, 1.4.6 (criteria for placement in an RTC); 2.9 (bond hearings); DX-78 [Dr. Londino Expert Rebuttal Rep.] | Guide § 1.4.2 fails to include the most important part of the text: "Step-downs *may* occur when ORR, *in its discretion*, determines the UAC no longer poses a *danger to himself or others*, or no longer presents an escape risk (for staff secure step downs only). Ex. 1 [ORR Policy Guide] § 1.4.2 at 29 (emphasis added). The remainder of § 1.4.2 does not indicate limited discretion. *Id.* at 28–29. ORR allegedly considers an immigration judge's decision in a bond hearing and "criteria identified for making secure placement and takes into consideration any mitigating factors based on an assessment of the UAC's current functioning and behavior, previous conduct, self-disclosures and criminal/delinquent history," *id.* at 29, but nothing instructs ORR staff as to whether any of these considerations have a determinative impact on the case or how to weigh these factors. *Id*. at 22–33 (no guidance on how to weigh any criteria considered). |

122.

| | | ¶ 43. *See also* DX-62 [Dr. Londino Expert Rep.] ¶100 (noting that discharge planning at Shiloh and MercyFirst RTCs for step-down (or release) begins at admission and continues throughout a child's therapeutic stay). | Stability is a factor in step-down decisions where it is used synonymously with the requirement that a child no longer be a danger to self or others. ORR FFS Vergara testified that she uses the term stable to describe when a child is no longer a danger to self or others. Ex. 39 [Vergara Dep. Tr.] at 120:4–12, 222:17–23. FFS Smith similarly testified to using "stabilized" as a term to signal when a child is no longer a danger to self or others. Ex. 35 [Smith Dep. Tr.] at 159:21–161:6. FFS Heath testified that whether a child is stable is considered in making a step-down decision. Ex. 24 [Heath Dep. Tr.] at 210:8–10. |
| 151. | ORR policy does not provide standardized metrics to determine whether a particular Class Member is adequately stabilized to merit step-down.<br><br>Ex. 1 [ORR Policy Guide] § 1 at 22–33 (providing no standardized metric to assess | Disputed to the extent it asserts that "adequately stabilized" is a metric by which ORR determines whether UACs are eligible for step-down. *See* Fact Response ¶ 150. | **Remains Undisputed.**<br>*See* Plaintiffs' Response to Defendants' Disputed Fact ¶ 150. |

123.

| | | | |
|---|---|---|---|
| | step down eligibility); *see also* Ex. 6 [RFA 2nd Set] No. 198 at 555; Ex. 16 [Contreras Dep. Tr.] at 143:11–22 | | |
| 152. | As a matter of practice, ORR and its care providers require that children have at least 30 days of good behavior before they may be stepped down.<br><br>Ex. 14 [Castaneda Dep. Tr.] at 145:9–18; Ex. 35 [Smith Dep. Tr.] at 156:8–158:7; Ex. 24 [Heath Dep. Tr.] at 199:10–13, 204:13–17, 206:14–208:1; Ex. 49 [Heath Dep. Ex. 171] at 1305 ("The minor does not qualify for a step down at this time, as the minor has not completed his 30 days without an SIR."); *id.* at 1303 (FFS Supervisor directing programs to accept lateral transfer); Ex. 16 [Contreras Dep. Tr.] at 141:18–143:5; Ex. 17 [Cook Dep. Tr.] at 181:10– 182:15 | Disputed. The criteria for step-downs, as set forth in the ORR Guide § 1.4.2, does not contain a "good behavior" requirement, see DX-73 [Castaneda Dep. Supp.] 149:9-17. Nor have Plaintiffs offered evidence that such a requirement exists more often than not as a matter of practice. To the contrary, Plaintiffs' cited evidence confirms that there is not a practice of requiring 30 days of good behavior before step down. While it is true that at times, "facilities that receive a transfer request will deny it, and they will deny it and ask that the minor have 30 days of nonincident behavior before they may reconsider the transfer," there is simply "not a requirement" imposed by ORR that a child must have 30 days of good behavior in order to be stepped down." Ex. 35 [Smith Dep. Tr.] at 156:8-11, 157:5-8. *See also* Ex. 24 [Heath Dep. Tr.] 207:15-19 ("Q. And you said you're not aware of any ORR policy that requires currently 30 days of no SIRs before a child is eligible for step- | **Remains Undisputed.**<br>Plaintiffs' UF ¶ 152 does not make a statement with respect to ORR policy. Plaintiffs' statement strictly speaks to ORR's practice. Thus, Defendants' cited evidence, which only addresses a lack of ORR policy regarding a 30-day good behavior requirement, does not create a genuine dispute as to Plaintiffs' UF ¶ 152 or the cited evidence.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 152. |

124.

| | | | |
|---|---|---|---|
| | | down? A. No."); Ex. 16 [Contreras Dep. Tr.] at 142:20-22 (confirming at SVJC that children have indeed been stepped down prior to 30 days); Ex. 17 [Cook Dep. Tr.] 181:14-17 ("Q: Is that a current requirement? A: I don't know if it's a direct policy. Q: Was it a direct policy before? A: I'm not sure."); DX-79 [Ruiz Dep.] 272:2-9 ("Q: And was there ever a time in the past where there was a policy that a child needed to maintain 30 days of good behavior before you would recommend step down? A: No, no, no. Q: And is – A: No, that would be based on clinical information and how they're doing."); DX-78 [Dr. Londino Expert Rebuttal Rep.] ¶ 49 (disputing that UACs need to demonstrate "good behavior" to be transferred from an RTC to a shelter and noting that "the documentation in the files that I reviewed indicated instead that criteria for transfer or step-down was to demonstrate more adaptive coping skills to mitigate risk of an undesired and potentially tragic outcome through harm to self or harm to another" ). *See* Defs.' Evidentiary Objection ¶ 152. | |
| 153. | ORR evaluates a child's "good behavior" on, among other | Disputed. The criteria for step-downs, as set forth in the ORR Guide, does not | **Undisputed (with correction).** |

| | | | |
|---|---|---|---|
| things, the number of SIRs the child has received.<br><br>Ex. 16 [Contreras Dep. Tr.] at 138:4–7; Ex. 26 [Londino Dep. Tr.] at 236:22–237:11 | contain a "good behavior" requirement. Furthermore, Significant Incident Reports (SIRs) are not determinative of step-down.<br><br>ORR Guide § 1.4.2; DX-10 [Biswas Decl.] ¶ 49 ("SIRs are merely a tool for care providers to report a number of different kinds of incidents to ORR in an efficient manner, including incidents entirely unrelated to a child's behavior such as experiencing a fall or accident."). *See also* Fact Response ¶ 152; DX-78 [Dr. Londino Expert Rebuttal Rep.] ¶ 49 (disputing that UACs need to demonstrate "good behavior" to be transferred from an RTC to a shelter); Ex. 26 [Londino Dep Tr.] at 236:22-237:11 (explaining that serious unsafe behavior such as self-harm, aggression or use of weapons to harm others, or inappropriate sexual activity -- as distinguished from more minor behaviors such as cursing at staff-- may be documented in a SIR and considered in determining a UAC's level of care).<br><br>*See* Defs.' Evidentiary Objection ¶ 153. | Plaintiffs' statement is corrected to reflect cited evidence: ORR evaluates a child's "good behavior" on, among other things, the SIRs the child has received. Ex. 16 [Contreras Dep. Tr.] at 138:4–7; Ex. 26 [Londino Dep. Tr.] at 236:22–237:11; *see also* Plaintiffs' evidence in support of UF ¶ 152.<br><br>Defendants' assertion does not change Plaintiffs' UF ¶ 153 where Plaintiffs state that SIRs are factored into step down decisions, not that they determine the outcome.  Ex. 16 [Contreras Dep. Tr.] at 138:4–7 (good behavior is evaluated through "their presenting behavior, significant incident reports"); *see also* Ex. 26 [Londino Dep. Tr.] at 236:22–237:11 (Defendants' expert testifying that certain SIRs "would be used to determine whether a change of placement was indicated or additional observation"). |

126.

| | | | *See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 153. |
|---|---|---|---|
| 154. | The behavior that triggers an SIR varies from program to program.<br><br>Ex. 10 [Bartholomew Dep. Tr.] at 83:18–22, 85:9–14; Ex. 23 [Fink Dep. Tr.] at 73:5–9 | Undisputed to the extent that programs may have differences in how they report; however, disputed to the extent statement implies there are no standards for SIRs. The ORR Guide contains a non-exhaustive list of examples of significant incidents and different ORR programs may vary in terms of what behavior necessitates a SIR due to differences between ORR reporting requirements and state licensing reporting requirements.<br>ORR Guide § 5.8.2; DX-74 [Fink Dep. Supp.] 73:5-25. | **<u>Remains Undisputed.</u>** Defendants attempt to create a dispute of fact by proposing an implication that does not exist and therefore have not created a genuine dispute of fact. |
| 155. | The step-down process can take several weeks and sometimes even several months.<br><br>Ex. 28 [Murray Dep.Tr.] at 190:16–18; 191:5–192:18, 193:10–17, 196:1–17; Ex. 33 [Deposition Transcript of Faith Ray ("Ray Dep. Tr.")] at 166:23–167:7; Ex. 39 [Vergara | Disputed to the extent it implies that step-downs routinely take several weeks and sometimes even several months and that ORR is responsible for the delay. ORR "steps down kids as soon as possible. Once they receive that determination that they're no longer a danger to self or others, they will immediately, even prior, work on a transfer to a less restrictive environment. And so basically what happens is within one or two weeks, sometimes it is a little bit longer, but the child will get step down to | **<u>Remains Undisputed.</u>** Defendants attempt to create a dispute of fact by proposing an implication that does not exist and therefore have not created a genuine dispute of fact.<br><br>Defendants' assertion as to what causes the delay in step-down is irrelevant. Plaintiffs make no statement regarding the cause of the delay in step-down. Plaintiffs |

127.

| | | | |
|---|---|---|---|
| | Dep. Tr.] at 129:15–130:17, 257:6–10 | another facility." Ex. 39 [Vergara Dep. Tr.] at 129:20-130:4, Ex. 28 [Murray Dep. Tr.] at 193:10-17; DX-10 [Biswas Decl.] ¶ 26 ("Placement may be dependent on the licensing requirements of a facility. For example, some facilities can only take males, or some facilities can only take children between the ages of 6 and 17."); ORR MAP § 1, p. 38 (outlining steps that must be taken if step down to a less restrictive environment is not completed within 7 days). | state that children remain in restrictive settings when they have been determined eligible for step down for several weeks and sometimes several months. Defendants' own cited evidence supports this statement. Ex. 168 [Vergara Dep. Tr.] at 130:1–4 ("And so basically what happens is within one or two weeks, sometimes it is a little bit longer, but the child will get step down to another facility."); Ex. 2 [ORR MAP] § 1.4.2 at 95 (outlining steps that must be taken if step down to a less restrictive environment is not completed within 7 days). |
| 156. | ORR generally requires home studies or home study addendums of proposed custodians of children it detains in restrictive placements.<br><br>Ex. 35 [Smith Dep. Tr.] at 138:17– 139:3, 139:22–140:1; Ex. 17 [Cook Dep. Tr.] at 238:15–23; Ex. 28 [Murray Dep. Tr.] at 198:4-21, 211:23-212:11; Ex. 39 [Vergara Dep.] | Disputed. ORR has no policy of requiring discretionary home studies in cases involving children in restrictive placements. Rather, the case manager and case coordinator "must have a reasonable expectation that results of the home study process (*i.e.,* home visit, face-to-face interviews with the potential sponsor and household members) will provide additional information, other than what has already been gathered via the sponsor | **Remains Undisputed.**<br>Plaintiffs' UF ¶ 156 does not make a statement with respect to ORR policy. Plaintiffs' UF ¶ 156 speaks to ORR's practice of routinely requiring home studies or home study addendums of proposed custodians of children it detains in restrictive placements.<br><br>The fact that (1) some home |

128.

at 159:7-19; Ex. 24 [Heath Dep.] 145:15-18; Ex. 92 at 1610; Ex.104 at 1822 (minor being stepped up to who was placed in secure was referred for a home study shortly before step up); Ex. 106 at 1833; Ex 109 at 1845; Ex. 112 at 1865; Ex. 137 [F.R.A. Declaration] ¶ 14; Ex. 113 at 1872; Ex. 114 at 1879–80; Ex. 115 at 1887; Ex. 118 at 1904; Ex. 119 at 1910; Ex 127 at 1951

assessment process, which will mitigate concerns." Furthermore, some home studies of children placed in restrictive settings are required by the TVPRA – e.g., for victims of human trafficking or child abuse/neglect, or children with disabilities.

ORR Guide § 2.4.2; Ex. 2 [ORR MAP] § 2.4.2 at 175; DX-30 [Dr. Ryan Expert Rep.] ¶ 57 ("Not all potential sponsors require a home study. In contrast with the domestic system child welfare system, in which all families experience a home evaluation/study, only a small percentage (7%) of UAC cases actually receive a home study."); *see also* DX-14 [Dr. Mohn Expert Rep.] ¶ 43 (noting that home studies can be "required by law, or in discretionary situations where a home study is appropriately requested for important safety reasons").

Further disputed to the extent that in the cases cited by Plaintiffs, ORR either was required to provide a home study under the TVPRA, or there were critical reasons why ORR concluded that a discretionary home study was necessary in order to assess whether the potential sponsors could

studies may be required by the TVPRA, or (2) that ORR believes the TVPRA requires such a home study or that it has good reason to request a discretionary home study, or (3) that some home studies may have yielded information ORR deemed relevant, does not rebut Plaintiffs' fact and evidence that home studies or home study addendums are generally required of proposed custodians of children ORR detains in restrictive placements.  Ex. 35 [Smith Dep. Tr.] at 138:17–22 (FFS testifying that sponsors of children at Yolo have been required to undergo discretionary home studies because Case Managers often request a home study); 139:22–140:1 (more often than not, Yolo requests home studies); Ex. 17 [Cook Dep. Tr.] at 238:15–19 (Shenandoah clinician testifying that all children in secure placements have home studies completed.); Ex. 28 [Murray Dep. Tr.] at 198:4–21 (testifying that a home study addendum might be



protect the children's safety upon release, and provide for their physical and emotional well-being. *See, e.g.,* Ex. 104 at 1824-26 ( █████████████████████████ ); Ex. 106 at 1833-35 ( █████████████████████ ); Ex. 109 at 1845-47 (discretionary home study for child who ██████████████ ); Ex. 112 at 1864-65 ( █████████ ; Ex. 113 at 1872-75 ████████████████ );

required after step-up "just to make sure that the sponsor is really aware of what's going on"), 211:23–212:11 (testifying that a home study is required for children placed at Shiloh and that she is not aware of a case where a child was released from Shiloh without a home study having been completed); Ex. 24 [Heath Dep. Tr.] at 145:15–18 (FFS testifying that many of the kids placed in therapeutic staff-secure would be undergoing a home study of some sort); Ex. 92 at 1610 (Shiloh's Site Visit Guide stating that "Shiloh's cases typically involve home studies, additional criteria are required to check sponsor and additional adults in the home.").

Plaintiffs further respond that evidence cited by Defendants is inadmissible. *See* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 35; Plaintiffs' Objections to Opposition ¶¶ 11, 23.

130.




Ex. 114 at 1879-83 (

; Ex. 115 at 1887-90

); Ex. 118 at
1904-07

); Ex. 119 at 1911

).

Furthermore, Plaintiffs fail to mention that
in several of the cases that they cite, the
completed home studies revealed
significant concerns about the potential
sponsor's capability to care for the child's
physical and mental well-being as is

131.

required by the TVPRA. *See, e.g.,* DX-84 at 264-91 (

"); DX-84 at 292-334 (

); DX-84 at 335-63

. *See also* DX-52 [Vergara GN Decl.] ¶ 86 (discussing many concerns expressed by home study worker concerning Gabriela N.'s grandfather's ability to care for her); DX-35 [Dr. Lubit Expert Rep.] Add. 4 ¶¶ 56-61 (describing

).

132.

| 157. | ORR's written policies and procedures govern ORR's placement and transfer decisions.<br><br>Ex. 1 [ORR Policy Guide] § 1 at 22 (title "Placement in ORR Care Provider Facilities); *id.* § 1.1 at 22 (heading, "Summary of Policies for Placement and Transfer of Unaccompanied Alien Children in ORR Care Provider Facilities"); Ex 2 [ORR MAP] § 1 at 58 (Manual of Procedures on "Placement in ORR Case Provider Facilities"); *id.* § 1.1 at 62 ("Summary of Procedures for Placement and Transfer of UAC") | Undisputed. | **Undisputed.** |
| 158. | None of ORR's policies or practices concerning step-ups or step-downs is formally published in the Federal Register or a Notice of Proposed Rulemaking. | Disputed. ORR published proposed and final rules in the Federal Register regarding implementation of the Flores Settlement Agreement, but it is currently enjoined by the Central District of California in the case, *Flores v. Barr*. In addition, the ORR Guide implements the Flores Settlement Agreement, and is posted online and | **Remains Undisputed.**<br>The ORR policies and procedures at issue for the step-up claim are those published in the ORR Policy Guide and ORR MAP. *See* Ex. 1 [ORR Policy Guide] at 22–33; Ex. 2 [ORR MAP] at 58–133. |

133.

| | | | |
|---|---|---|---|
| | Ex. 5 [RFA 1st Set] No. 2 at 468; ECF 144 [Azar Answer] ¶¶ 109, 123; Ex. 11 [Bartholomew 30(b)(6) Dep. Tr.] at 43:11–44:6 | available to the public. Furthermore, ORR regularly holds stakeholder meetings where interested parties have the opportunity to comment on ORR's policies.<br><br>*See* Defs.' Evidentiary Objection ¶ 158. | The fact that ORR's Policy Guide is published online does not change the fact that these policies being challenged by Class Members are not published in the Federal Register or a Notice of Proposed Rulemaking.<br><br>Defendants cite no evidence in support of their statement that ORR holds regular stakeholder meetings where interested parties have the opportunity to comment on ORR's policies. In addition, such statement is irrelevant to Plaintiffs' fact that ORR policies and practices are not published in the Federal Register or a Notice of Proposed Rulemaking.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 158. |
| 159. | ORR's online Policy Guide and ORR MAP are not always consistent.<br><br>Ex. 24 [Heath Dep. Tr.] at 92:6–14, 294:19–295:4; Ex. 11 | Undisputed only to the extent that the ORR Guide and MAP have been inconsistent due to a time delay between an update or change to the Guide and updating the MAP to reflect those changes. ORR does | **Remains Undisputed.**<br>Defendants admit that the Policy Guide and ORR MAP have not always been consistent. That emails may be sent with updates to |

134.

| | | |
|---|---|---|
| [Bartholomew 30(b)(6) Dep. Tr.] at 46:15–47:4; Ex. 32 [Deposition Transcript of Mae C. Quinn ("Quinn Dep. Tr.")] at 17:9–14, 169:23–170:4 | communicate updates to the MAP to its care providers, grantees, and their staff "through email communications and distribution of the notice that procedures have been updated or there are new procedures." Ex. 24 [Heath Dep. Tr.] at 294:19-295:4.<br><br>*See* Ex. 11 [Bartholomew 30(b)(6) Dep. Tr.] at 46:20-47:4 ("I would say that the MAP is not – it's not a one-for-one meeting that the policy is updated or changed. I think that they do their due diligence and try to update the MAP, if applicable, to any updated policy changes, any new policies. I think there's probably a lag time of getting any type of procedures associated with those policies to provide guidance to the programs."), 47:6-17.<br><br>*See* Defs.' Evidentiary Objection ¶ 159. | the MAP does not change the fact that the MAP itself, which is referred to by ORR and grantee staff, is not always consistent with the Policy Guide or up to date.<br><br>The postings of revisions show obvious inconsistencies and delays in updating both documents to be consistent. *Compare* Ex. 132 [ORR Record of Posting and Revision Dates] at 1975 (Section 2.2.4 was revised on 10/3/16 to include a "list of acceptable documents to prove identity for sponsors and household members), *with* Ex. 136 at 2006 (Section 2.2.4 of the ORR MAP was not revised to reflect a list of acceptable documents "*consistent* with FRP" until 9/5/18).<br><br>Moreover, Professor Quinn testified that there were inconsistencies between the ORR Policy Guide and ORR MAP with respect to the Notice of Placement. Ex. 32 [Quinn Dep. Tr.] at 169:20–170:1. Indeed, a side-by-side |

135.

comparison of ORR's Notice of Placement policies and procedures show inconsistencies. ORR Policy Guide § 1.4.2 states the following with respect to the timing of the Notice of Placement "When a UAC is stepped up to a more restrictive setting . . . he/she is provided a *Notice of Placement in Restrictive Setting* in a language that he/she understands within a reasonable time *either before or after ORR's placement decision*." Ex. 1 [ORR Policy Guide] § 1.4.2 at 29 (first emphasis in original). In contrast, ORR MAP directs notice upon step up as follows: "The UAC is provided specific information regarding the placement decision in a language he or she understands *upon arrival at the receiving care provider facility*, which is included in the summary portion of the *Notice of Placement in Restrictive Setting*." Ex. 2 [ORR MAP] § 1.4.2 at 95 (first emphasis in original).

136.

| | | | *See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 159. |
|---|---|---|---|
| 160. | ORR frequently changes the policies and procedures set out in its Policy Guide and MAP.<br><br>Ex. 24 [Heath Dep. Tr.] at 28:19–20, 90:16–18; Ex. 28 [Murray Dep. Tr.] at 59:7–8; *see* Ex. 132 (reflecting changes to ORR Policy Guide); Ex. 136 (reflecting to changes to ORR MAP) | Disputed to the extent Plaintiffs' use of the term "frequently" is a statement of opinion, not fact. Defendants do not dispute that ORR has updated its policies and procedures in the ORR Guide and the MAP over time, to better effectuate ORR's mission in response to ever evolving needs and circumstances, to implement Congressional directives, and to implement Court orders.<br><br>*See* Defs.' Evidentiary Objection ¶ 160. | **Remains Undisputed.**<br>The use of the term "frequently" does not convert the statement from an undisputed fact to an opinion. Plaintiffs' Exhibit 132 clearly shows that since 2015 many of the policies at issue have been changed numerous times in the past 5 years. Ex. 132 [ORR Record of Posting and Revision Dates] at 1974–78 (ORR Policy Guide §§ 1.2.4, 1.4.2, 2.3.1, 2.7.4 and 2.7.7 have been changed twice in the past five years; §§ 2.2.1 and 2.3.2 have been changed three times; § 2.2.3 and § 2.7 have been changed four times;  and §§ 2.2.4 and 2.4.2 have been changed six times).<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 160. |

137.

| 161. | Case Managers are tasked with recommending that children be stepped up and stepped down.<br><br>Ex. 35 [Smith Dep. Tr.] at 76:13–24, 78:17–22; Ex. 31 [Deposition Transcript of Judette Padilla ("Padilla Dep. Tr.")] at 84:1–7; Ex. 28 [Murray Dep. Tr.] at 103:22–104:2; Ex. 19 [David Dep. Tr.] at 149:19–150:1; Ex. 33 [Ray Dep. Tr.] at 82:3–4 | Disputed. ORR's practice and policy is that when ORR transfers a UAC from one facility to another, it does so only after a consultation process occurs between the case manager, the case coordinator, and the FFS.<br><br>Defs.' U.F. ¶¶ 49, 51, 53. | **Remains Undisputed.**<br>Plaintiffs' UF ¶ 161 does not state that the step-up process is wholly decided by a Case Manager; Plaintiffs' statement recognizes that a Case Manager is tasked with providing a recommendation on step-up or step-down as part of the consultation process.<br><br>Defendants' purported uncontroverted fact ¶ 15 reflects this very point with respect to ORR's practice. *See* ECF No. 263-2 [Defendants' Statement of Uncontroverted Facts and Conclusions of Law] ¶ 15 ("It is ORR's practice that case managers . . . make transfer and release recommendations…"). Similarly, ORR's policy reflects the same. Ex. 1 [ORR Policy Guide] § 2.3.2 at 39 ("Care provider Case Managers perform a variety of duties, including . . . making transfer and release recommendations . . ."). |
| 162. | Case Managers compile the information and evidence ORR | Disputed to the extent Plaintiffs' use of the word "the" implies that the only | **Remains undisputed.** |

| | | |
|---|---|---|
| uses to decide whether children will be stepped up or stepped down.<br><br>Ex. 2 [ORR MAP] § 1.4 at 79; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 276:9–16, 281:8–282:1; Ex. 35 [Smith Dep. Tr.] at 49:20–50:3 | information or evidence that is considered in stepping up or down a child is compiled by Case Managers. It is ORR's practice and policy that when ORR transfers a UAC from one facility to another, it does so only after a consultation process occurs between the case manager, the case coordinator, and the FFS. Furthermore, in determining whether a step-up is appropriate, the case manager, case coordinator, and FFS staff the case and confer to determine whether the UAC's behavior, criminal history, or self-disclosures require placement in a more restrictive environment, using the factors identified in the ORR Guide.<br><br>Defs.' U.F. ¶¶ 49, 51, 53. | Defendants' response and cited evidence do not create a genuine dispute. The fact that a transfer decision is made through a consultation process does not change the fact that the Case Manager is tasked with compiling the information and evidence to be used and discussed in the decision-making process. Similarly, it is irrelevant that the Case Manager, Case Coordinator and FFS discuss the UAC's behavior, criminal history, or self-disclosures because this does not change or undermine Plaintiffs' undisputed fact that the behavior, criminal history and self-disclosures are information and evidence compiled by the Case Manager for the purpose of aiding the decision-making process. |
| 163. | Case Coordinators rely almost exclusively on written documentation compiled and provided by Case Managers in formulating their recommendations regarding step-up or step-down. | Disputed to the extent Plaintiffs' use of the phrase "almost exclusively" is a statement of opinion, not fact. Case coordinators are available to meet with the UAC and can share information at any point during their stay in ORR's custody and care. Also disputed to the extent Plaintiffs' use of the | **Remains Undisputed.** Defendants do not create a genuine dispute of fact as Case Coordinators generally do not speak with the UACs in forming their recommendations and primarily use information and |

139.

| | | |
|---|---|---|
| Ex. 35 [Smith Dep. Tr.] at 80:15–22; Ex. 24 [Heath Dep. Tr.] at 81:23– 82:25; Ex. 28 [Murray Dep.] 46:6–47:3, 104:14-25, 117:16–23, 119:2–24, 131:14–21 | phrase "almost exclusively on written documentation" implies that case coordinators consider all information on the papers. To the contrary, case coordinators participate in weekly staffing meetings to discuss each child's case, including with clinicians.<br><br>DX-25 [Murray Dep.] 135:20-136:13 (confirming that case coordinators can meet with UACs "before the case coordinator [gives] the recommendation"); DX-09 [Antkowiak Decl.] ¶ 24; DX-10 [Biswas Decl.] ¶ 38.<br><br>*See* Defs.' Evidentiary Objection ¶ 163. | documents from the UAC portal and emails to make a recommendation. Ex. 24 [Heath Dep. Tr.] at 81:23–82:2 (it is not very often that a Case Coordinator meets with a child before making a recommendation), 82:17–25 (Case Cooridnator reviews documents in minor's file and UAC portal); Ex. 28 [Murray Dep. Tr.] at 46:6–47:3 (to make a recommendation, Case Coordinators review documents in the UAC portal and sometimes from emails if document is missing rom the portal), 104:23–25 (Case Coordinator testifying "so we are looking at the case facts and not having that close contact with the child or the sponsor"), 117:16–23 (Case Coordinator reviews anything in the UAC portal in making transfer recommendation), 119:2–24 (Case Coordinator can request information missing from portal that should have been included with the transfer request per policy's specific list of what should be included), 131:14–21 |

140.

("Q. Does the case coordinator ever review evidence or information beyond that which is submitted by ORR or the facilities? A. No. There's only - - there's only that. They're the ones that receive the information. It's in the UAC portal or even sometimes provided by email. But that's about all."); Ex. 35 [Smith Dep. Tr.] at 80:15–22 (Case Coordinator uses the information in the portal to make a step-up recommendation to the FFS).

That Case Coordinators participate in weekly staff meetings to discuss UAC cases and that clinicians are sometimes present does not change the fact that the primary source of information relied upon by Case Coordinators to make their decisions is from documents compiled by the Case Manager, uploaded to the UAC portal, sent via email, and reviewed by the Case Coordinator. Ex. 28 [Murray Dep. Tr.] at 46:6–47:3, 117:16–23,

141.

| | | | |
|---|---|---|---|
| | | | 119:2–24, 131:14–21; *see* Ex. 2 [ORR MAP] § 1.4 at 81−82 (the Case Manager "[c]ompiles the Transfer Request File, which contains attachments sent via email and issued by all parties involved (Case Coordinator, FFS, other programs) at various stages of transfer."). <br><br> *See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 163. |
| 164. | ORR's written policy does not mandate that Case Coordinators interview children before they make a recommendation on step-up or step-down. <br><br> Joint Stip. ¶ 66 | Undisputed. | **Undisputed.** |
| 165. | In practice, Case Coordinators rarely speak with children before making step-up and step-down recommendations. <br><br> Ex. 28 [Murray Depo. Tr.] at 67:10– 68:8, 69:2–3, 70:18–22, 136:10–13, 137:7–14 | Disputed to the extent Plaintiffs' evidence of "practice" is based on the fact deposition testimony of just one case coordinator, who cannot speak to the practice of all case coordinators in the ORR program. <br><br> *See* Defs.' Evidentiary Objection ¶ 165. | **Remains Undisputed.** <br> Plaintiffs' evidence of ORR's practice is based on the testimony of a former Case Coordinator, who at the time of the deposition was the Direct Operations Coordinator responsible for supervising eight |

142.

| | | | Case Coordinators. Ex. 201 [Murray Dep. Tr.] at 38:18–24.<br><br>Defendants offer no evidence to contradict this testimony and therefore do not create a genuine dispute of fact. |
|---|---|---|---|
| 166. | FFS are ORR staff members.<br><br>Joint Stip. ¶ 67 | Undisputed. | **Undisputed.** |
| 167. | FFS make final step-up and step-down decisions without further review by any other official, even when the FFS's decisions depart from a Case Manager's, Clinician's and/or Case Coordinator's recommendation.<br><br>Ex. 1 [ORR Policy Guide] §§ 1.4, 2.3.1 at 28, 39; Ex. 2 [ORR MAP] § 1.4 at 79, 84–85; *id.* § 1.4.6 at 100– 01; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 282:24–284:13; Ex. 23 [Fink Dep. Tr.] at 23:9–14, 106:10–15, 169:10– 15, 170:1–11, 177:19–22; Ex. 20 [Eich Dep. Tr.] at 154:1–6; Ex. 18 [De La | Disputed to the extent it implies an FFS has unilateral authority to make step-up or step-down decisions even contrary to recommendation. The case manager's summary notes are required to include "[t]he FFS's name, decision and basis for it" and if the "FFS decides that a UAC should continue in a more restrictive placement," the ORR MAP requires that "the information justifying the UAC's placement in a restrictive setting is summarized by the case manager and provided in a new Notice of Placement in a Restrictive Setting." The MAP further provides that if "the case manager is unclear what the rationale for the FFS decision is, the case manager contacts the FFS for clarification and assistance in drafting language into the summary portion | **Remains Undisputed.**<br>Defendants do not create a genuine dispute of fact. Defendants' assertions regarding what the ORR MAP requires a Case Manager include in the summary notes is irrelevant to Plaintiffs' statement that an FFS can make a decision that departs from a Case Manager's recommendation. The ORR MAP merely directs the Case Manager to reach out to the FFS for clarification on the basis for placement and to document such decision. There is no indication that someone else is required to review the summary notes when the FFS's decision departs from a |

| | | |
|---|---|---|
| Cruz Dep. Tr.] at 21:6–8, 59:4–60:21, 132:23–133:21, 200:3–7; Ex. 31 [Padilla Dep. Tr.] at 84:1– 86:18; Ex 37 [Sualog Dep. Tr.] at 52:9–53:4; Ex. 33 [Ray Dep. Tr.] at 76:8–17, 83:2–11, 127:21–128:1; Ex. 35 [Smith Depo. Tr.] at 46:16–47:16, 97:17–20; Ex. 16 [Contreras Dep. Tr.] at 69:16–22; Ex. 84 at 1562, 1566, 1568; Ex. 85 at 1573, 1575 | of the form." Furthermore, if "a UAC has resided in a secure or RTC facility for over 90 straight calendar days the FFS consults with Supervisory ORR staff on the case regarding the reasons for the UAC's continued placement, and thereafter after every 30 day restrictive placement review (unless the UAC is stepped down or discharged)." Ex. 2 [ORR MAP] § 1.4.2 at 83; DX-09 [Antkowiak Decl.] ¶¶ 24, 25; | Case Manager's recommendation. Ex. 2 [ORR MAP] § 1.4.2 at 83.<br><br>Defendants' contention that if "a UAC has resided in a secure or RTC facility for over 90 straight calendar days the FFS consults with Supervisory ORR staff on the case regarding the reasons for the UAC's continued placement, and thereafter every 30 restrictive placement review (unless the UAC is stepped down or discharged)" is irrelevant to Plaintiffs' statement with respect to FFS's ability to make a step-up decision without further review. The consultation with ORR Supervisory staff is only triggered after 90 days of restrictive placement and not upon step-up. Ex. 2 [ORR MAP] § 1.4.2 at 92.<br><br>Defendants' assertion that FFSs consult with ORR supervisory staff [after 90 days in secure or RTC] does not indicate that such consultation is required, the nature |

144.

| | | | of the consultation, or whether, after such consultations, the FFS's decision whether to continue to detain a minor in RTC or secure placement prevails. |
|---|---|---|---|
| 168. | FFS rely exclusively on information and evidence provided by Case Managers in making step-up and step-down decisions.<br><br>Ex. 35 [Smith Dep. Tr.] at 99:12–17, 100:4–8, 149: 9–25; Ex. 24 [Heath Dep. Tr.] at 83:5–10, 86:16–21; Ex. 20 [Eich Dep. Tr.] at 170:15–19 | Disputed to the extent it implies that placement decisions are made exclusively based on the information gathered by case managers. In making placement decisions, the FFS can meet with children and reviews "information provided at the UAC's referral/transfer request and the information gathered by the case manager/FFS." DX-09 [Antkowiak Decl.] ¶ 24 (emphasis added). This includes information discussed at staff meetings related to a UAC's eligibility for step-up or step-down. Furthermore, transfers to residential treatment centers also include psychiatric or psychological evaluations; psychiatric hospitalization records and discharge summary (if applicable); and clinical, psychological and psychiatric progress notes which are typically provided by the clinician. Ex. 2 [ORR MAP] § 1.4.2 at 83; Ex. 35 [Smith Dep. Tr.] at 99:12-100:8; DX-26 [Heath Dep.] 216:8-22 ("Q: Can a child present any additional information to you that you | **Remains Undisputed.**<br>Defendants do not create a genuine dispute of fact. Defendants' contention that FFS can meet with the children does not change the fact that FFS generally do not speak with the UACs in making a step-up or step-down decision. Ex. 35 [Smith Dep. Tr.] at 99:12–17 (FFS testifying that as an FFS she does not interview the child in connection with making a step-up determination and relies "exclusively" on the documents in the portal); Ex. 24 [Heath Dep. Tr.] at 84:2–6 (FFS testifying that she rarely interviews a child in making decisions about the child).<br><br>Defendants misstate or misunderstand Plaintiffs' UF ¶ 168. Plaintiffs' UF ¶ 168 does not state that the FFS relies only on |

145.

| | | can take into consideration for step-down? A: Always."). *See also* DX-20 [David Dep.] 7:17-8:12 ("Q: Do you have much direct contact with the children? A: Yes. Q: Can you explain just the circumstances where that would occur? A: There are times where I would meet with children or they request to meet with me. Q: What would be the type of thing that a child would ask to meet with you about? A: To discuss their case. Q: And would that include your decision on their safe and timely release? A: It allows them to provide me with information or talk to me about their case. That supports decisions that I make. Q: Okay. So other than the decision on release, what other types of decisions that you make would a child have occasion to talk to you about? A: I've spoken to children in regards to their placement."); DX-41 [De La Cruz LR Decl.] ¶ 35 ("Since my employment in 2004, I have been personally involved in children's cases when a concern about a case has been elevated by a parent, a care provider staff, an attorney, medical providers, consular staff, or the child him or herself. This concern and attention to transparency | information from the Case Manager but rather information and evidence *provided* by the Case Manager. Indeed, per ORR MAP the Case Manager "[c]ompiles the Transfer Request File, which contains attachments sent via email and issued by all parties involved (Case Coordinator, FFS, other programs) at various stages of transfer." Ex. 2 [ORR MAP] § 1.4 at 81–82. Defendants' assertion that transfers to residential treatment centers also include psychiatric or psychological evaluations; psychiatric hospitalization records and discharge summary (if applicable); and clinical, psychological and psychiatric progress notes *which are typically provided by the clinician* is inaccurate. As noted above, the *Case Manager* is tasked with compiling all the information to be included in the Transfer Request File, which for transfers to RTCs include the documents identified by Defendants: |

146.

| | | | |
|---|---|---|---|
| | | continue today; and all FFS are attentive to stakeholder concerns. In fact, on almost any day, I am working with an FFS to resolve a case brought to their attention by an attorney, sponsor, child advocate, or other interested party."). *See* Defs.' Evidentiary Objection ¶ 168. | psychiatric or psychological evaluations; psychiatric hospitalization records and discharge summary (if applicable); and clinical, psychological and psychiatric progress notes. *Id.* at 83. *See also* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 168; *see* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 29. |
| 169. | The information and evidence FFS rely on in making step-up and step-down decisions is not always accurate. Ex. 24 [Heath Dep. Tr.] at 211:5–12 | Disputed to the extent it implies that FFS decisions are based on inaccurate information. While "not everything in the UAC portal is necessarily accurate" and there have been times where "a document in the UAC portal [ ] was inconsistent with [the FFS's] understanding of the case," placement decisions are made based on the documents in the UAC portal as well as "clinical recommendations and the case manager and the case coordinator recommendations." Ex. 24 [Heath Dep. Tr.] at 211:5-18. Plaintiffs point to no evidence that the information itself that ORR relies upon is inaccurate. | **Remains Undisputed.** Defendants attempt to create a dispute of fact by proposing an implication that does not exist and therefore have not created a genuine dispute of fact. Defendants concede that "not everything in the UAC portal is necessarily accurate." Defendants' assertion that FFS also rely on the recommendation of clinicians, Case Managers and Case Coordinators and therefore do not rely on inaccurate information fails to recognize that the documents in |

| | | | |
|---|---|---|---|
| | | *See* Defs.' Evidentiary Objection ¶ 169. | the UAC portal come from clinicians and Case Managers, and that Case Coordinators rely almost exclusively on the documents in the UAC portal in order to make their recommendation. Ex. 2 [ORR MAP] § 1.4 at 81–83 (Case Manager is tasked with compiling all the information to be included in the Transfer Request File); *see* Plaintiffs' UF ¶ 163 (Case Coordinators rely almost exclusively on written documentation compiled and provided by Case Managers in formulating their recommendations regarding step-up or step-down; Ex. 28 [Murray Dep. Tr.] at 131:14–21 ("Q. Does the case coordinator ever review evidence or information beyond that which is submitted by ORR or the facilities? A. No. There's only - - there's only that. They're the ones that receive the information. It's in the UAC portal or even sometimes provided by email. But that's about all.") |

148.

| | | | *See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 169. |
|---|---|---|---|
| 170. | ORR's written policy does not require FFS to interview children before making a final step-up and step-down decision.<br><br>Joint Stip. ¶ 68 | Undisputed. | **Undisputed.** |
| 171. | An FFS did not interview Class Representatives Lucas R., Gabriela N., Daniela Marisol, Sirena P., or Benjamin F. before stepping them up to Shiloh RTC. Notes in their case files show they met with their Case Managers to discuss their case.<br><br>Joint Stip. ¶ 69 | Undisputed. | **Undisputed.** |
| 172. | An FFS did not interview Class Representative Jaime D. before stepping him up to Yolo secure. Jaime D. met with his Case Manager to discuss his case.<br><br>Joint Stip. ¶ 70 | Undisputed. | **Undisputed.** |

149.

| | | | |
|---|---|---|---|
| 173. | ORR's policy does not require FFS to communicate with a child's potential custodian before making a step-up or step-down decision.<br><br>Joint Stip. ¶ 71 | Undisputed. | **Undisputed.** |
| 174. | ORR policies do not require an FFS to consult with an FFS Supervisor or anyone else regarding step-up for placement into OON facilities.<br><br>Ex. 23 [Fink Dep. Tr.] at 23:15–21, 169:5–25; Ex. 1 [ORR Policy Guide] § 1.2 at 22–23; Ex. 2 [ORR MAP] § 1.4, at 89; Ex. 18 [De La Cruz Dep. Tr.] at 58:19–59:3, 133:16–21, 135:14–24, 137:12–17; Ex. 35 [Smith Dep. Tr.] at 83:11–84:1 | Disputed to the extent it implies that it is ORR's policy and practice for FFS to make unilateral step-up decisions. It is ORR's policy and practice that when ORR transfers a UAC from one facility to another, or determines a more restrictive level of placement remains warranted, it does so only after a consultation process occurs between the case manager, the case coordinator, and the FFS. The FFS (along with the case manager and case coordinator) can also consult with the FFS Supervisor for Special Populations, the Senior Advisor for Child Well-Being, the Senior FFS Supervisor, the Division of Health and Unaccompanied Children, members of the ORR Division of Policy and Procedure, and the Deputy Director of ORR on step-up decisions.<br><br>Defs.' U.F. ¶¶ 49, 51, 53; Ex. 35 [Smith Dep. Tr.] at 83:16-20 ("I would invite my | **Remains Undisputed.**<br>Defendants attempt to create a dispute of fact by proposing an implication that does not exist and therefore have not created a genuine dispute of fact.<br><br>Plaintiffs' statement is not intended to imply that FFS do not collaborate with Case Managers and Case Coordinators in ultimately making a final step-up decision. Plaintiffs' statement is that ORR does not *require* FFS to consult with an FFS Supervisor or any other type of supervisor regarding step up except for placement into an OON facility. Ex. 23 [Fink Dep. Tr.] at 23:15–21 ("Q. When, if ever, is an FFS required to discuss a case with an FFS supervisor prior to making a |

150.

| | | supervisor to attend if I wanted her to hear a case update that was maybe a more complex case."); Ex. 23 [Fink Dep. Tr.] at 23:19-21 ("I'm not sure of any requirements. I know that if it's a complicated case they will reach out to their supervisor to staff it.").<br><br>*See* Defs.' Evidentiary Objection ¶ 174 | decision regarding the placement, transfer or release of a youth? A. I'm not sure of any requirements. I know that if it's a complicated case they will reach out to their supervisor to staff it."), 169:5–18 (testifying that FFS have independent authority to serve as a final decision maker on release and transfers with the exception of OON placements); *see also* Ex. 1 [ORR Policy Guide] § 1.2 at 22–23 (no reference to any requirement that an FFS consult with an FFS supervisor for placement decisions, except for out-of-network placements); Ex. 2 [ORR MAP] § 1.4 at 85 (only referencing that an FFS *may* consult with an FFS Supervisor regarding placement); Ex. 18 [De La Cruz Dep. Tr.] at 58:19–59:3 (FFS Senior Supervisor testifying that there is no list of circumstances or criteria for when an FFS would need to elevate an issue to an FFS Senior Supervisor), 133:16–21 (same), 135:14–24 (FFS have discretion to elevate a step-up |

151.

decision to an FFS Supervisor); Ex. 35 [Smith Dep. Tr.] at 83:11–84:1 (no standard for an FFS supervisor's involvement in a case).

That an FFS may consult with others does not change the fact that FFS are not *required* to consult with any individual regarding step up. Indeed, Defendants' own evidence supports Plaintiffs' statement that there is no such requirement. Ex. 35 [Smith Dep. Tr.] at 83:18–20 ("I *would invite* my supervisor to attend *if* I wanted her to hear a case update that was maybe a more complex case.") (emphasis added); Ex. 23 [Fink Dep. Tr.] at 23:19–21 ("*I'm not sure of any requirements*. I know that if it's a complicated case they will reach out to their supervisor to staff it.").

*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 174.

152.

| 175. | FFS have not received formal training on the differences between therapeutic staff-secure, staff- secure, and RTC placements.<br><br>Ex. 35 [Smith Dep. Tr.] at 37:21–24; Ex. 23 [Fink Dep. Tr.] at 55:1–5; Ex. 39 [Vergara Dep. Tr.] at 97:11–25 | Disputed to the extent Plaintiffs' use of the word "formal" is a statement of opinion, not fact and to the extent it mischaracterizes testimony by omitting relevant portions of the transcript. *See* Ex. 35 [Smith Dep. Tr.] at 37:21-24 ("Q: Do you remember receiving any training up step-ups? A: I recall learning –learning about it and reviewing the policy, but not a formal training."); Ex. 23 [Fink Dep. Tr.] at 55:1-5 ("Q: Do you believe that the FFSs have been trained on and understand the differences between a therapeutic staff secure, a staff secure and a residential treatment program? A: Some have, yes."); Ex. 39 [Vergara Dep. Tr.] at 97:22-25 ("Q: Do you know whether any of the FFSs that you supervise have received training about therapeutic staff secure placement? A: I don't remember."); DX-16 [De La Cruz Dep.] 233:2-13 ("Q: As the senior FFS supervisor, do you ensure that FFS receive the guidance they need to do their jobs? A: Yes, sir. Q. Do you expect that FFS will ensure that grantee care provider programs know and follow ORR policy? A: Yes, sir. Q: And in your experience, do FFS ensure | **Remains Undisputed.**<br>Plaintiffs' citations to transcripts for deponents Smith, Fink and Vergara are inclusive of the citations relied upon by Defendants in their response. Plaintiffs' statement does not mischaracterize testimony where FFS Smith clearly testified to the following with respect to whether she remembered receiving any training on step up: "I recall learning –learning about it and reviewing the policy, but not a *formal training*." Ex. 35 [Smith Dep. Tr.] at 37:21–24. FFS Supervisor for Special Populations testified that *some*, meaning not all, FFS have received training on the differences between therapeutic staff-secure, staff-secure and RTCs. Ex. 23 [Fink Dep. Tr.] at 55:1–5.<br><br>Plaintiffs' UF ¶ 175 does not address whether ORR's Division of Policy and Procedures develops trainings regarding step-up generally. Plaintiffs' statement is that FFS are not *formally trained* |

| | | that grantee care provider programs know and follow ORR policy? A: Yes."). | on the differences between certain types of restrictive settings, specifically therapeutic staff-secure, staff-secure and RTC placements. This is supported by both FFS Smith and FFS Supervisor for Special Populations Fink's deposition testimony. Ex. 35 [Smith Dep. Tr.] at 37:21–24; Ex. 23 [Fink Dep. Tr.] at 55:1–5.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 175. |
| | | ORR's Division of Policy and Procedures develops training on matters of policy and for "step up in particular, the Policy team ensures that personnel that are involved in step-up, including ORR care providers, case managers and clinicians, case coordinators, and ORR federal staff (specifically FFS and FFS Supervisors), are adequately trained." DX-10 [Biswas Decl.] ¶ 14.<br><br>*See* Defs.' Evidentiary Objection ¶ 175. | |
| 176. | Although ORR uses the criteria whether a child is a "danger to self or others" to determine step-up or step-down eligibility, ORR employs no standardized metric to determine whether a child meets this standard, *i.e.,* the child is a danger to self or others.<br><br>Ex. 24 [Heath Dep. Tr.] at 96:19–22, 97:23-25, 98:1-4; Ex. 1 [ORR Policy Guide] | Disputed. The standard ORR applies is set forth by Congress under the TVPRA, 8 U.S.C. § 1232(c)(2)(A), in which ORR is required to determine that a child "poses a danger to self or others" prior to placing the child in a secure facility. 8 U.S.C. §1232(c)(2)(A) ("A child shall not be placed in a secure facility absent a determination that the child poses a danger to self or others or has been charged with having committed a criminal offense.").<br><br>The multiple factors articulated in the ORR Guide § 1.2.4 are meant to determine, | **Remains Undisputed.**<br>Defendants' contention that ORR applies the standard set forth by Congress under the TVPRA misrepresents what is required in the TVPRA. The TVPRA states the criteria for placement in a secure facility and does not change that ORR employs no standardized metric to make such determinations with regards to the TVPRA criteria.<br><br>That ORR provides a list of factors |

154.

| | | |
|---|---|---|
| § 1.2.1 at 23 (placement consideration "danger to self" and "danger to the community"); *id.* § 1.2.4 at 24 (secure placement criteria includes "danger to self or others"); *id.* § 1.4.2 at 29 ("[s]tep downs may occur when ORR, in its discretion, determines the UAC no longer poses a danger to himself or others"); *id.* § 1.4.6 at 30 (RTC placement criteria – danger to self or others) | whether when taken together, a child is a danger to self or others.  *See* Defs.' Evidentiary Objection ¶ 176. | to consider in determining whether a child is a danger to self or others does not change the fact that there is no guidance on whether any of these factors themselves are determinative and/or how to make a finding that a child meets one or more of the factors, or how to weigh these factors. Ex. 1 [ORR Policy Guide] § 1.2.4 at 24 (unclear what each of the following factors mean and how ORR would make such an assessment: what makes something a "credible threat []," what constitutes a "violent or malicious act," what is considered "serious" self-harming behavior, what does it mean to engage "in conduct that has proven to be unacceptably disruptive of normal functioning of a staff secure facility," and what does it mean to "display[] sexual predatory behavior," or to "engage[] in inappropriate sexual behavior"). |

155.

| | | | *See* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 176. |
|---|---|---|---|
| 177. | ORR employs no evidentiary standard in deciding whether a child should be stepped up or stepped down.<br><br>Ex. 1 [ORR Policy Guide] § 1 (no evidentiary standard articulated for step-up or step-down decisions); Ex. 5 [RFA 1st Set] No. 97 at 508–09; Ex. 6 [RFA 2nd Set] No. 112 at 531; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 74:7-11, 76:23–77:22 | Disputed to the extent it implies ORR is required to employ a legal evidentiary standard in a child-welfare context, which is not adversarial in nature. *See* 8 U.S.C. § 1232(c)(2)(A) (A UAC in the custody of HHS "shall be promptly placed in the least restrictive setting that is in the best interest of the child… A child shall not be placed in a secure facility absent a determination that the child poses a danger to self or others or has been charged with having committed a criminal offense."). The decision to transfer an unaccompanied alien child to a more restrictive placement is based on consideration of multiple factors as articulated in the ORR Guide at §1.2.4, which are documented in the case files and provided upon demand to the child's counsel of record, legal services organization, or Child Advocate." Ex. 5 [RFA 1st Set] No. 97 at 508-09. | **Remains Undisputed.** Defendants' cited evidence does not create a genuine dispute, nor could it as Defendants agreed in their RFA responses that "ORR does not use an 'evidentiary' standard." Ex. 5 [RFA 1st Set] No. 97 at 509 ("Defendants admit that ORR does not use a specific evidentiary standard in assessing whether, for the child's own protection and/or the protection of others, the child should be transferred to a more restrictive setting."); Ex. 6 [RFA 2nd Set] No. 112 at 531 ("Defendants admit that ORR does not use a specific evidentiary standard in assessing whether a child may be transferred to a less restrictive setting, and no longer needs to be in a more restrictive setting for the child's own protection and/or the protection of others."). |

156.

| 178. | ORR provides no guidance on how to weigh placement considerations under ORR Policy Guide § 1.2.1.<br><br>Ex. 1 [ORR Policy Guide] § 1.2.1 at 23 (absence of guidance or direction on how to weigh these factors); Ex. 2 [ORR MAP] § 1.2.1 at 65 (same) | Disputed. Whether the ORR Guide provides guidance is a statement of opinion, not fact. In addition, the ORR MAP operationalizes the Guide, and provides extensive instructions, and is meant to be read together with the Guide. Placement decisions are made based on established child-welfare principles and multiple factors articulated by the ORR Guide and the ORR Policy Team provides guidance and training on how to implement ORR policy.<br><br>ORR Guide §§1.2.4, 1.4.2; DX-10 [Biswas Decl.] ¶ 14; DX-67 [Biswas 30(b)(6) Dep. Supp.] 435:19-436:18.<br><br>*See* Defs.' Evidentiary Objection ¶ 178. | **Remains Undisputed.**<br>Defendants' contention that the ORR MAP operationalizes the Guide and provides extensive instructions and is meant to be read together does not change the fact that § 1.2.1 of the Policy Guide does not provide guidance on how to weigh the placement considerations listed and that the ORR MAP provides no additional guidance where it merely says "See Section 1.2.1. of the UAC Policy Guide." Ex. 1 [ORR Policy Guide] § 1.2.1 at 23 (absence of guidance or direction on how to weigh these factors); Ex. 2 [ORR MAP] § 1.2.1 at 65.<br><br>Defendants' contention that the ORR Policy Division provides guidance and training on how to implement ORR policy does not change the fact that the ORR Policy Guide and ORR MAP do not provide such guidance on how to weigh placement considerations under § 1.2.1. ORR points to no evidence specific to ORR Policy |

| | | | Guide § 1.2.1 to show such trainings or guidance have involved discussions of this particular policy.

Plaintiffs further respond that evidence cited by Defendants is inadmissible. *See* Plaintiffs' Objections to Opposition ¶ 14; *see also* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 178. |
|---|---|---|---|
| 179. | ORR does not require that a child be provided prior notice that he or she may be stepped up or the reasons for step-up.

Joint Stip. ¶ 73 | Undisputed. | **Undisputed.** |
| 180. | Class Representatives Lucas R. Gabriela N., Daniela Marisol, Sirena P., Jaime D., and Benjamin F. were stepped up without being provided written notice of the basis for restrictive placement prior to step-up.

Joint Stip. ¶ 74 | Undisputed. | **Undisputed.** |

158.

| | | | |
|---|---|---|---|
| 181. | ORR does not require that a parent or other potential custodian receive prior written notice that a child is going to be stepped up.<br><br>Ex. 1 [ORR Policy Guide] § 1 (absence of any reference to notice to a child's parent or potential sponsor); Ex. 2 [ORR MAP] § 1.4 at 88 (only referring to verbal notification to "UAC's approved contacts"); Ex. 31 [Padilla Dep. Tr.] at 89:12–24 | Undisputed. | **Undisputed.** |
| 182. | Class Representatives Lucas R., Gabriela N., Daniela Marisol, Sirena P, Jaime D., and Benjamin F.'s potential sponsors were not provided written notice of the basis for restrictive placement prior to the child being stepped-up.<br><br>Joint Stip. ¶ 75 | Undisputed. | **Undisputed.** |
| 183. | ORR requires that children be given a form notice of placement ("NOP") within 48 hours following step-up to a | Disputed to the extent it states the NOP is only provided within 48 hours *following* placement. The ORR Guide provides that "[w]hen a UAC is stepped up to a more | **Remains Undisputed.** Defendants' cited evidence does not create a genuine dispute of fact. |

| | | |
|---|---|---|
| secure, staff secure or in-network RTC placement. The NOP is the means by which ORR informs a child of the reason for step-up.<br><br>Ex. 2 [ORR MAP] § 1.2.4 at 65; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 65:2–6, 79:1–5, 330:17–22; Ex. 35 [Smith Dep. Tr.] at 129:7–15; Ex. 19 [David Dep. Tr.] at 145:3–10, 147:10–20; Ex. 23 [Fink Dep. Tr.] at 83:19–24; Ex. 16 [Contreras Dep. Tr.] at 116:1–3 | restrictive setting (secure, staff-secure or RTC facility), he/she is provided with a *Notice of Placement in Restrictive Setting* in a language that he/she understands within a reasonable time either *before* or *after* ORR's placement decision." ORR Guide § 1.4.2 (emphasis added). | Defendants accurately quote the ORR Policy Guide and in practice ORR requires such notice occur after step-up has taken place. Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 65:2–6 ("They're provided [the NOP] *at the time of their admission* and then subsequently after a 30-day review has been completed." (emphasis added)), 330:17–22 ("Q. Okay. When a child is stepped up and receives the first Notice of Placement in a Restrictive Setting, how soon *after the step up* occurs does ORR require the notice to be provided to the child? A. Within 48 hours of placement." (emphasis added)); Ex. 35 [Smith Dep. Tr.] at 129:7–15 (Q. When does the child receive the notice of placement? A. When *they arrive at the facility* and then every 30 days." (emphasis added)); Ex. 19 [David Dep. Tr.] at 145:3–10 (NOP provided to minor "after the transfer"); Ex. 23 [Fink Dep. Tr.] at 83:19–24 ("*when a child enters* one of those levels of |

160.

| | | | care that requires a notice of placement, they're required to inform that minor within 48 hours of placement of *why they're placed in that particular level of care*, be it a staff secure or a TC or secure." (emphasis added)); Ex. 16 [Contreras Dep. Tr.] at 116:1–3 ("*During our intake meeting* where we provide them the notice of placement and reason for placement in secure…" (emphasis added)); DX-33 [Ray Dep. Tr.] at 196:11–14 (Case Manager is responsible for giving a NOP to the child within 48 hours *after* their placement (emphasis added)); *see also* Ex. 2 [ORR MAP] § 1.4.2 at 95 ("The UAC is provided specific information regarding the placement decision in a language he or she understands *upon arrival at the receiving care provider facility*, which is included in the summary portion of the Notice of Placement in Restrictive Setting." (emphasis added)). |
|---|---|---|---|

161.

| | | | |
|---|---|---|---|
| 184. | ORR's procedures do not require that a child receive a NOP within 48 hours of placement in TAR or RTC facilities (*i.e.,* out-of-network facilities).<br><br>Ex. 2 [ORR MAP] § 1.2.4 at 65; *id.* § 1.4.6 at 100–01 (no reference to the same "within 48-hour" language). | Disputed. It is ORR's policy and practice that when a UAC is stepped up to a more restrictive setting, he/she is provided with a NOP of the grounds for their placement in a language that he/she understands within a reasonable time (48 hours) either before or after the placement. ORR Guide § 1.4.2; Defs.' U.F. ¶ 54. | **Remains Undisputed.**<br>Defendants' assertion regarding ORR's policy and practice is irrelevant to and fails to rebut Plaintiffs' statement regarding ORR procedures outlined in the ORR MAP.<br><br>Moreover, ORR Policy says nothing about the notice being provided "within 48 hours" and does not mention "out-of-network" facilities. Ex. 1 [ORR Policy Guide] § 1.4.2 at 29. |
| 185. | A child placed in a therapeutic group home does not receive a NOP.<br><br>Ex. 2 [ORR MAP] § 1.2.4 at 65–66 (no mention of whether a child in a therapeutic group home would receive a NOP); Ex. 23 [Fink Dep. Tr.] at 151:5–8 | Undisputed to the extent a therapeutic group home is no more restrictive than non-secure shelters and thus, ORR MAP § 1.2.4 "Secure and Staff Secure Care Provider Facilities" requirements would not apply. DX-67 [Biswas 30(b)(6) Dep. Supp.] 328:16-25 ("A therapeutic group home . . . [is] a smaller scale shelter that . . . has a therapeutic component to it so more clinical services that might be more -- that are more specialized or targeted to a particular population."); DX-71 [De La Cruz Dep. Supp.] 45:24-46:3 (Therapeutic group home more closely aligned with long-term | **Undisputed.**<br>Defendants do not dispute UF ¶ 185. Defendants' response that a therapeutic group home is non-secure does not change the fact that a child placed in a therapeutic group home does not receive a NOP. Ex. 2 [ORR MAP] § 1.2.4 at 65–66 (no mention of whether a child in a therapeutic group home would receive a NOP); Ex. 23 [Fink Dep. Tr.] at 151:5–8 (FFS Supervisor of Special Populations testified that therapeutic group |

| | | | |
|---|---|---|---|
| | | foster care, but with a more therapeutic setting or milieu.). *See* Defs.' Evidentiary Objection ¶ 185. | home placements do not require an NOP). *See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 185. |
| 186. | The NOP is supposed to inform a child in a restrictive setting of the reason for the placement and their right to challenge the placement. Ex. 41 [Ray Dep. Ex. 115] at 122728; *see* Ex. 1 [ORR Policy Guide] § 1.2.4 at 24 ("ORR provides the youth notice of the reasons for placement in a secure or staff secure facility."); Ex. 18 [De La Cruz Dep. Tr.] at 154:1–16; Ex. 33 [Ray Dep. Tr.] at 85:5–11 | Undisputed. | **Undisputed.** |
| 187. | The NOP states that: "ORR will review your placement at a minimum, every 30 days to determine whether your placement in a restrictive level of care is still necessary. If you remain in a secure facility or RTC after 30 days, you may | Undisputed. | **Undisputed.** |

163.

| | | | |
|---|---|---|---|
| | request that the ORR Director reconsider your placement. For more information on the process, please ask your case manager. If you believe you have not been properly placed or that you have been treated improperly, you may also ask a Federal District court to review your case. You may call a lawyer to assist you." Joint Stip. ¶ 76 | | |
| 188. | Stepped up children do not always receive a NOP within 48 hours after arrival at a restrictive placement. Ex. 16 [Contreras Dep. Tr.] at 119:17–20; Ex. 33 [Ray Dep. Ex. 119]; Ex. 126 at 1948 ▮▮▮▮▮▮▮▮ ); Ex. 123 at 1928 ▮▮▮▮▮▮▮▮ ); Ex. 124 at 1934, 1936 (▮▮▮▮ | Disputed to the extent it implies that it is common for stepped-up children not to receive a NOP within 48 hours of placement in a restrictive setting, or that ORR has a practice of not providing notice within 48 hours. Ex. 16 [Contreras Dep. Tr.] at 119:17-120:2 ("Q: Has there ever been an instance when a child has not received the notice of placement within the initial 48 hours? A: Yes. Q: And do you remember how many times that's happened? A: Once or twice. Q: Do you know why that happened? A: Their arrival occurred over a long weekend or something related to case managers not | **Remains Undisputed.** Defendants attempt to create a dispute of fact by proposing an implication that does not exist and therefore have not created a genuine dispute of fact. *See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 168; *see also* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 2. |

164.



| | | being – or not during business hours."); DX-10 [Biswas Decl.] ¶ 52 ("When ORR first started doing the compliance reviews [for secure placements, including timely notice], it did return noncompliant cases, but since then, the reviews have resulted in almost 100 percent compliance."). *See also* DX-11 [ORR Juvenile Coord. Rep.] at 30 (Flores compliance team reviews every NOP to ensure compliance); DX-74 [Fink Dep. Supp.] 85:13-16 (noncompliance more regarding uploading and reporting NOPs to ORR); Defs.' U.F. ¶ 59 ("In November 2018, when ORR first started doing its compliance reviews through the monitoring panel, there were noncompliant cases, but since then, the reviews have resulted in almost 100 percent compliance for secure placements."). *See* Defs.' Evidentiary Objection ¶ 188. | |
| 189. | Stepped up children do not consistently know or understand the reasons for restrictive placement. Ex. 24 [Heath Depo. Tr.] at 283:21– 284:15; Ex. 70 [K.S.G.P. Decl.] ¶ 2; Ex. 82 [Y.A.M.S. Decl.] ¶ 42; Ex 65 | Disputed to the extent Plaintiffs' use of the phrase "do not consistently know or understand" is speculative. It is ORR's practice and policy that when a UAC is stepped up to a more restrictive setting, the UAC is provided with a NOP regarding the grounds for their placement in a language that he/she understands. Furthermore, the | **Remains Undisputed.** None of Defendants' cited evidence or assertions create a genuine dispute of fact that children do not consistently know or understand the reasons for their placement, especially where the NOP is not always provided in a |

165.

| | | |
|---|---|---|
| [D.S.J.L. Decl.] ¶ 4; Ex. 44 [Ray Dep. Ex. 119] at 1264 (noting non- compliance issue of "[n]ot citing evidence for placement basis in NOP") | assigned case manager at the ORR grantee care facility reviews the NOP with the UAC in a language the UAC understands, which the minor is asked to sign and date. The case manager is available to answer the child's questions about placement and reunification efforts, among others. Defs.' U.F. ¶¶ 54, 56, 57; DX-09 [Antkowiak Decl.] ¶¶ 26, 27 (describing what is contained in the NOP). *See also* DX-50 [Fink MAS Decl.] ¶ 27 (█████ ████████████████████, DX-44 [Fink JD Decl.] ¶¶ 15-17 ██████ █████████████████████████ ████████████████████████). The declarations that Plaintiffs cite are from children who have long, complex and severe mental health histories and for whom acute psychiatric symptoms made them a danger to themselves or others, and necessitated their immediate step-up to an RTC for safety reasons. The children had an opportunity to participate in meetings with care provider staff and to ask questions about their own care and need for intensive psychiatric treatment, as evidenced by their signatures on acute case review meeting notes, although the severity | language the minor understands, does not always include a summary of the reasons for placement, and does not always include the evidence for placement basis. Ex. 44 [Ray Dep. Ex. 119] at 1264 (noting non-compliance issues of not (1) "providing a NOP every 30 days," (2) "providing a NOP written in a language the minor understands," (3) "providing a summary in the NOP," (4) "providing a summary in the NOP in a language the minor understands," and (5) "citing evidence for placement basis in NOP").

Defendants' contention that the declarations that Plaintiffs cite to are from children with complex cases and possibly severe mental health issues that may impact their ability to understand does not change the fact that those individuals did not understand the reasons for restrictive placement. |

166.

of their mental illness may have compromised their full understanding. *See, e.g.,* DX-84 at 385-409 (███████); DX-84 at 142-48, 410-26 (███████)

*See* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 189.



167.



; DX-84 at 43-45, 371-84

(

)

*See* Defs.' Evidentiary Objection ¶ 189.

| 190. | Stepped up children are not consistently informed and sometimes do not understand that they may contest restrictive placement.<br><br>Ex. 33 [Ray Dep. Tr.] at 89:14–90:4, 92:8–93:5, 94:17–95:3, 95:18–96:1, 212:16–213:15, 216:7-25; 218:12-23; Ex. 40 [Ray Dep. Ex. 113] at 1120 ("No staff were aware of | Disputed. It is ORR's practice and policy that when a UAC is stepped up to a more restrictive setting, he/she is provided with a NOP that explains, among others, the UACs ability to challenge their placement before the ORR Director or in federal court, in a language that he/she understands. Furthermore, the assigned case manager at the ORR grantee care facility reviews the NOP with the UAC in a language the UAC | **<u>Remains Undisputed.</u>**<br>Defendants' assertion regarding ORR policy and intended practice is irrelevant to and fails to rebut Plaintiffs' statement regarding the experience of minors in ORR custody, whose reports that they are not consistently informed that they may contest placement are confirmed by facility staff. |

168.

| | | | |
|---|---|---|---|
| | minor's right to challenge secure placement . . . No one has been communicating this right to minors"); Ex. 24 [Heath Dep. Tr.] at 283:21-284:15; Ex. 65 [J.M.R.R. Decl.] ¶ 4; Ex. 67 [K.L.F. Decl.] ¶ 8; Ex. 62 [D.S.J.L. Decl.] ¶ 4 | understands, which the minor is asked to sign and date.<br><br>Defs.' U.F. ¶¶ 54, 56, 57, 59; DX-09 [Antkowiak Decl.] ¶¶ 26, 27 (describing what is contained in the NOP); DX-10 [Biswas Decl.] ¶ 52 ("When ORR first started doing the compliance reviews [for secure placements, including timely notice], it did return noncompliant cases, but since then, the reviews have resulted in almost 100 percent compliance."). | None of Defendants' cited evidence or statements dispute that children are not consistently informed and sometimes do not understand that they may contest restrictive placement. Ex. 33 [Ray Dep. Tr.] at 212:16–213:8 (ORR Policy Analyst agreeing that even if provided a NOP, children may not understand the reasons for their placement, their right to challenge the placement, or their right to file a federal lawsuit and that these are "very difficult concepts for children to understand.") |
| 191. | ORR's written policy does not require that a child's NOP be provided to the child's parents or other potential sponsors.<br><br>Joint Stip. ¶ 77 | Undisputed. | **Undisputed.** |
| 192. | ORR's policy does not require that the NOP include documents or other evidence supporting the step-up decision.<br><br>Ex. 13 [Biswas Dep. Tr.] at 69:16– 70:9; *see* Ex. 1 [ORR | Undisputed. However, as a matter of practice, "secure placements such as Shenandoah Valley Juvenile Center include in the NOP the full summary of information presented by the case manager to the FFS used to make the decision. Thus, the NOP in these cases contains all the information that the case manager and case | **Undisputed.** Defendants do not dispute Plaintiffs' UF ¶ 192. Defendants' additional statements with respect to ORR's practice are irrelevant to Plaintiffs' UF ¶ 192. |

169.

| | | | |
|---|---|---|---|
| | Policy Guide] § 1.2.4 at 24 (no reference to including these documents or evidence); Ex. 2 [ORR MAP] § 1.2.4, at 65–66 (same); *id.* § 1.4.2 at 91 (same); *id.* § 1.4.2, Fig. 1.12 at 94 (evidence used for 30-day review available upon demand by UAC's attorney); *id.* at 123–24 | coordinator reviewed in recommending whether a child should be stepped up or remain in a more restrictive placement." DX-10 [Biswas Decl.] ¶ 43. In addition, all information used in assessing a 30-day Case Review decision is shared with the UAC's attorney of record, legal service provider or Child Advocate on demand and does not require a prior Authorization for Release of Records, only proof of representation. Ex. 2 [ORR MAP] at § 1.4.2 at 89. | |
| 193. | ORR's policy does not afford children an opportunity to challenge a step-up prior to placement in a restrictive setting. <br><br> Ex. 5 [RFA 1st Set] No. 93 at 506–07; Ex. 1 [ORR Policy Guide § 1 at 22–33; *id.* § 1.4.7 at 30; Ex. 19 [David Dep. Tr.] at 143:10-14; Ex. 55 [Londino Expert Rep.] ¶ 14 at 1369 | Disputed. Before a child is stepped up, the case manager will have met with the child, often repeatedly, to discuss the child's placement and reunification efforts, and it is during that time that the child would provide information regarding step-up. <br><br> DX-62 [Dr. Londino Expert Rep.] ¶ 14; Ex. 35 [Smith Dep. Tr.] at 97:7-16 ("The step up wouldn't just happen out of nowhere. There would be behaviors and rationale for meeting a step-up criteria, so the child would have been probably on a behavioral plan or working with their case manager to try to mitigate the need to be stepped up."); DX-26 [Heath Dep.] 76:9-13 ("Q: Aside from your understanding that the child is | **Remains Undisputed.** Defendants offer no evidence to dispute Plaintiffs' UF ¶ 193 and therefore there is no genuine dispute. Whether a child is able to discuss his or her placement with his or her Case Manager is not information relevant to Plaintiffs' UF ¶ 193, which states that *ORR's policy* does not afford children an opportunity to *challenge* a step-up prior to placement in a restrictive setting. Ex. 5 [RFA 1st Set] No. 93 at 507 ("The policy does not require that a hearing take place before the transfer occurs."); Ex. 1 |

170.

| | | notified, is the child involved in the staffing of a step-up decision? A: Yes. Q: Is that always the case? A: When it's feasible, yes."). *See also* Fact Response ¶ 197; Defs.' U.F. ¶ 50 ("ORR's practice [is] that when assessing a possible transfer, care providers must consider[, among others,] … information from stakeholders such as the UAC's legal service provider, attorney of record, or child advocate."). | [ORR Policy Guide] § 1.4.7 at 30 ("*After 30 days of placement in a secure or RTC facility*, UAC may request the ORR Director…to reconsider their placement." (emphasis added)). |
|---|---|---|---|
| 194. | In practice, ORR does not provide an opportunity to challenge a step-up prior to placement in a restrictive setting.<br><br>ECF 144 [Answer] ¶¶ 52, 81, 90; Ex. 79 [P.D.O.P. Decl.] ¶ 4; Ex. 66 [J.S.C.M. Decl.] ¶ 6-7; Ex. 60 [C.J.A.L. Decl.] ¶ 7; Ex. 61 [D.D.R.O. Decl.] ¶ 3; Ex. 64 [H.A.R.M. Decl.] ¶ 5 | Undisputed. However, before a child is stepped up, the case manager will have met with the child, often repeatedly, to discuss the child's placement and reunification efforts, and it is during that time that the child would provide information regarding step-up.<br><br>DX-62 [Dr. Londino Expert Rep.] ¶ 14; DX-28 [Smith Dep.] 97:7-16 ("The step up wouldn't just happen out of nowhere. There would be behaviors and rationale for meeting a step-up criteria, so the child would have been probably on a behavioral plan or working with their case manager to try to mitigate the need to be stepped up."); DX-26 [Heath Dep.] 76:9-13 ("Q: Aside from your understanding that the child is notified, is the child involved in the staffing | **Undisputed.**<br>Defendants do not dispute Plaintiffs' UF ¶ 194.<br><br>Defendants' statement regarding whether a child is able to discuss his or her placement with his or her Case Manager does not change the fact that in practice, ORR does not provide an opportunity to challenge a step-up prior to placement in a restrictive setting. ECF No. 144 [Answer] ¶ 52 (With respect to minor Miguel Angel S. "Defendants admit that ORR did not provide Miguel Angel S. with the opportunity to be heard before he was transferred to Yolo…."), ¶ 81 (With respect to Sirena P., |

171.

| | | | |
|---|---|---|---|
| | | of a step-up decision? A: Yes. Q: Is that always the case? A: When it's feasible, yes."). *See also* Fact Response ¶ 197. | "Defendants admit that ORR transferred Sirena P. to Shiloh without providing a formal opportunity to be heard before being transferred…"), ¶ 90 (with respect to Benjamin F., "Defendants admit that Benjamin F. did not have an opportunity to be formally heard concerning this transfer."). |
| 195. | Class Representatives Lucas R., Gabriela N., Daniela Marisol, Sirena P., and Benjamin F. were stepped up to an RTC, and Jaime D. was stepped up to secure juvenile detention without being provided an evidentiary hearing to challenge the step-up decision.<br><br>Joint Stip. ¶ 79 | Undisputed. | **<u>Undisputed.</u>** |
| 196. | ORR's policy does not allow children to present evidence on their own behalf before they are stepped up.<br>Ex. 1 [ORR Policy Guide] § 1 at 22–33; Ex. 5 [RFA 1st Set] No. 99 at 510–12; Ex. 29 | Disputed. Before a child is stepped up, the case manager will have met with the child, often repeatedly, to discuss the child's placement and reunification efforts, and it is during that time that the child would | **<u>Remains Undisputed.</u>**<br>Defendants' cited evidence and response does not create a genuine dispute of fact. Plaintiffs' UF ¶ 196 does not address whether a child is able to discuss his or her placement with his or her Case Manager. |

172.

| | | | |
|---|---|---|---|
| | [Nathan-Pineau Dep. Tr.] at 17:8–14; Ex. 36 [Stuart Dep. Tr.] at 100:13–22 | provide information on their own behalf regarding step-up.<br><br>DX-28 [Smith Dep.] 97:7-16 ("The step up wouldn't just happen out of nowhere. There would be behaviors and rationale for meeting a step-up criteria, so the child would have been probably on a behavioral plan or working with their case manager to try to mitigate the need to be stepped up."); DX-26 [Heath Dep.] 76:9-13 ("Q. Aside from your understanding that the child is notified, is the child involved in the staffing of a step-up decision? A. Yes. Q. Is that always the case? A. When it's feasible, yes."). *See also* DX-62 [Dr. Londino Expert Rep.] ¶ 14 (ORR's policy concerning step-ups in care to restrictive settings for UACs "with significant mental health needs are consistent with the management of acute mental health needs in domestic children in foster care, where assent by the minor is not required for placement, and decisions are made by the state child welfare agency to prioritize safety."); Fact Response ¶ 197; Defs.' U.F. ¶ 50. | Plaintiffs' UF ¶ 196 states that *ORR's policy* does not allow children to present evidence on their own behalf before they are stepped up. Ex. 1 [ORR Policy Guide] § 1 at 22–33 (no reference to a child's ability to present evidence on their own prior to step up); Ex. 5 [RFA 1st Set] No. 99 at 510–11 (with respect to whether ORR policy and practice allowed children to present evidence and witnesses prior to step up, "Defendants admit that unaccompanied alien children do not have the opportunity to present witnesses or evidence before they are stepped up to a more restrictive setting."). |
| 197. | ORR's policy does not provide children with the opportunity to | Disputed. Before a child is stepped up, the case manager will have met with the child, | **Remains Undisputed.** |

173.

inspect or rebut adverse evidence before step-up.

Ex. 1 [ORR Policy Guide] § 1 at 22–33; ; Ex. 35 [Smith Dep. Tr.] at 97:21– 99:17; Ex. 36 [Stuart Dep. Tr.] at 100:13-22; Ex. 33 [Ray Dep. Tr.] at 202:10–22; Ex. 24 [Heath Dep. Tr.] at 85:16–23, 86:2–9; Ex. 19 [David Dep. Tr.] at 176:2–14

often repeatedly, to discuss the child's placement and reunification efforts, and it is during that time that the child would provide information regarding step-up.

DX-62 [Dr. Londino Expert Rep.] ¶ 14; DX-28 [Smith Dep.] 97:7-16 ("The step up wouldn't just happen out of nowhere. There would be behaviors and rationale for meeting a step-up criteria, so the child would have been probably on a behavioral plan or working with their case manager to try to mitigate the need to be stepped up."); DX-26 [Heath Dep.] 76:9-13 ("Q: Aside from your understanding that the child is notified, is the child involved in the staffing of a step-up decision? A: Yes. Q. Is that always the case? A: When it's feasible, yes."); DX-67 [Biswas 30(b)(6) Dep. Supp.] 54:25-55:4-7 (Leading up to 30-day review, the child is "meeting with their case manager who goes over their case with the child and talks to them about, you know, their behavior and that sort of thing."). *See, e.g.,* DX-52 [Vergara DMT Decl.] ¶¶ 34 ██████████████████████████ ██████████████████████████ , 41 (at

Defendants' cited evidence and response does not create a genuine dispute of fact. Plaintiffs' UF ¶ 197 does not address whether a child is able to discuss his or her placement with his or her Case Manager. Plaintiffs' UF ¶ 197 states that *ORR's policy* does not provide children with the opportunity to inspect or rebut adverse evidence before step-up. Ex. 1 [ORR Policy Guide] § 1 at 22–33 (no reference to a child's ability to inspect or rebut adverse evidence prior to step up); Ex. 19 [David Dep. Tr.] at 176:2–7 ("There's no policy in allowing a child to rebut information.").

Plaintiffs further respond that evidence cited by Defendants is inadmissible. *See* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 29; *see also* Plaintiffs' Objections to Opposition ¶¶ 9, 14.

174.

| | | | |
|---|---|---|---|
| | | Shiloh Daniela Marisol T. met with her Case Manager on a weekly basis), 47 (her placement was sometimes reviewed weekly), 54 (Daniela Marison T. met with her case manager on at least a weekly basis); DX-52 [Vergara GN Decl.] ¶¶ 28, 42, 44; DX-50 [Fink MAS Decl.] ¶ 16; DX-41 [De La Cruz LR Decl.] ¶¶ 8, 30, 35. | |
| 198. | Class Representatives Lucas R., Gabriela N., Daniela Marisol T., Sirena P., and Benjamin F. were stepped up to an RTC, and Jaime D. was stepped up to secure juvenile detention without being provided an opportunity to inspect or rebut adverse evidence in an evidentiary hearing regarding step- up or placement in a restrictive setting.<br><br>Joint Stip. ¶ 80 | Undisputed. | **Undisputed.** |
| 199. | ORR does not provide children the opportunity to cross-examine witnesses in an evidentiary hearing regarding | Undisputed with respect to formal cross-examination. *But see* Fact Response ¶ 216 (discussing Placement Review Panel hearing in which minor may provide evidence and review evidence against him or her). | **Undisputed.** Defendants attempt to dispute in part a fact to which they have stipulated. *See* Joint Stip. ¶ 81. |

175.

| | | | |
|---|---|---|---|
| | step-up or placement in a restrictive setting.<br><br>Joint Stip. ¶ 81 | | |
| 200. | Class Representatives Lucas R., Gabriela N., Daniela Marisol, Sirena P., and Benjamin F. were stepped up to an RTC, and Jaime D. was stepped up to secure juvenile detention without being provided an opportunity to cross- examine witnesses in an evidentiary hearing regarding step-up or placement in a restrictive setting.<br><br>Joint Stip. ¶ 82 | Undisputed. | **Undisputed.** |
| 201. | ORR  does not permit children to request reconsideration or otherwise challenge step-up until after they have spent 30 days in a secure facility or RTC.<br><br>Ex. 5 [RFA 1st Set] No. 99 at 510–12; Ex. 6 [RFA 2nd Set] No. 105 at 528–29; *id.* No. 120 at 536; Ex. 1[ORR Policy | Disputed. ORR continually assesses minors in its care and documents significant updates in its records. There is no prohibition against children requesting reconsideration or otherwise challenging a step-up until after they have spent 30 days in a secure facility or RTC. Furthermore, as Plaintiffs negotiated in the *Flores* Settlement Agreement, a UAC may challenge placement by seeking judicial review in federal court at any time. UACs | **Remains Undisputed.**<br>Plaintiffs' UF ¶ 201 states that ORR policy does not permit children to request reconsideration or otherwise challenge step-up until after they have spent 30 days in a secure facility or RTC. While it is true that ORR does not expressly *prohibit* this request, ORR policy also does not provide for reconsideration. Defendants do |

176.

| | | |
|---|---|---|
| Guide] § 1.4.7 at 30; Ex. 2 [ORR MAP] at Appendix 1.3 Notice of Placement in Restrictive Setting 123–24; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 77:23–78:7; Ex. 24 [Heath Dep. Tr.] at 140:3–11; Ex. 19 [David Dep. Tr.] at 157:12–19; Ex. 55 [Londino Expert Rep.] ¶ 14 at 1369 | may also request a bond hearing to challenge their placement in secure and staff secure facilities if they have been placed there based upon a finding of dangerousness to self or others.<br><br>Defs.' U.F. ¶¶ 63, 64; ORR Guide §§ 1.4.7; 2.9; Ex. 13 [Biswas 30(b)(6) Dep.] 73:25–74:13. *See* Fact Response ¶¶ 202, 216. | not dispute this. Ex. 5 [RFA 1st Set] No. 99 at 510–11 (With respect to whether ORR policy and practice allowed children to present evidence and witnesses prior to step up, "Defendants admit that unaccompanied alien children do not have the opportunity to present witnesses or evidence before they are stepped up to a more restrictive setting."); Ex. 6 [RFA 2nd Set] No. 105 at 528–29 (ORR Policy Guide section 1.4.7 provides "after 30 days in a secure or RTC facility, a UAC may request that the ORR Director, or Director's designee, reconsider the placement."); *id.* No. 120 at 536; Ex. 1 [ORR Policy Guide] § 1.4.7 at 30 (same); DX-02 [Biswas 30(b)(6) Dep. Tr.] at 77:23–78:7 (same); Ex. 24 [Heath Dep. Tr.] at 140:3–11 (same); Ex. 19 [David Dep. Tr.] at 157:12–19 (same); Ex. 2 [ORR MAP] Appendix 1.3 Notice of Placement in Restrictive Setting at 123–24 ("If you remain in secure facility or RTC after 30 days, you may |

177.

request that the ORR Director reconsider your placement.").

Defendants' assertion with respect to judicial review per the *Flores* Settlement Agreement is irrelevant to Plaintiffs' statement regarding ORR Policy. ORR Policy does not mention judicial review per the *Flores* Settlement Agreement. Ex. 1 [ORR Policy Guide] § 1 at 22–33.

A *Flores* bond hearing provides a UAC with a determination regarding dangerousness not an opportunity to challenge a step-up. And as Defendants' own response asserts, it only provides this bond opportunity for UACs in staff secure and secure facilities, *not* RTC's. *Flores* bond hearings also have no determinative effect on placement and therefore are irrelevant to Plaintiffs' UF ¶ 201 regarding opportunities to challenge placement. *See* Plaintiffs' UF ¶ 205; ECF No. 263-2 [Defendants' Statement of

178.

| | | | Uncontroverted Facts and Conclusions of Law] ¶ 66. |
|---|---|---|---|
| 202. | ORR policy does not afford children an opportunity to request reconsideration or otherwise challenge step-up to staff-secure, therapeutic staff-secure facilities or therapeutic group homes.<br><br>Ex. 1 [ORR Policy Guide] § 1.4.7 at 30 (only referring to ORR director review option for secure and RTC placements); Ex. 2 [ORR MAP] § 1.4.7 at 102 (same); Ex. 24 [Heath Dep. Tr.] at 133:20–134:11 | Disputed. As Plaintiffs negotiated in the *Flores* Settlement Agreement, a UAC may challenge placement by seeking judicial review in federal court at any time. UACs may also request a bond hearing to challenge their placement in secure and staff secure facilities if they have been placed there based upon a finding of dangerousness to self or others. Furthermore, it is ORR's policy and practice that UACs placed in a secure facility or a residential treatment center can challenge that placement by the ORR Director or the ORR Director's designee after 30 days of placement.<br><br>Defs.' U.F. ¶¶ 63, 64, 65; ORR Guide §§ 1.4.7; 2.9. *See* Fact Response ¶¶ 203, 216.<br><br>*See* Defs.' Evidentiary Objection ¶ 202. | **Remains Undisputed.** Defendants' cited evidence and response does not create a genuine dispute of fact.<br><br>Defendants' assertion with respect to judicial review per the *Flores* Settlement Agreement and *Flores* bond hearings are irrelevant. *See* Plaintiffs' Response to UF ¶ 201.<br><br>Defendants' final statement with respect to ORR's policy allowing challenges to placements in secure and RTC facilities further supports Plaintiffs statement that such opportunity is not afford to children placed in therapeutic staff-secure, staff-secure and therapeutic group homes.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 202. |

179.

| | | | |
|---|---|---|---|
| 203. | Stepped up children rarely seek reconsideration or otherwise challenge step-up through ORR's director review process.

Ex. 13 [Biswas 30(b)(6) Dep.] 94:5– 14; Ex. 24 [Heath Dep. Tr.] at 130:13–19, 137:24–138:5; Ex. 35 [Smith Dep. Tr.] at 132:11–18; Ex. 14 [Castaneda Dep. Tr.] at 81:12–82:20; Ex. 19 [David Dep. Tr.] at 160:7–18; Ex. 23 [Fink Dep. Tr.] at 155:2–12 | Disputed to the extent Plaintiffs' use of the term "rarely" is a statement of opinion, not fact.

*See* Defs.' Evidentiary Objection ¶ 203. | **Remains Undisputed.** Plaintiffs' UF ¶ 203 is not a statement of opinion. Ex. 13 [Biswas 30(b)(6) Dep.] 94:5–9 (not many UACs request ORR director to reconsider their placement), 94:10–14 (doesn't recall any request for reconsideration in the past year); Ex. 24 [Heath Dep. Tr.] at 130:8–19 (only aware of two challenges to placement in 10 years); Ex. 35 [Smith Dep. Tr.] at 132:11–14 (it is not often that children challenge their restrictive placement by seeking ORR director review).

*See* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 203. |
| 204. | The request for reconsideration by the ORR Director does not include a hearing with the right to present evidence or confront adverse evidence.

Ex. 1 [ORR Policy Guide] § 1.4.7 at 30 (no mention of right to request hearing or any | Disputed. The Placement Review Panel (PRP) comprises three ORR staff-personnel with several years of professional experience in the fields of child welfare, mental health, and related policy. ORR Director review occurs through the PRP and ensures that the UAC (or his/her attorney of record) reviews any evidence supporting the UACs continued placement | **Remains Undisputed.** Defendants' references to the PRP pilot program should be disregarded. *See* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶¶ 1–2.

Defendants have no policy implementing the alleged program, |

180.

| | | | |
|---|---|---|---|
| | form of hearing with right to present evidence or confront evidence); compare with *id.* § 2.7.8 at 50 (when appealing a denial of release to a parent or legal guardian, policy is clear that the person challenging the decision can request a hearing with an opportunity to present evidence and testimony) | at the secure setting. UACs are permitted to provide the PRP with a written statement and/or request a hearing and it is the UACs decision whether to have either a written statement or a hearing or both. After reviewing the evidence, the PRP provides the UAC with a written decision regarding their placement.<br><br>DX-10 [Biswas Decl.] ¶ 59; DX-11 [ORR Juvenile Coord. Rep.] at 32; Defs.' U.F. ¶¶ 67-74. | and it is not referenced in ORR's Policy Guide nor its MAP. *See* Ex. 1 [ORR Policy Guide] § 1 at 22–23; Ex. 2 [ORR MAP] § 1 at 58–133. There is no reference to a PRP program or a process by which a UAC and/or his attorney can request a hearing concerning continued placement at an RTC or secure facility. *See id.*<br><br>*See* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 2. |
| 205. | Although a child who ORR steps up may request a *Flores* bond hearing before an immigration judge, the outcome of the bond hearing has no determinative outcome on the child's level of placement in ORR custody.<br><br>Ex. 6 [RFA 2nd Set] No. 105 at 528–29 ("ORR…takes into consideration the immigration judge's decision"); Ex. 1 [ORR Policy Guide] § 1.4.2 at 28–29 (same); *id.* § 2.9 at 54 ("An | Disputed. While ORR is not bound by the immigration judge's bond hearing determination, ORR takes the immigration judge's decision into consideration in determining whether a UAC should be stepped down.<br><br>Defs.' U.F. ¶ 66. *See also* DX-02 [Biswas 30(b)(6) Dep.] 106:8-13 (An immigration judge's decision that a child is not too dangerous to be released is "considered as evidence that the child is not a danger to self or others" for purposes of placement.).<br><br>*See* Defs.' Evidentiary Objection ¶ 205. | **Remains Undisputed.**<br>Defendants' cited evidence and response does not create a genuine dispute of fact. Defendants' assertion that an immigration judge's decision is considered but that ORR is not bound by it supports rather than disputes<br><br>Plaintiffs' statement that an immigration judge's decision has no determinative outcome on a child's level of placement. |

| | | | |
|---|---|---|---|
| | immigration judge does not rule on any of the following…the unaccompanied alien child's placement… while in ORR custody."); Ex. 29 [Nathan-Pineau Dep. Tr.] at 47:9–23; Ex. 42 [Ray Dep. Ex. 116] at 1257 ("The judge's determination does not automatically change the child's placement in a particular care provider facility) | | *See* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 205. |
| 206. | Stepped up children rarely, if ever, seek federal court review of restrictive placement without the assistance of counsel. There were only 9 instances of habeas petitions found within the Defendants hundreds of thousands of produced documents.<br><br>Ex. 86 at 1579; Ex. 87 at 1583; Ex. 88 at 1586; Ex. 89 at 1589; Ex. 90 at 1593; Ex. 91 at 1596; Ex. 108 at 1842–43 ▮▮▮▮▮; Ex. 110 | Disputed to the extent Plaintiffs' use of the phrase "rarely, if ever" is a statement of opinion, not fact. Further disputed as Plaintiffs' assertion is based on a limited universe of documents produced in discovery based largely on search terms (proposed by Plaintiffs) for electronic discovery negotiated between the parties that cannot purport to capture the entire universe of habeas petitions filed by minors in ORR custody.<br><br>*See* Defs.' Evidentiary Objection ¶ 206. | **<u>Remains Undisputed.</u>** Plaintiffs' statement is not an opinion but a statement of fact with respect to the small number of habeas petitions found in Defendants' voluminous production. Plaintiffs' statement does not purport to capture the entire universe of habeas petitions filed by minors in ORR custody. Plaintiffs' statement clearly indicates that "[t]here were only 9 instances of habeas petitions found within the Defendants' hundreds of |

182.

| | | | |
|---|---|---|---|
| | at 1851 ▮▮▮▮▮ ▮▮▮▮ ; Ex. 98 at 1764 (subject line "BDAC habeas case") | | thousands of produced documents," and not that there were only 9 filed habeas petitions for all minors ever in ORR custody.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 206. |
| 207. | All 50 states and the District of Columbia require a hearing before a neutral factfinder before a child can be detained in a secure facility.<br><br>Ex. 54 [Expert Report of Professor Jessica Heldman ("Heldman Expert Rep.")] at 1356–57 | Disputed. Plaintiffs' cited report does not support Plaintiffs' assertion that all jurisdictions require a pre-placement, not post-placement, hearing. Ex. 54 [Heldman Expert Rep.] at 1356–57 ("[A]ll 50 states and the District of Columbia require a hearing before a neutral arbiter *to be held within 48 hours* of a juvenile being detained in a secure facility.") (emphasis added). *See also* DX-35 [Dr. Lubit Expert Rep.] ¶ 61 ("It is not standard practice for courts or other 'neutrals' to become involved before the person is even sent to a structured facility. This is especially the case with children.").<br><br>Further disputed to the extent it implies that the Juvenile Justice Delinquency Prevention Act, which governs the juvenile justice system, applies to ORR placement | **Remains Undisputed (with correction).** Plaintiffs' statement is corrected to reflect the cited evidence: All 50 states and the District of Columbia require a hearing before a neutral factfinder in order to detain a child in a secure facility. Ex. 54 [Heldman Expert Rep.] at 1356–57.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 207. |

183.

| | | decisions, rather than the TVPRA (particularly 8 U.S.C. § 1232(c)(2)(A) directing the Secretary to prescribe procedures for monthly review of secure placement), the Homeland Security Act, and the *Flores* Settlement Agreement.<br><br>*See* Defs.' Evidentiary Objection ¶ 207. | |
|---|---|---|---|
| 208. | A majority of states also require a hearing before a neutral factfinder before a child can be detained in a staff-secure facility.<br><br>Ex. 54 [Heldman Expert Rep.] at 1356–57 | Disputed. Plaintiffs' cited report is premised on an incorrect definition of "staff secure." The report defines "staff secure" as a "residential facilit[y] in which physical restriction is provided solely by staff." DX-82 [Heldman Expert Rep.] at p. 6. *See also* DX-70 [Heldman Dep. Supp.] 104:16-20 ("The staff secure facility would be one in which staff are primarily – or staff are given the ability to physically restrain children from leaving"). But, an ORR staff-secure facility employs no physical restraints of any kind. Rather, ORR staff-secure facilities maintain the same state licensing and physical set-up as a shelter, with the primary difference being a higher staff-to-minor ratio in the former. Plaintiffs point to *no* evidence that automatic hearings are required by the majority of states for such placements, let alone that automatic hearings are required by due | **Remains Undisputed (with correction).**<br>Plaintiffs' statement is corrected to reflect the cited evidence. A majority of states also require a hearing before a neutral factfinder in order to detain a child in a staff-secure facility. Ex. 54 [Heldman Expert Rep.] at 1357.<br><br>Defendants' cited evidence and response do not create a genuine dispute of fact, as Plaintiffs' statement does not address ORR staff-secure facilities. Plaintiffs' UF ¶ 208 relates to what a majority of states require in order to detain a child in a staff-secure facility.<br><br>Plaintiffs' statement also make no reference to automatic hearings, |

184.

| | | process. Defs.' U.F. ¶¶ 38, 39, 40. *See also* DX-12 [ORR Juvenile Coord. Rep.] at 27 ("staff-secure providers maintain identical type of licensure as a non-secure provider"); DX-10 [Biswas Decl.] ¶ 30 (staff-secure facilities provide heightened level of staff supervision, increased communication, and services to control problem behavior and prevent escape).<br><br>*See* Defs.' Evidentiary Objection ¶ 208. | and as such Defendants' assertions with respect to automatic hearings are irrelevant to the fact at issue.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 208. |
|---|---|---|---|
| 209. | ORR's Policy Guide requires that stepped up children receive a placement review at least once every thirty days they spend in a restrictive placement.<br><br>Joint Stip. ¶ 84; Ex. 1 [ORR Policy Guide] § 1.4.2 at 28 ("At least every 30 days, the care provider staff, in collaboration with the Case Coordinator and the ORR/FFS, reviews the placement of a UAC") | Undisputed. | **Undisputed.** |
| 210. | ORR's Policy Guide provides that step-downs may occur when ORR, in its discretion, | Undisputed. | **Undisputed.** |

185.

| | | | |
|---|---|---|---|
| | determines the UAC no longer poses a danger to himself or others, or no longer presents an escape risk (for staff secure step downs only). Joint Stip. ¶ 49; Ex. 1 [ORR Policy Guide] § 1.4.2 at 29 | | |
| 211. | Stepped up children may receive a placement review earlier than 30 days only if an FFS approves the request.<br><br>Ex. 1 [ORR Policy Guide] § 1.4.2 at 28 ("FFS may allow the review to take place earlier than 30 days") | Disputed to the extent it implies that ORR's policy and practice is for an FFS to reject requests for a placement review despite care providers showing that "new information makes clear an alternate placement is more appropriate so that the UAC may be transferred to a more appropriate care setting without delay." ORR Guide § 1.4.2. | **Remains Undisputed.** Defendants attempt to create a dispute of fact by proposing an implication that does not exist, and therefore have not created a genuine dispute of fact. |
| 212. | ORR sometimes fails to provide children with a 30-day placement review.<br><br>Ex. 44 [Ray Dep. Ex. 119] at 1264 (citing non-compliance issue of "[n]ot providing a NOP every 30 days"); Ex. 45 [Ray Dep. Ex. 120] at 1266 (email from policy analyst Faith Ray to FFS on 11/28/18 regarding a UAC who had not | Disputed to the extent it implies it is a common occurrence or that ORR's practice or policy is to fail to provide children with a 30-day placement review. *See* DX-11 [ORR Juvenile Coord. Rep.] at 30 (Flores compliance team reviews every NOP to ensure compliance); DX-74 [Fink Dep. Supp.] 26:7-11 (Flores compliance team), 85:13-16 (noncompliance more regarding uploading and reporting NOPs to ORR); DX-02 [Biswas 30(b)(6) Dep.] 53:19-24; 54:2-4 (same); DX-10 [Biswas Decl.] ¶ 51 | **Remains Undisputed.** Defendants attempt to create a dispute of fact by proposing an implication that does not exist and therefore have not created a genuine dispute of fact.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 212; *see also* Plaintiffs' Objections to |

186.

| | | | |
|---|---|---|---|
| | had a case review since 6/30/18) | (central office compliance team reviews placements in and step-ups to secure, staff-secure, and RTC facilities); Ex. 44 [Ray Dep. Ex. 119] at 1264 ("[I]ssues are now being addressed by the FFS and care provider staff."); Ex. 45 [Ray. Dep. Ex. 120] at 1266 (noting just one case where Portal failed to show a secure review).<br><br>*See* Defs.' Evidentiary Objection ¶ 212. | Defendants' Evidence (ECF No. 289-2) ¶ 2. |
| 213. | Stepped up children are not permitted to participate in or submit evidence for 30-day placement reviews.<br><br>Ex. 1 [ORR Policy Guide] § 1; Ex. 2 [ORR MAP] § 1; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 54:16–22, 92:2–7; Ex. 16 [Contreras Dep. Tr.] at 147:11–13; Ex. 6 [RFA 2nd Set] No. 114 at 532–33 ("Defendants admit that unaccompanied alien children do not have the opportunity to present witnesses or evidence before they are stepped down to a less restrictive setting") | Disputed. "Leading up to the time of the 30-day review, ORR requires that the case manager meet with the UAC on a weekly basis to go over the UAC's case with him or her, and discuss their behavior and improvements." DX-10 [Biswas Decl.] ¶ 48; Defs.' U.F. ¶ 61. The minor's account of improvements and their behaviors is evidence that the case manager, case coordinator, and FFS consider. *See also* Fact Response ¶ 204 (discussing PRP process).<br><br>*See* Defs.' Evidentiary Objection ¶ 213. | **Remains Undisputed.**<br>Defendants' cited evidence and response do not create a genuine dispute of fact. Defendants' assertions regarding Case Manager meetings with UACs leading up to the time of the 30-day review does not change the fact that children are not permitted to participate in the 30-day placement review staffing with the Case Manager, Case Coordinator and FFS. DX-10 [Biswas Decl.] ¶ 48 ("*Although the child does not participate in the 30-day review*, they are provided with the outcome and the evidence that is relied on in determining that continued placement is warranted." (emphasis added)); Ex. 19 [David |

187.

Dep. Tr.] at 153:8–24 (child's participation in 30 day review is limited to discussing his or her case with their Case Manager); DX-02 [Biswas 30(b)(6) Dep. Tr.] at 54:16–55:4 (besides discussing their case generally with their Case Manager, "they're told *at the end of the process* what their, what the decision has been made regarding their placement, and they're provided a notice of the reasons for either step-down or their continued placement." (emphasis added)).

Defendants cite no evidence to support their assertion that "a minor's account of improvements and their behaviors is evidence" considered in 30-day placements reviews. Moreover, Defendants themselves admit that unaccompanied alien children do not have the "opportunity to present witnesses *or evidence* before they are stepped down to a less restrictive setting." Ex. 6 [RFA

188.

| | | | |
|---|---|---|---|
| | | | 2nd Set] No. 114 at 533 (emphasis added).<br><br>As noted in Plaintiffs' Response to ¶ 204, Defendants' references to the PRP pilot program should be disregarded. *See* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 2; *see also* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 213; Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 23. |
| 214. | Class Representatives Lucas R., Gabriela N., Daniela Marisol, Sirena P., Jaime D., and Benjamin F. participated in case management meetings with their Case Managers, but they were not a part of the case staffing meetings that occurred between Case Managers, Clinicians, Case Coordinators, and the FFS to discuss their cases.<br><br>Joint Stip. ¶ 87 | Undisputed. | **Undisputed.** |

189.

| 215. | ORR does not require that children be allowed an opportunity to inspect the evidence ORR personnel will consider in conducting 30-day placement reviews.<br><br>Ex. 1 [ORR Policy Guide] § 1.4.2 at 28–29; Ex. 2 [ORR MAP] § 1.4.2 at 90–95; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 76:2–12; 73:25–74:6 | Disputed. "Leading up to the time of the 30-day review, ORR requires that the case manager meet with the UAC on a weekly basis to go over the UAC's case with him or her, and discuss their behavior and improvements. . . . Although the child does not participate in the 30-day review, they are provided with the outcome and the evidence that is relied on in determining that continued placement is warranted." Biswas Decl. ¶ 48; Defs.' U.F. ¶ 61. *See also* Fact Response ¶¶ 204 (discussing PRP process), 213. | <u>**Remains Undisputed.**</u><br>Defendants' cited evidence and response do not create a genuine dispute of fact. Defendants' assertion that children meet with their Case Managers and discuss their case does not change the fact that ORR does not require that children be allowed an *opportunity to inspect* the evidence that will be considered at the 30-day placement review. Similarly, that children may be provided the outcome and the evidence that is relied upon is irrelevant to the fact where the outcome and evidence is provided after a 30-day placement review. Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 54:18–22 ("they're told *at the end of the process* what their, what the decision has been made regarding their placement, and they're provided a notice of the reasons for either step-down or their continued placement." (emphasis added)). Plaintiffs' statement deals with an opportunity to inspect evidence that "will be |

190.

| | | | |
|---|---|---|---|
| | | | considered" not has been considered.<br><br>As noted in Plaintiffs' Response to ¶ 204, Defendants' references to the PRP pilot program should be disregarded. *See* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 1. |
| 216. | ORR does not allow children an opportunity to cross-examine witnesses who supply information considered in determining whether they will be stepped down.<br><br>Ex. 1 [ORR Policy Guide] § 1 at 22–33; *id*. § 1.4.2 at 28–29; Ex. 2 [ORR MAP] § 1 at 90–95; Ex. 6 [RFA 2nd Set] No. 116 at 534–35 | Disputed to the extent it implies there is no opportunity for children to rebut FFS statements in examining step-down. *See* DX-11 [ORR Juvenile Coord. Rep.] at 32 (holding a hearing (if elected); DX-10 [Biswas Decl.] ¶ 59; Fact Response ¶ 204 (discussing PRP process). | **Remains Undisputed.**<br>Defendants attempt to create a dispute of fact by proposing an implication that does not exist and therefore have not created a genuine dispute of fact.<br><br>As noted in Plaintiffs' Response to UF ¶ 204, Defendants' references to the PRP pilot program should be disregarded. *See* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 1.<br><br>*See* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 2. |
| 217. | Class Representatives Lucas R., Gabriela N., Daniela | Undisputed. | **Undisputed.** |

191.

| | | | |
|---|---|---|---|
| | Marisol, Sirena P., Jaime D., and Benjamin F. were not provided an opportunity to cross-examine witnesses in an evidentiary hearing regarding eligibility for step-down.<br><br>Joint Stip. ¶ 89 | | |
| 218. | ORR has erroneously stepped up children to restrictive placements.<br><br>ECF No. 144 [Answer] ¶ 75; Ex. 33 [Ray Dep. Tr.] at 148:16–22, 152:14–153:22; 157:10–158:17, 162:7–10, 163:14–164:12; 166:23–167:7; Ex. 43 [Ray Dep. Ex. 117] at 1261–62; Ex. 139 [Ray Dep. Ex. 118] at 2028 ("the NOP was so vague and did not contain enough information to know if [minor] is an actual danger to self or others"); Ex. 44 [Ray Dep. Ex. 119]; Ex. 16 [Contreras Dep. Tr.] at 71:3–12, 75:11–76:1, 76:18–77:3, 77:5– 78:1, 80:2–17, 105:5–106:22, 113:12–114:17; Ex. 22 | Disputed to the extent it omits relevant information or mischaracterizes evidence and implies that it is common or ORR's policy or practice to erroneously step up children to restrictive placements.<br><br>*See, e.g.*, Ex. 16 [Contreras Dep. Tr.] at 155:1-5 ("Q: Okay. Would you agree that, if a child remains at Shenandoah after they have already been approved for step down, that child is in an inappropriate placement? A: Yes."); DX-44 [Fink JD Decl.] ¶¶ 24-27; ████████████████████ ██████████████████████ ██████████████████████ ██████████████████████ ██████████████████████ █████████████); Ex. 33 [Ray Dep. Tr.] at 148:16-22 (noting that one instance of noncompliance was for a child that had been charged with a crime, but | **Remains Undisputed.** Defendants attempt to create a dispute of fact by proposing an implication that does not exist and therefore have not created a genuine dispute of fact. Plaintiffs' UF ¶ 218 does not state anything regarding the frequency of ORR's erroneous step-ups to restrictive placements.<br><br>Moreover, Plaintiffs do not omit relevant information or mischaracterize the evidence. For example, citation to Ex. 16 [Contreras Dep. Tr.] at 155:1–5 was not included in Plaintiffs' UF ¶ 218 because it relates to failure to step-down and not erroneous step ups. Consequently, Plaintiffs included this evidence as a citation |

192.

| | | |
|---|---|---|
| [Fields Dep. Tr.] at 123:5–16, 172:7–15; Ex. 23 [Fink Dep. Tr.] at 40:13– 17, 153:8–13; Ex. 24 [Heath Dep. Tr.] at 98:5–16, 99:3–7; Ex. 14 [Castaneda Dep. Tr.] at 74:13–76:7, 88:21–90:9; Ex. 27 [Meyerstein Dep. Tr.] at 225:19– 226:6; Ex. 20 [Eich Dep. Tr.] at 108:7–109:5; Ex. 96 at 1757 ("some of the minors were inappropriately placed in secure") | "the charges were later dropped, and that was the basis for the child's placement in secure"); Ex. 16 [Contreras Dep. Tr.] at 71:3-22 (discussing an instance where case manager recommended against admission but FFS made the decision to place the child at Shenandoah and "informed [the case manager] of the FFS's thought process or reasons for wanting to admit the child to Shenandoah"); DX-81 [Fields Dep. Supp.] at 172:7–173:6 (noting that UACs are "screened better if they are referred to staff secure, especially if the presenting problem is mental health" and "if they require a higher level of treatment on top, that is not being met, then they are referred to a facility that would accommodate that need"). | to Plaintiffs' UF ¶ 219, not ¶ 218. Nothing cited in DX-44 [Fink Decl.] ¶¶ 24–27 disputes that Jaime D. was inappropriately stepped up and that staff subsequently realized their error. And citation to Ex. 16 [Contreras Dep. Tr.] at 71:3–22 does not change the fact that the Case Manager did not agree secure placement was warranted. |
| 219.  ORR has erroneously refused children step-down from restrictive placement.<br><br>Ex. 16 [Contreras Dep. Tr.] at 155:1– 5; ECF No. 144 [Answer] ¶ 75; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 348:12–24, 393:1–7; Ex. 33 [Ray Dep. Tr.] at 170:19– 23; Ex. 35 [Smith Dep. Tr.] at 82:20–83:5, | Disputed to the extent it omits relevant information or mischaracterizes evidence and implies that it is common or ORR's policy or practice to erroneously refused children step-down from restrictive placements.<br><br>*See, e.g.*, DX-67 [Biswas 30(b)(6) Dep. Supp.] 348:12-24 (discussing that it can take "several days" to find a facility to take the child, but not supportive of conclusion | **Remains Undisputed**<br>Defendants attempt to create a dispute of fact by proposing an implication that does not exist and therefore have not created a genuine dispute of fact. Plaintiffs' UF ¶ 219 does not state anything regarding the frequency of ORR's erroneous step-ups to restrictive placements. |

162:16–163:8; Ex. 24 [Heath Dep. Tr.] at 212:16– 23; Ex. 18 [De La Cruz Dep. Tr.] at 162:3–16, 163:7–164:5; Ex. 17 [Cook Dep. Tr.] at 197:21–25; Ex. 28 [Murray Dep. Tr.] at 193:10–17, 156:18–23, 158:6– 21, 170:3–7, 184:20-189:4, 192:18–193:4; Ex. 47 [Murray Dep. Ex. 162] ("I have several cases at yolo that are in need of RTC but our RTC keep rejecting them."); Ex. 16 [Contreras Dep. Tr.] at 151:17– 152:8; Ex. 22 [Fields Dep. Tr.] at 148:8–23; Ex. 39 [Vergara Dep. Tr.] at 129:15–130:17, 257:6–10

that such operational realities make the determination a "refusal" or "erroneous"; nor that any real-world system could instantaneously find placement for a child immediately after a determination is made), 349:1-21 (discussing procedures to ensure minor is stepped down expeditiously), 351:12-23 (seeking additional facilities, additional beds and bringing them on line can take up to nine months); ORR Guide § 1.3.3 ("After ORR requests a placement in a particular facility, the care provider may only deny ORR's request for placement" for reasons outside of ORR's control.").

Further, Plaintiffs assert that two weeks after Jaime D. was transferred to Yolo, the Yolo staff were "all in agreement that [Jaime] isn't appropriately placed in a secure setting," but that Jaime D. remained at Yolo for another three weeks following that determination. ████████

Plaintiffs' cited evidence shows children who have been deemed eligible for step down have remained in a more restrictive setting than warranted, thus converting their continued placement in such a restrictive setting into an erroneous placement. Ex. 16 [Contreras Dep. Tr.] at 155:1– 5 (agreeing that "if a child remains at Shenandoah after they have already been approved for step down, that child is in an inappropriate placement"); Ex. 33 [Ray Dep. Tr.] at 170:19–23 (agreeing "it happened more than once where it changed in a way that secure placement was no longer appropriate but where the kid stayed in secure placement"); Ex. 22 [Fields Dep. Tr.] at 148:18– 23 (agreeing that "based on [her] review, [she] concluded that there were quite a few children for whom the psychiatrist had recommended stepdown or

194.

| | | ███████. Ex. 16 [Contreras Dep. Tr.] at 155:1-5; DX-44 [Fink JD Decl.] ¶¶ 24-27; DX-83 at 14.<br><br>See Defs.' Evidentiary Objection ¶ 219. | reunification, but who were still at Shiloh").<br><br>Nothing in Defendants' cited evidence disputes that Jaime D. remained in a secure placement for three weeks *after* a determination that secure placement was not warranted. ECF No. 144 [Answer] ¶ 75 (Defendants "admit that Yolo staff informed Jaime D. they hoped to transfer him to another grantee care provider" and "that Jaime D. remained at Yolo for three weeks after this conversation.")<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 219. |
| 220. | ORR policies and practices for placing children in restrictive settings are inconsistent with accepted state and federal child welfare practice.<br><br>Ex. 54 [Heldman Expert Rep.] at 1350 | Disputed to the extent it implies ORR's policies and practices should be adjudged as compared to juvenile justice systems or dependency proceedings for children removed from their family homes, rather than the TVPRA (particularly 8 U.S.C. § 1232(c)(2)(A) directing the Secretary to prescribe procedures for monthly review of secure placement), the Homeland Security Act, and the *Flores* Settlement Agreement. | **Remains Undisputed.**<br>Defendants attempt to create a dispute of fact by proposing an implication that does not exist. Plaintiffs' UF ¶ 220 compares ORR policies and practices with state and federal welfare practices to conclude that the two are inconsistent with respect to placing children in restrictive settings. |

195.

| | | DX-70 [Heldman Dep. Supp.] 25:10-16 (juvenile justice and state child welfare systems governed by Federal statutes: the Social Security Act, the Child Abuse Prevention and Treatment Act, the Adoption and Safe Families Act; and the Juvenile Justice Delinquency Prevention Act.). *See* Fact Response ¶¶ 207, 208.<br><br>Further disputed to the extent it implies that ORR policies and practices for placing children in restrictive settings falls below accepted standards for state and federal child welfare practice. ORR's policies, procedures, and practices "concerning UACs either meet or exceed the standards of care for domestic children in out of home care in the United States with regard to placement in the least restrictive environment." DX-13 [Dr. Earner Expert Rep.] ¶¶ 3, 4 ("ORR policies, procedures, and practices ensure that UACs are maintained safely in the least restrictive environment."), 42 ("ORR-funded facilities follow child welfare practices in assessment, placement and unification of UAC"), 47 (noting that the "type of case management that is present at the ORR facilities is in keeping with the standards of | Defendants offer no evidence to dispute this fact and therefore do not create a genuine dispute of fact.<br><br>Defendants' experts' statements are irrelevant because they reference only case management of children in ORR custody generally and not detaining children in *restrictive* settings specifically.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 220. |

196.

| | | | |
|---|---|---|---|
| | | excellence in domestic child welfare"); DX-14 [Dr. Mohn Expert Rep.] ¶ 21 ("I'm able to conclude that the ORR standards are best practice – and also best that the standards are also followed in practice."). See Defs.' Evidentiary Objection ¶ 220. | |
| 221. | ORR's placement of children in RTCs is more financially expensive than placing them in shelters. Joint Stip. ¶ 90 | Undisputed. | **Undisputed.** |
| 222. | ORR steps up relatively few children. Joint Stip. ¶ 91 | Undisputed. | **Undisputed.** |
| 223. | As of March 13, 2020, 14 of the total 3,621 children in ORR in- network care were detained in a secure facility, 17 were placed in an RTC, 30 were placed in a staff- secure facility, 6 were placed in a therapeutic staff- secure facility, and 13 were placed in therapeutic group homes. | Disputed to the extent the count fails to account for individuals in staff-secure or other settings who are reflected in the Out-of-Network tab, but have as their home-shelter the facility listed in census tab. *See* Ex. 93 at 1630. *See* Defs.' Evidentiary Objection ¶ 223. | **Remains Undisputed (with correction).** As of March 13, 2020, 14 of the total 3,621 children in ORR care were detained in a secure facility, 16 were placed in an RTC, 28 were placed in a staff- secure facility, 6 were placed in a therapeutic staff-secure facility, and 12 were placed in therapeutic group homes. Ex. 93, Census Tab at Row J, at 1630–1745 (Program Type) (number of |

197.

| | | | |
|---|---|---|---|
| | Ex. 93 at Ex. 93 at Census Tab, at Row J at 1630–1745 (Program_Type) (number of children detained in ORR custody as of March 13, 2020) | | children detained in ORR custody as of March 13, 2020).<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 223. |
| 224. | As of March 13, 2020, 11 children were placed in out-of-network RTCs.<br><br>Ex. 93 at Out of Network Placements Tab, at Row A at 1746 (children placed in OON RTC as of March 13, 2020) | Disputed, as the report notes, "This data is in reference to all UAC referred to ORR care in the month of February 2020." *See* Ex. 93 at 1630.<br><br>*See* Defs.' Evidentiary Objection ¶ 224. | **Remains Undisputed (with correction).**<br>As of February 13, 2020, 11 children were placed in out-of-network RTCs. Ex. 93 at Out of Network Placements Tab, at Row A at 1746 (children placed in OON RTC as of February 13, 2020).<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 224. |
| 225. | ORR denies that the principal reason it does not afford Class Members greater procedural protections against unnecessary step-ups is because it would entail greater expense and administrative inconvenience.<br><br>Ex. 6 [RFA 2nd Set] No. 107 at 529–30 | Disputed to the extent it states that ORR does not afford Class Members procedural protection. *See* DX-10 [Biswas Decl.] ¶¶ 57-60 (discussing PRP process for seeking Director review and how children are reminded of such right). Further disputed to the extent it implies that cost and administrative inconvenience are dispositive factors in whether ORR provides "great procedural protections" as opposed to the lack of any evidence | **Remains Undisputed.**<br>As noted in Plaintiffs' Response to UF ¶ 204, Defendants' references to the PRP pilot program should be disregarded. *See* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 1.<br><br>Plaintiffs' UF ¶ 225 does not imply that cost and administrative inconvenience are dispositive |

198.

suggesting that "greater procedural protections" would meaningfully improve child welfare outcomes. See DX-35 [Dr. Lubit Expert Rep.] ¶¶ 3, 61 ("Plaintiffs want there to be a neutral decision maker and time for the UAC to challenge a restrictive placement before being moved. They fail to note that delaying the move risks harm to the individual child and others; the risk of harm to self or others that led to the decision to transfer to a more secure setting does not disappear while waiting for the decision of an outside person. It is not standard practice for courts or other 'neutrals' to become involved before the person is event sent to a structured facility. This is especially the case with children."); DX-30 [Dr. Ryan Expert Rep.] ¶ 47 ("[P]laintiffs have not offered any evidence that categorical, mandatory consultation with a child's legal representative before decisions are made would improve child welfare outcomes in the areas of placement, release, and other ORR decisions."); DX-09 [Antkowiak Decl.] ¶¶ 33¬37 (discussing how time and expenditures on additional procedures would detract from current responsibilities,

factors in whether ORR provides greater procedural protections. Plaintiffs state that ORR denied that the "principal reason" it does not afford Class Members greater procedural protections against unnecessary step-ups is because it would entail greater expense and administrative inconvenience. Ex. 6 [RFA 2nd Set] No. 107 at 529–30. As such, Defendants do not create a genuine dispute.

Plaintiffs further respond that evidence cited by Defendants is inadmissible. *See* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶¶ 12–15; Plaintiffs' Objections to Opposition ¶¶ 4, 14.

199.

| | | limit willingness of licensed care providers to work with ORR, require hiring of numerous additional attorneys and interfere with inability to predict census); DX-67 [Biswas 30(b)(6) Dep.] 444:16-446:12 (costs of more adversarial process include interfering with collaborative process and would be detrimental to children. Also costs of time, as FFS's and care providers would have less time to work on cases of other children if spending time on an adversarial process; taking funding away from other services; distrust between children and ORR ("they're kids and we're trying to do what's in their best interest, and I don't think that always means sitting in a courtroom.")). | |
| 226. | Plaintiff Class Members are typically indigent, speak little or no English, and have little or no knowledge of the United States' legal system.<br><br>ECF No. 144 [Answer] ¶ 146; Ex. 6 [RFA 2nd Set] No. 141 at 538-39 | Disputed to the extent Plaintiffs' use of the phrase "little or no knowledge" is speculative and Plaintiffs' proffered evidence does not support this statement. Defendants further note that ORR provides all UACs with "[l]egal services information, including the viability of free legal assistance, the right to be represented by counsel at no expense to the government, the right to a removal hearing before an immigration judge, the right to | **Remains Undisputed**.<br>Plaintiffs' proffered evidence supports the proposed fact. Plaintiffs' RFA No. 141 asked Defendants to "[a]dmit that the majority of CLASS MEMBERS have little or no knowledge of the United States legal system." Although Defendants objected to the request much as they do now, they "[a]lternatively . . . admit this |

200.

| | | apply for voluntary departure or to request voluntary departure in lieu of deportation." ORR Guide §3.3; Defs.' U.F. ¶ 81.<br><br>See Defs.' Evidentiary Objection ¶ 226. | request." Ex. 6 [RFA 2nd Set] No. 141 at 538–39.<br><br>Additionally, Defendants' cited evidence speculates that ORR policy requirements create legal knowledge, but they offer no evidence to support this speculation.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 226. |
|---|---|---|---|
| 227. | ORR is required to ensure "to the greatest extent practicable" that children from noncontiguous countries have counsel to represent them "in legal proceedings or matters and protect them from mistreatment."<br><br>8 U.S.C. § 1232(c)(5) | Disputed, to the extent the statement limits access to counsel to UACs "from noncontiguous countries." 8 U.S.C. § 1232(c)(5) contains no such limitation, instead commanding that the "Secretary of [HHS] shall ensure, to the greatest extent practicable and consistent with [8 U.S.C. § 1362], that all unaccompanied alien children who are or have been in the custody of the Secretary or the Secretary of Homeland Security, and who are not described in section (a)(2)(A), have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." | **Undisputed (with correction)**. Plaintiffs agree that ORR's obligation to ensure "to the greatest extent practicable" that children have counsel to represent them "in legal proceedings or matters or protect them from mistreatment" is not limited to children from noncontiguous countries. 8 U.S.C. § 1232(c)(5).<br><br>*See also* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 227 |

201.

| | | | |
|---|---|---|---|
| | | *See* Defs.' Evidentiary Objection ¶ 227. | |
| 228. | ORR and care provider facilities are required to provide children with information about the availability of free legal assistance and their right to be represented by counsel.<br><br>Ex. 1 [ORR Policy Guide] § 2.2.5 at 38-39; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 400:13–18 | Undisputed with respect to Plaintiffs' assertion that ORR and its care provider facilities are required to provide children with information about the availability of free legal assistance and the right to representation by counsel. Disputed to the extent Plaintiffs' suggest that class members have a right to government-paid counsel to challenge ORR placement or release. Further disputed to the extent it implies that ORR Guide § 2.2.5 discusses legal services for children, when, in fact, it concerns the legal orientation program for children's custodians and not legal representation for children. Further disputed as Plaintiffs' cited testimony merely states that children receive a list of free legal services. Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 400:13–18. | **Remains Undisputed**.<br>Plaintiffs' undisputed fact does not suggest that class members have a right to government-paid counsel to challenge ORR placement or release. |
| 229. | The U.S. Department of Health and Human Services ("HHS") contracts with the Vera Institute of Justice ("VIJ"), a non-profit organization, to coordinate the delivery of free legal services to children who | Undisputed. | **Undisputed**. |

202.

| | | | |
|---|---|---|---|
| | are or have been in ORR custody.<br><br>Ex. 6 [RFA 2nd Set] No. 138 at 537 | | |
| 230. | ORR has a legal services contract with VIJ that funds limited scope direct representation for children in immigration-related matters.<br><br>Joint Stip. ¶ 97 | Undisputed. | **Undisputed**. |
| 231. | VIJ in turn subcontracts with non-profit legal aid providers to counsel and represent children in immigration proceeding.<br><br>Ex. 6 [RFA 2nd Set] No. 138 at 537 | Undisputed. | **Undisputed**. |
| 232. | VIJ is a contractor whose scope of work is to implement regional programs providing limited scope legal services to children.<br><br>Joint Stip. ¶ 98 | Undisputed. | **Undisputed**. |
| 233. | The vast majority of Class Members are represented, if at | Undisputed, to the extent reference is to representation relating to immigration | **Undisputed**. |

203.

| | | | |
|---|---|---|---|
| | all, by legal service providers under subcontract with VIJ.<br><br>Ex. 30 [Ortiz Dep. Tr.] at 77:7–18; Ex. 29 [Nathan-Pineau Dep. Tr.] at 61:5–62:2 | status or proceedings. DX-02 [Biswas 30(b)(6) Dep.] 68:2-8; 400:1-8. | |
| 234. | ORR does not require Case Coordinators to communicate with Class Members' legal counsel.<br><br>Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 118:3–11; Ex. 37 [Sualog Dep. Tr.] at 130:23–131:21 | Disputed to the extent it implies case coordinators do not meet with UACs' legal counsel. Case coordinators are responsible for maintaining stakeholder relations and thus, are able to communicate with legal counsel for UACs at their discretion.<br><br>Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 118:3-11; ORR Guide. § 2.3.3. *See* Fact Response ¶ 260; Defs.' U.F. ¶ 16. | **Remains Undisputed**.<br>Defendants' attempt to create a dispute of fact by proposing an implication that does not exist, and therefore have not created a genuine dispute of fact.<br><br>Defendants provide no evidence regarding a *requirement* that Case Coordinators communicate with Class Members' legal counsel. ORR's allowing Case Coordinators to communicate with class members' legal counsel at their discretion does not place Plaintiffs' proposed fact that "ORR does not require" communication into dispute. |
| 235. | In practice, children's counsel rarely, if ever, communicate with Case Coordinators or FFS. | Disputed to the extent Plaintiffs' use of the phrase "rarely, if ever" is a statement of opinion, not fact. *See also* Fact Response ¶ 260. | **Undisputed**.<br>Defendants' response and cited evidence do not create a genuine dispute of fact, as Defendants offer no evidence of any instance in |

204.

| | | | |
|---|---|---|---|
| | Ex. 28 [Murray Dep. Tr.] at 124:1–25; Ex. 30 [Ortiz Dep. Tr.] at 32:11-22; Ex. 29 [Nathan-Pineau Dep. Tr.] at 22:16–23:9; Ex. 24 [Heath Dep. Tr.] at 50:20–51:10; Ex. 25 [Husted Dep. Tr.] at 176:4–25 | | which a Case Coordinator or FFS has actually communicated with a Class Member's lawyer, much less that such communication occurs more than rarely. |
| 236. | Although ORR policy provides that "Case Manager[s] inform[] other stakeholders of the progress" toward releasing a child, it does not require Case Managers to inform children's lawyers of such progress. Instead, ORR policies say that "other stakeholders" "may include local legal service providers and attorneys of record."<br><br>Ex. 1 [ORR Policy Guide] § 2.3.2 at 39-40 | Disputed. The ORR Guide's requirement that case managers inform "other stakeholders of the progress of a child's case" includes a UAC's attorney of record, and this requirement is mandatory.<br><br>ORR Guide § 2.3.2; DX-10 [Biswas Decl.] ¶¶ 18, 44, 91; DX-02 [Biswas 30(b)(6) Dep.] 69:10-70:1 ("We require case managers to provide general case updates to attorneys of record"); DX-09 [Antkowiak Decl.] ¶ 61 ("Attorneys of record are always permitted to be in contact with care provider case managers to determine the status of release."); DX-68 [Sualog Dep. Supp.] 101:24-102:4 ("ORR may have policies and procedures regarding ensuring that case managers or facilities update, update attorneys and in my experience attorneys and case managers who have been on site visits in the past | **Remains Undisputed**.<br>Defendants' response and cited evidence does not create a genuine dispute of fact, given that deposition testimony and declarations do not change the ORR Policy Guide's clear language that "other stakeholders" "*may* include local legal service providers and attorneys of record." Ex. 1 [ORR Policy Guide] § 2.3.2 at 39–40 (emphasis added). Moreover, present tense descriptive statements in ORR's Policy Guide purporting to describe what Case Managers currently do are not equivalent to mandatory duties. *Flores v. Barr*, 407 F. Supp. 3d 909, 923-24 (C.D. Cal. 2019). |

205.

| | | | |
|---|---|---|---|
| | | interacting in the facility."), 102:9-19 ("Q: Would there be any consequences if a facility as a whole were to preclude case managers from speaking directly with children's lawyers? A: There would be consequences ...ORR has requirements that basically mandates access to facilities, to children and to the facility as a whole to legal service providers."). | Defendants do not identify any specific provision of the ORR Policy Guide or the ORR Manual of Procedures requiring Case Managers to inform children's lawyers of progress toward release.<br><br>Plaintiffs further respond that evidence cited by Defendants is inadmissible. *See* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 20; *see also* Plaintiffs' Objections to Opposition ¶ 15. |
| 237. | In practice, Case Managers have discretion to communicate—or not—with Class Members' lawyers. In some facilities, children's lawyers do not even know who a client's Case Manager is.<br><br>Ex. 37 [Sualog Dep. Tr.] at 101:8–21; Ex. 30 [Ortiz Dep. Tr.] at 28:4–30:22; Ex. 29 [Nathan- Pineau Dep. Tr.] at 20:4–25 | Disputed to the extent Plaintiffs' use of the phrase "in practice" is a statement of opinion, not fact and because the ORR Guide's requirement that case managers inform "other stakeholders of the progress of a child's case" includes a UACs attorney of record.<br><br>ORR Guide § 2.3.2; DX-10 [Biswas Decl.] ¶¶ 18, 44, 91; DX-02 [Biswas 30(b)(6) Dep.] 69:10-70:1 ("We require case managers to provide general case updates to attorneys of record"); DX-09 | **Remains Undisputed**. Defendants' response and cited evidence does not create a genuine dispute of fact because ORR's policies are irrelevant to Plaintiffs' statement regarding ORR's practice.<br><br>*See* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 20; *see also* Plaintiffs' |

206.

| | | [Antkowiak Decl.] ¶ 61 ("Attorneys of record are always permitted to be in contact with care provider case managers to determine the status of release."). *See* Defs.' Evidentiary Objection ¶ 237. | Response to Defendants' Evidentiary Objection ¶ 237. |
|---|---|---|---|
| 238. | ORR does not require FFS to communicate directly or regularly with children's legal counsel. Ex. 37 [Sualog Dep. Tr.] at 119:1–16; Ex. 38 [Deposition Transcript of Stephanie Treviño, Mar. 5, 2020 ("Trevino Dep. Tr.")] at 100:10–13 | Disputed. It is ORR's practice that FFS serve as a local liaison to community stakeholders (including other federal agencies, local legal service providers, communities, child advocates, etc.). Defs.' U.F. ¶ 13; DX-09 [Antkowiak Decl.] ¶ 15 ("The process for stepping up a child is multi-disciplinary and iterative, based on the observations and input of numerous professionals – most of whom are independent of the care providers making the requests to transfer the child – and where attorneys can weigh in, informally, if they wish."). *See also* Fact Response ¶ 241 (ORR policy and practice of FFS openness to communicating with attorney of record); DX-66 [Ortiz Dep.] 62:4-12, 68:4-14; 70:10-19 (discussion with FFS). | **Remains Undisputed**. Defendants' statement and cited evidence does not create a genuine dispute of fact. Defendants' cited evidence does not contain any *requirement* to communicate directly or regularly with children's legal counsel, nor does serving as a "local liaison to community stakeholders" amount to a requirement that FFS communicate with children's legal counsel. None of the testimony Defendants cite regarding "openness" or an occasional communication between an FFS and a child's lawyer place Plaintiffs' UF ¶ 238 into material dispute. *See also* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 7. |

207.

| 239. | In practice, FFS exercise discretion to communicate or not with children's lawyers.

Ex. 24 [Heath Dep. Tr.] at 50:20–23, 86:13–15, 241:15–17; Ex. 38 [Treviño Dep. Tr.] at 95:21–23; Ex. 25 [Husted Dep. Tr.] at 176:22–25; Ex. 35 [Smith Dep. Tr.] at 46:12–47:3; Ex. 29 [Nathan-Pineau Dep. Tr.] at 18:1–15 | Disputed as Plaintiffs have mischaracterized by omitting relevant language. See, e.g., DX-65 [Heath Dep. Supp.] 49:24-51:14 ("Q: Have they ever reached out to you regarding a child's case? A: I've had attorneys ask me about – via email, like 'Can you tell me why it's taking this –this is taking so long to unify?' Yes...Q: And do you ever respond to those emails? A: I do sometimes. But first I let my supervisor know to make sure that I can."); Ex. 38 [Trevino Dep. Tr.] at 95:21–23 ("Q: Do you communicate with attorneys for children? A: Yes."); Ex. 25 [Husted Dep. Tr.] at 176:22–25 ("Q: In the cases you handled of transfers to staff secure, have you ever had to deal with a child's lawyer? A: I have not personally dealt with the attorney, no."); DX-28 [Smith Dep.] 45:21-24 ("Q: Okay. Do you communicate with attorneys for the children or the sponsors? A: I communicate with the VERA grantee attorneys here."); Ex. 29 [Nathan-Pineau Dep. Tr.] at 18:8–15 ("Q: So in terms of step-up or step-down, is Ms. David available to speak with you so that you can advocate for your clients' interest in either being stepped down or | **Remains Undisputed**. None of the testimony Defendants cite places Plaintiffs' proposed fact into material dispute. Additionally, the evidence Defendants cite provides examples of testimony confirming that FFS do not speak to children's attorneys or involve children's attorneys in placement and release decisions. *See, e.g.*, Ex. 25 [Husted Dep. Tr.] at 176:22–25; Ex. 29 [Nathan-Pineau Dep. Tr.] at 18:8–15. Defendants' cited evidence also confirms that FFS are not required to respond to children's lawyers. *See, e.g.,* DX-65 [Heath Dep. Supp.] 50:20–51:14.

*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 239. |

| | | avoiding a step-up? A: We have reached out to her, and typically the response is that the decision has already been made."). *See also* DX-41 [De La Cruz LR Decl.] ¶35 (Experience of working collaboratively with attorneys and other stakeholders); DX-52 [Vergara GN Decl.] ¶ 11 ("Under ORR policy, when making step-up and release decisions, information provided from a child's stakeholders, including the child's attorney, are taken into consideration. *See* ORR Guide § 1.4, 2.3, 2.3.1, 2.7. I follow these policies in making such decisions. In addition, I am open to communicating with UAC counsel, and will consider any input they offer."). <br><br> *See* Defs.' Evidentiary Objection ¶ 239. | |
|---|---|---|---|
| 240. | ORR leaves it up to facilities and clinicians to communicate or not with children's legal counsel. <br><br> Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 181:3–13; Ex. 17 [Cook Dep. Tr.] at 66:1–17 | Disputed. ORR's practice is to require care provider staff to communicate with UAC's attorney of record, legal services provider, or child advocates. <br><br> Defs.' U.F. ¶¶ 62, 85; DX-09 [Antkowiak Decl.] ¶¶ 15, 61; DX-10 [Biswas Decl.] ¶¶ 18, 44, 91. <br><br> *See* Defs.' Evidentiary Objection ¶ 240. | **Remains Undisputed**. Defendants' cited evidence does not support Defendants' statement. *See e.g.*, DX-09 [Antkowiak Decl.] ¶ 61 (lawyers may affirmatively ask for information); DX-10 [Biswas Decl.] ¶ 18 ("Stakeholders *may include* … attorneys of record…."). Moreover, the cited |

209.

| | | | |
|---|---|---|---|
| | | | paragraphs of DX-09 and DX-10 say nothing about clinicians at all.<br><br>By contrast, Defendants' Rule 30(b)(6) deponent confirmed that "[i]t's up to the facility and the clinicians as to whether they want to talk to the [child's] lawyer." Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 181:8–11. And Plaintiffs' cited evidence further demonstrates "clinicians do not generally speak to attorneys." Ex. 17 [Cook Dep. Tr.] at 66:11–12.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 240; *see also* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶¶ 7, 20. |
| 241. | Case Managers do not regularly provide children's legal representatives with evidence relied upon in recommending for or against release, nor do children's lawyers receive a copy of the Case Manager's | Disputed to the extent Plaintiffs' use of the word "regularly" is speculative and unsupported by Plaintiffs' cited evidence. Further disputed as ORR's practice is that when a "UAC has his or her own attorney of record, there should be open lines of communication with the case manager to keep the attorney up-to-date on the minor's | **Remains Undisputed**. Defendants' response and cited evidence does not create a genuine dispute of fact. To the contrary, Defendants' cited evidence supports Plaintiffs' UF ¶ 241 by acknowledging that communication is not required. *See* |

| | | | |
|---|---|---|---|
| | recommendation for or against release.<br><br>Ex. 30 [Ortiz Dep. Tr.] at 37:4–38:7 | case, and to provide the attorney on demand of any 30-day review of a more restrictive placement." DX-10 [Biswas Decl.] ¶ 91; DX-09 [Antkowiak Decl.] ¶ 61. *See also* Fact Response ¶ 242. | *e.g.*, DX-10 [Biswas Decl.] ¶ 91 ("… there *should be* open lines of communication…") (emphasis added); DX-09 [Antkowiak Decl.] ¶ 61 (lawyers may affirmatively ask for information). |
| 242. | Case Managers sometimes allow children's counsel to submit affirmative evidence in support of release or non-restrictive placement and sometimes they do not.<br><br>Ex. 30 [Ortiz Dep. Tr.] at 31:11–21, 140:2–9 | Disputed. Plaintiffs' cited evidence does not support this assertion. DX-66 [Ortiz Dep.] 31:11–21 ("Q. Did Homestead permit AIJ lawyers to provide information about potential sponsors in the United States to case managers? A. I'm not sure if 'permit is the appropriate, simply because there was not a channel of communication to facilitate that."), 140:2–9 ("Q. So if I understand right, AIJ lawyers had her e-mail address -- had Ms. Wood's e-mail address and sent her e-mails, right? A. We were told that we were not to communicate with anyone, that everything had to go through her, that she was the only person who had reliable, accurate information. And then we were told that we sent too many e-mails."). "ORR policy [is that] when making step-up and release decisions, information provided from a child's stakeholders, including the child's attorney, are taken into consideration." DX-52 | **Remains Undisputed**.<br>The cited evidence supports the proposed fact. *See* Ex. 30 [Ortiz Dep. Tr.] at 31:11–21 (example of lawyers not being able to submit evidence re potential sponsors); 140:2–13 (example of lawyers initially being allowed to email information to the facility Director, but then being told to stop). And that FFS are open to communicating with UACs' counsel or that FFS Senior Supervisor has experience working collaboratively with attorneys is irrelevant to Plaintiffs' UF ¶ 242.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 242. |

211.

| | | | |
|---|---|---|---|
| | | [Vergara GN Decl.] ¶ 11 ("I follow these policies in making such decisions. In addition, I am open to communicating with UAC counsel, and will consider any input they offer."); DX-41 [De La Cruz LR Decl.] ¶ 35 (Experience of working collaboratively with attorneys and other stakeholders); DX-02 [Biswas 30(b)(6) Dep.] 69:10-20 (case managers keep attorneys of record up-to-date on child's case).<br><br>*See* Defs.' Evidentiary Objection ¶ 242. | |
| 243. | ORR does not permit children's lawyers to see a Case Coordinator's recommendation regarding a client's release.<br><br>Ex. 30 [Ortiz Dep. Tr.] at 38:3–7 | Disputed to the extent the statement implies such disclosure is prohibited. Plaintiffs' only cited evidence does not support the assertion that there is a prohibition. Ex. 30 [Ortiz Dep. Tr.] at 38:3–7 ("Q: And when those recommendations would go to the case coordinators, was AIJ ever provided a copy of the recommendation of the case coordinator with respect to release? A: No. Not to my knowledge."). Lack of knowledge on the part of a single service provider does not establish a policy or practice of not permitting a child's attorney to see the case coordinator's recommendation. | **Remains Undisputed**.<br>Plaintiffs' evidence supports the proposed fact and Defendants offer no evidence that places this fact in dispute *See* Ex. 30 [Ortiz Dep. Tr.] at 38:3–7 (confirming AIJ did not receive Case Coordinator recommendations with respect to release).<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 243. |

212.

|   | | | *See* Defs.' Evidentiary Objection ¶ 243. | |
|---|---|---|---|---|
| 244. | FFS are under no obligation to receive evidence regarding a client's release or placement from children's legal counsel, and they rarely, if ever, do so.<br><br>Ex. 29 [Nathan-Pineau Dep. Tr.] at 18:1–7 | | Disputed to the extent Plaintiffs' use of the phrase "rarely, if ever" is speculative and unsupported by the evidence Plaintiffs cite. Ex. 29 [Nathan-Pineau Dep. Tr.] at 18:1–7 ("Q: What kind of ability do you have to speak with Ms. David in order to advocate for your clients? A: We're able to communicate with her by email and phone, but we don't have any sort of regular types of meetings or opportunities for discussion."). That are no "regular types of meetings or opportunities for discussion" does not establish that FFS's "rarely, if ever" receive evidence of a client's release or placement.<br><br>To the extent it implies that FFS routinely refuse to receive evidence regarding a child's release or placement from children's legal counsel, Defendants respond as follows. FFS serve as local liaison to community stakeholders and coordinate all aspects of a child's case with care provider staff, case coordinators, and stakeholders. In making placement decisions, ORR's practice is to require care providers to consider information from a variety of sources, including the UAC's | **Remains Undisputed**.<br>It is undisputed that FFS are under no obligation to receive evidence regarding a client's release or placement from children's legal counsel.<br><br>Defendants' own cited evidence indicates that any requirement to involve children's legal counsel in placement decisions is limited to notice of step up.  DX-71 [De La Cruz Dep. Tr. Supp.] at 137:18¬138:25.<br><br>*Multiple* FFS testified they do not speak to children's lawyers regarding placement decisions. *See e.g.*, Ex. 25 [Husted Dep. Tr.] at 176:22–25; Ex. 35 [Smith Dep. Tr.] at 46:16–47:11.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 244. |

| | | legal service provider, attorney of record, or child advocate. Defs.' U.F. ¶¶ 13, 50. See also DX-66 [Ortiz Dep.] 62:4-12; 68:4-14; 70:10¬19; DX-71 [De La Cruz Dep. Supp.] 137:21¬138:7.<br><br>*See* Defs.' Evidentiary Objection ¶ 244. | |
|---|---|---|---|
| 245. | In practice, Class Members' legal representatives are sometimes permitted to provide information about potential custodians for their clients to Case Managers and sometimes they are not.<br><br>Ex. 30 [Ortiz Dep. Tr.] at 31:11–21, 140:2–9 | Disputed. Plaintiffs' cited evidence does not support this assertion. See Fact Response ¶ 242.<br><br>Furthermore disputed as case managers coordinate the completion of UAC assessments, complete individual service plans, assess potential sponsors, communicate with potential sponsors, make release and transfer recommendations, and coordinate the release of children from ORR custody. When a UAC has his or her own attorney of record, there is an open line of communication with the case manager to keep the attorney up to date on the minor's case.<br><br>Defs.' U.F. ¶¶ 15, 24, 50, 85; DX-10 [Biswas Decl.] ¶ 91; DX-09 [Antkowiak Decl.] ¶ 61 (noting that "[a]ttorneys of record are always permitted to be in contact | **Remains Undisputed**.<br>Plaintiffs' UF ¶ 245 is supported by the evidence. *See* Ex. 30 [Ortiz Dep. Tr.] at 31:11–21 (example of lawyers not being able to submit evidence regarding potential sponsors), 140:2–9 (example of lawyers initially being allowed to email information to the facility Director, but then being told to stop); DX-10 [Biswas Decl.] ¶ 91 ("… there *should be* open lines of communication…") (emphasis added); DX-09 [Antkowiak Decl.] ¶ 61 (lawyers may affirmatively ask for information).<br><br>*See also* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 245. |

214.

| | | | |
|---|---|---|---|
| | | with care provider case managers to determine the status of release"). *See* Defs.' Evidentiary Objection ¶ 245. | |
| 246. | As a matter of policy and practice, ORR does not regularly provide children's legal representatives a copies [*sic*] of FFS decisions for or against releasing the legal representatives' clients to available custodians. Ex. 30 [Ortiz Dep. Tr.] at 38:3–7 | Disputed. Plaintiffs' use of the phrase "does not regularly" is speculative. Further disputed as Plaintiffs' only cited evidence does not support this assertion as the testimony concerns case coordinator recommendations, not FFS decisions. *See* Fact Response ¶ 243. . The lack of knowledge on the part of a single service provider does not establish a policy or practice  of not permitting a UAC's attorney copies of FFS decisions. *See* Defs.' Evidentiary Objection ¶ 246. | **Remains Undisputed**. Defendants' failure to point to any policy or testimony affirmatively showing that lawyers are provided FFS decisions leaves the proposed fact undisputed. *See* Ex. 30 [Ortiz Dep. Tr.] at 38:11–14 ("Q. And did AIJ ever obtain a copy of the federal field specialist recommendation or decision in favor of or against release? A. Not to my knowledge."). *See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 246. |
| 247. | If a child's counsel wishes to see the evidence and information ORR has for restrictive placement, she or he must formally request a copy of the client's file. | Disputed. It is ORR's policy that when there is a step-up or continued placement in a restrictive placement, that the case manager is required to share all of the information used in assessing the restrictive placement with the UAC's attorney of record, legal service provider, or child | **Remains Undisputed.** Defendants attempt to dispute this uncontroverted fact by pointing to an ORR MAP section that indicates that "care provider staff" "provide" the evidence supporting restrictive placement to children's |

215.

| | | |
|---|---|---|
| Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 272:14–23 | advocate, on demand. "This does not require a request for the full case file, *only proof of representation*. Such information will include the recommendations of the case manager and case coordinator as well." DX-10 [Biswas Decl.] ¶¶ 44 (emphasis added), 91; Defs.' U.F. ¶ 85 (requiring case managers to provide case updates to a UAC attorney/LSP in step-up placement); DX-09 [Antkowiak Decl.] ¶¶ 19, 22, 27; Ex. 2 [ORR MAP] § 1.4.2 at 90– 91.<br><br>*See* Defs.' Evidentiary Objection ¶ 247. | lawyers without requiring a request for the entire case file.  Ex. 2 [ORR MAP] § 1.4.2 at 94. However, this MAP section applies to 30-day reviews, not initial placements. *Id.* ("All information used in assessing a 30-day Case Review … must be shared…").<br><br>Moreover, Shenandoah Valley Juvenile Center's Lead Case Manager, Carina Contreras, testified, "Q. What is your understanding of whether an attorney is entitled to review any of the evidence used to justify a child's step down or continued placement at Shenandoah? A. It's my understanding that they have -- they have -- like, they can ask for the notice of placement to review the reasons for placement. Q. Okay. Are the attorneys allowed to look at any other documentation other than the notice of placement? A. It's my understanding they have to file a formal request and have consent from the minor to have the |

216.

| | | | entire case file." Ex. 16 [Contreras Dep. Trans.] at 148:3–15.<br><br>*See* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 20; *see also* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 247. |
|---|---|---|---|
| 248. | ORR has no limit on how long it may take to disclose a child's file after counsel requests it and will not release it to counsel until after its headquarters office approves release.<br><br>Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 276:17–277:16; Ex. 37 [Sualog Dep. Tr.] at 139:19–140:19 | Undisputed to the extent statement references a formal, written policy. *See also* Fact Response ¶ 249. | **Undisputed**. |
| 249. | In practice, children's counsel may wait several weeks or months before ORR produces a client's file.<br><br>Ex. 29 [Nathan-Pineau Dep. Tr.] at 16:13–21; Ex. 30 [Ortiz Dep. Tr.] at 41:18–23 | Disputed to the extent it implies it is ORR's policy or practice to take several weeks or months to produce a UAC's file to counsel.<br><br>*See* Defs.' Evidentiary Objection ¶ 249. | **Undisputed**.<br>*See* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 249. |

217.

| | | | |
|---|---|---|---|
| 250. | When it does produce a client's file, ORR gives children's counsel a version from which the names and contact information of third parties, including those of a child's potential custodians and witnesses to events ORR alleges justify restrictive placement, have been redacted.<br><br>Ex. 16 [Contreras Dep. Tr.] at 228:11–16; Ex. 29 [Nathan-Pineau Dep. Tr.] at 19:23–21:11; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 278:1–9 | Undisputed to the extent statement references practice of redacting personally identifiable information of an applicant sponsor or other children when such individual has not consented to disclosure of his or her information, as would be required under the Privacy Act of 1974. ORR "ensure[s] compliance with all requirements imposed by Federal statutes concerning the collection and maintenance of data that includes personal identifying information." ORR Guide § 5.6.2. *See also* ORR Requests for UAC Case File Information at n. 1, *available at*: https://www.acf.hhs.gov/orr/resource/requests-for-uac-case-file-information | **Remains Undisputed**. |
| 251. | ORR allows Class Members' legal representatives no role in the course of its deciding to place or continue a child in staff- secure, residential treatment, or secure facilities.<br><br>Ex. 6 [RFA 2nd Set] No. 146 at 539; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 71:7–17; Ex. 23 [Fink Dep. Tr.] at 155:13–17; Ex. 19 [David Dep. Tr.] at | Disputed. ORR's practice is that when assessing a possible transfer, care providers must consider information from assessment tools, interviews, the location of the UAC's sponsor or family in the United States, applicable records and information from stakeholders such as the UAC's legal service provider, attorney of record, or child advocate. Furthermore, should the UAC seek to challenge a placement decision via ORR's PRP, the UAC's attorney is given the opportunity to review | **Remains Undisputed**.<br>Defendants' cited evidence does not create a genuine dispute of fact. *See e.g.*, DX-09 [Antkowiak Decl.] ¶ 15 ("… where attorneys can weigh in, informally, if they wish."); DX-10 [Biswas Decl.] ¶ 91 ("… there *should be* open lines of communication…") (emphasis added). |

218.

| | | | |
|---|---|---|---|
| | 154:5–8; Ex. 29 [Nathan-Pineau Dep. Tr.] at 15:9–21 | ORR's evidence in support of continued placement and the UAC's attorney can provide the PRP with a written statement concerning the UAC's placement.<br><br>Defs.' U.F. ¶¶ 50, 69-71, 69-71; DX-10 [Biswas Decl.] ¶¶ 59, 91; DX-09 [Antkowiak Decl.] ¶¶ 15, 16. *See also* Fact Response ¶¶ 257, 258; ORR Guide § 2.3.2. | *See also* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶¶ 1, 7. |
| 252. | ORR affords children's legal representatives no right to submit evidence material to release or non-restrictive placement to Case Coordinators.<br><br>Ex. 28 [Murray Dep. Tr.] at 123:14–20 | Undisputed to the extent it is limited to a UAC's legal representatives' ability to *directly* submit information to a case coordinator. *But see* Fact Response ¶¶ 251, 257, 258 (regarding ability to share information with case managers, which would then be included in the case files). | **Undisputed**. |
| 253. | ORR does not affirmatively disclose its evidence for placing or continuing clients in staff-secure, residential treatment, or secure facilities to children's counsel.<br><br>Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 272:14–23; Ex. 29 [Nathan-Pineau Dep. Tr.] at 14:14–21 | Undisputed to extent it is limited to whether ORR automatically and affirmatively discloses its evidence concerning placement. *But see* Fact Response ¶ 257 (discussing practice and procedure of sharing information with attorneys of record). *See also* Ex. 2 [ORR MAP] 1.4.2 at 94 ("The case manager uploads all information used in assessing the restrictive placement case review (including the signed Summary Notes) in | **Undisputed**.<br><br>Plaintiffs' further respond that evidence cited by Defendants is inadmissible. *See* Objections to Opposition ¶ 2. |

219.

| | | the UAC Portal. All information used in assessing a 30-day Case Review decision is considered evidence. This information must be shared with the UAC's attorney of record, LSP or Child Advocate, on demand and does not require a prior *Authorization for Release of Records* only proof of representation. "); DX-10 [Biswas Decl.] ¶¶ 43 (Shenandoah Valley Juvenile Center in practice includes in the NOP the full summary of information presented by the case manager to the FFS used to make the decision. Thus, the NOP contains all the information that the case manager and case coordinator reviewed in recommending whether a child should be stepped up or remain in a more restrictive placement.), 44 (emphasis added), 91; Defs.' U.F. ¶ 85 (requiring case managers to provide case updates to a UAC attorney/LSP in step-up placement); DX-09 [Antkowiak Decl.] ¶¶ 19, 22, 27. | |
| 254. | ORR does not disclose a child's psychological report to his or her legal representative before relying on it to step-up a child to a secure or psychiatric facility. | Disputed to the extent Plaintiffs' cited evidence does not discuss psychological reports. *See* Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 70:5–21. Further disputed as the UAC's psychological report is included in the evidence the case manager is required | **Remains Undisputed**. Defendants' response and cited evidence does not create a genuine dispute of fact. ORR does not require that a child's legal representative receive a client's |

| | | | |
|---|---|---|---|
| | Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 70:5–21 | to share upon proof of representation. *See* DX-10 [Biswas Decl.] ¶¶ 44 (emphasis added), 91; Defs.' U.F. ¶ 85 (requiring case managers to provide case updates to a UAC attorney/LSP in step-up placement); DX-09 [Antkowiak Decl.] ¶¶ 19, 22, 27; Ex. 2. [ORR MAP] § 1.4.2 at 94.<br><br>*See* Defs.' Evidentiary Objection ¶ 254. | psychological report before relying on it to step-up a child to a secure or psychiatric facility. *See* Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 272:14–23.<br><br>Plaintiffs further respond that evidence cited by Defendants is inadmissible. *See* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 20; Plaintiffs' Objections to Opposition ¶ 2; *see also* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 254. |
| 255. | ORR policy does not require that a child's lawyer be informed that his or her client is being stepped up until transfer to a restrictive placement has been completed, or nearly so.<br><br>Ex. 12 [Deposition Transcript of Toby Biswas ("Biswas Dep. Tr.")] at 233:13–20; Ex. 29 [Nathan-Pineau Dep. Tr.] at 13:15–14:13; Ex. 30 [Ortiz Dep. Tr.] at 71:23–72:4 | Undisputed to extent it is limited to a written policy concerning an affirmative obligation to inform a UAC's lawyer that UAC is being stepped up until transfer to a restrictive placement has been completed, or nearly so. *But see* Fact Response ¶ 257 (discussing practice of informing attorneys prior to transfer and considering their input). | **Undisputed**. |

221.

| | | | |
|---|---|---|---|
| 256. | ORR often wakes children in the middle of the night or early in the morning, sending them to psychiatric facilities, juvenile halls, and medium-secure facilities—i.e., unlicensed facilities—without any prior notice or an opportunity to be heard.<br><br>Ex. 80 [Jaime D. Decl.] at ¶¶ 6–7; Ex. 81 [Lucas R. Decl.] at ¶ 5; Ex. 78 [Sirena P. Decl.] at ¶ 4 | Disputed to the extent Plaintiffs' use of the term "often" is a statement of opinion, not fact. Nor do Plaintiffs point to any evidence in support of their assertion that this practice is commonplace, or unnecessary to accommodate early flight times. *See* DX-44 [Fink JD Decl.] ¶¶ 13("███████████ ███████████████ ███████████████ ███████████████ ███████████████ ███████████████ ███████████████ ███████████████ ███████ ), 14 ("Jaime D. was aware that he would be leaving Cayuga Centers shelter, at least two days prior to the date the transfer took place.").<br><br>*See* Defs.' Evidentiary Objection ¶ 256. | **Remains Undisputed**. Defendants' response and cited evidence does not create a genuine dispute of fact. Plaintiffs provide evidence from three named plaintiffs. Ex. 80 [Jaime D. Decl.] ¶¶ 6–7 at 1515; Ex. 81 [Lucas R. Decl.] ¶ 5 at 1520; Ex. 78 [Sirena P. Decl.] ¶ 4 at 1505. Plaintiffs also provide declarations of several other Class Members who report being woken in the middle of the night or early in the morning for transfer. *See, e.g.*, Ex. 58 [A.D.A. Decl.] ¶ 4 at 1409; Ex. 59 [A.M.R.A. Decl.] ¶ 4 at 1414; Ex. 72 [M.H.S. Decl.] ¶ 3 at 1478; Ex. 77 [N.B.C.R. Decl.] ¶ 3 at 1501.<br><br>Defendants offer no evidence that ORR has a policy or practice contrary to Plaintiffs' proposed fact.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 256. |
| 257. | ORR has identified no reason for failing to advise Class | Disputed as to whether legal representatives as a matter of practice and | **Remains Undisputed**. |

| | | |
|---|---|---|
| Members' legal representatives that their clients are to be stepped up prior to transfer.<br><br>Ex. 35 [Smith Dep. Tr.] at 93:1– 4; Ex. 9 [Deposition Transcript of Stephen Antkowiak ("Antkowiak Dep. Tr.")] at 159:10–160:4 | procedure are not advised that their clients are to be stepped up prior to transfer. DX-71 [De La Cruz Dep. Supp.] 137:21-138:7 (attorneys involved before step-up; experience with attorneys); DX-22 [Contreras Dep.] 112:5-16 (facility consults with attorney to determine how transfer will affect legal case). *See also* Fact Response ¶ 260.<br><br>*See* Defs.' Evidentiary Objection ¶ 257. | Defendants provide no evidence to dispute the fact that ORR has identified no reason for failing to advise Class Members' legal representatives that their clients are to be stepped up prior to transfer. Nor do Defendants cite evidence that Class Members' legal representatives are regularly notified that their clients are to be stepped up prior to transfer.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 257. |
| 258. | ORR policy does not require that a child's lawyer be informed that it will keep a client in a restrictive placement until after a "30-day review" is complete, and then, only if counsel inquires.<br><br>Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 70:5–16; Ex. 16 [Contreras Dep. Tr.] at 148:3–9; Ex. 19 [David Dep. Tr.] at 158:20–159:6 | Undisputed to extent it is limited to a written policy concerning an affirmative obligation to notify, rather than an obligation to provide information to a UACs attorney of record who requests it and facilities remaining open to receiving information from said attorneys of record.<br><br>DX-02 [Biswas 30(b)(6) Dep.] 71:2-6; 72:15-17; 101:19-23 (Counsel are "fairly sophisticated parties," and know how to obtain access.); DX-20 [David Dep.] 158:20-24 (attorneys notified of right to challenge placement), 159:7-8. | **Remains Undisputed**.<br><br>Plaintiffs further respond that evidence cited by Defendants is inadmissible. *See* Plaintiffs' Objections to Opposition ¶ 1. |

223.

| | | |
|---|---|---|
| 259. | ORR does not require that Class Members' legal representatives be informed that their clients are being administered psychotropic drugs.<br><br>Ex. 29 [Nathan-Pineau Dep. Tr.] at 70:1–8 | Undisputed to the extent it is limited to a formal policy concerning a requirement and automatic obligation. Disputed to the extent the sole evidence cited by Plaintiffs in support of this assertion is by an attorney for the Capital Area Immigrant Rights organization, which provides ORR-funded legal representation for UACs on immigration related issues – not other aspects of ORR care and custody. Attorneys representing children pro bono or without ORR funding, including for issues like psychotropic medication, always have access to case managers. DX-02 [Biswas 30(b)(6) Dep.] 69:10-13 ("We require case managers to provide general case updates to attorneys of record"), 69:18-29 ("It's a general requirement in the description of what a case manager's role is."); ORR Guide § 2.3.2. | **Remains Undisputed**. |
| 260. | ORR has identified no burden that would result were Class Members' legal representatives to have access to Case Coordinators, which it has permitted in at least some instances in the past. | Disputed to the extent it implies UAC legal representatives have no access to case coordinators. *See* DX-02 [Biswas 30(b)(6) Dep.] 118:7-9 ("Case coordinators are responsible for maintaining stakeholder relations, so they would, you know, be able to reach out to attorneys that way."); DX-83 at 37 (Case Coordinators participate in | **Remains Undisputed**. Defendants' response and cited evidence is irrelevant to the cited fact. Defendants' cited evidence relates to ORR policy regarding a Case Coordinators role, not an identifiable burden in allowing |

| | | |
|---|---|---|
| Ex. 37 [Sualog Dep. Tr.] at 136:1–23; Ex. 29 [Nathan-Pineau Dep. Tr.] at 23:20–24:24 | collaborative meetings with stakeholder – which would include attorneys); DX-83 at 38 (Subtask 5.2 of the GDIT Contract requires case coordinator to participate in quarterly stakeholder meetings with legal service providers.). Further disputed to the extent it asserts ORR has identified no burden. *See* DX-67 [Biswas 30(b)(6) Dep. Supp.] 445:7-25; 446:1-12 (Costs of a "more adversarial" process, including FFS time taken away from other services, taking funding away from other services impacts ability to open new programs, award grants, creates distrust between a child and their case manager.).<br><br>*See* Defs.' Evidentiary Objection ¶ 260. | legal representatives access to Case Coordinators.<br><br>Moreover, Defendants' cited evidence to rebut this fact discusses the hypothetical burden of "a more adversarial process" and not any burden related to Class Members' legal representatives having access the Case Coordinators. It is undisputed that ORR has allowed Class Members' legal representatives to have access to Case Coordinators in some instances. Ex. 29 [Nathan-Pineau Dep. Tr.] at 23:20–24:24. Moreover, Plaintiffs' cited evidence confirms there is no identified "adverse effect" were Class Members' legal representatives to have access to Case Coordinators. *See* Ex. 37 [Sualog Dep. Tr.] at 136:10–23.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 260. |
| 261. | Children's legal counsel have no access to the persons who | Disputed to the extent it implies ORR is obligated to connect a home study worker | **Remains Undisputed**. |

| | | | |
|---|---|---|---|
| | perform home studies of potential custodians, even though such home studies may be determinative in deciding whether ORR releases a child.<br><br>Ex. 37 [Sualog Dep. Tr.] at 210:24–11:3; Ex. 30 [Ortiz Dep. Tr.] at 122:4–7; Ex. 29 [Nathan-Pineau Dep. Tr.] at 83:8–84:6; ECF No. 37-13 [Madelyn R. Decl.] ¶¶ 10–13 | with UAC's legal counsel. Further disputed to the extent it implies that as a matter of practice and policy, ORR prohibits a UAC's legal counsel from working with a potential sponsor (or the sponsor's attorney) in connection with a home study.<br><br>*See* Defs.' Evidentiary Objection ¶ 261. | Defendants attempt to create a dispute of fact by proposing an implication that does not exist and therefore have not created a genuine dispute of fact.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 261. |
| 262. | As a matter of policy and practice, ORR leaves it up to Case Managers to provide children's legal representatives with information about potential custodians.<br><br>Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 122:11–24; Ex. 16 [Contreras Dep. Tr.] at 228:11–16; Ex. 29 [Nathan- Pineau Dep. Tr.] at 19:23–21:11 | Disputed to the extent it suggests ORR, as a matter of policy and practice, should affirmatively release the personally identifiable information of applicant sponsors, absent consent from the applicant to share information. Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 122:18-24 ("Q: And are case managers instructed to provide children's lawyers with name and contact information for proposed sponsors? A: There's nothing specifically prohibiting them from providing names of sponsors, but generally we don't provide other contact information without a sponsor permission."). | **Remains Undisputed**.<br>Defendants' response and cited evidence do not create a genuine dispute of fact. Defendants cite no evidence to dispute Plaintiffs' undisputed fact. Additionally, Defendants' statement that personally identifiable information is not released "absent consent from the applicant to share information" is not supported by the evidence. Ex. 20 [Eich Dep. Tr.] at 48:21–25 ("…So approximately one year ago, I believe, or in the spring a year ago, it was announced that ORR and ICE had entered into a |

226.

| | | | memorandum, and that sponsor immigration information results would be sent to ICE."). |
|---|---|---|---|
| 263. | ORR's written policies do not guarantee children's counsel's involvement in release and placement decisions.<br><br>*See generally* Ex. 1 [ORR Policy Guide] | Disputed. To the extent UACs have counsel representing them in release and placement decisions, ORR Policies require involvement of attorneys of record. *See, e.g.*, Ex. 2 [ORR MAP] §§ 1.4 at 79 (transfers involve attorneys and child advocates as appropriate); 1.4.2 at 94 (information must be shared with attorney of record, LSP or Child Advocate on demand and does not require a prior authorization for release of records); 3.2.2 at 290 (notify attorney of discrepancy in birth certificate); 3.3.1 at 301 (notify the UAC's attorney of record or local legal service provide, and child advocate, if applicable, if there is a violent criminal history); Appendix 3.6 at 348 (interview guidelines for case managers and clinicians to ensure they learn if UAC has or had an attorney); 2.7.1 at 204 (approval of releases emailed to legal services provider or attorney of record); 2.7.4. at 208 (notification of attorney of record, legal service provider, child advocate and home study provider if Category 2A/B or 3 | **Remains Undisputed**. Defendants' response and cited evidence do not create a genuine dispute of fact. Additionally, Defendants' cited evidence does not support their statement that "ORR policies *require* involvement of attorneys of record." (emphasis added). *See e.g.*, Ex. 2 [ORR MAP] § 1.4.2 at 79 ("… other stakeholders *such as* attorneys and child advocates as appropriate."(emphasis added)), at 94 (not a guarantee of involvement but an "update" on status). Aall other citations relate to information sharing but do not evidence a "guarantee of counsel's involvement in release and placement decisions." |

227.

| | | Sponsor is denied); 2.7.8 at 211 (appeal of Category 1 denial); 2.9 at 224 (advise UAC to consult with an attorney, or legal service provider for any legal advice regarding *Flores* bond hearings). | |
|---|---|---|---|
| 264. | ORR's written policies do not guarantee the right to an interpreter.<br><br>*See generally* Ex. 1 [ORR Policy Guide]; Ex. 53 [Edwards Expert Rep.] at 1341 | Disputed. ORR requires care providers to provide on-site staff or interpreters as needed and to allow UACs to communicate in their preferred language when they choose. Furthermore, all ORR-documents provided to UAC must be translated in the UAC's preferred language, either written or verbally. When no written translation (assuming UAC is literate), on-site staff or interpreters are available, translation services should be used.<br><br>ORR Guide § 3.3.7; Defs.' U.F. ¶¶ 54, 57; Ex. 4 [ORR MAP] § 3.3.7 at 312 ("Care providers must make every effort to provide on-site staff or interpreters who speak the native language of each UAC. If staff or on-site interpreters are unavailable in the geographic region of the care providers, they may utilize a paid translation services, such as a telephone-accessible language line.").<br><br>*See* Defs.' Evidentiary Objection ¶ 264. | **Remains Undisputed**.<br>Defendants' response and cited evidence do not create a genuine dispute of fact. Defendants' cited evidence does not dispute Plaintiffs' UF ¶ 264 but instead indicates that ORR must "make every effort" which is not a guarantee of the right to an interpreter. *See* Ex. 4 [ORR MAP] § 3 at 312.<br><br>*See also* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 264. |

228.

| 265. | ORR provided Plaintiffs Lucas R., Daniela Marisol T., Gabriela N., Jaime D., and Sirena P. no legal assistance with respect to release, administration of psychotropic medications, or restrictive placement.<br><br>ECF No. 144 [Answer] ¶¶ 35, 46, 69, 77, 85 | Disputed to the extent it implies ORR did not provide Plaintiffs with access to legal screenings and access to free legal services as described in its policies; or, that case managers, clinicians, case coordinators, and FFSs failed to assist UACs with ensuring proper placement and treatment.<br><br>Lucas R. was provided a know-your-rights presentation, a list of pro bono legal services provider, and a legal screening for possible legal relief from the Cabrini Center 10 days after his arrival at Shiloh on May 31, 2018. *See* Defs.' U.F. ¶ 110. On August 9, 2018, an attorney entered an appearance on his behalf. *Id.* Jaime D., on his first day in ORR custody, received a know-your-rights presentation, was legally screened by a legal services provider, and was provided a list of pro bono legal services provider. *Id.* ¶ 113. Similarly, Daniela Marisol T. provided a signed acknowledgment that she had received a know-your-rights presentation, was legally screened by legal service provider Pro-Bar on August 8, 2016, and provided a list of pro bono legal service providers and received a second know-your-rights presentation upon entering Shiloh. Defs.' | **Remains Undisputed**. Defendants' response and cited evidence do not create a genuine dispute of fact, and instead Defendants merely dispute alleged implications and offer no evidence to dispute the fact as stated.<br><br>Indeed, Defendants offer no evidence that Lucas R., Daniela Marisol T., Gabriela N., Jaime D., and Sirena P. received any legal assistance *with respect to release, administration of psychotropic medications, or restrictive placement*. Evidence of legal screenings or other types of legal services are irrelevant.<br><br>*See also* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 29. |

229.

| | | U.F. ¶¶ 124-25. She was also provided a list of pro bono legal service providers and was referred to a child advocate. *Id.* ¶ 126. Gabriela N. also received multiple know-your-rights presentations, a legal screening, and was provided the opportunity to meet with attorneys while at Shiloh. *Id.* ¶¶ 133, 141. Sirena P. was also apprised of her right to counsel, acknowledged receipt of a know-your-rights presentation, and worked with an attorney to prepare a declaration in connection with this litigation while being treated at Shiloh. DX-55 [De La Cruz SP Decl.] ¶ 8. | |
|---|---|---|---|
| 266. | HHS's Administration for Children and Families ("ACF")— of which ORR is a subordinate entity— states, "Numerous studies and reports point to the importance of competent legal representation for parents, children, and youth in ensuring that salient information is conveyed to the court, parties' legal rights are protected and that the wishes of parties are effectively voiced." The ACF exhorts "all child | Undisputed that this document states as cited. However, the document is not a fact material to the case, as the current case does not challenge child welfare proceedings, in which children are removed by the state from their custodial homes, often due to abuse or neglect, parental rights may be terminated, and children may be freed for adoption after such termination, thus altering the dynamic of their families. Ex. 134 at 1995 ("Once a child is removed from home . . . federal law requires that judges make a number of determinations about the safety of the home | **Remains Undisputed**.<br><br>Plaintiffs further respond that evidence cited by Defendants is inadmissible. *See* Plaintiffs' Objections to Opposition ¶ 3. |

230.

| | | | |
|---|---|---|---|
| | welfare agencies . . . to work together to ensure parents, children and youth . . . receive high quality legal representation at all stages of child welfare proceedings." <br><br> Ex. 134 [ACF, High Quality Legal Representation for All Parties in Child Welfare Proceedings Policy] at 1994-95 | of removal, the welfare of the child, and that child's permanency plan. . . . A court must review agency decisions about the family, the suitability of the child or youth's temporary placement, and the child's permanency plan that will result in family preservation, reunification, or another permanency goal. . . . The decisions courts make in child welfare proceedings are serious and life changing. Parents stand the possibility of permanently losing custody and contact with their children. Children and youth are subject to court decisions that may forever change their family composition."). *See also* DX-09 [Antkowiak Decl.] ¶¶ 50-51 (describing ways in which "ORR is unique among agencies with care and custody of unaccompanied children..."). | |
| 267. | In responding to Plaintiffs' Requests for Admission, Defendants failed to identify any state or local jurisdiction that denies children appointed counsel in proceedings to determine whether they may be detained, whether their parents are fit, whether they may be | Disputed. Plaintiffs have failed to include objections lodged by Defendants in response to RFA Nos. 178-82 and Defendants' response to the RFAs stated that "[i]n light of these objections, Defendants are unable to admit this request as worded, and therefore deny it." Ex. 6 [RFA 2nd Set] Nos. 178–82 at 547-52. <br><br> *See* Defs.' Evidentiary Objection ¶ 267. | **Remains Undisputed**. Plaintiffs' RFA No. 179, for example, asked Defendants to "[a]dmit that YOU know of no state or local jurisdiction that denies CHILDREN appointed counsel in proceedings to determine whether their parents are FIT." Ex. 6 [RFA 2nd Set] No. |

231.

| | | |
|---|---|---|
| placed in secure juvenile detention facilities or psychiatric treatment centers, or whether they may be administered psychotropic medications.<br><br>Ex. 6 [RFA 2nd Set] Nos. 178–82 at 547-52 | | 179 at 548–49. Defendants refused to make this and related requested admissions "in light of" multiple boilerplate objections, which the Court should now overrule. Nowhere in Defendants' responses to RFA Nos. 178–82 did they identify any state or local jurisdiction that denies children appointed counsel in proceedings to determine whether they may be detained, whether their parents are fit, whether they may be placed in secure juvenile detention facilities or psychiatric treatment centers, or whether they may be administered psychotropic medications. *See* Ex. 6 [RFA 2nd Set] at 547–52.<br><br>Defendants offer no evidence that any state denies children counsel with respect to release, placement, or medication decisions, all of which leaves Plaintiffs' UF ¶ 267 undisputed. |

232.

| | | | |
|---|---|---|---|
| | | | *See* Plaintiffs' Response to Defendants' Evidentiary Objection ¶ 267. |
| 268. | ORR's policies and practices regarding the role of counsel in release, step-up, and step-down decisions require Class Members' legal representatives to devote more time and resources to piece together the reasons for clients' restrictive placement or continued detention than they otherwise would. This reduces the ability of children's lawyers to advocate for release or transfer to a less restrictive setting.<br><br>Ex. 30 [Ortiz Dep. Tr.] at 51:7–52:23 | Disputed to the extent Plaintiffs' use of the term "policies and practices," "devote more time," "pieces together," and "reduces ability" are statements of opinion, not fact. Further disputed as Plaintiffs' cited evidence pertains to only the experience of a single service provider at one particular facility and does not establish a general policy or policy. Ex. 30 [Ortiz Dep. Tr.] at 51:7–52:23. This is particularly true as the individual later praises other facilities for a "very close relationships" with "regular meetings," and "constant communication." Ex-30 [Ortiz Dep. Tr.] at 59:19-24.<br><br>*See* Defs.' Evidentiary Objection ¶ 268. | **Remains Undisputed**. Defendants offer no evidence to contradict this UF ¶ 268 and Plaintiffs' evidence of experience by a service provider is sufficient evidence to support the time and resources required of Class Members' legal representatives. Ex. 30 [Ortiz Dep. Tr.] at 51:7–52:23.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 268. |
| 269. | Apart from possibly delaying release, ORR has identified no governmental interest that would be adversely affected were FFS required to have regular communication with Class Members' legal representatives. | Disputed as Plaintiffs' have mischaracterized by omitting relevant language. Plaintiffs' assert that the only harm ORR has identified is "possibly delaying release." But, routine delays in release would adversely affect ORR's ability to provide for the physical and mental well-being of all UACs in its care as undue delay "could affect the minor's | **Remains Undisputed**. Defendants offer no evidence that FFS' speaking with children's lawyers would actually delay release. Defendants' cited evidence addresses delays in *placement*, not release, that could possibly be resulting from requiring a hearing prior to restrictive placement, not |

| | | | |
|---|---|---|---|
| | Ex. 37 [Sualog Dep. Tr.] at 136:24– 138:18 | behavior toward him or herself, toward other children, and finally toward staff." *See* DX-09 [Antkowiak Decl.] ¶ 34 ("[I]t is important to place the child in a location where their needs can be met without undue delay. A hearing would prolong placement at a site that cannot meet the individual's needs...This could affect the minor's behavior toward him or herself, toward other children, and finally toward staff."). *See also* Fact Response ¶ 225 (discussing additional costs associated with Plaintiffs' requested "procedural protections").<br><br>*See* Defs.' Evidentiary Objection ¶ 269. | from speaking with children's lawyers.<br><br>Moreover, the Deputy Director of ORR testified "[t]he only adverse effect [to a policy requiring FFS to have regular communication with children's lawyers] would be" FFS may not "know enough about each child's case to have regular contact with their attorneys." Ex. 37 [Sualog Dep. Tr.] at 136:24–137:6.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 269; *see also* Plaintiffs' Objections to Defendants' Evidence (ECF No. 289-2) ¶ 13. |
| 270. | ORR has not promulgated a regulation nor issued any formal interpretation of "legal proceedings or matters" as that phrase is used in the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 | Disputed. ORR's legal interpretation is within its contract with Vera. *See* Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 398:10-12 ("It's within our -- it's sort of the underlying basis of our legal service contract. . . ."); DX-83 at 39 (████████ █████████████████████ ██████████). Plaintiffs' proposed fact overlooks that ORR has formally stated in | **Remains Undisputed**.<br>Contractual provisos enforcing Defendants' policy against LSPs using Vera funds to represent children with respect to release, placement, and medication decisions do not formally interpret "legal proceedings or matters" as |

234.

| | | |
|---|---|---|
| ("TVPRA"), 8 U.S.C. § 1232(c)(5).<br><br>Ex. 13 [Biswas 30(B)(6) Dep. Tr.] at 398:3–399:4; Ex. 37 [Sualog Dep. Tr.] at 114:4–9 | notice and comment rulemaking that: "[T]he TVPRA, 8 U.S.C. § 1232(c)(5), does not require that counsel be provided at government expense to UACs. Rather, HHS is encouraged to use pro bono services, and the statute specifically says that counsel is at no expense to the government." 84 Fed. Reg. 44392, 44427 (Aug. 23, 2019); *see also id.* at 44481; DX-10 [Biswas Decl.] at ¶ 90 (explaining that the term "proceedings," is also used within the Homeland Security Act, and interpreted by ORR to mean "immigration" "proceedings."); *see generally* DX-85 [Vera Contract Scope of Work].<br><br>*See* Defs.' Evidentiary Objection ¶ 270. | that phrase is used in the TVPRA: they are rather *ipse dixit*.<br><br>The quoted text from the commentary preceding the enjoined *Flores* sunset rules does not purport to interpret "legal matters or proceedings" as used in the TVPRA either. It states, "[T]he TVPRA, 8 U.S.C. § 1232(c)(5), does not require that counsel be provided at government expense to UACs," which is a proposition immaterial to Plaintiffs' instant claims.<br><br>*See* Plaintiffs' Response to Defendants' Evidentiary Objections ¶ 270. |
| 271. | ORR prohibits legal services providers from using federal funds appropriated in furtherance of the TVPRA to represent children with respect to (i) release to available custodians, (ii) restrictive placement, and (iii) the | Undisputed, as to the Vera contract as funded per 8 U.S.C. § 1232(c)(5). | **Undisputed**. |

235.

| | | | |
|---|---|---|---|
| | appropriateness of their taking psychotropic drugs.<br><br>ECF No. 144 [Answer] ¶ 111; Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 400:1– 12 | | |
| 272. | ORR views its Congressional appropriation for legal services funding as funding immigration- related legal services. ORR does not view the appropriation as funding other attorney work to represent children with respect to (i) release, (iii) step-up or step-down, and/or (iii) the administration of psychotropic medications.<br><br>Joint Stip. ¶ 99 | Undisputed. *See* DX-10 [Biswas Decl.] ¶ 90 (stating that decisions on medication, step-up, and release are not legal matters or proceedings, as they are not before an administrative or federal judge; nor do ORR attorneys appear when these decisions are being made, as would occur in a typical "legal" matter or proceeding). Defendants aver as well that Congress views the appropriation in this way as well. See, e.g., EMERGENCY SUPPLEMENTAL APPROPRIATIONS FOR HUMANITARIAN ASSISTANCE AND SECURITY AT THE SOUTHERN BORDER ACT, 2019, 165 Cong. Rec. H5147-01, H5148 (funding for legal services is for the "same purposes" as in fiscal year 2017); H.R. REP. 116-450, 116th Cong., 2nd. Sess., Committee on Appropriations Report on appropriations for FY 2021 ("[L]egal services for unaccompanied children . . . . provided by qualified and independent legal counsel . . . | **Undisputed**. |

236.

| | | can increase the efficiency and effectiveness of immigration proceedings, significantly reduce the failure-to-appear rate of children who are released from HHS custody, and help relieve the immigration court backlog. . . . In addition, the Committee strongly encourages ORR to work with legal service providers to develop a strategy to minimize the risks of any child having to go to immigration court without independent legal counsel. . . . The recommendation includes an additional $5,500,000 for legal service providers to recruit and train additional attorneys for the purposes of building the capacity necessary to provide independent representation to unaccompanied children with pending immigration cases."). | |
|---|---|---|---|
| 273. | Some facilities permit Case Managers to communicate regularly with Class Members' legal representatives, regularly share potential custodians' contact information with children's legal representatives, and freely disclose the basis for any delay in release. | Disputed only to the extent it implies that not all facilities are expected to work with children's legal representatives. DX-68 [Sualog Dep. Supp.] 102:12 (describing consequences when a shelter precludes case managers from speaking with attorneys), 102:16-19 ("ORR has requirements that basically mandates access to facilities, to children and to the facility as a whole to legal services providers."). | **Remains Undisputed**. |

237.

| | | | |
|---|---|---|---|
| | Ex. 30 [Ortiz Dep. Tr.] at 59:5–60:4 | | |
| 274. | Case Managers are not federal employees but are employed by "care providers": *i.e.*, private facilities with which ORR enters into cooperative agreements to place and care for children in ORR legal custody.<br><br>Joint Stip. ¶ 92; Ex. 1 [ORR Policy Guide] § 2.3.2 at 39-40 | Undisputed. | **Undisputed**. |
| 275. | Case Managers, Case Coordinators, and FFS all routinely review psychological reports before step-up to a restrictive setting is approved.<br><br>Ex. 13 [Biswas 30(b)(6) Dep. Tr.] at 275:7–276:16 | Undisputed. | **Undisputed**. |
| 276. | *Flores* Bond hearings put the onus to initiate the hearing and the burden of proof on the unaccompanied child.<br><br>Evidence: Ex. 1 (ORR Policy Guide] § 2.8 at 54-55 ("unaccompanied alien | Undisputed. ORR has explained the policy on bond hearings in its final rule on "Apprehension, Processing, Care, and Custody of Alien Minors." *See, e.g.*, 84 Fed. Reg. 44392, 44477 (Aug. 23, 2019) (explaining that: "In accordance with the Flores district court's order analogizing Flores custody hearings to bond hearings | **Undisputed**. |

238.

| | | |
|---|---|---|
| children have the opportunity to seek a bond hearing with an immigration judge...The burden is on the requestor to demonstrate that the child can be released because he or she is not a danger to the community.") | for adults, immigration judges currently apply the standard of . . . . Thus, under current practice, the burden is on the UAC to demonstrate that he or she would not be a danger to the community (or flight risk) if released. Due to the unique vulnerabilities of children and subsequent enactment of the TVPRA, however, HHS requested comments on whether the burden of proof should be on ORR to demonstrate that the UAC would be a danger or flight risk if released."). <br><br> In the final rule, ORR explained that it would alter the burdens that currently are applied by immigration judges in bond hearings – in order to "balance the equities of UACs in care with its responsibility under the FSA to ensure public safety." *Id.* at 44481 (explaining that under the final rule HHS will assume the burden of producing documentation and evidence, which the UAC must then successfully rebut under a preponderance of the evidence standard). ORR has also previously explained that it uses an "opt-in rather than opt-out right" but each minor receives a "notice of the procedures" for bond hearings, and a "form . . . to make a | |

239.

written request for a hearing." Proposed 45
C.F.R. § 410.810(a)(2). Requests can be
made by children or their "parents, legal
guardians, or legal representatives." 84 Fed.
Reg. 44,478. ORR explained that many
minors prefer *not* to have a custody hearing
given that such a hearing can make
placement more difficult, and make a
minor's history of danger part of a
permanent immigration record. *Id.*
(hearings "provid[e] no benefit for the
overwhelming majority of UACs" who "are
not considered dangerous or flight risks to
begin with"). This is borne out by the case
files in this case. *See, e.g.*, DX-50 [Fink
MAS Decl.] ¶ 28 ("

.). *Flores* counsel have also
admitted they agreed to an opt-in process
under the *Flores* settlement agreement. *See*
https://www.ca9.uscourts.gov/media/view_
video.php?pk_vid=0000017417 at 47.01-03
("That was an agreement between the
parties.").

240.

1   Dated November 20, 2020         COOLEY LLP

2

3                                     /s/

4                                     Summer J. Wynn (240005)
                                    Attorneys for Plaintiffs

5                                     Email: swynn@cooley.com

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Cooley LLP
Attorneys at Law
Los Angeles

238.

**Plaintiffs' Response to Defendants'
Statement of Genuine Disputes
Case No. 2:18-cv-05741 DMG PLA**