# Exhibit 199

Exhibit 199
Page 2

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               WESTERN DIVISION

4        Case No. 2:18-cv-05741 DMG PLA

5    ---------------------------------------x

6   LUCAS R., et al.,

7                    Plaintiffs,

8        v.

9   ALEX AZAR, Secretary of U.S. Department

10  of Health and Human services, et al.,

11                   Defendants.

12   ---------------------------------------x

13

14      TELEPHONIC DEPOSITION OF ILZE EARNER

15         Monday, August 10, 2020

16

17

18

19

20

21  Reported by:

22  Amy A. Rivera, CSR, RPR, CLR

23  JOB NO. 182276

24

25

1    potential sponsor is.

2          Q.    And is it your testimony that they

3    have a say if ORR makes the decision to deny that

4    sponsor?

5          A.    Well, why is the sponsor denied?

6                They're usually denied because they

7    are either inappropriate or there are some

8    concerns about the ability of the sponsor to meet

9    the needs of the child.

10                I think those are fair concerns.

11    Those are appropriate concerns.

12                Again, you're talking about minors and

13    you're talking about individuals who may be under

14    pressure to say, yes, I want to go with so and so.

15    So and so is a great person.  And so and so may

16    not be such a great person for this kid.

17          Q.    Is ORR infallible?

18          A.    Are any of them?

19                MR. SHIEH:  Argumentative.

20          Q.    Fair question.

21          A.    I don't think anyone is infallible.

22                Are mistakes made?  Of course they're

23    made.  But, again, you have to look at how many

24    mistakes are made and is this an organization that

25    rife with mistakes, indiscriminate, arbitrary,

1  capricious, I don't see that.

2           I see that people do have concerns.

3  They have legitimate concerns for kids, and it's a

4  population that's at very high risk, and I don't

5  think, you know, appropriate concerns for their

6  safety is such a far-fetched concern to -- to

7  undertake with a degree of -- of being impartial,

8  of being thorough, of being sure that when you

9  release this kid, this kid isn't going to wind up

10  as some domestic slave somewhere.

11      Q.    How does having a fair hearing

12  undermine the safety of a child?

13      A.    I think a fair hearing is a -- people

14  hear a fair hearing and they think it's fair and

15  they think they're going to get their way, and

16  what winds up happening?  There is more delay,

17  more arguing, more adversarial, contentious

18  relationships, and you know what?  In the end, I

19  don't think you really benefit from this.  I mean,

20  I just don't see the purpose of it.

21      Q.    I'm sorry, Dr. Earner, but you didn't

22  answer my question.

23           How does a fair hearing undermine the

24  safety of the child?

25      A.    I think it undermines --

1            MR. SHIEH:  Object.

2            THE WITNESS:  I didn't hear those.

3            MR. SHIEH:  Objection.

4      Mischaracterizes what's written in the

5      report.

6       A.    Fair hearings give false hope.

7       Q.    Can you explain that?

8       A.    I think everybody thinks -- or a lot

9  of people think -- and I've seen this over and

10 over in child welfare -- oh, I'm going to go to

11 court and I'm going to, you know, blah, blah,

12 blah, and I'm going to get a lawyer and things are

13 going to be rough.

14            And what happens?  You have got one

15 six-month delay after another, and nobody is

16 satisfied.  Nobody gets anything out of it, and

17 you remain in limbo and nothing changes.

18            It has nothing to do with safety.  It

19 has nothing to do with -- with well-being.  Just

20 creates a burdensome process that, I don't know,

21 makes more work for lawyers.

22            Maybe that's what you want.  I mean --

23 sorry.

24      Q.    So is it your testimony that a fair

25 hearing has nothing to do with safety.  Is that

1   fair?

2         A.    I didn't say that.

3               I think fair hearings are in the

4   concept that it somehow guarantees something, and

5   in experience -- in my experience, generally, they

6   accomplish not much.

7         Q.    Might continued residents in an ORR

8   facility be unsafe?

9         A.    In what way?

10        Q.    Well, I think you testified earlier

11  that knowing about sexual abuses occurring in the

12  ORR facilities, might continued residence in a

13  facility and, perhaps, exposure to the possibility

14  for sexual abuse be unsafe for a minor?

15        A.    The world is unsafe.

16              How about releasing a child to someone

17  that you don't really know how this child is going

18  to be treated or where this -- what situation

19  they're going to wind up in, how is that fixed?

20        Q.    How does denial of a fair hearing

21  further the safety of -- strike that.

22              The question that I asked is:  Is

23  continued residence in an ORR facility where

24  there's a possibility for sexual exposure safe?

25              MR. SHIEH:  Objection.  Form.

1                        CERTIFICATE

2              I, AMY A. RIVERA, a Certified Shorthand

3     Reporter, Registered Professional Reporter,

4     Certified LiveNote Reporter, and Notary Public of

5     the State of New York, do hereby certify that prior

6     to the commencement of the examination ILZE EARNER,

7     was duly sworn by me to testify the truth, the whole

8     truth and nothing but the truth.

9              I DO FURTHER CERTIFY that the foregoing is

10    a true and accurate transcript of the testimony as

11    taken stenographically by and before me at the time,

12    place and on the date hereinbefore set forth.

13             I DO FURTHER CERTIFY that I am neither a

14    relative nor employee nor attorney nor counsel of

15    any of the parties to this action, and that I am

16    neither a relative nor employee of such attorney or

17    counsel, and that I am not financially interested in

18    the action.

19    _____

20              Amy Rivera

21              Notary Public of the State of New York

22              My commission expires December 6, 2021

23              License No. XI00939

24    Dated:  August 20, 2020

25

# Exhibit 200

Exhibit 200
Page 9

Page 1

1            UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
2                WESTERN DIVISION
3

    LUCAS R., et al.,        )
4                            )
                             )
5        Plaintiffs,         )
                             )    CASE NO.
6        vs.                 )    2:18-cv-05741 DMG PLA
                             )
7    ALEX AZAR, Secretary    )    CONFIDENTIAL
    of U.S. Department of    )
8    Health and Human        )
    Services, et al.,        )
9                            )
        Defendants.          )
10
11
12
13
14                  DEPOSITION
15                     OF
16               YESENIA HEATH
17      1700 7th Avenue, Seattle, Washington
18             FEBRUARY 26, 2020
19
20
21               CONFIDENTIAL
22
23
24  Reported by:
    Monna J. Nickeson, CRR, CLR, RPR, CRR
25  Job No. 176785

Exhibit 200
Page 10

Confidential

1       A.      Staff Secure.

2       Q.      Staff Secure.  Okay.

3               So the child would have to make the

4   criteria for placement in a Staff Secure

5   setting?

6       A.      Yes.  But with staff -- I staff it

7   with my supervisor, and this is something that

8   we have been discussing, that the kids in my

9   therapeutic placement tend to remain there

10  because they need more treatment to -- more

11  time to complete the treatment.  So there has

12  to be a little bit of wiggle room for us to be

13  able to do good work and complete the

14  treatment.

15      Q.      Before the child is released or

16  before the child is transferred to a different

17  facility?

18      A.      Before the child is stepped down to

19  like a shelter-level care.  For release, there

20  isn't another placement to file.  You are

21  released when all the paperwork comes in.

22      Q.      But you were saying sometimes a

23  child needs more time to finish the program?

24      A.      Yes.  So if you have a Notice of

25  Placement on a child in my Therapeutic Staff

**Exhibit 200**
**Page 11**

Confidential

Page 120

1    Secure, and let's just say that we're talking

2    about the program that handles my programs with

3    kids with sex offenders, the sex offenders have

4    a requirement of six months treatment that they

5    have to meet in order for them to be able to go

6    to a regular community setting or to be in the

7    long-term foster community area.

8               So there is different guidances that

9    guide us to being able to do that.  And so

10   every 30 months, we can't just move him and

11   disturb the completion treatment.  We have to

12   maintain.

13              And that is something that I have

14   notified my supervisor about and headquarters

15   is aware that we can't do it in 30 days, so...

16       Q.    So most children placed in the

17   Therapeutic Staff Secure setting won't be

18   stepped down within 30 days?

19       A.    Yes.

20       Q.    How long does it usually take before

21   a child is eligible for step-down from

22   Therapeutic Staff Secure?

23       A.    Case-by-case.

24       Q.    What is the shortest amount of time

25   it has taken for a child to be stepped down

**Exhibit 200**
**Page 12**

Confidential

Page 121

1    from Friends of Youth?

2        A.    Thirty days.

3        Q.    That's the fastest?

4        A.    Yes.

5        Q.    Does that happen often?

6        A.    Most of the time.  But, again, it's

7    on a case-by-case basis.

8        Q.    What's the longest amount of time a

9    child has been in Therapeutic Staff Secure

10   before they were eligible because of treatment

11   requirements?

12       A.    About a year.

13       Q.    About a year.

14             Who decides if a child is a sex

15   offender?

16       A.    They come in with that.

17       Q.    What do you mean by that?

18       A.     If the child has committed a crime

19   in other regions or by the time he gets picked

20   up, it will be part of their record.  And then

21   they will send it to intake saying, "This kid

22   has committed a crime that's of a sex offense

23   nature."  And they get sent to us.

24       Q.    Does the child have to be convicted

25   of a sex offense?

**Exhibit 200**
**Page 13**

Confidential

Page 122

1    A.    No.  But what I see is intake makes

2    that decision before they get to us.  So intake

3    says, "This kid was picked up for committing

4    this crime."  Instead of, like, putting them in

5    the domestic system, they find out they that

6    are undocumented, so they refer them to us.  So

7    we have to move forward with providing the

8    treatment.

9    Q.    So there are times where children

10   have not been convicted of sex offenses that

11   are required to undergo treatment for sex

12   offense?

13   A.    I think you have to be convicted to

14   be in the program, but don't quote me on that.

15   I don't know for sure.  I haven't looked at

16   every single case, so, again --

17        MS. STEVENSON:  Personal knowledge

18        objection.

19   A.    It's on a case-by-case basis, I

20   guess.  I don't know.

21        MR. CARTER:  You said, "Don't quote

22        me."

23        THE WITNESS:  Yeah.  Sorry.  I won't

24        say that again.

25   Q.    The Notice of Placement, aside from

**Exhibit 200**
**Page 14**

Page 298

1            C E R T I F I C A T E

2    STATE OF WASHINGTON            )

                                    )

3    COUNTY OF BENTON               )

4            I, Monna J. Nickeson, a Certified

5    Court Reporter within and for the State of

6    Washington, do hereby certify:

7            YESENIA HEATH, the witness whose

8    deposition is hereinbefore set forth, was duly

9    sworn by me and that such deposition is a true

10   record of the testimony given by such witness.

11           I further certify that I am not

12   related to any of the parties to this action by

13   blood or marriage; and that I am in no way

14   interested in the outcome of this matter.

15           IN WITNESS WHEREOF, I have hereunto

16   set my hand this day, March 11th, 2020.

17

18

19                *Monna Nickeson*

20   _____

     MONNA J. NICKESON, CRR, CLR, RPR, CCR 3322

21

22

23

24

25

**Exhibit 200
Page 15**

# Exhibit 201

Exhibit 201
Page 16

CONFIDENTIAL

Page 1

1           UNITED STATES DISTRICT COURT

2        IN THE CENTRAL DISTRICT OF CALIFORNIA

3

4    ------------------------------x

5    LUCAS R., et al

6              Plaintiffs,        CASE NO:

7         v.                      2:18-CV-05741-

8    ALEX AZAR, SECRETARY OF U.S.      DMGPLA

9    DEPARTMENT OF HEALTH AND HUMAN

10   SERVICES, INC.

11             Defendants.

12   ------------------------------x

13

14             CONFIDENTIAL

15     TELEPHONIC DEPOSITION OF NIDIA MURRAY

16              Houston, Texas

17               9:14 a.m.

18

19

20

21

22

23   Reported by:

24   Paula J. Eliopoulos

25   JOB NO. 170999

CONFIDENTIAL

Page 38

1          Q.      That's okay.

2          A.      I know that the last facility I

3    covered was Shiloh.

4          Q.      Okay.

5          A.      Up until April.

6          Q.      When you switched positions.

7          A.      Yes.

8          Q.      When were you first assigned to

9    Shiloh?

10         A.      I don't know the exact date, but I

11   know that when reviewing -- we looked at, I had

12   been there for four years.

13         Q.      So around 2014, somewhere around

14   there?

15         A.      Perhaps.

16         Q.      Or early 2015, maybe?

17         A.      2015.

18         Q.      So in April of 2019 you took a new

19   position which was?

20         A.      Direct operations coordinator.

21         Q.      And what are your job responsibilities

22   in that role?

23         A.      I supervise eight case coordinators in

24   the Houston area at this time.

25         Q.      Where are those case coordinators

Exhibit 201
Page 18

CONFIDENTIAL

Page 287

1                     CERTIFICATE

2    STATE OF NEW JERSEY      )

3    COUNTY OF MORRIS         )

4              I, JANET HAMILTON, a Registered

5    Professional Reporter and New Jersey Notary

6    Public, do hereby certify that:

7              I joined this deposition telephonically

8    after the lunch recess, at 12:41 p.m. CST, and

9    ended my reporting at 5:45 p.m. CST, at which time

10   the deposition was concluded.

11             I further certify that I am not related

12   to any of the parties to this action by blood or

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15             In witness whereof, I have hereunto set

16   my hand this 2nd day of January, 2020.

17

18

19   _____

     JANET HALL, RPR, CRC, FPR, NJCCR

20   NJCCR License 30X100240200

     Expires 6/30/2020

21

22

23

24

25

**Exhibit 201**
**Page 19**

# Exhibit 202

Exhibit 202
Page 20

CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF CALIFORNIA
2                 WESTERN DIVISION
3          CASE NO. 2:18-CV-057441-DMG-PLA
4    LUCAS R., et al.,
5         Plaintiffs,
6    vs.
7    ALEX AZAR, Secretary of U.S. Department
     of Health and Human Services, et al.,
8
          Defendants.
9    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _/
10
11                    6355 NW 36th Street
                      Suite 2201
12                    Miami, Florida
                      Thursday, August 22, 2019
13                    9:35 a.m. to 2:48 p.m.
14
15
16
17               CONFIDENTIAL
18        DEPOSITION OF MICHELLE ORTIZ
19
20
21        Taken on behalf of the Plaintiffs before Carol
22   Hill Weng, FPR, RMR, CRR, CMRS, CPE, CRI, a Notary
23   Public in and for the State of Florida at Large,
24   pursuant to Plaintiffs' Notice of Taking Deposition in
25   the above cause.

CONFIDENTIAL

Page 139

1    your colleagues at AIJ then follow up with the

2    child?

3        A.    Yes.

4        Q.    Still talking about Homestead, when

5    AIJ lawyers learned about potential sponsors for

6    children who were at Homestead, is it correct

7    that AIJ lawyers were able to communicate about

8    those potential sponsors with the director of

9    the facility by sending an e-mail?

10       A.    I'm not sure that's correct.  I know

11   that during the time that I supervised our staff

12   at the facility, the way that our staff handled

13   it was to instruct the child to put in a request

14   to speak to their case manager and provide them

15   with that information and we would help them do

16   the request to speak with the case manager.

17       Q.    I see.

18       A.    We were also -- I'll wait for the

19   question.

20       Q.    No.  It sounds like you had more of

21   your answer.

22       A.    I mean, we were told to limit our

23   e-mails.  We were told we sent too many e-mails.

24       Q.    And who told you that you sent too

25   many e-mails?

Page 140

1      A.    Leslie Wood, multiple times.

2      Q.    So if I understand right, AIJ lawyers

3   had her e-mail address -- had Ms. Wood's e-mail

4   address and sent her e-mails, right?

5      A.    We were told that we were not to

6   communicate with anyone, that everything had to

7   go through her, that she was the only person who

8   had reliable, accurate information.  And then we

9   were told that we sent too many e-mails.

10      Q.    So first she told you to e-mail her,

11   and then you did e-mail her, and then she said

12   you're e-mailing too much; is that correct?

13      A.    Absolutely.

14      Q.    In representing minors in ORR custody,

15   have AIJ lawyers had the occasion to e-mail

16   federal field specialists?

17      A.    Yes.

18      Q.    And I think you actually testified

19   about that, happened -- would you say it

20   happened frequently?

21      A.    Yes.

22      Q.    Did you ever hear from FFSs saying you

23   sent too many e-mails?

24      A.    No.

25      Q.    How was your relationship with FFSs?

CONFIDENTIAL

Page 159

1           REPORTER'S DEPOSITION CERTIFICATE

2

3       I, Carol Hill Weng, FPR, RMR, CRR, CMRS, CPE, CRI,

4   certify that I was authorized to and did

5   stenographically report the deposition of Michelle

6   Ortiz, the witness herein on August 22, 2019; that a

7   review of the transcript was requested; that the

8   foregoing pages are a true and complete record of my

9   stenographic notes of the deposition of said witness;

10  and that this computer-assisted transcript was prepared

11  under my supervision.

12      I further certify that I am not a relative,

13  employee, attorney or counsel of any of the parties,

14  nor am I a relative or employee of any of the parties'

15  attorney or counsel connected with the action.

16      DATED this August 31, 2019.

17

18

               *Carol Hill Weng*

19             Carol Hill Weng, FPR, RMR, CRR

               CMRS, CPE, CRI

20

21

22

23

24

25

**Exhibit 202**
**Page 24**

# Exhibit 203

Exhibit 203
Page 25

Confidential

1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

3                  WESTERN DIVISION

4

5   LUCAS R., et al.,

6            Plaintiffs,

7   vs.                    CASE NO. 2:18-CV-05741

8   ALEX AZAR, et al.,              DMG PLA

9            Defendants.

10

11

12            REMOTE DEPOSITION OF

13             DONNA LYNN LONDINO

14            Monday, August 3, 2020

15               9:28 a.m. EDT

16

17          *** CONFIDENTIAL ***

18

19

20

21

22   Reported by:

23   GRETA H. DUCKETT, CCR, RPR, CRR, CVR-S, RVR-M-S

24   JOB NO.: 181949

25

Confidential

1  in disciplinary action?

2      Q.    Yes.

3      A.    So I would qualify disciplinary action.

4  I didn't find evidence in my file review that

5  anyone was punished per se.  Now, because of safety

6  they may have been found to be needy of a change in

7  placement.  As I opined, I believe, in my rebuttal,

8  the last part of my rebuttal to the third report,

9  it is standard to use token economy.  So oftentimes

10 privileges can be earned by direct behavior.

11     If I might go back to your direct

12 questioning, definitely it should be considered.

13 So therapeutic holds had been devised in a manner

14 that other interventions are attempted first,

15 because you don't want to use excessive physical

16 contact with an individual that has had trauma in

17 their past.  That could just bring up a lot of

18 uncomfortable thoughts and feelings and behavior

19 that aren't helpful for anyone.

20     Q.    Do you have any documented cases where

21 disciplinary action was taken?

22     A.    What I would attest to is that unsafe

23 behavior could lead to a decision to an additional

24 level of care.  And so those would be what would be

25 in the significant incident report.  So not just,

Confidential

1  you know, perhaps cursing at a staff member.  Those

2  would be specific behaviors of trying to harm

3  oneself, trying to harm others through aggression,

4  use of weapons that were available, albeit, if that

5  was something that was in the shelter, to hit

6  someone with, trying to coerce someone into a

7  sexual type of engagement.

8       So those would be significant incident

9  reports that then would be used to determine

10  whether a change in placement was indicated or

11  additional observation.

12       Q.     What type of actions would you consider

13  to be disciplinary in nature?

14       A.     I consider disciplinary in nature is

15  seclusions.  Those have been utilized in some

16  facilities.  Neither of those residential

17  facilities use that as far as locking up a child

18  against their -- they're allowed to give their own

19  permission, do you think it would be helpful to go

20  into what they oftentimes call a sensory room to

21  calm down and to collect yourself before you enter

22  the milieu again.  Maybe someone would consider

23  that punishment because you get removed from an

24  milieu, but it really is intended to help the

25  individual calm down so that they can re-enter in

Confidential

1  an adaptive fashion.  If the child wasn't bad or,

2  you know, again, I guess they could be struck, but

3  that would be illegal.

4       So those are the biggies that I

5  consider disciplinary or threats.  So threats of

6  malicious intent by staff if a child didn't behave.

7       Q.     If a child is being considered for a

8  step-up to a more restrictive level of placement,

9  do you believe that decision makers should consider

10 the causes of their behavior?

11      A.     It depends on the behavior.  Again, if

12 it warranted what they call the significant

13 incident report, those would be behaviors that

14 should be acted on immediately, because they pose

15 an imminent risk.  That means if something is not

16 done that there could be harm to the UAC or others.

17 So -- but in other behavior, yes, those should be

18 reported to the therapist and in my review of the

19 chart files, were generally addressed in that

20 manner.

21                MS. COOPER:  Okay.  Do you want

22           to take the last break now or do you

23           want to keep going?

24                MR. MOSS:  We're happy to take a

25           short break now if now is a convenient

Confidential

1          REPORTER'S CERTIFICATE

2          I, Greta H. Duckett, Certified Court

3 Reporter, Registered Professional Reporter, and

4 Certified Realtime Reporter, hereby certify that on

5 Monday, August 3, 2020, I reported the deposition

6 of DONNA LYNN LONDINO, who was first duly sworn or

7 affirmed to speak the truth in the matter of the

8 foregoing cause, and that the pages herein contain

9 a true and accurate transcription of the

10 examination of said witness by counsel for the

11 parties set out herein.

12          I further certify that I am neither of kin

13 nor of counsel to any of the parties to said cause,

14 nor in any manner interested in the results

15 thereof.

16          This 13th day of August, 2020.

17

18          *Greta Duckett*

19 _____

20 GRETA H. DUCKETT, RPR, CRR, CVR-S, RVR-M-S
   ACCR-12, GCCR-2891, MCCR-1945, TNLCR-671

21

22

23

24

25