# DX-86

Deposition of Melissa Cook, November 18, 2019 (Supplemental Excerpts)

```
                                                              Page 1

 1
 2           IN THE UNITED STATES DISTRICT COURT
 3              CENTRAL DISTRICT OF CALIFORNIA
 4                     WESTERN DIVISION
 5   **********************************************************
     LUCAS R., et al.,
 6
                    Plaintiffs,
 7          v.                          Case Number
                                        2:18-CV-05741 DMG PLA
 8   ALEX AZAR, Secretary of U.S.
     Department of Health and Human
 9   Services, et al.,
10                  Defendants.
     **********************************************************
11
12      Confidential pursuant to the protective order
13                      DEPOSITION OF
14                      MELISSA COOK
15                   November 18, 2019
16               9:10 a.m.  -  5:06 p.m.
17                Harrisonburg, Virginia
18
19
20
21
22
23
24   REPORTED BY:  GWENDA E. APPLEGATE, RPR, CRR
25   Job #:171764
```

Case 2:18-cv-05741-DMG-PLA   Document 304-3   Filed 11/23/20   Page 3 of 10   Page ID
#:18162
Confidential pursuant to the protective order

Page 107

1      Q     Is there any written document that lays out
2   what services a child will receive?
3      A     We have the case review.
4      Q     And what information about services is in
5   the case review?
6      A     What type of services would you be
7   referring to?
8      Q     Your clinical services.
9      A     Clinical services?  Clinical services,
10  we're more of a triage, so we're not coming up with a
11  specific plan for each kid.  We're triaging and
12  helping them adjust and supporting them.  And we're
13  not a treatment facility.
14     Q     What do you mean by triage?
15     A     The kids who come to us usually could be
16  having behavior difficulties if they're coming
17  straight from a crisis situation or if they've been
18  incarcerated in the local setting or something.
19  There's -- there could be behavior issues, so we're
20  just dealing with what's there.  We're not doing deep
21  psychological fixing or counseling or, you know, if
22  they're borderline, we're not coming up with
23  treatment plans on treating them because we're not a
24  treatment facility.  We're just taking care of them
25  while they're there.  And it should be a short time.

Page 109

1    higher level of secure, security.
2        Q    And what does higher level of secure mean?
3        A    It mean -- it would mean the most -- it
4    would mean whatever level that youth needs to be in
5    to be maintained in a safe manner for themself or
6    others.
7        Q    Is Shenandoah, to your understanding, the
8    highest level of security that ORR --
9        A    Yes.
10       Q    -- uses?  Yes.
11            And it's called a secure facility?
12       A    Yes.
13       Q    What does it mean to be a secure facility?
14       A    It means that the youth have 24-hour
15   supervision.  It means that they are in a locked
16   facility.  They cannot come and go as they please.
17       Q    Anything else?
18       A    I'm sure there are other things, but I
19   can't think of specifics.
20       Q    Do children have any privacy at Shenandoah?
21       A    Yes.
22       Q    When?
23       A    They have their own bedrooms.
24       Q    Are there windows out to the hallway?
25       A    Are there windows out to the hallway?

Page 110

1  Q    From the bedrooms?
2  A    Yes.  There's a window to the main unit,
3  uh-huh.
4  Q    Are the children allowed to cover them?
5  A    If they choose.  They need to have a little
6  bit of a space so that staff can monitor for
7  self-care -- I mean for self-harm.
8  Q    Do you know what the ratio of staff to
9  children at Shenandoah is?
10 A    No.  Not exactly.
11 Q    Do you know approximately?
12 A    No.  It's not within my area of expertise.
13 Q    When you have a clinical appointment with a
14 child, where does it take place?
15 A    Typically in my office.
16 Q    Does the child come to your office alone or
17 are they with a staff member?
18 A    Typically it will be me and the child.
19 Q    But when the child moves from their room or
20 unit to your office, are they on their own or are
21 they with a staff member?
22 A    They are always with a staff.
23 Q    Are they always with staff whenever they
24 are moving within the facility?
25 A    Yes.

Case 2:18-cv-05741-DMG-PLA Document 304-3 Filed 11/23/20 Page 6 of 10 Page ID #:18165
Confidential pursuant to the protective order

Page 118

1  somebody is stepping up a child that has had multiple
2  hospitalizations within a month, then we're going to
3  say we're going to assess it and be, like, the child
4  is too high, too high maintenance medically for us,
5  so we would recommend that they either need to be
6  hospitalized or that they need to look at RTC
7  placement.  So we would not accept a child who is
8  actively suicidal and had just attempted suicide,
9  like, the day before.  We would recommend that go to
10 an appropriate placement.
11      Q   Are there other reasons you would recommend
12 against a child coming to Shenandoah other than
13 suicide risk?
14      A   If their -- if their behavior didn't appear
15 to be as severe, as concerning as possibly the
16 placement referring was deeming it.
17      Q   Okay.  So you might be looking both at does
18 this child have needs that Shenandoah can't meet, and
19 also, is this an appropriate placement?
20      A   Correct.
21      Q   So am I correct that you might make
22 recommendations both -- am I correct that you would
23 make recommendations against step-up if you thought
24 it was inappropriate?
25      A   Yes.

Confidential pursuant to the protective order

Page 119

1   Q    Would you ever make a recommendation for a
2   step-up?
3   A    Yes.
4   Q    And when would you make a recommendation
5   for a step-up?
6   A    I mean, I wouldn't make the recommendation.
7   I would just be in agreement with it.  I wouldn't --
8   I don't make the decisions.  That would be if a kid
9   has been violent and aggressive and has been
10  dangerous for other people or to himself and needed
11  to be stabilized as far as his behavior.
12  Q    Is Shenandoah a place where you stabilize
13  kids' behavior?
14  A    I would say that we do stabilize kids'
15  behavior by the dynamics that we are programmed,
16  we're a predictable setting for kids so it creates a
17  sense of safety for them, and they tend to calm down
18  and tend to be able to process a little bit better.
19  Q    Because of the structure?
20  A    Because of the structure.
21  Q    If you are making a recommendation either
22  for step-up or against step-up, who are you making
23  that recommendation to?
24  A    Again, we're the highest level, so I don't
25  make recommendations.  I just review it to see if

Case 2:18-cv-05741-DMG-PLA   Document 304-3   Filed 11/23/20   Page 8 of 10   Page ID #:18167
Confidential pursuant to the protective order

Page 133

1      Q    Does the youth have to consent to family
2   counseling?
3      A    Does the youth have to consent to family
4   counseling?
5      Q    To family counseling?
6      A    Yes.
7      Q    And whose decision is it whether to provide
8   family counseling?
9      A    It's a clinical decision.
10     Q    It's your decision?
11     A    It's a clinical decision.  It's based on
12  the needs.
13     Q    If one of the two clinicians who is not a
14  lead clinician wants to provide family counseling,
15  can they do that on their own or do they need to get
16  approval from you?
17     A    No.  They can do that on their own.
18     Q    They can do that on their own.
19          Okay.  So we've talked about individual
20  counseling, group counseling, and family counseling.
21  What other mental health related services might a
22  child at Shenandoah receive?
23     A    Medication management.
24     Q    Anything else?
25     A    As far as mental health?

Case 2:18-cv-05741-DMG-PLA   Document 304-3   Filed 11/23/20   Page 9 of 10   Page ID #:18168
Confidential pursuant to the protective order

Page 134

1      Q    Yes.
2      A    Just medication management, or they can
3  have a psychological evaluation if that is requested.
4      Q    Do children ever receive psychiatric
5  services that aren't medication management?
6      A    No.
7      Q    And if a child is receiving medication
8  management, that's Dr. Cane?
9      A    Yes, Dr. Cane and his associates.
10     Q    And you mentioned the children might
11  receive a psychological evaluation --
12     A    Correct.
13     Q    -- if one was requested.  Who would request
14  a psychological evaluation?
15     A    That would be the FFS.
16     Q    And what does a psychological evaluation
17  entail?
18     A    I don't know the specific testing, but it
19  would -- it would provide mental health testing and
20  risk assessment testing.
21     Q    And what's the purpose in getting a
22  psychological evaluation for a child at Shenandoah?
23     A    To help -- to help the decisions that are
24  made as to the -- as far as the placement and what's
25  going to be in their best health, what is the needs.

Confidential pursuant to the protective order

Page 294

COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

I, Gwenda E. Applegate, Court Reporter, Notary Public in and for the Commonwealth of Virginia at Large, and whose commission expires November 30, 2021, do certify that the aforementioned appeared before me, was sworn by me, and was thereupon examined by counsel; and that the foregoing is a true, correct, and full transcript of the testimony adduced.

I further certify that I am neither related to nor associated with any counsel or party to this proceeding, nor otherwise interested in the event thereof.

Given under my hand and notarial seal at Palmyra, Virginia, this 3rd day of December 2019.

*Gwenda E. Applegate*
_____

Gwenda E. Applegate, Notary Public
Commonwealth of Virginia at Large
Notary Registration Number 115863