

1                  UNITED STATES DISTRICT COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3            HONORABLE DOLLY M. GEE, JUDGE PRESIDING

4    LUCAS R., ET AL.,                    )
                                          )
5                                         )
                                          )
6                        Plaintiffs,      )
                                          )
7                                         )
                                          )
8           Vs.                           )   No. CV18-5741-DMG
                                          )
9                                         )
                                          )
10   ALEX AZAR, ET AL.,                   )
                                          )
11                                        )
                                          )
12                       Defendants.      )
                                          )
13   _____     )

14

15

16     REPORTER'S TRANSCRIPT OF VIDEO TELECONFERENCE PROCEEDINGS

17                     *MOTION HEARING*

18                 TUESDAY, DECEMBER 22, 2020

19

20

21

22

23            MIRIAM V. BAIRD, CSR 11893, CCRA
            OFFICIAL U.S. DISTRICT COURT REPORTER
24          411 WEST FOURTH STREET, SUITE 1-053
              SANTA ANA, CALIFORNIA 92701
25                 MVB11893@aol.com

                   UNITED STATES DISTRICT COURT

1                    **A P P E A R A N C E S**

2

3     **IN BEHALF OF THE PLAINTIFFS,**      CARLOS HOLGUIN
      **LUCAS R., ET AL.,:**                CENTER FOR HUMAN RIGHTS AND
4                                           CONSTITUTIONAL LAW
                                            256 SOUTH OCCIDENTAL
5                                           BOULEVARD
                                            LOS ANGELES, CA 90057
6
                                            ALEXANDRA REX MAYHUGH
7                                           COOLEY LLP
                                            1333 SECOND STREET SUITE
8                                           400
                                            SANTA MONICA, CA 90401-4100
9

10

11

12    **IN BEHALF OF THE DEFENDANTS,**      CHRISTOPHER BATES
      **ALEX AZAR, ET AL.,:**               DANIEL SHIEH
                                            U.S. DEPARTMENT OF JUSTICE
13                                          950 PENNSYLVANIA AVENUE NW
                                            WASHINGTON, DC 20530
14

15

16    **ALSO PRESENT (TELEPHONICALLY)**
      **SUMMER WYNN**
17    **HOLLY COOPER**
      **DAISY FELT**
18    **BRENDA SHUM**
      **JONATHAN MULLIGAN**
19    **LEECIA WELCH**

20

21

22

23

24

25

```
 1          LOS ANGELES, CALIFORNIA; TUESDAY, DECEMBER 22, 2020; 1107

 2                              ---

 3          THE COURT:  Good morning, everyone.  I made a

 4   gargantuan effort to try to get you a written tentative, but

 5   unfortunately, I could not.  It's already in the 70-page

 6   range, and I'm not finished yet.  So what I'm going to do is

 7   give you an oral tentative.  This is truly a tentative,

 8   because I'm going to need some of you to address some of

 9   these issues through oral argument.  There's just been a huge

10   volume of materials that have been filed.  Because of some

11   other business, I haven't been able to finish all of the

12   issues.  It's a very complicated case with a lot of different

13   issues.

14   So I'm going to try my best to cover what I think are the

15   primary matters by an oral ruling.  I know that you're

16   scheduled for a further session with Judge Pym, I think,

17   sometime in January, and I would like you to have the benefit

18   of at least my tentative thinking on some of these issues

19   when you return to Judge Pym for your mediation.

20   First of all, as a preliminary matter, let me rule on the res

21   judicata issue.  In cases involving class actions, case law

22   has instructed courts that we must apply res judicata very

23   carefully.  I've reviewed the pleadings in both of the cases,

24   Flores and this case and I think that given the 33 years

25   between the filing of the complaint in Flores and the fact
```

```
 1    that Lucas R. involves violations allegedly of the TVPRA and

 2    a new complex ORR infrastructure that did not even exist at

 3    the time of the Flores case, that res judicata does not apply

 4    to the claims.

 5    I'm going to move to the plaintiffs' motion of summary

 6    judgment as to the step-up class procedural due process

 7    claim.  My tentative is to grant partial summary judgment

 8    with regard to the step-up class procedural due process claim

 9    because I think that the step-up class has established

10    liberty interests stemming from constitutional freedom from

11    physical restraint and freedom from unnecessary medical

12    treatment, as well as the TVPRA's stated goal of promptly

13    placing in the least restrictive setting minors unless the

14    government determines that the minor poses a danger to self

15    or others or has been charged with a criminal offense.

16    The liberty interest also flows from the Flores Settlement

17    Agreement itself, because it too places an emphasis on

18    putting minors into the least restrictive setting with

19    certain substantive predicates with regard to when a minor

20    can be placed in a secure environment.  It is a ruling that

21    pertains to the juvenile detention facilities and the

22    residential treatment centers.  The ruling does not apply to

23    the other medium secure facilities, because I don't think

24    there's sufficient information in the record to determine

25    that liberty interests are implicated in those facilities.
```

```
 1    My perception from a review of the evidence is that the

 2    medium secure facilities differ from the shelters primarily,

 3    just in terms of the ratio of staff to the minors.  It does

 4    not have many of the security hallmarks that are prevalent

 5    within the detention facilities and the RTCs.  If I am

 6    incorrect in that regard, feel free to correct me and cite to

 7    the record so that I can review that.

 8    With regard to the procedure that is due for those who are in

 9    the step-up class in the secure facilities, I find that pre-

10    step-up notice and hearing are not necessary.  Given that the

11    government's and the minors' interests in step-up can only

12    occur if the ORR finds that the child is a danger to himself

13    or others or has committed a crime, or in the case of an RTC,

14    that the licensed psychologist or psychiatrist has to have

15    made that finding in order to deem an RTC to be necessary.  I

16    do think that robust post step-up hearing procedures and

17    notice are necessary with an opportunity for minors to --

18    with the assistance of counsel, to determine whether or not

19    there is evidence to sustain the finding that they should be

20    stepped up.

21    I think that the placement review program, the pilot program

22    appears to be a step in the right direction, but needs to

23    have more robust protections.  The notice of placement should

24    be affirmatively provided to counsel of record and to

25    parents, but not necessarily to potential sponsors who have
```

```
 1    not yet been approved.  I'm not sure of what legal status a
 2    potential sponsor would have to receive such notice.  I
 3    didn't see anything cited in the papers to support that.
 4    The parties have cited to recent notices of placement in the
 5    record dating to 2018 or early 2019.  Those are not quite as
 6    recent as I would like.  So I don't know exactly what is in
 7    the notices of placement currently.  I think that the notices
 8    of placement should include information regarding how an
 9    appeal can be made and other statements regarding the proper
10    process in order to challenge a placement if that's not
11    already in the current version of the notice of placement.
12    I don't find that the hearings need to be formal
13    adjudications with the procedures set forth in the APA
14    because due process can be flexible and in situations of
15    great sensitivity like this, there may be a need for some
16    flexibility and the expertise of some of the ORR personnel
17    who are very familiar with the minors and the facilities that
18    are at issue, and may be more efficient than having a neutral
19    decision maker who knows nothing about the environment or the
20    minors involved or their circumstances.  Also, the TVPRA
21    gives the secretary some discretion in its language to
22    prescribe procedures.  So I think that while the procedures
23    should meet a flexible due process standard, it doesn't have
24    to be in the nature of a formal adversary process.
25    To the extent that the plaintiffs raise an independent claim
```

1    for a violation of the TVPRA with regard to the step-up

2    class, I would probably grant summary judgment to defendants

3    in that regard because it's not clear what specific agency

4    action plaintiffs want to set aside and what remedies they

5    seek beyond those already granted through the procedural due

6    process claim.

7    Moving on to the unfit custodian class procedural due process

8    claim.  I would likely tentatively grant plaintiffs' summary

9    judgment motion on that class claims as well with regard to

10   constitutional claims for procedural due process.  The Court

11   finds that the unfit custodian class has established

12   constitutional interest in freedom from restraint and

13   interest in familial relationships, including with extended

14   family.  Apart from the constitutional interest, I don't find

15   that there is any mandatory TVPRA or Flores Settlement

16   Agreement liberty interest.

17   In balancing the *Mathews* factors in terms of determining what

18   process is due, the plaintiffs, I do not think are entitled

19   to automatic hearings on all sponsor denials.  The TVPRA

20   gives ORR an affirmative obligation to determine if a

21   proposed custodian is suitable, but ORR should not bear the

22   burden of proof by clear and convincing evidence that they

23   are not.  I think sponsors have to show their suitability.

24   I think that Category 1 and 2 sponsors should be given a more

25   formalized opportunity to request hearings on denials of

```
 1    sponsorship applications, because the current opportunities
 2    for review are too ad hoc and should not be limited to only
 3    Category 1 sponsors.
 4    Because the parties have not provided sufficient briefing on
 5    the First Amendment claim, the Court is inclined not to rule
 6    on that or to give a tentative on it because I'm not sure how
 7    it adds to the procedural due process aspect of the claim
 8    that I've already ruled on.
 9    The Court tentatively grants the defendants' motion for
10    summary judgment on the legal representation class claim.
11    First of all, I think established case law indicates that
12    there is no constitutional right to appointed counsel at
13    government expense in proceedings.  In looking at the
14    language of the TVPRA, I think the parties have focused a lot
15    on the language referring to legal proceedings or matters.  I
16    think that equally important in that provision of the TVPRA
17    is the phrase that follows that, which is "and to protect
18    them from mistreatment, exploitation and trafficking."
19    I think that language informs what the meaning of legal
20    proceedings or matters is.  A legal matter would not be, for
21    example, to deal with a minor's wills and trust issue.  It's
22    a legal proceeding or manner that deals with the protection
23    of the minors from mistreatment, exploitation, and
24    trafficking.  I don't think that the mission of the TVPRA was
25    to attack the ORR's mistreatment, exploitation, and
```

1    trafficking.  It was to deal with minors' core immigration

2    issues.  Even if the language is susceptible to plaintiffs'

3    interpretation, I think that ORR's decision not to fund

4    attorneys to challenge ORR's decisions is not arbitrary,

5    capricious, or an abuse of discretion or in violation of the

6    law.

7    With regard to the claim that ORR has blocked legal counsel

8    in those proceedings where legal counsel is required due to

9    retaliation for their having challenged ORR administrative

10   decisions regarding placement, release, and medication or

11   whatnot, by retaliating against them and pulling their

12   funding or making clients and records inaccessible and not

13   providing them with information, I think that there are

14   triable issues of fact with regard to those claims.  So

15   summary judgment would not be appropriate for either side as

16   to those claims at this juncture.

17   Those are my core rulings.  I'm going to have parties report

18   back with a joint status report by January 18th of next year

19   following their next mediation session with Judge Pym.  If no

20   resolution can be achieved informally, then I will issue a

21   written ruling after that.

22   So those are the basic tentatives.  I'm open to any argument

23   from counsel.  So, perhaps, starting with plaintiffs'

24   counsel, Mr. Holguin or Ms. Mayhugh, would you like to be

25   heard?

1          MS. MAYHUGH:  Thank you, Your Honor.  This is

2    Alexandria Mayhugh on behalf of plaintiffs.  I will be

3    addressing some of the points Your Honor made in the

4    tentative with respect to the first and second claims for

5    relief, the procedural due process claims for restrictive

6    placement, and release.

7          Obviously, we agree with Your Honor's tentative

8    with the respect to the liberty interest at issue for the

9    step-up class.  A couple of notes you had mentioned with

10   respect to the medium secure facilities.  We submitted

11   evidence that staff-secure facilities or the medium-secure

12   facilities differ in some respects to the juvenile detention

13   centers, but that they also have features that are consistent

14   with restriction of movement.  So those thoughts are

15   described in plaintiffs' separate statement of undisputed

16   facts, Numbers 122 through 124.

17         We also submitted data from our an expert witness

18   showing a strong correlation between restrictive settings

19   regardless of the title and prolonged detention.

20         So what that means --

21         THE COURT:  Ms. Mayhugh, can I interrupt you for a

22   moment.  You say that there are restrictive requirements, are

23   they more restrictive than shelters?

24         MS. MAYHUGH:  They are, yes.  That's undisputed,

25   Your Honor.  For example, some of those facts describe that

```
1     the facilities are fenced.  Kids are not free to leave.  With

2     respect to therapeutic staff-secures, some kids are forced to

3     undergo sex offender treatment without any adjudication of

4     guilt.  Therapeutic group homes, they're administered

5     medications in some respects.

6          So in addition to those facts, what our expert has

7     found is that when a child spends time in any of these

8     placements, whether it is therapeutic, staff-secure,

9     therapeutic group homes, the average length of time --

10         THE COURT:  The court reporter needs you to repeat.

11         MS. MAYHUGH:  I think I said whether it therapeutic

12    staff-secure, therapeutic group homes, or staff-secure

13    facilities, our expert submitted evidence that the average

14    length of care increases significantly.  So this can jump

15    from the average length of stay being 50 days in ORR custody

16    to up to 180 days for therapeutic group homes, close to

17    250 days for therapeutic staff-secure.

18         So our position is that given these dramatically

19    longer lengths of stay, these medium-secure facilities

20    impinge, perhaps, even more on plaintiffs' rights to be free

21    from detention, and then, of course, clearly when they are in

22    ORR custody, they are also away from their families longer.

23    So we believe that it also implicates their constitutional

24    rights to familial association.

25         With respect to the procedures that Your Honor
```

```
1    discussed, we respectfully disagree and believe that

2    pre-deprivation notice and hearing where feasible is proper

3    and required under the due process clause.  These are

4    significant liberty interests at issue.  We also submitted

5    evidence, anecdotal evidence from class members who were

6    erroneously stepped up.  The process to step them back down

7    can take up to three weeks, close to a month, which means

8    that kids are being unnecessarily placed in jail-like

9    settings while ORR decides whether its initial placement

10   decision was erroneous.

11            Now, of course --

12            THE COURT:  Was that before or after my ruling in

13   Flores that requires a psychiatric -- a licensed psychiatrist

14   or psychologist to make a determination that the minor is a

15   danger to self or others?

16            MS. MAYHUGH:  My understanding, Your Honor, I'm

17   thinking specifically of class representative Jaime D.  My

18   understanding that he was stepped up to a juvenile detention

19   center, which does not have that same requirement that a

20   psychiatric make a danger to self or others determination.

21            THE COURT:  In the evidence that you have cited, is

22   there any incident of that happening with regard to an RTC

23   after my Flores ruling?

24            MS. MAYHUGH:  Your Honor, I'm not sure on that, but

25   we would be happy to submit supplemental briefing if that
```

1    would be helpful.

2              THE COURT:  All right.

3              MS. MAYHUGH:  So for those reasons, you know,

4    particularly with respect to this risk of erroneous

5    deprivation and placement and jail-like facilities, coupled

6    with the undisputed evidence we submitted of the harm that

7    these kids suffer inherently in restrictive custody, we do

8    think that pre- step-up notice and a hearing are necessary.

9              We also believe that it should be feasible.

10   Defendants themselves tout their robust internal

11   collaborative process.  It shouldn't be -- they're already

12   undertaking that internal process.  It should not be

13   difficult to provide written notice and an opportunity to be

14   heard for these children.

15             A couple of points on the placement review panel.

16   We appreciate Your Honor's statement that it seems like a

17   placement review panel may be getting closer to the right

18   direction.  We have a couple of concerns.  These are listed

19   in the briefing and also evidentiary objections.  The first

20   being that we have very little information about what this

21   placement review panel actually entails because defendants

22   didn't disclose any of it in discovery in contravention of

23   their duties to supplement under Federal Rule of Civil Rule

24   of Procedure 26(e).  It's also a pilot program.  So it's not

25   incorporated in the ORR policy.  It's not clear at all or how

1    long or pervasive --

2            THE COURT:  Let me clarify.  I'm not suggesting

3    that the placement review program should remain a pilot

4    program or that there shouldn't be a notice of placement that

5    is more informative and provides information that either

6    counsel or minor's representative would be able to look at to

7    determine what the precise basis for the placement is.  I'm

8    just saying that that is a step in the right direction.  It

9    can be built upon and its procedures made more robust.  Given

10   that it is only being used, I believe, right now on a limited

11   basis, I think at maybe one facility, Alexandria.

12           MS. MAYHUGH:  Understood.  Thank you, Your Honor.

13   Thank you for the clarification.

14           THE COURT:  Yeah, they should be expanded.

15           MS. MAYHUGH:  So just trying to look through the

16   other statements you made.  You mentioned the notice of

17   placement.  You weren't sure how detailed it is currently.  I

18   believe you can find a copy of the current version of the

19   notice of placement on Exhibit 2.  It's pages 123 to 124.

20   Our position is unsurprisingly that the limited information

21   is insufficient, which I believe Your Honor agrees with.

22           THE COURT:  What's the date on that?

23           MS. MAYHUGH:  Sorry?

24           THE COURT:  What is the time frame of that notice

25   of placement?  What I said was I didn't find one that is

1    current.  There's some from 2018 or 2019, I thought I saw,

2    but I'm not sure if that's still the same verbiage that is

3    being used now.

4            MS. MAYHUGH:  My apologies.  I believe that also is

5    an older version.  So you're right.  There does not appear to

6    be a current version of the notice of placement in the

7    record.

8            THE COURT:  All right.  If there is one for 2020,

9    perhaps, the parties can supplement the record.

10           MS. MAYHUGH:  Yes, will do.

11           Then with respect to the idea of formal

12    adjudication, as required by APA, we certainly agree that due

13    process is flexible and that there are personnel within ORR

14    who have expertise.  Our concern, though, is that currently,

15    ORR's process affords an incredible amount of discretion to

16    very few ORR employees.  As we set out in our briefing,

17    federal field specialists are responsible for making the

18    final decisions with respect to both step-up and release.

19    They're under no obligation to even speak to the kids before

20    they make those decisions.  So it worries us that we already

21    have a very internal okay'd-purpose process.  Without an

22    adversary hearing with some sort of neutral fact finder,

23    there's no guarantee that our children will be able to

24    adequately rebut findings that ORR has made, you know,

25    sometimes without their involvement at all in the first

```
 1   place.
 2            We also think that the case law and the APA both
 3   support this idea of a neutral fact finder.  Of course, you
 4   know, that can vary based on the circumstance, but should be
 5   someone who isn't involved in the initial investigation and
 6   have some semblance of neutrality.  So they're not
 7   overseeing, for example, the initial fact finder or the FFS
 8   who made the initial --
 9            THE COURT:  Again, I'm not suggesting that there
10   shouldn't be a fact finder who is not involved in the
11   decision-making.  It could be a neutral fact finder.  I'm
12   just not sure it has to be an extra agency neutral fact
13   finder.
14            MS. MAYHUGH:  Got it.  Thank you for the
15   clarification.
16            Before I wrap up step-up, I wanted to go back one
17   point.  I believe if you look at plaintiffs' statement of
18   undisputed facts, Numbers 218 and 219, that will show
19   evidence of erroneous steps-ups and erroneous refusals to
20   step down children once it's been determined that they are no
21   longer a danger to self or others.
22            I forgot to mention --
23            THE COURT:  Let me interrupt you for a moment.
24            MS. MAYHUGH:  Yes.
25            THE COURT:  The placement review program solely for
```

```
 1    challenging step-ups, or can it also be used for challenging

 2    failures to step down?

 3              MS. MAYHUGH:  My current understanding of the

 4    process is that it kicks in at the 30-day review mark.  So I

 5    presume that it both looks at whether a child is

 6    appropriately placed, which would include, I think, you know,

 7    the converse of that, whether they should be stepped down.

 8    Certainly, a more robust process should account for both

 9    decisions and opportunities to challenge both.

10              THE COURT:  All right.  Perhaps that's a question

11    more appropriate for Mr. Shieh?

12              MS. MAYHUGH:  And, Your Honor, I can -- oh, sorry.

13    One more thing about the step-up claim.  When I was talking

14    about the various facilities within OR's network.  I forgot

15    to mention out-of-network facilities.  I know that the oral

16    tentative didn't address them directly.  We submitted

17    undisputed evidence.  I believe that's at Number 121 of

18    plaintiffs' statement of undisputed facts that out-of-network

19    facilities are often RTCs.

20              So we would just request that any additional

21    procedures that are applied to RTCs are similarly applied to

22    out-of-network facilities.

23              THE COURT:  Are out-of-network facilities

24    comparable to RTCs?

25              MS. MAYHUGH:  They are in many respects, yes.
```

```
 1              THE COURT:  Is that somewhere in the undisputed

 2    facts?

 3              MS. MAYHUGH:  Your Honor, that is -- I thought it

 4    was 121, but let me just check.

 5              (Brief pause in the proceedings)

 6              THE COURT:  Yes.  If you go to 121 of plaintiffs'

 7    undisputed facts -- and maybe the reply version is easiest

 8    since that shows the government's response as well -- it says

 9    that out-of-network facilities are often RTCs that are

10    similarly restrictive as in-network RTCs.  That's undisputed.

11              THE COURT:  All right.  Are there some that are

12    not?

13              MS. MAYHUGH:  That I'm not positive about.

14              THE COURT:  All right.  Well, I guess my analogy is

15    it a facility that is similar to a juvenile detention center

16    or to an RTC.  It should be covered within what I have or in

17    tentative ruling.

18              MS. MAYHUGH:  Thank you, Your Honor.

19              I can go on to address some of the points made with

20    respect to the oral tentative on unfit custodian class,

21    unless you prefer to have the government respond to the

22    step-up class claim?

23              THE COURT:  Let's go ahead and have Mr. Shieh

24    respond to what you've said with regard to the step-up class.

25              Mr. Shieh, we can't hear you.
```

1          MR. SHIEH:  I'm not used to this technology.  I had

2     to hit un-mute button.  Sorry about that.

3          A few points to address what Ms. Mayhugh has

4     pointed out.  First, on staff-secure, plaintiffs note that

5     staff-secure are different from shelters because they have

6     fencing, and children are not allowed to leave.  That's also

7     true in shelters.  The shelters often do have fencing as

8     well.  That's not a unique mark to staff-secure facilities.

9     Similarly, children are also not allowed to leave shelters.

10    It's just part of what it means to be in government custody.

11         So, as we pointed out in our papers, the ratio is a

12    primary difference.  There are behavioral plans that go with

13    having a higher staff to child ratio, but other than that,

14    our experts who visited the sites have noted that the

15    facilities are basically indistinguishable.  They're often

16    side by side with shelter facilities.  In fact, they use the

17    same types of room.  They use the same types of staff.

18    It's -- it's -- they have the same licensing.  So we would

19    note that is actually not a difference between shelters and

20    staff-secure.

21         On class --

22         THE COURT:  How about the out-of-network treatment

23    center?

24         MR. SHIEH:  So, Your Honor, there are a few

25    different types of out-of-network -- we would first point to

```
 1    the fact that out-of-network facilities are not covered by

 2    the class definition.  Those -- the class definitions

 3    themselves were proffered by plaintiffs.  They were granted

 4    by this Court in this 2018 order certifying the classes.

 5    Those were proposed by the plaintiffs.

 6            So these facilities were not included, but even if

 7    we were to actually address these facilities on the merits,

 8    they're not all the same.  So there are primarily three

 9    out-of-network facilities that OR [sic] uses.  One are

10    therapeutic group homes.  Those are, other than more

11    wraparound services for minors who have special needs, they

12    are basically shelters.  They are no different -- no more

13    restrictive than shelters.

14            Then you have out-of-network staff-secures.  They

15    would be comparable to normal staff-secures with more

16    wraparound services.  Then there are some out-of-network

17    RTCs, but those are not the bulk of the out-of-network

18    placements.  Certainly, not the only out-of-network

19    placements.

20            THE COURT:  Would the out-of-network RTCs be

21    comparable to the RTCs?

22            MR. SHIEH:  Yes, they're largely comparable.

23            THE COURT:  All right.  Thank you.

24            MR. SHIEH:  To the -- to the merits of these

25    claims -- and my colleague Mr. Bates will address the res
```

```
1    judicata claims and legal representations claim if this Court
2    has time later to hear from us.  We think that the step-up
3    claim and the release claims suffer from four fatal flaws.  I
4    think in terms of how the merits of this claim shake out in
5    terms of the procedures this Court ends up ordering, there
6    are four things the Court should keep in mind.  We do believe
7    that they wrongly discount many of OR's policies and
8    procedures.
9         It seems almost that much of what they ask for only
10   works if we assumed the worst faith on the part of the
11   government.  So, for example, staffing decisions are made by
12   federal field specialists, the case manager, and the case
13   coordinator.  It's true that all three of them have
14   responsibility to care for the child.  They're all employed
15   by different people.  FSSs are employed by ORR.  Case
16   coordinators are third-party contractors employed by GDIT.
17   Case managers are employed by the shelters.  That's a pretty
18   diverse group of people to make a decision together, and if
19   you --
20        THE COURT:  Isn't all due process procedures geared
21   towards protecting people against the worst possible
22   scenario?  I mean, I think that in every setting in which
23   there's procedural due process claim, what you look at is the
24   liberty interest and the potential scope of the deprivation
25   and the seriousness of that deprivation in order to determine
```

1   what process is due.

2          So, of course, you have to also balance the

3   government's interest in an expeditious procedure and to

4   protect the minor from himself and the community, but there's

5   no assumption necessarily that everyone is in bad faith.

6   It's to protect minors against errors that can be very

7   serious if they occur.

8          MR. SHIEH:  Yes, Your Honor, that is true, but not

9   every grant of discretion involves bad faith.

10         So courts, other adjudicators all entrusted with a

11  lot of discretion.  We don't presume, as a matter of law,

12  that judges and administrative law judges and immigration

13  judges will take a discretion and act it out in the worst

14  possible way, which is essentially -- so, for example, case

15  managers -- there's no evidence that case managers can

16  unilaterally just deny on -- I'm moving ahead of myself a

17  little bit.

18         Now, is it possible that one case manager decides

19  hey, if this person calls, I'm not going to do anything in

20  violation of their obligations under the grant, sure.

21  Anybody can be a bad actor.  That doesn't mean that the grant

22  of discretion itself is wrong.

23         THE COURT:  Let me ask you something.  I don't

24  think I said that any grant of discretion to those actors is

25  wrong.  What I'm suggesting is that the placement review

1    program is a step in the right direction to providing some

2    procedure to be able to allow people to challenge decisions

3    that they think are wrong.

4         So, perhaps, you could focus your comments on the

5    placement review program and whether you think that there is

6    room for that program to be more robust in terms of its

7    procedures and whether a neutral fact finder from within the

8    agency would be feasible in that process.

9         MR. SHIEH:  Yes, Your Honor.  On the current

10   placement review program, there -- they currently consist of

11   three child welfare experts from within the agency.  They're

12   not tied to the decision-making process itself.  So they are

13   individual to child welfare backgrounds.  There's a panel of,

14   I believe, three individuals.  They're not always the same

15   people.  That helps to prevent any one person from making all

16   of the decisions in that process.  There are three

17   individuals.  They are from ORR, but they're also going to

18   know the kids best.  They're going to know the program best.

19   They're going to know the different interests at stake best.

20        In terms of --

21        THE COURT:  So none of the three panel members were

22   involved in any way in the decision-making?

23        MR. SHIEH:  In the initial step-up decision,

24   correct.  Right.  They are individuals with child welfare

25   backgrounds from OR headquarters.  They are not field staff.

1          THE COURT:  All right.

2          MR. SHIEH:  They hear evidence for or against the

3     placement decision.  They can receive and take evidence from

4     counsel.  The child can be represented by an attorney at the

5     hearing.  If they can't find an attorney, OR will seek to use

6     the juvenile coordinator to help the child prepare for a

7     hearing or a child advocate.  Then a decision issues upon the

8     conclusion of the hearing.

9          THE COURT:  A written decision?

10         MR. SHIEH:  A written decision, correct.

11         THE COURT:  Which I presume could also be used in a

12    follow-up in federal court under the Flores Agreement?

13         MR. SHIEH:  Correct.  Just to clarify one issue

14    that the current placement review panel is for both RTCs and

15    secure facilities.  It is not just for secured, Your Honor.

16         In terms of Ms. Mayhugh's point on the risk of

17    errors, I think *Mathews* is instructive on that point.  The

18    Court in *Mathews* also had the plaintiffs put forward evidence

19    that the reversal rate for the claims brought under that

20    particular statute were very high.  It was 58.6 percent, I

21    believe, as high as some estimates were.

22         The Court states in *Mathews,* bear statistics rarely

23    provide a satisfactory measure of the fairness of the

24    decision-making process.  The adequacy especially suspect

25    here says the administrative review process is --

 1          THE REPORTER:  I'm sorry.  Can you please slow

 2     down.

 3          MR. SHIEH:  I apologize.  The point is -- I did

 4     point out in our papers, there have been extensive review.

 5     Any deficiencies in the previous placement compliance issues

 6     were -- were largely resolved through the internal monitor.

 7     There's multiple levels of monitoring.  It's important to

 8     note that these cases are decided on open-file basis.  So

 9     that means that there can only be new evidence.

10          For example, the only named plaintiff who was

11     placed in a secure facility was Jaime D.  There's some

12     disagreement between the parties on whether that was an

13     erroneous placement.  We would note, as we point in our

14     papers, that the initial placement was not in error.  That

15     based on what he had reviewed and stated with detail in our

16     view, all three, the case manager, the case coordinator, FFS

17     all agreed that he needed to be placed in more safe setting.

18     Again, OR's concern is for the safety of everyone not just

19     the child but also the staff and other children under OR's

20     care.

21          Now, three weeks later, new evidence came to light.

22     Story is now different.  OR acted on that story.  That is a

23     reversal.  It's not error.  It's just that there's been new

24     evidence.  So that's the sort of thing where you can look at

25     evidence and say well, you know, you just look at bare

1    statistics and you think well, he was wrongly stepped up.  He

2    wasn't wrongly stepped up when he was initially stepped up.

3    He was wrongly -- well, he wasn't wrongly.  He was -- he was

4    not supposed to be secure after new evidence came to light.

5    That's different.

6           THE COURT:  Let me also mention for the sake of

7    your future mediation effort, I'm very -- I'm also very

8    concerned about how long it takes for the determination of

9    whether or not someone has been wrongly stepped up or not

10    quickly enough stepped down.  So I think that should also be

11    a focus of your discussions.  I'm not sure that I can just

12    prescribe what the amount of time is, but I think that the

13    parties would be well served if they examined the procedure

14    and see if there's some reasonable time frame that can -- so

15    that there isn't a situation where people are held for, you

16    know, months on end waiting for some sort of determination.

17           MR. SHIEH:  Yes, Your Honor.  I -- I think we

18    agree.  It is OR's every aim to step them down as quickly as

19    they're able to do.  One of the challenges with the current

20    network is that OR operates under grant.  There are multiple

21    shelters all around the country.  They are all subject to

22    their own state laws, as I'm sure Your Honor knows.  One

23    shelter that wants to step a child down might not satisfy the

24    step-down requirements for a receiving shelter.  That's been

25    an issue.  OR is the working to rectify that, but that

1    sometimes is the primary cause of the delay.

2           There's no shelter willing to -- with a lot of

3    decisions, it's not binary.  Whether a child is dangerous,

4    somebody might see the child as dangerous.  Someone might

5    not.  It's not a binary call many times.  People can look at

6    same facts and come to different conclusions.  Someone might

7    think this doesn't meet their state licensing guidelines for

8    keeping that child in care.  So that does add to the

9    complication of stepping down in some circumstances.

10          Moving quickly to the procedures, and -- I don't

11   know if the Court has preliminary thoughts on the exact

12   procedures.  I think that -- that, as we pointed out at our

13   last status conference, is very much at issue in this case in

14   our view.  So we agree that -- well, let me start with where

15   do we get the due process law?  As we pointed in our papers,

16   I don't think you can directly import criminal procedures for

17   adults to children in immigration custody.  The Courts have

18   consistently not done that.

19          So I don't think that it is a one-for-one

20   comparison.  Even if we were to do that, if we just look at

21   the case law, as we pointed out, many of the procedures the

22   plaintiffs seek are not required even if for adults held for

23   criminal proceedings.

24          For example --

25          THE COURT:  What procedure are you specifically

```
 1    hung up on?  I've already mentioned that I think there should
 2    be a more informative notice of placement, although I don't
 3    know what the 2020 version of the notice of placement says.
 4    Certainly, it should have some sort of instruction as to how
 5    to appeal a decision.
 6            What are your other hang-ups that you need my
 7    guidance on?
 8            MR. SHIEH:  Certainly, Your Honor.  To start, we do
 9    agree with the Court that both pre-placement and pre-notice
10    hearings, that's not required even for adults in a criminal
11    justice context.  We don't think they're required here.
12    There are certainly child welfare issues that come into play.
13    Feasibility is not the standard for due process.  The
14    Constitution is.
15            It doesn't --
16            (Background noise interruption)
17            MR. SHIEH:  So that certainly we agree with the
18    Court on that.  That there -- that is not even available for
19    the adults in the criminal context.  It shouldn't be
20    available here.
21            In terms of the other features, and we've gone
22    through the orders pretty carefully.  We would note that the
23    closest -- that the plaintiffs rely on for these hearings
24    that are automatic that happen very quickly are probable
25    cause hearings.  Probable cause hearings, as this Court
```

```
 1    certainly knows, are much more preliminary than what the

 2    plaintiffs are seeking.

 3            So the plaintiffs want proof by clear and

 4    convincing evidence and we want --

 5            THE COURT:  Let me interrupt you, Mr. Shieh.  Don't

 6    argue about things that you you've already won on.

 7            MR. SHIEH:  Okay.  Sorry.  I wasn't sure.  I

 8    apologize.  Yes, we'll move on.

 9            I think that's -- I think those are our main

10    points.  You know, we think that the process that is required

11    is flexible, as this Court has already noted.  We would note

12    especially for RTCs, we do believe that OR's procedures would

13    satisfy due process under Parham.  Parham was the seminal

14    case on juvenile commitment for involuntary hospitalization.

15    That case is not even analogous to RTCs.  RTCs are less

16    restrictive.  Even if they were, we believe that OR's

17    procedures do satisfy that.  OR is always willing to do more

18    as they are with the PRP hearings.  So that is something we

19    wanted to point out to the Court.

20            So if the Court has nothing else on step-up, I

21    yield my time to Ms. Mayhugh on the release claim or whoever

22    else the Court wants to hear from.

23            THE COURT:  All right.  Ms. Mayhugh, you can move

24    up to the unfit custodian class.

25            MS. MAYHUGH:  Thank you, Your Honor.  Let me just
```

1     make one quick point with respect to the step-up claim based

2     on Mr. Shieh's representation.  I mentioned this briefly,

3     but, you know, our concern with the lack of a pre-deprivation

4     hearing is not only erroneous decision-making, but also that

5     the evidence shows that it is much harder to step down a

6     child once they've been stepped up to a more restrictive

7     placement.

8            I believe Mr. Shieh touched on this when he talked

9     about the contracts that ORR has with different facilities.

10    They all have different requirements.  What this means is

11    that you could step up a kid without this pre-deprivation

12    hearing.  They get stuck in a staff-secure or secure or RTC

13    facility, and they're not able to be stepped down -- back

14    down to a shelter placement even though there's no danger to

15    self or others because a shelter facility will not accept

16    them.

17           So we do think that the consequences are

18    significant.  For that reason, a pre-deprivation hearing is

19    required.

20           Moving on to the custodial fitness claim.  I

21    believe Your Honor mentioned that you agree with plaintiffs

22    that additional process is due for release to Category 1 and

23    2 sponsors.  I wanted to make a note that with respect to

24    Category 3 sponsors -- and this is set out in plaintiffs'

25    statement of undisputed fact 30, which is undisputed.

1    Category 3 sponsors are distant relatives or adults

2    designated by the child's parents.  So we do believe that

3    some of these more distant relatives could have familial

4    association rights similar to what the Supreme Court and

5    other courts have found with respect to grandparents and

6    siblings and aunts and uncles.

7              Additionally, if the parents are involved in

8    designating an adult to care for the child, we think that

9    similarly implicates a right to familial association.  So

10   would, you know, argue that Category 3 sponsors are also

11   entitled to some sort of process.

12             THE COURT:  All right.  Do you have any case law to

13   cite that would suggest that the *Moore* case would extend to

14   even more distant relatives?

15             MS. MAYHUGH:  I don't, Your Honor, but we would be

16   happy to submit supplemental briefing if that would be

17   helpful.  We do cite additional case law in our briefing that

18   extends it to siblings, and I think part of the issue is the

19   distinction between what a close relative or a Category 2

20   purpose or a more distant relative is for Category 3 purpose

21   is not well known.  So to the extent --

22             THE COURT:  A sibling would the covered under

23   Category 2; right?

24             MS. MAYHUGH:  I'm sorry, Your Honor?

25             THE COURT:  A sibling would be covered under

1    Category 2?

2             MS. MAYHUGH:  I believe that is right.  An adult

3    sibling, yes.

4             With respect to Your Honor's finding about liberty

5    interests under the TVPRA and FSA, we respectfully disagree.

6    If you look at the TVPRA, it similarly requires that children

7    be promptly placed in the least restrictive setting that is

8    in their best interest.  That includes placement with a

9    suitable family member, because that we think not only do

10   children have liberty interests stemming from the TVPRA to

11   non-secure licensed facilities, but also to placement with

12   their families should ORR determine that the sponsors are

13   suitable.

14            The same goes with respect to the Flores Settlement

15   Agreement.  The same mandatory language is used to require

16   ORR to release a minor without unnecessary delay.  And then

17   it actually lists out the following -- the order preference.

18   That includes family members as the very first priority

19   there.

20            With respect to the procedures, we think that even

21   if ORR is not required to apply a clear and convincing

22   evidentiary standard, there needs to be some sort of

23   evidentiary standard applied.  Our concern as addressed in

24   the briefing is that there is near limitless discretion

25   currently afforded to ORR employees without any requirements

1    that those employees speak with or even consult with the

2    child or proposed sponsor.  And so to the extent that some

3    additional type of evidentiary standard is necessary, we

4    would ask that that be included in any due process procedures

5    under *Mathews*.  We certainly agree with Your Honor that there

6    needs to be a more formalized opportunity to appeal denials

7    of sponsors.

8            One more point with respect to the category of

9    potential sponsors.  The ORR policy guide distinguishes

10   between Category 2A and Category 2B sponsors.  It's the same

11   degree of familial association.  The difference being that 2A

12   sponsors have previously served as a primary caregiver, and

13   2B presumably have not -- this is just one more example of

14   the lack of standards that are in ORR's policies and

15   procedures.  We don't know what that means, serving as a

16   primary caregiver.  Certainly, gives the sponsors whether

17   that is, you know, the fact that an adult sibling watch their

18   younger brother for one year or five years.  We're not sure

19   what constitutes primary caregiver.  We do believe that both

20   sponsors and children should have an opportunity to be heard

21   on whether that requirement has been met or not.

22           I think that's all I have, Your Honor, in response

23   to your oral tentative.

24           THE COURT:  All right.  Mr. Holguin, did you want

25   to address the tentative in any way?

1              MR. HOLGUIN:  Yes, Your Honor.  Thank you.

2          With respect to the legal representation claim, you

3     know, I think the claim is really two parts.  The first is

4     the array -- the panoply of methods by which the government

5     essentially obstructs children's counsel from representing

6     them effectively.  This is sort of the threshold claim we

7     have under the TVPRA.

8          I know that the tentative order that Your Honor has

9     described focuses the language of 8 USC 13 -- 1232(c)(5) in

10    that it provides that -- directs the ORR to ensure that

11    children have counsel to represent them in legal proceedings

12    or matters and protect them from mistreatment, exploitation,

13    and trafficking.  I think that the -- the use of the

14    conjunction in that phrase would be inconsistent with

15    interpreting the prior phrase, which talks about legal

16    proceedings and matters.  Because if Congress had wanted to

17    limit legal proceedings and matters to protecting children

18    from mistreatment, it would not have used the word "and"

19    there.  It would have simply put a "to" or "related to"

20    protecting them from mistreatment or some other type of

21    language.  These are two independent clauses, which I think

22    it is important to -- to read it in accordance with the

23    normal rules of construction and statutory interpretation.

24              THE COURT:  Mr. Holguin, do you know of any

25    analogous situation in which the government provides funding

1       for counsel to challenge the government's own decisions?

2                   MR. HOLGUIN:  Well, certainly the -- when the

3       government prosecutes anyone, the preference of the state at

4       that point is to prosecute them and convict them.  We pay for

5       public defenders all of the time.  Legal services lawyers are

6       routinely funded to challenge the federal government with

7       respect to benefits determinations and all manners of

8       circumstances.

9                   I think that, you know, when you look at what the

10      HHS itself has said with respect to the administration for

11      children and families, in which it has said, quote -- this is

12      where they're preaching to the states -- numerous studies and

13      reports point to the importance of competent legal

14      representation for parents, children, and youth in ensuring

15      that salient information is conveyed to the Court, parties'

16      legal rights are protected, and the wishes of parties are

17      effectively voiced.  The ACF then goes on to exort, all child

18      welfare agencies to work together to ensure parents,

19      children, and youth receive high quality legal representation

20      at all stages of child welfare proceedings.  That is what HHS

21      tells the states.

22                  The Supreme Court -- what basically what ORR has

23      done here is it has attempted to insulate itself from

24      children challenging its decisions.  In *Legal Services*

25      *Corporation vs. Velasquez,* the Supreme Court cautioned,

1    quote, We must be vigilant when Congress imposes rules and

2    conditions which, in effect, insulate its own laws from

3    legitimate judicial challenge.

4           Now, this is an example of a self-serving policy.

5    It's admitted.  There's no controverted issue of fact here

6    that these children are primarily non-English speaking,

7    primarily indigent, and have little or any -- or no ability

8    to defend themselves.  It's also uncontroverted and

9    stipulated that the only source of legal counsel that the

10   vast majority of the plaintiff children have are the legal

11   services providers funded through the Vera Institute of

12   Justice.

13          In effect, if ORR is permitted to say to these

14   legal service providers, you may not represent these children

15   about our medication decisions -- if we drug your client,

16   that's not something you are supposed to get involved in.  If

17   we decide that your client's parent is unfit, and, therefore,

18   we are going to detain your client, that's not something you

19   can get involved in.  These types of decisions --

20          THE COURT:  Well, the issue is not, Mr. Holguin,

21   whether they can get involved or not.  The issue is whether

22   they should pay for it.

23          MR. HOLGUIN:  Congress itself has appropriated

24   funds again and again.  We're not saying that Congress must

25   appropriate this money.  When it does, for ORR to say, we're

1    not going to allow you to use any of that money in order to

2    challenge anything that we might do to your client, that is

3    not being vigilant when ORR itself has imposed rules and

4    conditions which in effect insulate its own decisions from

5    legitimate challenge.

6           THE COURT:  The ORR was established to assist in

7    implementing the TVPRA.  The ORR is not making decisions

8    about a child's asylum case or the immigration proceedings.

9    They are merely taking care of the children while children go

10   through that process.

11          I don't think the TVPRA envisioned that the ORR

12   would be the adversary of the children.  Yes, there may be

13   mistakes that ORR makes and may need to have procedures in

14   place to be able to hold them accountable for those mistakes.

15   But the question here is whether the TVPRA envisioned that

16   children should have counsel paid to challenge ORR.

17          MR. HOLGUIN:  Well, the TVPRA doesn't really

18   envision paying counsel for any purpose.  What it talks about

19   is that ORR is supposed to try to facilitate this.  It

20   doesn't require ORR to pay.

21          On the other hand, when Congress appropriates funds

22   to ORR and says, you know, pay these Vera Institute

23   contracted lawyers to represent children.  I have worked for

24   legal services programs for four years.  I have never seen

25   the kinds of restrictions that this sort of policy prevails.

1    We are constantly challenging government decisions, even

2    though the federal government funds legal services

3    corporation.  It's up to the lawyer and their duty of

4    vigorous representation to determine what is it that my

5    client really needs here?

6           Now, we have testimony in the record that lawyers

7    are saying look, oh, it's fine for me to represent a child

8    with respect to asylum.  My job as a lawyer to help my client

9    achieve asylum or win asylum is much more difficult when my

10   client is locked up.  My client cannot assist me in gathering

11   evidence.  In -- I don't have the kind of access to my client

12   that I would normally have if he or she were released, et

13   cetera.

14          So to -- to be a lawyer and, for example, to watch

15   your client being administered multiple psychotropic drugs in

16   a place like Shiloh.  And the government to say, look, that's

17   just too bad.  You -- if you want to represent this child

18   with respect to these drugs, find some way to pay for it.

19   We're not going to pay for it even though Congress has given

20   us money to support legal services, and the TVPRA has

21   directed HHS to ensure the greatest extent possible that

22   children have counsel to represent them.  I'll stop there on

23   that.

24          The next issue --

25          THE COURT:  Do you agree that the standard of

1    arbitrary, capricious abuse of discretion or contrary to law

2    applies to the ORR's decision to limit funding in that

3    regard?

4            MR. HOLGUIN:  I do, Your Honor.  For government

5    agency to say yes, you're entitled to a lawyer, but if we do

6    something to you like detain you or drug you or send you off

7    to a psychiatric facility or a juvenile hall, and, you know,

8    we just don't want to be troubled by your having counsel to

9    challenge these issues.  That is -- is -- is -- it strikes me

10   as self-serving.  It also strikes me as arbitrary.  Not from

11   the standpoint of self-interest, but in terms of looking at

12   the need the children have for counsel.  It is arbitrary.  It

13   is capricious.

14           THE COURT:  Given that there are times when there

15   are tens of thousands of UACs in a surge, there's a

16   possibility, I presume, that the funds would not be

17   sufficient to cover even the core mission, which is to

18   represent children in their immigration proceedings if they

19   were to be used in multiple other ways.

20           So isn't it within the agency's discretion to be

21   able to determine how funds should be used so that the corpus

22   of those funds are not going to be unavailable for the core

23   mission?

24           MR. HOLGUIN:  Your Honor, in the circumstance where

25   there is a scarcity of resources, there is nothing wrong with

1     an agency prescribing general parameters as to what -- how

2     those resources may or may not be used.  This is, again,

3     something that happens in legal services practice all of the

4     time.  We're told, you know, you have to represent people who

5     are indigent.  These are the income guidelines.  There are

6     general categories of matters in which we can become

7     involved, but not to the point where an agency is telling

8     legal aid lawyers, thou shall not represent your client

9     against anything that our government does.

10            That has never been the case.  It is a matter up to

11     the lawyer and her or his assessment as to what is in the

12     client's best interest to determine whether it makes more

13     sense to do a know-your-rights presentation, or whether it's

14     more important to your client to stop the administration of

15     multiple psychotropics.  This is something that lawyers have

16     done funded by the government for decades.  If there is a

17     shortage of money, of course, then there needs to be some

18     allocations.  For ORR to say the basis for ORR setting

19     priorities is to insulate ourselves from effective judicial

20     review and effective review of the decisions we've made in

21     these momentous areas, that is simply not a type of resource

22     allocation decision that deserves any deference.

23            In terms of the other types -- this is now lawyers

24     acting on their own dime or in terms of advocating for

25     children with respect to release, medication, and step-up

1    restrictive placement, the facts are really undisputed in

2    terms of many of these elements.  For example, the facts are

3    undisputed that Federal Field Specialists, the only one who

4    make the decisions after all.  We know that Federal Field

5    Specialists will -- are empowered to disregard the

6    recommendations of case managers.  They are entitled to

7    disregard the recommendations of case coordinators.  That's

8    really where the decision is made, the Federal Field

9    Specialists.  Federal Field Specialists are under no

10   requirement to even speak to children's lawyers.  In many

11   cases, deponents, Federal Field Specialists that we've

12   deposed, say they've never spoken to a child's lawyer.

13            Now, it is not -- there's no dispute that sometimes

14   they will speak to a child's lawyer, but there is no dispute

15   that they aren't required to ever do so.  It's as though, you

16   know, we were not permitted to speak to Your Honor in the

17   course of this hearing.  Somebody else we would speak with.

18   They would tell you, well, you know, this is the way the

19   decisions is going to go.  The decision comes from on high.

20   The lawyer has not had any opportunity at all to try to

21   persuade the decision-maker of -- of a position that would be

22   in favor of his or her client.

23            The -- the Supreme Court, again, has said, you

24   know, it's meaningless if you don't have -- allow a lawyer to

25   act on behalf of a client.  The right of counsel is

1    meaningless.  So there are just a number of these things.

2    For example, for a lawyer to try to get the evidence that ORR

3    relies on in deciding that a parent is unfit, you have to

4    make a file request.  The file request, there's no time limit

5    on how long ORR has to respond to that file request, even if

6    it's coming from a lawyer.

7            So you can have your client twisting in the wind

8    for months and months -- weeks and months because you can't

9    even see the file.  ORR does not consider a lawyer's request

10   to merit priority in giving the file or sharing the evidence

11   with the child's lawyer supporting its decision declaring the

12   child's parent unfit, or justifying the step-up to a juvenile

13   hall or psychiatric facility.

14           There is no dispute, for example, that lawyers are

15   not permitted to know the names and contact information of

16   proposed sponsors.  We have testimony where one -- on one

17   lawyer who found out that a proposed custodian that ORR was

18   considering releasing a child to was a child abuser.  She was

19   the one who advised ORR, look, I understand you're

20   considering this individual to release my client to.  That's

21   not a good idea.

22           So it's not always the case that a lawyer is going

23   to be opposing ORR's decision-making.  Sometimes they're

24   going to provide information that is actually helpful and

25   that will save a client from an improper placement.  They

1   can't do that if they don't know who the sponsor is going

2   to --

3            THE COURT:  Mr. Holguin, I think I ruled that the

4   current process to challenge a place -- a decision about a

5   sponsor is too ad hoc and does not have sufficient

6   guidelines.

7            So I think many of the issues that you are raising

8   are appropriate issues to raise with the government in your

9   future meet-and-confer.  That's not to say that I'm not going

10  to address that at some future point if you can't come to a

11  decision on how to resolve the issue.  As I've said many

12  times before, including in the Flores case, I am not an

13  expert in the area of the administrative process.  You folks

14  know much more about the process and the difficulties and

15  challenges in the process than I do.  So it behooves both

16  sides to try to reach some sort of common ground about some

17  of the problems that exist, to troubleshoot them, and to have

18  some procedure that addresses some of these things.

19           If you cannot, obviously, the ball will be back in

20  my court.  I will have to rule on that.  I think that it is a

21  better system if the parties who use it and who know it come

22  up with some solutions before I do.

23           MR. HOLGUIN:  Agreed, Your Honor.  I have nothing

24  further.

25           THE COURT:  All right.  Mr. Shieh, would you like

1    to respond?  You'll have to un-mute yourself and slow down.

2    You're still muted.  You're still muted.

3           MR. SHIEH:  Sorry.  That was a separate muting

4    mechanism that shut me down.  I have one over here that I

5    kept on muted.  My apologies.

6           A few quick points on release.  Then I'll yield my

7    time to my colleague Mr. Bates on legal representation.  This

8    case is not about the right of parents or legal guardians.

9    This case is about whether the same procedures that are

10   provided to parents and legal guardians should also be

11   provided to extended relations, which this Court -- the

12   Supreme Court in --

13          THE CLERK:  One moment.  This is the Clerk.

14   Mr. Shieh, is there anyone shuffling papers or typing?

15          MR. SHIEH:  I am moving my podium closer to the

16   microphone.

17          THE CLERK:  Make sure that there is no one in the

18   room shuffling paper or typing.  We hear that type of noise.

19          MR. SHIEH:  Understood, sir.  It was a table.

20          This case isn't even about the right of sponsors,

21   right, because none of the named plaintiffs are sponsors.

22   That's not the certified class.  It's just children.

23          So the question before the Court isn't whether or

24   not distant relations or even siblings have a right to be

25   unified with a minor in ORR care.  That issue is not before

1    the Court.  Every named plaintiff in this case is a minor who

2    was in ORR custody.  If you look at the federal case law,

3    even the case that the plaintiff cite, federal law does not

4    provide an evidentiary hearing, a fair hearing for

5    non-parents and non-legal guardians.  That is simply not the

6    law.  So from an analogous standpoint, we just don't think

7    that even if you were to apply it one to one, it doesn't

8    work.

9          In terms of specific factual matters, we would note

10   on category -- ORR does accept affidavits from -- from the

11   parties in those cases.  We would also note that for

12   Category 2A, grandparents and siblings are always included in

13   that process.  So they're always considered to be primary

14   caregivers.  They're always Category 2A irrespective whether

15   there's a primary caregiver relationship.

16         In terms of the specific procedures on what is

17   required again, we understand that this Court has not issued

18   a ruling on that, but we would note that there are many

19   different phases of domestic child welfare proceedings in the

20   determination context, many of which, as we noted in our

21   papers, takes far longer.  To put some of these procedures in

22   place that plaintiffs seek would actually drag out the

23   process for a much longer period of time.

24         Even for California, I mean, what their pointing to

25   are legislative fixes.  They're not saying that the --

1   California Supreme Court -- those are required in a domestic

2   context.  The legislature got together and decided that this

3   is what they thought was best for the children of California.

4   What the plaintiffs are asking is for those same procedures

5   basically to be imported whole stock as a matter of

6   constitutional and due process into a federal program that is

7   spread across many different states.  We just think that is

8   not what due process requires in that case.

9           Again, going back to the point on the procedures

10  that are required to the discretion, we -- the record doesn't

11  bear out that FSSs don't speak with children.  We have

12  testimony that they do.  They do speak with sponsors, but a

13  lot of this comes down to basically how the program is run.

14  This is not a partnership between plaintiffs' counsel and the

15  federal government.  Due process requirements absolutely have

16  to be met.  The statute has to be satisfied, but beyond that

17  in terms of how the procedures are enacted, how it's

18  operationalized, OR is going to know best how to do that.

19          We would just urge the Court in whatever procedures

20  the Court decides is appropriate in this context in your

21  order to bear that in mind as well.  If the Court has no

22  questions for me on release, I -- I yield my time to

23  Mr. Bates on the legal representation issue, as well as any

24  questions on res judicata.

25          One other thing for the Court.  Just to know, we do

1    have a January 11th settlement conference, but currently it

2    is scheduled to talk about issues not before the Court on

3    summary judgment.  It doesn't mean that we couldn't, but that

4    is not what is currently scheduled.

5              THE COURT:  You are always welcome to meet and

6    confer outside of that context.

7              MR. SHIEH:  Thank you, Your Honor.  Understood.

8    Thank you so much.

9              THE COURT:  Mr. Bates, I trust that you won't have

10   a lot to say.

11             MR. BATES:  I will exercise economy, Your Honor.

12   Good afternoon, Your Honor.  Christopher Bates for the

13   defendants.

14             Just a few points on legal representation.

15   Your Honor indicated that Your Honor declined in the

16   tentative ruling to find summary judgment is not appropriate

17   on the issue of whether ORR blocks access to counsel

18   retaliation.  I'm going to draw the Court's attention to page

19   56 of our motion for summary judgment where we identify the

20   evidence that the plaintiffs rely on in supporting their

21   assertion that ORR blocks -- blocks representation and

22   retaliation.  And paragraphs or -- in our statement of

23   undisputed facts numbers 90, 93, and 94 contained further

24   information about the evidence that the plaintiffs rely on.

25             In the depositions of the declarants that provided

1    the evidence in support of the plaintiffs' claim, it became

2    clear that the basis for this assertion was speculation or

3    hearsay.  For example, the deposition of Ms. Williams, who

4    was a legal services provider, who provided support for

5    plaintiffs' retaliation claim.

6         This is Plaintiffs' Exhibit 198, and it is

7    discussed in, I believe, paragraphs 90, 93, 94 of the

8    defendants' statement of undisputed facts.  She says that she

9    was told by a supervisor that ORR had terminated funds of an

10   organization that has sued ORR.  She admits -- this is at

11   page 84 of her deposition -- she did not confirm any of this

12   information herself.  This was a hearsay statement by

13   Ms. Williams.

14        Other support or other individuals on whom

15   plaintiffs relied such as Whitney Eick.

16        THE COURT:  Mr. Bates, let me interrupt you for a

17   moment.  I'm not sure if you know but in the Ninth Circuit,

18   hearsay is permitted in support of or in opposition to

19   motions for summary judgment or preliminary injunctions as

20   long as the evidence may eventually be put forth in a proper

21   format at trial.

22        MR. BATES:  Thank you, Your Honor.  Then I think

23   that we would emphasize to the Court that the -- it is a

24   hearsay statement.  There is no further grounds that is

25   provided by the plaintiffs beyond the information that they

```
 1    said that they heard from another person.  So that the

 2    statement or the evidence remains speculative.  So does not,

 3    you know, go to support summary judgment.

 4              Let me just mention also the deposition of Whitney

 5    Eick, Justin -- these are youth care shelter employee, a

 6    legal services provider who provided support.  Again, from

 7    their depositions, it's clear that their assertions that ORR

 8    engaged in retaliation, that they don't have personal

 9    knowledge of these assertions that they have provided to the

10    Court.  In contrast, the defendants have provided

11    declarations from a -- the CDC supervisor policy counsel for

12    ORR, Toby Vislas, who confirms that it is ORR's policy not to

13    block representation retaliation.

14              Just briefly to reply to some of the points that

15    Mr. Holguin made.  As Your Honor noted in providing the

16    tentative ruling, it is our view that the TVPRA -- that

17    the -- that the provisions for counsel there apply to

18    immigration and removal proceedings, and that the statement

19    of the TVPRA regarding legal proceedings and matters and to

20    protect minors against mistreatment, exploitation, and

21    trafficking, that still happens in the context of

22    applications for asylum or for T and U visas.  That statutory

23    language still has operation under ORR -- under ORR's policy.

24              Mr. Holguin also noted that the TVPRA does not

25    require paid counsel for any purpose.  The defendants'
```

1   position appears to be that if Congress appropriates money

2   for provision of counsel, then ORR must, therefore, allow

3   them to use it for any purpose that is sought.  That is no

4   different from saying that ORR has to provide funding for

5   counsel in those situations.

6           Mr. Holguin also talked about FFSs and

7   communication between FFSs and lawyers.  FFSs are not the

8   only part of the decision-making process.  There are also the

9   case managers and the case coordinators.  We've provided

10  evidence, declarations that ORR's policy is to maintain open

11  lines of communication with the case managers and counsel.

12  That case managers are required to regularly inform

13  stakeholders of the progress of the child's case, which

14  includes the child's attorney of record.  This is, again, the

15  declaration of Mr. Viszlas, defense Exhibit 10.

16          Let me emphasize to the Court that the FFSs are not

17  the only part of this process.  The decision-making process

18  involved case managers, case coordinators, FFSs, and that

19  there is certainly an ORR policy to maintain open channels

20  between attorneys and crucial members of that decision-making

21  process to include case managers.

22          Just very briefly on res judicata, Your Honor.

23  Your Honor indicated that you intended to find that res

24  judicata does not apply to this case.  As we indicated in our

25  papers, we believe that this case should be viewed as in many

1   respects a collateral attack on the Flores Settlement.  The

2   Flores Settlement, the parties entered into to resolve the

3   due process claims that the plaintiffs brought in that case

4   with regard to the procedures that the agency follows in

5   making determinations about placement in secured detention

6   and making release decisions.  In satisfaction of those

7   claims, the parties set forth what the settlement describes

8   as a nationwide policy for the detention release and

9   treatment of minors in the custody of what was then the INS.

10          So to the extent that the plaintiffs in this case

11   are arguing that due process requires more than what the

12   plaintiffs agreed to in satisfaction of those due process

13   claims in Flores, that res judicata should be understood to

14   apply.

15          If the Court has no further questions --

16          THE COURT:  No, I do not.

17          MR. BATES:  Thank you, Your Honor.

18          THE COURT:  Mr. Shieh's representation is that your

19   January 11th meeting is intended for a different issue and

20   recognizing that the holidays are intervening, I'll give you

21   a bit more time to file your joint status report after your

22   meet-and-confer on some of the issues that we've discussed

23   today.  I'm going to ask that you file your joint status

24   report by February 1st.

25          (Background noise)

```
 1              THE COURT:  I cannot hear you, Ms. Mayhugh.  I
 2    don't think the court reporter can hear you either.
 3              THE CLERK:  Mr. Shieh, you need to mute.
 4              THE COURT:  Mr. Shieh, can you mute yourself,
 5    please.
 6              THE CLERK:  You're not muted.  I'll mute you on my
 7    end.
 8              MR. SHIEH:  I have a mute button over here.  You
 9    won't hear me.  I promise.
10              THE COURT:  All right.  Ms. Mayhugh.
11              MS. MAYHUGH:  Can you hear me now?
12              THE COURT:  Yes.
13              MS. MAYHUGH:  I wanted to ask for clarification.
14    We currently have a deadline of January 8th for a status
15    report.  Does this new deadline replace that one?
16              THE COURT:  Yes.
17              MS. MAYHUGH:  Okay.  We also currently have Daubert
18    and motions in limine due on January 15th.  We just wanted to
19    clarify whether we should still file those per the current
20    schedule or if that deadline should be continued to --
21              THE COURT:  What is the current trial date that is
22    on your schedule?
23              MS. MAYHUGH:  I believe it's in March.
24              MR. SHIEH:  March 31st.
25              THE COURT:  That's all I need to know.  There's no
```

1     likelihood that you'll go to trial on March 31st.  The

2     courthouse has been closed.  We aren't having criminal or

3     civil jury trials.  This case is a court trial; is that

4     correct?

5                 MS. MAYHUGH:  Correct.

6                 THE COURT:  So there's a possibility that I might

7     be able to have a court trial, but it's not likely that I

8     will be able to do it by March 30th or whatever the date you

9     mentioned is.

10                So in conjunction with your meet-and-confer

11    regarding the tentative ruling and other issues that you wish

12    to discuss, you should also discuss a continuance of your

13    trial and pretrial dates and deadlines because the -- even

14    though there's vaccine, I don't think that it's going to be

15    distributed in a sufficiently timely manner that would allow

16    all of our court trials and jury trials to proceed

17    immediately.

18                So I think that there's going to be a backlog of

19    criminal jury trials that will have to take priority over all

20    of the civil trials when we are able to have trials again.

21    So there's going to be a likelihood of a backlog on a lot of

22    our civil trials.  That's just unfortunately the reality of

23    the situation.

24                So I would suggest that you meet and confer and

25    come up with some alternative later dates for 2021.

```
1                MS. MAYHUGH:  Understood, Your Honor.  In the
2       meantime, I --
3                THE COURT:  I'm sorry.  You're not -- you're
4       unclear.
5                MS. WYNN:  Your Honor, this is Summer Wynn.  My
6       colleague Alex Mayhugh may be having some technical
7       difficulties.  I believe what she was asking for
8       clarification on is can we then regard the January 15th
9       filing it deadline and other dates as moot for now while the
10      parties discuss --
11               THE COURT:  I'm going to vacate all of your current
12      dates and deadlines subject to a future order that will reset
13      them after you've had an opportunity to meet and confer about
14      new dates.
15               MS. WYNN:  Thank you, Your Honor.
16               THE COURT:  Anything further?  Mr. Shieh?
17               MR. SHIEH:  I think I've been muted.
18               THE COURT:  No.  We can hear you.
19               MR. SHIEH:  Sorry.  There's a way you can mute on
20      your side.  I thought Mr. Tien had muted me.
21               Quick question on that.  So is the February 1st,
22      that's the next agenda for all of us that status report.  Are
23      we expecting the order to come out that day or after that
24      date?
25               THE COURT:  After that date.
```

1              MR. SHIEH:  Okay.  Great.  Thank you.

2              THE COURT:  If you need more time because you're

3    doing such a great job of meeting and conferring, and you've

4    reached a lot of tentative agreements, by all means, you can

5    ask me to extend that date.  I will likely do so.

6              MR. SHIEH:  Thank you, Your Honor.

7              THE COURT:  All right.  Thank you.  We are

8    adjourned.

9              (Proceedings concluded at 12:40 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATE

 2   I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

 3   TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN

 4   THE ABOVE MATTER.

 5   FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

 6   REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

 7   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

 8

 9   /s/ Miriam V. Baird          12/23/2020

10   MIRIAM V. BAIRD                      DATE
     OFFICIAL REPORTER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| / |
|---|

**/s** [1] - 56:9

| 1 |
|---|

**1** [3] - 7:24, 8:3, 30:22
**1-053** [1] - 1:24
**10** [1] - 50:15
**1107** [1] - 3:1
**11893** [1] - 1:23
**11th** [2] - 47:1, 51:19
**12/23/2020** [1] - 56:9
**121** [3] - 17:17, 18:4, 18:6
**122** [1] - 10:16
**123** [1] - 14:19
**1232(c)(5** [1] - 34:9
**124** [2] - 10:16, 14:19
**12:40** [1] - 55:9
**13** [1] - 34:9
**1333** [1] - 2:7
**15th** [2] - 52:18, 54:8
**180** [1] - 11:16
**18th** [1] - 9:18
**198** [1] - 48:6
**1st** [2] - 51:24, 54:21

| 2 |
|---|

**2** [6] - 7:24, 14:19, 30:23, 31:19, 31:23, 32:1
**2018** [3] - 6:5, 15:1, 20:4
**2019** [2] - 6:5, 15:1
**2020** [4] - 1:18, 3:1, 15:8, 28:3
**2021** [1] - 53:25
**20530** [1] - 2:13
**218** [1] - 16:18
**219** [1] - 16:18
**22** [2] - 1:18, 3:1
**250** [1] - 11:17
**256** [1] - 2:4
**26(e)** [1] - 13:24
**2A** [4] - 33:10, 33:11, 45:12, 45:14
**2B** [2] - 33:10, 33:13

| 3 |
|---|

**3** [4] - 30:24, 31:1, 31:10, 31:20
**30** [1] - 30:25
**30-day** [1] - 17:4
**30th** [1] - 53:8
**31st** [2] - 52:24, 53:1
**33** [1] - 3:24

| 4 |
|---|

**400** [1] - 2:8
**411** [1] - 1:24

| 5 |
|---|

**50** [1] - 11:15
**56** [1] - 47:19
**58.6** [1] - 24:20

| 7 |
|---|

**70-page** [1] - 3:5

| 8 |
|---|

**8** [1] - 34:9
**84** [1] - 48:11
**8th** [1] - 52:14

| 9 |
|---|

**90** [2] - 47:23, 48:7
**90057** [1] - 2:5
**90401-4100** [1] - 2:8
**92701** [1] - 1:24
**93** [2] - 47:23, 48:7
**94** [2] - 47:23, 48:7
**950** [1] - 2:13

| A |
|---|

**ability** [1] - 36:7
**able** [11] - 14:6, 15:23, 23:2, 26:19, 30:13, 37:14, 39:21, 53:7, 53:8, 53:20
**ABOVE** [1] - 56:4
**absolutely** [1] - 46:15
**abuse** [2] - 9:5, 39:1
**abuser** [1] - 42:18
**accept** [2] - 30:15, 45:10
**access** [2] - 38:11, 47:17
**accordance** [1] - 34:22
**account** [1] - 17:8
**accountable** [1] - 37:14
**ACF** [1] - 35:17
**achieve** [1] - 38:9
**achieved** [1] - 9:20
**act** [2] - 22:13, 41:25
**acted** [1] - 25:22
**acting** [1] - 40:24
**action** [1] - 7:4
**actions** [1] - 3:21
**actor** [1] - 22:21
**actors** [1] - 22:24
**ad** [2] - 8:2, 43:5
**add** [1] - 27:8
**addition** [1] - 11:6
**additional** [4] - 17:20, 30:22, 31:17, 33:3
**additionally** [1] - 31:7
**address** [8] - 3:8, 17:16, 18:19, 19:3, 20:7, 20:25, 33:25, 43:10
**addressed** [1] - 32:23
**addresses** [1] - 43:18

**addressing** [1] - 10:3
**adds** [1] - 8:7
**adequacy** [1] - 24:24
**adequately** [1] - 15:24
**adjourned** [1] - 55:8
**adjudication** [2] - 11:3, 15:12
**adjudications** [1] - 6:13
**adjudicators** [1] - 22:10
**administered** [2] - 11:4, 38:15
**administration** [2] - 35:10, 40:14
**administrative** [4] - 9:9, 22:12, 24:25, 43:13
**admits** [1] - 48:10
**admitted** [1] - 36:5
**adult** [3] - 31:8, 32:2, 33:17
**adults** [5] - 27:17, 27:22, 28:10, 28:19, 31:1
**adversary** [3] - 6:24, 15:22, 37:12
**advised** [1] - 42:19
**advocate** [1] - 24:7
**advocating** [1] - 40:24
**affidavits** [1] - 45:10
**affirmatively** [1] - 5:24
**afforded** [1] - 32:25
**affords** [1] - 15:15
**afternoon** [1] - 47:12
**agencies** [1] - 35:18
**agency** [8] - 7:3, 16:12, 23:8, 23:11, 39:5, 40:1, 40:7, 51:4
**agency's** [1] - 39:20
**agenda** [1] - 54:22
**agree** [9] - 10:7, 15:12, 26:18, 27:14, 28:9, 28:17, 30:21, 33:5, 38:25
**agreed** [3] - 25:17, 43:23, 51:12
**Agreement** [4] - 4:17, 7:16, 24:12, 32:15
**agreements** [1] - 55:4
**agrees** [1] - 14:21
**ahead** [2] - 18:23, 22:16
**aid** [1] - 40:8
**aim** [1] - 26:18
**AL** [3] - 1:4, 1:10, 2:12
**Alex** [1] - 54:6
**ALEX** [2] - 1:10, 2:12
**ALEXANDRA** [1] - 2:6
**Alexandria** [2] - 10:2, 14:11
**allegedly** [1] - 4:1
**allocation** [1] - 40:22
**allocations** [1] - 40:18
**allow** [5] - 23:2, 37:1, 41:24, 50:2, 53:15
**allowed** [2] - 19:6, 19:9
**almost** [1] - 21:9
**ALSO** [1] - 2:16
**alternative** [1] - 53:25
**Amendment** [1] - 8:5
**amount** [2] - 15:15, 26:12
**ANA** [1] - 1:24
**analogous** [3] - 29:15, 34:25, 45:6
**analogy** [1] - 18:14
**AND** [2] - 2:3, 56:2

**AND/OR** [1] - 56:6
**anecdotal** [1] - 12:5
**ANGELES** [2] - 2:5, 3:1
**ANY** [1] - 56:5
**APA** [3] - 6:13, 15:12, 16:2
**apart** [1] - 7:14
**apologies** [2] - 15:4, 44:5
**apologize** [2] - 25:3, 29:8
**appeal** [3] - 6:9, 28:5, 33:6
**appear** [1] - 15:5
**applications** [2] - 8:1, 49:22
**applied** [3] - 17:21, 32:23
**applies** [1] - 39:2
**apply** [8] - 3:22, 4:3, 4:22, 32:21, 45:7, 49:17, 50:24, 51:14
**appointed** [1] - 8:12
**appreciate** [1] - 13:16
**appropriate** [6] - 9:15, 17:11, 36:25, 43:8, 46:20, 47:16
**appropriated** [1] - 36:23
**appropriately** [1] - 17:6
**appropriates** [2] - 37:21, 50:1
**approved** [1] - 6:1
**arbitrary** [4] - 9:4, 39:1, 39:10, 39:12
**ARE** [1] - 56:6
**area** [1] - 43:13
**areas** [1] - 40:21
**argue** [2] - 29:6, 31:10
**arguing** [1] - 51:11
**argument** [2] - 3:9, 9:22
**array** [1] - 34:4
**aside** [1] - 7:4
**aspect** [1] - 8:7
**assertion** [2] - 47:21, 48:2
**assertions** [2] - 49:7, 49:9
**assessment** [1] - 40:11
**assist** [2] - 37:6, 38:10
**assistance** [1] - 5:18
**association** [4] - 11:24, 31:4, 31:9, 33:11
**assumed** [1] - 21:10
**assumption** [1] - 22:5
**asylum** [5] - 37:8, 38:8, 38:9, 49:22
**attack** [2] - 8:25, 51:1
**attempted** [1] - 35:23
**attention** [1] - 47:18
**attorney** [3] - 24:4, 24:5, 50:14
**attorneys** [2] - 9:4, 50:20
**aunts** [1] - 31:6
**automatic** [2] - 7:19, 28:24
**available** [2] - 28:18, 28:20
**AVENUE** [1] - 2:13
**average** [3] - 11:9, 11:13, 11:15
**AZAR** [2] - 1:10, 2:12

**B**

**background** [2] - 28:16, 51:25
**backgrounds** [2] - 23:13, 23:25

**backlog** [2] - 53:18, 53:21
**bad** [4] - 22:5, 22:9, 22:21, 38:17
**BAIRD** [2] - 1:23, 56:10
**Baird** [1] - 56:9
**balance** [1] - 22:2
**balancing** [1] - 7:17
**ball** [1] - 43:19
**bare** [1] - 25:25
**based** [3] - 16:4, 25:15, 30:1
**basic** [1] - 9:22
**basis** [5] - 14:7, 14:11, 25:8, 40:18, 48:2
**BATES** [4] - 2:11, 47:11, 48:22, 51:17
**Bates** [6] - 20:25, 44:7, 46:23, 47:9, 47:12, 48:16
**bear** [4] - 7:21, 24:22, 46:11, 46:21
**became** [1] - 48:1
**become** [1] - 40:6
**BEHALF** [2] - 2:3, 2:11
**behalf** [2] - 10:2, 41:25
**behavioral** [1] - 19:12
**behooves** [1] - 43:15
**benefit** [1] - 3:17
**benefits** [1] - 35:7
**best** [3] - 3:14, 23:18, 23:19, 32:8, 40:12, 46:3, 46:18
**better** [1] - 43:21
**between** [9] - 3:25, 10:18, 19:19, 25:12, 31:19, 33:10, 46:14, 50:7, 50:20
**beyond** [3] - 7:5, 46:16, 48:25
**binary** [2] - 27:3, 27:5
**bit** [2] - 22:17, 51:21
**block** [1] - 49:13
**blocked** [1] - 9:7
**blocks** [3] - 47:17, 47:21
**BOULEVARD** [1] - 2:5
**BRENDA** [1] - 2:18
**Brief** [1] - 18:5
**briefing** [7] - 8:4, 12:25, 13:19, 15:16, 31:16, 31:17, 32:24
**briefly** [3] - 30:2, 49:14, 50:22
**brother** [1] - 33:18
**brought** [2] - 24:19, 51:3
**built** [1] - 14:9
**bulk** [1] - 20:17
**burden** [1] - 7:22
**business** [1] - 3:11
**button** [2] - 19:2, 52:8

**C**

**CA** [2] - 2:5, 2:8
**CALIFORNIA** [3] - 1:2, 1:24, 3:1
**California** [3] - 45:24, 46:1, 46:3
**cannot** [3] - 38:10, 43:19, 52:1
**capricious** [3] - 9:5, 39:1, 39:13
**care** [8] - 11:14, 21:14, 25:20, 27:8, 31:8, 37:9, 44:25, 49:5
**carefully** [2] - 3:23, 28:22
**caregiver** [4] - 33:12, 33:16, 33:19,

45:15
**caregivers** [1] - 45:14
**CARLOS** [1] - 2:3
**case** [49] - 3:12, 3:21, 3:24, 4:3, 5:13, 8:11, 16:2, 21:12, 21:15, 21:17, 22:14, 22:15, 22:18, 25:16, 27:13, 27:21, 29:14, 29:15, 31:12, 31:13, 31:17, 37:8, 40:10, 41:6, 41:7, 42:22, 43:12, 44:8, 44:9, 44:20, 45:1, 45:2, 45:3, 46:8, 50:9, 50:11, 50:12, 50:13, 50:18, 50:20, 50:24, 50:25, 51:3, 51:10, 53:3
**cases** [5] - 3:21, 3:23, 25:8, 41:11, 45:11
**categories** [1] - 40:6
**category** [2] - 33:8, 45:10
**Category** [14] - 7:24, 8:3, 30:22, 30:24, 31:1, 31:10, 31:19, 31:20, 31:23, 32:1, 33:10, 45:12, 45:14
**cautioned** [1] - 35:25
**CCRA** [1] - 1:23
**CDC** [1] - 49:11
**center** [3] - 12:19, 18:15, 19:23
**CENTER** [1] - 2:3
**centers** [2] - 4:22, 10:13
**CENTRAL** [1] - 1:2
**certain** [1] - 4:19
**certainly** [12] - 15:12, 17:8, 20:18, 28:4, 28:8, 28:12, 28:17, 29:1, 33:5, 33:16, 35:2, 50:19
**CERTIFICATE** [1] - 56:1
**certified** [1] - 44:22
**CERTIFY** [1] - 56:2
**certifying** [1] - 20:4
**cetera** [1] - 38:13
**challenge** [12] - 6:10, 9:4, 17:9, 23:2, 35:1, 35:6, 36:3, 37:2, 37:5, 37:16, 39:9, 43:4
**challenged** [1] - 9:9
**challenges** [2] - 26:19, 43:15
**challenging** [4] - 17:1, 35:24, 38:1
**channels** [1] - 50:19
**charged** [1] - 4:15
**CHARGED** [1] - 56:5
**check** [1] - 18:4
**child** [27] - 5:12, 11:7, 17:5, 19:13, 21:14, 23:11, 23:13, 23:24, 24:4, 24:6, 24:7, 25:19, 26:23, 27:3, 27:4, 27:8, 28:12, 30:6, 31:8, 33:2, 35:17, 35:20, 38:7, 38:17, 42:18, 45:19
**child's** [8] - 31:2, 37:8, 41:12, 41:14, 42:11, 42:12, 50:13, 50:14
**children** [31] - 13:14, 15:23, 16:20, 19:6, 19:9, 25:19, 27:17, 32:6, 32:10, 33:20, 34:11, 34:17, 35:11, 35:14, 35:19, 35:24, 36:6, 36:10, 36:14, 37:9, 37:12, 37:16, 37:23, 38:22, 39:12, 39:18, 40:25, 44:22, 46:3, 46:11
**children's** [2] - 34:5, 41:10
**CHRISTOPHER** [1] - 2:11
**Christopher** [1] - 47:12

**CIRCUIT** [1] - 56:5
**Circuit** [1] - 48:17
**circumstance** [2] - 16:4, 39:24
**circumstances** [3] - 6:20, 27:9, 35:8
**cite** [4] - 5:6, 31:13, 31:17, 45:3
**cited** [3] - 6:3, 6:4, 12:21
**civil** [3] - 53:3, 53:20, 53:22
**Civil** [1] - 13:23
**claim** [23] - 4:7, 4:8, 6:25, 7:6, 7:8, 8:5, 8:7, 8:10, 9:7, 17:13, 18:22, 21:1, 21:3, 21:4, 21:23, 29:21, 30:1, 30:20, 34:2, 34:3, 34:6, 48:1, 48:5
**claims** [14] - 4:4, 7:9, 7:10, 9:14, 9:16, 10:4, 10:5, 20:25, 21:1, 21:3, 24:19, 51:3, 51:7, 51:13
**clarification** [4] - 14:13, 16:15, 52:13, 54:8
**clarify** [3] - 14:2, 24:13, 52:19
**class** [21] - 3:21, 4:6, 4:8, 4:9, 5:9, 7:2, 7:7, 7:9, 7:11, 8:10, 10:9, 12:5, 12:17, 18:20, 18:22, 18:24, 19:21, 20:2, 29:24, 44:22
**classes** [1] - 20:4
**clause** [1] - 12:3
**clauses** [1] - 34:21
**clear** [7] - 7:3, 7:22, 13:25, 29:3, 32:21, 48:2, 49:7
**clearly** [1] - 11:21
**CLERK** [4] - 44:13, 44:17, 52:3, 52:6
**Clerk** [1] - 44:13
**client** [16] - 36:15, 36:18, 37:2, 38:5, 38:8, 38:10, 38:11, 38:15, 40:8, 40:14, 41:22, 41:25, 42:7, 42:20, 42:25
**client's** [2] - 36:17, 40:12
**clients** [1] - 9:12
**close** [3] - 11:16, 12:7, 31:19
**closed** [1] - 53:2
**closer** [2] - 13:17, 44:15
**closest** [1] - 28:23
**collaborative** [1] - 13:11
**collateral** [1] - 51:1
**colleague** [3] - 20:25, 44:7, 54:6
**coming** [1] - 42:6
**comments** [1] - 23:4
**commitment** [1] - 29:14
**committed** [1] - 5:13
**common** [1] - 43:16
**communication** [2] - 50:7, 50:11
**community** [1] - 22:4
**comparable** [4] - 17:24, 20:15, 20:21, 20:22
**comparison** [1] - 27:20
**competent** [1] - 35:13
**complaint** [1] - 3:25
**complex** [1] - 4:2
**compliance** [1] - 25:5
**complicated** [1] - 3:12
**complication** [1] - 27:9
**concern** [4] - 15:14, 25:18, 30:3, 32:23

**concerned** [1] - 26:8
**concerns** [1] - 13:18
**concluded** [1] - 55:9
**conclusion** [1] - 24:8
**conclusions** [1] - 27:6
**conditions** [2] - 36:2, 37:4
**confer** [6] - 43:9, 47:6, 51:22, 53:10, 53:24, 54:13
**CONFERENCE** [1] - 56:7
**conference** [2] - 27:13, 47:1
**conferring** [1] - 55:3
**confirm** [1] - 48:11
**confirms** [1] - 49:12
**CONFORMANCE** [1] - 56:6
**Congress** [7] - 34:16, 36:1, 36:23, 36:24, 37:21, 38:19, 50:1
**conjunction** [2] - 34:14, 53:10
**consequences** [1] - 30:17
**consider** [1] - 42:9
**considered** [1] - 45:13
**considering** [2] - 42:18, 42:20
**consist** [1] - 23:10
**consistent** [1] - 10:13
**consistently** [1] - 27:18
**constantly** [1] - 38:1
**constitutes** [1] - 33:19
**Constitution** [1] - 28:14
**CONSTITUTIONAL** [1] - 2:4
**constitutional** [7] - 4:10, 7:10, 7:12, 7:14, 8:12, 11:23, 46:6
**construction** [1] - 34:23
**consult** [1] - 33:1
**contact** [1] - 42:15
**contained** [1] - 47:23
**context** [7] - 28:11, 28:19, 45:20, 46:2, 46:20, 47:6, 49:21
**continuance** [1] - 53:12
**continued** [1] - 52:20
**contracted** [1] - 37:23
**contractors** [1] - 21:16
**contracts** [1] - 30:9
**contrary** [1] - 39:1
**contrast** [1] - 49:10
**contravention** [1] - 13:22
**controverted** [1] - 36:5
**converse** [1] - 17:7
**conveyed** [1] - 35:15
**convict** [1] - 35:4
**convincing** [3] - 7:22, 29:4, 32:21
**COOLEY** [1] - 2:7
**COOPER** [1] - 2:17
**coordinator** [3] - 21:13, 24:6, 25:16
**coordinators** [4] - 21:16, 41:7, 50:9, 50:18
**copy** [1] - 14:18
**core** [4] - 9:1, 9:17, 39:17, 39:22
**Corporation** [1] - 35:25
**corporation** [1] - 38:3
**corpus** [1] - 39:21

**CORRECT** [1] - 56:2
**correct** [6] - 5:6, 23:24, 24:10, 24:13, 53:4, 53:5
**correlation** [1] - 10:18
**counsel** [27] - 5:18, 5:24, 8:12, 9:7, 9:8, 9:23, 9:24, 14:6, 24:4, 34:5, 34:11, 35:1, 36:9, 37:16, 37:18, 38:22, 39:8, 39:12, 41:25, 46:14, 47:17, 49:11, 49:17, 49:25, 50:2, 50:5, 50:11
**country** [1] - 26:21
**couple** [3] - 10:9, 13:15, 13:18
**coupled** [1] - 13:5
**course** [6] - 11:21, 12:11, 16:3, 22:2, 40:17, 41:17
**COURT** [67] - 1:1, 1:23, 3:3, 10:21, 11:10, 12:12, 12:21, 13:2, 14:2, 14:14, 14:22, 14:24, 15:8, 16:9, 16:23, 16:25, 17:10, 17:23, 18:1, 18:6, 18:11, 18:14, 18:23, 19:22, 20:20, 20:23, 21:20, 22:23, 23:21, 24:1, 24:9, 24:11, 26:6, 27:25, 29:5, 29:23, 31:12, 31:22, 31:25, 33:24, 34:24, 36:20, 37:6, 38:25, 39:14, 43:3, 43:25, 47:5, 47:9, 48:16, 51:16, 51:18, 52:1, 52:4, 52:10, 52:12, 52:16, 52:21, 52:25, 53:6, 54:3, 54:11, 54:16, 54:18, 54:25, 55:2, 55:7
**Court** [37] - 7:10, 8:5, 8:9, 20:4, 21:1, 21:5, 21:6, 24:18, 24:22, 27:11, 28:9, 28:18, 28:25, 29:11, 29:19, 29:20, 29:22, 31:4, 35:15, 35:22, 35:25, 41:23, 44:11, 44:12, 44:23, 45:1, 45:17, 46:1, 46:19, 46:20, 46:21, 46:25, 47:2, 48:23, 49:10, 50:16, 51:15
**court** [7] - 11:10, 24:12, 43:20, 52:2, 53:3, 53:7, 53:16
**Court's** [1] - 47:18
**courthouse** [1] - 53:2
**courts** [3] - 3:22, 22:10, 31:5
**Courts** [1] - 27:17
**cover** [2] - 3:14, 39:17
**covered** [4] - 18:16, 20:1, 31:22, 31:25
**crime** [1] - 5:13
**criminal** [7] - 4:15, 27:16, 27:23, 28:10, 28:19, 53:2, 53:19
**crucial** [1] - 50:20
**CSR** [1] - 1:23
**current** [13] - 6:11, 8:1, 14:18, 15:1, 15:6, 17:3, 23:9, 24:14, 26:19, 43:4, 52:19, 52:21, 54:11
**custodial** [1] - 30:20
**custodian** [6] - 7:7, 7:11, 7:21, 18:20, 29:24, 42:17
**custody** [7] - 11:15, 11:22, 13:7, 19:10, 27:17, 45:2, 51:9
**CV18-5741-DMG** [1] - 1:8

# D

**DAISY** [1] - 2:17

**danger** [6] - 4:14, 5:12, 12:15, 12:20, 16:21, 30:14
**dangerous** [2] - 27:3, 27:4
**DANIEL** [1] - 2:12
**data** [1] - 10:17
**date** [6] - 14:22, 52:21, 53:8, 54:24, 54:25, 55:5
**DATE** [1] - 56:10
**dates** [5] - 53:13, 53:25, 54:9, 54:12, 54:14
**dating** [1] - 6:5
**Daubert** [1] - 52:17
**days** [3] - 11:15, 11:16, 11:17
**DC** [1] - 2:13
**deadline** [4] - 52:14, 52:15, 52:20, 54:9
**deadlines** [2] - 53:13, 54:12
**deal** [2] - 8:21, 9:1
**deals** [1] - 8:22
**decades** [1] - 40:16
**DECEMBER** [2] - 1:18, 3:1
**decide** [1] - 36:17
**decided** [2] - 25:8, 46:2
**decides** [3] - 12:9, 22:18, 46:20
**deciding** [1] - 42:3
**decision** [27] - 6:19, 9:3, 12:10, 16:11, 21:18, 23:12, 23:22, 23:23, 24:3, 24:7, 24:9, 24:10, 24:24, 28:5, 30:4, 39:2, 40:22, 41:8, 41:19, 41:21, 42:11, 42:23, 43:4, 43:11, 50:8, 50:17, 50:20
**decision-maker** [1] - 41:21
**decision-making** [9] - 16:11, 23:12, 23:22, 24:24, 30:4, 42:23, 50:8, 50:17, 50:20
**decisions** [20] - 9:4, 9:10, 15:18, 15:20, 17:9, 21:11, 23:2, 23:16, 27:3, 35:1, 35:24, 36:15, 36:19, 37:4, 37:7, 38:1, 40:20, 41:4, 41:19, 51:6
**declarants** [1] - 47:25
**declaration** [1] - 50:15
**declarations** [2] - 49:11, 50:10
**declaring** [1] - 42:11
**declined** [1] - 47:15
**deem** [1] - 5:15
**defend** [1] - 36:8
**DEFENDANTS** [1] - 2:11
**defendants** [5] - 7:2, 13:10, 13:21, 47:13, 49:10
**Defendants** [1] - 1:12
**defendants'** [3] - 8:9, 48:8, 49:25
**defenders** [1] - 35:5
**defense** [1] - 50:15
**deference** [1] - 40:22
**deficiencies** [1] - 25:5
**definition** [1] - 20:2
**definitions** [1] - 20:2
**degree** [1] - 33:11
**delay** [2] - 27:1, 32:16
**denials** [3] - 7:19, 7:25, 33:6
**deny** [1] - 22:16

**DEPARTMENT** [1] - 2:12
**deponents** [1] - 41:11
**deposed** [1] - 41:12
**DEPOSIT** [1] - 56:6
**deposition** [3] - 48:3, 48:11, 49:4
**depositions** [2] - 47:25, 49:7
**deprivation** [7] - 12:2, 13:5, 21:24, 21:25, 30:3, 30:11, 30:18
**describe** [1] - 10:25
**described** [2] - 10:15, 34:9
**describes** [1] - 51:7
**deserves** [1] - 40:22
**designated** [1] - 31:2
**designating** [1] - 31:8
**detail** [1] - 25:15
**detailed** [1] - 14:17
**detain** [2] - 36:18, 39:6
**detention** [9] - 4:21, 5:5, 10:12, 10:19, 11:21, 12:18, 18:15, 51:5, 51:8
**determination** [5] - 12:14, 12:20, 26:8, 26:16, 45:20
**determinations** [2] - 35:7, 51:5
**determine** [9] - 4:24, 5:18, 7:20, 14:7, 21:25, 32:12, 38:4, 39:21, 40:12
**determined** [1] - 16:20
**determines** [1] - 4:14
**determining** [1] - 7:17
**differ** [2] - 5:2, 10:12
**difference** [3] - 19:12, 19:19, 33:11
**different** [15] - 3:12, 19:5, 19:25, 20:12, 21:15, 23:19, 25:22, 26:5, 27:6, 30:9, 30:10, 45:19, 46:7, 50:4, 51:19
**difficult** [2] - 13:13, 38:9
**difficulties** [2] - 43:14, 54:7
**dime** [1] - 40:24
**directed** [1] - 38:21
**direction** [4] - 5:22, 13:18, 14:8, 23:1
**directly** [2] - 17:16, 27:16
**directs** [1] - 34:10
**disagree** [2] - 12:1, 32:5
**disagreement** [1] - 25:12
**disclose** [1] - 13:22
**discount** [1] - 21:7
**discovery** [1] - 13:22
**discretion** [12] - 6:21, 9:5, 15:15, 22:9, 22:11, 22:13, 22:22, 22:24, 32:24, 39:1, 39:20, 46:10
**discuss** [3] - 53:12, 54:10
**discussed** [3] - 12:1, 48:7, 51:22
**discussions** [1] - 26:11
**dispute** [3] - 41:13, 41:14, 42:14
**disregard** [2] - 41:5, 41:7
**distant** [5] - 31:1, 31:3, 31:14, 31:20, 44:24
**distinction** [1] - 31:19
**distinguishes** [1] - 33:9
**distributed** [1] - 53:15
**DISTRICT** [3] - 1:1, 1:2, 1:23
**diverse** [1] - 21:18

**DOLLY** [1] - 1:3
**domestic** [2] - 45:19, 46:1
**done** [3] - 27:18, 35:23, 40:16
**down** [16] - 12:6, 16:20, 17:2, 17:7, 25:2, 26:10, 26:18, 26:23, 26:24, 27:9, 30:5, 30:13, 30:14, 44:1, 44:4, 46:13
**drag** [1] - 45:22
**dramatically** [1] - 11:18
**draw** [1] - 47:18
**drug** [2] - 36:15, 39:6
**drugs** [2] - 38:15, 38:18
**due** [29] - 4:6, 4:8, 5:8, 6:14, 6:23, 7:5, 7:7, 7:10, 7:18, 8:7, 9:8, 10:5, 12:3, 15:12, 21:20, 21:23, 22:1, 27:15, 28:13, 29:13, 30:22, 33:4, 46:6, 46:8, 46:15, 51:3, 51:11, 51:12, 52:18
**duties** [1] - 13:23
**duty** [1] - 38:3

## E

**early** [1] - 6:5
**easiest** [1] - 18:7
**economy** [1] - 47:11
**effect** [3] - 36:2, 36:13, 37:4
**effective** [2] - 40:19, 40:20
**effectively** [1] - 34:6, 35:17
**efficient** [1] - 6:18
**effort** [2] - 3:4, 26:7
**Eick** [2] - 48:15, 49:5
**either** [3] - 9:15, 14:5, 52:2
**elements** [1] - 41:2
**emphasis** [1] - 4:17
**emphasize** [2] - 48:23, 50:16
**employed** [4] - 21:14, 21:15, 21:16, 21:17
**employee** [1] - 49:5
**employees** [3] - 15:16, 32:25, 33:1
**empowered** [1] - 41:5
**enacted** [1] - 46:17
**end** [2] - 26:16, 52:7
**ends** [1] - 21:5
**engaged** [1] - 49:8
**English** [1] - 36:6
**ensure** [3] - 34:10, 35:18, 38:21
**ensuring** [1] - 35:14
**entails** [1] - 13:21
**entered** [1] - 51:2
**entitled** [4] - 7:18, 31:11, 39:5, 41:6
**entrusted** [1] - 22:10
**environment** [2] - 4:20, 6:19
**envision** [1] - 37:18
**envisioned** [2] - 37:11, 37:15
**equally** [1] - 8:16
**erroneous** [6] - 12:10, 13:4, 16:19, 25:13, 30:4
**erroneously** [1] - 12:6
**error** [2] - 25:14, 25:23
**errors** [2] - 22:6, 24:17

especially [2] - 24:24, 29:12
essentially [2] - 22:14, 34:5
established [4] - 4:9, 7:11, 8:11, 37:6
estimates [1] - 24:21
ET [3] - 1:4, 1:10, 2:12
et [1] - 38:12
eventually [1] - 48:20
evidence [31] - 5:1, 5:19, 7:22, 10:11, 11:13, 12:5, 12:21, 13:6, 16:19, 17:17, 22:15, 24:2, 24:3, 24:18, 25:9, 25:21, 25:24, 25:25, 26:4, 29:4, 30:5, 38:11, 42:2, 42:10, 47:20, 47:24, 48:1, 48:20, 49:2, 50:10
evidentiary [5] - 13:19, 32:22, 32:23, 33:3, 45:4
exact [2] - 27:11
exactly [1] - 6:6
examined [1] - 26:13
example [14] - 8:21, 10:25, 16:7, 21:11, 22:14, 25:10, 27:24, 33:13, 36:4, 38:14, 41:2, 42:2, 42:14, 48:3
exercise [1] - 47:11
Exhibit [3] - 14:19, 48:6, 50:15
exist [2] - 4:2, 43:17
exort [1] - 35:17
expanded [1] - 14:14
expecting [1] - 54:23
expeditious [1] - 22:3
expense [1] - 8:13
expert [4] - 10:17, 11:6, 11:13, 43:13
expertise [2] - 6:16, 15:14
experts [2] - 19:14, 23:11
exploitation [5] - 8:18, 8:23, 8:25, 34:12, 49:20
extend [2] - 31:13, 55:5
extended [2] - 7:13, 44:11
extends [1] - 31:18
extensive [1] - 25:4
extent [5] - 6:25, 31:21, 33:2, 38:21, 51:10
extra [1] - 16:12

## F

facilitate [1] - 37:19
facilities [30] - 4:21, 4:23, 4:25, 5:2, 5:5, 5:9, 6:17, 10:10, 10:11, 10:12, 11:1, 11:13, 11:19, 13:5, 17:14, 17:15, 17:19, 17:22, 17:23, 18:9, 19:8, 19:15, 19:16, 20:1, 20:6, 20:7, 20:9, 24:15, 30:9, 32:11
facility [7] - 14:11, 18:15, 25:11, 30:13, 30:15, 39:7, 42:13
fact [14] - 3:25, 9:14, 15:22, 16:3, 16:7, 16:10, 16:11, 16:12, 19:16, 20:1, 23:7, 30:25, 33:17, 36:5
factors [1] - 7:17
facts [12] - 10:16, 10:25, 11:6, 16:18, 17:18, 18:2, 18:7, 27:6, 41:1, 41:2, 47:23, 48:8

factual [1] - 45:9
failures [1] - 17:2
fair [1] - 45:4
fairness [1] - 24:23
faith [3] - 21:10, 22:5, 22:9
familial [5] - 7:13, 11:24, 31:3, 31:9, 33:11
familiar [1] - 6:17
families [3] - 11:22, 32:12, 35:11
family [3] - 7:14, 32:9, 32:18
far [1] - 45:21
fatal [1] - 21:3
favor [1] - 41:22
feasibility [1] - 28:13
feasible [3] - 12:2, 13:9, 23:8
features [2] - 10:13, 28:21
February [2] - 51:24, 54:21
federal [9] - 15:17, 21:12, 24:12, 35:6, 38:2, 45:2, 45:3, 46:6, 46:15
Federal [6] - 13:23, 41:3, 41:4, 41:8, 41:9, 41:11
FEE [1] - 56:5
FEES [1] - 56:5
FELT [1] - 2:17
fenced [1] - 11:1
fencing [2] - 19:6, 19:7
few [5] - 15:16, 19:3, 19:24, 44:6, 47:14
FFS [2] - 16:7, 25:16
FFSs [5] - 50:6, 50:7, 50:16, 50:18
Field [5] - 41:3, 41:4, 41:8, 41:9, 41:11
field [3] - 15:17, 21:12, 23:25
file [9] - 25:8, 42:4, 42:5, 42:9, 42:10, 51:21, 51:23, 52:19
filed [3] - 3:10
filing [2] - 3:25, 54:9
final [1] - 15:18
finder [7] - 15:22, 16:3, 16:7, 16:10, 16:11, 16:13, 23:7
findings [1] - 15:24
fine [1] - 38:7
finish [1] - 3:11
finished [1] - 3:6
First [1] - 8:5
first [9] - 3:20, 8:11, 10:4, 13:19, 15:25, 19:4, 19:25, 32:18, 34:3
fitness [1] - 30:20
five [1] - 33:18
fixes [1] - 45:25
flaws [1] - 21:3
flexibility [1] - 6:16
flexible [4] - 6:14, 6:23, 15:13, 29:11
Flores [13] - 3:24, 3:25, 4:3, 4:16, 7:15, 12:13, 12:23, 24:12, 32:14, 43:12, 51:1, 51:2, 51:13
FLORES [1] - 2:3
flows [1] - 4:16
focus [2] - 23:4, 26:11
focused [1] - 8:14
focuses [1] - 34:9

folks [1] - 43:13
follow [1] - 24:12
follow-up [1] - 24:12
following [2] - 9:19, 32:17
follows [2] - 8:17, 51:4
FOR [2] - 2:3, 56:5
forced [1] - 11:2
FOREGOING [1] - 56:2
forgot [2] - 16:22, 17:14
formal [3] - 6:12, 6:24, 15:11
formalized [2] - 7:25, 33:6
format [1] - 48:21
forth [3] - 6:13, 48:20, 51:7
forward [2] - 24:18
four [3] - 21:3, 21:6, 37:24
FOURTH [1] - 1:24
frame [2] - 14:24, 26:14
free [3] - 5:6, 11:1, 11:20
freedom [3] - 4:10, 4:11, 7:12
FSA [1] - 32:5
FSSs [2] - 21:15, 46:11
fund [1] - 9:3
funded [3] - 35:6, 36:11, 40:16
funding [9] - 9:12, 34:25, 39:2, 50:4
funds [7] - 36:24, 37:21, 38:2, 39:16, 39:21, 39:22, 48:9
future [4] - 26:7, 43:9, 43:10, 54:12

## G

gargantuan [1] - 3:4
gathering [1] - 38:10
GDIT [1] - 21:16
geared [1] - 21:20
GEE [1] - 1:3
general [2] - 40:1, 40:6
given [5] - 3:24, 5:10, 7:24, 11:18, 14:9, 38:19, 39:14
goal [1] - 4:12
government [17] - 4:14, 8:13, 18:21, 19:10, 21:11, 34:4, 34:25, 35:3, 35:6, 38:1, 38:2, 38:16, 39:4, 40:9, 40:16, 43:8, 46:15
government's [4] - 5:11, 18:8, 22:3, 35:1
grandparents [2] - 31:5, 45:12
grant [8] - 4:7, 7:2, 7:8, 22:9, 22:20, 22:21, 22:24, 26:20
granted [2] - 7:5, 20:3
grants [1] - 8:9
great [3] - 6:15, 55:1, 55:3
greatest [1] - 38:21
ground [1] - 43:16
grounds [1] - 48:24
group [6] - 11:4, 11:9, 11:12, 11:16, 20:10, 21:18
guarantee [1] - 15:23
guardians [3] - 44:8, 44:10, 45:5
guess [1] - 18:14

**guidance** [1] - 28:7
**guide** [1] - 33:9
**guidelines** [3] - 27:7, 40:5, 43:6
**guilt** [1] - 11:4

## H

**hall** [2] - 39:7, 42:13
**hallmarks** [1] - 5:4
**hand** [1] - 37:21
**hang** [1] - 28:6
**hang-ups** [1] - 28:6
**happy** [2] - 24:5, 31:16
**harder** [1] - 30:5
**harm** [1] - 13:6
**headquarters** [1] - 23:25
**hear** [10] - 18:25, 21:2, 24:2, 29:22, 44:18, 52:1, 52:2, 52:9, 52:11, 54:18
**heard** [4] - 9:25, 13:14, 33:20, 49:1
**hearing** [14] - 5:10, 5:16, 12:2, 13:8, 15:22, 24:5, 24:7, 24:8, 30:4, 30:12, 30:18, 41:17, 45:4
**HEARING** [1] - 1:17
**hearings** [8] - 6:12, 7:19, 7:25, 28:10, 28:23, 28:25, 29:18
**hearsay** [4] - 48:3, 48:12, 48:18, 48:24
**held** [2] - 26:15, 27:22
**help** [2] - 24:6, 38:8
**helpful** [3] - 13:1, 31:17, 42:24
**helps** [1] - 23:15
**HEREBY** [1] - 56:2
**herself** [1] - 48:12
**HHS** [3] - 35:10, 35:20, 38:21
**high** [4] - 24:20, 24:21, 35:19, 41:19
**higher** [1] - 19:13
**himself** [2] - 5:12, 22:4
**hit** [1] - 19:2
**hoc** [2] - 8:2, 43:5
**hold** [1] - 37:14
**Holguin** [8] - 9:24, 33:24, 34:24, 36:20, 43:3, 49:15, 49:24, 50:6
**HOLGUIN** [8] - 2:3, 34:1, 35:2, 36:23, 37:17, 39:4, 39:24, 43:23
**holidays** [1] - 51:20
**HOLLY** [1] - 2:17
**homes** [5] - 11:4, 11:9, 11:12, 11:16, 20:10
**Honor** [44] - 10:1, 10:3, 10:25, 11:25, 12:16, 12:24, 14:12, 14:21, 17:12, 18:3, 18:18, 19:24, 22:8, 23:9, 24:15, 26:17, 26:22, 28:8, 29:25, 30:21, 31:15, 31:24, 33:5, 33:22, 34:1, 34:8, 39:4, 39:24, 41:16, 43:23, 47:7, 47:11, 47:12, 47:15, 48:22, 49:15, 50:22, 50:23, 51:17, 54:1, 54:5, 54:15, 55:6
**Honor's** [3] - 10:7, 13:16, 32:4
**HONORABLE** [1] - 1:3
**hospitalization** [1] - 29:14
**huge** [1] - 3:9
**HUMAN** [1] - 2:3

**hung** [1] - 28:1

## I

**idea** [3] - 15:11, 16:3, 42:21
**identify** [1] - 47:19
**immediately** [1] - 53:17
**immigration** [6] - 9:1, 22:12, 27:17, 37:8, 39:18, 49:18
**impinge** [1] - 11:20
**implementing** [1] - 37:7
**implicated** [1] - 4:25
**implicates** [2] - 11:23, 31:9
**import** [1] - 27:16
**importance** [1] - 35:13
**important** [4] - 8:16, 25:7, 34:22, 40:14
**imported** [1] - 46:5
**imposed** [1] - 37:3
**imposes** [1] - 36:1
**improper** [1] - 42:25
**IN** [4] - 2:3, 2:11, 56:3, 56:6
**in-network** [1] - 18:10
**inaccessible** [1] - 9:12
**incident** [1] - 12:22
**inclined** [1] - 8:5
**include** [3] - 6:8, 17:6, 50:21
**included** [3] - 20:6, 33:4, 45:12
**includes** [3] - 32:8, 32:18, 50:14
**including** [2] - 7:13, 43:12
**income** [1] - 40:5
**inconsistent** [1] - 34:14
**incorporated** [1] - 13:25
**incorrect** [1] - 5:6
**increases** [1] - 11:14
**incredible** [1] - 15:15
**independent** [2] - 6:25, 34:21
**indicated** [3] - 47:15, 50:23, 50:24
**indicates** [1] - 8:11
**indigent** [1] - 36:7, 40:5
**indistinguishable** [1] - 19:15
**individual** [2] - 23:13, 42:20
**individuals** [4] - 23:14, 23:17, 23:24, 48:14
**inform** [1] - 50:12
**informally** [1] - 9:20
**information** [12] - 4:24, 6:8, 9:13, 13:20, 14:5, 14:20, 35:15, 42:15, 42:24, 47:24, 48:12, 48:25
**informative** [1] - 14:5, 28:2
**informs** [1] - 8:19
**infrastructure** [1] - 4:2
**inherently** [1] - 13:7
**initial** [6] - 12:9, 16:5, 16:7, 16:8, 23:13, 25:14
**injunctions** [1] - 48:19
**INS** [1] - 51:9
**Institute** [2] - 36:11, 37:22
**instructed** [1] - 3:22
**instruction** [1] - 28:4

**instructive** [1] - 24:17
**insufficient** [1] - 14:21
**insulate** [4] - 35:23, 36:2, 37:4, 40:19
**intended** [2] - 50:23, 51:19
**interest** [11] - 4:16, 7:12, 7:13, 7:14, 7:16, 10:8, 21:24, 22:3, 32:8, 39:11, 40:12
**interests** [7] - 4:10, 4:25, 5:11, 12:4, 23:19, 32:5, 32:10
**internal** [4] - 13:10, 13:12, 15:21, 25:6
**interpretation** [2] - 9:3, 34:23
**interpreting** [1] - 34:15
**interrupt** [4] - 10:21, 16:23, 29:5, 48:16
**interruption** [1] - 28:16
**intervening** [1] - 51:20
**investigation** [1] - 16:5
**involuntary** [1] - 29:14
**involved** [10] - 6:20, 16:5, 16:10, 23:22, 31:7, 36:16, 36:19, 36:21, 40:7, 50:18
**involvement** [1] - 15:25
**involves** [2] - 4:1, 22:9
**involving** [1] - 3:21
**irrespective** [1] - 45:14
**IS** [1] - 56:2
**issue** [19] - 3:21, 6:18, 8:21, 9:20, 10:8, 12:4, 24:13, 26:25, 27:13, 31:18, 36:5, 36:20, 36:21, 38:24, 43:11, 44:25, 46:23, 47:17, 51:19
**issued** [1] - 45:17
**issues** [15] - 3:9, 3:12, 3:13, 3:18, 9:2, 9:14, 24:7, 25:5, 28:12, 39:9, 43:7, 43:8, 47:2, 51:22, 53:11
**itself** [7] - 4:17, 22:22, 23:12, 35:10, 35:23, 36:23, 37:3

## J

**jail** [2] - 12:8, 13:5
**jail-like** [2] - 12:8, 13:5
**Jaime** [2] - 12:17, 25:11
**January** [7] - 3:17, 9:18, 47:1, 51:19, 52:14, 52:18, 54:8
**JENNY** [1] - 2:3
**job** [3] - 38:8, 55:3
**joint** [3] - 9:18, 51:21, 51:23
**JONATHAN** [1] - 2:18
**JUDGE** [1] - 1:3
**Judge** [3] - 3:16, 3:19, 9:19
**judges** [3] - 22:12, 22:13
**judgment** [11] - 4:6, 4:7, 7:2, 7:9, 8:10, 9:15, 47:3, 47:16, 47:19, 48:19, 49:3
**judicata** [8] - 3:21, 3:22, 4:3, 21:1, 46:24, 50:22, 50:24, 51:13
**judicial** [2] - 36:3, 40:19
**JUDICIAL** [1] - 56:7
**jump** [1] - 11:14
**juncture** [1] - 9:16
**jury** [3] - 53:3, 53:16, 53:19
**JUSTICE** [1] - 2:12

justice [1] - 28:11
Justice [1] - 36:12
justifying [1] - 42:12
Justin [1] - 49:5
juvenile [8] - 4:21, 10:12, 12:18, 18:15, 24:6, 29:14, 39:7, 42:12

## K

keep [1] - 21:6
keeping [1] - 27:8
kept [1] - 44:5
kicks [1] - 17:4
kid [1] - 30:11
kids [6] - 11:1, 11:2, 12:8, 13:7, 15:19, 23:18
kind [1] - 38:11
kinds [1] - 37:25
know-your-rights [1] - 40:13
knowledge [1] - 49:9
known [1] - 31:21
knows [3] - 6:19, 26:22, 29:1

## L

lack [2] - 30:3, 33:14
language [9] - 6:21, 8:14, 8:15, 8:19, 9:2, 32:15, 34:9, 34:21, 49:23
largely [2] - 20:22, 25:6
last [1] - 27:13
law [14] - 3:21, 8:11, 9:6, 16:2, 22:11, 22:12, 27:15, 27:21, 31:12, 31:17, 39:1, 45:2, 45:3, 45:6
LAW [1] - 2:4
laws [2] - 26:22, 36:2
lawyer [14] - 38:3, 38:8, 38:14, 39:5, 40:11, 41:12, 41:14, 41:20, 41:24, 42:2, 42:6, 42:11, 42:17, 42:22
lawyer's [1] - 42:9
lawyers [9] - 35:5, 37:23, 38:6, 40:8, 40:15, 40:23, 41:10, 42:14, 50:7
least [4] - 3:18, 4:13, 4:18, 32:7
leave [3] - 11:1, 19:6, 19:9
LEECIA [1] - 2:19
legal [34] - 6:1, 8:10, 8:15, 8:19, 8:20, 8:22, 9:7, 9:8, 21:1, 34:2, 34:11, 34:15, 34:17, 35:5, 35:13, 35:16, 35:19, 36:9, 36:10, 36:14, 37:24, 38:2, 38:20, 40:3, 40:8, 44:7, 44:8, 44:10, 45:5, 46:23, 47:14, 48:4, 49:6, 49:19
Legal [1] - 35:24
legislative [1] - 45:25
legislature [1] - 46:2
legitimate [2] - 36:3, 37:5
length [3] - 11:9, 11:14, 11:15
lengths [1] - 11:19
LESS [1] - 56:5
less [1] - 29:15
levels [1] - 25:7
liberty [9] - 4:10, 4:16, 4:25, 7:16, 10:8,

12:4, 21:24, 32:4, 32:10
licensed [3] - 5:14, 12:13, 32:11
licensing [2] - 19:18, 27:7
light [2] - 25:21, 26:4
likelihood [2] - 53:1, 53:21
likely [3] - 7:8, 53:7, 55:5
limine [1] - 52:18
limit [3] - 34:17, 39:2, 42:4
limited [3] - 8:2, 14:10, 14:20
limitless [1] - 32:24
lines [1] - 50:11
listed [1] - 13:18
lists [1] - 32:17
LLP [1] - 2:7
locked [1] - 38:10
look [14] - 14:6, 14:15, 16:17, 21:23, 25:24, 25:25, 27:5, 27:20, 32:6, 35:9, 38:7, 38:16, 42:19, 45:2
looking [2] - 8:13, 39:11
looks [1] - 17:5
LOS [2] - 2:5, 3:1
Lucas [1] - 4:1
LUCAS [1] - 1:4

## M

main [1] - 29:9
maintain [2] - 50:10, 50:19
majority [1] - 36:10
maker [2] - 6:19, 41:21
manager [2] - 21:12, 22:18, 25:16
managers [9] - 21:17, 22:15, 41:6, 50:9, 50:11, 50:12, 50:18, 50:21
mandatory [2] - 7:15, 32:15
manner [2] - 8:22, 53:15
manners [1] - 35:7
March [4] - 52:23, 52:24, 53:1, 53:8
mark [2] - 17:4, 19:8
materials [1] - 3:10
Mathews [5] - 7:17, 24:17, 24:18, 24:22, 33:5
MATTER [1] - 56:4
matter [5] - 3:20, 8:20, 22:11, 40:10, 46:5
matters [9] - 3:15, 8:15, 8:20, 34:12, 34:16, 34:17, 40:6, 45:9, 49:19
MAYHUGH [30] - 2:6, 10:1, 10:24, 11:11, 12:16, 12:24, 13:3, 14:12, 14:15, 14:23, 15:4, 15:10, 16:14, 16:24, 17:3, 17:12, 17:25, 18:3, 18:13, 18:18, 29:25, 31:15, 31:24, 32:2, 52:11, 52:13, 52:17, 52:23, 53:5, 54:1
Mayhugh [9] - 9:24, 10:2, 10:21, 19:3, 29:21, 29:23, 52:1, 52:10, 54:6
Mayhugh's [1] - 24:16
mean [4] - 21:22, 22:21, 45:24, 47:3
meaning [1] - 8:19
meaningless [2] - 41:24, 42:1
means [7] - 10:20, 12:7, 19:10, 25:9, 30:10, 33:15, 55:4

meantime [1] - 54:2
measure [1] - 24:23
mechanism [1] - 44:4
mediation [3] - 3:19, 9:19, 26:7
medical [1] - 4:11
medication [3] - 9:10, 36:15, 40:25
medications [1] - 11:5
medium [5] - 4:23, 5:2, 10:10, 10:11, 11:19
medium-secure [2] - 10:11, 11:19
meet [6] - 6:23, 27:7, 43:9, 47:5, 51:22, 53:10, 53:24, 54:13
meet-and-confer [3] - 43:9, 51:22, 53:10
meeting [2] - 51:19, 55:3
member [1] - 32:9
members [4] - 12:5, 23:21, 32:18, 50:20
mention [4] - 16:22, 17:15, 26:6, 49:4
mentioned [6] - 10:9, 14:16, 28:1, 30:2, 30:21, 53:9
merely [1] - 37:9
merit [1] - 42:10
merits [3] - 20:7, 20:24, 21:4
met [2] - 33:21, 46:16
methods [1] - 34:4
microphone [1] - 44:16
might [6] - 26:23, 27:4, 27:6, 37:2, 53:6
mind [2] - 21:6, 46:21
minor [7] - 4:14, 4:19, 12:14, 22:4, 32:16, 44:25, 45:1
minor's [2] - 8:21, 14:6
minors [11] - 4:13, 4:18, 5:3, 5:17, 6:17, 6:20, 8:23, 20:11, 22:6, 49:20, 51:9
minors' [2] - 5:11, 9:1
Miriam [1] - 56:9
MIRIAM [2] - 1:23, 56:10
mission [3] - 8:24, 39:17, 39:23
mistakes [2] - 37:13, 37:14
mistreatment [7] - 8:18, 8:23, 8:25, 34:12, 34:18, 34:20, 49:20
moment [4] - 10:22, 16:23, 44:13, 48:17
momentous [1] - 40:21
money [5] - 36:25, 37:1, 38:20, 40:17, 50:1
MONICA [1] - 2:8
monitor [1] - 25:6
monitoring [1] - 25:7
month [1] - 12:7
months [4] - 26:16, 42:8
Moore [1] - 31:13
moot [1] - 54:9
morning [1] - 3:3
MOTION [1] - 1:17
motion [4] - 4:5, 7:9, 8:9, 47:19
motions [2] - 48:19, 52:18
move [3] - 4:5, 29:8, 29:23
movement [1] - 10:14
moving [5] - 7:7, 22:16, 27:10, 30:20, 44:15

**MR** [35] - 19:1, 19:24, 20:22, 20:24, 22:8, 23:9, 23:23, 24:2, 24:10, 24:13, 25:3, 26:17, 28:8, 28:17, 29:7, 34:1, 35:2, 36:23, 37:17, 39:4, 39:24, 43:23, 44:3, 44:15, 44:19, 47:7, 47:11, 48:22, 51:17, 52:8, 52:24, 54:17, 54:19, 55:1, 55:6
**MS** [31] - 10:1, 10:24, 11:11, 12:16, 12:24, 13:3, 14:12, 14:15, 14:23, 15:4, 15:10, 16:14, 16:24, 17:3, 17:12, 17:25, 18:3, 18:13, 18:18, 29:25, 31:15, 31:24, 32:2, 52:11, 52:13, 52:17, 52:23, 53:5, 54:1, 54:5, 54:15
**MULLIGAN** [1] - 2:18
**multiple** [5] - 25:7, 26:20, 38:15, 39:19, 40:15
**must** [4] - 3:22, 36:1, 36:24, 50:2
**mute** [7] - 19:2, 44:1, 52:3, 52:4, 52:6, 52:8, 54:19
**muted** [6] - 44:2, 44:5, 52:6, 54:17, 54:20
**muting** [1] - 44:3
**MVB11893@aol.com** [1] - 1:25

## N

**named** [3] - 25:10, 44:21, 45:1
**names** [1] - 42:15
**nationwide** [1] - 51:8
**nature** [1] - 6:24
**near** [1] - 32:24
**necessarily** [2] - 5:25, 22:5
**necessary** [5] - 5:10, 5:15, 5:17, 13:8, 33:3
**need** [9] - 3:8, 6:12, 6:15, 28:6, 37:13, 39:12, 52:3, 52:25, 55:2
**needed** [1] - 25:17
**needs** [7] - 5:22, 11:10, 20:11, 32:22, 33:6, 38:5, 40:17
**network** [17] - 17:14, 17:15, 17:18, 17:22, 17:23, 18:9, 18:10, 19:22, 19:25, 20:1, 20:9, 20:14, 20:16, 20:17, 20:18, 20:20, 26:20
**neutral** [6] - 6:18, 15:22, 16:3, 16:11, 16:12, 23:7
**neutrality** [1] - 16:6
**never** [3] - 37:24, 40:10, 41:12
**new** [7] - 4:2, 25:9, 25:21, 25:23, 26:4, 52:15, 54:14
**next** [4] - 9:18, 9:19, 38:24, 54:22
**Ninth** [1] - 48:17
**noise** [3] - 28:16, 44:18, 51:25
**non** [4] - 32:11, 36:6, 45:5
**non-English** [1] - 36:6
**non-legal** [1] - 45:5
**non-parents** [1] - 45:5
**non-secure** [1] - 32:11
**none** [2] - 23:21, 44:21
**normal** [2] - 20:15, 34:23
**normally** [1] - 38:12

**note** [10] - 19:4, 19:19, 25:8, 25:13, 28:22, 29:11, 30:23, 45:9, 45:11, 45:18
**noted** [5] - 19:14, 29:11, 45:20, 49:15, 49:24
**notes** [1] - 10:9
**nothing** [4] - 6:19, 29:20, 39:25, 43:23
**notice** [16] - 5:10, 5:17, 5:23, 6:2, 6:11, 12:2, 13:8, 13:13, 14:4, 14:16, 14:19, 14:24, 15:6, 28:2, 28:3, 28:9
**notices** [3] - 6:4, 6:7
**number** [1] - 42:1
**Number** [1] - 17:17
**numbers** [1] - 47:23
**Numbers** [2] - 10:16, 16:18
**numerous** [1] - 35:12
**NW** [1] - 2:13

## O

**objections** [1] - 13:19
**obligation** [2] - 7:20, 15:19
**obligations** [1] - 22:20
**obstructs** [1] - 34:5
**obviously** [2] - 10:7, 43:19
**OCCIDENTAL** [1] - 2:4
**occur** [2] - 5:12, 22:7
**OF** [8] - 1:2, 1:16, 2:3, 2:11, 2:12, 56:3, 56:7
**offender** [1] - 11:3
**offense** [1] - 4:15
**OFFICIAL** [2] - 1:23, 56:10
**often** [4] - 17:19, 18:9, 19:7, 19:15
**okay'd** [1] - 15:21
**okay'd-purpose** [1] - 15:21
**older** [1] - 15:5
**once** [2] - 16:20, 30:6
**One** [1] - 44:13
**one** [27] - 14:11, 14:25, 15:8, 16:16, 17:13, 20:9, 22:18, 23:15, 24:13, 26:19, 26:22, 27:19, 30:1, 33:8, 33:13, 33:18, 41:3, 42:16, 42:19, 44:4, 44:17, 45:7, 46:25, 52:15
**one-for-one** [1] - 27:19
**open** [4] - 9:22, 25:8, 50:10, 50:19
**open-file** [1] - 25:8
**operates** [1] - 26:20
**operation** [1] - 49:23
**operationalized** [1] - 46:18
**opportunities** [2] - 8:1, 17:9
**opportunity** [7] - 5:17, 7:25, 13:13, 33:6, 33:20, 41:20, 54:13
**opposing** [1] - 42:23
**opposition** [1] - 48:18
**OR** [8] - 20:9, 23:25, 24:5, 25:22, 26:20, 26:25, 29:17, 46:18
**OR's** [7] - 17:14, 21:7, 25:18, 25:19, 26:18, 29:12, 29:16
**oral** [6] - 3:7, 3:9, 3:15, 17:15, 18:20, 33:23

**order** [10] - 5:15, 6:10, 20:4, 21:25, 32:17, 34:8, 37:1, 46:21, 54:12, 54:23
**ordering** [1] - 21:5
**orders** [1] - 28:22
**organization** [1] - 48:10
**ORR** [55] - 4:2, 5:12, 6:16, 7:20, 7:21, 9:7, 9:9, 11:15, 11:22, 12:9, 13:25, 15:13, 15:16, 15:24, 21:15, 23:17, 30:9, 32:12, 32:16, 32:21, 32:25, 33:9, 34:10, 35:22, 36:13, 36:25, 37:3, 37:6, 37:7, 37:11, 37:13, 37:16, 37:19, 37:20, 37:22, 40:18, 42:2, 42:5, 42:9, 42:17, 42:19, 44:25, 45:2, 45:10, 47:17, 47:21, 48:9, 48:10, 49:7, 49:12, 49:23, 50:2, 50:4, 50:19
**ORR's** [10] - 8:25, 9:3, 9:4, 15:15, 33:14, 39:2, 42:23, 49:12, 49:23, 50:10
**ourselves** [1] - 40:19
**out-of-network** [14] - 17:15, 17:18, 17:22, 17:23, 18:9, 19:22, 19:25, 20:1, 20:9, 20:14, 20:16, 20:17, 20:18, 20:20
**outside** [1] - 47:6
**overseeing** [1] - 16:7
**own** [5] - 26:22, 35:1, 36:2, 37:4, 40:24

## P

**p.m** [1] - 55:9
**page** [2] - 47:18, 48:11
**pages** [1] - 14:19
**paid** [2] - 37:16, 49:25
**panel** [6] - 13:15, 13:17, 13:21, 23:13, 23:21, 24:14
**panoply** [1] - 34:4
**paper** [1] - 44:18
**papers** [8] - 6:3, 19:11, 25:4, 25:14, 27:15, 44:14, 45:21, 50:25
**paragraphs** [2] - 47:22, 48:7
**parameters** [1] - 40:1
**parent** [3] - 36:17, 42:3, 42:12
**parents** [8] - 5:25, 31:2, 31:7, 35:14, 35:18, 44:8, 44:10, 45:5
**Parham** [1] - 29:13
**part** [5] - 19:10, 21:10, 31:18, 50:8, 50:17
**partial** [1] - 4:7
**particular** [1] - 24:20
**particularly** [1] - 13:4
**parties** [13] - 6:4, 8:4, 8:14, 9:17, 15:9, 25:12, 26:13, 35:16, 43:21, 45:11, 51:2, 51:7, 54:10
**parties'** [1] - 35:15
**partnership** [1] - 46:14
**parts** [1] - 34:3
**party** [1] - 21:16
**pause** [1] - 18:5
**pay** [6] - 35:4, 36:22, 37:20, 37:22, 38:18, 38:19
**paying** [1] - 37:18

**PENNSYLVANIA** [1] - 2:13
**people** [8] - 21:15, 21:18, 21:21, 23:2, 23:15, 26:15, 27:5, 40:4
**per** [1] - 52:19
**percent** [1] - 24:20
**perception** [1] - 5:1
**perhaps** [5] - 9:23, 11:20, 15:9, 17:10, 23:4
**period** [1] - 45:23
**permitted** [4] - 36:13, 41:16, 42:15, 48:18
**person** [3] - 22:19, 23:15, 49:1
**personal** [1] - 49:8
**personnel** [2] - 6:16, 15:13
**persuade** [1] - 41:21
**pertains** [1] - 4:21
**pervasive** [1] - 14:1
**phases** [1] - 45:19
**phrase** [3] - 8:17, 34:14, 34:15
**physical** [1] - 4:11
**pilot** [3] - 5:21, 13:24, 14:3
**place** [5] - 16:1, 37:14, 38:16, 43:4, 45:22
**placed** [6] - 4:20, 12:8, 17:6, 25:11, 25:17, 32:7
**placement** [40] - 5:21, 5:23, 6:4, 6:7, 6:8, 6:10, 6:11, 9:10, 10:6, 12:9, 13:5, 13:15, 13:17, 13:21, 14:3, 14:4, 14:7, 14:17, 14:19, 14:25, 15:6, 16:25, 22:25, 23:5, 23:10, 24:3, 24:14, 25:5, 25:13, 25:14, 28:2, 28:3, 28:9, 30:7, 30:14, 32:8, 32:11, 41:1, 42:25, 51:5
**placements** [3] - 11:8, 20:18, 20:19
**places** [1] - 4:17
**placing** [1] - 4:13
**plaintiff** [4] - 25:10, 36:10, 45:1, 45:3
**Plaintiffs** [1] - 1:6
**plaintiffs** [23] - 6:25, 7:4, 7:18, 10:2, 19:4, 20:3, 20:5, 24:18, 27:22, 28:23, 29:2, 29:3, 30:21, 44:21, 45:22, 46:4, 47:20, 47:24, 48:15, 48:25, 51:3, 51:10, 51:12
**PLAINTIFFS** [1] - 2:3
**Plaintiffs'** [1] - 48:6
**plaintiffs'** [13] - 4:5, 7:8, 9:2, 9:23, 10:15, 11:20, 16:17, 17:18, 18:6, 30:24, 46:14, 48:1, 48:5
**plans** [1] - 19:12
**play** [1] - 28:12
**pleadings** [1] - 3:23
**podium** [1] - 44:15
**point** [15] - 16:17, 19:25, 24:16, 24:17, 25:3, 25:4, 25:13, 29:19, 30:1, 33:8, 35:4, 35:13, 40:7, 43:10, 46:9
**pointed** [5] - 19:4, 19:11, 27:12, 27:15, 27:21
**pointing** [1] - 45:24
**points** [8] - 10:3, 13:15, 18:19, 19:3, 29:10, 44:6, 47:14, 49:14
**policies** [2] - 21:7, 33:14

**policy** [10] - 13:25, 33:9, 36:4, 37:25, 49:11, 49:12, 49:23, 50:10, 50:19, 51:8
**poses** [1] - 4:14
**position** [4] - 11:18, 14:20, 41:21, 50:1
**positive** [1] - 18:13
**possibility** [2] - 39:16, 53:6
**possible** [4] - 21:21, 22:14, 22:18, 38:21
**post** [1] - 5:16
**potential** [4] - 5:25, 6:2, 21:24, 33:9
**practice** [1] - 40:3
**pre** [8] - 5:9, 12:2, 13:8, 28:9, 30:3, 30:11, 30:18
**pre-deprivation** [4] - 12:2, 30:3, 30:11, 30:18
**pre-notice** [1] - 28:9
**pre-placement** [1] - 28:9
**preaching** [1] - 35:12
**precise** [1] - 14:7
**predicates** [1] - 4:19
**prefer** [1] - 18:21
**preference** [2] - 32:17, 35:3
**preliminary** [4] - 3:20, 27:11, 29:1, 48:19
**prepare** [1] - 24:6
**prescribe** [2] - 6:22, 26:12
**prescribing** [1] - 40:1
**PRESENT** [1] - 2:16
**presentation** [1] - 40:13
**PRESIDING** [1] - 1:3
**presumably** [1] - 33:13
**presume** [4] - 17:5, 22:11, 24:11, 39:16
**pretrial** [1] - 53:13
**pretty** [2] - 21:17, 28:22
**prevails** [1] - 37:25
**prevalent** [1] - 5:4
**prevent** [1] - 23:15
**previous** [1] - 25:5
**previously** [1] - 33:12
**primarily** [4] - 5:2, 20:8, 36:6, 36:7
**primary** [8] - 3:15, 19:12, 27:1, 33:12, 33:16, 33:19, 45:13, 45:15
**priorities** [1] - 40:19
**priority** [3] - 32:18, 42:10, 53:19
**probable** [2] - 28:24, 28:25
**problems** [1] - 43:17
**procedural** [8] - 4:6, 4:8, 7:5, 7:7, 7:10, 8:7, 10:5, 21:23
**Procedure** [1] - 13:24
**procedure** [6] - 5:8, 22:3, 23:2, 26:13, 27:25, 43:18
**procedures** [29] - 5:16, 6:13, 6:22, 11:25, 14:9, 17:21, 21:5, 21:8, 21:20, 23:7, 27:10, 27:12, 27:16, 27:21, 29:12, 29:17, 32:20, 33:4, 33:15, 37:13, 44:9, 45:16, 45:21, 46:4, 46:9, 46:17, 46:19, 51:4
**proceed** [1] - 53:16
**proceeding** [1] - 8:22

**proceedings** [16] - 8:13, 8:15, 8:20, 9:8, 18:5, 27:23, 34:11, 34:16, 34:17, 35:20, 37:8, 39:18, 45:19, 49:18, 49:19, 55:9
**PROCEEDINGS** [2] - 1:16, 56:3
**process** [53] - 4:6, 4:8, 6:10, 6:14, 6:23, 6:24, 7:6, 7:7, 7:10, 7:18, 8:7, 10:5, 12:3, 12:6, 13:11, 13:12, 15:13, 15:15, 15:21, 17:4, 17:8, 21:20, 21:23, 22:1, 23:8, 23:12, 23:16, 24:24, 24:25, 27:15, 28:13, 29:10, 29:13, 30:22, 31:11, 33:4, 37:10, 43:4, 43:13, 43:14, 43:15, 45:13, 45:23, 46:6, 46:8, 46:15, 50:8, 50:17, 50:21, 51:3, 51:11, 51:12
**proffered** [1] - 20:3
**program** [13] - 5:21, 13:24, 14:3, 14:4, 16:25, 23:1, 23:5, 23:6, 23:10, 23:18, 46:6, 46:13
**programs** [1] - 37:24
**progress** [1] - 50:13
**prolonged** [1] - 10:19
**promise** [1] - 52:9
**promptly** [2] - 4:12, 32:7
**proof** [2] - 7:22, 29:3
**proper** [3] - 6:9, 12:2, 48:20
**proposed** [5] - 7:21, 20:5, 33:2, 42:16, 42:17
**prosecute** [1] - 35:4
**prosecutes** [1] - 35:3
**protect** [5] - 8:17, 22:4, 22:6, 34:12, 49:20
**protected** [1] - 35:16
**protecting** [3] - 21:21, 34:17, 34:20
**protection** [1] - 8:22
**protections** [1] - 5:23
**provide** [5] - 13:13, 24:23, 42:24, 45:4, 50:4
**provided** [11] - 5:24, 8:4, 44:10, 44:11, 47:25, 48:4, 48:25, 49:6, 49:9, 49:10, 50:9
**provider** [2] - 48:4, 49:6
**providers** [2] - 36:11, 36:14
**provides** [3] - 14:5, 34:10, 34:25
**providing** [3] - 9:13, 23:1, 49:15
**provision** [2] - 8:16, 50:2
**provisions** [1] - 49:17
**PRP** [1] - 29:18
**psychiatric** [4] - 12:13, 12:20, 39:7, 42:13
**psychiatrist** [2] - 5:14, 12:13
**psychologist** [2] - 5:14, 12:14
**psychotropic** [1] - 38:15
**psychotropics** [1] - 40:15
**public** [1] - 35:5
**pulling** [1] - 9:11
**purpose** [6] - 15:21, 31:20, 37:18, 49:25, 50:3
**put** [4] - 24:18, 34:19, 45:21, 48:20
**putting** [1] - 4:18
**Pym** [3] - 3:16, 3:19, 9:19

## Q

**quality** [1] - 35:19
**questions** [3] - 46:22, 46:24, 51:15
**quick** [3] - 30:1, 44:6, 54:21
**quickly** [4] - 26:10, 26:18, 27:10, 28:24
**quite** [1] - 6:5
**quote** [2] - 35:11, 36:1

## R

**raise** [2] - 6:25, 43:8
**raising** [1] - 43:7
**range** [1] - 3:6
**rarely** [1] - 24:22
**rate** [1] - 24:19
**ratio** [3] - 5:3, 19:11, 19:13
**reach** [1] - 43:16
**reached** [1] - 55:4
**read** [1] - 34:22
**reality** [1] - 53:22
**really** [5] - 34:3, 37:17, 38:5, 41:1, 41:8
**reason** [1] - 30:18
**reasonable** [1] - 26:14
**reasons** [1] - 13:3
**rebut** [1] - 15:24
**receive** [3] - 6:2, 24:3, 35:19
**receiving** [1] - 26:24
**recent** [2] - 6:4, 6:6
**recognizing** [1] - 51:20
**recommendations** [2] - 41:6, 41:7
**record** [9] - 4:24, 5:7, 5:24, 6:5, 15:7, 15:9, 38:6, 46:10, 50:14
**RECORDED** [1] - 56:3
**records** [1] - 9:12
**rectify** [1] - 26:25
**REDUCTION** [1] - 56:6
**referring** [1] - 8:15
**refusals** [1] - 16:19
**regard** [14] - 4:8, 4:19, 5:6, 5:8, 7:1, 7:3, 7:9, 9:7, 9:14, 12:22, 18:24, 39:3, 51:4, 54:8
**regarding** [5] - 6:8, 6:9, 9:10, 49:19, 53:11
**regardless** [1] - 10:19
**regularly** [1] - 50:12
**REGULATIONS** [1] - 56:7
**related** [1] - 34:19
**relations** [2] - 44:11, 44:24
**relationship** [1] - 45:15
**relationships** [1] - 7:13
**relative** [2] - 31:19, 31:20
**relatives** [3] - 31:1, 31:3, 31:14
**release** [13] - 9:10, 10:6, 15:18, 21:3, 29:21, 30:22, 32:16, 40:25, 42:20, 44:6, 46:22, 51:6, 51:8
**released** [1] - 38:12
**releasing** [1] - 42:18
**relied** [1] - 48:15

**relief** [1] - 10:5
**relies** [1] - 42:3
**rely** [3] - 28:23, 47:20, 47:24
**remain** [1] - 14:3
**remains** [1] - 49:2
**remedies** [1] - 7:4
**removal** [1] - 49:18
**repeat** [1] - 11:10
**replace** [1] - 52:15
**reply** [2] - 18:7, 49:14
**report** [6] - 9:17, 9:18, 51:21, 51:24, 52:15, 54:22
**REPORTER** [3] - 1:23, 25:1, 56:10
**reporter** [2] - 11:10, 52:2
**REPORTER'S** [1] - 1:16
**reports** [1] - 35:13
**represent** [9] - 34:11, 36:14, 37:23, 38:7, 38:17, 38:22, 39:18, 40:4, 40:8
**representation** [12] - 8:10, 30:2, 34:2, 35:14, 35:19, 38:4, 44:7, 46:23, 47:14, 47:21, 49:13, 51:18
**representations** [1] - 21:1
**representative** [2] - 12:17, 14:6
**represented** [1] - 24:4
**representing** [1] - 34:5
**request** [6] - 7:25, 17:20, 42:4, 42:5, 42:9
**require** [3] - 32:15, 37:20, 49:25
**required** [14] - 9:8, 12:3, 15:12, 27:22, 28:10, 28:11, 29:10, 30:19, 32:21, 41:15, 45:17, 46:1, 46:10, 50:12
**requirement** [3] - 12:19, 33:21, 41:10
**requirements** [5] - 10:22, 26:24, 30:10, 32:25, 46:15
**requires** [4] - 12:13, 32:6, 46:8, 51:11
**res** [8] - 3:20, 3:22, 4:3, 20:25, 46:24, 50:22, 50:23, 51:13
**reset** [1] - 54:12
**residential** [1] - 4:22
**resolution** [1] - 9:20
**resolve** [2] - 43:11, 51:2
**resolved** [1] - 25:6
**resource** [1] - 40:21
**resources** [2] - 39:25, 40:2
**respect** [22] - 10:4, 10:8, 10:10, 11:2, 11:25, 13:4, 15:11, 15:18, 18:20, 30:1, 30:23, 31:5, 32:4, 32:14, 32:20, 33:8, 34:2, 35:7, 35:10, 38:8, 38:18, 40:25
**respectfully** [1] - 12:1, 32:5
**respects** [4] - 10:12, 11:5, 17:25, 51:1
**respond** [4] - 18:21, 18:24, 42:5, 44:1
**response** [2] - 18:8, 33:22
**responsibility** [1] - 21:14
**responsible** [1] - 15:17
**restraint** [2] - 4:11, 7:12
**restriction** [1] - 10:14
**restrictions** [1] - 37:25
**restrictive** [13] - 4:13, 4:18, 10:5, 10:18, 10:22, 10:23, 13:7, 18:10, 20:13,

29:16, 30:6, 32:7, 41:1
**retaliating** [1] - 9:11
**retaliation** [6] - 9:9, 47:18, 47:22, 48:5, 49:8, 49:13
**return** [1] - 3:19
**reversal** [2] - 24:19, 25:23
**review** [18] - 5:1, 5:7, 5:21, 8:2, 13:15, 13:17, 13:21, 14:3, 16:25, 17:4, 22:25, 23:5, 23:10, 24:14, 24:25, 25:4, 40:20
**reviewed** [2] - 3:23, 25:15
**REX** [1] - 2:6
**RIGHTS** [1] - 2:3
**rights** [5] - 11:20, 11:24, 31:4, 35:16, 40:13
**risk** [2] - 13:4, 24:16
**robust** [6] - 5:16, 5:23, 13:10, 14:9, 17:8, 23:6
**room** [2] - 19:17, 23:6, 44:18
**routinely** [1] - 35:6
**RTC** [5] - 5:13, 5:15, 12:22, 18:16, 30:12
**RTCs** [13] - 5:5, 17:19, 17:21, 17:24, 18:9, 18:10, 20:17, 20:20, 20:21, 24:14, 29:12, 29:15
**rule** [3] - 3:20, 8:5, 43:20
**Rule** [2] - 13:23
**ruled** [2] - 8:8, 43:3
**rules** [3] - 34:23, 36:1, 37:3
**ruling** [11] - 3:15, 4:20, 4:22, 9:21, 12:12, 12:23, 18:17, 45:18, 47:16, 49:16, 53:11
**rulings** [1] - 9:17
**run** [1] - 46:13

## S

**safe** [1] - 25:17
**safety** [1] - 25:18
**sake** [1] - 26:6
**salient** [1] - 35:15
**SANTA** [2] - 1:24, 2:8
**satisfaction** [2] - 51:6, 51:12
**satisfactory** [1] - 24:23
**satisfied** [1] - 46:16
**satisfy** [3] - 26:23, 29:13, 29:17
**save** [1] - 42:25
**saw** [1] - 15:1
**scarcity** [1] - 39:25
**scenario** [1] - 21:22
**schedule** [2] - 52:20, 52:22
**scheduled** [3] - 3:16, 47:2, 47:4
**scope** [1] - 21:24
**SECOND** [1] - 2:7
**second** [1] - 10:4
**secretary** [1] - 6:21
**secure** [22] - 4:20, 4:23, 5:2, 5:9, 10:10, 10:11, 11:8, 11:12, 11:17, 11:19, 19:4, 19:5, 19:8, 19:20, 24:15, 25:11, 26:4, 30:12, 32:11
**secured** [2] - 24:15, 51:5

**secures** [3] - 11:2, 20:14, 20:15
**security** [1] - 5:4
**see** [4] - 6:3, 26:14, 27:4, 42:9
**seek** [4] - 7:5, 24:5, 27:22, 45:22
**seeking** [1] - 29:2
**self** [8] - 4:14, 12:15, 12:20, 16:21, 30:15, 36:4, 39:10, 39:11
**self-interest** [1] - 39:11
**self-serving** [2] - 36:4, 39:10
**semblance** [1] - 16:6
**seminal** [1] - 29:13
**send** [1] - 39:6
**sense** [1] - 40:13
**sensitivity** [1] - 6:15
**separate** [2] - 10:15, 44:3
**serious** [1] - 22:7
**seriousness** [1] - 21:25
**served** [2] - 26:13, 33:12
**service** [1] - 36:14
**services** [10] - 20:11, 20:16, 35:5, 36:11, 37:24, 38:2, 38:20, 40:3, 48:4, 49:6
**Services** [1] - 35:24
**serving** [3] - 33:15, 36:4, 39:10
**session** [2] - 3:16, 9:19
**set** [5] - 6:13, 7:4, 15:16, 30:24, 51:7
**setting** [6] - 4:13, 4:18, 21:22, 25:17, 32:7, 40:18
**settings** [2] - 10:18, 12:9
**settlement** [2] - 47:1, 51:7
**Settlement** [5] - 4:16, 7:15, 32:14, 51:1, 51:2
**sex** [1] - 11:3
**shake** [1] - 21:4
**shall** [1] - 40:8
**sharing** [1] - 42:10
**shelter** [7] - 19:16, 26:23, 26:24, 27:2, 30:14, 30:15, 49:5
**shelters** [11] - 5:2, 10:23, 19:5, 19:7, 19:9, 19:19, 20:12, 20:13, 21:17, 26:21
**Shieh** [10] - 17:11, 18:23, 18:25, 29:5, 30:8, 43:25, 44:14, 52:3, 52:4, 54:16
**SHIEH** [26] - 2:12, 19:1, 19:24, 20:22, 20:24, 22:8, 23:9, 23:23, 24:2, 24:10, 24:13, 25:3, 26:17, 28:8, 28:17, 29:7, 44:3, 44:15, 44:19, 47:7, 52:8, 52:24, 54:17, 54:19, 55:1, 55:6
**Shieh's** [2] - 30:2, 51:18
**Shiloh** [1] - 38:16
**shortage** [1] - 40:17
**show** [2] - 7:23, 16:18
**showing** [1] - 10:18
**shows** [2] - 18:8, 30:5
**shuffling** [2] - 44:14, 44:18
**SHUM** [1] - 2:18
**shut** [1] - 44:4
**sibling** [4] - 31:22, 31:25, 32:3, 33:17
**siblings** [4] - 31:6, 31:18, 44:24, 45:12

**sic** [1] - 20:9
**side** [4] - 9:15, 19:16, 54:20
**sides** [1] - 43:16
**significant** [2] - 12:4, 30:18
**significantly** [1] - 11:14
**similar** [2] - 18:15, 31:4
**similarly** [5] - 17:21, 18:10, 19:9, 31:9, 32:6
**simply** [3] - 34:19, 40:21, 45:5
**sites** [1] - 19:14
**situation** [3] - 26:15, 34:25, 53:23
**situations** [2] - 6:14, 50:5
**slow** [2] - 25:1, 44:1
**solely** [1] - 16:25
**solutions** [1] - 43:22
**someone** [4] - 16:5, 26:9, 27:4, 27:6
**sometime** [1] - 3:17
**sometimes** [4] - 15:25, 27:1, 41:13, 42:23
**somewhere** [1] - 18:1
**sorry** [9] - 14:23, 17:12, 19:2, 25:1, 29:7, 31:24, 44:3, 54:3, 54:19
**sort** [9] - 15:22, 25:24, 26:16, 28:4, 31:11, 32:22, 34:6, 37:25, 43:16
**sought** [1] - 50:3
**source** [1] - 36:9
**SOUTH** [1] - 2:4
**speaking** [1] - 36:6
**special** [1] - 20:11
**Specialists** [5] - 41:3, 41:5, 41:9, 41:11
**specialists** [2] - 15:17, 21:12
**specific** [3] - 7:3, 45:9, 46:16
**specifically** [2] - 12:17, 27:25
**speculation** [1] - 48:2
**speculative** [1] - 49:2
**spends** [1] - 11:7
**spoken** [1] - 41:12
**sponsor** [5] - 6:2, 7:19, 33:2, 43:1, 43:5
**sponsors** [19] - 5:25, 7:23, 7:24, 8:3, 30:23, 30:24, 31:1, 31:10, 32:12, 33:7, 33:9, 33:10, 33:12, 33:16, 33:20, 42:16, 44:20, 44:21, 46:12
**sponsorship** [1] - 8:1
**spread** [1] - 46:7
**staff** [18] - 5:3, 10:11, 11:2, 11:8, 11:12, 11:17, 19:4, 19:5, 19:8, 19:13, 19:17, 19:20, 20:14, 20:15, 23:25, 25:19, 30:12
**staff-secure** [10] - 10:11, 11:8, 11:12, 11:17, 19:4, 19:5, 19:8, 19:20, 30:12
**staff-secures** [3] - 11:2, 20:14, 20:15
**staffing** [1] - 21:11
**stages** [1] - 35:20
**stake** [1] - 23:19
**stakeholders** [1] - 50:13
**standard** [6] - 6:23, 28:13, 32:22, 32:23, 33:3, 38:25
**standards** [1] - 33:14
**standpoint** [2] - 39:11, 45:6

**start** [2] - 27:14, 28:8
**starting** [1] - 9:23
**state** [3] - 26:22, 27:7, 35:3
**statement** [11] - 10:15, 13:16, 16:17, 17:18, 30:25, 47:22, 48:8, 48:12, 48:24, 49:2, 49:18
**statements** [2] - 6:9, 14:16
**STATES** [2] - 1:1, 56:7
**states** [4] - 24:22, 35:12, 35:21, 46:7
**statistics** [2] - 24:22, 26:1
**status** [7] - 6:1, 9:18, 27:13, 51:21, 51:23, 52:14, 54:22
**statute** [1] - 24:20, 46:16
**statutory** [2] - 34:23, 49:22
**stay** [2] - 11:15, 11:19
**stemming** [2] - 4:10, 32:10
**STENOGRAPHICALLY** [1] - 56:3
**step** [33] - 4:6, 4:8, 4:9, 5:9, 5:10, 5:11, 5:16, 5:22, 7:1, 10:9, 12:6, 13:8, 14:8, 15:18, 16:16, 16:20, 17:1, 17:2, 17:13, 18:22, 18:24, 21:2, 23:1, 23:23, 26:18, 26:23, 26:24, 29:20, 30:1, 30:5, 30:11, 40:25, 42:12
**step-down** [1] - 26:24
**step-up** [21] - 4:6, 4:8, 4:9, 5:9, 5:10, 5:11, 5:16, 7:1, 10:9, 13:8, 15:18, 16:16, 17:13, 18:22, 18:24, 21:2, 23:23, 29:20, 30:1, 40:25, 42:12
**step-ups** [1] - 17:1
**stepped** [11] - 5:20, 12:6, 12:18, 17:7, 26:1, 26:2, 26:9, 26:10, 30:6, 30:13
**stepping** [1] - 27:9
**steps** [1] - 16:19
**steps-ups** [1] - 16:19
**still** [6] - 15:2, 44:2, 49:21, 49:23, 52:19
**stipulated** [1] - 36:9
**stock** [1] - 46:5
**stop** [2] - 38:22, 40:14
**story** [2] - 25:22
**STREET** [2] - 1:24, 2:7
**strikes** [2] - 39:9, 39:10
**strong** [1] - 10:18
**stuck** [1] - 30:12
**studies** [1] - 35:12
**subject** [2] - 26:21, 54:12
**submit** [2] - 12:25, 31:16
**submitted** [6] - 10:10, 10:17, 11:13, 12:4, 13:6, 17:16
**substantive** [1] - 4:19
**sued** [1] - 48:10
**suffer** [2] - 13:7, 21:3
**sufficient** [4] - 4:24, 8:4, 39:17, 43:5
**sufficiently** [1] - 53:15
**suggest** [2] - 31:13, 53:24
**suggesting** [3] - 14:2, 16:9, 22:25
**suitability** [1] - 7:23
**suitable** [3] - 7:21, 32:9, 32:13
**SUITE** [2] - 1:24, 2:7
**summary** [11] - 4:5, 4:7, 7:2, 7:8, 8:10,

9:15, 47:3, 47:16, 47:19, 48:19, 49:3
**Summer** [1] - 54:5
**SUMMER** [1] - 2:16
**supervisor** [2] - 48:9, 49:11
**supplement** [2] - 13:23, 15:9
**supplemental** [2] - 12:25, 31:16
**support** [9] - 6:3, 16:3, 38:20, 48:1, 48:4, 48:14, 48:18, 49:3, 49:6
**supporting** [2] - 42:11, 47:20
**supposed** [3] - 26:4, 36:16, 37:19
**Supreme** [6] - 31:4, 35:22, 35:25, 41:23, 44:12, 46:1
**surge** [1] - 39:15
**susceptible** [1] - 9:2
**suspect** [1] - 24:24
**sustain** [1] - 5:19
**system** [1] - 43:21

**T**

**table** [1] - 44:19
**talks** [2] - 34:15, 37:18
**technical** [1] - 54:6
**technology** [1] - 19:1
**TELECONFERENCE** [1] - 1:16
**TELEPHONICALLY** [1] - 2:16
**tens** [1] - 39:15
**tentative** [18] - 3:4, 3:7, 3:18, 4:7, 8:6, 10:4, 10:7, 17:16, 18:17, 18:20, 33:23, 33:25, 34:8, 47:16, 49:16, 53:11, 55:4
**tentatively** [2] - 7:8, 8:9
**tentatives** [1] - 9:22
**terminated** [1] - 48:9
**terms** [15] - 5:3, 7:17, 21:4, 21:5, 23:6, 23:20, 24:16, 28:21, 39:11, 40:23, 40:24, 41:2, 45:9, 45:16, 46:17
**testimony** [3] - 38:6, 42:16, 46:12
**THAT** [1] - 56:2
**THE** [78] - 2:3, 2:11, 3:3, 10:21, 11:10, 12:12, 12:21, 13:2, 14:2, 14:14, 14:22, 14:24, 15:8, 16:9, 16:23, 16:25, 17:10, 17:23, 18:1, 18:6, 18:11, 18:14, 18:23, 19:22, 20:20, 20:23, 21:20, 22:23, 23:21, 24:1, 24:9, 24:11, 25:1, 26:6, 27:25, 29:5, 29:23, 31:12, 31:22, 31:25, 33:24, 34:24, 36:20, 37:6, 38:25, 39:14, 43:3, 43:25, 44:13, 44:17, 47:5, 47:9, 48:16, 51:16, 51:18, 52:1, 52:3, 52:4, 52:6, 52:10, 52:12, 52:16, 52:21, 52:25, 53:6, 54:3, 54:11, 54:16, 54:18, 54:25, 55:2, 55:7, 56:2, 56:3, 56:4, 56:6, 56:7
**themselves** [3] - 13:10, 20:3, 36:8
**therapeutic** [9] - 11:2, 11:4, 11:8, 11:9, 11:11, 11:12, 11:16, 11:17, 20:10
**therefore** [2] - 36:17, 50:2
**they've** [2] - 30:6, 41:12
**thinking** [2] - 3:18, 12:17
**third** [1] - 21:16
**third-party** [1] - 21:16

**THIS** [1] - 56:5
**thou** [1] - 40:8
**thoughts** [2] - 10:14, 27:11
**thousands** [1] - 39:15
**three** [9] - 12:7, 20:8, 21:13, 23:11, 23:14, 23:16, 23:21, 25:16, 25:21
**threshold** [1] - 34:6
**tied** [1] - 23:12
**Tien** [1] - 54:20
**timely** [1] - 53:15
**title** [1] - 10:19
**Toby** [1] - 49:12
**today** [1] - 51:23
**together** [3] - 21:18, 35:18, 46:2
**touched** [1] - 30:8
**tout** [1] - 13:10
**towards** [1] - 21:21
**trafficking** [5] - 8:18, 8:24, 9:1, 34:13, 49:21
**TRANSCRIPT** [3] - 1:16, 56:3, 56:5
**treatment** [5] - 4:12, 4:22, 11:3, 19:22, 51:9
**triable** [1] - 9:14
**trial** [6] - 48:21, 52:21, 53:1, 53:3, 53:7, 53:13
**trials** [7] - 53:3, 53:16, 53:19, 53:20, 53:22
**troubled** [1] - 39:8
**troubleshoot** [1] - 43:17
**TRUE** [1] - 56:2
**true** [3] - 19:7, 21:13, 22:8
**truly** [1] - 3:7
**trust** [2] - 8:21, 47:9
**try** [6] - 3:4, 3:14, 37:19, 41:20, 42:2, 43:16
**trying** [1] - 14:15
**TUESDAY** [2] - 1:18, 3:1
**TVPRA** [20] - 4:1, 6:20, 7:1, 7:15, 7:19, 8:14, 8:16, 8:24, 32:5, 32:6, 32:10, 34:7, 37:7, 37:11, 37:15, 37:17, 38:20, 49:16, 49:19, 49:24
**TVPRA's** [1] - 4:12
**twisting** [1] - 42:7
**two** [2] - 34:3, 34:21
**type** [4] - 33:3, 34:20, 40:21, 44:18
**types** [5] - 19:17, 19:25, 36:19, 40:23
**typing** [2] - 44:14, 44:18

**U**

**U.S** [2] - 1:23, 2:11
**UACs** [1] - 39:15
**un-mute** [2] - 19:2, 44:1
**unavailable** [1] - 39:22
**unclear** [1] - 54:4
**uncles** [1] - 31:6
**uncontroverted** [1] - 36:8
**under** [17] - 12:3, 13:23, 15:19, 22:20, 24:12, 24:19, 25:19, 26:20, 29:13,

31:22, 31:25, 32:5, 33:5, 34:7, 41:9, 49:23
**undergo** [1] - 11:3
**understood** [4] - 14:12, 44:19, 51:13, 54:1
**Understood** [1] - 47:7
**undertaking** [1] - 13:12
**undisputed** [15] - 10:15, 10:24, 13:6, 16:18, 17:17, 17:18, 18:1, 18:7, 18:10, 30:25, 41:1, 41:3, 47:23, 48:8
**unfit** [7] - 7:7, 7:11, 18:20, 29:24, 36:17, 42:3, 42:12
**unfortunately** [2] - 3:5, 53:22
**unified** [1] - 44:25
**unilaterally** [1] - 22:16
**unique** [1] - 19:8
**UNITED** [2] - 1:1, 56:7
**unless** [2] - 4:13, 18:21
**unnecessarily** [1] - 12:8
**unnecessary** [2] - 4:11, 32:16
**unsurprisingly** [1] - 14:20
**up** [42] - 4:6, 4:8, 4:9, 5:9, 5:10, 5:11, 5:16, 5:20, 7:1, 10:9, 11:16, 12:6, 12:7, 12:18, 13:8, 15:18, 16:16, 17:13, 18:22, 18:24, 21:2, 21:5, 23:23, 24:12, 26:1, 26:2, 26:9, 28:1, 29:20, 29:24, 30:1, 30:6, 30:11, 38:3, 38:10, 40:10, 40:25, 42:12, 43:22, 53:25
**ups** [3] - 16:19, 17:1, 28:6
**urge** [1] - 46:19
**USC** [1] - 34:9
**uses** [1] - 20:9

**V**

**vacate** [1] - 54:11
**vaccine** [1] - 53:14
**various** [1] - 17:14
**vary** [1] - 16:4
**vast** [1] - 36:10
**Velasquez** [1] - 35:25
**Vera** [2] - 36:11, 37:22
**verbiage** [1] - 15:2
**version** [6] - 6:11, 14:18, 15:5, 15:6, 18:7, 28:3
**VIDEO** [1] - 1:16
**view** [3] - 25:16, 27:14, 49:16
**viewed** [1] - 50:25
**vigilant** [2] - 36:1, 37:3
**vigorous** [1] - 38:4
**violation** [3] - 7:1, 9:5, 22:20
**violations** [1] - 4:1
**visas** [1] - 49:22
**visited** [1] - 19:14
**Vislas** [1] - 49:12
**Viszlas** [1] - 50:15
**voiced** [1] - 35:17
**volume** [1] - 3:10
**Vs** [1] - 1:8

**vs** [1] - 35:25

## W

**waiting** [1] - 26:16
**wants** [2] - 26:23, 29:22
**WASIHNGTON** [1] - 2:13
**watch** [2] - 33:17, 38:14
**ways** [1] - 39:19
**weeks** [3] - 12:7, 25:21, 42:8
**WELCH** [1] - 2:19
**welcome** [1] - 47:5
**welfare** [7] - 23:11, 23:13, 23:24, 28:12, 35:18, 35:20, 45:19
**WEST** [1] - 1:24
**whatnot** [1] - 9:11
**Whitney** [2] - 48:15, 49:4
**whole** [1] - 46:5
**Williams** [2] - 48:3, 48:13
**willing** [2] - 27:2, 29:17
**wills** [1] - 8:21
**win** [1] - 38:9
**wind** [1] - 42:7
**wish** [1] - 53:11
**wishes** [1] - 35:16
**WITH** [1] - 56:6
**witness** [1] - 10:17
**won** [1] - 29:6
**word** [1] - 34:18
**works** [1] - 21:10
**worries** [1] - 15:20
**worst** [3] - 21:10, 21:21, 22:13
**wrap** [1] - 16:16
**wraparound** [2] - 20:11, 20:16
**written** [5] - 3:4, 9:21, 13:13, 24:9, 24:10
**wrongly** [6] - 21:7, 26:1, 26:2, 26:3, 26:9
**WYNN** [3] - 2:16, 54:5, 54:15
**Wynn** [1] - 54:5

## Y

**year** [2] - 9:18, 33:18
**years** [3] - 3:24, 33:18, 37:24
**yield** [3] - 29:21, 44:6, 46:22
**younger** [1] - 33:18
**yourself** [2] - 44:1, 52:4
**youth** [3] - 35:14, 35:19, 49:5