1  CENTER FOR HUMAN RIGHTS
   & CONSTITUTIONAL LAW
2  CARLOS R. HOLGUIN (90754)
   256 South Occidental Boulevard
3  Los Angeles, CA 90057
   Telephone: (213) 388-8693
4  Email: crholguin@centerforhumanrights.email

5  *Attorneys for Plaintiffs*

6  *Additional counsel listed on following pages*

7

8              UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10                  WESTERN DIVISION

11

12  LUCAS R., et al.,                    Case No.  2:18-CV-05741 DMG PLA

13            Plaintiffs,                **PLAINTIFFS' SUPPLEMENTAL
                                         SUBMISSION REGARDING
14      v.                               ERRONEOUS STEP-UPS
                                         PURSUANT TO THE COURT'S
15  ALEX AZAR, et al.,                   DECEMBER 22, 2020 ORDER**

16            Defendants.                Complaint Filed: June 29, 2018
                                         Judge: Hon. Dolly M. Gee
17

18

19

20

21

22

23

24

25

26

27

28

HOLLY S. COOPER (197626)
Co-Director, Immigration Law Clinic
CARTER C. WHITE (164149)
Director, Civil Rights Clinic
DAISY O. FELT (307958)
JONATHAN P. MULLIGAN (CAL RLSA NO. 803383)
MONICA J. JULIAN (265075)
University of California Davis School of Law
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email:  hscooper@ucdavis.edu
        ccwhite@ucdavis.edu
        dofelt@ucdavis.edu
        jmulligan@ucdavis.edu
        mjulian@ucdavis.edu

NATIONAL CENTER FOR YOUTH LAW
LEECIA WELCH (208741)
NEHA DESAI (CAL. RLSA NO. 803161)
POONAM JUNEJA (300848)
FREYA PITTS (295878)
MISHAN WROE (299296)
MELISSA ADAMSON (319201)
1212 Broadway, Suite 600
Oakland, CA 94612
Telephone: (510) 835-8098
Email:  lwelch@youthlaw.org
        ndesai@youthlaw.org
        pjuneja@youthlaw.org
        fpitts@youthlaw.org
        mwroe@youthlaw.org
        madamson@youthlaw.org

NATIONAL CENTER FOR YOUTH LAW
BRENDA SHUM *(ADMITTED PRO HAC VICE)*
CRYSTAL ADAMS (308638)
1313 L St. NW, Suite 130
Washington, DC 20005
Telephone: (202) 868-4785
Email: bshum@youthlaw.org
       cadams@youthlaw.org

COOLEY LLP
SUMMER J. WYNN (240005)
MICHAEL J. MCMAHON (*ADMITTED PRO HAC VICE*)
REBECCA L. TARNEJA (293461)
ALEXANDRA R. MAYHUGH (300446)
JAYME B. STATEN (317034)
1333 2nd Street, Suite 400
Santa Monica, CA  90401
Telephone:   (310) 883-6400
Facsimile:   (310) 883-6500
Email:  swynn@cooley.com
         mmcmahon@cooley.com
         rtarneja@cooley.com
         amayhugh@cooley.com
         jstaten@cooley.com

*Attorneys for Plaintiffs*

On December 22, 2020, following a hearing on the parties' cross motions for summary judgment, the Court issued an Order Re Supplemental Submissions, Pretrial Dates and Deadlines, and Joint Status Report requiring Plaintiffs to submit a description of "any incidents where a stepped-up minor was incorrectly found to be a danger to self or others that occurred *after* the Court's Order in *Flores v. Sessions*, NO. CV 85-4544-DMG (AGRx), 2018 WL 10162328 (C.D. Cal. July 30, 2018)." (ECF No. 320.) In response, Plaintiffs submit the following evidence.

## I.   Introduction

Numerous children have been erroneously stepped up to restrictive placements since the Court's July 30, 2018 Order in *Flores v. Sessions*. These instances, among others, are detailed in Section II *infra*, as well as in Plaintiffs' Motion for Partial Summary Judgment ("Pls. MSJ") and Statement of Undisputed Facts. (*See* ECF No. 271-1, at 38-51; ECF No. 271-2, at ¶ 218.)

There are a few caveats to the evidence described *infra* that are worth noting at the outset. ***First***, Plaintiffs' access to evidence of erroneous step-ups is inherently limited. As recognized in the oral tentative order given by this Court at the summary judgment hearing, ORR's current policies and procedures violate the Due Process Clause by failing to provide Class Members an adequate opportunity to challenge ORR's step-up decisions, which should include, *inter alia*, "robust post step-up hearing procedures and notice." (Ex. 204 [MSJ Hearing Tr.] at 5:15-20.) Given the absence of any meaningful opportunity to contest the basis for restrictive placement before a neutral factfinder, limited evidence exists regarding whether a child is or was erroneously placed. In effect, Plaintiffs must rely on ORR and its contractors to identify their own errors. A number of erroneous placements are nonetheless evident from a review of (1) ORR casefiles, (2) email correspondence referencing the government's own review and finding of erroneous placements and non-compliant Notices of Placement ("NOPs"), and (3) deposition testimony from government employees and

contractors. Finally, fact discovery closed on March 13, 2020, meaning that any evidence of more recent erroneous placements is solely within Defendants' possession.

In light of these significant limitations, the evidence addressed below is undoubtedly underinclusive, but nevertheless conclusively establishes that erroneous placements continue to occur. And the record also amply demonstrates that the ***risk*** of erroneous deprivation is sufficiently high to warrant robust procedural protections, including pre-deprivation process when the child does not present an ***imminent*** danger to themself or others. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (three-factor test considers "the risk of an erroneous deprivation of such interest through the procedures used"); *see also Zinermon v. Burch*, 494 U.S. 113, 127-28 (1990) (due process generally requires "some kind of hearing" before a deprivation of protected liberty interests). To the extent safety concerns foreclose the possibility of pre-deprivation notice and hearing—as argued by Defendants—the proposed order submitted with Plaintiffs' Motion for Partial Summary Judgment explicitly provides for an exigency exception. (*See* ECF NO. 271-3, at ¶ 8.)

***Second***, Plaintiffs provide the Court with evidence of erroneous step-ups to staff-secure and therapeutic staff-secure facilities for two reasons. First, ORR compliance reviews often address erroneous or non-compliant placement in these types of facilities concurrently with similar placement issues for secure facilities and RTCs. Second, to the extent therapeutic staff-secure facilities treat children with mental health issues, they function similarly to RTCs. (*See* ECF No. 271-2, at ¶ 135 (children in therapeutic staff-secure may be required to undergo sex offender treatment); *see also id*., at ¶ 122.) The undisputed evidence also shows that children placed in therapeutic staff-secure facilities stay in ORR custody on average longer than children placed in RTCs and are often denied subsequent placement in less restrictive facilities or programs. (*Id*., at ¶ 142; Pls. MSJ Ex. 24 [Heath Dep. Tr.] at 214:2-7; Pls. MSJ Ex. 46 at 1271.) For these reasons, Plaintiffs respectfully assert that therapeutic staff-secure facilities are more akin to

RTCs than other, less restrictive placements and therefore children placed in such facilities should be afforded similar procedural protections.[1]

## II.   Class Members Have Been Erroneously Stepped-Up After This Court's July 30, 2018 *Flores* Order.

As a threshold matter, the current NOP form submitted with the parties' concurrently filed joint submission demonstrates on its face that ORR fails to comply with this Court's July 30, 2018 *Flores* Order because it does ***not*** require that a licensed psychiatrist or psychologist determine that a child poses a danger to self or others before placement at an RTC. Instead, the form states that "***ORR*** has determined that . . . you are a danger to self or others," and that a licensed psychiatrist or psychologist has indicated that the minor satisfies one of four listed criteria. (ECF No. 323-1 at 2) (emphasis added).) Only one of the four possible criteria requires a finding that the child poses a "real risk of harm to self, others, or the community." (*Id.*; *see* Pls. MSJ Opp. Ex. 152 [Contreras Dep. Tr.] at 124:13−16 (child does not have to satisfy all four bullets of RTC placement criteria); Ex. 156 [Fields Dep. Tr.] at 242:17−243:16.) Tellingly, none of the representative sample NOPs selected by Defendants for the joint submission indicate that a licensed psychiatrist or psychologist determined the child posed a danger to self or others.[2] (*See* ECF No. 324-1 at 14–30.)

---

[1] As addressed in Plaintiffs' briefing and at the hearing, Plaintiffs also respectfully maintain their position that Class Members stepped up to staff-secure and therapeutic group homes—which are more restrictive than shelters—are likewise entitled to procedural protections. (*See* ECF No. 271-1, at 8-11; ECF No. 271-2, at ¶¶ 122-125, 142; ECF No. 289, at 16-17; ECF No. 300, at 12 & n.15; *see also* Pls. MSJ Ex. 180 [Quinn Expert Report] at 330–33.)

[2] The representative NOPs are also inadequate to protect Class Members' due process rights in that they contain boilerplate language regarding the availability of administrative and judicial review—which was added into the "summary of placement decision or case review" and was not provided in older NOPs—that fails to meaningfully inform children of the process to request review procedures. (*See, e.g.*, ECF No. 324-1 at 6.) Indeed, the boilerplate language adds no new information beyond what the template form already includes regarding a child's ability to challenge his/her

The following evidence illustrates additional instances of erroneous placements following this Court's July 30, 2018 *Flores* Order.[3]

- **December 2018**:  During just the first week of a compliance review of secure facilities, Faith Ray, an ORR Policy Analyst, determined that 18 out of 34 cases "***were not compliant in the placement criteria*** and/or the Notice of Placement requirement." (Pls. MSJ Ex. 190 at 427 (emphasis added); *see Flores v. Sessions*, 2018 WL 10162328, at *21-22 (delineating requirements for secure placements and ordering that NOPs specify, in the child's preferred language, the reasons for restrictive placement).)

- In **December 2018**, minor C.J.E.M. was stepped-up to Shiloh RTC. (Ex. 205 at 61.) Nothing in the Transfer Request or NOP indicates that C.J.E.M. was found to be a danger to herself or others or that her transfer was recommended by a psychologist or psychiatrist. (*See* Exs. 205 at 62–63 & 206 at 65, 68, 72, 74, 77, 81, 85, 89, 93.) Although a note from C.J.E.M.'s shelter clinician references an RTC referral from a nurse practitioner on September 4, 2018, C.J.E.M.'s Clinical Progress notes (signed by the same nurse practitioner) from her shelter placement, the latest dated October 23, 2018, all indicate her risk for suicide and violence were low and recommended outpatient treatment. (Ex. 207 at 102, 107,

---

placement. Moreover, such addition does not guarantee that the information was discussed in any further detail than what was provided in writing in the NOP itself.

[3] As recognized by the Court, children placed in out-of-network facilities ("OONs") are entitled to all of the same procedural protections as children placed in their in-network analogs. (*See* Ex. 204 [MSJ Hearing Tr.] at 18:6-17.) That does not appear to be the case under ORR's current policy and procedures as the undisputed evidence shows that OONs are often RTCs and are similarly restrictive as in-network RTCs, yet ORR fails to offer specified criteria for OON placements in its Policy Guide or require written notice of placement in the same timeframe as in-network RTCs. (*See* ECF No. 271-2, at ¶¶ 114, 121, 183−84.) Further, the absence of placement criteria means that Plaintiffs are not able to identify erroneous step-ups to OONs based on the evidence produced by Defendants in this case. Plaintiffs nonetheless maintain that all the same procedural protections be afforded to children placed in OONs.

**PLAINTIFFS' SUPPLEMENTAL SUBMISSION**
**CASE NO. 2:18-CV-05741 DMG PLA**

112, 117, 122, 127, 132, 135–36.) In other words, C.J.E.M. was placed in an RTC without any indication that she was a danger to herself or others, much less a determination of the same from a licensed psychiatrist or psychologist in violation of this Court's July 30, 2018 Order. *See Flores v. Sessions*, 2018 WL 10162328, at *21. C.J.E.M. remained at Shiloh until at least July 2019. (Ex. 206 at 66.)

- **January 2019**: An ORR Policy Analyst emailed Toby Biswas, U.S. Department of Health and Human Services Senior Supervisory Policy Counsel, indicating that a NOP review of staff-secure facilities and RTCs in the month of January 2019 revealed an astonishing 93 NOPs were not compliant with this Court's order and ORR's own policies, out of the 128 cases reviewed. (Pls. MSJ Ex. 171 at 264; *see also* Pls. MSJ Ex. 23 [Fink Dep. Tr.] at 153:8−13 (confirming that in January 2019, "over 70 percent of kids in [staff-secure facilities and RTCs] were placed there out of compliance with ORR's own policies **and a standing court order specific to NOPs.**") (emphasis added).)

- **January 14, 2019**: Without citing specific examples of minors in custody, Ms. Ray emailed Mr. Biswas a list of policies and procedures that corresponded with compliance issues she had seen in her review of secure facilities, including placement in secure facilities based on "risk of escape," placement based on "suspected gang membership or affiliation only," and placement based on "the arrest and subsequent dismissal of charges." (Pls. MSJ Ex. 44 [Ray Dep. Ex. 119] at 1264.) In other words, Class Members were placed in secure facilities without any indication they were a danger to themselves or others and in violation of this Court's July 30, 2018 order specifying the limited circumstances under which suspected gang membership and criminal charges trigger restrictive placement. *See Flores v. Sessions*, 2018 WL 10162328, at *22.

- **February 2019**: Ms. Ray identified a minor who had been placed at Yolo Secure Facility ("Yolo") for over three weeks without a finding that he was a danger to

**PLAINTIFFS' SUPPLEMENTAL SUBMISSION**
**CASE NO. 2:18-CV-05741 DMG PLA**

self or others. At Ms. Ray's deposition, she testified that she asked the Federal Field Specialist ("FFS") overseeing Yolo about the minor and the reasons the FFS provided for placing the minor in a secure facility "were not adequate or appropriate for placement in secure." (Pls. MSJ Ex. 33 [Ray Dep. Tr.] at 152:14–153:22.)

- **February 2019**: During a compliance review of Yolo, Ms. Ray identified "a new secure placement at Yolo" where the "NOP was so vague and did not contain enough information to know if [the minor] is an actual danger to self or others." (Pls. MSJ Ex. 139 at 2028.) After reviewing the minor's serious incident reports (SIRs), Ms. Ray determined that it appeared as though the minor was "more of an annoyance than an actual danger." (*Id*.) During her deposition, Ms. Ray recalled that the information she reviewed "did not speak to dangerousness." (Pls. MSJ Ex. 33 [Ray Dep. Tr.] at 157:10–158:17.)

- **February 21, 2019**: An ORR Policy Analyst emailed the FFS for Friends of Youth McEachern, a therapeutic staff-secure facility, indicating that a NOP review for the month of February 2019 revealed six out of seven cases that were non-compliant with the Court's July 30 Order. (Ex. 208 at 138.)

- **March 4, 2019**: An ORR Policy Analyst emailed the FFS for Friends of Youth McEachern and Friends of Youth Matsen, both therapeutic staff-secure facilities, indicating that a NOP review revealed four out of 13 cases across two facilities that were non-compliant with the Court's July 30, 2018 Order. (Ex. 209 at 140.)

- In **July 2019**, Shenandoah Valley Juvenile Center ("SVJC"), a secure facility, accepted a child even after Yolo secure facility declined placement and recommended that the child be placed in staff-secure rather than secure. (Ex. 210 [Contreras Dep. Tr.] at 104:11-106:22.) According to Yolo, the child "is very young and displays childlike and immature behaviors" making them "vulnerable in a more sophisticated environment such as a secure program." (*Id*.)

- In **September 2019**, minor D.M.M.R. was transferred to an RTC based

**PLAINTIFFS' SUPPLEMENTAL SUBMISSION**
**CASE NO. 2:18-CV-05741 DMG PLA**

1    apparently on a psychiatrist's determination that the child "presented symptoms
2    of depression." (Ex. 211 at 179.) The recommendation letter makes no finding
3    that D.M.M.R. was a danger to self or others. (*Id.* at 177.) D.M.M.R.'s case file
4    shows that a psychiatrist continued to recommend that she stay at Shiloh despite
5    an improvement in mood and behavior and without the requisite finding that
6    D.M.M.R. was a danger to self or others. As of June 12, 2020, D.M.M.R. was
7    still at Shiloh. (Ex. 212 at 190–91.)

8    • During her **January 23, 2020** deposition, Carina Contreras, lead Case Manager
9      at SVJC, a secure facility, described examples of inappropriate justifications used
10     to place children at SVJC, including "behavioral history that was related to
11     escape risk, which meets staff secure criteria" and a "more recent[]" situation in
12     which a minor was charged with a "nonviolent offense." (Pls. MSJ Ex. 16
13     [Contreras Dep. Tr.] at 75:11–77:3.)

14   • During her **January 23, 2020** deposition, Ms. Contreras also testified that there
15     were children who have been placed at SVJC who had criminal charges dropped
16     *prior* to their admission to SVJC which made their placement in a secure facility
17     inappropriate. (Pls. MSJ Ex. 16 [Contreras Dep. Tr.] at 80:2–5.)

18   • During her **February 24, 2020** deposition, Marivic Fields, ORR Senior Advisor
19     for Child Welfare and Safety, testified that it was still her opinion that "not all
20     [children] are referred to Shiloh or any RTC for reasons that they pose a risk to
21     self or others, and it shouldn't be just for these reasons, but primarily for safety
22     reasons and these UACs require a higher level of care." (Pls. MSJ Ex. 112 [Fields
23     Dep. Tr.] at 188:16-24.)

24   • During his **September 25, 2020** deposition, Shiloh RTC Medical Director Dr.
25     Javier Ruiz testified that ORR does not require that he "state that the child is a
26     danger to themselves or others" to accept them at Shiloh. (Pls. MSJ Ex. 163 [Ruiz
27     Dep. Tr.] at 259:19–25.) Dr. Ruiz further testified that he evaluates danger to self
28     or others, "but it's not a requirement from ORR that something like that has to be

1   found." (*Id.* at 274:17-22; *see also* ECF No. 289-1, at ¶¶ 46-47.)

2   - In addition, it is undisputed that both children who had hearings before ORR's

3     newly-established (and similarly deficient) Placement Review Panel ("PRP")

4     pilot program were stepped down following panel review of their placement.

5     (DX-10 [Biswas Dec.] ¶ 60; *see also* ECF No. 289 [Pls. MSJ Opp.] at 33.)[4]

6   ## III.   Conclusion

7        Based on the arguments and evidence presented in Plaintiffs' Motion for Partial

8   Summary Judgment, as well as in this supplemental submission, Plaintiffs respectfully

9   request the Court order adequate pre-deprivation procedures to protect against the

10  erroneous placement of Class Members in restrictive placements, which include

11  juvenile detention centers and highly restrictive psychiatric institutions. As shown in

12  the undisputed evidence submitted with Plaintiffs' Motion (*see, e.g.,* ECF No. 271-2, at

13  ¶¶ 1-9, 130, 133-149, 155, 218–219), such placements are inherently harmful to

14  children, are correlated with significantly longer periods of detention in ORR custody

15  away from family members, and are difficult to remedy because of substantial obstacles

16  to prompt step-down.

17

18  Dated:  January 8, 2021              COOLEY LLP

19

20                                       By:  */s/ Summer J. Wynn*
                                              Summer J. Wynn (240005)
21                                            Attorneys for Plaintiffs
                                              Email:  swynn@cooley.com
22

23

24

25

26

---

27  [4] Defendants failed to produce any information relating to ORR's new PRP pilot
    program during discovery, so it is possible that the program has uncovered additional
28  erroneous step-ups.