1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCAS R., *et al.*,<br><br>          Plaintiffs,<br><br>     v.<br><br>XAVIER BECERRA,<br>Secretary of U.S. Dep't of Health and<br>Human Services, *et al.*,<br><br>          Defendants. | Case No.: 2:18-cv-05741 DMG PLA<br><br>**DECLARATION OF LAURA KIESLER, UC PROGRAM ACTING DIRECTOR, IN SUPPORT OF DEFENDANTS' MOTION TO EXTEND**<br><br>Honorable Dolly M. Gee<br>United States District Judge |

I, Laura Kiesler, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that my testimony below is true and correct:

1.      I am the Acting Director of the Division of Unaccompanied Children ("UC") Operations in the Office of Refugee Resettlement ("ORR"), an office within the Administration of Children and Families ("ACF"), U.S. Department of Health and Human Services ("HHS"). I joined ORR in November 2021 and have served in my current role since that time.

2.      My past experience includes leading efforts to improve outcomes for children and families in the State of Rhode Island Department of Children Youth and Families. In this role, I focused on increasing family placements, recruiting, and retaining foster families, monitoring for licensing standards, and supporting field staff in using data to drive case-related decisions. I have over 15 years of experience in inter-agency collaboration, process improvement, and strategy implementation across local, state and federal human services and education agencies. I earned a bachelor's degree in Organizational Studies from the University of Michigan and a Master of Public Administration from the American University.

3.      The UC Program is the component of ORR responsible for the care and custody of UC as defined by 6 U.S.C. § 279(g)(2). As Acting Director, I am responsible for all aspects of the UC Program, including oversight of major decisions regarding the placement and release of UC, and for ensuring that ORR operations are informed by child welfare principles and concern for the particular vulnerability of these children. I also have responsibilities over the teams responsible for the development and issuance of ORR policies and procedures and for training ORR's nationwide network of grantee child-care providers.

4.      The following statements are based on my personal knowledge, information I have acquired in the course of performing my official duties, information contained in the records of ORR, and information supplied to me by knowledgeable ORR personnel.

5.      I submit this declaration in the above-captioned matter to describe the steps ORR has taken to-date to prepare for implementation of the preliminary injunction when it becomes effective on October 31, 2022, and the remaining steps that must be taken to ensure adequate preparation of field staff for the major policy and operational changes required by the order.

6.      As an initial matter, it is important to understand that ORR carries out its functions through a nationwide network of grantee child-care providers, who provide day-to-day care to UC according to the terms of their cooperative agreements with ORR, which incorporate ORR policies and procedures.

7.      ORR policies are embodied in the ORR Policy Guide ("Policy Guide"), which is publicly available on ORR's website[1], and in ORR's Manual of Procedures ("MAP"), which is a non-public set of documents that provides grantees with more detailed instructions for operationalizing the Policy Guide.

8.      ORR's nationwide network includes approximately 175 grantees, who operate a total of 289 different child-care facilities located in 28 states. ORR grantees employ approximately 28,000 personnel. In turn, grantees are overseen by a cadre of approximately 100 Federal Field Staff ("FFS") personnel (including FFS, FFS supervisors, and field managers), who are the ORR personnel responsible for making major decisions regarding the care and custody of UC, such as the decisions to step-up a UC to a more secure setting or grant/deny release to a particular sponsor.

---

[1] ORR Unaccompanied Children Program Policy Guide | The Administration for Children and Families (hhs.gov)

3

9.      Unlike some other federal agencies involved in the immigration system, ORR does not directly operate the facilities that house UC, nor are the various child welfare personnel who care for UC on a daily basis (e.g., case managers, counselors, clinicians, etc.) employees of ORR. Rather, they are employed by the various grantees and contractors with whom ORR engages in cooperative agreements or contracts for direct-care services. In some cases, grantees may subcontract with other entities for particular services (e.g., food, education, healthcare, transportation, etc.).

10.      Under this indirect operating structure, ORR does not have perfect "command and control" over its grantees such that it can ensure a particular operational change will occur instantaneously across its nationwide network simply by issuing a new policy. Rather, the coherent rollout of major, nationwide policy changes requires a multi-step effort that begins with the publication of new policies, but also must include efforts to transition grantees and their staff to the new modes of operating, such as trainings, question-and-answer sessions, and the provision of written guidance and other job aids.

11.      The preliminary injunction made extensive changes to ORR's release and step-up processes, which are core ORR functions embodied in a number of long-standing policies. The preliminary injunction required changes in terms of the number and sequence of procedural steps, applicable evidentiary standards, and documentation and notice requirements for multiple ORR processes, which are embodied across dozens of separate policies. Consequently, ORR was unable to simply share the preliminary injunction with the field and expect compliance, nor could ORR immediately start training the field on the preliminary injunction. Rather, ORR first had to translate the preliminary injunction into new or revised policies, then clear those policies through various levels of agency leadership, before issuing those policies to the grantees and providing training.

4

12.     Since the Court issued its preliminary injunction on August 30, 2022, ORR has worked diligently to revise the Policy Guide and MAP to the reflect the terms of the preliminary injunction, which required ORR to make significant revisions to current sections of the Policy Guide and MAP, as well as develop entirely new sections. Currently, all of the necessary policy updates have been drafted and are undergoing final review and clearance prior to issuance.

13.     In addition, ORR is also attempting to marshal the human resources necessary to ensure the new procedures required by the preliminary injunction are appropriately scaled to meet anticipated demand from the increased number of UC and sponsors who will be able to avail themselves of the new procedures (e.g., staff secure step-ups, Category 2 appeals). This includes ensuring a sufficient number of appropriately credentialed ORR personnel are available to participate in the PRP process; ORR's case file processing team is appropriately staffed to handle the increased number of case files that will need to be collected, collated, and redacted; and FFS are aware of the new evidentiary and documentation requirements that will bear on their routine step-up and release decisions.

14.     Here, it should be noted that all of the individuals involved are effectively child welfare professionals, *not* attorneys, and I anticipate there will be confusion among FFS regarding the meaning of "clear and convincing evidence"—which I understand to be a technical legal standard—and how to sufficiently document that this standard has been met.

15.     Although ORR anticipates that all of the necessary policy changes implementing the preliminary injunction will be published on or about October 31, 2022, I believe that additional time will be required to provide necessary training and to triage available human resources appropriately. I anticipate that ORR will need an additional 30 days following October 31, 2022

to ensure sufficient familiarity among ORR's grantees and FFS in order to achieve uniform availability and application of the new procedures in the field.

16.     If granted a 30-day extension, ORR intends to use this additional time to provide 3 training sessions to grantees on the new and revised policies and procedures issued in response to the preliminary injunction, with each training taking place approximately one week apart. The trainings will be recorded and made available to grantees and their staff for reference. Between these trainings, grantees and their staff will have the opportunity to submit questions to ORR regarding the new policies and procedures. ORR will then hold a question-and-answer session with grantees to provide answers to their questions and focus on areas of potential confusion or hurdles to implementation. Finally, ORR will develop and distribute a written frequently-asked-questions document memorializing the grantee questions and ORR's responses, as well as any other written guidance that is needed based on grantee feedback.

17.     Based on my personal experience, the training regimen described above is consistent with typical ORR practice and represents the minimum training and preparation necessary to ensure grantees and FFS are sufficiently familiar with—and therefore able to correctly implement—the major policy changes required by the preliminary injunction.

Executed on October 25, 2022.

_____

Laura Kiesler