# Exhibit A

CARLOS R. HOLGUÍN (90754)
Center for Human Rights & Constitutional Law
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.org

*Attorneys for Plaintiffs*
*(Additional counsel listed on next page)*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LUCAS R., et al., <br><br> Plaintiffs, <br><br> v. <br><br> XAVIER BECERRA, Secretary of U.S. Department of Health and Human Services, et al., <br><br> Defendants. | No. 2:18-CV-05741 DMG PLA <br><br> [PROPOSED] STIPULATED SETTLEMENT OF PLAINTIFFS' THIRD CLAIM FOR RELIEF [PSYCHOTROPIC MEDICATIONS] |

i

HOLLY S. COOPER (197626)
Co-Director, Immigration Law Clinic
CARTER C. WHITE (164149)
Director, Civil Rights Clinic
JONATHAN P. MULLIGAN
   (CAL RLSA NO. 803383)
University of California Davis School of Law
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu
         ccwhite@ucdavis.edu
         jmulligan@ucdavis.edu

POONAM JUNEJA (300848)
FREYA PITTS (295878)
MISHAN WROE (299296)
MELISSA ADAMSON (319201)
DIANE de GRAMONT (324360)
National Center for Youth Law
1212 Broadway, Suite 600
Oakland, CA 94612
Telephone: (510) 835-8098
Email: pjuneja@youthlaw.org
         fpitts@youthlaw.org
         mwroe@youthlaw.org
         madamson@youthlaw.org
         ddegramont@youthlaw.org

BRENDA SHUM
   (ADMITTED PRO HAC VICE)
National Center for Youth Law
818 Connecticut Ave. NW, Suite 425
Washington, DC 20006
Telephone: (202) 868-4785
Email: bshum@youthlaw.org

SUMMER J. WYNN (240005)
MICHAEL J. MCMAHON
   (ADMITTED PRO HAC VICE)
REBECCA L. TARNEJA (293461)

ii

ALEXANDRA R. MAYHUGH (300446)
JAMIE D. ROBERTSON (326003)
Cooley LLP
1333 2nd Street, Suite 400
Santa Monica, CA  90401
Telephone: (310) 883-6400
Facsimile:  (310) 883-6500
Email:  swynn@cooley.com
        mmcmahon@cooley.com
        rtarneja@cooley.com
        amayhugh@cooley.com
        jdrobertson@cooley.com

*Attorneys for Plaintiffs*

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

ERNESTO H. MOLINA, JR.
Deputy Director

SARAH WILSON
Assistant Director

BENJAMIN MARK MOSS
NANCY K. CANTER
Senior Litigation Counsel
JONATHAN K. ROSS
ANTHONY J. MESSURI
Trial Attorneys
Office of Immigration Litigation
Civil Division, U.S. Department of Justice
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-9802
Facsimile: (202) 305-1890
ernesto.h.molina@usdoj.gov

*Attorneys for Official-Capacity Defendants*

iii

# PREAMBLE

This Settlement Agreement ("Agreement") is entered into by all Plaintiffs and Defendants in this class action lawsuit (collectively "the Parties"). Plaintiffs and class representatives Lucas R., Daniela Marisol T., Gabriela N., Jaime D., Sirena P., and Benjamin F. are or were children formerly in the custody of the Office of Refugee Resettlement ("ORR") of the U.S. Department of Health and Human Services ("HHS").  Defendants are the Secretary of HHS and the Director of ORR, both of whom are sued in their respective official capacities.

WHEREAS Plaintiffs filed this lawsuit challenging, *inter alia*, Defendants' policies and practices with respect to the administration of psychotropic drugs to minors in ORR's care and custody;

WHEREAS the District Court certified this case as a class action on behalf of, *inter alia*, all minors in ORR custody pursuant to 6 U.S.C. § 279 and/or 8 U.S.C. § 1232 who are or will be prescribed or administered one or more Psychotropic Medications without procedural safeguards;

WHEREAS Exhibit 1 to the class-wide settlement in *Flores v. Barr*, No. CV85-4454-DMG (C.D. Cal.), as currently in effect, requires that licensed programs "comply with all applicable state child welfare laws and regulations. . .";

WHEREAS on July 30, 2018, the District Court ordered "Defendants to comply with all Texas child welfare laws and regulations governing the administration of psychotropic drugs to Class Members at Shiloh RTC" (July 30, 2018 Order at 23);

WHEREAS the Parties agree: (a) that Psychotropic Medications should be used to treat psychiatric conditions only following a diagnostic assessment by a licensed healthcare provider and considering other situational factors that may be contributing to the condition (i.e., trauma); (b) that Psychotropic Medications should be aligned with the child's diagnosis (i.e., the medication is appropriately used on- or off-label to treat the child's specific diagnosis and not used due to other therapies being inconvenient or more expensive, recognizing that payment systems may utilize

formularies); (c) that Psychotropic Medications should be administered only in accordance with a licensed prescriber's recommendation based upon the minor's symptoms and periodically reassessed by a licensed prescriber for side-effects and benefits; (d) that recognizing that Psychotropic Medications may be prescribed off-label, Psychotropic Medications should be administered at dosages that do not exceed dosing guidelines that recommend a specific dose based upon age and weight where dosing guidelines are available; and (e) that Psychotropic Medications shall never be used as punishment for disruptive or inappropriate behavior, for the convenience of staff members or caregivers, or as a substitute for adequate staffing and/or adequate ongoing programming for a child's needs;

WHEREAS the Parties have conducted discussions and negotiations in good faith with respect to a compromise and resolution of Plaintiffs' Third Claim for Relief in the operative First Amended Complaint [ECF No. 81], and to resolve disagreements regarding compliance with the District Court's July 30, 2018 Order in *Flores v. Barr*, with a view to settling the issues in dispute and achieving the most effective relief possible consistent with the interests of the Parties;

WHEREAS had the case gone to trial, a decision of the District Court may be subject to appeal by the losing Party with the final outcome uncertain;

WHEREAS the Parties have concluded that the terms and conditions of this Settlement are fair, reasonable, and in the best interests of all Class Members, after considering the substantial benefits that the Parties will receive from settlement of Plaintiffs' Third Claim for Relief; and

NOW, THEREFORE, in settlement of Plaintiffs' Third Claim for Relief and in consideration of the promises and undertakings set forth herein and other consideration, the sufficiency of which is hereby acknowledged, it is hereby AGREED, by and among the Parties to this Settlement, through their respective attorneys, subject to the approval of the Court pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, in consideration of the benefits flowing to the Parties hereto

from the Settlement, that Plaintiffs' Third Claim for Relief shall be settled upon and subject to the following terms and conditions:

## I.   DEFINITIONS

Wherever used in this Agreement, the following terms have the meanings set forth below:

A. "Authorized Consenter" means either a "Primary Consenter," "Sponsor Consenter" or "UC Consenter."

B. "Care Provider" means any care provider for UCs in ORR legal custody. This includes ORR funded programs that are licensed, certified, or accredited by an appropriate State agency to provide residential care for children, including shelter, group, foster care, staff-secure, secure, therapeutic, or residential treatment care for children.  It also includes influx care facilities that care for children in ORR's custody, out-of-network facilities, and formerly licensed programs that lost their licenses due to a state's actions to exclude all ORR programs from state licensing.

C. "Case Manager" means the care provider staff member who coordinates assessments of unaccompanied children, individual service plans, and efforts to release unaccompanied children from ORR custody.  Case Managers facilitate documentation of services for children and youth and maintain case files for unaccompanied children.

D. "Centralized Concurrence Unit" or "CCU" means an entity under an agreement (for instance, a contract or grant) with the U.S. Department of Health and Human Services that will undertake the responsibilities set forth in Section VIII below.  However, ORR may rely on a psychiatrist within its Division of Health for Unaccompanied Children ("DHUC") to act as the CCU.

E. "Class" or "Class Members" includes "all minors in ORR custody pursuant to 6 U.S.C. section 279 and/or 8 U.S.C. section 1232 . . . who are or will be

6

1       prescribed or administered one or more psychotropic medications without

2       procedural safeguards" [ECF No. 141 at 27-28].

3    F. "Effective Date" is the date of final approval of the Agreement by the Court,

4       in accordance with Section XII.A.1.

5    G. "Legal Guardian" means a person who has the legal authority and duty to

6       care for the UC.  Although ORR has both legal authority and duty to care for

7       UCs within its care, when used in this Agreement the term "legal guardian"

8       does not refer to ORR.

9    H. "Monitor" means Kathleen Noonan, whose appointment and role is

10       governed by Section VII.

11    I. "Office of Refugee Resettlement" or "ORR" means the U.S. Department of

12       Health and Human Services ("HHS"), Administration for Children and

13       Families, Office of Refugee Resettlement ("ORR").

14    J. "Parent" means a child's biological mother or father, as well as an individual

15       recognized by a governmental entity as the child's parent.

16    K. "Party" or "Parties" means Defendants and Plaintiffs.

17    L. "Plaintiff" or "Plaintiffs" means the named Plaintiffs and all Class Members

18       as defined herein.

19    M. "Primary Consenter" means a parent or legal guardian, whether residing in

20       or outside the United States.

21    N. "Primary Caregiver" means any person who was previously or currently is

22       primarily entrusted with the child's care and who lived with the child prior

23       to ORR legal custody.

24    O. "Psychotropic Medication" means a prescription medication that is

25       prescribed for the treatment of symptoms of psychosis or another mental,

26       emotional, or behavioral disorder and that is used to exercise an effect on the

27       central nervous system to influence and modify behavior, cognition, or

28       affective state.  The term includes the following categories: (A) psychomotor

1    stimulants; (B) antidepressants; (C) antipsychotics or neuroleptics;

2    (D) agents for control of mania or depression; (E) antianxiety agents; and

3    (F) sedatives, hypnotics, or other sleep-promoting medications.  For

4    purposes of this Agreement, the medications listed in the Texas Department

5    of Health and Human Services document entitled "Classes of Medications

6    Frequently Used for Psychiatric Indications," linked below, as may be

7    updated from time to time, or its successor publication, shall be considered

8    the universe of Psychotropic Medications to which the terms of this

9    Agreement apply:  https://hhs.texas.gov/sites/default/files/documents/doing-

10    business-with-hhs/provider-portal/facilities-

11    regulation/psychiatric/psychotropic-medications-consent-drug-list.pdf.

12    Notwithstanding the previous sentence, the Parties will meet and confer on

13    an annual basis to determine whether any newly FDA-approved medications

14    should be added to the list of medications.

15    P.  "Residential Treatment Center" ("RTC") is a sub-acute, time limited,

16    interdisciplinary, psycho-educational, and therapeutic 24-hour-a-day

17    structured program with community linkages, provided through non-

18    coercive, coordinated, individualized care, specialized services, and

19    interventions.  Residential treatment centers provide highly customized care

20    and services to individuals following either a community-based placement or

21    more intensive intervention, with the aim of moving individuals toward a

22    stable, less intensive level of care or independence.  A child may only be

23    placed in an RTC at the recommendation of a licensed psychiatrist or

24    psychologist consulted by ORR for an unaccompanied child who poses a

25    danger to self or others and does not require inpatient hospitalization.  All

26    references to RTC in the Agreement include out-of-network RTCs.

27    Q.  "Sponsor Consenter" means a potential, viable sponsor pending in the ORR

28    UC Portal who bears the following relationship to the UC: (1) sibling

(including half-siblings and step-siblings if there is an adoption relationship by the parent(s)); (2) grandparent; or (3) aunt or uncle (including aunts/uncles through legal marriage), or first cousin, but only if such aunt/uncle/first cousin previously served as the UC's primary caregiver.

R.  "Substantial Compliance" is when ORR has satisfied the intended purpose of the Agreement through the process outlined in Sections VII.C.4 and XII.D.1.  The Parties recognize that strict and literal compliance with every term of the Agreement is not required for a finding of Substantial Compliance as long as any deviations are unintentional and do not substantially defeat the purpose of the Agreement.  Substantial Compliance is not vitiated by a few technical violations where every reasonable effort has been made to comply.

S.  "UC Consenter" means a UC, age 16 or 17, from whom a doctor has obtained informed consent.

T.  "Unaccompanied Child" or "UC" means a minor as defined in 6 U.S.C. § 279(g)(2) who is in the legal custody of the U.S. Department of Health and Human Services under the authority of 8 U.S.C. §§ 1232(b) and (c), and excludes any minor placed or receiving services in an Unaccompanied Refugee Minor program, under section 412(d) of the Immigration and Nationality Act (8 U.S.C. § 1522(d)).

## II.  AUTHORIZED CONSENT/CONCURRENCE

A. Consent Process.  This Agreement is intended to outline, at most, a two-step consent process, where the Care Provider first seeks consent from the identified Authorized Consenter, and then, where permitted, turns to the alternate process under Section II.C.

B. Authorized Consenter

    1.  Three categories of persons can serve as the Authorized Consenter and provide informed consent for the administration of Psychotropic

9

Medication to UCs in ORR custody:  Primary Consenters, Sponsor Consenters, and UC Consenters.

2. For all UCs prescribed one or more Psychotropic Medication(s), informed consent shall be sought from the child's parent or legal guardian, referred to as the "Primary Consenter," who serves as the Authorized Consenter for the child unless there is no Primary Consenter as outlined below in Section II.B.3.

3. There is no Primary Consenter only where a parent or legal guardian is deemed unavailable to act as a consenter because:

   a. The UC has no living parent or legal guardian as documented in the case file;

   b. The case file shows that the parent or legal guardian has repeatedly – that is, after three outreach attempts or more on not less than two separate days – failed to respond to telephone contacts or other outreach by the Care Provider;

   c. The case file shows that the parent or legal guardian who resides in the United States has been contacted but refused to act as the UC's Sponsor; or

   d. There is a documented history of abuse, abandonment,[1] or neglect by the parent or legal guardian and the UC (only for ages 14 or over) voluntarily states in writing that the UC does not wish for the parent or legal guardian to act as consenter.

4. If there is no Primary Consenter, then the Sponsor Consenter, if one exists for the UC, may be the Authorized Consenter. A Sponsor Consenter shall be deemed unavailable to act as the Authorized Consenter if:

---

[1] The fact that a UC has traveled to the United States unaccompanied shall not alone be a basis for finding them to be "abandoned."

a. The case file shows that the Sponsor Consenter has repeatedly – that is, after three outreach attempts or more on not less than two separate days – failed to respond to telephone contacts or other outreach by the Care Provider.

5. If there is no Primary Consenter and no Sponsor Consenter, then a UC Consenter, if applicable, may be the Authorized Consenter.

6. This Agreement does not require a Care Provider to seek to obtain informed consent from both the parent or legal guardian and Sponsor Consenter.

7. This Agreement does not require the Care Provider to obtain informed consent from both parents.

8. If the Authorized Consenter denies consent, the procedures of Section IV may apply.

C. Alternative Process When Authorized Consent Cannot be Obtained

1. The Care Provider may seek concurrence from the CCU in the following circumstances:

   a. there is no Authorized Consenter as documented in the case file; or

   b. The Care Provider obtains a verbal consent decision but cannot reach the Authorized Consenter to obtain follow-up written signature consent, as applicable, after three documented attempts (with none required by mail) occurring at least one week apart.

2. If CCU concurrence with a Psychotropic Medication prescription is sought and obtained, it shall be in writing and signed by a licensed psychiatrist or psychiatric nurse under the supervision of a psychiatrist, with a preference for a child and adolescent psychiatrist, if available.

11

# III. CONSENT PROCEDURES FOR AUTHORIZED CONSENTERS

## A. Verbal Consent

1. Except as specified in Section VI of this Agreement (governing emergencies), in the case of a UC who is not yet taking a prescription Psychotropic Medication or course of medications, the Care Provider shall seek the verbal informed consent of the Authorized Consenter prior to beginning the course of medication.  Further, except as specified in Section VI of this Agreement (governing emergencies), in the case of a UC who is already taking a prescription Psychotropic Medication or course of medications and who has no authorized consent that complies with this Agreement already on file, the Care Provider shall seek the verbal informed consent of the Authorized Consenter within five days of receiving the UC.

2. Verbal informed consent must also be obtained prior to increases in dosage of Psychotropic Medication, other than (a) titrating on or off a medication, for which informed consent has already been obtained, or (b) where the Psychotropic Medication is FDA-approved for administration to children of the UC's age and the proposed dosage is within parameters for the child's age and weight as noted in the "literature-based maximum dosage" established by the Texas Department of Health & Human Services document entitled "Psychotropic Medication Utilization Parameters for Children and Youth in Texas Public Behavioral Health (6th Ed.)" and linked as follows: https://hhs.texas.gov/sites/default/files/documents/doing-business-with-hhs/provider-portal/facilities-regulation/psychiatric/psychotropic-medication-utilization-parameters.pdf (as may be updated from time to time), or its successor publication.

12

3.   Verbal consent must be documented in accordance with Section III.B.

4.   The Care Provider shall ensure that prior to administering the Psychotropic Medication, the case manager or clinical staff (such as a nurse, psychologist, physician assistant, or physician) who is familiar with the minor's history verbally provides the Authorized Consenter with information necessary to make an informed decision about whether the UC should be administered the Psychotropic Medication. Such information shall be provided in a language such Authorized Consenter understands.  In cases where the Care Provider employs or contracts with the prescriber of the Psychotropic Medication(s), the following information shall be provided:

a.   The child's diagnosis;

b.   The nature of the child's specific condition to be treated;

c.   An explanation of the purpose of the medication;

d.   The beneficial effects on that condition expected from the medication;

e.   The risks and benefits of not consenting to the medication;

f.   A description of any accompanying discomforts, possible side effects, risks associated with the medication, and the nature and possible occurrence of irreversible symptoms;

g.   A statement of whether the medication is habituating in nature;

h.   Alternatives to the use of Psychotropic Medication that have been attempted and have been unsuccessful;

i.   The generally accepted alternative medications and non-pharmacological interventions to the medication, if any, and the risks and benefits of those alternatives;

j.   Contact information for the prescribing clinician;

13

      k.  An explanation that the Authorized Consenter may provide or withhold consent and an explanation of what will happen if such authorized consenter does not consent;

      l.  An explanation that the Authorized Consenter may withdraw consent and request the Psychotropic Medication(s) be discontinued at any time;

      m. An explanation that the Care Provider will not delay or deny step down or release of the UC as a consequence of the Authorized Consenter withholding or withdrawing consent; and

      n.  Any other information the Care Provider determines is necessary for the Authorized Consenter to provide informed consent.

5. In cases where the Care Provider does not employ or contract with the prescriber of the Psychotropic Medication(s), the following information shall be provided to the Authorized Consenter:

      a.  The child's diagnosis;

      b.  The nature of the child's specific condition to be treated;

      c.  A general explanation of the purpose of the medication;

      d.  A general description of the risks and benefits expected;

      e.  Nonpharmacological alternative interventions that either have been attempted or that could be attempted in lieu of prescription medication and the risks and benefits of such interventions;

      f.  An explanation that the Authorized Consenter may ask questions about the child's response to the medication;

      g.  An explanation that the Authorized Consenter may ask questions of the prescribing clinician but that the prescribing clinician may not be an employee of the care provider;

14

h. The contact information for the clinician if requested by the Authorized Consenter;

i. An explanation that the Authorized Consenter may provide or withhold consent;

j. An explanation that the Authorized Consenter may withdraw consent and request the Psychotropic Medication(s) be discontinued at any time; and

k. An explanation that the Care Provider will not delay or deny step down or release of the UC as a consequence of the Authorized Consenter withholding or withdrawing consent.

B. Documentation of Verbal Consent

   1. The Care Provider shall document the verbal consent decision of the Authorized Consenter by documenting the following in the case file:

a. The name(s) of the clinical personnel providing the information to the Authorized Consenter;

b. The name(s) of the prescribing clinician and the clinician who diagnosed the UC's condition;

c. The name(s) and dosage(s) (or course of dosage) of the Psychotropic Medication(s) for which consent is sought;

d. The name and relationship to the UC of the Authorized Consenter;

e. The date verbal consent was obtained or denied;

f. That the information listed in Section III.A.4.a-n or III.A.5.a-k (as applicable) was provided; and

g. The spoken language used to explain the prescribed Psychotropic Medication(s) and obtain the verbal consent decision.

C. Written Consent

    1. Verbal consent under Section III.A of this Agreement shall be followed up by written consent.  Such verbal consent shall remain valid until rescinded, either orally or in writing, and shall remain valid for no more than 45 days, subject to the further limitations set forth in Section III.C.5 below.

    2. The Authorized Consenter shall receive in writing, either via electronic or mail delivery or similar communication method, a written communication that confirms that the Authorized Consenter verbally received the information included in Section III.A.4.a-n, or III.A.5.a-k (as applicable), in a language the Authorized Consenter understands.  Such written communication shall also advise the Authorized Consenter of the condition being treated, as well as the name of the Psychotropic Medication(s).  If the Authorized Consenter is illiterate, the above procedures shall still be followed; however, after the Authorized Consenter has received the written communication, the Care Provider shall certify in writing that the document was fully communicated to the Authorized Consenter in a language the consenter understands.

    3. The Authorized Consenter may provide written consent by either mailing, texting, faxing, or otherwise electronically sending a signature evincing their consent to the prescription and administration of the Psychotropic Medication(s).

    4. The Authorized Consenter may choose to waive providing written consent in cases where doing so would result in safety risks or undue burden.  In such cases, the Care Provider shall document the waiver in the child's case file.

    5. If written consent is not received within two weeks following verbal

16

consent, as set forth in II.C.1.b, the Care Provider shall initiate efforts
to obtain concurrence from the CCU.

D. Additional Requirements

1. Every six months, the Care Provider shall provide written or verbal
notice to the Authorized Consenter that such Authorized Consenter
may withdraw consent and afford the Authorized Consenter an
opportunity to request information regarding the Psychotropic
Medication(s) as specified in Section III.A.4.a-n or III.A.5.a-k (as
applicable) of this Agreement.  The notice shall be provided in a
language the authorized consenter understands.

2. Informed consent from the Authorized Consenter must be obtained
voluntarily and without undue influence or coercion.  No UC or
Authorized Consenter shall be subjected to retaliation for providing,
withholding, or withdrawing consent for any Psychotropic
Medication.  Actions of the Care Provider that are solely due to
behavior(s) that result from the UC not taking recommended
medication(s), and where such actions are not intended to punish the
UC (including transfer to another placement, alteration of behavioral
plans, increased staffing for the UC, or determining a UC is a danger
to self or others), shall not constitute retaliation.

3. ORR shall direct that when a UC Consenter consents to the
administration of antipsychotics or to the administration of three or
more Psychotropic Medications, the Care Provider must flag the case
for DHUC review.

4. ORR shall promulgate a policy requiring that Care Providers ensure
that: (1) the terms of this Agreement are followed when a UC is
admitted to a hospital for 14 days or more; (2) a UC's hospital
medical records are promptly uploaded to the ORR UC Portal or other

17

data system; and (3) Psychotropic Medications that UCs are prescribed while admitted to a hospital are tracked in the ORR UC Portal or other data system.  This provision does not affect the requirements that a Care Provider adhere to the terms of this Agreement before a UC is admitted to a hospital, including the Emergencies provisions set forth in Section VI.  The Primary Consenter or Sponsor Consenter shall be notified as soon as practicable, and in all cases within one week of admission, each time a youth is admitted to a hospital for psychiatric treatment.

5. The child, their counsel, if any, and their Child Advocate, if applicable, will have access to the documentation required under Sections III.B and III.C upon request in accordance with ORR UC Policy on the confidentiality of mental health and medical records.

6. Nothing in this Agreement will be a justification to delay an otherwise appropriate release to a suitable sponsor, step-down, or placement in a URM program in accordance with ORR UC Policy.

## IV. OVERRIDING DENIAL OF CONSENT

A. In cases where a Primary Consenter or Sponsor Consenter denies consent, the prescribing clinician and/or Care Provider may seek consent from the UC Consenter; or (including in cases where there is no UC Consenter) seek concurrence from the CCU to override the Primary Consenter or Sponsor Consenter's denial.

B. The CCU may concur to override denial of consent only as follows:

1. After consultation with the prescribing clinician, the Care Provider, and the Primary Consenter or Sponsor Consenter (as applicable under IV.B.2. of this Agreement), the CCU finds based on its professional judgment that:

a. Administering the prescribed medication is in the best interest of the child; <u>and</u>

b. The failure to take the prescribed medication is likely to:

   i. Either

     A. Result in observable and material impairment to the growth, development, or functioning of the UC, <u>or</u>

     B. Place the UC at imminent risk of substantial bodily harm or of inflicting substantial bodily harm to others; <u>and</u>

   ii. All other reasonable measures, alone, have been determined unlikely to prevent the UC from the impairment or harm described in IV.B.1.b.i.A or B above.

2. The CCU shall make two documented attempts to contact the Primary Consenter or Sponsor Consenter to obtain the basis for the denial of consent, if not provided by the Care Provider or prescribing clinician.

C. If the CCU concurs to override a Primary Consenter or Sponsor Consenter, the Care Provider will notify the Primary Consenter or Sponsor Consenter, in a language such Primary Consenter or Sponsor Consenter understands, of the CCU's determination and document this communication in the UC's case file.  In all cases of override, the Primary Consenter or Sponsor Consenter will be provided with the contact information of the Monitor so that the Primary Consenter or Sponsor Consenter may report their concerns to the Monitor.

D. In no case shall the CCU override a UC Consenter's denial of consent.

E. The CCU shall document and track any instance it concurs to override the Primary Consenter or Sponsor Consenter's denial of consent.

# V.  UC ASSENT

A. For any UC aged 14 or older, prior to administering Psychotropic Medication(s), the Care Provider must attempt to seek informed assent or agreement from the UC, consistent with the following, but with the understanding that a Primary Consenter or Sponsor Consenter's consent will control even in the absence of UC assent:

1. That the UC is informed, in an age and developmentally appropriate manner and in a language the UC understands, of the recommendation for the prescribed Psychotropic Medication(s) as part of the UC's treatment plan, the purpose of the medication(s), and the potential side effects of the medication(s), and has an opportunity to voice reactions or concerns regarding the prescribed medication(s).

2. That the UC is shown a written notice (also included in the case file with the date shown) explaining that the UC may speak privately with the prescribing healthcare provider if the provider is willing to do so regarding any proposed Psychotropic Medication.

B. Informed assent need not be sought when a medication is administered on an emergency basis as described in Section VI of this Agreement.

# VI. EMERGENCIES

A. Prior consent (both verbal and written) from an Authorized Consenter is not required when an emergency exists such that the immediate failure to administer Psychotropic Medication poses a threat of imminent probability of death or substantial bodily harm to the UC or to others.  However, the Primary Consenter or Sponsor Consenter and DHUC shall be notified of each emergency administration of the medication and the reasons therefor as soon as practicable and in all cases within one week of its initial administration.  The UC's case file must include an explanation of the nature and circumstances of each administration of an emergency medication.  The

20

Care Provider shall ensure that the child, the child's case manager, and the child's clinician, as appropriate, meet within a week after the emergency administration to discuss what should be done in the future to meet the child's needs in lieu of administration of emergency medication.  This emergency exception may not be relied upon for the routine or ongoing administration of Psychotropic Medication(s) to a UC.

B. ORR shall require all Care Providers to follow existing ORR policies regarding the use of chemical restraints on any UC.  In addition, ORR shall maintain a policy requiring that use of any chemical restraint must terminate when the emergency situation has ended, and be documented as a Significant Incident Report within twenty-four hours.  Any Care Provider that has a pattern of using chemical restraints (defined as three or more uses on the same child while placed with the Care Provider or five or more uses on any child within 30 days), shall be flagged for DHUC for follow up, training, and monitoring by ORR.

## VII.  MONITOR

A. Appointment

    1. The Monitor of Defendants' compliance with this Agreement will be Kathleen Noonan.

        a. If the Monitor becomes unable or unwilling to serve, the Parties shall agree on a replacement Monitor, taking into account the input and recommendations of the outgoing Monitor, if available.

        b. If the Parties are unable to reach agreement on a replacement Monitor, they will seek the assistance of a neutral mediator to resolve the dispute.

    2. Defendants will engage the Monitor at Defendants' expense no later than 60 days after the Court's approval of the Monitor and shall be

21

1    responsible for the Monitor's fees and costs to satisfy the Monitor's

2    duties under this Agreement.  The Monitor will serve through the

3    Termination Date of the Agreement.  Neither Party shall have

4    supervisory authority over the Monitor.

5    B. Duties

6    1.  The Monitor's duties will include overseeing, evaluating, reporting

7    on, and certifying implementation progress and compliance with this

8    Agreement.

9    a.  The Monitor will have the authority reasonably necessary to

10   evaluate progress toward compliance with the Agreement.  This

11   authority includes the ability to hire staff and engage

12   consultants, including for data analysis and/or validation, so

13   long as the cost limit to be negotiated between the Defendants

14   and the Monitor is not exceeded; request and receive records

15   within ORR's access and control, including underlying data,

16   files, and records; and conduct verification activities, including,

17   but not limited to, case file reviews (not to exceed 100 per

18   year), site visits, and independent communications with and/or

19   interviews of federal and care provider staff, service providers,

20   and youth and their families and sponsors (with their consent to

21   be interviewed).

22   b.  Both Parties will receive notice of Monitoring site visits and

23   will have the option to attend no more than two site visits per

24   year.

25   c.  Defendants will ensure that the Monitor has access to resources,

26   data, information, and individuals the Monitor deems necessary

27   to perform the Monitor's assigned responsibilities under this

28   Agreement, as is consistent with any applicable state licensing

22

1    requirements, is reasonably obtainable, and within ORR's

2    control.

3    2. The Monitor and any staff or consultants hired by the Monitor will

4    sign and be bound by the Protective Order governing this action.

5    3. The Monitor, at their discretion, may have ex parte communication

6    with the Parties.

7    C. Reporting

8    1. Defendants' Quarterly Reports

9    a. ORR will provide the Monitor with quarterly reports that

10   include: (1) the name of each minor in ORR custody who has

11   been identified as having a disability and/or has been prescribed

12   or administered one or more Psychotropic Medication(s); (2)

13   that minor's alien registration number; and (3) placement

14   location ("Quarterly Report").  The Quarterly Reports will

15   include minors placed at care providers that are required to be

16   in compliance with the terms of this Agreement at the time each

17   report is issued.  *See* Section X.

18   b. Quarterly reporting will begin 90 days after the Effective Date

19   of this Agreement.

20   c. Defendants will provide a copy of the Quarterly Report to

21   Plaintiffs at the time it is delivered to the Monitor.

22   2. Defendants' Periodic Reports

23   a. Defendants will provide Periodic Reports to the Monitor,

24   detailing ORR's implementation of and compliance with the

25   terms of the Agreement.

26   b. Defendants' Periodic Reports will be issued every six months

27   following the Effective Date of this Agreement.  The relevant

28

23

1        period of review will be the six months ending on the reporting

2        date, as applicable.

3        c.  The format and content of Defendants' Periodic Reports will be

4        determined by Defendants with input from the Monitor, but at a

5        minimum will include the information in Exhibit A. For

6        example, Defendants and the Monitor may agree to a schedule

7        that contemplates alternating formal and less formal Periodic

8        Reports. The Periodic Reports will include the qualitative,

9        quantitative, and other information the Monitor identifies as

10       necessary for the Monitor to evaluate, report on, and certify

11       compliance with the Agreement, that is within ORR's control,

12       reasonably obtainable, and is consistent with any applicable

13       state licensing requirements.

14    3.  Defendants' Public Reports

15        a.  At the same time that Defendants provide their Periodic Reports

16        to the Monitor, Defendants will publish streamlined public

17        reports online, including aggregated information concerning:

18        the number of children in ORR custody prescribed

19        Psychotropic Medications; the number of children in ORR

20        custody prescribed certain classes of Psychotropic Medications;

21        the type of placement(s); the number of times Psychotropic

22        Medication was prescribed for an emergency to a child in ORR

23        custody; and any other information ORR chooses to publish.

24    4.  Monitor's Reports

25        a.  The Monitor shall file an Annual Report on the docket until the

26        Termination Date, evaluating Defendants' implementation

27        progress, analyzing the data identified in Exhibit A to this

28        Agreement, and evaluating whether Defendants have

1    demonstrated that they are in Substantial Compliance with the

2    terms of this Agreement.

3        b.  The first Annual Report will be filed 16 months after the

4            Effective Date.  Reports will be filed every 12 months

5            thereafter for as long as the Agreement is in effect (no later than

6            the Termination Date).

7        c.  If the Monitor concludes that Defendants have not

8            demonstrated Substantial Compliance with the Agreement, the

9            Annual Report will include recommendations as to actions

10           Defendants should take to achieve and/or demonstrate

11           Substantial Compliance.

12       d.  Two months before the filing date, the Monitor will provide a

13           draft report to the Parties.  The Parties will have one month to

14           review the draft report and provide any input to the Monitor.

15           The Monitor will then have one month to finalize and file the

16           Annual Report.

17       e.  The Monitor's reports will be public, except that any

18           individually identifiable information concerning children or

19           information otherwise protected from disclosure by law will be

20           redacted or otherwise removed from the publicly filed reports.

21   D. Periodic Meetings

22       1.  The Monitor will convene confidential meetings between the Monitor

23           and the Parties (jointly) at least every six months, beginning nine

24           months from the Effective Date and lasting through the Termination

25           Date, to discuss implementation progress.

26       2.  The Monitor and the Parties will make every effort to schedule one of

27           these meetings during the month when the Parties are reviewing and

28           providing input on the Monitor's draft Annual Report each year.

3. One year after the Effective Date of this Agreement, the Monitor shall evaluate data and information (including through interviewing Care Provider and ORR staff), as well as the data identified in Exhibit A, and advise the Parties whether various provisions of this Agreement should be modified to ensure the safety and well-being of Class Members; or, because the cost of implementing the provisions (including the list of information provided in Section III.A.4.a-n or III.A.5.a-k (as applicable)) outweighs the benefits.  Based on the Monitor's recommendation, the Parties will meet and confer, if necessary, to discuss modification of the consent process, the role of the CCU, data issues, or any other provision of the Agreement no later than the next scheduled meeting of the Parties.

E. Access to Information

1. Plaintiffs will have access to the information provided to the Monitor, subject to the Protective Order in effect in this case, at the discretion of the Monitor.

F. Attorney-Client Visits

1. Class counsel, including legal professionals within class counsel's organizations, and interpreters, may conduct confidential attorney-client visits during ordinary business hours, excluding holidays and weekends.

2. Plaintiffs' counsel shall notify ORR seven days in advance of a planned attorney-client visit.

3. No later than 24 hours prior to the attorney-client visit, ORR shall provide Plaintiffs' counsel with a list of minors at the facility, including: names, dates of birth, alien registration numbers, countries of origin, and admission dates.

26

4.  48 hours in advance of class counsel visits, ORR shall provide a sign-up sheet for Class Members who wish to meet with class counsel.

## VIII.  ROLE OF CENTRALIZED CONCURRENCE UNIT (CCU)

A. ORR will enter into an agreement with an entity to act as the CCU and will require as part of the agreement that the CCU acquire the services of at least one licensed psychiatrist, with a preference for a licensed child and adolescent psychiatrist when available, to oversee responsibilities; however, ORR may rely on a psychiatrist within DHUC to act as the CCU.

B. The CCU shall have the following responsibilities:

1.  Provide or withhold concurrence to Psychotropic Medication prescriptions as provided herein where informed consent cannot be otherwise obtained, as specified in this Agreement.

2.  Override denial of consent, as specified in Section IV of this Agreement.

3.  Document and track its work relating to Sections VIII.B.1 and 2 above and provide such information to the Monitor for inclusion in her reports.

C. Nothing in this Agreement requires that ORR/DHUC or the CCU override the state medical licensing standards under which licensed psychiatrists (and/or child and adolescent psychiatrists) operate.  If a CCU psychiatrist notifies ORR that their state license is at risk based on implementing any of the provisions of the policies adopted pursuant to this Agreement, ORR will ensure that the Monitor is notified of the conflict within ten days of discovering such conflict and will provide the Monitor with ORR's proposed plan to ensure substantial compliance with this Agreement with respect to UCs housed within the State.  The Monitor may share this information with Plaintiffs' counsel at the Monitor's discretion, as is consistent with VII.E.1.

27

D. If the CCU is under a contract, grant, or other agreement with HHS, the terms of any agreement between HHS and the CCU shall provide that the CCU's final decision on withholding concurrence or concurring to the administration of Psychotropic Medications will not be overturned by ORR or HHS, and that the CCU shall grant or withhold concurrence solely on the basis of the criteria set forth *supra* in Section IV for override and Section II.C for consent.  Nothing in this Agreement overrides contract or grant laws and regulations that ordinarily apply to HHS contractors or grantees (including, but not limited to, enforcement, periods of performance, and reasonable costs).

## IX.  OVERSIGHT RESPONSIBILITIES OF ORR'S DIVISION OF HEALTH FOR UNACCOMPANIED CHILDREN

Beginning within a reasonable transition period of no more than 24 months from the Effective Date, ORR's DHUC shall perform the following oversight responsibilities:

A. Review cases that have been flagged by a Care Provider where a UC Consenter consents to the administration of antipsychotics or to the administration of three or more Psychotropic Medications or cases where the Care Provider flags other concerns regarding Psychotropic Medications.

B. Develop a system for conducting retrospective, secondary reviews of prescriptions of Psychotropic Medications prescribed to UCs in ORR custody and conduct such reviews.  Criteria for review are subject to the discretion of DHUC, but must include:

    1. Use of any Psychotropic Medication for a child aged three years or younger;

    2. For a child aged four years or older:

        a. Simultaneous use of three or more Psychotropic Medications for 90 days or more;

         b. Use of two or more antipsychotic medications for 60 days or more; and

    3. Instances where the CCU overrides a denial of consent by a Primary Consenter or Sponsor Consenter.  These instances may be reviewed annually.

    4. Use of Psychotropic Medication dosages in excess of the guidelines described in Section III.A.2.

C. Conduct an annual case review of 30 files of UCs administered Psychotropic Medications to evaluate whether ORR is ensuring that Care Providers exercise reasonable and diligent efforts to compile and maintain UCs' medical records.

D. DHUC shall document and track its work relating to Sections IX.A-C above and provide such information to the Monitor for inclusion in their reports.

E. A licensed child and adolescent psychiatrist within DHUC shall oversee DHUC's responsibilities under this section. In the event DHUC is unable to hire or contract with a licensed child and adolescent psychiatrist, ORR shall notify the Monitor and may rely, in the interim, on a licensed psychiatrist or a child and adolescent psychiatric nurse practitioner to oversee these responsibilities.  Under such circumstances, DHUC will continue to make diligent efforts to hire or contract with a licensed child and adolescent psychiatrist.

## X.   TRANSITION PLAN

ORR shall require Care Providers to comply with the provisions of this Agreement in accordance with the timeline set forth in Section X.A-F below.

A. With respect to Shiloh Residential Treatment Center, MercyFirst RTC, and any other in-network RTCs, ORR shall require compliance as soon as practicable immediately after the Effective Date, but in no case longer than three months after the Effective Date.

B. With respect to all other Texas Care Providers, ORR shall require compliance with this Agreement beginning nine months from the Effective Date of this Agreement.

C. With respect to the remaining Care Providers nationwide, ORR shall publish a transition plan so as to require compliance of the first third of such remaining Care Providers beginning no later than the first day of the first month that is nine months from the finalization of the agreement for the establishment of the CCU; ORR shall require compliance of the second third of such remaining Care Providers beginning no later than the first day of the first month that is 16 months from the finalization of the agreement for the establishment of the CCU; and ORR shall require compliance of the final third of such remaining Care Providers beginning no later than the first day of the first month that is 21 months from the finalization of the agreement for the establishment of the CCU.  Nothing in this Section prevents earlier compliance.

D. Defendants will use diligent efforts to establish a CCU within six months of the Effective Date of this Agreement.  If the CCU is not established by such date, ORR will establish an agreement such that a licensed psychiatrist or psychiatric nurse, with a preference for a licensed child and adolescent psychiatrist when available, shall serve in the role of the CCU as provided in Section VIII.

E. Within three months of the Effective Date of this Agreement, Defendants shall develop an Implementation Plan addressing the tasks needed to satisfy the requirements of this Agreement, the entity responsible for completing the tasks, and the proposed timeline for completion.  The Implementation Plan shall be subject to review and approval by the Monitor.

F. Within three months of the Effective Date of this Agreement, ORR shall add to or modify the UC Manual of Procedures ("UC MAP") and ORR Policy

1    Guide to implement the requirements of this Agreement.  ORR shall solicit
2    and consider input from Plaintiffs in making these additions and
3    modifications.  The additions and modifications to the UC MAP and ORR
4    Policy Guide to implement the requirements of this Agreement shall be
5    subject to review and approval by the Monitor.

6  **XI. CONFLICT WITH STATE LAW**

7    A. If a Care Provider notifies ORR that its state license is at risk based on
8    implementing any of the provisions of the policies adopted pursuant to this
9    Agreement, ORR will ensure that the Monitor is notified of the conflict
10    within ten days of discovering such conflict and will provide the Monitor
11    with ORR's proposed plan to ensure substantial compliance with this
12    Agreement with respect to UCs housed within the State.  The Monitor may
13    share this information with Plaintiffs' counsel at the Monitor's discretion, as
14    is consistent with VII.E.1.

15    B. Section XI.A shall not be read to invalidate any provision of this Agreement
16    solely on the grounds that it is not required or provides more robust
17    protections than does a State's law, or where there is no risk to a Care
18    Provider's licensing.

19  **XII. SETTLEMENT APPROVAL, DISMISSAL OF PLAINTIFFS' THIRD**
20  **CLAIM FOR RELIEF, RETENTION OF JURISDICTION, AND EXIT**

21    A. Settlement Approval

22      1. This Agreement is effective only with Court approval.  The Effective
23      Date is the date of final approval of the Agreement by the Court.

24      2. Within 30 days after signing this Agreement, the Parties will file a
25      joint or unopposed motion with the Court seeking preliminary
26      approval of this Agreement, approval of a notice plan and proposed
27      notice to the Class, a briefing schedule for final approval, and a final
28      fairness hearing.

31

3.  In seeking final approval of this Agreement, the Parties will file a joint or unopposed motion requesting entry of a proposed judgment and order that:

a.  Grants final approval of the Agreement, without modification of any of its terms (unless the Parties have agreed to such modification), as a fair, reasonable, and adequate resolution of Plaintiffs' Third Claim for Relief under Federal Rule of Civil Procedure 23;

b.  Finds that the Agreement resulted from extensive arms-length, good faith negotiations between the Parties through experienced counsel;

c.  Dismisses Plaintiffs' Third Claim for Relief of the operative First Amended Complaint with prejudice;

b.  Finds that each Class Member shall be deemed to have released all claims for systemic declarative and injunctive relief presented in the Third Claim for Relief of the First Amended Complaint arising or accruing against the Defendants on or before the Termination Date, as well as all claims for systemic declarative and injunctive relief based on an identical factual predicate as the Third Claim for Relief of the operative First Amended Complaint arising or accruing against the Defendants on or before the Termination Date, even if such claims were not presented or might not have been presentable in this class action.  Notwithstanding the foregoing, this provision does not release, relinquish, or discharge the First, Second, Fourth, and/or Fifth claims for Relief in the operative First Amended Complaint.  In addition, all disputes regarding this Agreement arising before the Termination Date will be resolved in

accordance with the dispute resolution processes in Section
XIII.B-D; and

    a. Incorporates the terms of this Agreement, makes the Parties'
compliance with the terms of the Agreement part of the
dismissal order, and provides that the Court has and shall retain
jurisdiction over its judgment and order for the purposes of
interpreting and enforcing this Agreement until the Termination
Date.

B. Individual Claims

    1. This Agreement is intended to provide a class-wide solution to matters
covered by the Agreement.  Nothing in this Agreement is intended to
limit the ability of any individual Class Member to obtain individual
relief to which they would otherwise be entitled under state or federal
law.  Likewise, nothing in this Agreement is intended to create an
individual right of action to enforce this Agreement.

C. Jurisdiction

    1. The Court shall have and retain jurisdiction to interpret and enforce
this Agreement.

    2. The Parties agree that notwithstanding any other term or provision of
this Agreement, the Court shall not have jurisdiction to enforce this
Agreement after the Termination Date.

D. Notwithstanding any other provision of this Agreement, this Agreement
shall terminate on the earliest of the following dates (the "Termination
Date"):

    1. Beginning three years after the Effective Date, Defendants may move
for a Court Order permitting early termination if they can demonstrate
Substantial Compliance for a continuous period of six months

1    following implementation of this Agreement nationwide, supported by

2    certification from the Monitor; or

3    2.  Six years from the Effective Date.

4  **XIII. NOTICE AND DISPUTE RESOLUTION**

5    A. Communications

6    1.  All written communications required by this Agreement shall be

7    transmitted by email to counsel using the following contact

8    information:

9    Plaintiffs' counsel:

10    Holly Cooper – hscooper@ucdavis.edu

11    Carlos Holguín – crholguin@centerforhumanrights.email

12    Mishan Wroe – mwroe@youthlaw.org

13    Michael McMahon – mmcmahon@cooley.com

14    Defendants' counsel:

15    Benjamin Mark Moss – benjamin.m.moss2@usdoj.gov

16    Nancy K. Canter – nancy.k.canter@usdoj.gov

17    Jonathan K. Ross – jonathan.k.ross@usdoj.gov

18    2.  Counsel shall promptly notify the Monitor and the other Party of any

19    updates to the designated representatives or contact information for

20    communications under this Agreement.

21    B. Informal Dispute Resolution

22    1.  If any Party has a concern regarding this Agreement, that Party should

23    email Opposing Counsel and the Monitor and attach any relevant

24    documentation.

25    2.  The receiving Party will respond within ten days of receipt of the

26    initial email stating the concern(s), explaining what initial measures

27    are being taken and a likely timeframe for resolution.  Either Party

28

34

1   may request a conference with the Monitor to further discuss the issue

2   with both Parties present.

3      3. If the Parties are unable to resolve the concern(s) or develop a plan to

4   resolve the concern(s) within 21 days of receipt of the initial email

5   stating the concern(s), either of the Parties may proceed to the formal

6   dispute resolution process described in Section XIII.C for any alleged

7   breach of the Agreement.

8      4. The Parties can mutually agree to extend the time period in the

9   informal dispute resolution process to attempt to resolve the

10   concern(s) before proceeding to formal dispute resolution for any

11   alleged breach of the Agreement.

12   C. Formal Dispute Resolution

13      1. If either Party believes that the other is in breach of the Agreement,

14   and the informal dispute resolution described above has not

15   adequately resolved the issue, they will notify both the Monitor and

16   the other Party.

17         a. The notification shall be in writing and shall include a detailed

18   description of the alleged breach of the Agreement.

19      2. Within ten days of service of the notice described in Section XIII.C.1

20   alleging breach of the Agreement, the Parties will meet and confer in

21   a good faith effort to resolve the dispute.

22      3. If the Parties are unable to resolve the dispute through the process

23   described in Section XIII.C.2, then the Parties will contact the

24   Monitor to schedule a meeting.  The meeting will be held within 30

25   days of the notification described in Section XIII.C.1.a. alleging

26   breach of the Agreement (with extensions permitted by agreement of

27   the Parties and the Monitor).  Within 14 days of the meeting (with

28

extensions permitted by agreement of the Parties and the Monitor), the Monitor will either:

    a. Make recommendations as to how the alleged breach should be cured, including a timeline for compliance; or

    b. Inform the Parties of their finding that a breach has not occurred.

D. Court Enforcement

    1. In the event that (a) the Party that allegedly breached the Agreement is unwilling or unable to comply with the Monitor's proposed cure or (b) the Party alleging a breach disagrees with the Monitor's recommendations and/or findings, the Party alleging a breach may seek resolution from the Court by filing a motion to enforce the Agreement.

    2. The Parties agree:

        a. Not to file a motion for enforcement of this Agreement without first following the Dispute Resolution procedure in Sections XIII.B-C;

        b. Not to file a motion for enforcement of this Agreement before the Monitor submits their first Annual Report.

        c. Nothing in the Agreement waives the Parties' right to pursue class-wide relief addressing systemic issues under Federal Rule of Civil Procedure 65(b).

E. Waiver

    1. A waiver of any breach of this Agreement by any Party shall not be deemed a waiver of any other prior or subsequent breach.

## XIV. NOTICE TO CLASS MEMBERS

A. The Parties acknowledge that Rule 23(e) of the Federal Rules of Civil Procedure requires that the Court direct notice to the Class and that it

approve this Agreement before the claims of the Class may be dismissed with prejudice pursuant to this Agreement.

B. Within 30 days after signing this Agreement, the Parties will file a joint or unopposed motion with the Court for preliminary approval of this Agreement, as specified in Section XII.A.2.

C. Within 45 days of the Court approval and direction of Notice, Defendants shall inform the public about the existence of this Agreement via the Defendants' websites. The Parties shall pursue such other public dissemination of information regarding this Agreement as they may independently deem appropriate.

D. Within 30 days of the Effective Date of this Agreement, Defendants shall distribute to ORR facilities receiving federal funds to provide shelter services to Class Members copies of this Agreement.

E. Within 30 days of the Effective Date of this Agreement, Defendants shall post in a prominent location at each facility in which ORR houses minors a notice including the information set forth in Exhibit B.

## XV. ATTORNEYS' FEES AND COSTS

A. Plaintiffs reserve their right to seek attorneys' fees and costs associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412. The Parties agree to meet and confer in a good faith effort to settle such fees and costs.

B. This Agreement is without prejudice to Plaintiffs' right to seek future attorneys' fees and/or litigation costs in this action pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

## XVI. ADMISSION OF LIABILITY

A. This Agreement does not constitute and shall not be construed or viewed as an admission of any wrongdoing or liability by any Party.

37

# XVII. MODIFICATION OF AGREEMENT

A. This Agreement constitutes the entire agreement among the Parties as to Plaintiffs' Third Claim for Relief, and supersedes all prior agreements, representations, warranties, statements, promises, covenants, and understandings, whether oral or written, express or implied, with respect to the subject matter thereof.

B. This Agreement is an integrated agreement at the time of authorization and may not be altered, amended, or modified except in writing executed by Plaintiffs and Defendants.

# XVIII.  MUTUAL EXCLUSIVITY OF PROVISIONS

A. If any provision of this Agreement is declared invalid, illegal, or unenforceable in any respect, the remaining provisions shall remain in full force and effect, unaffected and unimpaired.

# XIX. MULTIPLE COUNTERPARTS

A. This Agreement may be executed in a number of identical counterparts, all of which shall constitute one agreement, and such execution may be evidenced by signatures delivered electronically.

# XX. TITLES AND HEADINGS

A. Titles and headings to Articles and Sections herein are inserted for convenience and reference only and are not intended to be part of, or to affect the meaning or interpretation of, this Agreement.

# XXI.  REPRESENTATIONS AND WARRANTY

A. Counsel for the Parties, on behalf of themselves and their clients, represent that they know of nothing in this Agreement that exceeds the legal authority of the Parties or is in violation of any law.  Defendants' counsel represent and warrant that they are fully authorized and empowered to enter into this Agreement on behalf of the Secretary of the HHS and acknowledge that Plaintiffs enter into this Agreement in reliance on such representation.

Plaintiffs' counsel represent and warrant that they are fully authorized and empowered to enter into this Agreement on behalf of Plaintiffs, and acknowledge that Defendants enter into this Agreement in reliance on such representation.  The undersigned, by their signatures on behalf of Plaintiffs and Defendants, warrant that upon execution of this Agreement in their representative capacities, their principals, agents, assignees, employees, successors, and those working for or on behalf of Defendants and Plaintiffs shall be fully and unequivocally bound hereunder to the full extent authorized by law.

Dated:   November 2, 2023

CARLOS R. HOLGUÍN
Center for Human Rights & Constitutional Law

HOLLY S. COOPER
CARTER C. WHITE
JONATHAN P. MULLIGAN
U.C. Davis Immigration Law Clinic
and Civil Rights Clinic

BRENDA SHUM
POONAM JUNEJA
FREYA PITTS
MISHAN WROE
MELISSA ADAMSON
DIANE DE GRAMONT
National Center for Youth Law

SUMMER J. WYNN
Cooley LLP

_____

Carlos R. Holguín

_____

Holly S. Cooper

_____

Brenda Shum

_____

Summer Wynn

*Attorneys for Plaintiffs*

40

Dated:                                          BENJAMIN MARK MOSS
                                                Senior Litigation Counsel
                                                Office of Immigration Litigation
                                                U.S. Department of Justice
                                                P.O. Box 878
                                                Ben Franklin Station
                                                Washington, D.C. 20044
                                                benjamin.m.moss2@usdoj.gov

BENJAMIN MOSS   Digitally signed by BENJAMIN MOSS
                Date: 2023.11.02 14:05:12 -04'00'

Benjamin Mark Moss

*Attorney for Defendants*

41

# Exhibit A

### Exhibit A

1.  Identifying information for UC

    a.  Full Name

    b.  Alien Registration Number ("A #")

    c.  Date of Birth ("DOB")

    d.  Country of Origin ("COO")

    e.  Sex

    f.  Date of entry to ORR custody

2.  Psychotropic Medication(s) information

    a.  Name(s) of Psychotropic Medication(s) and relevant class(es) of
        Psychotropic Medication

    b.  Dosage(s)

    c.  Diagnosis

    d.  Name of prescriber

    e.  Address of prescriber

    f.  Professional credentials of prescriber (e.g., M.D., Nurse Practitioner, etc.).

    g.  Date of prescription

    h.  Date prescription is planned to terminate, or date prescription was
        terminated

3.  Care Provider or Psychiatric Hospital Information

    a.  Care Provider name and type (including, but not limited to, secure, staff-
        secure, RTC, therapeutic staff-secure, therapeutic group home, long-term
        foster care, transitional foster care, special needs shelter, non-secure
        shelter, influx facility, or out-of-network RTC).  In addition, if the Class
        Member is placed in a psychiatric hospital for more than 14 days, the name
        of the hospital and the type of hospital.

      b.  Care Provider or psychiatric hospital city, state

4.  Consenter Information

      a.  Name of consenter and whether in or outside the United States

      b.  Relationship to UC

      c.  Date consenter was provided the information in Section III.A.4.a-n or
III.A.5.a-k (as applicable)

      d.  The spoken language used to explain the prescribed Psychotropic
Medication and obtain the verbal consent decision

      e.  Date of written consent, as applicable

      f.  Whether verbal consent was provided or denied

      g.  Date of verbal consent

5.  CCU Information

      a.  If CCU overrides, date of override, reason for override, date Primary
Consenter or Sponsor Consenter denied consent, and why

      b.  If CCU is asked to override but decides not to do so, date of request, and
reason for decision not to override

6.  Emergencies

      a.  Whether the Psychotropic Medication was prescribed for an emergency

      b.  The nature of the emergency

      c.  Date that notification of the administration of emergency medication was
sent to the Primary Consenter or Sponsor Consenter

# Exhibit B

Case 2:18-cv-05741-DMG-PLA   Document 495-3   Filed 11/15/23   Page 9 of 48   Page ID #:21769

# Lucas R. Psychotropic Medication Settlement - YOUR RIGHTS

## What is a psychotropic medication?

- Psychotropic medications are a type of medication that treats a mental, emotional, or behavioral condition and affects your behavior, mental processes, or emotions/moods.

- For example, if you are prescribed medications to help you feel less anxious or to help you control your emotions, these are likely psychotropic medications.

## Consenters

If a doctor prescribes psychotropic medication, your care provider will ask for consent, or permission to give you the medication, from one of the following people:

- If staff can contact your **parent/legal guardian**, staff must first ask them for permission except in a few special situations. If you do not want your parent or legal guardian to be contacted, you should tell staff.

- If your parent/legal guardian is not available but you have a **sponsor who is a brother, sister, or grandparent (or an aunt, uncle, or cousin who has been your primary caregiver)**, then staff will ask your sponsor for permission.

- If **you are 16 or 17 years old and you do not have an available parent, legal guardian, or sponsor**, then staff can ask you whether you agree to take the medication.

If none of these people can give permission, the care provider can ask a second doctor to agree that you should take the medication.

## Informed Consent

**1** **Important Information:** Before asking your consenter (your parent/legal guardian, sponsor, or you) for permission, staff must explain what the medication does, why the doctor believes it is needed, the benefits and risks of the medication, and options other than medication. They must also explain that the person agreeing to the medication may change their mind and decide not to give permission at any time. This information must be shared in a language that your consenter understands.

**2** **Verbal Consent:** If you have not taken a prescription psychotropic medication yet, then staff must ask for your consenter's verbal consent before you start taking the medication. If you are already taking the medication, but staff don't have consent yet, then they must get verbal consent within five days of you arriving at their facility. Under some circumstances, staff must also get verbal consent before giving you a higher dosage of medication. If you have questions about when they have to get verbal consent, please ask.

**3** **Written Consent:** After getting verbal consent, staff have to get permission from your consenter in writing.

**4** **Follow-up:** Every six months, staff must remind your consenter that they can change their mind and not give permission for you to take a psychotropic medication. Your consenter must also be able to ask for information about the psychotropic medication(s) in a language they understand.

**No one may punish you or your consenter for not giving permission for any psychotropic medication or for either of you changing your mind about giving permission.**



Exhibit A
Page 47

# Lucas R. Psychotropic Medication Settlement - YOUR RIGHTS

## Overriding denial

- If either your parent/legal guardian or your sponsor refuses to agree to you taking psychotropic medication(s), a second doctor may decide that you must take the medication anyway if they determine that it is in your best interest and that there will be serious harmful consequences if you do not take the medication. The doctor must first try to find out why your parent/legal guardian or sponsor does not want you to take the medication.

- If the doctor does decide you must take the medication even though your consenter disagreed, they must notify your parent/legal guardian or sponsor in a language that they understand.

## Emergencies

There's an emergency if not taking a psychotropic medication is very dangerous to you or others.

- **In an emergency, consent is not required** before you receive the medication.

- But staff must **tell** your parent/legal guardian or sponsor consenter about the emergency as soon as possible (and always within one week).

- Staff must **meet** with you, your case manager, and sometimes your clinician within one week to discuss options other than medication.

Except in emergency situations, ORR will never force you to take psychotropic medication(s).

If you are 16 or 17 years old without a parent/legal guardian or sponsor consenter and you decide you do not want to take psychotropic medication(s), your decision is final and cannot be overruled by a doctor.

## Access to documentation

You, your attorney (if you have one), and your child advocate (if you have one) can get documentation showing your consenter's agreement to you taking psychotropic medication(s).



## Your right to assent

- If you are **at least 14 years old**, staff must **ask you to agree** before giving you psychotropic medication(s).

- Staff must explain why a doctor is giving you the medication and possible side effects in a language you understand.

- You should have the chance to share your **thoughts and questions**. You should also be able to **speak privately with the doctor**.

## Questions?

If you have any questions or concerns about these rights, you can contact an attorney at (510) 920-3531.



Exhibit A
Page 48