# Exhibit C

Exhibit C
Page 71

CARLOS R. HOLGUÍN (90754)
Center for Human Rights & Constitutional Law
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.org

*Attorneys for Plaintiffs*
*(Additional counsel listed on next page)*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LUCAS R., et al., | No. 2:18-CV-05741 DMG PLA |
| Plaintiffs, | |
| v. | [PROPOSED] STIPULATED SETTLEMENT OF PLAINTIFFS' FIFTH CLAIM FOR RELIEF [DISABILITY] |
| XAVIER BECERRA, Secretary of U.S. Department of Health and Human Services, et al., | |
| Defendants. | |

1

HOLLY S. COOPER (197626)
Co-Director, Immigration Law Clinic
CARTER C. WHITE (164149)
Director, Civil Rights Clinic
JONATHAN P. MULLIGAN
   (CAL RLSA NO. 803383)
University of California Davis School of Law
One Shields Ave. TB 30
Davis, CA 95616
Telephone: (530) 754-4833
Email: hscooper@ucdavis.edu
         ccwhite@ucdavis.edu
         jmulligan@ucdavis.edu

POONAM JUNEJA (300848)
FREYA PITTS (295878)
MISHAN WROE (299296)
MELISSA ADAMSON (319201)
DIANE de GRAMONT (324360)
National Center for Youth Law
1212 Broadway, Suite 600
Oakland, CA 94612
Telephone: (510) 835-8098
Email: pjuneja@youthlaw.org
         fpitts@youthlaw.org
         mwroe@youthlaw.org
         madamson@youthlaw.org
         ddegramont@youthlaw.org

BRENDA SHUM
   (ADMITTED PRO HAC VICE)
National Center for Youth Law
818 Connecticut Ave. NW, Suite 425
Washington, DC 20006
Telephone: (202) 868-4785
Email: bshum@youthlaw.org

SUMMER J. WYNN (240005)
MICHAEL J. MCMAHON
   (ADMITTED PRO HAC VICE)
REBECCA L. TARNEJA (293461)

2

ALEXANDRA R. MAYHUGH (300446)
JAMIE D. ROBERTSON (326003)
Cooley LLP
1333 2nd Street, Suite 400
Santa Monica, CA  90401
Telephone: (310) 883-6400
Facsimile:  (310) 883-6500
Email:  swynn@cooley.com
          mmcmahon@cooley.com
          rtarneja@cooley.com
          amayhugh@cooley.com
          jdrobertson@cooley.com

*Attorneys for Plaintiffs*

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

ERNESTO H. MOLINA, JR.
Deputy Director

SARAH WILSON
Assistant Director

BENJAMIN MARK MOSS
NANCY K. CANTER
Senior Litigation Counsel
JONATHAN K. ROSS
ANTHONY J. MESSURI
Trial Attorneys
Office of Immigration Litigation
Civil Division, U.S. Department of Justice
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-9802
Facsimile: (202) 305-1890
ernesto.h.molina@usdoj.gov

*Attorneys for Official-Capacity Defendants*

3

# PREAMBLE

This Settlement Agreement ("Agreement") is entered into by all Plaintiffs and Defendants in this class action lawsuit (collectively "the Parties"). Plaintiffs and class representatives Lucas R., Daniela Marisol T., Gabriela N., Jaime D., Sirena P., and Benjamin F. are or were children formerly in the custody of the Office of Refugee Resettlement ("ORR") of the U.S. Department of Health and Human Services ("HHS"). Defendants are the Secretary of HHS and the Director of ORR, both of whom are sued in their respective official capacities.

WHEREAS Plaintiffs filed this lawsuit challenging, *inter alia*, Defendants' policies and practices with respect to the rights of children in ORR custody who have or are perceived to have a behavioral, mental health, intellectual, and/or developmental disability;

WHEREAS the District Court certified this case as a class action on behalf of, *inter alia*, "all minors in ORR custody pursuant to 6 U.S.C. section 279 and/or 8 U.S.C. section 1232 . . . who have or will have a behavioral, mental health, intellectual, and/or developmental disability as defined in 29 U.S.C. section 705, and who are or will be placed in a secure facility, medium-secure facility, or RTC solely by reason of such disabilities (*i.e.*, the 'disability class');"

WHEREAS, under Section 504 of the Rehabilitation Act, "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency," 29 U.S.C. § 794;

WHEREAS children with disabilities in ORR's custody must receive services in the least restrictive setting that is in the best interest of the child and also the most integrated setting appropriate to their needs unless ORR can demonstrate that this would fundamentally alter the nature of its Unaccompanied Children Program, and

4

1   shall be released from ORR's custody without unnecessary delay due to their

2   disability; and

3       WHEREAS the Trafficking Victims Protection Reauthorization Act of 2008

4   ("TVPRA"), codified at 8 U.S.C. § 1232, *et. seq.*, provides that, "an unaccompanied

5   alien child may not be placed with a person or entity unless the Secretary of Health

6   and Human Services makes a determination that the proposed custodian is capable of

7   providing for the child's physical and mental well-being.  Such determination shall, at

8   a minimum, include verification of the custodian's identity and relationship to the

9   child, if any, as well as an independent finding that the individual has not engaged in

10  any activity that would indicate a potential risk to the child." *Id.* at § 1232(c)(3)(A).

11  A determination whether a proposed custodian is capable of providing for the physical

12  and mental well-being of a child with a disability involves consideration of that

13  disability; and

14      WHEREAS the TVPRA, 8 U.S.C. § 1232(c)(3)(B), requires that a home study

15  be completed for a special needs child with a disability in ORR custody, and that the

16  Secretary of HHS conduct follow-up services for such children; and

17      WHEREAS the Parties have conducted discussions and negotiations in good

18  faith with respect to a compromise and resolution of Plaintiffs' Fifth Claim for Relief

19  in the operative First Amended Complaint [ECF No. 81], with a view to settling the

20  issues in dispute and achieving the most effective class-wide relief possible consistent

21  with the interests of the Parties; and

22      WHEREAS had the case gone to trial, a decision of the District Court may have

23  been subject to appeal by the losing Party with the final outcome uncertain; and

24      WHEREAS the Parties have concluded that the terms and conditions of this

25  Agreement are fair, reasonable, and in the best interests of the named Plaintiffs and all

26  Class Members, after considering the substantial benefits that the Parties will receive

27  from settlement of Plaintiffs' Fifth Claim for Relief;

28

NOW, THEREFORE, in settlement of Plaintiffs' Fifth Claim for Relief and in consideration of the promises and undertakings set forth herein and other consideration, the sufficiency of which is hereby acknowledged, it is hereby AGREED, by and among the Parties to this Agreement, through their respective attorneys, subject to the approval of the Court pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, in consideration of the benefits flowing to the Parties hereto from the Agreement, that Plaintiffs' Fifth Claim for Relief shall be settled upon and subject to the following terms and conditions:

## I.   DEFINITIONS

Wherever used in this Agreement, the following terms have the meanings set forth below:

A. "Care Provider" means any care provider for children in ORR legal custody. This includes ORR funded programs that are licensed, certified, or accredited by an appropriate State agency to provide residential care for children, including shelter, group, foster care, staff-secure, secure, therapeutic, or residential treatment care for children.  It also includes influx care facilities that care for children in ORR's custody, out-of-network facilities, and formerly licensed programs that lost their licenses due to a state's action to exclude all ORR programs from state licensing.

B. "Case Manager" means the care provider staff member who coordinates assessments of unaccompanied children, individual service plans, and efforts to release unaccompanied children from ORR custody.  Case Managers facilitate documentation of services for children and youth and maintain case files for unaccompanied children.

C. "Class" or "Class Members" includes "all minors in ORR custody pursuant to 6 U.S.C. section 279 and/or 8 U.S.C. section 1232 . . . who have or will have a behavioral, mental health, intellectual, and/or developmental disability as ["disability" is] defined in 29 U.S.C. section 705, and who are

1    or will be placed in a secure facility, medium secure facility, or RTC solely

2    by reason of such disabilities" [ECF No. 141 at 27-28] (i.e., the "disability

3    class").

4    D. "Disability" means, with respect to an individual, a physical or mental

5    impairment that substantially limits one or more major life activities of such

6    individual; a record of such an impairment; or being regarded as having such

7    an impairment.  29 U.S.C. § 705(9)(B) (citing 42 U.S.C. § 12102).

8    E. "Effective Date" is the date of final approval of the Agreement by the Court,

9    in accordance with Section VII.A.1.

10   F. "Implementation Date" is the date 12 months after the Effective Date.  By

11   this date, ORR will meet the commitments in Sections II-V, except that

12   ORR shall update the Policy Guide and Manual of Procedures 75 days after

13   the Effective Date of this Agreement and provide a copy of each to the

14   Monitor and Class Counsel at that time.  The Monitor may approve an

15   extension of no more than six additional months for the implementation of

16   any specific provision(s) based on a written good cause statement from ORR

17   explaining why the 12-month deadline could not be met for the specific

18   provision(s).  The Monitor shall share any such written statement with Class

19   Counsel.

20   G. "Integrated Setting" or "Integrated Placement" refers to a setting that

21   enables individuals with disabilities to interact with non-disabled persons to

22   the fullest extent possible.

23   H. "Monitor" means Kathleen Noonan, whose appointment and role is

24   governed by Section VI.C.

25   I. "Non-restrictive Placement" refers to any placement that is not a "restrictive

26   placement."

27

28

7

J.  "Office of Refugee Resettlement" or "ORR" means the U.S. Department of Health and Human Services, Administration for Children and Families, Office of Refugee Resettlement.

K.  "Parent" means a child's biological mother or father, as well as an individual recognized by a governmental entity as the child's parent.

L.  "Party" or "Parties" applies to Defendants and Plaintiffs.

M. "Plaintiff" or "Plaintiffs" applies to the named Plaintiffs and all Class Members as defined herein.

N.  "Residential Treatment Center" ("RTC") is a sub-acute, time limited, interdisciplinary, psycho-educational, and therapeutic 24-hour-a-day structured program with community linkages, provided through non-coercive, coordinated, individualized care, specialized services, and interventions.  Residential treatment centers provide highly customized care and services to individuals following either a community-based placement or more intensive intervention, with the aim of moving individuals toward a stable, less intensive level of care or independence.  A child may only be placed in an RTC at the recommendation of a licensed psychiatrist or psychologist for an unaccompanied child who poses a danger to self or others and does not require inpatient hospitalization.  All references to RTC in the Agreement include out-of-network RTCs.

O.  "Restrictive Placement" refers to placement in a secure juvenile detention facility, a residential treatment center ("RTC"), a staff-secure facility, or a therapeutic staff-secure facility.  Any reference to a secure juvenile detention facility, RTC, staff-secure facility, or therapeutic staff-secure facility will include out-of-network ("OON") facilities that are the same level of restrictiveness.

8

P. "Section 504 Service Plan" refers exclusively to the service plans ORR has agreed to develop and implement pursuant to Section II.B of this Agreement for children with identified disabilities within ORR's custody.

Q. "Step-down" refers to transfer from (1) a restrictive placement to a non-restrictive placement; (2) a secure juvenile detention facility to an RTC, staff-secure, or therapeutic staff-secure facility; or (3) an RTC to a staff-secure or therapeutic staff-secure facility.

R. "Step-up" refers to transfer from (1) a non-restrictive placement to a restrictive placement; (2) an RTC, staff-secure, or therapeutic staff-secure facility to a secure juvenile detention facility; or (3) a staff-secure or therapeutic staff-secure facility to an RTC. "Step-up" also refers to initial placement by ORR in a secure juvenile detention facility, RTC, staff-secure, or therapeutic staff-secure facility.

S. "Substantial Compliance" is when ORR has satisfied the intended purpose of the Agreement through the process outlined in Sections VI.D.3.b. and VII.D.2. The Parties recognize that strict and literal compliance with every term of the Agreement is not required for a finding of Substantial Compliance as long as any deviations are unintentional and do not substantially defeat the purpose of the Agreement. Substantial Compliance is not vitiated by a few technical violations where every reasonable effort has been made to comply.

T. "Termination Date" is five years after the Implementation Date or an earlier date if the Court approves early termination based on Defendants demonstrating Substantial Compliance with the Agreement. The Termination Date is the date on which all terms of the Agreement and ongoing Court jurisdiction terminate.

9

## II.   IDENTIFICATION, ASSESSMENT, AND TRACKING OF CHILDREN WITH DISABILITIES IN ORR'S CARE

A. Identification of Children with Disabilities

    1.  ORR will identify a child as having a disability:

        a.  If the individual performing the initial medical examination for ORR, *see* ORR Policy Guide—as of this writing codified at § 3.4.2,—determines that the child has a physical or mental impairment that substantially limits one or more of the child's major life activities; or

        b.  If, while the child is in ORR custody, a licensed medical provider or licensed mental health professional determines that the child has a physical or mental impairment that substantially limits one or more of the child's major life activities; or

        c.  Based on the results of an evaluation conducted pursuant to Section II.A.2.

    2.  Evaluation for disability

        a.  Any one or more of the following events will trigger an evaluation for disability to determine whether a child has a physical or mental impairment that substantially limits one or more of the child's major life activities:

            i.  If a child is psychiatrically hospitalized or evaluated for psychiatric hospitalization (upon discharge, unless an evaluation for disability has already been completed in connection with the hospitalization or evaluation for hospitalization, in which case, if a disability is identified, the child will be considered for an individualized service plan pursuant to Section II.B); or

10

1    ii.   If a child is considered for step-up to an RTC or secure

2          facility based on danger to self or danger to others

3          (unless an evaluation for disability has already been

4          completed in connection with the consideration for step-

5          up, in which case, if a disability is identified, the child

6          will be considered for an individualized service plan

7          pursuant to Section II.B); or

8    iii.  At the request of the child after being informed of the

9          purpose, scope, and nature of the evaluation, including a

10         request made through counsel of record (for whom ORR

11         has documentation of the attorney's individual

12         representation of the child), a child advocate, or a parent

13         or guardian.

14   b.  When a child has been identified as having a disability and/or

15       evaluated for a potential disability pursuant to this Section, the

16       child will not be re-evaluated for the same presenting

17       symptoms except upon the recommendation of a medical or

18       mental health professional.

19   c.  Evaluations will be conducted as promptly as is practicable

20       unless the child is released to a sponsor or placed in an

21       Unaccompanied Refugee Minors ("URM") program before

22       the evaluation is started or completed, or the evaluating

23       professional recommends waiting to evaluate the child.  ORR

24       will make and document best efforts to ensure that:

25    i.   An evaluation for disability is initiated within 30 days of

26         the triggering event; and

27    ii.   An evaluation is completed within 60 days of ORR

28         identifying the need for an evaluation.

11

d. The purpose of the evaluation is to identify qualified children with disabilities for the purpose of developing a Section 504 Service Plan (*see* Section II.B) if one is needed to meet their disability-related needs, to ensure that they receive services in the most integrated setting appropriate to their needs (unless ORR can demonstrate that this would fundamentally alter the nature of its UC Program), and to ensure to the best extent practicable that they are released to a suitable sponsor from ORR's custody without unnecessary delay due to their disability.

e. The evaluation will be conducted by one or more individuals qualified to assess children in the area(s) of suspected disability or presenting symptoms.  Nothing in this Agreement shall be construed as providing the right to a particular evaluator(s).  The evaluator(s) will select the appropriate tools and/or assessments using their professional judgment and provide ORR documentation of the evaluation findings and any recommendations.  ORR's Division of Health for Unaccompanied Children ("DHUC") will:

   i. issue written guidance on the selection of qualified evaluators, the inclusion of necessary assessments, the process for advising a child about the purpose and scope of the evaluation, and the sharing of relevant records in ORR's possession with the evaluator(s) (including any relevant records and assessments from the child's home country and/or current or prior ORR placements); and

   ii. provide consultation to care providers, on an as-needed basis, on the evaluation process.

12

f. A copy of the evaluation report(s) shall be provided to the child's parent or guardian, if reasonably available (and no child welfare concerns exist).  Evaluation reports shall also be provided on demand to any attorney of record (who provides ORR documentation of individual representation of the child) and the child advocate, if applicable.

g. ORR shall not share any evaluation report or related clinical or mental health documents or Significant Incident Reports ("SIRs") with any component of the Department of Homeland Security ("DHS") for purposes of any deportation, removal, application for relief from removal, custody hearing, or United States Citizenship and Immigration Services ("USCIS") adjudication.

h. A pending, scheduled, or partially completed evaluation will not be a justification to delay an otherwise appropriate release to a suitable sponsor, step-down to a less restrictive placement, or placement in a URM program, although such an evaluation may inform the appropriateness of a step-down and/or suitability determination where appropriate.  *See* Section V.C.

B. Individualized Section 504 Service Plans

1. The purpose of a Section 504 Service Plan is to meet the child's disability-related needs, to ensure that they can participate in the UC Program in the most integrated setting appropriate to their needs (unless ORR can demonstrate that this would fundamentally alter the nature of its UC Program), and to ensure to the best extent practicable that they are released from ORR's custody without any unnecessary delay due to their disability.

13

2. When a child in ORR's legal custody is identified as having a disability pursuant to Section II.A.1, ORR will, in consultation with individuals with relevant expertise, *see* Section II.B.3:

    a. Assess the child's potential need for reasonable accommodations, modifications, services, and/or supports to meet the child's disability-related needs, to ensure that they can participate in the UC Program in the most integrated setting appropriate to their needs (unless ORR can demonstrate and document that this would fundamentally alter the nature of its UC Program), and to ensure to the best extent practicable that they are released from ORR's custody without any unnecessary delay due to their disability; and

    b. If needed, develop and implement an individualized Section 504 Service Plan for the child.

3. For purposes of Sections II.B.2 and II.B.11, the individuals with relevant expertise consulted must include the child (if the child is willing and able to communicate about their service plan, preferences, and needs) and the child advocate (if any).  ORR will use best efforts to include the parent/legal guardian (if reasonably available and with the child's consent) and the child's individual attorney of record (who provides ORR documentation of individual representation of the child and if the child consents).  The individuals consulted may also include, as appropriate, individuals such as care provider staff working directly with the child, the child's clinician(s), and/or other medical or mental health provider(s).

4. Any decision pursuant to Section II.B.2.a that an individualized Section 504 Service Plan is not required for a child with an identified disability and the reasons why must be documented in the child's file.

14

5. The Section 504 Service Plan, if one is needed, will be developed and implemented as soon as possible, and within 60 days of identification of the child as having a disability (see Section II.A.1), unless the child is released to a sponsor or placed in a URM program before the Section 504 Service Plan is started or completed.  The Section 504 Service Plan may be implemented in a piecemeal fashion as appropriate and feasible within the 60-day window.

6. ORR will make best efforts to develop and implement a Section 504 Service Plan, if one is needed, before any step-up of a child with an identified disability unless the child is released to a sponsor or placed in a URM program earlier.  If a Section 504 Service Plan is not developed and implemented before step-up, ORR will document in the child's case file the specific reasons why it was not feasible to do so before step-up, and will complete development and begin implementation of a Section 504 Service Plan, if one is needed, within 30 days of the step-up.

7. The Section 504 Service Plan, if one is deemed necessary, will be targeted to the individual child, and must:

   a. Identify the child's disability-related needs and, if applicable, specific triggers of the child's disability-based behaviors; and

   b. Include an individualized plan that (i) proactively identifies and provides for services, supports, and reasonable accommodations and modifications to meet the child's identified disability-based needs; (ii) documents any reasonable accommodations or modifications to the UC Program needed to maintain the child's participation in the most integrated setting appropriate to the child's needs while in ORR custody (unless ORR can demonstrate and document

15

that this would fundamentally alter the nature of its UC Program), taking into account the specific triggers of the child's behavior; and (iii) includes a transition plan and consideration of available post-release services to enable safe release to a suitable sponsor without unnecessary delay due to the child's disability.

8. In consultation with internal or external subject matter expert(s), ORR will issue written guidance governing the development of Section 504 Service Plans, including regarding:

   a. Services, supports, reasonable modifications, and accommodations that may be included in a Service Plan;

   b. Procedures for consulting with the individuals with relevant expertise described in Section II.B.3;

   c. Consideration of any relevant medical, mental health, and/or educational records that are in ORR's possession (including from the child's home country); and

   d. Guidelines for specifying when, how often, and by whom services will be provided.

9. In developing a Section 504 Service Plan, ORR shall consider all recommendations provided by individual(s) who conduct evaluation(s) for disability.  ORR will include a written explanation of any significant departures from an evaluator's major recommendation(s) in the Service Plan.

10. ORR is not obligated under this Agreement to pay for or provide post-release services, except that post-release services can provide case management to identify services, including no- or low-cost services, available in the community.

16

11. An existing Section 504 Service Plan or a decision that no Section 504 Service Plan is necessary will be reviewed and revised as necessary by ORR in consultation with the individuals with relevant expertise described in Section II.B.3:

    a. Every six months;

    b. Within 30 days after step-up;

    c. If a child is psychiatrically hospitalized, within 30 days thereafter (if a child is hospitalized multiple times in a three-month period, the Plan need only be reviewed once in that three-month period); and

    d. Upon the recommendation of a licensed medical or mental health provider, including the child's clinician, within 30 days thereafter.

12. ORR's review of an existing Section 504 Service Plan will:

    a. Determine whether the services, supports, reasonable modifications, and accommodations set out in the Plan have been and are currently being provided to the child.  If any services, supports, reasonable modifications, or accommodations have not been provided, ORR will include in the revised Plan a brief written explanation of why the Plan has not been fully implemented and what steps will be taken to ensure full implementation of the Plan with any needed revisions thereto, as provided in Section II.B.12(c);

    b. Revisit the identification of the child's needs and triggers and individualized plan specified in Section II.B.7; and

    c. Assess whether the Plan appropriately meets the child's identified needs, maintains the child in the least restrictive and most integrated setting appropriate to those needs (unless

17

ORR can demonstrate and document that this would
fundamentally alter the nature of its UC Program), and
includes a transition plan to enable safe release to a suitable
sponsor without unnecessary delay due to the child's
disability.  If not, ORR shall consider whether additional or
alternative services, supports, reasonable modifications, or
accommodations (that would not fundamentally alter the
nature of the UC Program) should be provided.

13. A pending, scheduled, or partially completed Section 504 Service
Plan will not be a justification to delay an otherwise appropriate
release to a suitable sponsor, step-down, or placement in a URM
program.  *See* Section V.B, C.

C.  Children's Case Files

1.  ORR will direct care providers to include, as applicable, in children's
case files:

a.  Any Section 504 Service Plan;

b.  Documentation of the implementation of any Section 504
Service Plan, including, but not limited to, progress notes; and

c.  Any evaluation or assessment pursuant to Section II.A.2.

2.  With the child's consent, ORR will make such records available to
their attorney of record upon request following ordinary case file
request procedures.  With the child's consent, such records will be
shared with the child's child advocate, if applicable.

3.  In no case will ORR share clinical or mental health records or SIRs,
including, but not limited to, any Section 504 Service Plan and related
documentation, with any component of DHS for purposes of any
deportation, removal, application for relief from removal, custody
hearing, or USCIS adjudication.

18

D. Tracking Children with Disabilities

    1. ORR will track data across the ORR system concerning, at least:

        a. The number of children in ORR custody identified as having one or more disabilities;

        b. Identified disabilities, placements, step-ups, step-downs, and length of stay for children identified as having one or more disabilities;

        c. The development and implementation of Section 504 Service Plans for children with disabilities who need them, and any determinations that children with identified disabilities do not need Section 504 Service Plans;

        d. Referrals made for post-release services; and

        e. Transition planning for the safe release of children identified as having one or more disabilities without unnecessary delay due to the child's disability.

    2. This information must be stored in a format that can be aggregated and is easily searchable.

## III.   ACCOMMODATIONS AND SERVICES AVAILABLE TO CHILDREN WITH DISABILITIES IN ORR'S CARE

A. Needs Assessment and Disability Plan

    1. Working with internal or external expert(s), ORR will undertake a comprehensive needs assessment to evaluate:

        a. The adequacy of services, supports, and resources currently in place for children with disabilities in ORR's custody across its network, including ORR's capacity to serve children with disabilities in the most integrated setting appropriate for their needs without fundamentally altering the UC Program; and

   b. Gaps in the current system, including, but not limited to, gaps related to identification, services and supports (including both facility-based and community-based services), placement array (including, but not limited to, the availability of therapeutic foster care and shelter placements for children with higher-level needs and children ready to step down), and connections to available post-release services.

  2. Working with internal or external expert(s), ORR will develop and implement a disability plan with steps to address identified gaps, if any, including a concrete timeline.

  3. The needs assessment will be completed and the disability plan developed within one year of the Effective Date of this Agreement.

B. Access to Services

  1. ORR, in conjunction with grantee care providers, will make and document best efforts to develop and provide a range of services and supports network-wide, including available community-based services and supports, designed to enable children with disabilities to be placed in the least restrictive setting that is in their best interest, and the most integrated setting appropriate to their needs, and further their release to suitable sponsors without unnecessary delay due to their disability (unless ORR can demonstrate and document that providing such a service or support would fundamentally alter the nature of its UC Program).

  2. ORR will within 12 months of the Effective Date of this Agreement develop a policy which includes the provision of trauma-informed mental health screening for all unaccompanied children in ORR's care and provides for enhanced mental health services for those children with a positive screening.  Such a positive screening would not

1   automatically identify a child as having a disability or lead to an

2   evaluation for a disability, or the development of a Section 504

3   Service Plan.

4   C. Range of Placements

5       1. ORR will make and document best efforts to enter into cooperative

6          agreements or contracts with a range of placements appropriate for

7          children in ORR's legal custody, including those with disabilities.  To

8          the extent feasible, ORR will prioritize placements that provide access

9          to trauma-informed, therapeutic, and other disability-related services

10         in integrated settings as defined herein at Section I.G (e.g., shelter and

11         foster care settings).

12  D. Placement Denials

13      1. ORR will include in every new and renewed care provider cooperative

14         agreement and Notice of Funding Opportunity (NOFO) a requirement

15         that ORR care providers, including foster care providers, may not

16         refuse placement of a child based solely on the child's disability,

17         absent individualized documentation that:

18             a. State licensing requirements bar acceptance of the specific

19                child, based on the child's individual needs; or

20             b. The care provider concludes it is unable to meet the child's

21                disability-related needs, even with additional support from

22                ORR.

23  E. ORR Support

24      1. ORR will engage in best efforts to support the inclusion of children

25         with disabilities in integrated settings by providing resources to

26         support placement, including, as relevant, by:

27

28

21

    a. Offering direct assistance to care providers as needed and subject to congressional appropriations (e.g., support for staff working with children exhibiting challenging behaviors);

    b. Connecting providers with and coordinating delivery of available community-based services;

    c. Connecting providers with available telehealth resources; and

    d. Providing training and technical assistance as needed.

  2. ORR will develop and deliver mandatory trauma-informed disability-related training as a component of pre-service training and at least annually thereafter to all appropriate Federal and care provider staff (e.g., training through the National Child Traumatic Stress Network or another suitable trainer).

## IV. PLACEMENT OF CHILDREN WITH DISABILITIES IN ORR'S CARE

A. Plaintiffs' Second Claim for Relief

  1. The terms in this Agreement resolving Plaintiffs' Fifth Claim for Relief supplement, and do not supplant or waive for members of any certified class, the protections, procedures, and other relief provided in resolving Plaintiffs' Second Claim for Relief (the "step-up claim").

B. Placement of a Child Identified as Having a Disability in a Restrictive Placement

  1. For a child identified as having a disability who is placed in a restrictive placement, *see* Section II.A.1, ORR will document why the child's needs cannot be met in a more integrated and less restrictive setting with additional services, supports, and/or accommodations. The documentation will be included with the child's first Notice of Placement.

22

    2.  ORR will describe and document the services or care that will be provided at the restrictive placement, why they are necessary for the child, and why they cannot be provided in a less restrictive placement.

C.  Step-down of Children with Identified Disabilities in Restrictive Settings

    1.  ORR will assess children with identified disabilities who are placed in restrictive placements for step-down at least every 30 days, as part of ORR's 30-day placement review.

    2.  The 30-day placement review will include and document consideration of the child's disability, the services and supports needed to address it, and whether services and supports could be provided safely in a less restrictive placement.

    3.  If the 30-day placement review does not recommend step-down, ORR will document why the child's needs cannot be met in a more integrated and less restrictive setting with additional services, supports, and/or accommodations.  For a child placed in an RTC, ORR's documentation will include the written assessment of the treating mental health professional(s) as to why the child cannot be safely stepped down to a less restrictive setting.

    4.  If the 30-day placement review recommends step-down, the child will be placed in the least restrictive setting in the best interest of the child as expeditiously as possible.  Efforts to locate a less restrictive placement following a recommendation for step-down will be documented in the child's case file.

D.  Access to Documentation

    1.  The child, their attorney of record, if any, and their child advocate, if applicable, will have access to the documentation required under Sections IV.B and IV.C (which is part of Notice of Placement documentation) upon request.

23

E.  Access to Services

 1. ORR will make and document efforts to place each child with an identified disability in a placement that can provide access to the services and supports identified in the child's Section 504 Service Plan (unless ORR can demonstrate and document that this would fundamentally alter the nature of its UC Program), except that ORR may maintain a child in their current shelter or foster care placement upon a determination that maintaining their current placement would be in the best interest of the child.

 2. To facilitate continuity in care, when ORR transfers a child with an identified disability, it will ensure that all records related to Section 504 Service Plans are included in the health records accompanying the child upon transfer.  ORR will direct the care provider to provide these records to the child's new medical and mental health providers as needed.

**V. RELEASE OF CHILDREN WITH DISABILITIES IN ORR'S CARE TO SPONSORS**

A.  Home Studies

 1. When ORR identifies a child as having a disability under Section II.A.1, the TVPRA requires a home study of the child's potential sponsor(s).  When ORR determines that the TVPRA mandates a home study and a potential sponsor has become potentially viable, meaning that the potential sponsor has submitted a complete Family Reunification Application and supporting documentation, and that ORR has not denied that application, ORR will obtain such a home study as expeditiously as possible, with the goal of avoiding any unnecessary delay in release.

24

2. Background checks for any case referred for a home study because of a child's disability may be conducted concurrently to the referral and home study process itself.  Unless results of the background check are required prior to the initiation of the home study for a specified safety reason, the home study should be conducted pending receipt of background check results.

B. Support for Sponsors

1. When ORR identifies a viable potential sponsor for a child with an identified disability, ORR will affirmatively support and assist that sponsor in accessing and coordinating post-release community-based services and supports, to the extent they are available (and subject to appropriations), in an effort to work toward release without unnecessary delay.  This support and assistance must be documented in the child's case file.  However, ORR will not delay the release of the child if post-release services are not in place before the child's release, unless the needs of the child require it.

2. ORR's evaluation of a potential sponsor of a child with an identified disability must explicitly include consideration of the potential benefits to the child of release to a community-based setting.  Correspondingly, ORR's evaluation of a potential sponsor's ability to meet the physical and emotional needs of the child must necessarily include explicit consideration of the impact of the child's disability, as well as the availability of post-release services to meet the child's needs.

3. The child, and their child advocate, if applicable, will have access to the documentation required under Section V.B.1 and V.B.2 upon request.  The child's attorney(s) of record who provide(s) ORR with documentation of individual representation of the child may request

the records in accordance with ORR's policy on requesting
information from the child's case file.

C. Delays in Release

1. A pending or final Section 504 Service Plan or evaluation for
disability will not be justification to delay release to a sponsor, absent
a determination that the child is a danger to themselves or others or
that the sponsor is not capable of providing for the child's physical
and mental well-being.  Note that in some instances the evaluation
may be needed in order to determine the potential sponsor's
suitability.

D. Continuity of Care

1. Upon release, with the consent of either the sponsor or the child (if the
child is 14 or older), and upon request, ORR will within a reasonable
timeframe share treatment records of a child with an identified
disability with the child's new community-based provider(s), if any.

## VI. IMPLEMENTATION AND OVERSIGHT

A. ORR Policy Documents

1. ORR shall incorporate the commitments in this Agreement into its
Policy Guide and Manual of Procedures (MAP) within 75 days after
the Effective Date and shall provide a copy of the updated Policy
Guide and MAP to the Monitor and to Class Counsel at that time.

2. The Parties anticipate that the Disability Plan developed pursuant to
Section III.A.2 may also result in additions and/or revisions to the
Policy Guide and MAP.  ORR shall provide a copy of any such
additions and/or revisions to the Monitor and to Class Counsel within
30 calendar days of making any such additions and/or revisions.

B.  Internal Oversight

    1.  ORR will designate an ORR staff member or group of staff members to oversee compliance with the commitments in Sections II-V of this Agreement throughout its network.  *See* Section II.D.1.

    2.  ORR will provide notice of the protections against discrimination assured to children with disabilities by Section 504 while in the custody of ORR and the available procedures for raising concerns about children with suspected and identified disabilities in ORR's custody by:

        a.  Publishing a nondiscrimination notice on its website, in the Policy Guide, and in the written materials provided to children describing their rights while in the custody of ORR.

        b.  Creating a mailbox for concerns raised by or on behalf of children with suspected or identified disabilities in ORR's custody that will be monitored by a designated ORR staff member or group of staff members, who will respond in writing within a reasonable timeframe, not to exceed 30 days, explaining what, if any, steps were taken, or are planned, to address the concerns raised and providing information on the right to file a complaint with the U.S. Department of Health and Human Services, Office for Civil Rights (HHS-OCR) and the procedures for doing so.

        c.  Notifying grantee care providers that they must have policies consistent with 45 C.F.R. § 84.7 requirements.

C.  Monitor

    1.  The Monitor of Defendants' compliance with this Agreement will be Kathleen Noonan.

27

a. If the Monitor becomes unable or unwilling to serve, the Parties shall agree on a replacement Monitor, taking into account the input and recommendations of the outgoing Monitor, if available.

b. If the Parties are unable to reach agreement on a replacement Monitor, they will seek the assistance of a neutral mediator to resolve the dispute.

2. Defendants will engage the Monitor at Defendants' expense no later than 60 days after the Court's approval of the Monitor and shall be responsible for the Monitor's fees and costs to satisfy the Monitor's duties under this Agreement. The Monitor will serve through the Termination Date of the Agreement. Neither Party shall have supervisory authority over the Monitor.

3. The Monitor's duties will include overseeing, evaluating, reporting on, and certifying implementation progress and compliance with this Agreement.

a. The Monitor will have the authority reasonably necessary to evaluate progress toward compliance with the Agreement. This authority includes the ability to hire staff and engage consultants, including for data analysis and/or validation, so long as a cost limit to be negotiated between the Defendants and the Monitor is not exceeded; request and receive records within ORR's access and control, including underlying data, files, and records; and conduct verification activities, including, but not limited to, case file reviews (not to exceed 100 per year), site visits, and independent communications with and/or interviews of federal and care provider staff,

1   service providers, and youth and their families and sponsors

2   (with their consent to be interviewed).

3      b. The Monitor's authority further includes the receipt of

4   quarterly reports from ORR that include: (1) the name of each

5   child in ORR custody who has been identified as having a

6   disability and/or has been prescribed or administered one or

7   more psychotropic medication(s); (2) each such child's alien

8   registration number; and (3) each such child's placement

9   location, ("Quarterly Report").  The first Quarterly Report

10  under this Agreement will be issued three months after the

11  Implementation Date.

12     c. Both Parties will receive notice of Monitoring site visits and

13  will have the option to attend no more than two per year.

14     d. Defendants will ensure that the Monitor has access to

15  resources, data, information, and individuals the Monitor

16  deems necessary to perform the Monitor's assigned

17  responsibilities under this Agreement, as is consistent with

18  any applicable state licensing requirements, is reasonably

19  obtainable, and within ORR's control.

20     4. The Monitor and any staff or consultants hired by the Monitor will

21  sign and be bound by the Protective Order governing this action.

22     5. The Monitor, at their discretion, may have ex parte communication

23  with the Parties.

24  **D. Reporting**

25     1. Within ten calendar days after the Implementation Date, Defendants

26  will provide a written report to the Monitor and Class Counsel

27  confirming that they have implemented the terms of this Agreement

28

1    and detailing the steps they have taken to do so (the "Implementation

2    Report").

3      2.  Defendants will provide Periodic Reports to the Monitor, detailing

4    ORR's implementation of and compliance with the terms of the

5    Agreement.

6        a.  Defendants' Periodic Reports will be issued every six months.

7    The relevant period of review will be the six months ending

8    on the reporting date.  The first such report will be provided to

9    the Monitor at the same time as the Implementation Report.

10       b.  The format and contents of Defendants' Periodic Reports will

11   be determined by Defendants with input from the Monitor.

12   For example, Defendants and the Monitor may agree to a

13   schedule that contemplates alternating formal and less formal

14   Periodic Reports.  The Periodic Reports will only include the

15   qualitative, quantitative, and other information the Monitor

16   identifies as necessary for the Monitor to evaluate, report on,

17   and certify compliance with the Agreement that is within

18   ORR's control, reasonably obtainable, and is consistent with

19   any applicable state licensing requirements.

20       c.  Plaintiffs will have access to the information provided to the

21   Monitor, subject to the Protective Order in effect in this case,

22   at the discretion of the Monitor.  Defendants will provide a

23   copy of the Quarterly Report to Plaintiffs at the time it is

24   delivered to the Monitor.

25       d.  At the same time that Defendants provide their Periodic

26   Reports to the Monitor, Defendants will publish streamlined

27   public reports online, including aggregated information

28   concerning: the number of children in ORR custody identified

as having a disability; the categories of disabilities identified;
services and supports provided to children with disabilities;
type of placement(s); lengths of stay of children with
disabilities system-wide; and any other information ORR
chooses to include.

3. The Monitor will file an Annual Report on the docket every 12
months until the Termination Date (*see* Section I.T.), evaluating
Defendants' implementation progress and whether Defendants have
demonstrated that they are in Substantial Compliance (*see* Section
I.S.) with the terms of this Agreement.

   a. The first Annual Report will be filed four months after the
   Implementation Report, and then Annual Reports will be filed
   every twelve months thereafter for as long as the Agreement
   is in effect (no later than the Termination Date).

   b. If the Monitor concludes that Defendants have not
   demonstrated Substantial Compliance with the Agreement,
   the Annual Report will include recommendations as to actions
   Defendants should take to achieve and/or demonstrate
   Substantial Compliance such that the Monitor will provide
   certification of Substantial Compliance.  *See* VII.D.2.

   c. Two months before the filing date, the Monitor will provide a
   draft report to the Parties.  The Parties will have one month to
   review the draft report and provide any input to the Monitor.
   The Monitor will then have one month to finalize and file the
   Annual Report.

   d. The Monitor's reports will be public, except that any
   individually identifiable information concerning children or
   information otherwise protected from disclosure by law will

31

be redacted or otherwise removed from the publicly filed reports.

E. Periodic Meetings

    1. The Monitor will convene confidential meetings between the Monitor and the Parties (jointly) at least every six months, beginning nine months from the Effective Date and lasting through the Termination Date, to discuss implementation progress.

    2. The Monitor and the Parties will make every effort to schedule one of these meetings during the month when the Parties are reviewing and providing input on the Monitor's draft Annual Report each year.

F. Attorney-Client Visits

    1. Class counsel, including legal professionals within class counsel's organizations, and interpreters, may conduct confidential attorney-client visits.

    2. Prior to or upon Plaintiffs' counsel's arrival at a facility for attorney-client visits:

        a. Plaintiffs' counsel shall notify ORR seven days in advance of a planned attorney-client visit.

        b. No later than 24 hours prior to the attorney-client visit, ORR shall provide Plaintiffs' counsel with a list of children at the facility, including: names, dates of birth, alien registration numbers, countries of origin, and admission dates.

        c. 48 hours in advance of class counsel visits, ORR shall provide a sign-up sheet for Class Members who wish to meet with class counsel.

## VII. SETTLEMENT APPROVAL, DISMISSAL OF PLAINTIFFS' FIFTH CLAIM FOR RELIEF, RETENTION OF JURISDICTION, AND EXIT

A. Settlement Approval

32

1. This Agreement is effective only with Court approval.  The Effective Date is the date of final approval of the Agreement by the Court.

2. Within 30 days after signing this Agreement, the Parties will file a joint or unopposed motion with the Court seeking preliminary approval of this Agreement, approval of a notice plan and proposed notice to the Class, a briefing schedule for final approval, and a final fairness hearing.

3. In seeking final approval of this Agreement, the Parties will file a joint or unopposed motion requesting entry of a proposed judgment and order that:

   a. Grants final approval of the Agreement, without modification of any of its terms (unless the Parties have agreed to such modification), as a fair, reasonable, and adequate resolution of Plaintiffs' Fifth Claim for Relief under Federal Rule of Civil Procedure 23;

   b. Finds that the Agreement resulted from extensive arms-length, good faith negotiations between the Parties through experienced counsel;

   c. Dismisses Plaintiffs' Fifth Claim for Relief of the operative First Amended Complaint with prejudice;

   d. Finds that each Class Member shall be deemed to have fully, finally, and forever released, relinquished, and discharged, all claims for systemic declarative and injunctive relief presented in the Fifth Claim for Relief of the First Amended Complaint arising or accruing against the Defendants on or before the Termination Date, as well as all claims for systemic declarative and injunctive relief under Section 504 of the Rehabilitation Act based on an identical factual predicate as

33

1    the Fifth Claim for Relief of the operative First Amended

2    Complaint arising or accruing against the Defendants on or

3    before the Termination Date, even if such claims were not

4    presented or might not have been presentable in this class

5    action.  Notwithstanding the foregoing, this provision does not

6    release, relinquish, or discharge the First, Second, Third,

7    and/or Fourth claims for Relief in the operative First

8    Amended Complaint.  In addition, all disputes regarding this

9    Agreement arising before the Termination Date will be

10   resolved in accordance with the dispute resolution processes

11   in Section VIII.B-D; and

12   e. Incorporates the terms of this Agreement, makes the Parties'

13   compliance with the terms of the Agreement part of the

14   dismissal order, and provides that the Court has and shall

15   retain jurisdiction over its judgment and order for the

16   purposes of interpreting and enforcing this Agreement until

17   the Termination Date.

18   **B. Individual Claims**

19   1. This Agreement is intended to provide a class-wide solution to

20   matters covered by the Agreement.  Nothing in this Agreement is

21   intended to limit the ability of any individual Class Member to

22   obtain individual relief to which they would otherwise be entitled

23   under state or federal law.  Likewise, nothing in this Agreement is

24   intended to create an individual right of action to enforce this

25   Agreement.

26   **C. Jurisdiction**

27   1. The Court shall have and retain jurisdiction to interpret and enforce

28   this Agreement.

2. The Parties agree that notwithstanding any other term or provision of this Agreement, the Court shall not have jurisdiction to enforce this Agreement after the Termination Date.

D. Exit

1. The Agreement will terminate on the Termination Date as defined in Section I.T.

2. Beginning two years after the Implementation Date, Defendants may move for an order permitting early termination if they can demonstrate Substantial Compliance to the Court, supported by certification from the Monitor.

3. Plaintiffs will not oppose early termination of the Agreement absent a good faith showing that Defendants have not demonstrated Substantial Compliance with the Agreement.

VIII. NOTICE AND DISPUTE RESOLUTION

A. Communications

1. All written communications required by this Agreement shall be transmitted by email to counsel using the following contact information:

Plaintiffs' counsel:

Holly Cooper – hscooper@ucdavis.edu

Carlos Holguín – crholguin@centerforhumanrights.email

Mishan Wroe – mwroe@youthlaw.org

Michael McMahon – mmcmahon@cooley.com

Defendants' counsel:

Benjamin Mark Moss – benjamin.m.moss2@usdoj.gov

Nancy K. Canter – nancy.k.canter@usdoj.gov

Jonathan K. Ross – jonathan.k.ross@usdoj.gov

2. Counsel shall promptly notify the Monitor and the other Party of any updates to the designated representatives or contact information for communications under this Agreement.

B. Informal Dispute Resolution

1. If any Party has a concern regarding this Agreement, that Party should email Opposing Counsel and the Monitor and attach any relevant documentation.

2. The receiving Party will respond within 10 days of receipt of the initial email stating the concern(s), explaining what initial measures are being taken and a likely timeframe for resolution. Either Party may request a conference with the Monitor to further discuss the issue with both Parties present.

3. If the Parties are unable to resolve the concern(s) or develop a plan to resolve the concern(s) within 21 days of receipt of the initial email stating the concern(s), either of the Parties may proceed to the formal dispute resolution process described in Section VIII.C for any alleged breach of the Agreement.

4. The Parties can mutually agree to extend the time period in the informal dispute resolution process to attempt to resolve the concern(s) before proceeding to formal dispute resolution for any alleged breach of the Agreement.

C. Formal Dispute Resolution

1. If either Party believes that the other is in breach of the Agreement, and the informal dispute resolution described above has not adequately resolved the issue, they will notify both the Monitor and the other Party.

a. The notification shall be in writing and shall include a detailed description of the alleged breach of the Agreement.

36

2. Within 10 days of service of the notice described in Section VIII.C.1 alleging breach of the Agreement, the Parties will meet and confer in a good faith effort to resolve the dispute.

3. If the Parties are unable to resolve the dispute through the process described in Section VIII.C.2, then the Parties will contact the Monitor to schedule a meeting.  The meeting will be held within 30 days of the notification described in Section VIII.C.1 alleging breach of the Agreement (with extensions permitted by agreement of the Parties and the Monitor).  Within 14 days of the meeting (with extensions permitted by agreement of the Parties and the Monitor), the Monitor will either:

    a.  Make recommendations as to how the alleged breach should be cured, including a timeline for compliance; or

    b.  Inform the Parties of their finding that a breach has not occurred.

D. Court Enforcement

1. In the event that (a) the Party that allegedly breached the Agreement is unwilling or unable to comply with the Monitor's proposed cure or (b) the Party alleging a breach disagrees with the Monitor's recommendations and/or findings, the Party alleging a breach may seek resolution from the Court by filing a motion to enforce the Agreement.

2. The Parties agree:

    a.  Not to file a motion for enforcement of this Agreement without first following the Informal Dispute Resolution procedure in Section VIII.B and the Dispute Resolution procedure in Section VIII.C.

b. Not to file a motion for enforcement of this Agreement before the Monitor submits their first Annual Report.

c. Nothing in the Agreement waives the Parties' right to pursue class wide relief addressing systemic issues under Federal Rule of Civil Procedure 65(b).

E. Waiver

    1. A waiver of any breach of this Agreement by any Party shall not be deemed a waiver of any other prior or subsequent breach.

## IX.   NOTICE TO CLASS MEMBERS

A. The Parties acknowledge that Rule 23(e) of the Federal Rules of Civil Procedure requires that the Court direct notice to the Class and that it approve this Agreement before the claims of the Class may be dismissed pursuant to this Agreement.

B. Within 30 days after signing this Agreement, the Parties will file a joint or unopposed motion with the Court for preliminary approval of this Agreement as specified in Section VII.A.2.

C. Within 45 days of Court approval and direction of Notice, Defendants shall inform the public about the existence of this Agreement via the Defendants' websites.  Subject to Section XI below, the Parties shall pursue such other public dissemination of information regarding this Agreement as they may independently deem appropriate.

D. Within 30 days of the Effective Date of this Agreement, Defendants shall distribute to ORR facilities receiving federal funds to provide shelter services to Class Members copies of this Agreement.  If Defendants forward to their offices, employees, or agents any memorandum or instructions to implement this Agreement, they will within five business days forward copies of such memoranda or instructions to Plaintiffs' counsel.

38

E. Within 30 days of the Effective Date of this Agreement, Defendants shall post in a prominent location at each facility in which ORR houses children a notice including the information set forth in Exhibit A attached.

**X.   ATTORNEYS' FEES AND COSTS**

A. Plaintiffs reserve their right to seek attorneys' fees and costs associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412. The Parties agree to meet and confer in a good faith effort to settle such fees and costs.

B. This Agreement is without prejudice to Plaintiffs' right to seek future attorneys' fees and/or litigation costs in this action pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

**XI.   ADMISSION OF LIABILITY**

A. This Agreement does not constitute and shall not be construed or viewed as an admission of any wrongdoing or liability by any Party.

B. The Parties assert that they have meritorious claims and defenses in this matter.  The Parties have entered into this Agreement solely for the purpose of settling and compromising Plaintiffs' claims and to avoid the expense and diversion of resources caused by protracted litigation.

C. This Agreement shall not be offered or received against any Party as evidence of, or construed as or deemed to be evidence of, any presumption, concession, or admission by any of the Parties of the truth of any fact or the validity of any claim that had been or could have been asserted in the action or in any litigation, or the deficiency of any defense that has been or could have been asserted in the action, or any liability, negligence, fault, or wrongdoing of the Defendants; or any admission by the Defendants of any violations of, or failure to comply with, the Constitution, laws, or regulations of the United States.

**XII.  MODIFICATION OF AGREEMENT**

    A. This Agreement constitutes the entire agreement among the Parties as to Plaintiffs' Fifth Claim for Relief, and supersedes all prior agreements, representations, warranties, statements, promises, covenants, and understandings, whether oral or written, express or implied, with respect to the subject matter thereof.

    B. This Agreement is an integrated agreement at the time of authorization and may not be altered, amended, or modified except in writing executed by Plaintiffs and Defendants.

**XIII.  MUTUAL EXCLUSIVITY OF PROVISIONS**

    A. If any provision of this Agreement is declared invalid, illegal, or unenforceable in any respect, the remaining provisions shall remain in full force and effect, unaffected and unimpaired.

**XIV.  MULTIPLE COUNTERPARTS**

    A. This Agreement may be executed in a number of identical counterparts, all of which shall constitute one agreement, and such execution may be evidenced by signatures delivered electronically.

**XV.  TITLES AND HEADINGS**

    A. Titles and headings to Articles and Sections herein are inserted for convenience and reference and are not generally intended to be part of, or to affect the meaning or interpretation of, this Agreement.

**XVI.  REPRESENTATIONS AND WARRANTY**

    A. Counsel for the Parties, on behalf of themselves and their clients, represent that they know of nothing in this Agreement that exceeds the legal authority of the Parties or is in violation of any law.  Defendants' counsel represent and warrant that they are fully authorized and empowered to enter into this Agreement on behalf of the Secretary of HHS and acknowledge that Plaintiffs enter into this Agreement in reliance on such representation.

Plaintiffs' counsel represent and warrant that they are fully authorized and empowered to enter into this Agreement on behalf of Plaintiffs, and acknowledge that Defendants enter into this Agreement in reliance on such representation.  The undersigned, by their signatures on behalf of Plaintiffs and Defendants, warrant that upon execution of this Agreement in their representative capacities, their principals, agents, assignees, employees, successors, and those working for or on behalf of Defendants and Plaintiffs shall be fully and unequivocally bound hereunder to the full extent authorized by law.

Dated:   November 2, 2023

CARLOS R. HOLGUÍN
Center for Human Rights & Constitutional Law

HOLLY S. COOPER
CARTER C. WHITE
JONATHAN P. MULLIGAN
U.C. Davis Immigration Law Clinic and Civil Rights Clinic

BRENDA SHUM
POONAM JUNEJA
FREYA PITTS
MISHAN WROE
MELISSA ADAMSON
DIANE DE GRAMONT
National Center for Youth Law

SUMMER J. WYNN
Cooley LLP

_____
Carlos R. Holguín

_____
Holly S. Cooper

_____
Brenda Shum

_____
Summer Wynn

*Attorneys for Plaintiffs*

42

STIPULATED SETTLEMENT
CASE NO. 2:18-CV-05741 DMG PLA

Exhibit C
Page 113

Dated:                                        BENJAMIN MARK MOSS
                                              Senior Litigation Counsel
                                              Office of Immigration Litigation
                                              U.S. Department of Justice
                                              P.O. Box 878
                                              Ben Franklin Station
                                              Washington, D.C. 20044
                                              benjamin.m.moss2@usdoj.gov

                                              BENJAMIN MOSS  Digitally signed by BENJAMIN MOSS
                                                             Date: 2023.11.02 14:09:06 -04'00'

                                              Benjamin Mark Moss

                                              *Attorney for Defendants*

43

# Exhibit A

Exhibit C
Page 115

# Lucas R. Disability Settlement - YOUR RIGHTS

## What does it mean to have a disability?

- In the United States, a disability is a physical or mental condition that substantially limits one or more of your major life activities. For example, if you have a condition that makes it harder for you to learn in school or harder for you to sleep at night, you might have a disability. The definition of disability in the United States might be different from the definition of disability in your home country.

- If you have a disability, you have protections under the law. The government and this program cannot discriminate against you because of your disability.

## How will I know if I have a disability?

- A doctor or other medical professional might decide you have a disability.

- You will be evaluated for a disability if: (1) you go to a hospital because of your mental health; (2) you are considered for placement in a more secure facility because you are a danger to yourself or others; or (3) you ask for an evaluation.

- An evaluation will help: (1) find out if you have a disability and (2) decide if you need a Section 504 Service Plan (explained in the next box).

- If you have already had an evaluation, you won't have another evaluation for the same symptoms (unless a medical or mental health professional recommends it).

- Usually, evaluations must happen as soon as possible and within 60 days.

- Evaluations are private and will not be used against you in your immigration case.

## Service Plans



### What is a service plan?

If you need a service plan, it will include services and supports to help you. The plan should make it so you can fully participate in the program with other youth and help make sure that your disability does not create any unnecessary delay in release to your sponsor.



### Your right to be consulted

You and your child advocate (if you have one) must be asked about what you want and need in your plan. If you wish, your parent(s) or legal guardian(s) and your attorney (if you have one) should be consulted as well.



### Timelines

- If you need a service plan, you must receive one as soon as possible - at the latest, 60 days after your disability is identified.

- Every six months, staff must review your plan with you, your advocate (if you have one), and, if you wish, with your attorney and with your parent(s) or legal guardian(s).

- Your plan must also be reviewed within 30 days if you are: (1) placed in a more secure facility, (2) hospitalized for your mental health, or (3) if a medical or mental health provider recommends it.



**Your placement cannot be more restrictive or more separated from other youth than necessary for your needs.**

Exhibit C
Page 116

# Lucas R. Disability Settlement - YOUR RIGHTS

## Placement Transfers

- If you are stepped up to a restrictive facility, the government must explain why you couldn't be in a less restrictive setting with additional supports and services. This explanation must be included in the Notice of Placement that you receive when you arrive at the facility.

- If you are in a restrictive setting, your placement must be reviewed at least <u>every 30 days.</u> If you have an identified disability, this review must consider your disability, the services and supports you need, and whether you could receive those services in a less restrictive setting.



**30-day Review**

| | |
|---|---|
| If the review recommends a less restrictive setting, you must be transferred as soon as possible. | If the review recommends that you stay in your current placement, you must receive an explanation of why. |

## Release to sponsor

- A home study must happen as soon as possible. Usually, it can happen at the same time as a background check.

- If you have a disability, the government must help your sponsor find services if you need them after release.



## Access to information

You, your child advocate, and your attorney (with your permission) can see:

- Copies of any disability evaluation.

- Your Section 504 Service Plan and information about how it is being followed.

- If you are in a restrictive facility, information about why you couldn't be in a less restrictive place with more services instead.

- Information about the government's decision-making about releasing you to your sponsor and how the government is helping your sponsor find any services you'll need.

## Questions?

**If you have any questions or concerns about these rights, you can contact an attorney at (510) 920-3531.**



Exhibit C
Page 117