# Lucas R. Settlement

FIRST ANNUAL MONITORING REPORT
LUCAS R. v. KENNEDY
PSYCHOTROPIC MEDICATIONS AND DISABILITY
SETTLEMENT AGREEMENTS

Kathleen Noonan, J.D., Monitor
TEAM: Gail B. Nayowith, Sarah Zlotnik, Aaron Truchil, Melea Weber, Lourdes Caban

SEPTEMBER 3, 2025

## Table of Contents


**A. INTRODUCTION** ........ 3

**B. METHODOLOGY AND DOCUMENTATION** ........ 7

**C. OVERVIEW OF SETTLEMENT AGREEMENTS, AND THE OFFICE OF REFUGEE RESETTLEMENT ("ORR") FOUNDATIONAL RULE** ........ 8

I. Psychotropic Settlement ........ 8

II. Disability Settlement ........ 12

III. ORR Foundational Rule: What it is and how it applies to Lucas R. ........ 15

**D. ORR SYSTEM OF CARE** ........ 17

I. ORR Care Arrangements ........ 17

II. Child Discharge to Sponsors and Length of Stay ........ 19

**E. PSYCHOTROPIC SETTLEMENT:** ORR Progress Toward Commitments ........ 21

**I. Did ORR put in place the requisite policies and procedures?** ........ 22

a. Policy Guide and Manual of Procedures ........ 22

b. Consent and Assent Forms and Policies ........ 23

c. ORR Status Reports and Data ........ 25

d. ORR Implementation and Transition Plans ........ 27

e. ORR Reporting and Data Systems Challenges ........ 28

f. Monitor's Recommended Modifications ........ 30

g. Conclusion ........ 31

**II. Did ORR make the requisite organizational changes?** ........ 31

a. UAC Policy Division ........ 31

b. Division of Health for Unaccompanied Children ........ 32

c. The Centralized Concurrence Unit ........ 33

d. Point Comfort United ........ 34

e. Conclusion ........ 35

**III. Did the field make progress implementing the new policies and procedures?** ........ 36

a. ORR Onboarding and Training for the Field ........ 36

b. Monitor's Site Visits ........ 38

c. Monitor's Case Reviews ........ 40

d. Conclusion ........ 48

**F. DISABILITY SETTLEMENT:** ORR Progress Toward Commitments ........ 48

**G. CLOSING** ........ 52

**APPENDIX** ........ 53

**Appendix A:** ORR Consent Form ........ 53

**Appendix B:** ORR Assent Form ........ 58

**Appendix C:** PCU Psychotropic Treatment Authorization Request Form ....................60
**Appendix D:** Draft Case Review Tool....................61
**Appendix E:** Section 504 Service Plan Form....................63

## A. INTRODUCTION

In June 2018, the United States ("US") Department of Health and Human Services ("HHS") Administration for Children and Families' ("ACF") Office of Refugee Resettlement ("ORR") was sued on behalf of unaccompanied immigrant and asylum-seeking children under 18 years of age who were, had been or would be in the custody of ORR based on a number of alleged constitutional and statutory violations ("Lucas R.").[1] This first Annual Monitor's Report ("Report") concerns two Settlement Agreements reached by the Parties in connection with the Lucas R. litigation — the Psychotropic Medications Settlement Agreement (the "Psychotropic Settlement") and the Disability Settlement Agreement (the "Disability Settlement," and collectively with the Psychotropic Settlement Agreement, the "Settlement Agreements"). At the center of the Settlement Agreements are the children and youth in ORR custody who: (1) are or will be prescribed or administered one or more psychotropic medications; and (2) have or will have a behavioral, mental health, intellectual, and/or developmental disability and who are or will be placed in a secure facility, medium-secure facility, or residential treatment center ("RTC") solely by reason of such disabilities.

Both Settlement Agreements were approved by the US District Court for the Central District of California Western Division ("the Court") and became effective on May 3, 2024 ("Effective Date"). The Mediator who was involved in the settlement discussions agreed to assume the role of Monitor of both Settlement Agreements; this decision was informed by the Settlement Agreements' overlapping and mutually reinforcing goals related to children and youth with individualized needs and the Parties' commitments to approach implementation with the same problem-solving framework used in mediation.

The Settlement Agreements articulate ORR's commitment to key procedural improvements regarding the prescribing and administering of psychotropic medications to children in their care as well as ORR's commitment to assess for and provide reasonable accommodations, supports, and services to children with disabilities in its care. Both Settlement Agreements are time-limited for approximately six years, with the possibility of early exit for the Government if it can demonstrate "substantial compliance" per the requirements of the Agreements.[2]

---

[1] Lucas R. v. Azar, 2:18-cv-05741-DMG-PLA (C.D. Cal.) First Amended Complaint accessed via the website of the National Youth Law Center on June 15, 2025. FAC FINAL TO FILE.

[2] See Psychotropic Medications Settlement Agreement, Section XII.D.: "Notwithstanding any other provision of the Agreement, this Agreement shall terminate on the earliest of the following dates (the "Termination Date"): (1) Beginning three years after the Effective Date, Defendants may move for a Court Order permitting early termination if they can demonstrate Substantial Compliance for continuous period of six months following implementation of this Agreement nationwide, supported by certification from the Monitor; or (2) Six years from the Effective Date."; and the Disability Settlement Agreement, Section I.T.: "Termination Date is

### Children and Youth Affected by the Settlement Agreements

As of April 2025, ORR's Unaccompanied Alien Children Bureau ("UACB") provided care for 2,281 unaccompanied children ("UC")[3] — this represents a significant decrease from one year prior, in March 2024, when ORR reported 6,090 children in care.[4] The majority (63%) of children served by ORR are between the ages of 15- and 17-years old, with more teenaged males in care than teenaged females. Young children, 12 years of age and under, represent 24% of the ORR population. According to ORR's data, children in its care are predominantly Spanish speaking (89%) with smaller numbers of children speaking Haitian Creole, the Mayan languages of Q'eqchi and Mam, and French.[5]

In May 2024, ORR's data showed that 3% of children in ORR custody were prescribed one or more psychotropic medications.[6] One year later, in April 2025, this percentage rose to 5%.[7] While children's use of psychotropic medications is infrequent, the Monitor has observed the potential of the new Lucas R. commitments to strengthen ORR's processes and policies, and, thereby, provide critical safeguards for children and youth in ORR care with respect to the use of psychotropic medications.

ORR UACB has not historically maintained data on the number of children in its care with disabilities; so, this single figure is presently unknown. While ORR has several mechanisms in place to identify when a child has a disability and needs disability supports, pursuant to the Disability Settlement Agreement, ORR will begin maintaining and reporting on this important figure. The Monitor will track these critical data improvements in the coming year.

### Report Overview

In preparation for this Report, the Monitor spent the last 12 months engaged with the Parties around the planning, implementation, and oversight of both Settlement

---

five years after the Implementation Date or an earlier date if the Court approves early termination based on Defendants demonstrating Substantial Compliance with the Agreement. The Termination Date is the date on which all terms of the Agreement and ongoing Court jurisdiction terminate."

[3] ORR uses "Unaccompanied Alien Children" or "UAC" to refer to this population of children. For the purpose of this and future reports, the Monitor uses "Unaccompanied Children" or "UC" to be consistent with the language used in the Settlement Agreements.

[4] HHS ACF ORR (2025, June). Data.

[5] HHS ACF ORR (2025, June). Data.

[6] HHS ACF ORR (2024, November). Public Report on the Administration of Psychotropic Medication to Children in ORR Custody from May to September 2024.

[7] HHS ACF ORR (2025, May). Public Report on the Administration of Psychotropic Medication to Children in ORR Custody from November 2024 to April 2025.

Agreements. Through this work, the Monitor and her team visited programs in Texas, Florida, New York, and California; reviewed child records; assisted in and reviewed ORR's development of plans, forms, and guidance; and met with numerous stakeholders. During this year, the Monitor found that the goals of the Parties, as well as the care providers visited in the field, reflect a shared commitment to the well-being of the children and youth in ORR care.

Through their monitoring activities, the Monitor also observed the complexity and breadth of ORR's portfolio across departments, regions, and personnel, and its large network of private (non-profit and for-profit) care providers across the country. For example, the Monitor found that seemingly straightforward tasks, such as ORR's efforts to disseminate guidance and secure broad use of a new informed consent form, proved challenging for both ORR and care provider personnel. In addition, federal contracting processes resulted in a significant delay for ORR's new disability consultant to start their work. Such communication, uptake, and structural barriers are especially concerning to the Monitor in the context of time-limited settlement agreements. Over the next year, the Monitor will closely observe ORR's efforts to effectively work across its vast system to implement the Settlement Agreements as it is vitally important that the children and youth affected by the Agreements receive the full benefit of the system reforms required in each reporting period.

The Monitor appreciates that ORR communicated regularly about implementation plans and delays, which the Monitor then shared promptly with Plaintiffs. That said, the Monitor expects that ORR will continue to work diligently to improve its communications and other processes, given the importance of these issues for both children and care providers. Positively, through discussions in the field, the Monitor learned that ORR has worked over the past few years to bring more cohesion to its expansive array of programs, including through ORR leadership visiting states for listening and feedback sessions, which providers reported they appreciated. The Monitor urges ORR to continue this work, as it will invariably improve implementation of the Settlement Agreements and result in better outcomes for children in ORR care.

During the review period, the Monitor also observed that ORR encountered rapid change in its leadership and management as one team of leaders departed and a new team entered. The Monitor found that, for the most part, these leadership transitions occurred smoothly. The ORR team handling the day-to-day management of Settlement implementation moved quickly into their new roles, and Plaintiffs were accommodating about delays caused by some of this transition. That said, the Monitor is carefully tracking the extent to which these transitions in management could directly or inadvertently affect the children in ORR custody, as well as their provider caretakers (both the federal employees and private providers who work every day to care for these children).

This Annual Report is the Monitor's first evaluation of ORR's implementation of the Settlement Agreements, reflecting the review period of May 2024 to May 2025. The terms of the Settlement Agreements established a phased implementation schedule. This Report focuses principally on the Psychotropic Settlement, where implementation began in May 2024, shortly after the Settlements were signed. Because the Disability Settlement anticipated a longer planning and implementation runway and ORR also received two approved implementation extensions from the Monitor,[8] this Report includes only early observations of ORR's work around the Disability Settlement. The Monitor's next report will discuss both Settlement Agreements comprehensively, including ORR's completion of its disability implementation documents and data reports.

This Report is organized into six sections following the Introduction. Section B describes the methodology used by the Monitor to assess ORR's implementation and compliance. Section C provides an overview of the Settlement Agreements. Section D describes the ORR system of care for children in the psychotropic and disability classes.

Section E focuses on the Psychotropic Settlement's implementation progress and compliance; it is organized to answer three questions:

1) Did ORR put in place the requisite policies and procedures related to consent, assent, and prescribing, as well as deliver the necessary data reporting and Implementation Plan to demonstrate progress in implementing the Lucas R. Psychotropic Settlement?

2) Did ORR make the requisite organizational changes and build capacity to support its new psychotropic medication requirements and practices?

3) Did ORR enable and support the field — in and out-of-network care providers and ORR field personnel — in making significant progress implementing the new Lucas R. related policies and procedures?

The first two questions represent important policy and organizational milestones that ORR must attain in order to influence the last and most important question, the answer to which will demonstrate ORR's implementation progress, in concrete terms, for the children and youth in its care. When addressing this third question in the Report, the Monitor was

[8] The Monitor initially approved a five-month extension of the Disability Settlement Needs Assessment extending this deliverable to October 2025. In addition, in April 2025, the Monitor approved an extension through November 2025 for ORR's completion of the majority of commitments in the Disability Settlement (including the disability plan, the disability assessment in the initial medical exam, trauma-informed mental health screening process, 504 Service Plans, updates to the ORR Portal, range of placements, placement denials, and release to Sponsors).

informed by the reality that ORR is still in the early stages of implementation. While the Monitor concludes that, during this reporting period, ORR has done what was required under the Psychotropic Settlement related to the first two questions, the Monitor reserves judgment as to whether the third question — the degree to which sufficient implementation progress has been made in field operations — has yet been answered. This remains a work in progress.

Section F discusses ORR's early work on the Disability Settlement. Here again, given the approved extension through Fall 2025 of key deliverables required by the Disability Settlement, the Monitor reserves judgment in this reporting period. Section G closes the Report.

## B. METHODOLOGY AND DOCUMENTATION

The Monitor has been involved in the case since 2021 when she served as Mediator for both Settlements. The Settlement Agreements grant the Monitor the authority to evaluate ORR's progress toward compliance with the Lucas R. Psychotropic and Disability Settlement Agreements. This authority extends to hiring monitoring staff. The Monitor and her team are referred to collectively in this report as "the Monitor."

The Monitor established the following three-part approach to monitor implementation of the Lucas R. Settlement Agreements.

First, the Monitor created processes and an accountability structure to monitor fidelity and progress made toward meeting the requirements and timeframes outlined in the Agreements. This included regular bi-weekly meetings between the Monitor and the ORR implementation team: ORR Division of UAC Policy ("UAC Policy") and Division of Health for Unaccompanied Alien Children ("DHUC"), as well as HHS's Office of the General Counsel ("OGC") Children, Families and Aging Division. The Monitor also held topical meetings with Point Comfort United ("PCU," formerly Point Comfort Underwriters), the health care management and third-party administrator that manages claims and health care benefits for all children in ORR custody; and KVC Health Systems, ORR's disability consultant.[9]

Second, the Monitor established regular avenues for communication and consultation with Plaintiffs' Counsel. During both required and ad hoc meetings, the Monitor and the Parties

[9] The Monitor held 17 Lucas R. bi-weekly meetings in 2024 and nine as of May 2025. Meeting agendas reflected a list of required updates, status reports, and discussion items covering policies, data and reporting, planning, case review findings, and any challenges related to Lucas R. implementation.

met to discuss ORR's implementation of the requirements included in the Settlement Agreements, any challenges or barriers encountered by ORR, and remedial efforts to address those challenges. The Monitor also engaged with the Parties around ORR's development of policies, procedures, and implementation plans.[10]

Finally, the Monitor conducted hands-on monitoring activities, including site visits and interviews at ORR facilities, reviews and analyses of relevant data reports, meetings with stakeholders, and case record reviews, to closely observe and assess ORR's progress implementing the terms of the Psychotropic Settlement. The Monitor's approach was designed to promote candor and constructive problem solving in the service of both compliance and improved practice for the children in ORR custody.

This Monitor's Report is a public document, filed with the Court and posted on the websites of both ORR and Plaintiffs' Counsel.[11]

## C. OVERVIEW OF SETTLEMENT AGREEMENTS, AND THE OFFICE OF REFUGEE RESETTLEMENT ("ORR") FOUNDATIONAL RULE

### I. Psychotropic Settlement

ORR entered into the Psychotropic Settlement regarding its "policies and practices with respect to the administration of psychotropic drugs to minors in ORR's care and custody on behalf of all minors on ORR custody pursuant to 6 U.S.C. § 279 and/or 8 U.S.C.§ 1232 who are or will be prescribed or administered one or more psychotropic medications without

---

[10] The Parties met for an annual meeting and for as-needed meet and confer meetings and communicated regularly in writing on emerging issues. The Monitor values and encourages consistent and transparent communication, preferring that Parties share information and discuss concerns timely and directly. The Monitor also met with Plaintiffs' Counsel at scheduled intervals and ad hoc as needed, to review updates to the ORR UACB Policy Guide and Manual of Procedures, consent/assent forms, the Section 504 Service Plan Form, the ORR UACB request for an extension to complete work on its Lucas R. Disability Needs Assessment, trauma-focused mental health screening, and Lucas R. Disability Settlement Agreement Implementation Plan. ORR hosted a listening session on May 28, 2025, bringing together KVC and Plaintiffs' Counsel to discuss the attorneys' perspectives on the experience of children with disabilities in ORR UACB care provider programs and the challenge of securing the services and accommodations that they need.

[11] In undertaking the work related to the Settlement Agreements, ORR UACB developed documents and implementation tools. To the extent possible, this Report cites these resources as hyperlinks for easy reference. Where hyperlinks are not possible, the Report cites sources in traditional footnotes or includes them as attachments in the Appendix.

procedural safeguards" (i.e., the psychotropic medication class) that was approved by the Court on May 3, 2024.[12]

The Psychotropic Settlement set forth standards around the use of psychotropic medications for children in ORR custody; specifically, that:

a) "Psychotropic medications should be used to treat psychiatric conditions only following a diagnostic assessment by a licensed healthcare provider and considering other situational factors that may be contributing to the condition (i.e., trauma);
b) Psychotropic medications should be used aligned with the child's diagnosis (i.e., the medication is appropriately used on- or off-label to treat the child's specific diagnosis and not used due to other therapies being inconvenient or more expensive, recognizing that payment systems may utilize formularies);
c) Psychotropic medications should be administered only in accordance with a licensed prescriber's recommendation based upon the minor's symptoms and periodically reassessed by a licensed prescriber for side-effects and benefits;
d) Recognizing that psychotropic medications may be prescribed off-label, psychotropic medications should be administered at dosages that do not exceed dosing guidelines that recommend a specific dose based upon age and weight where dosing guidelines are available; and
e) Psychotropic medications shall never be used as punishment for disruptive or inappropriate behavior, for the convenience of staff members or caregivers, or as a substitute for adequate staffing and/or adequate ongoing programming for a child's needs."[13]

To support this framework, the Psychotropic Settlement requires ORR to amend its policies and develop new processes, including:

- **Establish a Centralized Concurrence Unit** ("CCU") overseen by "at least one licensed psychiatrist" to "(1) Provide or withhold concurrence to Psychotropic Medication prescriptions as provided herein where informed consent cannot be otherwise obtained, as specified in this Agreement; (2) Override denial of consent,

---

[12] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Third Claim for Relief [Psychotropic Medications]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23.

[13] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Third Claim for Relief [Psychotropic Medications]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Preamble, page 5, lines 22-28; page 6, lines 1-10)

as specified in Section IV of this Agreement; and (3) Document and track its work…and provide such information to the Monitor for inclusion in her reports."[14]

- **Design a process and prioritization for authorized consent and concurrence:**
  - "For all UCs ("unaccompanied children") prescribed one or more Psychotropic Medication(s), informed consent shall be sought from the child's parent or legal guardian, referred to as the Primary Consenter," who serves as the Authorized Consenter for the child unless there is no Primary Consenter…If there is no Primary Consenter, then the Sponsor Consenter, if one exists for the UC, may be the Authorized Consenter."
  - "If there is no Primary Consenter and no Sponsor Consenter, then a UC Consenter, if applicable, may be the Authorized Consenter."
  - The Settlement Agreement also lays out an "alternative process when Authorized Consent cannot be obtained…The Care Provider may seek concurrence from the CCU…If CCU concurrence with a Psychotropic Medication prescription is sought and obtained, it shall be in writing and signed by a licensed psychiatrist or psychiatric nurse under the supervision of a psychiatrist."[15]

- **Ensure the provision of verbal and written consent procedures for authorized consenters within delineated timelines**:
  - "The Care Provider shall seek the verbal informed consent of the Authorized Consenter prior to beginning the course of medication" except in cases of emergency."
  - "Verbal informed consent must also be obtained prior to increases in dosage of Psychotropic Medication."
  - "Verbal consent must be documented."
  - "The Care Provider shall ensure that prior to administering the Psychotropic Medication, the case manager or clinical staff (such as a nurse, psychologist, physician assistant, or physician) who is familiar with the minor's history verbally provides the Authorized Consenter with information necessary to make an informed decision about whether the UC should be administered the Psychotropic Medication."

---

[14] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Third Claim for Relief [Psychotropic Medications]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section VIII.)

[15] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Third Claim for Relief [Psychotropic Medications]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section II.)

- "Verbal consent…shall be followed up by written consent. Such verbal consent shall remain valid until rescinded, either orally or in writing, and shall remain valid for no more than 45 days."
- "If written consent is not received within two weeks following verbal consent, as set forth in II.C.1.b, the Care Provider shall initiate efforts to obtain concurrence from the CCU."[16]

- **Create a clinical process when there is a denial of consent**: "In cases where a Primary Consenter or Sponsor Consenter denies consent, the prescribing clinician and/or Care Provider may seek consent from the UC Consenter; or (including in cases where there is no UC Consenter) seek concurrence from the CCU to override the Primary Consenter or Sponsor Consenter's denial…The CCU may concur to override denial of consent only as follows: (1) After consultation with the prescribing clinician, the Care Provider, and the Primary Consenter or Sponsor Consenter), the CCU finds based on its professional judgement that administering the prescribed medication is in the best interest of the child and the failure to administer the medication is likely to result in…impairment…or harm."[17]

- **Establish unaccompanied minor assent**: "For any UC aged 14 or older, prior to administering Psychotropic Medication(s), the Care Provider must attempt to seek informed assent or agreement from the UC, consistent with the following, but with the understanding that a Primary Consenter or Sponsor Consenter's consent will control even in the absence of UC assent."[18]

- **In emergencies, ensure a process for notification about the use of psychotropic medication(s) and ensure ORR policies are followed regarding the use of chemical restraints.** "The Primary Consenter or Sponsor Consenter and DHUC shall be notified of each emergency administration of the medication and the reasons therefor as soon as practicable and in all cases within one week of its

---

[16] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Third Claim for Relief [Psychotropic Medications]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section III.)

[17] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Third Claim for Relief [Psychotropic Medications]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section IV.)

[18] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Third Claim for Relief [Psychotropic Medications]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section VI.)

initial administration. The UC's case file must include an explanation of the nature and circumstances of each administration of an emergency medication."[19]

- **Provide ongoing oversight by DHUC of psychotropic medication use for children in ORR custody.** DHUC's work should be overseen by a "licensed child and adolescent psychiatrist." DHUC's responsibilities include (1) "Review cases that have been flagged by a Care Provider where a UC Consenter consents to the administration of antipsychotics or to the administration of three or more Psychotropic Medications or cases where the Care Provider flags other concerns regarding Psychotropic Medications; (2) Develop a system for conducting retrospective, secondary reviews of prescriptions of Psychotropic Medications prescribed to UCs in ORR custody and conduct such reviews; and (3) Conduct an annual case review of 30 files of UCs administered Psychotropic Medications."[20]

Finally, the Psychotropic Settlement notes that "the medications listed in the Texas Department of Health and Human Services document," known as the 'Texas Formulary' shall be considered the "universe of Psychotropic Medications to which the terms of this Agreement apply.[21] It also links appropriate dosage to the Texas standards.[22]

To achieve the goals and fulfill the requirements of the Psychotropic Settlement, ORR committed to build out an operations architecture to manage implementation activities and undertake a series of system and process improvements.[23]

## II. Disability Settlement

The Disability Settlement was also approved by the Court on May 3, 2024. ORR entered into this Settlement Agreement regarding its "policies and practices with respect to the rights of

---

[19] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Third Claim for Relief [Psychotropic Medications]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section V.)

[20] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Third Claim for Relief [Psychotropic Medications]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section IX.)

[21] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Third Claim for Relief [Psychotropic Medications]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section I.O.) See Psychiatric Drug Formulary | Texas Health and Human Services.

[22] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Third Claim for Relief [Psychotropic Medications]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section III. A.2.)

[23] HHS ACF ORR Bureau of Unaccompanied Children (2025, February). Implementation Plan for the Lucas R. Psychotropic Medication Settlement Agreement.

children in ORR custody who have or are perceived to have a behavioral, mental health, intellectual, and/or developmental disability...on behalf of all minors in ORR custody pursuant to 6 U.S.C. § 279 and/or 8 U.S.C.§ 1232...who have or will have a behavioral, mental health, intellectual, and/or developmental disability as defined in 29 U.S.C. section 705, and who are or will be placed in a secure facility, medium-secure facility,[24] or RTC solely by reason of such disabilities (i.e., the disabilities class)."[25] The implementation date for the Disability Settlement is one year from the Effective Date or May 3, 2025.

The Disability Settlement sets forth processes to ensure "children with disabilities in ORR must receive services in the least restrictive setting that is in the best interest of the child and also the most integrated setting appropriate to their needs unless ORR can demonstrate that this would fundamentally alter the nature of its Unaccompanied Children Program, and shall be released from ORR custody without unnecessary delay due to their disability."[26]

Specifically, the Disability Settlement requires ORR to:

- **Conduct a comprehensive disability needs assessment and develop a disability plan.** "The needs assessment will evaluate the adequacy of services, supports, and resources currently in place for children in ORR's custody across its network, including ORR's capacity to serve children with disabilities in the most integrated setting appropriate for their needs without fundamentally altering the UACB; and gaps in the current system, including but not limited to, gaps related to identification, services and supports (including both facility-based and community-based services), placement array (including, but not limited to, the availability of therapeutic foster care and shelter placements for children with higher-level needs and children ready to step down), and connections to available post-release services. ORR's disability plan will address any identified gaps and will include a concrete timeline." [27]

---

[24] In its regulations and policies, ORR refers to medium security facilities as "heightened supervision" facilities. See 89 FR 34384, 34424 (explaining that in the Foundational Rule, ORR uses the term "heightened supervision facility" in place of the term "medium secure" facility, provided in the *Flores* Settlement Agreement, and in place of the term "staff secure facility" used by ORR at 45 CFR part 411 and in its sub-regulatory guidance).

[25] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Fifth Claim for Relief [Disability]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23.

[26] HHS ACF ORR Bureau of Unaccompanied Children (2025, February). Implementation Plan for the Lucas R. Psychotropic Medication Settlement Agreement.

[27] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Fifth Claim for Relief [Disability]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section III.)

- **Establish a protocol that enables care providers to identify children with disabilities and processes for evaluating children with disabilities**. "Any one or more of several enumerated events will trigger an evaluation for disability to determine whether a child has a physical or mental impairment that substantially limits one or more of the child's major life activities. These include: (1) if a child is psychiatrically hospitalized or evaluated for hospitalization (if an evaluation has not already been completed); (2) if a child is considered for step-up to a RTC or secure facility based on danger to self or danger to others (unless an evaluation has already been completed); or (3) at the request of the child after being informed of the purpose, scope and nature of the evaluation, including a request made through counsel of record, a child advocate, or a parent/legal guardian."[28]

- **Develop "written guidance** on the selection of qualified evaluators, the inclusion of necessary assessments, the process for advising a child about the purpose and scope of the evaluation, and the sharing of relevant records."[29]

- **Develop timely individualized Section 504 Service Plans for the child**. The plans "will be developed and implemented as soon as possible, and within 60 days of identification of the child as having a disability...ORR will make best efforts to develop and implement a Section 504 Service Plan, if one is needed, before any step-up of a child with an identified disability. In consultation with internal or external subject matter expert(s), ORR will issue written guidance governing the development of Section 504 Service Plans."[30]

- **Ensure placement in the least restrictive setting**: "ORR will make and document best efforts to enter into cooperative agreements or contracts with a range of placements appropriate for children in ORR's legal custody, including those with disabilities. To the extent feasible, ORR will prioritize placements that provide

---

[28] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Fifth Claim for Relief [Disability]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section I-II.A.2.)

[29] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Fifth Claim for Relief [Disability]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section II.A.2.e.)

[30] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Fifth Claim for Relief [Disability]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section II.B.)

access to trauma-informed, therapeutic, and other disability-related services in integrated settings."[31]

- **Timely release and support to sponsors**: "When ORR identifies a viable potential sponsor for a child with an identified disability, ORR will affirmatively support and assist that sponsor in accessing and coordinating post-release community-based services and supports, to the extent they are available (and subject to appropriations), in an effort to work toward release without unnecessary delay... A pending or final Section 504 Service Plan or evaluation for disability will not be justification to delay release to a sponsor, absent a determination that the child is a danger to themselves or others or that the sponsor is not capable of providing for the child's physical and mental well-being."[32]

As with the Psychotropic Settlement, ORR committed to specific goals and the fulfillment of requirements codified in the Disability Settlement. To achieve the goals and fulfill the requirements of the Disability Settlement, ORR committed to establish an operations architecture to manage implementation activities and undertake a series of system and process improvements.[33]

## III. ORR Foundational Rule: What it is and how it applies to Lucas R.

ORR published the Foundational Rule in the Federal Register on April 30, 2024[34] to codify core provisions of the Flores Settlement Agreement,[35] an earlier settlement regarding children in federal immigration custody. The Foundational Rule anticipated key elements of the Lucas R. Settlement Agreements, which were approved three days later, stating "The purpose of this rule is to codify policies, standards, and protections for the UC Program,

[31] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Fifth Claim for Relief [Disability]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section III.C.)

[32] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Fifth Claim for Relief [Disability]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section V.B.)

[33] HHS ACF ORR Bureau of Unaccompanied Children (2025, February). Implementation Plan for the Lucas R. Psychotropic Medication Settlement Agreement.

[34] Published on April 30, 2024, with a correction issued on June 26, 2024, and an effective date of July 1, 2024.

[35] Published as the Unaccompanied Children Program Foundational Rule, 89 FR 34384, codified at 45 CFR part 410 ("Foundational Rule").

consistent with the HSA and TVPRA,[36] and to implement the substantive requirements of the FSA as they pertain to ORR."[37]

The Foundational Rule establishes minimum standards for the detention, release, and treatment of unaccompanied children in ORR custody in programs throughout the country. It requires ORR and its care providers to place children in the least restrictive, non-secure settings, when possible,[38] and also requires placement in state-licensed programs that serve dependent children or equivalent programs in states that do not license ORR facilities.[39] The Foundational Rule directs ORR to conduct regular data collection and produce reports on psychotropic medication and disability practices.[40]

For the Lucas R. Psychotropic Settlement, the Foundational Rule addresses voluntary informed consent and defines authorized consenters, considers the use of emergency psychotropic medication, and requires ORR to conduct meaningful oversight of the prescription and use of psychotropic medication.[41]

For children with or suspected of having disabilities covered by the Lucas R. Disability Settlement, the Foundational Rule calls for placement of these children in integrated settings, with reasonable modifications that insure accessible services, equipment, and treatment.[42]

---

[36] "HSA" is the Homeland Security Act of 2002 and "TVPRA" is the Trafficking Victims Protection Reauthorization Act of 2008.

[37] Unaccompanied Children Program Foundational Rule. Federal Register. Vol. 89, No. 84. (April 30, 2024). 45 CFR Part 410, 34384.

[38] According the Foundational Rule, "ORR shall place each unaccompanied child in the least restrictive setting that is in the best interest of the child and appropriate to the unaccompanied child's age and individualized needs, provided that such setting is consistent with the interest in ensuring the unaccompanied child's timely appearance before DHS and the immigration courts and in protecting the unaccompanied child's well-being and that of others." Unaccompanied Children Program Foundational Rule. Federal Register. Vol. 89, No. 84. (April 30, 2024). 45 CFR Part 410. 1103.a.

[39] The Unaccompanied Children Program Foundational Rule's definition of "standard program" includes a program, agency, or entity that is state-licensed; or that "meets the requirements of State licensing that would otherwise be applicable if it is in a State that does not allow state licensing of programs providing care and services to unaccompanied children." Unaccompanied Children Program Foundational Rule. Federal Register. Vol. 89, No. 84. (April 30, 2024). 45 CFR Part 410, 1001.

[40] Unaccompanied Children Program Foundational Rule. Federal Register. Vol. 89, No. 84. (April 30, 2024). 45 CFR Part 410, 1501.

[41] Unaccompanied Children Program Foundational Rule. Federal Register. Vol. 89, No. 84. (April 30, 2024). 45 CFR Part 410, 1310.

[42] Unaccompanied Children Program Foundational Rule. Federal Register. Vol. 89, No. 84. (April 30, 2024). 45 CFR Part 410, 1311.

## D. ORR SYSTEM OF CARE

The Monitor discussed earlier in the Report the scale and complexity of ORR's system of care for unaccompanied minor children. This section provides background on key structures of the ORR system of care upon which Lucas R. implementation activities and reforms are being built. As discussed below, there are two features of the ORR system that have special bearing on the Lucas R. Settlement Agreements — least restrictive residential placements for children and timely release of children to Sponsors with supports as necessary. Going forward, the Monitor will seek to understand the ways in which ORR's system of care accommodates children prescribed psychotropic medication(s) and those identified as having a disability or suspected of having a disability in terms of placing them in the least restrictive settings and ensuring their release to Sponsors with supports and 504 Service Plans, and other Settlement related requirements.

### I. ORR Care Arrangements

At the time of this writing, ORR provides residential care to children through a network of 209 care provider facilities. These facilities must comply with ORR policies and procedures and offer all required services.[43] As Chart 1 below details, ORR's care provider network offers a continuum of residential placement types for children in custody. ORR may place a child in a shelter facility, foster home or group home (which may be therapeutic), heightened supervision facility or secure facility (including residential treatment centers), or other care facility that can provide for their specific individualized needs.[44] These settings can be restrictive or non-restrictive and children may move between different levels of care — stepping up or stepping down or moving laterally between placements — depending on their health and behavioral health needs.

ORR data shows that the majority of children 12 years of age and younger are placed in transitional foster care, which serves children in family-like settings until they are unified with their Sponsor. Most older children, between the ages of 13 and 17, are placed in shelter care.[45]

---

[43] HHS ACF ORR Bureau of Unaccompanied Children (2025, February). Implementation Plan for the Lucas R. Psychotropic Medication Settlement Agreement.

[44] HHS ACF ORR (2025, June). Data.

[45] HHS ACF ORR (2025, May 19). 2.9 Risk Determination Hearings for Unaccompanied Alien Children. ORR UACB Policy Guide.

**CHART 1: Types of ORR Residential Care Programs**

**Shelter Care**

- Standard care facilities offering basic needs such as housing, food, education, and medical services.
- Designed for the majority of unaccompanied children without significant behavioral or security concerns.

**Staff-Secure Facilities**

- Provide a higher level of supervision and security than standard shelters.
- Intended for children who may have behavioral issues or a history of running away, requiring closer monitoring.

**Secure Care Facilities**

- Restrictive environments with locked settings.
- Used for unaccompanied children who pose a danger to themselves or others or have serious behavioral or criminal issues.

**Group Homes**

- Group homes typically serve four to 12 children and are run by 24-hour staff or house parents.
- They specialize in caring for specific populations (e.g., teen mothers).

**Transitional Foster Care**

- Short-term placement in a family or group home for children under 13 years of age, sibling groups with one sibling under 13 years of age, children who are pregnant or parenting, or with specific individualized needs. Typically, children in this placement type attend school and receive most service components at the care provider site.

**Long-Term Foster Care**

- Family or group home placement in a community-based setting, where children typically attend public school and receive community-based services.
- This placement is used for children whom ORR determines will be in their custody for an extended period of time.

**Residential Treatment Centers**

- Specialized facilities for unaccompanied children with significant mental health needs.
- Provide therapeutic services and structured programs to address psychological issues.

**Influx Care Facilities**

- Temporary shelters activated during periods of high arrival rates of unaccompanied children. Designed to expand capacity quickly and provide basic care until children can be placed in standard settings.

Source: ORR UACB Policy Guide Section 1: Placement in ORR Care Provider Facilities and Guide to Terms.

ORR's data also shows that most youth are placed in "in-network" programs, which have been developed and/or contracted to be an ORR facility. The in-network care provider programs are typically state-licensed facilities and most have cooperative agreements, except for programs in Florida, South Carolina and Texas, which no longer license ORR facilities. Per the Foundational Rule, such facilities must still follow state licensing requirements, even though those states do not license facilities that care for unaccompanied children.[46]

If ORR does not have an appropriate in-network care provider for a child, they are placed in an "out-of-network" program. In these instances, ORR develops a child-specific contract with an out-of-network provider (which may be in a restrictive or non-restrictive setting); these providers are licensed by an appropriate state agency and provide care for children in ORR care on a case-by-case basis.

While ORR policy expresses a preference for placing children in-network, there are instances when ORR determines that an out-of-network provider or a restrictive placement is better able to provide a child with specialized services that meet his or her individual needs.[47, 48, 49]

## II. Child Discharge to Sponsors and Length of Stay

An element of the Psychotropic Settlement is children's length of stay in ORR care. For example, children who remain in ORR care for 60 days and in care for greater than 90 days, require specific oversight, according to the Settlement Agreement. The Disability Settlement also asks ORR to track length of stay related to children with disabilities in conjunction with tracking "placements, step-ups, [and] step downs."[50] Further, length of

---

[46] Unaccompanied Children Program Foundational Rule. Federal Register. Vol. 89, No. 84. (April 30, 2024). 45 CFR Part 410,1302.a.

[47] HHS ACF ORR (2025, May 19). 1.4.6 Residential Treatment Center and Out-of-Network Placements. ORR UACB Policy Guide.

[48] An ORR/Federal Field Specialist and the Federal Field Specialist Supervisor must approve placement of a child in an out-of-network facility, confirming that the placement is the least restrictive placement in the child's best interests.

[49] Unaccompanied Children Program Foundational Rule. Federal Register. Vol. 89, No. 84. (April 30, 2024). 45 CFR Part 410, 1102.

[50] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Fifth Claim for Relief [Disability]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section II.D.1.b.)

stay must be monitored in reference to release without unnecessary delay due to a child's disability.[51]

Based on site visits and interviews completed by the Monitor as well as a review of available data and case records this report period, the Monitor observed that the length of stay of children in ORR custody corresponds to the availability of an approved Sponsor who can accept the child as a condition of release from ORR UACB care.[52,53] (See Chart 2 below for a description of Sponsor Categories). Typically, children in Category 3 and Category 4 remain in care longer than children in the other categories.

**CHART 2: Sponsor Categories**

**Category 1**: Parent or legal guardian. This includes qualifying stepparents that have legal or joint custody of the child or teen.

**Category 2A:** A brother; sister; grandparent or other immediate relatives (e.g., aunt, uncle, first cousin) who previously served as the child's primary caregiver. This includes biological relatives, relatives through legal marriage, and half-siblings.

**Category 2B:** An immediate relative (e.g., aunt, uncle, first cousin) who was not previously the child's primary caregiver. This includes biological relatives, relatives through legal marriage.

**Category 3:** Other Sponsor, such as distant relatives and unrelated adult individuals.

**Category 4:** No Sponsor identified.

Source: ORR UACB Policy Guide Section 2.2.1 Identification of Qualified Sponsors.

According to ORR data, the length of stay for children in ORR custody appears to be on the rise since the beginning of the reporting period. ORR UACB reports the "average length of stay" ("ALOS") of children in ORR custody in two ways — retrospectively, for children who have been discharged, and currently, for children still in care. For children discharged to

---

[51] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Fifth Claim for Relief [Disability]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section V.)

[52] HHS ACF ORR (2025, May 19). 2.2.1 Identification of Qualified Sponsors. ORR UACB Policy Guide.

[53] Unaccompanied Children Program Foundational Rule. Federal Register. Vol. 89, No. 84. (April 30, 2024). 45 CFR Part 410, 1202.

date, ALOS significantly increased from a 35-day average in October 2024 to a 217-day average in April 2025. For children presently in care, ALOS has also increased from 67 days in October 2024 to170 days in April 2025.[54]

The Monitor will continue to track children's length of stay in ORR care as it relates to the Settlement Agreements. In addition, the Monitor includes some additional observations of children's length of stay in its case review findings (see Report Section E.III.).

## **E. PSYCHOTROPIC SETTLEMENT:** ORR Progress Toward Commitments

System change and systemwide improvement activities of the sort contemplated by the Lucas R. Settlement Agreements are a massive undertaking, touching virtually every department at ORR UACB and requiring careful orchestration of functions and operations across ORR's portfolio. It is not surprising then that while ORR made some notable progress during this review period to implement the commitments contained in Psychotropic Settlement, ORR also encountered some challenges, as the Monitor discusses below. As described earlier in the report overview, the Monitor sought to answer the following three questions with regard to ORR's activities related to the Psychotropic Settlement:

1) Did ORR put in place the requisite policies and procedures related to consent, assent, and prescribing, as well as deliver the necessary data reporting and Implementation Plan to demonstrate progress in implementing the Lucas R. Psychotropic Settlement Agreement?

2) Did ORR make the requisite organizational changes and build capacity to support its new psychotropic medication requirements and practices?

3) Did ORR enable and support the field — in and out-of-network care providers and ORR field personnel — in making significant progress implementing the new Lucas R. related policies and procedures?

The Monitor includes an overall conclusion to each of these questions at the end of the corresponding section.

---

[54] HHS ACF ORR (2025, June). Data.

## I. Did ORR put in place the requisite policies and procedures?

**Question 1:** Did ORR put in place the requisite policies and procedures related to consent, assent, and prescribing, as well as deliver the necessary data reporting and Implementation Plan to demonstrate progress in implementing the Lucas R. Psychotropic Medications Settlement Agreement?

In assessing Question 1, this section details the various activities ORR undertook during this first period of review to develop and amend its policies, data reporting, and procedures to meet the requirements of the Psychotropic Settlement. As noted earlier, the Psychotropic Settlement requires several upfront changes to ORR's policies and procedures, followed by a phased implementation schedule for the field.

### *a. Policy Guide and Manual of Procedures*

ORR's UACB Policy Guide and UAC Manual of Procedures ("MAP") summarize the policies and standards that guide care provider programs and practices regarding the placement, care, and services provided to children in ORR custody, including prescribing and use of psychotropic medications. In accordance with the Psychotropic Settlement Agreement, the Monitor found that ORR appropriately updated these two documents to reflect the new requirements contained in the Psychotropic Settlement, as detailed below.

Before the Court approved the Psychotropic Settlement in May 2024, ORR had begun work to align its policies with what would become the Lucas R. required priorities. Specifically, ORR's Division of UAC Policy commenced policy revisions to the UACB Policy Guide by adding Section 3.4.4.1 Informed Consent for Psychotropic Medication. In addition, ORR incorporated the terms of the anticipated Settlement Agreement in the UAC MAP in December 2023. On August 2, 2024 (thereby meeting the Settlement deadline of August 3, 2024), ORR provided drafts of the policies and procedures to Plaintiffs' Counsel and the Monitor for comment and review, which ORR considered. The Parties also met to discuss the draft policies and procedures. Another revised draft was provided to the Monitor on November 25, 2024, and the Monitor provided final feedback on the draft to ORR on December 2, 2024.

The Monitor observed that the multi-level approval processes, internal to and up through the chain of command outside of ORR UACB, while well-orchestrated, added time delays to the release of ORR UACB Policy Guide and MAP updates. That said, the Policy Division has played an important role in coordinating and managing the ORR divisions tasked with Lucas R. implementation, and leadership has supported their work.

In March 2025, ORR published a final version of the UACB Policy Guide Section 3.4.4.1 Informed Consent for Psychotropic Medication in the UACB Policy Guide and the UAC MAP.

With more information and implementation experience, the Monitor expects that ORR will continue to review and update the UACB Policy Guide and UAC MAP; consider improvements to its consent, assent, and other forms; and align the requirements of the Psychotropic and Disability Settlements, as needed.

*b. Consent and Assent Forms and Policies*

The Psychotropic Settlement specifies who can provide consent for the administration of psychotropic medications to children in ORR care and custody, prioritizing parents or legal guardians, certain Sponsors who are close relatives and previously served as the child's primary caregiver, and UC 16 years old or older.[55] The Settlement Agreement also requires that, except in the case of emergencies, children 14 years of age or older must provide their assent before being administered psychotropic medication(s). The goal of these requirements is to ensure that ORR provides each child's "Authorized Consenter" with the information they need to make an informed decision about a child's health and well-being and to ensure that ORR maintains appropriate documentation of consent.

As detailed in Chart 3 below, ORR developed and rolled out the required consent and assent policies and related forms, notices, and guidance in compliance with the Settlement Agreement. For all forms, the Monitor reviewed drafts ahead of publication or commented on postings in the Federal Register during the public comment period, recommended changes, solicited and shared comments from Plaintiffs, and otherwise worked with ORR to finalize these documents.[56] The Monitor finds that the finalized policies and forms adequately reflect the requirements included in the Settlement Agreement and provide care providers with sufficient guidance and instruction to fulfill the Settlement requirements.[57]

---

[55] "'UC Consenter' means a UC, age 16 or 17, from whom a doctor has obtained informed consent." Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Third Claim for Relief [Psychotropic Medications].(Section I.S.)

[56] The Consent and Assent Forms went through the approval process required by the Paperwork Reduction Act (PRA). As part of this process, ORR UACB provided an opportunity for the Monitor and Plaintiffs' Counsel to submit feedback on the forms. The PRA submission was published in the Federal Register (89 FR 59115) on July 22, 2024, received public comments, and received final Office of Management and Budget approval on January 13, 2025. The forms are required for use by ORR UACB care providers in Texas now, and soon, for the next cohort of states to be onboarded pursuant to ORR's onboarding plan, described in greater detail below.

[57] The Monitor's observations and findings on the field's use of these new forms can be found in the Case Review section of this Report, Section E.III.

**CHART 3: Lucas R. Psychotropic Medications Required Policies and Forms with Review/Approval by the Monitor, as Appropriate**[58]

| Settlement Required Policies and Forms | Reviewed/Approved by the Monitor, As Appropriate |
|---|---|
| Lucas R. Settlement notices to be posted at all ORR facilities[59] | Completed June 2024. |
| Foundational Rule with Lucas R. Psychotropic provisions | Final rule published in April 2024; Correction published in June 2024. Effective date July 1, 2024. |
| Consent/Assent forms (See Appendices A and B) | Completed November 2024. |
| Lucas R. Psychotropic Settlement revisions to the ORR UACB Policy Guide and MAP including consent, assent, concurrence and consent overrides, emergency medication | Completed March 2025. |
| Psychotropic Transition Onboarding Plan and Implementation Plan | August 2024 Implementation Plan first submitted, the Monitor requested edits and extended the deadline to February 2025.<br><br>November 2024, the Monitor approved Transition Onboarding Plan.<br><br>February 2025 Final Psychotropic Transition Onboarding Plan and Psychotropic Settlement Agreement Implementation Plan submitted and approved. |

There is an expectation that Lucas R. related policies, documents, and guidance will be updated and amended over time, which the Monitor will track and report on, as appropriate.

[58] Note the Treatment Authorization Request form, which is integral to Settlement implementation, was developed prior to finalization of Settlement Agreement in 2017.

[59] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Third Claim for Relief [Psychotropic Medications]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Exhibit B)

*c. ORR Status Reports and Data*

The Psychotropic Settlement requires that ORR produce three reports on a specific schedule — a Quarterly Report, a Periodic Report, and a Public Report.

**Quarterly Report**

ORR must provide the Quarterly Report to Plaintiffs' Counsel and the Monitor every quarter (or three months) from the Effective Date, May 3, 2024, in accordance with Section VII.C.1. of the Settlement Agreement. ORR met this reporting obligation, submitting the first, second, and third Quarterly Reports to Plaintiffs' Counsel and the Monitor by the deadlines of August 2, 2024, November 4, 2024, and February 3, 2025.

The purpose of the Quarterly Report is to provide a high-level overview of psychotropic medication utilization by children in ORR custody; the report also serves as a baseline tool for monitoring variation in the number of children prescribed medication and the prescribing practice of various care provider programs.

Under the Settlement Agreement, the report is required to include the name of each child who has been prescribed or administered one or more psychotropic medications, their "alien registration number" and their location. The Monitor reviewed ORR's updated report and is working with ORR to ensure it includes the necessary data elements as well as conforms with the psychotropic medication reports. In November 2025, ORR will update the Quarterly Report to include children identified as having a disability.

**Periodic Report**

ORR is also required to provide the Periodic Report to the Monitor semi-annually (or every six months), as calculated from the Effective Date, in accordance with Section VII.C.2. of the Settlement Agreement. ORR submitted the first Periodic Report to the Monitor by the deadline of November 3, 2024. ORR notified the Monitor that it would submit the second Periodic Report a couple of weeks late, which the Monitor accepted.

The purpose of the Periodic Report is to track ORR's implementation and compliance with the terms of the Settlement Agreement.[60] According to Exhibit A of the Settlement Agreement, the Periodic Report must include the following: identifying information for each child prescribed psychotropic medication and their current care provider, information

---

[60] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Third Claim for Relief [Psychotropic Medications]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (page 23)

about the medication prescribed and the prescriber, consenter information, CCU overrides or denial of overrides, and emergency medication and consenter notice.

After the first report was delivered to the Monitor, ORR incorporated additional information into the report, as requested by the Monitor, to improve tracking and assessment of the children covered by the Settlement Agreement.

In the coming year, the Monitor will continue to work with ORR to hone the contents of the Periodic Report to "include the qualitative, quantitative, and other information the Monitor identifies as necessary for the Monitor to evaluate, report on, and certify compliance with the Agreement, that is within ORR's control, reasonably obtainable, and is consistent with any applicable state licensing requirements"[61] in a manner that concurrently satisfies these requirements and supports the continuous quality improvement efforts of ORR. Once finalized, the Periodic Report should function as a robust tool that can be used by both ORR and the Monitor to thoroughly "evaluate, report on and monitor" implementation of the Settlement Agreement and "certify compliance" with the Settlement Agreement.[62]

### Public Report

The third report is called the Public Report, which ORR must publish on its website twice a year, at the same time that it provides its Periodic Reports to the Monitor, in accordance with Section VII.C.3. of the Settlement Agreement (i.e., semi-annually, calculated from the Effective Date). The Public Report is a streamlined document that includes, at a minimum, aggregated information concerning:

- The number of unaccompanied children in ORR custody prescribed psychotropic medications;
- The number of unaccompanied children in ORR custody prescribed certain classes of psychotropic medications;
- The type of placements children reside; and
- The number of times psychotropic medications were prescribed for an emergency to unaccompanied children in ORR custody.

[61] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Third Claim for Relief [Psychotropic Medications]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section VII.C.2.c.)

[62] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Third Claim for Relief [Psychotropic Medications]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section VII.C.2.)

The first Public Report, Public Report on the Administration of Psychotropic Medication to Children in ORR Custody from May to September 2024, was available on ORR's website on November 3, 2024. The second public report, Public Report on the Administration of Psychotropic Medication to Children in ORR Custody from November 2024 to April 2025, was available on ORR's website on May 16, 2025, eight days late. The Public Report is an important tool that ORR can use to inform and educate its care providers and other stakeholders as well as maintain accountability in practice and transparency in reporting regarding children prescribed psychotropic medications in ORR care.

Regarding the three data reports discussed above, the Monitor finds that ORR met its obligations to create and deliver these reports under the terms of the Settlement Agreement. The Monitor expects that ORR will continually evaluate — and the Monitor will track — whether these reports adequately inform its adherence to the Settlement Agreement and, as appropriate, make necessary changes to address any identified limitations of the reports.

*d. ORR Implementation and Transition Plans*

The Psychotropic Settlement requires ORR to develop two planning documents, a Transition Plan and an Implementation Plan. The Division of UAC Policy, with assistance from a colleague detailed from ORR's Division of Unaccompanied Children's Services, led the development of these documents. The purpose of the ORR Psychotropic Implementation Plan is to outline the steps that UACB "has taken, as well as steps it will undertake, with respect to system and process improvements and implementation" from the Psychotropic Settlement Agreement. Prior to its finalization, ORR's Implementation Plan went through several iterations, as described below.

In August 2024, the Monitor did not accept ORR's initial draft of the Psychotropic Implementation Plan and returned it to UACB for additional detail and revision. The UACB incorporated the Monitor's feedback and made substantial improvements to the Implementation Plan for the Lucas R. Psychotropic Settlement, which was approved by the Monitor in February 2025. A draft of the Implementation Plan was shared and discussed with the Plaintiffs, providing useful feedback prior to the Monitor's approval. The final Psychotropic Implementation Plan was made available to care providers and other stakeholders on the ORR website.

As Chart 4 below shows, the Implementation Plan includes a timeline that allows ORR to stagger its rollout of the informed consent process regionally through August 3, 2026. It also includes a schedule of implementation-related benchmarks that ORR must meet in accordance with the Settlement Agreement. The plan specifies that the first programs to

be onboarded are RTC programs and all Texas care providers and, then over the next two years, onboarding will continue in regional cohorts of care providers across the country. The plan also describes the training and technical assistance to be provided to care providers through on-line training and monthly office hours.

**CHART 4: Rollout of Lucas R. Psychotropic Medication Implementation**[63]

| Onboarding Deadline | ORR Region | States in Region | Number of ORR Care Providers | FY 2024 Psychotropic Medications Administered |
|---|---|---|---|---|
| **08/03/2024** | RTC programs[64] | N/A | 3 | 23 |
| **02/03/2025** | 6 (TX Only) | TX | 66 | 752 |
| **08/01/2025** | 4, 5, 6 (LA), 7, 8, and 10 | FL, GA, IL, IN, KS, KY, LA, MI, NC, OH, SC, TN, WA | 74 | 499 |
| **03/01/2026** | 9 and 1 | AZ, CA, CT, MA, NV | 75 | 337 |
| **08/01/2026** | 2 and 3 | DC, MD, NJ, NY, PA, VA, WI, WV | 68 | 441 |

The ORR Transition Plan is a shorter document, which works in tandem with the Implementation Plan. The finalized Transition Plan seeks "to ensure a smooth and orderly shift to the new procedures mandated by the Agreement." The Transition Plan details ORR's learning from a pilot in Texas regarding obtaining informed consent and describes how ORR plans to apply this learning to implementation of informed consent across the country.

The Monitor accepted ORR's Transition Plan and found that ORR crafted a robust Implementation Plan to drive its implementation, oversight and quality assurance activities related to the Settlement Agreements.

### *e. ORR Reporting and Data Systems Challenges*

Finally, the Monitor believes it is important to provide some comments related to the electronic information and data systems that underpin the Settlement Agreements as they are critical to supporting the health of children in ORR's care and meeting some of the

[63] Out-of-network placements will be included in the rollout according to the location of the child's administrative in-network placement.

[64] While there were three RTCs operational at some point during FY2024, as of August 2024, there is only one in-network RTC (Shiloh Treatment Center).

terms of the Agreements. Through their work this year, the Monitor observed repeated challenges with the ORR UAC Case Management Portal ("ORR Portal"), which is the data repository for all child-specific and related care and service information. The ORR Portal is an old operating system that has limited capacity to accommodate the upgrades needed to implement the Settlement Agreements as well as to meet the daily demands of ORR personnel. In April 2025, the ORR Portal came off its year-long code freeze enabling some technical changes to move forward, including the ability to update or add new fields so data could be directly entered into the ORR Portal without needing to upload an external document.

The challenges with the ORR Portal were also evident to the Monitor and ORR in their joint case record reviews (described in detail in Report Section E.III.). Through these reviews, the Monitor and ORR observed that care providers inconsistently uploaded forms into the ORR Portal — with variability in both the tabs chosen and the documents uploaded — making the required Settlement forms difficult to locate. Further, many of the documents required by the Settlement Agreement (e.g., consents/assents, Treatment Authorization Requests ("TARs"), and prescription details) were not consistently found in the ORR Portal. Instead, they were found in ORR's third-party medical management administrator database — the PCU Portal ("PCU Portal").[65,66] Through the PCU Portal, the Monitor was able to verify that ORR followed the consent procedures, since most cases reviewed through the ORR Portal did not contain a reliable level of detail for the Monitor's review.

Because of the limitations of the ORR Portal, the current system requires care providers to upload forms and information twice — once into the PCU Portal to get approval for psychotropic medication use and payment and a second time into the ORR Portal. The Monitor also observed that manually searching in the ORR Portal for data, forms, and notes, including those related to mental and behavioral health, is too time-consuming.

ORR UACB, care providers, and other regular users acknowledge the limitations of the ORR Portal. ORR reports that it plans to migrate to another case management system at a future date but, in the meantime, ORR will need to build workarounds to accommodate the data collection, analysis, and reporting requirements of the Lucas R. implementation.

---

[65] The PCU and its portal are described later in this Annual Report. By way of brief explanation, the PCU Portal is a proprietary and protected data system with a data sharing agreement in place under its vendor contract with ORR, and to which the Monitor has no visibility.

[66] The PCU Portal generates data reports for ORR that, when combined with child-specific case data from the ORR Portal, enables ORR to create the requisite reports called for in the Settlement Agreement. The PCU data repository also provided copies of the TARs and consent and assent forms needed by the Monitor to complete the case review.

Other data management and analysis issues surfaced in November 2024 with ORR's first submission of the Periodic Report to the Monitor. While the report was submitted timely, the data collection to create the report required ORR UACB to pull information from two separate, not interoperable, data systems — the ORR Portal and the PCU Portal — which presented challenges similar to those noted above.

ORR UACB is considering procurement of an Electronic Medical Record ("EMR") system to be used by all ORR UACB programs. By mandating a single EMR for all care provider programs, ORR may be able to improve the accuracy and timeliness of reporting. Recognizing that systemic improvements to data collection will take time to develop, the Division of UAC Policy implemented an interim process for retrieving the information necessary to complete the reports required by the Psychotropic Settlement.

These limitations mean that real-time information about some of the Lucas R. issues is hard to obtain. ORR is not the only big system that experiences these data constraints. Most child welfare systems in the country do not have access to children's real-time medical records except through the type of workarounds pursued by ORR. This is not meant to suggest that this is an acceptable standard; it is not, but it is offered to provide context. The Monitor will continue to work with ORR on data access issues and evaluate how ORR's data and information systems support or hinder ORR's efforts to implement the Settlement Agreements.

#### *f. Monitor's Recommended Modifications*

The Psychotropic Settlement includes a provision that gives the Monitor authority to "evaluate data and information" and "advise the parties" whether she believes "various provisions of this Agreement should be modified to ensure the safety and well-being of Class Members; or because, the cost of implementing the provisions...outweighs the benefits. If this occurs, the Parties are expected to meet and confer to "discuss modification of the consent process, the role of the CCU, data issues, or any other provision of the Agreement."[67] While the Psychotropic Settlement expected this be completed by one year after the Effective Date (May 3, 2025), the Monitor advised the Parties that it is too early in implementation to make any recommendations. The Monitor will continue to assess these issues and apprise the Parties of possible modifications over the coming year.

---

[67] See Psychotropic Medication Settlement Agreement, Section VII.D.3.

### *g. Conclusion*

During this period of review, as this section details, ORR undertook numerous activities to establish the groundwork upon which to implement the Psychotropic Settlement. Namely, ORR updated its UACB Policy Guide and UAC MAP, developed and rolled out informed consent and assent forms and related guidance, produced data reports, and crafted its Transition and Implementation Plans. While ORR encountered some delays and challenges related to these activities, the Monitor finds that ORR is building a solid foundation to support its continued implementation of the Settlement Agreement. Thereby, in relation to this set of activities, the Monitor finds that ORR has met its commitments as articulated by the Settlement Agreement. The Monitor expects ORR to frequently review and, as appropriate, adjust and refine the activities described in this section to ensure they continue to support implementation, in tandem with the safety and well-being of children in ORR care. In addition, the Monitor notes that these commitments, while accomplished for this period, are ongoing and evolving. Accordingly, the Monitor will continue to review in its next report whether ORR has made appropriate adjustments and revisions to these commitments as implementation progresses.

## II. Did ORR make the requisite organizational changes?

**Question 2:** Did ORR make the requisite organizational changes and build capacity to support its new psychotropic medication requirements and practices?

In assessing Question 2, this section details the various activities ORR undertook to restructure its operating divisions, add staff, and embed Lucas R. responsibilities into its operations to fulfill the goals and requirements of the Lucas R. Settlement Agreement.[68]

### *a. UAC Policy Division*

The UAC Policy Division has responsibility for the day-to-day coordination and orchestration of Lucas R. Settlement activities. This Team serves as the ORR UACB liaison and the point of access and accountability for the Monitor. The Team also produces Lucas R. related policies; generates reports; provides bi-weekly updates; tracks deadlines; coordinates internally with ORR departments, HHS OGC, and care provider programs; and reports regularly to ORR leadership, to ensure that ORR is on track to meet the requirements of the Psychotropic and Disability Settlements.

[68] HHS ACF ORR Bureau of Unaccompanied Children (2025, February). Implementation Plan for the Lucas R. Psychotropic Medication Settlement Agreement.

Among early challenges, the Monitor requested access to the ORR UAC Case Management Portal in August 2024, but did not receive access until the beginning of January 2025. Similarly, it took several months to provide the Monitor with a complete list of ORR care providers. Discussion with the US Department of Justice, HHS OGC, and ORR in September 2024 clarified the Monitor's role and scope of work and enabled a significant shift that allowed much of the monitoring work to move ahead. The Monitor and the ORR Policy Division have since built a solid working relationship in order to advance the implementation of the Lucas R. Settlement Agreements.

To monitor implementation progress and compliance, the Policy Division developed an internal tracker to ensure that deadlines are met, and deliverables are produced. This tracker was integrated into the Monitor's own planning documents to align expectations around due dates and deliverables and facilitate planning. In addition, the Policy Division and OGC have provided the Monitor with ample notice of delays through the bi-weekly meetings or email correspondence. For example, a recent delay in producing the second Periodic Report was promptly reported to the Monitor.

The Monitor will continue to work with the Policy Division, and track how it supports the field's implementation of the terms of Settlement Agreements.

*b. Division of Health for Unaccompanied Children* [69]

Prior to 2017, children's health and clinical oversight responsibilities were under the ORR Medical Team. In 2019, ORR UACB established DHUC Mental and Behavioral Health Services Team ("MBHST") ahead of the final Lucas R. Psychotropic Settlement to develop policies, improve practice, and provide clinical guidance and consultation to care providers to enable them to meet the mental and behavioral health needs of children in ORR custody. Specifically relevant to Lucas R. is DHUC's role in supporting trauma-informed care, strengthening psychotropic medication prescribing and consent practices, and coordinating with the PCU (discussed later in this section of the Report).

In order for DHUC to serve in a central oversight role as outlined in the Settlement Agreement, ORR UACB identified a highly qualified child psychiatrist as required by Section IX.E. of the Psychotropic Settlement.[70] As of May 2025, the DHUC MBHST Team included

[69] The Division of Health for Unaccompanied Children ("DHUC") currently goes by the Division of Health for Unaccompanied Alien Children and/or the Division of Health. For the purpose of this Report, the Monitor used DHUC to be consistent with the language in the Settlement Agreements.

[70] "A licensed child and adolescent psychiatrist...shall oversee DHUC's responsibilities." See Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Third Claim for Relief [Psychotropic Medications]. US District

two child psychiatrists, one of whom is designated as a Team Lead; one psychiatric nurse practitioner; one advanced practice nurse practitioner; one licensed clinical social worker; and one child psychologist. In addition, the DHUC Team includes a neuro-developmental pediatrician who serves as the Disabilities Team Lead. Critically, this level of staffing is necessary for ORR UACB to develop the required clinical expertise to consult with care providers on psychotropic medication and disability-related practice, develop policies and practice guidance, and conduct quality monitoring to meet the goals of the Settlement Agreements as well as fulfill ORR commitments regarding implementation planning and monitoring implementation performance over time.

The Settlement Agreement also requires that DHUC, "within a reasonable transition period of no more than 24 months from the Effective Date," begin to provide oversight of the prescription of psychotropic medication(s) including through clinical and retrospective case review for priority groups of children (see Report Section C.I).[71] The Monitor has been working with DHUC to develop a protocol for case reviews and notes that DHUC is in the process of testing its approach in advance of the implementation date, during the "reasonable transition period" provided in the Agreement.

Finally, the Monitor observed that DHUC is already tracking complex and other "red flag" cases identified by care providers and following up with care providers and practitioners to support Lucas R. compliant prescribing, consent, and case practice. It is the Monitor's hope that DHUC's role in promoting the mental health and well-being of all children in ORR custody will be a lasting one that goes above and beyond the terms of the Lucas R. Settlement Agreement.

### *c. The Centralized Concurrence Unit* [72]

In the Summer of 2022, ORR established the Centralized Concurrence Unit ("CCU") to test the feasibility of implementing the terms of the draft Settlement Agreement that were under negotiation. At that time, the functions performed by the CCU were primarily focused on providing concurrence (or non-concurrence) in situations where consent from an "Authorized Consenter" could not be obtained, as is contemplated by Section VIII.B.1. of the Settlement Agreement.

---

Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section IX.E.)

[71] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Third Claim for Relief [Psychotropic Medications]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section IX.B-C.)

[72] HHS ACF ORR Bureau of Unaccompanied Children (2025, February). Implementation Plan for the Lucas R. Psychotropic Medication Settlement Agreement.

The CCU officially began operations under the terms of the Settlement Agreement in May 2024, operating through ORR's third-party medical management administrator, Point Comfort United ("PCU," formerly Point Comfort Underwriters). The CCU is staffed by a rotating panel of psychiatrists licensed in the US, who provide an independent clinical opinion on the appropriateness of a care provider's request to prescribe and administer psychotropic medications when "informed consent cannot be otherwise obtained" or to "override denial of consent."[73]

As ORR's implementation rolls out across the country, the Monitor will closely review CCU operations and care providers' experiences in the field. Some concerns were raised with the Monitor about the required CCU process and its potential conflict with state licensing requirements for some ORR UACB care providers. As of the time of this writing, no specific situations of this kind have been brought to the Monitor's attention. If one arises, the Settlement Agreement instructs the CCU to notify ORR, who must inform the Monitor within ten days and offer an alternative that enables ORR to substantially comply with the Settlement Agreement. The Monitor will continue to track this issue over the coming year.

### *d. Point Comfort United*

In June 2022, ORR issued updated guidance outlining the process for approving payment for psychotropic medications by ORR's health care management and third-party administrator, PCU. PCU manages claims and health care benefits for children in ORR custody and uses the Magellan RX network. PCU requires advance authorization for all health care services except initial medical screenings and emergency care. ORR UACB care providers submit Treatment Authorization Requests ("TARs") and consent forms in order to get prior approval for medical, dental, and mental health services (see Appendix C for a sample psychotropic medication TAR). Once approved, payment is made through PCU for the medical, mental health, or pharmacy services rendered. This process ensures that PCU completes a review of each request and verifies that required consent was obtained before authorizing a prescription to be filled and issuing payment.

The PCU prior authorization process had an implementation date for all Texas care provider programs effective February 3, 2025, and will be rolled out regionally in accordance with the Settlement Agreement Transition Plan. In the Monitor's case review, the Monitor verified the use of the PCU process, the submission of consent, assent, and TAR forms and prescribing practice consistent with the Texas formulary (see Report Section E.III.). In

---

[73] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Third Claim for Relief [Psychotropic Medications]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section VIII.B.)

addition, the Monitor's site visits found that Texas care providers had familiarity with the PCU prior approval process. To strengthen practice, ORR reported that it will continue to provide care providers with instruction related to the use of the new ORR consent and assent forms and require care providers to take an initial training when onboarded as well as complete an annual refresher training each year thereafter.[74]

In August 2025, the next cohort of states will come on board and begin implementing Lucas R. Psychotropic Settlement requirements. As noted above, the PCU process requires that these care provider programs submit a TAR for each psychotropic medication prescribed to a child in care and for any change in dosage. The Monitor will continue to evaluate whether the PCU prior authorization process is adhered to as new cohorts are onboarded and begin implementation of the Settlement Agreement requirements.

#### *e. Conclusion*

During this period of review, the Monitor found that ORR made organizational changes that met the goals and requirements of the Lucas R. Psychotropic Settlement. In particular, the Monitor observed that DHUC effectively expanded its role to provide oversight of prescribing practice and consultation on appropriate use of psychotropic medications and is actively supporting Settlement requirements around consent/assent. Regarding the CCU and PCU, the Monitor observed that both entities have worked to align their processes with the Settlement Agreement. As such, the Monitor found that ORR UACB has restructured and enhanced the capacity of its operating divisions, increased staffing and embedded Lucas R. responsibilities in its day-to-day operations and longer-term planning activities. Thereby, in relation to this set of activities, the Monitor finds that ORR has met its commitments as articulated by the Settlement Agreement. As regional implementation rolls out across the country, the Monitor will continue to track the ways in which DHUC, the CCU, and PCU support ORR and care providers' compliance with the system and process improvements included in the Settlement Agreement.

[74] More details on PCU processes can be found in the Point Comfort Underwriters' Provider Manual Refugee Medical Assistance & Unaccompanied Children (2019, August).

## III. Did the field make progress implementing the new policies and procedures?

**Question 3:** Did ORR enable and support the field — in and out-of-network care providers and ORR field personnel — in making significant progress implementing the new Lucas R. related policies and procedures?

In assessing Question 3, this section details the various activities ORR undertook to prepare and support the field to implement the Psychotropic Settlement process changes. This section also discusses the Monitor's site visits and case review findings. As noted above, given the phased implementation of the new Psychotropic Settlement requirements, only a small fraction of ORR's care providers were covered under the compliance requirements of the Settlement during this review period.[75]

### *a. ORR Onboarding and Training for the Field* [76]

#### Provider Onboarding Pilot

In June 2022, while Settlement negotiations were still underway, ORR UACB released new guidance for providers based in Texas as a pilot program. The guidance built on previous policy issued to providers in Texas in 2018, which first introduced the hierarchy of individuals who can provide informed consent (starting with parents, then close adult relatives who served as the child's primary caregiver) to the ORR network.[77] The major change from the 2018 guidance to the 2022 guidance was the introduction of the CCU's role. Prior to 2022, ORR care provider programs based in Texas were directed to seek appointment of a medical consenter by court order in circumstances in which there was no consent from a parent or close adult relative.[78] The goal of the pilot was to do a soft launch of new policies and practices in order to build a body of knowledge about how ORR could scale and embed necessary changes as it relates to psychotropic medication practice across its care provider network.

Based on the Monitor's visits to programs and interviews with other stakeholders, the Texas care provider programs did have some advantages from having participated in the two-year pilot project. For ORR UACB, the pilot offered a staging ground to develop its approach to

---

[75] This includes ORR's only remaining in-network RTC, Shiloh RTC, and 66 care providers in the state of Texas.

[76] HHS ACF ORR Bureau of Unaccompanied Children (2025, February). Implementation Plan for the Lucas R. Psychotropic Medication Settlement Agreement.

[77] HHS ACF ORR Bureau of Unaccompanied Children (2025, February). Implementation Plan for the Lucas R. Psychotropic Medication Settlement Agreement.

[78] See Texas Family Code § 266.004 for procedures.

implementation and helped identify areas where more capacity was needed. The Texas pilot provided ORR with valuable lessons regarding the necessary content and proposed use of new forms; the consent and concurrence processes; and prescribing practices.

### Onboarding In-Network Care Providers

As noted earlier, the Psychotropic Settlement outlines a phased approach to rolling out its requirements across the country.[79] The first programs to be onboarded were the ORR RTCs, including children who are administratively placed with an RTC, but physically located at an out-of-network provider. After that, 66 Texas-based programs were required to adopt the new processes, including the psychotropic medication TAR process and use the ORR consent and assent forms.

As of this report writing, ORR completed onboarding of the first two cohorts and is in compliance with this Settlement timeframe. Subsequently, ORR has begun the onboarding process for the next regional care provider cohort, two months in advance of the compliance deadline of August 2025. The remaining care provider programs will be onboarded sequentially in two future cohorts.[80]

ORR UACB has taken a three-part approach to onboarding the cohorts. First, it did a mass mailing of the required Lucas R. Psychotropic Settlement posting notice to all care providers with guidance on use. Second, care providers were trained in Settlement-related policy requirements, procedural changes, and other Lucas R. required activities through a series of on-line trainings. Three on-line trainings were offered to care providers and ORR staff, all of which are available on demand via the ORR Portal:

- Lucas R. Revisions to UAC Policy Guide and UAC MAP
- Part 1 Training on Disabilities, Psychotropic Medications, & Risk Determination Hearings
- Part 2 Training on Disabilities, Psychotropic Medications, & Risk Determination Hearings

In accordance with the plan above, a recorded Lucas R. Psychotropic Medications training was available to the August 2025 cohort and a related Q&A session was held on two dates — July 22nd and July 30th — to accommodate care providers' schedules. ORR reported to the Monitor that approximately 400 people attended each Q&A session. As mentioned earlier,

---

[79] See Chart 4 "Rollout of Lucas R. Psychotropic Medication Implementation" in Report Section E.I.d.

[80] HHS ACF ORR Bureau of Unaccompanied Children (2025, February). Implementation Plan for the Lucas R. Psychotropic Medication Settlement Agreement.

ORR also reported to the Monitor its intent to initiate a mandatory on-line Lucas R. compliance refresher training for all Texas providers and, in coming years, to require it annually for all care providers. Lastly, ORR UAC Policy Division hosts monthly care provider meetings which include Lucas R. Settlement content; ORR also holds regular "office hours" where care providers can get more individualized assistance.

During the next report period, the Monitor will further assess the quality of these trainings and whether ORR has ensured care providers have the adequate training and guidance to comply with the Settlement Agreement.

### ORR Onboarding Out-of-Network Providers

As noted earlier, ORR uses out-of-network care providers when a child requires specialized services not offered by an in-network provider. Children in out-of-network care provider programs are administratively case managed by an in-network ORR care provider who is responsible for ensuring that the out-of-network provider adheres to ORR policies and procedures, including the process improvements ORR committed to in the Settlement Agreement.[81]

During this report period, the Monitor interviewed stakeholders regarding out-of-network care providers' awareness and adherence to the commitments included in the Settlement Agreement. Stakeholders reported to the Monitor that early out-of-network RTC provider compliance was challenging, and that the establishment of ORR Lucas R. practice expectations were slow to develop in provider programs located across the country and operating under varied state licensing requirements. The Monitor is also concerned that the new training modules on the Lucas R. requirements are only available on the ORR Portal, which out-of-network providers do not have access. ORR has committed to invite out-of-network providers to attend their regular office hours, and to figure out how trainings can be made available. The Monitor will include in their next report an update regarding ORR's efforts to ensure out-of-network care providers have access to ORR trainings and other ORR supports to strengthen their familiarity and practice related to the Settlement Agreement.

### *b. Monitor's Site Visits*

For this report period, the Monitor conducted site visits to gather a baseline understanding of how the ORR care provider network operates and how care providers and frontline staff (provider and ORR field staff) are translating the new Psychotropic Settlement guidance

[81] HHS ACF ORR (2025, May 19) 1.4.6 Residential Treatment Center and Out-of-Network Placements. ORR UACB Policy Guide.

and requirements into practice for the children they care for daily. During visits, the Monitor assessed the level of familiarity providers and frontline staff demonstrated regarding the following key areas of the Psychotropic Settlement:

- The Texas Formulary and dosing guidelines;
- Requirements for use of multiple psychotropic medications (polypharmacy) and antipsychotic medications;
- Emergency administration of psychotropic medications;
- The consent and assent process and CCU override;
- PCU and TAR processes;
- DHUC case review, consultation, and case staffing processes; and
- The presence of posted Lucas R. Settlement Agreement Notices.

During this period, the Monitor visited a total of 11 sites including six sites in Texas, the first state required to implement the Lucas R. Psychotropic Settlement. Many of the sites the Monitor visited operated multiple programs on the same campus. As such, the Monitor completed site visits to nine programs in Texas (accompanied by HHS OGC and the US Department of Justice on three sites visits), one program in New York, three programs in Florida, and one program in California. The Monitor also met virtually with a regional provider trade group in New York. For the site visits, the Monitor developed a group and individual interview guide and toured multiple co-located program sites. The Monitor met with program directors, clinicians, residential and care managers, nurses, teachers, kitchen and quality improvement staff. The Monitor observed children during site visits but did not conduct any individual or group discussions with them.

The Monitor mostly visited shelter programs, the program type that serves most children in ORR care and operates as the standard level of care in the ORR care provider network.[82] The Monitor also visited a few sites categorized as special populations sites, such as RTC or heightened supervision sites. These are programs where many of the children in residence are members of the Lucas R. class of children who are prescribed psychotropic medication(s).

### Shiloh Treatment Center Visit

The Psychotropic Settlement required all ORR RTCs to be in compliance by August 3, 2024. At this time, there is only one RTC in-network — Shiloh Treatment Center. As such, on September 11, 2024, the Monitor conducted a virtual visit with Shiloh by videoconference. In preparation for the visit, the Monitor met with DHUC and ORR Federal Field Specialists to

[82] The Settlement Agreement specifies that both Parties are able to join the Monitor on two site visits each year.

understand ORR's work to facilitate Shiloh's compliance with the Psychotropic Settlement. The Monitor also traveled to Shiloh for an in-person site visit in October 2024, accompanied by HHS OGC and the US Department of Justice. After the visit, the Monitor conducted a follow-up videoconference with Shiloh's prescribing psychiatrist to support its fact-finding and due diligence. From these visits, the Monitor observed that Shiloh demonstrated familiarity with the requirements included in the Settlement Agreement.

**Texas Site Visits**

In February 2025, all Texas care providers were required to be onboarded, according to the Implementation Plan. In response, the Monitor conducted site visits in Texas and found that the sites had a solid awareness of the requirements embodied in Psychotropic Settlement. Notably, all of the sites had Lucas R. Settlement Agreement notices posted in English and Spanish within view of resident children and staff.

The Monitor also identified several challenges from the site visits, which will continue to be tracked and reported on. First, there were concerns expressed to the Monitor that the PCU is unavailable evenings, weekends, and holidays, which could hinder the timely release of a child with a required 30-day supply of psychotropic medications. Additionally, providers reported challenges using the ORR UAC Case Management Portal and expressed frustration about having to upload consent and TAR forms and case detail twice — once into the ORR Portal and another time into the PCU Portal (which the Monitor discussed earlier in this Report). Finally, while most care providers were aware that new ORR consent and assent forms were available and required for use, many continued to rely on their own forms beyond the implementation date, which the Monitor also observed during its case review, discussed below.

*c. Monitor's Case Reviews*

The Monitor conducted a qualitative case review of a sample of children in ORR Texas programs between April and June 2025 to evaluate whether ORR complied with the new protocols related to prescription and oversight of psychotropic medications administered to children, as stipulated by the Settlement Agreement. The Monitor worked jointly with DHUC on the development and design of a case review tool (the "Case Review Tool"). While the Monitor drew its own independent conclusions about ORR's performance (described below), the Monitor and DHUC discussed their respective observations and lessons from the cases reviewed.

To help the Monitor understand how DHUC was approaching its case review and assist in the use of the ORR Portal, the Monitor reviewed four cases with DHUC and the Policy Division. The Monitor also worked with its own data expert to ensure data quality control

and identify any input errors. As noted previously, since the Monitor does not have access to the PCU Portal, the Monitor requested that ORR provide the necessary PCU data (TARs and ORR consent/assent forms) directly to the Monitor.[83]

### Case Review Tool

The Case Review Tool (see Appendix D) asked reviewers to gather information regarding specific system and process improvements ORR committed to in the Settlement Agreement. This included:

- Using an Authorized Consenter;
- Obtaining and documenting informed consent and assent of children's use of psychotropic medications; and
- Obtaining and documenting TARs for each prescribed psychotropic medication to children in care.

The Case Review Tool also gathered child-specific information, such as identifying and demographic data, placement location, and diagnostic and medication details.

The Case Review Tool tracked compliance using a rating of "Met" or "Not Met." A "Met" rating was entered when the Monitor observed the required documentation or practice standards in a case file and conversely, a "Not Met" rating was entered when the required documentation or practice standards were not observed in a case file.[84] To ensure accuracy in the review, the Monitor had two people review the same cases, as an interrater reliability method.

Independent of the Monitor's case review, DHUC has also been piloting use of the Case Review Tool for cases it is required to review under the Settlement Agreement, including cases flagged by a care provider and cases that meet specific criteria, such as a child under the age of three or a child's use of two or more antipsychotic medications for 60

[83] The Monitor accessed most information from the ORR Portal; however, the tool's "PCU Data" section requires access to data in the PCU's separate portal, which the Monitor currently does not have access to. Working through ORR, PCU data was provided to the Monitor for 28 of the 33 cases. For an additional two cases, while PCU data was provided there were no TARs included, and for a third case, PCU data was provided but only outside the review period. For the other cases, the PCU data provided included TARs, consents, and assents.

[84] In cases where a system or process improvement was not applicable to a child's circumstance, the Monitor used a rating of "Not Applicable" (N/A).

days.[85] Moving forward, DHUC will build out its clinical review process for these cases, and will also update its Case Review Tool for an annual retrospective review of 30 cases, which is required to begin in 2026. The Monitor was pleased to observe DHUC's early launch of these efforts and will track over the next year how they are standardized as part of DHUC's routine clinical and case review practice.

### Case Review Sample

Because the Settlement Agreement outlines a phased regional approach to implementing the new requirements around psychotropic medications, the Monitor focused its review on the small number of cases in Texas where Lucas R. requirements had been implemented at the time of the case review — Shiloh RTC and Texas-based programs.

The Monitor reviewed cases pulled from a PCU list of children prescribed psychotropic medication(s) who were residing in or administratively case managed by a Texas program during the review period using the following criteria:

- All young children between the ages of zero and 12 years old prescribed a psychotropic medication;
- All children prescribed antipsychotic medication;
- All polypharmacy cases involving children prescribed three or more psychotropic medications;
- One case from each care provider in Texas where a child was prescribed medications; and
- Cases from Shiloh RTC, including children residing at the RTC or instances where Shiloh administratively case managed a child placed with a care provider in or outside of the state of Texas.

This broad search criteria generated a net of 33 cases for review. For Shiloh RTC, the Monitor reviewed cases reflecting the period of August 3, 2024 to March 31, 2025 and for all other Texas-based programs from February 3, 2025 to March 31, 2025. It is important to note that these review periods align with the date when each care provider cohort was required to have completed onboarding. The Monitor acknowledges that its case review coincided with the earliest implementation phase of the Settlement requirements among ORR's first two onboarded cohorts, which invariably means that these practices and processes were still new to the field. As such, the Monitor urges ORR to use the following findings to inform its continued implementation of cohorts across the country.

---

[85] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Third Claim for Relief [Psychotropic Medications]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section IX.A-C.)

## Child and Youth Demographic Background

Of the total sample of 33 cases, the Monitor reviewed all but two. These two cases were excluded because one youth was no longer in ORR custody during the review period, and the other was determined to not take psychotropic medications. The Monitor provides the following case sample demographic information for context, noting too, that it tracks roughly with data collected for the Periodic Reports. Over time, the Monitor plans to identify findings and trends from both sources of information.

The case review identified the following characteristics of the children and youth reviewed:

- Sixteen (52%) of the children were male and 15 (48%) were female.

- Two children were under the age of 12 and the other 29 youth were between the ages of 13 and 17, with over half (52%) of the youth 17 years old.

- The majority of children (25) had been in care more than 90 days and 13 of these children had been in care for over one year. The median length of stay for children in this sample was 297 days.

- Most youth (17) were placed in shelters, followed by long-term foster care, RTCs, and transitional foster care placements. Twenty-four of the 31 children were placed with in-network providers.

- Most youth (23) had experienced two or more placements while in ORR custody.

- Regarding diagnoses, over three-quarters of the children receiving psychotropic medications in the case review sample were diagnosed with Major Depressive Disorder and about half of the youth were diagnosed with Post-Traumatic Stress Disorder, followed by Generalized Anxiety Disorder, and Disruptive Mood Dysregulation Disorder.

## Monitor's Findings

By design, the Monitor's case review evaluated ORR's implementation of system and process improvements to improve ORR's oversight and administration of psychotropic medications for children in its care, as required by the Settlement Agreement. Although not the primary goal of the case review, the Monitor found that overall, psychotropic

medication usage appeared in alignment with the Texas Formulary.[86] Further, the Monitor was able to share case review findings with DHUC in a series of meetings and learned from DHUC that the prescribing patterns in the Monitor's case review sample aligned with what DHUC often sees in day-to-day practice.

The Monitor assessed ORR performance across eight Settlement-required process improvement areas (see Chart 5 below).

**CHART 5*:* Case Review Summary (n=31)**

| Process Improvement Area | # of Applicable Cases | Met | Not Met |
|---|---|---|---|
| 1) Policy followed for determining Consenter for medication informed consent | 31 | 23 (74.2%) | 8 (25.8%) |
| 2) Psychotropic TAR submitted to PCU for verbal consent for administration of psychotropic medications within 5 days | 31 | 22 (71.0%) | 9 (29.0%) |
| 3) Psychotropic TAR submitted to PCU for written consent for administration of psychotropic medications within 25 days | 31 | 20 (64.5%) | 11 (35.5%) |
| 4) Informed consent renewed for medication dose changes | 22 | 15 (68.2%) | 7 (31.8%) |
| 5) Informed consent renewed every 6 months after date of initial verbal informed consent | 19 | 12 (63.2%) | 7 (36.8%) |
| 6) Verbal and written informed consent obtained when psychotropic medication changes | 22 | 14 (63.6%) | 8 (36.4%) |
| 7) Adequate documentation to explain CCU override of consent denial by Primary or Sponsor Consenter | 5 | 4 (80.0%) | 1 (20.0%) |
| 8) Mental health appointment entered into Health section of UC Portal within 48 hours of appointment (actual notes may be in "pending" status) | 30 | 29 (96.7%) | 1 (3.3%) |

[86] The Monitor's case review found high compliance in the use of medications and dosing guidelines for psychiatric diagnoses consistent with the Texas Formulary. The four most commonly prescribed psychotropic medications were Hydroxyzine (sedative), Fluoxetine (antidepressant), Trazodone (antidepressant), and Aripiprazole (antipsychotic). Almost half of the children in the sample were prescribed an antipsychotic medication (primarily Aripiprazole), and one-third of children used three or more psychotropic medications.

As the Chart illustrates, the Monitor found that ORR compliance was strongest in relation to the eighth process improvement area, which requires that a child's mental health appointment is entered into the UC Portal (ORR Portal) within 48 hours of an appointment. In this area, the Monitor consistently (96.7%) found the required documentation in children's case files.

Regarding the seventh process improvement area, which requires evidence of adequate documentation to explain a CCU override of consent denial in a child's file, the Monitor's review identified only five applicable cases. Of these five applicable cases, the review found that four (80%) included the appropriate documentation in children's case files and one did not (20%).

The other items reviewed (process improvement areas #1 to #6 in the Chart) — identification of an authorized consenter, presence of a TAR submitted for psychotropic medication, and requisite documentation of informed consent and assent — are foundational requirements of the Settlement Agreement. During the review, the Monitor was unable to locate or verify the required documentation for approximately a quarter or more of the cases reviewed in these areas. There is clearly an opportunity for improvement in each of these areas, as discussed further below.

*Consents and Assents*

The Monitor found that over a quarter of sampled children's case files did not include the required consent and assent documentation for children's prescribed medication (process improvement areas #4, #5, and #6 in the Chart). In addition, the review showed that when consent and assent documentation was found in a case file, the new ORR consent form was generally not used. The Monitor's case review found only two cases where the new ORR form was used. Instead, most care providers used their own consent forms, which the Monitor observed vary greatly in their level of disclosure about risks and benefits of the medications and the rights of the consenter and assenter.[87]

ORR rolled out the new consent and assent forms in February 2025;[88] thus, it is not surprising that the Monitor found limited usage of the ORR consent and assent forms in this

---

[87] Following the case period of review (which ended in March 2025), in the months of April and May 2025, the Monitor observed increased documentation of ORR consent and assent forms in case files. This may reflect a positive trend as implementation of the forms becomes more embedded in daily practice.

[88] The Monitor approved ORR's new consent and assent forms in November 2024 and PRA clearance and Office of Management and Budget approval was received on January 17, 2025. ORR trained care providers on the new forms in late January 2025, and the effective date of the forms was February 1, 2025. Lastly, ORR disseminated the new forms to care providers again on March 18, 2025, along with the newly published psychotropic policies and procedures.

case review. However, it remains an area for improvement as the implementation continues to rollout. The Monitor recommends that ORR provide support to care providers to increase adoption of the ORR form. To this end, ORR is reportedly working with PCU to update its policy for required documents to mandate the use of the new ORR consent and assent forms when TARs are submitted by care providers, which should support standardization of this new process. Lastly, the Monitor observed that consent and assent documentation was often inconsistently labeled and filed in the ORR Portal in either in “UAC Documents” or the “Health” tab. As such, ORR also needs to provide more direct guidance to the field regarding where and when to upload the forms in the ORR Portal. ORR reports this standardization and training is in progress, along with the development of a “consent” and “assent” label in the ORR Portal to better identify these forms.

*Treatment Authorization Requests*

The Monitor’s case review identified that about one-third of TARs appeared they were not submitted to the PCU (process improvement areas #2 and #3 in the Chart). The cases where the Monitor was unable to locate TARs were largely those that had missing PCU data; these cases were scored lower. Given that the PCU will not authorize payment of a psychotropic medication without being provided a consent form in concert with a TAR, the Monitor assumes that this missing information is most likely attributable to the appropriate TARs not being provided to the Monitor and not the failure of their submission. While the Monitor’s review did not surface concern that children were administered medication without consent being obtained, ensuring appropriate filing of consent, assent, and TAR documents remains a clear area for improved performance.

When the Monitor observed TARs, they generally documented a thorough description of a child and the rationale for the prescription of medication to the child. In this case review, the Monitor did not observe any instances where the PCU denied a TAR request for a child’s prescription of medication. The Monitor will probe this question in its next case review to better understand whether denials occur and how such denials are managed.

*Significant Incident Report Emergency Medication and CCU Override*

None of the cases the Monitor reviewed involved the administration of emergency medications. The Monitor did see evidence in the case file of medication refusals. Some care providers entered these as a Significant Incident Reports (“SIR”) and other providers used their own form and uploaded it to the Portal’s “Health” tab.

The Monitor did not observe many instances of the CCU Override in the review. Instead, the Monitor saw multiple instances where the CCU was asked to provide consent after a written consent was unable to be secured by the Authorized Consenter.

*Length of Stay*

In the case review, the Monitor observed two distinct cohorts of children: short stayers and long stayers. Long stayers typically did not have an identified Sponsor and remained in care for 90 days or longer. Conversely, short stayers exited care in under 60 days. The Monitor is carefully tracking how the Settlement Agreement consent and assent timeframes and expectations work for short stayers to ensure the Lucas R. timelines are not onerous or negate other critical case practices since so much care provider's early case work relates to sponsorship and release. The Monitor will carefully track this process and the related forms over the next year to see if changes are recommended, particularly for children receiving multiple psychotropic medications and antipsychotics.

*Data Systems*

As discussed earlier, the Monitor found the ORR Portal to be difficult to use, with content challenging to locate. Going forward, ORR should continue to provide guidance to care providers about where consent and assent documentation should be uploaded and require the use of ORR consent and assent forms.[89] The Monitor also recommends that ORR move forward expeditiously with its plan to replace its case portal with a new electronic case record system and institute temporary upgrades to make the ORR Portal easier to navigate.

*Final Observations on Case Review*

The Monitor's first case review showed evidence of ORR's efforts to implement the requirements of the Psychotropic Settlement with Texas care providers. Overall, ORR and care provider practice appears on the right track with implementation of the Settlement Agreement, especially given that the review occurred only a few months into implementation. However, as noted above, continued attention is needed to ensure improved performance related to Authorized Consenters; the quality and consistency of consent and assent documentation; and streamlined access to TARs. The Monitor will continue to track ORR's performance in these areas as implementation proceeds and becomes more embedded in the field.

[89] ORR reported to the Monitor that it provided additional guidance to Texas providers as well as the cohort onboarding in August 2025 about the use of consent and assent forms, and where to upload them, at the new psychotropic training and at the July 2025 Q&A provider session.

Lastly, the Monitor will continue to track how ORR is integrating feedback from the Monitor and ORR's internal case reviews into its CQI processes as well as how it is incorporating feedback into its work with Federal Field Specialists to push learnings out to the field including through ORR's ongoing training and technical assistance supports.

*d. Conclusion*

During this monitoring period, ORR undertook necessary education and engagement activities to prepare in-and out-of-network care providers and ORR personnel to execute the requirements of the Settlement Agreement in their daily practice. Based on the Monitor's site visits and case review, it is clear that ORR has worked diligently to ensure that care providers and ORR personnel have a working familiarity with the Settlement Agreement and its requirements. It is also clear that the system and process improvements required by the Settlement Agreement have not yet been fully embedded in practice by all Texas care providers. To some extent, this is not surprising since implementation is still in the early stages. However, the Monitor expected to see a greater uptake of the new processes and requirements given the two-year Texas pilot leading up to the final Settlement Agreement. As such, for this report period, the Monitor reserves final judgement as to whether ORR adequately prepared the field to implement the Settlement Agreement. In the next report, the Monitor will revisit this question.

## **F. DISABILITY SETTLEMENT:** ORR Progress Toward Commitments

As described earlier (Section C. II.), the Lucas R. Disability Settlement requires ORR to commit to new goals and requirements for children in their custody with a disability. Broadly, ORR is required to establish new operational capacity with expert staffing and develop new policies, forms, protocols, and guidance. Specifically, ORR is required to prepare a comprehensive Needs Assessment and a Disability Plan, as well as new policies for screening, identifying, and evaluating children with disabilities. The Settlement Agreement also calls on ORR to develop written guidance for care providers regarding the development of 504 Service Plans as needed, with special obligations related to placement step-ups, and the release of children to Sponsors with post-release services and supports, as needed.

As discussed earlier, the two Settlement Agreements contain different implementation timelines. In April 2025, ORR requested an extension on some of the Disability Settlement components to align with the completion of its Needs Assessment (which had previously received an extension from the Monitor) and Disability Plan and to provide sufficient time

for the development of new protocols and practices that were not a standard part of the ORR system. From the Monitor's perspective, the additional time would enable ORR to incorporate findings from the Needs Assessment into its Disability Plan and introduce new policies, forms, practices, and reporting requirements. Accordingly, the Monitor approved the extension, with this expectation articulated to the Parties.

In addition, as a result of discussions between the Monitor and the Parties related to the extension, ORR agreed to continue phasing in other components of the Disability Settlement. Chart 6 below includes some of the Disability documents already developed by ORR.

**CHART 6: Lucas R. Disability Required Policies and Forms**

| Settlement Related Policies and Forms | Monitor Review and Approval |
|---|---|
| Foundational Rule incorporated key aspects of the Lucas R. Disability Settlement Agreement provisions (e.g., 504 Plans)[90] | Final rule published in April 2024; Correction published in June 2024. Effective date July 2024. |
| Section 504 Service Plan Form | Released for Public Comment April 2025 and finalized in July 2025. |
| Initial disability revisions to the ORR UACB Policy Guide and MAP | Completed July 2024. |
| Updated UAC Policy Section 3.8.3 and UAC MAP Section 3.8.3 | Completed July 2025. |
| Section 504 Service Plan Completion Guide | Completed July 2025. |

At the end of September 2024, ORR retained KVC Health Systems ("KVC") as a consultant with disabilities expertise. KVC is conducting the Disability Needs Assessment and supporting ORR in the development of its Disability Plan. Of particular importance to the Monitor is KVC's approach to fact-finding — specifically site visits, case review, and key informant interviews — to ensure that the experiences of children with or suspected of having a disabling condition as well as care providers and Sponsors are accounted for in the development of the Needs Assessment and Plan. Contracting delays hindered ORR's ability to get started timely and also delayed other implementation deliverables, as already noted.

During the report period, ORR made key policy changes, including the inclusion of critical aspects of the Disability Settlement requirements in the Foundational Rule, as discussed

[90] Unaccompanied Children Program Foundational Rule. Federal Register. Vol. 89, No. 84. (April 30, 2024). 45 CFR Part 410, 1311.

earlier. In addition, adoption of the Foundational Rule in July 2024 formed the basis for disability-related amendments made to the ORR Policy Guide and MAP that were reviewed and approved by the Monitor. The Policy Guide (Section 3.8) was added to define what constitutes a disability and to direct care providers to identify, evaluate, plan, and make reasonable accommodations for children with disabilities in the least restrictive, most integrated setting in their best interests and appropriate to their needs. On July 1, 2025, the Division of UAC Policy published revisions to the UACB Policy Guide and UAC Manual of Procedures ("UAC MAP"). These revisions, effective July 8, 2025, adjust language related to parent/guardian involvement in Individualized Section 504 Service Plan development and introduce a form template and instructions for preparing the Section 504 plan. It is possible that the Policy Guide and MAP will be updated again, once the Needs Assessment is completed.

These policy changes also set the stage for the development and release of the new Section 504 Service Plan Form, which was finalized in July 2025 (see Appendix E). The form was previously open for public comment. ORR plans to upgrade the ORR Portal to allow care providers to upload 504 forms and related disability information. Presently, ORR reports that 504 Plans can be uploaded to the ORR Portal but only as PDFs. As such, ORR is exploring an improvement that would allow 504 Plan information to be entered directly into a fillable form within the ORR Portal and thereby eliminate the need to upload an external document. The Monitor will assess progress on this in the coming year.

Chart 7 below lists other readiness planning and interim activities underway at ORR during this extension period.

**CHART 7: Interim Activities During the Extension Period**

| Date | Activity |
|---|---|
| April 3, 2025 | Comprehensive Needs Assessment progress report. |
| April 2025 | Section 504 Plan released for public comment. |
| May-June 2025 | The Monitor reviewed ORR's revisions to Home Studies/Post-Release Services (PRS) and assessment-related forms (including the Sponsor Assessment Form) to incorporate Settlement requirements. The Home Study/PRS Form was approved by Office of Management and Budget on July 28, 2025, and the Sponsor Assessment Form is still pending as of report writing.[91] |

[91] For these forms, the information collection requests were submitted by ORR to the Office of Management and Budget on May 28, 2025, and the 30-day Federal Register Notice was published on May 27, 2025, and the comment period ended on June 26, 2025.

| | |
|---|---|
| May-July 2025 | ORR and Monitor consult on data elements/indicators for inclusion in the Periodic Report. |
| June 2025 | Interim case escalation process initiated. |
| June-September 2025 | Develop care provider on-line training, the disability assessment at the initial medical exam, and mental health trauma-informed screening process. |
| July 2025 | Section 504 Plan finalized. |
| August 1, 2025 | Draft Disability Needs Assessment report and slide deck provided to Monitor. |
| September 3, 2025 | Needs Assessment will be finalized, and draft Disability Plan will be provided to Monitor. |
| November 3, 2025 | Disability Settlement Implementation Plan deadline (incorporating detail on the rollout of the Disability Plan, care provider onboarding, trauma-informed mental health screening, and enhanced mental health services). |

ORR also oversaw significant progress to create new operational capacity and clinical expertise. As noted earlier in the DHUC section, ORR brought on a disability expert last Fall — a physician credentialled in physical medicine and rehabilitation, pediatric rehabilitation medicine, pediatrics, and neurodevelopmental disabilities — to serve as the Bureau's Disabilities Lead and serve as a member of the DHUC Team. The Monitor expects to see this new expertise incorporated into ORR's work on identifying children with disabilities, selecting qualified medical providers to evaluate children, incorporating disability evaluations and 504 Service Plans into children's care planning, and providing clinical support on disability cases and 504 Service Plan development to care providers. This approach to care provider capacity-building mirrors similar work done by DHUC in the space of children's mental health and has enriched ORR efforts to meet the requirements of the Psychotropic Settlement; the Monitor hopes to see similar impacts on the disabilities front.

The Parties agreed to an interim case escalation process during the extension period whereby the Plaintiffs could notify the Monitor and request escalation of specific cases. Plaintiffs have invoked this process once to date, involving a child with complex health needs and a disabling medical condition that posed barriers to unification with the child's Sponsor. The Monitor elevated the case to ORR UAC Policy, OGC, and the DHUC Disabilities Team. The Monitor found the child was already well known to the DHUC Disabilities Team; specifically, DHUC shared detailed clinical knowledge and understanding of the child's needs, a high level of attention to the child, and active engagement of the child's family. ORR continues to do concurrent planning on this case to

ensure that the child will have a stable living arrangement and continued access to lifesaving care. The Monitor consulted with Plaintiffs about the information it learned from ORR regarding this child.

Finally, during every site visit, the Monitor asked providers about their experience and practice related to children with complex needs and disabling conditions. Many sites had experience with children with special physical health needs, and all had experience with children with behavioral health needs. That said, the process of screening, assessing and formalizing 504 Plans will be new for many providers. The Monitor will follow this carefully over the next year.

## G. CLOSING

Over the coming year, the Monitor will closely track ORR progress and the field's implementation of the Settlement Agreements. The Monitor looks forward to continuing to partner with both ORR and the Plaintiffs' Counsel in these efforts. The Monitor will report on ORR's progress annually in a combined report for the Psychotropic and Disability Settlements. The next report is due in September 2026.

# APPENDIX

## **Appendix A:** ORR Consent Form

OMB 0970-0641 [valid through 01/31/2028]

**Administration for Children & Families**
**Office of Refugee Resettlement**

### Psychotropic Medication Informed Consent

Care providers must obtain informed consent from an authorized consenter before administering psychotropic medication to any child in ORR custody. New informed consent may be required before increases in dosage. If no authorized consenter is available then care providers must obtain concurrence for administration of the medication from the Centralized Concurrence Unit (CCU). Care providers may administer psychotropic medication to a child in ORR custody without prior consent in the event of an emergency.

Care providers must complete one form for each psychotropic medication prescribed (non-emergency) or administered during an emergency. Care providers must complete the entire form unless otherwise stated in the form's instructions.

**Child's Information**

DEMOGRAPHIC INFORMATION

| | | | |
|---|---|---|---|
| **Name** | | **A#** *(no spaces)* | |
| **Sex** | | **Birth Date** | |
| **Country of Birth** | | **Age** | |
| **Program Name** | | **Program Type** | |

PSYCHIATRIC HOSPITALIZATION

**Is the child hospitalized?** ◯ Yes ◯ No

Hospital Name ______ Date Admitted ______

DISABILITY

**Does the child have a disability?** ◯ Yes ◯ No

If yes, what is the disability? ______

Is there an Individual 504 Service Plan? ◯ Yes ◯ No

**Psychotropic Medication Information**

**Diagnosis/Condition Under Treatment** ______

**Psychotropic Medication Name** ______ **Dosage** ______

THE PAPERWORK REDUCTION ACT OF 1995 (Pub. L. 104-13) STATEMENT OF PUBLIC BURDEN: The purpose of this information collection is to allow care providers to document information about a prescribed psychotropic medication, confirm required topics were discussed with an authorized consenter, and document verbal and written consent (or dissent) from the authorized consenter. Public reporting burden for this collection of information is estimated to average 1.5 hours per response, including the time for reviewing instructions, gathering and maintaining the data needed, and reviewing the collection of information. This is a mandatory collection of information (Homeland Security Act, 6 U.S.C. § 279). An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information subject to the requirements of the Paperwork Reduction Act of 1995, unless it displays a currently valid OMB control number. If you have any comments on this collection of information please contact UACPolicy@acf.hhs.gov.

MMH-1 | Version 1
03/18/2025

Pag

Micro

# Psychotropic Medication Informed Consent
## Office of Refugee Resettlement

**Psychotropic Medication Class** | **Frequency**

**Prescriber's Name** | **Prescription Date**

**Prescriber's Credentials/Title** | **Prescription Termination Date**

### EMERGENCY MEDICATION

**Was emergency medication administered?** ◯ Yes ◯ No

**Was the consenter and the Division of Health for Unaccompanied Alien Children (DHUAC) informed of the reasons for the administration of emergency medication?** ◯ Yes ◯ No

**Date Consenter Informed** | **Date DHUAC Informed**

*(Enter date Emergency Significant Incident Report was submitted in UAC Portal)*

**Nature of Emergency**

**Follow-Up Meeting Date**

**Follow-Up Meeting Attendees** *(use the +/- buttons to add or delete rows)*

| | Name | Role |
|---|---|---|
| | | Child |
| | | Case Manager |
| | | Clinician |
| + - | | |

### Verbal Consent

*This section is not required if emergency psychotropic medication was administered.*

**Name** | **Relationship to Child**

**Consenter Type** | **Preferred Language**

**Consent Decision** | **Date of Decision**

**Reason consent is not from Primary Consenter:**

**Reason consent is not from Secondary Consenter:**

**Reason consent is not from UAC Consenter:**

## Informed Consent Discussion Topics

**Child's Name** | **Child's A#** *(no spaces)*

**Person Discussing Topics Name** | **Role/Position**

**Date Discussion Occurred** | **Employer**

**Language Used to Discuss Topics** | **Interpreter Used?** ◯ Yes ◯ No

### DISCUSSION TOPICS

*Please discuss the following topics with the Authorized Consenter before obtaining informed consent. Confirm that each topic was discussed by selecting "Discussed" or "Not Discussed" below.*

1. The child's diagnosis
2. The nature of the child's specific condition to be treated
3. An explanation of the purpose of the medication
4. The beneficial effects on that condition expected from the medication
5. A description of any accompanying discomforts, possible side effects, risks associated with the medication, and the nature and possible occurrence of irreversible symptoms
6. The risks and benefits of not consenting to the medication
7. A statement of whether the medication is habituating in nature
8. Alternatives to use of psychotropic medication that have been attempted and were unsuccessful
9. The generally accepted alternative medication and nonpharmacological interventions to the medication, if any, and the risks and benefits of those alternatives
10. Provided the contact information for the prescribing professional
11. Explanation that they may provide or withhold consent and informed of the next steps that will be taken if they do not consent
12. Explanation that they may withdraw consent at any time after already given and informed of the next steps that will be taken if they do not consent

13. Explanation that step-down or release of the child will not be delayed due to them withholding or withdrawing consent
14. Other information necessary to obtain informed consent

## Written Consent

*This section is not required if emergency psychotropic medication was administered.*

### CONSENTER INFORMATION

*To be completed by the care provider.*

**Name**

**Relationship to Child**

**Consenter Type**

**Preferred Language**

**Reason consent is not from Primary Consenter:**

**Reason consent is not from Secondary Consenter:**

**Reason consent is not from UAC Consenter:**

### CONSENTER DECISION

*To be completed by the consenter.*

I affirm that I was provided information on the psychotropic medication prescribed for the child and the topics under the Informed Consent Discussion Topics section of this form were discussed with me.

**Consent Decision**

**Date of Decision**

**Consenter Signature**

*To be completed by the care provider if the consenter is illiterate and/or waived written consent.*

**The consenter is unable to read.**
I affirm that information on the psychotropic medication prescribed for the child and the topics under the Informed Consent Discussion Topics section of this form were fully communicated to the consenter in a language that they understand.

**The consenter is able to read but waived written consent.**
I affirm that written consent was explained to the consenter in a language that they understand, and the consenter decided to waive written consent due to a safety risk or undue burden. I further affirm that information on the psychotropic medication prescribed for the child and the topics under the Informed Consent Discussion Topics section of this form were fully communicated to the consenter in a language that they understand.

| | |
|---|---|
| **Care Provider Staff Signature** | |
| **Care Provider Staff Name and Title** | |
| **Date** | |

## Centralized Concurrence Unit

*Complete this section if the case was referred to the Centralized Concurrence Unit (CCU) to seek 1) concurrence because verbal and/or written consent could not be obtained from an authorized consenter or 2) to seek concurrence to override the primary consenter's denial of consent. This section is not required if emergency psychotropic medication was administered.*

| | | | |
|---|---|---|---|
| **CCU's Decision** | | **Date of Decision** | |

**Reason concurrence sought from CCU:**

## **Appendix B:** ORR Assent Form

OMB 0970-0641 [valid through 01/31/2028]

**Administration for Children & Families**
**Office of Refugee Resettlement**

# Psychotropic Medication Assent Notice

Care providers must complete and review this notice with children aged 14 years or older before administering psychotropic medication. The discussion with the child must take place following consent from an authorized consenter or concurrence from the Centralized Concurrence Unit (CCU) or after administration of emergency medication.

Care providers must complete one form for each psychotropic medication prescribed. Care providers must complete the entire form.

## Child's Information

### DEMOGRAPHIC INFORMATION

| | | | |
|---|---|---|---|
| **Name** | | **A#** *(no spaces)* | |
| **Sex** | | **Birth Date** | |
| **Country of Birth** | | **Age** | |
| **Program Name** | | **Program Type** | |

### PSYCHIATRIC HOSPITALIZATION

**Is the child hospitalized?** ◯ Yes ◯ No

Hospital Name ______ Date Admitted ______

### DISABILITY

**Does the child have a disability?** ◯ Yes ◯ No

If yes, what is the disability? ______

Is there an Individual 504 Service Plan? ◯ Yes ◯ No

## Explanation for the Child

You were prescribed medication by a doctor or a nurse practitioner. This medicine is expected to help you. ORR obtained permission for you to take the medication from your parent/legal guardian or a family member who applied to sponsor you, or another doctor. During this conversation, we will talk about why the doctor or nurse thinks you should take this medicine, what this medicine is supposed to do, and how this medicine might make you feel (which are known as a side effects). As we discuss this medication with you, please ask questions and let us know your feelings about taking the medication. If you would like to talk privately with the doctor or nurse practitioner that prescribed the medication, we can ask them if they will speak with you. We also list their contact information on this document.

THE PAPERWORK REDUCTION ACT OF 1995 (Pub. L. 104-13) STATEMENT OF PUBLIC BURDEN: The purpose of this information collection is to allow care providers to document and review information about a prescribed psychotropic medication with children aged 14 years or older and document their assent (or dissent). Public reporting burden for this collection of information is estimated to average 0.75 hours per response, including the time for reviewing instructions, gathering and maintaining the data needed, and reviewing the collection of information. This is a mandatory collection of information (Homeland Security Act, 6 U.S.C. § 279). An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information subject to the requirements of the Paperwork Reduction Act of 1995, unless it displays a currently valid OMB control number. If you have any comments on this collection of information please contact UACPolicy@acf.hhs.gov.

# Psychotropic Medication Assent Notice
## Office of Refugee Resettlement

### Psychotropic Medication Information

#### MEDICATION INFORMATION

**Diagnosis/Condition Under Treatment**

**Psychotropic Medication Name**

**Psychotropic Medication Class**

**Dosage** | **Prescription Termination Date**

**Frequency** | **Prescription Date**

#### DOCTOR OR NURSE WHO RECOMMENDED THE MEDICATION

**Name**

**Credentials/Title**

**Phone Number**

### Record of Review with Child

**Prescriber/Staff Who Reviewed with Child** | **Date Reviewed**

**Staff Employer** | **Staff Role/Position**

**Language Used to Review with Child** | **Interpreter Used?** ◯ Yes ◯ No

**Did child assent to taking the medication?** ◯ Yes ◯ No

### Topics Discussed with the Child

*Please discuss the following topics with the child before obtaining assent. Confirm that each topic was discussed by selecting "Discussed" or "Not Discussed" below.*

1. Explanation of the purpose of the psychotropic medication and that it is part of their treatment plan
2. The potential side effects of the medication
3. An explanation of the purpose of the medication
4. The child's reactions and concerns
6. Showed the child the written notice that they may speak privately with the prescriber

## **Appendix C:** PCU Psychotropic Treatment Authorization Request Form

### Psychotropic and Anti-psychotic Medication Request Form

**Visit Information**

**UAC ID#** [redacted]

**Facility Name:** [redacted]

**Category:**
◉ Mental: Psychotropic/Anti-psychotic Medication

**Prescribing Information**

**Name of Prescriber:** *Name of Prescriber*

**Address of Prescriber:** *Prescriber Address*

**Credentials of Prescriber:** Select Credentials

**Dosage Prescribed:** *Dosage Prescribed*

**Diagnosis:** *Diagnosis*

**Medication(s) Prescribed:** *Medication(s) Prescribed*

**Date of Prescription:** mm/dd/yyyy

**Is UC currently hospitalized?**
○ Yes ○ No

○ **Consenter Information**

○ **For Consent by Competent UC**

○ **For Consent Waived due to Emergency**

**Brief History of Condition:**
*Brief History of Condition*

## **Appendix D:** Draft Case Review Tool

*This is the ORR Case Review Tool that was current as of April 2025, when the Monitor began case review, and is the version the Monitor utilized for case review. Since, ORR has slightly updated the Tool to better aggregate findings and align the questions with case practice. In planning for Year Two, the Monitor and ORR both anticipate making further modifications to increase the utility of the Tool.*

**Chart Review Form**

**Section 1: Information**

| | | | | |
|---|---|---|---|---|
| **Reviewer's Name:** | | | | |
| **Date of Review:** | | | | |
| **Facility:** | **Type of Facility:** | | | |
| **Unaccompanied Child PID#:** | **Age:** | **DOB:** | **COO:** | **Admission date to ORR:** |
| **Diagnoses:** | | | | |
| **Medications/dose:** | | | | |
| **Prescriber Type:** | | | | |
| **Type of Review:** | ○ UC CONSENTER | ○ ANNUAL | ● RETROSPECTIVE | |

UC Consenter:
- ☐ Antipsychotic Use
- ☐ 3 or more psychotropics
- ☐ Other concerns by Care Provider

Retrospective:
- ☐ Psychotropic med use in children age 3 or younger
- ☐ Age 4 or older: simultaneous use of 3 or more psych meds for >90 days
- ☐ Age 4 or older: use of 2 or more antipsychotics for 60 days or more
- ☐ psychotropic med dosages in excess of guidelines
- ☐ CCU overrides denial of consent by Primary or Sponsor Consenter

**Section 2: PCU Data**

| Type of Review | Element Reviewed | MET | NOT MET | N/A | Comments |
|---|---|---|---|---|---|
| A; UC; R | Policy followed for determining Consenter for medication informed consent | | | | |
| A; UC; R | Psych TAR submitted to PCU for verbal consent for administration of psychotropic medications within 5 days. | | | | |
| A; UC; R | Psych TAR submitted to PCU for written consent for administration of psychotropic medications within 25 days | | | | |
| A; UC; R | Informed Consent renewed when dose changes (only verbal needed IF both verbal and written received within 6 months) | | | | |
| A; UC; R | Informed Consent renewed every 6 months after date of initial verbal informed consent | | | | |
| A; UC; R | Verbal and written informed consent obtained when psychotropic medication changes | | | | |
| R | Adequate documentation to explain CCU overide of consent denial by Primary or Sponsor Consenter | | | | |

| Section 3: Case Review | | | | | |
|---|---|---|---|---|---|
| Type of Review | Element Reviewed | MET | NOT MET | N/A | Comments |
| A; UC; R | Proof of verbal consent entered into UAC DOCUMENTS section of UC Portal | | | | |
| A; UC; R | Proof of written informed consent entered into UAC DOCUMENTS section of UC Portal | | | | |
| A; UC; R | Mental Health appointment entered into HEALTH section of UC portal within 48 hours of appointment (actual notes may be in "pending" status) | | | | |
| A; UC; R | SIR entered into CLE portion of UC Portal within 24 hours of administration of Emergency Medication | | | | |
| A; UC; R | Portal documentation by prescriber (MD,DO, PSYCH NP) supports use of psychotropic medication, as seen in Notes in HEALTH Section of UC Portal | | | | |
| A; UC; R | Management of care/treatment is consistent with accepted community standards (documentation supports diagnosis; meds appropriate for dx; number of meds and doses not excessive; other modes of treatment utilized.) | | | | |
| R | Documentation supports use of psychotropic medication in UC age 3 or younger | | | | |
| UC; R | Documentation supports simultaneous use of 3 or more psychotropic medications for > 90 days in UC ages 4 or older | | | | |
| R | Documentation supports use of 2 or more antipsychotics for > 60 days in UC ages 4 or older | | | | |
| UC | Documentation supports need for use of antipsychotic medication with UC Consenter | | | | |
| UC | Documentation supports need for use of three or more psychotropic medications with UC Consenter | | | | |

## **Appendix E:** Section 504 Service Plan Form

OMB 0970-0643 [valid through 06/30/2028

**Administration for Children & Families**
**Office of Refugee Resettlement**

# Individualized Section 504 Service Plan

Care providers must develop and implement an individualized Section 504 service plan for any child in ORR custody identified as having one or more disabilities. Service plans must be documented by completing this form in its entirety. In addition, care providers must continuously update this form to reflect any changes in the service plan and to provide updates on the progress of the home study and post-release services planning.

### Unaccompanied Alien Child's Information

| | | | | | |
|---|---|---|---|---|---|
| **Name** | | **A#** *(no spaces)* | | **Sex** | |
| **Country of Birth** | | **Birth Date** | | **Age** | |
| **Program Name** | | **Program Type** | | | |
| | ☐ **Check if Out-of-Network (OON) Placement** | **OON Provider** | | | |

### Details on Disability/Diagnosis

**Date 504 Plan Created** ______ **Date 504 Plan Last Updated** ______

*Enter each identified disability in a separate row. Enter the disability/diagnosis as well as triggers, behaviors, and/or symptoms related to the disability.*
*Use the +/- buttons to add or delete rows.*

| | Date Disability Identified | Disability/Diagnosis | Related Triggers, Behaviors, and Symptoms |
|---|---|---|---|
| + - | | | |

THE PAPERWORK REDUCTION ACT OF 1995 (Pub. L. 104-13) STATEMENT OF PUBLIC BURDEN: The purpose of this information collection is to allow ORR care providers to identify a child's disability-related needs and document accommodations and/or services provided that will enable the child to reside in the least restrictive setting in their best interest and the most integrated setting appropriate to their needs; and document updates on the home study and post-release services planning. Public reporting burden for this collection of information is estimated to average 3 hours per response, including the time for reviewing instructions, gathering and maintaining the data needed, and reviewing the collection of information. This is a mandatory collection of information (Homeland Security Act, 6 U.S.C. § 279). An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information subject to the requirements of the Paperwork Reduction Act of 1995, unless it displays a currently valid OMB control number. If you have any comments on this collection of information please contact UACPolicy@acf.hhs.gov.

# Individualized Section 504 Service Plan
## Office of Refugee Resettlement

### 504 Service Plan Team

*The service plan team must include:*

- *The child (if able and willing to communicate about their service plan, including preferences and needs)*
- *Parent(s) or legal guardian (if and when available with the child's consent)*
- *Professional evaluator (in-person or via their written report)*
- *Care provider staff (i.e., clinician, case manager)*
- *Medical and/or mental health staff treating the child*
- *Child advocate appointed to serve the child*
- *ORR staff (i.e., Federal Field Specialist, DHUAC staff)*
- *Attorney of record with a completed Notice of Attorney Representation on file with ORR (if the child consents)*

*Use the +/- buttons to add or delete rows.*

| | Name | Role | Contact Information |
|---|---|---|---|
| | | Child | |
| + - | | | |

### Accommodations and/or Services

## SERVICE PLAN

*Use the +/- buttons to add or delete rows.*

| | Area of Need/Specific Disability-Related Trigger | Accommodation or Service | Person Responsible for Implementing | Frequency of Accommodation or Service | Date of Implementation *Leave blank if not implemented* |
|---|---|---|---|---|---|
| + - | | | | | |

Does this Service Plan incorporate all recommendations provided by the individual(s) who conducted the child's evaluation(s) for disability, if applicable? ◯ Yes ◯ No ◯ N/A
*If not, please explain in the Notes table below.*

## NOTES

*Add any additional notes about the service plan and/or explain why part(s) of the service plan have not been implemented, if applicable.*
*Use the +/- buttons to add or delete rows.*

| | Date | Note |
|---|---|---|
| + - | | |

## Discharge Planning

### SPONSOR INFORMATION

**Sponsor Name** ______ **Sponsor Category** ______

### HOME STUDY UPDATES

*Use the +/- buttons to add or delete rows.*

| | Date | Note |
|---|---|---|
| + - | | |

### POST-RELEASE SERVICES PLANNING UPDATES

*Use the +/- buttons to add or delete rows.*

| | Area of Need/Specific Disability-Related Trigger | Post-Release Service or Support | Assistance Provided to Sponsor | Date Assistance Provided |
|---|---|---|---|---|
| + - | | | | |