# EXHIBIT B

# Lucas R. Settlement

SECOND ANNUAL MONITORING REPORT
LUCAS R. v. KENNEDY
PSYCHOTROPIC MEDICATIONS AND DISABILITY
SETTLEMENT AGREEMENTS

Kathleen Noonan, J.D., Monitor
TEAM: Sarah Zlotnik, Melea Weber, Aaron Truchil, Suzanne Barnard, Lourdes Caban

SEPTEMBER 2026

## Table of Contents

I. INTRODUCTION & SUMMARY OF YEAR 2 PROGRESS .................... 3

II. MONITOR'S METHODOLOGY & DATA SOURCES .................... 9
A. Methodology .................... 10
B. Data Sources .................... 11

III. DEMOGRAPHICS OF CHILDREN IN THE SETTLEMENT CLASSES .................... 14
A. Children in the Psychotropic Settlement Class .................... 14
B. Children in the Disability Settlement Class .................... 19
C. Children in Both Lucas R. Classes .................... 24

IV. PSYCHOTROPIC SETTLEMENT IMPLEMENTATION FINDINGS: ORR Progress Toward Commitments .................... 25
A. ORR Transition Plan and its Rollout .................... 25
B. DHUC and Other Staffing and Organizational Supports .................... 33
i. DHUC .................... 33
ii. Centralized Concurrence Unit .................... 36
iii. UACB Policy Division .................... 37
iv. Point Comfort United .................... 38
C. Authorized Consent and Consent Procedures .................... 40
i. Authorized Consent and Concurrence (and ORR Consent Forms) .................... 40
ii. Consent Procedures for Authorized Consenters .................... 45
iii. UC Assent .................... 50
iv. Emergency Administration of Psychotropic Medication .................... 51
D. Psychotropic Medication Use Practices .................... 52
E. ORR Data Reporting .................... 55
F. Conclusion .................... 58

V. DISABILITY SETTLEMENT IMPLEMENTATION FINDINGS: ORR Progress Toward Commitments .................... 60
A. ORR Needs Assessment, Implementation Plan and Rollout .................... 61
B. Identification and Evaluation of Children with Disabilities .................... 68
i. Identification of Children with Disabilities .................... 68
ii. Evaluation for Disability .................... 71
C. Individualized Section 504 Service Plans .................... 73
D. Accommodations and Services Available to Children with Disabilities in ORR Care .................... 77
i. Access to Services .................... 77
ii. Range of Placements .................... 78
E. Placement of Children with Disabilities in ORR's Care .................... 80
F. Release of Children with Disabilities in ORR's Care to Sponsors .................... 82
G. Implementation .................... 84
i. ORR Policy Documents .................... 84
ii. ORR Data Reporting .................... 86
H. Conclusion .................... 88

**VI. SITE VISITS & CASE REVIEWS** .......... 89
**A. Site Visits** .......... 89
**B. Case Reviews** .......... 91
i. Case Review Tool .......... 92
ii. Year 2 Review Process .......... 93
iii. Psychotropic Case Review Demographics and Findings .......... 98
iv. Disability Case Review Demographics and Findings .......... 103

**VII. CLOSING** .......... 105

**APPENDIX** .......... 106
**Appendix A:** Types of ORR Residential Care Programs .......... 106
**Appendix B**: ORR Sponsor Categories .......... 109
**Appendix C**: ORR Foundational Rule: What it is and how it applies to Lucas R. .......... 110
**Appendix D:** ORR's Psychotropic Case Review Instructions .......... 112
**Appendix E:** Updated PCU Psychotropic Treatment Authorization Request Forms .......... 114
**Appendix F:** Psychotropic Settlement Exhibit A .......... 120
**Appendix G**: Disability Diagnosis Reporting Tool .......... 122
**Appendix H:** Division of Health Dispatch: Disability Determination and 504 Service Plans .......... 124
**Appendix I:** Division of Health's "Dear Colleague Letter" .......... 129
**Appendix J:** S-25 Individualized Section 504 Service Plan .......... 130
**Appendix K:** Notice of Placement in a Restrictive Setting Form .......... 133
**Appendix L:** Fields in ORR's Disability Periodic Report .......... 138
**Appendix M:** Monitor's Spring 2026 Psychotropic Case Review Tool .......... 139
**Appendix N:** Monitor's Spring 2026 Disability Case Review Tool .......... 142

# I. INTRODUCTION & SUMMARY OF YEAR 2 PROGRESS

This is the second Annual Monitor's Report ("Report") concerning two Settlement Agreements in connection with the Lucas R. litigation ("Lucas R.") — the Psychotropic Medications Settlement Agreement (the "Psychotropic Settlement") and the Disability Settlement Agreement (the "Disability Settlement," and collectively with the Psychotropic Settlement, the "Settlement Agreements"). In June 2018, the United States (US) Department of Health and Human Services (HHS) Administration for Children and Families' (ACF) Office of Refugee Resettlement (ORR) was sued on behalf of unaccompanied immigrant and asylum-seeking children under 18 years-of-age who were, had been, or would be in the custody of ORR based on a number of alleged constitutional and statutory violations.[1] At the center of these Settlement Agreements are the children and youth in ORR custody who: (1) "are or will be prescribed or administered one or more psychotropic medications without procedural safeguards"[2] ("the psychotropic class"); and (2) "have or will have a behavioral, mental health, intellectual, and/or developmental disability...and who are or will be placed in a secure facility, medium-secure facility, or residential treatment center (RTC) solely by reason of such disabilities"[3] ("the disability class").

Both Settlement Agreements were approved by the US District Court for the Central District of California-Western Division ("the Court") and became effective on May 3, 2024 ("Effective Date"). The Settlement Agreements articulate ORR's commitment to key procedural improvements regarding the prescribing and administering of psychotropic medications to children in their care as well as ORR's commitment to assess for, and to provide reasonable accommodations, supports, and services to children with disabilities in its care. Both Settlement Agreements are time-limited for approximately six years, with the possibility of early exit for the Government if it can demonstrate "Substantial Compliance" with the requirements of the Settlement Agreements.[4]

[1] Lucas R. v. Azar, 2:18-cv-05741-DMG-PLA (C.D. Cal.) First Amended Complaint accessed via the website of the National Youth Law Center on June 15, 2025. FAC FINAL TO FILE.

[2] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Third Claim for Relief [Psychotropic Medications]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section I.E.)

[3] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Fifth Claim for Relief [Disability]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Section I.C.)

[4] See Psychotropic Settlement, Section XII.D.: "Notwithstanding any other provision of the Agreement, this Agreement shall terminate on the earliest of the following dates (the "Termination Date"): (1) Beginning three years after the Effective Date, Defendants may move for a Court Order permitting early termination if they can demonstrate Substantial Compliance for continuous period of six months following implementation of this Agreement nationwide, supported by certification from the Monitor; or (2) Six years from the Effective Date."; and the Disability Settlement, Section I.T.: "Termination Date is five years after the Implementation Date or an earlier date if the Court approves early termination based on Defendants demonstrating

This Second Annual Report by the Monitor assesses ORR's progress implementing both the Psychotropic and Disability Settlement Agreements.[5] Because the timeline for implementation of the Disability Settlement lagged behind the Psychotropic Settlement, the Monitor's First Annual Report (for Year 1, May 2024 – April 2025),[6] focused largely on Lucas R. psychotropic implementation. In that Report, the Monitor concluded that ORR was "building a solid foundation to support its continued implementation of the Settlement Agreement" as:

> *ORR updated its UACB [Unaccompanied Alien Children Bureau], Policy Guide and UAC MAP [Unaccompanied Alien Children Manual of Procedures], developed and rolled out informed consent and assent forms and related guidance, produced data reports, and crafted its Transition and Implementation Plans[7] ...The Monitor found that ORR made organizational changes that met the goals and requirements of the Lucas R. Psychotropic Settlement. In particular, the Monitor observed that DHUC [Division of Health for Unaccompanied Children][8] effectively expanded its role to provide oversight of prescribing practice and consultation on appropriate use of psychotropic medications and is actively supporting Settlement requirements around consent/assent.[9] ...[Lastly,] ORR undertook necessary education and engagement activities to prepare in- and out-of-network care providers and ORR*

---

Substantial Compliance with the Agreement. The Termination Date is the date on which all terms of the Agreement and ongoing Court jurisdiction terminate." On January 20, 2026, a Joint Stipulation was filed with the Court that clarifies that ORR's Termination Date remains May 3, 2030, unless the Court approves early termination of the Settlements, even though the Disability Settlement implementation was delayed by six months.

[5] The January 20, 2026 Joint Stipulation affirmed that "(1) The Monitor's next Annual Report regarding the Disability Settlement and Psychotropic Medications Settlement will be filed in September 2026, and every 12 months thereafter so long as the settlements remain in effect. (2) The Monitor will issue a final Annual Report in April 2030 prior to the settlements' Termination Date on May 3, 2030, or a month prior to an earlier termination date if the Court approves early termination of the settlements based on Defendants demonstrating Substantial Compliance with them. If the Court approves an early but different termination date for each settlement, or only approves early termination for one settlement, the Monitor will issue a final Annual Report in the month prior to the settlement that remains in effect longest." Lucas R. et al. v. Kennedy. Order RE Joint Stipulation Regarding Annual Reports from Monitor [480]. US District Court Central District of California Western Division (Case 2:18-cv-05741-DMG-BFM). Filed 1/21/26.

[6] Based on the timing of the Court's approval of the Settlement Agreements (May 2024), the Monitor assesses progress from May 1st through April 30th of each year. The First Annual Report for "Year 1" was for the period May 1, 2024 through April 30, 2025; Year 2 was May 1, 2025 through April 30, 2026; and so on.

[7] First Annual Monitoring Report Lucas R. v. Kennedy Psychotropic Medications and Disability Settlement Agreements. Page 31.

[8] The Monitor uses Division of Health for Unaccompanied Children (DHUC) consistent with the Settlement Agreements. As of May 2026, DHUC is called the Division of Health (DoH) by ORR.

[9] First Annual Monitoring Report Lucas R. v. Kennedy Psychotropic Medications and Disability Settlement Agreements. Page 35.

*personnel to execute the requirements of the Settlement Agreement in their daily practice.*[10]

The Monitor refrained from making a judgment in the Year 1 Report related to the field's implementation given that the early rollout of the Psychotropic Settlement was limited largely to providers in a single state, Texas. This Second Report focuses much more on the field's uptake and implementation of the Psychotropic Settlement provisions and provides an initial assessment of the policy and organizational changes ORR made to support implementation of the Disability Settlement in Year 2 (May 2025 – April 2026).

Overall, for Year 2, the Monitor found continued concerted efforts by ORR to diligently and comprehensively implement the provisions of the Psychotropic and Disability Settlements. The Monitor observed ORR's Unaccompanied Alien Children Bureau Division of Policy Administration and Legal Affairs (DPALA) and Division of Health of Unaccompanied Children[11] (DHUC), the divisions overseeing the day-to-day implementation of the Lucas R. Settlements, making significant progress to create the policy and health practice infrastructure needed to implement the Settlement Agreements and to consistently engage with the field to identify which organizational and implementation supports would best support the needs of children in care. The Monitor also observed a robust partnership between DHUC and DPALA[12] in the face of changing ORR policies that significantly changed the nature of ORR care from short-term stays to longer term care for the children in its custody.

Specifically, over this reporting period, the Monitor observed the field's increased awareness and compliance with the new policies, procedures, and forms connected to the consent and assent processes set forth in the Psychotropic Settlement. Similarly, the Monitor observed the field's early use of the new 504 Plan disability protocols, albeit with less certainty and consistency because that implementation is earlier in its launch. In addition, as compared to Year 1, the Monitor observed expanded efforts by ORR to provide training, office hours, and other implementation resources to providers. The Monitor is encouraged by the progress ORR made over Year 2 but also, as discussed in this Report, has identified opportunities for ORR to strengthen its support and oversight of the field to ensure the Settlements' requirements are rigorously implemented.

[10] First Annual Monitoring Report Lucas R. v. Kennedy Psychotropic Medications and Disability Settlement Agreements. Page 48.
[11] As stated earlier, the Monitor uses DHUC, as it was used in the Settlement Agreements. As of May 2026, DHUC is called by DoH.
[12] In the First Annual Report, the Monitor referred to DPALA by its prior name, ORR Unaccompanied Alien Children Bureau Division of Policy and Legal Affairs.

Of course, Lucas R. is not being implemented in a bubble, but in the context of a number of significant policy changes that have dramatically affected how ORR programs operate across the country, and how children experience their care in ORR custody. Notably, during Year 2, ORR changed how it vets sponsors — including by now requiring mandatory fingerprinting, changing the acceptable identity documentation and proof-of-income requirements, and expanding the DNA sampling requirements. Not only did these changes necessitate new practices by care providers,[13] but they also directly and substantially impacted children, as these policy changes caused, and continue to cause, children to experience significantly longer stays in ORR custody. For example, in October 2024, when the Monitor conducted their first site visits, the average length of stay for any child in an ORR residential program was approximately 35 days,[14] whereas in April 2026 when the Monitor visited programs, the average length of stay had risen to 215 days, a remarkable 514% increase in less than two years.[15] The length of stay for children in the Lucas R. classes is far longer, an average of 303 days for children on psychotropic medications[16] and 379 days for children with disabilities.[17] In Year 3, the Monitor plans to examine the reasons why children in the Lucas R. classes have longer lengths of stay in care.

Because most ORR programs were not designed to be long-term residential placements for children, but instead short-term settings for children who would be quickly released to sponsors (parents or relatives in most cases), this new reality has had important implications for Lucas R. implementation. Today, the majority of children in ORR care are placed in shelter and transitional foster care (TFC) programs, established for the provision of short-term (30 day) stays.[18] Many of these programs have little to no experience providing long-term educational, therapeutic, and physical health supports to the ORR

---

[13] According to the Psychotropic Settlement, Section I.B., "'Care Provider' means any care provider for UCs in ORR legal custody. This includes ORR funded programs that are licensed, certified, or accredited by an appropriate State agency to provide residential care for children, including shelter, group, foster care, staff-secure, secure, therapeutic, or residential treatment care for children. It also includes influx care facilities that care for children in ORR's custody, out-of-network facilities, and formerly licensed programs that lost their licenses due to a state's actions to exclude all ORR programs from state licensing."

[14] HHS ACF ORR (2025, June). Data. (The Monitor retrieved this data in June 2025; however, the October 2024 data is no longer publicly posted on ORR's website, only more recent data).

[15] HHS ACF ORR (2026, May). Data.

[16] Calculated by data provided to the Monitor in the May 2026 Psychotropic Periodic Report, of children on psychotropic medications November 1, 2025 to April 30, 2026. See more on the Monitor's analyses under Report Section IV.E. (ORR Data Reporting).

[17] HHS ACF ORR (2026, June). Amended Public Report on Children with Identified Disabilities in ORR Custody from November 2025 through April 2026.

[18] Shelter programs are the primary placement for children older than 12-years-of-age. TFC are the primary placement for children 12-years-of-age and younger. Both were designed as short-term programs, for care when children's average length of stay was around a month. Long Term Foster Care is a family or group home placement in a community-based setting, where children typically attend public school and receive community-based services. This placement is used by sponsor Category 4 children whom ORR determines will be in its custody for an extended period of time.

children in their care. The Monitor has observed some programs attempting to shift how they operate to accommodate children's longer stays, and, in some cases, children's new, and in many cases, heightened needs due to these extended stays, such as, for example, experimenting with sending children to community-based public schools. However, other programs continue to implement their same, fairly rigid program model (See Appendix A for full review of ORR's placement continuum).

Moreover, while shelters are considered a "least restrictive placement" by ORR, and children are most certainly not confined to locked rooms as in a detention setting, there are troubling detention-like conditions of their custody. For example, children reside in locked buildings (often behind multiple, locked doors) and their movement is highly controlled. In addition, rules designed to protect children's safety and hygiene, such as prohibiting them from hugging or even braiding each other's hair, were less problematic when children were staying for a few weeks. At this point, however, given far longer stays, these restrictions may be experienced by children as needlessly cruel and could themselves be emotionally harmful. The Monitor discusses the placement continuum in greater detail in the Disability Settlement section of this Report, specifically related to Settlement provisions affecting both range of placements and least restrictive placements (see Report Sections V.D.ii. and V.E.), and plans to work with ORR in Year 3 to determine how applicable rules might be adjusted without comprising the safety of children in care.

The Monitor wants to be clear that they have found the ORR team assigned to Lucas R. to be highly engaged in quality improvement and very committed to meeting the needs of children in the custody of ORR. The Monitor meets bi-weekly with this team in sessions that are focused on problem-solving and service improvement. And yet, an important limiting factor for this team is their inability to control some of the larger policy shifts at ORR that appear to be negatively affecting children in the Lucas R. classes.

In addition and related to the ORR team assigned to Lucas R., the Monitor was informed in May 2026 that the Mental Health Services Branch Chief planned to retire in July 2026. This child psychiatrist serves in a central oversight role of DHUC in accordance with Section IX.E. of the Psychotropic Settlement[19] — a role that the Monitor has observed has grown in its importance to both children in ORR custody and to care providers given the increasing length of stay for children. In July 2026, DHUC's other (and, at the time, second) child psychiatrist on staff assumed the Lucas R. psychotropic oversight responsibilities for ORR. At the time of this writing, the Monitor is not aware of any plan by ORR to hire an additional psychiatrist. The Monitor is concerned about this reduced capacity, and believes it is likely that a second psychiatrist will be needed even though the Lucas R. Settlement Agreement

[19] "A licensed child and adolescent psychiatrist...shall oversee DHUC's responsibilities." See Psychotropic Settlement. Section IX.E.

only specifies one. Given the current length of stay for children in the Lucas R. classes and other complex realities on the ground, it is the position of the Monitor that any vacancy in the DHUC team should be immediately filled. The Monitor will track this closely in Year 3 and plans to follow up directly with the DHUC team on resource and capacity needs related to implementation of both Lucas R. Settlements.

Throughout Year 2, ORR's census showed that most providers were significantly below their funded bed capacity as the population of children in ORR care has decreased. As a result, in early 2026, ORR began to consolidate its contracts with care providers to better align its provider array with the reduced number of children in care, including by closing programs operated by numerous providers. However, despite these changes, most providers remained under their funded capacity. In Year 3, the Monitor will carefully track ORR's consolidation and changes to its placement array to ensure (1) ORR has appropriate placements to meet the least restrictive best interests of children in care with disabilities, and (2) providers have the capacity to effectively implement the Lucas R. provisions.

Year 2 also saw significant organizational challenges for ORR. From October 1 to November 12, 2025, the federal government experienced a 43-day shutdown. While ORR staff continued work during this period, HHS's Office of the General Counsel (OGC) and Department of Justice (DOJ) staff supporting Lucas R. implementation were furloughed at a key moment of finalizing the disability implementation plan. To ORR's credit, it was able to stay on track with the timeline for this deliverable, but the shutdown slowed other Lucas R. implementation efforts occurring at ORR. In addition, in July 2025, ORR's Unaccompanied Alien Children Bureau (UACB) underwent a significant reorganization. Among other changes, Federal Field Specialists (FFS), who had previously been locally based and assigned to specific programs they visited on-site monthly, were re-organized into the Division of Child Administration (DCA) and Division of Sponsor Administration (DSA). As a result, sponsor vetting moved in-house and is no longer the responsibility of care providers and other outside contractors.

Throughout the year, almost every care provider program visited by the Monitor described a revolving door of FFS staff assigned to their program. In addition, all programs commented about the lack of a monthly FFS on-site presence, which had previously been the practice. It is perplexing to the Monitor that broader ORR policy shifts have been justified on the grounds of child safety (i.e., heightened evaluation of sponsor candidates), while the on-site presence of ORR has been reduced. Given likely programmatic changes needed due to ORR's new long-term custody of children, it would stand to reason that more on-site health and support services expertise from ORR is needed. While ORR has since rolled back some of these organizational changes, the effect can still be felt in the field. At the time of this report writing, ORR FFS and DHUC staff rarely travel to sites. The Monitor continues to

track the extent to which these changes and transitions affect the Lucas R. classes of children in ORR custody, as well as the providers responsible for their care.

### Report Roadmap

This Second Annual Report reflects the Monitor's evaluation of ORR's implementation during the review period of May 2025 through April 2026. As noted above, the terms of the Settlement Agreements established a phased implementation schedule for both Agreements. The Psychotropic Settlement implementation began in May 2024, shortly after the Settlements were signed. The Disability Settlement implementation did not start until November 13, 2025, reflecting a longer planning and implementation runway provided under the Agreement.

This Report is organized into seven sections following this Introduction. *Section II* describes the methodology used by the Monitor to assess ORR's implementation and performance, including an overview of the data sources used by the Monitor. *Section III* provides an overview of demographics of children in each Settlement class. *Section IV* focuses on the Psychotropic Settlement's implementation progress and compliance, and *Section V* focuses on the Disability Settlement's implementation progress and compliance. *Section VI* describes findings from the Monitor's site visits and case reviews. *Section VII* closes the Report.

This Monitor's Report is a public document, filed with the Court, and posted on the websites of both ORR and Plaintiffs' Counsel.[20]

## II. MONITOR'S METHODOLOGY & DATA SOURCES

The Monitor has been involved in the case since 2021 when she served as Mediator for both Settlements. The Settlement Agreements grant the Monitor the authority to evaluate ORR's progress toward compliance with the terms of the Lucas R. Psychotropic and Disability Settlement Agreements. This authority extends to hiring monitoring staff. The Monitor and her team are referred to collectively in this report as "the Monitor" or "she/her/they/their."

---

[20] In undertaking the work related to the Settlement Agreements, DPALA developed documents and implementation tools. To the extent possible, this Report cites these resources as hyperlinks for easy reference. Where hyperlinks are not available, the Report cites sources in traditional footnotes or includes them as attachments in the Appendix.

## A. Methodology

The Monitor established the following three-part approach to monitor implementation of the Lucas R. Settlement Agreements.

First, the Monitor created processes and an accountability structure to monitor fidelity and progress made by ORR toward meeting the requirements and timeframes outlined in the Agreements. This includes regular bi-weekly meetings between the Monitor and the ORR implementation team: DPALA and DHUC as well as OGC's Children, Families and Aging Division along with other data and policy partners, who were included as needed.[21] The Monitor also met more frequently with DPALA to monitor ORR's ongoing implementation activities.[22]

Second, the Monitor established regular avenues for communication between the Parties and for consultation with Plaintiffs' Counsel. During both required and ad hoc meetings, the Monitor and the Parties met to discuss ORR's implementation of the requirements included in the Settlement Agreements, challenges or barriers encountered by ORR, concerns raised by Plaintiffs or colleagues of theirs in the field, and remedial efforts to address those challenges. The Monitor also engaged with the Parties around ORR's development of policies, procedures, and implementation plans.[23] The Parties also met formally twice during the year, as required in the Settlement Agreements.

Finally, the Monitor conducted hands-on monitoring activities, including site visits and interviews at ORR facilities, reviews and analyses of relevant data reports, meetings with stakeholders, and case record reviews, to closely observe and assess ORR's progress implementing the terms of both Settlements. This year the Monitor conducted site visits at 17 programs in eight states and met with nearly 20 ORR DCA FFS and Project Officers. The Monitor also met extensively with DHUC, including its data and quality assurance teams, its third-party insurer (Point Comfort United), and its disability consultant (KVC Health Systems).

---

[21] The Monitor-ORR bi-weekly meeting agendas reflected a list of required updates, status reports, and discussion items covering policies, data and reporting, planning, case review findings, and any challenges related to Lucas R. implementation. This included a meeting with ORR's disability consultant as well as with relevant ORR divisions, as needed.

[22] In February 2026, the Monitor began an additional scheduled monthly meeting with the DPALA Lucas R. leads, which increased to bi-weekly during the Monitor's drafting of this Report (April to June 2026). Previously, the Monitor's meetings with DPALA, beyond the routine Monitor-ORR bi-weekly meeting, had been ad hoc.

[23] The Parties also met as needed and communicated regularly in writing on emerging issues. The Monitor values and encourages consistent and transparent communication, preferring that Parties share information and discuss concerns timely and directly.

Throughout this work, the Monitor's approach was designed to promote candor and constructive problem solving in the service of compliance, improved practice and conditions of custody, and overall well-being for children in the Lucas R. classes.

## B. Data Sources

The Psychotropic and Disability Settlements require that ORR produce three data reports on a specific schedule — a Quarterly Report, a Periodic Report, and a Public Report.[24] See Table 1 for a brief description and schedule for each report. These reports enable the Monitor to track implementation and compliance with the terms of the Settlement Agreements.

[24] Regarding the three required data reports — (1) The Quarterly Report goes to the Monitor and Plaintiffs' Counsel and is used to track Settlement implementation, including as a tool to monitor variation in the number of children prescribed medications and the number of children with identified disabilities at different care provider programs. The Monitor also uses this data to inform and prioritize the programs they visit. (2) The more detailed Periodic Report is prepared semi-annually for the Monitor and provides a case-level window into Settlement compliance. (3) Lastly, the Public Report is an important tool that ORR uses to inform and educate its care providers and other stakeholders as well as maintain accountability and transparency regarding children prescribed psychotropic medications and children who have disabilities in ORR care. The Public Report is posted on ORR's website.

**TABLE 1: ORR Settlement Data Reports Overview and Schedule**[25]

| Report | Report Audience | Year 2 Reporting Schedule | Purpose |
|---|---|---|---|
| **Quarterly Report** | | | |
| **Psychotropic Medication** | Plaintiffs' Counsel and Monitor | Quarterly (8/4/25, 11/3/25, 2/3/26, 5/4/26) | High-level overview of psychotropic medication utilization by children in ORR custody |
| **Disability** | Plaintiffs' Counsel and Monitor | Quarterly (2/3/26, 5/4/26) | High-level overview of disability diagnoses for children in ORR custody |
| **Periodic Report** | | | |
| **Psychotropic Medication** | Monitor | Semi-annually (11/3/25, 5/4/26) | Case-level psychotropic medication prescribing and consent practices for children in ORR custody |
| **Disability** | Monitor | Semi-annually (11/3/25, 5/4/26) | Case-level profile of 504 Plans and disability diagnoses for children in ORR custody |
| **Public Report** | | | |
| **Psychotropic Medication** | Public, published to ORR's website | Semi-annually (11/3/25, 5/4/26) | A streamlined documentation of number of children in ORR custody on psychotropic medications, classes of medications, placement types, and emergency prescription of psychotropic medications |
| **Disability** | Public, published to ORR's website | Semi-annually (11/3/25, 5/4/26) | A streamlined documentation of number of disability diagnoses for children in ORR custody |

[25] Per the Disability Settlement, the inclusion of disability reporting data lagged behind the psychotropic medication reporting, with the first Disability Periodic and Public Reports produced in November 2025. The first Disability Quarterly Report was produced in February 2026.

Beginning with this Second Report, the Monitor includes aggregate data from ORR's Periodic Reports. The Monitor's data scientist analyzed and aggregated these data from ORR's Periodic Reports to independently track compliance with the Settlements and observe implementation trends over time. The data in the Periodic Report provided to the Monitor include children in care only in states that had reached the implementation stage of the Settlement Agreements' Transition Plans (see Report Sections IV.A. and V.A.). This means the Year 2 Periodic Report data does not include all children in ORR custody but instead represents the subsection of children placed in states where rollout is underway. Because ORR onboarded additional states and provider networks to Settlement reporting requirements over the review period, the population captured in each successive Periodic Report expanded over time and does not represent a consistent cohort of children. Accordingly, increases or decreases in children reflected in successive Periodic Reports should not be interpreted as changes in prevalence unless otherwise noted. Once ORR's rollout finishes next year, a more complete nationwide view of the Settlement classes and ORR's implementation will be available.

In Year 2, the Monitor analyzed data from the following three semi-annual Psychotropic Medication Periodic Reports ("Report Periods"):[26]

- **May 2025**: 76 children prescribed 324 psychotropic medications from November 1, 2024 to April 30, 2025
- **November 2025**: 119 children prescribed 423 psychotropic medications from May 1, 2025 to October 31, 2025
- **May 2026**: 180 children prescribed 528 psychotropic medications from November 1, 2025 to April 30, 2026

ORR's first Periodic Report from November 2024 was excluded from the Monitor's aggregate analyses, as that report only included the first cohort to onboard to the Psychotropic Settlement requirements and was comprised of just four children who were prescribed psychotropic medications in RTC care. As such, this first cohort was too small to meaningfully compare trends over time and was excluded from the Monitor's analyses.

For the Disability Settlement, the Monitor reviewed data from the following two semi-annual Periodic Reports, which reported on disabilities:

- **November 2025**: 131 children ORR identified as having one or more disability while in ORR care from May 1, 2025 to October 31, 2025

[26] Medication counts include dosage changes and therefore do not represent unique medications prescribed to children. A single medication may be counted multiple times if its dosage changed during the reporting period. Elsewhere in this Report, medication records may be deduplicated to unique medications when more appropriate for the metric being reported.

- **May 2026**: 233 children ORR identified as having one or more disability while in ORR care from November 1, 2025 to April 30, 2026

## III. DEMOGRAPHICS OF CHILDREN IN THE SETTLEMENT CLASSES

As of April 2026, ORR provided care for 1,977 unaccompanied children ("UC").[27] This represents the full population of children and youth in ORR care. While this is lower than the number of the children in care during Year 1 of the Settlement Agreements, it represents a significant decrease from just two years earlier when ORR reported 6,090 children in its care.[28] The majority (63%) of children served by ORR are between the ages of 15 and 17 years old, with more teenaged males in care than teenaged females. Young children, age 12 and under, represent 24% of the ORR population. Children in ORR's care are predominantly Spanish speaking (88%) and mostly from Guatemala, El Salvador, and Mexico with smaller numbers of children speaking Haitian Creole, the Mayan languages of Q'eqchi and Mam, and French.[29]

### A. Children in the Psychotropic Settlement Class

The Monitor uses ORR's semi-annual Public Reports to track the overall rate of psychotropic medication use among children in ORR custody. In the May 2024 Public Report, ORR's data showed that 3% of children in ORR custody were prescribed one or more psychotropic medications.[30] One year later, this percentage rose to 5.1%.[31] In its May 2026 Public Report,[32] the percentage declined slightly to 4.4%.[33] Given ORR's total

[27] ORR uses "Unaccompanied Alien Children" or "UAC" to refer to this population of children. For the purpose of this and future reports, the Monitor uses "Unaccompanied Children" or "UC" to be consistent with the language used in the Settlement Agreements.
[28] This data was from April 2024. HHS ACF ORR (2025, June). Data. The Monitor retrieved this data in June 2025; however, the April 2024 data is no longer publicly posted on ORR's website.
[29] HHS ACF ORR (2026, May). Data.
[30] HHS ACF ORR (2024, November). Public Report on the Administration of Psychotropic Medication to Children in ORR Custody from May to September 2024.
[31] HHS ACF ORR (2025, May). Public Report on the Administration of Psychotropic Medication to Children in ORR Custody from November 2024 to April 2025.
[32] In this Report, the Monitor uses the "May 2026 Psychotropic Public Report" for ORR's Amended Public Report on the Administration of Psychotropic Medication to Children in ORR Custody from November 2025 to April 2026. This report was first issued on time on May 4, 2026, and was corrected and re-issued on June 11, 2026. For a detailed explanation of ORR's Public Report, see Report Section IV.E.
[33] HHS ACF ORR (2026, June). Amended Public Report on the Administration of Psychotropic Medication to Children in ORR Custody from November 2025 to April 2026.

population in April 2026, this percentage represents approximately 87 children in ORR care who were prescribed at least one psychotropic medication.[34]

For a more detailed review of the psychotropic class, the Monitor analyzed data from the May 2025, November 2025, and May 2026 semi-annual Periodic Reports. The May 2026 Periodic Report showed that the age distribution of children taking psychotropic medications tended to be older than the overall population in ORR care. In FY2025, 63% of children in ORR care were 15 years and older,[35] compared with 74% of children prescribed psychotropic medications. Conversely, just over 10% of children prescribed psychotropic medications were under 13 years of age, compared with 24% of children in the overall ORR population (see Chart 1).

**CHART 1: Age Distribution of Children Prescribed Psychotropic Medications (November 2025-April 2026) Compared with All Children in ORR Care (FY2025)**




Note: Children prescribed psychotropic medications (N = 180). The total FY2025 ORR population is not publicly reported; comparisons are based on ORR's published age distribution percentages.
Source: Monitor analysis of the May 2026 ORR Psychotropic Periodic Report and ORR FY2025 population data.

The psychotropic class contains a slightly higher proportion of males (68%) than the overall population of children in ORR care (63%).[36] This represents a shift from the May

[34] This estimate is slightly lower than the Periodic Report count noted above because the Periodic Report reflects children prescribed psychotropic medications at any point during the six-month reporting period, whereas this count reflects a point-in-time snapshot.
[35] HHS ACF ORR (2026, May). Data.
[36] HHS ACF ORR (2026, May). Data.

2025 and November 2025 Periodic Reports, in which 61% of children on psychotropic medications were male — an increase of seven percentage points. The Monitor will continue to track this trend over time to better understand whether it reflects changes in the population under review, prescribing patterns, or other factors.

Children prescribed psychotropic medications continue to experience longer stays in ORR care than the overall population. In the May 2026 Periodic Report, the average length of stay for children prescribed psychotropic medications was approximately 303 days, remaining relatively stable following the substantial increase observed during Year 1 (see Chart 2). This average length of stay is considerably longer than the 196 day average for the overall population of children in ORR custody. Notably, many children prescribed psychotropic medications remain in care for more than a year.

**CHART 2: Average Length of Stay for Children Prescribed Psychotropic Medications Across Report Periods (November 2024-April 2026)**




<u>Source</u>: Monitor analysis of the May 2025, November 2025, and May 2026 ORR Psychotropic Periodic Reports.

As shown in Chart 3 below, the distribution of lengths of stay across the past three reporting periods indicates a growing concentration of children with extended stays in care. The proportion of children prescribed psychotropic medications who had been in care for at least one year increased from 19% to 25% across the three reporting periods, driven primarily by growth in the percentage of children who had remained in care for more than two years (3% to 9%).

**CHART 3: Distribution of Length of Stay for Children Prescribed Psychotropic Medications Across Report Periods (November 2024-April 2026)**




Source: Monitor analysis of the May 2025, November 2025, and May 2026 ORR Psychotropic Periodic Reports.

For children prescribed psychotropic medications, 15% were placed in restrictive placements (including RTC, heightened supervision, and secure programs). Among less-restrictive placements, 54% of children were in shelters, 20% were in Long Term Foster Care (LTFC), and 10% were in TFC placements (see Charts 4 and 5). Nine percent of children prescribed psychotropic medications were placed in out-of-network placements, including secure facilities, RTC, heightened supervision facilities, and therapeutic group homes (TGH).

**CHART 4: Placement Types for Children Prescribed Psychotropic Medications (November 2025-April 2026)**




Note: Children prescribed psychotropic medications (N = 180). This chart includes children placed both in-network and out-of-network.
Source: Monitor analysis of the May 2026 ORR Psychotropic Periodic Report.

**CHART 5: Distribution of Restrictive Placement Types Among Children Prescribed Psychotropic Medications (November 2025-April 2026)**




Note: Percentages are based on the full population of children prescribed psychotropic medications (N = 180). Twenty-seven children were placed in restrictive settings. This chart includes children placed both in-network and out-of-network.
Source: Monitor analysis of the May 2026 ORR Psychotropic Periodic Report.

From the Monitor's analysis of ORR's May 2026 Psychotropic Periodic Report, the Monitor found that 47% of children prescribed psychotropic medications did not have an identified sponsor and were assigned sponsor Category 4. Thirty-nine percent of children prescribed psychotropic medications had an identified sponsor and were assigned Category 1 (22%), Category 2 (9%), or Category 3 (8%) (see Chart 6). For a description of ORR's sponsor categories, see Appendix B. The Monitor is struck that while nearly half of children were sponsor Category 4, only 20% of children were in an LTFC placement. Examining the placement array for children in the Lucas R. classes, with particular attention to Category 4 children, will be a monitoring priority in Year 3.

**CHART 6: Sponsor Categories for Children Prescribed Psychotropic Medications (November 2025-April 2026)**[37]




Note: Children prescribed psychotropic medications (N = 180).
Source: Monitor analysis of the May 2026 ORR Psychotropic Periodic Report.

## B. Children in the Disability Settlement Class

In Year 1, the Monitor was unable to report the total number of children in the disability class because ORR was still developing a mechanism to identify and capture these data. During Year 2, the Monitor worked extensively with ORR to strengthen its capacity to collect data on this key measure. As a result, ORR can now better identify and track children with disabilities in its care pursuant to the requirements of the Disability Settlement. In its November 2025 Public Report, ORR estimated that approximately 10% of children in ORR care had one or more disabilities.[38] In its May 2026 Public Report,[39] using a revised methodological approach, ORR reported that 19% of children in ORR care had one or more disabilities.[40] This increase likely reflects improved identification and reporting

---

[37] According to ORR, "Unknown Relationship" means no sponsor category has been assigned in the UC Portal to an identified sponsor typically because of lack of documentation to prove the relationship.
[38] HHS ACF ORR (2025, November). Public Report on Children with Identified Disabilities in ORR Custody as of October 2025.
[39] In this Report, the Monitor uses the "May 2026 Public Report" for ORR's Amended Public Report on Children with Identified Disabilities in ORR Custody from November 2025 through April 2026. This report was first issued on time on May 4, 2026, and was corrected and re-issued on June 11, 2026. For a detailed explanation of ORR's Public Report, see Report Section V.G.ii.
[40] HHS ACF ORR (2026, June). Amended Public Report on Children with Identified Disabilities in ORR Custody from November 2025 through April 2026.

practices, as well as refinements to ORR's methodology, and should not be interpreted as a change in the underlying prevalence of disability among children in ORR care.

ORR's November 2025 Public Report categorized disabilities as mental or behavioral health conditions, intellectual or developmental disabilities, physical disabilities, and sensory disabilities (see Chart 7 below). Nearly half (49%) of children with an identified disability had a mental or behavioral health condition, making it the most commonly reported disability category.[41]

Chart 7 reflects the disability categories used in ORR's November 2025 Public Report. In its May 2026 Public Report, ORR revised its methodology and reporting framework, resulting in more detailed disability classifications. Accordingly, the categories shown in Table 2 below are not directly comparable to those listed in Chart 7. As shown in Table 2, 21% of children had a developmental (neurodevelopmental) condition, 16% had an immunologic or allergic condition, and 7% had a sensory condition. Both ORR's November 2025 and May 2026 Public Reports indicate that the most prevalent disability category among children in ORR care is mental or behavioral health related.

While the availability of these data represents a significant organizational milestone for ORR, the figures should still be viewed as preliminary estimates as ORR continues to improve its data quality and strengthen its identification of children with disabilities. The availability of this data represent important and necessary operational and clinical progress for ORR, which the Monitor describes in greater detail in Report Section V.G.ii.

**CHART 7: Disability Categories Among Children in ORR Care (May 2025-October 2025)**[42]




Note: Children with identified disabilities (N = 132).
Source: November 2025 ORR Disability Public Report.

[41] ORR's November 2025 Public Report estimates the percentage as 49%. ORR's May 2026 Public Report estimates the percentage as 59%.
[42] Note that some children had disabilities in more than one category.

**TABLE 2: Categories of Disabilities Identified Among Children in ORR Care (November 2025-April 2026)**

| Disability Type | % | # |
|---|---|---|
| Psychiatric/Behavioral | 59% | 140 |
| Unable to be Categorized | 28% | 66 |
| Developmental (Neurodevelopmental) | 21% | 49 |
| Immunologic/Allergic | 16% | 38 |
| Sensory | 7% | 16 |
| Musculoskeletal | 5% | 11 |
| Neurologic (Non-Developmental) | 5% | 12 |
| Endocrine/Metabolic | 2% | 4 |
| Renal/Genitourinary | 2% | 4 |
| Cardiac | 1% | 2 |
| Hematologic (Blood) | 1% | 3 |
| Pulmonary | 1% | 3 |
| Oncologic (Cancer) | 0.4% | 1 |

Note: Children with identified disabilities (N = 236). Children may have more than one disability; therefore, percentages sum to more than 100%.
Source: May 2026 ORR Disability Public Report.

In its May 2026 Public Report, ORR estimated that the average length of stay for children with disabilities was 379 days, more than 50% longer than the average length of stay for children without disabilities (196 days).[43]

[43] HHS ACF ORR (2026, June). Amended Public Report on Children with Identified Disabilities in ORR Custody from November 2025 through April 2026.

**CHART 8: Length of Stay for Children with Disabilities (November 2025-April 2026)**




Note: Children with identified disabilities (N = 233).
Source: Monitor analysis of the May 2026 ORR Disability Periodic Report.

Most children with disabilities are placed in shelter care, followed by LTFC and TFC placements (see Chart 9). According to ORR's May 2026 Public Report, very few children with disabilities are placed in ORR settings that are considered more restrictive, including secure, RTC, and heightened supervision placements (see Chart 9).[44] This is important because the Disability Settlement requires that "children with disabilities in ORR custody must receive services in the least restrictive setting that is in the best interest of the child and also the most integrated setting appropriate to their needs."[45]

[44] HHS ACF ORR (2026, June). Amended Public Report on Children with Identified Disabilities in ORR Custody from November 2025 through April 2026.
[45] Disability Settlement. Preamble, lines 25-27.

**CHART 9: Placement Types for Children with Disabilities (November 2025-April 2026)**[46]




Note: Children with identified disabilities (N = 233). Restrictive placements include secure facilities, staff secure facilities, and RTCs. This chart includes children placed both in-network and out-of-network.
Source**:** Monitor analysis of the May 2026 ORR Disability Periodic Report.

From the Monitor's independent analyses of ORR's May 2026 Periodic Report disability data, the Monitor found that 42% of children with disabilities did not have an identified sponsor and were assigned a sponsor Category 4. Thirty-seven percent of children with disabilities had a known sponsor and were assigned Category 1 (24%), Category 2 (9%), and Category 3 (4%) (see Chart 10). For a description of ORR's sponsor categories, see Appendix B.[47]

[46] For a description of the types of restrictive placements for children with disabilities, see Report Section V.E.
[47] Note that, unlike the Psychotropic Periodic Report, the Disability Periodic Report does not contain age or sex data. Therefore, the Monitor could not report the same demographic descriptives for each class.

**CHART 10: Sponsor Categories for Children with Disabilities (November 2025-April 2026)**[48]




Note: Children with identified disabilities (N = 233).
Source: Monitor analysis of the May 2026 ORR Disability Periodic Report.

## C. Children in Both Lucas R. Classes

In May 2026, ORR reported that 5.2% of children in ORR care were members of both Lucas R. psychotropic and disability classes.[49] Applying this percentage to ORR's April 2026 population of children in care suggests that approximately 103 children may have been members of both classes. While this estimate is higher than ORR's November 2025 estimate of 2.4%,[50] this increase likely reflects changes in ORR's data collection and reporting methodologies and may not reflect a true increase in the number of children in both classes. The Monitor will continue to work with ORR during Year 3 to refine and validate this number.

---

[48] According to ORR, "Unknown Relationship" means no sponsor category has been assigned in the UC Portal to an identified sponsor; this is typically due to a lack of documentation to prove the relationship.
[49] HHS ACF ORR (2026, June). Amended Public Report on Children with Identified Disabilities in ORR Custody from November 2025 through April 2026.
[50] HHS ACF ORR (2025, November). Public Report on Children with Identified Disabilities in ORR Custody as of October 2025.

# IV. PSYCHOTROPIC SETTLEMENT IMPLEMENTATION FINDINGS: ORR Progress Toward Commitments

In Year 2, the Monitor focused their assessment on ORR's rollout of the Lucas R. Psychotropic Settlement provisions to the field. Importantly, ORR's efforts during Year 1 laid the foundation for its subsequent Year 2 implementation activities. Specifically, those activities in Year 1 included developing and amending policies related to the assent and consent process, creating new data reports to measure and assess implementation, and building out new practices within ORR's DHUC team. This effort was codified in ORR's *Implementation Plan for the Lucas R. Psychotropic Settlement*, which set out a phased implementation schedule for the field. In assessing ORR's progress in Year 1, the Monitor acknowledged that "system change and systemwide improvement activities of the sort contemplated by the Lucas R. Settlement Agreements are a massive undertaking, touching virtually every department at ORR UACB and requiring careful orchestration of functions and operations across ORR's portfolio… while ORR made some notable progress, … ORR also encountered some challenges."

For Year 2, the Monitor revisited both the progress and challenges reported in their Year 1 Report and also assessed ORR's performance as related to the broader implementation requirements of the Settlement Agreement. This section describes the Monitor's assessment of ORR's progress in the following key areas: (A) ORR's rollout of the Psychotropic Settlement across ORR's in-network and out-of-network provider community, (B) DHUC and other organizational entities' facilitation and oversight of implementation and practice change, (C) care providers' adherence to the authorized consent and consent procedures, (D) analysis of children's psychotropic medication use, and (E) ORR data reports and monitoring over the past year.

## A. ORR Transition Plan and its Rollout

**Settlement Agreement Requirement**:

Section X: ORR shall require Care Providers to comply with the provisions of this Agreement in accordance with the timeline set forth in Section X.A-F.

The Settlement Agreement requires ORR to ensure that its care providers comply with the requirements agreed to by the Parties. In Year 1, the Monitor found that ORR's *Implementation Plan for the Lucas R. Psychotropic Settlement* ("Psychotropic Implementation Plan") was a "robust plan" that, if implemented well, could drive its implementation, oversight, and quality assurance activities related to the Settlement

Agreement. ORR submitted this plan to the Monitor, and it was approved in February 2025. The Psychotropic Implementation Plan outlines the steps that ORR "has taken, as well as steps it will undertake, with respect to system and process improvements and implementation" from the Psychotropic Settlement. It also includes ORR's Psychotropic Transition Onboarding Plan which lays out a timeline for a phased rollout to states of the Psychotropic Settlement (see Table 3). This approach has allowed ORR to stagger its rollout of the Lucas R. psychotropic medication requirements regionally through August 3, 2026. As states are onboarded, the Settlement Agreement requires that they adopt the new psychotropic medication processes, including the use of the new ORR consent and assent forms.

**TABLE 3: Rollout of Lucas R. Psychotropic Medication Implementation**[51]

| Onboarding Deadline | ORR Region | States in Region[52] | Number of ORR Care Providers[53] | FY2024 Psychotropic Medications Administered |
|---|---|---|---|---|
| **8/3/2024** | RTC programs[54] | N/A | 3 | 23 |
| **2/3/2025** | 6 (TX Only) | TX | 66 | 752 |
| **8/1/2025** | 4, 5, 6 (LA), 7, 8, and 10 | CO, FL, GA, IL, IN, KS, KY, LA, MI, NC, OH, SC, TN, WA | 74 | 499 |
| **3/1/2026** | 9 and 1 | AZ, CA, CT, MA, NV | 75 | 337 |
| **8/1/2026** | 2 and 3 | DC, MD, NJ, NY, PA, VA, WI, WV | 68 | 441 |

As Table 3 shows, in Year 2, ORR onboarded two new cohorts representing eight federal regions and 19 states pursuant to the timeline of the Psychotropic Implementation Plan. Specifically, in August 2025, ORR onboarded six federal regions which included the following states: Colorado, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Louisiana, Michigan, North Carolina, Ohio, South Carolina, Tennessee, and Washington. In March

[51] Out-of-network placements are included in the rollout according to the location of the child's administrative in-network placement.
[52] The "States in Region" are from the 2024 ORR Psychotropic Implementation Plan and are those that ORR had care provider programs located in those states at the time of the Plan's drafting.
[53] The "Number of ORR Care Providers" listed is from the 2024 ORR Psychotropic Implementation Plan.
[54] As of August 2024, there was only one in-network RTC (Shiloh Treatment Center).

2026, ORR onboarded two additional federal regions which included Arizona, California, Connecticut, Massachusetts, and Nevada. By the end of Year 2, all but two regions of ORR's ten regions were onboarded. This last cohort (Regions 2 and 3) will be onboarded in Year 3.[55] To date, ORR has onboarded all eligible cohorts on schedule consistent with the Settlement timeframe.

In its Year 1 Report, the Monitor described that ORR had run a two-year pilot of its new psychotropic processes and policies in Texas (the pilot was launched while the Settlement Agreement while still being negotiated). The pilot enabled many providers in Texas to participate in a soft launch of ORR's new psychotropic medication policies and practices. As discussed in the Year 1 Report, this provided a valuable "staging ground [for ORR] to develop its approach to implementation and identify areas where more capacity was needed." While states in Year 2 did not have the runway provided to Texas providers, they benefited from the greater implementation capacities and lessons learned from ORR's Year 1 rollout and earlier pilot work.

### Onboarding In-Network Providers

Most children in ORR custody are placed in "in-network" programs, which have been developed and/or contracted to be an ORR facility. The in-network care provider programs are typically state-licensed facilities and most have cooperative agreements, except for programs in Florida, South Carolina, and Texas, which no longer license ORR facilities. Per the Foundational Rule[56] (see Appendix C for overview of the Foundational Rule), such facilities must still follow state licensing requirements, even though those states do not license facilities that care for unaccompanied children.[57] ORR reports using out-of-network care providers in the limited instance when a child requires specialized services not offered by an in-network provider.[58]

---

[55] HHS ACF ORR Bureau of Unaccompanied Children (2025, February). Implementation Plan for the Lucas R. Psychotropic Medication Settlement Agreement.

[56] Three days before the Settlement Agreements were approved, ORR published the Foundational Rule in the Federal Register on April 30, 2024 to codify core provisions of the Flores Settlement Agreement, an earlier settlement regarding children in federal immigration custody. The Foundational Rule also codifies key provisions of the Psychotropic and Disability Settlement Agreements.

[57] Unaccompanied Children Program Foundational Rule. Federal Register. Vol. 89, No. 84. (April 30, 2024). 45 CFR Part 410,1302.a.

[58] While ORR prefers to use in-network providers, ORR may use out-of-network care providers when a child requires specialized services not offered by an in-network provider. Children in out-of-network programs are administratively case managed by an in-network ORR care provider who is responsible for ensuring that the out-of-network provider adheres to ORR policies and procedures, including the process improvements ORR committed to in the Settlement Agreements. HHS ACF ORR (2025, May 19) 1.4.6 Residential Treatment Center and Out-of-Network Placements. ORR UACB Policy Guide.

As in Year 1, ORR continues to utilize a multi-faceted approach to onboarding in-network ORR care providers — working to balance broad outreach and targeted technical assistance. First, ORR launched a mass mailing of the required Lucas R. Psychotropic Settlement posting notices to all care providers with guidance on use; the Monitor has observed that these notices are displayed at care provider programs in both English and Spanish and in a location that is typically easily viewed by both staff and children. Second, ORR developed and delivered training for care providers in Settlement-related policy requirements, procedural changes, and other Lucas R. required activities through a series of online trainings. For the August 2025 Cohort, ORR updated its online training, and asked care providers to virtually attend a pre-recorded training entitled, "Lucas R. Onboarding Training – Informed Consent for Psychotropic Medication." The March 2026 cohort was also asked to attend this training.

The Monitor observed this training and found it to be comprehensive and well-organized. That said, while the training provides adequate beginner preparation to meet the Lucas R. Psychotropic requirements, as with any training, it requires ORR to provide follow-up support and more targeted implementation guidance based on the cases and issues that emerge from the field.

In tandem with the virtual asynchronous training, providers were required to attend a two-part live Q&A session.[59] For the August 2025 Q&A, ORR reported to the Monitor that approximately 400 people attended each session. For the March 2026 Q&A, approximately 100 people attended each session. The March Q&A sessions were co-led by DPALA, DHUC, and a Point Comfort United (PCU)[60] representative and focused on rollout of both Settlement Agreements. The Monitor attended the March Q&A and observed that the materials were clearly presented and there was a high level of care provider engagement.

Lastly, DPALA hosts monthly "office hours" with care providers to review content on both Lucas R. Settlements, provide targeted technical assistance, and answer questions from care providers about implementation. These sessions are open to all care providers, regardless of whether the program is among the cohorts that are required to be fully compliant. Approximately 100 attendees participated in each of these monthly sessions. ORR often invites subject matter experts to co-present, including DHUC and the Division of Provider Programming. Usually at least half of the session is a capacity building presentation reviewing key forms and policies related to Lucas R., with the presentation topic informed by ongoing implementation challenges identified by PCU, DHUC, and the field. During the office hours, ORR also answers real-time questions raised by care

[59] The August 2025 Cohort's Q&A sessions were held July 22 and July 30, 2025. The March 2026 Cohort's Q&A sessions were held February 24 and February 25, 2026.
[60] Point Comfort United is ORR's third-party medical management administrator, see Report Section IV.B.iv.

providers and solicits care providers' feedback on implementation barriers and potential support.

Starting in March 2026, the Monitor began to attend ORR's office hours. For most sessions, the Monitor observed that ORR uses slides to formally present along with an informal question and answer portion. There was an active back and forth dialogue between care providers and ORR, and care providers shared many questions in the chat. The Monitor has recommended that ORR be "on video" during the Q&A and office hours, which are conducted virtually through Microsoft Teams, especially given the recent decline in ORR's on site presence with most care providers. ORR received this feedback, and the Monitor has observed an uptick of ORR's on camera presence.

A strength of ORR's implementation is the collaborative tone set in these sessions, and its proactive approach to addressing implementation challenges raised by providers. Multiple times, the Monitor observed that ORR took questions raised by care providers in the Q&A back to the larger ORR team to develop greater guidance or technical assistance supports (for example, developing the out-of-network provider FAQ discussed in the next section). This active continuous quality improvement (CQI) process enables DPALA to stay attuned to the real-world implementation needs of the field.

To further support the ongoing capacity building of care providers, ORR created a "Lucas R. Sandbox" that will compile all the Lucas R. trainings and relevant resources for both Settlements into one place on ORR's Learning Center connected to the ORR UC Portal ("UC Portal").[61] This Sandbox has the potential to more comprehensively organize and provide Lucas R.-related supports. However, ORR acknowledges that not all care providers have UC Portal access, particularly out-of-network providers that care for children with more complex needs. The Monitor expects that ORR will work to ensure its training materials are reaching all of its care providers. As of this report writing, the Lucas R. Sandbox has been built and is under clearance review. A preliminary version was previewed with the Monitor and Plaintiffs. The Monitor will assess the finalized development of this resource and the field's utilization in the coming year.

In Year 1, ORR also reported it was "working to initiate a mandatory online Lucas R. compliance refresher training for all Texas providers and, in the coming year, to require it annually for all care providers." ORR made this training available to care providers through

[61] The Monitor uses ORR UC Portal as this was used in the Settlement Agreements. As of May 2026, the UC Portal goes by the ORR UAC Portal. In the First Annual Report, the Monitor referred to the UC Portal as the "ORR Portal." The UC Portal is the data repository for all child-specific and related care and service information. The UC Portal is an old operating system that has limited capacity to accommodate the upgrades needed to implement the Settlement Agreements as well as to meet the daily demands of ORR personnel.

the ORR Learning Center in Year 2. The Monitor's case reviews, discussed in greater detail in Report Section VI.B., found improved adherence to Lucas R. requirements, in part likely due to the training materials produced by ORR. However, given the frequent turnover in many care provider programs, continual efforts to onboard staff to the Settlement requirements should remain a priority.

Based on the Monitor's review of training materials, observation of ORR training sessions and office hours, as well as case reviews and site visits (see Report Section VI), the Monitor found a provider network highly familiar with the basics of the Psychotropic Settlement requirements. Provider staff across roles were knowledgeable about these requirements and expressed general comfort with implementing the authorized consent process. ORR and specifically its DPALA and DHUC teams should be commended for their work in this area, especially given the changing policy environment in which they found themselves in Year 2.

Despite this positive progress, the Monitor observed a number of implementation nuances where ongoing technical assistance from DPALA, DHUC, and/or FFS would be supportive to care providers, including related to the timing when providers should engage the CCU, understanding the policy for when and how to use UC Consenters[62], increasing the completion of assents, and working with out-of-network providers (all discussed below). Further, while the Monitor recognizes the strong efforts ORR has made to date onboarding care providers across its network, these efforts to train, support, and evaluate care providers must be rigorous and ongoing to ensure sustainable practice change. During Year 3, the Monitor will continue to track ORR's efforts to prepare and support care providers' ongoing implementation of the Settlement Agreements so that children receive appropriate care.

### Onboarding Out-of-Network Providers

In Year 2, the Monitor paid particular attention to the rollout of the Lucas R. provisions among out-of-network providers, given this was a noted challenge in Year 1. As stated above, children may be placed in a specialized out-of-network placement when ORR is

[62] The Monitor uses UC Consenter, as this was the term used in the Settlement Agreement. As of May 2026, ORR uses "UAC Consenter" for this term.

unable to find an in-network provider that is able to meet a child's specialized needs, such as those with significant mental health concerns.[63, 64, 65] In Year 1, the Monitor noted:

> *Stakeholders reported to the Monitor that early out-of-network RTC provider compliance was challenging, and that the establishment of ORR Lucas R. practice expectations were slow to develop in care provider programs located across the country and operating under varied state licensing requirements.*

Based on the Monitor's case reviews, observations at ORR trainings, site visits, and many stakeholder discussions, the Monitor continues to find variability in the quality and consistency in the practices of out-of-network providers' implementation of the requirements of the Settlement Agreements. Challenges navigating how to implement Lucas R. requirements with out-of-network placements was raised in discussions with the Monitor by ORR care providers and also in office hours with ORR. This issue appeared most pronounced related to the disability provisions, especially 504 Plans, which are still early in implementation. Positively, consents for children in out-of-network placements now appear to be completed more consistently, which is an improvement from Year 1.

ORR is aware of this challenge, and the Monitor has observed a proactive response on their part. For example, in its trainings, ORR emphasized that the ORR administrative placement (the in-network provider) has the ultimate responsibility of ensuring the Lucas R. requirements are met and not the out-of-network provider. To clarify this further, in April 2026, ORR circulated an *FAQ 20: Out-of-Network Facilities and Administrative Placements* to its provider network. The FAQ addresses common questions regarding roles, responsibilities, and documentation when a child in ORR care requires an out-of-network placement. In addition, the FAQ was developed to aid coordination between providers, especially related to the consent and assent process and the timely development of 504 Plans. In the coming year, the Monitor will track whether this guidance, in tandem with ORR technical assistance with providers, improves the quality of Lucas R. implementation for children in out-of-network placements, and whether it reduces role confusion between administrative and out-of-network providers.

Further, in the coming year ORR plans to offer a Lucas R. training that covers both Settlements for out-of-network providers. While out-of-network providers cannot currently be required to complete this training pursuant to the single case contracting mechanism

---

[63] HHS ACF ORR (2025, May 19). 1.4.6 Residential Treatment Center and Out-of-Network Placements. ORR UACB Policy Guide.

[64] An ORR FFS and the FFS Supervisor must approve placement of a child in an out-of-network facility, confirming that the placement is the least restrictive placement in the child's best interests.

[65] Unaccompanied Children Program Foundational Rule. Federal Register. Vol. 89, No. 84. (April 30, 2024). 45 CFR Part 410, 1102.

used for out-of-network placements, ORR plans to strongly encourage attendance for frequently used out-of-network placements. The Monitor is pleased to see ORR's efforts to standardize roles and distribute more Lucas R. information to out-of-network providers. The Monitor will continue to track this issue in Year 3 to ensure out-of-network providers have access to ORR trainings and other supports to strengthen their familiarity and practice related to the Settlement Agreements.

### Policy Updates

In the Monitor's First Report, they stated, "there is an expectation that Lucas R. related policies, documents, and guidance will be updated and amended over time, which the Monitor will track and report on, as appropriate." ORR's UACB Policy Guide and UAC Manual of Procedures ("MAP") summarize the policies and standards that guide care provider programs and practices regarding the placement, care, and services provided to children in ORR custody, including prescribing and use of psychotropic medications. Foremost, these were updated in UACB Policy Guide 3.4.4.1, published in March 2025. ORR has been working to update this and other Lucas R. related policies and procedures. This package of updates was approved for distribution on June 30, 2026, just outside this Report's period of review, significantly behind ORR's original timeline. In Year 2, the Monitor found that the ORR Lucas R. team worked to move these updates forward to the best of their ability and span of control. An overview of ORR's policy updates related to the Psychotropic Settlement in Year 2 is in Table 4 below.

**TABLE 4: Lucas R. Psychotropic Updated Policies and Forms in Year 2**

| Settlement Related Policies and Guidance | Date |
|---|---|
| FAQ 20: Out-of-Network Facilities and Administrative Placements | Distributed April 2026 |
| UACB Policy Guide 3.4.9 and MAP 3.4.9: Revisions to TAR process to streamline request process for primary care, urgent care, and emergency room visits | Completed April 2026 |
| DoH Dispatch on TAR and Medication Coverage Updates | Distributed April 2026 |
| Lucas R. policies and procedures package | Distributed June 2026 (after the close of Year 2) |

## B. DHUC and Other Staffing and Organizational Supports

### *i. DHUC*

**Settlement Agreement Requirements**:

Section IX. DHUC shall perform the following oversight responsibilities:

A. Review cases that have been flagged by a Care Provider where a UC Consenter consents to the administration of antipsychotics or to the administration of three or more Psychotropic Medications or cases where the Care Provider flags other concerns regarding Psychotropic Medications.
B. Develop a system for conducting retrospective, secondary reviews of prescriptions of Psychotropic Medications prescribed to UCs in ORR custody...
C. Conduct an annual case review of 30 files of UCs administered Psychotropic Medications to evaluate whether ORR is ensuring that Care Providers exercise reasonable and diligent efforts to compile and maintain UCs' medical records.
D. DHUC shall document and track its work relating to Sections IX.A-C above and provide such information to the Monitor for inclusion in their reports.
E. A licensed child and adolescent psychiatrist within DHUC shall oversee DHUC's responsibilities under this section.

In 2019, ORR UACB established DHUC Mental Health Services Branch[66] ahead of the final Lucas R. Psychotropic Settlement to develop policies, improve practice, and provide clinical guidance and consultation to care providers to enable them to meet the mental and behavioral health needs of children in ORR custody. In addition to the work on Lucas R., this team plays a broader role in supporting trauma-informed care across ORR's provider network. The Monitor has observed that the role and importance of DHUC has grown for a number of reasons, including the increasing length of stay for children in ORR custody.

ORR identified a highly qualified child psychiatrist to serve in a central oversight role of DHUC in accordance with Section IX.E. of the Psychotropic Settlement.[67] As of May 2026, DHUC's Mental Health Services Branch included two child psychiatrists; one psychiatric nurse practitioner; one advanced practice nurse practitioner; one licensed clinical social worker; and one child psychologist — the same staffing as was place in Year 1. In May

[66] In the Monitor's Year 1 Report, the "Mental Health Services Branch" was known as the "Mental and Behavioral Health Services Team" (MBHST).
[67] "A licensed child and adolescent psychiatrist...shall oversee DHUC's responsibilities." See Psychotropic Settlement. Section IX.E.

2026, the Monitor was informed that DHUC's lead psychiatrist who was responsible for the Lucas R. psychotropic oversight was planning to retire in July 2026. The second child psychiatrist is expected to assume the Lucas R. psychotropic oversight responsibilities, transitioning into this position without an additional psychiatrist joining the team. While the Settlement Agreement only specifies one child psychiatrist, the Monitor is concerned about this reduced capacity and anticipates a second psychiatrist will be needed. The Monitor will track this closely in Year 3 and plans to follow up directly with the DHUC team on resource and capacity needs, if any, related to implementation of both Lucas R. Settlements.

As noted already, DHUC plays a vital role in the implementation of the Psychotropic Settlement. The clinical oversight of psychotropic medication use continues to be overseen by DHUC's lead psychiatrist with the support of the Mental Health Services Branch. In accordance with the requirements of Section IX.A. and Section IX.B. of the Settlement, the Branch created a system to identify and provide timely clinical review of red flag cases along with regular quality assurance reviews. (See Appendix D for ORR's Psychotropic Case Review Instructions, summarizing how DHUC conducts its three required Settlement reviews).

To carry out its retrospective review, DHUC secures a monthly pharmacy report from the PCU of children prescribed psychotropic medications in the states required to be in compliance with the Settlement Agreement. DHUC then uses this to identify red flag cases, including all children under three years of age on any psychotropic medication and all children age four or older on three or more psychotropics or on two or more antipsychotics. DHUC's lead psychiatrist then follows up directly with providers when there appears to be overuse of antipsychotic medications or medication prescribing that is not consistent with the Texas formulary prescribing parameters.[68] The Mental Health Services Branch tracks this both at the case level and in aggregate across programs and prescribers to support prescribing, consent, and case practice standards that are consistent with the Lucas R. Settlement requirements.

At the case level, DHUC also tracks priority cases for children with elevated mental and behavioral health needs, including many children on psychotropic medications. DHUC shared with the Monitor that its Mental Health Services Branch currently tracks between 150 and 200 children at any time for elevated oversight, clinical guidance, and engagement

---

[68] The Psychotropic Settlement notes that the medications listed in the Psychiatric Drug Formulary | Texas Health and Human Services shall be considered the universe of "Psychotropic Medications to which the terms of this Agreement apply." It also links appropriate dosage to these Texas standards. (Psychotropic Settlement. Section I.O. and Section III. A.2.)

with providers.[69] In the Monitor's discussions with DHUC regarding a handful of specific cases elevated to their attention, the Monitor consistently found that DHUC was already carefully tracking the cases.[70]

Lastly, starting in Year 2, the Settlement Agreement requires that DHUC begin its "annual case review of 30 files of UCs administered Psychotropic Medications" in accordance with Section IX.D. of the Settlement. ORR agreed to review 30 cases jointly with the Monitor (15 from the Monitor's Fall 2025 Case Review and 15 from the Monitor's Spring 2026 Case Review). The Monitor then met with DHUC and DPALA to review themes and insights from the reviewed cases. The Monitor continues to find ORR's collaborative approach to case review an important part of the agency's CQI practices.

A resounding theme of feedback across the Monitor's site visits was the invaluable role of DHUC's case consultation and support to care providers related to the Lucas R. Settlement requirements, but also to overall child well-being and health. The Monitor has met many providers in the field who worked with ORR prior to the development of the DHUC team. Across the board, providers expressed how helpful it was to have a team of experts to call upon for questions, advice, issues with billing and/or help with tracking down a health specialist. It continues to be the Monitor's hope that DHUC's role in promoting the mental health and well-being of all children in ORR custody will be a lasting one beyond the terms of the Lucas R. Settlement Agreement. As noted earlier, the Monitor will continue in Year 3 to track the DHUC team's capacity to oversee the Psychotropic Settlement's implementation, including its clinical case review and consultation.

---

[69] DHUC shared that the cases the Mental Health Services Branch systematically tracks include, but are not limited to, acute psychiatric hospitalization, any RTC or heightened supervision placement, mental health diagnoses of bipolar or psychosis, active non-nicotine substance use or withdrawal symptoms, occurrence of ten or more behavior or mental health related Child Level Events in two weeks, any polypharmacy, and any successful elopement.

[70] See Report Section V.A. for a discussion related to the Parties' time-bound case escalation process during the development of the Disabilities Implementation Plan, where Plaintiffs lifted up a handful of cases to ORR related to children with mental health disabilities.

### *ii. Centralized Concurrence Unit*

**Settlement Agreement Requirements**:

Section VIII.B. The Centralized Concurrence Unit shall have the following responsibilities:

1. Provide or withhold concurrence to Psychotropic Medication prescriptions as provided herein where informed consent cannot be otherwise obtained, as specified in this Agreement.
2. Override denial of consent, as specified in Section IV of this Agreement.
3. Document and track its work relating to Sections VIII.B.1 and 2 above and provide such information to the Monitor for inclusion in her reports.

The Centralized Concurrence Unit (CCU) officially began operations under the terms of the Settlement Agreement in May 2024, operating through ORR's third-party medical management administrator, PCU. As required by the Settlement, the CCU is overseen by a licensed psychiatrist and is staffed by a rotating panel of psychiatrists licensed in the US who provide an independent clinical opinion on the appropriateness of a care provider's request to prescribe and administer psychotropic medications to a child when "informed consent cannot be otherwise obtained" or to "override denial of consent."[71]

Over this past year, the Monitor observed a slightly lower rate of requests made to the CCU to review an authorized consenter's denial of consent or to obtain consent when informed consent could not be obtained. According to ORR's Periodic Report data, there were six CCU overrides in Year 2 and four overrides in the second half of Year 1 respectively — meaning the CCU continues to be used infrequently.[72]

The Monitor has inquired about the consent process and the use of the CCU during all of their site visits. While it is true that providers are becoming much more adept at obtaining consent, especially through the use of the "WhatsApp" platform for consenters who reside outside of the US, the Monitor also observed that many providers are still becoming familiar with the CCU and how to engage with it when they experience trouble obtaining consent. Positively, providers are correctly focused on reaching out to primary consenters first, which is the best practice. However, whether and when it is most appropriate for providers to reach out to the CCU is still an evolving question based on the Monitor's review and discussions with the field.

---

[71] Psychotropic Settlement. Section VIII.B.

[72] The denominator expanded in Year 2, therefore there was a smaller proportion of children who used the CCU in Year 1.

As Lucas R. implementation continues to rollout, the Monitor will closely review CCU operations and care providers' experiences in the field. At the beginning of the Settlement, some concerns were raised with the Monitor about the required CCU process and its potential conflict with state licensing requirements for some ORR care providers. Over the past year, this specific situation has not been brought to the Monitor's attention. If one arises, the Settlement Agreement instructs the CCU to notify ORR, which must inform the Monitor within ten days and offer an alternative that enables ORR to substantially comply with the Settlement Agreement. The Monitor will continue to track this issue and the use of the CCU in Year 3.

*iii.* *UACB Policy Division*[73]

**Psychotropic Settlement Implementation Plan**:

Psychotropic Implementation Plan, Page 20: The primary divisions within UAC Bureau that have responsibility for monitoring compliance with the terms of the Settlement Agreement are the Division of UAC Policy (specifically, the Legal Affairs Team) and DHUC. The Legal Affairs Team developed an internal tracking system to ensure ORR meets benchmarks identified in the Settlement Agreement. Furthermore, the Legal Affairs Team drafted and submitted the Transition Plan, which specifies the timeline for how ORR will proceed with implementing the Settlement Agreement terms over time in different jurisdictions across the country. The Legal Affairs Team has responsibility for tracking these deadlines, coordinating internally and with ORR programs, and reporting regularly to leadership and other affected UAC Bureau Divisions, to ensure that ORR is on track with meeting all agreed-upon milestones.

UACB Policy's Division of Policy Administration and Legislative Affairs (DPALA) has responsibility for the day-to-day coordination and orchestration of both Lucas R. Settlements' activities. While DPALA's role is not identified directly in the Settlement Agreement, it is identified in the Psychotropic Implementation Plan (see box above). The DPALA Team serves as the central implementing function for both Agreements, and as the ORR liaison and the point of contact and accountability for the Monitor. The Team also produces Lucas R. related policies; generates reports; provides bi-weekly updates; tracks deadlines; coordinates internally with ORR departments, OGC, and care provider programs; and reports regularly to ORR leadership to ensure that ORR is on track to meet the requirements of the Psychotropic and Disability Settlements.

[73] The Psychotropic Settlement does not mention specific guidance related to ORR's oversight of the Settlement Agreement's implementation. However, the Psychotropic Implementation Plan specifies this oversight role is the responsibility of UACB's Legal Affairs Team, which is currently known as DPALA.

The Monitor and DPALA continued to have a solid working relationship in Year 2 to advance the implementation of the Lucas R. Settlement Agreements. In February 2026, the Monitor started monthly meetings with DPALA to focus on specific issues related to data and case reviews. This meeting is in addition to a regular bi-weekly, between the Monitor and ORR. In addition, DPALA leads an internal ORR Lucas R. workgroup that includes, DHUC, data and technology, and quality assurance staff, as well as representation from OGC to coordinate Lucas R. implementation.

From the Monitor's perspective, DPALA has met its obligations in Year 2 as specified in the Implementation Plan. The Monitor has found the Team assigned to Lucas R. to be highly engaged in quality improvement and very committed to meeting the needs of children in the custody of ORR. A limiting factor for the Team is their inability to control some of the larger policy shifts at ORR that seem to be negatively affecting the children in the Lucas R. classes. The Monitor will continue to track these trends and their work with DPALA in how it can support the field's implementation of the Settlement Agreements.

### *iv. Point Comfort United*

In June 2022, ORR issued updated guidance outlining the process for approving payments for psychotropic medications by ORR's health care management and third-party administrator, Point Comfort United (PCU). PCU manages claims and health care benefits for children in ORR custody and uses the Magellan RX network. PCU requires advance authorization for all health care services except initial medical screenings and emergency care. Historically, ORR care providers submitted Treatment Authorization Requests (TARs) in order to get prior approval for medical, dental, and mental health services. Once approved, payment was made through PCU for the medical, mental health, or pharmacy services rendered. In April 2026, ORR updated its TAR guidance through its *Division of Health Dispatch (DoH) on TARs and Medication Coverage Updates* to clarify that TARs are not required for most urgent/emergent health services or primary care visits.

PCU has a specific Psychotropic TAR process to ensure the submission of the appropriate consents for psychotropic medication authorization (see Appendix E). The PCU process requires that care provider programs submit a Psychotropic TAR for each psychotropic medication prescribed to a child in care and for any change in dosage. The PCU then completes a review of each request and verifies that required consent was obtained before authorizing a prescription to be filled and issuing payment. The one exception to this process is when a small titration range is written into the original pharmacy script, providers can secure one Psychotropic TAR and consent for this prescription, without requiring new paperwork for each titration interval. The Monitor observed titration ranges

were written infrequently into consents in the case review, perhaps suggesting that many providers may not be aware of this policy.

Because of the direct connection between the pharmacy, care provider, and PCU, the Monitor works with PCU through ORR on implementation of the Psychotropic Settlement. The PCU prior authorization process is being rolled out regionally in accordance with the Settlement Agreement Transition Plan. In the Monitor's case review, the Monitor verified the submission of consent, assent, and Psychotropic TARs (see Report Section IV.B.). Through the Monitor's site visits, they found that care providers had familiarity with the PCU prior approval process, although there is still some uncertainty about changes put in place to make approvals easier like the titration interval noted above.

In April 2026, the Monitor met with the CEO of PCU and the nurse who oversees Lucas R. implementation and the Psychotropic TAR process. PCU relayed a robust working relationship with ORR through bi-weekly meetings and monthly aggregate data meetings. Because there is only one private insurer, ORR is able to streamline and engage in implementation efforts at scale with PCU. For example, to support the rollout of new ORR consents forms, PCU required that they would only accept consents — and pay for medication — via the new ORR form starting in March 2026. PCU notified care providers a few months earlier about the required use the ORR consent forms. This policy made a significant impact; in the Monitor's ORR case reviews, the Monitor observed that nearly 100% of the consents reviewed utilized ORR's new standardized form. PCU also provides real-time feedback on trends and implementation challenges, which ORR shares back to providers. For example, with the March 2026 implementation cohort, PCU noticed providers submitting one Psychotropic TAR for multiple medications at the same time. ORR incorporated this feedback into its technical assistance with care providers at its monthly office hours later that month. This is an important CQI loop to maintain.

During the Monitor's site visits, multiple providers noted that PCU could only approve TARs during working hours, Monday to Friday (and not holidays or weekends), which sometimes made it challenging to access real-time support that was needed and delayed medication authorization. PCU advised that they have not observed an increase in Friday afternoon or Monday morning psychotropic medication requests. The accessibility of PCU to providers and how it impacts psychotropic medication authorization is something that the Monitor will closely track in Year 3.

Lastly, during Year 2, the Monitor noted greater data sharing between ORR and PCU and the increased use of data for CQI. ORR receives two monthly reports from PCU: (1) Psychotropic TARs submitted the previous month, and (2) psychotropic medications dispensed by pharmacies the previous month. Because the Psychotropic Periodic Report draws directly from these PCU reports, the Monitor worked closely with ORR to better

understand and leverage the data for quality assurance and monitoring efforts. For example, the Monitor's analyses helped identify data entry errors by care providers, as the Psychotropic TAR information is manually entered. In response, ORR worked with providers to improve their Psychotropic TAR submission process and began relying on PCU pharmacy data, rather than TAR data, for reporting because it is less susceptible to data entry errors. Consequently, DPALA has led quality assurance reviews of providers' consents and Psychotropic TAR submissions. The Monitor will continue to track these efforts and, where possible, support the use of the most reliable administrative data sources for Lucas R. reporting and ORR's ongoing CQI efforts (see more in the Data Reporting Section IV.E.).

## C. Authorized Consent and Consent Procedures

### *i. Authorized Consent and Concurrence (and ORR Consent Forms)*

**Settlement Agreement Requirements:**

Section II.B.2. For all UCs prescribed one or more Psychotropic Medication(s), informed consent shall be sought from the child's parent or legal guardian, referred to as the Primary Consenter, who serves as the Authorized Consenter for the child unless there is no Primary Consenter...If there is no Primary Consenter, then the Sponsor Consenter, if one exists for the UC, may be the Authorized Consenter.

Section II.B.4. If there is no Primary Consenter and no Sponsor Consenter, then a UC Consenter, if applicable, may be the Authorized Consenter.

Section II.C.2. When Authorized Consent cannot be obtained...The Care Provider may seek concurrence from the CCU...If CCU concurrence with a Psychotropic Medication prescription is sought and obtained, it shall be in writing and signed by a licensed psychiatrist or psychiatric nurse under the supervision of a psychiatrist.

The Psychotropic Settlement specifies who can consent for the administration of psychotropic medications for children in ORR custody, prioritizing parents or legal guardians, followed by sponsors who are close relatives and previously served as the child's primary caregiver, and unaccompanied children consenters ("UC consenters") who are 16 years old or older.[74] The Settlement Agreement also requires that, except in the case

[74] "'UC Consenter' means a UC, age 16 or 17, from whom a doctor has obtained informed consent." Psychotropic Settlement. Section I.S.

of emergencies, children 14 years or older provide their assent before being administered psychotropic medication(s). The goal of these requirements is to ensure that ORR provides each child's "authorized consenter" with the information they need to make an informed decision about a child's health and well-being and to ensure that ORR maintains appropriate documentation of informed consent.

In Year 1, ORR developed and rolled out the required consent and assent policies and related forms, notices, and guidance in compliance with the Settlement Agreement. The Monitor found that ORR's finalized policies and forms adequately reflected the Settlement Agreement requirements. In Year 2, the Monitor's assessment focused on care provider's implementation of ORR's authorized consent processes, prioritization of authorized consenters, and adherence to documentation timelines. The Monitor assessed these processes through site visits; analyzing Periodic Report data; case reviews;[75] conversations with ORR, Plaintiffs, and other stakeholders; and observations of ORR trainings.

Overall, the Monitor found that ORR made substantial improvements in implementation of the authorized consent process from Year 1. Through site visits and meetings with FFS, the Monitor observed that the field was highly conversant about the Lucas R. consent process and prioritization of authorized consenters. Care providers spoke about the creative strategies they employed to reach families with limited cell phone or internet access to discuss informed consent and secure required signatures. Most cases in the Monitor's case review (80%) demonstrated compliance following the appropriate identification of the authorized consenter.

In the case reviews, the Monitor also observed visible improvement in the consent and assent process compared to Year 1. Specifically, the Monitor found that only 11% of cases did not include the required consent and assent documentation for children's prescribed medications, an improvement from the 25% of cases that were missing these documents in the Year 1 review.

An additional sign of progress the Monitor observed from Year 1 was providers' consistent use of ORR's consent and assent forms in Year 2. In the First Annual Report, the Monitor noted that many providers continued to complete their own program forms despite the availability of the new, required ORR consent and assent forms, which ORR implemented in February 2025.[76] In contrast, in Year 2, the Monitor observed that nearly all providers

[75] See Report Section VI.B.iii. for more on consent and assent related case reviews findings.
[76] The Monitor approved ORR's new consent and assent forms in November 2024 and PRA clearance and Office of Management and Budget approval was received on January 17, 2025. ORR trained care providers on the new forms in late January 2025, and the effective date of the forms was February 1, 2025. ORR

used the ORR consent and assent forms. This was a significant shift, and in large part due to the change made by ORR, in consultation with PCU as noted above, that tied authorization and payment to use of the ORR consent form. While the Monitor appreciates that many providers had and were using their own consent forms, in a national program like the one operated by ORR, it is necessary to have consistency across programs, especially because children move within and among a network of providers and this important documentation must move with them and be understood by new providers. In this regard, ORR's use of a single payment entity, the PCU, offers it the ability to more easily standardize processes than systems that are working with multiple payers (e.g., state child welfare systems where children are covered across multiple managed care payers).

In the First Annual Report, the Monitor also noted that providers "expressed frustration about having to upload consent and Psychotropic TAR forms and case detail twice — once into the UC Portal and another time into the PCU Portal." Of significance, this challenge was not brought up in Year 2 in conversations with providers. However, providers still had to enter consents twice, one to each portal. ORR reports that PCU streamlined this process by enabling providers to upload consents directly into the PCU Portal, rather than completing the Psychotropic TAR and then emailing the consents separately to PCU. The Monitor will continue to track the paperwork burden on providers and how it impacts both compliance and case practice. The Monitor — like ORR and many care providers — is hopeful that ORR's updated case management system and portal, ORRbit, will provide efficiencies in areas like this.[77]

In the Year 2 case review, the Monitor found a significant improvement in the ability to locate Lucas R. psychotropic forms in the UC Portal. In comparison to the Year 1 review, nearly all the consents were appropriately filed within the UC Portal's "Health" tab. ORR improved documentation identification in Year 2 by the introduction of tags to label "consent" and "assent" in the UC Portal. Although rare, there was still a handful of consents and assents misfiled in UC Portal's "UAC Documents" tab.

For children where there were multiple medications, dose changes, and/or medication changes, tracking which medications the child was currently taking and ensuring all the proper consents were in the file was especially challenging. ORR similarly identified this issue, sharing it is difficult to discern which medications are active or discontinued for a

disseminated the new forms to care providers again on March 18, 2025, along with the newly published psychotropic policies and procedures.

[77] ORR anticipates launching ORRbit in late 2026. It will be developed and rolled out in stages.

child.[78] Consequently, DPALA is partnering with DHUC and its technology team to build a more prominent and accessible feature in the UC Portal to identify each child's current medications, medication dosage, and prescription dates. Such progress would be advantageous for care providers, health providers, and quality assurance staff alike; the Monitor has noted their preference that this implementation does not wait until the new ORR portal launches.

Even though progress was observed in the correct filing of documents within the UC Portal, the Monitor found that the titling of documents was still inconsistent and could make documentation navigation difficult. Providers' nomenclature to title the files varied widely, with some documents not meaningfully labeled at all, making it challenging to track and organize paperwork when downloaded. ORR and DHUC are now managing complex medical issues for children who sometimes move between care providers, including providers that are out-of-network. Developing a consistent nomenclature and filing system will be beneficial not just to children but to the staff and clinicians who rely on historical and current medical records; this is especially important given the increase in length of stay as discussed above. The Monitor observed that most — if not all — programs have staff who are responsible for medical filing in the UC Portal. These staff, across providers, should be using standardized filing practices and processes. Creating a clear and consistent file nomenclature throughout ORR's provider network would be a significant improvement to the overall health program run by ORR, and would be especially beneficial for the children in the Lucas R. classes.

Last, ORR is working to have consent and assent forms available in Spanish and other common languages spoken by the children in ORR care. However, the process was significantly delayed. During site visits, numerous providers shared challenges related to consents and assents failing to be in children and families' primary languages. Again, what appears to be a routine administrative process to translate a form into common languages is taking a needlessly long time due to what the Monitor is told are administrative hurdles. The Spanish versions of the consent and assent forms were approved for release by ORR in late July 2026 after the Year 2 review period. ORR has committed to the Monitor that it is working on translating the consent and assent forms into other common languages. However, ORR stated these translations will not be released until Year 3, as ORR will seek their approval as part of a broader package of anticipated modifications to the consent and assent forms. The Monitor expects that ORR will work with urgency to resolve this issue as a key component of ensuring informed consent is providing children and families information in their primary language. The Monitor will track ORR's progress on getting the

[78] The current UC Portal does have a backend tool that lists a child's current and prior medications, including indicating which are psychotropic medications, but this is not prominently displayed in the "Health" tab, and this functionality is not currently available to the Monitor.

updated and translated forms to the field in Year 3. This is a critical compliance and best practice issue from the Monitor's perspective.

### UC Consent

The Settlement Agreement specifies a categorical preference for a primary consenter followed by the sponsor consenter. Only if these cannot be obtained and the youth is deemed capable by a doctor can the youth serve as an authorized consenter ("UC consenter") to provide informed consent for their psychotropic medication. According to ORR's Periodic Report data, 32 youth served as UC consenters for one or more of their psychotropic medications in Year 2.

In practice, how providers determine if and when a youth can serve as an UC consenter appears variable. Through their case reviews, the Monitor observed that some youth's files contained a doctor's note asserting the youth's competence to provide consent; however, most did not. Similarly, some consents explicitly documented that the youth did not have a suitable primary or sponsor consenter or provided another rationale why the youth was a UC consenter, but again many did not. Providers mentioned they did not know if there is a specific manner in which they are supposed to document the rationale that the youth is the authorized consenter and is capable to provide consent in the youth's case file.

Notably, in the Year 2 Periodic Reports, the Monitor found that 28% UC consenters only provided consent for some but not all of their medications. Consent was provided by the primary or sponsor consenter for some of these youth's psychotropic medications, whereas for other medications, the youth provided consent. The Monitor will seek to understand better in Year 3 the reasons for this variability and whether there are policy reasons or just more practical expediency issues associated with a providers' choice of consenter.

In conversations with stakeholders, including providers and FFS, the Monitor observed some uncertainty about the UC consenter process. This was especially true in understanding under what circumstances a youth can serve as a UC consenter. For example, one provider asked if a youth is over 16 years old and parenting if they can automatically serve as UC consenter. Another provider queried whether a youth who wants to keep psychotropic medication use private can serve as a UC consenter, despite there being a primary or sponsor consenter available.

These are all places where greater technical assistance and guidance from ORR would be helpful. In addition, it would be very useful for ORR to use these questions as case studies in their office hours sessions, perhaps having the providers themselves present the issues and solutions (if they felt comfortable doing so) to foster more participation from the field.

More closely examining the UC consent process and related ORR guidance will be a priority for the Monitor in Year 3.

### *ii. Consent Procedures for Authorized Consenters*

**Settlement Agreement Requirements:**

Section III.A. Verbal Consent

1. The Care Provider shall seek the verbal informed consent of the Authorized Consenter prior to beginning the course of medication [except in cases of emergency] ...the Care Provider shall seek the verbal informed consent of the Authorized Consenter within five days of receiving the UC.
2. Verbal informed consent must also be obtained prior to increases in dosage of Psychotropic Medication.
3. Verbal consent must be documented.
4. The Care Provider shall ensure that prior to administering the Psychotropic Medication, the case manager or clinical staff...who is familiar with the minor's history verbally provides the Authorized Consenter with information necessary to make an informed decision about whether the UC should be administered the Psychotropic Medication.

Section III.C. Written Consent

1. Verbal consent under Section III.A of this Agreement shall be followed up by written consent. Such verbal consent shall remain valid until rescinded, either orally or in writing, and shall remain valid for no more than 45 days.
5. If written consent is not received within two weeks following verbal consent...the Care Provider shall initiate efforts to obtain concurrence from the CCU.

Section III.D.1. Every six months, the Care Provider shall provide written or verbal notice to the Authorized Consenter that such Authorized Consenter may withdraw consent.

Section III.D.6. Nothing in this Agreement will be a justification to delay an otherwise appropriate release to a suitable sponsor, step-down, or placement in a URM [Unaccompanied Refugee Minors] program.

This year, the Monitor examined the timeliness and thoroughness of providers' completion of ORR's two-step informed consent process for obtaining verbal and written consent. In alignment with the Settlement Agreement, ORR's UACB Policy Guide 3.4.4.1 Informed Consent for Psychotropic Medication outlines the required consent timeline:

> *Informed consent for administering psychotropic medication to children in ORR custody is a two-step process that care providers must follow. First, the care provider must obtain verbal consent from an authorized consenter within five (5) calendar days of a licensed medical professional prescribing the medication. Second, the care provider must obtain written consent from an authorized consenter within 25 calendar days of a licensed medical professional prescribing the medication.*

The Monitor assessed care providers' adherence to this policy in two ways: through analysis of the Periodic Report data and through case reviews.

Using the Periodic Report data, the Monitor first assessed whether care providers completed the required verbal and written consent processes for each psychotropic medication prescription (see Table 5). This table examined if both the verbal consent and written consents were present in the file. In a handful of cases the consents were deemed not applicable ("N/A") or waived, per the Settlement Agreement. [79,] The Monitor found that the percentage of cases with both required consents increased from 50% to 87% from the May 2025 to the May 2026 Periodic Reports. The Monitor also analyzed whether those consents were obtained within ORR's required timelines of five days for verbal and 25 days for written consent (see Table 6).

[79] "N/A" would be noted for all emergency psychotropic use, as there would not need to be consents secured. Additionally, "N/A" would be noted if there was a dosage or medication change that superseded another medication's use. Lastly, "N/A" would be noted if the child was discharged before written consent was due. Regrading where "waived" is noted, an authorized consenter may choose to "waive providing written consent in cases where doing so would result in safety risks or undue burden," often due to a parent's detention or technology barriers to securing written consent. See Disability Settlement, Section III.C.4.

**TABLE 5: Completion of Verbal and Written Consents Across Report Periods (November 2024-April 2026)[80]**

| Presence of Verbal and Written Consents | May 2025 (N = 324) | | November 2025 (N = 423) | | May 2026 (N = 528) | |
|---|---|---|---|---|---|---|
| | % | # | % | # | % | # |
| **Both Verbal Consent and Written Consent Present** | 50% | 161 | 77% | 325 | 87% | 460 |
| **Verbal Consent Present, but No Written Consent** | 3% | 11 | 9% | 39 | 3% | 17 |
| **Verbal Consent Present, and Written Consent N/A** | 14% | 44 | 1% | 3 | 4% | 20 |
| **Verbal Consent Present, and Written Consent Waived** | 0% | 0 | 0% | 0 | 1% | 4 |
| **No Verbal Consent nor Written Consent** | 30% | 97 | 9% | 38 | 1% | 3 |
| **No Verbal Consent, but Written Consent Present** | 0% | 0 | 0% | 1 | 1% | 5 |
| **No Verbal Consent, and Written Consent N/A** | 0% | 0 | 1% | 3 | 0% | 0 |
| **Verbal Consent N/A, and Written Consent Present** | 2% | 6 | 0% | 1 | 0% | 0 |
| **Both Verbal Consent and Written Consent N/A** | 2% | 5 | 3% | 13 | 4% | 19 |

Source: Monitor analysis of the May 2025, November 2025, and May 2026 ORR Psychotropic Periodic Reports.

[80] Consents are required for the initial medication and dosage changes (except for titration details written into the original prescription) and must renewed every six-months.

**TABLE 6: Timeliness of Verbal and Written Consents Across Report Periods (November 2024-April 2026)**

| Timeliness of Consent Documentation | May 2025 (N = 324) | November 2025 (N = 423) | May 2026 (N = 528) |
|---|---|---|---|
| **Meets Consent Timeline Requirements** (Verbal consent under 5 days of prescription and written consent within 19 days of verbal consent) | **37% (119)** | **56% (235)** | **70% (368)** |
| **Close to Meeting Timeline Requirements** (Verbal consent within 6-10 days of prescription and written consent within 20-30 days of verbal consent) | **2% (7)** | **4% (18)** | **7% (37)** |
| **Does Not Meet Timeline Requirements** | **44% (143)** | **36% (150)** | **15% (80)** |
| ***Far from meeting requirements*** *(Verbal consent exceeds 11 days of prescription and written consent exceeds 31 days from verbal consent)* | *4% (14)* | *9% (37)* | *10% (53)* |
| ***No consent*** *(For verbal, written, or both consents)* | *33% (108)* | *18% (78)* | *5% (25)* |
| ***Unable to assess due to dates missing*** *(For verbal, written, or both consents)* | *7% (21)* | *8% (35)* | *0% (2)* |
| **Not Applicable** (labeled N/A on verbal, written, or both consents) | **17% (55)** | **5% (20)** | **8% (43)** |

Note: Percentages may not sum to 100% due to rounding.
Source: Monitor analysis of the May 2025, November 2025, and May 2026 ORR Psychotropic Periodic Reports.

Upon receipt of the November 2025 Periodic Report, the Monitor analyzed the May and November 2025 Periodic Reports. The November 2025 Periodic Report data showed that over one-third of psychotropic medication records did not have consent documentation on file within the required five day and 25 day windows. Notably, the November 2025 Periodic

Report indicated that 18% of records were missing the verbal and/or written consent documentation. These findings were surprising to the Monitor given that the PCU will not process a Psychotropic TAR or approve a prescription without the required consents in place. The Monitor shared these findings with the ORR team, who were similarly concerned and took swift action to examine the data further. ORR hypothesized that the findings were most likely attributable to errors by care providers in entering information into the Psychotropic TARs, rather than failures to obtain the required consents. ORR subsequently launched a quality assurance project to review providers' non-compliance with consent requirements and manually verify the completion of each consent. When errors were identified, ORR followed up directly with providers to correct the records. ORR has also aggregated findings from these reviews to identify lessons learned and share them more broadly with care providers through its technical assistance vehicles.

In the May 2026 Periodic Report, the Monitor observed a notable improvement in the recorded completion and timeliness of consent documentation. Eighty-seven percent of medication records included both verbal and written consents on file, up from 77% in the November 2025 Periodic Report. Less than 1% of records were missing both consents, compared with 9% of records in the November 2025 Periodic Report. Significantly, only 15% of records were noted by the Monitor to not meet the requirements of the Settlement, down from 36% in the November 2025 Periodic Report. Given the shift in ORR's data reporting methodology, the Monitor cannot fully assess if these improvements are evidence of improved care provider practice, improved data quality, or a combination of both. Nevertheless, the findings represent meaningful progress. That said, ORR must continue to guide care providers toward strengthened compliance to ensure the appropriate consent practices are in place for young people.

The Monitor commends ORR for proactively addressing this data issue and using lessons learned to strengthen care provider practices and ORR's ongoing data monitoring. This data review led to ORR's decision to move from using PCU's TAR Report to the Pharmacy Report as the basis for its Periodic Report starting in May 2026 (see Report Section IV.E. on Data Reporting for more on this change). This shift reflected concerns that Psychotropic TAR data were too susceptible to provider data entry errors to reliably support reporting and monitoring activities.

Similar gaps in consent completion and timeliness were observed in the Monitor's case reviews (see Report Section VI.B.iii. for a fuller discussion). The Monitor found that most consents were appropriately maintained in the case files. However, among children with multiple medications and/or dosage changes, a handful were missing consents — either because they failed to be uploaded or because consent had not been appropriately secured. The Monitor also observed an increase in cases in which care providers simultaneously secured verbal and written consent. ORR shared that it has been

encouraging care providers to adopt this strategy, where appropriate, to more expeditiously secure consents.

The Monitor will continue to closely track ORR's authorized consent completeness (verbal and written) and timeliness and expects to see continued improvements by care providers in the coming year.

### *iii. UC Assent*

**Settlement Agreement Requirement**:

Section V.A. For any UC aged 14 or older, prior to administering Psychotropic Medication(s), the Care Provider must attempt to seek informed assent or agreement from the UC, consistent with the following, but with the understanding that a Primary Consenter or Sponsor Consenter's consent will control even in the absence of UC assent.

Providers must secure assent for the provision of psychotropic medication for all children aged 14 and older in concert with informed consent from the authorized consenter. This is an important process to ensure older children are actively involved in the decision-making process of medications that are prescribed for them. In the Monitor's Fall 2025 Case Review, they examined if the necessary assents were in place for children 14 and older, which they looked for whenever examining for consents. While the Monitor found that consents were nearly always properly secured and uploaded to the UC Portal, assents were missing in a handful of cases, indicating that support for the practice of securing assents needs greater attention. The Monitor shared this observation with ORR in the debrief of their Fall 2025 ORR's joint case review. ORR acknowledged that they had not been systematically tracking assents in its quality assurance activities. ORR elected to add a new data element to its Spring 2026 Case Review Tool, "proof of assent form entered in the "Health" tab of UC Portal for UC ages 14 and over." ORR also incorporated a greater focus on assents in its ongoing technical assistance work with providers. This concerted attention on assents was evident in the Monitor's Spring 2026 Case Review, where they observed providers more consistently securing both consents and assents.

One outstanding issue related to assents is whether providers need to secure assents for youth age 16 and older who provide UC consent. In the Monitor's case reviews, they observed that some providers secured both assent and informed consent from the youth. Other providers just had the youth complete the informed consent. This duplicative issue of assents was also raised by care providers during ORR's office hours. In Year 3 the Monitor will seek joint clarification from the Parties on this issue to enable ORR to provide better policy guidance to the field.

### *iv. Emergency Administration of Psychotropic Medication*

**Settlement Agreement Requirement**:

Section VI.A. The Primary Consenter or Sponsor Consenter and DHUC shall be notified of each emergency administration of the medication and the reasons therefore as soon as practicable and in all cases within one week of its initial administration. The UC's case file must include an explanation of the nature and circumstances of each administration of an emergency medication.

The Settlement Agreement articulates a process for the timely notification of emergency administration of psychotropic medication(s) and stipulates that ORR policies are followed regarding the use of chemical restraints. In the Year 1 Report, the Monitor noted that the emergency administration of psychotropic medications "happened very infrequently and was properly documented in the TARs and consents when this happened." In Year 2, the trend was similar. According to ORR's Periodic Report, in Year 2, six children were administrated emergency psychotropic medications (and there were ten instances of administration — five in each reporting period).[81] The Monitor will continue to examine these trends carefully and is encouraged to observe the infrequent use of emergency medications, when at all possible.

[81] This included children where there was the emergency administration of multiple psychotropic medications on the same day, as well children who were administered multiple emergency psychotropic medications across different days.

## D. Psychotropic Medication Use Practices

**Settlement Agreement Requirements**:

Preamble. The Parties agree that:

a. Psychotropic medications should be used to treat psychiatric conditions only following a diagnostic assessment by a licensed healthcare provider and considering other situational factors that may be contributing to the condition (i.e., trauma);
b. Psychotropic medications should be used aligned with the child's diagnosis (i.e., the medication is appropriately used on- or off-label to treat the child's specific diagnosis and not used due to other therapies being inconvenient or more expensive, recognizing that payment systems may utilize formularies);
c. Psychotropic medications should be administered only in accordance with a licensed prescriber's recommendation based upon the minor's symptoms and periodically reassessed by a licensed prescriber for side-effects and benefits;
d. Recognizing that psychotropic medications may be prescribed off-label, psychotropic medications should be administered at dosages that do not exceed dosing guidelines that recommend a specific dose based upon age and weight where dosing guidelines are available; and
e. Psychotropic medications shall never be used as punishment for disruptive or inappropriate behavior, for the convenience of staff members or caregivers, or as a substitute for adequate staffing and/or adequate ongoing programming for a child's needs.

In Year 2, the Monitor used the aggregated Periodic Report data and Public Reports to examine psychotropic medication use by children in ORR care. Over the past year, the overall rate of psychotropic medication use declined slightly from 5.1%[82] to 4.4% of children in ORR care.[83] This decline is notable given the increased mental and behavioral health needs of children experiencing longer lengths of stay, frequently raised in the Monitor's meetings with care providers and other stakeholders. One explanation for this trend is that care providers are addressing children's increased mental and behavioral health challenges proactively through non-pharmacological means. This sentiment was expressed by most care providers, who noted the use of more frequent therapy sessions and specialized therapeutic supports, but not an increased use of psychotropic

[82] HHS ACF ORR (2025, May). Public Report on the Administration of Psychotropic Medication to Children in ORR Custody from November 2024 to April 2025.
[83] HHS ACF ORR (2026, June). Amended Public Report on the Administration of Psychotropic Medication to Children in ORR Custody from November 2025 to April 2026.

medications by children in their programs. In contrast, a few care providers did observe a rise in the number of children being referred for and/or receiving psychotropic medications in their programs, which they attributed to the growing length of stay's challenges on children's mental health. While the Monitor appreciates that many programs are attempting to meet children's mental and behavioral health needs through non-pharmacological interventions, the Monitor also wants to ensure that providers are adequately attending to children's mental and behavioral needs. The Monitor is in close conversation with ORR to track and understand trends in psychotropic medication prescribing, particularly as children experience longer lengths of stay in ORR's care.

Through the Periodic Report data, the Monitor examined the most commonly prescribed psychotropic medications for children in ORR care (see Table 7). Over the past year and a half, ORR's data shows an uptick in Melatonin usage, a signal of more distressed sleep among young people.[84] The Monitor also heard from providers that they have observed an increase in sleep problems among children in care, which was also documented in case records reviewed by the Monitor. Melatonin, while available over the counter without a prescription, is classified as a psychotropic in accordance with the *"Psychotropic Medication Utilization Parameters for Children and Youth in Texas Public Behavioral Health,"* and requires the completion of ORR consents, assents, and Psychotropic TARs. The three most commonly prescribed antipsychotics for children in ORR care were Aripiprazole, Quetiapine, and Risperidone. These medications' usage, as a percentage of the total number of psychotropics prescribed, decreased during Year 2 (see Table 7).

[84] ORR did not report any Melatonin usage in the May 2025 Psychotropic Periodic Report. Given the Monitor's frequent review of Melatonin use in case files, the Monitor assumes this was an initial data omission by ORR, which has been corrected in later reports. The Monitor and ORR continue to review data accuracy around this issue.

**TABLE 7: Ten Most Commonly Prescribed Psychotropic Medications Across Report Periods (November 2024-April 2026)**

| May 2025 (N = 75) | | | November 2025 (N = 110) | | | May 2026 (N = 180) | | |
|---|---|---|---|---|---|---|---|---|
| **Medication** | **%** | **#** | **Medication** | **%** | **#** | **Medication** | **%** | **#** |
| Fluoxetine | 36% | 27 | Fluoxetine | 33% | 39 | Melatonin | 23% | 42 |
| Trazodone | 30% | 23 | Sertraline | 20% | 24 | Hydroxyz Hcl | 20% | 38 |
| Aripiprazole* | 28% | 21 | Trazodone | 20% | 24 | Trazodone | 18% | 33 |
| Hydroxyz Hcl | 24% | 18 | Escitalopram | 19% | 23 | Fluoxetine | 18% | 33 |
| Hydroxyz Pam | 24% | 18 | Melatonin | 19% | 22 | Escitalopram | 16% | 28 |
| Sertraline | 22% | 17 | Aripiprazole* | 18% | 21 | Sertraline | 15% | 27 |
| Escitalopram | 15% | 11 | Hydroxyz Hcl | 17% | 20 | Hydroxyz Pam | 11% | 20 |
| Risperidone* | 11% | 8 | Hydroxyzine | 13% | 16 | Aripiprazole* | 11% | 20 |
| Mirtazapine | 8% | 6 | Hydroxyz Pam | 13% | 15 | Risperidone* | 8% | 14 |
| Quetiapine* | 7% | 5 | Mirtazapine | 9% | 11 | Guanfacine (tie) | 6% | 11 |
| | | | | | | Prazosin (tie) | 6% | 11 |
| | | | | | | Mirtazapine (tie) | 6% | 11 |

Note: The asterisked medications are antipsychotics. Percentages are based on the total cohort in each report period. Counts represent the number of unique children prescribed each medication; children prescribed more than one medication may appear in multiple rows. Hydroxyzine hydrochloride (Hydroxyz HCl), hydroxyzine pamoate (Hydroxyz Pam), and hydroxyzine are reported separately because they are recorded separately in ORR data.
Source: Monitor analysis of the May 2025, November 2025, and May 2026 ORR Psychotropic Periodic Reports.

The final psychotropic medication pattern that the Monitor examined was the most common therapeutic classes prescribed to children in ORR care (see Table 8). As shown in Table 8, most therapeutic classes remained relatively stable across the three report periods. The proportion of medications classified as antipsychotics, however, decreased over time. The Monitor will continue to track these trends, particularly the use of antipsychotics among children in ORR care.

**TABLE 8: Most Common Psychotropic Medication Therapeutic Classes Across Report Periods (November 2024-April 2026)**

| Psychotropic Medication Class | May 2025 (N = 202) | | November 2025 (N = 321) | | May 2026 (N = 390) | |
|---|---|---|---|---|---|---|
| | % | # | % | # | % | # |
| **Antidepressants** | 50% | 102 | 43% | 138 | 37% | 146 |
| **Antianxiety Agents** | 19% | 38 | 19% | 61 | 20% | 77 |
| **Antipsychotics** | 21% | 43 | 14% | 46 | 12% | 48 |
| **Stimulants** | 3% | 6 | 3% | 10 | 7% | 29 |
| **Others** | 6% | 13 | 21% | 66 | 23% | 90 |

Note: This table presents the most common therapeutic classes by the percentage of psychotropic medications. Percentages are based on the total number of unique psychotropic medications prescribed within each reporting period. When a medication appeared multiple times due to dosage changes, it was counted once within its therapeutic class. The therapeutic classes listed were those provided by ORR in its May 2025, November 2025, and May 2026 Periodic Reports. The "Others" category includes medications that do not fall within the antidepressant, antianxiety-agent, antipsychotic, or stimulant classes

Source: Monitor analysis of the May 2025, November 2025, and May 2026 ORR Psychotropic Periodic Reports.

## E. ORR Data Reporting

**Settlement Agreement Requirement**:

Section IV.C. ORR will provide the Monitor with quarterly reports… Defendants will provide Periodic Reports to the Monitor, detailing ORR's implementation of and compliance with the terms of the Agreement… At the same time that Defendants provide their Periodic Reports to the Monitor, Defendants will publish streamlined public reports online.

In Year 2, ORR met all data reporting requirements related to the development and submission of the Quarterly, Periodic, and Public Reports.[85] During Year 2, the Monitor approved a short extension for submission of data reports, but ORR notified the Monitor in

[85] The Psychotropic Quarterly Reports were delivered to the Monitor on August 2, 2025, November 4, 2025, February 3, 2026, and May 3, 2026. The Psychotropic Periodic and Public Reports were delivered to the Monitor on November 17, 2025 and May 12, 2026.

advance, and requested an extension for the purpose of completing a more comprehensive report. Specifically, because ORR relies on PCU data to compile its reports and those data are not available until after the end of each month, ORR requested additional time to incorporate the prior month's psychotropic data. The Monitor is working with ORR to better streamline this process and review reporting timelines to ensure that ORR can produce high quality, timely data in accordance with the Settlement Agreement's deadlines.

In addition, while ORR submitted its May 2026 Quarterly, Periodic, and Public Reports on time, it reissued all three Reports in early June 2026 after correcting data discrepancies identified by the Monitor. ORR spent a considerable amount of time during Year 2 refining its data collection approach to be more streamlined and accurate — foremost moving from basing its data reports on PCU's Psychotropic TARs Report (a PCU compilation of its submitted Psychotropic TARs) to its Pharmacy Report (a PCU generated Pharmacy Report of filled psychotropic medication prescriptions) for its May 2026 Lucas R. reporting. ORR shifted this after the Monitor's analyses of ORR's November 2025 Periodic Report data on consent completeness and timeliness identified potential data entry errors in care providers' Psychotropic TAR submissions (see Report Section IV.C.ii.).

As a result, ORR based its May 2026 Lucas R. reports primarily on the Pharmacy Report, which is less susceptible to data entry errors, while also implementing manual reviews of consent documentation. Given the scale of this methodological change, some data discrepancies and omissions were identified and subsequently corrected by ORR following the Monitor's review. Moving forward, ORR is continuing to refine its reporting approach by incorporating both the Pharmacy and TAR Reports to create a more comprehensive reporting framework with built in data validation and quality assurance checks. The Monitor encourages ORR to continue strengthening its internal quality assurance processes to proactively identify data issues as its reporting systems continue to mature.

Starting in late 2026, ORR anticipates the launch of its updated case management system and portal, ORRbit. This system is expected to rollout in stages, so it is unclear to the Monitor how this new system will impact ORR's Year 3 data reporting. The Monitor will be tracking this rollout carefully and hopes it can create more efficiencies for the field, and higher quality CQI and management reporting data for ORR.

Year 2 reflects ORR's effort to both streamline data collection and improve data quality. The Monitor expects that ORR will continually evaluate — and the Monitor will track — whether these reports adequately inform its adherence to the Settlement Agreements and, as appropriate, make necessary changes to address any identified limitations of the reports.

### Periodic Report

In accordance with Section VII.C.2. of the Settlement Agreement, ORR must report all of the items referenced in Exhibit A of the Settlement Agreement in its Periodic Report, including identifying information for each child prescribed psychotropic medication and their current care provider; information about the medication prescribed and the prescriber; consenter information; CCU overrides or denial of overrides; and emergency medication and consenter notice (see Appendix F).

During Year 1, ORR informed the Monitor that the preparation of the Periodic Report required substantial manual data entry and staff time. The Monitor recommended ORR identify ways to streamline its data collection process, even if it meant the delivery of semi-annual data was temporarily delayed. In their Year 1 Report, the Monitor advised ORR that the Periodic Report should "function as a robust tool that can be used by both ORR and the Monitor to thoroughly 'evaluate, report on, and monitor'[86] implementation of the Settlement Agreement and certify compliance with the Settlement Agreement." The long-term objective of improved ORR data was not solely for the Monitor to track compliance but rather for ORR, its care providers, and other relevant stakeholders to have and use good quality data for their own program oversight and quality improvement.

In Year 2, ORR made headway in both the preparation and use of its psychotropic medication data. Most notably, ORR partnered more closely with PCU to better automate its data collection processes and improve data quality (as noted earlier). These efforts substantially reduced the amount required for ORR to prepare the Periodic Report.

Over the course of Year 2, ORR also began making greater use of data to inform program oversight, identify trends and patterns, and, as appropriate, adjust and refine implementation. However, it is the Monitor's expectation that ORR's use of data will expand once ORR has finalized its data reporting methodology. As the Monitor and ORR have discussed, the data reporting requirements included in the Settlement Agreement intend to provide ORR with actionable tools to review child and program level assent and consent practice; information about child psychotropic medication use (including medication type, dosage and start and end dates); and identification of patterns by and within providers. The Monitor is continuing to more robustly understand the ongoing CQI capacities of ORR, as well as work with ORR to model ways of using the Periodic Report to identify trends and track implementation over time.

---

[86] Psychotropic Settlement. Section VII.C.2.

### Public Report

ORR is required to post the Public Report on its website twice a year, at the same time that it provides its Periodic Reports to the Monitor, in accordance with Section VII.C.3. of the Settlement Agreement. The Public Report is a streamlined document that includes, at a minimum, aggregated information concerning:

- The number of unaccompanied children in ORR custody prescribed psychotropic medications,
- The number of unaccompanied children in ORR custody prescribed certain classes of psychotropic medications,
- The type of placements children reside, and
- The number of times psychotropic medications were prescribed for an emergency to unaccompanied children in ORR custody.

In Year 2, ORR published two Public Reports on its website. In November 2025 ORR released, *Public Report on the Administration of Psychotropic Medication to Children in ORR Custody from May 2025 to October 2025*. In May 2026 ORR released its next Public Report, which was subsequently corrected and reissued in June 2026, *Amended Public Report on the Administration of Psychotropic Medication to Children in ORR Custody from November 2025 to April 2026.*

The Public Report provides a review of monthly aggregate psychotropic medication rates over time. This is important as the Periodic Report is submitted only to the Monitor on a semi-annual basis and does not track trends against the overall number of children in care. Further, as noted earlier, the Monitor anticipates that, moving forward, ORR will be able to include in its Public Report the number of children on psychotropic medications who have an identified disability and/or 504 Plan to create a more comprehensive picture of the children in both classes.

## F. Conclusion

Overall, during Year 2, the Monitor found ORR made substantial progress related to policy, organizational, and field implementation to support the rollout and uptake of the Psychotropic Settlement provisions. ORR adhered to all the agreed upon timelines and the Monitor observed greater consistency and quality of case practice in securing and completing consents and assents. However, the Monitor observed continued uncertainty among providers about many of the nuances within some of the Settlement Agreement requirements, particularly in areas where there can be role confusion (e.g., between out-of-network and administrative placements and around UC consenters). In their

observations of the field, the Monitor finds ORR care providers are committed to supporting the children in their care, particularly as they observe increased mental and behavioral health symptoms of these children as they contend with increased lengths of stay and greater hopelessness of reconnecting with their families.

Over Year 2, ORR continued to update its policies and supports to the field based on places where additional clarification was needed. While the process to make updates continued to be slowed by administrative delays, the Monitor has observed concerted diligence by the DPALA to continue to move this work forward.

In the area of data reporting, ORR made important progress this past year, but work remains for ORR to ensure its data reports are comprehensive, accurate, and actionable. This is critical in order for ORR to engage in meaningful CQI. Further, as children experience longer lengths of stay in ORR care, ORR's ability to collect and analyze accurate data will be particularly vital to understanding how the field and children are responding to a new reality of long-term placement.

Lastly, as the Monitor discussed in the Year 1 Report, the Psychotropic Settlement includes a provision that gives the Monitor authority to "evaluate data and information" and "advise the parties" whether she believes "various provisions of this Agreement should be modified to ensure the safety and well-being of Class Members; or, because the cost of implementing the provisions...outweighs the benefits." If this occurs, the Parties are expected to meet and confer to "discuss modification of the consent process, the role of the CCU, data issues, or any other provision of the Agreement."[87] While the Psychotropic Settlement expected this be completed by one year after the Effective Date (May 3, 2025), the Monitor advised the Parties that it still remains too early in implementation to make any recommendations. The Monitor will continue to assess these issues and apprise the Parties of possible modifications in Year 3.

[87] Psychotropic Settlement, Section VII.D.3.

# V. DISABILITY SETTLEMENT IMPLEMENTATION FINDINGS: ORR Progress Toward Commitments

The Lucas R. Disability Settlement requires ORR to commit to new goals and requirements for children in their custody with a disability. Broadly, ORR is required to establish new operational capacity with expert staffing and to develop new policies, forms, protocols, and guidance. Specifically, in the pre-implementation period (Year 1), ORR was required to prepare a comprehensive Needs Assessment and a Disability Plan, as well as new policies for screening, identifying, and evaluating children with disabilities. The Settlement Agreement also calls on ORR to develop written guidance for care providers regarding the development of 504 Service Plans, with special obligations related to placement step-ups, and the release of children to sponsors with post-release services and supports.

ORR was responsible for implementing the Disability Settlement Agreement beginning on November 17, 2025 — over one year after the implementation start date of the Psychotropic Settlement. The Settlement Agreement contains a later implementation timeline for the Disability Settlement to allow ORR a longer period to develop its Implementation Plan based on the then current configuration of services, supports, and resources for children with disabilities. Therefore, in contrast to the Monitor's Year 2 assessment of the Psychotropic Settlement implementation, which examines ORR's second year of field implementation, the Monitor's Year 2 assessment of ORR's Disability Settlement progress is focused largely on whether and how ORR put in place the requisite policies and organizational structures to support the field in implementing the disability provisions. As such, the Monitor's Year 2 assessment focuses less on field implementation as rollout for many Disability Settlement changes to care provider programs only began in January 2026. For some components, like the use of a 504 Plan, the requirement technically came online earlier, however, its use was not yet incorporated into ORR's more comprehensive disability implementation strategy until this later date. Consequently, at the time of this report writing, the Monitor considers field implementation nascent, and in Year 2 did not expect to observe full implementation of the Disability Settlement requirements.

The Monitor's assessment of Year 2 Disability Settlement implementation specifically examines ORR's progress related to the requirements set forth in the agreement: (A) ORR's Needs Assessment, Implementation Plan, and rollout; (B) identification and evaluation of disabilities; (C) individualized Section 504 Service Plans; (D) disability-related accommodations and services; (E) placement of children with disabilities in ORR care; (F) release of children with disabilities in ORR care; and (G) ORR policy documents and data reporting over the past year.

## A. ORR Needs Assessment, Implementation Plan and Rollout

**Settlement Agreement Requirements**:

Section III.A. Needs Assessment and Disability Plan

1. Working with internal or external expert(s), ORR will undertake a comprehensive needs assessment to evaluate:
    a. The adequacy of services, supports, and resources currently in place for children in ORR's custody across its network, including ORR's capacity to serve children with disabilities in the most integrated setting appropriate for their needs without fundamentally altering the UC Program; and
    b. Gaps in the current system, including but not limited to, gaps related to identification, services and supports (including both facility-based and community-based services), placement array (including, but not limited to, the availability of therapeutic foster care and shelter placements for children with higher-level needs and children ready to step down), and connections to available post-release services.
    c. Working with internal or external expert(s), ORR will develop and implement a disability plan with steps to address any identified gaps, if any including a concrete timeline.
    d. The needs assessment will be completed and the disability plan developed within one year of the Effective Date of this Agreement.

In April 2025, ORR requested an extension on some of the Disability Settlement requirements to align with the completion of its Needs Assessment and Disability Plan (the deadline for which had previously been extended by the Monitor) to provide sufficient time for the development of new protocols and practices that were not yet standardized in the ORR system. As stated in the Monitor's Year 1 Report, "from the Monitor's perspective, the additional time would enable ORR to incorporate findings from the Needs Assessment into its Disability Plan and introduce new policies, forms, practices, and reporting requirements. Accordingly, the Monitor approved the extension, with this expectation articulated to the Parties."

ORR retained KVC Health Systems ("KVC") in Year 1 as ORR's external consultant with disabilities expertise. KVC conducted the ORR's Disability Needs Assessment and supported ORR in the development of ORR's Disability Plan. At the beginning of August 2025, and on schedule, ORR shared with the Monitor KVC's draft of its Disability Needs Assessment report and an accompanying slide deck that was developed for ORR

leadership. The Monitor had an opportunity to provide feedback on these documents with ORR as well as with KVC directly.

While ORR's Needs Assessment created an initial picture of program readiness to implement the disability components of the Settlement, the Needs Assessment was limited by its inability to include data on the children in ORR care with disabilities. As a result, the Needs Assessment relied largely on interviews, case review, and observation but was unable to incorporate any analysis of administrative data. The Needs Assessment also included a review of care providers' familiarity with children with disabilities as well as the creation of need-based plans like a 504 Plan. The Needs Assessment recommended training for the field in both the identification and recognition of disabilities, and in the ongoing accommodations necessary to support children at the program level. In the Needs Assessment, KVC shared many tools to strengthen ORR's data tracking efforts and to more fully understand the profiles of young people with disabilities in ORR care. The Monitor recommended that ORR utilize many of these approaches in their disability tracking and training efforts and the Monitor observes that ORR is actively working to do so.

ORR incorporated key findings from the Needs Assessment conducted by KVC into its Disability Plan, which ORR termed, the *Lucas R. Disabilities Implementation Plan* ("Disabilities Implementation Plan"). In contrast to the Psychotropic Implementation Plan, the Disability Settlement did not formally require the Monitor's review and approval. Despite this, ORR provided opportunities for both the Monitor and Plaintiffs to review the draft plan. ORR also used the joint meeting of the Parties in October 2025 to obtain feedback from Plaintiffs' Counsel on the strategic direction and core content of the implementation plan. The Monitor found ORR's collaborative approach effective and resulted in a robust Disabilities Implementation Plan to drive its implementation, oversight, and quality assurance activities related to the Settlement Agreement. The final Disabilities Implementation Plan was made available to care providers and other stakeholders on the ORR website in November 2025.

As Table 9 below shows, the Disabilities Implementation Plan includes a timeline that allows ORR to stagger its rollout regionally through August 2026. It also includes a schedule of implementation-related benchmarks that ORR must meet in accordance with the Settlement Agreement. The plan was designed to rollout regionally in alignment with the Psychotropic Implementation Plan. The Disabilities Implementation Plan also describes the training and technical assistance ORR needs to provide to care providers through training, monthly office hours, and other capacity building support.

**TABLE 9: Rollout of Lucas R. Disability Implementation**[88]

| Onboarding Deadline | ORR Region | States in Region[89] | Number of ORR Care Providers[90] |
|---|---|---|---|
| **1/1/2026** | 4, 5, 6, 7, 8, and 10 | CO, FL, GA, IL, IN, KY, LA, MI, NC, OH, OR, SC, TN, TX, WA | 98 |
| **3/1/2026** | 9 and 1 | AZ, CA, CT, MA, NV | 40 |
| **8/1/2026** | 2 and 3 | DC, MD, NJ, NY, PA, VA, WI, WV | 54 |

### Onboarding ORR Field Staff

ORR field staff, in particular FFS and Project Officers, play a vital role supporting policy rollout, care provider compliance, and case oversight for children in ORR custody. Consequently, the Monitor is pleased to see growing efforts by DPALA to build ORR's field staff's understanding of the Lucas R. requirements. In the Monitor's conversations with FFS and Project Officers, the Monitor found significant variability in their knowledge of the Lucas R. requirements, especially related to the Disability Settlement, given its later implementation stage. Also, while most FFS were familiar with the Lucas R. requirements, the range of knowledge was much more variable for Project Officers, who mostly oversee program operations, contracting, and compliance standards.

ORR's expanded training and other support related to Lucas R. requirements for field staff is an important component of implementation. This year, ORR launched a two-part training for DCA FFS and Project Officers.[91] The first training module was delivered in Spring 2026 and focused on a Lucas R. Disability overview; a second Lucas R. training module will focus on both Settlements and is being scheduled for later this year. The Monitor hopes

[88] Out-of-network placements will be included in the rollout according to the location of the child's administrative in-network placement.
[89] The "States in Region" are from the 2025 ORR Disabilities Implementation Plan and are the states where ORR's care provider programs were located at the time of the Plan's drafting.
[90] The "Number of ORR Care Providers" is the number provided in the 2025 ORR Disabilities Implementation Plan.
[91] The FFS training was in March 2026, and the Project Officer training was in June 2026. The Monitor observed both.

that these training opportunities will increase field staff's familiarity with the Settlements' requirements.

To better understand field implementation of the Lucas R. requirements, in Year 2, the Monitor prioritized meeting with field staff — speaking with nearly 20 FFS and Project Officers. Notably, in Year 2, it became difficult for the Monitor to connect with the FFS, especially in Fall 2025 and Winter 2026, as ORR was in the middle of its reorganization. For a portion of the year, ORR reorganized its operations to have FFS follow specific children rather than being assigned to programs. Many programs visited by the Monitor found this much more challenging for a host of reasons including multiple FFS interacting with a single program and holding different interpretations of new ORR policy and practices. As a result, programs found adherence to policy was much more challenging, and coordinated information sharing and case planning for children was much more variable.

Many times, the Monitor reached out to one FFS and was told the program has been reassigned to another FFS. On multiple occasions, the Monitor set up an interview with a program's FFS only to learn at the time of the meeting that that person was re-assigned, and a new FFS was sent to the meeting with only limited knowledge of the program and their assigned children at the program. Consequently, while many FFS could speak about the requirements of Lucas R. Settlements, they had less specific information about program level performance and compliance. Multiple programs shared they had in excess of three and up to seven different FFS assigned to them this past year. From the Monitor's perspective, because the FFS role is essentially ORR's eyes and ears on the ground for children, these changes did not result in a safer custody situation for children, nor did it facilitate the implementation of Lucas R. Settlement requirements.

In Year 3, the Monitor will continue to prioritize regular conversation with FFS, who work most closely with programs on field implementation to better understand their program experience including positive trends and potential challenges with the Lucas R. implementation.

### Onboarding ORR Care Providers

In accordance with its Disabilities Implementation Plan, ORR is rolling out the implementation of both Settlements in tandem. Thus, all providers except the last implementation cohort (Regions 2 and 3) were included in ORR's Lucas R. March 2026 care provider onboarding efforts, including the recorded Lucas R. trainings, live Q&A sessions, and monthly office hours, which integrated requirements from both Settlements (see Report Section IV.A. for more details on this onboarding process). As states were onboarded, ORR reported that they made a concerted effort to ensure all children with

identified disabilities had high-quality 504 Plans and that the necessary services and accommodations identified in their plans were in place.

Further, as states come online for having to meet the requirements of the Lucas R. Disability implementation, ORR has requested the care providers in these states complete a Disability Diagnosis Reporting Tool ("Tool") for each child with a disability in their care (see Appendix G for the Tool). ORR developed this new Tool to aid the agency in identifying and tracking children in ORR care with disabilities (see Report Section V.G.ii. for more on this Tool).

In the Monitor's conversations with care providers, many raised the concern that it has felt like an inundation of policy changes this year, which have been difficult to implement simultaneously but especially in the context of federal staffing changes and significantly longer lengths of stay for the children in their care. Programs report that the primary way they learn about policy updates is through emails from ORR, which they describe as dense and technical. Programs also shared that they appreciate, and the Monitor has observed first-hand, the impact of ORR's efforts to provide Lucas R. implementation guidance and technical assistance through live and recorded trainings, Q&A sessions, and office hours. The Monitor will continue to assess providers' feedback on Lucas R. implementation supports in the coming year.

For programs in Regions 2 and 3, a few care providers noted confusion about the Lucas R. implementation expectations and appeared less aware of the implementation resources noted above than other providers. This is not surprising, as most of these new resources were targeted to the newly onboarded programs. However, given that programs in Regions 2 and 3 are required to complete 504 Plans, ensuring these programs have sufficient clarity and support to successfully comply with the Lucas R. requirements is also critical. The Monitor shared this feedback with ORR, which is looking into more and better ways to communicate with programs. The Monitor will continue to assess providers' feedback on how ORR prepares and supports them in their implementation of the Lucas R. implementation requirements in the coming year.

### Onboarding Out-of-Network Care Providers

The onboarding of out-of-network providers to the Disability Settlement largely mirrors the efforts in the Psychotropic Settlement rollout discussed in Report Section IV.A. Given the critical role that out-of-network providers play, it is important that they are well versed in the required practices in the Lucas R. Settlements. This is particularly true for the development and implementation of the 504 Plans, which require close partnership between the administrative in-network program and the out-of-network program, which is responsible for implementing disability services and accommodations.

From the case records reviewed, the Monitor found that many 504 Plan meetings often included only one representative from the out-of-network program and numerous staff from the administrative in-network program. As mentioned previously, the anticipated out-of-network provider training and new FAQ policy guidance are steps in the right direction to address this issue. However, the Monitor expects that more tools and greater engagement with out-of-network providers by ORR will occur to support the development and implementation of 504 Plans for children in their care. This issue is particularly important because out-of-network programs are more likely to serve children with enhanced needs that require strong implementation of 504 Plans. The Monitor will continue to track this issue in Year 3.

### Implementation Support from DHUC

**Settlement Agreement Requirements**:

Section II.A.2.e. DHUC will:

i. Issue written guidance on the selection of qualified evaluators, the inclusion of necessary assessments, the process for advising a child about the purpose and scope of the evaluation, and the sharing of relevant records in ORR's possession with the evaluator(s) (including any relevant records and assessments from the child's home country and/or current or prior ORR placements); and
ii. Provide consultation to care providers, on an as-needed basis, on the evaluation process.

Section II.B.8. In consultation with internal or external subject matter expert(s), ORR will issue written guidance governing the development of Section 504 Service Plans.

As described earlier, ORR now includes an expanded health team with DHUC, which plays an essential role in the implementation of the Disability Settlement. In Year 1, the Monitor reported, ORR made "significant progress to create new operational capacity and clinical expertise," and the Monitor finds this continued and deepened in Year 2. The DHUC Team now includes a neuro-developmental pediatrician who serves as the Disabilities Team Lead and as ORR's internal disabilities expert. The Disabilities Team is part of DHUC's Medical Services Branch. The Medical Services Branch includes the Medical Branch Chief, one nurse case manager, one pediatrician, one adolescent health specialist, and one nurse practitioner.

In the Year 1 Report, the Monitor advised that they would like:

> *To see this [DHUC's] expertise incorporated into ORR's work on identifying children with disabilities, selecting qualified medical providers to evaluate children, incorporating disability evaluations and 504 Service Plans into children's care planning, and providing clinical support on disability cases and 504 Service Plan development to care providers.*

This has indeed begun to occur, much like the approach that DHUC took related to children's mental health and psychotropic prescribing. ORR's implementation is enhanced by the close partnership of its Disabilities Team with the field; this partnership brings together the Disabilities Team's deep clinical knowledge of disability conditions with the fields' experience in complex real-world care provision.

The Medical Services Branch consults on and supervises complex care cases in which many, but not all of the children have disabilities. Through these staffings, the Medical Services Branch closely follows and ensures the appropriate care provision for these children. DHUC aims to review every 504 Plan and provides extensive advising to programs on children's care while in ORR custody and post-release supports upon discharge. Regarding case tracking for children with disabilities, if the child has a physical, developmental, sensory, and/or neurological condition, they are primarily tracked and their 504 Plan is overseen by the Medical Services Branch. If the primary disability is mental health related, then the child's 504 Plan and care is overseen by the Mental Health Services Branch. One of the areas of strength most consistently mentioned by providers during the Monitor's site visits was the consultative and clinical support DHUC's Medical Services and Mental Health Services Branches provide to programs caring for children with disabilities. Given the importance of DHUC to the Lucas R. requirements, the Monitor expects that DHUC will continue to be staffed and resourced robustly to provide ongoing clinical expertise and support to the field.

### Interim Case Escalation Process

The Parties agreed to an interim case escalation process during the extension period, through November 2025, whereby the Plaintiffs could notify the Monitor and request escalation of specific cases. Plaintiffs invoked this process once in Year 1. They elevated a handful of cases in Year 2, involving both children with mental health and physical health disabilities. The Monitor raised these cases with DPALA, OGC, and DHUC. Consistently, the Monitor found each case was already well known to DHUC's Medical Services and Mental Health Services Branches, and the appropriate team was already closely tracking the case. Through these conversations, the Plaintiffs were able to help raise concerns related to ensuring that core elements of the Disability Settlement were adhered to including placement in the least restrictive setting in the best interest of the child, assurance of needed accommodations and services in placement, and the provision of

necessary post-release services. While the Parties did not always agree on how every case or issue was resolved, this practice has been an important channel of communication between the Parties moderated by the Monitor and team. The Monitor anticipates continuing this practice in Year 3.

## B. Identification and Evaluation of Children with Disabilities

### *i. Identification of Children with Disabilities*

**Settlement Agreement Requirement:**

Section II.A.1. ORR will identify a child as having a disability:

a. If the individual performing the initial medical examination for ORR...determines that the child has a physical or mental impairment that substantially limits one or more of the child's major life activities; or
b. If, the child is in ORR custody, a licensed medical provider or licensed mental health professional determines that the child has a physical or mental impairment that substantially limits one or more of the child's major life activities; or
c. Based on the results of an evaluation conducted pursuant to Section II.A.2.

Fundamental to the implementation of the Disability Settlement is the timely identification and evaluation of children with disabilities. The Disability Settlement utilizes the federal Americans with Disabilities Act ("ADA") definition of disability:

> *"Disability" means, with respect to an individual, a physical or mental impairment that substantially limits one or more major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment.*[92]

This is a legal definition of disability that broadly focuses on functionality, and reasonable accommodation that will support a person's equal access. At the advent of the Settlement, ORR and care providers already had numerous policies and practices in place to ensure children with health and mental health conditions could access needed services and supports; however, utilizing this ADA disability framework was new for most providers in the ORR network. As ORR described in its Disabilities Implementation Plan, "one of the principal challenges identified through ORR's early implementation of the Settlement

[92] Disability Settlement. Section I.D.

Agreement is the recognition that the ADA criterion for a disability is not a customary or familiar framework within the medical community."[93]

During Year 2, ORR undertook a number of steps to support care providers in the identification of children with disabilities. Based on lessons from its Disability Needs Assessment, ORR recognized there was a significant need to educate the field about the ADA disability definition and help providers better understand how to identify and evaluate children for disabilities. In October 2025, ORR released the *DoH Dispatch: Disability Determination and 504 Service Plans* (see Appendix H) developed by DHUC in concert with DPALA in anticipation of ORR onboarding the first cohort of providers to the full implementation of the Disability Settlement. This dispatch answers frequently asked questions regarding ORR's disability definition, the disability determination process, and the mechanisms by which a disability may be identified and provides examples of common physical or mental impairments which may be a disability.

From the Monitor's disabilities case review, they found great variability in the disability identification process. For many children with health conditions that require ongoing health maintenance (e.g., diabetes, sickle cell anemia), these were often identified at the Initial Medical Exam (IME) or through the child's self-disclosure but were rarely noted earlier in the Customs and Border Protection paperwork prior to placement with ORR. For other conditions, like sensory concerns, there was often a multistep process of the child failing multiple screens across a prescribed timeline before more specialized support was provided. For example, according to notes in a case record, a child with a confirmed sensory disability, who now uses hearing aids, had to wait the required three weeks from a first failed hearing test at the IME to the next screen, and then wait another month before seeing an audiologist and securing a disability diagnosis. The Monitor is concerned that in some instances, ORR policy protocols or providers' interpretation of these policies may delay some children from the timely receipt of support and accommodations that ORR is required to ensure — as once this child's disability was officially confirmed, there was the timely development of the 504 Plan and evidence to support the child's needed accommodations were put in place.

For children with mental health conditions, the Monitor observed that the process of disability identification was less consistent and often protracted. From the Monitor's case review, a mental health disability was never identified at the IME, although a handful of children did indicate prior psychotropic medication use during the IME. For children with mental health challenges, for many, the disability designation often came after a psychiatric hospitalization or as part of the psychiatric consultation related to the prescribing of psychotropic medications. In the Monitor's psychotropic case review, they

[93] HHS ACF ORR (2025, December). Lucas R. Disabilities Implementation Plan.

identified an inconsistency with what threshold of mental health acuity was needed to identify a child with a disability. This is not surprising given it is still early in implementation but certainly something that requires concerted quality improvement focus as has been the practice of DPALA and DHUC. The Monitor will track the field's growing understanding of the disability identification process and ensure ORR provides strong guidance and necessary training to support these efforts in Year 3.

*Trauma-Informed Mental Health Screener*

**Settlement Agreement Requirement**:

Section III.B.2. ORR will…develop a policy which includes the provision of trauma-informed mental health screening for all unaccompanied children ORR's care in and provides for enhanced mental health services for those children with a positive screening.

To support the ongoing identification of mental health conditions, ORR has been working to select and implement a trauma-informed mental health screener. This mental health screener would be provided at regular intervals to flag children potentially in need of additional assessment and support. While "a positive screener would not automatically identify a child as having a disability or lead to an evaluation for a disability" it should trigger further inquiry by the care team. The Monitor believes the implementation of a trauma-informed mental health screener will be an important tool to better track shifts in child well-being over time.

This is especially important as length of stay increases, as the Monitor has observed and care providers have shared that mental health challenges for children in their care often escalate a few months into care and/or upon them learning about a change of a sponsor designation. The expectation is that the screener will create a more standard pathway for the proactive identification of mental health concerns and the provision of related supports to reduce the escalation of more acute conditions, particularly for children with internalizing conditions. This tracking, as facilitated by the screener, should begin within a few days from when a child enters care or enters a new program and should occur at regular intervals to establish a baseline that can be referenced over time.

Based on the Monitor's discussions with DHUC, a thorough deliberation of screener choices has been underway over the course of Year 2. DHUC informed the Monitor that their goal was to find a screener that was already validated (meaning it has been tested and proven effective by researchers), and cost-effective so that neither ORR nor care providers would encounter costs related to screening. As of the time of writing this Report,

it appeared ORR was close to choosing a screener and was engaged in conversations with the developer on its application for ORR. ORR hopes to employ both a written and pictorial version of this screener, expanding access for children of different ages and linguistic capacities. ORR also hopes to translate the screener into the most common languages of children in ORR care. With the screener nearly lined up, ORR is now considering the best delivery method, frequency, and procedures for administration. The Monitor recommended to ORR that it pilot the screener in a few programs to work out its implementation before scaling the screener across ORR's network. This would also give providers and other stakeholders, like Plaintiffs, the ability to consider and comment on the screener, where appropriate. The Monitor will track this process closely in Year 3 and believes the screener's comprehensive, timely rollout will be beneficial for disability identification and support and, thereby, the well-being of children.

#### *ii. Evaluation for Disability*

**Settlement Agreement Requirements**:

Section II.A.2. Evaluation for disability

a. Any one or more of the following events will trigger an evaluation for disability to determine whether a child has a physical or mental impairment ... (i) psychiatrically hospitalized or evaluated for psychiatric hospitalization; or (ii) if a child is considered for an RTC or a secure facility based on danger to self or danger to others; or (iii) at the request of the child after being informed of the purpose, scope or nature of the evaluation.
b. When a child has been identified as having a disability and/or evaluated for a potential disability, the child will not be re-evaluated for the same presenting symptoms except upon the recommendations of a medical or mental health professional.
c. Evaluations will be conducted as promptly as possible [including] ... within 30 days of the triggering event ... [and] completed within 60 days of ORR identifying the need for an evaluation.

One of the issues where the Monitor heard the most confusion from the field regarding Lucas R. implementation is how and when to secure a disability evaluation for a child. ORR is aware of this concern and has been actively working to provide greater guidance to care providers in this area. In site visits, care providers shared that health and mental health providers were often unfamiliar with the ADA disability definition and often uncomfortable making a blanket disability determination. In some of the Monitor's Fall 2025 site visits, care providers expressed frustration that "evaluations" were not part of their negotiated

PCU contracts with health and mental providers and found their providers unwilling to make a disability determination. Other care providers expressed confusion about who was qualified to provide an evaluation and what level of specialization was necessary to make such a determination.

To provide greater guidance, on October 1, 2025, ORR published a "*Dear Colleague letter*" (see Appendix I). This letter was shared with ORR programs and was written for health and mental health providers evaluating a child for a disability. ORR recommends that care providers bring the letter to the health care visit to support the provider in making a disability determination in real-time. The *"Dear Colleague letter"* explains the ORR definition of disability and what it might look like in practice. While this guidance is a step in the right direction, the Monitor continues to hear confusion from providers during site visits and office hours. As ORR knows, this is an area where continued DHUC and DPALA attention is needed.

ORR has also advised in its office hours and consultations with care providers that the professional that provides routine clinical care to the child can also perform the evaluation and make the disability determination — for example, a child's treating psychiatrist or mental health provider. ORR has emphasized that rarely will children require a full psychiatric evaluation or psychological testing to receive a disability determination in their program. Both DHUC and PCU confirm that these are frequently requested services, but are often denied by PCU, as DHUC has found that they infrequently alter care provision plans for children and take a very long time to get scheduled and completed. With greater provider education, DHUC has observed fewer full evaluation requests and more programs able to obtain what they need from the child's clinician regarding the disability determination.

Based on discussions with DHUC and care providers, it appears to the Monitor that most providers are able to work with their clinicians (at the program or externally) to make the disability determination. In rare cases where a provider was unable to do so, DHUC can review the case itself and render a disability determination. DHUC has emphasized, however, that it is their preference and better practice if the local clinician working with the child makes the determination. The only other instance where DHUC may make the disability determination is if there is an extended wait for a specialized provider; for example, if providers are experiencing a six-month wait to see a neurologist to confirm an epilepsy diagnosis.

The Settlement Agreement requires DHUC to provide "written guidance on the selection of qualified evaluators" and ensure timely evaluation receipt.[94] This is an area that the

[94] Disability Settlement. Section 2.e.ii.

Monitor will ask both Parties to review and consider in Year 3 to ensure the goals and requirements of the Settlement are concordant with best practice on the ground. In the Monitor's case reviews, they rarely found a separate documentation of a child's disability determination. Instead, a disability determination was often found in the 504 Plan records. While there were some cases with a signed note by a clinician or email documentation from DHUC of the child's disability determination, this was not typical. The Monitor will prioritize the rollout of the evaluation component in Year 3 and confer with both Parties on the issues noted above.

## C. Individualized Section 504 Service Plans

**Settlement Agreement Requirements**:

Section II.B.1. The purpose of a Section 504 Service Plan is to meet the child's disability-related needs, to ensure that they can participate in the UC Program in the most integrated setting appropriate to their needs (unless ORR can demonstrate that this would fundamentally alter the nature of its UC Program), and to ensure to the best extent practicable that they are released from ORR's custody without any unnecessary delay due to their disability.

Section II.B.2. When a child in ORR custody is identified as having a disability…ORR will…

a. Assess potential need for reasonable accommodations, modifications, services, and/or supports to meet the child's disability-related needs, to ensure that they can participate in the UC Program in the most integrated setting appropriate to their needs.

Section II.B.5. The Section 504 Service Plan, if one is needed, will be developed and implemented as soon as possible, and within 60 days of identification of the child as having a disability.

Section II.B.6. ORR will make best efforts to develop and implement a Section 504 Service Plan, if one is needed, before any step-up of a child with an identified disability.

The anchor of the Disability Settlement is the institutionalization of the creation of 504 Service Plans ("504 Plan") for children with disabilities, which was the first major component of the Settlement to launch. A 504 Plan identifies and provides for "the reasonable accommodations, modifications, services, and/or supports" that will support a child with a disability in the "most integrated setting appropriate to their needs." ORR's

policy was codified in July 2024 in UACB Policy Guide 3.8.3, and subsequently, care providers were required to develop 504 Plans for all children in their care with disabilities. This occurred before ORR circulated specific guidance, training, or model forms to providers — resulting in confusion for the field as some providers attempted to find 504 Plan templates on the internet in an effort to comply with the new policy.

Over the course of Year 2, the Monitor has observed profound headway in the field's understanding of a concept and process that was little understood a year ago. While the Disability Settlement implementation is still in its early stages, at the end of Year 2, the Monitor has found a much more educated field. In July 2025, ORR released a 504 Plan template, *S-25 Individualized Section 504 Service Plan,* for care providers to use (see Appendix J). The Monitor and Plaintiffs both had an opportunity to review and provide feedback to the form in Spring 2025, much of which was incorporated by ORR. The Monitor's case reviews found that most care providers are using the new 504 Plan form.

In Year 1, the Monitor's Report noted "ORR is exploring an improvement that would allow 504 Plan information to be entered directly into a fillable form within the UC Portal and thereby eliminate the need to upload an external document." Currently, the 504 form is a fillable PDF, but it must be uploaded directly into a folder called "UAC Documents" and cannot be completed directly in the UC Portal. This makes it difficult for multiple members of a care provider team to work on the development of the 504 Plan. In addition, it is currently difficult to locate a child's 504 Plan in the UC Portal. From the Monitor's conversations with ORR, it sounds like there is an intention for the 504 Plan to be incorporated into new key case management pages within ORRbit (ORR's updated case management portal) to make disability information more prominent; this new application will be field-tested this summer. The Monitor appreciates ORR's prioritization of some of the disability components in its early build out of ORRbit, and believes the new portal is a promising opportunity to better support case and system level compliance and CQI related to the Settlements. Currently, the process is extremely cumbersome for providers and does not encourage collaboration given the difficulty of having multiple people work on the form.

In October 2025, ORR released the *DoH Dispatch Disability Determination and 504 Service Plans* ("504 Dispatch," which was discussed earlier) that provides guidance about the 504 Plans to care providers. This 504 Dispatch explains what the 504 Plan is and reviews ORR expectations regarding required timing, participation, and core components to be included in the Plan. The 504 Dispatch also addressed commonly asked questions, like, "are 504 Plans just for school settings?" DHUC requests care providers notify them about all 504 Plan meetings, many of which DHUC attends. As noted above, DHUC aims to review all the 504 Plans and provides feedback and technical assistance as care providers develop and refine the 504 Plans.

As discussed further in the case review section (see Report Section VI.B.), the Monitor reviewed the case records of 29 children with 504 Plans. The Monitor found them quite variable in quality — some 504 Plans were very detailed and specifically tailored to the child, while others were quite sparse and generic. Where the Monitor saw DHUC's participation in a meeting, not surprisingly, the 504 Plans for those children were more detailed and of higher quality. Given this variability, it appears that DHUC may review most, but not all 504 Plans, especially ones developed early in the Disability Settlement rollout. DPALA in partnership with DHUC is working on a number of technical assistance efforts to support improving the completion, quality, and meaningful implementation of the 504 Plans. In particular, in the Lucas R. Sandbox, ORR partnered with KVC to develop "bench cards" for care providers that include common disabilities with specific model accommodation recommendations that can be included in a 504 Plan.

In the service of quality assurance, KVC is conducting a review of 30 504 Plans during late Spring 2026. ORR aims to use lessons from KVC's case reviews for a targeted technical assistance session with care providers and FFS's at the end of the year. Part of this technical assistance is likely to include circulating model 504 Plans to the field. ORR's focused exploration of the field's implementation challenges and strengths related to 504 Plans, and developing subsequent targeted support are all promising components to a successful disability implementation rollout.

In addition, ORR sought feedback from Plaintiffs on 504 Plan implementation at the April 2026 joint meeting of the Parties. Plaintiffs shared a number of suggestions, including strategies to better capture youth voice and to ensure many of ORR's newly developed 504 implementation supports, like the disability bench cards, are shared with legal service providers and other partners in the 504 Plan meeting who do not have UC Portal access. ORR also held a focus group with providers to get feedback on developing and utilizing the 504 Plan in case practice.

Across these stakeholders, the Monitor has appreciated DPALA and DHUC's collaborative posture in seeking (and incorporating) real-time feedback about how to most effectively implement the Lucas R. requirements. ORR has stated it hopes to use this feedback to update and improve upon the 504 Plan form in the coming year. In addition, ORR is hoping to have the new form translated into Spanish and other common languages of children in care. The Monitor encourages ORR to move quickly on this as having the forms in a child's own language is important to supporting youth voice and involvement. (This year, the Monitor did observe a handful of completed 504 Plans that were dually drafted in Spanish and English, but this was not the norm).

The Monitor will be tracking these updates closely and is hopeful that ORR can make the 504 Plan process even stronger and more accessible for providers, children, and families alike. Further, in the coming year, the Monitor will focus more closely on the quality of 504

Plans along with an assessment of how the accommodations, supports, and post-release services are being instituted in accordance with the Settlement Agreement.

*504 Plan Meetings / Timelines*

The Disabilities Implementation Plan requires the provider's case manager to convene a meeting to develop the 504 Plan within ten calendar days of disability identification. Some care providers expressed a concern that the condensed timeline can be difficult to get everything organized and pulled together. Other providers said it was doable but took extensive coordination. Specifically, care providers said it was most challenging to get the youth, foster family (if LTFC or TFC), sponsor, and/or family of origin to attend within the prescribed timeline. Care providers also shared that DHUC requested 72 hours to review the 504 Plan prior to the meeting. While DHUC's feedback is helpful, this requirement can make an already compressed timeline more challenging for care providers to develop a meaningful plan and gather the right people in the room. The UACB Policy Guide 3.8.3, in accordance with the Settlement Agreement lays out that "the Individualized Section 504 Service Plan must be completed and implemented within 60 calendar days of identifying the child's disability" — but does not specify when the 504 Plan meeting must occur. The Monitor appreciates ORR's efforts to ensure timely 504 Plan development and implementation and will continue to track these efforts in Year 3, including how the above-described timelines affect Plan development, quality, and meeting participation.

Rightsizing attendance at the 504 Meetings is another area that ORR is working to strengthen. Disability Settlement Section II.B.3. lays out the key people who must be consulted with in the development of the 504 Plan, including the child and the child's advocate (if assigned), the child's attorney and parent/legal guardian, as best as possible, along with provider and clinical staff working directly with the child. Many 504 Plans reviewed by the Monitor had upwards of 20 people in attendance at 504 Meetings. This was often true for many meetings involving more straightforward plans, like for children with allergies. It seems likely to the Monitor (and the Monitor knows DHUC shares this concern) that with so many professionals in attendance, it could be harder for a child to participate in the meeting. For other 504 Plans, as mentioned, while there were always many participants from the administrative placement at the 504 Meeting, often there was only one representative from the out-of-network provider, who is responsible for implementing the 504 Plan. ORR has emphasized in its office hours that there is a difference between who is consulted and who attends the meeting. In a future iteration of the 504 Plan form, ORR intends to add a field that indicates who is consulted in the plan's development. The Monitor will continue to track this practice issue in Year 3.

The Disability Settlement identifies specific scenarios in which the 504 Plan must be reviewed. This includes within 30 days of a child experiencing a step-up or a psychiatric hospitalization. From the Monitor's initial case review of 504 Plans, the Monitor often did not see documentation of the 504 Plan being re-reviewed within this timeframe. The Monitor recognizes ORR is early in implementation and hopes to observe progress on this issue in Year 3.

## D. Accommodations and Services Available to Children with Disabilities in ORR Care

### *i. Access to Services*

**Settlement Agreement Requirement**:

Section III.B.1. ORR, in conjunction with grantee care providers, will make and document best efforts to develop and provide a range of services and supports network-wide, including available community-based services and supports, designed to enable children with disabilities to be placed in the least restrictive setting that is in their best interest, and the most integrated setting appropriate to their needs, and further their release to suitable sponsors without unnecessary delay due to their disability (unless ORR can demonstrate and document that providing such a service or support would fundamentally alter the nature of its UC Program).

In Year 2, ORR spent more of its time focused on the development of 504 Plans than on the service array needed to implement them. This was the right approach given 504 Plans were very new to the field. While DHUC helped when possible, with the identification of and access to services and supports included in 504 Plans, the Monitor expects ORR will work in earnest in Year 3 to deploy more concerted "best efforts to develop and provide a range of services and supports network-wide, including available community-based services and supports." As ORR better understands the disability profiles of children in care and can aggregate identified accommodations in children's 504 Plans, the Monitor anticipates that ORR will be able to proactively identify the types of supports and flexibilities that might benefit children with disabilities, and what types of provider relationships are necessary for programs in ORR's care provider network to facilitate these services. The Monitor observed many programs increased their referrals for specialized health care, as services and supports that historically were not needed for children in their temporary care were now needed. Multiple programs described strengthening their ties to community mental health

and medical providers to more nimbly make referrals to support children with disabilities. The Monitor will report in more detail on this issue in their Year 3 report.

### *ii. Range of Placements*

**Settlement Agreement Requirement**:

Section III.C. ORR will make and document best efforts to enter into cooperative agreements or contracts with a range of placements appropriate for children's in ORR's legal custody, including those with disabilities. To the extent feasible, ORR will prioritize placements that provide access to trauma-informed, therapeutic, and other disability-related services in integrated settings ... (e.g., shelter and foster care settings).

At the time of this report writing, ORR provides residential care to children through a network of 157 programs with active ORR grants. Forty-six of these programs are pending closure due to relinquishment or the end of the grant period, leaving the anticipated program total to be approximately 111 programs.[95] This is almost a 50% decrease in programs from 209 active programs a year earlier. Most of this decrease is attributable to closures of shelter, LTFC, and TFC programs, all least restrictive placements. The one new program ORR established in its placement continuum in Year 2 is a secure program, the highest level of restrictive placement. Given ORR's increased understanding of the needs of the Lucas R. disability class, the Monitor has requested that ORR provide them with an understanding of their plans for its placement continuum.

The Monitor is also tracking this issue given the growing concern by providers that their programs — especially their shelter programs — were not designed for long lengths of stay and increasingly do not necessarily feel "least restrictive" given the highly standardized program schedules and operating rules that were designed for children who typically were placed for one month. Surprisingly, the Monitor observed and heard from a variety of stakeholders that restrictive placements and out-of-network programs, by design and due to lower child-to-staff ratios, have the ability to give children much more freedom and flexibility. In contrast, shelter facilities were set up for children to move in singular blocks (i.e., from school to cafeteria to after-school setting to bedtime).[96] Accommodating children who need 30-minutes alone to listen to music or take a walk has never been part of the practice of ORR shelters, which the Monitor often sees listed as accommodations

[95] ORR shared this data was from a May 27, 2026 program status report.
[96] ORR has shared with the Monitor that they are reviewing and updating their educational curriculum for children in shelter care given the longer length of stay, including supporting children to potentially attend public school when it is in their best interest.

for children with mental health disabilities in shelter care. In addition, these types of activities offer children opportunities to experience normalcy while in placement and are likely to have a protective factor, regardless of disability status, as lengths of stay increase.

The Monitor was also surprised given the longer lengths of stay and higher number of Category 4 children that ORR did not use more LTFC placements, especially since there appeared to be open placements in many of them. In particular in their case reviews, the Monitor observed success for a few older youth placed in supervised independent living placements, which are part of the LTFC structure. For example, one child with a mental health disability prescribed psychotropic medications, moved into an LTFC supervised independent living placement from a shelter at age 17. Upon this placement change, the case record noted significant improvements in the child's mental and behavioral health, and a titrating of the child's psychotropic medications. There are likely other older youth with disabilities who could be considered for this placement type. Yet, in direct contrast, the Monitor heard from stakeholders that children who wanted to be considered for LTFC were told it was not an option until their behavior stabilized rather than the care provider considering how a child's 504 Plan, with necessary accommodations and supports, may be able to support the child in an LTFC placement.

The Monitor continues to raise in its discussions with ORR how a significantly reduced set of programs will accommodate the needs of children with disabilities and other mental health needs. Given the longer lengths of stay for children in ORR care, the Monitor is working to understand what efforts are being made to ensure placements provide access to "trauma-informed, therapeutic, and other disability-related services in integrated settings" in the least restrictive environment. In its Disabilities Implementation Plan, ORR notes the anticipated adoption of a Continuum of Care practice model, which would "connect licensed and accredited facilities within a cohesive geographic region that offers various levels of care." The Monitor has not observed evidence of this effort's launch as of this writing and will continue to work with ORR to better understand the potential of this implementation effort to support children with disabilities in the least restrictive placement.

In response to the Monitor's inquiry about the placement continuum for children with disabilities, ORR has emphasized its use of single-use case agreements for specialized placements when needed to meet the disability related needs of young people. The Monitor saw this in action in their case reviews. For example, they read a file noting there were no therapeutic group homes for girls, and so the child was placed in an out-of-network facility. Whether this approach is sufficient remains an open question as ORR continues to tackle Lucas R. requirements. In practice there are very few out-of-network placements compared to the number of children in shelters with disabilities, so while single-use case agreements may be an approach in individual cases it is not a system-level

solution. The Monitor will carefully track the impact of program closures on children with disabilities and how ORR's better understanding of children with disabilities is informing its development of its placement continuum and efforts to ensure children with disabilities have access to least restrictive placements in their best interest.

## E. Placement of Children with Disabilities in ORR's Care

**Settlement Agreement Requirements**:

Section IV.B. Placement of a Child Identified as Having a Disability in a Restrictive Placement

1. For a child identified as having a disability who is placed in a restrictive placement...ORR will document why the child's needs cannot be met in a more integrated and less restrictive setting with additional services, supports, and/or accommodations. This documentation will be included with the child's first Notice of Placement.
2. ORR will describe and document the services or care that will be provided at the restrictive placement, why they are necessary for the child, and why they cannot be provided in a less restrictive placement.

Section IV.C. Step-down of Children with Identified Disabilities in Restrictive Settings

1. ORR will assess children with identified disabilities who are placed in restrictive placements for step-down at least every 30 days, as part of ORR's 30-day placement review.

According to ORR data, approximately 7% of children with disabilities are in restrictive placements (approximately 15 children in programs onboarded to the Disability Settlement). The restrictive placements are broken down by placement type in Chart 11, with RTC and staff secure placements being the most common.

**CHART 11: Children with Disabilities by Restrictive Placement Type (November 2025-April 2026)**




Note: Children with identified disabilities placed in restrictive settings (N = 19). RTC (N = 9), staff secure (N = 8), and secure (N = 2). This chart includes children placed both in-network and out-of-network. For children placed in multiple restrictive placements during the review period, the Monitor assigned each child to their most restrictive placement type in this order (secure, RTC, staff secure, and HSF). Only one child was in an HSF placement, but that child was also in a more restrictive placement, so no HSF placements are shown.
Source**:** Monitor analysis of the May 2026 ORR Disability Periodic Report.

In May 2025, ORR updated its UACB Policy Guide and MAP 1.4.6 Residential Treatment Center and Out-of-Network Placements and in September 2025, updated its Notice of Placement in a Restrictive Setting (NOP) forms to be in alignment with the Settlement Agreement. The NOP form's updates included if the child has a disability, the accommodations or services being offered to meet the child's disability related needs, the services or care that will be provided at the restrictive placement, why these services are necessary, and why they cannot be provided in a more integrated and less restrictive setting (see Appendix K). The NOP must be provided to the child and the attorney of record within 48 hours of the child's admission to the restrictive program and re-issued every 30 days thereafter. The Monitor consistently observed the NOPs in the case file for children placed in restrictive placements. However, the level of explanatory detail provided to justify the restrictive placement was variable and rarely was the form completed at a literacy level suitable for the child's easy comprehension.

In Year 3, the Monitor aims to better understand and report on ORR's efforts to ensure placement of children is in the least restrictive environment in their best interest, including non-restrictive placements with the appropriate accommodations, services, and supports. This includes examining ORR's step-up process as it relates to children with disabilities. For each step-up, the FFS, DPALA, DHUC, among others are closely involved and providers must submit a substantial evidentiary record to secure a step-up. Yet, care providers

consistently shared with the Monitor step-up challenges for children with acute mental health and behavior issues, and the complex evidentiary burden needed to secure step-ups. Similarly, from the case review, the Monitor reviewed numerous children in shelter placements who were in and out of the hospital for homicidal, suicidal ideation, or psychosis where the capacity of their current placement to meet their needs was not discussed, and a step-up did not appear to be considered or pursued.

In tandem, the Monitor has observed successful step-downs and seen the beneficial role of the 30 day NOP review in documenting the strategic direction for the young person and what it will take for the young person to return to a less restrictive placement. The Monitor hopes ORR expands its consideration of a wide range of placements with appropriate accommodations and services for children who are struggling in shelter placements, including a non-restrictive out-of-network placement or a therapeutic foster care placement, as well as restrictive placement only when it is necessary. In the coming year, the Monitor will examine the processes for securing the least restrictive environment children with disabilities, assurance of the necessary accommodations and services for these children, and the quality of 504 Plan guidance for care providers, especially related to step-ups and step-downs.

## F. Release of Children with Disabilities in ORR's Care to Sponsors

**Settlement Agreement Requirements**:

Section V.A. Home Studies

1. When ORR identifies a child as having a disability...the TVPRA requires a home study of the child's potential sponsor(s)... [when] a potential sponsor has become potentially viable...ORR will obtain such a home study as expeditiously as possible, with the goal of avoiding any unnecessary delay in release.

Section V.B. Support for Sponsors

1. When ORR identifies a viable potential sponsor for a child with an identified disability, ORR will affirmatively support and assist that sponsor in accessing and coordinating post-release community-based services and supports, to the extent they are available (and subject to appropriations), in an effort to work toward release without unnecessary delay.

The Monitor also plans to examine home studies[97] and post-release services[98] further in Year 3. Despite children's extended length of stay in ORR custody, home studies are still regularly occurring where required. However, even after home study approval, it appears common that many children's discharge from ORR custody still extends many months due to other barriers in the case. Depending on the time frame, these delays may necessitate ORR to re-complete the home study — further extending the child's time in custody. For children who are Category 4, meaning they do not have an eligible sponsor, a home study is not required. ORR's home studies and post-release services are conducted by contracted providers. In Year 3, the Monitor aims to better understand these providers' familiarity with the Lucas R. Settlement provisions and how their services may impact the expeditious release of children with disabilities without unnecessary delay.

Related to the post-release services section of the 504 Plans, the Monitor observed great variability in the level of specificity and quality. The best plans identified community referrals and there was evidence that a warm hand off was made or planned. Strong plans were anchored in ensuring a strong continuity of care, including access to all durable medical supplies that were needed. Moving forward, the field would be aided by ORR providing specific guidance and model post-release services sections of the 504 Plan, clarifying and helping norm what ORR expects providers document in this section.

Additionally, in case reviews, the Monitor noted that some providers utilized the 504 Plan's post-release services for Category 4 youth in anticipation of them aging out — even though it was not required. Given that so many youth with disabilities discharge from ORR custody upon turning 18 years of age, it may be helpful to better understand the potential interplay of 504 Plan post-release services section in tandem with ORR's required Post-18 Plan for youth with disabilities.

Care providers frequently shared DHUC's Medical Services Branch's critical support in securing needed durable medical supplies and lining up clinical care upon release. The

[97] According to ORR's Guide to Terms, "home study" is an "in-depth investigation of the potential sponsor's ability to ensure the child's safety and well-being initiated by ORR as part of the sponsor suitability assessment. A home study includes an investigation of the living conditions and standard of care that the unaccompanied alien child would receive if released and placed with a particular potential sponsor. The process includes interviews with the potential sponsor and other household members. A home study is conducted for any case where it is required by the TVPRA, mandated by ORR sub-regulatory guidance, and for other cases at ORR's discretion, including for those in which the safety and well-being of the unaccompanied alien child is in question."

[98] According to ORR's Guide to Terms, "post-release services" are "ORR-approved services which may, and when required by statute must, be provided to an unaccompanied alien child and the child's sponsor, subject to available resources as determined by ORR, after the child's release from ORR custody. Assistance may include linking families to educational and community resources, home visits, case management, in-home counseling, and other social welfare services, as needed. When follow-up services are required by statute, the nature and extent of those services would be subject to available resources."

Monitor also heard about at least one case where securing the child's necessary post-release medical equipment led to significant delays in discharge. In this instance, the child's approval for discharge was pending until the medical supplies were purchased, yet the child was told the medical supplies could not be purchased until the child was approved for discharge. The Monitor hopes to better understand if these chicken-and-egg challenges are common, and the efforts being made by ORR to "work toward release without unnecessary delay" for children with disabilities.

## G. Implementation

### *i. ORR Policy Documents*

**Settlement Agreement Requirement**:

Section VI.A.2. The Parties anticipate that the Disability Plan developed pursuant to Section III.A.2 may also result in additions and/or revisions to the Policy Guide and MAP.

In Year 1, ORR substantially updated its UACB Policy Guide and UAC Manual of Procedures ("UAC MAP") in alignment with the July 2024 Foundational Rule and the Disability Settlement. Most substantially in Year 1, ORR added Section 3.8 Children with Disabilities in ORR Care and Custody to the UACB Policy Guide to define what constitutes a disability and to direct care providers to identify, evaluate, plan, and make reasonable accommodations for children with disabilities in the least restrictive, most integrated setting in their best interests and appropriate to their needs.

During Year 2, ORR made continued efforts to revise the UACB Policy Guide and UAC MAP with regard to the Disability Settlement requirements, particularly in alignment with the Disabilities Implementation Plan (see Table 10 below). On July 1, 2025, UACB Policy published revisions to the UACB Policy Guide and UAC MAP, adjusting language related to parent/guardian involvement in 504 Plan development and introducing ORR's 504 Plan template. Foremost, in Year 2, ORR released substantive guidance to the field addressing common implementation challenges for care providers and FFS. The Monitor anticipates ORR will further develop guidance and revise its form and policy documents accordingly as it works to comply with the requirements of the Disability Settlement.

**TABLE 10: Lucas R. Disability Updated Policies, Guidance, and Forms in Year 2**

| Settlement Related Policies and Forms | Date |
|---|---|
| Updated UAC Policy Section 1.4.6 and UAC MAP Section 1.4.6 (Residential Treatment Center and Out-of-Network Placements) | Completed May 2025 |
| Section 504 Service Plan Form | Completed July 2025 |
| Updated UAC Policy Section 3.8.3 and UAC MAP Section 3.8.3 (Individualized Section 504 Service Plan) | Completed July 2025 |
| Section 504 Service Plan Completion Guide (UAC MAP Appendix 3.12) | Completed July 2025 |
| DoH Dispatch: Disability Determination and 504 Service Plans | Distributed October 2025 |
| Notice of Placement in a Restrictive Setting (Form P-4) and UAC Referral (Form P-7) revisions | Distributed September 2025 |
| FAQ 20: Out-of-Network Facilities and Administrative Placements | Distributed April 2026 |
| DoH Dispatch: Triage for Non-emergency Healthcare Concerns | Distributed April 2026 |
| Lucas R. policies and procedures package | Distributed June 2026 (after the close of Year 2) |

*ii. ORR Data Reporting*

**Settlement Agreement Requirements**:

Section VI.C.3.b. [Quarterly Report]: The Monitor's authority further includes the receipt of quarterly reports from ORR.

Section VI.D.2. [Periodic Report]: Defendants will provide Periodic Reports to the Monitor, detailing ORR's implementation of and compliance with the terms of the Agreement… The first such report will be provided to the Monitor at the same time as the Implementation Report.

Section VI.D.2.d. [Public Report]: Defendants will publish streamlined public reports online, including aggregated information concerning: the number of children in ORR custody identified as having a disability; the categories of disabilities identified; services and supports provided to children with disabilities.

This was the first year that ORR reported disability data in accordance with the data requirements of the Settlement Agreement. During Year 1, ORR focused on developing and refining its approach to identifying, capturing, and analyzing disability-related information across its systems. As a result, the Year 2 data establish an initial baseline for understanding the prevalence, characteristics, and experience of children with disabilities in ORR care.

The Monitor commends ORR for their forthrightness regarding the limitations of its current data system and for the numerous strategies that it has employed, both internally and in partnership with providers and PCU, to improve disability-related data collection. In the Year 1 Report, the Monitor was unable to provide a comprehensive picture of the disability class. During Year 2, the Monitor witnessed ORR's strides to better identify and track children with disabilities and to build a more complete picture of the disability class, even as the precise size of that population continues to be refined.

For its first Public Report (*Public Report on Children with Identified Disabilities in ORR Custody as of October 2025*) and Periodic Report issued in November 2025, ORR used a number of proxies to identify children in ORR care identified as having one or more disabilities.[99] This provided an important baseline, but ORR's inability to easily search

[99] A few of the proxies used in the first Disability Public Report include: (1) home study referrals indicating the referral is mandated by TVPRA based on the child's disability status, (2) post-release services referrals indicating the referral is mandated by the TVPRA based on the child's disability status under the ADA, (3)

fields in the UC Portal and extract text made this process laborious and with the potential to easily over or under sample children.

In the second Public Report *(Amended Public Report on Children with Identified Disabilities in ORR Custody from November 2025 through April 2026)* and Periodic Report first issued in May 2026 and then corrected and re-issued June 2026,[100] ORR used the new Disability Diagnosis Reporting Tool created by ORR for the express purpose of collecting the fields ORR plans to include in their Periodic Report and providing a comprehensive way for ORR to identify all children in care with disabilities. Many of these fields also satisfy the Disability Settlement requirement that ORR have a system that is "aggregated and is easily searchable" with all the elements in Section II.D.[101]

ORR launched the Disability Diagnosis Reporting Tool requirement in March 2026 in conjunction with the onboarding of the first two implementation cohorts. ORR trained providers during its Lucas R. trainings and the Q&A sessions. The Tool consists of a Microsoft Form that care providers are required to complete within 24 hours of a child's disability identification. Providers must submit a separate form for each identified disability. Care providers in the initial disability cohort were expected to have completed the form for all children in their care with disabilities by the onboarding date. While the Disability Diagnosis Reporting Tool will enable more comprehensive data capture, the Monitor will continue to assess both the quality of the data submitted and the additional reporting burden placed on providers.

ORR's Disability Periodic Report reports semi-annually on the elements listed in Appendix L. This includes all the elements from the Disability Settlement Section II.D. In addition, ORR incorporated similar data elements to its Psychotropic Periodic Report and utilized a similar reporting structure. Most of the required data is captured from providers through the Disability Diagnosis Reporting Tool. ORR sought and incorporated the Monitor's feedback on its data elements for the Periodic Report, and the Monitor continues to work closely with ORR on its data collection and aggregation process, including ensuring ORR

---

uploaded 504 Service Plans, (4) children in RTC placements, and (5) children on three or more psychotropic medications.

[100] The second Disability Public Report was initially issued on time May 4, 2026. It was re-issued by ORR on June 11, 2026 at the request of the Monitor to include a few additional data elements as well as provide a more detailed explanation of the Report's methodology.

[101] Section II.D. of the Disability Settlement requires ORR "to track data across the ORR system concerning, at least: (a) The number of children in ORR custody identified as having one or more disabilities; (b) Identified disabilities, placements, step-ups, step-downs, and length of stay for children identified as having one or more disabilities; (c) The development and implementation of Section 504 Service Plans for children with disabilities who need them, and any determinations that children with identified disabilities do not need Section 504 Service Plans; (d) Referrals made for post-release services; and (e) Transition planning for the safe release of children identified as having one or more disabilities without unnecessary delay due to the child's disability."

provides the Monitor with the data necessary "to evaluate, report on, and certify compliance with the Agreement."

Concurrently, DHUC is collaborating with PCU to utilize "ICD-10 codes" (International Classification of Diseases) to describe the service usage and diagnoses for children with disabilities. The Monitor has worked closely with DHUC on utilizing administrative data to create a more comprehensive picture of children with disabilities. Given the many constraints of relying on manually entered data by providers throughout the Disability Diagnosis Reporting Tool, the Monitor expects ORR will continue to explore the potential of merging its data with PCU claims data.

A limitation of the existing UC Portal is it cannot readily flag which children have disabilities; ORR aims to remedy this in their upgrade to the new ORR portal system, ORRbit, with clear population tags to track children on psychotropic medications and with disabilities.

Regarding the Settlement's data reporting requirements, ORR delivered each of the required Quarterly, Periodic, and Public Reports. As they shared in the last report, the Monitor will continue to work with ORR to hone the contents of the Periodic Report to "include the qualitative, quantitative, and other information the Monitor identifies as necessary for the Monitor to evaluate, report on, and certify compliance with the Agreement, that is within ORR's control, reasonably obtainable, and is consistent with any applicable state licensing requirements"[102] in a manner that concurrently satisfies these requirements and supports the CQI efforts of ORR. Once finalized, the Periodic Report should function as a robust tool that can be used by both ORR and the Monitor to thoroughly "evaluate, report on and monitor" implementation of the Settlement Agreement and "certify compliance" with the Settlement Agreement.[103] ORR is making considerable progress in this direction, but more work is needed.

## H. Conclusion

During this monitoring period, ORR undertook necessary training, policy development, and data reporting requirements to prepare care providers and ORR personnel to execute the requirements of the Disability Settlement. Further, ORR adhered to the agreed upon timeline for all its deliverables. Based on the Monitor's site visits and case review, it is clear that ORR has worked diligently to ensure that care providers and ORR personnel have a working familiarity with the Disability Settlement and its requirements, particularly, the

[102] Disability Settlement. Section VI.D.2.b.
[103] Disability Settlement. Section VI.D.2.b.

ORR disability definition, identification and evaluation process, and 504 Plan development and implementation. It is also clear that the system and process improvements required by the Settlement Agreement have not yet been fully embedded in practice by all care providers, especially by out-of-network providers. This is not surprising since implementation is still in its early stages. There are also other significant changes occurring within the ORR system related to the length of stay of children in care and program closure that are having considerable effect on children in ORR care, ORR field staff, providers, and sponsors. In Year 3, the Monitor will closely track these issues as well as ORR's implementation of 504 Plans, placement of young people in the least restrictive environment, the availability of appropriate services and accommodations and post-release services.

# VI. SITE VISITS & CASE REVIEWS

## A. Site Visits

The Monitor is authorized to conduct site visits as part of their responsibility "to evaluate progress toward compliance with the Agreement."[104] For this report period, the Monitor conducted site visits to deepen their understanding of how care providers and frontline staff (care provider and ORR field staff) are translating and implementing the Psychotropic Settlement and Disability Settlement guidance and requirements into daily practice.

Throughout Year 2, the Monitor visited a total of 17 care provider programs across the country.[105] This included three programs operating in Texas, the first state required to implement the Lucas R. Psychotropic Settlement, which is now over a year post-implementation. The Monitor visited eight programs in the cohort that launched in August 2025, including five programs in Illinois, two programs in Georgia, and one program in Washington State. The Monitor also visited programs in several pre-launch states including three programs in California, one program Oregon, and one program in Virginia. The Monitor predominantly visited shelter programs; the provider type that serves most children in ORR care (age 13 years and older) and operates as the standard level in the ORR care provider network. The Monitor also visited several programs categorized as special populations sites (see Appendix A for the full list of ORR placement types). This included two out-of-network sites with staff secure and/or RTC level of care and one in-

[104] Psychotropic Settlement. Section VII.B.I.a.
[105] The Settlement Agreement specifies that both Parties are able to join the Monitor on two site visits each year. In Year 2, neither Party joined the Monitor for a site visit. Both Parties joined the Monitor's first Year 3 site visit in May 2026, which included meeting with four care provider programs.

network Heightened Supervision Facility. The Monitor met with two TFC programs, which typically care for younger children. Lastly, the Monitor met virtually with a regional provider trade group in the New York area.

The Monitor's site visits sought to assess providers' implementation of key areas of the Lucas R. Settlements.[106] The Monitor toured each care provider's educational, clinical, recreational, and residential accommodations. At each site visit, the Monitor interviewed key staff responsible for the implementation of the Lucas R. Settlements' requirements. Typically, the interviews were conducted in groups using a structured interview guide and included program directors, clinicians, residential and care managers, nurses, teachers, and quality improvement staff. During the site visits, the Monitor observed children but did not conduct any individual or group discussions with them.

For nearly all the programs visited, the Monitor also met separately with the assigned ORR DCA FFS staff. In addition, the Monitor spoke with three ORR Project Officers, who are the contract managers for programs. As noted many times previously, in attempting to schedule an interview with the FFS, the Monitor learned that the identified FFS had been reassigned to a different program. Once the Monitor connected with the correct FFS, it was observed that these staff had often only recently assumed responsibility for that program. Consequently, many FFS spoke in great detail about their role and the Lucas R. Settlements, but less specifically about program level implementation of Lucas R., as the FFS had more limited knowledge in this space (See Report Sections IV.A. and V.A. for greater discussion on these conversations with ORR field staff).

Overall, the Monitor found that all the programs they visited appeared familiar with the requirements of the Lucas R. Settlement Agreements, especially program directors and clinical staff. Consistently, programs prominently featured the Lucas R. Settlement notices in areas frequently visited by children and staff. However, often there were so many concurrent notices posted, the material could be overwhelming to take in. Also, a few provider staff shared they wished the Lucas R. notices were presented in more accessible child-friendly language. The Monitor agrees with this sentiment.

[106] At the site visits, items that the Monitor tracks related to the Psychotropic Settlement include: (1) Requirements for use of multiple psychotropic medications (polypharmacy) and antipsychotic medications; (2) Emergency administration of psychotropic medications; (3) The consent and assent process and CCU override; (4) PCU and TAR processes; (5) DHUC case review, consultation, and case staffing processes. For the Disability Settlement, items that the Monitor tracks include: (1) Identification and evaluation for disabilities; (2) Step-up and step-downs including NOPs; (3) Developing and updating 504 Plans; and (4) Placing children with disabilities in the least restrictive placement in their best interest. The Monitor also always assesses the presence of posted Lucas R. Settlement Agreement notices.

As noted earlier in this Report, perhaps the Monitor's most significant finding from their visits to programs was the impact children's increased lengths of stay has had on how programs operate, particularly in the face of children experiencing heightened mental and behavioral health needs as they contend with prolonged stays in care away from their families. This is a central issue the Monitor will continue to track as it intersects with the child well-being issues that are fundamental to both Settlement Agreements.

Other site visit feedback on the specific provisions of the Settlements is incorporated directly within the relevant implementation sections above.

## B. Case Reviews

The Monitor reviewed a total of 80 cases in Year 2 across two separate reviews which aimed "to evaluate [ORR's] progress toward compliance with the Agreement(s)."[107] The first round of case review was conducted in Fall 2025 and a second in Spring 2026. This section discusses the Monitor's Year 2 case review process and summary findings. The Fall 2025 review focused on a cohort of children prescribed psychotropic medications and also piloted a set of disability-specific questions within that review. The Spring 2026 review utilized an updated review tool that included implementation questions specific to both Settlements and examined two distinct cohorts of children: (1) a cohort of children prescribed psychotropic medications, and (2) a cohort of children with identified disabilities. This Year 2 review provides an early picture of providers' practice related to children with disabilities (as the Disability Settlement's implementation did not officially launch until November 2025). See Table 11 for a summary of the Year 2 case reviews.

[107] Psychotropic Settlement. Section VII.B.I.a.

**TABLE 11: Summary of Year 2 Case Reviews**

| Timing | Primary Focus of the Review | Sub-focus of the Review | Number of Cases Selected | Number of Cases Reviewed[108] |
|---|---|---|---|---|
| **Fall 2025** | Children prescribed psychotropic medication | Examination of children with mental health disabilities | 35 Cases | 33 Cases |
| **Spring 2026** | Children prescribed psychotropic medication | Examination of children with mental health disabilities | 25 Cases | 24 Cases |
| | Children with disabilities | Examination of children without an identified mental health disability | 20 Cases | 21 Cases |

*i. Case Review Tool*

In Year 2, the Monitor used an updated "Case Review Tool" to collect information regarding specific system and process improvements that ORR committed to in the Settlement Agreements. The Case Review Tool used in Year 2 closely mirrored the tool that the Monitor used in Year 1, which was jointly developed with DHUC to assess compliance with the Psychotropic Settlement. The DHUC Psychotropic Case Review Tool ("DHUC Tool") includes questions related to:

- Using an authorized consenter;
- Obtaining and documenting informed consent of children's use of psychotropic medications; and
- Obtaining TARs for each prescribed psychotropic medication to children in care.

The DHUC Tool also gathered child-specific information, including identifying and demographic data, placement location, and diagnostic and medication details.

[108] See Report Section VI.B.ii. for details on case selection and case review process. Three cases pulled did not end up meeting the eligibility criteria upon review of the file. In the Spring 2026 Review, one case moved from the psychotropic to the disability case review, as the identified medication was for epilepsy. This accounts for the total of 21 cases reviewed for the disability review, despite only 20 cases being selected.

The Monitor's Year 2 Case Review Tool added questions to more comprehensively track a child's trajectory in ORR care as it relates to the Settlement Agreements.[109] In the Spring 2026 review, the Monitor further refined the disability specific questions. These questions largely focus on providers' practice related to identification of disability; the determination of disability; and the presence, quality, and timeliness of 504 Plans. These disability questions were also embedded in the Psychotropic Case Review Tool to be able to review the Settlements' implementation for children with mental health disabilities; this subset of children is included in both Lucas R. classes (see Appendix M for the Monitor's Spring 2026 Psychotropic Case Review Tool). For the assessment of the non-mental health disability related cases, a pared down tool that removed most of the psychotropic medication questions was used (see Appendix N for the Monitor's Spring 2026 Disability Case Review Tool).

In Year 2, the Monitor's scoring approach was also updated; the Year 2 tools all tracked Settlement implementation using the ratings "Met," "Not Met," or "Partially Met." A "Met" rating was entered when the Monitor observed the required documentation or practice standards in a case file. A "Not Met" rating was entered when the required documentation or practice standards were not observed in a case file.[110] The new "Partially Met" rating was added to capture instances where the practice standards were mostly met, but were not consistent (e.g., the criteria were not for all medications or medication changes) — to provide a more nuanced picture of implementation progress.

The Monitor anticipates that their team will continue to refine the Monitor's Case Review Tool. In particular, the Monitor will continue to hone the disability-related review questions. Further, future case reviews are expected to more deeply examine the Settlements' implementation challenges discussed in this Report as well as emergent implementation issues identified from the Monitor's data review and field observations; as such, the Case Review Tool will be updated accordingly.

### *ii. Year 2 Review Process*

The Monitor utilized three reviewers for the Fall 2025 review and four reviewers for the Spring 2026. To increase interrater reliability, the Monitoring team normed their scoring on several cases and reviewed scoring differences to identify, discuss, and resolve outlier interpretations in the review criteria. For all the reviews, the Monitor partnered with their

---

[109] In Year 2, starting in the Fall 2025 review, the Monitor added questions to track placement trajectories including step-ups and step-downs to more restrictive placements, length of stay, placement in an out-of-network program, sponsor category, and children who re-entered ORR care.

[110] In cases where a system or process improvement was not applicable to a child's circumstance, the Monitor used a rating of N/A.

data scientist to ensure data quality control and to identify any possible input errors. As the Monitoring team refined the Case Review Tool over time, additional safeguards were introduced to improve the reliability and consistency of the data collected. These enhancements included the use of standardized dropdown response options, data validation checks, and routine quality assurance reviews to identify missing, inconsistent, or potentially inaccurate entries. Together, these measures helped strengthen data quality and support more consistent application of the review methodology across reviewers and review periods. The Monitoring team met multiple times to identify emergent themes and trends. One team member oversaw the review process and read and analyzed all the case reviews.

Nearly all the data to complete the case review was acquired via the UC Portal. However, to review the PCU section of the case tool, ORR provided the Monitor with a spreadsheet of the Psychotropic TARs filed during each month of the review period. This was a vast improvement from Year 1, both in terms of data efficiency and comprehensiveness, as in Year 1, ORR staff manually downloaded all the needed TARs and, as a result, many required TARs were missing from what was shared with the Monitor. The Monitor does not have direct access to PCU Portal, unlike ORR, which decontextualizes the TARs from the PCU's broader case file for the child. The Monitor has requested direct access to the PCU Portal and ORR is exploring this possibility with PCU. In the interim, ORR's providing the monthly PCU TARs Report to the Monitor is significant headway from the year prior.

While the Monitor drew its own independent conclusions about ORR's performance (described below), the Monitor and DHUC along with DPALA discussed their independent observations about the cases, and identified lessons learned, as applicable. In this way, the case review process served not only as a compliance exercise required under the Settlement Agreements, but also as an ongoing quality improvement process that supported shared learning and implementation refinement with ORR.

### Fall 2025 Case Review

As noted previously, the Fall 2025 Case Review examined implementation of ORR's psychotropic medication processes and policies, and piloted disability-specific questions related to the implementation of the Settlement Agreements. The review focused on a sample of children prescribed psychotropic medications utilizing the same sampling parameters that the Monitor used in Year 1. This enabled the Monitor to track Psychotropic Settlement implementation progress over time, examining practice at least five months post-implementation in the Texas programs and at least 11 months post implementation at Shiloh RTC (the only RTC operating at the time of the first review).

As in Year 1, the Monitor reviewed cases pulled from the PCU's list of children prescribed psychotropic medication(s) who were residing in Texas programs or those programs administratively case managed by a Texas program between July 1 and September 30, 2025 using the following criteria:

1. All young children between the ages of zero and 12 years old prescribed a psychotropic medication;
2. All children prescribed antipsychotic medication;
3. All polypharmacy cases involving children prescribed three or more psychotropic medications;
4. Cases from Shiloh RTC, including children residing at the RTC or instances where Shiloh administratively case managed a child placed with a care provider in or outside of the state of Texas; and
5. One case from each care provider in Texas where a child was prescribed a psychotropic medication.

This sampling criteria generated 78 unique cases. To arrive at the final sample of 35 cases, the Monitor oversampled cases meeting the first four criteria while balancing the sample based on age and sex. Additional cases were then randomly selected from programs not already represented above. This created a case sample of 35 children placed at 27 programs.

For this review, case practice was examined from the first date that the child was in care during the review period (either July 1, 2025 or when the child entered care after that date) until either the child's exit from care or the date of the case review (conducted November 5 to December 7, 2025). Thus, the latest date that practice was reviewed was December 7, 2025.

The Monitor selected 15 of the 35 cases using a stratified random sample for joint review by DHUC as part of ORR's required annual review of 30 cases.

### Spring 2026 Case Review

The Spring 2026 Case Review examined compliance with psychotropic medication- and disability-related processes and policies, as stipulated by the Settlement Agreements. Two separate case pulls were completed to achieve a sample of 45 cases, 25 psychotropic medication cases and 20 disability specific cases. The psychotropic medication review oversampled children with mental health disabilities to concurrently examine Settlement implementation and case practice for children in both Lucas R. classes. Given this oversampling for the psychotropic medication review, the disability specific review

focused on children whose primary disability was not mental health related, but was instead sensory, neurological, intellectual/developmental, and/or physical.

The process of each Spring 2026 Case Review is discussed below.

### *Spring 2026 Psychotropic Case Review*

The Spring 2026 Psychotropic Case Review examined implementation of the Lucas R. psychotropic medication processes and policies in states that were part of the August 2025 Cohort (Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Louisiana, Michigan, North Carolina, Ohio, South Carolina, Tennessee, and Washington). The Monitor asked ORR to pull a sample of all children prescribed one or more psychotropic medications during the review period (November 1, 2025 to January 31, 2026), who were in care for at least some portion of the review period. ORR identified the list of eligible children using pharmacy data from the PCU.

This netted a total of 33 cases for potential review. The Monitor then worked with ORR to stratify a sample that oversampled for:

1. Young children between the ages of zero and 12 years old prescribed a psychotropic medication;
2. Children prescribed antipsychotic medication;
3. Polypharmacy cases involving children prescribed three or more psychotropic medications; and
4. Children who had a disability.

Then the Monitor randomly selected cases from the remaining programs that were not already represented above, balancing the sample based on age and sex. This created a final case sample of 25 children in 18 programs across five states.

This Spring 2026 Psychotropic Case Review examined case practice four to eight months post-implementation for the August 2025 Cohort. The review examined case practice from the first date that the child was in care during the review period (either November 15, 2025 or when the child subsequently entered care) until either the child's exit from care or until March 15, 2026, totaling a review period of up to four months.

Fifteen of the Monitor's 25 cases were jointly reviewed by the DHUC as part of ORR's required annual review of 30 cases.

These cases were scored using the Psychotropic Case Review Tool in Appendix M.

*Spring 2026 Disability Case Review*

For the Monitor's first disability specific review, the Monitor asked ORR to pull all children with disabilities who were in ORR care during the review period (November 1, 2025 to January 31, 2026) from the cohorts required to have fully implemented the Disability Settlement, which are the following states: Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Louisiana, Michigan, North Carolina, Ohio, South Carolina, Tennessee, Texas, and Washington as well as all children in an RTC.

ORR identified children with disabilities utilizing the provider completed, "Disability Diagnosis Tool," resulting in an original sample of over 150 children. Then the Monitor worked with ORR to remove children whose disability was primarily mental health related, resulting in a potential pool of 78 children.[111] Because the Psychotropic Case Review (discussed above) oversampled children prescribed psychotropic medications who also had mental health disabilities, the Monitor did not prioritize those children for inclusion in the disability review.

To further stratify the sample by disability category, ORR provided the Monitor with the children's ICD-10 health care utilization codes.[112] The Monitor analyzed the ICD-10 codes to identify the most common conditions and organized the data by disability categories. The Monitor then used this disability prevalence to create a stratified random sample, ensuring the most frequent disability types and more complex disabilities were represented. Finally, the Monitor affirmed the child had a 504 Plan documented in the UC Portal before the case was selected. Of the sampled cases, about one-third of the originally selected cases, did not have a 504 Plan on file.[113] Cases were iteratively reviewed and replaced, as needed, until the Monitor identified a final sample of 20 cases balanced on age and sex. The final sample included children from 16 programs across five states.

These cases were scored using the Disability Case Review Tool in Appendix N.

---

[111] While the Spring 2026 Disability Case Review sample primarily did not include children on psychotropic medications, one child with an endocrine disorder who was on psychotropic medications was included to capture data on that condition.

[112] ORR secured ICD-10 utilization and diagnoses codes from the PCU for all the disability cases ORR sent to the Monitor. ORR matched the data using the child's UAC number. The Monitor then used the ICD-10 codes to organize the data by ORR's disability categories and by common disability types.

[113] The Monitor is working with ORR to understand why all children identified by the Disability Diagnosis Tool did not have a 504 Plan on file — whether this was because providers were overinclusive in their use of the Tool ; their 504 Plan was not yet complete; or the provider failed to develop a 504 Plan. This quality assurance is something the Monitor hopes to examine with ORR in the coming year.

*iii. Psychotropic Case Review Demographics and Findings*

**Children Prescribed Psychotropics Demographic Background**

A total of 57 case files for children on psychotropic medications were reviewed in Year 2. For the Fall 2025 Psychotropic Case Review, of the total sample of 35 cases, the Monitor reviewed all but two cases. For the Spring 2026 Psychotropic Case Review, 24 of the identified 25 cases were reviewed. Three cases were excluded because, upon further review, these children were determined not to be on a psychotropic medication but taking a psychoactive medication for another health condition (e.g., for epilepsy or a rash).[114]

The characteristics of children in the Year 2 Psychotropic Case Review sample included:

- Thirty-four (60%) of the children were male and 23 (40%) were female.
- Six children (10%) were 12 years and younger, 22 children (39%) were between the ages of 13 and 16 years old, and 29 children (51%) were 17 years old.
- The average length of stay for children in this sample was 344 days. Twenty children (35%) were in care longer than one year, 34 children (60%) were in care three months to one year, and three children (5%) were in care for less than three months.
- Six of the children had re-entered ORR care after having been reunified earlier with a sponsor.
- Most children (39, or 68%) were placed in shelters. The other children were in RTC, staff secure, LTFC, or TFC placements. Six of the 57 children were placed with an out-of-network provider.
- Two-thirds (37) of the children had experienced two or more placements while in ORR custody.
- Eleven children were taking one antipsychotic medication. Nine children were prescribed three or more psychotropics including at least one antipsychotic.[115]

---

[114] For the one excluded psychotropic case in the Spring 2026 Case Review, it was a child with epilepsy with a 504 Plan, so the Monitor moved that case into our Disability Case Review, bringing that case total to 21.
[115] The nine children who were on three or more psychotropics including at least one antipsychotic, were all included in the Fall 2025 Review. This was a larger review pull, so the Monitor stratified for more cases with red flag concerns, hence in aggregate these cases had a more acute mental health profile than the Spring 2026 review.

Another ten children were taking three or more psychotropics (but not on an antipsychotic medication).

- About half of the psychotropic medication cases (29) reviewed were children who had been identified as having a mental health disability and had a 504 Plan on file.

### Psychotropic Medication Monitor's Findings

The Monitor's case review evaluated ORR's implementation of the Lucas R. Settlement Agreement's processes to improve ORR's oversight and administration of psychotropic medications for children in its care. While the Monitor examined all the elements in the Psychotropic Case Review Tool, the review focused on ORR performance across seven Settlement-required process improvements:

1. Policy followed for determining Consenter for medication informed consent
2. Proof of verbal informed consent in the UC health tab
3. Proof of written informed consent in the UC health tab
4. Informed consent renewed for medication dose changes
5. Informed consent renewed every six months after date of initial verbal informed consent
6. Verbal and written informed consent obtained when psychotropic medication changes
7. Adequate documentation to explain CCU override of consent denial by Primary or Sponsor Consenter

See Charts 12 to 15 below for a summary of the Monitor's case review findings for the process improvement areas above.

**CHART 12: Authorized Consent Process Followed**
**Process Improvement Area #1** (N = 57)




The first process improvement area (#1) — appropriate determination of an authorized consenter was a strength for ORR (see Chart 12), discussed further in Report Section IV.C.i. In most cases (80%), the care provider engaged the appropriate authorized consenter, foremost the parent and/or sponsor. The primary reason that a few cases did

not meet this requirement was due to the inappropriate use of a UC consenter, either because the child who served as an UC consenter was younger than the required age of 16 years old or because the care provider did not appear to sufficiently engage a parent or sponsor consenter before requesting the UC to provide consent (for more on UC consents, see Report Section IV.C.i.).

**CHART 13: Consents in Health Tab**
**Process Improvement Areas #2 and #3** (N = 57)




The second (#2) and third (#3) process improvement areas examine the appropriate documentation and filing of informed consent and assent (see Chart 13). Overall, the Monitor found documentation in the UC Portal to be in much better order than the year prior. In Year 1, the Monitor noted that "care providers inconsistently uploaded forms into the UC Portal — with variability in both the tabs chosen and the documents uploaded — making the required Settlement forms difficult to locate." In Year 2, consents and assents were far more clearly and consistently labeled and correctly uploaded to the "Health" tab. In Year 1, many more were misfiled in the "UAC Documents" tab. ORR's new consent and assent tags in the UC Portal make documents much easier to identify. However, the Monitor found locating documents was still cumbersome, and the inconsistent nomenclature to the naming of files made the documents especially challenging to navigate when downloaded. Greater consistent coding architecture would make this far easier, particularly for the staff who need to access these documents in their daily work. (For more on consent documentation, see Report Section IV.C.i.).

**CHART 14: Timely Updates to Consents**
**Process Improvement Areas #4, #5, and #6** (N = 57)[116]




The fourth through sixth (#4 to #6) process improvement areas examine timely updates of informed consent and assents after the initial approval (due to medication changes or extended medication use, see Chart 14). While the majority of cases had appropriate consents and assents on file, improvement is still needed to make sure these are updated in a consistent and timely manner when there is a dosage change, medication change, and/or every six months. The Monitor frequently observed that care providers met these requirements for some, but not all, psychotropic medications prescribed to a child, and data quality declined when children were on multiple medications or had multiple medication changes. As a result, many cases received a "Partially Met" rating. This is an area where practice is not yet consistent across medications and medication changes. (For more on timely consent procedures, see Report Section IV.C.ii.).

**CHART 15: Adequate Documentation of CCU Override**
**Process Improvement Area #7** (N = 57)




Regarding the seventh (#7) process improvement area, which requires evidence of adequate documentation to explain a CCU override of consent denial in a child's file, the Monitor's review identified eight applicable cases (see Chart 15). The review found all eight (100%) included the appropriate documentation, an improvement from the Year 1 review

[116] For these three process improvement areas, over one-third of the cases were not scored on these measures and labeled as N/A, as these elements did not apply.

where one of the cases was missing this documentation. (For more on the CCU, see Report Section IV.B.ii.).

For this review, the Monitor did not provide a score for the "Mental health appointment entered into Health section of UC Portal within 48 hours of appointment."[117] The Monitor observed the required mental health documentation was consistently in the child's case files; however, the Monitor found it was usually not within 48 hours. It was often uploaded one to two weeks after the appointment, and sometimes much longer. The Monitor is considering with ORR, through discussions with the field and conferring with Plaintiffs, the appropriate application of the 48-hour requirement in alignment with best practice and what is feasible for providers to secure in a timely manner.

Also, for this review, the Monitor did not provide a score for the two TARs questions in the Case Review Tool.[118] The Monitor observed the timely submission of TARs for verbal and written consent for most care providers (see Report Section IV.B.iv.). However, a large number of TARs that the Monitor tried to locate in the spreadsheets provided by ORR were still missing. This is likely a limitation of the TAR spreadsheets provided to the Monitor. Given the Monitor's ongoing work to better understand the TARs data with ORR, the Monitor elected not to report a specific compliance number for these questions in this Report. The Monitor will continue to work ORR to better understand the TARs process and track ORR's quality assurance processes.

The Monitor observed direct improvements across all the above process areas examined in the last review. Based on this data along with the Monitor's observations and discussions with ORR, ORR is integrating feedback from the Monitor and ORR's internal case reviews into ORR's CQI processes and ORR's ongoing training and technical assistance supports to push learnings out to the field.

The Monitor's Year 2 case review demonstrates continued evidence of ORR's efforts to implement the requirements of the Psychotropic Settlement with the August 2025 Cohort, Texas, and RTC care providers. Overall, ORR and care provider practice appears on the right track with implementation of the Settlement Agreement. However, as noted above, continued attention is needed to ensure the quality and consistency of UC consenters, consistent informed consent process with medication changes, and improvements to the timely uploading of documents. The Monitor will continue to track ORR's performance in these areas as implementation proceeds and becomes more embedded in the field.

---

[117] This was process improvement area #8 in the First Annual Report.
[118] In the Monitor's First Annual Report, these were identified as process improvement #2 ("Psychotropic TAR submitted to PCU for verbal consent for administration of psychotropic medications within 5 days") and #3 ("Psychotropic TAR submitted to PCU for written consent for administration of psychotropic medications within 25 days").

### *iv. Disability Case Review Demographics and Findings*

**Children with Disabilities Demographic Background**

For the disability components of the review, the Monitoring team reviewed the disability related questions for all 57 cases included in the psychotropic medication case review, but with a more targeted focus on a subset of 29 children who were prescribed at least one psychotropic medication and had a documented disability. In addition, the Monitor reviewed 21 children who did not have a mental health related disability, but instead a sensory, neurological, intellectual/developmental, and/or physical disability as part of their Spring 2026 review. Because the profiles of the children and content of the review tools were distinct, the mental health disabilities review and the non-mental health disabilities review are discussed separately below.

*Mental Health Disabilities Review*

Sixteen of 33 cases in the Psychotropic Fall 2025 Review had a 504 Plan and 13 of the 24 cases in the Psychotropic Spring 2026 Review had a 504 Plan. For these 29 children with mental health disabilities, their demographics were the following:

- Fifteen (52%) of the children were female and 14 (48%) were male.
- Three children (10%) were 12 years and younger, 11 children (38%) were between the ages of 13 and 16, and 15 children (52%) were 17 years old.
- The average length of stay was 346 days. Eight children (27%) were in care for a year or longer. Sixteen children (55%) were in care 91 to 364 days. Five children (17%) were in care 31 to 90 days.
- Three of the children (10%) had re-entered ORR care after having been reunified earlier with a sponsor.
- Two-thirds of children (19 children) were placed in shelters. The other children were in RTC, LTFC, and TFC placements.[119]
- Over two-thirds of children (20 children) experienced two or more placements while in ORR custody.

---

[119] The Monitor did not create a field to track out-of-network placements in the Fall 2025 Case Review. In the Spring 2026 Case Review, one of the 13 children was in an out-of-network placement. The two RTC placements in this group were both in the Fall 2025 Case Review.

- Nine children (31%) were taking one antipsychotic medication. Five children (17%) were on three or more psychotropics including at least one antipsychotic. Another five children (17%) were taking three or more psychotropics (but were not on an antipsychotic medication).

- Mental health disabilities included the following diagnoses: Adjustment Disorder, Attention Deficit Hyperactivity Disorder, Disruptive Mood Dysregulation Disorder, Generalized Anxiety Disorder, Major Depressive Disorder, Oppositional Defiance Disorder, Post-Traumatic Stress Disorder, Psychosis, and Substance Use Disorder.

*Non-Mental Health Disabilities Review*

In Spring 2026, the Monitor completed their first disability specific review pull, examining 21 non-mental health disability cases. The demographics of the cases were the following:

- Twelve (57%) of the children were male and nine (43%) were female.

- Four children were 12 years and younger, nine children were between the ages 13 and 16, and eight children were 17 years old.

- The average length of stay in the sample was 319 days. Two children were in care fewer than 90 days. The majority of children (76%) had been in care between 90 days and one year. Four children had been in care for over one year. About one-third of the children were assigned sponsor Category 4.

- One child had re-entered ORR care after having been reunified earlier with a sponsor.

- Most children (71%) were placed in shelters. The other children were in LTFC and TFC placements. Two children were at an out-of-network placement.

- More than half (57%) had experienced only one placement while in ORR custody.

- Disability types included cardiac, endocrine/metabolic, immunologic/allergic, musculoskeletal, neurodevelopmental, neurologic, pulmonary, renal, and sensory disabilities.

### Disability Case Review Monitor's Findings

The Monitor's disability case review largely focused on two primary attributes, (1) the identification and evaluation of disabilities, and (2) the development of the 504 Plan. This year's review was preliminary, to create an initial baseline picture of existing practice related to the Disability Settlement's provisions and to help the Monitor envision the likely changes required by ORR as the new Lucas R. requirements are phased in. Therefore, in this Year 2 Report, the Monitor does not provide specific scores on ORR's performance. The Monitor discusses specific findings from this case review throughout Report Section V., where the Monitor notes the great variability in the determination of mental health disabilities and variation in the quality of 504 Plans — all of which make sense given the early tenure in the Disability Settlement's implementation and provide a clear area of focus for ORR in the coming year.

In addition to exploring the quality of 504 Plans, this initial review sought to understand how 504 Plans were implemented by providers in the field to improve the well-being of children. This is an area that the Monitor also observed variability. In the coming year, the Monitor intends to focus on whether and how providers implement 504 Plans to the betterment of children's well-being.

Moving forward, the Monitor plans to continue to maintain a focused review of children prescribed psychotropic medications who have a disability or potentially could have a disability to create a more nuanced understanding of the overlap between the two classes, particularly because children with mental health disabilities were a primary focus for the Settlements.

## VII. CLOSING

Over the coming year, the Monitor will closely track ORR progress and the field's implementation of the Settlement Agreements. The Monitor looks forward to continuing to partner with both ORR and the Plaintiffs' Counsel in these efforts. The Monitor will report on ORR's progress annually in a combined report for the Psychotropic and Disability Settlements. The next report will be released in September 2027.

# APPENDIX

## **Appendix A:** Types of ORR Residential Care Programs

According to ORR UACB Policy Guide Section 1: Placement in ORR Care Provider Facilities.

> ORR may place a child in a shelter facility, transitional or long-term foster care (which may be a group home or therapeutic), heightened supervision facility or secure facility (including residential treatment centers), or other care facility that can provide for their specific individualized needs, including out-of-network (OON) placements, which may be restrictive or non-restrictive (see Section 1.4.6 Residential Treatment Center and Out-of-Network Placements). ORR makes reasonable efforts to provide licensed placements in those geographical areas where DHS encounters the majority of unaccompanied alien children.

ORR's residential programs include the following, as defined by ORR's Guide to Terms.[120]

- **Emergency or Influx Care Facility (EIF):** A type of care provider facility that opens temporarily to provide shelter and services for unaccompanied alien children during an influx or emergency. An EIF is not defined as a standard program, shelter, or secure facility. Because of the emergency nature of EIFs, they may be unlicensed or may be exempted from licensing requirements by State and/or local licensing agencies. EIFs may be operated on federally owned or leased property.

- **Group Home**: A care provider facility that offers a group home setting and that specializes in caring for specific populations (e.g., teen mothers). A group home, which is run by 24-hour staff or house parents, typically houses four to 12 unaccompanied alien children.

- **Heightened Supervision Facility:** A facility that is operated by a program, agency, or organization licensed by an appropriate State agency, or that meets the requirements of State licensing that would otherwise be applicable if it is in a State that does not allow state licensing of programs providing care and services to unaccompanied alien children, and that meets the standards for standard programs set forth in 45 CFR § 410.1302, and that is designed for an unaccompanied alien child who requires close supervision but does not need placement in a secure facility, including a residential treatment center (RTC). It provides 24-hour supervision, custody, care, and treatment.

[120] HHS ACF ORR (2025, August 8). Guide to Terms. ORR UACB Policy Guide.

It maintains stricter security measures than a shelter, such as intensive staff supervision, in order to provide supports, manage problem behavior, and prevent children from running away. A heightened supervision facility may have a secure perimeter but shall not be equipped internally with major restraining construction or procedures typically associated with juvenile detention centers or correctional facilities. Historically, this type of facility was referred to as "staff secure" in ORR sub-regulatory guidance and information collections.

- **Long-Term Foster Care:** An ORR-funded family or group home placement in a community-based setting. An unaccompanied alien child may be placed in long-term foster care if ORR determines that the child will be in ORR custody for an extended period of time. Unaccompanied alien children in ORR long-term foster care typically attend public school and receive community-based services. This definition is consistent with the definition of long-term home care at 45 CFR § 410.1001.

- **Residential Treatment Center (RTC):** A sub-acute, time limited, interdisciplinary, psycho-educational, and therapeutic 24-hour-a-day structured program with community linkages, provided through non-coercive, coordinated, individualized care, specialized services, and interventions. RTCs provide highly customized care and services to individuals following either a community-based placement or more intensive intervention, with the aim of moving individuals toward a stable, less intensive level of care or independence. RTCs are a type of secure facility and are not a standard program.

- **Restrictive Placement**: A secure facility, including RTCs, or a heightened supervision facility.

- **Secure Care Facility:** A facility with an ORR contract or cooperative agreement having separate accommodations for children, in a physically secure structure with staff able to control violent behavior. ORR uses a secure facility as the most restrictive placement option for an unaccompanied alien child who poses a danger to self or others or has been charged with having committed a criminal offense. A secure facility is not defined as a standard program or shelter.

- **Shelter Care**: A kind of standard program in which all of the programmatic components are administered on-site, consistent with the standards set forth in 45 CFR § 410.1302. Shelters are considered a least restrictive environment.

- **Therapeutic Foster Care**: Therapeutic foster care is a foster family placement funded by ORR for unaccompanied alien children whose exceptional needs cannot be met in regular or basic level family foster care homes. The child resides with licensed foster

parent(s) and receives additional treatment services and/or supervision specific to the child's identified treatment needs. Children with significant emotional, behavioral, medical, psychiatric and/or developmental needs receive structured treatment within a therapeutic foster care setting. Foster care programs work in collaboration with foster parent(s) to provide interventions, treatment, protection, care, and nurturance to meet the needs of children. The unaccompanied alien child typically attends public school and receives community-based services.

- **Transitional Foster Care (TFC):** An ORR-funded short-term placement in a family or group home. Transitional foster care is an initial placement option for unaccompanied alien children under 13 years of age, sibling groups with one sibling under 13 years of age, pregnant/parenting teens, or unaccompanied alien children with specific individualized needs. Children in ORR transitional foster care typically attend school and receive most service components at the care provider site. However, some children may attend public school and/or receive limited community-based services in addition to services provide onsite. This definition is consistent with the definition of transitional home care at 45 CFR § 410.1001.

## **Appendix B**: ORR Sponsor Categories[121]

ORR releases children to a sponsor in the following order of preference: parent; legal guardian; an adult relative (brother, sister, aunt, uncle, grandparent or first cousin); an adult individual or entity designated by the parent or legal guardian (through a signed declaration or other document that ORR determines is sufficient to establish the signatory's parental/guardian relationship); a licensed program willing to accept legal custody; or an adult individual or entity seeking custody when it appears that there is no other likely alternative to long term ORR care and custody. ORR has grouped unaccompanied alien children cases into the following categories.

**Category 1:** Parent or legal guardian. This includes qualifying step-parents that have legal or joint custody of the child or teen.

**Category 2:** A brother; sister; grandparent **or** other immediate relatives (e.g., aunt, uncle, first cousin). This includes biological relatives, relatives through legal marriage, and half-siblings.[122]

**Category 3:** Other sponsor, such as distant relatives, unrelated adult individuals, or an institutional/organizational Sponsor.

**Category 4:** No sponsor identified.

[121] HHS ACF ORR (2026, March 6). Section 2.2.1 Identification of Qualified Sponsors. UACB Policy Guide.
[122] On March 6, 2026, ORR updated the UACB Policy Guide Section 2.2.1 Identification of Qualified Sponsors to consolidate Category 2A and 2B sponsors into a single Category 2 designation.

## **Appendix C**: ORR Foundational Rule: What it is and how it applies to Lucas R.

ORR published the Foundational Rule in the Federal Register on April 30, 2024[123] to codify core provisions of the Flores Settlement Agreement,[124] an earlier settlement regarding children in federal immigration custody. The Foundational Rule anticipated key elements of the Lucas R. Settlement Agreements, which were approved three days later, stating "The purpose of this rule is to codify policies, standards, and protections for the UC Program, consistent with the HSA and TVPRA,[125] and to implement the substantive requirements of the FSA as they pertain to ORR."[126]

The Foundational Rule establishes minimum standards for the detention, release, and treatment of unaccompanied children in ORR custody in programs throughout the country. It requires ORR and its care providers to place children in the least restrictive, non-secure settings, when possible,[127] and also requires placement in state-licensed programs that serve dependent children or equivalent programs in states that do not license ORR facilities.[128] The Foundational Rule directs ORR to conduct regular data collection and produce reports on psychotropic medication and disability practices.[129]

For the Lucas R. Psychotropic Settlement, the Foundational Rule addresses voluntary informed consent and defines authorized consenters, considers the use of emergency psychotropic medication, and requires ORR to conduct meaningful oversight of the prescription and use of psychotropic medication.[130]

---

[123] Published on April 30, 2024, with a correction issued on June 26, 2024, and an effective date of July 1, 2024.
[124] Published as the Unaccompanied Children Program Foundational Rule, 89 FR 34384, codified at 45 CFR part 410 ("Foundational Rule").
[125] "HSA" is the Homeland Security Act of 2002 and is codified at 6 U.S.C. § 279. "TVPRA" is the Trafficking Victims Protection Reauthorization Act of 2008 and is codified at 8 U.S.C. § 1232.
[126] Unaccompanied Children Program Foundational Rule. Federal Register. Vol. 89, No. 84. (April 30, 2024). 45 CFR Part 410, 34384.
[127] According the Foundational Rule, "ORR shall place each unaccompanied child in the least restrictive setting that is in the best interest of the child and appropriate to the unaccompanied child's age and individualized needs, provided that such setting is consistent with the interest in ensuring the unaccompanied child's timely appearance before DHS and the immigration courts and in protecting the unaccompanied child's well-being and that of others." Unaccompanied Children Program Foundational Rule. Federal Register. Vol. 89, No. 84. (April 30, 2024). 45 CFR Part 410. 1103.a.
[128] The Unaccompanied Children Program Foundational Rule's definition of "standard program" includes a program, agency, or entity that is state-licensed; or that "meets the requirements of State licensing that would otherwise be applicable if it is in a State that does not allow state licensing of programs providing care and services to unaccompanied children." Unaccompanied Children Program Foundational Rule. Federal Register. Vol. 89, No. 84. (April 30, 2024). 45 CFR Part 410, 1001.
[129] Unaccompanied Children Program Foundational Rule. Federal Register. Vol. 89, No. 84. (April 30, 2024). 45 CFR Part 410, 1501.
[130] Unaccompanied Children Program Foundational Rule. Federal Register. Vol. 89, No. 84. (April 30, 2024). 45 CFR Part 410, 1310.

For children with or suspected of having disabilities covered by the Lucas R. Disability Settlement, the Foundational Rule calls for placement of these children in integrated settings, with reasonable modifications that ensure accessible services, equipment, and treatment.[131]

[131] Unaccompanied Children Program Foundational Rule. Federal Register. Vol. 89, No. 84. (April 30, 2024). 45 CFR Part 410, 1311.

## **Appendix D:** ORR's Psychotropic Case Review Instructions[132]

**Instructions for reviewer on the specifics of performing psychotropic medication reviews:**

Per the Lucas R Settlement Agreement Exhibit A, Section IX, the Division of Health for Unaccompanied Children is responsible for reviewing the use of psychotropic medications for children in ORR custody. The reviews encompass three categories of consideration.

**A. Review cases flagged by a Care Provider (or PCU) due to:**

1. UC Consenter consents to administration of antipsychotics
2. UC Consenter consents to administration of 3 of more psychotropic medications
3. Care Provider flags other concerns regarding psychotropic medications.

These reviews should be completed contemporaneously. While there are not prescribed timelines within the Lucas R. Settlement Agreement for completion of this category of review, the review should occur within 72 business hours of receiving the notice that a child has been designated as a UC consenter. Point Comfort United (PCU) has simplified the process by sending notification when they learn that a child has been deemed competent to be a UC consenter.

**B. Retrospective reviews, which must include:**

1. Use of ANY psychotropic medication for a child 3 years or younger
2. For children 4 years and older:
    a. Simultaneous use of 3 or more psychotropic medications for 90 days or more
    b. Use of 2 or more antipsychotic medications for 60 days or more
3. When CCU overrides a denial of consent by a Primary or Sponsor Consenter
   Use of psychotropic medication dosages in excess of the guidelines described in the Texas Department of Health & Human Services document entitled "Psychiatric Drug Formulary, 2026" and linked as follows (or latest updated version): https://www.hhs.texas.gov/sites/default/files/documents/doing-business-with-hhs/provider-portal/facilities-regulation/psychiatric/psychiatric-drug-formulary.pdf

---

[132] These are the instructions ORR developed on how it conducts the case review for the three required components under the Psychotropic Settlement. These instructions are embedded in ORR's case review tool, entitled "Template Lucas R Monitoring Tool V.6 4.14.2026 collaborative with calcs."

Information for these reviews is available between the 1st and 15th of the month and encompasses all psychotropic medications prescribed in the prior month. Ex: information for the month of April will be available on the PCU website between May 1st – 15th. Collaboration with Division of Health Data experts yields a spreadsheet that helps to identify the specific cases needed for review. With this information, develop a system that allows for review of these cases retrospectively every 30 to 90 days. Using your professional discretion, select cases based on Category B - 1 through 4 above.

**E. Annual Case Review**

1. 30 files of UC administered psychotropic medication will be reviewed annually to ensure Care Provider Programs exercise reasonable and diligent efforts to compile and maintain UCs' medical records.

This process may be done in collaboration with the Monitor team (Kathleen Noonan, et al).

## **Appendix E:** Updated PCU Psychotropic Treatment Authorization Request Forms

Version 1: Authorized Consenter

POINT COMFORT GROUP

### Request Psych TAR (Psychotropic and Anti-psychotic Medication)

**VISIT INFORMATION**

UC ID# *

UNKNOWN

Facility Name *

PCU - ORR Unknowns

**Category:** *

( ) Mental: Psychotropic/Anti-psychotic Medication

**PRESCRIBING INFORMATION**

Name of Prescriber *

Name of Prescriber

Address of Prescriber *

Address of Prescriber

Credentials of Prescriber: *

Select Prescriber Credentials

Medication(s) Prescribed *

Medication(s) Prescribed

Dosage Prescribed *

Dosage Prescribed

Diagnosis *

Diagnosis

Date of Prescription *

mm/dd/yyyy

End Date of Prescription *

mm/dd/yyyy

Therapeutic Class *

Therapeutic Class

Is patient currently hospitalized *

( ) Yes ( ) No

Select consent type *

( ) Consenter Information

( ) For Consent by Competent UC

( ) For Consent Waived due to Emergency

**Consenter Information**

Name of Consenter *

Name of Consenter

Location of Consenter *

Location of Consenter

Relationship of Consenter to UC *

Select Relationship

Nature of Consent *

Select Nature of Consent

Date of Consent *

mm/dd/yyyy

Language used for Consent

Language used for Consent

If Verbal or Written Non-consent has been selected, does prescribing medical professional disagree: *

Yes No

**BRIEF HISTORY OF CONDITION**

Brief History of Condition

**Upload Supporting Document**

Select files to upload

Upload supporting documents related to this TAR (PDF or images)

Submit

Version 2: UC Consenter

POINT COMFORT GROUP

## Request Psych TAR (Psychotropic and Anti-psychotic Medication)

**VISIT INFORMATION**

UC ID# *

UNKNOWN

Facility Name *

PCU - ORR Unknowns

**Category:** *

Mental: Psychotropic/Anti-psychotic Medication

**PRESCRIBING INFORMATION**

Name of Prescriber *

Name of Prescriber

Address of Prescriber *

Address of Prescriber

Credentials of Prescriber: *

Select Prescriber Credentials

Medication(s) Prescribed *

Medication(s) Prescribed

Dosage Prescribed *

Dosage Prescribed

Diagnosis *

Diagnosis

Date of Prescription *

mm/dd/yyyy

End Date of Prescription *

mm/dd/yyyy

Therapeutic Class *

Therapeutic Class

**Is patient currently hospitalized** *

Yes No

Select consent type *

Consenter Information

For Consent by Competent UC

For Consent Waived due to Emergency

**For Consent by Competent UC**

Date Determined Competent *

mm/dd/yyyy

Language *

Language

Determination Made By *

Determination Made By

**BRIEF HISTORY OF CONDITION**

Brief History of Condition

**Upload Supporting Document**

Select files to upload

Upload supporting documents related to this TAR (PDF or images)

Submit

Version 3: Emergency Use

POINT COMFORT GROUP

## Request Psych TAR (Psychotropic and Anti-psychotic Medication)

**VISIT INFORMATION**

UC ID# *

UNKNOWN

Facility Name *

PCU - ORR Unknowns

**Category:** *

Mental: Psychotropic/Anti-psychotic Medication

**PRESCRIBING INFORMATION**

Name of Prescriber *

Name of Prescriber

Address of Prescriber *

Address of Prescriber

Credentials of Prescriber: *

Select Prescriber Credentials

Medication(s) Prescribed *

Medication(s) Prescribed

Dosage Prescribed *

Dosage Prescribed

Diagnosis *

Diagnosis

Date of Prescription *

mm/dd/yyyy

End Date of Prescription *

mm/dd/yyyy

Therapeutic Class *

Therapeutic Class

**Is patient currently hospitalized** *

Yes No

Select consent type *

Consenter Information

For Consent by Competent UC

For Consent Waived due to Emergency

**For Consent Waived due to Emergency**

Nature of Emergency *

Nature of Emergency

Waived By *

Waived By

Date Consenter Notified *

mm/dd/yyyy

**BRIEF HISTORY OF CONDITION**

Brief History of Condition

**Upload Supporting Document**

Select files to upload

Upload supporting documents related to this TAR (PDF or images)

Submit

## **Appendix F:** Psychotropic Settlement Exhibit A[133]

1. **Identifying information for UC**
   a. Full Name
   b. Alien Registration Number (“A #”)
   c. Date of Birth (“DOB”)
   d. Country of Origin (“COO”)
   e. Sex
   f. Date of entry to ORR custody

2. **Psychotropic Medication(s) information**
   a. Name(s) of Psychotropic Medication(s) and relevant class(es) of
   b. Psychotropic Medication
   c. Dosage(s)
   d. Diagnosis
   e. Name of prescriber
   f. Address of prescriber
   g. Professional credentials of prescriber (e.g., M.D., Nurse Practitioner, etc.).
   h. Date of prescription
   i. Date prescription is planned to terminate, or date prescription terminated

3. **Care Provider or Psychiatric Hospital Information**
   a. Care Provider name and type (including, but not limited to, secure, staff secure, RTC, therapeutic staff-secure, therapeutic group home, long-term foster care, transitional foster care, special needs shelter, non-secure shelter, influx facility, or out-of-network RTC). In addition, if the Class Member is placed in a psychiatric hospital for more than 14 days, the name of the hospital and the type of hospital.
   b. Care Provider or psychiatric hospital city, state

4. **Consenter Information**
   a. Name of consenter and whether in or outside the United States
   b. Relationship to UC
   c. Date consenter was provided the information in Section III.A.4.a-n or III.A.5.a-k (as applicable)
   d. The spoken language used to explain the prescribed Psychotropic
   e. Medication and obtain the verbal consent decision
   f. Date of written consent, as applicable
   g. Whether verbal consent was provided or denied
   h. Date of verbal consent

[133] Lucas R. et al. v. Becerra Stipulated Settlement of Plaintiffs' Third Claim for Relief [Psychotropic Medications]. US District Court Central District of California Western Division (No. 2:18-CV-05741 DMG PLA). Filed 11/14/23. (Exhibit A).

**5. CCU Information**

a. If CCU overrides, date of override, reason for override, date Primary Consenter or Sponsor Consenter denied consent, and why
b. If CCU is asked to override but decides not to do so, date of request, and reason for decision not to override

**6. Emergencies**

a. Whether the Psychotropic Medication was prescribed for an emergency
b. The nature of the emergency
c. Date that notification of the administration of emergency medication was sent to the Primary Consenter or Sponsor Consenter

## **Appendix G**: Disability Diagnosis Reporting Tool

### Disability Diagnosis Report

Complete this form for every child who has been diagnosed with a physical/mental impairment that is affecting/may affect a major life activity, as indicated in the Plan section on the Medical Assessment Form or Mental Health Assessment Form completed by the child's healthcare provider (HCP).

THE PAPERWORK REDUCTION ACT OF 1995 (Pub. L. 104-13) STATEMENT OF PUBLIC BURDEN: The purpose of this information collection is to allow ORR care providers to identify a child's disability-related needs and document accommodations and/or services provided that will enable the child to reside in the least restrictive setting in their best interest and the most integrated setting appropriate to their needs; and document updates on the home study and post-release services planning. Public reporting burden for this collection of information (including the primary form and this appendix) is estimated to average 3 hours per response, including the time for reviewing instructions, gathering and maintaining the data needed, and reviewing the collection of information. This is a mandatory collection of information (Homeland Security Act, 6 U.S.C. § 279). An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information subject to the requirements of the Paperwork Reduction Act of 1995, unless it displays a currently valid OMB control number.

The OMB control number is 0970-0643 and the expiration date is 06/30/2028.

If you have any comments on this collection of information, please contact UACPolicy@acf.hhs.gov

*Required

.

## Responder Information

1. What is your name? *

Enter your answer

2. What is your job title or role at your program? *

Enter your answer

## UAC Basic Information

3. What is the child's UAC Portal ID number? *

Enter your answer

4. Is the child currently placed at an out-of-network facility? *

- Yes
- No

5. What is the name of the out-of-network facility where the child is currently placed? *

Enter your answer

6. In what type of out-of-network facility is the child currently placed? *

- Acute Medical Care/Rehabilitation Facility
- Heightened Supervision Facility
- Therapeutic Foster Care
- Therapeutic Group Home
- Residential Treatment Center (RTC)

- Secure
- Other

7. What date was the child placed at the out-of-network facility? *
Enter date

## Health Information

8. What physical or mental impairments have been diagnosed by a licensed health care provider that are affecting or may affect a major life activity for at least six (6) months? *
Enter your answer

9. Please identify the credentials of the diagnosing health care provider. *
Enter your answer

10. During which type of healthcare visit did the health care provider diagnose the first physical/mental impairment that is affecting/may affect a major life activity for at least six (6) months? *

- Initial Medical Exam
- Medical visit (not IME)
- Mental health visit
- Required evaluation following a triggering event (please refer to the list of triggering events identified in UAC Policy Guide Section 3.8.3)
- Other

11. If you selected "identified subsequent to a triggering event" for the previous question, what type of triggering event first identified the child's physical/mental impairment that is affecting/may affect a major life activity for at least six (6) months? *

- The child was hospitalized for a psychiatric-related reason
- The child was being considered for hospitalization for a psychiatric-related reason
- The child is under consideration for placement or transfer to an RTC or similar restrictive therapeutic facility
- The child is under consideration for placement in a secure facility
- Child was recommended for an evaluation by a treating licensed medical or mental health professional.
- Direct request of the child or through the child's parent or legal guardian, or through their attorney and/or child advocate

12. When was the child first diagnosed by a health care provider with a physical/mental impairment that is affecting/may affect a major life activity for at least six (6) months? *
Enter date

13. How did the care provider first learn that the child has, or has had, challenges performing major life activities (select one). *

- Reported by the child's health care provider
- Reported by the child
- By verbal or written report from the child's parent/legal guardian or sponsor
- Through review of a child's health records by the care provider program staff
- Observed by care provider program staff/foster parents
- Other

## **Appendix H:** Division of Health Dispatch: Disability Determination and 504 Service Plans

**Office of Refugee Resettlement (ORR)**
**Division of Health (DoH) Dispatch**
**Disability Determination and 504 Service Plans**
**Issued October 1, 2025**

This guidance covers identification and response to a disability, including general procedures for developing Individualized Section 504 Service Plans (504 Plans) for unaccompanied alien children (UAC). It provides an overview of triggers for initiating 504 Plans, along with the required timeline and information to be included in the plans. Refer also to the Foundational Rule at 45 C.F.R. §§ 410.1106 and 410.1311, UAC Policy Guide Section 3.8.3, and UAC MAP Section 3.8.3. This is a reminder that all information should be maintained and up-to-date in the ORR Portal, as this is the system of record.

**Q1: How does ORR define a disability?**
ORR uses the Americans with Disabilities Act (ADA) definition of disability, which is much broader than the definition used by the U.S. Social Security Administration. Under the ADA, a person is considered disabled if they:

- Have a physical or mental impairment that substantially limits one or more major life activities, or
- Have a history or record of such an impairment (such as depression or cancer that is in remission)

The term "substantially limits" refers to the child having more difficulty completing a major life activity compared to most children of similar age. **This can be continuous or intermittent** (e.g., seizures, anxiety, juvenile arthritis). Typically, this limitation is expected to last **at least 6 months**.

Major life activities are the kind of activities that people do every day, including the body's own internal processes. Some examples of major life activities include:

- Actions like eating, sleeping, speaking, and breathing
- Movements like walking, standing, lifting, and bending
- Cognitive functions like thinking and concentrating
- Sensory functions like seeing and hearing
- Tasks like working, reading, and learning
- Emotions and behaviors like peer relations and communication
- Major bodily functions like circulation, digestion, reproduction, and the operation of individual organs

**Q2: What are some examples of physical/mental impairments that may rise to the level of disability?**
Examples of impairments that may be disabilities include, **but are not limited to**:

- Post-traumatic stress disorder (PTSD)
- Major depressive disorder
- Deafness or hearing loss
- Blindness or low vision
- Epilepsy
- Developmental delay

- Intellectual disabilities
- Diabetes
- HIV
- Autism
- Cerebral palsy
- Mobility disabilities such as those requiring the use of a wheelchair, walker, or cane
- Traumatic brain injury
- Cancer

Remember, not all disabilities are visible. Whether an impairment qualifies as a disability depends on the severity and impact on the child's daily life. For example, a child may require the use of a wheelchair while recovering from a broken leg. This would not qualify as a disability unless the child would need the wheelchair for more than 6 months while recovering.

**Q3: Do all children need to be assessed by a licensed healthcare provider (HCP) for physical/mental impairments that rise to the level of disability?**
Yes, all children **must** be evaluated for physical/mental impairments that rise to the level of a disability during the initial medical exam (IME). Disabilities may also be identified during problem-focused visits with the primary HCP or specialists, routine well-child visits, and counseling sessions with mental health professionals.

In addition, children must be assessed for a new disability when any of the following triggering events occur:

- Child is hospitalized for a psychiatric-related reason
- Child is under consideration for hospitalization for a psychiatric-related reason
- Child is under consideration for placement in or transfer to a Residential Treatment Center (RTC) or similar restrictive therapeutic facility
- Child is under consideration for placement in a secure facility
- Child has been recommended for an evaluation by a treating licensed medical or mental health professional
- Direct request of the child or through the child's parent or legal guardian, or through their attorney or a legal service representative/child advocate

Evaluations must begin within 30 calendar days of one of the triggering events described above. Refer to UAC Policy Guide Section 3.8.2 *Identifying Children with Disabilities in ORR Custody* for additional guidance on trigger-based evaluations.

**Q4: How else might a child's physical or mental impairment be discovered?**
Physical and mental impairments may not be evident during the IME or other visits with HCPs. Sometimes, an impairment is discovered when others notice that a child needs help performing major life activities. Therefore, an impairment may also be identified by:

- The child's report
- A verbal or written report by the child's parent(s)/legal guardian(s) or sponsor
- A review of a child's health records by the care provider program staff
- Observation by care provider program staff/foster parents

**Reminder**: Under UAC Policy Guide Section 3.2.1 *Admissions for Unaccompanied Alien Children,* care providers must ask children about any healthcare conditions or needs they have, including disabilities, in the child's native or preferred language upon admission.

**Q5: What should a care provider do if they learn that a child without a diagnosed physical/mental impairment is having or has had, difficulty performing major life activities?**
Care providers are required to seek healthcare services when they observe or learn that a child requires medical attention, which includes children who have difficulty performing major life activities (see UAC Policy Guide Section 3.4.3 *Requests for Healthcare Services, including Medical Services Requiring Heightened ORR Involvement).* If a child is identified as having difficulty performing major life activities, the care provider must triage the concern with a healthcare professional as soon as possible but no more than two (2) hours after the request or observation that a child needs medical attention. The care provider must also immediately notify DoH at ORRDHUAC@acf.hhs.gov.

The child must be evaluated by a licensed HCP as determined through the triage process. The care provider must give the evaluating HCP the *ORR Healthcare Letter on Disabilities* (see bottom of page) and ORR's Medical/Mental Health Assessment Form and clearly state the reason for the evaluation (e.g., difficulty bathing alone, trouble focusing in the classroom). If the HCP diagnoses the child with a physical or mental impairment, the care provider must ensure the HCP has appropriately documented the impairment and any relevant accommodation with expected duration in the appropriate field in the Plan section of the Medical/Mental Health Assessment Form.

**Q6: What should the care provider do when a child has been determined to have a disability?**
When a child has been determined to have a physical/mental impairment that rises to the level of a disability, the care provider must:

- Document the findings in the field "Special accommodation required for a physical/mental impairment that is affecting/may affect a major life activity" into the **Additional Information (IME)/Recommendations from Healthcare Provider** (Medical Complaint and Update Visit reports) field of the appropriate report in the UAC Portal Health tab; all information should be maintained and up-to-date in the ORR Portal, as this is the system of record.
- Inform DoH by emailing ORRDHUAC@acf.hhs.gov within 24 hours of identifying that a child has a disability (see UAC Policy Guide Section 3.8.2);
- Develop a 504 Plan;
- Refer the child for a TVPRA Home Study; **and**
- Refer the child for Post Release Services (PRS).

**Q7: What is a 504 Plan?**
A 504 Plan describes services, supports, reasonable accommodations, and/or program modifications to ensure a child with a disability can reside in the least restrictive and most integrated setting appropriate to their needs and best interests. A 504 Plan also helps ensure that a child with a disability is released from ORR's custody without any unnecessary delay due to their disability.

**Q8: Why is a 504 Plan required?**
Section 504 of the Rehabilitation Act of 1973 prohibits discrimination against individuals with disabilities by entities that receive Federal financial assistance, which includes all ORR care providers. A 504 Plan is required by the *Lucas R*. Disability Settlement[1], the Foundational Rule, and ORR sub-regulatory guidance, for each child in ORR custody with one or more identified disabilities.

**Q9: Does a child with a disability always need a 504 Plan?**
Yes. Per UAC Policy Guide Section 3.8.3), a 504 Plan is needed for all children with a disability. Each 504 Plan will only reflect services, supports, and/or accommodations or program modifications if the child's

disability related needs require them. If no accommodations are needed, this should be documented in the 504 Plan.

**Q10 Are 504 Plans just for school settings?**
No. Although most people are familiar with 504 Plans in the school setting, 504 Plans for children in ORR care need to include all necessary services, supports, or accommodations for all aspects of the child's needs, including activities of daily living (ADLs), sleeping, education, recreation, etc. The local public school should not be involved in preparing these 504 Plans, although if a child in ORR care attends public school, the school may have a separate 504 Plan for use in the school setting.

**Q11: When does a 504 Plan need to be made?**
ORR policy requires that a 504 Plan Development Meeting be held within 10 days of identification of a disability. If further evaluation of the disability is needed for medical management, the 504 Plan should still move forward while awaiting additional evaluation. Per the *Lucas R.* Disability Settlement and UAC Policy Guide Section 3.8.3, the 504 Plan must be implemented within 60 days of identification of the child having a disability; this can be done in stages but must be fully implemented by day 60.

**Q12: Who participates in the 504 Plan Development Meeting?**
Attendees for the 504 Plan Development Meeting **must** include all of the following: The child (if able and willing to participate), the parent/legal guardian (if reasonably available and with consent of the child), medical or mental health care providers caring for the child, the case manager, the child's clinician, ORR federal staff (Federal Field Specialist (FFS) and/or DoH, child advocate (if appointed), and interpreter.

Attendees for the 504 Plan Development Meeting *may also* include additional care provider staff involved in the child's care and the child's attorney (with the child's consent).

**Q13: What must be included in a 504 Plan?**
- Identification and review of:
    - the child's disability and functional limitations (including review of the diagnosing HCP's documentation)
    - specific triggers, behaviors, and/or symptoms related to the child's disability.
- Services, supports, and/or reasonable accommodations or program modifications needed, considering all areas of the program including:
    - Physical accessibility to environment (ramps, visual aids)
    - Bathing/hygiene/dressing
    - Eating/Dining
    - School
    - Communication
    - Socialization
    - Recreation/sports – physical adaptations, support personnel or buddy
    - Outings
    - Sleeping
    - Safety
- Documentation of reasonable accommodations or program modifications required to maintain the child in the most integrated setting appropriate to the child's needs and the least restrictive setting in their best interests while in ORR custody.
- A transition plan regarding the disability and available community-based services and supports that need to be in place for a safe release from ORR custody. This includes a

referral for PRS with plans to minimize delays during transition of care. Note, ORR cannot delay a child's release if PRS are not in place before the child's release, unless the child's disability-related needs require it. For example, if a child has epilepsy and their seizures are under poor control, the treating Neurologist may require that immediate accessibility to Neurology care be arranged prior to release.

- This is a reminder that all information should be maintained and up-to-date in the ORR Portal, as this is the system of record.

**Q14: What types of accommodations might be included in a 504 Plan?**
Accommodations vary depending on the nature and severity of the disability. Examples include:

- Physical modifications such as ramps, door openers, adjusted height furniture
- Shower or toilet modifications or equipment for assistance with dressing and hygiene
- Adaptive utensils
- Extra time, modified assignments, assistive technology for school
- Communication devices or translators, Braille books or auditory books
- Small group socialization opportunities
- Support personnel or buddy system for recreation or outings
- Headphones to decrease auditory stimulation during the day or for sleeping
- Safety plans such as visual alarms
- Opportunities for time to rest in a quiet place when needed
- Adaptive equipment to facilitate participation in recreation activities

**Q15: When do 504 Plans need to be reviewed?**
504 Plans must be reviewed at least every six (6) months. Review is also required within 30 days of a psychiatric-related hospitalization or step-up to a restrictive (or more restrictive) placement, and when recommended by a licensed HCP or mental health professional.

**Q16: Is there a special form to document a 504 Plan for ORR?**
Yes. Care provider programs must use ORR's *Individualized Section 504 Service Plan* Form for all 504 Plans along with the guidance provided. A blank copy can be downloaded from the UAC Portal right sidebar menu under **UCB UC Policy and Procedures -> Forms, Checklists, and Other Tools -> Service -> S-25 *Individualized Section 504 Service Plan***.

The completed form should be uploaded to the UAC Document(s) section of the Case Management tab. Care provider programs should label the file as '504 Plan' so it can be easily found. This is a reminder that all information should be maintained and up-to-date in the ORR Portal, as this is the system of record.

**Q17: Do we need a 504 form from the HCP?**
No, the HCP will document their findings and recommendations on the ORR Medical Assessment Form or ORR Mental Health Assessment Form.

---

[1] Disability Settlement Agreement in *Lucas R. v. Kennedy*, Case No. 2:18-cv-5741 (C.D. Cal. Filed Jun. 29, 2018), Section II.B.2: "When a child in ORR's legal custody is identified as having a disability pursuant to Section II.A.1, ORR will, in consultation with individuals with relevant expertise...develop and implement an individualized Section 504 Service Plan for the child."

## **Appendix I:** Division of Health's "Dear Colleague Letter"

ADMINISTRATION FOR CHILDREN & FAMILIES
Office of Refugee Resettlement | 330 C Street, S.W., Washington, DC 20201
www.acf.hhs.gov/programs/orr

10/01/2025

Dear Colleague,

Thank you for evaluating this child who is in the custody of the Office of Refugee Resettlement (ORR), a program administered by the U.S. Department of Health and Human Services (HHS). ORR is responsible for the child's health and safety while they are in custody and for supporting safe unification with a sponsor as soon as possible. While in ORR custody, children are placed in government-funded care provider programs that provide day-to-day care.

This child has been identified as having challenges performing one or more major life activities. ORR is required to immediately determine if the child has a physical or mental impairment that qualifies as a disability under the Americans with Disabilities Act (ADA) which defines a disability as:

- A physical or mental impairment that substantially limits a person's ability to perform major life activities;
- A record of such an impairment; or
- Being regarded as having such an impairment

Substantial limitation means more difficulty completing a major life activity than most children of similar age. It is intentionally broad rather than a strict standard. An impairment does not need to prevent, or significantly or severely restrict a major life activity to be substantially limiting. The limitation may be continuous or intermittent (e.g., seizures, anxiety). Typically, the limitation is expected to last **at least 6 months**.

Examples of major life activities include, but are not limited to:

- Physical (walking, eating, dressing, lifting, bending, performing manual tasks, standing, sleeping)
- Cognitive/Sensory (thinking, hearing, seeing, learning, concentrating, speaking)
- Emotional/Behavioral (maintaining relationships, participating in social situations, communicating)
- Bodily functions (breathing, neurologic, metabolism, cell growth, circulation, immunity, digestion, excretion)

Please note that a child can be diagnosed with a physical or mental impairment that qualifies as a disability before a work-up is complete. ORR errs on the side of caution when a disability is suspected. If you determine that this child has or may have a disability under the ADA definition, ORR asks that you:

- Document all physical or mental impairments and the necessary accommodations in the Plan section of ORR's Medical/Mental Health Assessment Form. Please ensure that you indicate that the impairment is expected to last at least 6 months.
- Provide all indicated emergency protocols and action plans.
- Work with the care provider program staff to develop an Individualized Section 504 Service Plan ('504 Plan').

If you have questions or concerns, please contact the Division of Health in ORR's Unaccompanied Alien Children Bureau (UACB) at ORRDHUAC@acf.hhs.gov. For more information about the UACB, visit: https://acf.gov/orr/programs/uac.

Thank you for your support and collaboration in providing high-quality care to the children in our custody.

Joanna Gaines PhD, MPH
Director (Acting), Division of Health (DoH)
Unaccompanied Alien Children Bureau / Office of Refugee Resettlement
Administration for Children and Families / U.S. Department of Health and Human Services

## **Appendix J:** S-25 Individualized Section 504 Service Plan

OMB 0970-0643 [valid through 06/30/2028

**Administration for Children & Families**
**Office of Refugee Resettlement**

# Individualized Section 504 Service Plan

Care providers must develop and implement an individualized Section 504 service plan for any child in ORR custody identified as having one or more disabilities. Service plans must be documented by completing this form in its entirety. In addition, care providers must continuously update this form to reflect any changes in the service plan and to provide updates on the progress of the home study and post-release services planning.

### Unaccompanied Alien Child's Information

| | | | | | |
|---|---|---|---|---|---|
| **Name** | | **A#** *(no spaces)* | | **Sex** | |
| **Country of Birth** | | **Birth Date** | | **Age** | |
| **Program Name** | | **Program Type** | | | |
| | ☐ **Check if Out-of-Network (OON) Placement** | **OON Provider** | | | |

### Details on Disability/Diagnosis

**Date 504 Plan Created** ______ **Date 504 Plan Last Updated** ______

*Enter each identified disability in a separate row. Enter the disability/diagnosis as well as triggers, behaviors, and/or symptoms related to the disability.*
*Use the +/- buttons to add or delete rows.*

| | Date Disability Identified | Disability/Diagnosis | Related Triggers, Behaviors, and Symptoms |
|---|---|---|---|
| + - | | | |

THE PAPERWORK REDUCTION ACT OF 1995 (Pub. L. 104-13) STATEMENT OF PUBLIC BURDEN: The purpose of this information collection is to allow ORR care providers to identify a child's disability-related needs and document accommodations and/or services provided that will enable the child to reside in the least restrictive setting in their best interest and the most integrated setting appropriate to their needs; and document updates on the home study and post-release services planning. Public reporting burden for this collection of information is estimated to average 3 hours per response, including the time for reviewing instructions, gathering and maintaining the data needed, and reviewing the collection of information. This is a mandatory collection of information (Homeland Security Act, 6 U.S.C. § 279). An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information subject to the requirements of the Paperwork Reduction Act of 1995, unless it displays a currently valid OMB control number. If you have any comments on this collection of information please contact UACPolicy@acf.hhs.gov.

# Individualized Section 504 Service Plan
## Office of Refugee Resettlement

## 504 Service Plan Team

*The service plan team must include:*

- *The child (if able and willing to communicate about their service plan, including preferences and needs)*
- *Parent(s) or legal guardian (if and when available with the child's consent)*
- *Professional evaluator (in-person or via their written report)*
- *Care provider staff (i.e., clinician, case manager)*
- *Medical and/or mental health staff treating the child*
- *Child advocate appointed to serve the child*
- *ORR staff (i.e., Federal Field Specialist, DHUAC staff)*
- *Attorney of record with a completed Notice of Attorney Representation on file with ORR (if the child consents)*

*Use the +/- buttons to add or delete rows.*

| | Name | Role | Contact Information |
|---|---|---|---|
| | | Child | |
| + - | | | |

## Accommodations and/or Services

### SERVICE PLAN

*Use the +/- buttons to add or delete rows.*

| | Area of Need/Specific Disability-Related Trigger | Accommodation or Service | Person Responsible for Implementing | Frequency of Accommodation or Service | Date of Implementation *Leave blank if not implemented* |
|---|---|---|---|---|---|
| + - | | | | | |

Does this Service Plan incorporate all recommendations provided by the individual(s) who conducted the child's evaluation(s) for disability, if applicable? ◯ Yes ◯ No ◯ N/A
*If not, please explain in the Notes table below.*

### NOTES

*Add any additional notes about the service plan and/or explain why part(s) of the service plan have not been implemented, if applicable.*
*Use the +/- buttons to add or delete rows.*

| | Date | Note |
|---|---|---|
| + - | | |

## Discharge Planning

### SPONSOR INFORMATION

**Sponsor Name** | **Sponsor Category**

### HOME STUDY UPDATES

*Use the +/- buttons to add or delete rows.*

| | Date | Note |
|---|---|---|
| + - | | |

### POST-RELEASE SERVICES PLANNING UPDATES

*Use the +/- buttons to add or delete rows.*

| | Area of Need/Specific Disability-Related Trigger | Post-Release Service or Support | Assistance Provided to Sponsor | Date Assistance Provided |
|---|---|---|---|---|
| + - | | | | |

## **Appendix K:** Notice of Placement in a Restrictive Setting Form

OMB 0970-0554 [valid through 02/28/2026]
**Administration for Children & Families**
**Office of Refugee Resettlement**

# Notice of Placement in a Restrictive Setting

You are in the care and custody of the Office of Refugee Resettlement (ORR) and have been placed in a restrictive setting (a secure facility, heightened supervision facility, residential treatment center, or an out-of-network psychiatric hospital) for the reason(s) listed below. Your case manager will explain the information in this form to you in your native or preferred language. You also have the right to receive a translated copy of this form in your native or preferred language. If you have any questions about this placement, please discuss them with your case manager, your attorney, an ORR-funded legal service provider, or your child advocate.

### Your Rights to Challenge Your Placement in a Restrictive Setting

ORR will review your placement in a restrictive setting, at a minimum, every 30 days to determine whether your placement in a restrictive level of care is still necessary.

- If you are placed in a residential treatment center, your 30-day review will involve a psychiatrist or psychologist.
- If you are placed in a secure facility, a more intensive 90-day review will be done by ORR supervisory staff.

You have the right to consult an attorney to assist you and get advice about your rights to challenge your placement in a restrictive setting and potential avenues for relief, at no cost to the federal government. This *Notice of Placement* will be provided to your attorney automatically. You may also request assistance from a child advocate.

The *Notice of Placement* will also be provided to your parent or legal guardian, unless: (1) they cannot be reached, (2) there is an important reason not to share it with them for your own welfare, or (3) you are age 14 years or older and you request that they not receive it.

**At any time** after you receive this *Notice of Placement*, you may request a Placement Review Panel to reconsider your placement in a restrictive setting.

If you were placed in a restrictive setting based on a finding of dangerousness, you will be provided a risk determination hearing in front of a Departmental Appeals Board judge who will decide whether you are a danger to yourself or the community, unless you decline such a hearing in writing. However, the hearing outcome does not automatically change your placement.[1]

**For more information on how to request reconsideration of your placement, please ask your case manager, attorney, legal service provider, or child advocate (as applicable).**

| Section A: Child Information | | | |
|---|---|---|---|
| Child Full Name | | A# *(no spaces)* | |
| Date of Birth | | Sex | |
| Country of Origin | | Preferred Language | |

[1] A Departmental Appeals Board judge does not rule on any of the following in the risk determination hearing: release to a sponsor; the child's placement or conditions of placement while in ORR custody; or releasing the child on his or her own recognizance (see UAC Policy Guide Section 2.9 Risk Determination Hearings for Unaccompanied Alien Children).

THE PAPERWORK REDUCTION ACT OF 1995 (Pub. L. 104-13) STATEMENT OF PUBLIC BURDEN: The purpose of this information collection is to allow ORR to document and inform unaccompanied alien children of the reason they have been placed in a restrictive setting. Public reporting burden for this collection of information is estimated to average 0.5 hours per response, including the time for reviewing instructions, gathering and maintaining the data needed, and reviewing the collection of information. This is a mandatory collection of information (Flores v. Reno Settlement Agreement, No. CV85-4544-RJK (C.D. Cal. 1996)). An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information subject to the requirements of the Paperwork Reduction Act of 1995, unless it displays a currently valid OMB control number. If you have any comments on this collection of information please contact UACPolicy@acf.hhs.gov.

# Notice of Placement in a Restrictive Setting
## Office of Refugee Resettlement

## Section B: Placement Information

**Care Provider Name**

**Type of Facility**

**Out-of-Network Facility Name** *(if applicable)*

**If applicable, explain the reasons that the child is placed in an out-of-network facility.**

**Date of Placement at Current Restrictive Facility**

**Date of Initial Notice of Placement**

**Date Next Notice of Placement is Due** *(within 30 days)*

### Disability Considerations

**Does the child have an identified disability or disabilities?** ◯ Yes ◯ No

*If yes, answer the following questions:*

**What is the disability or disabilities?**

**If the child was not previously identified as having a disability, a referral for an evaluation based on their presenting symptoms is required. If applicable, when was such a referral made?** ☐ N/A

**What accommodations or services are currently being offered to meet the child's disability-related needs?**

**Describe the services or care that will be provided at the restrictive placement, why they are necessary, and why they cannot be provided in a more integrated and less restrictive setting with additional services, supports, and/or accommodations.**

# Notice of Placement in a Restrictive Setting
## Office of Refugee Resettlement

## Section C: Reasons for Restrictive Placement

*Check the reason(s) that apply for the **current** placement recommendation **only**. Do **not** check reasons listed under a type of placement that is not applicable to the current facility.*

### Secure Facility

ORR has determined based on clear and convincing evidence, that you:

☐ Have been charged with a crime or convicted of a crime, or are the subject of delinquency proceedings, have been adjudicated delinquent, or are chargeable with a criminal offense and ORR believes that these circumstances show that you are a danger to others.

*Note that you will **not** be placed in a secure facility for:*

- *An isolated offense that was not within a pattern or practice of criminal activity and that did not involve violence against a person or the use or carrying of a weapon; or*
- *A petty offense, which is not considered grounds for a stricter means of detention in any case.*

☐ Have committed, or have made credible threats to commit, a violent or malicious act directed at others while in ORR custody; Department of Homeland Security (DHS) custody: or in the presence of an immigration officer, ORR official, or ORR contracted staff.

☐ Have engaged, while in a restrictive placement, in conduct that has proven to be unacceptably disruptive to the normal functioning of a care provider facility, and removal is necessary to ensure the welfare of others, as determined by the staff of the care provider facility ( e.g., stealing, fighting, intimidation of others, or sexually predatory behavior), and ORR determined that you pose a danger to others based on such conduct.

☐ Are pending transfer or discharge/release to: __________ *(no other option above should be checked)*

### Residential Treatment Center (RTC)

A licensed psychiatrist or licensed doctoral level psychologist has determined that you require special healthcare services because of a mental health diagnosis. It has been determined, based on clear and convincing evidence, that you:

☐ Are a danger to yourself or others.

☐ Are pending transfer or discharge/release to: __________ *(no other option above should be checked)*

### Heightened Supervision Facility

ORR has determined, based on clear and convincing evidence, that you:

☐ Have been unacceptably disruptive to the normal functioning of a shelter care facility such that transfer is necessary to ensure your welfare or the welfare of others.

☐ Are a runaway risk.

☐ Have displayed a pattern of severity of behavior, either prior to entering ORR custody or while in ORR care, that requires an increase in supervision by trained staff.

☐ Have non-violent criminal or delinquent history not warranting placement in a secure facility, but which evidences a behavioral concern that requires an increase in supervision above what would be provided in a non-restrictive facility.

☐ Are pending transfer or discharge/release to: __________ *(no other option above should be checked)*

### Out-of-Network Psychiatric Hospital

ORR has determined, based on clear and convincing evidence, that you:

☐ Require placement in an out-of-network psychiatric facility that has lasted 14 days or more.

## Section D: Summary of Supporting Evidence for Restrictive Placement

### Case Manager Notes

**Name** ____________________ **Recommendation** ____________________

**Provide a detailed summary of the reason(s) for restrictive placement you selected above.**

### Case Coordinator Notes

**Name** ____________________ **Recommendation** ____________________

**Provide a detailed summary of the reason(s) for restrictive placement you selected above.**

### Federal Field Specialist Notes

**Name** ____________________ **ORR Overall Recommendation** ____________________

**Provide a detailed summary of the reason(s) for restrictive placement you selected above.**

## Section E: Acknowledgment and Certification

### Child's Acknowledgment of Receipt

Child's Signature/Mark

Date

☐ Please check this box *ONLY* if the child refused to sign the *Notice of Placement*.
*Refusing to sign will not affect the child's placement in the ORR care provider facility, services provided to the child by ORR, or ORR's decision to release child to their sponsor.*

### Care Provider/Issuing Official Certification

Care Provider/Issuing Official's Signature

Date

Care Provider/Issuing Official's Name and Title

### Interpretation

This document was explained to the child in enter language

by enter name , ID# enter n/a if not applicable

### Translation

This document was translated into enter language

by enter name , ID# enter n/a if not applicable

## **Appendix L:** Fields in ORR's Disability Periodic Report

These fields are contained in ORR's May 2026 Disability Periodic Report to the Monitor:

- UAC# Number
- First Name
- Last Name
- Country of Birth
- Status (Admitted/Discharged)
- Date of Admission
- Date of Mental Health Screening
- Sponsor Category
- Length of Care
- Last Program
- Program Type
- Restrictive Placement (Yes/No)
- Out-of-Network Placement (if applicable)
- Out-of-Network Program Type
- Out-of-Network Admission Date
- Date Disability Identified
- Identified Disability
- 504 Plan (Yes/No)
- Date 504 Plan Completed
- Date 504 Updated (if applicable)
- Types of Accommodations
- Types of Services
- PRS Services
- Release Date

## **Appendix M:** Monitor's Spring 2026 Psychotropic Case Review Tool

**Chart Review Form**

(Dates of Review: November 15, 2025 to March 15, 2026)

| legend for data entry field colors: | *drop down (click right on cell)* | *manual entry field* | *calculated field* | | | |
|---|---|---|---|---|---|---|
| **Section 1: Information** | | | | | | |
| **OVERVIEW** | | | | | | |
| **Reviewer's Name:** | | **UAC #:** | | | | |
| **Date of Review:** | | **DOB:** | | **Date Entered Care:** | | **Date Exited Care:** |
| **COO:** | | **Age:** | | **LOS:** | | **Sex:** |
| **Most Recent Facility:** | | **Type of Facility:** | | | | **Dates at Facility:** |
| **2nd Facility:** | | **Type of Facility:** | | | | **Dates at Facility:** |
| **3rd Facility:** | | **Type of Facility:** | | | | **Dates at Facility:** |
| **Any Step Ups:** | | **Any Step Downs:** | | | | **Any OON Placements:** |
| **# of Placements in ORR Care:** | | **Re-entered OOR Care:** | | | | **Sponsor Level:** |
| **Notes on the placement:** | | | | | | |
| **PSYCHOTROPIC MEDICATIONS** | | | | | | |
| **Psych Med (types):** | | | | | | |
| **Mental Health Diagnoses:** | | | | | | |
| **Prescriber Type (on last Rx):** | | | **Psych Meds Red Flags:** | | | |
| **MH Hospitalization:** | | **Number of MH Hospitalizations in the Review Period:** | | | | |
| | **Timing of Psychotropic Medication Onset** (in relationship to entry into care): | | | | | |
| **Notes on psychotropic medication use** (e.g., LOS, context for onset of medication use, etc): | | | | | | |
| **DISABILITY** | | | | | | |
| **Has a Disability (according to ORR):** | | **Date Disability Identified** | | **504 Plan:** | | **Date of Last 504 Plan** |
| **Disability(ies):** | | | | | | |
| **How was the Disability Identified** (e.g., IME, triggering event): | | | | | | |
| **Timing of Disability Identification** (in relationship to entry into care): | | | | | | |
| **Notes related to disability** (including related to LOS, disablity evaluation, etc): | | | | | | |
| **OTHER** | | | | | | |
| **Other notes on the case:** | | | | | | |

**Section 2: PCU Data**

(put an X in 1 box, and add comments if applicable and indicate why any item was partially met or not met)

| Element Reviewed | MET | PARTIALLY MET | NOT MET | N/A | Comments |
|---|---|---|---|---|---|
| **Policy followed for determining Consenter** for medication informed consent | | | | | |
| **Psych TAR submitted to PCU for verbal consent** for administration of psychotropic medications within 5 days. | | | | | |
| **Psych TAR submitted to PCU for written consent** for administration of psychotropic medications within 25 days | | | | | |
| **Informed Consent renewed when dose changes** (only verbal needed IF both verbal and written received within 6 months) | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| **Informed Consent renewed every 6 months** after date of initial verbal informed consent | | | | | |
| **Verbal and written informed consent obtained when psychotropic medication changes** | | | | | |
| **Adequate documentation to explain CCU override** of consent denial by Primary or Sponsor Consenter | | | | | |
| **Section 3: Case Review**<br>(put an X in 1 box, and add comments if applicable and indicate why any item was partially met or not met) | | | | | |
| **Element Reviewed** | **MET** | **PARTIALLY MET** | **NOT MET** | **N/A** | **Comments** |
| **Proof of verbal consent** entered into the Health Tab of UC Portal | | | | | |
| **Proof of written informed consent** entered into the Health Tab of UC Portal | | | | | |
| **Mental Health appointment** entered into HEALTH section of UC portal within 48 hours of appointment (actual notes may be in "pending" status) | | | | | |
| **SIR entered** into CLE portion of UC Portal within 24 hours of administration of Emergency Medication | | | | | |
| **Portal documentation by prescriber (MD,DO, PSYCH NP) supports use of psychotropic medication,** as seen in Notes in HEALTH Section of UC Portal | | | | | |
| **Section 4: Disability Review**<br>(put an X in 1 box, and add comments if applicable and indicate why any item was partially met or not met) | | | | | |
| **Element Reviewed** | **MET** | **PARTIALLY MET** | **NOT MET** | **OTHER (Drop Down)** | **Comments** |
| **504 Plan** occurred within the required 10 day window. | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| **504 Plan provides a high quality indivuated plan for the child, including:**<br>- **Adequately Identifes the child's disability-related needs** and, if applicable, speicific triggers of the disability-based behaviors<br>- **Proactively identifies and provides for services, supports, and reasonable accommodations and modifications** to meet the child identified disability-based needs<br>- **Documents any reasonable accommodations or modifications** to the UC Program needed to maintain the child in the most integrated setting appropriate to needs while in ORR custody<br>- **Includes a transition plan and consideration of available post-release services** to enable safe release to a suitable sponsor without unnecessary delay due to disability | | | | | |
| **Evidence of the 504 Plans' impact on the child's well-being** and/or evidence of the team closely monitoring and adjusting the 504 to meet the needs of the child | | | | | |
| Documentation of **implementation of 504 services** within 60 days of plan | | | | | |
| 504 Plan is **reviewed every 6 months** | | | | | |
| Demonstration of best efforts to develop and implement a 504 Plan, if one is needed, **before any step-up of a child with an identified disability** | | | | | |
| 504 Plan is **reviewed within 30 days of step up or psychiatric hospitalization** | | | | | |
| 504 documents **are in the appropriate case file** | | | | | |
| **Documentation of why a more restrictive placement is warranted is in the NOP.** Youth appears to be in the least restrictive placement as possible. | | | | | |

| | Elements Reviewed | Met | Partially Met | Not Met | N/A | Elements Not Reviewed |
|---|---|---|---|---|---|---|
| Totals | 0 | 0 | 0 | 0 | 0 | 21 |

## **Appendix N:** Monitor's Spring 2026 Disability Case Review Tool

| Spring 2026 Disablity Case Review | | | | | | | |
|---|---|---|---|---|---|---|---|
| legend for data entry field colors: | *drop down (click right on cell)* | *manual entry field* | *calculated field* | | | | |
| **Section 1: Information** | | | | | | | |
| **OVERVIEW** | | | | | | | |
| **Reviewer's Name:** | | **UAC #:** | | | | | |
| **Date of Review:** | | **DOB:** | | **Date Entered Care:** | | **Date Exited Care:** | |
| **COO:** | | **Age:** | | **LOS:** | | **Sex:** | |
| **Most Recent Facility:** | | **Type of Facility:** | | | | **Dates at Facility:** | |
| **2nd Facility:** | | **Type of Facility:** | | | | **Dates at Facility:** | |
| **3rd Facility:** | | **Type of Facility:** | | | | **Dates at Facility:** | |
| **Any Step Ups:** | | **Any Step Downs:** | | | | **Any OON Placements:** | |
| **# of Placements in ORR Care:** | | **Re-entered OOR Care:** | | | | **Sponsor Level:** | |
| **Notes on the placement:** | | | | | | | |
| **PSYCHOTROPIC MEDICATIONS** | | | | | | | |
| **Psych Med (types):** | | | | | | | |
| **Mental Health Diagnoses:** | | | | | | | |
| **Prescriber Type (on last Rx):** | | | **Psych Meds Red Flags:** | | | | |
| **MH Hospitalization:** | | **Number of MH Hospitalizations in the Review Period:** | | | | | |
| **Timing of Psychotropic Medication Onset** (in relationship to entry into care): | | | | | | | |
| **Notes on psychotropic medication use** (e.g, LOS, context for onset of medication use, etc): | | | | | | | |
| **DISABILITY** | | | | | | | |
| **Has a Disability (according to ORR):** | | **Date Disability Identified** | | **504 Plan:** | | **Date of Last 504 Plan** | |
| **Disability(ies):** | | | | | | | |
| **How was the Disability Identified** (e.g., IME, triggering event): | | | | | | | |
| **Timing of Disability Identification** (in relationship to entry into care): | | | | | | | |
| **Notes related to disability** (including related to LOS, disablity evaluation, etc): | | | | | | | |
| **OTHER** | | | | | | | |
| **Other notes on the case:** | | | | | | | |

**Section 4: Disability Review**
(put an X in 1 box, and add comments if applicable and indicate why any item was partially met or not met)

| Element Reviewed | MET | PARTIALLY MET | NOT MET | OTHER (Drop Down) | Comments |
|---|---|---|---|---|---|
| **504 Plan** occurred within the required 10 day window. | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| **504 Plan provides a high quality indivuated plan for the child, including:**<br>- **Adequately Identifes the child's disability-related needs** and, if applicable, speicific triggers of the disability-based behaviors<br>- **Proactively identifies and provides for services, supports, and reasonable accommodations and modifications** to meet the child identified disability-based needs<br>- **Documents any reasonable accommodations or modifications** to the UC Program needed to maintain the child in the most integrated setting appropriate to needs while in ORR custody<br>- **Includes a transition plan and consideration of available post-release services** to enable safe release to a suitable sponsor without unnecessary delay due to disability | | | | | |
| **Evidence of the 504 Plans' impact on the child's well-being** and/or evidence of the team closely monitoring and adjusting the 504 to meet the needs of the child | | | | | |
| Documentation of **implementation of 504 services** within 60 days of plan | | | | | |
| 504 Plan is **reviewed every 6 months** | | | | | |
| Demonstration of best efforts to develop and implement a 504 Plan, if one is needed, **before any step-up of a child with an identified disability** | | | | | |
| 504 Plan is **reviewed within 30 days of step up or psychiatric hospitalization** | | | | | |
| 504 documents **are in the appropriate case file** | | | | | |
| **Documentation of why a more restrictive placement is warranted is in the NOP.** Youth appears to be in the least restrictive placement as possible. | | | | | |

| | Elements Reviewed | Met | Partially Met | Not Met | N/A | Elements Not Reviewed |
|---|---|---|---|---|---|---|
| Totals | 0 | 0 | 0 | 0 | 0 | 9 |